No. 23-3682

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

SIERRA CLUB, et al.,
*Petitioners*

v.

TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION, et al.,
*Respondents*

and

TENNESSEE GAS PIPELINE COMPANY, L.L.C.,
*Intervenor-Respondent*

On Petition for Review from the
Tennessee Department of Environment and Conservation's
§401 Water Quality Certification and ARAP Permit NRS 22.192 (July 21, 2023)

## PETITIONERS' RULE 30(c) PAGE PROOF OPENING BRIEF

JAMES S. WHITLOCK
SPENCER SCHEIDT
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

STEPHANIE BIGGS
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Email: sbiggs@selctn.org

DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES
PO Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email: dteaney@appalmad.org

*Counsel for Petitioners*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: __23-3682__          Case Name: __Sierra Club v. T.D.E.C.__

Name of counsel: __James Whitlock, Stephanie Biggs, and Derek Teaney__

Pursuant to 6th Cir. R. 26.1, __Sierra Club__
                                    *Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

---

### CERTIFICATE OF SERVICE

I certify that on _____ August 21, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Derek O. Teaney

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: __23-3682__          Case Name: __Sierra Club v. T.D.E.C.__

Name of counsel: __James Whitlock, Stephanie Biggs, and Derek Teaney__

Pursuant to 6th Cir. R. 26.1, __Appalachian Voices__
<i>Name of Party</i>

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

CERTIFICATE OF SERVICE

I certify that on _____August 21, 2023_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ __Derek O. Teaney__

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT .........................................................2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................5

STATEMENT OF THE CASE..................................................................6

  Legal Framework....................................................................................6

  Statement of Facts .................................................................................9

SUMMARY OF THE ARGUMENT .....................................................15

ARGUMENT ..........................................................................................20

  Standard of Review ..............................................................................20

  Discussion of the Issues.......................................................................21

  I.    TDEC'S DETERMINATION THAT TGP'S PREFERRED
       WATERBODY CROSSING METHODS ARE THE LEAST
       IMPACTFUL PRACTICABLE ALTERNATIVE WAS ARBITRARY
       AND CAPRICIOUS.....................................................................21

      A.    TDEC Is Required to Evaluate the Practicability of Crossing Method
          Alternatives On A Crossing-By-Crossing Basis. ................................22

      B.    The Record Evidence Establishes—And TDEC Acknowledges—That
          Trenchless Crossing Methods are the Least Impactful Alternative. ...25

      C.    TDEC Neither Evaluated the Practicability of Trenchless Methods On
          A Crossing-By-Crossing Basis Nor Explained the Agency's
          Conclusions. ......................................................................................26

  II.    TDEC'S ISSUANCE OF THE CERTIFICATION WAS NOT IN
       ACCORDANCE WITH LAW BECAUSE IT VIOLATED TDEC'S
       REGULATIONS AND UNLAWFULLY DELEGATED REGULATORY
       AUTHORITY TO TGP...............................................................31

      A.    TDEC Failed to Determine That TGP's Rock Removal Methods Are
          the Least Impactful Practicable Alternative Before Issuing the
          Certification.......................................................................................32

      B.    TDEC Unlawfully Delegated Regulatory Authority and
          Responsibilities to TGP and Its Contractors. .....................................34

III. TDEC'S CONCLUSION THAT ACTIVITIES IN WET WEATHER CONVEYANCES WILL NOT LEAD TO WATER QUALITY STANDARDS VIOLATIONS WAS UNREASONABLE. .....................36

    A.    TDEC Failed to Consider Whether TGP's Activities in Wet Weather Conveyances Would Result in Downstream Sediment Transport......38

    B.    TDEC's Conclusion That Water Quality Standards Violations Will Not Occur Based on Compliance with the Certification's Conditions Is Arbitrary and Capricious. ................................................................42

IV. TDEC'S EVALUATION OF THE RISK OF WATER QUALITY STANDARDS VIOLATIONS WAS ARBITRARY AND CAPRICIOUS BECAUSE IT FAILED TO GRAPPLE WITH CONTRARY RECORD EVIDENCE AND ITS EXPLANATION RUNS COUNTER TO THE RECORD. ..................................................................................45

V. TDEC'S FLAWED DATA GATHERING AND DEFICIENT ANALYSIS OF THE PROJECT'S IMPACT TO RESOURCE VALUES OF AFFECTED WATERBODIES WAS ARBITRARY AND CAPRICIOUS. ...........................................................................50

    A.    TDEC's Analysis of Whether TGP's Activities Would Significantly Impact Resource Values of Crossed Waterbodies was Corrupted by the Agency's Failure to Establish the Existing Conditions of Those Waterbodies..........................................................................51

    B.    TDEC's Summary Conclusion That TGP's Activities Will Not Cumulatively Impact Resource Values Lacks Analysis and is Not Supported by the Record. ...................................................56

CONCLUSION ....................................................................60

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*All. For Cmty. Media v. FCC*,
   529 F.3d 763 (6th Cir. 2008) ..................................................................21

*Amerijet Int'l, Inc. v. Pistole*,
   753 F.3d 1343 (D.C. Cir. 2014) ..........................................21, 41, 55

*Cincinnati Bell Tel. Co. v. FCC*,
   69 F.3d 752 (6th Cir. 1995) ...................................................18, 42, 49

*City of Cleveland v. Ohio*,
   508 F.3d 827 (6th Cir. 2007) ..................................................................33

*City of Olmstead Falls v. EPA*,
   435 F.3d 632 (6th Cir. 2006) ....................................................................7

*Constitution Pipeline Co. v. N.Y. Dep't of Envtl. Conservation*,
   868 F.3d 87 (2d Cir. 2017) ..........................................24, 25, 26, 27

*Fred Meyer Stores, Inc. v. NLRB*,
   865 F.3d 630 (D.C. Cir. 2017) ..............................................................21

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*,
   681 F.3d 581 (4th Cir. 2012) ..........................................................51, 56

*Friends of Buckingham v. State Air Pollution Control Bd.*,
   947 F.3d 68 (4th Cir. 2020) .....................................................................20

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
   805 F.2d 1050 (D.C. Cir. 1986) ............................................................41

*Ky. Waterways All. v. Johnson*,
   540 F.3d 466 (6th Cir. 2008) ..........................................19, 35, 44, 59

*Louisville Gas & Elec. Co. v. FERC*,
   988 F.3d 841 (6th Cir. 2021) ......................................................1, 20, 24

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)......................................................................................5

*Mo. Pub. Serv. Comm'n v. FERC*,
    234 F.3d 36 (D.C. Cir. 2000) ................................................................. 41

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) .............................................................. 56

*N.C. Dep't of Envtl. Quality v. FERC*,
    3 F.4th 655 (4th Cir. 2021) ................................................................. 43

*Nat'l Park & Conservation Ass'n v. Stanton*,
    54 F.Supp.2d 7 (D.D.C. 1999) ................................................. 34, 35, 36

*Ohio v. Becerra*,
    87 F.4th 759 (6th Cir. 2023) ............................................................... 57

*Ohio Valley Envtl. Coalition, Inc. v. U.S. Army Corps of Eng'rs*,
    716 F.3d 119 (4th Cir. 2013) .............................................................. 54

*Or. Nat'l Desert Ass'n v. BLM*,
    625 F.3d 1092 (9th Cir. 2010) ............................................................ 59

*Perot v. FEC*,
    97 F.3d 553 (D.C. Cir. 1996) ....................................................... 17, 34

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
    374 F.3d 1209 (D.C. Cir. 2004) .................................................... 57, 58

*S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*,
    547 U.S. 370 (2006) ............................................................................ 45

*Sec'y of Lab., Mine Safety & Health Admin. v. Westfall Aggregate & Materials, Inc.*,
    69 F.4th 902 (D.C. Cir. 2023) ...................................................... 19, 55

*Sierra Club v. EPA*,
    793 F.3d 656 (6th Cir. 2015) ................................................................. 3

*Sierra Club v. Sigler*,
    695 F.2d 957 (5th Cir. 1993) .............................................................. 34

*Sierra Club v. State Water Control Bd.*,
    64 F.4th 187 (4th Cir. 2023) .................................................... 2, 19, 50

*Sierra Club v. State Water Control Bd.*,
  898 F.3d 383 (4th Cir. 2018) ...............................................................29

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  981 F.3d 251 (4th Cir. 2020) .................................................................7

*Sierra Club v. U.S. Dep't of Interior*,
  899 F.3d 260 (4th Cir. 2018) ........................................20, 26, 27, 59

*Sierra Club v. U.S. Forest Serv.*,
  828 F.3d 402 (6th Cir. 2016) ...............................................................42

*Sierra Club v. W. Va. Dep't of Envtl. Prot.*,
  64 F.4th 487 (4th Cir. 2023) .......................................................*passim*

*Simms v. Nat'l Traffic Safety Admin.*,
  45 F.3d 999 (6th Cir. 1995) ........................................................*passim*

*Tourus Recs., Inc. v. DEA*,
  259 F.3d 731 (D.C. Cir. 2001).....................................................18, 42

*Wilson v. Comm'r of Soc. Sec.*,
  378 F.3d 541 (6th Cir. 2004) ...............................................................33

## Constitutional Provisions

United States Constitution Article III .......................................................2

## Federal Statutes

5 U.S.C. § 706(2) ....................................................................................20

5 U.S.C. § 706(2)(A)................................................................................20

15 U.S.C. § 717f........................................................................................2

15 U.S.C. § 717f(c)(1)(a) ..........................................................................7

15 U.S.C. § 717r(d)(1) ...................................................................2, 6, 20

33 U.S.C. § 1341 .............................................................................*passim*

33 U.S.C. § 1341(a)(1)..........................................................................7, 45

**State Statutes**

T.C.A. § 4-5-322(h) ...................................................................................20

T.C.A. § 69-3-103(46) ...............................................................................37

T.C.A. § 69-3-108 ......................................................................................44

T.C.A. § 69-3-108(b)(1) ..............................................................................7

T.C.A. § 69-3-108(q) ........................................................................9, 40, 45

T.C.A. § 69-3-108(q)(1) ...................................................................37, 43, 44

T.C.A. § 69-3-108(q)(2) ...................................................................18, 37, 43

**Regulations**

40 C.F.R. § 121.1(j) (2023) ........................................................................38

40 C.F.R. § 121.1(n) (2021) .......................................................................38

40 C.F.R. § 121.3(a)-(b) (2024) ..............................................................8, 38

40 C.F.R. § 121.7(b) (2021) .....................................................................7, 38

40 C.F.R. § 230.10(a) .................................................................................23

Tenn. Comp. R. & Regs. (TN ADC) 0400-40-07-.04(3) ...........................7

TN ADC 0400-40-3-.02(6) .....................................................................9, 37

TN ADC 0400-40-3-.03 ..............................................................................53

TN ADC 0400-40-3-.04(36) .......................................................................37

TN ADC 0400-40-3-.06 ..............................................................................53

TN ADC 0400-40-7-.01(1) .........................................................................23

TN ADC 0400-40-7-.01(3) .........................................................................50

TN ADC 0400-40-7-.03(16) ....................................................................8, 52

TN ADC 0400-40-7-.03(2) .....................................................................15, 23

TN ADC 0400-40-7-.03(24) ...........................................................................8, 16, 23

TN ADC 0400-40-7-.03(25) ...........................................................................40

TN ADC 0400-40-7-.03(3) ...........................................................................52

TN ADC 0400-40-7-.03(6) ...........................................................................50

TN ADC 0400-40-7-.03(9) ...........................................................................57

TN ADC 0400-40-7-.04(1) ...........................................................................7, 46, 50

TN ADC 0400-40-7-.04(2) ...........................................................................46, 47

TN ADC 0400-40-7-.04(5)(b) ...........................................................................*passim*

TN ADC 0400-40-7-.04(6)(c) ...........................................................................*passim*

TN ADC 0400-40-7-.04(7)(a) ...........................................................................50, 51

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Petitioners respectfully request that this Court allow oral argument on this petition for review because it presents questions of continuing and important public interest. TGP will trench through scores of streams and wetlands under the Certification at issue. Moreover, given the legal and factual issues presented, the decisional process would be aided by oral argument.

