No. 23-3682

# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

SIERRA CLUB, et al.,
*Petitioners*

v.

TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION, et al.,
*Respondents*

and

TENNESSEE GAS PIPELINE COMPANY, L.L.C.,
*Intervenor-Respondent*

On Petition for Review from the
Tennessee Department of Environment and Conservation's
§401 Water Quality Certification and ARAP Permit NRS 22.192 (July 21, 2023)

## ADDENDUM TO PETIONERS' OPENING BRIEF

JAMES S. WHITLOCK
SPENCER SCHEIDT
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

STEPHANIE BIGGS
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Email: sbiggs@selctn.org

DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES
PO Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email: dteaney@appalmad.org

*Counsel for Petitioners*

# <u>ADDENDUM TABLE OF CONTENTS</u>

## FEDERAL STATUTES
15 U.S.C. § 717r ........................................................................................AD003
33 U.S.C. § 1341 .......................................................................................AD006

## FEDERAL REGULATIONS
40 C.F.R. § 121.1 (2021)...........................................................................AD010
40 C.F.R. § 121.1 (2024)...........................................................................AD012
40 C.F.R. § 121.3(a)-(b) (2024) ...............................................................AD014
40 C.F.R. § 121.7 (2021)...........................................................................AD015
40 C.F.R. § 230.10 ....................................................................................AD018

## STATE STATUTES
Tenn. Code Ann. § 69-3-103......................................................................AD022
Tenn. Code Ann. § 69-3-108......................................................................AD028

## STATE REGULATIONS
TN ADC 0400-40-3-.02 .............................................................................AD038
TN ADC 0400-40-3-.04 .............................................................................AD041
TN ADC 0400-40-3-.05 .............................................................................AD046
TN ADC 0400-40-7-.01 .............................................................................AD056
TN ADC 0400-40-7-.03 .............................................................................AD058
TN ADC 0400-40-7-.04 .............................................................................AD062

## STANDING DECLARATIONS
Robert Connor.............................................................................................AD073
Charles Crow...............................................................................................AD082
Jerry Steven Shafer .....................................................................................AD091
Amy Kelly....................................................................................................AD098
Angela Mummaw.........................................................................................AD104

**ADDENDUM**

**FEDERAL STATUTES**



KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717r

§ 717r. Rehearing and review

Effective: August 8, 2005
Currentness

**(a) Application for rehearing; time**

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**(b) Review of Commission order**

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation,

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

**(c) Stay of Commission order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**(d) Judicial review**

**(1) In general**

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

**(2) Agency delay**

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

**(3) Court action**

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4) Commission action**

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**(5) Expedited review**

The Court shall set any action brought under this subsection for expedited consideration.

## CREDIT(S)

(June 21, 1938, c. 556, § 19, 52 Stat. 831; June 25, 1948, c. 646, § 32(a), 62 Stat. 991; May 24, 1949, c. 139, § 127, 63 Stat. 107; Pub.L. 85-791, § 19, Aug. 28, 1958, 72 Stat. 947; Pub.L. 109-58, Title III, § 313(b), Aug. 8, 2005, 119 Stat. 689.)

Notes of Decisions (791)

15 U.S.C.A. § 717r, 15 USCA § 717r
Current through P.L.118-7. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

AD005

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

> United States Code Annotated
>   Title 33. Navigation and Navigable Waters (Refs & Annos)
>     Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
>       Subchapter IV. Permits and Licenses (Refs & Annos)

33 U.S.C.A. § 1341

§ 1341. Certification

Currentness

**(a) Compliance with applicable requirements; application; procedures; license suspension**

**(1)** Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title. In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 1311(b) and 1312 of this title, and there is not an applicable standard under sections 1316 and 1317 of this title, the State shall so certify, except that any such certification shall not be deemed to satisfy section 1371(c) of this title. Such State or interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.

**(2)** Upon receipt of such application and certification the licensing or permitting agency shall immediately notify the Administrator of such application and certification. Whenever such a discharge may affect, as determined by the Administrator, the quality of the waters of any other State, the Administrator within thirty days of the date of notice of application for such Federal license or permit shall so notify such other State, the licensing or permitting agency, and the applicant. If, within sixty days after receipt of such notification, such other State determines that such discharge will affect the quality of its waters so as to violate any water quality requirements in such State, and within such sixty-day period notifies the Administrator and the licensing or permitting agency in writing of its objection to the issuance of such license or permit and requests a public hearing on such objection, the licensing or permitting agency shall hold such hearing. The Administrator shall at such hearing submit his evaluation and recommendations with respect to any such objection to the licensing or permitting agency. Such agency, based upon the recommendations of such State, the Administrator, and upon any additional evidence, if any, presented to the agency at the hearing, shall condition such license or permit in such manner as may be necessary to insure compliance with applicable water quality requirements. If the imposition of conditions cannot insure such compliance such agency shall not issue such license or permit.

AD006

**(3)** The certification obtained pursuant to paragraph (1) of this subsection with respect to the construction of any facility shall fulfill the requirements of this subsection with respect to certification in connection with any other Federal license or permit required for the operation of such facility unless, after notice to the certifying State, agency, or Administrator, as the case may be, which shall be given by the Federal agency to whom application is made for such operating license or permit, the State, or if appropriate, the interstate agency or the Administrator, notifies such agency within sixty days after receipt of such notice that there is no longer reasonable assurance that there will be compliance with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title because of changes since the construction license or permit certification was issued in (A) the construction or operation of the facility, (B) the characteristics of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements. This paragraph shall be inapplicable in any case where the applicant for such operating license or permit has failed to provide the certifying State, or, if appropriate, the interstate agency or the Administrator, with notice of any proposed changes in the construction or operation of the facility with respect to which a construction license or permit has been granted, which changes may result in violation of section 1311, 1312, 1313, 1316, or 1317 of this title.

**(4)** Prior to the initial operation of any federally licensed or permitted facility or activity which may result in any discharge into the navigable waters and with respect to which a certification has been obtained pursuant to paragraph (1) of this subsection, which facility or activity is not subject to a Federal operating license or permit, the licensee or permittee shall provide an opportunity for such certifying State, or, if appropriate, the interstate agency or the Administrator to review the manner in which the facility or activity shall be operated or conducted for the purposes of assuring that applicable effluent limitations or other limitations or other applicable water quality requirements will not be violated. Upon notification by the certifying State, or if appropriate, the interstate agency or the Administrator that the operation of any such federally licensed or permitted facility or activity will violate applicable effluent limitations or other limitations or other water quality requirements such Federal agency may, after public hearing, suspend such license or permit. If such license or permit is suspended, it shall remain suspended until notification is received from the certifying State, agency, or Administrator, as the case may be, that there is reasonable assurance that such facility or activity will not violate the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

**(5)** Any Federal license or permit with respect to which a certification has been obtained under paragraph (1) of this subsection may be suspended or revoked by the Federal agency issuing such license or permit upon the entering of a judgment under this chapter that such facility or activity has been operated in violation of the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

**(6)** Except with respect to a permit issued under section 1342 of this title, in any case where actual construction of a facility has been lawfully commenced prior to April 3, 1970, no certification shall be required under this subsection for a license or permit issued after April 3, 1970, to operate such facility, except that any such license or permit issued without certification shall terminate April 3, 1973, unless prior to such termination date the person having such license or permit submits to the Federal agency which issued such license or permit a certification and otherwise meets the requirements of this section.

**(b) Compliance with other provisions of law setting applicable water quality requirements**

Nothing in this section shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements. The Administrator shall, upon the request of any Federal department or agency, or State or interstate agency, or applicant, provide, for the purpose of this section, any relevant information on applicable effluent limitations, or other limitations, standards, regulations, or requirements, or water quality criteria, and shall, when requested by any such department or agency or State or interstate agency, or applicant, comment on any methods to comply with such limitations, standards, regulations, requirements, or criteria.

AD007

**(c) Authority of Secretary of the Army to permit use of spoil disposal areas by Federal licensees or permittees**

In order to implement the provisions of this section, the Secretary of the Army, acting through the Chief of Engineers, is authorized, if he deems it to be in the public interest, to permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees, and to make an appropriate charge for such use. Moneys received from such licensees or permittees shall be deposited in the Treasury as miscellaneous receipts.

**(d) Limitations and monitoring requirements of certification**

Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.

<div align="center">

**CREDIT(S)**

</div>

(June 30, 1948, c. 758, Title IV, § 401, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 877; amended Pub.L. 95-217, §§ 61(b), 64, Dec. 27, 1977, 91 Stat. 1598, 1599.)

Notes of Decisions (163)

33 U.S.C.A. § 1341, 33 USCA § 1341
Current through P.L.118-13. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

<div align="center">

AD008

</div>

**FEDERAL REGULATIONS**

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter D. Water Programs
        Part 121. State Certification of Activities Requiring a Federal License or Permit (Refs & Annos)
          Subpart A. General

This section has been updated. Click here for the updated version.

40 C.F.R. § 121.1

§ 121.1 Definitions.

Effective: September 11, 2020 to November 26, 2023

<In Louisiana v. American Rivers, 2022 WL 1019417, the US Supreme Court on April 6, 2022, ordered, "The district court's October 21, 2021 order, insofar as it vacates the current certification rule, 40 C.F.R. Part 121, is stayed pending disposition of the appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the petition for a writ of certiorari, if such a writ is timely sought. Should the petition for a writ of certiorari be denied, this order shall terminate automatically. In the event the petition for a writ of certiorari is granted, the order shall terminate upon the sending down of the judgment of this Court." See district court's order at In re Clean Water Act Rulemaking, 2021 WL 4924844 (N.D. Cal. 2021). See, also, Ninth Circuit's order at In re Clean Water Act Rulemaking, 2023 WL 2129631, 60 F.4th 583 (9th Cir. Feb. 21, 2023). See, now, amendments included in 88 FR 66558.>

(a) Administrator means the Administrator of the Environmental Protection Agency or an authorized representative.

(b) Certification means a water quality certification issued in accordance with Clean Water Act section 401 and this part.

(c) Certification request means a written, signed, and dated communication that satisfies the requirements of § 121.5(b) or (c).

(d) Certified project means a proposed project that has received a certification or for which the certification requirement has been waived.

(e) Certifying authority means the agency responsible for certifying compliance with applicable water quality requirements in accordance with Clean Water Act section 401.

(f) Discharge for purposes of this part means a discharge from a point source into a water of the United States.

(g) Federal agency means any agency of the Federal Government to which application is made for a license or permit that is subject to Clean Water Act section 401.

AD010

(h) License or permit means any license or permit granted by an agency of the Federal Government to conduct any activity which may result in a discharge.

(i) Neighboring jurisdiction means any other state or authorized tribe whose water quality the Administrator determines may be affected by a discharge for which a certification is granted pursuant to Clean Water Act section 401 and this part.

(j) Project proponent means the applicant for a license or permit or the entity seeking certification.

(k) Proposed project means the activity or facility for which the project proponent has applied for a license or permit.

(l) Reasonable period of time means the time period during which a certifying authority may act on a certification request, established in accordance with § 121.6 of this part.

(m) Receipt means the date that a certification request is documented as received by a certifying authority in accordance with applicable submission procedures.

(n) Water quality requirements means applicable provisions of §§ 301, 302, 303, 306, and 307 of the Clean Water Act, and state or tribal regulatory requirements for point source discharges into waters of the United States.

<center>&lt;Part effective until Nov. 27, 2023.&gt;</center>

SOURCE: 85 FR 42284, July 13, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Notes of Decisions (6)

End of Document                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

<center>AD011</center>

⚑ KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version Held Invalid  In re Clean Water Act Rulemaking,  N.D.Cal.,  Oct. 21, 2021

> Code of Federal Regulations
>   Title 40. Protection of Environment
>     Chapter I. Environmental Protection Agency (Refs & Annos)
>       Subchapter D. Water Programs
>         Part 121. State Certification of Activities Requiring a Federal License or Permit (Refs & Annos)
>           Subpart A. General

40 C.F.R. § 121.1

§ 121.1 Definitions.

Effective: November 27, 2023

Currentness

As used in this part, the following terms shall have the meanings indicated:

(a) Administrator means the Administrator, Environmental Protection Agency (EPA).

(b) Certifying authority means the entity responsible for certifying compliance with applicable water quality requirements in accordance with Clean Water Act section 401.

(c) Federal agency means any agency of the Federal Government to which application is made for a Federal license or permit that is subject to Clean Water Act section 401.

(d) Federal Indian Reservation, Indian reservation, or reservation means all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation.

(e) Indian Tribe or Tribe means any Indian Tribe, band, group, or community recognized by the Secretary of the Interior and exercising governmental authority over a Federal Indian Reservation.

(f) License or permit means any license or permit issued or granted by an agency of the Federal Government to conduct any activity which may result in any discharge into waters of the United States.

(g) Neighboring jurisdiction means any state, or Tribe with treatment in a similar manner as a state for Clean Water Act section 401 in its entirety or only for Clean Water Act section 401(a)(2), other than the jurisdiction in which the discharge originates or will originate.

AD012

(h) Project proponent means the applicant for a Federal license or permit, or the entity seeking certification.

(i) Regional Administrator means the Regional designee appointed by the Administrator, Environmental Protection Agency.

(j) Water quality requirements means any limitation, standard, or other requirement under sections 301, 302, 303, 306, and 307 of the Clean Water Act, any Federal and state or Tribal laws or regulations implementing those sections, and any other water quality-related requirement of state or Tribal law.

SOURCE: 88 FR 66661, Sept. 27, 2023, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Current through May 28, 2024, 89 FR 46035. Some sections may be more current. See credits for details.

                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD013

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    2

⚑ KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version Held Invalid  In re Clean Water Act Rulemaking,  N.D.Cal.,  Oct. 21, 2021

---

Code of Federal Regulations
   Title 40. Protection of Environment
      Chapter I. Environmental Protection Agency (Refs & Annos)
         Subchapter D. Water Programs
            Part 121. State Certification of Activities Requiring a Federal License or Permit (Refs & Annos)
               Subpart A. General

---

40 C.F.R. § 121.3

§ 121.3 Scope of certification.

Effective: November 27, 2023
Currentness

(a) When a certifying authority reviews a request for certification, the certifying authority shall evaluate whether the activity will comply with applicable water quality requirements. The certifying authority's evaluation is limited to the water quality-related impacts from the activity subject to the Federal license or permit, including the activity's construction and operation.

(b) Consistent with the scope of review identified in paragraph (a) of this section, a certifying authority shall include any conditions in a grant of certification necessary to assure that the activity will comply with applicable water quality requirements.

SOURCE: 88 FR 66661, Sept. 27, 2023, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Current through May 28, 2024, 89 FR 46035. Some sections may be more current. See credits for details.

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD014

---

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter D. Water Programs
        Part 121. State Certification of Activities Requiring a Federal License or Permit (Refs & Annos)
          Subpart B. Certification Procedures

This section has been updated. Click here for the updated version.

40 C.F.R. § 121.7

§ 121.7 Action on a certification request.

Effective: September 11, 2020 to November 26, 2023

<In Louisiana v. American Rivers, 2022 WL 1019417, the US Supreme Court on April 6, 2022, ordered, "The district court's October 21, 2021 order, insofar as it vacates the current certification rule, 40 C.F.R. Part 121, is stayed pending disposition of the appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the petition for a writ of certiorari, if such a writ is timely sought. Should the petition for a writ of certiorari be denied, this order shall terminate automatically. In the event the petition for a writ of certiorari is granted, the order shall terminate upon the sending down of the judgment of this Court." See district court's order at In re Clean Water Act Rulemaking, 2021 WL 4924844 (N.D. Cal. 2021). See, also, Ninth Circuit's order at In re Clean Water Act Rulemaking, 2023 WL 2129631, 60 F.4th 583 (9th Cir. Feb. 21, 2023). See, now, amendments included in 88 FR 66558.>

(a) Any action by the certifying authority to grant, grant with conditions, or deny a certification request must be within the scope of certification, must be completed within the reasonable period of time, and must otherwise be in accordance with section 401 of the Clean Water Act. Alternatively, a certifying authority may expressly waive certification.

(b) If the certifying authority determines that a discharge from a proposed project will comply with water quality requirements, it may issue or waive certification. If the certifying authority cannot certify that the discharge from a proposed project will comply with water quality requirements, it may deny or waive certification.

(c) Any grant of certification shall be in writing and shall include a statement that the discharge from the proposed project will comply with water quality requirements.

(d) Any grant of certification with conditions shall be in writing and shall for each condition include, at a minimum:

(1) For certification conditions on an individual license or permit,

(i) A statement explaining why the condition is necessary to assure that the discharge from the proposed project will comply with water quality requirements; and

AD015

(ii) A citation to federal, state, or tribal law that authorizes the condition.

(2) For certification conditions on issuance of a general license or permit,

(i) A statement explaining why the condition is necessary to assure that any discharge authorized under the general license or permit will comply with water quality requirements; and

(ii) A citation to federal, state, or tribal law that authorizes the condition.

(e) Any denial of certification shall be in writing and shall include:

(1) For denial of certification for an individual license or permit,

(i) The specific water quality requirements with which the discharge will not comply;

(ii) A statement explaining why the discharge will not comply with the identified water quality requirements; and

(iii) If the denial is due to insufficient information, the denial must describe the specific water quality data or information, if any, that would be needed to assure that the discharge from the proposed project will comply with water quality requirements.

(2) For denial of certification for issuance of a general license or permit,

(i) The specific water quality requirements with which discharges that could be authorized by the general license or permit will not comply;

(ii) A statement explaining why discharges that could be authorized by the general license or permit will not comply with the identified water quality requirements; and

(iii) If the denial is due to insufficient information, the denial must describe the types of water quality data or information, if any, that would be needed to assure that the range of discharges from potential projects will comply with water quality requirements.

(f) If the certifying authority determines that no water quality requirements are applicable to the waters receiving the discharge from the proposed project, the certifying authority shall grant certification.

<Part effective until Nov. 27, 2023.>

AD016

SOURCE: 85 FR 42284, July 13, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD017

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter H. Ocean Dumping
        Part 230. Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material (Refs & Annos)
          Subpart B. Compliance with the Guidelines

40 C.F.R. § 230.10

§ 230.10 Restrictions on discharge.

Currentness

Note: Because other laws may apply to particular discharges and because the Corps of Engineers or State 404 agency may have additional procedural and substantive requirements, a discharge complying with the requirement of these Guidelines will not automatically receive a permit.

Although all requirements in § 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities.

(a) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

(1) For the purpose of this requirement, practicable alternatives include, but are not limited to:

(i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;

(ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters;

(2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

(3) Where the activity associated with a discharge which is proposed for a special aquatic site (as defined in subpart E) does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

AD018

(4) For actions subject to NEPA, where the Corps of Engineers is the permitting agency, the analysis of alternatives required for NEPA environmental documents, including supplemental Corps NEPA documents, will in most cases provide the information for the evaluation of alternatives under these Guidelines. On occasion, these NEPA documents may address a broader range of alternatives than required to be considered under this paragraph or may not have considered the alternatives in sufficient detail to respond to the requirements of these Guidelines. In the latter case, it may be necessary to supplement these NEPA documents with this additional information.

(5) To the extent that practicable alternatives have been identified and evaluated under a Coastal Zone Management program, a section 208 program, or other planning process, such evaluation shall be considered by the permitting authority as part of the consideration of alternatives under the Guidelines. Where such evaluation is less complete than that contemplated under this subsection, it must be supplemented accordingly.

