**Case No. 23-3682**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

◆

**SIERRA CLUB, et al.,**
*PETITIONERS,*

v.

**TENNESSEE DEPARTMENT OF ENVIRONMENT AND
CONSERVATION,**
*RESPONDENT*

AND

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.,**
*INTERVENOR-RESPONDENT.*

◆

On Petition for Review from the
Tennessee Department of Environment and Conservation's
§ 401 Water Quality Certification and ARAP Permit NRS 22.192 (July 21, 2023)

◆

**BRIEF FOR INTERVENOR-RESPONDENT
TENNESSEE GAS PIPELINE COMPANY, L.L.C.**

◆

Bartholomew J. Kempf
Lela M. Hollabaugh
Bradley Arant Boult Cummings LLP
1221 Broadway, Suite 2400
Nashville, Tennessee 37203
(615) 244-2582
(615) 252-4714 (fax)
bkempf@bradley.com
lhollabaugh@bradley.com

Scott Burnett Smith
Schyler B. Burney
Bradley Arant Boult Cummings LLP
200 Clinton Avenue West, Suite 900
Huntsville, Alabama 35801
(256) 517-5100
(256) 517-5200 (fax)
ssmith@bradley.com
sburney@bradley.com

Emily M. Ruzic
Bradley Arant Boult Cummings LLP
One Federal Place
1819 5th Avenue N
Birmingham, Alabama 35203
(205) 521-8447
(205) 521-8800 (fax)
eruzic@bradley.com

David A. Super
Kevin A. Ewing
Bracewell LLP
2001 M Street, NW, Suite 900
Washington, D.C. 20036
Telephone: (202) 828-5836
david.super@bracewell.com
kevin.ewing@bracewell.com

*Counsel for Tennessee Gas Pipeline Company L.L.C.*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-3682         Case Name: Sierra Club v. TDEC

Name of counsel: Scott Burnett Smith

Pursuant to 6th Cir. R. 26.1, Intervenor Tennessee Gas Pipeline Company, L.L.C.
                                *Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> Yes. Kinder Morgan, Inc. (NYSE ticker: KMI) owns 100% Kinder Morgan GP LLC, which is the general partner of Kinder Morgan Energy Partners, L.P., owning the 1% general partner interest (the limited partner interest is owned by Kinder Morgan, Inc. (97.5842%) and Kinder Morgan GP LLC (1.4158%). Kinder Morgan Energy Partners, L.P. owns 100% of Kinder Morgan Operating LLC "A", which is the immediate parent and owner of all the outstanding membership interests of Tennessee Gas Pipeline Company, L.L.C.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> Yes. Kinder Morgan, Inc. (NYSE ticker: KMI) owns 100% Kinder Morgan GP LLC, which is the general partner of Kinder Morgan Energy Partners, L.P., owning the 1% general partner interest (the limited partner interest is owned by Kinder Morgan, Inc. (97.5842%) and Kinder Morgan GP LLC (1.4158%). Kinder Morgan Energy Partners, L.P. owns 100% of Kinder Morgan Operating LLC "A", which is the immediate parent and owner of all the outstanding membership interests of Tennessee Gas Pipeline Company, L.L.C.

---

### CERTIFICATE OF SERVICE

I certify that on _____ July 22, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Scott Burnett Smith

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

TABLE OF CONTENTS

**Page**

Corporate Disclosure........................................................................ i

Table of Authorities........................................................................ iv

Statement in Support of Oral Argument ............................................. vii

Statement of Jurisdiction.................................................................. ix

Statement of the Case......................................................................1

I.     The Cumberland Pipeline Project .................................................1

II.    The Federal and State Permitting Process......................................2

    A.   The Role of the Federal Energy Regulatory Commission ............................2

    B.   The Role of the U.S. Army Corps of Engineers..............................................4

    C.   The Process and Standards for 401 Certification ...........................................5

III.   TDEC's Comprehensive Review of the 401 Certification................................8

    A.   Tennessee Gas Pipeline's Application................................................8

    B.   TDEC's Thorough Review of Tennessee Gas Pipeline's Request for Certification under Section 401 and ARAP ...............................12

Summary of the Argument...............................................................17

Argument.........................................................................................19

I.     Standard of Review ....................................................................19

II.    TDEC Fully Complied with the Requirements for the 401 Certification and ARAP. ........................................................................21

    A.   TDEC properly considered yet found no practicable alternatives to the proposed activities.......................................................22

        1.   TDEC carefully assessed route alternatives.............................................22

        2.   TDEC properly evaluated proposed waterbody crossings.........................26

    B.   TDEC properly considered whether the proposed activity would result in any appreciable permanent loss of resource values. ...............................32

        1.   TDEC properly gathered and analyzed data regarding the project's impact to resource values of affected waterbodies..................................33

        2.   TDEC was not required to consider "baseline conditions" to the extent Sierra Club argues.......................................................37

C.    TDEC properly considered whether Tennessee Gas Pipeline's actions would adversely affect downstream water quality. ....................................39

1.    TDEC properly considered the impact of activities in wet weather conveyances. ................................................................................39

2.    TDEC's evaluation of the risk of water quality standards violations is fully supported by the record. ...................................................41

**III.**    TDEC Acted Fully Within its Discretion in Authorizing Tennessee Gas Pipeline's In-Field Determinations. ...........................................44

A.    TDEC's established specific criteria governing Tennessee Gas Pipeline's in-field activities. ...........................................................45

B.    TDEC required Tennessee Gas Pipeline to implement the least impactful trenching technique at each stream crossing based on site-specific conditions. ................................................................47

C.    TDEC prohibited Tennessee Gas Pipeline from blasting without first obtaining TDEC approval. ...........................................................49

**IV.**    If the Court Finds that TDEC's Analysis Is Deficient, it Should Remand Without Vacating. .......................................................................50

Conclusion ...................................................................................................52

Certificate of Compliance ............................................................................55

Certificate of Service ....................................................................................56

## TABLE OF AUTHORITIES

**Cases**

*AES Sparrow Point LNG v. Wilson*,
  589 F.3d 721 (4th Cir. 2009) ...............................................................20

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993)......................................................50, 51

*Appalachian Voices v. State Water Control Board*,
  912 F.3d 746 (2019).................................................................45, 46, 50

*Bar MK Ranches v. Yuetter*,
  994 F.2d 735 (10th Cir. 1993) .............................................................20

*City of Olmsted Falls v. U.S. Env't Prot. Agency*,
  435 F.3d 632 (6th Cir. 2006) ...............................................................19

*Constitution Pipeline Co. v. New York Department of Environmental
  Conservation*,
  868 F.3d 87 (2d Cir. 2017) .......................................................31, 32, 35

*Kelly v. Selin*,
  42 F.4d 1501, 1518 (6th Cir. 1995) ......................................................20

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*,
  746 F.3d 698 (6th Cir. 2014) ...............................................................19

*Loper Bright Enterprises v. Raimondo*,
  __ U.S. __, No. 22-451, slip op. (June 28, 2024) ...............................20

*Louisville Gas & Electric Co. v. Fed. Energy Regul. Comm'n*,
  988 F.3d 841 (6th Cir. 2021) .........................................22, 26, 30, 35

*Ohio Valley Env't Coal. v. Bulen*,
  429 F.3d 493 (4th Cir. 2005) ...............................................................47

*Sierra Club v. State Water Control Bd.*,
  898 F.3d 383 (4th Cir. 2018) ...............................................................19

*Sierra Club v. U.S. Env't Prot. Agency*,
    60 F.4th 1008 (6th Cir. 2023) ..............................................................50

*Sierra Club v. State Water Control Board*,
    64 F.4th 187 (4th Cir. 2023) ...........................................28, 29, 36, 38

*Sierra Club v. West Virginia Department of Environmental
    Protection*,
    64 F.4th 487 (4th Cir. 2023) .........................................................30, 31

*St. Marys Cement Inc. v. U.S. Env't Prot. Agency*,
    782 F.3d 280 (6th Cir. 2015) ................................................................21

*Summit Petroleum Corp. v. U.S. Env't Prot. Agency*,
    690 F.3d 733 (6th Cir. 2012) ................................................................20

*In re United States Dep't of Def. & United States Env't Prot. Agency
    Final Rule*,
    No. 15-3751, 2016 WL 5845712 (6th Cir. Oct. 4, 2016) ...................20

**Statutes**

5 U.S.C. § 706 ....................................................................................................20

15 U.S.C. § 717f .............................................................................................2, 23

15 U.S.C. § 717r ..................................................................................................ix

33 U.S.C. § 403 ....................................................................................................5

33 U.S.C. § 1341 .......................................................................... viii, ix, 4, 5, 15

33 U.S.C. § 1344 .............................................................................................5, 47

Clean Water Act § 401 ...............................................................................*passim*

Natural Gas Act § 19 ..........................................................................................ix

Rivers and Harbors Act § 10 ..........................................................................4, 5

TENN. CODE ANN. § 4-5-322 ............................................................................19

TENN. CODE ANN. § 69-3-103 ...........................................................................7

Tᴇɴɴ. Cᴏᴅᴇ Aɴɴ. § 69-3-108 ..............................................................*passim*

**Other Authorities**

33 C.F.R. § 325.2 ...............................................................................5

40 C.F.R. § 121.1 ........................................................................6, 7, 39

40 C.F.R. § 121.3 ...........................................................................6, 39

40 C.F.R. § 121.7 .............................................................................6, 7

88 Fed. Reg. 61964 ............................................................................8

Tᴇɴɴ. Cᴏᴍᴘ. R. & Rᴇɢs. 0400-40-03-.02....................................8, 39, 40

Tᴇɴɴ. Cᴏᴍᴘ. R. & Rᴇɢs. 0400-40-03-.04........................................39, 40

Tᴇɴɴ. Cᴏᴍᴘ. R. & Rᴇɢs. 0400-40-03-.05................................................40

Tᴇɴɴ. Cᴏᴍᴘ. R. & Rᴇɢs. 0400-40-07-.01..................................................7

Tᴇɴɴ. Cᴏᴍᴘ. R. & Rᴇɢs. 0400-40-07-.03...........................7, 8, 11, 34, 37

Tᴇɴɴ. Cᴏᴍᴘ. R. & Rᴇɢs. 0400-40-07-.04..........................................*passim*

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

This appeal challenges the Tennessee Department of the Environment and Conservation's ("TDEC") issuance of a Clean Water Act § 401 water quality certification ("401 Certification") in connection with federal permits authorizing the construction of a natural gas pipeline and associated facilities (the "Project").

