NO. 23-3682

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

SIERRA CLUB and APPALACHIAN VOICES,
*Petitioners*,

v.

TENNESSEE DEPARTMENT OF ENVIRONMENT AND
CONSERVATION, DAVID W. SALYERS, in his official capacity as
Commissioner of the Tennessee Department of Environment and
Conservation, and APRIL GRIPPO, in her official capacity as
Interim Director of the Division of Water Resources of the
Tennessee Department of Environment and Conservation,
*Respondents,*

and

TENNESSEE GAS PIPELINE COMPANY, L.L.C.
*Respondent-Intervenor.*

On Petition for Review of State Administrative Order
Pursuant to 15 U.S.C. § 717r(d)(1) of the Natural Gas Act

_____

PROOF BRIEF OF RESPONDENTS

_____

**JONATHAN SKRMETTI**
**Attorney General and Reporter**

**WILSON S. BUNTIN**
**Sr. Assistant Attorney General**

**HARRISON G. KILGORE**
**Assistant Solicitor General**

**J. MATTHEW RICE**
**Solicitor General**

**JOSEPH AHILLEN**
**Sr. Assistant Attorney General**
**Office of Attorney General and Reporter**
**P.O. Box 20207**
**Nashville, Tennessee 37202-0207**

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...............................................1

STATEMENT OF JURISDICTION.........................................................1

INTRODUCTION ......................................................................2

ISSUES PRESENTED FOR REVIEW ......................................................3

STATEMENT OF THE CASE.............................................................4

SUMMARY OF THE ARGUMENT .........................................................15

STANDARD OF REVIEW ..............................................................17

ARGUMENT ........................................................................19

    I.    Petitioners Lack Standing....................................................19

    II.    TDEC Reasonably Determined that Tennessee Gas Had Demonstrated that the Crossing Methods It Proposed Were the Least Impactful Practicable Alternatives for the Pipeline....................24

        A.    TDEC reasonably approved the crossing methods proposed by Tennessee Gas which were determined on a crossing-by-crossing basis. ......................................26

        B.    TDEC permissibly relied on project-wide information to determine the viability of different crossing methods.. ............27

        C.    TDEC reasonably concluded that conventional bore was not a practicable alternative... ....................................29

        D.    TDEC did not "rubber-stamp" Tennessee Gas's crossing-method selections..................................................30

    III.    TDEC Properly Conditioned the Certification on Tennessee Gas Using the LIPA Trenching Method......................................32

A.     The Certification complies with TDEC's regulations. .............32

B.     TDEC did not unlawfully delegate its authority........................36

IV.    TDEC Reasonably Concluded that Impacts to WWCs Will Not Lead to Water Quality Standards Violations........................................40

A.     Petitioners have waived their arguments about WWCs ...........41

B.     Not all the conditions in the Certification apply to WWCs......42

C.     TDEC reasonably concluded that if Tennessee Gas complies with the conditions in Tenn. Code Ann. § 69-3-108(q)(1), water quality standards would not be violated because of alterations to WWCs ................................................43

D.     Petitioners cannot rely on privileged, internal agency correspondence............................................................................46

V.     TDEC Reasonably Concluded that the Pipeline, as Conditioned, Would Not Result in Violations of State Water Quality Standards.................................................................................................47

VI.    TDEC Reasonably Determined that Construction of the Pipeline Would Not Result in an Appreciable Permanent Loss of Resource Values ..........................................................................................................52

A.     TDEC was not required to analyze baseline data on impacted waterbodies..................................................................53

B.     TDEC did review extensive baseline data that Tennessee Gas provided about streams and wetlands to be impacted by the Pipeline...........................................................................56

C.     TDEC was not required to consider cumulative or secondary impacts to the water resources................................57

CONCLUSION .......................................................................................................59

# TABLE OF AUTHORITIES

## FEDERAL CASES

*AES Sparrows Point LNG, LLC v. Wilson*,
　589 F.3d 721 (4th Cir. 2009) .......................................................... 22

*Amerijet Int'l, Inc. v. Pistole*,
　753 F.3d 1343 (D.C. Cir. 2014) ...................................................... 46

*Appalachian Voices v. State Water Control Bd.*,
　912 F.3d 746 (4th Cir. 2019) .......................................................... 23

*Berry v. U.S. Dep't of Labor*,
　832 F.3d 627 (6th Cir. 2016) .......................................................... 23

*Citizens Coal. Council v. EPA*,
　447 F.3d 879 (6th Cir. 2006) .......................................................... 18

*Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*,
　365 F.3d 435 (6th Cir. 2004) .......................................................... 41

*Const. Pipeline Co., LLC v. New York State Dep't of Env't Conservation*,
　868 F.3d 87 (2d Cir. 2017) ............................................................. 22

*Consumers' Rsch. v. FCC*,
　67 F.4th 773 (6th Cir. 2023) .......................................................... 36

*Coyne v. Am. Tobacco Co.*,
　183 F.3d 488 (6th Cir. 1999) ............................................................ 1

*Del. Riverkeeper Network v. Sec. of Pa. Dep't of Envt'l Prot.*,
　870 F.3d 171 (3d Cir. 2017) ........................................................... 17

*Fox v. Saginaw Cnty.*,
　67 F.4th 284 (6th Cir. 2023) .......................................................... 19

*In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*,
　87 F.4th 315 (6th Cir. 2023) .......................................................... 19

*Islander E. Pipeline Co., LLC v. McCarthy*,
   525 F.3d 141 (2d Cir. 2008) ..........................................................22

*Kisor v. Wilkie*,
   598 U.S. 558 (2019)...........................................................18, 35

*Lujan v. Defs. Of Wildlife*,
   504 U.S. 555 (1992)...................................................................22

*Mich. Dep't of Env't Quality v. Browner*,
   230 F.3d 181 (6th Cir. 2000) .......................................................41

*Millennium Pipeline Co., L.L.C. v. Seggos*,
   860 F.3d 696 (D.C. Cir. 2017)....................................................22

*Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality*,
   990 F.3d 818 (4th Cir. 2021) ...................................................5, 22

*National Park and Conservation Ass'n v. Stanton*,
   54 F. Supp. 2d 7 (D.D.C. 1999) ..................................................39

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004)......................................................................20

*Oklahoma v. United States*,
   62 F.4th 221 (6th Cir. 2023) .......................................................37

*Perot v. Fed. Election Comm'n*,
   97 F.3d 553 (D.C. Cir. 1996)..............................36, 37, 38, 39

*Sierra Club v. EPA*,
   793 F.3d 656 (6th Cir. 2015)........................................................19

*Sierra Club v. La. Dep't of Env't Quality*,
   100 F.4th 555 (5th Cir. 2024) ......................................................17

*Sierra Club v. State Water Control Bd.*,
   64 F.4th 187 (4th Cir. 2023) .......................................................48

*Sierra Club v. State Water Control Bd.*,
 898 F.3d 383 (4th Cir. 2018) .......................................................................23

*Sierra Club v. Sigler*,
 695 F.2d 957 (5th Cir. 1983) ........................................................................40

*Sierra Club v. W. Va. Dep't of Env't. Prot.*,
 64 F.4th 487 (4th Cir. 2023) ........................................................................45

*Spokeo, Inc. v. Robbins*,
 578 U.S. 330 (2016).....................................................................................20

*Summers v. Earth Island Inst.*,
 555 U.S. 488 (2009).....................................................................................20

*Texas v. Rettig*,
 987 F.3d 518 (5th Cir. 2021) ........................................................................36

*Townes v. Jarvis*,
 577 F.3d 543 (4th Cir. 2009) ........................................................................23

*Turaani v. Wray*,
 988 F.3d 313 (6th Cir. 2021) ........................................................................21

*Unemployment Comp. Comm'n v. Aragon*,
 329 U.S. 143 (1946).....................................................................................41

*United States v. Darden*,
 353 F. Supp. 3d 697 (M.D. Tenn. 2018) .......................................................46

*United States v. Moore*,
 661 F.3d 309 (6th Cir. 2011) ........................................................................46

*United States v. Phillips*,
 54 F.4th 374 (6th Cir. 2022) ........................................................................18

*United States v. L.A. Tucker Truck Lines, Inc.*,
 344 U.S. 33 (1952).......................................................................................41

*Weaver's Cove Energy, LLC v. R.I. Dep't of Env't. Mgmt.*,
   524 F.3d 1330 (D.C. Cir. 2008) ...................................................................22

*Williams v. Int'l Paper Co.*,
   227 F.3d 706 (6th Cir. 2000) ........................................................................17

**STATE CASES**

*StarLink Logistics Inc. v. ACC, LLC*,
   494 S.W.3d 659 (Tenn. 2016) ...............................................................18, 30

**FEDERAL STATUTES**

5 U.S.C. § 706 ...............................................................................................17

15 U.S.C. § 717f ....................................................................................4, 5, 21

15 U.S.C. § 717r .........................................................................................1, 4

33 U.S.C. § 1251 ..............................................................................................5

33 U.S.C. § 1313 .........................................................................................5, 6

33 U.S.C. § 1341 ....................................................................................passim

**STATE STATUTES**

Tenn. Code Ann. § 4-5-322 ....................................................................17, 30

Tenn. Code Ann. § 4-5-326 ...........................................................................19

Tenn. Code Ann. § 69-3-103 ...........................................................................9

Tenn. Code Ann. § 69-3-105 ...........................................................................7

Tenn. Code Ann. § 69-3-108 ...................................................................passim

## FEDERAL REGULATIONS

40 C.F.R. § 121.1 (2023) ............................................................6

40 C.F.R. § 131.4 (2023) ............................................................5

40 C.F.R. § 131.5 (2023) ............................................................5

## STATE REGULATIONS

Tenn. Comp. R. & Reg. 0400-40-01........................................7

Tenn. Comp. R. & Reg. 0400-40-03........................................9

Tenn. Comp. R. & Reg. 0400-40-07...................................passim

## OTHER AUTHORITIES

88 Fed. Reg. 66558, 66663 (Sept. 27, 2023) (to be codified at 40 C.F.R. § 121.7(f))
...........................................................................6, 20, 21, 22

Fed. R. Civ. P. 25 .....................................................................1

## STATEMENT REGARDING ORAL ARGUMENT

Respondents, Tennessee Department of Environment and Conservation, David W. Salyers, and April Grippo[1] (collectively "TDEC"), agree with Petitioners that oral argument would aid the Court's decisional process.

## STATEMENT OF JURISDICTION

The Natural Gas Act provides that federal circuit courts have jurisdiction to review a state administrative agency's decision to issue a permit that is required under federal law. *See* 15 U.S.C. § 717r(d)(1). This provision generally allows this Court to review a state agency's decision to issue a Water Quality Certification under Section 401 of the Clean Water Act, 33 U.S.C. § 1341(a). However, and as discussed in Argument Section I below, TDEC maintains that this Court lacks jurisdiction because Petitioners cannot meet Article III standing requirements. *See Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999).

---

[1] April Grippo became Interim Director of the Division of Water Resources of the Tennessee Department of Environment and Conservation on April 29, 2024, and is automatically substituted for Respondent Jennifer Dodd under Fed. R. Civ. P. 25(d).

