No. 23-3682

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

_____

**SIERRA CLUB, et al.,**
*Petitioners,*

**v.**

**TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION, et al.,**
*Respondents,*

and

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.,**
*Intervenor-Respondent.*

_____

On Petition for Review from the Tennessee Department of Environment and Conservation's §401 Water Quality Certification and ARAP Permit NRS 22.192 (July 21, 2023)

_____

**JOINT APPENDIX VOLUME I OF VI**
**PAGES JA0001 TO JA0559**

_____

JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL
LAW CENTER
48 Patton Ave, Ste 304
Asheville, NC 28801
Telephone: (828) 258-2023

STEPHANIE BIGGS
SOUTHERN ENVIRONMENTAL
LAW CENTER
1033 Demonbreun St, Ste 205
Nashville, TN 37203
Telephone: (615) 921-9470

DEREK O. TEANEY
APPALACHIAN MOUNTAIN
ADVOCATES
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182

*Counsel for Petitioners*

JONATHAN SKRMETTI
J. MATTHEW RICE
WILSON S. BUNTIN
JOSEPH AHILLEN
HARRISON G. KILGORE
OFFICE OF ATTORNEY GENERAL AND REPORTER
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 253-5118

*Counsel for Respondents*

BARTHOLOMEW J. KEMPF
LELA M. HOLLABAUGH
BRADLEY ARANT BOULT CUMMINGS LLP
1221 Broadway, Ste 2400
Nashville, TN 37203
Telephone: (615) 244-2582

EMILY M. RUZIC
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 5th Ave N
Birmingham, AL 35203
Telephone: (205) 521-8447

SCOTT BURNETT SMITH
SCHYLER B. BURNEY
BRADLEY ARANT BOULT CUMMINGS LLP
200 Clinton Ave W, Ste 900
Huntsville, AL 35801
Telephone: (256) 517-5100

DAVID A. SUPER
KEVIN A. EWING
BRACEWELL LLP
2001 M St NW, Ste 900
Washington, DC 20036
Telephone: (202) 828-5836

*Counsel for Intervenor-Respondent*

# TABLE OF CONTENTS

## VOLUME I

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA0001 | Final §401 Water Quality Certification issued to TGP 07.21.23 (NRS 22.192) | 96 |
| JA0189 | Petition for Review | ECF 1-2 |
| JA0194 | Cumberland Pipeline Project Jurisdictional Waters and Tennessee Hydrologic Determinations (JD/HD) Report submitted May 2022 by Tennessee Gas Pipeline (TGP) | 1 |
| JA0288 | TGP's ARAP and State 401 Water Quality Certification Application, 07.22.22 | 2 |
| JA0348 | TGP's Signed ARAP/401 Certification Application Form, 07.22.22 | 3 |
| JA0351 | 401 Certification App. Attachment 1, Impact Tables | 5 |
| JA0368 | 401 Certification App. Attachment 5, Construction Management Plans | 9 |
| JA0459 | 401 Certification App. Attachment 6, Permitting Table | 10 |
| JA0473 | 401 Certification App. Attachment 7, Horizontal Directional Drilling (HDD) Feasibility Studies | 11 |
| JA0543 | 401 Certification App. Attachment 8, Route Variations | 12 |
| JA0554 | 401 Certification App. Attachment 9, Summary of Trenchless Construction Methods | 13 |
| JA0556 | FERC Notice of Waiver Period for 401 Cert. App., 08.18.22 | 17 |
| JA0557 | TGP Application Supplement Letter re: field visits, 09.30.22 | 19 |

i

## VOLUME II

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA0560 | Attachment to TGP 09.30.22 Supplement Letter | 20 |
| JA0638 | TDEC Revised Hydrologic Determination (HD) of Water Resources, 10.21.22 | 22 |
| JA0655 | TDEC Request for Additional Information to TGP, 11.03.22 | 23 |
| JA0659 | TGP Response to Request for Additional Information, 12.01.22 | 26 |

## VOLUME III

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA1019 | TGP Response to Request for Additional Information, 12.01.22 | 26 |

## VOLUME IV

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA1470 | TGP Response to Request for Additional Information, 12.01.22 | 26 |
| JA1691 | TGP's Final Resource Report 1 (General Project Description), received 01.06.23 | 28 |
| JA1769 | TDEC Request for Additional Information to TGP, 02.24.23 | 32 |
| JA1771 | TGP response to TDEC Request for Additional Information, 03.17.23 | 35 |

## VOLUME V

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA1951 | TDEC's draft §401 Certification, NRS22.192, 05.30.23 | 40 |
| JA2138 | FERC Final EIS for Cumberland pipeline project, June2023 | 42 |
| JA2175 | TDEC e-mail to TGP re: public notice process, 05.30.23 | 43 |
| JA2176 | TDEC ltr. to TGP re: responsibility for public notification, 05.30.23 | 44 |
| JA2178 | TDEC Notice of Public Hearing on 401 Certif., 05.30.23 | 45 |
| JA2180 | TDEC Public Notice on draft permit (401) with instructions for public comments, 05.30.23 | 46 |
| JA2183 | Transcript of Public Hearing July 6, 2023, in Dickson, Tennessee | 62 |
| JA2235 | Large Google Earth Map of Entire Route of Proposed Pipeline | 64 |
| JA2236 | E-mail Comments by Sierra Club, 07.14.23 | 72 |
| JA2273 | E-mailed Comment ltr. from Conservation Groups (SELC, et al.), 07.14.23 | 73 |
| JA2342 | E-mailed Exhibits 1-2 to Conservation Groups' Comment Letter, 07.14.23 | 74 |

## VOLUME VI

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA2382 | E-mailed Exhibit 3 to Conservation Groups' Comment Letter, 07.14.23 | 75 |

| | | |
|---|---|---|
| JA2561 | E-mailed Exhibits 4-7, 11, and 12 to Conservation Groups' Comment Letter, 07.14.23 | 76 |
| JA2731 | E-mailed Exhibits 15-18 and 21 to Conservation Groups' Comments Letter, 07.14.23 | 77 |
| JA2796 | E-mailed Exhibits 24-36 to Conservation Groups' Comment Letter, 07.14.23 | 78 |
| JA2805 | E-mail Comments #2 by Angie Mummaw and Appalachian Voices, 07.15.23 | 82 |
| JA2811 | TDEC cover letter to TGP re: approval of §401 Water Quality Certification, 07.21.23 | 95 |
| JA2814 | TDEC Notice of Determination and Response to Public Comments on Permit NRS22.192, 07.21.23 | 97 |
| JA2831 | General Aquatic Resource Alteration Permit for Utility Line Crossings | 98 |
| JA2837 | General Aquatic Resource Alteration Permit for Minor Alterations to Wetlands | 99 |
| JA2840 | General Permit for Discharges of Stormwater Associated with Construction Activities (CGP) | 100 |
| JA2930 | General Aquatic Resource Alteration Permit for Bank Armoring and Vegetative Stabilization | 101 |
| JA2935 | General Aquatic Resource Alteration Permit for Construction or Removal of Minor Road Crossings | 102 |
| JA2939 | TDEC e-mail re: Gas Pipeline Project Discussion | ECF 29-3, Doc. 4 |
| JA2942 | TGP Cumberland Project – TDEC Blasting Presentation | ECF 29-3, Doc. 9 |

iv

Cumberland Gas Pipeline Project; NRS22.192
§401 Water Quality Certification



**AQUATIC RESOURCE ALTERATION PERMIT NRS 22.192**

Pursuant to the Tennessee Water Quality Control Act of 1977 (T.C.A. §§ 69-3-101 et seq.) and supporting regulations, a permit is required to alter the properties of waters of the state. Also, pursuant to section 401 of the Clean Water Act (33 U.S.C. § 1341), an applicant for a federal license or permit which may result in a discharge into the waters of the U.S., shall provide the federal licensing or permitting agency a certification from the State in which the discharge will originate. Accordingly, the Division of Water Resources requires reasonable assurance that the activity will not violate provisions of the Tennessee Water Quality Control Act of 1977 (T.C.A. §§ 69-3-101 et seq.) or provisions of sections 301, 302, 303, 306 or 307 of the Clean Water Act.

Subject to conformance with accepted plans, specifications, and other information submitted in support of the application, the state of Tennessee hereby certifies pursuant to 33 U.S.C. § 1341, and permits pursuant to T.C.A. § 69-3-108(b), the activity described below:

**PERMITTEE**            Tennessee Gas Pipeline Company, LLC

**AUTHORIZED WORK:**   Temporary impacts to 0.69 acres of wetland, permanent impacts to 0.03 acres of wetland, temporary impacts to approximately 5400 linear feet of stream, temporary water withdrawals from eight streams and one reservoir, and permanent impacts to 490 linear feet of stream associated with the construction of a 32-mile 30-inch diameter natural gas pipeline.

**LOCATION:**            From near Claylick Rd., Dickson, to near Old Scott Rd., Cumberland City
                         Dickson, Houston, and Stewart Counties, Tennessee
                         Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, Barkley Reservoir
                         Harpeth River Watershed and Lake Barkley Watershed
                         From approximately 36.161840, -87.206428 to approximately 36.372977, -87.675641

**EFFECTIVE DATE:** July 21, 2023

**EXPIRATION DATE:** July 20, 2028

                                                    *M Lee Barker*
                                          _____
                                                    for Jennifer Dodd
                                          Director, Division of Water Resources

**Table of Contents**

LIST OF ABBREVIATIONS AND ACRONYMS USED IN THIS PERMIT AND APPENDICES.... 3

| PART I | 4 |

AUTHORIZED WORK: ........................................................................................................................ 4

SPECIAL CONDITIONS:.................................................................................................................. 11

GENERAL CONDITIONS: ............................................................................................................... 16

| PART II | 17 |

MONITORING REQUIREMENTS ................................................................................................... 17

DUTY TO REAPPLY ........................................................................................................................ 17

PROPERTY RIGHTS ........................................................................................................................ 17

OTHER INFORMATION .................................................................................................................. 18

CHANGES AFFECTING THE PERMIT ......................................................................................... 18

    Transfer/Change of Ownership ..................................................................................................... 18

    Change of Mailing Address .......................................................................................................... 18

NONCOMPLIANCE ......................................................................................................................... 18

    Effect of Noncompliance .............................................................................................................. 18

    Reporting of Noncompliance ....................................................................................................... 19

    Adverse Impact ............................................................................................................................ 19

LIABILITIES ..................................................................................................................................... 19

    Civil and Criminal Liability .......................................................................................................... 19

    Liability under State Law............................................................................................................... 19

| APPENDIX | 21 |

PERMIT RATIONALE....................................................................................................................... 21

TABLES .............................................................................................................................................. 48

SITE MAPS ......................................................................................................................................... 54

PLANS AND DRAWINGS ................................................................................................................ 179

AR 006763

**List of abbreviations and acronyms used in this permit and appendices**

ac = acres
BMP = best management practice
ETW = Exceptional Tennessee Water
FERC = Federal Energy Regulation Commission
ft = feet
gpm = gallons per minute
HD = hydrologic determination
HDD = horizontal directional drilling
Lat. = latitude
Long. = longitude
Misc. tribs. = miscellaneous tributaries
MP = milepost
N/A = not applicable
NPDES = National Pollutant Discharge Elimination System
PEM = palustrine emergent
PFO = palustrine forested
RAI = request for additional information
ROW = right-of-way
SWPPP = stormwater pollution prevention plan
TDEC = Tennessee Department of Environment and Conservation
TGP = Tennessee Gas Pipeline Company
TVA = Tennessee Valley Authority
USACE = United States Army Corps of Engineers
UT = unnamed tributary
WWC = wet weather conveyance

AR 006764

**PART I**
**Authorized Work:**

Table 1: Authorized habitat alteration impacts to streams and wetlands.

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SDKA023 | Upper Sugar Camp Branch | TN05130204001_1100 | UT Harpeth | 36.1630 | -87.2073 | 97 ft. | | | 10 ft. | 97 ft. |
| | | | | 36.1655 | -87.2057 | 77 ft. | | | 10 ft. | 77 ft. |
| SDKA026 | Jordan Branch | TN05130204002_0100 | Jordan Branch | 36.1705 | -87.2128 | 126.5 ft. | | | 10 ft. | 126.5 ft. |
| SDKA027 | UT to Jordan Branch | TN05130204002_0100 | Jordan Branch | 36.1709 | -87.2131 | 86 ft. | | | 10 ft. | 86 ft. |
| SDKA004 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1765 | -87.2235 | 79.6 ft. | | | 10 ft. | 79.6 ft. |
| SDKA006 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1809 | -87.2317 | 78 ft. | | | 10 ft. | 78 ft. |
| SDKA008 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1826 | -87.2348 | 78.6 ft. | | | 10 ft. | 78.6 ft. |
| SDKA058 | Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1853 | -87.2430 | 76.7 ft. | | | 10 ft. | 76.7 ft. |
| SDKA013 | Gafford Branch | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1979 | -87.2624 | 76 ft. | | | 10 ft. | 76 ft. |
| SDKA049 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1920 | -87.2442 | 53.1 ft. | | | 10 ft. | 53.1 ft. |
| SDKA051 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1899 | -87.2485 | 75.5 ft. | | | 10 ft. | 75.5 ft. |
| SDKA053 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1924 | -87.2536 | 89.4 ft. | | | 10 ft. | 89.4 ft. |
| SDKA054 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1927 | -87.2480 | | | 20.1 ft. | | 20.1 ft. |
| SDKA055 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1948 | -87.2566 | 80.4 ft. | | | 10 ft. | 80.4 ft. |
| SDKA048 | Jones Creek | TN05130204002_1000 | Jones Creek | 36.1875 | -87.2439 | | 0 ft. | | 0 ft. | 0 ft. |

Page 4 of 188

JA0004

AR 006765

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| | | | | 36.1923 | -87.2425 | | | 127 ft. | | 127 ft. |
| | | | | 36.1876 | -87.2439 | | | 2 ft. | | 2 ft. |
| SDKA014 | UT to Gafford Branch | TN05130204002_1500 | Peabody Branch | 36.1978 | -87.2622 | | | 19.3 ft. | | 19.3 ft. |
| SDKB025 | UT to Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2833 | -87.4932 | 250 ft. | | | 10 ft. | 250 ft. |
| | | | | 36.2840 | -87.4940 | 127 ft. | | | 10 ft. | 127 ft. |
| SDKB026 | Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2845 | -87.4962 | 95 ft. | | | 10 ft. | 95 ft. |
| SDKB027 | UT to Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2845 | -87.4980 | 76.7 ft. | | | 10 ft. | 76.7 ft. |
| SDKB028 | UT to Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2855 | -87.4995 | 190 ft. | | | 10 ft. | 190 ft. |
| | | | | 36.2855 | -87.5007 | | | 4 ft. | | 4 ft. |
| SHNC010-1 | UT Yellow Creek | TN05130205019_0999 | Misc tribs to Yellow Creek | 36.2978 | -87.5494 | | 0 ft. | | 0 ft. | 0 ft. |
| SHNC018 | UT to Yellow Creek | TN05130205019_0999 | Misc tribs to Yellow Creek | 36.3025 | -87.5572 | 99 ft. | | | 10 ft. | 99 ft. |
| | | | | 36.3021 | -87.5592 | | | 20 ft. | | 20 ft. |
| SHNC020 | Indian Branch | TN05130205019_0999 | Misc tribs to Yellow Creek | 36.3100 | -87.5770 | 84 ft. | | | 10 ft. | 84 ft. |
| SHNC007-1 | Yellow Creek | TN05130205019_1000 | Yellow Creek | 36.2982 | -87.5500 | | 0 ft. | | 0 ft. | 0 ft. |
| SDKA046 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2639 | -87.4195 | 84.8 ft. | | | 10 ft. | 84.8 ft. |
| SDKB009 | Furnace Creek | TN05130205024_0400 | Furnace Creek | 36.2498 | -87.3804 | 102.9 ft. | | | 10 ft. | 102.9 ft. |

Page 5 of 188

JA0005

AR  006766

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | Total impacts |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SDKB011 | Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2610 | -87.4113 | 206 ft. | | | 10 ft. | 206 ft. |
| | | | | 36.2614 | -87.4089 | | | 21 ft. | | 21 ft. |
| SDKB014 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2665 | -87.4261 | 104.3 ft. | | | 10 ft. | 104.3 ft. |
| SDKR005 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2609 | -87.4118 | | | 25.7 ft. | | 25.7 ft. |
| SDKR008 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2668 | -87.4288 | 97 ft. | | | 10 ft. | 97 ft. |
| | | | | 36.2669 | -87.4287 | 49 ft. | | | 10 ft. | 49 ft. |
| SDKB023 | Little Bartons Creek | TN05130205024_0600 | Little Bartons Creek | 36.2726 | -87.4552 | 81.9 ft. | | | 10 ft. | 81.9 ft. |
| SDKA038 | UT to Harris Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2283 | -87.3231 | | | 23 ft. | | 23 ft. |
| | | | | 36.2276 | -87.3211 | 82 ft. | | | 10 ft. | 82 ft. |
| | | | | 36.2283 | -87.3222 | 76 ft. | | | 10 ft. | 76 ft. |
| SDKA041 | Harris Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2303 | -87.3252 | 90.3 ft. | | | 10 ft. | 90.3 ft. |
| SDKA042 | UT to Bartons Creek | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2349 | -87.3365 | 77.5 ft. | | | 10 ft. | 77.5 ft. |
| SDKB001 | Miller Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2375 | -87.3453 | 107 ft. | | | 10 ft. | 107 ft. |
| | | | | 36.2365 | -87.3452 | | | 21 ft. | | 21 ft. |
| SDKB004 | UT to Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2430 | -87.3608 | 86.5 ft. | | | 10 ft. | 86.5 ft. |
| SDKB005 | UT to Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2436 | -87.3643 | 78.2 ft. | | | 10 ft. | 78.2 ft. |
| SDKB008 | Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2452 | -87.3689 | 55.2 ft. | | | 10 ft. | 55.2 ft. |

Page 6 of 188

JA0006

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SDKB002 | Bartons Creek | TN05130205024_1000 | Bartons Creek | 36.2379 | -87.3469 | 112.6 ft. | | | 10 ft. | 112.6 ft. |
| SDKA033 | UT to Johnson Creek | TN05130205031_0999 | Misc tribs to Johnson Creek | 36.2180 | -87.3004 | 108.8 ft. | | | 10 ft. | 108.8 ft. |
| SDKA034 | UT to Johnson Creek | TN05130205031_0999 | Misc tribs to Johnson Creek | 36.2187 | -87.3038 | 77.2 ft. | | | 10 ft. | 77.2 ft. |
| SDKA036 | Johnson Creek | TN05130205031_1000 | Johnson Creek | 36.2237 | -87.3132 | 263 ft. | | | 10 ft. | 263 ft. |
| | | | | 36.2237 | -87.3130 | | | 21 ft. | | 21 ft. |
| SHNA001 | Guices Creek | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3376 | -87.6087 | 78.6 ft. | | | 10 ft. | 78.6 ft. |
| SHNA011 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3313 | -87.6007 | 75 ft. | | | 10 ft. | 75 ft. |
| | | | | 36.3310 | -87.6011 | | | 23 ft. | | 23 ft. |
| SHNB030 | UT to Guices Creek | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3472 | -87.6254 | 168 ft. | | | 10 ft. | 168 ft. |
| | | | | 36.3477 | -87.6257 | | | 31 ft. | | 31 ft. |
| SHNC023 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3118 | -87.5828 | 89 ft. | | | 10 ft. | 89 ft. |
| SHNC030 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3195 | -87.5886 | 79.5 ft. | | | 10 ft. | 79.5 ft. |
| SHNE003 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3243 | -87.5930 | 75.1 ft. | | | 10 ft. | 75.1 ft. |
| SHNA012 | Guices Branch | TN05130205121_1000 | Guices Creek | 36.3327 | -87.6041 | 93 ft. | | | 10 ft. | 93 ft. |
| | | | | 36.3309 | -87.6035 | | | 20 ft. | | 20 ft. |
| SHNA008 | UT to Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3548 | -87.6395 | | | 44 ft. | | 44 ft. |
| | | | | 36.3544 | -87.6395 | | | 62 ft. | | 62 ft. |

Page 7 of 188

JA0007

AR 006768

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SHNB033-1 | Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3527 | -87.6339 | 104.9 ft. | | | 10 ft. | 104.9 |
| SHNB033-2 | Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3549 | -87.6388 | 139.4 ft. | | | 10 ft. | 139.4 |
| SHNB033-3 | Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3664 | -87.6559 | 76.4 ft. | | | 10 ft. | 76.4 |
| SHNA010 | Wells Creek | TN051302051735_1000 | Wells Creek | 36.3713 | -87.6622 | | 0 ft. | | | 0 ft. |
| WDKB001 | Wetland WDKB001 | N/A | Unnamed PFO wetland | 36.2494 | -87.3803 | 0.02 ac | | 0.01 ac | 0.02 ac | 0.03 ac |
| WHNA001 | Wetland WHNA001 | N/A | Unnamed PEM wetland | 36.3558 | -87.6394 | | | 0.10 ac | | 0.10 ac |
| WHNB002 | Wetland WHNB002-PEM | N/A | Unnamed PEM wetland | 36.3664 | -87.6554 | 0.33 ac | | 0.04 ac | | 0.37 ac |
| | Wetland WHNB002-PFO | N/A | Unnamed PFO wetland | 36.3664 | -87.6554 | | | 0.03 ac | 0.01 ac | 0.04 ac |
| WHNW001 | Wetland WHNW001 | N/A | Unnamed PEM wetland | 36.2903 | -87.5159 | | | 0.03 ac | | 0.03 ac |
| WHNW002 | Wetland WHNW002 | N/A | Unnamed PEM wetland | 36.2926 | -87.5251 | | | 0.01 ac | | 0.01 ac |
| WSTA001 | Wetland WSTA001 | N/A | Unnamed PEM wetland | 36.3722 | -87.6662 | 0.05 ac | | 0.06 ac | | 0.11 ac |

[1]Here and throughout this permit and rationale, where waterbodies are mentioned, the label and name as written in TGP's permit application materials and the TDEC Waterbody ID and Waterbody Name are given to facilitate review of authorized impacts. The project will also impact waterbodies identified by TDEC as WWCs (listed in this permit's Appendix). In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), impacts to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q).

[2]The linear feet of stream impacts and acreage of wetland impacts associated with pipeline installation via trench include the 10-foot-wide trench in which the pipeline will be installed. The impacts associated with the pipeline installation via trenching will be temporary.

[3]The linear feet of stream impacts associated with pipeline installation via HDD is reported as zero because this method does not require disturbance to the channel. No ongoing vegetation mowing or clearing will take place in riparian areas that are between HDD entry and exit points.

[4]The linear feet of stream impacts and acreage of wetland impacts associated with road or workspace crossings include impacts from construction of access roads, additional workspace areas, and equipment or construction staging areas. The impacts associated with road or workspace crossings will be temporary.

[5]To facilitate periodic corrosion/leak surveys, a corridor centered on the pipeline and up to 10 feet wide may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state, resulting in conversion of plant communities in forested riparian zones and forested wetlands to herbaceous/emergent or scrub-shrub plant communities. In addition, individual trees that are located within 15 feet of the pipeline that have roots that could compromise the integrity of the pipeline coating may be cut and removed from the permanent right-of-way. These impacts will not result in loss of wetland acreage.

Page 9 of 188

AR  006770

Table 2: Authorized temporary water withdrawals from streams and reservoirs.

| Waterbody | | | | Impact location | | Flow statistics | | Class 1 minor water withdrawal | Class 2 minor water withdrawal | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | 7Q10 flow rate (gpm)[1] | Summer mean flow rate (gpm)[2] | Maximum instantaneous stream withdrawal percentage of instantaneous flow[3] | Maximum instantaneous reservoir withdrawal rate (gpm) | Duration (days) |
| SDKA048 | Jones Creek | TN05130204002_1000 | Jones Creek | 36.1874 | -87.2440 | 4263.89 | 28680.24 | 10% | | ≤ 30 |
| SDKB002 | Bartons Creek | TN05130205024_1000 | Bartons Creek | 36.2380 | -87.3467 | 628.40 | 4712.72 | 10% | | ≤ 30 |
| SDKB009 | Furnace Creek | TN05130205024_0400 | Furnace Creek | 36.2496 | -87.3804 | 291.70 | 2217.22 | 10% | | ≤ 30 |
| SDKB011 | Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2611 | -87.4112 | 71.80 | 561.04 | 10% | | ≤ 30 |
| SDKB023 | Little Bartons Creek | TN05130205024_0600 | Little Bartons Creek | 36.2725 | -87.4554 | 59.70 | 411.13 | 10% | | ≤ 30 |
| SHNC007-1 | Yellow Creek | TN05130205019_1000 | Yellow Creek | 36.2983 | -87.5504 | 8707.30 | 38644.26 | 10% | | ≤ 30 |
| SHNA012 | Guices Creek | TN05130205121_1000 | Guices Creek | 36.3329 | -87.6040 | 475.80 | 2082.57 | 10% | | ≤ 30 |
| SHNA010 | Wells Creek | TN051302051735_1000 | Wells Creek | 36.3714 | -87.6616 | 4093.30 | 17818.55 | 10% | | ≤ 30 |
| None | Cumberland River | TN05130205015_1000 | Barkley Reservoir | 36.3969 | -87.6593 | 325401.80 | 5655258.00 | N/A | 1500 | ≤ 30 |

[1]7Q10 flow rate is the lowest seven-day average flow with a 10% probability of occurring in any given year (i.e., that occurs on average once every ten years).

[2]Summer mean flow rate is the average individual daily mean discharge measured from June 1 through August 31 over an entire stream gage period of record.

[3]Temporary stream and reservoir impacts from minor water withdrawals are associated with hydrostatic testing of the pipeline before it is put into service. Withdrawals from streams are Class 1 minor water withdrawals, and the withdrawals from Barkley Reservoir is a Class 2 minor water withdrawal as defined by the TDEC *General Aquatic Resource Alteration Permit for Minor Water Withdrawals*.

AR  006771

The project will also impact waterbodies identified by TDEC as WWCs (listed in this permit's Appendix). In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), impacts to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q).

**Special Conditions:**

a. **Impacts to streams or wetlands in the project area and along the pipeline ROW are not authorized until the permittee has:**
   1. **Obtained a notice to proceed with project construction from the Federal Energy Regulatory Commission and submitted a copy to the Division,**
   2. **Submitted amendments to the project aquatic resources inventory to the permit writer that address parcels not previously inventoried,**
   3. **Received an updated Aquatic Resources Inventory/HD concurrence letter from the Division,**
   4. **Submitted an application for a modified permit that addresses newly inventoried resources, and**
   5. **Received a modified ARAP covering all proposed impacts to aquatic resources for the entire pipeline project.**

b. Unless stated otherwise, all work shall be accomplished in conformance with the accepted plans, specifications, data, and other information submitted in support of application NRS22.192.

c. Written notification of the commencement of authorized work shall be provided to the TDEC Nashville Environmental Field Office prior to, or within 24 hours after initiation.

d. The permittee shall notify this office of project completion and supply as-constructed or record drawings of the final structure within 45 days after completion.

e. Wetlands and streams outside of the permitted impact area shall be clearly marked with signs, high visibility fencing, or similar structures so that all work performed by the contractor is solely within the permitted area of impact.

f. **The permittee shall submit a post-construction monitoring report annually to the Division for three years following the project's completion.** This annual report shall include documentation of the maintenance of jurisdictional status and resource value in **all** impacted wetlands and streams in each monitoring year. See Monitoring Requirements section of this permit for details.

g. For each stream crossing to be accomplished by a method other than HDD:
   1. The permittee shall select from the list of potentially practicable alternatives below. This list is arranged in ascending order of perceived impact to the resource:
      i. Conventional excavation with an excavator;
      ii. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;
      iii. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;
      iv. Removal by rock trencher; or
      v. Controlled blasting and excavation with a backhoe.
   2. The permittee shall select the least impactful practicable trenching technique for each stream crossing. Evaluation criteria include observed conditions at the stream crossing, the technical feasibility and limitations of each particular technique, best professional judgment of experienced personnel, logistics, and costs. The permittee shall select one or

AR  006772

more non-blasting alternatives unless it demonstrates that each of these is impracticable. Prior to blasting, the permittee shall attempt at least one non-blasting alternative.

h.  For controlled blasting within 50 feet of a stream or wetland:

1.  Unless stated otherwise, all blasting shall adhere to the conditions and other information submitted in the Draft Blasting Plan found in the document entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

2.  The blasting contractor(s) will create a site-specific blasting plan for each blasting location as described in the Draft Blasting Plan. The blasting plans must be submitted by the blasting contractor(s) to the permittee for review and approval by one if its engineers.

3.  Blasting operations must be conducted by, or under the direct and constant supervision of, personnel licensed and certified to perform such activity in Tennessee. Prior to any blasting activities, the blasting contractor(s) will provide documentation of the experience, licenses, and permits associated with blasting personnel to the permittee. The individual directly overseeing any controlled blasting activities will be required to hold a registration classification as defined in the T.C.A. Title 68, Chapter 105. The Geohazard Inspector will have prior experience in geohazard identification and characterization and experience in providing support/oversight during construction. The Geohazard Inspector will work under the direction of a licensed Professional Engineer. All blasting must be conducted with a Geohazard Inspector present.

4.  Blasting will not be used in Tennessee jurisdictional streams characterized by karst-prone geology or with an unacceptable risk of hydrologic loss, as identified in the Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022. Only streams in which 1) karst is unlikely *and* 2) risk of hydrologic loss is "reduced" *and* 3) HDD has been determined to not be practicable may blasting be considered.

5.  Blasting is not authorized within wetlands.

6.  The Division (Natural Resources Unit permit writer and Nashville Environmental Field Office) must be contacted in writing at least 48 hours in advance when controlled blasting is proposed. The permittee must provide site-specific documentation to the Natural Resources Unit permit writer supporting that controlled blasting is the least environmentally damaging practicable alternative for that particular stream crossing per Special Condition g. Written authorization must be obtained from the Division prior to initiation of controlled blasting.

7.  A qualified project biologist will survey the proposed blasting zone identified by the pipeline blasting contractor(s) immediately in advance of any blasting for the presence of any state-listed species and if found, will contact the TWRA and TDEC Division of Natural Areas before proceeding.

8.  Blasting will be conducted in dry conditions within the workspace.

9.  The permittee will minimize the length of time that aquatic resources are disturbed by expediting completion of each crossing and completing stream crossings separate from the mainline construction.

10.  All streams and stream banks will be restored to original contours immediately following pipeline installation.

11.  **The permittee shall submit a post-blasting monitoring report to the Division within 30 days of the restoration of the temporary stream impacts**. See Monitoring Requirements section of this permit for details.

Page 12 of 188

AR  006773

**i.** Loss of stream flow due to fracturing of bedrock is prohibited. Adequate provisions shall be made to prevent the loss of stream flow due to fracturing of bedrock during pipeline installation across streams and wetlands.

    **1.** Trench plugs are barriers placed within a pipeline excavation to slow flow and reduce erosion in the trench and also to prevent the trench from becoming a subsurface drainage path. Since gas line bedding and embedment are constructed using cohesionless, free-draining soils, a path is created for water to flow easily (French drain effect) alongside the pipe. In areas where there is high groundwater, where the pipeline crosses streams or aquifers, or where the natural groundwater flow would be affected or even diverted by the select material, trench plugs of compacted, cohesive, soils or impervious materials shall be constructed at intervals along the pipeline.

    **2.** Pipeline crossings of streams with bedrock streambeds must provide non-erodible fill and cover, such as concrete or controlled low strength materials (flowable fill), and trench plugs at each end of the crossing.

    **3.** Trench plugs shall be placed in the portions of any trench within 50 feet of a stream channel.

    **4.** The trench plug area will have a bedding of compacted, cohesive soils or impervious materials (such as concrete or controlled low strength materials (i.e., flowable fill)), whereas the bedding on both sides of the trench plug will have a bedding of uncompacted, cohesionless soil. Trench plugs must have lower permeability than the surrounding native soil.

**j.** For pipeline installation areas that cross streams or wetlands using horizontal directional drilling:

    **1.** Entry and exit locations must be at least 50 feet from the stream bank or wetland margin.

    **2.** The depth of bore below the streambed must be sufficient to reasonably prevent release of drilling fluid, based on the parent material.

    **3.** In the event of an inadvertent release of drilling fluid, a site-specific contingency plan must be followed. This plan includes notification to the Division within 24 hours after release to surface waters. Site-specific proposed containment plans must be approved by the Division prior to initiation.

**k.** For the minor water withdrawals for the purposes of hydrostatic testing:

    **1.** All stream and river water withdrawals will adhere to the notification requirements, conditions, and limits of Class 1 water withdrawals in TDEC's *General Aquatic Resource Alteration Permit for Minor Water Withdrawals:*

        **i.** Withdrawal rates will not exceed 10% of instantaneous flow, and will not take place for more than 30 days in a calendar year from a particular waterbody. The permittee must demonstrate that instantaneous flow of the source water is accurately measured or determined for the purpose of compliance with the terms and limits of this permit.

    **2.** The reservoir water withdrawal from Barkley Reservoir will adhere to the notification requirements, conditions, and limits of Class 2 water withdrawals in TDEC's *General Aquatic Resource Alteration Permit for Minor Water Withdrawals:*

        i. Withdrawal rates will not exceed 1500 gpm and will not take place for more than 30 days in a calendar year.

    **3.** Where the total average withdrawal exceeds 10,000 gallons per day, the withdrawal shall be registered under the Water Resources Information Act of 2002 (T.C.A. § 69-7-301 et seq.) More information regarding water withdrawal information may be found at:

AR 006774

https://www.tn.gov/environment/program-areas/wr-water-resources/water-quality/water-withdrawal-registration-program.html

4. Except for withdrawals from Barkley Reservoir, withdrawal is not authorized from a stream or river in a county or region during severe (D2), extreme (D3), or exceptional (D4) drought as indicated by the National Drought Mitigation Center website: https://droughtmonitor.unl.edu/CurrentMap/StateDroughtMonitor.aspx?TN

5. The permittee must screen all water intake to minimize the potential for entrainment of fish.

6. The permittee must adhere to conditions intended to minimize water withdrawal and hydrostatic testing impacts in the documented entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

7. **The permittee shall submit a one-time water withdrawal monitoring report to the Division following the completion of all water withdrawals to demonstrate adherence to permit conditions. See Monitoring Requirements section of this permit for details.**

l. The permittee will adhere to the recommendations and other information submitted in the geologic and hydrotechnical hazard assessment, karst surveys, and geohazard mitigation guidance for the project provided in Attachment 6 of the documented entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022.

m. The permittee will use low pressure ground equipment in wetlands and riparian areas to minimize vegetation damage, soil compaction, and rutting.

n. Temporary wetland crossings shall utilize timber matting. Gravel, riprap, or other rock is not approved for construction of temporary crossings or haul roads across wetlands. Upon completion of construction activities, all temporary wetland impact areas are to be restored to pre-construction contours and elevations. Non-native soils, side-cast material, or other materials shall not be placed within the temporary impact locations during restoration. Permanent vegetative stabilization must use native species as described in Special Condition p.

o. Temporary impacts to wetlands associated with trench excavation shall be mitigated by the removal and stockpiling of the first 12 inches of topsoil prior to construction. Upon completion of construction activities, all temporary wetland impact areas are to be restored to pre-construction contours, and the stockpiled topsoil spread to restore these areas to pre-construction elevation. Non-native soils, side-cast material, or other materials shall not be placed within the temporary impact locations during restoration. Permanent vegetative stabilization must use native species as described in Special Condition p.

p. Permanent vegetative stabilization using native species of all disturbed areas in or near streams and wetland must be initiated within 14 days of project completion (see also *Landscaping With Natives* at https://www.tnipc.org/wp-content/uploads/2017/10/landscaping_2016_forweb.pdf). Non-native, non-invasive annuals may be used as cover crops until native species can be established.

q. Only earthen materials comprising native, uncontaminated soil or rock, or a combination thereof shall be "Acceptable Fill" to be placed as fill in wetlands and streams. Acceptable Fill shall consist of only soil or rock in which all substances naturally occurring therein are present in concentrations not exceeding the concentrations of such substances occurring naturally in the local area. Acceptable Fill shall not contain any sewage, industrial wastes, additives or materials such as refuse, rubble, muck, metal, glass, concrete pieces, bricks, or asphalt paving materials, wood or other wastes.  For the purposes of this permit, "other wastes" means any and all other substances or forms of energy, including, but not limited to, decayed wood, sand, garbage, silt, municipal refuse, sawdust, shavings, bark, lime, ashes, offal, oil, hazardous materials, tar, sludge, or other petroleum byproducts, radioactive

AR  006775

material, chemicals, heated substances, dredged spoil, solid waste, incinerator residue, sewage sludge, munitions, biological materials, wrecked and discarded equipment, and cellar dirt.

**r.** The authorized alterations shall not cause measurable degradation to resource values and classified uses of hydrologically connected waters of the state, including disruption of sustaining surface or groundwater hydrology. Adjacent wetlands or streams determined likely to be measurably degraded by such hydrologic alteration, or by partial fill, must be included in the cumulative impact calculation, even if not filled or otherwise directly altered physically.

**s.** The use of monofilament-type erosion control netting or blanket is prohibited in the wetland, and in any stream channels, stream banks, or any disturbed riparian areas within 30 feet of top of bank.

**t.** Hard armoring of banks at any stream or wetland crossing is prohibited.

**u.** The pipeline, access roads, workspaces, and staging areas shall be located to avoid permanent alteration or damage to the integrity of the stream channel. Large trees, steep banks, rock outcroppings, etc., should be avoided.

**v.** The pipeline, access roads, workspaces, and staging areas shall not impound normal or base flows on the upstream side, and shall not result in a permanent disruption or barrier to the movement of fish or other aquatic life on the downstream side. Base flow is the usual or normal flow of the stream that is supplied primarily by groundwater from springs and seeps, but not affected by rapid runoff during and after rainfall.

**w.** The width of the stream channel and bank modifications, or other impacts associated with the installation of the pipeline, access roads, workspaces, and staging areas shall be limited to the minimum necessary.

**x.** Erosion control measures shall be utilized where stream bank vegetation is disturbed for the purpose of temporary stream crossings. Stream beds shall not be used as linear transportation routes for mechanized equipment. The stream channel may be crossed perpendicularly with equipment provided no additional fill or excavation is necessary. EPSC measures shall be utilized when streambanks are disturbed.

**y.** The stream channels shall not be over-widened as a result of the installation of the pipeline, access roads, workspaces, or staging areas.

**z.** Backfill activities must be accomplished in the least impactful manner possible that stabilizes the streambed and banks to prevent erosion. Permanent vegetative stabilization must use native species as described in Special Condition p.

**aa.** All dewatering activities shall be conducted in a manner that prevents the discharge of sediment-laden water into waters of the state.

**bb.** All spoil material from trench excavation, bore pits, and other earth-disturbing activities shall be deposited in an upland location and stabilized within seven days.

**cc.** Erosion prevention and sediment control measures must be in place and functional before any earth moving operations begin, and shall be designed according to the department's Erosion and Sediment Control Handbook (http://tnepsc.org/handbook.asp).

**dd.** Erosion prevention and sediment control measures such as silt fences shall be removed following completion of construction.

**ee.** Best Management Practices (BMPs) shall be stringently implemented throughout the construction period to prevent sediments, oils, or other project-related pollutants from being discharged into waters of the state. All spills must be reported to the appropriate emergency management agency, and measures shall be taken immediately to prevent the pollution of waters of the state, including groundwater, should a spill occur.

**ff.** Equipment staging and maintenance areas shall be developed a sufficient distance from any water to ensure that oil, gas, other petroleum products, and other hazardous materials do not enter the waters.

Page 15 of 188

AR 006776

**gg.** The permittee shall minimize the use of heavy equipment in streams or wetlands. Equipment shall be free of noticeable leaks of fluids and oils.

**hh.** Where practicable, all activities shall be accomplished during drier times of year or when recent conditions have been dry at the impact location. The excavation and fill activities associated with the pipeline crossing of streams and wetlands shall be kept to a minimum and shall be separated from flowing waters. Wet-cut trenching methods are not authorized. All surface water flowing towards or from the construction activity shall be diverted using flume or dam-and-pump methods as described in the permit application materials. Temporary diversion channels shall be protected by non-erodible material and lined to the expected high water level. Cofferdams and/or berms must be constructed of sandbags, steel sheeting, or other non-erodible, non-toxic material. All such diversion materials must be removed upon completion of the work.

**ii.** The permittee shall minimize clearing, grubbing, and other disturbance to riparian vegetation. Unnecessary native vegetation removal, including tree removal, and soil disturbance is prohibited. Native riparian vegetation must be reestablished in all areas of disturbance outside of any permanent authorized structures or vegetation management zones after work is completed, per Special Condition p. Coverage under this permit does not waive any local riparian buffer protection requirement, and the permittee is responsible for obtaining any necessary local approval.

**jj.** In addition to the erosion prevention and sediment control measures described herein associated with authorized aquatic impacts, the permittee must comply with the conditions of the National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges of Stormwater Associated with Construction Activities (CGP), TNR100000 for the entire area of disturbance associated with the construction project.

## General Conditions:

**a.** It is the responsibility of the permittee to convey all terms and conditions of this permit to all contractors. A copy of this permit, approved plans, and any other documentation pertinent to the activities authorized by this permit shall be maintained on site at all times during periods of construction activity.

**b.** Work shall not commence until the permittee has obtained and maintained all necessary authorizations pursuant to applicable provisions of section 10 of The Rivers and Harbors Act of 1899, section 404 of the Clean Water Act, section 26a of The Tennessee Valley Authority Act, or any other applicable federal, state or local laws.

**c.** All activities must be carried out in such a manner as will prevent violations of water quality criteria as stated in TDEC Rule Chapter 0400-40-03, or impairment of the uses of waters of the state as designated by Rule Chapter 0400-40-04.

**d.** This activity may not result in a disruption or barrier to the movement of fish or other aquatic life and wetland dependent species upon project completion.

**e.** Adverse impact to formally listed state or federal threatened or endangered species or their critical habitat is prohibited.

**f.** This permit does not authorize adverse impacts to cultural, historical, or archeological features or sites.

**g.** This permit does not authorize access to public or private property. Arrangements concerning the use of public or private property shall be made with the landowner. The permittee is responsible for obtaining any additional permitting or maintenance agreements with other government or public agencies or lands.

Page 16 of 188

AR 006777

**PART II**

**Monitoring Requirements**

All reports must be submitted in report form to the Division's Natural Resources Unit located on the 11th Floor of the William R. Snodgrass Tennessee Tower, 312 Rosa L. Parks Avenue, Nashville, Tennessee 37243, or via email to water.permits@tn.gov and to the permit writer Claire Wainwright at Claire.wainwright@tn.gov. Please be sure to indicate the ARAP permit number on your submittal.

**a.** **An as-constructed report** must be submitted within 45 days after the project's completion (per Special Condition d above) and must contain as-constructed or record drawings of the final structure.

**b.** **An annual post-construction monitoring report** must be submitted by April 30 each year for three years after the project's completion (per Special Condition f above) to document evidence of the maintenance of jurisdictional status and successful restoration within **all impacted jurisdictional features**, and shall include:

    **1.** Representative photographs of each feature pre-impact and post-impact

    **2.** Wetland delineations and stream hydrologic determinations. All stream hydrologic determinations must be made during the February 1 – April 15 time period each year and in accordance with the procedures in TDEC Rule 0400-40-03-.05(9)

    **3.** Identification of any features that have not returned to pre-impact condition, and a corresponding proposed adaptive management plan

**c.** **A post-blasting monitoring report** must be completed for each applicable stream crossing within 30 days post-impact (per Special Condition h above). This report will include:

    **1.** Representative photographs of each feature pre-impact and post-impact

    **2.** A description of the attempts to implement the potentially practicable alternatives to blasting techniques,

    **3.** The results for each technique attempted prior to blasting,

    **4.** A narrative description of the site-specific factors necessitating blasting, and

    **5.** The date of the blasting.

**d.** **A water withdrawal monitoring report** must be submitted within 30 days following the completion of all hydrostatic testing associated with the pipeline installation (per Special Condition k above). The report shall include, for each withdrawal location:

    **1.** Specific location of each intake

    **2.** Daily maximum withdrawal rates

    **3.** Instantaneous flow rates and the source of instantaneous flow data, and

    **4.** Total daily withdrawal volume

**Duty to Reapply**

If any portion of the permitted activities, including the authorized impacts to water resources, compensatory mitigation requirements, or post-project monitoring is not completed before the expiration date of this permit **the applicant must apply for permit re-issuance**. The permittee shall submit such information and forms as are required to the director of the Division of Water Resources at least ninety (90) days prior to its expiration date. Such applications must be properly signed and certified.

**Property Rights**

The issuance of this permit does not convey any property rights in either real or personal property, or any exclusive privileges, nor does it authorize any injury to private property or any invasion of personal rights, nor any infringement of Federal, State, or local laws or regulations.

**Other Information**

If the permittee becomes aware that he/she failed to submit any relevant facts in a permit application or submitted incorrect information in a permit application or in any report to the Director, then he/she shall promptly submit such facts or information.

**Changes Affecting the Permit**

**Transfer/Change of Ownership**

**a.**  This permit may be transferred to another party, provided there are no activity or project modifications, no pending enforcement actions, or any other changes which might affect the permit conditions contained in the permit, by the permittee if:

**b.**  The permittee notifies the Director of the proposed transfer at least 30 days in advance of the proposed transfer date;

**c.**  The notice includes a written agreement between the existing and new permittees containing a specified date for transfer of permit responsibility, coverage, and contractual liability between them; and

**d.**  The Director does not notify the current permittee and the new permittee, within 30 days, of his intent to modify, revoke, reissue, or terminate the permit, or require that a new application be filed rather than agreeing to the transfer of the permit.

**e.**  The permittee must provide the following information to the division in their formal notice of intent to transfer ownership:

   **1.**  the permit number of the subject permit;
   **2.**  the effective date of the proposed transfer;
   **3.**  the name and address of the transferor;
   **4.**  the name and address of the transferee;
   **5.**  the names of the responsible parties for both the transferor and transferee;
   **6.**  a statement that the transferee assumes responsibility for the subject permit;
   **7.**  a statement that the transferor relinquishes responsibility for the subject permit;
   **8.**  the signatures of the responsible parties for both the transferor and transferee, and;
   **9.**  a statement regarding any proposed modifications to the permitted activities or project, its operations, or any other changes which might affect the permit conditions contained in the permit.

**Change of Mailing Address**

The permittee shall promptly provide to the Director written notice of any change of mailing address. In the absence of such notice the original address of the permittee will be assumed to be correct.

**Noncompliance**

**Effect of Noncompliance**

All impacts shall be consistent with the terms and conditions of this permit. Any permit noncompliance constitutes a violation of applicable State and Federal laws and is grounds for enforcement action, permit termination, permit modification, or denial of permit reissuance.

AR  006779

**Reporting of Noncompliance**
**24-Hour Reporting**

**a.** In the case of any noncompliance which could cause a threat to public drinking supplies, or any other discharge which could constitute a threat to human health or the environment, the required notice of non-compliance shall be provided to the Division of Water Resources in the appropriate Environmental Field Office within 24-hours from the time the permittee becomes aware of the circumstances. (The Environmental Field Office should be contacted for names and phone numbers of environmental response personnel).

**b.** A written submission must be provided within five (5) days of the time the permittee becomes aware of the circumstances unless this requirement is waived by the Director on a case-by-case basis. The permittee shall provide the Director with the following information:

  **1.** A description of the discharge and cause of noncompliance;
  **2.** The period of noncompliance, including exact dates and times or, if not corrected, the anticipated time the noncompliance is expected to continue; and
  **3.** The steps being taken to reduce, eliminate, and prevent recurrence of the non-complying discharge.

**Scheduled Reporting**

For instances of noncompliance which are not reported under subparagraph a. above, the permittee shall report the noncompliance by contacting the permit coordinator, and provide all information concerning the steps taken or planned to reduce, eliminate, and prevent recurrence of the violation and the anticipated time the violation is expected to continue.

**Adverse Impact**

The permittee shall take all reasonable steps to minimize any adverse impact to the waters of Tennessee resulting from noncompliance with this permit, including but not limited to, accelerated or additional monitoring as necessary to determine the nature and impact of the noncompliance.  It shall not be a defense for the permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit.

**Liabilities**

**Civil and Criminal Liability**

Nothing in this permit shall be construed to relieve the permittee from civil or criminal penalties for noncompliance. Notwithstanding this permit, the permittee shall remain liable for any damages sustained by the State of Tennessee, including but not limited to fish kills and losses of aquatic life and/or wildlife, as a result of the discharge of pollutants to any surface or subsurface waters. Additionally, notwithstanding this Permit, it shall be the responsibility of the permittee to conduct its discharge activities in a manner such that public or private nuisances or health hazards will not be created.

**Liability under State Law**

Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties established pursuant to any applicable State law or the Federal Water Pollution Control Act, as amended.

This permit does not preclude requirements of other federal, state or local laws.  This permit also serves as a State of Tennessee Aquatic Resource Alteration Permit (ARAP) pursuant to the Tennessee Water Quality Control Act of 1977 (T.C.A. § 69-3-101 et seq.).

AR  006780

The State of Tennessee may modify, suspend or revoke this permit or seek modification or revocation should the state determine that the activity results in more than an insignificant violation of applicable water quality standards or violation of the act. Failure to comply with permit terms may result in penalty in accordance with T.C.A. § 69-3-115.

An appeal of this action may be made as provided in T.C.A. § 69-3-105(i) and Rule 0400-40-07-.04(9) by submitting a petition for appeal:

**a.**  The petition must be filed within 30 days after public notice of the issuance of the permit.

**b.**  The petition must specify the basis for the appeal and state a claim for relief based on an alleged violation of the Tennessee Water Quality Control Act or the rules promulgated thereunder. Third parties shall specify facts sufficient to establish that they have satisfied the statutory and regulatory preconditions and otherwise have standing to appeal.

**c.**  The petition should be addressed to the technical secretary of the Tennessee Board of Water Quality, Oil and Gas at the following address: Jennifer Dodd, Director, Division of Water Resources, William R. Snodgrass - Tennessee Tower, 312 Rosa L. Parks Avenue, Nashville, Tennessee 37243-1102, or you may submit such petition electronically to TDEC.Appeals@tn.gov. Any hearing would be in accordance with T.C.A. §§ 69-3-110 and 4-5-301 et seq.

Page 20 of 188

AR  006781

**APPENDIX**
**Permit Rationale**

---

**PERMIT RATIONALE**
**Aquatic Resource Alteration Permit NRS22.192**

---

Tennessee Natural Gas Company, LLC

Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, and Barkley Reservoir; Harpeth River and Lake Barkley Watersheds, Dickson, Houston, and Stewart Counties, Tennessee

July 21, 2023

*Permit Writer: Claire Wainwright*

**Summary**

Names of Applicants:
Tennessee Natural Gas Company, LLC

Contact:
Gina Dorsey
1001 Louisiana St, Suite 1000
Houston, TX 77002-5089

Activity Location:  From near Claylick Road, Dickson to near Old Scott Road, Cumberland City

Nature of Business: Construction of a natural gas pipeline and associated infrastructure

Authorized Activity: Temporary impacts to 0.69 acres of wetland, permanent impacts to 0.03 acres of wetland, temporary impacts to approximately 5400 linear feet of stream, temporary water withdrawals from eight streams and one reservoir, and permanent impacts to 490 linear feet of stream associated with the construction of a 32-mile 30-inch diameter natural gas pipeline.

Waterbody Name: Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, Barkley Reservoir; Harpeth River and Lake Barkley Watersheds, Dickson, Houston, and Stewart Counties, Tennessee

**Permit Status**

ARAP NRS22.192 issued:  **July 21, 2023**

ARAP NRS22.192 expires:  **July 20, 2028**

Application for ARAP received:  **July 22, 2022**

Application Complete:  **April 20, 2023**

Page 21 of 188

AR  006782

**Status of Affected Waters**

<u>Streams</u>

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SDKA023 | Upper Sugar Camp Branch | TN05130204001_1100 | UT Harpeth | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA026, SDKA027 | Jordan Branch, UT to Jordan Branch | TN05130204002_0100 | Jordan Branch | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA004, SDKA006, | UT to Porters Branch, | TN05130204002_0200 | UT Jones Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | June 3, 2019 | Unavailable | Not a known ETW |

Page 22 of 188

AR 006783

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SDKA008, SDKA058 | Porters Branch | | | Irrigation | Fully Supporting | N/A | N/A | June 3, 2019 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Supporting | Flow regime modification | Dam or impoundment | June 3, 2019 | | |
| SDKA013, SDKA049, SDKA051, SDKA053, SDKA054, SDKA055 | Gafford Branch, UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA048 | Jones Creek | TN05130204002_1000 | Jones Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | June 5, 2019 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | June 5, 2019 | | |
| | | | | Recreation | Fully Supporting | N/A | N/A | June 5, 2019 | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | June 5, 2019 | | |

Page 23 of 188

AR 006784

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Industrial Water Supply | Fully Supporting | N/A | N/A | June 5, 2019 | | |
| SDKA014 | UT to Gafford Branch | TN05130204002 _1500 | Peabody Branch | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKB025, SDKB026, SDKB027, SDKB028 | UT to Leatherwood Creek, Leatherwood Creek | TN05130205019 _0100 | Leatherwood Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| SHNC010-1, SHNC018, SHNC020 | UT Yellow Creek, Indian Branch | TN05130205019 _0999 | Misc tribs to Yellow Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |

Page 24 of 188

AR  006785

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | | | | | |
| SHNC007-1 | Yellow Creek | TN05130205019_1000 | Yellow Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| SDKA046, SDKB009, SDKB011, SDKB014, SDKR005, SDKR008 | UT to Dry Hollow Branch, Furnace Creek, Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| SDKB023 | Little Bartons Creek | TN05130205024_0600 | Little Bartons Creek | | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |

Page 25 of 188

JA0025

AR 006786

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Fully Supporting | | | | | |
| | | | | Fish and aquatic life | | N/A | N/A | May 29, 2018 | | |
| SDKA038, SDKA041, SDKA042, SDKB001, SDKB004, SDKB005, SDKB008 | UT to Harris Branch, Harris Branch, UT to Bartons Creek, Miller Branch, UT to Nesbitt Branch, Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKB002 | Bartons Creek | TN05130205024_1000 | Bartons Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |

Page 26 of 188

AR  006787

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SDKA033, SDKA034 | UT to Johnson Creek | TN05130205031 _0999 | Misc tribs to Johnson Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA036 | Johnson Creek | TN05130205031 _1000 | Johnson Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNA001, SHNA011, SHNB030, SHNC023, SHNC030, SHNE003 | Guices Creek, UT from Guices Branch | TN05130205121 _0999 | Misc tribs to Guices Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |

Page 27 of 188

AR 006788

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SHNA012 | Guices Branch | TN05130205121_1000 | Guices Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNA008, SHNB033-1, SHNB033-2, SHNB033-3 | UT to Lickskillet Branch, Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNA010 | Wells Creek | TN051302051735_1000 | Wells Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 30, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 30, 2018 | | |
| | | | | Recreation | Not Supporting | E. coli | Sanitary sewer overflows (collection system failures) | May 30, 2018 | | |

Page 28 of 188

AR 006789

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| None | Cumberland River | TN05130205015_1000 | Barkley Reservoir (Cumberland River) | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 25, 2018 | Available | ETW due to documented non-experimental populations of state-listed threatened and endangered aquatic animal species |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Recreation | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Domestic Water Supply | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Industrial Water Supply | Fully Supporting | N/A | N/A | May 25, 2018 | | |

Page 29 of 188

AR  006790

Cumberland Gas Pipeline Project; NRS22.192
§401 Water Quality Certification

<u>Wetlands</u>

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody Name | TDEC Waterbody ID | Wetland Type | Parameters for Habitat Alteration | ETW Status |
|---|---|---|---|---|---|---|
| WDKB001 | Wetland WDKB001 | Unnamed PFO wetland | N/A | PFO | Available | Not a known ETW |
| WHNA001 | Wetland WHNA001 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| WHNB002 | Wetland WHNB002-PEM | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| | Wetland WHNB002-PFO | Unnamed PFO wetland | N/A | PFO | Available | Not a known ETW |
| WHNW001 | Wetland WHNW001 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| WHNW002 | Wetland WHNW002 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| WSTA001 | Wetland WSTA001 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |

**Authorized Alterations**

TGP is authorized to conduct stream and wetland alterations associated with the construction of approximately 32 miles of new 30-inch-diameter natural gas lateral pipeline and associated infrastructure. A detailed summary of these impacts can be found in Tables 1 and 2 in this permit. The project also will impact waterbodies identified by TDEC as WWCs (listed in this permit's Appendix in Table 3). In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), alterations to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q).

The broad categories of activities associated with the project that may alter Waters of the State include vegetation clearing, soil disturbance for grading purposes, water withdrawals for hydrostatic testing, trenching, HDD, and temporary fill from construction timber mats or temporary culvert crossings.

Prior to construction, temporary and permanent ROW workspaces will be cleared of woody vegetation. The pipeline construction corridor, adjacent work areas, and contractor yards will be cleared of vegetation and graded, as needed, to accommodate mobilization of equipment and materials and to facilitate access. During operation, the permanent easement or ROW will be maintained clear of trees and woody shrubs to allow for ongoing pipeline inspection and maintenance as required by United States Department of Transportation pipeline safety regulations. A corridor not exceeding ten feet in width, centered on the pipeline, may be

AR  006791

maintained annually in an herbaceous state as required to facilitate periodic corrosion and leak detection surveys.

Trench excavation will be the primary construction method to install the pipeline. Installation of the proposed pipeline will primarily entail excavation of a trench 4.5 to 8 feet in depth (averaging approximately 5 feet deep) and 4 to 5 feet in width (averaging approximately 4.5 feet wide). After the pipe is installed, the pipeline trench will be backfilled to grade by a minimum of 18 to 36 inches of cover (depending on location-specific soil and rock conditions) and vegetatively stabilized. All buried pipelines will be installed with a minimum cover of 48 inches of soil or 24 inches of consolidated rock between the top of the pipe and the underwater natural bottom.

TGP will cross all waterbodies in accordance with the FERC Procedures (with requested deviations to be approved by the FERC), the project's SWPPP, and applicable USACE and TDEC permit conditions. The proposed construction procedures will ensure that authorized impacts at all stream crossings are minimized to the extent practicable. TGP anticipates that waterbodies will be crossed primarily by dry open-cut methods, which may include a flumed crossing or dam-and-pump techniques, depending on site-specific conditions at the time of construction. Approximately 0.8 miles of the pipeline will be installed via HDD to avoid open-cut construction methods in three larger and potentially higher-flow streams as well as one associated unnamed tributary.

Construction BMPs will include:
- Minimizing vegetation clearing, use of timber mats, and minimizing soil disturbance;
- Avoiding unnecessary vehicular traffic and equipment use;
- Installing and maintaining erosion and sedimentation control devices such as straw bales and silt fences;
- Restricting the duration of construction to the extent practicable;
- Using timber construction mats to create a temporary work surface in wet conditions;
- Using low pressure ground equipment in wet conditions to minimize vegetation damage, soil compaction, and rutting;
- Training employees and contractors regarding the handling of oils and hazardous materials commensurate with their position;
- Inspecting equipment used in construction and operations at regular intervals;
- Using only approved access roads for vehicles transporting oils or fuel to construction workspaces;
- At the discretion of the Environmental Inspector, fueling equipment at the construction workspaces at least 100 feet from any waterbody;
- Storing hazardous materials, including chemicals, fuels, and oils, more than 100 feet from any waterbody;
- Using secondary containment, as appropriate, for pumps that transfer hazardous substances or petroleum within 100 feet of a waterbody to prevent spills and overflow; and
- Keeping spill response materials on site and in designated vehicles in the construction workspaces.

Disturbances to all other Waters of the State identified in the project area outside of the construction ROW will be avoided.

Stabilization will be achieved according to the conditions of the National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges of Stormwater Associated with Construction Activities (CGP), TNR100000. The work will be completed in the dry at all crossings. Where practicable, all stream and wetland impacts shall be accomplished during drier times of year or when recent conditions have been

AR 006792

dry at the impact location. The excavation and fill activities associated with the pipeline crossing of streams and wetlands shall be kept to a minimum and shall be separated from flowing waters. When working in drier times of year or under dry recent conditions is not practicable, check dams, diversions, or a system of pumps and sediment bags may be used to create dry sections and reduce sedimentation. All surface water flowing towards or from the construction activity shall be diverted primarily using flume or dam-and-pump methods as described in the permit application materials.

<u>Streams</u>
The proposed construction ROW includes the permanent easement, temporary workspaces, access roads, and contractor yards. A total of 53 streams are located within the construction ROW, with some features crossed by the ROW more than once, for a total of 69 stream crossings (approximately 5400 linear feet). Of the total 69 stream crossings, 49 are open-cut pipeline crossings. An additional 16 stream crossings will incur minor, temporary impacts due to workspace disturbances (i.e., equipment/construction staging locations, access roads, and additional workspace areas). The remaining four stream crossings will have no direct impacts due to the use of the HDD crossing method described in more detail below.

Stream crossings will be perpendicular to stream flow to the extent practicable. Temporary erosion control measures will be installed as necessary to prevent downstream impacts. If necessary, the pipe used for waterbody crossings will be weighted to prevent flotation. Prior to waterbody crossing construction, TGP will clear vegetation on each side of the waterbody, install sediment barriers, and prepare prefabricated segments of pipeline for installation.

Except for waterbodies that are proposed to be crossed using the trenchless HDD crossing method, TGP is authorized to cross the remaining waterbodies using dry open cut crossing methods. Dry open cut crossing methods, which consist of the "dam-and-pump" and "dry-flumed" crossing methods, will be accomplished by temporarily diverting stream flow around or through the work area to minimize contact between stream water and excavation and to minimize sediment suspension during trench excavation, pipeline installation, and backfill activities.

*Flumed method for installation via trench*
A flumed stream crossing redirects the water flow through one or more flume pipes to allow for the trenching and pipe installation to occur in dry conditions. The number, length, and diameter of the pipes are dependent on estimated stream flow for the stream being crossed. This method allows for drier trenching, pipe installation, and restoration, while maintaining continuous downstream flow and passage for aquatic organisms. Soil types must have characteristics that allow stable stream bank conditions, and stream flow must be low enough for this method to be used successfully and safely. The flume pipe(s) must be long enough to account for the potential for the ditch width to increase during excavation (due to sloughing) and over-sized somewhat to accommodate the possibility of high flow conditions. An effective seal must be created around the flume(s) at both the inlet and outlet ends, so water will not penetrate and potentially compromise the channelized dam. TGP will implement the following measures where the flumed crossing method is used:

- The flume pipe will be installed before any trenching;
- An effective seal will be created around the flume pipe with sandbags or an equivalent seal mechanism;
- The flume pipe(s) will be aligned parallel with natural water flow to prevent scouring of the bank, preventing erosion and sedimentation;

<center>Page 32 of 188</center>

- The flume pipe will not be removed during trenching, pipe-laying, backfilling activities, or initial streambed restoration efforts, except in rare conditions where a severe flow event causes conditions that make it unsafe for the pipe to remain; and
- Flume pipes and dams that are not associated with an equipment bridge will be removed as soon as final clean-up of the stream bed and bank is complete.

*Dam-and-pump dewatering method for installation via trench*

The dam-and-pump method may be used for stream crossings where pumps and hoses can adequately transfer stream flow volumes from upstream of the work area to downstream of the work area, and where there are no concerns with preventing the passage of aquatic organisms.

TGP will implement the following measures where the dam and pump method is utilized:

- Sufficient pump size, horsepower, and hose capacity, including on site backup pumps, will be used to maintain downstream flows;
- Coffer dams will be constructed with "clean" materials to prevent pollutants from entering the waterbody (e.g., sandbags or clean gravel with plastic liner);
- Water intakes will be suspended in the water column above the stream bed and will be screened to reduce entrainment of aquatic organisms or particles that may clog the pump;
- Pumps will be located within secondary containment structures to catch petroleum liquids and prevent them from entering the waterbody during refueling or if a pump failure occurs;
- For waterbodies with large volumes and strong velocity discharges, water dispersion structures will be placed at the downstream discharge location to prevent streambed scour; and
- The coffer dam, pumps, and hoses will be monitored and maintained to ensure proper operation for the duration of the waterbody crossing.

*Rock removal methods for installation via trench*

Bedrock refers to the solid rock that is found beneath the soil layer and other unconsolidated rock or sediment fragments. Shallow and hard bedrock can restrict trenching, requiring special mechanical means or blasting in certain areas to excavate to required design depths.

If bedrock is encountered during trenching, TGP plans to remove such bedrock using one of the techniques detailed below. The technique selected by TGP's construction contractor will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location. Techniques to be attempted are the following, in increasing order of perceived impact to aquatic resources:

1. Conventional excavation with an excavator;
2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;
3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;
4. Removal by rock trencher; or
5. Controlled blasting and excavation with a backhoe.

Evaluation criteria for the above-listed techniques include observed conditions at the stream crossing, the technical feasibility and limitations of each particular technique, considerations based on the experience of TGP personnel and its construction contractor, logistics, and costs. Based on the evaluation, one or more of the four non-blasting techniques may be determined not to be a practicable alternative at a particular crossing. However, based on the results of the evaluation at each stream crossing, TGP will attempt the remaining potentially practicable non-blasting techniques to determine which is the least adverse yet

AR 006794

practicable alternative. Only if evaluation and attempted implementation of the non-blasting techniques indicate that these non-blasting alternatives are not practicable will controlled blasting be selected as the least impactful to resource values, yet practicable, alternative. If techniques 1-4 are unsuccessful for rock removal and excavation at stream crossings, controlled blasting will be considered in non-karst areas that are also not streams with an unacceptable risk of hydrologic loss. In accordance with the permit Special Condition, blasting in wetlands is prohibited.  The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location as identified in the Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022.

TGP anticipates encountering areas of shallow bedrock during construction that may require controlled blasting to remove, based on the following information: review of surficial geology, soil mapping, and desktop geotechnical survey results. TGP has developed a Draft Blasting Plan for the project, provided in Draft Blasting Plan found in the documented entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package. To avoid potential damage, TGP's blasting contractor will conduct pre-blasting of the rock, as needed, and develop site-specific blasting operations and monitoring plans to be approved by TGP. Control of blasting will limit stresses on existing pipelines, nearby structures, water supply wells, oil and gas wells, electrical transmission tower footings, and other utilities located near the project. Blasting activities will not begin until occupants of nearby buildings, stores, residences, businesses, and farms have been notified, and pre-blast inspections have been conducted on structures and water wells. Special care will be taken to monitor and assess blasting within 200 feet of residences and 200 feet of private or public water supply wells. Blasting mats will be used during blasting to keep the material within the approved workspaces. TGP and its blasting contractor will adhere to the provisions in the Draft Blasting Plan, which identifies blasting procedures, including use, storage, and transportation of explosives. Following blasting, where necessary, excess rock will be removed from the construction workspace, subject to affected landowner approval and applicable permit conditions. In areas where rock is predominant and little suitable backfill material is available, rock will be pulverized and placed in the trench as pad material around the pipe.

*Horizontal Directional Drilling (HDD) for trenchless installation*
HDD is a construction technique that is used to install pipelines in areas where traditional open cut excavations are not practicable due to technical feasibility, logistics, and costs. With the HDD method, a small diameter pilot hole is drilled from the entry point to the exit point. Drilling fluids are pumped to the drill bit, to cool the bit, remove rock cuttings, seal the drilled path, and lubricate the drill stem. From there, the hole is widened, and the pipeline is pulled into position. Compared to the other crossing methods, the HDD technique minimizes the impacts to an area by drilling down and under a sensitive resource, leaving the portion of land in between the entry and exit point relatively undisturbed.  HDDs are authorized at three locations that will avoid direct impacts to four streams: Jones Creek (MP 3.2), Yellow Creek and an unnamed tributary (MP 22.4), and Wells Creek (MP 30.7). The use of HDDs at these three locations will be implemented to overcome obstacles posed by use of other stream crossing construction methods that are impracticable because of channel dimensions, flow, or other constraints. The feasibility of HDDs at these three (3) locations has been confirmed by analysis of geotechnical testing. HDD feasibility studies were conducted in June 2022 and provided as "Attachment 7 – HDD Feasibility Studies" submitted to the Division on July 22, 2022, as part of the initial permit application package. In the case of inadvertent release of drilling fluid, TGP and its contractors will follow the HDD contingency plan submitted to the Division as part of "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

Page 34 of 188

Following construction, streambeds will be restored to their pre-construction elevations and grades and as specified in "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package. Spoil, debris, piping, construction materials, and any other obstructions resulting from or used during construction of the pipeline will be removed to prevent interference with normal stream flow. Any excavated material not used as backfill will be removed and disposed of in uplands. Following grading, all waterbody banks will be restored to pre-construction conditions and in accordance with permit requirements.

*Water withdrawals for hydrostatic testing*

In compliance with U.S. Department of Transportation specifications, TGP will conduct hydrostatic testing on all pipeline segments prior to placing them in service. Authorized sources of hydrostatic test water for the Project are identified in Table 2 of this permit. Hydrostatic test manifolds will be located outside of wetlands and riparian areas to the maximum extent practicable. The pipe segments will be capped with manifolds, filled with water, pressurized, and held for one or eight hours. Any significant loss of pressure will indicate that a leak may have occurred and warrant further inspection and, where necessary, repair. Water may be re-used for hydrostatic testing between the new pipeline segments. The test water is expected to contact only new pipe, and no additives or chemicals will be added to the test water. Upon completion of the hydrostatic tests, the hydrotest water will be discharged to an upland area through a dewatering structure consisting of an energy dissipation device and water filtration structure. Environmental impacts from withdrawal and discharge of test water will be minimized by utilizing the measures outlined in the documented entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

Wetlands

No permanent fill or loss of wetland acreage is authorized. However, the project will result in the permanent vegetation conversion of up to 0.03 acres of wetlands from forested to herbaceous within the new permanent easement due to construction clearing and periodic maintenance activities. Post-construction monitoring will be conducted to ensure that the areas are restored and that invasive non-native plant species do not dominate as detailed in "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

*Wetland construction methods*

"Conventional" wetland construction methods support construction equipment without significant soil disturbance. Prior to crossing and movement of construction equipment through these wetlands, the ROW will be stabilized using timber mats to allow for a stable, safe working condition. All trenches will be dewatered according to permit conditions to ensure that work is done in the dry. TGP will segregate up to the top 12 inches of wetland topsoil over the trench line. Trench soil will be temporarily stockpiled in a ridge along the pipeline trench. Gaps in the spoil pile will be left at appropriate intervals to provide for natural circulation or drainage of water. While the trench is dug, the pipeline will be assembled in a staging area located in an upland area. After the pipeline is lowered into the trench, wide-track bulldozers or backhoes supported on timber mats will be used for backfilling, final clean-up, and grading. This method will minimize the amount of equipment and travel in wetland areas. Where necessary, a drag-section may be used with the conventional wetland construction method. The drag-section involves the trenching, installation, and backfill of a prefabricated length of pipeline containing several pipe segments all in one day. The trench is backfilled at the end of each day after the pipe is lowered in as necessary to ensure safety.

**Alternatives Analysis and Selection of Least Impactful Practicable Alternative**

Page 35 of 188

AR 006796

The applicant has submitted potentially practicable alternatives to the activity. The overall stated goal and purpose of the activity is to transport natural gas to TVA from TGP's existing interstate pipeline system, as follows:

> "The proposed Project, which consists of the construction of the approximately 32-mile Cumberland Pipeline and appurtenant facilities (Cumberland Meter Station, Pressure Regulation Station, mainline valves, and inline inspection facilities), will allow TGP to transport approximately 245,040 dekatherms per day ("Dth/d") of natural gas from TGP's existing interstate pipeline system for TVA."

The applicant has considered the following alternatives:

**Alternative 1: Major route variations**

> "TGP conducted an analysis to determine if alternatives to construct and install the Cumberland Pipeline are practicable based on environmental considerations, construction costs, technical feasibility, human safety, and logistics."

> "The proposed Cumberland Pipeline will be constructed and installed generally parallel and adjacent to an existing TVA electric utility easement (approximately 80 percent co-located) and other utility easements."

> "The route for the Project is spatially constrained by two existing and fixed locations: (1) TVA's Cumberland Fossil Plant and (2) TGP's existing natural gas pipeline system (Lines 100-3 and 100-4). A primary routing consideration was co-locating the Cumberland Pipeline with existing utility easements for approximately 80 percent of its length, thereby minimizing environmental and landowner impacts. Based on TGP's analysis, an alternate Project route that is not co-located with existing utility easements would not result in decreased impacts to water quality, and would have additional environmental and landowner impacts than the preferred route, where land-use and property disruptions have already occurred."

> "In order to meet the purpose and need for the Project, the Cumberland Pipeline was designed to extend from the Project receipt point on TGP's existing interstate natural gas pipeline system along the Project's eastern beginning point to the Project delivery point at the location of TVA's proposed combined-cycle combustion turbine gas plant to be located on the Cumberland Fossil Plant Reservation at the Project's western terminus. Because these points are fixed as existing facilities, alternate routes with other starting or terminating points are not practicable or feasible to achieve the Project purpose. TGP's preferred route for the Cumberland Pipeline extends between these two points generally along an existing TVA powerline easement and other utility easements. This route is preferred primarily because of its generally co-located alignment between the Project receipt and delivery points. Further, with regard to Project impacts, disruptions to existing land-use along the TVA powerline easement and other utility easements have already occurred and have been assimilated, minimizing impacts to the environment and to new landowners for alternative routes. Finally, ease of access along the existing TVA easement and other utility easements by use of existing access roads for Project construction and operations provides another advantage for the preferred route as compared to alternative routes. Because of the ubiquitous occurrence of streams and wetlands in the topographically dissected Western Highland Rim Physiographic Province in which the Project is located, it is unlikely that other routes between the Cumberland Pipeline's receipt and delivery points would encounter substantially fewer aquatic resources than those along the preferred route, which is co-located with an existing TVA powerline easement and other utility easements for approximately 80 percent of its length. Further, alternative routes likely would

<center>Page 36 of 188</center>

contain aquatic resources that have not been disturbed by previous utility clearing and maintenance activities. For these reasons, TGP has chosen the route generally extending along the TVA powerline easement and other utility easement as the preferred alternative for the Cumberland Pipeline."

"There are no additional major route alternatives to the Cumberland Project."

**Alternative 2: Minor Route Variations**

"During the process of siting the Project, TGP has and will continue to consider multiple minor route variations to refine the pipeline alignment and to address concerns raised by potentially affected landowners and regulatory agencies. Route variations have been made to accommodate construction limitations, to improve the alignment for features such as roads and waterbody crossings, and to avoid natural features that would be challenging during construction, restoration, and operation of the pipeline, as well as to address landowner concerns. Table 10.2-1 summarizes the route variations that TGP has considered and incorporated in the Project alignment. At this time, TGP continues to refine the pipeline route and address route variations requested by potentially affected landowners and regulatory agencies, which may necessitate further changes to proposed pipeline route."

**TABLE 10.2-1**
**Cumberland Project Minor Route Variations**

| Mile Post | Variation Description | At Landowner Request |
|-----------|----------------------|----------------------|
| 0 | Potential sites for Pressure Regulation Station | |
| 2.3 | Rock ledge avoidance | |
| 3 | Landowner request to shift onto TVA easement | X |
| 4.5 | Avoid building on east side of White Oak Flat Road and eliminate additional pipeline points of inflection | |
| 8.5 | Improve crossing angle at two streams on tract 1.055 | |
| 12.5 | Avoid water feature | X |
| 16.5 | Avoid spring well and align the route for improved stream crossing and create a more perpendicular crossing for Little Bartons Creek | |
| 22.7 | Adjust stream crossing away from middle of the stream | |
| 25 | Avoid side hill construction and align the route to parallel the TVA easement | |
| 26 | Improve crossing angle at Highway 13 and stream (encroaches on TVA) | |
| 30-32 | Address multiple HDD routing issues at Wells Creek | |

"Three minor route variations were evaluated between MP 30-32 where the pipeline needed to be routed away from the original pipeline route (paralleling the TVA powerline easement) to connect to the meter station location specified by the Project Shipper on TVA property."

"Table 10.2-2 summarizes the collective items addressed in the interconnected route variations that were considered between MP 30-32 The preferred route, which incorporates the minor route

Page 37 of 188

AR  006798

variations set forth in Table 10.2-2, results in an increase of approximately 0.12 miles over alternative routes considered between MP 30 and MP 32."

**TABLE 10.2-2**
**Minor Route Variations (Summary MP 30-32)**

| Mile Post | Construction Method | Variation Description (Selected Route) |
|---|---|---|
| 29.8–32 | Upland Construction; Stream-crossing Construction; HDD | Shifted route westward toward TVA's preferred location for the Cumberland Meter Station and to avoid the Stewart Houston Industrial Park. |
| 30.1 | Upland Construction; Stream-crossing Construction | Shifted 50 feet to the south to avoid old railroad bridge supports when crossing abandoned railroad. |
| 30.3–30.8 | Upland Construction; HDD | Moved route to attain a more perpendicular HDD crossing of Wells Creek and avoid crossings of Booster Branch and another tributary to Wells Creek, as well as avoid known cultural resource locations. Moved onto TVA property toward TVA's preferred location for the Cumberland Meter Station. |

For full descriptions of each variation in the tables above please refer to "Attachment 8 – Route Variations" submitted to the Division on July 22, 2022.

During course of application review by TDEC, additional jurisdictional wetlands were found within the ROW. TGP made additional minor route changes to avoid impacts to these features. These changes are summarized in TGP's response to a TDEC Request for Additional Information "TGP & USACE Cumberland Project – TDEC Field Review / Revisions (Supplement 1)", document dated September 29, 2022.

### Alternative 3: Pipeline installation via dry-cut trenching vs. wet-cut trenching

"The dry open cut construction procedure involves isolating the streambed work area from the stream to allow the construction to be performed in a controlled "dry" state by temporarily diverting the stream around the work area. The most common dry open cut methods include the flumed crossing and the dam and pump crossing methods. The dry open cut method has been selected as the preferred crossing method for the majority of waterbody crossings for the Cumberland Pipeline. The two main types of dry open cut crossing methods are discussed below. While dry open cut methods result in increased time to cross a stream as compared to wet open cut methods, the potential for weather to affect the flow in the stream and thus the crossing, and the ability to handle flow volume, some stream flow may not be appropriately handled by the use of the dry open cut crossing methods. In that case, a trenchless crossing method (HDD or conventional bore method, as discussed below) may be more appropriate."

"In the flumed crossing method, a flumed stream crossing redirects the water flow through one or more pipes to allow for the trenching and pipe installation to occur in dry conditions. The number, length, and diameter of the pipes are dependent on estimated stream flow for the stream being crossed. The major advantage of this method is that it allows for dry trenching, pipe installation, and restoration, while maintaining continuous downstream flow and passage for aquatic organisms. Further, because this method isolates the stream flow from the construction activities, the only downstream turbidity that is created is during the dam/flume installation."

"The dam-and-pump crossing method is primarily used for stream crossing where pumps and hoses can adequately transfer stream flow volumes from upstream work to downstream of the work area,

Page 38 of 188

and where there are no concerns with preventing the passage of aquatic organisms. The major advantage of this method is that it allows for dry trenching, pipe installation, and restoration, while maintaining continuous downstream flow. Further, because this method isolates the stream flow from the construction activities, the only downstream turbidity that is created is transient conditions of short duration during the dam installation. Both methods require that the waterway is dewatered in the construction area by pumping the standing water into a dewatering structure on the banks. The streambed material is then segregated and stockpiled to prevent mixing with other materials and used during the stream restoration process. In terms of adverse environmental effects and practicability, these two methods are essentially equivalent."

### Alternative 4: Rock removal methods for trenched pipeline installation

"If bedrock is encountered during trenching, TGP plans to remove such bedrock using one of the techniques detailed below. The technique selected by TGP's construction contractor will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location. Techniques to be used are the following:

> 1. Conventional excavation with an excavator;
> 2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;
> 3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;
> 4. Removal by rock trencher; or
> 5. Controlled blasting and excavation with a backhoe."

"[The conventional excavation] method consists of using a backhoe to dig a trench. It is most effective in poorly or unconsolidated materials, such as a dry stream bed underlain by fluvial materials. In conditions supporting its use, including unconsolidated substrate materials that can be relatively easily removed, Conventional Excavation ("CE") presents little environmental risk to water quality and is the most practicable alternative considering technical feasibility, logistics, and costs. However, in instances where tougher substrate materials are present, this alternative may not be practicable because of technical infeasibility. Accordingly, CE will not be used to trench across channels with exposed bedrock substrate. For channels covered by unconsolidated materials overlying bedrock at greater depths, CE will be used to depths at which it is practicable, but removal of deeper materials will necessitate selection among the additional methods described below."

"[The ripping] method makes use of an excavator equipped with concave tooth that is inserted into and dragged through substrate materials. After ripping, a conventional excavator is used to remove the dislodged materials from the trench. For streams at which bedrock is encountered at or beneath the streambed surface, ripping will be the preferred alternative in terms of least environmentally adverse effects because it confers little or no risk of hydrologic loss."

"[The hammering method] entails use of a pneumatic tool attached to a backhoe boom to break apart substrate materials. After hammering, a conventional excavator is used to remove the dislodged materials from the trench. Hammering is time-consuming and increases construction costs considerably in comparison with CE or ripping. Further, hammering exposes equipment operators to prolonged hours on the work-site, potentially resulting in safety risks. Hammering also entails a risk of fracturing potentially resulting in hydrologic loss."

AR 006800

"[The rock trenching] method uses a large trenching machine to cut through bedrock. Although costly to mobilize, this method can reduce construction time at the work site. Primary disadvantages are cost and inaccessibility for many sites where tight space or steep slopes prevent the effective use of the equipment."

"At stream crossings, TGP's construction contractor will evaluate and attempt the use of [each of the] Techniques 1-4 described above based on the conditions observed at the time of construction to determine the best method for rock removal and excavation. If [Techniques 1-4 are] unsuccessful for rock removal and excavation at stream crossings, Technique 5 (controlled blasting) will be considered in non-karst areas or in wetlands or streams with an unacceptable risk of hydrologic loss. The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location at which a bedrock substrate has been identified (see [Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "Aquatic Resource Alteration Permit (ARAP) Application and State 401 Water Quality Permit" submitted to the Division on July 22, 2022, as part of the initial permit application package]). If controlled blasting is necessary at a waterbody or wetland crossings, TGP's construction contractor will utilize a dry-ditch crossing method (either dam-and-pump or flume crossing) and adhere to 1) all applicable federal, state, and local regulations, including the FERC Procedures, USACE and TDEC permit conditions, 2) Draft Blasting Plan (see ["Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package], and 3) karst mitigation measures. Immediately following blasting, TGP would remove rock that impedes stream flow."

"The use of the dry open cut method with controlled blasting will only be used if other rock removal methods have been evaluated but deem impracticable. TGP anticipates that controlled blasting will be used rarely to facilitate waterbody crossings. In no event will controlled blasting be used in karst-prone areas or wetlands. A desktop analysis of the study area has identified a few areas of shallow bedrock where controlled blasting may become necessary to cross certain waterbodies using the dry open cut construction method (see [Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "Aquatic Resource Alteration Permit (ARAP) Application and State 401 Water Quality Permit" submitted to the Division on July 22, 2022, as part of the initial permit application package]). TGP's Draft Blasting Plan is provided in ["Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package]. In the unlikely event that controlled blasting is needed, a qualified contractor will review and update this plan to address the specific circumstances of each dry open cut waterbody crossing that requires controlled blasting to remove rock. A qualified Project biologist will survey the area immediately in advance of the controlled blasting activities, including any drilling. for the presence of any sensitive species. Once cleared, holes will be drilled into the streambed and carefully loaded with explosives and packed with aggregates. A pre-blast safety check will then be performed followed by the controlled detonation of the explosives, which will result in a small release of dust and mounding of the surface. The use of controlled blasting would drastically minimize the duration of in-stream work and temporary disruptions to stream flow. The overall area of construction impacts when using controlled blasting is significantly smaller in comparison to other construction methods and results in less costs given reduced time in the workspace. However, the use of controlled blasting may confer a higher risk of loss of stream flow than other crossing construction methods; thus, it is not generally considered to be the [least environmentally damaging practicable alternative] at locations where other methods are feasible and practicable. Although TGP expects the use of blasting for the removal of rock at

Page 40 of 188

waterbody crossing for the Project to be limited and has eliminated the use of controlled blasting for rock removal for use in karst-prone areas, crossing conditions at non-karst prone locations where CE, ripping, hammering, or rock trenching are technically infeasible to dislodge bedrock materials may require controlled blasting as the only practicable alternative. In these instances, TGP will ensure that controlled basting is localized and isolated to within the trench line to minimize the movement of materials outside of the waterbody. Drill patterns will be set so that they achieve smaller rock fragments, which will allow for the use of as much of the fragmented rock as possible when restoring the trench to its pre-construction condition. Rock fragments also will be shifted, as needed, to maintain the contours and flow patterns of the waterbody after the blasting is complete."

"TGP will not utilize the dry open cut crossing method with controlled blasting for rock removal in wetland habitats."

### Alternative 5: Pipeline installation via trenchless methods vs. open-cut trenching

"The HDD method is a trenchless construction procedure in which a waterbody is crossed by pulling the prefabricated pipeline into place using drilled boreholes. In this procedure, a small diameter pilot hole is drilled down from an entry point to an exit point by pumping a slurry mixture of bentonite clay, drilling additives, and water into the ground at high pressure. The hole is then widened, and the pipeline is pulled into position. The HDD method has been a standard construction procedure for linear pipeline installations across large waterbodies since the 1970s. This construction procedure drastically reduces the impacts to waterbodies and their aquatic environments by drilling down and under the sensitive resource, resulting in the surface area between the entry and exit point remaining relatively undisturbed. While the HDD method is a proven technology for pipeline installations, there is still the potential that the HDD method can fail for reasons such as encountering soil conditions that are not conducive to boring, borehole collapse, and loss of the drill string or drilling fluid return. TGP has performed a feasibility analysis of the study area to determine if HDD is a viable waterbody crossing method. This analysis included geological surveys, reviews of nearby public drinking water sources, private wells, and mining activities (active and abandoned). Three (3) HDDs are being proposed for the Project at the following waterbodies: (1) Yellow Creek, (2) Jones Creek, and (3) Wells Creek. Prior to the final HDD determination, TGP conducted geotechnical investigations in June 2022 at each of these three crossings to assess the characteristics of the geologic formations. This information was reviewed, and it was confirm that a HDD is technically feasible for each crossing given the specific geology evaluated by project engineers to ensure the HDD has a high rate of success."

"Conventional boring consists of creating a shaft/tunnel for a pipe or conduit to be installed to minimize surface disturbance. This is accomplished by first excavating a bore pit and a receiving pit. The bore pit is excavated to a depth slightly deeper than the depth of the associated trench and is graded such that the bore will follow the proposed angle of the pipe. A boring machine is then lowered to the bottom of the bore pit to tunnel using a cutting head mounted on an auger. The auger rotates through a bore casing, both of which are pushed forward as the hole is cut. The pipeline is then installed through the bored hole and welded to the adjacent pipeline. The typical workspace configurations required for boring operations consist of staging areas (50 feet by 100 feet) for boring machine setup, cuttings/return settlement and storage pits, pipe storage, entrance and exit pit spoil storage, and construction equipment necessary to support the operation. Major factors limiting the success of a boring operation under waterbodies for the Project include the crossing

Page 41 of 188

AR 006802

distance, subsurface soil and geologic conditions, and existing topography. Boring operations typically occur over a crossing distance of 50 to 60 feet. The maximum length a bore could achieve in ideal soil conditions typically does not exceed 400 feet. Subsurface soil and geologic conditions must be conducive to establishing and maintaining a safe bore pit excavation, as well as provide the capabilities for the boring equipment to conduct a successful bore. Loosepacked sediment, free of rock material, is preferred when conducting boring operations. The topographic conditions for most waterbody crossing locations on this Project also limit the use of this method, as preferred locations are generally consistent with level or moderately convex terrain, such that the depth of the bore pit does not present concerns relative to constructability or safety constraints."

"TGP considered six (6) factors when evaluating the use of HDD or conventional bore crossing methods versus a dry open-cut method for Project waterbody crossings: (1) the length of the crossing, (2) the potential for risk of loss of drilling fluid (i.e., inadvertent/lost returns), (3) geological considerations, and (4) length of time of the crossing (5) worker safety and technical feasibility, and (6) cost of the crossing method. For a 30-inch diameter pipe, as will be installed for the Project, the minimum distance needed to achieve the necessary radius for the HDD pipe string is approximately 1,300 feet, which means that each HDD must be at least 1,300 feet long, regardless of the width of the feature it is avoiding in order to reduce stress pressure on the pipeline. Considering the undulating topography of the Project area, many HDD entry/exit pads or conventional bore entry/exit pits likely would be located on slopes, which create a construction safety and technical feasibility challenge. Further, given the need for HDD or conventional bore entry and exit pads or pits to be at or near the same elevation to promote drill cutting returns, use of these methods in hilly terrain may not be practicable. For example, if either the entry or exit points is at a higher location than the other, greater annular pressure is needed to facilitate the drill cutting returns. This increase in pressure could contribute to additional risks of inadvertent returns to the formation or to the surface. Inadvertent returns are characterized by drilling fluid flowing through the underlying formation and finding a pathway of least resistance to the surface or to voids in the formation. These returns may be expressed on land or in the feature that is being avoided. Although the drilling fluid is generally inert bentonite clay that is not toxic or harmful, it may be discharged to downstream waters. In that event, inadvertent returns would be contained and cleaned up once identified. Costs associated with an HDD and Conventional Bore, in general, may be five (5) times more per foot than costs for a conventional crossing using open cut methods, which can become prohibitive to the Project budget (see ["Attachment 9 – Summary of Trenchless Construction Methods for the Cumberland Project" submitted to the Division on July 22, 2022, as part of the initial permit application package]). Geology plays a major role in the success of an HDD or conventional bore. In an area without the appropriate geology to support an HDD or conventional bore, the drilling hole will not maintain its integrity and could collapse, causing delays. In other areas, if the geology contains large boulders or voids, the drilling head cannot negotiate these obstacles and the bore may fail. Further, for a HDD, in order for the radius of the drill and pipe to be maintained, the boring must be made to greater depths in the formation, potentially impacting groundwater resources or karst topography. HDD and conventional bores take more time to complete than open cut crossings due to the amount of drilling equipment necessary, the mobilization and demobilization of the drilling equipment, the drilling itself, pipe preparation, and for a HDD, the pullback of the pipeline. For the proper pullback of the pipeline, the same length of construction workspace is needed to accommodate a straight entry into the exit point of the HDD. In some cases, due to pipeline inflections, and the lack of available straight construction workspace, a false ROW may be needed, thus increasing potential impacts. A false ROW is a work area approximately 50 feet wide by the length of the HDD pullback section that is

Page 42 of 188

AR 006803

prepared to stage the pipeline. Generally, HDDs can take a month or longer to complete. HDDs occur over a longer timeframe with continuous activities throughout the procedure in comparison to open cut methods. During this time, there is the possibility of impacts to noise sensitive areas, inadvertent returns, and equipment failures throughout the duration of the HDD. When comparing an HDD or conventional bores to conventional open cuts of streams/wetlands, the issues associated with the HDDs and conventional bores are reduced or mitigated by the use of open cut methods. For example, the trench line for open-cut methods is much shallower across a stream, thus minimizing the potential impact to deep geological features. Also, there is no need for long pull back sections for conventional open cut crossings because there is no minimum length of pipeline that is needed to cross a stream. The length of the pipeline is dictated by the stream width, not the necessity to maintain a certain radius to reduce pipe stressors, as is the case with an HDD. There are no risks of inadvertent returns for a conventional open cut crossing as no drilling fluid is used during the process. The conventional open cut crossing is a straightforward digging of the trench line, installing the pipeline, and backfilling with native material. At all times during a conventional dry open cut of a stream, the contactor is able to see the trenchline and the surrounding work zone, unlike that of a HDD or conventional bore, which increases the safety factor. Also, in general, it takes one to two days to complete a conventional open cut crossing (if not using controlled blasting for rock removal), as opposed to at least one month for an HDD or up to 10 days for a conventional bore. While the timing of an open cut crossing can be extended for certain reasons, such as weather, stability of the trench line, and water flow, the time for an open cut crossing is still much less than that for an HDD. Notwithstanding the concerns outlined above, HDDs are proposed for certain crossings to avoid environmental impacts at two Natural Rivers Inventory stream reaches (Jones Creek and Yellow Creek) and due to the physical characteristics of Wells Creek. The HDD at Yellow Creek will also avoid direct impacts to one of its unnamed tributaries."

Based on the available information the Division has made a final determination that applicant has demonstrated that the route selection method and process for determining the appropriate crossing method will result in the use of the least impactful practicable alternative to accomplish the project purpose.

**Existing Conditions/ Loss of Resource Values**

Streams
Jurisdictional streams identified within the project impact areas are characterized by predominantly silt/clay substrates. Several intermittent and perennial streams within the study area are characterized by bedrock, cobble, and gravel substrates. Fish, amphibians, and populations of benthic macroinvertebrates were observed in some of the streams during TGP's on-site aquatic resource inventory. A summary of stream channel dimensions and general characteristics can be found in Table D-1 within "TGP & USACE Cumberland Project – TDEC Field Review / Revisions (Supplement 1)", dated September 26, 2022.

Reservoir
Barkley Reservoir (Cumberland River) is located adjacent to the existing TVA Cumberland Fossil Plant in Cumberland City, Tennessee. This segment of the reservoir is an Exceptional Tennessee Water due to the observed presence of state-listed aquatic animal species.

Wetlands
The wetlands to be impacted by the project are characteristic of low to moderate resource value wetlands typically found in the region. Dominant tree species in the PFO wetlands along the proposed alignment includes red maple (*Acer rubrum*), sweetgum (*Liquidambar styraciflua*), tulip poplar (*Liriodendron*

AR  006804

*tulipifera*), and blackgum/black tupelo (*Nyssa sylvatica*). Dominant herbaceous species in the PEM wetlands along the proposed alignment includes bluestem (*Andropogon* spp.), soft rush (*Juncus effusus*), beaksedge (*Rhynchospora* spp.), blackberry (*Rubus argutus*), goldenrod *(Solidago elliottii)*, and dog fennel (*Eupatorium capillifolium)*.

Permanent impacts to streams and wetlands include ongoing vegetation management in riparian zones. A corridor above the pipeline and up to 10 feet wide may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state, resulting in conversion of plant communities in forested riparian zones and forested wetlands to herbaceous/emergent or scrub-shrub plant communities. In addition, individual trees that are located within 15 feet of the pipeline that have roots that could compromise the integrity of the pipeline coating may be cut and removed from the permanent right-of-way. These impacts will not result in loss of wetland acreage.

Temporary wetland and stream impacts will be mitigated by returning impacted areas to original elevation and condition following appropriate erosion prevention and sediment control measures. All features that are temporarily impacted will be monitoring annually for three years following completion of project construction to ensure no net loss of resource value by the Division.

In an email from TWRA to consultants of TGP dated August 31, 2022 (provided in Attachment 6 of the documented entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022), TWRA states:

> "It is TWRA's understanding that state listed species (outlined in TWRA's consultation from August, 2, 2022) will not be impacted by the current design of the project" and "With the above understandings, TWRA agrees that time-of-year restrictions for state protected species do not apply to the Cumberland Project, and that the project will have no effect on state listed species." On October 3, 2022, TWRA conveyed to a consultant of TGP via email that "The TWRA has no concerns for non-listed aquatic species as outlined by the project location that was presented to TWRA on 7/19/2022."

In a letter to a consultant of TGP dated June 29, 2021 (provided with initial permit application materials submitted to the Division on July 22, 2022 in "Attachment 4 – Agency Correspondences"), the TDEC Division of Natural Areas states:

> "The Division of Natural Areas - Natural Heritage Program has reviewed the location of the proposed project workspace with respect to rare plant species. While the extent of the project (33.2 miles) makes the project more likely to encounter rare species at previously unsurveyed locations, the current project route is mostly confined to a previously established ROW and comes within one mile of just two rare plant records – neither of which are in the project area - at the easternmost extent of the route. Thus, we do not anticipate any impacts to known occurrences of rare, threatened, or endangered plant species from this project and believe risk to unknown occurrences is minimal."

The Division has made a final determination that the overall activities, if conducted in accordance with the submitted plans and permit conditions, will not result in any appreciable permanent loss of resource values.

## Mitigation Required

The Division has made a final determination that the authorized impacts to jurisdictional waters, if carried out in accordance with the permit's conditions, will result in *de minimis* degradation; therefore, compensatory mitigation is not required.

AR 006805

**Social or Economic Justification Information**

Formal social and economic justification for the impacts associated with this activity is not required based on the Division's final determination that the authorized impacts to jurisdictional waters will result in *de minimis* degradation. However, the applicant has provided the following information on social and economic justification:

> "… construction of the Project will have a net positive impact on local and regional businesses within counties impacted by the Project. TGP estimates that approximately $17,300,000 in Dickson County, $8,100,000 in Houston County, and $1,300,000 in Stewart County ($26,700,000 total) will be distributed in construction payroll for personnel working at the various Project sites over the 12-month construction period. During construction, it is anticipated that 20 to 30 percent of worker payroll will be spent locally by both local and nonlocal workers for the purchase of housing, food, gasoline, entertainment, and luxury items. The dollar amount would be dependent on the number of construction workers employed at any given time and the duration of the non-local worker's residence in the Project area.
>
> It is also anticipated that some portion of construction materials will be purchased locally. Material purchases, including construction equipment, pipe, and valves, are estimated to be $16,500,000 in Dickson County, $6,800,000 in Houston County, and $2,200,000 in Stewart County ($25,500,000 total), including freight and taxes. An additional estimated $71,000,000 in Dickson County, $34,500,000 in Houston County, $3,900,000 in Stewart County ($109,400,000 total) will be spent by TGP on other construction related expenditures, for a total estimated construction cost of $161,600,000. These payroll and materials expenditures will have a positive impact on the local economy.
>
> Construction and operation will result in increased tax revenues for the state of Tennessee, Dickson County, Houston County, and Stewart County, and potentially other local taxing authorities. The prevailing state sales tax rate for most items in Tennessee is seven percent. An additional 2.75 percent county sales tax is levied in Dickson and Houston counties. In Stewart County, an additional 2.25 percent sales tax is levied. Assuming all material purchases are taxed at an effective sales tax rate of 9.25 percent, TGP will pay approximately $2,300,000 in sales tax during construction. Once in operation, TGP will also pay ad valorem taxes based on the assessed value of the Project facilities. TGP estimates paying approximately $2,400,000 annually in ad valorem taxes on average over the first 10 years of Project operations. Ad valorem taxes are anticipated to be paid annually at similar or higher levels for the remaining life of the Project.
>
> Although the preferred Cumberland Pipeline route that is co-located generally with an existing TVA powerline easement and other utility easements (for approximately 80 percent of its length) is the [Least Environmentally Damaging Practicable Alternative], other routes extending from TGP's existing interstate natural gas pipeline system to TVA's Cumberland Fossil Plant would not vary in terms of socioeconomic benefits. Use of an alternate route would unnecessarily result in land-use disruptions that have primarily already occurred in constructing and maintaining the TVA powerline and easement and other utility easements. Social and economic consequences to property owners or local communities of the considered crossing methodologies summarized in [Table 1 of this permit and Table 10.5-1 of TGP's initial permit application materials] would be minor, and

Page 45 of 188

would not materially vary, as the method to be implemented at each crossing is limited in area and length with no more than localized, temporary effects.

The Project is not anticipated to have significant adverse impacts during construction or operation on population, employment, regional or local services, traffic or transportation, residences or businesses, or minority communities. In addition, TGP has identified environmental justice communities near the location of the Project, and will continue to identify and address any concerns of these environmental justice communities (designated below poverty level but not with disproportionately high minority populations). TGP's communication and involvement with the environment justice communities is ongoing and will continue through the certificate, permitting, construction, and restoration phases of the Project. TGP will continue its engagement of minority and low-income populations in proximity to the proposed Project through meaningful participation and coordination with community leaders and groups within environmental justice communities. TGP plans to take the following steps during the certificate, permitting, construction, and restoration phases of the Project to continue to inform and engage environmental justice communities: (1) beginning in the third quarter 2022, conduct small group discussions (e.g., 5-10 people) with community leaders and organizations in environmental justice communities to discuss the Project and any concerns or issues; (2) beginning in the third quarter 2022, provide formal presentations to groups in the impacted environmental justice communities; (3) distribute Project information to community partners for further distribution within their communities; and (4) translate certain Project materials for distribution within environmental justice communities, as well as portions of the Project website, Overall, Project construction activities are anticipated to have temporary, short-term impacts on population, housing, public services, and traffic and transportation, and will provide an overall net positive impact on employment and the local economy when the Project is operational."

**Antidegradation**

In accordance with the Tennessee Antidegradation Statement (Rule 0400-40-03-.06):

For impacts to streams in the TDEC Waterbodies known as Unnamed tributaries to Harpeth River, Jordan Branch, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, and Wells Creek, the Division has made a final determination that the authorized activities will result in *de minimis* degradation of waters with available parameters for habitat alteration and/or water withdrawals without mitigation, and will not result in an appreciable permanent loss of resource values.

For impacts to Barkley Reservoir, the Division has made a final determination that the authorized activities will result in *de minimis* degradation of Exceptional Tennessee Waters without mitigation, and will not result in an appreciable permanent loss of resource values.

For impacts to streams in the TDEC Waterbody known as Unnamed tributaries to Jones Creek, the Division has made a final determination that the authorized activities will result in no significant degradation in a waterbody with unavailable parameters for habitat alteration because the activities will not result in an appreciable permanent loss of resource values.

Page 46 of 188

AR 006807

For impacts to jurisdictional wetlands, the Division has made a final determination that the authorized activities will result in *de minimis* degradation of waters with available parameters for alteration without mitigation, and will not result in an appreciable permanent loss of resource values.

For more information please reference Tennessee's Antidegradation Statement which is found in Chapter *0400-40-03* of the Rules of the Tennessee Department of Environment and Conservation.

Page 47 of 188

AR  006808

Cumberland Gas Pipeline Project; NRS22.192
§401 Water Quality Certification

**Tables**

Table 3: list of features to be impacted that have been identified by TDEC to be WWCs.

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SDKA001 | UT to Jordan Branch | N/A (WWC) | N/A (WWC) | 36.1730 | -87.2174 | 112.2 |
| SDKA002 | UT to Jordan Branch | N/A (WWC) | N/A (WWC) | 36.1733 | -87.2176 | 10.8 |
| SDKA012 | UT to Jones Creek | N/A (WWC) | N/A (WWC) | 36.1979 | -87.2590 | 99.1 |
| SDKA015 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.1984 | -87.2649 | 55.5 |
| SDKA016 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.1989 | -87.2655 | 20.9 |
| SDKA017 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2025 | -87.2730 | 97 |
| SDKA019 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2032 | -87.2735 | 76.9 |
| SDKA020 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2078 | -87.2827 | 127 |
| SDKA024 | UT to Upper Sugar Camp Branch | N/A (WWC) | N/A (WWC) | 36.1663 | -87.2063 | 93.2 |
| SDKA028 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2114 | -87.2891 | 14.7 |
| SDKA029 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2121 | -87.2909 | 75.3 |
| SDKA030 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2141 | -87.2944 | 33.2 |
| SDKA031 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2101 | -87.2907 | 40.4 |
| SDKA035 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2186 | -87.3039 | 43.1 |

AR  006809

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SDKA037 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2237 | -87.3132 | 76.2 |
| SDKA040 | UT to Harris Branch | N/A (WWC) | N/A (WWC) | 36.2291 | -87.3231 | 111.4 |
| SDKA047 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2749 | -87.4715 | 109 |
| SDKA050 | UT to Jones Creek | N/A (WWC) | N/A (WWC) | 36.1896 | -87.2484 | 79.3 |
| SDKA056 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2747 | -87.4652 | 60 |
| SDKA057 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2747 | -87.4652 | 91.2 |
| SDKB006 | UT to Nesbitt Branch | N/A (WWC) | N/A (WWC) | 36.2441 | -87.3658 | 80 |
| SDKB007 | UT to Nesbitt Branch | N/A (WWC) | N/A (WWC) | 36.2455 | -87.3687 | 72 |
| SDKB010 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2585 | -87.4036 | 80.3 |
| SDKB013 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2649 | -87.4211 | 174.3 |
| SDKB015 | UT to Woods Valley Branch | N/A (WWC) | N/A (WWC) | 36.2670 | -87.4302 | 95.4 |
| SDKB016 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2683 | -87.4353 | 78.7 |
| SDKB017 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2691 | -87.4373 | 77.6 |
| SDKB018 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2696 | -87.4396 | 297.9 |

Page 49 of 188

AR  006810

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SDKB019 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2706 | -87.4435 | 97.3 |
| SDKB020 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2710 | -87.4460 | 70 |
| SDKB024 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2740 | -87.4609 | 74 |
| SDKR002 | UT to Furnace Creek | N/A (WWC) | N/A (WWC) | 36.2474 | -87.3755 | 125.3 |
| SDKR003 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2609 | -87.4118 | 75.4 |
| SDKR004 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2609 | -87.4118 | 26.4 |
| SDKR006 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2609 | -87.4118 | 94.2 |
| SDKR007 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2656 | -87.4237 | 106.8 |
| SDKR009 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2671 | -87.4301 | 11.3 |
| SDKR010 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2881 | -87.5081 | 115.1 |
| SDKR011 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2893 | -87.5121 | 96.2 |
| SHNA002 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3401 | -87.6140 | 5.4 |
| SHNA003 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3404 | -87.6145 | 50 |
| SHNA005 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3406 | -87.6148 | 38.7 |

Page 50 of 188

AR  006811

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| **TGP Waterbody ID** | **TGP Waterbody Name** | **TDEC Waterbody ID** | **TDEC Waterbody Name** | **Lat.** | **Long.** | |
| SHNA007 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3429 | -87.6182 | 20 |
| SHNA013 | UT to Lickskillet Branch | N/A (WWC) | N/A (WWC) | 36.3557 | -87.6390 | 124.4 |
| SHNB031 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3429 | -87.6182 | 83 |
| SHNB032 | UT to Lickskillet Branch | N/A (WWC) | N/A (WWC) | 36.3558 | -87.6400 | 84.2 |
| SHNB034 | UT to Lickskillet Branch | N/A (WWC) | N/A (WWC) | 36.3663 | -87.6556 | 77.9 |
| SHNC001 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.3376 | -87.6087 | 56.6 |
| SHNC002 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.3401 | -87.6140 | 17.6 |
| SHNC003 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.3404 | -87.6145 | 93.3 |
| SHNC004 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2978 | -87.5409 | 71.9 |
| SHNC005 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.297882 | -87.5421 | 110 |
| SHNC006 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.2986 | -87.5439 | 74 |
| SHNC006 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.2985 | -87.5451 | 80 |
| SHNC015 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3038 | -87.5628 | 124.7 |
| SHNC016 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3041 | -87.5630 | 98.5 |

Page 51 of 188

AR 006812

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SHNC017 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3038 | -87.5626 | 81.6 |
| SHNC019 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3099 | -87.5766 | 77.2 |
| SHNC021 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3106 | -87.5796 | 87.1 |
| SHNC022 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3114 | -87.5814 | 116.4 |
| SHNC023-2 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3187 | -87.5878 | 20.6 |
| SHNC024 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3130 | -87.5847 | 80.7 |
| SHNC025 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3141 | -87.5860 | 89.7 |
| SHNC041 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2951 | -87.5318 | 75.2 |
| SHNC042 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2945 | -87.5296 | 83 |
| SHNE001 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3070 | -87.5710 | 134.1 |
| SHNE002 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3099 | -87.5770 | 12 |
| SHNE002 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3098 | -87.5770 | 90 |
| SHNE004 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3252 | -87.5947 | 64 |
| SHNE004 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3253 | -87.5948 | 76 |

Page 52 of 188

AR  006813

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SHNE005 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3267 | -87.5955 | 102 |
| SHNE006 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3268 | -87.5957 | 76.1 |
| SHNE007 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3225 | -87.5920 | 77.2 |
| SHNW002 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2909 | -87.5186 | 22.5 |
| SHNW003a | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2945 | -87.5231 | 162 |
| SHNW004a | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2931 | -87.5251 | 79.6 |

[1] All features listed above are considered WWCs by the State of Tennessee, and do not require an Aquatic Resource Alteration Permit for the alterations proposed. In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), the impacts to WWCs shall require no notice or approval, and do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions in the Tennessee Water Quality Control Act 69-3-108(q).

AR 006814

Cumberland Gas Pipeline Project; NRS22.192
§401 Water Quality Certification

**Site maps**

Note: PDF versions of these maps, which may enhance visibility of map features, can be found in "Attachment 1 – Updated Aerial and USGS Figures" in the RAI response document submitted by TGP to the Division on December 1, 2022. Photos of each waterbody crossing are available in the document entitled "Attachment 3 – Project Design Plans and Permit Drawings" submitted with the initial permit application packaged to the Division on July 22, 2022.



AR 006815



JA0055

AR 006816



Page 56 of 188

AR 006817



AR 006818



JA0058

AR 006819



Page 59 of 188

AR  006820



AR 006821



Page 61 of 188

AR 006822



Page 62 of 188

AR 006823



AR 006824



AR  006825



Page 65 of 188

AR  006826



Page 66 of 188

AR 006827



AR 006828



Page 68 of 188

AR 006829



AR 006830



JA0070

AR 006831



AR 006832



AR 006833



AR 006834



JA0074

AR 006835



AR 006836



AR_006837



AR 006838



Page 78 of 188

AR 006839



Page 79 of 188

AR 006840



JA0080

AR 006841



Page 81 of 188

AR 006842



Page 82 of 188

AR 006843



Page 83 of 188

AR 006844



AR 006845



AR 006846



Page 86 of 188

AR 006847



AR 006848



AR 006849



Page 89 of 188

AR 006850



AR 006851



Page 91 of 188

AR 006852



AR 006853



Page 93 of 188

AR 006854



AR 006855



Page 95 of 188

AR 006856



AR 006857



AR 006858



AR 006859



AR 006860



AR 006861



AR 006862



Page 102 of 188

AR 006863



AR 006864



JA0104

AR 006865



Page 105 of 188

AR 006866



AR 006867



Page 107 of 188

AR 006868



AR 006869



AR 006870



Page 110 of 188

AR 006871



AR 006872



Page 112 of 188

AR 006873



JA0113

AR 006874



AR 006875



Page 115 of 188

AR 006876



AR 006877



AR 006878





Page 118 of 188

AR 006879



Page 119 of 188

AR 006880



Page 120 of 188

AR 006881



Page 121 of 188

AR 006882



AR 006883



AR 006884



AR 006885



AR 006886



AR 006887



AR 006888



AR 006889



AR 006890



Page 130 of 188

AR 006891



AR 006892



Page 132 of 188

AR 006893



AR 006894



Page 134 of 188

AR 006895



AR 006896



AR 006897



AR 006898



Page 138 of 188

AR 006899



AR 006900



JA0140

AR 006901



AR 006902



AR 006903



AR 006904



Page 144 of 188

AR 006905



Page 145 of 188

AR 006906



AR 006907



Page 147 of 188

AR 006908



Page 148 of 188

AR 006909



Page 149 of 188

AR 006910



AR 006911



Page 151 of 188

AR 006912



JA0152

AR 006913



Page 153 of 188

AR 006914



Page 154 of 188

AR 006915



Page 155 of 188

AR 006916



Page 156 of 188

AR 006917



Page 157 of 188

AR 006918



Page 158 of 188

AR 006919



Page 159 of 188

AR 006920



AR 006921



Page 161 of 188

AR 006922



Page 162 of 188

AR 006923



Page 163 of 188

AR 006924



Page 164 of 188

AR 006925



AR 006926



Page 166 of 188

AR 006927



AR 006928



AR 006929



Page 169 of 188

AR 006930



Page 170 of 188

AR 006931



AR 006932



Page 172 of 188

AR 006933



AR  006934



Page 174 of 188

AR 006935



Page 175 of 188

AR 006936



Page 176 of 188

AR 006937



AR 006938

Cumberland Gas Pipeline Project; NRS22.192
§401 Water Quality Certification



Above: water withdrawal locations.

AR 006939

**Plans and drawings**

Note: full sized PDFs of the drawings and photos of each waterbody crossing are available in the document entitled "Attachment 3 – Project Design Plans and Permit Drawings" submitted with the initial permit application packaged to the Division on July 22, 2022. Note that minor revisions to pipeline alignment are shown in updated maps and plans found in "Attachment 1 – Revised USGS Figure" in the RAI response document submitted by TGP to the Division on March 17, 2023.

AR  006940



JA0180

AR 006941



AR 006942



Page 182 of 188

AR 006943



TYPICAL ADDITIONAL TEMPORARY WORK SPACE AT CREEK CROSSINGS

NOTES:

1.  THIS TYPICAL WORK SPACE LAYOUT WILL BE ADJUSTED TO ACCOMMODATE SITE-SPECIFIC CONDITIONS.

2.  THE SIZE OF THE ADDITIONAL TEMPORARY WORKS SPACE (ATWS) WILL VARY WITH THE DEPTH OF THE CREEK, STEEPNESS OF THE SURROUNDING SLOPES, AND OTHER CONDITIONS.

Page 183 of 188

AR 006944



EXTRA TEMP. WORKSPACE
(AS REQUIRED)
CONSTRUCTION R.O.W. WIDTH

PLAN VIEW

NOTES:

1. METHOD APPLIES TO WATERBODIES WHERE DOWNSTREAM SILTATION MUST BE AVOIDED. FLUMES ARE GENERALLY NOT RECOMMENDED FOR USE ON WATERBODIES WITH A BROAD UNCONFINED CHANNEL, PERMEABLE SUBSTRATE, EXCESSIVE DISCHARGE, OR WHERE A SIGNIFICANT AMOUNT OF BED OR BANK ALTERATION IS REQUIRED TO INSTALL FLUMES OR DAMS.

2. SCHEDULE CROSSING DURING LOW FLOW PERIOD IF POSSIBLE.

3. COMPLETE ALL WATERCOURSE ACTIVITIES AS EXPEDIENTLY AS POSSIBLE.

4. NO REFUELING OF MOBILE EQUIPMENT WITHIN 100 FEET OF WATERBODY. REFUEL STATIONARY EQUIPMENT AS PER THE SPCC PLAN.

5. INSTALL TEMPORARY EQUIPMENT CROSSING.

6. IN AGRICULTURAL LAND, STRIP TOPSOIL FROM SPOIL STORAGE AREA.

7. IN-STREAM SPOIL TO BE STORED ON BANKS A MINIMUM OF 10 FEET FROM THE TOP OF THE BANK.

8. LEAVE HARD PLUGS AT THE STREAM BANK EDGE UNTIL JUST PRIOR TO PIPE INSTALLATION.

9. SIZE FLUME TO HANDLE 150 % ANTICIPATED FLOWS. INSTALL FLUME IN WATERCOURSE AND MAINTAIN CORRECT ALIGNMENT UNTIL REMOVED.

10. CONSTRUCT UPSTREAM DAM FOLLOWED BY DOWNSTREAM DAM. INSTALL A FLANGE ON UPSTREAM END OF FLUME AND SEAL TO SUBSTRATE WITH SANDBAGS AND POLYETHYLENE LINER WHERE NECESSARY TO ENSURE A WATERTIGHT BARRIER. "KEY" DAMS INTO BANKS OR CONSTRUCT SECONDARY DAM, IF NECESSARY.

11. PUMP STREAM CHANNEL BETWEEN DAMS, IF NECESSARY. DISCHARGE WATER THROUGH A DEWATERING STRUCTURE AND ONTO A STABLE WELL VEGETATED AREA TO PREVENT EROSION AND SEDIMENTATION. NO HEAVILY SILT-LADEN WATER MAY BE DISCHARGED IN THE STREAM.

12. CONSTRUCT SEDIMENT BARRIERS (STRAW BALES AND/OR SILT FENCE) TO PREVENT SILT LADEN WATER AND SPOIL FROM FLOWING BACK INTO WATERCOURSE. CONSTRUCTED SEDIMENT BARRIERS SHALL EXTEND ALONG THE SIDES OF THE STOCKPILES AND THE ENDS OF DAMS. BARRIERS MAY BE TEMPORARILY REMOVED TO ALLOW CONSTRUCTION ACTIVITIES BUT MUST BE REPLACED BY THE END OF EACH WORK DAY.

13. COMPLETE PREFABRICATION OF IN-STREAM PIPE SECTION AND WEIGHT PIPE AS NECESSARY PRIOR TO COMMENCEMENT OF IN-STREAM ACTIVITY.

14. TRENCH THROUGH WATERCOURSE. INSTALL TEMPORARY (SOFT) PLUGS, IF NECESSARY, TO CONTROL WATER FLOW AND TRENCH SLOUGHING.

15. MAINTAIN STREAM FLOW, IF PRESENT, THROUGH FLUME THROUGHOUT CROSSING CONSTRUCTION.

16. LOWER-IN PIPE, INSTALL TRENCH PLUG AND BACKFILL IMMEDIATELY.

17. BACKFILL WITH NATIVE MATERIAL.

18. RESTORE WATERCOURSE CHANNEL TO APPROXIMATE PRE-CONSTRUCTION PROFILE AND SUBSTRATE.

19. RESTORE STREAM BANKS TO APPROXIMATE ORIGINAL CONDITION AND STABILIZE, AS REQUIRED.

DRAWING DEPICTED IS SUPERSEDED BY WRITTEN STANDARD, SCOPE OF WORK OR LINE LIST.

| REVISIONS | | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR |
| 1 | 07/08/04 | ISSUED FOR REVIEW | RB | CM | |
| 2 | 07/13/04 | REVISED PER CLIENT COMMENT | RB | CM | |
| 3 | 07/01/05 | DWG REWRITE RELEASE | WS | | |

KINDER MORGAN

WATERBODY CROSSING
OPEN CUT DRY FLUME

| DATE: | 07/01/05 | | APPROVED BY: | |
|---|---|---|---|---|
| SCALE: | N.T.S. | CST-P-1150-A375 | SH. 1 OF 1 |

JA0184

AR 006945



PLAN VIEW

NOTES:

1. THIS METHOD APPLIES TO WATERBODIES WITH LIMITED FLOW AT TIME OF CONSTRUCTION WHERE DOWNSTREAM SILTATION MUST BE AVOIDED AND THE CROSSING WIDTH IS NOT PROHIBITIVE.

2. SCHEDULE CROSSING DURING LOW FLOW PERIOD IF POSSIBLE.

3. COMPLETE ALL IN-STREAM ACTIVITIES AS EXPEDIENTLY AS POSSIBLE.

4. NO REFUELING OF MOBILE EQUIPMENT WITHIN 100 FEET OF WATERBODY. REFUEL STATIONARY EQUIPMENT AS PER THE SPCC PLAN.

5. INSTALL TEMPORARY EQUIPMENT CROSSING, IF REQUIRED.

6. IN AGRICULTURAL LAND, STRIP TOPSOIL FROM SPOIL STORAGE AREA.

7. CONSTRUCT SEDIMENT BARRIERS TO PREVENT SILT LADEN WATER AND SPOIL FROM FLOWING INTO WATERBODY. CONSTRUCTED SEDIMENT BARRIERS SHALL EXTEND ALONG THE SIDES OF THE SPOIL AND TOPSOIL STOCKPILES AND ACROSS THE ENTIRE CONSTRUCTION R.O.W. BARRIERS MAY BE TEMPORARILY REMOVED TO ALLOW CONSTRUCTION ACTIVITIES BUT MUST BE REPLACED BY THE END OF EACH WORK DAY.

8. CONSTRUCT UPSTREAM STRUCTURE (DAM) FOLLOWED BY DOWNSTREAM STRUCTURE (DAM). WATER STRUCTURES (AQUA DAM, JERSEY BARRIERS, SAND BAGS, STEEL PLATE, POLYETHYLENE LINER, ETC.) FINAL LOCATION WILL BE APPROVED BY THE ENVIRONMENTAL INSPECTOR.

9. SIZE PUMPS FOR DIVERSION OF ENTIRE STREAM FLOW. CONTRACTOR SHALL MAINTAIN 100% SPARE PUMPING CAPACITY ON SITE. PUMPS SHALL BE INSTALLED ON POLYETHYLENE BARRIERS FOR FUEL/OIL SPILL CONTAINMENT. PUMP INTAKES WILL BE SCREENED TO PREVENT ENTRAPMENT OF FISH. CONTRACTOR SHALL MONITOR PUMPS AND WATER STRUCTURES ON A 24 HOUR BASIS UNTIL THE CROSSING INSTALLATION IS COMPLETE. SHOULD LEAKAGE AT THE DAM STRUCTURES OCCUR, CONTRACTOR SHALL DEWATER BETWEEN THE STRUCTURES THROUGH AN APPROPRIATE FILTER AND ONTO A WELL VEGETATED UPLAND AREA. NO HEAVILY SILT-LADEN WATER SHALL BE DISCHARGED INTO THE STREAM.

10. LEAVE HARD PLUGS AT STREAM BANK EDGE UNTIL JUST PRIOR TO PIPE INSTALLATION.

11. COMPLETE CONSTRUCTION OF IN-STREAM PIPE SECTION. WEIGHT PIPE AS NECESSARY PRIOR TO COMMENCEMENT OF IN-STREAM ACTIVITY.

12. TRENCH THROUGH WATERBODY AS EXPEDIENTLY AS PRACTICAL. INSTALL TEMPORARY (SOFT) PLUGS, IF NECESSARY, TO CONTROL WATER FLOW AND TRENCH SLOUGHING.

13. MAINTAIN STREAM FLOW THROUGHOUT CROSSING CONSTRUCTION.

14. LOWER-IN PIPE, INSTALL TRENCH PLUG AND BACKFILL IMMEDIATELY.

15. BACKFILL WITH NATIVE MATERIAL.

16. RESTORE WATERBODY CHANNEL TO APPROXIMATE PRE-CONSTRUCTION PROFILE AND SUBSTRATE.

17. DISMANTLE DOWNSTREAM WATER STRUCTURE (DAM) AND UPSTREAM WATER STRUCTURE (DAM) AFTER TRENCH BACKFILL.

18. RESTORE STREAM BANKS TO APPROXIMATE ORIGINAL CONDITION AND STABILIZE, AS REQUIRED.

DRAWING DEPICTED IS SUPERSEDED BY WRITTEN STANDARD, SCOPE OF WORK OR LINE LIST.

| REVISIONS | | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR. |
| 1 | 07/08/04 | ISSUED FOR REVIEW | RB | CM | |
| 2 | 07/13/04 | REVISED PER CLIENT COMMENT | RB | CM | |
| 3 | 07/01/05 | DWG REWRITE RELEASE | WS | | |

KINDER MORGAN

WATERBODY CROSSING
OPEN CUT DAM & PUMP

DATE: 07/01/05    APPROVED BY:

SCALE: N.T.S.    CST-P-1150-A370    SH. 1 OF 1

AR 006946



PLAN

PROFILE

NOTES:

1. SET UP DRILLING EQUIPMENT A MINIMUM OF 100 FEET FROM THE EDGE OF THE WATERCOURSE. DO NOT CLEAR OR GRADE WITHIN THE 100 FOOT ZONE.

2. ENSURE THAT ONLY BENTONITE BASED DRILLING MUD IS USED. DO NOT ALLOW THE USE OF ANY ADDITIVES TO THE DRILLING MUD WITHOUT THE APPROVAL OF COMPANY'S INSPECTOR.

3. INSTALL SUITABLE DRILLING MUD TANKS OR SUMPS TO PREVENT CONTAMINATION OF WATERCOURSE.

4. INSTALL BERMS DOWNSLOPE FROM THE DRILL ENTRY AND ANTICIPATED EXIT POINTS TO CONTAIN ANY RELEASE OF DRILLING MUD.

5. DISPOSE OF DRILLING MUD IN ACCORDANCE WITH THE APPROPRIATE REGULATORY AUTHORITY REQUIREMENTS.

DRAWING DEPICTED IS SUPERSEDED BY WRITTEN STANDARD, SCOPE OF WORK OR LINE LIST.

| REVISIONS | | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR |
| 1 | 07/06/04 | ISSUED FOR REVIEW | RB | CM | |
| 2 | 07/13/04 | REVISED PER CLIENT COMMENT | RB | CM | |
| 3 | 07/01/05 | DWG REWRITE RELEASE | WS | | |

KINDER⚡MORGAN

WATERBODY CROSSING
HORIZONTAL DIRECTIONAL DRILL

DATE: 07/01/05     APPROVED BY:
SCALE: N.T.S.     CST–P–1160–A365     SH. 1 OF 1

Page 186 of 188

JA0186

AR 006947



TYPICAL WETLAND CROSSING

KINDER MORGAN

TENNESSEE NATURAL GAS PIPELINE

Page 187 of 188

AR 006948



TYPICAL PIPELINE
CONSTRUCTION SEQUENCE

Page 188 of 188

AR 006949

No. _____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

SIERRA CLUB and APPALACHIAN VOICES,
*Petitioners*

v.

TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION,
DAVID W. SALYERS, in his official capacity as Commissioner of the Tennessee
Department of Environment and Conservation, and JENNIFER DODD, in her
official capacity as Director of the Division of Water Resources of the Tennessee
Department of Environment and Conservation
*Respondents*

**PETITION FOR REVIEW**

JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

STEPHANIE BIGGS
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Email: sbiggs@selctn.org

DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email:  dteaney@appalmad.org

*Counsel for Petitioners*

Pursuant to Section 19(d)(1) of the Natural Gas Act, 15 U.S.C. § 717r(d)(1), and Rule 15(a) of the Federal Rules of Appellate Procedure, SIERRA CLUB and APPALACHIAN VOICES hereby petition the United States Court of Appeals for the Sixth Circuit for review of a July 21, 2023 order of the Tennessee Department of Environment and Conservation issuing a Water Quality Certification under Section 401 of the Clean Water Act, 33 U.S.C. § 1341(a), to Tennessee Gas Pipeline Company, LLC, for its proposed Cumberland Pipeline. A copy of the Water Quality Certification (NRS 22.192) is attached hereto as Exhibit A.

In accordance with Rule 15(c) of the Federal Rules of Appellate Procedure, parties admitted to participate in the underlying proceedings have been served with a copy of this Petition. Also attached hereto is a list of Respondents specifically identifying the Respondents' names and addresses.

DATED: August 18, 2023

Respectfully submitted,

/s/ James S. Whitlock
James S. Whitlock
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

Stephanie Biggs
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203

Telephone: (615) 921-9470
Email: sbiggs@selctn.org

/s/ Derek O. Teaney
Derek O. Teaney
Appalachian Mountain Advocates, Inc.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email:   dteaney@appalmad.org

*Counsel for Petitioners*

2

# LIST OF RESPONDENTS

Petitioners hereby provide a list of Respondents specifically identifying the

Respondents' names and the addresses where Respondents and/or their counsel may

be served with copies of the Petition:

> Stephanie A. Durman
> Deputy General Counsel
> Tennessee Department of Environment and Conservation
> 312 Rosa L. Parks Ave.
> Nashville, TN 37243

> David W. Salyers, P.E.
> Commissioner
> Tennessee Department of Environment and Conservation
> 312 Rosa L. Parks Ave.
> Nashville, TN 37243

> Jennifer Dodd
> Director, Division of Water Resources
> Tennessee Department of Environment and Conservation
> 312 Rosa L. Parks Ave.
> Nashville, TN 37243

## CERTIFICATE OF SERVICE

In accordance with Federal Rule of Appellate Procedure 15(c)(1) & (2), the undersigned hereby certifies that, on August 18, 2023, a true copy of this Petition for Review was served via U.S. first-class certified mail, return receipt requested on the following entities admitted to participate in the agency proceedings:

> Capitol Corporate Services, Inc.
> Registered Agent for Tennessee Gas Pipeline Company, LLC
> 992 Davidson Dr., Suite B
> Nashville, TN 37205-1051

Petitioners also certify that, on August 18, 2023, a true copy of this Petition was served via U.S. first-class certified mail, return receipt requested and email on the following:

> Office of Tennessee Attorney General and Reporter
> P.O. Box 20207
> Nashville, TN 37202-0207
> tnattygen@ag.tn.gov

DATED:  August 18, 2023

> /s/ James S. Whitlock
> James S. Whitlock
> SOUTHERN ENVIRONMENTAL LAW CENTER
> 48 Patton Avenue, Suite 304
> Asheville, NC 28801-3321
> Telephone: (828) 258-2023
> Email: jwhitlock@selcnc.org

4



Cumberland Project

# Jurisdictional Waters Determinations and Tennessee Hydrologic Determinations Report

May 26, 2022

Prepared for:



Tennessee Gas Pipeline Company, L.L.C.
1001 Louisiana Street, Suite 1000 | Houston, TX 77002

Prepared by:

Stantec

Stantec
601 Grassmere Park, Suite 22 | Nashville, TN 37211

AR 000001

# Document Information and Qualifications Statement

| | |
|---|---|
| Prepared for | Tennessee Gas Pipeline Company, L.L.C. |
| Prepared by | Trey Fitzpatrick, TN-QHP and Katie Smith, TN-QHP-IT |
| Reviewed by | Rhett Baggett, PWS, TN-QHP |
| Project Name | Cumberland Project<br>Jurisdictional Waters Determinations and Tennessee Hydrologic Determinations Report |
| Project Number | E219091507/1726 |
| Project Manager | Mary L. Miller, CHMM |
| Date | May 26, 2022 |

This document entitled Cumberland Project – Jurisdictional Waters Determinations and Tennessee Hydrologic Determinations Report was prepared by Stantec Consulting Services Inc. ("Stantec") for the account of Tennessee Gas Pipeline Company, L.L.C. ("TGP"). Any reliance on this document by any third party is strictly prohibited. The material in it reflects Stantec's professional judgment considering the scope, schedule and other limitations stated in the document and in the contract between Stantec and the TGP. The opinions in the document are based on conditions and information existing at the time the document was published and do not take into account any subsequent changes. Any use of this document by a third party is the responsibility of such third party. Such third party agrees that Stantec shall not be responsible for costs or damages of any kind, if any, suffered by it or any other third party as a result of decisions made or actions taken based on this document.

Waters of the US (WOTUS) and Waters of the State (WOTS) surveys for the Cumberland Project were completed between June 21, 2021, and April 20, 2022, by qualified staff trained and proficient in Tennessee Hydrologic Determinations and Wetland Delineations. Staff qualifications are summarized in the table below.

| Stantec Employee | Relevant Professional Certification/ Licenses | Hydrologic Determination Course (Year Completed) | TN QHP Certification |
|---|---|---|---|
| Trey Fitzpatrick | TN-QHP | 2018 | 1177-TN18 |
| Rhett Baggett | TN-QHP, PWS | 2011 | 1013-TN11 |
| Emery Hartz | TN-QHP | 2015 | 1148-TN15 |
| Wes Cunningham | TN-QHP, PWS | 2018 | 1175-TN18 |
| Katie Smith | TN-QHP - IT | 2022 | N/A |
| Amy Arnold | TN-QHP - IT | 2022 | N/A |

I, Rhett Baggett, being a TN-QHP in good standing in the State of Tennessee, do certify, to the best of my knowledge, information, and belief:

1. That the information contained in this report is prepared in accordance with the accepted practice of hydrologic determination in the State of Tennessee.

2. That the information contained herein is true, accurate, and complete as of the date of my signature below.

**Rhett Baggett,** PWS, TN- QHP
Stantec

JA0195

AR 000002

# Table of Contents

**1    Introduction** .......................................................................................................**1-1**
    1.1    Project Description  ...................................................................................... 1-1
    1.2    Study Area .................................................................................................... 1-2

**2    Assessment Methodology** ...............................................................................**2-1**
    2.1    Jurisdictional Waters of the United States................................................. 2-1
        2.1.1    Waterbodies ..................................................................................... 2-1
        2.1.2    Wetlands ........................................................................................... 2-3
    2.2    Jurisdictional Waters of the State of Tennessee ...................................... 2-5
        2.2.1    Definition of Waters of the State of Tennessee ............................... 2-5
        2.2.2    Hydrological Determinations ............................................................ 2-5
        2.2.3    Wetlands ........................................................................................... 2-5

**3    Results** ...............................................................................................................**3-1**
    3.1    Potentially Jurisdictional Waters of the United States and/or the State of Tennessee .... 3-2
        3.1.1    Waterbodies ..................................................................................... 3-2
        3.1.2    Wetlands ........................................................................................... 3-3

**4    References**............................................................................................................**4-1**

# Tables

Table 3-1:    Calculation of Normal Weather Conditions, Dickson, Tennessee Monitoring
           Station ................................................................................................... 3-2

# Figures

Figure 1-1:  General Project Location ...................................................................... 1-3

# Appendices

Appendix A    Jurisdictional Waters Figures

Appendix B    Hydrologic Determination Field Datasheets

Appendix C    Wetland Determination Field Datasheets – Eastern Mountains and Piedmont
           Region

Appendix D    Waterbody Data Table

Appendix E    Wetland Data Table

Appendix F    Antecedent Precipitation Results

# Acronyms

| | |
|---|---|
| AgACIS | Agricultural Applied Climate Information System |
| CBD | Cannot Be Determined |
| CWA | Clean Water Act |
| FAC | Facultative |
| FACU | Facultative Upland |
| FACW | Facultative Wetland |
| FEMA | Federal Emergency Management Agency |
| FERC | Federal Energy Regulatory Commission |
| GIS | Geographic Information System |
| GPS | Global Positioning System |
| HUC | Hydrologic Unit Code |
| NI | No Indicator |
| NRCS | Natural Resources Conservation Service |
| NWI | National Wetlands Inventory |
| OBL | Obligate |
| OHWM | Ordinary High Water Mark |
| PEM | Palustrine Emergent |
| PFO | Palustrine Forested |
| PSS | Palustrine Scrub/Shrub |
| Project | Cumberland Project |
| RHA | Rivers and Harbors Act |
| SSURGO | Soils and Soil Survey Geographic |
| Stantec | Stantec Consulting Services, Inc. |
| STATSGO | State Soil Geographic |
| TDEC | Tennessee Department of Environment and Conservation |
| TGP | Tennessee Gas Pipeline Company, L.L.C. |
| TNW | Traditional Navigable Water |
| TVA | Tennessee Valley Authority |
| US | United States |

| USACE | United States Army Corps of Engineers |
| USEPA | United States Environmental Protection Agency |
| USFWS | United States Fish and Wildlife Service |
| USGS | United States Geological Survey |
| WOST | Waters of the State of Tennessee |
| WOTUS | Waters of the United States |

# 1 Introduction

## 1.1 Project Description

Stantec Consulting Services, Inc. ("Stantec") has prepared this Jurisdictional Waters Determinations and Tennessee Hydrologic Determinations Report for Tennessee Gas Pipeline Company, L.L.C. ("TGP") for the proposed Cumberland Project ("Project"). The pipeline route proposed by TGP originates west of Nashville in Dickson County, Tennessee. The pipeline route extends approximately 32 miles northwest generally along an existing TVA electric transmission line right-of-way through Dickson, Houston, and Stewart counties, and terminates near the TVA Cumberland Fossil Plant in Cumberland City, Tennessee. The Project location is depicted on **Figure 1-1**.

TGP is filing an application with the Federal Energy Regulatory Commission ("Commission" or "FERC") under Section 7(c) of the Natural Gas Act ("NGA") and Part 157 of the Commission's regulations, 18 CFR Part 157 (2021), seeking the issuance of a certificate of public convenience and necessity ("Certificate") for the construction, operation, and maintenance of the proposed Project.

The proposed Project involves the construction and operation of the following facilities, as described in more detail below:

- Approximately 32 miles of new 30-inch-diameter natural gas lateral pipeline, connecting to TGP's existing Lines 100-3 and 100-4 (hereinafter referred to as the "Cumberland Pipeline"), located in Dickson, Houston, and Stewart counties, Tennessee. To the extent that it is practicable, feasible, and legally permitted, TGP will locate the pipeline generally parallel and adjacent to existing electric transmission lines owned and operated by Tennessee Valley Authority ("TVA").

- New bi-directional back pressure regulation facilities on TGP's Lines 100-3 and 100-4 (hereinafter referred to as the "Pressure Regulation Station"), located at the origin of the proposed Cumberland Pipeline in Dickson County, Tennessee.

- A new meter station (hereinafter referred to as the "Cumberland Meter Station"), at the terminus of the proposed Cumberland Pipeline within the TVA property located in Stewart County, Tennessee.

- In-line inspection traps (also referred to as a pig launcher and receiver) at each end of the proposed Cumberland Pipeline.

- Three new mainline valves ("MLV"), with one MLV to be located at an intermediate location along the proposed Cumberland Pipeline, and the remaining two MLVs to be located on TGP's Lines 100-3 and 100-4 (one MLV to be installed on each existing line), within the new Pressure Regulation Station.

To facilitate the construction of the Project Facilities, TGP has identified two contractor yards, one located in Houston County, Tennessee (Contractor Yard 1), and the other located in Dickson County, Tennessee (Contractor Yard 2). Access to the Project's construction workspace and permanent easement for construction and operation purposes will be provided using temporary access roads ("TAR") and permanent access roads ("PAR").

TGP is proposing the Project to provide up to 245,000 dekatherms per day ("Dth/d") of additional firm natural gas transportation capacity to TVA, who has executed a precedent agreement for all of the firm transportation capacity to be created by the Project

.

The primary purpose of this report is to document the following features that were identified during the field surveys conducted on June 21-30, 2021; August 4-5, 2021; August 16-19, 2021, September 8-9, 2021, January 24-25, 2022, and April 19-20, 2022:

> Jurisdictional Waters of the United States ("WOTUS") regulated by the United States Army Corps of Engineers ("USACE") under Section 404 of the Clean Water Act ("CWA") and Section 10 of the Rivers and Harbors Act ("RHA"); and

> Jurisdictional Waters of the State of Tennessee ("WOST") includes wet-weather conveyances, streams, wetlands, ponds, and groundwater which are regulated by the Tennessee Department of Department of Environment and Conservation ("TDEC") under the Tennessee Water Quality Control Act of 1977. The regulation also includes groundwater, which is not a subject of this report.

This report presents a summary of each methodology used to identify features in the field, descriptions of the features identified, and potential regulatory and/or construction concerns. This report will be used to support regulatory permitting efforts required for construction and operation of the Project.

## 1.2    Study Area

The study area for the survey included the following areas for all past and current pipeline routes throughout the design process:

- A 200 to 300-foot varying corridor along the proposed pipeline route.

- A 200 to 300-foot varying corridor along alternate pipeline routes.

- A 50-foot corridor centered along proposed permanent and temporary access roads plus a 75 x 100-foot area where access roads approach public roads.

- Two sites for the proposed pressure regulation station.

- Two proposed contractor yards.

Case: 23-3682    Document: 56-1    Filed: 08/19/2024    Page: 207



**Figure 1-1: General Project Location**

# 2 Assessment Methodology

## 2.1 Jurisdictional Waters of the United States

The USACE and United States Environmental Protection Agency ("USEPA") promulgated the Navigable Waters Protection Rule in 2020, which replaced all earlier versions of the definition of the term "waters of the United States." 85 Fed. Reg. 22,250 (Apr. 21, 2020). However, the 2020 rule has been vacated by at least one federal district court and remanded to the USACE and USEPA by at least two federal district courts. *See Pasqua Yaqui Tribe, et al. v. United States Environmental Protection Agency, et al.*, No. CV-20-00266-TUC-RM (D. AZ, Aug. 30, 2021); *Conservation Law Foundation, et al. v. United States Environmental Protection Agency, et al.*, No. 1:20-cv-10820-DPW (D. Mass. Sept. 1, 2021). Consequently, the USACE and USEPA "have halted implementation of the Navigable Waters Protection Rule and are interpreting 'waters of the United States' consistent with the pre-2015 regulatory regime." *See* https://www.epa.gov/wotus; *see also* https://www.usace.army.mil/Missions/Civil-Works/Regulatory-Program-and-Permits/. In addition, the USACE and USEPA announced on June 9, 2021, their intent to initiate new rulemaking to redefine "waters of the United States." *See also* 86 Fed. Reg. 41,911 (Aug. 4, 20210). Consequently, this report relies on the following authorities:

> 33 C.F.R. Part 328, Definition of Waters of the United States (July 1, 2015 Edition, which contains the language of the USACE's 1986 and 1993 rules in section 328.3);

> Joint Memorandum issued by the USACE and USEPA, December 2, 2008, "Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States* & *Carabell v. United States*".

> Joint Memorandum issued by the USACE and USEPA, 68 Fed. Reg. 1995 (Jan. 15, 2003) (guidance following the U.S. Supreme Court's decision in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"); and

> All other applicable policy and guidance documents relevant to the pre-2015 regulatory regime.

### 2.1.1 Waterbodies

This section describes the methods used during the field surveys to identify and document waterbodies within the study area. Waterbody metric data and notes were recorded on a standardized waterbody data sheet; and the locations were recorded using a global positioning system ("GPS"). Streams and wet weather conveyances ("WWC") metric data and notes were recorded using the Tennessee Division of Water Control's Hydrologic Determination Field Data Sheet, Version 1.5; and the locations were recorded using a GPS.

#### 2.1.1.1 Quantitative Assessment

Waterbodies within the study area were identified by the presence of an Ordinary High Water Mark ("OHWM"). The top of bank or the centerline of the channels or edge of ponds was geographically located by using GPS with sub-meter accuracy. Information was collected on each waterbody including flow type (*e.g.*, perennial, intermittent, or ephemeral), substrate type (mud/silt, sand, gravel, large rock, boulder, and/or bedrock), and channel width and depth.

During the field review, the following categories of waterbodies were evaluated for the Project:

> **Traditional Navigable Waters ("TNW")** – All those waters that are subject to the ebb and flow of the tide, and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. For the purposes of this Project, TNWs are those identified in List of Navigable WOTUS within the Nashville District.

> **Perennial Stream** – A waterbody expected to have continuous year-round flow, with a well-defined OHWM, and sometimes (but not always) indicated on the United States Geological Survey ("USGS") Quadrangle as a solid blue line;

> **Intermittent Stream** – A waterbody expected to have seasonal flow with seasonal flow defined as continuous flow for a consecutive period of at least three months, with a defined OHWM;

> **WWC/Ephemeral Channel** – A watercourse expected to only have flow of short duration after a rainfall event, often with an ill-defined OHWM and channel, usually not indicated on the USGS Quadrangles; and

> **Pond** – A basin or area of non-flowing water where water is expected to pool on at least a seasonal basis defined as pooling for a consecutive period of at least three months, with a well-defined OHWM, hydrophyte vegetation may be present, in some cases man-made or altered, and may be indicated on the USGS Quadrangles.

### 2.1.1.2    *Qualitative Assessment*

Qualitative waterbody assessments were performed to determine the current quality and potential construction impacts on each waterbody. The qualitative waterbody assessments are based on five ecological parameters: level of disturbance, quality of riparian vegetation, diversity and stability of aquatic habitat, water quality, and channelization.

Generally, undisturbed, intrinsic waterbodies with low turbidity and a diverse and stable fish, plant, and wildlife habitat are considered to be of higher quality. Waterbodies which have been altered show evidence of erosion or have low species diversity are treated as low quality waterbodies.

Disturbances to a waterbody may result from transportation and utility easements, silviculture, agricultural activities, mining activities, development, dams, or natural disturbances including invasion of exotic or nuisance plants. These disturbances usually alter riparian vegetation and aquatic species composition by changing stream flow and water quality. It can be generally said that a greater level of disturbance is directly proportional to a lower quality of waterbody.

After evaluating the five ecological parameters for each waterbody, the following guidelines were used to categorize waterbodies into one of three levels of stream quality (high, medium, or low). The definition of the three quality categories are as follows:

> **High Quality Stream** - Field observations show no indication of stress or disturbance in the stream or adjacent area. The riparian zone consists of diverse and mature vegetation, and a diverse and stable fish and wildlife habitat exist. Gravel beds, submerged logs, undercut banks, riffles and pools are present. The stream channel is in a natural condition with no structures, dikes or evidence of down cutting or excessive lateral cutting.

> **Medium Quality Stream** - Field observations show mild to moderate disturbances resulting in minor recognizable alterations. Existing pipeline, road, railroad, or other rights-of-way may cross the stream. Trees, grass, or forbs dominate the bank vegetation. The stream provides fair fish and wildlife habitat with some diversity. Some erosion potential may be present and fine sediment deposits predominate. There is a limited flow and depth variation. The stream exhibits some channelization.

> **Low Quality Stream** - Field observations show disturbances, which have caused significant changes. Mechanical alterations are present. Signs of intense grazing activity may be present. Stream course channelization or ditching is prevalent. Habitat diversity is lacking and/or suitable wildlife habitat is not present. Grass or forbs dominate stream bank vegetation.

## 2.1.2    Wetlands

This section describes the methods used during the field surveys to delineate wetlands within the study area. The wetland determination and delineation was performed using the routine on-site determination methods described in the USACE's Wetlands Delineation Manual (USACE, Environmental Laboratory 1987), hereafter referred to as the "1987 Manual," and is consistent with the methods, guidelines, and indicators present in the Regional Supplement to the USACE's Wetland Delineation Manual: Eastern Mountains and Piedmont Region ([Regional Supplement] USACE 2012).

According to the 1987 Manual and Regional Supplement, areas must exhibit three distinct characteristics to be considered wetlands:

1. The prevalent vegetation must consist of plants adapted to life in hydric soil conditions. These species, due to morphological, physiological, and/or reproductive adaptations, can and do persist in anaerobic soil conditions;

2. Soils in wetlands must be classified as hydric or they must possess characteristics that are associated with reducing soil conditions; and

3. The area must be inundated either permanently or periodically at mean water depths less than 6.6 feet (2 meters) or the soil saturated at the surface for at least part of the growing season of the prevalent vegetation.

Under normal circumstances (site not altered in the last five years), the absence of any of one of these three parameters results in a non-jurisdictional determination. If disturbed conditions are present, then consideration must be given to what conditions would have been present had the disturbance not occurred.

Vegetation, soil, and hydrology data were collected during field surveys in order to determine whether the three criteria are satisfied within each suspect wetland area. All data was recorded electronically using a GPS, manually on datasheets, and using aerial photography.

Vegetation data collected during field surveys included a list of dominant plants present within the tree, sapling/shrub, herb, and woody vine strata of each vegetation unit. The determination of plant species dominance was based on visual estimates of species abundance. According to the 1987 Manual, hydrophytic vegetation is defined as, "the sum total of macrophytic plant life that occurs in areas where the frequency and duration of inundation or soil saturation produce permanently or periodically saturated soils of sufficient duration to exert a controlling influence on the plant species present." Plant species are further categorized according to their probability of occurrence in wetlands. Each plant species is assigned an "Indicator Status," which ranges from Obligate Wetland (greater than 99% occurrence in wetlands) to Obligate Upland (almost always does not occur in wetlands). Indicator status categories are further defined as follows:

> **Obligate ("OBL"):** A species that almost always (under natural conditions) occurs in wetlands (estimated probability greater than 99%).

> **Facultative Wetland ("FACW"):** A species that usually occurs in wetlands (estimated probability 67% - 99%), but occasionally is found in non-wetlands.

> **Facultative ("FAC"):** A species that is equally likely to occur in non-wetlands (estimated probability 34% - 66%).

> **Facultative Upland ("FACU"):** A species that usually occurs in non-wetlands (estimated probability 67% - 99%) but is occasionally found in wetlands.

> **Upland ("UPL"):** A species that almost always (under natural conditions) occurs in non-wetlands (estimated probability greater than 99%).

> **No Indicator ("NI"):** A species for which there is insufficient information to determine an indicator status ranking.

> **Cannot Be Determined ("CBD"):** A species that was only identified to the genus level. Therefore, no indicator could be assigned.

The hydrophytic vegetation criterion is met when more than 50% of the dominant plant species identified are obligate, facultative wetland, or facultative plants (USACE 1987). Wetlands were classified as palustrine forested ("PFO"), palustrine scrub-shrub ("PSS"), or palustrine emergent ("PEM") in accordance with Classification of Wetlands and Deepwater Habitats of the United States (Cowardin et al. 1979).

Soil sampling was conducted in suspected wetland areas. For soil samples, the presence or absence of histosol soils or a histic epipedon was determined. Soil color, as well as the presence or absence of a clay layer, soil mottles, hydrogen sulfide odor, or other hydric soil indicators were determined. Soil colors were determined using Munsell Soil Color Charts (Munsell Color 1992). The hydric soil criterion was satisfied when hydric soil characteristics were encountered at the appropriate depth within the soil profile (USACE 1987).

Site hydrology was evaluated during field surveys by noting whether the soil at the surface was inundated or saturated. If the ground surface was dry, the depth to free-standing surface water was measured and the presence or absence of other field evidence of wetland hydrology (e.g., pneumatophores, drift lines, water-stained leaves) were noted. The wetland hydrology criterion was met if one or more field indicators were present (USACE 1987). In the absence of evidence of significant hydrologic modification, the presence of hydric soil characteristics was used as a positive indicator of wetland hydrology.

Vegetation, soil, and hydrology of surrounding upland areas were characterized and documented during wetland delineation surveys. These areas were designated as "upland plots" and were documented electronically using a GPS with at least one upland data sheet for each corresponding wetland system recorded manually on a datasheet.

### 2.1.2.1    Quantitative Assessment

Wetland data was collected in the field using a GPS. This information was later transferred into a Geographic Information Systems ("GIS") database format for quantitative wetland analysis. The wetland data was analyzed to determine the locations of each wetland traversed.

### 2.1.2.2    Qualitative Assessment

Qualitative wetland assessments were performed to determine the current quality and potential construction impacts on each waterbody.

> **High Quality Wetland –** High quality wetlands do not show any indication of stress or disturbance within or in the adjacent area. High quality forested wetlands typically are composed of diverse and mature vegetation types. Hydrologic and soil indicators are characteristic of the specific community type. High quality wetlands usually provide suitable habitat for wildlife species or rare, threatened, and endangered ("RTE") plant and/or animal species. High quality perennial streams often are observed within these wetlands.

> **Moderate Quality Wetland –** Moderate quality wetlands are those for which field observations and visual inspection of aerial photographs indicate that mild to moderate disturbances have resulted in minor recognizable alterations to the plant community, hydrology, or soils within the delineated wetland. Disturbances such as existing pipeline, road, railroad, or power line rights-of-ways within these wetlands or silvicultural practices and logging roads in the area immediately adjacent to these wetlands may slightly alter natural vegetation, hydrology, and/or soil characteristics. The majority of moderate quality wetlands provide suitable habitat for wildlife species or RTE plant and/or animal species. Perennial or intermittent streams within these wetlands are of relatively good quality and

are not significantly disturbed (i.e., high erosion, damming, poor water quality) due to the disturbances within the wetland or in the adjacent area.

> **Low Quality Wetland –** Low quality wetlands are those for which field observations and visual inspection of aerial photographs indicate that severe disturbances have resulted in significant changes to the vegetation, soils, or hydrology of the wetland. Hydroperiod alterations, if present, have directly affected plant species through changes in community composition or noticeable stress to, or death of, species present. In addition, soil subsidence might have occurred in areas with a decreased hydroperiod. Mechanical alteration of plant species or soils might have occurred within the wetland. Intense grazing activities from livestock may be evident. Channelization of stream courses or ditching might have occurred. Exotic, nuisance, or invasive species may comprise significant amounts of the plant community. Disturbances such as existing pipeline, road, railroad, or power line rights-of-ways within these wetlands or silvicultural practices and logging roads in the area immediately adjacent to these wetlands have altered natural vegetation, hydrology, and/or soil characteristics. Very few low-quality wetlands provide suitable habitat for wildlife or RTE plant and/or animal species because of their disturbance intensity. Perennial or intermittent streams, if present, may be significantly disturbed (i.e., high erosion, damming, poor water quality) due to the disturbances within the wetland or in an adjacent area.

## 2.2     Jurisdictional Waters of the State of Tennessee

### 2.2.1     Definition of Waters of the State of Tennessee

The Tennessee Water Quality Control Act of 1977 defines WOST as "any and all water, public or private, on or beneath the surface of the ground, that are contained within, flow through, or border upon Tennessee or any portion thereof, except those bodies of water confined to and retained within the limits of private property in single ownership that do not combine or effect a junction with natural surface or underground waters" [T.C.A. § 69-3-103(45)].

### 2.2.2     Hydrological Determinations

A hydrological determination of each apparent linear watercourse was conducted in accordance with TDEC guidance (TDEC 2020a). by a Tennessee Qualified Hydrological Professional to determine its jurisdictional status. Linear watercourses were classified as streams or wet weather conveyances.

#### 2.2.2.1     Streams

Streams, according to the Tennessee Water Quality Control Act of 1977, are "a surface water that is not a wet weather conveyance" [T.C.A. § 69-3-103(41)].

#### 2.2.2.2     Wet Weather Conveyances/Ephemeral Channel

Wet weather conveyances, according to the Tennessee Water Quality Control Act of 1977, are "man-made or natural watercourses, including natural watercourses that have been modified by channelization: that flow only in direct response to precipitation runoff in their immediate locality: whose channels are at all times above the ground water table: that are not suitable for drinking water supplies: and in which hydrological and biological analysis indicate that, under normal weather conditions, due to naturally occurring ephemeral or low flow there is not sufficient water to support fish, or multiple populations of obligate lotic aquatic organisms whose life cycle includes an aquatic phase of at least two months" [T.C.A. § 69-3-103(46)].

### 2.2.3     Wetlands

The TDEC defines wetlands as "an area that is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances does support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include

swamps, marshes, bogs, and similar areas" [Rule 0400-40-07-.03(31) of the Tennessee Water Quality Control Act of 1977].

As noted in Section 2.1.2, the wetland determination and delineation was performed using the routine on-site determination methods described in the 1987 Manual, and is consistent with the methods, guidelines, and indicators present in the Regional Supplement (USACE 2012).

# 3    Results

Prior to the start of the field surveys, existing background data and information were reviewed to provide information regarding the presence of previously identified wetlands, the location of hydric soils, and/or locations where jurisdictional wetlands could exist that have not been previously mapped. Information reviewed included recent aerial imagery, USGS 7.5-minute Quadrangle Maps, Natural Resources Conservation Service ("NRCS") Soils and Soil Survey Geographic ("SSURGO")/State Soil Geographic ("STATSGO") Databases for hydric soil classifications, the United States Fish and Wildlife Service ("USFWS") National Wetlands Inventory ("NWI"), and the Federal Emergency Management Agency ("FEMA") designated 100-year floodplain.

All features identified were within the Harpeth River (8-digit hydrologic unit code ("HUC") 05130204) and Lower Cumberland River (8-digit HUC 05130205) watersheds. The Project is located within the Outlet Harpeth River subwatershed defined by the 12-digit HUC 051302040606, Lower Jones Creek subwatershed (HUC 051302040503), Johnson Creek-Cumberland River subwatershed (HUC 051302050302), Upper Bartons Creek subwatershed (HUC 051302050102), Furnace Creek subwatershed (HUC 051302050101), Lower Bartons Creek subwatershed (HUC 05130205010), Lower Yellow Creek subwatershed (HUC 501302050203), Outlet Yellow Creek subwatershed (HUC 051302050205), Guices Creek subwatershed (HUC 051302050401), and Wells Creek subwatershed (HUC 051302050402).

Climate data for June, August, and September 2021, as well as the January and April 2022 US Drought Monitor indicated that the study area was not exhibiting drought conditions during the June 21-30, 2021; August 4-5, 2021; August 16-19, 2021, September 8-9, 2021, January 24-25, 2022, and April 19-20, 2022 field surveys (US Drought Monitor 2022).

Precipitation data from the nearest monitoring station (Dickson, Tennessee) was evaluated to determine if conditions were dry, normal, or wet in accordance with the guidelines outlined in the 2020 TDEC Division of Water Pollution Control Guidance for Making Hydrologic Determinations V 1.5 (**Table 3-1**). Monthly climate normal and actual precipitation was obtained from Agricultural Applied Climate Information System ("AgACIS") 2000-Present data (NRCS 2021). Conditions observed within the study area during the field surveys ranged from normal weather conditions to wetter than normal conditions. A full report of weather conditions during the time of surveys is provided in **Appendix F**.

**Table 3-1:    Calculation of Normal Weather Conditions, Dickson, Tennessee Monitoring Station**

| | | Month | Std Dev. | Minus One Std Dev. (Dry) | Normal (Mean Inches) | Plus One Std. Dev. (Wet) | Actual Rainfall | Condition (dry, wet, normal) | Condition Value | Month Weight Value | Product of Previous Two Columns |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **June 2021** | 1st Prior Month | June 21 | 0.87 | 3.16 | 4.03 | 4.89 | 6.07 | Wet | 3 | X 3 | 9 |
| | 2nd Prior Month | May 21 | 0.91 | 4.04 | 4.95 | 5.86 | 5.83 | Normal | 2 | X 2 | 4 |
| | 3rd Prior Month | Apr. 21 | 1.00 | 3.57 | 4.57 | 5.57 | 7.82 | Wet | 3 | X1 | 3 |
| | **Wetter than Normal** | | | | | | | | | **Sum** | **16** |
| **August 2021** | 1st Prior Month | Aug. 21 | 1.42 | 2.81 | 4.23 | 5.64 | 5.83 | Wet | 3 | X 3 | 9 |
| | 2nd Prior Month | July 21 | 0.84 | 2.86 | 3.70 | 4.53 | 3.80 | Normal | 2 | X 2 | 4 |
| | 3rd Prior Month | June 21 | 0.92 | 3.68 | 4.60 | 5.52 | 5.39 | Normal | 2 | X 1 | 2 |
| | **Wetter than Normal** | | | | | | | | | **Sum** | **15** |
| **September 2021** | 1st Prior Month | Sep. 21 | 1.22 | 1.75 | 2.97 | 4.19 | 6.24 | Wet | 3 | X 3 | 9 |
| | 2nd Prior Month | Aug. 21 | 1.13 | 2.57 | 3.70 | 4.83 | 4.72 | Normal | 2 | X 2 | 4 |
| | 3rd Prior Month | July 21 | 1.02 | 2.92 | 3.94 | 4.95 | 2.02 | Dry | 1 | X 1 | 1 |
| | **Normal Weather Conditions** | | | | | | | | | **Sum** | **14** |
| **January 2022** | 1st Prior Month | Jan. 22 | 1.31 | 2.97 | 4.28 | 5.58 | 6.38 | Wet | 3 | X 3 | 9 |
| | 2nd Prior Month | Dec. 21 | 0.74 | 4.36 | 5.10 | 5.83 | 3.85 | Dry | 1 | X 2 | 2 |
| | 3rd Prior Month | Nov. 21 | 1.08 | 2.67 | 3.75 | 4.82 | 2.52 | Dry | 1 | X 1 | 1 |
| | **Normal Weather Conditions** | | | | | | | | | **Sum** | **12** |
| **April 2022** | 1st Prior Month | Apr. 22 | 2.63 | 3.10 | 5.73 | 8.36 | 8.36 | Wet | 3 | X 3 | 9 |
| | 2nd Prior Month | Mar. 22 | 1.21 | 3.93 | 5.14 | 6.35 | 6.35 | Normal | 2 | X 2 | 4 |
| | 3rd Prior Month | Feb. 22 | 1.26 | 3.12 | 4.38 | 5.64 | 5.10 | Normal | 2 | X1 | 2 |
| | **Wetter than Normal** | | | | | | | | | **Sum** | **15** |

Note: 6-9 = Dry, 10-14 = Normal, 15-18 = Wet

## 3.1    Potentially Jurisdictional Waters of the United States and/or the State of Tennessee

Waterbodies and wetlands identified during the field surveys are summarized in the following section and depicted on figures provided in **Appendix A**. Hydrologic Determination Field Data Sheets are provided as **Appendix B** and Wetland Determination Field Data Sheets are provided as **Appendix C**. Tables summarizing the waterbodies and wetlands identified during the field surveys are provided in **Appendix D** and **Appendix E**, respectively.

### 3.1.1    Waterbodies

For the purposes of this report, all streams, whether intermittent or perennial, wet weather conveyances or ephemeral channels for federal permitting, and ponds or lakes were considered waterbodies. A total of 200 waterbodies were surveyed within the study area, of which, 128 waterbodies were identified within the current Project footprint. Data collected on all waterbodies identified within the study area is provided in Table D-1 of **Appendix D**.

#### 3.1.1.1    Streams

One waterbody identified within the study area, Jones Creek, is listed on the USACE Nashville District list of Section 10 Navigable Waters for the Cumberland River and Tributaries (USACE 2021).

A total of 64 streams were identified within the entire study area. Forty-four (44) streams fall within the current Project footprint, including 28 perennial streams and 16 intermittent streams. There were 19 named streams within the study area, including Porter's Branch, Jones Creek, Jordan Branch, Gafford Branch, Johnson Creek, Harris Branch, Barton's Creek, Miller Branch, Nesbitt Branch, Furnace Creek, Dry Hollow Branch, Little Barton's Creek, Leatherwood Creek, Yellow Creek, Indian Branch, Guices Creek, Lickskillet Branch, and Wells Creek. These streams are characterized by bedrock, cobble and gravel substrates, often having fish and amphibians present along with multiple populations of benthic macroinvertebrates. Hydrologic Determination data sheets along with photographs for each stream are provided in **Appendix B**.

### 3.1.1.2    *Wet Weather Conveyances/ Ephemeral Channels*

A total of 117 WWC/ephemeral channels were identified within the study area, of which, 83 WWC/ephemeral channels fall within the current Project footprint. These channels are characterized by predominately silt/clay and organic substrates. Hydrologic Determination data sheets along with photographs for each WWC/ephemeral channel are provided in **Appendix B**.

### 3.1.1.3    *Ponds/Lakes*

A total of 19 ponds were identified in the study area, of which, two fall within the current Project footprint. Ponds in the study corridor are characterized by silt clay substrate. These ponds are primarily used for watering cattle and often are situated within open grass pastures.

## 3.1.2    Wetlands

A total of six (6) wetlands were identified within the study area and are described below. Data collected on all wetlands identified within the study area is provided in Table E-1 of **Appendix E** and datasheets are provided in **Appendix C**.

### 3.1.2.1    *Palustrine Emergent ("PEM")*

PEM wetlands are dominated by erect, herbaceous vegetation with little or no woody vegetation sub-canopy or canopy species (Cowardin et. al. 1979). Four (4) PEM wetland communities were identified within the study area. Data sheets and photographs for each wetland are provided in **Appendix C**.

**WDKA001** is a PEM herbaceous wetland formed by a dry isolated man-made farm pond and is dominated by swamp smartweed (*Persicaria hydropiperoides*), slender spikerush (*Eleocharis baldwinii*) and maidencane (*Amphicarpum muehlenbergianum*).

**WHNW002** is a PEM wetland system near MP 20.8 that is dominated by sweetgum (*Liquidambar styraciflua*), stiltgrass (*Microstegium vimineum*), and smallspike false nettle (*Boehmeria cylindrica*).

**WHNA001** is a PEM wetland system near MP 29 that is dominated by bushy bluestem (*Andropogon glomeratus*), common rush (*Juncus effusus*), and goldenrod (*Solidago elliottii*).

**WSTA001** is a PEM wetland system near MP 31 that is dominated by common rush, giant cane, sawtooth blackberry, and hawthorn.

### 3.1.2.2    *Palustrine Scrub Shrub ("PSS")*

PSS wetlands are dominated by woody vegetation less than 20 feet (6m) tall (Cowardin et. al. 1979). No PSS wetlands were identified in the study area.

### 3.1.2.3    *Palustrine Forested ("PFO")*

PFO wetlands are dominated by woody vegetation 20 feet (6 m) or taller (Cowardin et. al. 1979). Within the eastern United States, forested wetlands are the dominant wetland type. Within the study area, PFO

wetlands were most often associated with riverine corridors. The extent and diversity of the herbaceous understory and shrub sub-canopy was often dependent on the degree of canopy closure and light penetration. two (2) PFO wetland communities were identified in the study area. Data sheets and photographs for each wetland are provided in **Appendix C**.

**WDKB001** is a PFO wetland dominated by boxelder maple (*Acer negundo*), sycamore (*Platanus occidentalis*), and green ash (*Fraxinus pennsylvanica*).

**WHNB002** is a PFO wetland dominated by boxelder maple, sycamore, green ash, and sweetgum (*liquidambar styraciflua*).

# 4    References

Cowardin, L.W., V. Carter, F.C. Golet and E.T. LaRoe. 1979. Classification of Wetlands and Deepwater Habitats of the United States. U.S. Fish and Wildlife Service, Washington, D.C. FWS/OBS-79/31.

Munsell Color Co. 2009. Munsell Soil Color Charts: with Genuine Munsell Color Chips. Grand Rapids, MI: Munsell Color.

TDEC. 2020a. Guidance for Making Hydrologic Determinations Version 1.5. Available at: https://www.tnhdt.org/PDF/HD%20Guidance.pdf. Site accessed May 2022.

TDEC. 2020b. Final 2020 EPA Approved List of Impaired Waters. Available at: https://www.tn.gov/environment/program-areas/wr-water-resources/water-quality/water-quality-reports---publications.html. Site accessed May, 2022.

United States Army Corps of Engineers (USACE). 1987. Corps of Engineers Wetlands Delineation Manual. Technical Report Y-87-1. Vicksburg, MS: Waterways Experiment Station.

USACE. 2012. Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Eastern Mountains and Piedmont Region Version 2.0, ed. J. F. Berkowitz, J. S. Wakeley, R. W. Lichvar, C. V. Noble. ERDC/EL TR-12-9. Vicksburg, MS: U.S. Army Engineer Research and Development Center.

USACE. 2021. USACE Nashville District List of Section 10 Navigable Waters for the Cumberland River and Tributaries. Available at: https://www.lrn.usace.army.mil/Missions/Regulatory/Navigable-Waters-List/. Site accessed May, 2022.

U.S. Drought Monitor. 2022. U.S. Drought Monitor. Website: http://droughtmonitor.unl.edu/. Site Accessed May 2022.

United States Environmental Protection Agency (USEPA). 2017. Definition of Waters of the United States Under the Clean Water Act. Website: https://www.epa.gov/cwa-404/definition-waters-united-states-under-clean-water-act. Site Accessed May 2022.

## A.1    Aerials



Case: 23-3682   Document: 56-1   Filed: 08/19/2024   Page: 220

R 0.0

R 0.1

SDKA023

JA0214

AR 000023

**Potentially Jurisdictional Waters of the United States within the Cumberland Project**

Page 1 of 125

Cumberland Project
Dickson, Houston & Stewart Counties, Tennessee

Stewart
Montgomery
Houston
Dickson
Humphreys

| Legend | |
|---|---|
| ● Milepost | |
| — Proposed Pipeline | |
| **Surveyed Streams** | **Surveyed Wetlands** |
| Wet Weather Conveyance/Ephemeral | Palustrine Emergent |
| Stream/Intermittent | Palustrine Forested |
| Stream/Perennial | |
| **Surveyed Waterbodies** | No Survey Area |
| Pond | Contractor Yard |
| | MLV Site |

| Permanent Easement | Cumberland Meter Station |
| Temporary Workspace | ● Wet Weather Conveyance Start |
| Additional Temporary Workspace | ● Wet Weather Conveyance End |
| Access Roads | ● Photo Point |
| Proposed Pressure Regulation Station | |

0    200    400 Feet
0    61    122 Meters

**Stantec**

Date Created: 5/26/2022   Date Revised: 5/26/2022   File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\WOTUS_Mapbook_20220525.mxd
GIS Analyst: Peter,Marsey

Potentially Jurisdictional Waters of the United
States within the Cumberland Project
Page 2 of 125
Cumberland Project
Dickson, Houston & Stewart Counties, Tennessee

**Legend**

- Milepost

Surveyed Wetlands
- Palustrine Emergent
- Palustrine Forested

Surveyed Streams
- Wet Weather Conveyance/Ephemeral
- Stream/Intermittent
- Stream/Perennial

Surveyed Waterbodies
- Pond

- No Survey Area
- Contractor Yard
- Proposed Pressure Regulation Station
- MLV Site

- Permanent Easement
- Proposed Pipeline
- Temporary Workspace
- Additional Temporary Workspace
- Access Roads

- Wet Weather Conveyance Start
- Wet Weather Conveyance End
- Photo Point
- Cumberland Meter Station

0  200  400 Feet
0  61  122 Meters

Stewart
Montgomery
Houston
Dickson
Humphreys

Date Created: 5/26/2022  Date Revised: 5/26/2022  File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\WOTUS_Mapbook_20220525.mxd
GIS Analyst: Peter Marsey

JA0215

Case: 23-3682    Document: 56-1    Filed: 08/19/2024    Page: 221

AR  000024



0.8

0.7

0.5

0.6

SDKA025
36.1683,
-87.21039

SDKA025

SDKA025
36.16823,
-87.21044

**Potentially Jurisdictional Waters of the United States within the Cumberland Project**
Page 3 of 125
Cumberland Project
Dickson, Houston & Stewart Counties, Tennessee

Stewart
Montgomery
Houston
Dickson
Humphreys

Milepost
Proposed Pipeline
**Surveyed Streams**
Wet Weather Conveyance/Ephemeral
Stream/Intermittent
Stream/Perennial
**Surveyed Waterbodies**
Pond

**Surveyed Wetlands**
Palustrine Emergent
Palustrine Forested
No Survey Area
Contractor Yard
Proposed Pressure Regulation Station
MLV Site
Cumberland Meter Station

Permanent Easement
Temporary Workspace
Additional Temporary Workspace
Access Roads
Wet Weather Conveyance Start
Wet Weather Conveyance End
Photo Point

0    200    400 Feet
0    61    122 Meters

Stantec

Date Created: 5/26/2022    Date Revised: 5/26/2022  File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\WOTUS_Mapbook_20220525.mxd
GIS Analyst: Peter,Marsey

JA0216

AR  000025



**Potentially Jurisdictional Waters of the United States within the Cumberland Project**
Page 4 of 125
Cumberland Project
Dickson, Houston & Stewart Counties, Tennessee

Milepost
Proposed Pipeline

**Surveyed Streams**
Wet Weather Conveyance/Ephemeral
Stream/Intermittent
Stream/Perennial

**Surveyed Waterbodies**
Pond

**Surveyed Wetlands**
Palustrine Emergent
Palustrine Forested
No Survey Area
Contractor Yard
Proposed Pressure Regulation Station
MLV Site
Cumberland Meter Station

Permanent Easement
Temporary Workspace
Additional Temporary Workspace
Access Roads
Wet Weather Conveyance Start
Wet Weather Conveyance End
Photo Point

Stewart
Montgomery
Houston
Dickson
Humphreys

0    200    400 Feet
0    61    122 Meters

Stantec

Date Created: 5/26/2022   Date Revised: 5/26/2022   File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\WOTUS_Mapbook_20220525.mxd
GIS Analyst: Peter,Marsey

JA0217

AR 000026



Case: 23-3682    Document: 56-1    Filed: 08/19/2024    Page: 224

**Potentially Jurisdictional Waters of the United States within the Cumberland Project**
Page 5 of 125
Cumberland Project
Dickson, Houston & Stewart Counties, Tennessee

SDKA001
36.17356,
-87.21749

SDKA002
36.17336,
-87.21757

SDKA002
36.17325,
-87.21814

SDKA001
36.17287,
-87.21742

1.4    1.3    1.2    1.1

Stewart    Montgomery
Houston
Dickson
Humphreys

**Milepost**
**Proposed Pipeline**
**Surveyed Streams**
Wet Weather Conveyance/Ephemeral
Stream/Intermittent
Stream/Perennial
**Surveyed Waterbodies**
Pond

**Surveyed Wetlands**
Palustrine Emergent
Palustrine Forested
No Survey Area
Contractor Yard
Proposed Pressure Regulation Station
MLV Site
Cumberland Meter Station

**Permanent Easement**
**Temporary Workspace**
**Additional Temporary Workspace**
**Access Roads**
Wet Weather Conveyance Start
Wet Weather Conveyance End
Photo Point

0    200    400 Feet
0    61    122 Meters

Stantec

Date Created: 5/26/2022    Date Revised: 5/26/2022    File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\WOTUS_Mapbook_20220525.mxd
GIS Analyst: Peter.Marsey

JA0218

AR 000027



Case: 23-3682    Document: 56-1    Filed: 08/19/2024    Page: 225

**Potentially Jurisdictional Waters of the United States within the Cumberland Project**
Page 6 of 125
Cumberland Project
Dickson, Houston & Stewart Counties, Tennessee

Stantec

1.7    1.6    1.5    1.4

SDKA004

JA0219

AR 000028

Legend:

Milepost
Proposed Pipeline

Surveyed Streams
Wet Weather Conveyance/Ephemeral
Stream/Intermittent
Stream/Perennial

Surveyed Waterbodies
Pond

Surveyed Wetlands
Palustrine Emergent
Palustrine Forested

No Survey Area
Contractor Yard
Proposed Pressure Regulation Station
MLV Site
Cumberland Meter Station

Permanent Easement
Temporary Workspace
Additional Temporary Workspace
Access Roads
Wet Weather Conveyance Start
Wet Weather Conveyance End
Photo Point

0    200    400 Feet
0    61    122 Meters

Date Created: 5/26/2022    Date Revised: 5/26/2022    File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\WOTUS_Mapbook_20220525.mxd
GIS Analyst: Peter.Marsey

Stewart    Montgomery
Houston
Dickson
Humphreys



Case: 23-3682    Document: 56-1    Filed: 08/19/2024    Page: 226

SDKA006

SDKA005
36.17854,
-87.22681

SDKA005

SDKA005
36.17826,
-87.22663

2.0    1.9    1.8    1.7

**Potentially Jurisdictional Waters of the United States within the Cumberland Project**
Page 7 of 125
Cumberland Project
Dickson, Houston & Stewart Counties, Tennessee

Stantec

Milepost

**Surveyed Streams**
Wet Weather Conveyance/Ephemeral
Stream/Intermittent
Stream/Perennial

**Surveyed Waterbodies**
Pond

**Surveyed Wetlands**
Palustrine Emergent
Palustrine Forested
No Survey Area
Contractor Yard
Proposed Pressure Regulation Station
MLV Site
Cumberland Meter Station

Permanent Easement
Temporary Workspace
Additional Temporary Workspace
Access Roads
Wet Weather Conveyance Start
Wet Weather Conveyance End
Photo Point

0    200    400 Feet
0    61    122 Meters

Stewart    Montgomery
Houston
Dickson
Humphreys

Date Created: 5/26/2022    Date Revised: 5/26/2022  File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\WOTUS_Mapbook_20220525.mxd
GIS Analyst: Peter.Marsey

JA0220

AR 000029



SDKA007

SDKA006

2.3     2.2     2.1     2.0

**Potentially Jurisdictional Waters of the United States within the Cumberland Project**
Page 8 of 125
Cumberland Project
Dickson, Houston & Stewart Counties, Tennessee

Stewart
Montgomery
Houston
Dickson
Humphreys

**Legend:**

Midpost
Proposed Pipeline

**Surveyed Streams**
Wet Weather Conveyance/Ephemeral
Stream/Intermittent
Stream/Perennial

**Surveyed Waterbodies**
Pond

**Surveyed Wetlands**
Palustrine Emergent
Palustrine Forested
No Survey Area
Contractor Yard
Proposed Pressure Regulation Station
MLV Site
Cumberland Meter Station

Permanent Easement
Temporary Workspace
Additional Temporary Workspace
Access Roads
Wet Weather Conveyance Start
Wet Weather Conveyance End
Photo Point

Stantec

0    200    400 Feet
0    61    122 Meters

JA0221

AR 000030

Date Created: 5/26/2022   Date Revised: 5/26/2022  File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\WOTUS_Mapbook_20220525.mxd
GIS Analyst: Peter,Marsey



Case: 23-3682   Document: 56-1   Filed: 08/19/2024   Page: 228

**Potentially Jurisdictional Waters of the United States within the Cumberland Project**
Page 9 of 125
Cumberland Project
Dickson, Houston & Stewart Counties, Tennessee

Milepost
Proposed Pipeline

Surveyed Streams
Wet Weather Conveyance/Ephemeral
Stream/Intermittent
Stream/Perennial

Surveyed Waterbodies
Pond

Surveyed Wetlands
Palustrine Emergent
Palustrine Forested
No Survey Area
Contractor Yard
Proposed Pressure Regulation Station
MLV Site

Permanent Easement
Temporary Workspace
Additional Temporary Workspace
Access Roads
Wet Weather Conveyance Start
Wet Weather Conveyance End
Photo Point

Cumberland Meter Station

0    200    400 Feet
0    61    122 Meters

Stewart
Montgomery
Houston
Dickson
Humphreys

Stantec

Date Created: 5/26/2022   Date Revised: 5/26/2022   File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\WOTUS_Mapbook_20220525.mxd
GIS Analyst: Peter.Marsey

JA0222

AR 000031



**Potentially Jurisdictional Waters of the United States within the Cumberland Project**

Page 10 of 125

Cumberland Project

Dickson, Houston & Stewart Counties, Tennessee

Case: 23-3682   Document: 56-1   Filed: 08/19/2024   Page: 229

**Legend**

- Milepost
- Proposed Pipeline

Surveyed Streams
- Wet Weather Conveyance/Ephemeral
- Stream/Intermittent
- Stream/Perennial

Surveyed Waterbodies
- Pond

Surveyed Wetlands
- Palustrine Emergent
- Palustrine Forested
- No Survey Area
- Contractor Yard
- Proposed Pressure Regulation Station
- MLV Site

- Permanent Easement
- Temporary Workspace
- Additional Temporary Workspace
- Access Roads
- Cumberland Meter Station
- Wet Weather Conveyance Start
- Wet Weather Conveyance End
- Photo Point

Stewart   Montgomery
Houston
Dickson
Humphreys

0    200    400 Feet
0    61    122 Meters

**Stantec**

Date Created: 5/26/2022   Date Revised: 5/26/2022   File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\WOTUS_Mapbook_20220525.mxd
GIS Analyst: Peter,Marsey

JA0223

AR 000032

Jurisdictional Waters
Determinations and Tennessee
Hydrologic Determinations Report

APPENDIX

# B

HYDROLOGIC DETERMINATION
FIELD DATA SHEETS

AR  000274

# Appendix B
# Hydrologic Determination Field Data Sheets

AR 000275

# Hydrologic Determination Field Data Sheet

SDKA023

Tennessee Division of Water Pollution Control, Version 1.5

| | |
|---|---|
| Named Waterbody: Upper Sugarcamp Branch | Date/Time: 20210625 |
| Assessors/Affiliation: T. Fitzpatrick, J. Frizzell / Cardno | Project ID : |
| Site Name/Description: TVA Cumberland | |
| Site Location: | |
| HUC (12 digit): 051302040606 | Lat/Long: |
| Previous Rainfall (7-days) : ~6" | |
| Precipitation this Season vs. Normal : abnormally wet    elevated    average    low    abnormally dry    unknown | |
| Source of recent & seasonal precip data : | |
| Watershed Size : ~3 sq. miles | County: Dickson |
| Soil Type(s) / Geology : TN043 (Hawthorne-Sulphura 20-40%) | Source: NRCS |
| Surrounding Land Use : Forested - crosses power line ROW | |
| Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes) : | |
| Severe          Moderate          Slight          Absent | |

## Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1. Hydrologic feature exists solely due to a process discharge | ✓ | WWC |
| 2. Defined bed and bank absent, vegetation composed of upland and FACU species | ✓ | WWC |
| 3. Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | N/A | WWC |
| 4. Daily flow and precipitation records showing feature only flows in direct response to rainfall | ✓ | WWC |
| 5. Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | ✓ | Stream |
| 6. Presence of fish (except *Gambusia*) | | Stream |
| 7. Presence of naturally occurring ground water table connection | ✓ | Stream |
| 8. Flowing water in channel and 7 days since last precip >0.1" in local watershed | N/A | Stream |
| 9. Evidence watercourse has been used as a supply of drinking water | ✓ | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

**Overall Hydrologic Determination =** Stream

**Secondary Indicator Score (if applicable) =** N/A

**Justification / Notes :**

Fish present
Defined stream bed with
bedrock substrate
Molluscs present, crayfish

JA0226

AR 000276

## Secondary Field Indicator Evaluation

### A. Geomorphology (Subtotal =     )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 1. Continuous bed and bank | 0 | 1 | 2 | 3 |
| 2. Sinuous channel | 0 | 1 | 2 | 3 |
| 3. In-channel structure: riffle-pool sequences | 0 | 1 | 2 | 3 |
| 4. Sorting of soil textures or other substrate | 0 | 1 | 2 | 3 |
| 5. Active/relic floodplain | 0 | 0.5 | 1 | 1.5 |
| 6. Depositional bars or benches | 0 | 1 | 2 | 3 |
| 7. Braided channel | 0 | 1 | 2 | 3 |
| 8. Recent alluvial deposits | 0 | 0.5 | 1 | 1.5 |
| 9. Natural levees | 0 | 1 | 2 | 3 |
| 10. Headcuts | 0 | 1 | 2 | 3 |
| 11. Grade controls | 0 | 0.5 | 1 | 1.5 |
| 12. Natural valley or drainageway | 0 | 0.5 | 1 | 1.5 |
| 13. At least second order channel on existing USGS or   NRCS map | No = 0 | | Yes = 3 | |

### B. Hydrology (Subtotal =     )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 14. Subsurface flow/discharge into channel | 0 | 1 | 2 | 3 |
| 15. Water in channel and >48 hours since sig. rain | 0 | 1 | 2 | 3 |
| 16. Leaf litter in channel (January – September) | 1.5 | 1 | 0.5 | 0 |
| 17. Sediment on plants or on debris | 0 | 0.5 | 1 | 1.5 |
| 18. Organic debris lines or piles (wrack lines) | 0 | 0.5 | 1 | 1.5 |
| 19. Hydric soils in channel bed or sides of channel | No = 0 | | Yes = 1.5 | |

### C. Biology (Subtotal =     )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 20. Fibrous roots in channel bed 1 | 3 | 2 | 1 | 0 |
| 21. Rooted plants in the thalweg 1 | 3 | 2 | 1 | 0 |
| 22. Crayfish in stream (exclude in floodplain) | 0 | 1 | 2 | 3 |
| 23. Bivalves/mussels | 0 | 1 | 2 | 3 |
| 24. Amphibians | 0 | 0.5 | 1 | 1.5 |
| 25. Macrobenthos (record type & abundance) | 0 | 1 | 2 | 3 |
| 26. Filamentous algae; periphyton | 0 | 1 | 2 | 3 |
| 27. Iron oxidizing bacteria/fungus | 0 | 0.5 | 1 | 1.5 |
| 28. Wetland plants in channel bed 2 | 0 | 0.5 | 1 | 1.5 |

1 Focus is on the presence of terrestrial plants.    2 Focus is on the presence of aquatic or wetland plants.

Total Points = _____

*Under Normal Conditions, Watercourse is a Wet Weather Conveyance if Secondary Indicator Score < 19 points*

## Notes :

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

JA0227

AR 000277



**SDKA023:** North flowing perennial stream near Mile Post 1.

AR 000278

SDKA003

# Hydrologic Determination Field Data Sheet
## Tennessee Division of Water Pollution Control, Version 1.5

| | |
|---|---|
| Named Waterbody: UT to Upper Sugarcamp Branch | Date/Time: 20210622  15:30 |
| Assessors/Affiliation: T. Fitzpatrick / J. Frizzell - Cardno | Project ID : |
| Site Name/Description: TVA Cumberland | |
| Site Location: MP 0 | |
| HUC (12 digit): 051302040503 | Lat/Long: |
| Previous Rainfall (7-days) : ~6" | |

Precipitation this Season vs. Normal : abnormally wet   (elevated)   average   low   abnormally dry   unknown
Source of recent & seasonal precip data :

| | |
|---|---|
| Watershed Size : ~20 sq. miles | County: Dickson |
| Soil Type(s) / Geology : TN043 (Hawthorne - Sulphura 20-60%) | Source: NRCS |
| Surrounding Land Use : Forested originating in Power lines ROW roadside gorge | |

Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes) :
Severe          Moderate          (Slight)          Absent

## Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1. Hydrologic feature exists solely due to a process discharge | ✓ | WWC |
| 2. Defined bed and bank absent, vegetation composed of upland and FACU species | ✓ | WWC |
| 3. Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | N/A | WWC |
| 4. Daily flow and precipitation records showing feature only flows in direct response to rainfall | ✓ | WWC |
| 5. Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | ✓ | Stream |
| 6. Presence of fish (except *Gambusia*) | ✓ | Stream |
| 7. Presence of naturally occurring ground water table connection | ✓ | Stream |
| 8. Flowing water in channel and 7 days since last precip >0.1" in local watershed | N/A | Stream |
| 9. Evidence watercourse has been used as a supply of drinking water | ✓ | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

| | |
|---|---|
| **Overall Hydrologic Determination =** | WWC |
| **Secondary Indicator Score (if applicable) =** | 15 |

Justification / Notes :
Moderate/Slight alteration due to power lines
Very steep gradient from highway runoff erosion
  - vegetated 40-60% slopes
  - bed rock visible in dry channel

JA0229

## Secondary Field Indicator Evaluation

### A. Geomorphology (Subtotal = 10.25)

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 1. Continuous bed and bank | 0 | 1 | 2 | 3 |
| 2. Sinuous channel | 0 | 1 | 2 | 3 |
| 3. In-channel structure: riffle-pool sequences | 0 | 1 | 2 | 3 |
| 4. Sorting of soil textures or other substrate | 0 | 1 | 2 | 3 |
| 5. Active/relic floodplain | 0 | 1 | 2 | 3 |
| 6. Depositional bars or benches | 0 | 0.5 | 1 | 1.5 |
| 7. Braided channel | 0 | 1 | 2 | 3 |
| 8. Recent alluvial deposits | 0 | 1 | 2 | 3 |
| 9. Natural levees | 0 | 0.5 | 1 | 1.5 |
| 10. Headcuts | 0 | 1 | 2 | 3 |
| 11. Grade controls | 0 | 1 | 2 | 3 |
| 12. Natural valley or drainageway | 0 | 0.5 | 1 | 1.5 |
| 13. At least second order channel on existing USGS or NRCS map | 0 | 0.5 | 1 | 1.5 |
| | No = 0 | | Yes = 3 | |

### B. Hydrology (Subtotal = 1.25)

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 14. Subsurface flow/discharge into channel | 0 | 1 | 2 | 3 |
| 15. Water in channel and >48 hours since sig. rain | 0 | 1 | 2 | 3 |
| 16. Leaf litter in channel (January – September) | 1.5 | 1 | 0.5 | 0 |
| 17. Sediment on plants or on debris | 0 | 0.5 | 1 | 1.5 |
| 18. Organic debris lines or piles (wrack lines) | 0 | 0.5 | 1 | 1.5 |
| 19. Hydric soils in channel bed or sides of channel | No = 0 | | Yes = 1.5 | |

### C. Biology (Subtotal = 3.5)

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 20. Fibrous roots in channel bed [1] | 3 | 2 | 1 | 0 |
| 21. Rooted plants in the thalweg [1] | 3 | 2 | 1 | 0 |
| 22. Crayfish in stream (exclude in floodplain) | 0 | 1 | 2 | 3 |
| 23. Bivalves/mussels | 0 | 1 | 2 | 3 |
| 24. Amphibians | 0 | 0.5 | 1 | 1.5 |
| 25. Macrobenthos (record type & abundance) | 0 | 1 | 2 | 3 |
| 26. Filamentous algae; periphyton | 0 | 1 | 2 | 3 |
| 27. Iron oxidizing bacteria/fungus | 0 | 0.5 | 1 | 1.5 |
| 28. Wetland plants in channel bed [2] | 0 | 0.5 | 1 | 1.5 |

[1] Focus is on the presence of terrestrial plants.    [2] Focus is on the presence of aquatic or wetland plants.

---

Total Points = ___15.25___

*Under Normal Conditions, Watercourse is a Wet Weather Conveyance if Secondary Indicator Score < 19 points*

---

**Notes :**  Prior to treeline streambed very bottom of steep vegetated slopes.
Defined bed and bank strong after
entering the treeline — bed rough - cobble substrate.
TOB oHWM 4-6'  WW Ø
BH 2.0'  DHBF 5"

Biology indicators weak

large rusted corregated pipes on streambed

Large Underground electrical conduits surface
on ebars stream bank ~10' high in lower reach.

JA0230



**SDNK003:** North flowing wet weather conveyance/ephemeral channel near Mile Post 1.

AR 000281

SDK A045

# Hydrologic Determination Field Data Sheet
## Tennessee Division of Water Pollution Control, Version 1.5

| | |
|---|---|
| Named Waterbody: UT to Upper Sugarcamp Branch | Date/Time: 8/4/21 |
| Assessors/Affiliation: T. Fitzpatrick, A. Arnold | Project ID : |
| Site Name/Description: TVA Cumberland | |
| Site Location: | |
| HUC (12 digit): 051302040606 | Lat/Long: |
| Previous Rainfall (7-days) : ~6" | |

Precipitation this Season vs. Normal : abnormally wet    elevated    (average)    low    abnormally dry    unknown
Source of recent & seasonal precip data :

| | |
|---|---|
| Watershed Size : ~ 6 sq. mi | County: Dickson |
| Soil Type(s) / Geology : TN097 (Hawthorne-Sulphur 20-60%) | Source: NRCS |
| Surrounding Land Use : Farm & Utility/Road | |

Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes) :
Severe          (Moderate)          Slight          Absent

## Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1. Hydrologic feature exists solely due to a process discharge | ✓ | WWC |
| 2. Defined bed and bank absent, vegetation composed of upland and FACU species | ✓ | WWC |
| 3. Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | N/A | WWC |
| 4. Daily flow and precipitation records showing feature only flows in direct response to rainfall | ✓ | WWC |
| 5. Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | ✓ | Stream |
| 6. Presence of fish (except *Gambusia*) | ✓ | Stream |
| 7. Presence of naturally occurring ground water table connection | ✓ | Stream |
| 8. Flowing water in channel and 7 days since last precip >0.1" in local watershed | N/A | Stream |
| 9. Evidence watercourse has been used as a supply of drinking water | ✓ | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

| | |
|---|---|
| **Overall Hydrologic Determination =** WWC | |
| **Secondary Indicator Score (if applicable) =** 11.25 | |

Justification / Notes : Crossed by 2 two track farm roads
& multiple culverts
Broken brick and blocks added to control
erosion in channel

JA0232

AR 000282

## Secondary Field Indicator Evaluation

**A. Geomorphology** (Subtotal = 6.5)

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 1. Continuous bed and bank | 0 | 1 | 2 | 3 |
| 2. Sinuous channel | 0 | 1 | 2 | 3 |
| 3. In-channel structure: riffle-pool sequences | 0 | 1 | 2 | 3 |
| 4. Sorting of soil textures or other substrate | 0 | 1 | 2 | 3 |
| 5. Active/relic floodplain | 0 | 0.5 | 1 | 1.5 |
| 6. Depositional bars or benches | 0 | 1 | 2 | 3 |
| 7. Braided channel | 0 | 1 | 2 | 3 |
| 8. Recent alluvial deposits | 0 | 0.5 | 1 | 1.5 |
| 9. Natural levees | 0 | 1 | 2 | 3 |
| 10. Headcuts | 0 | 1 | 2 | 3 |
| 11. Grade controls | 0 | 0.5 | 1 | 1.5 |
| 12. Natural valley or drainageway | 0 | 0.5 | 1 | 1.5 |
| 13. At least second order channel on existing USGS or NRCS map | No = 0 | | Yes = 3 | |

**B. Hydrology** (Subtotal = 1.25)

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 14. Subsurface flow/discharge into channel | 0 | 1 | 2 | 3 |
| 15. Water in channel and >48 hours since sig. rain | 0 | 1 | 2 | 3 |
| 16. Leaf litter in channel (January – September) | 1.5 | 1 | 0.5 | 0 |
| 17. Sediment on plants or on debris | 0 | 0.5 | 1 | 1.5 |
| 18. Organic debris lines or piles (wrack lines) | 0 | 0.5 | 1 | 1.5 |
| 19. Hydric soils in channel bed or sides of channel | No = 0 | | Yes = 1.5 | |

**C. Biology** (Subtotal = 3.5)

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 20. Fibrous roots in channel bed [1] | 3 | 2 | 1 | 0 |
| 21. Rooted plants in the thalweg [1] | 3 | 2 | 1 | 0 |
| 22. Crayfish in stream (exclude in floodplain) | 0 | 1 | 2 | 3 |
| 23. Bivalves/mussels | 0 | 1 | 2 | 3 |
| 24. Amphibians | 0 | 0.5 | 1 | 1.5 |
| 25. Macrobenthos (record type & abundance) | 0 | 1 | 2 | 3 |
| 26. Filamentous algae; periphyton | 0 | 1 | 2 | 3 |
| 27. Iron oxidizing bacteria/fungus | 0 | 0.5 | 1 | 1.5 |
| 28. Wetland plants in channel bed [2] | 0 | 0.5 | 1 | 1.5 |

[1] Focus is on the presence of terrestrial plants.     [2] Focus is on the presence of aquatic or wetland plants.

Total Points = 11.25

*Under Normal Conditions, Watercourse is a Wet Weather Conveyance if Secondary Indicator Score < 19 points*

**Notes :** Rocky ditch on steep grade
between 2 farm roads in
sampled area-
Bio Indicators mostly absent

JA0233

AR 000283



**SDKA045:** Northwest flowing wet weather conveyance/ephemeral channel near Mile Post 1.

AR  000284

SDKA021

## Hydrologic Determination Field Data Sheet
### Tennessee Division of Water Pollution Control, Version 1.5

| | |
|---|---|
| Named Waterbody: UT. Upper Sugar Camp Branch | Date/Time: 20210625  09:2 |
| Assessors/Affiliation: T. Fitzpatrick, J. Frizzell / Cardno | Project ID : |
| Site Name/Description: TVA Cumberland | |
| Site Location: | |
| HUC (12 digit): 051302040606 | Lat/Long: |
| Previous Rainfall (7-days): ~ 5" | |
| Precipitation this Season vs. Normal : abnormally wet   elevated   (average)   low   abnormally dry   unknown | |
| Source of recent & seasonal precip data : | |
| Watershed Size : ~3 sq. miles | County: Dickson |
| Soil Type(s) / Geology : TN047 (Hawthorne-Sulphura 20-60%)   Source: NRCS | |
| Surrounding Land Use : Forest   Power line ROW | |
| Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes) : Severe   Moderate   (Slight)   Absent | |

### Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1.  Hydrologic feature exists solely due to a process discharge | ✓ | WWC |
| 2.  Defined bed and bank absent, vegetation composed of upland and FACU species | ✓ | WWC |
| 3.  Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | N/A | WWC |
| 4.  Daily flow and precipitation records showing feature only flows in direct response to rainfall | ✓ | WWC |
| 5.  Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | ✓ | Stream |
| 6.  Presence of fish (except *Gambusia*) | ✓ | Stream |
| 7.  Presence of naturally occurring ground water table connection | | (Stream) |
| 8.  Flowing water in channel and 7 days since last precip >0.1" in local watershed | N/A | Stream |
| 9.  Evidence watercourse has been used as a supply of drinking water | ✓ | Stream |

**NOTE:  If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

| Overall Hydrologic Determination = | Stream |
|---|---|
| Secondary Indicator Score (if applicable) = | N/A |

**Justification / Notes :**
Ground water feed / connection confirmed
Mollusks, amphibians present
well defined stream
Baseflow present throughout

JA0235

AR  000285

## Secondary Field Indicator Evaluation

**A. Geomorphology** (Subtotal =     )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 1. Continuous bed and bank | 0 | 1 | 2 | 3 |
| 2. Sinuous channel | 0 | 1 | 2 | 3 |
| 3. In-channel structure: riffle-pool sequences | 0 | 1 | 2 | 3 |
| 4. Sorting of soil textures or other substrate | 0 | 1 | 2 | 3 |
| 5. Active/relic floodplain | 0 | 0.5 | 1 | 1.5 |
| 6. Depositional bars or benches | 0 | 1 | 2 | 3 |
| 7. Braided channel | 0 | 1 | 2 | 3 |
| 8. Recent alluvial deposits | 0 | 0.5 | 1 | 1.5 |
| 9. Natural levees | 0 | 1 | 2 | 3 |
| 10. Headcuts | 0 | 1 | 2 | 3 |
| 11. Grade controls | 0 | 0.5 | 1 | 1.5 |
| 12. Natural valley or drainageway | 0 | 0.5 | 1 | 1.5 |
| 13. At least second order channel on existing USGS or     NRCS map | No = 0 | | Yes = 3 | |

**B. Hydrology** (Subtotal =     )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 14. Subsurface flow/discharge into channel | 0 | 1 | 2 | 3 |
| 15. Water in channel and >48 hours since sig. rain | 0 | 1 | 2 | 3 |
| 16. Leaf litter in channel (January – September) | 1.5 | 1 | 0.5 | 0 |
| 17. Sediment on plants or on debris | 0 | 0.5 | 1 | 1.5 |
| 18. Organic debris lines or piles (wrack lines) | 0 | 0.5 | 1 | 1.5 |
| 19. Hydric soils in channel bed or sides of channel | No = 0 | | Yes = 1.5 | |

**C. Biology** (Subtotal =     )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 20. Fibrous roots in channel bed ₁ | 3 | 2 | 1 | 0 |
| 21. Rooted plants in the thalweg ₁ | 3 | 2 | 1 | 0 |
| 22. Crayfish in stream (exclude in floodplain) | 0 | 1 | 2 | 3 |
| 23. Bivalves/mussels | 0 | 1 | 2 | 3 |
| 24. Amphibians | 0 | 0.5 | 1 | 1.5 |
| 25. Macrobenthos (record type & abundance) | 0 | 1 | 2 | 3 |
| 26. Filamentous algae; periphyton | 0 | 1 | 2 | 3 |
| 27. Iron oxidizing bacteria/fungus | 0 | 0.5 | 1 | 1.5 |
| 28. Wetland plants in channel bed ₂ | 0 | 0.5 | 1 | 1.5 |

₁ Focus is on the presence of terrestrial plants.      ₂ Focus is on the presence of aquatic or wetland plants.

Total Points = _____

*Under Normal Conditions, Watercourse is a Wet Weather Conveyance if Secondary Indicator Score < 19 points*

**Notes :**

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

AR 000286



**SDKA021:** North flowing stream near Mile Post 1.

AR  000287

SDKA022

# Hydrologic Determination Field Data Sheet
## Tennessee Division of Water Pollution Control, Version 1.5

| | |
|---|---|
| Named Waterbody: UT to Upper Sugar Camp Branch | Date/Time: 20210626 09:3 |
| Assessors/Affiliation: T. Fitzpatrick J. Frizzell / Cardno | Project ID : |
| Site Name/Description: TVA Cumberland | |
| Site Location: | |
| HUC (12 digit): 0 5 1 3 0 2 0 4 0 6 0 6 | Lat/Long: |
| Previous Rainfall (7-days): ~6" | |
| Precipitation this Season vs. Normal : abnormally wet    elevated    average    low    abnormally dry    unknown | |
| Source of recent & seasonal precip data : | |
| Watershed Size : ~3 sqr miles | County: Dickson |
| Soil Type(s) / Geology : TN043 (Hawthorne-Sulphura 20-60%)    Source: NRCS | |
| Surrounding Land Use : Forest | |

Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes) :
Severe                Moderate                Slight                (Absent)

## Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1.  Hydrologic feature exists solely due to a process discharge | ✓ | WWC |
| 2.  Defined bed and bank absent, vegetation composed of upland and FACU species | ✓ | WWC |
| 3.  Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | N/A | WWC |
| 4.  Daily flow and precipitation records showing feature only flows in direct response to rainfall | ✓ | WWC |
| 5.  Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | ✓ | Stream |
| 6.  Presence of fish (except *Gambusia*) | ✓ | Stream |
| 7.  Presence of naturally occurring ground water table connection | | Stream |
| 8.  Flowing water in channel and 7 days since last precip >0.1" in local watershed | N/A | Stream |
| 9.  Evidence watercourse has been used as a supply of drinking water | ✓ | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

| | |
|---|---|
| **Overall Hydrologic Determination =** | Stream |
| **Secondary Indicator Score (if applicable) =** | N/A |

**Justification / Notes :** Spring fed seepage
well defined bed and bank
mollusks present

AR 000288

## Secondary Field Indicator Evaluation

**A. Geomorphology** (Subtotal = ___ )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 1. Continuous bed and bank | 0 | 1 | 2 | 3 |
| 2. Sinuous channel | 0 | 1 | 2 | 3 |
| 3. In-channel structure: riffle-pool sequences | 0 | 1 | 2 | 3 |
| 4. Sorting of soil textures or other substrate | 0 | 1 | 2 | 3 |
| 5. Active/relic floodplain | 0 | 0.5 | 1 | 1.5 |
| 6. Depositional bars or benches | 0 | 1 | 2 | 3 |
| 7. Braided channel | 0 | 1 | 2 | 3 |
| 8. Recent alluvial deposits | 0 | 0.5 | 1 | 1.5 |
| 9. Natural levees | 0 | 1 | 2 | 3 |
| 10. Headcuts | 0 | 1 | 2 | 3 |
| 11. Grade controls | 0 | 0.5 | 1 | 1.5 |
| 12. Natural valley or drainageway | 0 | 0.5 | 1 | 1.5 |
| 13. At least second order channel on existing USGS or NRCS map | No = 0 | | Yes = 3 | |

**B. Hydrology** (Subtotal = ___ )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 14. Subsurface flow/discharge into channel | 0 | 1 | 2 | 3 |
| 15. Water in channel and >48 hours since sig. rain | 0 | 1 | 2 | 3 |
| 16. Leaf litter in channel (January – September) | 1.5 | 1 | 0.5 | 0 |
| 17. Sediment on plants or on debris | 0 | 0.5 | 1 | 1.5 |
| 18. Organic debris lines or piles (wrack lines) | 0 | 0.5 | 1 | 1.5 |
| 19. Hydric soils in channel bed or sides of channel | No = 0 | | Yes = 1.5 | |

**C. Biology** (Subtotal = ___ )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 20. Fibrous roots in channel bed 1 | 3 | 2 | 1 | 0 |
| 21. Rooted plants in the thalweg 1 | 3 | 2 | 1 | 0 |
| 22. Crayfish in stream (exclude in floodplain) | 0 | 1 | 2 | 3 |
| 23. Bivalves/mussels | 0 | 1 | 2 | 3 |
| 24. Amphibians | 0 | 0.5 | 1 | 1.5 |
| 25. Macrobenthos (record type & abundance) | 0 | 1 | 2 | 3 |
| 26. Filamentous algae; periphyton | 0 | 1 | 2 | 3 |
| 27. Iron oxidizing bacteria/fungus | 0 | 0.5 | 1 | 1.5 |
| 28. Wetland plants in channel bed 2 | 0 | 0.5 | 1 | 1.5 |

1 Focus is on the presence of terrestrial plants.     2 Focus is on the presence of aquatic or wetland plants.

Total Points = _____

*Under Normal Conditions, Watercourse is a Wet Weather Conveyance if Secondary Indicator Score < 19 points*

**Notes :**

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

AR 000289



**SDK022:** Northeast flowing stream near Mile Post 1.

AR 000290

# Hydrologic Determination Field Data Sheet
Tennessee Division of Water Pollution Control, Version 1.5

SDKA024

| | |
|---|---|
| Named Waterbody: UT to Sugarcamp Branch | Date/Time: 2021 0625   11:00 |
| Assessors/Affiliation: T. Fitzgerald, J. Frizzell / Cardno | Project ID : |
| Site Name/Description: TVA Cumberland | |
| Site Location: | |
| HUC (12 digit): 05 13 02 04 06 06 | Lat/Long: |
| Previous Rainfall (7-days) : ~6" | |

Precipitation this Season vs. Normal : abnormally wet   elevated   average   low   abnormally dry   unknown
Source of recent & seasonal precip data :

| | |
|---|---|
| Watershed Size : ~3 sq. miles | County: Dickson |
| Soil Type(s) / Geology : TN043 (Hawthorne-Sulphura 20-40%) | Source: NRCS |
| Surrounding Land Use : Forested | |

Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes) :
Severe          Moderate          Slight          (Absent)

## Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1. Hydrologic feature exists solely due to a process discharge | ✓ | WWC |
| 2. Defined bed and bank absent, vegetation composed of upland and FACU species | ✓ | WWC |
| 3. Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | N/A | WWC |
| 4. Daily flow and precipitation records showing feature only flows in direct response to rainfall | ✓ | WWC |
| 5. Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | ✓ | Stream |
| 6. Presence of fish (except *Gambusia*) | ✓ | Stream |
| 7. Presence of naturally occurring ground water table connection | ✓ | Stream |
| 8. Flowing water in channel and 7 days since last precip >0.1" in local watershed | N/A | Stream |
| 9. Evidence watercourse has been used as a supply of drinking water | ✓ | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

**Overall Hydrologic Determination =** WWC

**Secondary Indicator Score (if applicable) =** 10.5

**Justification / Notes :**
Dry watercourse
Fill way over and
losing stream characteristics
as it goes downslope.

JA0241

AR 000291

## Secondary Field Indicator Evaluation

**A. Geomorphology** (Subtotal = 8 )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 1. Continuous bed and bank | 0 | 1 | 2 | 3 |
| 2. Sinuous channel | 0 | 1 | 2 | 3 |
| 3. In-channel structure: riffle-pool sequences | 0 | 1 | 2 | 3 |
| 4. Sorting of soil textures or other substrate | 0 | 1 | 2 | 3 |
| 5. Active/relic floodplain | 0 | 0.5 | 1 | 1.5 |
| 6. Depositional bars or benches | 0 | 1 | 2 | 3 |
| 7. Braided channel | 0 | 1 | 2 | 3 |
| 8. Recent alluvial deposits | 0 | 0.5 | 1 | 1.5 |
| 9. Natural levees | 0 | 1 | 2 | 3 |
| 10. Headcuts | 0 | 1 | 2 | 3 |
| 11. Grade controls | 0 | 0.5 | 1 | 1.5 |
| 12. Natural valley or drainageway | 0 | 0.5 | 1 | 1.5 |
| 13. At least second order channel on existing USGS or NRCS map | No = 0 | | Yes = 3 | |

**B. Hydrology** (Subtotal = 1 )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 14. Subsurface flow/discharge into channel | 0 | 1 | 2 | 3 |
| 15. Water in channel and >48 hours since sig. rain | 0 | 1 | 2 | 3 |
| 16. Leaf litter in channel (January – September) | 1.5 | 1 | 0.5 | 0 |
| 17. Sediment on plants or on debris | 0 | 0.5 | 1 | 1.5 |
| 18. Organic debris lines or piles (wrack lines) | 0 | 0.5 | 1 | 1.5 |
| 19. Hydric soils in channel bed or sides of channel | No = 0 | | Yes = 1.5 | |

**C. Biology** (Subtotal = 1.5 )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 20. Fibrous roots in channel bed [1] | 3 | 2 | 1 | 0 |
| 21. Rooted plants in the thalweg [1] | 3 | 2 | 1 | 0 |
| 22. Crayfish in stream (exclude in floodplain) | 0 | 1 | 2 | 3 |
| 23. Bivalves/mussels | 0 | 1 | 2 | 3 |
| 24. Amphibians | 0 | 0.5 | 1 | 1.5 |
| 25. Macrobenthos (record type & abundance) | 0 | 1 | 2 | 3 |
| 26. Filamentous algae; periphyton | 0 | 1 | 2 | 3 |
| 27. Iron oxidizing bacteria/fungus | 0 | 0.5 | 1 | 1.5 |
| 28. Wetland plants in channel bed [2] | 0 | 0.5 | 1 | 1.5 |

[1] Focus is on the presence of terrestrial plants.     [2] Focus is on the presence of aquatic or wetland plants.

Total Points = 10.5

*Under Normal Conditions, Watercourse is a Wet Weather Conveyance if Secondary Indicator Score < 19 points*

**Notes :** Channel more defined in upper reach as dry water course meanders becomes gradual sloped draw becoming flat and entering clogged culvert at powerline ROW crossing. Hydro / Bio generally weak.

JA0242

AR 000292



**SDKA024:** Northeast flowing wet weather conveyance/ephemeral channel near Mile Post 1.

AR 000293

50KA025

# Hydrologic Determination Field Data Sheet
Tennessee Division of Water Pollution Control, Version 1.5

| | |
|---|---|
| Named Waterbody: UT to "Jordan Branch" | Date/Time: 22212624  1/14 |
| Assessors/Affiliation: T. Fitzpatrick, J. Ferrell / Cardno | Project ID : |
| Site Name/Description: TVA Cumberland | |
| Site Location: | |
| HUC (12 digit): 051302040503 | Lat/Long: |
| Previous Rainfall (7-days): ~6" | |

Precipitation this Season vs. Normal :  abnormally wet    elevated    (average)    low    abnormally dry    unknown

Source of recent & seasonal precip data :

| | |
|---|---|
| Watershed Size : ~7 sqi miles | County: Dickson |
| Soil Type(s) / Geology: TN093 (Hawthorne-Sulphura 20-40%) | Source: NRCS |
| Surrounding Land Use : utility corridor – forest | |

Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes) :
Severe          (Moderate)          Slight          Absent

## Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1. Hydrologic feature exists solely due to a process discharge | ✓ | WWC |
| 2. Defined bed and bank absent, vegetation composed of upland and FACU species | | (WWC) |
| 3. Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | N/A | WWC |
| 4. Daily flow and precipitation records showing feature only flows in direct response to rainfall | ✓ | WWC |
| 5. Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | ✓ | Stream |
| 6. Presence of fish (except *Gambusia*) | ✓ | Stream |
| 7. Presence of naturally occurring ground water table connection | ✓ | Stream |
| 8. Flowing water in channel and 7 days since last precip >0.1" in local watershed | N/A | Stream |
| 9. Evidence watercourse has been used as a supply of drinking water | ✓ | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

**Overall Hydrologic Determination =** WWC

**Secondary Indicator Score (if applicable) =** N/A

**Justification / Notes :** Steep ditch – bed bank absent → from power line corridor

JA0244

AR 000294

## Secondary Field Indicator Evaluation

**A. Geomorphology** (Subtotal = )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 1. Continuous bed and bank | 0 | 1 | 2 | 3 |
| 2. Sinuous channel | 0 | 1 | 2 | 3 |
| 3. In-channel structure: riffle-pool sequences | 0 | 1 | 2 | 3 |
| 4. Sorting of soil textures or other substrate | 0 | 1 | 2 | 3 |
| 5. Active/relic floodplain | 0 | 0.5 | 1 | 1.5 |
| 6. Depositional bars or benches | 0 | 1 | 2 | 3 |
| 7. Braided channel | 0 | 1 | 2 | 3 |
| 8. Recent alluvial deposits | 0 | 0.5 | 1 | 1.5 |
| 9. Natural levees | 0 | 1 | 2 | 3 |
| 10. Headcuts | 0 | 1 | 2 | 3 |
| 11. Grade controls | 0 | 0.5 | 1 | 1.5 |
| 12. Natural valley or drainageway | 0 | 0.5 | 1 | 1.5 |
| 13. At least second order channel on existing USGS or NRCS map | No = 0 | | Yes = 3 | |

**B. Hydrology** (Subtotal = )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 14. Subsurface flow/discharge into channel | 0 | 1 | 2 | 3 |
| 15. Water in channel and >48 hours since sig. rain | 0 | 1 | 2 | 3 |
| 16. Leaf litter in channel (January – September) | 1.5 | 1 | 0.5 | 0 |
| 17. Sediment on plants or on debris | 0 | 0.5 | 1 | 1.5 |
| 18. Organic debris lines or piles (wrack lines) | 0 | 0.5 | 1 | 1.5 |
| 19. Hydric soils in channel bed or sides of channel | No = 0 | | Yes = 1.5 | |

**C. Biology** (Subtotal = )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 20. Fibrous roots in channel bed ₁ | 3 | 2 | 1 | 0 |
| 21. Rooted plants in the thalweg ₁ | 3 | 2 | 1 | 0 |
| 22. Crayfish in stream (exclude in floodplain) | 0 | 1 | 2 | 3 |
| 23. Bivalves/mussels | 0 | 1 | 2 | 3 |
| 24. Amphibians | 0 | 0.5 | 1 | 1.5 |
| 25. Macrobenthos (record type & abundance) | 0 | 1 | 2 | 3 |
| 26. Filamentous algae; periphyton | 0 | 1 | 2 | 3 |
| 27. Iron oxidizing bacteria/fungus | 0 | 0.5 | 1 | 1.5 |
| 28. Wetland plants in channel bed 2 | 0 | 0.5 | 1 | 1.5 |

₁ Focus is on the presence of terrestrial plants.     ₂ Focus is on the presence of aquatic or wetland plants.

Total Points = _____

*Under Normal Conditions, Watercourse is a Wet Weather Conveyance if Secondary Indicator Score < 19 points*

**Notes :**

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

AR 000295



**SDKA025:** South flowing wet weather conveyance/ephemeral channel near Mile Post 1.

AR  000296

SDKA026

## Hydrologic Determination Field Data Sheet
Tennessee Division of Water Pollution Control, Version 1.5

| Named Waterbody: Jordan Branch | Date/Time: 2021 0625 |
|---|---|
| Assessors/Affiliation: T. Fitzpatrick, J. Frizzell / Cardno | Project ID : |
| Site Name/Description: TVA Cumberland | |
| Site Location: | |
| HUC (12 digit): 051302090503 | Lat/Long: |
| Previous Rainfall (7-days) : ~6" | |

Precipitation this Season vs. Normal : abnormally wet    elevated    average    low    abnormally dry    unknown
Source of recent & seasonal precip data :

| Watershed Size : ~ 7 sq miles | County: Dickson |
|---|---|
| Soil Type(s) / Geology: TN04J (Hawthorn - Sulphura 20-40%) | Source: NRCS |
| Surrounding Land Use : Forest | |

Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes) :
Severe          Moderate          Slight          (Absent)

### Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1.  Hydrologic feature exists solely due to a process discharge | ✓ | WWC |
| 2.  Defined bed and bank absent, vegetation composed of upland and FACU species | ✓ | WWC |
| 3.  Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | N/A | WWC |
| 4.  Daily flow and precipitation records showing feature only flows in direct response to rainfall | ✓ | WWC |
| 5.  Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | | (Stream) |
| 6.  Presence of fish (except *Gambusia*) | | (Stream) |
| 7.  Presence of naturally occurring ground water table connection | | (Stream) |
| 8.  Flowing water in channel and 7 days since last precip >0.1" in local watershed | N/A | Stream |
| 9.  Evidence watercourse has been used as a supply of drinking water | ✓ | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

**Overall Hydrologic Determination =** Stream

Secondary Indicator Score (if applicable) = N/A

**Justification / Notes :** Fish prevalent, gastropods salamanders, stonefly nymphs, caddis flyes / casings, crayfish -
Long rock shelf feeding alongside - gnd. connect.
↳ High Quality Stream

JA0247

AR 000297

## Secondary Field Indicator Evaluation

**A. Geomorphology** (Subtotal = ____ )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 1. Continuous bed and bank | 0 | 1 | 2 | 3 |
| 2. Sinuous channel | 0 | 1 | 2 | 3 |
| 3. In-channel structure: riffle-pool sequences | 0 | 1 | 2 | 3 |
| 4. Sorting of soil textures or other substrate | 0 | 1 | 2 | 3 |
| 5. Active/relic floodplain | 0 | 0.5 | 1 | 1.5 |
| 6. Depositional bars or benches | 0 | 1 | 2 | 3 |
| 7. Braided channel | 0 | 1 | 2 | 3 |
| 8. Recent alluvial deposits | 0 | 0.5 | 1 | 1.5 |
| 9. Natural levees | 0 | 1 | 2 | 3 |
| 10. Headcuts | 0 | 1 | 2 | 3 |
| 11. Grade controls | 0 | 0.5 | 1 | 1.5 |
| 12. Natural valley or drainageway | 0 | 0.5 | 1 | 1.5 |
| 13. At least second order channel on existing USGS or NRCS map | No = 0 | | Yes = 3 | |

**B. Hydrology** (Subtotal = ____ )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 14. Subsurface flow/discharge into channel | 0 | 1 | 2 | 3 |
| 15. Water in channel and >48 hours since sig. rain | 0 | 1 | 2 | 3 |
| 16. Leaf litter in channel (January – September) | 1.5 | 1 | 0.5 | 0 |
| 17. Sediment on plants or on debris | 0 | 0.5 | 1 | 1.5 |
| 18. Organic debris lines or piles (wrack lines) | 0 | 0.5 | 1 | 1.5 |
| 19. Hydric soils in channel bed or sides of channel | No = 0 | | Yes = 1.5 | |

**C. Biology** (Subtotal = ____ )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 20. Fibrous roots in channel bed 1 | 3 | 2 | 1 | 0 |
| 21. Rooted plants in the thalweg 1 | 3 | 2 | 1 | 0 |
| 22. Crayfish in stream (exclude in floodplain) | 0 | 1 | 2 | 3 |
| 23. Bivalves/mussels | 0 | 1 | 2 | 3 |
| 24. Amphibians | 0 | 0.5 | 1 | 1.5 |
| 25. Macrobenthos (record type & abundance) | 0 | 1 | 2 | 3 |
| 26. Filamentous algae; periphyton | 0 | 1 | 2 | 3 |
| 27. Iron oxidizing bacteria/fungus | 0 | 0.5 | 1 | 1.5 |
| 28. Wetland plants in channel bed 2 | 0 | 0.5 | 1 | 1.5 |

1 Focus is on the presence of terrestrial plants.     2 Focus is on the presence of aquatic or wetland plants.

Total Points = _____

*Under Normal Conditions, Watercourse is a Wet Weather
Conveyance if Secondary Indicator Score < 19 points*

**Notes :**

AR 000298



**SDKA026:** North flowing perennial stream near Mile Post 1.

AR 000299

SDKA027

# Hydrologic Determination Field Data Sheet
## Tennessee Division of Water Pollution Control, Version 1.5

| | |
|---|---|
| Named Waterbody: _UT to Jordan Branch_ | Date/Time: |
| Assessors/Affiliation: _T. Fitzpatrick, J. Frizzell / Cardno_ | Project ID : |
| Site Name/Description: _TVA Cumberland_ | |

| |
|---|
| Site Location: |
| HUC (12 digit): _051302040503_    Lat/Long: |
| Previous Rainfall (7-days) : _~6"_ |
| Precipitation this Season vs. Normal : abnormally wet   elevated   average   low   abnormally dry   unknown |
| Source of recent & seasonal precip data : |
| Watershed Size : _~7 sq. miles_    County: _Dickson_ |
| Soil Type(s) / Geology : _TN043 (Hawthorn-Sulphura 20-40%)_    Source: _NRCS_ |
| Surrounding Land Use : _Forest_ |
| Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes) : |
| Severe            Moderate            Slight            (Absent) |

## Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1. Hydrologic feature exists solely due to a process discharge | ✓ | WWC |
| 2. Defined bed and bank absent, vegetation composed of upland and FACU species | ✓ | WWC |
| 3. Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | N/A | WWC |
| 4. Daily flow and precipitation records showing feature only flows in direct response to rainfall | ✓ | WWC |
| 5. Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | | Stream |
| 6. Presence of fish (except *Gambusia*) | | Stream |
| 7. Presence of naturally occurring ground water table connection | | Stream |
| 8. Flowing water in channel and 7 days since last precip >0.1" in local watershed | N/A | Stream |
| 9. Evidence watercourse has been used as a supply of drinking water | ✓ | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

| |
|---|
| **Overall Hydrologic Determination** = _Stream_ |
| **Secondary Indicator Score (if applicable)** = _N/A_ |

**Justification / Notes :** _Well defined (10+ ft wide bedrock bed in places)
Stream bed and bank
Fish prevalent in lower reach, molluscs,
macros present as well - gw connect confirmed
(plecoptera)_

JA0250

AR 000300

## Secondary Field Indicator Evaluation

| A. Geomorphology (Subtotal =    ) | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 1. Continuous bed and bank | 0 | 1 | 2 | 3 |
| 2. Sinuous channel | 0 | 1 | 2 | 3 |
| 3. In-channel structure: riffle-pool sequences | 0 | 1 | 2 | 3 |
| 4. Sorting of soil textures or other substrate | 0 | 1 | 2 | 3 |
| 5. Active/relic floodplain | 0 | 0.5 | 1 | 1.5 |
| 6. Depositional bars or benches | 0 | 1 | 2 | 3 |
| 7. Braided channel | 0 | 1 | 2 | 3 |
| 8. Recent alluvial deposits | 0 | 0.5 | 1 | 1.5 |
| 9. Natural levees | 0 | 1 | 2 | 3 |
| 10. Headcuts | 0 | 1 | 2 | 3 |
| 11. Grade controls | 0 | 0.5 | 1 | 1.5 |
| 12. Natural valley or drainageway | 0 | 0.5 | 1 | 1.5 |
| 13. At least second order channel on existing USGS or NRCS map | No = 0 | | Yes = 3 | |

| B. Hydrology (Subtotal =    ) | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 14. Subsurface flow/discharge into channel | 0 | 1 | 2 | 3 |
| 15. Water in channel and >48 hours since sig. rain | 0 | 1 | 2 | 3 |
| 16. Leaf litter in channel (January – September) | 1.5 | 1 | 0.5 | 0 |
| 17. Sediment on plants or on debris | 0 | 0.5 | 1 | 1.5 |
| 18. Organic debris lines or piles (wrack lines) | 0 | 0.5 | 1 | 1.5 |
| 19. Hydric soils in channel bed or sides of channel | No = 0 | | Yes = 1.5 | |

| C. Biology (Subtotal =    ) | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 20. Fibrous roots in channel bed 1 | 3 | 2 | 1 | 0 |
| 21. Rooted plants in the thalweg 1 | 3 | 2 | 1 | 0 |
| 22. Crayfish in stream (exclude in floodplain) | 0 | 1 | 2 | 3 |
| 23. Bivalves/mussels | 0 | 1 | 2 | 3 |
| 24. Amphibians | 0 | 0.5 | 1 | 1.5 |
| 25. Macrobenthos (record type & abundance) | 0 | 1 | 2 | 3 |
| 26. Filamentous algae; periphyton | 0 | 1 | 2 | 3 |
| 27. Iron oxidizing bacteria/fungus | 0 | 0.5 | 1 | 1.5 |
| 28. Wetland plants in channel bed 2 | 0 | 0.5 | 1 | 1.5 |

1 Focus is on the presence of terrestrial plants.    2 Focus is on the presence of aquatic or wetland plants.

Total Points = _____

*Under Normal Conditions, Watercourse is a Wet Weather
Conveyance if Secondary Indicator Score < 19 points*

## Notes :

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

JA0251

AR 000301



**SDKA027:** Southwest flowing perennial stream near Mile Post 1.

AR 000302

## Hydrologic Determination Field Data Sheet
Tennessee Division of Water Pollution Control, Version 1.5

| | |
|---|---|
| Named Waterbody: UT to Jordan Branch | Date/Time: 20210622  09 |
| Assessors/Affiliation: T. Fitzpatrick / J. Frizzell | Project ID : |
| Site Name/Description: TVA Cumberland | |
| Site Location: MP 1.17 | |
| HUC (12 digit): 051302040503 | Lat/Long: |
| Previous Rainfall (7-days) : ~6" | |

Precipitation this Season vs. Normal : abnormally wet  (elevated)  average  low  abnormally dry  unknown
Source of recent & seasonal precip data :

| | |
|---|---|
| Watershed Size : ~20 square miles | County: Dickson |
| Soil Type(s) / Geology : TN093 (Hawthorne-Sulphura 20-60%) | Source: NRCS |
| Surrounding Land Use : Forested-upper reach power lines ROW | |

Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes) :
Severe       (Moderate)       Slight       Absent

### Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1. Hydrologic feature exists solely due to a process discharge | ✓ | WWC |
| 2. Defined bed and bank absent, vegetation composed of upland and FACU species | ✓ | WWC |
| 3. Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | N/A | WWC |
| 4. Daily flow and precipitation records showing feature only flows in direct response to rainfall | ✓ | WWC |
| 5. Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | ✓ | Stream |
| 6. Presence of fish (except *Gambusia*) | ✓ | Stream |
| 7. Presence of naturally occurring ground water table connection | ✓ | Stream |
| 8. Flowing water in channel and 7 days since last precip >0.1" in local watershed | N/A | Stream |
| 9. Evidence watercourse has been used as a supply of drinking water | ✓ | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

| | |
|---|---|
| **Overall Hydrologic Determination =** | WWC |
| **Secondary Indicator Score (if applicable) =** | 15.25 |

Justification / Notes :
Moderate alteration to natural channel from power line ROW

AR 000303

## Secondary Field Indicator Evaluation

**A. Geomorphology** (Subtotal = 9.5)

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 1. Continuous bed and bank | 0 | 1 | 2 | 3 |
| 2. Sinuous channel | 0 | 1 | 2 | 3 |
| 3. In-channel structure: riffle-pool sequences | 0 | 1 | 2 | 3 |
| 4. Sorting of soil textures or other substrate | 0 | 1 | 2 | 3 |
| 5. Active/relic floodplain | 0 | 1 | 2 | 3 |
| 6. Depositional bars or benches | 0 | 0.5 | 1 | 1.5 |
| 7. Braided channel | 0 | 1 | 2 | 3 |
| 8. Recent alluvial deposits | 0 | 1 | 2 | 3 |
| 9. Natural levees | 0 | 0.5 | 1 | 1.5 |
| 10. Headcuts | 0 | 1 | 2 | 3 |
| 11. Grade controls | 0 | 1 | 2 | 3 |
| 12. Natural valley or drainageway | 0 | 0.5 | 1 | 1.5 |
| 13. At least second order channel on existing USGS or NRCS map | No = 0 | | Yes = 3 | |

**B. Hydrology** (Subtotal = 4.5)

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 14. Subsurface flow/discharge into channel | 0 | 1 | 2 | 3 |
| 15. Water in channel and >48 hours since sig. rain | 0 | 1 | 2 | 3 |
| 16. Leaf litter in channel (January – September) | 1.5 | 1 | 0.5 | 0 |
| 17. Sediment on plants or on debris | 0 | 0.5 | 1 | 1.5 |
| 18. Organic debris lines or piles (wrack lines) | 0 | 0.5 | 1 | 1.5 |
| 19. Hydric soils in channel bed or sides of channel | No = 0 | | Yes = 1.5 | |

**C. Biology** (Subtotal = 1.25)

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 20. Fibrous roots in channel bed [1] | 3 | 2 | 1 | 0 |
| 21. Rooted plants in the thalweg [1] | 3 | 2 | 1 | 0 |
| 22. Crayfish in stream (exclude in floodplain) | 0 | 1 | 2 | 3 |
| 23. Bivalves/mussels | 0 | 1 | 2 | 3 |
| 24. Amphibians | 0 | 0.5 | 1 | 1.5 |
| 25. Macrobenthos (record type & abundance) | 0 | 1 | 2 | 3 |
| 26. Filamentous algae; periphyton | 0 | 1 | 2 | 3 |
| 27. Iron oxidizing bacteria/fungus | 0 | 0.5 | 1 | 1.5 |
| 28. Wetland plants in channel bed [2] | 0 | 0.5 | 1 | 1.5 |

[1] Focus is on the presence of terrestrial plants.    [2] Focus is on the presence of aquatic or wetland plants.

Total Points = 15.25

*Under Normal Conditions, Watercourse is a Wet Weather Conveyance if Secondary Indicator Score < 19 points*

**Notes :**

Bed + bank formed/incised draining power line ROW
Some pools (standing, not flowing) beneath head cuts.
Head cuts formed from topography drops.
 ↳ Grade control root observed
Biology very weak – 1 frog heard in largest pool
  ↳ no other aquatic fauna present/observed
  – no wetland vegetation

JA0254

AR 000304



**SDKA001:** North flowing wet weather conveyance/ephemeral channel near Mile Post 1.

AR  000305

SDKA002

## Hydrologic Determination Field Data Sheet
Tennessee Division of Water Pollution Control, Version 1.5

| | |
|---|---|
| Named Waterbody: UT to Jordan Branch | Date/Time: 20210627 09:3 |
| Assessors/Affiliation: T Fitzpatrick / J. Frizzell | Project ID : |
| Site Name/Description: TVA Cumberland | |
| Site Location: MP 1.19 | Lat/Long: |
| HUC (12 digit): 051302040503 | |
| Previous Rainfall (7-days) : ~6" | |

Precipitation this Season vs. Normal : abnormally wet   elevated   average   low   abnormally dry   unknown
Source of recent & seasonal precip data :

| Watershed Size : ~20 sq. miles | County: Dickson |
|---|---|
| Soil Type(s) / Geology: TN043 (Hawthorne-Sulphur 20-60%) | Source: NRCS |
| Surrounding Land Use : Forested with most upper reach in power line ROW | |

Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes) :
Severe    Moderate    Slight    Absent

### Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1. Hydrologic feature exists solely due to a process discharge | ✓ | WWC |
| 2. Defined bed and bank absent, vegetation composed of upland and FACU species | ✓ | WWC |
| 3. Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | N/A | WWC |
| 4. Daily flow and precipitation records showing feature only flows in direct response to rainfall | ✓ | WWC |
| 5. Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | ✓ | Stream |
| 6. Presence of fish (except *Gambusia*) | ✓ | Stream |
| 7. Presence of naturally occurring ground water table connection | ✓ | Stream |
| 8. Flowing water in channel and 7 days since last precip >0.1" in local watershed | N/A | Stream |
| 9. Evidence watercourse has been used as a supply of drinking water | ✓ | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

**Overall Hydrologic Determination =** WWC

**Secondary Indicator Score (if applicable) =** 7

**Justification / Notes :**
This WWC dry at the time of survey despite recent rainfall.
The majority of the stream reach within the survey area was inaccessible and unobservable due to recent tree felling. Many mature trees still having green foliage have been felled with canopies covering streambed

JA0256

AR 000306

## Secondary Field Indicator Evaluation

**A. Geomorphology** (Subtotal = 5.5)

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 1. Continuous bed and bank | 0 | (1) | 2 | 3 |
| 2. Sinuous channel | 0 | 1 | 2 | 3 |
| 3. In-channel structure: riffle-pool sequences | (0) | 1 | 2 | 3 |
| 4. Sorting of soil textures or other substrate | 0 | (1) | 2 | 3 |
| 5. Active/relic floodplain | 0 | 0.5 | 1 | 1.5 |
| 6. Depositional bars or benches | 0 | (1) | 2 | 3 |
| 7. Braided channel | (0) | 1 | 2 | 3 |
| 8. Recent alluvial deposits | 0 | 0.5 | 1 | 1.5 |
| 9. Natural levees | (0) | 1 | 2 | 3 |
| 10. Headcuts | 0 | (1) | 2 | 3 |
| 11. Grade controls | (0) | 0.5 | 1 | 1.5 |
| 12. Natural valley or drainageway | 0 | (0.5) | 1 | 1.5 |
| 13. At least second order channel on existing USGS or NRCS map | No = 0 | | Yes = 3 | |

**B. Hydrology** (Subtotal = 1 )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 14. Subsurface flow/discharge into channel | (0) | 1 | 2 | 3 |
| 15. Water in channel and >48 hours since sig. rain | (0) | 1 | 2 | 3 |
| 16. Leaf litter in channel (January – September) | 1.5 | 1 | (0.5) | 0 |
| 17. Sediment on plants or on debris | 0 | (0.5) | 1 | 1.5 |
| 18. Organic debris lines or piles (wrack lines) | 0 | (0.5) | 1 | 1.5 |
| 19. Hydric soils in channel bed or sides of channel | No = 0 | | Yes = 1.5 | |

**C. Biology** (Subtotal = 0.5 )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 20. Fibrous roots in channel bed 1 | 3 | 2 | 1 | (0) |
| 21. Rooted plants in the thalweg 1 | 3 | 2 | 1 | (0) |
| 22. Crayfish in stream (exclude in floodplain) | (0) | 1 | 2 | 3 |
| 23. Bivalves/mussels | (0) | 1 | 2 | 3 |
| 24. Amphibians | (0) | 0.5 | 1 | 1.5 |
| 25. Macrobenthos (record type & abundance) | (0) | 1 | 2 | 3 |
| 26. Filamentous algae; periphyton | (0) | 1 | 2 | 3 |
| 27. Iron oxidizing bacteria/fungus | (0) | 0.5 | 1 | 1.5 |
| 28. Wetland plants in channel bed 2 | (0) | 0.5 | 1 | 1.5 |

1 Focus is on the presence of terrestrial plants.    2 Focus is on the presence of aquatic or wetland plants.

Total Points = 7

*Under Normal Conditions, Watercourse is a Wet Weather Conveyance if Secondary Indicator Score < 19 points*

**Notes :** Some bed and bank observed
Much of stream bed covered and or altered from tree fellings.

- No water present
- Some leaf deposits in channel
- Few wrack lines.

Many roots in channel.

AR 000307



**SDKA002:** Northeast flowing wet weather conveyance/ephemeral channel near Mile Post 1.

AR 000308

SDKA004 

## Hydrologic Determination Field Data Sheet
### Tennessee Division of Water Pollution Control, Version 1.5

| | | |
|---|---|---|
| Named Waterbody: UT to Porter Branch | Date/Time: 20210623 09:3 | |
| Assessors/Affiliation: T. Fitzpatrick, J. Frizzell / Cardno | Project ID : | |
| Site Name/Description: TVA Cumberland | | |
| Site Location: | | |
| HUC (12 digit): 051302040503 | Lat/Long: | |
| Previous Rainfall (7-days) : ~6" | | |

Precipitation this Season vs. Normal :  abnormally wet    elevated    ~~average~~    low    abnormally dry    unknown
Source of recent & seasonal precip data :

| | |
|---|---|
| Watershed Size : ~ 20 sq. miles | County: Dickson |
| Soil Type(s) / Geology : TN047 (Hawthorne - Sulphura 20-60% | Source: NRCS |
| Surrounding Land Use : Forest (crosses power line ROW) | |

Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes) :
Severe          Moderate          Slight          Absent

### Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1. Hydrologic feature exists solely due to a process discharge | ✓ | WWC |
| 2. Defined bed and bank absent, vegetation composed of upland and FACU species | ✓ | WWC |
| 3. Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | N/A | WWC |
| 4. Daily flow and precipitation records showing feature only flows in direct response to rainfall | ✓ | WWC |
| 5. Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | ✓ | Stream |
| 6. Presence of fish (except *Gambusia*) | ✓ | Stream |
| 7. Presence of naturally occurring ground water table connection | ✓ | Stream |
| 8. Flowing water in channel and 7 days since last precip >0.1" in local watershed | N/A | Stream |
| 9. Evidence watercourse has been used as a supply of drinking water | ✓ | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

| |
|---|
| **Overall Hydrologic Determination =** Stream |
| **Secondary Indicator Score (if applicable) =** 22.75 |

Justification / Notes :  Macros + amphibians present
seeps feeding stream observed

AR 000309

## Secondary Field Indicator Evaluation

### A. Geomorphology (Subtotal = 12 )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 1. Continuous bed and bank | 0 | 1 | 2 | 3 |
| 2. Sinuous channel | 0 | 1 | 2 | 3 |
| 3. In-channel structure: riffle-pool sequences | 0 | 1 | 2 | 3 |
| 4. Sorting of soil textures or other substrate | 0 | 1 | 2 | 3 |
| 5. Active/relic floodplain | 0 | 0.5 | 1 | 1.5 |
| 6. Depositional bars or benches | 0 | 1 | 2 | 3 |
| 7. Braided channel | 0 | 1 | 2 | 3 |
| 8. Recent alluvial deposits | 0 | 0.5 | 1 | 1.5 |
| 9. Natural levees | 0 | 1 | 2 | 3 |
| 10. Headcuts | 0 | 1 | 2 | 3 |
| 11. Grade controls | 0 | 0.5 | 1 | 1.5 |
| 12. Natural valley or drainageway | 0 | 0.5 | 1 | 1.5 |
| 13. At least second order channel on existing USGS or NRCS map | No = 0 | | Yes = 3 | |

### B. Hydrology (Subtotal = 5 )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 14. Subsurface flow/discharge into channel | 0 | 1 | 2 | 3 |
| 15. Water in channel and >48 hours since sig. rain | 0 | 1 | 2 | 3 |
| 16. Leaf litter in channel (January – September) | 1.5 | 1 | 0.5 | 0 |
| 17. Sediment on plants or on debris | 0 | 0.5 | 1 | 1.5 |
| 18. Organic debris lines or piles (wrack lines) | 0 | 0.5 | 1 | 1.5 |
| 19. Hydric soils in channel bed or sides of channel | No = 0 | | Yes = 1.5 | |

### C. Biology (Subtotal = 5.75 )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 20. Fibrous roots in channel bed [1] | 3 | 2 | 1 | 0 |
| 21. Rooted plants in the thalweg [1] | 3 | 2 | 1 | 0 |
| 22. Crayfish in stream (exclude in floodplain) | 0 | 1 | 2 | 3 |
| 23. Bivalves/mussels | 0 | 1 | 2 | 3 |
| 24. Amphibians | 0 | 0.5 | 1 | 1.5 |
| 25. Macrobenthos (record type & abundance) | 0 | 1 | 2 | 3 |
| 26. Filamentous algae; periphyton | 0 | 1 | 2 | 3 |
| 27. Iron oxidizing bacteria/fungus | 0 | 0.5 | 1 | 1.5 |
| 28. Wetland plants in channel bed [2] | 0 | 0.5 | 1 | 1.5 |

[1] Focus is on the presence of terrestrial plants.   [2] Focus is on the presence of aquatic or wetland plants.

Total Points = 22.75

*Under Normal Conditions, Watercourse is a Wet Weather Conveyance if Secondary Indicator Score < 19 points*

**Notes :**

Gastropods (Left) present in sampled reach
Salamander observed beneath beed root
Stonefly nymphs

Streambed mostly bedrock where sampled.
Seep from west hillside flowing in
Rock shelf headcut
Beech tree roots natural levee

AR 000310



**SDKA004:** Northwest flowing perennial stream near Mile Post 2.

AR 000311

## Hydrologic Determination Field Data Sheet
### Tennessee Division of Water Pollution Control, Version 1.5

| | |
|---|---|
| Named Waterbody: Unnamed tributary to Nesbitt Branch | Date/Time: 6/22/2021 |
| Assessors/Affiliation: Justin Stelly    Jay Stodghill | Project ID : |
| Site Name/Description: TVA Cumberland Project | SIDKB04 |
| Site Location: Cumberland Furnace, TN | |
| HUC (12 digit): 051302050102 | Lat/Long: 36.24281, -87.361463 |
| Previous Rainfall (7-days) : 1 inch | |

Precipitation this Season vs. Normal : abnormally wet (elevated) average low abnormally dry unknown
Source of recent & seasonal precip data :

| | |
|---|---|
| Watershed Size : 16278.7 acres | County: Dickson |
| Soil Type(s) / Geology : SeF | Source: NRCS |
| Surrounding Land Use : Cattle, residential agriculture | |

Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes) :
Severe        Moderate        Slight        (Absent)

### Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1. Hydrologic feature exists solely due to a process discharge | X | WWC |
| 2. Defined bed and bank absent, vegetation composed of upland and FACU species | X | WWC |
| 3. Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | | WWC N/A Outside window |
| 4. Daily flow and precipitation records showing feature only flows in direct response to rainfall | X | WWC |
| 5. Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | X | Stream |
| 6. Presence of fish (except *Gambusia*) | X | Stream |
| 7. Presence of naturally occurring ground water table connection | X | Stream |
| 8. Flowing water in channel and 7 days since last precip >0.1" in local watershed | X | Stream |
| 9. Evidence watercourse has been used as a supply of drinking water | X | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

| | |
|---|---|
| **Overall Hydrologic Determination =** WWC    Primary secondary | |
| **Secondary Indicator Score (if applicable) =** 12.5 | |

Justification / Notes : BD, Short ephemeral drain to Nesbitt Branch. Steep slope and runs off ROW.

AR 000450

## Hydrologic Determination Field Data Sheet
Tennessee Division of Water Pollution Control, Version 1.5

| | |
|---|---|
| Named Waterbody: Unnamed tributary to Nesbitt Branch | Date/Time: 6/28/21 |
| Assessors/Affiliation: Justin Skelly     Jay Stodghill | Project ID: |
| Site Name/Description: TVA Cumberland Project | SDKB06 |
| Site Location: Cumberland Furnace, TN | |
| HUC (12 digit): 051302050102 | Lat/Long: 36.244400 |
| Previous Rainfall (7-days): 1 inch | -87.365790 |

Precipitation this Season vs. Normal: abnormally wet (elevated) average low abnormally dry unknown
Source of recent & seasonal precip data:

| | |
|---|---|
| Watershed Size: 16278.7 acres | County: Dickson |
| Soil Type(s) / Geology: SeF | Source: NRCS |
| Surrounding Land Use: Cattle, residential, agriculture | |

Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes):
Severe          Moderate          Slight          (Absent)

### Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1. Hydrologic feature exists solely due to a process discharge | X | WWC |
| 2. Defined bed and bank absent, vegetation composed of upland and FACU species | X | WWC |
| 3. Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | | WWC N/A Outside window |
| 4. Daily flow and precipitation records showing feature only flows in direct response to rainfall | X | WWC |
| 5. Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | X | Stream |
| 6. Presence of fish (except *Gambusia*) | X | Stream |
| 7. Presence of naturally occurring ground water table connection | X | Stream |
| 8. Flowing water in channel and 7 days since last precip >0.1" in local watershed | X | Stream |
| 9. Evidence watercourse has been used as a supply of drinking water | X | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

**Overall Hydrologic Determination =** WWC

**Secondary Indicator Score (if applicable) =** 5

**Justification / Notes:** Short sloped ephemeral WWC that flows during heavy rain events.

JA0263

AR 000456

### Hydrologic Determination Field Data Sheet
Tennessee Division of Water Pollution Control, Version 1.5



| Named Waterbody: Unnamed Tributary to Nesbitt Branch | Date/Time: 1/22/21 |
|---|---|
| Assessors/Affiliation: Justin Skelly    Jay Stodghill | Project ID: |
| Site Name/Description: TVA Cumberland Project | SDKB07 |
| Site Location: Cumberland Furnace, TN | |
| HUC (12 digit): 051302050102 | Lat/Long: 36.245432 |
| Previous Rainfall (7-days): 1 inch | −87.368765 |
| Precipitation this Season vs. Normal: abnormally wet (elevated) average low abnormally dry unknown | |
| Source of recent & seasonal precip data: | |
| Watershed Size: 16278.7 acres | County: Dickson |
| Soil Type(s) / Geology: SeF | Source: NRCS |
| Surrounding Land Use: Cattle, residential, agriculture | |
| Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes): Severe    Moderate    Slight    (Absent) | |

### Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1. Hydrologic feature exists solely due to a process discharge | X | WWC |
| 2. Defined bed and bank absent, vegetation composed of upland and FACU species | X | WWC |
| 3. Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | | WWC N/A Outside Window |
| 4. Daily flow and precipitation records showing feature only flows in direct response to rainfall | X | WWC |
| 5. Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | X | Stream |
| 6. Presence of fish (except *Gambusia*) | X | Stream |
| 7. Presence of naturally occurring ground water table connection | X | Stream |
| 8. Flowing water in channel and 7 days since last precip >0.1" in local watershed | X | Stream |
| 9. Evidence watercourse has been used as a supply of drinking water | X | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

| **Overall Hydrologic Determination** = WWC |
|---|
| **Secondary Indicator Score (if applicable)** = 5 |

**Justification / Notes:** Clear ephemeral WWC. @ short sloped ephemeral drain.

AR 000459

## Secondary Field Indicator Evaluation

**A. Geomorphology** (Subtotal = )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 1. Continuous bed and bank | 0 | (1) | 2 | 3 |
| 2. Sinuous channel | 0 | (1) | 2 | 3 |
| 3. In-channel structure: riffle-pool sequences | (0) | 1 | 2 | 3 |
| 4. Sorting of soil textures or other substrate | (0) | 1 | 2 | 3 |
| 5. Active/relic floodplain | (0) | 0.5 | 1 | 1.5 |
| 6. Depositional bars or benches | (0) | 1 | 2 | 3 |
| 7. Braided channel | (0) | 1 | 2 | 3 |
| 8. Recent alluvial deposits | (0) | 0.5 | 1 | 1.5 |
| 9. Natural levees | (0) | 1 | 2 | 3 |
| 10. Headcuts | (0) | 1 | 2 | 3 |
| 11. Grade controls | (0) | 0.5 | 1 | 1.5 |
| 12. Natural valley or drainageway | 0 | 0.5 | (1) | 1.5 |
| 13. At least second order channel on existing USGS or NRCS map | (No = 0) | | Yes = 3 | |

**B. Hydrology** (Subtotal = )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 14. Subsurface flow/discharge into channel | (0) | 1 | 2 | 3 |
| 15. Water in channel and >48 hours since sig. rain | (0) | 1 | 2 | 3 |
| 16. Leaf litter in channel (January – September) | 1.5 | 1 | 0.5 | (0) |
| 17. Sediment on plants or on debris | (0) | 0.5 | 1 | 1.5 |
| 18. Organic debris lines or piles (wrack lines) | (0) | 0.5 | 1 | 1.5 |
| 19. Hydric soils in channel bed or sides of channel | (No = 0) | | Yes = 1.5 | |

**C. Biology** (Subtotal = )

| | Absent | Weak | Moderate | Strong |
|---|---|---|---|---|
| 20. Fibrous roots in channel bed 1 | 3 | (2) | 1 | 0 |
| 21. Rooted plants in the thalweg 1 | 3 | 2 | 1 | (0) |
| 22. Crayfish in stream (exclude in floodplain) | (0) | 1 | 2 | 3 |
| 23. Bivalves/mussels | (0) | 1 | 2 | 3 |
| 24. Amphibians | (0) | 0.5 | 1 | 1.5 |
| 25. Macrobenthos (record type & abundance) | (0) | 1 | 2 | 3 |
| 26. Filamentous algae; periphyton | (0) | 1 | 2 | 3 |
| 27. Iron oxidizing bacteria/fungus | (0) | 0.5 | 1 | 1.5 |
| 28. Wetland plants in channel bed 2 | (0) | 0.5 | 1 | 1.5 |

1 Focus is on the presence of terrestrial plants.     2 Focus is on the presence of aquatic or wetland plants.

Total Points = _5_

*Under Normal Conditions, Watercourse is a Wet Weather Conveyance if Secondary Indicator Score < 19 points*

Notes : Natural precipitation drain. Drains rainwater directly to Nesbitt Branch.

AR 000460

## Hydrologic Determination Field Data Sheet

Tennessee Division of Water Pollution Control, Version 1.5

| | |
|---|---|
| Named Waterbody: Unnamed Tributary | Date/Time: 1/24/22 12:07 pm |
| Assessors/Affiliation: Emery Hartz (QHP 1148-TN15), Amy Arnold | Project ID: 172678163 |
| Site Name/Description: Cumberland Project | |
| Site Location: SHNE-001 | |
| HUC (12 digit): 051302050203 | Lat/Long: 36.306767°N 87.577233°W |
| Previous Rainfall (7-days): 1.14 inches | |

Precipitation this Season vs. Normal : abnormally wet    elevated    (average)    low    abnormally dry    unknown
Source of recent & seasonal precip data:

| | |
|---|---|
| Watershed Size: 25-30 ac, Yellow Creek | County: Houston |
| Soil Type(s) / Geology: SeD - Sengtown gravelly silt loam | Source: NRCS |
| Surrounding Land Use: Farmland, Residential, Transmission line  Raw. | |

Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes):
Severe    (Moderate)    Slight    Absent

### Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1. Hydrologic feature exists solely due to a process discharge | | WWC |
| 2. Defined bed and bank absent, vegetation composed of upland and FACU species | | WWC |
| 3. Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | | WWC |
| 4. Daily flow and precipitation records showing feature only flows in direct response to rainfall | | WWC |
| 5. Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | No | Stream |
| 6. Presence of fish (except *Gambusia*) | No | Stream |
| 7. Presence of naturally occurring ground water table connection | No | Stream |
| 8. Flowing water in channel and 7 days since last precip >0.1" in local watershed | No | Stream |
| 9. Evidence watercourse has been used as a supply of drinking water | No | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

**Overall Hydrologic Determination =** WWC

**Secondary Indicator Score (if applicable) =**

Justification / Notes : Wet weather conveyance is short in length and crosses transmission line where it disperses out to into what appears to be swale surrounded by brier/thickets(blackberry), Black Locust, Multiflora Rose,

AR 000647

Case: 23-3682     Document: 56-1     Filed: 08/19/2024     Page: 273

# Hydrologic Determination Field Data Sheet
## Tennessee Division of Water Pollution Control, Version 1.5

| | |
|---|---|
| Named Waterbody: Unnamed Tributary to Lickskillet Branch | Date/Time: 6/29/21 |
| Assessors/Affiliation: Justin Stilly    Jay Stodghill | Project ID : |
| Site Name/Description: TVA Cumberland Project | SHNB 34 |
| Site Location: Cumberland City, TN | |
| HUC (12 digit): 051302050402 | Lat/Long: 36.3065822 |
| Previous Rainfall (7-days) : 0 | -87.655574 |

Precipitation this Season vs. Normal : abnormally wet  (elevated)  average  low  abnormally dry  unknown
Source of recent & seasonal precip data :

| | |
|---|---|
| Watershed Size : 36518.4 acres | County: Houston |
| Soil Type(s) / Geology : Ec | Source: NRCS |
| Surrounding Land Use : Agriculture/Cattle | |

Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes) :
Severe          Moderate          Slight          Absent

## Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1. Hydrologic feature exists solely due to a process discharge | ✓ | WWC |
| 2. Defined bed and bank absent, vegetation composed of upland and FACU species | ✓ | WWC |
| 3. Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | ✓ | WWC |
| 4. Daily flow and precipitation records showing feature only flows in direct response to rainfall | ✓ | WWC |
| 5. Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | ✓ | Stream |
| 6. Presence of fish (except *Gambusia*) | ✓ | Stream |
| 7. Presence of naturally occurring ground water table connection | ✓ | Stream |
| 8. Flowing water in channel and 7 days since last precip >0.1" in local watershed | ✓ | Stream |
| 9. Evidence watercourse has been used as a supply of drinking water | ✓ | Stream |

**NOTE: If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

| | |
|---|---|
| **Overall Hydrologic Determination =** WWC | |
| **Secondary Indicator Score (if applicable) =** 17 | |

Justification / Notes : Secondary Scoring
Small heavily vegetated ＃ ephemeral
drain connected to wetland WHNB02.

AR 000779

Case: 23-3682    Document: 56-1    Filed: 08/19/2024    Page: 274

## Hydrologic Determination Field Data Sheet
Tennessee Division of Water Pollution Control, Version 1.5

| Named Waterbody: Unnamed Tributary to Lickskillet Branch | Date/Time: 6/29/21 |
|---|---|
| Assessors/Affiliation: Justin Stilly    Jay Stodghill | Project ID : |
| Site Name/Description: TVA Cumberland Project | SHNB 34 |
| Site Location: Cumberland City, TN | |
| HUC (12 digit): 051302050402 | Lat/Long: 36.306522 |
| Previous Rainfall (7-days) :  0 | -87.655574 |

Precipitation this Season vs. Normal :  abnormally wet  (elevated)  average  low  abnormally dry  unknown
Source of recent & seasonal precip data :

| Watershed Size : 36518.4 acres | County: Houston |
|---|---|
| Soil Type(s) / Geology: Ec | Source: NRCS |
| Surrounding Land Use : Agriculture/Cattle | |

Degree of historical alteration to natural channel morphology & hydrology (circle one & describe fully in Notes) :
Severe          Moderate          Slight          Absent

### Primary Field Indicators Observed

| Primary Indicators | NO | YES |
|---|---|---|
| 1.  Hydrologic feature exists solely due to a process discharge | ✓ | WWC |
| 2.  Defined bed and bank absent, vegetation composed of upland and FACU species | ✓ | WWC |
| 3.  Watercourse dry anytime during February through April 15th, under normal precipitation / groundwater conditions | ✓ | WWC |
| 4.  Daily flow and precipitation records showing feature only flows in direct response to rainfall | X | WWC |
| 5.  Presence of multiple populations of obligate lotic organisms with ≥ 2 month aquatic phase | ✓ | Stream |
| 6.  Presence of fish (except *Gambusia*) | ✓ | Stream |
| 7.  Presence of naturally occurring ground water table connection | ✓ | Stream |
| 8.  Flowing water in channel and 7 days since last precip >0.1" in local watershed | ✓ | Stream |
| 9.  Evidence watercourse has been used as a supply of drinking water | ✓ | Stream |

**NOTE:  If any Primary Indicators 1-9 = "Yes", then no further investigation is necessary. However, assessors may choose to score secondary indicators as supporting evidence.**

In the absence of a primary indicator, or other definitive evidence, complete the secondary indicator table on page 2 of this sheet, and provide score below.

Guidance for the interpretation and scoring of both the primary & secondary indicators is provided in *TDEC-WPC Guidance For Making Hydrologic Determinations, Version 1.5*

**Overall Hydrologic Determination =** WWC

**Secondary Indicator Score (if applicable) =**

**Justification / Notes :** Secondary Scoring
Small heavily vegetated ephemeral
drain connected to wetland WHNB02.

JA0268

AR 000785

# Appendix D
# Waterbody Data Table

AR 000875

**Table D-1:  Waterbodies Identified within the Cumberland Project Study Area**

| Waterbody ID | Waterbody Name [a] | Approx. Mile Post | County | Type / Flow Regime | Begin Latitude / Longitude | End Latitude / Longitude | Water body Min/ Max Width (ft) [b] | Avg Water body Width (ft)[b] | Amount in Study Area (acres) | Amount in Study Area (LF) | State Use Classification [c] | Sensitive Resource Water [d] | Currently Impacted by Project |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Pipeline and Regulator Station** | | | | | | |
| SDKA023 | Upper Sugarcamp Branch | R 0.09 | Dickson | Stream/ Perennial | 36.16596 / -87.20431 | 36.16529 / -87.20620 | 3 / 5 | 4 | --- | 2,642 | FAL, REC, LWW, IRR | NA | Y |
| SDKA003 | UT to Upper Sugarcamp Branch | 0.2 | Dickson | WWC / Ephemeral | 36.16425 / -87.19911 | 36.16487 / -87.19917 | 5 / 7 | 6 | --- | 243 | FAL, REC, LWW, IRR | NA | N |
| SDKA045 | UT to Upper Sugarcamp Branch | 0.2 | Dickson | WWC / Ephemeral | 36.16400 / -87.20138 | 36.16430 / -87.20142 | 1 / 4 | 2.5 | --- | 182 | FAL, REC, LWW, IRR | NA | N |
| SDKA021 | UT to Upper Sugarcamp Branch | 0.3 | Dickson | Stream/ Perennial | 36.16528 / -87.20410 | 36.16580 / -87.20390 | 4 / 8 | 6 | --- | 233 | FAL, REC, LWW, IRR | NA | N |
| SDKA022 | UT to Upper Sugarcamp Branch | 0.3 | Dickson | Stream/ Perennial | 36.17090 / -87.21302 | 36.17110 / -87.21289 | 1 / 3 | 2 | --- | 71 | FAL, REC, LWW, IRR | NA | N |
| SDKA024 | UT to Upper Sugarcamp Branch | 0.37 | Dickson | WWC / Ephemeral | 36.16630 / -87.20684 | 36.16639 / -87.20596 | 1 / 3 | 2 | --- | 296 | FAL, REC, LWW, IRR | NA | Y |
| SDKA025 | UT to Jordan Branch | 0.63 | Dickson | WWC / Ephemeral | 36.16823 / -87.21044 | 36.16830 / -87.21039 | 1 / 2 | 1.5 | --- | 38 | FAL, REC, LWW, IRR | NA | N |
| SDKA026 | Jordan Branch | 0.86 | Dickson | Stream/ Perennial | 36.17106 / -87.21281 | 36.17034 / -87.21270 | 7 / 35 | 21 | --- | 379 | FAL, REC, LWW, IRR | NA | Y |
| SDKA027 | UT to Jordan Branch | 0.89 | Dickson | Stream/ Perennial | 36.17093 / -87.21302 | 36.17085 / -87.21324 | 8 / 12 | 10 | --- | 151 | FAL, REC, LWW, IRR | NA | Y |
| SDKA001 | UT to Jordan Branch | 1.17 | Dickson | WWC / Ephemeral | 36.17287 / -87.21742 | 36.17356 / -87.21749 | 1 / 3 | 2 | --- | 280 | FAL, REC, LWW, IRR | NA | Y |
| SDKA002 | UT to Jordan Branch | 1.19 | Dickson | WWC / Ephemeral | 36.17336 / -87.21757 | 36.17325 / -87.21814 | 1 / 2 | 1.5 | --- | 205 | FAL, REC, LWW, IRR | NA | Y |
| SDKA004 | UT to Porters Branch | 1.59 | Dickson | Stream/ Perennial | 36.17668 / -87.22329 | 36.17632 / -87.22386 | 2 / 6 | 4 | --- | 246 | FAL, REC, LWW, IRR | NA | Y |
| SDKA005 | | 1.8 | Dickson | | 36.17826 | 36.17854 | 1 | 1.5 | --- | 121 | | NA | N |

Cumberland Project
Jurisdictional Waters Determinations and Tennessee Hydrologic Determinations Report

| Waterbody ID | Waterbody Name [a] | Approx. Mile Post | County | Type / Flow Regime | Begin Latitude / Longitude | End Latitude / Longitude | Water body Min/ Max Width (ft) [b] | Avg Water body Width (ft)[b] | Amount in Study Area (acres) | Amount in Study Area (LF) | State Use Classification [c] | Sensitive Resource Water [d] | Currently Impacted by Project |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UT to Porters Branch | | | WWC / Ephemeral | -87.22663 | -87.22681 | 2 | | | | FAL, REC, LWW, IRR | | |
| SDKA006 | UT to Porters Branch | 2.13 | Dickson | Stream/Intermittent | 36.18090 / -87.23163 | 36.18067 / -87.23197 | 4 / 8 | 6 | --- | 2,150 | FAL, REC, LWW, IRR | NA | Y |
| SDKA007 | UT to Porters Branch | 2.13 | Dickson | Stream/Perennial | 36.18090 / -87.23163 | 36.18106 / -87.23147 | 4 / 8 | 6 | --- | 182 | FAL, REC, LWW, IRR | NA | N |
| SDKA008 | UT to Porters Branch | 2.34 | Dickson | Stream/Perennial | 36.18278 / -87.23467 | 36.18227 / -87.23496 | 1 / 4 | 2.5 | --- | 234 | FAL, REC, LWW, IRR | NA | Y |
| SDKA009 | UT to Porters Branch | 2.4 | Dickson | Stream/Perennial | 36.18484 / -87.23456 | 36.18384 / -87.23787 | 8 / 12 | 10 | --- | 513 | FAL, REC, LWW, IRR | NA | N |
| SDKA010 | UT to Porters Branch | 2.5 | Dickson | Stream/Intermittent | 36.18527 / -87.23789 | 36.18572 / -87.23820 | 3 / 5 | 4 | --- | 702 | FAL, REC, LWW, IRR | NA | N |
| SDN1C008 | UT to Porters Branch | 2.7 | Dickson | Stream/Perennial | 36.18322 / -87.24585 | 36.18291 / -87.24041 | 8 / 12 | 10 | --- | 216 | FAL, REC, LWW, IRR | NA | N |
| SDKA058 | Porters Branch | 2.99 | Dickson | Stream/Perennial | 36.18552 / -87.24324 | 36.18512 / -87.24230 | 2 / 5 | 3.5 | --- | 604 | FAL, REC, LWW, IRR | NA | Y |
| SDKA011 | UT to Jones Creek | 3.1 | Dickson | Stream/Perennial | 36.19051 / -87.23871 | 36.19076 / -87.23881 | 1 / 5 | 3 | --- | 103 | FAL, REC, LWW, IRR | NA | N |
| SDKA048 | Jones Creek | 3.2 | Dickson | Stream/Perennial | 36.18719 / -87.24412 | 36.18774 / -87.24393 | 50 / 90 | 70 | --- | 497 | NAV, IWS, FAL, REC, LWW, IRR | NA | Y |
| SDKA050 | UT to Jones Creek | 3.49 | Dickson | WWC / Ephemeral | 36.18950 / -87.24844 | 36.19002 / -87.24818 | 2 / 5 | 3.5 | --- | 261 | FAL, REC, LWW, IRR | NA | Y |
| SDKA051 | UT to Jones Creek | 3.51 | Dickson | Stream/Intermittent | 36.19003 / -87.24821 | 36.18966 / -87.24875 | 3 / 6 | 4.5 | --- | 262 | FAL, REC, LWW, IRR | NA | Y |
| SDKA054 | UT to Jones Creek | R 3.6 | Dickson | Stream/Intermittent | 36.19283 / -87.24804 | 36.19269 / -87.24803 | 2 / 4 | 3 | --- | 129 | FAL, REC, LWW, IRR | NA | N |
| SDKA052 | | R 3.7 | Dickson | | 36.19121 | 36.19136 | 3 | 5.5 | --- | 97 | | NA | N |

| Waterbody ID | Waterbody Name [a] | Approx. Mile Post | County | Type / Flow Regime | Begin Latitude / Longitude | End Latitude / Longitude | Water body Min/ Max Width (ft) [b] | Avg Water body Width (ft)[b] | Amount in Study Area (acres) | Amount in Study Area (LF) | State Use Classification [c] | Sensitive Resource Water [d] | Currently Impacted by Project |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UT to Jones Creek | | | Stream/Intermittent | -87.25079 | -87.25068 | 8 | | | | FAL, REC, LWW, IRR | | |
| SDKA049 | UT to Jones Creek | R 3.78 | Dickson | Stream/ Perennial | 36.19136 / -87.25191 | 36.19098 / -87.24998 | 10 / 15 | 12.5 | --- | 1,064 | FAL, REC, LWW, IRR | NA | Y |
| SDKA053 | UT to Jones Creek | 3.85 | Dickson | Stream/ Intermittent | 36.19230 / -87.25367 | 36.19293 / -87.25361 | 2 / 4 | 3 | --- | 291 | FAL, REC, LWW, IRR | NA | Y |
| SDKA055 | UT to Jones Creek | 4.08 | Dickson | Stream/ Intermittent | 36.19451 / -87.25677 | 36.19539 / -87.25636 | 3 / 7 | 5 | --- | 500 | FAL, REC, LWW, IRR | NA | Y |
| SDKA012 | UT to Jones Creek | 4.34 | Dickson | WWC / Ephemeral | 36.198388 / -87.259063 | 36.19638 / -87.25870 | 1 / 3 | 2 | --- | 821 | FAL, REC, LWW, IRR | NA | Y |
| SDKA014 | UT to Gafford Branch | 4.53 | Dickson | Stream/ Perennial | 36.19783 / -87.26218 | 36.19755 / -87.26214 | 3 / 5 | 4 | --- | 121 | FAL, REC, LWW, IRR | NA | Y |
| SDKA013 | Gafford Branch | 4.54 | Dickson | Stream/ Perennial | 36.19824 / -87.26259 | 36.19750 / -87.26212 | 25 / 50 | 37.5 | --- | 589 | FAL, REC, LWW, IRR | NA | Y |
| SDKA015 | UT to Gafford Branch | 4.69 | Dickson | WWC / Ephemeral | 36.19841 / -87.26485 | 36.19871 / -87.26470 | 1 / 5 | 3 | --- | 203 | FAL, REC, LWW, IRR | NA | Y |
| SDKA016 | UT to Gafford Branch | 4.75 | Dickson | WWC / Ephemeral | 36.19892 / -87.26512 | 36.19920 / -87.26594 | 1 / 5 | 3 | --- | 428 | FAL, REC, LWW, IRR | NA | Y |
| SDKA017 | UT to Gafford Branch | 5.23 | Dickson | WWC / Ephemeral | 36.20249 / -87.27303 | 36.20298 / -87.27314 | 1 / 3 | 2 | --- | 248 | FAL, REC, LWW, IRR | NA | Y |
| SDKA018 | UT to Gafford Branch | 5.3 | Dickson | Stream/ Intermittent | 36.20337 / -87.27428 | 36.20410 / -87.27538 | 4 / 8 | 6 | --- | 824 | FAL, REC, LWW, IRR | NA | N |
| SDKA019 | UT to Gafford Branch | 5.32 | Dickson | WWC / Ephemeral | 36.20313 / -87.2745 | 36.20337 / -87.27428 | 2 / 4 | 3 | --- | 115 | FAL, REC, LWW, IRR | NA | Y |
| SDKA020 | UT to Gafford Branch | 5.98 | Dickson | WWC / Ephemeral | 36.20775 / -87.282049 | 36.207572 / -87.282951 | 5 / 12 | 8.5 | --- | 333 | FAL, REC, LWW, IRR | NA | Y |
| SDKA028 | UT to Johnson Creek | 6.32 | Dickson | WWC / Ephemeral | 36.21135 / -87.28910 | 36.21153 / -87.28892 | 1 / 3 | 2 | --- | 129 | FAL, REC, LWW, IRR | NA | Y |

| Waterbody ID | Waterbody Name [a] | Approx. Mile Post | County | Type / Flow Regime | Begin Latitude / Longitude | End Latitude / Longitude | Water body Min/ Max Width (ft) [b] | Avg Water body Width (ft)[b] | Amount in Study Area (acres) | Amount in Study Area (LF) | State Use Classification [c] | Sensitive Resource Water [d] | Currently Impacted by Project |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SDKA031 | UT to Johnson Creek | 6.35 | Dickson | WWC / Ephemeral | 36.21014 / -87.29114 | 36.21011 / -87.29097 | 1 / 3 | 2 | --- | 225 | FAL, REC, LWW, IRR | NA | Y |
| SDKA029 | UT to Johnson Creek | 6.43 | Dickson | WWC / Ephemeral | 36.21213 / -87.29090 | 36.21251 / -87.29069 | 1 / 3 | 2 | --- | 220 | FAL, REC, LWW, IRR | NA | Y |
| SDKA030 | UT to Johnson Creek | 6.66 | Dickson | WWC / Ephemeral | 36.21408 / -87.29437 | 36.21415 / -87.29429 | 1 / 3 | 2 | --- | 33 | FAL, REC, LWW, IRR | NA | Y |
| SDKA032 | UT to Johnson Creek | 7.05 | Dickson | WWC / Ephemeral | 36.21777 / -87.29923 | 36.21788 / -87.30039 | 2 / 5 | 3.5 | --- | 373 | FAL, REC, LWW, IRR | NA | N |
| SDKA033 | UT to Johnson Creek | 7.08 | Dickson | Stream/ Intermittent | 36.21800 / -87.30037 | 36.21788 / -87.30039 | 5 / 20 | 12.5 | --- | 384 | FAL, REC, LWW, IRR | NA | Y |
| SDKA034 | UT to Johnson Creek | 7.31 | Dickson | Stream/ Perennial | 36.21872 / -87.30375 | 36.21862 / -87.30381 | 7 / 12 | 9.5 | --- | 289 | FAL, REC, LWW, IRR | NA | Y |
| SDKA035 | UT to Johnson Creek | 7.32 | Dickson | WWC / Ephemeral | 36.21856 / -87.30392 | 36.21862 / -87.30381 | 2 / 3 | 2.5 | --- | 43 | FAL, REC, LWW, IRR | NA | Y |
| SDKA036 | Johnson Creek | 7.97 | Dickson | Stream/ Perennial | 36.22364 / -87.31282 | 36.22402 / -87.31475 | 8 / 12 | 10 | --- | 660 | FAL, REC, LWW, IRR | NA | Y |
| SDKA037 | UT to Johnson Creek | 8.07 | Dickson | WWC / Ephemeral | 36.22429 / -87.31525 | 36.22478 / -87.31518 | 4 / 7 | 5.5 | --- | 189 | FAL, REC, LWW, IRR | NA | Y |
| SDKA038 | UT to Harris Branch | 8.46 | Dickson | Stream/ Intermittent | 36.22804 / -87.32107 | 36.22906 / -87.32405 | 5 / 7 | 6 | --- | 1,414 | FAL, REC, LWW, IRR | NA | Y |
| SDKA039 | UT to Harris Branch | 8.46 | Dickson | Stream/ Intermittent | 36.22804 / -87.32107 | 36.22806 / -87.32098 | 3 / 5 | 4 | --- | 27 | FAL, REC, LWW, IRR | NA | N |
| SDKA040 | UT to Harris Branch | 8.64 | Dickson | WWC / Ephemeral | 36.22912 / -87.32309 | 36.22907 / -87.32365 | 5 / 8 | 6.5 | --- | 168 | FAL, REC, LWW, IRR | NA | Y |
| SDKA041 | Harris Branch | 8.76 | Dickson | Stream/ Perennial | 36.23034 / -87.32520 | 36.22972 / -87.32526 | 5 / 8 | 6.5 | --- | 323 | FAL, REC, LWW, IRR | NA | Y |
| SDKA042 | | 9.48 | Dickson | | 36.23494 / | 36.23448 / | 6 | 8 | --- | 271 | | NA | Y |

| Waterbody ID | Waterbody Name [a] | Approx. Mile Post | County | Type / Flow Regime | Begin Latitude / Longitude | End Latitude / Longitude | Water body Min/ Max Width (ft) [b] | Avg Water body Width (ft)[b] | Amount in Study Area (acres) | Amount in Study Area (LF) | State Use Classification [c] | Sensitive Resource Water [d] | Currently Impacted by Project |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UT to Bartons Creek | | | Stream/ Perennial | -87.33649 | -87.33689 | 10 | | | | FAL, REC, LWW, IRR | | |
| SDKA043 | UT to Bartons Creek | 9.5 | Dickson | WWC / Ephemeral | 36.234701 / -87.337793 | 36.234511 / -87.337152 | 3 / 5 | 4 | --- | 207 | FAL, REC, LWW, IRR | NA | N |
| SDKA044 | Miller Branch | 9.8 | Dickson | Stream/ Perennial | 36.23462 / -87.34480 | 36.23461 / -87.34469 | 15 / 25 | 20 | --- | 34 | FAL, REC, LWW, IRR | NA | N |
| SDKB001 | Miller Branch | 10 | Dickson | Stream/ Perennial | 36.23786 / -87.34530 | 36.23724 / -87.34522 | 15 / 25 | 20 | --- | 561 | FAL, REC, LWW, IRR | NA | Y |
| SDKB002 | Bartons Creek | 10.08 | Dickson | Stream/Perennial | 36.23787 / -87.34694 | 36.23824 / -87.34645 | 50 / 75 | 62.5 | --- | 260 | FAL, REC, LWW, IRR | NA | Y |
| SDKB003 | UT to Bartons Creek | 10.09 | Dickson | WWC / Ephemeral | 36.23797 / -87.34703 | 36.23787 / -87.34694 | 3 / 5 | 4 | --- | 47 | FAL, REC, LWW, IRR | NA | N |
| WBDKA002 | Pond | 10.2 | Dickson | Pond | 36.23954 | -87.34804 | --- | --- | 0.27 | --- | FAL, REC, LWW, IRR | NA | N |
| WBDKB001 | Pond | 10.45 | Dickson | Pond | 36.24020 | -87.35255 | --- | --- | 0.11 | --- | FAL, REC, LWW, IRR | NA | N |
| WBDK001 | Pond | 10.45 | Dickson | Pond | 36.23892 | -87.35343 | --- | --- | 0.12 | --- | FAL, REC, LWW, IRR | NA | N |
| WBDKB002 | Pond | 10.6 | Dickson | Pond | 36.24080 | -87.35519 | --- | --- | 0.1 | --- | FAL, REC, LWW, IRR | NA | Y |
| WBDKB003 | Pond | 10.92 | Dickson | Pond | 36.24287 | -87.36054 | --- | --- | 0.09 | --- | FAL, REC, LWW, IRR | NA | N |
| SDKB004 | UT to Nesbitt Branch | 10.95 | Dickson | Stream/ Intermittent | 36.24300 / -87.36080 | 36.24276 / -87.36142 | 10 / 15 | 12.5 | --- | 326 | FAL, REC, LWW, IRR | NA | Y |
| WBDKB004 | Pond | 11.1 | Dickson | Pond | 36.24384 | -87.36350 | --- | --- | 0.07 | --- | FAL, REC, LWW, IRR | NA | N |
| SDKB005 | UT to Nesbitt Branch | 11.14 | Dickson | Stream/ Intermittent | 36.24355 / -87.36427 | 36.24404 / -87.36393 | 2 / 5 | 3.5 | --- | 252 | FAL, REC, LWW, IRR | NA | Y |
| SDKB006 | UT to Nesbitt Branch | 11.24 | Dickson | WWC / Ephemeral | 36.24412 / -87.36584 | 36.24453 / -87.36580 | 2 / 5 | 3.5 | --- | 161 | FAL, REC, LWW, IRR | NA | Y |
| WBDKB005 | Pond | 11.35 | Dickson | Pond | 36.24522 | -87.36754 | --- | --- | 0.01 | --- | FAL, REC, LWW, IRR | NA | N |
| SDKB007 | UT to Nesbitt Branch | 11.42 | Dickson | WWC / Ephemeral | 36.24551 / -87.36866 | 36.24539 / -87.36883 | 4 / 6 | 5 | --- | 72 | FAL, REC, LWW, IRR | NA | Y |

| Waterbody ID | Waterbody Name [a] | Approx. Mile Post | County | Type / Flow Regime | Begin Latitude / Longitude | End Latitude / Longitude | Water body Min/ Max Width (ft) [b] | Avg Water body Width (ft)[b] | Amount in Study Area (acres) | Amount in Study Area (LF) | State Use Classification [c] | Sensitive Resource Water [d] | Currently Impacted by Project |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SDKB008 | Nesbitt Branch | 11.43 | Dickson | Stream/ Perennial | 36.24515 / -87.36891 | 36.24550 / -87.36893 | 4 / 6 | 5 | --- | 131 | FAL, REC, LWW, IRR | NA | Y |
| SDKR002 | UT to Furnace Creek | 11.84 | Dickson | WWC / Ephemeral | 36.24738 / -87.37553 | 36.24807 / -87.37589 | 2 / 5 | 3.5 | --- | 290 | FAL, REC, LWW, IRR | NA | Y |
| SDKB009 | Furnace Creek | 12.14 | Dickson | Stream/ Perennial | 36.24976 / -87.38037 | 36.24933 / -87.38076 | 40 / 70 | 55 | --- | 229 | FAL, REC, LWW, IRR | NA | Y |
| WBDKB006 | Pond | R 12.45 | Dickson | Pond | 36.25132 | -87.38564 | --- | --- | 0.42 | --- | FAL, REC, LWW, IRR | NA | N |
| SDKB010 | Tributary to Dry Hollow Branch | 13.56 | Dickson | WWC / Ephemeral | 36.25845 / -87.40360 | 36.25801 / -87.40395 | 2 / 5 | 3.5 | --- | 199 | FAL, REC, LWW, IRR | NA | Y |
| SDKR003 | Tributary to Dry Hollow Branch | 13.91 | Dickson | WWC / Ephemeral | 36.260079 / -87.409603 | 36.26054 / -87.409251 | 2 / 6 | 4 | --- | 198 | FAL, REC, LWW, IRR | NA | Y |
| SDKB011 | Dry Hollow Branch | 14.01 | Dickson | Stream/ Perennial | 36.26091 / -87.41178 | 36.26140 / -87.40883 | 20 / 40 | 30 | --- | 941 | FAL, REC, LWW, IRR | NA | Y |
| SDKB012 | UT to Woods Valley Branch | 14 | Dickson | WWC / Ephemeral | 36.26091 / -87.41178 | 36.26140 / -87.40883 | 4 / 8 | 6 | --- | 219 | FAL, REC, LWW, IRR | NA | Y |
| SDKR006 | UT to Woods Valley Branch | 14.34 | Dickson | WWC / Ephemeral | 36.263631 / -87.415772 | 36.263187 / -87.415653 | 5 / 7 | 6 | --- | 168 | FAL, REC, LWW, IRR | NA | Y |
| SDKR005 | UT to Nesbitt Branch | 14.35 | Dickson | WWC / Ephemeral | 36.263728 / -87.415625 | 36.263631 / -87.415772 | 2 / 5 | 3.5 | --- | 58 | FAL, REC, LWW, IRR | NA | Y |
| SDKR004 | UT to Nesbitt Branch | 14.35 | Dickson | WWC / Ephemeral | 36.263809 / -87.415716 | 36.263631 / -87.415772 | 5 / 7 | 6 | --- | 91 | FAL, REC, LWW, IRR | NA | Y |
| SDKA046 | UT to Dry Hollow Branch | 14.59 | Dickson | Stream/ Intermittent | 36.26387 / -87.41952 | 36.26501 / -87.41978 | 6 / 10 | 8 | --- | 594 | FAL, REC, LWW, IRR | NA | Y |
| SDKB013 | UT to Woods Valley Branch | 14.64 | Dickson | WWC / Ephemeral | 36.26491 / -87.42113 | 36.26493 / -87.42031 | 2 / 5 | 3.5 | --- | 248 | FAL, REC, LWW, IRR | NA | Y |
| SDKR007 | UT to Dry Hollow Branch | 14.8 | Dickson | WWC / Ephemeral | 36.26564 / -87.42366 | 36.26531 / -87.42331 | 1 / 3 | 2 | --- | 161 | FAL, REC, LWW, IRR | NA | Y |

| Waterbody ID | Waterbody Name [a] | Approx. Mile Post | County | Type / Flow Regime | Begin Latitude / Longitude | End Latitude / Longitude | Water body Min/ Max Width (ft) [b] | Avg Water body Width (ft)[b] | Amount in Study Area (acres) | Amount in Study Area (LF) | State Use Classification [c] | Sensitive Resource Water [d] | Currently Impacted by Project |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SDKB014 | UT to Woods Valley Branch | 14.97 | Dickson | WWC / Ephemeral | 36.26651 / -87.42606 | 36.26608 / -87.42653 | 4 / 6 | 5 | --- | 239 | FAL, REC, LWW, IRR | NA | Y |
| SDKR008 | UT to Woods Valley Branch | 15.1 | Dickson | WWC / Ephemeral | 36.26714 / -87.42849 / -87.42849 | 36.26646 / -87.42897 / -87.42897 | 2 / 4 / 4 | 3 | --- | 234 | FAL, REC, LWW, IRR | NA | Y |
| SDKR009 | UT to Woods Valley Branch | 15.17 | Dickson | WWC / Ephemeral | 36.26705 / -87.43005 | 36.266921 / -87.429935 | 1 / 3 | 2 | --- | 56 | FAL, REC, LWW, IRR | NA | Y |
| SDKB015 | UT to Woods Valley Branch | 15.19 | Dickson | WWC / Ephemeral | 36.26705 / -87.43016 | 36.26754 / -87.43042 | 1 / 8 | 4.5 | --- | 395 | FAL, REC, LWW, IRR | NA | Y |
| SDKB016 | UT to Little Bartons Creek | 15.48 | Dickson | WWC / Ephemeral | 36.26830 / -87.43525 | 36.26866 / -87.43544 | 1 / 3 | 2 | --- | 165 | FAL, REC, LWW, IRR | NA | Y |
| SDKB017 | UT to Little Bartons Creek | 15.6 | Dickson | WWC / Ephemeral | 36.26912 / -87.43727 | 36.26871 / -87.43734 | 1 / 3 | 2 | --- | 175 | FAL, REC, LWW, IRR | NA | Y |
| SDKB018 | UT to Little Bartons Creek | 15.78 | Dickson | WWC / Ephemeral | 36.26973 / -87.43915 | 36.27182 / -87.44262 | 3 / 5 | 4 | --- | 1,398 | FAL, REC, LWW, IRR | NA | Y |
| SDKB019 | UT to Little Bartons Creek | 15.96 | Dickson | WWC / Ephemeral | 36.27182 / -87.44262 | 36.27041 / -87.44355 | 1 / 4 | 2.5 | --- | 591 | FAL, REC, LWW, IRR | NA | Y |
| SDKB020 | UT to Little Bartons Creek | 16.11 | Dickson | WWC / Ephemeral | 36.27099 / -87.44596 | 36.27130 / -87.44604 | 1 / 3 | 2 | --- | 116 | FAL, REC, LWW, IRR | NA | Y |
| SDKB021 | UT to Little Bartons Creek | 16.5 | Dickson | WWC / Ephemeral | 36.27249 / -87.45183 | 36.27272 / -87.45242 | 2 / 5 | 3.5 | --- | 197 | FAL, REC, LWW, IRR | NA | N |
| SDKB022 | UT to Little Bartons Creek | 16.5 | Dickson | Stream/ Perennial | 36.27272 / -87.45242 | 36.27299 / -87.45254 | 2 / 5 | 3.5 | --- | 129 | FAL, REC, LWW, IRR | NA | N |
| SDKA059 | UT to Little Bartons Creek | 16.5 | Dickson | WWC / Ephemeral | 36.27146 / -87.45534 | 36.27137 / -87.45473 | 1 / 3 | 2 | --- | 192 | FAL, REC, LWW, IRR | NA | N |
| SDKB023 | Little Bartons Creek | 16.66 | Dickson | Stream/ Perennial | 36.27266, / -87.45238 | 36.27272 / -87.45242 | 15 / 25 | 20 | --- | 714 | FAL, REC, LWW, IRR | NA | Y |

| Waterbody ID | Waterbody Name [a] | Approx. Mile Post | County | Type / Flow Regime | Begin Latitude / Longitude | End Latitude / Longitude | Water body Min/ Max Width (ft) [b] | Avg Water body Width (ft)[b] | Amount in Study Area (acres) | Amount in Study Area (LF) | State Use Classification [c] | Sensitive Resource Water [d] | Currently Impacted by Project |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SDKB024 | UT to Little Bartons Creek | 17 | Dickson | WWC / Ephemeral | 36.27404 / -87.46094 | 36.27382 / -87.46137 | 1 / 4 | 2.5 | --- | 152 | FAL, REC, LWW, IRR | NA | Y |
| WBDKB007 | Pond | 17.03 | Dickson | Pond | 36.27405 | -87.46163 | 85 | --- | 0.15 | --- | FAL, REC, LWW, IRR | NA | Y |
| SDKA056 | UT to Leatherwood Creek | 17.21 | Dickson | WWC / Ephemeral | 36.27470 / -87.46515 | 36.27498 / -87.46471 | 2 / 5 | 3.5 | --- | 208 | FAL, REC, LWW, IRR | NA | Y |
| SDKA057 | UT to Leatherwood Creek | 17.25 | Dickson | WWC / Ephemeral | 36.27471 / -87.46522 | 36.27520 / -87.46543 | 1 / 3 | 2 | --- | 241 | FAL, REC, LWW, IRR | NA | Y |
| SDKA047 | UT to Leatherwood Creek | 17.47 | Dickson | WWC / Ephemeral | 36.27492 / -87.47146 | 36.27484 / -87.47160 | 1 / 3 | 2 | --- | 514 | FAL, REC, LWW, IRR | NA | Y |
| WBDKB008 | Pond | 18.36 | Dickson | Pond | 36.28041 | -87.48420 | --- | --- | 0.11 | --- | FAL, REC, LWW, IRR | NA | N |
| WBDKB009 | Pond | 18.76 | Dickson | Pond | 36.28239 | -87.49102 | --- | --- | 0.04 | --- | FAL, REC, LWW, IRR | NA | N |
| SDKB025 | UT to Leatherwood Creek | 18.93 | Dickson | Stream/ Intermittent | 36.28285 / -87.49261 | 36.28366 / -87.49532 | 8 / 12 | 10 | --- | 872 | FAL, REC, LWW, IRR | NA | Y |
| SDKB026 | Leatherwood Creek | 19.08 | Dickson | Stream/ Perennial | 36.28451 / -87.49620 | 36.28385 / -87.49597 | 20 / 25 | 22.5 | --- | 301 | FAL, REC, LWW, IRR | NA | Y |
| SDKB027 | UT to Leatherwood Creek | 19.18 | Dickson | WWC / Ephemeral | 36.28446 / -87.49800 | 36.28498 / -87.49780 | 8 / 12 | 10 | --- | 235 | FAL, REC, LWW, IRR | NA | Y |
| SDKB028 | UT to Leatherwood Creek | 19.3 | Dickson | Stream/ Intermittent | 36.28549 / -87.49948 | 36.28564 / -87.50193 | 8 / 12 | 10 | --- | 785 | FAL, REC, LWW, IRR | NA | Y |
| WBDKB010 | Pond | 19.57 | Dickson | Pond | 36.28653 | -87.50452 | 60 | 60 | 0.08 | --- | FAL, REC, LWW, IRR | NA | N |
| SDKR010 | UT to Leatherwood Creek | 19.81 | Dickson | WWC / Ephemeral | 36.28807 / -87.50809 | 36.28771 / -87.50878 | 4 / 6 | 5 | --- | 244 | FAL, REC, LWW, IRR | NA | Y |
| SDKR011 | UT to Leatherwood Creek | 20.03 | Dickson | WWC / Ephemeral | 36.28925 / -87.51214 | 36.28869 / -87.51201 | 1 / 3 | 2 | --- | 218 | FAL, REC, LWW, IRR | NA | Y |
| SHNW001 | UT to Williamson Branch | 20.25 | Dickson | WWC / Ephemeral | 36.28978 / -87.51620 | 36.28989 / -87.51601 | 5 / 7 | 6 | --- | 77 | FAL, REC, LWW, IRR | NA | N |

| Waterbody ID | Waterbody Name [a] | Approx. Mile Post | County | Type / Flow Regime | Begin Latitude / Longitude | End Latitude / Longitude | Water body Min/ Max Width (ft) [b] | Avg Water body Width (ft)[b] | Amount in Study Area (acres) | Amount in Study Area (LF) | State Use Classification [c] | Sensitive Resource Water [d] | Currently Impacted by Project |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SHNW002 | UT to Williamson Branch | 20.42 | Dickson | WWC / Ephemeral | 36.29090 / -87.51860 | 36.29068 / -87.51883 | 2 / 5 | 3.5 | --- | 113 | FAL, REC, LWW, IRR | NA | Y |
| SHNW003a | UT to Williamson Branch | 20.7 | Houston | WWC / Ephemeral | 36.29242 / -87.52306 | 36.29226 / -87.52425 | 2 / 5 | 3.5 | --- | 390 | FAL, REC, LWW, IRR | NA | Y |
| SHNW004a | UT to Williamson Branch | 20.81 | Houston | WWC / Ephemeral | 36.29306 / -87.52511 | 36.29266 / -87.52532 | 1 / 3 | 2 | --- | 176 | FAL, REC, LWW, IRR | NA | Y |
| SHNW004b | UT to Williamson Branch | 20.81 | Houston | WWC / Ephemeral | 36.29266 / -87.52532 | 36.29260 / -87.52534 | 1 / 3 | 2 | --- | 24 | FAL, REC, LWW, IRR | NA | N |
| SHNC042 | UT to Williamson Branch | 21.08 | Houston | WWC / Ephemeral | 36.29449 / -87.52960 | 36.29395 / -87.52972 | 4 / 6 | 5 | --- | 251 | FAL, REC, LWW, IRR | NA | Y |
| SHNC041 | UT to Williamson Branch | 21.21 | Houston | WWC / Ephemeral | 36.29515 / -87.53183 | 36.29469 / -87.53218 | 2 / 5 | 3.5 | --- | 207 | FAL, REC, LWW, IRR | NA | Y |
| SHNC003 | UT to Williamson Branch | 21.56 | Houston | WWC / Ephemeral | 36.296498 / -87.538405 | 36.296886 / -87.537473 | 2 / 10 | 6 | --- | 318 | FAL, REC, LWW, IRR | NA | Y |
| SHNC002 | UT to Williamson Branch | 21.63 | Houston | WWC / Ephemeral | 36.297076 / -87.538994 | 36.297121 / -87.539015 | 1 / 3 | 2 | --- | 18 | FAL, REC, LWW, IRR | NA | Y |
| SHNC001 | UT to Williamson Branch | 21.64 | Houston | WWC / Ephemeral | 36.297202 / -87.539201 | 36.293786 / -87.539243 | 2 / 5 | 3.5 | --- | 155 | FAL, REC, LWW, IRR | NA | Y |
| SHNC004 | UT to Williamson Branch | 21.74 | Houston | WWC / Ephemeral | 36.29776 / -87.54090 | 36.29732 / -87.54099 | 2 / 5 | 3.5 | --- | 169 | FAL, REC, LWW, IRR | NA | Y |
| SHNC005 | UT to Williamson Branch | 21.82 | Houston | WWC / Ephemeral | 36.297882, / -87.54208 | 36.29799 / -87.54242 | 2 / 5 | 3.5 | --- | 110 | FAL, REC, LWW, IRR | NA | Y |
| SHNC006 | UT to Yellow Creek | 21.93 | Houston | WWC / Ephemeral | 36.29861 / -87.54391 | 36.29891 / -87.54606 | 1 / 3 | 2 | --- | 740 | FAL, REC, LWW, IRR | NA | Y |
| SHNC009 | UT to Williamson Branch | 22 | Houston | WWC / Ephemeral | 36.29862 / -87.54533 | 36.29903 / -87.54489 | 1 / 3 | 2 | --- | 202 | FAL, REC, LWW, IRR | NA | N |
| SHNC010-2 | | 22 | Houston | | 36.29893 | 36.29942 | 3 | 5 | --- | 219 | | NA | N |

| Waterbody ID | Waterbody Name [a] | Approx. Mile Post | County | Type / Flow Regime | Begin Latitude / Longitude | End Latitude / Longitude | Water body Min/ Max Width (ft) [b] | Avg Water body Width (ft)[b] | Amount in Study Area (acres) | Amount in Study Area (LF) | State Use Classification [c] | Sensitive Resource Water [d] | Currently Impacted by Project |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UT to Yellow Creek | | | WWC / Ephemeral | -87.54635 | -87.54602 | 7 | | | | FAL, REC, LWW, IRR | | |
| SHNC011 | UT to Yellow Creek | 22 | Houston | WWC / Ephemeral | 36.29963 / -87.54789 | 36.29947 / -87.54794 | 1 / 3 | 2 | --- | 60 | FAL, REC, LWW, IRR | NA | N |
| SHNC008 | UT to Yellow Creek | 22.2 | Houston | WWC / Ephemeral | 36.29740 / -87.54829 | 36.29730 / -87.54816 | 1 / 3 | 2 | --- | 54 | FAL, REC, LWW, IRR | NA | N |
| SHNC012 | UT to Williamson Branch | 22.21 | Houston | Stream/ Intermittent | 36.29618 / -87.54906 | 36.29618 / -87.54909 | 2 / 5 | 3.5 | --- | 133 | FAL, REC, LWW, IRR | NA | N |
| SHNC013 | UT to Williamson Branch | 22.21 | Houston | WWC / Ephemeral | 36.29619 / -87.54907 | 36.29618 / -87.54906 | 2 / 5 | 3.5 | --- | 231 | FAL, REC, LWW, IRR | NA | N |
| SHNC014 | Williamson Branch | 22.25 | Houston | Stream/ Perennial | 36.295509, / -87.54911 | 36.29623 / -87.54962 | 15 / 25 | 20 | --- | 365 | FAL, REC, LWW, IRR | NA | N |
| SHNC010-1 | UT to Yellow Creek | 22.33 | Houston | Stream/ Intermittent | 36.29775 / -87.54995 | 36.29778 / -87.55033 | 8 / 12 | 10 | --- | 338 | FAL, REC, LWW, IRR | NA | Y |
| SHNC007-1 | Yellow Creek | 22.35 | Houston | Stream/ Perennial | 36.29867 / -87.55008 | 36.29772 / -87.55033 | 130 / 100 | 115 | --- | 378 | FAL, REC, LWW, IRR | NA | Y |
| SHNC007-2 | Yellow Creek | 22.35 | Houston | Stream/ Perennial | 36.29569 / -87.55168 | 36.29572 / -87.55193 | 130 / 170 | 150 | --- | 380 | FAL, REC, LWW, IRR | NA | N |
| SHNC007-3 | Yellow Creek | 22.35 | Houston | Stream/ Perennial | 36.29647 / -87.55428 | 36.29634 / -87.55529 | 85 / 140 | 112.5 | --- | 311 | FAL, REC, LWW, IRR | NA | N |
| SHNC007-4 | Yellow Creek | 22.5 | Houston | Stream/ Perennial | 36.30077 / -87.55057 | 36.30009 / -87.55023 | 50 / 80 | 65 | --- | 278 | FAL, REC, LWW, IRR | NA | N |
| SHNC007-5 | Yellow Creek | 22.5 | Houston | Stream/ Perennial | 36.30093 / -87.55108 | 36.30037 / -87.55116 | 50 / 80 | 65 | --- | 210 | FAL, REC, LWW, IRR | NA | N |
| SHNC018 | UT to Yellow Creek | 22.88 | Houston | Stream/ Intermittent | 36.30193 / -87.55971 | 36.30259 / -87.55665 | 10 / 40 | 25 | --- | 869 | FAL, REC, LWW, IRR | NA | Y |
| SHNC017 | UT to Williamson Branch | 23.18 | Houston | WWC / Ephemeral | 36.30379 / -87.56263 | 36.30407 / -87.56210 | 1 / 3 | 2 | --- | 200 | FAL, REC, LWW, IRR | NA | Y |

AR 000885

| Waterbody ID | Waterbody Name [a] | Approx. Mile Post | County | Type / Flow Regime | Begin Latitude / Longitude | End Latitude / Longitude | Water body Min/ Max Width (ft) [b] | Avg Water body Width (ft)[b] | Amount in Study Area (acres) | Amount in Study Area (LF) | State Use Classification [c] | Sensitive Resource Water [d] | Currently Impacted by Project |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SHNC016 | UT to Yellow Creek | 23.24 | Houston | WWC / Ephemeral | 36.30411 / -87.56302 | 36.30436 / -87.56324 | 2 / 5 | 3.5 | --- | 118 | FAL, REC, LWW, IRR | NA | Y |
| SHNC015 | UT to Yellow Creek | 23.25 | Houston | WWC / Ephemeral | 36.30383 / -87.56276 | 36.30463 / -87.56349 | 8 / 12 | 10 | --- | 405 | FAL, REC, LWW, IRR | NA | Y |
| SHNE001 | UT to Yellow Creek | 23.72 | Houston | WWC / Ephemeral | 36.30702 / -87.57095 | 36.30650 / -87.57140 | 1 / 3 | 2 | --- | 318 | FAL, REC, LWW, IRR | NA | Y |
| SHNC019 | UT to Indian Branch | 24.08 | Houston | WWC / Ephemeral | 36.30994 / -87.57665 | 36.30929 / -87.57643 | 1 / 3 | 2 | --- | 280 | FAL, REC, LWW, IRR | NA | Y |
| SHNE002 | UT to Indian Branch | 24.12 | Houston | WWC / Ephemeral | 36.30958 / -87.57701 | 36.31010 / -87.57699 | 1 / 3 | 2 | --- | 160 | FAL, REC, LWW, IRR | NA | Y |
| SHNC020 | Indian Branch | 24.12 | Houston | Stream/ Intermittent | 36.31003 / -87.57697 | 36.30944 / -87.57721 | 7 / 10 | 8.5 | --- | 241 | FAL, REC, LWW, IRR | NA | Y |
| WBHNC001 | Pond | 24.28 | Houston | Pond | 36.31059 | -87.57937 | --- | --- | 0.24 | --- | FAL, REC, LWW, IRR | NA | N |
| SHNC021 | UT to Indian Branch | 24.28 | Houston | WWC / Ephemeral | 36.31059 / -87.57956 | 36.31026 / -87.57955 | 2 / 5 | 3.5 | --- | 145 | FAL, REC, LWW, IRR | NA | Y |
| SHNC022 | UT from Guices Branch | 24.41 | Houston | WWC / Ephemeral | 36.31139 / -87.58139 | 36.31229 / -87.58181 | 2 / 5 | 3.5 | --- | 353 | FAL, REC, LWW, IRR | NA | Y |
| SHNC023 | UT from Guices Branch | 24.47 | Houston | WWC / Ephemeral | 36.31184 / -87.58275 | 36.31241 / -87.58217 | 2 / 5 | 3.5 | --- | 318 | FAL, REC, LWW, IRR | NA | Y |
| SHNC024 | UT from Guices Branch | 24.63 | Houston | WWC / Ephemeral | 36.31302 / -87.58470 | 36.31378 / -87.58426 | 2 / 5 | 3.5 | --- | 311 | FAL, REC, LWW, IRR | NA | Y |
| SHNC025 | UT from Guices Branch | 24.72 | Houston | WWC / Ephemeral | 36.31407 / -87.58595 | 36.31461 / -87.58575 | 2 / 5 | 3.5 | --- | 219 | FAL, REC, LWW, IRR | NA | Y |
| WBHNC002 | Pond | 24.75 | Houston | Pond | 36.31468 | -87.58578 | --- | --- | 0.28 | --- | FAL, REC, LWW, IRR | NA | N |
| SHNC026 | UT from Guices Branch | 24.85 | Houston | WWC / Ephemeral | 36.31577 / -87.58735 | 36.31625 / -87.58695 | 1 / 3 | 2 | --- | 214 | FAL, REC, LWW, IRR | NA | N |
| SHNC027 | | 24.9 | Houston | | 36.31634 | 36.31681 | 1 / 3 | 2 | --- | 234 | | NA | N |

| Waterbody ID | Waterbody Name [a] | Approx. Mile Post | County | Type / Flow Regime | Begin Latitude / Longitude | End Latitude / Longitude | Water body Min/ Max Width (ft) [b] | Avg Water body Width (ft)[b] | Amount in Study Area (acres) | Amount in Study Area (LF) | State Use Classification [c] | Sensitive Resource Water [d] | Currently Impacted by Project |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UT to Guices Branch | | | WWC / Ephemeral | -87.58777 | -87.58731 | 3 | | | | FAL, REC, LWW, IRR | | |
| SHNC028 | UT to Guices Branch | 25 | Houston | WWC / Ephemeral | 36.31708 / -87.58840 | 36.31742 / -87.58823 | 1 / 3 | 2 | --- | 133 | FAL, REC, LWW, IRR | NA | N |
| SHNC023-1 | UT from Guices Branch | 25 | Houston | WWC / Ephemeral | 36.31708 / -87.58749 | 36.31787 / -87.58799 | 2 / 5 | 3.5 | --- | 336 | FAL, REC, LWW, IRR | NA | N |
| WBHNC003 | Pond | 25.03 | Houston | Pond | 36.31768 | -87.58900 | --- | --- | 0.23 | --- | FAL, REC, LWW, IRR | NA | N |
| SHNC023-2 | UT from Guices Branch | 25.08 | Houston | WWC / Ephemeral | 36.31870 / -87.58776 | 36.31884 / -87.58772 | 2 / 5 | 3.5 | --- | 51 | FAL, REC, LWW, IRR | NA | Y |
| SHNC029 | UT from Guices Branch | 25.12 | Houston | WWC / Ephemeral | 36.31864 / -87.58977 | 36.31876 / -87.58961 | 1 / 3 | 2 | --- | 62 | FAL, REC, LWW, IRR | NA | N |
| WBHNC004 | Pond | 25.32 | Houston | Pond | 36.32087 | -87.59273 | --- | --- | 0.17 | --- | FAL, REC, LWW, IRR | NA | N |
| SHNC031 | UT to Guices Branch | 25.34 | Houston | WWC / Ephemeral | 36.32099 / -87.59284 | 36.32149 / -87.59245 | 2 / 5 | 3.5 | --- | 244 | FAL, REC, LWW, IRR | NA | N |
| SHNC030 | UT from Guices Branch | 25.37 | Houston | WWC / Ephemeral | 36.31949 / -87.58855 | 36.32187 / -87.59226 | 8 / 12 | 10 | --- | 1,520 | FAL, REC, LWW, IRR | NA | Y |
| SHNC032 | UT to Guices Branch | 25.39 | Houston | WWC / Ephemeral | 36.32181 / -87.59342 | 36.32189 / -87.59340 | 1 / 3 | 2 | --- | 30 | FAL, REC, LWW, IRR | NA | N |
| SHNE007 | UT to Guices Branch | 25.43 | Houston | WWC / Ephemeral | 36.32246 / -87.59202 | 36.32307 / -87.59156 | 1 / 3 | 2 | --- | 265 | FAL, REC, LWW, IRR | NA | Y |
| WBHNC005 | Pond | 25.5 | Houston | Pond | 36.32244 | -87.59507 | --- | --- | 0.09 | --- | FAL, REC, LWW, IRR | NA | N |
| SHNE003 | UT to Guices Branch | 25.59 | Houston | WWC / Ephemeral | 36.32433 / -87.59303 | 36.32409 / -87.59393 | 2 / 5 | 3.5 | --- | 433 | FAL, REC, LWW, IRR | NA | Y |
| SHNE004 | UT to Guices Branch | 25.68 | Houston | WWC / Ephemeral | 36.32563 / -87.59454 | 36.32513 / -87.59506 | 1 / 3 | 2 | --- | 312 | FAL, REC, LWW, IRR | NA | Y |
| SHNE005 | UT to Guices Branch | 25.79 | Houston | WWC / Ephemeral | 36.32669 / -87.59547 | 36.32640 / -87.59622 | 2 / 5 | 3.5 | --- | 288 | FAL, REC, LWW, IRR | NA | Y |

| Waterbody ID | Waterbody Name [a] | Approx. Mile Post | County | Type / Flow Regime | Begin Latitude / Longitude | End Latitude / Longitude | Water body Min/ Max Width (ft) [b] | Avg Water body Width (ft)[b] | Amount in Study Area (acres) | Amount in Study Area (LF) | State Use Classification [c] | Sensitive Resource Water [d] | Currently Impacted by Project |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SHNE006 | UT to Guices Branch | 25.8 | Houston | WWC / Ephemeral | 36.32675 / -87.59565 | 36.32647 / -87.59621 | 2 / 6 | 4 | --- | 213 | FAL, REC, LWW, IRR | NA | Y |
| SHNC033 | Guices Creek | 25.9 | Houston | Stream/ Perennial | 36.32702 / -87.60119 | 36.32622 / -87.60152 | 25 / 35 | 30 | --- | 368 | FAL, REC, LWW, IRR | NA | N |
| SHNC034 | UT to Guices Branch | 26.05 | Houston | WWC / Ephemeral | 36.32721 / -87.60392 | 36.32644 / -87.60474 | 2 / 5 | 3.5 | --- | 581 | FAL, REC, LWW, IRR | NA | N |
| SHNC035 | UT to Guices Branch | 26.1 | Houston | WWC / Ephemeral | 36.32720 / -87.60615 | 36.32721 / -87.60594 | 1 / 3 | 2 | --- | 64 | FAL, REC, LWW, IRR | NA | N |
| WBHNC006 | Pond | 26.1 | Houston | Pond | 36.34183 | -87.61691 | --- | --- | 0.13 | --- | FAL, REC, LWW, IRR | NA | N |
| SHNC036 | UT to Guices Branch | 26.2 | Houston | WWC / Ephemeral | 36.32860 / -87.60687 | 36.32903 / -87.60587 | 2 / 5 | 3.5 | --- | 404 | FAL, REC, LWW, IRR | NA | N |
| SHNC037 | UT to Guices Branch | 26.2 | Houston | WWC / Ephemeral | 36.328482, / -87.60625 | 36.32888 / -87.60628 | 1 / 3 | 2 | --- | 148 | FAL, REC, LWW, IRR | NA | N |
| SHNA011 | UT to Guices Creek | 26.21 | Houston | Stream/ Intermittent | 36.33150 / -87.60050 | 36.33090 / -87.60124 | 10 / 15 | 12.5 | --- | 907 | FAL, REC, LWW, IRR | NA | Y |
| SHNC038 | UT to Guices Branch | 26.21 | Houston | WWC / Ephemeral | 36.32930 / -87.60687 | 36.32943 / -87.60646 | 1 / 3 | 2 | --- | 135 | FAL, REC, LWW, IRR | NA | N |
| SHNA012 | Guices Creek | 26.43 | Houston | Stream/ Intermittent | 36.33086 / -87.60352 | 36.33327 / -87.60392 | 15 / 20 | 17.5 | --- | 529 | FAL, REC, LWW, IRR | NA | Y |
| SHNC039 | UT to Guices Branch | 26.45 | Houston | WWC / Ephemeral | 36.32986 / -87.60692 | 36.33038 / -87.60672 | 1 / 3 | 2 | --- | 198 | FAL, REC, LWW, IRR | NA | N |
| SHNC040 | UT to Guices Branch | 26.45 | Houston | WWC / Ephemeral | 36.33038 / -87.60672 | 36.33090 / -87.60609 | 1 / 3 | 2 | --- | 377 | FAL, REC, LWW, IRR | NA | N |
| WBHNC007 | Pond | 26.68 | Houston | Pond | 36.33522 | -87.60700 | --- | --- | 0.05 | --- | FAL, REC, LWW, IRR | NA | N |
| SHNA001 | Guices Creek | 26.87 | Houston | Stream/ Perennial | 36.33759 / -87.60869 | 36.33719 / -87.60900 | 15 / 25 | 20 | --- | 208 | FAL, REC, LWW, IRR | NA | Y |
| SHNA002 | | 27.22 | Houston | | 36.34008 | 36.34028 | 1 | 2 | --- | 92 | | NA | Y |

| Waterbody ID | Waterbody Name [a] | Approx. Mile Post | County | Type / Flow Regime | Begin Latitude / Longitude | End Latitude / Longitude | Water body Min/ Max Width (ft) [b] | Avg Water body Width (ft)[b] | Amount in Study Area (acres) | Amount in Study Area (LF) | State Use Classification [c] | Sensitive Resource Water [d] | Currently Impacted by Project |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | UT to Guices Creek | | | WWC / Ephemeral | -87.61398 | -87.61389 | 3 | | | | FAL, REC, LWW, IRR | | |
| SHNA003 | UT to Guices Creek | 27.26 | Houston | WWC / Ephemeral | 36.34037 / -87.61448 | 36.34075 / -87.61445 | 1 / 3 | 2 | --- | 159 | FAL, REC, LWW, IRR | NA | Y |
| SHNA005 | UT to Guices Creek | 27.28 | Houston | WWC / Ephemeral | 36.34056 / -87.61479 | 36.34086 / -87.61471 | 1 / 3 | 2 | --- | 136 | FAL, REC, LWW, IRR | NA | Y |
| SHNA004 | UT to Guices Creek | 27.29 | Houston | WWC / Ephemeral | 36.34072 / -87.61505 | 36.34091 / -87.61506 | 1 / 3 | 2 | --- | 268 | FAL, REC, LWW, IRR | NA | N |
| SHNA006 | UT to Guices Creek | 27.41 | Houston | WWC / Ephemeral | 36.34183 / -87.61691 | 36.34177 / -87.61673 | 1 / 3 | 2 | --- | 85 | FAL, REC, LWW, IRR | NA | N |
| SHNB031 | UT to Lickskillet Branch | 27.52 | Houston | WWC / Ephemeral | 36.34288 / -87.61818 | 36.34304 / -87.61779 | 4 / 8 | 6 | --- | 229 | FAL, REC, LWW, IRR | NA | Y |
| SHNA007 | UT to Guices Creek | 27.52 | Houston | WWC / Ephemeral | 36.34288 / -87.61818 | 36.34285 / -87.61862 | 4 / 8 | 6 | --- | 153 | FAL, REC, LWW, IRR | NA | Y |
| SHNB029 | UT to Lickskillet Branch | 27.95 | Houston | WWC / Ephemeral | 36.34662 / -87.62335 | 36.34728 / -87.62428 | 2 / 5 | 3.5 | --- | 382 | FAL, REC, LWW, IRR | NA | N |
| SHNB030 | UT to Lickskillet Branch | 28.03 | Houston | WWC / Ephemeral | 36.34779 / -87.62580 | 36.34682 / -87.62525 | 2 / 5 | 3.5 | --- | 410 | FAL, REC, LWW, IRR | NA | Y |
| SHNB033-1 | Lickskillet Branch | 28.61 | Houston | Stream/ Perennial | 36.35270 / -87.63395 | 36.35203 / -87.63390 | 15 / 30 | 22.5 | --- | 259 | FAL, REC, LWW, IRR | NA | Y |
| SHNB033-2 | Lickskillet Branch | 28.92 | Houston | Stream/ Perennial | 36.35491 / -87.63879 | 36.35506 / -87.63790 | 8 / 12 | 10 | --- | 270 | FAL, REC, LWW, IRR | NA | Y |
| SHNA008 | UT to Lickskillet Branch | 28.95 | Houston | Stream/ Perennial | 36.35450 / -87.63947 | 36.35455 / -87.63945 | 2 / 5 | 3.5 | --- | 242 | FAL, REC, LWW, IRR | NA | Y |
| SHNA013 | UT to Lickskillet Branch | 29 | Houston | WWC / Ephemeral | 36.35570 / -87.63900 | 36.35582 / -87.63982 | 1 / 3 | 2 | --- | 269 | FAL, REC, LWW, IRR | NA | Y |
| SHNB032 | UT to Lickskillet Branch | 29.03 | Houston | WWC / Ephemeral | 36.35577 / -87.63999 | 36.35624 / -87.63970 | 5 / 8 | 6.5 | --- | 218 | FAL, REC, LWW, IRR | NA | Y |

| Waterbody ID | Waterbody Name [a] | Approx. Mile Post | County | Type / Flow Regime | Begin Latitude / Longitude | End Latitude / Longitude | Water body Min/ Max Width (ft) [b] | Avg Water body Width (ft) [b] | Amount in Study Area (acres) | Amount in Study Area (LF) | State Use Classification [c] | Sensitive Resource Water [d] | Currently Impacted by Project |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SHNB034 | UT to Lickskillet Branch | 30.18 | Houston | WWC / Ephemeral | 36.36627 | 36.36680 | 2 | 3.5 | --- | 239 | FAL, REC, LWW, IRR | NA | Y |
| | | | | | -87.65559 | -87.65555 | 5 | | | | | | |
| SHNB033-3 | Lickskillet Branch | 30.19 | Houston | Stream/ Perennial | 36.36639 | 36.36757 | 15 | 17.5 | --- | 900 | FAL, REC, LWW, IRR | NA | Y |
| | | | | | -87.65585 | -87.65633 | 20 | | | | | | |
| SHNB035 | Wells Creek | 30.5 | Stewart | Stream/ Perennial | 36.36838 | 36.36842 | 50 | 60 | --- | 380 | FAL, REC, LWW, IRR | Yes | N |
| | | | | | -87.66295 | -87.66298 | 70 | | | | | | |
| SHNA010 | Wells Creek | 30.67 | Stewart | Stream/ Perennial | 36.37133 | 36.37155 | 50 | 60 | --- | 456 | FAL, REC, LWW, IRR | NA | Y |
| | | | | | -87.66217 | -87.66119 | 70 | | | | | | |
| SHNB036 | UT to Lickskillet Branch | 31.3 | Stewart | WWC / Ephemeral | 36.37619 | 36.37588 | 2 | 3.5 | --- | 394 | FAL, REC, LWW, IRR | NA | N |
| | | | | | -87.67162 | -87.67269 | 5 | | | | | | |

Notes:

a - UT = Unnamed Tributary

b - Calculated based on the surveyed top-of-bank to top-of-bank waterbody width using Ordinary High Water as reference.

c - State Use Classifications (TDEC 2019):

DOM = Domestic Water Supply

IWS = Industrial Water Supply

FAL = Fish and Aquatic Life

TS = Trout Stream

NRTS = Naturally Reproducing Trout Stream

REC = Recreation

LWW = Livestock Watering and Wildlife

IRR = Irrigation

NAV = Navigation

d – Sensitive Resource Water (TDEC 2020b): Tennessee's 2020 Final List of Impaired Waters

Jurisdictional Waters
Determinations and Tennessee
Hydrologic Determinations Report

APPENDIX

# E

WETLAND DATA TABLE

AR  000891

# Appendix E
# Wetland Data Table

**Table E-1:  Wetlands Identified within the Cumberland Project Study Area**

| Wetland ID | Approx. Milepost | County | Cowardin Classification [a] | HGM Classification | Latitude | Longitude | Quality | Amount in Study Area (acres) |
|---|---|---|---|---|---|---|---|---|
| **Pipeline and Facilities** | | | | | | | | |
| WDKA001 | 8.48 | Dickson | PEM | Depressional | 36.221467 | -87.309851 | Low | 0.16 |
| WDKB001 | 12.09 | Dickson | PFO | Riverine | 36.24933 | -87.380413 | Low | 0.05 |
| WHNC001 | 23.95 | Houston | PEM | Depressional | 36.299699 | -87.547268 | Low | 0.02 |
| WHNC002 | 22.05 | Houston | PFO | Riverine | 36.295941 | -87.548897 | Low | 0.33 |
| WHNB002 | 30.01 | Houston | PFO | Riverine | 36.365759 | -87.654323 | High | 1.04 |
| **Access Roads** | | | | | | | | |
| No wetlands were identified along access roads. | | | | | | | | |
| | | | | | | | | |
| | | | | | | | Total PEM | 0.18 |
| | | | | | | | Total PSS | 0.00 |
| | | | | | | | Total PFO | 1.42 |
| | | | | | | | Grand Total | 1.60 |
| Notes: a - Designations for each type of wetland follow the classifications developed by the USFWS after Cowardin et al. (1979). | | | | | | | | |



Cumberland Project

Aquatic Resource Alteration
Permit (ARAP) Application
and State 401 Water Quality
Permit

July 22, 2022

Prepared for:



Tennessee Gas Pipeline Company, L.L.C.
1001 Louisiana Street, Suite 1000 | Houston, TX
77002

Prepared by:



Stantec
601 Grassmere Park, Suite 22 | Nashville, TN 37211



AR  000920

**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

## Table of Contents

**1.0 TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION ("TDEC") APPLICATION FOR AQUATIC RESOURCE ALTERATION PERMIT ("ARAP") AND 401 WATER QUALITY CERTIFICATION** ................................................. 1

**2.0 ALTERNATE CONTACT / CONSULTANT INFORMATION** ......................... 1

**3.0 FEE** ............................................................................................................. 1

**4.0 PROJECT DETAILS** ................................................................................... 1

**5.0 PROJECT SCHEDULE** ............................................................................... 3

**6.0 PROJECT DESCRIPTION** .......................................................................... 3

6.1 Project Scope ..................................................................................... 3

6.2 Topographic Map ............................................................................... 4

6.3 Photographs ....................................................................................... 4

6.4 Existing Conditions ............................................................................ 4
    6.4.1 Waterbodies ........................................................................... 5
    6.4.2 Wetlands ................................................................................. 6
    6.4.3 Ponds ...................................................................................... 6

6.5 Proposed Stream, Wetland, and Pond Characteristics ..................... 6

**7.0 PROJECT RATIONALE** .............................................................................. 8

7.1 Purpose and Need ............................................................................. 8

7.2 General Pipeline Construction Considerations .................................. 9
    7.2.1 Preferred Alternative ............................................................. 10

**8.0 TECHNICAL INFORMATION** ..................................................................... 10

8.1 Detailed Plans .................................................................................. 10

8.2 Construction Sequencing and Methods ........................................... 10
    8.2.1 Waterbodies ......................................................................... 10
    8.2.2 Wetlands ............................................................................... 14

8.3 Sediment and Erosion Control Measures ........................................ 15

**9.0 WATER RESOURCE DEGRADATION** ...................................................... 15

**10.0 DETAILED ALTERNATIVES ANALYSIS** ................................................. 15

10.1 No-Action Alternative ...................................................................... 16

10.2 Route Alternatives .......................................................................... 16
    10.2.1 Major Route Alternatives .................................................... 17



Case: 23-3682    Document: 56-1    Filed: 08/19/2024    Page: 296

**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

        10.2.2    Minor Route Variations.................................................................17

10.3    Construction Methods Alternatives .........................................................21
        10.3.1    Open Trench Crossing Methods..................................................22
        10.3.2    Trenchless Crossing Methods ....................................................26

10.4    Social and Economic Consequences of Each Alternative.............................29

10.5    Degradation Associated with the Preferred Alternative ................................31

**11.0  COMPENSATORY MITIGATION .................................................................45**

11.1    Proposed Compensatory Mitigation .......................................................45

11.2    Describe How the Compensatory Mitigation Would Result in No Net Loss of
        Resource Value...............................................................................45

11.3    Provide a Detailed Monitoring Plan........................................................45
        11.3.1    Qualitative Visual Assessment ...................................................45
        11.3.2    Photo Documentation...............................................................46

11.4    Describe the Long-term Protection Measures for the Compensatory Mitigation
        Site...............................................................................................46

**12.0  REFERENCES.......................................................................................46**


**LIST OF TABLES**
TABLE 10.2-1    Cumberland Project Minor Route Variations................................................18
TABLE 10.2-2    Minor Route Variations (Summary MP 30-32)............................................21
TABLE 10.5-1    Waterbodies Crossings Hydrologic Risk Analysis.......................................32


**LIST OF ATTACHMENTS**

ATTACHMENT 1 – WETLANDS AND WATERBODIES IMPACTS TABLES

        Table 1        Cumberland Waterbodies Impact
        Table 2        Cumberland Wetlands Impact
        Table 3        Cumberland Ponds Impact

ATTACHMENT 2 – JURISDICTIONAL WATERS DETERMINATION AND TENNESSEE
                HYDROLOGIC DETERMINATION REPORT SUBMITTAL CONFIRMATION

ATTACHMENT 3 – PROJECT DESIGN PLANS AND PERMIT DRAWINGS

        Alignment Sheets
        Typical ROW Cross-Section Diagrams, Typical Construction Drawings and Details
        Permit Drawings



AR 000922

**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

ATTACHMENT 4 – AGENCY COORDINATION AND CONCURRENCE LETTERS

ATTACHMENT 5 –ENVIRONMENTAL CONSTRUCTION MANAGEMENT PLAN

> Appendix A    Federal Energy Regulatory Commission Upland Erosion Control,
> Revegetation, and Maintenance Plan
> Appendix B    Federal Energy Regulatory Commission Wetland and Waterbody
> Construction and Mitigation Procedures
> Appendix C    Spill Prevention and Control Plan
> Appendix D    HDD Contingency Plan
> Appendix E    Blasting Plan
> Appendix F    Hydrostatic Test Plan

ATTACHMENT 6 – PERMITTING TABLE

ATTACHMENT 7 – HDD FEASIBLITY STUDIES

> HDD Feasibility Study TGP Cumberland Pipeline - Jones Creek
> HDD Feasibility Study TGP Cumberland Pipeline - Wells Creek
> HDD Feasibility Study TGP Cumberland Pipeline - Yellow Creek

ATTACHMENT 8 – MINOR ROUTE VARIATIONS FIGURES

ATTACHMENT 9 – SUMMARY OF TRENCHLESS CONSTRUCTION METHODS



AR  000923

## 1.0 TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION ("TDEC") APPLICATION FOR AQUATIC RESOURCE ALTERATION PERMIT ("ARAP") AND 401 WATER QUALITY CERTIFICATION

See the ARAP application form following this page. The application form comprises Sections 1-11. Information for Sections 2 and 3 is included on the application form. Supplemental information for Sections 4-11 follows this application form and is provided in the subsequent pages.

## 2.0 ALTERNATE CONTACT / CONSULTANT INFORMATION

Please see the application form.

## 3.0 FEE

TGP has paid the application fee through the TDEC Division of Fiscal Services-Consolidated Fees Section. Please see the application form for additional information.

## 4.0 PROJECT DETAILS

**Site or Project Name:** Cumberland Project ("Project")

**Nearest City, Town, or Major Landmark:** The proposed Project pipeline route traverses portions of Dickson, Houston, and Stewart counties, Tennessee ("TN") and terminates near Cumberland City, TN. Please see Project Overview Map below.

Additional Project and workspace details are provided below.

**Street Address or Location:** ~32-mile linear route from Clay Lick Road, Dickson County (37187) to near Old Scott Road, Stewart County (37050)
**Counties:** Dickson, Houston, and Stewart
**MS4 Jurisdiction:** N/A
**Start Location:** Approximate milepost ("MP") 0 in Dickson County (~36.161840°; ~-87.206428°)
**End Location:** Cumberland Meter Station (MP 32) in Stewart County (~36.372977°; ~-87.675641°)

**Resources Proposed for Alteration:** Streams and Wetlands. Please see the three Wetlands and Waterbodies (Watercoures and Ponds) Impacts Tables in **Attachment 1** for the proposed impacts on water resources. Maps of all wetlands and waterbodies within the Project footprint are presented in **Attachment 2** – Jurisdictional Waters Determinations and Tennessee Hydrologic Determinations Report.

**Name of Water Resources:** Various waterbodies located in the Lower Cumberland watersheds. Of the 125 watercoures identified within the Project area, 19 were named streams: Gafford Branch, Upper Sugarcamp Branch, Jordan Branch, Johnson Creek, Harris Branch, Jones Creek,



**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

Porters Branch, Miller Branch, Bartons Creek, Nesbitt Branch, Furnace Creek, Dry Hollow
Branch, Little Bartons Creek, Leatherwood Creek, Guices Creek, Wells Creek, Lickskillet Branch,
Yellow Creek, and Indian Branch.

**Brief Project Description:**

Tennessee Gas Pipeline Company, L.L.C. ("TGP") proposes the construction and operation of a
new approximately 32 mile 30-inch diameter natural gas pipeline lateral, connecting to TGP's
existing Lines 100-3 and 100-4 ("Cumberland Pipeline"), located in Dickson, Houston, and
Stewart Counties, TN, and appurtenant facilities.

**Does the proposed activity require approval from the United States ("U.S.") Army Corps of
Engineers, the Tennessee Valley Authority, or any other federal, state, or local government
agency?** Yes

**If yes, provide the permit reference numbers:**

TGP is providing a dredge and fill request to U.S. Army Corps of Engineers ("USACE") Nashville
District for an Individual Permit under Section 404 of the Clean Water Act and Section 10 of the
Rivers and Harbors Act and review of a Preliminary Jurisdictional Determination ("PJD").

TGP is submitting contemporaneously with this application an application for a certificate of public
convenience and necessity to the Federal Energy Regulatory Commission ("FERC") pursuant to
Section 7(c) of the Natural Gas Act. TGP utilized the FERC pre-filing procedures in FERC Docket
No. PF22-2-000 for preliminary review of the Project and will provide the FERC docket number
when assigned for the certificate application. Please see permit table provided as **Attachment 6**.

**Will the activity require a 401 Water Quality Certification?**  Yes.

**If Yes, attach any 401 WQC pre-filing meeting request documentation**.

TGP's previous communications with TDEC related to the Project include:

- Project introductory meeting held with the USACE, TDEC, and Tennessee Valley Authority
  ("TVA") staff on September 21, 2021.

- Request for participation in the FERC pre-filing process was sent to the TDEC on September
  28, 2021. TDEC response received October 7, 2021, agreeing to participate.

- Introductory meeting with TDEC Commissioners held on November 15, 2021.

- Consultation meetings held with TDEC to discuss ARAP application on March 11, 2022, April
  6, 2022, and June 3, 2022.

**Is the proposed activity associated with a larger common plan of development?**       No

**If yes, submit site plans and identify the location and overall scope of the common
plan of development. Plans Attached?**       N/A



JA0293

2

**If applicable, indicate any other federal, state, or local permit authorizations that the overall project site (common plan of development) has obtained in the past (i.e., construction general permit coverage and/or other ARAPs):**    None

# 5.0    Project Schedule

TGP is requesting issuance of a certificate order from FERC for the Project in November 2023 and, following receipt of all applicable approvals, anticipates beginning construction activities that do not require tree felling in August 2024, felling and clearing trees from the Project construction workspace beginning mid-October 2024, and commencing all remaining construction activities by November 2024. To meet TVA's requested in-service date, TGP plans to place all facilities in-service by September 1, 2025, with final restoration estimated to be completed by December 2025.

**SUMMARY:**

**Estimated Start Date:**                                    August 2024
**Estimated End Date:**                                    December 2025
**Is any portion of the activity complete, now?**                        No
**If yes, describe the extent of the completed portion:**                    N/A

# 6.0    Project Description

## 6.1    Project Scope

The scope of the proposed Project includes the construction, installation, operation and maintenance of the Cumberland Pipeline, a new approximately 32 mile 30-inch diameter natural gas pipeline lateral connecting TGP's existing gas transmission lines to TVA's Cumberland Fossil Plant, an electric power generation facility near Cumberland City, Tennessee. The proposed Project will address the need to provide natural gas to replace existing coal-fired power generation capacity at TVA's Cumberland Fossil plant. To the extent practicable, feasible, and legally permitted, TGP proposes to locate the pipeline generally parallel and adjacent to existing electrical transmission lines owned and operated by TVA and to other utility easements for approximately 80% of the length of the Cumberland Pipeline. As part of the Project, TGP also proposes the construction of new bi-directional back pressure regulation facilities to be constructed on TGP's Lines 100-3 and 100-4 ("Pressure Regulation Station"), located at the origin of the proposed Cumberland Pipeline in Dickson County, Tennessee. In addition, TGP proposes the construction and operation of a new meter station ("Cumberland Meter Station"), at the terminus of the proposed Cumberland Pipeline within the proposed TVA reservation located in Stewart County, TN. TGP plans to install In-line inspection traps (also referred to as pig launchers and receivers) at each end of the proposed  Cumberland Pipeline. Finally, TGP proposes the installation of three new mainline valves ("MLV"), with one to be located at an intermediate location along the proposed Cumberland Pipeline, and the remaining two MLVs to be located on TGP's Lines 100-3 and 100-4 (one MLV to be installed on each existing line), within the new Pressure Regulation Station.



**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

The proposed alignment of the Cumberland Pipeline is generally along an existing TVA transmission line corridor and other utility easements and intersects multiple jurisdictional streams, wetlands, as well as non-jurisdictional wet-weather conveyances ("WWC"s) and ponds. Unavoidable impacts to jurisdictional aquatic resources resulting from construction of the proposed Cumberland Pipeline and related facilities will be temporary and minimized to the extent practicable.

## 6.2   Topographic Map

This Project is located within the Ellis Mills, Slayden, Charlotte, and Harpeth Valley, TN U.S. Geological Survey ("USGS") 7.5-Minute Topographic Quadrangles (see **Attachment 2, Appendix 2.A**) and is in the Interior Plateau Level III Ecoregion in TN. More specifically, the Project lies within the Western Highland Rim Level IV Ecoregion that is characterized by rolling terrain and a geologic base of primarily Mississippian-age limestone, chert, and shale. The proposed Cumberland Pipeline is located along an approximately 32-mile corridor extending from Clay Lick Road in Dickson County to near Old Scott Road in Stewart County.

## 6.3   Photographs

The photolog of the study area collected during the Hydrologic Determination ("HD") surveys performed in June, August, September of 2021, and January and April 2022, were included as Appendix B – Hydrologic Determination Field Data Sheets in the previously submitted Jurisdictional Waters Determinations and Tennessee Hydrologic Determinations Report and submitted to TDEC on May 27, 2022 and in this submittal (see **Attachment 3, Page 2**, of the Permit Drawings).

## 6.4   Existing Conditions

Documentation of the TGP Cumberland Project Jurisdictional Waters Determinations and Tennessee HD Report submittal and confirmation of receipt is provided in **Attachment 2.**

Field surveys included 100 percent of all construction workspaces where landowner access had been granted as of the date of this application.. Access to 1.15 miles of the Project pipeline, equating to approximately 16.45 acres of the Project construction right-of-way ("ROW"), is outstanding. Based on desktop information and interpretation, TGP anticipates potentially adding short, localized reaches of three streams and three wet weather conveyances to the Project following field verification of parcels that have not yet been surveyed. TGP will provide supplemental information to TDEC once remaining access has been obtainedand surveys have been conducted.

Field surveys conducted from June 2021 to April 2022 identified surface waters located within and immediately adjacent to the Project's workspaces, including intermittent and perennial streams, wet weather conveyances, ponds, and wetlands.



**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

### 6.4.1  Waterbodies

For the purposes of this application, waters that will be unavoidably altered by the Project include streams, wet weather conveyances, and ponds, and are considered waterbodies. Watercourses are restricted to streams and wet weather conveyances. Waters that include wetlands are discussed below in Section 6.4.2. A desktop review of USGS topographic maps, National Hydrography Datasets, Natural Resources Conservation Service ("NRCS") Soils and Soil Survey Geographic/State Soil Geographic  Databases for hydric soil classifications, the United States Fish and Wildlife Service  ("USFWS") National Wetlands Inventory ("NWI"), and the Federal Emergency Management Agency ("FEMA") designated 100-year floodplain was conducted to identify waterbodies inside the Project study area, as well as any outside Project workspaces that may extend into the area of the Project. Field surveys were then performed to verify the accuracy of waterbody locations and their extent. The Project study area includes the Project footprint or construction ROW, but that only those resources inventoried within the Project footprint are anticipated to be disturbed by Project activities.

Two hundred (200) of these waterbodies were surveyed within the entire study area, including 117 WWCs/ephemeral channels, 21 intermittent streams, 43 perennial streams, and 19 ponds.

A total of 181 watercourses, including 117 WWCs and 64 streams, were identified within the entire Project study area. There are 19 named streams located within the Project footprint, which include: Gafford Branch, Upper Sugarcamp Branch, Jordan Branch, Johnson Creek, Harris Branch, Jones Creek, Porters Branch, Miller Branch, Bartons Creek, Nesbitt Branch, Furnace Creek, Dry Hollow Branch, Little Bartons Creek, Leatherwood Creek, Guices Creek, Wells Creek, Lickskillet Branch, Yellow Creek, and Indian Branch.

Many of the streams identified within the study area are characterized by predominantly silt/clay and organic substrates. Several intermittent and perennial streams within the study area are characterized by bedrock, cobble, and gravel substrates, sometimes having fish, amphibians, and populations of benthic macroinvertebrates.

The Project study area was designed to be larger than the proposed Project footprint or construction ROW where impacts will occur. The proposed construction ROW includes permanent easement, temporary workspaces, additional temporary workspaces, access roads and contractor yards. A total of 125 watercourses (53 streams and 72 WWC) are located within the construction ROW with some watercourses crossed the ROW more than once for a total of 149 crossings (69 streams and 80 WWCs).

Please see **Attachment 1 –** Watercourses Impact Table (Table 1) for detailed descriptions of each watercourse and crossing identified as a stream within the construction ROW. Additionally, data collected on all streams identified within the Project study area has been previously provided to TDEC as part of the Jurisdictional Waters Determinations and Tennessee Hydrologic Determination Report submittal.



**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

### 6.4.2  Wetlands

Wetland delineations were performed in accordance with the methodology set out in the USACE
Wetlands Delineation Manual (USACE 1987) and the Regional Supplement to the Corps of
Engineers Wetland Delineation Manual: Eastern Mountains and Piedmont Region (USACE
2012b). Field surveys for all construction workspaces, including the 300-ft survey corridor, where
landowner access has been granted have been completed as of April 2022. Two broad classes
(Cowardin et al. 1979) of palustrine (freshwater) wetland systems are present in the study area:
palustrine forested ("PFO") and palustrine emergent ("PEM").

A total of six (6) wetlands were identified within the study area which are also crossed by the
construction ROW. One wetland is crossed at two locations for a total of seven (7) wetland
crossings within the construction ROW. Data collected on all wetlands identified within the study
area is provided in the previously submitted Jurisdictional Waters Determinations and Tennessee
Hydrologic Determination Report. Descriptions of six wetlands that will be unavoidably disturbed
by Project activities within the Project footprint are included in **Attachment 1** – Wetlands Impact
Table (Table 2).

### 6.4.3  Ponds

A total of 19 ponds were identified in the Project study area, of which two fall within the current
construction ROW and are crossed once each. Ponds in the construction ROW are characterized
by silt clay substrate. These ponds are primarily used for watering cattle and are predominantly
situated within open grass pastures. Data collected on all ponds identified within the study area
is provided in in the previously submitted Jurisdictional Waters Determinations and Tennessee
Hydrologic Determination Report. Descriptions of ponds that will be unavoidably disturbed by
Project activities are included in Table 3 of **Attachment 1**, Wetlands and Waterbodies Impacts
Tables.

## 6.5  Proposed Stream, Wetland, and Pond Characteristics

A total of 125 watercourses, 53 streams and 72 WWCs, are located within the construction ROW
with some crossed more than once by the ROW. There are 69 crossings of streams and 80
crossings of WWCs within the construction ROW for a total of 149. There is a total of 11,493.5 ft
of watercourse crossings within the construction ROW (5,401.9 ft of streams and 6,091.5 ft of
WWC). These crossings also account for 1.95 acres within the construction ROW (1.51 acres of
streams and 0.44 acre of WWC) but does not include area for four streams (Jones Creek, Yellow
Creek and an unnamed tributary, and Wells Creek) proposed to be crossed by horizontal
directional drill ("HDD") at three locations where no direct impacts are anticipated. All disturbances
to streams and WWCs are temporary.

Construction of the facilities in the Project footprint will also temporarily disturb two ponds (totaling
0.20 acre) and six wetlands (totaling 0.27 acre). Of the total 69 stream crossings, 50 will occur
from pipeline crossings. An additional 15 stream crossings will incur minor, temporary impacts
due to workspace disturbances (i.e., equipment/construction staging locations, access roads, and



6

AR  000929

**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

additional workspace areas). The remaining four (4) stream crossings will have no direct impacts due to the use of the HDD crossing method.

Disturbances to all other resources identified in the Project study area, outside of the construction ROW, will be avoided.

No permanent filling or loss of wetlands is proposed for the Project. However, the Project will result in the permanent conversion of 0.02 acre of forested wetlands within the new permanent easement to an herbaceous wetland due to construction clearing and periodic maintenance activities in accordance with the FERC Wetland and Waterbody Construction and Mitigation Procedures ("Procedures") (with requested deviations to be approved by the FERC). In addition, 0.01 acre of forested wetland in the temporary workspace will be cleared during construction but allowed to revegetate to its forested state following restoration efforts, also in accordance with the FERC Procedures (with requested deviations to be approved by the FERC).

**Palustrine Forested Wetlands –** Prior to construction, temporary and permanent ROW workspaces will be cleared of woody vegetation. During operation, the permanent easement or ROW will be maintained clear of trees and woody shrubs to allow for ongoing pipeline inspection and maintenance as required by U.S Department of Transportation pipeline safety regulations, 49 CFR Part 192. A corridor not exceeding ten feet in width, centered on the pipeline, may be maintained annually in an herbaceous state as required to facilitate periodic corrosion and leak detection surveys. Dominant vegetation in the PFO wetlands along the proposed Project includes red maple (*Acer rubrum*), sweetgum (*Liquidambar styraciflua*), tulip poplar (*Liriodendron tulipifera*), blackgum/black tupelo (*Nyssa sylvatica*), and loblolly pine (*Pinus taeda*).

**Palustrine Emergent Wetlands –** Construction of the proposed Project will temporarily affect PEM wetlands. PEM wetlands will not be permanently impacted as these areas will revert back to the same type of wetland following construction. Post-construction monitoring will be conducted to ensure that the areas are restored and that nuisance or exotic vegetation does not take over the areas. Herbaceous species found in these wetlands include bluestem (*Andropogon* spp.), soft rush (*Juncus effusus*), beaksedge (*Rhynchospora* spp.), blackberry (*Rubus argutus*), goldenrod *(Solidago elliottii)*, and dog fennel (*Eupatorium capillifolium)*.

The broad categories of activities associated with the Project that may alter waterbodies include vegetation clearing, soil disturbance, construction related erosion and sedimentation, hydrostatic testing, horizontal directional drilling, temporary fill from construction timber mats, and short-term habitat modification. Temporary wetland and stream impacts will be mitigated by returning impacted areas to original elevation and condition. TGP will follow the FERC's Upland Erosion Control, Revegetation, and Maintenance Plan and the FERC Procedures (with requested deviations to be approved by the FERC), including the Best Management Practices ("BMPs") used to prevent the deterioration of protected water resources during Project construction: These BMPs include:

- Minimizing vegetation clearing, use of timber mats, and minimizing soil disturbance;

- Avoiding unnecessary vehicular traffic and equipment use;



**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

- Installing and maintaining erosion and sedimentation control devices such as straw bales and silt fences;

- Restricting the duration of construction to the extent practicable;

- Using timber construction mats to create a temporary work surface in wet conditions;

- Using low pressure ground equipment in wet conditions to minimize vegetation damage, soil compaction, and rutting;

- Training employees and contractors regarding the handling of oils and hazardous materials commensurate with their position;

- Inspecting equipment used in construction and operations at regular intervals;

- Using only approved access roads for vehicles transporting oils or fuel to construction workspaces;

- At the discretion of the Environmental Inspector, fueling equipment at the construction workspaces at least 100 feet from any waterbody;

- Storing hazardous materials, including chemicals, fuels, and oils, more than 100 feet from any waterbody;

- Using secondary containment, as appropriate, for pumps that transfer hazardous substances or petroleum within 100 feet of a waterbody to prevent spills and overflow; and

- Keeping spill response materials on site and in designated vehicles in the construction workspaces.

A summary of proposed stream, wetland, and pond impacts can be found in Tables 1-3 (see **Attachment 1**), Wetlands and Waterbodies Impacts Tables. Detailed Permit Drawings summarizing waterbody impacts and proposed construction methods at waterbody crossing locations are located in **Attachment 3**.

# 7.0   Project Rationale

## 7.1   Purpose and Need

The proposed Project, which consists of the construction of the approximately 32-mile Cumberland Pipeline and appurtenant facilities (Cumberland Meter Station, Pressure Regulation Station, mainline valves, and inline inspection facilities), will allow TGP to transport approximately 245,040 dekatherms per day ("Dth/d") of natural gas from TGP's existing interstate pipeline system for TVA. TVA has entered into a precedent agreement with TGP for all of the transportation capacity to be created by the Project. TVA is evaluating several options to replace coal-fired electric generation plant at its Cumberland Fossil Plant ("CUF"), including one option that would involve the construction and installation of a combined-cycle natural gas power plant at the CUF as a replacement for one of the coal-fired plants to be retired. TGP's Project would serve this option, referred to as "Alternative A" by TVA, if selected by TVA as part of its evaluation process. In its draft Environmental Impact Statement ("DEIS") issued in April 2022, TVA concluded that the



AR  000931

8

**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

construction of a new combined-cycle natural gas power plant to replace one of the existing coal-fired plants at the CUF, which the Project facilities would serve, is the "best overall solution to provide low-cost, reliable, and cleaner energy to the TVA power system."[1]  TGP is the closest interstate natural gas pipeline system to the combined-cycle natural gas power plant proposed by TVA as "Alternative A" and is uniquely positioned to serve TVA's expressed need for additional firm transportation capacity on TGP's system if "Alternative A" is ultimately TVA's selected option.

Contemporaneously with this application, TGP is filing an application for a certificate of public convenience and necessity for the Project with the FERC, pursuant to Section 7(c) of the Natural Gas Act. TGP is filing the certificate application for the Project with the FERC at this time in order to be in a position to meet the in-service date requested by TVA in the event "Alternative A" is selected by TVA for its retirement and replacement project. Consistent with the FERC regulations, TGP is also submitting its application for a Clean Water Act Section 404/Section 10 Rivers and Harbors Act dredge and fill individual permit for the Project with the USACE Nashville District contemporaneously with the filing of the certificate application with FERC, and submits this application to TDEC since the Clean Water Act Section 401 Water Quality Certification that is requested as part of this application must be issued prior to the issuance of the requested authorization by the USACE.

## 7.2   General Pipeline Construction Considerations

Trench excavation will be the primary construction method to install the pipeline, although drilling (i.e., "trenchless") methods may be used to advance pipe under selected waterbody crossings. The pipeline construction corridor, adjacent work areas, and contractor yards will be cleared of vegetation and graded, as needed, to accommodate mobilization of equipment and materials and to facilitate access. Installation of the proposed pipeline will primarily entail excavation of a trench, 4.5 to 8 feet in depth (averaging approximately 5 feet deep) and 4 to 5 feet in width (averaging approximately 4.5 feet wide).

After the pipe is installed, the pipeline trench will be backfilled to grade by a minimum of 18 to 36 inches of cover (depending on location-specific soil and rock conditions) and vegetatively stabilized. Depth of cover over the pipeline installed beneath stream channels will be in accordance with U.S. Department of Transportation pipeline safety regulations, 49 CFR Section 192.327(e), which addresses pipeline installations occurring in navigable rivers or streams. Per subpart (e) of this section, all buried pipelines will be installed with a minimum cover of 48 inches of soil or 24 inches of consolidated rock between the top of the pipe and the underwater natural bottom.

Additional detail regarding construction methodologies and sequencing is provided below in Section 8.

---

[1] Tennessee Valley Authority, <u>Cumberland Fossil Plant Retirement Draft Environmental Impact Statement</u>, (last accessed June 29, 2022), https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/environment/cuf-deis-report-only-20220421.pdf?sfvrsn=61161246_3, at 197



### 7.2.1  Preferred Alternative

TGP conducted an analysis to determine if alternatives to construct and install the Cumberland Pipeline are practicable based on environmental considerations, construction costs, technical feasibility, human safety, and logistics. For proposed aquatic resource crossing methods, TGP considered alternatives including wet open cut and dry open cut trenching crossing methods, as well as trenchless crossing methods including conventional bore and HDD. After extensive consideration, TGP incorporated site designs that have led to a preferred alternative with reduced environmental impacts in comparison to others considered. The proposed Cumberland Pipeline will be constructed and installed generally parallel and adjacent to an existing TVA electric utility easement (approximately 80 percent co-located) and other utility easements. TGP plans to utilize dry open cut crossing methods at 145 watercourses (65 streams and 80 WWCs) and HDD construction methods at 4 streams for the crossings of Jones Creek (approximate MP 3.2), Yellow Creek and an unnamed tributary (approximate MP 22.4), and Wells Creek (approximate MP 30.7).

The route for the Project is spatially constrained by two existing and fixed locations: (1) TVA's Cumberland Fossil Plant and (2) TGP's existing natural gas pipeline system (Lines 100-3 and 100-4). A primary routing consideration was co-locating the Cumberland Pipeline with existing utility easements for approximately 80 percent of its length, thereby minimizing environmental and landowner impacts. Based on TGP's analysis, an alternate Project route that is not co-located with existing utility easements would not result in decreased impacts to water quality, and would have additional environmental and landowner impacts than the preferred route, where land-use and property disruptions have already occurred. A detailed Alternatives Analysis is also provided in Section 10.

## 8.0  Technical Information

### 8.1  Detailed Plans

Please see **Attachment 3** for Project Design Plans and Permit Drawings for the Cumberland Pipeline.

### 8.2  Construction Sequencing and Methods

#### 8.2.1  Waterbodies

TGP will cross all waterbodies in accordance with the FERC Procedures (with requested deviations to be approved by the FERC), the Project's Stormwater Pollution Prevention Plan ("SWPPP"), and applicable USACE permit conditions. The proposed construction procedures will ensure that impacts at all stream crossings are minimized to the extent practicable. Prior to waterbody crossing construction, TGP will clear vegetation on each side of the waterbody, install sediment barriers, and prepare prefabricated segments of pipeline for installation. Stream crossings will be perpendicular to stream flow to the extent practicable. Temporary erosion control measures will be installed as necessary to prevent downstream impacts. If necessary, the pipe used for waterbody crossings will be weighted to prevent flotation.



Following construction, streambeds will be restored to their pre-construction elevations and grades. Spoil, debris, piping, construction materials, and any other obstructions resulting from or used during construction of the pipeline will be removed to prevent interference with normal stream flow. Any excavated material not used as backfill will be removed and disposed of in accordance with applicable federal, local, state, and local requirements. Following grading, all waterbody banks will be restored to pre-construction conditions and in accordance with permit requirements.

Waterbody and wetland construction methods may vary according to the physical and environmental characteristics of the crossing location. TGP anticipates that waterbodies will be crossed primarily by dry open cut methods, which may include a flumed crossing or dam-and-pump techniques, depending on site-specific conditions at the time of construction. Approximately 0.8 mile of the Project will be installed via HDD to avoid open cut construction methods in three (3) larger and potentially higher-flow streams as well as one associated unnamed tributary. All impacts on waterbodies due to pipeline construction will be temporary. A brief description of crossing methods that may be utilized at impacted waterbodies is provided below.

### 8.2.1.1 Dry Open Cut

Except for waterbodies that are proposed to be crossed using the trenchless HDD crossing method, TGP is proposing to cross the remaining waterbodies using dry open cut crossing methods. Use of "wet cut" methods, which would be implemented without diverting stream flow, are not anticipated for the Project. Dry open cut crossing methods, which consist of the "dam-and-pump" and "dry-flumed" crossing methods, will be accomplished by temporarily diverting stream flow around or through the work area to minimize contact between stream water and excavation and to minimize sediment suspension during trench excavation, pipeline installation, and backfill activities.

**Flumed Crossing**

A flumed stream crossing redirects the water flow through one or more flume pipes to allow for the trenching and pipe installation to occur in dry conditions. The number, length, and diameter of the pipes are dependent on estimated stream flow for the stream being crossed. This method allows for drier trenching, pipe installation, and restoration, while maintaining continuous downstream flow and passage for aquatic organisms. Soil types must have characteristics that allow stable stream bank conditions, and stream flow must be low enough for this method to be used successfully and safely. The flume pipe(s) must be long enough to account for the potential for the ditch width to increase during excavation (due to sloughing) and over-sized somewhat to accommodate the possibility of high flow conditions. An effective seal must be created around the flume(s) at both the inlet and outlet ends, so water will not penetrate and potentially compromise the channelized dam. TGP will implement the following measures where the flumed crossing method is used:

- The flume pipe will be installed before any trenching;



**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

- An effective seal will be created around the flume pipe with sandbags or an equivalent seal mechanism;

- The flume pipe(s) will be aligned parallel with natural water flow to prevent scouring of the bank, preventing erosion and sedimentation;

- The flume pipe will not be removed during trenching, pipe-laying, backfilling activities, or initial streambed restoration efforts, except in rare conditions where a severe flow event causes conditions that make it unsafe for the pipe to remain; and

- Flume pipes and dams that are not associated with an equipment bridge will be removed as soon as final clean-up of the stream bed and bank is complete.

## Dam-and-Pump

The dam-and-pump method may be used for stream crossings where pumps and hoses can adequately transfer stream flow volumes from upstream of the work area to downstream of the work area, and where there are no concerns with preventing the passage of aquatic organisms. TGP will implement the following measures where the dam and pump method is utilized:

- Sufficient pump size, horsepower, and hose capacity, including on site backup pumps, will be used to maintain downstream flows;

- Coffer dams will be constructed with "clean" materials to prevent pollutants from entering the waterbody (e.g., sandbags or clean gravel with plastic liner);

- Water intakes will be suspended in the water column above the stream bed and will be screened to reduce entrainment of aquatic organisms or particles that may clog the pump;

- Pumps will be located within secondary containment structures to catch petroleum liquids and prevent them from entering the waterbody during refueling or if a pump failure occurs;

- For waterbodies with large volumes and strong velocity discharges, water dispersion structures will be placed at the downstream discharge location to prevent streambed scour; and

- The coffer dam, pumps, and hoses will be monitored and maintained to ensure proper operation for the duration of the waterbody crossing.

## Rock Removal

Bedrock refers to the solid rock that is found beneath the soil layer and other unconsolidated rock or sediment fragments. Shallow and hard bedrock can restrict trenching, requiring special mechanical means or blasting in certain areas to excavate required design depths.

TGP anticipates encountering areas of shallow bedrock during Project construction that may require controlled blasting to remove, based on the following information: review of surficial geology, soil mapping, and desktop geotechnical survey results.

If bedrock is encountered during trenching, TGP plans to remove such bedrock using one of the techniques detailed below. The technique selected by TGP's construction contractor will be



**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location. Techniques to be used are the following:

1. Conventional excavation with an excavator;

2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;

3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;

4. Removal by rock trencher; or

5. Controlled blasting and excavation with a backhoe.

At stream crossings, TGP's construction contractor will evaluate and attempt the use of at least one of Techniques 1-4 described above based on the conditions observed at the time of construction to determine the best method for rock removal and excavation. If the initial technique is unsuccessful for rock removal and excavation at stream crossings, Technique 5 (controlled blasting) will be considered in non-karst areas that are also not in wetlands or streams with an unacceptable risk of hydrologic loss. The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location at which a bedrock substrate has been identified, and the analysis is summarized in Section 10.2 (see **Table 9.4-1**, Waterbodies Crossings Hydrologic Risk Analysis).

TGP has developed a Draft Blasting Plan for the Project, provided in **Attachment 5** – Environmental Construction Management Plan, **Appendix E** – Draft Blasting Plan. To avoid potential damage, TGP's blasting contractor will conduct pre-blasting of the rock, as needed, and develop site-specific blasting operations and monitoring plans to be approved by TGP. Control of blasting will limit stresses on existing pipelines, nearby structures, water supply wells, oil and gas wells, electrical transmission tower footings, and other utilities located near the Project area. Blasting activities will not begin until occupants of nearby buildings, stores, residences, businesses, and farms have been notified, and pre-blast inspections have been conducted on structures and water wells.

Special care will be taken to monitor and assess blasting within 200 feet of residences and 200 feet of private or public water supply wells. Blasting mats will be used during blasting to keep the material within the approved workspaces. TGP and its blasting contractor will adhere to the provisions in the Draft Blasting Plan, which identifies blasting procedures, including use, storage, and transportation of explosives (see **Attachment 5** – Environmental Construction Management Plan, **Appendix E** – Draft Blasting Plan).

Following blasting, where necessary, excess rock will be removed from the Project's construction workspace, subject to affected landowner approval and applicable permit conditions. In areas where rock is predominant and little suitable backfill material is available, rock will be pulverized and placed in the trench as pad material around the pipe.



### *8.2.1.2 Horizontal Directional Drill (HDD)*

HDD is a specialized construction technique that is used to install pipelines in areas where traditional open cut excavations are not practicable due to technical feasibility, logistics, and costs. With the HDD method, a small diameter pilot hole is drilled from the entry point to the exit point. Drilling fluids are pumped to the drill bit, to cool the bit, remove rock cuttings, seal the drilled path, and lubricate the drill stem. From there, the hole is widened, and the pipeline is pulled into position. Compared to the other crossing methods, the HDD technique minimizes the impacts to an area by drilling down and under a sensitive resource, leaving the portion of land in between the entry and exit point relatively undisturbed. This trenchless construction method is described in detail in **Attachment 5** – Environmental Construction Management Plan, **Appendix D** – Draft HDD Contingency Plan.

HDDs are proposed at three locations that will avoid direct impacts to four streams. HDDs are proposed for the crossings of Jones Creek (MP 3.2), Yellow Creek and an unnamed tributary (MP 22.4), and Wells Creek (MP 30.7). The use of HDDs at these three locations will be implemented to overcome obstacles posed by use of other stream crossing construction methods that are impracticable because of channel dimensions, flow, or other constraints. The feasibility of HDDs at these three (3) locations has been confirmed by analysis of geotechnical testing. HDD feasibility studies were conducted in June 2022 and provided as **Attachment 7**.

## 8.2.2  Wetlands

Approximately 0.27 acre of temporary impacts will occur to wetlands from the Project, with only 0.03 acre of forested canopy conversion (0.02 acre permanent and 0.01 acre temporary). TGP will protect and minimize potential adverse impacts on wetlands through implementation of standard wetland construction and conventional wetland construction methods. A brief description of both methods is provided below.

### *8.2.2.1 Standard Wetland Construction*

The standard wetland construction method will be used in wetlands where soils are non-saturated and able to support construction equipment at the time of crossing. This method requires segregation of topsoil from subsoil along the trench line. Where present, a maximum of 12 inches of topsoil will be segregated from the area disturbed by trenching, except where standing water is present or if soils are saturated. Topsoil segregation is followed by trench excavation, pipe laying, backfilling, and grade restoration. Immediately after backfilling is complete, the segregated topsoil will be restored to its original location. Of the six (6) total wetlands (one crossed twice for a total of seven (7) crossings) identified within the Project area, only one, WSTA001 (PEM, depressional), will be crossed by the proposed pipeline. The remaining six (6) temporary crossings will incur minor, temporary impacts due to workspace disturbances (i.e., equipment/construction staging locations, access roads, and additional workspace areas).



**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

### *8.2.2.2 Conventional Wetland Construction*

Conventional wetland construction methods support construction equipment without significant soil disturbance. Prior to crossing and movement of construction equipment through these wetlands, the ROW will be stabilized using timber mats to allow for a stable, safe working condition. Unless soils are saturated, TGP will segregate up to the top 12 inches of wetland topsoil over the trench line. Trench soil will be temporarily stockpiled in a ridge along the pipeline trench. Gaps in the spoil pile will be left at appropriate intervals to provide for natural circulation or drainage of water. While the trench is dug, the pipeline will be assembled in a staging area located in an upland area. After the pipeline is lowered into the trench, wide-track bulldozers or backhoes supported on timber mats will be used for backfilling, final clean-up, and grading. This method will minimize the amount of equipment and travel in wetland areas.

Where necessary, a drag-section may be used with the conventional wetland construction method. The drag-section involves the trenching, installation, and backfill of a prefabricated length of pipeline containing several pipe segments all in one day. The trench is backfilled at the end of each day after the pipe is lowered in, as necessary to ensure safety.

Construction will not begin until all applicable authorizations are received. Please reference **Attachment 5** – Environmental Construction Management Plan, which includes the *FERC Upland Erosion Control, Revegetation, and Maintenance Plan; FERC Wetland and Waterbody Construction and Mitigation Procedures; Draft Spill Prevention and Control Plan; Draft HDD Contingency Plan; Draft Blasting Plan; and Draft Hydrostatic Test Plan*.

### 8.3   Sediment and Erosion Control Measures

Stabilization will be achieved according to the limitations of the approved Construction General Permit and SWPPP. The work will be completed in the dry when practicable. When working in the dry is not practicable, check dams, diversions, or a system of pumps and sediment bags may be used to create dry sections and reduce sedimentation. If these sediment controls prove ineffective at reducing discharge, then the contactor may work in the wet, but it will be limited to only what is necessary.

# 9.0   Water Resource Degradation

No more than *de minimis* degradation to aquatic resources will result from the Project. All impacts to jurisdictional resources will be temporary and no appreciable permanent loss of resource values will result from the Project activity.

# 10.0 Detailed Alternatives Analysis

This detailed alternative analysis is an adaptation of the information included in Resource Report 10 – *Alternatives* provided as part of the FERC certificate application filed contemporaneously with this application on July 22, 2022. A copy of the full Environmental Report (including all Resource Reports) will be provided to TDEC.



**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

TGP has investigated multiple alternatives in deciding how to best route the proposed Cumberland Pipeline. The preferred alternative was chosen not only to minimize environmental impacts, but also to minimize impacts to cultural sites, public lands, landowners, and communities during the construction and operation of this pipeline. To the extent practicable, the proposed pipeline route runs will be co-located with existing powerline and other utility easements (for approximately 80 percent of the pipeline's length), with additional avoidance and minimization measures implemented to further reduce impacts to water resources and the environment where possible. A discussion of the alternatives considered is provided below.

## 10.1 No-Action Alternative

Under the No-Action Alternative, the Project facilities would not be constructed. Although the No-Action Alternative would avoid the temporary alterations of aquatic resources associated with construction of the proposed Project, under the No-Action Alternative, TGP would not be able to meet TVA's stated need for the Project, as discussed in Section 7.0 above.

The No-Action Alternative was rejected from further consideration because it did not meet the purpose and need for the Project.

## 10.2 Route Alternatives

In order to meet the purpose and need for the Project, the Cumberland Pipeline was designed to extend from the Project receipt point on TGP's existing interstate natural gas pipeline system along the Project's eastern beginning point to the Project delivery point at the location of TVA's proposed combined-cycle combustion turbine gas plant to be located on the Cumberland Fossil Plant Reservation at the Project's western terminus. Because these points are fixed as existing facilities, alternate routes with other starting or terminating points are not practicable or feasible to achieve the Project purpose. TGP's preferred route for the Cumberland Pipeline extends between these two points generally along an existing TVA powerline easement and other utility easements. This route is preferred primarily because of its generally co-located alignment between the Project receipt and delivery points.  Further, with regard to Project impacts, disruptions to existing land-use along the TVA powerline easement and other utility easements have already occurred and have been assimilated, minimizing impacts to the environment and to new landowners for alternative routes. Finally, ease of access along the existing TVA easement and other utility easements by use of existing access roads for Project construction and operations provides another advantage for the preferred route as compared to alternative routes.

Because of the ubiquitous occurrence of streams and wetlands in the topographically dissected Western Highland Rim Physiographic Province in which the Project is located, it is unlikely that other routes between the Cumberland Pipeline's receipt and delivery points would encounter substantially fewer aquatic resources than those along the preferred route, which is co-located with an existing TVA powerline easement and other utility easements for approximately 80 percent of its length. Further, alternative routes likely would contain aquatic resources that have not been disturbed by previous utility clearing and maintenance activities. For these reasons, TGP



AR  000939

16

has chosen the route generally extending along the TVA powerline easement and other utility easement as the preferred alternative for the Cumberland Pipeline.

## 10.2.1 Major Route Alternatives

There are no additional major route alternatives to the Cumberland Project.

## 10.2.2 Minor Route Variations

During the process of siting the Project, TGP has and will continue to consider multiple minor route variations to refine the pipeline alignment and to address concerns raised by potentially affected landowners and regulatory agencies. Route variations have been made to accommodate construction limitations, to improve the alignment for features such as roads and waterbody crossings, and to avoid natural features that would be challenging during construction, restoration, and operation of the pipeline, as well as to address landowner concerns. **Table 10.2-1** summarizes the route variations that TGP has considered and incorporated in the Project alignment. At this time, TGP continues to refine the pipeline route and address route variations requested by potentially affected landowners and regulatory agencies, which may necessitate further changes to proposed pipeline route.



AR  000940

**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**TABLE 10.2-1**
**Cumberland Project Minor Route Variations**

| Mile Post | Variation Description | At Landowner Request |
|-----------|----------------------|----------------------|
| 0 | Potential sites for Pressure Regulation Station | |
| 2.3 | Rock ledge avoidance | |
| 3 | Landowner request to shift onto TVA easement | X |
| 4.5 | Avoid building on east side of White Oak Flat Road and eliminate additional pipeline points of inflection | |
| 8.5 | Improve crossing angle at two streams on tract 1.055 | |
| 12.5 | Avoid water feature | X |
| 16.5 | Avoid spring well and align the route for improved stream crossing and create a more perpendicular crossing for Little Bartons Creek | |
| 22.7 | Adjust stream crossing away from middle of the stream | |
| 25 | Avoid side hill construction and align the route to parallel the TVA easement | |
| 26 | Improve crossing angle at Highway 13 and stream (encroaches on TVA) | |
| 30-32 | Address multiple HDD routing issues at Wells Creek | |

### 10.2.2.1    Route Variation at MP 0

TGP examined multiple locations for the siting of the Pressure Regulation Station at MP 0, with the tie-in points with the existing TGP 100-3 and 100-4 pipelines, and the placement of the pigging facilities (see **Attachment 8**).

### 10.2.2.2    Route Variation at MP 2.3

The route variation located at approximate MP 2.3 (see **Attachment 8**) was designed to avoid a vertical rock cliff along the original alignment of the pipeline route, east of Jones Creek. Once TGP was able to access the original pipeline route in this area, the sheer rock cliff was discovered. After review of this area, TGP determined that rather than physically impacting the cliff slope to construct the pipeline and then restoring the cliff following construction, it would be preferable to consider a route variation in this area. TGP did consider using HDD technology to cross the rock cliff but has determined that elevation changes between the entry and exit locations would make execution of the HDD difficult, with a probable low success of successful completion. This route variation deviates from the TVA powerline corridor to the south, avoiding the rock cliff. Once past the cliff area, the pipeline route will then turn north to re-join the original pipeline route at the HDD exit additional temporary workspace ("ATWS") for Jones Creek on the north side of the TVA powerline easement. This variation results in an additional 0.02 mile of pipeline length as compared to the original pipeline route in this area.

AR  000941

### 10.2.2.3        Route Variation at MP 3

A route variation will be located at MP 3 in response to a request from a potentially affected landowner to minimize tree clearing on his property (see **Attachment 8**). In order to minimize tree clearing on this property, TGP evaluated whether the proposed pipeline could be located within TVA's existing powerline easement. However, based on discussions with TVA's power transmission group, the proximity of constructing a pipeline within an existing powerline easement to the powerline towers and the conductors would raise safety concerns during construction (including during the performance of the HDD to cross Jones Creek) and operation of the pipeline. Therefore, constructing the proposed pipeline within the existing TVA powerline easement is not a viable option. In order to minimize tree clearing, TGP is locating the proposed pipeline route on the southside of TVA's existing powerline easement. This variation results in an increase in pipeline length of 0.05 mile as compared to the original pipeline route in this area.

### 10.2.2.4        Route Variation at MP 4.5

This route variation located at approximate MP 4.5 (see **Attachment 8**) was adopted to avoid a building on the east side of the White Oak Flat Road points of inflection ("PI"). At this location, the original alignment was already not co-located with TVA's existing powerline easement. The original routing of the pipeline away from the existing powerline easement was used to avoid a group of homes and structures located immediately adjacent to the TVA powerline easement. This variation moved the original alignment an additional 150 feet further to the north to avoid a home. The original alignment also contained numerous PIs that would necessitate routing the pipeline across White Oak Flat Road and subsequently back to the TVA easement. This variation avoids the need for those PIs, but still allows a perpendicular crossing of the road. This variation does not result in a change in pipeline length as compared to the original pipeline route in this area.

### 10.2.2.5        Route Variation at MP 8.5

The route variation located at approximate MP 8.5 (see **Attachment 8)** was made to avoid paralleling an unnamed tributary of Harris Branch. The original route paralleled the tributary for approximately 375 feet. The movement of the pipeline to the south by approximately 20 feet eliminates the paralleling the tributary in the construction ROW. This variation results in a reduction in pipeline length of 0.01 mile as compared to the original pipeline route in this area.

### 10.2.2.6        Route Variation at MP 12.5

The route variation located at approximate MP 12.5 (see **Attachment 8**) was made to avoid a pond. The original route paralleled the powerline for approximately 660 feet. This variation results in an additional pipeline length of 38 feet as compared to the original pipeline route.

AR  000942

### 10.2.2.7    Route Variation at MP 16.5

The route variation located at approximate MP 16.5 (see **Attachment 8**) involved the realignment of the pipeline route from the north side to the south side of the TVA powerline easement to avoid a spring and to provide an improved perpendicular crossing of Little Bartons Creek. The routing of the pipeline on the south side of the TVA powerline easement maintains co-location with the TVA powerline easement and allows for a more perpendicular crossing of Little Bartons Creek than the original routing. In addition, the route variation provides for ATWS between the creek and Little Bartons Creek Road than the original route. This additional ATWS will allow TGP to safely and efficiently conduct the road bore planned for Little Bartons Creek Road. This variation does not result in a change in pipeline length.

### 10.2.2.8    Route Variation at MP 22.7

The route variation located at approximate MP 22.7 (see **Attachment 8)** was made to accommodate a more perpendicular crossing of Highway 939 and to accommodate more perpendicular crossings for two unnamed tributaries of Yellow Creek. The original alignment placed the pipeline parallel to the TVA powerline easement and would have the pipeline crossing a stream at an angle, thus increasing the length of the stream crossing, and generally not conforming to crossing roads at a 90-degree angle. At the furthest point in the variation, the pipeline was moved approximately 175 feet away from the TVA powerline easement. Both the original route, as well as the route variation, are located within active agricultural areas; thus, there are no additional impacts to any sensitive features with this route variation. This variation does not result in a change in pipeline length.

### 10.2.2.9    Route Variation at MP 25

The route variation located at approximate MP 25 (see **Attachment 8**) avoids difficult side slope and stream construction along the southern side of the TVA powerline easement. Further, the variation will allow for increased co-location with TVA's powerline easement over the original routing. This variation results in a reduction in pipeline length of 0.01 mile as compared to the original pipeline route in this area.

### 10.2.2.10    Route Variation at MP 26

The route variation located at approximate MP 26 (see **Attachment 8**) addresses two items. First, the variation allows for a more perpendicular crossing of Highway 13 and provides more area between the crossing and TVA's powerline easement. Second, the variation allows for a more perpendicular crossing of Guices Creek. At the original crossing location of Guices Creek and Highway 13, which was parallel the south side of the TVA easement, TGP determined that there was insufficient workspace to cross both features at the same time. This would have resulted in a congested construction work area, leading to safety and constructability issues. The variation moved the pipeline to more agricultural land, which allows for more workspace for both the road and waterbody crossings and reduces about 120 feet of forested impacts on the east side of Highway 13. This variation does not result in a change in pipeline length.



AR  000943

### *10.2.2.11    Route Variations MPs 30-32*

Three minor route variations were evaluated between MP 30-32 where the pipeline needed to be routed away from the original pipeline route (paralleling the TVA powerline easement) to connect to the meter station location specified by the Project Shipper on TVA property. To accommodate multiple routing issues, including the preferred location of the HDD of Wells Creek, avoidance of known archaeological sites, and an adjustment to avoid a railroad bridge, the preferred pipeline to the Cumberland Meter Station within the TVA property was selected (see **Attachment 8 - Sheet 10 of 10**). **Table 10.2-2** summarizes the collective items addressed in the interconnected route variations that were considered between MP 30-32 The preferred route, which incorporates the minor route variations set forth in **Table 10.2-2**, results in an increase of approximately 0.12 miles over alternative routes considered between MP 30 and MP 32.

**TABLE 10.2-2**
**Minor Route Variations (Summary MP 30-32)**

| Mile Post | Construction Method | Variation Description (Selected Route) |
|---|---|---|
| 29.8–32 | Upland Construction; Stream-crossing Construction; HDD | Shifted route westward toward TVA's preferred location for the Cumberland Meter Station and to avoid the Stewart Houston Industrial Park. |
| 30.1 | Upland Construction; Stream-crossing Construction | Shifted 50 feet to the south to avoid old railroad bridge supports when crossing abandoned railroad. |
| 30.3–30.8 | Upland Construction; HDD | Moved route to attain a more perpendicular HDD crossing of Wells Creek and avoid crossings of Booster Branch and another tributary to Wells Creek, as well as avoid known cultural resource locations. Moved onto TVA property toward TVA's preferred location for the Cumberland Meter Station. |

## 10.3 Construction Methods Alternatives

Pipeline construction across varied terrain and through a variety of materials requires flexibility to select construction methods from a number of potential options. For the Project's crossings of aquatic resources, including those underlain by bedrock and unconsolidated materials, TGP evaluated multiple considerations (safety, potential impacts to water quality, hydrologic loss, cost, existing technology, and logistics). Additionally, preliminary geotechnical and geological studies were undertaken to identify the physical constraints and conditions that are or may be presented by the underlying geology. A summary of the various geologic, hydrologic, and watershed conditions at each waterbody crossing location is presented in **Table 10.5-1,** Waterbodies Crossings Hydrologic Risk Analysis. The information provided in this table was used to support TGP's selection of the most appropriate construction method at each of the waterbody crossing locations.

TGP evaluated various waterbody crossing alternatives that meet accepted pipeline construction using TGP standards and industry practices. Crossing methods considered for the Project were divided into two main categories: (I) open trench and (II) trenchless. Open trench methods consist of a trench that is excavated within a stream or wetland to allow placement of the pipe. Trenchless



methods use specialized equipment to bore or tunnel underneath a waterbody through which the pipe is installed. Open trench and trenchless crossing methods considered for the Project include:

I.    Open Trench
    A. Wet Open Cut, consisting of trench excavation across a flowing stream. Because of considerations for adverse water quality consequences (e.g., turbidity, downstream sedimentation), TGP has determined that wet open cut crossing methods will not be used for the Project.
    B. Dry Open Cut
      i. Flume Crossing
      ii. Dam and Pump Crossing

II.   Trenchless Crossing Methods:

    A. Horizontal directional drilling (HDD)
    B. Conventional bore

**Attachment 9** provides an overview of the differences between trenching and trenchless methods (adapted from information developed for the Constitution Pipeline Company, LLC project in 2013). In general, open trench methods take less time, are less expensive, and present less risk of failure or complications as compared to trenchless methods. However, trenchless methods are proposed for certain crossings to avoid environmental impacts at two Natural Rivers Inventory stream reaches (Jones Creek and Yellow Creek) and due to the physical characteristics of Wells Creek. As will be discussed in more detail below, the selection of the appropriate crossing method for a particular waterbody is dependent on a variety of factors, including the specific geology of an area.

## 10.3.1 Open Trench Crossing Methods

### 10.3.1.1        *Wet Open Cut*

The wet open cut construction procedure provides the most rapid and economical method for constructing a pipeline at a stream crossing. For this method, a trench is excavated across the waterbody during times of seasonal normal or below-normal stream flow. A prefabricated section of the pipe is then laid into the trench, which is subsequently backfilled to cover the pipe. The waterbody is then restored to its pre-construction conditions. However, when utilizing the wet open cut method, the waterbody is at an increased risk for negative impacts to the aquatic environment, including an increase in turbidity caused by the exposure of unconsolidated soil material, an increase in erosion rates that may increase turbidity downstream of construction activities, and the potential introduction of contaminants into the waterbody from potential incidental releases during construction activities.

While there are advantages to using the wet open cut method, including less time in stream than other crossing methods and less time to prepare before trenching begins, there are disadvantages to this method, including (1) the contactor being unable to inspect the trenchline before the pipeline is installed, (2) downstream sedimentation and turbidity increase, and (3) aquatic species that may be adversely affected.

While the FERC Procedures allow for the use of the wet open cut method for waterbody crossings in linear pipeline projects, TGP has removed this crossing method from consideration for pipeline waterbody crossings due to the potential environmental and water resources risks posed by the technique.

### 10.3.1.2    Dry Open Cut

The dry open cut construction procedure involves isolating the streambed work area from the stream to allow the construction to be performed in a controlled "dry" state by temporarily diverting the stream around the work area. The most common dry open cut methods include the flumed crossing and the dam and pump crossing methods. The dry open cut method has been selected as the preferred crossing method for the majority of waterbody crossings for the Cumberland Pipeline. The two main types of dry open cut crossing methods are discussed below. While dry open cut methods result in increased time to cross a stream as compared to wet open cut methods, the potential for weather to affect the flow in the stream and thus the crossing, and the ability to handle flow volume, some stream flow may not be appropriately handled by the use of the dry open cut crossing methods. In that case, a trenchless crossing method (HDD or conventional bore method, as discussed below) may be more appropriate.

#### _Flume Crossing_

In the flumed crossing method, a flumed stream crossing redirects the water flow through one or more pipes to allow for the trenching and pipe installation to occur in dry conditions. The number, length, and diameter of the pipes are dependent on estimated stream flow for the stream being crossed. The major advantage of this method is that it allows for dry trenching, pipe installation, and restoration, while maintaining continuous downstream flow and passage for aquatic organisms. Further, because this method isolates the stream flow from the construction activities, the only downstream turbidity that is created is during the dam/flume installation.

#### _Dam-and-Pump Crossing_

The dam-and-pump crossing method is primarily used for stream crossing where pumps and hoses can adequately transfer stream flow volumes from upstream work to downstream of the work area, and where there are no concerns with preventing the passage of aquatic organisms. The major advantage of this method is that it allows for dry trenching, pipe installation, and restoration, while maintaining continuous downstream flow. Further, because this method isolates the stream flow from the construction activities, the only downstream turbidity that is created is transient conditions of short duration during the dam installation.

Both methods require that the waterway is dewatered in the construction area by pumping the standing water into a dewatering structure on the banks. The streambed material is then segregated and stockpiled to prevent mixing with other materials and used during the stream restoration process. In terms of adverse environmental effects and practicability, these two methods are essentially equivalent.

#### _Rock Removal_



AR  000946

**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

If bedrock is encountered during trenching, TGP plans to remove such bedrock using one of the techniques detailed below. The technique selected by TGP's construction contractor will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location. Techniques to be used are the following:

1. Conventional excavation with an excavator;

2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;

3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;

4. Removal by rock trencher; or

5. Controlled blasting and excavation with a backhoe.

At stream crossings, TGP's construction contractor will evaluate and attempt the use of at least one of Techniques 1-4 described above based on the conditions observed at the time of construction to determine the best method for rock removal and excavation. If the initial technique is unsuccessful for rock removal and excavation at stream crossings, Technique 5 (controlled blasting) will be considered in non-karst areas or in wetlands or streams with an unacceptable risk of hydrologic loss. The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location at which a bedrock substrate has been identified (see **Attachment 9**).

If controlled blasting is necessary at a waterbody or wetland crossings, TGP's construction contractor will utilize a dry-ditch crossing method (either dam-and-pump or flume crossing) and adhere to 1) all applicable federal, state, and local regulations, including the FERC Procedures, USACE and TDEC permit conditions, 2) Draft Blasting Plan (see **Attachment 5**), and 3) karst mitigation measures. Immediately following blasting, TGP would remove rock that impedes stream flow.

*Conventional Excavation*

This method consists of using a backhoe to dig a trench. It is most effective in poorly or unconsolidated materials, such as a dry stream bed underlain by fluvial materials. In conditions supporting its use, including unconsolidated substrate materials that can be relatively easily removed, Conventional Excavation ("CE") presents little environmental risk to water quality and is the most practicable alternative considering technical feasibility, logistics, and costs. However, in instances where tougher substrate materials are present, this alternative may not be practicable because of technical infeasibility. Accordingly, CE will not be used to trench across channels with exposed bedrock substrate. For channels covered by unconsolidated materials overlying bedrock at greater depths, CE will be used to depths at which it is practicable, but removal of deeper materials will necessitate selection among the additional methods described below.



AR 000947

*Ripping*

This method makes use of an excavator equipped with concave tooth that is inserted into and dragged through substrate materials. After ripping, a conventional excavator is used to remove the dislodged materials from the trench. For streams at which bedrock is encountered at or beneath the streambed surface, ripping will be the preferred alternative in terms of least environmentally adverse effects because it confers little or no risk of hydrologic loss.

*Hammering*

Hammering entails use of a pneumatic tool attached to a backhoe boom to break apart substrate materials. After hammering, a conventional excavator is used to remove the dislodged materials from the trench. Hammering is time-consuming and increases construction costs considerably in comparison with CE or ripping. Further, hammering exposes equipment operators to prolonged hours on the work-site, potentially resulting in safety risks. Hammering also entails a risk of fracturing potentially resulting in hydrologic loss.

*Rock Trenching*

This method uses a large trenching machine to cut through bedrock. Although costly to mobilize, this method can reduce construction time at the work site. Primary disadvantages are cost and inaccessibility for many sites where tight space or steep slopes prevent the effective use of the equipment.

*Controlled Blasting*

The use of the dry open cut method with controlled blasting will only be used if other rock removal methods have been evaluated but deem impracticable. TGP anticipates that controlled blasting will be used rarely to facilitate waterbody crossings. In no event will controlled blasting be used in karst-prone areas or wetlands. A desktop analysis of the study area has identified a few areas of shallow bedrock where controlled blasting may become necessary to cross certain waterbodies using the dry open cut construction method (see **Attachment 9**). TGP's Draft Blasting Plan is provided in **Attachment 5**, **Appendix E**. In the unlikely event that controlled blasting is needed, a qualified contractor will review and update this plan to address the specific circumstances of each dry open cut waterbody crossing that requires controlled blasting to remove rock. A qualified Project biologist will survey the area immediately in advance of the controlled blasting activities, including any drilling. for the presence of any sensitive species. Once cleared, holes will be drilled into the streambed and carefully loaded with explosives and packed with aggregates. A pre-blast safety check will then be performed followed by the controlled detonation of the explosives, which will result in a small release of dust and mounding of the surface.

The use of controlled blasting would drastically minimize the duration of in-stream work and temporary disruptions to stream flow. The overall area of construction impacts when using controlled blasting is significantly smaller in comparison to other construction methods and results in less costs given reduced time in the workspace. However, the use of controlled blasting may confer a higher risk of loss of stream flow than other crossing construction methods; thus, it is not



generally considered to be the LEDPA at locations where other methods are feasible and practicable.

Although TGP expects the use of blasting for the removal of rock at waterbody crossing for the Project to be limited and has eliminated the use of controlled blasting for rock removal for use in karst-prone areas, crossing conditions at non-karst prone locations where CE, ripping, hammering, or rock trenching are technically infeasible to dislodge bedrock materials may require controlled blasting as the only practicable alternative. In these instances, TGP will ensure that controlled basting is localized and isolated to within the trench line to minimize the movement of materials outside of the waterbody. Drill patterns will be set so that they achieve smaller rock fragments, which will allow for the use of as much of the fragmented rock as possible when restoring the trench to its pre-construction condition. Rock fragments also will be shifted, as needed, to maintain the contours and flow patterns of the waterbody after the blasting is complete.

To further avoid or minimize the impacts to wetlands and waterbodies to the extent practicable, TGP will implement the following procedures if it is necessary to use controlled blasting to remove rock with dry open cut trenching:

- Limiting the width of crossing to 75 feet;

- Locating extra workspace at a minimum of 50 feet from waterbodies (except where adjacent land is agricultural or disturbed);

- Conducting all controlled blasting in dry conditions within the 75 feet workspace;

- Expediting each crossing during construction activities by completing stream crossings separate from the mainline construction; and

- Restoring crossings and original contours immediately following installation.

Karst mitigation measures will be implemented during and after controlled blasting operations. These measures are detailed in Section 8. TGP has included dry open cut crossing method with controlled blasting for rock removal in its site-specific analysis of appropriate crossing methods. TGP will not utilize the dry open cut crossing method with controlled blasting for rock removal in wetland habitats.

## 10.3.2 Trenchless Crossing Methods

### 10.3.2.1    Horizontal Directional Drilling

The HDD method is a trenchless construction procedure in which a waterbody is crossed by pulling the prefabricated pipeline into place using drilled boreholes. In this procedure, a small diameter pilot hole is drilled down from an entry point to an exit point by pumping a slurry mixture of bentonite clay, drilling additives, and water into the ground at high pressure. The hole is then widened, and the pipeline is pulled into position. The HDD method has been a standard construction procedure for linear pipeline installations across large waterbodies since the 1970s. This construction procedure drastically reduces the impacts to waterbodies and their aquatic

environments by drilling down and under the sensitive resource, resulting in the surface area between the entry and exit point remaining relatively undisturbed.

While the HDD method is a proven technology for pipeline installations, there is still the potential that the HDD method can fail for reasons such as encountering soil conditions that are not conducive to boring, borehole collapse, and loss of the drill string or drilling fluid return. TGP has performed a feasibility analysis of the study area to determine if HDD is a viable waterbody crossing method. This analysis included geological surveys, reviews of nearby public drinking water sources, private wells, and mining activities (active and abandoned).

Three (3) HDDs are being proposed for the Project at the following waterbodies: (1) Yellow Creek, (2) Jones Creek, and (3) Wells Creek. Prior to the final HDD determination, TGP conducted geotechnical investigations in June 2022 at each of these three crossings to assess the characteristics of the geologic formations. This information was reviewed, and it was confirm that a HDD is technically feasible for each crossing given the specific geology evaluated by project engineers to ensure the HDD has a high rate of success.

TGP has included the HDD crossing method in the site-specific analysis in **Attachment 5**.

### 10.3.2.2    *Conventional Bore*

Conventional boring consists of creating a shaft/tunnel for a pipe or conduit to be installed to minimize surface disturbance. This is accomplished by first excavating a bore pit and a receiving pit. The bore pit is excavated to a depth slightly deeper than the depth of the associated trench and is graded such that the bore will follow the proposed angle of the pipe. A boring machine is then lowered to the bottom of the bore pit to tunnel using a cutting head mounted on an auger. The auger rotates through a bore casing, both of which are pushed forward as the hole is cut. The pipeline is then installed through the bored hole and welded to the adjacent pipeline. The typical workspace configurations required for boring operations consist of staging areas (50 feet by 100 feet) for boring machine setup, cuttings/return settlement and storage pits, pipe storage, entrance and exit pit spoil storage, and construction equipment necessary to support the operation.

Major factors limiting the success of a boring operation under waterbodies for the Project include the crossing distance, subsurface soil and geologic conditions, and existing topography. Boring operations typically occur over a crossing distance of 50 to 60 feet. The maximum length a bore could achieve in ideal soil conditions typically does not exceed 400 feet. Subsurface soil and geologic conditions must be conducive to establishing and maintaining a safe bore pit excavation, as well as provide the capabilities for the boring equipment to conduct a successful bore. Loose-packed sediment, free of rock material, is preferred when conducting boring operations. The topographic conditions for most waterbody crossing locations on this Project also limit the use of this method, as preferred locations are generally consistent with level or moderately convex terrain, such that the depth of the bore pit does not present concerns relative to constructability or safety constraints.



**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

Based on the factors discussed above, conventional boring under waterbodies is unlikely for pipeline waterbody crossings for the Project.

*HDD/Conventional Bore Methods versus Conventional Dry Open Cut Crossing Methods*

TGP considered six (6) factors when evaluating the use of HDD or conventional bore crossing methods versus a dry open-cut method for Project waterbody crossings: (1) the length of the crossing, (2) the potential for risk of loss of drilling fluid (i.e., inadvertent/lost returns), (3) geological considerations, and (4) length of time of the crossing (5) worker safety and technical feasibility, and (6) cost of the crossing method. For a 30-inch diameter pipe, as will be installed for the Project, the minimum distance needed to achieve the necessary radius for the HDD pipe string is approximately 1,300 feet, which means that each HDD must be at least 1,300 feet long, regardless of the width of the feature it is avoiding in order to reduce stress pressure on the pipeline. Considering the undulating topography of the Project area, many HDD entry/exit pads or conventional bore entry/exit pits likely would be located on slopes, which create a construction safety and technical feasibility challenge. Further, given the need for HDD or conventional bore entry and exit pads or pits to be at or near the same elevation to promote drill cutting returns, use of these methods in hilly terrain may not be practicable. For example, if either the entry or exit points is at a higher location than the other, greater annular pressure is needed to facilitate the drill cutting returns. This increase in pressure could contribute to additional risks of inadvertent returns to the formation or to the surface.

Inadvertent returns are characterized by drilling fluid flowing through the underlying formation and finding a pathway of least resistance to the surface or to voids in the formation. These returns may be expressed on land or in the feature that is being avoided. Although the drilling fluid is generally inert bentonite clay that is not toxic or harmful, it may be discharged to downstream waters. In that event, inadvertent returns would be contained and cleaned up once identified.

Costs associated with an HDD and Conventional Bore, in general, may be five (5) times more per foot than costs for a conventional crossing using open cut methods, which can become prohibitive to the Project budget (see **Attachment 8**).

Geology plays a major role in the success of an HDD or conventional bore. In an area without the appropriate geology to support an HDD or conventional bore, the drilling hole will not maintain its integrity and could collapse, causing delays. In other areas, if the geology contains large boulders or voids, the drilling head cannot negotiate these obstacles and the bore may fail. Further, for a HDD, in order for the radius of the drill and pipe to be maintained, the boring must be made to greater depths in the formation, potentially impacting groundwater resources or karst topography.

HDD and conventional bores take more time to complete than open cut crossings due to the amount of drilling equipment necessary, the mobilization and demobilization of the drilling equipment, the drilling itself, pipe preparation, and for a HDD, the pullback of the pipeline. For the proper pullback of the pipeline, the same length of construction workspace is needed to accommodate a straight entry into the exit point of the HDD. In some cases, due to pipeline inflections, and the lack of available straight construction workspace, a false ROW may be



needed, thus increasing potential impacts. A false ROW is a work area approximately 50 feet wide by the length of the HDD pullback section that is prepared to stage the pipeline. Generally, HDDs can take a month or longer to complete. HDDs occur over a longer timeframe with continuous activities throughout the procedure in comparison to open cut methods. During this time, there is the possibility of impacts to noise sensitive areas, inadvertent returns, and equipment failures throughout the duration of the HDD.

When comparing an HDD or conventional bores to conventional open cuts of streams/wetlands, the issues associated with the HDDs and conventional bores are reduced or mitigated by the use of open cut methods. For example, the trench line for open-cut methods is much shallower across a stream, thus minimizing the potential impact to deep geological features. Also, there is no need for long pull back sections for conventional open cut crossings because there is no minimum length of pipeline that is needed to cross a stream. The length of the pipeline is dictated by the stream width, not the necessity to maintain a certain radius to reduce pipe stressors, as is the case with an HDD. There are no risks of inadvertent returns for a conventional open cut crossing as no drilling fluid is used during the process. The conventional open cut crossing is a straightforward digging of the trench line, installing the pipeline, and backfilling with native material. At all times during a conventional dry open cut of a stream, the contactor is able to see the trenchline and the surrounding work zone, unlike that of a HDD or conventional bore, which increases the safety factor. Also, in general, it takes one to two days to complete a conventional open cut crossing (if not using controlled blasting for rock removal), as opposed to at least one month for an HDD or up to 10 days for a conventional bore. While the timing of an open cut crossing can be extended for certain reasons, such as weather, stability of the trench line, and water flow, the time for an open cut crossing is still much less than that for an HDD.

Notwithstanding the concerns outlined above, HDDs are proposed for certain crossings to avoid environmental impacts at two Natural Rivers Inventory stream reaches (Jones Creek and Yellow Creek) and due to the physical characteristics of Wells Creek. The HDD at Yellow Creek will also avoid direct impacts to one of its unnamed tributaries.

## 10.4 Social and Economic Consequences of Each Alternative

This social and economic consequences section is an adaptation of information included in Resource Report 5 – *Socioeconomics* provided as part of the FERC certificate application to be filed contemporaneously with this application. A copy of the full Environmental Report (including all Resource Reports) will be provided to TDEC.

As discussed in Section 7, the Project will provide a broad benefit of meeting future power generation demand in and beyond the Project area by supporting TVA's replacement of existing coal-fired electric generation plant capacity with a natural gas-fired electric generation plant (if "Alternative A" is TVA's selected option as part of its ongoing NEPA review for its retirement and replacement project). Moreover, construction of the Project will have a net positive impact on local and regional businesses within counties impacted by the Project. TGP estimates that approximately $17,300,000 in Dickson County, $8,100,000 in Houston County, and $1,300,000 in Stewart County ($26,700,000 total) will be distributed in construction payroll for personnel



**TENNESSEE GAS PIPELINE COMPANY, L.L.C. APPLICATION FOR AQUATIC RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

working at the various Project sites over the 12-month construction period. During construction, it is anticipated that 20 to 30 percent of worker payroll will be spent locally by both local and non-local workers for the purchase of housing, food, gasoline, entertainment, and luxury items. The dollar amount would be dependent on the number of construction workers employed at any given time and the duration of the non-local worker's residence in the Project area.

It is also anticipated that some portion of construction materials will be purchased locally. Material purchases, including construction equipment, pipe, and valves, are estimated to be $16,500,000 in Dickson County, $6,800,000 in Houston County, and $2,200,000 in Stewart County ($25,500,000 total), including freight and taxes. An additional estimated $71,000,000 in Dickson County, $34,500,000 in Houston County, $3,900,000 in Stewart County ($109,400,000 total) will be spent by TGP on other construction related expenditures, for a total estimated construction cost of $161,600,000. These payroll and materials expenditures will have a positive impact on the local economy.

Construction and operation will result in increased tax revenues for the state of Tennessee, Dickson County, Houston County, and Stewart County, and potentially other local taxing authorities. The prevailing state sales tax rate for most items in Tennessee is seven percent. An additional 2.75 percent county sales tax is levied in Dickson and Houston counties. In Stewart County, an additional 2.25 percent sales tax is levied. Assuming all material purchases are taxed at an effective sales tax rate of 9.25 percent, TGP will pay approximately $2,300,000 in sales tax during construction. Once in operation, TGP will also pay ad valorem taxes based on the assessed value of the Project facilities. TGP estimates paying approximately $2,400,000 annually in ad valorem taxes on average over the first 10 years of Project operations. Ad valorem taxes are anticipated to be paid annually at similar or higher levels for the remaining life of the Project.

Although the preferred Cumberland Pipeline route that is co-located generally with an existing TVA powerline easement and other utility easements (for approximately 80 percent of its length) is the LEDPA, other routes extending from TGP's existing interstate natural gas pipeline system to TVA's Cumberland Fossil Plant would not vary in terms of socioeconomic benefits. Use of an alternate route would unnecessarily result in land-use disruptions that have primarily already occurred in constructing and maintaining the TVA powerline and easement and other utility easements. Social and economic consequences to property owners or local communities of the considered crossing methodologies summarized in **Table 10.5-1** would be minor, and would not materially vary, as the method to be implemented at each crossing is limited in area and length with no more than localized, temporary effects.

The Project is not anticipated to have significant adverse impacts during construction or operation on population, employment, regional or local services, traffic or transportation, residences or businesses, or minority communities. In addition, TGP has identified environmental justice communities near the location of the Project, and will continue to identify and address any concerns of these environmental justice communities (designated below poverty level but not with disproportionately high minority populations). TGP's communication and involvement with the environment justice communities is ongoing and will continue through the certificate, permitting,



construction, and restoration phases of the Project. TGP will continue its engagement of minority and low-income populations in proximity to the proposed Project through meaningful participation and coordination with community leaders and groups within environmental justice communities. TGP plans to take the following steps during the certificate, permitting, construction, and restoration phases of the Project to continue to inform and engage environmental justice communities: (1) beginning in the third quarter 2022, conduct small group discussions (e.g., 5-10 people) with community leaders and organizations in environmental justice communities to discuss the Project and any concerns or issues; (2) beginning in the third quarter 2022, provide formal presentations to groups in the impacted environmental justice communities; (3) distribute Project information to community partners for further distribution within their communities; and (4) translate certain Project materials for distribution within environmental justice communities, as well as portions of the Project website, Overall, Project construction activities are anticipated to have temporary, short-term impacts on population, housing, public services, and traffic and transportation, and will provide an overall net positive impact on employment and the local economy when the Project is operational.

## 10.5 Degradation Associated with the Preferred Alternative

Activities associated with the constructing the Cumberland Pipeline preferred alternative will not result in more than *de minimis* degradation, and no appreciable permanent loss of resource values.



**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

### TABLE 10.5-1
### Waterbodies Crossings Hydrologic Risk Analysis

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 0.09 | SDKA023 | Upper Sugarcamp Branch | Perennial/ Spring | Bedrock | Mfp | Possible | U | 0.02 | 0.010 | M | Dry Open Cut | Dam & Pump |
| 0.29 | SDKA023 | Upper Sugarcamp Branch | Perennial | Bedrock | Mfp | Possible | U | 0.05 | 0.052 | M | Dry Open Cut | Dam & Pump |
| 0.37 | SDKA024 | UT to Upper Sugarcamp Branch | Ephemeral / WWC | Silt/Clay | Mfp | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 0.87 | SDKA026 | Jordan Branch | Perennial | Bedrock | Mfp | Possible | U | 0.46 | 0.257 | M | Dry Open Cut | Dam & Pump |
| 0.89 | SDKA027 | UT to Jordan Branch | Perennial | Bedrock | Mfp | Possible | U | 0.07 | 0.036 | M | Dry Open Cut | Dam & Pump |
| 1.18 | SDKA001 | UT to Jordan Branch | Ephemeral / WWC | Silt / Clay / Organic | Msw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 1.20 | SDKA002 | UT to Jordan Branch | Ephemeral / WWC | Silt / Clay / Organic | Msw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 1.59 | SDKA004 | UT to Porters Branch | Perennial | Bedrock | Msw | Possible | U | 0.05 | 0.025 | H | Dry Open Cut | Dam & Pump |
| 2.13 | SDKA006 | UT to Porters Branch | Intermittent | Bedrock | Mfp | Unlikely[5] | I | 0.12 | 0.070 | M | Dry Open Cut | NFP or D&P |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
      Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
      Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
      Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**



**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

### TABLE 10.5-1
### Waterbodies Crossings Hydrologic Risk Analysis

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 2.34 | SDKA008 | UT to Porters Branch | Perennial / Spring | Bedrock | Mfp | Unlikely[5] | I | 0.01 | 0.006 | M | Dry Open Cut | Dam & Pump |
| 2.99 | SDKA058 | Porters Branch | Perennial | Gravel / Cobble / Silt clay | Mfp | Unlikely[5] | L | 2.98 | 2.000 | R | Dry Open Cut | D&P or Flume |
| 3.20 | SDKA048 | Jones Creek | Perennial | Bedrock / Cobble / Gravel / loam | QAL | Unlikely[5] | L | 92.34 | 63.900 | R | HDD | N.A. |
| 3.49 | SDKA050 | UT to Jones Creek | Ephemeral / WWC | Silt / Clay/ Organic | Mfp | Unlikely[5] | L | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 3.51 | SDKA051 | UT to Jones Creek | Intermittent | Silt Clay / Gravel/ Organic | Mfp | Unlikely[5] | I | 0.03 | 0.018 | M | Dry Open Cut | NFP or D&P |
| 3.79 | SDKA049 | UT to Jones Creek | Perennial | Bedrock / Cobble / Gravel | Mfp | Unlikely[5] | I | 0.20 | 0.130 | M | Dry Open Cut | Dam & Pump |
| 3.85 | SDKA053 | UT to Jones Creek | Intermittent | Silt Clay / Gravel / Organic | Mfp | Unlikely[5] | I | 0.03 | 0.018 | M | Dry Open Cut | NFP or D&P |
| 4.08 | SDKA055 | UT to Jones Creek | Intermittent | Silt Clay / Gravel / Organic | Mfp | Unlikely[5] | U | 0.02 | 0.000 | M | Dry Open Cut | NFP or D&P |
| 4.34 | SDKA012 | UT to Jones Creek | Ephemeral / WWC | Silt / Clay | Mfp | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
     Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
     Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
     Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**



**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC**
**RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**TABLE 10.5-1**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 4.5 | SDKA014 | UT to Gafford Branch | Perennial / Spring | Cobble | Mfp | Possible | I | 0.01 | NA | M | Dry Open Cut | D&P or Flume |
| 4.54 | SDKA013 | Gafford Branch | Perennial | Bedrock | Mfp | Possible | I | 1.02 | 0.565 | R | Dry Open Cut | D&P or Flume |
| 4.69 | SDKA015 | UT to Gafford Branch | Ephemeral / WWC | Organic | Mfp | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 4.7 | SDKA016 | UT to Gafford Branch | Ephemeral / WWC | Organic | Mfp | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 5.24 | SDKA017 | UT to Gafford Branch | Ephemeral / WWC | Silt/Clay | Mfp | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 5.32 | SDKA019 | UT to Gafford Branch | Ephemeral / WWC | Gravel | Mfp | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 5.89 | SDKA020 | UT to Gafford Branch | Ephemeral / WWC | Gravel | Mfp | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 6.43 | SDKA029 | UT to Johnson Creek | Ephemeral / WWC | Silt / Clay / Gravel | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 6.66 | SDKA030 | UT to Johnson Creek | Ephemeral / WWC | Organic | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
    Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
    Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
    Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**



**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**

Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit

**JULY 2022**

### TABLE 10.5-1
### Waterbodies Crossings Hydrologic Risk Analysis

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] Pipe Install Method | Proposed Construction Method[4] Flow Mgmt. Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7.08 | SDKA033 | UT to Johnson Creek | Intermittent | Bedrock | Mw | Possible | U | 0.16 | 0.080 | H | Dry Open Cut | NFP or D&P |
| 7.31 | SDKA034 | UT to Johnson Creek | Perennial | Cobble | Mw | Possible | U | 0.62 | 0.327 | H | Dry Open Cut | Dam & Pump |
| 7.97 | SDKA036 | Johnson Creek | Perennial | Bedrock / Cobble | Mw | Possible | U | 0.78 | 0.416 | H | Dry Open Cut | N.A. |
| 8.07 | SDKA037 | UT to Johnson Creek | Ephemeral / WWC | Gravel | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 8.4 | SDKA038 | UT to Johnson Creek | Intermittent | Cobble / Gravel | Msl | Possible | U | 0.02 | NA | H | Dry Open Cut | NFP or D&P |
| 8.5 | SDKA038 | UT to Johnson Creek | Intermittent | Cobble / Gravel | Msl | Possible | U | 0.01 | NA | H | Dry Open Cut | NFP or D&P |
| 8.64 | SDKA040 | UT to Harris Branch | Ephemeral / WWC | Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 8.76 | SDKA041 | Harris Branch | Perennial | Cobble / Gravel | Mw | Possible | U | 0.28 | 0.143 | H | Dry Open Cut | Dam & Pump |
| 9.48 | SDKA042 | UT to Bartons Creek | Perennial | Cobble / Gravel | Mw | Possible | I | 0.23 | 0.111 | H | Dry Open Cut | Dam & Pump |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
    Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
    Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
    Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**



**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**

Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit

**JULY 2022**

### TABLE 10.5-1
### Waterbodies Crossings Hydrologic Risk Analysis

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 10.00 | SDKB001 | Miller Branch | Perennial | Gravel | Mw | Possible | L | 1.31 | 0.721 | R | Dry Open Cut | D&P or Flume |
| 10.07 | SDKB002 | Bartons Creek | Perennial | Cobble / Gravel | Mw | Possible | L | 17.29 | 10.500 | R | Dry Open Cut | D&P or Flume |
| 10.96 | SDKB004 | UT to Nesbitt Branch | Intermittent | Silt / Gravel / Cobble | Msl | Possible | U | 0.03 | NA | H | Dry Open Cut | NFP or D&P |
| 11.14 | SDKB005 | UT to Nesbitt Branch | Intermittent | Silt / Gravel / Cobble | Msl | Possible | U | 0.04 | 0.019 | H | Dry Open Cut | NFP or D&P |
| 11.24 | SDKB006 | UT to Nesbitt Branch | Ephemeral / WWC | Silt / Clay | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 11.42 | SDKB007 | UT to Nesbitt Branch | Ephemeral / WWC | Silt / Clay | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 11.43 | SDKB008 | Nesbitt Branch | Perennial | Silt / Clay | Msl | Unlikely[5] | U | 0.1 | 4.94 | H | Dry Open Cut | Dam & Pump |
| 11.86 | SDKR002 | UT to Furnace Creek | Ephemeral / WWC | Silt / Clay | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 12.13 | SDKB009 | Furnace Creek | Perennial | Cobble | Mw | Possible | L | 8.41 | 0.029 | R | Dry Open Cut | D&P or Flume |



[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
    Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
    Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
    Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**



**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**

Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit

**JULY 2022**

### TABLE 10.5-1
### Waterbodies Crossings Hydrologic Risk Analysis

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 13.56 | SDKB010 | UT to Dry Hollow Branch | Ephemeral / WWC | Silt / Clay | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 13.91 | SDKR003 | UT to Dry Hollow Branch | Ephemeral / WWC | Silt/ Clay | Mw | Possible | I | <0.06 | NA | NA | Dry Open Cut | No Flow |
| 14.01 | SDKB011 | Dry Hollow Branch | Perennial | Gravel | Mw | Possible | L | 2.31 | 1.27 | R | Dry Open Cut | D&P or Flume |
| 14.34 | SDKR006 | UT to Dry Hollow Branch | Ephemeral / WWC | Silt / Clay | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 14.59 | SDKA046 | UT to Dry Hollow Branch | Intermittent | Gravel / Cobble / Silt Clay | Msl | Possible | U | 0.22 | 0.109 | H | Dry Open Cut | NFP or D&P |
| 14.64 | SDKB013 | UT to Woods Valley Branch | Ephemeral / WWC | Gravel | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 14.81 | SDKB007 | UT to Dry Hollow Branch | Ephemeral / WWC | Organic | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 14.96 | SDKB014 | UT to Woods Valley Branch | Intermittent | Gravel | Msl | Possible | U | <0.05 | NA | H | Dry Open Cut | No Flow Period |
| 15.1 | SDKB008 | UT to Woods Valley Branch | Intermittent | Silt / gravel | Msl | Possible | U | 0.03 | 0.014 | H | Dry Open Cut | NFP or D&P |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
    Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
    Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
    Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**



37

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC**
**RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

### TABLE 10.5-1
### Waterbodies Crossings Hydrologic Risk Analysis

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Pipe Install Method | Flow Mgmt. Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Proposed Construction Method[4] | |
| 15.11 | SDKB008 | UT to Woods Valley Branch | Intermittent | Silt / gravel | Msl | Possible | U | 0.03 | 0.014 | H | Dry Open Cut | NFP or D&P |
| 15.19 | SDKB015 | UT to Woods Valley Branch | Ephemeral / WWC | Silt / Clay | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 15.48 | SDKB016 | UT to Little Bartons Creek | Ephemeral / WWC | Gravel | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 15.6 | SDKB017 | UT to Little Bartons Creek | Ephemeral / WWC | Gravel | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 15.97 | SDKB019 | UT to Little Bartons Creek | Ephemeral / WWC | Silt / Clay / Sand | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 16.11 | SDKB020 | UT to Little Bartons Creek | Ephemeral / WWC | Silt / Clay / Sand | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 16.66 | SDKB023 | Little Bartons Creek | Perennial | Silt / Clay | Mw | Possible | U | 1.6 | 0.916 | H | Dry Open Cut | D&P or Flume |
| 16.99 | SDKB024 | UT to Little Bartons Creek | Ephemeral / WWC | Silt / Clay | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 17.21 | SDKA056 | UT to Leatherwood Creek | Ephemeral / WWC | Silt Clay / Organic / Gravel | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
    Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
    Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
    Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**



**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**

Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit

**JULY 2022**

**TABLE 10.5-1**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 17.24 | SDKA057 | UT to Leatherwood Creek | Ephemeral / WWC | Silt Clay / Organic / Gravel | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 17.47 | SDKA047 | UT to Leatherwood Creek | Ephemeral / WWC | Silt Clay / Organic / Gravel | Msl | Possible | U | 0.13 | 0.068 | NA | Dry Open Cut | No Flow |
| 18.93 | SDKB025 | UT to Leatherwood Creek | Intermittent | Cobble / Gravel | Mw | Possible | I | 0.13 | 0.0793 | H | Dry Open Cut | NFP or D&P |
| 19 | SDKB025 | UT to Leatherwood Creek | Intermittent | Cobble / Gravel | Mw | Possible | I | 0.15 | 0.0921 | H | Dry Open Cut | NFP or D&P |
| 19.08 | SDKB026 | Leatherwood Creek | Perennial | Cobble / Gravel | Mw | Possible | I | 3.54 | 2.46 | M | Dry Open Cut | D&P or Flume |
| 19.18 | SDKB027 | UT to Leatherwood Creek | Ephemeral / WWC | Cobble / Gravel | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 19.3 | SDKB028 | UT to Leatherwood Creek | Intermittent | Cobble / Gravel | Mw | Possible | I | 0.16 | 0.0985 | H | Dry Open Cut | NFP or D&P |
| 19.81 | SDKR010 | UT to Leatherwood Creek | Ephemeral / WWC | Silt / Clay / Organic | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 20.03 | SDKR011 | UT to Williamson Branch | Ephemeral / WWC | Silt / Clay / Organic | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
    Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
    Rock/Material Removal Method: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
    Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**



JA0330

AR 000962

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC**
**RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**TABLE 10.5-1**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 20.69 | SHNW003a | UT to Williamson Branch | Ephemeral / WWC | Silt / Clay / Organic | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 20.81 | SHNW004a | UT to Williamson Branch | Ephemeral / WWC | Silt / Clay / Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 21.08 | SHNC042 | UT to Williamson Branch | Ephemeral / WWC | Silt / Clay / Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 21.21 | SHNC041 | UT to Williamson Branch | Ephemeral / WWC | Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 21.56 | SHNC003 | UT to Williamson Branch | Ephemeral / WWC | Organic | Mw | Possible | U | 0.22 | 0.137 | NA | Dry Open Cut | No Flow |
| 21.64 | SHNC001 | UT to Williamson Branch | Ephemeral / WWC | Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 21.74 | SHNC004 | UT to Williamson Branch | Ephemeral / WWC | Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 21.93 | SHNC006 | UT to Yellow Creek | Ephemeral / WWC | Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 22 | SHNC006 | UT to Yellow Creek | Ephemeral / WWC | Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
    Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
    Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
    Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**



**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC**
**RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

## TABLE 10.5-1
## Waterbodies Crossings Hydrologic Risk Analysis

| M.P. | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 22.32 | SHNC010-1 | UT to Yellow Creek | Intermittent | Organic | Mw | Possible | L | 0.15 | 0.090 | M | HDD | NFP or D&P |
| 22.36 | SHNC007 | Yellow Creek | Perennial | Cobble | Qal | Unlikely[5] | L | 101.27 | 86.1 | R | HDD | N.A. |
| 22.88 | SHNC018 | UT to Yellow Creek | Intermittent | Cobble | Qal | Unlikely[5] | I | 0.65 | 0.39 | R | Dry Open Cut | NFP or D&P |
| 23.18 | SHNC017 | UT to Yellow Creek | Ephemeral / WWC | Silt / Clay | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 23.23 | SHNC016 | UT to Yellow Creek | Ephemeral / WWC | Organic | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 23.24 | SHNC015 | UT to Yellow Creek | Ephemeral / WWC | Cobble | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 23.72 | SHNE001 | UT to Yellow Creek | Ephemeral / WWC | Cobble | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 24.07 | SHNC019 | UT to Indian Branch | Ephemeral / WWC | Cobble | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 24.12 | SHNE002 | UT to Indian Branch | Ephemeral / WWC | Silt / Clay | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
    Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
    Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
    Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**



**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC**
**RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**TABLE 10.5-1**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] Pipe Install Method | Proposed Construction Method[4] Flow Mgmt. Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24.12 | SHNC020* | Indian Branch | Intermittent | Silt / Clay | Mw | Possible | I | 0.07 | 0.038 | H | Dry Open Cut | NFP or D&P |
| 24.28 | SHNC021 | UT to Indian Branch | Ephemeral / WWC | Silt / Clay | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 24.41 | SHNC022 | UT from Guices Branch | Ephemeral / WWC | Cobble | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 24.47 | SHNC023 | UT from Guices Branch | Intermittent | Silt / Clay | Mw | Possible | U | 0.15 | 0.084 | H | Dry Open Cut | No Flow Period |
| 24.62 | SHNC024 | UT from Guices Branch | Ephemeral / WWC | Cobble | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 24.72 | SHNC025 | UT from Guices Branch | Ephemeral / WWC | Silt / Clay | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 25.37 | SHNC030 | UT from Guices Branch | Intermittent | Gravel | Mw | Possible | U | 0.43 | 0.253 | H | Dry Open Cut | NFP or D&P |
| 25.43 | SHNE007 | UT from Guices Branch | Ephemeral / WWC | Cobble | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 25.59 | SHNE003 | UT from Guices Branch | Intermittent | Coble / Gravel / Silt / Organics | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | NFP or D&P |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
      Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
      Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
      Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**



JA0333

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**

Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit

**JULY 2022**

---

**TABLE 10.5-1**

**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] Pipe Install Method | Proposed Construction Method[4] Flow Mgmt. Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25.68 | SHNE004 | UT from Guices Branch | Ephemeral / WWC | Gravel / Cobble | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 25.69 | SHNE004 | UT from Guices Branch | Ephemeral / WWC | Gravel / Cobble | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 25.79 | SHNE005 | UT from Guices Branch | Ephemeral / WWC | Gravel / Cobble | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 25.8 | SHNE006 | UT from Guices Branch | Ephemeral / WWC | Gravel / Cobble | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 26.21 | SHNA011 | UT from Guices Branch | Intermittent | Gravel / Cobble | Qal | Unlikely[5] | I | 1 | 0.611 | R | Dry Open Cut | NFP or D&P |
| 26.43 | SHNA012 | UT from Guices Branch | Intermittent | Gravel/Cobble | Qal | Unlikely[5] | I | 6.95 | 4.64 | R | Dry Open Cut | NFP or D&P |
| 26.87 | SHNA001 | Guices Creek | Perennial | Cobble | Qal | Unlikely[5] | I | 1.79 | 1.12 | R | Dry Open Cut | D&P or Flume |
| 27.26 | SHNA003 | UT from Guices Branch | Ephemeral / WWC | Silt / Clay / Cobble / Gravel | Msl | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 27.52 | SHNB031 | UT to Lickskillet Branch | Ephemeral / WWC | Silt / Clay | Msl | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
    Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
    Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
    Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**



**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC**
**RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**TABLE 10.5-1**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 28.02 | SHNB030 | UT to Lickskillet Branch | Intermittent | Silt / Clay | Mw | Possible | U | 0.08 | 0.0437 | H | Dry Open Cut | NFP or D&P |
| 28.61 | SHNB033-1 | Lickskillet Branch | Perennial | Cobble / Gravel | Qal | Unlikely[5] | U | 0.67 | 0.403 | R | Dry Open Cut | D&P or Flume |
| 28.92 | SHNB033-2 | Lickskillet Branch | Perennial | Cobble / Gravel | Qal | Unlikely[5] | U | 1.29 | 0.798 | R | Dry Open Cut | D&P or Flume |
| 29 | SHNA013 | UT to Lickskillet Branch | Ephemeral / WWC | Silt / Clay | Qal | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 29.02 | SHNB032 | UT to Lickskillet Branch | Ephemeral / WWC | Silt / Clay | Qal | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 30.18 | SHNB034 | UT to Lickskillet Branch | Ephemeral / WWC | Silt / Clay | Qal | Unlikely[5] | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 30.19 | SHNB033-3 | Lickskillet Branch | Perennial | Cobble / Gravel | Qal | Unlikely[5] | I | 2.17 | 1.37 | R | Dry Open Cut | D&P or Flume |
| 30.67 | SHNA010 | Wells Creek | Perennial | Loam / Gravel / Organic / Cobble | Qal | Unlikely[5] | I | 49.39 | 39.7 | R | HDD | N.A. |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
    Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
    Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
    Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**



# 11.0  Compensatory Mitigation

## 11.1 Proposed Compensatory Mitigation

Streams or wetland activities associated with this Project will result in no more than *de minimis* degradation and no appreciable permanent loss of resource values. Therefore, TGP does not propose compensatory mitigation (e.g., purchase of mitigation credits) for the temporary impacts to aquatic resources.

## 11.2 Describe How the Compensatory Mitigation Would Result in No Net Loss of Resource Value

Project activities will not result in permanent alterations to streams or wetlands. Although less than 0.03-acre of PFO wetlands will be converted to PEM wetlands (0.02-acre permanent and 0.01-acre temporary), this alteration will not result in loss of resource function nor appreciable permanent loss. Stream impacts from the proposed Project activities will be limited to short-term and localized alterations. Therefore, TGP does not propose compensatory mitigation for impacts to streams and wetlands. Waterbodies temporarily impacted by construction activities will be reseeded and restored to pre-construction conditions, as much as practicable. Annual monitoring in accordance with the FERC Procedures (with requested deviations to be approved by the FERC) and any USACE and TDEC permit conditions, will be conducted to ensure all streams are properly restored to pre-construction conditions.

## 11.3 Provide a Detailed Monitoring Plan

Annual monitoring in accordance with the FERC Procedures (with requested deviations to be approved by FERC) and any applicable USACE and TDEC permit conditions, will be conducted to ensure all aquatic resources are properly restored to pre-construction conditions. Aquatic crossings will be monitored after the completion of construction and restoration activities to ensure successful revegetation of channel stream buffers and wetlands, stabilization of previously disturbed stream geomorphology (i.e., channel bed and bank, dimension, and profile), and to ensure no loss to streams' hydrologic regimes.

Features meeting success criteria will be excluded from future annual monitoring events. It is expected that features will rebound quickly so that fewer features will need to be monitored in successive years.

### 11.3.1 Qualitative Visual Assessment

Visual assessments will be used to qualitatively evaluate previous wetland and waterbody crossing locations. Evaluations using the TDEC's Hydrologic Determination Field Data Sheets will be performed at each stream crossing location. An overall qualitative assessment of each reach will also be conducted to ensure that areas that are not otherwise measured or documented do not contain conditions that may require further analysis or attention. For wetlands, USACE datasheets completed during pre-construction surveys will be used for comparative purposes to

determine restoration success with regards to aerial cover and species composition. Conditions observed during the overall visual assessment will be documented, photographed, and described in a final mitigation monitoring report.

### 11.3.2 Photo Documentation

Photographs will be taken upstream and downstream at the crossing locations to characterize the streams and to support the evaluation of the monitoring efforts. Each photo will be taken at the same bearing/orientation as the wetland and waterbody delineation field surveys.

### 11.4 Describe the Long-term Protection Measures for the Compensatory Mitigation Site

N/A

## 12.0 References

Constitution Pipeline Company, LLC. November 2013. Supplemental FERC filing in Docket CP13-499-000. Volume II Appendix N. Feasibility Study: Trenchless Construction Methods for Sensitive Environmental Resource Crossings.

Cowardin, L.M., V. Carter, F.C. Golet, and E.T. LaRoe. 1979. Classification of Wetlands and Deepwater Habitats of the United States. U.S. Department of the Interior, Fish and Wildlife Service, Washington, D.C. FWS/OBS-79/31.

FERC. 2013b. Wetland and Waterbody Construction and Mitigation Procedures. Available at: https://www.ferc.gov/industries/gas/enviro/procedures.pdf. Accessed July 2021.

TDEC. 2019. Stream Mitigation Guidelines. TDEC, Division of Water Resources, Natural Resources Unit. DWR-NR-G-01-Stream Mitigation Guidelines-05202019. Available at: https://www.tn.gov/content/dam/tn/environment/water/policy-and-guidance/dwr-nr-g-01-stream-mitigation-guidelines-052019.pdf. Accessed April 2022.

TDEC. 2020. Water Qualities Rules, Reports, and Publications: EPA Approved Lists of Impaired and Threatened Waters. Available at: https://www.tn.gov/environment/program-areas/wr-water-resources/water-quality/water-quality-reports---publications.html. Accessed March 2022.

Tennessee Erosion and Sediment Control Handbook: A Guide for Protection of State Waters Through the Use of Best Management Practices during Land Disturbing Activities, Fourth Edition. TDEC, Division of Water Pollution Control. Nashville, TN. Available at: https://tnepsc.org/handbook.asp. Accessed April 2022.

Transportation of Natural Gas and Other Gas by Pipeline: Minimum Federal Safety Standards, 49 C.F.R. §192.327(e)

Tennessee Valley Authority ("TVA"). May 11, 2021. Notice of Intent. Available at: https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/environment/environmental-stewardship/nepa-environmental-

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

reviews/cumberland-retirement/2021-09945_fr_0511202107f98de0-9eab-471e-8ddc-580ee4601b3f.pdf?sfvrsn=e368d9c3_5. Accessed April 2022.

TVA. Cumberland Fossil Plant. Accessed June 4, 2022. Available at: https://www.tva.com/energy/our-power-system/coal/cumberland-fossil-plant

TVA. 2017. A Guide for Environmental Protection and Best Management Practices for Tennessee Valley Authority Construction and Maintenance Activities, Revision 3. Edited by G. Behel, S. Benefield, R. Brannon, C. Buttram, G. Dalton, C. Ellis, G. Henley, T. Korth, T. Giles, A. Masters, J. Melton, R. Smith, J. Turk, T. White, and R. Wilson. Chattanooga, TN. Available at: https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/energy/transmission/a-guide-for-environmental-protection-and-best-management-practices-for-tva-construction-and-maintenance-activities.pdf?sfvrsn=60c6b80d_2. Accessed April 2022.

United States Army Corps of Engineers ("USACE"). 2012a. Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Atlantic and Gulf Coastal Plain Region (Version 2.0), ed. J.S. Lichvar, and C.V. Noble. ERFC/EL TR-10-20. Vicksburg, MS: U.S. Army Engineer Research and Development Center.

USACE. Regional Supplement to the Corps of Engineers Wetland Delineation Manual. 2012b Eastern Mountains and Piedmont Region (Version 2.0), ed Vicksburg, MS: U.S. Army Engineer Research and Development Center.

USACE. Corps of Engineers Wetland Delineation Manual. 1987. Vicksburg, MS: U.S. Army Engineer Research and Development Center. Available at: 1987 Army Corps Wetlands Delineation Manual (rutgers.edu). Accessed January 2022.

United States Energy Information Administration. 2021 Annual Energy Outlook. Available at: - Production - Natural gas consumption growth between 2020 and 2050 is concentrated in two areas: exports and industrial use - U.S. Energy Information Administration (EIA), http://www.eia.gov/outlooks/aeo/production/sub-topic-03.php. Accessed December 22, 2021

.

⬤

AR 000970

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC**
**RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

# Attachment 1 – Wetlands and Waterbodies Impacts Tables



AR 000971

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**Attachment 2** – Jurisdictional Waters Determinations and
Tennessee Hydrologic Determination Report Submittal
Confirmation



AR 000972

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC**
**RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**Attachment 3** – Project Design Plans and Permit Drawings



3

AR  000973

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**Attachment 4** – Agency Coordination and Concurrence Letters



AR  000974

4

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC**
**RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**Attachment 5** – Environmental Construction Management Plans



**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**Attachment 6** – Permitting Table



6

AR 000976

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**Attachment 7** – HDD Feasiblity Studies



AR 000977

7

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC**
**RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**Attachment 8** – Minor Route Variations Figures



8

AR  000978

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC**
**RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**Attachment 9** – Summary of Trenchless Construction Methods
for the Cumberland Project



9

AR 000979



Page: 354    Filed: 08/19/2024    Document: 56-1    Case: 23-3682

## TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION
### Division of Water Resources
William R. Snodgrass Tennessee Tower, 312 Rosa L. Parks Avenue, 11th Floor,
Nashville, Tennessee, 37243
1-888-891-8332 (TDEC)

**Application for Aquatic Resource Alteration Permit (ARAP) & State §401 Water Quality Certification**

| *OFFICIAL STATE USE ONLY* | Site #: | | Permit #: | |
|---|---|---|---|---|

**Section 1. Applicant Information** (individual responsible for site, signs certification below)

| Applicant Name (company or individual): Tennessee Gas Pipeline Company, L.L.C. | SOS #: 00004207 Status: N/A |
|---|---|

| Primary Contact/Signatory: Gina B. Dorsey | Signatory's Title or Position: Director, EHS | | |
|---|---|---|---|
| Mailing Address: 1001 LOUISIANA ST STE 1000 | City: HOUSTON | State: TX | Zip: 77002-5089 |
| Phone: (713) 369-8975 | Fax: | E-mail: gina_dorsey@kindermorgan.com | |

**Section 2. Alternate Contact/Consultant Information** (a consultant is not required)

| Alternate Contact Name: David E. Jackson | | | |
|---|---|---|---|
| Company: BDY Environmental, LLC | Title or Position: Principal | | |
| Mailing Address: 2607 Westwood Drive | City: Nashville | State: TN | Zip: 37027 |
| Phone: 615 400-8476 | Fax: | E-mail: djackson@bdy-inc.com | |

**Section 3. Fee** (application will be incomplete until fee is received)

☐ No Fee        ☑ Fee Submitted with Application        Amount Submitted: $ 2,500

Current application fee schedules can be found at the Division of Water Resources webpage at:
*https://www.tn.gov/environment/permit-permits/water-permits1/aquatic-resource-alteration-permit--arap-.html*
or by calling (615) 532-0625. Please make checks payable to "Treasurer, State of Tennessee".

| Billing Contact (if different from Applicant): | Name: | | Email: |
|---|---|---|---|
| Address: | | Phone: | |

**Section 4. Project Details** (fill in information and check appropriate boxes)

| Site or Project Name: Cumberland Project | Nearest City, Town or Major Landmark: Cumberland City, TN |
|---|---|

Street Address or Location (include zip): ~32 mile linear route from Clay Lick Road, Dickson County (37187) to near Old Scott Road, Stewart County (37050).

| County(ies): Dickson, Houston, Stewart | MS4 Jurisdiction: N/A | Latitude (dd.dddd): ~36.161840° to ~36.372977° |
|---|---|---|
| | | Longitude (dd.dddd): ~-87.206428° to ~-87.675641° |

| Resources Proposed for Alteration: | ☑ Stream / River | ☑ Wetland | ☐ Reservoir |
|---|---|---|---|

Name of Water Resource (for more information, access *http://tdeconline.tn.gov/dwr* ): Various named and unnamed streams and waterbodies in the Lower Cumberland River watershed.

Brief Project Description (a more detailed description is required under Section 8): Construct & operate ~32 miles of new 30-inch diameter natural gas pipeline.

Does the proposed activity require approval from the U.S. Army Corps of Engineers, the Tennessee Valley Authority, or any other federal, state, or local government agency?        ☑ Yes        ☐ No

If Yes, provide the permit reference numbers:

Will the activity require a 401 Water Quality Certification:        ☑ Yes        ☐ No

If Yes, attach any 401 WQC pre-filing meeting request documentation

Is the proposed activity associated with a larger common plan of development:        ☐ Yes  ☑ No

If Yes, submit site plans and identify the location and overall scope of the common plan of development.

Plans attached?        ☐ Yes  ☑ No
If applicable, indicate any other federal, state, or local permits that are associated with the overall project site (common plan of development) that have been obtained in the past (e.g., construction general permit and/or other ARAP):

CN-1091 (Rev. 09-2021)          (Page 1 of 3)          RDA 2970

JA0348

AR 000980

## Application for Aquatic Resource Alteration Permit (ARAP) & State §401 Water Quality Certification

Case: 23-3682    Document: 56-1    Filed: 08/19/2024    Page: 355

| Section 5. Project Schedule (fill in information and check appropriate boxes) | | |
|---|---|---|
| Proposed start date: August 2024 | Estimated end date: December 2025 | |
| Is any portion of the activity complete now? | ☐ Yes | ☑ No |
| If yes, describe the extent of the completed portion: N/A | | |

**The required information in Sections 6-11 must be submitted on a separate sheet(s) and submitted in the same numbered format as presented below. If any question in not applicable, state the reason why it is not applicable.**

| Section 6. Description | | Attached Yes | No |
|---|---|---|---|
| 6.1 | A narrative description of the scope of the project | ☑ | ☐ |
| 6.2 | USGS topographic map indicating the exact location of the project (can be a photographic copy) | ☑ | ☐ |
| 6.3 | Photographs of the resource(s) proposed for alteration with location description (photo locations should be noted on map) | ☑ | ☐ |
| 6.4 | A narrative description of the **existing** stream and/or wetland characteristics including, but not limited to, dimensions (e.g., depth, length, average width), substrate and riparian vegetation | ☑ | ☐ |
| 6.5 | A narrative description of the **proposed** stream and/or wetland characteristics including, but not limited to, dimensions (e.g., depth, length, average width), substrate and riparian vegetation | ☑ | ☐ |
| 6.6 | In the case of wetlands, include a wetland delineation with delineation forms and site map denoting location of data points | ☑ | ☐ |
| 6.7 | A copy of all hydrologic or jurisdictional determination documents issued for water resources on the project site | ☑ | ☐ |

| Section 7. Project Rationale | Attached Yes | No |
|---|---|---|
| Describe the need for the proposed activity, including, but not limited to the purpose, alternatives considered and rationale for selection of least impactful alternative, and what will be done to avoid or minimize impacts to water resources | ☑ | ☐ |

| Section 8. Technical Information | | Attached Yes | No |
|---|---|---|---|
| 8.1 | Detailed plans, specifications, blueprints, or legible sketches of present site conditions and the proposed activity. Plans must be 8.5 x 11 inches. Additional larger plans may also be submitted to aid in application review. The detailed plans should be superimposed on existing and new conditions (e.g., stream cross sections where road crossings are proposed) | ☑ | ☐ |
| 8.2 | For the proposed activity and compensatory mitigation, provide a discussion regarding the sequencing of events and construction methods and any proposed monitoring | ☑ | ☐ |
| 8.3 | Depiction and narrative on the location and type of erosion prevention and sediment control (EPSC) measures for the proposed alterations and any other measures to treat, control, or manage impacts to waters | ☑ | ☐ |

| Section 9. Water Resources Degradation (degree of proposed impact) |
|---|

Note that in most cases, activities that exceed the scope of the General Permit limitations are considered greater than *de minimis* degradation to water quality.

Please provide your basis for concluding the proposed activity will cause one of the following levels of water quality degradation:

☑ a. *De minimis* degradation, no appreciable permanent loss of resource values
☐ b. Greater than *de minimis* degradation (if greater than *de minimis* complete Sections 10-11)

*For information and guidance on the definition of de minimis and degradation, refer to the Antidegradation Statement in Chapter 0400-40-03-.06 of the Tennessee Water Quality Criteria Rule:*
*https://publications.tnsosfiles.com/rules/0400/0400-40/0400-40.htm*
*For more information on specifics on what General Permits can cover, refer to the Natural Resources Unit webpage at:*
*https://www.tn.gov/environment/permit-permits/water-permits1/aquatic-resource-alteration-permit--arap-.html*

## Application for Aquatic Resource Alteration Permit (ARAP) & State §401 Water Quality Certification

| Section 10. Detailed Alternatives Analysis | | Attached | |
|---|---|---|---|
| | | Yes | No |
| 10.1 | Analyze all reasonable alternatives and describe the level of degradation and permanent loss of resource value caused by each alternative. Assessment must consider options other than the "Preferred" and "No Action" alternatives. Provide associated rationale for selecting or rejecting all alternatives considered and demonstration that the least impactful practicable alternative was selected. | ☒ | ☐ |
| 10.2 | Discuss the social and economic consequences of each alternative | ☒ | ☐ |
| 10.3 | Demonstrate that the degradation associated with the preferred alternative will not violate water quality criteria for uses designated in the receiving waters, and is necessary to accommodate important economic and social development in the area | ☒ | ☐ |

| Section 11. Compensatory Mitigation | | Attached | |
|---|---|---|---|
| | | Yes | No |
| 11.1 | A detailed discussion of the proposed compensatory mitigation. Provide evidence of credit reservation if proposing to utilize a third-party provider. | ☐ | ☒ |
| 11.2 | Analysis of any proposed appreciable loss of resource value using the TN Stream Mitigation Guidelines. Provide Stream Quantification Tool (SQT) results if applicable. Include Existing Condition Score (ECS) and debit/credit calculations. | ☐ | ☒ |
| 11.3 | Describe how the compensatory mitigation would result in no net loss of resource value | ☐ | ☒ |
| 11.4 | Provide a detailed monitoring plan for the compensatory mitigation site if permittee-responsible project is proposed | ☐ | ☒ |
| 11.5 | Describe the long-term protection measures for the compensatory mitigation site if permittee-responsible project is proposed (e.g., deed restrictions, conservation easement) | ☐ | ☒ |

### Certification and Signature

An application submitted by a corporation must be signed by a principal executive officer; from a partnership or proprietorship, by the partner or proprietor respectively; from a municipal, state, federal or other public agency or facility, the application must be signed by either a principal executive officer, ranking elected official, or other duly authorized employee. *I certify under penalty of law that this document and all attachments were prepared by me, or under my direction or supervision. The submitted information is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment. As specified in Tennessee Code Annotated Section 39-16-702(a)(4), this declaration is made under penalty of perjury. The project proponent hereby requests that the certifying authority review and take action on this CWA 401 certification request within the applicable reasonable period of time.*

| Gina B. Dorsey | Director, EHS | *Gina B. Dorsey* | 7/22/2022 |
|---|---|---|---|
| Printed Name | Official Title | Signature | Date |

Note that this form must be signed by the principal executive officer, partner or proprietor, or a ranking elected official in the case of a municipality; for details see **Certification and Signature** statement above. For more information, contact your local EFO at the toll-free number 1-888-891-8332 (TDEC). Submit the completed ARAP Application form (keep a copy for your records) to the appropriate EFO for the county(ies) where the proposed activity is located, addressed to **Attention: ARAP Processing**. You may also electronically submit the complete application and all associated attachments to water.permits@tn.gov.

| EFO | Street Address | Zip Code | EFO | Street Address | Zip Code |
|---|---|---|---|---|---|
| Memphis | 8383 Wolf Lake Drive, Bartlett | 38133-4119 | Cookeville | 1221 South Willow Ave. | 38506 |
| Jackson | 1625 Hollywood Drive | 38305-4316 | Chattanooga | 1301 Riverfront Pkwy., Ste. 206 | 37402 |
| Nashville | 711 R S Gass Boulevard | 37243 | Knoxville | 3711 Middlebrook Pike | 37921 |
| Columbia | 1421 Hampshire Pike | 38401 | Johnson City | 2305 Silverdale Road | 37601 |



| CN-1091 (Rev. 01-2021) | (Page 3 of 3) | RDA2366 |

AR 000982

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC**
**RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

# Attachment 1 – Wetlands and Waterbodies Impacts Tables



1
AR 000988

**Table 1. Cumberland Waterbodies Impact Table**

| MP | Water-body ID | Waterbody Name | Flow Regime | TDEC HD Class | Substrate | Resource Description[1] | Start Lat | Start Long | End Lat | End Long | Avg Stream Bkf Width (Feet) | Avg OHWM / Bkf Height (Feet) | TDEC HD Score | USACE Pre-2015 Classification | Waterbody Intercepts Pipeline | Temp WB Crossing Impact Type | Temp WB Crossing Acres | Temp WB Crossing Linear Feet | Temp Workspace Impact Type | Temp Workspace Acres | Temp Workspace Linear Feet | Total Impacts Acres | Total Impacts Linear Feet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Dickson County** | | | | | | | | | | | | | | | | | | | | | | | |
| 0.1 | SDKA023 | Upper Sugarcamp Branch | Perennial/ Spring | Stream | Bedrock | Stable, spring fed channel with a moderately dense, mature forest buffer. Moderate alteration to steep surrounding terrain and drainage basin. | 36.1630 | -87.2073 | 36.1632 | -87.2073 | 4 | 2.5 | PI | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.008 | 87.2 | 0.009 | 97.2 |
| 0.3 | SDKA023 | Upper Sugarcamp Branch | Perennial/ Spring | Stream | Bedrock | | 36.1655 | -87.2057 | 36.1655 | 36.1655 | 4 | 2.5 | PI | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 67.1 | 0.007 | 77.1 |
| 0.4 | SDKA024 | UT to Upper Sugarcamp Branch | Ephemeral | WWC | Silt/Clay | Shallow narrow ephemeral stream (dry during field visit June 2021), immature forest, gradual slope, flat and cleared at powerline crossing. | 36.1663 | -87.2063 | 36.1664 | -87.2060 | 2 | 1 | 10.5 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.004 | 83.2 | 0.004 | 93.2 |
| 0.9 | SDKA026 | Jordan Branch | Perennial | Stream | Bedrock | Perennial, high quality shallow ~10ft stream with good bio matrix. Mature forest, rock shelves, moderate steep slopes, stable. | 36.1705 | -87.2128 | 36.1709 | -87.2130 | 21 | 8 | PI | RPW | Y | Dry Open Cut | 0.005 | 10.0 | Pipeline Crossing | 0.056 | 116.5 | 0.061 | 126.5 |
| 0.9 | SDKA027 | UT to Jordan Branch | Perennial | Stream | Bedrock | Perennial, stable rocky stream with good bio matrix. Mature dense forest, shallow, ~10ft wide with surrounding gradual slopes. | 36.1709 | -87.2131 | 36.1708 | -87.2133 | 10 | 6 | PI | RPW | Y | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.017 | 76.0 | 0.020 | 86.0 |
| 1.2 | SDKA001 | UT to Jordan Branch | Ephemeral | WWC | Silt/ Clay/ Organic | Ephemeral stream with moderately dense forest buffer. Moderate alteration to channel within powerline ROW. Weak hydrology and biology, eroded slopes. Surrounding gradual slopage. | 36.1730 | -87.2174 | 36.1733 | -87.2175 | 2 | 1 | 15.25 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.005 | 102.2 | 0.005 | 112.2 |
| 1.2 | SDKA002 | UT to Jordan Branch | Ephemeral | WWC | Silt/ Clay/ Organic | Ephemeral stream with moderately dense forest buffer. No inundation at the time of June 2021 field visit. Slight erosion of banks, significant blockage with fallen trees. Moderately steep surrounding slopes. | 36.1733 | -87.2176 | 36.1733 | -87.2176 | 1.5 | 0.5 | 7 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.000 | 0.8 | 0.000 | 10.8 |
| 1.6 | SDKA004 | UT to Porters Branch | Perennial | Stream | Bedrock | Perennial stream with good biology and seepage slopes feeding hydrology. Narrow ~2ft wide, no erosion, moderately steep surrounding slopes, rock shelves, dense forest, stable. | 36.1765 | -87.2235 | 36.1764 | -87.2237 | 4 | 1 | 22.75 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 69.6 | 0.007 | 79.6 |
| 2.1 | SDKA006 | UT to Porters Branch | Intermittent | Stream | Bedrock | Intermittent channel with steep surrounding slopes, heavy leaf litter, no observed fauna. Nearly dry during field visit June 2021. No visible erosion, moderately dense forest. | 36.1809 | -87.2317 | 36.1807 | -87.2319 | 6 | 3 | 29.5 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.009 | 68.0 | 0.011 | 78.0 |
| 2.3 | SDKA008 | UT to Porters Branch | Perennial/ Spring | Stream | Bedrock | Perennial stream with fish present, ~1ft depth, ~10ft wide, slight bank erosion, moderately steep surrounding slopes and dense forest. | 36.1826 | -87.2348 | 36.1824 | -87.2349 | 2.5 | 2 | PI | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.004 | 68.6 | 0.005 | 78.6 |
| 3.0 | SDKA058 | Porters Branch | Perennial | Stream | Gravel/ Cobble/ Silt clay | Perennial stream with steep sideslopes and gradual surrounding slopes with moderately dense forest. Shallow bed ~20ft wide in some places, fish present, moderate light penetration. | 36.1853 | -87.2430 | 36.1852 | -87.2429 | 3.5 | 1 | 33 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 66.7 | 0.006 | 76.7 |

**Table 1. Cumberland Waterbodies Impact Table**

| MP | Water-body ID | Waterbody Name | Flow Regime | TDEC HD Class | Substrate | Resource Description[1] | Start Lat | Start Long | End Lat | End Long | Avg Stream Bkf Width (Feet) | Avg OHWM / Bkf Height (Feet) | TDEC HD Score | USACE Pre-2015 Classification | Waterbody Intercepts Pipeline | Temporary Waterbody Crossing Impacts (Trench) Impact Type | Acres | Linear Feet | Temporary Workspace Impacts/Disturbance (Outside Trench) Impact Type | Acres | Linear Feet | Total Impacts Acres | Linear Feet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.2 | SDKA048 | Jones Creek | Perennial | Stream | Bedrock/ Cobble/ Gravel/ loam | Stable, perennial stream with moderately dense, mature forest on the left bank and agricultural fields on the right bank. Minnows, fish, and mussel shells were observed during the June 2021 field visit. | 36.1875 | -87.2439 | 36.1873 | -87.2440 | 70 | 2 | PI | RPW | Y | HDD | 0.000 | 0.0 | Pipeline Crossing | 0.000 | 0.0 | 0.000 | 0.0 |
| | | | | | | | 36.1923 | -87.2425 | 36.1920 | -87.2425 | 70 | 2 | PI | RPW | N | N/A | 0.000 | 0.0 | Access Road | 0.205 | 127.7 | 0.205 | 127.7 |
| | | | | | | | 36.1876 | -87.2439 | 36.1876 | -87.2439 | 70 | 2 | PI | RPW | N | N/A | 0.000 | 0.0 | Access Road | 0.003 | 2.0 | 0.003 | 2.0 |
| 3.4 | SDKA049 | UT to Jones Creek | Perennial | Stream | Bedrock/Cobble / Gravel | Stable, perennial stream with sparse trees and agricultural buffer. | 36.1920 | -87.2442 | 36.1921 | -87.2444 | 12.5 | 1 | PI | RPW | Y | Dry Open Cut | 0.003 | 10.0 | Pipeline Crossing | 0.012 | 43.1 | 0.015 | 53.1 |
| 3.5 | SDKA050 | UT to Jones Creek | Ephemeral | WWC | Silt/ Clay | Poorly defined ephemeral stream which conveys drainage from the agricultural fields at the western extent. Buffered by primarily sparse forest on the left and right bank, with agricultural fields at the western extent. | 36.1896 | -87.2484 | 36.1898 | -87.2483 | 3.5 | 0.5 | 11.5 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 69.3 | 0.006 | 79.3 |
| 3.5 | SDKA051 | UT to Jones Creek | Intermittent | Stream | Silt Clay/ Gravel/ Organic | Stable, intermittent stream with sparse forest and agricultural buffer. | 36.1899 | -87.2485 | 36.1898 | -87.2487 | 4.5 | 0.5 | 17.25 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.007 | 65.5 | 0.008 | 75.5 |
| 3.6 | SDKA054 | UT to Jones Creek | Intermittent | Stream | Gravel/Silt Clay/ Organic | Stable, intermittent stream buffered by sparse mature trees and maintained residential lawn. The stream is conveyed beneath Slated Road via a corrugated metal pipe. | 36.1927 | -87.2480 | 36.1927 | -87.2480 | 3 | 0.2 | 19 | RPW | N | N/A | 0.000 | 0.0 | Access Road | 0.001 | 20.1 | 0.001 | 20.1 |
| 3.9 | SDKA053 | UT to Jones Creek | Intermittent | Stream | Silt Clay/ Gravel/ Organic | Stable, intermittent stream with moderately dense, mature forest buffer. Base flow, hydric soils, and amphibians were observed during the June 2021 field visit. | 36.1924 | -87.2536 | 36.1926 | -87.2536 | 3 | 0.5 | 21.5 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 79.4 | 0.006 | 89.4 |
| 4.1 | SDKA055 | UT to Jones Creek | Intermittent | Stream | Bedrock/ Gravel | Stable, intermittent stream with moderately dense, mature forest buffer. Base flow, amphibians, and moderate geomorphic attributes were observed during the June 2021 field visit. | 36.1948 | -87.2566 | 36.1950 | -87.2565 | 5 | 0.5 | 20.75 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.008 | 70.4 | 0.009 | 80.4 |
| 4.3 | SDKA012 | UT to Jones Creek | Ephemeral | WWC | Silt/ Clay | Ephemeral stream with a defined bed and bank in the upper reach with becomes disturbed in the lower reach. Some sinuosity is observed in the southern reach as the stream respondes to disturbance. Moderatley dense, mature forest buffer both banks of the stream. | 36.1979 | -87.2590 | 36.1982 | -87.2589 | 2 | 0.5 | 11.25 | NRPW | Y | Dry Open Cut | 0.004 | 10.0 | Pipeline Crossing | 0.004 | 89.1 | 0.005 | 99.1 |
| 4.5 | SDKA014 | UT to Gafford Branch | Perennial/ Spring | Stream | Cobble | Stable, spring fed channel with a moderately dense, mature forest buffer. Three distinct seepages were identified as steadily flowing and contributing to the baseflow. Mollusca and Plecoptera species were observed during the June 2021 field visit. | 36.1978 | -87.2622 | 36.1978 | -87.2621 | 3 | 0.2 | PI | RPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.001 | 9.3 | 0.001 | 19.3 |
| 4.5 | SDKA013 | Gafford Branch | Perennial | Stream | Bedrock | Stable, bedrock bottom, perennial stream with moderately dense mature forest buffer. Fish, Plecoptera species, Trichoptera species, Gastropoda species, and Odonata species observed during the June 2021 field visit. | 36.1979 | -87.2624 | 36.1977 | -87.2623 | 37.5 | 35 | PI | RPW | Y | Dry Open Cut | 0.009 | 10.0 | Pipeline Crossing | 0.057 | 66.0 | 0.065 | 76.0 |

AR  000990

**Table 1. Cumberland Waterbodies Impact Table**

| MP | Water-body ID | Waterbody Name | Flow Regime | TDEC HD Class | Substrate | Resource Description[1] | Start Lat | Start Long | End Lat | End Long | Avg Stream Bkf Width (Feet) | Avg OHWM / Bkf Height (Feet) | TDEC HD Score | USACE Pre-2015 Classification | Waterbody Intercepts Pipeline | Temp Crossing Impact Type | Acres | Linear Feet | Temp Workspace Impact Type | Acres | Linear Feet | Total Acres | Total Linear Feet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4.7 | SDKA015 | UT to Gafford Branch | Ephemeral | WWC | Organic | Ephemeral stream with moderately dense, mature forest buffer. The stream has a high gradient within the powerline crossing and is full of leaf litter. | 36.1984 | -87.2649 | 36.1985 | -87.2647 | 3 | 0.5 | 8.75 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.003 | 45.5 | 0.004 | 55.5 |
| 4.7 | SDKA016 | UT to Gafford Branch | Ephemeral | WWC | Organic | Dry, ephemeral streambed running down a steep draw. The stream is covered with leaf litter and has rooted plants within the channel. The stream is buffered by moderately dense, mature forest. | 36.1989 | -87.2655 | 36.1989 | -87.2656 | 1 | 0.5 | 13.5 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.000 | 10.9 | 0.000 | 20.9 |
| 5.2 | SDKA017 | UT to Gafford Branch | Ephemeral | WWC | Silt/Clay | Ephemeral drainage feature with a defined bed and moderately dense, mature forest buffer. However a defined bank was absent. | 36.2025 | -87.2730 | 36.2027 | -87.2732 | 2 | 0.5 | PI | NRPW | y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.004 | 87.0 | 0.004 | 97.0 |
| 5.3 | SDKA019 | UT to Gafford Branch | Ephemeral | WWC | Gravel | Ephemeral drainage feature with a moderately dense, mature forest buffer. The channel was steep and dry during the June 2021 field visit. | 36.2032 | -87.2735 | 36.2034 | -87.2743 | 3 | 1 | 8.75 | NRPW | y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 66.9 | 0.005 | 76.9 |
| 5.9 | SDKA020 | UT to Gafford Branch | Ephemeral | WWC | Gravel | Deep ephemeral stream which receives drainage from State Road 49 adjacent. The channel is buffered by primarily agricultural land with sparse trees along the bank. Some plants are rooted within the stream channel. | 36.2078 | -87.2827 | 36.2076 | -87.2830 | 8.5 | 4.5 | 17.25 | NRPW | Y | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.023 | 117.0 | 0.025 | 127.0 |
| 6.3 | SDKA028 | UT to Johnson Creek | Ephemeral | WWC | Silt/Clay | Ephemeral stream within a cattle pasture area. Although buffered by mature trees, the stream bed appears to receive disturbance from cattle traffic and is becoming overgrown with successional plants. | 36.2114 | -87.2891 | 36.2115 | -87.2889 | 2 | 1 | 9.75 | NRPW | N | N/A | 0.000 | 0.0 | Workspace Crossing | 0.001 | 14.7 | 0.001 | 14.7 |
| 6.4 | SDKA029 | UT to Johnson Creek | Ephemeral | WWC | Silt/ Clay/ Gravel | Unstable ephemeral stream with mature forest and pasture buffer. The channel is shallow and appears to receive disturbance from cattle traffic. | 36.2121 | -87.2909 | 36.2125 | -87.2907 | 2 | 0.5 | 11 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 65.3 | 0.003 | 75.3 |
| 6.4 | SDKA031 | UT to Johnson Creek | Ephemeral | WWC | Silt/Clay | Poorly developed ephemeral stream with moderately dense, mature forest buffer. The bed and bank have been severely disturbed by cattle traffic and vegetation has began to fill in the stream channel. | 36.2101 | -87.2907 | 36.2101 | -87.2906 | 2 | 0.2 | PI | NRPW | N | N/A | 0.000 | 0.0 | Access Road | 0.001 | 20.3 | 0.001 | 20.3 |
| | | | | | | | 36.2101 | -87.2911 | 36.2101 | -87.2910 | 2 | 0.2 | PI | NRPW | N | N/A | 0.000 | 0.0 | Access Road | 0.001 | 20.1 | 0.001 | 20.1 |
| 6.7 | SDKA030 | UT to Johnson Creek | Ephemeral | WWC | Organic | Poorly developed ephemeral stream with moderately dense, mature forest buffer. The bed and bank are poorly developed and the channel has strong leef litter and rooted plants. | 36.2141 | -87.2944 | 36.2142 | -87.2943 | 2 | 0.5 | 6.25 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.001 | 23.2 | 0.002 | 33.2 |

AR 000991

**Table 1. Cumberland Waterbodies Impact Table**

| MP | Water-body ID | Waterbody Name | Flow Regime | TDEC HD Class | Substrate | Resource Description[1] | Start Lat | Start Long | End Lat | End Long | Avg Stream Bkf Width (Feet) | Avg OHWM / Bkf Height (Feet) | TDEC HD Score | USACE Pre-2015 Classification | Waterbody Intercepts Pipeline | Temp. Crossing Impact Type | Temp. Crossing Acres | Temp. Crossing Linear Feet | Temp. Workspace Impact Type | Temp. Workspace Acres | Temp. Workspace Linear Feet | Total Acres | Total Linear Feet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7.1 | SDKA033 | UT to Johnson Creek | Intermittent | Stream | Bedrock | Intermittent steam with moderately dense, mature forest and maintained residential lawn buffer. The stream appears to be impounded by a pond upstream, outside of the project area. Therefore the stream lacked hydrology and biology during the June 2021 field visit. | 36.2180 | -87.3004 | 36.2179 | -87.3004 | 12.5 | 8 | 20.75 | RPW | Y | Dry Open Cut | 0.003 | 10.0 | Pipeline Crossing | 0.028 | 98.8 | 0.031 | 108.8 |
| 7.3 | SDKA034 | UT to Johnson Creek | Perennial | Stream | Cobble | Perennial stream with dense, mature forest buffer. Lotic species and fish were well developed. The stream appears to be well developed with stable banks and substrate. | 36.2187 | -87.3038 | 36.2186 | -87.3038 | 9.5 | 7 | PI | RPW | Y | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.015 | 67.2 | 0.017 | 77.2 |
| 7.3 | SDKA035 | UT to Johnson Creek | Ephemeral | WWC | Silt/Clay | Poorly developed ephemeral feature with mature, forested buffer. The bed and bank are poorly developed and the channel has strong leaf litter and rooted plants. | 36.2186 | -87.3039 | 36.2186 | -87.3038 | 2.5 | 1 | 9.75 | NRPW | N | N/A | 0.000 | 0.0 | Workspace Crossing | 0.002 | 43.1 | 0.002 | 43.1 |
| 8.0 | SDKA036 | Johnson Creek | Perennial | Stream | Bedrock/Cobble | Perennial stream with moderately dense, mature forest buffer with heavy agricultural distubance. The stream has well degined bed and bank with hydric soild present in the bed. | 36.2237 | -87.3132 | 36.2239 | -87.3141 | 10 | 6 | 23.25 | RPW | Y | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.058 | 252.7 | 0.060 | 262.7 |
| | | | | | | | 36.2237 | -87.3130 | 36.2237 | -87.3131 | 10 | 6 | 23.25 | RPW | N | N/A | 0.000 | 0.0 | Access Road | 0.005 | 21.0 | 0.005 | 21.0 |
| 8.1 | SDKA037 | UT to Johnson Creek | Ephemeral | WWC | Gravel | Weakly developed ephemeral feature within a narrow treeline between two agricultural fields. The feature has strong leaf liter, fibrous roots, and rooted plants in the channel bed. | 36.2243 | -87.3153 | 36.2248 | -87.3152 | 5.5 | 1 | 7.75 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.008 | 66.2 | 0.010 | 76.2 |
| 8.4 | SDKA038 | UT to Harris Branch | Intermittent | Stream | Cobble/ Gravel | Intermittent stream with a well defined bed and bank, buffered by forested and agricultural land usage. The stream is steep and rocky, and appears to have been filled with rocks from a historic wall/fence to control erosion. | 36.2283 | -87.3231 | 36.2283 | -87.3231 | 6 | 2 | 21.5 | RPW | N | N/A | 0.000 | 0.0 | Access Road | 0.003 | 23.1 | 0.003 | 23.1 |
| 8.5 | | | | | | | 36.2276 | -87.3211 | 36.2278 | -87.3211 | 6 | 2 | 21.5 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.010 | 71.9 | 0.011 | 81.9 |
| 8.5 | | | | | | | 36.2283 | -87.3222 | 36.2282 | -87.3224 | 6 | 2 | 21.5 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.009 | 66.1 | 0.010 | 76.1 |
| 8.6 | SDKA040 | UT to Harris Branch | Ephemeral | WWC | Organic | Poorly developed ephemeral feature with agricultural and sparse tree buffer. The feature is strongly overgrown with rooted plants in the channel bed. | 36.2291 | -87.3231 | 36.2291 | -87.3237 | 6.5 | 0.5 | PI | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.015 | 101.4 | 0.017 | 111.4 |
| 8.8 | SDKA041 | Harris Branch | Perennial | Stream | Cobble/ Gravel | Perennial stream with maintained residential and pasture land buffer, with sparse trees along the bank. The stream has been disturbed and channelized along Harris Hollow Road within the project area. | 36.2303 | -87.3252 | 36.2297 | -87.3253 | 6.5 | 4 | 28.25 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.012 | 80.3 | 0.013 | 90.3 |
| 9.5 | SDKA042 | UT to Bartons Creek | Perennial | Stream | Cobble/ Gravel | Perennial stream with agricultural and forested buffer which is cleared within the pipeline ROW. Isolated pools, amphibians, and wetland plants in the channel bed were observed. | 36.2349 | -87.3365 | 36.2345 | -87.3369 | 8 | 4 | 32.25 | RPW | Y | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.012 | 67.5 | 0.014 | 77.5 |

**Table 1. Cumberland Waterbodies Impact Table**

| MP | Water-body ID | Waterbody Name | Flow Regime | TDEC HD Class | Substrate | Resource Description[1] | Start Lat | Start Long | End Lat | End Long | Avg Stream Bkf Width (Feet) | Avg OHWM / Bkf Height (Feet) | TDEC HD Score | USACE Pre-2015 Classification | Waterbody Intercepts Pipeline | Temporary Waterbody Crossing Impacts (Trench) Impact Type | Acres | Linear Feet | Temporary Workspace Impacts/Disturbance (Outside Trench) Impact Type | Acres | Linear Feet | Total Impacts Acres | Linear Feet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10.0 | SDKB001 | Miller Branch | Perennial | Stream | Gravel | Perennial stream with maintained herbaceous and agricultural buffer, with sparse trees along the bank. The stream has been disturbed and channelized along State Road 48 within the project area. Lotic species, amphibians, and wetland plants in the channel bed were observed. | 36.2375 | -87.3453 | 36.2377 | -87.3453 | 20 | 3 | 29.5 | RPW | Y | Dry Open Cut | 0.005 | 10.0 | Pipeline Crossing | 0.045 | 97.6 | 0.049 | 107.6 |
| | | | | | | | 36.2365 | -87.3452 | 36.2365 | -87.3452 | 20 | 3 | 29.5 | RPW | N | N/A | 0.000 | 0.0 | Access Road | 0.010 | 20.7 | 0.010 | 20.7 |
| 10.1 | SDKB002 | Bartons Creek | Perennial | Stream | Cobble/ Gravel | Perennial stream with maintained herbaceous and agricultural buffer, with sparse trees along the bank. Lotic species and fish were observed. The stream appears to be well developed with stable banks, substrate, and ripple/run/pool complex. | 36.2379 | -87.3469 | 36.2382 | -87.3465 | 62.5 | 3 | PI | RPW | Y | Dry Open Cut | 0.014 | 10.0 | Pipeline Crossing | 0.147 | 102.6 | 0.162 | 112.6 |
| 11.0 | SDKB004 | UT to Nesbitt Branch | Intermittent | Stream | silt/ Gravel/ Cobble | Short ephemeral stream with a mixture of cattle pasture, residential, agricultural, and sparsely wooded buffer. The stream has a steep slope and rocky bed. | 36.2430 | -87.3608 | 36.2428 | -87.3614 | 12.5 | 2 | 28.75 | RPW | Y | Dry Open Cut | 0.003 | 10.0 | Pipeline Crossing | 0.022 | 76.5 | 0.025 | 86.5 |
| 11.1 | SDKB005 | UT to Nesbitt Branch | Intermittent | Stream | silt/ Gravel/ Cobble | Intermittent stream with a mixture of cattle pasture, residential, agricultural, and sparsely wooded buffer. The stream is first order and contains hydric soils in the bed. | 36.2436 | -87.3643 | 36.2440 | -87.3639 | 3.5 | 0.5 | 23 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 68.2 | 0.006 | 78.2 |
| 11.2 | SDKB006 | UT to Nesbitt Branch | Ephemeral | WWC | Silt/ Clay | Eroded ephemeral stream with a moderately dense, mature forest buffer. The channel is steep with high levels of leaf litter and rooted plants. | 36.2441 | -87.3658 | 36.2445 | -87.3658 | 3.5 | 0.5 | 5 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 70.0 | 0.006 | 80.0 |
| 11.4 | SDKB007 | UT to Nesbitt Branch | Ephemeral | WWC | Silt/ Clay | Steep ephemeral stream with direct connection to Nesbitt Branch. The stream is highly eroded and an agricultural and weedy herbaceous buffer. | 36.2455 | -87.3687 | 36.2454 | -87.3688 | 5 | 0.5 | 5 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.007 | 62.0 | 0.008 | 72.0 |
| 11.4 | SDKB008 | Nesbitt Branch | Perennial | Stream | Silt/ Clay | Perennial stream which becomes more defined downstream, outside of the project area. The stream has developed geomorphology and forested buffer, but lacks strong hydrology and biology. | 36.2452 | -87.3689 | 36.2455 | -87.3689 | 5 | 0.5 | 27.5 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 45.2 | 0.006 | 55.2 |
| 11.9 | SDKR002 | UT to Furnace Creek | Ephemeral | WWC | Silt/ Clay | Poorly developed ephemeral stream with moderately dense, mature forest and agricultural buffer. The bed and bank are poorly defined and the channel is filled with leaf litter. | 36.2474 | -87.3755 | 36.2481 | -87.3759 | 3.5 | 2 | 8 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.009 | 115.3 | 0.010 | 125.3 |
| 12.1 | SDKB009 | Furnace Creek | Perennial | Stream | Cobble | Perennial stream with moderately dense, mature forest on the right bank and agricultural row crops on the left bank. The stream has steep, eroded banks. Fish and lotic organisms were observed during the June 2021 field visit. | 36.2498 | -87.3804 | 36.2493 | -87.3808 | 55 | 25 | PI | RPW | Y | Dry Open Cut | 0.013 | 10.0 | Pipeline Crossing | 0.117 | 92.9 | 0.130 | 102.9 |

AR  000993

**Table 1. Cumberland Waterbodies Impact Table**

| MP | Water-body ID | Waterbody Name | Flow Regime | TDEC HD Class | Substrate | Resource Description[1] | Start Lat | Start Long | End Lat | End Long | Avg Stream Bkf Width (Feet) | Avg OHWM / Bkf Height (Feet) | TDEC HD Score | USACE Pre-2015 Classification | Waterbody Intercepts Pipeline | Temp. Crossing Impact Type | Temp. Crossing Acres | Temp. Crossing Linear Feet | Temp. Workspace Impact Type | Temp. Workspace Acres | Temp. Workspace Linear Feet | Total Acres | Total Linear Feet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13.6 | SDKB010 | UT to Dry Hollow Branch | Ephemeral | WWC | Silt/ Clay | Poorly defined ephemeral stream with sparsely forested buffer. The channel was highly vegetated with facultative species and did not contain hydric soils during the June 2021 field visit. | 36.2585 | -87.4036 | 36.2580 | -87.4040 | 2 | 1 | 4 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 70.3 | 0.004 | 80.3 |
| 13.9 | SDKR003 | UT to Dry Hollow Branch | Ephemeral | WWC | Silt/ Clay | Ephemeral stream with moderately dense forest and agricultural buffer. While this feature historically may have had a larger drainage area, it appears that the channel may have been relocated further east with surrounding development. The channel now has a high volume of leaf litter and ephemeral flow. | 36.2609 | -87.4118 | 36.2614 | -87.4088 | 4 | 3 | 11.5 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 65.4 | 0.007 | 75.4 |
| 14.0 | SDKB011 | Dry Hollow Branch | Perennial | Stream | Gravel | Perennial stream with residential, agricultural, and cattle pasture buffer. The stream appears to have been recently impacted due to construction of a bridge crossing. Fish and lotic organisms were observed during the June 2021 field visit. | 36.2610 | -87.4113 | 36.2610 | -87.4106 | 30 | 9.5 | PI | RPW | Y | Dry Open Cut | 0.007 | 10.0 | Pipeline Crossing | 0.135 | 196.3 | 0.142 | 206.3 |
| | | | | | | | 36.2614 | -87.4089 | 36.2614 | -87.4088 | 30 | 9.5 | PI | RPW | Y | N/A | 0.000 | 0.0 | Access Road | 0.014 | 21.0 | 0.014 | 21.0 |
| 14.3 | SDKR004 | UT to Dry Hollow Branch | Ephemeral | WWC | Gravel/Cobble/Silt/Clay | Poorly defined ephemeral stream which drains to SDKR006. The stream has a moderately dense mature forest buffer and strong amounts of fibrous roots and rooted plants within the channel bed. | 36.2609 | -87.4118 | 36.2614 | -87.4088 | 6 | 2 | 13 | NRPW | N | N/A | 0.000 | 0.0 | Workspace Crossing | 0.004 | 26.4 | 0.004 | 26.4 |
| 14.3 | SDKR005 | UT to Dry Hollow Branch | Intermittent | Stream | Gravel/Cobble/Silt/Clay | Poorly defined ephemeral stream which drains to SDKR006. The stream has a moderately dense mature forest buffer and strong amounts of fibrous roots and rooted plants within the channel bed. | 36.2609 | -87.4118 | 36.2614 | -87.4088 | 3.5 | 2 | 7 | RPW | N | N/A | 0.000 | 0.0 | Workspace Crossing | 0.002 | 25.7 | 0.002 | 25.7 |
| 14.6 | SDKA046 | UT to Dry Hollow Branch | Intermittent | Stream | Gravel/Cobble/Silt/Clay | Well defined ephemeral stream with gravel substrate. The stream has a moderately dense mature forest buffer and is cleared within the powerline ROW. | 36.2639 | -87.4195 | 36.2650 | -87.4198 | 8 | 1 | 19.5 | NRPW | Y | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.014 | 74.8 | 0.016 | 84.8 |
| 14.6 | SDKB013 | UT to Dry Hollow Branch | Ephemeral | WWC | Gravel | Ephemeral stream with moderately dense mature forest buffer cleared within the powerline ROW. Moderate amounts of fibrous roots and rooted plants within the channel bed. | 36.2649 | -87.4211 | 36.2649 | -87.4203 | 3.5 | 1 | 6 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.013 | 164.3 | 0.014 | 174.3 |
| 14.6 | SDKR006 | UT to Dry Hollow Branch | Ephemeral | WWC | Silt/ Clay | Ephemeral stream at the confluence of SDKR004 and SDKR005. The stream has a moderately dense mature forest buffer and fibrous roots within the channel bed. | 36.2609 | -87.4118 | 36.2614 | -87.4088 | 6 | 2.5 | 13 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.012 | 84.2 | 0.013 | 94.2 |
| 14.8 | SDKR007 | UT to Dry Hollow Branch | Ephemeral | WWC | Organic | Braided channel ephemeral stream with moderately dense mature forest buffer cleared within the powerline ROW. Moderate amount of rooted plants within the channel bed. | 36.2656 | -87.4237 | 36.2653 | -87.4233 | 2 | 0.5 | 16 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.004 | 96.8 | 0.005 | 106.8 |

JA0357

**Table 1. Cumberland Waterbodies Impact Table**

| MP | Water-body ID | Waterbody Name | Flow Regime | TDEC HD Class | Substrate | Resource Description[1] | Start Lat | Start Long | End Lat | End Long | Avg Stream Bkf Width (Feet) | Avg OHWM / Bkf Height (Feet) | TDEC HD Score | USACE Pre-2015 Classification | Waterbody Intercepts Pipeline | Temporary Waterbody Crossing Impacts (Trench) Impact Type | Acres | Linear Feet | Temporary Workspace Impacts/Disturbance (Outside Trench) Impact Type | Acres | Linear Feet | Total Impacts Acres | Total Impacts Linear Feet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15.0 | SDKB014 | UT to Dry Hollow Branch | Intermittent | Stream | Gravel | Poorly defined intermittent stream with moderately dense mature forest buffer cleared within the powerline ROW. The channel held water, but was not flowing during the June 2021 field visit. Moderate amount of rooted plants within the channel bed. | 36.2665 | -87.4261 | 36.2661 | -87.4265 | 5 | 0.5 | 23 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.011 | 94.3 | 0.012 | 104.3 |
| 15.1 | SDKR008 | UT to Dry Hollow Branch | Intermittent | Stream | silt/ gravel | Intermittent stream with moderately dense mature forest buffer cleared within the powerline ROW. The stream is strongly defined within the forested area and becomes less defined and braided within the powerline ROW. Crayfish and amphibians were observed during the June 2021 field visit. | 36.2668 | -87.4288 | 36.2670 | -87.4286 | 3 | 1.5 | 22 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 88.6 | 0.007 | 98.6 |
| | | | | | | | 36.2669 | -87.4287 | 36.2668 | -87.4287 | 3 | 1.5 | 22 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.003 | 39.2 | 0.003 | 49.2 |
| 15.2 | SDKB015 | UT to Woods Valley Branch | Ephemeral | WWC | Silt/ Clay | Dry bed ephemeral feature with sparsely wooded buffer, cleared within the powerline ROW. The feature is poorly developed with some fibrous roots and rooted plants within the channel bed. | 36.2670 | -87.4302 | 36.2675 | -87.4304 | 4.5 | 0.5 | 8 | NRPW | y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.009 | 85.4 | 0.010 | 95.4 |
| 15.2 | SDKR009 | UT to Dry Hollow Branch | Intermittent | WWC | Silt/ Clay | Intermittent stream with pasture and sparse woody vegetative buffer. The stream had a strong bed and bank and hydrology. Crayfish and amphibians were observed. | 36.2671 | -87.4301 | 36.2669 | -87.4306 | 2 | 1 | 30.5 | NRPW | y | N/A | 0.000 | 0.0 | Workspace Crossing | 0.001 | 11.3 | 0.001 | 11.3 |
| 15.5 | SDKB016 | UT to Little Bartons Creek | Ephemeral | WWC | Gravel | Ephemeral feature with sparsely wooded buffer, cleared within the powerline ROW. The feature is poorly developed with some fibrous roots and rooted plants within the channel bed. | 36.2683 | -87.4353 | 36.2687 | -87.4354 | 2 | 0.5 | 8 | NRPW | y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 68.7 | 0.004 | 78.7 |
| 15.6 | SDKB017 | UT to Little Bartons Creek | Ephemeral | WWC | Gravel | Ephemeral feature with sparsely wooded buffer, cleared within the powerline ROW. The feature has a strong amount of fibrous roots, rooted plants, and leaf litter within the channel bed. | 36.2691 | -87.4373 | 36.2687 | -87.4373 | 2 | 0.5 | 4 | NRPW | y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 67.6 | 0.004 | 77.6 |
| 15.8 | SDKB018 | UT to Little Bartons Creek | Ephemeral | WWC | Gravel | Ephemeral feature with a moderately forested buffer, cleared within the powerline ROW. The feature has a strong amount of fibrous roots, rooted plants, and leaf litter within the channel bed. | 36.2696 | -87.4396 | 36.2698 | -87.4404 | 4 | 1 | 4 | NRPW | N | N/A | 0.000 | 0.0 | Workspace Crossing | 0.026 | 277.8 | 0.026 | 277.8 |
| | | | | | | | 36.2718 | -87.4425 | 36.2718 | -87.4426 | 4 | 1 | 4 | NRPW | N | N/A | 0.000 | 0.0 | Access Road | 0.002 | 20.1 | 0.002 | 20.1 |
| 16.0 | SDKB019 | UT to Little Bartons Creek | Ephemeral | WWC | Silt/Clay/Sand | Ephemeral feature with a moderately forested buffer, cleared within the powerline ROW. The feature has a strong amount of fibrous roots, rooted plants, and leaf litter within the channel bed. | 36.2706 | -87.4435 | 36.2704 | -87.4436 | 2.5 | 1 | PI | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.003 | 54.6 | 0.004 | 64.6 |
| | | | | | | | 36.2718 | -87.4427 | 36.2717 | -87.4427 | 2.5 | 1 | PI | NRPW | N | N/A | 0.000 | 0.0 | Access Road | 0.002 | 32.7 | 0.002 | 32.7 |
| 16.1 | SDKB020 | UT to Little Bartons Creek | Ephemeral | WWC | Silt/ Clay/ Sand | Ephemeral feature with a moderately forested buffer, cleared within the powerline ROW. The feature has a strong amount of fibrous roots, rooted plants, and leaf litter within the channel bed. | 36.2710 | -87.4460 | 36.2713 | -87.4460 | 2 | 1 | 4 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 60.0 | 0.003 | 70.0 |

AR  000995

**Table 1. Cumberland Waterbodies Impact Table**

| MP | Water-body ID | Waterbody Name | Flow Regime | TDEC HD Class | Substrate | Resource Description[1] | Start Lat | Start Long | End Lat | End Long | Avg Stream Bkf Width (Feet) | Avg OHWM / Bkf Height (Feet) | TDEC HD Score | USACE Pre-2015 Classification | Waterbody Intercepts Pipeline | Temporary Waterbody Crossing Impacts (Trench) Impact Type | Acres | Linear Feet | Temporary Workspace Impacts/Disturbance (Outside Trench) Impact Type | Acres | Linear Feet | Total Impacts Acres | Linear Feet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16.7 | SDKB023 | Little Bartons Creek | Perennial | Stream | Silt/ Clay | Perennial stream with residential lawn and forested buffer cleared within the powerline ROW. The concrete road within the stream bed appears to lift the natural grade slightly. Multiple fish and lotic species were observed during the June 2021 field visit. | 36.2725 | -87.4518 | 36.2727 | -87.4524 | 20 | 1.5 | PI | RPW | Y | Dry Open Cut | 0.005 | 10.0 | Pipeline Crossing | 0.033 | 71.9 | 0.038 | 81.9 |
| 17.0 | SDKB024 | UT to Little Bartons Creek | Ephemeral | WWC | Silt/ Clay | Steep ephemeral feature with a moderately forested buffer. The feature has a strong amount of fibrous roots, rooted plants, and leaf litter within the channel bed. | 36.2740 | -87.4609 | 36.2738 | -87.4614 | 2.5 | 0.5 | 3.5 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.004 | 64.0 | 0.004 | 74.0 |
| 17.2 | SDKA056 | UT to Leatherwood Creek | Ephemeral | WWC | Silt Clay/ Organic/ Gravel | Steep ephemeral feature with a moderately forested buffer. The feature has a moderate amount of fibrous roots, rooted plants, and leaf litter within the channel bed. | 36.2747 | -87.4652 | 36.2750 | -87.4647 | 3.5 | 0.5 | 10 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.004 | 50.0 | 0.005 | 60.0 |
| 17.2 | SDKA057 | UT to Leatherwood Creek | Ephemeral | WWC | Silt Clay/ Organic/ Gravel | Poorly defined ephemeral feature with a moderately forested buffer. The feature has a moderate amount of fibrous roots, rooted plants, and leaf litter within the channel bed. | 36.2747 | -87.4652 | 36.2752 | -87.4654 | 2 | 0.5 | 7.75 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.004 | 81.2 | 0.004 | 91.2 |
| 17.5 | SDKA047 | UT to Leatherwood Creek | Ephemeral | WWC | Silt Clay/ Organic/ Gravel | Ephemeral feature with a moderately forested buffer, cleared within the powerline ROW. The feature has a moderate amount of fibrous roots, rooted plants, leaf litter, and trash within the channel bed. | 36.2749 | -87.4715 | 36.2748 | -87.4716 | 2 | 0.5 | 11.75 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.004 | 78.7 | 0.004 | 88.7 |
| 17.5 | SDKA047 | UT to Leatherwood Creek | Ephemeral | WWC | Silt Clay/ Organic/ Gravel | Ephemeral feature with a moderately forested buffer, cleared within the powerline ROW. The feature has a moderate amount of fibrous roots, rooted plants, leaf litter, and trash within the channel bed. | 36.2749 | -87.4715 | 36.2748 | -87.4716 | 2 | 0.5 | 11.75 | NRPW | N | N/A | 0.000 | 0.0 | Access Road | 0.001 | 20.1 | 0.001 | 20.1 |
| 19.0 | SDKB025 | UT to Leatherwood Creek | Intermittent | Stream | Cobble/Gravel | Well developed intermittent stream with agricultural pasture buffer, with sparse trees along the banks. The stream had isolated pools of water during the June 2021 field visit. While the stream scored strongly in geomorphology, it scored weakly in hydrology and biology. | 36.2833 | -87.4932 | 36.2837 | -87.4939 | 10 | 7 | 25 | RPW | Y | Dry Open Cut | 0.002 | 240.3 | Pipeline Crossing | 0.055 | 240.3 | 0.057 | 250.3 |
| 19.0 | SDKB025 | UT to Leatherwood Creek | Intermittent | Stream | Cobble/Gravel | | 36.2840 | -87.4947 | 36.2838 | -87.4951 | 10 | 7 | 25 | RPW | Y | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.027 | 117.0 | 0.029 | 127.0 |
| 19.1 | SDKB026 | Leatherwood Creek | Perennial | Stream | Cobble/Gravel | Perennial stream with cleared herbaceous and forested buffer along Leatherwood Road. The banks appear stable and multiple fish and lotic species were observed during the June 2021 field visit. | 36.2845 | -87.4962 | 36.2839 | -87.4960 | 22.5 | 3 | PI | RPW | Y | Dry Open Cut | 0.005 | 10.0 | Pipeline Crossing | 0.044 | 85.0 | 0.049 | 95.0 |

AR 000996

**Table 1. Cumberland Waterbodies Impact Table**

| MP | Water-body ID | Waterbody Name | Flow Regime | TDEC HD Class | Substrate | Resource Description[1] | Start Lat | Start Long | End Lat | End Long | Avg Stream Bkf Width (Feet) | Avg OHWM / Bkf Height (Feet) | TDEC HD Score | USACE Pre-2015 Classification | Waterbody Intercepts Pipeline | Temporary Waterbody Crossing Impacts (Trench) Impact Type | Acres | Linear Feet | Temporary Workspace Impacts/Disturbance (Outside Trench) Impact Type | Acres | Linear Feet | Total Impacts Acres | Linear Feet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19.2 | SDKB027 | UT to Leatherwood Creek | Intermittent | Stream | Cobble/ Gravel | Well developed intermittent stream with agricultural pasture buffer, with sparse trees along the banks. The stream had isolated pools of water during the June 2021 field visit. While the stream scored strongly in geomorphology, it scored weakly in hydrology and biology. | 36.2845 | -87.4980 | 36.2850 | -87.4978 | 10 | 7 | 22 | NRPW | Y | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.015 | 66.7 | 0.018 | 76.7 |
| 19.3 | SDKB028 | UT to Leatherwood Creek | Intermittent | Stream | Cobble/ Gravel | Well developed intermittent stream with moderately forested buffer cleared within the powerline ROW. The stream had isolated pools of water during the June 2021 field visit. While the stream scored strongly in geomorphology, it scored weakly in hydrology and biology. | 36.2855 | -87.4995 | 36.2856 | -87.5019 | 10 | 7 | 22 | RPW | Y | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.041 | 179.8 | 0.044 | 189.8 |
| 19.3 | SDKB028 | UT to Leatherwood Creek | Intermittent | Stream | Cobble/ Gravel | Well developed intermittent stream with moderately forested buffer cleared within the powerline ROW. The stream had isolated pools of water during the June 2021 field visit. While the stream scored strongly in geomorphology, it scored weakly in hydrology and biology. | 36.2855 | -87.5007 | 36.2855 | -87.5007 | 10 | 7 | 22 | RPW | N | N/A | 0.000 | 0.0 | Workspace Crossing | 0.041 | 179.8 | 0.044 | 4.4 |
| 19.8 | SDKR010 | UT to Leatherwood Creek | Ephemeral | WWC | Silt/ Clay/ Organic | Poorly defined ephemeral feature with a moderately forested buffer cleared within the powerline ROW. The feature has moderate to strong amounts of fibrous roots, rooted plants, and leaf litter within the channel bed. | 36.2881 | -87.5081 | 36.2877 | -87.5088 | 5 | 1 | 6 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.012 | 105.1 | 0.013 | 115.1 |
| 20.0 | SDKR011 | UT to Leatherwood Creek | Ephemeral | WWC | Silt/ Clay/ Organic | Poorly defined ephemeral feature with a moderately forested buffer cleared within the powerline ROW. The feature has moderate amounts of fibrous roots, rooted plants, and leaf litter within the channel bed. | 36.2893 | -87.5121 | 36.2887 | -87.5120 | 2 | 1 | 7 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.004 | 86.2 | 0.004 | 96.2 |
| **Houston County** | | | | | | | | | | | | | | | | | | | | | | | |
| 20.4 | SHNW002 | UT to Williamson Branch | Ephemeral | WWC | Silt/Clay/Gravel/ Sand | Ephemeral channel, narrow (~1ft wide), no visible water during June 2021 field assessment, weak hydrology/biology, no visible erosion, heavy leaf litter, moderately steep surrounding slopes, moderately dense immature forest. | 36.2909 | -87.5186 | 36.2907 | -87.5188 | 3.5 | 1 | 11.5 | NRPW | N | N/A | 0.000 | 0.0 | Workspace Crossing | 0.002 | 22.5 | 0.002 | 22.5 |
| 20.7 | SHNW003a | UT to Williamson Branch | Ephemeral | WWC | Silt/ Clay/ Organic | Ephemeral channel, narrow, somewhat dry, weak hydrology/biology, heavy leaf litter, moderately steep slopes, non-dense immature forest. | 36.2924 | -87.5231 | 36.2923 | -87.5243 | 3.5 | 3 | 15.25 | NRPW | y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.012 | 152.0 | 0.013 | 162.0 |
| 20.8 | SHNW004a | UT to Williamson Branch | Ephemeral | WWC | Silt/ Clay/ Organic | Ephemeral channel, weak hydrology/biology, heavy leaf litter, moderately steep slopes, non-dense immature forest, lots of blockage with vegetative debris. | 36.2931 | -87.5251 | 36.2927 | -87.5253 | 2 | 2 | 14.25 | NRPW | y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 69.6 | 0.004 | 79.6 |

**Table 1. Cumberland Waterbodies Impact Table**

| MP | Water-body ID | Waterbody Name | Flow Regime | TDEC HD Class | Substrate | Resource Description[1] | Start Lat | Start Long | End Lat | End Long | Avg Stream Bkf Width (Feet) | Avg OHWM / Bkf Height (Feet) | TDEC HD Score | USACE Pre-2015 Classification | Waterbody Intercepts Pipeline | Temp Crossing Impact Type | Temp Crossing Acres | Temp Crossing Linear Feet | Temp Workspace Impact Type | Temp Workspace Acres | Temp Workspace Linear Feet | Total Acres | Total Linear Feet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 21.1 | SHNC042 | UT to Williamson Branch | Ephemeral | WWC | Silt/ Clay/ Organic | Ephemeral channel, steep surrounding slopes, no visible bank, rocky bed, no inundation during June 2021 field visit, some signs of erosion, dense forest buffer. | 36.2945 | -87.5296 | 36.2940 | -87.5297 | 5 | 0.5 | 18 | NRPW | y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.008 | 73.0 | 0.010 | 83.0 |
| 21.2 | SHNC041 | UT to Williamson Branch | Ephemeral | WWC | Organic | Ephemeral channel, steep surrounding slopes, no visible bank, thick leaf litter, no signs of erosion, dense forest buffer. | 36.2951 | -87.5318 | 36.2947 | -87.5322 | 3.5 | 0.5 | 12.5 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 65.2 | 0.006 | 75.2 |
| 21.6 | SHNC001 | UT to Williamson Branch | Ephemeral | WWC | Organic | Ephemeral channel, gradual surrounding slopes, thick leaf litter and vegetation growth, no signs of erosion, dense hardwood forest. | 36.3376 | -87.6087 | 36.3372 | -87.6090 | 3.5 | 2.5 | 13.25 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.004 | 46.6 | 0.005 | 56.6 |
| 21.6 | SHNC002 | UT to Williamson Branch | Ephemeral | WWC | Organic | Ephemeral channel, gradual surrounding slopes, thick leaf litter and vegetation growth, no signs of erosion, dense hardwood forest. | 36.3401 | -87.6140 | 36.3403 | -87.6139 | 2 | 1.5 | PI | NRPW | N | N/A | 0.000 | 0.0 | Workspace Crossing | 0.001 | 17.6 | 0.001 | 17.6 |
| 21.6 | SHNC003 | UT to Williamson Branch | Ephemeral | WWC | Organic | Ephemeral channel, steep banks, gradual surrounding slopes, thick leaf litter, dense hardwood forest, indications that peak flow is high during storm events. | 36.3404 | -87.6145 | 36.3407 | -87.6144 | 6 | 1.5 | 15 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.011 | 83.3 | 0.013 | 93.3 |
| 21.7 | SHNC004 | UT to Williamson Branch | Ephemeral | WWC | Organic | Ephemeral channel, gradual surrounding slopes, thick leaf litter and vegetation growth, no signs of erosion, dense hardwood forest. | 36.2978 | -87.5409 | 36.2973 | -87.5410 | 3.5 | 2.5 | 15.5 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 61.9 | 0.006 | 71.9 |
| 21.8 | SHNC005 | UT to Williamson Branch | Ephemeral | WWC | Organic | Ephemeral channel, gradual surrounding slopes, thick leaf litter and vegetation growth, no signs of erosion, dense hardwood forest. | 36.297882 | -87.5421 | 36.2980 | -87.5424 | 3.5 | 1 | 8.5 | NRPW | N | N/A | 0.000 | 0.0 | Workspace Crossing | 0.009 | 110.0 | 0.009 | 110.0 |
| 21.9 | SHNC006 | UT to Yellow Creek | Ephemeral | WWC | Organic | Ephemeral channel, steep surrounding slopes, thick leaf litter and vegetation growth, moderately dense forest buffer. | 36.2986 | -87.5439 | 36.2985 | -87.5441 | 2 | 1 | 14 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 63.8 | 0.003 | 73.8 |
| 22.0 | SHNC006 | UT to Yellow Creek | Ephemeral | WWC | Organic | Ephemeral channel, steep surrounding slopes, thick leaf litter and vegetation growth, moderately dense forest buffer. | 36.2985 | -87.5451 | 36.2986 | -87.5453 | 2 | 1 | 14 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 69.7 | 0.004 | 79.7 |
| 22.3 | SHNC010-1 | UT to Yellow Creek | Intermittent | Stream | Organic | Intermittent stream with defined banks, steep surrounding slopes, moderately dense forest, no observed inundation or fauna. | 36.2978 | -87.5494 | 36.2978 | -87.5494 | 10 | 0.2 | 24.5 | RPW | Y | HDD | 0.000 | 0.0 | Pipeline Crossing | 0.000 | 0.0 | 0.000 | 0.0 |
| 22.4 | SHNC007-1 | Yellow Creek | Perennial | Stream | Cobble | Perennial stream ~50-100ft wide and ~1-5ft deep with good bio, surrounding dense mature forest and steep slopes. One side is cliff face. | 36.2982 | -87.5500 | 36.2982 | -87.5500 | 115 | 111 | PI | RPW | Y | HDD | 0.000 | 0.0 | Pipeline Crossing | 0.000 | 0.0 | 0.000 | 0.0 |
| 22.9 | SHNC018 | UT to Yellow Creek | Intermittent | Stream | Cobble | Intermittent stream with defined banks, steep surrounding slopes, moderately dense forest, small pools in certain locations, mostly dry during June 2021 field visit. | 36.3025 | -87.5572 | 36.3024 | -87.5575 | 25 | 4 | 22.25 | RPW | Y | Dry Open Cut | 0.006 | 10.0 | Pipeline Crossing | 0.051 | 88.9 | 0.057 | 98.9 |
| | | | | | | | 36.3021 | -87.5592 | 36.3021 | -87.5592 | 25 | 4 | 22.25 | RPW | N | N/A | 0.000 | 0.0 | Access Road | 0.012 | 20.1 | 0.012 | 20.1 |
| 23.2 | SHNC015 | UT to Yellow Creek | Ephemeral | WWC | Cobble | Ephemeral stream with defined banks, steep surrounding slopes, moderately dense forest, no observed inundation or fauna, thick leaf litter, erosion potential. | 36.3038 | -87.5628 | 36.3046 | -87.5635 | 10 | 7 | 17 | NRPW | Y | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.026 | 114.7 | 0.029 | 124.7 |

AR  000998

**Table 1. Cumberland Waterbodies Impact Table**

| MP | Water-body ID | Waterbody Name | Flow Regime | TDEC HD Class | Substrate | Resource Description[1] | Start Lat | Start Long | End Lat | End Long | Avg Stream Bkf Width (Feet) | Avg OHWM / Bkf Height (Feet) | TDEC HD Score | USACE Pre-2015 Classification | Waterbody Intercepts Pipeline | Temporary Waterbody Crossing Impacts (Trench) Impact Type | Acres | Linear Feet | Temporary Workspace Impacts/Disturbance (Outside Trench) Impact Type | Acres | Linear Feet | Total Impacts Acres | Linear Feet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23.2 | SHNC016 | UT to Yellow Creek | Ephemeral | WWC | Organic | Ephemeral channel, gradual surrounding slopes, thick leaf litter and vegetation growth, no signs of erosion, dense hardwood forest. | 36.3041 | -87.5630 | 36.3044 | -87.5632 | 3.5 | 1.25 | 5 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.007 | 88.5 | 0.008 | 98.5 |
| 23.2 | SHNC017 | UT to Yellow Creek | Ephemeral | WWC | Silt/Clay | Ephemeral channel, steep surrounding slopes, thick leaf litter and vegetation growth, moderately dense forest buffer, vegetative debris within flow path, dry during field visit. | 36.3038 | -87.5626 | 36.3041 | -87.5621 | 2 | 0.6 | 7 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 71.6 | 0.004 | 81.6 |
| 23.7 | SHNE001 | UT to Yellow Creek | Ephemeral | WWC | Cobble | Shallow/narrow ephemeral channel, shallow flat surrounding herbaceous pasture-type land. | 36.3070 | -87.5710 | 36.3065 | -87.5714 | 2 | 0.5 | 3.5 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.006 | 124.1 | 0.006 | 134.1 |
| 24.1 | SHNC019 | UT to Indian Branch | Ephemeral | WWC | Cobble | Ephemeral channel, gradual surrounding slopes, thick leaf litter and vegetation growth, no signs of erosion, moderately dense hardwood forest. | 36.3099 | -87.5766 | 36.3093 | -87.5764 | 8.5 | 1 | 10 | NRPW | Y | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.013 | 67.2 | 0.015 | 77.2 |
| 24.1 | SHNE002 | UT to Indian Branch | Ephemeral | WWC | Silt/Clay | Ephemeral channel, gradual surrounding slopes, thick leaf litter and vegetative debris, no signs of erosion, immature hardwood forest. | 36.3099 | -87.5770 | 36.3098 | -87.5770 | 2 | 0.5 | 1.5 | NRPW | N | N/A | 0.000 | 0.0 | Workspace Crossing | 0.004 | 92.2 | 0.005 | 11.8 |
| 24.1 | SHNE002 | UT to Indian Branch | Ephemeral | WWC | Silt/Clay | Ephemeral channel, gradual surrounding slopes, thick leaf litter and vegetative debris, no signs of erosion, immature hardwood forest. | 36.3098 | -87.5770 | 36.3096 | -87.5770 | 2 | 0.5 | 1.5 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.004 | 80.5 | 0.004 | 90.5 |
| 24.1 | SHNC020* | Indian Branch | Intermittent | Stream | Silt/ Clay | Intermittent channel, steep eroded banks, gradual surrounding slopes, moderately dense forest buffer, no observed fauna. | 36.3100 | -87.5770 | 36.3094 | -87.5772 | 8.5 | 4 | 23 | RPW | Y | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.014 | 74.0 | 0.016 | 84.0 |
| 24.3 | SHNC021 | UT to Indian Branch | Ephemeral | WWC | Silt/Clay | Ephemeral channel, steep eroded banks, gradual surrounding slopes, moderately dense forest buffer, no observed fauna. | 36.3106 | -87.5796 | 36.3103 | -87.5796 | 3.5 | 0.1 | 13.5 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 77.1 | 0.007 | 87.1 |
| 24.4 | SHNC022 | UT from Guices Branch | Ephemeral | WWC | Cobble | Ephemeral channel, vegetated banks, gradual surrounding slopes, moderately dense forest buffer, no observed fauna, slight inundation. | 36.3114 | -87.5814 | 36.3123 | -87.5818 | 3.5 | 0.2 | 13.25 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.009 | 106.4 | 0.009 | 116.4 |
| 24.5 | SHNC023 | UT from Guices Branch | Intermittent | Stream | Silt/Clay | Intermittent stream, steep eroded banks, gradual surrounding slopes, immature forest, no observed fauna, no inundation June 2021. | 36.3118 | -87.5828 | 36.3124 | -87.5822 | 3.5 | 0.1 | 23 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 79.0 | 0.007 | 89.0 |
| 24.6 | SHNC024 | UT from Guices Branch | Ephemeral | WWC | Cobble | Ephemeral channel, vegetated banks, heavy leaf litter, gradual surrounding slopes, dense forest cover, no observed fauna. | 36.3130 | -87.5847 | 36.3138 | -87.5843 | 3.5 | 0.1 | 13.5 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 70.7 | 0.006 | 80.7 |
| 24.7 | SHNC025 | UT from Guices Branch | Ephemeral | WWC | Silt/Clay | Ephemeral channel, gradual surrounding slopes, steep banks, erosion potential, moderately dense hardwood forest. | 36.3141 | -87.5860 | 36.3146 | -87.5858 | 3.5 | 0.2 | 13.5 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 79.7 | 0.007 | 89.7 |

AR  000999

**Table 1. Cumberland Waterbodies Impact Table**

| MP | Water-body ID | Waterbody Name | Flow Regime | TDEC HD Class | Substrate | Resource Description[1] | Start Lat | Start Long | End Lat | End Long | Avg Stream Bkf Width (Feet) | Avg OHWM / Bkf Height (Feet) | TDEC HD Score | USACE Pre-2015 Classification | Waterbody Intercepts Pipeline | Temporary Waterbody Crossing Impacts (Trench) Impact Type | Acres | Linear Feet | Temporary Workspace Impacts/Disturbance (Outside Trench) Impact Type | Acres | Linear Feet | Total Impacts Acres | Linear Feet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25.1 | SHNC023-2 | UT from Guices Branch | Ephemeral | WWC | Silt/Clay/Gravel | Intermittent stream, steep slide slopes, gradual surrounding slopes, immature forest buffer, shallow inundation, evidence of high flow during storm events. | 36.3187 | -87.5878 | 36.3188 | -87.5877 | 3.5 | 0.1 | 22.5 | NRPW | N | N/A | 0.000 | 0.0 | Access Road | 0.002 | 20.6 | 0.002 | 20.6 |
| 25.4 | SHNC030 | UT from Guices Branch | Intermittent | Stream | Gravel | Intermittent stream, defined banks, gradual surrounding slopes, immature forest buffer, shallow inundation, ~5ft wide. | 36.3195 | -87.5886 | 36.3219 | -87.5923 | 10 | 4 | 22.75 | RPW | Y | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.016 | 69.5 | 0.018 | 79.5 |
| 25.4 | SHNE007 | UT from Guices Branch | Ephemeral | WWC | Cobble | Ephemeral feature, heavy leave litter, no defined banks, gradual surrounding slopes, sparse forest cover, no inundation during field visit, no observed fauna. | 36.3225 | -87.5920 | 36.3231 | -87.5916 | 2 | 1 | 3.5 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 67.2 | 0.004 | 77.2 |
| 25.6 | SHNE003 | UT from Guices Branch | Intermittent | Stream | Cobble/Gravel/Silt/Organic | Ephemeral feature, slightly eroded banks, heavy leaf litter, narrow, gradual surrounding slopes, no inundation, no evidence of fauna. Moderately dense forest buffer. | 36.3243 | -87.5930 | 36.3241 | -87.5939 | 3.5 | 2 | 20.25 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 65.1 | 0.006 | 75.1 |
| 25.7 | SHNE004 | UT from Guices Branch | Ephemeral | WWC | Organic/Cobble/Gravel | Ephemeral feature, heavy leaf litter, no defined banks, gradual surrounding slopes, immature forest cover, no inundation during field visit, no observed fauna. | 36.3252 | -87.5947 | 36.3253 | -87.5949 | 2 | 1 | 1.5 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.002 | 53.6 | 0.003 | 63.6 |
| | | | | | | | 36.3253 | -87.5948 | 36.3252 | -87.5950 | 2 | 1 | 1.5 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 66.5 | 0.004 | 76.5 |
| 25.8 | SHNE005 | UT from Guices Branch | Ephemeral | WWC | Organic/Silt/Gravel/Cobble | Ephemeral feature with somewhat defined banks, heavy leaf litter, gradual adjacent slopes, moderately dense immature forest cover, no obsevrd inundation or fauna. | 36.3267 | -87.5955 | 36.3264 | -87.5962 | 3.5 | 1 | 3 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.007 | 92.0 | 0.008 | 102.0 |
| 25.8 | SHNE006 | UT from Guices Branch | Ephemeral | WWC | Silt/Organic | Ephemeral feature with somewhat defined banks, heavy leaf litter, gradual adjacent slopes, moderately dense immature forest cover, no observed inundation or fauna. | 36.3268 | -87.5957 | 36.3265 | -87.5962 | 4 | 3 | 5 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 66.1 | 0.007 | 76.1 |
| 26.2 | SHNA011 | UT from Guices Branch | Intermittent | Stream | Gravel/Cobble | Intermittent stream ~10ft wide with defined vegetated side slopes and dense forest buffer. Rocky non-inundated substrate at the time of field visit August 2021. | 36.3313 | -87.6007 | 36.3312 | -87.6009 | 12.5 | 2 | 28.5 | RPW | Y | Dry Open Cut | 0.003 | 10.0 | Pipeline Crossing | 0.019 | 65.3 | 0.022 | 75.3 |
| | | | | | | | 36.3310 | -87.6011 | 36.3309 | -87.6012 | 12.5 | 2 | 28.5 | RPW | N | N/A | 0.000 | 0.0 | Access Road | 0.007 | 22.9 | 0.007 | 22.9 |
| 26.4 | SHNA012 | Guices Branch | Intermittent | Stream | Gravel/Cobble | Intermittent stream ~15ft wide with defined vegetated side slopes and dense herbaceous/shrubby buffer. Rocky non-inundated substrate during field visit. | 36.3327 | -87.6041 | 36.3329 | -87.6040 | 17.5 | 1 | PI | RPW | Y | Dry Open Cut | 0.004 | 10.0 | Pipeline Crossing | 0.033 | 82.7 | 0.037 | 92.7 |
| | | | | | | | 36.3309 | -87.6035 | 36.3309 | -87.6036 | 17.5 | 1 | PI | RPW | N | N/A | 0.000 | 0.0 | Access Road | 0.008 | 20.6 | 0.008 | 20.6 |
| 26.9 | SHNA001 | Guices Creek | Perennial | Stream | Cobble | Well developed intermittent stream with cattle pasture and maintained highway buffer. While the stream has high geomorphology, it lacks hydrology and biology. The stream has likely been channelized due to roadway and farming development. | 36.3376 | -87.6087 | 36.3372 | -87.6090 | 20 | 15 | 28.5 | RPW | Y | Dry Open Cut | 0.005 | 10.0 | Pipeline Crossing | 0.031 | 68.6 | 0.036 | 78.6 |

**Table 1. Cumberland Waterbodies Impact Table**

| MP | Water-body ID | Waterbody Name | Flow Regime | TDEC HD Class | Substrate | Resource Description[1] | Start Lat | Start Long | End Lat | End Long | Avg Stream Bkf Width (Feet) | Avg OHWM / Bkf Height (Feet) | TDEC HD Score | USACE Pre-2015 Classification | Waterbody Intercepts Pipeline | Temporary Waterbody Crossing Impacts (Trench) Impact Type | Acres | Linear Feet | Temporary Workspace Impacts/Disturbance (Outside Trench) Impact Type | Acres | Linear Feet | Total Impacts Acres | Total Impacts Linear Feet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27.2 | SHNA002 | UT to Guices Creek | Ephemeral | WWC | Silt/Clay/Cobble /Gravel | Poorly developed ephemeral feature located within a small forested tract within agricultural fields. The feature is steep and has strong amounts of fibrous roots and rooted palnts within the channel bed. | 36.3401 | -87.6140 | 36.3403 | -87.6139 | 2 | 0.5 | 9 | NRPW | N | N/A | 0.000 | 0.0 | Workspace Crossing | 0.000 | 5.4 | 0.000 | 5.4 |
| 27.3 | SHNA003 | UT from Guices Branch | Ephemeral | WWC | Silt/ Clay/ Cobble/ Gravel | Poorly developed ephemeral feature located within a forested tract within agricultural fields. The feature has strong amounts of fibrous roots and rooted palnts within the channel bed and active animal burrows. | 36.3404 | -87.6145 | 36.3407 | -87.6144 | 2 | 0.5 | PI | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.002 | 40.0 | 0.002 | 50.0 |
| 27.3 | SHNA005 | UT to Guices Creek | Ephemeral | WWC | Organic | Poorly developed ephemeral feature located within a sparsely forested tract. The feature has a very faint bed and bank and strong amounts of fibrous roots and rooted palnts within the channel bed. | 36.3406 | -87.6148 | 36.3409 | -87.6147 | 2 | 0.5 | PI | NRPW | N | N/A | 0.000 | 0.0 | Workspace Crossing | 0.002 | 38.7 | 0.002 | 38.7 |
| 27.5 | SHNA007 | UT to Guices Creek | Ephemeral | WWC | Gravel | Moderately developed ephemeral feature with a roadway and sparse woody vegetation adjacent. While the stream has developed geomorphology it is weak in hydrology and biology. | 36.3429 | -87.6182 | 36.3428 | -87.6186 | 6 | 2 | PI | NRPW | N | N/A | 0.000 | 0.0 | Workspace Crossing | 0.003 | 20.0 | 0.003 | 20.0 |
| 27.5 | SHNB031 | UT to Guices Creek | Ephemeral | WWC | Silt/ Clay | Weakly developed ephemeral feature with agricultural buffer. The feature had strong amounts of fibrous roots and rooted palnts in the channel bed. | 36.3429 | -87.6182 | 36.3430 | -87.6178 | 6 | 2 | 3 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.010 | 73.0 | 0.011 | 83.0 |
| 28.0 | SHNB030 | UT to Guices Creek | Intermittent | Stream | Silt/ Clay | Weakly developed intermittent stream with forested buffer which is cleared within the powerline ROW. Isolated pools were observed during the June 2021 field visit. A trail crosses the stream within the project area. | 36.3472 | -87.6254 | 36.3476 | -87.6256 | 3.5 | 2 | 20.75 | RPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.013 | 158.1 | 0.014 | 168.1 |
|  |  |  |  |  |  |  | 36.3477 | -87.6257 | 36.3478 | -87.6258 | 3.5 | 2 | 20.75 | RPW | N | N/A | 0.000 | 0.0 | Access Road | 0.002 | 30.8 | 0.002 | 30.8 |
| 28.6 | SHNB033-1 | Lickskillet Branch | Perennial | Stream | Cobble/ Gravel | Perennial stream with a thin forested buffer within agricultural pasture land. Fish and lotic species were observed during the June 2021 field visit. | 36.3527 | -87.6339 | 36.3520 | -87.6339 | 22.5 | 3 | PI | RPW | Y | Dry Open Cut | 0.005 | 94.9 | Pipeline Crossing | 0.049 | 94.9 | 0.054 | 104.9 |
| 28.9 | SHNB033-2 | Lickskillet Branch | Perennial | Stream | Cobble/ Gravel | Perennial stream with a forested buffer on the left bank and roadside herbaceous on the right bank. Fish and lotic species were observed during the June 2021 field visit. The stream appears to be disturbed and channelized from Kizer Ridge Road. | 36.3549 | -87.6388 | 36.3551 | -87.6379 | 10 | 3 | PI | RPW | Y | Dry Open Cut | 0.002 | 129.4 | Pipeline Crossing | 0.030 | 129.4 | 0.032 | 139.4 |
| 29.0 | SHNA008 | UT to Lickskillet Branch | Perennial | Stream | Gravel/Cobble/ Silt/Clay | Perennial stream with mature forested buffer. Fish and aquatic speces were observed during the June 2021 field visit. | 36.3548 | -87.6395 | 36.3547 | -87.6395 | 3.5 | 0.5 | PI | RPW | N | N/A | 0.000 | 0.0 | Workspace Crossing | 0.004 | 43.6 | 0.004 | 43.6 |
|  |  |  |  |  |  |  | 36.3544 | -87.6395 | 36.3546 | -87.6395 | 3.5 | 0.5 | PI | RPW | N | N/A | 0.000 | 0.0 | Access Road | 0.005 | 61.6 | 0.005 | 61.6 |

AR  001001

**Table 1. Cumberland Waterbodies Impact Table**

| MP | Water-body ID | Waterbody Name | Flow Regime | TDEC HD Class | Substrate | Resource Description[1] | Start Lat | Start Long | End Lat | End Long | Avg Stream Bkf Width (Feet) | Avg OHWM / Bkf Height (Feet) | TDEC HD Score | USACE Pre-2015 Classification | Waterbody Intercepts Pipeline | Temporary Waterbody Crossing Impacts (Trench) Impact Type | Acres | Linear Feet | Temporary Workspace Impacts/Disturbance (Outside Trench) Impact Type | Acres | Linear Feet | Total Impacts Acres | Linear Feet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 29.0 | SHNA013 | UT to Lickskillet Branch | Ephemeral | WWC | Silt/ Clay | Poorly developed ephemeral feature with herbaceous buffer and sparse trees. The feature had strong amounts of fibrous roots and rooted plants in the channel bed. | 36.3557 | -87.6390 | 36.3558 | -87.6398 | 2 | 1 | 12 | NRPW | Y | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.005 | 114.4 | 0.006 | 124.4 |
| 29.0 | SHNB032 | UT to Lickskillet Branch | Ephemeral | WWC | Silt/ Clay | Poorly developed ephemeral feature with maintained herbaceous buffer with spare trees. The feature has strong amounts of fibrous roots and rooted palnts within the channel bed. | 36.3558 | -87.6400 | 36.3562 | -87.6397 | 6.5 | 2 | 3 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.011 | 74.2 | 0.013 | 84.2 |
| 30.2 | SHNB034 | UT to Lickskillet Branch | Ephemeral | WWC | Silt/ Clay | Ephemeral stream with pasture buffer and sparse trees. The stream is heavily vegetated and connected to Wetland WHNB02. | 36.3663 | -87.6556 | 36.3668 | -87.6556 | 3.5 | 2 | 12 | NRPW | Y | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 67.9 | 0.006 | 77.9 |
| 30.2 | SHNB033-3 | Lickskillet Branch | Perennial | Stream | Cobble/ Gravel | Perennial stream with a thin forested buffer within agricultural pasture land. Fish and lotic species were observed during the June 2021 field visit. The stream appears to be disturbed and channelized from previous development. | 36.3664 | -87.6559 | 36.3676 | -87.6563 | 17.5 | 3 | PI | RPW | Y | Dry Open Cut | 0.004 | 10.0 | Pipeline Crossing | 0.027 | 66.4 | 0.031 | 76.4 |
| **Stewart County** | | | | | | | | | | | | | | | | | | | | | | | |
| 30.7 | SHNA010 | Wells Creek | Perennial | Stream | Loam / Gravel/ Organic/ Cobble | Perennial stream with a thin forested buffer within agricultural pasture land. Fish and lotic species were observed during the June 2021 field visit. Banks appear stable with rock shelves within the channel. | 36.3713 | -87.6622 | 36.3716 | -87.6612 | 60 | 3 | PI | RPW | Y | HDD | 0.000 | 0.0 | Pipeline Crossing | 0.000 | 0.0 | 0.000 | 0.0 |

[1] Resource Description - In general, all channel reaches evaluated within the Project study area ranged between 50 and 300 ft

AR 001002

**Table 2. Cumberland Wetland Impacts**

| Wetland ID | Mile Post | County | Cowardin Classification[1] | HGM Classification | Latitude | Longitude | Additional Temporary Workspace (acres) | Access Roads (acres) | Temporary Workspace for Construction (acres) | New Permanent Easement/ Operations (acres) | Total Workspace (acres) | Crossing Method[2] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WDKB001 | 12.1 | Dickson | PFO | Riverine | 36.2494 | -87.3803 | 0 | 0 | 0.01 | 0.02 | **0.03** | Open Cut |
| WHNW001 | 20.2 | Dickson | PEM | Depressional | 36.2903 | -87.5159 | 0 | 0 | 0.03 | <0.01 | **0.03** | Open Cut |
| WHNW002 | 20.8 | Houston | PEM | Depressional | 36.2926 | -87.5251 | 0 | 0.01 | 0 | 0 | **0.01** | Open Cut |
| WHNA001 | 29 | Houston | PEM | Depressional | 36.3558 | -87.6394 | 0 | 0 | 0.09 | 0 | **0.09** | Open Cut |
| WHNB002 | 30.1 | Houston | PFO | Riverine | 36.3664 | -87.6554 | 0 | 0 | <0.01 | 0 | **<0.01** | Open Cut |
| WSTA001 | 31 | Stewart | PEM | Depressional | 36.3722 | -87.6662 | 0.02 | 0 | 0.04 | 0.05 | **0.11** | Open Cut |
| | | | | | | **PEM** | 0.02 | 0.01 | 0.16 | 0.05 | **0.24** | |
| | | | | | | **PFO** | 0 | 0 | 0.01 | 0.02 | **0.03** | |
| | | | | | | **Total** | **0.02** | **0.01** | **0.17** | **0.07** | **0.27** | |

[1] Designations for each type of wetland follow the classifications developed by the United States Fish and Wildlife Service ("USFWS") after Cowardin et al. (1979). PEM = Palustrine Emergent Wetland, PFO = Palustrine Forested Wetland

[2] Crossing Methods: SWC = Standard Wetland Construction; CWC = Conventional Wetland Construction

Note: Temporary Workspace includes both Additional Temporary Workspaces and Access Roads.

AR  001003

**Table 3.  Cumberland Pond Impacts**

| Wetland ID | Mile Post | County | Flow Type | Latitude | Longitude | Additional Temporary Workspace (acres) | Access Roads (acres) | Temporary Workspace for Construction (acres) | New Permanent Easement/ Operations (acres) | Total Workspace (acres) | Crossing Method[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WBDKB002 | 10.6 | Dickson | Pond | 36.2408 | -87.3552 | 0 | 0 | 0.07 | 0.05 | 0.12 | Open Cut |
| WBDKB007 | 17.1 | Houston | Pond | 36.2741 | -87.4616 | 0 | 0 | 0.05 | 0.04 | 0.09 | Open Cut |
| | | | | | Total | 0 | 0 | 0.12 | 0.09 | 0.20 | |

[1] Crossing Methods: SWC = Standard Wetland Construction; CWC = Conventional Wetland Construction

Note: Temporary Workspace includes both Additional Temporary Workspaces and Access Roads.

JA0367

AR  001004

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC**
**RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

# **Attachment 5** – Comprehensive Environmental Construction Management Plans



**APPENDIX A**

# FERC *Upland Erosion Control, Revegetation, and Maintenance Plan*

AR 001451





**Office of
Energy Projects**

**May 2013**

# UPLAND EROSION CONTROL,

# REVEGETATION, AND

# MAINTENANCE PLAN

Washington, DC 20426

MAY 2013 VERSION

JA0370

AR  001452

# UPLAND EROSION CONTROL, REVEGETATION, AND MAINTENANCE PLAN

## TABLE OF CONTENTS

I.  APPLICABILITY ................................................................................................ 1

II.  SUPERVISION AND INSPECTION .................................................................. 2
    A.     ENVIRONMENTAL INSPECTION ........................................................ 2
    B.     RESPONSIBILITIES OF ENVIRONMENTAL INSPECTORS ................. 2

III.  PRECONSTRUCTION PLANNING ................................................................ 4
    A.     CONSTRUCTION WORK AREAS ........................................................ 4
    B.     DRAIN TILE AND IRRIGATION SYSTEMS ........................................ 4
    C.     GRAZING DEFERMENT ....................................................................... 5
    D.     ROAD CROSSINGS AND ACCESS POINTS ........................................ 5
    E.     DISPOSAL PLANNING ......................................................................... 5
    F.     AGENCY COORDINATION ................................................................. 5
    G.     SPILL PREVENTION AND RESPONSE PROCEDURES ...................... 6
    H.     RESIDENTIAL CONSTRUCTION ....................................................... 6
    I.     WINTER CONSTRUCTION PLANS ..................................................... 6

IV.  INSTALLATION ............................................................................................. 7
    A.     APPROVED AREAS OF DISTURBANCE ............................................ 7
    B.     TOPSOIL SEGREGATION ................................................................... 8
    C.     DRAIN TILES ...................................................................................... 9
    D.     IRRIGATION ....................................................................................... 9
    E.     ROAD CROSSINGS AND ACCESS POINTS ........................................ 9
    F.     TEMPORARY EROSION CONTROL ................................................... 9
        1.    Temporary Slope Breakers ....................................................... 9
        2.    Temporary Trench Plugs ........................................................ 10
        3.    Sediment Barriers ................................................................... 10
        4.    Mulch ..................................................................................... 11

V.  RESTORATION ............................................................................................... 12
    A.     CLEANUP ........................................................................................... 12
    B.     PERMANENT EROSION CONTROL DEVICES ................................. 13
        1.    Trench Breakers ..................................................................... 13
        2.    Permanent Slope Breakers ...................................................... 14
    C.     SOIL COMPACTION MITIGATION ................................................... 14
    D.     REVEGETATION ............................................................................... 15
        1.    General ................................................................................... 15
        2.    Soil Additives ........................................................................ 15
        3.    Seeding Requirements ............................................................ 15

VI.  OFF-ROAD VEHICLE CONTROL ............................................................... 16

VII.  POST-CONSTRUCTION ACTIVITIES AND REPORTING ........................ 17
    A.     MONITORING AND MAINTENANCE ............................................... 17
    B.     REPORTING ....................................................................................... 18

**UPLAND EROSION CONTROL, REVEGETATION,
AND MAINTENANCE PLAN (PLAN)**

I.    <u>APPLICABILITY</u>

A.    The intent of this Plan is to assist project sponsors by identifying baseline mitigation measures for minimizing erosion and enhancing revegetation.  Project sponsors shall specify in their applications for a new FERC authorization and in prior notice and advance notice filings, any individual measures in this Plan they consider unnecessary, technically infeasible, or unsuitable due to local conditions and fully describe any alternative measures they would use.  Project sponsors shall also explain how those alternative measures would achieve a comparable level of mitigation.

Once a project is authorized, project sponsors can request further changes as variances to the measures in this Plan (or the applicant's approved plan). The Director of the Office of Energy Projects (Director) will consider approval of variances upon the project sponsor's written request, if the Director agrees that a variance:

1.    provides equal or better environmental protection;

2.    is necessary because a portion of this Plan is infeasible or unworkable based on project-specific conditions; or

3.    is specifically required in writing by another federal, state, or Native American land management agency for the portion of the project on its land or under its jurisdiction.

Sponsors of projects planned for construction under the automatic authorization provisions in the FERC's regulations must receive written approval for any variances in advance of construction.

Project-related impacts on wetland and waterbody systems are addressed in the staff's Wetland and Waterbody Construction and Mitigation Procedures (Procedures).

MAY 2013 VERSION

II.    SUPERVISION AND INSPECTION

    A.    ENVIRONMENTAL INSPECTION

        1.    At least one Environmental Inspector is required for each construction spread during construction and restoration (as defined by section V). The number and experience of Environmental Inspectors assigned to each construction spread shall be appropriate for the length of the construction spread and the number/significance of resources affected.

        2.    Environmental Inspectors shall have peer status with all other activity inspectors.

        3.    Environmental Inspectors shall have the authority to stop activities that violate the environmental conditions of the FERC's Orders, stipulations of other environmental permits or approvals, or landowner easement agreements; and to order appropriate corrective action.

    B.    RESPONSIBILITIES OF ENVIRONMENTAL INSPECTORS

    At a minimum, the Environmental Inspector(s) shall be responsible for:

        1.    Inspecting construction activities for compliance with the requirements of this Plan, the Procedures, the environmental conditions of the FERC's Orders, the mitigation measures proposed by the project sponsor (as approved and/or modified by the Order), other environmental permits and approvals, and environmental requirements in landowner easement agreements.

        2.    Identifying, documenting, and overseeing corrective actions, as necessary to bring an activity back into compliance;

        3.    Verifying that the limits of authorized construction work areas and locations of access roads are visibly marked before clearing, and maintained throughout construction;

        4.    Verifying the location of signs and highly visible flagging marking the boundaries of sensitive resource areas, waterbodies, wetlands, or areas with special requirements along the construction work area;

        5.    Identifying erosion/sediment control and soil stabilization needs in all areas;

        6.    Ensuring that the design of slope breakers will not cause erosion or direct water into sensitive environmental resource areas, including cultural resource sites, wetlands, waterbodies, and sensitive species habitats;

7. Verifying that dewatering activities are properly monitored and do not result in the deposition of sand, silt, and/or sediment into sensitive environmental resource areas, including wetlands, waterbodies, cultural resource sites, and sensitive species habitats; stopping dewatering activities if such deposition is occurring and ensuring the design of the discharge is changed to prevent reoccurrence; and verifying that dewatering structures are removed after completion of dewatering activities;

8. Ensuring that subsoil and topsoil are tested in agricultural and residential areas to measure compaction and determine the need for corrective action;

9. Advising the Chief Construction Inspector when environmental conditions (such as wet weather or frozen soils) make it advisable to restrict or delay construction activities to avoid topsoil mixing or excessive compaction;

10. Ensuring restoration of contours and topsoil;

11. Verifying that the soils imported for agricultural or residential use are certified as free of noxious weeds and soil pests, unless otherwise approved by the landowner;

12. Ensuring that erosion control devices are properly installed to prevent sediment flow into sensitive environmental resource areas (e.g., wetlands, waterbodies, cultural resource sites, and sensitive species habitats) and onto roads, and determining the need for additional erosion control devices;

13. Inspecting and ensuring the maintenance of temporary erosion control measures at least:

    a. on a daily basis in areas of active construction or equipment operation;

    b. on a weekly basis in areas with no construction or equipment operation; and

    c. within 24 hours of each 0.5 inch of rainfall;

14. Ensuring the repair of all ineffective temporary erosion control measures within 24 hours of identification, or as soon as conditions allow if compliance with this time frame would result in greater environmental impacts;

15. Keeping records of compliance with the environmental conditions of the FERC's Orders, and the mitigation measures proposed by the project sponsor in the application submitted to the FERC, and other federal or state environmental permits during active construction and restoration;

MAY 2013 VERSION

AR  001456

16.     Identifying areas that should be given special attention to ensure stabilization and restoration after the construction phase; and

17.     Verifying that locations for any disposal of excess construction materials for beneficial reuse comply with section III.E.

III.    PRECONSTRUCTION PLANNING

The project sponsor shall do the following before construction:

A.      CONSTRUCTION WORK AREAS

1.      Identify all construction work areas (e.g., construction right-of-way, extra work space areas, pipe storage and contractor yards, borrow and disposal areas, access roads) that would be needed for safe construction. The project sponsor must ensure that appropriate cultural resources and biological surveys are conducted, as determined necessary by the appropriate federal and state agencies.

2.      Project sponsors are encouraged to consider expanding any required cultural resources and endangered species surveys in anticipation of the need for activities outside of authorized work areas.

3.      Plan construction sequencing to limit the amount and duration of open trench sections, as necessary, to prevent excessive erosion or sediment flow into sensitive environmental resource areas.

B.      DRAIN TILE AND IRRIGATION SYSTEMS

1.      Attempt to locate existing drain tiles and irrigation systems.

2.      Contact landowners and local soil conservation authorities to determine the locations of future drain tiles that are likely to be installed within 3 years of the authorized construction.

3.      Develop procedures for constructing through drain-tiled areas, maintaining irrigation systems during construction, and repairing drain tiles and irrigation systems after construction.

4.      Engage qualified drain tile specialists, as needed to conduct or monitor repairs to drain tile systems affected by construction. Use drain tile specialists from the project area, if available.

C.    GRAZING DEFERMENT

Develop grazing deferment plans with willing landowners, grazing permittees, and land management agencies to minimize grazing disturbance of revegetation efforts.

D.    ROAD CROSSINGS AND ACCESS POINTS

Plan for safe and accessible conditions at all roadway crossings and access points during construction and restoration.

E.    DISPOSAL PLANNING

Determine methods and locations for the regular collection, containment, and disposal of excess construction materials and debris (e.g., timber, slash, mats, garbage, drill cuttings and fluids, excess rock) throughout the construction process. Disposal of materials for beneficial reuse must not result in adverse environmental impact and is subject to compliance with all applicable survey, landowner or land management agency approval, and permit requirements.

F.    AGENCY COORDINATION

The project sponsor must coordinate with the appropriate local, state, and federal agencies as outlined in this Plan and/or required by the FERC's Orders.

1.    Obtain written recommendations from the local soil conservation authorities or land management agencies regarding permanent erosion control and revegetation specifications.

2.    Develop specific procedures in coordination with the appropriate agencies to prevent the introduction or spread of invasive species, noxious weeds, and soil pests resulting from construction and restoration activities.

3.    Develop specific procedures in coordination with the appropriate agencies and landowners, as necessary, to allow for livestock and wildlife movement and protection during construction.

4.    Develop specific blasting procedures in coordination with the appropriate agencies that address pre- and post-blast inspections; advanced public notification; and mitigation measures for building foundations, groundwater wells, and springs.  Use appropriate methods (e.g., blasting mats) to prevent damage to nearby structures and to prevent debris from entering sensitive environmental resource areas.

MAY 2013 VERSION

AR  001458

G.    SPILL PREVENTION AND RESPONSE PROCEDURES

The project sponsor shall develop project-specific Spill Prevention and Response Procedures, as specified in section IV of the staff's Procedures.  A copy must be filed with the Secretary of the FERC (Secretary) prior to construction and made available in the field on each construction spread.  The filing requirement does not apply to projects constructed under the automatic authorization provisions in the FERC's regulations.

H.    RESIDENTIAL CONSTRUCTION

For all properties with residences located within 50 feet of construction work areas, project sponsors shall:  avoid removal of mature trees and landscaping within the construction work area unless necessary for safe operation of construction equipment, or as specified in landowner agreements; fence the edge of the construction work area for a distance of 100 feet on either side of the residence; and restore all lawn areas and landscaping immediately following clean up operations, or as specified in landowner agreements.  If seasonal or other weather conditions prevent compliance with these time frames, maintain and monitor temporary erosion controls (sediment barriers and mulch) until conditions allow completion of restoration.

I.    WINTER CONSTRUCTION PLANS

If construction is planned to occur during winter weather conditions, project sponsors shall develop and file a project-specific winter construction plan with the FERC application.  This filing requirement does not apply to projects constructed under the automatic authorization provisions of the FERC's regulations.

The plan shall address:

1.    winter construction procedures (e.g., snow handling and removal, access road construction and maintenance, soil handling under saturated or frozen conditions, topsoil stripping);

2.    stabilization and monitoring procedures if ground conditions will delay restoration until the following spring (e.g., mulching and erosion controls, inspection and reporting, stormwater control during spring thaw conditions); and

3.    final restoration procedures (e.g., subsidence and compaction repair, topsoil replacement, seeding).

IV.    <u>INSTALLATION</u>

A.    APPROVED AREAS OF DISTURBANCE

1.    Project-related ground disturbance shall be limited to the construction right-of-way, extra work space areas, pipe storage yards, borrow and disposal areas, access roads, and other areas approved in the FERC's Orders. Any project-related ground disturbing activities outside these areas will require prior Director approval. This requirement does not apply to activities needed to comply with the Plan and Procedures (i.e., slope breakers, energy-dissipating devices, dewatering structures, drain tile system repairs) or minor field realignments and workspace shifts per landowner needs and requirements that do not affect other landowners or sensitive environmental resource areas. All construction or restoration activities outside of authorized areas are subject to all applicable survey and permit requirements, and landowner easement agreements.

2.    The construction right-of-way width for a project shall not exceed 75 feet or that described in the FERC application unless otherwise modified by a FERC Order. However, in limited, non-wetland areas, this construction right-of-way width may be expanded by up to 25 feet without Director approval to accommodate full construction right-of-way topsoil segregation and to ensure safe construction where topographic conditions (e.g., side-slopes) or soil limitations require it. Twenty-five feet of extra construction right-of-way width may also be used in limited, non-wetland or non-forested areas for truck turn-arounds where no reasonable alternative access exists.

Project use of these additional limited areas is subject to landowner or land management agency approval and compliance with all applicable survey and permit requirements. When additional areas are used, each one shall be identified and the need explained in the weekly or biweekly construction reports to the FERC, if required. The following material shall be included in the reports:

a.    the location of each additional area by station number and reference to previously filed alignment sheets, or updated alignment sheets showing the additional areas;

b.    identification of the filing at FERC containing evidence that the additional areas were previously surveyed; and

MAY 2013 VERSION

AR  001460

      c.     a statement that landowner approval has been obtained and is available in project files.

Prior written approval of the Director is required when the authorized construction right-of-way width would be expanded by more than 25 feet.

B.     TOPSOIL SEGREGATION

1.     Unless the landowner or land management agency specifically approves otherwise, prevent the mixing of topsoil with subsoil by stripping topsoil from either the full work area or from the trench and subsoil storage area (ditch plus spoil side method) in:

     a.     cultivated or rotated croplands, and managed pastures;

     b.     residential areas;

     c.     hayfields; and

     d.     other areas at the landowner's or land managing agency's request.

2.     In residential areas, importation of topsoil is an acceptable alternative to topsoil segregation.

3.     Where topsoil segregation is required, the project sponsor must:

     a.     segregate at least 12 inches of topsoil in deep soils (more than 12 inches of topsoil); and

     b.     make every effort to segregate the entire topsoil layer in soils with less than 12 inches of topsoil.

4.     Maintain separation of salvaged topsoil and subsoil throughout all construction activities.

5.     Segregated topsoil may not be used for padding the pipe, constructing temporary slope breakers or trench plugs, improving or maintaining roads, or as a fill material.

6.     Stabilize topsoil piles and minimize loss due to wind and water erosion with use of sediment barriers, mulch, temporary seeding, tackifiers, or functional equivalents, where necessary.

C.   DRAIN TILES

    1.   Mark locations of drain tiles damaged during construction.

    2.   Probe all drainage tile systems within the area of disturbance to check for damage.

    3.   Repair damaged drain tiles to their original or better condition. Do not use filter-covered drain tiles unless the local soil conservation authorities and the landowner agree. Use qualified specialists for testing and repairs.

    4.   For new pipelines in areas where drain tiles exist or are planned, ensure that the depth of cover over the pipeline is sufficient to avoid interference with drain tile systems. For adjacent pipeline loops in agricultural areas, install the new pipeline with at least the same depth of cover as the existing pipeline(s).

D.   IRRIGATION

Maintain water flow in crop irrigation systems, unless shutoff is coordinated with affected parties.

E.   ROAD CROSSINGS AND ACCESS POINTS

    1.   Maintain safe and accessible conditions at all road crossings and access points during construction.

    2.   If crushed stone access pads are used in residential or agricultural areas, place the stone on synthetic fabric to facilitate removal.

    3.   Minimize the use of tracked equipment on public roadways. Remove any soil or gravel spilled or tracked onto roadways daily or more frequent as necessary to maintain safe road conditions. Repair any damages to roadway surfaces, shoulders, and bar ditches.

F.   TEMPORARY EROSION CONTROL

Install temporary erosion controls immediately after initial disturbance of the soil. Temporary erosion controls must be properly maintained throughout construction (on a daily basis) and reinstalled as necessary (such as after backfilling of the trench) until replaced by permanent erosion controls or restoration is complete.

    1.   Temporary Slope Breakers

        a.   Temporary slope breakers are intended to reduce runoff velocity and divert water off the construction right-of-way. Temporary slope

breakers may be constructed of materials such as soil, silt fence, staked hay or straw bales, or sand bags.

b.      Install temporary slope breakers on all disturbed areas, as necessary to avoid excessive erosion. Temporary slope breakers must be installed on slopes greater than 5 percent where the base of the slope is less than 50 feet from waterbody, wetland, and road crossings at the following spacing (closer spacing shall be used if necessary):

| Slope (%) | Spacing (feet) |
|-----------|----------------|
| 5 - 15 | 300 |
| >15 - 30 | 200 |
| >30 | 100 |

c.      Direct the outfall of each temporary slope breaker to a stable, well vegetated area or construct an energy-dissipating device at the end of the slope breaker and off the construction right-of-way.

d.      Position the outfall of each temporary slope breaker to prevent sediment discharge into wetlands, waterbodies, or other sensitive environmental resource areas.

2.    Temporary Trench Plugs

Temporary trench plugs are intended to segment a continuous open trench prior to backfill.

a.      Temporary trench plugs may consist of unexcavated portions of the trench, compacted subsoil, sandbags, or some functional equivalent.

b.      Position temporary trench plugs, as necessary, to reduce trenchline erosion and minimize the volume and velocity of trench water flow at the base of slopes.

3.    Sediment Barriers

Sediment barriers are intended to stop the flow of sediments and to prevent the deposition of sediments beyond approved workspaces or into sensitive resources.

a.      Sediment barriers may be constructed of materials such as silt fence, staked hay or straw bales, compacted earth (e.g., driveable berms across travelways), sand bags, or other appropriate materials.

b.  At a minimum, install and maintain temporary sediment barriers across the entire construction right-of-way at the base of slopes greater than 5 percent where the base of the slope is less than 50 feet from a waterbody, wetland, or road crossing until revegetation is successful as defined in this Plan.  Leave adequate room between the base of the slope and the sediment barrier to accommodate ponding of water and sediment deposition.

c.  Where wetlands or waterbodies are adjacent to and downslope of construction work areas, install sediment barriers along the edge of these areas, as necessary to prevent sediment flow into the wetland or waterbody.

4.  Mulch

a.  Apply mulch on all slopes (except in cultivated cropland) concurrent with or immediately after seeding, where necessary to stabilize the soil surface and to reduce wind and water erosion.  Spread mulch uniformly over the area to cover at least 75 percent of the ground surface at a rate of 2 tons/acre of straw or its equivalent, unless the local soil conservation authority, landowner, or land managing agency approves otherwise in writing.

b.  Mulch can consist of weed-free straw or hay, wood fiber hydromulch, erosion control fabric, or some functional equivalent.

c.  Mulch all disturbed upland areas (except cultivated cropland) before seeding if:

(1)  final grading and installation of permanent erosion control measures will not be completed in an area within 20 days after the trench in that area is backfilled (10 days in residential areas), as required in section V.A.1; or

(2)  construction or restoration activity is interrupted for extended periods, such as when seeding cannot be completed due to seeding period restrictions.

d.  If mulching before seeding, increase mulch application on all slopes within 100 feet of waterbodies and wetlands to a rate of 3 tons/acre of straw or equivalent.

e.  If wood chips are used as mulch, do not use more than 1 ton/acre and add the equivalent of 11 lbs/acre available nitrogen (at least 50 percent of which is slow release).

f. Ensure that mulch is adequately anchored to minimize loss due to wind and water.

g. When anchoring with liquid mulch binders, use rates recommended by the manufacturer. Do not use liquid mulch binders within 100 feet of wetlands or waterbodies, except where the product is certified environmentally non-toxic by the appropriate state or federal agency or independent standards-setting organization.

h. Do not use synthetic monofilament mesh/netted erosion control materials in areas designated as sensitive wildlife habitat, unless the product is specifically designed to minimize harm to wildlife. Anchor erosion control fabric with staples or other appropriate devices.

## V. RESTORATION

### A. CLEANUP

1. Commence cleanup operations immediately following backfill operations. Complete final grading, topsoil replacement, and installation of permanent erosion control structures within 20 days after backfilling the trench (10 days in residential areas). If seasonal or other weather conditions prevent compliance with these time frames, maintain temporary erosion controls (i.e., temporary slope breakers, sediment barriers, and mulch) until conditions allow completion of cleanup.

If construction or restoration unexpectedly continues into the winter season when conditions could delay successful decompaction, topsoil replacement, or seeding until the following spring, file with the Secretary for the review and written approval of the Director, a winter construction plan (as specified in section III.I). This filing requirement does not apply to projects constructed under the automatic authorization provisions of the FERC's regulations.

2. A travel lane may be left open temporarily to allow access by construction traffic if the temporary erosion control structures are installed as specified in section IV.F. and inspected and maintained as specified in sections II.B.12 through 14. When access is no longer required the travel lane must be removed and the right-of-way restored.

3. Rock excavated from the trench may be used to backfill the trench only to the top of the existing bedrock profile. Rock that is not returned to the trench shall be considered construction debris, unless approved for use as mulch or for some other use on the construction work areas by the landowner or land managing agency.

MAY 2013 VERSION

AR 001465

4.      Remove excess rock from at least the top 12 inches of soil in all cultivated or rotated cropland, managed pastures, hayfields, and residential areas, as well as other areas at the landowner's request.  The size, density, and distribution of rock on the construction work area shall be similar to adjacent areas not disturbed by construction.  The landowner or land management agency may approve other provisions in writing.

5.      Grade the construction right-of-way to restore pre-construction contours and leave the soil in the proper condition for planting.

6.      Remove construction debris from all construction work areas unless the landowner or land managing agency approves leaving materials onsite for beneficial reuse, stabilization, or habitat restoration.

7.      Remove temporary sediment barriers when replaced by permanent erosion control measures or when revegetation is successful.

B.      PERMANENT EROSION CONTROL DEVICES

1.      Trench Breakers

a.      Trench breakers are intended to slow the flow of subsurface water along the trench.  Trench breakers may be constructed of materials such as sand bags or polyurethane foam.  Do not use topsoil in trench breakers.

b.      An engineer or similarly qualified professional shall determine the need for and spacing of trench breakers.  Otherwise, trench breakers shall be installed at the same spacing as and upslope of permanent slope breakers.

c.      In agricultural fields and residential areas where slope breakers are not typically required, install trench breakers at the same spacing as if permanent slope breakers were required.

d.      At a minimum, install a trench breaker at the base of slopes greater than 5 percent where the base of the slope is less than 50 feet from a waterbody or wetland and where needed to avoid draining a waterbody or wetland.  Install trench breakers at wetland boundaries, as specified in the Procedures.  Do not install trench breakers within a wetland.

MAY 2013 VERSION

AR  001466

2.      Permanent Slope Breakers

    a.     Permanent slope breakers are intended to reduce runoff velocity, divert water off the construction right-of-way, and prevent sediment deposition into sensitive resources. Permanent slope breakers may be constructed of materials such as soil, stone, or some functional equivalent.

    b.     Construct and maintain permanent slope breakers in all areas, except cultivated areas and lawns, unless requested by the landowner, using spacing recommendations obtained from the local soil conservation authority or land managing agency.

          In the absence of written recommendations, use the following spacing unless closer spacing is necessary to avoid excessive erosion on the construction right-of-way:

| Slope (%) | Spacing (feet) |
|-----------|----------------|
| 5 - 15    | 300            |
| >15 - 30  | 200            |
| >30       | 100            |

    c.     Construct slope breakers to divert surface flow to a stable area without causing water to pool or erode behind the breaker. In the absence of a stable area, construct appropriate energy-dissipating devices at the end of the breaker.

    d.     Slope breakers may extend slightly (about 4 feet) beyond the edge of the construction right-of-way to effectively drain water off the disturbed area. Where slope breakers extend beyond the edge of the construction right-of-way, they are subject to compliance with all applicable survey requirements.

## C.    SOIL COMPACTION MITIGATION

1.     Test topsoil and subsoil for compaction at regular intervals in agricultural and residential areas disturbed by construction activities. Conduct tests on the same soil type under similar moisture conditions in undisturbed areas to approximate preconstruction conditions. Use penetrometers or other appropriate devices to conduct tests.

2.     Plow severely compacted agricultural areas with a paraplow or other deep tillage implement. In areas where topsoil has been segregated, plow the subsoil before replacing the segregated topsoil.

AR 001467

If subsequent construction and cleanup activities result in further compaction, conduct additional tilling.

3.   Perform appropriate soil compaction mitigation in severely compacted residential areas.

D.   REVEGETATION

1.   General

a.   The project sponsor is responsible for ensuring successful revegetation of soils disturbed by project-related activities, except as noted in section V.D.1.b.

b.   Restore all turf, ornamental shrubs, and specialized landscaping in accordance with the landowner's request, or compensate the landowner.  Restoration work must be performed by personnel familiar with local horticultural and turf establishment practices.

2.   Soil Additives

Fertilize and add soil pH modifiers in accordance with written recommendations obtained from the local soil conservation authority, land management agencies, or landowner.  Incorporate recommended soil pH modifier and fertilizer into the top 2 inches of soil as soon as practicable after application.

3.   Seeding Requirements

a.   Prepare a seedbed in disturbed areas to a depth of 3 to 4 inches using appropriate equipment to provide a firm seedbed.  When hydroseeding, scarify the seedbed to facilitate lodging and germination of seed.

b.   Seed disturbed areas in accordance with written recommendations for seed mixes, rates, and dates obtained from the local soil conservation authority or the request of the landowner or land management agency. Seeding is not required in cultivated croplands unless requested by the landowner.

c.   Perform seeding of permanent vegetation within the recommended seeding dates.  If seeding cannot be done within those dates, use appropriate temporary erosion control measures discussed in section IV.F and perform seeding of permanent vegetation at the beginning of the next recommended seeding season.  Dormant seeding or temporary

seeding of annual species may also be used, if necessary, to establish cover, as approved by the Environmental Inspector.  Lawns may be seeded on a schedule established with the landowner.

d.     In the absence of written recommendations from the local soil conservation authorities, seed all disturbed soils within 6 working days of final grading, weather and soil conditions permitting, subject to the specifications in section V.D.3.a through V.D.3.c.

e.     Base seeding rates on Pure Live Seed.  Use seed within 12 months of seed testing.

f.     Treat legume seed with an inoculant specific to the species using the manufacturer's recommended rate of inoculant appropriate for the seeding method (broadcast, drill, or hydro).

g.     In the absence of written recommendations from the local soil conservation authorities, landowner, or land managing agency to the contrary, a seed drill equipped with a cultipacker is preferred for seed application.

Broadcast or hydroseeding can be used in lieu of drilling at double the recommended seeding rates.  Where seed is broadcast, firm the seedbed with a cultipacker or roller after seeding.  In rocky soils or where site conditions may limit the effectiveness of this equipment, other alternatives may be appropriate (e.g., use of a chain drag) to lightly cover seed after application, as approved by the Environmental Inspector.

## VI.     OFF-ROAD VEHICLE CONTROL

To each owner or manager of forested lands, offer to install and maintain measures to control unauthorized vehicle access to the right-of-way.  These measures may include:

A.     signs;

B.     fences with locking gates;

C.     slash and timber barriers, pipe barriers, or a line of boulders across the right-of-way; and

D.     conifers or other appropriate trees or shrubs across the right-of-way.

16                                          MAY 2013 VERSION

AR  001469

VII.    <u>POST-CONSTRUCTION ACTIVITIES AND REPORTING</u>

    A.    MONITORING AND MAINTENANCE

        1.    Conduct follow-up inspections of all disturbed areas, as necessary, to determine the success of revegetation and address landowner concerns. At a minimum, conduct inspections after the first and second growing seasons.

        2.    Revegetation in non-agricultural areas shall be considered successful if upon visual survey the density and cover of non-nuisance vegetation are similar in density and cover to adjacent undisturbed lands. In agricultural areas, revegetation shall be considered successful when upon visual survey, crop growth and vigor are similar to adjacent undisturbed portions of the same field, unless the easement agreement specifies otherwise.

           Continue revegetation efforts until revegetation is successful.

        3.    Monitor and correct problems with drainage and irrigation systems resulting from pipeline construction in agricultural areas until restoration is successful.

        4.    Restoration shall be considered successful if the right-of-way surface condition is similar to adjacent undisturbed lands, construction debris is removed (unless otherwise approved by the landowner or land managing agency per section V.A.6), revegetation is successful, and proper drainage has been restored.

        5.    Routine vegetation mowing or clearing over the full width of the permanent right-of-way in uplands shall not be done more frequently than every 3 years. However, to facilitate periodic corrosion/leak surveys, a corridor not exceeding 10 feet in width centered on the pipeline may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state. In no case shall routine vegetation mowing or clearing occur during the migratory bird nesting season between April 15 and August 1 of any year unless specifically approved in writing by the responsible land management agency or the U.S. Fish and Wildlife Service.

        6.    Efforts to control unauthorized off-road vehicle use, in cooperation with the landowner, shall continue throughout the life of the project. Maintain signs, gates, and permanent access roads as necessary.

MAY 2013 VERSION

AR 001470

B.    REPORTING

    1.    The project sponsor shall maintain records that identify by milepost:

        a.    method of application, application rate, and type of fertilizer, pH modifying agent, seed, and mulch used;

        b.    acreage treated;

        c.    dates of backfilling and seeding;

        d.    names of landowners requesting special seeding treatment and a description of the follow-up actions;

        e.    the location of any subsurface drainage repairs or improvements made during restoration; and

        f.    any problem areas and how they were addressed.

    2.    The project sponsor shall file with the Secretary quarterly activity reports documenting the results of follow-up inspections required by section VII.A.1; any problem areas, including those identified by the landowner; and corrective actions taken for at least 2 years following construction.

        The requirement to file quarterly activity reports with the Secretary does not apply to projects constructed under the automatic authorization, prior notice, or advanced notice provisions in the FERC's regulations.

MAY 2013 VERSION

AR  001471

**APPENDIX B**

# FERC *Wetland and Waterbody Construction and Mitigation Procedures*

AR 001472



**Office of Energy Projects**

**May 2013**

# WETLAND AND WATERBODY CONSTRUCTION AND MITIGATION PROCEDURES (DRAFT With Deviation Requests)

Washington, DC 20426

MAY 2013 VERSION (DRAFT with Deviation Requests)

AR  001473

# WETLAND AND WATERBODY CONSTRUCTION AND MITIGATION PROCEDURES

## TABLE OF CONTENTS

I.      APPLICABILITY ................................................................................................ 1

II.     PRECONSTRUCTION FILING ........................................................................ 2

III.    ENVIRONMENTAL INSPECTORS .................................................................. 3

IV.     PRECONSTRUCTION PLANNING ................................................................. 3

V.      WATERBODY CROSSINGS ............................................................................ 5
        A.      NOTIFICATION PROCEDURES AND PERMITS ....................................... 5
        B.      INSTALLATION ............................................................................................. 5
                1.    Time Window for Construction ............................................................. 5
                2.    Extra Work Areas .................................................................................. 5
                3.    General Crossing Procedures ................................................................ 6
                4.    Spoil Pile Placement and Control ......................................................... 7
                5.    Equipment Bridges ................................................................................ 7
                6.    Dry-Ditch Crossing Methods ................................................................ 8
                7.    Crossings of Minor Waterbodies .......................................................... 9
                8.    Crossings of Intermediate Waterbodies .............................................. 10
                9.    Crossings of Major Waterbodies ......................................................... 10
                10.   Temporary Erosion and Sediment Control .......................................... 10
                11.   Trench Dewatering ............................................................................... 11
        C.      RESTORATION ............................................................................................ 11
        D.      POST-CONSTRUCTION MAINTENANCE ............................................... 12

VI.     WETLAND CROSSINGS ................................................................................ 13
        A.      GENERAL .................................................................................................... 13
        B.      INSTALLATION ........................................................................................... 14
                1.    Extra Work Areas and Access Roads .................................................. 14
                2.    Crossing Procedures ............................................................................ 15
                3.    Temporary Sediment Control .............................................................. 16
                4.    Trench Dewatering ............................................................................... 17
        C.      RESTORATION ............................................................................................ 17
        D.      POST-CONSTRUCTION MAINTENANCE AND REPORTING .............. 18

VII.    HYDROSTATIC TESTING ............................................................................. 19
        A.      NOTIFICATION PROCEDURES AND PERMITS ..................................... 19
        B.      GENERAL .................................................................................................... 19
        C.      INTAKE SOURCE AND RATE ................................................................... 19
        D.      DISCHARGE LOCATION, METHOD, AND RATE .................................. 20

MAY 2013 VERSION
(Draft with Deviation Requests)

AR 001474

**WETLAND AND WATERBODY
CONSTRUCTION AND MITIGATION PROCEDURES
(PROCEDURES)**

I.    <u>APPLICABILITY</u>

A.    The intent of these Procedures is to assist project sponsors by identifying baseline mitigation measures for minimizing the extent and duration of project-related disturbance on wetlands and waterbodies. Project sponsors shall specify in their applications for a new FERC authorization, and in prior notice and advance notice filings, any individual measures in these Procedures they consider unnecessary, technically infeasible, or unsuitable due to local conditions and fully describe any alternative measures they would use. Project sponsors shall also explain how those alternative measures would achieve a comparable level of mitigation.

Once a project is authorized, project sponsors can request further changes as variances to the measures in these Procedures (or the applicant's approved procedures). The Director of the Office of Energy Projects (Director) will consider approval of variances upon the project sponsor's written request, if the Director agrees that a variance:

1.    provides equal or better environmental protection;

2.    is necessary because a portion of these Procedures is infeasible or unworkable based on project-specific conditions; or

3.    is specifically required in writing by another federal, state, or Native American land management agency for the portion of the project on its land or under its jurisdiction.

Sponsors of projects planned for construction under the automatic authorization provisions in the FERC's regulations must receive written approval for any variances in advance of construction.

Project-related impacts on non-wetland areas are addressed in the staff's Upland Erosion Control, Revegetation, and Maintenance Plan (Plan).

B.    DEFINITIONS

1.    "Waterbody" includes any natural or artificial stream, river, or drainage with perceptible flow at the time of crossing, and other permanent waterbodies such as ponds and lakes:

a.    "minor waterbody" includes all waterbodies less than or equal to 10 feet wide at the water's edge at the time of crossing;

MAY 2013 VERSION
(Draft with Deviation Requests)

AR 001475

b.  "intermediate waterbody" includes all waterbodies greater than 10 feet wide but less than or equal to 100 feet wide at the water's edge at the time of crossing; and

c.  "major waterbody" includes all waterbodies greater than 100 feet wide at the water's edge at the time of crossing.

2.  "Wetland" includes any area that is not in actively cultivated or rotated cropland and that satisfies the requirements of the current federal methodology for identifying and delineating wetlands.

II.  <u>PRECONSTRUCTION FILING</u>

A.  The following information must be filed with the Secretary of the FERC (Secretary) prior to the beginning of construction, for the review and written approval by the Director:

1.  site-specific justifications for extra work areas that would be closer than 50 feet from a waterbody or wetland; and

2.  site-specific justifications for the use of a construction right-of-way greater than 75-feet-wide in wetlands.

B.  The following information must be filed with the Secretary prior to the beginning of construction. These filing requirements do not apply to projects constructed under the automatic authorization provisions in the FERC's regulations:

1.  Spill Prevention and Response Procedures specified in section IV.A;

2.  a schedule identifying when trenching or blasting will occur within each waterbody greater than 10 feet wide, within any designated coldwater fishery, and within any waterbody identified as habitat for federally-listed threatened or endangered species. The project sponsor will revise the schedule as necessary to provide FERC staff at least 14 days advance notice. Changes within this last 14-day period must provide for at least 48 hours advance notice;

3.  plans for horizontal directional drills (HDD) under wetlands or waterbodies, specified in section V.B.6.d;

4.  site-specific plans for major waterbody crossings, described in section V.B.9;

5.  a wetland delineation report as described in section VI.A.1, if applicable; and

6.    the hydrostatic testing information specified in section VII.B.3.

III.    <u>ENVIRONMENTAL INSPECTORS</u>

    A.    At least one Environmental Inspector having knowledge of the wetland and waterbody conditions in the project area is required for each construction spread. The number and experience of Environmental Inspectors assigned to each construction spread shall be appropriate for the length of the construction spread and  the number/significance of resources affected.

    B.    The Environmental Inspector's responsibilities are outlined in the Upland Erosion  Control, Revegetation, and Maintenance Plan (Plan).

IV.    <u>PRECONSTRUCTION PLANNING</u>

    A.    The project sponsor shall develop project-specific Spill Prevention and Response  Procedures that meet applicable requirements of state and federal agencies.  A copy  must be filed with the Secretary prior to construction and made available in the field  on each construction spread.  This filing requirement does not apply to projects  constructed under the automatic authorization provisions in the FERC's regulations.

        1.    It shall be the responsibility of the project sponsor and its contractors to structure their operations in a manner that reduces the risk of spills or the accidental exposure of fuels or hazardous materials to waterbodies or wetlands.  The project sponsor and its contractors must, at a minimum, ensure  that:

            a.    all employees handling fuels and other hazardous materials are  properly trained;

            b.    all equipment is in good operating order and inspected on a regular  basis;

            c.    fuel trucks transporting fuel to on-site equipment travel only on  approved access roads;

            d.    all equipment is parked overnight and/or fueled at least 100 feet from  a waterbody or in an upland area at least 100 feet from a wetland  boundary.  These activities can occur closer only if the Environmental  Inspector determines that there is no reasonable alternative, and the project sponsor and its contractors have taken appropriate steps  (including secondary containment structures) to prevent spills and provide for prompt cleanup in the event of a spill;

            e.    hazardous materials, including chemicals, fuels, and

lubricating oils,  are not stored within 100 feet of a wetland, waterbody, or designated  municipal watershed area, unless the location is designated for such  use by an appropriate governmental authority.  This applies to storage of these materials and does not apply to normal operation or use of  equipment in these areas;

f.      concrete coating activities are not performed within 100 feet of a  wetland or waterbody boundary, unless the location is an existing  industrial site designated for such use.  These activities can occur  closer only if the Environmental Inspector determines that there is no reasonable alternative, and the project sponsor and its contractors  have taken appropriate steps (including secondary containment  structures) to prevent spills and provide for prompt cleanup in the  event of a spill;

g.      pumps operating within 100 feet of a waterbody or wetland boundary  utilize appropriate secondary containment systems to prevent spills;  and

h.      bulk storage of hazardous materials, including chemicals, fuels, and  lubricating oils have appropriate secondary containment systems to  prevent spills.

2.      The project sponsor and its contractors must structure their operations in a manner that provides for the prompt and effective cleanup of spills of fuel  and other hazardous materials. At a minimum, the project sponsor and its contractors must:

a.      ensure that each construction crew (including cleanup crews) has on hand sufficient supplies of absorbent and barrier materials to allow the rapid containment and recovery of spilled materials and knows the procedure for reporting spills and unanticipated discoveries of contamination;

b.      ensure that each construction crew has on hand sufficient tools and material to stop leaks;

c.      know the contact names and telephone numbers for all local, state, and federal agencies (including, if necessary, the U. S. Coast Guard and the National Response Center) that must be notified of a spill; and

d.      follow the requirements of those agencies in cleaning up the spill, in excavating and disposing of soils or other materials contaminated by a spill, and in collecting and disposing of waste generated during spill cleanup.

MAY 2013 VERSION
(Draft with Deviation Requests)

AR  001478

B.    AGENCY COORDINATION

The project sponsor must coordinate with the appropriate local, state, and federal agencies as outlined in these Procedures and in the FERC's Orders.

V.    WATERBODY CROSSINGS

A.    NOTIFICATION PROCEDURES AND PERMITS

1.    Apply to the U.S. Army Corps of Engineers (COE), or its delegated agency, for the appropriate wetland and waterbody crossing permits.

2.    Provide written notification to authorities responsible for potable surface water supply intakes located within 3 miles downstream of the crossing at least 1 week before beginning work in the waterbody, or as otherwise specified by that authority.

3.    Apply for state-issued waterbody crossing permits and obtain individual or generic section 401 water quality certification or waiver.

4.    Notify appropriate federal and state authorities at least 48 hours before beginning trenching or blasting within the waterbody, or as specified in applicable permits.

B.    INSTALLATION

1.    Time Window for Construction

Unless expressly permitted or further restricted by the appropriate federal or state agency in writing on a site-specific basis, instream work, except that required to install or remove equipment bridges, must occur during the following time windows:

a.    coldwater fisheries - June 1 through September 30; and

b.    coolwater and warmwater fisheries - June 1 through November 30.

2.    Extra Work Areas

a.    Locate all extra work areas (such as staging areas and additional spoil storage areas) at least 50 feet away from water's edge, except where the adjacent upland consists of cultivated or rotated cropland or other disturbed land.

**Requested Deviations from the FERC Procedures at Section V.B.2.a**

| MP | Feature | County | Requested Deviation | Justification |
|----|---------|--------|---------------------|---------------|
| 10 | Miller Branch | Dickson | ATWS closer than 50 feet | Steep topography adjacent to feature and the need for additional spoil storage due to stream crossing and road crossing proximity; spoil containment, such as hay bales and silt fence, both will be employed to protect the feature |
| 10.1 | Bartons Creek | Dickson | ATWS closer than 50 feet | Steep topography adjacent to feature and the need for additional spoil storage due to stream crossing and road crossing proximity; spoil containment, such as hay bales and silt fence, both will be employed to protect the feature |
| 12.1 | Wetland WDKB001 | Dickson | ATWS closer than 50 feet | Wetland is within the Cumberland Pipeline ROW |
| 26.4 | Guices Creek | Houston | ATWS closer than 50 feet | Steep topography adjacent to feature and the need for additional spoil storage due to stream crossing and road crossing proximity; spoil containment, such as hay bales and silt fence, both will be employed to protect the feature |
| 30.2 | Unnamed Tributary to Lickskillet Branch | Houston | ATWS closer than 50 feet | Abandoned railroad bed crossing and two stream crossings in close proximity to one another requires additional spoil storage; spoil containment, such as hay bales and silt fence, both will be employed to protect the feature |

    b.    The project sponsor shall file with the Secretary for review and written approval by the Director, site-specific justification for each extra work area with a less than 50-foot setback from the water's edge, except where the adjacent upland consists of cultivated or rotated cropland or other disturbed land. The justification must specify the conditions that will not permit a 50-foot setback and measures to ensure the waterbody is adequately protected.

    c.    Limit the size of extra work areas to the minimum needed to construct the waterbody crossing.

3.    General Crossing Procedures

MAY 2013 VERSION
(Draft with Deviation Requests)

AR 001480

a.  Comply with the COE, or its delegated agency, permit terms and conditions.

b.  Construct crossings as close to perpendicular to the axis of the waterbody channel as engineering and routing conditions permit.

c.  Where pipelines parallel a waterbody, maintain at least 15 feet of undisturbed vegetation between the waterbody (and any adjacent wetland) and the construction right-of-way, except where maintaining this offset will result in greater environmental impact.

d.  Where waterbodies meander or have multiple channels, route the pipeline to minimize the number of waterbody crossings.

e.  Maintain adequate waterbody flow rates to protect aquatic life, and prevent the interruption of existing downstream uses.

f.  Waterbody buffers (e.g., extra work area setbacks, refueling restrictions) must be clearly marked in the field with signs and/or highly visible flagging until construction-related ground disturbing activities are complete.

g.  Crossing of waterbodies when they are dry or frozen and not flowing may proceed using standard upland construction techniques in accordance with the Plan, provided that the Environmental Inspector verifies that water is unlikely to flow between initial disturbance and final stabilization of the feature.  In the event of perceptible flow, the project sponsor must comply with all applicable Procedure requirements for "waterbodies" as defined in section I.B.1.

4.  Spoil Pile Placement and Control

a.  All spoil from minor and intermediate waterbody crossings, and upland spoil from major waterbody crossings, must be placed in the construction right-of-way at least 10 feet from the water's edge or in additional extra work areas as described in section V.B.2.

b.  Use sediment barriers to prevent the flow of spoil or silt-laden water into any waterbody.

5.  Equipment Bridges

a.  Only clearing equipment and equipment necessary for installation of equipment bridges may cross waterbodies prior to bridge installation. Limit the number of such crossings of each waterbody to one per  piece

MAY 2013 VERSION
(Draft with Deviation Requests)

AR  001481

of clearing equipment.

b.    Construct and maintain equipment bridges to allow unrestricted flow and to prevent soil from entering the waterbody.  Examples of such bridges include:

(1)    equipment pads and culvert(s);
(2)    equipment pads or railroad car bridges without culverts;
(3)    clean rock fill and culvert(s); and
(4)    flexi-float or portable bridges.

Additional options for equipment bridges may be utilized that achieve the performance objectives noted above.  Do not use soil to construct  or stabilize equipment bridges.

c.    Design and maintain each equipment bridge to withstand and pass the highest flow expected to occur while the bridge is in place.  Align culverts to prevent bank erosion or streambed scour.  If necessary, install energy dissipating devices downstream of the culverts.

d.    Design and maintain equipment bridges to prevent soil from entering the waterbody.

e.    Remove temporary equipment bridges as soon as practicable after permanent seeding.

f.    If there will be more than 1 month between final cleanup and the beginning of permanent seeding and reasonable alternative access to  the right-of-way is available, remove temporary equipment bridges as  soon as practicable after final cleanup.

g.    Obtain any necessary approval from the COE, or the appropriate state agency for permanent bridges.

6.    Dry-Ditch Crossing Methods

a.    Unless approved otherwise by the appropriate federal or state agency, install the pipeline using one of the dry-ditch methods outlined below for crossings of waterbodies up to 30 feet wide (at the water's edge at the time of construction) that are state-designated as either coldwater  or significant coolwater or warmwater fisheries, or federally-  designated as critical habitat.

b.    Dam and Pump

(1)    The dam-and-pump method may be used without prior  approval for crossings of waterbodies where pumps can  adequately

MAY 2013 VERSION
(Draft with Deviation Requests)

AR  001482

transfer streamflow volumes around the work area, and there are no concerns about sensitive species passage.

(2)   Implementation of the dam-and-pump crossing method must meet the following performance criteria:

(i)    use sufficient pumps, including on-site backup pumps, to maintain downstream flows;

(ii)   construct dams with materials that prevent sediment and other pollutants from entering the waterbody (e.g., sandbags or clean gravel with plastic liner);

(iii)  screen pump intakes to minimize entrainment of fish;

(iv)   prevent streambed scour at pump discharge; and

(v)    continuously monitor the dam and pumps to ensure proper operation throughout the waterbody crossing.

c.    Flume Crossing

The flume crossing method requires implementation of the following steps:

(1)   install flume pipe after blasting (if necessary), but before any trenching;

(2)   use sand bag or sand bag and plastic sheeting diversion structure or equivalent to develop an effective seal and to divert stream flow through the flume pipe (some modifications to the stream bottom may be required to achieve an effective seal);

(3)   properly align flume pipe(s) to prevent bank erosion and streambed scour;

(4)   do not remove flume pipe during trenching, pipelaying, or backfilling activities, or initial streambed restoration efforts; and

(5)   remove all flume pipes and dams that are not also part of the equipment bridge as soon as final cleanup of the stream bed and bank is complete.

d.    Horizontal Directional Drill

For each waterbody or wetland that would be crossed using the HDD method, file with the Secretary for the review and written approval by the Director, a plan that includes:

(1)   site-specific construction diagrams that show the location of mud pits, pipe assembly areas, and all areas to be disturbed or

cleared for construction;

(2)     justification that disturbed areas are limited to the minimum needed to construct the crossing;

(3)     identification of any aboveground disturbance or clearing between the HDD entry and exit workspaces during construction;

(4)     a description of how an inadvertent release of drilling mud would be contained and cleaned up; and

(5)     a contingency plan for crossing the waterbody or wetland in the event the HDD is unsuccessful and how the abandoned drill hole would be sealed, if necessary.

The requirement to file HDD plans does not apply to projects constructed under the automatic authorization provisions in the FERC's regulations.

7.     Crossings of Minor Waterbodies

Where a dry-ditch crossing is not required, minor waterbodies may be crossed using the open-cut crossing method, with the following restrictions:

a.     except for blasting and other rock breaking measures, complete instream construction activities (including trenching, pipe installation, backfill, and restoration of the streambed contours) within 24 hours. Streambanks and unconsolidated streambeds may require additional restoration after this period;

b.     limit use of equipment operating in the waterbody to that needed to construct the crossing; and

c.     equipment bridges are not required at minor waterbodies that do not have a state-designated fishery classification or protected status (e.g., agricultural or intermittent drainage ditches). However, if an equipment bridge is used it must be constructed as described in section V.B.5.

8.     Crossings of Intermediate Waterbodies

Where a dry-ditch crossing is not required, intermediate waterbodies may be crossed using the open-cut crossing method, with the following restrictions:

a.     complete instream construction activities (not including blasting and other rock breaking measures) within 48 hours, unless site-specific

MAY 2013 VERSION
(Draft with Deviation Requests)

conditions make completion within 48 hours infeasible;

b.      limit use of equipment operating in the waterbody to that needed to construct the crossing; and

c.      all other construction equipment must cross on an equipment bridge as specified in section V.B.5.

9.      Crossings of Major Waterbodies

Before construction, the project sponsor shall file with the Secretary for the review and written approval by the Director a detailed, site-specific construction plan and scaled drawings identifying all areas to be disturbed by construction for each major waterbody crossing (the scaled drawings are not required for any offshore portions of pipeline projects). This plan must be developed in consultation with the appropriate state and federal agencies and shall include extra work areas, spoil storage areas, sediment control structures, etc., as well as mitigation for navigational issues. The requirement to file major waterbody crossing plans does not apply to projects constructed under the automatic authorization provisions of the FERC's regulations.

The Environmental Inspector may adjust the final placement of the erosion and sediment control structures in the field to maximize effectiveness.

10.     Temporary Erosion and Sediment Control

Install sediment barriers (as defined in section IV.F.3.a of the Plan) immediately after initial disturbance of the waterbody or adjacent upland. Sediment barriers must be properly maintained throughout construction and reinstalled as necessary (such as after backfilling of the trench) until replaced by permanent erosion controls or restoration of adjacent upland areas is complete. Temporary erosion and sediment control measures are addressed in more detail in the Plan; however, the following specific measures must be implemented at stream crossings:

a.      install sediment barriers across the entire construction right-of-way at all waterbody crossings, where necessary to prevent the flow of sediments into the waterbody. Removable sediment barriers (or driveable berms) must be installed across the travel lane. These removable sediment barriers can be removed during the construction day, but must be re-installed after construction has stopped for the day and/or when heavy precipitation is imminent;

b.      where waterbodies are adjacent to the construction right-of-way and the right-of-way slopes toward the waterbody, install sediment barriers along the edge of the construction right-of-way as necessary to contain spoil within the construction right-of-way and prevent sediment flow

into the waterbody; and

c.    use temporary trench plugs at all waterbody crossings, as necessary, to prevent diversion of water into upland portions of the pipeline trench and to keep any accumulated trench water out of the waterbody.

11.    Trench Dewatering

Dewater the trench (either on or off the construction right-of-way) in a  manner that does not cause erosion and does not result in silt-laden water  flowing into any waterbody.  Remove the dewatering structures as soon as  practicable after the completion of dewatering activities.

C.    RESTORATION

1.    Use clean gravel or native cobbles for the upper 1 foot of trench backfill in all waterbodies that contain coldwater fisheries.

2.    For open-cut crossings, stabilize waterbody banks and install temporary sediment barriers within 24 hours of completing instream construction activities.  For dry-ditch crossings, complete streambed and bank stabilization before returning flow to the waterbody channel.

3.    Return all waterbody banks to preconstruction contours or to a stable angle of repose as approved by the Environmental Inspector.

4.    Install erosion control fabric or a functional equivalent on waterbody banks at the time of final bank recontouring.  Do not use synthetic monofilament mesh/netted erosion control materials in areas designated as sensitive wildlife habitat unless the product is specifically designed to minimize harm to  wildlife. Anchor erosion control fabric with staples or other appropriate  devices.

5.    Application of riprap for bank stabilization must comply with COE, or its delegated agency, permit terms and conditions.

6.    Unless otherwise specified by state permit, limit the use of riprap to areas where flow conditions preclude effective vegetative stabilization techniques such as seeding and erosion control fabric.

7.    Revegetate disturbed riparian areas with native species of conservation grasses, legumes, and woody species, similar in density to adjacent undisturbed lands.

8.    Install a permanent slope breaker across the construction right-of-way at the base of slopes greater than 5 percent that are less than 50 feet from the waterbody, or as needed to prevent sediment transport into the waterbody.  In addition, install sediment barriers as outlined in the Plan.

MAY 2013 VERSION
(Draft with Deviation Requests)

AR  001486

In some areas, with the approval of the Environmental Inspector, an earthen berm may be suitable as a sediment barrier adjacent to the waterbody.

9. Sections V.C.3 through V.C.7 above also apply to those perennial or intermittent streams not flowing at the time of construction.

D. POST-CONSTRUCTION MAINTENANCE

1. Limit routine vegetation mowing or clearing adjacent to waterbodies to allow a riparian strip at least 25 feet wide, as measured from the waterbody's mean high water mark, to permanently revegetate with native plant species across the entire construction right-of-way.  However, to facilitate periodic corrosion/leak surveys, a corridor centered on the pipeline and up to 10 feet wide may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state.  In addition, trees that are located within 15 feet of the pipeline that have roots that could compromise the integrity of the pipeline coating may be cut and removed from the permanent right-of-way.  Do not conduct any routine vegetation mowing or clearing in riparian areas that are between HDD entry and exit points.

2. Do not use herbicides or pesticides in or within 100 feet of a waterbody except as allowed by the appropriate land management or state agency.

3. Time of year restrictions specified in section VII.A.5 of the Plan (April 15 – August 1 of any year) apply to routine mowing and clearing of riparian areas.

VI. WETLAND CROSSINGS

A. GENERAL

1. The project sponsor shall conduct a wetland delineation using the current federal methodology and file a wetland delineation report with the Secretary before construction.  The requirement to file a wetland delineation report does not apply to projects constructed under the automatic authorization provisions in the FERC's regulations.

   This report shall identify:

   a. by milepost all wetlands that would be affected;

   b. the National Wetlands Inventory (NWI) classification for each wetland;

   c. the crossing length of each wetland in feet; and

   d. the area of permanent and temporary disturbance that would

occur in each wetland by NWI classification type.

The requirements outlined in this section do not apply to wetlands in actively cultivated or rotated cropland. Standard upland protective measures, including workspace and topsoiling requirements, apply to these agricultural wetlands.

2.  Route the pipeline to avoid wetland areas to the maximum extent possible. If a wetland cannot be avoided or crossed by following an existing right-of-way, route the new pipeline in a manner that minimizes disturbance to wetlands. Where looping an existing pipeline, overlap the existing pipeline right-of-way with the new construction right-of-way. In addition, locate the loop line no more than 25 feet away from the existing pipeline unless site-specific constraints would adversely affect the stability of the existing pipeline.

3.  Limit the width of the construction right-of-way to 75 feet or less. Prior written approval of the Director is required where topographic conditions or soil limitations require that the construction right-of-way width within the boundaries of a federally delineated wetland be expanded beyond 75 feet. Early in the planning process the project sponsor is encouraged to identify site-specific areas where excessively wide trenches could occur and/or where spoil piles could be difficult to maintain because existing soils lack adequate unconfined compressive strength.

4.  Wetland boundaries and buffers must be clearly marked in the field with signs and/or highly visible flagging until construction-related ground disturbing activities are complete.

5.  Implement the measures of sections V and VI in the event a waterbody crossing is located within or adjacent to a wetland crossing. If all measures of sections V and VI cannot be met, the project sponsor must file with the Secretary a site-specific crossing plan for review and written approval by the Director before construction. This crossing plan shall address at a minimum:

    a.  spoil control;

    b.  equipment bridges;

    c.  restoration of waterbody banks and wetland hydrology;

    d.  timing of the waterbody crossing;

    e.  method of crossing; and

MAY 2013 VERSION
(Draft with Deviation Requests)

AR 001488

      f.    size and location of all extra work areas.

6.    Do not locate aboveground facilities in any wetland, except where the location of such facilities outside of wetlands would prohibit compliance with U.S. Department of Transportation regulations.

B.    INSTALLATION

1.    Extra Work Areas and Access Roads

    a.    Locate all extra work areas (such as staging areas and additional spoil storage areas) at least 50 feet away from wetland boundaries, except where the adjacent upland consists of cultivated or rotated cropland or other disturbed land.

    b.    The project sponsor shall file with the Secretary for review and written approval by the Director, site-specific justification for each extra work area with a less than 50-foot setback from wetland boundaries, except where adjacent upland consists of cultivated and rotated cropland or other disturbed land.  The justification must specify the site-specific conditions that will not permit a 50-foot setback and measures to ensure the wetland is adequately protected.

    c.    The construction right-of-way may be used for access when the wetland soil is firm enough to avoid rutting or the construction right-of-way has been appropriately stabilized to avoid rutting (e.g., with timber riprap, prefabricated equipment mats, or terra mats).

        In wetlands that cannot be appropriately stabilized, all construction equipment other than that needed to install the wetland crossing shall use access roads located in upland areas.  Where access roads in  upland areas do not provide reasonable access, limit all other  construction equipment to one pass through the wetland using the  construction right-of-way.

    d.    The only access roads, other than the construction right-of-way, that  can be used in wetlands are those existing roads that can be used with  no modifications or improvements, other than routine repair, and no impact on the wetland.

2.    Crossing Procedures

    a.    Comply with COE, or its delegated agency, permit terms and conditions.

    b.    Assemble the pipeline in an upland area unless the wetland is dry enough to adequately support skids and pipe.

MAY 2013 VERSION
(Draft with Deviation Requests)

AR  001489

c.     Use "push-pull" or "float" techniques to place the pipe in the trench where water and other site conditions allow.

d.     Minimize the length of time that topsoil is segregated and the trench is open.  Do not trench the wetland until the pipeline is assembled and ready for lowering in.

e.     Limit construction equipment operating in wetland areas to that needed to clear the construction right-of-way, dig the trench, fabricate and install the pipeline, backfill the trench, and restore the construction right-of-way.

f.     Cut vegetation just above ground level, leaving existing root systems in place, and remove it from the wetland for disposal.

     The project sponsor can burn woody debris in wetlands, if approved by the COE and in accordance with state and local regulations, ensuring that all remaining woody debris is removed for disposal.

g.     Limit pulling of tree stumps and grading activities to directly over the trenchline.  Do not grade or remove stumps or root systems from the rest of the construction right-of-way in wetlands unless the Chief Inspector and Environmental Inspector determine that safety-related construction constraints require grading or the removal of tree stumps from under the working side of the construction right-of-way.

h.     Segregate the top 1 foot of topsoil from the area disturbed by trenching, except in areas where standing water is present or soils are saturated.  Immediately after backfilling is complete, restore the segregated topsoil to its original location.

i.     Do not use rock, soil imported from outside the wetland, tree stumps, or brush riprap to support equipment on the construction right-of-way.

j.     If standing water or saturated soils are present, or if construction equipment causes ruts or mixing of the topsoil and subsoil in wetlands, use low-ground-weight construction equipment, or operate normal equipment on timber riprap, prefabricated equipment mats, or terra mats.

k.     Remove all project-related material used to support equipment on the construction right-of-way upon completion of construction.

3.    Temporary Sediment Control

Install sediment barriers (as defined in section IV.F.3.a of the Plan) immediately after initial disturbance of the wetland or adjacent upland.  Sediment barriers

must be properly maintained throughout construction and reinstalled as necessary (such as after backfilling of the trench). Except as noted below in section VI.B.3.c, maintain sediment barriers until replaced by permanent erosion controls or restoration of adjacent upland areas is complete. Temporary erosion and sediment control measures are addressed in more detail in the Plan.

a.  Install sediment barriers across the entire construction right-of-way immediately upslope of the wetland boundary at all wetland crossings where necessary to prevent sediment flow into the wetland.

b.  Where wetlands are adjacent to the construction right-of-way and the right-of-way slopes toward the wetland, install sediment barriers along the edge of the construction right-of-way as necessary to contain spoil within the construction right-of-way and prevent sediment flow into the wetland.

c.  Install sediment barriers along the edge of the construction right-of-way as necessary to contain spoil and sediment within the construction right-of-way through wetlands. Remove these sediment barriers during right-of-way cleanup.

4.  Trench Dewatering

Dewater the trench (either on or off the construction right-of-way) in a manner that does not cause erosion and does not result in silt-laden water flowing into any wetland. Remove the dewatering structures as soon as practicable after the completion of dewatering activities.

C.  RESTORATION

1.  Where the pipeline trench may drain a wetland, construct trench breakers at the wetland boundaries and/or seal the trench bottom as necessary to maintain the original wetland hydrology.

2.  Restore pre-construction wetland contours to maintain the original wetland hydrology.

3.  For each wetland crossed, install a trench breaker at the base of slopes near the boundary between the wetland and adjacent upland areas. Install a permanent slope breaker across the construction right-of-way at the base of slopes greater than 5 percent where the base of the slope is less than 50 feet from the wetland, or as needed to prevent sediment transport into the wetland. In addition, install sediment barriers as outlined in the Plan. In some areas, with the approval of the Environmental Inspector, an earthen berm may be suitable as a sediment barrier adjacent to the wetland.

4.  Do not use fertilizer, lime, or mulch unless required in writing by the appropriate federal or state agency.

MAY 2013 VERSION
(Draft with Deviation Requests)

AR  001491

5.      Consult with the appropriate federal or state agencies to develop a project-specific wetland restoration plan.  The restoration plan shall include measures for re-establishing herbaceous and/or woody species, controlling the invasion and spread of invasive species and noxious weeds (e.g., purple loosestrife and phragmites), and monitoring the success of the revegetation and weed control efforts.  Provide this plan to the FERC staff upon request.

6.      Until a project-specific wetland restoration plan is developed and/or implemented, temporarily revegetate the construction right-of-way with  annual ryegrass at a rate of 40 pounds/acre (unless standing water is present).

7.      Ensure that all disturbed areas successfully revegetate with wetland herbaceous and/or woody plant species.

8.      Remove temporary sediment barriers located at the boundary between wetland and adjacent upland areas after revegetation and stabilization of adjacent upland areas are judged to be successful as specified in section VII.A.4 of the Plan.

## D.    POST-CONSTRUCTION MAINTENANCE AND REPORTING

1.      Do not conduct routine vegetation mowing or clearing over the full width of  the permanent right-of-way in wetlands.  However, to facilitate periodic corrosion/leak surveys, a corridor centered on the pipeline and up to 10 feet wide may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state.  In addition, trees within 15 feet of the pipeline with roots that could compromise the integrity of pipeline coating may be  selectively cut and removed from the permanent right-of-way.  Do not  conduct any routine vegetation mowing or clearing in wetlands that are  between HDD entry and exit points.

2.      Do not use herbicides or pesticides in or within 100 feet of a wetland, except as allowed by the appropriate federal or state agency.

3.      Time of year restrictions specified in section VII.A.5 of the Plan (April 15 – August 1 of any year) apply to routine mowing and clearing of wetland areas.

4.      Monitor and record the success of wetland revegetation annually until wetland revegetation is successful.

5.      Wetland revegetation shall be considered successful if all of the following criteria are satisfied:

      a.      the affected wetland satisfies the current federal definition for a wetland (i.e., soils, hydrology, and vegetation);

      b.      vegetation is at least 80 percent of either the cover documented for the

MAY 2013 VERSION
(Draft with Deviation Requests)

AR  001492

wetland prior to construction, or at least 80 percent of the cover in adjacent wetland areas that were not disturbed by construction;

    c.    if natural rather than active revegetation was used, the plant species composition is consistent with early successional wetland plant communities in the affected ecoregion; and

    d.    invasive species and noxious weeds are absent, unless they are abundant in adjacent areas that were not disturbed by construction.

6.    Within 3 years after construction, file a report with the Secretary identifying the status of the wetland revegetation efforts and documenting success as defined in section VI.D.5, above. The requirement to file wetland restoration reports with the Secretary does not apply to projects constructed under the automatic authorization, prior notice, or advance notice provisions in the FERC's regulations.

For any wetland where revegetation is not successful at the end of 3 years after construction, develop and implement (in consultation with a professional wetland ecologist) a remedial revegetation plan to actively revegetate wetlands. Continue revegetation efforts and file a report annually documenting progress in these wetlands until wetland revegetation is successful.

## VII.  <u>HYDROSTATIC TESTING</u>

    A.    NOTIFICATION PROCEDURES AND PERMITS

        1.    Apply for state-issued water withdrawal permits, as required.

        2.    Apply for National Pollutant Discharge Elimination System (NPDES) or state-issued discharge permits, as required.

        3.    Notify appropriate state agencies of intent to use specific sources at least 48 hours before testing activities unless they waive this requirement in writing.

    B.    GENERAL

        1.    Perform 100 percent radiographic inspection of all pipeline section welds or hydrotest the pipeline sections, before installation under waterbodies or wetlands.

        2.    If pumps used for hydrostatic testing are within 100 feet of any waterbody or wetland, address secondary containment and refueling of these pumps in the project's Spill Prevention and Response Procedures.

        3.    The project sponsor shall file with the Secretary before construction a list

MAY 2013 VERSION
(Draft with Deviation Requests)

AR  001493

identifying the location of all waterbodies proposed for use as a hydrostatic test water source or discharge location. This filing requirement does not apply to projects constructed under the automatic authorization provisions of the FERC's regulations.

C.    INTAKE SOURCE AND RATE

1.    Screen the intake hose to minimize the potential for entrainment of fish.

2.    Do not use state-designated exceptional value waters, waterbodies which provide habitat for federally listed threatened or endangered species, or waterbodies designated as public water supplies, unless appropriate federal, state, and/or local permitting agencies grant written permission.

3.    Maintain adequate flow rates to protect aquatic life, provide for all waterbody uses, and provide for downstream withdrawals of water by existing users.

4.    Locate hydrostatic test manifolds outside wetlands and riparian areas to the maximum extent practicable.

D.    DISCHARGE LOCATION, METHOD, AND RATE

1.    Regulate discharge rate, use energy dissipation device(s), and install sediment barriers, as necessary, to prevent erosion, streambed scour, suspension of sediments, or excessive streamflow.

2.    Do not discharge into state-designated exceptional value waters, waterbodies which provide habitat for federally listed threatened or endangered species, or waterbodies designated as public water supplies, unless appropriate federal, state, and local permitting agencies grant written permission.

MAY 2013 VERSION
(Draft with Deviation Requests)

AR  001494

**APPENDIX C**

# Draft Spill Prevention and Control Plan

AR 001495

July 2022

# Cumberland Project

## DRAFT SPILL PREVENTION AND CONTROL PLAN



AR 001496

# Contents

1     Spill Prevention and Control Plan ................................................................. 1

1.1.     Introduction ........................................................................................ 1

1.2.     Preventative Measures ...................................................................... 1

1.2.1          Training ............................................................................. 2

1.2.2          Equipment Inspection/Maintenance ................................. 2

1.2.3          Refueling ........................................................................... 2

1.2.4          Storage ............................................................................. 3

1.3.     Impact Minimization Measures ......................................................... 4

1.3.1          Spill Response and Reporting Procedures ....................... 4

1.4.     Suggested Equipment List ............................................................... 5

1.4.1          Terrestrial Construction ................................................... 5

1.4.2          Waterbody and Wetland Crossings ................................. 6

# Abbreviations and Acronyms

| | |
|---|---|
| AR | Access Road |
| Certificate | Certificate of Public Convenience and Necessity |
| EI | Environmental Inspector |
| ERL | Emergency Response Line |
| FERC or Commission | Federal Energy Regulatory Commission |
| MLV | Mainline Valve |
| NGA | Natural Gas Act |
| NRC | National Response Center |
| Project | Cumberland Project |
| ROW | Right-of-Way |
| RQ | Reportable Quantity |
| TGP | Tennessee Gas Pipeline Company, L.L.C. |
| TVA | Tennessee Valley Authority |

# 1 Spill Prevention and Control Plan

## 1.1. Introduction

Tennessee Gas Pipeline Company, L.L.C. ("TGP") is filing an application with the Federal Energy Regulatory Commission ("Commission" or "FERC") under Section 7(c) of the Natural Gas Act ("NGA") and Part 157 of the Commission's regulations, 18 CFR Part 157 (2022), seeking the issuance of a certificate of public convenience and necessity ("Certificate") for the construction, operation, and maintenance of the proposed Cumberland Project ("Project").

The proposed Project involves the construction and operation of the following facilities, as described in more detail below:

- Approximately 32 miles of new 30-inch-diameter natural gas lateral pipeline, connecting to TGP's existing Lines 100-3 and 100-4 (hereinafter referred to as the "Cumberland Pipeline"), located in Dickson, Houston, and Stewart counties, Tennessee. To the extent that it is practicable, feasible, and legally permitted, TGP will locate the pipeline generally parallel and adjacent to existing electric transmission lines owned and operated by Tennessee Valley Authority ("TVA").

- New bi-directional back pressure regulation facilities on TGP's Lines 100-3 and 100-4 (hereinafter referred to as the "Pressure Regulation Station"), located at the origin of the proposed Cumberland Pipeline in Dickson County, Tennessee.

- A new meter station (hereinafter referred to as the "Cumberland Meter Station"), at the terminus of the proposed Cumberland Pipeline within the TVA property located in Stewart County, Tennessee.

- In-line inspection traps (also referred to as a pig launcher and receiver) at each end of the proposed Cumberland Pipeline.

- Three new mainline valves ("MLV"), with one MLV to be located at an intermediate location along the proposed Cumberland Pipeline, and the remaining two MLVs to be located on TGP's Lines 100-3 and 100-4 (one MLV to be installed on each existing line) within the new Pressure Regulation Station.

These proposed facilities may be collectively referred to herein as the "Project Facilities."

To facilitate the construction of the Project Facilities, TGP has identified two contractor yards: one located in Houston County, Tennessee (Contractor Yard 1) and one located in Dickson County, Tennessee (Contractor Yard 2). Access to the Project's construction workspace and permanent easement for construction and operation purposes will be provided using temporary and permanent access roads.

TGP, through its construction contractors ("Contractors"), shall be responsible for the administration and implementation of this Plan. This Plan is intended to provide minimum requirements for spill prevention and response during construction activities. The Contractors may develop their own spill prevention and response plan or use an existing plan provided that the plan used contains, at a minimum, all of the provisions of this Plan.

## 1.2. Preventative Measures

The SPCP provides preventative and mitigative measures to be employed by TGP during construction of the Project and/or operations and maintenance activities for the Project facilities. Methods listed in this plan are based on approved spill controls plans that TGP has used successfully in the past and are established to minimize the environmental impact associated with spills or releases at fuel, lubricant, or

hazardous materials storage areas, during normal upland construction and refueling activities, and during special refueling activities within 100 feet of perennial stream banks, wetland boundaries, or within municipal watersheds.  The Project's on-site Environmental Inspector ("EI") is responsible for ensuring that TGP's Contractors implement the measures and procedures outlined in this SPCP.

## 1.2.1    Training

The Contractors will instruct personnel on the operation and maintenance of equipment to prevent the accidental discharge or spill of fuel, oil, and lubricants.  Personnel will also be made aware of the pollution control laws, rules, and regulations applicable to their work.  The Contractors will be responsible for maintaining records of the training provided.

Spill prevention briefings with the construction crew will be scheduled and conducted by the Contractors to ensure adequate understanding of spill prevention measures.  These briefings will highlight:

- Precautionary measures to prevent spills;

- Sources of spills, such as equipment failure or malfunction;

- Standard operating procedures in case of a spill;

- Equipment, materials, and supplies available for clean-up of a spill;

- Sample collection procedures; and

- A list of known spill events.

A spill is an un-permitted release of product, raw materials, or chemicals outside any secondary containment and into the environment.  Spills can occur as a result of leaks, accidents, or third-party incidents.

## 1.2.2    Equipment Inspection/Maintenance

The Contractors will inspect and maintain equipment that must be fueled and/or lubricated according to a strict schedule.  The Contractors will submit to TGP for approval written documentation of the methods used and work performed.

All containers, valves, pipelines, and hoses will be examined regularly to assess their general condition.  The examination will identify any signs of deterioration that could cause a spill and signs of leaks, such as accumulated fluids.  All leaks will be promptly corrected and/or repaired.

## 1.2.3    Refueling

The Contractors will ensure the following: (i) fuel trucks transporting fuel to on-site equipment travel only on approved access roads ("ARs"); (ii) all equipment is parked overnight and/or fueled at least 100 feet from a waterbody or in an upland area; and (iii) equipment is refueled and lubricated within the right-of-way ("ROW"), meter station site, contractor yard, fee property, or other permitted area and at least 100 feet away from all waterbodies and wetlands.

Exceptions from the 100-foot setback for refueling and parking are only permitted if the EI finds, in advance, that no reasonable alternative is available and the Contractors and TGP have taken appropriate steps (including secondary containment structures) to prevent spills and provide for prompt cleanup in the event of a spill.  Examples of such situations may include:

- Areas such as rugged terrain or steep slopes where movement of equipment to refueling stations will cause excessive disturbance to the ROW or workspace;

- Areas where removing equipment from a wetland for servicing will increase adverse impacts to the wetland;

- Sites where moving equipment to refueling stations from pre-fabricated equipment pads is impractical or where there is a barrier from the waterbody/wetland (e.g., road or railroad);

- Locations where the waterbody or wetland is located adjacent to a road crossing, compressor station yard, or meter station site (from which the equipment can be serviced); and

- Refueling of immobile equipment, including, but not limited to, bending and boring machines, air compressors, padding machines, and hydro-test fill pumps. Pumps operating within 100 feet of a waterbody or wetland boundary must utilize appropriate secondary containment systems to prevent spills.

In these areas, auxiliary fuel tanks will be used to reduce the frequency of refueling operations and in no case will refueling take place within 100 feet of any known potable water wells.

The Contractors will ensure that all refueling is done pursuant to the following conditions:

- Impact minimization measures and equipment will be available and sufficient to prevent discharged fluids from leaving the ROW, compressor station yard, meter station site, workspace, or from reaching wetlands or waterbodies, and will be readily available for use. These will include a combination of the following:

  o Dikes, berms, or retaining walls sufficiently impervious to contain spilled oil;

- Sorbent and barrier materials in quantities determined by the Contractors to be sufficient to capture the largest reasonably foreseeable spill;

  o Drums or containers suitable for holding and transporting contaminated materials;

  o Curbing;

  o Culverts, gutters, or other drainage systems;

  o Weirs, booms, or other barriers;

  o Spill diversion or retention ponds; and

  o Sumps and collection systems.

- All spills will be cleaned up immediately. Containment equipment will not be used for storing contaminated material.

Concrete coating activities will not be performed within 100 feet of a wetland or waterbody boundary, unless the location is an existing industrial site designated for such use. These activities can occur closer only if the EI determines that there is no reasonable alternative, and the Project sponsor and its contractors have taken appropriate steps (including secondary containment structures) to prevent spills and provide for prompt cleanup in the event of a spill.

The Contractors will prepare, for approval by TGP, a list of the type, quantity, and the storage location of containment and cleanup equipment to be used during construction.

## 1.2.4    Storage

The Contractors will ensure that hazardous materials, including chemicals, fuels, and lubricating oils, are not stored within 100 feet of a wetland, waterbody, or designated municipal watershed area, unless the location is designated for such use by an appropriate governmental authority. This applies to storage of these materials and does not apply to normal operation or use of equipment in these areas. Any exceptions would require prior written approval by TGP and applicable regulatory agencies.

Storage containment areas will not have drains unless such drains lead to a containment area or vessel where the entire spill can be recovered. The Contractors will ensure that bulk storage of hazardous materials, including chemicals, fuels, and lubricating oils will have appropriate secondary containment

systems.

# 1.3. Impact Minimization Measures

Containment is the immediate priority in the case of a spill. A spill will be contained on TGP's property, ROW, meter station site, or workspace, if possible. Cleanup procedures will begin immediately after a spill is contained. In no case will containment equipment be used to store contaminated material.

Project operations will be structured in a manner that provides for the prompt and effective cleanup of spills of fuel and other hazardous materials. The Contractors will ensure the construction crews (including cleanup crews) have on hand:

- sufficient supplies of absorbent and barrier materials to allow the rapid containment and recovery of spilled materials and knows the procedure for reporting spills and unanticipated discoveries of contaminants;

- sufficient tools and material to stop leaks; and

- names and telephone numbers for all applicable federal, state, and local federal agencies (including, if necessary, the U.S. Coast Guard and the National Response Center) that must be notified of a spill for this Project.  See Section 1.3.1 for Spill Reporting Procedures.  The Contractors will follow the requirements of those agencies in cleaning up the spill, excavating and disposing of soils or other materials contaminated by a spill, and collecting and disposing of waste generated during spill cleanup.

## 1.3.1    Spill Response and Reporting Procedures

Upon identification of a spill or release, the Contractors shall immediately report any spill or release of the following materials, regardless of location or quantity, to the EI:

- Oil or petroleum products (e.g., hydraulic fluid, vegetable oil, lubricating oils);

- Hazardous substances or hazardous wastes (e.g., fuels, solvents, paint);

- Chemicals;

- Unplanned natural gas (flaring or venting); and

- Asbestos containing materials.

If a spill enters a body of water, the Contractors will immediately take samples upstream and downstream from point of entry and refrigerate samples. If advised, additional analysis will be completed and/or additional samples will be gathered.

The EI and/or Chief Inspector shall notify the following TGP environmental personnel: (1) Project Permitting Environmental Project Manager, and (2) Field Environmental Services Specialist. The following information shall be provided to TGP:

- The date, time and location of the occurrence or discovery of the occurrence;

- A description or identity of the material spilled;

- An estimate of the quantity spilled;

- The circumstances that caused the spill (e.g., equipment failure);

- A list of wetlands and waterbodies affected or potentially affected by the spill;

- A statement verifying whether a sheen is present;



- The size of the affected area;

- An estimate of the depth that the material has reached in water or on soil;

- A determination of whether the spill will migrate off of the TGP's fee-owned property. ROW, or workspace;

- A determination of whether the spill is under control;

- A statement verifying that cleanup has begun and a description of the methods being used to clean up the spill;

- The names of the people observing the spill (with their affiliations) and the extent of injuries, if any; and

- The "Spill Documentation Form."

TGP will determine if the incident is reportable to federal, state, and local agencies and make any necessary agency notifications.

If the spill or release is reportable to state or federal agencies, TGP will enter the incident into its internal notifications system, IMPACT, and contact Project Management for a Project Emergency Response Line (ERL) entry, as necessary.

### 1.3.1.1     *Reporting Criteria*

The following releases require immediate (within one (1) hour of discovery) notification to the National Response Center ("NRC"):

- Any petroleum product released into streams, rivers, lakes, or dry washes;

- A release that exceeds the reportable quantity ("RQ") of any CERCLA hazardous substances in any 24-hour period which is not fully contained;

- A release of a hazardous substance or hazardous waste which occurs during transportation; and,

- A release of hazardous waste which contains a RQ of a hazardous substance.

The National Response Center (1-800-424-8802) will be notified immediately if spills occur above threshold levels (Clean Water Act, 40 CFR 110.10) into surface waters and/or wetlands.

# 1.4. Suggested Equipment List

Section 1.3 of this Plan states that the Contractors will prepare a list of the type, quantity, and location of storage, containment, and cleanup equipment to be used on the Project construction site.  The list will include the procedures and impact minimization measures to be used in response to a spill.  The Contractors' choice of impact minimization measures and equipment will be tailored to meet the characteristics of the affected terrain, as well as the types and amounts of material that could potentially be spilled.  The types of equipment that TGP expects to use to control spills at terrestrial sites and wetlands are described in the FERC's Upland Revegetation and Erosion Control Plan (May 2013), incorporated as part of the Project's Environmental Construction Management Plan.

## 1.4.1     Terrestrial Construction

General equipment that the Contractors will use for spill containment and cleanup on terrestrial areas includes:

- Sorbents (pillows, socks, and wipe sheets) for containment and pickup of spilled liquids;

- Commercially available spill kits (or the functional equivalent thereof) that are prepackaged, self-



contained spill kits containing a variety of sorbents for small to large spills;

• Structures such as gutters, culverts, and dikes for immediate spill containment;

• Shovels, backhoes, etc., for excavating contaminated materials;

• Sumps and collection systems; and

• Drums, barrels, and temporary storage bags to clean up and transport contaminated materials.

### 1.4.1.1 *Fuels and Lubricating Oil Storage*

The Contractors will implement special measures to prevent spills in areas where trucks carrying fuel and oil barrels are loaded. Containment equipment will be kept close to tanks and barrels to minimize spill response time and will include absorbent pads or mats. The quantity and capabilities of the mats will be sufficient to capture the largest foreseeable spill, given ROW or workspace characteristics, crankcase, and other fuel vessel capacities.

### 1.4.1.2 *Routine Refueling and Maintenance*

Absorbent pads and mats will be placed on the ground beneath equipment before refueling and maintenance. Equipment that will be stored on-site for routine refueling and maintenance includes small sorbent kits (or their functional equivalent).

### 1.4.1.3 *Equipment Failure*

Kits with the capacity of absorbing up to five (5) gallons of liquid can fit beneath the operator's seat on construction equipment for use in an equipment failure.

## 1.4.2 Waterbody and Wetland Crossings

For each wetland and waterbody crossed, the equipment listed below will be available, in addition to that needed for terrestrial construction. This equipment will be stored close to the water or wetland to minimize response time, and will include:

• Oil containment booms and the related equipment needed for rapid deployment; and

• to remove oils from water, such as oleophilic and hydrophobic absorbent booms and mats, and/or mechanical skimmers.

**APPENDIX D**

# Draft HDD Contingency Plan

AR  001505

July 2022

# Cumberland Project

## DRAFT HORIZONTAL DIRECTIONAL DRILLING CONTINGENCY PLAN



AR  001506

Case: 23-3682    Document: 56-1    Filed: 08/19/2024    Page: 431

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

CUMBERLAND PROJECT
DRAFT HDD CONTINGENCY PLAN

# Contents

**1. INTRODUCTION**...................................................................................................**1-1**

**2. Flood Events**....................................................................................................**2-1**

**3. HDD Contingency**..........................................................................................**3-1**

**4. Inadvertent Returns Contingency** ...............................................................**4-1**

    4.1.      Background ...........................................................................................4-1

          4.1.1.   Drilling Fluid Composition ....................................................4-1

          4.1.2.   Drilling Fluid Disposal ..........................................................4-2

    4.2.      Monitoring ............................................................................................4-2

          4.2.1.   Monitoring Protocol for Condition 1 – Full Circulation..........................4-2

          4.2.2.   Monitoring Protocol for Condition 2 – Loss of Circulation ....................4-3

          4.2.3.   Monitoring Protocol for Condition 2 – Inadvertent Returns ..................4-3

    4.3.      Minimization of Environmental Impact ...............................................4-3

    4.4.      Notifications..........................................................................................4-4

    4.5.      Clean-up ...............................................................................................4-4

# Abbreviations and Acronyms

| | |
|---|---|
| Certificate | Certificate of Public Convenience and Necessity |
| EI | Environmental Inspector |
| FERC or Commission | Federal Energy Regulatory Commission |
| FERC Plan | FERC's Upland Erosion Control, Revegetation and Maintenance Plan |
| FERC Procedures | FERC's Wetland and Waterbody Construction and Mitigation Procedures |
| HDD | Horizontal Directional Drill |
| MLV | Mainline Valve |
| NGA | Natural Gas Act |
| Project | Cumberland Project |
| TGP | Tennessee Gas Pipeline Company, L.L.C. |
| TVA | Tennessee Valley Authority |

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

# 1.     INTRODUCTION

Tennessee Gas Pipeline Company, L.L.C. ("TGP") is filing an application with the Federal Energy Regulatory Commission ("Commission" or "FERC") under Section 7(c) of the Natural Gas Act ("NGA") and Part 157 of the Commission's regulations, 18 CFR Part 157 (2022), seeking the issuance of a certificate of public convenience and necessity ("Certificate") for the construction, operation, and maintenance of the proposed Cumberland Project ("Project").

The proposed Project involves the construction and operation of the following facilities, as described in more detail below:

- Approximately 32 miles of new 30-inch-diameter natural gas lateral pipeline, connecting to TGP's existing Lines 100-3 and 100-4 (hereinafter referred to as the "Cumberland Pipeline"), located in Dickson, Houston, and Stewart counties, Tennessee. To the extent that it is practicable, feasible, and legally permitted, TGP will locate the pipeline generally parallel and adjacent to existing electric transmission lines owned and operated by Tennessee Valley Authority ("TVA").

- New bi-directional back pressure regulation facilities on TGP's Lines 100-3 and 100-4 (hereinafter referred to as the "Pressure Regulation Station"), located at the origin of the proposed Cumberland Pipeline in Dickson County, Tennessee.

- A new meter station (hereinafter referred to as the "Cumberland Meter Station"), at the terminus of the proposed Cumberland Pipeline within the TVA property located in Stewart County, Tennessee.

- In-line inspection traps (also referred to as a pig launcher and receiver) at each end of the proposed Cumberland Pipeline.

- Three new mainline valves ("MLV"), with one MLV to be located at an intermediate location along the proposed Cumberland Pipeline, and the remaining two MLVs to be located on TGP's Lines 100-3 and 100-4 (one MLV to be installed on each existing line) within the new Pressure Regulation Station.

These proposed facilities may be collectively referred to herein as the "Project Facilities."

To facilitate the construction of the Project Facilities, TGP has identified two contractor yards: one located in Houston County, Tennessee (Contractor Yard 1) and one located in Dickson County, Tennessee (Contractor Yard 2). Access to the Project's construction workspace and permanent access easement for construction and operation purposes will be provided using temporary and permanent access roads.

Horizontal Directional Drills ("HDDs") for the installation of pipeline facilities typically require establishing staging areas on either side of a crossing at the drill entry and exit points. These staging areas often require a substantial area of workspace for equipment and pipe staging on either end of the HDD, which may result in a greater total workspace requirement than installation through the same area with conventional trenching techniques, depending on site conditions and the length of the crossing. After set-up of the drilling equipment and bore pits, a pilot hole is drilled, typically from the entry side of the crossing. Upon completion of the pilot hole, a reamer is attached to the drill string to enlarge the pilot hole. It may take several ream passes to achieve the diameter necessary for installation of the pipe. The final pass before pipe installation is a swab pass; one or more swab passes may be necessary to ensure that the hole is ready to receive the pipe. During the drilling process, a bentonite drilling fluid mixture is pumped to lubricate the drill bit, remove drill cuttings from the hole, and fill void space to maintain the integrity of the drilled pathway prior to pipe installation. Cuttings are separated from the drilling fluid when the mixture returns to the surface, and fluid is reclaimed.

AR 001508



Pipe is staged with one or more pipe pull sections pre-fabricated in a workspace on the exit side of the HDD pathway, known as the "pull-back" area. If possible, given any topographical or other workspace constraints, the pull section is pre-fabricated into one continuous length in the pull-back area, to prevent stopping while pulling the pipe during installation, which can add risk to the success of the drill. The pull-back occurs when the pipe is pulled through the reamed hole from the exit to the entry side, completing the installation of the pipe. The pipe is then tied-in to the pipeline facilities on both ends of the crossing.

Although HDDs are often completed with minimal surface impact between the workspaces for the drill entry and exit points, risks associated with HDD include inadvertent returns of drilling fluid to the surface, and/or differential settlement or surface subsidence along or adjacent to the drill path. TGP has prepared this HDD Contingency Plan to present best management practices for drilling, monitoring, and minimizing risks and environmental impacts during HDD drilling activities, including any inadvertent returns of drilling fluid that may occur. This Plan will be provided to the HDD contractors, and changes may be made to accommodate contractor preferences or site conditions. However, the Plan will be finalized prior to any HDD being conducted.

Throughout the Project, drilling activities will be carried out in accordance with the Federal Energy Regulatory Commission's *Upland Erosion Control, Revegetation and Maintenance Plan* ("FERC Plan", 2013 version) and *Wetland and Waterbody Construction and Mitigation Procedures* ("FERC Procedures", 2013 version), as may be modified for the Project.

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

# 2.    FLOOD EVENTS

TGP recognizes there is potential, though unlikely, for the occurrence of localized short-term flooding events or longer-term flooding events during construction, including HDD activities.

If a short-term flooding event occurs before construction crews have mobilized to the Project site, the construction crews will wait until water levels subside before mobilizing and setting up the HDD. If a short-term flooding event occurs after construction crews have mobilized and set up, construction crews will react appropriately depending on the water level. If the water level is such that work can be performed safely and in accordance with the FERC Plan and FERC Procedures, construction will continue using construction techniques for saturated conditions, and proper monitoring will continue to ensure any water does not reach a level that is unmanageable. If there is a potential that water could reach a level that could jeopardize safety and/or compliance with the FERC Plan and FERC Procedures, TGP will demobilize crews and secure equipment until the water level subsides.

# 3.    HDD CONTINGENCY

Although TGP will conduct a technical feasibility assessment for each proposed HDDs for the Project, unexpected subsurface conditions could be encountered along the drill path during the drilling operation. In the event that an attempted HDD installation is unsuccessful, TGP will evaluate the failed installation to determine if the conditions that resulted in the failure can be effectively mitigated. TGP will notify the appropriate regulatory agencies and provide information used to determine whether a second HDD attempt has a reasonable chance to succeed. If it is determined that a second HDD attempt has a reasonable chance of success, TGP will relocate the entry and/or exit point if necessary (subject to any necessary regulatory agency and landowner approvals) and will proceed with a second attempt to install the crossing by HDD. If this second HDD attempt fails (or if TGP determines that a second HDD attempt does not have a reasonable chance to succeed), the crossing will be installed by conventional trenching (with receipt of applicable permits).

TGP will provide on-site inspection during the HDD process to maintain adequate daily progress reports, as-built information, and other applicable construction documentation that would describe the events leading up to an HDD failure. TGP will submit this documentation to the appropriate agencies with notification of an HDD failure, and the subsequent schedule for implementing the approved alternate crossing method. The alternate crossing method will not be implemented until TGP has received confirmation that appropriate agencies have received the documentation of HDD failure and approved an alternative crossing method.

In the event that a drilled hole from either a first or second HDD attempt has to be abandoned, the hole will be filled with a mixture of bentonite and drilled spoil.

# 4. INADVERTENT RETURNS CONTINGENCY

Inadvertent returns are typically a result of drilling fluid formational loss to high permeability soil or rock formations or drilling fluid fracturing of the surrounding soil formations; either mechanism can result in the drilling fluid leaving the bored hole and eventually migrating to the surface. Inadvertent returns typically occur when the HDD profile is shallow and/or situated in weak or low shear strength soils, or weathered, jointed, or fractured rock formations. This section details the procedures that will be used for monitoring, minimizing, and cleaning up inadvertent returns, as applicable, should they occur during HDD activities.

# 4.1. Background

All stages of HDD involve circulating drilling fluid from surface equipment through the drill pipe to the down-hole assembly, and back to the surface through the annular space between the pipe and the wall of the hole. Drilling fluid returns collected at the entry and exit points are processed through the cleaning system, which removes drill spoil from the drilling fluid, allowing the fluid to be reused. The cleaning system uses mechanical separation by shakers, de-sanders, and de-silters.

Drilling fluid is used in HDD operations principally for the following functions:

- Excavating during crossings with soft soils by jetting high velocity fluid streams through nozzles on drill bits or reaming tools;

- Transmitting power to a downhole motor in order to turn the bit and mechanically drill a hole, on crossings through harder soils or rock,

- Transporting drilled spoil, consisting of excavated soil or rock cuttings, by suspending it in the fluid and carrying it to the surface with the fluid stream flowing in the annulus between the pipe and the wall of the hole;

- Stabilization of the drilled hole through building up a "wall cake", which seals pores and holds soil particles in place (this process is critical in HDD pipeline installation as holes are often in unconsolidated formations and are uncased);

- Cooling and cleaning the bits and cutters on the downhole assembly, removing the spoil build-up on the bit or reamer cutters with high velocity fluid streams directed at the cutters;

- Providing hydrostatic pressure to offset geostatic and groundwater pressures; and

- Lubricating to reduce the friction between pipe and the drilled hole.

## 4.1.1. Drilling Fluid Composition

The major component of drilling fluid used in HDD pipeline installation is fresh water, which will be obtained from municipal sources or nearby waterbodies. In order for water to perform the required drilling functions, it is generally necessary to modify its properties by adding a viscosifier. The viscosifier used almost exclusively in HDD drilling fluids is naturally occurring bentonite clay typically mined by "open pit" methods from locations in Wyoming and South Dakota. Bentonite is soft clay, formed by the weathering of volcanic ash, with the unique characteristic of swelling to several times its original volume when mixed with water. It is not a hazardous material as defined by the U.S. Environmental Protection Agency's ("USEPA") characteristics of ignitability, corrosivity, reactivity, or commercial chemicals. It can also be used to seal earth structures (e.g., ponds or dams), and as a suspending component in livestock feeds.

The properties of bentonite used in drilling fluids are often enhanced by the addition of polymers. Enhancement typically results in increasing the yield, reducing the amount of dry bentonite required to

AR 001512

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

CUMBERLAND PROJECT
DRAFT HDD CONTINGENCY PLAN

produce a given amount of drilling fluid and augmenting its rheologic properties to maximize the effectiveness within a given formation. Non-treated bentonite yields in excess of 85 barrels (3,570 gallons) of drilling fluid per ton of material. Addition of non-toxic polymers to produce high yield bentonite can increase the yield to more than 200 barrels (8,400 gallons) per ton of material. Typical HDD drilling fluids are made with high yield bentonite and are composed of less than 4 percent viscosifier by volume, with the remaining components being water and drilled spoil. Drilling fluid consists of non-toxic bentonite, but, depending on the drilling conditions, may also contain drilling fluid additives. The bentonite and any additives must meet the National Sanitation Foundation International/American National Standards Institute ("ANSI") Standard 60 for safe drinking water requirements. This is the same drilling fluid used for drilling drinking water wells, so there is no risk to drinking water from its use.

### 4.1.2. Drilling Fluid Disposal

Waste drilling fluid and cuttings will be collected, temporarily stored in the construction workspace, and then disposed of off-site at an approved facility. Disposal of excess drilling fluid will be the responsibility of the selected HDD contractor. Prior to beginning HDD operations, the HDD contractor will be required to submit its proposed drilling fluid disposal procedures and disposal facility to Tennessee for approval. TGP will review these procedures and verify that they comply with all environmental regulations, easement and workspace agreements, and permit requirements.

## 4.2. Monitoring

To ensure that HDD operations are conducted in accordance with established requirements and standard HDD industry practice, TGP will provide an inspector experienced in HDD construction to monitor the HDD contractor's performance at the Project site. The primary functions of TGP's inspector will be to document construction activities, report on the HDD contractor's performance, and notify TGP if the HDD contractor fails to conform to established requirements. Established requirements to which the HDD contractor must conform include, but are not limited to, the construction drawings, technical specifications, permits, easement and workspace agreements, and HDD contractor submittals.

This section discusses the monitoring protocol that will be applied by TGP's inspector relative to drilling fluid and inadvertent returns.

The drilling fluid monitoring protocol to be applied will vary depending upon the following operational conditions:

- Condition 1:    Full Circulation;
- Condition 2:    Loss of Circulation; and
- Condition 3:    Inadvertent Returns.

### 4.2.1. Monitoring Protocol for Condition 1 – Full Circulation

When HDD operations are in progress and full drilling fluid circulation is being maintained at one or both of the HDD endpoints, the following monitoring protocol will be implemented:

- The presence of drilling fluid returns at one or both of the HDD endpoints will be periodically documented;

- Land-based portions of the drilled alignment will be periodically walked and visually inspected for signs of inadvertent drilling fluid returns as well as surface heaving and settlement.

- Waterways will be visually inspected from the banks for a visible drilling fluid plume; and

- Drilling fluid products present at the jobsite will be documented.

If an inadvertent drilling fluid return is detected during routine monitoring, the monitoring protocol associated with Condition 3 will be implemented immediately.

### 4.2.2.    Monitoring Protocol for Condition 2 – Loss of Circulation

When HDD operations are in progress and drilling fluid circulation to the HDD endpoints is lost or severely diminished, the following monitoring protocol will be implemented.  It should be noted that lost circulation is common and anticipated during HDD installation and does not necessarily indicate that drilling fluid is inadvertently returning to a point on the surface.

- TGP's inspector will notify TGP if drilling fluid circulation to the HDD endpoints has been lost or severely diminished.

- TGP's inspector will document steps taken by the HDD contractor to restore circulation.  If the HDD contractor fails to comply with the requirements of the HDD specification, TGP's inspector will notify TGP so that appropriate actions can be taken.

- If circulation is regained, TGP's inspector will inform TGP and resume the monitoring protocol associated with Condition 1.

- If circulation is not re-established, TGP's inspector will increase the frequency of visual inspection along the drilled path alignment as appropriate.  Additionally, Tennessee's inspector will document periods of HDD contractor downtime (during which no drilling fluid is pumped) and the HDD contractor's drilling fluid pumping rate should it become necessary to estimate lost circulation volumes.

### 4.2.3.    Monitoring Protocol for Condition 2 – Inadvertent Returns

If an inadvertent return of drilling fluids is detected, the following monitoring protocol will be implemented:

- The HDD contractor will first reduce the pressure, if possible, and commence containment of drilling mud.

- TGP's inspector will then notify construction management that an inadvertent drilling fluid return has occurred and provide documentation with respect to the location, magnitude, and potential impact of the return.

- Notification and response protocols will be followed depending on whether the release is located on land or to a waterway, as described in Sections 4.4 and 4.5 below.

## 4.3.     Minimization of Environmental Impact

The most effective way to minimize environmental impacts associated with HDD drilling fluids is to maintain drilling fluid circulation to the extent possible. However, resources spent in an effort to maintain circulation should be weighed against the potential benefits achieved through full circulation. It should be recognized that in subsurface conditions that are not conducive to annular flow, restoration of circulation may not be practicable or possible. In such cases, environmental impacts can often be minimized most effectively by completing HDD operations in the shortest possible amount of time.

Steps that may be taken by the HDD contractor to either prevent lost circulation or regain circulation include, but are not limited to, the following:

- Size the hole frequently by advancing and retracting the drill string in order to keep the annulus clean and unobstructed;

- When drilling fluid flow has been suspended, establish circulation slowly before advancing;

AR  001514

- Drilling fluid rheology will be checked periodically and modified as needed to ensure drilling fluid properties are optimized for the subsurface conditions encountered;

- Control penetration rates and pump volumes in order to ensure cuttings are effectively transported from the hole;

- Seal a zone of lost circulation using a high viscosity bentonite plug;

- Employ the use of lost circulation materials; any lost circulation materials proposed for use must be approved by Tennessee prior to utilization; and

- Suspend drilling activities for a period of 6 to 8 hours.

# 4.4.    Notifications

In the event of an inadvertent drilling fluid return within a waterway, wetland, or sensitive environmental resource area, TGP will contact FERC, and or the FERC representative, and the applicable federal and state agencies that regulate returns according to permit reporting requirements, but no later than 24 hours after detection. Once the HDD contractor has been selected, a more specific notification system will be developed to comply with permit conditions.

Details of the inadvertent return will contain, at a minimum:

- The location, nature of the release and estimated volume;

- Take immediate corrective actions that may include, but are not limited to, installation of ECDs to contain the release, determination of any permit reporting limits, a temporary shutdown of the drilling operations to determine the cause of the release, and coordination with TGP PM to determine if there are other drilling techniques that can be used to eliminate the return such as the use of additives or lower drilling pressures.

Once a release has been identified, the appropriate agency notifications will be made. Notification protocols will be determined during the permitting process with state and federal agencies, and these protocols will be provided to the drilling contractor, the TGP inspection staff and will be part of the environmental training to be conducted prior to construction. During the permitting process, it will be determined if agency approval is needed to commence drilling operations after a release. If so, a detailed communication protocol will be established in consultation with the contractor, TGP staff, and the agencies. The protocol will include agency contact names, TGP contacts, reporting limits, reporting time schedules, reporting tracking, and approval tracking.

# 4.5.    Clean-up

Inadvertent returns are most frequent near the exit and entry points of the HDD crossing, where the drill is relatively near the surface and usually traversing the soils or sediments above bedrock. If inadvertent surface returns occur on dry land, it will be the responsibility of the HDD contractor to contain, collect, and restore the disturbed area in accordance with the requirements of TGP's construction specifications. If inadvertent returns occur within a wetland, waterway or other sensitive areas, TGP will notify appropriate agencies and evaluate the potential impact of the release on a site-specific basis in order to determine an appropriate corrective actions.

In general, TGP does not believe that it is environmentally beneficial to try to contain and collect drilling fluid returns in a waterway since HDD drilling fluids are nontoxic and discharge of the amounts normally associated with inadvertent returns does not pose a threat to the environment and public health and safety (see Section 4.1.1 above). Placement of containment structures and attempts to collect drilling fluid within a waterway often results in greater environmental impact than simply allowing the drilling fluid returns to dissipate naturally.

AR 001515

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

The following response actions will be taken if an inadvertent release is detected on the surface: If an inadvertent return occurs on land:

- Tennessee's inspector will document steps taken by the HDD contractor to contain and collect the return.

- Inadvertent surface returns of drilling fluids will be contained immediately with hand placed barriers (i.e., hay bales, sand bags, silt fences, etc.) and collected using pumps, as practicable.

  o If the amount of the surface return exceeds that which can be contained with hand placed barriers, small collection sumps (less than 5 cubic yards) may be used.

  o If the amount of the surface return is not enough to allow practical collection, the affected area will be diluted with fresh water and the fluid allowed to dry and dissipate naturally.

- If the amount of the surface return exceeds that which can be contained and collected using small sumps, drilling operations will be suspended until surface return volumes can be brought under control.

- If the HDD contractor fails to comply with the requirements of the HDD specification, Tennessee's inspector will notify Tennessee so that appropriate actions can be taken.

If an inadvertent return occurs in a wetland:

- After notifying appropriate regulatory agencies, Tennessee will determine if the return poses a threat to the environment.

- Protocols for release in a wetland area are similar to those for upland areas above. However, the Environmental Inspector ("EI") will consider and advise if the amount of wetland disturbance required to contain and/or collect the drilling fluid return is likely to result in greater wetland impact than impacts from the original drilling fluid return. In that case, the drilling fluid may be diluted with fresh water or allowed to dissipate over time.

If an inadvertent return occurs in a waterway:

- After notifying appropriate regulatory agencies, Tennessee will determine if the return poses a threat to the environment.

- If it is determined by the EI that the return does not pose a threat to the environment (i.e., will not affect resources such as sensitive environmental areas, protected species or their habitat, and/or cultural or archaeological sites), HDD operations will continue, as per permit conditions, and as per the notification protocol discussed earlier.

Tennessee's inspector will monitor and document the inadvertent return as well as periods of HDD contractor downtime and the HDD Contractor's drilling fluid pumping rate in case it becomes necessary to estimate inadvertent return volumes.

- If it is determined by the EI that the return does pose a threat to the environment, drilling operations will be suspended until containment measures are implemented by the HDD contractor.

  o Documentation of any containment measures employed will be provided by Tennessee's inspector.

  o Once adequate containment measures are in place, and the appropriate notification protocol has been followed, the HDD contractor will be permitted to resume drilling operations, subject to the condition that drilling operations will again be suspended immediately should the containment measures fail.



o Tennessee's inspector will periodically monitor and document both the inadvertent return and the effectiveness of the containment measures. Periods of HDD contractor downtime and the HDD contractor's drilling fluid pumping rate also will be documented in case it becomes necessary to estimate inadvertent return volumes.

**APPENDIX E**

# Draft Blasting Plan

AR 001518

July 2022

# CUMBERLAND PROJECT

## DRAFT BLASTING PLAN



AR 001519



# Contents

**1.0**     **Introduction** ...................................................................................................1-1

**2.0**     **Purpose of Blasting Plan** ...........................................................................2-1

**3.0**     **General Blasting Requirements** ................................................................3-1

**4.0**     **Site Specific Blasting Plans** .....................................................................4-1

**5.0**     **Pre-Blasting Requirements** .......................................................................5-1

**6.0**     **Monitoring** ...................................................................................................6-1

**7.0**     **Safety** .........................................................................................................7-1

     7.1     Protection of Aboveground and Underground Structures ........................7-1

     7.2     Protection of Personnel .........................................................................7-2

     7.3     Protection of Threatened and Endangered Species ..............................7-4

     7.4     Lightning Hazard ...................................................................................7-4

**8.0**     **In-Water Blasting** .......................................................................................8-2

**9.0**     **Storage Requirements** ..............................................................................9-1

JA0438

AR  001520

Case: 23-3682     Document: 56-1     Filed: 08/19/2024     Page: 445

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

CUMBERLAND PROJECT
DRAFT BLASTING PLAN

# Abbreviations and Acronyms

| | |
|---|---|
| CFR | Code of Federal Regulations |
| TGP | Tennessee Gas Pipeline Company, L.L.C. |
| Project | Cumberland Project |
| TDEC | Tennessee Department of Environment & Conservation |
| Plan | Blasting Plan |
| PPL | Peak Pressure Level |
| PPV | Peak Particle Velocity |

# 1.0    INTRODUCTION

Tennessee Gas Pipeline Company, L.L.C. ("TGP") is filing an application with the Federal Energy Regulatory Commission ("Commission" or "FERC") under Section 7(c) of the Natural Gas Act ("NGA") and Part 157 of the Commission's regulations, 18 CFR Part 157 (2022), seeking the issuance of a certificate of public convenience and necessity ("Certificate") for the construction, operation, and maintenance of the proposed Cumberland Project ("Project").

The proposed Project involves the construction and operation of the following facilities, as described in more detail below:

- Approximately 32 miles of new 30-inch-diameter natural gas lateral pipeline, connecting to TGP's existing Lines 100-3 and 100-4 (hereinafter referred to as the "Cumberland Pipeline"), located in Dickson, Houston, and Stewart counties, Tennessee. To the extent that it is practicable, feasible, and legally permitted, TGP will locate the pipeline generally parallel and adjacent to existing electric transmission lines owned and operated by Tennessee Valley Authority ("TVA").

- New bi-directional back pressure regulation facilities on TGP's Lines 100-3 and 100-4 (hereinafter referred to as the "Pressure Regulation Station"), located at the origin of the proposed Cumberland Pipeline in Dickson County, Tennessee.

- A new meter station (hereinafter referred to as the "Cumberland Meter Station"), at the terminus of the proposed Cumberland Pipeline within the TVA property located in Stewart County, Tennessee.

- In-line inspection traps (also referred to as a pig launcher and receiver) at each end of the proposed Cumberland Pipeline.

- Three new mainline valves ("MLV"), with one MLV to be located at an intermediate location along the proposed Cumberland Pipeline, and the remaining two MLVs to be located on TGP's Lines 100-3 and 100-4 (one MLV to be installed on each existing line) within the new Pressure Regulation Station.

These proposed facilities may be collectively referred to herein as the "Project Facilities."

To facilitate the construction of the Project Facilities, TGP has identified two contractor yards: one located in Houston County, Tennessee (Contractor Yard 1) and one located in Dickson County, Tennessee (Contractor Yard 2). Access to the Project's construction workspace and permanent easement for construction and operation purposes will be provided using temporary and permanent access roads.

This Draft Blasting Plan ("Plan") describes the procedures and conditions that Tennessee Gas Pipeline Company, L.L.C. ("TGP") will use where blasting is required for the Cumberland Project ("Project"). Blasting activities will follow the general guidance and specifications in this Plan as well as the site-specific plans to be prepared by TGP's blasting contractor(s).



# 2.0    PURPOSE OF BLASTING PLAN

This Plan provides guidelines and general conditions for all blasting activities that may occur during the Project. In addition, TGP's blasting contractor(s) will be required to develop their own overall blasting procedures and site-specific blasting plans for each blasting location, which will provide more specifics than provided in this Plan.

This Plan is intended to identify general blasting procedures, including safety, use, storage, and transportation of explosives that are consistent with minimum safety requirements as defined by federal, state, and local regulations ATF P-5400.7 (including Title 27 Code of Federal Regulations ["CFR"] 181 – Commerce in Explosives; Title 49 CFR 177 - Carriage by Public Highway; Title 29 CFR 1926.900 et seq. Sub-part U – Safety and Health Regulations for Construction – Blasting and Use of Explosives; Title 29 CFR 1910.109 – Explosives and Blasting Agents; 29 CFR 1926.900- General Provisions and sections 901, 902, and 904-911; Tennessee Code, Title 68, Chapter 105, Blasting and Explosives) and National Fire Prevention Association 495, Explosive Materials Code, Chapter 11, and SLP 22. Additionally, this Plan is intended to address environmental aspects of blasting activities and to identify areas of concern along the proposed pipeline route. Conventional trenching techniques will typically be used to bury the pipeline below existing grade; however, field survey and desktop data have identified the potential for shallow bedrock where blasting will be necessary.



# 3.0    GENERAL BLASTING REQUIREMENTS

Blasting operations must be conducted by or under the direct and constant supervision of personnel legally licensed and certified to perform such activity in the jurisdiction where blasting occurs. Prior to any blasting activities, the blasting contractor(s) will provide TGP with appropriate information documenting the experience, licenses, and permits associated with blasting personnel.

Blasting-related operations, including obtaining, transporting, storing, handling, loading, detonating, and disposing of blasting material; drilling; and ground vibration monitoring shall comply with applicable federal, state, and local regulations; permit conditions; and the construction contract.

Blasting for grade or trench excavation must be used where deemed necessary by a construction expert after examination of the site and in other locations only after other reasonable means of excavation have been used and are unsuccessful in achieving the required results. TGP may specify locations (e.g., foreign line crossings, near structures) where consolidated rock must be removed by approved mechanical equipment such as rock-trenching machines, rock saws, hydraulic rams, or jack hammers in lieu of blasting.

Before blasting, site-specific blasting plans consistent with the provisions of this Plan must be submitted by the blasting contractor(s) to TGP for approval and review by a TGP engineer. Should there be an existing pipeline within 50 feet of an area proposed for blasting, the blasting contractor shall complete pipeline stress calculations for the proposed blast design. The proposed blast design and stress calculations must be reviewed by TGP and approved before blasting may commence.

Controlled blasting will not be used in TDEC jurisdictional waters or USACE jurisdictional waters characterized by karst-prone geology with an unacceptable risk of hydrologic loss. TGP will not utilize controlled blasting in wetland habitats. All blasting must be conducted with a TGP Inspector present.

# 4.0    SITE SPECIFIC BLASTING PLANS

The blasting contractor(s) will create a site-specific blasting plan for any area determined to require blasting. The site-specific blasting plan will include specific details and calculations regarding dynamic environmental variables that will be measured closer to the time of the blast. This site-specific blasting plan will consider environmental conditions and specific blasting methods to be used at the time of construction. The site-specific blasting plan will include a pre- blast risk assessment and must include at a minimum the following information:

- Blasting contractor's name, company, copy of license, and statement of qualifications; seismograph company, names, equipment, and sensor location;

- Site location (stationing), and associated rock type and geological structure (e.g., solid, layered, or fractured);

- Copies of all required federal, state, and local permits;

- Methods and materials including explosive type, product name and size, weight per unit, and density; stemming material; tamping method; blasting sequence; use of non-electric or electronic initiation systems for all blasting operations; magazine type; and locations for storage of explosives and detonating caps;

- Site dimensions, including explosive depth, distribution, and maximum charge and weight per delay, and hole depth, diameter, and pattern, and number of holes per delay;

- Dates and hours for conducting blasting, distance and, orientation to nearest aboveground and underground structures;

- The distance within which structures may be affected by the blast and note all structures located within that distance. At a minimum, all structures within 200 feet of any blast shall be noted.

- Blasting procedures for:

  o Storing, handling, transporting, loading, and firing explosives;

  o Prevention of misfires, flyrock (including the flyrock performance measures specific to the blasting location/activity), fire prevention, noise, and stray current accidental detonation;

  o Signs, flagmen, and warning signals (prior to each blast);

  o Those locations where the pipeline route and construction workspace:

    – Parallels or crosses an electrical transmission corridor, cable, or pipeline;

    – Parallels or crosses a highway or road;

    – Is within 150 feet of a well or other potable water source; or

  o Those locations where the blasting is within 200 feet of any residence, building, or occupied structure.

- Local notification of affected residences, buildings, and occupied structures within the distances established by the blasting contractor's pre-blast surveys. The contractor must include the method(s) and timing of all notifications;

- Inspections after each blast; and

- Disposal of waste blasting material.



# 5.0    PRE-BLASTING REQUIREMENTS

Prior to the initiation of blasting operations, the blasting contractor(s) must comply with the following:

- Submit to the TGP representative its site-specific blasting plan for approval prior to execution of blasting activity.

- Obtain all required federal, state, and local permits relating to the transportation, storage, handling, loading, and detonation of explosives.

- Make all necessary "One Call" notifications in accordance with local One Call requirements.

- Complete all necessary notifications, surveys, and testing for the protection of aboveground and underground structures as described under Section 7.1 and be responsible for the protection of existing underground facilities.

- Before performing any work on or accessing the right-of-way, verify to TGP that all property owners have been notified of the impending construction.



# 6.0   MONITORING

During blasting operations, the blasting contractor(s) will be required to monitor operations in the following manner:

- Provide seismographic equipment to measure the peak particle velocity ("PPV") of all blasts in the vertical, horizontal, and longitudinal directions. Seismic monitoring can only be discontinued if 1) the blasting schedule and blasting performance consistently produce PPVs at the pipeline that are lower than the maximum allowable limit; and 2) a TGP representative provides written authorization.

  - An independent third-party contractor will monitor the seismographs and provide Blasting Log records to a TGP representative and the blasting contractor(s).

  - All seismographs will be deployed and calibrated per the standards outlined by the International Society of Explosive Engineers.

- Measure the PPV at adjacent pipeline(s), at potable water sources, and at any aboveground structure. If access cannot be gained to these locations, the PPV shall be measured at the edge of the construction workspace, or as close as possible to the location.

- Complete a Blast Report immediately after each blast and submit a copy to a TGP representative.


# 7.0   SAFETY

## 7.1   Protection of Aboveground and Underground Structures

Where blasting is required, TGP will assist with identifying municipal water mains and will consult the local water authority.

The blasting contractor(s) shall exercise control to prevent damage to aboveground and underground structures, including buildings, pipelines, utilities, springs, and water wells within 150 feet of the proposed construction area. The contractor will implement the following procedures:

- Any potable water source and/or associated pipe system within will be tested, as allowed by the landowner, for yield and water quality before blasting. If damaged, TGP will repair or otherwise restore any damage, or TGP will compensate the owner for damages. TGP will provide an alternative potable water supply to the landowner until repairs occur. Locations of water pipes within the construction workspace will be noted on TGP's construction alignment sheets.

- A third-party monitor and a TGP representative will inspect all aboveground structures within 200 feet of the blasting area, before and after the blasting. In the unlikely event that damage occurs to the aboveground structure, the owner will be compensated.

- The blasting contractor(s) is responsible for the ultimate resolution of all damage claims resulting from blasting. Such liability is not restricted by the inspection distance established by the blasting contractor, as discussed above.

- Blasting will not be allowed within 15 feet of an existing pipeline, unless specifically authorized by TGP.

- Holes that have contained explosive material shall not be re-drilled. Holes must not be drilled where danger exists of intersecting another hole containing explosive material.

- Blasting mats or padding may be used on shots where necessary to prevent scattering of loose rock onto adjacent property and to prevent damage to nearby structures and overhead utilities.

- Blasting cannot begin until occupants of nearby buildings, stores, residences, places of business, places of public gathering, administrators of public recreation areas, and farmers have been notified by the blasting contractor(s) sufficiently in advance to protect personnel, property, and livestock. The blasting contractor(s) must notify all such parties at least 48 hours prior to blasting; the specifics of how this notification will occur will be in the site-specific blasting plan.

- Blasting in or near environmentally sensitive areas such as streams and wildlife areas may include additional restrictions.

- All blasting is subject to the following limitations.

  o Maximum PPV of 1.25 inches/second measured at the edge of any structure within 300 feet of the blast.

  o Maximum PPL of 128 dB measured at a residential point of reception

  o Maximum diameter of explosive may be no larger than 2 inches unless approved by TGP.

  o Explosive agents and ignition methods shall be approved by TGP. Ammonium nitrate-fuel oil (ANFO) and other free flowing explosives and blasting agents are not acceptable and cannot

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

CUMBERLAND PROJECT
DRAFT BLASTING PLAN

be used.

- o   Drill holes may not be left loaded overnight.

- o   Clean, crushed 1/4 - 3/8-inch angular stemming material is to be used in all holes.

- The drilling pattern must be set in a manner to achieve smaller rock fragmentation (maximum 1 foot in diameter) in order to use as much as possible of the blasted rock as backfill material after the pipe has been padded in accordance with the specifications. The blasting contractor(s) must submit the proposed drilling pattern to TGP for approval.

- Under pipeline crossings and all other areas where drilling and blasting is required within 15 feet of existing facilities:

- o   Drill holes must be reduced to a maximum of 2 inches or less in diameter.

- o   The number of holes shot at one time is limited to three unless otherwise approved by TGP.

- o   Appropriate delay between charges to attain desired fragmentation.

# 7.2     Protection of Personnel

The blasting contractor(s) must include in its procedures all federal, state, county, and local safety requirements for blasting. The blasting contractor's procedures must address, at a minimum, the following requirements:

- Only authorized, qualified, and experienced personnel can handle explosives.

- All blasting activities must be conducted only during daylight hours.

- No explosive materials may be located where they may be exposed to flame, excessive heat, sparks, or impact. Smoking, firearms, matches, open flames, and heat- and spark- producing devices shall be prohibited in or near explosive magazines or while explosives are being handled, transported, or used.

- A code of blasting signals must be established, posted in conspicuous places, and utilized during blasting operations. Employee training shall be conducted on the use and implementation of the code.

- The blasting contractor(s) must use every reasonable precaution to ensure personnel safety, including but not limited to visual and audible warning signals, warning signs, flag person, and barricades.

- Warning signs, with lettering a minimum of 4 inches in height on a contrasting background, will be erected and maintained at all approaches to the blast area.

- Flaggers shall be stationed on all roadways passing within 1,000 feet of the blast area to stop all traffic during blasting operations.

- All personnel not involved in the actual detonation must stand back at least 1,000 feet and workers involved in the actual detonation must stand back at least 650 feet from the time the blast signal is given until the "ALL CLEAR" has been sounded.

- No loaded holes can be left unattended or unprotected. No explosives or blasting agent can be abandoned.

- In the case of a misfire, the blaster must provide proper safeguards for personnel until the misfire has been re-blasted or safely removed.

- The blasting contractor(s) will be required to develop a plan to prevent fly rock. Blast mats shall be used in areas where the blast design alone is not adequate to prevent fly rock.

- TGP may employ two-way radios for communication between vehicles and office facilities. The blasting contractor(s) must advise TGP and other pipeline contractors of any need to cease use of such equipment during blasting activities.

- Previous blast areas must be inspected to verify the absence of misfires. No drilling may commence until such inspection occurs. If a misfire occurs adjacent to a hole to be drilled, the misfire will be cleared by the blaster using whatever techniques are called for by the situation prior to commencement of drilling. If a misfire occurs at some distance from the drilling area, drilling may be stopped while clearing preparations are underway. When the misfire is to be cleared by re-shooting, drilling will be shut down and personnel evacuated to a place of safety prior to detonation.

- All transportation of explosives will be in accordance with applicable federal, state, and local laws and regulations. Vehicles used to transport explosives must be in proper working condition and equipped with tight wooden or non-sparking metal floor and sides. If explosives are carried in an open-bodied truck, they will be covered with a waterproof and flame-resistant tarpaulin. Wiring will be fully insulated to prevent short-circuiting and at least two fire extinguishers will be carried onboard. The truck will be plainly marked to identify its cargo so that the public may be adequately warned. Metal, flammable, or corrosive substances will not be transported in the same vehicle with explosives. There will be no smoking, and unauthorized or unnecessary personnel will not be allowed in the vehicle. Competent, qualified personnel will load and unload explosives into or from the vehicle.

- No sparking metal tools will be used to open of explosives. Metallic slitters will be used to open fiberboard cases, provided the metallic slitter does not come in contact with the metallic fasteners of the case. There will be no smoking, no matches, no open lights, or other fire or flame nearby while handling or using explosives. Explosives will not be placed where they are subject to flame, excessive heat, sparks, or impact. Partial cases or packages of explosives will be re-closed after use. No explosives will be carried in the pockets or clothing of personnel. The wires of an electric blasting cap shall not be tampered with in any way. Wires will not be uncoiled. The use of electric blasting caps will not be permitted during dust storms or near any other source of large charges of static electricity. Uncoiling of the wires or use of electric caps will not be permitted near radio-frequency transmitters. The firing circuit will be completely insulated from the ground or other conductors.

- No blast will be fired without a positive signal from the person in charge. This person will have made certain that all surplus explosives are in a safe place; all persons, vehicles, and/or boats are at a safe distance; and adequate warning has been given. Adequate warning of a blast will consist of but not be limited to the following:

  o Notification to nearby homeowners and local agencies if necessary;

  o Stop vehicular and/or pedestrian traffic near the blast site; and

  o Signal given by an air horn, whistle, or similar device using standard warning signals.

- Only authorized and necessary personnel will be present where explosives are being handled or used.

- Condition of the hole will be checked with a wooden tamping pole prior to loading. Surplus explosives will not be stacked near working areas during loading. No explosives will be forced into a bore hole past an obstruction.

- Loading will be done by a blaster holding a valid license or by personnel under his direct

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

supervision.

- If fly-rock leaves the right-of-way, it shall be retrieved immediately.

# 7.3    Protection of Threatened and Endangered Species

TGP has consulted with state and federal agencies regarding sensitive habitats or where species are known to occur and will continue these consultations. Areas identified as containing sensitive habitats or species, as directed by the appropriate agencies, will be staked and flagged. A qualified project biologist will survey the proposed blasting zone identified by the pipeline blasting contractor(s) immediately in advance of any drilling or blasting. Areas will be checked before and after blasting for the presence of sensitive species, and disturbance to species and habitats will be resolved in accordance with guidance provided by the appropriate agencies.

# 7.4    Lightning Hazard

A risk of accidental detonation caused by lightning strikes exists at any time the workplace is experiencing an electrical storm and there are loaded holes on site. If this hazard is judged to exist by the TGP representative, work will discontinue at all operations and workers will be moved to secure positions away from the loaded holes. Furthermore, workers may not return to the work site until the storm has passed and the TGP representative has indicated it is clear to return.

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

CUMBERLAND PROJECT
DRAFT BLASTING PLAN

# 8.0 BLASTING IN WATERBODIES

A desktop analysis of the study area identified a few areas of shallow bedrock where controlled blasting may become necessary to cross the waterbody using the dry open cut construction method.

If bedrock is encountered during trenching, TGP plans to remove such bedrock using one of the techniques detailed below. The technique selected by TGP's construction contractor will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location. Techniques to be used are the following:

1. Conventional excavation with an excavator;

2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;

3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;

4. Removal by rock trencher; or

5. Controlled blasting and excavation with a backhoe.

At stream crossings, TGP's construction contractor will evaluate and attempt the use of at least one of Techniques 1-4 described above based on the conditions observed at the time of construction to determine the best method for rock removal and excavation. If the initial technique is unsuccessful for rock removal and excavation at stream crossings, Technique 5 (controlled blasting) will be considered in non-karst areas that are also not in wetlands or streams with an unacceptable risk of hydrologic loss.

In the event that controlled blasting is needed, a qualified contractor will develop a plan of action that is specific and unique to each waterbody crossing that requires controlled blasting. A qualified Project biologist will then survey the area immediately in advance of any drilling or controlled blasting for the presence of any sensitive species. Once cleared, holes will be drilled down into the streambed and carefully loaded with explosives and packed with aggregates. A pre-blast safety check will then be performed, followed by the detonation of the explosives that will result in a small release of dust and mounding of the surface.

The use of controlled blasting would drastically minimize the duration of instream work and temporary disruptions to stream flow. The overall area of construction impacts when using controlled blasting is significantly smaller in comparison to the other construction methods. TGP will ensure that controlled basting is localized and isolated to within the trench line to minimize the movement of materials outside of the waterbody. Drill patterns will be set so that they achieve smaller rock fragments which will allow for the use of as much of the fragmented rock as possible when restoring the trench to its pre-construction condition. Rock fragments will also be shifted, as needed, to maintain the contours and flow patterns of the waterbody after the blasting is complete.

After extensive geotechnical analysis, it does not appear that controlled blasting will be required for most waterbody crossing locations. Regardless, controlled blasting will not be used in karst-prone materials. The use of the dry open cut with controlled blasting will only be used as a last resort if other trenching methods have been considered but found to be unsuccessful. To further avoid or minimize the impacts to waterbodies to the extent practicable, TGP will implement the following procedures when utilizing controlled blasting with dry open cut trenching.

• Limiting the width of crossing to 75 feet;

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

CUMBERLAND PROJECT
DRAFT BLASTING PLAN

- Locating extra work areas at a minimum of 50 feet from waterbodies (except where adjacent land is agriculture or disturbed);

- Conduct all blasting in dry conditions within the 75 feet workspace;

- Expediting each crossing during construction activities by completing stream crossings separate from the mainline construction; and

- Restoring crossings and original contours immediately following installation.

TGP has consulted with the Tennessee Department of Environment & Conservation Division of Natural Areas ("DNA") and the U.S. Fish and Wildlife Service ("USFWS") regarding these waterbody crossings to understand the presence of protected species. Both the DNA and USFWS have concurred that protected species are not likely to be adversely affected by Project activities. Following all construction activities, all affected waterbody channels, wetlands, and adjacent floodplains will be restored to pre-construction contours, alignment, and conditions through post-construction restoration activities to the maximum extent practicable. TGP will monitor these crossings following construction as part of its post-construction monitoring plan.

Where specified, the blasting contractor(s) will furnish the necessary labor and equipment to for the protection of existing pipelines, wildlife, or other facilities, or other best management practices required by regulatory agencies.

JA0451

AR  001533



# 9.0    STORAGE REQUIREMENTS

All explosives, blasting agents, and initiation devices must be stored in authorized magazines provided by third-party vendors that meet U.S. Department of Homeland Security and Bureau of Alcohol, Tobacco, Firearms, and Explosives security regulations. The magazines must further be constructed, approved, and licensed in accordance with all additional local, state, and federal regulations. Magazines must be dry, well-ventilated, reasonably cool (painting of the exterior with a reflective color), bullet and fire resistant, and clean.

Initiation devices cannot be stored in the same box, container, or magazine with other explosives. Explosives, blasting agents, or initiation devices cannot be stored in wet or damp areas; near oil, gasoline, or cleaning solvents; or near sources of heat radiators, steam pipes, stoves, etc. No metal or metal tools can be stored in the magazine. There can be no smoking, matches, open lights, or other fire or flame inside or within 50 feet of storage magazines or explosive materials. The loading and unloading of explosive materials into or out of the magazine will be done in a business-like manner with no loitering, horseplay, or prank playing.

Magazines will be kept locked at all times unless explosives are being delivered or removed by authorized personnel. Admittance will be restricted to the magazine keeper, blasting supervisor, or licensed blaster. Magazine construction shall meet the requirements of Bureau of Alcohol, Tobacco, Firearms, and Explosives P5400.7 "Explosives Law and Regulations" and be in accordance with local, state, or federal regulations and the Blaster's Handbook.

Accurate and current records must be kept of the explosive material inventory to ensure that oldest stocks are utilized first, satisfy regulatory requirements, and facilitate immediate notification of any loss or theft. Magazine records will reflect the quantity of explosions removed, the amount returned, and the net quantity used at the blasting site.

When explosive materials are taken from the storage magazine, they must be kept in the original containers until used. Small quantities of explosive materials may be placed in day boxes, powder chests, or detonator boxes. Any explosive material not used at the blast site must be returned to the storage magazine and replaced in the original container as soon as possible.

Magazine locations must be in accordance with local, state, or federal regulations. Where no regulations apply, magazines shall be located in accordance with the latest edition of the 175th Anniversary Edition of the Blaster's Handbook and ATF P5400-7 "Explosives Law and Regulations."

Magazines will be marked in minimum 3-inch-high letters with the words "DANGER – EXPLOSIVES" prominently displayed on all sides and roof.

JA0452

**APPENDIX F**

# Draft Hydrostatic Test Plan

AR 001535

July 2022

# CUMBERLAND PROJECT

## DRAFT HYDROSTATIC TEST PLAN



AR  001536

# Contents

1.0   **Introduction** ...................................................................................................**1-1**

2.0   **Draft Hydrostatic Test Plan**..............................................................................**2-1**

# List of Tables

TABLE 2-1     Potential Sources of Hydrostatic Pressure Test Water for the Project ............. 2-1

# Abbreviations and Acronyms

| | |
|---|---|
| Certificate | Certificate of Public Convenience and Necessity |
| FERC or Commission | Federal Energy Regulatory Commission |
| MLV | Mainline Valve |
| NGA | Natural Gas Act |
| Project | Cumberland Project |
| TGP | Tennessee Gas Pipeline Company, L.L.C. |
| TVA | Tennessee Valley Authority |
| USDOT | United States Department of Transportation |

# 1.    INTRODUCTION

Tennessee Gas Pipeline Company, L.L.C. ("TGP") is filing an application with the Federal Energy Regulatory Commission ("Commission" or "FERC") under Section 7(c) of the Natural Gas Act ("NGA") and Part 157 of the Commission's regulations, 18 CFR Part 157 (2022), seeking the issuance of a certificate of public convenience and necessity ("Certificate") for the construction, operation, and maintenance of the proposed Cumberland Project ("Project").

The proposed Project involves the construction and operation of the following facilities, as described in more detail below:

- Approximately 32 miles of new 30-inch-diameter natural gas lateral pipeline, connecting to TGP's existing Lines 100-3 and 100-4 (hereinafter referred to as the "Cumberland Pipeline"), located in Dickson, Houston, and Stewart counties, Tennessee. To the extent that it is practicable, feasible, and legally permitted, TGP will locate the pipeline generally parallel and adjacent to existing electric transmission lines owned and operated by Tennessee Valley Authority ("TVA").

- New bi-directional back pressure regulation facilities on TGP's Lines 100-3 and 100-4 (hereinafter referred to as the "Pressure Regulation Station"), located at the origin of the proposed Cumberland Pipeline in Dickson County, Tennessee.

- A new meter station (hereinafter referred to as the "Cumberland Meter Station"), at the terminus of the proposed Cumberland Pipeline within the TVA property located in Stewart County, Tennessee.

- In-line inspection traps (also referred to as a pig launcher and receiver) at each end of the proposed Cumberland Pipeline.

- Three new mainline valves ("MLV"), with one MLV to be located at an intermediate location along the proposed Cumberland Pipeline, and the remaining two MLVs to be located on TGP's Lines 100-3 and 100-4 (one MLV to be installed on each existing line) within the new Pressure Regulation Station.

These proposed facilities may be collectively referred to herein as the "Project Facilities."

To facilitate the construction of the Project Facilities, TGP has identified two contractor yards: one located in Houston County, Tennessee (Contractor Yard 1) and one located in Dickson County, Tennessee (Contractor Yard 2). Access to the Project's construction workspace and permanent easement for construction and operation purposes will be provided using temporary and permanent access roads.

# 2.    DRAFT HYDROSTATIC TEST PLAN

In compliance with U.S. Department of Transportation (USDOT) specifications, TGP will conduct, hydrostatic testing on all pipeline segments prior to placing them in service. Preliminary sources of hydrostatic test water and construction methods for the proposed Project are identified in **Table 2-1** and in Resource Report 1. Hydrostatic testing will be conducted in accordance with USDOT regulations codified at Title 49 CFR Part 192 to verify the integrity of the pipelines before being placed into service. Determination of the exact locations of test sections depends on a number of factors, including pipeline class location, elevation differences along the route, available water sources, construction constraints, and the most practical testing method (e.g., hydrostatic or air). Water will be pumped into the test section behind a fill pig. Hydrostatic test water will be obtained in compliance with state regulations and existing water rights.

The pipe segments will be capped with manifolds, filled with water, pressurized, and held for one or eight hours. Any significant loss of pressure will indicate that a leak may have occurred and warrant further inspection and, where necessary, repair. Water may be re-used for hydrostatic testing between the new pipeline segments. The test water is expected to contact only new pipe, and no additives or chemicals will be added to the test water. Upon completion of the hydrostatic tests, the wastewater will be discharged to an upland area through a dewatering structure consisting of an energy dissipation device and water filtration structure. Environmental impacts from withdrawal and discharge of test water will be minimized by utilizing the measures outlined in the Commission's Plan and Procedures (Resource Report 1, Appendix 1.D.1 and 1.D.2), as well as by complying with all applicable state and federal permit requirements. The test water will not be discharged directly into streams/rivers or contain chemical additives, and no chemicals will be used after testing (e.g., to dry the pipe). Should it be determined that additives are necessary based on the source and composition of the test water, TGP will submit detailed information on any chemicals to the Commission for review and approval prior to use. Compressed air, nitrogen, or other inert gases may be used as a test medium as allowed by 49 CFR Part 192.

TGP anticipates filing applications with state agencies for hydrostatic testing water uptake and discharge. In accordance with Sections VII.C.2 and VII.D.2 of the Commission's Procedures, hydrostatic test water will not be obtained from, or discharged to, designated high quality streams unless approved by the applicable state permitting agency.

**TABLE 2-1**
**Potential Sources of Hydrostatic Pressure Test Water for the Project**

| Potential Source(s) | Approximate Milepost | Water Quantity (gallons) | Manifold/Discharge Location (MP)[1] |
|---|---|---|---|
| **Dickson County** | | | |
| Jones Creek | 3.20 | 3,212,000 | 3.20 |
| Barton's Creek | 10.08 | 1,696,000 | 10.08 |
| Furnace Creek | 12.14 | 748,000 | 12.14 |
| Dry Hollow Branch | 14.02 | 357,000 | 14.02 |
| Little Barton's Creek | 16.65 | 499,000 | 16.65 |
| Municipal and/or Private Sources | N/A | Unknown | Unknown |
| **Houston County** | | | |

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

**TABLE 2-1**
**Potential Sources of Hydrostatic Pressure Test Water for the Project**

| Potential Source(s) | Approximate Milepost | Water Quantity (gallons) | Manifold/Discharge Location (MP)[1] |
|---|---|---|---|
| Yellow Creek | 22.75 | 3,571,000 | 22.75 |
| Guices Creek | 26.44 | 915,000 | 26.44 |
| Municipal and/or Private Sources | N/A | Unknown | Unknown |
| **Stewart County** | | | |
| Wells Creek | 30.68 | 3,627,000 | 30.6 |
| Cumberland River (offline source) if needed Lat. 36 23'48.82" Long. 87 39'33.29" | | 2,000,000 | TBD |
| Municipal and/or Private Sources | N/A | Unknown | Unknown |
| **Project Total** | | **6,131,000[2]** | -- |
| [1] Water will be discharged to upland areas near the point of withdrawal through an energy dissipating device. [2] Project Total Water needed. Does not represent column total. | | | |

AR  001540

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC**
**RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**Attachment 6** – Permitting Table



**Attachment 6**
**Permits, Approvals, Certifications, Consultations, and Notifications Anticipated for Construction and Operation of the Cumberland Project**

| Agency/Native American Tribe | Permit/Approval/ Consultation/ Notification | Anticipated/Actual Date [1] | | Agency Contact | Status |
|---|---|---|---|---|---|
| | | Submittal | Approval | | |
| **Federal** | | | | | |
| Federal Energy Regulatory Commission ("FERC"), Office of Energy Projects | Section 7(c) Natural Gas Act - Certificate of Public Convenience and Necessity | *7/2022* | *11/2023* | Doug Cotton, Project Manager FERC<br><br>Julia Yuan, Assistant Project Manager<br>Office of Energy Projects<br>888 First Street, NE<br>Washington, DC 20426 | This certificate application, filed 7/22/2022. |
| United States Environmental Protection Agency ("USEPA"), Region 4 | Compliance with Sections 401, 402, and 404 of the Clean Water Act | -- | -- | USEPA, Region 4<br>61 Forsyth Street SW<br>Atlanta, GA 30303 | USEPA will be notified upon submittal of the certificate application. USEPA review anticipated to be concurrent with FERC's review of the certificate application. |

AR 001542

**Attachment 6**
**Permits, Approvals, Certifications, Consultations, and Notifications Anticipated for Construction and Operation of the Cumberland Project**

| Agency/Native American Tribe | Permit/Approval/ Consultation/ Notification | Anticipated/Actual Date [1] | | Agency Contact | Status |
|---|---|---|---|---|---|
| | | Submittal | Approval | | |
| United States Army Corps of Engineers ("USACE"), Nashville Regulatory District, West Branch Section | Section 404 Clean Water Act / Section 10 Rivers and Harbors Act Permit | 7/2022 | Q4/2023 | Tim Wilder, Chief USACE, Nashville District, West Branch 3701 Bell Road, Nashville, TN 37214 | Joint meeting with USACE and TDEC staff held 9/21/2021.<br><br>Participation in FERC Pre-Filing process request sent 9/28/2021. Response agreeing to participate in process received 9/28/2021.<br><br>Meeting to discuss preliminary Project impacts and permit mechanism held 11/29/2021.<br><br>Pre-consultation information letter provided to USACE on 4/21/22.<br><br>Pre-application meeting with USACE held on 5/4/2022, and follow-up meeting held on 5/24/2022.<br><br>USACE Section 404 Clean Water Act / Section 10 Rivers and Harbors Act Permit Application submitted to USACE on 7/22/2022. |

AR  001543

**Attachment 6**
**Permits, Approvals, Certifications, Consultations, and Notifications Anticipated for Construction and Operation of the Cumberland Project**

| Agency/Native American Tribe | Permit/Approval/ Consultation/ Notification | Anticipated/Actual Date [1] | | Agency Contact | Status |
|---|---|---|---|---|---|
| | | Submittal | Approval | | |
| United States Fish and Wildlife Service ("USFWS"), Tennessee Ecological Services Office | Consultation under Endangered Species Act, Bald and Golden Eagle Protection Act, and Migratory Bird Treaty Act | *2/22/2022* | *3/11/2022* | David Pelren, Fish & Wildlife Biologist USFWS, TN Ecological Services Office 446 Neal Street Cookeville, TN 38501-4027 | Initial notification letter / request for review of federally listed species survey list sent 6/3/2021. Response confirming species list received 7/21/2021. Meeting with USFWS to discuss preliminary listed species findings and aquatic survey plans held 7/27/2021. Participation in FERC Pre-Filing process request sent 9/28/2021. Response agreeing to participate in process received 10/15/2021. Concurrence of "not likely to adversely affect" dated 3/10/2022. |
| Advisory Council on Historic Preservation ("ACHP") | National Historic Preservation Act (NHPA), Section 106 Consultation | -- | -- | ACHP 401 F Street NW, Suite 308 Washington, DC 20001 | ACHP will be notified if it is determined that the Project would have an adverse effect on historic properties. |

AR 001544

| Tennessee Historical Commission ("THC"), State Historic Preservation Office | NHPA, Section 106 Consultation | 3/2022 | 8/2022 | Patrick McIntyre, Executive Director<br>Jennifer Barnett, Federal Programs Archaeologist THC<br>2941 Lebanon Pike<br>Nashville, TN 37243-0442 | Initial notification letter / request for of Phase I cultural work plan sent 6/14/2021. Response approving Phase I cultural work plan received 6/15/2021<br><br>Phase II cultural workplans sent 9/13/2021. Response requesting Phase I cultural survey report received 9/14/2021.<br><br>Participation in FERC Pre-Filing process request sent 9/28/2021. No response received.<br><br>Phase I cultural survey report and revised Phase II cultural workplans sent 10/28/2021. Concurrence with Phase I cultural survey report (with exception of recommendations for site 40SW63) and Phase II cultural workplans received 11/03/2021.<br><br>Phase II workplans for site 40SW63 and 40SW710 (TVA property) sent 2/17/2022 and concurrence received from THC on 2/17/2022.<br><br>TVA ARPA Permit application for site 40SW63 and 40SW710 submitted 2/17/2022. Revised Phase II workplan submitted to TVA 3/2/2022. ARPA permit approval was received 4/14/2022.<br><br>An updated Unanticipated Discovery Plan was submitted for review to THC and TVA on 6/8/2022. THC provided approval of the updated UDP on 6/9/2022 and TVA approved on 6/14/2022.<br><br>The Phase I Cultural Resources Survey Addendum Report was submitted to THC on 7/7/2022 and THC provided concurrence with the report on 7/12/2022. |

AR  001545

**Attachment 6**
**Permits, Approvals, Certifications, Consultations, and Notifications Anticipated for Construction and Operation of the Cumberland Project**

| Agency/Native American Tribe | Permit/Approval/ Consultation/ Notification | Anticipated/Actual Date [1] | | Agency Contact | Status |
|---|---|---|---|---|---|
| | | Submittal | Approval | | |
| | | | | | The Phase II reports for the Archaeological Investigation of Site 40DS113 Report; Phase II Archaeological Investigation of Site 40HO83 Report; and Phase II Archaeological Investigation of Sites 40HO84, 40HO85, and 40HO86 Report submitted on 7/18/2022.  Updated cover letter for these sites provided to THC on 7/19/2022. |
| National Park Service ("NPS"), Southeast Region | Consultation under Wild and Scenic River Act for Crossing of Nationwide Rivers Inventory Segments | 2/2022 | 4/25/2022 | Jeff Duncan NPS, SE Region 100 Alabama Street SW, 1924 Building, Atlanta, GA 30303 | Consultation letter sent on 1/27/22. Updated letter provided to NPS on 3/22/2022 with proposed water uptake alternatives. NPS notified TGP on 4/25/2022 that the NPS has no comments or objections to the Project. |
| Natural Resources Conservation Service ("NRCS"), Nashville State Office | FERC Data Gathering Consultations | 3/22/2022 | 3/29/2022 | Sheldon Hightower NRCS, Nashville State Office 801 Broadway, 675 Courthouse Nashville, Tennessee 37203 | Initial contact made by telephone 3/9/2022 regarding soils, erosion control, and seed mixtures. Follow up on request via email on 3/22/2022. Replied on 3/29/2022 with seed mix and confirmed that no NRCS Agricultural Conservation Easement Program easements are crossed by the Project. |

AR  001546

**Attachment 6**
**Permits, Approvals, Certifications, Consultations, and Notifications Anticipated for Construction and Operation of the Cumberland Project**

| Agency/Native American Tribe | Permit/Approval/ Consultation/ Notification | Anticipated/Actual Date [1] | | Agency Contact | Status |
|---|---|---|---|---|---|
| | | Submittal | Approval | | |
| **State** | | | | | |
| Tennessee Department of Environment and Conservation ("TDEC"), Division of Natural Areas ("DNA"), Natural Heritage Program | State Threatened and Endangered Species Review | 5/18/2021 | 6/29/2021 | Dillon Blankenship TDEC, DNA, Natural Heritage Program (NHP) William R. Snodgrass Tennessee Tower, 312 Rosa L. Parks Ave., 11th Floor, Nashville, TN 37243 | Online Environmental Review Request submitted 5/18/2021. Project review response received 6/29/2021. NHP letter stated it does not anticipate any impacts to protected species. |
| TDEC, Division of Water Resources ("DWR") | Initial Consultations | 3/2022 | 6/2022 | Thomas Moss, P.G. Environmental Review Coordinator TDEC, DWR 312 Rosa L. Parks Avenue 11th Floor, Nashville, TN 37243 Tim Jennette, Field Office Manager TDEC, DWR Nashville Environmental Field Office 711 R.S. Gass Blvd, Nashville, TN 37216 Tara Wohlgemuth, Regional Director of External Affairs TDEC, DWR Cookville Environmental Field Office 1221 South Willow Avenue Cookville, TN 38506 | Project introduction meeting with USACE and TDEC staff held 9/21/2021. Participation in FERC Pre-Filing process request sent 9/28/2021. Response agreeing to participate in the process received 10/07/2021. Introductory meeting with TDEC Commissioners held 11/15/2021. |

AR 001547

**Attachment 6**
**Permits, Approvals, Certifications, Consultations, and Notifications Anticipated for Construction and Operation of the Cumberland Project**

| Agency/Native American Tribe | Permit/Approval/ Consultation/ Notification | Anticipated/Actual Date [1] | | Agency Contact | Status |
|---|---|---|---|---|---|
| | | Submittal | Approval | | |
| TDEC, DWR | Aquatic Resource Alteration Permit (which also serves as the 401 WQC) | 7/2022 | Q3 or Q4/2023 | Thomas Moss, P.G. Environmental Review Coordinator TDEC, DWR 312 Rosa L. Parks Avenue 11th Floor, Nashville, TN 37243 Lee Barber, Ph.D. Manager, Natural Resources Unit TDEC DWR 312 Rosa L. Parks Avenue, 11th Floor Nashville, TN 37243 | Application to be developed and submitted concurrently with USACE Section 404 Clean Water Act / Section 10 Rivers and Harbors Act Permit Application. Consultation meetings held with TDEC on 3/11/2022, 4/6/2022, and 6/3/2022. The Hydraulic Determination (HD) Report was submitted to TDEC 5/27/2022.   HD Report request for additional information submittal 7/19/2022. Aquatic Resource Alteration Permit (ARAP) application submitted to TDEC on 7/22/2022. |
| TDEC, DWR | National Pollutant Discharge Elimination System (NPDES) Construction General Permit No. TNR100000 | 11/2023 | 12/2023 | Thomas Moss, P.G. Environmental Review Coordinator TDEC, DWR 312 Rosa L. Parks Avenue 11th Floor, Nashville, TN 37243 Tim Jennette, Field Office Manager TDEC, DWR Nashville Environmental Field Office 711 R.S. Gass Blvd, Nashville, TN 37216 | Application to be submitted prior to construction. |

AR  001548

**Attachment 6**
**Permits, Approvals, Certifications, Consultations, and Notifications Anticipated for Construction and Operation of the Cumberland Project**

| Agency/Native American Tribe | Permit/Approval/ Consultation/ Notification | Anticipated/Actual Date [1] | | Agency Contact | Status |
|---|---|---|---|---|---|
| | | Submittal | Approval | | |
| TDEC, DWR | NPDES Hydrostatic Test Water General Permit No. TNG670000 | Q3/2023 | Q4/2023 | Thomas Moss, P.G. Environmental Review Coordinator TDEC, DWR 312 Rosa L. Parks Avenue 11th Floor, Nashville, TN 37243 Tim Jennette, Field Office Manager TDEC, DWR Nashville Environmental Field Office 711 R.S. Gass Blvd, Nashville, TN 37216 | Application to be submitted following issuance of FERC Certificate. |
| TDEC, DWR | Water Withdrawal Registration Program | -- | -- | TDEC, DWR William R. Snodgrass Tennessee Tower, 312 Rosa L. Parks Ave., 11th Floor, Nashville, TN 37243 | Annual reporting of water withdrawals based on a calendar year and reported by February 15 of the next year. |
| Tennessee Wildlife Resources Agency ("TWRA") | State Threatened and Endangered Species Consultations | 3/2022 | 10/2022 | Katie Murphy, Aquatic Habitat Protection Biologist, TWRA 5105 Edmondson Pike Nashville, TN 37211 | Initial notification letter / request for review of state listed species survey list sent 6/11/2021. Response confirming species list received 6/14/2021. TWRA Coordination letter sent on 3/24/2022. Response received 4/4/2022 requesting additional consultation on stream crossing methods. Follow up letter providing requested stream crossing methodology information and provided to TWRA on 7/15/2022. Stream crossing information with GPS coordinates provided to TWRA on 7/19/2022. |

AR 001549

**Attachment 6**
**Permits, Approvals, Certifications, Consultations, and Notifications Anticipated for Construction and Operation of the Cumberland Project**

| Agency/Native American Tribe | Permit/Approval/ Consultation/ Notification | Anticipated/Actual Date [1] | | Agency Contact | Status |
|---|---|---|---|---|---|
| | | Submittal | Approval | | |
| **Native American Tribes** | | | | | |
| Absentee-Shawnee Tribe of Indians of Oklahoma | Native American Tribal Coordination | *9/2021* | *11/2023* | Devon Frazier, Tribal Historic Preservation Officer ("THPO") 2025 S. Gordon Cooper Drive, Shawnee, OK 74801 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. No response to date. FERC letter inviting tribal participation in FERC's review of the Project posted to Docket No. PF22-2-000 on 6/14/2022. |
| Alabama-Quassarte Tribal Town | Native American Tribal Coordination | *9/2021* | *11/2023* | Wilson Yargee, Chief PO Box 187, Wetumka, OK 74883 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. No response to date. FERC letter inviting tribal participation in FERC's review of the Project posted to Docket No. PF22-2-000 on 6/14/2022. |
| Catawba Indian Nation | Native American Tribal Coordination | *9/2021* | *11/2023* | Dr. Wenonah Haire, THPO 1536 Tom Steven Road, Rock Hill, SC 29730 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. Response stating no concerns received 10/14/2021. |
| Cherokee Nation | Native American Tribal Coordination | *9/2021* | *11/2023* | Elizabeth Toombs, THPO PO Box 948, Tahlequah, OK 74465 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. Response requesting additional information received on 10/26/2021. Additional information provided 11/10/2021. FERC letter inviting tribal participation in FERC's review of the Project posted to Docket No. PF22-2-000 on 6/14/2022. |

AR 001550

**Attachment 6**
**Permits, Approvals, Certifications, Consultations, and Notifications Anticipated for Construction and Operation of the Cumberland Project**

| Agency/Native American Tribe | Permit/Approval/ Consultation/ Notification | Anticipated/Actual Date [1] | | Agency Contact | Status |
|---|---|---|---|---|---|
| | | Submittal | Approval | | |
| The Chickasaw Nation, Division of Historic Preservation, Department of Culture & Human ties | Native American Tribal Coordination | *9/2021* | *11/2023* | Karen Brunso, THPO PO Box 1548, Ada, OK 74821 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. Response received on 3/29/2022 stating that they will participate in the NHPA Section 106 process. FERC letter inviting tribal participation in FERC's review of the Project posted to Docket No. PF22-2-000 on 6/14/2022. Phase I Cultural Survey Report provided to THPO on 6/29/2022 per FERC request. Phase II workplans provided to THPO on 7/7/2022 per FERC request. |
| Choctaw Nation of Oklahoma | Native American Tribal Coordination | *9/2021* | *11/2023* | Dr. Ian Thompson, THPO PO Box 1210, Durant, OK 74702 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. No response to date. FERC letter inviting tribal participation in FERC's review of the Project posted to Docket No. PF22-2-000 on 6/14/2022. |
| Coushatta Tribe of Louisiana | Native American Tribal Coordination | *9/2021* | *11/2023* | Linda Langley, THPO PO Box 10, Elton, LA 70532 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. No response to date. FERC letter inviting tribal participation in FERC's review of the Project posted to Docket No. PF22-2-000 on 6/14/2022. |

AR 001551

**Attachment 6**
**Permits, Approvals, Certifications, Consultations, and Notifications Anticipated for Construction and Operation of the Cumberland Project**

| Agency/Native American Tribe | Permit/Approval/ Consultation/ Notification | Anticipated/Actual Date [1] | | Agency Contact | Status |
|---|---|---|---|---|---|
| | | Submittal | Approval | | |
| Eastern Band of Cherokee Indians | Native American Tribal Coordination | *9/2021* | *11/2023* | Russell Townsend, THPO PO Box 455, Cherokee, NC 28719 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. No response to date. FERC letter inviting tribal participation in FERC's review of the Project posted to Docket No. PF22-2-000 on 6/14/2022. |
| Eastern Shawnee Tribe of Oklahoma | Native American Tribal Coordination | *9/2021* | *11/2023* | Paul Barton, THPO 70500 East 128 Road, Wyandotte, OK 74370 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. Response stating no adverse effect received 9/30/2021. FERC letter inviting tribal participation in FERC's review of the Project posted to Docket No. PF22-2-000 on 6/14/2022. |
| Jena Band of Choctaw Indians | Native American Tribal Coordination | *9/2021* | *11/2023* | Alina J. Shively, THPO PO Box 14, Jena, LA 71342 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. No response to date. FERC letter inviting tribal participation in FERC's review of the Project posted to Docket No. PF22-2-000 on 6/14/2022. |
| Kialegee Tribal Town | Native American Tribal Coordination | *9/2021* | *11/2023* | David Cook, Tribal Administrator PO Box 332, Wetumka, OK 74883 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. No response to date. FERC letter inviting tribal participation in FERC's review of the Project posted to Docket No. PF22-2-000 on 6/14/2022. |

AR  001552

**Attachment 6**
**Permits, Approvals, Certifications, Consultations, and Notifications Anticipated for Construction and Operation of the Cumberland Project**

| Agency/Native American Tribe | Permit/Approval/ Consultation/ Notification | Anticipated/Actual Date [1] | | Agency Contact | Status |
|---|---|---|---|---|---|
| | | Submittal | Approval | | |
| Mississippi Band of Choctaw Indians | Native American Tribal Coordination | 9/2021 | 11/2023 | Kenneth Carleton, THPO PO Box 6257, 101 Industrial Road, Choctaw, MS 39350 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. No response to date. FERC letter inviting tribal participation in FERC's review of the Project posted to Docket No. PF22-2-000 on 6/14/2022. |
| The Muscogee Nation | Native American Tribal Coordination | 9/2021 | 11/2023 | Corain Lowe-Zepeda, THPO PO Box 580, Okmulgee, OK 74447 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. No response to date. FERC letter inviting tribal participation in FERC's review of the Project posted to Docket No. PF22-2-000 on 6/14/2022. |
| The Osage Nation, Osage Nation Historic Preservation Office | Native American Tribal Coordination | 9/20213 | 11/2023 | Dr. Andrea Hunter, Director and THPO 627 Grandview Avenue, Pawhuska, OK 74056 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. No response to date. FERC letter inviting tribal participation in FERC's review of the Cumberland Project posted to PF22-2 6/14/2022. |
| Quapaw Nation | Native American Tribal Coordination | 9/2021 | 11/2023 | Everett Bandy, QNHPP Director & Preservation Officer PO Box 765, Quapaw, OK 74363 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. No response to date. Response stating the project is outside of the current area of interest for the Quapaw Nation received 10/13/2021. |
| Shawnee Tribe | Native American Tribal Coordination | 9/2021 | 11/2023 | Tonya Tipton, THPO PO Box 189, Miami, OK 74355 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. No response to date. FERC letter inviting tribal participation in FERC's review of the Cumberland Project posted to PF22-2 6/14/2022. |

AR 001553

**Attachment 6**
**Permits, Approvals, Certifications, Consultations, and Notifications Anticipated for Construction and Operation of the Cumberland Project**

| Agency/Native American Tribe | Permit/Approval/ Consultation/ Notification | Anticipated/Actual Date [1] | | Agency Contact | Status |
|---|---|---|---|---|---|
| | | Submittal | Approval | | |
| Thlopthlocco Tribal Town | Native American Tribal Coordination | *9/2021* | *11/2023* | Galen Cloud, THPO PO Box 188, Okemah, OK 74859 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. No response to date. FERC letter inviting tribal participation in FERC's review of the Project posted to Docket No. PF22-2-000 on 6/14/2022. |
| United Keetoowah Band of Cherokee Indians in Oklahoma | Native American Tribal Coordination | *9/2021* | *11/2023* | Whitney Warrior, Director Historic Preservation & Environmental Services 18263 W. Keetoowah Circle, Tahlequah, OK 74464 | Initial notification letter and request for review of Phase II cultural workplans sent 9/13/2021. No response to date. FERC letter inviting tribal participation in FERC's review of the Project posted to Docket No. PF22-2-000 on 6/14/2022. |
| [1] Anticipated dates are shown in italics. | | | | | |

JA0472

AR 001554

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC
RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**Attachment 7** – HDD Feasiblity Studies





# Tennessee Gas Pipeline (TGP)
# Cumberland 30" Pipeline
# 30" Steel HDD at Sta. 169+00
# Jones Creek Crossing

**Submitted by:**

**Nick Garver, Oil & Gas Professional**
**p 314.391.9751**
**ngarver@f-w.com**
**July 1, 2022**

AR 001556

# TABLE OF CONTENTS

Contact Information:

**Nick Garver, Oil & Gas Professional**

p 314.391.9751

ngarver@f-w.com

July 1, 2022

1.0    **Introduction** ....................................................................................................................**3**
    1.1 Crossing Description ..................................................................................................3
    1.2 Information Provided by Others ...............................................................................3

2.0    **HDD Industry Guidelines and Best Practices** .................................................................**3**
    2.1 General Geometry ....................................................................................................3
        2.2.1 Entry Angle ....................................................................................................3
        2.2.2 Entry Tangent .................................................................................................3
        2.2.3 Exit Angle ......................................................................................................3
        2.2.4 Exit Tangent ...................................................................................................4
        2.2.5 Design Radius of Curvature ...........................................................................4
        2.2.6 Bottom Tangent .............................................................................................4
    2.2 Pipe Stress ...............................................................................................................4
        2.2.1 Pre-installation ..............................................................................................4
        2.2.2 Installation .....................................................................................................4
        2.2.3 Post Installation .............................................................................................5
        2.2.3 In-service .......................................................................................................5
    2.3 Code Requirements Followed ...................................................................................5
    2.4 Other Design Guides Referenced ..............................................................................5

3.0    **Pipe Design & Stress Analysis** .....................................................................................**6**
    3.1 Pipe Design ..............................................................................................................6
    3.2 Minimum Combined Radius of Curvature .................................................................6
    3.3 Estimated Pull Force .................................................................................................6
    3.4 Maximum Allowable Pull Force ................................................................................6

4.0    **HDD Design** ................................................................................................................**7**
    4.1 HDD Geometry .........................................................................................................7
    4.2 Topographic Challenges ...........................................................................................7
    4.3 Stratigraphic Challenges ..........................................................................................7
        4.3.1 Methane Pockets ...........................................................................................8

5.0    **Evaluation of Hydro-fracture / Inadvertent Returns** ....................................................**9**
    5.1 Subsurface Geotechnical Investigations ...................................................................9
    5.2 Methodology ............................................................................................................9
    5.3 Assumptions .............................................................................................................9

6.0    **Hydro-fracture / Inadvertent Returns Analysis** ..........................................................**11**
    6.1 Model Results .........................................................................................................11

7.0    **Construction Plans** ...................................................................................................**12**
    7.1 Owner Responsibilities ...........................................................................................12
    7.2 Contractor Responsibilities.....................................................................................12

7.2.1 Minimum Required List of IR Response Equipment / Resources .................................................12
7.2.2 Proper Tooling Selections and Drilling Techniques...........................................................................12
7.2.3 Mud Quality .................................................................................................................................13
7.2.4 Circulation Monitoring and Ground Surface Inspections ..........................................................13


**Appendix A – Proposed Plan and Profile Drawing – Preliminary** ........................................................**14**
**Appendix B – Pipe Stress Summary**...........................................................................................................**16**
**Appendix C – Hydro-fracture Pressure vs. Annular Pressure Plot** ......................................................**18**
**Appendix D – Detailed Drill Plan Requirements**.......................................................................................**20**

**Attachments:**
- **Attachment 1 – Final Geotechnical Report (Bores 1A and 1B)**

# 1.0   INTRODUCTION

## 1.1   CROSSING DESCRIPTION

The Tennessee Gas Pipeline (TGP) Cumberland 30" Pipeline is an approximately 31-mile pipeline spanning Dickson, Houston, and Stewart Counties in Tennessee. There are three (3) creeks along the alignment that require a Horizontal Directional Drill (HDD).

Farnsworth Group (FGI) was contracted to perform the HDD design on the three crossings. This report is for the 30" Steel pipeline crossing of Jones Creek at Sta. 169+00 in Dickson County, TN.

## 1.2   INFORMATION PROVIDED BY OTHERS

- Existing Conditions Linework and Surface files by Tablerock Energy
- Final Geotechnical Engineering Report by ATC Atlas containing field and laboratory testing results for geotechnical borings 1A and 1B as well as specific geotechnical properties for the Fort Payne Formation and the Chattanooga Shale
- MAOP and design pressure by TGP

# 2.0   HDD INDUSTRY GUIDELINES AND BEST PRACTICES

## 2.1   GENERAL GEOMETRY

A horizontal directional drill profile consists of a series of straight lines (known as tangents) and curves. The boundary between straight and curved sections are called points of curvature and points of tangency; these become defined by the determination of entry and exit points, entry and exit angles, radius of curvature, and desired elevation change / depth of cover.

### 2.1.1   ENTRY ANGLE

The entry angle of an HDD is ultimately determined upon several factors. Of most importance though is allowing for the anticipated rig to setup at the site. A typical entry angle ranges from 8° to 14°. Steeper angles are possible, but consideration should be given to the safe setup and position of the rig. Shallower angles are also possible, but usually only desired for slick bore crossings.

### 2.1.2   ENTRY TANGENT

There is no minimum or maximum requirement for the length of the entry tangent. However, it is suggested to provide at least 30 feet for the drilling contractor to establish at least a joint of drill pipe in the ground prior to having to make any directional changes horizontally or vertically.

### 2.1.3   EXIT ANGLE

The exit angle of an HDD is unlimited. For practical purposes of getting the bit out of the ground and avoiding longer runs of shallower depth of cover when annular pressures are usually higher, 8° is usually the recommended minimum. Exit angles can approach 14° (or higher), but extra provisions may be necessary to not overstress the product pipe during pullback. Large diameter pipe, typically greater than

20", require additional considerations for pipe breakover during pullback. The recommended maximum exit angle relative to backside grade for 30" pipe is 12°.

### 2.1.4    EXIT TANGENT

Similar to the entry tangent, there is no minimum or maximum requirement for the length of the exit tangent. It is suggested to provide at least 50 feet. The more length of exit tangent that can be provided, the better chances a drilling contractor will have to not overrun the proposed exit point. This is especially true when softer or loose soils exist on the exit side of a crossing.

### 2.1.5    DESIGN RADIUS OF CURVATURE

Within the HDD industry for steel pipelines, there exists a rule of thumb for radius of curvature equal to 100 times nominal pipe diameter (100 x NPS). This rule of thumb radius is usually a good starting point for a profile and/or drill that is to have horizontal curve(s). The design radius of curvature may need to be increased to accommodate bending limitation of the drill pipe and tooling that may be required for a given crossing. Occasionally, tighter design radius of curvature may be to be made tighter to fit the proposed geometry within the limiting features of a given site. Finally, the design radius of curvature shall be chosen to provide a factor of safety against pipe failure that is being bent. The modes of failure can occur in the form of localized buckling, yielding under axial tension plus bending, or yielding under combination of internal/external pressure plus bending.

### 2.1.6    BOTTOM TANGENT

As was stated for the prior tangents section, there is no stated minimum or maximum requirement for the length of the bottom tangent. Similar to the exit tangent, it is recommended to provide a minimum of 50 feet. This should allow for a drilling contractor to play catch up to a design profile, in the event they are too deep after attempting to drill the downward entry curve section, prior to attempting to drill the upward exit curve section of the HDD.

## 2.2    PIPE STRESS

The loads and stresses on the pipe of an HDD are multi-phase and are relatively high compared to conventionally bored or open cut pipe sections. Due to these facts in combination to the other plan view constraints and profile view (depth of cover) requirements, the HDD design process is usually iterative and the selection of a certain pipe specification needs to be able to pass the minimum (or controlling) set of loading conditions.

### 2.2.1    PRE-INSTALLATION

During pre-installation analysis, the chosen pipe's strength is evaluated versus maximum internal hydrostatic test pressure, bending that occur from pipe being continuously supported above grade, and/or bending that may occur from natural elevation changes or horizontally curved section(s) of the pipe stringing area.

### 2.2.2    INSTALLATION

During installation analysis, an estimated pull force is evaluated and compared to a maximum allowable pull force. The estimated pull force is determined for the chosen geometry considering pipe weight/buoyancy, friction between the pipe wall and the bore hole, and hydrokinetic losses due to pulling the

product pipe through a viscous drilling mud. The maximum allowable pull force is evaluated under two loading states. The first loading condition considers only tension from applied tension (pull force/cross sectional area of the pipe) and bending stress (from minimum combined radius of drilled hole). The second loading condition considers tension, bending, and external hydrostatic pressure. A good HDD design will allow for ample factor of safety such that the chosen pipe can be successfully pulled into the reamed hole without exceeding the determined maximum allowable pull force.

### 2.2.3   POST INSTALLATION

During post installation analysis, the chosen pipe's strength is evaluated versus the maximum internal hydrostatic pressure and bending from the minimum combined radius of drilled hole. The pipe is considered to be in an unrestrained to partially restrained state, since the HDD bore hole has likely not deformed or completely collapsed during the post installation hydrotest.

### 2.2.4   IN-SERVICE

During in-service analysis, the chosen pipe's strength is evaluated verses the maximum allowable operating pressure, bending stress from the minimum combined radius of the drilled hole, and thermal stress from installation temperature vs. operating pressure. The pipe is considered to be in a restrained state, since the HDD bore hole has likely completely collapsed for the long-term duration of the service life of the pipe.

### 2.3   CODE REQUIREMENTS FOLLOWED

- Code of Federal Regulations (CFR), Title 49 – Transportation, Part 192 – Transportation of Natural and Other Gas by Pipeline
- ASME B31.8 – Gas Transmission and Distribution Pipe Systems

### 2.4   OTHER DESIGN GUIDES REFERENCED

- American Society of Civil Engineers (ASCE) Manual No. 108 – Pipeline Design for Installation by Horizontal Directional Drilling
- Pipeline Research Council International (PRCI) PR-277-144507-Z01 – Installation of Pipelines by Horizontal Directional Drilling Engineering Design Guide
- American Society of Civil Engineers (ASCE) Step by Step Evaluation of Hydrofracture Risk for Horizontal Directional Drilling Projects
- American Society of Civil Engineers (ASCE) Predicting and Controlling Hydraulic Fracturing During Horizontal Directional Drilling
- North American Society for Trenchless Technology (NASTT) No-Dig Show 2010 Paper F-1-01 Effectiveness of Hydrofracture Prediction for HDD Design
- American Society of Civil Engineers (ASCE) Numerical Modeling Evaluation of Drilling Mud Loss risk for an HDD Borehole in Low-Strength Component Bedrock

# 3.0    PIPE DESIGN & STRESS ANALYSIS

## 3.1    PIPE DESIGN

The MAOP and design pressure for the Cumberland 30" pipeline is 750 psig.  The Jones Creek crossing falls within a Class I area as determined by a class location study completed by TGP, which requires a pipe design factor of 0.72 per 49 CFR 192.105 (a).  Additional considerations were given for pipe design, such as minimum D/t ratio of 60 and minimum combined radius of curvature and allowable pull force as described in subsequent sections.  The pipe specified for this crossing is 30" NPS, 0.500" WT, Grade X-70 pipe.

## 3.2    MINIMUM COMBINED RADIUS OF CURVATURE

The absolute minimum combined radius is calculated as 1,161 feet and ultimately contributes to a predicted total stress failure state in the Post Installation loading condition. For construction, the minimum combined radius for the crossing is suggested to be 1,400 feet. It is a good practice to assign the construction minimum combined radius above the failure minimum combined radius. The profile of the crossing is drawn on 3,000-foot vertical radii. It is also a good practice to assign a profile radius above the construction minimum combined radius. During drill execution, there will be deflection in both the vertical and horizontal planes. Per ASCE Manual No 108, the individual vertical radii and horizontal radii can be combined per the following formula. Although the contractor will make their best attempt to drill the alignment and profile perfectly, they will ultimately drill a path that has three-dimensional combined bending tighter than what the drawing shows.

$$R_c = \sqrt{\frac{R_v^2 \times R_h^2}{R_v^2 + R_h^2}}$$

## 3.3    ESTIMATED PULL FORCE

Large diameter pipe (typically considered greater than 20") experiences significant buoyant forces during pullback due to the large internal volume of the pipe and weight of the drilling mud in the annulus.  To offset the buoyant force, buoyancy control (water filling the product pipe) is considered which minimizes or neutralizes the upward force.  The calculated estimated pull force for the designed crossing is expected to be approximately 272,900 lbs without buoyancy control considerations and 129,500 lbs when considering 100% water filled product pipe.

## 3.4    MAXIMUM ALLOWABLE PULL FORCE

TGP construction standards limit the total stress on the pipe during pullback, combining bending stress due to the HDD curvature with the pulling force of the HDD rig, to 50% SMYS. For a construction minimum combined radius equal to 1,400-foot, the maximum allowable pull force should be limited to 380,500 lbs. When comparing the maximum allowable pull force to the estimated pull forces, the current design accommodates a factor of safety during pullback equal to approximately 2.9 with buoyancy control and 1.4 without.

---

Tennessee Gas Pipeline / Cumberland 30" Pipeline
Dickson County, Tennessee

FARNSWORTH GROUP / 6

AR 001562

# 4.0   HDD DESIGN

## 4.1   HDD GEOMETRY

The design radii of curvature follow the industry rule of thumb of 100 x NPS and are 3,000-foot.  A 50-foot bottom tangent was selected to keep the HDD as short as possible – a shorter HDD means less friction losses during drilling operations, and therefore lower annular pressure, as well as a lower estimated pull force during pullback.  The entry angle is 10° to allow for a steep encounter angle, which ensures greater downward force at the bit and allows for increased ability to penetrate the surface of the rock layer.  The exit angle is 14° relative to the horizontal, which allows for a steep exit from the rock layer as well as maximum depth of cover at the hill (further discussed below). For either side of the crossing, casing could be installed along the entry or exit tangent sections in order to stabilize the overburden soils above bedrock and/or allow for drilling returns to more fully return to surface pits, thus limiting the build-up of downhole drilling pressures due to plugging off.

## 4.2   TOPOGRAPHIC CHALLENGES

The west side of Jones Creek is nearly 70 feet higher in elevation than the east side. This difference in elevation makes this proposed HDD slightly riskier due to increased difficulty in stabilizing the high side of the hole during all phases of the HDD.  A good practice is to place the HDD entry at lower elevation, which allows gravity to help force drilling fluid downhill and back to the drilling rig.  This should reduce annular pressure during drilling operations and decreases truck traffic as drilling fluid should not need to be hauled from exit side to entry side. However, the drilling contractor is expected to implement additional measures to ensure the higher portion of the hole is wetted and the pipe is fully submerged in drilling fluids (to the extents possible) during pipe pullback operations.

TGP construction standards and industry rule of thumb requires a minimum of 20 feet depth of cover under intermediate creek crossings.  Due to the large diameter of the product pipe and final reamed hole, as well as the large elevation difference between the west and east sides of the creek, the designed bottom tangent is over 40 feet deep under the creek.  The additional depth should provide additional overburden pressure that is expected to aid in the mitigation of inadvertent returns; this is discussed further in Section 6.

The HDD exits on an existing hill.  This slope reduces the exit angle to 11° relative to grade which heavily decreases the breakover requirements of the product pipe during pullback.  Additionally, the hill extends approximately 330 feet east of HDD exit.  This downward sloping hill requires the high exit angle to ensure greater depth of cover while "chasing" the hill.  A standard 10 - 12° HDD exit angle would result in minimal cover under the hill and therefore increased probability of inadvertent returns.

## 4.3   STRATIGRAPHIC CHALLENGES

The east side bore (1A) encountered bedrock at 11.3 ft deep, while the west side bore (1B) encountered bedrock at 13 ft deep.  The HDD entry and exit angles are designed to be aggressive at the assumed top of rock.  This allows for maximum downward force at the drill bit when entering the rock, and maximum upward force when exiting.  Encountering the rock face at a steep angle should help prevent the drill bit from "skating", as it will always prefer the path of least resistance.

The stratigraphy was largely homogenous and made up of cherty limestone of the Fort Payne Formation.  The presence of chert, a hard sedimentary rock comprised of crystalline quartz, adds

hardness to the strata.  Unconfined compressive strength tests were performed and yielded rock strength of 8,900 psi to 13,200 psi, which classifies as "hard".  The drilling contractor will need to be prepared for the hard rock and may utilize a mud motor and aggressive tooling, such as polycrystalline diamond compact (PDC) drill bits and reamers.  The hard material can also be overcome by a lower rate of penetration.

The Fort Payne Formation had great Rock Quality Designation (RQD) values and recovery, typically over 90%.  This signifies a high quality and mostly unfractured stratum that possesses a high ability to contain drilling fluids.

### 4.3.1    METHANE POCKETS

Unexpected methane pockets were encountered on boring 1A at approximately 41 feet and 56 feet deep. For safety precautions during geotechnical boring, the unexpected gas was allowed to vent before continuing with the borings.  There may be additional methane pockets within the formation that may be encountered during later pipeline construction.  The encounter of gas under pressure during geotechnical or general drilling work is not unheard of in some formations, but it is difficult to predict when it will attempt to surface in significant quantities.  Monitoring and additional safety requirements are highly recommended for the horizontal directional drilling operation.

The National Institute for Occupational Safety and Health (NIOSH) recommends a maximum methane concentration for workers during an 8-hour period of 1,000 ppm (0.1%).  Conversely, the Occupational Safety and Health Administration (OSHA) considers oxygen content less than 19.5% to be oxygen deficient.  Therefore, TGP and the drilling contractor are highly encouraged to utilize air meters on site to monitor the amount of gas at the HDD entry and exit work pads. A site-specific safety plan is recommended to be prepared, approved, and reviewed prior to onsite construction. Construction may need to immediately cease, and all possible ignition sources may need to be shut down, if and as necessary. TGP may need to coordinate with the local, state, or federal authorities for additional safety measures to inform and protect the general public. Additionally, TGP may need to obtain air discharge permit(s) ahead of construction.

# 5.0   EVALUATION OF HYDROFRACTURE / INADVERTENT RETURNS

## 5.1   SUBSURFACE GEOTECHNCIAL INVESTIGATIONS

Reference Attachment 1 - Final Geotechnical Report (Borings 1A and 1B) for geotechnical bore locations and soil consistencies.

## 5.2   METHODOLOGY

Hydrofracture analysis is the comparison of the ability of the subsurface formation to withstand loading against the expected drilling fluid pressures along the HDD.

The evaluation of the subsurface soils' ability to resist fracturing during drilling is outlined by the Delft Equation. This equation/tool is commonly used by the United States Army Corps of Engineers for HDD projects involving drilling beneath levees. The basic relationship for hydraulic fracture pressure is a function of the overburden stress (σ) plus the undrained shear strength (Su).

$$P_{max} = u + [\sigma_0' \cdot (1 + sin\varphi) + c \cdot cos\varphi + c \cdot cot\varphi] \cdot \left( \left( \frac{R_0}{R_{pmax}} \right)^2 + \frac{\sigma_0' \cdot sin\varphi + c \cdot cos\varphi}{G} \right)^{\frac{-sin\varphi}{1+sin\varphi}} - c \cdot cot\varphi$$

Where:
$P_{max}$ = maximum allowable mud pressure (psf)
$u$ = groundwater pressure (psf)
$\sigma_0'$ = Effective Stress (psf), where
  = $\gamma_{soil}$ (drill depth – height of ground water over drill) + $\gamma_{water}$ (height of groundwater over drill)
$\varphi$ = soil friction angle
$c$ = soil cohesion (psf)
$R_o$ = radius of borehole (ft)
$R_{pmax}$ = radius of plastic zone (ft)
$G$ = shear modulus (psf), where
  = Elastic Modulus of Soil / [2 x (1 + Poisson's Ratio of Soil)]

The suggested method for evaluation of the expected drilling fluid pressure(s) along the HDD is by utilizing a rheological model assuming drilling mud's behavior as a Bingham plastic fluid. The basic concept of the model is that under low stresses the drilling mud behaves as a rigid body but flows as a viscous fluid at higher stresses.

## 5.3   ASSUMPTIONS

Delft Equation:
- Sufficient geotechnical data is available for the entire length and depth of the proposed directional drill. Consistency in the stratigraphy of layers across the bore as well as the heights of the layers are critical to creating an accurate model.
- The analysis is best suited for homogenous soil when there is uniform soil above the proposed drill/bore. However, density of soil likely varies with depth and/or different soil types may exist in varying thicknesses. To handle variations in density, it is more practical to calculate the effective stress for each soil layer and sum them up at a point of interest. To handle variations for different soils types, a weighted average was applied, based on soil layer thicknesses, to a

point of interest for determination of the other input variables of the equation (elastic modulus, Poisson's ratio, friction angle, and cohesion).

Hoek-Brown Criterion:
- Hoek-Brown criterion is used in cavity expansion theory. The Mohr-Coulomb criterion with a tensile strength value can be used to identify tensile/shear failure of a bedrock, but to consider unique rock properties geological strength index (GSI) value is added to calculations. The Hoek-Brown parameters were used as a bridge to correlate Mohr-Coulomb parameters and GSI value to determine bedrock parameters such as:
  - Rock Mass Modulus of Deformation
  - Friction angle
  - Cohesion
- To accurately estimate the GSI value the following needs to be provided:
  - Boring logs with the description of rock mass structure
  - Unconfined Compressive strength of sample (UCS), RQD and Recovery values
  - The pictures of the samples to determine the sample surface conditions, joint and rock mineral conditions
- Once Rock parameters are determined based on GSI value and the information provided in boring logs, all the data received is applied to cavity expansion theory (Delft Equation) to determine the limiting drilling mud pressure.

Bingham Plastic Fluid Model:
- To appropriately generate an accurate annular pressure model, the following must be estimated or provided:
  - Drill Bit Diameter (typically selected by contractor)
  - Nominal Drill Pipe Diameter (typically selected by contractor)
  - Minimum and Maximum Mud Pump Rates (controlled by contractor)
  - Fresh Drilling Mud (controlled by contractor):
    - Density
    - Yield Point
    - Plastic Viscosity
  - Drilling Returns- combination of mud and soil cuttings (controlled by base/fresh drilling mud being pumped at a given flow rate in combination to penetration rate – all controlled by contractor)
    - Density
    - Yield Point
    - Plastic Viscosity
- For simplicity and calculation of maximum annular velocity, it is assumed that no drilling mud is lost to the surrounding formation (analyze mud flow as closed loop).
- The variable that most significantly impacts the final pressure gradient is the yield point of the drilling mud.
  - When able to be measured, the yield point of fresh drilling mud is typically around 9 – 10.5 lbs/100 sq-ft.
  - Yield points of mud containing heavy drilling returns (typically associated with returning mud weight equal to 10.5 – 12 ppg) can be as high as 50 lbs/sq-ft.

# 6.0   HYDROFRACTURE / INADVERTENT RETURNS ANALYSIS

## 6.1   MODEL RESULTS

A minimum safety factor of 2.0 was achieved with the hydrofracture/inadvertent returns modelling. Appendix C contains a plot produced for the purpose of visualizing existing grade, the proposed HDD, corresponding soil limiting pressure (Pmax) and recommended maximum allowable drilling pressure (Pmax/2), and the expected operating range of the annular pressure.

Based on the results displayed in the plot, it is the opinion of Farnsworth Group that if the drilled hole remains clean/open, if the drilling mud is maintained within reasonable rheological properties, and if the minimum depth of cover is achieved, the factor of safety of greater than 2 will be in place under the single critical feature (Jones Creek).

As is always to be expected, the exit side of the drill does present increased risk of having an inadvertent return due to the length of the annular space that the drilling mud must be pumped through, which creates a higher hydraulic gradient than when the bit was closer to the entry/rig side of the drill. It is assumed that if the mud properties are optimal and if the mud flushing rate can outpace the penetration rate, the general risk of having an inadvertent return should be decreased. As the flow rate may need to be decreased towards exit, the penetration rate may need to subsequently decrease to keep annular pressures lower.

A factor of safety greater much greater than 2 is expected while the HDD is in the rock strata.  There may be lost circulation risks due to weathered shale layers, fractures, and the methane pockets, but the largely homogenous strata ultimately had great to excellent RQD values that point toward a well opened and shaped hole.

# 7.0    CONSTRUCTION PLANS

## 7.1    TGP RESPONSIBILITIES

- Before the start of HDD operations, HDD Contractor shall provide TGP a detailed drill plan that includes applicable details as outlined in Appendix D – Detailed Drill Plan Requirements for Owner approval
- Stake proposed centerline at proposed HDD entry and exit and every 100 feet on the proposed +00 stationing callouts.
- Stake proposed workspace limits (at corners and sufficient for line of site).
- Flag/mark environmentally sensitive areas.
- Provide Environmental Inspector to participate in Drilling Kick-off Meeting to cover any permit requirements and make routine site visits to ensure compliance with all federal/state/local requirements.
- Provide HDD Drilling Inspector/Observer to monitor compliance of drill tolerances, general hole preparation, and pullback stresses.

## 7.2    CONTRACTOR RESPONSIBILITIES

The following sub sections are related to minimizing and/or being able to successfully handle any potential inadvertent returns.

### 7.2.1    MINIMUM REQUIRED LIST OF IR RESPONSE EQUIPMENT / RESOURCES

- Trash pump(s) that are capable of being able to pump any inadvertent returns to the entry/exit pit(s)
- Visqueen / plastic sheeting for establishing secondary containment around mobilized trash pumps.
- Trash pump suction hosing – for each trash pump that may be used
- Lay flat hosing
- Erosion control devices (ECDs) – silt fence / straw bales that can be placed on downward slopes and act as buffer between any inadvertent returns and sensitive water features
- Shovels, brooms, squeezes, and other appropriate hand tools
- Excavator for digging of potential containment sumps at inadvertent return location(s)
- Contingency plan for matting in case rubber-tired equipment requires access to difficult portions of the right-of-way
- Vac trailer/transport or vac truck at site or on call during all drilling operations

### 7.2.2    PROPER TOOLING SELECTION AND DRILLING TECHNIQUES

- Appropriately size drilling rig, mud pump, and reclaimer/cleaning system to execute the proposed HDD by length and subsurface conditions.
- Appropriately size (diameter) drill bit(s) / reamer(s) in comparison to drill pipe/mud motor (as applicable) diameter(s) such that sufficient cross-sectional area exists for proper annular velocity and circulation.
- Source appropriate tracking tooling for maximum depth of the crossing.
- Implement continuous annular pressure monitoring during pilot hole execution.

### 7.2.3    MUD QUALITY

- Drilling contractor shall have an on-site technician, present at all times, to perform monitoring of drilling fluid weight, viscosity, and yield point. Drilling contractor shall provide all the appropriate equipment to properly measure drilling fluid properties.
- Appropriately sized reclaimer/cleaning system shall be onsite for proper filtering of cuttings from returning mud.
- The drilling contractor shall source water for generation of fresh mud that will be required as the hole is generally cut and enlarged. The drilling contractor will test mud prior to storing, hauling, or disposing.
- Owner approved Loss of Circulation Materials (LCMs) shall be readily available to mix into the drilling mud in order to plug off inadvertent return path(s).

### 7.2.4    CIRCULATION MONITORING AND GROUND SURFACE INSPECTIONS

- The drilling contractor is responsible for continually monitoring mud pressures and circulation. It is suggested that the contractor become familiar with the annular pressure limits and at a minimum are required to stay below the assigned Pmax/2 location by stationing.
- If at any point during the drilling process the drilling mud spikes above the allowable limit, it is recommended that tripping pipe and swabbing of joint(s) occur.
- If at any point during the drilling process the returns suddenly cease, drilling shall be halted and immediate inspection of the right-of-way shall be conducted.
- If inadvertent return(s) are noted, Contractor shall immediately:
    - Implement steps in accordance with the Inadvertent Returns Response Plan.
    - Notify appropriate parties including but limited to the onsite inspector.

# APPENDIX A

PROPOPOSED PLAN AND PROFILE DRAWING – PRELIMINARY



## HDD NOTES:

1. REFERENCE COMPANY STANDARDS FOR DIRECTIONALLY DRILLED CROSSING INSTALLATION REQUIREMENTS.
2. MINIMUM ALLOWABLE COMBINED RADIUS = 1,400 FEET.
3. FOR ALL OTHER TOLERANCES REFER TO COMPANY STANDARDS.
4. MAXIMUM ALLOWABLE PULLBACK FORCE = 390,500 LBS PER PULL.
5. THEORETICAL PULLBACK FORCE REQUIRED = 272,900 LBS. (NO BUOYANCY CONTROL), 129,500 LBS. (100% WATER FILL).
6. MAXIMUM ROTATIONAL TORQUE = 0 IN-LBS PER PULL.
7. MAXIMUM PIPE SUPPORT SPACING, HYDROTEST = 70 FEET; STRINGING/PULLBACK = 75 FEET.
8. PRE-PULLBACK HYDROTESTING SHALL BE IN ACCORDANCE WITH THE PROJECT-SPECIFIC HYDROTEST PLAN.
9. AVOIDANCE, MITIGATION, AND CLEAN-UP OF ANY INADVERTENT RETURNS ARE THE SOLE RESPONSIBILITY OF THE CONTRACTOR.
10. SOIL BORE INFORMATION PROVIDED BY ATC ATLAS.
11. SOIL BORE ELEVATIONS PROVIDED BY TABLEROCK ENERGY.
12. THE GEOTECHNICAL INFORMATION SHOWN ON THESE DRAWINGS AND PROVIDED IN THE GEOTECHNICAL REPORT ARE NOT A COMPLETE AND ACCURATE REPRESENTATION OF ALL THE SUBSURFACE CONDITIONS THAT MAY BE ENCOUNTERED DURING CONSTRUCTION. SUBSEQUENT INTERPRETATION OF THE GEOTECHNICAL INFORMATION PERTAINING TO THE FEASIBILITY AND/OR CONSTRUCTION OF THE DESIGN ARE THE RESPONSIBILITY OF THE CONTRACTOR.

## DESIGN DATA

DESIGN CODE: ASME B31.8 DOT 192

MEASURED LENGTH:
TRENCH: 1477
HDDBORE: 1477
TOTAL: 1477

PIPE SPECIFICATIONS:
PIPE - 30" NOMINAL DIAMETER, 0.500" WT, SAWL, PLAIN END, API 5L-PSL2, GR X70. MATL SPEC M8220, COAT SPEC M8570, FBE (14-16 MIL ID & 30-40 MILS ARO

DESIGN PRESSURE: 750 PSIG
PROPOSED MAOP: 750 PSIG

### VERTICAL CURVE DATA

| STATION | ELEVATION | DESCRIPTION |
|---------|-----------|-------------|
| 0+00.0 | 442.7 | HDD ENTRY |
| 0+36.7 | 436.2 | PC, R=3000', Δ=10° |
| 5+57.6 | 390.6 | PT |
| 6+07.6 | 390.6 | PC, R=3000', Δ=14° |
| 13+33.4 | 479.7 | PT |
| 14+63.0 | 512.1 | HDD EXIT |

### SB-1A

440.6 - 440.6'   SILTY CLAY (CL), VERY MOIST, SOFT, N = 3
440.6' - 435.3'  CLAYEY FINE TO MEDIUM SAND WITH SILT (SC), SATURATED
435.3' - 405.6'  CHERTY LIMESTONE, GOOD RECOVERY AND RQD.
405.6' - 405.6'  GAS POCKETS ENCOUNTERED AT 41' DEPTH (ELEVATION 405.6')
405.6' - 395.1'  CHERTY LIMESTONE, GOOD RECOVERY AND RQD.
395.1' - 390.3'  CHERTY LIMESTONE, GOOD RECOVERY AND RQD. OCCASIONAL HORIZONTAL FRACTURES CONTAINING GAS POCKETS, COMPRESSIVE STRENGTH = 8,900 PSI

### SB-1B

506.5' - 501.9'  SILTY CLAY WITH CHERT (SC), VERY MOIST, MEDIUM DENSE, N = 22
501.9' - 498.5'  CLAYEY FINE TO MEDIUM SAND WITH SILT (SC), SATURATED
498.5' - 493.5'  CHERTY LIMESTONE, OCCASIONAL HORIZONTAL FRACTURES & SEAMS, POOR RECOVERY AND RQD.
493.5' - 486.2'  CHERTY LIMESTONE, OCCASIONAL QUARTZ GEODIC INCLUSIONS, GOOD RECOVERY AND RQD, COMPRESSIVE STRENGTH = 18,000 PSI
486.2' - 486.2'  WEATHERED HORIZONTAL SEAM AT 20.3' DEPTH (ELEVATION 486.2')
486.2' - 471.2'  CHERTY LIMESTONE, OCCASIONAL QUARTZ GEODIC INCLUSIONS, GOOD RECOVERY AND RQD
471.2' - 471.2'  WEATHERED HORIZONTAL SEAM AT 35.3' DEPTH (ELEVATION 471.2')
471.2' - 469.7'  CHERTY LIMESTONE, GOOD RECOVERY AND RQD
469.7' - 469.7'  WEATHERED HORIZONTAL SEAM AT 36.8' DEPTH (ELEVATION 469.7')
469.7' - 368.0'  CHERTY LIMESTONE, OCCASIONAL HORIZONTAL FRACTURES, GOOD RECOVERY AND RQD, COMPRESSIVE STRENGTH = 16,500 - 13,500 PSI

## PLAN

SCALE: 1" = 60'
PROJECTION: NSRS 2011 TENNESSEE STATE PLANE ZONE, US FOOT

## DETAIL A

SCALE: 1" = 5'

## PROFILE

SCALE: 1" = 60'

## LEGEND

| | |
|---|---|
| ——— | PROPOSED PIPELINE |
| ——— | PROPERTY LINE |
| – – – | TEMPORARY CONSTRUCTION WORKSPACE |
| – – – | ADDITIONAL TEMPORARY CONSTRUCTION WORKSPACE |

**PRELIMINARY**
NOT FOR CONSTRUCTION
DATE: 07-01-2022

Notes:
1. CONTRACTOR MAY BE REQUIRED TO UTILIZE MATS TO PLACE DRILLING RIG OVER TOP OF THE SWALE.

**Tennessee Gas Pipeline Company, L.L.C.**
a Kinder Morgan company

TGP CUMBERLAND 30" PIPELINE
PRELIMINARY HDD EXHIBIT
JONES CREEK
M.P. 3.2

Status: **PRELIMINARY**
County: DICKSON
Category: NEW INSTALLATION
Scale: AS NOTED

Drawing No: **EX-1**    Rev: **B**

| | | | |
|---|---|---|---|
| B | PRELIMINARY | 302800 | 07—01—2022 |
| A | PRELIMINARY | 302800 | 03-30-2022 |
| Rev | Revision Description | Project ID | Date |

# APPENDIX B

## PIPE STRESS SUMMARY

**Farnsworth Group, Inc.**
**ASME B31.8**
**Horizontal Directional Drill Stress Analysis**
**TGP 30" Cumberland Pipeline**

| | |
|---:|:---|
| **Project:** | 0210665.01 |
| **Client:** | Tennessee Gas Pipeline (Kinder Morgan) |
| **Crossing(s):** | Jones Creek, Yellow Creek, Wells Creek |
| **Date:** | 7/1/2022 |
| **By:** | Nick Garver |

| Pipe Specifications | | | |
|---|---|---|---|
| **Bore Pipe** | | **Tie-In Pipe** | |
| O.D. | 30.000 | O.D. | 30.000 |
| w.t. | 0.500 | w.t. | 0.312 |
| SMYS | 70,000 | SMYS | 65,000 |

| Design Factors | |
|---|---|
| Design Factor for Pre-Installation Test, $F_{pre}$: | 0.75 |
| Design Factor for Installation Pull-back, $F_i$: | 0.50 |
| Design Factor for Installation Pull-back, $F_s$: | 0.50 |
| Design Factor for Post-Installation Test, $F_{post}$: | 1.02 |
| In-service Design Factor for Bore Pipe, F: | 0.50 |
| In-service Design Factor for Tie-in Pipe, F: | 0.72 |

| | |
|---:|:---:|
| **Absolute Minimum Allowable Combined Radius:** | 1,161 |
| **Recommended Minimum Allowable Combined Radius:** | 1,400 |

| HDD Force and Stress Analysis | | | | | |
|---|---|---|---|---|---|
| **Design Criteria** | **Bore Pipe** | | **Tie-In Pipe** | | **Units** |
| | **Value** | **Check** | **Value** | **Check** | |
| **Bending Stress** | 26,339 | 44,620 | - | - | psi |
| Pre-Test | | | | | |
| **Hoop Stress** | 22,500 | 35,000 | - | - | psi |
| **Long. Stress** | 33,135 | 63,000 | - | - | psi |
| **Max Pipe Span** | 79.9 | 269.2 | - | - | ft |
| **Deflection** | 1.00 | 128.93 | - | - | in |
| **Max Pipe Span** | 73.7 | 106.3 | - | - | ft |
| **Deflection** | 1.00 | 4.32 | - | - | in |
| Installation | | | | | |
| **Max Pull Force** | 272,900 | 380,500 | - | - | lb |
| Post-Test | | | | | |
| **Hoop Stress** | 41,370 | 70,000 | 66,298 | 66,298 | psi |
| **Long. Stress** | 47,024 | 52,500 | 33,149 | 48,750 | psi |
| In Service Stresses | | | | | |
| **Hoop Stress** | 22,500 | 35,000 | 50,330 | 50,400 | psi |
| **Thermal Stress** | -9,588 | 63,000 | 8,775 | 63,000 | psi |
| **Long. Stress** | -29,177 | 63,000 | 23,874 | 63,000 | psi |
| **Comb. Stress** | 51,677 | 63,000 | 43,606 | 63,000 | psi |
| **Shear Stress** | 25,838 | 31,500 | 13,228 | 31,500 | psi |
| **d/t** | 60.0 | 60.0 | - | - | (-) |

# APPENDIX C

HYDRO-FRACTURE PRESSURE VS. ANNULAR PRESSURE PLOT



Jones Creek - HFIR Analysis
Profile View
Pressure (psi)
Elevation (ft)
Stationing
EXIT
ENTRY
RISK ZONE
RISK ZONE
Bore - 1B
506.5
368.5
13+33.40
Jones Creek CL
Bore - 1A
446.6
390.3
6+07.60
5+57.60
0+36.70
3,000
2,800
2,600
2,400
2,200
2,000
1,800
1,600
1,400
1,200
1,000
800
600
400
200
0
550
525
500
475
450
425
400
375
350
325
300
275
250
225
200
175
150
15+00
14+00
13+00
12+00
11+00
10+00
9+00
8+00
7+00
6+00
5+00
4+00
3+00
2+00
1+00
0+00
Pmax
Pmax/2
Annular Pressure - Low End
Annular Pressure - High End
Existing Surface
Proposed HDD
1A
1B
Bedrock

# APPENDIX D

The drilling subcontractor shall provide the following information before the mobilization of drilling equipment:

Sections:
1. Resumes for all key personnel- including project history and general years of experience.

2. Describe Proposed Mechanical Equipment:
   - Rig(s) make/manufacturer & include specifications:
     o Weight
     o Length
     o Max pull/thrust w/ conversion factors for each gearing option
     o Max spindle torque w/ conversion factors for each gearing option
     o Notification of any plan to perform major service or rebuild the rig(s) before coming onto the job site (such that mechanical issues are limited).
   - Mud pump(s):
     o Flow rate capabilities
     o Address availability of spare parts (lines, plungers, etc.) or backup pumps.
   - Mud cleaning system(s):
     o Make/model
     o Size (length & width)
     o Capacity
   - Drill pipe handling equipment:
     o Crane(s) and/or excavator(s)
   - Product pipe handling equipment:
     o Excavator(s) and/or side boom(s).
     o Number of rollers
   - Mud Handling/Recovery equipment:
     o Vac trucks/trailers & tanker transports

3. Required Site Layout:
   - Identify the location of fixed mechanical equipment on construction drawings.
   - Identify the location of matting needed for equipment setup and ingress/egress.
   - Identify the material storage area(s).

4. Proposed HDD Tooling:
   - Drill pipe:
     o Nominal diameter
     o Total footage onsite
   - Pilot hole:
     o Available Bit Size(s)- diameter
     o Available Bit Type(s)- mill tooth, TCI, etc.
     o Intention to use mud motor or not
     o Quantity of available spares
   - Reaming:
     o Available or Planned Reamer Type(s)- fly cutter, beaver tail, hole opener, barrel, etc.
     o Available or Planned Reamer Size(s)- diameter
     o Custom built or vendor supplied
     o Quantity of available spares

5. Proposed Tracking Equipment:
   - Document accuracy and submit calibration history of tracking equipment (must be per applicable standards within past 6 months).
   - Describe plan to successfully navigating crossing.

6. Drilling Fluid(s) Makeup/Properties & Logistics:
   - Mud Makeup/Properties:
     - Provide SDSs for all potential additives
     - Describe purpose of additives and reason for intended use
     - Describe target mud mixture (percentage by weight or volume)
     - Properties (viscosity & mud density)
   - Logistics
     - Describe plan for water sourcing
     - Describe water hauling logistics (if applicable):
       - Number and size of vac/tanker trucks
       - Estimated quantity of needed loads per day
     - Describe estimation of mud/cuttings volume for disposal
     - Describe mud/cutting hauling logistics
       - Number and size of truck loads
       - Estimated quantity of loads per day/week/month

7. Drilling Fluid(s) Management- Testing, Monitoring, & Inadvertent Returns Monitoring/Response Plan:
   - Testing:
     - Describe mud engineer qualifications
     - Describe testing intervals (with maintained documentation) to ensure intended mud properties are maintained
   - Monitoring:
     - Describe response for limited or nonexistent drilling returns
   - Inadvertent Returns:
     - Describe procedures and equipment/materials available for inadvertent returns response

8. Pilot Hole Drilling Process:
   - Describe target mud flow rate(s)
   - Describe target penetration rate(s)
   - Describe chosen tooling

9. Hole Opening Process:
   - Describe number of ream pass(es).
   - Describe size(s), chosen tooling, and direction of ream pass(es).
   - Describe target penetration rate(s).
   - Describe target mud flow rate(s).
   - Is Contractor pulling tail string at exit or is the rig always pulling the reamer(s)?
   - Is Contractor maintaining string in the hole at all times?
   - Will a swab pass be planned for final verification and adjustment of mud in hole?

10. Pipe Installation (Pullback)
    - Document load rating on swivel
    - Describe equipment available for product pipe break over
    - Describe target pull rate
    - Describe plan to complete mid-weld (if necessary)

11. Proposed Schedule:
- Contractor to include (at a minimum) the following in their construction schedule:
    - HDD Mobilization
    - HDD Equipment setup & centerline surveying
    - HDD Pilot Hole
    - HDD Hole Opening (by pass)
    - HDD Swab (if applicable)
    - HDD Pullback
    - HDD Equipment tear down & mud hauling
    - HDD Demobilization



Tennessee Gas Pipeline (TGP)

Cumberland 30" Pipeline

30" Steel HDD at Sta. 1619+26

Wells Creek Crossing

**Submitted by:**

**Nick Garver, Oil & Gas Professional**
**p 314.391.9751**
**ngarver@f-w.com**
**July 1, 2022**

AR 001579

# TABLE OF CONTENTS

Contact Information:

**Nick Garver, Oil & Gas Professional**

p 314.391.9751

ngarver@f-w.com

July 1, 2022

1.0    **Introduction** ................................................................................................**3**
    1.1 Crossing Description ...........................................................................3
    1.2 Information Provided by Others ...........................................................3

2.0    **HDD Industry Guidelines and Best Practices**.........................................**3**
    2.1 General Geometry ...............................................................................3
        2.2.1 Entry Angle ...............................................................................3
        2.2.2 Entry Tangent ...........................................................................3
        2.2.3 Exit Angle .................................................................................3
        2.2.4 Exit Tangent .............................................................................4
        2.2.5 Design Radius of Curvature .....................................................4
        2.2.6 Bottom Tangent .......................................................................4
    2.2 Pipe Stress ..........................................................................................4
        2.2.1 Pre-installation ........................................................................4
        2.2.2 Installation ...............................................................................4
        2.2.3 Post Installation .......................................................................5
        2.2.3 In-service .................................................................................5
    2.3 Code Requirements Followed ..............................................................5
    2.4 Other Design Guides Referenced ........................................................5

3.0    **Pipe Design & Stress Analysis** ...............................................................**6**
    3.1 Pipe Design .........................................................................................6
    3.2 Minimum Combined Radius of Curvature ............................................6
    3.3 Estimated Pull Force ...........................................................................6
    3.4 Maximum Allowable Pull Force ...........................................................6

4.0    **HDD Design**............................................................................................**7**
    4.1 HDD Geometry ....................................................................................7
    4.2 Topographic Challenges ......................................................................7
    4.3 Stratigraphic Challenges .....................................................................7

5.0    **Evaluation of Hydro-fracture / Inadvertent Returns** ............................**9**
    5.1 Subsurface Geotechnical Investigations..............................................9
    5.2 Methodology .......................................................................................9
    5.3 Assumptions .......................................................................................9

6.0    **Hydro-fracture / Inadvertent Returns Analysis** ..................................**11**
    6.1 Model Results ...................................................................................11

7.0    **Construction Plans** .............................................................................**12**
    7.1 Owner Responsibilities .....................................................................12
    7.2 Contractor Responsibilities................................................................12
        7.2.1 Minimum Required List of IR Response Equipment / Resources ....12

7.2.2 Proper Tooling Selections and Drilling Techniques.................................................12

7.2.3 Mud Quality .............................................................................................................13

7.2.4 Circulation Monitoring and Ground Surface Inspections ........................................13


**Appendix A – Proposed Plan and Profile Drawing – Preliminary** ........................................**14**

**Appendix B – Pipe Stress Summary**...........................................................................................**16**

**Appendix C – Hydro-fracture Pressure vs. Annular Pressure Plot** .......................................**18**

**Appendix D – Detailed Drill Plan Requirements**.......................................................................**20**

**Attachments:**

- **Attachment 3 – Final Geotechnical Report (Bores 3A and 3B)**

# 1.0    INTRODUCTION

## 1.1    CROSSING DESCRIPTION

The Tennessee Gas Pipeline (TGP) Cumberland 30" Pipeline is an approximately 31-mile pipeline spanning Dickson, Houston, and Stewart Counties in Tennessee. There are three (3) creeks along the alignment that require a Horizontal Directional Drill (HDD).

Farnsworth Group (FGI) was contracted to perform the HDD design on the three crossings. This report is for the 30" Steel pipeline crossing of Wells Creek at Sta. 1619+26 in Stewart County, TN.

## 1.2    INFORMATION PROVIDED BY OTHERS

- Existing Conditions Linework and Surface files by Tablerock Energy
- Final Geotechnical Engineering Report by ATC Atlas containing field and laboratory testing results for geotechnical borings 3A and 3B as well as specific geotechnical properties for the Knox Dolomite
- MAOP and design pressure by TGP

# 2.0    HDD INDUSTRY GUIDELINES AND BEST PRACTICES

## 2.1    GENERAL GEOMETRY

A horizontal directional drill profile consists of a series of straight lines (known as tangents) and curves. The boundary between straight and curved sections are called points of curvature and points of tangency; these become defined by the determination of entry and exit points, entry and exit angles, radius of curvature, and desired elevation change / depth of cover.

### 2.1.1    ENTRY ANGLE

The entry angle of an HDD is ultimately determined upon several factors. Of most importance though is allowing for the anticipated rig to setup at the site. A typical entry angle ranges from 8° to 14°. Steeper angles are possible, but consideration should be given to the safe setup and position of the rig. Shallower angles are also possible, but usually only desired for slick bore crossings.

### 2.1.2    ENTRY TANGENT

There is no minimum or maximum requirement for the length of the entry tangent. However, it is suggested to provide at least 30 feet for the drilling contractor to establish at least a joint of drill pipe in the ground prior to having to make any directional changes horizontally or vertically.

### 2.1.3    EXIT ANGLE

The exit angle of an HDD is unlimited. For practical purposes of getting the bit out of the ground and avoiding longer runs of shallower depth of cover when annular pressures are usually higher, 8° is usually the recommended minimum. Exit angles can approach 14° (or higher), but extra provisions may be necessary to not overstress the product pipe during pullback. Large diameter pipe, typically greater than

20", require additional considerations for pipe breakover during pullback. The recommended maximum exit angle relative to backside grade for 30" pipe is 12°.

### 2.1.4   EXIT TANGENT

Similar to the entry tangent, there is no minimum or maximum requirement for the length of the exit tangent. It is suggested to provide at least 50 feet. The more length of exit tangent that can be provided, the better chances a drilling contractor will have to not overrun the proposed exit point. This is especially true when softer or loose soils exist on the exit side of a crossing.

### 2.1.5   DESIGN RADIUS OF CURVATURE

Within the HDD industry for steel pipelines, there exists a rule of thumb for radius of curvature equal to 100 times nominal pipe diameter (100 x NPS). This rule of thumb radius is usually a good starting point for a profile and/or drill that is to have horizontal curve(s). The design radius of curvature may need to be increased to accommodate bending limitation of the drill pipe and tooling that may be required for a given crossing. Occasionally, tighter design radius of curvature may be to be made tighter to fit the proposed geometry within the limiting features of a given site. Finally, the design radius of curvature shall be chosen to provide a factor of safety against pipe failure that is being bent. The modes of failure can occur in the form of localized buckling, yielding under axial tension plus bending, or yielding under combination of internal/external pressure plus bending.

### 2.1.6   BOTTOM TANGENT

As was stated for the prior tangents section, there is no stated minimum or maximum requirement for the length of the bottom tangent. Similar to the exit tangent, it is recommended to provide a minimum of 50 feet. This should allow for a drilling contractor to play catch up to a design profile, in the event they are too deep after attempting to drill the downward entry curve section, prior to attempting to drill the upward exit curve section of the HDD.

## 2.2   PIPE STRESS

The loads and stresses on the pipe of an HDD are multi-phase and are relatively high compared to conventionally bored or open cut pipe sections. Due to these facts in combination to the other plan view constraints and profile view (depth of cover) requirements, the HDD design process is usually iterative and the selection of a certain pipe specification needs to be able to pass the minimum (or controlling) set of loading conditions.

### 2.2.1   PRE-INSTALLATION

During pre-installation analysis, the chosen pipe's strength is evaluated versus maximum internal hydrostatic test pressure, bending that occur from pipe being continuously supported above grade, and/or bending that may occur from natural elevation changes or horizontally curved section(s) of the pipe stringing area.

### 2.2.2   INSTALLATION

During installation analysis, an estimated pull force is evaluated and compared to a maximum allowable pull force. The estimated pull force is determined for the chosen geometry considering pipe weight/ buoyancy, friction between the pipe wall and the bore hole, and hydrokinetic losses due to pulling the

product pipe through a viscous drilling mud. The maximum allowable pull force is evaluated under two loading states. The first loading condition considers only tension from applied tension (pull force/cross sectional area of the pipe) and bending stress (from minimum combined radius of drilled hole). The second loading condition considers tension, bending, and external hydrostatic pressure. A good HDD design will allow for ample factor of safety such that the chosen pipe can be successfully pulled into the reamed hole without exceeding the determined maximum allowable pull force.

### 2.2.3    POST INSTALLATION

During post installation analysis, the chosen pipe's strength is evaluated versus the maximum internal hydrostatic pressure and bending from the minimum combined radius of drilled hole. The pipe is considered to be in an unrestrained to partially restrained state, since the HDD bore hole has likely not deformed or completely collapsed during the post installation hydrotest.

### 2.2.4    IN-SERVICE

During in-service analysis, the chosen pipe's strength is evaluated verses the maximum allowable operating pressure, bending stress from the minimum combined radius of the drilled hole, and thermal stress from installation temperature vs. operating pressure. The pipe is considered to be in a restrained state, since the HDD bore hole has likely completely collapsed for the long-term duration of the service life of the pipe.

## 2.3    CODE REQUIREMENTS FOLLOWED

- Code of Federal Regulations (CFR), Title 49 – Transportation, Part 192 – Transportation of Natural and Other Gas by Pipeline
- ASME B31.8 – Gas Transmission and Distribution Pipe Systems

## 2.4    OTHER DESIGN GUIDES REFERENCED

- American Society of Civil Engineers (ASCE) Manual No. 108 – Pipeline Design for Installation by Horizontal Directional Drilling
- Pipeline Research Council International (PRCI) PR-277-144507-Z01 – Installation of Pipelines by Horizontal Directional Drilling Engineering Design Guide
- American Society of Civil Engineers (ASCE) Step by Step Evaluation of Hydrofracture Risk for Horizontal Directional Drilling Projects
- American Society of Civil Engineers (ASCE) Predicting and Controlling Hydraulic Fracturing During Horizontal Directional Drilling
- North American Society for Trenchless Technology (NASTT) No-Dig Show 2010 Paper F-1-01 Effectiveness of Hydrofracture Prediction for HDD Design
- American Society of Civil Engineers (ASCE) Numerical Modeling Evaluation of Drilling Mud Loss risk for an HDD Borehole in Low-Strength Component Bedrock

# 3.0   PIPE DESIGN & STRESS ANALYSIS

## 3.1   PIPE DESIGN

The MAOP and design pressure for the Cumberland 30" pipeline is 750 psig.  The Wells Creek crossing falls within a Class I area as determined by a class location study completed by TGP, which requires a pipe design factor of 0.72 per 49 CFR 192.105 (a).  Additional considerations were given for pipe design, such as minimum D/t ratio of 60 and minimum combined radius of curvature and allowable pull force as described in subsequent sections.  The pipe specified for this crossing is 30" NPS, 0.500" WT, Grade X-70 pipe.

## 3.2   MINIMUM COMBINED RADIUS OF CURVATURE

The absolute minimum combined radius is calculated as 1,161 feet and ultimately contributes to a predicted total stress failure state in the Post Installation loading condition. For construction, the minimum combined radius for the crossing is suggested to be 1,400 feet. It is a good practice to assign the construction minimum combined radius above the failure minimum combined radius. The profile of the crossing is drawn on 2,800-foot vertical radii. It is also a good practice to assign a profile radius above the construction minimum combined radius. During drill execution, there will be deflection in both the vertical and horizontal planes. Per ASCE Manual No 108, the individual vertical radii and horizontal radii can be combined per the following formula. Although the contractor will make their best attempt to drill the alignment and profile perfectly, they will ultimately drill a path that has three-dimensional combined bending tighter than what the drawing shows.

$$R_c = \sqrt{\frac{R_v^2 \times R_h^2}{R_v^2 + R_h^2}}$$

## 3.3   ESTIMATED PULL FORCE

Large diameter pipe (typically considered greater than 20") experiences significant buoyant forces during pullback due to the large internal volume of the pipe and weight of the drilling mud in the annulus.  To offset the buoyant force, buoyancy control (water filling the product pipe) is considered which minimizes or neutralizes the upward force.  The calculated estimated pull force for the designed crossing is expected to be approximately 269,300 lbs without buoyancy control considerations and 149,000 lbs when considering 100% water filled product pipe.

## 3.4   MAXIMUM ALLOWABLE PULL FORCE

TGP construction standards limit the total stress on the pipe during pullback, combining bending stress due to the HDD curvature with the pulling force of the HDD rig, to 50% SMYS. For a construction minimum combined radius equal to 1,400-foot, the maximum allowable pull force should be limited to 380,500 lbs. When comparing the maximum allowable pull force to the estimated pull forces, the current design accommodates a factor of safety during pullback equal to approximately 2.6 with buoyancy control and 1.4 without.

## 4.0  HDD DESIGN

### 4.1  HDD GEOMETRY

The design radii of curvature are slightly lower than the industry rule of thumb of 100 x NPS and are 2,800-foot.  A 50-foot bottom tangent was selected to keep the HDD as short as possible – a shorter HDD means less friction losses during drilling operations, and therefore lower annular pressure, as well as a lower estimated pull force during pullback.  The entry angle is 13° to allow for a steep encounter angle, which ensures greater downward force at the bit and allows for increased ability to penetrate the surface of the rock layer, as well as maximum cover under the hill (discussed further in Section 4.2).  The exit angle is 10°, which allows for a steep exit from the rock layer. For either side of the crossing, casing could be installed along the entry or exit tangent sections in order to stabilize the overburden soils above bedrock and/or allow for drilling returns to more fully return to surface pits, thus limiting the build-up of downhole drilling pressures due to plugging off.

### 4.2  TOPOGRAPHIC CHALLENGES

The west side of Wells Creek is approximately 7 feet higher in elevation than the east side.  This elevation difference is minimal and should have little to no impact of drilling fluid flow direction. Because of the minimal allowable workspace on the west side of the crossing for a pull string, HDD entry was placed on the west side of the creek.

The HDD entry sits on an approximately 6° down slope, sloping down towards the east.  Earthwork will be required by the contractor to level out the entry side to allow for the rig to sit squarely and securely on the hill.  The 13° entry angle from the horizontal allows for maximum cover underneath the hill as entry angle relative to frontside grade is 7°.

TGP construction standards and industry rule of thumb requires a minimum of 20 feet depth of cover under intermediate creek crossings.  Due to the large diameter of the product pipe and final reamed hole, as well as the deeper location of the top of rock (discussed further in Section 4.3), the designed bottom tangent is 65 feet deep under the creek.  The additional depth should provide additional overburden pressure that is expected to aid in the mitigation of inadvertent returns; this is discussed further in Section 6.

### 4.3  STRATIGRAPHIC CHALLENGES

The east side bore (3A) encountered bedrock at 40.5 ft deep, while the west side bore (3B) encountered bedrock at 22 ft deep.  The HDD entry and exit angles are designed to be aggressive at the assumed top of rock.  This allows for maximum downward force at the drill bit when entering the rock, and maximum upward force when exiting.  Encountering the rock face at a steep angle should help prevent the drill bit from "skating", as it will always prefer the path of least resistance.

The soils above the rock strata at both borings is largely very loose sands with slight gravel.  The low blow counts and poor recovery points to problem areas for inadvertent return risks, hole stability, and drill stem control.  The drilling contractor can set surface casing from HDD entry to the entry radius point of curvature, which will mitigate inadvertent return risks by forcing drilling fluid through the annulus, keep the hole stable and prevent cave ins due to loose soils and gravel, and provide stability for the drill stem while drilling through the rock during pilot hole.  Additionally, the drilling contractor can set surface casing from HDD exit to the assumed top of rock to mitigate inadvertent return risks and

keep the hole stable.  This is further discussed in Section 6.

The rock stratigraphy was largely homogenous and made up of dolomite and shaly limestone of the Knox Dolomite Formation.  Unconfined compressive strength tests were performed and yielded rock strength of 6,900 psi to 11,100 psi, which classifies as "hard".  A single unconfined compressive strength test was performed on a shale band layer which yielded a strength of 3,600 psi.  The drilling contractor will need to be prepared for the hard rock and may utilize a mud motor and aggressive tooling, such as polycrystalline diamond compact (PDC) drill bits and reamers.  The hard material can also be overcome by a lower rate of penetration.

The Knox Dolomite Formation had good Rock Quality Designation (RQD) values and recovery, typically over 80%, above a depth of 92 feet.  Below 92 feet, the RQD dropped slightly but was still fair.  This signifies a high quality and mostly unfractured stratum that possesses a high ability to contain drilling fluids.  There exist several horizontal and diagonal fractures within the strata which may fracture easily and become avenues for inadvertent returns.  Additionally, the HDD profile will encounter several shale bands that have significantly lower compressive strength.

# 5.0  EVALUATION OF HYDROFRACTURE / INADVERTENT RETURNS

## 5.1  SUBSURFACE GEOTECHNCIAL INVESTIGATIONS

Reference Attachment 1 - Final Geotechnical Report (Borings 1A and 1B) for geotechnical bore locations and soil consistencies.

## 5.2  METHODOLOGY

Hydrofracture analysis is the comparison of the ability of the subsurface formation to withstand loading against the expected drilling fluid pressures along the HDD.

The evaluation of the subsurface soils' ability to resist fracturing during drilling is outlined by the Delft Equation. This equation/tool is commonly used by the United States Army Corps of Engineers for HDD projects involving drilling beneath levees. The basic relationship for hydraulic fracture pressure is a function of the overburden stress (σ) plus the undrained shear strength (Su).

$$P_{max} = u + \left[\sigma_0' \cdot (1 + sin\varphi) + c \cdot cos\varphi + c \cdot cot\varphi\right] \cdot \left(\left(\frac{R_0}{R_{pmax}}\right)^2 + \frac{\sigma_0' \cdot sin\varphi + c \cdot cos\varphi}{G}\right)^{\frac{-sin\varphi}{1+sin\varphi}} - c \cdot cot\varphi$$

Where:
$P_{max}$ = maximum allowable mud pressure (psf)
$u$ = groundwater pressure (psf)
$\sigma_0'$ = Effective Stress (psf), where
   = $\gamma_{soil}$ (drill depth – height of ground water over drill) + $\gamma_{water}$ (height of groundwater over drill)
$\varphi$ = soil friction angle
$c$ = soil cohesion (psf)
$R_o$ = radius of borehole (ft)
$R_{pmax}$ = radius of plastic zone (ft)
$G$ = shear modulus (psf), where
   = Elastic Modulus of Soil / [2 x (1 + Poisson's Ratio of Soil)]

The suggested method for evaluation of the expected drilling fluid pressure(s) along the HDD is by utilizing a rheological model assuming drilling mud's behavior as a Bingham plastic fluid. The basic concept of the model is that under low stresses the drilling mud behaves as a rigid body but flows as a viscous fluid at higher stresses.

## 5.3  ASSUMPTIONS

Delft Equation:
- Sufficient geotechnical data is available for the entire length and depth of the proposed directional drill. Consistency in the stratigraphy of layers across the bore as well as the heights of the layers are critical to creating an accurate model.
- The analysis is best suited for homogenous soil when there is uniform soil above the proposed drill/bore. However, density of soil likely varies with depth and/or different soil types may exist in varying thicknesses. To handle variations in density, it is more practical to calculate the effective stress for each soil layer and sum them up at a point of interest. To handle variations for different soils types, a weighted average was applied, based on soil layer thicknesses, to a

point of interest for determination of the other input variables of the equation (elastic modulus, Poisson's ratio, friction angle, and cohesion).

Hoek-Brown Criterion:

- Hoek-Brown criterion is used in cavity expansion theory. The Mohr-Coulomb criterion with a tensile strength value can be used to identify tensile/shear failure of a bedrock, but to consider unique rock properties geological strength index (GSI) value is added to calculations. The Hoek-Brown parameters were used as a bridge to correlate Mohr-Coulomb parameters and GSI value to determine bedrock parameters such as:
  - Rock Mass Modulus of Deformation
  - Friction angle
  - Cohesion
- To accurately estimate the GSI value the following needs to be provided:
  - Boring logs with the description of rock mass structure
  - Unconfined Compressive strength of sample (UCS), RQD and Recovery values
  - The pictures of the samples to determine the sample surface conditions, joint and rock mineral conditions
- Once Rock parameters are determined based on GSI value and the information provided in boring logs, all the data received is applied to cavity expansion theory (Delft Equation) to determine the limiting drilling mud pressure.

Bingham Plastic Fluid Model:

- To appropriately generate an accurate annular pressure model, the following must be estimated or provided:
  - Drill Bit Diameter (typically selected by contractor)
  - Nominal Drill Pipe Diameter (typically selected by contractor)
  - Minimum and Maximum Mud Pump Rates (controlled by contractor)
  - Fresh Drilling Mud (controlled by contractor):
    - Density
    - Yield Point
    - Plastic Viscosity
  - Drilling Returns- combination of mud and soil cuttings (controlled by base/fresh drilling mud being pumped at a given flow rate in combination to penetration rate – all controlled by contractor)
    - Density
    - Yield Point
    - Plastic Viscosity
- For simplicity and calculation of maximum annular velocity, it is assumed that no drilling mud is lost to the surrounding formation (analyze mud flow as closed loop).
- The variable that most significantly impacts the final pressure gradient is the yield point of the drilling mud.
  - When able to be measured, the yield point of fresh drilling mud is typically around 9 – 10.5 lbs/100 sq-ft.
  - Yield points of mud containing heavy drilling returns (typically associated with returning mud weight equal to 10.5 – 12 ppg) can be as high as 50 lbs/sq-ft.

# 6.0   HYDROFRACTURE / INADVERTENT RETURNS ANALYSIS

## 6.1   MODEL RESULTS

A minimum safety factor of 2.0 was achieved with the hydrofracture/inadvertent returns modelling. Appendix C contains a plot produced for the purpose of visualizing existing grade, the proposed HDD, corresponding soil limiting pressure (Pmax) and recommended maximum allowable drilling pressure (Pmax/2), and the expected operating range of the annular pressure.

Based on the results displayed in the plot, it is the opinion of Farnsworth Group that if the drilled hole remains clean/open, if the drilling mud is maintained within reasonable rheological properties, and if the minimum depth of cover is achieved, the factor of safety of greater than 2 will be in place under the single critical feature (Wells Creek).

The entry side of the drill present increased risk of having an inadvertent return due to the steep hillside which results in a 7° entry angle relative to grade as well as the loose gravelly soils. To offset the risks for inadvertent returns, the drilling contractor may set surface casing from HDD entry to the entry radius point of curvature, which has been designed to roughly intersect the assumed top of rock. The surface casing will force drilling fluid through the annulus and will mitigate inadvertent return risks.

As is always to be expected, the exit side of the drill does present increased risk of having an inadvertent return due to the length of the annular space that the drilling mud must be pumped through, which creates a higher hydraulic gradient than when the bit was closer to the entry/rig side of the drill. Additionally, the soils above the rock strata are very loose and contain gravel. It is assumed that if the mud properties are optimal and if the mud flushing rate can outpace the penetration rate, the general risk of having an inadvertent return should be decreased. As the flow rate may need to be decreased towards exit, the penetration rate may need to subsequently decrease to keep annular pressures lower. The drilling contractor may set surface casing from HDD exit to the assumed top of rock to further mitigate inadvertent returns risks.

A factor of safety greater much greater than 2 is expected while the HDD is in the rock strata. There may be lost circulation risks due to shale banding and horizontal/diagonal fractures, but the largely homogenous strata ultimately had great to excellent RQD values that point toward a well opened and shaped hole.

# 7.0   CONSTRUCTION PLANS

## 7.1   TGP RESPONSIBILITIES

- Before the start of HDD operations, HDD Contractor shall provide TGP a detailed drill plan that includes applicable details as outlined in Appendix D – Detailed Drill Plan Requirements for Owner approval
- Stake proposed centerline at proposed HDD entry and exit and every 100 feet on the proposed +00 stationing callouts.
- Stake proposed workspace limits (at corners and sufficient for line of site).
- Flag/mark environmentally sensitive areas.
- Provide Environmental Inspector to participate in Drilling Kick-off Meeting to cover any permit requirements and make routine site visits to ensure compliance with all federal/state/local requirements.
- Provide HDD Drilling Inspector/Observer to monitor compliance of drill tolerances, general hole preparation, and pullback stresses.

## 7.2   CONTRACTOR RESPONSIBILITIES

The following sub sections are related to minimizing and/or being able to successfully handle any potential inadvertent returns.

### 7.2.1   MINIMUM REQUIRED LIST OF IR RESPONSE EQUIPMENT / RESOURCES

- Trash pump(s) that are capable of being able to pump any inadvertent returns to the entry/exit pit(s)
- Visqueen / plastic sheeting for establishing secondary containment around mobilized trash pumps.
- Trash pump suction hosing – for each trash pump that may be used
- Lay flat hosing
- Erosion control devices (ECDs) – silt fence / straw bales that can be placed on downward slopes and act as buffer between any inadvertent returns and sensitive water features
- Shovels, brooms, squeezes, and other appropriate hand tools
- Excavator for digging of potential containment sumps at inadvertent return location(s)
- Contingency plan for matting in case rubber-tired equipment requires access to difficult portions of the right-of-way
- Vac trailer/transport or vac truck at site or on call during all drilling operations

### 7.2.2   PROPER TOOLING SELECTION AND DRILLING TECHNIQUES

- Appropriately size drilling rig, mud pump, and reclaimer/cleaning system to execute the proposed HDD by length and subsurface conditions.
- Appropriately size (diameter) drill bit(s) / reamer(s) in comparison to drill pipe/mud motor (as applicable) diameter(s) such that sufficient cross-sectional area exists for proper annular velocity and circulation.
- Source appropriate tracking tooling for maximum depth of the crossing.
- Implement continuous annular pressure monitoring during pilot hole execution.

### 7.2.3    MUD QUALITY

- Drilling contractor shall have an on-site technician, present at all times, to perform monitoring of drilling fluid weight, viscosity, and yield point. Drilling contractor shall provide all the appropriate equipment to properly measure drilling fluid properties.
- Appropriately sized reclaimer/cleaning system shall be onsite for proper filtering of cuttings from returning mud.
- The drilling contractor shall source water for generation of fresh mud that will be required as the hole is generally cut and enlarged. The drilling contractor will test mud prior to storing, hauling, or disposing.
- Owner approved Loss of Circulation Materials (LCMs) shall be readily available to mix into the drilling mud in order to plug off inadvertent return path(s).

### 7.2.4    CIRCULATION MONITORING AND GROUND SURFACE INSPECTIONS

- The drilling contractor is responsible for continually monitoring mud pressures and circulation. It is suggested that the contractor become familiar with the annular pressure limits and at a minimum are required to stay below the assigned Pmax/2 location by stationing.
- If at any point during the drilling process the drilling mud spikes above the allowable limit, it is recommended that tripping pipe and swabbing of joint(s) occur.
- If at any point during the drilling process the returns suddenly cease, drilling shall be halted and immediate inspection of the right-of-way shall be conducted.
- If inadvertent return(s) are noted, Contractor shall immediately:
  - Implement steps in accordance with the Inadvertent Returns Response Plan.
  - Notify appropriate parties including but limited to the onsite inspector.

# APPENDIX A

PROPOPOSED PLAN AND PROFILE DRAWING – PRELIMINARY

# HDD NOTES:

1. REFERENCE COMPANY STANDARDS FOR DIRECTIONALLY DRILLED CROSSING INSTALLATION REQUIREMENTS.
2. MINIMUM ALLOWABLE RADIUS = 1,400 FEET.
3. FOR ALL OTHER TOLERANCES REFER TO COMPANY STANDARDS.
4. MAXIMUM ALLOWABLE PULLBACK FORCE = 380,500 LBS PER PULL.
5. THEORETICAL PULLBACK FORCE REQUIRED = 269,100 LBS. (NO BUOYANCY CONTROL), 149,000 LBS. (100% WATER FILL)
6. MAXIMUM ROTATIONAL TORQUE = 0 IN-LBS PER PULL.
7. MAXIMUM PIPE SUPPORT SPACING: HYDROTEST = 70 FEET; STRINGING/PULLBACK = 75 FEET.
8. PRE-P3/LBACK HYDROTESTING SHALL BE IN ACCORDANCE WITH THE PROJECT-SPECIFIC HYDROTEST PLAN.
9. AVOIDANCE, MITIGATION, AND CLEAN-UP OF ANY INADVERTENT RETURNS ARE THE SOLE RESPONSIBILITY OF THE CONTRACTOR.
10. SOIL BORE INFORMATION PROVIDED BY ATC ATLAS.
11. SOIL BORE ELEVATIONS PROVIDED BY TABLEROCK ENERGY.
12. THE GEOTECHNICAL INFORMATION SHOWN ON THESE DRAWINGS AND PROVIDED IN THE GEOTECHNICAL REPORT ARE NOT A COMPLETE AND ACCURATE REPRESENTATION OF ALL THE SUBSURFACE CONDITIONS THAT MAY BE ENCOUNTERED DURING CONSTRUCTION. SUBSEQUENT INTERPRETATION OF THE GEOTECHNICAL INFORMATION PERTAINING TO THE FEASIBILITY DESIGN AND/OR CONSTRUCTION OF THE DESIGN ARE THE RESPONSIBILITY OF THE CONTRACTOR.

## DESIGN DATA

DESIGN CODE: ASME B31.8 DOT 192

MEASURED LENGTH:
TRENCH:
HDDBORE:          1600'
TOTAL:            1600'

PIPE SPECIFICATIONS:
PIPE - 30" NOMINAL DIAMETER, 0.500" WT, SAWL, PLAIN END,
API 5L-PSL2, GR X70, MATL SPEC M8220, COAT SPEC M8370,
FBE (14-16 MILS) & 30-40 MILS ARO

DESIGN PRESSURE:     750 PSIG
PROPOSED MAOP:       750 PSIG

### SB-3A

362.3 - 359.3   SILTY CLAY (CL), MOIST
359.3' - 355.8'  CLAYEY FINE TO COARSE SAND (SC), MOIST & VERY LOOSE, NO RECOVERY, N = 0
355.8' - 354.3'  SILTY FINE TO COARSE SAND WITH 1/2" GRAVEL (SM), SATURATED & LOOSE, LOW RECOVERY, N = 6
350.3' - 345.3'  SLIGHTLY SILTY FINE TO COARSE SAND WITH 1/2" GRAVEL (SM-SW), SATURATED, MEDIUM DENSE, N = 13
345.3 - 330.3'   1/2" GRAVELY FINE TO COARSE SAND WITH SLIGHT SILT (SW-SM), SATURATED, MEDIUM DENSE TO DENSE, N= 31 TO 36
330.3' - 326.3'  CHURTY CLAY (CL), SATURATED, VERY STIFF, N= 50
326.3' - 320.3'  CLAYEY FINE TO COARSE SAND WITH 1/2" SLIGHT GRAVEL (SC), SATURATED, DENSE, N = 50
321.6'- 320.3'   WEATHERED DOLOMITE, FRACTURES & SOME ROUNDED FRAGMENTS, FAIR RECOVERY AND RQD
320.3'- 311.3'   DOLOMITE WITH OCCASIONAL SHALE BANDING, GOOD RECOVERY AND RQD, COMPRESSIVE STRENGTH = 11,400 PSI
311.3'- 299.3'   SHALY LIMESTONE WITH MODERATE HORIZONTAL AND DIAGONAL FRACTURES, COMPRESSIVE STRENGTH = 10,900 PSI
299.3' - 268.3'  LIMESTONE WITH OCCASIONAL SHALE BANDING, MODERATE HORIZONTAL AND DIAGONAL FRACTURES, COMPRESSIVE STRENGTH = 11,000 PSI

### SB-3B

362.2' - 357.2'  SILTY CLAY (CL), MOIST, VERY SOFT, N = 1
357.2' - 350.7'  SILTY FINE TO COARSE SAND WITH CLAY (SM), SATURATED & LOOSE, N = 4
350.7'- 346.2'   GRAVELY TO 1/2" FINE TO COARSE SAND WITH SILT (SW), SATURATED & VERY LOOSE, N = 2
346.2'- 340.2'   GRAVELY TO 1/2" FINE TO COARSE SAND WITH SILT (SP-SM), SATURATED & VERY LOOSE, NO RECOVERY, N=1
340.2'- 335.7'   WEATHERED DOLOMITE, OCCASIONAL FRACTURES AND SHALE PARTINGS, FAIR RQD
335.7' - 330.7'  DOLOMITE WITH SHALY LIMESTONE AND OCCASIONAL SHALE ZONES, GOOD RECOVERY AND RQD, COMPRESSIVE STRENGTH = 10,900 PSI
330.7' - 329.7'  SHALY LIMESTONE WITH DIAGONAL FRACTURES, GOOD RECOVERY AND RQD
329.7'- 322.2'   LIMESTONE, GOOD RECOVERY AND RQD
322.2'- 314.0'   LIMESTONE WITH OCCASIONAL SHALE BANDING, EXCELLENT RECOVERY AND RQD, COMPRESSIVE STRENGTH = 6,900 PSI
314.0'- 312.9'   BLACKISH GRAY SHALE LAYER
312.9'- 304.7'   LIMESTONE WITH OCCASIONAL SHALE BANDING, EXCELLENT RECOVERY AND RQD, COMPRESSIVE STRENGTH = 3,600 PSI
304.7'- 295.7'   SHALY LIMESTONE AND LIMESTONE, GOOD RECOVERY AND RQD
295.7'- 286.7'   SHALEY LIMESTONE, GOD TO EXCELLENT RECOVERY AND RQD, COMPRESSIVE STRENGTH = 10,700 PSI
286.7'- 268.3'   DOLOMITE, EXCELLENT RECOVERY AND RQD
286.2'- 265.8'   DOLOMITE AND LIMESTONE WITH SHALE BANDING, OCCASIONAL FRACTURES, GOOD RECOVERY AND RQD, COMPRESSIVE STRENGTH = 11,100 PSI

## VERTICAL CURVE DATA

| STATION | ELEVATION | DESCRIPTION |
|---|---|---|
| 0+00.0 | 371.5 | HDD ENTRY |
| 1+29.9 | 341.5 | PC, R=2800', Δ=13° |
| 7+59.6 | 269.7 | PT |
| 8+09.8 | 269.7 | PC, R=2800', Δ=10° |
| 12+96.0 | 312.3 | PT |
| 15+92.8 | 364.6 | HDD EXIT |

## PLAN

SCALE: 1" = 60'
PROJECTION: NSRS 2011 TENNESSEE STATE PLANE ZONE, US FOOT

HDD ENTRY
STA. 0+00.0
N:746406.5259
E:1478038.4059
ALIGN. STA. 1623+72.6

HDD EXIT
STA. 15+92.8
N:745150.1496
E:1480015.4563
ALIGN. STA. 1607+79.80

## PROFILE

SCALE: 1" = 60'

## DETAIL A

SCALE: 1" = 5'

## LEGEND

| | |
|---|---|
| ──── | PROPOSED PIPELINE |
| ──── | PROPERTY LINE |
| ─ ─ ─ | TEMPORARY CONSTRUCTION WORKSPACE |
| ─ ─ ─ | ADDITIONAL TEMPORARY CONSTRUCTION WORKSPACE |

## PRELIMINARY
NOT FOR CONSTRUCTION
DATE: 07-01-2022

### Notes:

1. CONTRACTOR REQUIRED TO MAINTAIN A 13° ENTRY ANGLE RELATIVE TO THE HORIZONTAL. EARTHWORK WILL BE REQUIRED TO ALLOW THE DRILLING RIG TO ACHIEVE A 8° - 10° ENTRY ANGLE RELATIVE TO GRADE BEHIND THE RIG.
2. FINAL GEOTECHNICAL REPORT SHOWED GRAVEL, SUBOPTIMAL RECOVERY, AND LOW BLOW COUNTS FOR THE SOILS ABOVE THE ASSUMED TOP OF ROCK. CONTRACTOR TO CONSIDER SETTING SURFACE CASING ON BOTH SIDES TO TOP OF ROCK TO MITIGATE INADVERTENT RETURN RISKS AND PROVIDE SUPPORT FOR THE DRILL STRING DURING PILOT HOLE.

TENNESSEE GAS PIPELINE
Company, L.L.C.
a Kinder Morgan company

TGP CUMBERLAND 30" PIPELINE
PRELIMINARY HDD EXHIBIT
WELLS CREEK
M.P. 30.6

| Status | PRELIMINARY |
|---|---|
| State | TENNESSEE |
| County | STEWART |
| Category | CIVIL |
| File Name | C_HDD3 Wells Creek - 0210665.00.dwg |

Scale: AS NOTED

EX-3

Rev: B

| | | | | |
|---|---|---|---|---|
| B | PRELIMINARY | 302800 | 07-01-2022 | |
| A | PRELIMINARY | 302800 | 03-30-2022 | |
| Rev | Revision Description | Project ID | Date | |

# APPENDIX B

## PIPE STRESS SUMMARY

**Farnsworth Group, Inc.**
**ASME B31.8**
**Horizontal Directional Drill Stress Analysis**
**TGP 30" Cumberland Pipeline**

| | |
|---:|:---|
| **Project:** | 0210665.01 |
| **Client:** | Tennessee Gas Pipeline (Kinder Morgan) |
| **Crossing(s):** | Jones Creek, Yellow Creek, Wells Creek |
| **Date:** | 7/1/2022 |
| **By:** | Nick Garver |

| Pipe Specifications | | | |
|---|---|---|---|
| **Bore Pipe** | | **Tie-In Pipe** | |
| O.D. | 30.000 | O.D. | 30.000 |
| w.t. | 0.500 | w.t. | 0.312 |
| SMYS | 70,000 | SMYS | 65,000 |

| Design Factors | |
|---|---|
| Design Factor for Pre-Installation Test, $F_{pre}$: | 0.75 |
| Design Factor for Installation Pull-back, $F_i$: | 0.50 |
| Design Factor for Installation Pull-back, $F_s$: | 0.50 |
| Design Factor for Post-Installation Test, $F_{post}$: | 1.02 |
| In-service Design Factor for Bore Pipe, F: | 0.50 |
| In-service Design Factor for Tie-in Pipe, F: | 0.72 |

| | |
|---:|:---:|
| **Absolute Minimum Allowable Combined Radius:** | 1,161 |
| **Recommended Minimum Allowable Combined Radius:** | 1,400 |

| HDD Force and Stress Analysis | | | | | |
|---|---|---|---|---|---|
| **Design Criteria** | **Bore Pipe** | | **Tie-In Pipe** | | **Units** |
| | **Value** | **Check** | **Value** | **Check** | |
| **Bending Stress** | 26,339 | 44,620 | - | - | psi |
| Pre-Test | | | | | |
| **Hoop Stress** | 22,500 | 35,000 | - | - | psi |
| **Long. Stress** | 33,135 | 63,000 | - | - | psi |
| **Max Pipe Span** | 79.9 | 269.2 | - | - | ft |
| **Deflection** | 1.00 | 128.93 | - | - | in |
| **Max Pipe Span** | 73.7 | 106.3 | - | - | ft |
| **Deflection** | 1.00 | 4.32 | - | - | in |
| Installation | | | | | |
| **Max Pull Force** | 272,900 | 380,500 | - | - | lb |
| Post-Test | | | | | |
| **Hoop Stress** | 41,370 | 70,000 | 66,298 | 66,298 | psi |
| **Long. Stress** | 47,024 | 52,500 | 33,149 | 48,750 | psi |
| In Service Stresses | | | | | |
| **Hoop Stress** | 22,500 | 35,000 | 50,330 | 50,400 | psi |
| **Thermal Stress** | -9,588 | 63,000 | 8,775 | 63,000 | psi |
| **Long. Stress** | -29,177 | 63,000 | 23,874 | 63,000 | psi |
| **Comb. Stress** | 51,677 | 63,000 | 43,606 | 63,000 | psi |
| **Shear Stress** | 25,838 | 31,500 | 13,228 | 31,500 | psi |
| **d/t** | 60.0 | 60.0 | - | - | (-) |

JA0514

# APPENDIX C

# HYDRO-FRACTURE PRESSURE VS. ANNULAR PRESSURE PLOT



JA0516

AR 001598

# APPENDIX D

The drilling subcontractor shall provide the following information before the mobilization of drilling equipment:

Sections:
1. Resumes for all key personnel- including project history and general years of experience.

2. Describe Proposed Mechanical Equipment:
   - Rig(s) make/manufacturer & include specifications:
     - Weight
     - Length
     - Max pull/thrust w/ conversion factors for each gearing option
     - Max spindle torque w/ conversion factors for each gearing option
     - Notification of any plan to perform major service or rebuild the rig(s) before coming onto the job site (such that mechanical issues are limited).
   - Mud pump(s):
     - Flow rate capabilities
     - Address availability of spare parts (lines, plungers, etc.) or backup pumps.
   - Mud cleaning system(s):
     - Make/model
     - Size (length & width)
     - Capacity
   - Drill pipe handling equipment:
     - Crane(s) and/or excavator(s)
   - Product pipe handling equipment:
     - Excavator(s) and/or side boom(s).
     - Number of rollers
   - Mud Handling/Recovery equipment:
     - Vac trucks/trailers & tanker transports

3. Required Site Layout:
   - Identify the location of fixed mechanical equipment on construction drawings.
   - Identify the location of matting needed for equipment setup and ingress/egress.
   - Identify the material storage area(s).

4. Proposed HDD Tooling:
   - Drill pipe:
     - Nominal diameter
     - Total footage onsite
   - Pilot hole:
     - Available Bit Size(s)- diameter
     - Available Bit Type(s)- mill tooth, TCI, etc.
     - Intention to use mud motor or not
     - Quantity of available spares
   - Reaming:
     - Available or Planned Reamer Type(s)- fly cutter, beaver tail, hole opener, barrel, etc.
     - Available or Planned Reamer Size(s)- diameter
     - Custom built or vendor supplied
     - Quantity of available spares

5. Proposed Tracking Equipment:
   - Document accuracy and submit calibration history of tracking equipment (must be per applicable standards within past 6 months).
   - Describe plan to successfully navigating crossing.

6. Drilling Fluid(s) Makeup/Properties & Logistics:
   - Mud Makeup/Properties:
     o Provide SDSs for all potential additives
     o Describe purpose of additives and reason for intended use
     o Describe target mud mixture (percentage by weight or volume)
     o Properties (viscosity & mud density)
   - Logistics
     o Describe plan for water sourcing
     o Describe water hauling logistics (if applicable):
       ▪ Number and size of vac/tanker trucks
       ▪ Estimated quantity of needed loads per day
     o Describe estimation of mud/cuttings volume for disposal
     o Describe mud/cutting hauling logistics
       ▪ Number and size of truck loads
       ▪ Estimated quantity of loads per day/week/month

7. Drilling Fluid(s) Management- Testing, Monitoring, & Inadvertent Returns Monitoring/Response Plan:
   - Testing:
     o Describe mud engineer qualifications
     o Describe testing intervals (with maintained documentation) to ensure intended mud properties are maintained
   - Monitoring:
     o Describe response for limited or nonexistent drilling returns
   - Inadvertent Returns:
     o Describe procedures and equipment/materials available for inadvertent returns response

8. Pilot Hole Drilling Process:
   - Describe target mud flow rate(s)
   - Describe target penetration rate(s)
   - Describe chosen tooling

9. Hole Opening Process:
   - Describe number of ream pass(es).
   - Describe size(s), chosen tooling, and direction of ream pass(es).
   - Describe target penetration rate(s).
   - Describe target mud flow rate(s).
   - Is Contractor pulling tail string at exit or is the rig always pulling the reamer(s)?
   - Is Contractor maintaining string in the hole at all times?
   - Will a swab pass be planned for final verification and adjustment of mud in hole?

10. Pipe Installation (Pullback)
    - Document load rating on swivel
    - Describe equipment available for product pipe break over
    - Describe target pull rate
    - Describe plan to complete mid-weld (if necessary)

11. Proposed Schedule:
- Contractor to include (at a minimum) the following in their construction schedule:
    - HDD Mobilization
    - HDD Equipment setup & centerline surveying
    - HDD Pilot Hole
    - HDD Hole Opening (by pass)
    - HDD Swab (if applicable)
    - HDD Pullback
    - HDD Equipment tear down & mud hauling
    - HDD Demobilization



Tennessee Gas Pipeline (TGP)

Cumberland 30" Pipeline

30" Steel HDD at Sta. 1180+60

Yellow Creek Crossing

**Submitted by:**

**Nick Garver, Oil & Gas Professional**
**p 314.391.9751**
**ngarver@f-w.com**
**July 1, 2022**

# TABLE OF CONTENTS

Contact Information:

**Nick Garver, Oil & Gas Professional**

p 314.391.9751

ngarver@f-w.com

July 1, 2022

1.0    **Introduction** ...................................................................................................................................**3**

    1.1 Crossing Description ......................................................................................................................3

    1.2 Information Provided by Others ....................................................................................................3

2.0    **HDD Industry Guidelines and Best Practices** ...................................................................................**3**

    2.1 General Geometry .........................................................................................................................3

        2.2.1 Entry Angle ..........................................................................................................................3

        2.2.2 Entry Tangent ......................................................................................................................3

        2.2.3 Exit Angle ............................................................................................................................3

        2.2.4 Exit Tangent ........................................................................................................................4

        2.2.5 Design Radius of Curvature .................................................................................................4

        2.2.6 Bottom Tangent ..................................................................................................................4

    2.2 Pipe Stress ....................................................................................................................................4

        2.2.1 Pre-installation ...................................................................................................................4

        2.2.2 Installation ..........................................................................................................................4

        2.2.3 Post Installation ..................................................................................................................5

        2.2.3 In-service .............................................................................................................................5

    2.3 Code Requirements Followed ........................................................................................................5

    2.4 Other Design Guides Referenced ..................................................................................................5

3.0    **Pipe Design & Stress Analysis** ........................................................................................................**6**

    3.1 Pipe Design ...................................................................................................................................6

    3.2 Minimum Combined Radius of Curvature .....................................................................................6

    3.3 Estimated Pull Force .....................................................................................................................6

    3.4 Maximum Allowable Pull Force .....................................................................................................6

4.0    **HDD Design** ....................................................................................................................................**7**

    4.1 HDD Geometry .............................................................................................................................7

    4.2 Topographic Challenges ...............................................................................................................7

    4.3 Stratigraphic Challenges ..............................................................................................................7

5.0    **Evaluation of Hydro-fracture / Inadvertent Returns** .......................................................................**9**

    5.1 Subsurface Geotechnical Investigations .......................................................................................9

    5.2 Methodology ................................................................................................................................9

    5.3 Assumptions .................................................................................................................................9

6.0    **Hydro-fracture / Inadvertent Returns Analysis** ............................................................................**11**

    6.1 Model Results .............................................................................................................................11

7.0    **Construction Plans** .......................................................................................................................**12**

    7.1 Owner Responsibilities ...............................................................................................................12

    7.2 Contractor Responsibilities .........................................................................................................12

        7.2.1 Minimum Required List of IR Response Equipment / Resources ........................................12

7.2.2 Proper Tooling Selections and Drilling Techniques..................................................12

7.2.3 Mud Quality ...........................................................................................................13

7.2.4 Circulation Monitoring and Ground Surface Inspections ........................................13

**Appendix A – Proposed Plan and Profile Drawing – Preliminary** ........................................**14**

**Appendix B – Pipe Stress Summary**....................................................................................**16**

**Appendix C – Hydro-fracture Pressure vs. Annular Pressure Plot** ....................................**18**

**Appendix D – Detailed Drill Plan Requirements**..................................................................**20**

**Attachments:**

- **Attachment 2 – Final Geotechnical Report (Bores 2A and 2B)**

# 1.0   INTRODUCTION

## 1.1   CROSSING DESCRIPTION

The Tennessee Gas Pipeline (TGP) Cumberland 30" Pipeline is an approximately 31-mile pipeline spanning Dickson, Houston, and Stewart Counties in Tennessee. There are three (3) creeks along the alignment that require a Horizontal Directional Drill (HDD).

Farnsworth Group (FGI) was contracted to perform the HDD design on the three crossings. This report is for the 30" Steel pipeline crossing of Yellow Creek at Sta. 1180+60 in Houston County, TN.

## 1.2   INFORMATION PROVIDED BY OTHERS

- Existing Conditions Linework and Surface files by Tablerock Energy
- Final Geotechnical Engineering Report by ATC Atlas containing field and laboratory testing results for geotechnical borings 2A and 2B as well as specific geotechnical properties for the Fort Payne Formation and the Warsaw Limestone
- MAOP and design pressure by TGP

# 2.0   HDD INDUSTRY GUIDELINES AND BEST PRACTICES

## 2.1   GENERAL GEOMETRY

A horizontal directional drill profile consists of a series of straight lines (known as tangents) and curves. The boundary between straight and curved sections are called points of curvature and points of tangency; these become defined by the determination of entry and exit points, entry and exit angles, radius of curvature, and desired elevation change / depth of cover.

### 2.1.1   ENTRY ANGLE

The entry angle of an HDD is ultimately determined upon several factors. Of most importance though is allowing for the anticipated rig to setup at the site. A typical entry angle ranges from 8° to 14°. Steeper angles are possible, but consideration should be given to the safe setup and position of the rig. Shallower angles are also possible, but usually only desired for slick bore crossings.

### 2.1.2   ENTRY TANGENT

There is no minimum or maximum requirement for the length of the entry tangent. However, it is suggested to provide at least 30 feet for the drilling contractor to establish at least a joint of drill pipe in the ground prior to having to make any directional changes horizontally or vertically.

### 2.1.3   EXIT ANGLE

The exit angle of an HDD is unlimited. For practical purposes of getting the bit out of the ground and avoiding longer runs of shallower depth of cover when annular pressures are usually higher, 8° is usually the recommended minimum. Exit angles can approach 14° (or higher), but extra provisions may be necessary to not overstress the product pipe during pullback. Large diameter pipe, typically greater than

20", require additional considerations for pipe breakover during pullback. The recommended maximum exit angle relative to backside grade for 30" pipe is 12°.

### 2.1.4   EXIT TANGENT

Similar to the entry tangent, there is no minimum or maximum requirement for the length of the exit tangent. It is suggested to provide at least 50 feet. The more length of exit tangent that can be provided, the better chances a drilling contractor will have to not overrun the proposed exit point. This is especially true when softer or loose soils exist on the exit side of a crossing.

### 2.1.5   DESIGN RADIUS OF CURVATURE

Within the HDD industry for steel pipelines, there exists a rule of thumb for radius of curvature equal to 100 times nominal pipe diameter (100 x NPS). This rule of thumb radius is usually a good starting point for a profile and/or drill that is to have horizontal curve(s). The design radius of curvature may need to be increased to accommodate bending limitation of the drill pipe and tooling that may be required for a given crossing. Occasionally, tighter design radius of curvature may be to be made tighter to fit the proposed geometry within the limiting features of a given site. Finally, the design radius of curvature shall be chosen to provide a factor of safety against pipe failure that is being bent. The modes of failure can occur in the form of localized buckling, yielding under axial tension plus bending, or yielding under combination of internal/external pressure plus bending.

### 2.1.6   BOTTOM TANGENT

As was stated for the prior tangents section, there is no stated minimum or maximum requirement for the length of the bottom tangent. Similar to the exit tangent, it is recommended to provide a minimum of 50 feet. This should allow for a drilling contractor to play catch up to a design profile, in the event they are too deep after attempting to drill the downward entry curve section, prior to attempting to drill the upward exit curve section of the HDD.

## 2.2   PIPE STRESS

The loads and stresses on the pipe of an HDD are multi-phase and are relatively high compared to conventionally bored or open cut pipe sections. Due to these facts in combination to the other plan view constraints and profile view (depth of cover) requirements, the HDD design process is usually iterative and the selection of a certain pipe specification needs to be able to pass the minimum (or controlling) set of loading conditions.

### 2.2.1   PRE-INSTALLATION

During pre-installation analysis, the chosen pipe's strength is evaluated versus maximum internal hydrostatic test pressure, bending that occur from pipe being continuously supported above grade, and/or bending that may occur from natural elevation changes or horizontally curved section(s) of the pipe stringing area.

### 2.2.2   INSTALLATION

During installation analysis, an estimated pull force is evaluated and compared to a maximum allowable pull force. The estimated pull force is determined for the chosen geometry considering pipe weight/buoyancy, friction between the pipe wall and the bore hole, and hydrokinetic losses due to pulling the

product pipe through a viscous drilling mud. The maximum allowable pull force is evaluated under two loading states. The first loading condition considers only tension from applied tension (pull force/cross sectional area of the pipe) and bending stress (from minimum combined radius of drilled hole). The second loading condition considers tension, bending, and external hydrostatic pressure. A good HDD design will allow for ample factor of safety such that the chosen pipe can be successfully pulled into the reamed hole without exceeding the determined maximum allowable pull force.

### 2.2.3    POST INSTALLATION

During post installation analysis, the chosen pipe's strength is evaluated versus the maximum internal hydrostatic pressure and bending from the minimum combined radius of drilled hole. The pipe is considered to be in an unrestrained to partially restrained state, since the HDD bore hole has likely not deformed or completely collapsed during the post installation hydrotest.

### 2.2.4    IN-SERVICE

During in-service analysis, the chosen pipe's strength is evaluated verses the maximum allowable operating pressure, bending stress from the minimum combined radius of the drilled hole, and thermal stress from installation temperature vs. operating pressure. The pipe is considered to be in a restrained state, since the HDD bore hole has likely completely collapsed for the long-term duration of the service life of the pipe.

## 2.3    CODE REQUIREMENTS FOLLOWED

- Code of Federal Regulations (CFR), Title 49 – Transportation, Part 192 – Transportation of Natural and Other Gas by Pipeline
- ASME B31.8 – Gas Transmission and Distribution Pipe Systems

## 2.4    OTHER DESIGN GUIDES REFERENCED

- American Society of Civil Engineers (ASCE) Manual No. 108 – Pipeline Design for Installation by Horizontal Directional Drilling
- Pipeline Research Council International (PRCI) PR-277-144507-Z01 – Installation of Pipelines by Horizontal Directional Drilling Engineering Design Guide
- American Society of Civil Engineers (ASCE) Step by Step Evaluation of Hydrofracture Risk for Horizontal Directional Drilling Projects
- American Society of Civil Engineers (ASCE) Predicting and Controlling Hydraulic Fracturing During Horizontal Directional Drilling
- North American Society for Trenchless Technology (NASTT) No-Dig Show 2010 Paper F-1-01 Effectiveness of Hydrofracture Prediction for HDD Design
- American Society of Civil Engineers (ASCE) Numerical Modeling Evaluation of Drilling Mud Loss risk for an HDD Borehole in Low-Strength Component Bedrock

# 3.0   PIPE DESIGN & STRESS ANALYSIS

## 3.1   PIPE DESIGN

The MAOP and design pressure for the Cumberland 30" pipeline is 750 psig.  The Yellow Creek crossing falls within a Class I area as determined by a class location study completed by TGP, which requires a pipe design factor of 0.72 per 49 CFR 192.105 (a).  Additional considerations were given for pipe design, such as minimum D/t ratio of 60 and minimum combined radius of curvature and allowable pull force as described in subsequent sections.  The pipe specified for this crossing is 30" NPS, 0.500" WT, Grade X-70 pipe.

## 3.2   MINIMUM COMBINED RADIUS OF CURVATURE

The absolute minimum combined radius is calculated as 1,161 feet and ultimately contributes to a predicted total stress failure state in the Post Installation loading condition. For construction, the minimum combined radius for the crossing is suggested to be 1,400 feet. It is a good practice to assign the construction minimum combined radius above the failure minimum combined radius. The profile of the crossing is drawn on 3,000-foot vertical radii. It is also a good practice to assign a profile radius above the construction minimum combined radius. During drill execution, there will be deflection in both the vertical and horizontal planes. Per ASCE Manual No 108, the individual vertical radii and horizontal radii can be combined per the following formula. Although the contractor will make their best attempt to drill the alignment and profile perfectly, they will ultimately drill a path that has three-dimensional combined bending tighter than what the drawing shows.

$$R_c = \sqrt{\frac{R_v^2 \times R_h^2}{R_v^2 + R_h^2}}$$

## 3.3   ESTIMATED PULL FORCE

Large diameter pipe (typically considered greater than 20") experiences significant buoyant forces during pullback due to the large internal volume of the pipe and weight of the drilling mud in the annulus.  To offset the buoyant force, buoyancy control (water filling the product pipe) is considered which minimizes or neutralizes the upward force.  The calculated estimated pull force for the designed crossing is expected to be approximately 271,200 lbs without buoyancy control considerations and 157,300 lbs when considering 100% water filled product pipe.

## 3.4   MAXIMUM ALLOWABLE PULL FORCE

TGP construction standards limit the total stress on the pipe during pullback, combining bending stress due to the HDD curvature with the pulling force of the HDD rig, to 50% SMYS. For a construction minimum combined radius equal to 1,400-foot, the maximum allowable pull force should be limited to 380,500 lbs. When comparing the maximum allowable pull force to the estimated pull forces, the current design accommodates a factor of safety during pullback equal to approximately 2.4 with buoyancy control and 1.4 without.

# 4.0   HDD DESIGN

## 4.1   HDD GEOMETRY

The design radii of curvature follow the industry rule of thumb of 100 x NPS and are 3,000-foot.  The entry angle is 12° to allow for a steep encounter angle, which ensures greater downward force at the bit and allows for increased ability to penetrate the surface of the rock layer.  Similarly, the exit angle is 10°, which allows for a steep exit from the rock layer. For either side of the crossing, casing could be installed along the entry or exit tangent sections in order to stabilize the overburden soils above bedrock and/or allow for drilling returns to more fully return to surface pits, thus limiting the build-up of downhole drilling pressures due to plugging off.

The bottom tangent is over 330 feet long to push the HDD exit west of archeological artifacts found during a cultural survey.  The HDD remains in the rock strata underneath the culturally sensitive area and for an approximate 50 additional feet.

## 4.2   TOPOGRAPHIC CHALLENGES

The east side of Yellow Creek is approximately 20 feet higher in elevation than the west side.  Standard industry practice is to place the HDD entry at lower elevation, which allows gravity to help force drilling fluid downhill and back to the drilling rig.  However, there is minimal allowable workspace on the east side to allow for a pull string.  Additionally, the minimal elevation difference should not result in severely increased annular pressure during drilling operations.  The drilling contractor may need to haul some drilling fluid from the exit side to the entry side. Additionally, the drilling contractor may need to implement additional measures to ensure the higher portion of the hole is wetted and the pipe is fully submerged in drilling fluids (to the extents possible) during pipe pullback operations.

The HDD entry sits in a field on an approximately 4° side slope, sloping down towards the north. Earthwork will be required by the contractor to level out the entry side to allow for the rig to sit squarely and securely on the hill.

TGP construction standards and industry rule of thumb requires a minimum of 20 feet depth of cover under intermediate creek crossings.  Due to the large diameter of the product pipe and final reamed hole, as well as the total HDD length required due to the cultural findings, the designed bottom tangent is 50 feet deep under the creek.  The additional depth should provide additional overburden pressure that is expected to aid in mitigation of inadvertent returns; this is discussed further in Section 6.

## 4.3   STRATIGRAPHIC CHALLENGES

The east side bore (2A) encountered bedrock at 11.3 ft deep, while the west side bore (2B) encountered bedrock at 13 ft deep.  The HDD entry and exit angles are designed to be aggressive at the assumed top of rock.  This allows for maximum downward force at the drill bit when entering the rock, and maximum upward force when exiting.  Encountering the rock face at a steep angle should help prevent the drill bit from "skating", as it will always prefer the path of least resistance.

The stratigraphy was largely homogenous and made up of cherty limestone of the Warsaw Limestone and Fort Payne Formation.  The presence of chert, a hard sedimentary rock comprised of crystalline quartz, as well as occasional quartz geodic inclusions, adds hardness to the strata.  Unconfined compressive strength tests were performed and yielded rock strength of 13,900 psi to 16,600 psi, which

classifies as "hard". The drilling contractor will need to be prepared for the hard rock and may utilize a mud motor and aggressive tooling, such as polycrystalline diamond compact (PDC) drill bits and reamers. The hard material can also be overcome by a lower rate of penetration.

The limestone formation is historically karst prone and may contain eroded voids within the stratigraphy. Soil bore 2B encountered such a void approximately 6 – 8 inches thick and 15.5 deep. However, there were no sinkholes or visible karst noted during topographic survey or geotechnical investigation. The presence of karst poses risks for lost circulation downhole, as drilling fluid would fill any encountered void before being able to flow through the annulus. The drilling contractor should be aware of karst as lost circulation will ultimately require more mud to be mixed.

The Fort Payne Formation had great Rock Quality Designation (RQD) values and recovery, typically over 90%. This signifies a high quality and mostly unfractured stratum that possesses a high ability to contain drilling fluids. There exist several thin layers of weathered horizontal seams within the strata which may fracture easily and become avenues for inadvertent returns. These seams can be overcome by a lower rate of penetration.

# 5.0   EVALUATION OF HYDROFRACTURE / INADVERTENT RETURNS

## 5.1   SUBSURFACE GEOTECHNCIAL INVESTIGATIONS

Reference Attachment 1 - Final Geotechnical Report (Borings 1A and 1B) for geotechnical bore locations and soil consistencies.

## 5.2   METHODOLOGY

Hydrofracture analysis is the comparison of the ability of the subsurface formation to withstand loading against the expected drilling fluid pressures along the HDD.

The evaluation of the subsurface soils' ability to resist fracturing during drilling is outlined by the Delft Equation. This equation/tool is commonly used by the United States Army Corps of Engineers for HDD projects involving drilling beneath levees. The basic relationship for hydraulic fracture pressure is a function of the overburden stress (σ) plus the undrained shear strength (Su).

$$P_{max} = u + \left[ \sigma_0' \cdot (1 + sin\varphi) + c \cdot cos\varphi + c \cdot cot\varphi \right] \cdot \left( \left( \frac{R_0}{R_{pmax}} \right)^2 + \frac{\sigma_0' \cdot sin\varphi + c \cdot cos\varphi}{G} \right)^{\frac{-sin\varphi}{1+sin\varphi}} - c \cdot cot\varphi$$

Where:
$P_{max}$ = maximum allowable mud pressure (psf)
$u$ = groundwater pressure (psf)
$\sigma_0'$ = Effective Stress (psf), where
   = $\gamma_{soil}$ (drill depth – height of ground water over drill) + $\gamma_{water}$ (height of groundwater over drill)
$\varphi$ = soil friction angle
$c$ = soil cohesion (psf)
$R_0$ = radius of borehole (ft)
$R_{pmax}$ = radius of plastic zone (ft)
$G$ = shear modulus (psf), where
   = Elastic Modulus of Soil / [2 x (1 + Poisson's Ratio of Soil)]

The suggested method for evaluation of the expected drilling fluid pressure(s) along the HDD is by utilizing a rheological model assuming drilling mud's behavior as a Bingham plastic fluid. The basic concept of the model is that under low stresses the drilling mud behaves as a rigid body but flows as a viscous fluid at higher stresses.

## 5.3   ASSUMPTIONS

Delft Equation:
- Sufficient geotechnical data is available for the entire length and depth of the proposed directional drill. Consistency in the stratigraphy of layers across the bore as well as the heights of the layers are critical to creating an accurate model.
- The analysis is best suited for homogenous soil when there is uniform soil above the proposed drill/bore. However, density of soil likely varies with depth and/or different soil types may exist in varying thicknesses. To handle variations in density, it is more practical to calculate the effective stress for each soil layer and sum them up at a point of interest. To handle variations for different soils types, a weighted average was applied, based on soil layer thicknesses, to a

point of interest for determination of the other input variables of the equation (elastic modulus, Poisson's ratio, friction angle, and cohesion).

Hoek-Brown Criterion:

- Hoek-Brown criterion is used in cavity expansion theory. The Mohr-Coulomb criterion with a tensile strength value can be used to identify tensile/shear failure of a bedrock, but to consider unique rock properties geological strength index (GSI) value is added to calculations. The Hoek-Brown parameters were used as a bridge to correlate Mohr-Coulomb parameters and GSI value to determine bedrock parameters such as:
  - Rock Mass Modulus of Deformation
  - Friction angle
  - Cohesion
- To accurately estimate the GSI value the following needs to be provided:
  - Boring logs with the description of rock mass structure
  - Unconfined Compressive strength of sample (UCS), RQD and Recovery values
  - The pictures of the samples to determine the sample surface conditions, joint and rock mineral conditions
- Once Rock parameters are determined based on GSI value and the information provided in boring logs, all the data received is applied to cavity expansion theory (Delft Equation) to determine the limiting drilling mud pressure.

Bingham Plastic Fluid Model:

- To appropriately generate an accurate annular pressure model, the following must be estimated or provided:
  - Drill Bit Diameter (typically selected by contractor)
  - Nominal Drill Pipe Diameter (typically selected by contractor)
  - Minimum and Maximum Mud Pump Rates (controlled by contractor)
  - Fresh Drilling Mud (controlled by contractor):
    - Density
    - Yield Point
    - Plastic Viscosity
  - Drilling Returns- combination of mud and soil cuttings (controlled by base/fresh drilling mud being pumped at a given flow rate in combination to penetration rate – all controlled by contractor)
    - Density
    - Yield Point
    - Plastic Viscosity
- For simplicity and calculation of maximum annular velocity, it is assumed that no drilling mud is lost to the surrounding formation (analyze mud flow as closed loop).
- The variable that most significantly impacts the final pressure gradient is the yield point of the drilling mud.
  - When able to be measured, the yield point of fresh drilling mud is typically around 9 – 10.5 lbs/100 sq-ft.
  - Yield points of mud containing heavy drilling returns (typically associated with returning mud weight equal to 10.5 – 12 ppg) can be as high as 50 lbs/sq-ft.

# 6.0   HYDROFRACTURE / INADVERTENT RETURNS ANALYSIS

## 6.1   MODEL RESULTS

A minimum safety factor of 2.0 was achieved with the hydrofracture/inadvertent returns modelling. Appendix C contains a plot produced for the purpose of visualizing existing grade, the proposed HDD, corresponding soil limiting pressure (Pmax) and recommended maximum allowable drilling pressure (Pmax/2), and the expected operating range of the annular pressure.

Based on the results displayed in the plot, it is the opinion of Farnsworth Group that if the drilled hole remains clean/open, if the drilling mud is maintained within reasonable rheological properties, and if the minimum depth of cover is achieved, the factor of safety of greater than 2 will be in place under the single critical feature (Yellow Creek).

As is always to be expected, the exit side of the drill does present increased risk of having an inadvertent return due to the length of the annular space that the drilling mud must be pumped through, which creates a higher hydraulic gradient than when the bit was closer to the entry/rig side of the drill. It is assumed that if the mud properties are optimal and if the mud flushing rate can outpace the penetration rate, the general risk of having an inadvertent return should be decreased. As the flow rate may need to be decreased towards exit, the penetration rate may need to subsequently decrease to keep annular pressures lower.

A factor of safety greater much greater than 2 is expected while the HDD is in the rock strata.  There may be lost circulation risks due to horizontal/diagonal fractures, but the largely homogenous strata ultimately had great to excellent RQD values that point toward a well opened and shaped hole.

# 7.0   CONSTRUCTION PLANS

## 7.1   TGP RESPONSIBILITIES

- Before the start of HDD operations, HDD Contractor shall provide TGP a detailed drill plan that includes applicable details as outlined in Appendix D – Detailed Drill Plan Requirements for Owner approval
- Stake proposed centerline at proposed HDD entry and exit and every 100 feet on the proposed +00 stationing callouts.
- Stake proposed workspace limits (at corners and sufficient for line of site).
- Flag/mark environmentally sensitive areas.
- Provide Environmental Inspector to participate in Drilling Kick-off Meeting to cover any permit requirements and make routine site visits to ensure compliance with all federal/state/local requirements.
- Provide HDD Drilling Inspector/Observer to monitor compliance of drill tolerances, general hole preparation, and pullback stresses.

## 7.2   CONTRACTOR RESPONSIBILITIES

The following sub sections are related to minimizing and/or being able to successfully handle any potential inadvertent returns.

### 7.2.1   MINIMUM REQUIRED LIST OF IR RESPONSE EQUIPMENT / RESOURCES

- Trash pump(s) that are capable of being able to pump any inadvertent returns to the entry/exit pit(s)
- Visqueen / plastic sheeting for establishing secondary containment around mobilized trash pumps.
- Trash pump suction hosing – for each trash pump that may be used
- Lay flat hosing
- Erosion control devices (ECDs) – silt fence / straw bales that can be placed on downward slopes and act as buffer between any inadvertent returns and sensitive water features
- Shovels, brooms, squeezes, and other appropriate hand tools
- Excavator for digging of potential containment sumps at inadvertent return location(s)
- Contingency plan for matting in case rubber-tired equipment requires access to difficult portions of the right-of-way
- Vac trailer/transport or vac truck at site or on call during all drilling operations

### 7.2.2   PROPER TOOLING SELECTION AND DRILLING TECHNIQUES

- Appropriately size drilling rig, mud pump, and reclaimer/cleaning system to execute the proposed HDD by length and subsurface conditions.
- Appropriately size (diameter) drill bit(s) / reamer(s) in comparison to drill pipe/mud motor (as applicable) diameter(s) such that sufficient cross-sectional area exists for proper annular velocity and circulation.
- Source appropriate tracking tooling for maximum depth of the crossing.
- Implement continuous annular pressure monitoring during pilot hole execution.

### 7.2.3    MUD QUALITY

- Drilling contractor shall have an on-site technician, present at all times, to perform monitoring of drilling fluid weight, viscosity, and yield point. Drilling contractor shall provide all the appropriate equipment to properly measure drilling fluid properties.
- Appropriately sized reclaimer/cleaning system shall be onsite for proper filtering of cuttings from returning mud.
- The drilling contractor shall source water for generation of fresh mud that will be required as the hole is generally cut and enlarged. The drilling contractor will test mud prior to storing, hauling, or disposing.
- Owner approved Loss of Circulation Materials (LCMs) shall be readily available to mix into the drilling mud in order to plug off inadvertent return path(s).

### 7.2.4    CIRCULATION MONITORING AND GROUND SURFACE INSPECTIONS

- The drilling contractor is responsible for continually monitoring mud pressures and circulation. It is suggested that the contractor become familiar with the annular pressure limits and at a minimum are required to stay below the assigned Pmax/2 location by stationing.
- If at any point during the drilling process the drilling mud spikes above the allowable limit, it is recommended that tripping pipe and swabbing of joint(s) occur.
- If at any point during the drilling process the returns suddenly cease, drilling shall be halted and immediate inspection of the right-of-way shall be conducted.
- If inadvertent return(s) are noted, Contractor shall immediately:
  - Implement steps in accordance with the Inadvertent Returns Response Plan.
  - Notify appropriate parties including but limited to the onsite inspector.

# APPENDIX A

PROPOPOSED PLAN AND PROFILE DRAWING – PRELIMINARY



**PLAN**

SCALE: 1" = 60'
PROJECTION: NCRS 2011 TENNESSEE STATE PLANE ZONE, US FOOT

**PROFILE**

SCALE: 1" = 60'

## HDD NOTES:

1. REFERENCE COMPANY STANDARDS FOR DIRECTIONALLY DRILLED CROSSING INSTALLATION REQUIREMENTS.
2. MINIMUM ALLOWABLE COMBINED RADIUS = 1,400 FEET.
3. FOR ALL OTHER TOLERANCES REFER TO COMPANY STANDARDS.
4. MAXIMUM ALLOWABLE PULLBACK FORCE = 380,500 LBS PER PULL.
5. THEORETICAL PULLBACK FORCE REQUIRED = 271,200 LBS. (NO BUOYANCY CONTROL, 157,300 LBS. (100% WATER FILL).)
6. MAXIMUM ROTATIONAL TORQUE = 0 IN-LBS PER PULL.
7. MAXIMUM PIPE SUPPORT SPACING: HYDROTEST = 70 FEET; STRINGING/PULLBACK = 75 FEET.
8. PRE-PULLBACK HYDROTESTING SHALL BE IN ACCORDANCE WITH THE PROJECT-SPECIFIC HYDROTEST PLAN.
9. AVOIDANCE, MITIGATION, AND CLEAN-UP OF ANY INADVERTENT RETURNS ARE THE SOLE RESPONSIBILITY OF THE CONTRACTOR.
10. SOIL BORE INFORMATION PROVIDED BY ATC ATLAS.
11. SOIL BORE ELEVATIONS PROVIDED BY TABLEROCK ENERGY.
12. THE GEOTECHNICAL INFORMATION SHOWN ON THESE DRAWINGS AND PROVIDED IN THE GEOTECHNICAL REPORT ARE NOT A COMPLETE AND ACCURATE REPRESENTATION OF ALL THE SUBSURFACE CONDITIONS THAT MAY BE ENCOUNTERED DURING CONSTRUCTION. SUBSEQUENT INTERPRETATION OF THE GEOTECHNICAL INFORMATION PERTAINING TO THE FEASIBILITY AND/OR CONSTRUCTION OF THE DESIGN ARE THE RESPONSIBILITY OF THE CONTRACTOR.

## DESIGN DATA

DESIGN CODE: ASME B31.8 DOT 192

MEASURED LENGTH:
TRENCH:
HDD/BORE: 1660'
TOTAL: 1660'

PIPE SPECIFICATIONS:
PIPE - 30" NOMINAL DIAMETER, 0.500" WT, SAWL, PLAIN END, API 5L-PSL2, GR X70, MAPL SPEC M8220, COAT SPEC M8370, FBE (14-16 MILS) & 30-40 MILS ARO

DESIGN PRESSURE: 750 PSIG
PROPOSED MAOP: 750 PSIG

## VERTICAL CURVE DATA

| STATION | ELEVATION | DESCRIPTION |
|---|---|---|
| 0+00.0 | 459.2 | HDD ENTRY |
| 0+79.0 | 442.4 | PC, R=3000', Δ=12° |
| 7+02.7 | 376.9 | PT |
| 10+41.4 | 376.9 | PC, R=3000', Δ=10° |
| 15+62.4 | 422.4 | PT |
| 16+54.3 | 438.7 | HDD EXIT |

SB-2A

457.4' - 452.4'  CLAYEY FINE TO MEDIUM SAND WITH SILT (SC), VERY MOIST & LOOSE, N = 9
452.4' - 445.4'  CLAYEY FINE TO COARSE SAND (SC), VERY MOIST, MEDIUM DENSE, N = 25
445.4' - 443.4'  GRAVELLY FINE TO COARSE SAND WITH CLAY (SM), SATURATED, MEDIUM DENSE, NO RECOVERY
443.4' - 438.4'  CHERTY LIMESTONE, OCCASIONAL HORIZONTAL FRACTURES, GOOD RECOVERY AND RQD, COMPRESSIVE STRENGTH = 14,000 PSI
438.4' - 403.4'  CHERTY LIMESTONE, OCCASIONAL QUARTZ GEODIC INCLUSIONS, GOOD TO FAIR RECOVERY AND RQD, COMPRESSIVE STRENGTH = 14,800 - 16,300 PSI

SB-2B

436.3' - 431.3'  FINE TO MEDIUM SANDY SILT WITH CLAY (ML), VERY MOIST, SOFT, N = 4
431.3' - 426.3'  GRAVELLY FINE TO COARSE SAND WITH SLIGHT CLAY (SW-SM), SATURATED & LOOSE, LOW RECOVERY, N = 9
426.3' - 422.3'  GRAVELLY FINE TO COARSE SAND WITH CLAY (SM), SATURATED, MEDIUM DENSE, LOW RECOVERY
422.3' - 420.8'  CHERTY LIMESTONE, OCCASIONAL QUARTZ GEODIC INCLUSIONS, FAIR TO POOR RECOVERY AND RQD
420.8' - 420.0'  APPROXIMATE 8" - 8" VOID AT ABOUT 15.5' DEPTH
420.0' - 414.8'  CHERTY LIMESTONE, OCCASIONAL QUARTZ GEODIC INCLUSIONS, GOOD RECOVERY AND RQD, COMPRESSIVE STRENGTH = 13,900 PSI
414.8' - 414.8'  WEATHERED HORIZONTAL SEAM AT 21.0' DEPTH (ELEVATION 414.8')
414.8' - 368.0'  CHERTY LIMESTONE, OCCASIONAL QUARTZ GEODIC INCLUSIONS, OCCASIONAL HORIZONTAL FRACTURES, GOOD RECOVERY AND RQD, COMPRESSIVE STRENGTH = 15,900 - 16,600 PSI
368.0' - 368.0'  WEATHERED HORIZONTAL SEAM AT 68.3' DEPTH (ELEVATION 368.0')
368.0' - 352.0'  CHERTY LIMESTONE, OCCASIONAL QUARTZ GEODIC INCLUSIONS, OCCASIONAL HORIZONTAL FRACTURES, GOOD RECOVERY AND RQD, COMPRESSIVE STRENGTH = 14,000 PSI

Notes:
1. HDD ENTRY IS ON AN APPROXIMATE 4° SLIDE SLOPE (SLOPING DOWN TO THE NORTH). EARTHWORK IS REQUIRED TO ALLOW THE DRILLING RIG TO ACHIEVE A 12° ENTRY ANGLE AND TO ALLOW THE RIG TO SITE SAFELY AND SECURELY ON THE HILL.

PRELIMINARY
NOT FOR CONSTRUCTION
DATE: 07-01-2022

**Tennessee Gas Pipeline Company, L.L.C.**
a Kinder Morgan company

TGP CUMBERLAND 30" PIPELINE
PRELIMINARY HDD EXHIBIT
YELLOW CREEK
M.P. 22.3

PRELIMINARY

| | | | | |
|---|---|---|---|---|
| B | PRELIMINARY | 302800 | 07-01-2022 | |
| A | PRELIMINARY | 302800 | 03-30-2022 | |
| | Revision Description | Project ID | Date | |

Status: PRELIMINARY
State: TENNESSEE
County: HOUSTON
Category: CIVIL
File Name: C_HDD2 Yellow Creek - 0210665.00.dwg
Drawing No: EX-2
Scale: AS NOTED
Rev: B

# APPENDIX B

PIPE STRESS SUMMARY

**Farnsworth Group, Inc.**
**ASME B31.8**
**Horizontal Directional Drill Stress Analysis**
**TGP 30" Cumberland Pipeline**

| | |
|---|---|
| **Project:** | 0210665.01 |
| **Client:** | Tennessee Gas Pipeline (Kinder Morgan) |
| **Crossing(s):** | Jones Creek, Yellow Creek, Wells Creek |
| **Date:** | 7/1/2022 |
| **By:** | Nick Garver |

| Pipe Specifications | | | |
|---|---|---|---|
| **Bore Pipe** | | **Tie-In Pipe** | |
| O.D. | 30.000 | O.D. | 30.000 |
| w.t. | 0.500 | w.t. | 0.312 |
| SMYS | 70,000 | SMYS | 65,000 |

| Design Factors | |
|---|---|
| Design Factor for Pre-Installation Test, $F_{pre}$: | 0.75 |
| Design Factor for Installation Pull-back, $F_i$: | 0.50 |
| Design Factor for Installation Pull-back, $F_s$: | 0.50 |
| Design Factor for Post-Installation Test, $F_{post}$: | 1.02 |
| In-service Design Factor for Bore Pipe, F: | 0.50 |
| In-service Design Factor for Tie-in Pipe, F: | 0.72 |

| | |
|---|---|
| **Absolute Minimum Allowable Combined Radius:** | 1,161 |
| **Recommended Minimum Allowable Combined Radius:** | 1,400 |

| HDD Force and Stress Analysis | | | | | |
|---|---|---|---|---|---|
| **Design Criteria** | **Bore Pipe** | | **Tie-In Pipe** | | **Units** |
| | **Value** | **Check** | **Value** | **Check** | |
| **Bending Stress** | 26,339 | 44,620 | - | - | psi |
| **Pre-Test** | | | | | |
| **Hoop Stress** | 22,500 | 35,000 | - | - | psi |
| **Long. Stress** | 33,135 | 63,000 | - | - | psi |
| **Max Pipe Span** | 79.9 | 269.2 | - | - | ft |
| **Deflection** | 1.00 | 128.93 | - | - | in |
| **Max Pipe Span** | 73.7 | 106.3 | - | - | ft |
| **Deflection** | 1.00 | 4.32 | - | - | in |
| **Installation** | | | | | |
| **Max Pull Force** | 272,900 | 380,500 | - | - | lb |
| **Post-Test** | | | | | |
| **Hoop Stress** | 41,370 | 70,000 | 66,298 | 66,298 | psi |
| **Long. Stress** | 47,024 | 52,500 | 33,149 | 48,750 | psi |
| **In Service Stresses** | | | | | |
| **Hoop Stress** | 22,500 | 35,000 | 50,330 | 50,400 | psi |
| **Thermal Stress** | -9,588 | 63,000 | 8,775 | 63,000 | psi |
| **Long. Stress** | -29,177 | 63,000 | 23,874 | 63,000 | psi |
| **Comb. Stress** | 51,677 | 63,000 | 43,606 | 63,000 | psi |
| **Shear Stress** | 25,838 | 31,500 | 13,228 | 31,500 | psi |
| **d/t** | 60.0 | 60.0 | - | - | (-) |

AR 001619

# APPENDIX C

# HYDRO-FRACTURE PRESSURE VS. ANNULAR PRESSURE PLOT



Yellow Creek - HFIR Analysis
Profile View
Pressure (psi)
Elevation (ft)
Stationing
2,000
1,900
1,800
1,700
1,600
1,500
1,400
1,300
1,200
1,100
1,000
900
800
700
600
500
400
300
200
100
0
500
475
450
425
400
375
350
325
300
275
250
225
200
175
150
17+00
16+00
15+00
14+00
13+00
12+00
11+00
10+00
9+00
8+00
7+00
6+00
5+00
4+00
3+00
2+00
1+00
0+00
EXIT
ENTRY
15+62.29
0+78.77
10+41.35
7+02.50
Bore - 2B
436.3'
352.3'
Yellow Creek CL
Bore - 2A
457.4'
403.4'
RISK ZONE
RISK ZONE
Pmax
Pmax/2
Annular Pressure - Low End
Annular Pressure - High End
Existing Surface
Proposed HDD
2B
2A
Bedrock

JA0539

# APPENDIX D

The drilling subcontractor shall provide the following information before the mobilization of drilling equipment:

Sections:
1. Resumes for all key personnel- including project history and general years of experience.

2. Describe Proposed Mechanical Equipment:
   - Rig(s) make/manufacturer & include specifications:
     - Weight
     - Length
     - Max pull/thrust w/ conversion factors for each gearing option
     - Max spindle torque w/ conversion factors for each gearing option
     - Notification of any plan to perform major service or rebuild the rig(s) before coming onto the job site (such that mechanical issues are limited).
   - Mud pump(s):
     - Flow rate capabilities
     - Address availability of spare parts (lines, plungers, etc.) or backup pumps.
   - Mud cleaning system(s):
     - Make/model
     - Size (length & width)
     - Capacity
   - Drill pipe handling equipment:
     - Crane(s) and/or excavator(s)
   - Product pipe handling equipment:
     - Excavator(s) and/or side boom(s).
     - Number of rollers
   - Mud Handling/Recovery equipment:
     - Vac trucks/trailers & tanker transports

3. Required Site Layout:
   - Identify the location of fixed mechanical equipment on construction drawings.
   - Identify the location of matting needed for equipment setup and ingress/egress.
   - Identify the material storage area(s).

4. Proposed HDD Tooling:
   - Drill pipe:
     - Nominal diameter
     - Total footage onsite
   - Pilot hole:
     - Available Bit Size(s)- diameter
     - Available Bit Type(s)- mill tooth, TCI, etc.
     - Intention to use mud motor or not
     - Quantity of available spares
   - Reaming:
     - Available or Planned Reamer Type(s)- fly cutter, beaver tail, hole opener, barrel, etc.
     - Available or Planned Reamer Size(s)- diameter
     - Custom built or vendor supplied
     - Quantity of available spares

5. Proposed Tracking Equipment:
   - Document accuracy and submit calibration history of tracking equipment (must be per applicable standards within past 6 months).
   - Describe plan to successfully navigating crossing.

6. Drilling Fluid(s) Makeup/Properties & Logistics:
   - Mud Makeup/Properties:
     - Provide SDSs for all potential additives
     - Describe purpose of additives and reason for intended use
     - Describe target mud mixture (percentage by weight or volume)
     - Properties (viscosity & mud density)
   - Logistics
     - Describe plan for water sourcing
     - Describe water hauling logistics (if applicable):
       - Number and size of vac/tanker trucks
       - Estimated quantity of needed loads per day
     - Describe estimation of mud/cuttings volume for disposal
     - Describe mud/cutting hauling logistics
       - Number and size of truck loads
       - Estimated quantity of loads per day/week/month

7. Drilling Fluid(s) Management- Testing, Monitoring, & Inadvertent Returns Monitoring/Response Plan:
   - Testing:
     - Describe mud engineer qualifications
     - Describe testing intervals (with maintained documentation) to ensure intended mud properties are maintained
   - Monitoring:
     - Describe response for limited or nonexistent drilling returns
   - Inadvertent Returns:
     - Describe procedures and equipment/materials available for inadvertent returns response

8. Pilot Hole Drilling Process:
   - Describe target mud flow rate(s)
   - Describe target penetration rate(s)
   - Describe chosen tooling

9. Hole Opening Process:
   - Describe number of ream pass(es).
   - Describe size(s), chosen tooling, and direction of ream pass(es).
   - Describe target penetration rate(s).
   - Describe target mud flow rate(s).
   - Is Contractor pulling tail string at exit or is the rig always pulling the reamer(s)?
   - Is Contractor maintaining string in the hole at all times?
   - Will a swab pass be planned for final verification and adjustment of mud in hole?

10. Pipe Installation (Pullback)
    - Document load rating on swivel
    - Describe equipment available for product pipe break over
    - Describe target pull rate
    - Describe plan to complete mid-weld (if necessary)

11. Proposed Schedule:

- Contractor to include (at a minimum) the following in their construction schedule:
  - HDD Mobilization
  - HDD Equipment setup & centerline surveying
  - HDD Pilot Hole
  - HDD Hole Opening (by pass)
  - HDD Swab (if applicable)
  - HDD Pullback
  - HDD Equipment tear down & mud hauling
  - HDD Demobilization

**TENNESSEE GAS PIPELINE, L.L.C. APPLICATION FOR AQUATIC**
**RESOURCE AND ALTERATION PERMIT & STATE §401 WATER QUALITY PERMIT**
Application for Aquatic Resource Alteration Permit & State §401 Water Quality Permit
**JULY 2022**

**Attachment 8** – Route Variations



8
AR 001625



Minor Route Variations
Page 1 of 10
Cumberland Project
Dickson, Houston & Stewart Counties, Tennessee

Tennessee Gas Pipeline Company, L.L.C.
a Kinder Morgan company

Milepost
Minor Route Variations
Proposed Pipeline

Alternative Pressure Regulation Station 1 (Preferred)
Alternative Pressure Regulation Station 2

JA0544

AR 001626

**Minor Route Variations**
Page 2 of 10
**Cumberland Project**
Dickson, Houston & Stewart Counties, Tennessee

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

Milepost
Minor Route Variations
Proposed Pipeline

Alternative Pressure Regulation
Station 1 (Preferred)
Alternative Pressure Regulation
Station 2

0        900        1,800 Feet
0    274        548 Meters

JA0545

Date Created: 6/6/2022    Date Revised: 6/7/2022    File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\RR10\Appendix_10D_Minor Route Variations_20220525.mxd
GIS Analyst: Peter.Marsey

AR  001627

**Minor Route Variations**
Page 3 of 10
**Cumberland Project**
**Dickson, Houston & Stewart Counties, Tennessee**

Milepost
Minor Route Variations
Proposed Pipeline

Alternative Pressure Regulation Station 1 (Preferred)
Alternative Pressure Regulation Station 2

Tennessee Gas Pipeline Company, L.L.C.
a Kinder Morgan company

0    900    1,800 Feet
0    274    548 Meters

JA0546

Date Created: 6/6/2022    Date Revised: 6/7/2022    File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\RR10\Appendix_10D_Minor Route Variations_20220525.mxd
GIS Analyst: Peter.Marsey

AR  001628

**Minor Route Variations**
Page 4 of 10
**Cumberland Project**
Dickson, Houston & Stewart Counties, Tennessee

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

Milepost
Minor Route Variations
Proposed Pipeline
Alternative Pressure Regulation Station 1 (Preferred)
Alternative Pressure Regulation Station 2

0    900    1,800 Feet
0    274    548 Meters

Date Created: 6/6/2022    Date Revised: 6/7/2022    File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\RR10\Appendix_10D_Minor Route Variations_20220525.mxd
GIS Analyst: Peter Marsey

JA0547

AR 001629

**Minor Route Variations**
Page 5 of 10
**Cumberland Project**
Dickson, Houston & Stewart Counties, Tennessee

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

Milepost
Minor Route Variations
Proposed Pipeline
Alternative Pressure Regulation Station 1 (Preferred)
Alternative Pressure Regulation Station 2

0    900    1,800 Feet
0    274    548 Meters

JA0548

Date Created: 6/6/2022    Date Revised: 6/7/2022    File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\RR10\Appendix_10D_Minor Route Variations_20220525.mxd
GIS Analyst: Peter.Marsey

AR  001630

**Minor Route Variations**
Page 6 of 10
Cumberland Project
Dickson, Houston & Stewart Counties, Tennessee

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

● Milepost
Minor Route Variations
Proposed Pipeline

Alternative Pressure Regulation Station 1 (Preferred)
Alternative Pressure Regulation Station 2

0    900    1,800 Feet
0    274    548 Meters

JA0549

AR 001631

Date Created: 6/6/2022    Date Revised: 6/7/2022    File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\RR10\Appendix_10D_Minor Route Variations_20220525.mxd
GIS Analyst: Peter.Marsey

**Minor Route Variations**
Page 7 of 10
**Cumberland Project**
**Dickson, Houston & Stewart Counties, Tennessee**

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

Legend:
- Milepost
- Minor Route Variations
- Proposed Pipeline
- Alternative Pressure Regulation Station 1 (Preferred)
- Alternative Pressure Regulation Station 2

0    900    1,800 Feet
0    274    548 Meters

JA0550

Date Created: 6/6/2022    Date Revised: 6/7/2022    File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\RR10\Appendix_10D_Minor Route Variations_20220525.mxd
GIS Analyst: Peter.Marsey

AR  001632



**Minor Route Variations**
Page 8 of 10
**Cumberland Project**
**Dickson, Houston & Stewart Counties, Tennessee**

Milepost
Minor Route Variations
Proposed Pipeline

Alternative Pressure Regulation Station 1 (Preferred)
Alternative Pressure Regulation Station 2

0    900    1,800 Feet
0    274    548 Meters

**Tennessee Gas Pipeline Company, L.L.C.**
a Kinder Morgan company

Date Created: 6/6/2022    Date Revised: 6/7/2022    File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\RR10\Appendix_10D_Minor Route Variations_20220525.mxd
GIS Analyst: Peter.Marsey

JA0551

AR  001633

**Minor Route Variations**
Page 9 of 10
Cumberland Project
Dickson, Houston & Stewart Counties, Tennessee

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

● Milepost
— Minor Route Variations
━ Proposed Pipeline

Alternative Pressure Regulation
Station 1 (Preferred)
Alternative Pressure Regulation
Station 2

0    900    1,800 Feet
0    274    548 Meters

JA0552

AR 001634

Date Created: 6/6/2022    Date Revised: 6/7/2022    File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\RR10\Appendix_10D_Minor Route Variations_20220525.mxd
GIS Analyst: Peter.Marsey

Minor Route Variations
Page 10 of 10
Cumberland Project
Dickson, Houston & Stewart Counties, Tennessee

Tennessee Gas Pipeline Company, L.L.C.
a Kinder Morgan company

Milepost
Minor Route Variations
Proposed Pipeline

Alternative Pressure Regulation Station 1 (Preferred)
Alternative Pressure Regulation Station 2
Proposed Cumberland Meter Station

JA0553

AR 001635

Date Created: 6/6/2022    Date Revised: 6/7/2022    File Path: S:\GIS\Kinder Morgan\Cumberland Lateral\MXD\RR10\Appendix_10D_Minor Route Variations_20220525.mxd
GIS Analyst: Peter.Marsey

**Attachment 9** – Summary of Trenchless Construction Methods
for the Cumberland Project



## Summary of Trenchless Construction Methods for the Cumberland Project

| Type | Max Distance (feet) | Min Distance (feet) | Typical workspace requirements (Square Feet) | Typical Duration Compared to Open Cut Construction | Typical construction cost compared to an Open Cut Design | Advantages | Limitations | Risks |
|---|---|---|---|---|---|---|---|---|
| Conventional Bore | 400 | N/A | 10,000 (entry and exit workspace) | Three times slower than typical duration for open-cut excavations. | ~$1,550 more per foot when compared to the cost associated with open cut. | Avoidance of surface disturbance, ideal for shore crossing distances with no rock. | Limited by crossing distance, subsurface soil and geological conditions, and existing topography and groundwater. | Safety constraints related to excavation and shoring of bore pit locations. Potential drill failure resulting in abandonment and implementation of an open cut design. |
| Horizontal Directional Drill | 7000 | 1,300 | 100,000 (entry and exit pit workspaces) as well as additional false ROW for pull back locations. False ROW is generally 150 feet wide with a length dictated by the crossing segment. | Five times slower than typical duration for open-cut excavations. | Approximately $2,050 more per foot when compared to the cost associated with conventional surface installation methods. | Avoidance of surface disturbances, significant crossing lengths. | Geotechnical investigation requires access road development, and potential tree clearing, wetland/waterbody crossings prior to pipeline construction, large workspace requirements. Continuous day and night noise disturbances associated with drilling equipment, generator, water and drill fluid pumps, construction vehicles and other additional equipment. Water allocation for drilling operation and disposal requirements of drilling fluids. Pipeline accessibility for visual inspection and repairs and uneven cathodic protection on the pipeline. | Potential inadvertent returns of drilling fluids and tailing and associated additional workspace for access and mitigation, potential hole collapse or subsequent settlement following installation. Potential drill failure resulting in abandonment and implementation of an open cut design. |
| Direct Pipe | 900 | 200 | 80,000 (entry and exit pit workspace) as well as additional false ROW for pull back locations. False ROW is generally 150 feet wide with a length dictated by the crossing segment. | Four times slower than typical durations for open-cut excavations. | Approximately $3,050 more per foot when compared to the cost associated with conventional surface installation methods. | Avoidance of surface disturbances, significant crossing lengths at shallower evaluations. Decreased drilling fluid pressure requirement when compared to HDD. | Sensitive to soil conditions. Cannot tunnel through rocky substrate. Large workspace requirements. Continuous day and night noise disturbance associated with drilling equipment, generator, water and drill fluid pumps, construction vehicles and other equipment. Water allocations for drilling operations and disposal requirements for drilling fluids. Pipeline inaccessibility for visual inspection and repairs and uneven cathodic protection on the pipeline. | Potential inadvertent return of drilling fluids and tailing associated additional workspace for access and mitigation. Potential drill failure resulting in abandonment and implementation of an open-cut design. Requires construction personnel to periodically enter pipe to monitor and adjust settings underground. |

*Source: Constitution Pipeline: Trenchless Construction Methods for Sensitive Environmental Resource Crossings*

AR 001637

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Tennessee Gas Pipeline Company, L.L.C.          Project/Docket No. CP22-493-000

NOTICE OF WAIVER PERIOD FOR
WATER QUALITY CERTIFICATION APPLICATION

(August 18, 2022)

On July 22, 2022, Tennessee Gas Pipeline Company, L.L.C. submitted to the Federal Energy Regulatory Commission (Commission) a copy of its application for a Clean Water Act section 401(a)(1) water quality certification filed with Tennessee Department of Environment and Conservation, in conjunction with the above captioned project.  Pursuant to 40 C.F.R. § 121.6 and section 157.22 of the Commission's regulations,[1] we hereby notify the Tennessee Department of Environment and Conservation of the following:

Date of Receipt of the Certification Request: July 22, 2022

Reasonable Period of Time to Act on the Certification Request:  July 22, 2023

If the Tennessee Department of Environment and Conservation fails or refuses to act on the water quality certification request on or before the above date, then the agency certifying authority is deemed waived pursuant to section 401(a)(1) of the Clean Water Act, 33 U.S.C. § 1341(a)(1).

Kimberly D. Bose,
Secretary.

---

[1] 18 C.F.R. § 157.22.

AR  001777



Tennessee Gas Pipeline Company, L.L.C.
1001 Louisiana Street, Suite 1000
Houston, TX 77002

September 30, 2022

Claire Wainright, PhD
Environmental Consultant
Tennessee Department of Environment and Conservation
Division of Water Resources
William R. Snodgrass Tennessee Tower, 11th Floor
312 Rosa L Parks Ave
Nashville, TN 37243
claire.wainright@tn.gov

RE:    Tennessee Gas Pipeline Company, L.L.C., Cumberland Project
       Dickson, Houston, and Stewart Counties, Tennessee
       TDEC Field Reviews Revisions / Supplemental 1
       TDEC ARAP Application No. NRS22.192
       TDEC Hydrologic Determination No. DWR ID No. 3562
       USACE Project No. LRN-2021-00866

Dear Dr. Wainwright,

Please find enclosed Tennessee Gas Pipeline Company, L.L.C.'s ("TGP's") Supplemental 1 for the
Cumberland Project ("Project").  The Tennessee Department of Environment and Conservation ("TDEC")
conducted field reviews for TGP's Project on August 23, 2022 and September 14, 2022.  As a result of
these reviews, revisions were necessary to figures and tables submitted as part of TGP's hydrologic
determination request and Aquatic Alteration Permit ("ARAP") application with TDEC.  A copy of
Supplemental 1 will also be provided to the United States Army Corps of Engineers ("USACE") to update
the federal dredge and fill application request.

TGP appreciates the TDEC's assistance with the review of this Project. Please do not hesitate to contact
me at 832-799-4759 or via email at michael_letson@kindermorgan.com if you have any questions or wish
to discuss any aspect of the Project. The alternate TGP contact is Blake Amos at 225-620-3338 or via email
at blake_amos@kindermorgan.com.

Respectfully submitted,

Mike Letson
Specialist – Permitting Compliance Lead

Enclosure:       TGP Cumberland Project – TDEC Field Reviews / Revisions Supplemental 1

Cc:      David Jackson, BDY
        Mary Miller, Stantec
        Blake Amos, TGP

**Enclosure**

# TGP Cumberland Project – TDEC Field Reviews / Revisions Supplemental 1

AR 001793

## CERTIFICATE OF COMPLIANCE

Pursuant to 6 Cir R. 30(b)(4)(E), the undersigned certifies that the documents included in this joint appendix are properly part of the agency record filed on October 27, 2023 [ECF 20-1 – 20-2] and as supplemented on December 7, 2023 [ECF 29-1 – 29-3].

/s/ James S. Whitlock
James S. Whitlock

DATED: August 19, 2024

## CERTIFICATE OF SERVICE

I hereby certify that I have, on this 19th day of August 2024, electronically filed the foregoing deferred joint appendix using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ James S. Whitlock
James S. Whitlock