No. 23-3682

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

### SIERRA CLUB, et al.,
*Petitioners,*

v.

### TENNESSEE DEPARTMENT OF ENVIRONMENT
### AND CONSERVATION, et al.,
*Respondents,*

and

### TENNESSEE GAS PIPELINE COMPANY, L.L.C.,
*Intervenor-Respondent.*

On Petition for Review from the Tennessee Department of Environment and Conservation's §401 Water Quality Certification and ARAP Permit NRS 22.192 (July 21, 2023)

### JOINT APPENDIX VOLUME V OF VI
### PAGES JA1951 TO JA2381

JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL
LAW CENTER
48 Patton Ave, Ste 304
Asheville, NC 28801
Telephone: (828) 258-2023

STEPHANIE BIGGS
SOUTHERN ENVIRONMENTAL
LAW CENTER
1033 Demonbreun St, Ste 205
Nashville, TN 37203
Telephone: (615) 921-9470

DEREK O. TEANEY
APPALACHIAN MOUNTAIN
ADVOCATES
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182

*Counsel for Petitioners*

JONATHAN SKRMETTI
J. MATTHEW RICE
WILSON S. BUNTIN
JOSEPH AHILLEN
HARRISON G. KILGORE
OFFICE OF ATTORNEY GENERAL AND REPORTER
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 253-5118

*Counsel for Respondents*

BARTHOLOMEW J. KEMPF
LELA M. HOLLABAUGH
BRADLEY ARANT BOULT CUMMINGS LLP
1221 Broadway, Ste 2400
Nashville, TN 37203
Telephone: (615) 244-2582

EMILY M. RUZIC
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 5th Ave N
Birmingham, AL 35203
Telephone: (205) 521-8447

SCOTT BURNETT SMITH
SCHYLER B. BURNEY
BRADLEY ARANT BOULT CUMMINGS LLP
200 Clinton Ave W, Ste 900
Huntsville, AL 35801
Telephone: (256) 517-5100

DAVID A. SUPER
KEVIN A. EWING
BRACEWELL LLP
2001 M St NW, Ste 900
Washington, DC 20036
Telephone: (202) 828-5836

*Counsel for Intervenor-Respondent*

# TABLE OF CONTENTS

## VOLUME I

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA0001 | Final §401 Water Quality Certification issued to TGP 07.21.23 (NRS 22.192) | 96 |
| JA0189 | Petition for Review | ECF 1-2 |
| JA0194 | Cumberland Pipeline Project Jurisdictional Waters and Tennessee Hydrologic Determinations (JD/HD) Report submitted May 2022 by Tennessee Gas Pipeline (TGP) | 1 |
| JA0288 | TGP's ARAP and State 401 Water Quality Certification Application, 07.22.22 | 2 |
| JA0348 | TGP's Signed ARAP/401 Certification Application Form, 07.22.22 | 3 |
| JA0351 | 401 Certification App. Attachment 1, Impact Tables | 5 |
| JA0368 | 401 Certification App. Attachment 5, Construction Management Plans | 9 |
| JA0459 | 401 Certification App. Attachment 6, Permitting Table | 10 |
| JA0473 | 401 Certification App. Attachment 7, Horizontal Directional Drilling (HDD) Feasibility Studies | 11 |
| JA0543 | 401 Certification App. Attachment 8, Route Variations | 12 |
| JA0554 | 401 Certification App. Attachment 9, Summary of Trenchless Construction Methods | 13 |
| JA0556 | FERC Notice of Waiver Period for 401 Cert. App., 08.18.22 | 17 |
| JA0557 | TGP Application Supplement Letter re: field visits, 09.30.22 | 19 |

## VOLUME II

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA0560 | Attachment to TGP 09.30.22 Supplement Letter | 20 |
| JA0638 | TDEC Revised Hydrologic Determination (HD) of Water Resources, 10.21.22 | 22 |
| JA0655 | TDEC Request for Additional Information to TGP, 11.03.22 | 23 |
| JA0659 | TGP Response to Request for Additional Information, 12.01.22 | 26 |

## VOLUME III

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA1019 | TGP Response to Request for Additional Information, 12.01.22 | 26 |

## VOLUME IV

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA1470 | TGP Response to Request for Additional Information, 12.01.22 | 26 |
| JA1691 | TGP's Final Resource Report 1 (General Project Description), received 01.06.23 | 28 |
| JA1769 | TDEC Request for Additional Information to TGP, 02.24.23 | 32 |
| JA1771 | TGP response to TDEC Request for Additional Information, 03.17.23 | 35 |

## VOLUME V

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA1951 | TDEC's draft §401 Certification, NRS22.192, 05.30.23 | 40 |
| JA2138 | FERC Final EIS for Cumberland pipeline project, June2023 | 42 |
| JA2175 | TDEC e-mail to TGP re: public notice process, 05.30.23 | 43 |
| JA2176 | TDEC ltr. to TGP re: responsibility for public notification, 05.30.23 | 44 |
| JA2178 | TDEC Notice of Public Hearing on 401 Certif., 05.30.23 | 45 |
| JA2180 | TDEC Public Notice on draft permit (401) with instructions for public comments, 05.30.23 | 46 |
| JA2183 | Transcript of Public Hearing July 6, 2023, in Dickson, Tennessee | 62 |
| JA2235 | Large Google Earth Map of Entire Route of Proposed Pipeline | 64 |
| JA2236 | E-mail Comments by Sierra Club, 07.14.23 | 72 |
| JA2273 | E-mailed Comment ltr. from Conservation Groups (SELC, et al.), 07.14.23 | 73 |
| JA2342 | E-mailed Exhibits 1-2 to Conservation Groups' Comment Letter, 07.14.23 | 74 |

## VOLUME VI

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA2382 | E-mailed Exhibit 3 to Conservation Groups' Comment Letter, 07.14.23 | 75 |

| JA2561 | E-mailed Exhibits 4-7, 11, and 12 to Conservation Groups' Comment Letter, 07.14.23 | 76 |
|---|---|---|
| JA2731 | E-mailed Exhibits 15-18 and 21 to Conservation Groups' Comments Letter, 07.14.23 | 77 |
| JA2796 | E-mailed Exhibits 24-36 to Conservation Groups' Comment Letter, 07.14.23 | 78 |
| JA2805 | E-mail Comments #2 by Angie Mummaw and Appalachian Voices, 07.15.23 | 82 |
| JA2811 | TDEC cover letter to TGP re: approval of §401 Water Quality Certification, 07.21.23 | 95 |
| JA2814 | TDEC Notice of Determination and Response to Public Comments on Permit NRS22.192, 07.21.23 | 97 |
| JA2831 | General Aquatic Resource Alteration Permit for Utility Line Crossings | 98 |
| JA2837 | General Aquatic Resource Alteration Permit for Minor Alterations to Wetlands | 99 |
| JA2840 | General Permit for Discharges of Stormwater Associated with Construction Activities (CGP) | 100 |
| JA2930 | General Aquatic Resource Alteration Permit for Bank Armoring and Vegetative Stabilization | 101 |
| JA2935 | General Aquatic Resource Alteration Permit for Construction or Removal of Minor Road Crossings | 102 |
| JA2939 | TDEC e-mail re: Gas Pipeline Project Discussion | ECF 29-3, Doc. 4 |
| JA2942 | TGP Cumberland Project – TDEC Blasting Presentation | ECF 29-3, Doc. 9 |

Cumberland Gas Pipeline Project; NRS22.192
§401 Water Quality Certification



## STATE OF TENNESSEE
## §401 WATER QUALITY CERTIFICATION

### AQUATIC RESOURCE ALTERATION PERMIT NRS 22.192

Pursuant to the Tennessee Water Quality Control Act of 1977 (T.C.A. §§ 69-3-101 et seq.) and supporting regulations, a permit is required to alter the properties of waters of the state. Also, pursuant to section 401 of the Clean Water Act (33 U.S.C. § 1341), an applicant for a federal license or permit which may result in a discharge into the waters of the U.S., shall provide the federal licensing or permitting agency a certification from the State in which the discharge will originate. Accordingly, the Division of Water Resources requires reasonable assurance that the activity will not violate provisions of the Tennessee Water Quality Control Act of 1977 (T.C.A. §§ 69-3-101 et seq.) or provisions of sections 301, 302, 303, 306 or 307 of the Clean Water Act.

Subject to conformance with accepted plans, specifications, and other information submitted in support of the application, the state of Tennessee hereby certifies pursuant to 33 U.S.C. § 1341, and permits pursuant to T.C.A. § 69-3-108(b), the activity described below:

**PERMITTEE**          Tennessee Gas Pipeline Company, LLC

**AUTHORIZED WORK:**   Temporary impacts to 0.69 acres of wetland, permanent impacts to 0.03 acres of wetland, temporary impacts to approximately 5400 linear feet of stream, temporary water withdrawals from eight streams and one reservoir, and permanent impacts 490 linear feet of stream associated with the construction of a 32-mile 30-inch diameter natural gas pipeline.

**LOCATION:**          From near Claylick Rd., Dickson, to near Old Scott Rd., Cumberland City Dickson, Houston, and Stewart Counties, Tennessee, Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, Barkley Reservoir Harpeth River Watershed and Lake Barkley Watershed from approximately 36.161840, -87.206428 to approximately 36.372977, -87.675641

**EFFECTIVE DATE:**    <mark>XXXX</mark>
**EXPIRATION DATE:**   <mark>XXXX</mark>

 

 

                                    for Jennifer Dodd
                              Director, Division of Water Resources

AR  003633

**Table of Contents**

LIST OF ABBREVIATIONS AND ACRONYMS USED IN THIS PERMIT AND APPENDICES.... 3

| PART I | 4 |

AUTHORIZED WORK: ........................................................................................................ 4

SPECIAL CONDITIONS: ................................................................................................... 11

GENERAL CONDITIONS: ................................................................................................. 16

| PART II | 16 |

MONITORING REQUIREMENTS ....................................................................................... 16

DUTY TO REAPPLY ........................................................................................................... 17

PROPERTY RIGHTS ........................................................................................................... 17

OTHER INFORMATION ..................................................................................................... 17

CHANGES AFFECTING THE PERMIT .............................................................................. 18

    Transfer/Change of Ownership ........................................................................................ 18

    Change of Mailing Address .............................................................................................. 18

NONCOMPLIANCE ............................................................................................................. 18

    Effect of Noncompliance ................................................................................................. 18

    Reporting of Noncompliance ........................................................................................... 18

    Adverse Impact ................................................................................................................ 19

LIABILITIES ........................................................................................................................ 19

    Civil and Criminal Liability ............................................................................................. 19

    Liability under State Law .................................................................................................. 19

| APPENDIX | 21 |

PERMIT RATIONALE ......................................................................................................... 21

TABLES ................................................................................................................................ 47

SITE MAPS ........................................................................................................................... 53

PLANS AND DRAWINGS ................................................................................................. 178

AR 003634

**List of abbreviations and acronyms used in this permit and appendices**

ac = acres
BMP = best management practice
ETW = Exceptional Tennessee Water
FERC = Federal Energy Regulation Commission
ft = feet
gpm = gallons per minute
HD = hydrologic determination
HDD = horizontal directional drilling
Lat. = latitude
Long. = longitude
Misc. tribs. = miscellaneous tributaries
MP = milepost
N/A = not applicable
NPDES = National Pollutant Discharge Elimination System
PEM = palustrine emergent
PFO = palustrine forested
RAI = request for additional information
ROW = right-of-way
SWPPP = stormwater pollution prevention plan
TDEC = Tennessee Department of Environment and Conservation
TGP = Tennessee Gas Pipeline Company
TVA = Tennessee Valley Authority
USACE = United States Army Corps of Engineers
UT = unnamed tributary
WWC = wet weather conveyance

Page 3 of 187

AR 003635

**PART I**

**Authorized Work:**

Table 1: Authorized habitat alteration impacts to streams and wetlands.

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SDKA023 | Upper Sugar Camp Branch | TN05130204001_1100 | UT Harpeth | 36.1630 | -87.2073 | 97 ft. | | | 10 ft. | 97 ft. |
| | | | | 36.1655 | -87.2057 | 77 ft. | | | 10 ft. | 77 ft. |
| SDKA026 | Jordan Branch | TN05130204002_0100 | Jordan Branch | 36.1705 | -87.2128 | 126.5 ft. | | | 10 ft. | 126.5 ft. |
| SDKA027 | UT to Jordan Branch | TN05130204002_0100 | Jordan Branch | 36.1709 | -87.2131 | 86 ft. | | | 10 ft. | 86 ft. |
| SDKA004 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1765 | -87.2235 | 79.6 ft. | | | 10 ft. | 79.6 ft. |
| SDKA006 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1809 | -87.2317 | 78 ft. | | | 10 ft. | 78 ft. |
| SDKA008 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1826 | -87.2348 | 78.6 ft. | | | 10 ft. | 78.6 ft. |
| SDKA058 | Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1853 | -87.2430 | 76.7 ft. | | | 10 ft. | 76.7 ft. |
| SDKA013 | Gafford Branch | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1979 | -87.2624 | 76 ft. | | | 10 ft. | 76 ft. |
| SDKA049 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1920 | -87.2442 | 53.1 ft. | | | 10 ft. | 53.1 ft. |
| SDKA051 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1899 | -87.2485 | 75.5 ft. | | | 10 ft. | 75.5 ft. |
| SDKA053 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1924 | -87.2536 | 89.4 ft. | | | 10 ft. | 89.4 ft. |
| SDKA054 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1927 | -87.2480 | | | 20.1 ft. | | 20.1 ft. |
| SDKA055 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1948 | -87.2566 | 80.4 ft. | | | 10 ft. | 80.4 ft. |
| SDKA048 | Jones Creek | TN05130204002_1000 | Jones Creek | 36.1875 | -87.2439 | | 0 ft. | | 0 ft. | 0 ft. |

Page 4 of 187

JA1954

AR 003636

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| | | | | 36.1923 | -87.2425 | | | 127 ft. | | 127 ft. |
| | | | | 36.1876 | -87.2439 | | | 2 ft. | | 2 ft. |
| SDKA014 | UT to Gafford Branch | TN05130204002_1500 | Peabody Branch | 36.1978 | -87.2622 | | | 19.3 ft. | | 19.3 ft. |
| SDKB025 | UT to Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2833 | -87.4932 | 250 ft. | | | 10 ft. | 250 ft. |
| | | | | 36.2840 | -87.4940 | 127 ft. | | | 10 ft. | 127 ft. |
| SDKB026 | Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2845 | -87.4962 | 95 ft. | | | 10 ft. | 95 ft. |
| SDKB027 | UT to Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2845 | -87.4980 | 76.7 ft. | | | 10 ft. | 76.7 ft. |
| SDKB028 | UT to Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2855 | -87.4995 | 190 ft. | | | 10 ft. | 190 ft. |
| | | | | 36.2855 | -87.5007 | | | 4 ft. | | 4 ft. |
| SHNC010-1 | UT Yellow Creek | TN05130205019_0999 | Misc tribs to Yellow Creek | 36.2978 | -87.5494 | | 0 ft. | | 0 ft. | 0 ft. |
| SHNC018 | UT to Yellow Creek | TN05130205019_0999 | Misc tribs to Yellow Creek | 36.3025 | -87.5572 | 99 ft. | | | 10 ft. | 99 ft. |
| | | | | 36.3021 | -87.5592 | | | 20 ft. | | 20 ft. |
| SHNC020 | Indian Branch | TN05130205019_0999 | Misc tribs to Yellow Creek | 36.3100 | -87.5770 | 84 ft. | | | 10 ft. | 84 ft. |
| SHNC007-1 | Yellow Creek | TN05130205019_1000 | Yellow Creek | 36.2982 | -87.5500 | | 0 ft. | | 0 ft. | 0 ft. |
| SDKA046 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2639 | -87.4195 | 84.8 ft. | | | 10 ft. | 84.8 ft. |
| SDKB009 | Furnace Creek | TN05130205024_0400 | Furnace Creek | 36.2498 | -87.3804 | 102.9 ft. | | | 10 ft. | 102.9 ft. |

Page 5 of 187

JA1955

AR 003637

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SDKB011 | Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2610 | -87.4113 | 206 ft. | | | 10 ft. | 206 ft. |
| | | | | 36.2614 | -87.4089 | | | 21 ft. | | 21 ft. |
| SDKB014 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2665 | -87.4261 | 104.3 ft. | | | 10 ft. | 104.3 ft. |
| SDKR005 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2609 | -87.4118 | | | 25.7 ft. | | 25.7 ft. |
| SDKR008 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2668 | -87.4288 | 97 ft. | | | 10 ft. | 97 ft. |
| | | | | 36.2669 | -87.4287 | 49 ft. | | | 10 ft. | 49 ft. |
| SDKB023 | Little Bartons Creek | TN05130205024_0600 | Little Bartons Creek | 36.2726 | -87.4552 | 81.9 ft. | | | 10 ft. | 81.9 ft. |
| SDKA038 | UT to Harris Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2283 | -87.3231 | | | 23 ft. | | 23 ft. |
| | | | | 36.2276 | -87.3211 | 82 ft. | | | 10 ft. | 82 ft. |
| | | | | 36.2283 | -87.3222 | 76 ft. | | | 10 ft. | 76 ft. |
| SDKA041 | Harris Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2303 | -87.3252 | 90.3 ft. | | | 10 ft. | 90.3 ft. |
| SDKA042 | UT to Bartons Creek | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2349 | -87.3365 | 77.5 ft. | | | 10 ft. | 77.5 ft. |
| SDKB001 | Miller Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2375 | -87.3453 | 107 ft. | | | 10 ft. | 107 ft. |
| | | | | 36.2365 | -87.3452 | | | 21 ft. | | 21 ft. |
| SDKB004 | UT to Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2430 | -87.3608 | 86.5 ft. | | | 10 ft. | 86.5 ft. |
| SDKB005 | UT to Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2436 | -87.3643 | 78.2 ft. | | | 10 ft. | 78.2 ft. |
| SDKB008 | Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2452 | -87.3689 | 55.2 ft. | | | 10 ft. | 55.2 ft. |

Page 6 of 187

JA1956

AR 003638

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SDKB002 | Bartons Creek | TN05130205024_1000 | Bartons Creek | 36.2379 | -87.3469 | 112.6 ft. | | | 10 ft. | 112.6 ft. |
| SDKA033 | UT to Johnson Creek | TN05130205031_0999 | Misc tribs to Johnson Creek | 36.2180 | -87.3004 | 108.8 ft. | | | 10 ft. | 108.8 ft. |
| SDKA034 | UT to Johnson Creek | TN05130205031_0999 | Misc tribs to Johnson Creek | 36.2187 | -87.3038 | 77.2 ft. | | | 10 ft. | 77.2 ft. |
| SDKA036 | Johnson Creek | TN05130205031_1000 | Johnson Creek | 36.2237 | -87.3132 | 263 ft. | | | 10 ft. | 263 ft. |
| | | | | 36.2237 | -87.3130 | | | 21 ft. | | 21 ft. |
| SHNA001 | Guices Creek | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3376 | -87.6087 | 78.6 ft. | | | 10 ft. | 78.6 ft. |
| SHNA011 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3313 | -87.6007 | 75 ft. | | | 10 ft. | 75 ft. |
| | | | | 36.3310 | -87.6011 | | | 23 ft. | | 23 ft. |
| SHNB030 | UT to Guices Creek | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3472 | -87.6254 | 168 ft. | | | 10 ft. | 168 ft. |
| | | | | 36.3477 | -87.6257 | | | 31 ft. | | 31 ft. |
| SHNC023 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3118 | -87.5828 | 89 ft. | | | 10 ft. | 89 ft. |
| SHNC030 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3195 | -87.5886 | 79.5 ft. | | | 10 ft. | 79.5 ft. |
| SHNE003 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3243 | -87.5930 | 75.1 ft. | | | 10 ft. | 75.1 ft. |
| SHNA012 | Guices Branch | TN05130205121_1000 | Guices Creek | 36.3327 | -87.6041 | 93 ft. | | | 10 ft. | 93 ft. |
| | | | | 36.3309 | -87.6035 | | | 20 ft. | | 20 ft. |
| SHNA008 | UT to Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3548 | -87.6395 | | | 44 ft. | | 44 ft. |
| | | | | 36.3544 | -87.6395 | | | 62 ft. | | 62 ft. |

Page 7 of 187

JA1957

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
|---|---|---|---|---|---|---|---|---|---|---|
| SHNB033-1 | Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3527 | -87.6339 | 104.9 ft. | | | 10 ft. | 104.9 |
| SHNB033-2 | Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3549 | -87.6388 | 139.4 ft. | | | 10 ft. | 139.4 |
| SHNB033-3 | Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3664 | -87.6559 | 76.4 ft. | | | 10 ft. | 76.4 |
| SHNA010 | Wells Creek | TN051302051735_1000 | Wells Creek | 36.3713 | -87.6622 | | 0 ft. | | | 0 ft. |
| WDKB001 | Wetland WDKB001 | N/A | Unnamed PFO wetland | 36.2494 | -87.3803 | 0.02 ac | | 0.01 ac | 0.02 ac | 0.03 ac |
| WHNA001 | Wetland WHNA001 | N/A | Unnamed PEM wetland | 36.3558 | -87.6394 | | | 0.10 ac | | 0.10 ac |
| WHNB002 | Wetland WHNB002-PEM | N/A | Unnamed PEM wetland | 36.3664 | -87.6554 | 0.33 ac | | 0.04 ac | | 0.37 ac |
| | Wetland WHNB002-PFO | N/A | Unnamed PFO wetland | 36.3664 | -87.6554 | | | 0.03 ac | 0.01 ac | 0.04 ac |
| WHNW001 | Wetland WHNW001 | N/A | Unnamed PEM wetland | 36.2903 | -87.5159 | | | 0.03 ac | | 0.03 ac |
| WHNW002 | Wetland WHNW002 | N/A | Unnamed PEM wetland | 36.2926 | -87.5251 | | | 0.01 ac | | 0.01 ac |
| WSTA001 | Wetland WSTA001 | N/A | Unnamed PEM wetland | 36.3722 | -87.6662 | 0.05 ac | | 0.06 ac | | 0.11 ac |

[1]Here and throughout this permit and rationale, where waterbodies are mentioned, the label and name as written in TGP's permit application materials and the TDEC Waterbody ID and Waterbody Name are given to facilitate review of authorized impacts. The project will also impact waterbodies identified by TDEC as WWCs (listed in this permit's Appendix). In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), impacts to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q).

[2]The linear feet of stream impacts and acreage of wetland impacts associated with pipeline installation via trench include the 10-foot-wide trench in which the pipeline will be installed. The impacts associated with the pipeline installation via trenching will be temporary.

[3]The linear feet of stream impacts associated with pipeline installation via HDD is reported as zero because this method does not require disturbance to the channel. No ongoing vegetation mowing or clearing will take place in riparian areas that are between HDD entry and exit points.

Page 8 of 187

[4]The linear feet of stream impacts and acreage of wetland impacts associated with road or workspace crossings include impacts from construction of access roads, additional workspace areas, and equipment or construction staging areas. The impacts associated with road or workspace crossings will be temporary.

[5]To facilitate periodic corrosion/leak surveys, a corridor centered on the pipeline and up to 10 feet wide may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state, resulting in conversion of plant communities in forested riparian zones and forested wetlands to herbaceous/emergent or scrub-shrub plant communities. In addition, individual trees that are located within 15 feet of the pipeline that have roots that could compromise the integrity of the pipeline coating may be cut and removed from the permanent right-of-way. These impacts will not result in loss of wetland acreage.



Page 9 of 187

AR  003641

Table 2: Authorized temporary water withdrawals from streams and reservoirs.

| Waterbody | | | | Impact location | | Flow statistics | | Class 1 minor water withdrawal | Class 2 minor water withdrawal | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | 7Q10 flow rate (gpm)[1] | Summer mean flow rate (gpm)[2] | Maximum instantaneous stream withdrawal percentage of instantaneous flow[3] | Maximum instantaneous reservoir withdrawal rate (gpm) | Duration (days) |
| SDKA048 | Jones Creek | TN05130204002_1000 | Jones Creek | 36.1874 | -87.2440 | 4263.89 | 28680.24 | 10% | | ≤ 30 |
| SDKB002 | Bartons Creek | TN05130205024_1000 | Bartons Creek | 36.2380 | -87.3467 | 628.40 | 4712.72 | 10% | | ≤ 30 |
| SDKB009 | Furnace Creek | TN05130205024_0400 | Furnace Creek | 36.2496 | -87.3804 | 291.70 | 2217.22 | 10% | | ≤ 30 |
| SDKB011 | Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2611 | -87.4112 | 71.80 | 561.04 | 10% | | ≤ 30 |
| SDKB023 | Little Bartons Creek | TN05130205024_0600 | Little Bartons Creek | 36.2725 | -87.4554 | 59.70 | 411.13 | 10% | | ≤ 30 |
| SHNC007-1 | Yellow Creek | TN05130205019_1000 | Yellow Creek | 36.2983 | -87.5504 | 8707.30 | 38644.26 | 10% | | ≤ 30 |
| SHNA012 | Guices Creek | TN05130205121_1000 | Guices Creek | 36.3329 | -87.6040 | 475.80 | 2082.57 | 10% | | ≤ 30 |
| SHNA010 | Wells Creek | TN051302051735_1000 | Wells Creek | 36.3714 | -87.6616 | 4093.30 | 17818.55 | 10% | | ≤ 30 |
| None | Cumberland River | TN05130205015_1000 | Barkley Reservoir | 36.3969 | -87.6593 | 325401.80 | 5655258.00 | N/A | 1500 | ≤ 30 |

[1]7Q10 flow rate is the lowest seven-day average flow with a 10% probability of occurring in any given year (i.e., that occurs on average once every ten years).
[2]Summer mean flow rate is the average individual daily mean discharge measured from June 1 through August 31 over an entire stream gage period of record.
[3]Temporary stream and reservoir impacts from minor water withdrawals are associated with hydrostatic testing of the pipeline before it is put into service. Withdrawals from streams are Class 1 minor water withdrawals, and the withdrawals from Barkley Reservoir is a Class 2 minor water withdrawal as defined by the TDEC *General Aquatic Resource Alteration Permit for Minor Water Withdrawals*.

Page 10 of 187

AR 003642

The project will also impact waterbodies identified by TDEC as WWCs (listed in this permit's Appendix). In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), impacts to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q).

**Special Conditions:**

a.  **Impacts to streams or wetlands in the project area and along the pipeline ROW are not authorized until the permittee has**

    1.  **obtained written permission from each landowner to conduct aquatic resource inventories on their property,**
    2.  **obtained contracts for all ROW access permissions associated with the entire pipeline project,**
    3.  **submitted documentation of landowner permission and contracts for full ROW access to the Division, which may be in the form of a signed affidavit of such from a responsible corporate officer,**
    4.  **submitted amendments to the project aquatic resources inventory to the permit writer that address parcels not previously inventoried,**
    5.  **received an updated Aquatic Resource Inventory/HD concurrence letter from the Division,**
    6.  **submitted an application for a revised permit that addresses newly inventoried resources, and,**
    7.  **received a revised ARAP covering all proposed impacts to aquatic resources for the entire pipeline project.**
    8.  **application for a revised permit that addresses newly inventoried resources, and,**
    9.  **received a revised ARAP covering all proposed impacts to aquatic resources for the entire pipeline project.**

b.  Unless stated otherwise, all work shall be accomplished in conformance with the accepted plans, specifications, data, and other information submitted in support of application NRS22.192.

c.  Written notification of the commencement of authorized work shall be provided to the TDEC Nashville Environmental Field Office prior to, or within 24 hours after initiation.

d.  The permittee shall notify this office of project completion and supply as-constructed or record drawings of the final structure within 45 days after completion.

e.  Wetlands and streams outside of the permitted impact area shall be clearly marked with signs, high visibility fencing, or similar structures so that all work performed by the contractor is solely within the permitted area of impact.

f.  **The permittee shall submit a post-construction monitoring report annually to the Division for three years following the project's completion. This annual report** shall include documentation of the maintenance of jurisdictional status and resource value in **all** impacted wetlands and streams in each monitoring year. See Monitoring Requirements section of this permit for details.

g.  For each stream crossing to be accomplished by a method other than HDD:

    1.  The permittee shall select from the list of potentially practicable alternatives below. This list is arranged in ascending order of perceived impact to the resource:
        i.   Conventional excavation with an excavator;
        ii.  Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;

Page 11 of 187

AR 003643

        **iii.** Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;

        **iv.** Removal by rock trencher; or

        **v.** Controlled blasting and excavation with a backhoe.

  **2.** The permittee shall select the least impactful practicable trenching technique for each stream crossing. Evaluation criteria include observed conditions at the stream crossing, the technical feasibility and limitations of each particular technique, best professional judgment of experienced personnel, logistics, and costs. The permittee shall select one or more non-blasting alternatives unless it demonstrates that each of these is impracticable. Prior to blasting, the permittee shall attempt at least one non-blasting alternative.

**h.** For controlled blasting within 50 feet of a stream or wetland:

  **1.** Unless stated otherwise, all blasting shall adhere to the conditions and other information submitted in the Draft Blasting Plan found in the document entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

  **2.** The blasting contractor(s) will create a site-specific blasting plan for each blasting location as described in the Draft Blasting Plan. The blasting plans must be submitted by the blasting contractor(s) to the permittee for review and approval by one if its engineers.

  **3.** Blasting operations must be conducted by, or under the direct and constant supervision of, personnel licensed and certified to perform such activity in Tennessee. Prior to any blasting activities, the blasting contractor(s) will provide documentation of the experience, licenses, and permits associated with blasting personnel to the permittee. The individual directly overseeing any controlled blasting activities will be required to hold a registration classification as defined in the T.C.A. Title 68, Chapter 105. The Geohazard Inspector will have prior experience in geohazard identification and characterization and experience in providing support/oversight during construction. The Geohazard Inspector will work under the direction of a licensed Professional Engineer. All blasting must be conducted with a Geohazard Inspector present.

  **4.** Blasting will not be used in Tennessee jurisdictional waters characterized by karst-prone geology with an unacceptable risk of hydrologic loss, as identified in the Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "Aquatic Resource Alteration Permit (ARAP) Application and State 401 Water Quality Permit" submitted to the Division on July 22, 2022, as part of the initial permit application package.

  **5.** Blasting is not authorized within wetlands.

  **6.** The Division must be notified at least 48 hours in advance when blasting is scheduled. The permittee shall provide written notification via email to the permit writer and to the Nashville Environmental Field Office 48 hours in advance of proposed blasting.

  **7.** A qualified project biologist will survey the proposed blasting zone identified by the pipeline blasting contractor(s) immediately in advance of any blasting for the presence of any state-listed species and if found, will contact the TWRA and TDEC Division of Natural Areas before proceeding.

  **8.** Blasting will be conducted in dry conditions within the workspace.

  **9.** The permittee will minimize the length of time that aquatic resources are disturbed by expediting completion of each crossing and completing stream crossings separate from the mainline construction.

  **10.** All streams and stream banks will be restored to original contours immediately following pipeline installation.

AR 003644

    **11. The permittee shall submit a post-blasting monitoring report to the Division within 30 days of the restoration of the temporary stream impacts**. See Monitoring Requirements section of this permit for details.

i. Loss of stream flow due to fracturing of bedrock is prohibited. Adequate provisions shall be made to prevent the loss of stream flow due to fracturing of bedrock during pipeline installation across streams and wetlands.

    1. Trench plugs are barriers placed within a pipeline excavation to slow flow and reduce erosion in the trench and also to prevent the trench from becoming a subsurface drainage path. Since gas line bedding and embedment are constructed using cohesionless, free-draining soils, a path is created for water to flow easily (French drain effect) alongside the pipe. In areas where there is high groundwater, where the pipeline crosses streams or aquifers, or where the natural groundwater flow would be affected or even diverted by the select material, trench plugs of compacted, cohesive, soils or impervious materials shall be constructed at intervals along the pipeline.

    2. Pipeline crossings of streams with bedrock streambeds must provide non-erodible fill and cover, such as concrete or controlled low strength materials (flowable fill), and trench plugs at each end of the crossing.

    3. Trench plugs shall be placed in the portions of any trench within 50 feet of a stream channel.

    4. The trench plug area will have a bedding of compacted, cohesive soils or impervious materials (such as concrete or controlled low strength materials (i.e., flowable fill)), whereas the bedding on both sides of the trench plug will have a bedding of uncompacted, cohesionless soil. Trench plugs must have lower permeability than the surrounding native soil.

j. For pipeline installation areas that cross streams or wetlands using horizontal directional drilling:

    1. Entry and exit locations must be at least 50 feet from the stream bank or wetland margin.

    2. The depth of bore below the streambed must be sufficient to reasonably prevent release of drilling fluid, based on the parent material.

    3. A site-specific contingency and containment plan for inadvertent release of drilling fluid must be followed. This plan includes notification to the Division within 24 hours after release to surface waters.

k. For the minor water withdrawals for the purposes of hydrostatic testing:

    1. All stream and river water withdrawals will adhere to the notification requirements, conditions, and limits of Class 1 water withdrawals in TDEC's *General Aquatic Resource Alteration Permit for Minor Water Withdrawals:*

        i. Withdrawal rates will not exceed 10% of instantaneous flow, and will not take place for more than 30 days in a calendar year from a particular waterbody. The permittee must demonstrate that instantaneous flow of the source water is accurately measured or determined for the purpose of compliance with the terms and limits of this permit.

    2. The reservoir water withdrawal from Barkley Reservoir will adhere to the notification requirements, conditions, and limits of Class 2 water withdrawals in TDEC's *General Aquatic Resource Alteration Permit for Minor Water Withdrawals:*

        i. Withdrawal rates will not exceed 1500 gpm and will not take place for more than 30 days in a calendar year.

    3. Where the total average withdrawal exceeds 10,000 gallons per day, the withdrawal shall be registered under the Water Resources Information Act of 2002 (T.C.A. § 69-7-301 et seq.) More information regarding water withdrawal information may be found at:

AR 003645

https://www.tn.gov/environment/program-areas/wr-water-resources/water-quality/water-withdrawal-registration-program.html

    **4.** Except for withdrawals from Barkley Reservoir, withdrawal is not authorized from a stream or river in a county or region during severe (D2), extreme (D3), or exceptional (D4) drought as indicated by the National Drought Mitigation Center website: https://droughtmonitor.unl.edu/CurrentMap/StateDroughtMonitor.aspx?TN

    **5.** The permittee must screen all water intake to minimize the potential for entrainment of fish.

    **6.** The permittee must adhere to conditions intended to minimize water withdrawal and hydrostatic testing impacts in the documented entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

    **7. The permittee shall submit a one-time water withdrawal monitoring report to the Division following the completion of all water withdrawals** to demonstrate adherence to permit conditions. See Monitoring Requirements section of this permit for details.

**l.** The permittee will adhere to the recommendations and other information submitted in the geologic and hydrotechnical hazard assessment, karst surveys, and geohazard mitigation guidance for the project provided in Attachment 6 of the documented entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022.

**m.** The permittee will use low pressure ground equipment in wetlands and riparian areas to minimize vegetation damage, soil compaction, and rutting.

**n.** Temporary wetland crossings shall utilize timber matting. Gravel, riprap, or other rock is not approved for construction of temporary crossings or haul roads across wetlands. Upon completion of construction activities, all temporary wetland impact areas are to be restored to pre-construction contours and elevations. Non-native soils, side-cast material, or other materials shall not be placed within the temporary impact locations during restoration. Permanent vegetative stabilization must use native species as described in Special Condition p.

**o.** Temporary impacts to wetlands associated with trench excavation shall be mitigated by the removal and stockpiling of the first 12 inches of topsoil prior to construction. Upon completion of construction activities, all temporary wetland impact areas are to be restored to pre-construction contours, and the stockpiled topsoil spread to restore these areas to pre-construction elevation. Non-native soils, side-cast material, or other materials shall not be placed within the temporary impact locations during restoration. Permanent vegetative stabilization must use native species as described in Special Condition p.

**p.** Permanent vegetative stabilization using native species of all disturbed areas in or near streams and wetland must be initiated within 14 days of project completion (see also *Landscaping With Natives* at https://www.tnipc.org/wp-content/uploads/2017/10/landscaping_2016_forweb.pdf). Non-native, non-invasive annuals may be used as cover crops until native species can be established.

**q.** Only earthen materials comprising native, uncontaminated soil or rock, or a combination thereof shall be "Acceptable Fill" to be placed as fill in wetlands and streams. Acceptable Fill shall consist of only soil or rock in which all substances naturally occurring therein are present in concentrations not exceeding the concentrations of such substances occurring naturally in the local area. Acceptable Fill shall not contain any sewage, industrial wastes, additives or materials such as refuse, rubble, muck, metal, glass, concrete pieces, bricks, or asphalt paving materials, wood or other wastes. For the purposes of this permit, "other wastes" means any and all other substances or forms of energy, including, but not limited to, decayed wood, sand, garbage, silt, municipal refuse, sawdust, shavings, bark, lime, ashes, offal, oil, hazardous materials, tar, sludge, or other petroleum byproducts, radioactive material, chemicals, heated substances, dredged spoil, solid waste, incinerator residue, sewage sludge, munitions, biological materials, wrecked and discarded equipment, and cellar dirt.

Page 14 of 187

AR 003646

**r.** The authorized alterations shall not cause measurable degradation to resource values and classified uses of hydrologically connected waters of the state, including disruption of sustaining surface or groundwater hydrology. Adjacent wetlands or streams determined likely to be measurably degraded by such hydrologic alteration, or by partial fill, must be included in the cumulative impact calculation, even if not filled or otherwise directly altered physically.

**s.** The use of monofilament-type erosion control netting or blanket is prohibited in the wetland, and in any stream channels, stream banks, or any disturbed riparian areas within 30 feet of top of bank.

**t.** Hard armoring of banks at any stream or wetland crossing is prohibited.

**u.** The pipeline, access roads, workspaces, and staging areas shall be located to avoid permanent alteration or damage to the integrity of the stream channel. Large trees, steep banks, rock outcroppings, etc., should be avoided.

**v.** The pipeline, access roads, workspaces, and staging areas shall not impound normal or base flows on the upstream side, and not result in a permanent disruption or barrier to the movement of fish or other aquatic life on the downstream side. Base flow is the usual or normal flow of the stream that is supplied primarily by groundwater from springs and seeps, but not affected by rapid runoff during and after rainfall.

**w.** The width of the stream channel and bank modifications, or other impacts associated with the installation of the pipeline, access roads, workspaces, and staging areas shall be limited to the minimum necessary.

**x.** Erosion control measures shall be utilized where stream bank vegetation is disturbed for the purpose of temporary stream crossings. Stream beds shall not be used as linear transportation routes for mechanized equipment. The stream channel may be crossed perpendicularly with equipment provided no additional fill or excavation is necessary. EPSC measures shall be utilized when streambanks are disturbed.

**y.** The stream channels shall not be over-widened as a result of the installation of the pipeline, access roads, workspaces, or staging areas.

**z.** Backfill activities must be accomplished in the least impactful manner possible that stabilizes the streambed and banks to prevent erosion. Permanent vegetative stabilization must use native species as described in Special Condition p.

**aa.** All dewatering activities shall be conducted in a manner that prevents the discharge of sediment-laden water into waters of the state.

**bb.** All spoil material from trench excavation, bore pits, and other earth-disturbing activities shall be deposited in an upland location and stabilized within seven days.

**cc.** Erosion prevention and sediment control measures must be in place and functional before any earth moving operations begin, and shall be designed according to the department's Erosion and Sediment Control Handbook (http://tnepsc.org/handbook.asp).

**dd.** Erosion prevention and sediment control measures such as silt fences shall be removed following completion of construction.

**ee.** Best Management Practices (BMPs) shall be stringently implemented throughout the construction period to prevent sediments, oils, or other project-related pollutants from being discharged into waters of the state. All spills must be reported to the appropriate emergency management agency, and measures shall be taken immediately to prevent the pollution of waters of the state, including groundwater, should a spill occur.

**ff.** Equipment staging and maintenance areas shall be developed a sufficient distance from any water to ensure that oil, gas, other petroleum products, and other hazardous materials do not enter the waters.

**gg.** The permittee shall minimize the use of heavy equipment in streams or wetlands. Equipment shall be free of noticeable leaks of fluids and oils.

Page 15 of 187

AR 003647

**hh.** Where practicable, all activities shall be accomplished during drier times of year or when recent conditions have been dry at the impact location. The excavation and fill activities associated with the pipeline crossing of non-navigable streams and wetlands shall be kept to a minimum and shall be separated from flowing waters. Temporary diversion channels shall be protected by non-erodible material and lined to the expected high water level. All surface water flowing towards or from the construction activity in non-navigable waters shall be diverted using flume or dam-and-pump methods as described in the permit application materials. Cofferdams and/or berms must be constructed of sandbags, steel sheeting, or other non-erodible, non-toxic material. All such diversion materials must be removed upon completion of the work. Activities may be conducted in the water if working in the dry will likely cause additional degradation. If work is conducted in the water it must be of a short duration and with minimal impact. For navigable streams as defined by section 10 of the Rivers and Harbors Act of 1899, the excavation and fill activities associated with utility line crossing may be accomplished within the flowing water.

**ii.** The permittee shall minimize clearing, grubbing, and other disturbance to riparian vegetation. Unnecessary native vegetation removal, including tree removal, and soil disturbance is prohibited. Native riparian vegetation must be reestablished in all areas of disturbance outside of any permanent authorized structures or vegetation management zones after work is completed, per Special Condition p. Coverage under this permit does not waive any local riparian buffer protection requirement, and the permittee is responsible for obtaining any necessary local approval.

**General Conditions:**

**a.** It is the responsibility of the permittee to convey all terms and conditions of this permit to all contractors. A copy of this permit, approved plans, and any other documentation pertinent to the activities authorized by this permit shall be maintained on site at all times during periods of construction activity.

**b.** Work shall not commence until the permittee has obtained all necessary authorizations pursuant to applicable provisions of section 10 of The Rivers and Harbors Act of 1899, section 404 of the Clean Water Act, section 26a of The Tennessee Valley Authority Act, section 402 of the Clean Water Act (including, but not limited to, an NPDES permit for construction stormwater), or any other federal, state or local laws.

**c.** All activities must be carried out in such a manner as will prevent violations of water quality criteria as stated in TDEC Rule Chapter 0400-40-03, or impairment of the uses of waters of the state as designated by Rule Chapter 0400-40-04.

**d.** This activity may not result in a disruption or barrier to the movement of fish or other aquatic life and wetland dependent species upon project completion.

**e.** Adverse impact to formally listed state or federal threatened or endangered species or their critical habitat is prohibited.

**f.** This permit does not authorize adverse impacts to cultural, historical, or archeological features or sites.

**g.** This permit does not authorize access to public or private property. Arrangements concerning the use of public or private property shall be made with the landowner. The permittee is responsible for obtaining any additional permitting or maintenance agreements with other government or public agencies or lands.

**PART II**

**Monitoring Requirements**

All reports must be submitted in report form to the Division's Natural Resources Unit located on the 11th Floor of the William R. Snodgrass Tennessee Tower, 312 Rosa L. Parks Avenue, Nashville, Tennessee

AR 003648

37243, via email at water.permits@tn.gov and to the permit writer Claire Wainwright at Claire.wainwright@tn.gov. Please be sure to indicate the ARAP permit number on your submittal.

a.  **An as-constructed report** must be submitted within 45 days after the project's completion (per Special Condition d above) and must contain as-constructed or record drawings of the final structure.

b.  **An annual post-construction monitoring report** must be submitted by April 30 each year for three years after the project's completion (per Special Condition f above) to document evidence of the maintenance of jurisdictional status and successful restoration within **all impacted jurisdictional features**, and shall include:

    1.  Representative photographs of each feature pre-impact and post-impact

    2.  Wetland delineations and stream hydrologic determinations. All stream hydrologic determinations must be made during the February 1 – April 15 time period each year and in accordance with the procedures in TDEC Rule 0400-40-03-.05(9)

    3.  Identification of any features that have not returned to pre-impact condition, and a corresponding proposed adaptive management plan

c.  **A post-blasting monitoring report** must be completed for each applicable stream crossing within 30 days post-impact (per Special Condition h above). This report will include:

    1.  Representative photographs of each feature pre-impact and post-impact

    2.  A description of the attempts to implement the potentially practicable alternatives to blasting techniques,

    3.  The results for each technique attempted prior to blasting,

    4.  A narrative description of the site-specific factors necessitating blasting, and

    5.  The date of the blasting.

d.  **A water withdrawal monitoring report** must be submitted within 30 days following the completion of all hydrostatic testing associated with the pipeline installation (per Special Condition k above). The report shall include, for each withdrawal location:

    1.  Specific location of each intake

    2.  Daily maximum withdrawal rates

    3.  Instantaneous flow rates and the source of instantaneous flow data, and

    4.  Total daily withdrawal volume

**Duty to Reapply**

If any portion of the permitted activities, including the authorized impacts to water resources, compensatory mitigation requirements, or post-project monitoring is not completed before the expiration date of this permit **the applicant must apply for permit re-issuance**. The permittee shall submit such information and forms as are required to the director of the Division of Water Resources at least ninety (90) days prior to its expiration date. Such applications must be properly signed and certified.

**Property Rights**

The issuance of this permit does not convey any property rights in either real or personal property, or any exclusive privileges, nor does it authorize any injury to private property or any invasion of personal rights, nor any infringement of Federal, State, or local laws or regulations.

**Other Information**

If the permittee becomes aware that he/she failed to submit any relevant facts in a permit application or submitted incorrect information in a permit application or in any report to the Director, then he/she shall promptly submit such facts or information.

Page 17 of 187

AR 003649

**Changes Affecting the Permit**

**Transfer/Change of Ownership**

**a.** This permit may be transferred to another party, provided there are no activity or project modifications, no pending enforcement actions, or any other changes which might affect the permit conditions contained in the permit, by the permittee if:

**b.** The permittee notifies the Director of the proposed transfer at least 30 days in advance of the proposed transfer date;

**c.** The notice includes a written agreement between the existing and new permittees containing a specified date for transfer of permit responsibility, coverage, and contractual liability between them; and

**d.** The Director does not notify the current permittee and the new permittee, within 30 days, of his intent to modify, revoke, reissue, or terminate the permit, or require that a new application be filed rather than agreeing to the transfer of the permit.

**e.** The permittee must provide the following information to the division in their formal notice of intent to transfer ownership:

    **1.** the permit number of the subject permit;

    **2.** the effective date of the proposed transfer;

    **3.** the name and address of the transferor;

    **4.** the name and address of the transferee;

    **5.** the names of the responsible parties for both the transferor and transferee;

    **6.** a statement that the transferee assumes responsibility for the subject permit;

    **7.** a statement that the transferor relinquishes responsibility for the subject permit;

    **8.** the signatures of the responsible parties for both the transferor and transferee, and;

    **9.** a statement regarding any proposed modifications to the permitted activities or project, its operations, or any other changes which might affect the permit conditions contained in the permit.

**Change of Mailing Address**

The permittee shall promptly provide to the Director written notice of any change of mailing address. In the absence of such notice the original address of the permittee will be assumed to be correct.

**Noncompliance**

**Effect of Noncompliance**

All impacts shall be consistent with the terms and conditions of this permit. Any permit noncompliance constitutes a violation of applicable State and Federal laws and is grounds for enforcement action, permit termination, permit modification, or denial of permit reissuance.

**Reporting of Noncompliance**
**24-Hour Reporting**

**a.** In the case of any noncompliance which could cause a threat to public drinking supplies, or any other discharge which could constitute a threat to human health or the environment, the required notice of non-compliance shall be provided to the Division of Water Resources in the appropriate Environmental Field Office within 24-hours from the time the permittee becomes aware of the circumstances. (The

Page 18 of 187

AR  003650

Environmental Field Office should be contacted for names and phone numbers of environmental response personnel).

**b.** A written submission must be provided within five (5) days of the time the permittee becomes aware of the circumstances unless this requirement is waived by the Director on a case-by-case basis. The permittee shall provide the Director with the following information:

   **1.** A description of the discharge and cause of noncompliance;

   **2.** The period of noncompliance, including exact dates and times or, if not corrected, the anticipated time the noncompliance is expected to continue; and

   **3.** The steps being taken to reduce, eliminate, and prevent recurrence of the non-complying discharge.

**Scheduled Reporting**

For instances of noncompliance which are not reported under subparagraph a. above, the permittee shall report the noncompliance by contacting the permit coordinator, and provide all information concerning the steps taken or planned to reduce, eliminate, and prevent recurrence of the violation and the anticipated time the violation is expected to continue.

**Adverse Impact**

The permittee shall take all reasonable steps to minimize any adverse impact to the waters of Tennessee resulting from noncompliance with this permit, including but not limited to, accelerated or additional monitoring as necessary to determine the nature and impact of the noncompliance.  It shall not be a defense for the permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit.

**Liabilities**

**Civil and Criminal Liability**

Nothing in this permit shall be construed to relieve the permittee from civil or criminal penalties for noncompliance. Notwithstanding this permit, the permittee shall remain liable for any damages sustained by the State of Tennessee, including but not limited to fish kills and losses of aquatic life and/or wildlife, as a result of the discharge of pollutants to any surface or subsurface waters. Additionally, notwithstanding this Permit, it shall be the responsibility of the permittee to conduct its discharge activities in a manner such that public or private nuisances or health hazards will not be created.

**Liability under State Law**

Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties established pursuant to any applicable State law or the Federal Water Pollution Control Act, as amended.

This permit does not preclude requirements of other federal, state or local laws.  This permit also serves as a State of Tennessee Aquatic Resource Alteration Permit (ARAP) pursuant to the Tennessee Water Quality Control Act of 1977 (T.C.A. § 69-3-101 et seq.).

The State of Tennessee may modify, suspend or revoke this permit or seek modification or revocation should the state determine that the activity results in more than an insignificant violation of applicable water quality standards or violation of the act. Failure to comply with permit terms may result in penalty in accordance with T.C.A. § 69-3-115.

An appeal of this action may be made as provided in T.C.A. § 69-3-105(i) and Rule 0400-40-07-.04(9) by submitting a petition for appeal:

AR  003651

**a.** The petition must be filed within 30 days after public notice of the issuance of the permit.

**b.** The petition must specify the basis for the appeal and state a claim for relief based on an alleged violation of the Tennessee Water Quality Control Act or the rules promulgated thereunder. Third parties shall specify facts sufficient to establish that they have satisfied the statutory and regulatory preconditions and otherwise have standing to appeal.

**c.** The petition should be addressed to the technical secretary of the Tennessee Board of Water Quality, Oil and Gas at the following address: Jennifer Dodd, Director, Division of Water Resources, William R. Snodgrass - Tennessee Tower, 312 Rosa L. Parks Avenue, Nashville, Tennessee 37243-1102, or you may submit such petition electronically to TDEC.Appeals@tn.gov. Any hearing would be in accordance with T.C.A. §§ 69-3-110 and 4-5-301 et seq.



Page 20 of 187

AR 003652

**APPENDIX**
**Permit Rationale**

---
**DRAFT PERMIT RATIONALE**
**Aquatic Resource Alteration Permit NRS22.192**
---

Tennessee Natural Gas Company, LLC
Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, and Barkley Reservoir; Harpeth River and Lake Barkley Watersheds, Dickson, Houston, and Stewart Counties, Tennessee
May 30, 2023
*Permit Writer: Claire Wainwright*

**Summary**

Names of Applicants:
Tennessee Natural Gas Company, LLC

Contact:
Gina Dorsey
1001 Louisiana St, Suite 1000
Houston, TX 77002-5089

Activity Location:  From near Claylick Road, Dickson to near Old Scott Road, Cumberland City

Nature of Business: Construction of a natural gas pipeline and associated infrastructure

Proposed Activity: Temporary impacts to 0.69 acres of wetland, permanent impacts to 0.03 acres of wetland, temporary impacts to approximately 5400 linear feet of stream, temporary water withdrawals from eight streams and one reservoir, and permanent impacts 490 linear feet of stream associated with the construction of a 32-mile 30-inch diameter natural gas pipeline

Waterbody Name: Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, Barkley Reservoir; Harpeth River and Lake Barkley Watersheds, Dickson, Houston, and Stewart Counties, Tennessee

**Permit Status**

ARAP NRS22.192 issued:  **XXXX**

ARAP NRS22.192 expires:  **XXXX**

Application for ARAP received:  **July 22, 2022**

Application Complete:  **April 20, 2023**

Page 21 of 187

AR  003653

**Status of Affected Waters**

<u>Streams</u>

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SDKA023 | Upper Sugar Camp Branch | TN05130204001_1100 | UT Harpeth | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA026, SDKA027 | Jordan Branch, UT to Jordan Branch | TN05130204002_0100 | Jordan Branch | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA004, SDKA006, | UT to Porters Branch, | TN05130204002_0200 | UT Jones Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | June 3, 2019 | Unavailable | Not a known ETW |

Page 22 of 187

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SDKA008, SDKA058 | Porters Branch | | | Irrigation | Fully Supporting | N/A | N/A | June 3, 2019 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Supporting | Flow regime modification | Dam or impoundment | June 3, 2019 | | |
| SDKA013, SDKA049, SDKA051, SDKA053, SDKA054, SDKA055 | Gafford Branch, UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA048 | Jones Creek | TN05130204002_1000 | Jones Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | June 5, 2019 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | June 5, 2019 | | |
| | | | | Recreation | Fully Supporting | N/A | N/A | June 5, 2019 | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | June 5, 2019 | | |

Page 23 of 187

JA1973

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Industrial Water Supply | Fully Supporting | N/A | N/A | June 5, 2019 | | |
| SDKA014 | UT to Gafford Branch | TN05130204002_1500 | Peabody Branch | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKB025, SDKB026, SDKB027, SDKB028 | UT to Leatherwood Creek, Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| SHNC010-1, SHNC018, SHNC020 | UT Yellow Creek, Indian Branch | TN05130205019_0999 | Misc tribs to Yellow Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |

Page 24 of 187

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | | | | | |
| SHNC007-1 | Yellow Creek | TN05130205019_1000 | Yellow Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| SDKA046, SDKB009, SDKB011, SDKB014, SDKR005, SDKR008 | UT to Dry Hollow Branch, Furnace Creek, Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| SDKB023 | Little Bartons Creek | TN05130205024_0600 | Little Bartons Creek | | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |

Page 25 of 187

AR 003657

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Fully Supporting | | | | | |
| | | | | Fish and aquatic life | | N/A | N/A | May 29, 2018 | | |
| SDKA038, SDKA041, SDKA042, SDKB001, SDKB004, SDKB005, SDKB008 | UT to Harris Branch, Harris Branch, UT to Bartons Creek, Miller Branch, UT to Nesbitt Branch, Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKB002 | Bartons Creek | TN05130205024_1000 | Bartons Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |

Page 26 of 187

JA1976

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SDKA033, SDKA034 | UT to Johnson Creek | TN05130205031_0999 | Misc tribs to Johnson Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA036 | Johnson Creek | TN05130205031_1000 | Johnson Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNA001, SHNA011, SHNB030, SHNC023, SHNC030, SHNE003 | Guices Creek, UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |

Page 27 of 187

AR 003659

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SHNA012 | Guices Branch | TN05130205121_1000 | Guices Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNA008, SHNB033-1, SHNB033-2, SHNB033-3 | UT to Lickskillet Branch, Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNA010 | Wells Creek | TN051302051735_1000 | Wells Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 30, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 30, 2018 | | |
| | | | | Recreation | Not Supporting | E. coli | Sanitary sewer overflows (collection system failures) | May 30, 2018 | | |

Page 28 of 187

AR 003660

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| None | Cumberland River | TN05130205015_1000 | Barkley Reservoir (Cumberland River) | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 25, 2018 | Available | ETW due to documented non-experimental populations of state-listed threatened and endangered aquatic animal species |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Recreation | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Domestic Water Supply | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Industrial Water Supply | Fully Supporting | N/A | N/A | May 25, 2018 | | |

Page 29 of 187

JA1979

Cumberland Gas Pipeline Project; NRS22.192
§401 Water Quality Certification

Wetlands

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody Name | TDEC Waterbody ID | Wetland Type | Parameters for Habitat Alteration | ETW Status |
|---|---|---|---|---|---|---|
| WDKB001 | Wetland WDKB001 | Unnamed PFO wetland | N/A | PFO | Available | Not a known ETW |
| WHNA001 | Wetland WHNA001 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| WHNB002 | Wetland WHNB002-PEM | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| | Wetland WHNB002-PFO | Unnamed PFO wetland | N/A | PFO | Available | Not a known ETW |
| WHNW001 | Wetland WHNW001 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| WHNW002 | Wetland WHNW002 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| WSTA001 | Wetland WSTA001 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |

**Proposed Alterations**

TGP proposes stream and wetland alterations associated with the construction of approximately 32 miles of new 30-inch-diameter natural gas lateral pipeline and associated infrastructure. A detailed summary of these impacts can be found in Tables 1 and 2 in this permit. The project also proposes to impact waterbodies identified by TDEC as WWCs (listed in this permit's Appendix in Table 3). In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), alterations to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q).

The broad categories of activities associated with the project that may alter Waters of the State include vegetation clearing, soil disturbance for grading purposes, water withdrawals for hydrostatic testing, trenching, HDD, and temporary fill from construction timber mats or temporary culvert crossings.

Prior to construction, temporary and permanent ROW workspaces will be cleared of woody vegetation. The pipeline construction corridor, adjacent work areas, and contractor yards will be cleared of vegetation and graded, as needed, to accommodate mobilization of equipment and materials and to facilitate access. During operation, the permanent easement or ROW will be maintained clear of trees and woody shrubs to allow for ongoing pipeline inspection and maintenance as required by United States Department of Transportation pipeline safety regulations. A corridor not exceeding ten feet in width, centered on the pipeline, may be

AR 003662

maintained annually in an herbaceous state as required to facilitate periodic corrosion and leak detection surveys.

Trench excavation will be the primary construction method to install the pipeline. Installation of the proposed pipeline will primarily entail excavation of a trench 4.5 to 8 feet in depth (averaging approximately 5 feet deep) and 4 to 5 feet in width (averaging approximately 4.5 feet wide). After the pipe is installed, the pipeline trench will be backfilled to grade by a minimum of 18 to 36 inches of cover (depending on location-specific soil and rock conditions) and vegetatively stabilized. Depth of cover over the pipeline installed beneath stream channels will be in accordance with United States Department of Transportation pipeline safety regulations which address pipeline installations occurring in navigable rivers or streams. All buried pipelines will be installed with a minimum cover of 48 inches of soil or 24 inches of consolidated rock between the top of the pipe and the underwater natural bottom.

TGP will cross all waterbodies in accordance with the FERC Procedures (with requested deviations to be approved by the FERC), the project's SWPPP, and applicable USACE and TDEC permit conditions. The proposed construction procedures will ensure that impacts at all stream crossings are minimized to the extent practicable. TGP anticipates that waterbodies will be crossed primarily by dry open cut methods, which may include a flumed crossing or dam-and-pump techniques, depending on site-specific conditions at the time of construction. Approximately 0.8 miles of the pipeline will be installed via HDD to avoid open-cut construction methods in three larger and potentially higher-flow streams as well as one associated unnamed tributary.

Construction BMPs will include:
- Minimizing vegetation clearing, use of timber mats, and minimizing soil disturbance;
- Avoiding unnecessary vehicular traffic and equipment use;
- Installing and maintaining erosion and sedimentation control devices such as straw bales and silt fences;
- Restricting the duration of construction to the extent practicable;
- Using timber construction mats to create a temporary work surface in wet conditions;
- Using low pressure ground equipment in wet conditions to minimize vegetation damage, soil compaction, and rutting;
- Training employees and contractors regarding the handling of oils and hazardous materials commensurate with their position;
- Inspecting equipment used in construction and operations at regular intervals;
- Using only approved access roads for vehicles transporting oils or fuel to construction workspaces;
- At the discretion of the Environmental Inspector, fueling equipment at the construction workspaces at least 100 feet from any waterbody;
- Storing hazardous materials, including chemicals, fuels, and oils, more than 100 feet from any waterbody;
- Using secondary containment, as appropriate, for pumps that transfer hazardous substances or petroleum within 100 feet of a waterbody to prevent spills and overflow; and
- Keeping spill response materials on site and in designated vehicles in the construction workspaces.

Disturbances to all other Waters of the State identified in the project area outside of the construction ROW will be avoided.

Stabilization will be achieved according to the limitations of the approved NPDES Construction General Permit and SWPPP. The work will be completed in the dry when practicable. When working in the dry is

AR 003663

not practicable, check dams, diversions, or a system of pumps and sediment bags may be used to create dry sections and reduce sedimentation.

<u>Streams</u>

The proposed construction ROW includes the permanent easement, temporary workspaces, access roads, and contractor yards. A total of 53 streams are located within the construction ROW, with some features crossed by the ROW more than once, for a total of 69 stream crossings (5402 linear feet). Of the total 69 stream crossings, 50 are pipeline crossings. An additional 15 stream crossings will incur minor, temporary impacts due to workspace disturbances (i.e., equipment/construction staging locations, access roads, and additional workspace areas). The remaining four stream crossings will have no direct impacts due to the use of the HDD crossing method described in more detail below.

Stream crossings will be perpendicular to stream flow to the extent practicable. Temporary erosion control measures will be installed as necessary to prevent downstream impacts. If necessary, the pipe used for waterbody crossings will be weighted to prevent flotation. Prior to waterbody crossing construction, TGP will clear vegetation on each side of the waterbody, install sediment barriers, and prepare prefabricated segments of pipeline for installation.

Except for waterbodies that are proposed to be crossed using the trenchless HDD crossing method, TGP is proposing to cross the remaining waterbodies using dry open cut crossing methods. Dry open cut crossing methods, which consist of the "dam-and-pump" and "dry-flumed" crossing methods, will be accomplished by temporarily diverting stream flow around or through the work area to minimize contact between stream water and excavation and to minimize sediment suspension during trench excavation, pipeline installation, and backfill activities.

*Flumed method for installation via trench*

A flumed stream crossing redirects the water flow through one or more flume pipes to allow for the trenching and pipe installation to occur in dry conditions. The number, length, and diameter of the pipes are dependent on estimated stream flow for the stream being crossed. This method allows for drier trenching, pipe installation, and restoration, while maintaining continuous downstream flow and passage for aquatic organisms. Soil types must have characteristics that allow stable stream bank conditions, and stream flow must be low enough for this method to be used successfully and safely. The flume pipe(s) must be long enough to account for the potential for the ditch width to increase during excavation (due to sloughing) and over-sized somewhat to accommodate the possibility of high flow conditions. An effective seal must be created around the flume(s) at both the inlet and outlet ends, so water will not penetrate and potentially compromise the channelized dam. TGP will implement the following measures where the flumed crossing method is used:

- The flume pipe will be installed before any trenching;
- An effective seal will be created around the flume pipe with sandbags or an equivalent seal mechanism;
- The flume pipe(s) will be aligned parallel with natural water flow to prevent scouring of the bank, preventing erosion and sedimentation;
- The flume pipe will not be removed during trenching, pipe-laying, backfilling activities, or initial streambed restoration efforts, except in rare conditions where a severe flow event causes conditions that make it unsafe for the pipe to remain; and
- Flume pipes and dams that are not associated with an equipment bridge will be removed as soon as final clean-up of the stream bed and bank is complete.

<div align="center">Page 32 of 187</div>

AR 003664

*Dam-and-pump dewatering method for installation via trench*

The dam-and-pump method may be used for stream crossings where pumps and hoses can adequately transfer stream flow volumes from upstream of the work area to downstream of the work area, and where there are no concerns with preventing the passage of aquatic organisms.

TGP will implement the following measures where the dam and pump method is utilized:

- Sufficient pump size, horsepower, and hose capacity, including on site backup pumps, will be used to maintain downstream flows;
- Coffer dams will be constructed with "clean" materials to prevent pollutants from entering the waterbody (e.g., sandbags or clean gravel with plastic liner);
- Water intakes will be suspended in the water column above the stream bed and will be screened to reduce entrainment of aquatic organisms or particles that may clog the pump;
- Pumps will be located within secondary containment structures to catch petroleum liquids and prevent them from entering the waterbody during refueling or if a pump failure occurs;
- For waterbodies with large volumes and strong velocity discharges, water dispersion structures will be placed at the downstream discharge location to prevent streambed scour; and
- The coffer dam, pumps, and hoses will be monitored and maintained to ensure proper operation for the duration of the waterbody crossing.

*Rock removal methods for installation via trench*

Bedrock refers to the solid rock that is found beneath the soil layer and other unconsolidated rock or sediment fragments. Shallow and hard bedrock can restrict trenching, requiring special mechanical means or blasting in certain areas to excavate to required design depths.

If bedrock is encountered during trenching, TGP plans to remove such bedrock using one of the techniques detailed below. The technique selected by TGP's construction contractor will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location. Techniques to be attempted are the following, in increasing order of perceived impact to aquatic resources:

    1. Conventional excavation with an excavator;
    2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;
    3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;
    4. Removal by rock trencher; or
    5. Controlled blasting and excavation with a backhoe.

Evaluation criteria for the above-listed techniques include observed conditions at the stream crossing, the technical feasibility and limitations of each particular technique, considerations based on the experience of TGP personnel and its construction contractor, logistics, and costs. Based on the evaluation, one or more of the four non-blasting techniques may be determined not to be a practicable alternative at a particular crossing. However, based on the results of the evaluation at each stream crossing, TGP will attempt the remaining potentially practicable non-blasting techniques to determine which is the least adverse yet practicable alternative. Only if evaluation and attempted implementation of the non-blasting techniques indicate that these non-blasting alternatives are not practicable will controlled blasting be selected as the least impactful to resource values, yet practicable, alternative. If techniques 1-4 are unsuccessful for rock removal and excavation at stream crossings, controlled blasting will be considered in non-karst areas that are also not in wetlands or streams with an unacceptable risk of hydrologic loss. The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location at

AR 003665

which a bedrock substrate has been identified, and the analysis is summarized in the Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "Aquatic Resource Alteration Permit (ARAP) Application and State 401 Water Quality Permit" submitted to the Division on July 22, 2022, as part of the initial permit application package

TGP anticipates encountering areas of shallow bedrock during construction that may require controlled blasting to remove, based on the following information: review of surficial geology, soil mapping, and desktop geotechnical survey results. TGP has developed a Draft Blasting Plan for the project, provided in Draft Blasting Plan found in the documented entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package. To avoid potential damage, TGP's blasting contractor will conduct pre-blasting of the rock, as needed, and develop site-specific blasting operations and monitoring plans to be approved by TGP. Control of blasting will limit stresses on existing pipelines, nearby structures, water supply wells, oil and gas wells, electrical transmission tower footings, and other utilities located near the project. Blasting activities will not begin until occupants of nearby buildings, stores, residences, businesses, and farms have been notified, and pre-blast inspections have been conducted on structures and water wells. Special care will be taken to monitor and assess blasting within 200 feet of residences and 200 feet of private or public water supply wells. Blasting mats will be used during blasting to keep the material within the approved workspaces. TGP and its blasting contractor will adhere to the provisions in the Draft Blasting Plan, which identifies blasting procedures, including use, storage, and transportation of explosives. Following blasting, where necessary, excess rock will be removed from the construction workspace, subject to affected landowner approval and applicable permit conditions. In areas where rock is predominant and little suitable backfill material is available, rock will be pulverized and placed in the trench as pad material around the pipe.

*Horizontal Directional Drilling (HDD) for trenchless installation*

HDD is a construction technique that is used to install pipelines in areas where traditional open cut excavations are not practicable due to technical feasibility, logistics, and costs. With the HDD method, a small diameter pilot hole is drilled from the entry point to the exit point. Drilling fluids are pumped to the drill bit, to cool the bit, remove rock cuttings, seal the drilled path, and lubricate the drill stem. From there, the hole is widened, and the pipeline is pulled into position. Compared to the other crossing methods, the HDD technique minimizes the impacts to an area by drilling down and under a sensitive resource, leaving the portion of land in between the entry and exit point relatively undisturbed. HDDs are proposed at three locations that will avoid direct impacts to four streams: Jones Creek (MP 3.2), Yellow Creek and an unnamed tributary (MP 22.4), and Wells Creek (MP 30.7). The use of HDDs at these three locations will be implemented to overcome obstacles posed by use of other stream crossing construction methods that are impracticable because of channel dimensions, flow, or other constraints. The feasibility of HDDs at these three (3) locations has been confirmed by analysis of geotechnical testing. HDD feasibility studies were conducted in June 2022 and provided as "Attachment 7 – HDD Feasibility Studies" submitted to the Division on July 22, 2022, as part of the initial permit application package. In the case of inadvertent release of drilling fluid, TGP and its contractors will follow the HDD contingency plan submitted to the Division as part of "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

Following construction, streambeds will be restored to their pre-construction elevations and grades. Spoil, debris, piping, construction materials, and any other obstructions resulting from or used during construction of the pipeline will be removed to prevent interference with normal stream flow. Any excavated material

AR 003666

not used as backfill will be removed and disposed of in uplands. Following grading, all waterbody banks will be restored to pre-construction conditions and in accordance with permit requirements.

*Water withdrawals for hydrostatic testing*

In compliance with U.S. Department of Transportation specifications, TGP will conduct hydrostatic testing on all pipeline segments prior to placing them in service. Proposed sources of hydrostatic test water for the Project are identified in Table 2 of this permit. Hydrostatic test manifolds will be located outside of wetlands and riparian areas to the maximum extent practicable. The pipe segments will be capped with manifolds, filled with water, pressurized, and held for one or eight hours. Any significant loss of pressure will indicate that a leak may have occurred and warrant further inspection and, where necessary, repair. Water may be re-used for hydrostatic testing between the new pipeline segments. The test water is expected to contact only new pipe, and no additives or chemicals will be added to the test water. Upon completion of the hydrostatic tests, the hydrotest water will be discharged to an upland area through a dewatering structure consisting of an energy dissipation device and water filtration structure. Environmental impacts from withdrawal and discharge of test water will be minimized by utilizing the measures outlined in the documented entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

Wetlands

No permanent fill or loss of wetland acreage is proposed. However, the project will result in the permanent vegetation conversion of up to 0.03 acres of wetlands from forested to herbaceous within the new permanent easement due to construction clearing and periodic maintenance activities.  Post-construction monitoring will be conducted to ensure that the areas are restored and that invasive non-native plant species do not dominate.

*Wetland construction methods*

"Conventional" wetland construction methods support construction equipment without significant soil disturbance. Prior to crossing and movement of construction equipment through these wetlands, the ROW will be stabilized using timber mats to allow for a stable, safe working condition. Unless soils are saturated, TGP will segregate up to the top 12 inches of wetland topsoil over the trench line. Trench soil will be temporarily stockpiled in a ridge along the pipeline trench. Gaps in the spoil pile will be left at appropriate intervals to provide for natural circulation or drainage of water. While the trench is dug, the pipeline will be assembled in a staging area located in an upland area. After the pipeline is lowered into the trench, wide-track bulldozers or backhoes supported on timber mats will be used for backfilling, final clean-up, and grading. This method will minimize the amount of equipment and travel in wetland areas. Where necessary, a drag-section may be used with the conventional wetland construction method. The drag-section involves the trenching, installation, and backfill of a prefabricated length of pipeline containing several pipe segments all in one day. The trench is backfilled at the end of each day after the pipe is lowered in as necessary to ensure safety.

**Alternatives Analysis and Selection of Least Impactful Practicable Alternative**

The applicant has submitted potentially practicable alternatives to the proposed activity. The overall stated goal and purpose of the activity is to transport natural gas to TVA from TGP's existing interstate pipeline system, as follows:

> "The proposed Project, which consists of the construction of the approximately 32-mile Cumberland Pipeline and appurtenant facilities (Cumberland Meter Station, Pressure Regulation Station, mainline valves, and inline inspection facilities), will allow TGP to transport approximately

AR  003667

245,040 dekatherms per day ("Dth/d) of natural gas from TGP's existing interstate pipeline system for TVA."

The applicant has considered the following alternatives:

### Alternative 1: Major route variations

"TGP conducted an analysis to determine if alternatives to construct and install the Cumberland Pipeline are practicable based on environmental considerations, construction costs, technical feasibility, human safety, and logistics."

"The proposed Cumberland Pipeline will be constructed and installed generally parallel and adjacent to an existing TVA electric utility easement (approximately 80 percent co-located) and other utility easements."

"The route for the Project is spatially constrained by two existing and fixed locations: (1) TVA's Cumberland Fossil Plant and (2) TGP's existing natural gas pipeline system (Lines 100-3 and 100-4). A primary routing consideration was co-locating the Cumberland Pipeline with existing utility easements for approximately 80 percent of its length, thereby minimizing environmental and landowner impacts. Based on TGP's analysis, an alternate Project route that is not co-located with existing utility easements would not result in decreased impacts to water quality, and would have additional environmental and landowner impacts than the preferred route, where land-use and property disruptions have already occurred."

"In order to meet the purpose and need for the Project, the Cumberland Pipeline was designed to extend from the Project receipt point on TGP's existing interstate natural gas pipeline system along the Project's eastern beginning point to the Project delivery point at the location of TVA's proposed combined-cycle combustion turbine gas plant to be located on the Cumberland Fossil Plant Reservation at the Project's western terminus. Because these points are fixed as existing facilities, alternate routes with other starting or terminating points are not practicable or feasible to achieve the Project purpose. TGP's preferred route for the Cumberland Pipeline extends between these two points generally along an existing TVA powerline easement and other utility easements. This route is preferred primarily because of its generally co-located alignment between the Project receipt and delivery points. Further, with regard to Project impacts, disruptions to existing land-use along the TVA powerline easement and other utility easements have already occurred and have been assimilated, minimizing impacts to the environment and to new landowners for alternative routes. Finally, ease of access along the existing TVA easement and other utility easements by use of existing access roads for Project construction and operations provides another advantage for the preferred route as compared to alternative routes. Because of the ubiquitous occurrence of streams and wetlands in the topographically dissected Western Highland Rim Physiographic Province in which the Project is located, it is unlikely that other routes between the Cumberland Pipeline's receipt and delivery points would encounter substantially fewer aquatic resources than those along the preferred route, which is co-located with an existing TVA powerline easement and other utility easements for approximately 80 percent of its length. Further, alternative routes likely would contain aquatic resources that have not been disturbed by previous utility clearing and maintenance activities. For these reasons, TGP has chosen the route generally extending along the TVA powerline easement and other utility easement as the preferred alternative for the Cumberland Pipeline."

"There are no additional major route alternatives to the Cumberland Project."

AR  003668

**Alternative 2: Minor Route Variations**

"During the process of siting the Project, TGP has and will continue to consider multiple minor route variations to refine the pipeline alignment and to address concerns raised by potentially affected landowners and regulatory agencies. Route variations have been made to accommodate construction limitations, to improve the alignment for features such as roads and waterbody crossings, and to avoid natural features that would be challenging during construction, restoration, and operation of the pipeline, as well as to address landowner concerns. Table 10.2-1 summarizes the route variations that TGP has considered and incorporated in the Project alignment. At this time, TGP continues to refine the pipeline route and address route variations requested by potentially affected landowners and regulatory agencies, which may necessitate further changes to proposed pipeline route."

**TABLE 10.2-1**
**Cumberland Project Minor Route Variations**

| Mile Post | Variation Description | At Landowner Request |
|---|---|---|
| 0 | Potential sites for Pressure Regulation Station | |
| 2.3 | Rock ledge avoidance | |
| 3 | Landowner request to shift onto TVA easement | X |
| 4.5 | Avoid building on east side of White Oak Flat Road and eliminate additional pipeline points of inflection | |
| 8.5 | Improve crossing angle at two streams on tract 1.055 | |
| 12.5 | Avoid water feature | X |
| 16.5 | Avoid spring well and align the route for improved stream crossing and create a more perpendicular crossing for Little Bartons Creek | |
| 22.7 | Adjust stream crossing away from middle of the stream | |
| 25 | Avoid side hill construction and align the route to parallel the TVA easement | |
| 26 | Improve crossing angle at Highway 13 and stream (encroaches on TVA) | |
| 30-32 | Address multiple HDD routing issues at Wells Creek | |

"Three minor route variations were evaluated between MP 30-32 where the pipeline needed to be routed away from the original pipeline route (paralleling the TVA powerline easement) to connect to the meter station location specified by the Project Shipper on TVA property."

"Table 10.2-2 summarizes the collective items addressed in the interconnected route variations that were considered between MP 30-32 The preferred route, which incorporates the minor route variations set forth in Table 10.2-2, results in an increase of approximately 0.12 miles over alternative routes considered between MP 30 and MP 32."

Page 37 of 187

AR 003669

**TABLE 10.2-2**
**Minor Route Variations (Summary MP 30-32)**

| Mile Post | Construction Method | Variation Description (Selected Route) |
|---|---|---|
| 29.8–32 | Upland Construction; Stream-crossing Construction; HDD | Shifted route westward toward TVA's preferred location for the Cumberland Meter Station and to avoid the Stewart Houston Industrial Park. |
| 30.1 | Upland Construction; Stream-crossing Construction | Shifted 50 feet to the south to avoid old railroad bridge supports when crossing abandoned railroad. |
| 30.3–30.8 | Upland Construction; HDD | Moved route to attain a more perpendicular HDD crossing of Wells Creek and avoid crossings of Booster Branch and another tributary to Wells Creek, as well as avoid known cultural resource locations. Moved onto TVA property toward TVA's preferred location for the Cumberland Meter Station. |

For full descriptions of each variation in the tables above please refer to "Attachment 8 – Route Variations" submitted to the Division on July 22, 2022.

During course of application review by TDEC, additional jurisdictional wetlands were found within the ROW. TGP made additional minor route changes to avoid impacts to these features. These changes are summarized in TGP's response to a TDEC Request for Additional Information "TGP & USACE Cumberland Project – TDEC Field Review / Revisions (Supplement 1)", document dated September 29, 2022.

**Alternative 3: Pipeline installation via dry-cut trenching vs. wet-cut trenching**

"The dry open cut construction procedure involves isolating the streambed work area from the stream to allow the construction to be performed in a controlled "dry" state by temporarily diverting the stream around the work area. The most common dry open cut methods include the flumed crossing and the dam and pump crossing methods. The dry open cut method has been selected as the preferred crossing method for the majority of waterbody crossings for the Cumberland Pipeline. The two main types of dry open cut crossing methods are discussed below. While dry open cut methods result in increased time to cross a stream as compared to wet open cut methods, the potential for weather to affect the flow in the stream and thus the crossing, and the ability to handle flow volume, some stream flow may not be appropriately handled by the use of the dry open cut crossing methods. In that case, a trenchless crossing method (HDD or conventional bore method, as discussed below) may be more appropriate."

"In the flumed crossing method, a flumed stream crossing redirects the water flow through one or more pipes to allow for the trenching and pipe installation to occur in dry conditions. The number, length, and diameter of the pipes are dependent on estimated stream flow for the stream being crossed. The major advantage of this method is that it allows for dry trenching, pipe installation, and restoration, while maintaining continuous downstream flow and passage for aquatic organisms. Further, because this method isolates the stream flow from the construction activities, the only downstream turbidity that is created is during the dam/flume installation."

"The dam-and-pump crossing method is primarily used for stream crossing where pumps and hoses can adequately transfer stream flow volumes from upstream work to downstream of the work area, and where there are no concerns with preventing the passage of aquatic organisms. The major advantage of this method is that it allows for dry trenching, pipe installation, and restoration, while

AR 003670

maintaining continuous downstream flow. Further, because this method isolates the stream flow from the construction activities, the only downstream turbidity that is created is transient conditions of short duration during the dam installation. Both methods require that the waterway is dewatered in the construction area by pumping the standing water into a dewatering structure on the banks. The streamed material is then segregated and stockpiled to prevent mixing with other materials and used during the stream restoration process. In terms of adverse environmental effects and practicability, these two methods are essentially equivalent."

**Alternative 4: Rock removal methods for trenched pipeline installation**

"If bedrock is encountered during trenching, TGP plans to remove such bedrock using one of the techniques detailed below. The technique selected by TGP's construction contractor will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location. Techniques to be used are the following:

    1. Conventional excavation with an excavator;

    2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;

    3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;

    4. Removal by rock trencher; or

    5. Controlled blasting and excavation with a backhoe."

"[The conventional excavation] method consists of using a backhoe to dig a trench. It is most effective in poorly or unconsolidated materials, such as a dry stream bed underlain by fluvial materials. In conditions supporting its use, including unconsolidated substrate materials that can be relatively easily removed, Conventional Excavation ("CE") presents little environmental risk to water quality and is the most practicable alternative considering technical feasibility, logistics, and costs. However, in instances where tougher substrate materials are present, this alternative may not be practicable because of technical infeasibility. Accordingly, CE will not be used to trench across channels with exposed bedrock substrate. For channels covered by unconsolidated materials overlying bedrock at greater depths, CE will be used to depths at which it is practicable, but removal of deeper materials will necessitate selection among the additional methods described below."

"[The ripping] method makes use of an excavator equipped with concave tooth that is inserted into and dragged through substrate materials. After ripping, a conventional excavator is used to remove the dislodged materials from the trench. For streams at which bedrock is encountered at or beneath the streambed surface, ripping will be the preferred alternative in terms of least environmentally adverse effects because it confers little or no risk of hydrologic loss."

"[The hammering method] entails use of a pneumatic tool attached to a backhoe boom to break apart substrate materials. After hammering, a conventional excavator is used to remove the dislodged materials from the trench. Hammering is time-consuming and increases construction costs considerably in comparison with CE or ripping. Further, hammering exposes equipment operators to prolonged hours on the work-site, potentially resulting in safety risks. Hammering also entails a risk of fracturing potentially resulting in hydrologic loss."

"[The rock trenching] method uses a large trenching machine to cut through bedrock. Although costly to mobilize, this method can reduce construction time at the work site. Primary disadvantages

AR  003671

are cost and inaccessibility for many sites where tight space or steep slopes prevent the effective use of the equipment."

"At stream crossings, TGP's construction contractor will evaluate and attempt the use of [each of the] Techniques 1-4 described above based on the conditions observed at the time of construction to determine the best method for rock removal and excavation. If [Techniques 1-4 are] unsuccessful for rock removal and excavation at stream crossings, Technique 5 (controlled blasting) will be considered in non-karst areas or in wetlands or streams with an unacceptable risk of hydrologic loss. The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location at which a bedrock substrate has been identified (see [Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "Aquatic Resource Alteration Permit (ARAP) Application and State 401 Water Quality Permit" submitted to the Division on July 22, 2022, as part of the initial permit application package]). If controlled blasting is necessary at a waterbody or wetland crossings, TGP's construction contractor will utilize a dry-ditch crossing method (either dam-and-pump or flume crossing) and adhere to 1) all applicable federal, state, and local regulations, including the FERC Procedures, USACE and TDEC permit conditions, 2) Draft Blasting Plan (see ["Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package], and 3) karst mitigation measures. Immediately following blasting, TGP would remove rock that impedes stream flow."

"The use of the dry open cut method with controlled blasting will only be used if other rock removal methods have been evaluated but deem impracticable. TGP anticipates that controlled blasting will be used rarely to facilitate waterbody crossings. In no event will controlled blasting be used in karst-prone areas or wetlands. A desktop analysis of the study area has identified a few areas of shallow bedrock where controlled blasting may become necessary to cross certain waterbodies using the dry open cut construction method (see [Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "Aquatic Resource Alteration Permit (ARAP) Application and State 401 Water Quality Permit" submitted to the Division on July 22, 2022, as part of the initial permit application package]). TGP's Draft Blasting Plan is provided in ["Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package]. In the unlikely event that controlled blasting is needed, a qualified contractor will review and update this plan to address the specific circumstances of each dry open cut waterbody crossing that requires controlled blasting to remove rock. A qualified Project biologist will survey the area immediately in advance of the controlled blasting activities, including any drilling. for the presence of any sensitive species. Once cleared, holes will be drilled into the streambed and carefully loaded with explosives and packed with aggregates. A pre-blast safety check will then be performed followed by the controlled detonation of the explosives, which will result in a small release of dust and mounding of the surface. The use of controlled blasting would drastically minimize the duration of in-stream work and temporary disruptions to stream flow. The overall area of construction impacts when using controlled blasting is significantly smaller in comparison to other construction methods and results in less costs given reduced time in the workspace. However, the use of controlled blasting may confer a higher risk of loss of stream flow than other crossing construction methods; thus, it is not generally considered to be the [least environmentally damaging practicable alternative] at locations where other methods are feasible and practicable. Although TGP expects the use of blasting for the removal of rock at waterbody crossing for the Project to be limited and has eliminated the use of controlled blasting for rock removal for use in karst-prone areas, crossing conditions at non-karst prone locations

AR  003672

where CE, ripping, hammering, or rock trenching are technically infeasible to dislodge bedrock materials may require controlled blasting as the only practicable alternative. In these instances, TGP will ensure that controlled basting is localized and isolated to within the trench line to minimize the movement of materials outside of the waterbody. Drill patterns will be set so that they achieve smaller rock fragments, which will allow for the use of as much of the fragmented rock as possible when restoring the trench to its pre-construction condition. Rock fragments also will be shifted, as needed, to maintain the contours and flow patterns of the waterbody after the blasting is complete."

"TGP will not utilize the dry open cut crossing method with controlled blasting for rock removal in wetland habitats."

**Alternative 5: Pipeline installation via trenchless methods vs. open-cut trenching**

"The HDD method is a trenchless construction procedure in which a waterbody is crossed by pulling the prefabricated pipeline into place using drilled boreholes. In this procedure, a small diameter pilot hole is drilled down from an entry point to an exit point by pumping a slurry mixture of bentonite clay, drilling additives, and water into the ground at high pressure. The hole is then widened, and the pipeline is pulled into position. The HDD method has been a standard construction procedure for linear pipeline installations across large waterbodies since the 1970s. This construction procedure drastically reduces the impacts to waterbodies and their aquatic environments by drilling down and under the sensitive resource, resulting in the surface area between the entry and exit point remaining relatively undisturbed. While the HDD method is a proven technology for pipeline installations, there is still the potential that the HDD method can fail for reasons such as encountering soil conditions that are not conducive to boring, borehole collapse, and loss of the drill string or drilling fluid return. TGP has performed a feasibility analysis of the study area to determine if HDD is a viable waterbody crossing method. This analysis included geological surveys, reviews of nearby public drinking water sources, private wells, and mining activities (active and abandoned). Three (3) HDDs are being proposed for the Project at the following waterbodies: (1) Yellow Creek, (2) Jones Creek, and (3) Wells Creek. Prior to the final HDD determination, TGP conducted geotechnical investigations in June 2022 at each of these three crossings to assess the characteristics of the geologic formations. This information was reviewed, and it was confirm that a HDD is technically feasible for each crossing given the specific geology evaluated by project engineers to ensure the HDD has a high rate of success."

"Conventional boring consists of creating a shaft/tunnel for a pipe or conduit to be installed to minimize surface disturbance. This is accomplished by first excavating a bore pit and a receiving pit. The bore pit is excavated to a depth slightly deeper than the depth of the associated trench and is graded such that the bore will follow the proposed angle of the pipe. A boring machine is then lowered to the bottom of the bore pit to tunnel using a cutting head mounted on an auger. The auger rotates through a bore casing, both of which are pushed forward as the hole is cut. The pipeline is then installed through the bored hole and welded to the adjacent pipeline. The typical workspace configurations required for boring operations consist of staging areas (50 feet by 100 feet) for boring machine setup, cuttings/return settlement and storage pits, pipe storage, entrance and exit pit spoil storage, and construction equipment necessary to support the operation. Major factors limiting the success of a boring operation under waterbodies for the Project include the crossing distance, subsurface soil and geologic conditions, and existing topography. Boring operations typically occur over a crossing distance of 50 to 60 feet. The maximum length a bore could achieve

AR 003673

in ideal soil conditions typically does not exceed 400 feet. Subsurface soil and geologic conditions must be conducive to establishing and maintaining a safe bore pit excavation, as well as provide the capabilities for the boring equipment to conduct a successful bore. Loosepacked sediment, free of rock material, is preferred when conducting boring operations. The topographic conditions for most waterbody crossing locations on this Project also limit the use of this method, as preferred locations are generally consistent with level or moderately convex terrain, such that the depth of the bore pit does not present concerns relative to constructability or safety constraints."

"TGP considered six (6) factors when evaluating the use of HDD or conventional bore crossing methods versus a dry open-cut method for Project waterbody crossings: (1) the length of the crossing, (2) the potential for risk of loss of drilling fluid (i.e., inadvertent/lost returns), (3) geological considerations, and (4) length of time of the crossing (5) worker safety and technical feasibility, and (6) cost of the crossing method. For a 30-inch diameter pipe, as will be installed for the Project, the minimum distance needed to achieve the necessary radius for the HDD pipe string is approximately 1,300 feet, which means that each HDD must be at least 1,300 feet long, regardless of the width of the feature it is avoiding in order to reduce stress pressure on the pipeline. Considering the undulating topography of the Project area, many HDD entry/exit pads or conventional bore entry/exit pits likely would be located on slopes, which create a construction safety and technical feasibility challenge. Further, given the need for HDD or conventional bore entry and exit pads or pits to be at or near the same elevation to promote drill cutting returns, use of these methods in hilly terrain may not be practicable. For example, if either the entry or exit points is at a higher location than the other, greater annular pressure is needed to facilitate the drill cutting returns. This increase in pressure could contribute to additional risks of inadvertent returns to the formation or to the surface. Inadvertent returns are characterized by drilling fluid flowing through the underlying formation and finding a pathway of least resistance to the surface or to voids in the formation. These returns may be expressed on land or in the feature that is being avoided. Although the drilling fluid is generally inert bentonite clay that is not toxic or harmful, it may be discharged to downstream waters. In that event, inadvertent returns would be contained and cleaned up once identified. Costs associated with an HDD and Conventional Bore, in general, may be five (5) times more per foot than costs for a conventional crossing using open cut methods, which can become prohibitive to the Project budget (see ["Attachment 9 – Summary of Trenchless Construction Methods for the Cumberland Project" submitted to the Division on July 22, 2022, as part of the initial permit application package]). Geology plays a major role in the success of an HDD or conventional bore. In an area without the appropriate geology to support an HDD or conventional bore, the drilling hole will not maintain its integrity and could collapse, causing delays. In other areas, if the geology contains large boulders or voids, the drilling head cannot negotiate these obstacles and the bore may fail. Further, for a HDD, in order for the radius of the drill and pipe to be maintained, the boring must be made to greater depths in the formation, potentially impacting groundwater resources or karst topography. HDD and conventional bores take more time to complete than open cut crossings due to the amount of drilling equipment necessary, the mobilization and demobilization of the drilling equipment, the drilling itself, pipe preparation, and for a HDD, the pullback of the pipeline. For the proper pullback of the pipeline, the same length of construction workspace is needed to accommodate a straight entry into the exit point of the HDD. In some cases, due to pipeline inflections, and the lack of available straight construction workspace, a false ROW may be needed, thus increasing potential impacts. A false ROW is a work area approximately 50 feet wide by the length of the HDD pullback section that is prepared to stage the pipeline. Generally, HDDs can take a month or longer to complete. HDDs occur over a longer timeframe with continuous activities throughout the procedure in comparison

Page 42 of 187

AR 003674

to open cut methods. During this time, there is the possibility of impacts to noise sensitive areas, inadvertent returns, and equipment failures throughout the duration of the HDD. When comparing an HDD or conventional bores to conventional open cuts of streams/wetlands, the issues associated with the HDDs and conventional bores are reduced or mitigated by the use of open cut methods. For example, the trench line for open-cut methods is much shallower across a stream, thus minimizing the potential impact to deep geological features. Also, there is no need for long pull back sections for conventional open cut crossings because there is no minimum length of pipeline that is needed to cross a stream. The length of the pipeline is dictated by the stream width, not the necessity to maintain a certain radius to reduce pipe stressors, as is the case with an HDD. There are no risks of inadvertent returns for a conventional open cut crossing as no drilling fluid is used during the process. The conventional open cut crossing is a straightforward digging of the trench line, installing the pipeline, and backfilling with native material. At all times during a conventional dry open cut of a stream, the contactor is able to see the trenchline and the surrounding work zone, unlike that of a HDD or conventional bore, which increases the safety factor. Also, in general, it takes one to two days to complete a conventional open cut crossing (if not using controlled blasting for rock removal), as opposed to at least one month for an HDD or up to 10 days for a conventional bore. While the timing of an open cut crossing can be extended for certain reasons, such as weather, stability of the trench line, and water flow, the time for an open cut crossing is still much less than that for an HDD. Notwithstanding the concerns outlined above, HDDs are proposed for certain crossings to avoid environmental impacts at two Natural Rivers Inventory stream reaches (Jones Creek and Yellow Creek) and due to the physical characteristics of Wells Creek. The HDD at Yellow Creek will also avoid direct impacts to one of its unnamed tributaries."

Based on the available information the Division has made a preliminary determination that applicant has demonstrated that the route selection method and proposed process for determining the appropriate crossing method will result in the use of the least impactful practicable alternative to accomplish the project purpose.

## Existing Conditions/ Proposed Loss of Resource Values

### Streams

Jurisdictional streams identified within the project impact areas are characterized by predominantly silt/clay substrates. Several intermittent and perennial streams within the study area are characterized by bedrock, cobble, and gravel substrates. Fish, amphibians, and populations of benthic macroinvertebrates were observed in some of the streams during TGP's on-site aquatic resource inventory. A summary of stream channel dimensions and general characteristics can be found in Table D-1 within "TGP & USACE Cumberland Project – TDEC Field Review / Revisions (Supplement 1)", dated September 26, 2022.

### Reservoir

Barkley Reservoir (Cumberland River) is located adjacent to the existing TVA Cumberland Fossil Plant in Cumberland City, Tennessee. This segment of the reservoir is an Exceptional Tennessee Water due to the observed presence of state-listed aquatic animal species.

### Wetlands

The wetlands to be impacted by the project are characteristic of low to moderate resource value wetlands typically found in the region. Dominant tree species in the PFO wetlands along the proposed alignment includes red maple (*Acer rubrum*), sweetgum (*Liquidambar styraciflua*), tulip poplar (*Liriodendron tulipifera*), and blackgum/black tupelo (*Nyssa sylvatica*). Dominant herbaceous species in the PEM wetlands along the proposed alignment includes bluestem (*Andropogon* spp.), soft rush (*Juncus effusus*),

AR 003675

beaksedge (*Rhynchospora* spp.), blackberry (*Rubus argutus*), goldenrod *(Solidago elliottii)*, and dog fennel (*Eupatorium capillifolium)*.

Permanent impacts to streams and wetlands include ongoing vegetation management in riparian zones. A corridor above the pipeline and up to 10 feet wide may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state, resulting in conversion of plant communities in forested riparian zones and forested wetlands to herbaceous/emergent or scrub-shrub plant communities. In addition, individual trees that are located within 15 feet of the pipeline that have roots that could compromise the integrity of the pipeline coating may be cut and removed from the permanent right-of-way. These impacts will not result in loss of wetland acreage.

Temporary wetland and stream impacts will be mitigated by returning impacted areas to original elevation and condition following appropriate erosion prevention and sediment control measures. All features that are temporarily impacted will be monitoring annually for three years following completion of project construction to ensure no net loss of resource value by the Division.

In an email from TWRA to consultants of TGP dated August 31, 2022 (provided in Attachment 6 of the documented entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022), TWRA states:

> "It is TWRA's understanding that state listed species (outlined in TWRA's consultation from August, 2, 2022) will not be impacted by the current design of the project" and "With the above understandings, TWRA agrees that time-of-year restrictions for state protected species do not apply to the Cumberland Project, and that the project will have no effect on state listed species." On October 3, 2022, TWRA conveyed to a consultant of TGP via email that "The TWRA has no concerns for non-listed aquatic species as outlined by the project location that was presented to TWRA on 7/19/2022."

In a letter to a consultant of TGP dated June 29, 2021 (provided with initial permit application materials submitted to the Division on July 22, 2022 in "Attachment 4 – Agency Correspondences"), the TDEC Division of Natural Areas states:

> "The Division of Natural Areas - Natural Heritage Program has reviewed the location of the proposed project workspace with respect to rare plant species. While the extent of the project (33.2 miles) makes the project more likely to encounter rare species at previously unsurveyed locations, the current project route is mostly confined to a previously established ROW and comes within one mile of just two rare plant records – neither of which are in the project area - at the easternmost extent of the route. Thus, we do not anticipate any impacts to known occurrences of rare, threatened, or endangered plant species from this project and believe risk to unknown occurrences is minimal."

The Division has made a preliminary determination that the overall activities, if conducted in accordance with the submitted plans and permit conditions, will not result in any appreciable permanent loss of resource values.

**Mitigation Required**

The Division has made a preliminary determination that the proposed impacts to jurisdictional waters, if carried out in accordance with the permit's conditions, will result in *de minimis* degradation; therefore, compensatory mitigation is not required.

AR 003676

**Social or Economic Justification Information**

Formal social and economic justification for the impacts associated with this activity is not required based on the Division's preliminary determination that the proposed impacts to jurisdictional waters will result in *de minimis* degradation. However, the applicant has provided the following information on social and economic justification:

"… construction of the Project will have a net positive impact on local and regional businesses within counties impacted by the Project. TGP estimates that approximately $17,300,000 in Dickson County, $8,100,000 in Houston County, and $1,300,000 in Stewart County ($26,700,000 total) will be distributed in construction payroll for personnel working at the various Project sites over the 12-month construction period. During construction, it is anticipated that 20 to 30 percent of worker payroll will be spent locally by both local and nonlocal workers for the purchase of housing, food, gasoline, entertainment, and luxury items. The dollar amount would be dependent on the number of construction workers employed at any given time and the duration of the non-local worker's residence in the Project area.

It is also anticipated that some portion of construction materials will be purchased locally. Material purchases, including construction equipment, pipe, and valves, are estimated to be $16,500,000 in Dickson County, $6,800,000 in Houston County, and $2,200,000 in Stewart County ($25,500,000 total), including freight and taxes. An additional $71,000,000 in Dickson County, $34,500,000 in Houston County, $3,900,000 in Stewart County ($109,400,000 total) will be spent by TGP on other construction related expenditures, for a total estimated construction cost of $161,600,000. These payroll and materials expenditures will have a positive impact on the local economy.

Construction and operation will result in increased tax revenues for the state of Tennessee, Dickson County, Houston County, and Stewart County, and potentially other local taxing authorities. The prevailing state sales tax rate for most items in Tennessee is seven percent. An additional 2.75 percent county sales tax is levied in Dickson and Houston counties. In Stewart County, an additional 2.25 percent sales tax is levied. Assuming all material purchases are taxed at an effective sales tax rate of 9.25 percent, TGP will pay approximately $2,300,000 in sales tax during construction. Once in operation, TGP will also pay ad valorem taxes based on the assessed value of the Project facilities. TGP estimates paying approximately $2,400,000 annually in ad valorem taxes on average over the first 10 years of Project operations. Ad valorem taxes are anticipated to be paid annually at similar or higher levels for the remaining life of the Project.

Although the preferred Cumberland Pipeline route that is co-located generally with an existing TVA powerline easement and other utility easements (for approximately 80 percent of its length) is the [Least Environmentally Damaging Practicable Alternative], other routes extending from TGP's existing interstate natural gas pipeline system to TVA's Cumberland Fossil Plant would not vary in terms of socioeconomic benefits. Use of an alternate route would unnecessarily result in land-use disruptions that have primarily already occurred in constructing and maintaining the TVA powerline easement and other utility easements. Social and economic consequences to property owners or local communities of the considered crossing methodologies summarized in [Table 1 of this permit and Table 10.5-1 of TGP's initial permit application materials] would be minor, and would not materially vary, as the method to be implemented at each crossing is limited in area and length with no more than localized, temporary effects.

Page 45 of 187

AR 003677

The Project is not anticipated to have significant adverse impacts during construction or operation on population, employment, regional or local services, traffic or transportation, residences or businesses, or minority communities. In addition, TGP has identified environmental justice communities near the location of the Project, and will continue to identify and address any concerns of these environmental justice communities (designated below poverty level but not with disproportionately high minority populations). TGP's communication and involvement with the environment justice communities is ongoing and will continue through the certificate, permitting, construction, and restoration phases of the Project. TGP will continue its engagement of minority and low-income populations in proximity to the proposed Project through meaningful participation and coordination with community leaders and groups within environmental justice communities. TGP plans to take the following steps during the certificate, permitting, construction, and restoration phases of the Project to continue to inform and engage environmental justice communities: (1) beginning in the third quarter 2022, conduct small group discussions (e.g., 5-10 people) with community leaders and organizations in environmental justice communities to discuss the Project and any concerns or issues; (2) beginning in the third quarter 2022, provide formal presentations to groups in the impacted environmental justice communities; (3) distribute Project information to community partners for further distribution within their communities; and (4) translate certain Project materials for distribution within environmental justice communities, as well as portions of the Project website, Overall, Project construction activities are anticipated to have temporary, short-term impacts on population, housing, public services, and traffic and transportation, and will provide an overall net positive impact on employment and the local economy when the Project is operational."

**Antidegradation**

In accordance with the Tennessee Antidegradation Statement (Rule 0400-40-03-.06):

For impacts to streams in the TDEC Waterbodies known as Unnamed tributaries to Harpeth River, Jordan Branch, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, and Wells Creek, the Division has made a preliminary determination that the proposed activities will result in *de minimis* degradation of waters with available parameters for habitat alteration and/or water withdrawals without mitigation, and will not result in an appreciable permanent loss of resource values.

For impacts to Barkley Reservoir, the Division has made a preliminary determination that the proposed activities will result in *de minimis* degradation of Exceptional Tennessee Waters without mitigation, and will not result in an appreciable permanent loss of resource values.

For impacts to streams in the TDEC Waterbody known as Unnamed tributaries to Jones Creek, the Division has made a preliminary determination that the proposed activities will result in no significant degradation in a waterbody with unavailable parameters for habitat alteration because the proposed activities will not result in an appreciable permanent loss of resource values.

For impacts to jurisdictional wetlands, the Division has made a preliminary determination that the proposed activities will result in *de minimis* degradation of waters with available parameters for alteration without mitigation, and will not result in an appreciable permanent loss of resource values.

For more information please reference Tennessee's Antidegradation Statement which is found in Chapter *0400-40-03* of the Rules of the Tennessee Department of Environment and Conservation.

Page 46 of 187

JA1996

Cumberland Gas Pipeline Project; NRS22.192
§401 Water Quality Certification

**Tables**

Table 3: list of features proposed for impact that have been identified by TDEC to be WWCs.

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SDKA001 | UT to Jordan Branch | N/A (WWC) | N/A (WWC) | 36.1730 | -87.2174 | 112.2 |
| SDKA002 | UT to Jordan Branch | N/A (WWC) | N/A (WWC) | 36.1733 | -87.2176 | 10.8 |
| SDKA012 | UT to Jones Creek | N/A (WWC) | N/A (WWC) | 36.1979 | -87.2590 | 99.1 |
| SDKA015 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.1984 | -87.2649 | 55.5 |
| SDKA016 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.1989 | -87.2655 | 20.9 |
| SDKA017 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2025 | -87.2730 | 97 |
| SDKA019 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2032 | -87.2735 | 76.9 |
| SDKA020 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2078 | -87.2827 | 127 |
| SDKA024 | UT to Upper Sugar Camp Branch | N/A (WWC) | N/A (WWC) | 36.1663 | -87.2063 | 93.2 |
| SDKA028 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2114 | -87.2891 | 14.7 |
| SDKA029 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2121 | -87.2909 | 75.3 |
| SDKA030 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2141 | -87.2944 | 33.2 |
| SDKA031 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2101 | -87.2907 | 40.4 |
| SDKA035 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2186 | -87.3039 | 43.1 |

AR 003679

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SDKA037 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2237 | -87.3132 | 76.2 |
| SDKA040 | UT to Harris Branch | N/A (WWC) | N/A (WWC) | 36.2291 | -87.3231 | 111.4 |
| SDKA047 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2749 | -87.4715 | 109 |
| SDKA050 | UT to Jones Creek | N/A (WWC) | N/A (WWC) | 36.1896 | -87.2484 | 79.3 |
| SDKA056 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2747 | -87.4652 | 60 |
| SDKA057 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2747 | -87.4652 | 91.2 |
| SDKB006 | UT to Nesbitt Branch | N/A (WWC) | N/A (WWC) | 36.2441 | -87.3658 | 80 |
| SDKB007 | UT to Nesbitt Branch | N/A (WWC) | N/A (WWC) | 36.2455 | -87.3687 | 72 |
| SDKB010 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2585 | -87.4036 | 80.3 |
| SDKB013 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2649 | -87.4211 | 174.3 |
| SDKB015 | UT to Woods Valley Branch | N/A (WWC) | N/A (WWC) | 36.2670 | -87.4302 | 95.4 |
| SDKB016 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2683 | -87.4353 | 78.7 |
| SDKB017 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2691 | -87.4373 | 77.6 |
| SDKB018 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2696 | -87.4396 | 297.9 |

Page 48 of 187

AR 003680

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SDKB019 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2706 | -87.4435 | 97.3 |
| SDKB020 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2710 | -87.4460 | 70 |
| SDKB024 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2740 | -87.4609 | 74 |
| SDKR002 | UT to Furnace Creek | N/A (WWC) | N/A (WWC) | 36.2474 | -87.3755 | 125.3 |
| SDKR003 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2609 | -87.4118 | 75.4 |
| SDKR004 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2609 | -87.4118 | 26.4 |
| SDKR006 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2609 | -87.4118 | 94.2 |
| SDKR007 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2656 | -87.4237 | 106.8 |
| SDKR009 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2671 | -87.4301 | 11.3 |
| SDKR010 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2881 | -87.5081 | 115.1 |
| SDKR011 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2893 | -87.5121 | 96.2 |
| SHNA002 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3401 | -87.6140 | 5.4 |
| SHNA003 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3404 | -87.6145 | 50 |
| SHNA005 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3406 | -87.6148 | 38.7 |

Page 49 of 187

AR 003681

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SHNA007 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3429 | -87.6182 | 20 |
| SHNA013 | UT to Lickskillet Branch | N/A (WWC) | N/A (WWC) | 36.3557 | -87.6390 | 124.4 |
| SHNB031 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3429 | -87.6182 | 83 |
| SHNB032 | UT to Lickskillet Branch | N/A (WWC) | N/A (WWC) | 36.3558 | -87.6400 | 84.2 |
| SHNB034 | UT to Lickskillet Branch | N/A (WWC) | N/A (WWC) | 36.3663 | -87.6556 | 77.9 |
| SHNC001 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.3376 | -87.6087 | 56.6 |
| SHNC002 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.3401 | -87.6140 | 17.6 |
| SHNC003 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.3404 | -87.6145 | 93.3 |
| SHNC004 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2978 | -87.5409 | 71.9 |
| SHNC005 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.297882 | -87.5421 | 110 |
| SHNC006 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.2986 | -87.5439 | 74 |
| SHNC006 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.2985 | -87.5451 | 80 |
| SHNC015 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3038 | -87.5628 | 124.7 |
| SHNC016 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3041 | -87.5630 | 98.5 |

Page 50 of 187

AR 003682

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SHNC017 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3038 | -87.5626 | 81.6 |
| SHNC019 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3099 | -87.5766 | 77.2 |
| SHNC021 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3106 | -87.5796 | 87.1 |
| SHNC022 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3114 | -87.5814 | 116.4 |
| SHNC023-2 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3187 | -87.5878 | 20.6 |
| SHNC024 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3130 | -87.5847 | 80.7 |
| SHNC025 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3141 | -87.5860 | 89.7 |
| SHNC041 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2951 | -87.5318 | 75.2 |
| SHNC042 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2945 | -87.5296 | 83 |
| SHNE001 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3070 | -87.5710 | 134.1 |
| SHNE002 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3099 | -87.5770 | 12 |
| SHNE002 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3098 | -87.5770 | 90 |
| SHNE004 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3252 | -87.5947 | 64 |
| SHNE004 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3253 | -87.5948 | 76 |

Page 51 of 187

AR 003683

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SHNE005 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3267 | -87.5955 | 102 |
| SHNE006 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3268 | -87.5957 | 76.1 |
| SHNE007 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3225 | -87.5920 | 77.2 |
| SHNW002 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2909 | -87.5186 | 22.5 |
| SHNW003a | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2945 | -87.5231 | 162 |
| SHNW004a | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2931 | -87.5251 | 79.6 |

[1] All features listed above are considered WWCs by the State of Tennessee, and do not require an Aquatic Resource Alteration Permit for the alterations proposed. In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), the impacts to WWCs shall require no notice or approval, and do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions in the Tennessee Water Quality Control Act 69-3-108(q).

Page 52 of 187

AR  003684

Cumberland Gas Pipeline Project; NRS22.192
§401 Water Quality Certification

**Site maps**

Note: PDF versions of these maps, which may enhance visibility of map features, can be found in "Attachment 1 – Updated Aerial and USGS Figures" in the RAI response document submitted by TGP to the Division on December 1, 2022. Photos of each waterbody crossing are available in the document entitled "Attachment 3 – Project Design Plans and Permit Drawings" submitted with the initial permit application packaged to the Division on July 22, 2022.



AR  003685



Page 54 of 187

AR 003686



Page 55 of 187

AR 003687



JA2006

AR 003688



Page 57 of 187

AR  003689



JA2008

AR  003690



Potentially Jurisdictional Waters of the United
States within the Cumberland Project
Page 2 of 125
Cumberland Project
Dickson, Houston & Stewart Counties, Tennessee

Page 59 of 187

AR  003691



AR  003692



Page 61 of 187

AR 003693



Page 62 of 187

AR 003694



Page 63 of 187

AR  003695



Page 64 of 187

AR  003696



Page 65 of 187

AR  003697



JA2016

AR  003698



Page 67 of 187

AR 003699



JA2018

AR 003700



JA2019

AR 003701



Page 70 of 187

AR 003702



JA2021

AR 003703



AR 003704



JA2023

AR 003705



JA2024

AR 003706



Page 75 of 187

AR 003707



Page 76 of 187

AR  003708



Page 77 of 187

AR 003709



Page 78 of 187

AR 003710



Page 79 of 187

AR 003711



Page 80 of 187

AR 003712



JA2031

AR  003713



Page 82 of 187

AR 003714



JA2033

AR 003715



AR 003716



AR 003717



JA2036

AR 003718



JA2037

AR 003719



Page 88 of 187

AR  003720



Page 89 of 187

AR 003721



JA2040

AR 003722



JA2041

AR 003723



AR  003724



JA2043

AR 003725



Page 94 of 187

AR 003726



Page 95 of 187

AR 003727



AR 003728



Page 97 of 187

AR 003729



AR 003730



Page 99 of 187

AR 003731



AR  003732



JA2051

AR 003733



AR 003734



AR 003735



Page 104 of 187

AR 003736



AR 003737



Page 106 of 187

AR 003738



JA2057

AR  003739



AR  003740



Page 109 of 187

AR 003741



Page 110 of 187

AR 003742



Page 111 of 187

AR 003743



JA2062

AR 003744



Page 113 of 187

AR 003745



AR 003746



AR 003747



AR 003748



Page 117 of 187

AR 003749



AR 003750



AR 003751



Page 120 of 187

AR 003752



JA2071

AR  003753



Page 122 of 187

AR 003754



Page 123 of 187

AR 003755



Page 124 of 187

AR 003756



AR 003757



AR 003758



Page 127 of 187

AR 003759



Page 128 of 187

AR 003760



Page 129 of 187

AR 003761



AR 003762



AR  003763



Page 132 of 187

AR 003764



AR 003765



Page 134 of 187

AR 003766



Page 135 of 187

AR 003767



JA2086

AR 003768



AR 003769



Page 138 of 187

AR 003770



Page 139 of 187

AR 003771



Page 140 of 187

AR 003772



Page 141 of 187

AR 003773



Page 142 of 187

AR 003774



Page 143 of 187

AR 003775



Page 144 of 187

AR 003776



Page 145 of 187

AR 003777



Page 146 of 187

AR 003778



JA2097

AR 003779



Page 148 of 187

AR 003780



Page 149 of 187

AR 003781



Page 150 of 187

AR 003782



Page 151 of 187

AR 003783



Page 152 of 187

AR 003784



Page 153 of 187

AR 003785



Page 154 of 187

AR 003786



Page 155 of 187

AR 003787



Page 156 of 187

AR 003788



JA2107

AR 003789



Page 158 of 187

AR 003790



Page 159 of 187

AR  003791



AR 003792



Page 161 of 187

AR 003793



AR 003794



Page 163 of 187

AR 003795



AR 003796



Page 165 of 187

AR 003797



Page 166 of 187

AR 003798



Page 167 of 187

AR 003799



Page 168 of 187

AR 003800



Page 169 of 187

AR 003801



Page 170 of 187

AR 003802



Page 171 of 187

AR  003803



Page 172 of 187

AR 003804



Page 173 of 187

AR  003805



Page 174 of 187

AR 003806



Page 175 of 187

AR 003807



JA2126

AR  003808

Cumberland Gas Pipeline Project; NRS22.192
§401 Water Quality Certification



Above: proposed water withdrawal locations.

AR 003809

**Plans and drawings**

Note: full sized PDFs of the drawings and photos of each waterbody crossing are available in the document entitled "Attachment 3 – Project Design Plans and Permit Drawings" submitted with the initial permit application packaged to the Division on July 22, 2022. Note that minor revisions to pipeline alignment are shown in updated maps and plans found in "Attachment 1 – Revised USGS Figure" in the RAI response document submitted by TGP to the Division on March 17, 2023.



Page 178 of 187

AR 003810



NOTES:
1.  THE PURPOSE OF THIS TYPICAL CONSTRUCTION RIGHT–OF–WAY CROSS–SECTION DIAGRAM IS TO SHOW WIDTHS AND RELATIVE LOCATIONS OF EXISTING RIGHTS–OF–WAY, NEW PERMANENT RIGHT–OF–WAY, AND TEMPORARY CONSTRUCTION RIGHT–OF–WAY.
2.  THIS DRAWING IS REPRESENTATIVE OF THE TYPICAL CONSTRUCTION WORK SPACE.   SEE CONSTRUCTION ALIGNMENT SHEETS FOR SITE SPECIFIC DETAILS.
3.  ADDITIONAL TEMPORARY WORK SPACE (ATWS) IS REQUIRED NEAR ROAD AND STREAM CROSSINGS, SIDE SLOPES, AND OTHER AREAS WITH UNIQUE CONSTRUCTION REQUIREMENTS.   (SEE ALIGNMENT SHEETS FOR ATWS)
4.  AT LOCATIONS WITH CULTIVATED LAND, TOPSOIL SEPARATION WILL BE COMPLETED FOR THE, TRENCH, SPOIL PILE, AND WORKING SIDE.   AT FORESTED AND NON–CULTIVATED AREAS TOPSOIL SEPARATION WILL BE COMPLETED FOR THE TRENCH AND SPOIL PILE.
5.  DRAWING IS NOT TO SCALE.

| | REVISIONS | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR |

**Tennessee Gas Pipeline Company, L.L.C.**
a Kinder Morgan Company

TABLEROCK SURVEY LLC
2204 TIMBERLOCH PL., STE. 180
THE WOODLANDS, TX 77380
OFFICE: 832-415-3869
TBPELS FIRM NO. 10194261

PROPOSED 30" PIPELINE
ADJACENT TO TGP PIPELINE
TYPICAL CONSTRUCTION RIGHT–OF–WAY

| DATE: 04/05/2022 | DRAWN BY: EPG | APPROVED BY: CDW |
|---|---|---|
| SCALE: N.T.S. | P2021-1119-STD-0001 | SH. 1 OF 3 |



JA2130

AR 003812



1. THE PURPOSE OF THIS TYPICAL CONSTRUCTION RIGHT—OF—WAY CROSS—SECTION DIAGRAM IS TO SHOW WIDTHS AND RELATIVE LOCATIONS OF EXISTING RIGHTS—OF—WAY, NEW PERMANENT RIGHT—OF—WAY, AND TEMPORARY CONSTRUCTION RIGHT—OF—WAY.
2. THIS DRAWING IS REPRESENTATIVE OF THE TYPICAL CONSTRUCTION WORK SPACE. SEE CONSTRUCTION ALIGNMENT SHEETS FOR SITE SPECIFIC DETAILS.
3. ADDITIONAL TEMPORARY WORK SPACE (ATWS) IS REQUIRED NEAR ROAD AND STREAM CROSSINGS, SIDE SLOPES, AND OTHER AREAS WITH UNIQUE CONSTRUCTION REQUIREMENTS. (SEE ALIGNMENT SHEETS FOR ATWS)
4. AT LOCATIONS WITH CULTIVATED LAND, TOPSOIL SEPARATION WILL BE COMPLETED FOR THE, TRENCH, SPOIL PILE, AND WORKING SIDE. AT FORESTED AND NON—CULTIVATED AREAS TOPSOIL SEPARATION WILL BE COMPLETED FOR THE TRENCH AND SPOIL PILE.
5. DRAWING IS NOT TO SCALE.

| REVISIONS | | | | | | | PROPOSED 30" PIPELINE |
|---|---|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR | | ABUTTING TVA EASEMENT |
| | | | | | | | TYPICAL CONSTRUCTION RIGHT—OF—WAY |

Tennessee Gas Pipeline Company, L.L.C.
a Kinder Morgan Company

TABLEROCK SURVEY LLC
2204 TIMBERLOCH PL, STE. 180
THE WOODLANDS, TX 77380
OFFICE: 832—415—3869
TBPELS FIRM NO. 10194261

DATE: 04/05/2022    DRAWN BY: EPG    APPROVED BY: CDW
SCALE: N.T.S.    P2021—1119—STD—0001    SH.3 OF 3

Page 181 of 187

AR 003813



TYPICAL ADDITIONAL TEMPORARY WORK SPACE AT CREEK CROSSINGS

NOTES:

1. THIS TYPICAL WORK SPACE LAYOUT WILL BE ADJUSTED TO ACCOMMODATE SITE-SPECIFIC CONDITIONS.

2. THE SIZE OF THE ADDITIONAL TEMPORARY WORKS SPACE (ATWS) WILL VARY WITH THE DEPTH OF THE CREEK, STEEPNESS OF THE SURROUNDING SLOPES, AND OTHER CONDITIONS.

AR 003814



PLAN VIEW

NOTES:

1. METHOD APPLIES TO WATERBODIES WHERE DOWNSTREAM SILTATION MUST BE AVOIDED. FLUMES ARE GENERALLY NOT RECOMMENDED FOR USE ON WATERBODIES WITH A BROAD UNCONFINED CHANNEL, PERMEABLE SUBSTRATE, EXCESSIVE DISCHARGE, OR WHERE A SIGNIFICANT AMOUNT OF BED OR BANK ALTERATION IS REQUIRED TO INSTALL FLUMES OR DAMS.

2. SCHEDULE CROSSING DURING LOW FLOW PERIOD IF POSSIBLE.

3. COMPLETE ALL WATERCOURSE ACTIVITIES AS EXPEDIENTLY AS POSSIBLE.

4. NO REFUELING OF MOBILE EQUIPMENT WITHIN 100 FEET OF WATERBODY. REFUEL STATIONARY EQUIPMENT AS PER THE SPCC PLAN.

5. INSTALL TEMPORARY EQUIPMENT CROSSING.

6. IN AGRICULTURAL LAND, STRIP TOPSOIL FROM SPOIL STORAGE AREA.

7. IN-STREAM SPOIL TO BE STORED ON BANKS A MINIMUM OF 10 FEET FROM THE TOP OF THE BANK.

8. LEAVE HARD PLUGS AT THE STREAM BANK EDGE UNTIL JUST PRIOR TO PIPE INSTALLATION.

9. SIZE FLUME TO HANDLE 150 % ANTICIPATED FLOWS. INSTALL FLUME IN WATERCOURSE AND MAINTAIN CORRECT ALIGNMENT UNTIL REMOVED.

10. CONSTRUCT UPSTREAM DAM FOLLOWED BY DOWNSTREAM DAM. INSTALL A FLANGE ON UPSTREAM END OF FLUME AND SEAL TO SUBSTRATE WITH SANDBAGS AND POLYETHYLENE LINER WHERE NECESSARY TO ENSURE A WATERTIGHT BARRIER. "KEY" DAMS INTO BANKS OR CONSTRUCT SECONDARY DAM, IF NECESSARY.

11. PUMP STREAM CHANNEL BETWEEN DAMS, IF NECESSARY. DISCHARGE WATER THROUGH A DEWATERING STRUCTURE AND ONTO A STABLE WELL VEGETATED AREA TO PREVENT EROSION AND SEDIMENTATION. NO HEAVILY SILT-LADEN WATER MAY BE DISCHARGED IN THE STREAM.

12. CONSTRUCT SEDIMENT BARRIERS (STRAW BALES AND/OR SILT FENCE) TO PREVENT SILT LADEN WATER AND SPOIL FROM FLOWING BACK INTO WATERCOURSE. CONSTRUCTED SEDIMENT BARRIERS SHALL EXTEND ALONG THE SIDES OF THE STOCKPILES AND THE ENDS OF DAMS. BARRIERS MAY BE TEMPORARILY REMOVED TO ALLOW CONSTRUCTION ACTIVITIES BUT MUST BE REPLACED BY THE END OF EACH WORK DAY.

13. COMPLETE PREFABRICATION OF IN-STREAM PIPE SECTION AND WEIGHT PIPE AS NECESSARY PRIOR TO COMMENCEMENT OF IN-STREAM ACTIVITY.

14. TRENCH THROUGH WATERCOURSE. INSTALL TEMPORARY (SOFT) PLUGS, IF NECESSARY, TO CONTROL WATER FLOW AND TRENCH SLOUGHING.

15. MAINTAIN STREAM FLOW, IF PRESENT, THROUGH FLUME THROUGHOUT CROSSING CONSTRUCTION.

16. LOWER-IN PIPE, INSTALL TRENCH PLUG AND BACKFILL IMMEDIATELY.

17. BACKFILL WITH NATIVE MATERIAL.

18. RESTORE WATERCOURSE CHANNEL TO APPROXIMATE PRE-CONSTRUCTION PROFILE AND SUBSTRATE.

19. RESTORE STREAM BANKS TO APPROXIMATE ORIGINAL CONDITION AND STABILIZE, AS REQUIRED.

DRAWING DEPICTED IS SUPERSEDED BY WRITTEN STANDARD, SCOPE OF WORK OR LINE LIST.

| | | REVISIONS | | | | |
|---|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR. | |
| 1 | 07/08/04 | ISSUED FOR REVIEW | RB | CM | | |
| 2 | 07/13/04 | REVISED PER CLIENT COMMENT | RB | CM | | |
| 3 | 07/01/05 | ENG REWRITE RELEASE | WS | | | |

**KINDER⚡MORGAN**

WATERBODY CROSSING
OPEN CUT DRY FLUME

| DATE: | 07/01/05 | | APPROVED BY: |
|---|---|---|---|
| SCALE: N.T.S. | | CST-P-1150-A375 | SH. 1 OF 1 |

Page 183 of 187

AR 003815



**PLAN VIEW**

NOTES:

1. THIS METHOD APPLIES TO WATERBODIES WITH LIMITED FLOW AT TIME OF CONSTRUCTION WHERE DOWNSTREAM SILTATION MUST BE AVOIDED AND THE CROSSING WIDTH IS NOT PROHIBITIVE.

2. SCHEDULE CROSSING DURING LOW FLOW PERIOD IF POSSIBLE.

3. COMPLETE ALL IN-STREAM ACTIVITIES AS EXPEDIENTLY AS POSSIBLE.

4. NO REFUELING OF MOBILE EQUIPMENT WITHIN 100 FEET OF WATERBODY. REFUEL STATIONARY EQUIPMENT AS PER THE SPCC PLAN.

5. INSTALL TEMPORARY EQUIPMENT CROSSING, IF REQUIRED.

6. IN AGRICULTURAL LAND, STRIP TOPSOIL FROM SPOIL STORAGE AREA.

7. CONSTRUCT SEDIMENT BARRIERS TO PREVENT SILT LADEN WATER AND SPOIL FROM FLOWING INTO WATERBODY. CONSTRUCTED SEDIMENT BARRIERS SHALL EXTEND ALONG THE SIDES OF THE SPOIL AND TOPSOIL STOCKPILES AND ACROSS THE ENTIRE CONSTRUCTION R.O.W. BARRIERS MAY BE TEMPORARILY REMOVED TO ALLOW CONSTRUCTION ACTIVITIES BUT MUST BE REPLACED BY THE END OF EACH WORK DAY.

8. CONSTRUCT UPSTREAM STRUCTURE (DAM) FOLLOWED BY DOWNSTREAM STRUCTURE (DAM). WATER STRUCTURES' (AQUA DAM, JERSEY BARRIERS, SAND BAGS, STEEL PLATE, POLYETHYLENE LINER, ETC.) FINAL LOCATION WILL BE APPROVED BY THE ENVIRONMENTAL INSPECTOR.

9. SIZE PUMPS FOR DIVERSION OF ENTIRE STREAM FLOW. CONTRACTOR SHALL MAINTAIN 100% SPARE PUMPING CAPACITY ON SITE. PUMPS SHALL BE INSTALLED ON POLYETHYLENE BARRIERS FOR FUEL/OIL SPILL CONTAINMENT. PUMP INTAKES WILL BE SCREENED TO PREVENT ENTRAPMENT OF FISH. CONTRACTOR SHALL MONITOR PUMPS AND WATER STRUCTURES ON A 24 HOUR BASIS UNTIL THE CROSSING INSTALLATION IS COMPLETE. SHOULD LEAKAGE AT THE DAM STRUCTURES OCCUR, CONTRACTOR SHALL DEWATER BETWEEN THE STRUCTURES THROUGH AN APPROPRIATE FILTER AND ONTO A WELL VEGETATED UPLAND AREA. NO HEAVILY SILT-LADEN WATER SHALL BE DISCHARGED INTO THE STREAM.

10. LEAVE HARD PLUGS AT STREAM BANK EDGE UNTIL JUST PRIOR TO PIPE INSTALLATION.

11. COMPLETE CONSTRUCTION OF IN-STREAM PIPE SECTION. WEIGHT PIPE AS NECESSARY PRIOR TO COMMENCEMENT OF IN-STREAM ACTIVITY.

12. TRENCH THROUGH WATERBODY AS EXPEDIENTLY AS PRACTICAL. INSTALL TEMPORARY (SOFT) PLUGS, IF NECESSARY, TO CONTROL WATER FLOW AND TRENCH SLOUGHING.

13. MAINTAIN STREAM FLOW THROUGHOUT CROSSING CONSTRUCTION.

14. LOWER-IN PIPE, INSTALL TRENCH PLUG AND BACKFILL IMMEDIATELY.

15. BACKFILL WITH NATIVE MATERIAL.

16. RESTORE WATERBODY CHANNEL TO APPROXIMATE PRE-CONSTRUCTION PROFILE AND SUBSTRATE.

17. DISMANTLE DOWNSTREAM WATER STRUCTURE (DAM) AND UPSTREAM WATER STRUCTURE (DAM) AFTER TRENCH BACKFILL.

18. RESTORE STREAM BANKS TO APPROXIMATE ORIGINAL CONDITION AND STABILIZE, AS REQUIRED.

DRAWING DEPICTED IS SUPERSEDED BY WRITTEN STANDARD, SCOPE OF WORK OR LINE LIST.

| REVISIONS | | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR. |
| 1 | 07/08/04 | ISSUED FOR REVIEW | RB | CM | |
| 2 | 07/13/04 | REVISED PER CLIENT COMMENT | RB | CM | |
| 3 | 07/01/05 | DWG REWRITE RELEASE | WS | | |

**KINDER MORGAN**

WATERBODY CROSSING
OPEN CUT DAM & PUMP

DATE: 07/01/05

APPROVED BY:

SCALE: N.T.S.    CST-P-1150-A370    SH. 1 OF 1

AR 003816



PLAN

PROFILE

NOTES:

1. SET UP DRILLING EQUIPMENT A MINIMUM OF 100 FEET FROM THE EDGE OF THE WATERCOURSE.  DO NOT CLEAR OR GRADE WITHIN THE 100 FOOT ZONE.

2. ENSURE THAT ONLY BENTONITE BASED DRILLING MUD IS USED.  DO NOT ALLOW THE USE OF ANY ADDITIVES TO THE DRILLING MUD WITHOUT THE APPROVAL OF COMPANY'S INSPECTOR.

3. INSTALL SUITABLE DRILLING MUD TANKS OR SUMPS TO PREVENT CONTAMINATION OF WATERCOURSE.

4. INSTALL BERMS DOWNSLOPE FROM THE DRILL ENTRY AND ANTICIPATED EXIT POINTS TO CONTAIN ANY RELEASE OF DRILLING MUD.

5. DISPOSE OF DRILLING MUD IN ACCORDANCE WITH THE APPROPRIATE REGULATORY AUTHORITY REQUIREMENTS.

DRAWING DEPICTED IS SUPERSEDED  BY WRITTEN STANDARD, SCOPE OF WORK OR LINE LIST.

| REVISIONS | | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR |
| 1 | 07/06/04 | ISSUED FOR REVIEW | RB | CM | |
| 2 | 07/13/04 | REVISED PER CLIENT COMMENT | RB | CM | |
| 3 | 07/01/05 | DWG REWRITE RELEASE | WS | | |

**KINDER MORGAN**

WATERBODY CROSSING
HORIZONTAL DIRECTIONAL DRILL

DATE: 07/01/05    APPROVED BY:
SCALE: N.T.S.    CST-P-1160-A365    SH. 1 OF 1

Page 185 of 187

AR  003817



JA2136

AR 003818



Page 187 of 187

AR 003819

 

**Office of Energy Projects**

**FERC/EIS - 0329F**                                                                 **June 2023**

# CUMBERLAND PROJECT

## FINAL ENVIRONMENTAL IMPACT STATEMENT

Tennessee Gas Pipeline Company, LLC                        Docket No.  CP22-493-000

**Abstract:**

The staff of the Federal Energy Regulatory Commission (FERC or Commission) prepared a final Environmental Impact Statement (EIS) for the Cumberland Project, proposed by Tennessee Gas Pipeline Company, LLC (Tennessee).  Tennessee proposes to construct and operate approximately 32 miles of 30-inch-diameter natural gas pipeline and ancillary facilities in Dickson, Houston, and Stewart Counties, Tennessee.  The U.S. Army Corps of Engineers and the U.S. Environmental Protection Agency participated as cooperating agencies in the preparation of the EIS.  Commission staff conclude that construction and operation of the project would not result in significant environmental impacts.  Climate change impacts are not characterized in the EIS as significant or insignificant.

Estimate of Staff's Time Spent in Preparation of this EIS: $61,832.00
Cooperating agencies cost: $10,207.00
There were no direct contract costs.



U.S. Army Corps of Engineers



U.S. Environmental Protection Agency

Contact:  Office of External Affairs, (866) 208-FERC
Federal Energy Regulatory Commission
Office of Energy Projects
888 First Street NE, Washington, DC  20426

JA2138

FEDERAL ENERGY REGULATORY COMMISSION
WASHINGTON, D.C. 20426

OFFICE OF ENERGY PROJECTS

In Reply Refer To:
OEP/DG2E/Gas Branch 4
Tennessee Gas Pipeline Company, LLC
Cumberland Project
Docket No.  CP22-493-000

TO THE INTERESTED PARTY:

The staff of the Federal Energy Regulatory Commission (FERC or Commission) has prepared a final Environmental Impact Statement (EIS) for the Cumberland Project (Project), proposed by Tennessee Gas Pipeline Company, LLC (Tennessee) in the above-referenced docket.  Tennessee requests a Certificate of Public Convenience and Necessity to construct, operate, and maintain certain natural gas transmission pipeline and facilities in Dickson, Houston, and Stewart Counties, Tennessee.  The Project purpose is to provide up to 245,040 dekatherms per day of new firm transportation service to the Tennessee Valley Authority's (TVA) Cumberland Natural Gas Combined Cycle Power Plant.  Prior to filing its application, Tennessee participated in the Commission's Pre-filing Process for this Project under Docket No. PF22-2-000.

The final EIS assesses the potential environmental effects of the construction and operation of the Project in accordance with the requirements of the National Environmental Policy Act (NEPA) and responds to comments that were received on the Commission's February 3, 2023 draft EIS.  The FERC staff concludes that approval of the proposed Project would result in some adverse environmental impacts; however, with the exception of climate change impacts, these impacts would be reduced to less-than-significant levels because of avoidance, minimization, and mitigation measures proposed by Tennessee and those recommended by staff in the EIS.  Climate change impacts are not characterized in the EIS as significant or insignificant.

The U.S. Army Corps of Engineers and the U.S. Environmental Protection Agency participated as cooperating agencies in the preparation of the EIS.  Cooperating agencies have jurisdiction by law or special expertise with respect to resources potentially affected by a proposal and participate in the NEPA analysis.  Although both agencies provided input to the conclusions and recommendations presented in the EIS, each agency may present its own conclusions and recommendations in any applicable Records of Decision or other documentation for the Project.

The EIS addresses the potential environmental effects of the construction and operation of the following Project facilities, all in the state of Tennessee:

AR 003824

- Cumberland Pipeline: Construction of approximately 32 miles of new 30-inch-diameter natural gas pipeline, which would connect at Tennessee's existing Line 100-3 and Line 100-4. The Cumberland Pipeline would be located in Dickson, Houston, and Stewart Counties.

- Pressure Regulation Station: Construction of two new bi-directional back pressure regulation facilities on Line 100-3 and Line 100-4, at milepost 0.0 of the proposed new Cumberland Pipeline in Dickson County.

- Cumberland Meter Station: Construction of a new meter station at the terminus of the Cumberland Pipeline, located within TVA's property in Stewart County.

- Launcher and Receiver: Construction of in-line inspection traps, for in-line inspection tools at each end of the Cumberland Pipeline.

- Mainline Valves: Construction of three new mainline valves. One would be installed at an intermediate location along the Cumberland Pipeline, and the remaining two would be on Tennessee's Line 100-3 and Line 100-4 within the new Pressure Regulation Station.

The final EIS is not a decision document. It presents Commission staff's independent analysis of the environmental issues for the Commission to consider when addressing the merits of all issues in this proceeding.

The Commission mailed a copy of the *Notice of Availability* for the final EIS to federal, state, and local government representatives and agencies; elected officials; environmental and public interest groups; Native American Tribes; potentially affected landowners and other interested individuals and groups; and newspapers and libraries in the Project area. The final EIS is only available in electronic format. It may be viewed and downloaded from the FERC website (https://ferc.gov/), on the natural gas environmental documents page (https://www.ferc.gov/industries-data/natural-gas/environmental-overview/environmental-documents-2023). In addition, the EIS may be accessed using the eLibrary link on the FERC website. Click on the eLibrary link (https://elibrary.ferc.gov/eLibrary/search) select "General Search" and enter the docket number in the "Docket Number" field, excluding the last three digits (i.e., CP22-493). Be sure you have selected an appropriate date range. For assistance, please contact FERC Online Support at FercOnlineSupport@ferc.gov or toll free at (866) 208-3676, or for TTY, contact (202) 502-8659.

The Commission's Office of Public Participation (OPP) supports meaningful public engagement and participation in Commission proceedings. OPP can help members of the public, including landowners, environmental justice communities, Tribal members and others, access publicly available information and navigate Commission processes. For public inquiries and assistance with making filings such as interventions, comments, or requests for rehearing, the public is encouraged to contact OPP at (202) 502-6595 or OPP@ferc.gov.

AR 003825

Additional information about the project is available from the Commission's Office of External Affairs, at **(866) 208-FERC**, or on the FERC website ([www.ferc.gov](http://www.ferc.gov)) using the [eLibrary](http://www.ferc.gov) link. The eLibrary link also provides access to the texts of all formal documents issued by the Commission, such as orders, notices, and rulemakings.

In addition, the Commission offers a free service called eSubscription that allows you to keep track of all formal issuances and submittals in the specific dockets. This can reduce the amount of time you spend researching proceedings by automatically providing you with notification of these filings, document summaries, and direct links to the documents. Go to [https://www.ferc.gov/ferc-online/overview](https://www.ferc.gov/ferc-online/overview) to register for eSubscription.

AR 003826

# TABLE OF CONTENTS

## EXECUTIVE SUMMARY

Page No.

**1.0    INTRODUCTION** ................................................................... **1-1**
    1.1    Purpose and Need ................................................................ 1-2
    1.2    Purpose and Scope of the EIS ............................................. 1-3
            1.2.1    Federal Energy Regulatory Commission ............................. 1-4
            1.2.2    U.S. Army Corps of Engineers ......................................... 1-5
            1.2.3    U.S. Environmental Protection Agency ............................... 1-5
    1.3    Public Review and Comment ............................................... 1-6
            1.3.1    Summary of Submitted Alternatives, Information, and Analyses
                       During Scoping ............................................................ 1-2
            1.3.2    Summary of Submitted Comments During the Public Comment
                       Period ....................................................................... 1-3
    1.4    Permits, Approvals, and Consultations .................................. 1-3
            1.4.1    Endangered Species Act ................................................ 1-5
            1.4.2    Migratory Bird Treaty Act .............................................. 1-5
            1.4.3    Bald and Golden Eagle Protection Act ............................... 1-5
            1.4.4    Rivers and Harbors Act .................................................. 1-5
            1.4.5    Clean Water Act ........................................................... 1-6
            1.4.6    Clean Air Act ............................................................... 1-6
            1.4.7    National Historic Preservation Act ................................... 1-6

**2.0    DESCRIPTION OF THE PROPOSED ACTION** ............................... **2-1**
    2.1    Pipeline Facilities ............................................................. 2-1
    2.2    Aboveground Facilities ...................................................... 2-4
    2.3    Nonjurisdictional Facilities ................................................ 2-4
    2.4    Land Requirements ........................................................... 2-5
            2.4.1    Pipeline Right-of-Way ................................................... 2-6
            2.4.2    Aboveground Facilities .................................................. 2-7
            2.4.3    Contractor Yards, Pipe Storage, and Staging Areas ............. 2-7
            2.4.4    Access Roads .............................................................. 2-8
    2.5    Construction Procedures .................................................... 2-8
            2.5.1    General Pipeline Construction Procedures .......................... 2-9
            2.5.2    Aboveground Facility Construction Procedures .................. 2-13
            2.5.3    Specialized Construction Procedures ............................... 2-13
    2.6    Construction Schedule and Workforce .................................. 2-21
    2.7    Environmental Compliance, Monitoring, and Variances ............ 2-23
    2.8    Operation and Maintenance ................................................ 2-24

**3.0    ALTERNATIVES** ................................................................... **3-1**
    3.1    No-Action Alternative ........................................................ 3-2
    3.2    System Alternatives .......................................................... 3-2
    3.3    Major Pipeline Route Alternatives ........................................ 3-3

    3.4     Pipeline Route Variations ...................................................................... 3-4

**4.0   ENVIRONMENTAL ANALYSIS ........................................................ 4-5**
    4.1     Geology ................................................................................................ 4-10
          4.1.1   Geologic Setting .................................................................. 4-10
          4.1.2   Geotechnical Investigation .................................................. 4-11
          4.1.3   Mineral Resources .............................................................. 4-12
          4.1.4   Paleontological Resources .................................................. 4-13
          4.1.5   Geologic Hazards ................................................................ 4-13
          4.1.6   Blasting ............................................................................... 4-17
    4.2     Soils ...................................................................................................... 4-20
          4.2.1   Soil Characteristics ............................................................. 4-20
          4.2.2   Inadvertent Spills or Discovery of Contaminants .............. 4-22
          4.2.3   Impacts and Mitigation ....................................................... 4-22
    4.3     Water Resources ................................................................................. 4-23
          4.3.1   Groundwater Resources ...................................................... 4-23
          4.3.2   Surface Water Resources .................................................... 4-30
          4.3.3   Wetlands ............................................................................. 4-37
    4.4     Fisheries .............................................................................................. 4-40
          4.4.1   Fisheries and Aquatic Resources ....................................... 4-40
          4.4.2   Fisheries of Special Concern .............................................. 4-40
          4.4.3   Fisheries Impacts and Mitigation ...................................... 4-41
    4.5     Vegetation ........................................................................................... 4-42
          4.5.1   Special Vegetation Communities ....................................... 4-44
          4.5.2   Noxious and Invasive Weeds ............................................. 4-44
          4.5.3   Vegetation Impacts and Mitigation .................................... 4-44
    4.6     Wildlife ................................................................................................ 4-46
          4.6.1   Managed and Sensitive Wildlife Areas .............................. 4-46
          4.6.2   General Wildlife Impacts and Mitigation ........................... 4-47
          4.6.3   Migratory Birds and Bald and Golden Eagles ................... 4-47
          4.6.4   Special Status Species ........................................................ 4-49
    4.7     Land Use, Recreation, Special Interest Areas, and Visual Resources ............. 4-58
          4.7.1   Land Use ............................................................................. 4-60
          4.7.2   Residential Land and Planned Developments ..................... 4-63
          4.7.3   Public Land, Recreation, or Sensitive Land Areas ............. 4-64
          4.7.4   Visual Resources ................................................................ 4-65
    4.8     Socioeconomics and Environmental Justice ...................................... 4-66
          4.8.1   Socioeconomics .................................................................. 4-66
          4.8.2   Transportation and Traffic ................................................. 4-67
          4.8.3   Environmental Justice ......................................................... 4-70
    4.9     Cultural Resources .............................................................................. 4-85
          4.9.1   Cultural Resources Survey Results ..................................... 4-86
          4.9.2   Native American Consultations ........................................... 4-90
          4.9.3   Unanticipated Discoveries Plan .......................................... 4-91
          4.9.4   Compliance with the National Historic Preservation Act ......... 4-91
    4.10   Air Quality .......................................................................................... 4-92

4.10.1    Existing Air Quality ..................................................................... 4-93
4.10.2    Air Quality Regulations ............................................................... 4-94
4.10.3    Construction Emissions Impacts and Mitigation .............................. 4-98
4.10.4    Operational Air Emissions Impacts and Mitigation........................... 4-99
4.10.5    Impacts on Human Health ........................................................... 4-102
4.11    Noise ...................................................................................................... 4-102
4.11.1    Federal Noise Regulations .......................................................... 4-103
4.11.2    Ambient Noise Conditions........................................................... 4-103
4.11.3    Construction Noise Impacts and Mitigation .................................... 4-104
4.11.4    Operational Noise Impacts and Mitigation .................................... 4-106
4.12    Reliability and Safety .............................................................................. 4-108
4.12.1    Safety Standards ....................................................................... 4-109
4.12.2    Project Design Requirements....................................................... 4-109
4.12.3    Pipeline Safety .......................................................................... 4-109
4.12.4    Emergencies ............................................................................. 4-111
4.12.5    Pipeline Accident Data ............................................................... 4-111
4.12.6    Impact on Public Safety ............................................................. 4-113
4.13    Cumulative Impacts ................................................................................ 4-115
4.13.1    Projects and Activities Considered ............................................... 4-118
4.13.2    Geology and Soils ..................................................................... 4-120
4.13.3    Water Resources ....................................................................... 4-120
4.13.4    Vegetation & Wildlife.................................................................. 4-122
4.13.5    Visual Impacts .......................................................................... 4-122
4.13.6    Socioeconomics ........................................................................ 4-123
4.13.7    Environmental Justice ................................................................ 4-123
4.13.8    Air Quality - Construction .......................................................... 4-125
4.13.9    Noise ....................................................................................... 4-125
4.13.10   Climate Change ......................................................................... 4-125
4.13.11   Conclusion on Cumulative Impacts ............................................... 4-131

5.0    CONCLUSIONS AND RECOMMENDATIONS ................................................. 5-1
5.1    Summary of Environmental Analysis ........................................................ 5-1
5.2    FERC Staff's Recommended Mitigation .................................................... 5-1

**APPENDIX A - NOTICE OF AVAILABLITY OF THE FINAL EIS  DISTRIBUTION LIST**

**APPENDIX B - COMMENTS RECEIVED DURING THE CUMBERLAND PROJECT SCOPING PERIOD**

**APPENDIX C - PROJECT OVERVIEW MAPS**

**APPENDIX D - CONSTRUCTION TYPICALS**

**APPENDIX E - OVERSIZED TABLES**

**APPENDIX F - FERC'S UPLAND EROSION CONTROL, REVEGETATION AND MAINTENANCE PLAN**

**APPENDIX G - FERC'S WETLAND AND WATERBODY CONSTRUCTION AND MITIGATION PROCEDURES (WITH TENNESSEE'S REQUESTED DEVIATIONS)**

**APPENDIX H - SITE-SPECIFIC RESIDENTIAL CONSTRUCTION AND HDD DRAWINGS**

**APPENDIX I - COMMENTS AND RESPONSES FROM THE DRAFT EIS PUBLIC COMMENT PERIOD**

**APPENDIX J - LIST OF PREPARERS**

**APPENDIX K - REFERENCES**

AR  003830

# LIST OF TABLES

Table 1.3-1:  Issues Identified and Comments Received During the 2022 Public
              Scoping Process for the Cumberland Project ........................................ 1-2
Table 1.4-1:  Major Permits, Approvals, and Consultations for the Cumberland Project .......... 1-4
Table 2.4-1:  Land Requirements for the Cumberland Project [a/] ................................ 2-6
Table 2.4-2:  Co-located Easements along the Cumberland Project ............................ 2-7
Table 2.5-1:  Tennessee's Requested Deviations from the FERC Procedures .......................... 2-9
Table 2.5-2:  Tennessee Minimum Specifications for Depth of Cover (inches) ...................... 2-11
Table 2.5-3:  Roadways Crossed by the Cumberland Pipeline ...................................... 2-17
Table 2.6-1:  Construction Work Activities and Corresponding Schedule for the Project........ 2-21
Table 3.4-1:  Route Variations for the Cumberland Pipeline ...................................... 3-4
Table 4.1-1:  Horizontal Directional Drill Summary for the Project ............................. 4-12
Table 4.2-1:  Soil Characteristics for the Project ............................................ 4-20
Table 4.3-1:  Identified Wellhead and Water Protection Areas within 6 Miles of the
              Project Area ................................................................ 4-25
Table 4.3-2:  Identified Water Supply Wells and Springs within 1,000 feet of the
              Project Area ................................................................ 4-26
Table 4.3-3:  Watersheds Crossed by the Project ............................................. 4-31
Table 4.3-4:  Public Watershed Withdrawals within the Project Area ........................... 4-34
Table 4.3-5:  Hydrostatic Test Water for the Cumberland Project ............................. 4-35
Table 4.3-6:  Wetland Impact Summary for the Cumberland Project ............................. 4-38
Table 4.5-1:  Acreage of Construction and Operation Impacts on Vegetation..................... 4-43
Table 4.6-1:  Federal and State Listed Species with Potential to Occur in Project Area........... 4-50
Table 4.7-1:  Existing Land Uses Affected by Construction and Operation of the
              Cumberland Project (acres) ................................................... 4-59
Table 4.7-2:  Structures within 50 Feet of the Construction Workspace.................................. 4-63
Table 4.8-1:  Traffic Conditions on State and County Roads to be Used by the Project ......... 4-69
Table 4.8-2:  Communication and Outreach by Tennessee with Organizations
              Associated with EJ Communities Located within the Project Area.................... 4-72
Table 4.8-3:  Minority Populations by Race and Ethnicity and Low-Income Populations
              in the Project Area ........................................................ 4-76
Table 4.8-4:  Block Groups Designated as Environmental Justice Communities within
              the Project Area ........................................................... 4-79
Table 4.9-1:  Archaeological Sites Recorded during the Phase I and Phase II
              Investigations ............................................................. 4-87
Table 4.9-2:  Historic Architectural Properties Recording during Phase I Investigations......... 4-89
Table 4.10-1:  Summary of Climatological Data at the Cumberland Project........................... 4-93
Table 4.10-2:  Estimated Construction Emissions for the Project ............................. 4-98
Table 4.10-3:  Estimated Operational Emissions from Fugitive Equipment Leaks ............... 4-100
Table 4.10-4:  Estimated Operational Emissions from Other Pipeline Releases.................... 4-100
Table 4.10-5:  Potential Net Change in Emissions from the TVA CUF after the
               Proposed Action Implementation (tons per year).............................. 4-101
Table 4.11-1:  Summary of Measured Sound Levels at NSAs .............................. 4-103

Table 4.11-2:  Summary of Measured $L_d$, Measured $L_n$ and Resulting Ambient $L_{dn}$ at Closest NSAs to the Proposed HDD Entry and/or Exit Sites ........................... 4-104
Table 4.11-3:  Noise Analysis for 24-hour HDD Operations ................................................. 4-105
Table 4.11-4:  Summary of Sound Contribution of HDD Entry Site Operations at Closest NSA Assuming Additional Noise Mitigation Measures are Employed ...................................................................................................... 4-106
Table 4.11-5:  Summary of Estimated Sound Level from each Aboveground Facility at the Closest NSAs During "Worst Case" Operation[a] ......................................... 4-107
Table 4.11-6:  Typical Sound Pressure Levels Associated with Common Sound Sources ..... 4-108
Table 4.12-1:  USDOT Moderate Consequence Areas Along the Cumberland Pipeline ........ 4-110
Table 4.12-2:  Natural Gas Transmission Pipeline Significant Incidents by Cause (2002 – 2021) ..................................................................................................... 4-112
Table 4.12-3:  Excavation, Outside Force, and Natural Force Incidents by Cause (2002 – 2021) ..................................................................................................... 4-113
Table 4.12-4:  Injuries and Fatalities – Natural Gas Transmission Pipelines[a] ...................... 4-114
Table 4.12-5:  Nationwide Accidental Deaths ...................................................................... 4-114
Table 4.13-1:  Geographic Scope by Resource for Cumulative Impacts Associated with the Cumberland Project ...................................................................................... 4-116
Table 4.13-2:  Past, Present, and Reasonably Foreseeable Future Projects Evaluated for Potential Cumulative Impacts with the Cumberland Project ............................ 4-119
Table 4.13-3:  Cumulative Impacts on Aquatic Resources within the Wells Creek HUC-12 Watershed (51302050402) ......................................................................... 4-121

# LIST OF FIGURES

Page No.

Figure 2.1-1:  Project Location Map ....................................................................................... 2-3
Figure 4.8-1:  Environmental Justice Communities Meeting or Exceeding Low Income Thresholds along the Project .......................................................................... 4-77
Figure 4.8-2:  Environmental Justice Communities Based on Exceeding Minority Threshold along the Project .............................................................................. 4-78

# TECHNICAL ACRONYMS AND ABBREVIATIONS

| Abbreviation | Term/Phrase/Name |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| ACWI | Federal Advisory Committee on Water Information |
| ANSI | American National Standards Institute |
| ATWS | Additional Temporary Workspace |
| BGEPA | Bald and Golden Eagle Protection Act |
| bgs | below ground surface |
| Burns & McDonnell | Burns & McDonnell Engineering Company, Inc. |
| CCR | coal combustion residual |
| Certificate | Certificate of Public Convenience and Necessity |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| cfs | cubic feet per second |
| $CO_2e$ | carbon dioxide equivalent |
| Commission | Federal Energy Regulatory Commission |
| CUF | Cumberland Fossil Plant |
| Cumberland Gas Plant | Proposed Combined Cycle Combustion Turbine Gas Plant (TVA's Proposed Action) |
| CWA | Clean Water Act |
| Dth/d | Dekatherms per day |
| DWR | Tennessee Department of Environment and Conservation, Division of Water Resources |
| ECHO | Enforcement and Compliance History Online |
| ECMP | Environmental Construction Management Plan |
| EFH | Essential Fish Habitat |
| EI | Environmental Inspector |
| EIS | Environmental Impact Statement |
| EPA | U.S. Environmental Protection Agency |
| ESA | Endangered Species Act |
| FEMA | Federal Emergency Management Agency |
| FERC | Federal Energy Regulatory Commission |
| FR | Federal Register |
| FRS | Facility Registry Service |
| ft-bgs | feet below ground surface |
| gpm | gallons per minute |
| GW | Gigawatts |
| HCA | High consequence area |
| HDD | Horizontal directional drill |
| HUC | Hydrologic Unit Code |
| IP | Individual Permit |
| KM | Kinder Morgan Company |
| MAOP | Maximum allowable operating pressure |

| Abbreviation | Term/Phrase/Name |
|---|---|
| MBTA | Migratory Bird Treaty Act |
| mg/L | milligrams per liter |
| MLV | Mainline valve |
| MP | Milepost |
| NEPA | National Environmental Policy Act |
| NGA | Natural Gas Act |
| NHPA | National Historic Preservation Act |
| NLEB | Northern long-eared bat |
| NOI | Notice of Intent |
| NOS | Notice of Scoping |
| NPDES | National Pollution Discharge Elimination System |
| NPS | National Park Service |
| NRCS | Natural Resources Conservation Service |
| NRHP | National Register of Historic Places |
| NRI | Nationwide Rivers Inventory |
| NSF | National Sanitation Foundation |
| NWI | National Wetlands Inventory |
| PEM | Palustrine Emergent Wetland |
| PFO | Palustrine Forested Wetland |
| PSS | Palustrine Scrub Shrub Wetland |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| Plan | FERC Upland Erosion Control, Revegetation, and Maintenance Plan |
| Procedures | FERC Wetland and Waterbody Construction and Mitigation Procedures (with Tennessee's requested deviations) |
| Project | Cumberland Project |
| RCRA | Resource Conservation and Recovery Act |
| RTE | Rare, threatened, and/or endangered |
| SDWA | Safe Drinking Water Act |
| SHPO | State Historic Preservation Office(r) |
| SME | Subject Matter Expert |
| SPCP | Spill Prevention and Control Plan |
| SSURGO | Soils and Soil Survey Geographic |
| STATSGO | State Soil Geographic |
| SWPPP | Stormwater Pollution Prevention Plan |
| TCP | Traditional Cultural Property |
| TCWNHA | Tennessee Civil War National Heritage Area |
| TDEC | Tennessee Department of Environment and Conservation |
| TDOA | Tennessee Division of Archaeology |
| Tennessee | Tennessee Gas Pipeline Company, LLC |
| THC | Tennessee Historical Commission |
| TMDL | Total Maximum Daily Load |
| TRI | Toxic Release |
| TSCA | Toxic Substance Control Act |

| **Abbreviation** | **Term/Phrase/Name** |
| --- | --- |
| TVA | Tennessee Valley Authority |
| TWRA | Tennessee Wildlife Resources Agency |
| USACE | U.S. Army Corps of Engineers |
| U.S.C. | United States Code |
| USDOT | U.S. Department of Transportation |
| USFWS | U.S. Fish and Wildlife Service |
| USGS | U.S. Geological Survey |

AR  003835

**EXECUTIVE SUMMARY**

The staff of the Federal Energy Regulatory Commission (FERC or Commission) has prepared this final Environmental Impact Statement (EIS) to fulfill the requirements of the National Environmental Policy Act of 1969 (NEPA) and the Commission's implementing regulations under Title 18 of the Code of Federal Regulations, Part 380 (18 CFR 380). This final EIS assesses the potential environmental impacts that could result from constructing and operating the Cumberland Project (Project).

On November 5, 2021, Tennessee Gas Transmission Company, LLC (Tennessee) entered into FERC's Pre-Filing Process for the planned Project in Docket No. PF22-2-000. On July 22, 2022, Tennessee filed a formal application with the FERC in Docket No. CP22-493-000 pursuant to section 7(c) of the Natural Gas Act and Parts 157 and 284 of the Commission's regulations to construct, own, and operate an interstate natural gas pipeline and ancillary facilities in Dickson, Houston, and Stewart Counties, Tennessee. The Project would provide up to 245,040 dekatherms per day (Dth/d) of firm natural gas transportation capacity to the Tennessee Valley Authority's (TVA) Cumberland Gas Combined Cycle Power Plant, an electrical generating facility in Stewart County, Tennessee.

The purpose of the EIS is to inform FERC decision makers, the public, and the permitting agencies about the potential environmental impacts of the proposed Project and its alternatives, as well as staff's recommended mitigation measures that would reduce adverse impacts to the extent practicable. We[i] prepared our analysis based on information provided by Tennessee and further developed from data requests; field investigations; scoping; literature research; and contacts with or comments from federal, state, and local agencies, Native American tribes, and individual members of the public.

FERC is the federal agency responsible for authorizing interstate natural gas transmission facilities under the Natural Gas Act and is the lead federal agency for the preparation of this EIS. The U.S. Army Corps of Engineers and the U.S. Environmental Protection Agency participated as cooperating agencies in the preparation of the EIS. Cooperating agencies have jurisdiction by law or special expertise with respect to resources potentially affected by a proposal and participate in the NEPA analysis. Although both agencies provided input to the conclusions and recommendations presented in the EIS, each agency may present its own conclusions and recommendations in any applicable Records of Decision or other documentation for the Project.

**PROPOSED ACTION**

The Project would include construction of the following facilities in Dickson, Houston, and Stewart Counties, all in the state of Tennessee:

- Cumberland Pipeline: Construction of approximately 32 miles of new 30-inch-diameter natural gas pipeline, which would connect at Tennessee's existing Line 100-3 and Line 100-4. The Cumberland Pipeline would be located in Dickson, Houston, and Stewart Counties.

- Pressure Regulation Station: Construction of two new bi-directional back pressure regulation facilities on Line 100-3 and Line 100-4 at milepost 0.0 of the proposed new Cumberland Pipeline in Dickson County.

- Cumberland Meter Station: Construction of a new meter station at the terminus of the Cumberland Pipeline, located within TVA property in Stewart County.

- Launcher and Receiver: Construction of in-line inspection traps, for in-line inspection tools at each end of the Cumberland Pipeline.

- Mainline Valves (MLV): Construction of three new MLVs.  One would be installed at an intermediate location along the Cumberland Pipeline, and the remaining two would be on Tennessee's Line 100-3 and Line 100-4 within the vicinity of the new Pressure Regulation Station.

Tennessee would construct the Project using a 100-foot-wide construction right-of-way in most circumstances, along with additional temporary workspace, 2 contractor yards, and 55 access roads.  During Project operation, Tennessee would maintain a 50-foot-wide permanent right-of-way centered over the pipeline along with three new permanent access roads serving Project facilities.

Subject to all necessary regulatory approvals and clearances, Tennessee proposes to begin construction of the Project in August 2024.  Tennessee anticipates commencing service in September 2025.

**PUBLIC INVOLVEMENT**

On November 5, 2021, the Commission granted Tennessee's request to use FERC's Pre-Filing Process for the planned Project in Docket No. PF22-2-000.  The Pre-Filing Process is designed to encourage early involvement by citizens, governmental entities, non-governmental organizations, and other interested parties in the development of proposed natural gas transmission projects, prior to the filing of a formal application.  During the Pre-Filing Process, we worked with Tennessee and interested stakeholders, including federal and state agencies, to identify and resolve Project-related issues.  We participated in regular conference calls with Tennessee to discuss relevant Project issues, and we encouraged Tennessee to communicate frequently with the public and resource agencies.

Tennessee conducted two open house / information meetings on January 18 and 19, 2022, in the towns of Vanleer and Erin, Tennessee.  FERC representatives attended both meetings.  The open houses provided an opportunity for stakeholders to ask questions and express concerns.  Tennessee mailed letters to landowners and stakeholders inviting them to the meetings.  Approximately 50 individuals attended the two open house sessions.  Tennessee discussed Project information, routing, surveys, timeline, road crossings, stream crossings, and restoration.

On March 3, 2022, we issued in Docket PF22-2-000 a *Notice of Scoping Period Requesting Comments on Environmental Issues for the Planned Cumberland Project*.  The notice was mailed to approximately 250 entities, including affected landowners; federal, state, and local officials; Native American tribes; agency representatives; environmental and public interest groups; and local libraries and newspapers.  The 30-day scoping period was open from March 3 to April 4, 2022.  We received 16 comment letters during the Pre-Filing Process.

On July 29, 2022, the Commission issued in Docket CP22-493-000 a Notice of Application announcing that Tennessee filed its application with FERC.  This notice opened a comment period and indicated that the deadline for filing a motion to intervene would end on August 29, 2022.  On September 7, 2022, FERC issued a *Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Cumberland Project, Request for Comments on Environmental Issues, and Schedule for Environmental* Review (NOI).  The NOI opened another 30-day scoping period, which ended on October 7, 2022.  Between July 29 – October 7, 2022, we received approximately 65 comment letters, of which about 25 were Motions to Intervene.  The NOI was published in the Federal Register on September 7, 2022.[ii]

On February 3, 2023, we issued a *Notice of Availability of the Draft Environmental Impact Statement for the Proposed Cumberland Project*.  The draft EIS was filed with the U.S. Environmental Protection Agency (EPA), and EPA's formal notice of availability was issued in the Federal Register on Thursday, February 9, 2023, indicating that the draft EIS was available.[iii]  The Commission mailed a copy of the *Notice of Availability* to federal, state, and local government representatives and agencies; elected

officials; environmental and public interest groups; Native American Tribes; potentially affected landowners and other interested individuals and groups; and newspapers and libraries in the Project area. The notice of availability invited the public to comment on the draft EIS by filing comments electronically (via FERC eComment or eFiling), mailing written comments to the Secretary, or by attending one of the two in-person public comment sessions hosted by FERC staff in Dickson and Cumberland City, Tennessee on February 21, and February 22, 2023, respectively. The official comment period closed on March 27, 2023, although comments that were filed to the docket after that date are included in the analysis in the final EIS.

The environmental comments received are addressed, as applicable, in relevant sections of this EIS. Non-environmental comments, such as those declaring general support or opposition for the Project, or that focused on general energy policy concerns (such as comments requesting that TVA should consider other methods of power generation, or that FERC should evaluate and consider cumulative impacts of alternative energy sources of the Cumberland Gas Plant) are noted but are considered outside the scope of the EIS.

## PROJECT IMPACTS AND MITIGATION

Construction and operation of the Project could result in impacts on environmental resources, including geology, soils, groundwater, surface water, wetlands, vegetation, wildlife, fisheries, special status species, land use, visual resources, socioeconomics, environmental justice, cultural resources, air quality, noise, and safety. In section 3.0 of this EIS, we include a discussion of potential alternatives to the Project.

We evaluate the impacts of the Project, taking into consideration Tennessee's proposed avoidance, minimization, and mitigation measures. Our analysis of impacts on environmental resources is summarized below and is discussed in detail in section 4.0 of this EIS. Where necessary, we recommend additional mitigation measures to reduce impacts on specific resources. Section 5.2 of this EIS contains a compilation of our recommended mitigation measures.

### Geology

Potential geologic hazards in the Project area include seismicity, landslides, and karst features. We conclude that Tennessee's implementation of design criteria to minimize potential impacts from geologic hazards would avoid and minimize risk from geologic hazards.

Tennessee would cross sensitive resources (wetlands and National Rivers Inventory streams) via horizontal directional drill (HDD). Tennessee conducted a geotechnical investigation and assessed the risk for hydrofracture for each location where HDD installation of the Cumberland Pipeline is proposed and has determined that installation of the pipeline via HDD is feasible. Tennessee also determined the risk of hydrofracture to be low; but the potential is higher at the exit location of each HDD, and Tennessee would implement the measures in its HDD Contingency Plan during construction to minimize the potential for hydrofracture and incidental returns of drilling fluid. Overall, we conclude that implementation of Tennessee's HDD Contingency Plan would adequately minimize and mitigate potential adverse impacts associated with HDD construction to a less than significant level and we find the measures outlined in the HDD Contingency Plan to be acceptable.

### Soils

Project construction activities such as clearing, grading, excavation, backfilling, and heavy equipment traffic could result in adverse impacts on soil resources in temporary work areas, on access roads, and at aboveground facilities. The Project would result in the loss of 0.02 acre of prime farmland or farmland of statewide importance that would be encumbered by the Cumberland Meter Station. However, this land is not currently being used for farming practices as it's located within the limits of TVA's existing Cumberland Fossil Plant property. Tennessee would minimize impacts on soils by implementation of the

FERC *Upland Erosion Control, Revegetation, and Maintenance Plan* (FERC Plan) and the *Wetland and Waterbody Construction and Mitigation Procedures* (FERC Procedures),[iv] which have been adopted by Tennessee with certain approved alternative measures; these plans are referred to in the EIS as the Tennessee Plan and Procedures. The Tennessee Plan and Procedures include measures to segregate topsoil in agricultural areas and unsaturated wetlands, use timber mats in wetlands as necessary, install and maintain erosion and sediment control measures, and describe revegetation practices. Through Tennessee's adherence to the measures in its Plan and Procedures, we conclude that impacts on soils would not be significant.

### Groundwater

The Project area is located within the Mississippian-aged aquifers of the Western Highland Rim region of Tennessee. Wells within this aquifer system can yield from one to more than 400 gallons of water per minute (gpm). No EPA-designated sole-source aquifers were identified within the vicinity of the Project; and no known state or local wellhead protection areas are within 1 mile of the Project area.

Typical groundwater depths across the Project area are highly variable and range from relatively shallow depths of less than 5 feet below ground surface (ft bgs) to greater than 150 ft bgs. The average depth to water is 40 ft bgs across all three counties. Tennessee identified 62 wells and springs located near proposed Project construction workspaces. Tennessee proposes to monitor public and private groundwater supply wells and potable springs within 150 feet of the pipeline construction areas where no karst terrain is present. In areas where karst terrain is present, Tennessee would monitor wells within 1,000 feet of the construction areas. With well-owner permission, Tennessee would conduct pre- and post-construction monitoring of water quality and yield using a qualified, independent contractor to conduct the sampling. If wells are damaged by construction activities (including blasting), Tennessee would make the necessary repairs to restore the well to its preconstruction function. If necessary, Tennessee would re-work the existing well or install a comparable replacement. If the water supply is offline for any repair, reworking, or replacement, Tennessee states it would provide a temporary source of water.

With the implementation of Tennessee's project-specific plans such as its Spill Prevention and Countermeasures Plan (SPCP), and its Horizontal Directional Drill Plan (HDD Plan), as well as the proposed mitigation measures discussed in this EIS, we conclude that impacts on groundwater would be adequately minimized and not significant.

### Surface Water

The Project is within the Harpeth River and Lower Cumberland River watersheds. Tennessee identified 149 waterbody crossings during field surveys for the Project, which include 79 ephemeral channels, 35 intermittent streams, and 35 perennial streams. Named perennial stream crossings include Jordan Branch, Porters Branch, Jones Creek, Gafford Branch, Johnson Creek, Harris Branch, Miller Branch, Bartons Creek, Nesbitt Branch, Furnace Creek, Dry Hollow Branch, Little Bartons Creek, Leatherwood Creek, Yellow Creek, Guices Creek, Lickskillet Branch, and Wells Creek. Tennessee proposes to cross three of these streams using HDD. The HDD method would minimize direct impacts to banks and beds of waterbodies as only foot traffic and limited vegetation clearing would be necessary between the drilling bore entry and exit points.

Tennessee would construct the Project in accordance with its Procedures, its HDD Contingency Plan, and its Spill Prevention, Containment, and Countermeasures Plan and applicable permit conditions to prevent or mitigate contamination from spills in waterbody crossings. Surface waters could be used by Tennessee for hydrostatic testing and used to prepare drilling mud. Water uptake and discharge would be conducted in accordance with Tennessee's Procedures and applicable state permits.

With the implementation of Tennessee's project-specific plans and proposed mitigation measures discussed in this EIS, we conclude that impacts on surface waters would be adequately minimized and not significant.

### Wetlands

Project workspaces would cross seven wetlands that would result in impacts on 0.69 acre (0.07 acre of forested wetlands and 0.62 acre of emergent wetlands). Of the 0.69 acre of wetlands impacted during construction, 0.41 acre would occur within the operational right-of-way. The remaining 0.28 acre of wetland would be allowed to return to pre-construction conditions once construction was completed. Woody vegetation would be removed from the 0.07 acre of forested wetlands during construction. Following restoration, a 10-foot-wide corridor would be maintained in an herbaceous state through forested wetlands along with the selective cutting of woody vegetation within 15 feet of the pipeline, resulting in a limited amount of permanent wetland conversion from forested to emergent.

Given the minimal impacts on wetlands that would result from the Project; and, with the implementation of Tennessee's Procedures, project-specific plans, and proposed mitigation measures discussed in this EIS, significant impacts on wetlands due to construction and operation of the Project are not anticipated.

### Fisheries

No federally or state listed fish species or designated critical habitat for fish or Essential Fish Habitat (EFH) was identified within the Project area. Dry-ditch crossing methods, such as damn-and-pump, typically decrease downstream turbidity and sedimentation because the trench is excavated under non-flowing conditions while the streamflow is routed around the construction area. Where the dam-and-pump method is proposed, Tennessee would screen the pump intakes to minimize the potential for fish entrainment, injury, and mortality. Tennessee anticipates withdrawing about 6.1 million gallons of water from multiple surface water sources for hydrostatic testing of the pipeline. The pumping rate would vary from 250 to 500 gallons per minute (gpm) and the water would be passed through a mesh screen to block the uptake of various types of debris and aquatic biota. No chemicals would be added to the test water. After pressure testing of the pipeline, the water would be discharged back into upland areas near the point of withdrawal through an energy dissipating structure. When implemented, the measures outlined in Tennessee's Stormwater Pollution Protection Plan (SWPPP) would minimize impacts on water quality due to increased sedimentation from construction stormwater.

With Tennessee's use of dry-ditch or HDD crossing methods within the Project area, and through the adherence to the Procedures regarding maintenance of flow, the SWPPP, SPCP, and HDD Plan, impacts on fisheries would not be significant.

### Vegetation

Approximately 490 acres of vegetated land would be impacted by construction of the Project. There are three dominant vegetation communities within the Project area: forested land (60 percent), open land (20 percent) and agricultural land (20 percent). The Project would not cross any federal or state-designated sensitive vegetation communities or locations of rare plants. Tennessee conducted field surveys to identify noxious or invasive plant species. Only Japanese honeysuckle and Chinese privet were identified during the noxious or invasive plant surveys; and most occurrences were noted along roadways and at areas that were previously disturbed by agricultural equipment. The Project route generally follows parallel to TVA's existing overhead transmission line, which is maintained as open land. With the implementation of Tennessee's Plan and its *Noxious and Invasive Weed Control Plan*, we conclude that impacts on vegetation would not be significant.

**Wildlife**

Impacts on wildlife from construction and operation of the Project would range from temporary to permanent depending on the habitat requirements of the species and the vegetation crossed by the pipeline right-of-way, facilities, and other Project components such as additional temporary workspace and access roads. Temporary to short-term impacts on wildlife would potentially include displacement of individuals from construction areas and adjacent habitats, including pollinator species such as birds, bees, and butterflies; and the direct mortality of smaller, less mobile animals such as small mammals, reptiles, and amphibians that are not able to leave the active construction area. Long-term and permanent impacts would include permanent conversion of forested or scrub-shrub habitat to accommodate aboveground facilities or cleared and maintained right-of-way, and periodic disturbance of wildlife during operation and maintenance.

Tennessee is minimizing alteration of undisturbed areas by generally locating the Project adjacent or generally parallel to an existing TVA powerline easement and other utility easements, therefore avoiding additional fragmentation of contiguous habitats. Tennessee would also limit periodic vegetation maintenance activities within its easement to non-nesting periods to minimize effects to breeding birds during operation of the Project. Therefore, we conclude that the Project would not have a significant impact on wildlife, including migratory birds.

Tennessee consulted with the Tennessee Department of Environment and Conservation (TDEC) on the potential presence of state-listed species occurring within or near the Project. TDEC provided a list of four rare species previously observed within 1 mile of the proposed Project boundary and nine rare species within 4 miles of the Project boundaries. TDEC indicated that it does not anticipate any impacts on known occurrences of rare, threatened, or endangered plant species, and any risks to unknown occurrences is minimal. In consideration of state correspondence and survey results for the Project area, we have determined the Project would have "no impacts" or "no significant impacts" on state-listed species.

Tennessee identified one bird, seven plants, two freshwater mussels, four bats (including the tri-colored bat), and one reptile as federal and/or state protected species with potential to occur within the Project area. Habitat assessment surveys and consultation with U.S. Fish and Wildlife Service (USFWS) under section 7 of the Endangered Species Act was completed for the Project. The USFWS provided concurrence to Tennessee that the Project activities are *not likely to adversely affect* federally protected species. We agree.

**Land Use**

Land use in the Project area can be characterized as predominantly rural areas dominated by upland forests, agricultural land, and pasture or open land with some developed areas. Small areas of residential land also would be impacted by construction and operation of the Project. The Project would affect approximately 507.5 acres of land during construction, including pipeline construction right-of-way, ATWS, access roads, aboveground facilities, and contractor yards. Of that total acreage, 313.8 acres would be restored to pre-construction uses. The remaining 193.7 acres would be maintained for operation of the Project. However, of the 193.7 acres maintained, approximately 62.8 acres would be accessible to the landowner for pasture, grazing, or agricultural activities following construction.

In residential areas, Tennessee developed site-specific construction plans for locations where residences are located within 25 feet of the proposed construction work area. The site-specific construction plan includes mitigations measures to be implemented by Tennessee to further reduce impacts on residents during construction.

No known public or conservation lands or Natural Resources Conservation Service (NRCS) Conservation Reserve Program properties or NRCS controlled easements are present. Two NRI stream

segments (Jones Creek and Yellow Creek) would be crossed by the Project. These protected river segments are proposed to be crossed using HDD methodology. By utilizing the HDD method to cross NRI stream segments, no impacts on protected river segments would occur from Project construction. No other NRI river segments are within 0.25 mile of the Project area.

Due to the co-located nature of approximately 80 percent of the pipeline adjacent, parallel, and/or overlapping with TVA's existing powerline right-of-way, no new, large, cleared rights-of-way would be created, although the existing cleared right-of-way would be expanded. Therefore, we find that the overall impacts on the viewshed from clearing in forested land for the Project would be minor, yet long-term to permanent. Visual impacts on residences near the proposed Pressure Regulation Station would be mitigated through the installation of a wooden fence and the existing presence of mature trees.

Overall, we conclude that impacts on land use, recreation, special use areas, and visual resources from construction and operation of the Project would be less than significant.

**Socioeconomics**

Construction of the Project would temporarily increase the population in the general vicinity of the Project area during working hours. No significant impacts on the local housing markets are expected from this temporary population increase as most transient workers are expected to stay in Clarksville or Nashville where lodging is more prevalent. Existing public services are adequate to meet the anticipated needs of the construction and operational workforce for the Project.

Staging and delivery of construction personnel, equipment, and materials to project sites may temporarily impact the transportation system in the Project area, but no long-term impacts are anticipated. Tennessee would implement appropriate measures and notifications to minimize these impacts on residents or businesses along these local roads.

Tennessee would compensate landowners for the acquisition of new property for aboveground facilities and for easements, including compensation for construction-related damages and for damages associated with residential properties, crops, pasture, and timber. Construction of the Project would result in minor beneficial socioeconomic impacts due to increases in construction jobs, payroll taxes, purchases made by the workforce, and expenses associated with the acquisition of material goods and equipment. Operation of the Project would have a minor to moderate positive effect to the local governments' tax revenues due to the increase in property taxes that would be collected from Tennessee.

Overall, we conclude that the Project would not have a significant adverse effect to the socioeconomic conditions of the surrounding areas.

**Environmental Justice**

According to the U.S. Census Bureau information, minority and low-income populations exist within the Project Area. Of the 11 block groups within the geographic scope of the Project, 7 block groups are considered environmental justice communities. Three of these block groups have a minority population that exceeds 50 percent or is meaningfully greater than their respective counties. The other four block groups have a low-income population that is equal to or greater than its respective county. Project work within the identified environmental justice communities includes the construction and operation of portions of the pipeline, the Pressure Regulation Station, the Cumberland Meter Station, both Contractor Yards, and HDD activities at mileposts 3.2 and 22.4 along the Cumberland Pipeline.

Potential impacts on area residents include traffic delays during construction, impacts on groundwater, changes in the existing viewsheds, and temporary air emissions and noise during construction. There would be temporary impacts on local traffic based on an increase of construction traffic from

deliveries and workers commuting. Tennessee would employ traffic control measures to ensure the safety of the local population and minimize disruptions to normal traffic flow.

Construction and operation of the pipeline facilities would result in minor temporary and permanent visual impacts, including viewshed impacts for environmental justice communities. In addition, construction of aboveground facilities and continued vegetation clearing would create permanent impacts on localized viewsheds. However, with the visual setting already influenced by the presence of other utilities, existing screening from topography and vegetation, as well as the distance between proposed facilities and potential receptors, impacts on all of the viewsheds would be effectively minimized.

The Project does not include any new operational gas compressor facilities that would generate air quality emissions. Based on air quality analysis and proposed mitigation efforts for use during construction, we conclude air quality impacts from construction and operation of the pipeline facilities would not result in a significant impact on local or regional air quality for environmental justice communities. Through the implementation of noise abatement measures, and our recommended mitigation, impacts from construction and operation of the Pressure Regulation Station and Meter Station facilities would be less than significant.

As the Project includes the construction and operation of new pipeline facilities in environmental justice communities, it would result in disproportionately high and adverse impacts on these environmental justice communities. However, given the nature of the proposed facilities and the minimization and mitigation measures proposed, the Project impacts would not be significant.

### Cultural Resources

Tennessee completed cultural resources surveys for all the accessible project areas. The surveys encompassed approximately 1260.5 acres, and a total of 4,125 shovel test units were excavated. The surveys resulted in recording of 39 newly identified archaeological sites, a revisit of one previously recorded site, which was expanded in size, two additional previously recorded sites, 22 isolated finds, and one site which was previously recorded within the Project footprint but could not be relocated during the current survey. Of these sites, 34 were recommended ineligible for the NRHP, eight were recommended as potentially eligible for the NRHP, and one was unevaluated.

Two previously recorded sites and six newly recorded sites were recommended as potentially eligible for the NRHP during the Phase I survey and were recommended for Phase II testing. One of these was later avoided through Project design efforts, and the remaining seven potentially eligible sites have undergone Phase II testing. Following Phase II investigations, three of the sites were recommended ineligible for the National Register of Historic Places (NRHP) under Criterion D with no further investigations recommended. Two sites, both located on TVA's property, were recommended as eligible for the NRHP under Criterion D with no adverse effects based on Tennessee's avoidance plans. The State Historic Preservation Office (SHPO) has concurred with these recommendations and with Tennessee's avoidance plans on August 29, 2022. We agree. Phase II investigations of the remaining two sites were completed in 2022, resulting in recommendations that sites were eligible for the NRHP under Criterion D. The report and an avoidance plan for the two sites were submitted to the SHPO on February 13, 2023. On February 23, 2023, the SHPO concurred with the recommendations and found that with adherence to the avoidance plan, the Project would not adversely affect the two sites. We agree, and also find the plan acceptable.

Approximately 1.3 miles of the proposed pipeline route and two access roads remain to be surveyed due to denied access. Therefore, compliance with section 106 of the NHPA has not been completed for the entire Project. We have included a recommendation for completion of the unsurveyed portions of the Project.

As a result of the historic architectural survey, 47 historic resources were recorded, including 27 in Dickson County and 20 in Houston County. No historic resources were recorded within Stewart County in association with the Project. The 47 resources include four cemeteries, two bridges, and 41 structures or structure groups. Of the 41 structures and structure groups, 27 are or include residential structures, 10 comprise only barns or other outbuildings, two are commercial structures, one is an industrial structure, and one is a water tower. Two of the historic resources, including one structure and one bridge, are recommended eligible for the NRHP, while the other 45 are recommended ineligible. Tennessee consulted with the SHPO regarding avoidance and/or minimization measures and recommended that the Project would have no adverse effects on historic properties. The SHPO concurred. We concur also.

### Air Quality

The Project would not result in the installation or operation of significant sources of air pollutants, and no combustion of natural gas would occur as part of the Project. The Project is not subject to the New Source Review or Title V (major source) operating permit program. The General Conformity Rule does not apply to the Project.

Construction emissions would include dust from earthmoving and heavy equipment use, that would vary from day to day depending on the level of activity, the specific operations, and recent precipitation. Predominantly, these emissions would likely result from equipment traffic over existing unpaved access roads and wind. Emissions would also be produced from fuel combustion in construction equipment engines. Vehicles and equipment would use gasoline or diesel fuel compliant with the current federal regulations and would be operated with required emission control devices. Equipment diesel fuel would meet current requirements for using ultra-low-sulfur (15 parts per million) diesel fuel specifications.

Tennessee would minimize wind erosion and fugitive dust emissions during construction through the implementation of its *Fugitive Dust Control Plan*. This plan would prescribe mitigation measures such as regularly watering dusty areas, limiting activity during high winds, and other similar mitigation measures.

Fugitive dust and air pollutants from the internal combustion engines of construction equipment would be limited to the immediate vicinity of the Project area and would be short term. As the construction spread moves along the right-of-way, emission sources would move in tandem, and would cease when construction is complete. Through the implementation of the work practices described above and given the short duration of construction activities, the temporary emissions during construction of the Project would be minor, and the impact would be localized. Emissions from construction are not expected to cause or significantly contribute to a violation of any applicable ambient air quality standard. Therefore, we conclude that emissions generated during construction would not have significant impacts on local or regional air quality.

Fugitive emissions may occur at the proposed aboveground facilities. Small amounts of natural gas would also be released during pigging operations of the installed pipeline. These emissions would be minor in nature, and routine pigging is not anticipated to occur frequently during operation of the pipeline. As part of standard operations, Tennessee would monitor and repair leaks across its system according to appropriate safety requirements. We conclude that emissions generated during operation would not have significant negative impacts on local or regional air quality.

### Noise

The EPA has indicated that a day-night noise level ($L_{dn}$) of 55 A-weighted decibels (dBA) protects the public from indoor and outdoor activity interference. The FERC has adopted this criterion, and we use it to evaluate the potential noise impacts from operational noise sources and 24-hour HDDs at pre-existing noise-sensitive areas (NSA) such as schools, hospitals, and residences. Tennessee identified NSAs within

0.5 mile of two of the three HDD locations. However, Tennessee has stated that it would not perform HDD construction activities outside of normal day-time construction periods for HDDs located within 0.5 mile of an NSA and it would notify all affected landowners prior to commencing HDD activities. We find these measures adequate to mitigate noise impacts at these HDD locations.

The Project also includes operation of a new Pressure Regulation Station at milepost 0.0 of the Cumberland Pipeline. Noise modeling of the closest NSA to the Pressure Regulation Station shows estimated noise levels could increase by 8.7 decibels above ambient levels. In section 4.11.4, we have included a recommendation for operational noise surveys, and if the $L_{dn}$ at NSAs associated with the new station exceeds our noise threshold of 55 dbA $L_{dn}$, Tennessee would be required to install additional noise controls to reduce sounds levels in this area. Therefore, we conclude operation of the Project would not result in significant noise impacts on local residents.

### Safety

The Cumberland Pipeline and aboveground facilities would be designed, constructed, operated, and maintained to meet U.S. Department of Transportation Minimum Federal Safety Standards in title 49 of the Code of Federal Regulations, Part 192 (49 CFR 192) and other applicable federal and state regulations. These regulations include specifications for material selection and qualification; minimum design requirements; and protection from internal, external, and atmospheric corrosion.

Safety standards specified in 49 CFR 192 also require that each operator establish and maintain liaison with appropriate fire, law enforcement, and public officials to learn the resources and responsibilities of each organization that may respond to a natural gas pipeline emergency, and to coordinate mutual assistance in responding to emergencies. The operator must also establish a continuing education program to enable customers, the public, government officials, and those engaged in excavation activities to recognize a gas pipeline emergency and report it to appropriate public officials. Tennessee would utilize the emergency procedures contained in its *Emergency Operating Procedures Manual*, which requires communication with emergency responders on an annual basis. Local contact phone numbers, external contact information, equipment or resources available for mobilization, and any specific procedures to be followed for the Cumberland Pipeline would be incorporated into the *Emergency Operating Procedures Manual* prior to commencement of pipeline operations.

Based on Tennessee's compliance with federal design and safety standards and their implementation of safety measures, we conclude that constructing and operating the Project facilities would not significantly impact public safety.

### Climate Change

Construction and operation of the Project would increase the atmospheric concentration of greenhouse gases (GHG) in combination with past, current, and future emissions from all other sources globally and contribute incrementally to future climate change impacts. However, substantial downstream emissions reductions would be associated with the replacement of coal-fired generation with natural gas-powered generation at TVA's electrical generating facility that the Project is designed to serve. The net overall reduction in GHG emissions from the combined operation of the modified TVA Cumberland Plant and the Project's facilities would be almost 5 million tons per year of carbon dioxide equivalent emissions when compared to the current emissions baseline. This represents a 0.09 percent decrease in GHG emissions within the national inventory based on 2020 levels.

### Alternatives

The no-action alternative would avoid the temporary/short-term and permanent/long-term environmental impacts associated with construction of the proposed Project; however, Tennessee would

not be able to fulfill TVA's proposed action to provide up to approximately 245,040 Dth/d of firm transportation capacity to serve the Cumberland Gas Plant, as identified in TVA's final EIS for the Cumberland Fossil Plant Retirement; and similarly, the terms of the precedent agreement between Tennessee and TVA and Tennessee's FERC gas tariff would not be met. We have prepared this EIS to inform the Commission and stakeholders about the expected impacts that would occur if the Project were constructed and operated. The Commission will ultimately determine the Project need and could choose the no-action alternative. Based on our evaluations of alternative routes and smaller route variances for the proposed pipeline, we conclude that the proposed pipeline route, which is at least 80 percent co-located with TVA's existing overhead electric transmission line, is the preferred alternative to meet the Project objective.

**MAJOR CONCLUSIONS**

As described in this executive summary and throughout the environmental analysis section of this EIS, we conclude that construction and operation of the Project would result in some adverse environmental impacts. Most of these impacts would be temporary and occur only during construction. Impacts on environmental justice communities from the Project would not be significant. With implementation of Tennessee's impact avoidance, minimization, and mitigation measures, as well as its adherence to our recommendations, we conclude that the Project effects would be reduced to less-than-significant levels, except for climate change impacts that are not characterized in this EIS as significant or insignificant.

We recommend additional mitigation measures that Tennessee should implement to further reduce the environmental impacts that would otherwise result from construction and operation of the Project. We will recommend that these mitigation measures be attached as conditions to any authorization issued by the Commission. These recommended mitigation measures are presented throughout section 4 of the EIS in bulleted, bold text and are summarized in section 5.2.

---

[i] The pronouns "we," "us," and "our" refer to the environmental staff of the Federal Energy Regulatory Commission's Office of Energy Projects.
[ii] 87 Fed. Reg. 56048.
[iii] 88 Fed. Reg. 8417.
[iv] The FERC Plan and Procedures are a set of baseline construction and mitigation measures developed to minimize the potential environmental impacts of construction on upland areas, wetlands, and waterbodies. The Plan and Procedures can be viewed on the FERC website at: http://www.ferc.gov/industries/gas/enviro/plan.pdf and http://www.ferc.gov/industries/gas/enviro/procedures.pdf.

## 1.0    INTRODUCTION

The Federal Energy Regulatory Commission (Commission or FERC) is the federal agency responsible for authorizing applications to construct, operate, and maintain interstate natural gas transmission pipeline facilities. As part of its decision-making process, the Commission is required by the National Environmental Policy Act (NEPA) of 1969, as amended, and its implementing regulations to assess the environmental impact associated with the construction and operation of a proposed project. The Commission's environmental staff prepared this Environmental Impact Statement (EIS) to assess the potential environmental impacts that could result from the construction and operation of an interstate natural gas transmission pipeline and appurtenant facilities proposed by Tennessee Gas Pipeline Company, LLC (Tennessee).

On July 22, 2022, Tennessee filed an application with the Commission under section 7(c) of the Natural Gas Act (NGA), as amended. Tennessee is seeking a Certificate of Public Convenience and Necessity (Certificate) to construct, install, own, operate, and maintain a new interstate natural gas pipeline and ancillary facilities in the state of Tennessee, referred to in this EIS as the Cumberland Project (Project). Tennessee's application was assigned Docket No. CP22-493-000. We issued a Notice of Application for the Project on July 29, 2022, and the notice appeared in the *Federal Register* (FR) on August 4, 2022.[1]

Tennessee's Project would involve the construction and operation of the following facilities, all in the state of Tennessee:

- **Cumberland Pipeline**: Construction of approximately 32 miles of new 30-inch-diameter natural gas pipeline, which would connect at Tennessee's existing Line 100-3 and Line 100-4. The Cumberland Pipeline would be located in Dickson, Houston, and Stewart Counties.

- **Pressure Regulation Station**: Construction of two new bi-directional back pressure regulation facilities on Line 100-3 and Line 100-4 at milepost 0.0 of the proposed new Cumberland Pipeline in Dickson County.

- **Cumberland Meter Station**: Construction of a new meter station at the terminus of the Cumberland Pipeline, located within Tennessee Valley Authority's (TVA) property in Stewart County.

- **Launcher and Receiver**: Construction of in-line inspection traps, for in-line inspection tools at each end of the Cumberland Pipeline.

- **Mainline Valves (MLV)**: Construction of three new MLVs. One would be installed at an intermediate location along the Cumberland Pipeline, and the remaining two would be on Tennessee's Line 100-3 and Line 100-4 within the vicinity of the new Pressure Regulation Station.

The proposed Project would allow Tennessee to provide up to 245,040 dekatherms per day (Dth/d) of firm natural gas transportation capacity to TVA. According to Tennessee, the Project would support TVA's retirement and demolition of one of its two-unit, coal-fired Cumberland Fossil Plant (CUF). To recover the generation capacity lost from retirement of one coal-fired unit at the CUF, TVA is planning the addition of a 1,450 megawatt (MW) Combined Cycle Combustion Turbine Gas Plant (Cumberland Gas Plant), an electrical generating facility, on the same property as the CUF in Stewart County, Tennessee.

---

[1] Federal Register / Vol. 87, No. 149 / Thursday, August 4, 2022 / Notices.

The vertical line in the left margin identifies text that is new or modified in the final EIS and differs materially from corresponding text in the draft EIS. Changes were made to address comments from agencies and other stakeholders on the draft EIS and as a result of updated information that became available after the issuance of the draft EIS.

## 1.1 PURPOSE AND NEED

The Council on Environmental Quality's (CEQ) regulations for implementing NEPA at Title 40 of the Code of Federal Regulations § 1502.13 (40 CFR 1502.13) require that an EIS should briefly address the underlying purpose and need for a project. Tennessee states that the purpose of the proposed Project is to transport approximately 245,040 dekatherms per day (Dth/d) from its existing natural gas pipeline system to TVA. Under a signed precedent agreement, TVA would purchase all of the firm transportation capacity that would be transported via Tennessee's proposed Project, as described in the TVA's Record of Decision approving the retirement and replacement of facilities at its CUF.[2]

TVA was created by the U.S. Congress in 1933 under the TVA Act[3] for the purposes of improving the quality of life in the Tennessee Valley through the integrated management of the region's resources. TVA is the largest producer of public power in the United States. TVA is legislatively mandated to develop and provide a least-cost energy strategy that also delivers rate stability to its customers over a variety of future environmental scenarios (TVA 2019a). In addition to a congressional mandate regarding the availability of least-cost energy, TVA is also required by law to evaluate the full range of existing and incremental resources including new power supplies, energy conservation and efficiency, and renewable energy resources. In 2019, TVA issued its Integrated Resource Plan (IRP),[4] which examines how TVA can meet future power demands using newer, more innovative technologies. The IRP takes into account costs, environmental factors, reliability, regulations, energy efficiency, technological advancements, projected customer demands, and other factors to help guide TVA's decision-making for the energy future of its service area. The IRP lays out a 20-year plan that will result in the addition of up to 14 gigawatts (GW) of solar generation, 5 GW of battery energy storage, between 2 – 17 GW of natural gas additions, and the evaluation of further coal-fired unit retirements. The IRP predicts a reduction in $CO_2$ intensity of up to 70 percent (TVA 2019a). Based on the recommendations in the IRP, the TVA Board recommended the use of a target power supply mix to meet its requirements. The target power supply mix identified the addition of up to 500 MW of demand response and 2,200 MW of energy efficiency (demand-side options); 4,200 MW of wind; 5,300 MW of battery energy storage; 8,600 MW of combustion turbines (CT); 9,800 MW of combined cycle (CC); and 14,000 MW of solar by 2038.[5]

As per its Final EIS for the CUF Retirement (TVA FEIS), TVA proposes to retire and decommission the two coal-fired units, one by 2026 and the other unit by 2028, and to provide replacement generation that can supply 1,450 MW of firm, dispatchable power by the time the first unit is retired in

---

[2] The TVA's Record of Decision for the Cumberland Fossil Plant Retirement was published in the Federal Register on January 20, 2023, and is available to view at https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/environment/cumberland/cumberland-rode7068bb4-174e-4566-9f27-25e524220aa0.pdf?sfvrsn=7770ed94_5.

[3] The Tennessee Valley Authority Act of 1933. May 18, 1933; Enrolled Acts and Resolutions of Congress, 1789-1996; General Records of the United States Government; Record Group 11, National Archives.

[4] 2019 Integrated Resource Plan was issued by TVA and is available to the public on TVA's website at https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/default-document-library/site-content/environment/environmental-stewardship/irp/2019-documents/tva-2019-integrated-resource-plan-volume-i-final-resource-plan.pdf?sfvrsn=44251e0a_4.

[5] TVA Cumberland Fossil Plant Retirement Final Environmental Impact Statement, page 4.

2026.  TVA evaluated potential environmental impacts of the CUF Retirement Project using several alternatives.  The Cumberland Project would provide natural gas to serve TVA's Proposed Action (one of three action alternatives evaluated in the TVA FEIS).  TVA's Proposed Action involves the construction and operation of the Cumberland Gas Plant on the same TVA Reservation as the CUF in Stewart County.  The TVA Reservation is a large parcel that is dedicated to energy generation-related uses.  In its FEIS, TVA identified its preferred alternative, "Alternative A" (i.e., TVA's Proposed Action) as the "best overall solution to provide low-cost, reliable, and cleaner energy to the TVA power system" (TVA 2022).  TVA issued its FEIS in December 2022[6] and issued a Record of Decision adopting the Preferred Alternative, Alternative A, on January 10, 2023.[7]

The Commission's role in reviewing the details of any project under its jurisdiction is to make a determination of whether the project is in the public interest under Section 7(c) of the NGA and, if so, grant a Certificate of Public Convenience and Necessity to construct and operate the facilities.  The Commission bases its decisions on both economic issues, including need, and environmental impacts, based on the Commission's Policy Statement.  The Commission decision, in its Order, would review the need for Tennessee's proposed Project.

In accordance with the CEQ's regulations implementing NEPA, no agency decision on a proposed action may be made until 30 days after the U.S. Environmental Protection Agency (EPA) publishes a notice of availability of the final EIS in the federal register.  However, the CEQ regulations provide an exception to this rule when an agency decision is subject to a formal internal appeal process that allows other agencies or the public to make their views known.  In such cases, the agency decision may be made at the same time the notice of the final EIS is published, allowing both periods to run concurrently.  The Commission decision for this proposed action is subject to a 30-day rehearing period.

## 1.2    PURPOSE AND SCOPE OF THE EIS

Our[8] principal purposes in preparing this EIS are to:

- identify and assess the potential impacts on the natural and human environment that would result from the construction and operation of the proposed Project;

- describe and evaluate reasonable alternatives to the proposed Project that would avoid or minimize adverse impacts on environmental resources;

- recommend mitigation measures, as necessary, that could be implemented by Tennessee to reduce impacts on specific environmental resources; and

- encourage and facilitate involvement by the public and interested agencies in the environmental review process.

This EIS addresses topics including Project alternatives; geology; soils; water resources (including groundwater, surface water, and wetlands); fisheries, vegetation; wildlife and special status species; land use, recreation, special interest areas, and visual resources; socioeconomics; environmental justice; cultural resources; air quality and noise; greenhouse gas (GHG) emissions and climate change; reliability and safety;

---

[6] TVA's Cumberland Fossil Plant Retirement Final Environmental Impact Statement was issued on December 6, 2022, and is available for viewing at: https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/environment/cumberland-fossil-plant-retirement-final-eis4eeac6f0-b6bf-4843-9881-75d19ccf8ede.pdf?sfvrsn=d61f6b6f_7.

[7] https://www.tva.com/environment/environmental-stewardship/environmental-reviews/nepa-detail/cumberland-fossil-plant-retirement.

[8] The pronouns "we," "us," and "our" refer to the environmental staff of the FERC's Office of Energy Projects.

and cumulative impacts. This EIS describes the affected environment as it currently exists and analyzes the environmental consequences of the proposed Project. This EIS also presents our conclusions and recommended mitigation measures.

Our description of the affected environment is based on a combination of data sources, including desktop resources such as scientific literature and regulatory agency reports, information from resource and permitting agencies, scoping comments, and field data collected by Tennessee and its consultants. As of February 2023, Tennessee has completed environmental surveys for all identified Project workspace areas, except for survey corridors traversing eight "No Access" parcels (approximately 1.3 miles) and portions of two proposed access roads.

This EIS does not evaluate the purpose and need or potential direct impacts that could occur if TVA moved forward with its Proposed Action. The Federal Power Act exempts electric generation facilities from regulation by the Commission in areas traditionally regulated by the States, to which the evaluation of power generation needs traditionally fall.[9] Although the evaluation of need for additional electrical generation is generally up to the States, under the TVA Act,[10] the TVA Board has the exclusive authority to evaluate a need for generation facilities within TVA's service territory.[11] Accordingly, evaluation of TVA's proposed action is outside the scope of this proceeding, with the exception of potential cumulative effects that are addressed in section 4.13. Therefore, this EIS examines the alternatives and the direct, indirect, and cumulative impacts associated with the natural gas pipeline proposed by Tennessee to serve the Cumberland Gas Plant identified as the preferred alternative in TVA's EIS.

On March 2, 2022, and September 7, 2022, respectively, we sent our *Notice of Scoping Period Requesting Comments on Environmental Issues for the Planned Cumberland Project* and our *Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Cumberland Project, Request for Comments on Environmental Issues, and Schedule for Environmental Review* (NOI) to various federal and state resource agencies that may have an interest in cooperating in the preparation of the EIS for the Project, as defined in 40 CFR 1501.8. Following receipt of comments during the scoping period for the Project, the U.S. Army Corps of Engineers (USACE), Nashville District, on August 9, 2022, requested to participate as a cooperating agency to provide technical expertise in developing the analysis in this EIS. Additionally, on October 18, 2022, the EPA requested to be a cooperating agency in the development of the EIS. The role of the USACE and the EPA as cooperating agencies in the review and authorization process is described below. A cooperating agency has jurisdiction by law over part of a project and/or has special expertise with respect to environmental issues. Cooperating agencies play a role in the environmental analyses of projects and assist in developing mitigation plans or other measures. They participate in the NEPA process by reviewing the application and related materials, and by reviewing administrative drafts of the overall EIS or the specific portions related to agency permitting or special expertise.

### 1.2.1 Federal Energy Regulatory Commission

The FERC is an independent federal regulatory agency that regulates the interstate transportation of natural gas, among other industries, in accordance with the NGA. Pursuant to the Energy Policy Act of 2005 Section 313(b)(1), the FERC is the lead federal agency for the coordination of all applicable federal

---

[9] 16 U.S.C. § 824(b)(1) (excluding from FERC's jurisdiction "facilities used for the generation of electric energy or local distribution or only for the transmission of electric energy in intrastate commerce, or the transmission of electric energy consumed wholly by the transmitter").

[10] The Tennessee Valley Authority Act of 1933.

[11] *See* 16 U.S.C. § 831m-1 (requiring TVA to conduct a least cost planning program when evaluating and selecting new energy resources); 16 U.S.C. § 831c(j) (granting the TVA Board the power to acquire or construct power houses).

authorizations. Thus, the FERC is the lead federal agency for preparation of this EIS to comply with NEPA, as described in the CEQ's regulations at 40 CFR 1501.7, and in keeping with the May 2002 Interagency Agreement with other federal agencies. As the lead federal agency, we prepared this EIS to assess the environmental impacts that could result from constructing and operating the Project. This document was prepared in compliance with the requirements of the CEQ's regulations at 40 CFR 1500-1508, and the FERC's regulations for implementing NEPA at 18 CFR 380. As applicable, this EIS is also intended to support subsequent conclusions and decisions made by the Commission. The Commission would consider the analysis and conclusions of the EIS, as well as non-environmental issues, in its decision on whether to issue a Certificate to Tennessee.

## 1.2.2    U.S. Army Corps of Engineers

The USACE has jurisdictional authority pursuant to Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act. Section 404 governs the discharge of dredged or fill materials into waters of the United States., including wetlands. Section 10 applies to any dredging or disposal of dredged materials, structures, utility line or transportation crossings, or any other modification of a navigable water of the U.S. Because the USACE must comply with the requirements of NEPA before issuing permits under these statutes, it has elected to participate as a cooperating agency in the preparation of this EIS. The USACE would adopt the EIS per 40 CFR 1506.3 if, after an independent review of the document, it concludes that its comments and suggestions have been satisfied. The Project is located within the Nashville District of the USACE Great Lakes and Ohio River Division.

As an element of its review, the USACE must consider whether proposed projects represent the least environmentally damaging practicable alternative pursuant to the Clean Water Act (CWA) section 404(b)(1) guidelines. The term "practicable" means available and capable of being done after taking into consideration cost, existing technology, and logistics, in light of the overall purpose of the project. Therefore, the USACE will evaluate the Project under the 404(b)(1) guidelines and may require Tennessee to provide mitigation for adverse impacts on waters of the U.S.

Although this document addresses environmental impacts associated with the proposed Project as it relates to section 404 and section 10, it does not serve as a public notice for any of the USACE's permits. Based on its participation as a cooperating agency and its consideration of the EIS (including responses to public comments), the USACE would prepare a decision document of the proposed action to formally document its decision on the proposed action.

## 1.2.3    U.S. Environmental Protection Agency

The EPA is an independent federal agency responsible for protecting human health and safeguarding the natural environment. Under section 401 of the CWA, the EPA has delegated water quality certification to the jurisdiction of individual state agencies. The EPA may assume section 401 authority if no state program exists, if the state program is not functioning adequately, or at the request of the state. The EPA also oversees the issuance of a National Pollutant Discharge Elimination System (NPDES) permit by the state agency, under section 402 of the CWA, for point-source discharge of water used for hydrostatic testing of pipelines into waterbodies. In addition, the EPA has the authority to review and veto USACE decisions on section 404 permits. Tennessee's proposed Project is within EPA Region 4. EPA staff from Region 4 participated in the NEPA review and evaluated the proposed Project and potential impacts for region-specific issues.

The EPA also has jurisdictional authority to regulate air pollution under the Clean Air Act of 1970, as amended in 1977 and 1990 (CAA) (42 USC 85), by developing and enforcing rules and regulations for all entities that emit pollutants into the air. Under this authority, the EPA has developed regulations for major sources of air pollution. Pursuant to the CAA in CFR 51.160-164, states and local agencies are

required to develop their own regulations for major and non-major sources provided the state requirements are consistent with and at least as protective as the CAA and applicable federal regulations. The state provisions are then submitted to the EPA for approval and incorporation into the applicable State Implementation Plan. The EPA also establishes general conformity applicability thresholds, with which a federal agency can determine whether a specific action requires a general conformity assessment.

In addition to its permitting responsibilities, the EPA is required under section 309 of the CAA to review and publicly comment on the environmental impacts of major federal actions, including actions that are the subject of draft and final EISs, and is responsible for implementing certain procedural provisions of NEPA (e.g., publishing the Notices of Availability of the draft and final EISs in the *Federal Register* [FR]) to establish statutory timeframes for the environmental review process.

## 1.3    PUBLIC REVIEW AND COMMENT

There have been opportunities for public involvement during the Commission's environmental review processes. On November 5, 2021, the Commission approved Tennessee's request to use the pre-filing process to initiate the project review process. Tennessee conducted meetings with federal, state, county, and local elected officials in the Project area and the Chamber of Commerce for each county where the Project facilities are located as part of Tennessee's general community outreach. On January 18, 19, and 27, 2022, Tennessee hosted three open house meetings on the Project, two in-person and one virtual. Representatives from FERC were present at these meetings to answer questions regarding the FERC Pre-Filing Process and how to submit comments on the docket. On March 3, 2022, FERC issued a *Notice of Scoping Period Requesting Comments on Environmental Issues for the Planned Cumberland Project*. The notice was mailed to our environmental mailing list, which included federal and state resources agencies; elected officials; environmental groups and non-governmental organizations; Native American Tribes; potentially affected landowners (as defined in the Commission's regulations at 18 CFR 157.6); local libraries and newspapers; and other stakeholders who had indicated an interest in the Project. Issuance of the notice opened a 30-day scoping period, which expired on April 4, 2022. Sixteen comments were received in response to the Notice of Scoping.

Tennessee filed its formal FERC application on July 22, 2022, in Docket No. CP22-493-000. As a part of its Project development, Tennessee contacted federal, state, and local governmental agencies to inform them about the Project and discuss Project-specific issues. Tennessee also contacted affected landowners to inform them about the Project and to obtain permission to perform environmental surveys on their land. On July 29, 2022, the FERC issued a Notice of Application for the Project, which described the ways to become involved in the Commission's review of the Project. One way is to become an intervenor, or party to the proceeding. This is a legal position that carries certain rights and responsibilities and gives parties legal standing to request a rehearing and challenge a Commission decision in court. The second way to participate is to file comments with the Secretary of the Commission (Secretary). The comment period to respond to the Notice of Application closed on August 29, 2022. The following companies and organizations have filed for intervenor status:

| | |
|---|---|
| American Gas Association | National Grid Gas Delivery Companies |
| Antero Resources Corporation | New Jersey Natural Gas Company |
| Appalachian Mountain Advocates | New York State Electric and Gas Corporation |
| Appalachian Voices | NJR Energy Services Company |
| Atmos Energy Corporation | Sierra Club |
| Center for Biological Diversity | Southern Alliance for Clean Energy |
| Chattanooga Gas Company | Southern Company Services, Inc. |
| East Tennessee Group | Southern Environmental Law Center |

| State of Tennessee | Tennessee Valley Authority |
| Tennessee Customer Group | Tennessee Valley Public Power Association, Inc. |

The following individuals also have filed for intervenor status: Robert L. Baird, Cheryl Corlew, Burton Corlew, Dorothy Corlew, JoAnn McIntosh, Barbara C. Miller, Angela Mummaw, Christina Page, Edward M., and Nancy G. Polk, and Patrick E. Stephens.

On September 7, 2022, the FERC issued an NOI, which was published in the FR on September 13, 2022.[12] The notice was mailed to our environmental mailing list, which included federal and state resources agencies; elected officials; environmental groups and non-governmental organizations; Native American Tribes; potentially affected landowners (as defined in the Commission's regulations at 18 CFR 157.6); local libraries and newspapers; and other stakeholders who had indicated an interest in the Project. Issuance of the notice opened another 30-day formal scoping period, which expired on October 7, 2022.

On February 3, 2023, we issued a *Notice of Availability of the Draft Environmental Impact Statement for the Proposed Cumberland Project*. The draft EIS was filed with the EPA, and EPA's formal notice of availability was issued in the Federal Register on Thursday, February 9, 2023, indicating that the draft EIS was available.[13] The Commission mailed a copy of the *Notice of Availability* to federal, state, and local government representatives and agencies; elected officials; environmental and public interest groups; Native American Tribes; potentially affected landowners and other interested individuals and groups; and newspapers and libraries in the Project area. Along with the notice of availability, the Commission requested comments on the draft EIS. The official comment period closed on March 27, 2023, although comments that were filed to the docket after that date were considered. The Commission invited the public to comment on the draft EIS by filing comments electronically (via FERC eComment or eFiling), mailing written comments in to the Secretary, or by attending one of the two in-person public comment sessions hosted by FERC staff in Dickson and Cumberland City, Tennessee on February 21 and February 22, 2023, respectively. In addition to the public involvement opportunities issued by the Commission and described above, the U.S. Army Corps of Engineers has issued two public notices in response to Tennessee's application for a Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act Individual Permit. Public Notice No. 23-02 was issued on February 14, 2023, and opened a 30-day comment period that closed on March 16, 2023. Public Notice No. 23-13 was reissued on April 11, 2023, and opened a 30-day comment period that closed on May 10, 2023. Both of these public notices contained information regarding potential impacts from the proposed discharge of fill material into streams and wetlands, classified as waters of the U.S., by Tennessee during its construction of the Project.

### 1.3.1    Summary of Submitted Alternatives, Information, and Analyses During Scoping

We received about 55 unique comment letters during the scoping periods. These included comments from the Choctaw Nation of Oklahoma; from agencies including the USACE, EPA, TVA, U.S. Fish and Wildlife Service (USFWS), and Tennessee Department of Environmental Conservation (TDEC); from organizations such as the Sierra Club, Appalachian Voices, Southern Environmental Law Center, and the Environmental Justice Group; and from many members of the public. The environmental comments received were addressed, as applicable, in relevant sections of the February 2023 draft EIS, as shown in table 1.3-1. Non-environmental comments, such as those declaring general support for the Project, or comments that focused on general energy policy concerns (such as opposition to fossil fuels in general) or

---

[12] 87 Fed. Reg. 56048.

[13] 88 Fed. Reg. 8417.

TVA-specific actions (such as comments that requested TVA's CUF should consider other methods of power generation or that FERC should consider cumulative impacts of alternative energy sources of the TVA CUF) were noted but are considered outside the scope of the EIS.

As discussed above, our NOI established a defined scoping period with a concluding date. However, we continued to consider comments received after the close of the scoping period, up until the time we completed our reviews of the application and drafted this EIS. All filed comments are available for public review on the Commission's website as outlined in the cover letter to this EIS. In addition, appendix B includes a table of comments received during the scoping process for the Project.

Commentors, including the EPA, and several non-governmental organizations, expressed concerns regarding the Project purpose and need. Further, the EPA recommends that FERC postpone any approvals until the Record of Decision on TVA's proposed CUF retirement has been issued.[14] This EIS discloses the applicant's stated purpose and need in order to define the scope of our NEPA analysis and range of alternatives to consider. The need for the Project and timing of a decision would be addressed by the Commission in the Order and are outside the scope of this document.

Comments on alternatives were received from regulatory agencies such as the EPA, non-governmental organizations, and private citizens. Most of the comments centered on alternative energy sources (primarily renewables) and not using natural gas combustion turbines. Additionally, the EPA commented on the need to review existing pipeline systems in the area that could meet the Project's needs without construction of the lateral, in order to minimize impacts on resources such as streams, wetlands, forests, and wildlife.

**Table 1.3-1: Issues Identified and Comments Received During the 2022 Public Scoping Process for the Cumberland Project**

| Issue/Concern | EIS Section Addressing Comment |
|---|---|
| Air quality, health impacts, greenhouse gases, and climate change (including methane, fugitive emissions, and downstream emissions) (accession nos. 20220404-5249 and 20220404-5249. | 4.10.1 and 4.13.10 |
| Alternatives (including energy alternatives, route realignments, system alternatives) (accession no. 20221007-5084) | 3.0 |
| Socioeconomic impacts (including impacts on local communities, school age children, and environmental justice communities) (accession nos. 20221007-5002 and 20221007-5156). | 4.8 |
| Potential impacts on environmental justice populations and historic resources located in the Cumberland Furnace and Promise Land communities (accession no. 20221007-5002). | 4.7.3 4.9.2 4.8.3 |
| Special Status Species (bald eagles, listed bats, and state-listed species) (accession no. 20220329-5074). | 4.6 |
| Vegetation (including invasive species, pollinator plants, and impacts on forested areas) (accession no. 20220819-5094). | 4.7 |
| Water resources (including groundwater, surface water, and wetlands, including water withdrawals, erosion and sediment controls, contamination, and inadvertent releases of drilling fluid) (accession no. 20220311-5113). | 4.3 |
| Wildlife (including impacts on migratory birds, pollinators, and wildlife habitat) (accession no. 20220819-5094). | 4.6 |

---

[14] As noted, the TVA issued its Record of Decision adopting the TVA final EIS recommendation of Alternative A as its preferred alternative on January 10, 2023.

AR 003854

### 1.3.2    Summary of Submitted Comments During the Public Comment Period

During the public comment period for the draft EIS, FERC staff conducted two in-person comment sessions in Dickson and Cumberland City, Tennessee on February 21 and February 22, 2023, respectively. Approximately 14 people attended the public comment meeting on February 21 in Dickson; and approximately 15 people attended the public comment meeting in Cumberland City on February 22. In addition, during the comment period, we received 28 individual comment letters from the EPA, U.S. Department of Interior (DOI), TVA, TDEC, the State of Tennessee, the Southern Environmental Law Center, Appalachian Voices, Tennessee Interfaith Power and Light, Teamsters National Pipeline Labor Management Cooperation, Clean Up TVA, the Sierra Club, Southern Alliance for Clean Energy, Quapaw Nation, 11 individuals/members of the public, and Tennessee Gas Pipeline Company, LLC.

The EPA and TVA provided minor comments on the content of the draft EIS and recommendations for edits. The DOI indicated that Tennessee had completed its obligations under section 7 of the Endangered Species Act (ESA). The Quapaw Nation indicated it had no tribal interest in the Project. The Teamsters and the State of Tennessee expressed their support for the Project. The majority of the non-governmental organizations' comments were opposed to the Project and requested alternatives such as solar or other renewable energy sources be used in lieu of TVA's new natural gas generation facility. However, as previously noted in section 1.2, FERC's EIS is not intended to evaluate the purpose and need, alternatives, or potential direct impacts that could occur under TVA's Proposed Action.

No comments were submitted on the draft EIS identifying additional alternatives for the pipeline to be examined, such as specific route changes, or the location of an alternative pipeline system. Copies of all comment letters, and responses to the comments are provided in appendix I. In addition, where applicable, certain comments have been addressed in the relevant sections of this EIS.

This EIS addresses the potential environmental impacts of Tennessee's proposed Project and the concerns identified by commenters and permitting or resource agencies that responded to the Notice of Scoping and/or the Notice of Intent, or commented on the draft EIS, as well as our own independent evaluation of environmental resource impacts and other issues. Non-environmental comments, such as those declaring general support for the Project, or that focused on general TVA energy policy concerns were noted but are considered outside the scope of the EIS.

This EIS has been filed with the EPA, and the Notice of Availability of the EIS is being mailed to the environmental mailing list as described above, including individuals who provided comments or asked to be placed on the mailing list. The distribution list for the Notice of Availability of the EIS is provided in Appendix A. A formal notice indicating that the EIS is available for review will be published in the Federal Register.

### 1.4    PERMITS, APPROVALS, AND CONSULTATIONS

A list of major federal and state environmental permits, approvals, and consultations for the Project is provided in table 1.4-1. Examples of permits and approvals include the Bald and Golden Eagle Protection Act (BGEPA), CAA, CWA, ESA, Migratory Bird Treaty Act (MBTA), and the National Historic Preservation Act (NHPA). Each of these statutes have been taken into account in the preparation of this EIS, as discussed below. Tennessee would be responsible for obtaining all necessary permits and approvals required to construct and operate the Project, regardless of whether or not they appear in the table. Outreach to Native American Tribes is documented in section 4.9.

**Table 1.4-1: Major Permits, Approvals, and Consultations for the Cumberland Project**

| Agency | Permit/Approval/ Consultation | Status |
|---|---|---|
| **Federal** | | |
| FERC, Office of Energy Projects | Section 7(c) Natural Gas Act - Certificate of Public Convenience and Necessity | Certificate application filed 7/22/2022. |
| EPA Region 4 | Compliance with CWA and CAA | The EPA review anticipated to be concurrent with FERC's review of the certificate application. |
| USACE, Nashville Regulatory District, West Branch | Section 404 CWA/Section 10 Rivers and Harbors Act Permit | Permit Application submitted to the USACE on 7/22/2022. Supplement to Individual Permit Application filed on 9/30/2022. USACE issued a Preliminary Jurisdictional Determination on 1/4/2023. The Individual Permit public notice was issued on 2/9/2023 (PN 23-02). Due to additional information submitted, a second public notice was issued on 4/11/2023 (PN 23-13.) |
| USFWS, Tennessee Ecological Services Office | Consultation under Endangered Species Act, Bald and Golden Eagle Protection Act, and Migratory Bird Treaty Act | The USFWS provided concurrence of "not likely to adversely affect" dated 3/10/2022. Received concurrence of "not likely to adversely affect" the tricolored bat dated 3/15/2023. |
| Advisory Council on Historic Preservation (ACHP) | NHPA, Section 106 Consultation | The ACHP would be notified if it is determined that the Project would have an adverse effect on historic properties |
| National Park Service (NPS), Southeast Region | Consultation under Wild and Scenic River Act for Crossing of Nationwide Rivers Inventory Segments | The NPS notified Tennessee on 4/25/2022 that the NPS has no comments or objections to the Project. |
| Natural Resources Conservation Service (NRCS), Nashville State Office | FERC Data Gathering Consultations | The NRCS provided Tennessee with seed mix recommendations on 3/29/2022 and confirmed that no NRCS Agricultural Conservation Easement Program easements are crossed by the Project. |
| **State** | | |
| Tennessee Historical Commission - State Historic Preservation Office (SHPO) | NHPA, Section 106 Consultation | Concurrence with Phase I Cultural Resources surveys and reporting received on 11/3/21 and 7/12/2022. Concurrence with the Phase II Cultural Resources Surveys and Reporting and Avoidance Plans received on 7/19/22, 8/29/22, and 2/23/2023. |
| TDEC, Division of Natural Areas, Natural Heritage Program (NHP) | State Threatened and Endangered Species Review | Project review response received 6/29/2021. NHP letter stated it does not anticipate any impacts on protected species. |
| TDEC, Division of Water Resources (DWR) | Aquatic Resource Alteration Permit (ARAP), which also serves as the 401 CWA Water Quality Certification) | ARAP application submitted to TDEC on 7/22/2022. TDEC determined the application complete on 4/20/2023. A public Notice Requesting Public Comments on Draft Permit Actions (for draft ARAP Permit NRS22.192) was issued on 5/30/2023, and a TDEC public hearing will be held on 7/6/2023. |
| TDEC, DWR | Hydrologic Determination | Determination received on 10/24/2022 |

| Agency | Permit/Approval/ Consultation | Status |
|---|---|---|
| TDEC, DWR | Section 402 CWA, NPDES Construction General Permit No. TNR100000 | Application to be submitted prior to construction. |
| TDEC, DWR | NPDES Hydrostatic Test Water General Permit No. TNG670000 | Application to be submitted following issuance of FERC Certificate. |
| TDEC, DWR | Water Withdrawal Registration Program | Annual reporting of water withdrawals based on a calendar year and reported by February 15 of the next year. |
| Tennessee Wildlife Resources Agency (TWRA) | State Threatened and Endangered Species Consultations | Initial notification letter / request for review of state listed species survey list sent 6/11/2021. Response dated 6/29/2021, stated the TWRA does not anticipate impacts on protected species. |

## 1.4.1    Endangered Species Act

Section 7 of the ESA (16 United States Code [U.S.C.] 1536) requires federal agencies to ensure that their actions are not likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of the critical habitat of such species. As previously stated, the FERC, as the lead federal agency for the Project, is required to determine whether any federally listed or proposed endangered or threatened species or their designated critical habitat occur in the vicinity of the proposed Project and conduct consultations with the USFWS and/or National Marine Fisheries Service, if necessary. Additional information regarding compliance with the ESA can be found in section 4.6.3.

## 1.4.2    Migratory Bird Treaty Act

The MBTA (16 U.S.C. 703-712) dates back to 1918 but has been amended many times. The MBTA implements various treaties and conventions between the United States, Mexico, Canada, Japan, and Russia for the protection of migratory birds. Birds protected under the MBTA include all common songbirds, waterfowl, shorebirds, hawks, owls, eagles, ravens, crows, native doves and pigeons, swifts, martins, swallows, and others, including their body parts (feathers, plumes, etc.), nests, and eggs. The MBTA makes it unlawful to pursue, hunt, take, capture, or kill; attempt to take, capture, or kill; possess, offer to or sell, barter, purchase, deliver, or cause to be shipped, exported, imported, transported, carried, or received any migratory bird, part, nest, egg, or product, manufactured or not. This EIS discusses compliance with the MBTA in section 4.6.2.

## 1.4.3    Bald and Golden Eagle Protection Act

The BGEPA (16 U.S.C. 668) was originally passed by Congress in 1940 and amended in 1962. The BGEPA prohibits taking without a permit or taking with wanton disregard for the consequences of an activity, any bald or golden eagle or their body parts, nests, chicks, or eggs, which includes collection, molestation, disturbance, or killing. The BGEPA includes limited exceptions to its prohibitions through a permitting process. This EIS discusses compliance with the BGEPA in section 4.6.3

## 1.4.4    Rivers and Harbors Act

The Rivers and Harbors Appropriation Act of 1899 (33 U.S.C. Sec. 401 et seq.), commonly known as the Rivers and Harbors Act, was enacted to protect commercial navigation and enhance maritime commerce. Section 10 of the Rivers and Harbors Act requires authorization from the Secretary of the Army

for the construction of any structure in or over any navigable water of the United States. The Secretary's approval authority has been delegated to the Army Corps' Chief of Engineers. The law applies to any dredging or disposal of dredged materials, excavation, filling, re-channelization, or any other modification of a navigable water of the United States and applies to all structures, from a small dock to a large undertaking such as bridges and utility crossings, outfalls, and water intakes.

## 1.4.5    Clean Water Act

The CWA (33 U.S.C. 1251 et seq.) establishes the basic structure for regulating discharges of pollutants into the waters of the U.S. and regulates quality standards for surface waters. Section 404 of the CWA outlines procedures by which the USACE can issue permits for the discharge of dredged or fill material into waters of the U.S., including wetlands. The EPA also independently reviews Section 404 CWA applications and has veto power for individual permits issued by the USACE. Section 4.3 of this EIS discusses impacts on water resources that may be applicable to compliance with the CWA. The USACE also has jurisdiction over Section 10 of the Rivers and Harbors Act; therefore, Tennessee notified the USACE Nashville District of its intent to file an Individual Permit (IP) application for approval to cross Section 404 CWA and Section 10 of the Rivers and Harbors Act jurisdictional wetlands and waterbodies concurrently.

The TDEC is the state agency that oversees and approves permit applications for sections 401 and 402 of the CWA. Section 401 allows states the ability to grant water quality certifications prior to the issuance of a federal permit (under section 404). Section 402 establishes the NPDES program, which requires a permit for the discharge of stormwater from a construction site.

## 1.4.6    Clean Air Act

Congress originally passed the CAA (42 U.S.C. 85) in 1963, and made major revisions to it in 1970, 1977, and 1990. The primary objective of the CAA is to establish federal standards for various pollutants from both stationary and mobile sources, and to provide for the regulation of polluting emissions via state implementation plans. In addition, the CAA was established to prevent significant deterioration in certain areas where air pollutants meet national standards and to provide for improved air quality in areas that do not meet federal standards (nonattainment areas). The EPA has regulatory authority to administer the CAA. Section 309 of the CAA directs the EPA to review and comment in writing on environmental impacts associated with all major federal actions. Section 4.10.1 has a detailed discussion of air quality issues.

## 1.4.7    National Historic Preservation Act

Section 106 of the NHPA (54 U.S.C. 300101 et seq.), as amended, requires the FERC to take into account the effects of its undertakings on historic properties and afford the Advisory Council on Historic Preservation an opportunity to comment. Historic properties include prehistoric or historic sites, districts, buildings, structures, objects, or properties of traditional religious or cultural importance that are listed or eligible for listing on the National Register of Historic Places (NRHP). Tennessee, as a non-federal party, is assisting the FERC in meeting our obligations under Section 106 by preparing the necessary information, analyses, and recommendations, as allowed under 36 CFR 800.2(a)(3). However, the FERC remains responsible for all findings and determinations. The status of our compliance with the NHPA is summarized in section 4.9.4.

line prior to excavation, using handheld devices. Tennessee would give each operator adequate notice so they could be present during construction around their utility lines. Tennessee would limit mechanical excavation in proximity to existing utilities and would install the pipeline at a minimum offset of 24 inches. If foreign utilities are accidentally damaged during construction, Tennessee would contact emergency response, and evacuate the immediate area, as appropriate. To aid in immediate response in the event of accidental damage, Tennessee would coordinate with the utility companies on the timing of construction so that the utility company could have a representative on-site during excavation.

## 2.6    CONSTRUCTION SCHEDULE AND WORKFORCE

Tennessee anticipates that construction of the Project would begin immediately following receipt of Notice to Proceed from the Commission (anticipated by Tennessee in August 2024 subject to receipt of required permits and regulatory approvals) for activities that do not require tree felling or tree clearing. Tree felling would begin in mid-October 2024. Construction is expected to take approximately 15 - 16 months. Tennessee is aiming to place the Project into service by September 2025, with final restoration by December 2025.

Construction activities would generally occur between the hours of 7:00 a.m. to 7:00 p.m., Monday through Saturday; however, work at hydrostatic testing sites would occur on a 24 hour per day, 7 day per week schedule during certain periods of the Project. In addition, we recognize that certain construction efforts (e.g., equipment and material unloading, operation of pumps, non-destructive testing, and large concrete foundation pours) may require uninterrupted completion extending into nighttime hours. Tennessee also states that dry-ditch stream crossing timing windows may necessitate nighttime work or work on Sundays and holidays in the event of construction delays due to weather conditions, challenging site conditions, or equipment breakdown compounded by back-up equipment breakdown.

Aside from HDD and stream or road crossing construction activities (as identified in the table below), if work were required outside of normal construction work hours, the duration of such work would typically be limited to one evening only. Known construction work activities that could occur outside of the normal construction work hours are identified in the table below. Tennessee commented on the draft EIS and indicated that it would not perform waterbody and road crossing activities overnight or on Sundays in areas where a noise-sensitive area (NSA) is located within 0.5 mile of the Project. Table 2.6-1, below, has been updated to reflect this change.

**Table 2.6-1:  Construction Work Activities and Corresponding Schedule for the Project**

| Project Phase | Months (beginning in Aug. 2024 – Sep. 2025) | Nighttime (Yes/No)[a/] | Details for Nighttime/Extended Work Locations | | |
|---|---|---|---|---|---|
| | | | When | Milepost | Noise Sensitive Area Distance (ft) |
| Survey and Staking | Aug. – Aug. | No | Daytime | N/A | N/A |
| Building Access Pads off Roads | Aug. – May | No | Daytime | N/A | N/A |
| Clearing | Oct. – Apr. | No | Daytime | N/A | N/A |
| Front-End Grading | Nov. – June | No | Daytime | N/A | N/A |
| ROW Topsoil Stripping | Nov. - June | No | Daytime | N/A | N/A |
| Restaking Centerline of Trench | Nov. – June | No | Daytime | N/A | N/A |
| Trenching | Nov. - July | No | Daytime | N/A | N/A |
| Blasting | Nov. - July | No | Daytime | N/A | N/A |
| Padding Trench Bottom | Nov. - July | No | Daytime | N/A | N/A |
| Stringing Pipe | Nov. - July | No | Daytime | N/A | N/A |
| Field Bending Pipe | Nov. - July | No | Daytime | N/A | N/A |

AR  003879

## Malaika J. Newball

| | |
|---|---|
| **From:** | Malaika J. Newball |
| **Sent:** | Tuesday, May 30, 2023 5:34 PM |
| **To:** | gina_dorsey@kindermorgan.com |
| **Cc:** | blake_amos@kindermorgan.com; Jackson, David; DWR NEFO; NashvilleRegulatory@usace.army.mil; Claire Wainwright |
| **Subject:** | NRS22.192 |
| **Attachments:** | NRS22.192  Appl Ltr 5 30 23.pdf; NRS22.192 Newspaper PH Notice 5 30 23.docx; NRS22.192 PN 5 30 23.docx |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Hello,

Attached are your applicant's letter of responsibility and newspaper legal ad related to the permit NRS22.192.  Please note that the 30- day public notice period ends after you have run the attached newspaper ad, placed the sign near the site for 30 days, and provided the permit writer with proof of those activities.

The draft permit and rationale, and related comments are available for review at Water Resources Permits Dataviewer (Report on Permits (tn.gov):::::) by entering the permit number listed in this Public Notice.

If you have any questions, please contact the permit writer.


Sincerely,




**Malaika Newball** | Administrative Services Assistant II
Division of Water Resources – Natural Resources Unit
William R. Snodgrass Tennessee Tower, Eleventh Floor
312 Rosa L. Parks Ave., Nashville, TN 37243
p. (615) 532-0359  f. (615) 532-0686
Malaika.J.Newball@tn.gov
tn.gov/environment

TDEC Staff often work remotely from home. Please schedule in-person visits, meetings, or discussions in advance.

AR  004399



STATE OF TENNESSEE
**DEPARTMENT OF ENVIRONMENT AND CONSERVATION**
**DIVISION OF WATER RESOURCES**
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Avenue, 11th Floor
Nashville, Tennessee  37243-1102

May 30, 2023

Tennessee Gas Pipeline Company, LLC
Attn: Gina Dorsey
1001 Louisiana St, Suite 1000
Houston, TX 77002-5089
gina_dorsey@kindermorgan.com

RE:    ARAP Applicant's Responsibility for Public Notification
       File NRS22.192
       Cumberland Gas Pipeline Project
       Dickson, Houston, and Stewart Counties, Tennessee

Dear Ms. Dorsey:

Thank you for your Aquatic Resource Alteration Permit application submitted to the Division of Water Resources received in the Nashville Central Office on July 22, 2022. The Division is ready to begin the public notice process to allow for public comment on the proposed activities described below, and will post a public notice on our website within one week of the date of this letter (http://tn.gov/environment/topic/ppo-water).

The Rules of the Tennessee Board of Water Quality, Oil, and Gas require the applicant to publish the enclosed public notice one time in the legal notices section of a local newspaper of general circulation. Because this project occurs in Dickson, Houston, and Stewart Counties, publication is required in a local newspaper of general circulation in each of the three counties. The applicant bears responsibility for any associated costs. The applicant is also required to post and maintain a state issued sign for 30 days where it is legible from a public road near the proposed activity in each of the three counties in which the project occurs. **This must be done in each of the three counties through which the project passes.** The public notice signs may be obtained at any of the Division's Environmental Field Offices, including the Nashville Environmental Field Office (615) 687-7000. Using a permanent marker, complete the blank areas on both sides of the public notice signs with the following information:

| | |
|---|---|
| **Applicant:** | Tennessee Gas Pipeline Company, LLC |
| **File#:** | NRS22.192 |
| **Proposes:** | 0.72 acres of wetland impact, 5,890 feet of stream impact, and stream and reservoir water withdrawals for construction of a natural gas pipeline |

JA2176

AR  004400

**Comment Period:** (date posted) through July 16, 2023

**Please Note: State-issued public notification signs are available at any of the Division's Environmental Field Offices.**

Once the notice has been posted for the required time peroid you must provide proof the public notification requirements have been met, including proof of newspaper publication and photographic evidence of the signs. Required photographic evidence of the signs includes two photographs, one photograph demonstrating the lettering on the sign is clear and legible and one photograph establishing sign location. Proof of publication should be submitted within 45 days of receipt of this letter, failure to do so will result in suspension of application processing and possible termination of your application. We cannot take final action on your application until after the public comment period has expired (30 days after the public notice has been published, the newspaper ad has been published, and the sign has been placed, whichever occurs latest).

Thank you for your attention to these details and fulfilling your obligations in the public notice process. If you have any questions, please contact me at (615) 476-3450.

Sincerely,

Claire Wainwright
Natural Resources Unit

cc:    Blake Amos, Tennessee Gas Pipeline Company, LLC:  blake_amos@kindermorgan.com
       David Jackson, Davey Resource Group: djackson@davey.com
       TDEC DWR, Nashville Environmental Field Office: DWR.NEFO@tn.gov
       US Army Corps of Engineers: NashvilleRegulatory@usace.army.mil
       File Copy

Enc:   Legal Notice

AR  004401



**NOTICE OF HEARING**

**TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION**
Division of Water Resources
William R. Snodgrass – Tennessee Tower
312 Rosa L. Parks Avenue, 11th Floor
Nashville, Tennessee 37243

**Notice is hereby given:** the Tennessee Division of Water Resources will hold a public hearing regarding an application for a Section 401 Water Quality Certification for stream and wetland alterations associated with the proposed Cumberland Gas Pipeline Project.

| | |
|---|---|
| **Location:** | Dickson County Government Building |
| | 303 Henslee Drive |
| | Dickson, TN 37055 |
| **Date:** | **July 6, 2023** |
| **Informational Session:** | **5:30 – 6:30 p.m.** |
| **Public Hearing:** | **6:30 – 7:30 p.m.** |

Public comments will be received concerning the proposed permit action described below:

| | |
|---|---|
| **Applicant:** | Tennessee Gas Pipeline Company, LLC |
| | c/o Gina Dorsey |
| | 1001 Louisiana St, Suite 1000 |
| | Houston, TX 77002-5089 |
| | 713-369-8975 |
| **Division File Number:** | NRS22.192 |
| **End of Comment Period:** | **July 16, 2023** |

**Description:** Tennessee Gas Pipeline Company, LLC proposes temporary impacts to 0.69 acres of wetland, permanent impacts to 0.03 acres of wetland, temporary impacts to approximately 5,400 linear feet of stream, temporary water withdrawals from eight streams and one reservoir, and permanent impacts 490 linear feet of stream associated with the construction of a 32-mile 30-inch diameter natural gas pipeline.

**Join by Computer or Mobile App**
Meeting link: Click here to join the meeting

**Join by video system**
Meeting ID: 231 372 002 98
Passcode: CGLAk4
You can also dial join by phone if preferred.

**Join by phone**
Phone Number: 629-209-4396

Phone Conference ID: 252 504 617#

**Please note that you can join the meeting by telephone if you do not have internet access by calling the number above and entering the access code and password**.

If you are unfamiliar with Microsoft Teams you may review the platform in advance at

AR 004402

https://www.tn.gov/content/dam/tn/environment/water/water-public-notices/dwr-teams-usage-for-public-hearings.pdf

Prior to opening the formal public hearing, an informational session will be held. The informational session will allow participants to ask questions informally and receive input from TDEC staff. Once the formal public hearing begins, the question-and-answer format will end, and all public comments will be collected for the hearing record without response from TDEC during the hearing.

The meeting moderator may limit the length of oral comments in order to allow all parties an opportunity to speak and will require that all comments be relevant to the proposed permit action and Division of Water Resources issues. If you are unable to participate in the public hearing, or otherwise wish for your comments to be read into the record, please submit them to water.permits@tn.gov prior to the hearing and specifically indicate your request for the comment to read at the hearing.

Individuals with disabilities who wish to participate in these proceedings or review the file record should contact TDEC to discuss any auxiliary aids or services needed to facilitate such participation. Contact may be by writing, telephone, or other means, and should be made no less than ten working days prior to the hearing to allow time to provide such aid or services. Contact the ADA Coordinator (615-532-0207) for further information. If it is hard for you to read, speak, or understand English, TDEC may be able to provide translation or interpretation services free of charge. Please contact Brian Canada at 615-979-1406 or brian.canada@tn.gov for more information.

Si le resulta difícil leer, hablar o comprender inglés, TDEC puede proporcionarle servicios de traducción o interpretación sin cargo comunicándose con Brian Canada al 615-979-1406 o Brian.Canada@tn.gov.

Written comments will be accepted at the hearing and following the hearing and will be considered part of the hearing record. If one cannot attend but would like to comment, written comments will be accepted through the end of the comment period listed above. Please send to the attention of the permit writer at claire.wainwright@tn.gov or at the following address:

Division of Water Resources
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Avenue, 11th Floor
Nashville, Tennessee 37243

Interested persons may obtain additional information, including a copy of the draft permit, and may inspect and copy related documents at the Division's Central Office at the address listed above, or by emailing water.permits@tn.gov or claire.wainwright@tn.gov. Additional information may also be obtained from the Division's website at https://www.tn.gov/environment/ppo-public-participation/ppo-public-participation/ppo-water.html.

AR  004403



**Public Notice**
**Tennessee Department of Environment and Conservation**
**Division of Water Resources**
**Notice Requesting Public Comments on Draft Permit Actions**
# FILE # NRS22.192

The purpose of this notice is to advise the public of the following proposed permit action and solicit comments and information necessary to evaluate the potential impact of the proposed activities on the aquatic environment.

Pursuant to The Tennessee Water Quality Control Act of 1977, T.C.A. §69-3-108 and Tennessee Rules, Chapter 0400-40-07, the proposed activity described below has been submitted for approval under an Aquatic Resource Alteration Permit and Section 401 Water Quality Certification. Section 401 of the Clean Water Act requires that an applicant obtain a water quality certification from the state when a federal permit is required. This notice is intended to inform interested parties of this permit application and draft permit and rationale, and to ask for comments and information necessary to determine possible impacts to water quality. At the conclusion of the public notice period a final determination will be made whether to issue or deny the permit.

**PERMIT COORDINATOR**         Claire Wainwright
Tennessee Department of Environment & Conservation
Division of Water Resources, Natural Resources Unit
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Avenue
Nashville, Tennessee 37243
615-476-3450
claire.wainwright@tn.gov

**APPLICANT**         Tennessee Natural Gas Company, LLC
Attn. Gina Dorsey
1001 Louisiana St, Suite 1000
Houston, TX 77002-5089

**LOCATION**

From near Claylick Road in Dickson to near Old Scott Road in Cumberland City
From approximately 36.161840, -87.206428 to approximately 36.372977, -87.675641
Dickson, Houston, and Stewart Counties

Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, Barkley Reservoir Harpeth River Watershed and Lake Barkley Watershed

To view the proposed location of these impacts and the watershed condition, visit the Division's map viewer at http://tdeconline.tn.gov/dwr/ and search on the permit number or coordinates listed in this Public Notice.

AR 004404

**PROJECT DESCRIPTION / PURPOSE**

Tennessee Gas Pipeline Company, LLC proposes temporary impacts to 0.69 acres of wetland, permanent impacts to 0.03 acres of wetland, temporary impacts to approximately 5,400 linear feet of stream, temporary water withdrawals from eight streams and one reservoir, and permanent impacts 490 linear feet of stream associated with the construction of a 32-mile 30-inch diameter natural gas pipeline.

**ANTIDEGRADATION**

In accordance with the Tennessee Antidegradation Statement (Rule 0400-40-03-.06), for impacts to streams in the TDEC Waterbodies known as Unnamed tributaries to Harpeth River, Jordan Branch, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, and Wells Creek, the Division has made a preliminary determination that the proposed activities will result in de minimis degradation of waters with available parameters for habitat alteration and/or water withdrawals without mitigation, and will not result in an appreciable permanent loss of resource values. For impacts to Barkley Reservoir, the Division has made a preliminary determination that the proposed activities will result in de minimis degradation of Exceptional Tennessee Waters without mitigation, and will not result in an appreciable permanent loss of resource values. For impacts to streams in the TDEC Waterbody known as Unnamed tributaries to Jones Creek, the Division has made a preliminary determination that the proposed activities will result in no significant degradation in a waterbody with unavailable parameters for habitat alteration because the proposed activities will not result in an appreciable permanent loss of resource values. For impacts to jurisdictional wetlands, the Division has made a preliminary determination that the proposed activities will result in de minimis degradation of waters with available parameters for alteration without mitigation, and will not result in an appreciable permanent loss of resource values.

**FACTORS CONSIDERED**

In deciding whether to issue or deny this permit, the Division will consider all comments of record and the requirements of applicable federal and state laws. The Division will consider the nature, scale and effects of proposed impacts. The Division will consider practicable alternatives to the alteration, loss of waters or habitat, diminishment in biological diversity, cumulative or secondary impacts to the water resource, and adverse impacts to unique, high quality, or impaired waters. In making this decision, a final determination will be made evaluating appreciable permanent loss of resource values and proposed compensatory mitigation to ensure the project will result in no overall net loss of state water resources values.

**HOW TO COMMENT**

TDEC is requesting public comment on this proposed permit action. Obtaining a broad range of facts and opinions on Agency actions is one of the best ways to ensure appropriate decisions. Persons wishing to comment on the proposal are invited to submit written comments to the Division. Written comments must be received within **thirty days following distribution of the approved public notice materials** (including signage and newspaper ad). Comments will become part of the record and will be considered in the final decision. The applicant's name and permit number should be referenced. Send all written comments to the Division's address listed below to the attention of the permit coordinator. You may also comment via email to water.permits@tn.gov.

After the Division makes a final certification decision, an appeal may be filed by the applicant or by any person who participated in the public comment period whose appeal is based on comments given to the Division in writing during the public comment period or in testimony at a formal public hearing. If it is hard for you to read, speak, or understand English, TDEC may be able to provide translation or

AR  004405

interpretation services free of charge. Please contact Brian Canada at 615-979-1406 or Brian.Canada@tn.gov for more information.

Si le resulta difícil leer, hablar o comprender inglés, TDEC puede proporcionarle servicios de traducción o interpretación sin cargo comunicándose con Brian Canada al 615-979-1406 o Brian.Canada@tn.gov.

**PUBLIC HEARING**
The Tennessee Division of Water Resources will hold a public hearing regarding this permit action. A Notice of Hearing that contains details on the public hearing will be advertised concurrently with this Public Notice announcement.

**FILE REVIEW**
The permit application, supporting documentation, including detailed plans and maps, draft permit and rationale, and related comments are available for review on the internet at the Division's dataviewer at Report on Permits (tn.gov)::::: by entering the permit file number listed in the title of this Public Notice. The file may be viewed and copied at the address listed below.

Tennessee Department of Environment & Conservation
Division of Water Resources, Natural Resources Unit
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Avenue, 11th Floor
Nashville, Tennessee 37243

AR  004406

# TDEC 401 Public Hearing

## Transcript of Audio -7/06/2023



**Mississippi - Louisiana - Tennessee - New York**
**www.brookscourtreporting.com**

AR 004439

**AUDIO RECORDING IN RE:**

**PUBLIC HEARING FOR TENNESSEE GAS PIPELINE**

**July 6, 2023**

**NIKKI L. LLOYD, CCR #1870**

Jackson
Gulfport

Brooks Court Reporting
1-800-245-3376
JA2184

Meridian
New Orleans

AR 004440

Transcript of Audio -7/06/2023

```
 1        MS. PEDRAZA:  (Indiscernible)
 2   transcription.  Very good.  And I will queue
 3   this up, but it doesn't really matter for the
 4   folks in the room.
 5        Okay.  So start our formal public
 6   hearing.  The time is now 6:35.  As you came
 7   in tonight, like I said, hopefully you signed
 8   in.  This is a record of your attendance that
 9   we'll be keeping.  We will use it to send out
10   responses to your comments at the end of the
11   permit process, and we'll be also using it as
12   a way to organize our speakers here tonight.
13   So giving you all the floor.  So, Tiffany, if
14   you want to bring up that list of folks that
15   you have.
16        As I said before, the purpose of our
17   public hearing is to receive public comments
18   regarding the Section 401, Water Quality
19   Certification -- thank you, ma'am -- for
20   stream and wetland alterations associated
21   with the proposed Cumberland Gas Pipeline
22   project.  The most effective comments tonight
23   are relevant to the proposed action and the
24   associated water quality issues.  The
25   comments received verbally at this hearing
```

Transcript of Audio -7/06/2023

1    and in writing through July 16th, 2023, will

2    be reviewed by the Division of Water

3    Resources staff.  And after considering all

4    public comments, the Division will publish a

5    final permit decision and a notice of the

6    Division's determination.

7    Not that useful for you all, but -- oh,

8    wait, I need to share my screen.  Stop

9    sharing.  Sorry, y'all.  Trying to do this

10    double duty.  Okay.  Maybe it'll come back in

11    and you guys will get to see us.

12    Okay.  So if you want to comment in

13    writing but not speak today, you can submit

14    your comments to us in writing.  You can

15    submit them to a TDEC staff member here

16    tonight, which I pointed them out, and we'll

17    stand up at the front afterwards to take your

18    questions additionally, or you can submit

19    them via mail or e-mail to the contact

20    information provided on that agenda when you

21    came in, Ms. Claire Wainwright or

22    (indiscernible) address at 312 Rosa L. Parks

23    downtown (indiscernible).

24    So to ensure everyone has an opportunity

25    to speak, I will be limiting comments to five

Jackson            Brooks Court Reporting          Meridian
Gulfport              1-800-245-3376       New Orleans
JA2186

AR 004442

Transcript of Audio -7/06/2023

1    minutes tonight.  Got a lot of folks.  We

2    respectfully request that you keep your

3    comments to the time allowed, and we

4    encourage you to submit any verbal comments

5    that you have also in writing to us.  All

6    comments will be given the same

7    consideration, whether they be verbal or

8    written.  We will not be answering questions

9    at this period while we receive the public

10   comments.  While a commenter can ask a

11   question as part of their public comment,

12   that would be addressed along with the

13   comment in the Division's response to

14   comments in writing and not in this hearing.

15        So at this time, I'm going to read the

16   names of the people on this sheet here in

17   person who have indicated they wish to

18   provide a comment.  I'm going to call on two

19   names at a time, just so you know who's like

20   next up.  And I'm going to ask you all if you

21   would come to the front here and maybe stand

22   over by the table.  This is the device that's

23   doing the recording.  So we want to hear you

24   loud and clear.  And for those of us joining

25   online or by phone, I'll come to you after

Transcript of Audio -7/06/2023

```
 1    I've exhausted everybody in the room and you
 2    guys will have five minutes as well.
 3         Okay.  So let's hear from Ms. Angie
 4    Mummaw first.  And next on deck is Ms.
 5    Barbara Miller.
 6         Yep, I think that's fine as long as
 7    you're close enough to that.
 8         MS. MUMMAW:  (Indiscernible) for TDEC
 9    for giving us this opportunity to voice our
10    concerns.  I realized that, you know, it's a
11    32-mile pipeline and TDEC does not have
12    enough people on staff to go out and look at
13    each individual stream crossing, which I feel
14    that's unfortunate because they're all
15    unique, although they do have some things in
16    common.  All of -- the entire pipeline is
17    going to be in the Eastern Highland Rim
18    ecosystem.  It's very harsh terrain.  All of
19    the bedrock is limestone, so it's prone to
20    fissures and sinkholes.  And sometimes we
21    have a sinkhole that just opens up out of
22    nowhere, you know, and that concerns me with
23    the majority of the streams being -- them
24    planning on doing the dry cut and just, I
25    guess, blasting through the stream.  The few
```

Transcript of Audio -7/06/2023

```
 1    that they are doing horizontal direc- (audio
 2    cut out).  I felt that the comments from
 3    the -- from a few people about us relying on
 4    Kinder Morgan's resource report and them kind
 5    of, you know, policing themselves.  I have a
 6    problem with their resource report.
 7         They don't plan to recapture the
 8    drilling fluid that's leaked and the toxic
 9    limits are going to be determined by an
10    expert who is hired by the gas company.  So,
11    to me, that does not -- that does not make
12    sense.  I feel like the regulatory
13    agencies -- TDEC, TWRA, maybe Army Corps of
14    Engineers -- that there should be some other
15    authorities who are monitoring that and
16    determining, what are those toxic limits.
17         Also -- let's see.  In the resource
18    report from the gas company, they said they
19    contacted and would offer water testing for
20    anyone who had a well or spring that was
21    within 1,000 feet of the pipeline -- of the
22    pipeline that's being proposed.  And several
23    people that are here tonight fit that
24    category and have not been contacted.  In
25    fact, the group that we formed to help fight
```

Transcript of Audio -7/06/2023

1    the pipeline, we have received some funding

2    and plan to do our own water testing because

3    of that.  But I just feel like -- almost like

4    we're having to do their jobs or help TDEC.

5    You know, like you said, we can reach out to

6    you if we see something that doesn't look

7    right.

8         Also, you mentioned TWRA and there's

9    also permits that are required by U.S.  Fish

10   and Wildlife Service.  And I do want to let

11   folks know that we did discover a new species

12   of crayfish.  Me and some of my colleagues

13   from Austin Peace Center of Excellence for

14   Field Biology.  There is a new species of

15   crayfish in one of the creeks that's being

16   proposed to be crossed and we're working --

17   very, very hard trying to get that pushed

18   through.  As some of you may know, it takes a

19   long time to get a new species designated and

20   to get it listed.  We're currently working on

21   sequencing a second gene.  We sequenced one

22   gene and it fell out into its own little

23   branch on the tree of crayfish, so it is a

24   new species.  We're trying to get a second

25   gene sequenced that will back that up.  And

Transcript of Audio -7/06/2023

```
 1    then U.S. Fish and Wildlife has agreed to
 2    expedite that listing.  So as soon as we can
 3    get that done, that -- you know, and so one
 4    of my concerns is that crayfish.  And once we
 5    figure out its geological distribution, that
 6    may help, you know, with the listing of it.
 7         Also, in my formal comment, I just want
 8    to say that I did go out -- I realize it's a
 9    big job to go to all of these crossings, but
10    I did go out, navigate to the coordinates
11    where there will actually -- actually be the
12    pipeline crossings.  I assessed eight of
13    these stream crossings.  They all consist of
14    ripple and pool complexes, which are very
15    important to aquatic wildlife.  They have to
16    breathe oxygen, just like we do, so they pass
17    the water over their gills and absorb it
18    directly from the water.  So these areas --
19    you know, I feel like this Field of Dreams
20    restoration plan, like if we restore it,
21    it'll just all come back.  It'll all be, you
22    know, like it was before, and that's not the
23    case.  You know, I don't know how we ensure
24    that that's going to happen.  And I'm being
25    told time is up.
```

Transcript of Audio -7/06/2023

```
 1          So, anyway, thank you guys for --
 2          MS. PEDRAZA:  You can conclude
 3     (indiscernible crosstalk) --
 4          MS. MUMMAW:  That's okay.  You go ahead.
 5          MS. PEDRAZA:  And you can submit written
 6     comments to us.
 7          MS. MUMMAW:  Oh, I know.
 8          MS. PEDRAZA:  Okay.  Good.  And after
 9     Ms. Miller, I'm presuming we have Richard
10     Honeycut is next.
11          MS. MILLER:  Good evening.
12          MS. PEDRAZA:  Before you give your
13     comments, state your name and if you're
14     representing an organization.
15          MS. MILLER:  My name is Barbara Miller.
16     I am a member of Appalachian (indiscernible)
17     and I'm a stakeholder in what's about to
18     happen.  I am really concerned about our
19     watershed -- or our watersheds, I should say.
20     Once they are contaminated, there's just
21     really not anything that could be done.  And
22     my question is mitigation.  And also they
23     told me that when they wanted to -- can you
24     hear me?
25          MS. PEDRAZA:  (Indiscernible.)
```

Transcript of Audio -7/06/2023

```
 1        MALE SPEAKER:  (Indiscernible.)
 2        MS. MILLER:  They wanted to come onto my
 3   land.  I asked about clearcutting and the
 4   woman said, oh, yes.  And I said, well, in
 5   that case, I really have nothing to sell and
 6   thank you very much.
 7        I'm not trying to be oppositional.  It's
 8   that I don't want the pipeline on my
 9   property.  It is crossed by four pipelines
10   already and a power line from TVA runs on the
11   diagonal.  When they come on, am I supposed
12   to leave my land because the way it lays I
13   have woods that are on bluffs that if you
14   want down, you'd be well advised to repel in
15   some areas because there's not really any
16   easy walking.  We have horses.  I have a few
17   chickens.  And you're not interested in my
18   antidotal situation, but I'm going to
19   literally be forced within feet right off of
20   my property and the ten acres out of the 40
21   that I can live on and that I can have
22   pasture on and that I can raise hay on.  I
23   have a pond.  I have three springs that merge
24   at the back of the property.  I do have city
25   water and I have a well.  I use all of those
```

Transcript of Audio -7/06/2023

```
 1    things.  And if something were to happen to
 2    my pond or my springs, I would be just, hey,
 3    out of luck on a lot of instances.
 4        I understand that we need additional
 5    energy, but I am opposed to it being a fossil
 6    fuel that tears up people's farms and their
 7    lives when there are other ways of managing
 8    this.
 9        Obviously, I'm saying I would like this
10    ruling set aside, but so much for my saying
11    what I want.  I think the people here find
12    themselves in the same situation I do.  They
13    say it's going to be fixed.  It will not be
14    fixed.  When they clearcut my land, I will
15    never see those trees mature.  Never again
16    will those trees, in my lifetime, be mature.
17    I will not be able to sit in their shade.  I
18    will not be able to harvest potential lumber.
19    I will not be able to give shade to my stock.
20    I'm opposed to this situation.  I understand
21    you guys cannot say no to them, but they are
22    really going -- this pipeline will devastate
23    the land that it goes through.
24        Richard, would you like to come --
25        MS. PEDRAZA:  Thank you, Ms. Miller.
```

Transcript of Audio -7/06/2023

```
 1    Richard and then next up is -- sorry, I'm
 2    trying to block people from walking that way.
 3    Next is William Halsey.  You're on deck.
 4         MR. HONEYCUT:  I'm Richard Honeycut.  I
 5    live just less than a quarter mile from where
 6    the pipeline will be going through.  My
 7    biggest concern is as a first responder of
 8    any hazardous materials that might be
 9    dispersed during the construction of the
10    pipeline.  All of these are moving bodies of
11    water that we're talking about.  Therefore,
12    once again, it's kind of the fox guarding the
13    henhouse as far as the big corporation
14    policing themselves.  I do realize that you
15    guys are understaffed, and as a first
16    responder, I totally understand and I
17    appreciate that.
18         Depending on the well for water for my
19    entire family, there was no option of having
20    city water.  And with this runoff or any
21    other contamination, it would definitely get
22    into the aquifers.  There's no way to get
23    around it, to be honest.  And so that was our
24    biggest concerns.
25         Most of this area is in an extreme rural
```

Transcript of Audio -7/06/2023

```
 1    area as has been brought up before.  Some of
 2    these topographical areas are, like you said,
 3    repel worthy.  And I might actually talk to
 4    you about doing some training there.  But as
 5    far as the situation with this pipeline, it's
 6    going to affect more people than you can even
 7    imagine.  And, there again, even though we've
 8    had public meetings, I don't feel as though
 9    everybody has been adequately notified and
10    hadn't had a chance to verbalize their
11    concern.
12         Thank you very much for your time.
13         MS. PEDRAZA:  Is this William Halsey.
14    Okay.  Very good.  And then Cari Nofsinger,
15    you're going to be next.
16         MR. HALSEY:  It doesn't seem
17    unreasonable at all by this lady's request,
18    anybody who's on the line of this pipeline to
19    get their address and send them information
20    that, A, this is happening and it's going to
21    affect them.  It doesn't seem like an
22    unreasonable thing that TDEC can pull off.
23    So you all should make more of an effort with
24    that.
25         You all should know about SB Senate Bill
```

```
 1   2077 that was passed last year that gives oil
 2   companies right to eminent domain to your
 3   land without a say against your
 4   constitutional rights.  You should know about
 5   it.  You should hit up your reps and you can
 6   fight it however you can.  It's
 7   unconstitutional.  And any -- any Senate
 8   people and any representatives of us who
 9   voted on that should be ashamed of
10   themselves.  For whatever that's worth.
11        I realize this isn't a portion for
12   questions and just comments.  So as part of
13   the NEPA arrangement, as I understand it,
14   anybody doing a project on this size is
15   supposed to look at all plausible
16   alternatives.  I don't know what -- where
17   it's documented any alternatives, any
18   research that looked into alternatives,
19   alternative energy, solar, hydrogen or other
20   advanced forms, new tech that's yet to be
21   discovered.  I don't know if that information
22   exists, and if it does, where it is, but that
23   should be made public because people want
24   alternatives.  People want alternatives to
25   their land being destroyed, their watersheds
```

1    being destroyed.  That should be made

2    available.  That should be made public.

3        And this is a question -- I should have

4    asked it earlier -- but these pipelines have

5    a long history across the country and across

6    the world of causing a lot of damage.

7    There's explosions.  There's leaks.  The EPA

8    admitted that they're catching less than half

9    of the leaks that are coming from methane

10   pipelines.  If and hopefully not when there's

11   an explosion like there was here in the '90s

12   or when there's a leak, who is responsible

13   for that?  Who's paying for that and what

14   does -- how are those damages assessed?  I

15   don't know.  I pray for all of you.

16   Godspeed.

17        MS. PEDRAZA:  Ms. Nof- --

18        MS. NOFSINGER:  Nofsinger.

19        MS. PEDRAZA:  -- Nofsinger.  Very good.

20   And then Bob Baird, you're on deck.

21        MS. NOFSINGER:  So I'm Cari Nofsinger.

22   I live in Charlotte on 40 acres.  I have a

23   well, no access to water except the well.  I

24   have two ponds that are spring fed, so my

25   concern is the water.

Transcript of Audio -7/06/2023

```
 1         Also, I'm 1,000 feet from the pipeline
 2    and I was never contacted by Kinder Morgan,
 3    so I -- and the other thing, the crayfish was
 4    found in my creek, big garden right by my
 5    house.  So I'm concerned about the species
 6    and where it's crossing.
 7         But my main concern is water, because if
 8    the water gets contaminated, I can't water
 9    myself or my animals.
10         That's my comment.
11         MS. PEDRAZA:  Bob Baird, you're up next.
12    And Sharon -- B-A-I-R-D.
13         MALE SPEAKER:  He stepped out.
14         MS. PEDRAZA:  Oh, he stepped out.
15    Sorry.
16         Okay.  Sharon King.  And then Steve
17    Shafer.
18         MS. KING:  Hello.  I'm like all of you,
19    I have thoughts about the water too.  There
20    are a couple of sinkholes on my property,
21    and, you know, that's possible anywhere along
22    the line.
23         Also, I'd like to know, how do we know
24    if one of your members is out checking on the
25    company that's going to be doing all this
```

Transcript of Audio -7/06/2023

```
 1    drilling?  Do you have an outfit or how are
 2    we going to know if you're out there helping
 3    us?  And another question I have is, who are
 4    the other government agencies that are
 5    working in conjunction with you to get this
 6    pipeline done?  If there are other ones, can
 7    we write to them too and give them our two
 8    cents?
 9         And another thing is, we've -- just like
10    the guy just mentioned earlier, we just heard
11    of Texas.  It's so hot in Texas, they're
12    going to have to relieve the pressure on the
13    pipeline by letting methane gas go into the
14    air.  So what is that going to do to our
15    aquifers if something like that happens?
16    We're in a hot community.  We're not up
17    north.  So those are a lot of the questions I
18    have.
19         And if I have any time left, I refer to
20    Angie.
21         MS. PEDRAZA:  Steve Shafer is next.  And
22    then J.W. Luna.
23         MR. LUNA:  Oh, I'm sorry.  Steve's first
24    and I'm second.
25         MR. SHAFER:  My name is Steve Shafer.  I
```

Case: 23-3682    Document: 56-5    Filed: 08/19/2024    Page: 257

Transcript of Audio -7/06/2023

```
 1    have (audio cut out) crossings designated --
 2    the spots designated by the Corps of
 3    Engineers using my GPS, go to the exact spot
 4    where they're going to cross the stream.
 5    Now, those grades are steep.  I could barely
 6    walk down those grades.  They're down like
 7    this (indicating) and back up the other side.
 8    That's the topography of the eastern part of
 9    this pipeline where it starts.
10         Now, logically, they're going to -- one
11    of the spots crossing Gefford Branch, they're
12    going to have to deviate and go down a
13    different direction because it's too steep
14    for the pipeline.  They're going to have to
15    do a lot of clearcutting, and I brought this
16    up before in my question.  Clearcutting is
17    going to cause some type of erosion unless
18    somebody goes back in there and mitigates
19    that.  Now, I know -- I've done a lot of
20    research.  Also, most of the time, the
21    degradation to the streams is minimal, and
22    it's gone after maybe six months at most.
23    Streams are back to normal from the crossing,
24    but not from erosion.  If we've got an
25    erosion problem, it's going to last a long
```

Transcript of Audio -7/06/2023

```
 1    time.  We know what's happened with rain
 2    around here and what happens with our
 3    streams.  So that's going to be a continuing
 4    problem with erosion in our streams.
 5         Now, I have one of the streams that is
 6    on my farm.  Okay.  And that's the place we
 7    do take our grandchildren swimming at least
 8    twice a week.  So I'm hoping that won't
 9    affect that stream for their sake.  But
10    erosion control and also, as Richard will
11    attest, if we should have an explosion on the
12    pipeline -- I shouldn't say if.  It's
13    probably -- well, if or when, if there's a
14    resulting fire, the location of this, there
15    is no access to put the fire out.  Not the
16    pipeline fire, the resulting forest fire that
17    will -- from that.  This happens -- has
18    happened a lot in California.  If it happens
19    here, there's no way for our local fire
20    departments to get to it to put it out.
21    Whichever the way the wind's blowing, it's
22    just going to go that way.  If it's going --
23    blowing from the north, my house is gone.  My
24    farm is gone.  My trees are gone.  What value
25    that was in my timber, am I going to get that
```

Transcript of Audio -7/06/2023

```
 1    back?  I don't think so.  Can I rebuild all
 2    the shops and the barns and my hay storage on
 3    my farm?  And the other people are in the
 4    same situation.  So if there is a fire,
 5    controlling that resulting fire is going to
 6    be a real problem due to topography of where
 7    this is going to cross.  I don't think that's
 8    one thing that's been taken into
 9    consideration, the topography, especially the
10    eastern part of where the pipeline is going
11    to be.
12        Thank you.
13        MS. PEDRAZA:  Ron Bruno, you're on deck.
14        MR. LUNA:  Thank you, Tara.  I just
15    wanted to reiterate what I mentioned during
16    the comment period earlier.  I think it's
17    within the sound discretion of the Department
18    in the Division and always has been to give a
19    reasonable period of time for the public
20    comment period to be open after the hearing
21    of tonight.  I think given these nice ladies
22    asking for the maps, I just reiterate that
23    request, that the Division and the Department
24    in your sound discretion grant 30 days from
25    tonight to keep the public comment period
```

Transcript of Audio -7/06/2023

```
 1    open.
 2         Thank you very much.
 3         MS. PEDRAZA:  Yes, hello.
 4         MR. BRUNO:  Hello.  My name is Ron
 5    Bruno.  I'm here representing my family, the
 6    Bruno family.  I'm from Arizona.  We moved
 7    here about a year ago.  We were originally
 8    going to move somewhere else and that was
 9    Oklahoma.  Why didn't I buy that house and
10    beautiful property, because it's four miles
11    from smokestacks.  Once I saw those
12    smokestacks, I researched them and I saw how
13    horrible they were.  So then I came to
14    Tennessee, I found myself some land.  I have
15    almost 12 acres.  I was informed by my real
16    estate agent there's no smokestacks.  And I
17    moved.  I bought the house.  Guess what?  We
18    did all the research, but the smokestacks
19    aren't in my town, so they didn't show up.
20    So it makes me sick every single time I see
21    those things.  So the fact they were going to
22    come up with a solution, I was thrilled.
23    When I heard it was a pipeline, I laughed at
24    the ridiculous idea of it because a solution
25    already exists.  The man in the blue shirt
```

Transcript of Audio -7/06/2023

```
 1    right here talks about alternatives.
 2    Fantastic idea.  What type of research has
 3    been done?  I feel that if they can't contact
 4    people within 1,000 yards of the pipeline on
 5    time with giving them normal notice, what
 6    else are they going to drop the ball on?  I
 7    bet a whole lot of things that we don't even
 8    know about.
 9         Now, as of 2020, that was three years
10    ago, the cost parity and expense of solar
11    went down to the point where it was cheaper
12    than using -- let me make sure I say this
13    right -- a combination of solar and wind
14    energy with battery storage for renewable
15    energy is incredibly efficient, and there's
16    very little energy waste when that happens.
17    The other hand, you have -- smokestacks, we
18    don't need to get into; we know those are
19    bad -- if the pipeline magically appeared by
20    snapping our fingers and cost $0, it is still
21    cheaper to use the renewable energy source of
22    batteries, wind and solar.  So the fact that
23    this is even a meeting, it boggles my mind
24    that people are even considering doing a
25    pipeline because of all of the harm it's
```

Transcript of Audio -7/06/2023

```
 1    doing to everybody.  Everybody up here made
 2    perfect points.  They can all, 100% of them,
 3    be avoided by doing this other technique.
 4    It's already in existence.  They already do
 5    it in Hawaii.  They do it in Australia.  They
 6    do it across the country in different places.
 7    It's just on back order because the huge
 8    billions of dollars of Government incentives
 9    right now are being pushed towards electric
10    vehicles and clean energy.  There's gigawatt
11    money per gigawatt hour -- however, it works,
12    I don't know all of the technical terms --
13    that you can make, get free money from the
14    Government to go towards this project.
15    There's none of this digging.  There's none
16    of the wrecking the water.  There's no risk
17    of wildfires burning down our homes and
18    everything we've worked for.  The solution is
19    so simple and well documented.  And this is
20    three years ago.  Well, guess what happened
21    over time, costs actually declined.  Yes,
22    with inflation, the cost of this technology
23    has still declined because it's a new
24    technology and it's booming.  And there's --
25    I've talked about Hawaii.  The main thing
```

```
 1    that it's really helped in spots like
 2    Florida, Hawaii, Australia, is the rolling
 3    blackouts.  You will not have rolling
 4    blackouts anymore.  Wow.  Another problem
 5    that we just solved by not choosing the
 6    pipeline.  They won't find the leaks in a
 7    pipeline either, nor will they fix them
 8    correctly.  And if they do, it'll take years
 9    if it ever gets done.  The efficiency of this
10    type of energy source is incredibly
11    efficient.  He mentioned hydrogen briefly.
12    The problem with hydrogen -- so I don't want
13    that looked in too closely.  I mean, examine
14    it.  But you'll see, hydrogen leaks through
15    the pipes, and it cannot be transported very
16    easily at all.  It takes many times more
17    trucks to transport hydrogen than it does
18    other types of fuels currently being used.
19    Let's see here.  The toxic limit that
20    somebody mentioned, like how to judge it.
21    Absolutely, if it's not done by a third
22    party, well, then it's not going to be done
23    correctly at all, because people are very
24    greedy and liars, and they'll do what's in
25    their best interest.
```

Transcript of Audio -7/06/2023

```
 1        Now, this other type of energy is so

 2   efficient.  Go ahead, have any third party

 3   examine it.  Nothing much can really cause

 4   harm.  Can a fire happen?  Probably.  But

 5   they can have safety measures in that area

 6   for that.  But it's so rare that that's not

 7   even a concern.

 8        Everybody keeps saying -- I don't know

 9   who you are, ma'am, or who else in the room

10   is involved, but if everybody's so short

11   staffed, you can't even take on a project

12   like this.

13        That's the majority of what I want to

14   say.  The Government incentives are huge

15   right now.  I don't know how long they're

16   going to last, but right now they're on the

17   books to last all the way to 2030, and so

18   that's quite a bit of time.  I think it's

19   something we should get on.  As far as my

20   background, we're from Arizona.  I'm retired

21   law enforcement.  I was on SWAT when I

22   retired, and I graduated from ASU with my

23   bachelor's, and I have my master's from GCU.

24   I researched this type of technology because

25   I wanted to find a place that's very healthy
```

Transcript of Audio -7/06/2023

```
 1    for my kids.  We went into the woods, and to
 2    see that it was not healthier out here, I was
 3    shocked.  And the fact that they're going to
 4    put in a pipeline that's going to cost a ton
 5    of money to do that has been proven three
 6    years ago that even if it was free, is not
 7    worth it, it boggles my mind.  Solar and wind
 8    combined with battery storage is the way of
 9    the future, and it's happening all over the
10    world.  I think people who may be running
11    this are kind of stuck in a bubble.  We've
12    got to look all over the world to see what's
13    happening, and the U.S. is actually behind
14    the curve on this.  But we already have had
15    it happen in Hawaii, so it's a great spot to
16    look and see the research and it does stop
17    the rolling blackouts, and then it also opens
18    up the opportunity to have the power stored
19    at your house, so you don't even have to
20    worry (audio cut out).
21         Anyway, thank you so much for your time.
22    Everybody's been doing awesome and -- yes.
23         MS. PEDRAZA:  Thank you.
24         MR. BRUNO:  Thank you.
25         MS. PEDRAZA:  Okay.  Next Michelle
```

Transcript of Audio -7/06/2023

```
 1    Bruno.  And then George Wade.
 2         MS. BRUNO:  Hi, all.  My name is
 3    Michelle Bruno.  As my husband mentioned, we
 4    just represent our family, the Bruno family.
 5    These are my twin boys, our future.  The
 6    reason I'm here tonight, obviously, is
 7    because all of the things that you mentioned
 8    and us moving here from Arizona and just
 9    wanting to find a healthy, beautiful place to
10    live, and Tennessee was our calling, so this
11    is why we're here.  We love nature.  We enjoy
12    nature.  We homeschool.  Our kids are outside
13    enjoying the wildlife.  And it breaks my
14    heart to hear that species would be
15    endangered.  It breaks my heart to hear that
16    our water would be polluted, that people's
17    fishing holes where they take their grandkids
18    and want to make memories, excuse me, would
19    be compromised all because of greed.  So it's
20    very sad.
21         Gas is proven to destroy habitats.  This
22    project would only create 25 to 35 permanent
23    jobs.  That's not worth 25 to 35 permanent
24    jobs (audio cut out) and habitats and our
25    environment.  And the future is leaning
```

Transcript of Audio -7/06/2023

```
 1    towards renewable resources anyways.  So our
 2    future is going to be learning those skills
 3    and trades.  Not this.  Not gas.  It's --
 4    honestly, the atrocities that I have heard
 5    today about people receiving no notice is
 6    absolutely intentional and an absolute
 7    injustice, taking advantage of a community
 8    that you thought wouldn't speak out, but we
 9    are and we're here, and you need to hear us.
10         The fact that the regulation would be
11    completely biased, we know how that works and
12    how that happens.  And if we have gas or
13    methane polluting our waterways, look at what
14    happened in East Palestine.  Who is going to
15    come help these people?  Who is going to come
16    help save these lands, these people's private
17    properties that they poured their blood,
18    sweat and tears into?  Shame on you for
19    running your pipelines on people's private
20    properties and tearing apart their
21    livelihoods.
22         Hear us.  You can say no.  You are
23    choosing to stay and put these pipelines in.
24    Remember that, you're choosing this.  Thank
25    you.
```

Transcript of Audio -7/06/2023

```
 1       MS. PEDRAZA:  George Wade, and then Bob
 2   Baird, if he came back into the room.
 3       MR. WADE:  Well, this will probably be
 4   unaccustomedly short, since what I was going
 5   to request, I think, has already been made.
 6   But this evening so many varied and very
 7   valid concerns have been aired about what we
 8   have only heard about probably through word
 9   of mouth and only so very recently.
10       The fact that the legal requirement was
11   met by publishing this in the Federal
12   Register doesn't speak to the requirement for
13   transparency, perhaps the letter of the law.
14   But how many people in here subscribe to the
15   Federal Register?  Not too many.  But the
16   legal requirement was met would be what they
17   would say.
18       As you mentioned earlier, and you're
19   quite correct, these folks know their
20   wetlands.  These folks know their tributary
21   streams better than you do.  That's what you
22   just said, and I think you're right for your
23   department.  I would request from the depths
24   of my soul at least a 30 -- day.  This has
25   already been mentioned, I'm just seconding
```

Transcript of Audio -7/06/2023

```
 1    that -- so that there can be in the spirit of
 2    the thing and a true transparency where folks
 3    that haven't heard about this -- how many
 4    people have we talked to that said, what are
 5    you talking about?  And they may know that
 6    tributary and that stream in their backyard
 7    that you'd like to know about.  You can't do
 8    it in two days.  The first meeting at 5:30,
 9    people weren't off work yet.  They're here
10    now.
11         Please, Commission, extend a minimum of
12    30 for this permitting process so that we can
13    actually make informed assessments of the
14    impact and pass them on.
15         MS. PEDRAZA:  Did Bob Baird come back
16    in?
17         MALE SPEAKER:  No.
18         MS. PEDRAZA:  Is there anybody else in
19    the room who'd like to leave a comment for
20    the record?  Sure, okay.  You can come up.
21         FEMALE SPEAKER:  Just (indiscernible).
22         MS. PEDRAZA:  Oh.
23         FEMALE SPEAKER:  (Indiscernible)
24    officials are here, (indiscernible), I'd like
25    to see their hands.  Okay.  (Indiscernible)
```

Transcript of Audio -7/06/2023

```
1    represent me.  Am I the only one

2    (indiscernible)?  So many people

3    (indiscernible.  (Indiscernible) officials

4    (indiscernible) also.

5         FEMALE SPEAKER:  Some of them have been

6    notified but they had not come to any --

7         FEMALE SPEAKER:  Yes, but they were

8    notified (indiscernible) eight minutes

9    (indiscernible).

10        MS. PEDRAZA:  Yes.  Can you state your

11   name, ma'am?

12        FEMALE SPEAKER:  (Indiscernible.)

13        MS. PEDRAZA:  (Indiscernible.)

14        FEMALE SPEAKER:  I do.

15        MS. PEDRAZA:  Okay.  Good.

16        MS. HENRY:  Hi, Stephanie henry.  I just

17   want to throw this out not so much a comment

18   on the ARAP permit, but to thank TDEC for

19   coming out tonight and taking all these

20   people that are here.  That an evening to

21   help us with this or go over this with us and

22   to recognize that a lot of the comments we

23   threw at them tonight are about TVA and the

24   pipeline and the pipeline company, not so

25   much the Aquatic Resource Alteration Permit.
```

Transcript of Audio -7/06/2023

```
1    So thank you guys for coming out and helping

2    inform the public about what's going on with

3    the ARAP permit.

4         MS. PEDRAZA:  (Indiscernible) in the

5    building.  Yeah, sure, come on up.  Just tell

6    me your name.

7         MS. QUINO:  Hi, I'm Nerissa Quino.  I

8    also want to thank TDEC and you all hosting

9    this event.  I'm from Nashville, Tennessee,

10   but my niece lives here in Dixon County, goes

11   to Charlotte High School, so we come out here

12   and watch her play basketball since she was

13   little.  My climbing buddy lives in Charlotte

14   up on a hill.  It's really beautiful.  He

15   built his own house.  I'm a big paddler on

16   Harpeth River.  I support the Harpeth River

17   Watershed Association.  Yeah, this is my

18   backyard too.  And, you know, our own public

19   health department has already stated that the

20   natural gas industry is, like, top fifth

21   or -- top five chemical polluter in the

22   state.  At least -- this is like ten years

23   ago.  That 49 percent of the leaks or the

24   toxic leaks are from human error, and like,

25   28 percent is from just facility -- you know,
```

Transcript of Audio -7/06/2023

```
 1     just the equipment.  So if our public health
 2     has already identified that the natural gas
 3     industry is a pollutant, and this is ten
 4     years ago, why would, you know, TDEC even
 5     bother giving a permit or consider -- because
 6     that's a lot of work that you have to do.
 7     Once you start getting the ball rolling, it's
 8     like I thought of our taxpayer money, and
 9     you're supposed to protect us, our quality of
10     life, such as the beautiful land, the farm,
11     the natural beauty.  Why people come here to
12     enjoy Tennessee.  We're not even the top 15
13     as far as natural gas providers.  And let's
14     be real, our gas is going to Mexico or to --
15     we're funding other countries.  We're giving
16     in to their demands for energy.  That's
17     really what we're doing.  We're basically
18     compensating moving energy around so that we
19     can fund our partnerships on the
20     international scale.
21          So, anyway, this has nothing to do with
22     local.  This doesn't seem to fit what matters
23     to us Tennesseeans, new Tennesseeans.  So I
24     just ask that TDEC really thinks about where
25     you want to put your energy towards and just
```

Transcript of Audio -7/06/2023

```
 1    deny the permits or just move on and let's
 2    promote alternatives.  And let's just also be
 3    honest.  We need to also figure out ways to
 4    reduce our own energy consumption, humans,
 5    because we -- basically, if we have a demand,
 6    then they'll still want to have the pressure
 7    put on TDEC to say, hey, come on, give us the
 8    permits because people need it.  No, we need
 9    our land.  We need our livelihoods.  And we
10    want TDEC to continue to do what your mission
11    states is to provide a good quality of life.
12         Thank you.
13         MS. PEDRAZA:  Any other comments in the
14    room?
15         We're going to go to the folks the -- if
16    you change your mind, just let me know one
17    thing.
18         MALE SPEAKER:  I'd like to make a
19    comment.
20         MS. PEDRAZA:  Okay.
21         MALE SPEAKER:  (Indiscernible) give
22    Kinder Morgan one thing, they're a confident
23    (audio cut out).  When you start paying the
24    landowners money for the right-of-way across
25    their land before the permits are even
```

Transcript of Audio -7/06/2023

```
 1    okayed -- my neighbors, both of them, sold
 2    out (indiscernible).  Already paid, already
 3    in the bank, so they're pretty confident that
 4    you all are going to sign your permit and
 5    everybody else (indiscernible).
 6         MR. BRUNO:  It's arrogance not
 7    confidence.
 8         MALE SPEAKER:  (Indiscernible.)
 9         MS. PEDRAZA:  Great.  So we do have 14
10    people with us online.  Is there anybody that
11    would like to provide a comment for the
12    record online.  You can raise your hand or
13    you can type your name into the chat and we
14    will call on you.
15         If we have -- do we have any folks who
16    called in, Katie?
17         FEMALE SPEAKER:  We did earlier, but I
18    think they dropped off.  But you might want
19    to -- we might want to check and see if
20    there's anyone on the phone.
21         MS. PEDRAZA:  If you're on the phone and
22    would like to leave a comment, you can press
23    Star 6 to unmute yourself, say your name and
24    we'll let you provide your comment.
25         Is there anybody online who would like
```

Transcript of Audio -7/06/2023

```
 1      to provide a comment?  Raise your hand, type
 2      your name into the chat.  Do you see
 3      anything, Katie?  I'm not seeing anything.
 4           FEMALE SPEAKER:  I don't.
 5           MS. PEDRAZA:  Okay.  Anybody else in the
 6      room would like to provide an additional
 7      comment?
 8           MALE SPEAKER:  I'd like to add a PS.
 9           MS. PEDRAZA:  Yeah.  (Indiscernible.)
10           MR. WADE:  Focus on the water quality.
11      Many of these tributaries and springs are
12      spring fed.  After pipeline blasting, I don't
13      know if there's any way in the world you can
14      determine if these limestone shelves through
15      which the water feeding the spring
16      (indiscernible), then your tributaries are
17      affected.  (Audio cut out) do anything about
18      it.  What kinds of studies can be done to
19      that structure to assess the damage that
20      blasting will cause to these wetlands, the
21      tributaries, creeks, streams, not to mention
22      the springs that feed many of our homes as
23      well as the wetlands.
24           FEMALE SPEAKER:  (Indiscernible) can be
25      published in the, say, Tennessee -- or our
```

Transcript of Audio -7/06/2023

```
1    local newspaper, something like that, to try
2    to get -- tell people that this period is
3    ongoing for them to come in.  That's my
4    question right now.
5         MS. PEDRAZA:  I can't (indiscernible),
6    but I can ten minutes.  So we'll answer.
7         FEMALE SPEAKER:  (Indiscernible.)
8         MS. PEDRAZA:  It was.
9         Okay.  Sure, the gentleman with a
10   comment in the back, if you would come up to
11   the front, that would help me.  I'm sorry.
12        MR. CONNER:  Hi, my name is Robert
13   Connor, and I'm a local resident.  The
14   pipeline will be crossing my land.  My
15   background is a professional engineer.  I
16   work for Chevron and I install pipelines.  My
17   concern about this and my concern for the
18   environment -- I understand that this is only
19   construction, that you're only assessing
20   stream impacts for construction.  However, I
21   think the biggest potential impact in the
22   environment is going to happen during
23   operations in the event that there is a
24   problem that happens with the pipeline.  The
25   biggest issue that they have on this
```

Transcript of Audio -7/06/2023

```
 1    pipeline, which I understand is not directly
 2    where (indiscernible) would influence this,
 3    is the alignment alongside the high voltage
 4    transmission line.  Pipelines are mostly
 5    protected by cathodic protection.  Being next
 6    to the high voltage power lines is going to
 7    nullify that.  They can try to put in some
 8    safeguards, but I can tell you from industry
 9    practice, they don't always work.  So my
10    comment is -- and I'm not sure how this goes
11    in -- is if you're really -- I mean, for the
12    concern for the environment really needs to
13    look into the operation and the hazards of
14    their alignment of how they're planning to
15    put the pipeline in.
16        FEMALE SPEAKER:  (Indiscernible.)
17        MR. SHAFER:  Read it out loud.
18        FEMALE SPEAKER:  (Indiscernible.)  We
19    asked (indiscernible) --
20        MR. SHAFER:  (Indiscernible) --
21        FEMALE SPEAKER:  (Indiscernible.)
22        MR. SHAFER:  When this first started,
23    (indiscernible) got few of us together and
24    had a meeting.  There was five or six of us,
25    then there was ten or twelve of us, now
```

Transcript of Audio -7/06/2023

```
 1    there's a room full (indiscernible).  So
 2    those of you that are talking about your
 3    experiences, we're trying.  Okay.  There's a
 4    lot more of us now than there was when we
 5    started this process of information.
 6          Thank you, TDEC.  This is the second
 7    time that we've had the opportunity to come
 8    before you and express ourselves.  We've been
 9    to TVA meetings, we've been to
10    (indiscernible) meetings, all these different
11    permits, and now we've got more people.  So
12    the more they're here -- there was some
13    (indiscernible) Tennessee (indiscernible),
14    but a lot of people don't get a newspaper.
15    And if you don't do Facebook and get
16    information online, you have no idea what's
17    going on.  So, yes, there is a problem
18    accessing information for everybody, but at
19    least we are making some progress.
20    (Indiscernible) in the beginning.  So thank
21    the audience for coming.
22          MS. PEDRAZA:  What's your name again,
23    sir?
24          MR. SHAFER:  Steve Shafer.
25          MS. PEDRAZA:  Got it.  All right.
```

Transcript of Audio -7/06/2023

```
 1          FEMALE SPEAKER:  I would like to mention
 2     what is really an ugly word, but we have to
 3     deal with it, it's mitigation.  We hope
 4     everything will go wonderfully and swimmingly
 5     the way they say that it will go, but that
 6     never happens.  What about mitigation?  When
 7     things -- when it goes bad in the middle of
 8     the night or early on Sunday morning, what
 9     are the mitigation issues going to be and who
10     is responsible for dealing with those?  We
11     are told or it has been proven that that will
12     just be our problem.  Is that really
13     accurate?
14          MS. PEDRAZA:  I can't answer your
15     questions right now.  We can talk about what
16     mitigation means to us after we're finished
17     with this formal (indiscernible).
18          Are we ready to close out our comments
19     for the record?  Very good.
20          As we know, the public record will
21     remain open for at least another ten days,
22     until July 16th, 2026 (sic), so you can
23     submit comments to us via e-mail, online or
24     mail in additional comments.  You've got
25     contact information on your agenda here
```

Transcript of Audio -7/06/2023

```
 1    tonight.  You can call us, contact us any way
 2    you need to submit additional comments.
 3    Okay.
 4         And that's all we have for tonight.
 5    Appreciate everyone's participation and
 6    cooperation tonight for sticking around.  And
 7    you can make sure you signed in at the back,
 8    if you haven't already.  Thank you very much.
 9         Our staff will stay up at the front,
10    too.  We can answer any additional questions
11    you have.
12         (Recording concluded.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1              CERTIFICATE OF COURT REPORTER
2              I, Nikki L. Lloyd, Court Reporter and
3     Notary Public, in and for the State of
4     Mississippi, hereby certify that the foregoing
5     contains a true and correct transcript, to the
6     best of my ability, of the audio recording in the
7     aforementioned matter, as taken by stenotype and
8     later reduced to typewritten form under my
9     supervision by means of computer-aided
10    transcription.
11             I further certify that, to the best of
12    my knowledge, I am not in the employ of or related
13    to any party in this matter and have no interest,
14    monetary or otherwise, in the final outcome of
15    this matter.
16             Witness my signature and seal this the
17    26th day of September, 2023.
18
19
20             _____
21             NIKKI L. LLOYD, CCR #1870
22    My Commission Expires:
      April 30, 2025
23
24
25
```

| A | | | | |
|---|---|---|---|---|
| **ability** 42:6 | 38:14 | 14:13 | 25:20 37:15 | 19:23 |
| **able** 11:17,18,19 | **allowed** 4:3 | **arrogance** 35:6 | **backyard** 30:6 | **blue** 21:25 |
| **absolute** 28:6 | **alongside** 38:3 | **ashamed** 14:9 | 32:18 | **bluffs** 10:13 |
| **absolutely** 24:21 | **Alteration** 31:25 | **aside** 11:10 | **bad** 22:19 40:7 | **Bob** 15:20 16:11 |
| 28:6 | **alterations** 2:20 | **asked** 10:3 15:4 | **Baird** 15:20 | 29:1 30:15 |
| **absorb** 8:17 | **alternative** | 38:19 | 16:11 29:2 | **bodies** 12:10 |
| **access** 15:23 | 14:19 | **asking** 20:22 | 30:15 | **boggles** 22:23 |
| 19:15 | **alternatives** | **assess** 36:19 | **ball** 22:6 33:7 | 26:7 |
| **accessing** 39:18 | 14:16,17,18,24 | **assessed** 8:12 | **bank** 35:3 | **books** 25:17 |
| **accurate** 40:13 | 14:24 22:1 | 15:14 | **Barbara** 5:5 | **booming** 23:24 |
| **acres** 10:20 | 34:2 | **assessing** 37:19 | 9:15 | **bother** 33:5 |
| 15:22 21:15 | **Angie** 5:3 17:20 | **assessments** | **barely** 18:5 | **bought** 21:17 |
| **action** 2:23 | **animals** 16:9 | 30:13 | **barns** 20:2 | **boys** 27:5 |
| **add** 36:8 | **answer** 37:6 | **associated** 2:20 | **basically** 33:17 | **branch** 7:23 |
| **additional** 11:4 | 40:14 41:10 | 2:24 | 34:5 | 18:11 |
| 36:6 40:24 | **answering** 4:8 | **Association** | **basketball** 32:12 | **breaks** 27:13,15 |
| 41:2,10 | **antidotal** 10:18 | 32:17 | **batteries** 22:22 | **breathe** 8:16 |
| **additionally** | **anybody** 13:18 | **ASU** 25:22 | **battery** 22:14 | **briefly** 24:11 |
| 3:18 | 14:14 30:18 | **atrocities** 28:4 | 26:8 | **bring** 2:14 |
| **address** 3:22 | 35:10,25 36:5 | **attendance** 2:8 | **beautiful** 21:10 | **brought** 13:1 |
| 13:19 | **anymore** 24:4 | **attest** 19:11 | 27:9 32:14 | 18:15 |
| **addressed** 4:12 | **anyway** 9:1 | **audience** 39:21 | 33:10 | **Bruno** 20:13 |
| **adequately** 13:9 | 26:21 33:21 | **audio** 1:1 6:1 | **beauty** 33:11 | 21:4,5,6 26:24 |
| **admitted** 15:8 | **anyways** 28:1 | 18:1 26:20 | **bedrock** 5:19 | 27:1,2,3,4 35:6 |
| **advanced** 14:20 | **apart** 28:20 | 27:24 34:23 | **beginning** 39:20 | **bubble** 26:11 |
| **advantage** 28:7 | **Appalachian** | 36:17 42:6 | **best** 24:25 42:6 | **buddy** 32:13 |
| **advised** 10:14 | 9:16 | **Austin** 7:13 | 42:11 | **building** 32:5 |
| **affect** 13:6,21 | **appeared** 22:19 | **Australia** 23:5 | **bet** 22:7 | **built** 32:15 |
| 19:9 | **appreciate** | 24:2 | **better** 29:21 | **burning** 23:17 |
| **aforementioned** | 12:17 41:5 | **authorities** 6:15 | **biased** 28:11 | **buy** 21:9 |
| 42:7 | **April** 42:22 | **available** 15:2 | **big** 8:9 12:13 | |
| **agencies** 6:13 | **aquatic** 8:15 | **avoided** 23:3 | 16:4 32:15 | |
| 17:4 | 31:25 | **awesome** 26:22 | **biggest** 12:7,24 | C |
| **agenda** 3:20 | **aquifers** 12:22 | | 37:21,25 | **California** 19:18 |
| 40:25 | 17:15 | B | **Bill** 13:25 | **call** 4:18 35:14 |
| **agent** 21:16 | **ARAP** 31:18 | **B-A-I-R-D** | **billions** 23:8 | 41:1 |
| **ago** 21:7 22:10 | 32:3 | 16:12 | **Biology** 7:14 | **called** 35:16 |
| 23:20 26:6 | **area** 12:25 13:1 | **bachelor's** 25:23 | **bit** 25:18 | **calling** 27:10 |
| 32:23 33:4 | 25:5 | **back** 3:10 7:25 | **blackouts** 24:3,4 | **Cari** 13:14 15:21 |
| **agreed** 8:1 | **areas** 8:18 10:15 | 8:21 10:24 | 26:17 | **case** 8:23 10:5 |
| **ahead** 9:4 25:2 | 13:2 | 18:7,18,23 | **blasting** 5:25 | **catching** 15:8 |
| **air** 17:14 | **Arizona** 21:6 | 20:1 23:7 29:2 | 36:12,20 | **category** 6:24 |
| **aired** 29:7 | 25:20 27:8 | 30:15 37:10 | **block** 12:2 | **cathodic** 38:5 |
| **alignment** 38:3 | **Army** 6:13 | 41:7 | **blood** 28:17 | **cause** 18:17 25:3 |
| | **arrangement** | **background** | **blowing** 19:21 | 36:20 |
| | | | | **causing** 15:6 |

**CCR** 1:13 42:20
**Center** 7:13
**cents** 17:8
**CERTIFICATE** 42:1
**Certification** 2:19
**certify** 42:4,11
**chance** 13:10
**change** 34:16
**Charlotte** 15:22 32:11,13
**chat** 35:13 36:2
**cheaper** 22:11 22:21
**check** 35:19
**checking** 16:24
**chemical** 32:21
**Chevron** 37:16
**chickens** 10:17
**choosing** 24:5 28:23,24
**city** 10:24 12:20
**Claire** 3:21
**clean** 23:10
**clear** 4:24
**clearcut** 11:14
**clearcutting** 10:3 18:15,16
**climbing** 32:13
**close** 5:7 40:18
**closely** 24:13
**colleagues** 7:12
**combination** 22:13
**combined** 26:8
**come** 3:10 4:21 4:25 8:21 10:2 10:11 11:24 21:22 28:15,15 30:15,20 31:6 32:5,11 33:11 34:7 37:3,10 39:7
**coming** 15:9

31:19 32:1 39:21
**comment** 3:12 4:11,13,18 8:7 16:10 20:16,20 20:25 30:19 31:17 34:19 35:11,22,24 36:1,7 37:10 38:10
**commenter** 4:10
**comments** 2:10 2:17,22,25 3:4 3:14,25 4:3,4,6 4:10,14 6:2 9:6 9:13 14:12 31:22 34:13 40:18,23,24 41:2
**Commission** 30:11 42:22
**common** 5:16
**community** 17:16 28:7
**companies** 14:2
**company** 6:10 6:18 16:25 31:24
**compensating** 33:18
**completely** 28:11
**complexes** 8:14
**compromised** 27:19
**computer-aided** 42:9
**concern** 12:7 13:11 15:25 16:7 25:7 37:17,17 38:12
**concerned** 9:18 16:5
**concerns** 5:10 5:22 8:4 12:24

29:7
**conclude** 9:2
**concluded** 41:12
**confidence** 35:7
**confident** 34:22 35:3
**conjunction** 17:5
**CONNER** 37:12
**Connor** 37:13
**consider** 33:5
**consideration** 4:7 20:9
**considering** 3:3 22:24
**consist** 8:13
**constitutional** 14:4
**construction** 12:9 37:19,20
**consumption** 34:4
**contact** 3:19 22:3 40:25 41:1
**contacted** 6:19 6:24 16:2
**contains** 42:5
**contaminated** 9:20 16:8
**contamination** 12:21
**continue** 34:10
**continuing** 19:3
**control** 19:10
**controlling** 20:5
**cooperation** 41:6
**coordinates** 8:10
**corporation** 12:13
**Corps** 6:13 18:2
**correct** 29:19 42:5
**correctly** 24:8

24:23
**cost** 22:10,20 23:22 26:4
**costs** 23:21
**countries** 33:15
**country** 15:5 23:6
**County** 32:10
**couple** 16:20
**Court** 42:1,2
**crayfish** 7:12,15 7:23 8:4 16:3
**create** 27:22
**creek** 16:4
**creeks** 7:15 36:21
**cross** 18:4 20:7
**crossed** 7:16 10:9
**crossing** 5:13 16:6 18:11,23 37:14
**crossings** 8:9,12 8:13 18:1
**crosstalk** 9:3
**Cumberland** 2:21
**currently** 7:20 24:18
**curve** 26:14
**cut** 5:24 6:2 18:1 26:20 27:24 34:23 36:17

**D**
**damage** 15:6 36:19
**damages** 15:14
**day** 29:24 42:17
**days** 20:24 30:8 40:21
**deal** 40:3
**dealing** 40:10
**decision** 3:5
**deck** 5:4 12:3

15:20 20:13
**declined** 23:21 23:23
**definitely** 12:21
**degradation** 18:21
**demand** 34:5
**demands** 33:16
**deny** 34:1
**department** 20:17,23 29:23 32:19
**departments** 19:20
**Depending** 12:18
**depths** 29:23
**designated** 7:19 18:1,2
**destroy** 27:21
**destroyed** 14:25 15:1
**determination** 3:6
**determine** 36:14
**determined** 6:9
**determining** 6:16
**devastate** 11:22
**deviate** 18:12
**device** 4:22
**diagonal** 10:11
**different** 18:13 23:6 39:10
**digging** 23:15
**direc-** 6:1
**direction** 18:13
**directly** 8:18 38:1
**discover** 7:11
**discovered** 14:21
**discretion** 20:17 20:24
**dispersed** 12:9

Jackson
Gulfport

Brooks Court Reporting
1-800-245-3376

Meridian
New Orleans

JA2227

AR 004483

distribution 8:5
**Division** 3:2,4
  20:18,23
**Division's** 3:6
  4:13
**Dixon** 32:10
**documented**
  14:17 23:19
**doing** 4:23 5:24
  6:1 13:4 14:14
  16:25 22:24
  23:1,3 26:22
  33:17
**dollars** 23:8
**domain** 14:2
**double** 3:10
**downtown** 3:23
**Dreams** 8:19
**drilling** 6:8 17:1
**drop** 22:6
**dropped** 35:18
**dry** 5:24
**due** 20:6
**duty** 3:10

**E**

**e-mail** 3:19
  40:23
**earlier** 15:4
  17:10 20:16
  29:18 35:17
**early** 40:8
**easily** 24:16
**East** 28:14
**eastern** 5:17
  18:8 20:10
**easy** 10:16
**ecosystem** 5:18
**effective** 2:22
**efficiency** 24:9
**efficient** 22:15
  24:11 25:2
**effort** 13:23
**eight** 8:12 31:8
**either** 24:7

electric 23:9
**eminent** 14:2
**employ** 42:12
**encourage** 4:4
**endangered**
  27:15
**energy** 11:5
  14:19 22:14,15
  22:16,21 23:10
  24:10 25:1
  33:16,18,25
  34:4
**enforcement**
  25:21
**engineer** 37:15
**Engineers** 6:14
  18:3
**enjoy** 27:11
  33:12
**enjoying** 27:13
**ensure** 3:24 8:23
**entire** 5:16
  12:19
**environment**
  27:25 37:18,22
  38:12
**EPA** 15:7
**equipment** 33:1
**erosion** 18:17,24
  18:25 19:4,10
**error** 32:24
**especially** 20:9
**estate** 21:16
**evening** 9:11
  29:6 31:20
**event** 32:9 37:23
**everybody** 5:1
  13:9 23:1,1
  25:8 35:5
  39:18
**everybody's**
  25:10 26:22
**everyone's** 41:5
**exact** 18:3
**examine** 24:13

25:3
**Excellence** 7:13
**excuse** 27:18
**exhausted** 5:1
**existence** 23:4
**exists** 14:22
  21:25
**expedite** 8:2
**expense** 22:10
**experiences** 39:3
**expert** 6:10
**Expires** 42:22
**explosion** 15:11
  19:11
**explosions** 15:7
**express** 39:8
**extend** 30:11
**extreme** 12:25

**F**

**Facebook** 39:15
**facility** 32:25
**fact** 6:25 21:21
  22:22 26:3
  28:10 29:10
**family** 12:19
  21:5,6 27:4,4
**Fantastic** 22:2
**far** 12:13 13:5
  25:19 33:13
**farm** 19:6,24
  20:3 33:10
**farms** 11:6
**fed** 15:24 36:12
**Federal** 29:11
  29:15
**feed** 36:22
**feeding** 36:15
**feel** 5:13 6:12
  7:3 8:19 13:8
  22:3
**feet** 6:21 10:19
  16:1
**fell** 7:22
**felt** 6:2

**FEMALE** 30:21
  30:23 31:5,7
  31:12,14 35:17
  36:4,24 37:7
  38:16,18,21
  40:1
**Field** 7:14 8:19
**fifth** 32:20
**fight** 6:25 14:6
**figure** 8:5 34:3
**final** 3:5 42:14
**find** 11:11 24:6
  25:25 27:9
**fine** 5:6
**fingers** 22:20
**finished** 40:16
**fire** 19:14,15,16
  19:16,19 20:4
  20:5 25:4
**first** 5:4 12:7,15
  17:23 30:8
  38:22
**Fish** 7:9 8:1
**fishing** 27:17
**fissures** 5:20
**fit** 6:23 33:22
**five** 3:25 5:2
  32:21 38:24
**fix** 24:7
**fixed** 11:13,14
**floor** 2:13
**Florida** 24:2
**fluid** 6:8
**Focus** 36:10
**folks** 2:4,14 4:1
  7:11 29:19,20
  30:2 34:15
  35:15
**forced** 10:19
**foregoing** 42:4
**forest** 19:16
**form** 42:8
**formal** 2:5 8:7
  40:17
**formed** 6:25

forms 14:20
**fossil** 11:5
**found** 16:4
  21:14
**four** 10:9 21:10
**fox** 12:12
**free** 23:13 26:6
**front** 3:17 4:21
  37:11 41:9
**fuel** 11:6
**fuels** 24:18
**full** 39:1
**fund** 33:19
**funding** 7:1
  33:15
**further** 42:11
**future** 26:9 27:5
  27:25 28:2

**G**

**garden** 16:4
**gas** 1:4 2:21 6:10
  6:18 17:13
  27:21 28:3,12
  32:20 33:2,13
  33:14
**GCU** 25:23
**Gefford** 18:11
**gene** 7:21,22,25
**gentleman** 37:9
**geological** 8:5
**George** 27:1
  29:1
**getting** 33:7
**gigawatt** 23:10
  23:11
**gills** 8:17
**give** 9:12 11:19
  17:7 20:18
  34:7,21
**given** 4:6 20:21
**gives** 14:1
**giving** 2:13 5:9
  22:5 33:5,15
**go** 5:12 8:8,9,10

Transcript of Audio -7/06/2023

Page 4

9:4 17:13 18:3
18:12 19:22
23:14 25:2
31:21 34:15
40:4,5
**Godspeed** 15:16
**goes** 11:23 18:18
32:10 38:10
40:7
**going** 4:15,18,20
5:17 6:9 8:24
10:18 11:13,22
12:6 13:6,15
13:20 16:25
17:2,12,14
18:4,10,12,14
18:17,25 19:3
19:22,22,25
20:5,7,10 21:8
21:21 22:6
24:22 25:16
26:3,4 28:2,14
28:15 29:4
32:2 33:14
34:15 35:4
37:22 38:6
39:17 40:9
**good** 2:2 9:8,11
13:14 15:19
31:15 34:11
40:19
**government**
17:4 23:8,14
25:14
**GPS** 18:3
**grades** 18:5,6
**graduated** 25:22
**grandchildren**
19:7
**grandkids** 27:17
**grant** 20:24
**great** 26:15 35:9
**greed** 27:19
**greedy** 24:24
**group** 6:25

**guarding** 12:12
**guess** 5:25 21:17
23:20
**guy** 17:10
**guys** 3:11 5:2
9:1 11:21
12:15 32:1

---

**H**

**habitats** 27:21
27:24
**half** 15:8
**Halsey** 12:3
13:13,16
**hand** 22:17
35:12 36:1
**hands** 30:25
**happen** 8:24
9:18 11:1 25:4
26:15 37:22
**happened** 19:1
19:18 23:20
28:14
**happening**
13:20 26:9,13
**happens** 17:15
19:2,17,18
22:16 28:12
37:24 40:6
**hard** 7:17
**harm** 22:25 25:4
**Harpeth** 32:16
32:16
**harsh** 5:18
**harvest** 11:18
**Hawaii** 23:5,25
24:2 26:15
**hay** 10:22 20:2
**hazardous** 12:8
**hazards** 38:13
**health** 32:19
33:1
**healthier** 26:2
**healthy** 25:25
27:9

**hear** 4:23 5:3
9:24 27:14,15
28:9,22
**heard** 17:10
21:23 28:4
29:8 30:3
**hearing** 1:4 2:6
2:17,25 4:14
20:20
**heart** 27:14,15
**hello** 16:18 21:3
21:4
**help** 6:25 7:4 8:6
28:15,16 31:21
37:11
**helped** 24:1
**helping** 17:2
32:1
**henhouse** 12:13
**henry** 31:16,16
**hey** 11:2 34:7
**Hi** 27:2 31:16
32:7 37:12
**high** 32:11 38:3
38:6
**Highland** 5:17
**hill** 32:14
**hired** 6:10
**history** 15:5
**hit** 14:5
**holes** 27:17
**homes** 23:17
36:22
**homeschool**
27:12
**honest** 12:23
34:3
**honestly** 28:4
**Honeycut** 9:10
12:4,4
**hope** 40:3
**hopefully** 2:7
15:10
**hoping** 19:8
**horizontal** 6:1

**horrible** 21:13
**horses** 10:16
**hosting** 32:8
**hot** 17:11,16
**hour** 23:11
**house** 16:5
19:23 21:9,17
26:19 32:15
**huge** 23:7 25:14
**human** 32:24
**humans** 34:4
**husband** 27:3
**hydrogen** 14:19
24:11,12,14,17

---

**I**

**idea** 21:24 22:2
39:16
**identified** 33:2
**imagine** 13:7
**impact** 30:14
37:21
**impacts** 37:20
**important** 8:15
**incentives** 23:8
25:14
**incredibly** 22:15
24:10
**indicated** 4:17
**indicating** 18:7
**indiscernible** 2:1
3:22,23 5:8 9:3
9:16,25 10:1
30:21,23,24,25
31:2,3,3,4,8,9
31:12,13 32:4
34:21 35:2,5,8
36:9,16,24
37:5,7 38:2,16
38:18,19,20,21
38:23 39:1,10
39:13,13,20
40:17
**individual** 5:13
**industry** 32:20

33:3 38:8
**inflation** 23:22
**influence** 38:2
**inform** 32:2
**information**
3:20 13:19
14:21 39:5,16
39:18 40:25
**informed** 21:15
30:13
**injustice** 28:7
**install** 37:16
**instances** 11:3
**intentional** 28:6
**interest** 24:25
42:13
**interested** 10:17
**international**
33:20
**involved** 25:10
**issue** 37:25
**issues** 2:24 40:9
**it'll** 3:10 8:21,21
24:8

---

**J**

**J.W** 17:22
**job** 8:9
**jobs** 7:4 27:23
27:24
**joining** 4:24
**judge** 24:20
**July** 1:6 3:1
40:22

---

**K**

**Katie** 35:16 36:3
**keep** 4:2 20:25
**keeping** 2:9
**keeps** 25:8
**kids** 26:1 27:12
**kind** 6:4 12:12
26:11
**Kinder** 6:4 16:2
34:22

Jackson
Gulfport

Brooks Court Reporting
1-800-245-3376
JA2229

Meridian
New Orleans

AR 004485

**kinds** 36:18
**King** 16:16,18
**know** 4:19 5:10
  5:22 6:5 7:5,11
  7:18 8:3,6,19
  8:22,23,23 9:7
  13:25 14:4,16
  14:21 15:15
  16:21,23,23
  17:2 18:19
  19:1 22:8,18
  23:12 25:8,15
  28:11 29:19,20
  30:5,7 32:18
  32:25 33:4
  34:16 36:13
  40:20
**knowledge**
  42:12

**L**

**L** 1:13 3:22 42:2
  42:20
**ladies** 20:21
**lady's** 13:17
**land** 10:3,12
  11:14,23 14:3
  14:25 21:14
  33:10 34:9,25
  37:14
**landowners**
  34:24
**lands** 28:16
**laughed** 21:23
**law** 25:21 29:13
**lays** 10:12
**leak** 15:12
**leaked** 6:8
**leaks** 15:7,9 24:6
  24:14 32:23,24
**leaning** 27:25
**learning** 28:2
**leave** 10:12
  30:19 35:22
**left** 17:19

**legal** 29:10,16
**let's** 5:3 6:17
  24:19 33:13
  34:1,2
**letter** 29:13
**letting** 17:13
**liars** 24:24
**life** 33:10 34:11
**lifetime** 11:16
**limestone** 5:19
  36:14
**limit** 24:19
**limiting** 3:25
**limits** 6:9,16
**line** 10:10 13:18
  16:22 38:4
**lines** 38:6
**list** 2:14
**listed** 7:20
**listing** 8:2,6
**literally** 10:19
**little** 7:22 22:16
  32:13
**live** 10:21 12:5
  15:22 27:10
**livelihoods**
  28:21 34:9
**lives** 11:7 32:10
  32:13
**Lloyd** 1:13 42:2
  42:20
**local** 19:19
  33:22 37:1,13
**location** 19:14
**logically** 18:10
**long** 5:6 7:19
  15:5 18:25
  25:15
**look** 5:12 7:6
  14:15 26:12,16
  28:13 38:13
**looked** 14:18
  24:13
**lot** 4:1 11:3 15:6
  17:17 18:15,19

19:18 22:7
  31:22 33:6
  39:4,14
**loud** 4:24 38:17
**love** 27:11
**luck** 11:3
**lumber** 11:18
**Luna** 17:22,23
  20:14

**M**

**ma'am** 2:19 25:9
  31:11
**magically** 22:19
**mail** 3:19 40:24
**main** 16:7 23:25
**majority** 5:23
  25:13
**making** 39:19
**MALE** 10:1
  16:13 30:17
  34:18,21 35:8
  36:8
**man** 21:25
**managing** 11:7
**maps** 20:22
**master's** 25:23
**materials** 12:8
**matter** 2:3 42:7
  42:13,15
**matters** 33:22
**mature** 11:15,16
**mean** 24:13
  38:11
**means** 40:16
  42:9
**measures** 25:5
**meeting** 22:23
  30:8 38:24
**meetings** 13:8
  39:9,10
**member** 3:15
  9:16
**members** 16:24
**memories** 27:18

**mention** 36:21
  40:1
**mentioned** 7:8
  17:10 20:15
  24:11,20 27:3
  27:7 29:18,25
**merge** 10:23
**met** 29:11,16
**methane** 15:9
  17:13 28:13
**Mexico** 33:14
**Michelle** 26:25
  27:3
**middle** 40:7
**mile** 12:5
**miles** 21:10
**Miller** 5:5 9:9,11
  9:15,15 10:2
  11:25
**mind** 22:23 26:7
  34:16
**minimal** 18:21
**minimum** 30:11
**minutes** 4:1 5:2
  31:8 37:6
**mission** 34:10
**Mississippi** 42:4
**mitigates** 18:18
**mitigation** 9:22
  40:3,6,9,16
**monetary** 42:14
**money** 23:11,13
  26:5 33:8
  34:24
**monitoring** 6:15
**months** 18:22
**Morgan** 16:2
  34:22
**Morgan's** 6:4
**morning** 40:8
**mouth** 29:9
**move** 21:8 34:1
**moved** 21:6,17
**moving** 12:10
  27:8 33:18

**Mummaw** 5:4,8
  9:4,7

**N**

**name** 9:13,15
  17:25 21:4
  27:2 31:11
  32:6 35:13,23
  36:2 37:12
  39:22
**names** 4:16,19
**Nashville** 32:9
**natural** 32:20
  33:2,11,13
**nature** 27:11,12
**navigate** 8:10
**need** 3:8 11:4
  22:18 28:9
  34:3,8,8,9 41:2
**needs** 38:12
**neighbors** 35:1
**NEPA** 14:13
**Nerissa** 32:7
**never** 11:15,15
  16:2 40:6
**new** 7:11,14,19
  7:24 14:20
  23:23 33:23
**newspaper** 37:1
  39:14
**nice** 20:21
**niece** 32:10
**night** 40:8
**Nikki** 1:13 42:2
  42:20
**Nof-** 15:17
**Nofsinger** 13:14
  15:18,18,19,21
  15:21
**normal** 18:23
  22:5
**north** 17:17
  19:23
**Notary** 42:3
**notice** 3:5 22:5

28:5
**notified** 13:9
31:6,8
**nullify** 38:7

**O**

**obviously** 11:9
27:6
**offer** 6:19
**officials** 30:24
31:3
**oh** 3:7 9:7 10:4
16:14 17:23
30:22
**oil** 14:1
**okay** 2:5 3:10,12
5:3 9:4,8 13:14
16:16 19:6
26:25 30:20,25
31:15 34:20
36:5 37:9 39:3
41:3
**okayed** 35:1
**Oklahoma** 21:9
**once** 8:4 9:20
12:12 21:11
33:7
**ones** 17:6
**ongoing** 37:3
**online** 4:25
35:10,12,25
39:16 40:23
**open** 20:20 21:1
40:21
**opens** 5:21
26:17
**operation** 38:13
**operations**
37:23
**opportunity**
3:24 5:9 26:18
39:7
**opposed** 11:5,20
**oppositional**
10:7

**option** 12:19
**order** 23:7
**organization**
9:14
**organize** 2:12
**originally** 21:7
**outcome** 42:14
**outfit** 17:1
**outside** 27:12
**oxygen** 8:16

**P**

**paddler** 32:15
**paid** 35:2
**Palestine** 28:14
**parity** 22:10
**Parks** 3:22
**part** 4:11 14:12
18:8 20:10
**participation**
41:5
**partnerships**
33:19
**party** 24:22 25:2
42:13
**pass** 8:16 30:14
**passed** 14:1
**pasture** 10:22
**paying** 15:13
34:23
**Peace** 7:13
**PEDRAZA** 2:1
9:2,5,8,12,25
11:25 13:13
15:17,19 16:11
16:14 17:21
20:13 21:3
26:23,25 29:1
30:15,18,22
31:10,13,15
32:4 34:13,20
35:9,21 36:5,9
37:5,8 39:22
39:25 40:14
**people** 4:16 5:12

6:3,23 11:11
12:2 13:6 14:8
14:23,24 20:3
22:4,24 24:23
26:10 28:5,15
29:14 30:4,9
31:2,20 33:11
34:8 35:10
37:2 39:11,14
**people's** 11:6
27:16 28:16,19
**percent** 32:23,25
**perfect** 23:2
**period** 4:9 20:16
20:19,20,25
37:2
**permanent**
27:22,23
**permit** 2:11 3:5
31:18,25 32:3
33:5 35:4
**permits** 7:9 34:1
34:8,25 39:11
**permitting**
30:12
**person** 4:17
**phone** 4:25
35:20,21
**pipeline** 1:4 2:21
5:11,16 6:21
6:22 7:1 8:12
10:8 11:22
12:6,10 13:5
13:18 16:1
17:6,13 18:9
18:14 19:12,16
20:10 21:23
22:4,19,25
24:6,7 26:4
31:24,24 36:12
37:14,24 38:1
38:15
**pipelines** 10:9
15:4,10 28:19
28:23 37:16

38:4
**pipes** 24:15
**place** 19:6 25:25
27:9
**places** 23:6
**plan** 6:7 7:2 8:20
**planning** 5:24
38:14
**plausible** 14:15
**play** 32:12
**Please** 30:11
**point** 22:11
**pointed** 3:16
**points** 23:2
**policing** 6:5
12:14
**pollutant** 33:3
**polluted** 27:16
**polluter** 32:21
**polluting** 28:13
**pond** 10:23 11:2
**ponds** 15:24
**pool** 8:14
**portion** 14:11
**possible** 16:21
**potential** 11:18
37:21
**poured** 28:17
**power** 10:10
26:18 38:6
**practice** 38:9
**pray** 15:15
**press** 35:22
**pressure** 17:12
34:6
**presuming** 9:9
**pretty** 35:3
**private** 28:16,19
**probably** 19:13
25:4 29:3,8
**problem** 6:6
18:25 19:4
20:6 24:4,12
37:24 39:17
40:12

**process** 2:11
30:12 39:5
**professional**
37:15
**progress** 39:19
**project** 2:22
14:14 23:14
25:11 27:22
**promote** 34:2
**prone** 5:19
**properties** 28:17
28:20
**property** 10:9
10:20,24 16:20
21:10
**proposed** 2:21
2:23 6:22 7:16
**protect** 33:9
**protected** 38:5
**protection** 38:5
**proven** 26:5
27:21 40:11
**provide** 4:18
34:11 35:11,24
36:1,6
**provided** 3:20
**providers** 33:13
**PS** 36:8
**public** 1:4 2:5,17
2:17 3:4 4:9,11
13:8 14:23
15:2 20:19,25
32:2,18 33:1
40:20 42:3
**publish** 3:4
**published** 36:25
**publishing**
29:11
**pull** 13:22
**purpose** 2:16
**pushed** 7:17
23:9
**put** 19:15,20
26:4 28:23
33:25 34:7

38:7,15

**Q**

quality 2:18,24
  33:9 34:11
  36:10
quarter 12:5
question 4:11
  9:22 15:3 17:3
  18:16 37:4
questions 3:18
  4:8 14:12
  17:17 40:15
  41:10
queue 2:2
Quino 32:7,7
quite 25:18
  29:19

**R**

rain 19:1
raise 10:22
  35:12 36:1
rare 25:6
reach 7:5
read 4:15 38:17
ready 40:18
real 20:6 21:15
  33:14
realize 8:8 12:14
  14:11
realized 5:10
really 2:3 9:18
  9:21 10:5,15
  11:22 24:1
  25:3 32:14
  33:17,24 38:11
  38:12 40:2,12
reason 27:6
reasonable
  20:19
rebuild 20:1
recapture 6:7
receive 2:17 4:9
received 2:25

7:1
receiving 28:5
recognize 31:22
record 2:8 30:20
  35:12 40:19,20
recording 1:1
  4:23 41:12
  42:6
reduce 34:4
reduced 42:8
refer 17:19
regarding 2:18
Register 29:12
  29:15
regulation 28:10
regulatory 6:12
reiterate 20:15
  20:22
related 42:12
relevant 2:23
relieve 17:12
relying 6:3
remain 40:21
Remember
  28:24
renewable 22:14
  22:21 28:1
repel 10:14 13:3
report 6:4,6,18
Reporter 42:1,2
represent 27:4
  31:1
representatives
  14:8
representing
  9:14 21:5
reps 14:5
request 4:2
  13:17 20:23
  29:5,23
required 7:9
requirement
  29:10,12,16
research 14:18
  18:20 21:18

22:2 26:16
researched
  21:12 25:24
resident 37:13
resource 6:4,6
  6:17 31:25
resources 3:3
  28:1
respectfully 4:2
responder 12:7
  12:16
response 4:13
responses 2:10
responsible
  15:12 40:10
restoration 8:20
restore 8:20
resulting 19:14
  19:16 20:5
retired 25:20,22
reviewed 3:2
Richard 9:9
  11:24 12:1,4
  19:10
ridiculous 21:24
right 7:7 10:19
  14:2 16:4 22:1
  22:13 23:9
  25:15,16 29:22
  37:4 39:25
  40:15
right-of-way
  34:24
rights 14:4
Rim 5:17
ripple 8:14
risk 23:16
River 32:16,16
Robert 37:12
rolling 24:2,3
  26:17 33:7
Ron 20:13 21:4
room 2:4 5:1
  25:9 29:2
  30:19 34:14

36:6 39:1
Rosa 3:22
ruling 11:10
running 26:10
  28:19
runoff 12:20
runs 10:10
rural 12:25

**S**

sad 27:20
safeguards 38:8
safety 25:5
sake 19:9
save 28:16
saw 21:11,12
saying 11:9,10
  25:8
SB 13:25
scale 33:20
School 32:11
screen 3:8
seal 42:16
second 7:21,24
  17:24 39:6
seconding 29:25
Section 2:18
see 3:11 6:17 7:6
  11:15 21:20
  24:14,19 26:2
  26:12,16 30:25
  35:19 36:2
seeing 36:3
sell 10:5
Senate 13:25
  14:7
send 2:9 13:19
sense 6:12
September
  42:17
sequenced 7:21
  7:25
sequencing 7:21
Service 7:10
set 11:10

shade 11:17,19
Shafer 16:17
  17:21,25,25
  38:17,20,22
  39:24,24
Shame 28:18
share 3:8
sharing 3:9
Sharon 16:12,16
sheet 4:16
shelves 36:14
shirt 21:25
shocked 26:3
shops 20:2
short 25:10 29:4
show 21:19
sic 40:22
sick 21:20
side 18:7
sign 35:4
signature 42:16
signed 2:7 41:7
simple 23:19
single 21:20
sinkhole 5:1
sinkholes 5:20
  16:20
sir 39:23
sit 11:17
situation 10:18
  11:12,20 13:5
  20:4
six 18:22 38:24
size 14:14
skills 28:2
smokestacks
  21:11,12,16,18
  22:17
snapping 22:20
solar 14:19
  22:10,13,22
  26:7
sold 35:1
solution 21:22
  21:24 23:18

solved 24:5
somebody 18:18
    24:20
soon 8:2
sorry 3:9 12:1
    16:15 17:23
    37:11
soul 29:24
sound 20:17,24
source 22:21
    24:10
speak 3:13,25
    28:8 29:12
SPEAKER 10:1
    16:13 30:17,21
    30:23 31:5,7
    31:12,14 34:18
    34:21 35:8,17
    36:4,8,24 37:7
    38:16,18,21
    40:1
speakers 2:12
species 7:11,14
    7:19,24 16:5
    27:14
spirit 30:1
spot 18:3 26:15
spots 18:2,11
    24:1
spring 6:20
    15:24 36:12,15
springs 10:23
    11:2 36:11,22
staff 3:3,15 5:12
    41:9
staffed 25:11
stakeholder 9:17
stand 3:17 4:21
Star 35:23
start 2:5 33:7
    34:23
started 38:22
    39:5
starts 18:9
state 9:13 31:10

32:22 42:3
stated 32:19
states 34:11
stay 28:23 41:9
steep 18:5,13
stenotype 42:7
Stephanie 31:16
stepped 16:13
    16:14
Steve 16:16
    17:21,25 39:24
Steve's 17:23
sticking 41:6
stock 11:19
stop 3:8 26:16
storage 20:2
    22:14 26:8
stored 26:18
stream 2:20 5:13
    5:25 8:13 18:4
    19:9 30:6
    37:20
streams 5:23
    18:21,23 19:3
    19:4,5 29:21
    36:21
structure 36:19
stuck 26:11
studies 36:18
submit 3:13,15
    3:18 4:4 9:5
    40:23 41:2
subscribe 29:14
Sunday 40:8
supervision 42:9
support 32:16
supposed 10:11
    14:15 33:9
sure 22:12 30:20
    32:5 37:9
    38:10 41:7
SWAT 25:21
sweat 28:18
swimming 19:7
swimmingly

40:4

**T**
table 4:22
take 3:17 19:7
    24:8 25:11
    27:17
taken 20:8 42:7
takes 7:18 24:16
talk 13:3 40:15
talked 23:25
    30:4
talking 12:11
    30:5 39:2
talks 22:1
Tara 20:14
taxpayer 33:8
TDEC 3:15 5:8
    5:11 6:13 7:4
    13:22 31:18
    32:8 33:4,24
    34:7,10 39:6
tearing 28:20
tears 11:6 28:18
tech 14:20
technical 23:12
technique 23:3
technology
    23:22,24 25:24
tell 32:5 37:2
    38:8
ten 10:20 32:22
    33:3 37:6
    38:25 40:21
Tennessee 1:4
    21:14 27:10
    32:9 33:12
    36:25 39:13
Tennesseeans
    33:23,23
terms 23:12
terrain 5:18
testing 6:19 7:2
Texas 17:11,11
thank 2:19 9:1

10:6 11:25
13:12 20:12,14
21:2 26:21,23
26:24 28:24
31:18 32:1,8
34:12 39:6,20
41:8
thing 13:22 16:3
    17:9 20:8
    23:25 30:2
    34:17,22
things 5:15 11:1
    21:21 22:7
    27:7 40:7
think 5:6 11:11
    20:1,7,16,21
    25:18 26:10
    29:5,22 35:18
    37:21
thinks 33:24
third 24:21 25:2
thought 28:8
    33:8
thoughts 16:19
three 10:23 22:9
    23:20 26:5
threw 31:23
thrilled 21:22
throw 31:17
Tiffany 2:13
timber 19:25
time 2:6 4:3,15
    4:19 7:19 8:25
    13:12 17:19
    18:20 19:1
    20:19 21:20
    22:5 23:21
    25:18 26:21
    39:7
times 24:16
today 3:13 28:5
told 8:25 9:23
    40:11
ton 26:4
tonight 2:7,12

2:22 3:16 4:1
6:23 20:21,25
27:6 31:19,23
41:1,4,6
top 32:20,21
    33:12
topographical
    13:2
topography 18:8
    20:6,9
totally 12:16
town 21:19
toxic 6:8,16
    24:19 32:24
trades 28:3
training 13:4
transcript 42:5
transcription
    2:2 42:10
transmission
    38:4
transparency
    29:13 30:2
transport 24:17
transported
    24:15
tree 7:23
trees 11:15,16
    19:24
tributaries
    36:11,16,21
tributary 29:20
    30:6
trucks 24:17
true 30:2 42:5
try 37:1 38:7
trying 3:9 7:17
    7:24 10:7 12:2
    39:3
TVA 10:10
    31:23 39:9
twelve 38:25
twice 19:8
twin 27:5
two 4:18 15:24

17:7 30:8
**TWRA** 6:13 7:8
**type** 18:17 22:2
    24:10 25:1,24
    35:13 36:1
**types** 24:18
**typewritten** 42:8

**U**

**U.S** 7:9 8:1
    26:13
**ugly** 40:2
**unaccustomedly**
    29:4
**unconstitutio...**
    14:7
**understaffed**
    12:15
**understand** 11:4
    11:20 12:16
    14:13 37:18
    38:1
**unfortunate**
    5:14
**unique** 5:15
**unmute** 35:23
**unreasonable**
    13:17,22
**use** 2:9 10:25
    22:21
**useful** 3:7

**V**

**valid** 29:7
**value** 19:24
**varied** 29:6
**vehicles** 23:10
**verbal** 4:4,7
**verbalize** 13:10
**verbally** 2:25
**voice** 5:9
**voltage** 38:3,6
**voted** 14:9

**W**

**Wade** 27:1 29:1

29:3 36:10
**Wainwright**
    3:21
**wait** 3:8
**walk** 18:6
**walking** 10:16
    12:2
**want** 2:14 3:12
    4:23 7:10 8:7
    10:8,14 11:11
    14:23,24 24:12
    25:13 27:18
    31:17 32:8
    33:25 34:6,10
    35:18,19
**wanted** 9:23
    10:2 20:15
    25:25
**wanting** 27:9
**waste** 22:16
**watch** 32:12
**water** 2:18,24
    3:2 6:19 7:2
    8:17,18 10:25
    12:11,18,20
    15:23,25 16:7
    16:8,8,19
    23:16 27:16
    36:10,15
**watershed** 9:19
    32:17
**watersheds** 9:19
    14:25
**waterways**
    28:13
**way** 2:12 10:12
    12:2,22 19:19
    19:21,22 25:17
    26:8 36:13
    40:5 41:1
**ways** 11:7 34:3
**we'll** 2:9,11 3:16
    35:24 37:6
**we're** 7:4,16,20
    7:24 12:11

17:16,16 25:20
    27:11 28:9
    33:12,15,15,17
    33:17 34:15
    39:3 40:16
**we've** 13:7 17:9
    18:24 23:18
    26:11 39:7,8,9
    39:11
**week** 19:8
**went** 22:11 26:1
**weren't** 30:9
**wetland** 2:20
**wetlands** 29:20
    36:20,23
**Whichever**
    19:21
**wildfires** 23:17
**wildlife** 7:10 8:1
    8:15 27:13
**William** 12:3
    13:13
**wind** 22:13,22
    26:7
**wind's** 19:21
**wish** 4:17
**Witness** 42:16
**woman** 10:4
**wonderfully**
    40:4
**woods** 10:13
    26:1
**word** 29:8 40:2
**work** 30:9 33:6
    37:16 38:9
**worked** 23:18
**working** 7:16,20
    17:5
**works** 23:11
    28:11
**world** 15:6
    26:10,12 36:13
**worry** 26:20
**worth** 14:10
    26:7 27:23

**worthy** 13:3
**wouldn't** 28:8
**Wow** 24:4
**wrecking** 23:16
**write** 17:7
**writing** 3:1,13
    3:14 4:5,14
**written** 4:8 9:5

**X**

**Y**

**y'all** 3:9
**yards** 22:4
**Yeah** 32:5,17
    36:9
**year** 14:1 21:7
**years** 22:9 23:20
    24:8 26:6
    32:22 33:4
**Yep** 5:6

**Z**

**0**

**0** 22:20

**1**

**1,000** 6:21 16:1
    22:4
**100%** 23:2
**12** 21:15
**14** 35:9
**15** 33:12
**16th** 3:1 40:22
**1870** 1:13 42:20

**2**

**2020** 22:9
**2023** 1:6 3:1
    42:17
**2025** 42:22
**2026** 40:22
**2030** 25:17
**2077** 14:1
**25** 27:22,23

**26th** 42:17
**28** 32:25

**3**

**30** 20:24 29:24
    30:12 42:22
**312** 3:22
**32-mile** 5:11
**35** 27:22,23

**4**

**40** 10:20 15:22
**401** 2:18
**49** 32:23

**5**

**5:30** 30:8

**6**

**6** 1:6 35:23
**6:35** 2:6

**7**

**8**

**9**

**90s** 15:11

Jackson
Gulfport

Brooks Court Reporting
1-800-245-3376
JA2234

Meridian
New Orleans

AR 004490



# Proposed Pipeline Route

Tennessee Gas Pipeline Co., LLC
Cumberland Natural Gas Pipeline Project
TDEC ARAP #NRS22.192

**Legend**

⬨ Centerline of pipeline route

10 mi

Google Earth

AR 004616

## Malaika J. Newball

| | |
|---|---|
| **From:** | Water Permits |
| **Sent:** | Friday, July 14, 2023 2:52 PM |
| **To:** | Malaika J. Newball |
| **Subject:** | FW: [EXTERNAL] Sierra Club Cumberland ARAP Comments - Tennessee Gas Pipeline Company, LLC) and permit number (NRS22.192) |
| **Attachments:** | Sierra Club Cumberland ARAP Comments.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

| | |
|---|---|
| **Categories:** | ARAP |



**Malaika Newball** | Administrative Services Assistant II
Division of Water Resources – Natural Resources Unit
William R. Snodgrass Tennessee Tower, Eleventh Floor
312 Rosa L. Parks Ave., Nashville, TN 37243
p. (615) 532-0359  f. (615) 532-0686
Malaika.J.Newball@tn.gov
tn.gov/environment

TDEC Staff often work remotely from home. Please schedule in-person visits, meetings, or discussions in advance.

**From:** Amy Kelly <amy.kelly@sierraclub.org>
**Sent:** Friday, July 14, 2023 2:25 PM
**To:** Water Permits <Water.Permits@tn.gov>
**Subject:** [EXTERNAL] Sierra Club Cumberland ARAP Comments - Tennessee Gas Pipeline Company, LLC) and permit number (NRS22.192)

**\*\*\* This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email - STS-Security. \*\*\***

Please find attached comments from Sierra Club members and supporters in response to the Tennessee Gas Pipeline Company, LLC permit (NRS22.192).

Thank you,

AR  004627



**Amy Kelly (she/her)**
Senior Campaign Representative
Tennessee Valley Region
Sierra Club
amy.kelly@sierraclub.org

**Represented by the Progressive Workers' Union**

AR 004628



Friday, July 14, 2023

Re: Tennessee Gas Pipeline Company, LLC and permit number (NRS22.192)


To the Tennessee Department of Environment and Conservation,


**The Sierra Club submits the following 462 digital signatures on the behalf of our members and supporters with the following petition language 178 personalized messages:**

Dear TDEC, You have the opportunity to protect Tennessee communities and their waters through your Aquatic Resource Alteration Permit process. A 32 mile long pipeline threatens our water resources and does not take into account the economic, cultural, and environmental concerns of folks living in the area. Furthermore, the draft ARAP does not sufficiently analyze the impact this pipeline would have on our water resources. Please deny Tennessee Gas Pipeline Company's application today!

- Gas pipelines can pollute streams and drinking water and be dangerous.
- The terrain in this region is karst providing opportunities for polluted water to travel into wells that serve as drinking water sources.
- The Tennessee Gas Pipeline Company has not considered the full impact on streams and waters that construction would cause.
- These waters serve as critical habitat for species that are endemic to this region and are threatened by disturbances caused by pipeline construction. -The Tennessee Gas Pipeline Company did not sufficiently consider alternate routes that would have fewer stream and water crossings.
- The Tennessee Gas Pipeline Company did not adequately consider alternative crossing methods that would have fewer impacts on streams and wetlands.
- Community members have continually expressed concerns about water quality and this project that the Tennessee Gas Pipeline Company has not appropriately responded to.
- Many of the proposed crossing locations for the pipeline feature "riffle and pool complexes", which are special aquatic sites that are important for fish and aquatic species. Tennessee Gas Pipeline Company did not adequately account for these features in its application.


Thank you for considering my comment.

AR  004629

1. **Adam Glassman**,
   Chattanooga, TN
   37415
   We all want to build a better world for our children and the new generations to come. Please look into other sources of energy (ie. Nuclear power)

2. **Allister Layne**,
   Conyers, GA
   30094

3. **almetrez thomas**,
   Columbus, GA
   31901
   Field Goal

4. **Alyson Boyer Rode**,
   Durham, NC
   27713

5. **amanda Lentz**,
   Louisville, TN
   37777
   I enjoy Tennessee?s beautiful rivers and cherish the access to safe waters for sustenance and recreation.

   Please prevent unnecessary pollution and promote clean, sustainable energy development only.

6. **Amanda Dixon**,
   Nashville, TN
   37221
   This is the wrong direction for TN and the future of energy. TVA can do better and knows it. Water ways, rivers, and streams are the most important natural resources  TN has. Degrading them to create a pipeline when solar or wind infrastructure could be created instead is just backwards. It?s backwards technology that pollutes and degrades. It makes TN look backwards, frankly, when we could use a little more progress that moves us forward into a future where TN fares reasonably well from climate change and learns from past mistakes to take care of the land, the water and, therefore, the people who live here. It?s no longer just a matter of economics. Without truly sustainable solutions (this is not one) we are just investing in our own demise. The switch to carbon neutral energy production needs to happen, immediately and fully. All other plans and programs are delusional. This pipeline negates that AND threatens water supplies. It doesn?t make sense.

7. **Amber York**,
   , TN
   37849

8. **Amy Bell**,
   Knoxville, TN
   37922
   To whom it concerns;
   It took me 35 years to move to Tennessee. Please protect the waters here.

9. **Amy Robinson**,
   Decatur, GA
   30030

10. **Amy Pruett**,
    Goodlettsville, TN
    37072

11. **Amy Stewart-Banbury**,
    memphis, TN
    38107

12. **Andrea Claxton**,

JA2239

Seymour, TN
37865
Water is a vital resource for everyone this is definitely needs to be protected. I know out west farms fifth over water for crops but humans cannot due without water.

13. **Andrew Shookhoff**,
Nashville, TN
37212

14. **Anelisse Westmeyer**,
Madison, AL
35756

15. **Angela Callis**,
Newport News, VA
23601

16. **Ann Hawkins**,
Memphis, TN
38103

17. **Anne Cassebaum**,
Elon, NC
27244
There are so many reason to object to the 32 mile pipeline. Number one is that it delays our transforming our energy systems to safe energy. Why keep going in the wrong direction?

18. **Anne Lanzi**,
Asheville, NC
28806

19. **Anne Hill**,
Brentwood, TN
37027

20. **Annie Jo**,
Charlottesville, VA
22903

21. **Ariana Figueroa**,
Canton, NC
28716
The potential future pollution from this pipeline could impact my friends and family members who live close to the affected waterways.

22. **Ashlee Jones**,
Sandy Springs, GA
30328

23. **Ashlyn Wheeler**,
Knoxville, TN
37914
Tennessee is my home, my heaven on Earth. It is where I grew to adulthood, raised a family of my own and plan to stay for the rest of my life. I cannot see her poisoned and ruined for the sake of money. No pipeline! If the beauty of the Cumberland plateau, and the Tennessee River Valley are to last for generations, we must protect the environment of Tennessee. Under no circumstances, should this pipeline project be allowed to poison the ground water, where proximity to oil will kill thousands of species of plants and animals.

24. **Augusta Chambers**,
Brighton, AL
35020
We are depleting our natural water supplies. We don't need more pollution in our environment. Due to accidents from negligence and uncontrollable events that are inevitable. By not allowing this we preserve our natural eco system and environment.

25. **B. Robinson**,

AR 004631

Newnan, GA
30263

26. **Barbara Brothers**,
Staunton, VA
24401
We must do everything, everything that
is within our power to reduce global
warming, and methane is a huge
polluting factor in the warming of our
planet.

27. **Barbara Gholz**,
Falls Church, VA
22041

28. **Barbara Burton**,
Memphis, TN
38111

29. **Barbara Snell**,
Gallatin, TN
37066

30. **Barry Medlin**,
Cartersville, GA
30120

31. **Barton Nakdimen**,
Cleveland, TN
37312
This is another water quality risk and
more safer alternatives should be
considered

32. **Beatrice Ross**,
Hermitage, TN
37076

33. **Belinda Hedge**,
Lenoir City, TN
37771

As a life long Tennessean I DXPECT
CLEAN AIR AND HOOD ENVIRONMENT
for my family and friends!!!

34. **Benjamin Nakdimen**,
Crossville, TN
38555

35. **Bertha Glassford**,
Huntsville, AL
35805
Because I care about pipes leaking into
our Lands and water ways!! We need to
think ahead for our future if we want to
live on Earth!

36. **Betsy Klein**,
Knoxville, TN
37917
Clean water, clean air, healthy habitats
for me and other creatures matters to
me! Stop this pipeline.

37. **Bettina Bowers**,
Nashville, TN
37216

38. **Bill Kornrich**,
Sneedville, TN
37869
As a Tennessee resident, I feel strongly
that TVA should be turning towards
solar and wind - not methane. It is not
a "clean" fuel. Do not permit this
pipeline.

39. **Bill Askew**,
Fayetteville, TN
37334

40. **Bob Shippee**,
Richmond, VA
23233

AR 004632

41. **Bobbi Morgan**,
Memphis, TN
38105

42. **Bonita Moore**,
Maryville, TN
37801
Please do your part to protect TN water
and wildlife for my grandchildren to
have in their future as nature intended.

43. **Bonnie Poland**,
Canton, GA
30115

44. **Brad Hutcheson**,
Chattanooga, TN
37405

45. **Breika Schrade**,
Crossville, TN
38572
This pipeline would be going through
peoples farms, contaminating water,
increasing the risk of toxic spills. There
are other options. I hope they are
considered before irreversible damage
is done.

46. **Brenda Nakdimen**,
Cleveland, TN
37312
I am not in favor of expanding fossil fuel
in to protected and pristine regions. The
cost to our environment is too high. We
need to be researching other energy
sources and taking care of our
resources for future generations. The
damage during construction and the
risk of accidents is not worth taking. We
need to cut back on energy
consumption and work to control global
warming.

The impact to the pristine waters would
be devastating to the region.

47. **Brenda Gamache**,
Seymour, TN
37865

48. **Brenda Mercier**,
Ashland City, TN
37015

49. **Brian Hallgren**,
Kingston Springs, TN
37082
I want us to get away from fossil fuel
use and invest in clean renewables. The
heat we?ve experienced this summer so
far is a warning of worse weather to
come if we don?t change our ways. I
realize a move away from dinosaur fuel
would be gradual but let?s finish what
we started. That is, investing in energy
storage and energy production through
wind, solar and water. And the
pipelines are not 100% secure.  We
must change. Stop this gas plant and
pipeline.

50. **Brian Dunn**,
Henrico, VA
23233

51. **Brian Craig**,
Germantown, TN
38138

52. **Brian Arnett**,
Starkville, MS
39759

53. **Brian Doherty**,
Antioch, TN
37013

AR  004633

54. **Briana Pond**,
Nashville, TN
37214

55. **Brianna Hedge**,
Knoxville, TN
37917
NO METHANE GAS!! ITS DEADLY TO
PEOPLE, ANIMALS AND THE
ENVIRONMENT!!!!

56. **Brig Spearman**,
Decatur, AL
35601
To me because that was my childhood,
and looking back to my childhood was
since I was born and raised in San Diego
California. I know me about this stuff
because I learn about. I learned that I
understand it because either one who
brought Black people around the world
that was me That with my childhood

57. **Brittany Parks**,
Knoxville, TN
37924
TVA absolutely does not have authority
to do that and they can go to in hell just
like the Phillip and queen Elizabeth are
doing because you're going against your
oath of office to attempt this. I demand
a meeting to prove the Tennessee
senators are abiding by their oaths as
well as the president. I won't be
succumbed by an acute respiratory
illness while you act like I'm blind to
you. I'd advise you get a lawyer because
one state cannot run the constitution.
Treasonous bunch of heathens. At the
bench, too. Isn't that something.

58. **Brooke Kane**,
McLean, VA
22101

59. **C Allen**,
Franklin, KY
42134

60. **Cain Demumbra**,
Crossville, TN
38572
I do not want I pipeline run through my
community.

61. **candace L**,
Raleigh, NC
27604

62. **Carla Holder**,
Harvest, AL
35749
My family and I have asthma and
burning fossil fuel of any kind causes us
breathing problems.  We have noticed
the hottest day on earth just this week
in the last 125,000 years per Forbes.  It
is unbearable outside here in Alabama
and elsewhere.  While we need energy,
this plant is a devil's bargain as it is one
of the worst greenhouse gases.  For the
sake of your stakeholders, yourselves,
the planet, and all of our children,
please reconsider this misbegotten
proposal.

63. **Carol Dearborn**,
Lakemont, GA
30552

64. **Carole Newsome**,
Emerald Isle, NC
28594

65. **Carole Bonner**,
Birmingham, AL
35226

JA2243

AR  004634

66. **Carolyn Nevin**,
Powell, TN
37849
It is past time for TVA to show its leadership by moving on from fossil fuels. The technology exists to transition to clean energy, which is what TVA MUST do!

67. **Carolyn Sanderson**,
Trion, GA
30753
Our waters and people's health is very important in
There is solar panels to consider as alternative

68. **Carolyn Bailey**,
Goodlettsville, TN
37072
The reasons are obvious - we MUST do better to protect our environment. Please, please consider doing what we know in our hearts is the right and necessary thing.

69. **Carolyn Bramblett**,
Dahlonega, GA
30533
We need to do more research into other countries procedures that they are going green with before we do any more destruction to Nature and our country there are better Solutions than what we are coming up with I'm afraid we cannot afford to damage anymore nature

70. **Carrie Urquhart**,
Nashville, TN
37080
Stop pipeline!

71. **Catherine Gonzales**,

Cleveland, TN
37323

72. **Cecilia Rivas**,
Hermitage, TN
37076

73. **Charlee Graham**,
Memphis, TN
38112

74. **Charles Crow**,
Cumberland City, TN
37050

75. **Charles & Dinah Crow**,
Cumberland City, TN
37050

76. **Charlie Palmgren**,
Franklin, TN
37064

77. **Charlotte Nakdimen**,
Crossville, TN
38572

78. **chasity Lykins**,
Dunwoody, GA
30338
This matters to me because the construction of this new gas pipeline would be contributing to the increase of fossil fuel pollution. It seems as though there was no consideration of the local residents whom would be affected by this pipeline. Thank you for your time.

79. **Cherie Martinez**,
Chattanooga, TN
37405
Time to protect the American people!

80. **Chris Dacus**,

AR  004635

BELL BUCKLE, TN
37020

81. **Chris Simser**,
Atlanta, GA
30341

82. **Chris and Miranda O'Shields**,
Fort Payne, AL
35967

83. **Christine Garcia**,
Dickson, TN
37055
We have got to start investing in renewable energy and clean up our planet. We are running out of time.

84. **Christine Ackerson**,
Fairview, TN
37062

85. **Christine Eardley**,
BLACK MTN, NC
28711

86. **Christy Allen**,
Kingsport, TN
37664
The construction and intake and outfall structures such as the 32-mile pipeline are not a 'green' direction that we can afford to approve. Protecting the wetlands, water resources, and environment must be a priority. Converting a coal-generating plant to a methane (fracturing plant) is not the responsible thing to do. There are alternatives that go in the positive direction for our beautiful state. Please reconsider another proposal that is in line with the direction our nation is taking. Don't back-step and continue to let corporations destroy our lands.

87. **Chuck Pfaff**,
Nashville, TN
37214
With renewable resources getting cheaper there is absolutely no reason for TVA to install a risky gas pipeline that could potentially damage ecosystems.

Please do not allow big fossil fuel organizations to push this through.

Renewables are safer, cleaner, and more affordable.

88. **Cindy Elmore**,
Greenville, NC
27858
C'mon - stop listening to oil companies and join the 21st century. Listen to scientists, who don't have the self-interests of fossil fuel companies that lied and lied and hid the facts about climate change for 40 years! They've lost all public trust by their own actions.

89. **claudia mikulaninec**,
Ws, NC
27127
Too many cheap and available sources of wind and solar energy . Nonsense to create new forms of energy that pollute. Think of your grandkids!

90. **Coleman Harwell**,
Nashville, TN
37215

91. **Colin Dayan**,
Nashville, TN
37205

92. **Connie Raper**,

AR 004636

Rougemont, NC
27572

93. **Connie Arduini**,
Memphis, TN
38104

94. **Craig Drew**,
Chattanooga, TN
37421

95. **Crys Zinkiewicz**,
Nashville, TN
37205
We need a fossil free future. Don't hold hostage the long-term well-being of all humanity for the sake of the few who will have short-term gains of money and power.

96. **Crystal Hart**,
Rockwood, TN
37854
The rich just keep destroying the lands, for their own gains. Stop the greedy

97. **Curtis Tomlin**,
Chattanooga, TN
37421
Because we must protect our home!

98. **Cynthia Hintz**,
Johnson City, TN
37604
I am disturbed that you are considering added resources which could add further pollution to an already-polluting industry rather than investing in clean energy for the future of all inhabitants, whether they vote ? or live in our/their streams, or drink from them, etc.

99. **Cynthia Mcwilliams**,
Clarksville, TN

37040
Please consider that it is time that we do everything we can to avoid warming the planet even more than have already.  Every decision about whether we should use fossil fuels or look for a safer better resource should really be about which safer and better resource we should use.  In addition to the global problems, pipelines are constantly leaking, even the ones that were supposed to be safe.   When people demonstrated against those pipelines out West, the argument for them was that they would not cause problems, yet they have. Please do not place another problematic fossil fuel source here in TN.  Our water and soil and air are already tainted with man-made pollutions, and TVA should consider what would cause the least harm.

100. **Cynthia Willett**,
, TN
37167
Please put my green energy monthly gift into action, and use green energy. Nix the pipeline producing methane gas.

101. **Cynthia Howell**,
Sterling, VA
20165

102. **Cynthia Moseley**,
Memphis, TN
38117

103. **Cynthia Carlton**,
Greenbrier, TN
37073

104. **Dan Harrigan**,
Kennesaw, GA

AR  004637

30156

105.  **Dan Fernandez**,
Madison, TN
37115

106.  **Daniel & Lynn Langmeyer**,
Durham, NC
27705
Methane Gas -- no -- dirty fuel dirties
our breathing and our lives.

107.  **danna mclintock**,
waynesville, NC
28785

108.  **Dave Strong**,
Halls, TN
38040

109.  **David Polk**,
Lexington, KY
40507
As a lifelong citizen of Kentucky, a
major coal producing state, I am
concerned about the continuing use of
toxic fossil  fuels. The current
Republican majority in the Kentucky
and Tennessee state legislatures are
doing all they can to hinder the
transition to sustainable and non-toxic
energy sources. Inspite of this, I urge
TVA to do all it can to make the
transition off of fossil fuels and on to
cleaner non-toxic fuels.

110.  **David Bordenkircher**,
Nashville, TN
37211
I live in this area.   I am concerned
about drinking water.  Alternative
routes should have been considered.

111.  **David Rosmer**,

Norfolk, VA
23518
We must protect clean water

112.  **DAVID RIALL**,
Chattanooga, TN
37412
Why do you push the issue, take a little
more time and do it right!

113.  **David Addison**,
, VA
24401

114.  **David Olive**,
, TN
37013

115.  **David Lindsey**,
Beaver Dam, KY
42320

116.  **Deb O'Dell**,
Knoxville, TN
37922

117.  **Debbie Hallmark**,
Tupelo, MS
38804

118.  **Debi Combs**,
Decatur, GA
30033

119.  **Debra Dunson**,
Spring Hill, TN
37174
My experience in the chemical sciences
validates my concern for the potential
environmental and public dangers
inherent in natural gas pipelines.  The
primary component of natural gas is
methane.  I reiterate that methane is
one of the most potent greenhouse

AR  004638

gases. Measurements suggest that one quarter of the increase in temperature observed on our warming planet can be traced to methane gas. In Tennessee, climate related damage from fossil fuels has increased the number of extreme weather events, including severe heat, drought, tornadoes, and flooding.

I also want to mention the risks to our rural residents who own land within the pipeline siting areas. These vulnerable communities will lose land to the pipeline company through eminent domain. Furthermore, the gas pipeline infrastructure and methane gas will pose health and safety risks through air and water pollution in these rural communities. We need you to stop the methane pipeline in Tennessee.

120.     **Delanna Reed**,
Johnson City, TN
37601
Water around the globe has grown scarce. Tennessee is one of the few places with plenty of water. We have already suffered the pollutants and damage of coal mining. Don?t allow further damage to our ecosystem and precious water by approving this pipeline. Now is the time to transition to clean energy.

121.     **Dena Maguire Young**,
Dahlonega, GA
30533
Do not allow this pipeline or allow the alterations they propose in the ARAP

122.     **Denise Cooper-Waters**,
Denise, VA
22554

123.     **DeSean Freeman**,
Pike Road, AL
36064
Purity and paucity over pollution

124.     **Diane Price**,
Antioch, TN
37013
We need to figure a different way to fulfill our energy needs. This plant and the pipeline are a very bad idea! Would you want this in your backyard? Well, I don?t want it in mine!

125.     **Diane Fuchs**,
Spring Hill, TN
37174
We only have one chance to do things right by our planet, and its inhabitants! All of us, including our descendants and our wildlife, need clean water, and air to survive! Don?t make things worse than they already are. We don?t need another pipeline! Please, do the right thing!

126.     **Diane Kizer**,
Hendersonville, TN
37075

127.     **Diane Keeney**,
Nashville, TN
37215

128.     **Dianne Bowen**,
, TN
38122

129.     **Dianne Blane**,
37919, TN
37919

130.     **Don Owen**,
Murfreesboro, TN

AR 004639

37128
TVA needs to clean up the pollution it
has made before making more poor
decisions.

131.     **Donald Keyser**,
Johnson City, TN
37604
Come on now! We need clean energy,
not more pollution and pipelines

132.     **Donna Fisher**,
Westmoreland, TN
37186
We don?t want the methane gas
project. Keep our waters safe and
intact.

133.     **Donna Brian**,
Knoxville, TN
37914

134.     **Dorothy Pugh**,
Memphis, TN
38104
Don?t you think things are bad enough
now,  with scorching temps,  fires,
floods,  crazy thunderstorms,  polluted
lakes?  Please pay attention to science,
with compassion.   The Cumberland
Pipeline needs to be cancelled,  and
alternative ,  innovative approaches ,
with new jobs created.

135.     **Doug Franklin**,
Waynesville, NC
28786

136.     **Doug Carlson**,
Chattanooga, TN
37419

137.     **Dr. David Sloas**,
Cordova, TN

38018
There is no planet B.

138.     **Ebbe Anderson**,
Seymour, TN
37865

139.     **Edith Simpson**,
Asheville, NC
28805
Thos project does not seem to have
demonstrated its safety enough to be
approved.

140.     **Edna Jones**,
Hamilton, AL
35570
I have grand and great -grandchildren
who, along with all other children,
deserve your actions to help clean up
what we have already done to our
world.  Our descendants do NOT
deserve the added damage the
Methane Gas projects will do to our
atmosphere.
I have allergies to petroleum and gas
products and I know what these
products do to us.

141.     **Edward Alexander Gerster**,
Raleigh, NC
27606

142.     **Elaine Vowell**,
Memphis, TN
38104

143.     **Elise Jardine**,
Lebanon, TN
37090

144.     **Elizabeth Hungate**,
, TN
37015

AR  004640

I want to live.

145.     **Elizabeth Allen**,
Asheville, NC
28806
Please do the best thing for our
community, environment and future by
denying the pipeline permit.  We need
to protect our water systems, forests
and health by finding more sustainable
and less dangerous solutions than
building a pipeline through our crucial
waterways.  Evidence of flooding,
erosion, and habitat decline are already
evident throughout our area, building a
pipeline would  add to our collective
problems rather than alleviate them.
Also, outdoor recreation is a crucial part
of the economy, pipelines damage
natural beauty and our ability to enjoy
it.  Anyone saying otherwise is fooling
themselves or just looking to sell their
product.  The long and short term
damage to our livelihood and well being
is far more costly than any possible
perceived potential profits gained from
this unnecessary and destructive
project.

146.     **Elizabeth Marks**,
Decatur, GA
30033
TGPC should listen to Tennesseans who
don?t want this project to damage their
wetlands and water supply.

147.     **Elizabeth Cruise**,
Durham, NC
27705

148.     **Elizabeth Ketz-Robinson**,
alexandria, VA
22308

149.     **Elizabeth Green**,
Pigeon Forge, TN
37863

150.     **Ellen Thompson**,
Boone, NC
28607
As your neighbor in Watauga County
and dependent on well water, as we are
all dependent on drinkable water, as we
depend on farm animals and produce to
sustain us, and as there are now newer
and better ways of doing things that will
not create an environmental problem
for taxpayers to someday have to pay
for, please do not allow the pipeline.
Thank you, Ellen Thompson

151.     **Elyssa Looney**,
Maryville, TN
37803

152.     **Emily Cathcart**,
WATERTOWN, TN
37184

153.     **Eric Robinson**,
Memphis, TN
38104

154.     **Eva Lindsay**,
Arlington, VA
22206

155.     **farzana ismail**,
Thomasville, NC
27360

156.     **Felicity Shelton**,
Jackson, TN
38301

157.     **First_tennessee
Last_tennessee**,

AR  004641

Chattanooga, TN
37412

158.    **Gabe Dixon**,
Nashville, TN
37221
I was born and raised in Tennessee, and I sincerely hope that TVA will choose a clean energy solution such as a solar farm instead of this dirty Methane plant and polluting pipeline construction. Please help set Tennessee on the path toward a sustainable clean energy future!

159.    **Gail Troy**,
Shipman, VA
22971
Pipelines cause problems.

160.    **Garrett Sory**,
Nashville, TN
37204

161.    **Gary Lampman**,
Hendersonville, TN
37075

162.    **Geneva Andrews**,
Dayton, TN
37321
How can you continue to spew $CO_2$ into the atmosphere when you know it is killing your children and the planet they live on?

163.    **Gerald D. Gonyea**,
Greenbrier, TN
37073

164.    **Glen and Martha Wilson**,
Brentwood, TN
37027

No! Go wind and solar...we live here and this is the first step toward more pollution and disastrous pipeline leakages which are getting more common, thus causing disaster to bth humans and wildlife....Use some common sense!

165.    **Gloria Cash-Procell**,
Huntsville, AL
35803

166.    **Grace Holden**,
Arlington, VA
22207
Thank you for considering my thoughts on this issue that is very important to me and so many others who are deeply concerned about environmental and public health and the pervasive negatives impacts of polluted water. Please so the right thing!

167.    **Greg Singleton**,
Springfield, VA
22153

168.    **Greg Johnson**,
Oxford, MS
38655

169.    **Gretchen Dudley**,
Roanoke, VA
24018

170.    **Guy Morganstein**,
Asheville, NC
28805

171.    **H. Rosenberg**,
Sandy Springs, GA
30342

172.    **Heather Cooper**,

AR 004642

Knoxville, TN
37918
I want to protect the wildlife

173. **Heather Doncaster**,
Knoxville, TN
37932
We do not need this in TN! It will have a
dire impact on the environment and
communities.

174. **Helen Carrick**,
Antioch, TN
37013

175. **Helen Fisher**,
Lenoir, NC
28645

176. **Helen DeBuse**,
DeBuse, TN
37067

177. **Helene Harvey**,
Nashville, TN
37205
Please protect the watershed. We need
to face the reality that human impact
on the environment has gone too far.
Why create more gas pipeline when we
know that we need to reduce our
dependency on gas. Please consider
ways to get this gas to local consumers
without having to create a conduit that
is 32 miles long and would inevitably
disturb ecosystems and eventually leak.
Everyone of us needs to become
environmentally responsible With every
decision we make. This is a call for all to
stop destructive practices and put
human ingenuity to better use. Thank
you for caring!

178. **Herman Fletcher**,

Sevierville, TN
37876

179. **Hiasaura Rubenstein**,
Nashville, TN
37205

180. **Hiedi Tan**,
Knoxville, TN
37934

181. **hilarie malmberg**,
reston, VA
20190
Water, our nonrenewable, vital
resource: Protect it! Think Wind
turbines and Solar power, and
geothermal, not leaking, carbon filled
pipelines. Stop and think!

182. **Holly Schanuel**,
Bowling Green, KY
42103

183. **Irene Wade**,
Memphis, TN
38111
We need to protect and preserve our
water resources for our children and
grandchildren.

184. **Isabelle Robertson**,
Nashville, TN
37209

185. **Jack Gress**,
Sevierville, TN
37876

186. **Jacquelyn Waddell**,
, TN
38016
I care about our water and it's quality
for generations to come.

AR 004643

187.     **James Richman**,
Winchester, VA
22601
The use of methane will pollute the air with combustion products that cause a greenhouse gas effect, further heating up our only place to live, our Earth.

188.     **James Glucroft**,
Denver, NC
28037

189.     **james duncan**,
Lebanon, TN
37087

190.     **James Laws**,
Arlington, TN
38002

191.     **Jamie McClanahan**,
Nashville, TN
37216
Because of the multiple environmental, health, and safety threats posed by a gas pipeline running through our communities, particularly when more fiscally sound green options are available that would be safe for citizens and our environment, I am strongly opposed to the development of any new gas pipelines on behalf of myself, my family, my community, and the earth itself.  Recent headlines documenting the record heat we are experiencing here and around the world, as well as discussions among scientists about whether such dramatic changes in temperature over the past three decades should be considered a new epoch in the world?s climate, bring home how critical and urgent it is that we protect ourselves and by shifting to renewable energy wherever possible. The reasons to support the proposed pipeline are few and weak compared to the overwhelming evidence that fossil fuels must be eliminated and to their record of serious safety and health risks to the communities they impact.

192.     **Jan Steever**,
Davidson, NC
28036
Must stop fossil fuels

193.     **Jane Stopher**,
Louisville, KY
40205
Clean water is a basic human right

194.     **Jane Comings**,
Arlington, VA
22213

195.     **Jane Ilgner**,
, TN
37086

196.     **Janet Rountree**,
Suffolk, VA
23434

197.     **Janet Falcone**,
Louisville, KY
40207

198.     **Jean Zeller**,
Harrison, TN
37341
This statement says it all for me: This community deserves energy infrastructure that keeps them and their land safe. Stop this out of control pollution.

199.     **Jeannine Dorroh**,

AR  004644

Huntsville, AL
35811

200.    **Jenna Williams**,
Powell, TN
37849
I want us to protect our planet. We
need to preserve lands and waters.

201.    **Jennifer Miller**,
Durham, NC
27705
Hot.  Methane makes it worse.

202.    **Jennifer Thurman**,
White House, TN
37188
Our state is  BEAUTIFUL !!

Please don't do ANYTHING
to change it

203.    **Jennifer D'Andrea**,
Columbia, TN
38401
Please choose an alternative with no
dirty fossil power, instead relying on
clean energy like solar generation and
energy storage.

204.    **Jesse Gore**,
Nashville, TN
37206

205.    **Jessica Claudio**,
Hixson, TN
37343

206.    **JL Mulligan**,
Charlottesville, VA
22901

207.    **Jo McDaniel**,
Ashland City, TN

37015
This is where I live, and the quality of
my life and the environment where I
and my neighbors choose to live will be
negatively impacted by this project.

208.    **Jo Tilley Dortch**,
Paducah, KY
42001

209.    **JoAnn McIntosh**,
Clarksville, TN
37043

210.    **Joanne Rhea**,
Memphis, TN
38104

211.    **Jodi Mcdaniel**,
Ashland City, TN
37015
This construction will adversely impact
the waterways, the land, the flora and
fauna, and the lives of the people in this
county. It?s been stated that it is a
short term solution to be
decommissioned by 2050 and is
intended to most benefit the demands
of Davidson county. Instead of a short
term fix to a demand, invest in long
term solutions that are passive and
environmentally sound-solar, etc.
Institute more effective education
programs to help people reduce their
carbon footprint and improve energy
efficiency. As a resident of Cheatham
County, I want to see this environment
retain its natural beauty and resources.

212.    **Joe Franklin**,
Johnson City, TN
37601
Dear TDEC:

AR  004645

Please consider nullifying this project due to the hazards it would pose to the communities in middle Tennessee especially the risks to clean drinking water. Please, we need to leave fossil fuels in the ground !

213.     **john holland**,
College Park, TN
37409
All greenhouse gases need to be stopped at the source!

214.     **John Rainey**,
Henry, TN
38231

215.     **John Franklin**,
Raleigh, NC
27614

216.     **John Freeze**,
Asheboro, NC
27205

217.     **JOHN FISHMAN**,
HUNTSVILLE, AL
35803

218.     **John Pagnani**,
Crossville, TN
38558

219.     **John. McLain 2nd**,
Glen Allen, VA
23059

220.     **johnny plemens**,
oneida, TN
37841
Its in my fkn yard.

221.     **Jonathan McLelland**,
Tuscaloosa, AL

35401
We have got to stop acting like the natural world is infinite and that our wellbeing doesn't depend on the health of the rest of the environment.

222.     **Jonathan Mitchell**,
Madison, AL
35757

223.     **Joseph Harper**,
Apex, NC
27025

224.     **Joseph Dawes**,
Canton, NC
28716

225.     **Joseph Farone**,
Canton, NC
28716

226.     **Joyce Veit**,
Charlotte, NC
28213

227.     **Joyce Eyler**,
Nashville, TN
37205

228.     **Joyce Doughty**,
Johnson city, TN
37604

229.     **JUANELLE SMITH**,
COOKEVILLE, TN
38501

230.     **Juanita Martin**,
Joelton, TN
37080
I am concerned for the environment and the devaluation of my land. Bristol TN/VA put in methane gas and it didn?t

AR  004646

work and leaked methane gas out to the citizens for months. The smell was awful and it killed the leaves off of the tree tops for everywhere You could smell the methane. There was no ownership and everyone blamed each other who was involved in the installation of the project. It bankrupt the utility and the citizens paid for it, I don?t want that for my children! Big fat No

231.    **Judy Holt**,
Henagar, AL
35978
Asking TVA to do its part  to stop adding to climate change problems by using methane gas  in operating your plants.

232.    **Julia Hartman**,
Alexander, NC
28701

233.    **Julia Heimer**,
Asheville, NC
28805

234.    **Justin Veals**,
Cookeville, TN
38501
I live in Putnam County. I have lived in TN my whole life. This beautiful state is more important than the designs of a giant corporation. Please side with the people of this great state and stop this pipeline

235.    **K Melton**,
Butler, TN
37640
We are in the midst of SEVERE CLIMATE CRISIS! Why, in the name of God, would you trade one climactically horrid fuel

for another horrid fuel? Surely you can do better! I am one of your consumers.

236.    **Kara Dulac**,
Knoxville, TN
37931
As a society, we need to understand that every decision we make has an impact on our environment, and all those impacts have costs which must be paid. Either they're POSITIVE impacts, like phasing out fossil fuels, and the cost is re-tooling for sustainable energy options like solar or wind power, or they're NEGATIVE, like poisoning our own water supply/environment, and the cost comes when we must clean our water and air in order to continue living. What appears to be the less-expensive alternative usually presents its bill later on.

237.    **Karen Davis**,
Chattanooga, TN
37416
Please don't take a chance on harming our waterways, our children, or our wildlife. Even by accident.. Please do not do this. The families of the future depend on good choices of today.y

238.    **Karen Blanco**,
Harrison, TN
37341
Please no more pipelines. Why take the risk? Go solar. Its 90° & sunny out. Let's look to a positive the future of the TVA. Help the planet. Don't make it worse.

239.    **Karen McIntyre**,
Nashville, TN
37217
This is my backyard, and I really want you to understand how devastating the

AR  004647

continued use of fossil fuels is ruining the planet -- the Kingston spill is still active dispite the statements to the opposite.

240.     **Karen Chauvin**,
Springfield, VA
22153

241.     **Karen Spradlin**,
Jacksonville, AL
36265

242.     **Karen Murphy**,
Newport News, VA
23606

243.     **Karla Brown**,
Madison, TN
37115
It is past time to stop investing in fossil fuels! We are making the earth unlivable. Please change to renewable sources of energy.

244.     **Kathleen Mohning**,
Franklin, TN
37067

245.     **Kathleen Caldwell**,
Chapel Hill, NC
27516

246.     **Kathleen Mclane**,
Woodbridge, VA
22192

247.     **Kathryn Price**,
Leicester, NC
28804

248.     **Kathy Koehler**,
Hendersonville, TN
37075

Begging you to heed the calls for no further destruction of our beautiful state?s waterways in the name of progress which is more aptly named greed. We so obviously need our remaining green spaces and water sources left in tact as evidenced by the heat bearing down upon us and the smoke-filled skies. Please show it the reverence it deserves and in consideration of Tennesseans to come.

249.     **Kathy Gosnell**,
Chuckey, TN
37641
I love the water ?

250.     **Katie Rush Walker**,
Nashville, TN
37212
As a Tennessean and a teen, I have already experienced many effects of climate change in my home, including multiple floods that increased homelessness and a tornado that destroyed my school and disrupted my 8th grade year. I cannot allow more pollution and climate change to come to my home.

251.     **Keith Johnson**,
Siler City, NC
27344

252.     **Kelley Pendergraft**,
Surgoinsville, TN
37873

253.     **Kelly Smith**,
Henrico, VA
23233

254.     **Kelly Embry**,
Philpot, KY

AR 004648

42366

255.  **Kelly V Johnson**,
Bulls Gap, TN
37711
Climate change is impacting our region
and is only going to get worse. We must
act now to find clean energy solutions
that will make living in our beautiful
region possible for the future.

256.  **Kelsey McClain**,
Georgetown, TN
37336

257.  **Kent Minault**,
Knoxville, TN
37917

258.  **Kevin Riley**,
Cookeville, TN
38506

259.  **Kicab Castaneda-Mendez**,
Pittsboro, NC
27312

260.  **Kinsley Rawson**,
LaVergne, TN
37086

261.  **kristen werner**,
, TN
37922

262.  **Kristie Seabolt**,
Bridgeport, AL
35740

263.  **Kristin Wagner**,
Nashville, TN
37221
What would God do or say? He would
say please keep the earth clean just the

way I provided for you. Please do not
tamper with one of the most diverse
biological ecosystems by putting fuel
into it. Please consider clean energy for
our future generations.

264.  **Kurt Emmanuele**,
Chattanooga, TN
37405
This should not be built because it mars
the landscape.

265.  **LaDonna Weber**,
Nashville, TN
37221
Lakes and streams provide crucial
habitat and ecological services on some
level and any disturbance can have an
effect on biodiversity and water quality.
Many of these waters serve as drinking
water for livestock, natural filtration
systems, and cultural resources for
fishing, kayaking, etc. I join with
communities living near the proposed
pipeline route that have already
expressed concerns about the
construction of a pipeline across their
waters!

266.  **Larry Kown**,
Nashville, TN
37215
As a Nashville native, I'm really
concerned about the air quality, water
quality and soil health in middle TN.

We need cheap, renewable energy from
solar wind and water. Please do not
build another gas plant.

267.  **Larry Stockman**,
Huntsville, AL
35803

AR 004649

268.     **Laura Gruppo**,
Brambleton, VA
20148

269.     **Laura Dunn**,
Stantonville, TN
38379

270.     **Laurel Crooks**,
Marshall, VA
20115
We must prioritize protecting our water
sources at all costs. Without clean
water we cannot live.

271.     **Leanne Allen**,
Franklin, TN
37064
Pipelines have proven to be
problematic for water supplies in other
parts of the country.
Please do NOT risk the safety of
Tennessee's waters.  Stop the
Cumberland Methane Gas Project!

272.     **Lecil McGlocklin**,
Bluff City, TN
37618
I want to SAVE ALL WATERS ON EARTH
FOR  FISH & PEOPLE

273.     **Lesha Thornton**,
Knoxville, TN
37917

274.     **linda elswick**,
knoxville, TN
37920
Do not harm our waterways while doing
good!
No need to harm our waterways while
doing good! Please take time to review
these commonsense recommendations

and help make us proud as Tennesseans
of TDEC.

275.     **LINDA BEHRET**,
Woodstock, GA
30189
I don't want a methane gas pipeline and
plant in a neighboring state because of
the risk it poses to the nearby waters.
Solar generation, instead of a gas plant
and pipeline would reduce water
quality risks associated with methane
pipelines and their construction
process.  Please choose an alternative
with no dirty fossil power.  Clean energy
like solar generation and energy storage
would be much better for the entire
country!

-Benefits: Renewables are safer,
cleaner, and more affordable.

276.     **Linda Johnson**,
Ashland City, TN
37015
I live here.  We need a clean earth.
SUSTAINABLE Solutions please.

277.     **Linda Mulligan**,
Harriman, TN
37748
Please prioritize clean fuel over greed.
Keep this planet clean for generations
to come.

278.     **Linda Inness**,
PHILADELPHIA, TN
37846

279.     **Linda Newkirk**,
Huntsville, AL
35824

280.     **Linda Singer**,

AR  004650

Huntsville, AL
35801

281.       **Linds Singer**,
Huntsville, AL
35801

282.       **Lisa Schaeffer**,
White Bluff, TN
37187
Clean water is vital to life. We cannot
risk any more contamination of our
waterways. A methane gas pipeline is a
great risk to our waterways where we
obtain drinking water.

283.       **Lisa Gordon**,
Murfreesboro, TN
37128
This plan is so short-sighted. Please do
the right thing and don?t saddle us with
another gas project for years to come.
Our environment, our climate, our
future depends on clean, truly clean
and sustainable energy, not the farce of
?clean? natural gas. Do not sacrifice our
earth, our health, our futures, for the
gas industry and its profiteering.

284.       **LIsa Williams**,
Maryville, TN
37804

285.       **Lisa Fues**,
Alexandria, VA
22301

286.       **Lorenz Steiningr**,
stafford, VA
22554

287.       **Luke Walker**,
, TN
37207

288.       **MacKenzie Walker**,
, TN
37206

289.       **Maggie Brooks Taylor**,
Centerville, TN
37033
As a Native Nashvillian,  The
Cumberland River is too important to
gamble with.   Too many people depend
on it. Tennessee as it is, isn't ready for
the rapid growth.  The last thing we
need is a pipeline failure.
I'm sure there is another way thats
safer and nobody want to pay for it. For
once do the right thing.

290.       **Marcia Medford**,
Sewanee, TN
37375

291.       **Marcie Mott**,
Chattanooga, TN
37412

292.       **Margaret Davitt**,
Nashville, TN
37205

293.       **Margaret Rhodes**,
Arlington, VA
22206

294.       **Mari Lana Teska Echevarria**,
Knoxville, TN
37909

295.       **Marian Fitzgerald**,
Maryville, TN
37804

296.       **Marilyn Clark**,
Williamsburg, VA

AR  004651

23185

297.     **Marilyn Lee**,
Florence, AL
35630

298.     **Marina Little**,
Brevard, NC
28712

299.     **Mark Koritz**,
Atlanta, GA
30338

300.     **Mark Klugiewicz**,
Jamestown, TN
38556

301.     **Mark Blazer**,
Seymour, TN
37865

302.     **MARK VANCIL**,
Germantown, TN
38138

303.     **Marla West**,
Asheville, NC
28804

304.     **Martha Brimm**,
Durham, NC
27707
Why are you making it your mission to
destroy and sully God's creation? We
have a solemn responsibility to care for
this earth and its creatures. Greed and
selfishness are no excuse for evading
the responsibility to care for our
environment, for others and for our
futures together.

305.     **Martha Spencer**,
Brevard, NC

28712

306.     **Marty Aden**,
Wilmington, NC
28412

307.     **Mary Mayer**,
Richmond, VA
23227
I had the chance to stay and hike in
Tenn recently and I was delighted to
find a lush green landscape with tall
growth forests filled with lush plants,
wildflowers and many songbirds? all
because it was in harmony with the
local water sources. I am deeply
concerned that the proposed gas
pipeline would be a huge step
backwards when we have do many
renewable power sources. It would be a
vote for short term gains over longer
term sustainability, please do not go
forward with yet another pipeline
pulling valuable resources out of our
previous earth. Think about our 7
generation impacts when making these
choices. I?d like to take my grandkids to
these same forests growing by the
streams and know they will be
safeguarded from negative
environmental impact.

308.     **mary morris**,
Harriman, TN
37748

309.     **Mary Miller**,
RICHMOND, VA
23226

310.     **Mary Reed**,
Lancing, TN
37770

JA2261

AR  004652

311.     **Mary Anderson**,
KNOXVILLE, TN
37919

312.     **mary walton**,
spring hill, TN
37174

313.     **Mary Skirving**,
Franklin, TN
37064

314.     **Mary Ann Laverty**,
Newport News, VA
23608
Please keep our waters safe, clean, and
available.

315.     **Mary Louise Linn**,
Nashville, TN
37205
TVA has already environmentally
damaged parts of TN, such as, from coal
ash spills. Enough is enough!  Start
behaving responsibly.

316.     **matt cutts**,
greeneville, TN
37743

317.     **Maureen May**,
Nashville, TN
37212

318.     **Mayme Siders**,
, TN
37043

319.     **Megan McDonald**,
Huntsville, AL
35803

320.     **Mel Lencioni**,
Humboldt, TN

38343

321.     **Melissa Harris**,
Nashville, TN
37215

322.     **Michael Barnes**,
Cusseta, GA
31805

323.     **Michael Dubrick**,
Knoxville, TN
37932

324.     **Michael Poulos**,
Tupelo, MS
38804

325.     **Michael Tumblin**,
Smyrna, TN
37167

326.     **Michelle Bishop**,
Knoxville, TN
37922

327.     **Michelle Prince**,
Old Hickory, TN
37138

328.     **Miriam Wildeman**,
CHARLOTTESVILLE, VA
22901

329.     **Mr. & Mrs. Arthur MCKELDIN**,
Chattanooga, TN
37421
Please reconsider your position, and
think about our beautiful natural
resources. Many farmers use streams to
irrigate crops and provide water for
cattle. Children and grandchildren play
in and fish in nearby rivers as they have
for generations. Our wetlands provide

JA2262

AR  004653

critical habitat for native species and flood control.

330.    **Ms.Krishna Goel**,
Augusta, GA
30901

331.    **Nancy Dudney**,
Knoxville, TN
37934
This pipeline and new gas power plant makes no sense.  Energy companies like TVA  must  eliminate use of fossil fuel for power generation ASAP.  When building new plants, the investment should be in renewable energy or small modular nuclear.  Conversion from coal to gas should be limited to cases where the existing power plant has years of efficient service life remaining to 'keep the lights on'.  Old plants should never be replaced with old technology that continues to add greenhouse gases to out atmosphere.  Make the investment to a cleaner future.

332.    **Nancy Beavers**,
Asheville, NC
28806

333.    **Nash Maryann**,
Maryville, TN
37804
Please, help us keep all the Tennessee waters clean.

334.    **Nathan Coggins**,
37659, TN
37659
Don?t you think it?s time to keep fossil fuels in the ground, we have technology to make electricity from the sun, which has no danger of spills, leaks and doesn?t contribute to carbon in the

atmosphere, plus we have 3 million rooftops in Tennessee to install it on! Wake up it?s a new day!

335.    **Nathan Campbell**,
Tullahoma, TN
37388

336.    **Neil Smith**,
Kingsport, TN
37664
If we fail to protect streams, lakes and all of our water resources then we will end up dying in a very short period of time !!!

337.    **Neil Hansen**,
Columbia, TN
38401

338.    **Nellie Medlin**,
Holly Springs, MS
38635

339.    **Nettie Parr**,
Memphis, TN
38119
If you want this pipeline so bad, run it through YOUR backyard. Enough!

340.    **Nina Marable**,
Sunset Beach, NC
28468

341.    **Noel Beck**,
Florence, AL
35630

342.    **Noelle Goodin**,
Mt. Juliet, TN
37122
Please help protect our health, our ecosystem, and our region's future by

AR  004654

protecting our water systems and investing in clean energy.

343.     **Nora Reinke**,
Dunlap, TN
37327

344.     **Pamela Swindler**,
Johnson City, TN
37601
Pipelines or anything transporting gas or oil is not an if it leaks scenario, but WHEN ( Exxon Valdez, BP Deep Water Horizon, Keystone pipeline in Kansas, etc., etc., ). If renewable energy is the answer to climate change why do we keep investing in polluting the future? STOP THE GREED AND MADNESS!

345.     **Pamela Jiranek**,
Earlysville, VA, VA
22936

346.     **Pamela F Cox**,
Oak Ridge, TN
37830
This may be a planet largely made up of water, but we need that water to be CLEAN for us, for fish, and for water and other land mammals.  We have solar energy and other options that we can use.  Please consider other alternatives!

347.     **Patricia Quinn**,
Norfolk, VA
23503

348.     **Patricia E. LOWery**,
MCMINNVILLE, TN
37110

349.     **Patrick Conley**,
Murfreesboro, TN
37128

TVA's directors are antediluvian in their thinking--they doubtlessly breathed the toxic product of the Canadian fires of which 200  will probably burn all summer.  The heat dome which helped produce this fire is greatly intensified by global warming.  We are in a crisis now caused by fossil fuel emissions.  How much stupidity must we root out of TVA's upper echelon until it goes full scale green.  Survival is at stake in the short term if you pay attention to the IPCC latest report.

350.     **Patrick Tanner**,
Owensboro, KY
42301

351.     **Paul Hopper**,
Mount Juliet, TN
37122
I am glad to hear, but will only believe when actually see TVA, retire the coal-burning power plant in Cumberland City, TN. What is disappointing is that TVA is not using this opportunity to invest in clean, safe, and affordable energy for consumers such as myself. I would like to know WHY TVA leadership CONTINUES to not look to the future & invest in clean energy?

PLEASE do not permit Kinder Morgan to build a gas pipeline that could impact nearby streams, rivers, lakes, and wetlands. Again I ask, why is there not investment in clean energy. The first action I took when I moved to TN was to seek out a solar panel company to power my home. This is the best investment I made. Compared to my neighbors, I am paying a quarter of the electric bill they are. I would make even more if TVA looked at homeowners like

JA2264

me as their private electric company.
Tell TVA to set up procedures to buy
back unused solar power and invest in a
clean energy future!

352.     **Paul Blackburn**,
Elizabethtown, KY
42701

353.     **Paula Gordon**,
Jasper, GA
30143
My family has had FIRST HAND
experience with the importance of the
original TVA.  Good things CAN be done
and YOU CAN DO something GOOD for
our times.  PROTECT our WATER!  It has
countless benefits and NOT doing so
has even more NEGATIVE ones. ---STOP-
-- the Cumberland Methane Gas
Project...Entirely!  Our petition outlines
the "why" and - on the off-hand chance
you need a refresher, IT SPEAKS
VOLUMES for those of us AFFECTED,
across our too-often-suffers from being
neglected, overlooked and "dissed". So
PLEASE, TDEC. HELP us by doing the
RIGHT thing, THIS time.  Respectfully ...
begging!!

354.     **Paulette M Brown**,
KNOXVILLE, TN
37920
Haven't we. Messed up the earth
enough. We should try to salvage what
we can for others.

355.     **Paulette Kuziola**,
Butler, TN
37640

356.     **Peg Danka**,
Advance, NC
27006

357.     **Penny Harrison**,
Brasstown, NC
28902
Will TVA stop invading these lands and
leave them along.  Lets get back to
nature instead of profit

358.     **Perry Chapdelaine**,
Ashland City, TN
37015

359.     **Peter Boettger**,
Belhaven, NC
27810

360.     **Polly Gray**,
Murray, KY
42071

361.     **Randall Outland**,
Waynesville, NC
28786

362.     **Raymond Nuesch**,
Charlottesville, VA
22901

363.     **Rhonda Johnson**,
Aylett, VA
23009

364.     **Rhonda D. Wright MD**,
Atlanta, GA
30319

365.     **Richard Sakamoto-Pugh**,
Nashville, TN
37206
I treasure our natural environment.
Why kill what you love most?

366.     **Richard Gilbert**,
Franklin, TN

AR  004656

37067
We need clean air and clean water,
which is why we need clean energy!

367. **Richard Gillaspie**,
White Bluff, TN
37187

368. **Richard Phelps**,
Tullahoma, TN
37388

369. **Richard McLane**,
Woodbridge, VA
22192

370. **Ridge Reinert**,
Signal Mountain, TN
37377

371. **Rita Tinsley**,
Dover, TN
37058
I live in Stewart County. why it matters!
Dr.Rita Tinsley

372. **Rita Heinz**,
Durham, NC
27701
RENEWABLES! NO MORE PIPELINES!!!

373. **Robert Pugh**,
Memphis, TN
38104
I don?t want a methane gas pipeline in
my community.

374. **Robert Garrett**,
Huntsville, AL
35811
Please protect our water sources.  If this
plant would impact our water sources
then deny the request.  There are much
better alternatives for a power plant.

375. **Robert Dornfeld**,
Athens, TN
37303

376. **Robert And Sandra Dornfeld**,
Athens, TN
37303

377. **Robin Peeler**,
Knoxville, TN
37918

378. **Rocky Reuter**,
Greensboro, NC
27401

379. **Rocquelle Woods**,
Huntsville, AL
35824

380. **Ronnie Smith**,
Ashland City, TN
37015
As a resident near the proposed
methane gas plant in Cheatham County
I must strongly voice my opposition to
the proposed stream crossing of
Sycamore Creek and construction of the
methane gas plant.  Our neighborhood
is a quiet rural area with a high quality
of life.   The proposed TVA plant would
completely change our way of life with
its noise, construction activities, and
heavy truck and equipment traffic on
our narrow county roads.  In addition, it
would significantly decrease our
property values.  Sycamore Creek is one
of the few remaining high quality
streams in the Middle Tennessee region
and is popular with canoeists and
kayakers.   Stream crossing activities
and construction and operation of the
proposed plant would potentially create

AR 004657

significant adverse impacts upon water quality, the adjacent riparian zone and wildlife impacts as well as noise impacts caused by construction and operation of the plant.  Alternative sites are available such Cumberland City and Gallatin plants.

381.     **Russell Fowler**,
Swansboro NC, NC
28584

382.     **Ruth Shunick**,
Black Mountain, NC
28711

383.     **Ruthann McDermott**,
Wiliamsburg, VA
23188

384.     **S. R.**,
Bogart, GA
30622

385.     **Sabrina Buer**,
Lebanon, TN
37090
This pipeline will destroy a unique geological environment and threaten the health and safety of the air, soil, and water along the entire route. The construction of this pipeline must not be permitted to continue.

386.     **Sally Tucker**,
Charlottesville, VA
22903

387.     **Sally Schiller**,
Clarksville, TN
37040

388.     **Sam Walker**,
Nashville, TN

37206

389.     **Samuel Todd**,
Mint Hill, NC
28227

390.     **Sandra Walker**,
Salem, VA
24153
Methane gas, pipeline, wetlands, streams and rivers: very bad combination.Companies building the facilities SAY they will follow the rules, but will not if it interferes with their profits, and it always does. They will only get a slap on the wrist and a fine, which they can afford, when they break the law..

391.     **Sandra Middour**,
Round Hill, VA
20141

392.     **Sandy Ragsdale**,
Fulton, MS
38843
Again, the 32 mile long  Tennessee Gas Company, LLC  Pipeline which threatens our water resources and at the same time does not take into consideration the cultural, economic, and environmental aspects of the individuals living in the states of Alabama, Georgia, Kentucky, Mississippi, North Carolina, Tennessee and Virginia. Please use your opportunity to protect the TN communities and their waters with your Aquatic Resource Alteration Process. Please use all your resources to deny Tennessee Gas Pipeline Company?s application any day that it is presented. This matters to me because it hurts the people of this region as well as the

AR  004658

animals of the same region, and they can?t speak for themselves?.

393. **Sara Layne**,
Franklin, TN
37064

394. **SARAH RICHEY**,
Chattanooga, TN
37404

395. **Sarah Russell**,
Nashville, TN
37211

396. **Sarah E Hurd**,
Johnson City, TN
37604

397. **Saundra Williams**,
McMinnville, TN
37110

398. **Scharla England**,
Benton, KY
42025
We must stop putting money into non renewable energy.

399. **Scott Meyer**,
Louisville, KY
40213

400. **Scott Banbury**,
McMinnville, TN
37110

401. **SHANNON MCNALLY**,
Nashville, TN
37214
This matters to me because Tennessee is a state full of water ways and I don?t want to see it destroyed by out dates

402. **Sharon Hauser**,
Etowah, NC
28729
This really matters to me. I recently connected with my daughter who was adopted at birth 43 years ago. She has two children (my grandchildren). This matters to me because of them. I want to leave them a world with clean water, wonderful wildlife, and clean energy.

403. **Sharon Nakdimen**,
, TN
38555
We have knowledge and resources to have clean water areas   The idea placing a methane pipeline through our waterways is detrimental to All
It will negatively affect our environment in which humans, animals and plants live within
STOP destroying

404. **Sharon Brandon**,
Monterey, TN
38574

405. **Shelby H.**,
Franklin, TN
37064

406. **Shelby Hood**,
Franklin, TN
37064

407. **Sheri Kimble**,
Nashville, TN
37209
A gas pipeline in such a fragile area is an "accident" waiting to happen with a

fuel concerns. We need to think long term

AR  004659

devastating impact.  It could take
decades ir impossible to repair

408.     **Sherrill Gary**,
Pinehurst, GA
31070

409.     **Sierra Canada**,
Arab, AL
35016

410.     **Solara Key**,
Murfreesboro, TN
37129

411.     **Sonja Hunter**,
Lebanon, TN
37090
We deserve clean water and clean air.
We'll get neither of those things with
yet another gas project!!!

412.     **Spencer Diehl**,
Nashville, TN
37216

413.     **Stacey Cannon**,
Salisbury, NC
28146

414.     **Stacey Holliday**,
Chattanooga, TN
37412

415.     **Stephanie Wade**,
Lebanon, TN
37087
We must ensure our water quality stays
as clean as we can keep it. Fresh water
resources are dwindling at an alarming
rate, and it negatively affects human
and wildlife communities alike. Please,
our world cannot survive with our most
basic necessity: water.

416.     **Stephanie Johnsey**,
Knoxville, TN
37922

417.     **Stephen Sizemore**,
Bedford, VA
24523

418.     **Stephen Clark**,
Dunnville, KY
42528

419.     **Steve Keil**,
Hermitage, TN
37076
Tennessee Gas Pipeline Company
Needs to Go Back to the Drawing Board

420.     **Steve Lipson**,
Nashville, TN
37212

421.     **Steven Vogel**,
Falls Church, VA
22046

422.     **Steven Vogelaar**,
Murfreesboro, TN
37130

423.     **Steven Morris**,
Sevierville, TN
37876

424.     **Steven Cross**,
Nashville, TN
37207

425.     **Steven Kenneth Tyler**,
Franklin, TN
37067
Possible destruction of the land and
wildlife!

AR  004660

426.    **Sue Wright**,
Knoxville, TN
37919
It will pollute the land I love and live in

427.    **Susan Doughty**,
Brentwood, TN
37027
I'm a retired teacher, mother, and grandmother.  Clean water is an issue on which we can all agree, for our children?s well-being now and in the future.

428.    **Susan B O'connor**,
Cookeville, TN
38506
We have made the Green Switch on our TVA electricity because we feel it is critical for TVA to develop more wind and solar energy generation.

429.    **Susan Ilgner**,
Lenoir city, TN
37771

430.    **Susan Kincaid**,
Knoxville, TN
37922

431.    **Susan Johnston**,
Nashville, TN
37208

432.    **Susan Judge**,
Virginia Beach, VA
23454

433.    **Susan Thomas**,
Chattanooga, TN
37421

434.    **Suzannah Smith**,

Franklin, TN
37064
Methane is a dirty, carbon energy of the past. Beautiful Tennessee deserves clean solar energy of future!

435.    **Suzanne Nickel**,
Greensboro, NC
27455

436.    **Suzy Lawrence**,
Chapel Hill, NC
27516

437.    **Tammy Yarber**,
Kingsport, TN
37663

438.    **Terry Forrest**,
Bristol, TN
37620

439.    **Thelma Fite**,
Lebanon, TN
37087

440.    **Thomas Morris**,
Bowling Green, KY
42104
With Climate change an urgent threat, we need to do all we can to protect our children and grandchildren from the impacts. Let's take the renewable option!

441.    **Thomas And Rebecca Jackson**,
Maryville, TN
37801
Please consider the lives of our children and grandchildren and protect our environment. As lifelong Tennessee residents, we believe the long term impact on water quality and wetlands

AR 004661

needs to be carefully researched before approving this pipeline.

442. **Tim DiChiara**, Lovingston, VA 22949

443. **Tim Hacker**, Fulton, KY 42041

444. **Tim Jones**, La Follette, TN 37766

445. **Tina Vazquez**, Waynesville, NC 28786
We must protect nature!!

446. **Tobias Ray**, Greenbrier, TN 37073

447. **Tonda Bailey**, Knoxville, TN 37931

448. **Tonya Morrison**, Normandy, TN 37360

449. **Tracy Craddock**, Cleveland, TN 37323
Our world needs clean energy!

450. **Trish Rakes**, Harriman, TN 37748
Please save out water keep it clean, without clean water we die or there are deformities from our water.

451. **Tyler Schrade**, Crossville, TN 38572

452. **Ute Rohe**, Nashville, TN 37221

453. **Vance Sterling**, Tallassee, TN 37878

454. **Vanessa Valencia**, Murfreesboro, TN 37128
Because I HAVE A FAMILY AND A MILLION OTHER READONS

455. **Velma Bearup**, Collegedale, TN 37363
I live in the TN Valley. I consider safe water for  humans here as a part of the "critical habitat" mentioned before.

456. **Vetrel E Smith**, Nashville, TN 37210
Your plans for the future of energy in Tennessee are antiquated and are not in step with environmental issues and innovative technology already available. It seems like a waste of money and leadership that is not in touch with the realities all of our air water and Earth crises

457. **Vicki Carbone**, Jackson, TN 38305
Safe water is necessary to maintain life.

458. **Victoria Keith**, Oak Grove, KY

AR  004662

42262
I care about our streams and rivers!!
Not o Ky the aquatic life but for ckream
recreation!

459.    **Walter Morton**,
Bristol, TN
37620

460.    **William Thrasher**,
Joelton, TN
37080
We need clean water to survive.

461.    **William Shirey**,
Decatur, AL
35601

462.    **York Quillen**,
Knoxville, TN
37923

AR  004663



**Appalachian Mountain Advocates**

West Virginia
Post Office Box 507
Lewisburg, WV 24901
(304) 645-9006

Virginia
415 Seventh Street NE
Charlottesville, VA 22902
(434) 529-6787

www.appalmad.org

Great Horned Owl © Estate of Roger Tory Peterson. All rights reserved.

**SOUTHERN ENVIRONMENTAL LAW CENTER**

1033 Demonbreun Street, Suite 205
Nashville, TN 37203

Telephone 615-921-9470
Facsimile 615-921-8011

July 14, 2023

**Sent by E-mail to Claire.wainwright@tn.gov and to water.permits@tn.gov**
Division of Water Resources
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Avenue, 11th Floor
Nashville, TN 37243

Re:    **Public Comments on draft Aquatic Resource Alteration Permit NRS 22.192 for Tennessee Gas Pipeline Company, LLC's Cumberland Pipeline**

Dear Ms. Wainwright:

The Tennessee Department of Environment and Conservation ("TDEC") has solicited public comments on an application by Tennessee Gas Pipeline Company, LLC ("TGP") for an Aquatic Resource Alternation Permit ("ARAP") pursuant to the Tennessee Water Quality Control Act of 1977, Tenn. Code Ann. § 69-3-101 *et seq.* ("TWQCA"). Appalachian Mountain Advocates, Southern Environmental Law Center, Sierra Club, and Appalachian Voices ("Conservation Groups") respectfully submit the following comments on TGP's application.[1]

## INTRODUCTION

TGP seeks an individual ARAP permit pursuant to the TWQCA to cause temporary and permanent impacts to various wetlands, streams, and reservoirs associated with the construction of a 32-mile 30-inch diameter gas pipeline ("Cumberland Pipeline"). TGP's proposed construction right of way ("ROW") would involve a total of 155 stream crossings and seven wetland crossings.[2] Of the 122 proposed stream and wetland crossings for the pipeline right-of-way, TGP plans to utilize a dry-ditch, open cut method on all but four of them.[3] For the reasons explained below, TGP's application should be denied.

---

[1] Conservation Groups fully incorporate into our comments by reference the exhibits cited herein. The exhibits transmitted by email with this letter are also available at: https://southernenvironment.sharefile.com/d-sb5282f4ad09247c1be45b14c13b8d703.

[2] Letter from Blake Amos, Tenn. Gas Pipeline Co., LLC, to Claire Wainwright, Tenn. Dep't of Envt. & Conservation, Re: Request for Additional Information Response (Mar. 17, 2023), *Attachment 5 - Table 2.1-1 Revised March 2023* [hereinafter, "Table 2.1-1, rev. Mar. 17, 2023"].

[3] Table 2.1-1, rev Mar. 17, 2023.

AR 004664

## I.    TDEC MUST DENY TGP'S APPLICATION BECAUSE TGP HAS NOT ESTABLISHED THAT DRY-DITCH, OPEN-CUT CROSSINGS WILL HAVE THE LEAST ADVERSE IMPACTS ON AFFECTED RESOURCE VALUES.

Tennessee rules governing ARAPs specify that "[n]o Individual Permit shall be granted if there is a practicable alternative to the proposed activity that would have less adverse impact on resource values, so long as the alternative does not have other significant adverse environmental consequences."[4] A "practicable alternative" is one "that is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."[5]

That definition tracks the definition of "practicable alternative" in the Section 404(b)(1) Guidelines that the United States Army Corps of Engineers ("the Corps") applies when determining whether it can issue a Clean Water Act Section 404 permit. Those guidelines prohibit permit issuance where, among other things, a proposed discharge is not the least environmentally damaging practicable alternative, or "LEDPA."[6] The Section 404(b)(1) Guidelines provide that "[a]n alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology and logistics in light of overall project purposes."[7]

TDEC's regulations prohibit permit issuance where there is a less damaging practicable alternative (like the Section 404(b)(1) Guidelines,) and TDEC's regulations define "practicable alternative" identically to the way that term is used in the Section 404(b)(1) Guidelines. Accordingly, TDEC's application of its practicable alternatives obligations and alternatives analysis must be consistent with the LEDPA analysis in which the Corps must engage under the Section 404(b)(1) Guidelines—and the Section 404(b)(1) Guidelines and federal caselaw interpreting them are applicable and relevant to TDEC's alternatives analysis here.

Under the Section 404(b)(1) Guidelines, "practicable alternatives include, but are not limited to, (i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States . . . [and] (ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters[.]"[8] The burden to demonstrate that the proposed alternative is the least environmentally damaging practicable alternative falls to the applicant.[9] In performing a LEDPA analysis, the regulatory authority has "an obligation to independently verify the information supplied to it" by the applicant.[10]

As explained below, TGP's practicable alternative analysis is wholly inadequate. Relevant literature on pipeline crossings establishes that the potential environmental impacts

---

[4] Tenn. Comp. R. & Regs 0400-40-07-.04(5)(b).

[5] *Id.* at 0400-40-07-.03(24).

[6] 40 C.F.R. § 230.10(a).

[7] *Id.* § 230.10(a)(2).

[8] *Id.* § 230.10(a)(1).

[9] *Utahns for Better Transp. v. U.S Dep't of Transp.*, 305 F.3d 1152, 1187 (10th Cir. 2002), *modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003); *see also Alliance for Legal Action v. U.S.*

AR 004665

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **3** of **69**

could be severe and permanent.[11] Moreover, TGP has failed to demonstrate that there are not construction method alternatives or routing alternatives which could lessen these impacts. The cost of the proposed pipeline project is nearly $200,000,000 and the proposed route involves a significant number of crossings; it is imperative that TDEC analyze each of these crossings to determine whether TGP has met its burden to demonstrate that no practicable alternative exists to avoid, minimize, or mitigate the impacts of this enormous undertaking.[12]

There are at least two classes of practicable alternatives that must be considered:

(i)  Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters; [and]
(ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters.[13]

For purposes of evaluating TGP's application, those two classes of practicable alternatives should be considered "construction method alternatives" and "routing alternatives," respectively. TGP's presentation (and TDEC's evaluation) of both types of alternatives is so severely flawed that it borders on nonexistent, and TDEC must therefore deny TGP's application.

---

*Army Corps of Eng'rs*, 314 F.Supp.2d 534, 543 (M.D.N.C. 2004) (holding "the burden to clearly demonstrate a lack of practicable alternatives lies with the project applicant"); Tenn. Comp. R. & Regs. 0400-40-07-.04(5)(b) (requiring the applicant to submit an alternatives analysis).

[10] *Friends of the Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986).

[11] *See generally* Section II *infra*.

[12] *See generally* Section II *infra*.

[13] 40 C.F.R. § 230.10(a)(1)(i)–(ii).

AR  004666

### A. TGP CANNOT ESTABLISH THAT THERE ARE NOT LESS ENVIRONMENTALLY DAMAGING PRACTICABLE CONSTRUCTION METHOD ALTERNATIVES TO ITS PROPOSED DRY-DITCH, OPEN-CUT CROSSINGS.

TGP asks TDEC to allow it to use a dry-ditch, open-cut crossing to blast or trench through every stream that the Cumberland Pipeline would cross, except for four streams that would be crossed by Horizontal Directional Drilling ("HDD").[14] For the following reasons, TGP has failed to carry its burden to establish that there are no practicable alternatives which would have less adverse impacts on resource values to its proposed dry-ditch, open-cut crossing method at each proposed location.

#### 1. *TGP Fails to Consider A "No-Permit" Alternative on a Crossing-by-Crossing Basis.*

TDEC must evaluate whether there are practicable alternatives which would have less adverse impacts on resource values for each activity—that is, each crossing—proposed by TGP which requires an ARAP. Put another way, TDEC must evaluate on a crossing-by-crossing basis whether the practicable alternatives test has been met. As mentioned, practicable alternatives can include "construction alternatives" for each proposed crossing or "routing alternatives" which could avoid water impacts altogether. The alternatives analysis, correctly framed, should ask whether TGP can construct each of its stream and wetland crossings without an ARAP, either by implementing a crossing method that would not involve the alteration of state waters or by selecting a minor alignment variation that entirely avoids the stream or wetland at issue.

At the threshold, TGP's major routing alternatives analysis is insufficient. The company states that "[b]ecause of the ubiquitous occurrence of streams and wetlands in the topographically dissected Western Highland Rim Physiographic Province in which the Project is located, *it is unlikely* that other routes between the Cumberland Pipeline's receipt and delivery points would encounter substantially fewer aquatic resources than those along the preferred route."[15] Therefore, it declined to identify any major route alternatives.[16] This is not analysis; this is conjecture. TGP must take a closer look at whether an alternative route could avoid impacts to

---

[14] Tenn. Dep't of Envt. & Conservation, *Draft Aquatic Resource Alteration Permit NRS 22.192*, 34 (2023) [hereinafter "Draft ARAP"]. The streams that TGP would cross using HDD are Jones Creek, Yellow Creek and one of its unnamed tributaries, and Wells Creek. *Id.* Inexplicably, TGP appears to propose dry-ditch, open-cut crossings for all of the unnamed tributaries of Jones Creek. Letter from Blake Amos, Tenn. Gas Pipeline Co., LLC, to Claire Wainwright, Tenn. Dep't of Envt. & Conservation, Re: Request for Additional Information Response (Mar. 17, 2023), *Attachment 4 – Table 1: Cumberland Waterbodies Impacts Table Revised March 2023* [hereinafter "Table 1, rev. Mar. 17, 2023"].
TGP must explain that discrepancy before TDEC can act on its ARAP application.
[15] Tenn. Gas Pipeline Co., LLC, *Cumberland Project Aquatic Resource Alteration Permit (ARAP) Application and State 401 Water Quality Permit* 16 (July 22, 2022) [hereinafter "ARAP Application"] (emphasis added).
[16] ARAP Application at 17.

AR 004667

certain waterbodies entirely—it is not enough to opine, without any analysis, that such an outcome is unlikely. Further, and as discussed in greater detail below, TGP has failed to demonstrate that there are no practicable construction method or routing alternatives which would *avoid* streams or wetlands (and the attendant need for an ARAP) on a crossing-by-crossing basis.

### 2. Trenchless Crossing Methods Are the Least Environmentally Damaging Pipeline Crossing Methods.

TDEC's analysis of TGP's proposed crossing methods must start with this fundamental premise: "In general, avoidance of stream and wetland disturbances using trenchless methods is the least damaging alternative for waterbody crossings absent special site-specific conditions."[17] Expert engineer Starr Silvis explains that trenchless methods are the "preferred method for pipelines to cross streams and wetlands to reduce negative environmental impacts . . . absent special site-specific factors."[18]

Silvis reaches that conclusion because "[t]renchless methods are associated with fewer short-term and long-term negative effects on aquatic ecosystems."[19] Silvis continues:

> [T]renchless construction allows the pipeline to cross streams and wetlands without disrupting riparian vegetation, stream bed substrate, wetland soils, and flow in streams and rivers, thereby reducing short- and long-term fish and macroinvertebrate mortality, and allows streams and wetlands to remain intact, thereby reducing turbidity, suspended and settled sediment impacts.[20]

Silvis's conclusions are consistent with those of the pipeline regulatory community. For example, the New York State Department of Environmental Conservation ("NYSDEC") denied a Section 401 certification for open-cut pipeline stream and wetland crossings because the applicant refused to provide sufficient information about alternative trenchless crossing methods.[21] In its denial letter, NYSDEC concluded:

> Open trenching is a highly impactful construction technique involving significant disturbance of the existing stream bed and potential long-term stream flow disruption, destruction of riparian vegetation and establishment of a permanent

---

[17] Starr Silvis, *Evaluation of TGP Pipeline Company, LLC's Application for a Department of the Army Permit for the Cumberland Project* 2 (May 10, 2023) [hereinafter "Silvis (2023)"] (Exhibit 1).

[18] *Id.* at 5.

[19] *Id.* at 2.

[20] *Id.* at 5.

[21] *Constitution Pipeline Co., LLC v. N.Y. State Dept. of Envtl. Conservation*, 868 F.3d 87 (2d Cir. 2017). The United State Court of Appeals held that the state's denial of the Section 401 certification on those grounds was supported and permissible. *Id.* at 103.

AR 004668

cleared corridor. Comparatively, trenchless methods present significantly fewer environmental impacts to the regulated resource.[22]

The Federal Energy Regulatory Commission ("FERC") has reached similar conclusions on the environmental protection offered by trenchless crossings when compared to dry-ditch, open-cut crossings. Regarding the same pipeline for which NYSDEC denied a Section 401 certification on the ground that the applicant had not sufficiently considered trenchless crossings, FERC concluded:

> The potential impacts on waterbodies associated with the use of conventional bore or Direct Pipe trenchless crossing methods are considered minimal when compared to other crossing methods, The waterbody and its banks, and typically the entire immediate riparian zone, would not be disturbed by clear or trench; rather, the pipe would be installed below the feature.[23]

And in a recent Environmental Assessment of the effects of 120 proposed trenchless pipeline crossings, FERC stated:

> In contrast to open-cut dry trenching, the use of a trenchless crossing method to cross an environmental resource such as a waterbody or wetland avoids direct impacts associated with working directly within the sensitive resource. Trenchless crossing methods allow for uninterrupted existing streamflow and undisturbed wetland soils, scrub-shrub, and herbaceous vegetation, thereby minimizing impacts on aquatic resources and wetland and wildlife habitat. Additionally, the proposed trenchless crossings would result in reduced in-stream sedimentation as compared to [dry-ditch, open-cut crossings]. This reduction results from less disturbance of the riparian areas adjacent to the waterbodies and avoidance of impacts on the streambed. Lastly, trenchless crossings would avoid the ground disturbance

---

[22] Letter from John Ferguson, N.Y. State Dept. of Envtl. Conservation, to Lynda Schubring, Constitution Pipeline Company, LLC, Re: Joint Application: DEC Permit # 0-9999-00181/00024 Water Quality Certification/Notice of Denial (Apr. 22, 2016) (Exhibit 2).
[23] *Const. Pipeline Co.*, 868 F.3d at 94 (quoting FERC Final Environmental Impact Statement for the Constitution Pipeline, emphasis in *Const. Pipeline Co.*).

AR 004669

associated with trenching and backfilling in the subject wetlands and reduce longer-term impacts by accelerating the post-construction revegetation period.[24]

FERC also determined in that same Environmental Assessment that, "[i]n general, typical pipeline effects on waterbodies are avoided with trenchless methods."[25]

### 3. TGP Has Failed to Establish on a Crossing-by-Crossing Basis That Trenchless Crossings Are Not Practicable at Locations Where it Proposes Dry-Ditch, Open-Cut Crossings.

TGP has failed to carry its burden to establish that its proposed dry-ditch, open-cut crossings are exceptions to the general rule recognized by Silvis. Indeed, TGP has utterly failed to justify its selections on a crossing-by-crossing basis. Silvis—an environmental engineering expert with extensive regulatory experience—reviewed TGP's application for its corresponding Section 404 Clean Water Act permit from the Corps for the Cumberland Pipeline (which is materially identical to TGP's ARAP application) and concluded that the absence of site-specific analysis of the feasibility of trenchless methods requires denial of that application.[26] As Silvis observes:

- "[TGP] has not substantiated that any of the proposed crossings for which the company seeks a permit are the least environmentally damaging practicable alternative . . . One of the most striking defects in [TGP's] application is the company's failure to address the technical, logistical, and cost practicability of trenchless construction on a crossing-by-crossing basis for any of the proposed crossings beyond three HDD sites."[27]
- Because TGP does not substantiate its crossing determinations with adequate information, it is Silvis's "professional opinion that trenchless methods are likely practicable for many more of the streams and wetlands that would be crossed by the pipeline than [TGP] identifies. At a minimum, the deficiencies [in] the permit application make it impossible to conclude that TGP's proposal is, in fact, the LEDPA. Accordingly, it is my professional opinion that [TGP] has not demonstrated that any of its proposed open-cut crossings represent the least environmentally damaging practicable alternative."[28]
- "Since trenchless crossing methods are the least damaging to aquatic resources it is my professional opinion that trenchless crossing methods must, at a minimum, be evaluated on a crossing-by-crossing basis for use at all crossings. The application's failure to undertake this individualized evaluation compels the conclusion that [TGP] has not shown its proposed crossings are the LEDPA."[29]
- "Although the application at times suggests that [TGP] may have developed an internal rationale for its proposed method at each crossing, those individual rationales are not

---

[24] Fed. Energy Regul. Comm'n, *Mountain Valley Pipeline Amendment Project: Environmental Assessment* 8 (Aug. 2021) [hereinafter "FERC MVP EA"] (Exhibit 3).
[25] *Id.* at 33.
[26] Silvis (2023) at 5–7 (Exhibit 1).
[27] *Id.* at 5.
[28] *Id.* at 7.
[29] *Id.* at 5–6.

AR 004670

provided in the application or other materials. These are glaring omissions because an individualized LEDPA analysis is required under the Section 404(b)(1) Guidelines, and because it is an industry standard in applications for individual DA permits to evaluate trenchless crossing alternatives prior to proposing trenched crossings such as dry open-cut crossings, in order to reduce potential water quality and stream impacts."[30]

- "[C]onventional boring is not evaluated for any waterbody crossings in the application."[31]

As Silvis notes:

> The application overlooks the apparent practicability of trenchless methods across the route as evidenced by statements in the application and associated materials. For example, conventional boring is proposed for multiple road crossings shown in Attachment 3 to [TGP's] application, indicating that this trenchless method is appropriate for substrates found along the project length. However, conventional boring is not evaluated for any waterbody crossing in the application.[32]

Although Silvis made these observations as relevant to TGP's Section 404 permit application, they apply with equal force to TDEC's analysis under its ARAP permitting regime, as this permit would serve as the state's Section 401 water quality certification for many of those same activities.[33] TGP's high level discussion of the technology in its application is insufficient for TDEC to conclude that TGP's application establishes that a dry-ditch, open-cut crossing is the least impactful practicable alternative for any of the crossings where the applicant intends to employ it. Given the absence of site-by-site application of those factors, TDEC cannot verify that TGP's proposed activities are the least impactful practicable alternative as it must.

Because, as established above, trenchless crossings have fewer adverse environmental effects on streams and wetlands than open-cut crossings, TGP must either (1) employ a trenchless method at each crossing; or (2) present sufficient information to TDEC to allow the Department to independently verify that trenchless crossings are impracticable on a crossing-by-crossing basis. TGP has not done so. That alone justifies denying the pending application.

### *4. TGP Has Not Evaluated All Trenchless Crossing Techniques.*

TGP's assessment of trenchless crossing methods is also deficient because it limits its consideration to only two trenchless crossing methods: HDD and conventional bore.[34] But there are additional trenchless methods that TGP must consider as less environmentally damaging alternatives at each crossing. Four such methods are (1) guided conventional boring, (2) microtunneling, (3) Direct Pipe®, and (4) directional microtunneling.

---

[30] *Id.* at 5.
[31] *Id.* at 6.
[32] *Id.* at 6.
[33] *See* Tenn. Comp. R. & Regs. 0400-40-07-.04(3).
[34] ARAP Application at 26–29.

AR 004671

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **9** of 69

     ***Guided conventional boring*** is a variation of the conventional boring technique that uses pilot tubes to guide the auger.[35] Like conventional boring, this method is commonly used in waterbody crossings for natural gas pipelines.[36] Water can frequently be used in guided conventional boring to return drill cuttings and keep the cutting head cool, and where bentonite drilling fluids are used it is at a much lower pressure than with HDD.[37]

     ***Microtunneling*** allows pipe jacking with accurate guidance, remote operation, and continuous support of the bore hole.[38] The technique has been used to construct natural gas pipeline crossings beneath valuable aquatic resources such as streams protected by the Wild and Scenic Rivers Act.[39] As FERC has observed, "microtunneling can be used in many soil types, including boulders and rock," and can "span 200 to 1500 feet."[40] Microtunneling "is often used in longer trenchless crossings because the advanced control and guidance system allows for precise line and grade tolerances."[41] The technique uses little bentonite drilling fluid and at low pressure, minimizing inadvertent returns.[42]

     ***Direct Pipe®*** "is a hybrid technique combining aspects of microtunneling and HDD."[43] But, unlike HDD, "the borehole is never only mud supported" in this technique.[44] The risk of inadvertent return from Direct Pipe® installation is much lower than with HDD because of low pressures on the small quantities of drilling fluid used.[45] Because the borehole is continuously supported, and because of the low risk of hydraulic fracture, "the Direct Pipe® alignment can be designed much shallower than is typical for an HDD."[46] This method has been used to construct natural gas pipelines under waterbodies inhabited by species listed as threated under the ESA.[47]

---

[35] Raymond L. Sterling, *Developments & Research Directions in Pipe Jacking and Microtunneling*, 5 UNDERGROUND SPACE (BEIJING) 4 (2020) [hereinafter "Sterling (2020)"] (Exhibit 4), https://www.sciencedirect.com/science/article/pii/S2467967418301065/pdfft?md5=6bbb7dc48a705e7bf1acc4b5a0f7a459&pid=1-s2.0-S2467967418301065-main.pdf.

[36] Williams Field Servs. Co., LLC et al., Application for a Certificate of Environmental Compatibility and Public Need to Construct an Approximately 9.5-Mile Natural Gas Gathering Line, New York Mainline Loop Natural Gas Pipeline Project, Case 13-T-____ at 17 (Dec. 2, 2013) (Exhibit 5), https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={769A8A9D-418C-409C-9DD9-DC58FE8E6288}; FERC MVP EA at 12–13 (Exhibit 3).

[37] FERC MVP EA at 12–13 (Exhibit 3).

[38] Sterling (2020) at 2 (Exhibit 4).

[39] *See, e.g.*, Rockies Express Pipeline LLC, 123 FERC ¶ 61234, ¶ 131 (May 30, 2008).

[40] FERC MVP EA at 14 (Exhibit 3).

[41] *Id.*

[42] *Id.*

[43] Sterling (2020) at 5 (Exhibit 4).

[44] *Id.*

[45] FERC MVP EA at 13 (Exhibit 3).

[46] *Id.*

[47] Transcontinental Gas Pipe Line Company, LLC, 141 FERC ¶ 61091, ¶¶ 53, 57 (Nov. 2, 2012).

AR  004672

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **10** of **69**

　　　　***Directional microtunneling***, or curved microtunneling, "incorporate[s] the advantages of microtunneling, cartridge style feed of the pipe at entry and balancing earth pressures in a continuously cased tunnel, with the curved alignment of a [Direct Pipe®] to reduce entry and exit pit excavation requirements."[48] TGP used that method to complete a trenchless crossing for a methane pipeline in Pennsylvania.[49] The method has previously allowed TGP to use a trenchless crossing method "in an area with geotechnical constraints that made traditional crossing methods high risk or prohibitively expensive."[50]

　　　　Despite the established use of guided conventional bore, microtunneling, Direct Pipe®, and directional microtunneling in natural gas pipeline resource crossings, and despite their environmental advantages over both dry-ditch, open-cut crossings and HDD, TGP did not consider them as crossing method alternatives for the Cumberland Pipeline. Nor did the applicant provide an explanation for their omission. But it should have evaluated them for every crossing.[51] Because it did not, TGP's practicable alternative analysis is deficient, and the application should be rejected.

### 5. *TGP's Generalizations About Conventional Boring Are Unsupported and Cannot Justify Eliminating It As A Crossing Method.*

　　　　Rather than engage in a thorough, site-specific analysis of trenchless crossing methods, TGP chose to identify only a handful of general factors that *might* go into a site-specific analysis (had it conducted one) and to make various (and frequently unsupported) generalizations about HDD and conventional boring.[52] Those efforts fall short of what is required of alternatives analysis under Tennessee rules and a LEDPA analysis under the Clean Water Act's Section 404(b)(1) Guidelines.

　　　　At the outset of the "Construction Methods Alternatives" section of its application, TGP speaks of "preliminary geotechnical and geological studies" that it claims were undertaken.[53] But

---

[48] Jonathan L. Robison & Jim Elmore, *Innovative Directional Microtunnel Garners Success for Crucial Trenchless Crossing*, *in* PIPELINES 2014: FROM UNDERGROUND TO THE FOREFRONT OF INNOVATION AND SUSTAINABILITY 760 (2014), https://ascelibrary.org/doi/epdf/10.1061/9780784413692.069 (Exhibit 6).

[49] *Id.* at 758.

[50] *Id.* at 768.

[51] The need for an analysis of alternative trenchless crossings extends also to TGP's planned HDD crossings. As Silvis notes in her report, TGP's feasibility study for the proposed HDD crossing of Yellow Creek notes the presence of karst geology, increasing the risks of the loss of drilling fluid and "mak[ing] it crucial to evaluate the feasibility of other trenchless methods to minimize potential environmental impacts." Silvis (2023) at 20 (Exhibit 1); *see also* ARAP Application at 40.

[52] ARAP Application at 28–29.

[53] ARAP Application at 21.

AR 004673

the application fails to include any site-specific discussion about how those "studies" might limit the availability of trenchless crossing methods at any particular location.[54]

As FERC recently recognized, "[t]he conventional bore method is a technology that has been used for decades to install natural gas pipelines."[55] Nonetheless, TGP dismisses its use for the Cumberland Pipeline based on a general and unsupported discussion of three factors TGP claims limits the use of the technology. In each case, TGP does so in the abstract, without any site-specific context.

*First*, TGP maintains that crossing distances on the Project may preclude the use of conventional bore because, in TGP's view, "[b]oring operations typically occur over a crossing distance of 50 to 60 feet" and "[t]he maximum length a bore could achieve in ideal soil conditions typically does not exceed 400 feet."[56] TGP provides no citation to support those claims. Even if they were assumed to be true, however, they would remain unpersuasive because *the widest stream that TGP proposes to cross with a dry-ditch, open-cut crossing is Bartons Creek, with a span of 62.5 feet*.[57] As Silvis (2023) concludes, the width of the streams that TGP proposes to cross "does not preclude the use of conventional boring at any proposed open-cut crossing."[58]

*Second*, TGP insinuates that "subsurface soil and geologic conditions" might "limit[] the success of a boring operation under waterbodies for the Project."[59] TGP does not refer to the subsurface soil or geologic conditions at any particular crossing location, but instead generalizes about preferences for "[l]oose-packed soil, free of rock material."[60] TGP's *ipse dixet* assertion contradicts recent descriptions of the capabilities of conventional boring technology by FERC, where that agency concluded that "[b]oulders and cobbles up to one third of the diameter of the installed pipe can be accommodated" in conventional boring.[61]

In any event, there are certainly subsurface soil and rock conditions in the Project area that are conducive to conventional boring because TGP has committed to using that method to install its proposed pipeline under paved roads in the Project area.[62] TGP should be required to provide crossing-specific evidence of adverse geological conditions that contraindicate

---

[54] That failure renders entirely speculative and unsupported TDEC's statements at the July 6, 2023 public hearing on TGP's application suggesting that the region's geology (including bedrock) precludes widespread use of HDD.
[55] FERC MVP EA at 8 (Exhibit 3).
[56] ARAP Application, 27.
[57] Table 1, rev. Mar. 17 2023 at 6; *see also* Silvis (2023) at 6 (Exhibit 1).
[58] Silvis (2023) at 6 (Exhibit 1).
[59] ARAP Application at 27.
[60] *Id.*
[61] FERC MVP EA at 9 (Exhibit 3).
[62] Fed. Energy Regul. Comm'n, *Final Environmental Impact Statement for the Cumberland Project* at tbl. 2.5-3 (June 2023) [hereinafter "FEIS"], https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20230630-3003 (Exhibit 7).

conventional bore before it is allowed to afford fewer protections to Tennessee's aquatic resources than it does to paved roads.

***Third***, TGP asserts (again without support) that "[t]he topographic conditions for most waterbody crossing locations on this Project also limit the use of [conventional bore], as preferred locations are generally consistent with level or moderately convex terrain, such that the depth of the bore pit does not present concerns relative to constructability or safety constraints."[63] As Silvis notes, however, TGP has failed to meet industry standards of providing topographic information in its site plan mapping.[64] Without such topographical information, "[i]t is impossible to verify grades or stream crossing locations" to confirm TGP's general assertion of impracticable topography any particular crossing location.[65] Moreover, TGP's asserted topographical limitations on the use of conventional bore on the Cumberland Pipeline are undermined by FERC's approval of the use of that technique on a project in the steep slopes of Central Appalachia. That project will involve bore pits as deep as 57 feet on grades that could exceed 30% (so long as the slope was less than 400 feet long).[66]

Following its inadequate and unsupported description of the conventional bore technique, TGP purports to offer a contrast of "*HDD/Conventional Bore Methods versus Conventional Dry Open Cut Crossing Methods.*"[67] That section of TGP's application appears to have been written as a contrast between just HDD and dry-ditch, open-cut crossings, with conventional boring added as an afterthought and without consideration of the differences between HDD and conventional boring.

For example, TGP tries to emphasize the comparative risks of inadvertent returns between open-cut crossings and trenchless crossings, stating, "[t]here are no risks of inadvertent returns for a conventional open cut crossing," while suggesting that there is a high risk of such returns from conventional bore.[68] Not so. FERC recently concluded that "[t]here would be *no risk of inadvertent release of drilling fluids*" from conventional bores proposed for a different methane gas pipeline project.[69] That is because during a conventional bore, "the borehole is continuously supported by pipe throughout the process," rendering unnecessary "the circulation of drilling fluids to transport drill cuttings and to support the walls of the borehole."[70]

Moreover, although TGP sets out six factors it claims to have considered "when evaluating the use of trenchless HDD or conventional bore crossing methods versus a dry open-

---

[63] ARAP Application at 27.

[64] Silvis (2023) at 21 ("Industry standard is to provide topographic information and stream locations on site plan mapping.") (Exhibit 1).

[65] *Id.*

[66] FERC MVP EA at 95, App. D (Exhibit 3).

[67] ARAP Application at 28.

[68] ARAP Application at 29

[69] FERC MVP EA at 92 (Exhibit 3).

[70] *Id.* at 9. Risks of inadvertent return are similarly low with the trenchless crossing methods TGP failed to consider, such as guided conventional bore, microtunneling, and Direct Pipe®. *Id.* at 12–14.

AR 004675

cut method for Project waterbody crossings," its application is absolutely devoid of any evidence that TGP applied those factors on a crossing-by-crossing basis, as opposed to just making generalizations about the technologies and choosing a method based on its own convenience.[71] As Silvis notes, "[a]lthough the application at times suggests that TGP may have developed an internal rationale for its proposed method at each crossing, those individual rationales are not provided in the application or other available materials."[72] As discussed above, and emphasized by Silvis, "[t]he preferred method for pipelines to cross streams and wetlands to reduce negative environmental impacts is through trenchless construction absent site-specific factors."[73] Because of the site-specific nature of the analysis, "[o]ne of the most striking defects in [TGP's] application is the company's failure to address the technical, logistical, and cost practicability of trenchless construction on a crossing-by-crossing basis[.]"[74]

Moreover, the notion that TGP might have done a crossing-by-crossing evaluation of trenchless methods and rejected those methods because of technical impracticability is fatally undermined by the company's statement that it may use trenchless methods if it encounters adverse flow conditions at proposed dry-ditch, open-cut crossings.[75] As Silvis observes,

> These statements indicate that TGP prioritized trenched crossings except where they are impracticable instead of the other way around, starting with trenchless techniques for all sites unless they are shown to be impracticable. As stated above, trenchless crossings are less environmentally damaging than open-cut (*i.e.* trenched) crossings absent special site-specific circumstances. Therefore they should be the first option evaluated when determining the LEDPA.[76]

Finally, TGP's generalizations about the cost of trenchless crossing methods are insufficient to justify their rejection. TGP asserts that "[c]osts associated with a HDD and conventional bore, in general, may be five (5) times more per foot than costs for a conventional crossing using open cut methods, which can become prohibitive to the Project budget" and directs TDEC to Attachment 9 to support that claim.[77] As discussed further below, Attachment 9 is a decade-old, high-level summary of trenchless methods developed for a different project—a pipeline that was ultimately cancelled after it could not obtain permits because of its proponent's failure to evaluate and implement trenchless crossings more broadly. Because the summary in Attachment 9 is a decade old and does not support TGP's "five (5) times more per foot" assertion in any event, TGP must provide additional information before it can reject trenchless crossings on the basis of cost.

---

[71] ARAP Application at 28.
[72] Silvis (2023) at 5 (Exhibit 1).
[73] *Id.*
[74] *Id.*
[75] ARAP Application at 23.
[76] Silvis (2023) at 7 (Exhibit 1).
[77] ARAP Application at 28. Although TGP directs TDEC to Attachment 8 in this discussion, the company submitted the document as Attachment 9 to TDEC. To minimize confusion, Conservation Groups will refer to the documented in its submitted form as Attachment 9.

AR 004676

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **14** of **69**

      As EPA has emphasized for evaluating Section 404 permit applications, "[g]enerally, as the scope/cost of the project increases, the level of analysis should also increase."[78] The Cumberland Project is expected to cost nearly $200,000,000 and will bring guaranteed and substantial revenue to TGP. Accordingly, the level of analysis required to determine whether the costs of trenchless crossings are practicable is substantial.

      In the context of the Project's overall budget, the costs of the trenchless crossings TGP has rejected may be insignificant. TGP asserts, without support, that the costs may "become prohibitive to the project budget."[79] But, on an industry-wide basis, it is acknowledged that the "direct costs of various [stream] crossing techniques are difficult to predict" because of, among other things, necessary contingency factors.[80]

      As EPA explained in its August 23, 1993 Memorandum to the Field, Subject: Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guidelines Alternatives Requirements, "[t]he determination of what constitutes an unreasonable expense should generally consider whether the projected cost is substantially greater than the costs normally associated with the particular type of project. Generally, as the scope/cost of the project increases, the level of analysis should also increase."[81] EPA further explained that "[i]t is important to emphasize . . . that it is not a particular applicant's financial standing that is the primary consideration for determining practicability, but rather characteristics of the project and what constitutes a reasonable expense for these projects that are most relevant to practicability determinations."[82] Because TDEC's definition of a practicable alternative derives from that same concept embodied in the Section 404(b)(1) Guidelines, EPA's guidance applies here.

      Oil and gas pipelines are frequently multi-million-dollar affairs, and their capital costs have been increasing in recent years.[83] Stream crossings "strongly affect pipeline construction costs."[84] Because the cost practicability component must be evaluated in the context of natural

---

[78] Memorandum to the Field, Subject: Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guidelines Alternatives Requirements (signed Aug. 23, 1993), 62 Fed. Reg. 31497, 31497–99 (June 9, 1997) [hereinafter "EPA Guidance on 404(b)(1) Alternatives Analyses"].

[79] ARAP Application at 28.

[80] Canadian Ass'n of Petroleum Producers et al., Pipeline Associated Watercourse Crossings 3rd Ed., § 4.4.1 (2005) (Exhibit 8).

[81] EPA Guidance on 404(b)(1) Alternatives Analyses. That memorandum is available from multiple sources, including as noted above in the Federal Register at 62 Fed. Reg. at 31497–99 (June 9, 1997), and at https://www.epa.gov/cwa-404/memorandum-appropriate-level-analysis-required-evaluating-compliance-cwa-section-404b1.

[82] *Id.*

[83] Global Energy Monitor Wiki, *Oil and Gas Pipeline Construction Costs*, https://www.gem.wiki/Oil_and_Gas_Pipeline_Construction_Costs.

[84] *Id.* (citing Christopher E. Smith, *Natural gas pipeline profits, construction both up*, OIL & GAS JOURNAL (Sept. 5, 2016), https://www.ogj.com/pipelines-transportation/article/17209510/natural-gas-pipeline-profits-construction-both-up.

AR 004677

gas pipelines generally, and because such pipelines frequently cost hundreds of millions of dollars to build—with significant construction costs turning on the frequency of stream crossings—the cost increase that would result from implementing trenchless crossings are highly unlikely to render such methods impracticable from a cost standpoint. Indeed, FERC recently approved a request by a natural gas pipeline to construct more than 100 stream crossings using conventional bore, establishing that natural gas pipelines maintain financial viability even with frequent use of trenchless crossings.[85]

In any event, the materials submitted by TGP to date—without crossing-by-crossing comparisons of the projected costs of trenchless crossings to dry-ditch, open-cut crossings—are certainly insufficient to support a conclusion that additional trenchless crossings are impracticable because of cost. As with other aspects of the practicable alternative analysis, TDEC must independently verify the applicant's assertions. On this record, TDEC cannot conclude that trenchless crossings are impracticable on the basis of cost.

Without independent analysis, TDEC simply cut and pasted into its draft ARAP large excerpts from TGP's unsupported assertions in its "Construction Methods Alternatives" section of its ARAP application.[86] There is no evidence TDEC independently evaluated TGP's assertions. Rather, TDEC parroted the applicant through large block quotes, and then offered the bare conclusion that the "applicant has demonstrated that . . . the proposed process for determining the appropriate crossing method will result in the use of the least impactful practicable alternative to accomplish the project purpose."[87]

That bald assertion, based on a regurgitation of the applicant's unsupported assertions and without independent analysis, is wholly insufficient. As established above, TGP's assertions contradict the state-of-the-art in pipeline waterbody crossing methodology. TDEC must independently evaluate TGP's assertions, reasonably reflect upon the information contained in the record, and grapple with contrary evidence, or else risk arbitrary and capricious decision making.[88] That evaluation must occur before TDEC takes final action on TGP's permit, and the only rational result of such an evaluation must be permit denial.

---

[85] *Mountain Valley Pipeline, LLC*, 179 FERC ¶ 61,013, 2022 WL 1058057 (Apr. 8, 2022).

[86] *Compare* Draft ARAP at 41–43 *with* ARAP Application at 26–29.

[87] Draft ARAP at 43.

[88] *Louisville Gas & Elec. Co. v. Fed. Energy Regul. Com'n*, 988 F.3d 841, 846 (6th Cir. 2021) (holding that administrative agencies "must 'examine the relevant data and articulate a satisfactory explanation for [their] action including a rational connection between the facts found and the choice made.'") (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Sierra Club v. W. Va. Dep't of Envtl. Prot.*, 64 F.4th 487, 502 (4th Cir. 2023) (vacating state § 401 certification for natural gas pipeline because, *inter alia*, "[r]ecord evidence contrary to an agency's conclusion requires further elaboration and must be grappled with") (cleaned up).

AR 004678

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **16** of 69

### 6. *TGP Relies on A Stale and Unpersuasive Document to Support Its Contentions About Crossing Methods.*

In an attempt to justify its unsupported rejection of trenchless crossing methods for the overwhelming majority of its proposed crossings, TGP includes a one-page table that generally describes three trenchless methods as Attachment 9 to its ARAP application.[89] The source for Attachment 9 is a November 2013 effort by the proponent of the since-cancelled Constitution Pipeline to avoid using trenchless methods to the degree requested by regulatory authorities.[90] Attachment 9 is unpersuasive for a number of reasons.

**First**, it is outdated and stale. Attachment 9 is a decade old, yet TGP holds it out as an authority on the technical and cost limitations on conventional bore, HDD, and Direct Pipe®.[91] It cannot bear the weight TGP would put on it by dint of its age alone.

**Second,** Attachment 9 is inherently unpersuasive because of its source. Indeed, TGP's reliance on any aspect of the trenchless crossing analysis from the Constitution Pipeline is surprising. State regulators found the stubborn refusal of proponents of that pipeline to even evaluate trenchless crossings so unsubstantiated that they denied a Section 401 certification for the pipeline's proposed open-cut crossings, and a federal appellate court upheld that reasoning.[92] Like TGP does here,[93] the proponents of the Constitution Pipeline cited "industry recognized standard[s]" in refusing to further evaluate trenchless crossing methods.[94] New York regulators and the United States Court of Appeals for the Second Circuit alike rejected that reasoning. As the Second Circuit explained, "Industry preferences do not circumscribe environmental relevance."[95]

### 7. *TGP Has Not Presented a Sufficient Least Impactful Practicable Alternative Review of Rock Removal Alternatives, and TDEC Has Unlawfully Proposed to Delegate its Responsibility to Determine the Least Impactful Practicable Alternative to TGP.*

Even if TGP were to establish that a dry-ditch, open-cut crossing was the least impactful practicable alternative for any particular crossings (which it has not), its application would still

---

[89] ARAP Application at Attachment 9. Excepted where otherwise specifically noted, references to attachments to TGP's ARAP application refer to attachments submitted with TGP's July 22, 2023 application as available on TDEC's Dataviewer.
[90] *Id.*; *see generally Const. Pipeline Co.*, 868 F.3d at 102–03.
[91] ARAP Application at Attachment 9.
[92] *See generally Const. Pipeline Co.*, 868 F.3d at 102–03; *see also* Letter from John Ferguson, N.Y. State Dept. of Envtl. Conservation, to Lynda Schubring, Constitution Pipeline Company, LLC, Re: Joint Application: DEC Permit # 0-9999-00181/00024 Water Quality Certification/Notice of Denial (Apr. 22, 2016) (Exhibit 2).
[93] ARAP Application at 21 ("TGP evaluated various waterbody crossing alternatives that meet accepted pipeline construction using TGP standards and industry practices.").
[94] *Const. Pipeline Co.*, 868 F.3d at 102.
[95] *Id.* at 103.

AR 004679

fail to establish that its proposed *trenching* or rock removal methods are the least impactful practicable alternative at each site.[96]

TGP has identified blasting as the rock removal method for 29 stream crossings, with 20 additional locations as "Candidate[s] for Blasting."[97] But, as Silvis observes, in-stream blasting:

> is the most destructive and potentially environmentally damaging of all waterbody crossing methods. Blasting causes permanent changes to stream channel roughness, composition, and function, and may cause deposition of rock debris in channel. Blasting also may cause fissures, crack, and other alteration of subsurface structure that can lead to hydrologic losses. Additionally, blasting creates dust that may deposit in-stream and contribute to increased turbidity and sedimentation.[98]

Because Tennessee rules require that the least impactful practicable alternative be selected among activity alternatives, and because in-stream blasting yields devastating impacts, TDEC cannot authorize TGP to blast trenches through the streams in its path without an independently verified demonstration that no other rock removal options are practicable.

TGP's application does not even try to make that demonstration. Instead, it seeks to allow field construction contractors to make decisions about blasting on the fly.[99] That delegation of a practicable alternatives analysis to crews in the field is extremely alarming. In expert environmental engineer Silvis's "professional opinion, allowing contractors to make decision on the fly results in increased probability of negative impacts to aquatic resources."[100]

TGP's ARAP application identifies five options for rock removal: conventional excavation with an excavator, ripping with an excavator equipped with a ripping tooth, hammering, use of a rock trencher, or blasting.[101] TGP concedes that, because of its environmental risks,  blasting "is not generally considered to be the LEDPA at locations where other methods are feasible and practicable."[102] Nonetheless, TGP does not present TDEC with a

---

[96] Silvis (2023) at 7 (Exhibit 1).

[97] In Table 10-5.1 of its ARAP application, Tennessee Gas identifies 28 stream crossings as "Candidate[s] for Blasting" ARAP Application at Table 10.5-1. And in Attachment 3 to its ARAP Application, TGP expressly identifies blasting as the trenching method for 29 dry-ditch, open-cut crossings. Attachment 3 at 59–191. Only eight of those crossings appear on both lists— SDKA006, SDKA008, SDKA058, SDKA050, SDKA051, SDKA049, SDKA053, and SDKA005. *Compare* ARAP Application at Table 10.5-1 *with id.*, Attachment 3 at 59–191. Accordingly, TGP's ARAP application targets 49 streams for blasting.

[98] Silvis (2023) at 7 (Exhibit 1).

[99] ARAP Application at 13.

[100] Silvis (2023) at 7 (Exhibit 1).

[101] ARAP Application at 13.

[102] *Id.* at 32.

AR  004680

crossing-by-crossing analysis of whether the other identified methods are practicable. Instead, TGP says it will leave that task to its construction contractor.[103]

As a result, TDEC cannot issue the permit sought by TGP. The time to identify the least impactful practicable alternative is in the permit application and review process—not on the bank of a stream with the key to an excavator in one hand and an explosive in the other. TGP invited TDEC to delegate its obligation to verify the least impactful practicable alternative to its construction crews—who will be far more susceptible to time and cost pressures in their on-the-fly evaluation of what is "practicable." Fortunately for the streams in the path of the Cumberland Pipeline, TDEC cannot so-delegate its responsibilities under its rules governing ARAP permits. Because TDEC cannot issue a permit if there is a practicable alternative to the stream blasting that would have less adverse impact on resource values,[104] TDEC must make the practicable alternatives determination *before* permit issuance.

TDEC has not done so here. Rather, it has accepted TGP's invitation to delegate the practicable alternatives determination to its field crews.[105] Special Condition g of the Draft ARAP empowers TGP to "select the least impactful practicable trenching technique for each stream crossing."[106] That wholesale abdication of TDEC's regulatory obligations is contrary to law and cannot be part of any final permit TDEC issues. TDEC must determine the least impactful practicable trenching technique *before* permit issuance, or else deny the permit for insufficient information.

Moreover, TGP's scheme to allow its construction crew to evaluate and attempt a minimum of *one* alternative rock-removal method before resorting to blasting[107] (and TDEC's acceptance of that scheme)[108] is inconsistent with what TDEC initially told TGP it would require. In its November 3, 2022 request for additional information, TDEC told TGP that review of its application could not resume until, among other things, TGP accepted TDEC's requirement "that the contractor evaluate and attempt *all* non-blasting techniques at each stream crossing[.]"[109] In its response to TDEC, TGP reserved the right to unilaterally deem a non-blasting technique as impracticable based on its contractors' evaluation of technical considerations *and cost*.[110] That response further emphasizes that TGP is uninterested in evaluating the practicability of alternatives to blasting during the application and permitting

---

[103] *Id.* at 13.

[104] Tenn. Comp. R. & Regs. 0400-07-.04(5)(b).

[105] Draft ARAP at 33–34.

[106] *Id.* at 11–12.

[107] *Id.*

[108] Draft ARAP at 12.

[109] Letter from Claire Wainwright, PhD, Natural Resources Unit, Tenn. Dept. of Envt. & Conservation, to Gina Dorsey, TGP Pipeline, LLC, Re: Request for Additional Information at 3 (Nov. 3, 2022) (Exhibit 9).

[110] Letter from Blake Amos, TGP Pipeline Company, LLC, to Claire Wainright, PhD, Tenn. Dept. of Envl. & Conservation, Re: Request for Additional Information Response, Enclosure at 14 (Dec. 1, 2022) (Exhibit 10).

AR  004681

process, and wants to maintain the flexibility to allow construction contractors to make on-the-fly judgment calls based on their perceptions of "cost," notwithstanding the technical practicability of the alternatives. As explained above, however, TDEC's rules, require the practicable alternative be determined *before* a permit is issued and does not permit that evaluation to be deferred to a later date or deferred to the discretion of an unaccountable construction contractor.[111] Nonetheless, TDEC impermissibly retreated from its position that all non-blasting techniques be evaluated and attempted without explanation. That is arbitrary and capricious.[112]

Finally, TDEC's conclusions in the draft ARAP about blasting in streams with karst features or with potential for hydrologic loss are contradicted by the record and must be revised. draft Special Condition h.4 states:

> Blasting will not be used in Tennessee jurisdictional waters characterized by karst-prone geology with an unacceptable risk of hydrologic loss, as identified in the Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "Aquatic Resource Alteration Permit (ARAP) Application and State 401 Water Quality Permit" submitted to the Division on July 22, 2022 as part of the initial permit application package.[113]

And TDEC's draft ARAP quotes TGP's ARAP application as asserting that blasting "will be considered in non-karst areas or in wetlands or streams with an unacceptable risk of hydrologic loss."[114]

Neither the draft ARAP nor TGP's ARAP application define "an unacceptable risk of hydrologic loss." Nonetheless, TGP identifies Nesbitt Branch (Stream ID No. SDKB008 as a stream at "high" risk of hydrologic loss from a dry-ditch, open cut crossing, and yet names it as a "Candidate for Blasting" anyway.[115] And TGP identifies six other streams as "Candidate[s] for Blasting" that have a "medium" risk of hydrologic loss.[116]

Attachment 3 to TGP's ARAP application also contradicts the TDEC's draft ARAP. In that attachment, TGP identifies blasting as the trenching method for 29 crossings, 21 of which have the potential for karst and 20 of which have a "high" or "medium" potential for hydrologic loss.[117] Moreover, Attachment 3 leaves open the possibility for blasting at 78 crossings, 62 of

---

[111] *See* Tenn. Comp. R. & Regs. 0400-40-07-.04(5)(b).
[112] *See Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582, 594–95 (4th Cir. 2018) (holding agency action arbitrary and capricious where agency abandoned concerns about applicant's proposals without explanation of how those concerns had been alleviated).
[113] Draft ARAP at 12.
[114] *Id.* at 40 (quoting ARAP Application at 24).
[115] ARAP Application at 36.
[116] *Id.* at 32–33.
[117] ARAP Application at Attachment 3 at 59–191.

AR 004682

which have the potential for karst, and 13 of which have a "high" or "medium" potential for hydrologic loss.[118]

TGP's plans to blast through a significant number of streams in karst-prone areas and with a high or medium risk of hydrologic loss contradicts TDEC's draft ARAP. TDEC must address those inconsistencies *before* it makes a permitting decision, rather than turning TGP's blasting crews loose in Tennessee's waters empowered to decide on their own when and where to blast.

## B. TGP CANNOT ESTABLISH THAT THERE ARE NOT LESS ENVIRONMENTALLY DAMAGING PRACTICABLE ROUTE VARIATIONS.

As discussed elsewhere in these comments, TGP's limited discussion of routing alternatives does not provide the requisite level of detail for TDEC's' alternatives analysis. TGP must examine whether there are major or minor routing alternatives that will allow it to avoid certain resources, including by crossing waterbodies at locations that would have fewer impacts.

Tenn. Comp. R. & Regs. 0400-40-07-.01(1) and 0400-40-07-.04(5)(b) imposes an obligation on the applicant to consider actions to minimize adverse effects through the loss of resource values. Resource values are those "physical, chemical, and biological properties of the water resource that help maintain classified uses" and include qualities such as "[p]rovid[ing] habitat for fish, aquatic life, and wildlife," "[p]revent[ing] the entry of pollutants into downstream waters," and "[f]ilter[ing], settl[ing] and/or eliminat[ing] pollutants."[119] And to ensure it has chosen the least impactful practicable alternative, the applicant must reduce the effects of the discharge through its choice of disposal site.[120] Accordingly, TGP is obligated to evaluate routing alternatives that would avoid negatively impacting these resource value, and it must do so on a crossing-by-crossing basis. That is, it must look at each crossing and determine whether modest alignment changes would allow it to select a crossing location with fewer environmental impacts or avoid the aquatic resource entirely. For most stream and wetland resources, there is no evidence in the application that TGP has done so.

TGP's ARAP application presents only thirteen "minor route variations."[121] Of those thirteen, only three discuss *avoidance* of aquatic resources.[122] Two other minor route variations appear to address minimization of impacts to aquatic resources because their stated purpose was to allow "more perpendicular" dry-ditch, open-cut stream crossings.[123] Although insufficient to

---

[118] *Id.* Attachment 3 at 59–285.

[119] Tenn. Comp. R. & Regs. 0400-40-07-.03(25).

[120] *Cf.* 40 C.F.R. § 230.70.

[121] ARAP Application at 18–21; Draft ARAP at 37–38.

[122] A route variation at milepost 12.5 avoids a "pond," a route variation at milepost 16.5 avoids a "spring," and a route variation at milepost 25 "avoids difficult side slope and stream construction." ARAP Application at 19–20.

[123] A route variation at milepost 22.7 allows for more perpendicular crossings of two unnamed tributaries of Yellow Creek and a route variation at milepost 26 allows for a more perpendicular crossing of Guices Creek. *Id.* at 20.

constitute a complete alternatives analysis because they only address a handful of streams, those minor route variations nonetheless establish that TGP can avoid or minimize impacts to aquatic resources through minor route variations. For example, the route variation at milepost 12.5 to avoid a pond adds only *38 feet* to the length of the Cumberland Pipeline.[124]

Moreover, TGP says in its application that it "will continue to consider multiple minor route variations" and that it "continues to refine the pipeline route and address route variations."[125] Thus, TGP in essence concedes that additional minor route variations to avoid or minimize effects on waters of the United States that are practicable and less environmentally damaging may exist. TGP should have evaluated minor route variations at each crossing *before* it submitted its ARAP application. Because TGP did not do so, its application fails to provide sufficient detail to determine whether there are practicable routing alternatives under Tenn. Comp. R. & Regs. 0400-40-07-.04(5)(b). Accordingly, TDEC should deny the application.

## C. TGP'S APPLICATION IS INCOMPLETE BECAUSE IT FAILS TO ENGAGE IN A PRACTICABLE ALTERNATIVES ANALYSIS FOR ROAD CROSSINGS.

Another fatal deficiency in TGP's application is that it presents no crossing-by-crossing determination of whether the proposed road crossings use the least environmentally damaging practicable alternative or are at the least environmentally damaging location.

TGP has proposed 18 access road crossings of streams and wet weather conveyances, and one of a wetland.[126] Yet TGP's application provides no site-specific information about road crossing methods. Silvis (2023) concludes that "[t]he preferred access road method for avoidance of environmental impacts is spanning from dry ground beyond the existing top-of-bank on both sides of stream."[127] TGP provides no alternatives analysis of the practicability of spanning each of its proposed road crossings or indicates whether it intends to do otherwise. As Silvis observes, "TGP provides no detail on how its road crossings would be accomplished nor how the non-bridging options would be designed to reduce the likelihood of permanent impacts."[128] Silvis further identifies the advantages and disadvantages of a series of road crossing alternatives.[129]

Without both explaining what technique it will use at each road crossing and justifying that selection as the practicable alternative which will have the least adverse impact on resource values at each crossing, TGP cannot carry its burden to provide sufficient information to establish that the proposed discharges associated with its road crossings comply with TDEC rules governing individual ARAPs.

---

[124] *Id.* at 19.
[125] *Id.* at 17.
[126] ARAP Application Attachment 1.
[127] Silvis (2023) at 13 (Exhibit 1).
[128] *Id.*
[129] *Id.*, tbl. 3.

AR  004684

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **22** of **69**

## II. TDEC MUST DENY TGP'S REQUEST FOR AN INDIVIDUAL ARAP PERMIT BECAUSE THE PROPOSED DISCHARGES WILL UNLAWFULLY CAUSE OR CONTRIBUTE TO WATER QUALITY STANDARDS VIOLATIONS AND WILL CAUSE UNMITIGATED APPRECIABLE PERMANENT LOSS OF RESOURCE VALUES.

Under Tenn. Comp. R. & Regs. 0400-40-03-.05(6), "all discharges of . . . waste shall receive the degree of treatment or effluent reduction necessary to comply with water quality standards."[130] Moreover, federal regulations governing Section 401 certifications require state certifying authorities to determine whether discharges from a proposed project will comply with water quality requirements,[131] and define "water quality requirements" to include, *inter alia*, state water quality standards and other state "regulatory requirements for point source discharges into waters of the United States."[132] TDEC's draft ARAP does not include that required determination, or an analysis of the proposed project's effects on all the applicable water quality standards. And TDEC cannot reasonably conclude that the proposed discharges will comply with all water quality requirements, including state water quality standards based on the known and demonstrated effects of open-cut, dry-ditch pipeline crossings.

The applicable water quality standards at issue here include the narrative water quality criteria adopted by the State of Tennessee to protect uses such as the propagation and maintenance of aquatic life and the enjoyment of scenic and aesthetic qualities of waters, as well as Tennessee's Antidegradation Statement.[133] An additional water quality requirement is the prohibition against unmitigated appreciable permanent losses of resource values.[134]

---

[130] *See* Tenn. Comp. R. & Regs. 0400-40-03-.02(1). "Waste" is defined in the Tennessee Water Quality Control Act to include substances such as decayed wood, sand, silt, and rock and therefore would apply to TGP's construction discharges here. *See* Tenn. Code Ann. § 69-3-103(24).

[131] 40 C.F.R. § 121.7(b).

[132] *Id.* § 121.1(n).

[133] Specifically, and as discussed further below, those water quality standards include, *inter alia*:

- Tennessee's designated uses such as "sources of water supply for domestic and industrial purposes; propagation and maintenance of fish and other aquatic life; recreation in and on the waters including the safe consumption of fish and shellfish; livestock watering and irrigation; navigation; generation of power; propagation and maintenance of wildlife; and the enjoyment of scenic and aesthetic qualities of waters." Tenn. Comp. R. & Regs 0400-40-3-.02(2);
- Tennessee water quality criteria that prohibit distinctly visible solids, the formation of bottom deposits, and turbidity and total suspended solids. *See, e.g.*, Tenn. Comp. R. & Regs. 0400-40-03-.03(1)(e)–(f); *id.* at 0400-40-03-.03(2)(e)–(f); *id.* at 0400-40-03-.03(3)(c)–(d); *id.* at 0400-40-03-.03(4)(c)–(d); *id.* at 0400-40-03-.03(5)(d); *id.* at 0400-40-03-.03(6)(d); *id.* at 0400-40-03-.03(7)(a); and
- Tennessee's Antidegradation Statement. *Id.* at 0400-40-03-.06.

[134] Tenn. Comp. R. and Regs. 0400-40-07-.04(6)(c).

AR 004685

As explained below, because TGP's discharges will cause or contribute to both water quality standards violations and unmitigated appreciable permanent losses to resource values, TDEC cannot issue the permit sought by TGP.

## A.  TGP UNDERSTATES THE IMPACTS ON WATER QUALITY, AQUATIC LIFE, AND AQUATIC ECOSYSTEMS FROM DRY-DITCH, OPEN-CUT CROSSINGS.

TGP asserts, without support, that "Project activities will not result in permanent alterations to streams and wetlands" and that impacts "will be limited to *short-term and localized* alterations" and "temporary" impacts[135] TGP also asserts that "[s]treams or wetland activities associated with this Project will result in no more than *de minimis* degradation and no appreciable permanent loss of resource values."[136] But those categorical assertions are not supported by either TGP's own application or the rest of the literature on the ecological effects of dry-ditch, open-cut stream crossings.[137] Contrary to TGP's repetition of the common industry refrain, the adverse environmental effects of dry-ditch, open-cut crossings are measured in years, not in days.[138]

On another proposed natural gas pipeline, the United States Fish and Wildlife Service ("FWS") reviewed the literature and recently concluded, in a February 2023 Biological Opinion ("BiOp") for the proposed Mountain Valley Pipeline ("MVP") project, that it should assume that "effects to benthic invertebrates in aquatic areas that receive significant increased sedimentation as a result of the MVP project will persist for up to four years."[139] That conclusion stands in stark contrast to TGP's prediction of "short term" and "temporary" impacts.[140]

A West Virginia-based FWS biologist examining proposed natural gas pipeline stream crossings once grew so frustrated by the industry refrain that "crossings have only temporary

---

[135] ARAP Application at 45 (emphasis added).

[136] *Id.*

[137] As one journal article that examined pipeline crossing effects concluded, "before authoritative statements concerning environmental impact can be made[,] it is essential to have knowledge of the natural variation associated to be expected in streams of differing characteristics." P. D. Armitage & R. J. M. Gunn, *Differential Response of Benthos to Natural and Anthropogenic Disturbances in 3 Lowland Streams*, 81 INT'L REV. HYDROBIOLOGY 161 (1996) [hereinafter "Armitage & Gunn (1996)"] (Exhibit 11).

[138] *See, e.g.*, U.S. Fish and Wildlife Serv., Mountain Valley Pipeline, LLC; Revised Biological Opinion 191 (Feb. 28, 2023) [hereinafter "BiOp"] (Exhibit 12) (assuming sedimentation effects on benthics to persist for up to four years). Others have found adverse effects that persist "2-4 years after the construction of water crossings in areas with open forest canopies." Scott M. Reid & Paul G. Anderson, *Effects of Sediment Released During Open-Cut Pipeline Water Crossings*, 24 CANADIAN WATER RES. J. 235, 243 (1999) [hereinafter "Reid & Anderson (1999)"] (Exhibit 13). And Silvis concludes that the impacts associated with sediment deposits from dry-ditch, open-cut crossings can be permanent. Silvis (2023) at 2–5 (Exhibit 1).

[139] BiOp at 191 (Exhibit 12).

[140] ARAP Application at 45.

AR 004686

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **24** of **69**

impacts to the stream" that she felt it necessary to develop her own literature review to push back against that refrain.[141] The following is her summary of the literature:

> Pipeline stream crossings can affect fish habitat; food availability; and fish behavior, health, reproduction and survival. The most immediate effect of instream construction is the creation of short term pulses of highly turbid water and total suspended sediments (TSS) downstream of construction (Levesque & Dube 2007, pp. 399-400). Although these pulses are usually of relatively short duration and there is typically a rapid return to background conditions after activities cease, **instream construction has been shown to have considerable effects on stream substrates and benthic invert[ebrate] communities that persist after construction has been completed** (Levesque & Dube 2007, p. 396-397). Commonly documented effects include substrate compaction and silt deposition within the direct impact area and downstream that fills interstitial spaces in gravel substrates and reduces water flow through the substrate, this increases substrate embeddedness and reduces habitat quality (Levesque & Dube 2007, pp. 396-397; Penkal & Phillips 2011, pp. 6-7; Reid & Anderson 1999, p. 243). Construction also directly alters stream channels, beds, and banks resulting in changes in cover, channel morphology, and sediment transport dynamics. Streambank alterations can lead to increased water velocities, stream degradation, and migrations in stream channel. Removal of vegetation from the banks can change temperature regimes, and increase sediment and nutrient loads (Penkal & Phillips 2011, pp. 6-7).
>
> These instream changes not only directly affect the suitability of fish habitat, they also affect the availability and quality of fish forage altering the composition and reducing the density of benthic invertebrate communities within and downstream of the construction area (Levesque & Dube 2007, pp. 396-399; Penkal & Phillips 2011, pp. 6-7; Reid & Anderson 1999, pp. 235, 244). **Various studies have documented adverse effects to the benthic community that have been apparent for between six months and four years post-construction** (Levesque & Dube 2007, pp. 399-400; Reid & Anderson 1999, pp. 235, 244). Stream crossings have also been shown to affect fish physiology, survival, growth, and reproductive success (Levesque & Dube 2007, p. 399). Studies have found decreased abundance of fish downstream of crossings, as well as signs of physiological stress such as increased oxygen consumption and loss of equilibrium in remaining fish downstream of crossings (Levesque & Dube 2007, pp. 399-401; Reid & Anderson 1999, pp. 244-245). Increased sediment deposition and substrate compaction from pipeline crossings can degrade spawning habitat, result in the production of fewer and smaller fish eggs, impair egg and larvae development, limit food availability for young-of-year fish, and increase stress and reduce disease resistance of fish, (Levesque & Dube 2007, pp. 401-402; Reid & Anderson 1999, pp. 244- 245).

---

[141] Email from Barbara Douglas, Sr. Endangered Species Biologist, W. Va. Field Office, U.S. Fish & Wildlife Serv., to Cindy Shulz, U.S. Fish & Wildlife Serv. (Dec. 11, 2019, 11:44 AM) (Exhibit 14).

AR 004687

The duration and severity of these effects depends on factors such as the duration of disturbance, the length of stream segment directly impacted by construction, and whether there were repeated disturbances (Yount & Niemi 1999, p. 557). Most studies documented recovery of the affected stream reach within one to three years after construction (Reid & Anderson 1999, p. 247; Yount & Niemi 1999, pp. 557-558, 562). **However caution should be used when interpreting results of short-term studies. Yount & Niemi (1999, p. 558) cite an example of one study that made a preliminary determination of stream recovery within one year, but when the site was re-examined six years later, fish biomass, fish populations, macroinvertebrate densities, and species composition were still changing. It was suspected that shifts in sediment and nutrient inputs to the site as a result of construction in and around the stream contributed to the long-term lack of recovery. In another study, alterations in channel morphology, such as increased channel width and reduced water depth, were evident two to four years post-construction at sites that lacked an intact forest canopy** (Reid & Anderson 1999, p. 243). There is also the potential for cumulative effects. **While a single crossing may have only short-term or minor effects, multiple crossings or multiple sources of disturbance and sedimentation in a watershed can have cumulative effects on fish survival and reproduction that exceed the recovery capacity of the river, resulting in permanent detrimental effects** (Levesque & Dube 2007, pp. 406-407). Whether or how quickly a stream population recovers depends on factors such as the life history characteristics of the species, and the availability of unaffected populations upstream and downstream as a source of organisms for recolonization (Yount & Niemi 1999, p. 547). Species such as the diamond darter that are particularly susceptible to the effects of sedimentation and substrate embeddedness, and that have limited distribution and population numbers are likely to be more severely affected by instream disturbances than other more common and resilient species.[142]

And yet another FWS scientist (J.M. Castro) similarly concluded that there are significant and long-term effects from dry-ditch, open-cut pipeline crossings, stating, "Based on past experience at pipeline crossings, the potential for both short and long-term negative impacts on aquatic habitat and species is substantial."[143] Such impacts include both short-term, construction related impacts, such as increased turbidity, direct modification of aquatic habitat, and the potential for hydrocarbons to enter the stream through equipment failures and spills (Reid and Anderson, 1999; Reid *et al*, 2002a, 2002b), and long-term impacts that are more directly associated with the stream's response potential, such as channel incision and lateral migration (Thorne *et al.*, 2014).[144]

---

[142] *Id.* (emphasis added).

[143] J.M. Castro et al., *Risk-Based Approach to Designing and Reviewing Pipeline Stream Crossings to Minimize Impacts to Aquatic Habitats and Species*, 31 River Rsch. & Applications 767 (2015) [hereinafter "Castro et al. (2015)"] (Exhibit 15).

[144] *Id.*

AR 004688

Among other things, Castro concludes that "the effects of proposed and existing pipeline crossings on aquatic systems are significant because each pipeline may have hundreds or even thousands of stream crossings (Levy, 2009)[.]"[145]

These FWS scientists' conclusions are well-supported by the scientific literature. Open-cut, trenched crossings have long-term and substantial effects on water quality, stream structure, and aquatic life. As early as 1984, scientists recognized the substantial effects on water quality and aquatic life that open-cut trenches through streams can have. Penkal and Phillips (1984) state, "Because of the magnitude of pipeline projects, the number of waterways involved, the high quality of fishery resources in many of these waterways, and the potential for impacts to fisheries from spills or construction activities, safeguards must be adopted to protect these important resources."[146] They further state:

> Fishery habitat may be adversely affected by sedimentation from pipeline construction. Sedimentation can occur from (1) trenching to lay pipeline beneath the stream channel, (2) runoff at construction sites, (3) erosion resulting from construction of culverts, roads, bridges, or fords, and (4) hydrostatic testing. Additionally, silt or sand deposition can fill interstices in gravel and reduce water flow through substrate. Equipment operating in the stream can compact substrate, create sediment, and eliminate spawning habitat.[147]

Accordingly, they ultimately conclude that "[c]onstruction and operation of pipelines can cause significant damage to aquatic habitats and fishery resources."[148]

The seminal, peer-reviewed article on the effects of dry-ditch, open-cut crossings reaches similar conclusions. Lévesque and Dubé, in their 2007 *Review of the Effects of In-Stream Pipeline Crossing Construction on Aquatic Ecosystems and Examination of Canadian Methodologies for Impact Assessment*, found the following:

- "Pipeline crossing construction is shown to not only compromise the integrity of the physical and chemical nature of fish habitat, but also to affect biological habitat (e.g., benthic invertebrates and invertebrate drift), and fish behavior and physiology. Indicators of effect include: water quality (total suspended solids TSS), physical habitat (substrate particle size, channel morphology), benthic invertebrate community structure and drift (abundance, species composition, diversity, standing crop), and fish behavior and physiology (hierarchy, feeding, respiration rate, loss of equilibrium, blood hematocrit and leukocrit levels, heart rate and stroke volume)."[149]

---

[145] *Id.*

[146] Russ F. Penkal & Glenn R. Phillips, *Construction and Operation of Oil and Gas Pipelines*, 9 FISHERIES 6 (1984) [hereinafter "Penkal & Philips (1984)"] (Exhibit 16).

[147] *Id.*

[148] *Id.* at 8.

[149] Lévesque and Dubé, *Review of the Effects of In-stream Pipeline Crossing Construction on Aquatic Ecosystems and Examination of Canadian Methodologies for Impact Assessment*, 132

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **27** of **69**

- "Construction activities alter river and stream channel beds and banks, directly and indirectly affecting fish and fish habitat."[150]
- "[Dry-ditch, open-cut methods] may impact watercourse ecosystems both during, and for potentially some time after, construction. All in-stream construction activities, particularly trench excavation and pipeline installation and backfill, result in disturbance of channel bed and banks, and have the potential to alter suspended sediment concentration and sedimentation."[151]
- "[A]ny in-stream construction activity has the potential to impact aquatic ecosystems through alteration of stream and river bed and banks and, therefore, may result in direct effects such as physical alteration of channel morphology and habitat, and indirect effects such as alteration of water quality and sediment dynamics, on aquatic ecosystems (e.g., Alberta Environment 2001; Alberta Transportation and Utilities 2000)."[152]
- Even with dry-ditch, open-cut methods, "[m]ean TSS concentrations increased by between 4 and 100 mg l$^{-1}$ above background. Installation of dams and flumes for water diversion generated TSS concentrations on average less than 76 mg l$^{-1}$ greater than background over periods of 2 to 16.5 h (with one crossing experiencing an increase of 520 mg l$^{-1}$ for 3 h). Removal of dams and flumes resulted in TSS increases of between 1 and 703 mg l$^{-1}$ downstream of construction over periods of 20 min to 6.5 hrs. Other stages of construction were associated with average TSS increases of less than 8 mg l$^{-1}$, with the exception of accidental leaks from construction infrastructure (e.g., 820 mg l$^{-1}$ over 5.5 h). Plumes of highly turbid water were observed downstream of construction[.]"[153]
- "Armitage and Gunn (1996) noted that pipeline crossing construction in a stream in England resulted in a shift in invertebrate species due to an increased proportion of silt in stream substrates. This effect persisted for four years until a high magnitude flow event scoured the stream channel bed, promoting re-establishment of pre-construction invertebrate species. Tsui and McCart (1981) found that crossing construction of Archibald Creek, British Columbia, caused short-term increases in silt and sand accumulations and decreases in invertebrate standing crop and diversity, which lasted 1 to 2 years."[154]
- "The potential for cumulative effects associated with pipeline crossing construction should be taken into consideration in assessing the impacts of these activities on rivers and streams. Construction of a single crossing on a stream or river, or within a watershed, may not have significant effects on fish and fish habitat in that system. **Construction of multiple crossings on a stream or river, or within a watershed, however, has the potential for cumulative effects on that system. In such cases,**

---

ENVTL. MONITORING & ASSESSMENT 395, 406–07 (2007) [hereinafter "Lévesque and Dubé (2007)"] (Exhibit 17).

[150] *Id.*
[151] *Id.* at 396.
[152] *Id.*
[153] *Id.* at 398.
[154] *Id.* at 399.

AR 004690

> **the capacity of the system to recover from impact may be exceeded, and the detrimental effects of crossing construction permanent. The same may be said for the frequency of crossing construction within a given system; rivers and streams will have limited capacities to recover from multiple impacts. As well, recurrent stresses on fish, such as those that originate from elevated suspended sediment concentrations, may have cumulative effects on fish health, survival and reproduction. The long-term effects of such impacts are not well known at this time (Reid et al. 2003).[155]**

Following their own reviews of the literature, Hansen and Betcher (2021) and Silvis (2023) concur that the effects of dry-ditch, open-cut crossings are substantial and long-term. Hansen and Betcher (2021) recognize that data on those effects are "sparse" in the literature, but that the available data in the literature does substantiate long-term effects.[156] And Silvis (2023) describes those effects this way:

> Immediate environmental impacts associated with dry-ditch open-cut methods include death of all fish and benthic macroinvertebrates within the work area and increased turbidity and suspended sediment loads when the diversion is installed, for the duration of the disturbance, as well as when flow is returned to the disturbed channel bed . . . There are long-term increases in sedimentation due to stream bank and upland disturbances until vegetation can be re-established. Increased turbidity and high suspended sediment loads can cause long-term impacts to invertebrate communities downstream of the disturbance including reducing invertebrate biomass, growth rates, and species diversity and increasing invertebrate mortality. Increased suspended and deposited sediment causes negative impacts in fish populations as well. These impacts can include smothering of fish eggs, changes in stream bed characteristics which can reduce reproductive success, reduction of juvenile survival rates, reduction of food sources, as well as reduction in in-stream dissolved oxygen which causes respiratory distress.[157]

Based on her "experience in stream restoration, hydrology, stream geomorphology, and erosion and sediment control," Silvis concludes "that there are significant permanent impacts associated with trenched methods of stream and wetland crossings."[158]

---

[155] *Id.* at 406–07.

[156] Evan Hansen & Meghan Betcher, *Sediment Generation and Impacts from Dry-Ditch Open-Cut Stream Crossings Such as Those Proposed for the Mountain Valley Pipeline* 6 (May 26, 2021) [hereinafter "Hansen & Betcher (2021)"] (Exhibit 18). That "paucity of current, data-driven documentation of the long-term impacts" requires that, for permitting purposes, an evaluation "at each individual stream [is required] due to stream-specific factors that influence the duration of stream channel and aquatic life impacts." *Id.* at 2.

[157] Silvis (2023) at 3 (Exhibit 1).

[158] *Id.* at 2.

AR 004691

The inherent adverse effects of dry-ditch, open-cut crossings are exacerbated by improper application of protective measures. Even industry consultants acknowledge:

> The effectiveness of isolated crossing methods is dependent on proper design and application. Reported construction related difficulties include (1) pump failure or insufficient capacity, (2) dam or flume failure, (3) poor dam seal, (4) poor containment of pumped ditch water, and (5) inadequate maintenance of sediment control measures (Macks et al. 1997; CPWCC 1999; this study). During dam and pump crossings, construction related difficulties that resulted in large increases to downstream TSS concentrations were rare (1 of 23 crossings). Alternatively, such difficulties resulted in large increases in downstream TSS concentrations (60-1848 mg L$^{-1}$) during 5 of the 12 flumed crossings. Poor containment of pumped ditch water and poor dam seals were the causes. Flumed crossings are often applied to larger watercourses than dam and pump crossings. Larger water crossings require longer periods of instream activity and the control of larger volumes of both streamflow and trench water. Both characteristics increase the risk of sediment being released into the watercourse (Reid et al. 2002*b*, 2002*c*).[159]

Accordingly, there are a multitude of ways that dry-ditch, open-cut crossings can go wrong, and TDEC cannot rationally assume that TGP will flawlessly construct hundreds of such crossings. Rather, TDEC should expect multiple incidents with impermissible adverse effects, individually and cumulatively, on water quality and aquatic life.

TGP's mischaracterization of the effects of its proposed dry-ditch, open-cut crossings is important because TDEC must certify that TGP's discharges will comply with all water quality standards[160] and because Tennessee rules forbid unmitigated appreciable permanent losses of resource values.[161] Given that a complete review of the literature reveals that dry-ditch, open-cut crossings have substantial and long-term adverse impacts on waterbodies and aquatic life, TDEC cannot issue an individual ARAP or Section 401 certification to TGP.

## B. THE CUMBERLAND PROJECT WILL CAUSE OR CONTRIBUTE TO VIOLATIONS OF STATE WATER QUALITY STANDARDS.

The Tennessee Water Quality Control Act requires that issued discharge permits contain "the most stringent effluent limitations . . . required to implement any applicable water quality standards."[162] And Clean Water Act § 401 and its implementing regulations require that a state evaluate compliance with water quality standards before certifying a project requiring a federal

---

[159] S. M. Reid et al., *Sediment Entrainment During Pipeline Water Crossing Construction: Predictive Models and Crossing Method Comparison*, 3 J. ENV'T ENG. & SCI. 81, 82 (2004) [hereinafter "Reid et al. (2004)"] (Exhibit 19).

[160] 40 C.F.R. § 121.7(b).

[161] Tenn. Comp. R. & Regs. 0400-40-03-.05(6). TGP's understatement of the significance of the potential environmental impacts is also relevant to its practicable alternatives analysis as discussed above.

[162] Tenn. Code Ann. § 69-3-108(g)(4).

license.[163] The relevant water quality standards here are the Tennessee's water quality criteria protecting designated uses from sedimentation and turbidity, as well as the state's Antidegradation Statement. The scientific literature discussed above establishes that TGP will cause or contribute to violations of those standards.

### 1. *TGP's Stream Crossings Will Cause or Contribute to Violations of Tennessee's Narrative Water Quality Standards.*

Tennessee's narrative water quality criteria prohibit "distinctly visible solids . . . or the formation of . . . bottom deposits of such size or character as may" impair designated uses.[164] They also prohibit turbidity in amounts that would impair designated uses.[165]

Violations of those narrative standards can be assessed in numerous ways. For example, violations of the narrative criteria protecting the recreational and aesthetic uses of a stream can be assessed visually, since those criteria prohibit "total suspended solids, turbidity, or color in such amounts or character that will result in *any objectionable appearance to the water.*"[166] And because it is a fundamental principal under the Clean Water Act that water quality standards "are legally required to be met [at] all times,"[167] even short-term or temporary objectional appearances are prohibited.

Moreover, compliance with water quality standards can be assessed through biological assessments of particular waters, including benthic monitoring.[168] Once a violation of the

---

[163] 33 U.S.C. § 1341(a); 40 C.F.R. § 121.7(b); *Sierra Club*, 64 F.4th at 502.

[164] Tenn. Comp. R. & Regs. 0400-40-03-.03(1)(e); *id.* at 0400-40-03-.03(2)(e); *id.* at 0400-40-03-.03(3)(c); *id.* at 0400-40-03-.03(4)(c); *id.* at 0400-40-03-.03(5)(d); *id.* at 0400-40-03-.03(6)(d). For example, the narrative standard protecting the recreational use of Tennessee's waters prohibits such visible solids or deposits "that may be detrimental to recreation." *Id.* at 0400-40-03-.03(4)(c).

[165] *Id.* at 0400-40-03-.03(1)(f); *id.* at 0400-40-03-.03(2)(f); *id.* at 0400-40-03-.03(3)(d); *id.* at 0400-40-03-.03(4)(d). For example, the narrative standard protecting the fish and aquatic life use of Tennessee's waters prohibits "turbidity, total suspended solids, or color in such amounts or of such character that will material affect fish and aquatic life." *Id.* at 0400-40-03-.03(3)(d). And the narrative standard protecting the recreational use of Tennessee's waters prohibits "total suspended solids, turbidity, or color in such amounts or character that will result in *any objectionable appearance to the water.*" *Id.* at 0400-40-03-.03(4)(d) (emphasis added).

[166] *Id.* at 0400-40-03-.03(4)(d).

[167] *Sierra Club*, 64 F.4th at 503 (quoting 49 Fed. Reg. 37,998, 38,038 (Sept. 26, 1984)).

[168] *See* Tenn. Comp. R. & Regs. 0400-40-03-.03(3)(m); TDEC, *Quality System Standard Operating Procedure for Macroinvertebrate Stream Surveys, Control Number DWR-WP-P-01-QSSOP-Marcroinverts-122821* (2021); *see also Ohio Valley Envtl. Coalition, Inc. v. Pruitt*, 893 F.3d 225, 228 (4th Cir. 2018) (describing the West Virginia Stream Condition Index as a measure of compliance with narrative criteria); *Ohio Valley Envtl. Coalition v. Fola Coal Co.*, 845 F.3d 133, 138, 144 (4th Cir. 2017) (same); *Ohio Valley Envtl. Coalition, Inc. v. U.S. Army Corps of Eng'rs*, 716 F.3d 119, 124 (4th Cir. 2013) (explaining the use of benthic community metrics to determine that streams are biologically impaired); *S. Appalachian Mountain Stewards*

biological component of the narrative standards is found, its cause must be identified; sedimentation is frequently the stressor causing the impairment.[169]

Here, sedimentation from TGP's dry-ditch, open-cut crossings will contribute to violations of Tennessee's narrative water quality criteria. Those criteria prohibit floating solids, sediment deposits, total suspended solids, and turbidity.[170] The literature establishes that dry-ditch, open-cut crossings cause sediment deposits and visible turbidity plumes downstream from the crossing location.[171] For example, Reid and Anderson (1999) find that "large depositions in slow velocity areas such as shallow side pools, behind boulders and instream debris have been observed to require longer periods or higher flows for removal," and note that 30 cm deep deposits have been observed within 100 m of crossings.[172] And Lévesque, L.M., Dubé (2007) found that "[p]lumes of highly turbid water [have been] observed downstream of construction."[173] Such deposits and turbidity readily violate the relatively low threshold set by the narrative criteria protecting the recreational and aesthetic uses of Tennessee waters, which prohibit sediment deposits that "*may be detrimental to recreation*" and "suspended solids, turbidity or color in such amounts or character that will result in *any objectionable appearance to the water*[.]"[174]

Moreover, Tennessee's narrative criteria prohibit visible solids and sediment deposits that "*may be detrimental* to fish and aquatic life" and "turbidity, total suspended solids, or color in such amounts or of such character that will materially affect fish and aquatic life."[175] And the narrative criteria further provide:

> The waters shall not be modified through the addition of pollutants or through physical alteration to the extent that the diversity and/or productivity of aquatic biota within the receiving waters are substantially decreased or, in the case of wadeable streams, substantially different from conditions in reference streams in the same ecoregion.[176]

---

*v. Red River Coal Co., Inc.*, 420 F. Supp. 3d 481, 489 (W.D. Va. 2019) (explaining that Virginia's "narrative standards include a biological component that is assessed by, among other things, monitoring benthic invertebrates").

[169] *See, e.g.*, 2010 Release of CADDIS (Causal Analysis/Diagnosis Decision Information System), 75 Fed. Reg. 58,374 (Sept. 24, 2010).

[170] Tenn. Comp. R. & Regs. 0400-40-03-.03(1)(e)–(f); *id.* at 0400-40-03-.03(2)(e)–(f); *id.* at 0400-40-03-.03(3)(c)–(d); *id.* at 0400-40-03-.03(4)(c)–(d); *id.* at 0400-40-03-.03(5)(d); *id.* at 0400-40-03-.03(6)(d).

[171] Penkal & Phillips (1984) at 6 (Exhibit 16); Reid & Anderson (1999) at 242 (Exhibit 13).

[172] Reid & Anderson (1999) at 243 (Exhibit 13).

[173] Lévesque & Dubé (2007) at 398 (Exhibit 17).

[174] Tenn. Comp. R. & Regs. 0400-40-03-.03(4)(c)–(d) (emphasis added).

[175] *Id.* at 0400-40-03-.03(3)(c)–(d) (emphasis added).

[176] *Id.* at 0400-40-03-.03(3)(m).

AR  004694

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **32** of **69**

The literature establishes that dry-ditch, open-cut crossings cause such harm to fish and benthos.[177] As Hansen and Betcher (2021) conclude, sedimentation from pipeline construction:

> affects benthic macroinvertebrates in several ways: Sediment accumulation fills interstitial spaces used for refuge, decreases oxygen availability, and inhibits food sources (Harrison et al. 2007, Leitner et al. 2015). Some species are more susceptible to sediment impacts, which leads to a decrease in benthic biodiversity. Macroinvertebrates of the *Ephemeroptera*, *Plecoptera*, and *Trichoptera* orders are most impacted by sedimentation and are also important food sources for stream fish (Harrison et al. 2007).[178]

That is particularly true where, as here, there would be "multiple crossings on a stream or river, or within a watershed."[179] In those cases, "the detrimental effects of crossing construction [may be] permanent."[180]

The effects described above are more than theoretical. Such violations of state water quality standards caused by open-cut, dry-ditch pipeline crossings have been observed in recent years. For example, in 2019, the West Virginia Department of Environmental Protection ("WVDEP") entered a consent order to Columbia Gas Transmission, LLC, regarding water quality standards violations that occurred when that pipeline company allowed an upstream dam to fail on a dry-ditch, open-cut crossing of a trout stream in Pendleton County, West Virginia.[181] That particular crossing was using the dam-and-pump crossing method,[182] which is supposed to be less likely to fail than the flume crossing method.[183] WVDEP expressly found that the pipeline company had "cause[d] conditions not allowable [*i.e.*, a violation of West Virginia's

---

[177] Lévesque & Dubé (2007) at 395–96 (Exhibit 17); X. Yu et al., *Effects of Pipeline Construction on Wetland Ecosystems: Russia-China Oil Pipeline Project (Mohe-Daqing Section)*, 39 AMBIO 449 (2010) [hereinafter "Yu et al. (2010)"] (Exhibit 20) ("[P]ipeline crossing construction is shown to not only compromise with the integrity of the physical and chemical nature of fish habitat, but also to affect biological habitat and fish behavior and physiology (Lévesque, L.M., Dubé 2007), which will result in the avoidance movement of fish, altered distribution of populations (Newcombe and Jensen 1996) and reduce population size."); Penkal & Phillips (1984) at 7 (noting that blasting attendant to crossing construction kills fish; *id.* at 8 ("Construction and operation of pipelines can cause significant damage to aquatic habitats and fishery resources.") (Exhibit 16); Reid & Anderson (1999) at 244 (finding extirpation of benthic insects and reduced benthic diversity downstream of pipeline crossings) (Exhibit 13).

[178] Hansen & Betcher (2021) at 4 (Exhibit 18).

[179] Lévesque & Dubé (2007) at 406–07 (Exhibit 17). As discussed in Section III., *infra*, TGP proposes to cut several streams multiple times, and there are multiple of crossings in the same watershed in multiple important systems.

[180] Lévesque & Dubé (2007) at 406–07 (Exhibit 17).

[181] Consent Order Issued Under the West Virginia Water Pollution Control Act to Columbia Gas Transmission, LLC (Jan. 28, 2019) [hereinafter, "Columbia Gas Consent Order"] (Exhibit 21).

[182] *Id.*

[183] Reid et al. (2004) at 87 (Exhibit 19).

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **33** of **69**

narrative water quality criteria] by creating distinctly visible settleable solids in the North Fork of the South Branch of the Potomac River . . . , which is a trout stream."[184] The violation persisted through a ***19-mile-long*** reach of the trout stream.[185]

Scientific literature and analogous projects indicate that TGP's proposed dry-ditch, open-cut crossings will both cause violations of Tennessee's narrative water criteria and that those violations will be both substantial and long-term, if not permanent. Accordingly, and pursuant to the TWQCA and its implementing rules and regulations, as well as Clean Water Act Section 401 and its implementing regulations, TDEC cannot issue the permit sought by TGP or certify the Cumberland project under Section 401.

## 2. TGP's Stream Crossings Will Cause or Contribute to Violations of Tennessee's Antidegradation Statement.

Section 303 of the Clean Water Act establishes an antidegradation policy and "requir[es] that state standards be sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation."[186] The federal regulations similarly require that state antidegradation policies protect existing uses, maintain the existing quality of high-quality waters unless degradation is justified by important social or economic development, and prohibit degradation of outstanding national resource waters.[187]

Tennessee's Antidegradation Statement has been approved by EPA and is set out in Tenn. Comp. R. & Regs. 0400-40-03-.06. Tennessee's Antidegradation Statement categorizes Tennessee's waters into four categories, depending on their existing quality and their state and national significance: "waters with unavailable parameters,"[188] "waters with available parameters,"[189] "Exceptional Tennessee Waters,"[190] and "Outstanding National Resource Waters."[191] Utilizing the framework set forth for each category, TDEC must determine whether degradation and/or habitat alteration is permitted given the status of the impacted waterbody.

To conduct an antidegradation review to determine an activity's compliance with Tennessee's Antidegradation Statement, TDEC must ensure the application is complete and includes a legally sufficient alternatives analysis to "prevent or lessen the degradation associated with the proposed activity[.]"[192] As discussed, TGP has failed to do so. Yet in its draft ARAP, TDEC states that it "has made a preliminary determination that the proposed activities will result

---

[184]  Columbia Gas Consent Order at 2 (Exhibit 21).
[185]  *Id.*; *see also* Hansen & Betcher (2021) at 5 (concluding that "The 19-mile sediment impact from a failed dry ditch open-cut crossing during construction of the WB Express Pipeline . . . provides a vivid illustration of the scale of problems that can be caused.") (Exhibit 18).
[186] 33 U.S.C. § 1313(d).
[187] *Id.* § 131.12(a).
[188] Tenn. Comp. R. & Regs. 0400-40-03-.06(2).
[189] *Id.* at 0400-40-03-.06(3).
[190] *Id.* at 0400-40-03-.06(4).
[191] *Id.* at 0400-40-03-.06(5).
[192] *Id.* at 0400-40-03-.06(1)(b).

in *de minimis* degradation" or "no significant degradation" for all impacted waterbodies.[193] TDEC's determination is unsupported by the evidence, and the Department should deny TGP's application on the basis of the Project's degradation of state waters.

### a. TGP's activities may impermissibly affect waterways with unavailable parameters.

TDEC must amend its analysis of the effects of TGP's proposed activities on Tennessee streams that are not currently meeting their designated uses or are failing to meet specified water quality criteria. Under Tennessee's Antidegradation Statement, "[u]navailable parameters exist where water quality is at, or fails to meet, the levels specified in" Tennessee's water quality criteria.[194] Tennessee's Antidegradation Statement prohibits any further degradation when a stream is already impaired.[195]

In accordance with Section 303(d) of the Clean Water Act, Tennessee maintains a list of impaired streams.[196] In its ARAP application, TGP did not bother to address the Section 303(d)-listing status of the streams that it intends to trench or blast through. Section 4.3.2.2 of FERC's draft Environmental Impact Statement ("DEIS") for the Cumberland Project—available to TDEC when it issued the draft ARAP for public comment—claims that there are five waterbodies that do not meet state water quality criteria.[197] Specifically, Jones Creek is identified as impaired due to, *inter alia*, excessive sedimentation and siltation.[198] Two unnamed tributaries of Jones Creek are impaired because of flow alterations, and a third unnamed tributary of Jones Creek is impaired because of excessive sedimentation and siltation.[199] And Wells Creek is impaired because of *E. coli* contamination from sewer overflows.[200]

TGP does not intend to use dry-ditch, open-cut crossings on Wells Creek and Jones Creek, so the right-of-way crossings of those streams may not require antidegradation review.[201] But TGP does plan to use dry-ditch, open-cut crossings on as many as seven streams that it identifies as unnamed tributaries of Jones Creek.[202] TGP's ARAP application does not specify

---

[193] Draft ARAP at 46.

[194] Tenn. Comp. R. & Regs. § 0400-40-03-.06(2).

[195] *Id.*

[196] Tennessee 303(d) List (Exhibit 22).

[197] Fed. Energy Regul. Comm'n, *Draft Environmental Impact Statement for the Cumberland Project* at 4-31 (Feb. 2023) [hereinafter "DEIS"], https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20230630-300. .

[198] *Id.*

[199] *Id.* at 4-31 to 4-32.

[200] *Id.* at 4-32.

[201] ARAP Application at 6. TGP has proposed two access road crossings for Jones Creek, however, which require antidegradation review.

[202] *Id.* at 33. The plan to blast or trench through all unnamed tributaries to Jones Creek contradicts TGP's plans that it communicated to FERC contemporaneously with its Section 404 application. TGP's Resource Reports to FERC state that the company planned to use HDD to cross three unnamed tributaries to Jones Creek because of their impaired status. TGP Pipeline

which of those crossings are the impaired unnamed tributaries of Jones Creek discussed in the DEIS, let alone address how the impaired status of those streams affects the antidegradation analysis described in these comments.

Moreover, neither TGP's ARAP application nor the DEIS acknowledge or discuss the impaired status of a sixth stream. Tennessee's 2022 Section 303(d) list identifies Leatherwood Creek in the Harpeth River Watershed as impaired for unknown causes.[203] TGP proposes dry-ditch, open-cut crossings of Leatherwood and nine of its unnamed tributaries in its ARAP application, including two dry-ditch, open-cut crossings of one of those unnamed tributaries.[204] TGP's failure to acknowledge or discuss the impaired status of Leatherwood Creek and its unnamed tributaries, as well as its omission of the status of the unnamed tributaries of Jones Creek, is yet another reason its application is incomplete and grounds for TDEC's denial of the permit.

For the streams discussed above that have been identified as impaired because of sedimentation or biologically impaired for an unknown cause, the Antidegradation Statement prohibits additional lowering of the water quality for unavailable parameters.[205] TDEC must consider the effects of sedimentation from TGP's proposed crossings on these waterways. It has not done so. Rather, TDEC makes the bare assertion that, as to "Unnamed tributaries of Jones Creek, the Division has made a preliminary determination that the proposed activities will result in no significant degradation in a waterbody with unavailable parameters for habitat alteration because the proposed activities will not result in an appreciable permanent loss of resource values."[206] And TDEC ignores Leatherwood Creek and its tributaries.

Yet as discussed elsewhere in these comments, TGP's stream crossings will result in increased sedimentation in streams,[207] and the attendant impacts from that sedimentation will result in an appreciable permanent loss of resource values.[208] Because of the Antidegradation Statement's strict prohibition against further degradation of waters with unavailable parameters, and because of the persistent nature of sedimentation, additional sedimentation in those streams from TGP's proposed activities is prohibited by Tennessee's water quality standards. Accordingly, TDEC's antidegradation review is arbitrary, capricious, unsupported by the record, contrary to the applicable law, and cannot be finalized in its current form.

---

Co., LLC, Final Resource Report 2: Water Use and Quality, Cumberland Project, Docket No. CP22-493-000 at 2-14 (July 2022) (Exhibit 23). Inexplicably, TGP's Section 404 permit application proposes dry-ditch, open-cut crossings for all of the unnamed tributaries of Jones Creek. Table 1, rev. Mar. 17, 2023 at 2–3. TGP must explain that discrepancy before the Corps can act on its Section 404 application.

[203] Tennessee 303(d) List (Exhibit 22). Conservation Groups note that in its FEIS, FERC corrected its omission of Leatherwood Creek as an affected impaired waterbody.

[204] *Id.* at 38–39 (proposing two crossings of Stream ID No. SDKB025).

[205] Tenn. Comp. R. & Regs. 0400-40-03-.06(2).

[206] Draft ARAP at 46

[207] *See, e.g.*, Section II.B.1, *supra*.

[208] Tenn. Comp. R. & Regs. 0400-40-07-.04(6)(c).

AR  004698

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **36** of 69

      **b.** ***TDEC's Unsupported Conclusion that TGP's Proposed Activities Will Result in Only De Minimis Degradation in High-Quality Streams with Available Parameters is Arbitrary and Capricious.***

    For Tennessee waters with available parameters, new discharges that would cause more than *de minimis* degradation are only authorized in the absence of "practicable alternatives to prevent or lessen degradation" and where "necessary to accommodate important economic or social development in the area."[209] The same is true for habitat alteration of such waters that would cause more than *de minimis* degradation.[210] Thus, an antidegradation review of waters with available parameters cannot be performed without knowing the baseline water quality of a receiving stream and an analysis of effects of the discharge or habitat alteration at issue.

    TGP's ARAP application failed to include this needed information. Specifically, the application did not include (1) baseline water quality for the affected streams—such as measures of embeddedness, sedimentation, turbidity, or benthic macroinvertebrate assessment scores, and (2) the quantification through modeling of the amount of additional sediment loading that will result from the proposed activities.[211] Such a quantification is possible through the use of modeling techniques to predict the turbidity and suspended solids concentrations that would result from pipeline construction.[212]

    Without baseline water quality data for sedimentation and turbidity, and without quantification of increased sedimentation and turbidity from TGP's proposed activities, TDEC cannot effectively perform an antidegradation review for the waters with available parameters impacted by the proposed activities, and it was premature of the Department to opine (without support or explanation) that any impacts from TGP's activities would be *de minimis*.[213] A state acts arbitrarily and capriciously when it fails to conduct a location-specific antidegradation review before certifying a natural gas pipeline under CWA Section 401.[214] Accordingly, TDEC should deny TGP's application as incomplete. At minimum, TDEC should require TGP to gather the required data and solicit additional public comment—to ensure data quality—prior to acting on TGP's application.

    In part because it has purported to conduct an antidegradation review without sufficient information, TDEC reaches the unsupported conclusion that TGP's proposed activities will result

---

[209] Tenn. Comp. R. & Regs. at 0400-40-03-.06(3)(a). However, degradation of Outstanding National Resource Waters is strictly prohibited. *Id.* at 0400-40-03-.06(5).

[210] *Id.* at 0400-40-03-.06(3)(c).

[211] *See* Hansen & Betcher (2021) at 5 ("Detailed, site-specific and stream-specific information and modeling would be needed to predict the scale of impacts and the amount of time required to return to pre-construction conditions. This type of information and modeling is absent from MVP's application.") (Exhibit 18).

[212] *See, e.g.*, Fed. Energy Regul. Comm'n, *Final Environmental Impact Statement for the Jordan Cove Energy Project* 4-108 (Nov. 2019) (Exhibit 24), https://www.ferc.gov/sites/default/files/2020-05/11-15-19-FEIS_Part_1.pdf.

[213] Draft ARAP at 46.

[214] *Sierra Club*, 64 F.4th at 508.

AR  004699

in only *de minimis* degradation in high-quality waters.[215] Based on the scientific literature discussed above, it is entirely irrational for TDEC to conclude that TDP's proposed activities will have only *de minimis* effects. TDEC's conclusion regarding high-quality waters is further flawed for the additional reasons set forth below.

### i. *TGP's Stream Crossings Will Cause Cumulative Impacts to Tennessee Streams in violation of Tennessee's Antidegradation Statement.*

As part of its analysis, TDEC must consider cumulative impacts the proposed activity is reasonably likely to have on affected waterways. Tennessee's Antidegradation Statement makes clear that the state's intended purpose is to protect all existing uses of surface waters and to maintain the quality of those waters—thus, the Antidegradation Statement must be applied with a focus on the sum total impact on an activity on a receiving waterway.[216] Moreover, Tennessee rules make clear that an impact will only be considered *de minimis* after evaluating both individual and cumulative effects to a waterbody.[217]

Federal guidelines likewise recognize that, "[a]lthough the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems."[218] And TDEC's ARAP rules define "[c]umulative impacts" to mean "the impact on resource values which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."[219] Those descriptions of cumulative effects remarkably track the conclusions of the scientific literature on the significant cumulative effects of dry-ditch, open-cut crossings, like those proposed by TGP:

> The potential for cumulative effects associated with pipeline crossing construction should be taken into consideration in assessing the impacts of these activities on rivers and streams. Construction of a single crossing on a stream or river, or within a watershed, may not have significant effects on fish and fish habitat in that system. **Construction of multiple crossings on a stream or river, or within a watershed, however, has the potential for cumulative effects on that system. In such cases, the capacity of the system to recover from impact may be exceeded, and the detrimental effects of crossing construction permanent. The same may be said**

---

[215] Draft ARAP at 46.

[216] *See* Tenn. Comp. R. & Regs. 0400-40-03-.06(1)(a).

[217] *See, e.g.*, Tenn. Comp R. & Regs. 0400-40-03-.04(4)(b) (stating that habitat alterations should be considered *de minimis* only if individual and cumulative impacts are offset appropriately under the rules).

[218] 40 C.F.R. § 230.11(g).

[219] Tenn. Comp. R. & Regs. 0400-40-07-.03(9).

AR 004700

**for the frequency of crossing construction within a given system; rivers and streams will have limited capacities to recover from multiple impacts.**[220]

As discussed in Section III of these comments, despite TDEC's obligations to consider cumulative effects, and despite the scientific literature's clear predictions of significant effects, TGP's application to TDEC is devoid of any analysis of the cumulative effects of its proposed crossings. This is despite the fact that, in its ARAP application, TGP notes that it plans to cross several waterbodies at multiple locations.[221] A similar absence of such information from an application for an individual Section 404 permit for dry-ditch, open-cut pipeline crossings raised concerns for EPA.[222] As a result, EPA recommended "a conclusive evaluation at watershed scale (i.e. HUC 12) be provided to ensure that measures are undertaken to avoid and minimize the potential of cumulative impacts,"[223] and asked the Corps to require special provisions applicable to streams and wetlands impacted multiple times by construction of that pipeline.[224] At minimum, TDEC should require the same level of analysis.

Furthermore, also missing from TGP's application is any examination of the cumulative and aggregated impacts that would result from the combination of TGP's upland activities and proposed stream crossings. TGP's upland activities threaten to contribute substantial and long-term sediment loads to streams along the proposed route of the Cumberland Pipeline. Expert Starr Silvis predicts these impacts from upland disturbances:

> The conversion of forested land to maintained right-of-way increases runoff volumes, which will change stream morphology. Lack of intact forest cover has been found to change stream morphology for two to four years post-disturbance (Reid & Anderson 1999). Methods to maintain the right-of-way include the use of pesticides and herbicides which can be mobilized in stormwater runoff and cause degradation of aquatic ecosystems. The construction of temporary and permanent access roads also increases runoff volumes and increases turbidity and sediment migration from upland areas to water bodies. The increases in stormwater runoff volumes can alter stream morphology and stream bed composition. There are also long-term increases in temperature associated with the reduction of forested canopy for both streams and wetlands.[225]

TDEC must evaluate the cumulative and aggregate effects on the aquatic ecosystems of continued sedimentation from TGP's proposed open-cut stream crossings and sedimentation and

---

[220] Lévesque and Dubé (2007) at 406–07 (Exhibit 17).
[221] ARAP Application, 5.
[222] Letter from Jeffrey Lapp, Chief, Wetlands Branch, U.S. Envtl. Prot. Agency Region 3, to Michael Hatten, Chief, Regul. Branch, Huntington Dist., U.S. Army Corps of Eng'rs, Re: LRH-2015-00592-GBR, LRP-2015-798, NAO-2015-0898, Mountain Valley Pipeline, LLC; Mountain Valley Pipeline, Wetzel County, West Virginia to Pittsylvania County, Virginia at 1 (May 27, 2021) (Exhibit 25) (noting an "insufficient assessment of secondary and cumulative impacts").
[223] *Id*. at 8.
[224] *Id.* at 7.
[225] Silvis (2023) at 4 (Exhibit 1).

AR 004701

runoff from TGP's upland construction activities. Scientific literature suggests that these activities will cause more than *de minimis* degradation to receiving waterways in violation of Tennessee's Antidegradation Statement. TDEC's unsupported conclusion to the contrary[226] is thus flatly wrong.

### ii. *TGP's Crossings Will Cause Habitat Degradation Which Cannot Be Considered De Minimis.*

Tennessee regulations state that habitat alterations authorized by ARAPs can only be considered *de minimis* "if the Division finds that the impacts, individually and cumulatively, are offset by impact minimization and/or in-system mitigation."[227] TGP's proposed impacts to streams and wetlands will cause habitat degradation, yet those impacts are not offset and the company proposes no in-system mitigation. Therefore, these impacts cannot be considered *de minimis*.

First, the literature establishes that "silt or sand deposition can fill interstices in gravel," and that "[e]quipment operating in the stream . . . can eliminate spawning habitat."[228] As a result, stream crossings have been shown to affect fish reproductive success.[229] Specifically:

> Increased sediment deposition and substrate compaction from pipeline crossings can degrade spawning habitat, result in the production of fewer and smaller fish eggs, impair egg and larvae development, [and] limit food availability for young-of-year fish[.][230]

Notwithstanding all its other flaws, FWS's Revised Biological Opinion for the Mountain Valley Pipeline reaches the same conclusion, stating that sedimentation from pipeline construction, including dry-ditch, open-cut crossings, can be expected to:

> cause multiple adverse effects on all life stages of benthic fish, including loss of stream habitat essential for sheltering, foraging, and spawning; increased mortality of eggs, YOY, juveniles, and adults; increased predation on eggs by sediment-dwelling invertebrates; avoidance of previously occupied habitat; increased vulnerability of adults to predation; [and] reduced reproductive success.[231]

These impacts are made all the more severe by the cumulative nature of TGP's proposed activities, which will span multiple waterways and traverse several waterways numerous

---

[226] Draft ARAP at 46.
[227] Tenn. Comp. R. & Regs. 0400-40-03-.04(4)(b).
[228] Penkal & Phillips (1984) at 6 (Exhibit 16).
[229] Lévesque & Dubé (2007) at 399 (Exhibit 17).
[230] Email from Barbara Douglas, Sr. Endangered Species Biologist, W. Va. Field Office, U.S. Fish & Wildlife Serv., to Cindy Shulz, U.S. Fish & Wildlife Serv. (Dec. 11, 2019, 11:44 AM) at 3 (Exhibit 26).
[231] BiOp at 190 (Exhibit 12).

AR 004702

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **40** of **69**

times.[232] Consequently, TGP's proposed crossings will cause significant adverse effects on aquatic life through impacts including but not limited to habitat alteration. TGP's proposed actions therefore cannot be permitted.

### iii. TGP's crossings are not necessary to accommodate important economic or social development in the area where impacted waters are located.

Tennessee's Antidegradation Statement provides that:

> Where the quality of Tennessee waters is better than the level necessary to support the propagation of fish, shellfish, and wildlife, or recreation in and on the water, that quality will be maintained and protected unless the Department finds, after intergovernmental coordination and public participation, that lowering water quality is necessary to accommodate important economic or social development in the area in which the waters are located."[233]

TGP cannot demonstrate that its planned degradation of state waters is necessary to accommodate important economic or social development in the activity area; therefore, TDEC must deny its application.

*First,* it is appropriate for TDEC to consider disproportionate effects on environmental justice communities in an antidegradation analysis,[234] and here TGP's proposed activities will negatively impact environmental justice communities in the area of the pipeline route. In its FEIS for TGP's proposed pipeline, FERC identified several environmental justice communities within the Cumberland Pipeline area.[235] Specifically, FERC identified seven communities that would be considered environmental justice communities based on minority percentage thresholds and low-income thresholds.[236] Although FERC has identified at least seven environmental justice communities that would be impacted by the Cumberland Pipeline, TDEC must conduct its own evaluation. EPA's EJScreen and census data alone may not be sufficient to identify all impacted communities, and direct community outreach or on-the-ground data collection may be necessary.

Moreover, FERC only used a 1-mile radius around the proposed route and proposed aboveground facilities to determine the geographic scope of the Cumberland Pipeline's impacts.[237] FERC did not adequately explain or justify why the 1-mile radius was sufficient, and as a result, any TDEC reliance on FERC's determination would be unreasonable. As an initial matter, research on environmental justice mapping indicates that use of different geographic

---

[232] *See supra* Section III (discussing the cumulative impacts of TGP's proposed activities).
[233] Tenn. Comp. R. & Regs. 0400-40-03-.06(1)(a).
[234] TDEC, *Rationale, Water Authority of Dickson County, East Hickman Water Reclamation Facility, NPDES Permit No. TN0082376* (Apr. 5, 2023) [hereinafter "East Hickman Water Reclamation Facility Rationale"] (Exhibit 27).
[235] FEIS at 4-76 (Exhibit 28).
[236] *Id.*
[237] *Id.* at 4-74.

AR 004703

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **41** of **69**

units of analysis can yield drastically different results.[238] For example, impacts on transportation, access to public services, or water impacts could easily extend beyond the arbitrary 1-mile radius that FERC used. Drawing different boundaries for the study area may therefore have dramatic implications. Second, in previous environmental justice analysis TDEC has performed pursuant to its Antidegradation Statement analysis, the Department has analyzed EJ data with 1-mile, 5-mile, and 10-mile radii.[239] Based on TDEC's past practice, and because FERC did not provide an adequate or reasonable explanation for its delineation of the area potentially affected by the Cumberland Pipeline, TDEC should expand the scope of its EJ analysis beyond what was performed by FERC.[240]

Once TDEC has adequately identified all communities with environmental justice concerns that may be affected by the Cumberland Pipeline, it must then identify and evaluate whether the proposed lowering of local water quality is necessary to accommodate important economic or social development in the area. So too must it evaluate whether the opposite in fact would occur; namely, that the project would impair economic or social development in the area. In general, environmental justice communities may be more vulnerable than the general population to events that are low-probability but catastrophic—like pipeline explosions—due to lack of public or private resources to address such emergencies, inability to evacuate or relocate, lack of access to affordable, high-quality health care, and reliance on affected place-based resources.[241] Even though risk of death or injury from pipeline accidents to the general population may be higher in urban areas—because there are more people living in proximity to pipelines in urban areas than in rural areas—rural communities often have fewer resources to

---

[238] *See, e.g.*, Juliana Maantay, *Mapping Environmental Injustices: Pitfalls and Potential of Geographic Information Systems in Assessing Environmental Health and Equity*, 110 Envtl. Health Perspectives 161, 165 (2002), https://ehp.niehs.nih.gov/doi/epdf/10.1289/ehp.02110s2161 (Exhibit 29); Eric Sheppard et al., *GIS-based measures of environmental equity: Exploring their sensitivity and significance*, 9 J. Exposure Analysis & Envtl. Epidemiology 18, 19–20 (1999), https://www.researchgate.net/publication/13107786_GIS-based_measures_of_environmental_equity_Exploring_their_sensitivity_and_significance (Exhibit 30) ("In spatial analysis of environmental equity, it has now become clear that the choice of the geographic scale of the study area (e.g., states, metropolitan areas, counties, municipalities) and the spatial resolution of data within that study area (e.g., zip codes, census tracts, block groups) employed, influence the results of the analysis.").

[239] East Hickman Water Reclamation Facility Rationale (Exhibit 27).

[240] *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021) ("When conducting an environmental justice analysis, an agency's delineation of the area potentially affected by the project must be 'reasonable and adequately explained,' . . . and include 'a rational connection between the facts found and the decision made.'" (internal citations omitted)).

[241] *Id.* at 35.

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **42** of **69**

address those risks, and natural gas infrastructure "often exacerbates existing social vulnerability."[242]

In its FEIS for the Cumberland Pipeline, FERC concluded that disproportionate and adverse impacts to environmental justice communities would occur because "the Project includes the construction and operation of new pipeline facilities in environmental justice communities[.]"[243] In other words, FERC categorically concluded that construction and operation of new interstate methane pipelines necessarily has disproportionate and adverse effects on environmental justice communities along their route. TDEC must consider those impacts in its social and economic necessity review of TGP's application.

TDEC must conduct its own evaluation to identify and analyze the Cumberland Pipeline's disproportionate and adverse impacts to environmental justice communities. Those impacts may include visual impacts, socioeconomic impacts, and air and noise impacts, as identified by FERC.[244] But, they must also include other impacts ignored by FERC.

For example, low-income rural Americans are disproportionately reliant on wells and springs for domestic water supplies,[245] the loss or contamination of which due to pipeline construction or operation could be economically devastating due to the expense of relocation or water replacement. Moreover, pipeline construction will require 300-400 workers, 90% of which would be non-local.[246] The impact that the influx of these temporary construction workers will have on the environmental justice communities—including the strain on public services, affordable housing, and transportation—must be considered. Additionally, the Cumberland Pipeline will exacerbate the effects of climate change by supporting the continued combustion of fossil fuels, and climate change is known to disproportionately harm environmental justice communities.[247] Furthermore, proximity to natural gas pipelines may reduce local property values, which could lower the overall tax base of an impacted area and negatively affect even those who do not have pipeline easements on their property.[248]

---

[242] *See* Ryan E. Emanuel et al., *Natural Gas Gathering and Transmission Pipelines and Social Vulnerability in the United States*, 5 GEOHEALTH 8 (2021), https://agupubs.onlinelibrary.wiley.com/doi/epdf/10.1029/2021GH000442, (Exhibit 31).
[243] FEIS at viii (Exhibit 32).
[244] FEIS at 4-80 (Exhibit 28).
[245] *See* Erin Arciposki et al., *Clean Water, Clean Life: Promoting Healthier, Accessible Water in Rural Appalachia*, 161 J. CONTEMPORARY WATER RESEARCH & EDUC. 1 2017), https://onlinelibrary.wiley.com/doi/10.1111/j.1936-704X.2017.3248.x (Exhibit 33).
[246] FEIS at 4-66 (Exhibit 34).
[247] *See* Kristie S. Gutierrez & Catherine E. LePrevost, *Climate Justice in Rural Southeastern United States*, 13 INT'L J. ENVTL. RESEARCH & PUB. HEALTH 189 (2016), https://www.mdpi.com/1660-4601/13/2/189 (Exhibit 35).
[248] *See* Daniel Walmer, *Pipelines could affect property values*, LEBANON DAILY NEWS (Jan. 2, 2016), https://www.ldnews.com/story/news/local/2016/01/02/pipelines-could-affect-property-values/77984160/ (Exhibit 36); *see also* Martina Angela Caretta & Ryan E. Emanuel, *Does shale gas development impact property values in Central Appalachia? A mixed methods critical*

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **43** of **69**

*Second,* TGP's meager attempt at a socio-economic justification for its degradation of Tennessee's high quality waters—and TDEC's parroting of that justification without analysis—fall short of the regulatory requirements for such justifications. At the threshold, Conservation Groups note that TDEC simply cut and pasted TGP's socio-economic justification from its application.[249] That is regurgitation, not analysis.

In all events, TDP's efforts at socio-economic justification are insufficient to satisfy Tennessee's Antidegradation Statement for at least three additional reasons: First, as discussed elsewhere in these comments, there are practicable alternatives to TGP's proposed overwhelming use of open-cut, dry-ditch crossings.[250] But a socio-economic variance from the Antidegradation Statement is only available in the absence of practicable alternatives.[251] Second, a socio-economic variance requires "intergovernmental review and public participation,"[252] which have not happened here. Finally, a socio-economic variance requires specific findings by TDEC that "lowering water quality is necessary to accommodate important economic or social development in the area in which the waters are located[.]"[253] TDEC made no such findings here. Stated otherwise, in its draft ARAP, TDEC never purports to adopt TGP's analysis—rather it simply restates it.

## C. TGP'S PROPOSED ACTIVITIES WILL HAVE IMPERMISSIBLE IMPACTS ON IMPORTANT RESOUCE VALUES OF THE WATERS OF THE STATE.

Applicants for an ARAP must "consider avoidance and minimization" of impacts to streams and wetlands and provide mitigation for "appreciable permanent loss of resource values." TDEC's draft ARAP concludes that "the overall activities will not result in any appreciable permanent loss of resource values."[254] But as expert engineer Starr Silvis observed after reviewing TGP's proposed activities, TDP's application "[m]ischaracterizes many permanent impacts as temporary."[255] Silvis correctly recognizes that the duration of construction activities (and associated fills) is not coextensive with the duration of the impacts of such activities.[256] That is, even *temporary* fill activities can cause *permanent* effects on resource values.[257] Accordingly, and

---

*exploration*, 14 Extractive Industries & Soc'y 3 (2023), https://www.sciencedirect.com/science/article/pii/S22 14790X23000424 (Exhibit 37) (noting that "just the announcement of a proposed pipeline in NY showed to impact negatively property values by 9%" and that "a study looking at the impact of 864 gas distribution incidents between 2010 and 2020 shoed a reduction in housing prices between 4 and 6%").

[249] Draft ARAP at 45 (quoting ARAP Application at 29–31).

[250] See Section I.A, *supra.*

[251] Tenn. Comp. R. & Regs. 0400-40-03-.06(3)(a).

[252] *Id.* 0400-40-03-.06(a)(1).

[253] *Id.*

[254] Draft ARAP at 44.

[255] Silvis (2023) at 1 (Exhibit 1).

[256] *Id.*

[257] *Id.* at 5 ("[E]ven short-duration activities have permanent negative effects on aquatic resources.")

AR 004706

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **44** of **69**

as explained further below, TDEC's conclusion about effects on resource values is arbitrary and capricious.

> ### 1. *TGP's Crossing Will Result in Appreciable Permanent Loss of Resource Values Which Are Not Sufficiently Mitigated to Result in No Overall Net Loss From Existing Conditions.*

TDEC cannot issue an ARAP where the proposed activity would cause "any appreciable permanent loss of resource values" which is not offset by mitigation "sufficient to result in no overall net loss of resource values from existing conditions."[258] An "appreciable permanent loss of resource values" is defined to mean "a reduction in resource values that is expected to continue without fundamental change and is large enough to be observed and measured as resulting in more than minimal adverse effects."[259] Resource values include but are not limited to the ability of water resources to "filter, settle, and/or eliminate pollutants," "prevent the entry of pollutants into downstream waters," and "provide habitat for fish, aquatic life, and wildlife."[260] When analyzing whether a proposed activity causes any such permanent loss of resource values, TDEC is required to consider several factors, including:

1) Direct loss of stream length, flow, or wetland area due to the proposed activity;
2) Direct loss of in-stream or wetland habitat due to the proposed activity;
3) Impairment of stream channel stability due to the proposed activity;
4) Diminishment in species composition in any stream or wetland due to the proposed activity;
5) Direct loss of stream canopy due to the proposed activity;
6) Whether the proposed activity is reasonably likely to have cumulative or secondary impacts to the water resource;
7) Conversion of unique or high quality waters as established in Rule 0400-40-03-.06 to more common systems;
8) Hydrologic modifications resulting from the proposed activity;
9) The adequacy and viability of any proposed mitigation including, but not limited to, quantity, quality, likelihood of long term protection, and the inclusion of riparian buffers;
10) Quality of stream or wetland proposed to be impacted;

---

[258] Tenn. Comp. R. & Regs. 0400-40-07.04(6)(c).
[259] Tenn. Comp. R. & Regs. 0400-40-07-.03(3).
[260] Tenn. Comp. R. & Regs. 0400-40-07-.03(25).

AR 004707

11) Whether the stream or wetland is listed on the § 303(d) list or otherwise has unavailable parameters; whether the proposed activity is located in a component of the National Wild and Scenic River System, a State Scenic River, waters designated as Outstanding National Resource Waters, or waters identified as high quality waters as defined in Rule 0400-40-03-.06, known as Tier II waters; whether the activity is located in a waterway which has been identified by the Division as having contaminated sediments; and whether the activity will adversely affect species formally listed in State and federal lists of threatened or endangered species; and

12) Any other factors relevant under the Act.[261]

Based on TGP's ARAP application, relevant scientific literature, and expert opinions, it is clear that the Cumberland Pipeline will likely cause appreciable and permanent loss of relevant resource values. And because TGP does not propose mitigation sufficient to offset the overall net loss of these resource values, TDEC cannot issue an ARAP for the proposed activities. The following discussion provides some examples of those permanent losses.

### a. The Cumberland Pipeline will cause direct loss of stream length, flow, or wetland area.

TGP's proposed discharges will cause or contribute to significant adverse impacts to 0.72 acres of wetlands.[262] As a threshold matter, the lack of information in the application about how TGP intends to construct dry-ditch, open-cut crossings in standing water in wetlands is concerning. Upon review of TGP's application to the Corps for its Section 404 permit for these activities, Silvis concludes that that the "application's lack of information on wetland crossing methods to reduce environmental impacts does not meet minimum industry standards and will lead to substantial negative impacts to wetland resources."[263] In other words, Silvis predicts significant degradation to wetlands.

Further, TGP readily admits that the Cumberland Pipeline will permanently convert 0.03 acres of wetland while causing temporary impacts to 0.69 acres.[264] While temporarily impacted wetlands are supposed to be returned to their original elevation and condition, the draft ARAP notes that maintenance of a 10-foot corridor around the pipeline will require permanent conversion of plant communities in forested wetlands "to herbaceous/emergent or scrub-scrub plant communities."[265] Despite these impacts, TDEC concludes that these activities "will not result in any appreciable permanent loss of resource values."[266] Not so.

---

[261] Tenn. Comp. R. & Regs. 0400-40-07-.04(6)(c).
[262] Draft ARAP at 21.
[263] Silvis (2023) at 18 (Exhibit 1).
[264] Draft ARAP at 21.
[265] Draft ARAP at 44.
[266] Draft ARAP at 44.

The scientific literature concludes that pipeline crossings have the potential to destroy the integrity and background of wetland ecosystems.[267] As a result of the deep trenching required in an open-cut crossing of wetlands, Silvis (2023) states:

> Excavation of material in wetlands alters the hydraulic properties and the soil structure **permanently**. Olson and Doherty (2012) noted that '[i]nstallation of large-scale infrastructure, including pipelines, has the potential to damage soil and vegetation in wetlands within the path of construction by compacting soil, altering hydrology, decreasing plant diversity, and facilitating invasions of unwanted species." In one study, soils consistently showed evidence of compaction and hydrologic alteration eight years after the wetlands were crossed by natural gas pipelines (Olson and Doherty, 2012). Wetland soils take years to form and to function (Jackson et al., 2014). By excavating, stockpiling, and then replacing soils in wetlands, the hydraulic conductivity of the soil changes, the porosity is decreased, connectivity of pores decreases, compaction increases, and soil horizons are altered. All of these characteristics work in conjunction to form a functioning wetland soil (Jackson et al., 2014). Fill associated with trenching changes all of these characteristics. Even with the provision to replace the top layer of wetland soils, the functionality of the wetland is permanently negatively impacted.[268]

TGP's activities are likely to cause long-term degradation to wetland systems—even those which are meant to only be temporarily impacted. Further, the draft ARAP makes clear that at least some wetlands will be permanently converted to maintain the Cumberland Pipeline's ROW. Despite these long-term impacts and direct losses of wetland area, TDEC confoundingly concludes that no permanent loss of resource values will occur. This conclusion is at odds with the scientific literature, relevant expert opinions, and the admitted impacts of the proposed activity. TDEC must revise its analysis to account for these lost resource values, particularly given the absence of any proposal from TGP for mitigation.[269]

### b. The Cumberland Pipeline will cause direct loss of in-stream or wetland habitat and diminishment in species composition.

In its analysis of impacted resource values in the draft ARAP, TDEC is silent on whether and to what extent the Cumberland Pipeline will cause direct loss of in-stream or wetland habitat. The available stream-crossing literature establishes that such loss to habitat should be expected from TGP's proposed dry-ditch, open-cut crossings. For example, Reid and Anderson (1999) found:

> Downstream changes to the diversity and structure of benthic invertebrate communities have also occurred after pipeline construction (Anderson *et al.* 1998). One week after construction, the downstream benthic invertebrate community in Findlay Creek, Ontario was generally limited to sediment tolerant species of

---

[267] Yu et al. (2010) at 449 (Exhibit 20).
[268] Silvis (2023) at 3–4 (emphasis added) (Exhibit 1).
[269] ARAP Application at 45.

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **47** of **69**

oligochaetes (aquatic earthworms) (Anderson *et al.*, 1998). At upstream control sites, the benthic invertebrate fauna was characterized as very diverse with over 26 species comprised of chironomids, caddisflies, stoneflies, mayflies, and dragonflies. Observed changes in community structure likely resulted from reductions in habitat availability for species dependent on interstitial spaces between coarse substrates.[270]

And Lévesque and Dubé (2007) observed:

Armitage and Gunn (1996) noted that pipeline crossing construction in a stream in England **resulted in a shift in invertebrate species** due to an increased proportion of silt in stream substrates. **This effected persisted for 4 years** until a high magnitude flow event scoured the stream channel bed, promoting re-establishment of pre-construction invertebrate species. Tsui and McCart (1981) found that crossing construction of Archibald Creek, British Columbia, caused short-term increases in silt and sand accumulation **and decreases in invertebrate standing crop and diversity, which lasted 1 to 2 years.**[271]

Moreover, "[p]ipeline crossing construction is shown to not only compromise the integrity of the physical and chemical nature of fish habitat, but also to affect biological habitat and fish behavior and physiology (Lévesque and Dube 2007), which will result in avoidance movement of fish, altered distribution of populations (Newcombe and Jensen 1996), and reduce population size and species."[272] And "[t]he integrity and background of wetland ecosystems may be destroyed."[273] Those significant adverse effects on the aquatic ecosystems, diversity, productivity, and stability should have been accounted for by TDEC when evaluating the loss of resource values due to the Cumberland Pipeline. Because TDEC failed to take this factor into account in its analysis, that analysis must be supplemented.

### c. The Cumberland Pipeline could impair stream channel stability.

The scientific literature recognizes that open-cut, dry-ditch crossings pipeline crossings, like those proposed by TGP, can cause "long-term impacts . . . such as channel incision and lateral migration."[274] Indeed, in-stream pipeline construction activities "may result in direct effects such as physical alteration of channel morphology."[275] TGP and TDEC ignore the threats to stream channel stability posed by TGP's proposed dry-ditch, open-cut crossings. But TDEC cannot act on TGP's application without grappling with those adverse effects to resource values.

---

[270] Reid & Anderson (1999) at 244 (Exhibit 13).
[271] Lévesque & Dubé (2007) at 399 (emphasis added) (Exhibit 17).
[272] Yu et al. (2010) at 449 (Exhibit 20).
[273] *Id.*; *see also* Section II.B.3.b, *supra*.
[274] Castro et al. (2015) at 767 (Exhibit 15).
[275] Lévesque and Dubé (2007) (Exhibit 17).

AR 004710

### d. The Cumberland Pipeline may cause the loss of stream canopy.

In the draft ARAP, TDEC acknowledges that "individual trees that are located within 15 feet of the pipeline that have roots that could compromise the integrity of the pipeline coating may be cut and removed from the permanent right-of-way."[276] Despite this admission, TDEC engages in no analysis to ascertain whether any of these impacted trees provide stream canopy along the Cumberland Pipeline's proposed 115 open-cut stream crossings.[277] It is at least plausible, if not likely, that some trees which will be removed provide cover to impacted waterways. TDEC must therefore update its resource value analysis to account for any stream canopy that will be lost as a result of the Cumberland Pipeline.

### e. The Cumberland Pipeline is reasonably likely to have cumulative or secondary impacts on affected waters.

The Cumberland Pipeline crosses multiple waterbodies at multiple points, *see* Section III. As discussed elsewhere in these comments, repeated use of dry-ditch, open-cut crossings to cross waterway individual waterways multiple times can result in cumulative impacts waterways which can in turn effect habitat, species composition and reproductive success.[278] Given the number of waterways TGP proposes to cross at multiple points and the scientific literature establishing the compounding, cumulative effects such crossings can have on a receiving waterway, TDEC should have determined whether and to what extent these activities would result in permanent loss of resource values such as the waterway's ability to settle pollutants and provide habitat for aquatic species. Yet TDEC does not engage in any such analysis, and indeed does not even mention the multiple crossings of various waterways proposed by TGP in its resource values analysis. TDEC's determination is therefore based on an incomplete analysis, and the Department must supplement its analysis before making a decision on TGP's application.

### f. The Cumberland Pipeline may affect waters impaired by sediments.

As discussed in Section III, TGP plans to use dry-ditch, open-cut crossings on several unnamed tributaries of Jones Creek. One tributary to Jones Creek has been identified as impaired because of excessive sedimentation and siltation, and it is unclear whether TGP plans to use a dry-ditch, open-cut crossing on that waterway.[279] TDEC does not address that. Moreover, TGP proposes dry-cut, open-cut crossings of Leatherwood Creek and nine of its tributaries, although that waterway is impaired for unknown causes.[280]

TGP's stream crossing methods will result in increased sedimentation in these waterways which have been or may be identified as impaired for sedimentation.[281] Yet TDEC does not

---

[276] Draft ARAP at 44.
[277] Table 2.1-1, rev. Mar. 17, 2023.
[278] *See* Section III, *supra.*
[279] *Id.* at 4-31 to 4-32.
[280] Tennessee 303(d) List (Exhibit 22); ARAP Application at 39 (proposing two crossings of Stream ID No. SDKB025).
[281] For a discussion of these impacts, s*ee,* Section II.B.1, *supra.*

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **49** of **69**

consider this in its analysis of resource value loss due to the Cumberland Pipeline. This omission must be rectified, and TDEC must account for the loss of resource values which may occur due to increased sedimentation in waters already contaminated by sediments.[282]

### g. TGP proposes no mitigation to offset these lost resource values.

Although, as outline above, it is clear that TGP's proposed activities will result in appreciable permanent loss of resource values, TGP does not propose to undertake any mitigation to offset these lost resource values, and TDEC does not require any that the company perform any compensatory mitigation.[283] Moreover, TDEC fails to engage with all of the factors it must consider under the state's rules and regulations to determine the total loss of resource values which will occur due to construction of the Cumberland Pipeline and so as to determine the appropriate amount of mitigation necessary. This is insufficient. At minimum, the acknowledged permanent conversion of forested wetlands to herbaceous wetlands (which is an appreciable permanent loss of resource values because of, *inter alia*, its diminishment in species composition of those wetlands), require compensatory mitigation. But TDEC inexplicably accepts TGP's refusal to mitigate those (and other) permanent effects. Until TDEC determines the amount of lost resource values resulting from the Cumberland Project and requires a commensurate amount of mitigation, TDEC cannot issue an ARAP.

## III.   TGP HAS NOT PROVIDED SUFFICIENT INFORMATION TO ALLOW TDEC TO EFFECTIVELY EVALUATE ITS PROPOSED IMPACTS TO TENNESSEE WATERS.

TGP's permit application is far too summary about its proposed discharges and disposal sites to allow TDEC to make an informed decision regarding the proposed activities' impacts to state waters. It is almost as if the applicant is relying on the sheer scope of its proposed individual permit to overwhelm the process and allow it to skirt the information requirements. TGP attempts to push through an application for hundreds of stream, wet weather conveyance, and wetland crossings that would readily be found insufficient if it were submitted for any single one of its proposed crossings. But Tennessee water quality laws and regulations do not allow TGP to generalize about its crossing locations simply because it decided to build a project with scores of proposed discharges at scores of proposed locations. If it were otherwise, the biggest, most destructive projects would face fewer requirements than a project affecting just one stream or wetland.

Tennessee's ARAP rules and regulations require TGP to provide detailed information in its permit application about its proposed activities which would result in the alteration of properties of waters of the state.[284] "Activity" is defined broadly in the regulations as "**any and**

---

[282] As discussed in Section II.B.2, Tennessee's Antidegradation Statement prohibits new or increased discharges that cause measurable degradation of an unavailable parameter, so these sediment discharges into waterways impaired by sediments are prohibited under that section of Tennessee regulations.
[283] ARAP Application at 44.
[284] Tenn. Comp. R. & Regs. 0400-40-07-.04(5)(c).

AR 004712

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **50** of **69**

**all** work or acts associated with the performance, or carrying out of a project or a plan, or construction of a structure."[285] This means that TGP is required to provide the requisite information related to each and every action the company plans to undertake which would individually require an ARAP permit—that is, each and every action which would affect an individual stream or wetland crossing.

In addition, TGP is required to provide information on the baseline conditions of each impacted waterway where an activity occurs. Tennessee regulations specify that as part of its application, TGP is required to "describe the proposed project" including through use of the technical terms included in the regulations.[286] Part of that detailed information must include the status of the "existing conditions" of an impacted waterway, which includes the "biological, chemical, bacteriological, radiological, and physical conditions of a stream or wetland at the time the project is proposed as measured by a quantitative assessment tool or other defensible scientific method as approved or determined by [TDEC]."[287]

TGP simply has not met this requirement. For one, TGP has not completed surveying of all of its proposed discharge sites.[288] TGP's application is therefore incomplete. Additionally, TGP's failure to include sufficient information on the status of each impacted waterway impedes TDEC's ability to evaluate the magnitude of lost resource values which will be caused by TGP's proposed activity. In particular, TDEC's ability to evaluate required factors such as "hydrologic modifications," loss of in-steam and wetland habitat," and "diminishment of species composition" which could result from the proposed activity all require an understanding of the baseline conditions of the impacted waterway.[289]

For example, to understand potential impacts to habitat and species composition, TDEC must evaluate the suspended particulates and turbidity that are certain to result from TGP's discharges. TDEC therefore needs site-specific information about the current water quality at each and every crossing location, as well as modeling data to determine how much sediment and turbidity each specific crossing will add to the affected streams.[290] And to make determinations about the structure and function of the aquatic ecosystem and organisms, the TDEC needs benthic assessments and other water quality data from each and every affected stream and confirmation of the fish species present in each and every affected stream.

The Fourth Circuit's opinion in *Ohio Valley Environmental Coalition, Inc. v. U.S. Army Corps of Engineers*, 716 F.3d 119 (4th Cir. 2013), provides examples of the kinds of information an agency would need in order to survive a judicial challenge to TGP's proposed permit on the

---

[285] Tenn. Comp. R. & Regs. 0400-40-07-.03(2) (emphasis added).
[286] Tenn. Comp. R. & Regs. 0400-40-07-.04(5)(c).
[287] Tenn. Comp. R. & Regs. 0400-40-07-.03(16).
[288] *See supra* Section V.
[289] Tenn. Comp. R. & Regs. 0400-40-07-.04(6)(c)
[290] Hansen & Betcher (2021) at 5 ("Detailed, site-specific and stream-specific information and modeling would be needed to predict the scale of impacts and the amount of time required to return to pre-construction conditions. This type of information and modeling is absent from MVP's application.") (Exhibit 18); *see also* Section II.B.2.c.ii, *supra.*

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **51** of **69**

basis of insufficient baseline data. In that case, the environmental plaintiffs challenged whether the Corps had misapprehended the baseline conditions at impacted sites for purposes of issuing a Section 404 permit.[291] To determine whether the plaintiffs' claims had merit, the Court examined how the Corps examined the baseline conditions of the watershed at issue.[292] Among the factors the Corps considered were: (1) "the conditions at the [proposed] fill site itself,"[293] and (2) an analysis of the impaired conditions of the streams in the relevant watershed."[294]

The Corps' review of the conditions at the disposal site included a review of the flow regime, rapid bioassessment protocols, stream condition index scores, benthic macroinvertebrate analyses, the condition and functions of the receiving streams, and the existing stream quality.[295] From there, the Court noted that the Corps "followed up this summary by detailing the supporting data collected with respect to 'physical habitat,' 'water quality,' 'benthics,' and 'stream functioning.'"[296] When it turned to the impaired status of the watershed at issue, the Corps examined baseline water-quality testing data from eight sites in the watershed, including the stream to be filled and nearby streams, as well as the forest coverage in the watershed at issue and its ability to absorb the impacts.[297] Based on what it described as the Corps' "contextual judgment made after considering all relevant data," the Fourth Circuit rejected the environmental plaintiffs' contention that the Corps misapprehended the baseline conditions.[298]

In contrast, TGP has not provided the amount of data held to be sufficient in *Ohio Valley Environmental Coalition* for **_any single impacted site_**, let alone the 150+ sites it seeks to permit.[299] For example, TGP has not provided *any* water quality data or benthic assessment scores for *any* stream in its path. A robust dataset like that upheld in *Ohio Valley Environmental Coalition* is necessary for every waterbody at issue in order for TDEC to consider the Cumberland Pipeline's impacts to impacted waters.

The need for baseline data is also required by the scientific literature examining pipeline crossings. The authors of the article documenting benthic effects for four years after a pipeline crossing was completed concluded that, "the study has shown . . . that before authoritative statements concerning environmental impact can be made *it is essential to have knowledge of the*

---

[291] *Ohio Valley Envtl. Coalition*, 716 F.3d at 124. Accurate information about baseline conditions is essential because "[a] material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision." *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012).
[292] *Ohio Valley Envtl. Coalition*, 716 F.3d at 124.
[293] *Id.* at 125.
[294] *Id.*
[295] *Id.*
[296] *Id.* at 125–26.
[297] *Id.* at 126–27.
[298] *Id.* at 127.
[299] *See* Silvis (2023) at 14 (noting lack of site-specific information) (Exhibit 1).

AR 004714

*natural variation to be expected in streams of differing characteristics.*"[300] In order to predict the potential effects of dry-ditch, open-cut trenches on *specific* streams:

> Monitoring prior to construction should include both habitat and biological surveys upstream and downstream of the proposed crossing location. . . . Other important habitat measures pertain to . . . water quality (e.g., TSS, turbidity, DO, water temperature, pH, conductivity). Biotic measures provide information on fish and invertebrate communities specific to the river or stream, and/or habitat types, of interest.[301]

And because of the existence of multi-year impacts from stream crossings, robust baseline data is needed "to identify site-specific sensitivities and responses to disturbance."[302] That sort of information is absent from TGP's application,[303] yet it is required for each and every waterbody.

Silvis (2023) predicts dire consequences from that scarcity.[304] She notes that TGP has identified two types of dry-ditch, open-cut crossings that it might employ—dam-and-pump and flume—but does not specify which method would be used at which site:[305]

> [Each of these methods] require[s] prior crossing-specific knowledge of velocity, flow rate, soil conditions, contributing watershed area, seasonal rainfall data, stream plan, profile, and longitudinal surveys, channel cross-section, depth of flow, bank stability, and more because these methods are not fungible and their suitability and the extent of their impacts will vary site by site. . . . TGP's application does not provide the necessary information described above for making or justifying appropriate site-specific selections of dewatering method for each proposed open-cut crossing.[306]

The dearth of information and lack of planning will allow TGP's field personnel "to make decisions on the fly with no ability for regulatory agencies to evaluate the efficacy of the proposed crossing for environmental protection."[307] Silvis (2023) concludes:

> **As someone who has evaluated many stream crossing proposals, I conclude that TGP's application does not meet minimum industry standards for evaluating site-specific conditions. Furthermore, given the omission of critical site-specific information in the application, it is my professional opinion that there is significant likelihood of water quality violations, including increases**

---

[300] Armitage & Gunn (1996) at 161 (emphasis added) (Exhibit 11).
[301] Lévesque & Dubé (2007) at 405–06 (emphasis added) (Exhibit 17).
[302] *Id.* at 406.
[303] Silvis (2023) at 15 (Exhibit 1).
[304] *Id.*
[305] *Id.*
[306] *Id.*
[307] *Id.*

**in turbidity as well as in-stream sediment deposition, from the proposed crossings.**[308]

Information deficits infect every aspect of TGP's application. For example, as flagged elsewhere in these comments, such data gaps affect the practicable alternatives analysis, the determination of whether the project will cause water quality standards violations, and the determination of whether the project will cause appreciable permanent loss of resource values.

Additionally, more information is needed to determine the cumulative effects of the crossings proposed by TGP. TDEC must evaluate cumulative impacts both as part of its antidegradation review and to determine the loss of resource values from existing conditions associated with the proposed Project under the ARAP rules.[309] Cumulative effects must be evaluated as part of the factual determinations of the effects of the proposed discharge on the physical substrate, the effects of suspended particulates and turbidity, and the effects on the structure and function of the aquatic ecosystem and organisms.

Federal Section 404(b)(1) Guidelines recognize that, "[a]lthough the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems."[310] And the ARAP rule defines "cumulative impacts" to mean "the impact on resource values which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."[311] Those descriptions of cumulative effects remarkably track the conclusions of the scientific literature on the significant cumulative effects of dry-ditch, open-cut crossings:

The potential for cumulative effects associated with pipeline crossing construction should be taken into consideration in assessing the impacts of these activities on rivers and streams. Construction of a single crossing on a stream or river, or within a watershed, may not have significant effects on fish and fish habitat in that system. **Construction of multiple crossings on a stream or river, or within a watershed, however, has the potential for cumulative effects on that system. In such cases, the capacity of the system to recover from impact may be exceeded, and the detrimental effects of crossing construction permanent. The same may be said**

---

[308] *Id.* at 17 (emphasis added). Silvis identified similar information gaps regarding TGP's proposed waterbody crossings for its roads that would lead to ill-informed "on the fly" decision making. *Id.* at 13. Silvis concluded, "if left to field personnel to install without design documents, there will be excessive impacts and failures which will cause long-term damage to aquatic ecosystems . . . ." *Id.*

[309] Tenn Comp. R. & Regs. 0400-40-03-.06(1); Tenn. Comp. R. & Regs. 0400-40-07-.04(6)(c).

[310] 40 C.F.R. § 230.11(g).

[311] Tenn. Comp. R. & Regs. 0400-40-07-.03(9).

AR 004716

**for the frequency of crossing construction within a given system; rivers and
streams will have limited capacities to recover from multiple impacts.**[312]

TGP's application is devoid of any analysis of the cumulative effects of its proposed
crossings. Indeed, it does not even call TDEC's attention to, or otherwise quantify, the streams
and watersheds that it would cut multiple times with its proposed open-cut trenches. There are
many.

Lickskillet Branch presents an example of a stream poised to suffer permanent adverse
effects if TDEC issues an ARAP and Section 401 certification to TGP. TGP proposes to cross
Lickskillet Branch in Houston County with *three* open-cuts for the Cumberland Pipeline's right-
of-way.[313] TGP presents no analysis of Lickskillet Branch's capacity to recover from multiple
impacts of the scale threatened by the multiple proposed crossings. Although Lickskillet Branch
holds the unfortunate distinction of being the stream the Cumberland Pipeline will cross the
most, there is a six-way tie for second place between Upper Sugarcamp Branch, Porters Branch,
an unnamed tributary of Harris Branch (Stream ID No. SDKA038), an unnamed tributary of Dry
Hollow Branch (Stream ID No. SDKR008), an unnamed tributary of Leatherwood Creek
(Stream ID No. SDKB025), and an unnamed tributary of Guices Branch (Stream ID No.
SHNE004) with two proposed dry-ditch, open-cut crossings each.[314] As with Lickskillet Branch,
TGP does not provide any information about the capacity of those six streams to recover from
multiple open-cuts. TGP's silence is particularly problematic for the unnamed tributary of
Leatherwood Creek, given that Leatherwood Creek is listed on Tennessee's 303(d) List as
impaired for an unknown reason.[315]

Substantial and permanent adverse effects are not limited to multiple open-cuts on the
same stream, however; they are also implicated by multiple crossings in the same watershed.[316]
At this level of analysis, numerous river and stream systems face a high-risk of substantial and
permanent cumulative effects from open-cut trenches, yet TGP does not discuss those risks. TGP
proposes multiple cuts in small watersheds as follows:

- Two dry-ditch, open-cuts of the mainstem of Upper Sugarcamp Branch and one dry-
  ditch, open-cut crossing for one of its unnamed tributaries;[317]
- Dry-ditch, open-cut crossings of the mainstem of Jordan Branch and three of its unnamed
  tributaries;[318]
- Two dry-ditch, open-cut crossings of the mainstem of Porters Branch and four of its
  unnamed tributaries;[319]

---

[312] Lévesque & Dubé (2007) at 406–07 (Exhibit 17).
[313] Table 1, rev. Mar. 17, 2023 at 14–15.
[314] *Id.* at 1, 2, 5, 8, 10, 14.
[315] Tennessee 303(d) List (Exhibit 22).
[316] Lévesque & Dubé (2007) at 406–07 (Exhibit 17).
[317] Table 1, rev. Mar. 17, 2023 at 1.
[318] *Id.*
[319] *Id.* at 1–2.

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **55** of **69**

- Dry-ditch, open-cut crossings of six unnamed tributaries of Jones Creek;[320]
- Dry-ditch, open-cut crossings of the mainstem of Gafford Branch and five of its unnamed tributaries;[321]
- Dry-ditch, open-cut crossings of the mainstem of Johnson Creek and five of its unnamed tributaries;[322]
- A dry-ditch, open-cut crossing of the mainstem of Harris Branch, two dry-ditch, open-cut crossings of one of its unnamed tributaries (SDKA038), and a single dry-ditch, open-cut crossing of two other unnamed tributaries of that stream;[323]
- Dry-ditch, open-cut crossings of the mainstem of Bartons Creek and one of its unnamed tributaries;[324]
- Dry-ditch, open-cut crossings of the mainstem of Nesbitt Branch and four of its unnamed tributaries;[325]
- Dry-ditch, open-cut crossings of Furnace Creek and one of its unnamed tributaries;[326]
- A dry-ditch, open-cut crossing of the mainstem of Dry Hollow Branch, two dry-ditch, open-cut crossings of one of its unnamed tributaries (SDKR008), and a single dry-ditch, open-cut crossing of eight other unnamed tributaries of that stream;[327]
- Dry-ditch, open-cut crossings of Little Bartons Creek and five of its unnamed tributaries;[328]
- A dry-ditch, open-cut crossing of the mainstem of Leatherwood Creek, two dry-ditch, open-cut crossings of one of its unnamed tributaries (SDKA025), and a single dry-ditch, open-cut crossing of eight other unnamed tributaries of that stream;[329]
- Dry-ditch, open-cut crossings of seven unnamed tributaries of Williamson Branch;[330]
- Dry-ditch, open-cut crossings of seven unnamed tributaries of Yellow Creek;[331]
- Dry-ditch, open-cut crossings of the mainstem of Indian Branch and three of its unnamed tributaries;[332]
- A dry-ditch, open-cut crossing of the mainstem of Guices Branch, two dry-ditch, open-cut crossings of one of its unnamed tributaries (SHNE004), and a single dry-ditch, open-cut crossing of 11 other unnamed tributaries of that stream;[333]

---

[320] *Id.* at 2–3.
[321] *Id.* at 3–4.
[322] *Id.* at 4–5.
[323] *Id.* at 5.
[324] *Id.* at 5–6.
[325] *Id.* at 6.
[326] *Id.* at 6–7.
[327] *Id.* at 7–8.
[328] *Id.* at 9.
[329] *Id.* at 10–11.
[330] *Id.* at 11–12.
[331] *Id.* at 12–13.
[332] *Id.* at 13–14.
[333] *Id.* at 14–15.

AR 004718

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **56** of **69**

- Dry-ditch, open-cut crossings of the mainstem of Guices Creek and two of its unnamed tributaries;[334] and
- Three dry-ditch, open-cut crossings of Lickskillet Branch and one dry-ditch, open-cut crossing each for of its unnamed tributaries.[335]

TGP's application does not present any information about the capacity of those watersheds (or any others) to recover from the multiple open-cuts that TGP's proposed route would trench through those watersheds.[336]

In sum, TDEC must deny TGP's application because of the absence of baseline data or an analysis of cumulative effects.

## IV. TDEC CANNOT ISSUE THE REQUESTED PERMIT BECAUSE THERE ARE ADDITIONAL MEASURES AVAILABLE TO TGP THAT WOULD AVOID AND MINIMIZE IMPACTS TO STATE WATERS.

The ARAP program is designed to "prevent the future pollution of state waters and to plan for the future of such waters so that the water resources of Tennessee might be used enjoyed to the fullest extent consistent with the maintenance of unpolluted waters."[337] To that end,

---

[334] *Id.* at 15–16.

[335] *Id.* at 16.

[336] Also missing from TGP's application is any evaluation of the cumulative and aggregated impacts that would result from the combination of TGP's upland activities and proposed stream crossings. TGP's upland activities threaten to contribute substantial sediment loads to streams along the proposed route of the Cumberland Pipeline. Expert Starr Silvis predicts these impacts from upland disturbances:

> The conversion of forested land to maintained right-of-way increases runoff volumes, which will change stream morphology. Lack of intact forest cover has been found to change stream morphology for two to four years post-disturbance (Reid & Anderson 1999). Methods to maintain the right-of-way include the use of pesticides and herbicides which can be mobilized in stormwater runoff and cause degradation of aquatic ecosystems. The construction of temporary and permanent access roads also increases runoff volumes and increases turbidity and sediment migration from upland areas to waterbodies. The increases in stormwater runoff volumes can alter stream morphology and stream bed composition. There are also long-term increases in temperature associated with the reduction of forested canopy for both streams and wetlands.

Silvis (2023) at 4 (Exhibit 1). As a result, TDEC must evaluate whether the locations that would be affected by sedimentation from TGP's proposed open-cut stream crossings will also be affected by sedimentation and runoff from TGP's upland activities and determine the cumulative effects of those discharges on the aquatic ecosystems. *See* Tenn. Comp. R. & Regs. 0400-40-03-.06(1); Tenn. Comp. R. & Regs. 0400-40-07-.04(6)(c)(6).

[337] Tenn. Comp. R. & Regs. 0400-40-07-.01(1).

AR 004719

"[p]ersons who wish to conduct an activity that may impact a stream or wetland **shall consider avoidance and minimization of such impacts**"[338] and an "applicant shall submit an alternatives analysis evaluating a range of potentially practicable alternatives **to avoid and minimize the loss of resource values**[.]"[339]

As discussed above, given the deficiencies in TGP's alternatives analysis, the applicant has fallen woefully short of the requirements for an ARAP application. But even beyond construction method and routing alternatives, there are additional steps to avoid and minimize impacts that TGP should take. This section of the comments focuses on two of them in more detail: (1) TGP's dubious claims that its restoration techniques will minimize adverse effects on aquatic ecosystems;[340] and (2) the company's misplaced reliance on FERC's waterbody and wetland construction procedures to minimize the adverse effects of its open-cut crossings.[341] Following that discussion, the comments turn to proposing a risk-based assessment as an appropriate and practicable step that could be taken to minimize the effects of TGP's discharges if those discharges were otherwise permissible).

## A. TGP'S RESTORATION PLANS ARE INADEQUATE BECAUSE THEY DO NOT INCLUDE APPROPRIATE AND PRACTICABLE STEPS TO MINIMIZE ADVERSE IMPACTS TO WETLANDS AND STREAMS.

TDEC must deny TGP's application because it does not properly evaluate restoration measures that would avoid and minimize adverse effects on state waters.[342]

### 1. TGP's Restoration Plans Would Not Minimize Adverse Impacts to Streams and Wetlands.

#### a. TGP's restoration plans are bare-bones and one-size-fits-all.

TGP's restoration plans employ a one-size-fits-all approach, with no site-specific distinctions beyond the broad categories of "wetland"[343] or "stream."[344] Scientific literature on restoration emphasizes that "[e]very [restoration] project has unique features" and that, as a result, "[s]urprise is a common element in restoration[.]"[345] However, TGP does not address how any site-specific features might affect its restoration efforts or provide any plans for addressing common challenges, such as the invasion and domination of non-native species in the disturbed

---

[338] *Id.*

[339] *Id.* 0400-40-07-.04(5)(b)

[340] ARAP Application at 45–46.

[341] *See, e.g.*, *id.* at 10.

[342] Tenn. Comp. R. & Regs. 0400-40-07-.01(1); *id.* 0400-40-07-.04(5)b).

[343] ARAP Application at 14.

[344] *Id.* at 11.

[345] Joy B. Zedler & Suzanne Kercher, *Wetland Resources: Status, Trends, Ecosystem Services, and Restorability*, 30 Ann. Rev. Env't & Res. 39, 65 (2005), https://www.annualreviews.org/doi/pdf/10.1146/annurev.energy.30.050504.144248 [hereinafter "Zedler & Kercher (2005)"] (Exhibit 38).

AR 004720

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **58** of **69**

area beyond a vague statement that it will conduct post-construction monitoring for exotic species.[346]

    TGP's restoration plans pay no attention to site-specific features or ecological functions. It is clear TGP has not considered the needs of each site in its simplistic, one-size-fits-all approach and thereby will fail to minimize losses in ecosystem function. But TDEC is required to protect stream and wetland functions.[347] The agency cannot fulfill that obligation based only on TGP's general statements about restoration.

### b. TGP Plans to Gauge Its Restoration Success Based Only on Appearance (Structure), Ignoring Water Quality and Function.

    TGP's bare bones restorations plans focus on (1) achieving "pre-construction elevations and grades" for streams[348] and returning segregated topsoil "to its original location" for wetlands.[349] Post-construction, TGP intends to reseed, monitor for revegetation, and keep an eye on stream geomorphology.[350] The company does not appear to have any plans to perform baseline water quality surveys or post-construction water-quality monitoring of the areas to be restored. Baseline surveys or monitoring are not only recommended by experts,[351] but also intuitively necessary, as it is unclear how TGP would even attempt to return a disturbed area as close as practicable to its previous condition if it has no record of that condition. A true baseline includes not only the area's appearance, but also information about the habitat it provides and its other ecological functions. TGP's plans impermissibly conflate structure and function.

### c. TGP Has Not Established that Simply Rebuilding Streambeds Restores Ecological Function.

    TGP relies exclusively on a "Field of Dreams" restoration plan to minimize effects on aquatic life—"[Re]build it, and they will come." That simplistic approach, even if it were to get the *structure* right, does not ensure a restoration of *function*, and TGP's application is impermissibly silent on the latter.

---

[346] ARAP Application at 7.

[347] Tenn. Comp. R. & Regs. 0400-40-07-.04(7)(a).

[348] ARAP Application at 11.

[349] *Id.* at 14.

[350] *Id.* at 45.

[351] Leslie Sauer, *Achieving Higher Quality Restoration Along Pipeline Rights-of-Way: An Overview of Pipeline Construction Impacts with Recommendations for Reducing Environmental Damage* 9 (2014), https://delawareriverkeeper.org/sites/default/files/Documents/SauerL_Achieving_Higher_Quality_Restoration_Along_Pipeline_Rights_of_Way.pdf [hereinafter "Sauer (2014)"] (Exhibit 39) ("The purpose of baseline monitoring is to inform route selection and the determination of appropriate methods for construction, restoration and management for various segments of the route. Baseline monitoring can help to customize a process that is otherwise a one-size-fits-all approach.").

AR 004721

Given that manipulating physical attributes of streams has a very low success rate in promoting stream recovery biologically (as measured by biodiversity),[352] TGP cannot assume that function will simply follow form. Indeed, as Palmer (2014) observes, "habitat may be important ecologically, but it is not sufficient for assessing ecological outcomes (Doyle & Shields 2012), and in the vast majority of cases restoration of habitat does not lead to restoration biologically (Jahning et al. 2010)."[353] Accordingly, TDEC cannot rely on TGP's commitment to restore the form of the stream as a technique to minimize its adverse effects on the aquatic ecosystems through which it will trench.

### d. Even Compliant Restoration Efforts Would Not Reverse Expected and Significant Adverse Impacts, Including Cumulative Impacts.

Because restoration efforts are generally successful only in a limited sense, many of the impacts to wetlands, streams, and streambanks that TGP deems "temporary" due to restoration efforts are more likely to be long-term or permanent even if TGP follows through with the restoration plans included in its application.[354] That will place TGP in violation of the prohibition against unmitigated appreciable permanent losses.[355] According to Zedler and Kercher (2005), "Restoration can reverse some degradation but many damages are not reversible[.]"[356] Zedler and Kercher add that "[m]any local damages to ecosystems are . . . irreversible, at least in the time frame of most restoration projects (often 3 to 5 years, sometimes 10 to 20 years, rarely 50 years)."[357] Even "[i]f a wetland has survived filling, draining, or diversion, its integrity has not necessarily been preserved, nor is it safe from future degradation."[358] Employing any criteria related to ecological functions—rather than merely the superficial appearance of herbaceous ground cover—undermines TGP's optimism. Instead, it is most likely that genuine restoration will still not have occurred long after TGP abandons post-construction monitoring.

Wetlands perform valuable ecosystem services of global significance, including biodiversity support, water purification, flood abatement, and carbon storage,[359] yet restorations can be deemed completed and successful even if a wetland's ability to perform those functions has been degraded. One expert report (Sauer 2014) explains:

> Current pipeline construction restoration requirements are very low; they rely primarily on cool grass seeding and erosion blankets and often have poor long term results after the two required maintenance and monitoring seasons for the agencies. Even with such low stabilization standards, the rate of compliance is abysmal. For example, between June 2011 and October 2011, in just two counties in

---

[352] Palmer et al., *Ecological Restoration of Streams and Rivers: Shifting Strategies and Shifting Goals*, 45 Ann. Rev. Ecology, Evolution, & Systematics 259 (2014) (Exhibit 40).
[353] *Id.*
[354] *See* Silvis (2023) at 2–5 (Exhibit 1).
[355] Tenn. Comp. R. & Regs. 0400-40-07-.04(6)(c).
[356] *See, e.g.*, Zedler & Kercher (2005) at 57 (Exhibit 38).
[357] *Id.* at 58.
[358] *Id.* at 49.
[359] *Id.* at 39, 50.

AR 004722

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **60** of **69**

Pennsylvania there were 32 documented sediment discharge violations along the route of the Tennessee Gas Pipeline Company's 300 Line project. Imagine how many such violations go unobserved. Pipelines can also dewater the headwater areas through which they pass and change the hydrology of wetlands areas along the route. Taken with the loss of vegetation and soil compaction, these impacts cause landscape-scale changes to the watershed yet they are neither acknowledged nor mitigated.[360]

Solely focusing on the presence or absence of herbaceous ground cover is part of the problem. Sauer explains that, along the pipeline right-of-way, including at stream and wetland crossings:

The loss of vegetation may be the most apparent impact, but soil changes are the most pernicious. The single biggest problem is soil compaction, which may be as high as 98%, the same as concrete. Rainwater often runs off the ROW like a stream, creating gullies in the adjacent landscape, which leads to erosion and sedimentation locally. Once soil has been disturbed and compacted, it is very difficult to restore its capacity for water infiltration. Re-ripping the soil with a chisel plow is a partial solution to surface compaction, but it leaves behind an exceedingly erodible surface and does not address the issue of recharge. Ripping deep enough to effect recharge would destabilize large areas of the landscape and be almost impossible to re-stabilize. The damage from soil compaction, loss of vegetation, increased runoff, erosion, and resulting pollution has effects well beyond the boundaries of the ROW where it originates[.][361]

Even if restoration efforts are successful enough that soils look the same, soil properties have nonetheless changed due to the disturbance.[362] Additionally, as is common practice for wetland restorations, TGP plans to segregate the topsoil up to one foot in depth in wetlands.[363] That helps to ensure successful revegetation; however, that soil disturbance alone would result in a large release of carbon, as the greatest density of soil organic carbon is found in the top 30 centimeters of the soil profile.[364]

Another reason that restoration efforts fall short of restoring ecological functions is that the precise previous topography of a disturbed area cannot be re-established. In wetlands, "[a]n elevation difference as small as 10 cm can eliminate some species and allow others to dominate."[365] Hydrology can also be altered by very slight changes in grade, impacting a wetland's water supply and purification services.

---

[360] Sauer (2014) at 6 (Exhibit 39).

[361] *Id.* at 5–6.

[362] *See* Section I.B.3.c.i, *supra*.

[363] ARAP Application at 14.

[364] *See* A.M. Nahlik & M.S. Fennessy, *Carbon Storage in U.S. Wetlands*, NATURE COMMC'NS (Dec. 13, 2016) (Exhibit 41).

[365] Zedler & Kercher (2005) at 61 (Exhibit 38).

AR  004723

Because it is extremely unlikely that restoration efforts will be successful at restoring the stream and wetlands' ecological functions, TGP's plans will likely result in very significant cumulative impacts and appreciable permanent loss of resource values. Just as with TGP's lack of concern for cumulative impacts generally, the application downplays the expected damage to streams and wetlands by mislabeling many impacts as "temporary" and claiming that even the admittedly permanent losses are *de minimis*.[366] As discussed above, TGP underestimates the permanent loss or degradation of wetlands by treating "restored" wetlands as suffering only temporary impacts.  Furthermore, it does not matter that many affected wetlands are small, as a wetland's size does not determine its importance; indeed, if there are many small wetlands in an area dominated by drier areas, each wetland may be extremely important to birds and other wildlife.

This problem particularly impacts fauna that move among streams and wetlands. As Zedler and Kercher (2005) have noted, "The entire wetland landscape needs to be restored in order to attract some animal species. Amphibians are a good example because these animals move among ponds and cannot survive where pond-to-pond distances are too great."[367] Stream-associated salamanders also have low dispersal ability and may not be able to travel between forest gaps.[368] The primary factor in amphibian decline in the Southern Appalachians is habitat loss and degradation, and, because these salamanders are "highly influential in community and ecosystem processes," their fate has ripple effects on the whole ecosystem.[369]

In sum, TDEC should deny the permit because TGP's restoration plans—even if the company were to comply with all applicable requirements—do not come close to minimizing the project's adverse impacts on streams and wetlands.

B. **TGP's Reliance on FERC's Waterbody and Wetland Procedures is Insufficient to Minimize the Impacts of its Crossings.**

TGP relies on FERC's Wetland and Waterbody Construction and Mitigation Procedures (2013) ("FERC Procedures") to support its application.[370] But the scientific literature on stream crossings is highly critical of FERC's procedures. Indeed, a 2015 journal article authored by a FWS biologist stated,

[C]urrent FERC guidance for Wetland and Waterbody Construction and Mitigation procedures (Procedures; FERC 2013) is national in scope and general in nature and **therefore does not provide sufficient detailed and specific information at a**

---

[366] Tennessee Gas Pipeline Co., LLC, Cumberland Project: Section 404 Clean Water Act/Section 10 Rivers and Harbors Act Dredge and Fill – Individual Permit Application at 45 (July 22, 2022) (Exhibit 42).
[367] Zedler & Kercher (2005) at 63 (Exhibit 38).
[368] Kristen K. Cecala et al., *Multiple drivers, scales, and interactions influence southern Appalachian stream salamander* occupancy, 9 ECOSPHERE e02150 (2018), https://doi.org/10.1002/ecs2.2150 (Exhibit 43).
[369] *Id.*
[370] ARAP Application at 7.

AR  004724

**regional level to adequately protect aquatic ecosystems with numerous species in complex geographic and ecologic settings.**

\* \* \*

While the FERC Procedures do address some predictable pipeline impacts, especially during construction, the guidance does not address the longer term stream response potential, which is highly dependent on characteristics of the stream system rather than the pipeline. Therefore, depending upon the crossing locations, stream and catchment characteristics, timing, extent of activities, and application of Best Management Practices (BMPs—construction conservation measures intended to reduce impacts to the environment), impacts to aquatic species will vary but may include simplification of habitat, loss of aquatic species passage, removal of spawning gravel, increased sediment and turbidity, loss of side channels, disconnection from the floodplain, or change in hyporheic flow patterns (Reid *et al.*, 2002b). These impacts may occur at the project site or may propagate upstream, downstream, or laterally into the floodplain.[371]

In other words, adherence to the FERC Procedures is insufficient to ensure the avoidance and minimization of stream impacts or the prevention of appreciable permanent losses of resource values. The FERC Procedures are far too generalized. Accordingly, site-specific review and design is required to protect the aquatic ecosystems. As discussed elsewhere in these comments, such information is sorely lacking from TGP's application. As a result, neither TGP nor TDEC can rely on the FERC Procedures to comply with the avoidance and minimization requirements in Tenn. Comp. R & Regs. 0400-70-07-.01(1) & 0400-40-07-.04(5)(b).

## C. Use of a Risk-Based Assessment Would Constitute an Appropriate and Practicable Step to Minimize the Effects of TGP's Proposed Discharges, if Permitting Those Discharges Were Lawful.

Even assuming that the permit sought by TGP could be issued in compliance with Tennessee rules and regulations, TDEC should require TGP to minimize the effects of its proposed discharges through implementation of a risk-based approach.

Such an approach is endorsed by Castro et al. (2015). In that article, the FWS "developed a pipeline crossing framework and risk analysis approach to stratify potential aquatic impacts, based on both stream characteristics and project types."[372] The approach ranks pipeline crossings "in terms of relative short and long-term risk to aquatic habitat" and then analyzes, designs, and monitors the crossings in ways appropriate to their risk.[373]

---

[371] Castro et al. (2015) at 769 (Exhibit 15).
[372] Castro et al. (2015) at 767 (Exhibit 15).
[373] *Id.*

To apply this risk based approach, the applicant first gathers a robust dataset to establish baseline data and enable the crossings to be ranked based on their relative risk.[374] That ranking occurs through the application of the Pipeline Screening Risk Matrix to allow a qualitative analysis of risk.[375] The matrix cannot be successful, however, without "site-specific, field observations and measurements."[376] The objective of the matrix is "that pipeline crossings should do no long-term harm to aquatic habitat on-site, upstream, or downstream and that short and long-term negative impacts will be avoided where possible, minimized to the greatest extent possible, and mitigated where necessary."[377] In other words, the matrix is consistent with the requirements of Tennessee rules governing ARAPs.

Although these comments establish elsewhere that TDEC must deny TGP's application, even if that were not true, TGP's adverse impacts would still have to be minimized and TDEC should ensure that they are doing so by requiring TGP to implement the risk-based approach discussed in Castro et al. (2015).

## V.   TDEC MUST SEEK ADDITIONAL TIME FROM THE CORPS TO CERTIFY TGP'S STREAM CROSSING ACTIVITIES, OR DENY THE APPLICATION BECAUSE IT DOES NOT PROVIDE ALL REQUIRED INFORMATION.

TDEC does not have sufficient time to review and respond to these public comments or to grapple with the information herein that contradicts the applicant's submissions. TDEC should thus seek additional time from the Corps to certify discharges related to TGP's stream crossing activities or deny the application.

TDEC states that TGP's application was complete on April 20, 2023. To the contrary, and as explained in these comments, TGP still has not provided sufficient information about its proposed activities to complete its application. But even assuming that the application were complete on April 20, 2023, completing a public comment period on July 16, 2023, and issuing a final decision issuing a Section 401 certification by July 22, 2023 (as the Corps currently purports to require) would be unreasonable.

Under Tennessee's bill of rights for permit applicants, TDEC has a total of 180 days from its determination that an ARAP application is complete to act on the application when a public hearing is scheduled.[378] Assuming April 20, 2023 were the application completion date (it is not), the state deadline would not fall until October 17, 2023. Nonetheless, the Corps expects TDEC to act in approximately half that time, by July 22, 2023.

The Corps has set or reset multiple "reasonable period[s] of time" ("RPOT") for TDEC to act on TGP's Section 401 application, based in part on the applicant's inability to present a complete application. For example, in December 2022, the Corps appeared to entirely suspend

---

[374] *Id.* at 771.

[375] *Id.*

[376] *Id.*

[377] *Id.*

[378] Tenn. Code Ann. § 6 9-3-141(b)(5)(A).

AR 004726

the RPOT for TDEC to act because TGP withdrew its Section 404 application.[379] Then, in February 2023, the Corps set a new RPOT deadline for TDEC of June 11, 2023.[380] Subsequently, after the Corps belatedly recognized that TGP's application remained incomplete in March 2023,[381] the Corps reset TDEC's RPOT deadline for August 12, 2023.[382] But a month later the Corps unexpectedly purported to take "corrective action" to once more revise TDEC's RPOT deadline, this time to July 22, 2023.[383] The Corps represented that the revision was required "to limit the RPOT to one year from the date of TN Pipeline's WQC request on July 22, 2022[.]"[384]

The Corps' determination of the RPOT in this instance ignores the established fact—even conceded by the Corps—that TGP's application was incomplete when submitted in July 2022. Because it did not include all of the information required under 40 C.F.R. § 121.5(b) to constitute an effective certification request, it could not lawfully start the clock for TDEC's RPOT. Section 121.5(b) mandates that "[a] certification request for an individual license or permit shall . . . [i]dentify the location and nature of any potential discharge that may result from the proposed project and the location of receiving waters."[385] In its March 2023 letter to TGP, the Corps concedes that the July 2022 application did not include all of that information.[386] Indeed, that defect is apparent on the face of TGP's July 2022 application, in which the applicant admitted

---

[379] Email from Amy Priest, U.S. Army Corps of Eng'rs, to Claire Wainwright, Tenn. Dep't of Envt. & Conservation, RE: RPOT extension request – LRN-2021-00866 (Dec. 12, 2022).

[380] Email from Amy Priest, U.S. Army Corps of Eng'rs to Claire Wainright, Tenn. Dep't of Envtl. & Conservation, LRN-2021-00866; TN Gas Pipeline Company RPOT (Feb. 8, 2023).

[381] Letter from Timothy C. Wilder, Chief, West Branch of the Regulatory Division of the Nashville District, U.S. Army Corps of Eng'rs, to Gina Dorsey, Kinder Morgan, Inc. Re: File No. LRN-2021-00866, Request for Additional Information for the Proposed Tennessee Gas Pipeline, Natural Gas Line crossing multiple streams and wetlands from Dickson to Cumberland City, in Dickson, Houston, and Steward Counties, Tennessee (Latitude: 36.266637; Longitude: - 87.426619) (Mar. 10, 2023).

[382] Email from Amy Priest, U.S. Army Corps of Eng'rs, to Claire Wainwright, Tenn. Dep't of Envt. & Conservation, FW: LRN-2021-00866; TN Gas Pipeline Company RPOT (April 17, 2023).

[383] Email from Amy Priest, U.S. Army Corps of Eng'rs, to Claire Wainwright, Tenn. Dep't of Envt. & Conservation, Re: LRN-2021-00866; NRS22.192; RPOT Update for TN Natural Gas Pipeline project (May 18, 2023).

[384] *Id.*

[385] 40 C.F.R. § 121.5(b).

[386] Letter from Timothy C. Wilder, Chief, West Branch of the Regulatory Division of the Nashville District, U.S. Army Corps of Eng'rs, to Gina Dorsey, Kinder Morgan, Inc. Re: File No. LRN-2021-00866, Request for Additional Information for the Proposed Tennessee Gas Pipeline, Natural Gas Line crossing multiple streams and wetlands from Dickson to Cumberland City, in Dickson, Houston, and Steward Counties, Tennessee (Latitude: 36.266637; Longitude: - 87.426619) (Mar. 10, 2023).

that it had not accessed 1.15 miles of the route to conduct field surveys and anticipated adding additional discharge locations once it completed those surveys.[387]

The RPOT clock should not have started running on July 22, 2022, and the Corps is mistaken to state otherwise. As EPA explained when it promulgated the RPOT regulation, "if a project proponent does not submit a certification request as defined at section 121.5(b) of the rule, *then the reasonable period of time does not begin.*"[388] Accordingly, TDEC should raise this issue with the Corps and seek revision to the RPOT deadline.

If the Corps does not provide such a revision before July 22, 2023, then TDEC should deny TGP's application for certification of discharges related to its proposed stream crossing alternatives consistently with 40 C.F.R. § 121.7(e)(1)(iii). Under that regulation, a certifying authority can deny a Section 401 certification request on the basis of insufficient information, so long as it describes the information deficits.[389] As explained throughout these comments, there are a host of informational deficiencies in TGP's Section 401 application. For example, the application fails to provide sufficient information on practicable alternatives, cumulative effects, or baseline data about present stream conditions.[390] Moreover, the draft ARAP establishes that TDEC expects "amendments to the project aquatic resources inventory . . . that address parcels not previously inventoried" and even the issuance of "a revised ARAP covering all proposed impacts to aquatic resources for the entire pipeline project."[391] On those bases, TDEC must deny TGP's application because it would be arbitrary and capricious for TDEC to certify that it is reasonably assured the TGP's proposed stream crossing activities will comply with water quality requirements in the absence of necessary, missing information.

## VI.   TDEC MUST SEEK AND OBTAIN ACKNOWLEDGEMENT FROM FERC THAT TGP HAS NOT APPLIED FOR SECTION 401 CERTIFICATION OF ITS PROPOSED UPLAND CONSTRUCTION AND OPERATION ACTIVITIES, OR DENY CERTIFICATION OF SUCH ACTIVITIES

TDEC's draft permit does not acknowledge that TGP is seeking *two* federal licenses that will need state certification under Section 401—the Section 404 permit from the Corps *and* the Natural Gas Act Certificate of Public Convenience and Necessity from FERC.[392] That TDEC must evaluate discharges that would be authorized by both (1) the Section 404 permit and (2) the FERC Certificate is important because the scope of discharges authorized by the latter is broader than that of the former. That is, the FERC Certificate TGP seeks will authorize the construction and operation of the entire Pipeline facility, which will result in discharges beyond those at

---

[387] ARAP Application, 4.

[388] Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 42210, 42245 (July 13, 2020) (emphasis added).

[389] 40 C.F.R. § 121.7(e)(1)(iii).

[390] *See* Sections I.A, III, V.

[391] Draft ARAP at 11 (Special Condition a).

[392] 33 U.S.C. § 1341(a); *see also, e.g., Millenium Pipeline Co., LLC v. Seggos*, 860 F.3d 696, 698 (D.C. Cir. 2017); *Berkshire Envtl. Action Team, Inc. v. Tenn Gas Pipeline Co.*, 851 F.3d 105, 107 (1st Cir. 2017).

AR 004728

TGP's proposed stream crossings—namely, discharges of stormwater runoff from upland areas of the Pipeline ROW during both construction and operation. FERC appears to expect TDEC to act under Section 401 to certify the applied-for FERC Certificate of Public Convenience and Necessity, and has given TDEC until July 22, 2023 to act under Section 401 to avoid waiver.[393]

But TGP has failed to apply for certification for its FERC Certificate and the attendant discharges from upland construction. To be clear, those discharges would be authorized by the FERC Certificate, not the Section 404 permit. TGP needs Section 401 certification from TDEC *of each permit*, however. Where a proposed activity—like TGP's upland construction and operation of a natural gas pipeline—will result in discharges but does not require an ARAP, "the applicant for a federal license or permit may obtain a Section 401 certification by submitting a copy of the federal application to the Division and a request for a Section 401 certification."[394] Conservation Groups can find no publicly available evidence that TGP complied with that requirement. Nor can Conservation Groups find any evidence that TGP identified the streams that would receive discharges from upland areas during the Pipeline's construction and operation, as required by federal Section 401 regulations.[395]

EPA has explained that its application requirements are "necessary to provide a certifying authority with clear notice that a request has been submitted," and "if a project proponent does not submit a certification request as defined at section 121.5(b) of the final rule, *then the reasonable period of time does not begin*."[396]

Here, Tennessee Gas has failed to submit a cognizable certification request for the FERC Certificate of Public Convenience and Necessity it seeks, and the attendant upland discharges that would be authorized by that Certificate. As a result, the clock never started to run for a Section 401 certification for the applied-for FERC certificate. TDEC should immediately raise this issue with FERC and insist that FERC vacate or rescind its August 18, 2022 Notice of Waiver Period for Water Quality Certification Application.

Alternatively, or if FERC refuses to vacate or rescind its notice setting July 22, 2023 as the deadline for TDEC to certify the applied-for FERC certificate, TDEC should deny Section 401 certification for the applied-for FERC certificate on the basis of insufficient information. Federal regulations allow denial on the basis of insufficient information, so long as the certifying authority "describe[s] the types of water quality data or information, if any, that would be needed to assure that the range of discharges from potential projects will comply with water quality requirements."[397] Because TGP has not provided even basic information about the discharges

---

[393] FERC, *Notice of Waiver Period for Water Quality Certification Application* (Aug. 18, 2022) (Exhibit 44).
[394] Tenn. Comp. R. & Regs. 0400-40-07-.04(3).
[395] 40 C.F.R. § 121.5(b)(4) ("A certification request for an individual license or permit shall . . . identify the location and nature of any potential discharge that may result from the proposed project and the location of receiving waters[.]").
[396] Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 42210, 42245 (2020) (emphasis added).
[397] 40 C.F.R. § 121.7(e)(1)(iii).

AR 004729

from its upland construction and operation of the pipeline—such as the names of the streams receiving such discharges, estimated quantities of pollutants such as sediment, and information about measures TGP intends to employ to minimize pollutant discharges from its upland construction and operation activities—denial here would be appropriate under 40 C.F.R. § 121.7(e)(1)(iii).

Indeed, denial is not only appropriate, it is mandatory on this record. For TDEC to certify under Section 401 that it is assured that discharges from upland construction and operation activities will comply with water quality requirements—without having even received basic information from the applicant about the location and nature of those discharges—would be indefensible and vacated as arbitrary and capricious on judicial review. Consequently, TDEC **must** deny Section 401 certification for discharges from upland construction and operations activities for insufficient information under 40 C.F.R. § 121.7(e)(1)(iii), if FERC does not vacate, rescind, or otherwise modify its position that the reasonable period of time for TDEC to certify the applied-for FERC certificate is July 22, 2023.[398]

## VII.  ANY FINAL ARAP ISSUED BY TDEC SHOULD INCLUDE CERTAIN MODIFICATIONS TO THE DRAFT PERMIT'S TERMS AND CONDITIONS.

TDEC cannot lawfully issue a valid ARAP and/or § 401 certification to TGP given the deficiencies in TGP's application and based on the issues outlined above. But if TDEC were to act anyway, any final permit should contain certain modifications to clarify TGP's obligations under the permit's terms.[399]

In addition to obtaining an ARAP to impact various waterbodies and § 401 certifications of the § 404 permit and FERC Certificate it seeks, TGP must obtain several other state and

---

[398] If TDEC were to certify TGP's proposed discharges from upland construction and operation activities, it would be important for TDEC to include conditions requiring TGP to comply with the state's stormwater construction permit and SWPPPs. In the draft Permit and Rationale, TDEC states that "[s]tabilization will be achieved according to the limitations of the approved NPDES Construction General Permit and SWPPP." Draft ARAP at 31. That type of reliance requires TDEC to include compliance with the Construction General Permit and SWPPP as conditions of the § 401 certification. *Sierra Club*, 64 F.4th at 505–06.

To be clear, Conservation Groups do not concede that including conditions requiring compliance with construction stormwater permits or SWPPPs would suffice here to cure the irrationality of issuing a § 401 certification for discharges about which TDEC does not even know the location or nature. But it would at least avoid having state stormwater requirements preempted. *See Sierra Club*, 64 F.4th at 506 (holding that a state's § 401 "represents [a state's] primary opportunity to enshrine indispensable state permitting protocol into a [natural gas pipeline's] federal obligations" given that the Natural Gas Act "preempts most state environmental regulation" of natural gas pipelines, including state stormwater permitting).

[399] To be clear, making the modification requested in this section would not be sufficient to cure the myriad legal deficiencies in TGP's application or in TDEC's Draft ARAP.

AR 004730

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **68** of **69**

federal permits to construct and operate its gas pipeline. TDEC recognizes this in General
Condition B of the Draft ARAP, which provides:

> Work shall not commence until the permittee has obtained all necessary
> authorizations pursuant to applicable provisions of section 10 of The Rivers and
> Harbors Act of 1899, section 404 of the Clean Water Act, section 26a of the
> Tennessee Valley Authority Act, section 402 of the Clean Water Act (including,
> but not limited to, an NPDES permit for construction stormwater), or any other
> federal, state or local laws.[400]

Although this condition is a good start, it is incomplete. TDEC should clarify in any final
permit that construction done pursuant to this ARAP is conditioned on TGP receiving *and
maintaining* all other necessary authorizations. Accordingly, General Condition B of the draft
ARAP should be amended to state that work conducted pursuant to the ARAP may only occur
where TGP has obtained *and retained* all necessary authorizations under state and federal law to
do so. In other words, TGP's obligation to have all necessary permits to perform its work is a
continuing one. Work can only commence once all necessary authorizations are obtained, and
can only continue so long as TGP retains and/or maintains *all* necessary authorizations.

Any final permit must also acknowledge that TGP has disavowed the use of "'wet cut'
methods, which would be implemented without diverting stream flow" for this project.[401]
Nonetheless, certain statements in the draft ARAP could be interpreted (albeit erroneously) to
authorize the use of wet, open-cut methods and thus should be deleted. Specifically, the last three
sentences of Special Condition hh provide:

> Activities may be conducted in the water if working in the dry will likely cause
> additional degradation. If work is conducted in the water it must be of a short
> duration and with minimal impact. For navigable streams as defined by section 10
> of the Rivers and Harbors Act of 1899, the excavation and fill activities associated
> with utility line crossing may be accomplished within the flowing water.[402]

To avoid any implication that TDEC has authorized the use of a crossing method that
TGP has not asked to employ, TDEC should delete the final three sentences of Special Condition
hh and replace them with a clear prohibition on the use of wet, open-cut crossings.

---

[400] Draft ARAP at 16.
[401] ARAP Application at 11.
[402] Draft ARAP at 16.

AR 004731

Re: Conservation Groups' comments on draft ARAP NRS 22.192
July 14, 2023
Page **69** of **69**

## CONCLUSION

For the foregoing reasons, we respectfully request that TDEC deny TGP's application.

Respectfully submitted,

Amanda Garcia
Trey Bussey
Stephanie Biggs
Daniel J. Metzger
Southern Environmental Law Center
1033 Demonbreun Street
Suite 205
Nashville, TN 37203
(615) 921-9470
agarcia@selctn.org
tbussey@selctn.org
sbiggs@selctn.org
dmetzger@selctn.org

Gregory Buppert
Spencer Gall
Southern Environmental Law Center
201 West Main Street
Suite 14
Charlottesville, VA 22902
(434) 977-4090
gbuppert@selcva.org
sgall@selcva.org

Derek Teaney
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 646-1182
dteaney@appalmad.org

Brianna Knisley
Appalachian Voices
589 West King Street
Boone, NC 28607
(865) 219-3225
brianna@appvoices.org

Zachary Fabish
Sierra Club
50 F Street NW, 8th Floor
Washington, DC 20001
(202) 675-7917
zachary.fabish@sierraclub.org

AR  004732

## Malaika J. Newball

| | |
|---|---|
| **From:** | Water Permits |
| **Sent:** | Friday, July 14, 2023 1:43 PM |
| **To:** | Malaika J. Newball; Lee 2. Barber; Nicholas Summers |
| **Subject:** | FW: (1 of 6) Attachments to Conservation Groups' Comments on draft ARAP NRS 22.192 |
| **Attachments:** | Volume 1, Exhibits 1-2.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |
| | |
| **Categories:** | ARAP |

**From:** Daniel Metzger <dmetzger@selctn.org>
**Sent:** Friday, July 14, 2023 1:05 PM
**To:** Claire Wainwright <Claire.Wainwright@tn.gov>; Water Permits <Water.Permits@tn.gov>
**Cc:** Derek Teaney <dteaney@appalmad.org>; Amanda Garcia <agarcia@selctn.org>; Stephanie Biggs <sbiggs@selctn.org>; Trey Bussey <tbussey@selctn.org>
**Subject:** [EXTERNAL] (1 of 6) Attachments to Conservation Groups' Comments on draft ARAP NRS 22.192

**\*\*\* This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email - STS-Security. \*\*\***

Ms. Wainwright,

Enclosed are exhibits 1 and 2 to Conservation Groups' Comments on draft ARAP NRS 22.192

Best,

**Daniel J. Metzger** (he/him)
Associate Attorney
dmetzger@selctn.org

Southern Environmental Law Center
1033 Demonbreun Street
Suite 205
Nashville, TN 37203

Office (615) 921-9470
southernenvironment.org

PRIVILEGE AND CONFIDENTIALITY NOTICE
This email and any attachments may be protected by the attorney-client privilege, as attorney work-product, or based on other privileges or provisions of law. If you are not an intended recipient of this message, do not

AR  004733

read, copy, use, forward, or disclose the email or any of its attachments. Instead, immediately notify the sender by replying to this email and then delete it from your system. The unauthorized disclosure, copying, distribution, or use of this email or any attachments is prohibited.

AR 004734

<u>Exhibits to Conservation Groups' Comments on Draft Aquatic Resource Alteration Permit NRS 22.192</u>

<u>Volume 1: Exhibit 1-2</u>

AR 004735

Exhibit 1

AR 004736

# Evaluation of Tennessee Gas Pipeline Company, LLC's Application for a Department of the Army Permit for the Cumberland Pipeline Project

**Starr Silvis, M.S., P.E.**[*]

**May 10, 2023**

*Prepared for the Southern Environmental Law Center*

## Overview and Principal Conclusions

This report documents my evaluation of Tennessee Gas Pipeline Company, LLC's ("Tennessee Gas") application to the U.S. Army Corps of Engineers ("Corps") for a Department of the Army ("DA") permit authorizing discharges of dredged or fill material under Section 404 of the Clean Water Act to construct the proposed Cumberland Pipeline Project. This report is based on a review of the permit application and supporting materials that Tennessee Gas submitted to the Corps, as well as documents and records concerning the proposed pipeline that are available from the Tennessee Department of Environment and Conservation ("TDEC") and the Federal Energy Regulatory Commission ("FERC") as of May 8, 2023.

I conclude that the Corps must deny Tennessee Gas's permit application because it does not satisfy applicable regulatory standards. As relevant here, the Environmental Protection Agency's ("EPA") Section 404(b)(1) Guidelines mandate that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem" and/or if the discharge would "cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(a), (c). As EPA explains, permit applicants like Tennessee Gas must show that they "have, to the extent practicable: [t]aken steps to avoid wetland impacts; [m]inimized potential impacts on wetlands; and [p]rovided compensation for any remaining unavoidable impacts." (EPA, 2004).

Tennessee Gas's permit application does not meet these standards. My review of the permit application and associated materials revealed that the application:

1. Mischaracterizes many permanent impacts as temporary;

2. Fails to justify the proposed crossing methods as the least environmentally damaging practicable alternatives;

---

[*] Licensed in North Carolina. My curriculum vitae is attached to this report as Appendix A.

AR 004737

3.  Consistently omits critical site-specific information; and

4.  Includes significant inconsistencies, discrepancies, and gaps.

Given these defects, I conclude that Tennessee Gas's proposal is likely to result in significant long-term harm to aquatic ecosystems causing significant degradation to the waters of the United States and that less environmentally damaging alternatives exist.

**Permanent v. Temporary Impacts**

Tennessee Gas's proposed dry open-cut crossings are likely to be even more environmentally damaging that the company's permit application acknowledges, because the application incorrectly characterizes many permanent impacts as temporary and does not meet minimum industry standards for design and site-specific information.

Tennessee Gas proposes dry open-cut methods for the vast majority of stream and wetland crossings within the project area. Although dry open-cut methods are often less damaging than wet open-cut methods, the former are still associated with long-term negative impacts to aquatic ecosystems. Indeed, based on my experience in stream restoration, hydrology, stream geomorphology, and erosion and sediment control, I understand that there are significant permanent impacts associated with trenched methods of stream and wetland crossings. Trenchless methods are associated with fewer short-term and long-term negative effects on aquatic ecosystems. In general, avoidance of stream and wetland disturbances using trenchless methods is the least damaging alternative for waterbody crossings absent special site-specific conditions.

A key premise of Tennessee Gas's selection of dry open-cut methods for the majority of its proposed crossings is the assertion that "[a]ll impacts on waterbodies due to pipeline construction will be temporary." Application at 12. However, the company presents a skewed picture because the impacts of its proposal will be much greater than the application acknowledges.

The scientific literature shows that even "temporary" in-stream dredge and fill activities cause long-term ecosystem changes as well as changes in stream morphology. As observed by Castro et al. (2015), "[b]ased on past experience at pipeline crossings, the potential for both short and long-term negative impacts on aquatic habitat and species is substantial." Levesque and Dube (2007) noted that "[d]ry-ditch, open-cut methods may impact watercourse ecosystems both during, and for potentially some time after, construction. All in-stream construction activities, particularly trench excavation and pipeline installation and backfill, result in disturbance of channel bed and banks, and have the potential to alter suspended sediment concentration and sedimentation." Damage to aquatic ecosystems associated with installation of pipelines include: immediate mortality of fish and benthic macroinvertebrates in the area of active construction, downstream increases in turbidity and suspended sediment, downstream deposition of sediment, sedimentation from disturbance of stream banks, temperature increases, and increase in stormwater runoff due to change in runoff from upslope areas.

AR  004738

The Corps characterizes stream impacts as temporary or permanent for the purposes of Section 404 Clean Water Act permitting. The difference between the designation of temporary and permanent impact is the length of time that the proposed dredge or fill activity will take place. However, these designations do not adequately convey the duration of impacts to the aquatic ecosystem at the location of the impact and downstream from proposed in-stream dredge and fill activities. Castro et al. (2015) reported that the effects of pipeline stream crossings "include both short-term, construction related impacts, such as increased turbidity, direct modification of aquatic habitat, and the potential for hydrocarbons to enter the stream through equipment failures and spills (Reid and Anderson, 1999; Reid *et al*, 2002a, 2002b), and long-term impacts that are more directly associated with the stream's response potential, such as channel incision and lateral migration (Thorne *et al.*, 2014)."

Dry-ditch open-cut methods require routing stream flow around the active trench area. These methods require disturbing stream flow and active work in live channels to install diversion devices, as well as active work in live channels to remove diversion devices. Immediate environmental impacts associated with dry-ditch open-cut methods include death of all fish and benthic macroinvertebrates within the work area and increased turbidity and suspended sediment loads when the diversion is installed, for the duration of the disturbance, as well as when flow is returned to the disturbed channel bed. According to Levesque and Dube (2007):

> Pipeline crossing construction is shown to not only compromise the integrity of the physical and chemical nature of fish habitat, but also to affect biological habitat (e.g., benthic invertebrates and invertebrate drift), and fish behavior and physiology. Indicators of effect include: water quality (total suspended solids TSS), physical habitat (substrate particle size, channel morphology), benthic invertebrate community structure and drift (abundance, species composition, diversity, standing crop), and fish behavior and physiology (hierarchy, feeding, respiration rate, loss of equilibrium, blood hematocrit and leukocrit levels, heart rate and stroke volume).

There are long-term increases in sedimentation due to stream bank and upland disturbances until vegetation can be re-established. Increased turbidity and high suspended sediment loads can cause long-term impacts to invertebrate communities downstream of the disturbance including reducing invertebrate biomass, growth rates, and species diversity and increasing invertebrate mortality. Increased suspended and deposited sediment causes negative impacts in fish populations as well. These impacts can include smothering of fish eggs, changes in stream bed characteristics which can reduce reproductive success, reduction of juvenile survival rates, reduction of food sources, as well as reduction in in-stream dissolved oxygen which causes respiratory distress.

Excavation of material in wetlands alters the hydraulic properties and the soil structure permanently. Olson and Doherty (2012) noted that "Installation of large-scale infrastructure, including pipelines, has the potential to damage soil and vegetation in wetlands within the path

AR  004739

of construction by compacting soil, altering hydrology, decreasing plant diversity, and facilitating invasions of unwanted species". In one study, soils consistently showed evidence of compaction and hydrologic alteration eight years after the wetlands were crossed by natural gas pipelines (Olson and Doherty, 2012). Wetlands soils take years to form and to function (Jackson et al, 2014). By excavating, stockpiling, then replacing soils in wetlands the hydraulic conductivity of the soil changes, the porosity is decreased, connectivity of pores decreases, compaction increases, and soil horizons are altered. All these characteristics work in conjunction to form a functioning wetland soil (Jackson et al., 2014). Fill associated with trenching changes all of these characteristics. Even with a requirement to replace the top layer of wetland soils, the functionality of the wetland is permanently negatively impacted.

Studies on impacts to soils from pipeline crossings in upland areas are more common than those in wetland areas. In upland areas soil changes near pipelines include: higher density, lower water holding capacity, lower organic matter content, higher temperature variation, and higher pH (Olson and Doherty, 2012). Wetland soils generally have high moisture, high organic content, high water holding capacity and unique biochemistry (Olson and Doherty 2012, Jackson et al, 2014). Most of these negative impacts to wetland form and function have been attributed to compaction during construction and mixing of soil when the pipeline was backfilled (Olson and Doherty, 2012). Four studies of wetlands impacted by pipeline construction observed changes in hydrology, including interruptions in flow of surface waters, ponding above or upslope of the pipe, and resulting changes in soil moisture (Boelter and Close, 1974; Kittleson and McDavitt, 1980; Abernethy and Gosselink, 1988; Baumans and Turner, 1990; Olson and Doherty, 2012). In their study of the effects of pipeline crossings on wetlands eight years after constructions activity Olson and Doherty (2012) found "higher bulk density, lower depth of refusal, and lower soil moisture inside the pipeline corridor." Olson and Doherty (2012) concluded that "...construction led to soil compaction. It is also likely that the combinations of compactions and soil mixing (during trench backfilling) changed soil water holding capacity, and thus, altered hydrology, soil/sediment chemistry, and invertebrate and wetland plant habitat…."

In addition to impacts due to the use of trenched methods for stream and wetland crossings, there are also impacts, including cumulative impacts, resulting from associated upland disturbances. Multiple crossings or multiple sources of disturbance and sedimentation in a watershed can have cumulative effects on fish survival and reproduction that exceed the recovery capacity of the river, resulting in permanent detrimental effects (Levesque & Dube, 2007). The conversion of forested land to maintained right-of-way increases runoff volumes, which will change stream morphology. Lack of intact forest cover has been found to change stream morphology for two to four years post-disturbance (Reid & Anderson 1999). Methods to maintain the right-of-way include use of pesticides and herbicides which can be mobilized in stormwater runoff and cause degradation of aquatic ecosystems. The construction of temporary and permanent access roads also increases runoff volumes and increases turbidity and sediment migration from upland areas to water bodies. The increase in stormwater runoff volumes can alter stream morphology and stream-bed composition. There are also long-term increases in temperature associated with the reduction of forested canopy for both streams and wetlands.

4

JA2349

AR 004740

Removal of vegetation from the banks can change temperature regimes, and increase sediment loads (Penkal & Phillips, 1984).

In my professional opinion, many of the impacts listed as temporary in Tennessee Gas's application will, in fact, be permanent. As detailed in the previous paragraphs, even short-duration activities have permanent negative effects on aquatic ecosystems. Further, as detailed below, I conclude that the proposed stream and wetland crossing plans in Tennessee Gas's application do not meet minimum industry standards for design and site-specific information and will result in long-term harm to waterbodies.

**Stream and Wetland Crossing Methods**

Tennessee Gas has not substantiated that any of the proposed crossings for which the company seeks a permit are the least environmentally damaging practicable alternative ("LEDPA"), as required by the Section 404(b)(1) Guidelines.

    *a.  Trenchless Crossing Methods*

The preferred method for pipelines to cross streams and wetlands to reduce negative environmental impacts is through trenchless construction absent special site-specific factors. Indeed, use of trenchless construction presumptively is the LEDPA because trenchless construction allows the pipeline to cross streams and wetlands without disrupting riparian vegetation, stream bed substrate, wetland soils, and flow in streams and rivers, thereby reducing short- and long-term fish and macroinvertebrate mortality, and allows streams and wetlands to remain intact, thereby reducing turbidity and suspended and settled sediment impacts.

Even though trenchless construction is presumed to be the LEDPA for pipeline waterbody crossings, Tennessee Gas's application proposes to use the dry open-cut construction method for nearly all the company's proposed stream crossings. In fact, Tennessee Gas proposes to use a trenchless technique—specifically, horizontal directional drilling ("HDD")—at only three locations along the route of the proposed pipeline: (1) Jones Creek; (2) Wells Creek; and (3) Yellow Creek and a nearby unnamed tributary ("UNT") to Yellow Creek.

One of the most striking defects in Tennessee Gas's application is the company's failure to address the technical, logistical, and cost practicability of trenchless construction on a crossing-by-crossing basis for any of the proposed crossings beyond the three HDD sites. Similarly, there is no information provided for why the three HDD sites were selected for trenchless crossings compared to other crossings that were not. Although the application at times suggests that Tennessee Gas may have developed an internal rationale for its proposed method at each crossing, those individual rationales are not provided in the application or other available materials. These are glaring omissions because an individualized LEDPA analysis is required under the Section 404(b)(1) Guidelines, and because it is an industry standard in applications for individual DA permits to evaluate trenchless crossing alternatives prior to proposing trenched crossings such as dry open-cut crossings, in order to reduce potential water quality and stream impacts. Since trenchless crossing methods are the least damaging to aquatic resources, it is my professional opinion that trenchless crossing methods must, at a minimum, be evaluated on a

AR  004741

crossing-by-crossing basis for use at all crossings. The application's failure to undertake this individualized evaluation compels the conclusion that Tennessee Gas has not shown its proposed crossings are the LEDPA.

Even where Tennessee Gas's application addresses trenchless construction methods in general terms, the application overlooks important considerations. First, the application presents a false choice between HDD and conventional bore as the two potential trenchless techniques that Tennessee Gas could select. Several other available trenchless crossing techniques such as microtunneling, Direct Pipe®, and guided conventional boring could be practicable at a given site even if HDD or conventional bore would not, and therefore these techniques must be considered in any LEDPA analysis. These different techniques are not interchangeable, and they each come with corresponding advantages and disadvantages that are relevant to whether a particular trenchless method would be the LEDPA at a given crossing. For example, Tennessee Gas's application asserts that HDD and conventional bore carry risks that are not present with trenched construction, including that "[t]here are no risks of inadvertent returns for a conventional open cut crossing as no drilling fluid is used during the process." Application at 35. However, this comparison ignores or elides the fact that conventional boring does not use high-pressure drilling fluid like HDD, nor do microtunneling, Direct Pipe®, and guided conventional boring. Notably, Tennessee Gas's discussion of available trenchless techniques is based on a 2013 feasibility study prepared by the developers of the Constitution Pipeline, which was also briefly summarized in a table for the Constitution Pipeline that Attachment 11 to Tennessee Gas's application recreates almost verbatim. Although Attachment 11 at least mentions Direct Pipe® in addition to conventional boring and HDD, there is no discussion of Direct Pipe® in Tennessee Gas's application itself.

Second, the application overlooks the apparent practicability of trenchless methods across the route as evidenced by statements in the application and associated materials. For example, conventional boring is proposed for multiple road crossings shown in Attachment 3 to Tennessee Gas's application, indicating that this trenchless method is appropriate for substrates found along the project length. However, conventional boring in not evaluated for any waterbody crossings in the application. Similarly, the application states that the "maximum length a [conventional] bore could achieve in ideal soil conditions typically does not exceed 400 feet." Application at 34. Tennessee Gas cannot dismiss the practicability of conventional boring based on width because the widest stream proposed for a dry open-cut crossing, Bartons Creek, is only 62.5 feet wide as shown in Table 1 in the application. To summarize, Tennessee Gas's application establishes that width does not preclude the use of conventional boring at any proposed open-cut crossing. Tennessee Gas also cannot dismiss the practicability of a trenchless technique at any individual crossing based on the presence of karst without additional site-specific analysis and evaluation. Although the application characterizes karst as an obstacle for trenchless techniques, Tennessee Gas's HDD Feasibility Study, Attachment 9 to its application, reveals that Tennessee Gas encountered karst during test bores for the planned HDD crossing of Yellow Creek (SHNC007) and plans to proceed with a trenchless technique at that site, conclusively establishing that karst does not automatically disqualify other proposed crossings from a trenchless technique.

6

JA2351

Third, the application effectively concedes that Tennessee Gas did not appropriately tier its consideration of crossing methods at each site in order to select the LEDPA for each. Instead, the application reveals that Tennessee Gas began by prioritizing dry open-cut crossings. For example, the application states that HDD will be used at the three locations discussed above "to overcome obstacles posed by use of other stream crossing construction methods that are impracticable because of channel dimensions, flow, or other constraints." Application at 15. Similarly, the application states that, "[g]iven the potential for weather to affect the flow in the stream and thus the crossing, and the ability to handle flow volume, the use of dry open cut crossing methods may result in the inability to handle stream flow appropriately for certain waterbody crossings. In that case, a trenchless crossing method (HDD or conventional bore method[…]) may be determined to be more appropriate." Application at 34. These statements indicate that Tennessee Gas prioritized trenched crossings except where they are impracticable instead of the other way around, starting with trenchless techniques for all sites unless they are shown to be impracticable. As stated above, trenchless crossings are less environmentally damaging than open-cut (*i.e.* trenched) crossings absent special site-specific circumstances. Therefore, they should be the first option evaluated when determining the LEDPA.

In summary, it is my professional opinion that trenchless methods are likely practicable for many more of the streams and wetlands that would be crossed by the pipeline than Tennessee Gas identifies. At a minimum, the deficiencies the permit application make it impossible to conclude that Tennessee Gas's proposal is, in fact, the LEDPA. Accordingly, it is my professional opinion that Tennessee Gas has not demonstrated that any of its proposed open-cut crossings represents the least environmentally damaging practicable alternative.

*b.  Blasting*

Even assuming a dry open-cut crossing in general is the least environmentally damaging practicable alternative in comparison to trenchless techniques at many of Tennessee Gas's proposed crossing sites, Tennessee Gas's application still fails to demonstrate that its proposed methods for constructing dry open-cut crossings are the LEDPA at each site.

Blasting is a particular concern. Tennessee Gas's application states that the company "anticipates encountering areas of shallow bedrock during [pipeline] construction that may require controlled blasting to remove." Application at 13. Blasting is the most destructive and potentially environmentally damaging of all waterbody crossing methods. Blasting causes permanent changes to stream channel roughness, composition, and function, and may cause deposition of rock debris in channel. Blasting also may cause fissures, cracks, and other alteration of subsurface structure that can lead to hydrologic losses. Additionally, blasting creates dust that may deposit in-stream and contribute to increased turbidity and sedimentation.

Given the LEDPA standard and the magnitude of impacts from blasting, the Corps must not allow blasting unless and until it concludes that no other trenched or trenchless construction techniques are possible based upon determinations made by the Corps prior to permitting. However, Tennessee Gas's application does not establish that blasting will be the LEDPA. In fact, the application lacks critical details, seeks approval for Tennessee Gas's construction

AR 004743

contractor to make decisions about blasting on the fly, and is inconsistent both internally and when compared to other materials about the proposed pipeline available from FERC and TDEC.

The application indicates that Tennessee Gas anticipates encountering bedrock that may require blasting to construct dry open-cut crossings based on the company's "review of surficial geology, soil mapping, and desktop geotechnical survey results." Application at 13. Yet the application does not include any of the "soil mapping" or "desktop geotechnical survey results" used to determine areas where blasting may be necessary, nor does it provide site-specific "surficial geology" investigation results. Geologic investigations to determine the trenching technique to be used at each crossing site should be conducted prior to permitting. However, information was not provided regarding any conducted or proposed geologic investigations.

The need for this information is underscored by Tennessee Gas's request in its application for a permit that would allow its construction contractor to make decisions about blasting on the fly. Blasting implicates the LEDPA standard and decisions about its use must be made prior to permitting. In my experience and professional opinion, allowing contractors to make decisions on the fly results in increased probability of negative impacts to aquatic resources.

Tennessee Gas identifies five techniques that it seeks permission to allow its contractor to choose from when bedrock is encountered during trenching for dry open-cut crossings:

     1. Conventional excavation with an excavator;

     2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;

     3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;

     4. Removal by rock trencher; or

     5. Controlled blasting and excavation with a backhoe.

The application states that Tennessee Gas's "construction contractor will evaluate and attempt the use of at least one of Techniques 1-4 described above based on the conditions observed at the time of construction to determine the best method for rock removal and excavation." Application at 14. The application further states that the choice of technique "will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location." Application at 13.

The evaluation of the potential for use of Techniques 1-4 for rock removal should be conducted prior to permitting, as each method has different environmental impacts associated with it and requires different equipment to be onsite. Similarly, the "relative hardness, fracture susceptibility, and expected volume of bedrock, as well as its location" should be determined by geologic investigations and reporting prior to permitting to reduce negative impacts to aquatic resources.

8

AR  004744

Notably, Tennessee Gas's application and other materials available from TDEC and FERC reveal considerable uncertainty and inconsistency about Tennessee Gas's proposed use of blasting. First, the application states that, "[i]f the initial technique is unsuccessful for rock removal and excavation at stream crossings, Technique 5 (controlled blasting) will be considered in non-karst areas that are also not in wetlands or streams with an unacceptable risk of hydrologic loss. The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location at which a bedrock substrate has been identified." Application at 14. But elsewhere, the application states that blasting "will be considered in non-karst areas or in wetlands or streams with an unacceptable risk of hydrologic loss." Application at 30. These statements are incompatible with each other and the latter appears to reflect a mistake in drafting, because it is incomprehensible that the Corps would allow blasting to "be considered . . . in wetlands or streams with an unacceptable risk of hydrologic loss." Application at 30. Regardless of the reason for the inconsistency, the Corps must obtain clarification from Tennessee Gas.

Second, Tennessee Gas's application and supporting materials are not clear about which stream crossings are proposed for potential blasting. The footnote to Table 2.7-3 of Tennessee Gas's application—"Waterbodies Crossings Hydrologic Risk Analysis"—states that "Controlled Blasting is an option only in areas of karst potential listed as unlikely." In Table 2.7-3, Tennessee Gas identifies 28 proposed crossings as candidates for blasting based on the assertion that "karst potential" for those sites is rated "unlikely."

*Table 1: Crossings Denoted Candidate for Blasting in Application Table 2.7-3*

| Milepost | Waterbody ID | Waterbody Name |
|----------|--------------|----------------|
| 2.13 | SDKA006 | UT to Porters Branch |
| 2.34 | SDKA008 | UT to Porters Branch |
| 2.99 | SDKA058 | Porters Branch |
| 3.20 | SDKA048 | Jones Creek[*] |
| 3.49 | SDKA050 | UT to Jones Creek |
| 3.51 | SDKA051 | UT to Jones Creek |
| 3.79 | SDKA049 | UT to Jones Creek |
| 3.85 | SDKA053 | UT to Jones Creek |
| 4.08 | SDKA055 | UT to Jones Creek |
| 4.34 | SDKA012 | UT to Jones Creek |
| 4.69 | SDKA015 | UT to Gafford Branch |
| 4.70 | SDKA016 | UT to Gafford Branch |
| 5.24 | SDKA017 | UT to Gafford Branch |
| 5.32 | SDKA019 | UT to Gafford Branch |
| 5.89 | SDKA020 | UT to Gafford Branch |
| 11.43 | SDKB008 | Nesbitt Branch |
| 22.36 | SHNC007 | Yellow Creek[*] |
| 22.88 | SHNC018 | UT to Yellow Creek |
| 26.21 | SHNA011 | UT to Guices Branch |
| 26.43 | SHNA012 | UT to Guices Branch |

9

AR 004745

| 26.87 | SHNA001 | Guices Branch |
| 28.61 | SHNB033-1 | Lickskillet Branch |
| 28.92 | SHNB033-2 | Lickskillet Branch |
| 29.00 | SHNA013 | UT to Lickskillet Branch |
| 29.02 | SHNB032 | UT to Lickskillet Branch |
| 30.18 | SHNB034 | UT to Lickskillet Branch |
| 30.19 | SHNB033-3 | Lickskillet Branch |
| 30.67 | SHNA010 | Wells Creek* |

The crossings marked with an asterisk in Table 1 above are streams that Tennessee Gas identifies as candidates for blasting notwithstanding that Tennessee Gas proposes to construct these crossings using HDD, suggesting the company may intend to blast at these locations in the event of a failed bore or other contingency.

However, Attachment 3 to Tennessee Gas's application—"Project Design Plans and Permit Drawings"—is not consistent with Table 2.7-3. Attachment 3 provides two permit drawing sheets for each crossing, and the second drawing sheet for each crossing identifies the trenching method proposed to be used at that crossing. According to the Attachment 3 drawing sheets, 29 crossings are already designated "Blast" as the trenching method.

*Table 2: Crossings Designated for Blasting in Attachment 3*

| Waterbody ID | Waterbody Name | Candidate for Blasting in Table 2.7-3? |
|---|---|---|
| SDKA023 | Upper Sugarcamp Branch | No |
| SDKA023 | Upper Sugarcamp Branch | No |
| SDKA024 | UT to Upper Sugarcamp Branch | No |
| SDKA026 | Jordan Branch | No |
| SDKA027 | UT to Jordan Branch | No |
| SDKA004 | UT to Porters Branch | No |
| SDKA006 | UT to Porters Branch | Yes |
| SDKA008 | UT to Porters Branch | Yes |
| SDKA058 | Porters Branch | Yes |
| SDKA050 | UT to Jones Creek | Yes |
| SDKA051 | UT to Jones Creek | Yes |
| SDKA049 | UT to Jones Creek | Yes |
| SDKA053 | UT to Jones Creek | Yes |
| SDKA055 | UT to Jones Creek | Yes |
| SDKA033 | UT to Johnson Creek | No |
| SDKA034 | UT to Johnson Creek | No |
| SDKA036 | Johnson Creek | No |
| SDKA037 | UT to Johnson Creek | No |
| SDKA038 | UT to Harris Branch | No |
| SDKA038 | UT to Harris Branch | No |
| SDKA040 | UT to Harris Branch | No |

10

JA2355

AR 004746

| SDKA041 | Harris Branch | No |
| SDKA042 | UT to Bartons Creek | No |
| SDKB001 | Miller Branch | No |
| SDKB002 | Bartons Creek | No |
| SDKB009 | Furnace Creek | No |
| SDKB011 | Dry Hollow Branch | No |
| SDKB023 | Little Bartons Creek | No |
| SDKB028 | UT to Leatherwood Creek | No |

Notably, comparing the Attachment 3 drawing sheets for these crossings with the corresponding hydrologic risk analysis from Table 2.7-3 reveals that 21 of the proposed crossings designated "Blast" in Attachment 3 have "karst potential" rated "possible" in Table 2.7-3. In other words, only 8 of the crossings designated "Blast" in Attachment 3 are identified as candidates for blasting in Table 2.7-3. It therefore appears that Tennessee Gas may anticipate blasting at as many as 49 crossing sites, a total that does not include the numerous sites designated "TBD" in Attachment 3 where Tennessee Gas attempts to reserve the right to blast based upon decisions made in the field. Further, although the remaining 8 crossings designated "Blast" in Attachment 3 have "karst potential" rated "unlikely" in Table 2.7-3, one of those "unlikely" sites nevertheless is rated as having high potential for hydrologic loss. This is perplexing because karst is a principal risk factor for hydrologic loss. To summarize, blasting is designated as the trenching method for numerous sites that, according to Tennessee Gas's application, are potentially karst and/or have high potential for hydrologic loss. This is in direct opposition to the criteria Tennessee Gas claims will be used to determine when blasting may be considered. Furthermore, blasting in potentially karst locations and locations with high probability of hydrologic loss may cause permanent negative impacts to the environment.

Third, documents from FERC and TDEC reveal that regulators are not in accord about the extent to which Tennessee Gas expects to utilize blasting. The draft environmental impact statement ("DEIS") issued by FERC for the proposed pipeline states that, "[a]lthough Tennessee [Gas] does not anticipate encountering instances of shallow bedrock in streams that would require controlled blasting, this method could be required to remove challenging streambed materials. In no event would controlled blasting be used in locations characterized by karst-prone geology, wetlands, or with an unacceptable risk of hydrologic loss." (FERC, 2023). Further, the DEIS states that "Tennessee [Gas] has indicated that controlled blasting would not be attempted in Waters of the U.S. or in TDEC-jurisdictional waters." (FERC, 2023). These statements in the DEIS are directly contrary to Tennessee Gas's application for a DA permit. As described above, Attachment 3 designates blasting at 21 crossings with potential karst and one additional crossings listed in Table 2.7-3 as having a high risk of hydrologic loss. In addition, the DEIS's categorical statement that controlled blasting would not be attempted in waters of the United States or TDEC-jurisdictional waters is belied by the fact that Tennessee Gas is applying for permission to employ blasting for at least 29, and possibly up to 49, stream crossings as discussed above. Furthermore, Attachment 3 to the application designates the trenching method for all non-blasting sites as "TBD"—to be determined—meaning that allowing Tennessee Gas to

11

AR 004747

make decisions on the fly could result in the use of blasting at many more stream crossings than are currently identified in the application.

Fourth, correspondence between Tennessee Gas and TDEC reveals that TDEC is concerned about Tennessee Gas's approach to blasting, and Tennessee Gas's responses are not sufficient to ameliorate those concerns. As noted above, Tennessee Gas's DA permit application seeks approval for Tennessee Gas's construction contractor to make decisions on the fly about which of the 5 rock removal techniques to use. In a request for additional information, TDEC informed Tennessee Gas that TDEC "requires that the contractor evaluate and attempt all non-blasting techniques at each stream crossing, as appropriate.  For clarity, this language should be made clear in all construction plans as needed." (TDEC, 2023). However, in response, Tennessee Gas did not commit to evaluating and attempting all non-blasting techniques before employing blasting. Instead, Tennessee Gas informed TDEC that the company would evaluate—but not necessarily attempt—non-blasting techniques based on (1) observed conditions at the stream crossing, (2) the technical feasibility and limitations of each particular technique, (3) considerations based on the experience of Tennessee Gas personnel and its construction contractor, (4) logistic, and (5) costs.  Tennessee Gas asserts that it will determine which non-blasting alternative is practicable at each stream crossing based on this evaluation.

In my professional opinion, Tennessee Gas's response to TDEC highlights several of the flaws in the company's approach to blasting. First, Tennessee Gas makes no attempt to establish that blasting would be the LEDPA for any given crossing as required by the Section 404(b)(1) Guidelines prior to permitting. Evaluation of non-blasting trench construction techniques as described by Tennessee Gas must be done in the planning phase, not in the construction phase, to select and permit the LEDPA. Furthermore, Tennessee Gas's evaluation criteria do not appear intended to identify the LEDPA because they do not incorporate environmental impacts in the decision-making matrix. Tennessee Gas's response to TDEC response would eliminate attempting non-blasting trench construction techniques based on the evaluation of criteria that are so broad and non-specific in the metrics used as to allow for the company to dismiss all of the non-blasting options as not practicable, including on the basis of cost alone. This is not sufficient. Evaluation must be conducted prior to permitting to assure the LDEPA is selected for each crossing. Once evaluation of non-blasting technique practicability at each stream crossing is complete and is reviewed for accuracy, Tennessee Gas must be required to attempt all non-blasting techniques that were determined to be practicable before attempting blasting. Allowing evaluation to be completed without documentation prior to construction may result in inaccurate characterization of feasibility of the LEDPA for each crossing, which in turn would result in negative water quality and stream impacts.

### c.  Roads

Tennessee Gas's application does not provide site-specific details of either access road crossings or workspace crossing. It is not clear whether the proposed access roads are intended to be permanent features. Tennessee Gas's application shows several possible methods, including culvert crossings, timber mat and pipe bundle crossings, and bridge crossings.  However, no information is provided as to which method will be used at which locations. In addition, the

application does not provide information on waterbody crossing design for site-specific conditions. Engineering Best Practices and industry standards require information on sizing of culverts and crossings for site-specific flow conditions and site characteristics.  However, Tennessee Gas did not include any of the necessary designs for any of the access roads. It is not possible to conclude that any access road crossing will be the LEDPA without this information.

The least environmentally damaging crossing method for road crossings is bridging. That is, the preferred access road method for avoidance of environmental impacts is spanning from dry ground beyond the existing top-of-bank on both sides of the stream. But Tennessee Gas provides no detail on how its road crossings would be accomplished nor how non-bridging options would be designed to reduce the likelihood of permanent impacts. Because Tennessee Gas's application lacks site-specific information about the crossing method for each of its proposed road crossings, it preserves an unreasonable degree of discretion for Tennessee Gas to make complicated and important design decisions "on the fly" and "in the field" at waterway crossings. This is not protective of environmental resources and will lead to permanent impacts to aquatic ecosystems. In my experience, access road crossings must have site-specific design completed to minimize negative environmental impacts. This is because the methods are not fungible, and their advantages, disadvantages, and impacts will vary by site, as shown below.

*Table 3: Advantages and Disadvantages of Proposed Temporary Access Road Methods*

| Access Road Crossing Method | Advantages | Disadvantages |
|---|---|---|
| Mobile Bridge Crossing | Dry crossing with very minimal impact to waterway | — |
| Temporary Bridge | Dry crossing with very minimal impact to waterway | — |
| Culvert Crossing | May be used when dry crossing is not possible | • Requires digging into streambed 6"<br>• Needs extensive design and sizing<br>• Requires installation and removal in the dry to minimize environmental impact<br>• Requires in-stream fill<br>• May be a permanent impact in a variety of conditions |
| Timber Mat and Pipe-Bundle Crossing | Less impactful and less fill required than culvert crossing, and may provide for bank-to-bank crossing with minimal instream disturbance | • Not practical in larger streams<br>• Needs pipe sizing and design<br>• Compacts soils in wetlands |

Tennessee Gas's application does not meet minimum industry standards for its proposed access road crossings. If left to field personnel to install without design documents, there will be excessive impacts and failures which will cause long-term damage to aquatic ecosystems. Furthermore, the application does not commit to installing culverts in dry conditions. Digging by

large machinery in live streams causes plumes of environmentally damaging sediment to be released. Likewise, the application does not commit to requiring that machinery work from the bank to reduce in-stream impacts.

**Lack of Critical Site-Specific Information**

Tennessee Gas's application and supporting materials lack critical site-specific information that is necessary for a regulator to determine the required design criteria for, and evaluate the potential environmental impacts from, pipeline construction.

*a. Flow management*

Tennessee Gas proposes to use a dry open-cut method at the vast majority of its proposed crossing locations. However, dry open-cut construction requires the use of a technique to dewater the streambed, and these dewatering methods are not necessarily interchangeable. Critically, the choice of an appropriate dewatering method for a crossing is always influenced—and often dictated—by site-specific conditions. Selecting from among the various dewatering methods for an open-cut crossing must be part of the LEDPA analysis prior to permitting because the impacts are not equivalent, especially if an inappropriate method is chosen at a given site.

The three most widely used dewatering techniques are "dam-and-pump," "flume," and "coffer dam." The dam-and-pump method involves damming the waterbody to be crossed and transferring the flow of the waterbody downstream past the work site through pumps and hoses. The flume method involves redirecting water flow through one or more flume pipes and conveying it downstream past the work site. The coffer dam method involves a phased approach wherein part of the waterbody (usually half) is surrounded by a temporary dam and dewatered to permit construction in a dry work site while water flow continues downstream in the undammed portion of the waterbody. Tennessee Gas proposes only the dam-and-pump and flume methods in its permit application.

The following is a summary of the site characteristics that will generally govern which of these dewatering methods will be appropriate for a given crossing:

*Table 4: Summary of Open-Cut Dewatering Methods*

| Method | Appropriate site characteristics |
|---|---|
| Dam-and-pump | Used only on small streams with drainage areas of 1 square mile or less. Pump(s) and hose(s) must be sized to convey expected flows. Used only during periods of low flow. |
| Flume | Used on small streams (less than 15 feet wide) with drainage areas of 1 square mile or less. Flume pipe(s) must be sized to convey expected flows. |
| Coffer dam | Used on small to intermediate streams (greater than 10 feet wide but less than 3 feet deep) only during periods of low flow. Culverts or undammed portion must be sized with adequate capacity to convey expected flows. |

14

AR 004750

Site-specific information for each waterbody is critical to ensuring that an appropriate method is chosen for each crossing and preventing adverse impacts. In particular, the dam-and-pump and flume methods require prior crossing-specific knowledge of velocity, flow rate, soil conditions, contributing watershed area, seasonal rainfall data, stream plan, profile, and longitudinal surveys, channel cross-section, depth of flow, stream bed composition, bank stability, and more because these methods are not fungible and their suitability and the extent of their impacts will vary site by site. For both dam-and-pump and flume methods, site-specific information must be used to determine the sizing of the pumps, pipes, etc., and provisions must be made to conduct work during periods of low flow. It is common knowledge in the industry that both installation and removal of dam-and-pump and flume method equipment causes increases in downstream turbidity and sediment deposition. A lack of site-specific detail and planning will likely lead to increases in turbidity, in-stream sediment deposition, stream instability, and other adverse impacts to water quality and stream function, which will likely cause violations of water quality standards.

Tennessee Gas's application does not provide the necessary information described above for making or justifying appropriate site-specific selections of dewatering method for each proposed open-cut crossing. The application acknowledges the need for site-specific information on soil type, stream flow, and more, but my review of the application and supporting materials did not identify any instances where Tennessee Gas provided the necessary information. Attachment 3 to the application includes estimates of summer mean flow in cubic feet per second from the USGS Streamstats model, but this information does not accurately represent flows that will be present at the time of construction, which may or may not be in the summer. Attachment 3 does not provide any site-specific information that would be necessary to determine the number, length, and diameter of the pipes needed for a flumed stream crossing, nor information about soil types for each crossing that would allow identification of whether or not there are stable stream bank conditions. In my professional opinion the lack of site-specific information will lead to negative aquatic resource impacts. It is industry standard to have this information for each site.

In addition, there is no information provided in the application about the sizing of the pumps, hoses, or flume pipes to be used, nor is there information about how Tennessee Gas or its construction contractor will determine appropriate sizing. Similarly, there are no details provided on how Tennessee Gas or its construction contractor will determine whether the flow in a waterbody at the time of construction is appropriate for a given method. Furthermore, the dam-and-pump and flume methods often require trench dewatering in addition to flow diversion. Tennessee Gas's application does not include provisions and/or methods for removing silt from pumped water in connection with trench dewatering. These provisions and/or methods must be installed and implemented prior to trenching activities and maintained until backfilling is complete. Without these provisions and/or methods, there is a high likelihood of increased turbidity, and downstream sediment deposition in streams.

15

AR 004751

The lack of site-specific information for each crossing allows a contractor to make decisions on the fly with no ability for regulatory agencies to evaluate the efficacy of the proposed crossing for environmental protection. The probability of serious negative environmental impacts is increased substantially by omission of site-specific design. Negative environmental impacts associated with lack of prior planning and site-specific information may include increases in turbidity, alteration of channel pattern, alteration of bed material, and in-stream sediment deposition. Industry standard is to provide a site-specific flow management method for each crossing determined using clear analysis and consistent criteria.

Furthermore, Tennessee Gas's application does not evaluate the coffer dam method for any proposed crossing. As described above, the flume and dam-and-pump methods are not appropriate dewatering techniques for any crossing with a drainage area that is greater than or equal to 1 square mile. My review of the application—including Table 2.7-3 and Attachment 3—reveals that Tennessee Gas is proposing at least 12 waterbody crossings at sites with drainage areas that are larger than 1 square mile.

*Table 5: Proposed Waterbody Crossings with Drainage Area Greater Than 1 Square Mile*

| Milepost | Waterbody ID | Waterbody Name | Drainage Area (sq miles) | Summer Mean Flow (CFS) |
|---|---|---|---|---|
| 2.99 | SDKA058 | Porters Branch | 2.98 | 2 |
| 4.54 | SDKA013 | Gafford Branch | 1.02 | 0.0565 |
| 10 | SDKB001 | Miller Branch | 1.31 | 0.721 |
| 10.07 | SDKB002 | Bartons Creek | 17.29 | 10.5 |
| 12.13 | SDKB009 | Furnace Creek | 8.41 | 0.029 |
| 14.01 | SDKB011 | Dry Hollow Branch | 2.31 | 1.27 |
| 16.66 | SDKB023 | Little Bartons Creek | 1.6 | 0.916 |
| 19.08 | SDKB026 | Leatherwood Creek | 3.54 | 2.46 |
| 26.43 | SHNA012 | UT to Guices Creek | 6.95 | 4.64 |
| 26.87 | SHNA001 | Guices Creek | 1.79 | 1.12 |
| 28.92 | SHNB033-2 | Lickskillet Branch | 1.29 | 0.798 |
| 30.19 | SHNB033-3 | Lickskillet Branch | 2.17 | 1.37 |

Tennessee Gas must evaluate alternative methods at these crossings because their drainage area indicates the flume and dam-and-pump methods may be overwhelmed by high flow in the event of rainfall. This also underscores the need for Tennessee Gas to provide a LEPDA analysis for each crossing that consider the specific dewatering method that would be used, as well as evaluating the use of a trenchless technique.

In addition, my review of the application reveals that Tennessee Gas is proposing at least one waterbody crossings at a site with a drainage area that is less than 1 square mile, but where Tennessee Gas expects flows that would render the flume or dam-and-pump methods inappropriate.

16

AR  004752

*Table 6: Proposed Waterbody Crossings with High Expected Flow and Drainage Area Less Than 1 Square Mile*

| Milepost | Waterbody ID | Waterbody Name | Drainage Area (sq miles) | Summer Mean Flow (CFS) |
|----------|--------------|----------------|--------------------------|------------------------|
| 11.43 | SDKB008 | Nesbitt Branch | .01 | 4.94 |

Furthermore, I note that the application appears to include errors that indicate there may be other proposed crossings with drainage areas greater than 1 square mile, high expected flow, or both, but that are not apparent due to errors in the application. For example, the proposed crossing of Furnace Creek (SDKB009) described in Table 4 above includes Tennessee Gas's description of the drainage area as 8.41 square miles and the summer mean flow as 0.029 cubic feet per second. This flow rate is significantly lower than for other streams with similarly sized watersheds, so much so that I conclude it likely reflects a mistake in data collection or transcription. Consequently, it is probable that there are other crossings where the drainage size or flow characteristics make the flume and dam-and-pump methods inappropriate. Overall, regulators must require Tennessee Gas to make provisions to conduct work during periods where no rainfall is anticipated. No provisions were identified to monitor weather predictions and conduct work only when rain is not forecast. Without information on how activities will be conducted to avoid high flow events there is a high probability of failure of the dam-and-pump and flume methods, which would increase turbidity and in-stream sediment discharge and deposition, leading to a high probability of water quality standards violations.

Similarly, the majority of ephemeral and some intermittent streams listed in Attachment 3 designate "no flow period" as flow management method. It is imperative that Tennessee Gas provide more information about how this be determined and verified prior to mobilizing construction crews to site. Most pipeline projects proceed in a linear manner, meaning streams will be crossed when crews come to that site. No provision is given for how to assure that construction will occur during a "no flow period," and in my professional experience crews will work when they arrive regardless of conditions. A permit cannot be issued that leaves such critical decisions until the field. Further, it is especially important that crossings designated for construction during "no flow period[s]" be accompanied by a plan to ensure that no construction will occur when rainfall is possible.

As someone who has evaluated many stream crossing proposals, I conclude that Tennessee Gas's application does not meet minimum industry standards for evaluating site-specific conditions. Furthermore, given the omission of critical site-specific information in the application, it is my professional opinion that there is significant likelihood of water quality violations, including increases in turbidity as well as in-stream sediment deposition, from the proposed crossings.

### b. Restoration

Tennessee Gas's application asserts that streambeds will be restored to their preconstruction elevations and grades following construction. However, I conclude that

17

AR 004753

Tennessee Gas's application does not provide sufficient information to make any defensible predictions about the efficacy of post-construction restoration for at least two reasons.

First, it appears that Tennessee Gas is focused entirely on stream structure to the exclusion of stream function. This oversight is a critical gap. Stream structure and stream function are not equivalent. Tennessee Gas must be required to conduct pre-construction water quality sampling and testing at all proposed crossing locations to determine existing conditions before any in-stream or upland construction. Additional water quality sampling should be conducted during and after construction to evaluate impacts to water quality due to in-stream construction activities.

Second, detailed pre-construction topographic surveys are needed for each crossing in order to accurately match post-construction elevations to pre-construction elevations. Without detailed pre-construction topographic survey it is not possible to match post-construction grades with any accuracy. Additionally, restoration requires detailed information on pre-construction stream geomorphological and water quality characteristics and post-construction survey and monitoring to assure restoration to pre-construction conditions. Tennessee Gas's application does not provide this necessary information.

**Inconsistencies, Discrepancies, and Gaps**

My review of Tennessee Gas's application revealed a large number of inconsistencies, design deficiencies, and a lack of site-specific crossing information that I would expect in an application for a project applying industry standard practices to avoid or minimize the permanent negative impacts of waterbody crossings on aquatic ecosystems. In addition to the inconsistences, deficiencies, and omissions discussed elsewhere in this report, Tennessee Gas's application also suffers from the following flaws:

1.      Tennessee Gas's application lacks information about how Tennessee Gas and/or its construction contractor intends to construct dry open-cut crossings through wetlands when standing water is encountered. I conclude based on these omissions that Tennessee Gas is likely to construct wet open-cut crossings in wetlands, which are environmentally devastating. Additionally, the application's lack of information on wetland crossing methods to reduce environmental impacts does not meet minimum industry standards and will lead to substantial negative impacts to wetland resources. In my professional opinion, based on my review of the application and the scientific literature on wetland impacts discussed above, construction of Tennessee Gas's proposed wetland crossings will cause significant degradation to affected wetlands.

2.      The Application states at 10 that "[t] he PFO wetlands are dominated by woody vegetation that is at least six meters tall (Cowardin et al. 1979). Prior to construction, temporary and permanent workspaces will be cleared of woody vegetation." The construction details in Attachment 3 show a 75-foot construction right of way where all woody vegetation would be removed. Such vegetation removal is a permanent impact and requires mitigation.

18

AR 004754

3.      Attachment 1, Table 2—Cumberland Wetland Impacts—indicates that the Crossing Method is "Open Cut," and the footnote and the narrative indicate that the crossing method may be "Standard Wetland Construction" ("SWC") or "Conventional Wetland Construction" ("CWC").  The primary difference between SWC and CWC appears to be the use of a timber mat in CWC.  The determination of which method to use is based on whether the soil is "non-saturated and able to support construction equipment at the time of crossing." Application at 15. There is no information on how the ability to support construction equipment will be determined prior to attempting to cross the wetland. Moreover, the Application also states at 15 that, for CWC, timber mats will be used for crossing. In contrast, Attachment 3 at 52 states, "if saturated at time of construction, reduce soil compaction by utilizing wide-track or balloon tire construction equipment or timber, riprap, or mats." This is yet more contradictory information within the application.

4.      The Application states at 15 that, "[w]here present, a maximum of 12 inches of topsoil will be segregated from the area disturbed by trenching, except where standing water is present or if soils are saturated."  No information is provided on how topsoil will be segregated if there is standing water or if soils or saturated. Table 2.1-3 (revised March 17, 2023) of the Application lists pipeline crossings as dry-open cut for 0.51 acres of wetland.  If there is standing water or saturated soils present how will the crossing be accomplished? No details are provided for how Tennessee Gas would dewater the worksite, nor are any details provided regarding a wet-open cut. Soil saturation, standing water potential, and soils information for each wetland impact area should be determined prior to permitting and mobilization. This information does not appear to be included.

5.      It appears Tennessee Gas does not have physical access to 1.15 miles of the pipeline route totaling approximately 16.45 acres containing multiple proposed crossings. Based on Tennessee Gas's March 17, 2023 response to TDEC's February 24, 2023 request for additional information, it appears Tennessee Gas is relying on desktop assessments to obtain information about streams within the portions of the route to which it does not have physical access. Tennessee Gas cannot obtain the necessary information—including information about baseline stream geomorphology and function—from a desktop review. In fact, desktop surveys of the 1.15-mile section of the route to which Tennessee Gas does not have physical access have already proven unreliable. In Tennessee Gas's March 17 response to TDEC's request, Tennessee Gas identified four new pipeline crossings in the inaccessible area, despite ostensibly having conducted desktop reviews of the area before. Accordingly, the crossings in the inaccessible area cannot be permitted until access is obtained and Tennessee Gas provides the necessary information about stream condition.

6.      Tennessee Gas does not provide information about a construction sequence for waterbody crossings. Construction sequencing is necessary to reduce the duration and impacts of crossing construction activities.

7.      My review of the application and supporting materials did not reveal any site-specific designs for impact types listed in Table 1 as "Access Road" or "Workspace Crossing." Although Attachment 3 provides some limited site-specific information about pipeline crossings, it

19

provides no similar information in the form of a permit drawing or other document for access roads or workspace crossings. Details should include limits of disturbance, topographic contour lines, method of crossing, and specific locations for activities associated with the crossing at a minimum. Attachment 3 also contains alignment sheets that show plan and profile views of the linear project. Streams are not shown or called out on the alignment sheets with the exception of large named water bodies. Access Road stream impacts are not shown on the alignment sheets with anything besides general location.  No site-specific Access Road or Workspace Crossing location or details are depicted on the Attachment 3 permit drawings, nor the alignment sheets in Attachment 3.

8.      The application does not show a route variation for Yellow Creek at MP 22.0 through 22.7. However, Attachment 3 shows a significant route variation for crossing Yellow Creek.

9.      In Tennessee Gas's HDD Feasibility Studies, Attachment 9 to the application, the feasibility study for the proposed HDD crossing of Yellow Creek reports that the stratigraphy is largely homogenous and made up of cherty limestone of the Warsaw Limestone and Fort Payne Formation. However, Attachment 3 indicates that the geologic formation at this location is quaternary alluvium.

10.     The feasibility study for the proposed HDD crossing of Yellow Creek states that "[t]he limestone formation is historically karst prone and may contain eroded voids within the stratigraphy. Soil bore 2B encountered such a void approximately 6 − 8 inches thick and 15.5 deep.  However, there were no sinkholes or visible karst noted during topographic survey or geotechnical investigation. The presence of karst poses risks for lost circulation downhole, as drilling fluid would fill any encountered void before being able to flow through the annulus. The drilling contractor should be aware of karst as lost circulation will ultimately require more mud to be mixed." However, the HDD feasibility studies were prepared to design HDD crossings and it appears no information was provided as to evaluation of other trenchless crossing methods considered for the sites proposed for HDD, with the exception of Attachment 11 which is a general comparison of methods and is not site-specific. The fact that the limestone formation at Yellow Creek is historically karst prone and that borings encountered voids that may cause loss of drilling fluid makes it is crucial to evaluate the feasibility of other trenchless methods to minimize potential environmental impacts. It is also notable that Tennessee Gas encountered karst at Yellow Creek because Table 2.7-3 designates Yellow Creek as "unlikely" to have karst.

11.     Attachment 3 reports Temporary Dry-Open Cut Disturbance Length (LF) as 75 feet for each stream crossing.  However, Table 1 reports pipeline crossing Total Impacts Linear Feet as varying from 10.8 ft to 262.7 feet.  This discrepancy makes it impossible to determine proposed impacts for each stream.

12.     The draft EIS states that flume pipe would be installed *after* blasting. If this statement is correct, blasting will be conducted in-stream while flow is occurring.  This is not an industry standard and could have devasting consequences. Blasting in a live stream (*i.e.* during flow)

would cause increased turbidity, increased downstream sedimentation, as well as fish mortality. This statement from the draft EIS also conflicts with Tennessee Gas's representation in its application that all blasting will occur in dry conditions. This direct contradiction is troubling and requires clarification. The impacts of blasting in dry conditions versus wet conditions are not the same and bear directly on the LEDPA analysis.

13.     No blue line streams are shown in Attachment 3 in the alignment sheets, nor are there any plan views that show topographic lines to the best of my knowledge. Industry standard is to provide topographic information and stream locations on site plan mapping. It is impossible to verify grades or stream crossing locations without this information.

14.     The proposed crossing on Johnson Creek (SDKA036) is emblematic of the inconsistencies, discrepancies, and missing information that characterize the application. This crossing is described significantly differently in Table 1, Table 2.7-3 and Attachment 3, as shown below. It is impossible to determine impacts with such inconsistencies.

*Table 7: Inconsistent Descriptions of SDKA036*

| Source | Pipe Installation Method | Trenching Method | Flow Management Method | Temporary Dry Open-Cut Disturbance (Linear Feet) | Temporary Dry Open-Cut Disturbance (Square Feet) |
|---|---|---|---|---|---|
| Table 1 | Dry Open Cut | — | — | 262.7 | 2613 square feet (0.060 acres) |
| Table 2.7-3 | Dry Open Cut | — | "N.A." | — | — |
| Attachment 3 | HDD | Blast | "N.A." | 75 | 450 (0.010 acres) |

### Conclusion

The lack of site-specific information, incomplete LEDPA analysis, inconsistencies, and deficiencies require denial of the 404 IP application. In my professional opinion, as the application stands now, it is vague and incomplete and proposes activities that will likely cause substantial negative impacts to aquatic resources, including significant risk of violating water quality standards. It is also my professional opinion that, if permitted as proposed, these activities will contribute to significant degradation of waters of the United States.

AR 004757

# References

Abernethy, R.K., & Gosselink, J.G., 1988.Environmental-conditions of a backfilled pipeline canal four years after construction.*Wetlands* 8, 109–121

Baumann, B.H., & Turner, R.E.,1990. Direct impacts of outer continental shelf activities on wetland loss in the central Gulf of Mexico. *Environ.Geol.Water Sci.* 5, 189–198.

Boelter, Don H., &Gordon E. Close, Pipelines in Forested Wetlands: Cross Drainage Needed to Prevent Timber Damage, *Journal of Forestry*, Volume 72, Issue 9, September 1974, Pages 561–563

Castro, J. M., MacDonald, A., Lynch, E., & Thorne, C. R. (2015) Risk-based Approach to Designing and Reviewing Pipeline Stream Crossings to Minimize Impacts to Aquatic Habitats and Species. *River Res. Applic.*, 31: 767– 783

Jackson, C. Rhett,  Thompson, James A. & Kolka, Randall K. Ecology of Freshwater and Estuarine Wetlands Chapter 2. Wetland Soils, Hydrology, and Geomorphology. University of California Press | 2014

Kittleson, K.M. & McDavitt, M.E.,1980. Assessing the impact of pipeline construction on coniferous wetlands in central Michigan with aerial photography. Remote Sensing of Earth Resources vol.VIII. University of Tennessee. pp. 263–275

Levesque, L. M. & Dube, M.G. 2007. Review of the effects of in-stream pipeline crossing construction on aquatic ecosystems and examination of Canadian methodologies for impact assessment. *Environmental Monitoring and Assessment* 132:395-409.

Olson, Erik R., & Doherty, James M. 2012. The legacy of pipeline installation on the soil and vegetation of southeast Wisconsin wetlands. *Ecological Engineering* 39:53-62

Penkal, R. F. & G. R. Phillips. 1984. Construction and Operation of Oil and Gas Pipelines. *Fisheries* 9(3):6-8.

Reid, S. M. & P. G. Anderson. 1999. Effects of Sediment Released During Open-Cut Pipeline Water Crossings. Canadian Water Resources Journal 24(3):235-251.

Reid, Scott, Stoklosar, Scott, Metikosh, Serge & Evans, Jim. 2002 Effectiveness of Isolated Pipeline Crossing Techniques to Mitigate Sediment Impacts on Brook Trout Streams. *Water Quality Research Journal of Canada*. 37. 10.2166

Thorne, C, Castro, J, Cluer, B, Skidmore, P, & Shea, C. 2015. Project Risk Screening Matrix for River Management and Restoration. *River Res. Applic.*, 31, 611– 626

AR 004758

**NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION**

Division of Environmental Permits & Pollution Prevention
625 Broadway, 4th Floor, Albany, New York 12233-1750
P: (518) 402-9167 | F: (518) 402-9168 | deppermitting@dec.ny.gov
www.dec.ny.gov

April 22, 2016

Lynda Schubring, PMP
Environmental Project Manager
Constitution Pipeline Company, LLC
2800 Post Oak Boulevard
P.O. Box 1396
Houston, Texas 77251-1396

       Re: <u>Joint Application: DEC Permit # 0-9999-00181/00024 Water Quality
Certification/Notice of Denial</u>

Dear Ms. Schubring,

       On April 27, 2015, Constitution Pipeline Company, LLC (Constitution) submitted
to the New York State Department of Environmental Conservation (NYSDEC or
Department) a Joint Application (Application)[1] to obtain a Clean Water Act[2] Section 401
Water Quality Certification (WQC) for the proposed Project and New York State
Environmental Conservation Law (ECL) Article 15, Title 5 (Protection of Waters) and
Article 24, Title 23 Freshwater Wetlands permits.  Based on a thorough evaluation of the
Application as well as supplemental submissions, the Department hereby provides
notice to Constitution that in accordance with Title 6 New York Codes Rules and
Regulation (NYCRR) Part 621, the Application fails in a meaningful way to address the
significant water resource impacts that could occur from this Project and has failed to
provide sufficient information to demonstrate compliance with New York State water
quality standards.  Constitution's failure to adequately address these concerns limited
the Department's ability to assess the impacts and conclude that the Project will comply
water quality standards.  Accordingly, Constitution's request for a WQC is denied.[3] As
required by 6 NYCRR §621.10, a statement of the NYSDEC's rationale for denial is
provided below.

## BACKGROUND

       The Federal Energy Regulatory Commission (FERC) issued a certificate
approving construction and operation of the pipeline on December 2, 2014, conditioning

---

[1] New York State and U.S. Army Corps of Engineers Joint Application, Constitution Pipeline, August, 2013.
Constitution initially submitted its WQC application on August 28, 2013.  With the Department's concurrence
Constitution subsequently withdrew and re-submitted the WQC application on May 9, 2014 and April 27, 2015,
each time extending the period for the Department to review the application by up to one year.
[2] *See* 33 U.S.C.A. Section 1341.
[3] The other permits sought by Constitution in the Joint Application remain pending before the Department and are
not the subject of this letter.

NEW YORK | Department of
STATE OF | Environmental
OPPORTUNITY | Conservation

AR  004760

its approval on Constitution first obtaining all other necessary approvals. Accordingly, Constitution's Application for a WQC pending with the Department must be approved before construction may commence.  Constitution's Application was reviewed by NYSDEC in accordance with ECL Article 70 (Uniform Procedures Act or UPA) and its implementing regulations at 6 NYCRR Part 621, which provide a review process for applications received by NYSDEC.

Despite FERC conditioning its approval on Constitution's need to obtain a WQC, the Department has received reports that tree felling has already occurred in New York on the Project's right of way.  This tree cutting, both clear cutting and selective cutting, has occurred notwithstanding the fact that Constitution has right-of-way agreements with the property owners where this cutting has occurred.  The tree felling was conducted near streams and directly on the banks of some streams, and in one instance has resulted in trees and brush being deposited directly in a stream, partially damming it.  As described below, this type of activity, if not properly controlled, can severely impact the best usages of the water resource.

Concurrent with its review, the Department received a Clean Air Act Title V application[4] for the Wright Compressor Station (Wright Compressor Station) from Iroquois Gas Transmission System, Inc. Additionally, Constitution is obligated to obtain coverage from NYSDEC under the SPDES Stormwater General Permit for Construction Activities (GP-0-15-002) and prepare a Stormwater Pollution Prevention Plan (SWPPP) prior to Project construction.

**Proposed Project Description and Environmental Impacts**

Constitution proposes construction of approximately 124.14 miles of new interstate natural gas transmission originating in northeastern Pennsylvania, proceeding into New York State through Broome, Chenango, Delaware, and Schoharie Counties, terminating at the existing Wright Compressor Station in Schoharie County. In New York State, the Project, rather than co-locating a significant portion of the pipeline on an existing New York State Department of Transportation (NYSDOT) Interstate I-88 access area[5], proposes to include new right-of-way (ROW) construction of approximately 99

---

[4] Minor Source Air Permit Modification, Wright Compressor Station, Town of Wright, Schoharie County, NY, Iroquois Gas Transmission System, July 26, 2013.

[5] On September 25, 2013, NYSDEC provided FERC with comments on Constitution's Environmental Report dated June 13, 2013, supplemented in July, 2013 that concurred with the United States Army Corps of Engineers' (ACOE) comments and supported ACOE's request to FERC for additional details and documentation to support the reasons why all or some of the Project route could not be routed with the New York State Department of Transportation (NYSDOT) Interstate I-88 control of access area. On April 7, 2014, the Department provided FERC with preliminary comments on the DEIS which extensively analyzed the environmental benefits of utilizing Interstate I-88 (also referred to as Alternative "M") regarding stream, wetland, and interior forest habitats.

In June 2014, Constitution provided information about Alternative M which Department Staff found did not contain sufficient analysis to determine whether Alternative M would generate fewer impacts than Constitution's preferred route.  However, using Constitution's information, as well as publicly available information, Department Staff

2

AR 004761

miles of new 30-inch diameter pipeline, temporary and permanent access roads and additional ancillary facilities.

Although the Department repeatedly asked Constitution to analyze alternative routes that could have avoided or minimized impacts to an extensive group of water resources, as well as to address other potential impacts to these resources, Constitution failed to substantively address these concerns. Constitution's failure to adequately address these concerns limited the Department's ability to assess the impacts and conclude that the Project will comply with water quality standards. Project construction would impact a total of 251 streams, 87 of which support trout or trout spawning. Cumulatively, construction would include disturbance to 3,161 linear feet of streams resulting in a total of 5.09 acres of stream disturbance impacts. Furthermore, proposed Project construction would cumulatively impact 85.5 acres of freshwater wetlands and result in impacts to regulated wetland adjacent areas totaling 4,768 feet for crossings, 9.70 acres for construction and 4.08 for acres for Project operation. Due to the large amount of new ROW construction, the Project would also directly impact almost 500 acres of valuable interior forest. Cumulatively, within such areas, as well as the ROW generally, impacts to both small and large streams from the construction and operation of the Project can be profound and could include loss of available water body habitat, changes in thermal conditions, increased erosion, and creation of stream instability and turbidity.

The individual quality and integrity of streams form the primary trophic levels that support many aquatic organisms and enable the provision of stream ecosystems at large. Under the Project's proposal, many of the streams to be crossed present unique and sensitive ecological conditions that may be significantly impacted by construction and jeopardize best usages. For a number of reasons, streams that support trout and other cold water aquatic species are typically the most sensitive. The physical features of these streams include dense riparian vegetation often composed of old-growth trees which are free of invasive species and that shade and cool streams while also maintaining the integrity of adjacent banks or hillslopes. Undisturbed spring seeps provide clean, cold water and stable yet sensitive channel forms maintain the integrity of the stream itself and further preserve water quality. Biologically, these streams are vital in providing complex habitat for foraging, spawning and nursery protection by wild reproducing trout.

Impacts to these streams are exacerbated as the cumulative negative effects of multiple crossings are added. Demonstrating this, the trout stream Clapper Hollow Creek and its tributaries would be crossed 11 times by the project. Likewise, Ouleout Creek and its tributaries will be crossed 28 times. Many of these streams are part of tributary networks that are dependent upon the contributing quality of connected streams to supply and support the physical and biological needs of a system. This is especially true in supporting the viability of wild trout populations.

---

conducted a review that found that Alternative M could reduce overall impacts to water bodies and wetlands when compared to Constitution's preferred route.

3

AR  004762

Initially, 100 per cent loss of stream and riparian habitat will occur within the ROW as it is cleared and the pipeline trenched across streams. The trenching of streams will destroy all in-stream habitat in the shorter term and in some cases could destroy and degrade specific habitat areas for years following active construction. For example, highly sensitive groundwater discharge areas within streams could be disturbed, resulting in loss or degradation to critical spawning and nursery habitat. In addition, physical barriers will temporarily prevent the movement of aquatic species during active construction and changes to the stream channel will persist beyond the active construction period, creating physical and behavioral barriers to aquatic organism passage.

Changes to thermal conditions will also likely occur due to clearing of riparian vegetation. Because of the need to maintain an accessible ROW, subsequent revegetation will take considerable time to replace what was lost, notably long-lived, slow growing forest trees. Loss of riparian vegetation that shades streams from the warming effects of the sun will likely increase water temperatures, further limiting habitat suitability for cold-water aquatic species such as brook trout. The loss of shade provided by mature riparian vegetation may be exacerbated in the long term by climate change and thus be more significant since small changes in the thermal loading of cold water trout streams could result in the long term loss of trout populations.

NYSDEC Staff's extensive experience and technical reviews have shown that destabilization of steep hillslopes and stream banks will likely occur and may result in erosion and failure of banks, causing turbid inputs to waterbodies. Specifically, Project construction would include approximately 24 miles of steep slope or side slope construction. Cumulatively, this would amount to roughly 24 per cent of the new cleared right-of-way. Exposed hillslopes can become less stable and, when appropriate stormwater controls are not properly implemented, erosion can result in increased sediment inputs to streams and wetlands. If these events occur they can affect the water quality and habitat quality of these streams.

Trenching of streams can also destabilize the stream bed and such conditions can temporarily cause an exceedance of water quality standards, notably turbidity. Turbidity and sediment transport caused as a result of construction can negatively impact immediate and downstream habitat, can smother or kill sensitive aquatic life stages and reduce feeding potential of all aquatic organisms. More specifically, visual predators such as brook trout find food using visual cues. Thus, reductions in clear water conditions may reduce feeding success that can ultimately result in impacts on aquatic species' propagation and survival and corresponding reductions in the attainment of the waters' best usages.

As a result of chronic erosion from disturbed stream banks and hill slopes, consistent degradation of water quality may occur. Changes in rain runoff along ROW may change flooding intensity and alter stream channel morphology. Disturbed stream channels are at much greater risk of future instability, even if the actual work is conducted under dry conditions; long ranging stream erosion may occur up and

4

AR 004763

downstream of disturbed stream crossings well beyond the time of active construction. This longer term instability and erosion can result in the degradation of spawning beds and a decrease in egg development.  The loss of spawning potential in some cold headwater streams may significantly reduce the long-term viability of these streams to support trout. Constitution proposes to cross 50 known trout spawning streams which will likely result in cumulative impacts on the trout populations in these streams.  More specifically, and by way of an example of cumulative impacts to a water body, Constitution proposes to cross Ouleout Creek and its tributaries a total of 28 times with 15 of these crossings occurring in trout spawning areas.

Finally, at the landscape level, impacts to streams from the ROW construction are analogous to the cumulative impacts from roads. There is an established negative correlation between road miles per watershed area and stream quality. Thus, increases in the crossings of streams by linear features such as roads and the pipeline ROW can have cumulative impacts beyond the individual crossings.  In the case of the 1 mile corridor surrounding the proposed Constitution pipeline, the pre-construction crossing/area ratio for the New York section is 2.28 crossings/square mile. However, the post-construction ratio will increase 44 per cent to 3.29 crossings/square mile. In specific basins this ratio will be higher and may cause a permanent degradation in stream habitat quality and likewise affect associated natural resources, including aquatic species' propagation and survival.

## NYSDEC Application Reviews

On August 21, 2013, Constitution submitted the Application to obtain a CWA §401 WQC and NYSECL Article 15 and Article 24 permits to the Department.  Due to insufficient information, NYSDEC issued a Notice of Incomplete Application on September 12, 2013, indicating that the Application was not complete for commencing review. On May 9, 2014, Constitution simultaneously withdrew and resubmitted its WQC request to the NYSDEC. Constitution supplemented the Application a number of times in 2014.  A Notice of Complete Application for public review was published by NYSDEC in the Environmental Notice Bulletin (ENB) and local newspapers on December 24, 2014.

This notice commenced a public comment period ending on January 30, 2015 which was subsequently extended to February 27, 2015. To afford the Applicant time to respond to NYSDEC's requests for information based on thousands of public comments, and to extend the time period by which NYSDEC was required to issue the WQC and associated permits, Constitution submitted its second request to withdraw and resubmit the WQC on April 27, 2015. This resubmission initiated an additional UPA comment period until May 21, 2015. A total of 15,035 individual comments were received during the two comment periods. Most of these comments related to issues surrounding the Project applications; a relative handful were related to issues specific to the Compressor Station application.

AR  004764

Since August 21, 2013, Constitution supplemented its Application numerous times in response to additional information requests by the Department; Table 1 below provides an easy reference of the requests and submittals associated with the Application over the past several years.

| Table 1 | | |
|---|---|---|
| Prepared by | Date | Summary |
| DEC | June 21, 2012 | Summary of Pre-Application Meeting |
| DEC | May 30, 2013 | Sample Matrix for Linear Projects |
| Constitution | August 28, 2013 | 401 WQC and related NYS Joint Permit application/documentation received by DEC |
| DEC | September 12, 2013 | Notice of Incomplete Application |
| Constitution | November 27, 2013 | Joint Permit Application - Supplemental Information |
| Constitution | May 9, 2014 | 401 WQC Application Withdrawal and Re-submittal |
| DEC | July 3, 2014 | DEC Recommendations for Revised Joint Application |
| Constitution | August 13, 2014 | Joint Permit Application - Supplemental Information # 2 |
| Constitution | November 17, 2014 | Additional Information Submittal |
| Constitution | November 17, 2014 | Responses to Wetland Mitigation Plan Deficiencies |
| Constitution | November 24, 2014 | Updated and Revised Information |
| Constitution | December 1, 2014 | Response to Request for Additional Clarification of Wetland Impacts |
| DEC | December 24, 2014 | Notice of Complete Application |
| DEC | December 31, 2014 | NY Stream Crossing Feasibility Analysis Information Request |
| Constitution | January 22, 2015 | Summary of Changes Trenchless Locations |
| Constitution | February 2, 2015 | Revised Wetland Mitigation Plan |
| Constitution | February 6, 2015 | Phase I Stream Analysis/Open Cut |
| DEC | February 19, 2015 | DEC Proposed Wetland Re-route |
| Constitution | March 27, 2015 | Joint Permit Application - Supplemental Information |
| Constitution | April 24, 2015 | Response to DEC Preferred List of Trenchless Stream Crossings |
| Constitution | April 27, 2015 | 401 WQC Application Withdrawal and Re-submittal |
| DEC | April 27, 2015 | Notice of Complete Application - WQC Withdrawal and Re-submittal |

AR 004765

| Constitution | May 13, 2015 | Wetland Mitigation Area - Application for Pesticide Permit |
| Constitution | May 20, 2015 | Supplemental Information - Trenchless Crossings |
| DEC | June 1, 2015 | Notice of Incomplete Application - Pesticide Permit |
| Constitution | June 19, 2015 | Canadarago Lake Mitigation Area Update |
| Constitution | June 30, 2015 | Updated Trenchless Crossing Matrix |
| Constitution | July 8, 2015 | Joint Permit Application - Supplemental Information - Wetland Re-route |
| Constitution | July 14, 2015 | Additional Information Submittal - Wetland Impacts and Mitigation |
| Constitution | August 5, 2015 | Response to Notice of Incomplete Application - Pesticide Permit |
| Constitution | September 15, 2015 | Joint Permit Application - Supplemental Information |
| DEC | October 2, 2015 | Acknowledgement of NOI - SPDES MS GP - Contractor Yard 5B |
| Constitution | January 6, 2016 | Wetland Mitigation Area - Application for Pesticide Permit - Betty Brook |
| DEC | February 26, 2016 | Acknowledgement of NOT - SPDES MS GP - Contractor Yard 5B |
| | | |

## STATEMENT OF REASONS FOR DENIAL

The Department, in accordance with CWA §401, is required to certify that a facility meets State water quality standards prior to a federal agency issuing a federal license or permit in conjunction with its proposed operation. An applicant for a water quality certification must provide the Department sufficient information to demonstrate compliance with the water quality regulations found at 6 *NYCRR Section 608.9 (Water* Quality Certifications). Pursuant to this regulation, the Applicant must demonstrate compliance with §§301, 302, 303, 306 and 307 of the Federal Water Pollution Control Act, as implemented, by applicable water quality standards and thermal discharge criteria set forth in 6 NYCRR Parts 701,702,703, 704 and 750, and State statutes, regulations and criteria otherwise applicable to such activities.[6] Denial of a WQC may occur when an application fails to contain sufficient information to determine whether the application demonstrates compliance with the above stated State water quality standards and other applicable State statutes and regulations due to insufficient information. The Department is guided by statute to take into account the cumulative impact upon all resources in making a determination in connection with any license, order, permit or certification, which in this case includes being able to evaluate the cumulative water quality impacts of ROW construction and operation on the numerous water bodies mentioned in this letter.[7]

---

[6] 6 NYCRR §608.9 (2) and (6).
[7] ECL 3-0301(1)(b).

7

AR 004766

As noted above, Constitution supplemented its Application in response to information requests issued to it by the Department but has not supplied sufficient information for the Department to be reasonably assured that the State's water quality standards would be met during construction and operation of the proposed pipeline. As a result the Department cannot be assured that the aforementioned adverse impacts to water quality and associated resources will be avoided or adequately minimized and mitigated so as not to materially interfere with or jeopardize the best usages of affected water bodies. The following are the Department's reasons for denial of Constitution's Application based on applicable sections of the New York State environmental laws, regulations or standards related to water quality.

## Stream Crossings

Project construction would disturb a total of 251 streams under New York State's jurisdiction, 87 of which support trout or trout spawning. Cumulatively, construction would disturb a total of 3,161 linear feet of streams and result in a combined total of 5.09 acres of temporary stream disturbance impacts. From inception of its review of the Application, NYSDEC directed Constitution to demonstrate compliance with State water quality standards and required site-specific information for each of the 251 streams impacted by the Project. NYSDEC informed Constitution that *all 251* stream crossings must be evaluated for environmental impacts and that trenchless technology was the preferred method for stream crossing. This information was conveyed to Constitution and FERC on numerous occasions since November 2012; however, Constitution has not supplied the Department with the necessary information for decision making.

### Deficient Trenchless Stream Crossings Information and Lack of Specific Stream Crossings Details

Staff's review of the Application includes an analysis of adverse stream crossing impacts, specifically the suitability of open trenching versus trenchless techniques or subsurface boring methods. Open trenching is a highly impactful construction technique involving significant disturbance of the existing stream bed and potential long-term stream flow disruption, destruction of riparian vegetation and establishment of a permanently cleared corridor. Comparatively, trenchless methods present significantly fewer environmental impacts to the regulated resource. Because alternative trenchless techniques exist for this Project, the Department requested additional information from Constitution to evaluate their feasibility and to determine if the Application provides enough information to demonstrate compliance with water quality standards.

Since NYSDEC's most protective method for stream crossings is some form of a trenchless technology, NYSDEC directed Constitution to determine whether a trenchless technology was constructible for each stream crossing.[8] On a number of occasions NYSDEC identified the need to provide information so that it could evaluate trenchless stream installation methods (see Table 2, below); however, Constitution has not provided sufficient information to enable the Department to determine if the

---

[8] NYSDEC Comments to FERC, November 7, 2012.

AR 004767

Application demonstrates compliance with 6 NYCRR Part 703, including, but not limited to, standards for turbidity and thermal impacts (6 NYCRR §703.2), and 6 NYCRR Part 701 (best usages).

| Table 2 | | |
|---|---|---|
| Prepared by | Date | Summary |
| NYSDEC | June 21, 2012 | In a summary of the initial pre-application meeting with Constitution, which took place on June 7, 2012, NYSDEC stated in a letter to Constitution that for protected streams and wetlands, trenchless technology is the preferred method for crossing and should be considered for *all* such crossings (emphasis added). |
| NYSDEC | November 7, 2012 | In comments to FERC, NYSDEC stated that for streams and wetlands the preferred method for crossing is trenchless technology.  The draft EIS should evaluate cases where other methods are proposed and Constitution should explain why trenchless crossing technology will not work or is not practical for that specific crossing. |
| FERC | April 9, 2013 | FERC's Environmental Information Request (EIR) directed Constitution to address all of the comments filed in the public record by other agencies regarding the draft Resource Reports including all comments from the NYSDEC. |
| NYSDEC | May 28, 2013 | Meeting with Constitution and NYSDEC staff at the DEC Region 4 office to review stream crossings. NYSDEC reiterates that acceptable trenchless technology was the preferred installation method and that stream crossings should be reviewed for feasibility of using those technologies. |
| NYSDEC | July 17, 2013 | NYSDEC comments to FERC reiterates that trenchless technology is preferred method for stream crossings.  The DEIS should evaluate cases where other methods are proposed and the Project Sponsor should explain why trenchless technology will not work or is not practical for that specific crossing. |
| NYSDEC and Constitution staff | July - August 2013 | Field visits of proposed stream crossings prior to permit applications to the Department. At each crossing, NYSDEC emphasized to |

9

JA2376

AR 004768

| | | Constitution staff that trenchless technology is preferred/most protective. |
|---|---|---|
| Constitution | November 2013 | Trenchless Feasibility Study provided by Constitution that described its choices of stream crossing techniques. Upon review, document and justifications found insufficient and all streams less than 30' wide were arbitrarily eliminated from any consideration for trenchless crossing methods. |
| NYSDEC and Constitution staff | December 31, 2014 | Meeting conducted with Constitution staff in which NYSDEC indicated that the Trenchless Feasibility Study was inadequate, *e.g.* provided insufficient justification and removed all streams less than 30 feet in width from analysis. |
| NYSDEC | December 31, 2014 | To aid in an appropriate review of stream crossing techniques and compliance with water quality standards, an informational request table including required technical information was developed by NYSDEC and provided to Constitution. |
| US Army Corps of Engineers | January 13, 2015 | U.S. Army Corps of Engineers letter reiterates a request for a feasibility analysis of trenchless crossings. |
| Constitution and NYSDEC | January 23, 2015 | Meeting between Constitution and NYSDEC staff wherein Constitution stated it was unable to complete the table (described above on December 31, 2014). NYSDEC staff indicated that the justification for stream crossing methods was insufficient and that appropriate site specific information must be provided. |
| Constitution and NYSDEC | January 28, 2015 | Conference call: NYSDEC reiterated its request for a site specific analysis of trenchless stream crossings for all streams including those under 30 feet wide. |
| Constitution | February 5, 2015 | Constitution provided an updated example of a trenchless feasibility study but that example continued to exclude streams up to 30 feet wide from analysis and did not provide detailed information of the majority of streams. |

     Constitution submitted a Trenchless Feasibility Study (Study) to FERC in November of 2013 which the Department has analyzed for the purpose of reviewing Constitution's WQC application. This Study did not include the information that FERC directed Constitution to supply to NYSDEC (and others) in its April 9, 2013 EIR, which incorporated NYSDEC's information requests, including NYSDEC's request to

AR  004769

Constitution dated November 7, 2012. Moreover, the Study did not include information that NYSDEC specifically requested in meetings and site visits with Constitution throughout 2013 and did not provide a reasoned analysis to enable the Department to determine if the Project demonstrates compliance with water quality standards.

Of the 251 streams to be impacted by the Project, Constitution's Study evaluated only 87 streams, in addition to the Schoharie Creek, as part of the Phase I desktop analysis[9] which Constitution used to determine if surface installation methods warranted consideration for a trenchless design. Of the 87 streams reviewed, Constitution automatically eliminated 41 streams from consideration for trenchless crossing because those streams were 30 feet wide or less. Constitution further eliminated 10 more streams from the Study because although they were in the proposed ROW, they would not be crossed by the Project. Accordingly, a total of 24 streams were subsequently analyzed in the Study's Phase II analysis which evaluated construction limiting factors including available workspace, construction schedules and finances. Using its review criteria, Constitution's Study finally concluded that only 11 stream crossings of the 251 displayed preliminary evidence in support of a potentially successful trenchless design and were chosen for the Phase III geotechnical field analysis. Department staff consistently told Constitution that its November 2013 Trenchless Feasibility Study was incomplete and inadequate (See Table 2).

Constitution's continued unwillingness to provide a complete and thorough, Trenchless Feasibility Study required Department staff to engage in a dialogue with Constitution on potential trenchless crossings for a limited number of streams. On April 24, 2015, Constitution's consultant produced a revised draft list of 29 trenchless stream crossings and an example of plans that would be provided for each crossing on the proposed list. Subsequently, in May 2015, Constitution provided detailed project plans for 25 potential trenchless crossings, but only two of those plans were based on full geotechnical borings that are necessary to evaluate the potential success of a trenchless design.  Detailed project plans including full geotechnical borings for the remaining stream crossings have not been provided to the Department. From May through August 2015, NYSDEC engaged in a dialogue with Constitution on potential trenchless methods for 19 streams, although NYSDEC did not form a conclusion on a crossing method for the remaining streams, including the vast majority of trout and trout spawning streams.  Furthermore, as noted above, Constitution's unwillingness to adequately explore the Alternative M route alternative, with the prospect of potentially fewer overall impacts to water bodies and wetlands when compared to Constitution's preferred route, means that the Department is unable to determine whether an alternative route is actually more protective of water quality standards.  The Department therefore does not have adequate information to assure that sufficient impact avoidance, minimization or mitigation measures were considered as to each of the more than 200 streams proposed for trenched crossings.

---

[9] Constitution described the Phase I analysis as "a general evaluation of Project locations meeting the basic criteria for trenchless construction methods such as crossing distances, feature classifications and potential associated impacts."

AR 004770

Due to the lack of detailed project plans, including geotechnical borings, the Department has determined to deny Constitution's WQC Application because the supporting materials supplied by Constitution do not provide sufficient information for each stream crossing to demonstrate compliance with applicable narrative water quality standards for turbidity and preservation of best usages of affected water bodies. Specifically, the Application lacks sufficient information to demonstrate that the Project will result in no increase that will cause a substantial visible contrast to natural conditions.[10]

Furthermore, the Application remains deficient in that it does not contain sufficient information to demonstrate compliance with 6 NYCRR Part 701 setting forth conditions applying to best usages of all water classifications. Specifically, "the discharge of sewage, industrial waste or other wastes shall not cause impairment of the best usages of the receiving water as specified by the water classifications at the location of the discharge and at other locations that may be affected by such discharge."[11]

Cumulatively, impacts to both small and large streams from the construction and operation of the Project can be profound and include loss of available habitat, changes in thermal conditions, increased erosion, creation of stream instability and turbidity, impairment of best usages, as well as watershed-wide impacts resulting from placement of the pipeline across water bodies in remote and rural areas (See Project Description and Environmental Impacts Section, above). Because the Department's review concludes that Constitution did not provide sufficient detailed information including site specific project plans regarding stream crossings (*e.g.* geotechnical borings) the Department has determined to deny Constitution's WQC Application for failure to provide reasonable assurance that each stream crossing will be conducted in compliance with 6 NYCRR §608.9.

In addition, the Application lacks required site-specific information for each of the 251 stream crossings including, but not limited to the specific location of access roads, definite location of temporary stream crossing bridges, details of temporary bridges including depth of abutments in stream banks, details of proposed blasting and the location of temporary coffer dams for stream crossings. Absent this information and the information described above, the Department cannot determine whether additional water quality impact avoidance, minimization or mitigation measures must be taken to ensure compliance with water quality standards in water bodies associated with this infrastructure.

### Insufficient Site-Specific Information on Depth of Pipe

NYSDEC received numerous public comments regarding the necessary depth for pipeline burial in stream beds that would prevent inadvertent exposure of the pipe. Historically, Department staff has observed numerous and extensive vertical

---

[10] 6 NYCRR §703.2.
[11] 6 NYCRR §701.1.

AR 004771

movements of streams in New York State that have led to pipe exposure and subsequent remedial projects to rebury the pipe and armor the stream channel. These subsequent corrective actions caused severe negative impacts on water quality and seriously impacted the stability and ecology of the stream that could have been avoided with a deeper pipe. Department staff requested that Constitution provide a comprehensive and site-specific analysis of depth for pipeline burial, but Constitution provided only a limited analysis of burial depth for 21 of the 251 New York streams.[12] Without a site-specific analysis of the potential for vertical movement of each steam crossing to justify a burial depth, NYSDEC is unable to determine whether the depth of pipe is protective of State water quality standards and applicable State statutes and standards.

In addition to impacts to water quality described above and without proper site-specific evaluations, future high flow events could expose the pipeline, resulting in risks to the health, safety, and welfare of the people of New York State. Pipe exposure would require more extensive stabilization measures and in stream disturbances resulting in addition degradation to environmental quality. We note that flooding conditions from extreme precipitation events are projected to increase on the operational span of the pipeline due to climate change.

<u>Deficient Blasting Information</u>

Constitution's Blasting Plan, dated August, 2014, outlines the procedures and safety measures to which Constitution would adhere in the event that blasting is required for Project installation. The Blasting Plan does not provide site-specific information where blasting will occur but instead provides a list of potential blasting locations based on the presence of shallow bedrock. In New York alone, Constitution identifies 42.77 total miles where shallow bedrock occurs, or approximately 44 per cent of the route, involving 84 wetlands crossings and 27 waterbody crossings. Constitution indicates that a final determination on the need for blasting will be made at the time of construction in waterbodies and wetlands. Due to the lack of specific blasting information needed for review with respect to associated water bodies, NYSDEC is unable to determine whether this Plan is protective of State water quality standards and in compliance with applicable State statutes and standards.

**Wetlands Crossings**

Wetlands provide valuable water quality protection by retaining and cleansing surface runoff to water bodies. Constitution's Application does not demonstrate that wetland crossings will be performed in a manner that will avoid or minimize discharges to navigable waters that would violate water quality standards, including turbidity. Absent detailed information for each wetland crossing that demonstrates Constitution properly avoided, minimized and mitigated impacts to wetland and adjacent areas, the Application does not supply the Department with adequate information to assure that

---

[12] See, Trout Stream Restoration Report, dated August 2014.

13

AR 004772

streams and water bodies will not be subject to discharges that do not comply with applicable water quality standards.

### NYSDEC Denial

Constitution was required to submit an Application providing sufficient information to demonstrate compliance with the regulations found at 6 NYCRR §608.9, Water Quality Certifications. Pursuant to this regulation, an Applicant must demonstrate compliance with §§301, 302, 303, 306 and 307 of the Federal Water Pollution Control Act, as implemented, by applicable water quality standards and thermal discharge criteria set forth in 6 NYCRR Parts 701,702,703, 704 and 750, and State statutes, regulations and criteria otherwise applicable to such activities.[13] The Department must also take into account the cumulative impact to water quality of the full complement of affected water resources in making any determination in connection with any license, order, permit or certification.[14] For the reasons articulated above, the Department hereby denies Constitution's WQC Application because it does not supply adequate information to determine whether the Application demonstrates compliance with the above stated State water quality standards and other applicable State statutes and regulations.

This notice of denial serves as the Department's final determination.  Should Constitution wish to address the above deficiencies, a new WQC application must be submitted pursuant to 6 NYCRR §608.9 and 6 NYCRR Part 621.  Uniform Procedures Regulations, 6 NYCRR §621.10 provide that that an applicant has a right to a public hearing on the denial of a permit, including a §401 WQC.  A request for hearing must be made in writing to me within 30 days of the date of this letter.

Sincerely,

John Ferguson
Chief Permit Administrator

Cc:
T. Berkman
W. Little
P. Desnoyers
S. Tomasik
D. Merz
F. Bifera
Y. Hennessey
K. Bowman

---

[13] 6 NYCRR §608.9 (2) and (6).
[14] ECL 3-0301 (1)(b).

14

JA2381

AR 004773

# CERTIFICATE OF COMPLIANCE

Pursuant to 6 Cir R. 30(b)(4)(E), the undersigned certifies that the documents included in this joint appendix are properly part of the agency record filed on October 27, 2023 [ECF 20-1 – 20-2] and as supplemented on December 7, 2023 [ECF 29-1 – 29-3].

/s/ James S. Whitlock
James S. Whitlock

DATED: August 19, 2024

## CERTIFICATE OF SERVICE

I hereby certify that I have, on this 19th day of August 2024, electronically filed the foregoing deferred joint appendix using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ James S. Whitlock
James S. Whitlock