## **INTRODUCTION**

The Tennessee Department of Environment and Conservation ("TDEC") committed nearly every cardinal sin of administrative law when it issued the Aquatic Resource Alteration Permit ("ARAP") and Clean Water Act ("CWA") §401 certification ("Certification") to Tennessee Gas Pipeline Company, LLC ("TGP") that is the subject of this petition. "[I]n all cases agencies must engage in reasoned decisionmaking[.]" *Louisville Gas & Elec. Co. v. FERC*, 988 F.3d 841, 846 (6th Cir. 2021). But that did not happen here.

TGP proposes to construct and operate the 32-mile-long Cumberland Pipeline (the "Pipeline") to serve a proposed methane gas plant in Cumberland City, Tennessee. AR000926 (JA____). If constructed, the Pipeline would cross 118 waterbodies, including 56 streams and wetlands and 62 wet weather conveyances along its route through three Middle Tennessee counties. AR006765-69 (JA____-__), AR006809-14 (JA____-__). All but four of those crossings will be constructed by blasting or excavating a 4.5 to 8-feet-deep and 4 to 5-feet-wide trench through the streambeds to bury a 30" diameter pipe to transport flammable methane. AR000932 (JA____). Such open-cut crossing techniques can choke miles of a waterway with sediment. *See, e.g.*, AR005906-18 (JA____-__). The governing law required TDEC to analyze the impacts that Pipeline construction will have on

Tennessee water resources and to verify that TGP's activities will comply with applicable water quality requirements. TDEC failed in both respects.

As established below, TDEC failed to comply with governing law, ignored contrary record evidence, invoked boilerplate incantations rather than engaging in analysis, failed to consider important aspects of the problem, failed to explain inconsistencies in its reasoning, and reached conclusions counter to the record evidence and based on demonstrably false impressions. The Certification should be vacated.

## JURISDICTIONAL STATEMENT

On July 21, 2023, TDEC issued a §401 certification to TGP for the proposed Cumberland Pipeline. AR006762-949 (JA____-___). On August 18, 2023, Petitioners filed a timely petition for review of the Certification. ECF #1-2.

The Cumberland Pipeline is subject to Section 7 of the Natural Gas Act ("NGA"), 15 U.S.C. §717f, and is being constructed in this Circuit. AR000925 (JA____). The Certification is a state agency approval required under Federal law. 33 U.S.C. §1341 (AD006-08); *Sierra Club v. State Water Control Bd.*, 64 F.4th 187, 194-95 (4th Cir. 2023). Accordingly, this Court has jurisdiction under NGA Section 19(d)(1). 15 U.S.C. §717r(d)(1) (AD004).

Petitioners have standing under Article III of the United States Constitution. For Article III standing, a petitioner must establish (1) injury-in-fact, (2) traceability,

and (3) redressability. *Sierra Club v. EPA*, 793 F.3d 656, 661-62 (6th Cir. 2015). An organization has representational standing when (1) at least one of its members would have standing in his own right, (2) the organization's purpose is germane to the interests it seeks to protect, and (3) there is no need for direct participation by the individual members in the action. *Id.* at 661. To establish injury-in-fact in the environmental context, petitioners need only show that their members "use the affected area and are persons for whom the aesthetic and recreational values of the area are lessened by the challenged activity." *Id.* at 663 (cleaned up).

The addendum to this brief includes the Declarations of Robert Connor, Charles Crow, Jerry Steven Shafer, Amy Kelly, and Angela Mummaw. The declarations from Petitioners' members establish judicially cognizable harms to their aesthetic, recreational, and property interests threatened by the Pipeline.

Connor owns a multi-generational family farm which contains several creeks that the Cumberland Pipeline will cross. Connor Decl., ¶¶5, 8 (AD074-76). Connor enjoys hiking and seeing wildlife around those creeks, and he has expended significant time and resources obtaining grant money to improve the habitat on his farm. *Id.*, ¶13 (AD077-78). TGP plans to trench through the creeks on Connor's property and clearcut some of the forestland he has improved. *Id.*, ¶¶8, 13 (AD075-78). Connor is concerned that increased sedimentation in those creeks will cause "long-term harm to water quality and aquatic life" and "disrupt wildlife habitat," and

these concerns harm his aesthetic, recreational, and property interests. *Id*., ¶9 (AD076). Moreover, "[a]ll of the work that [he] did to improve that forestland will be wasted if the area is cleared for construction of the Cumberland Pipeline," diminishing his enjoyment of his property. *Id.*, ¶13 (AD077-78).

TGP plans to cross Yellow Creek and its tributaries multiple times upstream from Crow's home. Crow Decl., ¶7 (AD084). Buying his home on Yellow Creek "has been the realization of a dream," and Crow "get[s] so much joy" from spending time with his family and friends swimming and fishing in Yellow Creek and hosting cookouts on its banks. *Id.*, ¶¶8, 9, 14 (AD084-87). Crow's aesthetic and recreational interests in Yellow Creek are harmed by his concerns about sedimentation threats from pipeline construction. *Id.,* ¶11. (AD086). In fact, Crow does not believe "any amount of money would compensate losing [his] use and enjoyment and Yellow Creek in its current state." *Id.*, ¶¶11, 18 (AD086-88).

Shafer regularly takes his grandchildren swimming at the confluence of Gafford Branch and Peabody Branch. Shafer Decl., ¶¶4, 5 (AD092-93). Gafford Branch is hemmed in by steep and wooded terrain, and Shafer is concerned that TGP's plans to clearcut this area, as well as TGP's plan to cross Gafford Branch and its tributaries upstream from the family swimming spot, will pollute the creek with sediment. *Id.*, ¶¶6, 7 (AD093-94). Shafer's recreational and aesthetic interests are

already harmed by his concerns, and he will not take his grandchildren there to swim if that pollution occurs. *Id.*, ¶¶7, 8 (AD093-94).

The above-described injuries are fairly traceable to the Certification. Without the Certification, TGP cannot trench through streams owned or used by Petitioners' members. Connor Decl., ¶19 (AD080); Crow Decl., ¶21 (AD089); Shafer Decl., ¶17 (AD097). Moreover, judicial relief would redress those injuries. Connor Decl., ¶20 (AD080); Crow Decl., ¶22 (AD090); Shafer Decl., ¶16 (AD097); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992).

Because their members have standing, Petitioners also have organizational standing. Their members' interests in protecting Tennessee's waters and land are germane to their organizational purposes. Kelly Decl., ¶¶7-8, 15 (AD100-02); Mummaw Decl., ¶¶4-5, 10 (AD105-07). Moreover, the members' individual participation is unnecessary because this case seeks *vacatur* of agency action, not individualized relief. Accordingly, Petitioners have standing, and this Court has jurisdiction.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether issuance of the Certification was arbitrary and capricious because TDEC failed to evaluate whether TGP's proposed waterbody-crossing methods are the least impactful practicable alternative.

2. Whether issuance of the Certification was arbitrary and capricious or otherwise not in accordance with law because TDEC failed to determine prior to issuing the

Certification that TGP's rock-removal methods for its trenched crossings were the least impactful practicable alternative and instead unlawfully delegated this regulatory determination to TGP.

3.  Whether TDEC arbitrarily and capriciously relied on programmatic boilerplate—rather than reasoned analysis—to address TGP's activities in wet weather conveyances, without considering the potential for downstream sediment transport or the effect of a statutory limitation on the conditions that can be applied to such activities.

4.  Whether TDEC's conclusion that TGP's open-cut crossings will not cause violations of water quality standards was arbitrary and capricious because TDEC failed to grapple with contrary record evidence and instead relied on a demonstrably false impression of the terms of a related permit.

5.  Whether issuance of the Certification was arbitrary and capricious or otherwise not in accordance with law because TDEC failed to obtain needed baseline data and perform necessary cumulative impact analyses to support its determination that TGP's pipeline construction would not result in any appreciable permanent loss of resource values in affected waterbodies.

## STATEMENT OF THE CASE

### *Legal Framework*

This petition for review challenges the Certification that TDEC issued to TGP under CWA §401 for the Cumberland Pipeline. 15 U.S.C. §717r(d)(1) (AD004). TGP proposes to build a 32-mile long, 30-inch diameter methane gas pipeline from Dickson, Tennessee, to Cumberland City, Tennessee. AR006762 (JA____).

Because construction of the proposed pipeline would involve the discharge of fill material into streams and wetlands along its path, the CWA requires TGP to obtain a permit under CWA §404 from the U.S. Army Corps of Engineers ("Corps").

- 6 -

*See Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251, 255 (4th Cir. 2020). TGP was also required to obtain a Certificate of Public Convenience and Necessity from the Federal Energy Regulatory Commission for the Pipeline. *See* 15 U.S.C. §717f(c)(1)(a).

Both of those federal authorizations trigger CWA §401's requirement that TGP also obtain a certification from the State of Tennessee that the Pipeline will not result in violations of state water quality requirements. 33 U.S.C. §1341(a)(1) (AD006); 40 C.F.R. §121.7(b) (2021) (AD015); Tenn. Comp. R. & Regs. 0400-40-07-.04(3), TN ADC 0400-40-7-.04(3) (hereinafter "TN ADC") (AD063) (requiring an applicant for a federal permit to conduct an activity "which may result in a discharge to the navigable waters" to first obtain a §401 certification from TDEC); *see also City of Olmstead Falls v. EPA*, 435 F.3d 632, 633-34 (6th Cir. 2006). Tennessee administers §401 through its ARAP program, which requires an applicant to obtain a permit to carry out any activity that results in alteration of the properties of any waters of the State. T.C.A. §69-3-108(b)(1) (AD028); TN ADC 0400-40-7-.04(3) (AD056). Under Tennessee law, an ARAP "also serves as the §401 certification." TN ADC 0400-40-7-.04(1) (AD062).

States must consider and determine whether discharges will comply with applicable water quality requirements when deciding whether to issue a §401 certification. 33 U.S.C. §1341(a)(1) (AD006); 40 C.F.R. §121.7(b) (2021) (AD015);

*see also* 40 C.F.R. §121.3(a)-(b) (2024) (AD014). Three aspects of Tennessee's ARAP program are particularly relevant here. ***First***, TDEC may not issue—or must deny—an ARAP and §401 certification application when "there is a practicable alternative to the proposed activity that would have less adverse impact on resource values[.]" TN ADC 0400-40-7-.04(5)(b) (AD065). An alternative is practicable if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purpose." *Id*. 0400-40-7-.03(24) (AD060). Thus, an application for a §401 certification in Tennessee must include, among other things, an analysis "evaluating a range of potentially practicable alternatives to avoid and minimize the loss of resource values consistent with the purpose of the proposed activity." *Id*. 0400-40-7-.04(5)(b) (AD065).