(b) No discharge of dredged or fill material shall be permitted if it:

(1) Causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard;

(2) Violates any applicable toxic effluent standard or prohibition under section 307 of the Act;

(3) Jeopardizes the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of Interior or Commerce, as appropriate, to be a critical habitat under the Endangered Species Act of 1973, as amended. If an exemption has been granted by the Endangered Species Committee, the terms of such exemption shall apply in lieu of this subparagraph;

(4) Violates any requirement imposed by the Secretary of Commerce to protect any marine sanctuary designated under title III of the Marine Protection, Research, and Sanctuaries Act of 1972.

(c) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States. Findings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests required by subparts B and G, after consideration of subparts C through F, with special emphasis on the persistence and permanence of the effects outlined in those subparts. Under these Guidelines, effects contributing to significant degradation considered individually or collectively, include:

(1) Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites;

(2) Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes;

AD019

(3) Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy; or

(4) Significantly adverse effects of discharge of pollutants on recreational, aesthetic, and economic values.

(d) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem. Subpart H identifies such possible steps.

SOURCE: 45 FR 85344, Dec. 24, 1980; 80 FR 37115, June 29, 2015; 84 FR 56669, Oct. 22, 2019; 85 FR 22341, April 21, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Notes of Decisions (314)

Current through May 28, 2024, 89 FR 46035. Some sections may be more current. See credits for details.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD020

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**STATE STATUTES**

KeyCite Red Flag - Severe Negative Treatment

Enacted Legislation   Amended by   2024 Tennessee Laws Pub. Ch. 771 (S.B. 2100),

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

West s Tennessee Code Annotated
   Title 69. Waters, Waterways, Drains and Levees
      Chapter 3. Water Pollution Control (Refs & Annos)
         Part 1. Water Quality Control Act

T. C. A. § 69-3-103

§ 69-3-103. Definitions

Effective: July 1, 2018

Currentness

As used in this part, unless the context otherwise requires:

(1) "Administrator" means the administrator, or head by whatever name, of the United States environmental protection agency;

(2) "Animal feeding operation" means a lot or facility, other than an aquatic animal production facility, where the following conditions are met:

  (A) Animals, other than aquatic animals, have been, are, or will be stabled or confined and fed or maintained for a total of forty-five (45) days or more in any twelve-month period; and

  (B) Crops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility;

(3) "Areawide waste treatment management plan" means a plan that has been approved by the administrator pursuant to § 208 of the Federal Water Pollution Control Act, Public Law 92-500 (33 U.S.C. § 1288);

(4) "Board" means the board of water quality, oil and gas, created in § 69-3-104;

(5) "Boat" means any vessel or watercraft moved by oars, paddles, sails or other power mechanism, inboard or outboard, or any vessel or structure floating upon the water whether or not capable of self-locomotion, including, but not limited to, houseboats, barges, docks, and similar floating objects;

(6) "Commissioner" means the commissioner of environment and conservation or the commissioner's duly authorized representative and, in the event of the commissioner's absence or a vacancy in the office of commissioner, the deputy commissioner;

(7) "Construction" means any placement, assembly, or installation of facilities or equipment, including contractual obligations to purchase such facilities or equipment, at the premises where such equipment will be used, including preparation work at such premises;

(8) "Department" means the department of environment and conservation;

(9) "Director" means the director of the division of water management of the department;

(10) "Discharge of a pollutant," "discharge of pollutants," and "discharge," when used without qualification, each refer to the addition of pollutants to waters from a source;

(11) "Division" means the division of water management;

(12) "Effluent limitation" means any restriction, established by the board or the commissioner, on quantities, rates and concentrations of chemical, physical, biological, and other constituents that are discharged into waters or adjacent to waters;

(13) "Forestry best management practices" means those land and water resource conservation measures that prevent, limit, or eliminate water pollution for forest resource management purposes, as provided in rules promulgated in this part in accordance with § 11-4-301(d)(18). Until those rules are effective, "forestry best management practices" will be those that have been developed by the division of forestry of the department of agriculture. The commissioner of agriculture shall specifically identify these interim forestry best management practices prior to September 1, 2000;

(14) "Industrial user" means those industries identified in the standard industrial classification manual, bureau of the budget, 1967, as amended and supplemented, under the category "Division D--Manufacturing" and such other classes of significant waste producers as the board or commissioner deems appropriate;

(15) "Industrial wastes" means any liquid, solid, or gaseous substance, or combination thereof, or form of energy including heat, resulting from any process of industry, manufacture, trade, or business or from the development of any natural resource;

(16) "Liquid waste management system" means a waste management system that collects, stores, or land applies manure in a liquid, flowable form;

(17) "Local administrative officer" means the chief administrative officer of a pretreatment agency that has adopted and implemented an approved pretreatment program pursuant to this part and 33 U.S.C. § 1251 et seq. and 40 CFR 403.1 et seq.;

AD023

(18) "Local hearing authority" means the administrative board created pursuant to an approved pretreatment program that is responsible for the administration and enforcement of that program and §§ 69-3-123 -- 69-3-129;

(19) "Member" means a member of the board of water quality, oil and gas;

(20) "Municipal separate storm sewer system" means a municipal separate storm sewer system as defined in the Clean Water Act (33 U.S.C. § 1251 et seq.), and the rules promulgated thereunder;

(21) "New source" means any source, the construction of which is commenced after the publication of state or federal regulations prescribing a standard of performance applicable to such source;

(22) "Obligate lotic aquatic organisms" means organisms that require flowing water for all or almost all of the aquatic phase of their life cycles;

(23) "Operator" as used in the context of silvicultural activities, means any person who conducts or exercises control over any silvicultural activities; provided, however, that the term "operator" does not include an owner if the silvicultural activities are being conducted by an independent contractor;

(24) "Other wastes" means any and all other substances or forms of energy, with the exception of sewage and industrial wastes, including, but not limited to, decayed wood, sand, garbage, silt, municipal refuse, sawdust, shavings, bark, lime, ashes, offal, oil, hazardous materials, tar, sludge, or other petroleum byproducts, radioactive material, chemicals, heated substances, dredged spoil, solid waste, incinerator residue, sewage sludge, munitions, biological materials, wrecked and discarded equipment, rock, and cellar dirt;

(25) "Owner" as used in the context of silvicultural activities, means any person or persons that own or lease land on which silvicultural activities occur or own timber on land on which silvicultural activities occur;

(26) "Owner or operator" means any person who owns, leases, operates, controls, or supervises a source;

(27) "Person" means any and all persons, including individuals, firms, partnerships, associations, public or private institutions, state and federal agencies, municipalities or political subdivisions, or officers thereof, departments, agencies, or instrumentalities, or public or private corporations or officers thereof, organized or existing under the laws of this or any other state or country;

(28) "Pollutant" means sewage, industrial wastes, or other wastes;

(29) "Pollution" means such alteration of the physical, chemical, biological, bacteriological, or radiological properties of the waters of this state, including, but not limited to, changes in temperature, taste, color, turbidity, or odor of the waters that will:

   (A) Result or will likely result in harm, potential harm or detriment to the public health, safety, or welfare;

AD024

(B) Result or will likely result in harm, potential harm or detriment to the health of animals, birds, fish, or aquatic life;

(C) Render or will likely render the waters substantially less useful for domestic, municipal, industrial, agricultural, recreational, or other reasonable uses; or

(D) Leave or likely leave the waters in such condition as to violate any standards of water quality established by the board;

(30) "Pretreatment agency" means the owner of a publicly owned treatment works permitted pursuant to this part that is required by its permit to adopt and enforce an approved pretreatment program that complies with this part and 33 U.S.C. § 1251 et seq. and 40 CFR 403.1 et seq.;

(31) "Pretreatment program" means the rules, regulations, and/or ordinances of a pretreatment agency regulating the discharge and treatment of industrial waste that complies with this part and 33 U.S.C. § 1251 et seq. and 40 CFR 403.1 et seq.;

(32) "Qualified local program" means a municipal separate storm sewer system that has been approved as such by the department pursuant to this part;

(33) "Regional administrator" means the regional administrator of the United States environmental protection agency whose region includes Tennessee, or any person succeeding to the duties of this official;

(34) "Schedules of compliance" means a schedule of remedial measures including an enforceable sequence of actions or operations leading to compliance with an effluent limitation, condition of a permit, other limitation, prohibition, standard, or regulation;

(35) "Sewage" means water-carried waste or discharges from human beings or animals, from residences, public or private buildings, or industrial establishments, or boats, together with such other wastes and ground, surface, storm, or other water as may be present;

(36) "Sewerage system" means the conduits, sewers, and all devices and appurtenances by means of which sewage and other waste is collected, pumped, treated, or disposed;

(37) "Silvicultural activities" means those forest management activities associated with the harvesting of timber and including, without limitation, the construction of roads and trails;

(38) "Source" means any activity, operation, construction, building, structure, facility, or installation from which there is or may be the discharge of pollutants;

(39) "Standard of performance" means a standard for the control of the discharge of pollutants that reflects the greatest degree of effluent reduction that the commissioner determines to be achievable through application of the best available demonstrated

AD025

control technology, processes, operating methods, or other alternatives, including, where practicable, a standard permitting no discharge of pollutants;

(40) "Stop work order" means an order issued by the commissioner of environment and conservation requiring the operator to immediately cease part or all silvicultural activities;

(41) "Stream" means a surface water that is not a wet weather conveyance;

(42) "Toxic effluent limitation" means an effluent limitation on those pollutants or combinations of pollutants, including disease-causing agents, which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will, on the basis of available information, cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions, including malfunctions in reproduction, or physical deformations, in such organisms or their offspring;

(43) "Variance" means an authorization issued to a person by the commissioner that would allow that person to cause a water quality standard to be exceeded for a limited time period without changing the standard;

(44) "Watercourse" means a man-made or natural hydrologic feature with a defined linear channel that discretely conveys flowing water, as opposed to sheet-flow;

(45) "Waters" means any and all water, public or private, on or beneath the surface of the ground, that are contained within, flow through, or border upon Tennessee or any portion thereof, except those bodies of water confined to and retained within the limits of private property in single ownership that do not combine or effect a junction with natural surface or underground waters; and

(46) "Wet weather conveyance" means, notwithstanding any other law or rule to the contrary, man-made or natural watercourses, including natural watercourses that have been modified by channelization:

(A) That flow only in direct response to precipitation runoff in their immediate locality;

(B) Whose channels are at all times above the groundwater table;

(C) That are not suitable for drinking water supplies; and

(D) In which hydrological and biological analyses indicate that, under normal weather conditions, due to naturally occurring ephemeral or low flow there is not sufficient water to support fish, or multiple populations of obligate lotic aquatic organisms whose life cycle includes an aquatic phase of at least two (2) months.

**Credits**

1971 Pub.Acts, c. 164, § 3; 1977 Pub.Acts, c. 366, § 1; 1984 Pub.Acts, c. 804, § 1; 1987 Pub.Acts, c. 111, § 1; 1988 Pub.Acts, c. 688, §§ 2, 6; 1992 Pub.Acts, c. 693, § 1; 1998 Pub.Acts, c. 735, § 1, eff. April 8, 1998; 2000 Pub.Acts, c. 680, § 1; 2009

AD026

Pub.Acts, c. 464, § 1, eff. June 23, 2009; 2012 Pub.Acts, c. 1019, § 1; 2017 Pub.Acts, c. 293, § 1, eff. July 1, 2018; 2018 Pub.Acts, c. 523, §§ 1, 3, eff. July 1, 2018.

**Formerly** § 70-326.

T. C. A. § 69-3-103, TN ST § 69-3-103

Current with effective legislation through Chapter 774 of the 2024 Regular Session of the 113th Tennessee General Assembly. Some sections may be more current; see credits for details. Pursuant to §§ 1-1-110, 1-1-111, and 1-2-114, the Tennessee Code Commission certifies the final, official version of the Tennessee Code and, until then, may make editorial changes to the statutes. References to the updates made by the most recent legislative session should be to the Public Chapter and not to the T.C.A. until final revisions have been made to the text, numbering, and hierarchical headings on Westlaw to conform to the official text. Unless legislatively provided, section name lines are prepared by the publisher.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

⚑  KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West s Tennessee Code Annotated
  Title 69. Waters, Waterways, Drains and Levees
    Chapter 3. Water Pollution Control (Refs & Annos)
      Part 1. Water Quality Control Act

T. C. A. § 69-3-108

§ 69-3-108. Licenses and permits

Effective: May 5, 2023

Currentness

(a) Every person who is or is planning to carry on any of the activities outlined in subsection (b), other than a person who discharges into a publicly owned treatment works or who is a domestic discharger into a privately owned treatment works, or who is regulated under a general permit as described in subsection (*l*), shall file an application for a permit with the commissioner or, when necessary, for modification of such person's existing permit.

(b) It is unlawful for any person, other than a person who discharges into a publicly owned treatment works or a person who is a domestic discharger into a privately owned treatment works, to carry out any of the following activities, except in accordance with the conditions of a valid permit:

(1) The alteration of the physical, chemical, radiological, biological, or bacteriological properties of any waters of the state;

(2) The construction, installation, modification, or operation of any treatment works, or part thereof, or any extension or addition thereto;

(3) The increase in volume or strength of any wastes in excess of the permissive discharges specified under any existing permit;

(4) The development of a natural resource or the construction, installation, or operation of any establishment or any extension or modification thereof or addition thereto, the operation of which will or is likely to cause an increase in the discharge of wastes into the waters of the state or would otherwise alter the physical, chemical, radiological, biological or bacteriological properties of any waters of the state in any manner not already lawfully authorized;

(5) The construction or use of any new outlet for the discharge of any wastes into the waters of the state;

(6) The discharge of sewage, industrial wastes or other wastes into waters, or a location from which it is likely that the discharged substance will move into waters;

**AD028**

(7)(A) The construction, installation, or operation of a liquid waste management system supporting an animal feeding operation that stables or confines as many as, or more than, the numbers of animals specified by federal law defining a large concentrated animal feeding operation;

(B) A state operating permit issued pursuant to this subdivision (b)(7) shall be enforceable only in regards to submission and maintenance of a current approved nutrient management plan;

(C) Animal feeding operations that are not required under this subdivision (b)(7) to have a permit may apply for and be issued a state operating permit. An animal feeding operation issued a state operating permit pursuant to this subdivision (b)(7) is required to conduct such operations in accordance with the permit;

(8) The discharge of sewage, industrial wastes, or other wastes into a well or a location where it is likely that the discharged substance will move into a well, or the underground placement of fluids and other substances that do or may affect the waters of the state;

(9) The diversion of water through a flume for the purpose of generation of electric power by a utility; or

(10)(A) Animal feeding operations that are required under the federal Clean Water Act (33 U.S.C. § 1251 et seq.), to have a permit for concentrated animal feeding operations. Such operations must be conducted in accordance with the conditions of a valid national pollutant discharge elimination system (NPDES) permit;

(B) Animal feeding operations that are not required under the federal Clean Water Act to have a permit for concentrated animal feeding operations may apply for and, if eligible under federal law, be issued a NPDES permit. An animal feeding operation issued a NPDES permit pursuant to this subdivision (b)(10)(B) is required to conduct such operations in accordance with the permit.

(c) Any person operating or planning to operate a sewerage system shall file an application with the commissioner for a permit or, when necessary, for modification of such person's existing permit. Unless a person holds a valid permit, it is unlawful to operate a sewerage system.

(d) Nothing in this section shall be construed to require any person discharging into a septic tank connected only to a subsurface drainfield, or any person constructing or operating a sanitary landfill between March 25, 1980, and March 24, 1982, except in a county having a population of not less than sixty thousand two hundred fifty (60,250) nor more than sixty thousand three hundred fifty (60,350), according to the 1970 federal census or any subsequent federal census, as defined and regulated by §§ 68-211-101 -- 68-211-115, to secure a permit; provided, that the exemption provided in this subsection (d) shall not exempt such person from any other provision of this part; and provided further, that any such person who is exempt from obtaining a permit for constructing or operating a sanitary landfill between March 25, 1980, and March 24, 1982, shall not thereafter be required to obtain such permit.

(e) Applicants for permits that would authorize a new or expanded wastewater discharge into surface waters shall include in the application consideration of alternatives, including, but not limited to, land application and beneficial reuse of the wastewater.

AD029

(f) With regard to permits for activities related to the surface mining of coal:

(1) No permit shall be issued that would allow removal of coal from the earth from its original location by surface mining methods or surface access points to underground mining within one hundred feet (100′) of the ordinary high water mark of any stream or allow overburden or waste materials from removal of coal from the earth by surface mining of coal to be disposed of within one hundred feet (100′) of the ordinary high water mark of a stream; provided, however, that a permit may be issued or renewed for stream crossings, including, but not limited to, rail crossings, utilities crossings, pipeline crossings, minor road crossings, for operations to improve the quality of stream segments previously disturbed by mining and for activities related to and incidental to the removal of coal from its original location, such as transportation, storage, coal preparation and processing, loading and shipping operations within one hundred feet (100′) of the ordinary high water mark of a stream if necessary due to site specific conditions that do not cause the loss of stream function and do not cause a discharge of pollutants in violation of water quality criteria. Nothing in this subdivision (f)(1) shall apply to placement of material from coal preparation and processing plants;

(2) Without limiting the applicability of this section, if the commissioner determines that surface coal mining at a particular site will violate water quality standards because acid mine drainage from the site will not be amenable to treatment with proven technology both during the permit period or subsequent to completion of mining activities, the permit shall be denied.

(g)(1) The commissioner may grant permits authorizing the discharges or activities described in subsection (b), including, but not limited to, land application of wastewater, but in granting such permits shall impose such conditions, including effluent standards and conditions and terms of periodic review, as are necessary to accomplish the purposes of this part, and as are not inconsistent with the regulations promulgated by the board.

(2) Under no circumstances shall the commissioner issue a permit for an activity that would cause a condition of pollution either by itself or in combination with others.

(3) If a permit is required under this part for a public transportation project commissioned by a federal, state, or local government, the alternatives analysis required by Tenn. Comp. R & Regs. 0400-40-07-.04(5) does not need to include alternative road locations but must include other measures to avoid and minimize impacts to resource values.

(4) In addition, the permits shall include:

(A) The most stringent effluent limitations and schedules of compliance, either promulgated by the board, required to implement any applicable water quality standards, necessary to comply with an area-wide waste treatment plan, or necessary to comply with other state or federal laws or regulations;

(B) A definite term, not to exceed five (5) years, for which the permit is valid. This term is subject to provisions for modification, revocation, or suspension of the permit;

(C) Monitoring, recording, reporting, and inspection requirements;

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

(D) In the case of permits authorizing discharges from publicly owned treatment works, terms and conditions requiring the permittee to enforce user and cost recovery charges, pretreatment standards, and toxic effluent limitations applicable to industrial users discharging into the treatment works; and

(E) In the case of permits authorizing permanent impacts to waters of the state, provision for adequate compensatory mitigation to not result in a condition of pollution, by mitigation banking, permittee-responsible mitigation, or in-lieu fee payments as approved by the department:

(i) No sponsor of an in-lieu fee instrument may accept in-lieu fee payments for a project in this state unless the sponsor's in-lieu fee instrument requires the sponsor, as to both new and previously sold in-lieu fee credits, to agree that the department may bring an enforcement action pursuant to subdivision (g)(4)(E)(ii) if the sponsor fails to complete land acquisition and initial physical and biological improvements by the third full growing season after the first advance credit in that service area is secured by a permittee, unless the district engineer for the United States army corps of engineers determines that more or less time is needed to plan and implement an in-lieu fee project;

(ii) If an in-lieu fee sponsor fails to complete land acquisition and initial physical and biological improvements by the third full growing season after the first advance credit in that service area is secured by a permittee, unless the district engineer for the United States army corps of engineers determines that more or less time is needed to plan and implement an in-lieu fee project, and the sponsor's instrument complies with subdivision (g)(4)(E)(i), then the department may bring an enforcement action in the chancery court of Davidson County to require the in-lieu fee sponsor to solicit proposals to procure appropriate mitigation credits from qualified third parties to provide for equivalent compensatory mitigation;

(iii) For purposes of this subdivision (g)(4)(E), "equivalent compensatory mitigation" means mitigation equivalent, to the extent practicable as determined by the department, to the amount and nature of mitigation purchased by the original in-lieu fee payment; and

(iv) Proposals received by the in-lieu fee sponsor pursuant to an action brought by the department pursuant to subdivision (g)(4)(E)(ii) must be submitted for approval by the in-lieu fee sponsor to the department. To the extent permitted by federal law, upon approval by the department and the purchase of such mitigation credits by the in-lieu fee sponsor, the in-lieu fee sponsor is considered to have performed the original required mitigation.