The Project at issue is a thirty-two-mile natural gas pipeline that will provide gas to a Tennessee Valley Authority ("TVA") power plant. The TVA has decided to construct and operate a new natural gas-fueled combined cycle plant on the Cumberland Fossil Plant Reservation Site ("Cumberland Plant") to replace the generation capacity of one of two coal-fired units to be retired. The Project will provide gas for the Cumberland Plant and consists of a 30-inch diameter pipeline originating from Tennessee Gas Pipeline Company, L.L.C.'s ("Tennessee Gas Pipeline") existing natural gas pipeline system in Dickson County to a delivery point in Stewart County, Tennessee. The pipeline's route generally follows TVA's existing electrical transmission lines and other utility easements.

TDEC granted Tennessee Gas Pipeline a 401 Certification for the Project. The 401 Certification certifies that the activities subject to the jurisdiction of the federal Clean Water Act ("CWA") will not violate the State of Tennessee's water quality standards. State certification (or waiver) under CWA Section 401 is a predicate to

federal authorization of activities that may result in a discharge to water. *See* CWA § 401, 33 U.S.C. § 1341.[1] In Tennessee, the 401 Certification is prepared and issued jointly with the State's Aquatic Resource Alteration Permit ("ARAP"), which authorizes impacts to streams and wetlands under state law incident to construction of the pipeline. In this action, Petitioners, Sierra Club and Appalachian Voices (collectively, "Sierra Club"), challenge only the CWA 401 Certification.

Tennessee Gas Pipeline submitted extensive information in support of its application for the 401 Certification. TDEC comprehensively reviewed the materials and evidence in the administrative record in accordance with its regulations and issued its decision after careful analysis. TDEC's decision in issuing the 401 Certification was not arbitrary or capricious.

Sierra Club attacks TDEC's decision-making process, analysis, and ultimate decision. But Sierra Club's arguments ultimately fail because they are belied by the administrative record and are inconsistent with statutory and regulatory authority. In light of Sierra Club's attempts to second-guess TDEC's expert conclusions and given the importance of the Project to regional power supply, Tennessee Gas Pipeline believes oral argument would be beneficial in deciding this Petition for Review.

---

[1] All relevant statutes and regulations are included in Sierra Club's Addendum. ECF 47.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under the Natural Gas Act § 19(d)(1). *See* 15 U.S.C. § 717r.

On July 22, 2022, Tennessee Gas Pipeline applied to TDEC for issuance of a 401 Certification for the Project. On July 21, 2023, TDEC issued a 401 Certification to Tennessee Gas Pipeline. On August 18, 2023, Sierra Club filed a timely petition for review of the 401 Certification. AR006762–006949 (JA____-___); ECF Nos. 1–2. On March 19, 2024, this Court granted Tennessee Gas Pipeline's motion to intervene. ECF Nos. 9, 41. Accordingly, this Court has jurisdiction to review Sierra Club's challenge to TDEC's issuance of the 401 Certification. *See* 33 U.S.C. § 1341.

## STATEMENT OF THE CASE

### I.     The Cumberland Pipeline Project

Tennessee Gas Pipeline is an interstate natural gas transmission company, whose mainline transmission system extends in a northeasterly direction from the states of Texas and Louisiana, through the southeastern states and into the Northeast.

The Project will provide up to 245,040 dekatherms per day (Dth/d) of firm natural gas capacity to the TVA's new Cumberland Gas Combined Cycle Power Plant, an electrical generating facility in Stewart County, Tennessee. AR003836 (JA _____). Project facilities consist of 32 miles of 30-inch diameter pipeline, two pressure regulation stations, a meter station, in-line inspection traps, and three mainline valves. AR003836–003837 (JA_____-__).

Tennessee Gas Pipeline will construct the Project using a 100-foot-wide construction right-of-way in most circumstances, along with additional temporary workspace, two contractor yards, and access roads. AR003837 (JA _____). Relevant to the 401 Certification, Project construction will have only minor impacts to state waters, and the overwhelming percentage of those impacts will be temporary. Construction will result in permanent impacts to 0.03 acres of wetlands, compared with temporary impacts to 0.69 acres of wetlands. Similarly, construction will result

1

in permanent impacts to 490 linear feet of stream, compared with temporary impacts to roughly 5400 linear feet of stream. AR006762 (JA_____).

Subject to all necessary regulatory approvals and clearances, Tennessee Gas Pipeline plans to begin construction in October 2024. AR003879 (JA _____). Tennessee Gas Pipeline anticipates commencing service in September 2025. AR003879(JA _____).

## II.    The Federal and State Permitting Process

### A.    The Role of the Federal Energy Regulatory Commission

The Project is subject to the authority of the Federal Energy Regulatory Commission ("FERC"), which oversees interstate natural gas pipelines. FERC possesses exclusive authority to approve the siting, construction, and operation of facilities used to transport natural gas in interstate commerce. 15 U.S.C. § 717f(c)(1). Tennessee Gas Pipeline may not undertake the construction of any facilities or operate any such facilities unless it has received a certificate of public convenience and necessity issued by FERC authorizing such activity or operations ("FERC's Certificate Process"). *Id*.

As part of FERC's Certificate Process, FERC conducted an extensive review of the Project beginning with the commencement of FERC's formal pre-filing review process in November 2021 in Docket No. PF22-2-000. AR000925

(JA\_\_\_\_\_). Tennessee Gas Pipeline applied for a certificate of public convenience and necessity to FERC in Docket No. CP22-493-000 on July 22, 2022. AR001777 (JA\_\_\_\_\_); AR003836 (JA\_\_\_\_\_). Notice of Tennessee Gas Pipeline's application was issued on July 29, 2022, and appeared in the *Federal Register* on August 4, 2022. AR003836 (JA\_\_\_\_\_); AR003847 (JA\_\_\_\_\_). This notice began a comment period with an August 29, 2022 deadline to file a motion to intervene. AR003837 (JA\_\_\_\_\_). FERC published a notice and comment announcement in the *Federal Register* on September 7, 2022, with interventions, comments, and protests due on October 7, 2022. AR003837 (JA\_\_\_\_\_).

FERC is the lead agency for conducting environmental reviews required by the National Environmental Policy Act ("NEPA") for interstate pipeline projects. As part of FERC's Certificate Process, in cooperation with other federal agencies, FERC considered the environmental impacts resulting from the construction and operation of the Project and prepared an environmental document (in this case, a final Environmental Impact Statement, or "FEIS"). AR003823–004398 (JA\_\_\_\_-\_\_). In addition, FERC examined the need for the Project, the proposed route of the Project and possible alternative routes, land use issues, and any measures needed to ensure the safe construction and operation of the Project. AR002930–003055 (JA\_\_\_\_-\_\_).

3

FERC's Certificate Process involved comments from interested stakeholders, including affected landowners, and environmental groups, regulatory agencies, and governmental officials.

FERC issued the FEIS in June 2023. The FEIS addressed Project impacts and mitigation of impacts on a variety of environmental resources, including geology; soils; water resources; fisheries, vegetation, wildlife, and protected species; land use, recreation, and visual resources; cultural resources; socioeconomics and environmental justice; air quality; noise; reliability; safety; cumulative impacts; and alternatives. AR003823–004398 (JA____-__).

In January 2024, FERC issued a Certificate for the Project ("FERC Certificate"), which authorizes construction and operation of the Project, in Docket No. CP22-493-000. Exhibit C to Complaint at 40, Ordering ¶ (A). Because construction of the Project will cross Tennessee waterways, the FERC Certificate incorporated by reference the 401 Certification conditions. *Id*; *see also* CWA § 401; 33 U.S.C. § 1341.

## B.    The Role of the U.S. Army Corps of Engineers

The Project also requires a permit from the U.S. Army Corps of Engineers ("USACE") pursuant to both Section 404 of the CWA and Section 10 of the Rivers and Harbors Act. Section 404 of the CWA allows the issuance of a permit for the discharge of dredged or fill materials in "waters of the United States," including

4

wetlands. 33 U.S.C. §§ 1341, 1344. Section 10 of the Rivers and Harbors Act allows USACE to authorize activities that impact the traditional navigable waters of the United States. 33 U.S.C. § 403. The USACE permit does not authorize the Project itself but authorizes certain impacts to waters subject to Federal law.

On July 22, 2022, Tennessee Gas Pipeline applied for the USACE permit. AR001543 (JA_____); 33 U.S.C. § 1341. State action, or a waiver by the State, under Section 401 of the CWA is a required predicate to the issuance of the USACE permit. 33 C.F.R. § 325.2(b)(1)(ii).

## C.    The Process and Standards for 401 Certification

Under Section 401 of the CWA, "[a]ny applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters" must "provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate . . . that any such discharge will comply with the applicable [CWA] provisions" pertaining to effluent limitations, water quality standards, and national standards of performance. 33 U.S.C. § 1341(1); *see also* TENN. COMP. R. & REGS. 0400-40-07-.04(3) ("An applicant for a federal license or permit to conduct an activity which may result in a

discharge to the navigable waters must first obtain a § 401 certification from [TDEC].").

A state agency has only four options under Section 401: waive certification, grant the certification, grant the certification with conditions, or deny the certification. 40 C.F.R. § 121.7. All Section 401 certifications issued by the state permitting authority must certify that the activity will comply with all applicable state and federal water quality requirements.[2] 40 C.F.R. §§ 121.1(j), 121.3(a), 121.7(c)(3), (d)(3).