## INTRODUCTION

Even if Petitioners have standing to obtain this Court's review, the Court should decline Petitioners' invitation to second-guess TDEC's determinations on whether construction methods for a natural gas pipeline will cause violations of Tennessee's water quality standards. TDEC acted reasonably in granting a Water Quality Certification to Tennessee Gas Pipeline Company, LLC under Section 401 of the Clean Water Act, 33 U.S.C. § 1341(a). TDEC's factual determinations are entitled to deference, as technical and scientific expertise is needed to assess whether certain pipeline construction methods will lead to violations of Tennessee's water quality standards. And rather than waive certification, as permitted by federal law, TDEC required that Tennessee Gas comply with many stringent conditions to ensure Pipeline construction will not violate water quality standards.

TDEC did not "rubber-stamp" Tennessee Gas's application, as Petitioners assert. When TDEC had a question or concern, it did not hesitate to ask Tennessee Gas for an answer or explanation. Tennessee Gas answered TDEC's questions and provided detailed information and analysis, which TDEC reviewed and considered. TDEC also received significant input from the public, including Petitioners, about the Pipeline. This input was considered by TDEC, which responded in writing to public comments. Also, many of the concerns raised by the public led to TDEC making meaningful, substantive changes in the final Certification. TDEC complied

2

with its legal duties in issuing the Certification, thereby protecting water quality in Tennessee.

## ISSUES PRESENTED FOR REVIEW

### I

Whether Petitioners have standing to challenge the Tennessee Department of Environment and Conservation's ("TDEC") issuance of a Water Quality Certification under the Clean Water Act to Tennessee Gas.

### II

Whether TDEC acted reasonably in determining which waterbody-crossing methods are the least impactful practicable alternative.

### III

Whether TDEC acted reasonably and in accordance with applicable law by establishing certification conditions under which Tennessee Gas, subject to established criteria and oversight, determines which trenching and rock-removal methods for crossings are the least impactful practicable alternative.

### IV

Whether TDEC acted reasonably in determining that the Pipeline's impact to wet weather conveyances will not lead to violations of water quality standards.

## V

Whether TDEC acted reasonably in determining that Tennessee Gas's use of open-cut crossings will not lead to violations of water quality standards.

## VI

Whether TDEC acted reasonably and in accordance with applicable law in determining that Tennessee Gas's pipeline construction would not result in any appreciable permanent loss of resource values in affected waterbodies.

## STATEMENT OF THE CASE

Petitioners, Sierra Club and Appalachian Voices, seek judicial review of a Water Quality Certification that TDEC issued pursuant to Section 401 of the Clean Water Act, 33 U.S.C. § 1341(a). The Certification was requested by Respondent-Intervenor, Tennessee Gas Pipeline, LLC ("Tennessee Gas"), which is seeking to build a natural gas pipeline in Tennessee. AR000926 (JA___). The Certification faces judicial review under 15 U.S.C. § 717r(d)(1) of the Natural Gas Act.

### The Natural Gas Act and Clean Water Act

Under the Natural Gas Act, the Federal Energy Regulatory Commission ("FERC") must issue a "certificate of public convenience and necessity" before a new gas pipeline can be constructed. 15 U.S.C. § 717f(c)(1)(A). As part of FERC's review process, it must determine whether the proposed pipeline complies with all relevant federal laws and permitting requirements, including those in the Clean

Water Act, 33 U.S.C. §§ 1251 *et seq*. *See* 15 U.S.C. § 717f(e); 15 U.S.C. § 717b(d)(3).

The Natural Gas Act also reserves the rights of States to protect their waters under the CWA. *Id*. While the Act "largely preempts environmental regulation of interstate natural gas pipelines by states," it "expressly preserves State authority to regulate pipelines under the Clean Water Act." *Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality*, 990 F.3d 818, 823 (4th Cir. 2021). The CWA recognizes that States bear the primary responsibility for protecting water resources within their respective borders. 33 U.S.C. § 1251(b). Accordingly, the CWA operates through a model of cooperative federalism, in which States develop their own water quality standards. 33 U.S.C. § 1313(c)(2)(A); *see also* 40 C.F.R. § 131.4(a) (2023) (providing that "States . . . are responsible for reviewing, establishing, and revising water quality standards"). The state standards must be "consistent with the requirements of the [CWA]," 40 C.F.R. § 131.5(a)(1) (2023), though States can "develop water quality standards more stringent than required by" the CWA. 40 C.F.R. § 131.4(a) (2023).

Applicants seeking a federal license or permit to conduct an activity that "may result in any discharge into the navigable waters" must obtain a Section 401 certification from the State where the discharge will occur. *See* 33 U.S.C. 1341(a). A federal agency cannot grant the license or permit until the applicant provides "a

certification from the State in which the discharge originates or will originate . . . that any such discharge will comply with the applicable provisions of [the CWA]." 33 U.S.C. § 1341(a) (referring to §§ 1311 (Section 301 of the CWA), 1312 (Section 302), 1313 (Section 303), 1316 (Section 306) and 1317 (Section 307)).  The applicable provisions include state water quality standards.  33 U.S.C. § 1313.[2]  *Id.* A Section 401 certification can be waived by States if they fail or refuse to act on a certification request "within a reasonable period of time (which shall not exceed one year)."  *See* 33 U.S.C. § 1341(a).  When receiving a request for a Section 401 certification under the CWA, States can grant, grant with conditions, waive, or deny federal water qualification certification.  *See Clean Water Act Section 401 Water Quality Certification Improvement Rule*, 88 Fed. Reg. 66558, 66663 (Sept. 27, 2023) (to be codified at 40 C.F.R. § 121.7(f)).  If a State grants with conditions, the condition becomes part of the federal license or permit.  33 U.S.C. § 1341(d).  And States can include as conditions "any limitations necessary to ensure compliance with state water quality standards."  *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 713-14 (1994) (cleaned up).

---

[2] When TDEC reviewed Tennessee Gas's certification request, "water quality requirements" meant the "applicable provisions of the Clean Water Act and "state or tribal regulatory requirements for point source discharges into waters of the United States." 40 C.F.R. § 121.1(n) (2023).

**Tennessee's Water Quality Standards**

Under the Tennessee Water Quality Control Act, Tenn. Code Ann. §§ 69-3-101 to -148, the Tennessee Board of Water Quality, Oil, and Gas ("the State Board") establishes and adopts "standards of quality for all waters of the state." Tenn. Code Ann. § 69-3-105(a)(1). To that end, the State Board has promulgated several administrative rules regarding water quality. *See* Tenn. Comp. R. & Reg. 0400-40-01 to 0400-40-17 ("Tenn. Rules").

Tennessee has its own permitting requirements for activities affecting water quality. The Tennessee Water Quality Control Act requires that applicants obtain an Aquatic Resource Alteration Permit ("ARAP") if they will conduct certain activities, including "[t]he alteration of the physical, chemical, radiological, biological, or bacteriological properties of any waters of the state." Tenn. Code Ann. § 69-3-108(b)(1). "When a § 401 certification is required, the ARAP also serves as the § 401 certification." Tenn. Rule 0400-40-07-.04(1); Tenn. Rules 400-40-07-.01(3), 0400-40-07-.04 (3).

The procedures for obtaining an ARAP (and a 401 Certification) are set forth in Tenn. Rule 0400-40-07-.04. Upon receiving an ARAP, the applicant must comply "with all provisions of the [Tennessee Water Quality Control Act], the rules adopted pursuant to the [Act], and any special terms or conditions the Commissioner

7

determines are necessary to fulfill the purposes or enforce the provisions of the [Act]." Tenn. Rule 0400-40-07-.04(6)(a).

## Tennessee Gas's Application for Certification

Tennessee Gas applied for CWA Section 401 certification (and an ARAP) on June 22, 2022, for the proposed construction and operation of a natural gas pipeline in Tennessee, known as the Cumberland Pipeline.  AR000980, 000920, 000925 (JA____,_____,_____).  The Pipeline would be 32 miles in length and 30 inches in diameter.  AR000925 (JA___).  It would extend across three Tennessee counties (Dickson, Houston, and Steward), ending at the Tennessee Valley Authority's (TVA) power plant located near Cumberland City, Tennessee.[3]  AR000925-26 (JA___-____).  For approximately 80% of its length, the Pipeline would be adjacent and parallel to an existing TVA right-of-way power-line easement.  AR006806 (JA___).  Tennessee Gas indicated that it had also applied to FERC for a required certificate of public necessity and convenience, and to the United States Army Corps of Engineers for a required CWA Section 404 permit.  AR000925 (JA___).

---

[3] Tennessee Gas indicated that construction of the Pipeline "will address the need to provide natural gas to replace existing coal-fired power generation capacity at TVA's Cumberland Fossil Plant."  AR000926 (JA____).

Tennessee Gas's certification application was voluminous and detailed.[4] Tennessee Gas determined that the Pipeline would require crossing through various waterbodies, including streams, wetlands, and wet-weather conveyances (WWCs).[5] AR000928-000929 (JA___-____).  Before Tennessee Gas submitted its certification application, it had sent TDEC a Jurisdictional Determination/Hydrologic Determination Application ("JD/HD Report") on May 22, 2022, which identified potentially jurisdictional waterbodies that would be impacted by Pipeline construction.  AR000001-AR000918 (JA__-___).[6]

In its application, Tennessee Gas proposed two different construction methods for crossing the waterbodies affected by the Pipeline.  First, Tennessee Gas proposed using a dry, open-cut trenching method for most of the crossings.  AR000933 (JA____).  This method involves temporarily diverting stream flow around the area that will be disturbed by the trenching to avoid the possible release of sediment into

---

[4] The initial application totaled over 800 pages and included 8 separate attachments. AR000920, AR001775 (JA__-___).

[5] WWCs are man-made or natural watercourses or channels that are different from streams in many respects, including that they flow only in direct response to precipitation runoff in the immediate vicinity, have no connection to groundwater, are not suitable for drinking water supplies, and do not support the presence of aquatic life in the same way streams do.  *See* Tenn. Rule 0400-40-03-.04(36); Tenn. Code Ann. § 69-3-103(46).

[6] TDEC sent a letter to Tennessee Gas on October 21, 2022, approving its JD/HD Report as supplemented by Tennessee Gas on September 30, 2022.  AR0001872 (JA____).

the waters from construction activity.  AR000934 (JA____).  This crossing method is routinely permitted by TDEC pursuant to the terms of the *General Aquatic Resources Alteration Permit for Utility Line Crossings*.  AR006955 (JA__).  The dry, open-cut method minimizes the time that waters are disturbed, as pipeline installation can be accomplished relatively quickly—usually within a day or two if no controlled blasting is required.  AR000952 (JA____).

Tennessee Gas's application addressed how it proposed to conduct rock removal for crossings when using the dry, open-cut trenching method.  Tennessee Gas identified various rock-removal methods it could potentially use depending on conditions that were encountered at the site.  AR000947 (JA____).  Tennessee Gas also specified that controlled blasting would be used for rock removal only if all other rock-removal options were not practicable.  AR000948 (JA____).  Tennessee Gas also identified precautions that would be followed for blasting.  AR000948-49 (JA____-____).