***Second***, Tennessee's ARAP program requires TDEC to evaluate whether the proposed activity will result in "any appreciable permanent loss of resource values." *Id.* 0400-40-7-.04(6)(c) (AD067). To conduct this evaluation, TDEC must first determine the present resource values of all impacted waterbodies, which necessitates gathering baseline data on existing conditions, including "the biological, chemical, bacteriological, radiological, and physical" attributes of an impacted waterbody "as measured by a quantitative assessment tool or other defensible scientific method." *Id.* 0400-40-7-.03(16) (AD059). Only after TDEC establishes baseline conditions can it reasonably evaluate a project's site-specific impacts.

***Third***, Tennessee's ARAP program incorporates the water quality requirement that impacts to wet weather conveyances cannot "adversely affect the quality of downstream waters," and that water quality standards applicable to downstream waters must be maintained. *Id.* 0400-40-3-.02(6) (AD038). Alterations to wet weather conveyances must also be conducted in compliance with the Tennessee Water Quality Control Act's condition that prohibits activities from causing sediment to "enter[] other waters of the state." T.C.A. §69-3-108(q) (AD033).

## Statement of Facts

TGP's proposed Cumberland Pipeline would be a 32-mile long, 30-inch diameter methane gas pipeline traversing portions of Dickson, Houston, and Stewart Counties and terminating at the Tennessee Valley Authority's Cumberland Fossil Plant in Cumberland City, Tennessee. AR000924-26 (JA____-__), AR004616 (JA____). TGP's July 22, 2022 application sought a Certification authorizing it to construct its Pipeline across 118 waterbodies, including 56 streams and wetlands and 62 wet weather conveyances. AR000920 (JA____), AR006765-69 (JA____-__), AR006809-14 (JA____-__).[1]

---

[1] The Pipeline requires several additional waterbody crossings beyond those authorized by the Certification. *See* AR003453-54. Those crossings have no §401 certification.

In pipeline construction, there are two main ways to cross waterbodies. *Sierra Club v. W. Va. Dep't of Envtl. Prot.*, 64 F.4th 487, 494 (4th Cir. 2023). The developer can trench *through* the waterbody using an open-cut crossing, or it can tunnel *under* the waterbody using a trenchless crossing. *Id.* There are multiple species and subspecies of trenchless crossing methods. For example, horizontal directional drilling ("HDD") involves tunneling under a waterbody with a drill from one side to the other using pressurized drilling fluid and then pulling the pipe into position. AR000937 (JA____). As TGP concedes, this technique "minimizes the impacts to an area by drilling down and under a sensitive resource, leaving [the streambed] relatively undisturbed." *Id.*

Another well-established trenchless method for pipeline stream crossings is conventional boring—sometimes called "jack and bore." AR004796-97 (JA____-__) (noting that conventional boring "is a technology that has been used for decades to install natural gas pipelines" and describing the pipe jacking used in the conventional boring technique). In conventional boring, a pit is dug on either side of the resource, a tunnel is bored under the stream, and the pipe is jacked through the tunnel. *Id.* Unlike HDD, "using conventional bore to cross [waterbodies] avoids the risk of inadvertent returns as there is no high-pressure drilling fluid slurry." AR004827 (JA____). Additional species of trenchless crossing methods include

guided conventional boring, Direct Pipe®, microtunneling, and directional microtunneling. AR004671-73 (JA____-__); AR004800-03 (JA____-__).

Here, TGP proposes to tunnel under only four streams, insisting that it be allowed to trench through 52 streams and wetlands and 62 wet weather conveyances with dry, open-cut crossings. AR006769 (JA____), AR006793 (JA____), AR006809-14 (JA____-__). However, TGP's application only discussed two trenchless methods—HDD and conventional bore—and even then only at a conceptual level of generality rather than a site-specific basis.[2] AR004741-43 (JA____-__), AR004671-73 (AR____-__); AR000949-52 (JA____-__). Notwithstanding the fact that TGP intends to use conventional boring to cross eight public roads in the path of the Pipeline (AR005074-75 (JA____-__)), TGP summarily dismissed that method for waterbody crossings based on unsubstantiated and internally contradictory project-level contentions (AR004672-75 (JA____-__)). Indeed, TGP only proposed the three HDD crossings (under 4 streams) "*to avoid environmental impacts* at two National Rivers Inventory Stream reaches (Jones Creek and Yellow Creek) and due to physical characteristics of Wells Creek." AR000952 (JA____) (emphasis added). TGP did not evaluate the practicability of

---

[2] TGP also recognized Direct Pipe® as an available trenchless method in an attachment to its application but did not discuss that technique in any detail. AR001637 (JA____).

HDD or other trenchless methods on a site-specific basis at any other waterbody crossing.

In response to TGP's plans and TDEC's draft §401 Certification, AR003633 (JA_____), Petitioners submitted lengthy technical comments to TDEC alerting the Agency to the many deficiencies in both TGP's application and the draft Certification. AR004664-732 (JA____-___). Those comments, which were supported by expert opinion, scientific literature, and other information, established *inter alia*, the following.

**First**, Petitioners' expert engineer Starr Silvis established that trenchless crossings are the least impactful crossing method alternative and thus the practicability of trenchless construction must be considered on a crossing-by-crossing basis. AR004741-43 (JA____-__). Silvis's report also establishes "that trenchless methods are likely practicable for many more of the streams and wetlands that would be crossed by the pipeline than [TGP] identifies." AR004743 (JA____); *see also* AR005864-78 (JA____-__), AR004767 (JA____), AR004796 (JA____), AR004821 (JA____).

**Second**, Petitioners and expert engineer Silvis established that "[b]lasting is the most destructive and potentially environmentally damaging of all waterbody crossing methods." AR004743 (JA____); AR004680 (JA____); *see also W. Va.*

*Dep't of Envtl. Prot.*, 64 F.4th at 494 (describing potential "serious harm" from blasting through streams).

**Third**, through both scientific literature and expert opinion, Petitioners established that TGP's dry, open-cut crossings pose a high risk of substantial and long-term sedimentation and water quality standards violations—including downstream sediment transport. AR004685-96 (JA____-__); *see also* AR005311-31 (JA____-__), AR005843-78 (JA____-__), AR004737-58 (JA____-__), AR005880-89 (JA____-__).

**Fourth**, Petitioners and expert engineer Silvis established that TGP's application and TDEC's evaluation thereof were woefully short on baseline data that would allow TDEC to compare the existing conditions of the streams and wetlands to the potential conditions after trenching, and that TGP's plans to trench through some of the streams and watersheds in its path multiple times threatened permanent detrimental effects. AR004699-702 (JA____-__); AR004712-19 (JA____-__); AR004740 (JA____).

On July 21, 2023, TDEC issued the ARAP and §401 Certification sought by TGP. AR006762 (JA____). In the Certification, TDEC uncritically accepted TGP's proposal to undertake only three trenchless HDD crossings (under four streams) and to open cut the balance of waterbodies in the Pipeline's proposed path. AR006793-95 (JA____-__). Although TDEC concluded that trenchless methods were the least

environmentally impactful alternative, it stubbornly refused to evaluate whether those techniques were practicable at additional stream crossings on a site-specific basis. AR006951 (JA____). TDEC's decision was an administrative law nightmare: the agency cut and pasted large portions of TGP's application without critical analysis (AR006802-04 (JA____)), allowed TGP and its contractors to select rock-removal methods in the field (AR006772 (JA____)), failed to examine the potential for downstream sediment transport from activities in wet weather conveyances (*e.g.*, *id.*), relied on false equivalencies between the conditions of the Certification and the conditions of an inapposite permit to conclude that the Pipeline will not cause water quality standards violations (AR006954-55 (JA____-__)), and claimed it engaged in certain analyses without any evidence demonstrating that to be the case (AR006957-58 (JA____)). Consequently, the agency failed to articulate a satisfactory explanation for its action, failed to grapple with evidence contrary to its determinations in the record, failed to make required findings before issuing the Certification, violated the unlawful delegation doctrine, reached conclusions contrary to the record and based on demonstrably false impressions, failed to consider important aspects of the problem, and reached conclusions not supported by the record. On August 18, 2023, Petitioners filed this timely petition for review. ECF #1-2.

## SUMMARY OF THE ARGUMENT

As part of its review of whether TGP's proposed waterbody crossings will comply with water quality standards, TDEC was required to evaluate, among other things, **(1)** whether less damaging crossing methods are practicable, **(2)** the least environmentally impactful rock-removal technique, **(3)** whether TGP's activities in wet weather conveyances will lead to downstream water quality standards violations, **(4)** whether TGP's proposed open-cut crossings will cause water quality standards violations, and **(5)** how, based on a review of baseline data, TGP's crossings would cumulatively affect the resource values of the impacted streams and wetlands. On each of those tasks, TDEC's efforts fell short, rendering the Certification arbitrary, capricious, and otherwise not in accordance with law. This Court should vacate the Certification.

**1.** Tennessee's ARAP program prohibits TDEC from issuing a §401 certification "if there is a practicable alternative to the proposed activity that would have less adverse impact on resource values." TN ADC 0400-40-7-.04(5)(b) (AD065). The program further defines "activity" as "*any and all* work or acts associated with the performance, or carrying out of a project or plan, or construction of a measure." *Id.* 0400-40-7-.03(2) (AD058). Consequently, each waterbody crossing is a distinct activity, and TDEC must evaluate whether there is a practicable alternative *at each crossing* that would have less adverse impact on resource values.

TDEC concedes that trenchless crossings are less environmentally impactful than open-cut crossings. AR006951 (JA____). Thus, the remaining question before TDEC was whether trenchless methods were practicable on a crossing-by-crossing basis. An alternative is practicable if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." TN ADC 0400-40-7-.03(24) (AD060). But TDEC failed to conduct that required evaluation. Instead, it uncritically accepted TGP's unsubstantiated and *project-level* contentions.

As a result, TDEC failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Simms v. Nat'l Traffic Safety Admin.*, 45 F.3d 999, 1004 (6th Cir. 1995) (cleaned up). TDEC entirely failed to consider the universe of available practicable trenchless methods. And it failed to grapple with contrary record evidence establishing the widespread practicability of trenchless crossings across its project. *See e.g.*, AR004675-76 (JA____-__); AR004741 (JA____). When a state issues a §401 certification to a pipeline without grappling with or further elaborating on contrary record evidence, it acts arbitrarily and capriciously, and its action must be set aside. *W. Va. Dep't of Envtl. Prot.*, 64 F.4th at 502.

**2.**    TDEC was also required to evaluate whether TGP would implement the least impactful practicable rock-removal methods. Although it purported to do

so, its analysis was arbitrary and capricious for two reasons. ***First***, TDEC failed to make the least impactful practicable alternative determination *before* issuing the permit, as required by its regulations. TN ADC 0400-40-7-.04(5)(b) (AD065). Rather, TDEC concluded that it could allow TGP to select from a menu of rock removal options in the field during construction, and that such a "*process* for determining the appropriate crossing method *will result* in the use of the least impactful practicable alternative." AR006804 (JA____). But that is a far cry from what TDEC's regulations require.