(5) Underground injection activities authorized by rule are not subject to a definite term.

(h) The commissioner may revoke, suspend, or modify any permit for cause, including:

(1) Violation of any terms or conditions of the permit or of any provision of this part;

(2) Obtaining the permit by misrepresentation or failing to disclose fully all relevant facts; or

(3) A change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge.

AD031

(i) No permit under subsection (g) or (h) for the construction of any new outlet or for construction activities involved in the development of natural resources, for the construction of a new waste treatment system or for the modification or extension of an existing waste treatment system shall be issued by the commissioner until the plans have first been submitted to and approved by the commissioner. No such approval shall be construed as creating a presumption of correct operation nor as warranting by the commissioner that the approved facilities will reach the designated goals. If an environmental impact statement is required for any permit, the commissioner may require the applicant to pay for its preparation. Any such impact statement must also include and address economic and social impact.

(j) Any permit procedure or other action required by or undertaken in accordance with this section or part shall be conducted in accordance with title 13, chapter 18, when the permit or action involves a major energy project, as defined in § 13-18-102.

(k) Nothing in this section shall be construed to limit or circumscribe the authority of the commissioner to issue emergency orders as specified in § 69-3-109.

(l) Where the commissioner finds that a category of activities or discharges would be appropriately regulated under a general permit, the commissioner may issue such a permit. Any person conducting activities in the category covered by a general permit shall not be required to file individual applications for permits except as provided in specific requirements of the general permit. Any person conducting activities covered under a general permit may be required by the commissioner to file an application for any individual permit. Upon the issuance of an individual permit to a person with a general permit, the applicability of the general permit to that permitted activity or discharge shall be terminated. Any person who holds an individual permit for an activity or discharge covered under a general permit may request that the individual permit be revoked. Upon such revocation, the activity or discharge shall become subject to the general permit.

(m) Notwithstanding subsection (g), upon application by a person who discharges into groundwaters of the state and who is subject to a permit issued pursuant to the Hazardous Waste Management Act, compiled in title 68, chapter 212, the commissioner may issue variances from the applicable water quality standards, criteria, or classification for groundwater; provided, that:

(1) The waters to which the variance applies are not used as a current source of drinking water and such use is not reasonably anticipated for the term of the variance and a reasonable time thereafter;

(2) The applicant demonstrates that such discharges will not pose a substantial present or potential hazard to human health or the environment as defined in Tenn. Comp. R. & Reg. 1200-01-11-.06(6)(e)(2) (reserved) in effect on April 1, 1988, and will not impair any actual, current uses other than those affected by the variance;

(3) Variances will be effective for a specific term, not to exceed the effective term of the permit;

(4) The variance is consistent with the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), and the federal Safe Drinking Water Act (42 U.S.C. § 300f et seq.); and

(5) The variance provided for under this subsection (m) shall be applied for and issued in accordance with procedures regarding the issuance of permits as required by regulations issued under this chapter.

AD032

(n)(1) A chief administrative officer of a county highway department does not violate this chapter by repairing or causing the repair of up to four hundred feet (400′) of highway or road in an emergency situation, if immediate repairs are necessary to protect human safety and welfare, and if such repairs comply with rules and regulations promulgated by the board that regulate the manner in which the repairs are made. Such officer need not obtain a permit prior to making such repairs under such circumstances.

(2) As soon as practicable, the chief administrative officer of a county highway department shall notify the commissioner by telephone that an emergency has arisen and that such chief administrative officer intends to make repairs in response to such emergency. The giving of such notice shall not be construed to authorize the commissioner to terminate such repairs.

(3) Within ten (10) days of the completion of any highway or road repair made pursuant to this subsection (n), the chief administrative officer of the county highway department ordering such repair shall notify the commissioner, in writing, of the action taken and the nature of the emergency necessitating such immediate repair.

(o) The following activities do not require a permit under this section:

(1) The removal of downed trees by dragging or winching and without grading or reshaping of the stream channel;

(2) The placement of downed trees on stream banks for erosion protection; and

(3) The planting of vegetation on stream banks.

(p) Unless the applicant agrees otherwise, when an individual landowner applies for a permit for debris removal or stream bank stabilization activities, the commissioner shall either issue or deny the permit or take action scheduling a public hearing on the application within sixty (60) days of receipt of a complete application; provided further, however, that the staff of the division will communicate orally or in writing to the applicant within fifteen (15) days of receipt of any such application.

(q)(1) The alteration of a wet weather conveyance, as defined in § 69-3-103, by any activity is permitted by this subsection (q) and shall require no notice or approval; provided, that it is done in accordance with all of the following conditions:

(A) The activity may not result in the discharge of waste or other substances that may be harmful to humans or wildlife;

(B) Material may not be placed in a location or manner so as to impair surface water flow into or out of any wetland area;

(C)(i) Sediment shall be prevented from entering other waters of the state;

(ii) Erosion and sediment controls shall be designed according to the size and slope of disturbed or drainage areas to detain runoff and trap sediment and shall be properly selected, installed, and maintained in accordance with the manufacturer's specifications and good engineering practices;

AD033

(iii) Erosion and sediment control measures shall be in place and functional before earth moving operations begin, and shall be constructed and maintained throughout the construction period. Temporary measures may be removed at the beginning of the work day, but shall be replaced at the end of the work day;

(iv) Checkdams shall be utilized where runoff is concentrated. Clean rock, log, sandbag or straw bale checkdams shall be properly constructed to detain runoff and trap sediment. Checkdams or other erosion control devices are not to be constructed in stream. Clean rock can be of various type and size, depending on the application. Clean rock shall not contain fines, soils or other wastes or contaminants; and

(D) Appropriate steps shall be taken to ensure that petroleum products or other chemical pollutants are prevented from entering waters of the state. All spills shall be reported to the appropriate emergency management agency and to the division. In the event of a spill, measures shall be taken immediately to prevent pollution of waters of the state, including groundwater.

(2) There shall be no additional conditions upon a person's activity within a wet weather conveyance. This subdivision (q)(2) does not apply to national pollutant discharge elimination system (NPDES) permits.

(r) A person desiring to alter a specific water of the state may request a determination from the commissioner that it is a wet weather conveyance and submit a report from a qualified hydrologic professional in support of the request. If the report contains all information that is required in rules promulgated by the board, and in accordance with department procedures and guidance, and is certified by a qualified hydrologic professional to be true, accurate and complete and, if submitted after promulgation of the rules required by § 69-3-105(m), contains all information that is required in those rules, then the determination made in the report shall be presumed to be correct, unless the commissioner notifies the person, in writing, within thirty (30) days of submittal of the report, that the commissioner has affirmatively determined that there is a significant question about whether the water of the state in question is a stream or a wet weather conveyance and states the reasons for that determination. In that event, the commissioner must, within thirty (30) days following the initial notification, determine whether the water of the state in question is a stream or a wet weather conveyance and notify the person in writing of that decision and the reasons for that determination. A person may appeal a determination by the commissioner that the specific water is a stream by filing a petition for appeal with the board within thirty (30) days of receiving the commissioner's decision. For purposes of this subsection (r), a qualified hydrologic professional is a person holding a bachelor's degree in biology, geology, ecology, engineering or related sciences, having at least five (5) years of relevant experience in making hydrologic determinations and who has been certified as a hydrologic professional pursuant to rules promulgated by the board.

(s) Any NPDES permit issued pursuant to this section to a local governmental entity administering a municipal separate storm sewer system shall not impose post-construction storm water requirements, except to the extent necessary to comply with the minimum requirements of federal law. Any such NPDES permit that includes numeric or narrative effluent limitations to manage post-construction storm water shall allow the local governmental entity administering a municipal separate storm sewer system discretion in selecting measures to meet any such effluent limitations. These numeric or narrative effluent limitations to manage post-construction stormwater shall be adopted by the board as rules pursuant to the Uniform Administrative Procedures Act, compiled in title 4, chapter 5.

(t) This state shall not require any local governmental entity that administers a municipal separate storm sewer system under a NPDES permit issued pursuant to this section to impose control measures for post-construction storm water that exceed the minimum requirements of federal law. Any local governmental entity that adopts control measures that exceed the minimum requirements of federal law must do so by ordinance or resolution, as appropriate, by the local legislative body upon a majority

AD034

vote. This subsection (t) shall not apply to any ordinance or resolution in effect on April 23, 2016, but shall not preclude a local governmental entity that administers a municipal separate storm sewer system from making changes consistent with subsection (s) and this subsection (t). When a local governmental entity seeks coverage under any future version of the NPDES permit after April 23, 2016, such ordinance or resolution shall comply with subsection (s) and this subsection (t). The local government entity shall provide in writing the control measures that exceed federal minimum requirements to the local legislative body at least thirty (30) days in advance of a vote in order to provide for a public comment period.

(u)(1) Notwithstanding any other law, a person who has contracted for the right to store water in a reservoir owned by the U.S. Army Corps of Engineers shall have exclusive rights to any return flows generated directly or indirectly to that reservoir by the person. The rights conferred by this subsection (u) shall be subject to any regulatory requirements imposed by the commissioner and to the availability to the person of unused storage capacity within the reservoir to store such return flows.

(2) As used in this subsection (u), "return flow" means water that is discharged directly or indirectly to a reservoir from a water reclamation facility.

(v)(1) Compliance with a NPDES permit issued under this section shall be deemed compliance for purposes of §§ 69-3-109; 69-3-114(a); 69-3-114(b) with respect to this part or any rule, regulation, or standard of water quality promulgated by the board; 69-3-115; 69-3-116; 69-3-117; and 69-3-118(a), except for any standard imposed under Section 307 of the Federal Water Pollution Control Act [1] for a toxic pollutant injurious to human health.

(2) Compliance includes the discharge of pollutants for which no standard or limit is set forth in the permit if:

(A) The permit holder complies with applicable reporting and disclosure requirements under this part; and

(B) The discharge of pollutants is disclosed to the department in such a manner that the discharge is within the reasonable contemplation of the department at the time of issuance of the final permit.

(w) Watershed activities conducted in accordance with a site-specific design developed through full application of the Natural Resource Conservation Service (NRCS) Conservation Practice Standard 580 (Tennessee) and NRCS Engineering Field Handbook, Chapter 16 Streambank and Shoreline Protection, and subject to NRCS oversight as a federal action, do not result in pollution and do not require compensatory mitigation. Such watershed activities shall be regulated under a general permit for aquatic alterations pursuant to subsection (*l*). The commissioner shall draft an initial general permit authorizing such watershed activities, conduct public notice in accordance with the board's rules, and issue the initial general permit no later than December 31, 2020. Thereafter, the commissioner shall ensure timely renewal of the general permit.

(x)(1) The department may issue an aquatic resource alteration permit to a person in connection with the removal of sand, gravel, and similar sediments or deposits from streams or wetlands.

(2) A person who is issued a permit under this section associated with the commercial recovery of sand, gravel, and similar sediments or deposits, from a stream or wetland that is the property of this state is deemed to have received ownership of these materials from this state upon removal by the permittee from the stream or wetland and payment to this state as provided in subdivision (x)(3), notwithstanding the provisions of title 12 or another law to the contrary.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    8

(3) If the permittee removes sand, gravel, or similar sediments from property of this state, it shall compensate the state for two and one-half percent (2.5%) of the market value of the finished product.

(4) The department shall not grant a permit associated with the removal of sand, gravel, or similar sediments from streams or wetlands located on private property unless the permit applicant owns the property, owns the mineral estate, or has received written consent from the private property owner, and has submitted documentation of such ownership or consent to the department.

**Credits**

1971 Pub.Acts, c. 164, § 7; 1971 Pub.Acts, c. 386, § 2; 1973 Pub.Acts, c. 105, § 1; 1977 Pub.Acts, c. 366, § 1; 1980 Pub.Acts, c. 647, §§ 1, 2; 1981 Pub.Acts, c. 131, § 43; 1983 Pub.Acts, c. 38, § 1; 1984 Pub.Acts, c. 804, § 6; 1988 Pub.Acts, c. 688, §§ 3, 7; 1989 Pub.Acts, c. 114, § 1; 1993 Pub.Acts, c. 155, § 1, eff. April 12, 1993; 1998 Pub.Acts, c. 659, § 4, eff. March 25, 1998; 1998 Pub.Acts, c. 735, § 2, eff. April 8, 1998; 2004 Pub.Acts, c. 519, § 1, eff. April 12, 2004; 2009 Pub.Acts, c. 271, § 1, eff. May 21, 2009; 2009 Pub.Acts, c. 289, § 2, eff. May 21, 2009; 2009 Pub.Acts, c. 330, § 1, eff. June 1, 2009; 2009 Pub.Acts, c. 464, §§ 2, 5, eff. June 23, 2009; 2016 Pub.Acts, c. 1007, § 1, eff. April 23, 2016; 2017 Pub.Acts, c. 220, § 1, eff. July 1, 2017; 2017 Pub.Acts, c. 293, § 2, eff. July 1, 2018; 2018 Pub.Acts, c. 496, § 1, eff. Feb. 22, 2018; 2018 Pub.Acts, c. 523, §§ 2, 3, eff. July 1, 2018; 2018 Pub.Acts, c. 845, § 1, eff. April 26, 2018; 2019 Pub.Acts, c. 110, § 1, eff. April 11, 2019; 2020 Pub.Acts, c. 589, § 1, eff. March 20, 2020; 2021 Pub.Acts, c. 208, § 1, eff. April 22, 2021; 2023 Pub.Acts, c. 85, § 1, eff. March 31, 2023; 2023 Pub.Acts, c. 342, § 1, eff. May 5, 2023.

**Formerly** § 70-330.

Notes of Decisions (8)

**Footnotes**

1    See 33 U.S.C.A. § 1317.

T. C. A. § 69-3-108, TN ST § 69-3-108
Current with laws from the 2023 Regular Sess. and 1st Extraordinary Sess. of the 113th Tennessee General Assembly. Pursuant to §§ 1-1-110, 1-1-111, and 1-2-114, the Tennessee Code Commission certifies the final, official version of the Tennessee Code and, until then, may make editorial changes to the statutes. References to the updates made by the most recent legislative session should be to the Public Chapter and not to the T.C.A. until final revisions have been made to the text, numbering, and hierarchical headings on Westlaw to conform to the official text. Unless legislatively provided, section name lines are prepared by the publisher.

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

AD036

**STATE REGULATIONS**

Tennessee Rules and Regulations
    0400. Department of Environment and Conservation (Refs & Annos)
        0400-40. Water Resources (Wpc)
            Chapter 0400-40-03. General Water Quality Criteria

Tenn. Comp. R. & Regs. 0400-40-03-.02

Alternatively cited as TN ADC 0400-40-3-.02

0400-40-03-.02. GENERAL CONSIDERATIONS.

Effective: March 17, 2024

Currentness

(1) Tennessee water quality standards shall consist of the General Water Quality Criteria and the Antidegradation Statement found in Chapter 0400-40-03, and the Use Classifications for Surface Waters found in Chapter 0400-40-04.

(2) Waters have many uses which in the public interest are reasonable and necessary. Such uses include: sources of water supply for domestic and industrial purposes; propagation and maintenance of fish and other aquatic life; recreation in and on the waters including the safe consumption of fish and shellfish; livestock watering and irrigation; navigation; generation of power; propagation and maintenance of wildlife; and the enjoyment of scenic and aesthetic qualities of waters.

(3) The rigid application of uniform water quality is not desirable or reasonable because of the varying uses of such waters. The assimilative capacity of a stream for sewage and waste varies depending upon various factors and including the following: volume of flow, depth of channel, the presence of falls or rapids, rate of flow, temperature, natural characteristics, and the nature of the stream.

(4) In order to permit the reasonable and necessary uses of the waters of the state, existing pollution should be corrected as rapidly as practicable, and future pollution prevented through the level of treatment technology applicable to a specific source or that greater level of technology necessary to meet water quality standards; i.e., modeling and stream survey assessments, treatment plants, or other control measures.

(5) Because all streams are classified for more than one use, the most stringent criteria will be applicable.

(6) Waters identified as wet weather conveyances according to the definition found in Rule 0400-40-03-.04, shall be protective of humans and wildlife that may come in contact with them and shall not adversely affect the quality of downstream waters. Applicable water quality standards will be maintained downstream of wet weather conveyances.

(7) Where general water quality criteria are applied on a regional, ecoregional, or subecoregional basis, these criteria will be considered to apply to a stream if eighty percent (80%) of its watershed or catchment is contained within the unit upon which the criterion is based.

AD038

(8) All fish and aquatic life metals criteria are expressed as total recoverable, except cadmium, copper, lead, nickel, silver, and zinc which are expressed as dissolved. Translators will be used to convert the dissolved fraction into a total recoverable permit limit. One of three approaches to metals translation will be used: (1) translator is the same as the conversion factor, (2) translator is based on relationships derived from STORET data, (3) a site-specific translator is developed. Where available, a site-specific translator is preferred. For assessing whether criteria for cadmium, copper, lead, nickel, silver, and zinc are exceeded by ambient water quality conditions, the dissolved criteria will also be translated in order to allow direct comparison to the ambient data, if total recoverable. The Metals Translator: Guidance for Calculating a Total Recoverable Permit Limit From a Dissolved Criteria (EPA-823-B-96-007) may be referenced in applying this provision.

(9) Site-specific numeric criteria studies may be conducted on any appropriate fish and aquatic life criterion.

(a) Site-specific criteria studies based on a Water Effects Ratio (WER) calculated from the documented toxicity of a parameter in the stream in which it will be introduced may supersede the adopted criteria at a site. The Division shall approve a site-specific criterion for metals developed by others provided that the WER methodology [Interim Guidance on Determination and Use of Water-effect Ratios for Metals (EPA-823-B-94-001)] or the Streamlined Water-effects Ratio Procedure for Discharges of Copper (EPA-822-R-01-001) is used, both the study plan and results are approved by the Department, and the U.S. Environmental Protection Agency (EPA) has concurred with the final site specific criterion value(s).

(b) Any site-specific criterion for other toxics based on methodologies other than the above-listed methodologies which recalculate specific criterion, such as the Resident Species Method or the Recalculation Method or the Biotic Ligand Model (BLM) for copper, must be adopted as a revision to Tennessee water quality standards into this chapter, and following EPA approval, can be used for Clean Water Act purposes.

References on this subject include, but are not limited to: Technical Support Document for Water Quality-based Toxics Control (EPA - 505/2-90-001); Technical Guidance Manual for Performing Waste Load Allocations: Book VIII (EPA/600/6-85/002a/002b/002c); MinteqA2, An Equilibrium Metal Speciation Model (EPA/600/3-87/012); Water Quality Standards Handbook, Second Edition (EPA-823-B-93-002); Interim Guidance on Determination and Use of Water-effect Ratios for Metals (EPA-823-B-94-001).