Tennessee reviews and issues Section 401 certifications as part of the State's review of an ARAP, which is the permit that authorizes impacts to streams and wetlands under Tennessee law. Where an activity requires a 401 Certification *and* an ARAP, the ARAP "serves as the § 401 certification." Tenn. Comp. R. & Regs. 0400-40-07-.04(3). In effect, when TDEC issues an ARAP, it is accomplishing two authorizations in the same document. Specifically, TDEC is issuing an ARAP under Tennessee *state* law, which requires TDEC to find that there is no less impactful practicable alternative to the proposed activity and there will be no overall net loss of resource values from existing conditions. At the same time, TDEC is issuing a

---

[2] TDEC issued a 401 Certification to Tennessee Gas Pipeline on July 21, 2023. Accordingly, the 401 Certification here was issued under the prior version of the 401 regulations. *See* 40 C.F.R. § 121.1 *et seq*. (2020).

6

401 Certification under *federal* law. *See* 40 C.F.R. §§ 121.1(j), 121.7(c)(3), 121.7(d)(3); TENN. COMP. R. & REGS. 0400-40-07-.04(1), (3); *see also* TENN. COMP. R. & REGS. 0400-40-07-.03(4), (6) (separately defining "ARAP" and "Certification"). Thus, TDEC uses the ARAP process to understand the implications of the proposal for water quality standards so that it can act under Section 401, but the 401 Certification is not co-extensive with the ARAP.

The ARAP process addresses any activity that will result in "[t]he alteration of the physical, chemical, radiological, biological, or bacteriological properties of any waters of the state." TENN. CODE ANN. § 69-3-108(b)(1); TENN. COMP. R. & REGS. 0400-40-07-.04(1); *see also* TENN. COMP. R. & REGS. 0400-40-07-.03(4) (defining ARAPs). However, an ARAP is *not* required for alterations to "wet weather conveyances."[3] *See* TENN. CODE ANN. § 69-3-108(q); TENN. COMP. R. & REGS. 0400-40-07-.01(3).[4] Instead, alterations to wet weather conveyances must

---

[3] The Tennessee Code defines "wet weather conveyances" as "man-made or natural watercourses, including natural watercourses that have been modified by channelization" and that "flow only in direct response to precipitation runoff in their immediate locality;" "whose channels are at all times above the groundwater table;" "are not suitable for drinking water supplies;" and "[i]n which hydrological and biological analyses indicate that, under normal weather conditions, due to naturally occurring ephemeral or low flow there is not sufficient water to support fish, or multiple populations of obligate lotic aquatic organisms whose life cycle includes an aquatic phase of at least two (2) months." TENN. CODE ANN. § 69-3-103(46).

[4] Although State and Federal terms are not identical, these wet weather conveyances are not likely to be subject to the CWA. Under the CWA, ephemeral

7

comply with the conditions set forth in TENN. CODE ANN. § 69-3-108(q)(1) to ensure that associated activities "[do] not adversely affect the quality of downstream waters." TENN. COMP. R. & REGS. 0400-40-03-.02(6).

Tennessee's ARAP regulations require applicants to submit information sufficient for TDEC to determine whether "there is a practicable alternative to the proposed activity that would have less adverse impact on resource values." *See* TENN. COMP. R. & REGS. 0400-40-07-.04(b). If a less impactful "practicable alternative" exists, TDEC cannot issue the ARAP. *See* TENN. COMP. R. & REGS. 0400-40-07-.04(b); *see also id.* (requiring applicants submit an "alternatives analysis evaluating a range of potentially practicable alternatives"). A "practicable alternative" is one "that is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." TENN. COMP. R. & REGS. 0400-40-07-.03(24).

## III.    TDEC's Comprehensive Review of the 401 Certification.

### A.    Tennessee Gas Pipeline's Application

Tennessee Gas Pipeline submitted its application on July 22, 2022, seeking a 401 Certification and ARAP. AR000920–001637 (JA____-__). In its submission,

---

streams—*i.e.,* streams that flow only in direct response to precipitation—are not regulated. *See* Revised Definition of "Waters of the United States"; Conforming, 88 Fed. Reg. 61964 (final rule) (Sept. 8, 2023).

Tennessee Gas Pipeline provided a detailed evaluation of the "existing conditions" of the area and waters impacted by the Project. This included a 900-plus-page "Jurisdictional Waters Determinations and Tennessee Hydrologic Determinations Report" submitted in advance of its ARAP application. AR000001–000919 (JA____-__); AR000927 (JA____). Tennessee Gas Pipeline's ARAP application further included a "Cumberland Waterbodies Impact Table" with a detailed description of each impacted waterbody on a crossing-by-crossing basis. AR000927–000929 (JA____-__); AR000988–001004 (JA____-__). Tennessee Gas Pipeline also conducted a study "of the various geologic, hydrologic, and watershed conditions at *each waterbody crossing location*" to determine the physical limitations and conditions of each location's underlying geology. AR000944 (JA____) (emphasis added); *see also* AR000955–000967 (JA____-__) (table summarizing conditions at each crossing location).

In the "Project Rationale" section of its application, Tennessee Gas Pipeline explained that "[t]rench excavation will be the primary construction method to install the pipeline, although drilling (i.e., 'trenchless') methods may be used to advance pipe under selected waterbody crossings." AR000932 (JA____). Tennessee Gas Pipeline demonstrated that trench excavation is the least impactful practicable alternative for most waterbody crossings based on its alternatives analysis, which examined both open trench and trenchless crossing methods. AR000944–00967

9

(JA____-__);  AR001636–001637  (JA____-__).  Specifically,  Tennessee  Gas Pipeline evaluated two types of trenchless crossing methods: horizontal directional drilling and conventional boring. AR000949–000952 (JA____-__). It found that the associated costs for both methods "may be five (5) times more per foot than costs for a conventional crossing using open cut methods, which can become prohibitive to the Project budget." AR000951 (JA____).

Notwithstanding  the  cost,  Tennessee  Gas  Pipeline  proposed  using  the horizontal  directional  drilling  method  for  three  of  the  impacted  waterbodies  "to avoid environmental impacts at two Natural Rivers Inventory stream reaches (Jones Creek  and  Yellow  Creek)  and  due  to  the  physical  characteristics  of  Wells  Creek." AR000950  (JA____);  AR000952  (JA____).  It  concluded,  however,  that conventional boring under other waterbodies is "unlikely," based on "[m]ajor factors limiting  the  success  of  a  boring  operation"  under  the  waterbodies,  including  "the crossing  distance,  subsurface  soil  and  geologic  conditions,  and  existing topography." AR000950–000951 (JA____-__).

Thus, in its application, Tennessee Gas Pipeline explained to TDEC that there was no less impactful *practicable* alternative to the open trench method. AR000932– 000933 (JA___–__); AR000944–00967 (JA____-__). This means the open trench method is the alternative "that is available and capable of being done after taking

into consideration cost, existing technology, and logistics in light of overall project purposes." TENN. COMP. R. & REGS. 0400-40-07-.03(24).

In conformance with TDEC's requirements for permit applications, Tennessee Gas Pipeline provided TDEC with information on alternative routes. AR000939–000944 (JA____-__). Tennessee Gas Pipeline explained that there was no less impactful practicable alternative to its proposed route, which would be "generally parallel and adjacent to an existing TVA electric utility easement (approximately 80 percent co-located) and other utility easements"—*i.e.*, a route in which "land-use and property disruptions have already occurred." AR000933 (JA____). Any alternative route "that is not co-located with existing utility easements would not result in decreased impacts to water quality, and would have additional environmental and landowner impacts than the preferred route[.]" AR000933 (JA____). Tennessee Gas Pipeline noted that it was considering "multiple minor route variations," both to refine the pipeline's alignment and to respond to concerns raised by impacted landowners and regulatory agencies. AR000940 (JA____); *see also* AR000941–000944 (JA____-__) (describing minor route variations).

The preferred route poses no more than *de minimis* degradation to aquatic resources and "was chosen not only to minimize environmental impacts, but also to minimize the impacts to cultural sites, public lands, landowners, and communities."

11

AR000938–000939 (JA____-__). This route crosses only aquatic resources that have previously been disturbed. AR000939 (JA____). To follow alternative routes would likely require Tennessee Gas Pipeline to cross aquatic resources not previously disturbed by utility clearing and maintenance activities. AR000939 (JA____).

**B.     TDEC's Thorough Review of Tennessee Gas Pipeline's Request for Certification under Section 401 and ARAP**

TDEC engaged in a thorough and robust evaluation of Tennessee Gas Pipeline's request for the 401 Certification. In response to TDEC's field review of waters crossed by the pipeline,[5] Tennessee Gas Pipeline supplemented its application with revised figures and tables for its hydrologic determination request. AR001791–001871(JA____-__). TDEC also sent Tennessee Gas Pipeline two "Requests for Additional Information" which asked specific and probing questions about the Project and required Tennessee Gas Pipeline to submit hundreds of pages of additional information. AR001889–001892 (JA____-__); AR001896–002927 (JA____-__); AR003444–003445 (JA____-__); AR003449–003628 (JA____-__). Based on this back-and-forth between TDEC and Tennessee Gas Pipeline, TDEC

---

[5] When reviewing proposed projects, TDEC conducts on-the-ground, in-person field reviews to assess waters associated with a project. *See* AR001794–001795 (JA _____).

included stringent conditions and limitations on construction methods that will limit potential impacts to streams and wetlands.

TDEC's first Request for Additional Information was particularly comprehensive and detailed, asking multiple questions about Tennessee Gas Pipeline's proposed impacts and alternatives analysis. AR001889–001892 (JA____-__). TDEC specifically questioned the use of blasting techniques for rock removal and excavation, instructing that "the contractor [must] evaluate and attempt *all* non-blasting techniques at each stream crossing, as appropriate. For clarity, this language should be made clear in all construction plans as needed." AR001891 (JA____) (emphasis in original). Tennessee Gas Pipeline responded and agreed that "[o]nly if evaluation and attempted implementation of the non-blasting techniques indicate that these non-blasting alternatives are not practicable will controlled blasting be selected as the least adverse to resource values, yet practicable, alternative." AR001911 (JA____); AR001896–0002927 (JA____-__). Tennessee Gas Pipeline also responded to the second Request for Additional Information, which requested more information about its blasting plans. AR003449–003628 (JA____-__).