Second, Tennessee Gas proposed using horizontal directional drilling for four crossings that involved larger streams.  AR000990, 000998, 001002 (JA____,_____,___).  Horizontal directional drilling is a trenchless method that generally involves drilling a small hole under the stream.  The hole is gradually widened, and the pipe is pulled through the widened hole.  AR000937 (JA____).  Because horizontal directional drilling involves drilling under the waterbody, it has

the benefit of avoiding all impacts to the surface waterbodies and their aquatic life.[7]

AR000950 (JA_____).  However, horizontal directional drilling requires significant

staging space (each horizontal directional drilling crossing must be a minimum of

1300 feet), costs more (up to five times more expensive than open-cut trenching),

requires more time (at least one month per crossing), and creates the potential for

loss of drilling fluids through inadvertent returns.  AR000951-52 (JA___-____).

### TDEC's Review of the Certification Application

After receiving and reviewing TGP's application, TDEC twice asked

Tennessee Gas to answer questions and to provide additional documentation.  First,

on November 3, 2022, TDEC sent Tennessee Gas a detailed letter containing 17

separate questions and/or requests for additional documentation on a wide range of

topics.  AR001889-1891 (JA___-____).  Tennessee Gas submitted detailed written

responses to all TDEC's questions and provided the requested documentation on

December 1, 2022.  AR001896-AR003090 (JA__-___).

Second, on February 24, 2023, TDEC sent another request for additional

information to Tennessee Gas, including information on the qualifications of the

---

[7] Another trenchless method Tennessee Gas considered was conventional boring, which essentially involves excavating a bore pit and receiving pit and constructing a shaft or tunnel under the stream connecting the two through which the pipe is placed.  AR000950 (JA____).  Tennessee Gas ruled this method out because the topographic conditions for most of the crossing locations on the project were not suitable for such method due to the hilly nature of the terrain.  AR000950 (JA__).

contractors that would be involved with controlled blasting.  AR003444 (JA____).

Tennessee Gas submitted written responses to TDEC's questions and provided the

requested information on March 17, 2023.  AR003449-AR003628 (JA___-____).

### Public Notice of the Draft Certification and Public Hearing

TDEC issued a draft certification of the project, along with a draft rationale

for the certification, on May 30, 2023, for public notice and comment.  AR003633,

AR004399, AR004400, AR004401 (JA___, ___, ___, ___).  *See* Tenn. Rule 0400-

40-07-.04(a), (b).  The Draft Certification included numerous general and special

conditions to which Tennessee Gas would be subject in constructing and operating

the Pipeline.   Pursuant to Tenn. Rule 0400-40-07-.04(d)(2), TDEC required

Tennessee Gas to publish a public notice in newspapers in Dickson, Houston, and

Stewart Counties and to post and maintain signs about the application and Draft

Certification on public roads near where the Pipeline would be constructed.

AR004400-4404 (JA___-___).   The public notice of the Draft Certification

contained all the information required by Tenn. Rule 0400-40-07-.04(4)(c),

including a description of the proposed activity and the locations of the streams or

wetlands to be impacted by the Pipeline.  AR004404-AR004406 (JA___,___).

TDEC set a public hearing on the Draft Certification for July 6, 2023, to be

held in Dickson, Tennessee, and notified the public that the written-comment period

would end on July 16, 2023.  AR004402 (JA____).  Tennessee Gas published the

newspaper notices and posted the signs required by TDEC. AR004407-004431 (JA___-____). A total of 42 individuals attended the July 6, 2023 hearing in person, and 13 more attended online. AR006950 (JA____). Approximately 13 attendees spoke at the hearing. *See id.*

TDEC also received written comments from Tennessee Gas, Petitioners (Sierra Club and Appalachian Voices), and other interested individuals on the Draft Certification before the comment period ended. AR006950, AR004617-AR006756 (JA_____,_____-_____). TDEC reviewed and considered all the written comments, as well as the comments made at the public hearing. AR006950 (JA_____).

### Issuance of the Final Certification

TDEC issued its final Certification to Tennessee Gas, along with a final permit rationale explaining its decision, on July 21, 2023. AR006762-006949 (JA___-___). Although not required by State rules, TDEC also issued a Notice of Determination that responded to the various categories of comments that TDEC had received in writing and at the public hearing. AR006950-AR006966 (JA____-___).

In the Certification, TDEC authorized 65 stream crossings by dry, open-cut trenching, and four crossings via horizontal directional drilling, for a total of 69 crossings of 53 streams overall (some streams were crossed more than once). AR006793 (JA___). TDEC also authorized seven crossings of wetlands, AR006769

13

(JA\_\_\_),[8] and the crossing of 76 WWCs.  AR006809-006814 (JA\_\_-\_\_).  For the most part, TDEC in the Certification authorized only temporary impacts to streams and wetlands with some limited permanent impacts for vegetation management in riparian zones.  AR006762, AR006805 (JA\_\_\_,\_\_\_)

TDEC's Certification includes special conditions that are more stringent than those imposed by the Draft Certification.  For example, TDEC amended Special Conditions h.4 and h.6 in the Draft Certification to increase the requirements related to when controlled blasting could be utilized for rock removal in connection with dry, open-cut trenching.  *Compare* Certification at AR006773 (JA\_\_\_\_) *with* Draft Certification at AR003644 (JA\_\_\_\_).  TDEC also amended Special Condition j. to require Tennessee Gas to submit site-specific containment plans for TDEC approval before horizontal directional drilling could be commenced.  *Compare* Certification at AR006774 (JA\_\_\_\_\_) *with* Draft Certification at AR003645 (JA\_\_\_\_).  And TDEC added a specific prohibition in Special Condition hh. against "wet, open-cut" trenching crossing methods, *i.e.*, crossing methods implemented without diverting flow around the construction site, as is done with the dry, open cut method.  *Compare* Certification at AR006777 (JA\_\_\_\_) with Draft Certification at AR003648 (JA\_\_\_\_).

---

[8] TDEC determined that the Pipeline project would result in no overall wetland-acreage loss, but acknowledged that some wetlands would be changed from forested wetlands to herbaceous wetlands.  AR006770 (JA\_\_\_).

Finally, in response to public comments about sedimentation associated with land-clearing activities, TDEC added Special Condition jj. to the Certification. AR006777 (JA____). This condition demanded Tennessee Gas's compliance with the requirements of a general-construction stormwater permit known as the *National Pollutant Discharge Elimination System General Permit for Discharges of Stormwater Associated with Construction Activities*, TNR100000 ("Tennessee General Construction Stormwater Permit") "for the entire area of disturbance associated with the construction project." AR006777, AR006956 (JA__,__).

## SUMMARY OF THE ARGUMENT

Petitioners do not have standing because their asserted injuries are not traceable to TDEC's decision to issue the Certification and cannot be redressed by a favorable decision from this Court. So, the petition for review should be dismissed.

Alternatively, the petition should be denied. TDEC acted reasonably in granting the Certification pursuant to Section 401 of the CWA. Rather than waive certification, as permitted by federal law, TDEC required that Tennessee Gas comply with many stringent conditions which ensure Pipeline construction will not violate water quality standards. TDEC considered information that Tennessee Gas provided regarding possible construction methods for waterbody crossings. TDEC then included special conditions in the Certification that require Tennessee Gas to use the least impactful practicable alternative for each crossing.

15

These special conditions comport with Tennessee regulations, and they do not unlawfully delegate authority to Tennessee Gas because TDEC established the criteria for determining the least impactful practicable alternative.  Furthermore, TDEC can address any noncompliance with the terms of the Certification through enforcement actions.

The Certification also requires that Tennessee Gas comply with the conditions in Tenn. Code Ann. § 69-3-108(q)(1) addressing protections for WWCs. These conditions prohibit alterations to WWCs that would cause sediment to enter "other waters of the state," thereby preventing violations of any water quality standards related to WWCs.

The Certification also included several special conditions that address Petitioners' concerns about the possible release of sediment into waters resulting for the authorization of dry-open cut trenching.  It was therefore reasonable for TDEC to conclude that Pipeline construction, as conditioned, would not result in excess sedimentation in violation of state water quality standards.

Finally, TDEC reasonably determined that mitigation was not needed for the Pipeline because it would not cause an appreciable permanent loss of resource values.  Consequently, TDEC was not required to gather baseline data on existing conditions of waterbodies or to conduct a cumulative impacts analysis.

## STANDARD OF REVIEW

Petitioners contend that this Court should review TDEC's Certification under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). (Br. Petitioners, 20-21.) But the APA "does not cover state agencies." *Del. Riverkeeper Network v. Sec. of Pa. Dep't of Envt'l Prot.*, 870 F.3d 171, 179 n.8 (3d Cir. 2017). TDEC maintains that its Certification should be reviewed under Tennessee law. *See Sierra Club v. La. Dep't of Env't Quality*, 100 F.4th 555, 562 (5th Cir. 2024) (applying state standard).

Regardless, the APA—insofar as Petitioners invoke it—and Tennessee law are substantially similar, and TDEC's decision passes either test. Under the APA, a reviewing court "shall" set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). And under Tennessee law, a reviewing court "may" set aside an agency decision that is "[i]n violation of . . . statutory provisions" or "[a]rbitrary or capricious or characterized by abuse of discretion." Tenn. Code Ann. § 4-5-322(h)(1)(2). Such review is "narrow and deferential." *StarLink Logistics Inc. v. ACC, LLC*, 494 S.W.3d 659, 668 (Tenn. 2016).

Under federal law, "the arbitrary and capricious standard is the least demanding form of judicial review of administrative action." *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). An agency need only "examine the relevant

data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And "the highest level of deference is applied" to review of an agency's "technical or scientific evaluations and determinations. *Citizens Coal. Council v. EPA*, 447 F.3d 879, 890 (6th Cir. 2006) (citation omitted). Courts will likewise defer to an agency's interpretation of its own rules if they are ambiguous. *See Kisor v. Wilkie*, 588 U.S. 558, 568-69 (2019); *United States v. Phillips*, 54 F.4th 374, 379 (6th Cir. 2022).

Under Tennessee law, the decision of an administrative agency is arbitrary or capricious "when there is no substantial and material evidence supporting the decision," or "it amounts to a clear error in judgment." *StarLink Logistics*, 494 S.W.3d at 669. A decision is arbitrary or capricious if it lacks "any course of reasoning or exercise of judgment, or . . . disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Id.* "If there is room for two opinions," however, "a decision is not arbitrary or capricious if it is made honestly and upon due consideration, even though a reviewing court thinks a different conclusion might have been reached." *Id.* Courts "should defer to decisions of administrative agencies when they are acting within their area of specialized knowledge, experience, and expertise"; a court "will not overturn a decision of an agency acting within its area of expertise and within the exercise of its judgment solely because the court disagrees with an agency's

ultimate conclusion." *Id.* at 669, 670. But courts do not defer to an agency's interpretation of an agency rule. *See* Tenn. Code Ann. § 4-5-326.

## ARGUMENT

### I.    Petitioners Lack Standing.

As a threshold matter, Petitioners lack standing to seek this Court's review of TDEC's Certification decision.

Standing has three elements. Petitioners "must have suffered an injury. They must trace this injury to the defendant. And they must show that a court can redress it." *Fox v. Saginaw Cnty.*, 67 F.4th 284, 293 (6th Cir. 2023). "Every element of that inquiry is particularized: the court must carefully examine 'a [plaintiff's] allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted' against a particular defendant." *In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 87 F.4th 315, 319 (6th Cir. 2023) (citation omitted).