***Second***, TDEC's approach to allowing TGP to determine the least impactful practicable alternative on the fly (AR006772 (JA____)) violates the unlawful delegation doctrine—which prohibits agencies from shifting their authority and obligations to private actors without retaining final review authority. *Perot v. FEC*, 97 F.3d 553, 559 (D.C. Cir. 1996). Special Condition g of the Certification expressly delegates the least impactful practicable determination from TDEC to TGP, without any review authority remaining with TDEC as to the non-blasting method TGP will employ. AR006772-73 (JA____-__). That abdication of regulatory responsibility is contrary to law and warrants vacatur.

3.    TDEC unreasonably relied on boilerplate—rather than analysis—to address TGP's activities in wet weather conveyances, without considering the potential for downstream sediment transport to intermittent or perennial streams or

wetlands. TDEC also failed to consider the effect of the statutory limitation under Tennessee law on conditions that can be applied to activities in wet weather conveyances. *See* T.C.A. §69-3-108(q)(2) (AD033-34). That type of reliance on conclusions, without analysis or reasoned explanation, is arbitrary and capricious. *See, e.g.*, *Tourus Recs., Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001). An agency's predictive judgment must have a "reasoned basis" and factual support in the record. *Cincinnati Bell Tel. Co. v. FCC*, 69 F.3d 752, 763 (6th Cir. 1995). TDEC's "analysis" of water quality effects of activities in wet weather conveyances has neither.

4.     TDEC's belief that its general ARAP for utility lines includes the same or similar conditions to the Certification (AR006954 (JA___)) is demonstrably false. The former includes numerous conditions—such as a prohibition on blasting and a limit on the number of stream crossings—that have no equivalent in the latter. *Compare* AR006967-71 (JA____-__) *with* AR006772-77 (JA____-__).

Because TDEC relied on that demonstrably false impression about its general ARAP for utility lines as the only rebuttal to the voluminous record evidence that water quality standards violations from TGP's open-cut crossings were likely, TDEC acted arbitrarily and capriciously. A state acts arbitrarily and capriciously when it issues a §401 certification based on a demonstrable misunderstanding of a related permit. *W. Va. Dep't of Envtl. Prot.*, 64 F.4th at 508. Because the

Certification does not include the same or similar conditions to the general ARAP for utility lines, TDEC has offered "an explanation for its decision that runs counter to the evidence before the agency." *Simms*, 45 F.3d at 1004.

**5.**    Before issuing an ARAP, TDEC must evaluate whether an activity will result in "any appreciable permanent loss of resource values." TN ADC 0400-40-7-.04(6)(c) (AD067). Because Tennessee's ARAP program is essentially its §401 program, the resource-value-analysis requirement is federalized. *See State Water Control Bd.*, 64 F.4th at 194-95.

In evaluating effects on resource values, TDEC must determine the "existing condition"—*i.e.*, baseline condition—of each impacted waterbody. TN ADC 0400-40-7-.04(6)(c) (AD067). TDEC must also consider "[w]hether the proposed activity is reasonably likely to have cumulative or secondary impacts to the water resource." *Id.* But TDEC did neither. It refused to gather baseline data on each stream, and it paid lip service to cumulative effects. Indeed, although TDEC contends in its decision documents that it relied on internal baseline data and conducted a cumulative effects analysis, the administrative record is barren of any such data or analysis. Consequently, TDEC's resource values analysis is arbitrary and capricious. *See Ky. Waterways All. v. Johnson*, 540 F.3d 466, 474 (6th Cir. 2008) (recognizing that courts cannot rubber stamp unexplained agency action); *see also Sec'y of Lab., Mine Safety & Health Admin. v. Westfall Aggregate & Materials, Inc.*, 69 F.4th 902,

913 (D.C. Cir. 2023) (holding "there can be no reasoned decision-making when an agency relies on findings that are not supported by the record").

## **ARGUMENT**

### *Standard of Review*

In proceedings reviewing §401 certifications under NGA Section 19(d)(1), 15 U.S.C. §717r(d)(1) (AD004), federal circuit courts apply the Administrative Procedure Act's standard of review. *See, e.g.*, *W. Va. Dep't of Envtl. Prot.*, 64 F.4th at 501. Under that standard, the Court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).[3]

To survive arbitrary and capricious review, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Simms*, 45 F.3d at 1004 (cleaned up); *see also Louisville Gas & Electric Co.*, 988 F.3d at 846 (agencies must in all cases engage in "reasoned decisionmaking"). A satisfactory explanation requires more than bare recitals, particularly where there is contradictory evidence in the record. *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d

---

[3] There is no material difference between the federal Administrative Procedure Act's standard and the standard under Tennessee law. *Compare* 5 U.S.C. §706(2) *with* T.C.A. §4-5-322(h); *see also Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 81-82 (4th Cir. 2020).

260, 293 (4th Cir. 2018). Indeed, an agency acts arbitrarily and capriciously when it fails to "grapple with contrary evidence," *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638-39 (D.C. Cir. 2017), or when it provides conclusory statements in lieu of reasoning. *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350-51 (D.C. Cir. 2014). Agency action that misapplies an applicable statute or regulation is not in accordance with law. *See, e.g.*, *All. For Cmty. Media v. FCC*, 529 F.3d 763, 786 (6th Cir. 2008). Agency actions are also arbitrary and capricious when they fail to address important aspects of the problem or run counter to the record. *Simms*, 45 F.3d at 1004.

### *Discussion of the Issues*

**I.    TDEC'S DETERMINATION THAT TGP'S PREFERRED WATERBODY CROSSING METHODS ARE THE LEAST IMPACTFUL PRACTICABLE ALTERNATIVE WAS ARBITRARY AND CAPRICIOUS.**

Under Tennessee's ARAP program, TDEC is prohibited from issuing a §401 certification "if there is a practicable alternative to the proposed activity that would have less adverse impact on resource values." TN ADC 0400-40-7-.04(5)(b) (AD065). And the ARAP program requires TDEC to evaluate—on a crossing-by-crossing basis—whether TGP's preferred waterbody crossing methods are the least impactful practicable alternative. However, despite acknowledging that trenchless crossing methods are the least impactful alternative, TDEC conducted no evaluation of the practicability of trenchless crossings on a site-specific basis and instead simply

rubberstamped TGP's predetermined decision[4] to use a dry, open-cut method at all

certified waterbodies with the exception of three trenchless HDD crossings under

four streams. AR006802-04 (JA____-__).[5] As a result, TDEC's determination that

TGP's waterbody crossings are the least impactful practicable alternative is arbitrary

and capricious.

### A. TDEC Is Required to Evaluate the Practicability of Crossing Method Alternatives On A Crossing-By-Crossing Basis.

TDEC may not issue a §401 certification where a proposed activity is not the

least impactful practicable alternative. TN ADC 0400-40-7-.04(5)(b) (AD065).

Tennessee's "least impactful practicable alternative" requirement tracks the

language of the Corps' CWA §404(b)(1) guidelines, which prohibit permit issuance

where, among other things, a proposed discharge is not the least environmentally

---

[4] In an April 2022 *pre-application* meeting with TDEC about the Pipeline, TGP gave a presentation stating that "conventional trenching techniques will typically be used to cross streams." AR007132 (JA____). Similarly, TGP states in its application—prior to undertaking any alternatives analysis—that "[t]rench excavation will be the primary construction method to install the pipeline…." AR000932 (JA____).

[5] TGP proposed these HDD crossings "*to avoid environmental impacts* at two National Rivers Inventory Stream reaches (Jones Creek and Yellow Creek) and due to physical characteristics of Wells Creek." AR000952 (JA____) (emphasis added). TDEC concurs, stating in the Certification that these HDD crossings will "*avoid direct impacts* to four streams." AR006795 (JA____) (emphasis added). However, the record is devoid of any evidence demonstrating that TDEC evaluated the avoidance of such impacts to any other affected waterbodies through the use of trenchless methods.

damaging alternative. 40 C.F.R. §230.10(a) (AD018). Under both regulatory schemes, an alternative is practicable if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purpose." *Id.* §230.10(a)(1) (AD018); TN ADC 0400-40-7-.03(24) (AD060).

The ARAP rules define "activity" as "*any and all* work or acts associated with the performance, or carrying out of a project or plan, or construction of a measure." TN ADC 0400-40-7-.03(2) (AD058) (emphasis added); *see also id.* 0400-40-7-.01(1) (AD056) (requiring anyone conducting an "*activity* that may impact *a* stream or wetland" to avoid and minimize such impacts) (emphasis added). Given the purposes of the ARAP rules to avoid and minimize aquatic impacts and the definition of "activity," each waterbody crossing is a distinct activity within the overall Pipeline project, and TDEC is required to evaluate whether TGP's proposed crossing methods are the least impactful practicable alternative on a crossing-by-crossing basis as opposed to at the project level.

Importantly, TDEC's inclusion of Special Condition g in the Certification recognizes that each crossing is a distinct "activity" and that a crossing-by-crossing evaluation of the least impactful practicable alternative is required. AR006772-73 (JA____-__). However, this condition—which, as discussed *infra,* is unlawful for other reasons—pertains only to TGP's *rock-removal* methods for its *open-cut*

- 23 -

crossings. *Id.* Moreover, TDEC acknowledges that the project includes multiple activities at each crossing, stating in the Certification that the "*broad* categories of *activities* associated with the *project* that may alter Waters of the State include … trenching [and] HDD …." AR006791 (JA____) (emphasis added). Consequently, TDEC's failure to conduct a crossing-by-crossing evaluation of TGP's *crossing methods* (*i.e.*, trenchless versus open-cut crossings) is—in and of itself—arbitrary and capricious. *See Louisville Gas & Elec. Co.*, 988 F.3d at 846 (holding that "in all cases agencies must engage in reasoned decisionmaking") (internal quotations omitted).

Crossing-by-crossing analyses of practicable alternatives to open-cut crossings are common in state agency §401 certifications for pipelines. For example, in *West Virginia Department of Environmental Protection*, the Fourth Circuit recognized a gas company's efforts in its §401 application to conduct "a detailed *location-specific review* of practicable alternatives to open cut crossings." 64 F.4th at 499 (emphasis added); *see also id.* at 507 (describing a company's "*site-specific review* of practicable alternatives to open cut crossings") (emphasis added). Similarly, in *Constitution Pipeline Co. v. N.Y. Dep't of Envtl. Conservation*, the Second Circuit upheld the state's denial of a §401 certification for a pipeline because the developer "persistently refused to provide … *site-by-site information* as to the

feasibility of trenchless crossing methods" for the vast majority of the waterbodies to be crossed by the pipeline. 868 F.3d 87, 103 (2d Cir. 2017) (emphasis added).

**B.   The Record Evidence Establishes—And TDEC Acknowledges—That Trenchless Crossing Methods are the Least Impactful Alternative.**

The record evidence, including Petitioners' technical comments submitted to TDEC, AR004667-71 (JA____-__), affirmatively establishes that trenchless crossings are the least impactful alternative for pipeline waterbody crossings. Petitioners' expert engineer Silvis opines:

> The preferred method for pipelines to cross streams and wetlands to reduce negative environmental impacts is through trenchless construction absent special site-specific factors.