(10) Interpretation and application of narrative criteria shall be based on available scientific literature and EPA guidance and regulations.

**Credits**
*Authority:* *T.C.A. §§ 4-5-201, et seq., and 69-3-101, et seq.*

*Administrative History:* *Original rule filed September 17, 2013; effective December 16, 2013. Rule originally numbered 1200-04-03. Amendments filed June 13, 2019; effective September 11, 2019. Amendments filed December 18, 2023; effective March 17, 2024.*

Current through rules effective April 28, 2024. Some sections may be more current, see credits for details.

Tenn. Comp. R. & Regs. 0400-40-03-.02, TN ADC 0400-40-03-.02

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD040

Tennessee Rules and Regulations
0400. Department of Environment and Conservation (Refs & Annos)
0400-40. Water Resources (Wpc)
Chapter 0400-40-03. General Water Quality Criteria

Tenn. Comp. R. & Regs. 0400-40-03-.04
Alternatively cited as TN ADC 0400-40-3-.04

0400-40-03-.04. DEFINITIONS.

Effective: March 17, 2024
Currentness

In addition to the meanings provided in the Water Quality Control Act (T.C.A. § 69-3-103), terms used in these rules shall mean the following:

(1) Atypical consumers - Those persons in the vicinity of a stream or lake who due to physiological factors or previous exposure are more sensitive to specific pollutants than is the population in general. Examples of atypical consumers may include, but are not limited to: children; pregnant or nursing women; subsistence fishermen; frequent purchasers of commercially harvested fish; and agricultural, industrial, or military personnel who may have had previous occupational exposure to the contaminant of concern.

(2) Conventional water treatment - Conventional water treatment as referred to in the criteria denotes coagulation, sedimentation, filtration, and chlorination or disinfection.

(3) Degradation - The alteration of the properties of waters by the addition of pollutants, withdrawal of water, or removal of habitat, except those alterations of a short duration.

(4) De Minimis degradation - Degradation of a small magnitude, as provided in this paragraph.

(a) Discharges and withdrawals.

1. Subject to the limitation in part 3 of this subparagraph, a single discharge will be considered de minimis if it uses less than five percent of the available assimilative capacity for the substance being discharged.

(Note: Consistent with T.C.A. § 69-3-108, special consideration will be given to bioaccumulative substances to confirm the effect is de minimis, even if they use less than five percent of the available assimilative capacity under this part or less than 10% of the available assimilative capacity under part 3 of this subparagraph.)

2. Subject to the limitation in part 3 of this subparagraph, a single water withdrawal will be considered de minimis if it removes less than five percent of the 7Q10 flow of the stream, unless the withdrawal may adversely affect waters designated as Exceptional Tennessee Waters pursuant to part (4)(a)3 of Rule 0400-40-03-.06.

AD041

3. If more than one activity described in part 1 or 2 of this subparagraph has been authorized (including withdrawals exempted by paragraph (4) of Rule 0400-40-07-.02) in a segment, and the total impact of the authorized and proposed impacts uses no more than 10% of the assimilative capacity, or 7Q10 low flow, then activities are presumed to be de minimis, unless the withdrawal may adversely affect waters designated as Exceptional Tennessee Waters pursuant to part (4)(a)3 of Rule 0400-40-03-.06.

(b) Habitat alterations authorized by an Aquatic Resource Alteration Permit (ARAP) are de minimis if the Division finds that the impacts, individually and cumulatively are offset by impact minimization and/or in-system mitigation, provided however, in ONRWs the mitigation must occur within the ONRW.

(5) Domestic wastewater discharge - A discharge of sanitary and other non-process wastewater from a treatment facility other than a publicly-owned treatment works (POTW) treating municipal sewage and/or industrial waste. Examples of domestic wastewater discharges include, but are not limited to, homes, subdivisions, campgrounds, hotels, travel centers, parks, and schools.

(6) Ecoregion - A relatively homogeneous area defined by similarity of climate, landform, soil, potential natural vegetation, hydrology, or other ecologically relevant variables.

(7) Epilimnion - The upper layer of water in a thermally stratified lake or reservoir. This layer consists of the warmest water and has a fairly uniform (constant) temperature.

(8) Groundwater - Water beneath the surface of the ground within the zone of saturation, whether or not flowing through known and definite channels.

(9) Groundwater table - The upper surface of the zone of saturation by ground water.

(10) Hypolimnion - The lowest layer in a thermally stratified lake or reservoir. This layer consists of colder, more dense water, has a constant temperature and no mixing occurs. The hypolimnion of a eutrophic lake is usually low or lacking in oxygen.

(11) Interflow - The runoff infiltrating into the surface soil and moving toward streams as shallow, perched water above the main groundwater level.

(12) In-system mitigation - Mitigation for habitat alterations sufficient to result in no overall net loss of resource values, if provided in the same eight-digit hydrologic unit code as the alteration, or in another area proximate to the alteration as approved by the Division to offset the loss of resource values in the area. In-system mitigation may not occur within a different major river drainage basin as the alteration (i.e., Tennessee River, Cumberland River, Mississippi River).

(13) Lentic - Still water aquatic ecosystems such as ponds, lakes, or reservoirs.

(14) Lotic - Flowing water aquatic ecosystems such as streams and rivers.

AD042

(15) Measurable degradation, as used in the context of discharges or withdrawals - Changes in parameters of waters that are of sufficient magnitude to be detectable by the best available instrumentation or laboratory analyses.

(Note: Because analytical techniques change, the Department may consider either the most sensitive detection method needed to comply with State standards or any biological, chemical, physical, or analytical method, conducted in accordance with EPA approved methods as identified in 40 C.F.R. part 136 (2022). Consistent with T.C.A. § 69-3-108, for scenarios involving cumulative, non-measurable activities or parameters that are managed by a narrative criterion, the Department will use mathematical models and ecological indices to ensure no degradation will result from the authorization of such activities, consistent with the State's mixing zone policy.)

(16) Minimum Level (ML) - A term referring to the lowest sample concentration at which reliable quantitative measurements can be made as defined in Appendix A of 40 C.F.R. part 136 (2022).

(17) Mixing zone - That section of a flowing stream or impounded waters in the immediate vicinity of an outfall where an effluent becomes dispersed and mixed.

(18) Multiple populations - Two or more individuals from each of two or more distinct taxa, in the context of obligate lotic aquatic organisms.

(19) New or increased discharge - A new discharge of pollutants to waters of the state or an increase in the authorized loading of a pollutant above either (1) numeric effluent limitations established in a National Pollutant Discharge Elimination System permit for that discharge, or (2) if no such limitations exist, the actual discharges of that pollutant.

(20) Normal weather conditions - Those within one standard deviation of the cumulative monthly precipitation means for at least the three months prior to the hydrologic determination investigation, based on a 30-year average computed at the end of each decade. Precipitation data shall come from National Oceanographic and Atmospheric Agency's National Climatic Data Center, National Resources Conservation Service's National Climatic Data Center, Natural Resources Conservation Service's National Water and Climate Center, or other well-established weather station.

(21) Obligate lotic aquatic organisms - Organisms that require flowing water for all or almost all of the aquatic phase of their life cycles.

(22) Parameter - A biological, chemical, radiological, bacteriological, or physical property of water that can be directly measured. Some criteria are expressed in terms of a single parameter; others, such as habitat, nutrients, and biological integrity are not directly measured, but are derived from measurements of parameters.

(23) Perched water - Water that accumulates above an aquitard that limits downward migration where there is an unsaturated interval below it, between the aquitard and the zone of saturation.

(24) Photic zone - The region of water through which light penetrates and where photosynthetic organisms live.

AD043

Case: 23-3682    Document: 48-2    Filed: 05/31/2024    Page: 46

(25) Reference condition - A parameter-specific set of data from regional reference sites that establish the statistical range of values for that particular substance at least-impacted streams.

(26) Reference site - Least impacted waters within an ecoregion that have been monitored to establish a baseline to which alterations of other waters can be compared.

(27) Resource values - The physical, chemical, and biological properties of the water resource that help maintain classified uses. These properties may include, but are not limited to, the ability of the water resource to:

   (a) Filter, settle, and/or eliminate pollutants;

   (b) Prevent the entry of pollutants into downstream waters;

   (c) Assist in flood prevention;

   (d) Provide habitat for fish, aquatic life, and wildlife;

   (e) Provide drinking water for wildlife and livestock;

   (f) Provide and support recreational and navigational uses; and

   (g) Provide both safe quality and adequate quantity of water for domestic water supply and other applicable classified uses.

(28) Response variable - A characteristic of water quality that can be measured and changes as a result of an alteration of habitat, water withdrawal, or discharge of pollutants, as distinguished from agents that cause changes in aquatic systems.

(29) Significant degradation - An appreciable permanent loss of resource values resulting from a habitat alteration in a waterbody with unavailable parameters for habitat, unless mitigation sufficient to ensure no overall net loss of resource values is provided.

(30) Stratification - The tendency in lakes and reservoirs for distinct layers of water to form as a result of vertical change in temperature and, therefore, in the density of water. During stratification, dissolved oxygen, nutrients, and other parameters of water chemistry do not mix well between layers, establishing chemical as well as thermal gradients.

(31) Stream - A surface water that is not a wet weather conveyance.

(32) Subecoregion - A smaller, more homogenous area that has been delineated within an ecoregion.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.      4

(33) Thermocline - The middle layer in a thermally stratified lake or reservoir. In this layer there is a rapid decrease in temperature with depth. Also called the metalimnion.

(34) Wadeable streams - Streams that can be sampled using a hand held, one meter square or smaller kick net without water and materials escaping over the top of the net.

(35) Watercourse - A man-made or natural hydrologic feature with a defined linear channel which discretely conveys flowing water, as opposed to sheet-flow.

(36) Wet weather conveyance - Man-made or natural watercourses, including natural watercourses that have been modified by channelization:

(a) That flow only in direct response to precipitation runoff in their immediate locality;

(b) Whose channels are at all times above the groundwater table;

(c) That are not suitable for drinking water supplies; and

(d) In which hydrological and biological analyses indicate that, under normal weather conditions, due to naturally occurring ephemeral or low flow there is not sufficient water to support fish, or multiple populations of obligate lotic aquatic organisms whose life cycle includes an aquatic phase of at least two months.

(37) Wet weather conveyance determination - The decision based on site specific information of whether a particular watercourse is a stream or a wet weather conveyance. It is synonymous with "stream determination" and "hydrologic determination."

(38) Zone of saturation - A subsurface zone below the groundwater table in which all of the interconnected voids and pore spaces are filled with water.

**Credits**
***Authority:*** *T.C.A. §§ 4-5-201, et seq., and 69-3-101, et seq.*

***Administrative History:*** *Original rule filed September 17, 2013; effective December 16, 2013. Rule originally numbered 1200-04-03. Amendments filed January 6, 2015; effective April 6, 2015. Amendments filed June 13, 2019; effective September 11, 2019. Amendments filed December 18, 2023; effective March 17, 2024.*

Current through rules effective April 28, 2024. Some sections may be more current, see credits for details.

Tenn. Comp. R. & Regs. 0400-40-03-.04, TN ADC 0400-40-03-.04

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD045

Tennessee Rules and Regulations
  0400. Department of Environment and Conservation (Refs & Annos)
    0400-40. Water Resources (Wpc)
      Chapter 0400-40-03. General Water Quality Criteria

Tenn. Comp. R. & Regs. 0400-40-03-.05
Alternatively cited as TN ADC 0400-40-3-.05

0400-40-03-.05. INTERPRETATION OF CRITERIA.

Effective: March 17, 2024
Currentness

(1) Interpretation of the above criteria shall conform to any rules and regulations or policies adopted by the Board of Water Quality, Oil, and Gas.

(2) For measuring compliance with permit conditions, the effect of treated sewage or waste discharge on the receiving waters shall be considered beyond the mixing zone except as provided in this paragraph. Such mixing zones (See definition) shall be restricted in area and length; and shall not (a) prevent the free passage of fish or cause aquatic life mortality in the receiving waters; (b) contain materials in concentrations that exceed acute criteria beyond the zone immediately surrounding the outfall; (c) result in objectionable colors, odors, or other conditions; (d) produce undesirable aquatic life or result in dominance of a nuisance species; (e) endanger the public health or welfare; or (f) impair classified uses outside of the mixing zone; (g) create a condition of chronic toxicity beyond the edge of the mixing zone; (h) adversely affect nursery and spawning areas; or (i) adversely affect species with special state or federal status. Mixing zones shall not apply to the discharge of bioaccumulative pollutants to waters of the state where the risk-based factors in subparagraph (4)(l) of Rule 0400-40-03-.03 are exceeded for the pollutant group.

(3) Permits for the discharge of pollutants may establish a schedule of compliance when necessary to allow a reasonable opportunity to comply with these water quality standards. When the Division establishes a compliance schedule, it shall consider the technical and economic feasibility of waste treatment, recovery, or adjustment of the method of discharge. Any such schedule of compliance shall require compliance with an enforceable final effluent limitation as soon as possible and include a final compliance date. If compliance will take longer than one year, the schedule of compliance shall establish enforceable interim requirements, establish dates for compliance with these requirements that are no longer than one year apart, and require reporting of interim compliance actions within 14 days of the applicable deadline. If the time necessary for completion of any requirement is more than one year and the requirement is not readily divisible into stages for completion, the permit shall require, at a minimum, specified dates for annual submission of progress reports on the status of interim requirements.

(4) Water quality criteria for fish and aquatic life and livestock watering and wildlife set forth shall generally be applied in permits on the basis of the following stream flows: unregulated streams - stream flows equal to or exceeding the seven-day minimum, 10-year recurrence interval; regulated streams - all flows in excess of the minimum critical flow occurring once in 10 years as determined by the Division. All other criteria shall be applied in permits on the basis of stream flows equal to or exceeding the 30-day minimum five year recurrence interval.

AD046

(5) In general, deviations from normal water conditions are undesirable, but the frequency, magnitude, and duration of the deviations shall be considered in interpreting the above criteria in assessing use support. Excursions from water quality criteria of a magnitude, frequency, and/or duration such that a specific use classification is no longer supported by existing water quality is the condition of impairment. When interpreting pathogen data, samples collected during or immediately after significant rain events may be treated as outliers unless caused by point source dischargers. Such outlier data may be given less weight in assessment decisions than non-rain event sampling results.

(6) All discharges of sewage, industrial waste, and other waste shall receive the degree of treatment or effluent reduction necessary to comply with water quality standards, or state or federal laws and regulations pursuant thereto, and where appropriate will comply with the "Standards of Performance" as required by the Tennessee Water Quality Control Act, (T.C.A., §§ 69-3-101, et seq.).

(7) Where naturally formed conditions (e.g., geologic formations) or background water quality conditions are substantial impediments to attainment of the water quality standards, these natural or background conditions shall be taken into consideration in establishing any effluent limitations or restrictions on discharges to such waters. For purposes of water quality assessment, with the exception of pathogens, exceedances of water quality standards caused by natural conditions alone will not be considered the condition of impairment. Examples of natural conditions include alterations caused by beaver activity, non-construction related rockslides of pyritic materials, and groundwater with naturally elevated metals or low dissolved oxygen levels.

(8) All chemical data reported under this rule shall be generated using "sufficiently sensitive" analytical methods approved under 40 C.F.R. part 136 (2022) or required under 40 C.F.R. chapter I, subchapter N or O (2022). An approved method is "sufficiently sensitive" when:

(a) The method minimum level (ML) is at or below the level of the applicable water quality criterion or the effluent limit established by the permit for the measured pollutant or pollutant parameter; or

(b) The method ML is above the applicable water quality criterion or the effluent limit established by the permit, but the amount of the pollutant or pollutant parameter actually measured is high enough that the method detects and quantifies the level of the pollutant or pollutant parameter; or

(c) Demonstration is made showing that the method used has the lowest ML of the approved methods for the measured pollutant or pollutant parameter in the sample/matrix being analyzed. (Documentation supporting this demonstration is to be submitted with reported data and shall include narrative justification for why the method chosen is believed to have the lowest ML of all approved methods identified in 40 C.F.R. part 136 (2022). The Director shall determine whether the submitted information demonstrates sufficient method sensitivity.)

Note: When there is no analytical method that has been approved under 40 C.F.R. part 136 (2022) or required under 40 C.F.R. chapter I, subchapter N or O (2022), and a specific method is not otherwise required by the Director, the applicant may use any suitable method but shall provide a description of the method. When selecting a suitable method, factors such as a method's precision, accuracy, or resolution must be considered when assessing the performance of the method.

(9) Standard operating procedures for making stream and wet weather conveyance determinations (hydrologic determinations).

AD047

(a) General.

1. Because a primary purpose of the Water Quality Control Act is to protect the waters of the state for the public, and since streams receive a higher level of protection than wet weather conveyances, anyone desiring to alter a watercourse who wishes to avoid unnecessary expense and delay, may request the department to process a permit application or issue an authorization under a general permit with the presumption that the watercourse is a stream. In that instance, a full hydrologic determination would not be performed under these rules. However, nothing shall preclude an applicant from subsequently seeking a wet weather conveyance determination.

2. The procedures detailed in this rule are intended to be used in situations where there is some question whether a watercourse is a stream or wet weather conveyance. In situations where it is obvious that a watercourse is a stream, such as named rivers or streams with watersheds larger than a square mile, or spring-fed streams with consistent flow greater than one cubic foot per second, it is not necessary to conduct a detailed hydrologic determination.

3. It is the purpose of this rule to set out the framework for making stream and wet weather conveyance determinations taking into consideration all relevant and necessary information on the biology, geology, geomorphology, precipitation, hydrology, and other scientifically based principles. Staff of the Department and certified hydrologic professionals not employed by the Department who are making a submission pursuant to T.C.A. § 69-3-108(r) shall follow these rules and the Guidance for Making Hydrologic Determinations (Guidance) which contains the instructions and examples for proper application of these rules to situations in the field that has been developed pursuant to T.C.A. § 69-3-107(25) in making these determinations.

4. The format for documenting these determinations is provided in the Hydrologic Determination Field Data Sheet (Data Sheet) in the Guidance. All available field characteristics necessary to make an accurate determination shall be evaluated, and all evidence utilized in making a determination shall be documented using the Data Sheet or as an addendum. Applicants may choose to submit additional hydrological or geotechnical data not included in the standard procedure in support of a hydrologic determination. Any additional relevant information submitted to the Department shall be considered by the Division in its determination.

5. Any significant revision to the Data Sheet or Guidance shall be subject to a 30-day public comment period prior to adoption. The Department shall advertise its intent to modify the Data Sheet or Guidance by posting notice of proposed changes on the Department's internet web site and by sending to the permit mailing list. Significant modifications include the addition or deletion or substantive modification of either the primary or secondary indicators or a change in the scoring system. The Department shall consider the need for modifications to the Data Sheet and Guidance periodically and whenever a significant comment is submitted in regard to them.

6. To be classified as a wet weather conveyance, a watercourse must meet all four elements of the definition in T.C.A. § 69-3-103. Therefore, if it is determined that any one of the four elements does not apply to a watercourse, the watercourse is a stream.

7. Because natural variation and human activities can alter hydrologic conditions over time, hydrologic determination will only be considered valid for a maximum of five years or the term of a permit based on it.

AD048

8. Because there can be considerable variability within a given reach of a watercourse, wet weather conveyance determinations should not be made on a single point but must also investigate up and down channel and consider the watercourse's landscape context.