After receiving Tennessee Gas Pipeline's additional information and following the public notice and comment period, TDEC issued the final 401 Certification and ARAP effective July 21, 2023. AR004400–004406 (JA____-__);

AR006762–006949 (JA____-__). The final ARAP sets forth stringent requirements for the Project and imposes numerous special conditions. *See* AR006772–006781 (JA____-__).

For example, TDEC has placed extensive limitations on controlled blasting, prohibiting Tennessee Gas Pipeline from blasting in wetlands or in streams with karst geology or with an unacceptable risk of hydrologic loss. AR006772–006773 (JA____-__). Tennessee Gas Pipeline must also undertake substantial soil erosion control measures, including construction of trench plugs to reduce soil erosion in any areas "where there is high groundwater, where the pipeline crosses streams or aquifers, or where the natural groundwater flow would be affected or even diverted by the select material." AR006774 (JA____).

In addition, rather than simply authorizing trenching at water crossings, TDEC has required an additional adaptive management approach. Before Tennessee Gas Pipeline accomplishes a stream crossing by any method other than horizontal directional drilling, it must determine (for *each* stream crossing) "the least impactful practicable trenching technique." AR006772–006773 (JA____-_). The trenching methods considered included "[p]ipeline installation via dry-cut trenching vs. wet-cut trenching;" "[r]ock removal methods for trenched pipeline installation;" and "[p]ipeline installation via trenchless methods vs. open-cut trenching." AR006799–

14

006966 (JA____-__). Tennessee Gas Pipeline is also required to attempt at least one non-blasting alternative before proceeding with blasting methods. AR006772–006773 (JA____-_). Finally, TDEC has retained an active role that will require interacting with Tennessee Gas Pipeline as the Project moves forward. No blasting may occur without first obtaining TDEC's written authorization. AR006773 (JA____).

As required by Tennessee law, TDEC made "a final determination that the authorized impacts to jurisdictional waters, if carried out in accordance with the permit's conditions, will result in *de minimis* degradation." AR006805 (JA____); *see* TENN. COMP. R. & REGS. 0400-40-07-.04(5). Based on its evaluation of the record, including consideration of all relevant public comments (including Sierra Club's), TDEC concluded that the Project would not result in an appreciable permanent loss of resource value and accordingly did not require any compensatory mitigation. AR004617–006756 (JA____-__); AR006805 (JA____); *see also* TENN. COMP. R. & REGS. 0400-40-07-.04(4)(b), (5), (6).

In issuing its 401 Certification, TDEC explained that "[s]ubject to conformance with accepted plans, specifications, and other information submitted in support of the application," the State of Tennessee certifies the Project "pursuant to 33 U.S.C. § 1341, and . . . T.C.A. § 69-3-108(b)." AR006762 (JA____). Specifically,

15

for purposes of Section 401, TDEC certified that the following activities are

consistent with state water quality standards:

> Temporary impacts to 0.69 acres of wetland, permanent impacts to 0.03
> acres of wetland, temporary impacts to approximately 5400 linear feet
> of stream, temporary water withdrawals from eight streams and one
> reservoir, and permanent impacts to 490 linear feet of stream associated
> with the construction of a 32-mile 30-inch diameter natural gas
> pipeline.

AR006762 (JA____-__). TDEC comprehensively analyzed Tennessee Gas

Pipeline's application before issuing its 401 Certification.

## SUMMARY OF THE ARGUMENT

Sierra Club invites this Court to second-guess the considered judgment of TDEC concerning the impact of authorized activities on the State's waterbodies. But in assessing Tennessee Gas Pipeline's request for a 401 Certification and ARAP, TDEC thoroughly considered the voluminous materials submitted with Tennessee Gas Pipeline's application as well as supplemental materials and other documentation submitted in the public comment period (including comments from Sierra Club). Under Tennessee law, TDEC's decision to issue the 401 Certification was made in concert with the ARAP and complied with all applicable state regulations governing the issuance of 401 Certifications and ARAPs.

TDEC analyzed the evidence and documentation provided and requested additional information from Tennessee Gas Pipeline throughout the application process. TDEC's evaluation of the Project was in accordance with its regulatory guidance and State and Federal law. The record supports TDEC's reasoning and analysis.

This Court should decline Sierra Club's invitation to supplant TDEC's reasoned, record-supported judgment. TDEC is the entity entrusted to understand and protect Tennessee waterbodies and is in the best posture to gather and analyze data regarding the Project's impact to resource values of affected waterbodies. Sierra

Club's attempts to impose more stringent requirements are unsupported and inconsistent with TDEC's regulatory expertise. This Court should deny Sierra Club's Petition for Review and uphold TDEC's issuance of the 401 Certification for the Project.

**ARGUMENT**

## I.    Standard of Review

This Court reviews an agency's decision under the Administrative Procedure Act's arbitrary and capricious standard.[6] *See Sierra Club v. State Water Control Bd.,* 898 F.3d 383, 403 (4th Cir. 2018) (reviewing Virginia's 401 Certification under the arbitrary and capricious standard); *see also Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 705–06 (6th Cir. 2014) ("We review this grant of summary judgment in a challenge to the Corps's permitting decision under the Clean Water Act and NEPA under the Administrative Procedure Act's arbitrary and capricious standard."); *City of Olmsted Falls v. U.S. Env't Prot. Agency*, 435 F.3d 632, 636–37 (6th Cir. 2006) ("Because the Clean Water Act does not articulate its own standard of review, we review agency action pursuant to the Administrative Procedure[] Act."). Under the APA, the Court must "credit an agency action unless

---

[6] Sierra Club seeks judicial review of the 401 Certification TDEC issued to Tennessee Gas Pipeline. However, the 401 Certification is issued in connection with the ARAP, which is issued pursuant to Tennessee *state* law. Accordingly, this Court, in the alternative, could analyze TDEC's decision under Tennessee's standard. *See State Water Control Bd.*, 898 F.3d at 403 n.13. Under Tennessee's version on the Uniform Administrative Procedure Act, a reviewing court can reverse or modify agency action if the action (1) violates constitutional or statutory provisions, (2) exceeds the agency's statutory authority, (3) is "[m]ade upon unlawful procedure," (4) is "[a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion," or (5) is "unsupported by evidence that is both substantial and material in the light of the entire record." Tenn. Code Ann. § 4-5-322(h). TDEC's decision stands under either standard.

19

it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Summit Petroleum Corp. v. U.S. Env't Prot. Agency*, 690 F.3d 733, 740 (6th Cir. 2012) (cleaned up); *see also* 5 U.S.C. § 706(2)(A).

This Court will not "substitute [its] judgment of environmental impact for the judgment of the agency, once the agency has adequately studied the issue." *Kelly v. Selin*, 42 F.3d 1501, 1518 (6th Cir. 1995). The Supreme Court recently reiterated that 5 U.S.C. § 706 mandates that review of agency policymaking and factfinding, as at issue here, remain deferential. *See Loper Bright Enterprises v. Raimondo*, __ U.S. __, No. 22-451, slip op. at 14 (June 28, 2024) (citing 5 U.S.C. § 706(2)(A), (E)). Further, TDEC's analysis and certification of the record is entitled to a presumption of regularity that can be overcome only by "clear evidence to the contrary." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993); *In re United States Dep't of Def. & United States Env't Prot. Agency Final Rule*, No. 15-3751, 2016 WL 5845712, at *1 (6th Cir. Oct. 4, 2016). Accordingly, this Court should give substantial deference to TDEC's approval of the 401 Certification for the Project. *See AES Sparrow Point LNG v. Wilson*, 589 F.3d 721, 733 (4th Cir. 2009) (explaining that in reviewing state's certification, the court's scope of review under the arbitrary and capricious standard is "narrow and highly deferential. . . . Especially in matters involving not just simple findings of fact but complex predictions based on special expertise.").

20

## II.    TDEC Fully Complied with the Requirements for the 401 Certification and ARAP.

TDEC's comprehensive analysis of Tennessee Gas Pipeline's application complied with the requirements for issuing the 401 Certification and Tennessee's ARAP. Notably, Sierra Club seeks review of only the 401 Certification. But because TDEC reviews the 401 Certification and ARAP together, the underlying analysis is based on the ARAP requirements and ARAP record. Even so, there is a clear distinction between the requirements for a 401 Certification and an ARAP. Sierra Club has not challenged the ARAP in this Court or in any state administrative proceeding or state appeal. Sierra Club's theory that TDEC acted arbitrarily or capriciously in issuing the 401 Certification is without merit and belied by the record.

TDEC's analysis as reflected in the record shows that its decision to issue the 401 Certification was not arbitrary, capricious, or otherwise not in accordance with law. The full administrative record refutes Sierra Club's claim that TDEC "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *St. Marys Cement Inc. v. U.S. Env't Prot. Agency*, 782 F.3d 280, 286 (6th Cir. 2015) (cleaned up).

### A.    TDEC properly considered yet found no practicable alternatives to the proposed activities.

TDEC conducted a careful and probing analysis which supported its decision to certify under Section 401 that the proposed discharges comply with state water quality standards. TDEC comprehensively assessed whether practicable alternatives exist that would have less adverse impacts on resource values. When an applicant provides extensive information regarding practicable alternatives and the reviewing agency demonstrates it examined them, the agency's decision is not arbitrary or capricious. *See Louisville Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*, 988 F.3d 841, 846 (6th Cir. 2021). Armed with extensive information describing alternatives concerning the planned route and anticipated crossing methods, TDEC systematically analyzed and described the alternatives. Because TDEC "examin[ed] the relevant data and articulate[d] a satisfactory explanation for [its] action including a rational connection between the facts found and the choice made," its resulting action cannot be considered arbitrary and capricious. *See id.* (cleaned up).