Petitioners claim that the Pipeline will adversely impact their members' "aesthetic, recreational, and property interests" (Br. Petitioners, 2-3), but those injuries are not traceable to the Certification. Rather than "lessen[ing]" the "aesthetic and recreational values of the area," *Sierra Club v. EPA*, 793 F.3d 656, 663 (6th Cir. 2015), the Certification was a discretionary act by TDEC to impose conditions on Tennessee Gas *preserving* those values. Indeed, the CWA allows

States to waive Section 401 certification without any action or explanation. 33 U.S.C. § 1341(a)(1); *see also Clean Water Act Section 401 Water Quality Certification Improvement Rule*, 88 Fed. Reg. 66558, 66663 (Sept. 27, 2023) (to be codified at 40 C.F.R. § 121.7(f). Thus, the only way Petitioners could show injury from TDEC's actions is if they could show that the terms of the Certification *reduced* water quality below that which it would have been if TDEC had waived certification entirely.

Petitioners have not and could not make such a showing. Consequently, each of Petitioners' complaints about TDEC's evaluation of Tennessee Gas's application involves the sort of "bare procedural violation[s]" that cannot support standing. *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 341 (2016); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Petitioners cannot show harm from TDEC's alleged failure to follow procedures it did not have to undertake, nor from TDEC's failure to impose additional conditions on Tennessee Gas when the agency could have imposed none. *Cf. Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64-65 (2004) (limiting APA review to actions are "*required to take*") (emphasis added).

Petitioners' alleged harms are instead traceable to the certificate of public necessity and convenience recently issued by FERC, as that is the action that allows

pipeline construction to proceed.  *See* 15 U.S.C. § 717f.[9]  But FERC's decision to approve the Pipeline is not traceable to TDEC.  *See Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021) ("[H]arms 'result[ing] from the independent action of some third party not before the court are generally not traceable to the defendant.") (citation omitted).  TDEC's Certification was not a precondition for FERC's permit, given Tennessee's waiver rights.  33 U.S.C. § 1341(a)(1).  When a State waives Section 401 certification, FERC retains an independent obligation to assess whether the project satisfies the requirements of the Natural Gas Act.  *See id.* 15 U.S.C. § 717f(e); *see also Clean Water Act Section 401 Water Quality Certification Improvement Rule*, 88 Fed. Reg. 66558, 66663 (Sept. 27, 2023) (to be codified at 40 C.F.R. § 121.7(f)).

Nor can Petitioners show that a decision from this Court vacating the Certification "likely will redress" their injuries.  *See Turaani*, 988 F.3d at 316.  At bottom, redressing Petitioners' alleged harms would require TDEC to impose additional conditions on Tennessee Gas or deny the Certification for the Pipeline altogether.  Petitioners have not shown that either of these outcomes is "likely."  *Id.* For example, even if this Court were to vacate the Certification as Petitioners request (Br. Petitioners, 60), TDEC could simply *waive* 401 Certification for any new

---

[9] Petitioners' challenge to FERC's permit is pending in the D.C. Circuit.  *See Sierra Club v. FERC*, Nos. 24-1099, 24-1198 (D.C. Cir.).

application for Certification it receives in the future.  *See Clean Water Act Section 401 Water Quality Certification Improvement Rule*, 88 Fed. Reg. 66558, 66663 (Sept. 27, 2023) (to be codified at 40 C.F.R. § 121.7(f).  And because States need not provide any basis for a waiver decision, such a waiver would not be reviewable by any court.

It makes sense that Petitioners—and environmental groups and members alike—will generally lack standing to challenge a State's Section 401 certification. Article III standing "is ordinarily 'substantially more difficult' to establish" when the party invoking jurisdiction "is not himself the object of the government action or in action he challenges."  *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 562 (1992) (citation omitted).  It is therefore unsurprising that the vast majority of appeals related to Section 401 certifications are filed by companies challenging the *denial* of a certification or the failure of a state agency to act on a request for one.[10]

Of the few courts that have considered challenges to 401 certifications brought by environmental groups, it appears that only the Fourth Circuit has addressed

---

[10] *See, e.g.*, *Const. Pipeline Co., LLC v. New York State Dep't of Env't Conservation*, 868 F.3d 87, 101 (2d Cir. 2017) (challenge by affected company); *Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality*, 990 F.3d 818, 829 (4th Cir. 2021) (same); *Millennium Pipeline Co., L.L.C. v. Seggos*, 860 F.3d 696, 700 (D.C. Cir. 2017) (same); *AES Sparrows Point LNG, LLC v. Wilson*, 589 F.3d 721 (4th Cir. 2009) (same); *Weaver's Cove Energy, LLC v. R.I. Dep't of Env't. Mgmt.*, 524 F.3d 1330 (D.C. Cir. 2008) (same); *Islander E. Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 142 (2d Cir. 2008) (same).

standing.[11]  But the Fourth Circuit erred in *Sierra Club v. State Water Control Bd.*, 898 F.3d 383 (4th Cir. 2018), in holding that environmental groups could challenge Virginia's certification of the Mountain Valley Pipeline.  898 F.3d at 401.  While the court found, (mis)applying *Townes v. Jarvis*, 577 F.3d 543 (4th Cir. 2009), that Virginia's certification "ended [the p]etitioners' opportunity to have more stringent requirements imposed (or the project vetoed entirely)," *Sierra Club*, 898 F.3d at 401, the petitioners were not entitled to any such "opportunity"—given State's waiver rights under 33 U.S.C. § 1341(a)(1).

Section 401 is meant to give States a "veto" over "an energy pipeline that has secured approval from a host of other federal and state agencies."  *Const. Pipeline*, 868 F.3d at 100, 101 (cleaned up).  But again, States are under no obligation to act.  So, when a State wields this discretionary tool to impose additional conditions on pipeline construction, citizens will generally benefit, not suffer.  Interested parties may have standing if they can show that the State's conditions make matters worse, but they lack standing to complain that the State should have imposed even more conditions.  *Cf. Berry v. U.S. Dep't of Labor*, 832 F.3d 627, 634-35 (6th Cir. 2016) (actions committed to agency discretion are unreviewable).

---

[11] *See Appalachian Voices v. State Water Control Bd.,* 912 F.3d 746, 752-53 (4th Cir. 2019) (finding petitioners had standing and citing *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 400-02 (4th Cir. 2018)).

## II.    TDEC Reasonably Determined that Tennessee Gas Had Demonstrated that the Crossing Methods It Proposed Were the Least Impactful Practicable Alternatives for the Pipeline.

If the Court declines to dismiss the petition for lack of standing, it should deny the petition on the merits because Petitioners prevail on none of their arguments. Petitioners first contend that TDEC acted arbitrarily and capriciously in determining that Tennessee Gas's proposed waterbody crossing methods were the least impactful practicable alternatives. (Br. Petitioners, 21-31.) It did not.

TDEC's regulations provide that "[n]o Individual [ARAP] Permit shall be granted if there is a practicable alternative to the proposed activity that would have less adverse impact on resources values, so long as the alternative does not have other significant adverse environmental consequences."[12] Tenn. Rule 0400-40-07-.04(5)(b). A "practicable alternative" is "an alternative that is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." Tenn. Rule 0400-40-07-.03(24). TDEC reasonably determined that Tennessee Gas had demonstrated that its selected crossing methods were the least impactful practicable alternatives ("LIPA") in light of overall project purposes—i.e., constructing the Pipeline. AR0006804 (JA____).

---

[12] An ARAP permit can serve as a federal Section 401 Certification. *See* Tenn. Rule 0400-40-07-.04(1).

TDEC considered and accepted Tennessee Gas's analysis on alternatives, which evaluated trenched crossing options (wet, opencut and dry, open-cut) and trenchless crossing options (horizontal directional drilling and conventional bore). *See generally* AR006799-6804 (JA___-____). TDEC routinely authorizes dry, open-cut trenching for stream crossings under the *General Aquatic Resources Alteration Permit for Utility Line Crossings* for various types of utilities. AR006954-55 (JA__-__); AR006967-006972 (JA___-____). Tennessee Gas explained that "[i]n general, open trench methods take less time, are less expensive, and present less risk of failure or complications as compared to trenchless methods." AR000945 (JA____). To ensure minimal environmental impacts, Tennessee Gas proposed that construction at crossings via these methods would adhere to and follow all FERC procedures, applicable requirements of the U.S. Army Corps of Engineers, and any TDEC ARAP/Certification conditions. AR006792 (JA____). Tennessee Gas indicated that if it encountered bedrock during construction, it would follow a detailed process to determine the least impactful technique to excavate the rock. AR006794-95 (JA____).

TDEC also accepted Tennessee Gas's proposal to use the horizontal directional drilling method to cross four streams. AR006795 (JA____). Tennessee Gas selected horizontal directional drilling to cross these streams "to overcome obstacles posed by the use of other stream crossing construction methods that are

impracticable because of channel dimensions, flow, and other constraints." AR006795 (JA____).   Tennessee Gas confirmed the feasibility of horizontal directional drilling crossings at these locations through feasibility studies. AR006795 (JA__).

> **A.    TDEC reasonably approved the crossing methods proposed by Tennessee Gas which were determined on a crossing-by-crossing basis.**

Petitioners argue that TDEC failed to evaluate Tennessee Gas's proposed crossing methods—"i.e., trenchless versus open-cut crossings"—on "a crossing-by-crossing basis as opposed to at the project level."  (Br. Petitioners, 23-24.)  But evidence in the record proves this argument wrong.

First, TDEC reasonably accepted in its permit rationale Tennessee Gas's analysis, which reflected a rational process for determining whether a trenching or trenchless method would be the LIPA for each crossing.  Tennessee Gas had uniformly evaluated whether trenchless or trenched crossing methods would be the LIPA.  AR006802-006803 (JA___-____).  For example, Tennessee Gas had considered six factors to decide whether a particular crossing would be accomplished via trenching (dry, open-cut) or trenchless (horizontal directional drilling or conventional bore).  AR006803 (JA___). These factors included: "(1) the length of the crossing (2) the potential for risk of loss of drilling fluid (i.e. inadvertent returns/lost returns) (3) geological considerations (4) length of time of the crossing

(5) worker safety and technical feasibility and (6) cost of the crossing method."

AR006803 (JA____).

Second, TDEC reasonably relied on Tennessee Gas's crossing-by-crossing analysis supporting its determination of which crossing method would be LIPA for each crossing.  For example, Tennessee Gas submitted to TDEC a crossing data table, which contained information and analysis on stream substrate, geology, drainage area, and risk of hydrologic loss *for every stream and WWC to be crossed*. AR000955-000967 (JA___-___).  Geology "plays a major role in the success of an HDD."  AR006803 (JA___).  And Tennessee Gas's consultant observed that crossings at locations with karst geology, located higher in the watershed, and with a smaller drainage area are more susceptible to hydrologic loss.  AR001908 (JA___).

### B.    TDEC permissibly relied on project-wide information to determine the viability of different crossing methods.

In addition to relying upon Tennessee Gas's waterbody-by-waterbody crossing analysis, TDEC also considered more general project-wide information pertinent to the practicability of different crossing methods.  And TDEC reasonably accepted Tennessee Gas's evaluation of which trenchless crossing methods were practicable, based both on the waterbody-by-waterbody data pertinent to crossing-method suitability and project-wide information on factors such as cost and logistics.