AR004741 (JA____). Silvis's opinions are echoed in both the scientific literature, (AR005864-78 (JA____-__)), and by the regulatory community, (AR004767 (JA____), (AR004796 (JA____), (AR004821 (JA____)).

Importantly, TDEC recognizes this fact, stating in the Notice of Determination that it "considers installation of utility lines via horizontal direct drill ('HDD') or [conventional bore] to be the least impactful alternatives for utility lines of this size." AR006951 (JA____). Given this acknowledgement, the only remaining question before TDEC was whether trenchless methods were *practicable* on a crossing-by-crossing basis. However, TDEC failed to evaluate the practicability of trenchless crossings on a site-specific basis, and instead blindly accepted TGP's

unsubstantiated and project-level contentions that trenchless methods were impracticable at all but four waterbody crossings.[6] *Id.*

### C. TDEC Neither Evaluated the Practicability of Trenchless Methods On A Crossing-By-Crossing Basis Nor Explained the Agency's Conclusions.

Given its uncritical acceptance of TGP's crossing-method preferences, TDEC was unable to provide a rational explanation for its determination that open-cut crossings are the least impactful practicable alternative for all but four of the waterbodies crossed by the Pipeline. Instead, TDEC simply block-quoted pages of TGP's application into the Certification to attempt to justify its action. *Compare* AR006802-04 (JA____-__) *with* AR000950-52 (JA____-__). That was arbitrary and capricious because an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Simms*, 45 F.3d at 1004 (cleaned up); *see also U.S. Dep't of Interior,* 899 F.3d at 293 (a satisfactory explanation requires more than bare recitals, particularly where there is contradictory evidence in the record).

As a threshold matter, TDEC unreasonably turned a blind eye to TGP's presentation of a "false choice" between only HDD and conventional bore as

---

[6] Indeed, TGP only performed so-called "HDD Feasibility Studies" for its predetermined four HDD crossing locations and at no other crossings. AR001555-624 (JA____-___).

potentially practicable trenchless crossing methods. AR004742 (JA____). As Petitioners' comments and exhibits alerted TDEC, there are other trenchless methods that could be practicable at any given crossing. *See, e.g., id.;* AR004671-73 (JA____-__). Those include guided conventional boring, microtunneling, Direct Pipe®,[7] and directional microtunneling. *Id.* All of those are practicable methods—with less environmental impact than open-cut and even HDD methods—that have been successfully utilized for other pipeline waterbody crossings. AR004800-03 (JA____-__); AR004961-79 (JA____-__); AR004981-5057 (JA____-__); AR005059-69 (JA____-__). Nonetheless, TDEC never asked TGP for information about the practicability of those trenchless crossing methods, and the Certification and its contemporaneous justifications are silent as to such methods.

TDEC fared no better in its discussion of the conventional bore method. TDEC merely cut and pasted a long block quote from TGP's application into the Certification's rationale. *Compare* AR006802-04 (JA____-__) *with* AR000950-52 (JA____-__). In that excerpt, TGP begins by summarily dismissing the use of

---

[7] Demonstrating its potential practicability, TGP mentions Direct Pipe® in a "Summary of Trenchless Methods for the Cumberland Project" attached to its application. AR001637 (JA____). However, there is no discussion or evaluation of this method or its practicability at any crossing in the application itself. Moreover, that summary is a stale, decade-old document adopted from the Constitution Pipeline (*id.*), a pipeline ultimately cancelled because of the developer's refusal to provide requested trenchless crossing feasibility analyses. AR004679 (JA____); AR004760-72 (JA___-__); *Constitution Pipeline Co.*, 868 F.3d at 102-03.

conventional boring for waterbody crossings in a one paragraph and non-crossing specific discussion of three general factors (crossing distances, soil and geologic conditions, and topographic conditions) that purportedly make the use of this established technology "unlikely."[8] AR000950-51 (JA____-__). Of course, "unlikely" is not the applicable standard—practicability is.

Regardless, Petitioners and their engineering expert informed TDEC that each of TGP's excuses for refusing to use the conventional bore method were unsupported. AR004674-75 (JA____-__). ***First***, given that the widest stream TGP proposes to cross with an open-cut crossing is 62.5 feet, Petitioners' expert concluded that "width does not preclude the use of conventional boring at any of the proposed open-cut crossings." AR004742 (JA____). ***Second***, although TGP makes a general reference to subsurface soil and geologic conditions, it fails to demonstrate how any of those conditions would foreclose use of this method at any particular stream crossing, particularly in light of the fact that suitable subsurface conditions *plainly* exist in the project area as TGP has committed to using conventional boring to construct numerous *road* crossings. AR005074-75 (JA____-__). ***Third***, TGP's unsupported assertion that topographic conditions for "most" waterbody crossing locations for the Pipeline "limit" the use of this method (AR000950) (JA____) is

---

[8] As recently recognized by FERC, "[t]he conventional bore method is a technology that has been used for decades to install natural gas pipelines." AR004796 (JA____).

wholly undermined by Mountain Valley Pipeline, LLC's widespread use of this method on a pipeline in the steep slopes of Central Appalachia. AR004795 (JA____), AR004813 (JA____); *see also Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 384 (4th Cir. 2018) (noting that "much of the [Mountain Valley Pipeline] project crosses topography with steep slopes").

Despite being aware of the demonstrable errors in TGP's characterizations of the limitations on conventional boring, TDEC cut and pasted those characterizations into the Certification without any independent analysis. AR006802-03 (JA____-__). The upshot is that Tennessee's waterbodies will receive less protection from pipeline construction than will Tennessee's roads that TGP will cross using conventional bores.

TGP next claims to have considered internally six factors "when evaluating the use of HDD or conventional bore crossing methods versus a dry open-cut method." AR006803 (JA____). TGP's discussion of those factors consists of project-level generalizations and unsubstantiated contentions about conventional boring. AR006803-04 (JA____-__). There is *no* discussion or evaluation of crossing-specific information demonstrating that trenchless crossing methods were impracticable at any crossing. *Id.*; AR004741 (JA____). Indeed, the discussion of the six factors appears to have been written as a contrast between just HDD and open-cut crossings, with conventional boring added as an afterthought and without

- 29 -

consideration of the differences between HDD and conventional boring. That is established by the demonstrably incorrect statements about conventional boring that TGP made—and TDEC parroted.

For example, TGP attempted to emphasize the comparative risks of the release of drilling fluids into waterbodies through inadvertent returns between open-cut and trenchless crossings, stating, "[t]here are no risks of inadvertent returns for a conventional open cut crossing," while suggesting that there is a high risk of such returns from conventional bore. AR006803-04 (JA____-__). Not so. As FERC recently concluded, "there [is] no risk of inadvertent release of drilling fluids" from conventional bores because most bores do not use drilling fluids, and those that do use small, unpressurized volumes. AR004880 (JA____).

Petitioners and their expert engineer also warned TDEC that TGP's claims of evaluating conventional boring were not supported by any evidence that TGP applied the six factors on a crossing-by-crossing basis. AR004675-76 (JA____-__); AR004741 (JA____). Indeed, the notion that TGP might have conducted internally a crossing-by-crossing analysis of conventional boring and rejected that method because of technical impracticability is fatally undermined by the company's statement that it may use conventional boring if it encounters adverse flow conditions at proposed open-cut crossings. AR000946 (JA____). Again, Petitioners (and their engineering expert) alerted TDEC to that inconsistency, AR004676

(JA____), AR004743 (JA____), but again TDEC ignored those warnings and instead parroted TGP's language without analysis or explanation.

Regardless of whether a regulatory agency can ever lawfully blindly accept an applicant's position, it cannot do so when there is record evidence that contradicts its conclusions. *W. Va. Dep't of Envtl. Prot.*, 64 F.4th at 502. That is the case here. Petitioners' comments and expert reports established that the assertions TDEC copied from TGP's application were demonstrably incorrect, and an agency action based on demonstrably wrong premises is arbitrary and capricious. *Id.* at 508. At a fundamental level, TDEC's adoption of TGP's assertions without grappling with the voluminous contrary record evidence was arbitrary and capricious. *See, e.g.*, *id.* (holding state agency arbitrarily and capriciously issued a §401 certification to a pipeline where it failed to grapple with or further elaborate on contrary record evidence). Consequently, the Certification is arbitrary and capricious.

## II. TDEC'S ISSUANCE OF THE CERTIFICATION WAS NOT IN ACCORDANCE WITH LAW BECAUSE IT VIOLATED TDEC'S REGULATIONS AND UNLAWFULLY DELEGATED REGULATORY AUTHORITY TO TGP.

Although it arbitrarily failed to evaluate whether TGP's preferred *crossing methods* are the least impactful practicable alternative on a crossing-specific basis, TDEC at least purported to undertake this evaluation with regard to TGP's *rock-removal* methods for its trenched crossings. However, the culmination of that

evaluation was unlawful as the Certification's Special Condition g authorizes TGP—not TDEC—to make the determination of what rock removal method is the least impactful practicable alternative for any given stream crossing. By so empowering TGP, TDEC violated its own regulations requiring that it make that determination prior to issuing the Certification and further unlawfully delegated this regulatory authority and responsibility to TGP and its contractors.

A. **TDEC Failed to Determine That TGP's Rock Removal Methods Are the Least Impactful Practicable Alternative Before Issuing the Certification.**

TN ADC 0400-40-7-.04(5)(b) provides, in pertinent part:

> No Individual Permit shall be granted if there is a practicable alternative to the proposed activity that would have less adverse impact on resource values, so long as the alternative does not have other significant adverse environmental consequences.

(AD065). The plain language of this regulation required TDEC—*before* issuing the Certification—to determine that TGP's proposed rock-removal methods are, on a crossing-by-crossing basis, the least impactful practicable alternative.

Here, TDEC failed to make this required pre-issuance determination for TGP's rock-removal methods. Instead, TDEC added Special Condition g to the Certification, AR006772-73 (JA____-__), which authorizes TGP to choose from a list of potential rock-removal methods and, based on wide-ranging evaluation criteria, "select the least impactful practicable trenching technique for each stream

crossing" *during Pipeline construction*. AR006772 (JA____). Thus, TDEC

concluded in the Certification:

> Based on the available information the Division has made a final
> determination that applicant has demonstrated that the … *process for
> determining* the appropriate crossing method *will result* in the use of
> the least impactful practicable alternative to accomplish the project
> purpose.

AR006804 (JA____) (emphasis added).

Even if it were an otherwise satisfactory explanation or supported by the

record, that contingent determination is not what is required—or even contemplated

by—TN ADC 0400-40-7-.04(5)(b)'s unambiguous language, which requires TDEC

to determine the least impactful practicable alternative *before* permit issuance or

otherwise deny the permit. (AD065). TDEC's action violates that regulatory

provision and thus is not in accordance with law. *City of Cleveland v. Ohio*, 508 F.3d

827, 838 (6th Cir. 2007) (agency action is "not in accordance with law" when "it is

in conflict with the language of the [regulation] relied upon by the agency"); *Wilson

v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004) (recognizing "elemental

principle" of administrative law that agencies are required to follow their own

regulations).