9. All of the indicators referred to in these rules and the Guidance are evidence relevant to the presence or absence of one or more of the four elements of the wet weather conveyance definition. The difference between the primary and secondary indicators is that each of the primary indicators is considered presumptive evidence alone regarding one or more of the four elements, and will allow for an immediate hydrologic determination to be made in most cases. Some of the primary indicators involve direct observations of the presence or absence of one or more of the elements. The primary indicators of wet weather conveyances are:

(i) Hydrologic feature exists solely due to a process discharge;

(ii) Defined bed and bank absent, watercourse dominated by upland vegetation/grass;

(iii) Watercourse dry anytime during February through April 15 under normal precipitation/groundwater conditions; and

(iv) Daily flow and precipitation records showing feature only flows in direct response to rainfall.

10. Primary indicators of streams are:

(i) Presence of multiple populations of obligate lotic organisms with two months or longer aquatic phase;

(ii) Presence of fish (except Gambusia);

(iii) Presence of naturally occurring groundwater table connection;

(iv) Flowing water in channel seven days or more since the last precipitation in the local watershed; and

(v) Evidence watercourse has been used as a supply of drinking water.

11. When primary indicators cannot be observed or documented, then the investigator must evaluate the watercourse using secondary indicators. The secondary indicators are an aggregate set of observations that in total are used to evaluate the presence or absence of one or more of the elements of a wet weather conveyance. Secondary indicators are:

(i) Continuous bed and bank;

AD049

(ii) Sinuous channel;

(iii) In-channel structure, riffle-pool sequences;

(iv) Sorting of soil textures or other substrate;

(v) Active/relic floodplain;

(vi) Depositional bars or benches;

(vii) Braided channel;

(viii) Recent alluvial deposits;

(ix) Natural levees;

(x) Headcuts;

(xi) Grade controls;

(xii) Natural valley drainageway;

(xiii) At least second order channel on United States Geological Survey or Natural Resources Conservation Service map;

(xiv) Subsurface flow/discharge into channel;

(xv) Water in channel more than forty-eight hours since rain;

(xvi) Leaf litter in channel;

(xvii) Sediment on plants or on debris;

(xviii) Organic debris lines or piles (wrack lines);

AD050

(xix) Hydric soils in channel bed or sides;

(xx) Fibrous roots in channel;

(xxi) Rooted plants in channel;

(xxii) Crayfish in channel (exclude in floodplain);

(xxiii) Bivalves/mussels;

(xxiv) Amphibians;

(xxv) Macrobenthos;

(xxvi) Filamentous algae, periphyton;

(xxvii) Iron-oxidizing bacteria/fungus; and

(xxviii) Wetland plants in channel.

12. The secondary indicators shall be scored in accordance with the instructions in the Guidance. Hydrologic determinations will often be made on the basis of secondary indicators because none of the primary indicators are present at the time of investigation. Any of the primary indicators contained in these rules and the Guidance may be considered conclusive after consideration of appropriate background information including recent weather and precipitation, in the absence of any directly contradictory evidence. However, since hydrologic determinations are required to be made at all times of year, secondary indicators of hydrologic status will be used, in accordance with the Guidance and these rules, as determinant evidence in the absence of primary indicators. The secondary indicators used in the Guidance shall be based on sound scientific principles.

13. Watercourses in which flow is solely a result of process or wastewater discharge or other non-natural sources shall not be regulated as streams even though they may exhibit characteristics of a stream rather than a wet weather conveyance.

(b) The specific procedures outlined herein are intended to consider each of the four elements necessary for a watercourse to be classified as a wet weather conveyance.

1. Because the duration of the flow in a watercourse is the central inquiry of hydrologic determinations, all of the primary and secondary indicators are relevant to evaluating it. Although other factors may also be relevant, at a

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    6

minimum the following procedures shall be used to determine if a watercourse flows only in direct response to precipitation runoff in its immediate vicinity.

(i) Prior to conducting a field evaluation, the investigator should review recent precipitation patterns for the local area, the longer-term seasonal precipitation trends, and any other available information such as historic land use, regional geology and soil types, or previous hydrologic determinations near the site to be investigated.

(ii) The investigator must decide if the determination is being conducted under "normal weather conditions." The procedure for determining if weather conditions are normal, or either wetter or drier than normal, is contained in the Guidance. If conditions are either wetter or drier than normal the investigator must take this into consideration in making a hydrologic determination.

(iii) The vast majority of wet weather conveyances will generally cease to flow within 48 hours of almost all except some of the largest rain events. This is especially true in urbanized, impervious areas, or other areas with low infiltration rates, such as mowed lawns. The investigator shall document the presence or absence of flow within the watercourse. If in-stream surface flow is observed within the evaluated reach, and it has been at least seven days since the last rainfall event in the upstream watershed, the flow will not be considered a direct storm response, and the investigator shall conclude that the feature is a stream. The investigator shall document the source of the precipitation data. The source used shall be as close as feasible to the watercourse.

(iv) When subsurface water discharges such as seeps, interstitial flow, perched water, or interflow are observed and used as indicators of hydrology, investigators shall consider the influence of recent precipitation events and localized soil and geologic conditions on these features to determine if these features provide adequate hydrology such that the watercourse flows more than in direct response to precipitation. For example, since some such features have more flow when there has been significant recent precipitation, if they are flowing when there has not been much recent precipitation, it is more likely that they flow for sustained periods. In some instances, there may be observable outcroppings of a confining layer such as shale or clay that causes interstitial flow to discharge to a watercourse. In this situation, the capacity of up-gradient conditions such as the permeability and volume of the soils above the confining layer to sustain extended periods of surface flow should be considered. These types of sustained discharges should not be considered a direct response to rainfall. In other instances, such as in areas with a highly karst geology, observed seeps into a watercourse may be not be able to sustain extended periods of flow, and may be considered a more direct response to rainfall.

(v) Field investigations for hydrologic determinations should not be conducted if a one-inch precipitation event in 24 hours has occurred in the area of investigation within the previous 48 hours.

2. The following procedures are to determine if the channel is above the groundwater table at all times. Under the definition of wet weather conveyance in T.C.A. § 69-3-103, if there are any times that the channel is not above the groundwater table, it is a stream.

(i) Since larger streams and rivers are frequently in contact with the groundwater table, the investigator shall review topographic maps to determine if the watercourse is within the floodplain of, or within 20 feet in elevation of a larger stream or river known to carry perennial flow. Flow in such a watercourse should not be considered conclusive evidence of a groundwater table connection, but is contributing evidence to be considered in the

<div align="center">AD052</div>

determination. Therefore further investigation into additional factors including those listed below is necessary to determine that the watercourse in question is in contact with the groundwater table.

(ii) Since the presence of wetlands often indicates a shallow depth to the groundwater table, the investigator shall search for the presence of wetlands in the immediate vicinity of the watercourse both on topographic maps and in the field. The presence of wetlands in the vicinity of the watercourse being examined should not be considered conclusive evidence of a groundwater table connection, but is contributing evidence to be considered in the determination. Therefore further investigation into other factors including those listed below is necessary to determine that the watercourse in question is in contact with the groundwater table.

(iii) The investigator shall review United States Department of Agriculture soil surveys. Their soil descriptions often contain information on depth to water table. For watercourses whose channels are at a depth that indicates contact with the groundwater table for the soil type in which they are formed, the investigator can conclude that the watercourse is in contact with the water table, absent contradicting field information.

(iv) The investigator shall review site geological characteristics affecting the elevation of the groundwater table with respect to the elevation of the channel, including the presence of karst bedrock features, erodibility of watershed soils, thickness of regolith and channel alluvium, depth to bedrock or laterally persistent silt or clay horizons, land-use disturbances, and other watershed conditions controlling or contributing to the presence or absence of channel base flow.

(v) If data are available from water wells within one mile of and in similar landscape position to a watercourse under investigation, and if the surface elevation of standing water in the well is at or above the elevation of the bottom of the channel of the watercourse, then the investigator can conclude that the watercourse is in contact with the groundwater table.

(vi) The observed emergence of water from the ground is not necessarily water from the groundwater table and should not be considered as conclusive for the purpose of this element. Therefore further investigation into factors including those listed above is necessary to determine the source of the emergent water.

3. The following procedures are to determine if a watercourse is suitable for drinking water supplies. The investigator should note spring boxes, water pipes to carry water from the watercourse to a residence, or other observable evidence the watercourse is being used as a household water supply upstream of or within the segment being evaluated. When these features are noted, the investigator can conclude that the watercourse is a stream absent contradicting information.

4. The following procedures are to determine if a watercourse, under normal weather conditions, due to naturally occurring ephemeral or low flow does not have sufficient water to support fish, or multiple populations of obligate lotic aquatic organisms whose life cycle includes an aquatic phase of at least two months.

(i) The presence of the requisite aquatic life is a primary indicator that the watercourse supports that aquatic life. In order to find that the requisite aquatic life is present, the investigator must document more than one individual of at least two qualifying taxa in the evaluated reach under normal weather conditions. Unhatched eggs or any

AD053

other stage of a taxon's life cycle that could be found in a wet weather conveyance or lentic habitat (such as a deceased winged adult) should not be considered as a primary indicator that a watercourse is a stream. The specific taxa found should be noted on the Data Sheet. Representative individuals of the taxa used to make this determination should be collected for confirmation of identification. All aquatic life observed should be noted, even if some do not qualify as primary indicators. These organisms may also be relevant as secondary field indicators.

(ii) Indigenous members of taxa within the benthic macroinvertebrate groups listed below are obligate lotic aquatic organisms and thus are primary indicators that a watercourse is a stream when two or more specimens of two or more taxa are documented under normal weather conditions.

(I) Gastropoda: Pleuroceridae, Viviparidae, Valvatidae

(II) Bivalvia: Unionidae

(III) Coleoptera: Dryopidae, Elmidae, Psephenidae, Ptilodactylidae, Staphylinidae

(IV) Diptera: Athericidae, Blephariceridae, Chironomidae (except: Chironomini or red midges), Empididae, Ptychopteridae, Tanyderidae, and some Tipulidae (Antocha, Rhabdomastix, Dicranota, Hexatoma, Limnophila, Tipula)

(V) Ephemeroptera: all members, except: Siphlonuridae, and some Ephemeridae (Hexagenia)

(VI) Megaloptera: all members, except: Chauliodes

(VII) Odonata: Aeshnidae, Calopterygidae, Cordulegastridae, Gomphidae, some Coenagrionidae (Argia, Chromagrion, Amphiagrion), some Libellulidae (Perithemis), and some Corduliidae (Epitheca, Helocordulia, Neurocordulia)

(VIII) Plecoptera: all members

(IX) Trichoptera: all members, except: Molannidae, some Leptoceridae *(*Nectopsyche, Triaenodes*)*, and some Limnephilidae (Ironoquia, Limnephilus, Hesperophylax)

(X) Oligochaetes: Branchiobdellidae, Lumbriculidae, Sparganophilidae, some Tubificidae (subfamily Naidinae, Ilyodrilus, Rhyacodrilus, Varichaetadrilus), and some Lumbricidae (Eiseniella tetraedra only).

(iii) The presence of any indigenous fish species, other than the Mosquitofish (Gambusia), documented under normal weather conditions, is also a primary indicator that the watercourse is a stream, and constitutes support of the requisite aquatic life.

AD054

(iv) There are conditions in which a stream may be dry for a period of weeks or even months, but supports multiple populations of lotic aquatic organisms or fish at other times during a year. In such conditions, an investigator could appropriately determine that there is sufficient water on an annual basis to support such populations even though there were not any present on a particular date. In addition, man-made pollution or other water quality issues may preclude support of these organisms. Therefore, the absence of lotic aquatic organisms at the time of the investigation cannot be the sole basis for a determination that a watercourse meets the fourth element of the definition. When multiple populations of lotic aquatic organisms or fish cannot be documented to occur in a watercourse, then the investigator must consider the hydrologic and biologic factors referred to as secondary indicators in these rules and the Guidance to make a hydrologic determination.

(v) Under normal weather conditions, if the investigator documents the absence of water due to naturally occurring conditions in a watercourse between February 1 and April 15, then the investigator can conclude the watercourse is unable to support fish or multiple populations of obligate lotic aquatic organisms whose life cycle includes an aquatic phase of at least two months and is therefore a wet weather conveyance.

**Credits**
*Authority: T.C.A. §§ 4-5-201, et seq., and 69-3-101, et seq.*

*Administrative History: Original rule filed September 17, 2013; effective December 16, 2013. Rule originally numbered 1200-04-03. Amendments filed June 13, 2019; effective September 11, 2019. Amendments filed December 18, 2023; effective March 17, 2024.*

Current through rules effective April 28, 2024. Some sections may be more current, see credits for details.

Tenn. Comp. R. & Regs. 0400-40-03-.05, TN ADC 0400-40-03-.05

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Tennessee Rules and Regulations
 0400. Department of Environment and Conservation (Refs & Annos)
  0400-40. Water Resources (Wpc)
   Chapter 0400-40-07. Aquatic Resource Alteration

Tenn. Comp. R. & Regs. 0400-40-07-.01
Alternatively cited as TN ADC 0400-40-7-.01

0400-40-07-.01. GENERAL.

Currentness

(1) These rules are promulgated to prevent the future pollution of state waters and to plan for the future use of such waters so that the water resources of Tennessee might be used and enjoyed to the fullest extent consistent with the maintenance of unpolluted waters, T.C.A. § 69-3-102(b). Persons who wish to conduct an activity that may impact a stream or wetland shall consider avoidance and minimization of such impacts. If impacts to a stream or wetland will result in an appreciable permanent loss of resource values, mitigation as set forth in paragraph (7) of Rule 0400-40-07-.04 must be provided to ensure no overall net loss of resource values.

(2) Section 401 of the federal Water Pollution Control Act or Clean Water Act, 33 U.S.C. § 1341, provides that an applicant for a federal license or permit for a discharge into the waters of the United States must provide the federal licensing or permitting agency a certification from the state in which the discharge originates or will originate, and that any such discharge will comply with the applicable provisions of §§ 301, 302, 303, 306 and 307 of that Act.

(3) Additionally, the Tennessee Water Quality Control Act of 1977, T.C.A. § 69-3-108(b)(1), provides that it is unlawful for any person, except in accordance with the conditions of a valid permit, to carry out any activity which results in the alteration of the physical, chemical, radiological, biological, or bacteriological properties of any waters of the state, including wetlands. These activities include, but are not limited to: the discharge of dredge or fill material, dredging, stream channel modifications, water withdrawals, wetlands alterations including drainage, and other construction activities which result in the alteration of the waters of the state. State permits for these activities are Aquatic Resource Alteration Permits, which also serve as § 401 certifications where required. Alterations of wet weather conveyances are governed by, and must be conducted in compliance with, T.C.A. § 69-3-108(q).

(4) This Chapter prescribes the procedures applicable to Aquatic Resource Alteration Permits, in addition to the general requirements and procedures of Chapter 0400-40-01 of the rules of the Board of Water Quality, Oil and Gas and the Department of Environment and Conservation, and the Tennessee Water Quality Control Act of 1977. Permits issued pursuant to this chapter do not authorize activities that require a National Pollutant Discharge Elimination System (NPDES) permit, a state operating permit, or an underground injection control permit.

**Credits**
*Authority: T.C.A. §§ 4-5-201, et seq., and 69-3-101, et seq.*

*Administrative History: Original rule filed September 17, 2013; effective December 16, 2013. Rule originally numbered 1200-04-07. Amendments filed June 13, 2019; effective September 11, 2019.*

AD056

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.          1

Current through rules effective March 23, 2024. Some sections may be more current, see credits for details.

Tenn. Comp. R. & Regs. 0400-40-07-.01, TN ADC 0400-40-07-.01

AD057

Tennessee Rules and Regulations
  0400. Department of Environment and Conservation (Refs & Annos)
    0400-40. Water Resources (Wpc)
      Chapter 0400-40-07. Aquatic Resource Alteration

Tenn. Comp. R. & Regs. 0400-40-07-.03
Alternatively cited as TN ADC 0400-40-7-.03

0400-40-07-.03. DEFINITIONS.

Currentness

As used in this chapter and in any ARAP issued pursuant to this chapter, the following terms have these meanings:

(1) "Act" means The Tennessee Water Quality Control Act of 1977, as amended, T.C.A. §§ 69-3-101 et seq.

(2) "Activity" means any and all work or acts associated with the performance, or carrying out of a project or a plan, or construction of a structure.

(3) "Appreciable permanent loss of resource values" means a reduction in resource values that is expected to continue without fundamental change and is large enough to be observed and measured as resulting in more than minimal adverse effects.

(4) "Aquatic Resource Alteration Permit" or "ARAP" means a permit issued pursuant to T.C.A. § 69-3-108 of the Act, which authorizes the alteration of properties of waters of the state that result from activities other than discharges of wastewater through a pipe, ditch, or other conveyance.

(5) "Best management practices" or "BMPs" means a schedule of activities, prohibition of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of waters of the state. BMPs include methods, measures, practices, and design and performance standards.

(6) "Certification" means an Aquatic Resource Alteration Permit under the Act, when required by § 401 of the federal Water Pollution Control Act, which certifies, either unconditionally or through imposition of terms under which the activity must be carried out, that the activity will comply with applicable provisions of §§ 301, 302, 303, 306, and 307 of the federal Water Pollution Control Act and Chapter 0400-40-01 of the rules of the Board of Water Quality, Oil and Gas and the Department of Environment and Conservation and the Act.

(7) "Channelization" means the alteration of stream channels including but not limited to straightening, widening, or enlarging.

(8) "Constructed wetland" means a wetland intentionally designed, built and operated on previously nonwetland sites for the primary purpose of wastewater treatment or stormwater retention; such wetlands are not created to provide mitigation for adverse impacts or other wetlands.

AD058

(9) "Cumulative impacts" means the impact on resource values which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.

(10) "Debris" means woody materials, trash, flotsam, dislodged vegetation, and other potentially mobile materials which may, when located within a stream channel, contribute to flow blockage. This does not include gravel, sand, soil or its constituents such as silt, clay, or other sediments.

(11) "Ditch" means a man-made excavation for the purpose of conveying water. Ditches do not include streams, modified streams, or canals.

(12) "Division" means the Division of Water Resources within the Tennessee Department of Environment and Conservation.

(13) "Dredging" (sand and gravel dredging) means the removal of sand, gravel, and similar sediments or deposits from a stream, river, or lake bed or wetland by any method.

(14) "Emergency" means a situation where life, public health, the environment, or substantive improvements to real property is in immediate danger.

(15) "Erosion" means the process by which the land surface is worn away by the action of water, wind, gravity, chemicals, or a combination thereof.

(16) "Existing conditions" means the biological, chemical, bacteriological, radiological, and physical conditions of a stream or wetland at the time the project is proposed as measured by a quantitative assessment tool or other defensible scientific method as approved or determined by the Division.

(17) "General Permit" means a permit issued under the Act and this rule authorizing an alteration to state waters within the state for a specified category of activities that are substantially similar in nature.

(18) "Ground water" means water beneath the surface of the ground within the zone of saturation, whether or not flowing through known and definite channels.

(19) "HUC" means the hydrologic unit code assigned by the United States Geological Survey.

(20) "Individual Permit" means a permit issued by the Division to a specified person to conduct specified activities at a specified location. This type of permit does not authorize an activity by a class of persons or the public in general.

(21) "In the dry" means in such a manner that no equipment or dredged material is in contact with the stream or wetland and that the soil water boundary is not disturbed by equipment or that no infiltration is pumped to the stream from the dredge site.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

(22) "Minimal impacts" means an activity for which the scope is very limited in area, the impact is very short in duration, and that has no appreciable impact to waters just downstream of the location of the activity.

(23) "Mitigation" means the restoration, creation, enhancement, and/or preservation of aquatic resources to compensate for unavoidable impacts as provided by paragraph (7) of Rule 0400-40-07-.04.