### 1.    TDEC carefully assessed route alternatives.

TDEC thoroughly analyzed whether practicable route alternatives would have less adverse impacts on resource values than Tennessee Gas Pipeline's preferred route. Tenn. Comp. R. & Regs. 0400-40-07-.04(5)(b). Tennessee Gas Pipeline provided TDEC sufficient information, TDEC reviewed the evidence and materials

in the record in applying its regulations, and TDEC explained its conclusions. AR000939–000944 (JA____-__); AR006796–006799 (JA____-__). Thus, TDEC did not act arbitrarily or capriciously in issuing Tennessee Gas Pipeline's 401 Certification.[7]

The Project's proposed route was "designed to extend from the Project receipt point on [Tennessee Gas Pipeline's] existing interstate natural gas pipeline system along the Project's eastern beginning point to the Project delivery point at the location of TVA's proposed combined-cycle combustion turbine gas plant to be located on the Cumberland Fossil Plant Reservation at the Project's western terminus." AR000939 (JA____). Tennessee Gas Pipeline considered both major route alternatives and minor route variations and provided that information to TDEC for its independent review. AR000940 (JA____); AR006796–006799 (JA____-__). Based on existing easements and the fixed end points, Tennessee Gas Pipeline explained there were "no additional major route alternatives to the Cumberland Project." AR000940 (JA____); AR006798 (JA____-__). Tennessee Gas Pipeline

---

[7] FERC retains the exclusive authority to approve the siting, construction, and operation of facilities used to transport natural gas in interstate commerce. TDEC's role in the 401 Certification process is simply to certify or deny that a project conforms to state water quality standards. 15 U.S.C. § 717f(c)(1); *see also* AR006791–006792 (JA____-__). Here, Sierra Club seeks to impose a more stringent burden for TDEC's review.

also made additional minor route changes to avoid jurisdictional wetlands throughout the application process.[8] AR001625–1635 (JA____-__); AR001791–001871 (JA____-__).

TDEC evaluated Tennessee Gas Pipeline's application, which explained that Tennessee Gas Pipeline considered the presence of streams and wetlands that had to be crossed between the pipeline and TVA's plant, noting that "it is unlikely that other routes between the Cumberland Pipeline's receipt and delivery points would encounter substantially fewer aquatic resources than those along the preferred route." AR000939 (JA____). Tennessee Gas Pipeline further showed the alternative routes would require the Project to cross aquatic resources that had "not been disturbed by previous utility clearing and maintenance activities." AR000939 (JA____).

Following TDEC's analysis of route alternatives, TDEC evaluated the preferred route and the route selection process. AR006797–006799 (JA____-__). TDEC concluded that Tennessee Gas Pipeline "demonstrated that the route selection

---

[8] Even so, Tennessee Gas Pipeline confirmed that it had considered, and would continue to "consider multiple minor route variations to refine the pipeline alignment and to address concerns raised by potentially affected landowners and regulatory agencies." AR000940 (JA____). Tennessee Gas Pipeline's application reflected its commitment to considering variations by identifying and incorporating ten variations along the pipeline's route. AR000939–000944 (JA____-__).

method . . . will result in the use of the least impactful practicable alternative to accomplish the project purpose." AR006804 (JA_____). When prompted by public comment, TDEC reiterated its alternatives analysis in compliance with its regulations. AR006952 (JA\_\_\_\_). In response to a comment that less impactful alternatives were available, TDEC pointed to Tenn. Comp. R. & Regs. 0400-40-07-.04(5)(b), which states: "No Individual Permit shall be granted if there is a practicable alternative to the proposed activity that would have less adverse impact on resource values, *so long as the alternative does not have other significant adverse environmental consequences*." AR006952 (JA\_\_\_\_) (emphasis in original). TDEC emphasized that "[t]he second part of this clause is particularly applicable to linear projects such as roads, power lines, and pipelines, which must balance a variety of environmental and feasibility factors when selecting routes." AR006952 (JA\_\_\_\_).

TDEC reasoned that the preferred route imposed the least environmental impact relative to the proposed alternative routes by minimizing "overall environmental impacts such as clearing of vegetation, forest fragmentation, and aesthetic impacts." AR006952 (JA\_\_\_\_). Further, TDEC found that any alternative route is "unlikely to involve a meaningful reduction in aquatic impacts because any route of a roughly 32-mile linear project in Tennessee would likely require multiple stream crossings." AR006952 (JA\_\_\_\_). TDEC's analysis of the Project alternatives, including its review and response to public comments, reflects TDEC's

25

comprehensive analysis of Tennessee Gas Pipeline's preferred route and route variations. That TDEC ultimately agreed with Tennessee Gas Pipeline's alternatives analysis as presented in the application and supplemental materials does not detract from TDEC's concerted efforts in reviewing and evaluating the requested 401 Certification in this case. AR006796–006799 (JA____-__); *see also Louisville Gas & Elec. Co.*, 988 F.3d at 846.

### 2.    TDEC properly evaluated proposed waterbody crossings.

TDEC thoroughly considered extensive record materials concerning the proposed construction crossing method for each waterbody crossing and the practicability of method alternatives at each crossing. Applying its analysis in accordance with the ARAP regulations, TDEC determined Tennessee Gas Pipeline's proposed crossing methods were the least impactful practicable alternative. TENN. COMP. R. & REGS. 0400-40-07-.04(5)(b).

In developing and proposing the Project, Tennessee Gas Pipeline considered a variety of factors relevant to different crossing methods, including "safety, potential impacts to water quality, hydrologic loss, cost, existing technology, and logistics." AR000944 (JA____). Tennessee Gas Pipeline also analyzed geotechnical and geological studies. AR000944 (JA____); AR000955–000967 (JA____-__). Based on these factors, Tennessee Gas Pipeline provided comprehensive details

regarding each crossing and the proposed crossing method for each waterbody affected by the Project. AR000955–000967 (JA____-__).

Sierra Club asserts that "TDEC conducted no evaluation of the practicability of trenchless crossings on a site-specific basis." Sierra Club's Opening Br. at 21. But Tennessee Gas Pipeline's application materials and TDEC's analysis show the opposite. Tennessee Gas Pipeline described each potential crossing method and explained the benefits and detriments of each. Contemplating both open trench and trenchless crossing methods, Tennessee Gas Pipeline detailed the wet-open-cut method, dry-open-cut methods (including flume crossing and dam-and-pump crossing), and trenchless crossing methods of horizontal directional drilling and conventional boring. AR000944–000954 (JA____-__). Where rock must be removed in order to cross a waterbody, Tennessee Gas Pipeline outlined five different rock removal methods available for use depending on "the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location." AR000947 (JA____). In further support of its proposed methods and plans for construction management, Tennessee Gas Pipeline submitted its "Environmental Construction Management Plan," detailing its plans for construction of the Project, including plans to comply with FERC regulations and guidance, spill prevention and control, horizontal directional drilling, blasting, and hydrostatic testing. AR001450–001540 (JA____-__).

In addition to carefully detailing each potential crossing method, Tennessee Gas Pipeline identified and analyzed all crossings in its Waterbodies Crossings Hydrologic Risk Analysis. AR000955–000967 (JA____-__). That analysis identifies each crossing's flow type, substrate, geologic formation, karst potential, watershed position, drainage area, summer mean flow, and hydrologic loss potential. AR000955–000967 (JA____-__). Tennessee Gas Pipeline provided its proposed construction methods for each waterbody crossing, identifying both the pipe installation method and flow management method. AR000955–000967 (JA____-__).

TDEC properly analyzed and considered Tennessee Gas Pipeline's proposals before granting its approval, albeit with several special conditions. *See Sierra Club v. State Water Control Bd.*, 64 F.4th 187, 198 (4th Cir. 2023) (explaining record clearly supported that agency considered information relative to crossing methods, even where such review was not required). TDEC considered practicable alternatives for waterbody crossings, analyzing: "[p]ipeline installation via dry-cut trenching vs. wet-cut trenching;" "[r]ock removal methods for trenched pipeline installation;" and "[p]ipeline installation via trenchless methods vs. open-cut trenching." AR006799–006966 (JA____-__). TDEC concluded that "[b]ased on the available information" Tennessee Gas Pipeline "demonstrated that the . . . process for determining the appropriate crossing method will result in the use of the least

28

impactful practicable alternative to accomplish the project purpose." AR006804 (JA___).

The record establishes that TDEC *did* review and take into account *each* waterbody crossing. Nonetheless, Sierra Club fails to point to any Tennessee regulation requiring that TDEC expressly engage in a crossing-by-crossing analysis. *See Sierra Club* 64 F.4th at 198 (holding that where Virginia law did not require crossing-by-crossing analysis, agency decision to issue Section 401 Certification was not arbitrary and capricious).

In short, TDEC did not act arbitrarily or capriciously in approving Tennessee Gas Pipeline's proposed crossing methods. TDEC sufficiently evaluated the practicability of each proposed crossing method, as identified in TDEC's 401 Certification Table 1 and 2. AR006765–006771 (JA____-__).

TDEC further considered and appropriately responded to all relevant public comments. AR006950–006966 (JA____-__). *See Sierra Club*, 64 F.4th at 198 (concluding decision to issue 401 Certification was not arbitrary and capricious where agency took public comment and held public meetings). First, TDEC described the factors considered in assessing each waterbody crossing and identifying alternative crossing methods. AR006951 (JA____). TDEC also reiterated requirements for such proposed action, including Special Condition "g".

29

AR006951 (JA_____). That TDEC generally acknowledged horizontal directional drilling as the least impactful alternative for utility lines of this size does not render this crossing method the practicable alternative for *all* crossings. AR006951 (JA_____). Sierra Club's repeated assertions that TDEC acted arbitrarily and capriciously because it failed to deny the proposed crossing methods ignores the documentation, analysis, and commentary TDEC provided.