For example, Tennessee Gas provided TDEC with a table summarizing three trenchless crossing technologies (horizontal directional drilling, conventional bore,

and Direct Pipe) and addressing their advantages, limitations, and risks.  AR001637

(JA____).  The table provided information relating to whether the crossing method

was practicable for the purpose of the overall project, such as the typical cost per

square foot, typical workspace requirements, potential limiting factors, typical

duration of work compared to open-cut crossings, and the risk of equipment failure

or harm to workers and/or occurrence of inadvertent returns of drilling fluid into the

environment.  AR001637 (JA____).

Petitioners' insistence that trenchless methods are the least impactful (Br.

Petitioners, 25) fails to account for the fact that the costs for all trenchless options

were significantly higher than for dry, open-cut crossings.[13]  AR001637 (JA___).

The workspace requirements and staging areas needed for trenchless methods was

also significant, as compared to dry, open-cut methods.[14]  In addition, for horizontal

directional drilling to be used for stream crossings, the crossing width needs to be at

least 1300 feet in length.  AR001637 (JA____).  The length of time needed to

---

[13] Conventional bore is approximately $1,550 more per square foot than dry, open-cut crossing; horizontal directional drilling is approximately $2,050 more per square foot than dry, open-cut crossing; and Direct Pipe is approximately $3,050 more per square foot than dry, open-cut crossing.  AR001637 (JA_____).

[14] Conventional bore requires, 10,000 square feet of entry and exit workspace; horizontal directional drilling requires 100,000 square feet of entry and exit workspace; and Direct Pipe requires 80,000 square feet of entry and exit workspace.  AR001637 (JA____).

complete trenchless crossings is also significantly longer than that for the dry, open-cut crossing method.[15]  All of these factors bear on whether a crossing method is practicable.

## C.    TDEC reasonably concluded that conventional bore was not a practicable alternative.

Petitioners take issue with TDEC for not requiring Tennessee Gas to provide additional information about why conventional bore (a trenchless method) was not a practicable alternative.  (Br. Petitioners, 28-29).  But Tennessee Gas evaluated conventional bore as an option and provided TDEC with adequate justification for not selecting it.  AR006802 (JA___).  For example, Tennessee Gas indicated that "[m]ajor factors limiting the success of a boring operation under waterbodies for the Project include the crossing distance, subsurface soil and geologic conditions, and existing topography."  AR006803 (JA____).  Tennessee Gas elaborated that "topographic conditions for most waterbody crossing locations on this Project also limit the use of this method."  *Id*.  TDEC therefore had sufficient evidence that conventional bore was not a practicable alternative for the purposes of this project.[16]

---

[15] The conventional bore method is three times slower than the typical dry, open-cut method; horizontal directional drilling is five times slower than typical dry, open-cut crossing; and Direct Pipe is four times slower than typical duration of dry, open cut crossings.  AR001637 (JA____).

[16] Petitioners argue that TDEC could not simply accept Tennessee Gas's analysis because there was "record evidence that contradicts its conclusions."  (Br. Petitioners, 31).  Petitioners cite a Fourth Circuit case for this proposition, but that

### D. TDEC did not "rubber-stamp" Tennessee Gas's crossing-method selections.

Petitioners are wrong to say that TDEC merely "rubber-stamped" Tennessee Gas's crossing method of choice. (Br. Petitioners, 21-22.) To the contrary, after Tennessee Gas submitted its application, TDEC asked questions of, and requested additional information from, Tennessee Gas on two separate occasions.

TDEC sent a letter to Tennessee Gas on November 3, 2022—five months after the application had been submitted—asking 17 specific questions and requesting additional documentation. AR001889 (JA____). TDEC asked Tennessee Gas to expound upon a table in its application listing, on a waterbody-by-waterbody basis, the crossing method it was proposing, and the factors related to the selection of such method (*i.e.*, the potential for karst formation, the risk of hydrologic loss (high, medium, or low) at each crossing, etc.). AR001890, 000955 (JA___,___). Tennessee Gas responded in writing to TDEC's questions and provided the additional information requested by TDEC, including documentation about Phase I,

---

case relied on the APA standard of review, which provides in part that "record evidence contrary to an agency's conclusion requires further elaboration and must be grappled with." *W. Va. Dep't Envt'l Prot.*, 64 F.4th at 501-02. Tennessee law, however, is not so demanding. *See StarLink Logistics*, 494 S.W.3d at 669 (quoting Tenn. Code Ann. § 4-5-322(h)(5)(B) ("In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.").

Phase II, and Phase III Geologic and Hydrotechnical Hazard Assessments. AR001896, AR002709, AR002803, AR002896 (JA____-____-____-____). AR001896 (JA___).

TDEC sent another letter to Tennessee Gas on February 24, 2023, seeking even more information. TDEC asked Tennessee Gas about the qualifications of contractors that would be engaged if controlled blasting were deemed necessary for rock excavation. AR003444 (JA____). Tennessee Gas responded to TDEC's questions and provided the additional information TDEC had requested. AR003449-003628 (JA__-__).

That TDEC did not act as a "rubber stamp" is further evidenced by the conditions TDEC imposed on Tennessee Gas's use of trenching methods. For example, Special Condition g. of the Certification established a tightly controlled rubric to ensure that Tennessee Gas used only the LIPA trenching method. *See* AR006772-73 (JA__-__). And in response to public comments on the Draft Certification, TDEC changed several requirements in the final Certification. First, in response to comments about blasting being proposed at some streams where it was not appropriate, TDEC amended permit Special Condition h.4. to make clear that blasting would not be allowed if "1) karst is unlikely *and* 2) risk of hydrologic loss is reduced *and* 3) HDD has been determined not practicable." (emphasis in original). AR006953-006954. (JA__-___). Second, TDEC added language to the

Certification specifically prohibiting the use of wet, open-cut crossings. AR006954 (JA_____). Third, in response to concerns about the potential release of drilling fluids, TDEC amended Special Condition j.3 to require TDEC approval of site-specific drilling-fluid containment plans. AR006959 (JA_____). Finally, in response to comments about construction stormwater impacts associated with clearing, TDEC added a new Special Condition jj. to the Certification, which required Tennessee Gas to comply with the terms of a general construction stormwater permit for "the entire area of disturbances associated with the construction project." AR006962 (JA____).

## III.   TDEC Properly Conditioned the Certification on Tennessee Gas Using the LIPA Trenching Method.

Petitioners contend that Special Condition g. of the Certification is unlawful because it violates TDEC regulations and improperly delegates authority to TGP. (Br. Petitioners, 31-36.)   Neither contention has merit.   Consistent with its regulations, TDEC placed stringent controls on Tennessee Gas's use of dry, open-cut trenching methods.   And TDEC retains authority to inspect and review construction of permitted projects like the Pipeline.

### A.   The Certification complies with TDEC's regulations.

Petitioners maintain that TDEC must definitively "determine the least impactful practicable alternative" for each discrete crossing "*before* permit issuance." (Br. Petitioners, 33). But TDEC's regulations do not preclude site-based

determinations of the LIPA according to strict standards set forth in a permit. They require only that issued permits guarantee that a project will use the "practicable alternative . . . that would have [the least] adverse impact on resource values, so long as the alternative does not have other significant adverse environmental consequences." Tenn. Rule 0400-40-07-.04(5)(b). Special Condition g. does exactly that.

Special Condition g. sets forth a process for Tennessee Gas to determine the LIPA open-cut trenching technique at each stream crossing and requires Tennessee Gas to use that method. AR006772 (JA__). First, Tennessee Gas is limited to a list of five TDEC-approved "potentially practicable alternatives." *Id.* The list is "arranged in ascending order of perceived impact." *Id.* These methods are conventional excavation, ripping, hammering, and rock trenching and each carries different benefits as well as risks. AR000947-000948 (JA___-JA___). The final alternative—"[c]ontrolled blasting and excavation with a backhoe"—carries significant risks to resources making it appropriate for stringent regulation. *See* AR006772-73 (JA__-__). Next, Special Condition g. provides a rubric for determining which of the alternatives is the LIPA for a particular crossing, requiring Tennessee Gas to account for things like "observed conditions at the stream cross, the technical feasibility and limitations of each particular technique, . . . and costs." AR006772 (JA__).

33

In addition to considering the specified criteria, Special Condition g. requires Tennessee Gas to consider "the relative hardness, fracture susceptibility, and expected volume of the bedrock, and the location of the crossing" in selecting one of the four trenching alternatives. AR000935-000936 (JA__- JA__). TDEC placed extra guardrails on blasting in Special Condition g. AR006772-73 (JA_-__). Tennessee Gas must "attempt at least one non-blasting alternative" and demonstrate that each of the other techniques is "impracticable" before it can use the most extreme open-cut method. *See id.* Also, Special Condition g. must be read in conjunction with Special Condition h., which includes a litany of additional constraints on TGP's ability to use blasting.[17]

This stringent scheme satisfies TDEC's rule that a permit may issue only if no "practicable alternative to the proposed activity" exists "that would have less adverse impact on resource values." Tenn. Rule 0400-40-07-.04(5)(b). And TDEC thus properly concluded that the "process for determining the appropriate crossing

---

[17] Special Condition h., for example, provides that "[o]nly streams in which 1) karst is unlikely and 2) risk of hydrologic loss is 'reduced' and 3) HDD [horizontal directional drilling] has been determined to not be practicable may blasting be considered." AR006773 (JA___). Blasting is also not allowed in any wetlands. AR006773 (JA___). Tennessee Gas also must notify TDEC "in writing at least 48 hours in advance when controlled blasting is proposed." AR006773 (JA__). "[P]rior to initiation of controlled blasting" Tennessee Gas must obtain "[w]ritten authorization" from TDEC. TDEC added the prior written authorization condition to the Certification, which was not a requirement in the draft Certification. AR003644 (JA___).

method will result in the use of the least impactful practicable alternative to accomplish the project purpose." AR006804 (JA__). TDEC preconditioned the Certification on Tennessee Gas's adhering to Special Conditions g. and h., which ensures that Tennessee Gas will use the LIPA trenching method at "each stream crossing." AR006772 (JA__). Indeed, failing to do so—whether by ignoring the Special Conditions entirely or by miscalculating the "[e]valuation criteria," *id.*—would constitute "permit noncompliance" and subject Tennessee Gas to potential "enforcement action[s], permit termination, permit modification, or denial of permit reissuance," AR006779 (JA__).

Contrary to Petitioners' argument, Tenn. Rule 0400-40-07-.04(5)(b) does not require TDEC to *specify* the LIPA at each discrete crossing. Nothing in the rule's plain language prevents TDEC from granting a permit specifically conditioned on the permittee following a pre-determined rubric that ensures the LIPA is employed at each crossing. The Rule only prohibits TDEC from issuing a permit if a "practicable alternative . . . that would have [the least] adverse impact on resource values" exists, and Special Conditions g. and h. confirms that none will. And, in any event, to the extent any ambiguity exists about what the Rule requires, TDEC's reasonable interpretation of its own rule is entitled to deference. *See Kisor v. Wilkie*, 598 U.S. 558, 568-69 (2019).