**B.    TDEC Unlawfully Delegated Regulatory Authority and Responsibilities to TGP and Its Contractors.**

Through Special Condition g's inclusion in the Certification, TDEC also unlawfully delegated the Agency's regulatory authority and responsibilities to TGP and its contractors. Under the unlawful delegation doctrine, TDEC cannot shift its responsibilities under the ARAP and §401 program to private actors, particularly those whose objectivity may be questioned on grounds of conflict of interest, unless it retains final reviewing authority. *Perot*, 97 F.3d at 559; *Sierra Club v. Sigler*, 695 F.2d 957, 962 n.3 (5th Cir. 1993); *see also Nat'l Park & Conservation Ass'n v. Stanton*, 54 F.Supp.2d 7, 18-19 (D.D.C. 1999).

Special Condition g provides:

g. For each stream crossing to be accomplished by a method other than HDD:

1. The *permittee shall select* from the list of potentially practicable alternatives below. This list is arranged in ascending order of perceived impact to the resource:

    i.    Conventional excavation with an excavator;
    ii.   Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;
    iii.  Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by backhoe excavation;
    iv.   Removal by rock trencher; or
    v.    Controlled blasting and excavation with a backhoe.

2. *The permittee shall select the least impactful trenching technique for each stream crossing*. Evaluation criteria include observed conditions at the stream crossing, the technical feasibility and limitations of each particular technique, best professional judgment

of experienced personnel, logistics, and cost. The permittee shall select one or more non-blasting alternatives unless it demonstrates that each of these is impracticable. *Prior to blasting, the permittee shall attempt at least one non-blasting alternative.*

AR006772-73 (JA_____-__) (emphasis added). That condition expressly delegates the least impactful practicable alternative determination to TGP and its contractors during Pipeline construction. However, as discussed above, the time to determine the least impactful practicable alternative is *before* permit issuance, not on the streambank.

Under this scheme, TGP and its contractors enjoy nearly unfettered discretion to determine the least impactful rock removal technique for each stream crossing. Special Condition g lists five trenching techniques in "ascending order of perceived impact to the resource": four non-blasting rock removal methods and blasting. AR006772-73 (JA_____-__). TGP must only seek TDEC approval before employing the most impactful alternative—blasting—and need only attempt *one* non-blasting alternative before doing so. AR006773 (JA_____).[9] Thus, TGP is free to implement whatever non-blasting technique it wants without seeking pre-approval. *Id.* Stated otherwise, practicability and environmental

---

[9] During the application review process, TDEC informed TGP it would require that TGP "evaluate and attempt *all* non-blasting techniques at each stream crossing." AR001891 (JA_____). However, TGP told TDEC that it reserved the right to unilaterally deem a non-blasting technique as impracticable based on its contractors' evaluation of technical considerations and cost, AR001911-12 (JA_____-__), and TDEC capitulated in the Certification. AR006772-73 (JA_____-__).

impact determinations will be made in the field by TGP and its contractors with no oversight from TDEC. As observed by Petitioners' expert engineer, "allowing contractors to make decisions on the fly results in increased probability of negative impacts to aquatic resources." AR004744 (JA____).

As a result, this matter is analogous to *Stanton,* where the court found the National Park Service's delegation of statutory management duties violated the unlawful delegation doctrine because the agency retained no oversight or final reviewing authority over the private actor, and because the private actor's interests were likely to conflict with the agency's environmental protection responsibilities. *Stanton*, 54 F.Supp.2d at 20. Consequently, TDEC's abdication of its regulatory authority and responsibilities is contrary to law and warrants vacatur.

### III.    TDEC'S CONCLUSION THAT ACTIVITIES IN WET WEATHER CONVEYANCES WILL NOT LEAD TO WATER QUALITY STANDARDS VIOLATIONS WAS UNREASONABLE.

Streams and wetlands in the path of the Cumberland Pipeline will not only be directly impacted by open-cut crossings, but also indirectly by Pipeline construction in wet weather conveyances. The Cumberland Pipeline will impact 76 wet weather conveyances (AR006809-14 (JA____-__)), including 62 dry, open-cut pipeline

crossings (AR001842-61 (JA____-__)). Under Tennessee law, "wet weather conveyances" are:

> man-made or natural watercourses, including natural watercourses that have been modified by channelization … that flow only in direct response to precipitation runoff in their immediate locality; … whose channels are at all times above the groundwater table; … that are not suitable for drinking water supplies; and … in which hydrological and biological analyses indicate that, under normal weather conditions, due to naturally occurring ephemeral or low flow there is not sufficient water to support fish, or multiple populations of obligate lotic aquatic organisms whose life cycle includes an aquatic phase of at least two (2) months.

T.C.A. §69-3-103(46) (AD026); TN ADC 0400-40-3-.04(36) (AD045).

Although Tennessee law may not require an ARAP for activities in wet weather conveyances, T.C.A. §69-3-108(q)(1) (AD033-34), such activities are still subject to at least limited regulation by Tennessee state water quality requirements designed to protect downstream intermittent and perennial streams and wetlands. For example, the Tennessee Water Quality Control Act prohibits sediment from wet weather conveyances from reaching "other waters of the state," *i.e.*, intermittent and perennial streams and wetlands. *Id.* §69-3-108(q)(1)(C)(i) (AD033); *see also* TN ADC 0400-40-3-.02(6) (AD038) (mandating that wet weather conveyances "shall not adversely affect the quality of downstream waters"). But Tennessee law limits the conditions that TDEC can place on activities in wet weather conditions to the prohibition on downstream sediment transport and a handful of other conditions set out in T.C.A. §69-3-108(q)(1). T.C.A. §69-3-108(q)(2) (AD034).

- 37 -

TDEC's evaluation of TGP's proposed wet weather conveyance crossings was arbitrary and capricious because it substituted a boilerplate incantation for reasoning and analysis. Consequently, TDEC never evaluated whether TGP's wet weather conveyance activities would result in downstream sediment transport. Moreover, TDEC arbitrarily and capriciously concluded that water quality standards violations would not occur based on compliance with all of the Certification's conditions, even though TDEC lacked authority to impose many of those conditions on TGP's wet weather conveyance activities.

## A.    TDEC Failed to Consider Whether TGP's Activities in Wet Weather Conveyances Would Result in Downstream Sediment Transport.

Because the prohibition on downstream sediment transport from activities in wet weather conveyances is a "water quality requirement" as that term is used in the §401 context, TDEC was required to ensure that TGP's proposed instream activities would comply with it. 40 C.F.R. §121.1(n) (2021) (AD011) (defining "water quality requirements" to include "state … regulatory requirements for point source discharges"); *id.* §121.7(c) (2021) (AD015) (requiring states to "include a statement that the discharge from the proposed project will comply with water quality requirements" in any granted §401 certification); 40 C.F.R. §121.1(j) (2023) (AD013) (defining "water quality requirements" to include any "water quality-related requirement of state or Tribal law"); *id.* §121.3(a)-(b) (AD014) (requiring

states considering §401 certification applications to "evaluate whether the activity will comply with applicable water quality requirements" and "include any conditions … necessary to assure that the activity will comply with applicable water quality requirements").

Exhibits to public comments alerted TDEC to the need to consider downstream sediment transport from pipeline crossings, such as those proposed for wet weather conveyances. An Environmental Protection Agency ("EPA") letter to the Corps about dry, open-cut pipeline crossings—a copy of which was provided to TDEC—observes that:

> Even though some waterbodies may not exhibit surface flow every day of the year, they perform many of the foregoing important functions [including sediment transport] and contribute approximately 60% of the mean annual flow to all northeastern U.S. streams and rivers. Therefore, the proposed [dry, open-cut crossings] to these aquatic resources have implications not only for the direct impacts, but also downstream waters.

AR006352 (JA____). And the Fish and Wildlife Service, when examining the effects of sedimentation from dry, open-cut crossings on protected species, concluded that sedimentation impacts could occur up to 800 meters downstream from the confluence of pipeline-crossed tributaries and the next order stream. AR005387, AR005535, AR005547 (JA____, JA____, JA____). Moreover, Petitioners' comments warned TDEC that sedimentation "may occur at the project site or may propagate … downstream" (AR004725 (JA____)), and reminded the

Agency of its obligation to "'prevent the entry of pollutants into downstream waters'" (AR004707 (JA____) (quoting TN ADC 0400-40-7-.03(25) (AD060)).

The risks of downstream sedimentation on this project are more than academic. TGP's application describes multiple wet weather conveyances as being "short" or "small," and draining into higher order streams and wetlands. *See, e.g.*, AR000450, AR000456, AR000459-60, AR000647; AR000779; AR000785 (JA____, JA____, JA____-__, JA____, JA____).

Nonetheless, TDEC did not evaluate whether activities in wet weather conveyances would comply with all applicable water quality requirements. Nothing in the record indicates that TDEC considered the potential for downstream sediment transport to intermittent or perennial streams or wetlands. Indeed, it does not appear that TDEC even evaluated how far from such waters TGP's wet weather conveyance activities would occur. Rather, the Agency simply repeated a conclusory mantra— four different times—that impacts and alterations to wet weather conveyances "do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108(q)." AR006769, AR006772, AR006791, AR006814 (JA____, JA____, JA____, JA____).

Internal agency correspondence[10] reveals that ██████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

But "programmatic boilerplate" cannot substitute for a "reasoned explanation" for agency action. *See Amerijet Int'l*, 753 F.3d at 1352 (granting petition for review of agency action because the agency decision included "programmatic boilerplate rather than reasoned explanation"); *see also Mo. Pub. Serv. Comm'n v. FERC*, 234 F.3d 36, 41 (D.C. Cir. 2000) (holding that a "passing reference" cannot satisfy an agency's "obligation to carry out reasoned and principled decisionmaking" (internal quotation marks omitted)); *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1056-57 (D.C. Cir. 1986) (holding "boilerplate recitation" to fall short of reasoned decisionmaking).

---

[10] For the reasons set forth in Petitioners' Motion to Complete the Administrative Record (ECF #27-1) and Reply in support thereof (ECF #34), this internal agency correspondence is not privileged and is properly part of the administrative record in this matter. More specifically, neither the attorney-client nor deliberative process privileges apply to this document, and even if either privilege was applicable, State Respondents waived and/or destroyed any such privilege.

"To survive judicial review the agency must have examined the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Simms*, 45 F.3d at 1004. An agency's predictive judgment must have "a reasoned basis" and factual support in the record. *Cincinnati Bell Tel. Co.*, 69 F.3d at 763. Here, TDEC's boilerplate language about the statute governing wet weather conveyances "is not a statement of reasoning, but of conclusion," and, thus, is not a satisfactory explanation for the agency's action. *Tourus Recs.*, 259 F.3d at 737. An agency action is arbitrary and capricious if the agency entirely fails to consider an important aspect of the problem. *See, e.g.*, *Sierra Club v. U.S. Forest Serv.*, 828 F.3d 402, 407 (6th Cir. 2016). Because TDEC failed to consider whether activities in wet weather conveyances would result in sediment reaching downstream intermittent or perennial streams or wetlands, the Certification is arbitrary and capricious and must be vacated.

**B.    TDEC's Conclusion That Water Quality Standards Violations Will Not Occur Based on Compliance with the Certification's Conditions Is Arbitrary and Capricious.**

TDEC's treatment of wet weather conveyances also renders arbitrary and capricious its conclusion that the authorized activities will not violate applicable water quality standards, so long as they are "conducted in accordance with all permit conditions herein." AR006760 (JA____). That reasoning is flawed because TDEC

lacks the authority to impose most of the Certificate's conditions on activities in wet weather conveyances.