(24) "Practicable alternative" is an alternative that is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes.

(25) "Resource values" are the physical, chemical, and biological properties of the water resource that help maintain classified uses. These properties may include, but are not limited to, the ability of the water resource to:

    (a) Filter, settle and/or eliminate pollutants;

    (b) Prevent the entry of pollutants into downstream waters;

    (c) Assist in flood prevention;

    (d) Provide habitat for fish, aquatic life, and wildlife;

    (e) Provide drinking water for wildlife and livestock;

    (f) Provide and support recreational and navigational uses; and

    (g) Provide both safe quality and adequate quantity of water for domestic water supply and other applicable classified uses.

(26) "Sediment" means soil or its constituents that has been deposited in water, is in suspension in water, is being transported, or has otherwise been removed or disturbed from its site of origin.

(27) "Sedimentation" or "Siltation" mean the process by which sediment is deposited in or by the waters of the state.

(28) "Stabilize" means the proper placing, grading, and/or covering of soil, rock, or earth to insure their resistance to erosion, sliding, or other movement.

(29) "Stream" means a surface water that is not a wet weather conveyance. For purposes of this chapter, and permits issued pursuant to this chapter, a wetland is not a stream. See definition of wetland.

AD060

(30) "Structure" means any building, pier, wharf, dolphin, weir, boom, breakwater, bulkhead, revetment, riprap, jetty, mooring structure, moored floating vessel, piling, aid to navigation, bridge, culvert, or any other obstacle or obstruction.

(31) "Wetland" means an area that is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances does support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.

(32) "Wet weather conveyances" are man-made or natural watercourses, including natural watercourses that have been modified by channelization, that flow only in direct response to precipitation runoff in their immediate locality, whose channels are at all times above the groundwater table, that are not suitable for drinking water supplies, and in which hydrological and biological analyses indicate that, under normal weather conditions, due to naturally occurring ephemeral or low flow there is not sufficient water to support fish, or multiple populations of obligate lotic aquatic organisms whose life cycle includes an aquatic phase of at least two months.

Terminology not specifically defined herein shall be defined in accordance with the Act and the rules adopted thereunder.

**Credits**
*Authority:* *T.C.A. §§ 4-5-201, et seq., and 69-3-101, et seq.*

*Administrative History:* *Original rule filed September 17, 2013; effective December 16, 2013. Rule originally numbered 1200-04-07. Amendments filed June 13, 2019; effective September 11, 2019.*

Current through rules effective June 27, 2023. Some sections may be more current, see credits for details.

Tenn. Comp. R. & Regs. 0400-40-07-.03, TN ADC 0400-40-07-.03

---

AD061

Tennessee Rules and Regulations
    0400. Department of Environment and Conservation (Refs & Annos)
        0400-40. Water Resources (Wpc)
            Chapter 0400-40-07. Aquatic Resource Alteration

Tenn. Comp. R. & Regs. 0400-40-07-.04
Alternatively cited as TN ADC 0400-40-7-.04

0400-40-07-.04. PERMITS.

Currentness

(1) Application for a Permit.

Any person who plans to engage in any of the activities outlined in T.C.A. § 69-3-108 must obtain a permit from the Commissioner to lawfully engage in such activity. When a § 401 certification is required, the ARAP also serves as the § 401 certification. There are two (2) types of ARAPs: Individual Permits and General Permits. There are several types of General Permits: (1) a General Permit that authorizes the implementation of the activity in accordance with all the terms and conditions of the General Permit without prior notice and approval from the Commissioner; (2) a General Permit that requires the applicant to notify TDEC of the planned activity prior to implementing the activity in accordance with the terms and conditions of the General Permit; and (3) a General Permit that requires the applicant to notify the Commissioner of the planned activity and receive a notice of coverage from the Commissioner prior to implementing the activity in accordance with the terms and conditions of the General Permit. ARAP applications shall be submitted on forms approved by the Commissioner, and include all of the information requested therein. Certain of the General Permits authorize an activity that is authorized by a Nationwide Permit of the U.S. Corps of Engineers and therefore serve as a § 401 Certification. Persons need not file an application with the Commissioner if they are conducting an activity pursuant to a General Permit that does not require notice or approval, but must implement the planned activity in accordance with the terms and conditions of the General Permit. Persons who desire to implement an activity pursuant to a General Permit which requires notice, or notice and prior approval, must submit the necessary documentation required by the General Permit prior to implementing the planned activity in accordance with the terms and conditions of the General Permit. A person must file an application for an Individual Permit or for a § 401 Water Quality Certification with the Division, in accordance with paragraphs (3) and (5) of this rule, to implement any activity requiring an ARAP that is not authorized by a General Permit.

(2) General Permits.

The Commissioner may issue General Permits to authorize alterations to state waters for specific categories of activities that are substantially similar in nature within the state or other specified geographical areas. General Permits for habitat alterations may be issued only for activities that do not result in an appreciable permanent loss of resource values. General Permits may be issued for water withdrawals that cause no more than de minimis degradation. When the Commissioner determines that a category or activity is suitable for coverage by a General Permit, or that substantive modification of existing General Permits is consistent with T.C.A. § 69-3-108, the Commissioner will provide notice of, and conduct a minimum of, one public hearing. The public notice will contain the relevant information, as set forth in subparagraph (4) (c) of this rule and will be published along with a copy of the draft General Permit and a rationale explaining the basis for the permit. The Division will distribute the public notice to interested persons who have requested the Division notify them of ARAP applications and by posting on the Tennessee Department of Environment and Conservation's (TDEC's) website. Interested persons may submit written comments on the draft General Permit within 30 days of the public notice or such greater period as the Commissioner allows. All written comments submitted shall be retained and considered in

AD062

the final determination to issue a General Permit. The procedures for obtaining coverage under a General Permit shall be specified in the General Permit.

(3) Section 401 Water Quality Certification.

An applicant for a federal license or permit to conduct an activity which may result in a discharge to the navigable waters must first obtain a § 401 certification from the Division. If the proposed activity requires an ARAP, that permit serves as the § 401 certification and is subject to the application and public notice procedures for obtaining ARAP coverage established by this chapter. Coverage under a General Permit, obtained either through a notice of coverage or automatic coverage under a General Permit for which no prior notice to the Division is required, constitutes a § 401 certification. If the proposed activity does not require an ARAP, the applicant for a federal license or permit may obtain a § 401 certification by submitting a copy of the federal application to the Division and a request for a § 401 certification.

(4) Public Notice and Participation.

(a) An ARAP Individual Permit or a § 401 Certification requires the issuance of public notice seeking public participation and comment on the planned activity. However, public notice is not required for an activity authorized by General Permit because public notice is provided pursuant to paragraph (2) of this rule. Each completed application shall be subject to the public notice and participation requirements of subparagraph (b) of this paragraph with the following exceptions:

1. § 401 Certification.

The Division's procedure for issuing public notice for certification of an application for a federal license or permit pursuant to § 401 of the Clean Water Act for an activity that does not require an ARAP shall be a public notice issued by the Division. Such notice will describe the activity and advise the public of the scope of certification, their rights to comment on the proposed activity, and to request a public hearing. The notice will also inform the public to whom they should send their requests and comments.

2. Minimal impact activities.

For activities that are projected to have only minimal impacts to streams or wetlands, which can be readily addressed, the Commissioner may utilize a 20 day public notice period.

3. When the Commissioner determines that a proposed permit modification or renewal will not materially change water quality aspects of the project, or will result in an improvement of water quality, as compared to the originally permitted activity, a permit may be modified or renewed without public notice. Otherwise, a renewal or modification requires public notice.

4. Where the Commissioner determines an emergency situation exists, a permit for remedial action may be issued without prior public notice and participation. The emergency permit shall be advertised by public notice, however, no later than 20 days after issuance. This permit shall be subject to all other provisions of subparagraph (b) of this paragraph. The remedial actions allowed shall be limited to those necessary to remedy the emergency.

AD063

(b) Upon receipt of a completed ARAP application, the Commissioner will review and evaluate the proposed activity or project to make a determination whether to issue an Individual Permit, as described in paragraph (5) of this rule. In order to inform interested and potentially interested persons of the proposed activity, a public notice seeking public participation and comment on the activity will be given, along with a draft permit and a rationale explaining the basis for the draft permit, including the basis for determining whether a proposed activity will result in an appreciable permanent loss of resource values. Except as provided in subparagraph (5)(c) of this rule, if an activity will result in an appreciable permanent loss of resource values, the draft permit shall include requirements for mitigation and the rationale shall explain the basis for determining that the mitigation is sufficient to result in no overall net loss of resource values from existing conditions.

(c) The public notice will include the following information:

1. Name, address, and telephone number of the applicant;

2. Name, address, telephone number, and electronic mail address of the Division contact person;

3. A brief description of the proposed activity;

4. The location of the streams or wetlands impacted by the proposed activity;

5. The Division website at which additional information about the permit application can be found;

6. The procedure to submit comments on the proposed activity;

7. The procedure for requesting a public hearing; and

8. A brief description of the procedure for the Commissioner to make a final determination to issue a permit.

(d) The approved public notice shall be distributed to interested persons and shall be circulated within the geographical area of the proposed activity as follows:

1. The Division will distribute the approved public notice to interested persons who have requested the Division notify them of ARAP applications and by posting on the TDEC website.

2. The Applicant shall distribute the approved public notice to the neighboring landowners by publishing in a local newspaper of general circulation and by posting a sign within view of a public road in the vicinity of the proposed project site as specified by the Division. The sign shall contain those provisions as specified by the Division. The sign shall be of such size that is readily visible from the public road. Also, the sign shall be maintained for at least 30 days following distribution of the approved public notice.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                    3

3. The applicant shall provide certification to the Division of compliance with part 2 of this subparagraph.

(e) A copy of the public notice shall be sent to any person who specifically requests one. Interested persons may submit written comments on the proposed activity within 30 days of public notice or such greater period as the Commissioner allows. All written comments submitted shall be retained and considered in the final determination to issue a permit.

(f) Interested persons, including the applicant, may request, in writing, that the Commissioner hold a public hearing on any application. Said request from interested persons must be filed as soon as possible, but no later than the end of the period allowed for public comment, and must indicate the interest of the party filing it, must concisely state the water quality issues being raised, and the reasons why a hearing is warranted. If there are water quality issues and significant public interest in having a hearing, the Commissioner shall hold one in the geographical area of the proposed activity. No less than 30 days in advance of the hearing, public notice of it shall be circulated at least as widely as was notice of the application. The Commissioner will distribute notice of the public hearing as set forth in part (d) 1. of this paragraph. The notice shall cite the date, time and place of the public hearing, a statement of the issues raised by the person requesting the hearing, and the purpose of the public hearing.

(5) Individual Permits.

(a) Persons who plan to engage in any activity that requires an Aquatic Resource Alteration Permit which is not governed by a General Permit or a § 401 Water Quality Certification, must submit an application to the Commissioner for review and approval prior to implementing the planned activity. The Commissioner will review a completed application and make a determination whether to issue an Individual Permit. The application must describe the proposed activity and include all the necessary technical information for the Commissioner to make a determination.

(b) The applicant shall submit an alternatives analysis evaluating a range of potentially practicable alternatives to avoid and minimize the loss of resource values consistent with the overall purpose of the proposed activity. No Individual Permit shall be granted if there is a practicable alternative to the proposed activity that would have less adverse impact on resource values, so long as the alternative does not have other significant adverse environmental consequences.

(c) The applicant shall describe the proposed project including the use of technical terms defined in Rule 0400-40-07-.03 where relevant. The sketch or plans and specifications submitted with the application shall describe the method for implementation of the planned activity. Where the proposed activity would result in an appreciable permanent loss of resource value, the applicant must propose mitigation sufficient to result in no overall net loss of state water resource values. In the case of emergency permits or other situations compelling that measures be taken in a short time, a state, county, or local government applicant for a public works project may propose a specific mitigation plan after an Individual Permit has been issued, provided that the permit shall specify the amount of mitigation required and an implementation timeline. In this case, the permittee shall comply with the mitigation plan approved by the Division.

(d) An Individual Permit is required for water withdrawals which will or will likely result in alteration of the properties of the affected stream or wetland and will result in more than de minimis degradation as defined in Rule 0400-40-03-.04(4).

AD065

1. Persons proposing to withdraw water from waters of the state in a manner which will or will likely result in an alteration of the properties of a stream or wetland, shall file an application with the Division which includes the following minimum information:

(i) Proposed withdrawal rates and volumes;

(ii) Proposed withdrawal schedule; and

(iii) Flow data of the source stream (if free flowing).

2. Where a permit for water withdrawal is required, the Commissioner shall establish permit conditions which are protective of the resource values of the affected stream or wetland. These conditions may include flow levels below which no withdrawal may occur. The Commissioner may also establish a maximum withdrawal rate in order to maintain the natural flow fluctuation characteristics of the source stream. Monitoring and reporting requirements may be established to ensure and document compliance with permit conditions.

(6) Permit Evaluation Criteria.

(a) Some activities may not be entitled to a permit. When a permit is granted, it shall require compliance with all provisions of the Act, the rules adopted pursuant to the Act, and any special terms or conditions the Commissioner determines are necessary to fulfill the purposes or enforce the provisions of the Act.

(b) A permit may be modified, suspended, or revoked for cause by the Commissioner upon such notice to the permittee as required by law. Cause shall include, but not be limited to the following:

1. Violation of any terms or conditions of the permit;

2. Obtaining a permit by misrepresentation or failure to disclose fully all relevant facts;

3. Causing a condition of pollution;

4. Violation(s) of the Act or other environmental statutes;

5. A change in the Act or rules that substantively impacts the content of the permit;

6. A change in the federal Clean Water Act that substantively impacts the content of the permit; and

7. A significant change of the physical condition(s) of the site or the waters.

AD066

(c) No activity may be authorized by the Commissioner unless any appreciable permanent loss of resource values associated with the proposed impact is offset by mitigation sufficient to result in no overall net loss of resource values from existing conditions. In a situation in which an applicant proposes mitigation that would not result in no overall net loss, the Commissioner shall not issue the permit unless the applicant redesigns the project to avoid impacts, minimize them, or provide mitigation as provided in paragraph (7) of this rule so that the redesigned project would result in no net loss of resource value. In making a decision on a permit application, the Commissioner shall determine the loss of resource values from existing conditions associated with a proposed impact and the increase in resource values of any proposed mitigation and shall consider the following factors:

1. Direct loss of stream length, flow, or wetland area due to the proposed activity;

2. Direct loss of in-stream or wetland habitat due to the proposed activity;

3. Impairment of stream channel stability due to the proposed activity;

4. Diminishment in species composition in any stream or wetland due to the proposed activity;

5. Direct loss of stream canopy due to the proposed activity;

6. Whether the proposed activity is reasonably likely to have cumulative or secondary impacts to the water resource;

7. Conversion of unique or high quality waters as established in Rule 0400-40-03-.06 to more common systems;

8. Hydrologic modifications resulting from the proposed activity;

9. The adequacy and viability of any proposed mitigation including, but not limited to, quantity, quality, likelihood of long term protection, and the inclusion of riparian buffers;

10. Quality of stream or wetland proposed to be impacted;

11. Whether the stream or wetland is listed on the § 303(d) list or otherwise has unavailable parameters; whether the proposed activity is located in a component of the National Wild and Scenic River System, a State Scenic River, waters designated as Outstanding National Resource Waters, or waters identified as high quality waters as defined in Rule 0400-40-03-.06, known as Tier II waters; whether the activity is located in a waterway which has been identified by the Division as having contaminated sediments; and whether the activity will adversely affect species formally listed in State and federal lists of threatened or endangered species; and

12. Any other factors relevant under the Act.

AD067

(d) All permits which require mitigation of impacts shall contain conditions requiring that the mitigation is performed properly, performed in a timely manner, and is adequately maintained.

(7) Mitigation.

(a) If an applicant proposes an activity in a stream or wetland that would result in an appreciable permanent loss of resource values, the applicant must provide mitigation which results in no overall net loss of resource values from existing conditions. Because all streams and wetlands serve important functions, the determination of existing conditions shall ensure at least minimal protection for all streams and wetlands notwithstanding prior degradation.

1. The applicant shall provide the Division with a mitigation plan, including a time schedule for completion of all mitigation measures, for approval. To the extent practicable, the applicant shall complete any required mitigation, excluding monitoring, prior to, or simultaneous with, any authorized impacts. All mitigation shall include a permanent restriction on the use of the mitigation site in a form approved by the Division, including but not limited to a recorded notice of land use restrictions, conservation easement, or other equivalent mechanism.

2. Acceptable mitigation mechanisms include any combination of permittee-responsible mitigation, in-lieu fee programs, mitigation banks, or other mechanisms that are reasonably assured to result in no overall net loss of resource values from existing conditions.

3. Acceptable mitigation methods are prioritized in the following order: restoration, enhancement, preservation, creation, or any other measures that are reasonably assured to result in no net loss of resource values from existing conditions.

4. The Division will evaluate resource value compensation through the use of an appropriate quantitative assessment or other defensible scientific method, and where applicable will account for temporal loss of resource values. The Division will use a watershed prioritization approach to evaluate proposed mitigation sites. Mitigation should occur as close to the impact location as practicable, prioritized as follows:

(i) Projects providing an increase in resource values to degraded streams or wetlands on site or within the immediate impact area;

(ii) Projects providing an increase in resource values to degraded streams or wetlands within the HUC-12 in which the impact is located;

(iii) Projects providing an increase in resource values to degraded streams or wetlands within the HUC-8 in which the impact is located;

(iv) Projects providing an increase in resource values to degraded streams or wetlands outside the HUC-8 in which the impact is located; or

AD068

(v) A combination of any of the above activities.

Where appropriate, the Division may apply a multiplier based on items (i) through (v) of this part.

5. All mitigation plans shall include a monitoring and reporting program to document timely achievement of successful mitigation and remedial actions to correct any deficiency.

6. Mitigation for impacts to Tennessee streams and wetlands shall occur in Tennessee.

(b) Mitigation of streams.

Mitigation for impacts to streams must be developed in a scientifically defensible manner approved by the Division that demonstrates a sufficient increase in resource values to compensate for permitted impacts. At a minimum, all new or relocated streams must include a vegetated riparian zone, demonstrate lateral and vertical channel stability, and have a natural channel bottom. All mitigation watercourses must maintain or improve flow and classified uses after mitigation is complete.

(c) Mitigation of Wetlands.

1. Prioritization of mitigation site selection for wetland impacts may also be based on U.S. EPA Level III ecoregions.

2. The ratio of acres required for wetland mitigation should not be less than 2:1 for wetland restoration; 4:1 for wetland creation and enhancement; and 10:1 for wetland preservation. Applicants may propose and utilize, subject to the Division's approval, best professional judgment ratios. The best professional judgment ratios shall be based on the resource values and functions of the affected wetland, anticipated resource value of the proposed mitigation, temporal loss, and the likelihood of success of the proposed mitigation.

(8) Duration and Renewal of Permits.

(a) Each permit issued shall have a fixed term not to exceed five (5) years.

(b) Renewal of permits is not required for one-time alterations such as construction, as long as the alterations, mitigation, and monitoring are completed within the time limit established by permit. Any permittee that has not completed the alteration authorized by the permit, or the mitigation and monitoring required by the permit, must apply for renewal at least ninety (90) days prior to the expiration date.

(c) For ongoing alterations, such as water withdrawals, any permittee who wishes to continue the permitted activity after the expiration date of the permit must make application for renewal at least ninety (90) days prior to its expiration date. If an application for permit renewal does not fall within subparagraph (4)(a)3 of this rule, the Commissioner shall follow the procedures for public notice and participation detailed in paragraph (4) of this rule, regarding each application for renewal of the permit.