Second, when commenters posited that "dry-ditch, open-cut crossings will cause or contribute to violations of state water quality criteria, particularly for sedimentation," TDEC imposed Special Conditions "i," "j," and "o" to ensure protection of state water quality. AR006954–006955 (JA_____-__). TDEC grappled with opposing views and carefully addressed them, consistent with its regulations, and its considered expert determination merits deference. At bottom, that TDEC's "reasoned decisionmaking" produced a result consistent with Tennessee Gas Pipeline's own analysis does not make TDEC's determination arbitrary and capricious. *See Louisville Gas & Elec. Co.*, 988 F.3d at 846.

Sierra Club relies on unpersuasive authority to argue that TDEC was required to provide more analysis on a crossing-by-crossing basis. *See* Sierra Club's Opening Br. at 24–25. But that caselaw is distinguishable. First, Sierra Club cites *Sierra Club v. West Virginia Department of Environmental Protection*, 64 F.4th 487, 508 (4th

Cir. 2023), for the proposition that an agency's failure to conduct a location-specific analysis is arbitrary and capricious. *See* Sierra Club's Opening Br. at 24 (asserting the Fourth Circuit "recognized a gas company's efforts in its § 401 application to conduct a 'detailed *location-specific* review of practicable alternatives to open cut crossings." (quoting *W. Va. Dep't of Env't. Prot.*, 64 F.4th at 499)). But Sierra Club ignores the Fourth Circuit's reasoning. Specifically, the reason West Virginia "decided to forgo location-specific . . . review" was that it relied upon certification conditions and requirements that, the agency concluded, were "sufficient to prevent a lowering of water quality." But the Fourth Circuit found that the agency had excluded from the permit the very conditions it was relying upon. *Id.* at 505, 509.

Here, unlike in *West Virginia*, in addition to conducting a crossing-by-crossing analysis, TDEC also sufficiently incorporated into the 401 Certification all additional permitting and regulatory requirements, as well as numerous special conditions. AR006772–006777 (JA____-__); AR006792 (JA_____). Thus, Sierra Club's reliance on *West Virginia* is inapposite. *Cf. W. Va. Dep't of Env't. Prot.*, 64 F.4th at 505–509.

Sierra Club's reliance on *Constitution Pipeline Co. v. New York Department of Environmental Conservation*, 868 F.3d 87, 103 (2d Cir. 2017), is equally misplaced. There, the Second Circuit upheld the state agency's *denial* of a

Section 401 certification because the applicant refused to provide site-by-site information. *See* Sierra Club's Opening Br. 24. Again, Sierra Club ignores the basis for the Second Circuit's ruling. The court held that "the denial of the § 401 certification after [the applicant] refused to provide relevant information, despite repeated [agency] requests, was not arbitrary or capricious." *Constitution Pipeline*, 868 F.3d at 103. Notably, the court emphasized its decision to "defer to [the agency]'s expertise as to the significance of the information requested from [the applicant], given the record evidence supporting the relevance of that information to [the agency]'s certification determination." *Id.* Here, by contrast, Tennessee Gas Pipeline provided comprehensive, crossing-by-crossing information. TDEC twice requested, and received, additional information from Tennessee Gas Pipeline relating to minute details of its application. That TDEC did not submit further requests for additional information regarding Tennessee Gas Pipeline's proposed crossing methods or crossing-by-crossing plans, bolsters the conclusion that TDEC determined it had sufficient information to issue its decision and was not arbitrary and capricious in doing so. *Id.*

**B.      TDEC properly considered whether the proposed activity would result in any appreciable permanent loss of resource values.**

TDEC assessed whether Tennessee Gas Pipeline's proposed activities would result in any appreciable permanent loss of resource values. Because TDEC

considered the data provided consistent with its regulations, its decision is not arbitrary and capricious. TDEC's application of its regulations and subsequent factfinding deserves deference.

Sierra Club relies upon inapposite caselaw to distract from the fact that TDEC had ample data to assess any appreciable permanent loss to the affected waters and complied with its regulatory requirements. *See* Sierra Club's Opening Br. at 50–56. TDEC properly considered data, as required, and sufficiently analyzed the Project's impact. Thus, TDEC did not act arbitrarily and capriciously in issuing the 401 Certification.

### 1.    TDEC properly gathered and analyzed data regarding the project's impact to resource values of affected waterbodies.

When TDEC receives a request for a Section 401 Certification and, consequently, an application for an ARAP, the agency reviews that application to determine whether it is sufficient or whether additional information needs to be provided. TENN. COMP. R. & REGS. 0400-40-07-.04. TDEC reviewed Tennessee Gas Pipeline's application and requested additional information to support its review of the Project's potential impact on resource values. That review satisfied the appliable requirements.

In considering Tennessee Gas Pipeline's application, TDEC analyzed the potential for loss of resource values to streams, reservoirs, and wetlands. TDEC concluded that "the overall activities, if conducted in accordance with the submitted plans and permit conditions, will not result in any appreciable permanent loss of resource values." AR006804–006805 (JA____-__). TDEC found that, because "the authorized impacts to jurisdictional waters, if carried out in accordance with the permit's conditions, will result in *de minimis* degradation . . . , compensatory mitigation is not required." AR006805 (JA____); TENN. COMP. R. & REGS. 0400-40-07-.04(6)(c) ("No activity may be authorized by the Commissioner unless any appreciable permanent loss of resource values associated with the proposed impact is offset by mitigation sufficient to result in no overall net loss of resource values from existing conditions."). TDEC further explained that because the proposed permanent impacts do not represent appreciable permanent loss of resource value as defined in Tennessee Rules 0400-40-07, compensatory mitigation is not required. AR006957 (JA____); *see also* TENN. COMP. R. & REGS. 0400-40-07-.03(3) ("Appreciable permanent loss of resource values" is defined as "a reduction in resource values that is expected to continue without fundamental change and is large enough to be observed and measured as resulting in more than minimal adverse effects.").

34

As the regulator of Tennessee's waterbodies, TDEC is in the best position to gather and analyze data regarding a project's impact to resource values of affected waterbodies. *See Const. Pipeline Co.*, 868 F.3d at 103. Tennessee Gas Pipeline provided sufficient information and data regarding the Project's impact in its application and supplemental materials. TDEC's decision "examin[ed] the relevant data and articulate[d] a satisfactory explanation for [its] action including a rational connection between the facts found and the choice made," so its resulting action cannot be considered arbitrary and capricious. *See Louisville Gas & Elec. Co.*, 988 F.3d at 846.

Sierra Club challenges TDEC's conclusion that the Project will not cumulatively impact resource values. *See* Sierra Club's Opening Br. at 56–59. But these assertions purport to impose a burden on TDEC that has no support in the law. Under Rule 0400-40-07-.04(6)(c), TDEC (as part of its analysis of loss of resource values) must only "*consider*" "[w]hether the proposed activity is reasonably likely to have cumulative or secondary impacts to the water resource." TDEC's regulations do not mandate that TDEC outline all evidence it considered to reach its conclusion regarding impacts to resource values.

Even so, TDEC sufficiently considered the cumulative or secondary impact to the waterbodies at issue. TDEC's inclusion of Special Condition "r" requires

Tennessee Gas Pipeline to comply with TDEC's cumulative impact analysis. AR006776 (JA_____). Sierra Club argues that TDEC did not adequately analyze the cumulative impact, but Rule 0400-40-07-.04(6)(c) only requires TDEC consider the cumulative impacts. *See* Sierra Club's Op. Br. at 58–59. The Rule does not mandate the extent to which TDEC must describe its analysis. Sierra Club's position also ignores the additional permitting, monitoring, and approval that TDEC mandated Tennessee Gas Pipeline obtain to remain in compliance with the 401 Certification. AR006778–006781 (JA____-__). TDEC's probing analysis of the record supports its cumulative impact analysis.

TDEC addressed and expressly rejected Sierra Club's contentions in responding to public comments. In response to the comment that TDEC failed to evaluate cumulative impacts, TDEC stated that it "evaluated impacts cumulatively for each individual stream and for each TDEC Waterbody ID, *consistent with how impacts are evaluated across the ARAP program statewide*." AR006957 (JA_____) (emphasis added). Sierra Club's attempts to undermine TDEC's review and analysis lack merit. *See Sierra Club*, 64 F.4th at 198 (concluding state agency did not "rubber stamp" an application because it "asked a number of clarifying questions to ensure they were satisfied that the project" complied with the state's regulations).

**2.    TDEC was not required to consider "baseline conditions" to the extent Sierra Club argues.**

TDEC is not required to analyze the affected areas' "baseline conditions" when, as here, impacts are so minimal that compensatory mitigation is not required. Nevertheless, the agency did, in fact, consider existing conditions in the environment. *See* TENN. COMP. R. & REGS. 0400-40-07-.04 (TDEC is required to assess the overall net loss of resource values relative to existing conditions *if mitigation is required*.).

Even though the "existing conditions" assessment is only needed if mitigation is required, Tennessee Gas Pipeline's application detailed the existing conditions. Specifically, Tennessee Gas Pipeline documented the Cumberland Project Jurisdictional Waters Determinations, Tennessee HD Report, and field surveys in its application and supplemental materials. AR000927 (JA_____); AR000001–000919 (JA_____-__). Tennessee Gas Pipeline subsequently described the existing conditions for waterbodies, wetlands, and ponds. AR000927–000931 (JA_____-__). Additional details were also provided via Tennessee Gas Pipeline's Wetlands and Waterbodies Impact Tables. *See* AR000988–001004 (JA_____-__); *see also* TENN. COMP. R. & REGS. 0400-40-07-.03(16) (defining "existing conditions" to include defensible scientific methods as "approved or determined by the Division").

37

TDEC reviewed all the data provided by Tennessee Gas Pipeline. In response to public comments, TDEC explained its analysis and identified the types of data it considered in reaching its conclusions. That data included aerial and topographic maps, Tennessee Hydrologic Determination field sheets, wetland delineation forms, channel dimensions, and photographs from the original aquatic resources inventory. AR006958 (JA____). "Additionally, the [TDEC] used a variety of internal and external data sources, including water quality monitoring data, and in some cases conducted in-person field visits, to assess existing conditions of all features to be impacted." AR006958 (JA_____). TDEC's decision was not arbitrary or capricious because it was rational and based on a probing review of the record. *See Sierra Club*, 64 F.4th at 198.