### B.    TDEC did not unlawfully delegate its authority.

Petitioners are wrong in saying that the Certification grants "TGP [Tennessee Gas] and its contractors . . . nearly unfettered discretion to determine the least impactful . . . technique for each stream crossing."  (Br. Petitioners, 35).  As discussed above, the Certification strictly controls Tennessee Gas's decision about which trenching method to use and does not unlawfully delegate authority.

TDEC is responsible for certifying permittees' compliance with certain provisions of the Clean Water Act.  *See* 33 U.S.C. § 1341(a)(1).  When an agency is "specifically vested" with such authority, it generally may "not shift that responsibility to a private actor."  *Perot v. Fed. Election Comm'n*, 97 F.3d 553, 559 (D.C. Cir. 1996).  But so long as "the private entity functions subordinate to the agency . . . and the agency has authority and surveillance over the activities of the private entity," "[a]n unlawful delegation of authority . . . does not exist."  *Consumers' Rsch. v. FCC*, 67 F.4th 773, 795 (6th Cir. 2023) (cleaned up).  Indeed, an agency generally "does not improperly subdelegate its authority when it 'reasonabl[y] condition[s]' federal approval on an outside party's determination of some issue; such conditions only amount to legitimate requests for input."  *Texas v. Rettig*, 987 F.3d 518, 531 (5th Cir. 2021).  The agency need not micromanage the private actor to avoid non-delegation problems.  *See Consumers' Rsch.*, 67 F.4th at 796 ("[A]n agency exercises its policymaking discretion with equal force when it

makes policy by either 'decid[ing] to act' or 'decid[ing] *not* to act.'" (quoting *Oklahoma v. United States*, 62 F.4th 221, 230 (6th Cir. 2023)).

In *Perot v. Fed. Election Comm'n*, for example, the D.C. Circuit upheld the Federal Election Commission's ("FEC") regulation permitting eligible non-profit organizations to "choose their own 'objective criteria'" for selecting presidential debate participants. *Perot*, 97 F.3d at 560. While "the FEC gave individual organizations leeway to decide what specific criteria to use . . . the organization r[an] the risk that the FEC w[ould] subsequently determine that its criteria [were] not objective." *Id.* at 559-60. And "[i]f that happen[ed], the staging organization may be subject to penalties. *Id.* at 560. The court held that this scheme kept ultimate "authority to determine what the term 'objective criteria' means" with the FEC. *Id.*

Special Condition g. is even more stringent than the scheme upheld in *Perot*. While TGP has some "latitude," it may not choose just any method and under just any rubric. *Id.* Rather, Tennessee Gas must follow the controlled scheme that TDEC established for Tennessee Gas to determine and select the LIPA. Meanwhile, TDEC requires Tennessee Gas to receive written pre-approval before blasting and retains authority to "terminat[e]" or "modif[y]" the Certification if Tennessee Gas misapplies TDEC's LIPA rubric to select an inappropriate alternative. AR006772-73, AR006779 (JA__-__,__). TDEC also requires Tennessee Gas to submit a post-blasting monitoring report which must describe among other things the attempts to

37

implement an alternative, the results of the attempt, and the site-specific factors that necessitated blasting.  AR006778 (JA___).  And TDEC retains general authority to inspect and review construction of permitted projects like the Pipeline.  *See* Tenn. Code Ann. § 69-3-107(1), (5).

TDEC acknowledges that Special Condition g. does not mandate a specific trenching technique and gives TGP some discretion to decide which practicable alternative is "technical[ly] feasibl[e]," based on "best professional judgment . . . , logistics, and costs."  AR006772 (JA__).  But that does not create an unlawful delegation.  *See Perot*, 97 F.3d at 560.  If that alone were enough, "virtually any regulation of a private party could be described as a 'delegation' of authority, since the party must normally exercise some discretion in interpreting what actions it must take to comply." *Id.*  Like the organizations in *Perot*, Tennessee Gas "may be subject to . . . penalties" if it TDEC later determines the company miscalculated.  *Id.* at 560.  So, "[t]he ultimate authority to determine the" LIPA rests with TDEC.  *Id.* at 559-60.

Petitioners assert that "practicability and environmental impact determinations will be made in the field by TGP and its contractors with no oversight from TDEC."  (Br. Petitioners, 35).  That is incorrect.  The Certification requires Tennessee Gas and its contractors to follow a specific, TDEC-established process.  AR006772-AR006773 (JA__-__).  And while the Certification only requires written

pre-approval for blasting, (Br. Petitioners, 35), Tennessee Gas "acts at its peril" if it selects an implausible alternative "unless it first secures" TDEC's input given the agency's authority to revoke or modify the Certification for noncompliance. *Perot*, 97 F.3d at 560. It is also irrelevant that Tennessee Gas "need only *attempt* one non-blasting alternative before" seeking approval (Br. Petitioners, 35 (emphasis altered)), because Tennessee Gas still cannot move forward with blasting unless it demonstrates that all the other alternatives are "impracticable" and receives TDEC's stamp of approval. AR006773 (JA__).

For all these reasons, this case is in no way analogous to the district court decision in *National Park and Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7 (D.D.C. 1999). (Br. Petitioners, 36). In *Stanton*, the court struck down the National Park Service's ("NPS") plan to "*completely shift* its responsibility to administer the Niobrara [River] to a private actor" as an unlawful delegation. 54 F. Supp. 2d at 18-19 (emphasis added). "NPS [had] retain[ed] no oversight over the [private actor], no final reviewing authority over the [private actor's] actions or inaction, . . . the [private actor's] dominant private local interests are likely to conflict with the national environmental interests that NPS is statutorily mandated to represent." *Id.* at 20. The court also found it problematic that "[t]he only power NPS retain[ed] [was] the extreme remedy of totally terminating" its agreement with the private actor. *Id.*

Here, by contrast, TDEC retains significant oversight and approval authority. *See* AR006772-AR006773, AR006779 (JA__-__, __); Tenn. Code Ann. § 69-3-107(1), (5). And TDEC can impose its interest in maintaining environmental quality in Tennessee on Tennessee Gas through a menu of enforcement mechanisms—including, for example, "modif[ying]" the Certification to require new mitigation measures. AR006779 (JA__).[18]

## IV. TDEC Reasonably Concluded that Impacts to WWCs Will Not Lead to Water Quality Standards Violations.

Petitioners next contend that TDEC failed to properly evaluate Tennessee Gas's proposed WWC crossings. (Br. Petitioners, 36-45.) But Petitioners have waived this argument. And in any event, TDEC reasonably determined that "impacts to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108(q)." AR006769 (JA__).

Tennessee Code Annotated § 69-3-108(q) sets both the floor and the ceiling for water quality requirements associated with the alteration of WWCs. Under the

---

[18] Nor is *Sierra Club v. Sigler*, 695 F.2d 957 (5th Cir. 1983) helpful to Petitioners. (Br. Petitioners, 34.) Indeed, the footnote on which Petitioners rely amounts to little more than cautionary dicta. While the court expressed concern that the "private consulting firm hired by the [permit] applicants" appeared to have prepared "most, if not all," of the materials that informed the Army Corps' cost-benefit analysis—raising questions about its objectivity—the court did not find an unlawful delegation and ultimately "express[ed] no legal opinion on whether the Corps improperly rubberstamped [a report] prepared by someone else." *Id.* at 962 n.3.

statute, "no notice or approval" is required for activities altering WWCs if the conditions in Subsection (q)(1) are met. *See* Tenn. Code Ann. § 69-3-108(q)(1). TDEC cannot, however, impose "additional conditions" beyond those listed in Subsection (q)(1). *See* Tenn. Code Ann. § 69-3-108(q)(2).

### A.    Petitioners have waived their arguments about WWCs.

Under the administrative waiver doctrine, "it is inappropriate for courts reviewing agency decisions to consider arguments not raised before the administrative agency involved." *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 461–62 (6th Cir. 2004) (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)); *see also Mich. Dep't of Env't Quality v. Browner*, 230 F.3d 181, 183 (6th Cir. 2000) (holding that "petitioners failed to sufficiently raise these issues during the comment period and thus have waived them for purposes of appellate review"). "Courts decline to consider issues not raised before an agency because to do otherwise would 'deprive the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action.'" *Coal. for Gov't Procurement*, 365 F.3d at 462 (quoting *Unemployment Comp. Comm'n v. Aragon*, 329 U.S. 143, 155 (1946)) (brackets in original).

Here, Petitioners have waived their arguments about WWCs. Although Petitioners submitted 108 pages of written comments on the Draft Certification, they never raised concerns about the Pipeline's impact on WWCs. AR 004629-63, AR

41

004664-732, AR 006736-41 (JA_-__, JA__-__, JA_-__).  Nor did Petitioners raise

such concerns at the public hearing.  AR 004439-80 (JA__).  And the Draft

Certification included the same language about WWCs that Petitioners now

challenge in the final Certification.  *See* AR 003640; AR 003643; AR 003662; AR

003684 (JA__, JA__, JA__, JA__).  Since Petitioners did not raise this issue during

the comment period, it was not addressed in TDEC's Notice of Determination

responding to comments about the Pipeline.[19]  AR 006950 (JA__).  TDEC was thus

deprived of the opportunity to respond to Petitioners' concern about WWCs.

### B.    Not all the conditions in the Certification apply to WWCs.

Even if Petitioners' arguments are not waived, they fail.  Petitioners argue in

part that TDEC's decision regarding WWCs was arbitrary and capricious because

TDEC cannot impose many of the conditions it concluded were necessary to avoid

violations of state water quality standards.  (Br. Petitioners, 44.)  But Petitioners

proceed on a faulty premise—TDEC did *not* conclude that all the Certification's

conditions apply to WWCs.  Indeed, the Certification makes no mention of any of

the special conditions or general conditions in the Certification applying to WWCs.

Instead, the Certification states that if Tennessee Gas adheres to the conditions in the

---

[19] WWCs are mentioned once in the Notice of Determination in relation to the
impacts of 18 road crossings.  AR 006952 (JA__).  TDEC noted that ARAP coverage
is not required for WWCs.  *See id.*

applicable *statute*—Tenn. Code Ann. § 69-3-108(q)—the impacts to WWCs will not violate water quality standards.  AR006769 (JA___).

In support of its own premise, Petitioners cite a letter that TDEC sent to Tennessee Gas when the Certification was issued.  (Br. Petitioners, 44 (citing AR006760 (JA___)).  That letter, however, does not mention WWCs—it states generally that TGP "will not violate applicable water quality standards" if Tennessee Gas's activities are "conducted in accordance with all permit conditions." AR006760 (JA___).  This statement addresses the project in its entirety; it does not mean that every Certification condition applies to WWCs.  Petitioners acknowledge that an ARAP is not required for activities in WWCs (Br. Petitioners, 38), which supports that the Certification's general and special conditions are not intended to protect against unlawful alterations to the WWCs.  Petitioners have no basis for arguing that TDEC's decision is marked by "inconsistency" or that TDEC disregarded the clear directive in § 69-3-108(q)(2) and applied all the Certification's conditions to the WWCs.