Where a "state concludes that conditions on the operation of the project are necessary to ensure compliance with its water quality standards, those conditions must be set out in the §401 certification." *N.C. Dep't of Envtl. Quality v. FERC*, 3 F.4th 655, 661 (4th Cir. 2021). "[A] state must 'set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with … any appropriate requirement of State law.'" *W. Va. Dep't of Envtl. Prot.*, 64 F.4th at 505 (quoting 33 U.S.C. §1341(d) (AD008)).

TDEC concluded that numerous special and general conditions were necessary to ensure compliance with water quality standards, and thus included them in the Certification. AR006772-77 (JA____-__). Among those conditions are Special Condition b, which requires all work under the Certification to be accomplished in accordance with workplans provided to TDEC (AR006772 (JA____)), and Special Condition hh, which prohibits the use of "[w]et-cut trenching methods" (AR006777 (JA____)).

But TDEC cannot apply those conditions to TGP's activities in wet weather conveyances under Tennessee law. Tennessee Code Annotated §69-3-108(q)(2) (AD033-34) prohibits the imposition of conditions beyond those listed in T.C.A.

- 43 -

§69-3-108(q)(1) on activities in wet weather conveyances. The universe of conditions in T.C.A. §69-3-108(q)(1) (AD033-34) do not include requiring compliance with approved workplans or a prohibition on wet-cut trenching methods.

Because TDEC concluded that compliance with *all* the conditions of the Certification is necessary to avoid violations of state water quality standards (AR006760 (JA____)), and because TDEC cannot impose all of those conditions on activities in wet weather conveyances, TDEC's conclusion that activities in wet weather conveyances will not cause water quality standards violations is arbitrary and capricious. Accordingly, TDEC has left "out of the federal permit a central justification for its reasonable assurance determination." *W. Va. Dep't of Envtl. Prot.*, 64 F.4th at 506. With no evident justification for concluding that water quality standards downstream of wet weather conveyances will be met based only on compliance with the conditions in T.C.A. §69-3-108(q)(1)—and not on compliance with the rest of the conditions in the Certification—TDEC's action was arbitrary and capricious. *Id.* Stated otherwise, TDEC's conclusion that compliance with all the conditions in the Certification is necessary to assure compliance with water quality standards (AR006760 (JA____)) is inconsistent with TDEC's repeated statement that water quality standards downstream of wet weather conveyances will be met so long as the conditions in T.C.A. §69-3-108 are met (AR006769, AR006772, AR006791, AR006814 (JA____, JA____, JA____, JA____)). If the conditions in

the permit and the conditions in the statute were coextensive, TDEC's decision might be reasonable. But, they are not. *Compare* T.C.A. §69-3-108(q) (AD033) *with* AR006772-77 (JA____-__). As a result, TDEC's reasonable assurance determination is fatally flawed with an unexplained inconsistency and is thus arbitrary and capricious. *W. Va. Dep't of Envtl. Prot.*, 64 F.4th at 505-06 (holding unexplained inconsistency in §401 certification conditions unreasonable).

## IV. TDEC'S EVALUATION OF THE RISK OF WATER QUALITY STANDARDS VIOLATIONS WAS ARBITRARY AND CAPRICIOUS BECAUSE IT FAILED TO GRAPPLE WITH CONTRARY RECORD EVIDENCE AND ITS EXPLANATION RUNS COUNTER TO THE RECORD.

At the heart of a state's review of a §401 certification application is the question whether the activity would result in water quality standards violations. 33 U.S.C. §1341(a)(1) (AD006); *see also S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 374 (2006). In their comments on TGP's application to TDEC, Petitioners established the risk of substantial, long-term sedimentation effects (and concomitant water quality standards violations) from TGP's proposed open-cut crossings. AR004685-96 (JA____-__). Those comments were supported by both scientific literature (AR005311-31, AR005843-78 (JA____-__, JA____-__)) and expert reports that Petitioners provided to TDEC (AR004737-58, AR005880-89 (JA____-__, JA____-__)).

Despite the voluminous record evidence of the high risk of long-term and substantial water quality standards violations due to sedimentation from dry, open-cut crossings like those proposed by TGP, TDEC did not evaluate that evidence or grapple with its import. That failure to grapple with or further elaborate on contrary record evidence renders the Certificate arbitrary and capricious. *W. Va. Dep't of Envtl. Prot.*, 64 F.4th at 502.

Instead of confronting the record evidence, TDEC sidestepped it and discounted it, relying irrationally on a "demonstrably false impression" of pipeline crossings regulated under the state's general ARAP for utility line crossings. *Id.* at 508. In addition to issuing *individual* permits for specific projects (like it did here), TDEC can issue *general* permits for "specific categories of activities that are substantially similar in nature." TN ADC 0400-40-7-.04(1)-(2), (5) (AD062-66). TDEC has issued a general ARAP for utility line crossings (AR006967-72 (JA____-__)), but TGP's proposed project is not eligible for that stringent permit.

In its response to public comments on the draft Certification, TDEC acknowledged comments that "dry-ditch, open-cut crossings will cause or contribute to violations of state water quality criteria, particularly for sedimentation" and that such "[i]mpacts may persist for as long as four years." AR006954 (JA____). In response, TDEC stated that:

> [o]pen-cut/trenched crossings of streams by utility lines of various types are routinely authorized by coverage under TDEC's *General*

> *Aquatic Alteration Permit for Utility Line Crossings* as temporary impacts that do not cause appreciable permanent loss of resource value when they are conducted under the specific Special and General Conditions of the permit. TDEC is not aware of violations of water quality standards resulting from work conducted in compliance with these conditions. These or similar conditions are included in this permit (e.g., Special Conditions i, j, o).

*Id.* In effect, TDEC asserted that, because the Certification includes "similar conditions" to a general ARAP permit, and since that general permit does not routinely cause water quality standards violations, this Pipeline will not either.

But TDEC is comparing apples to oranges. Despite TDEC's assertions, the conditions of the general utility line ARAP are far more restrictive than the conditions in the Certification. Four examples make that clear.

**First**, the general permit includes a complete prohibition on in-stream blasting to construct pipeline crossings. AR006968 (JA____). In contrast, both the application and the Certification specifically contemplate that TGP will use in-stream blasting to construct the Cumberland Pipeline across Tennessee's streams. AR000935-36 (JA____-__); AR006773 (JA____).

**Second**, the general utility line ARAP limits the number of crossings per project to "[a] maximum of 5[.]" AR006968 (JA____). In contrast, the Certification authorizes more than ten times that number of stream and wetland crossings (and even more when wet weather conveyance crossings are considered), including as

many as three crossings on the same stream. AR006769, AR006793 (JA____, JA____).

**Third**, the general utility line ARAP prohibits using open-cut crossings to construct new pipelines through wetlands. AR006969 (JA____). In contrast, the Certification includes no such prohibition, and expressly authorizes TGP to trench through wetlands. AR006772-77, AR006796 (JA____-__, JA____).

**Fourth**, the general utility line ARAP includes a condition requiring the permittee to "utilize the least impactful practicable method of construction." AR006970 (JA____). As noted elsewhere, "TDEC considers installation of utility lines via horizontal directional drill ('HDD') or [conventional bore] to be the least impactful alternatives for utility lines of this size." AR006951 (JA____). Nonetheless (as discussed further in Section I, *supra*), TDEC neither required TGP to use trenchless construction methods beyond three HDD crossings of four streams, nor even bothered to evaluate trenchless crossings at the vast majority of locations. Accordingly, the general utility line ARAP is far more stringent in its conditions than the Certification at issue here.

TDEC's misplaced reliance on the similarity of the Certification to the general utility line ARAP is like West Virginia's arbitrary and capricious reliance on an EPA construction stormwater permit to justify its unlawful decision to certify the open-cut crossings of a natural gas pipeline in *Sierra Club v. West Virginia Department*

*of Environmental Protection*. In that case, West Virginia cited the conditions on *upland* construction in EPA's construction stormwater permit to support the state's determination that *in-stream* construction activities would comply with water quality standards. 64 F.4th at 507-08. West Virginia claimed that its certification was "nearly identical" to the EPA construction stormwater permit and, hence, it could be assured that water quality standards would not be violated. *Id.* at 508. But West Virginia was wrong—the EPA permit did not apply to in-stream construction. *Id.* Accordingly, the state's reliance on that permit was arbitrary and capricious because it had a "demonstrably false impression" about the EPA construction stormwater permit. *Id.*

Similarly, here TDEC was under a "demonstrably false impression" that the Certification included conditions the same as or similar to the conditions in the general utility line ARAP. AR006955 (JA____). Because TDEC's mistaken explanation runs counter to the record evidence before the Agency and lacks factual support in the record, the Agency's issuance of the Certification was arbitrary and capricious. *Simms*, 45 F.3d at 1004; *Cincinnati Bell Tel. Co.*, 69 F.3d at 763.

## V.  TDEC'S FLAWED DATA GATHERING AND DEFICIENT ANALYSIS OF THE PROJECT'S IMPACT TO RESOURCE VALUES OF AFFECTED WATERBODIES WAS ARBITRARY AND CAPRICIOUS.

As discussed above, Tennessee administers its federal §401 certification program through its ARAP program, and an ARAP serves as the §401 certification when a project requires both. TN ADC 0400-40-7-.01(3) (AD056); *id.* 0400-40-7-.04(1) (AD062); *id.* 0400-40-7-.03(6) (AD058). Before issuing an ARAP, TDEC must evaluate whether an activity will result in "any appreciable permanent loss of resource values." TN ADC 0400-40-7-.04(6)(c) (AD067-68). Thus, Tennessee law incorporates that evaluation as a requirement for a §401 certification. And this Court has jurisdiction to review TDEC's compliance with the resource values evaluation under the NGA, because Tennessee's incorporation of that evaluation into its §401 program federalizes the requirement. *See State Water Control Bd.*, 64 F.4th at 194-95.

As explained below, TDEC's assessment of the project's impact on resource values was arbitrary, capricious, and otherwise not in accordance with law because TDEC failed to adhere to requirements that it assess the baseline conditions of affected waterbodies (TN ADC 0400-40-7-.04(7)(a) (AD068)) and consider the crossings' cumulative effects (*id.* 0400-40-7-.04(6)(c) (AD067-68)).

**A.    TDEC's Analysis of Whether TGP's Activities Would Significantly Impact Resource Values of Crossed Waterbodies was Corrupted by the Agency's Failure to Establish the Existing Conditions of Those Waterbodies.**

Establishing existing conditions of impacted waterbodies is critical to protecting water resources. *See Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012) (holding that "[a] material misapprehension of the baseline conditions in advance of an agency action can lay the groundwork for an arbitrary and capricious decision"). Gathering baseline data is important for two primary reasons: it provides TDEC with information about the current status of waters that the Agency can use to evaluate the consequences of permitting a proposed activity, and it establishes pre-impact conditions from which compliance with permit conditions can thereafter be monitored. Tennessee rules explain that "[t]he determination of existing conditions shall ensure at least minimal protection for all streams and wetlands." TN ADC 0400-40-7.-04(7)(a) (AD068).