AD069

(9) Permit Appeals.

(a) Permittees, applicants for permits, and aggrieved persons meeting the criteria of subparagraph (9)(c) of this rule who disagree with the denial, issuance, terms, or conditions of a permit may seek review of the Commissioner's decision by the Board of Water Quality, Oil and Gas pursuant to T.C.A. § 69-3-105(i) and § 69-3-110.

(b) For permit modifications, only those terms that were the subject of the modification may be appealed. For permit renewals, only those terms that were changed in the permit renewal compared to the preceding permit may be appealed.

(c) To be entitled to a review of the Commissioner's permit decision, aggrieved persons shall:

1. Have submitted a written comment during the public comment period on the permit;

2. Given testimony at a formal public hearing on the permit; or

3. Attended a public hearing as evidenced by completion of a Department of Environment and Conservation Record of Attendance Card or other method as determined by the Division.

(d) The basis for the appeal for aggrieved persons may only include issues which:

1. Were provided to the Commissioner in writing during the public comment period;

2. Were provided in testimony at a formal public hearing on the permit; or

3. Arise from any material change to conditions in the final permit from those in the draft, unless the material change has been subject to additional opportunity for public comment.

(e) All petitions for permit appeals shall be filed with the Board of Water Quality, Oil and Gas within 30 days after the date that public notice of the permit issuance, denial, or modification is given by way of posting the notice on the Division's website. All petitioners shall specify the basis for their appeal, and state a claim for relief based on an alleged violation of the Act or the rules promulgated thereunder. Aggrieved persons shall specify facts sufficient to establish that they have satisfied the criteria of subparagraphs (9)(c) and (9)(d) of this rule and otherwise have standing to appeal.

(f) Any action taken by the Commissioner regarding a permit remains in effect unless and until an order of the Board of Water Quality, Oil and Gas or a reviewing court becomes final.

**Credits**
*Authority: T.C.A. §§ 4-5-201, et seq., and 69-3-101, et seq.*

AD070

***Administrative History:*** *Original rule filed September 17, 2013; effective December 16, 2013. Rule originally numbered 1200-04-07. Amendments filed June 13, 2019; effective September 11, 2019.*

Current through rules effective June 27, 2023. Some sections may be more current, see credits for details.

Tenn. Comp. R. & Regs. 0400-40-07-.04, TN ADC 0400-40-07-.04

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

AD071

# STANDING DECLARATIONS

No. 23-3682

IN THE UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

SIERRA CLUB and APPALACHIAN VOICES,

*Petitioners,*

v.

TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION;
DAVID W. SALYERS, in his official capacity as Commissioner of the Tennessee
Department of Environment and Conservation; JENNIFER DODD, in her official
capacity as Director of the Division of Water Resources of the Tennessee
Department of Environment and Conservation

*Respondents.*

**DECLARATION OF ROBERT CONNOR**

I, Robert Connor, hereby declare and state as follows:

1.    This declaration is based on my personal knowledge, information, and

belief. I am over the age of eighteen and competent to testify.

2.    I am a current member of the Sierra Club. I have supported the

organization for a long time and officially became a member last year. I joined the

1

AD073

Sierra Club because of my interest in the environment and concern for my local environment. I actively participate in my local Sierra Club chapter's events.

3.    I am aware that the Tennessee Valley Authority's ("TVA") construction of a combined-cycle natural gas facility at the Cumberland Fossil Plant would require the construction of a 32-mile, 30-inch natural gas pipeline ("the Cumberland Pipeline") originating from Tennessee Gas Pipeline, LLC's ("TGP") existing 100 Line in Dickson County and terminating at TVA's proposed gas facility.

4.    I own a 160-acre farm located in Cumberland Furnace, Tennessee. The proposed Cumberland Pipeline is slated to cross my farm, running parallel to TVA's existing transmission lines. As proposed, the Cumberland Pipeline will cross three creeks on my property as well as a fourth creek which constitutes the property boundary between me and a neighboring landowner. All four of these creeks are tributaries to Dry Hollow Branch.

5.    My father purchased the farm in 1983 and lived there until his death. My sister and I inherited the farm in 2010, and I have since purchased my sister's share. There is an old, unoccupied farmhouse on the property as well as a barn and some outbuildings. I keep some farm equipment in the barn, including a tractor. I use my farm primarily to grow hay and lumber. I have an agreement with a neighboring Mennonite family who clears the hay in exchange for a share of it.

There are also a number of trails on my property that I frequently hike. I spend as much of my time at the farm as I can.

6.      I have aesthetic, recreational, and property interests in the unnamed tributaries to Dry Hollow Branch located on my property. The areas around the creeks are my favorite areas to walk, hike, and observe wildlife, which I enjoy doing when I am at the farm. A multitude of wildlife tends to congregate along these waterways, including rabbits, deer, turkey, and a variety of birds. Occasionally, I will see bald eagles. In addition to regularly walking or hiking along these waterways and looking at the wildlife, I also occasionally hunt for deer in these areas.

7.      I am currently retired. Before retiring in 2015, I worked at Chevron for 34 years in various capacities, including as a drilling engineer, facilities engineer, and field superintendent. In my roles, I oversaw the construction of various projects, including gas pipelines. I also worked to ensure safety and environmental compliance at such projects. As a former pipeline engineer, I am very aware of the risks and dangers presented by construction and operation of infrastructure like the proposed Cumberland Pipeline.

8.      TDEC has approved TGP's use of open-cut, dry-ditch crossing methods to construct the pipeline across the creeks on my farm. Based on my experience as a pipeline engineer, my review of scientific literature, and pictures I

have seen of other pipeline construction projects utilizing this method, I know that

this trenched crossing method often causes increased sedimentation in waterbodies

which harms, among other things, water quality and aquatic life. I also understand

that multiple waterbody crossings in the same watershed can cause permanent

impacts to waters.

9.      I am concerned that construction of the Cumberland Pipeline will

cause increased sedimentation in the creeks on my property and long-term harm to

water quality and aquatic life in these and downstream waters. I am also concerned

that these impacts, as well as the noise from pipeline construction, will disrupt

wildlife habitat or drive wildlife away altogether so that I won't be able to enjoy

viewing wildlife when hiking and walking on my property. These concerns harm

my aesthetic, recreational, and property interests in these creeks as well as my use

and enjoyment of my property.

10.      When my family comes to visit, I enjoy taking the kids fishing in a

spring-fed creek on my property. I have reviewed an environmental analysis

concerning the construction of another pipeline which recognizes that both

groundwater quality and quantity can be negatively impacted during pipeline

construction activity. I am concerned that construction of the Cumberland Pipeline

could negatively impact groundwater which could adversely affect this spring-fed

creek. If the creek's water quantity or quality were negatively impacted by construction of the Cumberland Pipeline, I would fish less, if at all, in this creek.

11.    I also have recreational interests in Furnace Creek. The creeks on my property flow to Dry Hollow Branch, which is a tributary of Furnace Creek. Furnace Creek will also be crossed by the Cumberland Pipeline using a dry open-cut method. Downstream of where the Cumberland Pipeline will cross Furnace Creek, there is a local park abutting Furnace Creek called Cumberland Furnace Park. My relatives visit me on the farm multiple times a year, and when they visit, I enjoy taking the kids to play in the park and swim in Furnace Creek. Given the multiple trenched pipeline crossings upstream of this park, I am concerned that the area where I take my relatives to swim will become degraded due to increased sedimentation and related impacts. These concerns harm my recreational interests in Furnace Creek. If that creek becomes muddy and sediment laden, I will not take my family to swim at that park as frequently as I do now.

12.    The Cumberland Pipeline right-of-way will require a 50-foot permanent easement on my land. In addition, TGP will utilize an addition 50-foot to 100-foot temporary easement for its construction work. TGP will remove all of the trees for this temporary easement. That land is currently heavily forested.

13.    I have been working with the Natural Resources Conservation Service ("NRCS"), part of the U.S. Department of Agriculture, to improve the

timber/forest health and promote wildlife on my property. As part of that effort, I have spent considerable time and resources working on and submitting grant requests to NRCS, and I have commissioned a Forest Management Plan to guide this work. I was recently awarded a $38,528.14 grant by NRCS to engage in forest stand improvement and habitat development on approximately 100 acres my land. I completed that work recently which includes brush management, invasive vegetation removal, and tree planting. I used part of that money to improve approximately 1.1 acres of forestland that now falls within TGP's construction right-of-way easement. All of the work that I did to improve that forestland will be wasted if the area is cleared for construction of the Cumberland Pipeline. My enjoyment of my time on my farm will be diminished by the clearing of that area.

14.     I have also been approved for more grant money from NRCS to establish better quality deer habitat on my property. I planned to improve an additional six-acre lot which is also now part of the Cumberland Pipeline construction right-of-way. I have been forced to put that project on hold as I wait to see whether the Cumberland Pipeline will be constructed across my property.

15.     As a former pipeline engineer, I am very aware of the risks and dangers of operation of the proposed Cumberland Pipeline. I understand that TGP intends to bury the pipeline at a depth of between 30–36 inches. Given the area's hilly terrain, the constant water runoff and erosion, and my and others' use of farm

equipment like cultivators and plows, the risk of rupturing the pipeline underground is a serious concern. If the pipeline were to rupture in or near the waterbodies on my property, the pipeline would leak not only methane gas, but also liquid hydrocarbons into the waterbodies. Release of these substances could cause long-term damage to water quality and aquatic life in my creeks and downstream waterways.

16.    I am also very concerned about the Cumberland Pipeline's placement adjacent to the existing transmission lines that cross my property. These transmission lines in particular are one of—if not the—highest voltage lines in TVA's transmission system at 500 kV. I can feel the hairs on my arms stand up whenever I walk under the lines. The particularly strong current running through these transmission lines has the potential to induce a current in any surrounding metal. This poses a number of risks, including the potential to erode the Cumberland Pipeline's cathodic protections, thereby heightening the risk of a leak, as well as the potential to ignite any leaked gas if the pipeline were to rupture.

17.    Given the high voltage of the transmission lines that cross my property, and based on my experience as a pipeline engineer, I am concerned about the heightened risk of an incident and a pipeline explosion occurring. The potential damage of such an ignition is tremendous. I estimate that anything within 500 feet of the pipeline would be incinerated and anything within 1000 feet would be

seriously burned. Such an explosion would negatively impact my property for a long time, including by damaging my commercial hay crop, timber, equipment, and the buildings on my property, as well as degrading my waterways and driving away wildlife. An explosion also poses a threat to my safety. I spend a significant amount of time on the farm and so am in danger of personal harm or death in the event of a pipeline malfunction. Even if the Cumberland Pipeline does not explode, I will visit my property less frequently and avoid the pipeline right-of-way if the pipeline is constructed due to my concerns about the risk of explosion.

18.    I do not want to give up an easement for the Cumberland Pipeline. A pipeline easement would impair my land and creeks, prevent me from further improving my forestland, drive away wildlife, and interfere with my ability to use and enjoy this property that is so important to me and my family.

19.    Because the ARAP and Section 401 certification are necessary for pipeline construction, that approval causes my concerns about the Cumberland Pipeline's threats to my aesthetic, recreational, and property interests.

20.    I believe that a favorable decision in this matter, including, but not limited to, a decision to vacate TDEC's issuance of the ARAP to TGP, would provide redress for the injuries to my aesthetic, recreational, and property interests as described above.

21.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January $\underline{23}$, 2024.

_____
Robert Connor

No. 23-3682

IN THE UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

SIERRA CLUB and APPALACHIAN VOICES,

*Petitioners,*

v.

TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION;
DAVID W. SALYERS, in his official capacity as Commissioner of the Tennessee
Department of Environment and Conservation; JENNIFER DODD, in her official
capacity as Director of the Division of Water Resources of the Tennessee
Department of Environment and Conservation

*Respondents.*

## DECLARATION OF CHARLES CROW

I, Charles Crow, hereby declare and state as follows:

     1.     This declaration is based on my personal knowledge, information, and

belief. I am over the age of 18 and competent to testify. If called upon to testify, I

would testify under oath to the statements below.

1

2.      I am a member of the Sierra Club. I joined the Sierra Club in 2001 so that my deeply held conservation values are represented by an organization with the ability to protect the environment, not just document its decline.

3.      I understand that the Sierra Club and others are challenging the Tennessee Department of Environment and Conservation's ("TDEC") decision to issue an Aquatic Resource Alteration Permit ("ARAP") and certification under Section 401 of the Clean Water Act to Tennessee Gas Pipeline Company, LLC ("TGP"). I also understand that TGP needs that permit in order to build a gas pipeline ("Cumberland Pipeline") which will provide gas to the Tennessee Valley Authority's ("TVA") proposed new gas plant at its facility in Cumberland City, Tennessee ("Cumberland Fossil Plant").

4.      My interest in and desire to protect the environment are based on my love for my community and the environment, but they also stem from my education and professional experiences.

5.      After attending Clarksville High School, I received a Bachelor of Science degree from Austin Peay State University, where I majored in biology and minored in geology and chemistry. Following college, I began a graduate program in environmental sciences, but I did not complete the degree because I entered the National Guard. Upon returning from my National Guard service, I began working

at the Tennessee Department of Health—now known as TDEC—as an environmental specialist.

6.    I retired from TDEC in 2004 after thirty-two years of work. I was a supervisor for environmental specialists in Montgomery County when I retired. During my career at TDEC, I worked in the groundwater protection division.

7.    I live on an 87-acre property about seven miles from the Cumberland Fossil Plant. My property is mostly wooded with a few open fields, and it abuts Yellow Creek, which runs along the entire back portion of my property. The Cumberland Pipeline is proposed to cross Yellow Creek approximately a mile and a half upstream from my property, and it will also cross several tributaries of Yellow Creek upstream from my property. I understand that TGP intends to cross Yellow Creek using a Horizontal Directional Drilling ("HDD") crossing method but will use a dry-ditch, open-cut crossing method on Yellow Creek's tributaries upstream from my property. I also understand that TGP will have to trench through at least one of these tributaries multiple times.

8.    I have personal aesthetic, recreational, and property interests in the waters of Yellow Creek and its tributaries. I, along with my family, frequently recreate in Yellow Creek, and we spend a lot of time in its waters and along its banks near my property. We commonly invite friends and family over and have cook-outs along Yellow Creek, go swimming, and entertain guests on the gravel bar in the

3

creek. I also help my great-nieces and great-nephews look for crawdads and salamanders in the creek, as the water is clear enough that you can see the bottom up to six or seven feet deep. The kids snorkel and swim around looking at the aquatic life in the creek and find minnows and interesting rocks, fossils, and arrowheads. They will bring their discovered treasures to me, and I enjoy helping them identify what they have found. I get so much joy from spending time with my family and friends in and around the creek, teaching the next generation about nature, and seeing everyone enjoy it. I want to continue to be able to use and enjoy Yellow Creek in these ways.

9.    I also frequently fish in Yellow Creek, which is a fantastic smallmouth bass fishery. I have fished in the creek for many years, even before I bought my property, and I would like to continue doing so in the future. I usually wet wade into Yellow Creek and fly fish from my property. My great-nieces and great-nephews will sometimes fish with me, and I am currently teaching several of them to fish. We enjoy spending this time with each other in Yellow Creek.

10.    I used to paddle often in Yellow Creek. I would paddle upstream and downstream from our property, and I have explored by boat some of the tributaries to Yellow Creek that the Cumberland Pipeline will cross. I recently had surgery on my knee, so I cannot currently paddle as much as I used to, but I intend to resume

doing so. My family and guests still paddle in Yellow Creek, and I enjoy seeing them using our kayaks and exploring our natural surroundings.

11.    I am concerned that construction impacts due to sedimentation from open-cut crossing methods and drilling mud releases from HDD will burden Yellow Creek and its tributaries. Increased sediment loads will adversely impact these waterways and the aquatic life that resides in them, including the portion of Yellow Creek abutting my property. I have seen pictures from an open-cut pipeline construction crossing in West Virginia where sediment was visible in a stream 19 miles downstream from the crossing. I have also reviewed scientific literature which concludes that open-cut crossing methods can cause both short- and long-term impacts to aquatic life, its habitat, and its reproductive success. This literature also finds that multiple crossings in the same watershed can have permanent effects on streams. My aesthetic and recreational interests in Yellow Creek and my enjoyment of that stream are harmed by my concerns about the serious sedimentation threats to Yellow Creek from construction of the proposed Cumberland Pipeline.

12.    If construction of the Cumberland Pipeline proceeds as approved by TDEC, I will not fish as often in Yellow Creek in the future or enjoy that activity as much as I do now. To remain a great fishery, Yellow Creek needs abundant minnows and crawdads which in turn rely on healthy insect populations and clean water. Right now, those critters are all there, but pipeline construction activity in and around the

creek seriously threatens invertebrates directly and adversely, which would in turn harm the vertebrate population.

13.    Likewise, my use and enjoyment of Yellow Creek will be impaired by the risks created by pipeline construction. This includes the risk that the waters may become so muddy from construction of the Cumberland Pipeline that my great-nieces and great-nephews are no longer able to find crawdads, minnows, and interesting artifacts in the creek to share with me due to loss of habitat and poor visibility underwater.

14.    Buying and living on this property has been the realization of a dream for me and my wife. We spent our careers working in order to find a place like this where we could retire. We loved coming to Yellow Creek before we ever bought this land, and when this property along the creek came up for sale, we knew that this was the place where we wanted to live.

15.    My house is located on a bluff overlooking Yellow Creek. The side of my house overlooking the creek is full of windows, and I enjoy looking out of those windows or standing on my back porch and seeing the clear water in the creek down below. The view is gorgeous. Yellow Creek is one of the first things I see when I wake up every morning, and it is the backdrop to my day as I move around the house. On clear and bright days, I can see the water sparkling in Yellow Creek from sunlight and shiner minnows.

16.     One of my favorite pastimes at home is to watch all of the birds and wildlife which reside in the area and use Yellow Creek. A great blue heron frequently fishes in Yellow Creek just below my house, and I really enjoy watching him at work. Canada geese nest here, and I enjoy hearing them flying up and down the creek. Recently I've been really excited to see nesting bald eagles move into the area, and I believe they came here primarily to be close to Yellow Creek. I saw two bald eagles while sitting on my porch just last week.

17.     Construction impacts from the Cumberland Pipeline will reduce my use and enjoyment of not only Yellow Creek but also my property. I will be really sad to look out of my window and think about the serious threat that the Cumberland Pipeline poses to the clear waters of Yellow Creek below. Sediment in Yellow Creek would destroy the creek's natural beauty which I so value.

18.     The risk of a sediment-choked Yellow Creek also threatens my ability to observe the wildlife which use the creek and reside on my property. I worry that it will be difficult for the great blue heron and bald eagles to fish in cloudy, dirty water, and that these birds will abandon the area. I also worry that the other wildlife I so enjoy seeing on my property—critters like deer and turkey—will leave to search for cleaner drinking water, and that I won't be able to see these animals as often from my house or along the trails on my property. I don't believe any amount of money would compensate losing my use and enjoyment of Yellow Creek in its current state.

19.    I am also concerned about the health impacts of operating a gas pipeline. Methane is a deadly gas, and I think leaks from the Cumberland Pipeline could have harmful consequences on Yellow Creek, wildlife in the area, and human health, including my own.