Sierra Club accuses TDEC of engaging in deceptive tactics to avoid gathering the necessary data. *See* Sierra Club's Opening Br. at 53. This accusation is inexplicable in the light of the extensive data and analysis supporting TDEC's decision and TDEC's requests for supplemental information. AR000920–001637 (JA____-__); AR006958 (JA____). This Court should credit the actual record, not Sierra Club's *ad hominem* attacks.

**C.     TDEC properly considered whether Tennessee Gas Pipeline's actions would adversely affect downstream water quality.**

TDEC also considered whether Tennessee Gas Pipeline's actions would adversely affect downstream water quality. *See* Sierra Club's Opening Br. at 45. Tennessee Gas Pipeline presented ample evidence and TDEC comprehensively reviewed Tennessee Gas Pipeline's proposed impacts on downstream water quality. Sierra Club argues that TDEC should provide analysis that is not required under Tennessee Code § 69-3-108. *See* Sierra Club's Opening Br. at 36–45. But TDEC's analysis complies with controlling law and is not arbitrary or capricious.

**1.     TDEC properly considered the impact of activities in wet weather conveyances.**

TDEC correctly analyzed the impact of activities in wet weather conveyances.[9] Sierra Club concedes that Tennessee law does not require an ARAP for activities in wet weather conveyances. *See* Sierra Club's Opening Br. at 37; Tenn. Code Ann. § 69-3-108. But Tennessee provides guidelines to protect downstream water quality. *See* Tenn. Code Ann. § 69-3-108; Tenn. Comp. R. & Regs. 0400-40-03-.02; Tenn. Comp. R. & Regs. 0400-40-03-.04. Further, for ARAP

---

[9] Notably, wet weather conveyances are not subject to the 401 Certification's analysis. 40 C.F.R. §§ 121.1, 121.3; *see also* Tenn. Code Ann. § 69-3-108; Tenn. Comp. R. & Regs. 0400-40-03-.02; Tenn. Comp. R. & Regs. 0400-40-03-.04. They are, however, contemplated in TDEC's ARAP analysis. This is another example of Sierra Club's failure to acknowledge that the 401 Certification and ARAP are not co-extensive.

purposes, TDEC was required to review Tennessee Gas Pipeline's proposed activity for compliance with Tennessee's state water quality requirements. *See* TENN. CODE ANN. § 69-3-108; TENN. COMP. R. & REGS. 0400-40-03-.02; TENN. COMP. R. & REGS. 0400-40-03-.04.

In its application, Tennessee Gas Pipeline thoroughly addressed how its proposed activities impacted all waterbodies, including wet weather conveyances. Its Waterbodies Crossings Hydrologic Risk Analysis identified each wet weather conveyance and the existing characteristics, including flow type, substrate, geologic formation, karst potential, watershed potential, drainage area, summer mean flow, hydrologic loss potential, as well as the proposed construction methods. AR000955–000967 (JA____-__).

TDEC analyzed this information and explained that alterations to wet weather conveyances do not require approval if they comply with Tennessee law:

> All features listed [in Table 3] are considered [wet weather conveyances] by the State of Tennessee, and do not require an Aquatic Resource Alteration Permit for the alterations proposed. In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), the impacts to [wet weather conveyances] shall require no notice or approval, and do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions in the Tennessee Water Quality Control Act 69-3-108(q).

AR006809–006814 (JA____-__). Thus, TDEC sufficiently complied with the regulatory and statutory requirements. This is especially so, given that "[t]he

alteration of a wet weather conveyance . . . by any activity is permitted . . . *shall require no notice or approval*; provided, that it is done in accordance" with the conditions outlined in § 69-3-108(q)(1) (emphasis added). Although Sierra Club takes issue with the language TDEC opted to include in the ARAP, which is not itself challenged in this action, TDEC was under no burden to provide additional analysis.

### 2.    TDEC's evaluation of the risk of water quality standards violations is fully supported by the record.

TDEC evaluated the risk of water quality standards violations in accordance with the record. The record contains ample detail regarding the risk of—and efforts taken to avoid—violations of state water quality standards.

This included Tennessee Gas Pipeline's analysis of water quality concerns based on the various construction methods proposed for Project construction. AR000933–000951(JA____-__). It also included supplemental materials provided in response to TDEC's Requests for Additional Information regarding the proposed impacts, alternative methods, and continued monitoring. AR001896–002927 (JA____-__). Because TDEC reviewed and considered all of these record materials and relied on them in reaching its decision, TDEC's evaluation was not arbitrary and capricious.

Furthermore, to ensure against violations of water quality standards, TDEC's 401 Certification requires Tennessee Gas Pipeline to comply with special conditions, general conditions, and other State and Federal requirements. AR006772–006777 (JA____-__). Specifically, TDEC reiterated in Special Condition "b" that, "[*u*]*nless otherwise stated*, all work shall be accomplished in conformance with the accepted plans, specifications, data, and other information submitted in support of application NRS22.192." AR006772 (JA_____) (emphasis added). TDEC's approval accounted for both the conditions it mandated and those that govern wet weather conveyances.

Sierra Club argues that if all conditions must be complied with to protect water quality standards, then TDEC's decision is insufficient because those conditions cannot be enforced on wet weather conveyances. *See* Sierra Club's Opening Br. At 42–45; AR006772 (JA_____); *see also* TENN. CODE ANN. § 69-3-108(q)(1). But Sierra Club ignores the first part of Special Condition "b," qualifying that the condition controls "[u]nless otherwise stated." *See* TENN. CODE ANN. § 69-3-108(q)(1); AR006772 (JA____). Through its approval, TDEC properly considered that downstream water quality standards would be maintained under the statutory requirements in Section 69-3-108(q)(1).

Further, Sierra Club takes issue with TDEC's reference to a *General Aquatic Resource Alteration Permit for Utility Line Crossings*, maintaining that it is not

42

incorporated in Tennessee Gas Pipeline's ARAP. *See* Sierra Club's Opening Br. at 46–49; *see also* AR001890 (JA_____); AR001905 (JA_____). But Sierra Club ignores that Tennessee Gas Pipeline, in response to TDEC's Request for Additional Information, confirmed that "the restoration of all stream and wetland crossings following pipeline installation will adhere to the conditions of the TDEC *General Aquatic Resource Alteration Permit for Utility Line Crossings*. AR006954–006955 (JA____-__); *see also* AR006967–006972 (JA____-__).

Sierra Club also ignores the fact that conditions similar to those which are included in TDEC's *General Aquatic Resource Alteration Permit for Utility Line Crossings* are also included in the 401 Certification. Specifically, Special Conditions "i," "j," and "o" prevent the loss of stream flow at pipe installation cites, address utilization of horizontal directional drilling for certain crossings, and contemplate temporary impacts to wetlands. AR006774–006775 (JA____-__).

Even accounting for the numerous special conditions, Sierra Club ignores the fact that TDEC also retains the discretion to "modify, suspend or revoke this permit or seek modifications or revocation should the state determine that the activity results in more than an insignificant violation of applicable water quality standards or violation of the act." AR006780–006781 (JA____-__). TDEC adequately guarded

against violations to water quality standards. This Court should defer to TDEC's expertise in evaluating the evidence and issuing its 401 Certification.

### III.    TDEC Acted Fully Within its Discretion in Authorizing Tennessee Gas Pipeline's In-Field Determinations.

TDEC did *not* delegate its authority to certify consistency with state water quality requirements under Section 401. Nor did TDEC, to the extent relevant to Sierra Club's 401 Certification challenge, delegate regulatory authority to Tennessee Gas Pipeline in the ARAP. TDEC possesses the authority to determine how, in practice, applicants satisfy the 401 Certification and ARAP requirements and conditions. Sierra Club argues that TDEC unlawfully shifted regulatory authority to Tennessee Gas Pipeline when TDEC imposed certain adaptive management requirements to minimize the already minimal impacts on state waters. *See* Sierra Club's Op. Br. at 34. Sierra Club is wrong.

Sierra Club's argument is nothing more than a strawman. No responsibility has been delegated to Tennessee Gas Pipeline. TDEC issued a 401 Certification after full consideration of potential impacts of a range of crossing methods and the potential for less impactful methods where practicable. Through its adaptive management-type condition, TDEC is requiring Tennessee Gas Pipeline to use less impactful methods if possible, at particular crossings to further reduce the already

minimal impacts. This Court should defer to TDEC's expertise in authorizing proposed activity affecting its waterbodies.

A.     **TDEC's established specific criteria governing Tennessee Gas Pipeline's in-field activities.**

TDEC did not delegate the ability to decide whether a particular crossing method complies with state water quality standards. It issued the 401 Certification based on the range of possible crossing methods, to include those of most concern to Sierra Club. As a condition, TDEC required Tennessee Gas Pipeline to make certain in-field determinations pursuant to mandated requirements and under the supervision of TDEC to further minimize impacts, where practicable.

TDEC fully considered the trenching methods and set forth specific requirements for Tennessee Gas Pipeline's in-field determination. TDEC did not authorize Tennessee Gas Pipeline to act unilaterally without supervision. Rather, TDEC's specifications set forth adequate requirements for Tennessee Gas Pipeline's in-field determinations in accordance with Sixth Circuit precedent. AR006772–73 (JA____-__). Compliance with those requirements is subject to TDEC's continuous monitoring. Reliance on such conditions, even where they are prospective, is not a delegation of authority under Section 401 and does not render TDEC's decision arbitrary and capricious. *See Appalachian Voices v. State Water Control Bd.*, 912

F.3d 746, 758 (4th Cir. 2019) (explaining the inclusion of prospective conditions is not arbitrary and capricious).

In the unlikely event that monitoring reveals any unexpected impact, TDEC retains discretion to revoke the 401 Certification or seek modification or revocation. AR006779–006781 (JA____-__). This post-issuance monitoring is consistent with Tennessee's regulatory guidance that a "permit may be modified, suspended, or revoked for cause by the Commissioner upon such notice to the permittee as required by law." TENN. COMP. R. & REGS. 0400-40-07-.04(6)(b).