**C.   TDEC reasonably concluded that if Tennessee Gas complies with the conditions in Tenn. Code Ann. § 69-3-108(q)(1), water quality standards would not be violated because of alterations to WWCs.**

Petitioners also contend that TDEC failed to assess whether Tennessee Gas's alteration of WWCs would violate state water quality standards and had "no evident justification" for determining that TGP's compliance with statutory conditions

43

would not violate water quality standards. (Br. Petitioner, 40, 44). Neither contention has merit. TDEC reasonably concluded that conditions leading to state water quality violations (discharge of sediment to downstream waters) would not occur if Tennessee Gas followed the statutory requirements contained in Tenn. Code Ann. § 69-3-108(q) pertinent to WWCs, which are designed to control the release of sediment downstream.

Petitioners characterize TDEC's reliance on the requirements in Tenn. Code Ann. § 69-3-108(q) as a "conclusory mantra," implying that the requirements have no substantive effect. (Br. Petitioners, 40). But Petitioners notably fail to address the protections afforded by the requirements Subdivision (1) of § 69-3-108(q), which are quite restrictive, particularly concerning sediment transport. For example, the statute requires that sediment is to be prevented from entering waters of the State, that appropriate erosion and sediment control measures are to be properly designed, selected, installed before work begins, and that check dams must be used when runoff is concentrated. *See* Tenn. Code Ann. § 69-3-108(q)(1)(C)(i)-(iv). Subsection (q)(1) also prohibits "discharge of waste or other substances that may be harmful to humans or wildlife," and requires that "[a]ppropriate steps . . . be taken to ensure that petroleum products or other chemical pollutants are prevented from entering waters of the state." Tenn. Code Ann. § 69-3-108(q)(1)(A), -(D).

Petitioners claim that TDEC did not consider "the potential for downstream sediment transport to [enter] intermittent or perennial streams or wetlands." (Br. Petitioner, 40). But by incorporating the conditions in § 69-3-108(q)(1), the Certification prohibits Tennessee Gas from engaging in activities that cause sediment to enter "other waters of the state." Tenn. Code Ann. § 69-3-108(q)(1)(C)(i). Also, Tennessee Gas must implement "[e]rosion and sediment control measures" "to detain runoff and trap sediment." Tenn. Code Ann. § 69-3-108(q)(1)(C)(ii)-(iii). The potential for downstream sediment is adequately addressed by the inclusion of these requirements in the Certification.

Petitioners suggest that Tennessee Gas will violate the statutory conditions related to WWCs by allowing excess sedimentation to occur during its activities in WWCs. (Br. Petitioners, 39-40). But when considering permit conditions, TDEC need not assume that applicants will violate permit conditions. *Cf. Sierra Club v. W. Va. Dep't of Env't. Prot*., 64 F.4th 487, 509 (4th Cir. 2023) (observing that if the pipeline follows protocols incorporated as conditions to the certification, "then it would be reasonable to conclude that the project threatens to do at most temporary damage to the quality of West Virginia's waters"). And even if violations do occur, TDEC has adequate means to address them. For example, the Certification states that "[a]ny permit noncompliance constitutes a violation of applicable State and

45

Federal laws and is grounds for enforcement action, permit termination, permit modification, or denial of permit reissuance." *See* AR006779 (JA__).

### D. Petitioners cannot rely on privileged, internal agency correspondence.

Lastly, Petitioners make improper reference to an internal TDEC communication that discusses adding "boilerplate" to the Certification related to WWCs. (Br. Petitioners, 41-42). This internal communication is not presently in the record—it is privileged and should not be considered by this Court.[20] *See* Response, 6th Cir. Doc. No. 31-3. Nevertheless, the use of boilerplate language is not improper per se. *See United States v. Darden*, 353 F. Supp. 3d 697, 715 (M.D. Tenn. 2018) (stating that the use of boilerplate language in affidavits is not problematic per se if it contains specific information to satisfy probable cause) (citing *United States v. Moore*, 661 F.3d 309, 316 (6th Cir. 2011)). Indeed, boilerplate language can ensure administrative consistency. Petitioners argue that "'programmatic boilerplate' cannot substitute for a 'reasoned explanation' for agency action." (Br. Petitioners, 42) (quoting *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1352 (D.C. Cir. 2014)). But TDEC reasonably explained that Tennessee Gas's

---

[20] Petitioners previously moved to supplement the administrative record with this and other documents. A motion panel of this Court stated that the internal agency correspondence "appears to fall within the deliberative process privilege" but referred the motion to the merits panel for a final decision on whether the internal agency correspondence is privileged based "upon review of the entire record." (Order, 6th Cir. Doc. No. RE 41, Page No. 5.)

alterations to WWCs would not violate water quality standards because compliance with the conditions in § 69-3-108(q)(1) would prevent those violations from occurring.  AR006769, AR006814 (JA___, JA____).

## V.    TDEC Reasonably Concluded that the Pipeline, as Conditioned, Would Not Result in Violations of State Water Quality Standards.

Petitioners argue that TDEC acted arbitrarily and capriciously by failing to consider information in the record about the risks of water quality standard violations resulting from authorized construction methods, particularly the occurrence of excess sedimentation from dry, open-cut crossings.  (Br. Petitioners, 45-49).  But TDEC did not ignore the risks of sedimentation occurring from the construction of the Pipeline.

TDEC expressly acknowledged such risks in its Notice of Determination but pointed out that its Certification includes numerous conditions (Special Conditions i., j., and o.) designed to make sure that excessive sedimentation would not be released into streams and wetlands.  *See* AR006955 (JA___).  Other conditions in the Certification are also designed specifically to protect against sedimentation, including:

- Special Condition x. (requiring use of erosion and sediment control measures when stream bank vegetation is disturbed, not allowing streambeds to be used as transport routes for equipment, etc.);

- Special Condition aa. (dewatering activities to be conducted in a manner that prevents discharge of sediment-laden storm water);

47

- Special Condition cc. (installation of erosion and sediment control measures prior to earth moving operations beginning); and

- Special Condition ee. (implementation of Best Management Practices to prevent sediments, oil, or other project-related pollutants from being discharged into state waters).

- Special Condition jj. (comply with the conditions of the Tennessee General Construction Stormwater Permit for "the entire area of disturbance associated with the construction project."

AR006776, AR006777 (JA____, JA____).  It was therefore reasonable for TDEC to conclude that Tennessee Gas's compliance with the above-referenced conditions would adequately mitigate the risk of sedimentation and ensure there would be no violations of state water quality standards.

Petitioners argue that TDEC did not "grapple with" scientific literature that was presented, or with the report prepared by Starr Silvas ("Silvas Report"), about the risks of sedimentation posed by the Pipeline.  (Br. Petitioners, 46).  While TDEC did not specifically refer to the Silvas Report, it did consider all written comments and supporting materials that it received.  AR006950 (JA___).[21]  This is evident from the Notice of Determination, in which TDEC responded to public comments, including concerns discussed in the Silvas Report.  AR006950-006966 (JA__-

---

[21] TDEC rules do not require a written response to every specific comment, only that they must be "considered in the final determination to issue the permit."  Tenn. Rule 0400-40-07-.04(4)(e); *see also Sierra Club v. State Water Control Bd.*, 64 F.4th 187, 198 (4th Cir. 2023) (finding that Virginia did not need to address petitioners' expert by name).

JA___).  For example, the Silvas Report questioned allowing contractors to make "decision about blasting on the fly."  AR004744.  And in its response to written comments, TDEC indicated that it had added extensive requirements in the Certification on the use of blasting, including the need to obtain prior written approval from TDEC.  AR006953 (JA___).  The Silvas Report also expressed concerns about the wet, open-cut crossing method being potentially used for wetland crossings.  AR004754 (JA____).  In its response to comments, TDEC indicated that it had specifically added a condition expressly prohibiting the use of the wet, open-cut trenching method.  AR006954 (JA___).

Petitioners misplace their reliance on the Silvas Report anyway, because it was prepared *before* TDEC even issued the Draft Certification,[22] meaning that Mr. Silvas never considered the conditions TDEC put into the Draft Certification.  For instance, while the Silvas Report expressed concerns about "long-term increases in sedimentation due to stream bank and upland disturbances until vegetation can be reestablished," AR004739 (JA___), TDEC had included a condition in its Draft Certification (Special condition x.) requiring "[e]rosion control measures . . . where

---

[22] The Silvas Report was prepared on May 10, 2023, as a part of reviewing a different permit application—a Section 404 federal discharge-and-fill permit Tennessee Gas had applied for from the Army Corps of Engineers.  AR004737 (JA ___).  The Draft Certification was not issued until May 30, 2023.  AR006950 (JA___).

stream bank vegetation is disturbed for the purpose of temporary stream crossings." AR006776 (JA___).

Petitioners also wrongly argue that TDEC irrationally relied on the *General Aquatic Resources Alteration Permit for Utility Line Crossings* ("General ARAP") in explaining its decision.  (Br. Petitioners, 46-47).   Petitioners claim that TDEC's comparison of conditions in the General ARAP to conditions in the Certification amounts to comparing "apples to oranges," because the requirements of the General ARAP are more stringent.  (Br. Petitioners, 47-48).  But TDEC did not find that the General ARAP conditions were identical to those in the Certification.   TDEC referred to the General ARAP because there are noteworthy similarities between the two permits. For example, both authorize the use of the dry, open-cut trenching method.  *See* Certification at AR006792-AR006793 (JA__-___, JA__); General ARAP at AR006967.   Both also contain similar conditions designed to prevent sedimentation from occurring.  *See* Certification Special Conditions i., j. and aa. at AR006774, AR006775; General ARAP Conditions #4, #5, #14 at AR006968-6969 (JA__- JA___).

Petitioners also fail to recognize that the Certification is in some respects more stringent than the General ARAP.[23]   For example, the Certification contains 35

---

[23] While it is true that the General ARAP prohibits blasting and the Certification does not (Br. Petitioners, 47), Special Conditions g. and h. of the Certification place stringent conditions on when blasting can occur.  AR006772-006773 (JA__- JA___).

special conditions, while the General ARAP contains 15. *See* Certification at AR006772-AR006777; General ARAP at AR006967-006972. Also, a person or entity can undertake up to three HDD crossings under the General ARAP without written authorization from, or even submitting an application to, TDEC, provided the requirements of the permit are met. AR006967(JA__). Here, of course, the undertakings for Tennessee Gas's Pipeline required submission of a voluminous application to TDEC. AR000920-001775 (JA__-JA___).

Given the similarities between the General ARAP and Certification conditions, TDEC reasonably concluded that the Pipeline's crossing methods, as conditioned, would cause only temporary impacts and not lead to appreciable permanent loss of resource values. AR006954-AR006955(JA___-___). In its response to comment, TDEC indicated that it was "not aware of violations of water quality standards resulting from work conducted in compliance with these [the General ARAP's] conditions. AR006955 (JA___). Given TDEC's experience with the effectiveness of the General ARAP conditions, it was not unreasonable for TDEC to refer to and rely on that experience in determining that conditions in the Certification would be protective of state water quality standards.

Finally, Petitioners mistakenly rest their argument on that part of the Fourth Circuit's decision in *Sierra Club v. W. Va. Dep't of Env't Prot.*, in which the court found that the state agency had relied upon a "demonstrably false impression" that

conditions in the EPA general construction stormwater permit applied to in-stream crossings. (Br. Petitioners, 48-49 (citing 64 F.4th at 507-08)). For the reasons discussed above, TDEC was not under a "demonstrably false impression" that the General ARAP conditions applied to the Pipeline. Again, TDEC made reference to the General ARAP because of the similarities between the permit conditions and TDEC's experience regarding the effectiveness of General ARAP conditions in preventing water quality standards violations.