Tennessee recognizes the importance of baseline data by mandating that it be gathered, evaluated, and incorporated into the ARAP permitting process. Specifically, before issuing a permit, TDEC is required to determine the "existing conditions" of each impacted waterbody to evaluate whether the proposed activity

will result in "any appreciable permanent loss of resource values."[11] *Id.* 0400-40-7-.04(6)(c) (AD067). "Existing conditions" extend beyond the physical characteristics of a waterbody and also include "biological, chemical, bacteriological, [and] radiological" attributes "as measured by a quantitative assessment tool or other defensible scientific method." *Id.* 0400-40-7-.03(16) (AD059). Without this data, TDEC cannot "identify site-specific sensitivities and responses to disturbance," (AR005875 (JA____)), or "have knowledge of the natural variation to be expected in streams of differing characteristics," (AR005311 (JA____)).

TDEC acts unlawfully when it does not establish and analyze a water resources' existing conditions before permitting an activity that will affect that resource. *See* TN ADC 0400-40-7-.04(6)(c) (AD067-68). Only with baseline measurements in hand can TDEC undertake its regulatorily required resource-value inquiry. That includes "observ[ing]" and "measur[ing]" factors such as "hydrologic modifications," "loss of in-stream and wetland habitat," and "diminishment of species composition." *Id.* 0400-40-7-.03(3) (AD058); *id.* 0400-40-7-.04(6)(c) (AD067-68). Establishing a waterbody's baseline conditions is also necessary to

---

[11] Impacts cause an appreciable permanent loss of resource values when reduction in those values "is expected to continue without fundamental change and is large enough to be observed and measured as resulting in more than minimal adverse effects." TN ADC 0400-40-7-.03(3) (AD058).

evaluate a project's compliance with Tennessee's water quality standards. *See id.* 0400-40-3-.03 & 0400-40-3-.06 (AD046-55).

Here, TDEC failed to establish baseline conditions in impacted waterways before issuing the Certification. The record lacks data on the current biological, chemical, bacteriological, and radiological attributes of each waterbody at the pipeline crossing locations. Troublingly, TDEC's failure to gather that basic information appears deliberate. In email correspondence between a TGP contractor conducting aquatic resource assessments along the Pipeline route and a TDEC employee, the contractor asked whether his team should gather water quality data, such as benthic assessments of impacted waterbodies. AR007100 (JA____). The TDEC employee declined, stating that the Agency "does not typically require mitigation for utility line crossings and therefore we do not need [such] data." AR007099 (JA____).

In effect, TDEC unlawfully flipped the resource impact analysis on its head. Instead of *first* establishing baseline conditions, *then* analyzing impacted resource values, and *thereafter* determining whether any mitigation is needed to offset those impacts, TDEC began at the last step and worked backwards. TDEC relied on past decisions regarding unknown and unnamed utility line crossings to reason that, because those projects did not require mitigation, this Pipeline would not permanently affect resource values, and therefore baseline data need not be gathered

on in-stream characteristics of impacted waterbodies. This backwards analogy-for-analysis is arbitrary and capricious.

To properly determine the status of impacted waterbodies, TDEC should have gathered data on waterbody characteristics such as flow regimes, benthic macroinvertebrates, stream condition index scores, receiving stream conditions and functions, and rapid bioassessment results. Agency decision-making and analysis relying on comprehensive datasets with this type of information have been upheld by courts. *See, e.g.*, *Ohio Valley Envtl. Coalition, Inc. v. U.S. Army Corps of Eng'rs*, 716 F.3d 119, 125-27 (4th Cir. 2013) (finding that the agency's analysis of waterbody impacts was reasonable based on its "contextual judgment" after examining data related to physical habitat, water quality, benthics, and stream functioning). That type of data is also identified as necessary by the scientific literature to evaluate the impacts of pipeline construction. *See, e.g.*, AR005873 (JA____).

The only information TDEC required TGP to submit on impacted waterbodies focused on their physical attributes. *See* AR006958 (JA____) (identifying baseline data gathered on attributes such as channel dimensions, channel characteristics, and topography). Although TGP provided TDEC with nominal biological information as part of that process, the information falls far short of establishing in-stream baseline conditions. *See e.g.*, AR000276-77 (JA____-__) (handwritten notes in a

hydrologic determination that unidentified fish, mollusks, and crayfish were present in the stream). Upon reviewing the baseline data submitted by TGP in its permit application, an expert opined that "[a]s someone who has evaluated many stream crossing proposals, I conclude that TGP's application does not meet minimum industry standards for evaluating site-specific conditions." AR004753 (JA____).

TDEC's paltry data-gathering and backwards-looking reasoning is not saved by its belated assertion in the Notice of Determination accompanying the Certification that it also "used a variety of internal and external data sources" to assess the existing conditions of impacted water features. AR006958 (JA____). No evidence of any additional assessments exists in the record, and TDEC does not otherwise disclose the results of any such assessments to support its assertion that the baseline conditions of impacted waters have been appropriately measured and evaluated. *See Amerijet Int'l*, 753 F.3d at 1350 (noting that to justify its decision, "conclusory statements will not do; an agency's statement must be one of *reasoning*.") (emphasis in original) (cleaned up). Stated otherwise, TDEC's assertion that it "used a variety of internal and external data sources" in its evaluation of TGP's application is arbitrary and capricious because it is simply not supported by the record. *See, e.g.*, *Sec'y of Lab., Mine Safety & Health Admin.*, 69 F.4th at 913 (holding that "there can be no reasoned decision-making when an agency relies on findings that are not supported by the record").

By affirmatively declining to gather all necessary baseline data, TDEC was unable to examine that data to establish the existing conditions of impacted waterbodies and rationally conclude that TGP's pipeline construction would not cause an appreciable permanent loss of resource values. *Cf. Friends of Back Bay*, 681 F.3d at 588 ("A material misapprehension of the baseline data conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision."); *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011) (holding that, "without [baseline] data, an agency cannot carefully consider information about [anticipated] environment impacts," thereby failing "to consider an important aspect of the problem" and "resulting in an arbitrary and capricious decision"). In fact, evidence in the record suggests that TDEC actually worked backwards from its conclusion that no mitigation would be needed to decide that legally required baseline data need not be collected. TDEC's actions were arbitrary and fatally impair its resource values analysis.

**B.    TDEC's Summary Conclusion That TGP's Activities Will Not Cumulatively Impact Resource Values Lacks Analysis and is Not Supported by the Record.**

Under its regulations, TDEC must consider "[w]hether the proposed activity is reasonably likely to have cumulative or secondary impacts to the water resource" as part of its inquiry into whether TGP's construction activities will cause an appreciable permanent loss of resource values. TN ADC 0400-40-7-.04(6)(c)

(AD067). Cumulative impacts are those "which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id.* 0400-40-7-.03(9) (AD059). That analysis is a required component of Tennessee's state ARAP/§401 process, and TDEC is not free to shrug off its regulatory obligations. *See Ohio v. Becerra*, 87 F.4th 759, 772 (6th Cir. 2023) (an agency's failure to consider an important aspect of an issue is arbitrary and capricious); *see also Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004) (agency failure to consider a legally mandated factor in its decision-making is arbitrary and capricious).

Analyzing cumulative impacts to water quality from pipeline construction projects is crucial. That is because trenching or blasting through the same waterbody or through several waterbodies within the same watershed can overload "the capacity of the system to recover from impact," making the "detrimental effects of crossing construction permanent." AR005876 (JA____). Repeated dry-ditch, open-cut crossings through waterbodies or within watersheds can result in cumulative sedimentation impacts that "may continue to impact downstream streambeds and aquatic life for years following crossing completion" and can cause shifts in macroinvertebrate communities, decreases in aquatic biodiversity, changes to habitat, and impaired reproductive success. AR005883-85 (JA____-__).

It is undisputed that the Certification authorizes TGP to cut multiple streams multiple times. Lickskillet Branch would be crossed three times. AR006765-69 (JA____). Upper Sugar Camp Branch, Porters Branch, and unnamed tributaries to Dry Hollow Branch, Harris Branch, and Leatherwood Creek, would all be crossed twice.[12] AR006765-69 (JA____). The Certification also authorizes multiple waterbody crossings within discrete watersheds. AR006782-90 (JA___ _-__); *see also* AR004717-19 (JA____-__) (compiling information on multiple cuts in small watersheds).

Instead of analyzing the cumulative impacts to those waterbodies and watersheds from pipeline construction, TDEC merely asserts, repeatedly and superficially, that "[a]ll temporary and permanent impacts within stream segments/reaches, individual streams, and TDEC Waterbody IDs have been assessed cumulatively." AR006957 (JA____); *see also id.* ("TDEC evaluated impacts cumulatively for each individual stream and for each TDEC Waterbody ID."). Yet TDEC provides no evidence of doing so—the record is barren. Special Condition r of the Permit references a "cumulative impact calculation" which should have

---

[12] TDEC authorized impacts to one segment of Porters Branch in the Certification and to another segment of Porters Branch in a modified permit issued months later. TDEC was given notice from TGP and public commenters that the company planned to cross Porters Branch twice prior to issuing the Certification.   AR003596 (JA_____); AR004717 (JA_____). TDEC should have evaluated the cumulative effects of those aggregate crossings prior to issuing the Certification so as not to arbitrarily segment review of impacts to that waterbody.

occurred as part of TDEC's evaluation. *See* AR006776 (JA____). Details of that calculation, if TDEC performed it at all, are not in the record.

In fact, in its Permit Rationale determining that pipeline construction will not result in any appreciable permanent loss of resource values, TDEC does not mention cumulative impacts at all. *See* AR006804-05 (JA____-__). Instead, TDEC asks the public and the Court to take it at its word that none will occur. "Here, the agency decision is not accompanied by any explanation, let alone a satisfactory one." *U.S. Dep't of Interior*, 899 F.3d at 293; *see also Or. Nat'l Desert Ass'n v. BLM*, 625 F.3d 1092, 1121 (9th Cir. 2010) (holding that a court reviewing an agency action "cannot defer to a void").

TDEC was required to grapple with record evidence about the cumulative impact that pipeline construction would have on impacted waterbodies, and to show its work. To satisfactorily explain its ultimate conclusion, TDEC could not rely on bare recitals with "no further elaboration." *U.S. Dep't of Interior*, 899 F.3d at 293. Rubber stamping TDEC's work here "would be to accept an agency's blanket conclusions at face-value and to abdicate [the] Court's role to ensure that the agency has considered important aspects of the problem and rendered a decision that is at least rational." *Id.* (cleaned up); *see also Ky. Waterways All.*, 540 F.3d at 474 (recognizing that judicial review cannot result in rubber stamping unexplained agency actions).

## <u>CONCLUSION</u>

For the foregoing reasons, Petitioners respectfully request that this Court vacate TDEC's July 21, 2023 §401 Certification.

Dated:  May 31, 2024

Respectfully submitted,

/s/ **JAMES S. WHITLOCK**

JAMES S. WHITLOCK
SPENCER SCHEIDT
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org
Email: sscheidt@selcnc.org

STEPHANIE BIGGS
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Email: sbiggs@selctn.org

/S/ **DEREK O. TEANEY**

DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email: dteaney@appalmad.org

*Counsel for Petitioners*

**CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMIT**

This brief complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7), because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 12,744 words and has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

/s/ JAMES S. WHITLOCK
JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

## CERTIFICATE OF SERVICE

I hereby certify that, on May 31, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

**/s/ JAMES S. WHITLOCK**
JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org