20.    I utilize a private water well on my property. This well used to be our drinking water source, but my house is now hooked up to city water. However, I still use this well to irrigate my vegetable and flower gardens. I have reviewed a Federal Energy Regulatory Commission ("FERC") Environmental Impact Statement for a pipeline which acknowledges that blasting when constructing a pipeline can negatively impact both the quality and quantity of nearby groundwater, which can in turn negatively affect wells. As a result, I am concerned that blasting for the Cumberland Pipeline could decrease the amount of water I have available to use for irrigation on my property. City water is expensive, and if I am no longer able to use my private well water, my water bill will go up dramatically, as I will need to use city water to irrigate my gardens.

21.    Because the ARAP and Section 401 certification are necessary for pipeline construction and the crossing of Yellow Creek and its tributaries, that approval causes my concerns about the Cumberland Pipeline's threats to my aesthetic, recreational, and property interests.

22.    I believe that a favorable decision in this matter, including, but not limited to, a decision to vacate TDEC's issuance of the ARAP to TGP, would provide redress for the injuries to my aesthetic, recreational, and property interests as described above.

23.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on January __10__, 2024.

_____
Charles Crow

No. 23-3682

_____

IN THE UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

SIERRA CLUB and APPALACHIAN VOICES,

*Petitioners,*

v.

TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION; DAVID W. SALYERS, in his official capacity as Commissioner of the Tennessee Department of Environment and Conservation; JENNIFER DODD, in her official capacity as Director of the Division of Water Resources of the Tennessee Department of Environment and Conservation

*Respondents.*

_____

**DECLARATION OF JERRY STEVEN SHAFER**

I, Jerry Steven Shafer, hereby declare and state as follows:

1.      This declaration is based on my personal knowledge, information, and belief. I am over the age of eighteen and competent to testify.

2.      I am a member of Appalachian Voices and have been continuously since 2021.

3.    I understand that Appalachian Voices is challenging an Aquatic Resource Alteration Permit ("ARAP") and Clean Water Act Section 401 Certification issued by the Tennessee Department of Environment and Conservation ("TDEC") to Tennessee Gas Pipeline Company, LLC ("TGP") for the construction of a gas pipeline ("the Cumberland Pipeline") meant to service the Tennessee Valley Authority's ("TVA") proposed new gas plant at its Cumberland City, Tennessee facility.

4.    I am a retired teacher and have lived on my farm in Charlotte, Tennessee for approximately 33 years. My home is about a quarter of a mile from the proposed route of the Cumberland Pipeline. My property borders Peabody Branch upstream from where it merges with Gafford Branch. Gafford Branch—as well as several of its tributaries—will be crossed by the Cumberland Pipeline. Peabody Branch and Gafford Branch join prior to emptying into Jones Creek, another waterway which will be crossed by the Cumberland Pipeline.

5.    I have personal aesthetic and recreational interests in Peabody Branch and Gafford Branch and its tributaries. The confluence of Gafford Branch and Peabody Branch is a short drive from my home, and I regularly take my grandchildren there to swim, recreate, and explore nature—as often as every week when the weather is nice. My grandchildren and I enjoy swimming, hunting for crawdads, looking for fish and other aquatic life in the stream, and generally taking

2

pleasure in these waters in their current state. I have been visiting this beautiful spot for many years and would like to continue doing so. I know other families in the area who also regularly swim and recreate there.

6.    The banks of Gafford Branch and its tributaries upstream of its confluence with Peabody Branch are very steep and wooded. It is difficult to even walk down these banks to get to the water. I know that the Cumberland Pipeline route deviates from TVA's transmission line right-of-way along Gafford Branch because of the steep banks along that waterway. Construction of the Cumberland Pipeline will require clear-cutting the steep and wooded terrain along Gafford Branch and its tributaries. Cutting down trees in this area will cause erosion and result in sediment running into and damaging these and downstream waters.

7.    I am concerned that construction of the Cumberland Pipeline will adversely affect Peabody Branch and Gafford Branch. I understand that TGP plans to use a dry-ditch, open-cut crossing method to construct its pipeline through Gafford Branch and its tributaries. I have reviewed scientific literature which finds that this pipeline construction method can cause both short- and long-term impacts to aquatic life, habitat, and species' reproductive success due to increased sedimentation. I have also seen pictures of the environmental damage which occurred during another pipeline construction project in West Virginia which used the same crossing technique. There, the river downstream from the crossing was

filled with visible sediment for almost twenty miles. My recreational and aesthetic

interests in Peabody Branch and Gafford Branch are harmed by my concerns about

runoff and sedimentation—and their effects on these waters—caused by

construction of the Cumberland Pipeline.

8.    I want to continue visiting Peabody Branch and Gafford Branch with

my grandchildren to swim, explore, and enjoy the beautiful scenery. However, the

threats to these waterways posed by construction and operation of the Cumberland

Pipeline—including increased sedimentation negatively affecting water quality and

aquatic life—diminishes my current use and enjoyment of them. Further, if those

harms occur, I would visit Peabody Branch and Gafford Branch less often. I would

not take my grandchildren to swim or recreate in these streams if they turn into

muddy waterways impacted by sediment pollution.

9.    I enjoy living on my farm in part because I enjoy observing the

wildlife that lives nearby. About three quarters of my property is wooded, and I see

bald eagles, various birds, turkey, deer, racoons, and possums. I like to take my

grandchildren for walks around my land to see all of the wildlife and listen for

birdsong. I have an app on my phone which helps us to identify birds and plants,

and I use that tool to help my grandchildren learn about nature.

10.    I am concerned that construction of the Cumberland Pipeline will

disturb local wildlife and impair their habitat. Animals flee from construction

noises, and local wildlife habitat will be negatively impacted by the tree clearing

necessary to build the Cumberland Pipeline. I am also concerned about wildlife

being harmed if the Cumberland Pipeline causes a gas explosion. The resulting fire

would be really difficult to contain in this area, with its heavy forest cover and

steep terrain. Wildlife as well as people would be harmed during such a disaster.

These concerns, which will stay with me even after the Cumberland Pipeline is

constructed, cause harm to my interests in observing wildlife on my property and

enjoying nature in this way with my family.

11.    I was living here on my farm in 1992 when a gas pipeline exploded in

nearby White Bluff, Tennessee. I heard a roaring sound like a jet engine stuck in

one place. I climbed a hill about four or five miles from the site of the explosion,

and even from that distance, I was able to see the flames. I understand the pipeline

that exploded in 1992 had a 12-inch diameter, but the Cumberland Pipeline would

have a much larger, 30-inch diameter.

12.    We cut hay on my farm and also keep sheep, goats, and chickens. I

also teach blacksmithing classes from a forge I have on the farm. My home is next

to the "evacuation zone" for the pipeline, so I am concerned for my safety if the

pipeline were to explode. If there was an explosion, I may not have time to

evacuate myself, my family, or our animals. If the explosion damaged my

property, I would not be able to farm or continue teaching blacksmithing classes as

I currently do. The Cumberland Pipeline thus puts my life, my property, and my use and enjoyment of my property at risk. These safety concerns will significantly impact my daily use and enjoyment of my property.

13.    Even if a pipeline explosion did not directly affect myself or my property, a fire started by the pipeline would endanger me and my family. The area between my farm and the pipeline route is wooded and difficult to reach. Firefighters do not have adequate access to prevent any fire from rapidly spreading to my home. I have spoken to people who work at my local fire department, and they have told me they are not trained or equipped to deal with a pipeline fire.

14.    I am also concerned that placing this pipeline under the extremely high voltage TVA transmission line increases the risk of an accident. I understand the transmission line along the pipeline route has among the highest voltage of any in the country, and that static electricity can increase the danger of an explosion or leak in a pipeline located underneath such a transmission line.

15.    I am also concerned that the Cumberland Pipeline could contaminate and jeopardize my drinking water supply. City water is not available to me, so all of my water is supplied by a well on my property. I use that well both for personal use in my home and to water the livestock I have on my farm. I have reviewed environmental analyses which show that blasting during pipeline construction can negatively impact both the quality and quantity of well water. If the quantity of my

well water is negatively impacted by construction of the Cumberland Pipeline, I will not have enough water for personal and farm uses. Also, when there is heavy rain, my well water can have elevated sediment levels for a period of time. If sediment-laden well water occurs just from heavy rain events, I worry what could happen to my water supply due to major construction activities like blasting for pipeline construction.

16.    Because the ARAP and Section 401 Certification are necessary for pipeline construction and the crossing of Gafford Branch and its tributaries, that approval causes my concerns about the effects of the pipeline on my aesthetic and recreational interests.

17.    I believe that a favorable decision in this matter, including, but not limited to, a decision to vacate TDEC's issuance of the ARAP to TGP, would provide redress for the injuries to my recreational, aesthetic, and property interests as described above.

18.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on January _13_, 2024.


Jerry Steven Shafer

7

No. 23-3682

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

SIERRA CLUB and APPALACHIAN VOICES,

*Petitioners,*

v.

TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION,
ET AL.,

*Respondents,*

and

TENNESSEE GAS PIPELINE COMPANY,

*Intervenor.*

---

**DECLARATION OF AMY KELLY**

I, Amy Kelly, hereby declare and state as follows:

1.      This declaration is based on my personal knowledge, information, and belief. I am over the age of eighteen and competent to testify.

2.      I submit this declaration in support of the Sierra Club in the above-captioned petition seeking review of the Tennessee Department of Environment and Conservation's ("TDEC" or "the Department") decision to issue Aquatic Resource Alteration Permit NRS 22.192 ("ARAP") to Tennessee Gas Pipeline Company, LLC ("TGP"). This ARAP, which also

1

serves as TDEC's certification under Section 401 of the Clean Water Act, authorizes TGP to impact water resources during its construction of a methane gas pipeline ("the Cumberland Pipeline") intended to service the Tennessee Valley Authority's ("TVA") proposed gas plant in Cumberland City, Tennessee.

3.       I am a Tennessee resident and live in Maryville, Tennessee.

4.       I am the Tennessee Valley Region Field Organizing Strategist for the Sierra Club, and my work focuses on the Club's Beyond Coal and Beyond Dirty Fuels Campaigns. These Campaigns are projects of the Sierra Club, a non-profit organization organized under the laws of the State of California. I am responsible for overseeing the operations of these Campaigns in Tennessee, which focus on promoting clean energy. This work includes advocacy to ensure that TVA does not replace aging coal-fired power plants with new investments in fossil fuels like coal and gas. I work closely with the Sierra Club's Tennessee Chapter in promoting clean energy throughout the state.

5.       I have been working at the Sierra Club since July of 2021. In my position, I am responsible for directing the activities of the Campaigns in Tennessee. These activities include community outreach, public education, legislative lobbying, and litigation. In order to perform the responsibilities of my job, my staff and I interact on a daily basis with the Sierra Club's members in Tennessee. Because of my position and responsibilities, and through my regular interaction with members, I am familiar with the Sierra Club's purpose, organization, and activities, and with the environmental interests and concerns of Sierra Club members.

6.       As part of my position, I am familiar with membership statistics for the Sierra Club in the areas in which I work. Sierra Club currently has 6,491 members in Tennessee. I am also familiar with and have access to membership data for specific members.  As such, I am

aware that Robert Connor and Charles Crow were members on August 18, 2023, and remain current and active members of the Sierra Club.

7.    Sierra Club's purposes are to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's ecosystems and resources; to educate and enlist humanity in the protection and restoration of the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

8.    Sierra Club and its members are greatly concerned about environmental issues in Tennessee, including impacts from the power sector such as land use, air and water pollution, and climate change. Among other things, the Sierra Club advocates for a clean-energy transition for TVA and other utilities nationwide to reduce or eliminate climate-warming emissions and provide affordable renewable energy and clean jobs.

9.    To advance these goals, Sierra Club advocates for a clean-energy portfolio during the development every several years of TVA's integrated resource plan ("IRP"), a statutorily mandated forward-looking process in which TVA is supposed to make decisions about its future power supply that are intended to guide project-level decision making. Sierra Club has actively participated during every recent IRP process TVA has undertaken and we intend to continue doing so, including during the development of TVA's next IRP. To that end, we currently have representatives on TVA's IRP working group.

10.    Sierra Club staff and members regularly attend the meetings of TVA's Board of Directors and TVA listening sessions. In these forums, the Sierra Club submits comments on the direction of TVA's strategic plans, its operations, and individual project decisions.

11.    Sierra Club also advocates for policies that support affordable clean energy through outreach to the public and engagement with federal, state, and municipal governmental

bodies. For example, Sierra Club has worked in recent years to educate the public and the Board of Memphis Light, Gas, and Water ("MLGW") about the benefits of a clean energy portfolio as a way to protect the environment, lower energy costs, and address Memphis's energy burden, as well as ways Memphis could acquire more renewable energy and decrease its reliance on dirty fossil power.

12.     Sierra Club routinely advocates directly to TVA, other federal and state agencies with permitting authority over TVA, and federal and state agencies with permitting authority over companies which provide infrastructure to service TVA's energy facilities. For example, Sierra Club participates in the administrative processes for proposed TVA projects—including but not limited to new power plants like the proposed gas facility in Cumberland City, Tennessee—and encourages TVA to pursue carbon-free alternatives to fossil fuels such as solar and wind generation, battery storage, energy efficiency programs, and more. As part of this advocacy, Sierra Club submitted comments during TVA's environmental review of its proposal to build a large combined-cycle plant at its Cumberland facility and has filed a lawsuit challenging the sufficiency of that review under the National Environmental Policy Act ("NEPA").

13.     Sierra Club intervened in the proceeding before the Federal Energy Regulatory Commission ("FERC") regarding TGP's plans to construct and operate the Cumberland Pipeline to service TVA's Cumberland gas plant. Sierra Club participated at every opportunity in the FERC proceedings regarding TGP's application for a Certificate of Public Convenience and Necessity, advocating that FERC, among other things, must further analyze the purpose and need for TGP's proposed pipeline, alternatives to the proposed pipeline and gas plant, and climate change effects of the project.

14.     Sierra Club submitted comments to the U.S. Army Corps of Engineers opposing

TGP's application for a permit under Section 10 of the Rivers and Harbors Act and Section 404

of the Clean Water Act to construct the Cumberland Pipeline. Sierra Club also submitted

comments to TDEC on TGP's application for ARAP NRS 22.192, which also serves as TDEC's

certification under Section 401 of the Clean Water Act, to construct the Cumberland Pipeline. In

its comments to TDEC, Sierra Club alerted the Department to, among other issues, the

insufficiency of TGP's analysis on the cumulative impacts construction of the Cumberland

Pipeline would have on affected water resources as well as TGP's failure to identify the least

environmentally damaging practicable alternative for each body of water which TGP proposes to

cross along the pipeline route. TDEC did not meaningfully address Sierra Club's comments or

amend the conditions or analysis in the final ARAP to address these legal deficiencies.

15.     Sierra Club has members who live, work, and/or recreate along the proposed route

of TGP's Cumberland Pipeline and who have environmental, recreational, aesthetic, and

property interests in areas along that route, including in many of the waterbodies which TGP

must cross in order to construct the pipeline. TDEC's issuance of the ARAP and Section 401

certification to TGP—which will allow TGP to, among other things, trench through scores of

these waterbodies rather than using less damaging alternatives—will adversely affect the

environmental, recreational, aesthetic, and property interests of Sierra Club's members and is

inconsistent with the mission of the Sierra Club.  These injuries would be redressed by a

favorable decision in this matter, including, but not limited to, a decision to vacate TDEC's

issuance of the ARAP to TGP.

16.     I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge, information, and belief.

Executed on May __7__, 2024.

Amy Kelly

No. 23-3682

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

SIERRA CLUB and APPALACHIAN VOICES,

*Petitioners,*

v.

TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION,
ET AL.,

*Respondents,*

and

TENNESSEE GAS PIPELINE COMPANY,

*Intervenor.*

**DECLARATION OF ANGELA MUMMAW**

I, Angela Mummaw, hereby do declare and state as follows:

1.    I have personal knowledge of the following and could competently testify thereto
if called as a witness.

2.    I am a member of Appalachian Voices and currently serve as Appalachian Voices'
Middle Tennessee Organizer. I spend nearly all of my time in that role organizing opposition to
the Tennessee Valley Authority's ("TVA") proposed gas plant in Cumberland City, Tennessee,
and Tennessee Gas Pipeline, LLC's ("TGP") proposed pipeline ("Cumberland Pipeline") which

1

would service that plant. This work includes speaking to affected landowners and community members, attending public meetings, and submitting comments advocating that TVA replace its aging coal-fired power plant in Cumberland City with clean energy sources.

3.      As an employee of Appalachian Voices, I am familiar with the membership roster for the organization. Currently, Appalachian Voices has 957 members in Central and Southern Appalachia, including Tennessee. Based on my role, I also have access to and am aware of membership data for specific members and know that Jerry Steven Shafer was a member on August 18, 2023, and remains a current and active member of Appalachian Voices.

4.      Appalachian Voices is a grassroots advocacy organization which seeks to advance healthy communities and environmental protection in the Appalachian region. As part of its work, Appalachian Voices seeks to shift the region away from fossil fuel dependency to a clean and just energy future. Part of that work includes opposing unnecessary gas pipelines.

5.      Appalachian Voices and its members have a robust presence in Tennessee. Appalachian Voices has an office in Knoxville, Tennessee, and its employees and members are very concerned about TVA's proposed gas buildout in the state and the pipeline infrastructure which is necessary to support that buildout. Instead of doubling down on gas plants, Appalachian Voices and its members want TVA to provide renewable and clean energy to the region as well as renewable and clean energy jobs to the citizens of Tennessee.

6.      As part of our opposition to TVA's proposal to build a gas plant at its Cumberland facility, Appalachian Voices submitted comments on TVA's environmental review of its proposal and filed a lawsuit challenging the sufficiency of that review under the National Environmental Policy Act ("NEPA").

7.      Appalachian Voices also intervened in proceedings before the Federal Energy

Regulatory Commission ("FERC") opposing TGP's plans to construct and operate the
Cumberland Pipeline to service TVA's gas plant, and has participated at multiple opportunities in
the FERC proceedings on TGP's application for a Certificate of Public Convenience and
Necessity under the Natural Gas Act.

8.      Appalachian Voices has also submitted comments to the U.S. Army Corps of
Engineers and TDEC opposing the issuance of necessary state and federal water permits to allow
construction of the Cumberland Pipeline.

9.      In its comments to TDEC on the draft Aquatic Resource Alteration Permit
("ARAP") NRS22.192, which also serves as Tennessee's certification under Section 401 of the
Clean Water Act, Appalachian Voices pointed out that TGP has not demonstrated that its
proposed water-crossing methods to construct the pipeline are the least environmentally
impactful practicable alternatives.  Appalachian Voices also raised concerns with TGP's failure to
appropriately consider the cumulative impacts the Cumberland Pipeline will have on impacted
waterbodies. Based on these and other deficiencies, Appalachian Voices asked TDEC to deny
TGP's permit application. TDEC did not sufficiently address Appalachian Voices' comments and
instead issued a final version of ARAP NRS22.192 without fixing these deficiencies.

10.      Appalachian Voices has members who live, work, and recreate along the proposed
route of TGP's Cumberland Pipeline and who have environmental, recreational, aesthetic, and
property interests in areas along that route, including in many of the waterbodies which TGP
must cross to construct the pipeline. TDEC's issuance of the ARAP to TGP—which will allow
TGP to, among other things, trench through scores of these waterbodies rather than using less
damaging alternatives—will adversely affect the environmental, recreational, aesthetic and
property interests of Appalachian Voices' members and is inconsistent with the mission of

3

Appalachian Voices. These injuries would be redressed by a favorable decision in this matter,

including, but not limited to, a decision to vacate TDEC's issuance of the ARAP to TGP.

11.    I declare under penalty of perjury that the foregoing is true and correct.

Dated this $\underline{22}$ day of May 2024.

*angela Mummaw*

Angela Mummaw

4

AD107