Rule 0400-40-07-.04(b)(5) states that "[n]o Individual Permit shall be granted if there is a practicable alternative to the proposed activity that would have less adverse impact on resource values, so long as the alternative does not have other significant adverse environmental consequences." Without citing any authority, Sierra Club argues this rule "unambiguously" requires "TDEC to determine the least impactful practicable alternative *before* permit issuance." Sierra Club's Opening Br. at 33. Sierra Club further contends that "contingent determination" under Special Condition "g" "is not what is required—or even contemplated by—[Rule] 0400-40-07-.04(5)(b)." *Id.*

But Rule 0400-40-07-.04 is silent on whether TDEC may approve an ARAP by relying, in part, on the fact that post-issuance procedures will ensure compliance.

46

*See Ohio Valley Env't Coal. v. Bulen*, 429 F.3d 493, 500–01 (4th Cir. 2005) (holding 33 U.S.C. § 1344(e)(2) permits USACE to rely in part on post-issuance procedures in making pre-issuance minimal-impact determinations).

Tennessee Gas Pipeline has not been directed to handle any agency functions in furtherance of TDEC's regulatory role. Rather, TDEC issued the Section 401 Certification and included conditions, via the ARAP, that require adaptive management subject to detailed requirements. That a regulatory action imposes such preconditions is unremarkable, and Sierra Club cites no authority questioning such an approach. TDEC acted within its discretion in authorizing Tennessee Gas Pipeline to, in accordance with its express special and general conditions, make in-field least impactful determinations. Accordingly, the Court should rely on TDEC's determination that its post-issuance conditions are permissible under Rule 0400-40-07-.04.

**B.    TDEC required Tennessee Gas Pipeline to implement the least impactful trenching technique at each stream crossing based on site-specific conditions.**

TDEC imposed numerous special and general conditions on Tennessee Gas Pipeline's authorized action in implementing the least impactful trenching technique at each stream crossing. AR006762–006777 (JA____-__). These conditions serve as guideposts for "determining the appropriate crossing method[s that] will result in the

use of the least impactful practicable alternative to accomplish the project."
AR006804 (JA_____). One of the conditions, Special Condition "g," outlined
potentially practicable alternatives for each stream crossing to be accomplished by
a method other than by horizontal directional drilling. AR006772 (JA_____). The
methods allowed include: conventional excavation, ripping with an excavator and
ripping tooth, hammering with a pointed backhoe or pneumatic rock hammer,
removal by rock trencher, or controlled blasting and excavation. AR006772
(JA____). But TDEC's conditional approval did not authorize Tennessee Gas
Pipeline to pick *any* alternative method; rather, Special Condition "g" requires
Tennessee Gas Pipeline to "select the least impactful trenching technique for each
stream crossing." AR006772 (JA_____).

TDEC mandated specific criteria for determining the "least impactful
trenching technique," including: "observed conditions at the stream crossing, the
technical feasibility and limitations of each particular technique, best professional
judgment of experienced personnel, logistics, and costs." AR006772 (JA_____).
Pursuant to TDEC's Special Condition "g", Tennessee Gas Pipeline must "select one
or more non-blasting alternative[] unless it demonstrates that each of these
[alternatives] is impracticable," and Tennessee Gas Pipeline must attempt at least
one non-blasting alternative prior to blasting. AR006772–006773 (JA____–__).
Accordingly, TDEC ordered Tennessee Gas Pipeline to assess each stream crossing,

48

based on site-specific conditions, to determine the least impactful technique. Such a process is anything but "nearly unfettered discretion to determine the least impactful rock removal technique." Sierra Club's Opening Br. at 35.

### C.    TDEC prohibited Tennessee Gas Pipeline from blasting without first obtaining TDEC approval.

TDEC ordered Tennessee Gas Pipeline to comply with additional requirements, and to seek TDEC concurrence, when controlled blasting is proposed for a stream crossing. AR006773 (JA_____). Specifically, such blasting may only be considered in non-karst areas that are also not locations where the potential for water loss is significant. AR000936 (JA_____); AR006794–006795 (JA____–__). Special Condition "h" sets forth the requirements when controlled blasting within 50 feet of a stream of wetland is to be used for a stream crossing. AR006773 (JA_____). It "dictates the method for accomplishing the crossing when controlled blasting is deemed to be the least impactful practicable alternative" and requires compliance with the conditions and details of the Draft Blasting Plan. AR006951 (JA____); *see also* AR006773 (JA____); AR001518–001534 (JA____-__). Tennessee Gas Pipeline's plan extensively details both general and site-specific pre- and post-blasting safety and monitoring requirements. AR001518–001534 (JA____-__).

Moreover, if Tennessee Gas Pipeline determines controlled blasting is the least impactful practicable alternative for a water crossing, this determination "triggers extra reporting, approval, and monitoring requirements." AR006951 (JA____). This extra approval expressly requires Tennessee Gas Pipeline to obtain written authorization from TDEC prior to the initiation of controlled blasting. AR006773 (JA_____). That this approval is part of a post-issuance procedure does not invalidate TDEC's decision. *See Appalachian Voices*, 912 F.3d at 758.

## IV.    If the Court Finds that TDEC's Analysis Is Deficient, it Should Remand Without Vacating.

TDEC's Section 401 Certification should be upheld because it was based on TDEC's searching inquiry and a voluminous record. If this Court determines that TDEC's actions here were erroneous, however, then the Court should simply remand the matter to TDEC without vacating the 401 Certification. *See Sierra Club v. U.S. Env't Prot. Agency*, 60 F.4th 1008, 1022 (6th Cir. 2023); *see also Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). To determine whether vacatur is "appropriate," the Court analyzes "the seriousness of the agency error and the disruptive consequences of vacatur." *Sierra Club*, 60 F.4th at 1022 (cleaned up). In the unlikely event the Court concludes that TDEC erred, then both prongs of the *Allied-Signal* analysis would warrant a remand without vacatur.

50

First, TDEC will be able to cure any deficiency on remand. "The seriousness of the agency's error depends on how likely it is the agency will be able to justify its decision on remand." *Id.* (cleaned up). Thus, where an agency may be able to cure a defect in its reasoning, vacatur is not proper. *Allied-Signal, Inc.*, 988 F.2d at 150–51. The Court need not know with certainty that the agency will be able to cure the defect; rather, the Court need only identify "a seriously possibility" that the agency's decision may be cured. *Id.* TDEC was provided with ample information for an adequate comprehensive review. AR000920–001637 (JA____-__); AR001794–001871 (JA____-__); AR001889–001892 (JA____-__); AR001896–002927 (JA____-__); AR003444–003445 (JA____-__); AR003449–003628 (JA____-__).

If determined necessary by TDEC, Tennessee Gas Pipeline could provide additional information to reasonably supplement its application. Accordingly, any claimed error is not significant and there is a substantial possibility that any error is reasonably remedied on remand.

Second, when the consequences of vacating may be disruptive, the Court should not vacate. *See Allied-Signal, Inc.*, 988 F.2d at 150–51 ("The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." (cleaned up)). If the

Court were to vacate TDEC's 401 Certification, it would have significant disruptive consequences for TDEC, TVA, Tennessee Gas Pipeline, and the citizens of Tennessee. The Project will allow Tennessee Gas Pipeline to provide natural gas transportation service to TVA's new gas-fired power plant. This will, in turn, allow TVA to provide electric supply needs to thousands of Tennesseans.

Vacatur would not only halt the Project now, but also delay TVA's retirement of the Cumberland Fossil Plant, which would lead to additional construction, repairs, and maintenance upgrades and costs to maintain and comply with environmental regulatory requirements; delay TVA's ability to develop and implement a path to 80% carbon reduction by 2035 and net-zero carbon emissions by 2050; and create additional environmental, economic, and reliability risks. Moreover, it would delay Tennessee Gas Pipeline from completing its legal obligations in completing the Project. These disruptive effects far outweigh any potential harms that may occur in the interim while TDEC conducts additional review.

## CONCLUSION

The Court should deny Sierra Club's Petition for Review and affirm TDEC's Certification. In issuing the 401 Certification here, TDEC fully complied with the requirements for the 401 Certification and the record supports its findings.

Respectfully submitted,

/s/ Scott Burnett Smith
Scott Burnett Smith
Schyler B. Burney
Bradley Arant Boult Cummings LLP
200 Clinton Avenue West, Suite 900
Huntsville, AL 35801
Tel: (256) 517-5100
Fax: (256) 517-5200
ssmith@bradley.com
sburney@bradley.com

Bartholomew J. Kempf
Lela M. Hollabaugh
Bradley Arant Boult Cummings LLP
1221 Broadway, Suite 2400
Nashville, Tennessee 37203
(615) 244-2582
(615) 252-4714 (fax)
bkempf@bradley.com
lhollabaugh@bradley.com

Emily M. Ruzic
Bradley Arant Boult Cummings LLP
One Federal Place
1819 5th Avenue N
Birmingham, Alabama 35203
(205) 521-8447
(205) 521-8800 (fax)
eruzic@bradley.com

David A. Super
Kevin A. Ewing
Bracewell LLP
2001 M Street, NW, Suite 900
Washington, D.C. 20036
Telephone: (202) 828-5836
david.super@bracewell.com

kevin.ewing@bracewell.com

*Counsel for Intervenor-Respondent*
*Tennessee Gas Pipeline Company*
*L.L.C.*

July 22, 2024

### CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellant Procedure 32(a)(7) and 6th Circuit Rule 32(a), I certify that this brief complies with the applicable type-volume limitation. According to the word count in Microsoft Word, there are 10,585 words in this brief, excluding the items omitted from the computation by Rule 32(f).

/s/ Scott Burnett Smith
*Counsel for Intervenor-Respondent Tennessee Gas Pipeline Company L.L.C.*

**CERTIFICATE OF SERVICE**

I certify that on the 22nd of July 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Scott Burnett Smith
*Counsel for Intervenor-Respondent Tennessee Gas Pipeline Company L.L.C.*