## VI.    TDEC Reasonably Determined that Construction of the Pipeline Would Not Result in an Appreciable Permanent Loss of Resource Values.

Petitioners lastly contend that TDEC failed to properly evaluate whether the Pipeline would result in "any appreciable permanent loss of resource values" under Tenn. Rule 0400-40-07-.04(6)(c); Petitioner maintains that TDEC failed to assess baseline conditions of affected waterbodies or to consider the crossings' cumulative effects. (Br. Petitioners, 50.) Petitioners, however, misconstrue the applicable regulations—TDEC was not required to analyze baseline data (even though it did), nor was it required to consider the cumulative or secondary impacts.

TDEC requires mitigation for certain impacts affecting streams and wetlands. Tenn. Rule 0400-40-07-.04(7). Mitigation is needed if the proposed activity will cause "an appreciable permanent loss of resource values." Tenn. Rule 0400-40-07-.04(7)(a). In such instances, "the applicant must provide mitigation which results in no overall net loss of resource values from existing conditions." *Id.* TDEC enforces

this requirement through Rule 0400-40-07-.04(6)(c), under which TDEC cannot authorize an activity "unless any appreciable permanent loss of resource values associated with the proposed impact is offset by mitigation sufficient to result in no overall net loss of resource values from existing conditions."[24]   This rule has no application, however, unless the proposed activity requires mitigation, and the Pipeline does not. as discussed below.

### A.   TDEC was not required to analyze baseline data on impacted waterbodies.

Petitioners argue that TDEC violated Rule 0400-40-07-.04(6)(c) because it failed to gather the necessary baseline data to "determine the 'existing conditions' of each impacted waterbody."  (Br. Petitioners, 51).  Baseline data is relevant to the determination of "existing conditions," but TDEC need not determine the existing conditions under Rule 0400-40-07-.04(6)(c) unless mitigation is required.  And here, TDEC did not find that the mitigation is needed because the Pipeline will not cause "*appreciable permanent loss* of resource values."  Tenn. Rule 0400-40-07-.04(7)(a) (emphasis added).

---

[24] "Existing conditions" is defined as "the biological, chemical, bacteriological, radiological, and physical conditions of a stream or wetland at the time the project is proposed as measured by a quantitative assessment tool or other defensible scientific method as approved or determined by the Division."  Tenn. Rule 0400-40-07-.03(16).

The Certification authorizes temporary impacts to wetlands and streams.[25] AR006762 (JA___).  TDEC included conditions in the Certification to ensure that any impacts would be temporary.  AR006805 (JA____).  For example, under Special Condition h.4, "[a]ll streams and stream banks will be restored to original contours immediately following pipeline installation."  AR006773 (JA____).  Under Special Condition f., Tennessee Gas must submit an annual post-construction monitoring report to TDEC demonstrating that the jurisdictional status of streams and wetlands impacted by the construction of the Pipeline have been maintained.  AR006772 (JA___).

Although the Certification does authorize some permanent impacts,[26] TDEC reasonably determined that these impacts would not be "appreciable."[27]  AR006805, AR006957 (JA____,____).  TDEC determined that the permanent impacts to streams will involve only minimal riparian vegetation conversion to establish a 10 foot corridor above the pipeline maintained in a herbaceous state where the pipeline

---

[25] The Certification authorizes 0.69 acres of temporary impacts to wetlands and temporary impacts of 5400 linear feet to streams.  AR006762 (JA__).

[26] The Certification authorizes permanent impacts to 0.03 acres of wetlands and 490 linear feet of streams.  AR006762 (JA__).

[27] Tennessee's regulations define an "appreciable permanent loss of resource values" as "a reduction in resource values that is expected to continue without fundamental change and is large enough to be observed and measured as resulting in more than minimal adverse effect."  Tenn. Rule 0400-40-07-.03(3).

crosses a stream or a wetland.  AR 006805, AR006957 (JA___,____).  This type of

permanent impact is substantially less than what is authorized under two other TDEC

general permits authorizing similar activities (stream bank vegetation and riparian

canopy cover).[28]  AR006957.  Furthermore, these general permits, which allow for

higher levels of impact, assess impacts at a single stream, whereas here the impacts

are assessed for the entire Pipeline.  *See id.* AR006957 (JA____).

Likewise for wetlands,[29] TDEC determined that the permanent impacts to

wetlands would be minimal and consist of conversion of vegetation from forested to

emergent (i.e. herbaceous) wetland where the Pipeline would cross a forested

wetland.  AR006957.  TDEC noted that this impact was substantially less than what

is authorized under the *General ARAP for Minor Alteration to Wetlands*.

AR006957-006958 (JA__-___).  Additionally, this amount of permanent impact to

wetlands was well below the level set in the TDEC general permit authorizing minor

alterations to wetlands.[30]  Based on this information, it was reasonable for TDEC to

---

[28] These general permits are the *General Aquatic Resource Alteration Permit for Bank Armoring and Vegetative Stabilization* and the *General Aquatic Resource Alteration Permit for Construction and Removal of Minor Road Crossings*. AR007066, AR007071(JA___-____).

[29] The Certification authorizes permanent impacts of 0.03 acres of wetlands. AR006762 (JA__).

[30] The *TDEC General Aquatic Resource Alteration Permit for Minor Alterations to Wetlands* authorized up to .10 acres of disturbance of wetlands with a moderate resource value and .25 acres of wetlands that are degraded and are of low resource

conclude that the impacts to both streams and wetlands would not result in an "appreciable permanent loss." The absence of appreciable permanent loss meant no mitigation requirement—and thus no need for TDEC to require Tennessee Gas to collect baseline data.

## B. TDEC did review extensive baseline data that Tennessee Gas provided about streams and wetlands to be impacted by the Pipeline.

Although TDEC was not required to analyze baseline data, TDEC did in fact consider baseline data on the existing conditions in the impacted waterbodies. Tennessee Gas provided extensive baseline data on streams and wetlands in its JD/HD Report, which it submitted to TDEC. AR000001 (JA____). For instance, Tennessee Gas performed quantitative and qualitative assessments on each waterbody. AR000009-10 (JA__-__). The quantitative assessment involved collecting information on each waterbody, such as flow type, substrate type, and channel width and depth. AR000009 (JA__). The qualitative assessment evaluated the current water quality and potential construction impacts based on five ecological parameters: level of disturbance, quality of riparian vegetation, diversity and stability of aquatic habitat, water quality, and channelization. AR000010 (JA__). Each waterbody was then categorized as either a high, medium, or low-quality

_____

value. AR006973 (JA____). TDEC indicated that the wetlands to be impacted by the Pipeline are "characteristic of low to moderate resource value wetlands typically found in the region." AR006804 (JA____).

stream.  *Id.*  Similarly, TGP performed quantitative and qualitative assessments on each wetland, during which "[w]etland data was collected in the field using [a global positioning system]," and determinations were made about the "current quality and potential construction impacts to each waterbody."  AR000012-13 (JA__-__).

Tennessee Gas also detailed the width and use classification for each stream, AR000876-AR000890 (JA__-__), as well as aerial imagery showing baseline land use.  AR000022-147 (JA__-__).  The JD/HD Report also contains hydrologic determination data sheets, AR000274-AR000799 (JA__-__), that provide relevant information about the degree of historical alteration and surrounding land use, *e.g.*, AR 000276(JA__), the presence of biologic indicators such as the presence of fish, *e.g.*, AR 000276 (JA__), and detailed scoring of biological indicators, *e.g.*, AR000310 (JA____).  The datasheets also include stream photographs that document baseline conditions, *e.g.*, AR000278 (JA__).

**C.    TDEC was not required to consider cumulative or secondary impacts to the water resources.**

Petitioners also argue that TDEC violated Rule 0400-40-07-.04(6)(c) because it failed to consider whether the Pipeline activities were "'reasonably likely to have cumulative or secondary impacts to the water resource.'"  (Br. Petitioner, 56).  If an activity requires mitigation, TDEC must consider several factors under Rule 0400-40-07-.04(6)(c), including "[w]hether the proposed activity is reasonably likely to have cumulative or secondary impacts to the water resource."  Tenn. Rule 0400-40-

07-.04(6)(c)(6).  But, again, since TDEC determined that the proposed activities will not cause "an appreciable permanent loss of resource values" but only temporary and localized impacts, mitigation was not required for the Pipeline.  AR006805 (JA___).  Therefore, the rules did not require that TDEC consider "cumulative or secondary impacts to the water resource."

Nevertheless, TDEC's response to comments indicated that it did evaluate cumulative impacts for each individual stream in accordance with how such evaluation is done on a statewide basis.  AR006957 (JA___).  This was accomplished with the assistance of the TDEC Waterbody ID capability and special mapping technology.  *See id.*  The table at the beginning of the Certification provides information necessary for conducting such analysis, including the TN Waterbody ID, precise location of each impacted stream, and the total linear feet of impact.  AR006765 (JA__).  Since none of this was required, however, Petitioners' criticisms of TDEC's analysis fall flat.  (Br. Petitioners, 58.)

## CONCLUSION

For the reason stated, the petition for review should be dismissed for lack of jurisdiction.  Alternatively, the petition should be denied.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

J. MATTHEW RICE
Solicitor General

s/Wilson S. Buntin
WILSON BUNTIN, BPR #023231
Senior Assistant Attorney General
Office of the Attorney General
P. O. Box 20207
Nashville, Tennessee 37202-0207
(615) 253-5118
Wilson.Buntin@ag.tn.gov

JOSEPH AHILLEN, BPR #028378
Senior Assistant Attorney General
Office of the Attorney General
P. O. Box 20207
Nashville, Tennessee 37202-0207
(615) 532-2558
Joe.Ahillen@ag.tn.gov

HARRISON G. KILGORE, BPR # 041842
Strategic Litigation Counsel and
Assistant Solicitor General
Office of the Attorney General
P. O. Box 20207
Nashville, Tennessee 37202-0207
(615) 360-0351
harrison.kilgore@ag.tn.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B)(i), this is to certify that the foregoing brief complies with the type-volume limitation of that rule by containing 12,807 words.

/s/ Wilson S. Buntin

# CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of July 2024, a true and exact copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt:

James S. Whitlock
SOUTHERN ENVIRONMENTAL LAW
CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321

Stephanie Biggs
SOUTHERN ENVIRONMENTAL LAW
CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203

Derek O. Teaney
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901

Spencer Scheidt
SOUTHERN ENVIRONMENTAL LAW
CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321

Scott Burnett Smith
BRADLEY ARANT BOULT CUMMINGS LLP
200 Clinton Avenue West
Huntsville, AL 35801

Lela M. Hollabaugh
Bartholomew J. Kempf
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, TN 37206

Emily M. Ruzic
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, AL 35213

Schyler Burney
BRADLEY ARANT BOULT CUMMINGS LLP
200 Clinton Avenue W., Suite 900
Huntsville, AL 35801

David A. Super
Kevin A. Ewing
BRACEWELL LLP
2001 M Street, NW, Suite 900
Washington, D.C. 20036

s/Wilson S. Buntin