No. 23-3682

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**SIERRA CLUB, et al.,**
*Petitioners,*

v.

**TENNESSEE DEPARTMENT OF ENVIRONMENT
AND CONSERVATION, et al.,**
*Respondents,*

and

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.,**
*Intervenor-Respondent.*

On Petition for Review from the Tennessee Department
of Environment and Conservation's §401 Water Quality
Certification and ARAP Permit NRS 22.192 (July 21,
2023)

**JOINT APPENDIX VOLUME VI OF VI
PAGES JA2382 TO JA2961**

JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL
LAW CENTER
48 Patton Ave, Ste 304
Asheville, NC 28801
Telephone: (828) 258-2023

STEPHANIE BIGGS
SOUTHERN ENVIRONMENTAL
LAW CENTER
1033 Demonbreun St, Ste 205
Nashville, TN 37203
Telephone: (615) 921-9470

DEREK O. TEANEY
APPALACHIAN MOUNTAIN
ADVOCATES
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182

*Counsel for Petitioners*

JONATHAN SKRMETTI
J. MATTHEW RICE
WILSON S. BUNTIN
JOSEPH AHILLEN
HARRISON G. KILGORE
OFFICE OF ATTORNEY GENERAL AND REPORTER
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 253-5118

*Counsel for Respondents*

BARTHOLOMEW J. KEMPF
LELA M. HOLLABAUGH
BRADLEY ARANT BOULT CUMMINGS LLP
1221 Broadway, Ste 2400
Nashville, TN 37203
Telephone: (615) 244-2582

EMILY M. RUZIC
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 5th Ave N
Birmingham, AL 35203
Telephone: (205) 521-8447

SCOTT BURNETT SMITH
SCHYLER B. BURNEY
BRADLEY ARANT BOULT CUMMINGS LLP
200 Clinton Ave W, Ste 900
Huntsville, AL 35801
Telephone: (256) 517-5100

DAVID A. SUPER
KEVIN A. EWING
BRACEWELL LLP
2001 M St NW, Ste 900
Washington, DC 20036
Telephone: (202) 828-5836

*Counsel for Intervenor-Respondent*

# TABLE OF CONTENTS

## VOLUME I

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA0001 | Final §401 Water Quality Certification issued to TGP 07.21.23 (NRS 22.192) | 96 |
| JA0189 | Petition for Review | ECF 1-2 |
| JA0194 | Cumberland Pipeline Project Jurisdictional Waters and Tennessee Hydrologic Determinations (JD/HD) Report submitted May 2022 by Tennessee Gas Pipeline (TGP) | 1 |
| JA0288 | TGP's ARAP and State 401 Water Quality Certification Application, 07.22.22 | 2 |
| JA0348 | TGP's Signed ARAP/401 Certification Application Form, 07.22.22 | 3 |
| JA0351 | 401 Certification App. Attachment 1, Impact Tables | 5 |
| JA0368 | 401 Certification App. Attachment 5, Construction Management Plans | 9 |
| JA0459 | 401 Certification App. Attachment 6, Permitting Table | 10 |
| JA0473 | 401 Certification App. Attachment 7, Horizontal Directional Drilling (HDD) Feasibility Studies | 11 |
| JA0543 | 401 Certification App. Attachment 8, Route Variations | 12 |
| JA0554 | 401 Certification App. Attachment 9, Summary of Trenchless Construction Methods | 13 |
| JA0556 | FERC Notice of Waiver Period for 401 Cert. App., 08.18.22 | 17 |
| JA0557 | TGP Application Supplement Letter re: field visits, 09.30.22 | 19 |

## VOLUME II

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA0560 | Attachment to TGP 09.30.22 Supplement Letter | 20 |
| JA0638 | TDEC Revised Hydrologic Determination (HD) of Water Resources, 10.21.22 | 22 |
| JA0655 | TDEC Request for Additional Information to TGP, 11.03.22 | 23 |
| JA0659 | TGP Response to Request for Additional Information, 12.01.22 | 26 |

## VOLUME III

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA1019 | TGP Response to Request for Additional Information, 12.01.22 | 26 |

## VOLUME IV

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA1470 | TGP Response to Request for Additional Information, 12.01.22 | 26 |
| JA1691 | TGP's Final Resource Report 1 (General Project Description), received 01.06.23 | 28 |
| JA1769 | TDEC Request for Additional Information to TGP, 02.24.23 | 32 |
| JA1771 | TGP response to TDEC Request for Additional Information, 03.17.23 | 35 |

## VOLUME V

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA1951 | TDEC's draft §401 Certification, NRS22.192, 05.30.23 | 40 |
| JA2138 | FERC Final EIS for Cumberland pipeline project, June2023 | 42 |
| JA2175 | TDEC e-mail to TGP re: public notice process, 05.30.23 | 43 |
| JA2176 | TDEC ltr. to TGP re: responsibility for public notification, 05.30.23 | 44 |
| JA2178 | TDEC Notice of Public Hearing on 401 Certif., 05.30.23 | 45 |
| JA2180 | TDEC Public Notice on draft permit (401) with instructions for public comments, 05.30.23 | 46 |
| JA2183 | Transcript of Public Hearing July 6, 2023, in Dickson, Tennessee | 62 |
| JA2235 | Large Google Earth Map of Entire Route of Proposed Pipeline | 64 |
| JA2236 | E-mail Comments by Sierra Club, 07.14.23 | 72 |
| JA2273 | E-mailed Comment ltr. from Conservation Groups (SELC, et al.), 07.14.23 | 73 |
| JA2342 | E-mailed Exhibits 1-2 to Conservation Groups' Comment Letter, 07.14.23 | 74 |

## VOLUME VI

| Starting Page Number | Document Description | Administrative Record Document Number |
|---|---|---|
| JA2382 | E-mailed Exhibit 3 to Conservation Groups' Comment Letter, 07.14.23 | 75 |

| JA2561 | E-mailed Exhibits 4-7, 11, and 12 to Conservation Groups' Comment Letter, 07.14.23 | 76 |
|---|---|---|
| JA2731 | E-mailed Exhibits 15-18 and 21 to Conservation Groups' Comments Letter, 07.14.23 | 77 |
| JA2796 | E-mailed Exhibits 24-36 to Conservation Groups' Comment Letter, 07.14.23 | 78 |
| JA2805 | E-mail Comments #2 by Angie Mummaw and Appalachian Voices, 07.15.23 | 82 |
| JA2811 | TDEC cover letter to TGP re: approval of §401 Water Quality Certification, 07.21.23 | 95 |
| JA2814 | TDEC Notice of Determination and Response to Public Comments on Permit NRS22.192, 07.21.23 | 97 |
| JA2831 | General Aquatic Resource Alteration Permit for Utility Line Crossings | 98 |
| JA2837 | General Aquatic Resource Alteration Permit for Minor Alterations to Wetlands | 99 |
| JA2840 | General Permit for Discharges of Stormwater Associated with Construction Activities (CGP) | 100 |
| JA2930 | General Aquatic Resource Alteration Permit for Bank Armoring and Vegetative Stabilization | 101 |
| JA2935 | General Aquatic Resource Alteration Permit for Construction or Removal of Minor Road Crossings | 102 |
| JA2939 | TDEC e-mail re: Gas Pipeline Project Discussion | ECF 29-3, Doc. 4 |
| JA2942 | TGP Cumberland Project – TDEC Blasting Presentation | ECF 29-3, Doc. 9 |





**Federal Energy Regulatory Commission**

**Office of
Energy Projects**

**August 2021**

**Mountain Valley Pipeline, LLC**                    **Docket No. CP21-57-000**

# Mountain Valley Pipeline Amendment Project

# Environmental

# Assessment

Cooperating Agency:



**U.S. Army
Corps of
Engineers**

**Washington, DC  20426**

JA2382

AR  004778

FEDERAL ENERGY REGULATORY COMMISSION
WASHINGTON, D.C. 20426

OFFICE OF ENERGY PROJECTS

<u>In Reply Refer To</u>:
OEP/DG2E/Gas 3
Mountain Valley Pipeline, LLC
Mountain Valley Pipeline
Amendment Project
Docket No. CP21-57-000

TO THE INTERESTED PARTY:

The staff of the Federal Energy Regulatory Commission (FERC or Commission) has prepared an environmental assessment (EA) for the Mountain Valley Pipeline Amendment Project (Amendment Project), proposed by Mountain Valley Pipeline, LLC (Mountain Valley) in the above-referenced docket.  Mountain Valley requests authorization to change the crossing method of specific waterbodies and wetlands from open-cut dry crossings (as authorized by its October 13, 2017 Certificate of Public Convenience and Necessity [Certificate]) to trenchless methods (conventional bore, guided conventional bore, or Direct Pipe®[1]).  In addition, Mountain Valley requests authorization for two minor route adjustments to avoid wetlands and waterbodies and authorization to conduct nighttime construction at eight trenchless crossings.

The EA assesses the potential environmental effects of the construction and operation of the Amendment Project in accordance with the requirements of the National Environmental Policy Act (NEPA).  The FERC staff concludes that approval of the proposed project, with appropriate mitigating measures, would not constitute a major federal action significantly affecting the quality of the human environment.

The U.S. Army Corps of Engineers (COE) is a federal cooperating agency who assisted us in preparing this EA because they have jurisdiction by law or special expertise with respect to impacts to waters of the U.S.  The COE may adopt the EA per 40 CFR 1501.8 if, after an independent review of the document, it concludes that their requirements and/or regulatory responsibilities have been satisfied.  However, the COE would present its own conclusions and recommendations in its respective and applicable records of decision or determinations.  Otherwise, it may elect to conduct its own supplemental environmental analyses.

---

[1]     Direct Pipe® is a construction method developed by Herrenknecht AG that combines microtunneling and horizontal direction drill (HDD).

AR  004779

- 2 -

The proposed Amendment Project includes the following:

- 120 trenchless crossings (117 conventional bores, 2 guided conventional bores, and 1 Direct Pipe®) of 47 wetlands and 136 streams in Wetzel, Lewis, Webster, Nicholas, Greenbrier, Summers, and Monroe counties, West Virginia and Giles, Montgomery, Roanoke, Franklin, and Pittsylvania, counties, Virginia;
- avoidance of one wetland via a shift in the permanent operational right-of-way at MP 0.70;
- avoidance of one waterbody due to a route adjustment at MP 230.8; and
- 24-hour construction activities at the previously authorized Gauley River and Roanoke River, two guided conventional bore crossings, the Direct Pipe® crossing, and three conventional bore locations.

The Commission mailed a copy of the *Notice of Availability* to federal, state, and local government representatives and agencies; elected officials; environmental and public interest groups; Native American tribes; potentially affected landowners and other interested individuals and groups; and newspapers and libraries in the project area. The EA is only available in electronic format. It may be viewed and downloaded from the FERC's website (www.ferc.gov), on the natural gas environmental documents page (https://www.ferc.gov/industries-data/natural-gas/environment/environmental-documents). In addition, the EA may be accessed by using the eLibrary link on the FERC's website. Click on the eLibrary link (https://elibrary.ferc.gov/eLibrary/search), select "General Search" and enter the docket number in the "Docket Number" field, (i.e. CP21-57). Be sure you have selected an appropriate date range. For assistance, please contact FERC Online Support at FercOnlineSupport@ferc.gov or toll free at (866) 208-3676, or for TTY, contact (202) 502-8659.

The EA is not a decision document. It presents Commission staff's independent analysis of the environmental issues for the Commission to consider when addressing the merits of all issues in this proceeding. Any person wishing to comment on the EA may do so. Your comments should focus on the EA's disclosure and discussion of potential environmental effects, reasonable alternatives, and measures to avoid or lessen environmental impacts. The more specific your comments, the more useful they will be. To ensure that the Commission has the opportunity to consider your comments prior to making its decision on this project, it is important that we receive your comments in Washington, DC on or before 5:00pm Eastern Time on **September 13, 2021.**

For your convenience, there are three methods you can use to file your comments to the Commission. The Commission encourages electronic filing of comments and has

AR 004780

- 3 -

staff available to assist you at (866) 208-3676 or FercOnlineSupport@ferc.gov.  Please carefully follow these instructions so that your comments are properly recorded.

(1)    You can file your comments electronically using the eComment feature on the Commission's website (www.ferc.gov) under the link to FERC Online. This is an easy method for submitting brief, text-only comments on a project;

(2)    You can also file your comments electronically using the eFiling feature on the Commission's website (www.ferc.gov) under the link to FERC Online. With eFiling, you can provide comments in a variety of formats by attaching them as a file with your submission.  New eFiling users must first create an account by clicking on "eRegister."  You must select the type of filing you are making.  If you are filing a comment on a particular project, please select "Comment on a Filing"; or

(3)    You can file a paper copy of your comments by mailing them to the Commission.  Be sure to reference the project docket number (CP21-57-000) on your letter.  Submissions sent via the U.S. Postal Service must be addressed to: Kimberly D. Bose, Secretary, Federal Energy Regulatory Commission, 888 First Street NE, Room 1A, Washington, DC  20426. Submissions sent via any other carrier must be addressed to: Kimberly D. Bose, Secretary, Federal Energy Regulatory Commission, 12225 Wilkins Avenue, Rockville, Maryland 20852.

Filing environmental comments will not give you intervenor status, but you do not need intervenor status to have your comments considered.  Only intervenors have the right to seek rehearing or judicial review of the Commission's decision.  At this point in this proceeding, the timeframe for filing timely intervention requests has expired.  Any person seeking to become a party to the proceeding must file a motion to intervene out-of-time pursuant to Rule 214(b)(3) and (d) of the Commission's Rules of Practice and Procedures (18 CFR 385.214(b)(3) and (d)) and show good cause why the time limitation should be waived.  Motions to intervene are more fully described at https://www.ferc.gov/ferc-online/ferc-online/how-guides.

Additional information about the project is available from the Commission's Office of External Affairs, at **(866) 208-FERC**, or on the FERC website (www.ferc.gov) using the eLibrary link.  The eLibrary link also provides access to the texts of all formal documents issued by the Commission, such as orders, notices, and rulemakings.

AR  004781

- 4 -

      In addition, the Commission offers a free service called eSubscription which allows you to keep track of all formal issuances and submittals in specific dockets.  This can reduce the amount of time you spend researching proceedings by automatically providing you with notification of these filings, document summaries, and direct links to the documents.  Go to https://www.ferc.gov/ferc-online/overview to register for eSubscription.

AR  004782

# MOUNTAIN VALLEY PIPELINE AMENDMENT PROJECT
# ENVIRONMENTAL ASSESSMENT

## TABLE OF CONTENTS

SECTION | PAGE NUMBER
:--- | ---:

**SECTION A – PROPOSED ACTION** ........................................................................ 1
1.0 Introduction ...................................................................................................... 1
2.0 Purpose and Need ............................................................................................. 3
3.0 Public Review and Comment ............................................................................ 4
4.0 Proposed Facilities and Land Requirements .................................................... 7
    4.1 24-Hour Construction .............................................................................. 7
5.0 Trenchless Crossing Construction Procedures ................................................. 8
    5.1 Conventional Bore .................................................................................... 8
    5.2 Guided Conventional Bore ..................................................................... 12
    5.3 Direct Pipe® ........................................................................................... 13
    5.4 Microtunneling ....................................................................................... 14
    5.5 Trenchless Crossing Contingency Plans ................................................ 15
    5.6 Trenchless Crossing Schedule ............................................................... 15
6.0 Equipment Bridges .......................................................................................... 15
7.0 Environmental Compliance Inspection and Monitoring ................................. 16
8.0 Permit Approvals and Regulatory Consultations ........................................... 17

**SECTION B – ENVIRONMENTAL ANALYSIS** ................................................. 19
1.0 Geologic Hazards, and Soils ........................................................................... 22
2.0 Water Resources .............................................................................................. 26
    2.1 Groundwater ............................................................................................ 26
    2.2 Surface Water .......................................................................................... 33
    2.3 Wetlands .................................................................................................. 38
3.0 Fisheries, Vegetation, and Wildlife ................................................................ 41
    3.1 Fisheries and Aquatic Resources ........................................................... 41
    3.2 Vegetation ............................................................................................... 43
    3.3 Wildlife ................................................................................................... 45
    3.4 Migratory Birds ...................................................................................... 47
    3.5 Special Status Species ............................................................................ 48
4.0 Land Use .......................................................................................................... 54
    4.1 Environmental Justice ............................................................................ 55
5.0 Cultural Resources ........................................................................................... 57

i

JA2387

      5.1    Consultations ................................................................ 59
      5.2    Identification of Historic Properties ............................... 62
      5.3    Assessment of Effects .................................................. 64
      5.4    Unanticipated Discoveries ............................................. 66
      5.5    Compliance with the NHPA ........................................... 66
  6.0    Air Quality and Noise ......................................................... 67
      6.1    Air Quality ...................................................................... 67
      6.2    Noise ............................................................................. 75
  7.0    Reliability and Safety ........................................................ 88

**SECTION C – ALTERNATIVES** ................................................. **90**
  1.0    No-Action Alternative ........................................................ 90
  2.0    Alternative Crossing Techniques ...................................... 92
      2.1    Screening Criteria ......................................................... 94
      2.2    Alternative Crossing Techniques Conclusion ................ 97
  3.0    Conclusion ........................................................................ 98

**SECTION D – STAFF'S CONCLUSIONS AND RECOMMENDATIONS** ............ **99**

**SECTION E – REFERENCES** ................................................... **103**

**SECTION F – LIST OF PREPARERS** ..................................... **105**

## LIST OF TABLES

**TABLE**                                                           **PAGE NUMBER**

Table 1  Issues Identified From Agency and Public Comments ......................... 6
Table 2  Estimated Number of Crews and Duration by Spread for the Amendment Project ................................................................................ 12
Table 3  Crossings Requiring Installation of New Equipment Bridges ............ 16
Table 4  Foreseeable and Planned Activities within the Amendment Project Area ......... 21
Table 5.  Waterbodies in the Project Area Subject to Section 10 of the Rivers and Harbors Act ................................................................. 40
Table 6  Total Construction Emissions Comparison for All Open-Cut and Trenchless Crossings (tons)................................................................ 69

ii

AR 004784

## LIST OF FIGURES

**FIGURE**                                                               **PAGE NUMBER**

Figure 1  Predicted 48.6 dBA $L_n$ Contour for the Mitigated Little Stony Creek Conventional Boring Site ..................................................... 79

Figure 2  Predicted 48.6 dBA $L_n$ Contour for the Elk River Guided Conventional Bore Crossing ............................................................. 80

Figure 3  Predicted Mitigated 48.6 dBA $L_n$ Contour for the Greenbrier River Direct Pipe® Crossing ........................................................... 81

Figure 4  Predicted 48.6 dBA $L_n$ Contour for the E-012 Railroad Crossing ................. 82

Figure 5  Predicted Mitigated 48.6 dBA $L_n$ Contour for the H-016 Railroad Guided Conventional Bore Crossing Site ............................................... 83

Figure 6  Predicted Unmitigated 48.6 dBA $L_n$ Contour for the H-020 Railroad Guided Conventional Bore Crossing ................................................. 84

Figure 7  Predicted Unmitigated 48.6 dBA $L_n$ Contour for the Roanoke River Microtunnel Crossing ......................................................... 86

Figure 8  Predicted Unmitigated 48.6 dBA $L_n$ Contour for the Gauley River Microtunnel Crossing ......................................................... 87

## APPENDICES

Appendix A:  Proposed Trenchless Crossings

Appendix B:  Project Location Maps

Appendix C:  Construction, Restoration, and Mitigation Plans for the Mountain Valley Pipeline Project and Amendment Project

Appendix D:  Estimated Bore Pit Spoil Volumes

Appendix E:  Bore Pit Underlying Geology, Depths, Aquifer Characteristics, Duration, and Estimated Groundwater Drawdown

Appendix F:  Current Environmental Justice Community Data

iii

AR 004785

## TECHNICAL ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| AFM | acid forming material |
| AFM Plan | Acid Forming Materials Mitigation Plan |
| Amendment Project | Mountain Valley Pipeline Amendment Project |
| APE | area of potential effects |
| BGEPA | Bald and Golden Eagle Protection Act |
| BIA | Bureau of Indian Affairs |
| CAA | Clean Air Act |
| Certificates | Order Issuing Certificates |
| CFR | Code of Federal Regulations |
| $CH_4$ | methane |
| CO | carbon monoxide |
| $CO_2$ | carbon dioxide |
| $CO_2e$ | carbon dioxide equivalents |
| COE | U.S. Army Corps of Engineers |
| Commission | Federal Energy Regulatory Commission |
| CWA | Clean Water Act |
| dB | decibels |
| dBA | decibels on the A-weighted scale |
| DWWM | Division of Water and Waste Management |
| EA | environmental assessment |
| EPA | U.S. Environmental Protection Agency |
| ESA | Endangered Species Act |
| EI | environmental inspector |
| EEP | Equitrans Expansion Project |
| Equitrans | Equitrans, L.P. |
| EO | Executive Order |
| FERC | Federal Energy Regulatory Commission |
| FEIS | final environmental impact statement |
| FHWA | Federal Highway Administration |
| FWS | U.S. Fish and Wildlife Service |
| GHG | greenhouse gases |
| GPM | gallons per minute |
| HAP | hazardous air pollutants |
| $L_{dn}$ | day-night sound level |
| $L_{eq}$ | equivalent sound level |
| MBTA | Migratory Bird Treaty Act |

iv

AR 004786

| MP | mileposts |
| Mountain Valley | Mountain Valley Pipeline, LLC |
| $N_2O$ | nitrous oxide |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NGA | National Gas Act |
| NHPA | National Historic Preservation Act |
| NLAA | not likely to adversely affect |
| NOA | Notice of Application and Establishing Intervention Deadline |
| NOS | Scoping Notice |
| NOSS | Notice of Supplemental Scoping |
| $NO_x$ | oxides of nitrogen |
| NRCS | Natural Resources Conservation Service |
| NRHP | National Register of Historic Places |
| NSA | Noise Sensitive Area |
| OEP | Office of Energy Projects |
| Order | Order Issuing Certificates |
| PA | Programmatic Agreement |
| PEM | Palustrine Emergent |
| PFO | Palustrine Forested |
| Plan | *Upland Erosion Control, Revegetation, and Maintenance Plan* |
| $PM_{2.5}$ | particles with an aerodynamic diameter less than or equal to 2.5 microns |
| $PM_{10}$ | particles with an aerodynamic diameter less than or equal to 10 microns |
| Procedures | *Wetlands and Waterbody Construction and Mitigation Procedures* |
| PSS | Palustrine Scrub-shrub |
| RCNM | Roadway Construction Noise Model |
| $SO_2$ | sulfur dioxide |
| SPCC | Spill Prevention, Control, and Countermeasures Plan |
| SHPO | State Historic Preservation Office |
| SSURGO | Soil Survey Geographic Database |
| U.S.C | U.S. Code |
| USGCRP | U.S. Global Change Research Program |
| VDEQ | Virginia Department of Environmental Quality |
| VADHR | Virginia Department of Historic Resources |
| VOC | volatile organic compounds |
| WVDEP | West Virginia Department of Environmental Protection |
| WVDNR | West Virginia Department of Natural Resources |

AR 004787

WVDCH            West Virginia Division of Culture and History

AR 004788

# SECTION A – PROPOSED ACTION

## 1.0    Introduction

The staff of the Federal Energy Regulatory Commission (Commission or FERC) prepared this environmental assessment (EA) to assess the environmental impacts of the proposed Mountain Valley Pipeline Amendment Project (Amendment Project).  On October 13, 2017, the FERC published an Order Issuing Certificates (Order) to Mountain Valley Pipeline, LLC (Mountain Valley) and Equitrans, L.P. (Equitrans) to construct and operate pipeline, compression and metering facilities, and their related infrastructure as part of the Mountain Valley Pipeline Project and Equitrans Expansion Project (EEP).[1] The authorized Mountain Valley Pipeline Project facilities consist of approximately 304 miles of new natural gas pipeline and multiple aboveground facilities in West Virginia and Virginia.

Mountain Valley was authorized to begin construction of the Mountain Valley Pipeline Project in January 2018.  Since that date, Mountain Valley has installed and backfilled approximately 81 percent of the pipeline, and more than 52 percent of the Project right-of-way has been fully restored.  Due to permitting challenges, Mountain Valley has not been able to complete construction.  Mountain Valley has subsequently engaged in a comprehensive analysis of each remaining aquatic feature proposed to be crossed.[2]

On February 19, 2021, Mountain Valley, pursuant to section 7(c) of the Natural Gas Act (NGA), in FERC Docket No. CP21-57-000, filed an application seeking to amend the Certificate of Public Convenience and Necessity (Certificate) granted in Docket No. CP16-10-000 for its Mountain Valley Pipeline Project.  Mountain Valley proposes to change the crossing method of specific waterbodies and wetlands from open-cut dry crossings (as authorized by the Certificate) to trenchless methods (conventional bore, guided conventional bore, or Direct Pipe®[3]).  Specifically, Mountain Valley proposes to use trenchless methods at 120 locations to cross 183 waterbodies and wetlands that the Commission originally authorized as open-cut dry crossings.  Five

---

1    The Amendment Project would not impact Equitrans or EEP facilities; therefore, Equitrans and EEP are not discussed further.

2    Approximately 460 streams and 183 wetlands remain to be crossed.

3    Direct Pipe® is a construction method developed by Herrenknecht AG that combines microtunneling and horizontal direction drill (HDD).

AR  004789

waterbodies in the Project area would be subject to Section 10 of the Rivers and Harbors Act.  These waterbodies are discussed further in section B.2.3.1 of this EA.

On February 19, 2021, Mountain Valley also voluntarily requested the U.S. Army Corps of Engineers (COE) administratively revoke its September 25, 2020 Nationwide Permit 12 verifications for the Mountain Valley Pipeline Project.  The COE granted Mountain Valley's request and revoked the Nationwide Permit 12 verifications for the Mountain Valley Pipeline Project on March 2, 2021 (Pittsburgh and Huntington Districts) and March 3, 2021 (Norfolk District).  On March 4, 2021, Mountain Valley submitted a Department of the Army application to the COE Huntington, Pittsburgh, and Norfolk Districts requesting an Individual Permit, pursuant to Section 404 of the Clean Water Act (CWA) and Section 10 of the Rivers and Harbors Act, to complete the remaining crossings that Mountain Valley would complete via the open-cut method (i.e., the remaining crossings not covered by the amendment application).  This method is consistent with the Certificate.[4]  In the Individual Permit application, Mountain Valley proposes to permanently discharge dredged and/or fill material into 1,198 linear feet of streams and 0.5 acre of wetlands, to temporarily discharge dredged and/or fill material into 38,332 linear feet of streams and 13.92 acres of wetlands, including the permanent conversion of 3.7 acres of palustrine forested (PFO) and palustrine scrub-shrub (PSS) wetlands to palustrine emergent (PEM) wetlands, and to work in navigable waters of the U.S.

We[5] prepared this EA in compliance with the requirements of the National Environmental Policy Act (NEPA), the Council on Environmental Quality's (CEQ) regulations for implementing NEPA (Title 40 Code of Federal Regulations (CFR), Parts 1500-1508 [40 CFR 1500-1508])[6], and the Commission's regulations for implementing NEPA at 18 CFR 380.

The FERC is the lead federal agency for authorizing interstate natural gas transmission facilities under the NGA, and the lead federal agency for preparation of this EA, in accordance with NEPA (40 CFR 1501) and the Energy Policy Act of 2005.  The COE is a federal cooperating agency who assisted us in preparing this EA because they

---

4    The Individual Permit would include all Section 10 streams including those that would be crossed via a trenchless method (see section B.2.3.1).

5    "We," "us," and "our" refer to the environmental staff of the FERC's Office of Energy Projects.

6    On July 16, 2020, the Council on Environmental Quality issued a final rule, Update to the Regulations Implementing the Procedural Provisions of the NEPA (Final Rule, 85 Fed. Reg. 43,304), which was effective as of September 14, 2020.  Therefore, we are using the new regulations in the preparation of this EA.

AR 004790

have jurisdiction by law or special expertise with respect to impacts to waters of the U.S. The COE may adopt this EA per 40 CFR 1501.8 if, after an independent review of the document, it concludes that their requirements and/or regulatory responsibilities have been satisfied. However, the COE would present its own conclusions and recommendations in its respective and applicable records of decision or determinations. Otherwise, it may elect to conduct its own supplemental environmental analyses.

The assessment of environmental impacts is an integral part of the Commission's decision-making process to determine whether to authorize Mountain Valley's proposal. Our principal purposes in preparing this EA are to:

- identify and assess potential impacts on the natural and human environment that could result from implementation of the proposed action;

- identify and recommend reasonable alternatives and specific mitigation measures, as necessary, to avoid or minimize project-related environmental impacts; and

- facilitate public involvement in the environmental review process.

The trenchless crossing methods, a small route adjustment at milepost (MP) 230.8 and alignment shift at MP 0.7, and a requested modification to allow nighttime noise activities at certain crossings were not considered in the June 23, 2017 final environmental impact statement (FEIS) issued in FERC Docket No. CP16-10-000. In the FEIS, staff assessed the impacts that would result from open-cut dry crossings of the 183 waterbodies and wetlands considered here. The FEIS concluded that no long-term or significant impacts on surface waters were anticipated and that impacts on wetlands would not be significant.

## 2.0    Purpose and Need

On October 13, 2017, the Commission issued a Certificate to Mountain Valley to construct and operate pipeline, compression and metering facilities, and their related infrastructure as part of the Mountain Valley Pipeline Project. In its amendment application, Mountain Valley states it has re-evaluated the approved Mountain Valley Pipeline Project facilities and construction methods and now proposes certain modifications (which are more specifically described below) to facilitate completion of the Mountain Valley Pipeline Project.

This EA supplements the Commission staff's June 23, 2017 FEIS for the Mountain Valley Pipeline Project. As previously mentioned, the purpose of the proposed amendment is to allow Mountain Valley to change the crossing method for specific wetlands and waterbodies that remain to be crossed from open-cut dry crossings that

were authorized by the Certificate to trenchless crossing methods. In addition, Mountain Valley would complete a route adjustment and a minor alignment shift to avoid specific wetlands and waterbodies. Lastly, the Amendment Project's purpose includes the ability to complete nighttime construction at certain previously approved and newly proposed trenchless crossings.

Mountain Valley states that the reason for the change in crossing method, the alignment shift, and the route adjustment is to avoid certain waters of the U.S. As further explained below, Mountain Valley states that it conducted a detailed review of the waterbodies and wetlands that remain to be crossed on the Mountain Valley Pipeline Project route to determine whether the features could feasibly be crossed using a trenchless method or would be more practicable to use the previously authorized open-cut dry crossing method. Open-cut dry crossings of the waterbodies and wetlands were authorized by the Certificate and do not require additional Commission authorization. As mentioned above, Mountain Valley has separately submitted a joint Department of the Army Individual Permit application package to the COE Huntington, Pittsburgh, and Norfolk Districts requesting authorization to cross these open-cut crossings under Section 404 of the CWA and Section 10 of the Rivers and Harbors Act (as applicable).

Under section 7(c) of the NGA, the Commission determines whether interstate natural gas transportation facilities are in the public convenience and necessity and, if so, grants a Certificate to construct and operate them. The Commission bases its decisions on both economic issues, including need, and environmental impacts.

### 3.0    Public Review and Comment

Commission Staff issued four notices soliciting public comment during the NEPA process for the Amendment Project. On March 1, 2021, the Commission issued a *Notice of Application and Establishing Intervention Deadline* (NOA). The NOA established a 21-day comment and intervention period and requested comments on specific concerns about the Amendment Project or issues that should be considered during the preparation of the EA. The comment period ended on March 22, 2021.

On March 16, 2021, the Commission issued a *Notice of Scoping Period and Requesting Comments on Environmental Issues for the Proposed Amendment to the Certificate of Public Convenience and Necessity for the Mountain Valley Pipeline Project* (NOS). The NOS established a 30-day comment period to assist with the identification of the scope of issues to address in the EA. The scoping comment period ended on April 15, 2021.

AR  004792

On July 1, 2021, the Commission issued a *Notice of Supplemental Scoping Period for the Proposed Amendment to the Certificate of Public Convenience and Necessity for the Mountain Valley Pipeline Project and Request for Comments on Environmental Issues* (NOSS).  The NOSS established a second 30-day scoping period.  The supplemental scoping comment period ended on August 2, 2021.

On August 13, 2021, we issued a *Notice of Availability of the Environmental Assessment for the Proposed Mountain Valley Pipeline Amendment Project* that established a 30-day comment period on the EA.  The EA comment period will end on September 13, 2021.

In response to the NOA, NOS, and NOSS, the Commission received approximately 398 discrete comments from individuals, environmental non-profit groups, and an industry group.  We also received 1,092 form letters from individuals.  Several commenters request the original scoping comment period be extended.  We have reviewed all comment letters submitted prior to issuance of this EA, regardless of whether comments were received during or after the comment periods identified in the notices.

The pertinent[7] comments received in response to the NOA, NOS, and NOSS are summarized in table 1 below and are further addressed, as applicable, in the relevant sections of this EA.  However, other comments received that are outside the scope of our NEPA analysis are not addressed further in this EA because they are not specific to environmental resources that may be affected by the actions requested in Mountain Valley's amendment application.  Such topics may be addressed, as appropriate, in the subsequent Commission Order in this proceeding.  These comments:

- address the need for the Mountain Valley Pipeline Project and associated amendments and express opposition to fossil fuels in favor of renewable energy;

- request that a Supplemental Environmental Impact Statement be prepared for the Amendment Project;

- request a performance bond for completion of the Project or restoration if the Project is canceled or abandoned;

---

7    As stated previously, the purposes for preparing this EA are to identify and assess potential impacts on the natural and human environment and identify and recommend reasonable alternatives and specific mitigation measures, as necessary, to avoid or minimize project-related environmental impacts.  Comments that inform this analysis are considered pertinent.

AR 004793

- address the potential for community spread of COVID-19 by construction workers;

- request that the Commission not issue a Certificate for the Amendment Project until Mountain Valley obtains all permits necessary for completion of the entire Mountain Valley Pipeline Project, including a permit under Section 404 of the CWA for the COE-jurisdictional activities; and

- determination of whether a Section 401 certification is required for the Amendment Project.

Table 1

**Issues Identified From Agency and Public Comments**

| Issue | EA Section Addressing Issue |
|-------|------------------------------|
| Air quality, greenhouse gases, climate change (including fugitive emissions) | section B.6 Air Quality and Noise |
| Aquatic resources (including sedimentation impacts) | section B.3.1 Fisheries and Aquatic Resources |
| Cultural resources (including adherence to Section 106 of the National Historic Preservation Act [NHPA]) | section B.5 Cultural Resources |
| Geology (including karst; trenchless crossing constructability; blasting; steep terrain; and acid-producing rock) | section B.1 Geologic Hazards and Soils |
| Environmental Justice | section B.4.1 Environmental Justice |
| Noise | section B.6.2 Noise |
| Safety | section B.7 Reliability and Safety |
| Soils (including spoil storage, sedimentation, and constructability) | section B.1 Geologic Hazards and Soils |
| Surface water, groundwater, and wetlands (including water quality, sedimentation, subsidence, dewatering, and riparian buffers) | section B.2 Water Resources |
| Vegetation and wildlife (including riparian impacts) | section B.3 Fisheries, Vegetation, and Wildlife |
| Threatened and endangered species | section B.3.5 Special Status Species |

AR  004794

## 4.0    Proposed Facilities and Land Requirements

Mountain Valley proposes to conduct 120 trenchless crossings (117 conventional bores, 2 guided conventional bores, and 1 Direct Pipe®) of 47 wetlands and 136 streams in Wetzel, Lewis, Webster, Nicholas, Greenbrier, Summers, and Monroe counties, West Virginia and Giles, Montgomery, Roanoke, Franklin, and Pittsylvania, counties, Virginia. Appendix A of this EA provides a list of each of these crossings. Appendix B includes maps of each of the crossings. The change in crossing methods would not result in a change of land requirements as authorized by the October 13, 2017 Certificate. However, Mountain Valley proposes to avoid one wetland, W-A2a, via a shift in the permanent operational right-of-way at MP 0.70, which would modify 0.23 acre that was certificated as temporary construction workspace to permanent workspace. This is a minor shift that would occur entirely within the previously approved construction workspace and would move the pipeline closer to an existing meter station adjacent to the construction right-of-way. The total amount of permanent certificated workspace at MP 0.70 would not change. Mountain Valley also proposes to adjust the originally certificated pipeline centerline to avoid one waterbody (S-OO11) at MP 230.8. This route adjustment, which also includes the H-016 railroad crossing, would require 0.13 acre for construction right-of-way and 0.04 acre of new permanent operational right-of-way. The route adjustment at MP 230.8 would not affect new landowners and Mountain Valley has acquired the necessary land rights.

### 4.1    24-Hour Construction

As part of its amendment application, Mountain Valley requests that the Commission allow nighttime microtunneling activities at the Gauley River and Roanoke River crossings.[8] Commission staff previously authorized Mountain Valley to change the crossing method for the Gauley and Roanoke Rivers to a microtunneling technique under variances D-35 and H-21, respectively.[9] Additional information regarding these streams can be found in sections B.2.3.1 and B.2.4 of this EA.

Mountain Valley also proposes to conduct 24-hour trenchless crossing activities at both guided conventional bore crossings (Elk River and Little Stony Creek crossings), the Direct Pipe® crossing (Greenbrier River), and three conventional bore locations which also include railroad crossings (E-012, H-016, and H-020). Mountain Valley states that nighttime trenchless activities would be necessary at these locations in order to reduce the

---

8    See Mountain Valley's April 27, 2021 Response to Environmental Information Request #3 at 7.

9    See accession numbers 20200518-3008 and 20200527-3040.

AR  004795

length of time that the pit excavations would remain open. Crossings E-012, H-016[10], and H-020 would cross railroads operated by CSX, Roanoke Valley Resource Authority, and Norfolk Southern, respectively. The owners of these railroads require boring operations to progress on a 24-hour basis, without stopping, until complete. Nighttime activities would only include boring and welding of the pipe. Pit excavations at all of these crossings would not occur at night.

## 5.0    Trenchless Crossing Construction Procedures

In contrast to open-cut dry trenching, the use of a trenchless crossing method to cross an environmental resource such as a waterbody or wetland avoids direct impacts associated with working directly within the sensitive resource. Trenchless crossing methods allow for uninterrupted existing streamflow and undisturbed wetland soils, scrub-shrub, and herbaceous vegetation, thereby minimizing impacts on aquatic resources and wetland and wildlife habitat. Additionally, the proposed trenchless crossings would result in reduced in-stream sedimentation as compared to the in-water construction approved for the Mountain Valley Pipeline Project. This reduction results from less disturbance of the riparian areas adjacent to the waterbodies and avoidance of impacts on the streambed. Lastly, trenchless crossings would avoid the ground disturbance associated with trenching and backfilling in the subject wetlands and reduce longer-term impacts by accelerating the post-construction revegetation period.

Mountain Valley provided plan and profile views of topographic conditions at each of the planned crossings relative to borehole and bore pit depths below the resource, which provides information concerning bank conditions, the depth of the pipe, and the positioning of the bore pits.[11] Provided below is a summary of the techniques proposed.

### 5.1    Conventional Bore

As previously stated, the conventional bore method would be used for the majority (about 98 percent) of the trenchless crossings. The conventional bore method is a technology that has been used for decades to install natural gas pipelines. Mountain

---

10    According to Mountain Valley, the railroad at H-016 is owned by Roanoke Valley Resource Authority and operated under contract with Norfolk Southern. This railroad provides rail service to the Smith Gap Landfill. Mountain Valley's current permit requires a bored crossing and 24-hour boring operations. Roanoke Valley Resource Authority is currently paving over the railroad tracks. As of July 29, 2021 a base layer of asphalt has been installed. Mountain Valley is currently working with the Roanoke Valley Resource Authority to modify its permit to eliminate 24-hour boring.

11    See Appendix C of accession number 20210219-5176.

AR  004796

Valley has already successfully completed 52 conventional bores without incident. The conventional bore method requires excavation of launching and receiving bore pits located within upland areas of the existing construction right-of-way on each side of the feature(s) being crossed. We received multiple comments concerning bore pit collapse and maintaining the integrity of the bore pits during construction activities. The bore pit excavations would be sloped, shored, or shielded to comply with all local, state, and federal safety regulations, including the Occupational Safety and Health Administration (OSHA) regulations for excavations, which would minimize the possibility of collapse or a lack of integrity. According to Mountain Valley, relatively narrow excavations may use trench boxes while larger excavations may require specially designed shoring systems such as sheet pile walls, soldier pile walls, or secant pile walls. An excavation competent person, as defined by the OSHA, would determine if excavations within stable rock require supports. A registered professional engineer would design shoring for excavations greater than 20 feet deep.

Once the bore pits are excavated, the construction crew, working from the launching side, would advance a jacking pipe and a rotating cutting head that is attached to the leading edge of the auger string. The spoil would be transported back by the rotation of auger flights within the steel jacking pipe. The conventional bore method is non-steerable.

Conventional boring can be used to install pipes ranging from 4 to 60 inches in diameter and spanning lengths of up to several hundred feet. The major advantage of conventional auger borings over other boring technologies is that the drill pipe is installed as the boring is advanced and the line pipe is installed immediately behind the bore pipe once the boring is completed, leaving no unsupported borehole. Because the borehole is continuously supported by pipe throughout the process, the risk of bore collapse is minimized. Accordingly, the circulation of drilling fluids to transport drill cuttings and to support the wall of the borehole is generally not necessary for the drilling of conventional bores. However, in some situations, especially in long conventional bores or in conventional bores through mixed ground or clay, Mountain Valley may use small amounts of bentonite or polymer-based lubricant on the cutting head and exterior casing to reduce friction and to increase the success of the crossing. If the conventional auger bore encounters excessively hard rock, an air-driven rock hammer drill can be deployed at the bore face, as needed. Boulders and cobbles up to one third of the diameter of the installed pipe can be accommodated.

Conventional auger boring typically requires the least amount of areal footprint (workspace) of mechanical trenchless technologies because large tanks and drilling fluid-mixing systems are not required. Cuttings (spoil) generated by boring operations would

AR 004797

be stockpiled temporarily at the site but would ultimately be reused to backfill the bore pits. Prior to boring operations, wetlands and waterbodies adjacent to each work site would be protected using the erosion and sediment control devices and best management practices appropriate to the specific site (as discussed in section B.2 of this EA).

We received multiple comments regarding the potential for deflection of the bore intersecting the bottom of the resource (i.e., streambed). A bore deflection that would breach the stream bottom is very unlikely to occur, for the following reasons. Mountain Valley indicates that in order to breach the streambed an average bore length (less than 95 feet) would either have to be misaligned at least 10 percent at initial set up or deflect at least 10 percent due to encountering a large rock, cobble, or interface between two rock types. Bore operators thoroughly check the line and grade prior to beginning bore operations so as to prevent a misalignment.

A deflection of at least 10 percent would measurably increase bore machine resistance which would be detectable by the bore operator. A deflection of this magnitude would also likely damage the auger and halt any forward progress. Bore operators can also detect increased resistance in the bore machine due to deflections smaller than 10 percent for longer than average bores (greater than 95 feet). Additionally, bore operators can change the cutting heads during the bore process in order to select the appropriate cutting head for the expected substrate. Potential impacts on streambeds are further discussed in section B.2.2 of this EA.

We also received comments concerning protection of the external coating of the pipe from damage during installation via a trenchless crossing method. Mountain Valley states that pipe utilized at the trenchless crossings would have an abrasion resistant overlay (ARO) over the standard fusion bonded epoxy (FBE) coating used on all pipe. Most locations would use a mill-applied Powercrete ARO coating. ARO coatings are more durable than FBE coating and designed to protect the pipe from abrasions and gouging. Mountain Valley states that ARO coatings are commonly used in trenchless crossings.

Crews would coat welds with a field-applied Powercrete coating for crossings that would require more than a standard joint of pipe, generally more than about 40 feet long. According to Mountain Valley, the field-applied Powercrete coating is designed for field application and would provide the same protection as a mill-coated ARO. Mountain Valley would check the pipe and weld coatings for pinhole defects immediately prior to installation.

AR 004798

Bore pit dewatering would be required to provide for a dry workspace at all trenchless crossing locations. Dewatering would be conducted in accordance with all existing plans and procedures reviewed and approved for the Mountain Valley Pipeline Project. Mountain Valley would utilize 3-inch to 6-inch diameter submersible pumps in each of the bore pits. These pumps have the ability to control groundwater infiltration rates up to 2,750 gallons per minute, although anticipated infiltration rates are substantially less (see section B.2.1 of this EA for more discussion). In some instances, pumping may require 24-hour operation to keep up with water infiltration and ensure personnel are able to enter the bore pits safely and efficiently when beginning bore activities each day. Mountain Valley provided a qualitative estimate of dewatering conditions encountered at 54 previously completed trenchless crossing locations. Dewatering was not previously necessary at 19 of the 54 locations, while minimal dewatering was necessary at 13 locations. The remaining 22 locations required continuous dewatering with 2 locations reporting extensive dewatering. Any dewatering associated with the Amendment Project would be completed in accordance with the FERC's *Wetlands and Waterbody Construction and Mitigation Procedures* (Procedures), as well as West Virginia Department of Environmental Protection (WVDEP) and Virginia Department of Environmental Quality (VADEQ) specifications. Additional information regarding dewatering can be found in section B.2.1 of this EA.

Based on Mountain Valley's estimates, the average length of time required for a conventional bore (including pit excavation and boring) would be just over 2.5 weeks (18 days), with a median duration of slightly less (13 days). More than half (about 60 percent) of the conventional bores would be completed within 2 weeks. About 26 percent would be completed within 4 weeks, 7 percent would be completed within 4 to 6 weeks, and 7 percent would be completed within 5 to 10 weeks. One conventional bore may require 72 days (10.3 weeks) to complete. Mountain Valley's duration estimates are based primarily on the length of the bore. The actual duration could increase to some extent by weather delays or slow boring rates due to unexpectedly hard rock or changing geological makeup that may necessitate equipment change-outs. Mountain Valley estimates 41 crews would be working on the nine construction spreads[12] to complete all of trenchless crossings in about 4 months. Concurrent work within each spread would occur between 3 (Spreads A and B) and 13 (Spread I) locations (see table 2).

---

[12]    Construction of the Mountain Valley Pipeline Project is split into nine construction spreads ranging in length from 26.6 miles to 49.2 miles.

AR 004799

Table 2

**Estimated Number of Crews and Duration by Spread for the Amendment Project**

| Spread | Total Miles | Bore Crews | Duration (months) |
|--------|-------------|------------|-------------------|
| A & B | 65.4 | 3 | 4 |
| C & D | 62.8 | 7 | 4 |
| E & F | 66.9 | 4 | 4 |
| G | 32.3 | 8 | 4 |
| H | 26.6 | 6 | 4 |
| I | 49.2 | 13 | 4 |
| **Total** | **303.1** | **41** | **4** |

## 5.2    Guided Conventional Bore

The guided conventional bore method is a variation of the conventional bore method as discussed in section A.5.1 of this EA.  Following preparation of the bore pits (as discussed in section A.5.1 of this EA), a small diameter "guided pilot" would be installed first.  The drill string is attached to the front of the conventional auger during the final hole opening phase.  Placing the pilot in front of the auger keeps the path of the auger on its intended trajectory during the hole opening phase.

The pilot hole can be created using a small diameter self-propelled, hydraulic steerable drill unit with a tri-cone cutting head.  The tri-cone head is about 6 to 12 inches in diameter and is guided using a bottom-hole assembly.  The bottom-hole assembly includes an electronic communication device (sonde) which provides location and orientation information to the operator.

The guided conventional bore method may require the use of bentonite drilling fluid to bring drill cuttings back to the surface and to help stabilize the bore hole.  Shorter guided conventional bores can use only water to carry cuttings back and cool the cutting head.  Extremely hard rock may require an air hammer to create the pilot hole.  An air hammer uses air to remove cuttings.  Where bentonite drilling fluids are used, fluids are pressurized at levels that are much lower than those used for horizontal directional drills (HDD).  However, because the depth of the drill profile below the ground surface is less than what is typical for an HDD, the down-hole pressure would be monitored at the drill rig when drilling fluid or water are used to carry back cuttings and the surface is visually inspected for inadvertent returns.

AR  004800

Following completion of the pilot hole across the length of the crossing, the drill string remains in place and the conventional auger machine completes the bore to the required diameter attaching to the drill stem to keep the auger in line.  The risk of bore hole collapse is minimized as the drill string remains in place.  The stems are then removed on the exit side as the auger advances from the launching side.

We received multiple comments concerning the storage and use of drilling fluids and the possibility of contamination in resources.  Drilling fluids would be stored in tanks on the right-of-way.  Secondary containment (such as soil berms, straw bales with liners, or prefabricated liners) would be installed around the drilling fluid tanks.  Mountain Valley would utilize vacuums and pumps to remove all fluids from the bore pit.  All drilling fluids would be disposed of at an approved local waste management facility.

Guided conventional bores typically require 24-hour operation to avoid potential collapse of the bore or freezing up of the pipe within the bore.  To reduce potential impacts from 24-hour operation, Mountain Valley would perform as much work as possible during daylight hours, including preparation of the workspace, excavation of bore pits, and moving heavy equipment to the crossing locations.

The two guided conventional bores would require 33 to 79 days to complete.  As stated above, the actual duration could increase to some extent by weather delays or slow boring rates due to unexpectedly hard rock or changing geological makeup that may necessitate equipment change-outs.

### 5.3    Direct Pipe®

Direct Pipe® is a trenchless construction method that can be used to install pipelines underneath rivers or roads without surface impacts.  It is a combination of a micro-tunneling process, described below, and HDD.  Direct Pipe® crossings are completed using an articulated, steerable micro-tunnel boring machine (MTBM) mounted on the leading end of the pipe or casing.  A bentonite slurry is used to increase lubrication and advance the MTBM.  The pipeline is pre-fabricated and welded in sections to the back of subsequent sections as the MTBM advances.  Because the product pipe is attached to and advances with the MTBM, like microtunneling, it benefits from a continuously supported hole during the drilling process, and allows for the product pipe to be installed in varying formations such as boulders and rock.  Additionally, the bentonite lubrication system used to lubricate the annulus between the product pipe and the excavation is introduced at a relatively low pressure, reducing the potential for hydraulic fracture and inadvertent drilling fluid returns.  Because the drilled hole is continuously supported and the risk of hydraulic fracture is low, the Direct Pipe®

AR  004801

alignment can be designed much shallower than is typical for an HDD. During drilling, Mountain Valley will implement its approved contingency plan for inadvertent returns which includes downhole pressure monitoring. Installation of a Direct Pipe® typically requires 24-hour operation to avoid freezing up of the pipe within the bore. To reduce potential impacts from 24-hour operation, Mountain Valley would perform as much work as possible during daylight hours, including the preparation of the workspace, the excavation of bore pits, and moving heavy equipment to the crossing locations.

As with the guided conventional bore, drilling fluids would be stored in tanks on the right-of-way. Secondary containment (such as soil berms, straw bales with liners, or prefabricated liners) would be installed around the drilling fluid tanks. Mountain Valley would utilize vacuums and pumps to remove fluids from the bore pit. All drilling fluids would be disposed of at an approved local waste management facility.

The Direct Pipe® crossing of the Greenbrier River is estimated to require about 103 days total for pit excavation and boring. As stated above, the actual duration could increase to some extent by weather delays or slow boring rates due to unexpectedly hard rock or changing geological makeup that may necessitate equipment change-outs.

## 5.4    Microtunneling

No crossings utilizing microtunneling are proposed for the Amendment Project. Mountain Valley would utilize microtunneling to cross the Gauley River and the Roanoke River as previously approved under variances D-35 and H-21, respectively.

In a microtunnel crossing, a pipe is jacked behind a remotely controlled, steerable, guided, and articulated MTBM. Microtunneling can be used in many soil types, including boulders and rock. Boulders and cobbles up to one third of the diameter of the installed pipe can be accommodated. The microtunnel technique can range from 10 to 136 inches in diameter and span 200 feet to 1,500 feet. This technique is often used in longer trenchless crossings because the advanced control and guidance system allows for precise line and grade tolerances. This technique requires only one bore pass and the bore hole is continuously supported minimizing the chance of a collapse. A small amount of bentonite drilling fluid is used to cool and lubricate the cutting head. A dedicated drilling fluid return pipe carries cuttings through the installed line pipe at a low pressure. The closed drilling fluid return system and pressure-control features at the cutting head minimize inadvertent returns. In addition, during drilling, Mountain Valley will implement its approved contingency plan for inadvertent returns which includes downhole pressure monitoring. Microtunneling typically requires 24-hour operation to

AR 004802

avoid any potential for collapse above the bore or freezing up of the pipe within the bore hole.[13]

### 5.5    Trenchless Crossing Contingency Plans

Mountain Valley states that it would implement a contingency plan should insurmountable issues be encountered while using trenchless crossing methods, including excessive torqueing, poor cutting returns, mechanical failure of the drill string or bit assembly, deviation from the planned bore path, and unanticipated geological or hydrological conditions.  Should Mountain Valley encounter one or more of these issues, it would notify the appropriate FERC compliance monitor and attempt another bore 10 feet to either side of the original bore path within the existing right-of-way.  Should the failure involve a stuck pipe and a standard recovery fails, the pipeline in this area would be abandoned in place and backfilled with grout.  Should all attempts at the trenchless crossing fail, Mountain Valley would seek necessary variances or approvals from FERC and any applicable agency including the COE, to revise the crossing method.

### 5.6    Trenchless Crossing Schedule

Mountain Valley would begin trenchless crossings upon receipt of all necessary federal approvals and authorizations and a notice to proceed from the Commission.  Mountain Valley estimates 41 crews would be working on the nine spreads to complete all of the trenchless crossings in about 4 months.

### 6.0    Equipment Bridges

Mountain Valley states that 19 crossings still require the installation of equipment bridges to allow for the passage of equipment across the sensitive resource.  Mountain Valley anticipates that the equipment bridges, listed in table 3, would be installed at the 19 crossings.  These actions would be conducted in accordance with Mountain Valley's Procedures and any applicable agency approvals.  Impacts associated with the installation and removal of equipment bridges, including those listed in table 3, were analyzed in the FEIS.

---

13    The shallow depth profile could lead to ground settlement due to over-excavation by the MTBM leading to the loss of stability at the tunnel face and the formation of empty space above the tunnel.

Table 3

**Crossings Requiring Installation of New Equipment Bridges**

| Crossing Number | Waterbody or Wetland Features to be Bridged | Anticipated Equipment Bridge Type |
|---|---|---|
| E-009 | W-M18 | Timber mat |
| F-022 | S-19 | Clear span bridge |
| G-009 | S-G35 | Bridge |
| G-010 | S-SS4 | Bridge |
| G-017 | S-Y3 | Bridge |
| G-19B | S-E25-downstream and upstream | Bridge |
| H-030 | S-IJ82 | Bridge |
| H-031 | S-IJ83, S-IJ88, S-IJ84 | Bridge |
| H-032 | S-IJ89, S-IJ90 | Bridge |
| H-040 | S-ST9b | Bridge |
| H-042 | S-KL55 | Bridge |
| H-043 | S-IJ12 | Bridge |
| H-044 | S-EF44 | Bridge |
| H-045 | S-IJ43 | Bridge |
| H-046 | S-Y9, S-Y7, S-Y8 | Bridge |
| H-047A | S-B22, S-B23 | Bridge |
| H-048A | S-B25 | Bridge |
| H-054 | S-D11 | Bridge |
| I-121 | S-EF26 | Mat bridge[a] |
| a | As stated in the joint Department of the Army Individual Permit application, the mat bridge would have a temporary discharge of 20 linear feet (0.0092 acres) due to supports located within the ordinary high water mark.  A timber mat is used in wetlands to avoid compaction. | |

## 7.0    Environmental Compliance Inspection and Monitoring

We received multiple comments on environmental compliance and issues surrounding erosion and sediment control during construction activities associated with the Mountain Valley Pipeline Project.  Mountain Valley personnel and its contractors would be required to comply with any conditions of a FERC Order and the existing Mountain Valley Pipeline Project certificate, all mitigation measures identified in its application, and any other federal permits and authorizations.  At least one environmental inspector (EI) per spread would be responsible for Mountain Valley's environmental

AR  004804

compliance. The EIs performing environmental oversight would serve to monitor the implementation of all environmental requirements during construction. The EIs would have the authority to enforce compliance with permit conditions, the environmental conditions of a FERC Order, and environmental requirements in landowner agreements. The FERC third-party compliance monitoring program would also continue to be implemented.[14] Under this program, a contractor is selected by, managed by, and reports solely to the FERC staff to provide environmental compliance monitoring services. The FERC Compliance Monitors would provide daily reports to the FERC Project Manager on compliance issues and make recommendations on how to deal with compliance issues and construction changes, should they arise.

Mountain Valley would construct the Amendment Project in accordance with the methods described in the Mountain Valley Pipeline Project FEIS, including implementing its *Erosion and Sediment Control Plan*, our *Upland Erosion Control, Revegetation, and Maintenance Plan* (Plan) and its Procedures, its *Spill Prevention, Control, and Countermeasures Plan (*SPCC*)*, its *General Blasting Plan*, and its *Acid Forming Materials Mitigation Plan* (AFM Plan). Other resource-specific plans have been developed for the larger Mountain Valley Pipeline Project (see appendix C) and would be implemented as needed for the Amendment Project.

### 8.0    Permit Approvals and Regulatory Consultations

As discussed above, on March 4, 2021, Mountain Valley submitted a joint Department of the Army Individual Permit application package to the COE Huntington, Pittsburgh, and Norfolk Districts to complete the remaining open-cut crossings and to permanently discharge dredged and/or fill material into 1,198 linear feet of streams and 0.5 acre of wetlands, to temporarily discharge dredged and/or fill material into 38,332 linear feet of streams and 13.92 acres of wetlands, including the permanent conversion of 3.7 acres of PFO and PSS wetlands to PEM wetlands, and to work in navigable waters of the U.S.

We received many comments regarding the information contained within Mountain Valley's application to the COE for an Individual Permit. Review of the application for an Individual Permit and consideration of associated comments will be conducted by the COE and does not fall under the jurisdiction of the Commission. As mentioned above, the FERC has already analyzed and approved the open-cut dry

---

14    Under the current third-party compliance monitoring program for the Mountain Valley Pipeline Project, nine compliance monitors (one for each construction spread) typically inspect portions of the Project six days a week.

AR  004805

crossings for the waterbodies and wetlands contained within the requested COE Individual Permit.

Mountain Valley would be required to continue compliance with all authorizations issued for the original Mountain Valley Pipeline Project under Section 7 of Endangered Species Act (ESA), Section 106 of the NHPA, and the pending FERC certificate, if the amendment application is approved. Additional information regarding Section 7 of the ESA can be found in section B.3 of this EA, and information regarding Section 106 of the NHPA can be found in section B.5 of this EA.

AR 004806

**SECTION B – ENVIRONMENTAL ANALYSIS**

We incorporate by reference the environmental analyses contained in the FEIS in Docket No. CP16-10-000.  The Amendment Project would continue to be designed, operated, and maintained in accordance with the U.S. Department of Transportation (DOT) pipeline safety regulations, 49 CFR 192 and all applicable permits, as identified in the FEIS.

*Environmental Trends and Planned Activities*

According to the most recent Mountain Valley Pipeline Project weekly construction report from the reporting period of July 24, 2021 to July 30, 2021[15] the construction completeness of the pipeline right-of-way for all spreads is approximately 100 percent for tree felling, 95 percent for vegetation clearing, 95 percent for upland right-of-way-preparation, and 90 to 94 percent for trenching, stringing, welding, and coating and wrapping.  According to the status report, approximately 81 percent of the right-of-way has been backfilled and approximately 52 percent is in the final restoration stage.  Mountain Valley states that at areas of waterbody crossings, trees were cleared but a 50-foot riparian buffer of other vegetation was maintained.  These areas currently consist of tree stumps along with scrub-shrub and herbaceous vegetation.

Previously in the construction process and prior to filing the amendment application, Mountain Valley requested changes in crossing methods from open-cut dry crossings to trenchless techniques for over 70 wetlands and waterbodies.  Commission staff reviewed and approved each of those changes, determining that the change in crossing methods provided an equal or greater protection of resources than the previously proposed open-cut dry crossings.  As a result, Mountain Valley has completed 52 conventional bore crossings of 67 waterbodies and wetlands as part of the Mountain Valley Pipeline Project.  In addition, Mountain Valley completed one Direct Pipe® crossing of two waterbodies and one HDD of four wetlands and waterbodies.  Mountain Valley has completed all of these crossings in the construction workspaces granted by the Certificate for the Mountain Valley Pipeline Project.

As discussed in the FEIS, West Virginia has a humid continental climate while Virginia has a humid coastal climate.  Based on information gathered from the National Centers for Environmental Information during the period 1985 through 2014, average monthly precipitation was about 3.8 inches in West Virginia and 3.7 inches in Virginia. Construction of the Mountain Valley Pipeline Project began during the winter of 2018.

---

15        See accession number 20210811-5021.

AR  004807

By the end of 2018, about 88 percent of the construction right-of-way for the Mountain Valley Pipeline Project had been cleared.  The region was subjected to unusually high precipitation totals around this time.  For example, Roanoke County, Virginia averages about 42 inches of precipitation annually, but Roanoke County received about 63 inches of rain in 2018.  Lewis County in West Virginia also exceeded its annual average precipitation (about 48 inches) during this period by 21 inches.  Overall 2019 precipitation was very close to average.  However, in 2020, Roanoke County received about 23 inches above average rainfall, while Lewis County received only 8 inches above average rainfall.

Overall, for the period of construction of the Mountain Valley Pipeline Project (February 2018 to June 2021), Roanoke County received about 191 inches of rain, which exceeds the historical average by about 48 inches.  Lewis County received 190 inches of rain exceeding its average by almost 31 inches. (NOAA NCEI, 2021)

We received several comments stating that a cumulative impact analysis was needed for the Amendment Project.  As mentioned above, the Amendment Project would be constructed within the existing Mountain Valley Pipeline Project construction and permanent right-of-way except for one minor route adjustment that would be constructed adjacent to the current right-of-way.  This right-of-way has been the site of active construction and maintenance/restoration since 2018.  Current reasonably foreseeable planned actions in the Amendment Project area include logging/tree trimming operations, coal mining activities, the conversion of existing railroad tracks to a roadway, and the installation of a solar farm (see table 4).

AR  004808

Table 4

**Foreseeable and Planned Activities within the Amendment Project Area**

| Spread | Milepost(s) | Entity | Proposed/Current Activity |
|--------|-------------|--------|---------------------------|
| C | 74.9 – 87.4 | Unknown | Non-Project related logging operations that utilize Project access roads (MVP-BR-103.01, MVP-BR-104, MVP-BR-104.01, MVP-WB-119, and County Road 7). |
| D | 98.6 – 128.2 | Unknown | Non-Project related logging activities across the Spread. |
| D | 127.0 | Quinwood Coal Company | Longwall mining using Project access road AR-161. |
| F | 154.8 | Unknown | Non-project related logging activities near Springdale Dawson Road. |
| F | 155.6 – 156.5 | Local power company | Tree trimming near Project access roads MVP-GR-193 and MVP-GR-194. |
| H | 230.9 | Roanoke Valley Resource Authority | Conversion of existing railroad tracks to a roadway. This activity crosses the Project right-of-way and Project access road MVP-MN-275. |
| I | 292.4 – 294.0 | Dominion Energy | Construction of the 1,200-acre Maplewood Solar Project. The project includes sites adjacent to one or both sides of the Mountain Valley Pipeline Project limits of disturbance. |
| A-I | 0.0-304 | Mountain Valley | Completing construction of the pipeline, including open-cut crossings of streams included in the COE permit application. |

A cumulative impacts analysis was completed for the Mountain Valley Pipeline Project in the FEIS. This analysis concluded that when added to other past, present, and reasonably foreseeable future actions, the Mountain Valley Pipeline Project would not have significant adverse cumulative impacts on environmental resources within the geographic scope affected by the Mountain Valley Pipeline Project. As further discussed under each of the resource sections in this EA, the Amendment Project would largely reduce impacts on a number of environmental resources, including minimizing direct impacts on surface water resources, wetlands, aquatic resources, and riparian habitat. However, the Amendment Project would lead to changes in construction emissions and construction noise (see sections B.6 and B.7 of this EA).

As discussed in the FEIS, concurrent construction, including the proposed Amendment Project, could contribute to noise impacts in the area proximal to the proposed action if noise is generated at the same time as other projects within 0.25 mile of the Mountain Valley Pipeline Project right-of-way. However, the majority of the noise impacts from the Amendment Project and other projects in the area would be limited to

AR 004809

the periods of construction, and most of this construction would occur during daytime hours.  As discussed in section B.7 of this EA, there are limited locations where Mountain Valley anticipates 24-hour boring operations.  Mountain Valley conducted noise assessments for each of these sites and determined that mitigation would be required at three locations (F-021, G-013, and H-016).  In addition, as detailed in section B.7 of this EA, we are recommending Mountain Valley notify all landowners within 0.5 mile of nighttime trenchless crossing activities.  As such, the Amendment Project would only temporarily contribute to elevated increases in daytime and nighttime construction noise as compared to the certificated Mountain Valley Pipeline Project.

As further discussed in section B.6 of this EA, the Amendment Project would also lead to an increase in construction emissions compared to the Mountain Valley Pipeline Project.  These emissions may contribute to other emissions occurring within the Amendment Project area if projects are constructed simultaneously.  However, the increased emissions from the Amendment Project would be temporary and would be spaced along the entirety of the Mountain Valley Pipeline Project right-of-way.  As discussed in section B.6 of this EA, the Amendment Project does not require a General Conformity analysis for consistency with the applicable state implementation plans.

Based on the information above, we conclude that the impacts from the Amendment Project on emissions and noise in the vicinity of the Mountain Valley Pipeline Project right-of-way would exceed those analyzed in the FEIS but would not be significant.  As such, the conclusions from the FEIS remain appropriate based on the substance and scale of the Amendment Project and are adopted by reference.

The Amendment Project would not result in any changes to the following resources that were analyzed in the Mountain Valley Pipeline Project FEIS and certificated by the FERC in the Certificate:  mineral resources; hazardous waste sites; wellhead protection areas, sole source aquifers, or public surface water intakes; federally owned or managed lands; National or state wild or scenic rivers, national trails, nature preserves, wilderness areas, registered natural landmarks, or Native American reservations; and socioeconomics.  Therefore, these resources are not addressed further in this analysis.

## 1.0    Geologic Hazards, and Soils

Geologic resources and hazards along the Mountain Valley Pipeline Project's alignment are discussed in section 4.1 of the FEIS.  The bedrock lithology along the proposed trenchless crossings consists of sedimentary or metamorphic bedrock comprised primarily of shales, sandstone, siltstone, limestone and dolomite, granulite,

AR  004810

granitic gneiss, biotite gneiss, charnockite gneiss and actinolite schist. The rock is primarily of the Pennsylvanian, Mississippian, Ordovician, Cambrian, Mesoproterozoic, and Neoproterozoic Periods. The primary geologic groups represented include Dunkard, Monongahela, Conemaugh, Pottsville, Mauch Chunk, Blue Ridge Basement Complex, Lynchburg, and Smith River. Additionally, unconsolidated materials consisting of Holocene-age alluvium are present along streams, as well as residual, weathered bedrock material overlying competent bedrock. Five of the trenchless crossings (G-017, G-023, G-024, H-017, and H-020 – north side bore pit only) would occur in areas that may include karst terrain developed in carbonate bedrock, including Cambrian through Ordovician-age dolomite and limestone. These five crossings would cross eight streams and two wetlands as listed in appendix A. Four of these crossing locations would also be associated with conventional bores for road crossings. Karst terrain is addressed in the following section.

We received several comments regarding the feasibility of using trenchless crossing methods through subsurface material that may contain boulders, mixed face (overburden and bedrock along the drill path), flowing/heaving sand, and artesian groundwater flow. We also received comments regarding the adequacy of the information provided by Mountain Valley, the need for site-specific characterization of the subsurface material at each individual crossing, and depths to bedrock based on U.S. Department of Agriculture Natural Resources Conservation Service (NRCS) Soil Survey Geographic database (SSURGO) data.

Mountain Valley used NRCS SSURGO data to estimate depths to bedrock, which it determined would be encountered at depths greater than 7 feet at 73 percent of the crossings. Depth to bedrock was measured to be approximately 18 to 20 feet below the ground surface for select sites based on previously submitted geotechnical reports.[16] Based on this information, along with information obtained from previously installed pipeline, and given the proximity of the planned bore pits adjacent to the waterbody crossings, Mountain Valley expects that at most of the proposed crossings, the bore pits would be excavated within overburden material consisting of heterogeneous valley fill deposits of poorly graded silt, sand, gravel, cobbles, and boulders.

Based on experience from the trenchless crossings already completed for the certificated Mountain Valley Pipeline Project, Mountain Valley may encounter boulders and mixed-face conditions while conducting the proposed bores and would mitigate their potential impact through the use of appropriate conventional bore tooling and technology. In order to anticipate these conditions and to address them should they occur, Mountain Valley would use available geologic data, site-specific observations during excavation of

---

16    See filings in Docket No. CP16-10 under accession number 20201013-5344.

AR 004811

bore pits, and assessment of drill cuttings from the bores to modify boring tools and techniques, if needed.  Mountain Valley states that its contractors have access to a variety of cutter heads to overcome anticipated subsurface conditions, including all-purpose heads, rock-cutting heads, and mixed-ground heads.  Mountain Valley may also utilize alternative boring machines to bore through solid rock, such as an air hammer instead of a conventional track auger machine.

Also, based on familiarity with the regional geology from bores and excavations completed to date, and information from the NRCS SSURGO database, Mountain Valley does not anticipate encountering flowing sands or artesian conditions at any of the proposed bore locations.

The proposed trenchless crossings would occur entirely within the previously authorized workspace and would not result in a change in general impacts on or from geologic hazards or to soils compared to the Mountain Valley Pipeline Project.  The minor route adjustment proposed at MP 230.8 to avoid waterbody S-OO11 would impact 0.13 acre of new workspace, but would not affect soil types with soil limitations and contaminated soils, acid forming material (AFM), or oil and gas wells were not identified at that location.  The proposed alignment shift at MP 0.7 to avoid wetland W-A2a would occur within the same certificated workspace as the Mountain Valley Pipeline Project with no change to soils or geological hazards.

As discussed in section A.5 of this EA, the trenchless crossings would require excavation of bore pits on each side of the resource crossing.  Individual bore pits may be excavated to depths as shallow as 3 to 8 feet (at crossing I-103) or as deep as 35 to 49 feet (at crossing C-022), depending on resource attributes and local topography immediately adjacent to the individual bore pit location.  In some cases, bore pit excavation could encounter shallow bedrock consisting of potential AFM[17] such as coal seams, and other sulfide-rich materials such as pyrite-bearing shales and  sandstone.

In the event that AFM is encountered during excavation of the bore pits, Mountain Valley would implement its AFM Plan.  As outlined in the plan, field assessments would be conducted to identify potential AFM.  A Mountain Valley EI would be deployed on-site during excavation of the bore pits and any land disturbance to conduct field observations of the bore pit and excavated materials.   The EI, as appropriate, would conduct an evaluation of the soil horizon and strata, depths and colors (hue/value/chroma), depth and thickness of partially weathered "saprolite" zone, and would identify whether one or more coal seams are encountered  (coal possesses the highest susceptibility for acid

---

17      AFM is discussed in section 4.1 of the FEIS.

AR  004812

forming characteristics in the local and regional geological formations likely to be encountered by bore-pit excavation). Additionally, where deemed necessary by Mountain Valley, the EI would analyze field samples to determine moderate- and high-risk AFM and identify corresponding lime (acid-neutralizing material) application rates. A 30 percent hydrogen peroxide test is well-documented for rapid determination in the field of potentially reactive AFM (i.e., rapidly oxidizes sulfidic materials) via evolution of heat, vigorous frothing, and water vapor. A moderate reaction would be characterized as representing moderate-risk AFM, while highly reactive results would be characterized as high-risk AFM. As appropriate, Mountain Valley would apply agricultural lime to bore pit walls, floor, and spoils at a rate commensurate with either moderate- or high-risk AFM per its AFM Plan.

Once applied, the treated material would be used as normal backfill, with final land reclamation covering the treated material. Return of treated AFM to the bore-pit backfill would be compacted to limit internal permeability. The upper 12 to 18 inches of backfill would be left loosened to support plant growth for post-construction reclamation.

Excess AFM material that cannot be returned to the pit backfill due to construction factors or concerns over net swell, would be bulk-blended with agricultural lime at the applicable moderate-risk or high-risk rate and placed in accordance with Mountain Valley's standard practice for excess spoils, and managed per Mountain Valley's AFM and standard erosion and sediment control measures. In order to contain run-off and leachate, excess AFM would not be placed within an area that may become saturated as per the Project's *Erosion and Sediment Control Plans*. Bulk blending with lime would mitigate acidic leachate generated when exposed to surface elements such as rainfall. Additionally, Mountain Valley would conduct routine post-reclamation site inspections and would evaluate the potential for acidic leachate runoff, typically indicated by orange-discolored soil staining, and would apply spot-blending with agricultural lime as necessary.

Construction of the bore pits and stockpiling of soils could be impacted by the presence of steep slopes. The estimated volume of spoil for each bore pit is provided in appendix D. In areas containing steep slopes, Mountain Valley would relay bore-pit spoils away from the bore site and up or down the right-of-way to a nearby flat section of pipeline right-of-way or additional temporary workspace. In steep terrain, equipment may need to be winched down to and back from the bore pit site to remove spoil material. Where possible, Mountain Valley would temporarily spread spoil along those flatter portions of the limit of disturbance to avoid creating large stockpiles until bore operations are complete and the bore pits can be backfilled.

AR  004813

Mountain Valley would protect against slope failure resulting from the weight of spoil stockpiles by placing stockpiles away from slopes and on flatter terrain. Mountain Valley would implement the Project's *Erosion and Sediment Control Plans* to enhance stockpile stability and protect environmental resources downstream of bore pits and stockpiles. Protective measures include installation of silt fence or super silt fence and temporary mulching of stockpiles. Bore pits would be backfilled as soon as practicable upon completion of the bores to avoid having stockpiles exposed to excessive precipitation and erosional forces and to minimize the time over which existing slopes are subjected to additional loading. Lastly, in the event that bedrock is encountered that cannot be excavated by standard construction practices and blasting becomes necessary, Mountain Valley would conduct any blasting required to establish bore pits according to its *General Blasting Plan* approved in the certificated Mountain Valley Pipeline Project. During final restoration, Mountain Valley would restore any disturbed upland areas and soils in accordance with the FERC's Plan and its Procedures including backfilling the bore pits with the removed and stored soil. Based on these measures, we do not anticipate long-term or significant impacts on geological or soil resources as a result of construction or operation of the Amendment Project.

## 2.0    Water Resources

### 2.1    Groundwater

Aquifer conditions along Mountain Valley's pipeline alignment are thoroughly discussed in the FEIS. Bedrock aquifers predominate in the Amendment Project area with minor surficial alluvial aquifers occurring along streams. Bedrock aquifers consist of the Appalachian Plateau Regional, Valley and Ridge Regional, and the Blue Ridge and Piedmont Crystalline-Rock aquifer systems. With the exception of the sandstone aquifers, primary porosity and permeability in these bedrock aquifers are for all practical purposes negligible. Groundwater flow is predominantly through secondary permeability such as bedding planes, bedrock fractures and joints, as well as the potential for conduit flow through karst-developed carbonate bedrock aquifers.

Groundwater flow within the bedrock aquifers occurs within small, localized drainage basins where flow originates in groundwater recharge areas within and along hilltops and hillsides, and discharges to local streams. Aquifers in the Amendment Project area are typically characterized by small groundwater capture areas.[18] However, there are exceptions, and wells completed in close proximity to streams may be affected by induced recharge from the stream when the stream is within the radius of influence of

---

18      Three-dimensional volumetric portion of a groundwater-flow field that discharges water to a well.

AR  004814

groundwater pumping (Kozar and Paybins, 2016).  As discussed above in section B.1 of this EA, Mountain Valley expects that based on the NRCS SSURGO data, the bore pits at most of the proposed crossings would be excavated within bedrock overburden and alluvium material consisting of heterogeneous valley fill deposits of poorly graded silt, sand, gravel, cobbles, and boulders, as well as decomposed bedrock regolith.

The proposed Amendment Project conventional bore crossings range between 20 and 405 feet in length.  Mountain Valley prepared feasibility analyses for four conventional bores (C-035, H-017, H-031, I-121) that would exceed 300 feet in length, as well as for the two proposed guided conventional bores and the proposed 1,250-foot-long Direct Pipe® crossing.[19]  The desktop feasibility assessments for the four conventional bores that would exceed 300 feet and the guided conventional bore at Stony Creek (crossing G-013) concluded that the bores were feasible.  Mountain Valley completed test borings and resistivity imaging studies for the proposed guided conventional bore for the Elk River (crossing C-022) and the proposed Direct Pipe® crossing of the Greenbrier River (crossing F-021).  Based on the more detailed evaluations, the Elk River and Greenbrier River crossings also would be feasible and would reduce impacts on the waterbodies with minimal risk.

Mountain Valley also completed feasibility studies for the Gauley River and the Roanoke River (along with an adjacent braid of the Roanoke River), Section 10 streams. Both would be crossed by microtunneling.  These two crossings have already been approved by the FERC staff through our variance process.

We received comments regarding the bore pit dewatering and boring activities potentially impacting the local groundwater systems and local drinking water wells and springs.  The proposed trenchless crossings could result in a minor, temporary change to the impacts on shallow groundwater compared to the Mountain Valley Pipeline Project as a result of the bore-pit dewatering.  As discussed in section A.5.1 of this EA, Mountain Valley has the capacity to utilize 3-inch to 6-inch diameter submersible pumps in each of the bore pits with the capability to control groundwater infiltration rates up to 2,750 gallons per minute (gpm).  Pumping may be required 24 hours-per-day for several days depending upon site conditions.  However, given the low permeability constraints of the fractured bedrock aquifers and of the overburden material, the depths of the borings and bore pits, and local aquifer boundary conditions (i.e., alluvium valleys in contact with the bedrock over a short lateral distance), much lower pumping rates are expected to maintain dry working conditions in the drill pits.

---

19      See accession numbers 20210219-5176 (Appendix F) and 20210427-5306 (Attachment 1).

AR  004815

Mountain Valley has successfully completed 52 conventional bore crossings of streams in similar terrain for the Mountain Valley Pipeline Project using the drill-pit dewatering methodology. Mountain Valley provided a qualitative assessment of these crossings and states that many of the bore pits for these trenchless crossings were either dry or required pumping of minimal continuous flow of groundwater into the pits. In many of these cases, 3-inch diameter pumps with a maximum capacity of 300 gpm were all that was needed to maintain dry working conditions in the drill pit. Based on Mountain Valley's experience, we expect that many of the bore pits associated with the Amendment Project would not require dewatering except for stormwater and/or seasonally high water-table conditions.

Commenters also stated that drinking water wells may be impacted by boring operations. Mountain Valley stated that although no known public or private groundwater wells or springs are located within 150 feet of the Amendment Project, private wells could be located within 150 feet of the proposed bore pits at MPs 203.6 (near a residence at crossing G-009) and 270.6 (near a structure at crossing I-040). As outlined in its *Water Resources Identification and Testing Plan,*[20] Mountain Valley would identify and assess private water supplies within 150 feet, or 500 feet in karst terrain, of the Amendment Project.

Groundwater withdrawal during bore pit dewatering could potentially result in short-term water-level drawdown of shallow groundwater in wells within the vicinity of the bore pits, and in the temporary reduction in the discharge rate of nearby springs. The magnitude and lateral distance of water-level drawdown, and spring-flow impacts would depend on the existing groundwater levels at each site at the time of construction and site-specific aquifer characteristics. However, any groundwater-level drawdown and related impacts would be short-term and temporary and levels would be expected to recover to non-pumping conditions following construction.

Mountain Valley estimated the areal extent or radius of pumping influence ($r_0$) of groundwater drawdown using standard analytical methods for well and aquifer evaluation (Walton, 1962), and by utilizing published aquifer hydrogeologic characteristic data (hydraulic conductivity (K), Transmissivity (T) and Storativity (S)[21] for each of the

---

20    See accession number 20171101-5042.

21    Hydraulic Conductivity (K) is the rate of flow of water through a cross section of aquifer (i.e. one square foot) under a unit hydraulic gradient; Transmissivity (T) is the rate at which groundwater can flow through a unit width of an aquifer's saturated thickness (b) under a unit hydraulic gradient (T=Kb); and Storativity (S) is a dimensionless measure of the volume of water that will

AR  004816

underlying rock types and formations present at each crossing. The estimated depth to bedrock/thickness of overburden, the depth of the bore pit, the saturated thickness of the drill pit, and the duration of drilling for each specific crossing were input variables to the quantitative estimates developed for each of the planned conventional drills.

The selection of hydraulic conductivity values began with a review of the USGS *Water Resource Investigation Report and Scientific Investigations Report* (Kozar and Mathas, 2001 and USGS, 2016, respectively), as well as the USGS Open File Report *Documentation of Spreadsheets for the Analysis of Aquifer-Test and Slug-Test Data* (USGS, 2002). Selected hydraulic conductivity values were considered conservative, based on the review of the above documents, and reasonably valid based on previous boring logs and available subsurface geotechnical information performed by Mountain Valley.[22]

Utilizing information from the Greenbrier River geotechnical analysis, the depth to the water table for deeper pits (greater than 12 feet) was estimated to be 6 feet. For pits less than 12 feet in depth, the water table was estimated to be 2 feet below the surface as these bore pits are expected to be topographically closer to the waterbody being crossed. Saturated thickness was estimated to be the depth of the bore pit minus the water table for the pits in the alluvium. The bore pits in bedrock were assigned a saturated thickness of 50 feet. By assigning a saturated thickness to bedrock crossings of 50 feet, the transmissivity used in the analysis of the bedrock crossings is considered to be conservative and most likely more representative of the upper portion of the West Virginia stratigraphy. These data were applied to the reverse distance-drawdown calculator based on the Cooper-Jacob (1946) equations available from the North Carolina Division of Water Resources (2021).

The calculated radius of pumping influence ranged from 10 feet to 393 feet, and groundwater drawdown impacts ranged from a maximum at the bore pit face (the difference in feet between pit depth and groundwater depth [full pit saturated thickness]) to zero feet at the outer limit of the radius of influence as shown in appendix E. These calculations are considered conservative and the actual areal extent of potential temporary groundwater drawdown is reasonably assumed to be less than the values shown in appendix E as the calculations assume a totally flat water table of infinite extent. However, the Amendment Project area hydraulic gradient is steep with numerous

---

be discharged from an aquifer per unit area of the aquifer and per unit reduction in hydraulic head. For a confined aquifer, storativity results only from the rock and fluid compressibility.

22    Boring logs and/or subsurface geotechnical information was available for the proposed crossings at C-035, G-013, H-017, H-031, I-121, and the Elk (C-022) and Greenbrier (F-021) Rivers.

AR 004817

aquifer boundary conditions, which would contain effects on groundwater levels from bore pit dewatering. For example, alluvium valleys in contact with the bedrock over a short lateral distance from the center of pumping.

The radius of influence analysis can be used to estimate potential impacts on groundwater users near the proposed bore pits. A groundwater well at the very limit of the calculated radius of influence would show no change (zero feet) in groundwater level and no impact, while a well located within the calculated radius of influence would show some groundwater drawdown. The analysis shows that for a majority of the proposed crossings, about 74 percent, potential temporary dewatering effects on groundwater levels would be limited to within 150 feet of bore pits. With the exception of two crossings, the C-022 and D-041 crossings, where groundwater drawdown is estimated to be 8 feet and 7 feet, respectively, the analysis showed that groundwater drawdown would be in the range of 0 to 3 feet outside of the 150-foot radius, which is within the range of natural water table fluctuations.

Further, the average distance between the proposed trenchless crossings is 11,000 feet and if simultaneous bore pit dewatering was required, the calculated pumping radius of influence for each crossing shows that there would be no overlap except for at three locations. At those three locations, involving crossings D-011 and D-012, F-014 through F-017, and H-047A and H-048A, the crossings are located close enough together such that potential groundwater impacts could overlap if simultaneous bore-pit dewatering were required. However, at these locations, because of right-of-way access logistics, the crossings would be completed sequentially and not simultaneously. Therefore, if bore pit dewatering is required during any of these crossings, there would be no overlap of groundwater impacts and no cumulative drawdown impacts.

Calculated rates of pumping for the crossings ranged from less than 1 gpm to a maximum of 35 gpm, which is consistent with the observed dewatering at the crossings completed by Mountain Valley. Mountain Valley has already completed 52 crossings of 67 waterbodies and wetlands using conventional bores without any known impact on wells or springs. Based on this experience, and without any direct recharge (rainfall) events, it is anticipated that groundwater levels would recover to pre-pumping background conditions within 60 percent of the elapsed time that pumping occurred.

Mountain Valley would notify all potential groundwater users, both well and potable spring users, within the pumping radius of influence provided in appendix E of the initiation of dewatering activities.

AR 004818

Mountain Valley would construct the Amendment Project in accordance with the methods described in the FEIS, including Mountain Valley's commitments to protecting drinking water of nearby residents. As discussed in the FEIS, in the event of landowner complaints that nearby wells or springs are impacted by the dewatering activities, Mountain Valley would evaluate any complaints and identify a suitable solution with the landowner. If it is determined by Mountain Valley through the use of qualified groundwater and surface water scientists and engineers that suitable potable water is no longer available due to construction related activities, Mountain Valley would provide adequate quantities of potable water during repair or replacement of the damaged water supply. In the event that an impact occurs to a livestock well, Mountain Valley would provide a temporary water source to sustain livestock while a new water supply well is constructed. Mountain Valley would also need to continue to fully comply with its *Water Resources Identification and Testing Plan* for identifying and assessing water supplies in the vicinity of the Amendment Project.

The U.S. Environmental Protection Agency (EPA) requested the identification of mitigation measures to prevent water movement along the alignment where trenchless crossing methods would be used below the seasonal high water table. Additionally, we received comments from stakeholders concerned with the potential for creating preferential groundwater flow conduits from the drilling and installation of the pipeline, permanent changes to groundwater flow patterns, and the potential for the permanent loss of surface water (leakage) to these preferential flow conduits.

All of the crossings are positioned with their entry and exit points adjacent to the resource, outside of the high water mark for streams, and outside of the wetland areas. The drilling of the borehole and installation of the product pipeline would not permanently alter the groundwater flow or groundwater/surface water interactions near the resource. These interactions are governed by the location of the resource, relative to the course of recharge-discharge flow pattern within the basin. For example, stream sections that are characterized by perennial flow, intermittent flow, or ephemeral flow would remain as such following construction, and would not be permanently altered by the drilling and pipeline construction. Although the borehole and pipeline may represent a small linear permeability contrast relative to the surrounding aquifer matrix, its presence begins and terminates into undisturbed aquifer material on each side of the resource. An aquifer's thickness and lateral extent varies, but is much greater than the space that would be occupied by the pipeline proposed for the Amendment Project. The physical pipeline would occupy only a negligible portion of the aquifer and have no permanent influence on groundwater flow.

AR 004819

Mountain Valley's design also includes the installation of trench breakers on slopes and at all waterbodies to impede flow of water along the buried pipeline. Trench breakers would be constructed from earthen fill, sand, or concrete-filled sacks and would be a minimum of 24 inches to 36 inches thick and in accordance with the FERC's *Plan*. Trench breakers would be installed at both ends of a bored crossing. These measures have been implemented on the bores that have been successfully completed to date on the certificated Mountain Valley Pipeline Project.

Further, during the boring process, and in conjunction with bore pit dewatering, there is the potential for temporary, pumping-induced infiltration of surface water to enter the borehole through the bottom of the streambed and into the bore pits. This may lead to a temporary reduction in stream flow or wetland saturation. However, any water entering the bore hole would be pumped from the bore pits and into sediment-removal structures constructed within the same drainage basin. As such, any water pumped from the bore pits during dewatering activities would be discharged and infiltrated back into the same drainage basin and would not constitute a consumptive use of groundwater from the basin, or lead to a permanent impact on surface-water flow or wetland saturation.

Discharge of construction-related water within and in the near vicinity of the right-of-way in karst areas would be managed according to Mountain Valley's *Karst Mitigation Plan,*[23] which, among other things, prevents direct discharge to a karst feature. Specific to dewatering/filtering, these dewatering devices would be located within, or in the near vicinity of the right-of-way that has been cleared and graded and inspected for karst features. Notification and offers of pre- and post-construction testing of wells and springs located within 500 feet of work in karst areas would be provided to landowners in accordance with Mountain Valley's *Water Resources Identification and Testing Plan*.

Mountain Valley's *Karst Mitigation Plan* requires that karst inspectors be present in karst areas during construction to surveil potential karst feature formation. The inspectors have stop-work authority, and if a cover-collapse type feature is activated during dewatering/filtering, the karst inspector would notify Mountain Valley to stop work, assess the feature, and mitigate discharge directed toward the feature. The feature would be stabilized according to the *Karst Mitigation Plan*. Further discharge would be re-directed away from the karst feature. Five of the proposed conventional bores (crossings G-017, G-023, G-024, H-017, and H-020), located between MP 206.6 to 235.5, would be in areas that may exhibit karst features. Mountain Valley would implement its *Karst Mitigation Plan* for these crossings.

---

[23]    See Docket No. CP16-10 accession number 20171101-5042.

AR  004820

We also received multiple comments discussing the possibility of off right-of-way sedimentation caused by dewatering activities. As noted in the FEIS, water would be discharged through sediment-removal devices in well-vegetated upland areas away from waterbodies and wetlands. As discussed above, any water pumped from the bore pits during dewatering activities would be released back into the same drainage basin and would not be a consumptive use of groundwater from the basin, or a permanent impact on surface water flow.

Based on these measures and the others described previously, we do not anticipate long-term or significant impacts on groundwater resources as a result of construction or operation of the Amendment Project.

## 2.2    Surface Water

The Amendment Project would require the crossing of 136 surface waterbodies, which are described in appendix A. The Amendment Project would entirely avoid stream S-OO11 at MP 230.8, which was approved in the certified Mountain Valley Pipeline Project as an open-cut dry crossing, through implementation of a minor route adjustment. The proposed alignment shift at MP 0.7 would not affect waterbodies.

The conventional bore crossings range in length from 20 feet to 405 feet. The guided conventional bores range from 296 feet (Elk River) to 331 feet (Little Stony Creek) in length. The Direct Pipe® crossing of the Greenbrier River would be 1,250 feet long. The actual waterbody crossing widths, which are shorter than the bore lengths, were listed in the FEIS.[24] Installing the pipeline beneath these waterbodies via the three trenchless methods described previously (section A.5 of this EA) would avoid all in-water construction at these locations. Associated waterbody stream beds and banks would also not be disturbed.

During scoping and preparation of the EA, we received comments about surface water resources concerning bore feasibility, bore hole collapse and subsidence, water quality impacts, spills and inadvertent releases, dewatering, and surface water withdrawals. As appropriate, these comments are addressed herein.

Using trenchless crossing methods greatly reduces potential effects on surface waterbodies, particularly compared to open-cut crossings. In general, typical pipeline effects on waterbodies are avoided with trenchless methods. However, using these techniques, as proposed in the Amendment Project, could still affect water quality. We

---

24    Waterbody crossing lengths are listed in appendix F-1 of the FEIS.

AR 004821

received multiple comments concerning the possibility of erosion and off right-of-way sedimentation due to the storage of spoil from the bore pits and from the boring activities. The excavated material to create the bore pits would be placed in spoil piles within the existing pipeline right-of-way. Stockpiled soils would be stored away from existing slopes, in flatter locations or along ridges, and placed such that they do not exceed a stable angle of repose. Mountain Valley would implement the Project's *Erosion and Sediment Control Plans* to enhance stockpile stability and protect environmental resources downstream of bore pits and stockpiles. Such measures would include installation of silt fence or super silt fence and temporary mulching of stockpiles. Any spoil remaining following the completion of the bore and the backing filling of the bore pits would be evenly spread on the right-of-way. Thus, off right-of-way sedimentation should be unlikely to occur. Mountain Valley would use an off-site disposal facility for excess spoil as a last resort. In addition, equipment needed for these crossings could leak, resulting in adverse effects on water quality. To avoid and reduce these potential impacts on surface waterbodies, Mountain Valley would implement measures within its SPCC, including locating hazardous material storage and equipment refueling activities at least 100 feet from waterbodies. These measures would reduce the potential for hazardous materials to enter waterbodies.

Regarding bore feasibility, based on available geologic data (Appendix I of Mountain Valley's amendment application[25]) and Mountain Valley's site-specific feasibility studies for the two proposed guided conventional bores (see section B.2.1 of this EA), we conclude that the Direct Pipe® crossing, and all three conventional bores that would be longer than 300 feet are feasible. Conventional bores less than 300 feet long would be within acceptable soil types and crossing lengths for conventional boring technology and would also be feasible. Further, Mountain Valley has already successfully completed 54 trenchless crossings of 73 waterbodies and wetlands, including 67 waterbodies and/or wetlands crossed via 52 conventional bores. Additionally, Mountain Valley successfully crossed the Meadow River and an unnamed tributary to the Meadow River via a single Direct Pipe®, and crossed four additional waterbodies and wetlands via a single HDD at the Pigg River. Should Mountain Valley encounter difficulties during a trenchless crossing, such as excessive torqueing, poor cutting returns, mechanical failure, deviation of the bore path, or unanticipated site conditions, Mountain Valley would implement contingency measures including shifting the bore entry point over and re-attempting the bore. Mountain Valley would be required to seek any

---

25      See accession number 20210219-5176.

AR  004822

necessary authorizations and agency approvals before modifying the proposed crossing method.

Water that would infiltrate into the bore pits would be pumped out as needed (see section B.2.1 of this EA). During construction, water removed from the bore pits would be discharged through sediment removal devices such as filter bags and hay bale-lined dewatering structures[26] and directed to vegetated land surfaces (where available) to control erosion and runoff unless the water was used for boring purposes as described below. Mountain Valley would continuously monitor the structure, flow rate, and volume so as not to cause erosion, compromise the dewatering structures, or result in sediment-laden water entering a sensitive resource. The discharges of water from bore pits would flow back into the same watershed. Implementation of these measures would minimize potential local and temporary effects from turbidity and sedimentation. Dewatering of bore pits would occur in lieu of trench dewatering, which was approved as part of the Mountain Valley Pipeline Project.

Bore or drill hole collapse and resulting impacts on stream bottoms would be very unlikely to occur. As the conventional bore or Direct Pipe® is advanced, the pipeline is installed immediately behind the drill pipe, thereby greatly reducing the potential for borehole collapse or subsidence. There would not be an unsupported hole during these boring or drilling activities. A pilot hole would be bored first for guided conventional bores. The potential for hole collapse would be minimized since the main bore auger would be connected to the in-place pilot hole drill string after completion of the pilot hole. The main bore hole would then be completed with the hole supported at all times. In the unlikely chance of drill or borehole collapse, the overlying streambed could subside. Subsidence of the stream bank or channel could cause erosion or sedimentation, increased turbidity, and altered flow patterns.

A bore deflection that would breach the stream bottom is also very unlikely. As previously stated, in order to breach the streambed, an average bore length (less than 95 feet) would either have to be misaligned at least 10 percent at initial set up or deflect at least 10 percent due to encountering a large rock, cobble, or interface between two rock types. Bore operators thoroughly check the line and grade prior to beginning bore operations so as to prevent a misalignment. Bore operators can also detect increased resistance in the bore machine due to deflections of less than 10 percent for bores greater

---

26    See Appendix C-2_ESCP VA AS&S_113017_Part 1.pdf and Appendix C-2_ESCP VA AS&S_113017_Part 2.pdf at accession number 20171206-5004 for filter bag and dewatering structure typical drawings.

AR 004823

than 95 feet in length.  Deflections were not encountered during the 52 previously performed conventional bores.

In the event that a conventional bore deflected substantially enough to potentially breach the stream bottom, this condition would be readily observed by the bore operator and timely corrections could be made.  However, if a deflection were to breach the stream bottom, surface water would then flow into the borehole and into the bore pits.  If this were to happen and the water flow could be controlled through pumping, Mountain Valley would grout the hole and reattempt the bore crossing at an adjacent location.  If too much water were to enter the bore pit to maintain a dry workspace, Mountain Valley would work with the appropriate agencies to establish a repair methodology.  This would most likely include grouting the bore hole and rebuilding the streambed.  The guided conventional bore is steerable, thereby greatly reducing the potential for deflection during installation of the pilot hole.  The Direct Pipe® also uses an advanced guidance system for steering, thereby effectively limiting the possibility of deflection.

An inadvertent release of drilling fluids could impact surface water quality.  An inadvertent release of drilling fluids into a waterbody would increase turbidity and sedimentation within the affected waterbody.  The use of conventional bores greatly reduces the potential for an inadvertent return as no high-pressure drilling fluid slurry would be needed.  The majority of the conventional bore crossings proposed in the Amendment Project would not require the use of any drilling fluids; however, for some conventional bore crossings, like the longer conventional bores or the conventional bores through mixed ground or clay, Mountain Valley may use small amounts of bentonite or polymer-based lubricants on the cutting head and exterior casing to reduce friction and to increase the success of the crossing.  Because the borehole is not filled with drilling fluids under pressure with a conventional bore, hydraulic fracturing leading to an inadvertent release would not occur.  However, there is a small chance these drillings fluids could enter surface waterbodies incidentally as a result of an inadvertent spill at a workspace adjacent to the waterbody.  Mountain Valley states that the drilling fluids would be of small quantities and would be non-petrochemical-based, non-hazardous, NSF-60 compliant, and that ecotoxicity data would be provided to the FERC staff, and thus are not expected to negatively impact waterbodies.  Mountain Valley would submit a request to the FERC for the use of any polymer-based lubricants prior to their use.

A water-bentonite-based drilling mud mixture would be used during installation of the Direct Pipe® crossing.  However, for Direct Pipe®, the drilling fluids are utilized only at the cutting face.  A pressurized fluid-filled borehole is not required for Direct Pipe® drilling as the product pipe is advanced with the drill bit providing support for the drilled hole and eliminating the potential for hydraulic fracturing of the borehole and an

AR  004824

inadvertent release of drilling fluids.  The drill cuttings suspended in the drilling fluid returns are delivered back to the surface via umbilical piping inside the advancing installation pipe.

For the guided bore crossings (pilot hole drilling phase only), pressurized water or water/bentonite slurry is pumped through drill stem to pilot drill head to facilitate removal of formation cuttings.  An inadvertent surface return could occur during the pilot hole drilling phase dependent on geologic strata, down-hole pressure, and overburden confining pressure.  However, the drilling fluid pressures would be relatively low. Monitoring of downhole drilling pressure would be conducted by utilizing an annular pressure probe during pilot hole drilling for the guided bore method.

During construction, Mountain Valley would implement the construction practices outlined in its Procedures and its *Direct Pipe® and Horizontal Directional Drilling Contingency Plan* to reduce the potential for an impact to occur.  Inadvertent releases that could occur with the pilot hole phase of the guided conventional bore or during drilling by Direct Pipe® would be much smaller compared to other trenchless methods such as HDD, where the volume of drilling fluids under pressure used is considerably higher.  As with the conventional bores, any additives used for guided conventional bores and Direct Pipe® would be non-petrochemical-based, non-hazardous, NSF-60 compliant, and that ecotoxicity data would be provided to the FERC staff, and thus are not expected to negatively impact waterbodies.

Pits or containment structures could be constructed around the drilling fluid tanks to contain drilling fluid that may accidently spill on the surface of the ground, and a pump may be required to transfer the released drilling fluid from the pit or structure to a containment vessel.  All drilling fluids would be disposed of at an approved local waste management facility.

The guided conventional bores of the Elk River and Little Stony Creek (40,000 gallons each) and the Direct Pipe® crossing of the Greenbrier River (600,000 gallons) would require water to prepare the slurry described above.  Mountain Valley states that where possible it would obtain water to prepare the slurry from the bore pits (dewatering) and then store it in aboveground tanks.  Mountain Valley stated that the Greenbrier River would serve as a backup source of water for the Greenbrier crossing if the volume obtained from the bore pits is not sufficient.  Mountain Valley would coordinate with the West Virginia DEP's Division of Water and Waste Management (DWWM) and West Virginia Department of Natural Resources (WV DNR) regarding guidance, time of year restrictions, and other stream criteria if the backup water source is used.  Mountain Valley would use DWWM's water withdrawal guidance tool, limit water withdrawal

AR  004825

from the stream to 10 percent of instantaneous flow, and would not withdraw water during low flow or drought conditions. Mountain Valley would use municipal water supply as a backup water source for the proposed crossings of the Elk River and Little Stony Creek.

The EPA commented that Mountain Valley should implement a water quality monitoring plan. Mountain Valley is in the process of installing water quality monitoring equipment on streams containing or feeding into aquatic habitat supporting listed fish species, in compliance with the U.S. Fish and Wildlife Service's (FWS) September 2020 Biological Opinion (BO).

The Amendment Project would reduce impacts on waterbodies and water quality as compared to the certificated Mountain Valley Pipeline Project. Therefore, given the analyses above, we conclude that the Amendment Project would not have a significant impact on surface waters and would result in a reduction of the impacts already disclosed and analyzed in the FEIS.

## 2.3 Wetlands

The Amendment Project would require the crossing of 47 wetlands, including 37 conventional bore crossings (46 wetlands) and one guided conventional bore crossing. The bore lengths to cross these wetlands range in length from 31 feet to 405 feet. The actual wetland crossing widths, which would be shorter than the bore lengths, were listed in the FEIS.[27] Installing the pipeline across these wetlands via trenchless methods would avoid all in-wetland construction and disturbance (reducing wetland impacts by 4.2 acres). Additionally, the Amendment Project would avoid wetland W-A2a at MP 0.7 entirely through implementation of an alignment shift and the proposed new workspace associated with a minor route adjustment at MP 230.8 would not affect wetlands. The Amendment Project would avoid disturbance and trenching of a variable buffer between the edge of the bore pits and the wetland boundary, unlike the open-cut dry crossing methods associated with the certificated Mountain Valley Pipeline Project.

Using trenchless crossing techniques greatly reduces impacts on wetlands. However, as described previously, trenchless crossing techniques could result in an underlying borehole collapse and/or subsidence or deflection of the bore path resulting in breaching of the wetland bottom. As discussed in the preceding section, the potential for borehole collapse and/or subsidence and deflection is low. Subsidence or breaching of the wetland bottom would be unlikely, but could result in increased turbidity or modified

---

27    Wetland crossing lengths are listed in appendix G-1 of the FEIS.

AR 004826

hydrology. If these impacts were to occur, Mountain Valley would restore the wetland as necessary. Additionally, using conventional bores to cross wetlands avoids the risk of inadvertent returns as there is no high-pressure drilling fluid slurry. The risk of inadvertent release of drilling fluids from the guided conventional bore would be low and would be minimized and potential incidents mitigated as described above for surface water resources. Bore pit dewatering could temporarily affect wetland hydrology and subsequently wetland soils and vegetation. However, these effects would be minor and temporary, not unlike the natural within season variability experienced by wetlands based on fluctuations in precipitation.

To further reduce impacts on wetlands, Mountain Valley would implement measures in our Plan and its Procedures. This includes the installation of erosion and sediment controls. Mountain Valley would also adhere to measures within its SPCC, including locating hazardous material storage and equipment refueling activities at least 100 feet from wetlands. Therefore, given the analyses above and the implementation of impact minimization measures, we conclude that the Amendment Project would not have a significant impact on wetlands and would result in a reduction of the impacts already disclosed and analyzed in the FEIS.

### 2.3.1   U.S. Army Corps of Engineers Jurisdiction

Mountain Valley submitted a joint application to the COE Huntington, Pittsburgh, and Norfolk Districts for Individual Permits for crossings of waterbodies and wetlands per Section 10 of the Rivers and Harbors Act and Section 404 of the CWA. In association with its permit application to the COE, Mountain Valley applied to the WVDEP and the VADEQ for water quality certifications per Section 401 of the CWA.

The proposed open-cut dry crossings for waterbodies and wetlands described in the COE permit application are not a part of the Amendment Project, as the FERC has already analyzed those impacts in our FEIS and authorized the crossings for the certificated Mountain Valley Pipeline Project. Other waterbody and wetland crossings that would be modified from open-cut dry crossings as described in the FEIS to trenchless crossings are analyzed in this EA.

Five waterbodies in the Project area would be subject to Section 10 of the Rivers and Harbors Act. These waterbodies are described in table 5.

AR  004827

Table 5.

**Waterbodies in the Project Area Subject to Section 10 of the Rivers and Harbors Act**

| Waterbody Name (ID) | COE District | County, State | Original/Currently Certificated Crossing Method | Proposed Crossing Method a/ | Notes |
|---|---|---|---|---|---|
| Elk River (S-E68) | Huntington | Webster County, WV | Open-cut Dry | Guided Conventional Bore | |
| Gauley River (S-J29) | Huntington | Nicholas County, WV | Original: Open-cut Dry; Current: Microtunnel | Microtunnel | The FERC authorized the use of a microtunnel on May 18, 2020 per variance D-35 |
| Greenbrier River (S-I8) b/ | Huntington | Summers County, WV | Open-cut Dry | Direct Pipe® | |
| Roanoke River (two crossings – S-NN16 and S-NN16-Braid) | Norfolk | Montgomery County, VA | Original: Open-cut Dry; Current: Microtunnel | Microtunnel | The FERC authorized the use of a microtunnel on May 27, 2020 per variance H-21 |
| Blackwater River (S-F11) | Norfolk | Franklin County, VA | Open-cut Dry | Open-cut Dry | |
| a    See section A of this EA for a description of the guided conventional bore, Direct Pipe®, and microtunnel crossing methods.  Microtunnel is a trenchless crossing method that was approved by the Commission's variance process.  A description of the open-cut dry crossing method can be found in the FEIS. ||||||
| b    Included within the Amendment Project ||||||

Proposed modifications to the Elk River and Greenbrier River crossing methods are included in the analysis in this EA.  The crossing method changes for the Gauley River and Roanoke River were already authorized by the FERC staff as part of our variance process, and the crossing method for the Blackwater River has not changed (additional discussion regarding the Blackwater River is include in section C of this EA).

As noted in table 5 above, the change in crossing methods for the Gauley River and Roanoke River were already authorized by the FERC staff as part of our variance

AR  004828

process.  However, to support the COE's review of the joint application for the Section 10 regulated streams, we have included information concerning the crossings of these waterbodies in this EA.  A discussion of the microtunnel construction technique is included in section A.5.4 of this EA.  A summary of the expected construction emissions associated with the microtunnel crossings is included in section B.6.1 of this EA.  In addition, the crossings for these waterbodies are included in appendix A; the estimated bore pit spoils from the crossings are included in appendix D; and the bore pit underlying geology, depths, duration, and estimated groundwater drawdowns associated with the microtunnel crossings are included in appendix E.

As stated in our variance approvals[28] for the Gauley River and Roanoke River change in crossing methods, the use of a microtunnel construction technique would result in a reduction on impacts on aquatic resources in these waterbodies by avoiding impacts on the stream banks and channels.  The changes in these crossing methods would not affect historic properties and were considered in the 2020 BO issued by the FWS.

Lastly, as mentioned in section A above, as part of the Amendment Project, Mountain Valley is requesting the use of 24-hour construction at these locations. Information concerning nighttime noise impacts for these crossings is discussed in section B.6.2 below.

### 3.0    Fisheries, Vegetation, and Wildlife

### 3.1    Fisheries and Aquatic Resources

We received multiple comments regarding potential impacts on aquatic resources from the Amendment Project.  In general, the proposed trenchless crossings would result in less impact on fisheries and aquatic resources in the subject waterbody crossings as compared to open-cut crossings.  Trenchless crossings would occur at 47 wetlands and 136 streams.  Completing the waterbody crossings using trenchless crossing methods would avoid in-water construction and the associated short-term impacts on fisheries and aquatic species that are described in the FEIS for the Mountain Valley Pipeline Project. Additionally, the proposed route adjustment at MP 230.8 would avoid waterbody S-OO11 and associated impacts on the waterbody and aquatic resources.

The use of trenchless crossing methods to cross an environmental resource, such as a waterbody or wetland, avoids direct impacts associated with working directly within the resource.  Trenchless crossing methods allow for uninterrupted existing streamflow

---

28    See accession numbers 20200518-3008 and 20200527-3040.

AR  004829

and undisturbed wetland soils and scrub-shrub and herbaceous vegetation, thereby minimizing impacts on aquatic resources and wetland and wildlife habitat. Additionally, the proposed trenchless crossings would result in reduced in-stream sedimentation as compared to the in-water construction approved for the Mountain Valley Pipeline Project. Lastly, trenchless crossings would result in less disturbance of the riparian areas adjacent to the waterbodies. As a result, habitat for many aquatic and semi-aquatic species would not be affected.

The bore pits needed to accomplish these trenchless crossing methods may act as a sediment trap for upland sediment, thereby reducing sediment loading into the subject streams. As described in the FEIS, increased sediment loads into streams has the potential to alter aquatic habitat and affect aquatic species both physiologically and behaviorally. Dewatering would be necessary if water accumulates in the bore-pits. To minimize impacts, such as sediment loading into the waterbodies, dewatering would be conducted in accordance with all existing plans and procedures reviewed and approved for the Mountain Valley Pipeline Project. The water would pass through a pumped-water filter bag within an appropriately sized dewatering structure. Additionally, dewatering structures would be located within vegetated upland areas, where practicable. Mountain Valley would continuously monitor the structure, flow rate, and volume so as not to cause erosion, compromise the dewatering structures, or result in sediment-laden water entering a sensitive resource.

Construction activities for the proposed trenchless crossings could result in an inadvertent release of fuel, oil, or other hazardous materials from construction equipment into waterbodies that could have impacts on fish and aquatic species. A leak of hazardous material into a waterbody could result in direct mortality to aquatic species, altered behavior, changes in physiological processes, or effects on food sources. As described in the FEIS, Mountain Valley would implement its SPCC, which would include preventive measures such as personnel training, equipment inspection, and refueling procedures to reduce the likelihood of spills, as well as mitigation measures such as containment and cleanup to minimize potential impacts should a spill occur. Adherence to the SPCC would prevent a spill from occurring near surface waters because construction equipment fueling, and bulk hazardous material storage would be prohibited within 100 feet of the waterbody banks. In addition, portable equipment such as water pumps would be placed in secondary containment structures in order to contain any leaks or spills.

In order to protect all waterbody and wetland habitat near the areas where ground disturbance would occur, Mountain Valley would implement erosion, sediment, and spill control measures in compliance with the Plan and its Procedures, *Erosion and Sediment*

AR 004830

*Control Plans*, and SPCC.  Additionally, Mountain Valley would restore riparian areas that would be disturbed once boring operations are completed.  Given all factors discussed above, we conclude that Mountain Valley's proposed Amendment Project would not result in significant impacts on fisheries and aquatic resources.

### 3.2    Vegetation

The proposed trenchless crossings would occur almost entirely within previously authorized workspace.  Impacts on vegetation within these workspaces would not substantially differ from the impacts considered in the FEIS, excluding the minimization of impacts on riparian scrub-shrub and herbaceous vegetation.

Mountain Valley proposes to conduct a total of 120 trenchless crossings consisting of 117 conventional bores, 2 guided conventional bores, and 1 Direct Pipe® at 47 wetlands and 136 streams.[29]  Some vegetation clearing would be required between the proposed bore pits.  Vegetation clearing and bore pit excavations would be located within the existing already certificated construction right-of-way.  Vegetation clearing in the areas between the proposed bore pits was analyzed in the FEIS as this and additional clearing would be necessary for the completion of the open-cut dry crossings at these locations.

The proposed route adjustment at MP 230.8 would result in impacts on 0.13 acre of upland herbaceous vegetation outside of the certificated right-of-way for temporary construction right-of-way and workspace.  The route adjustment would also result in 0.04 acre of permanent operational impacts on herbaceous upland vegetation.  No tree felling would be required as part of the proposed route adjustment.  These areas were not analyzed as impacts in the FEIS.  The proposed alignment shift at MP 0.7 would result in a change in the location of the permanent right-of-way, within the certificated construction right-of-way, but the overall acreage of permanent right-of-way would not change.  All areas at this alignment shift location were analyzed as impacts in the FEIS.

---

29    On April 27, 2021, Mountain Valley requested the Commission allow nighttime microtunneling activities at the Gauley River and Roanoke River.  The Commission previously authorized Mountain Valley to change the crossing method to a microtunnel technique as part of our variance process.  Therefore, only new impacts associated with Mountain Valley's request to conduct 24-hour microtunneling activities at these locations are analyzed (see sections B.3.3 and B.6.2 of this EA).  As these waterbodies are also Section 10 streams they are also discussed in section B.2.3.1 of this EA.  In addition, Mountain Valley would utilize a conventional bore at the H-016 railroad crossing as authorized by the Certificate.  Nighttime noise associated with conventional boring activities at this location are evaluated as part of the Amendment Project.

AR 004831

As described in the FEIS, areas of temporary right-of-way and workspace would be allowed to revegetate to pre-construction conditions. Herbaceous and scrub-shrub areas are expected to be fully restored within 1 to 3 years. In upland areas, the 50-foot-wide permanent right-of-way would be maintained in an herbaceous state. In wetland areas, native vegetation would be allowed to regenerate; however, to facilitate periodic corrosion/leak surveys, a corridor centered on the pipeline and up to 10 feet wide may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state. In addition, trees that are located within 15 feet of the pipeline that have roots that could compromise the integrity of the pipeline coating may be cut and removed from the permanent right-of-way. Impacts of the route adjustment on the additional 0.13 acre of herbaceous uplands would be minimized by implementing the measures contained in the FERC Plan and Mountain Valley's Project-specific *Erosion and Sediment Control Plans*. Mountain Valley would continue to reduce the potential introduction and spread of non-native invasive plant and weed species by following the measures outlined in its Project-specific *Exotic and Invasive Species Control Plan*.

### 3.2.1   Riparian Areas

Riparian areas are functionally defined as three-dimensional ecotones of interaction that include terrestrial and aquatic ecosystems along perennial stream corridors. All riparian areas possess some similar ecological characteristics such as energy flow, hydrologic function, nutrient cycling, and plant and animal habitat. These functions give riparian areas unique values relative to the surrounding landscape. Riparian ecosystems are extremely productive and have diverse habitat values for wildlife. The linear nature of riparian ecosystems provides migration and dispersal corridors and connects habitats for wildlife. The presence and movement of the surface and groundwater enhance the recycling of nutrients and other chemical reactions beneficial to plant growth within the riparian zone.

Throughout construction, Mountain Valley has maintained, as feasible, a 50-foot riparian buffer on each side of the surface waterbodies. Mountain Valley has already cleared vegetation at 109 of the proposed trenchless crossings. Grading, in addition to clearing, has also occurred between the bore pits at three locations, along with grading for travel lanes at 95 locations. The certificated Mountain Valley Pipeline Project authorized impacts on approximately 28.4 acres of riparian buffer located within the Amendment Project work areas, of which approximately 4.5 acres of this buffer have been affected by already installed travel lanes. The remaining 23.9 acres of riparian buffer consist of tree stumps, where trees were previously felled, and a mix of herbaceous and shrub species. The Amendment Project would reduce impacts on the riparian buffer from 28.4 acres to a total of 17.7 acres (4.5 acres from already installed travel lanes, 2.0 acres of new travel

AR 004832

lanes, and 11.2 acres of impacts from bore pits).  Approximately 10.7 acres of riparian vegetation that would have been affected by the certificated open-cut dry crossings would remain undisturbed as a result of the proposed trenchless crossing methods.

As stated, all of the clearing and grading between the proposed bore pits that has already been completed was analyzed in the FEIS.  Apart from the activities discussed above, Mountain Valley does not anticipate the need to conduct any other vegetation clearing within the riparian buffer between the bore pits for the installation of the trenchless crossings.  However, if additional vegetation clearing is needed within certificated workspaces due to surveying or engineering concerns, clearing would be conducted via hand tools or mowing and without ground disturbance.  As mentioned above, impacts on riparian vegetation would be reduced compared to those already disclosed and analyzed in the FEIS.  No additional clearing outside of what was already analyzed in the FEIS would take place as a result of the Amendment Project.

Mountain Valley would conduct restoration activities in accordance with landowner agreements, permit requirements, and written recommendations on seeding mixes, rates, and dates obtained from the Wildlife Habitat Council and measures outlined in Mountain Valley's *Exotic and Invasive Species Control Plan* and *Migratory Bird Conservation Plan*.  In riparian areas, the FERC Procedures require Mountain Valley to allow a riparian strip of at least 25 feet to permanently revegetate with native species during post-construction maintenance.

Because the majority of vegetation clearing, including all tree clearing, has already occurred in the proposed workspaces and Mountain Valley would follow restoration protocols outlined in the FERC Plan and in accordance with all permits and recommended seeding requirements, we conclude that the Amendment Project would not result in a significant impact on vegetation.

### 3.3    Wildlife

We received multiple comments regarding potential impacts on wildlife from the Amendment Project.  Because the majority of the Amendment Project would occur entirely within previously authorized workspace, with the exception of 0.13 acre of herbaceous habitat that was included in previous biological surveys for the Mountain Valley Pipeline Project, the impacts and mitigation for wildlife would generally be the same as compared to the Mountain Valley Pipeline Project as described in the FEIS.

Mountain Valley would install orange construction safety fencing around unoccupied bore pits to prevent entrapment of animals.  Mountain Valley's EIs would

AR  004833

inspect the bore pits for entrapped animals prior to restarting work each day. The EIs would remove any animals from the bore pits.

Construction work for the two guided conventional bore crossings, the one Direct Pipe® crossing, three conventional bore crossings which include railroads (E-012, H-016, and H-020), dewatering activities at all trenchless crossings, and the microtunnel crossings of the Gauley River and Roanoke River, could require 24-hour operations resulting in additional noise and light pollution impacts on wildlife. Noise from dewatering activities would be similar to general construction noise. The FEIS described potential impacts on wildlife from construction related noise in section 4.5.2.3. In addition, based on noise studies conducted by Mountain Valley for the Elk River crossing, the Gauley River crossing, the Roanoke River crossing, and two railroad crossings (E-012 and H-020), the proposed nighttime activities would not require additional mitigation in order to meet sound levels identified in the FERC guidance. Noise studies conducted for the guided conventional bore crossing of Little Stony Creek, the Direct Pipe® crossing of the Greenbrier River, and the railroad crossing at H-016 indicate that sound levels would exceed levels identified in the FERC guidance. Therefore, Mountain Valley would install noise barriers around these sites to reduce noise to acceptable levels. Additional information regarding noise can be found in section B.6.2 of this EA.

Wildlife generally relies on hearing for courtship and mating, prey location, predator detection, and/or homing. These behaviors and interactions could be affected by noise resulting from construction activities. Specifically, construction noise could lead to nest abandonment, egg failure, reduced juvenile growth and survival, or malnutrition or starvation of the young. During construction, the effects of noise on wildlife would be greatest immediately adjacent to the construction work areas. Wildlife inhabiting the areas surrounding the trenchless crossings might be temporarily displaced due to noise during construction but would be able to return to the area after the trenchless crossings are completed. To reduce potential impacts from 24-hour operations, Mountain Valley would perform as much work as possible during daylight hours, including preparation of the workspace, excavation of bore pits, and moving heavy equipment to the crossing locations.

Another impact that the trenchless crossings would have on wildlife during nighttime construction is ecological light pollution. Construction work for dewatering, guided conventional bores, Direct Pipe® crossing, railroad crossings, and microtunneling occurring at night would need artificial lighting. As described in the FEIS, artificial lighting could affect natural patterns of light and dark in ecosystems, which in turn may affect wildlife. The effects of ecological light pollution may include causing

AR 004834

disorientation in nocturnal animals, disrupting migratory patterns of birds, altering seasonal day-length cues, which some wildlife may rely on as a trigger for critical behavior (e.g., migration).

To reduce potential noise and lighting impacts from nighttime activities, Mountain Valley committed to install noise barriers at the crossing of Little Stony Creek, Greenbrier River, and the H-016 railroad crossing. Mountain Valley would also use "full cut-off" lighting fixtures to maximize shielding to prevent unintentional lighting of surrounding areas. With these proposed measures, in consideration of the noise studies conducted, and the fact that noise and light pollution would be temporary and localized to the immediate areas surrounding the trenchless crossings, we conclude that impacts on wildlife would be minimal and not significant.

### 3.4    Migratory Birds

Migratory birds are species that nest in the United States and Canada during the summer and then migrate to and from tropical regions of Mexico, Central and South America, and the Caribbean for the non-breeding season. Migratory birds are protected under the Migratory Bird Treaty Act (16 U.S Code [U.S.C.] 703-711) (MBTA); bald and golden eagles are additionally protected under the Bald and Golden Eagle Protection Act (16 U.SC. 668-668d). Executive Order (EO) 13186 (66 FR 3853) directs federal agencies to identify where unintentional take is likely to have a measurable negative effect on migratory bird populations and to avoid or minimize adverse impacts on migratory birds through enhanced collaboration with the FWS.

On March 20, 2011, the FWS and the Commission entered into a Memorandum of Understanding that focuses on avoiding or minimizing adverse effects on migratory birds and strengthening migratory bird conservation though enhanced collaboration between the two agencies. This voluntary Memorandum of Understanding does not waive legal requirements under the MBTA, ESA of 1973, NGA, or any other statutes and does not authorize the take of migratory birds.

As stated above, the Mountain Valley Pipeline Project has completed approximately 100 percent of tree felling, 95 percent of vegetation clearing, and 95 percent of upland right-of-way-preparation. Mountain Valley states that at areas of trenchless crossings, trees and vegetation on the right-of-way were cleared but a 50-foot buffer of riparian vegetation was maintained, as feasible. These areas currently consist of tree stumps along with the scrub-shrub and herbaceous vegetation. No tree felling would be required as part of the Amendment Project. If clearing were required during nesting

AR 004835

season, Mountain Valley would conduct nest surveys prior to clearing, as outlined in its current *Migratory Bird Conservation Plan*.

Impacts on migratory birds and Mountain Valley's mitigation measures to protect migratory birds during construction and operation were discussed and evaluated in the FEIS.  Noise and ground-disturbing activities from the trenchless crossings could affect birds that might be nesting, foraging, or sheltering nearby.  Bird species inhabiting the surrounding area could be temporarily displaced during construction but would be able to return to the area after the trenchless crossing are completed.  Mountain Valley would follow its *Migratory Bird Conservation Plan* to minimize any potential impacts on migratory birds.  No bald or golden eagle nests were identified in the vicinity of the trenchless crossings.  Based on Mountain Valley's proposed measures, we conclude that the Amendment Project would not result in population-level impacts on migratory birds or significant measurable negative impacts on their habitat.

### 3.5    Special Status Species

Special status species are those species for which state or federal agencies afford an additional level of protection by law, regulation, or policy.  Special status species include federally listed species protected under the ESA, species proposed or candidates for listing by the FWS or the National Marine Fisheries Service, and those species that are state-listed as threatened or endangered, or other special status.  Section 7(a)(2) of the ESA requires the Commission to ensure that any action it authorizes, funds, or carries out would not jeopardize the continued existence of federally listed or proposed listed species, or result in the adverse modification or destruction of critical habitat for federally listed and proposed species.

The areas affected by the Amendment Project are areas previously analyzed for the certified Mountain Valley Pipeline Project.  However, the proposed route adjustment at MP 230.8 includes an additional 0.13 acre of disturbance of herbaceous ground cover habitat that was not analyzed as an impact for the certified Mountain Valley Pipeline Project.  This area was included in species surveys for ESA Section 7 consultation because Mountain Valley used a 300-foot-wide buffer to conduct biological surveys for the Mountain Valley Pipeline Project.  We received multiple comments stating that special status species may be impacted due to the Amendment Project.  These impacts are addressed below.

### 3.5.1   Federally Listed Species

We have determined that the Amendment Project would not result in additional impacts on federally listed species that would necessitate reinitiation of formal

AR  004836

consultation under Section 7 of the ESA as outlined in our June 4, 2021 letter to the FWS.[30]  Impacts on species as a result of the Amendment Project were already considered and analyzed during the ESA Section 7 consultation for the certificated Mountain Valley Pipeline Project in 2020, which was concluded with the FWS's 2020 BO and Conference Opinion, issued on September 4, 2020, and FWS concurrence letter, issued on July 9, 2020.  We conclude that the Amendment Project would not alter our prior effects determinations (made as part of the 2020 ESA section 7 consultation process)[31] or the analysis or conclusions in the 2020 BO.

We have also determined that our prior determination (of may affect, likely to adversely affect) for candy darter critical habitat analyzed in the Conference Opinion (as part of the 2020 BO) would not change.  The trenchless crossing methods, previously authorized by the FERC and assessed in the 2020 BO and Conference Opinion, of the Gauley River (microtunnel and water withdrawal) and Stony Creek (conventional bore), which do have designated critical habitat, have not changed.  As such, there would be no significant changes with respect to the designated critical habitat in the action as planned or in the information used to develop the Conference Opinion.  On May 14, 2021, the FWS confirmed the September 4, 2020 Conference Opinion as the BO for candy darter critical habitat.[32]

The Amendment Project includes changes to the Mountain Valley Pipeline Project in areas containing potential habitat for the following species:  Virginia big-eared bat, gray bat, clubshell, snuffbox, Indiana bat, northern long-eared bat, Roanoke logperch, and Virginia spiraea.[33]  As previously stated, all workspaces associated with the

---

30    See accession number 20210604-3030 – FERC letter to FWS re: Section 7 Consultation.

31    On July10, 2017, the FERC initiated formal consultation under Section 7 of the ESA for the certificated Mountain Valley Pipeline Project.  The FWS issued a BO on November 21, 2017.  In 2020, the FERC reinitiated Section 7 consultation to evaluate the impacts on the newly listed as endangered candy darter as well as new/additional impacts that occurred since the 2017 BO.  In response to the reinitiation, Mountain Valley submitted a Supplement to the Biological Assessment (SBA), which reassessed impacts on federally listed species potentially affected by the certificated Mountain Valley Pipeline Project.  The FWS issued a new BO on September 4, 2020.  The FWS also provided a letter of concurrence on July 9, 2020 for the species for which the FERC determined that the certificated Mountain Valley Pipeline Project may affect, but would not likely adversely affect.  We refer to the conclusions regarding effects determinations made in the most recent 2020 ESA Section 7 consultation process.

32    See accession number 20210514-3026.

33    For the other species included in the 2020 ESA Section 7 consultation process, the activities requested in the Amendment Project would not occur within areas that support these species.

AR  004837

Amendment Project would be within areas that were previously authorized by the FERC and analyzed during the 2020 ESA consultation, except for 0.13 acre of herbaceous habitat that would be affected by the slight route adjustment at MP 230.8. The 0.13 acre of herbaceous habitat was included in prior surveys for ESA consultation for the Mountain Valley Pipeline Project due to its proximity to the original certificated pipeline route. Therefore, there are no new areas that would be affected by the Amendment Project that have not been included in previous survey efforts for federally listed species. Overall, the Amendment Project would eliminate construction within potentially affected waterbodies and wetlands. Trenchless crossing methods would reduce the potential of any direct impacts on the streams and reduce impacts on stream banks and riparian areas, which would reduce the impacts of sedimentation on aquatic species as discussed above in section B.3.1 of this EA. Potential impacts and our determinations of effect for the eight species that are within the action area of the proposed Amendment Project are described below.

### Virginia Big-eared Bat and Gray Bat

As described in the FEIS and the supplement to the Biological Assessment (SBA)[34], no individuals of either species were captured during surveys and no habitat was found in the areas affected by the Mountain Valley Pipeline Project. However, as stated in the FEIS, there is a small chance for construction activities to affect bats migrating in the general Mountain Valley Pipeline Project area between summer roost sites and winter hibernacula. On July 9, 2020, the FWS concurred with the FERC's determination of "may affect, but is not likely to adversely affect" (NLAA) for these species. Because the areas affected by the Amendment Project would be within the workspaces previously authorized by the FERC and analyzed in the 2020 ESA Section 7 consultation for the Mountain Valley Pipeline Project, with the exception of 0.13 acre of new upland herbaceous vegetation that was included in prior surveys, we have determined that the Amendment Project would not change our overall effect determination (NLAA) for the Virginia big-eared bat and the gray bat, which we made in the 2020 ESA consultation for the Mountain Valley Pipeline Project.

### Clubshell and Snuffbox

Streams that potentially support snuffbox and clubshell mussel populations in the Mountain Valley Pipeline Project area include the Elk River, the Little Kanawha River, Meathouse Fork, and Leading Creek. The Little Kanawha River and Leading Creek crossings are already complete and are not part of the Amendment Project. During the

---

34    See accession number 20200702-5305.

AR 004838

2020 ESA Section 7 consultation, Mountain Valley proposed to cross the Elk River using a trenchless method called microtunneling and the headwaters of Meathouse Fork using an open-cut dry crossing method. On July 9, 2020, the FWS concurred with the FERC's determination that the Mountain Valley Pipeline Project is NLAA the snuffbox and clubshell mussels. This determination was made due to presumed absence of these species in the streams subject to potential impacts from the Mountain Valley Pipeline Project. Additionally, sediment modeling that Mountain Valley conducted for the SBA in 2019 and 2020[35] indicated that sediment impacts would not extend to areas with a potential to contain clubshell and snuffbox mussels.

As part of the Amendment Project, Mountain Valley proposes to cross the Elk River using a guided conventional bore and the headwaters of Meathouse Fork using a conventional bore. As compared to the open-cut dry crossing of Meathouse Fork, a conventional bore crossing would eliminate direct in-water work and reduce sedimentation impacts in the immediate area of the crossing and downstream. Regarding the Elk River, microtunneling and guided conventional bores are similar crossing methods with similar risks of an inadvertent return as discussed in table 12 of the 2020 BO. Given these factors, we have determined that the Amendment Project would not change our overall effect determination (NLAA) for clubshell and snuffbox mussels, which we made in the 2020 ESA consultation for the Mountain Valley Pipeline Project.

**Indiana Bat and Northern Long-eared Bat**

The 2020 BO concluded that the Mountain Valley Pipeline Project is likely to adversely affect (LAA) the Indiana bat and northern long-eared bat. There would be no additional impacts on Indiana bats and northern long-eared bats as a result of the Amendment Project that were not already considered in the 2020 BO. We note that tree felling has already occurred in all the workspaces required for the Amendment Project, and this tree removal was already accounted for in the 2020 BO. Additionally, Mountain Valley would avoid construction during hibernation season at the 10 proposed trenchless crossings where there are known/assumed occupied Indiana bat and northern long-eared

---

35    See accession number 20200702-5305.

AR 004839

bat hibernacula[36] within two miles of the work spaces that could experience noise levels above ambient levels due to construction activities at the trenchless crossings.[37]

Nighttime construction might be necessary at six of the proposed trenchless crossings, which would cause minor short-term noise and lighting effects that could impact active bats at night.[38]  These six crossings include two guided bores crossings, one Direct Pipe®, and three conventional bore crossings discussed in the FEIS associated with railroad crossings.  In addition, Mountain Valley proposes to conduct nighttime work at the previously approved, but yet to be completed, microtunnel crossings of the Roanoke River and Gauley River.  The potential for these noise impacts were discussed in the 2020 BO as noted below.  As discussed in the FEIS and Mountain Valley's SBA, dewatering activities may require 24-hour work for limited periods.  Mountain Valley states that it would conduct most work during daylight hours and use cut off fixtures to reduce lighting impacts if night work is required.  The 2020 BO states that "bats are not likely to be exposed to consequences as a result of increased noise, lighting, or dust within the areas of habitat removal."[39]  Because all tree removal has already occurred in the areas where nighttime work might occur, impacts on bats as a result of noise and lighting are not likely.[40]

Given the factors discussed above, we have determined that Amendment Project would not change the overall conclusions of the 2020 BO or the associated Incidental Take Statement for the Indiana bat and northern long-eared bat.

**Roanoke Logperch**

We received multiple comments regarding potential impacts on the Roanoke logperch as a result of the Amendment Project.  Streams that potentially support Roanoke logperch in the Mountain Valley Pipeline Project area include Harpen Creek, Bradshaw

---

36    These features include Tawney's Cave, Phlegars Cave, John Smith Cave, Kanodes Pit, Eight Point Cave, P-BTH-001, Pighole Cave, Spruce Run Mountain Cave, and Links Cave.  In the 2020 BO, FWS determined that portal P-BTH-001 is not a suitable hibernacula for the Indiana bat.

37    Mountain Valley's noise impact study included in its SBA concluded that hibernacula more than 2 miles from the trenchless crossings would not experience sound levels above ambient.

38    Nighttime work may be required due to stipulations of the crossing agreement (railroads and roadways), particular geologic conditions, or the particular method being used (guided conventional bore, microtunneling, and Direct Pipe®).

39    See pages 115 and 131.

40    See also email communication from Cindy Schulz (FWS) and Jennifer Fink (FERC) dated November 4, 2020 at accession number 20210604-303.

AR  004840

Creek, Roanoke River, North Fork Roanoke River, and Pigg River. Mountain Valley has already completed the crossings of the North Fork Roanoke River and Pigg River, which were analyzed in the 2020 BO. The 2020 BO also analyzed the crossing of the Roanoke River as a trenchless method (microtunneling). Because this crossing method was previously approved and analyzed in the 2020 BO, it is not included as part of the Amendment Project except for the request to conduct nighttime construction as discussed above. Mountain Valley is proposing to change the crossing methods from open-cut dry crossings to trenchless conventional bore crossings for Harpen Creek and Bradshaw Creek as part of the Amendment Project.

The 2020 BO concluded that the Mountain Valley Pipeline Project is LAA the Roanoke logperch. Although trenchless methods would eliminate direct impacts on the streams and reduce potential effects of sedimentation, we have determined that Amendment Project would not change the overall conclusions of the 2020 BO and the associated Incidental Take Statement for the Roanoke logperch.

### Virginia Spiraea

In the 2020 BO, FWS presumed that the Virginia spiraea is present on one 0.05-acre parcel along the Greenbrier River in Summers County, West Virginia.[41] The FWS concluded that Mountain Valley Pipeline Project construction would permanently remove all Virginia spiraea plants, seeds, and habitat in the 0.05 acre. As part of the Amendment Project, Mountain Valley proposes to change the Greenbrier River crossing to a Direct Pipe®, which would result in the same workspace requirements and impacts on this species as identified in the 2020 BO. Therefore, the impacts associated with the Amendment Project on the Virginia spiraea were fully analyzed and considered in the 2020 BO and Incidental Take Statement.

### Conclusion

As stated above, trenchless crossing methods would reduce the potential of any direct impacts on the streams and reduce impacts on stream banks and riparian areas. Therefore, we expect that any impacts associated with the crossing method changes at streams containing federally listed species would be insignificant and discountable and less than what was described in the FEIS. In addition, Mountain Valley would implement erosion and sediment control measures to minimize any sedimentation that could result from the trenchless crossing methods.

---

41    See pages 65 to 66 of the September 4, 2020 BO.

AR  004841

Given these factors, we conclude that the scope of impacts on federally listed species associated with the Amendment Project are fully considered in the 2020 BO and the 2020 ESA Section 7 consultation process for the Mountain Valley Pipeline Project. Although impacts on aquatic species would be reduced, we are not altering our determinations of effect on federally listed species that were concluded for the Mountain Valley Pipeline Project. On July 29, 2021, we received a response from the FWS to our June 4, 2021 letter requesting additional information regarding our determinations;[42] therefore, we recommend that:

- **Mountain Valley should <u>not commence construction activities</u> associated with the Amendment Project <u>until</u> Commission staff completes consultation with the FWS regarding potential impacts on federally listed species.**

### 3.5.2   Other Special Status Species

Impacts on state-listed and other species designated as sensitive were identified and described for the Mountain Valley Pipeline Project in the FEIS. The proposed trenchless crossings would not result in any new or additional impacts other than an increase in the amount of noise and light pollution occurring at night. As described above, the trenchless crossings would lessen the impact on aquatic species that may occur in and around the subject streams. Bore pits would occur in upland areas and Mountain Valley would erect erosion and sediment control devices to protect waterbodies and any surrounding wetland habitat that could provide habitat for state-listed or special status sensitive species. In addition, because tree clearing has already occurred in the subject areas, the impacts on any sensitive bird species potentially inhabiting the surrounding area would be limited to temporary displacement due to noise from construction as discussed above. For these reasons, we conclude that the proposed Amendment Project would not result in significant impacts on special status species.

### 4.0   Land Use

As described previously, the majority of the work associated with the Amendment Project would occur within the previously authorized limits of disturbance, which consists of disturbed right-of-way. Impacts on land use resulting from the proposed trenchless crossings would be similar in nature to impacts addressed in the FEIS. The Amendment Project would not result in any additional land requirements, except for 0.13 acre, consisting of agricultural land (0.07 acre) and residential land (0.06 acre) that would

---

42    See accession number 20210803-3020.

AR  004842

be affected by the route adjustment at MP 230.8, nor would there be a change in land requirements.

The trenchless crossing activities would result in short-term impacts on adjacent residential areas, including increased construction-related traffic on local roads, as well as dust, lighting, and noise generated during construction. As previously stated, nighttime construction may be necessary at six of the proposed trenchless crossings, and at the previously approved Gauley River and Roanoke River crossings, which would cause minor short-term noise and lighting effects. Mountain Valley states that it would conduct as much work as possible during daylight hours. Noise modeling conducted by Mountain Valley indicated that the proposed nighttime activities at five locations would not require additional mitigation in order to meet sound levels identified in the FERC guidance. Noise modeling indicated noise mitigation would be required at three locations to reduce noise to acceptable levels. Additional information regarding noise can be found in section B.6.2 of this EA. In addition, Mountain Valley would use cut off fixtures to reduce lighting impacts if night work is required.

Mountain Valley would minimize potential impacts through implementation of mitigation measures specified in its *Site-Specific Residential Construction Plans* for residences within 50 feet of the right-of-way. However, based on a review of alignment sheets, no residences appear to be located within 50 feet of the proposed trenchless crossings.

We received comments that the Amendment Project would impact recreational resources in the Amendment Project area. The areas affected by the Amendment Project were previously analyzed in the FEIS for the certificated Mountain Valley Pipeline Project. Impacts and mitigation on recreational and visual resources as discussed in the FEIS are expected to be similar for the Amendment Project. The proposed trenchless crossing methods would avoid in-stream work and construction would be temporary. As such, with the exception of the possible exclusion of recreation in the immediate vicinity of construction, no impacts on waterbodies used as recreational resources is expected.

No significant additional impacts would occur outside of the already certificated Mountain Valley Pipeline Project right-of-way. We do not anticipate significant impacts on land use as a result of the Amendment Project.

### 4.1    Environmental Justice

Executive Order 12898 encourages independent agencies to identify and address, as part of their NEPA review, "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations. Section

AR 004843

4.9.1.8 of the FEIS provides an analysis of minority and low-income populations in the vicinity of the larger Mountain Valley Pipeline Project.  In section 4.9.2.8 of the FEIS, we concluded that none of the counties or census blocks crossed by the Mountain Valley Pipeline Project have minority populations exceeding 50 percent nor have minority populations meaningfully greater than the minority population percentage in their respective states.  However, we note that low-income communities do exist along the Mountain Valley Pipeline route and that these populations may be affected by construction and operation of the larger Mountain Valley Pipeline Project.

The Amendment Project is a subset of the previously evaluated and authorized Mountain Valley Pipeline Project.  All of the communities that would be affected by the Amendment Project are the same as those reviewed in the FEIS.  However, to address public concern regarding the Amendment Project, Mountain Valley provided an updated analysis of the FEIS data using 2021 Census data.[43]  We have verified the updated data and found that the updated analysis is not materially changed from the analysis provided in the FEIS (appendix F).

We received several comments discussing concerns with outreach efforts, including the reliance on internet services, to potential environmental justice communities along the Mountain Valley Pipeline Project route.  The Amendment Project would not affect any new landowners and Mountain Valley has been in communication via telephone, U.S. mail, e-mail, and in-person meetings, with affected landowners.  Communications with affected landowners began before Mountain Valley filed a request to enter into the Commission's pre-filing environmental process for the Mountain Valley Pipeline Project on October 27, 2014.   Mountain Valley has also conducted local outreach efforts throughout the construction of the Mountain Valley Pipeline Project.  For the Amendment Project, Mountain Valley mailed all affected landowners a written copy of the Notice of Application as well as the Commission's "An Interstate Natural Gas Facility On My Land? What Do I Need To Know?" pamphlet.

With the exception of a 0.13-acre temporary construction workspace, the Amendment Project would be located entirely within the already certificated limits of disturbance.  This area consists of a disturbed right-of-way that has been under intermittent construction since 2018.  Mountain Valley estimates 41 crews would be working on the nine construction spreads to complete all of the trenchless crossings in about 4 months.  As mentioned in section 5.1, based on Mountain Valley's estimates, the average length of time required for a conventional bore (including pit excavation and boring) would be about 18 days.  It is predicted that around 60 percent of the

---

43    See accession number 20210427-5306.

AR  004844

conventional bores would be completed within 2 weeks and an additional 26 percent would be completed within 4 weeks. Fourteen percent of the remaining bores would be completed within 10 weeks while one conventional bore is estimated may require 72 days.

As stated in section 6.1.2 below, the bore crossing would result in higher levels of emissions per crossing. However, these increases would be dispersed over almost 304 miles of construction right-of-way and there would be no changes in operational emissions due to the Amendment Project. In addition, as further discussed in section 6.2.2, the Amendment Project would have two distinct phases of construction that would generate high levels of noise: 1) excavation of entry and exit bore pits; and 2) active boring. Most locations would involve conventional boring and noise impacts would occur during the day and would not significantly differ in intensity from those previously analyzed in the FEIS. However, eight crossings may include 24-hour boring operations. The noise impacts from those crossings would be temporary and we have included a recommendation that Mountain Valley notify all landowners within 0.5 miles of nighttime trenchless crossing activities prior to the start of these activities. Additional information concerning nighttime construction work can be found in section 6.2.2.

As stated above, the impacts associated with the Amendment Project would be temporary and do not involve the construction of any permanent, aboveground structures. While the proposed route adjustment will result in a minor addition of 0.04 acre of operational impacts, overall, impacts from the Amendment Project would be temporary in nature. We conclude that the Amendment Project would not result in a disproportionately high and adverse impact on environmental justice populations.

## 5.0   Cultural Resources

The NHPA is the cornerstone of the federal government's historic preservation program. Section 101(d)(6) of the NHPA states that properties of traditional religious and cultural importance to Indian tribes[44] may be determined eligible for the National Register of Historic Places (NRHP).

---

[44] Indian tribes are defined in 36 CFR 800.16(m) as: "an Indian tribe, band, nation, or other organized group or community, including a Native village, Regional Corporation, or Village Corporation, as those terms are defined in Section 3 of the Alaska Native Claims Settlement Act (43 U.S.C. 1602), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their special status as Indians."

AR  004845

Section 106 of the NHPA requires that the FERC take into account the effect of its undertakings[45] (including authorizations under Section 7 of the NGA) on historic properties,[46] and afford the Advisory Council on Historic Preservation (ACHP) an opportunity to comment.  Mountain Valley, as a non-federal applicant, is assisting the FERC staff in meeting our obligations under Section 106 by providing data, analyses, and recommendations in accordance with Title 36 CFR Part 800.2(a)(3) and the FERC's regulations at 18 CFR Part 380.12(f).  Cultural resources[47] information was gathered for Mountain Valley by its consultants.  However, the FERC staff remains responsible for all final determinations made under the NHPA.

The FERC staff examined the 120 proposed bore locations to determine if those activities may have impacts on historic properties.  As indicated in our FEIS, and the Programmatic Agreement (PA) executed December 15, 2017, for the Mountain Valley Pipeline Project in Docket No. CP16-10-000, the areas where the bores are proposed were previously inventoried for cultural resources.  The FEIS also documented our consultations with the West Virginia and Virginia State Historic Preservation Offices (SHPO), interested Indian tribes, and other consulting parties for the Mountain Valley Pipeline Project.  The PA was signed by the SHPOs and the ACHP.  Below we identify the cultural resources previously recorded in proximity to the bores, provide their NRHP status, and assess the Amendment Project effects.

The regulations for implementing Section 106 of the NHPA, at 36 CFR 800.9, encourage the integration of the Section 106 compliance process with the NEPA process; and we have done that in this section of the EA.  This section is divided into several

---

45    "Undertaking means a project activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; those requiring a Federal permit, license or approval; and those subject to state or local regulation administered pursuant to a delegation or approval by a Federal agency," as defined in 36 CFR 800.16(y).

46    Historic properties include prehistoric or historic sites, districts, buildings, structures, objects, landscapes, or properties of traditional religious or cultural importance listed on or eligible for listing on the National Register of Historic Places, as defined in 36 CFR 800.16(l).

47    Cultural resources are locations of human activity, occupation, or use.  According to the FERC's Office of Energy Projects "Guidelines for Reporting on Cultural Resources Investigations for National Gas Projects," cultural resources include any prehistoric or historic archaeological site, district, object, cultural feature, building or structure, cultural landscape, or traditional cultural property.  Although "cultural resources" are not defined in 36 CFR 800, it is a "term-of-art" in the field of historic preservation and archaeological research.  Some Indian tribes believe that cultural resources could include natural resources, such as plants and animals of traditional cultural or religious importance to tribes, topographic features that may be sacred, and viewsheds.

AR 004846

subsections that mirror the Section 106 compliance process. The process includes consultations; identification of historic properties; assessment of effects; and resolution of adverse effects, if necessary. Lastly, we reach conclusions about the status of our compliance with the NHPA.

## 5.1    Consultations

The FERC sent copies of our March 16, 2021 NOS and July 1, 2021 NOSS for the Amendment Project to a wide range of stakeholders, including other federal agencies, such as the ACHP, the COE, the EPA, the U.S. Department of the Interior Bureau of Indian Affairs (BIA), and the National Park Service (NPS), state and local government agencies, such as the SHPOs of West Virginia and Virginia, affected landowners, and Indian tribes that may have an interest in the Amendment Project area. The NOS contained a paragraph about Section 106 of the NHPA, which stated that we use the notice to initiate consultations with the SHPOs as well as to solicit their views and those of other government agencies, interested Indian tribes, and the public on the Amendment Project's potential effects on historic properties.

### 5.1.1    Consultations with the SHPOs

With a cover letter dated March 9, 2021, Mountain Valley sent copies of its *Desktop Review and Effects Analysis* reports (Dye et al., 2021a; Dye et al., 2021b) for the Amendment Project to the SHPOs of West Virginia and Virginia, and requested that their comments on the reports be filed with the FERC.

In a letter dated April 21, 2021, the West Virginia SHPO offered its review of Mountain Valley's *Desktop Review and Effects Analysis* report. That review stated that the West Virginia SHPO concurred "… that the proposed Amendment Project will have no effect on unevaluated and archaeological historic resources. We also concur that no further survey or evaluation is needed." With regard to standing structures and architectural resources, the West Virginia SHPO indicated that: "… it is our opinion that use of the proposed change in crossing methods will have no effect on the characteristics that qualify properties for inclusion in the National Register of Historic Places."

A response from the Virginia SHPO has not been received. The concurrence of the Virginia SHPO is assumed, under the stipulations of the PA, when more than 30 days have passed with no response after submittal of a report.

AR  004847

### 5.1.2   Consultations with Indian Tribes

The FERC sent our NOS to 30 federally-recognized Indians tribes that may have an interest in the Amendment Project.

Via cover letters dated March 10, 2021, Mountain Valley sent copies of its *Desktop Review and Effects Analysis* reports for the Amendment Project to interested Indian tribes, together with a request for tribes to file comments on the report with the FERC. Mountain Valley sent copies of reports to the Cherokee Nation of Oklahoma, Cheyenne River Sioux Tribe of South Dakota, Delaware Nation of Oklahoma, Eastern Band of Cherokee Indians in North Carolina, Eastern Shawnee Tribe of Oklahoma, Peoria Tribe of Oklahoma, Rosebud Sioux Tribe of South Dakota, and United Keetoowah Band of Cherokee Indians in Oklahoma.

In response to our NOS, in a filing on April 15, 2021, the Monacan Indian Nation, through its attorney Cultural Heritage Partners, requested to be a consulting party in this proceeding. We grant that request. On June 2, 2021, Mountain Valley provided copies of documents submitted to the SHPOs for the Amendment Project to the Monacan Indian Nation.

### 5.1.3   Communications with Other Consulting Parties and the Public

Mountain Valley sent copies of its *Desktop Review and Effects Analysis* reports to other consulting parties, via a cover letter dated March 10, 2021, with a request that comments on the reports be filed with the FERC. The parties contacted included the Summers County Historic Landmark Commission; Committee for Appalachian and Piedmont Preservation; Preservation Virginia; Historical Society of Western Virginia; Roanoke County Board of Supervisors; Roanoke Valley Preservation Foundation; Giles County Board of Supervisors; Giles County Administration, Greater Newport Rural Historic District Committee; Montgomery County Board of Supervisors; and Preserve Montgomery County, Virginia.

On March 19, 2021, Roanoke County Board of Supervisors filed a request to be a consulting party in the Section 106 process for the Amendment Project. We grant the request.

In a March 22, 2021 filing of a motion to intervene, Ms. Grace Terry, who is one of the landowners of the Coles-Terry Rural Historic District, and a representative of the Committee for Appalachian and Piedmont Preservation, requested consulting party status in Docket No. CP21-57. We grant Ms. Terry's request.

AR  004848

In response to our March 16, 2021 NOS, we received six other letters that commented on cultural resources issues. In a March 22, 2021 filing, Ms. Desiree Shelley stated that: "Many Eastern Siouxan historical and cultural sites, especially burial mounds, are located along waterbodies along the MVP route." We acknowledge that peoples associated with the Monacan, Sappony, Tutelo, Occaneehi, Sara, and Catawba tribes historically occupied or utilized portions of the Mountain Valley Pipeline Project area. No Native American burial mounds have been recorded along the Mountain Valley Pipeline route.

Preserve Giles County, in a filing on March 22, 2021, stated that the "pipeline route bisects the Historic Village of Newport." The Mountain Valley Pipeline route skirts but does not cross the boundaries of the Newport Historic District.

Also on March, 22, 2021, Mr. Fred Vest commented that he resides within the Bent Mountain Apple Orchard Rural Historic District, and that Mountain Valley seeks to use his driveway for an access road. Mr. Vest states that his driveway is part of an old network of historic roads within the District. Mr. Vest indicated that the Rosebud and Cheyenne River Sioux tribes had representatives visit the area. Mountain Valley conducted archaeological excavations across Mill Creek from his property in 2018, and returned artifacts to his possession. Mr. Vest is concerned that: "[b]oring may further disrupt, waste and destroy fields of as yet undiscovered Native and historical artifacts." No trenchless crossings are proposed on Mr. Vest's property. The closest crossing to Mr. Vest's property is H-044, which is approximately 250 feet away, and no cultural resource sites were recorded in this area by Mountain Valley's consultants.

Ms. Lois Waldron Martin, in a letter filed March 22, 2021, stated: "…we have found several Native American arrowheads throughout the years, leading us to believe that our land could have been a hunting ground. Therefore, we conclude the farm could have Native Americans buried in unmarked graves, possibly in, or near, MVP's right-of-way." Ms. Martin identified the steam crossing on her property as "S-EF44," which corresponds to Mountain Valley's bore number H-044. This area was previously inventoried for cultural resources by Mountain Valley's consultants, and no archaeological sites were recorded nearby.

In a filing dated March 20, 2021, Kathy and James Chandler stated that "MVP is not acknowledging the amount of workspace necessary; cultural and spiritual resources are present and at risk." They are concerned with impacts on Historic Green Hollow Drive[48], within the Bent Mountain Apple Orchard Rural Historic District. However, the

---

[48]    Green Hollow Drive is located adjacent to bore H-046.

road was not recorded as a contributing resource to the District, and was not assigned a state site number.  Amendment Project related impacts on the Bent Mountain Apple Orchard Rural Historic District are discussed below.  The Chandlers also mention a "Native American Burial site" recorded by Ben Rhodd of the Rosebud Sioux and Steve Vance of the Cheyenne River Sioux.  In past correspondence with Mr. Vance, the FERC staff requested that he file information about the site, but this information has not been provided.  Mountain Valley had its professional archaeological consultants investigate the area and found a "push pile," or bulldozed dirt and rocks, but not a burial mound.[49] Mountain Valley installed a 10-foot buffer and jersey barriers around the push pile.  In addition, Mountain Valley shifted the pipeline to the east.  The push pile is outside the limits of disturbance adjacent to bore H-045.  Bores H-045 and H-046 would be located on the Chandler's parcels.

In a filing on April 16, 2021, Elizabeth Terry Reynolds expressed concern that bores H-042 and H-043 could potentially impact archaeological sites 44RN400 and 44RN401.  As discussed below, both these sites were found eligible for the NRHP, could not be avoided by the Mountain Valley Pipeline Project, and impacts were mitigated through data recovery programs in accordance with the PA.

## 5.2    Identification of Historic Properties

### 5.2.1   Area of Potential Effect

In our FEIS for the Mountain Valley Pipeline Project, we defined the direct area of potential effect (APE) as a 300-foot-wide corridor along the pipeline route (150 feet on each side of centerline), a 100-foot-wide corridor along access roads, and the limits of ground disturbance at aboveground facilities, yards, and other extra workspaces.  The indirect APE was defined as 0.25-mile (1,320 feet) on each side of the pipeline centerline.  We adopt these definitions for the Amendment Project as well.

### 5.2.2   Inventory Results

Roanoke County expressed concerns about potential Amendment Project impacts on the NRHP-listed Blue Ridge Parkway and the eligible Appalachian Trail.  There are no bores proposed within the boundaries of the Blue Ridge Parkway Historic District (Virginia historic site number 80-5161) in the vicinity where the Mountain Valley Pipeline Project crosses the Blue Ridge Parkway.  Nor are there any bores associated

---

49      See accession number 20180511-5205.

AR  004850

with the Amendment Project proposed in the vicinity of the Appalachian National Scenic Trail near the Mountain Valley Pipeline Project crossing.

As part of its application to the FERC, Mountain Valley filed *Appendix H, Cultural Resources Site Information* which listed all cultural resources within 1,320 feet of the bore locations, recorder, and NRHP status. On March 12, 2021, Mountain Valley filed its *Desktop Review and Effects Analysis* reports.

Based on *Appendix H* and the *Desktop Review* reports, staff identified all cultural resources recorded within the APE. At 35 bore locations, there are no cultural resources nearby. Cultural resources were recorded near 85 bore locations and the two route realignments (MPs 0.7 and 230.8).

There are 144 resources in the indirect APE that are located between 150 and 1,320 feet of the bore locations. Of these, 101 sites were evaluated as not eligible for nomination to the NRHP. Outside of Historic Districts, three historic architectural sites in the indirect APE for the Amendment Project were evaluated as eligible for the NRHP. These are WZ-0154 (Mobley School) near the alignment shift at MP 0.7 (799 feet away), SU-0446 (Wiseman Residence) near bore F-021 (718 feet away), and 033-5304 (Clear View Dairy Farm) near bore I-067 (1,098 feet).

There are two bore locations (G-023 and G-024) inside the boundaries of the Greater Newport Rural Historic District (site number 35-412), which is listed on the NRHP. Within this Historic District, there are nine contributing properties located between 150 and 1,320 feet from the bores.

One bore (G-024) is in proximity to the Newport Historic District (site number 35-151), which is listed on the NRHP. Within 150 and 1,320 feet from this bore, there are 15 contributing properties to this Historic District.

There are three bore locations (H-030, H-031, and H-032) within the boundaries of the Coles-Terry Rural Historic District (80-5689), which has been determined eligible for the NRHP. Between 150 and 1,320 feet from those bores, there are three resources that contribute to the District.

There is one bore (H-040) within the Bent Mountain Rural Historic District (80-5677), which has been determined eligible for the NRHP. Within 150 and 1,320 feet from that bore, there are two resources that contribute to the District.

Within the Bent Mountain Apple Orchard Rural Historic District (80-5731), which has been determined eligible for the NRHP, there are seven bore locations (H-042, H-

AR 004851

043, H-044, H-045, H-046, H-047, and H-048).  Between 150 and 1,320 feet from those bores, there are five historic architectural sites that are contributing elements to the Bent Mountain Rural Historic District.

There are 36 archaeological sites in the direct APE for the Amendment Project. Of these, 23 are not eligible for the NRHP.

There are 12 archaeological sites (46NI847, 46NI848, 46SU147, 46SU722, 46SU740, 46SU767, 44FR355, 44FR370, 44GS230, 44RN400, 44RN401, and 44RN408) within 150 feet of a bore that are either unevaluated or eligible for the NRHP.  As further discussed below under effects, eight of those archaeological sites were avoided during installation of the Mountain Valley Pipeline Project.  Four archaeological sites could not be avoided, and impacts were mitigated through data recovery programs.

Outside of Historic Districts, there is one eligible historic site (060-5170) within 150 feet of a bore.  See section B.5.3 below for further details.

Within the Bent Mountain Apple Orchard Rural Historic District, there are two historic architectural sites (80-5677-9 [House] and 80-5677-6 [Hale Cabin]) that are contributing elements to the Bent Mountain Rural Historic District and the Bent Mountain Apple Orchard Rural Historic District within 150 feet of the bores.  See section B.5.3 below for further details.

### 5.3    Assessment of Effects

The Amendment Project would have no effect under Section 106 on sites that are not eligible for nomination to the NRHP.  Stipulation IIB of the Mountain Valley Pipeline Project PA states: "Those cultural resources which the FERC staff determines do not meet the NRHP criteria, after consultations with [the SHPO] (and federal land managing agencies for sites on federal lands, interested Indian Tribes, and other consulting parties, as appropriate), will require no further considerations."

We do not believe that the Amendment Project would have any adverse impacts on archaeological sites that may be unevaluated, listed on the NRHP, or eligible but are located more than 150 feet from an individual bore.  It is possible for the Amendment Project to have impacts on historic architectural sites between 150 and 1,320 feet of a bore location, where the bore may have visual or auditory effects that may alter the characteristics that contribute to elements that make a site eligible for the NRHP.

The pipeline would be installed underground, and once the right-of-way is restored, visual impacts would be reduced.  Likewise, construction noise would be

AR 004852

temporary during pipeline installation.  The Amendment Project should not have adverse long-term impacts on the three historic properties (sites WZ-0154, 033-5304, and SU-0446) outside of Historic Districts, which are located more than 150 feet away from Amendment Project facilities.  The Mobley School is about 800 feet from the alignment shift at MP 0.7; the Wiseman Residence is about 718 feet from the F-022 bore; and Clear View Dairy Farm is about 1,000 feet from the I-067 bore.

The Mountain Valley Pipeline Project right-of-way crosses through the boundaries of the Greater Newport Rural Historic District and the Coles-Terry Rural Historic District.  However, there are no contributing properties within the Greater Newport Rural Historic District or the Coles-Terry Rural Historic District that are closer than 150 feet from any bore for the Amendment Project.

We identified eight archaeological sites (46NI847, 46NI848, 46SU147, 46SU722, 46SU740, 44GS230, 44RN408, and 44FR355) evaluated as eligible for the NRHP located within 150 feet of a bore, which would be avoided by pipeline construction.  Mountain Valley previously filed avoidance plans for these sites that were accepted by the SHPOs and FERC staff.  Stipulation IIIA1 of the PA states that: "FERC staff and [the SHPO] (and federal land managing agencies for sites on federal lands) agree that the Mountain Valley [Pipeline Project] would have no effect (in accordance with 36 CFR 800.4(d)(l)) upon historic properties that are avoided."

There are four archaeological sites (46SU767, 44RN400, 44RN401, and 44FR370) that are eligible for the NRHP, located within 150 feet of a bore, and that cannot be avoided by pipeline construction.  For those sites, we concluded that the historic properties would be adversely affected by the Mountain Valley Pipeline Project.  In all these cases, impacts were mitigated by data recovery excavations, as outlined in filed Treatment Plans approved by the SHPO's and FERC's staff, in accordance with Stipulation IIIB1 of the PA.

There is one historic site (60-5170, Norfolk and Southern Railroad) outside of Historic Districts, within 150 feet of a bore (H-020).  Because the pipeline would be installed under the railroad using a bore, the Amendment Project would have no adverse effects on this historic property, in accordance with Stipulation IIIA2 of the PA.

Within the boundaries of the Bent Mountain Apple Orchard Rural Historic District and the Bent Mountain Rural Historic District, there are two historic architectural sites (80-5677-9 [House] and 80-5677-6 [Hale Cabin]) within 150 feet of two bores (H-043 and H-046) that are contributing elements to the Districts.  Site 80-5677-9 is located

outside of the limits of disturbance.  The Hale Cabin was fenced and would be avoided and monitored during construction.

The PA for the Mountain Valley Pipeline Project indicated that FERC staff agreed with the Virginia SHPO that the Mountain Valley Pipeline Project would have adverse effects on the Bent Mountain Rural Historic District and Bent Mountain Apple Orchard Rural Historic District.  In accordance with Stipulation IIIB1 of the PA, Mountain Valley previously filed Treatment Plans to mitigate impacts on the Bent Mountain Rural Historic District and Bent Mountain Apple Orchard Rural Historic District, and these plans were approved by the Virginia SHPO and FERC staff.  Mountain Valley implemented the Treatment Plans when it filed a Preliminary Information Form for the Bent Mountain Rural Historic District and an NRHP Nomination Form for the Bent Mountain Apple Orchard Rural Historic District, which were accepted by the SHPO, and distributed Preservation Funds to Roanoke County.  The Amendment Project does not require changes to the PA; and the original Treatment Plans are still applicable.

## 5.4    Unanticipated Discoveries

It is possible that during the excavation of the bores for the Amendment Project, currently unknown and unanticipated cultural resources could be discovered.  In its application for the Amendment Project, Mountain Valley stated that it would "use the same approved plan for unanticipated historic properties and human remains as for the Certificated Project."  Further, the 19th whereas clause of the PA executed for the Mountain Valley Pipeline Project on December 15, 2017 states that…"if any such discoveries are made during data recovery excavations or construction, the remains shall be treated in accordance with Mountain Valley's *Plan for Unanticipated Historic Properties and Human Remains* (Discovery Plan), discussed below in Stipulation I.E."  Stipulation I.E. of the PA reads: "Mountain Valley produced a Discovery Plan that has been reviewed and approved by FERC staff and the West Virginia Division of Culture and History (WVDCH) and Virginia Department of Historic Resources (VADHR).  The Discovery Plan includes procedures to be followed if human remains or unanticipated historic properties are discovered during identification or evaluation studies, data recovery excavations, or construction."

## 5.5    Compliance with the NHPA

No traditional cultural properties or properties of religious or cultural importance to Indian tribes were identified in the APE by Mountain Valley or its consultants, the SHPOs of West Virginia and Virginia, the BIA, the NPS, or Indian tribes contacted.  Therefore, we have complied with the intent of Section 101(d)(6) of the NHPA.

AR  004854

We agree with the West Virginia SHPO, in its April 21, 2021 review of Mountain Valley's *Desktop* report, that the Amendment Project would have no adverse impacts on archaeological and historic architectural sites in the direct APE. The concurrence of the Virginia SHPO is assumed, under the stipulations of the PA when more than 30 days have passed with no response after submittal of a report.

The PA executed for the Mountain Valley Pipeline Project required mitigation for historic properties that could not be avoided and may be adversely affected by the Mountain Valley Pipeline Project. As stated above, the Amendment Project does not require changes to the PA. Based on all of the above, we have complied with Section 106 of the NHPA.

## 6.0    Air Quality and Noise

### 6.1    Air Quality

The Amendment Project would result in emissions of regulated air pollutants and other air contaminants during construction. There would be no operational emissions from the Amendment Project except very minor fugitive methane emissions previously identified in the FEIS.

#### 6.1.1    Air Quality Regulations

The Clean Air Act (CAA) of 1970, as amended in 1977 and 1990, is the basic federal statute governing air quality. The provisions of the CAA that are potentially relevant to the Amendment Project include National Ambient Air Quality Standards (NAAQS) and General Conformity.

Federal and state air quality standards are designed to protect human health. The EPA has developed NAAQS for criteria air pollutants such as oxides of nitrogen (NOx) and carbon monoxide (CO), sulfur dioxide ($SO_2$), and inhalable particulate matter ($PM_{2.5}$ and $PM_{10}$). $PM_{2.5}$ includes particles with an aerodynamic diameter less than or equal to 2.5 micrometers, and $PM_{10}$ includes particles with an aerodynamic diameter less than or equal to 10 micrometers. The NAAQS were set at levels the EPA believes are necessary to protect human health and welfare. Volatile organic compounds (VOC) are regulated by EPA primarily to prevent the formation of ozone, another criteria pollutant included in the NAAQS and a constituent of photochemical smog. Many VOCs form ground-level ozone by reacting with sources of oxygen molecules such as NOx in the atmosphere in the presence of sunlight. NOx and VOCs are referred to as ozone precursors. Hazardous air pollutants (HAP) are also emitted during fossil fuel combustion and are suspected or known to cause serious health effects as well as adverse environmental effects.

AR 004855

Greenhouse gases (GHG) are gases that trap heat in the atmosphere and have been determined by the EPA to be the primary cause of climate change. Fossil fuel combustion primarily emits GHGs such as carbon dioxide ($CO_2$), methane ($CH_4$), and nitrous oxide ($N_2O$). Emissions of GHGs are typically expressed in terms of $CO_2$ equivalents ($CO_2e$) where the atmospheric heating potential of each gas is expressed as a multiple of the atmospheric heating potential of $CO_2$.

If measured ambient air pollutant concentrations for a subject area remain below the NAAQS criteria, the area is considered to be in attainment with the NAAQS. The proposed trenchless crossings are located in the counties of Wetzel, Harrison, Doddridge, Lewis, Webster, Nicholas, Greenbrier, Summers, and Monroe, West Virginia and Giles, Montgomery, Roanoke, Franklin, and Pittsylvania, Virginia. All counties where the trenchless crossings would be located are in attainment with the NAAQS for all criteria pollutants. Therefore, a CAA General Conformity Analysis is not required.

No county or local air quality regulations have been identified as being potentially applicable to the Amendment Project.

### 6.1.2  Construction Emissions and Impacts

During construction, a temporary reduction in ambient air quality would result from criteria pollutant emissions and fugitive dust generated by construction equipment. The quantity of fugitive dust emissions would depend on the moisture content and texture of the soils that would be disturbed. Dust suppression techniques, such as watering the right-of-way and working area may be used as necessary in construction zones near residential and commercial areas to minimize the impacts of fugitive dust on sensitive areas. In addition, Mountain Valley has committed to implementing the same measures to reduce construction emissions as described in the FEIS.

Mountain Valley conducted an analysis of estimated emissions from the proposed trenchless crossing methods compared to open-cut dry crossings. The bore crossings would result in higher levels of emissions per crossing. As discussed in section A.4 of this EA, Mountain Valley has already received authorization to microtunnel at the Gauley and Roanoke Rivers, but, as part of the Amendment Project, proposes to conduct nighttime microtunneling activities at those waterbodies. Table 6 below shows the original emissions estimate for open-cut dry crossings from the FEIS, as well as the estimated emissions for the crossings proposed in the Amendment Project and the Gauley and Roanoke River crossings.

AR  004856

Table 6

**Total Construction Emissions Comparison for All Open-Cut and Trenchless Crossings (tons)**

|  | NO$_x$ | CO | SO$_2$ | VOC | PM$_{10}$ | PM$_{2.5}$ | CO$_2$e |
|---|---|---|---|---|---|---|---|
| **Open-Cut Dry (FEIS)** | 50.37 | 17.26 | 0.13 | 0.42 | 2.97 | 2.87 | 17,136.81 |
| **Proposed Bore Type [a/]** | | | | | | | |
| **Conventional Bore** | 93.83 | 29.38 | 0.19 | 0.73 | 4.90 | 4.75 | 25,480.10 |
| **Guided Conventional Bore** | 7.85 | 2.01 | 0.01 | 0.06 | 0.35 | 0.34 | 1,429.18 |
| **Direct Pipe®** | 6.57 | 2.03 | 0.01 | 0.05 | 0.34 | 0.33 | 1,551.70 |
| **Microtunnel [b/]** | 15.74 | 4.73 | 0.03 | 0.12 | 0.78 | 0.76 | 3,301.85 |
| **Total Proposed** | 123.99 | 38.15 | 0.24 | 0.96 | 6.37 | 6.18 | 31,762.83 |
| **Emissions Increase** | **73.62** | **20.89** | **0.11** | **0.54** | **3.40** | **3.31** | **14,626.02** |

a    Emissions include both the bore pit excavation and boring.
b    Commission staff authorized Mountain Valley to change the crossing method to a microtunnel under variances D-35 and H-21, respectively.  Although the proposed action for the Amendment Project is only evaluating the modification to nighttime construction this estimate includes 24-hour emissions.

The Amendment Project would result in increases in construction emissions. However, those emissions would only occur during construction activities and would be dispersed over the 304 miles of the pipeline route.  The Amendment Project would not result in any change in operational emissions for the Mountain Valley Pipeline Project. We conclude that there would be minor temporary impacts on localized air quality due to increases in criteria pollutants, VOC, and fugitive dust in the areas of trenchless crossing activity.  Based on the above, we conclude that there would not be significant impacts associated with construction emissions from the Amendment Project.

### 6.1.3   Climate Change

We received comments regarding the Mountain Valley Pipeline Project's impact on climate change.  Specifically, the GHG emissions from the Mountain Valley Pipeline Project, as well as exploration, production, transport, and downstream end use combustion emissions from natural gas.  However, our analysis here is limited to construction emissions resulting from the Amendment Project, as there would be no

AR  004857

change to operational or downstream emissions of the Mountain Valley Pipeline Project as a result of the Amendment Project.

Climate change is the variation in climate (including temperature, precipitation, humidity, wind, and other meteorological variables) over time and cannot be characterized by an individual event or anomalous weather pattern. For example, a severe drought or abnormally hot summer in a particular region is not a certain indication of climate change. However, a series of severe droughts or hot summers that statistically alter the trend in average precipitation or temperature over decades may indicate climate change. Recent research has begun to attribute certain extreme weather events to climate change (U.S. Global Change Research Program [USGCRP], 2018).

The leading U.S. scientific body on climate change is the USGCRP, composed of representatives from 13 federal departments and agencies.[50] The Global Change Research Act of 1990 requires the USGCRP to submit a report to the President and Congress no less than every 4 years that "1) integrates, evaluates, and interprets the findings of the USGCRP; 2) analyzes the effects of global change on the natural environment, agriculture, energy production and use, land and water resources, transportation, human health and welfare, human social systems, and biological diversity; and 3) analyzes current trends in global change, both human-induced and natural, and projects major trends for the subsequent 25 to 100 years." These reports describe the state of the science relating to climate change and the effects of climate change on different regions of the United States on various societal and environmental sectors, such as water resources, agriculture, energy use, and human health.

In 2017 and 2018, the USGCRP issued its *Climate Science Special Report: Fourth National Climate Assessment*, Volumes I and II (Fourth Assessment Report) (USGCRP, 2017; and USGCRP, 2018, respectively). The Fourth Assessment Report states that climate change has resulted in a wide range of impacts across every region of the country. Those impacts extend beyond atmospheric climate change alone and include changes to water resources, transportation, agriculture, ecosystems, and human health. The U.S. and the world are warming; global sea level is rising and acidifying; and certain weather events are becoming more frequent and more severe. These changes are driven by accumulation of GHG in the atmosphere through combustion of fossil fuels (coal,

---

50    The USGCRP member agencies are: Department of Agriculture, Department of Commerce, Department of Defense, Department of Energy, Department of Health and Human Services, Department of the Interior, Department of State, Department of Transportation, Environmental Protection Agency, National Aeronautics and Space Administration, National Science Foundation, Smithsonian Institution, and U.S. Agency for International Development.

AR 004858

petroleum, and natural gas), combined with agriculture, clearing of forests, and natural sources. These impacts have accelerated throughout the end of the 20th and into the 21st century (USGCRP, 2018). The FEIS discussed the existing and estimated future climate change impacts in the Mountain Valley Pipeline Project area.

GHGs were identified by the EPA as pollutants in the context of climate change. GHG emissions do not result in proportional local and immediate impacts; it is the combined concentration in the atmosphere that affects the global climate system. These are fundamentally global impacts that feedback to local and regional climate change impacts. Thus, the geographic scope for cumulative analysis of GHG emissions is global, rather than local or regional. For example, a project 1 mile away emitting 1 ton of GHGs would contribute to climate change in a similar manner as a project 2,000 miles distant also emitting 1 ton of GHGs.

Climate change is a global phenomenon; however, for this analysis we will focus on the existing and potential climate change impacts in the general Amendment Project area. The USGCRP's Fourth Assessment Report notes the following observations of environmental impacts are attributed to climate change in the Northeast and Southeast regions of the United States[51] (USGCRP, 2017; USGCRP, 2018):

Northeast

- increases in annual average temperatures across the Northeast range from less than 1 °F (0.6 °C) in West Virginia to about 3 °F (1.7 °C) or more in New England since 1901;

- from 1958 to 2016, the Northeast experienced a 55 percent increase in the amount of precipitation falling in heavy events (the greatest increase in the nation) and 5 to 20 percent increase in average winter precipitation;

- warming during the winter–spring transition has led to earlier snowmelt-related runoff in areas of the Northeast with substantial snowpack; and

- ocean and coastal ecosystems are being affected by large changes in a variety of climate-related environmental conditions.

Southeast

- The decade of 2010 through 2017 has been warmer than any previous decade since 1920 for average daily maximum and average daily minimum temperature;

---

[51]    West Virginia is located in the Northeast region, while Virginia is located in the Southeast.

AR  004859

- since 1960, there have been lower numbers of days above 95°F compared to the pre-1960 period but during the 2010's the number of nights above 75°F has been nearly double the average over 1901 – 1960.  The length of the freeze free season was 1.5 weeks longer on average in the 2010s compared to any other historical period on record;

- number of days with 3 or more inches of rain has been historically high over the past 25 years.  The 1990s, 2000s and 2010s rank first, third and second, respectively in number of events; and

- summers have been either increasingly dry or extremely wet, depending on location.

The USGCRP's Fourth Assessment Report notes the following projections of climate change impacts in the Project region (Northeast and Southeast US) with high or very high level of confidence[52] (USGCRP, 2018):

Northeast

- precipitation in the Northeast is projected to be about 1 inch greater for December through April by end of century (2070–2100) under the higher scenario;

- temperatures are projected to increase by 5.1°F by the 2090s under the worst case scenario (continually increasing emissions) and would increase by 4.0°F if emissions were decreased;

- by the middle of the century, the freeze-free period across much of the Northeast is expected to lengthen by as much as two weeks under the lower scenario and by two to three weeks under the higher scenario.  By the end of the century, the freeze-free period is expected to increase by at least three weeks over most of the region;

- higher than average sea level rise along the Northeastern coast will occur due to land subsidence; and

---

52    The report authors assessed current scientific understanding of climate change based on available scientific literature.  Each "Key Finding" listed in the report is accompanied by a confidence statement indicating the consistency of evidence or the consistency of model projections.  A high level of confidence results from "moderate evidence (several sources, some consistency, methods vary and/or documentation limited, etc.), medium consensus."  A very high level of confidence results from "strong evidence (established theory, multiple sources, consistent results, well documented and accepted methods, etc.), high consensus." https://science2017.globalchange.gov/chapter/front-matter-guide.

AR  004860

- much of the infrastructure in the Northeast, including drainage and sewer systems, flood and storm protection assets, transportation systems, and power supply, is nearing the end of its planned life expectancy; climate-related disruptions will only exacerbate existing issues with aging infrastructure.

Southeast

- climate models project nighttime temperatures above 75°F and daytime maximum temperatures above 95°F will become the summer norm.  Nights above 80°F and days above 100°F, which are now relatively rare, would become common;

- lowland coastal areas are expected to receive less rainfall on average but experience more frequent intense rainfall events followed by longer drought periods; and

- tropical storms and hurricanes may become more intense.

It should be noted that while the impacts described above taken individually may be manageable for certain communities, the impacts of compound extreme events (such as simultaneous heat and drought, or flooding associated with high precipitation on top of saturated soils) can be greater than the sum of the parts (USGCRP, 2018).

The GHG emissions associated with construction of the Amendment Project were identified and quantified in section B.6.1.2 above.  The change from open-cut dry to trenchless crossings would result in increases in GHG emissions during construction equaling approximately  14,626.02 tons (13,268.5 metric tons) of $CO_2e$.  This amount of emissions from construction  of the Amendment Project would increase the atmospheric concentration of GHGs in combination  with past, current, and future emissions  from other sources  globally  and contribute incrementally to future climate change impacts.  In order to assess impacts on climate change associated with the Project, Commission staff considered whether it could identify discrete physical impacts resulting from the Amendment Project's GHG emissions or compare the Amendment Project's GHG emission to established targets designed to combat climate change.

To date, staff has not identified a methodology to attribute discrete, quantifiable, physical effects on the environment to the Amendment Project's incremental contribution to GHGs.  We have looked at atmospheric modeling used by the EPA, National Aeronautics and Space Administration, the Intergovernmental Panel on Climate Change, and others, and we found that these models are not reasonable for Project-level analysis for a number of reasons.  For example, these global models are not suited to determine the incremental impact of individual projects, due to both scale and overwhelming complexity.  We also reviewed simpler models and mathematical techniques to determine

AR  004861

global physical effects caused by GHG emissions, such as increases in global atmospheric $CO_2$ concentrations, atmospheric forcing, or ocean $CO_2$ absorption.  We could not identify a reliable, less complex model for this task and thus staff could not determine specific localized or regional physical impacts from GHG emissions from the Amendment Project.  Without the ability to determine discrete resource impacts, Commission staff are unable to assess the Amendment Project's contribution to climate change through any objective analysis of physical impact attributable to the Amendment Project.

Additionally, Commission staff have not been able to find an established threshold for determining the Amendment Project's significance when compared to established GHG reduction targets at the state or federal level.  We note that there have been a series of recent administrative changes and we continue to evaluate their impact on our review process.  For example, on January 20, 2021, President Biden issued the *Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis* (EO 13990) and on January 27, 2021, the *Executive Order on Tackling the Climate Crisis at Home and Abroad* (EO 14008).  Amongst other objectives, the Executive Orders call for a net-zero emission economy and a carbon-free electricity sector.  In addition, on January 20, 2021, President Biden announced that the U.S. will rejoin the Paris Climate Agreement (Agreement), enabling the U.S. to be a party to the Agreement on February 19, 2021.  The Agreement aims to limit global warming to well below 2 degrees Celsius, and preferably to 1.5 degrees Celsius, compared to pre-industrial levels.[53]  On April 20, 2021, the U.S. proposed establishing a U.S. economy-wide target of reducing net GHG emissions by 50-52 percent below 2005 levels by 2030.[54]  In 2020, Virginia enacted legislation establishing as an energy policy objective creating reduction goals necessary to achieve a statutory target of net-zero GHGs across economic sectors by 2045 (NCSL, 2021).  West Virginia currently does not have GHG emissions reduction targets.

In order to provide context of the Amendment Project emissions on a national level, we compare the Amendment Project's construction GHG emissions to the total GHG emissions of the United States as a whole.  At a national level, 5,769.1 million

---

[53]    Additional information is available at https://unfccc.int/process-and-meetings/the-paris-agreement/the-paris-agreement. Accessed May 19, 2021.

[54]    The United States of America Nationally Determined Contribution (Apr. 20, 2021).  Available at https://www4.unfccc.int/sites/ndcstaging/PublishedDocuments/United%20States%20of%20America%20First/United%20States%20NDC%20April%2021%202021%20Final.pdf.

AR 004862

metric tons of $CO_2e$ were emitted in 2019 (inclusive of $CO_2e$ sources and sinks).[55] The construction-related emissions of this Project could potentially increase $CO_2e$ emissions based on the 2019 national levels by 0.0002 percent.

In order to provide context of the Amendment Project emissions on a state level, we compare the Amendment Project's construction GHG emissions to the state GHG inventories. At the state level, energy related $CO_2$ emissions in 2018 were 90.0 million metric tons in West Virginia, and 107.8 million metric tons in Virginia.[56] Construction emissions from the Amendment Project could potentially increase $CO_2e$ emissions based on the West Virginia 2018 levels by 0.0069 percent. Construction related emissions from the Amendment Project could potentially increase $CO_2e$ emissions based on the Virginia 2018 levels by 0.0066 percent.

Based on our analysis in this EA, we are unable to assess the Amendment Project's contribution to climate change through any objective analysis of physical impacts attributable to the Amendment Project or an established threshold when compared to state or federal GHG reduction targets. However, in a recent order, the Commission considered a project emitting a total of 20,006 metric tons of $CO_2e$ during construction and operation and determined the project's contribution to climate change would not be significant.[57] The Amendment Project's emissions would be less (13,268.5 metric tons $CO_2e$) than the emissions in that proceeding and fall below the level that the Commission has previously determined would not be significant.

## 6.2    Noise

The noise environment can be affected both during construction and operation of a project. The magnitude and frequency of environmental noise may vary considerably over the course of the day, throughout the week, and across seasons, in part due to changing weather conditions and the effects of seasonal vegetative cover. For the Amendment Project, there would be no additional permanent (operational) noise that would result from the change in pipeline installation methods.

---

55    U.S. Environmental Protection Agency, *Inventory of U.S. Greenhouse Gas Emissions and Sinks 1990-2019* at ES-9 (Table ES-2) (2021). Available at https://www.epa.gov/sites/production/files/2021-04/documents/us-ghg-inventory-2021-main-text.pdf. Accessed June 2021.

56    U.S. Energy Information Administration, *Table 1, State Energy-Related Carbon Dioxide Emissions by Year, Unadjusted: West Virginia and Virginia*. Available at https://www.eia.gov/environment/emissions/state/. Accessed July 2021.

57    See Northern Natural Gas Company, 174 FERC ¶ 61,189, at P 29 (2021).

AR 004863

### 6.2.1   Noise Characteristics and Regulations

Decibels (dB) are the units of measurement used to quantify the intensity of noise. To account for the human ear's sensitivity to low level noises the dB values are corrected to weighted values known as dB on the A-weighted scale (dBA).  The A-weighting scale was developed and has been shown to provide a good correlation with the human response to sound and is the most widely used descriptor for community noise assessments.  The faintest sound that can be heard by a healthy ear is about 0 dBA, while an uncomfortably loud sound is about 120 dBA.  A 3 dBA change of sound level is considered to be barely perceivable by the human ear, a 5 or 6 dBA change of sound level is considered noticeable, and a 10 dBA increase is perceived as if the sound intensity has doubled.

Two measures used by the FERC relate the time-varying quality of environmental noise with its known effect on people are the equivalent continuous sound level ($L_{eq}$) and the day-night average sound level ($L_{dn}$).  The preferred single value figure to describe sound levels that vary over time is $L_{eq}$, which is defined as the sound pressure level of a noise fluctuating over a period of time, expressed as the amount of average energy.  $L_{dn}$ is defined as the 24-hour average of the equivalent average of the sound levels during the daytime ($L_d$ – from 7:00 a.m. to 10:00 p.m.) and the equivalent average of the sound levels during the nighttime ($L_n$ – 10:00 p.m. to 7:00 a.m.).  Specifically, in the calculation of the $L_{dn}$, late night and early morning (10:00 p.m. to 7:00 a.m.) noise exposures are increased by 10 dB to account for people's greater sensitivity to sound during nighttime hours.  In general, if the sound energy does not vary over the given time period, the $L_{dn}$ level will be equal to the $L_{eq}$ level plus 6.4 dB.  The 6.4 dB difference between the $L_{dn}$ and the $L_{eq}$ is a result of the 10 dB nighttime addition for the $L_{dn}$ calculation.

The EPA has indicated that an $L_{dn}$ of 55 dBA protects the public from outdoor activity interference.  We have adopted this criterion and use it to evaluate the potential noise impacts from construction and operation of projects.

The FERC guidelines require that the sound attributable to new or modified compressor equipment, or LNG-related equipment not exceed an $L_{dn}$ of 55 dBA at any nearby noise sensitive area (NSA) such as a residence, hospital, place of worship, etc.  Also, a sound level of 55 dBA ($L_{dn}$) can be used as a benchmark sound criterion or guideline for assessing the noise impact of other sources of noise, such as certain construction noise, including drilling or boring noise.  As a result of the nighttime penalty, a constant sound level at 48.6 dBA $L_{eq}/L_n$ for 24-hours will result in an $L_{dn}$ of 55 dBA.  We have not identified any state or local regulations or ordinances as being potentially applicable to the proposed Amendment Project.

AR  004864

### 6.2.2   Noise Impacts

The Amendment Project will have two distinct phases of construction that would generate high levels of noise:  1) excavation of entry and exit bore pits; and 2) active boring.  Noise from backfilling would be similar to excavation, although it would be for a much shorter duration.  The bore pits and adjacent upland trench tie-in locations would be backfilled at the same time.  In terms of the total volume of spoil material subject to movement by construction equipment, bore pit backfilling would be similar to the amount that was previously analyzed for open-cut dry crossings.

Mountain Valley proposes to use trenchless crossing methods at 120 locations along the pipeline route.  Most locations would involve conventional boring, which would occur in daily shifts that would typically last about 12 hours.  Consequently, noise impacts would occur during the day for these crossings and would not differ significantly from those previously analyzed in the FEIS.  However, Mountain Valley expects that the two guided conventional bores, the Direct Pipe® bore, the three conventional bores associated with railroad crossings, and the two microtunnel crossings of the Roanoke and Gauley Rivers would include 24-hour boring operations.[58]  As discussed in section A of this EA, nighttime microtunneling is necessary to minimize opportunities for the bore hole to settle around the drill pipe, which would require additional energy to restart boring, or for the bore machine to become stuck.  Crossings E-012, H-016,[59] and H-020 would cross railroads operated by CSX, Roanoke Valley Resource Authority, and Norfolk Southern, respectively.  The owners of these railroads require boring operations to progress on a 24-hour basis, without stopping, until complete.

Mountain Valley conducted construction noise assessments for the two guided conventional bores, the Direct Pipe® crossing, the three conventional bores associated with railroad crossings, and the two microtunnel bores.  A noise model was developed using the Cadna/A version 2020 MR 1 noise model (noise model).  The noise model used bore equipment specified by Mountain Valley for each trenchless crossing type and

---

58    Commission staff authorized Mountain Valley to change the crossing method of the Gauley and Roanoke Rivers to a microtunnel under variances D-35 and H-21, respectively.

59    According to Mountain Valley, the railroad at H-016 is owned by Roanoke Valley Resource Authority and operated under contract with Norfolk Southern.  This railroad provides rail service to the Smith Gap Landfill.  Mountain Valley's current permit requires a bored crossing and 24-hour boring operations.  Roanoke Valley Resource Authority is currently paving over the railroad tracks.  As of July 29, 2021 a base layer of asphalt has been installed.  Mountain Valley is currently working with the Roanoke Valley Resource Authority to modify its permit to eliminate 24-hour boring.

AR  004865

construction phase and estimated bore pit size and depth. The model assumed that only boring equipment would be located inside the bore pit for each of the sites and that all other equipment would be arranged at grade surrounding the pit. Additionally, a boring noise model was developed for the analyses using U.S. Federal Highway Administration (FHWA) Roadway Construction Noise Model (RCNM) noise data for the expected construction equipment that would be used during boring. Mountain Valley used the noise model to predict the boring sound level contribution at the NSAs. To be conservative, foliage was not included in the model. Mountain Valley provided noise levels at a specific distance of 500 feet from the bore pits.

As noted elsewhere, excavation activities would be limited to daytime hours only, so Mountain Valley only assessed nighttime noise levels associated with the proposed nighttime boring activities. Where nighttime noise is predicted to exceed the Commission's noise threshold, Mountain Valley commits to physical and operational mitigation measures that would decrease noise levels below the Commission's threshold. Mountain Valley would coordinate with affected and adjacent landowners regarding boring plans and nighttime boring activities. The results of the modeling for each of the eight modeled locations where nighttime activities would occur are summarized below. Best estimates were used for the duration of construction activities; however, site-specific conditions could require the use of longer durations for completing construction.

<u>Little Stony Creek Guided Conventional Boring Site</u>

The Little Stony Creek site would be located at MP 204.2 along the Mountain Valley Pipeline route (crossing number G-013). Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 30 days total. Boring operations would run 24 hours per day for a total of 3 days.

Predicted sound levels during the 3 nights of boring operations would exceed 48.6 dBA $L_{eq}$, however, with mitigation, the predicted nighttime sound levels during boring operations would be lower than 48.6 dBA $L_{eq}$ for all NSAs, and less than 55 dBA $L_{eq}$ for daytime activities. In order to lower nighttime sound levels, Mountain Valley would install barriers around the conventional boring equipment, ranging in height from 24 feet for the southern barrier to 26 feet for the northern barrier. Additionally, Mountain Valley would house welding rigs, trash pumps, and slurry pumps within three-sided enclosures with a roof. The open side of all enclosures would face west along the pipeline corridor. Additionally, Mountain Valley would only operate one excavator at night, which would assist with the guided conventional boring process, including lowering pipe sections into the bore pit. With these mitigations in place, the noise model predicts that sound levels at

AR 004866

Little Stony Creek would be lower than 48.6 dBA $L_{eq}$ during nighttime boring operations at all surrounding NSAs (see figure 1).



**Figure 1       Predicted 48.6 dBA $L_n$ Contour for the Mitigated Little Stony Creek Conventional Boring Site**

Elk River Guided Conventional Boring Site

The Elk River site would be located at MP 87.3 along the Mountain Valley Pipeline route (crossing number C-022).  Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 44 days total.  Boring operations would run 24 hours per day for a total of 35 days.

Predicted sound levels during all boring activities would be lower than 48.6 dBA $L_{eq}$ at all NSAs; therefore, mitigation would not be required (see figure 2).

AR  004867



**Figure 2      Predicted 48.6 dBA L$_n$ Contour for the Elk River Guided Conventional Bore Crossing**

<u>Greenbrier River Direct Pipe® Boring Site</u>

The Greenbrier River site would be located at MP 171.4 along the Mountain Valley Pipeline route (crossing number F-021).  Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 62 days total.  Boring operations would run 24 hours per day for a total of 41 days

Predicted sound levels during boring operations would exceed 48.6 dBA L$_{eq}$, however, with mitigation, the predicted sound levels during boring operations would be lower than 48.6 dBA L$_{eq}$ for all NSAs.  Mountain Valley would install a 24-foot-tall U-shaped noise barrier along the northwest, northeast, and southeast sides of the work area. Additionally, Mountain Valley would house welding rigs, trash pumps, and slurry pumps within three-sided enclosures with a roof.  The open side of all enclosures would face southwest along the pipeline corridor.  With this mitigation in place, the noise model predicts that sound levels at the Greenbrier River would be lower than 48.6 dBA L$_{eq}$ during nighttime boring operations at all surrounding NSAs (see figure 3).

AR  004868



**Figure 3      Predicted Mitigated 48.6 dBA $L_n$ Contour for the Greenbrier River Direct Pipe® Crossing**

E-012 Railroad Conventional Bore Crossing Site

The E-012 railroad conventional bore crossing would be located at MP 140.4 along the Mountain Valley Pipeline route (crossing number E-012).  Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 8 days total.  Boring operations would run 24 hours per day for a total of 9 days.

Predicted sound levels during all conventional boring would be lower than 48.6 dBA $L_{eq}$ at all surrounding NSAs therefore, mitigation is not required (see figure 4).

AR 004869



**Figure 4        Predicted 48.6 dBA L_n Contour for the E-012 Railroad Crossing**

<u>H-016 Railroad Conventional Bore Crossing Site</u>

The H-016 site is located at MP 230.8 along the Mountain Valley Pipeline route. Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 21 days.  Boring operations would run 24 hours per day for a total of 10 days.

Predicted sound levels during the 10 nights of nighttime boring operations would exceed 48.6 dBA $L_{eq}$, however, with mitigation, the predicted sound levels during all operations would be lower than 48.6 dBA $L_{eq}$ for all NSAs.  Mountain Valley would install two 24-foot-tall barriers on the north side of the work area and on the south/southwest side.  Additionally, Mountain Valley would house welding rigs, trash pumps, and slurry pumps within three-sided enclosures with a roof.  The open side of all enclosures would face east along the pipeline corridor.  With this mitigation in place, the noise model predicts that sound levels at the H-016 railroad site would be lower than 48.6 dBA $L_{eq}$ during nighttime boring operations at all surrounding NSAs (see figure 5).

AR  004870



**Figure 5      Predicted Mitigated 48.6 dBA L$_n$ Contour for the H-016 Railroad Guided Conventional Bore Crossing Site**

<u>H-020 Railroad Conventional Bore Crossing Site</u>

The H-020 railroad crossing site would be located at MP 235.5 along the Mountain Valley Pipeline route.  Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 36 days.  Boring operations would run 24 hours per day for a total of 3 days.

The H-020 railroad conventional bore work areas would be located next to a four-lane divided highway and two double track railroad corridors.  Accordingly, the background sound levels in the area are typically higher than 55 dBA Ldn due to noise from these nearby transportation sources.  Mountain Valley estimated background noise levels due to traffic and railroad noise at the NSAs surrounding the H-020 railroad crossing using the U.S. Department of Housing and Urban Development (HUD) Day/Night Noise Level (DNL) Calculator.  The HUD DNL Calculator is a nationally standardized method used to estimate environmental noise from railroads and highways for housing projects.  Based on a site evaluation at the H-020 railroad crossing, Mountain

AR  004871

Valley determined that traffic and railroad noise would be the prominent ambient sound sources at the NSAs for this crossing. As a result, the HUD DNL Calculator is appropriate for estimating the ambient sound levels at the closest NSAs to the bore site. The estimated existing background sound levels are above 55 dBA $L_{dn}$ or 48.6 dBA $L_{eq}$ at all NSAs.

Because the background sound levels at all NSAs exceed 55 dBA $L_{dn}$, the FERC guidance recommends that noise mitigation be implemented to reduce noise levels to no more than 10 dB over background levels. Predicted sound levels during construction operations would be less than a 10 dB increase at nighttime at all NSAs, therefore, no mitigation would be needed (see figure 6).



**Figure 6      Predicted Unmitigated 48.6 dBA $L_n$ Contour for the H-020 Railroad Guided Conventional Bore Crossing**

<u>Roanoke River Microtunnel Boring Site</u>

The Roanoke River microtunnel site is located at MP 235.4 along the Mountain Valley Pipeline route. Commission staff already authorized Mountain Valley to change

AR  004872

the crossing method of the Roanoke River to a microtunnel under variance H-21. As part of the Amendment Project, Mountain Valley proposes to conduct nighttime microtunneling activities at the Roanoke River. Therefore, a discussion of the Roanoke River crossing has been included in this EA in order to address impacts from 24-hour microtunneling activities and at the request of the COE because it is a Section 10 stream. Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 33 days. Boring operations would run 24 hours per day for a total of 90 days.

The Roanoke River microtunnel crossing work areas are located next to a four-lane divided highway and two double track railroad corridors. Accordingly, the background sound levels in the area are typically higher than 55 dBA $L_{dn}$ due to noise from these nearby transportation sources. Mountain Valley estimated background noise levels due to traffic and railroad noise at the NSAs surrounding the river crossing using the HUD DNL Calculator. Based on a site evaluation at the Roanoke River crossing, Mountain Valley determined that traffic and railroad noise would be the prominent ambient sound sources at the NSAs for this crossing and that the HUD DNL Calculator was appropriate for assessing ambient sound levels at the closest NSAs to the bore sites. The estimated existing background sound levels are above 55 dBA $L_{dn}$ or 48.6 dBA $L_{eq}$ at all NSAs.

Because the background sound levels at all NSAs exceed 55 dBA $L_{dn}$, FERC guidance recommends that noise mitigation be implemented to reduce noise levels to no more than 10 dB over background. Predicted sound levels during construction operations would be less than a 10 dB increase at nighttime at all NSAs, therefore, no mitigation would be needed (see figure 7).

AR  004873



**Figure 7**    **Predicted Unmitigated 48.6 dBA L$_n$ Contour for the Roanoke River Microtunnel Crossing**

<u>Gauley River Microtunnel Boring Site</u>

The Gauley River microtunnel site is located at MP 118.9 along the Mountain Valley Pipeline route.  Commission staff authorized Mountain Valley to change the crossing method of the Gauley River to a microtunnel under variance D-35.  As part of the Amendment Project, Mountain Valley proposes to conduct nighttime microtunneling activities at the Gauley River.  Therefore, a discussion of the Gauley River crossing has been included in this EA in order to address impacts from 24-hour microtunneling activities and at the request of the COE because it is a Section 10 stream.  Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 28 days.  Boring operations would run 24 hours per day for a total of 90 days.

Predicted sound levels during boring operations would be below 48.6 dBA L$_{eq}$ with the exception of NSA C (a regularly unoccupied hunting cabin) and therefore, noise mitigation would not be required during boring operations (see figure B.6–8).

AR 004874



**Figure 8    Predicted Unmitigated 48.6 dBA $L_n$ Contour for the Gauley River Microtunnel Crossing**

As discussed in section B.2.2, bore pit dewatering would be required to provide for a dry workspace at all trenchless crossing locations.  Dewatering would be conducted in accordance with all existing plans and procedures reviewed and approved for the Mountain Valley Pipeline Project.  In some instances, pumping may require 24-hour operation to keep up with water infiltration and ensure personnel are able to enter the bore pits safely and efficiently when beginning bore activities each day.  Bore pit dewatering pumps would generate noise.

The trenchless crossing activities proposed in the Amendment Project would be temporary and would not result in a change to the operational noise of the Mountain Valley Pipeline Project as compared to that discussed in the FEIS.  However, the bore activities would be stationary and would take place over several days to several months, and thus may impact NSAs for a longer period than the formerly proposed open-cut dry construction at the same locations.

AR  004875

Mountain Valley has committed to coordinate with directly affected and adjacent landowners regarding trenchless crossing plans. However, because noise impacts could extend farther than directly affected and adjacent landowners, **we recommend that:**

- **Prior to commencing any nighttime construction activities associated with the eight trenchless crossing locations where nighttime construction is proposed, Mountain Valley should notify all landowners within 0.5 mile of nighttime (7:00 pm to 7:00 am) trenchless crossing activities (boring and pipe welding) prior to the start of these activities. Mountain Valley should confirm its compliance with the required notification in its construction status reports.**

Nighttime noise from construction of the Amendment Project could include activities such as bore pit excavation/backfill, active boring, and dewatering (as needed). Each of these individually or cumulatively could result in nighttime noise impacts on nearby NSAs. However, to confirm that the noise from the nighttime construction would not exceed our noise criterion, **we recommend that:**

- **During any nighttime construction activities associated with the trenchless crossings, Mountain Valley should monitor noise levels, document the noise levels in the weekly status reports, and restrict the noise attributable to nighttime construction activities associated with the trenchless crossings to no more than an $L_{dn}$ of 55 dBA, or no more than a 10 dB increase over background levels where existing noise levels exceed 55 dBA $L_{dn}$, at any NSAs.**

Because of the temporary nature of construction activities, and with Mountain Valley's proposed mitigation measures and our recommendation, we conclude that no significant noise impacts are anticipated from construction of the proposed Amendment Project.

## 7.0    Reliability and Safety

The transportation of natural gas by pipeline involves some risk to the public in the event of an accident and subsequent release of gas. The greatest hazard is a fire or explosion following a major pipeline rupture. Methane, the primary component of natural gas, is colorless, odorless, and tasteless. It is not toxic, but is classified as a simple asphyxiate, possessing a slight inhalation hazard. If breathed in high concentration, oxygen deficiency can result in serious injury or death.

The pipeline facilities associated with the Amendment Project must be designed, constructed, operated, and maintained in accordance with the DOT Minimum Federal Safety Standards in 49 CFR Part 192 and other applicable federal and state regulations.

AR 004876

The regulations are intended to ensure adequate protection for the public and to prevent natural gas facility accidents and failures.  The DOT pipeline standards are published in Parts 190-199 of Title 49 of the CFR.  For example, Part 192 of 49 CFR specifically addresses natural gas pipeline safety issues, prescribes the minimum standards for operating and maintaining pipeline facilities, and incorporates compressor station design, including emergency shutdowns and safety equipment.  Part 192 also requires a pipeline operator to establish a written emergency plan that includes procedures to minimize the hazards in a natural gas pipeline emergency.

The operator must also establish a continuing education program to enable customers, the public, government officials, and those engaged in excavation activities to recognize a gas pipeline emergency and report it to appropriate public officials.  As discussed in section 4.12.1 of the FEIS, Mountain Valley would provide the appropriate training to local emergency service personnel before the facilities are placed in service.

We received several comments concerning the integrity of the pipeline coating on portions of the pipeline that have been exposed to the elements.  As the Commission noted in its October 9, 2020 *Order Partially Lifting Stop Work Order and Allow Certain Construction to Proceed*, Mountain Valley has stated previously that the coating thickness on its stored pipes is above the manufacturer's recommendation, and the coating on each pipe segment is inspected for damage and thickness before the pipe is installed in the trench.  As discussed in section A.5 of this EA, we received comments concerning protection of the external coating of the pipe from damage during installation via trenchless crossing methods.  Mountain Valley states that pipe utilized at the trenchless crossings would have an ARO over the standard FBE coating used on all pipe.

Further, based on Commission staff's review of the FBE chalking analysis submitted by Mountain Valley and all other pertinent materials[60], we found no basis for supplementing the FEIS to analyze potential toxicity associated with FBE coating or including an analysis in this EA.

Mountain Valley's use of trenchless crossing methods in lieu of the certificated and typical open-cut dry techniques would offer the pipeline an equivalent level of protection.  We conclude there would be no increase in risk to the public.

---

60    Letters to the Virginia Department of Health, the VADEQ, and the North Carolina Department of Health and Human Services' for both the Mountain Valley Pipeline and the Atlantic Coast Pipeline regarding FBE coatings.  Accession numbers 20201008-3000 and 20201008-3001, October 8, 2020.

AR  004877

**SECTION C – ALTERNATIVES**

In accordance with NEPA and Commission policy, we consider and evaluate alternatives to the proposed action, including the no-action alternative. These alternatives are evaluated using a specific set of criteria. The evaluation criteria applied to each alternative include a determination whether the alternative:

- meets the objective of the proposed Amendment Project;

- is technically and economically feasible and practical; and

- offers a significant environmental advantage over the proposed Amendment Project.

Through environmental comparison and application of our professional judgment, each alternative is considered (in the sequence identified above) to a point where it becomes clear if the alternative could or could not meet the three evaluation criteria. An alternative that cannot achieve the purpose for the Amendment Project cannot be considered as an acceptable replacement for the Amendment Project.

Because the proposed action does not involve the siting and construction of new facilities, our alternatives analyses are limited to considering the no-action alternative and an assessment of alternative crossing techniques.

### 1.0    No-Action Alternative

The no-action alternative is a Commission decision to not authorize the proposal presented by the project proponent in its application. Selecting the no-action alternative means that the impacts resulting from the proposed action of the Amendment Project and disclosed in this EA would not occur, at the cost of not meeting the purpose, need, and goals of the proposed action. If the no-action alternative is selected, Mountain Valley would not be authorized to change the crossing technique from open-cut dry to conventional bore, guided conventional bore, or Direct Pipe® for the 120 trenchless crossings of 183 waterbodies and wetlands.[61] Further, Mountain Valley would not be

---

61   As part of the Amendment Project, Mountain Valley also requests that the Commission allow nighttime microtunneling activities at the Gauley River and Roanoke River. Commission staff previously authorized Mountain Valley to change the crossing method for the Gauley and Roanoke Rivers to a microtunnel technique as part of our variance process. If the no-action alternative is selected, then Mountain Valley would not be authorized to conduct 24-hour microtunneling activities at these locations. Additionally, the Certificate authorized Mountain Valley to utilize a conventional bore at the H-016 railroad crossing. If the no-action *cont'd*

AR 004878

authorized to implement a minor route adjustment at MP 230.8 to avoid waterbody S-OO11 or a minor alignment shift at MP 0.7 within the previously authorized workspace to avoid wetland W-A2a.  As a result of the Commission selecting the no-action alternative, Mountain Valley could conduct the crossings via open-cut dry crossing techniques following appropriate additional Federal approvals; modify and resubmit an application for a similar or different crossing technique(s); or not construct the crossings.  Given the status of construction of the Mountain Valley Pipeline Project (approximately 81 percent of the pipeline has been installed and backfilled), it is unlikely that Mountain Valley would choose to not complete the crossings.  Consequently, use of the already authorized open-cut dry crossing technique is the likeliest outcome of the Commission selecting the no-action alternative.

As discussed in sections A and B above, the conventional bore, guided conventional bore, and Direct Pipe® crossings would not change the overall footprint of the Mountain Valley Pipeline Project as all trenchless crossing activities, including the bore pit excavations and Direct Pipe® staging areas, would occur entirely within the Mountain Valley Pipeline Project's already certificated right-of-way.  The impacts of performing the open-cut dry crossings were discussed in the FEIS, which include temporary increases in sediments mobilized downstream due to in-stream impacts and the clearing and grading of stream banks and wetlands.  As indicated in the FEIS,[62] no long-term or significant impacts on surface waters are anticipated from open-cut crossings because Mountain Valley would:

- not permanently affect the designated water uses and would bury the pipeline beneath the bed of all waterbodies;

- implement erosion and sedimentation controls;

- adhere to crossing guidelines in its Procedures; and

- restore the streambanks and streambed contours as close as practical to pre-construction conditions.

For wetland impacts, the FEIS concludes[63] that while adverse and long-term impacts on wetlands would occur, with the implementation of best management practices (BMPs) and mitigation proposed by Mountain Valley, as well as our recommendations,

---

alternative is selected, then Mountain Valley would not be authorized to conduct nighttime conventional boring activities at this location.

62      FEIS at page 4-149.

63      FEIS at page 4-163.

AR  004879

impacts on wetlands would not be significant.  We maintain that these conclusions would apply should the no-action alternative be adopted.

However, as indicated in section B of this EA, the conventional bore, guided conventional bore, and Direct Pipe® crossing techniques would reduce environmental impacts on surface waterbodies, wetlands, and aquatic resources, as compared to the no-action alternative, because trenchless crossing methods do not result in impacts associated with constructing directly in waterbodies and wetlands, including increased turbidity and disruption to stream bank and wetland vegetation.  The conventional bore, guided conventional bore, and Direct Pipe® crossings would cause increases in air emissions and noise during the excavation and boring activities as compared to the no-action alternative; however, these impacts would be temporary and would persist for only the short duration required to complete the bores.

There would be no risk of inadvertent release of drilling fluids with the 117 conventional bores because the majority of those crossings would not require the use of drilling fluids and for those limited few that would require drilling fluids, the fluids would be of small volume and not pressurized.  Although there is a risk of inadvertent release of drilling fluids into waterbodies or wetlands with the guided conventional bore (two crossings) and Direct Pipe® (one crossing) methods, the risk is small and potential impacts would be reduced due to use of non-hazardous additives and down-hole pressure monitoring.  Further, the comparatively lower drilling pressures and smaller amounts of slurry needed compared to other trenchless crossing methods such as HDD, would also reduce the potential for impacts due to inadvertent releases from the guided conventional bores and the Direct Pipe®.

Neither the no-action alternative nor the proposed Amendment Project are anticipated to result in significant environmental impacts.  Therefore, we have determined that the no-action alternative would not offer a significant environmental advantage over the proposed Amendment Project.

## 2.0    Alternative Crossing Techniques

We received multiple comments concerning the selection of a trenchless crossing method for each waterbody and wetland crossing.  We also received comments noting that Mountain Valley previously rejected boring of waterbodies and wetlands as too costly and risky during the application process for the Mountain Valley Pipeline Project.

As mentioned previously, various legal, regulatory, and permitting challenges have prevented Mountain Valley from completing construction of the Mountain Valley Pipeline Project as previously certified.  As such, Mountain Valley reevaluated the

AR 004880

crossing method for all remaining crossings. As part of its Individual Permit application,[64] Mountain Valley provided an explanation, including cost information, for each crossing method determination.

Mountain Valley evaluated a total of eight alternative stream and wetland pipeline crossing methods. The crossing methods can be generally categorized as either open-cut methods—meaning that a trench is excavated in the stream or wetland to install the pipe—or trenchless methods—meaning the pipe is installed with specialized equipment that bores or tunnels under or bridges over the resource.

As previously indicated, other trenchless technologies, besides the conventional bore methodology, were selected for some streams. Mountain Valley indicated that a guided conventional bore was selected for the Elk River because there are large boulders within the crossing, the stream depth would reduce available workspace if the stream was diverted for a dry-ditch open-cut crossing, and a trenchless crossing would further minimize impacts on mussel species. A guided conventional bore was selected for Little Stony Creek and its tributaries because it would minimize impacts on the streams. Direct Pipe® technology was selected for the Greenbrier River because the stream depth would reduce available workspace if the stream was diverted for a dry-ditch open-cut crossing and a trenchless crossing would further minimize impacts on mussel species.

As discussed in section B.2.2, the Mountain Valley Pipeline Project would cross five Section 10 streams. All of these streams, except for the Blackwater River, would be crossed via a trenchless crossing method. We have included the following discussion in order to support the COE's review of the joint application for Section 10 regulated streams. At the Blackwater River crossing, Mountain Valley stated that site conditions do not provide adequate space to stockpile spoil from bore pits that would be almost 40-feet-deep. We reviewed the Blackwater River crossing location and confirmed that there may not be space for spoil storage within the limits of disturbance and the slope on one side of the stream may not be conducive to a trenchless crossing.

Although differences exist in the specific construction techniques and associated risks with each type of trenchless crossings, the avoidance of in-stream construction and its protective nature on the sensitive resources and associated riparian zones are generally the same. As such, we have determined the use of one trenchless crossing method does not offer a significant environmental advantage when compared to another trenchless

---

[64]     See MVP COE Individual Permit application (table 15) at accession number 20210304-5122.

AR 004881

crossing method.  As such, alternatives relating to the specific trenchless techniques proposed by Mountain Valley based on the screening criteria below were not considered.

## 2.1    Screening Criteria

The construction method proposed for each crossing in the Amendment Project was the result of a feasibility analysis conducted by Mountain Valley to compare trenchless methods, predominantly conventional and guided bores, with the previously approved open-cut crossing methods for the sensitive resources.  The factors evaluated include bore pit depths, the presence of steep slopes on one or both sides of the crossing, stream width and depth, the presence of karst terrain, other feasibility concerns, and workspace constraints such as the presence of existing utilities and infrastructure.  These factors are more fully described in Mountain Valley's Individual Permit application, and are summarized below.

### Bore Pit Depth

For each crossing, Mountain Valley determined the depth of the two bore pits that would be necessary to complete the crossing.  That determination accounted for the pipe installation depth below the stream or wetland, the steepness and length of the slopes on both sides of the crossing, and the difference in elevation between the launch and receiving bore pit.  Mountain Valley also evaluated the volume of material to be excavated against the available working area to determine the approximate available workspace.  As discussed below, the compounding effect of limited workspace for material storage and site access hindered by long and steep slopes requiring winching of materials, equipment, and trench spoils, was evaluated with respect to its impact on the overall construction time and costs, and potential safety concerns.

Deep bore pits require a greater workspace area for equipment and spoils from the excavations the sides of the bore pit would need to have one or a series of horizontal levels or steps (benching) to create a safe working environment for work crew and equipment.  Additionally, deeper bore pits can expose a greater thickness of saturated subsurface material below the water table necessitating additional dewatering to keep the bore pits dry for the duration of the drill.  If site conditions are acceptable, trenchless crossing methods are generally considered technically and logistically achievable for any crossing where adequate workspace for equipment and trench spoil storage is available.  However, technical and logistical challenges associated with deeper bore pits, along with the resultant additional construction timing and costs when weighed against traditional open-cut crossings, can make conventional bore crossings less practicable.

AR  004882

**Steep Slopes**

Mountain Valley evaluated each crossing to determine if the presence of steep slopes on one or both approaches to the stream or wetland would make trenchless crossing methods impracticable. That evaluation primarily accounted for two criteria: slope steepness and slope length. Slopes with grades generally in excess of 30 percent typically require winching of equipment to work safely on the slope. Winching can be utilized on shorter slopes to conduct many pipeline construction activities. As slope lengths increase, additional pieces of heavy machinery must be winched together and anchored to the top of the slope, in daisy-chain fashion down the hillside. Based on generally accepted standard industry construction practices and professional pipeline construction experience, operating the equipment necessary to excavate a bore pit on slopes that require winching presents additional complicating factors. In particular, operating excavation equipment on the edge of a bore pit while winched to multiple pieces of equipment presents a heightened safety risk to equipment operators and other crew members.

Similarly, moving and storing spoil piles on steep slopes presents an additional layer of logistical challenges, as well as compounding safety and environmental risks. If there was not sufficient workspace adjacent to a crossing to store excavated materials, Mountain Valley evaluated the logistics of hauling materials to a suitable location for staging. The use of daisy-chained winch tractors to haul excavation materials across steep slopes for long distances requires an increased quantity of equipment. For example, due to limitations in winch cable length, hauling a load of spoil across a steep slope more than 400 feet in length would require four pieces of heavy equipment – one to hold the load and three to winch in daisy-chained fashion. The site logistics of winching multiple pieces of equipment on a 75-foot to 125-foot right-of-way could render such an operation impracticable. This deployment of multiple pieces of equipment on a steep slope increases worker safety risk. In addition, hauling excavation spoils across a steep slope creates an environmental risk of dropping spoils down the slope and potentially off right-of-way.

Therefore, Mountain Valley considered excavating bore pits on steep slopes greater than 30 percent to be generally possible, but would introduce additional safety and environmental risk. However, the compounding effect of unavailable storage space for bore pit excavation materials, steep slopes, and long winch hills over 400 feet generally make a conventional bore crossing in these scenarios impracticable.

AR  004883

**Stream Depth**

Stream depth may be a limiting factor on the use of the dry-ditch open-cut method. The technical, logistical, and safety challenges for the dry-ditch open-cut crossing method increase with stream depth. Based on generally accepted standard industry construction practices, professional pipeline construction experience, and, most significantly, the limited workspace available for Project crossings, Mountain Valley concluded that it is not advisable and may not be practicable, in most cases, to use the dry-ditch open-cut crossing method for streams deeper than 36 inches.

A dry-ditch, open-cut crossing can be accomplished using dam and pump, flume pipe diversion, or cofferdam methods to dewater the stream for pipeline installation. With any of these methods, a dam structure is needed to keep the stream from flowing through the workspace. In order to reduce impacts, the construction right-of-way for stream crossings is reduced from the normal 125-foot-width to 75 feet. Thus, sufficient room for the dam, pump, and construction activities is limited. The dam must be at least as tall as the depth of the stream plus a minimum amount of freeboard to ensure safe working conditions. For deeper streams, such as those greater than 36 inches, the most common and commercially available type of dam utilized is a bladder dam. Based on manufacturer's specifications, a four-foot-tall dam can support a maximum water depth of 36 inches. The footprint and manufacturer recommended clearance for a dam this size is 22-feet-wide. In a non-cofferdam installation, the dam on the back side can usually be lower and constructed with sandbags and is estimated to occupy a 9-foot-wide footprint. After allowing for space for a pump and discharge structure, a 34-foot workspace remains within the reduced 75-foot-wide right-of-way to install the pipe. Assuming the pipe is installed a minimum of five-feet-deep, in type C soil conditions,[65] and performing installation with equipment from an adjacent bridge, this workspace is just sufficient to excavate a trench and lower in pipe. For water depths greater than 36 inches, a larger dam would be necessary, which increases the footprint and manufacturer recommended clearance—further intruding into the limited workspace available.

For these reasons, Mountain Valley concluded that the dry-ditch open-cut crossing method is not a practicable alternative for stream depths greater than three feet deep. Stream depth is not a relevant consideration for trenchless crossing methods as long as it

---

[65]    Type C soil is the least stable type of soil. Type C includes granular soils in which particles don't stick together and cohesive soils with a low unconfined compressive strength; 0.5 tons per square foot or less. United States Department of Labor – Occupational Health and Safety Administration Soil Classification Transcript. Accessed at: https://www.osha.gov/dts/vtools/construction/soil_testing_fnl_eng_web_transcript.html.

AR  004884

is feasible to excavate bore pits for conventional bores to the proper depth to allow for crossing under the stream.

**Karst**

Mature karst bedrock aquifers are characterized by conduit flow systems and rapid transit times for groundwater, which can introduce sediment and surface contamination at long distance over short time frames downgradient from a work area. Additionally, greater rates of pumping may be necessary in these aquifers to keep the bore pits dry for the duration of the bore. However, the risk of boring through karst can be mitigated through avoidance of subsurface karst features that can be identified using geophysical methods.

Work conducted in karst terrain is more easily identified in a dry-ditch open-cut crossing than in a bore. Preference is given to dry-ditch open-cut crossings through karst geology to the extent an open-cut crossing is practicable. However, when a trenchless crossing method is used through karst terrain, any potential karst voids are observable during the trenching process and therefore, immediate mitigation measures can be implemented.

## 2.2    Alternative Crossing Techniques Conclusion

We have reviewed Mountain Valley's feasibility analysis and agree that the trenchless crossing techniques selected for the Amendment Project waterbodies and wetlands are feasible and appropriate.

According to Mountain Valley:

- eight sites were chosen for a conventional bore because they were adjacent to already approved bores of railroads and/or roadways and only required increasing the length of the bores;

- another 35 sites were selected for a conventional bore crossing to avoid direct aquatic impacts on possible orangefin madtom habitat, Roanoke logperch habitat, and/or because the waterbody is considered a trout stream;

- one site was chosen as a conventional bore because it is a wide and deep river with high flow conditions;

- two sites were chosen as guided conventional bore because of large boulders, stream depth, and to avoid direct aquatic impacts on mussel species;

AR 004885

- one site was chosen as a Direct Pipe® due to stream depth and to avoid direct aquatic impacts on mussel species; and

- the remaining 73 conventional bore locations did not have a significant constraint regarding installation method or a significant environmental impact relevant to the available installation methods.

As such, we have determined that completing the 120 trenchless crossings of 183 waterbodies and wetlands by open-cut dry methods would not offer a significant environmental advantage over the proposed Amendment Project and do not recommend any alternatives to the proposed action.

Waterbodies and wetlands originally approved as open-cut dry crossings that remained open-cut dry crossings following the feasibility analysis were evaluated in the FEIS. As stated in the FEIS, open-cut dry crossing methods would appropriately minimize turbidity and sedimentation and no long-term or significant impacts on surface waters are anticipated as a result of the Mountain Valley Pipeline Project. The features designated for open-cut dry crossings are included in Mountain Valley's Individual Permit application currently under review by the COE.

## 3.0    Conclusion

After reviewing the alternatives to the proposed Amendment Project, we conclude that none of the alternatives would satisfy the evaluation criteria. In summary, we have determined that the proposed action, as modified by our recommended mitigation measures, is the preferred alternative to meet the Amendment Project's objectives.

AR 004886

## SECTION D – STAFF'S CONCLUSIONS AND RECOMMENDATIONS

Based on the analysis in this EA, we have determined that if Mountain Valley completes the waterbody and wetland crossings via trenchless crossing methods in accordance with its application and supplements, and the staff's recommended mitigation measures below, approval of the Amendment Project would not constitute a major federal action significantly affecting the quality of the human environment. As described in section B of this EA, the Amendment Project would result in less direct impacts on a number of resources than the action considered in the FEIS and authorized by the Certificate. The Amendment Project would lead to an increase in construction emissions and construction noise. While we conclude that impacts from the Amendment Project on emissions and noise would exceed those analyzed in the FEIS, we conclude that these temporary and short-term increases would not be significant. Therefore, we recommend that the Commission Order contain a finding of no significant impact and include the measures listed below as conditions in any authorization the Commission may issue to Mountain Valley. We also recommend that Mountain Valley continue to comply with applicable environmental conditions set forth in Appendix C of the Mountain Valley Pipeline Certificate Order.

1. Mountain Valley shall follow the construction procedures and mitigation measures described in its amendment application and supplements including responses to staff data requests and as identified in the environmental assessment, unless modified by the Order. Mountain Valley must:

    a. request any modification to these procedures, measures, or conditions in a filing with the Secretary;

    b. justify each modification relative to site-specific conditions;

    c. explain how that modification provides an equal or greater level of environmental protection than the original measure; and

    d. receive approval in writing from the Director of OEP, or the Director's designee, **before using that modification**.

2. The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction of the Amendment Project. This authority shall allow:

    a. the modification of conditions of the Order;

    b. stop-work authority; and

AR 004887

    c.  the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from Amendment Project construction.

3.    Mountain Valley shall continue to comply with environmental conditions set forth in Appendix C of the October 13, 2017 Order in Docket No. CP16-010-000.

4.    The authorized facility locations shall be as shown in the EA, as supplemented by filed alignment sheets. **As soon as they are available, and before the start of construction**, Mountain Valley shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the Order. All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

5.    Mountain Valley shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP, or the Director's designee, **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the Commission's Plan and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

    a.  implementation of cultural resources mitigation measures;

AR 004888

    b.  implementation of endangered, threatened, or special concern species mitigation measures;

    c.  recommendations by state regulatory authorities; and

    d.  agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.  **Within 60 days of the acceptance of the authorization and before construction of the Amendment Project begins**, Mountain Valley shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP, or the Director's designee.  Mountain Valley must file revisions to the plan as schedules change.  The plan shall identify:

    a.  how Mountain Valley will implement the construction procedures and mitigation measures described in its amendment application and supplements (including responses to staff data requests), identified in the EA, and required by the Order;

    b.  how Mountain Valley will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

    c.  the number of EIs assigned, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

    d.  company personnel, including EIs and contractors, who will receive copies of the appropriate material;

    e.  the location and dates of the environmental compliance training and instructions Mountain Valley will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change);

    f.  the company personnel (if known) and specific portion of Mountain Valley's organization having responsibility for compliance;

    g.  the procedures (including use of contract penalties) Mountain Valley will follow if noncompliance occurs; and

    h.  for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

        1.    the completion of all required surveys and reports;

        2.    the environmental compliance training of onsite personnel;

        3.    the start of construction; and

AR  004889

       4.      the start and completion of restoration.

7.    Mountain Valley must receive written authorization from the Director of OEP, or the Director's designee, **before commencing construction of any Amendment Project facilities**.  To obtain such authorization, Mountain Valley must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

8.    Mountain Valley shall **not commence construction activities** associated with the Amendment Project **until** Commission staff completes consultation with the U.S. Fish and Wildlife Service regarding potential impacts on federally listed species.

9.    **Prior to commencing any nighttime construction activities associated with the eight trenchless crossing locations where nighttime construction is proposed**, Mountain Valley shall notify all landowners within 0.5 mile of nighttime (7:00 pm to 7:00 am) trenchless crossing activities (boring and pipe welding) prior to the start of these activities.  Mountain Valley shall confirm its compliance with the required notification in its construction status reports.

10.   **During any nighttime construction activities associated with the trenchless crossings**, Mountain Valley shall monitor noise levels, document the noise levels in the weekly status reports, and restrict the noise attributable to nighttime construction activities associated with the trenchless crossings to no more than a day-night average sound level ($L_{dn}$) of 55 dBA, or no more than a 10 dB increase over background levels where existing noise levels exceed 55 dBA $L_{dn}$, at any noise sensitive areas.

AR  004890

## SECTION E – REFERENCES

Cooper, H.H., Jr. and Jacob, C.E.  1946.  A Generalized Graphical Method for Evaluating Formation Constants and Summarizing Well-Field History.  Eos, Transactions, American Geophysical Union, Volume 27, Number 4.

Driscoll, F.G.  1987.  Groundwater and Wells, Johnson Division Second Edition.

Dunnfield.  G.M.  2020.  Representative Values of Hydraulic Properties.  Aquifer Testing 101.  AQTESOLV Home Aquifer Testing 101, Hydraulic Properties.  Available at http://www.aqtesolv.com/aquifer-tests/aquifer_properties.htm.

Dye. H. et al.  2021a.  Desktop Review and Effects Analysis for the Mountain Valley Pipeline Amendment Project, West Virginia.  Tetra Tech, Pittsburgh.

Dye. H. et al.  2021b.  Desktop Review and Effects Analysis for the Mountain Valley Pipeline Amendment Project, Virginia.  Tetra Tech, Pittsburgh.

Kozar, M.D. and Mathes, Melvin V.  2001.  Aquifer-Characteristics Data for West Virginia.  United States Geological Survey Water Resource Investigation Report 01-4036.  Available at https://pubs.usgs.gov/wri/wri01-4036/pdf/aquifer_report.pdf.

Kozar, M.D. and Paybins, K.S.  2016.  Assessment of Hydrogeologic Terrains, Well-Construction Characteristics, Groundwater Hydraulics, and Water-Quality and Microbial Data for Determination of Surface-Water-Influenced Groundwater Supplies in West Virginia (ver. 1.1, October 2016):  U.S. Geological Survey Scientific Investigations Report 2016–5048, 55 p.  Available at http://dx.doi.org/10.3133/sir20165048.

National Conference of State Legislatures (NCSL).  2021.  Greenhouse Gas Emissions Reduction Targets and Market-based Policies, Virginia. 11 March.  Retrieved on 12 May 2021.  Available at https://www.ncsl.org/research/energy/greenhouse-gas-emissions-reduction-targets-and-market-based-policies.aspx.

National Oceanic and Atmospheric Administration (NOAA) National Centers for Environmental Information (NCEI).  Climate at a Glance:  County Time Series, published July 2021, retrieved on July 18, 2021.  Available at https://www.ncdc.noaa.gov/cag/.

AR 004891

North Carolina Division of Water Resources.  2021.  Simple Groundwater Modeling - Reverse Distance Drawdown Analysis.  Available at https://www.ncwater.org/?page=21.

Powers, J.P.  1981.  *Construction Dewatering, A Guide To Theory and Practice*.  John Wiley and Sons.

United Nations Framework Convention on Climate Change (UNFCCC).  2021.  The United States of America Nationally Determined Contribution, Reducing Greenhouse Gases in the United States:  A 2030 Emissions Target.  22 April.

U.S. Geological Survey (USGS).  2002.  Documentation of Spreadsheets for the Analysis of Aquifer-Test and Slug-Test Data.  United States Geological Survey Open File Report  OFR-02-197.  Available at https://pubs.usgs.gov/of/2002/ofr02197/spreadsheets.html.

USGS.  2020.  Groundwater Watch, Site Number 380653080155301 - Poc-0256.  Available at https://groundwaterwatch.usgs.gov/AWLSites.asp?S=380653080155301&ncd=.

U.S. Global Change Research Program (USGCRP).  2017:  Climate Science Special Report: Fourth National Climate Assessment, Volume I [Wuebbles, D.J., D.W. Fahey, K.A. Hibbard, D.J. Dokken, B.C. Stewart, and T.K. Maycock (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, 470 pp., doi: 10.7930/J0J964J6.

U.S. Global Change Research Program (USGCRP).  2018:  Impacts, Risks, and Adaptation in the United States:  Fourth National Climate Assessment, Volume II [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, 1515 pp. doi: 10.7930/NCA4.2018.

Walton, W.C.  1962.  Selected Analytical Methods for Well and Aquifer Evaluation.  Illinois State Water Survey, State of Illinois Department of Registration and Education Bulletin 49.  Available at https://www.isws.illinois.edu/pubdoc/B/ISWSB-49.pdf.

AR  004892

## SECTION F – LIST OF PREPARERS

**Federal Energy Regulatory Commission**

**Fink, Jennifer – Environmental Project Manager, Proposed Action, Land Use**
M.S., Environmental Policy, 2016, George Washington University
B.S., Environmental Science, 2010, University of Delaware

**Friedman, Paul – Cultural Resources**
M.A., History, 1980, University of California at Santa Barbara
B.A., Anthropology and History, 1976, University of California at Santa Barbara

**Jeudy, Harry –Environmental Engineer – Air Quality and Reliability & Safety**
B.S., Mechanical Engineering, 2000, The Pennsylvania State University

**Mardiney, Amanda –Fisheries, Vegetation, and Wildlife**
M.A., Environmental Resource Policy, 2012, George Washington University
B.S. Biology, 2009, University of Maryland, College Park

**Peconom, John – Surface Water Resources**
B.S., Environmental Biology and Management, 2000, University of California at Davis

**Rana, Tony – Geology, Soils, and Groundwater Resources**
M.S., International Development, 2012, Tulane University
B.S., Geology, 1984, New Jersey City University
Graduate Studies, Hydrogeology and Geochemistry, 1988, Oklahoma State University

**Tomasi, Eric – Air Quality, Noise**
B.S. Aerospace Engineering, 1994, Boston University

**Cardno, Inc.**

**DiSanto, Lavinia – Project Manager, Proposed Action**
B.A., Biological Sciences, University of Delaware, 1999

AR  004893

**Mooneyhan, Douglas – Deputy Project Manager, Geology, Soils, Water Resources, and Alternatives**

M.S., Biology, Tennessee Technological University, Cookeville, 1989

B.S., Wildlife & Fisheries Science, University of Tennessee, Knoxville, 1987

**Hamilton, Lesley – Air and Noise**

B.A., Chemistry, Mary Baldwin College, 1988

**Koonjebeharry, Amanda – Fisheries, Vegetation, Wildlife, and Land Use**

B.S., Zoology and Botany, University of the West Indies, 2000

> *Cardno, Inc. is a third party contractor assisting the Commission staff in reviewing the environmental aspects of the project application and preparing the environmental documents required by NEPA. Third party contractors are selected by Commission staff and funded by project applicants. Per the procedures in 40 CFR 1506.5(b)(4), third party contractors execute a disclosure statement specifying that they have no financial or other conflicting interest in the outcome of the project. Third party contractors are required to self-report any changes in financial situation and to refresh their disclosure statements annually. The Commission staff solely directs the scope, content, quality, and schedule of the contractor's work. The Commission staff independently evaluates the results of the third-party contractor's work and the Commission, through its staff, bears ultimate responsibility for full compliance with the requirements of NEPA.*

AR  004894

**Appendix A**

AR 004895

Appendix A

**Proposed Trenchless Crossings**

| Spread | State | County | Crossing Number | MP | Crossing Length (feet) | Waterbody or Wetland Crossed | Crossing Type |
|--------|-------|--------|-----------------|-----|------------------------|------------------------------|---------------|
| A | WV | Wetzel | A-008 | 6.41 | 85 | S-A120, S-A119, W-A34 | Conventional Bore |
| B | WV | Lewis | B-012 | 58.5 | 148 | W-H103, S-H160 | Conventional Bore |
| B | WV | Lewis | B-015A | 61.21 | 193 | S-CD16, W-CD17, S-VV13 | Conventional Bore |
| C | WV | Webster | C-013A | 81.6 | 124 | S-A100 | Conventional Bore |
| C | WV | Webster | C-018 | 82.28 | 92 | S-F40 | Conventional Bore |
| C | WV | Webster | C-022 | 87.33 | 296 | S-E68 | Guided Conventional Bore |
| C | WV | Webster | C-024 | 87.32 | 272 | S-H111, S-H114, S-H112 | Conventional Bore |
| C | WV | Webster | C-028 | 89.56 | 267 | S-H110 | Conventional Bore |
| C | WV | Webster | C-035 | 95.25 | 312 | W-H60, W-H61 | Conventional Bore |
| D | WV | Webster | D-004 | 106.35 | 59 | S-B32, W-B30 | Conventional Bore |
| D | WV | Nicholas | D-010 | 109.94 | 59 | S-E46 | Conventional Bore |
| D | WV | Nicholas | D-011 | 111 | 174 | W-F12, W-F13, W-F15 | Conventional Bore |
| D | WV | Nicholas | D-012 | 111.09 | 104 | S-F20, W-F11 | Conventional Bore |
| D | WV | Nicholas | D-019 | 113.11 | 47 | S-B28, W-B27 | Conventional Bore |
| D | WV | Nicholas | D-020 | 113.39 | 158 | W-FF6-PEM, W-FF6-PSS | Conventional Bore |
| D | WV | Nicholas | D-022 | 114.17 | 117 | S-J32 | Conventional Bore |

AR 004896

| Spread | State | County | Crossing Number | MP | Crossing Length (feet) | Waterbody or Wetland Crossed | Crossing Type |
|--------|-------|--------|-----------------|-----|------------------------|------------------------------|---------------|
| D | WV | Nicholas | D-028 | 114.95 | 92 | W-A14, S-A72, S-A71, S-A71-Braid | Conventional Bore |
| D | WV | Nicholas | D-034 | 116.69 | 40 | S-N15 | Conventional Bore |
| D | WV | Nicholas | D-035 | 117.02 | 44 | S-N14 | Conventional Bore |
| D | WV | Nicholas | D-036 | 117.1 | 73 | S-I43, W-I7 | Conventional Bore |
| D | WV | Nicholas | D-037 | 117.28 | 32 | S-I44 | Conventional Bore |
| D | WV | Nicholas | D-038 | 117.4 | 20 | S-I45 | Conventional Bore |
| D | WV | Nicholas | D-040 | 118.24 | 35 | S-148 | Conventional Bore |
| D | WV | Nicholas | D-041 | 118.9 | 367 | S-J29 (Gauley River) | Microtunnel **a/** |
| D | WV | Nicholas | D-048 | 122.55 | 30 | S-EE1 | Conventional Bore |
| E | WV | Nicholas | E-005 | 132.36 | 56 | S-V3 | Conventional Bore |
| E | WV | Greenbrier | E-009 | 136.7 | 223 | W-M18 | Conventional Bore |
| E | WV | Greenbrier | E-012 | 140.44 | 255 | S-J20 | Conventional Bore |
| E | WV | Greenbrier | E-015 | 141.17 | 41 | S-I27 | Conventional Bore |
| F | WV | Summers | F-014 | 169.76 | 106 | S-N3 | Conventional Bore |
| F | WV | Summers | F-015 | 169.78 | 48 | S-N2 | Conventional Bore |
| F | WV | Summers | F-016 | 169.81 | 128 | S-CD23 | Conventional Bore |
| F | WV | Summers | F-017 | 169.84 | 99 | S-N4, W-EF40 | Conventional Bore |
| F | WV | Summers | F-021 | 171.44 | 1,250 | S-18 | Direct Pipe® |
| F | WV | Summers | F-022 | 171.77 | 91 | S-I9 | Conventional Bore |
| F | WV | Summers | F-027 | 173.14 | 30 | S-J4 | Conventional Bore |
| F | WV | Monroe | F-032 | 184.08 | 32 | S-D25 | Conventional Bore |

A-2

AR 004897

| Spread | State | County | Crossing Number | MP | Crossing Length (feet) | Waterbody or Wetland Crossed | Crossing Type |
|--------|-------|--------|-----------------|-----|------------------------|------------------------------|---------------|
| F | WV | Monroe | F-039 | 190.03 | 83 | S-G43, W-MN1 | Conventional Bore |
| G | VA | Giles | G-009 | 203.59 | 139 | S-G35 | Conventional Bore |
| G | VA | Giles | G-010 | 203.71 | 30 | S-SS4 | Conventional Bore |
| G | VA | Giles | G-011 | 203.88 | 48 | S-Z9 | Conventional Bore |
| G | VA | Giles | G-012 | 204 | 47 | S-Z7, S-Z7-Braid-1 | Conventional Bore |
| G | VA | Giles | G-013 | 204.18 | 331 | S-Z10, S-Z11, S-Z12-EPH, W-Z3, S-Z13 | Guided Conventional Bore |
| G | VA | Giles | G-014 | 204.35 | 53 | S-Z14 | Conventional Bore |
| G | VA | Giles | G-017 | 206.59 | 246 | S-Y3, S-Y2 | Conventional Bore |
| G | VA | Giles | G-019B | 207.9 | 92 | S-E25-Downstream | Conventional Bore |
| G | VA | Giles | G-023 | 211.17 | 140 | S-NN17 | Conventional Bore |
| G | VA | Giles | G-024 | 213 | 133 | S-RR2, S-YZ6, W-RR1b | Conventional Bore |
| H | VA | Montgomery | H-009 | 229.48 | 40 | S-MM31 | Conventional Bore |
| H | VA | Montgomery | H-015 | 230.55 | 90 | S-C21 | Conventional Bore |
| H | VA | Montgomery | H-016 | 230.8 | 280 | None (Roanoke Valley Resource Authority Railroad) | Conventional Bore **b/** |
| H | VA | Montgomery | H-017 | 234.19 | 360 | S-OO16 | Conventional Bore |
| H | VA | Montgomery | H-019 | 235.4 | 316 | S-NN16 (Roanoke River) | Microtunnel **a/** |
| H | VA | Montgomery | H-020 | 235.53 | 280 | S-I1, S-AB16, W-AB7 | Conventional Bore |

A-3
JA2502

| Spread | State | County | Crossing Number | MP | Crossing Length (feet) | Waterbody or Wetland Crossed | Crossing Type |
|--------|-------|--------|-----------------|-----|------------------------|------------------------------|---------------|
| H | VA | Montgomery | H-021 | 235.9 | 38 | S-CD12b | Conventional Bore |
| H | VA | Montgomery | H-022 | 235.9 | 114 | W-KL58 | Conventional Bore |
| H | VA | Roanoke | H-030 | 241.93 | 73 | S-IJ82 | Conventional Bore |
| H | VA | Roanoke | H-031 | 242.06 | 362 | W-IJ94-PEM, W-IJ95-PSS, S-IJ83, S-IJ88, S-IJ84, W-IJ102 | Conventional Bore |
| H | VA | Roanoke | H-032 | 242.28 | 108 | S-IJ89, S-IJ90 | Conventional Bore |
| H | VA | Roanoke | H-040 | 243.6 | 179 | W-EF46, S-ST9b | Conventional Bore |
| H | VA | Roanoke | H-042 | 243.9 | 202 | W-KL49-PEM, W-KL51-PEM, S-KL55, W-KL51-PSS | Conventional Bore |
| H | VA | Roanoke | H-043 | 244.1 | 87 | W-MN7-PEM, S-IJ12 | Conventional Bore |
| H | VA | Roanoke | H-044 | 244.5 | 45 | S-EF44, W-EF44 | Conventional Bore |
| H | VA | Roanoke | H-045 | 244.7 | 282 | W-IJ36, S-IJ43 | Conventional Bore |
| H | VA | Roanoke | H-046 | 245.05 | 140 | S-Y7, W-Y2, S-Y8 | Conventional Bore |
| H | VA | Roanoke | H-047A | 245.64 | 64 | S-B22 | Conventional Bore |
| H | VA | Roanoke | H-048A | 245.8 | 253 | W-B25-PSS-2, S-B25 | Conventional Bore |
| H | VA | Franklin | H-054 | 248.81 | 81 | S-D11 | Conventional Bore |
| H | VA | Franklin | H-060 | 252.35 | 43 | S-RR08 | Conventional Bore |
| I | VA | Franklin | I-001A | 258.23 | 22 | S-GH3 | Conventional Bore |
| I | VA | Franklin | I-009 | 260.56 | 60 | S-RR15 | Conventional Bore |

AR 004899

| Spread | State | County | Crossing Number | MP | Crossing Length (feet) | Waterbody or Wetland Crossed | Crossing Type |
|---|---|---|---|---|---|---|---|
| I | VA | Franklin | I-014 | 262.09 | 62 | S-C17 | Conventional Bore |
| I | VA | Franklin | I-016 | 262.5 | 94 | W-CD6 | Conventional Bore |
| I | VA | Franklin | I-020 | 264.53 | 72 | S-KL35, W-EF48 | Conventional Bore |
| I | VA | Franklin | I-021 | 264.66 | 39 | S-KL36 | Conventional Bore |
| I | VA | Franklin | I-034 | 268.9 | 52 | S-C20 | Conventional Bore |
| I | VA | Franklin | I-038 | 270.19 | 47 | S-F10 | Conventional Bore |
| I | VA | Franklin | I-039 | 270.5 | 66 | S-F9a | Conventional Bore |
| I | VA | Franklin | I-040 | 270.65 | 53 | S-GG4 | Conventional Bore |
| I | VA | Franklin | I-042 | 271.39 | 78 | S-A38 | Conventional Bore |
| I | VA | Franklin | I-044A | 272.65 | 103 | S-GH36, S-KL17 | Conventional Bore |
| I | VA | Franklin | I-046 | 273.09 | 217 | S-GH44, S-GH38, S-IJ47, W-GH16 | Conventional Bore |
| I | VA | Franklin | I-048 | 274.37 | 62 | S-G20 | Conventional Bore |
| I | VA | Franklin | I-053 | 277.13 | 169 | S-H38, W-H17 | Conventional Bore |
| I | VA | Franklin | I-055 | 277.58 | 84 | S-H36, W-H16 | Conventional Bore |
| I | VA | Franklin | I-056 | 277.75 | 32 | S-H34 | Conventional Bore |
| I | VA | Franklin | I-057 | 277.96 | 46 | S-H32 | Conventional Bore |
| I | VA | Franklin | I-060B | 278.5 | 82 | S-A20 | Conventional Bore |
| I | VA | Franklin | I-061A | 278.93 | 52 | S-A22 | Conventional Bore |
| I | VA | Franklin | I-062 | 279.2 | 54 | S-MM44 | Conventional Bore |
| I | VA | Franklin | I-063 | 279.51 | 83 | S-MM48 | Conventional Bore |
| I | VA | Franklin | I-064 | 279.9 | 31 | S-H25, W-H9 | Conventional Bore |

AR 004900

| Spread | State | County | Crossing Number | MP | Crossing Length (feet) | Waterbody or Wetland Crossed | Crossing Type |
|--------|-------|--------|-----------------|-----|------------------------|------------------------------|---------------|
| I | VA | Franklin | I-065 | 279.73 | 79 | S-H24 | Conventional Bore |
| I | VA | Franklin | I-067 | 280.29 | 54 | S-A13 | Conventional Bore |
| I | VA | Franklin | I-069A | 280.88 | 61 | S-A7 | Conventional Bore |
| I | VA | Franklin | I-070 | 281.45 | 51 | S-SS8 | Conventional Bore |
| I | VA | Franklin | I-073 | 281.88 | 81 | S-DD3 | Conventional Bore |
| I | VA | Franklin | I-074 | 282.04 | 53 | S-G16 | Conventional Bore |
| I | VA | Franklin | I-076 | 282.78 | 42 | S-G13 | Conventional Bore |
| I | VA | Pittsylvania | I-078 | 284.3 | 43 | S-D23 | Conventional Bore |
| I | VA | Pittsylvania | I-080 | 284.48 | 54 | S-D2, W-D3 | Conventional Bore |
| I | VA | Pittsylvania | I-085 | 286.03 | 44 | S-A6 | Conventional Bore |
| I | VA | Pittsylvania | I-086 | 286.83 | 65 | S-C7 | Conventional Bore |
| I | VA | Pittsylvania | I-087 | 289.58 | 126 | S-C4, S-C3 | Conventional Bore |
| I | VA | Pittsylvania | I-091 | 291.71 | 74 | S-G4 | Conventional Bore |
| I | VA | Pittsylvania | I-092 | 291.87 | 39 | S-G3 | Conventional Bore |
| I | VA | Pittsylvania | I-093 | 292.11 | 52 | S-CC16 | Conventional Bore |
| I | VA | Pittsylvania | I-094 | 293.34 | 110 | W-CC2-PEM, SCC13, S-CC14 | Conventional Bore |
| I | VA | Pittsylvania | I-095 | 293.5 | 39 | S-MM8, W-MM5 | Conventional Bore |
| I | VA | Pittsylvania | I-096 | 293.62 | 33 | S-CC15 | Conventional Bore |
| I | VA | Pittsylvania | I-097 | 294.2 | 78 | S-CC8, S-CC5 | Conventional Bore |
| I | VA | Pittsylvania | I-101A | 295.03 | 35 | W-MM9 | Conventional Bore |
| I | VA | Pittsylvania | I-103 | 295.28 | 47 | S-P5 | Conventional Bore |

AR 004901

| Spread | State | County | Crossing Number | MP | Crossing Length (feet) | Waterbody or Wetland Crossed | Crossing Type |
|--------|-------|--------|-----------------|-----|------------------------|------------------------------|---------------|
| I | VA | Pittsylvania | I-105 | 296.1 | 48 | S-Q4 | Conventional Bore |
| I | VA | Pittsylvania | I-106A | 296.36 | 51 | S-Q2 | Conventional Bore |
| I | VA | Pittsylvania | I-111A | 298.32 | 33 | S-DD4 | Conventional Bore |
| I | VA | Pittsylvania | I-114 | 299.86 | 122 | S-G2, W-G2 | Conventional Bore |
| I | VA | Pittsylvania | I-115 | 300.53 | 40 | S-B2 | Conventional Bore |
| I | VA | Pittsylvania | I-116 | 300.92 | 40 | S-H55 | Conventional Bore |
| I | VA | Pittsylvania | I-117 | 301.13 | 56 | S-H54 | Conventional Bore |
| I | VA | Pittsylvania | I-121 | 302.84 | 405 | S-EF26, W-IJ22-PFO, W-IJ22-PEM | Conventional Bore |
| I | VA | Pittsylvania | I-122 | 302.89 | 68 | S-H44 | Conventional Bore |
| I | VA | Pittsylvania | I-123 | 303.16 | 43 | S-H42 | Conventional Bore |

a    On April 27, 2021, Mountain Valley requested the Commission allow nighttime microtunneling activities at the Gauley River and Roanoke River.  The Commission previously authorized Mountain Valley to change the crossing method to a microtunnel technique as part of our variance process.  Therefore, only new impacts associated with Mountain Valley's request to conduct 24-hour microtunneling activities at these locations are analyzed (see sections B.3.3 and B.6.2).  As these waterbodies are also Section 10 streams they are also discussed in section B.2.3.1.

b    Mountain Valley would utilize a conventional bore at the H-016 railroad crossing as authorized by the Certificate.  Nighttime noise associated with conventional boring activities at this location are evaluated as part of the Amendment Project.

AR  004902

**Appendix B**

AR 004903

**ALIGNMENT SHIFT**

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N          1:24,000

0          0.5          1 Miles

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 1 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

- Proposed Trenchless Crossing Number
- Milepost
- Mainline Block Valve
- Surveyed Waterbody*
- Surveyed Wetland*
- Certificated Route
- Existing Equitrans H-302 Line
- Laydown Yard
- Parking Area
- Rock Disposal

**Certificated Compressor Station**
- Bradshaw Station

**Certificated Meter Station Location**
- Equitrans Mobley Interconnect receipt
  Permanent Area of Disturbance

West Virginia

Virginia

JA2508

*Surveys conducted prior to 10/15/20

AR 004904

**Mountain Valley Pipeline Project**

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 2 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

NAD 1983 UTM 17N

1:24,000

0    0.5    1
Miles

**Legend**
XXX  Proposed Trenchless Crossing Number
○    Milepost
▪    Proposed Bore Pit
━    Surveyed Waterbody*
▬    Surveyed Wetland*
━    Certificated Route
▭    Parking Area

West Virginia

Virginia

JA2509

*Surveys conducted prior to 10/15/20

AR 004905

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

0        0.5        1 Miles

**Appendix B-1
Wetland and Waterbodies
Proposed Trenchless Crossings**

Page 3 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX Proposed Trenchless Crossing Number
○ Milepost
▪ Proposed Bore Pit
— Surveyed Waterbody*
▪ Surveyed Wetland*
— Certificated Route
▢ Additional Parking
▢ Staging Area

JA2510

*Surveys conducted prior to 10/15/20

AR 004906

**Mountain Valley Pipeline Project**

**Mountain Valley** PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 4 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

NAD 1983 UTM 17N          1:24,000

**Legend**
XXX Proposed Trenchless Crossing Number
○ Milepost
▨ Proposed Bore Pit
── Surveyed Waterbody*
── Surveyed Wetland*
── Certificated Route

JA2511

*Surveys conducted prior to 10/15/20

AR 004407

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

0     0.5     1
Miles

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 5 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX Proposed Trenchless Crossing Number
○ Milepost
◻ Proposed Bore Pit
━━ Surveyed Waterbody*
━━ Surveyed Wetland*
━━ Certificated Route

JA2512

*Surveys conducted prior to 10/15/20

AR 004908

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 6 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○  Milepost
►◄  Mainline Block Valve
▪  Proposed Bore Pit
━  Surveyed Waterbody*
━  Surveyed Wetland*
━  Certificated Route

0    0.5    1
Miles

JA2513

*Surveys conducted prior to 10/15/20

AR_004909

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 7 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
- XXX Proposed Trenchless Crossing Number
- ○ Milepost
- ►◄ Mainline Block Valve
- ▪ Proposed Bore Pit
- — Surveyed Waterbody*
- — Surveyed Wetland*
- — Certificated Route

*Surveys conducted prior to 10/15/20

JA2514

AR 004910



**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

0    0.5    1
Miles

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 8 of 33

June 2021

**Legend**
XX Proposed Trenchless Crossing Number
○ Milepost
►◄ Mainline Block Valve
▪ Proposed Bore Pit
— Surveyed Waterbody*
▪ Surveyed Wetland*
— Certificated Route

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

JA2515

*Surveys conducted prior to 10/15/20

AR 004911

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N     1:24,000

**Appendix B-1
Wetland and Waterbodies
Proposed Trenchless Crossings**

Page 9 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX Proposed Trenchless Crossing Number
○ Milepost
■ Proposed Bore Pit
— Surveyed Waterbody*
— Surveyed Wetland*
— Certificated Route

*Surveys conducted prior to 10/15/20

JA2516

AR 004912

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

0    0.5    1 Miles

**Mountain Valley**
PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 10 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
XXX  Proposed Trenchless Crossing Number
○  Milepost
►◄  Mainline Block Valve
▪  Proposed Bore Pit
━  Surveyed Waterbody*
▬  Surveyed Wetland*
━  Certificated Route
▱  Laydown Yard

JA2517

*Surveys conducted prior to 10/15/20

AR 004913

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

0    0.5    1 Miles

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 11 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
XXX Proposed Trenchless Crossing Number
○ Milepost
■ Proposed Bore Pit
— Surveyed Waterbody*
— Surveyed Wetland*
— Certificated Route

JA2518

*Surveys conducted prior to 10/15/20

AR 004914

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

0    0.5    1 Miles

**Mountain Valley**
PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 12 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX Proposed Trenchless Crossing Number
○ Milepost
►◄ Mainline Block Valve
▪ Proposed Bore Pit
— Surveyed Waterbody*
▪ Surveyed Wetland*
— Certificated Route

West Virginia

Virginia

11

12

13

JA2519

*Surveys conducted prior to 10/15/20

AR 004915



**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

0 ____ 0.5 ____ 1 Miles

**Appendix B-1
Wetland and Waterbodies
Proposed Trenchless Crossings**

Page 13 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

- ▨ Proposed Trenchless Crossing Number
- ○ Milepost
- ▶◀ Mainline Block Valve
- ▣ Proposed Bore Pit
- ▬ Surveyed Waterbody*
- ▬ Surveyed Wetland*
- ▬ Certificated Route
- ▭ Laydown Yard

JA2520

*Surveys conducted prior to 10/15/20

AR_004916



**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N          1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 14 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
- XXX Proposed Trenchless Crossing Number
- ○ Milepost
- ►◄ Mainline Block Valve
- ■ Proposed Bore Pit
- ▬ Surveyed Waterbody*
- ▬ Surveyed Wetland*
- ▬ Certificated Route

West Virginia
Virginia

14

JA2521

*Surveys conducted prior to 10/15/20

AR 004917

F-032

183
184
185
186
187
188
189

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N     1:24,000

0     0.5     1 Miles

**Mountain Valley** PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 15 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
XXX   Proposed Trenchless Crossing Number
○    Milepost
►◄   Mainline Block Valve
▢    Proposed Bore Pit
━    Surveyed Waterbody*
▢    Surveyed Wetland*
━    Certificated Route

West Virginia

Virginia

15

16

JA2522

*Surveys conducted prior to 10/15/20

AR 004918



**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

0    0.5    1 Miles

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 16 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
- XXX Proposed Trenchless Crossing Number
- ○ Milepost
- ■ Proposed Bore Pit
- —— Surveyed Waterbody*
- ▬ Surveyed Wetland*
- — — Certificated Route
- —— Appalachian National Scenic Trail
- ▱ Laydown Yard
- ▨ U.S. Forest Service (National Forest) Lands

JA2523

*Surveys conducted prior to 10/15/20

AR_004919

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N          1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 17 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○    Milepost
■    Proposed Bore Pit
—    Surveyed Waterbody*
—    Surveyed Wetland*
—    Certificated Route
     U.S. Forest Service (National Forest) Lands

*Surveys conducted prior to 10/15/20

JA2524

AR 003920

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 18 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○  Milepost
►◄  Mainline Block Valve
▪  Proposed Bore Pit
—  Surveyed Waterbody*
—  Surveyed Wetland*
—  Certificated Route
  U.S. Forest Service (National Forest) Lands

JA2525

*Surveys conducted prior to 10/15/20

AR 004921



**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N     1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 19 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
XXX   Proposed Trenchless Crossing Number
○   Milepost
■   Proposed Bore Pit
━━   Surveyed Waterbody*
▬   Surveyed Wetland*
━ ━   Certificated Route
▢   Pipe Yard

MINOR ROUTE ADJUSTMENT

JA2526

*Surveys conducted prior to 10/15/20

AR 004922

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000    0    0.5    1 Miles

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 20 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
XXX Proposed Trenchless Crossing Number
○ Milepost
▶◀ Mainline Block Valve
■ Proposed Bore Pit
▬ Surveyed Waterbody*
▬ Surveyed Wetland*
▬ Certificated Route
▭ Pipe Yard

JA2527

*Surveys conducted prior to 10/15/20

AR 004922

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

0    0.5    1
Miles

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 21 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX Proposed Trenchless Crossing Number
○ Milepost
■ Proposed Bore Pit
── Surveyed Waterbody*
▬ Surveyed Wetland*
── Certificated Route

JA2528

*Surveys conducted prior to 10/15/20

AR  004924

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

**Mountain Valley**
PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 22 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○    Milepost
►◄   Mainline Block Valve
▪    Proposed Bore Pit
▬    Surveyed Waterbody*
▬    Surveyed Wetland*
▬    Certificated Route
▬    Blue Ridge Parkway

0    0.5    1
Miles

JA2529

*Surveys conducted prior to 10/15/20

AR 004925

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N     1:24,000

0     0.5     1 Miles

**Mountain Valley**
PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 23 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
XXX Proposed Trenchless Crossing Number
○ Milepost
■ Proposed Bore Pit
— Surveyed Waterbody*
— Surveyed Wetland*
— Certificated Route

JA2530

*Surveys conducted prior to 10/15/20

AR_004926

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N        1:24,000

0        0.5        1
Miles

![Mountain Valley Pipeline logo]

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 24 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

- XXX  Proposed Trenchless Crossing Number
- ○  Milepost
- ►◄  Mainline Block Valve
- ▪  Proposed Bore Pit
- ▬  Surveyed Waterbody*
- ▬  Surveyed Wetland*
- ▬  Certificated Route

JA2531

*Surveys conducted prior to 10/15/20

AR 004927

**Mountain Valley Pipeline Project**

**Mountain Valley** PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 25 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

NAD 1983 UTM 17N    1:24,000

0    0.5    1
Miles

**Legend**

XXX  Proposed Trenchless Crossing Number
○    Milepost
►◄   Mainline Block Valve
▪    Proposed Bore Pit
—    Surveyed Waterbody*
—    Surveyed Wetland*
—    Certificated Route

JA2532

*Surveys conducted prior to 10/15/20

AR 004928

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N     1:24,000

**Mountain Valley** PIPELINE

**Appendix B-1
Wetland and Waterbodies
Proposed Trenchless Crossings**

Page 26 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○  Milepost
►◄  Mainline Block Valve
▪  Proposed Bore Pit
━  Surveyed Waterbody*
▬  Surveyed Wetland*
━  Certificated Route

0    0.5    1 Miles

JA2533

*Surveys conducted prior to 10/15/20

AR_004929

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

0    0.5    1 Miles

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 27 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX   Proposed Trenchless Crossing Number
○     Milepost
▪     Proposed Bore Pit
—     Surveyed Waterbody*
—     Surveyed Wetland*
—     Certificated Route

JA2534

*Surveys conducted prior to 10/15/20

AR_004930

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

0    0.5    1
Miles

**Mountain Valley**
PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 28 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○    Milepost
▪    Proposed Bore Pit
━    Surveyed Waterbody*
▪    Surveyed Wetland*
━    Certificated Route

JA2535

AR 00493

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

0      0.5      1
Miles

**Mountain Valley**
PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 29 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX   Proposed Trenchless Crossing Number
○   Milepost
►◄   Mainline Block Valve
▪   Proposed Bore Pit
▬   Surveyed Waterbody*
▪   Surveyed Wetland*
▬   Certificated Route
▱   Laydown Yard

JA2536

*Surveys conducted prior to 10/15/20

AR 004932

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N        1:24,000

0        0.5        1 Miles

**Mountain Valley** PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 30 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
XXX  Proposed Trenchless Crossing Number
○  Milepost
■  Proposed Bore Pit
—  Surveyed Waterbody*
—  Surveyed Wetland*
—  Certificated Route

JA2537

*Surveys conducted prior to 10/15/20

AR 004933

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

Appendix B-1
Wetland and Waterbodies
Proposed Trenchless Crossings

Page 31 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

- XXX  Proposed Trenchless Crossing Number
- ○  Milepost
- ►◄  Mainline Block Valve
- ▪  Proposed Bore Pit
- —  Surveyed Waterbody*
- ▮  Surveyed Wetland*
- —  Certificated Route

JA2538

*Surveys conducted prior to 10/15/20

AR 004934

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

0    0.5    1 Miles

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 32 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
XXX Proposed Trenchless Crossing Number
○ Milepost
►◄ Mainline Block Valve
▪ Proposed Bore Pit
— Surveyed Waterbody*
— Surveyed Wetland*
— Certificated Route

West Virginia
Virginia

JA2539

AR 004935

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

0   0.5   1 Miles

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 33 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
- XXX  Proposed Trenchless Crossing Number
- ○  Milepost
- ►◄  Mainline Block Valve
- ■  Proposed Bore Pit
- ▬  Surveyed Waterbody*
- ▬  Surveyed Wetland*
- ▬  Certificated Route
- ▬  Existing Transco Pipeline

**Certificated Meter Station Location**
- Transco Interconnect delivery Permanent Area of Disturbance

*Surveys conducted prior to 10/15/20

JA2540

AR 004936

**Appendix C**

AR 004937

Appendix C

**Construction, Restoration, and Mitigation Plans for the Mountain Valley Pipeline Project and Amendment Project**

| Title | Location |
|-------|----------|
| Adopted the FERC Plan | https://www.ferc.gov/industries-data/natural-gas/environment/environmental-guidelines. |
| Modifications from the FERC Procedures | https://www.ferc.gov/industries-data/natural-gas/environment/environmental-guidelines. Modifications discussed in the FEIS. |
| *Erosion and Sediment Control Plans* | Mountain Valley's supplemental filing (Appendix C) filed December 6, 2017 (accession number 20171206-5004). |
| *Karst Hazards Assessment Report* | Mountain Valley's supplemental filing (Attachment RR2-4a) filed October 14, 2016 (accession number 20161014-5022). |
| *Karst Mitigation Plan* | Mountain Valley's Implementation Plan (Attachment IP-20) filed November 1, 2017 (accession number 20171101-5042). |
| *Karst-Specific Erosion and Sediment Control Plan* | Mountain Valley's supplemental filing filed February 26, 2016 (accession number 20160226-5404). |
| *Landslide Mitigation Plan* | Mountain Valley's Implementation Plan (Attachment IP-19) filed November 1, 2017 (accession number 20171101-5042). |
| *Water Resources Identification and Testing Plan* | Mountain Valley's Implementation Plan (Attachment IP-21) filed November 1, 2017 (accession number 20171101-5042). |
| *Vertical Scour and Lateral Channel Erosion Analysis* | Mountain Valley's variance request MVP-006 and H-9 filed September 21, 2018 (accession number 20180921-5228). |
| *Site-Specific Residential Construction and Mitigation Plans* | Mountain Valley's supplemental filing (Attachment D) filed May 3, 2018 (accession number 20180503-5127). |
| *Organic Farm Protection Plan* | Mountain Valley's filing on July 23, 2019 (accession number 20190723-5152). |
| *Spill Prevention, Control, and Countermeasures Plan (SPCCP) and Unanticipated Discovery of Contamination Plan for Construction Activities in West Virginia and Virginia* | Mountain Valley's supplemental filing (Attachment DR5 General 1e-1 and General 1e-2) filed March 30, 2017 (accession number 20170330-5339). |

AR 004938

| Title | Location |
|---|---|
| *General Blasting Plan* | Mountain Valley's variance request MVP-1 filed March 27, 2018 (accession number 20180327-5029). |
| *Compensatory Wetland Mitigation Plan* | Mountain Valley's supplemental filing (Attachments General 1e-1, 1e-2, and 1e-3) filed February 26, 2016 (accession number 20160226-5404). |
| *Migratory Bird Conservation Plan* | Mountain Valley's supplemental filing (Attachment DR5 General 1b1) filed May 11, 2017 (accession number 20170511-5018). |
| *Exotic and Invasive Species Control Plan* | Mountain Valley's supplemental filing (Attachment DR3 Vegetation-5) filed July 18, 2016 (accession number 20160718-5161). |
| *Traffic and Transportation Management Plan* | Mountain Valley's variance request H-9 and MVP-006 filed September 21, 2018 (accession number 20180921-5229). |
| *Fire Prevention and Suppression Plan* | Mountain Valley's supplemental filing (Attachment RR1-4) filed January 15, 2016 (accession number 20160119-5076). |
| *Mining Area Construction Plan* | Mountain Valley's supplemental filing (Attachment DR2 General-5b) filed April 21, 2016 (accession number 20160422-5012). |
| Avoidance Plans filed July 18, 2016. Individual Site Testing Plans for West Virginia included in county survey reports, variously filed. Testing Plans for Virginia archaeological sites filed July 22, 2016. Treatment Plans, variously filed. | N/A |
| *Plan for Unanticipated Historic Properties and Human Remains* | Mountain Valley's supplemental filing (Appendix O) filed December 6, 2017 (accession number 20171206-5004). |
| *Plan for Unanticipated Discovery of Paleontological Resources* | Mountain Valley's supplemental filing (Attachment 1-m) filed January 15, 2016 (accession number 20160119-5076). |
| *Fugitive Dust Control Plan* | Mountain Valley's supplemental filing (Attachment 1-g) filed January 15, 2016 (accession number 20160119-5076). |
| *Winter Construction Plan* | Mountain Valley's supplemental filing (Attachment RR1-30) filed January 15, 2016 (accession number 20160119-5076). |

AR 004939

| Title | Location |
|---|---|
| *Plan of Development (POD)**a/*** | https://eplanning.blm.gov/eplanning-ui/project/2000356/570. |
| *Unanticipated Mine Pool Mitigation Plan* | Mountain Valley's supplemental filing (Attachment DR4 Geology 12) filed February 17, 2017 (accession number 20170217-5199). |
| *Stormwater Pollution Prevention Plan (SWPPP)* | Mountain Valley's supplemental filing (Appendix F of Attachment F) filed June 24, 2016 (accession number 20160624-5244). |
| *Annual Standards and Specifications for Virginia* | https://www.mountainvalleypipeline.info/wp-content/uploads/2020/12/Mountain-Valley-Pipeline-LLC-ASS-January-2020_Revised-APRIL-2020-V4.pdf. |
| *Acid Forming Materials Mitigation Plan* | Mountain Valley's supplemental filing (Attachment DR5 General 1c) filed May 9, 2017 (accession number 20170509-5108). |
| *Habitat Mitigation Plan* | Mountain Valley's supplemental filing (Attachment DR5 Vegetation) filed May 11, 2017 (accession number 20170511-5018). |
| *Direct Pipe® and Horizontal Directional Drilling Contingency Plan* | Mountain Valley's supplemental filing filed January 16, 2019 (accession number 20190116-5132). |

N/A = Not Applicable

The table has been updated to reflect, as necessary, revisions and updates to plans since issuance of the FEIS.

a       The Amendment Project would not impact U.S. Forest Service lands.

AR  004940

**Appendix D**

AR 004941

Appendix D

**Estimated Bore Pit Spoil Volumes**

| Crossing Number | Bore Pit #1 | | | | | Bore Pit #2 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume |
| A-008 | 19 ft | 29 ft | 55 ft | 16 ft | 785 cy | 22 ft | 29 ft | 29 ft | 16 ft | 440 cy |
| B-012 | 17 ft | 24 ft | 35 ft | 16 ft | 430 cy | 17 ft | 17 ft | 55 ft | 16 ft | 555 cy |
| B-015A | 22 ft | 25 ft | 46 ft | 16 ft | 645 cy | 19 ft | 20 ft | 39 ft | 16 ft | 455 cy |
| C-013A | 18 ft | 24 ft | 55 ft | 16 ft | 685 cy | 19 ft | 18 ft | 60 ft | 16 ft | 660 cy |
| C-018 | 16 ft | 29 ft | 35 ft | 16 ft | 470 cy | 16 ft | 17 ft | 55 ft | 16 ft | 540 cy |
| C-022 | 40 ft | 44 ft | 60 ft | 20 ft | 1,870 cy | 35 ft | 49 ft | 40 ft | 20 ft | 1,245 cy |
| C-024 | 14 ft | 14 ft | 55 ft | 16 ft | 460 cy | 18 ft | 15 ft | 60 ft | 16 ft | 590 cy |
| C-028 | 21 ft | 22 ft | 35 ft | 16 ft | 450 cy | 11 ft | 5 ft | 55 ft | 16 ft | 265 cy |
| C-035 | 11 ft | 13 ft | 35 ft | 16 ft | 250 cy | 16 ft | 15 ft | 55 ft | 16 ft | 510 cy |
| D-004 | 13 ft | 15 ft | 55 ft | 16 ft | 460 cy | 16 ft | 20 ft | 35 ft | 16 ft | 375 cy |
| D-010 | 17 ft | 17 ft | 55 ft | 16 ft | 555 cy | 20 ft | 27 ft | 35 ft | 16 ft | 490 cy |
| D-011 | 13 ft | 15 ft | 35 ft | 16 ft | 295 cy | 11 ft | 11 ft | 55 ft | 16 ft | 360 cy |
| D-012 | 15 ft | 15 ft | 55 ft | 16 ft | 490 cy | 18 ft | 19 ft | 35 ft | 16 ft | 385 cy |
| D-019 | 15 ft | 18 ft | 55 ft | 16 ft | 540 cy | 17 ft | 15 ft | 35 ft | 16 ft | 335 cy |
| D-020 | 14 ft | 19 ft | 35 ft | 16 ft | 345 cy | 13 ft | 15 ft | 55 ft | 16 ft | 460 cy |
| D-022 | 16 ft | 21 ft | 55 ft | 16 ft | 605 cy | 18 ft | 23 ft | 35 ft | 16 ft | 430 cy |
| D-028 | 13 ft | 22 ft | 55 ft | 16 ft | 575 cy | 17 ft | 22 ft | 35 ft | 16 ft | 405 cy |
| D-034 | 13 ft | 17 ft | 55 ft | 16 ft | 490 cy | 13 ft | 23 ft | 35 ft | 16 ft | 375 cy |
| D-035 | 16 ft | 17 ft | 35 ft | 16 ft | 345 cy | 13 ft | 14 ft | 55 ft | 16 ft | 440 cy |
| D-036 | 12 ft | 18 ft | 55 ft | 16 ft | 490 cy | 13 ft | 20 ft | 35 ft | 16 ft | 345 cy |
| D-037 | 13 ft | 19 ft | 35 ft | 16 ft | 335 cy | 13 ft | 14 ft | 55 ft | 16 ft | 440 cy |
| D-038 | 13 ft | 19 ft | 35 ft | 16 ft | 335 cy | 12 ft | 13 ft | 55 ft | 16 ft | 410 cy |
| D-040 | 13 ft | 12 ft | 55 ft | 16 ft | 410 cy | 12 ft | 14 ft | 35 ft | 16 ft | 270 cy |
| D-041 (Gauley R.) | 40 ft | 57 ft | 50 ft | 20 ft | 1,800 cy | 42 ft | 56 ft | 60 ft | 20 ft | 2,180 cy |
| D-048 | 11 ft | 15 ft | 55 ft | 16 ft | 425 cy | 12 ft | 15 ft | 35 ft | 16 ft | 280 cy |
| E-005 | 12 ft | 18 ft | 35 ft | 16 ft | 315 cy | 15 ft | 23 ft | 55 ft | 16 ft | 620 cy |
| E-009 | 16 ft | 17 ft | 35 ft | 16 ft | 345 cy | 16 ft | 9 ft | 55 ft | 16 ft | 410 cy |
| E-012 | 15 ft | 18 ft | 55 ft | 16 ft | 540 cy | 32 ft | 37 ft | 35 ft | 16 ft | 720 cy |
| E-015 | 11 ft | 15 ft | 55 ft | 16 ft | 425 cy | 12 ft | 18 ft | 35 ft | 16 ft | 315 cy |
| F-014 | 13 ft | 14 ft | 35 ft | 16 ft | 280 cy | 13 ft | 15 ft | 55 ft | 16 ft | 460 cy |
| F-015 | 14 ft | 15 ft | 35 ft | 16 ft | 305 cy | 14 ft | 14 ft | 55 ft | 16 ft | 460 cy |
| F-016 | 15 ft | 15 ft | 55 ft | 16 ft | 490 cy | 12 ft | 12 ft | 35 ft | 16 ft | 250 cy |

AR  004942

| Crossing Number | Bore Pit #1 | | | | | Bore Pit #2 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume |
| F-017 | 14 ft | 16 ft | 35 ft | 16 ft | 315 cy | 14 ft | 15 ft | 55 ft | 16 ft | 475 cy |
| F-021 | 10 ft | 10 ft | 20 ft | 20 ft | 150 cy | 13 ft | 13 ft | 80 ft | 20 ft | 775 cy |
| F-022 | 13 ft | 11 ft | 55 ft | 16 ft | 395 cy | 14 ft | 18 ft | 35 ft | 16 ft | 335 cy |
| F-027 | 9 ft | 16 ft | 35 ft | 16 ft | 260 cy | 16 ft | 19 ft | 55 ft | 16 ft | 575 cy |
| F-032 | 13 ft | 18 ft | 55 ft | 16 ft | 510 cy | 13 ft | 19 ft | 35 ft | 16 ft | 335 cy |
| F-039 | 14 ft | 19 ft | 35 ft | 16 ft | 345 cy | 17 ft | 15 ft | 55 ft | 16 ft | 525 cy |
| G-009 | 21 ft | 26 ft | 20 ft | 15 ft | 265 cy | 18 ft | 30 ft | 50 ft | 20 ft | 890 cy |
| G-010 | 13 ft | 17 ft | 20 ft | 15 ft | 170 cy | 10 ft | 10 ft | 40 ft | 20 ft | 300 cy |
| G-011 | 16 ft | 27 ft | 20 ft | 15 ft | 240 cy | 12 ft | 17 ft | 40 ft | 20 ft | 430 cy |
| G-012 | 12 ft | 19 ft | 50 ft | 20 ft | 575 cy | 10 ft | 10 ft | 20 ft | 15 ft | 115 cy |
| G-013 | 16 ft | 15 ft | 60 ft | 20 ft | 690 cy | 21 ft | 23 ft | 45 ft | 15 ft | 550 cy |
| G-014 | 9 ft | 15 ft | 60 ft | 20 ft | 535 cy | 9 ft | 12 ft | 20 ft | 15 ft | 120 cy |
| G-017 | 11 ft | 11 ft | 20 ft | 15 ft | 125 cy | 24 ft | 37 ft | 60 ft | 20 ft | 1,360 cy |
| G-019B | 13 ft | 14 ft | 20 ft | 15 ft | 150 cy | 13 ft | 19 ft | 30 ft | 20 ft | 360 cy |
| G-023 | 15 ft | 25 ft | 20 ft | 20 ft | 300 cy | 23 ft | 22 ft | 60 ft | 20 ft | 1,000 cy |
| G-024 | 15 ft | 27 ft | 40 ft | 20 ft | 625 cy | 23 ft | 28 ft | 20 ft | 15 ft | 285 cy |
| H-009 | 9 ft | 10 ft | 40 ft | 25 ft | 355 cy | 10 ft | 11 ft | 40 ft | 25 ft | 390 cy |
| H-015 | 23 ft | 26 ft | 55 ft | 25 ft | 1,250 cy | 16 ft | 16 ft | 55 ft | 25 ft | 815 cy |
| H-016 | 9 ft | 5 ft | 60 ft | 16 ft | 250 cy | 19 ft | 21 ft | 40 ft | 16 ft | 475 cy |
| H-017 | 19 ft | 30 ft | 40 ft | 20 ft | 730 cy | 23 ft | 39 ft | 40 ft | 20 ft | 920 cy |
| H-019 (Roanoke R.) | 26 ft | 31 ft | 50 ft | 20 ft | 1,060 cy | 22 ft | 22 ft | 60 ft | 20 ft | 980 cy |
| H-020 | 12 ft | 12 ft | 40 ft | 20 ft | 360 cy | 14 ft | 16 ft | 40 ft | 20 ft | 445 cy |
| H-021 | 11 ft | 10 ft | 50 ft | 25 ft | 490 cy | 9 ft | 10 ft | 50 ft | 25 ft | 440 cy |
| H-022 | 12 ft | 12 ft | 60 ft | 25 ft | 670 cy | 11 ft | 10 ft | 50 ft | 25 ft | 490 cy |
| H-030 | 20 ft | 27 ft | 50 ft | 25 ft | 1,090 cy | 13 ft | 15 ft | 60 ft | 25 ft | 780 cy |
| H-031 | 17 ft | 18 ft | 45 ft | 25 ft | 730 cy | 14 ft | 28 ft | 60 ft | 25 ft | 1,170 cy |
| H-032 | 14 ft | 19 ft | 65 ft | 25 ft | 995 cy | 15 ft | 22 ft | 50 ft | 25 ft | 860 cy |
| H-040 | 12 ft | 14 ft | 60 ft | 25 ft | 725 cy | 12 ft | 21 ft | 50 ft | 25 ft | 765 cy |
| H-042 | 15 ft | 17 ft | 60 ft | 25 ft | 890 cy | 15 ft | 22 ft | 50 ft | 20 ft | 690 cy |
| H-043 | 18 ft | 20 ft | 50 ft | 25 ft | 880 cy | 16 ft | 25 ft | 50 ft | 25 ft | 950 cy |
| H-044 | 15 ft | 20 ft | 25 ft | 25 ft | 410 cy | 13 ft | 21 ft | 30 ft | 25 ft | 475 cy |
| H-045 | 18 ft | 24 ft | 50 ft | 25 ft | 975 cy | 14 ft | 30 ft | 50 ft | 25 ft | 1,020 cy |
| H-046 | 21 ft | 25 ft | 35 ft | 25 ft | 750 cy | 13 ft | 23 ft | 50 ft | 25 ft | 835 cy |
| H-047A | 12 ft | 14 ft | 60 ft | 25 ft | 725 cy | 13 ft | 10 ft | 77 ft | 25 ft | 820 cy |
| H-048A | 10 ft | 10 ft | 60 ft | 25 ft | 560 cy | 11 ft | 11 ft | 50 ft | 25 ft | 510 cy |

AR  004943

| Crossing Number | Bore Pit #1 | | | | | Bore Pit #2 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume |
| H-054 | 14 ft | 14 ft | 50 ft | 25 ft | 650 cy | 14 ft | 22 ft | 65 ft | 25 ft | 1,085 cy |
| H-060 | 12 ft | 15 ft | 60 ft | 25 ft | 750 cy | 11 ft | 15 ft | 45 ft | 25 ft | 545 cy |
| I-001A | 12 ft | 14 ft | 60 ft | 20 ft | 580 cy | 12 ft | 14 ft | 50 ft | 20 ft | 485 cy |
| I-009 | 16 ft | 16 ft | 60 ft | 20 ft | 715 cy | 18 ft | 20 ft | 50 ft | 20 ft | 705 cy |
| I-014 | 15 ft | 20 ft | 50 ft | 20 ft | 650 cy | 13 ft | 16 ft | 60 ft | 20 ft | 645 cy |
| I-016 | 11 ft | 10 ft | 50 ft | 20 ft | 390 cy | 10 ft | 9 ft | 60 ft | 20 ft | 425 cy |
| I-020 | 12 ft | 16 ft | 60 ft | 20 ft | 625 cy | 12 ft | 14 ft | 50 ft | 20 ft | 485 cy |
| I-021 | 12 ft | 17 ft | 60 ft | 20 ft | 645 cy | 12 ft | 16 ft | 50 ft | 20 ft | 520 cy |
| I-034 | 13 ft | 8 ft | 50 ft | 20 ft | 390 cy | 17 ft | 17 ft | 60 ft | 20 ft | 760 cy |
| I-038 | 11 ft | 4 ft | 50 ft | 20 ft | 280 cy | 12 ft | 16 ft | 50 ft | 20 ft | 520 cy |
| I-039 | 12 ft | 20 ft | 50 ft | 20 ft | 595 cy | 12 ft | 15 ft | 60 ft | 20 ft | 600 cy |
| I-040 | 10 ft | 11 ft | 60 ft | 20 ft | 470 cy | 12 ft | 17 ft | 50 ft | 20 ft | 540 cy |
| I-042 | 15 ft | 20 ft | 50 ft | 20 ft | 650 cy | 12 ft | 11 ft | 60 ft | 20 ft | 515 cy |
| I-044A | 14 ft | 19 ft | 60 ft | 20 ft | 735 cy | 14 ft | 11 ft | 50 ft | 20 ft | 465 cy |
| I-046 | 10 ft | 10 ft | 60 ft | 20 ft | 445 cy | 16 ft | 20 ft | 50 ft | 20 ft | 670 cy |
| I-048 | 12 ft | 15 ft | 60 ft | 20 ft | 600 cy | 12 ft | 14 ft | 50 ft | 20 ft | 485 cy |
| I-053 | 19 ft | 22 ft | 50 ft | 20 ft | 760 cy | 15 ft | 19 ft | 60 ft | 20 ft | 760 cy |
| I-055 | 17 ft | 30 ft | 50 ft | 20 ft | 875 cy | 10 ft | 21 ft | 60 ft | 20 ft | 690 cy |
| I-056 | 12 ft | 16 ft | 60 ft | 20 ft | 625 cy | 11 ft | 24 ft | 50 ft | 20 ft | 650 cy |
| I-057 | 14 ft | 26 ft | 50 ft | 20 ft | 745 cy | 12 ft | 20 ft | 60 ft | 20 ft | 715 cy |
| I-060B | 13 ft | 17 ft | 50 ft | 30 ft | 835 cy | 24 ft | 39 ft | 60 ft | 20 ft | 1,400 cy |
| I-061A | 13 ft | 16 ft | 37 ft | 20 ft | 400 cy | 12 ft | 16 ft | 60 ft | 20 ft | 625 cy |
| I-062 | 22 ft | 36 ft | 50 ft | 20 ft | 1,075 cy | 10 ft | 11 ft | 60 ft | 20 ft | 470 cy |
| I-063 | 17 ft | 29 ft | 50 ft | 20 ft | 855 cy | 10 ft | 17 ft | 60 ft | 20 ft | 600 cy |
| I-065 | 12 ft | 20 ft | 60 ft | 20 ft | 715 cy | 12 ft | 26 ft | 50 ft | 20 ft | 705 cy |
| I-064 | 15 ft | 28 ft | 60 ft | 20 ft | 960 cy | 16 ft | 27 ft | 50 ft | 20 ft | 800 cy |
| I-067 | 13 ft | 20 ft | 50 ft | 20 ft | 615 cy | 13 ft | 19 ft | 60 ft | 20 ft | 715 cy |
| I-069A | 12 ft | 19 ft | 60 ft | 20 ft | 690 cy | 16 ft | 16 ft | 50 ft | 20 ft | 595 cy |
| I-070 | 14 ft | 26 ft | 50 ft | 20 ft | 745 cy | 16 ft | 27 ft | 60 ft | 20 ft | 960 cy |
| I-073 | 13 ft | 13 ft | 60 ft | 20 ft | 580 cy | 12 ft | 16 ft | 50 ft | 20 ft | 520 cy |
| I-074 | 16 ft | 31 ft | 50 ft | 20 ft | 875 cy | 13 ft | 18 ft | 60 ft | 20 ft | 690 cy |
| I-076 | 13 ft | 20 ft | 60 ft | 20 ft | 735 cy | 17 ft | 26 ft | 50 ft | 20 ft | 800 cy |
| I-078 | 11 ft | 16 ft | 60 ft | 20 ft | 600 cy | 10 ft | 14 ft | 50 ft | 20 ft | 445 cy |
| I-080 | 13 ft | 13 ft | 50 ft | 20 ft | 485 cy | 12 ft | 19 ft | 60 ft | 20 ft | 690 cy |
| I-085 | 12 ft | 22 ft | 60 ft | 20 ft | 760 cy | 10 ft | 17 ft | 50 ft | 20 ft | 500 cy |
| I-086 | 14 ft | 19 ft | 60 ft | 20 ft | 735 cy | 15 ft | 16 ft | 50 ft | 20 ft | 575 cy |

AR 004944

| Crossing Number | Bore Pit #1 | | | | | Bore Pit #2 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume |
| I-087 | 15 ft | 15 ft | 60 ft | 20 ft | 670 cy | 14 ft | 27 ft | 50 ft | 20 ft | 760 cy |
| I-091 | 20 ft | 32 ft | 50 ft | 20 ft | 965 cy | 13 ft | 13 ft | 60 ft | 20 ft | 580 cy |
| I-092 | 12 ft | 19 ft | 60 ft | 20 ft | 690 cy | 13 ft | 20 ft | 50 ft | 20 ft | 615 cy |
| I-093 | 11 ft | 15 ft | 60 ft | 20 ft | 580 cy | 11 ft | 16 ft | 50 ft | 20 ft | 500 cy |
| I-094 | 17 ft | 23 ft | 60 ft | 20 ft | 890 cy | 15 ft | 21 ft | 50 ft | 20 ft | 670 cy |
| I-095 | 12 ft | 17 ft | 60 ft | 20 ft | 645 cy | 12 ft | 19 ft | 50 ft | 20 ft | 575 cy |
| I-096 | 11 ft | 18 ft | 50 ft | 20 ft | 540 cy | 10 ft | 16 ft | 60 ft | 20 ft | 580 cy |
| I-097 | 11 ft | 12 ft | 60 ft | 20 ft | 515 cy | 14 ft | 14 ft | 50 ft | 20 ft | 520 cy |
| I-101A | 10 ft | 18 ft | 60 ft | 20 ft | 625 cy | 9 ft | 16 ft | 49 ft | 20 ft | 455 cy |
| I-103 | 8 ft | 3 ft | 50 ft | 20 ft | 205 cy | 10 ft | 11 ft | 60 ft | 20 ft | 470 cy |
| I-105 | 14 ft | 19 ft | 60 ft | 20 ft | 735 cy | 13 ft | 19 ft | 50 ft | 20 ft | 595 cy |
| I-106A | 16 ft | 15 ft | 49 ft | 20 ft | 565 cy | 12 ft | 14 ft | 60 ft | 20 ft | 580 cy |
| I-111A | 12 ft | 15 ft | 60 ft | 20 ft | 600 cy | 12 ft | 14 ft | 50 ft | 20 ft | 485 cy |
| I-114 | 12 ft | 19 ft | 60 ft | 20 ft | 690 cy | 11 ft | 21 ft | 50 ft | 20 ft | 595 cy |
| I-115 | 11 ft | 18 ft | 50 ft | 20 ft | 540 cy | 10 ft | 17 ft | 60 ft | 20 ft | 600 cy |
| I-116 | 11 ft | 16 ft | 50 ft | 20 ft | 500 cy | 10 ft | 11 ft | 60 ft | 20 ft | 470 cy |
| I-117 | 13 ft | 15 ft | 50 ft | 20 ft | 520 cy | 13 ft | 16 ft | 60 ft | 20 ft | 645 cy |
| I-121 | 16 ft | 19 ft | 50 ft | 20 ft | 650 cy | 15 ft | 19 ft | 60 ft | 20 ft | 760 cy |
| I-122 | 13 ft | 14 ft | 60 ft | 20 ft | 600 cy | 13 ft | 17 ft | 50 ft | 20 ft | 560 cy |
| I-123 | 16 ft | 23 ft | 50 ft | 20 ft | 725 cy | 13 ft | 17 ft | 60 ft | 20 ft | 670 cy |
| ft = feet, cy = cubic yards | | | | | | | | | | |

AR  004945

**Appendix E**

AR 004946

Appendix E

**Bore Pit Underlying Geology, Depths, Aquifer Characteristics, Duration, and Estimated Groundwater Drawdown**

| Crossing Number | Milepost | Underlying Rock Type | Underlying Formation | SSURGO Estimated Depth to Bedrock (ft) | Depth of Bore Pit Analyzed (ft) a/ | Saturated Pit Depth (ft) b/ | Bore Duration (days) | Hydraulic Conductivity (ft/day) | Saturated Thickness (ft) | Transmissivity (ft b/day) | Storage | Pumping Rate (gpm) c/ | (R₀) Radius of Influence (ft) d/ | Drawdown at 150 ft from Bore Pit (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A-008 | 6.56 | sandstone | Greene, Washington | 5.8 | 22 | 16 | 11 | 1 | 50 | 50 | 0.12 | 16 | 102 | 0 |
| B-012 | 58.53 | sandstone | Uniontown, Pittsburg | >7 | 17 | 11 | 17 | 1 | 50 | 50 | 0.12 | 10 | 126 | 0 |
| B-015A | 61.21 | Shale | Casselman, Glenshaw | 6.3 | 22 | 16 | 18 | 1 | 50 | 50 | 0.12 | 14 | 130 | 0 |
| C-013A | 81.6 | Sandstone | Kanawha | 6.3 | 19 | 13 | 27 | 1 | 50 | 50 | 0.12 | 10 | 159 | 0.2 |
| C-018 | 82.28 | Sandstone | Kanawha | >7 | 16 | 10 | 15 | 1 | 50 | 50 | 0.12 | 9 | 119 | 0 |
| C-022 | 87.33 | Sandstone | New River | >7 | 40 | 34 | 79 | 1 | 50 | 50 | 0.12 | 22 | 272 | 7 |
| C-024 | 87.32 | Sandstone | New River | >7 | 15 | 9 | 36 | 1 | 50 | 50 | 0.12 | 7 | 184 | 0.8 |
| C-028 | 89.56 | Shale | Casselman, Glenshaw | >7 | 21 | 15 | 26 | 1 | 50 | 50 | 0.12 | 12 | 156 | <0.1 |
| C-035 | 95.45 | Sandstone | Allegheny | >7 | 15 | 9 | 28 | 1 | 50 | 50 | 0.12 | 7 | 162 | 0.5 |
| D-004 | 106.35 | Sandstone | Kanawha | >7 | 16 | 10 | 13 | 1 | 50 | 50 | 0.12 | 10 | 110 | 0 |
| D-010 | 109.94 | Sandstone | Kanawha | >7 | 20 | 14 | 18 | 1 | 50 | 50 | 0.12 | 13 | 130 | 0 |
| D-011 | 111 | Sandstone | Kanawha | >7 | 13 | 7 | 18 | 20 | 7 | 140 | 0.21 | 15 | 164 | 0.5 |
| D-012 | 111.09 | Sandstone | Kanawha | >7 | 18 | 12 | 17 | 1 | 50 | 50 | 0.12 | 11 | 126 | 0 |
| D-019 | 113.11 | Sandstone | Kanawha | >7 | 15 | 9 | 24 | 1 | 50 | 50 | 0.12 | 7 | 212 | 1 |
| D-020 | 113.39 | Sandstone | Kanawha | >7 | 14 | 8 | 20 | 20 | 8 | 160 | 0.21 | 19 | 185 | 0.8 |
| D-022 | 114.17 | Sandstone | Kanawha | >7 | 18 | 12 | 16 | 1 | 50 | 50 | 0.12 | 11 | 122 | 0 |
| D-028 | 114.95 | Sandstone | Kanawha | >7 | 17 | 11 | 14 | 1 | 50 | 50 | 0.12 | 11 | 115 | 0 |
| D-034 | 116.69 | Sandstone | Kanawha | 6 | 13 | 7 | 12 | 1 | 50 | 50 | 0.12 | 7 | 106 | 0 |
| D-035 | 117.02 | Sandstone | Kanawha | 4.7 | 16 | 10 | 9 | 1 | 50 | 50 | 0.12 | 11 | 92 | 0 |
| D-036 | 117.1 | Sandstone | Kanawha | >7 | 13 | 7 | 17 | 20 | 7 | 140 | 0.21 | 15 | 160 | 0.5 |
| D-037 | 117.28 | Sandstone | Kanawha | >7 | 13 | 7 | 9 | 20 | 7 | 140 | 0.21 | 18 | 116 | 0 |
| D-038 | 117.4 | Sandstone | Kanawha | >7 | 13 | 7 | 9 | 20 | 7 | 140 | 0.21 | 18 | 116 | 0 |
| D-040 | 118.24 | Sandstone | Kanawha | >7 | 12 | 10 | 7 | 20 | 10 | 200 | 0.21 | 35 | 122 | 0 |

AR 004947

| Crossing Number | Milepost | Underlying Rock Type | Underlying Formation | SSURGO Estimated Depth to Bedrock (ft) | Depth of Bore Pit Analyzed (ft) $\underline{a}$/ | Saturated Pit Depth (ft) $\underline{b}$/ | Bore Duration (days) | Hydraulic Conductivity (ft/day) | Saturated Thickness (ft) | Transmissivity (ft $\underline{b}$/day) | Storage | Pumping Rate (gpm) $\underline{c}$/ | ($R_0$) Radius of Influence (ft) $\underline{d}$/ | Drawdown at 150 ft from Bore Pit (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D-041 | 118.9 | Sandstone | Kanawha | >7 | 42 | 36 | 78 | 1 | 50 | 50 | 0.12 | 21 | 270 | 8 |
| D-048 | 122.55 | Sandstone | Kanawha | >7 | 12 | 10 | 7 | 20 | 10 | 200 | 0.21 | 35 | 122 | 0 |
| E-005 | 132.36 | Sandstone | New River | 4.7 | 15 | 9 | 11 | 1 | 50 | 50 | 0.12 | 10 | 102 | 0 |
| E-009 | 136.72 | sandstone | New River | >7 | 16 | 10 | 23 | 1 | 50 | 50 | 0.12 | 8 | 147 | 0 |
| E-012 | 140.44 | Sandstone | New River | >7 | 32 | 26 | 17 | 1 | 50 | 50 | 0.12 | 23 | 126 | 0 |
| E-015 | 141.17 | Sandstone | New River | >7 | 12 | 10 | 9 | 20 | 10 | 200 | 0.21 | 34 | 139 | 0 |
| F-014 | 169.76 | shale / sandstone | Bluefield | >7 | 13 | 7 | 31 | 20 | 7 | 140 | 0.21 | 13 | 216 | 1.4 |
| F-015 | 169.78 | shale / sandstone | Bluefield | >7 | 14 | 8 | 14 | 20 | 8 | 160 | 0.21 | 20 | 155 | 0 |
| F-016 | 169.81 | shale / sandstone | Bluefield | >7 | 15 | 9 | 14 | 1 | 50 | 50 | 0.12 | 9 | 115 | 0 |
| F-017 | 169.84 | shale / sandstone | Bluefield | >7 | 14 | 8 | 16 | 20 | 8 | 160 | 0.21 | 20 | 166 | 0.5 |
| F-021 | 171.44 | shale / sandstone | Bluefield | >7 | 13 | 7 | 103 | 20 | 7 | 140 | 0.21 | 11 | 393 | 2.5 |
| F-022 | 171.77 | shale / sandstone | Bluefield | >7 | 14 | 8 | 12 | 20 | 8 | 160 | 0.21 | 21 | 143 | 0 |
| F-027 | 173.14 | shale / sandstone | Bluefield | >7 | 16 | 10 | 8 | 1 | 50 | 50 | 0.12 | 11 | 87 | 0 |
| F-032 | 184.08 | shale / sandstone | Bluefield | 3.4 | 13 | 7 | 9 | 1 | 50 | 50 | 0.01 | 7 | 92 | 0 |
| F-039 | 190.03 | shale / sandstone | Bluefield | 3.4 | 15 | 9 | 10 | 1 | 50 | 50 | 0.12 | 11 | 97 | 0 |
| G-009 | 203.59 | silt, shale, sand | Martinsburg | 0 | 21 | 15 | 18 | 1 | 50 | 50 | 0.12 | 0.7 | 101 | 0 |
| G-010 | 203.71 | silt, shale, sand | Martinsburg | 0 | 13 | 7 | 6 | 1 | 50 | 50 | 0.01 | 9 | 75 | 0 |
| G-011 | 203.88 | silt, shale, sand | Martinsburg | 0 | 16 | 10 | 10 | 1 | 50 | 50 | 0.12 | 10 | 97 | 0 |
| G-012 | 204 | silt, shale, sand | Martinsburg | >7 | 12 | 10 | 8 | 20 | 10 | 200 | 0.21 | 35 | 131 | 0 |

E-2

AR 004948

| Crossing Number | Milepost | Underlying Rock Type | Underlying Formation | SSURGO Estimated Depth to Bedrock (ft) | Depth of Bore Pit Analyzed (ft) a/ | Saturated Pit Depth (ft) b/ | Bore Duration (days) | Hydraulic Conductivity (ft/day) | Saturated Thickness (ft) | Transmissivity (ft b/day) | Storage | Pumping Rate (gpm) c/ | ($R_0$) Radius of Influence (ft) d/ | Drawdown at 150 ft from Bore Pit (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G-013 | 204.34 | silt, shale, sand | Martinsburg | >7 | 21 | 15 | 33 | 1 | 50 | 50 | 0.12 | 11 | 176 | 0.7 |
| G-014 | 204.35 | silt, shale, sand | Martinsburg | >7 | 9 | 7 | 9 | 20 | 7 | 140 | 0.21 | 19 | 116 | 0 |
| G-017 | 206.59 | dolomite (k) | Undivided | 6.8 | 24 | 18 | 33 | 0.1 | 50 | 5 | 0.14 | 1.5 | 51 | 0 |
| G-019B | 207.9 | silt, shale, sand | Martinsburg | >7 | 13 | 7 | 72 | 20 | 7 | 140 | 0.21 | 12 | 329 | 2.5 |
| G-023 | 211.17 | limestone (k) | Undivided | >7 | 22 | 16 | 25 | 0.1 | 50 | 5 | 0.14 | 2 | 45 | 0 |
| G-024 | 213 | dolomite (k) | Honaker | >7 | 23 | 17 | 18 | 0.1 | 50 | 5 | 0.14 | 2 | 38 | 0 |
| H-009 | 229.48 | shale | Millboro / Needmore | 3.2 | 10 | 8 | 8 | 1 | 50 | 50 | 0.01 | 9 | 87 | 0 |
| H-015 | 230.55 | shale / sandstone | Bralier | 3.2 | 23 | 17 | 13 | 1 | 50 | 50 | 0.12 | 18 | 87 | 0 |
| H-016 | 230.8 | shale | Bralier | 3.2 | 19 | 13 | 42 | 1 | 50 | 50 | 0.12 | 23 | 198 | 3 |
| H-017 | 234.15 | dolomite/lime (k) | Elbrook | >7 | 23 | 17 | 34 | 0.1 | 50 | 5 | 0.14 | 1.5 | 52 | 0 |
| H-019 | 235.4 | dolomite/lime (k) | Elbrook | >7 | 26 | 20 | 36 | 0.05 | 50 | 5 | 0.14 | 3.5 | 54 | 0 |
| H-020 | 235.58 | dolomite/lime (k) | Elbrook | >7 | 14 | 8 | 39 | 20 | 8 | 160 | 0.21 | 17 | 259 | 1.5 |
| H-021 | 235.9 | shale | Rome | >7 | 10 | 8 | 7 | 20 | 8 | 160 | 0.21 | 25 | 110 | 0 |
| H-022 | 235.9 | shale | Rome | >7 | 12 | 10 | 13 | 20 | 10 | 200 | 0.21 | 31 | 167 | 0.5 |
| H-030 | 241.93 | granulite | Pyroxene Granulite | 5.3 | 20 | 14 | 8 | 0.05 | 50 | 2.5 | 0.01 | 0.9 | 67 | 0 |
| H-031 | 242.06 | granulite | Pyroxene Granulite | 5.3 | 17 | 11 | 62 | 0.05 | 50 | 2.5 | 0.01 | 0.4 | 187 | 1.5 |
| H-032 | 242.28 | granulite | Pyroxene Granulite | 5.3 | 15 | 9 | 13 | 0.05 | 50 | 2.5 | 0.01 | 0.5 | 86 | 0 |
| H-040 | 243.55 | granulite | Pyroxene Granulite | >7 | 12 | 10 | 19 | 20 | 10 | 200 | 0.21 | 28 | 202 | 0.8 |
| H-042 | 243.83 | granitic gneiss | Charnockite | 4.8 | 15 | 9 | 22 | 0.05 | 50 | 2.5 | 0.01 | 0.45 | 111 | |

AR 004949

| Crossing Number | Milepost | Underlying Rock Type | Underlying Formation | SSURGO Estimated Depth to Bedrock (ft) | Depth of Bore Pit Analyzed (ft) a/ | Saturated Pit Depth (ft) b/ | Bore Duration (days) | Hydraulic Conductivity (ft/day) | Saturated Thickness (ft) | Transmissivity (ft b/day) | Storage | Pumping Rate (gpm) c/ | ($R_0$) Radius of Influence (ft) d/ | Drawdown at 150 ft from Bore Pit (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| H-043 | 243.97 | granitic gneiss | Charnockite | 5.5 | 18 | 12 | 14 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 89 | 0 |
| H-044 | 244.5 | granitic gneiss | Charnockite | 5.3 | 15 | 9 | 10 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 75 | 0 |
| H-045 | 244.7 | granitic gneiss | Charockite | 5.3 | 18 | 12 | 33 | 0.05 | 50 | 2.5 | 0.01 | 0.5 | 136 | 0 |
| H-046 | 245.05 | granitic gneiss | Charockite | 5.3 | 21 | 15 | 18 | 0.05 | 50 | 2.5 | 0.01 | 0.7 | 101 | 0 |
| H-047A | 245.64 | granitic gneiss | Charnockite | 5.3 | 12 | 10 | 30 | 0.05 | 50 | 2.5 | 0.01 | 0.45 | 130 | 0 |
| H-048A | 245.8 | granitic gneiss | Charnockite | 5.3 | 11 | 9 | 25 | 1 | 50 | 50 | 0.01 | 0.4 | 119 | 0 |
| H-054 | 248.81 | granulite / gneiss | Biotite Gneiss | 4.8 | 14 | 8 | 10 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 75 | 0 |
| H-060 | 252.35 | granitic gneiss | Charnockite | >7 | 12 | 10 | 8 | 20 | 10 | 200 | 0.21 | 35 | 131 | 0 |
| I-001A | 258.23 | felsic gneiss | Augen Gneiss | >7 | 12 | 10 | 8 | 20 | 10 | 200 | 0.21 | 35 | 131 | 0 |
| I-009 | 260.56 | augen & flaser gneiss | Lovingston massif | >7 | 18 | 12 | 10 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 75 | 0 |
| I-014 | 262.09 | biotite gneiss | Ashe | >7 | 15 | 9 | 10 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 75 | 0 |
| I-016 | 262.5 | biotite gneiss | Ashe | >7 | 10 | 8 | 12 | 20 | 8 | 160 | 0.21 | 21 | 143 | 0 |
| I-020 | 264.53 | biotite gneiss | Ashe | >7 | 12 | 10 | 10 | 20 | 10 | 200 | 0.21 | 33 | 146 | 0 |
| I-021 | 264.66 | biotite gneiss | Ashe | >7 | 12 | 10 | 8 | 20 | 10 | 200 | 0.21 | 35 | 131 | 0 |
| I-034 | 268.9 | biotite gneiss | Ashe | >7 | 17 | 11 | 9 | 0.05 | 50 | 2.5 | 0.01 | 0.7 | 71 | 0 |
| I-038 | 270.19 | biotite gneiss | Ashe | 4.8 | 12 | 10 | 7 | 0.05 | 50 | 2.5 | 0.01 | 0.5 | 63 | 0 |
| I-039 | 270.5 | biotite gneiss | Ashe | >7 | 12 | 10 | 8 | 20 | 10 | 200 | 0.21 | 35 | 131 | 0 |

E-4

AR 004950

| Crossing Number | Milepost | Underlying Rock Type | Underlying Formation | SSURGO Estimated Depth to Bedrock (ft) | Depth of Bore Pit Analyzed (ft) a/ | Saturated Pit Depth (ft) b/ | Bore Duration (days) | Hydraulic Conductivity (ft/day) | Saturated Thickness (ft) | Transmissivity (ft b/day) | Storage | Pumping Rate (gpm) c/ | ($R_0$) Radius of Influence (ft) d/ | Drawdown at 150 ft from Bore Pit (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-040 | 270.65 | biotite gneiss | Ashe | 5.1 | 12 | 10 | 7 | 0.05 | 50 | 2.5 | 0.01 | 0.5 | 63 | 0 |
| I-042 | 271.39 | biotite gneiss | Ashe | 6.3 | 15 | 9 | 14 | 0.05 | 50 | 2.5 | 0.01 | 0.5 | 89 | 0 |
| I-044A | 272.65 | biotite gneiss | Ashe | >7 | 14 | 8 | 25 | 8 | 20 | 160 | 0.21 | 18 | 207 | 1 |
| I-046 | 273.09 | biotite gneiss | Ashe | 4.8 | 16 | 10 | 55 | 0.05 | 50 | 2.5 | 0.01 | 0.4 | 176 | 1 |
| I-048 | 274.37 | actinolite schist | Alligator Back | 4.8 | 12 | 10 | 10 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 75 | 0 |
| I-053 | 277.13 | actinolite schist | Alligator Back | >7 | 19 | 13 | 22 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 111 | 0 |
| I-055 | 277.58 | actinolite schist | Alligator Back | >7 | 17 | 11 | 18 | 0.05 | 50 | 2.5 | 0.01 | 0.55 | 101 | 0 |
| I-056 | 277.75 | actinolite schist | Alligator Back | >7 | 12 | 10 | 8 | 10 | 20 | 200 | 0.21 | 35 | 131 | 0 |
| I-057 | 277.96 | actinolite schist | Alligator Back | >7 | 14 | 8 | 11 | 8 | 20 | 160 | 0.21 | 22 | 137 | 0 |
| I-060B | 278.5 | actinolite schist | Alligator Back | >7 | 24 | 18 | 19 | 0.05 | 50 | 2.5 | 0.01 | 0.9 | 10 | 0 |
| I-061A | 278.93 | actinolite schist | Alligator Back | >7 | 13 | 7 | 8 | 7 | 20 | 140 | 0.21 | 19 | 110 | 0 |
| I-062 | 279.2 | actinolite schist | Alligator Back | >7 | 22 | 16 | 16 | 0.05 | 50 | 2.5 | 0.01 | 0.9 | 95 | 0 |
| I-063 | 279.51 | actinolite schist | Alligator Back | >7 | 17 | 11 | 14 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 89 | 0 |
| I-064 | 279.9 | actinolite schist | Alligator Back | >7 | 12 | 10 | 14 | 10 | 20 | 200 | 0.21 | 30 | 173 | 0.5 |
| I-065 | 279.73 | actinolite schist | Alligator Back | >7 | 16 | 10 | 14 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 89 | 0 |
| I-067 | 280.29 | actinolite schist | Alligator Back | >7 | 13 | 7 | 11 | 7 | 20 | 140 | 0.21 | 17 | 128 | 0 |
| I-069A | 280.88 | actinolite schist | Alligator Back | >7 | 16 | 10 | 10 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 75 | 0 |

AR 004951

| Crossing Number | Milepost | Underlying Rock Type | Underlying Formation | SSURGO Estimated Depth to Bedrock (ft) | Depth of Bore Pit Analyzed (ft) a/ | Saturated Pit Depth (ft) b/ | Bore Duration (days) | Hydraulic Conductivity (ft/day) | Saturated Thickness (ft) | Transmissivity (ft b/day) | Storage | Pumping Rate (gpm) c/ | ($R_0$) Radius of Influence (ft) d/ | Drawdown at 150 ft from Bore Pit (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-070 | 281.45 | actinolite schist | Alligator Back | >7 | 16 | 10 | 10 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 75 | 0 |
| I-073 | 281.88 | actinolite schist | Alligator Back | >7 | 13 | 7 | 11 | 7 | 20 | 140 | 0.21 | 17 | 128 | 0 |
| I-074 | 282.04 | actinolite schist | Alligator Back | >7 | 16 | 10 | 13 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 85 | 0 |
| I-076 | 282.78 | actinolite schist | Alligator Back | >7 | 17 | 11 | 44 | 0.05 | 50 | 2.5 | 0.01 | 0.4 | 157 | 1 |
| I-078 | 284.13 | amphibolite | Bassett | >7 | 11 | 9 | 10 | 9 | 20 | 180 | 0.21 | 27 | 146 | 0 |
| I-080 | 284.48 | biotite gneiss | Bassett | >7 | 13 | 7 | 22 | 7 | 20 | 140 | 0.21 | 15 | 182 | 0.7 |
| I-085 | 286.03 | amphibolite | Bassett | >7 | 12 | 10 | 10 | 10 | 20 | 200 | 0.21 | 33 | 146 | 0 |
| I-086 | 286.83 | mica schist | Fork Mountain | >7 | 15 | 9 | 13 | 0.05 | 50 | 2.5 | 0.01 | 0.5 | 86 | 0 |
| I-087 | 289.58 | mica schist | Fork Mountain | >7 | 15 | 9 | 13 | 0.05 | 50 | 2.5 | 0.01 | 0.5 | 86 | 0 |
| I-091 | 291.71 | biotite gneiss | Bassett | >7 | 20 | 14 | 13 | 0.05 | 50 | 2.5 | 0.01 | 0.8 | 86 | 0 |
| I-092 | 291.87 | biotite gneiss | Bassett | >7 | 13 | 7 | 10 | 7 | 20 | 140 | 0.21 | 18 | 122 | 0 |
| I-093 | 292.11 | biotite gneiss | Bassett | >7 | 11 | 9 | 10 | 9 | 20 | 180 | 0.21 | 27 | 146 | 0 |
| I-094 | 293.25 | biotite gneiss | Bassett | >7 | 17 | 11 | 48 | 0.05 | 50 | 2.5 | 0.01 | 0.4 | 164 | 1 |
| I-095 | 293.5 | biotite gneiss | Bassett | >7 | 12 | 10 | 11 | 10 | 20 | 200 | 0.21 | 32 | 154 | <0.1 |
| I-096 | 293.62 | mica schist | Fork Mountain | >7 | 11 | 9 | 10 | 9 | 20 | 180 | 0.21 | 27 | 146 | 0 |
| I-097 | 293.9 | biotite gneiss | Bassett | >7 | 14 | 8 | 22 | 8 | 20 | 160 | 0.21 | 18 | 194 | 0.8 |
| I-101A | 295.03 | mica schist | Fork Mountain | >7 | 10 | 8 | 60 | 8 | 20 | 160 | 0.21 | 15 | 321 | 2.2 |

| Crossing Number | Milepost | Underlying Rock Type | Underlying Formation | SSURGO Estimated Depth to Bedrock (ft) | Depth of Bore Pit Analyzed (ft) $\underline{a}$/ | Saturated Pit Depth (ft) $\underline{b}$/ | Bore Duration (days) | Hydraulic Conductivity (ft/day) | Saturated Thickness (ft) | Transmissivity (ft $\underline{b}$/day) | Storage | Pumping Rate (gpm) $\underline{c}$/ | (R$_0$) Radius of Influence (ft) $\underline{d}$/ | Drawdown at 150 ft from Bore Pit (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-103 | 295.28 | mica schist | Fork Mountain | >7 | 10 | 8 | 10 | 8 | 20 | 160 | 0.21 | 22 | 131 | 0 |
| I-105 | 296.1 | Granite | Leatherwood Granite | >7 | 14 | 8 | 10 | 8 | 20 | 160 | 0.21 | 23 | 131 | 0 |
| I-106A | 296.36 | Granite | Leatherwood Granite | >7 | 15 | 9 | 65 | 0.05 | 50 | 2.5 | 0.01 | 0.3 | 196 | 1 |
| I-111A | 298.2 | mica schist | Fork Mountain | >7 | 12 | 10 | 31 | 10 | 20 | 200 | 0.21 | 25 | 258 | 1.5 |
| I-114 | 299.86 | mica schist | Fork Mountain | >7 | 12 | 10 | 49 | 10 | 20 | 200 | 0.21 | 23 | 324 | 2.5 |
| I-115 | 300.53 | mica schist | Fork Mountain | >7 | 11 | 9 | 10 | 9 | 20 | 180 | 0.21 | 27 | 146 | 0 |
| I-116 | 300.92 | Granite | Leatherwood Granite | >7 | 11 | 9 | 10 | 9 | 20 | 180 | 0.21 | 27 | 146 | 0 |
| I-117 | 301.13 | Granite | Leatherwood Granite | >7 | 13 | 7 | 14 | 7 | 20 | 140 | 0.21 | 16 | 145 | 0 |
| I-121 | 302.9 | mica schist | Fork Mountain | >7 | 16 | 10 | 45 | 0.05 | 50 | 2.5 | 0.01 | 0.4 | 159 | 0.4 |
| I-122 | 302.89 | mica schist | Fork Mountain | >7 | 13 | 7 | 14 | 7 | 20 | 140 | 0.21 | 16 | 145 | 0 |
| I-123 | 303.16 | sandstone, siltstone | Leakesville | >7 | 16 | 10 | 10 | 1 | 50 | 50 | 0.12 | 10 | 97 | 0 |

a   From appendix C, the deepest bore pit at each crossing was selected for analysis. Bore pits excavated on a slope will have different front and back face depths in which case the shallower face depth  is used here since it defines the maximum depth of water that can be retained in the bore pit.

b   Saturated depth is pit depth minus the water table. For pits less than 12 feet, depth to water assumed at 2 feet. For pits greater than 12 feet, depth to water assumed at 6 feet.

c   Q = In gallons per minute (gpm) adjusted to meet drawdown to full depth of bore pit at max time.

d   Distance from bore pit at which estimated groundwater drawdown reaches zero. Calculation inputs include the following:

**Saturated Thickness** was estimated to be the saturated depth of the bore pit in the alluvium. The bore pits estimated to be in the bedrock were assigned a saturated thickness of 50 feet.

**Hydraulic Conductivity** from USGS (2002) likely maximum value in feet/day:
• Alluvium (Fine Sand from borings) = 20
• Sedimentary Rock (Fine Sandstone) = 1
• Limestone = 0.1
• Crystalline = 0.05

**Specific Storage:**
• Alluvium (Fine Sand from borings) = 0.21
• Sedimentary Rock (Siltstone) = 0.12
• Limestone = 0.14
• Crystalline = 0.01 r = 10 feet

AR  004953

**Appendix F**

AR  004954

**Appendix F**

**Current Environmental Justice Community Data**

| Geographic Area | No. of Crossings | Crossing Number | Total Population | White (%) a/ | African American/Black (%) a/ | American Indian/Alaska Native (%) a/ | Asian (%) a/ | Native HI & Other Pacific Islander (%) a/ | Some Other Race (%) a/ | Two or More Races (%) a/ | Hispanic Origin (any race) (%) a/ | Total Minority Populations (%) a/ | Households in Poverty (%) b/ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **WEST VIRGINIA** | | | 1,817,305 | 92.0% | 3.6% | 0.2% | 0.8% | 0.0% | 0.2% | 1.6% | 1.6% | 8.0% | 17.3% |
| **Wetzel County** | | | 15,436 | 96.9% | 1.1% | 0.0% | 0.0% | 0.0% | 0.3% | 0.9% | 0.9% | 3.1% | 18.3% |
| Block Group 5, Census Tract 305 | 1 | A-008 | 666 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 26.3% |
| **Lewis County** | | | 16,166 | 96.3% | 0.2% | 0.5% | 0.5% | 0.0% | 0.0% | 1.2% | 1.2% | 3.7% | 19.1% |
| Block Group 2, Census Tract 9676 | 1 | B-012 | 899 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 28.0% |
| Block Group 3, Census Tract 9676 | 1 | B-015A | 1,679 | 97.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 2.1% | 0.4% | 2.5% | 13.6% |
| **Webster County** | | | 8,386 | 99.6% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.3% | 0.1% | 0.4% | 26.0% |
| Block Group 1, Census Tract 9701 | 1 | C-013A | 684 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 29.4% |
| Block Group 2, Census Tract 9701 | 2 | C-018, C-022* | 1,001 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 18.8% |
| Block Group 4, Census Tract 9701 | 4 | C-022*, C-024, C-028, C-035 | 1,515 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 27.3% |
| Block Group 1, Census Tract 9703 | 1 | D-010 | 2,147 | 99.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.6% | 0.2% | 0.9% | 19.9% |
| **Nicholas County** | | | 25,078 | 96.9% | 0.7% | 0.4% | 0.2% | 0.0% | 0.0% | 1.0% | 0.8% | 3.1% | 17.5% |
| Block Group 1, Census Tract 9504 | 4 | D-022, D-028, D-034, D-035 | 986 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 8.2% |
| Block Group 2, Census Tract 9504 | 4 | D-036, D-037, D-038, D-040 | 1,437 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 23.4% |
| Block Group 3, Census Tract 9504 | 4 | D-011, D-012, D-019, D-020 | 1,939 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 13.2% |
| Block Group 3, Census Tract 9506 | 1 | D-048 | 1,798 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 15.8% |
| Block Group 1, Census Tract 9507 | 1 | E-005 | 288 | 84.0% | 0.0% | 16.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 16.0% | 27.5% |
| **Greenbrier County** | | | 35,155 | 92.2% | 2.8% | 0.0% | 0.6% | 0.0% | 0.5% | 1.8% | 2.0% | 7.8% | 16.6% |
| Block Group 1, Census Tract 9503 | 3 | E-009, E-012, E-015 | 632 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 46.5% |
| **Summers County** | | | 12,848 | 91.9% | 4.5% | 0.0% | 0.0% | 0.0% | 0.0% | 2.2% | 1.5% | 8.1% | 21.2% |
| Block Group 1, Census Tract 6 | 4 | F-014, F-015, F-016, F-017 | 516 | 87.8% | 10.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 1.7% | 12.2% | 34.8% |
| Block Group 2, Census Tract 6 | 3 | F-021, F-022, F-027 | 1,845 | 84.1% | 11.2% | 0.0% | 0.0% | 0.0% | 0.0% | 1.5% | 3.2% | 15.9% | 16.8% |
| **Monroe County** | | | 13,401 | 96.3% | 0.9% | 0.5% | 0.0% | 0.0% | 0.0% | 1.4% | 0.9% | 3.7% | 15.3% |
| Block Group 4, Census Tract 9502 | 1 | F-032 | 729 | 94.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 5.1% | 0.0% | 5.1% | 4.7% |
| Block Group 2, Census Tract 9503 | 1 | F-039 | 2,861 | 99.6% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.3% | 0.4% | 13.7% |
| **VIRGINIA** | | | 8,454,463 | 61.8% | 18.8% | 0.2% | 6.3% | 0.1% | 0.3% | 3.1% | 9.4% | 38.2% | 10.3% |
| **Giles County** | | | 16,772 | 94.9% | 2.2% | 0.0% | 0.1% | 0.2% | 0.0% | 0.9% | 1.7% | 5.1% | 9.6% |
| Block Group 1, Census Tract 9301 | 4 | G-017*, G-019B, G-023, G-024 | 1,035 | 99.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.5% | 8.5% |
| Block Group 3, Census Tract 9302 | 7 | G-09, G-010, G-011, G-012, G-013, G-014, G-017* | 1,258 | 93.2% | 4.1% | 0.0% | 0.0% | 0.0% | 0.0% | 1.8% | 0.9% | 6.8% | 13.4% |
| **Montgomery County** | | | 98,140 | 83.3% | 4.4% | 0.4% | 6.6% | 0.0% | 0.6% | 1.5% | 3.2% | 16.7% | 20.0% |
| Block Group 2, Census Tract 213 | 3 | H-009, H-015, H-017 | 939 | 96.8% | 0.0% | 0.6% | 0.0% | 0.0% | 0.0% | 1.5% | 1.1% | 3.2% | 5.7% |
| Block Group 1, Census Tract 214 | 2 | H-017, H-020* | 714 | 81.7% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 18.3% | 18.3% | 10.1% |
| Block Group 2, Census Tract 214 | 3 | H-020*, H-021, H-022 | 1,856 | 92.7% | 4.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 3.1% | 7.3% | 43.6% |
| **Roanoke County** | | | 93,823 | 85.8% | 5.9% | 0.2% | 3.1% | 0.0% | 0.1% | 1.8% | 3.1% | 14.2% | 8.1% |
| Block Group 3, Census Tract 306 | 11 | H-030, H-031, H-032, H-040, H-042, H-043, H-044, H-045, H-046, H-047A, H-048A | 789 | 89.6% | 0.0% | 0.0% | 1.5% | 0.0% | 0.0% | 8.9% | 0.0% | 10.4% | 5.0% |
| **Franklin County** | | | 56,187 | 87.2% | 7.4% | 0.3% | 0.5% | 0.0% | 0.3% | 1.5% | 2.8% | 12.8% | 13.4% |
| Block Group 1, Census Tract 201.02 | 1 | I-048 | 1,070 | 86.5% | 6.8% | 0.0% | 0.6% | 0.0% | 0.0% | 6.1% | 0.0% | 13.5% | 4.8% |
| Block Group 1, Census Tract 202 | 1 | I-034 | 1,582 | 93.4% | 4.4% | 0.0% | 0.0% | 0.0% | 0.0% | 2.2% | 0.0% | 6.6% | 6.9% |

AR 004955

## Appendix F

### Current Environmental Justice Community Data

| Geographic Area | No. of Crossings | Crossing Number | Total Population | White (%) a/ | African American/Black (%) a/ | American Indian/Alaska Native (%) a/ | Asian (%) a/ | Native HI & Other Pacific Islander (%) a/ | Some Other Race (%) a/ | Two or More Races (%) a/ | Hispanic Origin (any race) (%) a/ | Total Minority Populations (%) a/ | Households in Poverty (%) b/ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Block Group 2, Census Tract 202 | 6 | I-038, I-039, I-040, I-042, I-044A, I-046 | 1,392 | 87.7% | 7.4% | 0.5% | 0.0% | 0.0% | 0.0% | 0.0% | 4.4% | 12.3% | 6.9% |
| Block Group 1, Census Tract 205 | 3 | H-054, H-060, I-001A | 1,861 | 98.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 1.1% | 0.0% | 1.1% | 8.5% |
| Block Group 4, Census Tract 205 | 5 | I-009, I-014, I-016, I-020, I-021 | 2,169 | 87.5% | 6.6% | 0.0% | 1.6% | 0.0% | 0.0% | 2.9% | 1.4% | 12.5% | 11.1% |
| Block Group 1, Census Tract 209 | 16 | I-053, I-055, I-056, I-057, I-060B, I-061A, I-062, I-063, I-064, I-065, I-067, I-069A, I-070, I-073, I-074, I-076 | 928 | 76.6% | 19.2% | 0.0% | 2.2% | 0.0% | 0.0% | 2.0% | 0.0% | 23.4% | 17.7% |
| **Pittsylvania County** | | | **61,256** | 74.1% | 20.0% | 0.1% | 0.4% | 0.0% | 0.0% | 2.8% | 2.6% | 25.9% | 15.7% |
| Block Group 4, Census Tract 103 | 8 | I-078, I-080, I-085, I-086, I-087, I-091, I-092, I-093 | 630 | 58.3% | 40.0% | 0.0% | 0.0% | 0.0% | 0.0% | 1.7% | 0.0% | 41.7% | 29.1% |
| Block Group 1, Census Tract 105 | 8 | I-111A, I-114, I-115, I-116, I-117, I-121, I-122, I-123 | 1,147 | 60.4% | 38.4% | 0.0% | 1.1% | 0.0% | 0.0% | 0.0% | 0.0% | 39.6% | 12.7% |
| Block Group 3, Census Tract 105 | 4 | I-101A, I-103, I-105, I-106A | 2,267 | 54.2% | 38.2% | 0.0% | 1.4% | 0.0% | 0.0% | 1.6% | 4.5% | 45.8% | 14.2% |
| Block Group 2, Census Tract 106 | 4 | I-094, I-095, I-096, I-097 | 1,712 | 78.0% | 18.3% | 0.0% | 0.0% | 0.0% | 0.0% | 2.6% | 1.1% | 22.0% | 14.6% |

a Percent of Total Population (Table B03002 - Hispanic or Latino Origin by Race American Community Survey. 2019 ACS 5-Year Estimates Detailed Tables. U.S. Census Bureau, 2015-2019 American Community Survey 5-Year Estimates: https://api.census.gov/data/2019/acs/acs5). Accessed: May 13, 2021

b Percent of Households (Table B17017 - Poverty Status in the Past 12 months by Household Type by Age of Householder. 2019 ACS 5-Year Estimates Detailed Tables. U.S. Census Bureau, 2015-2019 American Community Survey 5-Year Estimates: https://api.census.gov/data/2019/acs/acs5). Accessed: May 13, 2021

* Crossing occurs in more than one Block Group

AR  004956


Available online at www.sciencedirect.com

## ScienceDirect

Underground Space 5 (2020) 1–19



http://www.keaipublishing.com/en/journals/underground-space/

# Developments and research directions in pipe jacking and microtunneling

## Raymond L. Sterling

*Louisiana Tech University, Ruston, Louisiana 71272, USA*[1]

Received 30 June 2018; accepted 17 September 2018
Available online 25 September 2018

## Abstract

This paper provides a review of the history and development of pipe jacking and microtunneling methods with extensive referencing to the published literature. The application of such methods in comparison with other trenchless technologies is discussed and the various planning, design and construction aspects are introduced. The emphasis of the paper is to trace the academic research and field monitoring results covering critical aspects of design and construction with a particular emphasis on jacking force estimation and the effect of lubrication on jacking forces.
© 2020 Tongji University and Tongji University Press. Production and hosting by Elsevier B.V. on behalf of KeAi Communications Co. This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/).

*Keywords:* Pipe jacking; Microtunneling; Design; Construction; Research; Review

## 1 Introduction

This paper is intended to provide a review of the development of pipe jacking and microtunneling technologies with an emphasis on research and development activities that have been published in the public domain. Naturally, in an equipment-intensive field with a substantial competition in terms of "know-how," there will be much important R&D that has been conducted and is held privately and only becomes visible as new products enter the marketplace or existing barriers are overcome in the range of projects that can be accomplished. Another limitation in the following discussion is that the review is essentially limited to papers that have been published in the English language. This is perhaps less of a issue in the past few years when English language versions of a wide range of key research papers are also published but, in prior years, a number of key contributions made internationally may have been missed.

Compared to tunneling technology in general, pipe jacking and microtunneling have more specific characteristics but remain difficult to precisely group because various types of hybrid methods have evolved that blur previously adopted definitions.

In this paper, the discussions will range across not only specific aspects of pipe jacking and microtunneling but also will touch on how these methods relate to other technologies that closely compete. The intent of the paper is to document the increasing level of theoretical research, computer simulation and field monitoring that is being applied to pipe jacking and microtunneling methods and to discuss how this research and allied technical innovations are overcoming application barriers. A complementary objective is to give a newcomer to the field a starting point for further study in the field.

### 1.1 A Brief discussion of methodologies and their history

The emphasis in this paper is on "**pipe jacking**" methods – of which "**microtunneling**" is one type. The essential ele-

---
[1] Retired.
*E-mail address:* sterling@latech.edu

https://doi.org/10.1016/j.undsp.2018.09.001
2467-9674/© 2020 Tongji University and Tongji University Press. Production and hosting by Elsevier B.V. on behalf of KeAi Communications Co.
This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/).

AR 004961

ment that distinguishes pipe jacking (as compared to other tunneling methods) is that the lining of the resulting tunnel is pushed through the ground from the starting point rather than being built section-by-section just behind the excavation face or within the tail shield of a tunnel boring machine. Pipe jacking has been identified as being used as early as 1896 to install a concrete culvert under the Northern Pacific Railroad in the USA although the method did not become popular in the USA until the 1950s (Barbera et al., 1993). Pipe jacking use was also noted in Vienna in the late 19th century (Thomson, 2009). This early form of pipe jacking required person access to the face in order to carry out the excavation work and to load and remove the spoil. Thus, the minimum diameter of such pipe jacking projects was around 1.0–1.2 m. One pipe jacking technique (**auger boring**) that allowed smaller diameter bores was initiated in the USA from 1936 (Barbera et al., 1993). In this technique, a steel auger and a cutting head are rotated in conjunction with the jacking of a steel pipe. The cutting head excavates the soil and the auger moves the soil back to the starting pit with no personnel access possible or required within the pipe. This technique saw continued development in the 1940s for mining thin coal seams that were uneconomical for person entry tunnels. The limitation of this method was that little control of the excavation face was possible and running ground especially below the water table could flow easily along the auger and lead to large settlements or sinkholes. This restricted the method to suitable types of soils and typically above the water table. The steel pipe that was required to house the auger was usually left in place as a casing to support the ground and a product pipe inserted within the casing. For crossings of road or rail, space is often available at the side of the right-of-way for preparation and welding of the pipe before the excavation is commenced. The method, however, is not so suitable for pipeline projects following a public right-of-way because of the large setup areas that would be required for each installation length.

Thus, up to the 1960s, pipe jacking was possible in person-entry sized tunnels and auger boring could be used for small to mid-size diameter crossing installations in non-flowing ground. In person-entry sized tunnels, support for running ground below the water table could be provided (albeit with difficulty and expense) by compressed air tunneling that was first used around 1910 at almost the same time in New York and Hamburg (Chapman, Metje, & Stärk, 2018). No solution, however, yet existed for non-person entry tunneling or pipe jacking.

That advance came in terms of the ability to remotely provide support to the excavation face while still accommodating the excavation process in non-person entry diameters. This new ability was given the name "**microtunneling**" because it allowed a controlled tunneling process in diameters below those permissible for person entry. The characteristics of microtunneling (see illustration in Fig. 1) – apart from its small size – were as a pipe jacking method, with accurate guidance, remote operation and an ability to con-



Fig. 1. Cut-away illustration of a microtunneling project (courtesy Unitracc).

trol the support of the excavation face. The fact that the last four characteristics could also be applied in larger diameter projects has led to some international differences in terminology – with North American usage dropping the linkage of the definition to the size of a tunnel and using instead the method characteristics. The various definitions can be consulted in ASCE (2015), ISTT Glossary (www.istt.com) and Stein (2005) among other sources.

The developments leading to modern microtunneling machine excavation occurred principally in Japan, Germany and the UK. The concept of a slurry pressure balance shield was put forward in patents as early as the late 19th century in the UK and Germany. A patent for a slurry machine was granted in the UK to John Bartlett in 1964 although problems were experienced on the first trial use of the patent on the New Cross experimental tunnel in south London in 1971/72 (Biggart, 2011; Thomson, 2009). Japan started trials with a "mud shield" in 1964 in very soft coastal alluviums and, in Germany, trials were carried out in Hamburg in 1976 using what was termed a "Hydroshield" (Biggart, 2011). Variants of machine excavation with continuous face support were introduced in the late 1960 s through the 1970s and 1980s in Japan including those for machines to serve the non-person-entry diameter range (e.g. Nomura, Hoshina, Shiomi, & Umezu, 1985). In the early 1980s, following the successful program of microtunneling in Hamburg, the German industry became more active and produced their own microtunneling machines. The first microtunneling project in the USA occurred in 1984. More information on historical developments can be found in Thomson (2009), Coller (1993) and Barbera et al. (1993). Early state-of-the-art reviews include Drennon (1979) and Craig (1984).

Three main variants of face support (besides compressed air) have been used in microtunneling and pipe jacking. One was the introduction of a closed pressurized face within a tunnel boring machine installed ahead of the pipes being jacked with bentonite slurry was pumped into this closed chamber to provide pressurized support to the excavation face as it was being excavated using mechanical

cutters. The slurry (mixed with the excavation cuttings) could then be pumped to the surface where the excavated material was separated from the slurry. This is termed a **slurry-type machine.** An alternate mode of face support was first developed in Japan in 1966 (Thomson, 2009) in which (for suitable types of soil), the excavated soil was kept compressed in the excavation chamber to provide support to the face and the pressure control was provided by managing the spoil removal rate compared to the machine advance rate. This is termed an **earth-pressure-balance (EPB) machine**. Both types of machine are widely used today across a wide range of tunneling applications with EPB machines generally being suitable for finer-grained soils and slurry machines for coarser grained soils. However, due to the size of the soil removal equipment in an EPB machine, it cannot be used for diameters below about 1.7 m. A third type of equipment was used in some earlier microtunneling machines with slurry/spoil removal via a small diameter cased auger within the jacking pipe. This was termed an **auger-type microtunneling machine**. Soil removal using augers is still a part of several trenchless excavation methods.

It is also worth noting here that microtunneling and pipe jacking methods have evolved over time to allow curved alignments for installation. Horizontal curvature allows pipe installation projects to more easily follow curved public rights-of-way without multiple manholes and short straight segments. Vertical curvature allows shallower launching and reception shafts when installing non-gravity pipelines. The ability to accomplish curved pipe jacking has involved developments in terms of understanding the transfer of jacking stresses across pipe joints in a curved alignment and developments in guidance that no longer required a direct line-of-sight for a laser system.

The use of particular excavation methods and their cost effectiveness depends not only on the development of their own capabilities, reliabilities, productivities, etc. but also whether there is an availability/emergence of competing methods. A few complementary or competing methods will be briefly introduced here and some of them will be touched on further in later discussions where they are providing means of making technological advances. An illustration of the hierarchy of trenchless methods can be seen in Fig. 2.

**Impact moling** is a trenchless method whereby a closed pipe is hammered into the ground and displaces the ground to accommodate the inserted pipe. This is referred to as a **compaction method** and was first developed in Poland and Russia during the 1960s (Barbera et al., 1993). Because of the need to displace the soil, the method is limited to diameters less than around 200 mm (typically much smaller) and near-surface installations. Various attempts have been



Fig. 2. Example classification of trenchless excavation methods.

AR  004963

made to develop commercial products that can be tracked and steered but almost all field applications today are unsteered over short distances between access pits. These methods serve as a complement to pipe jacking and microtunneling methods rather than competition because of the range of diameters suitable for each type of application.

**Pipe ramming** also uses a reciprocating hammer to drive a steel pipe into the ground but in this case the soil is allowed to enter inside the pipe as it is forced into the ground thus minimizing the volume of soil that must be displaced to only the cross-sectional rim of the pipe plus any additional thickness provided by a hardened leading edge of the pipe. This change allows much larger pipes to be installed and diameters from around 0.1 m up to around 4.5 m can be driven for distances typically ranging from a few meters to over 50 meters. Early pipe rams in the U.S. in the early 1970s used adapted impact moles. Tools designed specifically for ramming pipe appeared on the market in the US in 1981 (Griffin, 2002). There is little steering capability while ramming pipe but directional control can be improved by combining the method with a steered pilot bore (described below). Pipe ramming is typically used to install casing pipes in road or rail crossings where the large setup area is not a major disadvantage and the soil remaining in the pipe during installation provides security against face collapse. Pipe ramming is also used to assist in other trenchless installation techniques – most notably by installing a casing through problem soils when using horizontal directional drilling (HDD). Pipe ramming characteristics overlap only slightly with most pipe jacking and microtunneling projects and there is very little research on pipe ramming techniques reported in the literature – mainly what can be found are case history papers with few data. Pipe friction during installation in the presence of the vibration due to hammering plus the optimum levels of external and internal overcut provided by the leading edge are among the questions that appear to be addressed mainly by field experience at the current time although Meskele, and Stuedlein (2015) have investigated the pipe friction associated with pipe ramming. In loose granular fills, vibration settlement of the overlying soils may also be a concern (e.g. Murphy, & Morera, 2011). Project capabilities continue to increase as larger sized ramming equipment is introduced to the market (e.g. Griffin, 2013).

The first use of **horizontal directional drilling (HDD)** to install a pipeline was for a crossing of the Pajaro River in California in 1971 in which 600 LF of 100 mm diameter steel pipe was installed. From 1971 to 1979 only 36 crossings were made using HDD with all of them being in the USA (Barbera et al., 1993). From the 1980s, the method expanded widely with applications in large waterway crossings and in small urban utility installations. The basic method involves the ability to steer and track a drilling bit along a curved path underground forming a pilot hole that can then be enlarged (reamed) until it is large enough to install a product pipeline. During the intervening stages, the hole is supported by remaining filled with a bentonite mud slurry. Today the method has many variations in terms of drilling mechanics, tracking, guidance, hole support, etc. Key differences in comparison with traditional pipe jacking methods include the ability to install a crossing without the need for shafts but with less precise control of the vertical and horizontal alignment and increased issues for hole stability in larger diameter installations and in problem soils (e.g. gravels and cobbles). This paper will not attempt to provide a review of the technical developments and research in the HDD field but it can be noted that there is a substantial body of research into the mechanisms involved in HDD and the supporting technologies. This research both occurs within the equipment manufacturers (drilling equipment, tracking, guidance, etc.) and in terms of academic research (hole stability, cuttings transport, etc.). A recent review of research and development in the HDD field can be found in Yan, Ariaratnam, Dong, and Zeng (2018).

Two hybrid methods are also briefly introduced here since they remain part of the continued evolution of trenchless installation methods and particularly the evolution of pipe jacking and microtunneling techniques. The first technique is termed **pilot tube guidance** (but can be found in the literature also as pilot tube microtunneling and guided boring). It is reported in the literature that the method first came to the US in 1995. Starting from 200 to 250 mm diameters with 60 m drives the method has steadily increased in terms of diameters installed (600–700 mm diameters with drives up to 100 m reported in Huxoll (2006). In the basic method, a hollow steel tube with a slant-face solid head displaces the soil around a pilot tube. Steering is accomplished by stopping the rotation of the drilling head and thrusting the slant face to deviate the hole. Trajectory and orientation of the bit are viewed using a camera theodolite directed along the hollow pilot tube. Once the pilot tube is installed along the accurate alignment, the hole is enlarged using one or more reaming phases with temporary steel pipes and internal augers. In the final phase, the temporary steel pipes are pushed out using the final product pipe. The method installs only straight segments and has more intermediate steps than a full-face microtunneling operation. However, the equipment and required shafts are smaller and setup is quicker. Also, the product pipe does not have to resist the same level of jacking forces as for the face excavation and pipe advance within the same operation. Method adaptations now also allow installations in non-displaceable soils to be accomplished using steerable drilling/tunneling heads. Pilot tube guidance can also be applied in conjunction with other trenchless installation techniques such as pipe ramming (e.g. Murphy, & Morera, 2011) and HDD (e.g. Ramos, 2009). Pilot tube installation followed by pipe jacking of a large casing has been used to install a 98 m long 1.73 m diameter casing in clay soils in Vancouver (Koirala, 2013). A study of jacking forces and productivity in the guided boring method can be found in Olson,

AR 004964

Ariaratnam, and Lueke (2015) and a study of jacking force in the modified guided boring method (powered cutter head) can be found in Yi, Khondoker, Bayat, and Ranjbar (2017).

The second technique is a company-developed technique known commercially as **Direct Pipe™** (also referred to as pipe thrusting) and which is a hybrid technique combining aspects of microtunneling and HDD. Excavation and steering are accomplished with a microtunneling style TBM but the TBM is installed at the front end of a full-diameter steel pipe preferably of the full length of the crossing. Forward thrust is provided by an external pipe gripping mechanism installed at the launching point of the crossing. The combination provides vertical and horizontal steering of the pipeline installation allowing surface-to-surface installations without deep shafts. Importantly, the borehole is never only mud supported as in an HDD installation since the steel pipe follows and is connected to the TBM with only a small annular gap to reduce friction. Another characteristic which may be important in some crossings is that, compared to normal HDD installations, this method requires only a small site area at the reception location – enough to remove the TBM machine from the front of the installed pipe. The technique was first used in October 2007 to install a 464 m (1522 ft) long steel pipe underneath the Rhine River near Worms in Germany. More recent case histories can be found in Rautenkranz (n.d.) and suggested calculation procedures for friction load estimation in Pruiksma et al. (2012). A similar combination of techniques is now offered by at least one other company.

The combination of small diameter bores, full face support and accurate placement has also led to microtunneling being used for pre-support of large underground openings often at shallow depth. In the US, a crossing of interstate freeway I-285 for the Metropolitan Atlanta Rapid Transit System (MARTA) was completed in 1990–1991 using a microtunneling pipe roof system (Van Meter, 1991). Such pipe roof pre-support is often used for large urban non-open-cut underground excavations such as metro stations and recently has been used for a very challenging two-level, 6 lane highway tunnel on a curved alignment in Gongbei, China (Zhang, Ma, & Zhao, 2013).

Finally, in terms of introduction, it is also worth noting that pipe jacking methods can extend to larger structures than typical manufactured pipes. To overcome the size limitation for pipe transport in Japan, a 3.5 m diameter jacking pipe split longitudinally into two halves was jacked successfully in 2005 and in 2011, a 4.0 m diameter pipe was jacked using the same system (Shiomi 2006, 2011). Jacking methods can also be used to jack very large non-circular structures beneath existing railways and roads including, for example, the U.K. Cliffsend Underpass involving a 126 m long, 25 m wide and 6 m high rectangular concrete box section that was installed diagonally beneath an existing and operational railway with a 6 m depth of cover (Landers, 2012). The installation comprised pilot microtunnels at each side of the excavation that were

used to install guide rails and vertical support for the final structure. Next, a full width roof structure was jacked into place using the guide rails for alignment before the remainder of the full section was excavated to complete the 4-lane highway crossing. A recent paper (Thomson, Robinson, & Howe, 2017) gives fuller information on the evolution of these large-scale jacking methods.

### 1.2 Focus of this paper

Advances that allow a wider use of pipe jacking technologies include both technical issues and issues related to the selection of the technology compared to other options (including both other trenchless methods and open cut installation). Since the full range of topics is too broad to cover in this review, the categories are outlined below with some direction for further reading but with the core of this review reserved for some key issues that concern much of the research literature relating to microtunneling and pipe jacking.

## 2 Method components

### 2.1 Project planning and design

As microtunneling and pipe jacking increased in usage, a number of guidance documents were developed. Without trying to be comprehensive, English-language guidelines and standards as microtunneling and pipe jacking developed have included: USNCTT (NRC) (1989), Yorkshire Water (1990), TTC/NUCA (Iseley and Tanwani 1992), TTC/WES (Bennett et al., 1995), Pipe Jacking Association (1995, 2017), Najafi (2005), EN (2000) and ASCE (2001, 2015). Japanese guidelines have included, JSTT (1994) and JMTA (2000) and were part of early recommendations from ISTT (e.g. ISTT, 1994). Various other European and German standards apply and can be found according to their applicability to different aspects of the design process in reference books such as Stein (2005). A number of reference books have been written to aid in the design and construction of microtunneling and pipe jacking projects. These have included: Stein, Möllers, and Bielecki (1989), Thomson (1993), Stein (2005) and Chapman et al. (2018).

Nido, Knies, and Abraham (1999) analyzed microtunneling construction from an operational simulation perspective and Wilkinson (1999) provided a review of the issues that must be effectively addressed in a pipe jacking project to achieve success. Bennett (2006) also provided a summary of potential design, construction and equipment problems for microtunneling projects.

Project planning and design for microtunneling and pipe jacking projects has at its core the balancing of meeting project geometric and performance constraints while minimizing the cost and risk of the project by careful selection of the vertical and horizontal alignment, location of shafts, choice of equipment, etc. Due to the uncertainties involved

AR 004965

in predicting the geological environment for the tunneling works and the lack of access to the face (for many microtunneling projects), this may require substantial judgement rather than definitive analysis. The various aspects involved in a project are reviewed in turn below with references provided to pertinent research and guidance in that area.

There have been substantial differences internationally in typical ranges of application for microtunneling in terms of lengths of drive, use of curved drives, maximum curvature, etc. These differences have grown from both the severity of constraints on alternate construction options and the appetite for risk in different countries. For example Coller, in a US paper in 1993 (Coller, 1993), reported that drives of 300 to 600 m, either in a straight line or to a radius, were routine internationally. However, Klein (1995) reported that in North America typical drives were only in the range of 120 m to 150 m. Also, the first curved microtunneling project in the US was not constructed until 2010 (Palmer, Martin, & Seilert, 2011).

## 2.2 Geotechnical investigation, uncertainty and alignment selection

While many aspects of the geotechnical investigation for pipe jacking projects are similar to those for tunneling, they have some specific differences. Also, many utility microtunneling projects may evolve from designs that envisage open cut installation that would require far less attention to geotechnical investigation. Some key issues to be considered are:

- In non-person entry sizes, the machine and pipe once launched need to be able to reach the arrival shaft (depending on issues such as cutter wear, change of ground type, higher than expected friction, etc.).
- A microtunnel covering the same distance as a large tunnel requires the same length of geology to be categorized but the percentage of the project budget that is often allocated to site investigation means far less money available for the microtunnel project.
- How to fairly apportion the risk between the project owner and the contractor and to decide when project conditions have materially changed from those on which the bid was made. In this regard, the approaches are similar to those that have been adopted in conventional tunneling.

For guidance on geotechnical investigation, risks and contractual issues, papers such as Lyman and Camp (2006) and the manuals/guidelines referred to above provide a more detailed discussion of the issues and suggested approaches. The evolution in contractual practices to manage tunnel risk and litigation starting from early work by the US National Committee on Tunneling Technology (USNCTT) of the US National Research Council (NRC) through its broader application in guidelines from the American Society of Civil Engineers (ASCE) and the International Tunnelling Association (ITA) can be traced in the publications: USNCTT (NRC) (1974, 1978, 1984), ASCE (1997, 2007) and ITA (1988), ITA (2011). Many case study papers also address these issues but are too numerous to list individually. Such papers can be found by searching for microtunneling as a keyword on the technical paper resources of the ISTT (www.istt.com) or the NASTT (www.nastt.org). (Note: when searching internationally, both the British spelling "microtunnelling" and the American spelling with only one "l" should be tried).

## 2.3 Method selection

Appropriate method selection is a key step in ensuring a successful and cost-effective project but it is rarely a straightforward issue. Guidance has been developed to assist in trenchless method selection including guidance manuals, chapters within trenchless reference books and computer decision-support software (e.g. Russell, Udaipurwala, and M. Alldritt and K. EI-Guindy (1999), Leu, Adi (2011), Matthews and Allouche (2012), Jafarimoghaddam, Hamidi, and Najafi (2013) and Matthews, Allouche, Vladeanu, and Alam (2018)). However, as the capabilities of methods change and hybrid or new methods emerge, such guidance can quickly become outdated in particular respects. Method selection also brings into play the question of how closely to define the method in the design specifications and/or whether to pursue a design-build approach. Such issues are not discussed in this paper.

## 2.4 Equipment selection

Equipment selection also is an important part of ensuring success but is a topic on which it is hard to find clear and non-commercial guidance. Selection criteria may include the capabilities of the machine in terms say of size and strength of boulders that can be handled or ancillary systems to assist in face control and muck handling but, in many cases, the information comes from the manufacturer itself and is difficult to independently verify. Manufacturer reputation, service and support provision, etc. can all play a role in the choice of equipment. Case studies can provide useful insight into unforeseen issues with particular choices of equipment in a particular geology but it is often the case that the most instructive case studies are not fully reported in the literature – either due to reputational issues or legal conditions of financial settlements. However, it is also expected that past equipment problems with particular equipment will be addressed in future updates to the equipment, i.e. the R&D advancements resulting from failures often occur within the companies themselves.

Equipment has progressively improved to handle a wider range of ground conditions effectively. Some features have been introduced to the market at an early date but then disappear for a time before reappearing. For example,

a retractable microtunneling machine was first developed in Japan by Okamura (Thompson, 1993). A UK-developed machine using a temporary steel jacking pipe was used in the US in the early 1990s (Gilman and O'Brien, 1995; Staheli and Bennett, 1996) but then disappeared from the market. Recently, new machines that can be retracted within the jacking pipe have reentered the market for specific applications (Iseki, 2016).

For rock microtunneling, the performance of microtunneling machines on projects in hard rock is reviewed in Friant and Abbott (1994), Frank (1999) and Hunt and Del Nero (2009) and an analysis of jacking forces for microtunneling in limestone is given in Barla, Camusso, and Aiassa (2006) where the collapse of rock wedges onto the jacking pipe was analyzed to be responsible for much higher than anticipated jacking loads.

Interest in the use of rectangular cross-sections and other non-circular cross-sections for TBM-based pipe jacking has grown in recent years particularly in Japan and China where they have application for common utility tunnels and pedestrian crossings (e.g. Matsumoto et al., 2010; Li, 2017).

### 2.5 Social and indirect cost evaluation

An important issue in increasing the acceptance of trenchless technologies compared to the traditional open cut construction was in gaining an acceptance that costs to other parties affected by a construction project and costs in terms of general environmental damage ought to be considered in addition to the direct construction costs paid by the project owner. These issues have been outlined and revisited many times since they started to be put forward in the trenchless technology literature in the 1980s and early 1990s (e.g. Vickridge, Ling, & Read, 1992) and a detailed review is not provided in this paper. Discussions including the wise use of the underground space beneath public rights-of-way include Duffaut and Labbé (1992) and Sterling (1994). Some more recent journal papers on the topic include Gilchrist and Allouche (2005), Bottero and Peila (2005), Bobylev (2011) and Matthews, Allouche, and Sterling (2015) which provide extensive references to other literature sources. In the past few years, the impact of construction methods on the environment and carbon emissions has become both an issue of concern and a marketing issue for various technologies. Hunt et al. (2014) and Tavakoli et al. (2017) are examples of such evaluations.

### 2.6 Shaft construction

As mentioned earlier, shaft construction in connection with pipe jacking and microtunneling projects can be an important element in both the construction and cost of a project. Specific techniques may influence shaft shape and size and it has also been mentioned earlier in this paper that the ability to drive curved alignments and the ability to use methods that don't require deep shafts can affect the method selection and design decisions for a project. Shaft design and construction are not particular to pipe jacking and a detailed review is not provided here. Older reviews of shaft design options for microtunneling can be found in JSTT (1995), Robinson (1998) and Brown (1999). Some case histories that may be of interest include the Europipe "Landfalltunnel" for which the shaft was enlarged in size to allow two 4 m long pipe segments to be installed at a time to speed the pipe jacking process (Stein, 2005 (p358)) and offset shafts used to reduce the disturbance of the shafts in critical locations as illustrated in Stein (2005 p455) based on Japanese developments.

Microtunneling often allows the shaft dimensions to include the possibility for drilled shafts. For example, a project in California used drilled shafts of approximately 9 m in diameter (Smith et al., 2003). In recent years, a specialized shaft sinking system has been offered that can provide greater control and enhanced options for caisson shaft construction in problematic ground conditions (Schmäh, 2007).

### 2.7 Thrust reaction and shaft breakout/entry

Two aspects of shaft preparation are particular for pipe jacking applications.

One is the need to transfer the reaction from the jacks through the shaft wall to the ground surrounding the shaft. Design typically involves standard geotechnical passive pressure calculations for the resistance of the ground to the thrust and construction implementation may involve special thrust blocks cast inside the shaft or curved bearing plates to fit the shaft wall for smaller diameter shafts. Preparation may also involve ground improvement outside the shaft if the ground bearing capacity is insufficient. Relevant discussions can be found in some of the design guides and text books (e.g. Stein, 2005) but little is reported on this topic either in case histories or in research papers with a paper by Sun, Shen, Xu, and Xia (2014) as an exception.

The second aspect is to provide a safe exit from the starting shaft and a safe entry into the reception shaft which are typically below the water table. For pipe jacking and microtunneling, the exit arrangements must not only permit the machine to cut through the shaft wall and start its drive without allowing significant groundwater or soil inflow to the shaft but must maintain this seal as the following pipe segments are jacked into the ground. On arrival at the reception shaft, sealing provisions also are required to eliminate or minimize leakage and settlement. The design of these provisions is often left to the contractor but may include either a design requirement or a decision by the contractor to improve the ground in the vicinity of the exit/arrival points by grouting. German experience with the distribution of damages in pipe jacking in Germany (source: IFB, Hanover 1993 – image viewed at www.unitracc.com) indicated that 13% of problems with

microtunneling projects in Germany in the survey time period were related to shaft issues (6% groundwater intrusion and 7% thrust wall problems). However, there are few detailed discussions of this issue in the literature. For the particularly challenging Gongbei project in China, the number of individual microtunnels installed together with the ground conditions and depth below the water table led to the development of a special pressure lock chamber for the launching and reception of each drive (Zhang, Ma et al., 2016).

### 2.8 Surveying and guidance systems

Guidance systems for pipe jacking and microtunneling have seen major advances over the past several decades – permitting the broader use of curved alignment drives. The potential for gyroscopic instrumentation to allow curved microtunneling was already written about in 1991 (Atkin, 1991). The R&D that has advanced this technology has been brought to pipe jacking and tunneling technologies principally by specialist equipment manufacturers and hence there is little in the civil engineering research literature to access to trace its development (for an exception, see Iriyama et al., 2000). Both the guidance equipment manufacturers and the tunneling machine manufacturers provide information on capabilities of the equipment and may provide specialist support during construction (e.g. VMT, 2016). Shen, Lu, and Chen (2010) describe the development and testing of an automated total-station-based survey system. Particularly for the well-used and simpler laser guidance systems, there is guidance available in manuals and reference books as to expected tolerances, sources of inaccuracies and limits to application of particular guidance methods. Basic laser systems for example suffer from beam spreading and refraction over long distances as well as potential disturbance to the laser setup due to jacking force distortions in the shaft. The jacking length may be extended by incorporating a water level system for vertical alignment control since this is often the critical issue and refraction deflects the beam in the vertical plane (Wallin and Bennett, 2010).

Progress in the field can be noted by referring to the increasing length and complexity of successful projects and summaries of technical advances over time (e.g. Clarke-Hackston, 2007; Camp, Messing, & Seilert, 2013) and the equipment selection parameters provided by the specialist companies. A cable tunnel project in Seoul mentioned in the Clarke-Hackston article involved a drive of 800 m of 2.6 m ID with five curves of 200 m and 250 m radius. This allowed staying within the rights of way of the city street and avoided six intermediate shafts to depths of 45 m.

Curved drives have become more and more common with different systems able to be deployed depending on the pipe diameter and the need to stop the advance to make the gyroscopic measurement. The advanced guidance systems still rely on conventional surveying for their referencing to the planned alignment and for the transfer of alignment to the bottom of the shaft. They also, where feasible, use periodic hand survey checks for quality assurance in dealing with issues of measurement drift or equipment malfunction or human error (e.g. Mathy and Pilecki, 1997). Boyce, Havekost, Camp, and Joyal (2010) discuss a number of options for improving alignment control in very loose soil conditions. Oreste, Peila, Marchionni, and Sterling (2002) provides an analysis of the potential for microtunneling machines to sink in very soft ground. Jacking forces in relation to curved and/or inaccurate alignments are discussed in a later section. Ni and Cheng (2012) investigate relationships, based on project data, among steering corrections, geologic conditions, operator experience, etc.

### 2.9 Face support issues

Face support issues for pipe jacking are, for the most part, similar to those for conventional tunneling and hence there is a large body of research work and experience addressing this issue. The topic is addressed in a number of tunneling textbooks or handbooks (e.g. Stein, 2005, Maidl, Herrenknecht, Maidl, & Wehrmeyer, 2012, Maidl, Thewes, & Maidl, 2013; Chapman et al., 2018) and a large number of TBM-related research papers and case studies (too numerous to list or review here). One key difference from tunneling face support issues occurs when the pipe jacking project diameter is too small to allow personnel access to the face for inspection or to remove obstructions. This places a premium on knowing the geological conditions accurately and selecting a machine that can cope with all the ground conditions expected along the drive. In early person-entry diameter projects, assistance in face support was supplied by various types of mechanical support to the face such as sand shelves and breasting plates. Today, the choice is typically among slurry systems, EPB systems or systems that have additional features to deal with changing ground conditions. Specifically with respect to face support for pipe jacking and microtunneling, one can find several research papers. Phelipot et al. (2000) provide a summary of existing face pressure estimation procedures and compare these estimates with monitored data from 14 microtunneling drives in France. Some of the existing models consistently underpredicted face pressures whereas upper and lower bound theoretical estimates tended to bracket the observed data more closely. Broere (2015) provides a review of analytical models for face stability and looks in more detail at slurry-supported face stability in non-cohesive soils. He also identifies the risks involved in using water as a face support medium – a practice that is reported to have cause problems with liquefaction at the face and ground settlements. Ji, Ni, Barla, Zhao, and Mei (2018) use a modified limit equilibrium approach for wedges and silos of earth in front of the face to estimate the face pressures for deep pipe-jacked tunnels.

AR 004968

*2.10 Muck transport and disposal issues*

The muck transport and disposal system is closely tied to the face support and machine selection discussed above and can have a strong effect on the productivity and cost of a pipe jacking project. For slurry systems, key issues at the face can be dealing with boulders or rocks that cannot be crushed, fibrous wood materials that clog or jam the system and sticky clays that interfere with cutting and spoil removal. Key issues for slurry systems in terms of separation and disposal include the efficiency and cost of the separation, the throughput and the possibilities/requirements for spoil disposal. When the tunnel diameter is sufficient and the ground suitable, EPB machines can be used that avoid the separation requirements and avoid many of the muck disposal issues of slurry systems. Suitability of the ground for the EPB process can be improved by the addition of foam and studies by several researchers been reported in the literature (e.g. Borghi, 2006, Vinai, Oggeri, & Peila, 2008, Peila, Picchio, & Chieregato, 2013, Budach and Thewes, 2015; Oñate Salazar, 2018). Vacuum spoil removal has also been used in the field (primarily in Australia) for installing pipes by laser-guided microtunneling with the capability in 2018 to drill up to a 1200 mm hole. A review of the vacuum microtunneling process can be found in Savage et al. (2008). For the most part, muck transport and disposal issues are addressed in terms of technical advances made by specialist manufacturers of the component equipment and little research is found in the tunneling and pipe jacking literature.

Boyce, Wolski, Zavitz, and Camp (2011) and Camp, Zavitz, Sorteberg, and Boyce (2011) describe the chemical and practical aspects of mud slurries in terms of design and construction. Research and development in terms of bentonite and polymer slurries and additives to enhance specific performances are not covered in this paper although some results in terms of friction reduction for lubrication muds are included in a later section.

*2.11 Pipe selection and joint issues*

Pipe selection for pipe jacking projects derives from a combination of the future service requirements of the pipe required together with an assessment of the capability of the pipe and pipe jointing system to withstand the thrust forces during installation. Where the pipe type is not specified by the designer, cost compared to installation speed and risk as well as availability at the project location become important issues. A review of pipe suitability and issues can be found in Boyce and Gray (1996) but more current guidance on pipe selection, joint details, etc. can be found in the handbooks introduced above and manuals prepared by various pipe manufacturers.

Only a few key points will be made here:

- The ability of a jointed pipe to carry axial load depends not only on its component material but also the straightness of pipe segments and the parallelism of the pipe ends. This requires adequate specifications to control pipe tolerances. For instance, Tubbs (1993) noted that one of the most important requirements for keeping jacking loads to a minimum is for every pipe to be straight and have the exact outside shape as the pipe in front of it – comparing microtunneling 122 m with specialist pipe incurring a maximum jacking force of 27 tonnes to failing to complete a 91 m run with poor quality pipe even with 227 tonnes of jacking force.
- The transfer of axial forces between pipe segments (if not joined intimately by welding or similar) requires cushioning material. Due to the Poisson's Ratio effect or crushing of the cushioning material, splitting forces can develop within the pipe wall. Also, for a number of reasons, the full pipe cross-section is not available at the joint to carry the axial load.
- When the alignment is not straight, axial loads may be transferred with significant eccentricity, leading to a reduction in the axial carrying capacity. Reverse curvature alignments increase the problems experienced due to compression, relaxation and recompression of the cushioning materials.

R&D advancements in this area occur both within pipe manufacturers and in the broader research community studying the interaction between pipe and joint materials/design and the performance of the pipe system during pipe jacking. For example, Haslem (1998) describes and compares existing analyses of the stress distribution at joints for pipe-jacked curved alignments and Kiesselbach (2004) analyzes and simulates the capabilities for different pipe materials to accommodate jacking forces/eccentricity.

Two significant advances in recent years include the development of design aids and project monitoring systems that handle the complexities of curved pipe jacking to avoid damage to the pipe during installation (Beckman, Stein, Fabri, & Uhlenbroch, 2007; Jackcontrol, 2007) and the introduction of commercially available fluid-based joint cushioning systems (e.g. Marti, Trümpi, and Heinzmann (2009) and its use on a curved microtunneling project in the US (Fowler et al., 2013)).

When the required jacking force is expected to exceed the capability of the basic jacking system to provide it or the pipe, thrust wall, etc. to resist it, intermediate jacking stations (IJS) can be added at various points within the pipe string to allow different sections of the pipe string to be moved independently (see Fig. 1 for a conceptual illustration). The jacking components of the IJS are removed at the end of the drive leaving the steel shell in place to allow the jacking pipes on either side of the IJS to be pushed together and the pipe made good at the junction. Thus, IJS can only be used for person-entry diameters. The use of IJS can lower the risk of a pipe jacking project and the IJS do not have to be used if not needed. The inclusion of IJS adds to the setup cost of the project and, when

AR 004969

used, jacking speeds are lowered. They are not reviewed in detail in this paper.

### 2.12 Ground movements

The topic of ground movement and impacts on surrounding structures and utilities is an important one – not only to the success of projects but also in terms of research studies. The topic interacts with a wide range of geomechanics and groundwater issues as well as being an important influence on construction practices and the choice of excavation technology. As in the case of face support, most of the issues to be studied (e.g. systematic percent ground loss due to annular space and steering corrections, loss of face stability, groundwater changes, etc.) are common to both tunneling and pipe jacking work and many theoretical and case histories can be found across the entire field. Some research specifically connected to pipe jacking and microtunneling includes O'Reilly and Rogers (1990), Rogers and Chapman (1995), Marshall (1998) and Cheng, Ariaratnam, and Chen (2017). There can also be an important interaction of trenchless techniques with a variety of ground support and improvement methods through the use of the small diameter guided boring techniques to install pipe umbrellas for direct, physical support (e.g. Lunardi, 1990 and the Gongbei tunnel already referred to) or for grouting (e.g. Dickes, 2012).

Shen, Cui, Ho, and Xu (2016) describes detailed monitoring of 4 closely-spaced parallel microtunneling drives (450 m drives, 4.16 m dia, 4.8 m apart) giving ground movement data and the changes in ground movement caused by the sequence of pipe jacking.

Systematic ground losses can usually be well predicted and controlled through selection of the appropriate overcut and lubrication/grouting procedures. Excessive ground loss at the face or during shaft exit/entry is harder to guard against. While estimates of the volume of muck removed from the tunnel versus the volume represented by the machine advance are often carried out, there seems to be plenty of scope for improvements in the accuracy, reliability and speed of feedback from such methods.

## 3 Pipe friction assessment

### 3.1 Background to discussion

As identified earlier, the key characteristic of pipe jacking and microtunneling compared to conventional tunneling is the need to slide the pipe or tunnel support structure through the ground as the tunnel is advanced. The thrust that will be required to complete a pipe jacking drive and the ability of all the components of the thrust system to withstand the forces that will need to be applied are key elements for success of a project. The interaction of the pipe with the surrounding ground, the effect of intended and unintended curvature of alignment, the impact of overcut and the friction reduction by lubrication are factors

that complicate the assessment. As a key aspect of pipe jacking and one that crosses the concerns of designers, contractors and equipment manufacturers, it is an area of strong interest for methods of better estimation of expected forces but without falling strongly into the purview of specific companies. It is also a topic that offers academic challenges. For all the above reasons, the estimation of jacking force represents the main body of research literature for pipe jacking and microtunneling and hence is covered in more detail in this paper.

### 3.2 Overview of jacking force assessment

Many of the practical approaches to jacking force estimation are based on relatively simple physical models coupled with experience on prior projects and informed in some cases by laboratory testing.

Figure 3 illustrates the several components that contribute to the overall jacking thrust required for a pipe jacking project. Firstly, thrust is required to provide the necessary face pressure to support the face, to balance the groundwater pressure and to enable the appropriate force on the cutters to excavate the ground. Since this force will remain relatively constant over a length of pipe jacking (unless the geology changes radically along the alignment), it becomes a smaller percentage of the total jacking force as the drive extends and is typically not a critical issue in terms of total jacking force estimation for long drives. Another component of the jacking force results from the need to slide the shield or tunnel boring machine through the ground. The machine/shield is of a fixed weight and length and hence contributes a constant contribution to the total jacking force as the drive extends. The remainder of the components of the total jacking force all act based on the length/surface area of the pipe string and hence get larger as the drive extends. In a dry stable hole, the weight of the pipe will cause a frictional resistance to sliding. In a hole below the water table, buoyancy effects from the empty pipe below the groundwater surface will counteract and often exceed the weight of the pipe (in which case, the pipe will try to float within the hole and the friction will act along the upper surface of the pipe). The previous two components are easy to calculate for specific pipe sections and depths below the groundwater table. However, the pipe will only rarely slide through a stable hole created by the shield or TBM ahead of the pipe string. Typically, the overcut made by the machine results in an annular gap that can close or collapse on the pipe string behind the machine – allowing some proportion of the full ground pressure at the level of the microtunneling drive to act against the surface of the pipe. The actual contact area between the pipe and the soil, the contact pressure exerted, the effect of changing the annular gap, the influence of lubrication mud pumped into the annular space and the friction coefficient that is appropriate to be used are all difficult to assess. To add to this already complex problem, bores may not be exactly straight (even when intended to



Fig. 3. Basic force diagram for pipe jacking.

be), curved alignments are common, pipe and joints may have geometrical defects that cause dragging in the soil, pipe jacking is not continuous over time (allowing adhesion to occur), etc.

The development of more detailed analytical, empirical and semi-empirical models plus the quantification of the above effects form the core of much of the academic and industry-based research into jacking force calculation. The literature is too extensive to provide a detailed review of all the individual contributions but the research areas will be discussed in terms of their general research themes and methodologies with references to individual papers for detailed study.

### 3.3 Friction coefficient studies

A basic starting point for understanding the required jacking force is to know the interface friction between different pipe and soil materials. Various researchers have carried out laboratory tests to study the relevant interface friction coefficients either through sliding experiments of one material on another or soil shear box experiments with a pipe material in one half of the shear box. Some examples of research and tabulated data can be found in Potyondi (1961), Uesugi and Kishida (1986) and Uesugi, Kishida, and Tsubakihara (1988) and Stein (2005) as well as from such tests forming part of the pipe friction research discussed below.

Staheli conducted laboratory shear testing with different pipe and soil materials having quantified surface roughnesses and friction angles respectively. Field case study data were then used for comparison with the laboratory data for frictional resistance (Staheli et al., 2006; Staheli, 2006). In general, the use of basic interface friction coefficients often leads to high estimates of jacking force with

the coefficients measured depending on the surface roughness of the materials involved, angularity of the soil particles, etc. The use of lubrication during pipe jacking radically changes the contact mechanics between the pipe and the soil and enables much lower resistance to sliding (as discussed below).

### 3.4 Analysis of project jacking force data

A large body of research has focused on collecting or assembling field data of jacking projects and attempting to relate these data to various key project and site parameters that might be expected to have a significant effect on the jacking force. Since the jacking force is typically known with reasonable accuracy and the project geometry is well defined (length jacked and pipe surface area), a measure of jacking resistance per unit surface area of pipe is readily calculated. This unit value (often given the symbol M and expressed in $kN/m^2$) essentially integrates all the individual pipe-area/length-based effects into a single value that is easily compared from project to project and can be used for estimation of pipe jacking thrust requirements in future projects with similar project and site parameters. Stein (2005), for example, tabulates both friction coefficients and M values taken from various sources. One of his tables of collected values is reproduced in Table 1 where it can be seen that the reported values vary widely and include some very high unit friction estimates. Also, the graphs of jacking force versus length jacked that are included in many case history papers (e.g. Fig. 3 from the Gongbei project referred to earlier) show that the jacking force per unit length and hence the M value varies significantly during the course of the project. An assessment of the M value may take the lower envelope of the back-calculated M values along the drive with the assumption that the variations

Table 1
Values of skin friction based on practical experience (from Stein, 2005).

| Author | M (kN/m$^2$) | Remarks | |
|---|---|---|---|
| Krebs | 15–30 | | |
| Herrenknecht | 20–30 | Rough surface | |
| | 12–15 | Smooth surface | |
| Hafelin | 20–40 | | |
| | 25–50 | | |
| Scherle | 10–20 | Use of lubrication and support media, jacking in groundwater | |
| | 12–15 | | |
| Szechy | 100 | For concrete/fine sand with pipe coating | |
| | 15–50 | | |
| Hahn | 10 | | |
| Weber | 8.4 ± 2 | Gravel, sand | |
| | 9.3 ± 1 | Loamy sand | |
| | 7.3 ± 1 | Loam | |
| | 5.7 ± 4 | Loam, cobbles | |
| Australische Werte | 16 | Sand | |
| | 5–6 | Soft clay | |
| | 5–8 | Hard clay | |
| ISTT | 7.0 | Clay | Microtunneling with spiral conveying |
| | 7.5 | Sand, sand/gravel | |
| Stein | 10 | | |
| | 5 | Use of lubrication and support media | |

above this lower envelope are due to changes in face pressure, stoppages, etc. Researchers have been able to gain more insight into the effects of different project parameters by correlating these changes in jacking load to changes in construction or site parameters (e.g. Coller et al., 1996; Bennett, 1998).

Norris (1992) used heavily instrumented field studies to improve the scientific understanding of the pipe jacking process and in particular to investigate friction loads in different ground conditions including the effect of lubricants and the load/deflection characteristics of the joints with different packing materials. This work was extended to a greater variety of projects and ground conditions in Marshall's Ph.D. studies (Marshall and Milligan, 1996; Marshall, 1998).

Chapman and Ichioka (1999) used a large database from pipe jacking projects in Japan to study the variation of jacking loads with project and site parameters. They found no relationships of frictional resistance with depth or soil strength and only a weak trend with pipe diameter. Using regression analysis on the project data, they developed a semi-empirical method for predicting jacking loads.

French research on microtunneling also has included collection of extensive monitoring data from projects and its analysis to improve predictions for future projects. Publications from this work include Kastner et al. (1996), a summary of results from a French National Project "Microtunnels" in Guilloux (2002), Pellet-Beaucour and Kastner (2002) and the full report in English (FSTT 2006).

More recent work includes Barla and Camusso (2013) who developed jacking load estimation procedures targeted at the soils in the Torino area and Cheng, Ni, Arulrajah, and Huang (2018) who compared back-analysed friction coefficients to different estimation models and investigated

changes in the friction loads in comparison to changes in the detailed geology, face pressures, alignment control, etc. Other recent work also involving field data and targeted at specific issues such as lubrication or curved alignments are discussed below. Choo and Ong (2015) conducted shear testing of reconstituted tunneling rock spoils to obtain strength parameters that could be used in the calculation of friction coefficients from the field data. The back-calculated average friction coefficients for drives in four different rock types were 0.07, 0.20, 0.31 and 0.71 and the variations were explained in terms of the quality of lubrication, the rock type and the potential loss of lubrication fluid into the surrounding rock.

*3.5 Field test bed studies and laboratory-scale experiments*

The issue of pipe-soil friction has also been studied in specially prepared field test beds and in laboratory-scale experiments in soil boxes. Such work has mostly been undertaken by research institutions in the field and typically involving Ph.D. dissertation research.

In US studies, a test bed constructed at the Waterways Experiment Station of the US Army Corps of Engineers in Vicksburg, MS consisted of several different soil type sections with the capability of varying the ground water level within a test section. The test facility was 104 m long, 4.9 m wide, and 4.0 m deep (Iseley and Bennett, 1993; Staheli and Bennett, 1996). In the same time period, a test bed was also constructed at the Trenchless Technology Center at Louisiana Tech University. The test bed was used to test a new Japanese microtunneling system in addition to other uses for trenchless technology field studies (Najafi et al., 1993). In the UK, Yonan's Ph.D. dissertation

research used reduced scale testing in the laboratory to study pipe jacking forces in sand (Yonan, 1993).

Other research has involved laboratory and field testing as a component of studies as discussed below.

### 3.6 Development of jacking load estimation methodologies

In addition to estimation formulae developed as part of specific research, there is a strong body of research that combines or compares analytical approaches with empirical observations to develop recommended estimation procedures. Because of the importance of the issue, the ISTT was an early catalyst to formulate some guidance for the assessment of jacking forces in the early 1990s (ISTT, 1994) and the Japan Society for Trenchless Technology also prepared guidance (JMTA, 2000; JSTT, 1994). Text books and handbooks outlining calculation methods, recommended values and important issues include Stein et al. (1989), Thomson (1993) and Stein (2005). ASCE (2001) Std 27 for concrete pipes provides a table of values for M ranging from 2 to 45 kN/m$^2$. Individual authors also report typical ranges based on their experience, e.g. (Coller, 1993) indicates that, as a guide, frictional forces fall between 4.8 and 24 kN/m$^2$ of external circumferential area. The values listed in Table 1 collected by Stein range from 1.7 to 100 kN/m$^2$ with most of the values lying between 5 and 40 kN/m$^2$. Stein's own recommended values were 10 kN/m$^2$ for unlubricated drives and 5 kN/m$^2$ for lubricated drives. Coller et al. (1996) review jacking force issues and recommendations and shows through well documented case studies how the jacking load can change significantly based on construction and site variables.

The UK Pipe Jacking Association (PJA, 1995) provided guidelines for the pressure needed to provide tunnel face stability based on a tunnel stability factor. Its model for frictional load is based on Terzaghi's analysis for the vertical stress and the mid tunnel height vertical overburden pressure multiple by a lateral coefficient for the horizontal stress. These contact stresses are averaged to calculate an average pressure that is then multiplied by the friction coefficient.

DWA (2008) develops an analytical model for unit friction resistance based on Terzaghi's trap door approach together with face pressure estimation and a factor to increase the friction resistance based on the quality of the steering and the length of the bore. For a 200 m drive, the recommended friction coefficient increase would be 4% for good steering and 12% for bad steering. For a 400 m drive, the respective increases would be 16% increase for good steering and 48% for bad steering.

A number of authors and/or guidelines give estimates of the impact of construction variables on the jacking load. For example, (ASCE, 2001) indicates that increases of 20–50% in jacking load can be expected after delays and that the reduction due to lubrication may be more than 50% but more commonly the average reduction may be about 30%. The recommendations for reductions due to lubrication however vary over a wide range with Staheli (2006) recommending a reduction of 90%. The reasons for this wide range of impact is discussed in the section below.

A number of jacking load estimation approaches use Terzaghi's trap door research (Terzaghi, 1943) to assess the soil pressure that acts on the pipe as the annular space closes. However, several conditions of the geometry and soil conditions do not fully match between the trap door experiments and the pipe jacking case leading to various interpretations regarding the exact geometry of the shear bands formed and whether the shear bands reach all the way to the ground surface. Firstly, the annular space is created all around the pipe – leading to horizontal inward soil movements at the side of the pipe that could change the abutment support conditions that affect the soil arching expected above the pipe. Secondly, in Terzaghi's experiments and analysis, the ground above the trap door remains supported but is allowed to deflect downwards – initiating the arching in the ground above that reduces the support pressures required to maintain stability. In the pipe jacking case, the soil must either fail or deform substantially before encountering the support resistance from the pipe.

Nevertheless, the trap door type model offers one of the few opportunities to use an analytical model that captures the reduction of soil pressures on the pipe due to the ground movements allowed by the annular space. Differences among various models are nicely reviewed in Zhang, H.F. et al. (2016) which concludes that for deep burial cases, use of Terzaghi's first trapdoor-based model can lead to underestimates of ground pressures. This is because analysis using the first model (with shear bands extending to the surface) implies that for high pipe burial depth to pipe diameter ratios, the pressure does not depend on the depth of burial.

Bennett's dissertation (1998) used a model based on the effective normal stress acting on the pipeline together with a friction coefficient modified by an arching factor and friction reduction factor (e.g. lubrication). Staheli's dissertation (2006) developed a model for the average unit frictional stress during pipe jacking based on the Terzaghi trap door model and used collected project data for comparison.

In a detailed monitoring study of the Gongbei Tunnel pipe roofing installations, Shi, Liu, Pan, and Yu (2017) provide a detailed development of the predicted jacking loads and a comparison with the measured data. The back calculated unit friction values for the steel pipe on a curved alignment ranged from 0.1 to 0.4 kN/m$^2$ with a mean value of 0.25 kN/m$^2$. The interface frictional coefficients ranged from 0.003 to 0.023 with a mean value of 0.01. These values are determined using a trend line that runs approximately through the minima of the jacking load (as shown in Fig. 4) and hence do not consider the short-term fluctuations in jacking load caused by changes in face pressure or work stoppages. Clearly, the project was able to achieve

AR 004973



Fig. 4. Comparison of design and measured jacking loads for pipe number 5 on the Gonbei Project (from Shi et al., 2017).

very low unit jacking resistance – especially for a curved alignment.

The difficulty evident in the work to improve the theoretical estimates of friction load is trying to find reasonable analytical approximations to very complex construction and geotechnical conditions. An approach combining numerical simulation to generate input data for jacking force estimation can be found in Yen and Shou (2015). Extending this approach, it should be possible to use numerical modeling to estimate ground movements, surface settlements and pipe contact pressures in a parametric study covering a wide range of project and ground parameters. Estimates of the appropriate values for a particular case based on these numerical simulation results could then be made through their interpolation using neural network analysis or regression – providing the detail of numerical simulation in a format suitable for effective design in small projects. For an example using 2-D simulation of microtunneling cross-sections to provide rapid settlement estimates, see (Duan, 2001; Duan and Sterling, 2002).

### 3.7 Reviews and comparisons of jacking load assessments

The many estimations of jacking load using field data, analytical models and semi-empirical models have given rise to survey-type papers/book sections that, at different levels of detail, review jacking load estimation models. Such contributions include: Rahjoo et al. (2012) who reviews several estimation models, Peila et al. (1997) who develop estimation procedures for jacking loads and microtunneling performance based on project data and a review of the existing literature and Yonan (1993) who provides an excellent review of pipe jacking analysis approaches up to the time of his dissertation.

The comparisons of models are in general less helpful than expected because the various models and/or their comparisons use adjustment factors to account for such issues as lubrication and misalignment, choose face pressures anywhere between active and passive pressures, or have different estimation options for minimum, typical or maximum estimates. The range of such adjustments is high.

For example, Staheli (2006) uses 90% as the reduction when lubrication is used. Other researchers have also found high reductions from lubrication but there are still other researchers that have found more modest reductions (in the range of 25% to 60%) through lubrication depending on soil and pipe type. The user is left with the difficulty of deciding what level of reduction or increase should be applied to take account of particular project conditions.

Senda et al. (2010) also show a comparison of measured and calculated jacking forces with the calculated friction values greatly exceeding the measured data. This is again attributed to the calculation methods being unable to properly represent the large reductions in friction due to properly applied lubrication. Combining the measured data from lubricated drives with the analytical approaches for deeper underground layers resulted in estimates of the unit area friction resistance of 0.3 to 3.0 kN/m². The issues of tail void and lubrication for deep pipe jacking are further discussed in Senda, Maeda, Shimada, Sasaoka, and Matsui (2013). Ni, Ge, and Cheng (2016) reports field measurements of the variation of pipe jacking forces in coarse and fine soils.

The importance of lubrication and various studies that have focused on this issue are described in the next section.

### 3.8 Studies relating to the frictional impact of lubrication

Potential impacts of lubrication of the annular space with injected bentonite-additive mixtures have been expected by various researchers to include:

- The bentonite acts as a lubricant at the boundary between the soil and the pipe.
- When the soil collapses into the annular space, the bentonite mixes with the soil provide a material with a lower friction angle than the native soil.
- The lubricant fills and stabilizes the overcut and makes the pipeline partially or fully buoyant.
- If a positive pressure in the lubricant is maintained, the lubricant serves to reduce the effective stress in the soil and at the contact with the pipe.

The research studies below have tried to better understand which aspects of lubrication have the most impact and what the overall impact of lubrication can be under different project conditions.

Khazaei, Wu, Shimada, and Matsui (2006) conducted laboratory studies on different lubrication mud compositions and also modeled numerically the impact of the mud strength parameters on the jacking force. They found that the shearing took place at the mud-pipe interface, that it was important for the mud to retain its water content and, through the numerical modeling study, that jacking loads were reduced by 17% with a stable lubricant. In her Ph.D. dissertation research, McGillivray (2009) studied the lubrication mechanisms and their influence on interface friction through a series of laboratory interface tests with

different soils and different conditions for the injection of the lubrication mud. The effect of the lubrication mud in reducing the effective stress was found to be an important effect.

Namli and Guler, 2016) used a small-scale laboratory test apparatus to study the effect of bentonite slurry pressure on the interface friction of pipe jacking. Introducing bentonite into the interface of the laboratory testing resulted in about a 50% reduction in friction coefficient (0.25 vs 0.47). Keeping the bentonite under a constant pressure during the pipe movement increased the reduction to 90% (0.07 vs 0.47). The laboratory data was then compared with the friction coefficient values obtain from three different field measurements showing good agreement with the 3 laboratory experiments according to the use or absence of bentonite lubrication and whether the bentonite was supplied at a constant pressure or not.

Bai et al. (2013) used back analysis of field measurements of pipe jacking to compare with estimates of the friction loads (using an assumed value for the friction coefficient of 0.4). Their field data showed that the unit frictional resistance (M) decreased substantially from its initial value of about 45 kN/m² to an asymptotic value of 4 to 5 kN/m². This was attributed principally to the incomplete lubrication of the annular space during the early stages of pipe jacking. Shao et al. (2009) from field monitoring also noted high unit friction values during the early stages of a pipejacking run with the values typically dropping during the later stages. They also noted the changes in jacking force due to change in ground conditions, size of overcut, etc.

Zhou, Wang, and Huang (2009) studied effects of lubrication and variation in mud properties in laboratory soil box tests using 100 mm PVC pipe. Shou, Yen, and Liu (2010) used a simple test to measure the impact of different bentonite-polymer formulations on the friction resistance between a concrete block and the soil. Estimates of pipe jacking frictional resistance were then compared to case study results. Shou and Su (2016) also conducted simulation studies of variations in overcut and mud properties on the soil-pipe interaction. Wetter et al. (2011) discusses the effects of lubrication based on changes applied during different jacking drives in a case study project. Delivering the lubrication mud to the area immediately behind the machine and supplying an excess volume of mud over that required to fill the annular space were both found to reduce the frictional forces.

Reilly (2014) and Reilly and Orr (2017) present the results of a series of interface friction tests carried out to investigate this resistance using a conventional direct shear device and a novel triaxial testing apparatus, where a lubricant was injected into the interface between a coarse-grained soil and a rough concrete surface similar to a concrete jacking pipe, while the soil was shearing against the rough concrete surface. It is shown that, for coarse-grained soils, the main beneficial mechanism of pipe jacking lubricants is the reduction of the local effective stress

acting on the pipe through the generation and retention of excess pore water pressure in the soil near the interface.

Wang, Wang, Zhang, and Wang (2018) present data from more than 5 km of jacking of 4.0 m diameter steel pipe. Two different lubrication muds were used and mud volumes were also varied. The lubrication mud incorporating a polymer was found to work the best and also it was found that increasing mud volumes lowered the frictional resistance.

### 3.9 Assessment for curved pipe jacking alignments

Microtunneling on a curve can significantly increase jacking loads since the machine and the following straight sections of pipe are deflected along the curved alignment by the reaction forces on the wall of the tunnel. Researchers studying this problem through analysis and/or 3-D numerical modeling include Broere, Faassen, Arends, and van Tol (2007), Shou and Jiang (2010) and Shou and Yen (2010).

Nanno (1996) discussed the development and use in Japan of an adjustable four-point load transfer system between the sections of pipe jacked along a curved alignment (applicable to person-entry diameters). Sugimoto and Asanprakit (2010) combined geometrical analysis, a ground-reaction spring model and finite element modeling to study the behavior of pipes and the friction force during curved pipe jacking. Chen (2008) carried out physical modeling and jacking force analysis for curved pipe jacking.

## 4 Summary and conclusions

This review paper has been written to provide an introduction to the development of pipe jacking and microtunneling and to describe the key components of practice and research in the field. Extensive citations are provided to allow readers to identify early work in the field, expansion of capabilities over time and the recent areas of research and development. A particular focus of the paper is to categorize the research into the assessment of jacking loads which is the most extensive body of research in the field. Because of the variety of research findings and estimation procedures, it is difficult to provide a concise overall summary from the literature review. It can be said, however, that progress is being made on understanding the implications of such factors as soil type, overcut, stoppages and – most importantly – lubrication on the friction load for pipe jacking. Effective lubrication activated as soon as possible behind the machine and with sufficient volume and pressure to reduce the effective stress at or near the pipe interface have been shown to allow pipe jacking with very low unit frictional resistance.

Pipe jacking and microtunneling continue to evolve in terms of capabilities for distances jacked, increasingly challenging alignments, use in hybrid technologies and in handling more challenging geological conditions. Equipment development, courage of designers and constructors and

16                                    *R.L. Sterling / Underground Space 5 (2020) 1–19*

the increased understanding from research all contribute to these developments.

Future research directions will no doubt continue to include studies on how to model the complex interactions of pipe, soil, annular space and lubrication mud injection and how jacking loads are affected by curved alignments in various types of ground conditions.

## References

ASCE (1997). Geotechnical Baseline Reports for Underground Construction: Guidelines and Practices. Reston, VA: American Society of Civil Engineers.

ASCE (2015). Standard Design and Construction Guidelines for Microtunneling, ASCE/CI 36-15. Reston VA: Am. Soc. of Civil Engrs., 134.

ASCE (2001). Standard Practice for Direct Design of Precast Concrete Pipe for Jacking in Trenchless Construction, ASCE Standard 27-00, 62.

ASCE (2001). Standard Construction Guidelines for Microtunneling, ASCE/CI 36-01. Reston VA: Am. Soc. of Civil Engrs., 41.

ASCE (2007). Geotechnical Baseline Reports for Construction – Suggested Guidelines. Reston, VA: American Society of Civil Engineers.

Atkin, R. (1991). Mechanised Curved Pipe Jacking by Giro-Compass. Proc. Pipe Jacking and Microtunneling 91, 1st Intl. Conf., Oct. 23-24, London, Pipe Jacking Association, London, 17.1–17.6.

Bai, J. S., Ma, B. S., Zhou, P., & Jia, Z. (2013). Analysis and Calculation of Jacking Force in the Mudstone Formation. *Proc. ASCE Pipelines, 2013*, 905–914.

Barbera, L., Iseley, T., & Tanwani, R. (1993). Historical Development of Trenchless Construction Methods and Equipment in the United States. Proc. Trenchless Technology: An Advanced Technical Seminar for Trenchless Pipeline Rehabilitation, Horizontal Directional Drilling and Microtunneling, Vicksburg MS, 139–160.

Barla, M., & Camusso, M. (2013). A method to design microtunnelling installations in randomly cemented Torino alluvial soil. *Tunnelling and Underground Space Technology, 33*, 73–81.

Barla, M., Camusso, M., & Aiassa, S. (2006). Analysis of jacking forces during microtunnelling in limestone. *Trenchless Technology Research, Tunnelling and Underground Space Technology, 21*(6), 668–683.

Beckman, D., Stein, R., Fabri, T., & Uhlenbroch, A. (2007). CoJack – A new statics method of computing and controlling pipe jacking. *Tunnelling and Underground Space Technology, 22*(7), 587–599.

Bennett, D. (1998). *Jacking Forces and Ground Deformations Associated with Microtunneling*, Ph.D Thesis. University of Illinois.

Bennett, R. D., Guice, L. K., Khan, S., & Staheli, K. (1995). Guidelines for Trenchless Technology: Cured-in Place Pipe (CIPP), Fold and Formed Pipe (FFP), Mini-Horizontal Directional Drilling (mini-HDD), Microtunneling, TTC Technical Report No. 400, Technical Report CPAR-GL-95-2, Construction Productivity Advancement Research (CPAR) Program, U.S. Army Corps of Engineers 172.

Bennett, D. (2006). From one extreme to the other: Challenges with microtunneling in very soft soils and hard rock. In Proc. NASTT No-Dig Nashville.

Biggart, A. (2011). Closed face decisions – slurry or EPBM?. *Tunnelling Journal* (February), 32–37.

Bobylev, N. (2011). Comparative analysis of environmental impacts of selected underground construction technologies using the analytic network process. *Automation in Construction, 20*(8), 1030–1040.

Borghi, F. X. (2006). Soil conditioning for pipe-jacking and tunnelling (Ph.d thesis). Department of Engineering, University of Cambridge.

Bottero, M., & Peila, D. (2005). The use of the Analytic Hierarchy Process for the comparison between microtunnelling and trench excavation. *Tunnelling and Underground Space Technology*, Pergamon, Oxford, *20* (6), 501–513.

Boyce, G. M., Gray, W. W. S. (1996). A User's Guide of Pipe. In Proc. No-Dig International '96, March 31-April 3, 1996, New Orleans, Louisiana, USA (pp. 519–532).

Boyce, G., Havekost, M., Camp, C., Joyal, N. (2010). Grade control for microtunnels in very loose and very soft soils. In Proc. NASTT No-Dig Conf., Chicago, Paper B-5-02.

Boyce, G., Wolski, M., Zavitz, R., & Camp, C. (2011). Chemistry and Physics behind Microtunnel Slurries. In Proc. NASTT No-Dig Conf. Mar 27–31, Washington D.C. Paper A-2-01.

Broere, W. (2015). On the face support of microtunnelling TBMs. *Tunnelling and Underground Space Technology, 46*, 12–17.

Broere, W., Faassen, T. F., Arends, G., & van Tol, A. F. (2007). Modelling the boring of curves in (very) soft soils during microtunnelling. *Tunnelling and Underground Space Technology, 22*(5–6), 600–609.

Brown, D. (1999). Cost Effective Shafts in Microtunneling. In Proc. NASTT NO-DIG '99, Orlando, FL, 191–203, paper 3A-189.

Budach, C., & Thewes, M. (2015). Application ranges of EPB shields in coarse ground based on laboratory research. *Tunnelling and Underground Space Technology, 50*, 296–304.

Camp, C., Zavitz, R., Sorteberg, B., & Boyce, G. (2011). Slurry Management for Microtunneling Projects. In Proc. NASTT No-Dig Conf. Washington D.C. Paper A-2-05.

Camp, C., Messing, M., & Seilert, A. (2013). Surveying and Guidance for Microtunnel Construction. In Proc. NASTT No-Dig Conf., Sacramento, CA, Paper TM2-T4-01.

Chapman, D. N., & Ichioka, Y. (1999). Prediction of jacking forces for microtunneling operations. *Trenchless Technology Research, Tunnelling and Underground Space Technology, 14*(Suppl. 1), 31–42, Elsevier Science.

Chapman, D., Metje, N., & Stärk, A. (2018). Introduction to Tunnel Construction (2nd ed.). London: CRC Press, 425.

Chen, C. J. (2008). Physical modeling and jacking force analysis of curved pipejacking Master thesis. NCHU.

Cheng, L. Y., Ariaratnam, S. T., & Chen, S. X. (2017). Analytical solution for predicting ground deformation associated with pipe jacking. *Journal of Pipeline System Engineering Practice, 8*(3), 04017008.

Cheng, W. C., Ni, J. C., Arulrajah, A., & Huang, H. W. (2018). A simple approach for characterising tunnel bore conditions based upon pipe-jacking data. *Tunnelling and Underground Space Technology, 71*, 494–504.

Choo, C. S., & Ong, D. E. (2015). Evaluation of pipe-jacking forces based on direct shear testing of reconstituted tunneling rock spoils. *Journal of Geotechnical Geoenvironment Engineering*.

Clarke-Hackston, N. (2007). Expanding horizons: Technical advances give pipe jacking added versatility. Tunnel Business Magazine, 39.

Coller, P., Staheli, K., Bennett, D., & Post, R., (1996). A review of jacking forces by both theoretical and empirical methods as compared with 20 years of practical experience. In Proc. NASTT-ISTT No-Dig '96, New Orleans, 125–150.

Coller, P. (1993). Overview of microtunneling techniques. Trenchless technology: An advanced technical seminar, Vicksburg MS, Jan 26–30.

Craig, R. N. (1984). Pipe Jacking: A State-of-the-art Review. London: Construction Industry Research & Information Assoc.

Dickes, G. (2012). Support of tunneling with chemical grouting in new jersey. In Proc. NASTT Conf., Nashville TN, Paper F-2-03.

Drennon, C. B. (1979). Pipe Jacking: State of the Art. *Journal of the Construction Division, 105*(C03), 217–223.

Duan, Z., & Sterling, R. L. (2002). Rapid Prediction of Surface Settlements due to Normal Microtunneling Operations. In Proc. NASTT No-Dig 2002, Montreal, Canada.

Duan, Z. Y. (2001). Ground Deformation due to Microtunneling Ph.D. Thesis. Louisiana Tech University.

Duffaut, P., & Labbé, M. (1992). Coordination of utility networks as a first step towards underground town planning, No Trenches in Towns, Henry & Mermet (Eds.), Balkema, Rotterdam.

DWA-A 125E, (2008). Pipe Jacking and Related Techniques. DWA German Association for Water, Wastewater and Waste-Heuss-Allee 1753773 Hennef, Germany (Cited in Rahjoo et al., 2012).

EN (2000). Trenchless Construction and Testing of Drains and Sewers (03.2000). European Standard EN 12889, 26.

Fowler, J., Wallace, J., & Trümpi-Althaus, S., (2013). First application of the hydraulic joint on a curved microtunnel drive in North America. In Proc. NASTT No-Dig Conf., Sacramento, Paper MA-T4-04.

Frank, G. (1999). Performance prediction for hard-rock microtunneling. In Proc. North American NO-DIG'99, Orlando, FL, 119–130.

Friant, J. E., & Abbott, D. G. (1994). Developments in hard rock microtunneling. *Proc. of NASTT NO-DIG '94 Conference, Dallas, Texas.* Chicago, Illinois: NASTT, E2:1–E2:14.

FSTT (2006). *Microtunneling and Horizontal Drilling Recommendations.* French Society for Trenchless Technology (FSTT), 344.

JA2576

Gilchrist, A., & Allouche, E. (2005). Quantification of social costs associated with construction projects: State-of-art-review. *Tunnelling and Underground Space Technology, 20*(1), 89–104.

Gilman, B., & O'Brien, J. (1995). Historic Boston Offers a Real Challenge. In Proc. NASTT No-Dig 1995, Toronto, Ontario, 1A-1.1-10.

Griffin, J. (2002). Pipe ramming gains renewed popularity as uses expand. Underground Construction.

Griffin, J. (2013). Hammerhead introduces 34-inch Rammer. Underground Construction.

Guilloux, A. (2002). The French National Research Project 'Microtunnels'. In Proc. NASTT No-Dig 2002, Montreal, Canada.

Haslem, R. F. (1998). Stress formulation for joints in pipe-jacked tunnels. *Trenchless Technology Research, 12*(l-2), 39–48.

Hunt, S. W., & Del Nero, D. E. (2009). Rock Microtunneling – An Industry Review. In Proc. ISTT/NASTT No Dig Conf., Paper B-2-01.

Huxoll, S. (2006). Sewer project prepares nebraska city for growth, sets record with pilot tube microtunneling. Trenchless Technology Magazine.

Iriyama, Y., Hino, H., & Miyatake, M. (2000). Continuous high-precision position-detection system utilizing fiber-optic gyroscope for microtunneling machines. In Proc. ISTT No-Dig 2000, Perth.

Iseki Poly-Tech, Inc., 2016. Pullback and Redeploy System for Slurry Type Micro-Tunneling Boring Machine (MTBM). ISTT No-Dig New Installation 2016 Award Winner.

Iseley, T., & Bennett, D. (1993). Microtunneling tests at WES: Construction of test facility and preliminary test results, Trenchless Technology: An Advanced Technical Seminar, Vicksburg MS, A2: 1-15.

Iseley, T., & Tanwani, R. (1992). *Trenchless Excavation Construction Equipment and Methods Manual, prepared for National Utility Contractors Association*. Ruston, Louisiana: TTC LA Tech University, 65.

ISTT (1994). *Microtunneling Jacking Force*. International Society for Trenchless Technology Report, Working Group No. 3 (Microtunneling), 96.

ITA (1988). ITA Recommendations on Contractual Sharing of Risks. *Tunnelling and Underground Space Technology, 3*(2), 103–140 (International Tunnelling Assoc. Working Group #3).

ITA (2011). *The ITA Contractual Framework Checklist for Subsurface Construction Contracts*. International Tunnelling Association, Working Group #3, Report No. 006, 12.

Jackcontrol AG. 2007. Monitoring microtunneling, http://www.jackcontrol.com Aug. 10.

Jafarimoghaddam, A., Hamidi, J. K., & Najafi, Mohammad (2013). Application of decision tree to selection of MTBM for adverse geological conditions. *International Journal of Mining Science and Technology, 23*(4), 503–511.

Ji, X. B., Ni, P. P., Barla, M., Zhao, W., & Mei, G. X. (2018). "Earth pressure on shield excavation face for pipe jacking considering arching effect. *Tunnelling and Underground Space Technology, 72*, 17–27.

JMTA (2000). *Pipe-jacking Application*. Tokyo: Japan Micro Tunneling Association.

JSTT, (1994). *Microtunneling Jacking Force*. Japan Society for Trenchless Technology, Working Group No. 3, 95.

JSTT (1995). *State of the Art Vertical Shafts for Small Diameter Pipe Jacking*. International Society for Trenchless Technology Report, Working Group No. 3 (Microtunneling), Japan Society for Trenchless Technology, September, 33p.

Kastner, R., Pellet, A. L., Ouvry, J. F., & Guilloux, A. (1996). In-Situ Monitoring of Microtunneling Projects. In Proc. No-Dig International '96, New Orleans, 171–182.

Khazaei, S., Wu, W., Shimada, H., & Matsui, K. (2006). Effect of Lubrication Strength on Efficiency of Slurry Pipe Jacking. Proc. Underground Construction and Ground Movement Conf. (GSP 155).

Kiesselbach, G. (2004). Curved pipe-jacking – State of the art and usability. In Proc. ISTT No-Dig, Hamburg.

Klein, S. J. (1995). Design aspects of microtunneling projects. *No-Dig Engineering, 2*(2), 9–13.

Koirala, N., Bryski, T., & Linseman, J. (2013). Installation of large diameter water mains using pilot tube method. *Proceedings of NASTT No-Dig Conference*, Paper MM-T4-03.

Landers, J. (2012). *Large U.K. Highway Underpass Installed by Horizontal Jacking*. Reston VA: Civil Engineering, Am. Soc. of Civil Engrs., 27–29.

Leu, S. S., & Adi, T. J. W. (2011). Microtunneling decision support system (MDS) using Neural-Autoregressive Hidden Markov Model. *Expert Systems with Applications, 38*(2011), 5801–5808.

Li, J. B. (2017). Key technologies and applications of the design and manufacturing of non-circular TBMs. *Engineering, 3*(6), 905–914.

Lunardi, P. (1990). The cellular arch method: Technical solution for the construction of the Milan railway's Venezia station. *Tunnelling and Underground Space Technology, 5*(4), 351–356.

Lyman, T., & Camp, C. (2006). Subsurface Investigations and Ground Conditions for Trenchless/Tunnel Projects. In Proc. NASTT No-Dig Conf. Mar 26–28, 2006, Paper A-2-04.

Maidl, B., Herrenknecht, M., Maidl, U., & Wehrmeyer, G. (2012). *Mechanised Shield Tunnelling*. Berlin: Ernst & Sohn.

Maidl, B., Thewes, M., & Maidl, U. (2013). Handbook of Tunnel Engineering (1st ed.). (vol. 1 and 2), John Wiley & Sons Inc.

Marshall, M. A. (1998). *Pipe-Jacked Tunnelling: Jacking Loads and Ground Movements, Department of Engineering Science (Ph.D thesis)*. University of Oxford.

Marshall, M., Milligan, G. (1996). A Case Study of an Instrumented Microtunnel in Fine Sand. In Proc. No-Dig International'96, Mar 31– Apr 3, New Orleans (pp. 151–169).

Marti, P., Trümpi, S., & Heinzmann, D. (2009). Hydraulic joint for pipe jacking. *Journal of Construction Engineering and Management, 135*(6), 439–447.

Mathy, D. C., & Pilecki, T. (1997). Planning and Design Considerations for Microtunneling. In Proc. NASTT Conf. 1997, Seattle, WA, Session 3-B-2, 371–390.

Matsumoto, F., Morita, T., & Sakai, E. (2010). Application of a Rectangular Pipe Jacking Machine for Long Distance and Curved Pipeline Construction. In Proc ISTT No-Dig Conf. 8-10 Nov 2010, Singapore, Paper #22.

Matthews, J. C., & Allouche, E. N. (2012). Fully automated decision support system for assessing the suitability of trenchless technologies. *Journal of Pipeline Systems Engineering and Practice, 3*(2), 55–64.

Matthews, J. C., Allouche, E. N., & Sterling, R. L. (2015). Social cost impact assessment of pipeline infrastructure projects. *Environmental Impact Assessment Review, 50*(2015), 196–202.

Matthews, J., Allouche, E., Vladeanu, G., & Alam, S. (2018). "Multi-segment trenchless technology method selection algorithm for buried pipelines. *Tunnelling & Underground Space Technology, 73*(1), 295–301, Elsevier.go.

McGillivray, C. V. (2009). *Lubrication Mechanisms and Their Influence on Interface Friction During Installation of Subsurface Pipes* Ph.D. Thesis. School of Civil and Environmental Engineering. Georgia Institute of Technology.

Meskele, T., & Stuedlein, A. W. (2015). Static soil resistance to pipe ramming in granular soils. *Journal of Geotechnical and Geoenvironmental Engineering, 141*(3) article ID 04014108.

Murphy, J. P., Morera, J. (2011). Guided bore solves difficult multiple high railway embankment crossing. In Proc. NASTT No-Dig Conf., Washington D.C., Paper B-2-04.

Najafi, M. (2005). *Trenchless Technology: Pipelines and Utility Design, Construction and Renewal*. NY: McGraw-Hill.

Najafi, M., Iseley, D. T., Pumphrey, N.D., & Nishida, H. (1993). Details of Kidoh/Iseki/Carlon Research Project Conducted at TTC. In Proc. Advanced Technical Seminar for Trenchless Pipeline Rehabilitation, HDD and Microtunneling, Vicksburg, MS, 399–432.

Namli, M., & Guler, E. (2016). Effect of bentonite slurry pressure on interface friction of pipe jacking. *Journal of Pipeline Systems Engineering Practice*.

Nanno, T. (1996). A method for driving curved pipe-jacked tunnels. *Trenchless Technology Research, II*(2), 3–25.

Ni, J. C., & Cheng, W. C. (2012). Steering characteristics of microtunnelling in various deposits. *Tunnelling and Underground Space Technology, 28*, 321–330.

Ni, J. C., Ge, L., & Cheng, W. C. (2016). Variation of Slurry Pipe Jacking Force in Coarse and Fine Soils. Proc. Geo-China 2016.

Nido, A. A., Knies, C. J., & Abraham, D. M. (1999). Role of operation simulation in the analysis and improvement of microtunnelling projects. *Trenchless Technology Research, 14*(1), 1–19.

Nomura, Y., Hoshina, H., Shiomi, H., & Umezu, T. (1985). Pipe jacking method for long curve construction. *Journal of Construction Engineering Management, 111*(2), 138–148.

Norris, P. (1992). *The behaviour of jacked concrete pipes during site installation* D. Phil. Thesis. UK: Univ. of Oxford.

O'Reilly, M. P., & Rogers, C. D. (1990). Ground movement associated with pipe jacking and trenching. In Proc. 5th Intl. No-Dig 90 Conf., B1.1-B1.8.

JA2577

Olson, M. P., Ariaratnam, S. T., & Lueke, J. S. (2015). Jacking force and productivity analysis of pilot tube microtunneling installations. *Journal of Pipeline System Engineering Practice, 7*(1), 04015018.

Oñate Salazar, C. G., Todaro, C., Bosio, F., Bassini, E., Ugues, D., & Peila, D. (2018). A new test device for the study of metal wear in conditioned granular soil used in EPB shield tunneling. *Tunnelling and Underground Space Technology, 73*, 212–221.

Oreste, P. P., Peila, D., Marchionni, V., & Sterling, R. (2002). Analysis of the problems connected to the sinking of micro-TBMs in difficult grounds. *Tunnelling and Underground Space Technology, 16*(Suppl. 1), 33–45.

Palmer, R., Martin, L., & Seilert, A. (2011). The first planned curved microtunnel in the United States. *Proc. NASTT No-Dig Conf., Washington D.C., Paper F-2-03*, 1–10.

Peila, D., Pelizza, S., Pigorini, B., & Artigiani, E. (1997). Analysis of microtunnel performances in non-cohesive soil. *Proc. 14th Intl. No Dig, Genova*, 41–48.

Peila, D., Picchio, A., & Chieregato, A. (2013). Earth pressure balance tunnelling in rock masses: Laboratory feasibility study of the conditioning process. *Tunnelling and Underground Space Technology, 35*, 55–66.

Pellet-Beaucour, A. L., & Kastner, R. (2002). Experimental and analytical study of friction forces during microtunneling operations. *Tunnelling and Underground Space Technology, 17*(1), 83–97.

Phelipot, A., Pellet-Beaucour, A. L., & Kastner, R. (2000). Assessments of Face Loads During Microtunneling Operations. In Proc. ISTT No-Dig, Perth, 6.

Pipe Jacking Association (1995). *Guide to Best Practice for the Installation of Pipe Jacks and Microtunnels*. Pipe Jacking Association, 77.

Pipe Jacking Association (2017). *An introduction to pipe jacking and microtunnelling*. UK: Pipe Jacking Association, 24.

Potyondi, J. G. (1961). Skin friction between various soils and construction materials. *Geotechnique, 11*(4), 339–353.

Pruiksma, J. P., Pfeff, D., & Kruse, H. M. G. (2012). The Calculation of The Thrust Force for Pipeline Installation Using The Direct Pipe Method. In 7th Pipeline Technology Conference, Hannover.

Rahjoo, S., Najafi, M., Williammee, R., & Khankarli, G. (2012). Comparison of Jacking Load Models for Trenchless Pipe Jacking 1507–1520. Proc. Pipelines 2012.

Ramos, M. (2009). Field Challenges and Successes with Pilot-tube Microtunneling. In Proc. ISTT/NASTT No Dig Conf., Toronto, Paper C-1-03.

Rautenkranz, R. (nd). Innovative Direct 'Pipe Method' – Case Histories. Herrenknecht article, 11 pp, https://www.waternz.org.nz/Attachment?Action=Download&Attachment_id=1043 Mar 31, 2018.

Reilly, C. C., & Orr, T. L. L. (2017). Physical modelling of the effect of lubricants in pipe jacking. *Tunnelling and Underground Space Technology, 63*, 44–53.

Reilly, C. C. (2014). *The Influence of Lubricant Slurries on Skin Friction Resistance in Pipe Jacking* (Ph.D thesis). Trinity College Dublin: Department of Civil, Structural and Environmental Engineering.

Robinson, J. A., & James, C. T. (1998). Shafts for microtunneling and pipe jacking, layout, design & construction. In Proc. NASTT No-Dig 98, Albuquerque, NM, 196–217.

Rogers, C., & Chapman, D. (1995). Ground Movement Caused by Trenchless Pipe Installation Techniques. In Proc. Transportation Research Board, 74th Annual Meeting, Washington, D.C., 32.

Russell, A. D., Udaipurwala, A., Alldritt, M., & EI-Guindy, K. (1999). Computer system for the selection of trenchless and conventional methods for underground utilities. *Trenchless Technology Research, 14* (2), 1–12.

Savage, E., Ariaratnam, S. T., & Rankin, J., Harrison, S. (2008). Innovative Technique for On-grade Gravity Sewer Applications. In Proc. NASTT No-Dig 2008, Dallas TX.

Schmäh, P. (2007). Vertical shaft machines. State of the art and vision. *Acta Montanistica Slovaca Ročník, 12*, 208–216.

Senda, T., Shimada, H., Sasaoka, T., Matsui, K., Hirai, M., & Morita, T. (2010). Fundamental study on effect of pipe jacking on deeper underground area. In Proc. ISTT No-Dig 2010, Singapore, Paper #49, 9.

Senda, T., Maeda, Y., Shimada, H., Sasaoka, T., & Matsui, K. (2013). Studies on surrounding soil during construction using the deep pipe jacking method in the deep strata. *Procedia Earth and Planetary Science, 6*, 396–402.

Shao, B., Ma, B. S., & Shi, L. (2009). A Sewer Pipeline Installation Using Pipe-jacking in Langfang. *Proc ASCE ICPTT Conf, 2009*, 1413–1424.

Shen, S. L., Cui, Q. L., Ho, C. E., & Xu, Y. S. (2016). Ground response to multiple parallel microtunneling operations in cemented silty clay and sand. *Journal of Geotechnical Geoenvironment Engineering, 142*(5), article ID 04016001.

Shen, X. S., Lu, M., & Chen, W. (2010). Automatically Tracking and Guiding Underground Tunnel Boring Machines during Microtunneling and Pipe Jacking Operations. Proc. Construction Research 1827 Congress.

Shi, P. X., Liu, W., Pan, J. L., & Yu, C. C. (2017). Experimental and analytical study of jacking load during microtunneling Gongbei tunnel pipe roof. *Journal of Geotechnical Geoenvironment Engineering, 144*(1), article ID 05017006.

Shiomi, M. (2011). Constructing rainwater storage pipe by super-large pipe jacking method. *Monthly Pipe Jacking Magazine, 25*(3) (in Japanese).

Shiomi, M. (2006). Supersized pipe jacking using segmental pipes. *Tunnels and Tunnelling International*, (Nov), 21–22.

Shou, K. J., & Jiang, J. M. (2010). A study of jacking force for a curved pipejacking. *Journal of Rock Mechanics and Geotechnical Engineering, 2*(4), 298–304.

Shou, K. J., & Su, C. Y. (2016). Numerical analysis of the impact of overcut on the soil-pipe interaction in pipejacking. *Journal of Geoengineering, 11*(3), 151–156.

Shou, K. J., & Yen, J. H. (2010). On the behavior of a stuck curved pipe jacking. *Journal of Geoengineering, 5*(3), 77–85.

Shou, K., Yen, J., & Liu, M. (2010). On the frictional property of lubricants and its impact on jacking force and soil-pipe interaction of pipe-jacking. *Tunnelling and Underground Space Technology, 25*(4), 469–477.

Smith, D. L., Anderson, J. E., & Romero, B. C. (2003). Trenchless technology and the santa rosa geysers recharge project. In Proc. NASTT-ISTT No-Dig 2003., Las Vegas, Nevada, 14.

Staheli, K., & Bennett, D. (1996). Results of controlled field tests of a retrievable microtunneling system with reaming capabilities. In Proc. NASTT/ISTT No Dig Conf., New Orleans, Session 2A-4, 183–202.

Staheli, K., Frost, D., & Iscimen, M. (2006). Studies of interface friction between jacking pipe materials and frictional soils and the impact on jacking forces. In Proc. NASTT No-Dig 2006, Nashville, Paper D-2-02, 11.

Staheli, K. (2006). *Jacking force prediction: An interface friction approach based on pipe surface roughness* Dissertation. Georgia Institute of Technology.

Stein, D. (2005). *Trenchless Technology for Installation of Cables and Pipelines*. Bochum, Germany: Stein and Partner.

Stein, D., Möllers, K., & Bielecki, R. (1989). *Microtunneling: Installation and Renewal of Nonman-Size Supply and Sewage Lines by the Trenchless Construction Method*. Berlin: Ernst & Sohn.

Sterling, R.L. (1994). Indirect Costs of Utility Placement and Repair Beneath Streets, Report to the Minnesota Dept. of Transportation.

Sugimoto, M. & Asanprakit, A. (2010). Stack pipe model for pipe jacking method. *Journal of Construction Engineering Management, 136*(6), 683–692.

Sun, Y., Shen, S. L., Xu, Z. L., & Xia, X. H. (2014). Prediction of lateral displacement of soil behind the reaction wall caused by pipe jacking operation. *Tunnelling and Underground Space Technology, 40*, 210–217.

Tavakoli, R., Najafi, M., Tabesh, A., & Ashoori, T. (2017). Comparison of carbon footprint of trenchless and open-cut methods for underground freight transportation. In Proc. Pipelines 2017.

Terzaghi, K. (1943). *Theoretical Soil Mechanics*. NY: Wiley and Sons.

Thomson, James (1993). *Pipejacking and Microtunnelling*. Glasgow, UK: Chapman & Hall, 273.

Thomson, J. C. (2009). *Microtunnelling and How We Got There*. Trenchless International.

Thomson, J. C., Robinson, A., & Howe, C. (2017). Jacked installation of underbridges Paper 1600032. *Proceedings of Institution of Civil Engineers, Bridge Engineering, 171*(2), 118–126.

Tubbs, C. L. (1993). A houston contractor's perspective. Trenchless Technology: An Advanced Technical Seminar, Vicksburg MS, 249–257.

Uesugi, M., & Kishida, H. (1986). Influential factors of friction between steel and dry sands. *Soils Found, 26*, 33–46.

Uesugi, M., Kishida, H., & Tsubakihara, Y. (1988). Behaviour of sand particles in sandsteel friction. *Soils Found, 28*, 107–118.

USNCTT (NRC) (1974). *Better Contracting for Underground Construction*. Washington, DC: US National Committee on Tunneling Technology, National Research Council, National Academy of Sciences.

USNCTT (NRC) (1978). *Better Management of Major Underground Construction Projects*. Washington, DC:: US National Committee on Tunneling Technology, National Research Council, National Academy of Sciences.

USNCTT (NRC) (1984). *Geotechnical Site Investigations for Underground Projects, Volume 1 and 2*. Washington, DC: US National Committee on Tunneling Technology, National Research Council, National Academy of Sciences.

USNCTT (NRC) (1989). Micro and small diameter tunneling. Washington, DC: US National Committee on Tunneling Technology, National Research Council, National Academy of Sciences. *Report summarized in Tunnelling and Underground Space Technology, 4*(2), 193–199.

Van Meter, B. (1991). Microtunneling Methods for Constructing Pipe Arch Tunnels. In Proc. NASTT No-Dig Conf., May 5-8, Kansas City, MO, 6.

Vickridge, I., Ling, D. J., & Read, G. F. (1992). Evaluating the social costs and setting the charges for road space occupation. In Proc. ISTT No-Dig 92, Washington, D.C., 15.

Vinai, R., Oggeri, C., & Peila, D. (2008). Soil conditioning of sand for EPB applications: A laboratory research. *Tunnelling and Underground Space Technology, 23*(3), 308–317.

VMT (2016). Microtunneling Guidance Systems, VMT GMBH, Germany, presented at Microtunneling Short Course, Boulder, CO.

Wallin, M., & Bennett, D. (2010). Twenty Years of Perspective: Design and Construction Professional's Views on Improving Microtunneling. Proc. NASTT Conf. Chicago IL, Paper B-5-01, 1–15.

Wang, J. F., Wang, K., Zhang, T., & Wang, S. (2018). Key aspects of a DN4000 steel pipe jacking project in China: A case study of a water pipeline in the Shanghai Huangpu River. *Tunnelling and Underground Space Technology, 72*, 323–332.

Yorkshire, Water (1990). *Code of Practice for Microtunneling*. Leeds, UK: Yorkshire Water Plc, 18.

Wetter, L., Staheli, K., Davidson, D. (2011). Quantifying the effects of lubrication on jacking forces. In Proc. NASTT No-Dig Conf., Washington D.C., Paper A-2-02.

Wilkinson, D. (1999). Successful microtunnelling: Matters which must be considered. *Trenchless Technology Research, 14*(2), 47–61.

Yan, X. F., Ariaratnam, S. T., Dong, S., & Zeng, C. (2018). Horizontal directional drilling: State-of-the-art review of theory and applications. *Tunnelling and Underground Space Technology, 72*, 162–173.

Yen, J., & Shou, K. (2015). Numerical simulation for the estimation of the jacking force of pipe jacking. *Tunnelling and Underground Space Technology, 49*, 218–229.

Yi, Y. L., Khondoker, T. H., Bayat, A., & Ranjbar, M. (2017). Jacking force analysis of pipe installation using a modified guided boring method. *Journal of Pipeline System Engineering Practice, 8*(4), article ID 04017014.

Yonan, S.J., 1993. Pipe Jacking Forces in Sand, Ph.D. Thesis, Loughborough University, UK.

Zhang, P., Ma, B. S., Zeng, C., Xie, H. M., Wang, D. W., & Li, X. (2016). Steel curved pipe jacking construction under complicated conditions for a curved pipe roof. Proc. Pipelines Conf. 2016.

Zhang, P. P., Ma, B. S., & Zhao, W. (2013). The largest curved pipe roofing tunnel project in the world. *Proceedings of ASCE Pipelines, 2013*, 953–963.

Zhang, H. F., Zhang, P., Zhou, W., Dong, S., & Ma, B. S. (2016). A new model to predict soil pressure acting on deep burial jacked pipes. *Tunnelling and Underground Space Technology, 60*, 183–196.

Zhou, S., Wang, Y. Y., & Huang, X. C. (2009). Experimental study on the effect of injecting slurry inside a jacking pipe tunnel in silt stratum. *Tunnelling and Underground Space Technology, 24*(4), 466–471.

JA2579

# STATE OF NEW YORK
# PUBLIC SERVICE COMMISSION

## APPLICATION FOR A CERTIFICATE
## OF ENVIRONMENTAL COMPATIBILITY AND
## PUBLIC NEED TO CONSTRUCT AN APPROXIMATELY
## 9.5-MILE NATURAL GAS GATHERING PIPELINE

## NEW YORK MAINLINE LOOP
## NATURAL GAS PIPELINE PROJECT

## CASE 13-T-____

## UNDER ARTICLE VII OF THE
## NEW YORK PUBLIC SERVICE LAW

## DECEMBER 2, 2013

## TOWN OF WINDSOR, COUNTY OF
## BROOME, STATE OF NEW YORK

## APPLICANT:

## Williams Field Services Company, LLC and
## DMP New York, Inc.
## Park Place Corporate Center 2
## 2000 Commerce Drive
## Pittsburgh, Pennsylvania  15275-1026

## VOLUME I OF III

AR  004981

**WILLIAMS FIELD SERVICES COMPANY, LLC AND
DMP NEW YORK, INC.**

**Table of Contents**

Page

1.0    Application to Construct a Natural Gas Pipeline ................................................... 6
2.0    Project Description ............................................................................................ 8
    2.1    Statement of Public Need ............................................................................ 9
    2.2    Pipeline Location, Route and Approximate Length ................................... 15
        2.2.1    Description of Pipeline Route and Approximate Length ............... 15
        2.2.2    Cathodic Protection System ........................................................ 23
        2.2.3    Gas Quality Measures ................................................................. 24
        2.2.4    Visual, Noise, and Vehicular Traffic ............................................ 25
            2.2.4.1    Visual Impacts ............................................................ 25
            2.2.4.2    Noise Impacts ............................................................ 26
            2.2.4.3    Traffic Impacts ........................................................... 26
    2.3    Pipeline Safety, ROW Acquisition,
        Clearing Widths, Access, and Depth of Pipeline Cover .......................... 27
    2.4    Agency Field Verification ........................................................................... 29
    2.5    Ecosystem, Visual, and Cultural Resources ............................................. 30
        2.5.1    Ecosystem Resources ................................................................ 30
            2.5.1.1    Waterbodies ............................................................... 30
            2.5.1.2    Wetlands .................................................................... 37
            2.5.1.3    Wetland Mitigation ..................................................... 40
            2.5.1.4    Springs and Wells ...................................................... 40
            2.5.1.5    Floodplains ................................................................. 41
            2.5.1.6    Land Use .................................................................... 42
            2.5.1.7    Geology and Soils ...................................................... 45
            2.5.1.8    Agricultural Lands/District .......................................... 48
            2.5.1.9    Migratory Birds ........................................................... 51
            2.5.1.10    Rare, Threatened, and Endangered Species ............... 52
            2.5.1.11    Invasive Species .......................................................... 53
            2.5.1.12    Protected Vegetation .................................................. 55
            2.5.1.13    Visual Resources ........................................................ 55
            2.5.1.14    Project Construction and Economic Benefits ............... 56
        2.5.2    Cultural Resources ...................................................................... 57
        2.5.3    Other Resource Evaluations ....................................................... 57

**Table of Contents (Continued)**

**Page**

2.6    Streams, Road and Railroad Crossings.................................... 58
    2.6.1  Stream Crossings................................................ 58
    2.6.2  Road and Railroad Crossings ................................... 59
2.7    Additional Items ..................................................... 61
    2.7.1  ROW Agreements ................................................ 61
    2.7.2  Workspace ..................................................... 62
    2.7.3  Timber ........................................................ 63
    2.7.4  Blasting ...................................................... 64
    2.7.5  One-Call Summary .............................................. 65
    2.7.6  EM&CS&P ....................................................... 65
    2.7.7  Community Outreach Program..................................... 66
        2.7.7.1  Pre-Application Communication ................... 67
        2.7.7.2  Post-Application Communication ................. 67
2.8    State and Local Laws.................................................. 69
    2.8.1  Introduction .................................................. 69
    2.8.2  NY State ...................................................... 69
    2.8.3  Broome County ................................................. 70
        2.8.3.1  Air Pollution Control .......................... 70
        2.8.3.2  Solid Waste .................................... 70
        2.8.3.3  Motor Vehicles ................................. 70
    2.8.4  Town of Windsor ............................................... 71
        2.8.4.1  Flood Damage Prevention ........................ 71
        2.8.4.2  Noise Control .................................. 72
        2.8.4.3  Zoning ......................................... 73
    2.9    Stop Work Authority ...................................... 74
3.0    References ........................................................... 74

**Tables**

Table 1.0    Stream and Waterbody Crossings
Table 2.0    Wetland Crossings
Table 3.0    Field Identified Spring and Water Well Locations within 200 Feet of the NY Mainline Loop Pipeline ROW
Table 4.0    Land Uses Crossed by the NY Mainline Loop Pipeline Centerline

## **Table of Contents (Continued)**

Table 4.1     Land Use Acreage Crossed by the Project
Table 4.2     Residences within 500 Feet of the NY Mainline Loop Pipeline Construction ROW
Table 5.0     Soils Crossed by the Proposed Project
Table 6.0     Slopes Encountered Along the Proposed NY Mainline Loop Pipeline
Table 7.0     Active and Inactive Cropland and Pasture Land
Table 8.0     Road and Railroad Crossings for Proposed Route

### **Exhibits**

Exhibit A     Project Location Map
Exhibit B     Williams Proposed Certificate Conditions
Exhibit C     Appendix 7-D, Form A Report of Specifications for Proposed Construction
                    Exhibit C-1    NYPSC Case 10-T-0350 FERC Jurisdiction Determination Letter
Exhibit D     Field Summary
                    Exhibit D-1    Utility Crossing Plan
Exhibit E     Alternatives Analysis
Exhibit F     Williams Blasting Plan
Exhibit G     Williams Traffic and Transportation Plan
Exhibit H     Land ROW Summary Report
                    Exhibit H-1       McKnight Agreement
                    Exhibit H-2       Wilmot Agreement
                    Exhibit H-3       Howland Agreement
                    Exhibit H-4       Travis Agreement
                    Exhibit H-5       Rounds Agreement
                    Exhibit H-6       Parsons Agreement
                    Exhibit H-7       Fox Farm, LLC Agreement
                    Exhibit H-8       Fox Farm, LLC Road Agreement
                    Exhibit H-9       Osterhout Agreement
                    Exhibit H-10     Farr Agreement
                    Exhibit H-11     Root Agreement
                    Exhibit H-12     Donlick Agreement
                    Exhibit H-13     Smith Agreement
                    Exhibit H-14     Burnett Agreement
                    Exhibit H-15     Rogan Agreement
                    Exhibit H-16     GH Holdings, LLC Agreement

JA2583

AR  004984

## Table of Contents (Continued)

|  |  |
|---|---|
| Exhibit H-17 | Fluegel Agreement |
| Exhibit H-18 | Shaffer Agreement |
| Exhibit H-19 | Pollara Agreement |
| Exhibit H-20 | O'Conner Agreement |
| Exhibit H-21 | Kirgan Agreement |
| Exhibit H-22 | Hammer Back, LLC Summit Energy Agreement |
| Exhibit H-23 | Carinci Agreement |
| Exhibit H-24 | Nash Agreement |
| Exhibit H-25 | Collins Agreement |
| Exhibit H-26 | Whitelaw Agreement |
| Exhibit H-27 | Bigelow Agreement |
| Exhibit H-28 | Lyman Agreement |
| Exhibit H-29 | Scott Agreement |
| Exhibit H-30 | Scott Agreement |
| Exhibit I | Construction Alignment Sheets |
| Exhibit I-1 | Work Plan for Special Construction Procedures between Station 153+94 and 165+79 |
| Exhibit J | Wetland Delineation and Stream Identification Report |
| Exhibit K | Watershed Boundary Map |
| Exhibit L | Field Identified Spring House within 200 feet of the Project |
| Exhibit L-1 | Consultation with the NYDOH, City of Binghamton, and the Town of Kirkwood |
| Exhibit M | Town of Windsor FIRM and 100-Year Floodplain Map |
| Exhibit N | Land Use Map |
| Exhibit O | NYPSC Case 10-T-0350 Correspondence |
| Exhibit P | Agricultural Districts and Land Map |
| Exhibit Q | Appendix 7-G(a), Farmland Operator Forms |
| Exhibit R | Appendix 7-G, Notification for Construction |
| Exhibit S | ROW Restoration and Revegetation Plan |
| Exhibit T | Consultation with the United States Fish and Wildlife Service |
| Exhibit U | Consultation with New York State Department of Environmental Conservation Division of Fish, Wildlife, and Marine Resources, and the New York Natural Heritage Program |
| Exhibit V | Consultation with New York State Office of Parks, Recreation, and Historic Preservation |
| Exhibit W | Unanticipated Discoveries Plan |
| Exhibit X | Williams and Town of Windsor Road Use Agreements |
| Exhibit Y | Williams Hydrostatic Test Plan |

12/2/2013

AR  004985

## __Table of Contents (Continued)__

Exhibit Z      Horizontal Directional Drilling Contingency Plan
              Exhibit Z-1    Geotechnical Bore Test Report
              Exhibit Z-2    Horizontal Directional Drill Construction Drawings
Exhibit AA    Horizontal Directional Drilling Inadvertent Return Contingency Plan
Exhibit BB    Winter Construction, Restoration, and Remediation Plan
Exhibit CC    EM&CS&P Check-Off List
Exhibit DD    Town of Windsor Zoning Map

© 2013 GAI Consultants, Inc.

AR  004986

## 1.0    Application to Construct a Natural Gas Pipeline

Pursuant to Article VII, Section 121-(a)(3) of the New York ("NY") Public Service Law ("PSL") and 16 New  York Code of Rules and Regulations (NYCRR Part 85-1.3), Williams Field Services Company, LLC and DMP New York, Inc. ("DMP"), as co-applicants (collectively, "Williams" or "Applicants") hereby submit this application to construct a natural gas pipeline ("Application") to the NY Public Service Commission ("NYPSC") and respectfully request a Certificate of Environmental Compatibility and Public Need ("Certificate") to construct and operate a proposed 9.5 mile 16-inch diameter natural gas pipeline ("NY Mainline Loop Pipeline" or the "Project"), which will run parallel to Williams' existing 16-inch diameter natural gas pipeline ("NY Mainline") in the Town of Windsor, County of Broome, State of NY,  as shown on **Exhibit A** ("Project Location Map"). The installation of additional piping at Williams' Dunbar Compressor Station ("CS") is not required for satisfying the purpose and need of this Project. Williams' NY Mainline (9.5 miles of which is located in Broome County, NY) and its Dunbar CS were approved by the NYPSC by Order dated February 22, 2011 in Case 10-T-0350.[1]

The initial purpose of the NY Mainline and the pipelines located upstream in Pennsylvania ("PA") was to serve as a gathering line for natural gas from 9 existing wells and 9 permitted wells operated by WPX Energy Keystone, LLC's predecessor-in-interest, Alta Resources, LLC, to serve additional prospective wells drilled by Carrizo (Marcellus), LLC in Susquehanna County, PA and to transport that gas to the 30-inch transmission pipeline owned by the Millennium Pipeline Company, LLC ("MPC") in NY. As of June 2013, the NY Mainline and the pipeline system located upstream in PA gathers natural gas from over 120 wells in Susquehanna County, PA and Wyoming County, PA from its 3 exploration and production customers: WPX Energy Keystone, LLC; Carrizo (Marcellus), LLC; and Cabot Oil & Gas Corporation ("Williams' Customers"). Given the success of Williams' Customers, and the prolific nature of the Marcellus Shale wells that have been drilled by Williams' Customers, Williams' NY Mainline is almost, and will be in the near future, at full capacity.

The proposed Project will serve as an additional gathering line and outlet for the increased production by Williams' Customers. Approximately 150 wells will be attached

---

[1]    Case 10-T-0350, *Application of DMP New York, Inc. and Laser Northeast Gathering Company, LLC (Laser) for a Certificate of Environmental Compatibility and Public Need Pursuant to Article VII to Construct a 16-Inch Natural Gas Gathering Pipeline to the Existing Millennium Pipeline in the Town of Windsor, Broome County, NY Approximately 51,857 feet of Steel Coated Pipeline and a Gas Compressor Station,* Order Granting Certificate of Environmental Compatibility and Public Need (February 22, 2011). Subsequently, on July 25, 2012, Laser, pursuant to Section 121(3) of the PSL, filed a *Joint Petition for Approval of Amendment to Certificate of Environmental Compatibility and Public Need* requesting that the NYPSC issue an order amending the Certificate to add 2 additional compressor units to the Dunbar CS.

AR  004987

in PA by December 31, 2013, and Williams expects that approximately 180 wells will be attached by December 31, 2014. All of these prospective wells will be located in Susquehanna and Wyoming Counties, PA and the volumes produced will need pipeline capacity to reach Williams' downstream interconnection with MPC. The NY Mainline and NY Mainline Loop Pipeline will also have the capability to gather natural gas from wells in the Southern Tier of NY, should the opportunity arise.

The proposed NY Mainline Loop Pipeline  will begin at the NY/PA state line and will be adjacent to, and parallel with, the NY Mainline in Broome County, NY with an approximate 15-foot distance between the two pipelines(with several crossings) and located predominantly  in the right-of-way ("ROW") that Williams previously acquired with the approval of the property owners. The NY Mainline Loop Pipeline will feed into Williams' Dunbar CS for ultimate delivery into the existing interconnection with MPC's 30-inch transmission pipeline. The proposed Project will consist of 5 components: (1) approximately 9.2 miles of 16-inch diameter steel pipeline in the Town of Windsor; (2) a mainline block valve and pig launcher located along the ROW approximately 3,625 feet north of the NY/PA state line; (3) a mainline block valve located along the ROW immediately south of NY SR 17/I-86; (4) a mainline block valve and pig receiver that ties the NY Mainline Loop Pipeline into Williams' existing Dunbar CS; and (5) approximately 0.3-mile of 16-inch diameter steel pipeline from the discharge of the existing Dunbar CS to the interconnect with the MPC.

Williams also requests that the NYPSC issue a Water Quality Certification pursuant to Article 15, Title 5, of the Environmental Conservation Law ("ECL") and Section 401 of the Clean Water Act.

Pursuant to 16 NYCRR Subpart 85-1.2(c), Williams' is requesting that this Application be reviewed under 16 NYCRR 85-1.7 and Section 121-a.7 of the PSL. Section 2.8 herein contains the analysis required by Subpart 85-1.2(c). Williams has reviewed all applicable substantive municipal, county, and State laws, regulations, and codes which would otherwise be applicable to any portion of the proposed Project, had it not been pursued under Article VII, and there are applicable substantive requirements, if applied by the NYPSC to the Project that Williams believes are unreasonably restrictive. Compliance with, or a waiver requested for, applicable local requirements is addressed in Section 2.8 herein. Proposed exceptions to the Environmental Management and Construction Standards and Practices ("EM&CS&P") manual approved by the NYPSC in Case 06-T-1383 are discussed in this Application and in Section 2.7.6. As explained in more detail herein, substantive requirements concerning the use of heavy vehicles on Broome County Roads are discussed in Section 2.8.3.3 Motor Vehicles. Hours of proposed construction outside those identified in the EM&CS&P are also discussed in this Application, specifically Section 2.2.4.2. Furthermore, substantive local requirements that may be applicable to construction noise are discussed in Section



2.8.4.2. Williams will comply with all applicable NY gas safety requirements that, in some instances, are more stringent than Federal requirements.

Williams anticipates the Project should be completed within 4 months of the commencement of construction depending on applicable requirements, restrictions and other factors outside of Williams' control, including but not limited to weather, material availability, and construction resources.

On February 7, 2013, Laser Northeast Gathering, LLC ("Laser"), DMP, LNGC Holdings, LLC, and Williams filed for a Verified Joint Petition for Approval Pursuant to Section 70 of the NY PSL. The aforementioned entities petitioned the NYPSC for approval of the proposed transfer to Williams of all of the assets of the subsidiaries, Laser and LNGC Holdings, LLC, through a merger of these subsidiaries directly into Williams. On June 8, 2013, the NYPSC issued an Order Approving Transfer. After the transfer, DMP remains a viable entity and is a direct wholly owned subsidiary of Williams. As a result of the transfer, all assets previously held by Laser were transferred through a merger of LNGC Holdings, LLC and Laser directly into Williams.

DMP is a pipeline corporation organized under Article 7 of the NY Transportation Corporations Law and, as such, it is vested with the power of eminent domain. Williams Field Services Company, LLC is a foreign limited liability company authorized to do business in the State of NY.

Williams proposed Certificate Conditions are contained within **Exhibit B**.

## 2.0    Project Description

Williams is proposing to construct the NY Mainline Loop Pipeline, which will be a natural gas gathering pipeline, in the Town of Windsor, Broome County, NY, that will consist of 9.5 miles of 16-inch diameter steel pipeline. The maximum allowable operating pressure of the NY Mainline Loop Pipeline will be 1440 pounds per square inch gauge ("psig") and will be designed to the United States Department of Transportation ("USDOT") 49 CFR 192 criteria, as well as to the NYPSC 16 NYCRR (Part 255) pipeline safety regulations. The proposed NY Mainline Loop Pipeline will parallel the NY Mainline at approximately a 15-foot offset and located primarily within the existing 40-foot permanent ROW. The existing ROW is proposed to be modified in order to allow adequate space to construct and maintain the new pipeline as well as centering both pipelines with adequate spacing. The proposed construction work limit is anticipated to be a 65-foot corridor (40-foot existing permanent and 25-foot temporary) with additional temporary workspace as needed throughout the construction of the Project. In Case 10-T-0350, 20 feet of temporary ROW was used; however Williams proposes, where approved by the affected landowners, that 25 feet of temporary ROW be used as an additional 5 feet of temporary ROW is required due to the limited usable space on the

non-working side (area adjacent to the existing NY Mainline) of the proposed NY Mainline Loop Pipeline. Additional information pertaining to the proposed modifications of the ROW certified in Case 10-T-0350 is provided in the Petition for Approval of Amendment to the Certificate of Environmental Compatibility and Public Need ("Petition") filed contemporaneously with, and included in, this Application. Aboveground structures proposed for the Project include a pig launcher, pig receiver, and mainline block valves near the northern, middle, and southern end of the proposed NY Mainline Loop Pipeline. Access to the Project will be via public and private roads. A majority of the private access roads to be used for the Project are existing; some are new temporary or permanent access roads. The creation of these temporary and permanent access roads are discussed in Section 2.3 herein. A completed Appendix 7-D Form A of 16 NYCRR Part 255.302 is provided as **Exhibit C** as part of this Project description.

## 2.1    <u>Statement of Public Need</u>

Despite the existence of the NY Mainline and other pipelines (with which the Project will compete against), there is still an inadequate presence of natural gas pipelines and gathering infrastructure that are required to collect, aggregate and bring additional quantities of clean burning natural gas to NY. The proposed NY Mainline Loop Pipeline will serve this need. Like the NY Mainline, the NY Mainline Loop Pipeline will feed into Williams' existing facilities for ultimate delivery into the existing interconnection with the MPC. MPC serves the NY State service territories of National Grid, Orange and Rockland Utilities, NY State Electric and Gas Corporation, Corning Natural Gas, and Central Hudson Gas and Electric Corporation. Thus, the NY Mainline Loop Pipeline will provide NY, other northeast markets, and their residents with an additional supply of regionally produced natural gas.

As mentioned in Section 1.0 of this Application, the initial purpose of the NY Mainline and the pipelines located upstream in PA was to serve as a natural gas gathering line for natural gas from 9 existing wells and 9 permitted wells operated by WPX Energy Keystone, LLC's predecessor-in-interest, Alta Resources, LLC and to serve additional prospective wells drilled by Carrizo (Marcellus), LLC in Susquehanna County, PA. However, as of June 2013, the NY Mainline and the pipelines located upstream in PA is gathering natural gas from over 120 wells in Susquehanna and Wyoming Counties, PA for Williams' Customers. Given the success of Williams' Customers, which have long term binding agreements that dedicate acreage to Williams, and the prolific nature of the Marcellus Shale wells that have been drilled by Williams' Customers to date, Williams' NY Mainline is almost, and will be in the near future, at full capacity.

In order to alleviate this capacity constraint, Williams has developed a 2 prong plan: (1) complete an efficiency and reliability project at the Dunbar CS and add additional compression capacity at its Dunbar CS; and (2) add additional pipeline capacity in NY

upstream of the interconnection site at MPC. In that regard, on July 25, 2012, Williams filed the Joint Petition for Approval of Amendment to Certificate of Environmental Compatibility and Public Need in Case 10-T-0350 permitting the addition of 2 compressor units (and the removal of one compressor unit) at the existing Dunbar CS.[2] In addition, in the fall of 2013, Williams implemented an efficiency and reliability project to enhance the performance of the Dunbar CS ("Dunbar CS Efficiency Project"). The objective of the Dunbar CS Efficiency Project is to fully utilize the existing horsepower at the Dunbar CS while simultaneously increasing reliability due to enhanced filtration and separation capabilities.

The NY Mainline and the Dunbar CS as currently designed and constructed have an estimated throughput capacity of between 200 and 225 million cubic feet of gas per day (MMcf/d). Williams' total contracted capacity to the MPC interconnect is approximately 463 MMcf/d. Completing the Dunbar CS Efficiency Project and adding the 2 additional compressor units to the existing Dunbar CS will ultimately allow additional quantities of natural gas to be transported to market for sale. It is anticipated that, by completing the Dunbar CS Efficiency Project and adding the 2 additional compressor units only, throughput capacity will be increased by approximately 150 MMcf/d. This expansion of compression capacity only, therefore, will help, but it will not eliminate the existing capacity constraint, thereby prohibiting additional natural gas production from being supplied to NY.

As such, the NY Mainline Loop Pipeline is also needed to serve as an additional gathering line and an outlet for the increased production by Williams' Customers. The NY Mainline Loop Pipeline, once fully operational, and assuming that the additional compression capacity is approved and functioning and the Dunbar CS Efficiency Project is complete, will increase the overall capacity by approximately an additional 100 to 120 MMcf/d. This additional capacity is needed in that Williams expects approximately 150 wells to be attached in PA by December 31, 2013, and approximately 180 wells to be attached by December 31, 2014. All of these prospective wells will be located in Susquehanna and Wyoming Counties, PA. The NY Mainline Loop Pipeline will also have the capability to gather natural gas from wells in the Southern Tier of NY should the opportunity arise. Williams' Customers have already contracted with Williams for this additional capacity making Williams' total contracted capacity to the MPC interconnect approximately 463 MMcf/d, which is approximately between 238 to 263 MMcf/d greater than Williams' current capacity to MPC.

While the actual timing and productivity of these wells is dependent on a number of factors including, without limitation, actual well performance and gas prices, empirical

---

[2]   Case 10-T-0350, *Joint Petition of DMP New York, Inc. and Laser Northeast Gathering Company, LLC to amend Certificate of Environmental Compatibility and Public Need to Add Two Compressor Units* (July 25, 2012).

data strongly indicates that natural gas production from the Marcellus Shale will continue to increase and be substantial. Specifically, the natural gas production data released by the PA Department of Environmental Protection ("PaDEP") for the first half of 2013 revealed production of approximately 10.1 Bcf/d.[3] This production total is over 2 Bcf/d higher than the data released by PaDEP for the second half of 2012 and is over 8 Bcf/d higher than in 2009. Significantly, in the year immediately preceding Williams' initial Application in Case 10-T-0350, the total annual natural gas production in PA was less than 0.5 Bcf/d.

A closer look at this data also reveals that Susquehanna County, PA, which is the county where the majority of the applicable wells are located, continues to be one of PA's top natural gas producing counties. For the first half of 2013, and in past reporting periods, Susquehanna County, PA was, and is, the second most productive county in PA accounting for 21 percent of PA's total natural gas production. In particular, for the first half of 2013, natural gas wells located in Susquehanna County produced over 2.1 Bcf/d of natural gas. Furthermore, one of Williams' Customers, Cabot Oil & Gas Corporation, had 10 of the top 20 producing wells in the second half of 2012 and 9 of the 10 wells for the first half of 2013. While this increase in natural gas production has led to a higher than normal supply and, in turn, lower gas prices, industry analysts believe that the lower costs associated with the Marcellus Shale production techniques will allow drilling and production to continue.[4] It is this dramatic increase in production coupled with Williams' strong customer commitments and a lack of sufficient gathering infrastructure that has overwhelmed the capacity on the NY Mainline and has precipitated the need for the NY Mainline Loop Pipeline and its corresponding additional capacity in order to facilitate the delivery of additional volumes of natural gas to MPC and ultimately NY.

The Project is consistent with, and promotes the recommendation in the 2009 State Energy Plan to support local production and use of natural gas.[5] Historically, NY, and the northeast as a whole, has been reliant on natural gas supplies imported from other regions including the Gulf Coast, the Rockies, and Canada due to limited local supplies and a continuous and large demand from the northeast's largest cities. According to energy analysts, long-haul pipelines mainly from these 3 regions have historically supplied about 85 percent of the demand in the northeast, which translates into an estimated average of 11 Bcf/d to 12 Bcf/d between 2005 and 2010.[6] However, due to

---

[3]   https://www.paoilandgasreporting.state.pa.us/publicreports/Modules/DataExports/DataExports.aspx

[4]   www.standardandpoors.com/ratingsdirect, *How the Marcellus Shale is Changing the Dynamics of the U.S. Energy Industry,* October 15, 2012.

[5]   New York State Energy Board, December 2009, available at: http://www.nysenergyplan.com/final/New_York_Energy_Plan_VolumeI.pdf.

[6]   www.standardandpoors.com/ratingsdirect, *How the Marcellus Shale is Changing the Dynamics of the U.S. Energy Industry*, October 15, 2012.

natural gas resources being developed so close to NY and northeast markets, the amount of natural gas being imported is steadily declining and, if additional sources of natural gas continue to enter these markets, this decline trend will continue into the future. This is precisely why the State Energy Plan recommends tapping and using this local resource in order to "…increase the reliability and security of our energy systems, reduce energy costs and contribute to meeting climate change, public health and environmental objectives."[7]

The NY Mainline Loop Pipeline will provide NY with regionally produced natural gas that will displace supplies from the traditional distant imported sources. By displacing natural gas supplies from these other regions with a supply located and gathered regionally, deliverability and reliability are enhanced and supply disruptions due to pipeline capacity limitations, severe weather, and other factors that are present when transportation distances are greater will be minimized. Furthermore, by gathering and delivering natural gas in relative close proximity to NY and the MPC, natural gas price instability and volatility will be reduced and the costs for transporting gas long distances and other fees traditionally paid to intermediate brokers, pipelines, and other middlemen are minimized or eliminated thereby lowering the overall cost of the delivered natural gas. Increased steady supplies of economically produced natural gas entering NY together with lower costs will likely result in increased competition in the local gas markets and lower gas prices to regional consumers.

In NY, a market exists for the growing natural gas supply due to the displacement outlined above and due to demand growth projected in the region. A recent report prepared for NY City Mayor's Office of Long-Term Planning and Sustainability entitled *Assessment of New York City Natural Gas Market Fundamentals and Life Cycle of Fuel Emissions*,[8] projected that total gas consumption in the northeast is expected to grow from about 3.9 Tcf in 2010 to 5.3 Tcf in 2030. This is a growth rate of about 1.6 percent per year, which is almost the same growth rate for the entire United States and Canadian markets. The report notes that this increased demand growth is attributable to, among other things: (1) the power sector from the expanded use of natural gas-fired generating facilities; (2) increased industrial use and consumption; (3) new environmental regulations; (4) public policies that disfavor other fuel sources (i.e. coal and nuclear); and (5) increased residential and commercial use created by conversion from fuel oil to natural gas.

Although the Project will not provide any retail services or serve any retail customers, through its interconnection with MPC, the Project will serve the NY State service

---

[7]     New York State Energy Board, December 2009, available at: http://www.nysenergyplan.com/final/ New_York_Energy Plan_VolumeI.pdf.

[8]     www.nyc.gov/html/om/pdf/2012/icf_natural_gas_study.pdf, *Assessments of New York City Natural Gas Market Fundamentals and Life Cycle of Fuel Emissions*, August 2012.

territories of National Grid, Orange and Rockland Utilities, NY State Electric and Gas Corporation, Corning Natural Gas, and Central Hudson Gas and Electric Corporation which will lower the cost of energy for New Yorkers and NY's industries (including the power sector/electric generators) as natural gas retail customers.

The NY Mainline Loop Pipeline will compete against other pipelines, gathering lines and gas suppliers to deliver natural gas to the MPC system. The NY Mainline Loop Pipeline, therefore, promotes competition by increasing the available quantity of natural gas supplies for NY State's consumers. The NY Mainline Loop Pipeline will also compete with other prospective pipelines since there is currently a lack of sufficient gathering infrastructure which is needed to adequately handle the abundant natural gas supply.

Currently, even though there are other pipelines that exist or are planned in proximity to the NY Mainline Loop Pipeline, those pipelines either serve other exploration and production customers on long-term binding contractual arrangements or will serve as a transmission line and not a gathering line. For example, the Bluestone Gathering System,[9] which was recently approved by the NYPSC, will serve as an outlet for the production of natural gas being produced by affiliates of Southwestern Energy. Similar to Williams' commercial arrangements with its customers, this service is being provided by Bluestone Gas Corporation of NY, Inc. to the affiliates of Southwestern Energy pursuant to binding, long term agreements with significant volume and acreage commitments. Thus, notwithstanding the existence of the Bluestone Gathering System, the NY Mainline Loop Pipeline is still needed to serve as an additional gathering line and an outlet for the increased production and supply by Williams' Customers.

Moreover, the proposed Constitution Pipeline, which is a partnership between Williams, Cabot Oil & Gas Corporation, and Piedmont Natural Gas, will serve as a Federal Energy Regulatory Commission ("FERC") regulated natural gas transmission line similar to the MPC and dissimilar to the existing NY Mainline, the proposed NY Mainline Loop Pipeline, and the Bluestone Gathering System. Transporting natural gas from wellheads to various markets requires a wide array of interdependent facilities including gathering and transmission facilities. Natural gas gathering facilities, which are typically smaller diameter pipelines, collect, aggregate and move natural gas from natural gas wells to interconnections with larger diameter and length transmission pipelines. Natural gas transmission facilities, which are typically large diameter/long distance pipelines, receive gas at the various points of interconnection with the gathering facilities and transport the

---

[9]     Case 11-T-0401 and Case 12-G-0214, *Application of Bluestone Gas Corporation of New York, Inc. for a Certificate of Environmental Compatibility and Public Need Pursuant to PSL Article VII for the Construction and Operation of a 20" Natural Gas Gathering System and Dehydration and Compression Facilities, in the Town of Sanford, Broome County, and Request for Approval of Environmental Management and Construction Standards and Practices,* Order Adopting the Terms of a Joint Proposal and Granting Certificate of Environmental Compatibility and Public Need and Certificate of Public Convenience and Necessity (September 21, 2012).

natural gas to market areas. Without natural gas gathering infrastructure, transmission facilities like MPC and the proposed Constitution Pipeline would not be able to obtain natural gas to deliver to the market areas. Similarly, without natural gas transmission facilities, gathering facilities like the NY Mainline and the proposed NY Mainline Loop Pipeline would not be able to move natural gas from the production and development areas to the downstream markets. Most importantly, Williams has contractual obligations with its customers to deliver their natural gas to MPC and the proposed Constitution Pipeline cannot fulfill or meet this need since it will not be delivering natural gas to MPC. Therefore, the existence of the Constitution Pipeline by itself will not remedy Williams' current capacity constraint nor will it be able to meet Williams' Customers' needs in collecting and moving their natural gas from the wells to the downstream interconnection site with MPC.

Williams had informal conversations with, and obtained informal guidance from, FERC Staff to confirm that the Project does not fall under the FERC's jurisdiction and is consistent with the FERC's prior finding that the NY Mainline and the pipelines located upstream in PA functions as non-jurisdictional gathering. This same determination was made during the installation of the NY Mainline in NYPSC Case 10-T-0350. Williams explained to FERC Staff that the need for the Project is driven entirely by the substantial growth in Marcellus production and not by any change in function of the subject gathering system thereby making the determination in the Order Determining Jurisdictional Status of Facilities ("Order"; March 5, 2010; Docket No. CP 10-35-000) equally applicable to the Project. Based upon the structure and characteristics of the proposed Project, and its prior non-jurisdictional finding set forth in the Order, FERC staff concluded that the proposed Project does not fall under FERC's jurisdiction and is consistent with the FERC's Order. A copy of the Order stating that the NY Mainline did not fall under FERC's jurisdiction in NYPSC Case 10-T-0350 is included as **Exhibit C-1**.

In addition to the benefits outlined above, the NY Mainline Loop Pipeline will also provide other ancillary benefits to the public. The addition of in-state natural gas infrastructure will create numerous temporary jobs related to the construction and installation of the NY Mainline Loop Pipeline and, potentially, additional permanent jobs. Williams' field office, which is located in the Town of Windsor, will continue to grow and function and will result in continued patronage of local businesses. The Town of Windsor will continue to benefit from the increase in property tax revenues attributable to the Williams facilities. Recently, various local news outlets reported that property owners in the Windsor Central School District have received a 5.8 percent tax rate reduction as a result of Williams' existing facilities and real property ownership. Once operational, Williams will continue its practice of using local service providers in its operation and maintenance activities, which will provide additional economic benefits to Broome County and other surrounding NY areas.

## 2.2    Pipeline Location, Route and Approximate Length

### 2.2.1    Description of Pipeline Route and Approximate Length

Williams is proposing to construct approximately 50,187 feet (9.5 miles) of 16-inch natural gas pipeline that will start with connection to MPC and travel in a southerly direction through Broome County, NY to end at the PA/NY border.

The following is a general description, based off the Construction Alignment Sheets ("CAS") (**Exhibit I**), of the proposed NY Mainline Loop Pipeline route within the Town of Windsor, Broome County, NY.

Commencing at the MPC Interconnect, the NY Mainline Loop Pipeline travels in a southerly direction 1,485 feet crossing:

- Access Road-9 via open-cut

- an overhead electric line

- Streams SNY-SJB-009, SNY-SJB-001 via dry-ditch open-cut

- a ditch

- Stream SNY-SJB-010 via dry-ditch open-cut

The NY Mainline Loop Pipeline then connects to valves at the northwest corner of the Dunbar CS where it then re-starts at the southeastern corner and travels southeast 531 feet crossing an existing fence.

Then turning and continuing in a southerly direction 1,952 feet crossing:

- Stream SNY-SJB-002 via dry-ditch open-cut

- an existing wood trail

- Stream SNY-SJB-004 via dry-ditch open-cut

Then southwest 153 feet

Then turning southeast and continuing 362 feet crossing:

- the NY Mainline

- Wetland WNY-SLH-039 via timber-mat and open-cut

- the active agricultural area on the Travis property

AR 004996

Then turning southwest and continuing 155 feet crossing:

- a telephone line and an overhead electric line

- Dunbar Road via open-cut or conventional bore

- the NY Mainline

Thence continuing 1,386 feet southeast crossing:

- Access Road-8

- Stream SNY-SJB-005 via dry-ditch open-cut

- Wetland WNY-SJB-017 via timber-mat and open-cut

- The NY Mainline

Thence turning west and continuing 1,360 feet crossing:

- Stream SNY-SJB-006 (Occanum Creek) via dry-ditch open-cut

- Wetland WNY-SJB-018 via timber-mat and open-cut

- Stream SNY-SJB-008 via dry-ditch open-cut

- Wetland WNY-SJB-016 via timber-mat and open-cut

- the NY Mainline

Thence continuing in a southerly direction 4,539 feet crossing:

- Streams SNY-SJB-017 and SNY-SJB-016 via dry-ditch open-cut

- Wetlands WNY-SJB-023 and WNY-SJB-022 via timber-mat and open-cut

- Streams SNY-SJB-015, SNY-SJB-014, SNY-SJB-013 via dry-ditch open-cut

- an existing trail

- a stone wall

- an existing wood trail

- a stone wall

- an existing wood trail

AR 004997

Thence turning east and continuing 689 feet crossing:

- the NY Mainline

- a ditch and AR-6 via open-cut

Thence in a southerly direction 2,195 feet crossing:

- Via Guided Conventional Bore

  - the NY Mainline

  - an underground telephone line

  - an overhead electric line

  - a communication line

  - a ditch

  - Fox Farm Road (County Road 28)

  - Route 17/I-86 west bound

  - Route 17/I-86 east bound

  - a ditch

  - Wetland WNY-SJB-028

  - Stream SNY-SJB-020

  - AR-5

- the active agricultural area on the Fox Farm, LLC Property

- Stream SNY-SJB-019 via dry-ditch open-cut

- the active agricultural area on the Farr Property

- an overhead electric line

- a communication line

- an existing fence

- Rockwell Road via open-cut or conventional bore

- an existing storm culvert

AR  004998

- an existing fence

- an existing fence

Thence southeast 404 feet crossing:

- Wetland WNY-SLH-036 via open-cut

Thence in a southerly direction 1,368 feet crossing:

- an existing wood trail

Thence southeast 738 feet crossing the active agricultural area on the Root Property

Then 2,223 feet in a southerly direction crossing:

- a wood trail

- an overhead electric line

- an existing fence

- an existing storm culvert

- Hoadley Hill Road via open-cut or conventional bore

- an existing storm culvert

- an overhead electric line

- an existing fence

- an active agricultural area on the Donlick property

- Wetland WNY-SLH-035 [Palustrine Emergent ("PEM")] via timber-mat and open-cut

- Wetland WNY-SLH-035 [Palustrine Scrub-Shrub ("PSS")] via timber-mat and open-cut

Thence southeast 658 feet crossing:

- Stream SNY-SLH-029 via dry-ditch open-cut

Thence in a southerly direction 9,992 feet crossing:

- an existing wood trail

- Wetlands WNY-SLH-031 and WNY-SLH-030 and Pond PNY-SLH-004 via Horizontal Directional Drill ("HDD")

- an existing fence

- existing storm culvert

- Trim Street (County Road 32) via conventional bore

- a communications line

- an existing fence

- 2 overhead electric lines

- Wetland WNY-SLH-027 via timber-mat and open-cut

- Stream SNY-SLH-026 via dry-ditch open-cut

- Wetland WNY-SLH-026 via timber-mat and open-cut

- Stream SNY-SLH-025 via dry-ditch open-cut

- Wetland WNY-SLH-025 via timber-mat and open-cut

- Stream SNY-SLH-024 via dry-ditch open-cut

- an existing wood trail

- a stone wall

- an existing wood trail

- a stone wall

- an existing wood trail

- Wetland WNY-SLH-023 via timber-mat and open-cut

- an existing wood trail

- Stream SNY-SLH-022 via dry-ditch open-cut

- 3 existing wood trails

- an overhead electric line

- an existing fence

- an existing storm culvert

- Bell Road via open-cut or conventional bore

- a communications line

- an overhead electric line

- an existing fence

- 2 existing wood trails

- Streams SNY-SLH-020 and SNY-SLH-021 via dry-ditch open-cut

- an existing wood trail

Thence southwest 522 feet.

Thence south 1,368 feet.

Thence southeast 1,509 feet crossing:

- the NY Mainline

- an existing fence

- an existing storm culvert

- John White Road via open-cut or conventional bore

- an existing fence

- the NY Mainline

Thence 1,519 feet southwest crossing:

- Stream SNY-SLH-018 via dry-ditch open-cut

- 7 existing wood trails

Thence south southwest 2,059 feet crossing:

- an existing wood trail

- Wetland WNY-SLH-018 via timber-mat and open-cut

- Streams SNY-SLH-014 and SNY-SLH-016 via dry-ditch open-cut



**Page 20**                                                    12/2/2013

JA2600

AR 005001

- 2 existing wood trails

Thence in a westerly direction 3,172 feet crossing:

- Wetland WNY-SLH-017 via timber-mat and open-cut

- an existing wood trail

- a stone wall

- an existing wood trail

- an existing fence

- an existing storm culvert

- Phillips Road via open-cut or conventional bore

- an existing fence

- the NY Mainline

- an overhead electric line

Thence south 112 feet crossing:

- an existing fence

- an existing storm culvert

- Farr Road via open-cut or conventional bore

- 3 existing fences

Thence southwest 808 feet crossing:

- 2 existing barbed wire fences

- an active agricultural area on the Nash property

Thence southeast 155 feet.

Thence southerly direction 7,865 feet crossing:

- Wetland WNY-SLH-014 via timber-mat and open-cut

- Stream SNY-SLH-010 via dry-ditch open-cut

- the NY Mainline

- an existing fence

- the NY Mainline 2 times

- via HDD

  - AR-2

  - Stream SNY-SLH-004 (Trowbridge Creek)

  - Stream SNY-SLH-003

  - Wetland WNY-SLH-008

  - the active agricultural area on the Bigelow property

  - Wetland WNY-SLH-006

- the NY Mainline

- an existing fence

- AR-2

- 2 existing fences

- the active agricultural area on the Goff property

- an existing wood trail

- WNY-SLH-004 via timber-mat and open-cut

- Blatchley Road via open-cut or conventional bore

- an overhead electric line

- a ditch

- existing barbed wire fence

- Wetland WNY-SLH-001 via timber-mat and open-cut

- an existing fence

- Wetland WNY-SJB-029 via timber-mat and open-cut

- Stream SNY-SJB-024 via dry-ditch open-cut

- Stream SNY-SJB-023 via dry-ditch open-cut

Thence southwest 283 feet.

Thence south 625 feet terminating at the NY/PA border.

The land use along the proposed NY Mainline Loop Pipeline route is described in the Field Summary, **Exhibit D**. The Field Summary includes pipeline specifications, road crossings, agriculture districts, and utility crossings. **Exhibit D-1**, Utility Crossing Plan, describes the measures that will be taken when crossing foreign utilities. An alternative analysis for the Project is provided as **Exhibit E**.

### 2.2.2    Cathodic Protection System

As with nearly all steel pipelines, corrosion must be controlled using an effective coating system and cathodic protection.

The NY Mainline Loop Pipeline will be a 16-inch diameter steel pipe manufactured to American Petroleum Institute 5L specifications.  The external surface of the pipe will be coated with 15 mils of fusion bonded epoxy coating with some sections receiving an additional 30 mils of an abrasion resistant overcoat (i.e. at bored/ HDD crossings or areas where coating damage may occur during installation).

Williams will follow the State of NY's Rules and Regulations (16 NYCRR Part 255) which prescribe minimum safety requirements for the design, fabrication, installation, inspection, testing and operation and maintenance of natural gas pipelines.

Cathodic protection for the proposed NY Mainline Loop Pipeline will be provided through the existing (along the NY Mainline) impressed current system of rectifiers and ground beds. Rectifiers and remote anode ground beds will be used in an effort to maintain pipe-to-soil electrical potentials at levels sufficient to control corrosion. Through annual readings taken at cathodic test stations, the effectiveness of the existing cathodic protection system will be evaluated and appropriate measures taken (e.g. add ground beds, linear anodes, increase current output, etc.) to resolve deficiencies, as needed.

The NY Mainline Loop Pipeline will also be designed and constructed to minimize the risk of internal corrosion. The NY Mainline Loop Pipeline will be designed with pigging facilities to allow for routine cleaning as well as future in-line integrity ("smart pig") inspections. The pigging facilities have been designed with corrosion monitoring ports to allow for monitoring of internal corrosion through the use of corrosion coupons. The corrosion coupons will be periodically inspected for evidence of corrosion. The



monitoring will take place at the launcher/valve setting near the beginning of the NY Mainline Loop Pipeline (approximately 3,625 feet north of the PA/NY border), at the mainline block valve immediately south of SR 17/I-86, and at the receiver upstream of the Dunbar CS. Because the gas stream supplied to the corrosion monitoring ports feeds both the NY Mainline and the NY Mainline Loop Pipeline, the results of the inspections should be representative of the level of corrosion occurring in both pipelines. The results of the inspections will determine if more aggressive measures are required (e.g. corrosion inhibitor injection, more frequent pigging, etc.). In addition, operation of the NY Mainline Loop Pipeline will be monitored to ensure that the gas velocities are sufficient to sweep any liquids from low lying areas.

### 2.2.3    <u>Gas Quality Measures</u>

Williams currently gathers gas from wells in Wyoming and Susquehanna County, PA. The wells feeding the system deliver and blend a combination of dehydrated and non-dehydrated gas. Some field receipt points have facilities in place to dehydrate and compress gas for transport to transmission pipeline systems while some facilities simply measure and transport gas to other facilities for dehydration and compression. The services provided at each receipt point facility are dictated by the contracts in place with Williams' Customers.

Currently, gas quality is achieved through Williams' design, operations, and control measures that are integrated with the existing facilities located at the Dunbar CS and at various field receipt points in PA. Gas composition, water vapor content, and BTU values are measured before gas enters MPC. Gas is continually sampled and monitored by a gas chromatograph and moisture analyzer before it passes through and is measured by the existing 12-inch ultrasonic meter setting located at the Dunbar CS.

The gas enters the Dunbar CS through pig receivers immediately upstream of the station. Williams' current operations and maintenance practice involves regularly pigging the pipeline to remove free water that may be either produced from the gas wells feeding the pipeline or condensed out of the gas stream due to temperature and/or pressure drop. Pigging the pipeline with "scraper" or "polypigs" is an effective means of removing free water as well as cleaning the internal surface of the pipeline.

Once gas enters the Dunbar CS, it passes through a vertical inlet separator, a horizontal slug catcher, and the suction header. As part of the Dunbar CS Efficiency Project, high-efficiency inlet separators are being installed to remove free and entrained liquids at the inlet of the Dunbar CS. In addition, each individual compressor unit contains control systems to prevent free liquid from entering the compressor. Suction scrubbers on each individual unit detect free liquid and automatically shut down each compressor to prevent severe damage that could be caused to the compressor unit by

free liquid. This control ensures free liquid cannot pass through the compressor units and into MPC. As part of the Dunbar CS Efficiency Project, coalescing filters are being installed on the suction of individual compressor units in order to further reduce free liquids in the gas stream prior to compression.

After the gas is compressed, it is filtered for lube oil and particulate matter. It then enters the triethylene glycol ("TEG") dehydration contactors where the water vapor content is reduced to levels below 7 pounds of water per million cubic feet of gas. This is the threshold that is necessary to meet the transmission pipeline gas quality specifications of MPC.

Upon leaving the dehydration unit, the gas is filtered prior to delivery into MPC. As part of the Dunbar CS Efficiency Project, high-efficiency coalescing filters are being installed downstream of the dehydration contactors to capture entrained glycol prior to delivery to MPC.

Control systems are in place to continuously monitor the water content of the gas before it enters the MPC. If the water vapor content exceeds 5.5 pounds of water per million cubic feet, the control system initiates an alarm to notify Dunbar CS personnel that action is required. If the water vapor content exceeds 7 pounds of water per million cubic feet, MPC's control valve at the Dunbar CS has the ability to shut in all gas flowing to its pipeline.

This redundancy provides a considerable safety factor and ensures that "pipeline quality gas" is delivered as expected.

### 2.2.4    Visual, Noise, and Vehicular Traffic

The potential visual, noise, and traffic impacts associated with construction and operation of the Project are discussed below.

#### 2.2.4.1  *Visual Impacts*

Potential visual impacts during construction will be temporary due to the fact that activities will be limited to the vicinity of the existing pipeline ROW, access roads, and existing gravel yards. Furthermore, the proposed NY Mainline Loop Pipeline parallels an existing pipeline and will utilize existing access roads to the greatest extent practicable, thus minimizing alterations to the existing visual landscape. Williams considered the location of nearby residences that could potentially have a view of construction activities and there are 26 residences within 500 feet of the proposed NY Mainline Loop Pipeline ROW (refer to Table 4.2). Of the 26 residences within 500 feet of the NY Mainline Loop Pipeline ROW, 15 have signed easement agreements for the Project and 1 is currently being negotiated for temporary workspace.



### 2.2.4.2   Noise Impacts

Project construction will generate sound that could temporarily affect the local environment. Construction of the proposed Project will include the following activities: tree clearing, excavation of the pipeline trench, earth moving, and typical sound associated with construction activities. Williams will comply with noise control measures identified in the EM&CS&P approved by the NYPSC in Case 06-T-1383 except hours of construction as discussed below. Noise impacts expected during construction will be minimized by the rural and forested nature of the proposed NY Mainline Loop Pipeline route. In order to minimize potential disturbance due to construction sound, construction activities will be concentrated from 7:30 am to 7:00 pm. However, HDD, hydrostatic testing, or other construction activities may require work to be continually conducted and uninterrupted outside of the proposed concentrated construction hours and the restricted hours outlined in the EM&SC&P. When construction activity will occur after 7 pm, Williams will notify the Town of Windsor, landowners, and adjacent neighbors. Williams respectfully requests approval from the NYPSC to deviate from the restricted construction hours set forth in Section 15.3.1 of the EM&CS&P.

To further mitigate construction sound, construction equipment manufacturers' sound muffling devices will be used and kept in good repair during construction. Blasting is not anticipated to be required; however, Williams has developed a blasting plan should the need arise. In the event that blasting is required during construction, the duly licensed contractor will provide 48 hours advance notice to all applicable and potentially-affected parties, including adjacent property owners (within 500 feet), local municipalities, and other parties as may be required by the Certificate conditions and applicable regulations, according to the Williams Blasting Plan, **Exhibit F**.

Noise as it relates to local laws is discussed further in Section 2.8.4.2.

### 2.2.4.3   Traffic Impacts

Vehicular and pedestrian traffic impacts during construction will be minimal due to the rural nature of the proposed Project route. Travel of heavy equipment, hauling trucks, and small commercial vehicles, to and from the construction ROW, will be concentrated during the hours of 7:00 a.m. to 7:00 p.m. The contractor selected by Williams will maintain at least 1 lane of traffic open for detours around construction at road crossing locations, in accordance with the Traffic and Transportation Plan, **Exhibit G**. A single lane of traffic will be maintained during all construction operations with the use of flagging and plating; no complete roadway closures are planned. If an unforeseen circumstance requires the use of a road closure, the Town of Windsor Highway Superintendent will be contacted to develop a suitable detour and other traffic mitigation measures prior to implementation. Williams will discuss this Traffic and Transportation



AR  005007

Plan with the Town of Windsor and seek their input. Dust control measures will be applied as frequently as is necessary by the Williams contractor in response to increased traffic and construction requirements.

Due to the size of the proposed Project, heavy construction is anticipated to occur throughout the entire duration of construction depending on timing of issuance of a Certificate and the conditions set forth in the easements with landowners. The use of heavy equipment on Broome County Roads is discussed further in Section 2.8.3.3.

Normal pipeline operations will consist of small commercial vehicles and light duty trucks routinely accessing the ROW for short periods of time.

## 2.3    Pipeline Safety, ROW Acquisition, Clearing Widths, Access, and Depth of Pipeline Cover

The proposed Project was designed to avoid or minimize potential impacts to persons, properties, and sensitive natural resources, while providing adequate work space for safe and efficient construction and operation of the NY Mainline Loop Pipeline. The route is located in a rural area with a low population density. Williams will construct the NY Mainline Loop Pipeline according to 16 NYCRR, Part 255 Transmission and Distribution of Gas and Title 49, CFR, Part 192, USDOT Regulations for Transportation of Natural and Other Gas by Pipeline:  Minimum Federal Safety Standards. These standards require that, among other things, in Class I and II locations (this Project is Class I only) x-rays of 10 percent and 15 percent of the welds, respectively, are completed. However, Williams will exceed these minimum requirements and perform nondestructive radiographic testing on 100 percent of the welds along the entire length of the NY Mainline Loop Pipeline.

The proposed Project will be installed through ROW easements, property rights acquisitions, and/or fee properties that have been obtained in preparation for construction of the NY Mainline. The easements acquired for the NY Mainline provided multiple line rights in anticipation of an additional 16-inch gathering pipeline. Additional temporary workspaces necessary for the safe and efficient construction have been or will be negotiated, acquired and/or purchased prior to construction. A ROW summary report is included as **Exhibit H**. Where possible, Williams proposes to maintain the existing 40-foot wide permanent ROW for both the existing NY Mainline and the proposed NY Mainline Loop Pipeline. However, the existing location of the NY Mainline in relation to the permanent ROW does not allow for industry standard pipeline spacing or ROW layout to be established. Therefore, concurrent with this Application Williams has submitted a Petition to the NYPSC for approval to modify the certified ROW in Case 10-T-0350 to establish industry standard pipeline spacing and ROW layout for the proposed Project.



**Page 27**                                                              12/2/2013

JA2607

AR  005008

As discussed in the Petition to modify the ROW certified in Case 10-T-0350, Williams proposes to expand the 40-foot permanent ROW on the Bigelow property (Parcel #229.02-1-15) to 60 feet in order to decrease the risk of damage to the existing 16-inch pipeline during the HDD crossing of Trowbridge Creek. The increased ROW will allow for greater separation between the existing NY Mainline and the NY Mainline Loop Pipeline. Williams has obtained a modified easement for the Bigelow property to accommodate this proposed expansion (**Exhibit H-27**).

Following Project construction, the 40 (or 60 foot on Bigelow)-foot wide permanent ROW will continue to be maintained by Williams. In addition to the permanent ROW, temporary ROW of 25 feet will be required along the length of the proposed NY Mainline Loop Pipeline. Furthermore, additional temporary workspace will be required where necessary for safe and reliable construction. Williams has identified temporary work space needed to facilitate pipeline construction and vehicle access and these areas are depicted on **Exhibit I** CAS. The proposed construction workspace will be cleared within the width of the permanent and temporary workspace, unless otherwise specified on **Exhibit I**.

Special construction techniques have been developed for installation of the proposed NY Mainline Loop Pipeline on the Farr property between Stations 153+94 and 165+79. The proposed NY Mainline Loop Pipeline would be installed without removing trees (greater than 6-inches in diameter at breast height) in this location by storing spoil in the construction ROW on the existing NY Mainline as well as among the trees (along the working side) within the temporary ROW. Sections of pipe will be welded and coated in the field along Hoadley Hill Road and moved into place after the trench is dug. Construction activities would occur in the construction ROW on top of the existing NY Mainline through this area. A work plan describing the special construction techniques through this area is provided in **Exhibit I-1**.

In order to prevent soil erosion along streams and wetlands, and in accordance with the EM&CS&P and relevant permits, vegetation (ground cover, shrubs, small trees, and large tree stumps) will be left in place within a 15-foot buffer area from each stream bank or wetland boundary until the time of crossing. In these areas, tree cutting will be limited to the use of chain saws. The buffer area will extend the entire width of the construction ROW, except for where vegetation grubbing and initial grading is necessary for equipment crossing along the travel-way. In such areas, erosion and sediment control structures will be installed.

Access to the NY Mainline Loop Pipeline ROW will be along existing public roads that cross the ROW, as well as private access roads within the property of private landowners. Private access roads are either existing roads, roads to be improved by Williams, or roads to be constructed as noted on **Exhibit I**. Williams has, or is,

AR  005009

negotiating rights to use these access roads as summarized in **Exhibit H**. Existing access roads that will only be used for construction will be graded and gravel will be added as necessary and restored following construction per Certificate Conditions and landowner easement agreements. For new temporary access roads, the site will be cleared of vegetation, erosion and sedimentation controls will be installed, and the site will be graded and graveled per Certificate Conditions and landowner easement agreements. Two access roads will be considered permanent for the purpose of access to the gate valve sites located along the NY Mainline Loop Pipeline. One of these permanent access roads, AR-5, is already an existing dirt/gravel road that will be improved through grading and the addition of gravel and maintained by Williams. Williams does not propose to expand the current width of AR-5 for permanent use. The second permanent access road consists of a portion of an existing dirt/gravel road and the creation of a new gravel road within the permanent ROW to access a gate valve. Impacts to ecosystem resources associated with both temporary and permanent access roads are expected to be minimal and are discussed further in Section 2.5.1.

Use of the existing bridge over Occanum Creek along AR-7 will be limited to use by light duty vehicles only due to concern with weight load limits. Access to the ROW will be pursuant to the Project's Traffic and Transportation Plan and easements negotiated with individual landowners.

Trench depth will be adequate to conform to Gas Safety Regulations (16 NYCRR Part 255.327). The proposed NY Mainline Loop Pipeline will be buried with a minimum of 3 feet of cover in all areas except the following:

- agricultural lands - minimum of 4 feet of cover,
- roads - minimum of 5 feet of cover,
- streams - minimum of 5 feet of cover, and
- Trowbridge Creek - minimum of 10 feet of cover.

## 2.4    Agency Field Verification

The existing NY Mainline was field reviewed by the NY Department of Public Service ("NYDPS") and a representative of the NY State Department of Agriculture and Markets ("NYDAM") on multiple occasions from January 2010 through August 2010 under NYPSC Case 10-T-0350. Members of the Williams Project team as well as members of the NYDPS and a representative from the NYDAM visited agricultural lands on August 16, 2012. On November 7, 2012, a pre-application field review was held and attended by representatives from the NYDPS, NYDAM, NYSDEC, and Williams Project team. Representatives from the United States Army Corps of Engineers (USACE)

Buffalo District were also invited but chose not to attend. As necessary, outcomes of those discussions were incorporated into this Application.

A second pre-application field review occurred on January 30 and 31, 2013 and was attended by members of the Williams Project team, and representative(s) of the NYDPS, NYSDEC, and the NYDAM. As necessary, outcomes of those discussions were incorporated into this Application.

On February 8, 2013, a site-specific field review was held with representatives from Williams, a pipeline contractor, and NYDPS to discuss construction on the Farr property (Station 153+94 to 165+79), particularly the ability to construct within the already cleared area without additional tree removal. Based on this meeting Williams believes that the proposed NY Mainline Loop Pipeline could be installed without removing trees (greater than 6-inches diameter at breast height) through the use of site-specific special construction methods. Additional information regarding the use of special construction techniques is discussed in the prior section (Section 2.3) and the visual impacts are further discussed in Section 2.5.1.13.

On September 26, 2013, Williams met with representatives of the NYDPS to review the revised construction plans for the portion of the proposed NY Mainline Loop Pipeline on the Collins (station 424+96 to 421+21) and Nash (station 421+21 to 403+98) properties. The existing NY Mainline crossed the Collins property and stream SNY-SLH-010 (unnamed tributary to Trowbridge Creek) via HDD which was done primarily at landowner request to avoid tree clearing. The results of Williams' geotechnical study led to a conclusion that the possibility of completing a successful HDD was highly unlikely. As a result, Williams chose a route that would allow a conventional lay across the Collins property and down the hillside onto the open pasture at the south end of the Nash property. The onsite meeting included a review of the route, 40-foot permanent ROW utilizing no temporary ROW (minimized clearing), as well as the temporary workspace needed to cross stream SNY-SLH-010 at the bottom of the hill.

## 2.5     Ecosystem, Visual, and Cultural Resources

### 2.5.1     Ecosystem Resources

#### 2.5.1.1   Waterbodies

The Project was designed to minimize the environmental impacts associated with waterbody crossings. A number of the waterbodies crossed provide habitat for a range of aquatic species including invertebrates, fish, and other freshwater aquatic biota. There are a total of 64 waterbodies identified within the Project study area. These include 26 ephemeral streams, 14 intermittent streams, 19 perennial streams and 5 ponds. There are a total of 44 stream/pond crossings of the 64 identified features. The environmental impacts are expected to be minimal and limited to temporary,

construction-related disturbance. Stream crossing methods are discussed in Section 2.6.1. **Exhibit I**, CAS, shows waterbody locations and crossing locations. **Exhibit J**, Wetland Delineation and Stream Identification Report ("WDSIR"), provides a detailed report of water resources identified within the Project study area. **Table 1.0** lists the waterbodies that will be crossed, the area of the waterbody to be impacted, and the methods used to cross the waterbody.

***Waterbody Classifications***. In NY, surface waters and groundwater classifications are outlined in Title 6 of the NYCRR, Chapter X - Division of Water, Part 701: Classification-Surface Waters and Groundwaters. Waterbodies are assigned a classification in 6 NYCRR Parts 800 through 941. All waters of the state are provided a class and standard designation based on existing or expected best usage of each water or waterway segment.

The classifications for fresh surface waters for Class C and above are as follows:

- General Conditions Applying to All Water Classifications - The discharge of sewage, industrial waste or other wastes shall not cause impairment of the best usages of the receiving water as specified by the water classifications at the location of discharge and at other locations that may be affected by such discharge.

- Class AA Special ("AA-S") Fresh Surface Waters - The best usages of Class AA-S waters are:  a source of water supply for drinking; culinary or food processing purposes; primary and secondary contact recreation; and fishing. The waters shall be suitable for fish, shellfish, and wildlife propagation and survival. These waters shall contain no floating solids, settle able solids, oil, sludge deposits, toxic wastes, deleterious substances, colored or other wastes or heated liquids attributable to sewage, industrial wastes or other wastes. There shall be no discharge or disposal of sewage, industrial wastes or other wastes into these waters. These waters shall contain no phosphorus and nitrogen in amounts that will result in growths of algae, weeds and slimes that will impair the waters for their best usages. There shall be no alteration to flow that will impair the waters for their best usages. There shall be no increase in turbidity that will cause a substantial visible contrast to natural conditions.

Class A Special ("A-S") Fresh Surface Waters - The best usages of Class A-S waters are:  a source of water supply for drinking; culinary or food processing purposes; primary and secondary contact recreation; and fishing. The waters shall be suitable for fish, shellfish, and wildlife propagation and survival. This classification may be given to  those international boundary waters that,  if subjected to approved treatment, equal to coagulation, sedimentation, filtration and disinfection with additional treatment, if necessary, to reduce naturally present impurities, meet or will meet NY State Department of Health ("NYDOH") drinking water standards and are or will be considered safe and satisfactory for drinking water purposes.



## Table 1.0  Stream and Waterbody Crossings

| GAI Field and Map Designation | Mile Post | Stationing | Waterbody | Stream Type | State Water Quality Classification[1] | Trout Water[2] | Crossing Width (feet)[3] | Length of Stream Within Construction ROW (feet)[4] | Construction ROW Crossing Area (Temporary Impacts) (square feet)[5] | Operation ROW Crossing Area (Permanent Impacts) (square feet)[5,6] | Crossed By | Crossing Construction Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SNY-SJB-001 | 0.19 | 10+42 | Unnamed Tributary to Occanum Creek | Intermittent | Regulation Code Part 931-914- Class C - Standard C | No | 5 | 65 | 325 | 0 | Pipeline | Dry-Ditch Open-Cut[7] |
| SNY-SJB-001 | 0.2 | 10+60; AR-9 | Unnamed Tributary to Occanum Creek | Intermittent | Regulation Code Part 931-914- Class C - Standard C | No | 5 | 61 Total = 126 | 305 Total = 630 | 0 Total = 0 | AR-9 | Existing 24-Inch Diameter Plastic Culvert[8] |
| SNY-SJB-002 | 0.62 | 32+85 | Unnamed Tributary to Occanum Creek | Intermittent | Regulation Code Part 931-914- Class C - Standard C | No | 6 | 102 | 612 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SJB-004 | 0.70 | 37+11 | Unnamed Tributary to Occanum Creek | Perennial | Regulation Code Part 931-914- Class C - Standard C | No | 4 | 176 | 704 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SJB-005 | 0.90 | 52+30 | Unnamed Tributary to Occanum Creek | Perennial | Regulation Code Part 931-914- Class C - Standard C | No | 11.5 | 106 | 1,219 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SJB-006 | 0.92 | 49+00; AR-8 | Occanum Creek | Perennial | Regulation Code Part 931-914- Class C - Standard C | No | 18 | 34 | 507 | 0 | AR-8 | Temporary Bridge or Temporary Rock Flume Bridge |
| SNY-SJB-006 | 1.19 | 62+93 | Occanum Creek | Perennial | Regulation Code Part 931-914- Class C - Standard C | No | 60 | 128 Total = 210 | 3,877 Total = 5,260 | 0 Total = 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SJB-006 | 1.17 | 62+00; AR-7 | Occanum Creek | Perennial | Regulation Code Part 931-914- Class C - Standard C | No | 16 | 48 | 876 | 0 | AR-7 | Existing Bridge[9] |
| SNY-SJB-007 | 1.38 | 73+00; AR-8 | Unnamed Tributary to Occanum Creek | Intermittent | Regulation Code Part 931-914- Class C - Standard C | No | 4 | 51 | 204 | 0 | AR-8 | Temporary Bridge or Temporary Rock Flume Bridge |
| SNY-SJB-008 | 1.21 | 64+33 | Unnamed Tributary to Occanum Creek | Perennial | Regulation Code Part 931-914- Class C - Standard C | No | 8 | 96 | 768 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SJB-009 | 0.19 | 10+34 | Unnamed Tributary to Occanum Creek | Ephemeral | Regulation Code Part 931-914- Class C - Standard C | No | 2 | 55 | 110 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SJB-010 | 0.23 | 12+42 | Unnamed Tributary to Occanum Creek | Ephemeral | Regulation Code Part 931-914- Class C - Standard C | No | 3 | 56 | 168 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SJB-010 | 0.24 | 12+75; AR-9 | Unnamed Tributary to Occanum Creek | Ephemeral | Regulation Code Part 931-914- Class C - Standard C | No | 3 | 108 Total = 164 | 324 Total = 492 | 0 Total = 0 | AR-9 | Existing18-Inch Diameter Plastic Culvert |
| SNY-SJB-011 | 1.13 | 60+00; AR-7 | Unnamed Tributary to Occanum Creek | Intermittent | Regulation Code Part 931-914- Class C - Standard C | No | 6 | 130 | 780 | 0 | AR-7 Construction ROW | Temporary Bridge or Temporary Rock Flume Bridge |
| SNY-SJB-013 | 1.50 | 79+89 | Unnamed Tributary to Occanum Creek | Ephemeral | Regulation Code Part 931-914- Class C - Standard C | No | 2 | 94 | 188 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SJB-014 | 1.49 | 79+00 | Unnamed Tributary to Occanum Creek | Ephemeral | Regulation Code Part 931-914- Class C - Standard C | No | 2 | 78 | 156 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SJB-015 | 1.48 | 78+61 | Unnamed Tributary to Occanum Creek | Ephemeral | Regulation Code Part 931-914- Class C - Standard C | No | 2 | 63 | 126 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SJB-016 | 1.45 | 76+60 | Unnamed Tributary to Occanum Creek | Intermittent | Regulation Code Part 931-914- Class C - Standard C | No | 3 | 74 | 222 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SJB-017 | 1.43 | 75+96 | Unnamed Tributary to Occanum Creek | Ephemeral | Regulation Code Part 931-914- Class C - Standard C | No | 4 | 70 | 280 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SJB-018 | 2.40 | 130+19; AR-5 | Unnamed Tributary to Occanum Creek | Intermittent | Regulation Code Part 931-914- Class C - Standard C | No | 4 | 43 | 172 | 0 | AR-5[10] | Existing 36-Inch Diameter Plastic Culvert |
| SNY-SJB-019 | 2.40 | 130+19; AR-5 | Unnamed Tributary to Occanum Creek | Perennial | Regulation Code Part 931-914- Class C - Standard C | No | 20 | 45 Total = 108 | 873 Total = 1,506 | 0 Total = 0 | AR-5 | Existing 60-Inch Diameter Metal Culvert |
| SNY-SJB-019 | 2.64 | 139+73 | Unnamed Tributary to Occanum Creek | Perennial | Regulation Code Part 931-914- Class C - Standard C | No | 17 | 63 | 1,063 | 0 | Pipeline | Dry-Ditch Open-Cut |

**Table 1.0  (Continued)**

| GAI Field and Map Designation | Mile Post | Stationing | Waterbody | Stream Type | State Water Quality Classification[1] | Trout Water[2] | Crossing Width (feet)[3] | Length of Stream Within Construction ROW (feet)[4] | Construction ROW Crossing Area (Temporary Impacts) (square feet)[5] | Operation ROW Crossing Area (Temporary Impacts) (square feet)[5,6] | Crossed By | Crossing Construction Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SNY-SJB-020 | 2.40 | 129+05 | Unnamed Tributary to Occanum Creek | Ephemeral | Regulation Code Part 931-914- Class C - Standard C | No | 4 | 19 | 76 | 0 | Construction ROW | Guided Conventional Bore[9] |
| SNY-SJB-021 | 2.40 | 130+25 | Unnamed Tributary to Occanum Creek | Intermittent | Regulation Code Part 931-914- Class C - Standard C | No | 3 | 7 | 21 | 0 | AR-5 Construction ROW | Temporary Bridge or Temporary Rock Flume Bridge |
| SNY-SJB-022 | 2.51 | 133+00; AR-5 | Unnamed Tributary to Occanum Creek | Ephemeral | Regulation Code Part 931-914- Class C - Standard C | No | 3 | 93 | 279 | 0 | AR-5 | Existing 12-Inch Diameter Metal Culvert |
| SNY-SJB-023 | 9.31 | 491+63 | Unnamed Tributary to Trowbridge Creek | Intermittent | Regulation Code Part 931-903- Class C - Standard C | No | 4 | 76 | 304 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SJB-024 | 9.27 | 489+51 | Unnamed Tributary to Trowbridge Creek | Ephemeral | Regulation Code Part 931-903- Class C - Standard C | No | 2 | 60 | 120 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SLH-001 | 8.82 | 466+11 | Unnamed Tributary to Trowbridge Creek | Ephemeral | Regulation Code Part 931-903- Class C - Standard C | No | 5 | 65 | 325 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SLH-003 | 8.45 | 446+55 | Unnamed Tributary to Trowbridge Creek | Ephemeral | Regulation Code Part 931-903- Class C - Standard C | No | 6 | 128 | 768 | 0 | Pipeline | HDD[8] |
| SNY-SLH-004 | 8.42 | 444+75 | Trowbridge Creek | Perennial | Regulation Code Part 931-903- Class C - Standard C | No | 79 | 70 (Total = 125) | 4,794 (Total=6,344) | 0 (Total=0) | Pipeline | HDD[8] |
| SNY-SLH-004 | 8.40 | 443+78; AR-2 | Trowbridge Creek | Perennial | Regulation Code Part 931-903- Class C - Standard C | No | 36 | 55 | 1,550 | 0 | AR-2 | Temporary Bridge or Temporary Rock Flume Bridge |
| SNY-SLH-006 | 7.40 | 394+20 | Unnamed Tributary to Trowbridge Creek | Ephemeral | Regulation Code Part 931-903- Class C - Standard C | No | 2 | 114 | 228 | 0 | Construction ROW | Temporary Bridge or Temporary Rock Flume Bridge |
| SNY-SLH-010 | 7.95 | 419+79 | Unnamed Tributary to Trowbridge Creek | Perennial | Regulation Code Part 931-903- Class C - Standard C | No | 8 | 182 | 1,456 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SLH-014 | 6.92 | 365+75 | Unnamed Tributary to Trowbridge Creek | Perennial | Regulation Code Part 931-903- Class C - Standard C | No | 6 | 98 | 588 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SLH-015 | 6.80 | 362+50 | Unnamed Tributary to Trowbridge Creek | Perennial | Regulation Code Part 931-903- Class C - Standard C | No | 3.5 | 29 | 102 | 0 | Construction ROW | Temporary Bridge or Temporary Rock Flume Bridge |
| SNY-SLH-016 | 6.95 | 366+96 | Unnamed Tributary to Trowbridge Creek | Ephemeral | Regulation Code Part 931-903- Class C - Standard C | No | 4 | 95 | 380 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SLH-018 | 6.45 | 341+04 | Unnamed Tributary to Trowbridge Creek | Perennial | Regulation Code Part 931-903- Class C - Standard C | No | 5 | 74 | 370 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SLH-020 | 5.55 | 293+46 | Unnamed Tributary to Trowbridge Creek | Perennial | Regulation Code Part 931-903- Class C - Standard C | No | 20 | 103 | 1,914 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SLH-021 | 4.92 | 259+96 | Unnamed Tributary to Trowbridge Creek | Perennial | Regulation Code Part 931-903- Class C - Standard C | No | 9 | 71 | 598 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SLH-022 | 4.93 | 260+49 | Unnamed Tributary to Trowbridge Creek | Perennial | Regulation Code Part 931-903- Class C - Standard C | No | 11 | 75 | 753 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SLH-023 | 4.91 | 259+50 | Unnamed Tributary to Trowbridge Creek | Perennial | Regulation code Part 913-903- Class C - Standard C | No | 4 | 14 | 56 | 0 | Construction ROW | Temporary Bridge or Temporary Rock Flume Bridge |
| SNY-SLH-024 | 4.49 | 237+47 | Unnamed Tributary to Trowbridge Creek | Perennial | Regulation Code Part 931-903- Class C - Standard C | No | 4 | 89 | 356 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SLH-025 | 4.43 | 234+36 | Unnamed Tributary to Trowbridge Creek | Perennial | Regulation Code Part 931-903- Class C - Standard C | No | 5 | 65 | 325 | 0 | Pipeline | Dry-Ditch Open-Cut |

**Table 1.0  (Continued)**

| GAI Field and Map Designation | Mile Post | Stationing | Waterbody | Stream Type | State Water Quality Classification[1] | Trout Water[2] | Crossing Width (feet)[3] | Length of Stream Within Construction ROW (feet)[4] | Construction ROW Crossing Area (Temporary Impacts) (square feet)[5] | Operation ROW Crossing Area (Temporary Impacts) (square feet)[5,6] | Crossed By | Crossing Construction Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SNY-SLH-026 | 4.38 | 231+46 | Unnamed Tributary to Trowbridge Creek | Intermittent | Regulation Code Part 931-903- Class C - Standard C | No | 4 | 72 | 288 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SLH-027 | 4.28 | 226+00; AR-3 | Unnamed Tributary to Trowbridge Creek | Intermittent | Regulation Code Part 931-903- Class C - Standard C | No | 3 | 45 | 135 | 0 | AR-3 | Existing 15-Inch Diameter Plastic Culvert |
| SNY-SLH-029 | 3.73 | 197+15 | Unnamed Tributary to Occanum Creek | Intermittent | Regulation Code Part 931-914- Class C - Standard C | No | 3 | 67 | 201 | 0 | Pipeline | Dry-Ditch Open-Cut |
| SNY-SLH-034[11] | 2.80 | 143+50 | Unnamed Tributary to Occanum Creek | Ephemeral | Regulation Code Part 931-914- Class C - Standard C | No | 5 | 254 | 1,270 | 0 | Construction ROW | Temporary Bridge or Temporary Rock Flume Bridge |
| SNY-SLH-036 | 0.30 | 116+00; AR 6-A | Unnamed Tributary to Occanum Creek | Perennial | Regulation Code Part 931-903- Class C - Standard C | No | 4.75 | 40 | 190 | 0 | AR-6A | Existing 24-Inch Diameter Plastic Culvert |
| PNY-SLH-004 | 4.10 | 219+00 | N/A | N/A | N/A | N/A | 9 | 9 | 850 | 0 | Pipeline | HDD[9] |
| | | | | | | Totals | 457.75 | 3,815 | 32,156 | 0 | | |

Notes:

[1]    As classified by Title 6 of the NY Code of Rules and Regulations (NYCRR) Part 701: Classification-Surface Waters and Groundwaters. Class C (C) fresh surface waters - The best usage of Class C waters is fishing. These waters shall be suitable for fish, shellfish, and wildlife propagation and survival. The water quality shall be suitable for primary and secondary contact recreation, although other factors may limit the use for these purposes. Trout waters (T or TS)- The symbol (T), appearing in an entry in the "standards" column in the classification tables of Parts 800 through 941 of Title 6 NYCRR, means that the classified waters in that specific item are trout waters. Any water quality standard, guidance value, or thermal criterion that specifically refers to trout or trout waters, or trout spawning waters applies. The symbol (TS), appearing in an entry in the "standards" column in the classification tables of Parts 800 through 941 of Title 6 NYCRR, means that the classified waters in that specific item are trout spawning waters. Any water quality standard, guidance value, or thermal criterion that specifically refers to trout, trout spawning, trout waters, or trout spawning waters applies.

[2]    Trout waters are waters that provide habitat in which trout can survive and grow within a normal range on a year-round basis, or on a year-round basis except periods of time during which almost all of the trout inhabiting such waters could and would temporarily retreat into and survive in adjoining or tributary waters due to natural circumstances. When these conditions exist or have been met a water may be classified as a trout water and identified with the symbol (T), appearing in an entry in the "standards" column in the classification tables of Parts 800 through 941 of Title 6.

[3]    Stream width as measured from top of banks during the field investigation.

[4]    Crossing length refers to the linear length of the stream within the Project construction ROW.

[5]    Crossing area as measured in Geographic Information System using the Global Positioning System data gathered during the field investigation.

[6]    The buried NY Mainline Loop Pipeline will have 5 feet of cover below the streambed except Trowbridge Creek will be buried with a minimum of 10 feet of cover. Vegetation in the ROW along stream banks will be allowed to revegetate to herbaceous conditions; therefore, no permanent impacts are anticipated. Stream bed and banks will be restored to pre-construction conditions.

[7]    Stream crossings will be crossed using an approved dry-ditch crossing per the NYPSC EM&CS&P and applicable permits and approvals and the actual method (e.g. dam and pump/flume) to be used will be decided by the contractor at the time of construction.

[8]    Existing culverts may be upgraded as necessary during construction and if replaced, a culvert of the same material, length, and diameter will be used.

[9]    Although impacts to these resources are included, disturbance to these waterbodies during construction is not anticipated, however they are included should the need arise to conduct in-stream work during Project construction.

[10]   AR-5 will be a permanent access road. The road width will not increase, however, general upgrades will be made such as minor re-grading and addition of gravel where necessary.

[11]   Due to the need to construct the NY Mainline Loop Pipeline within the existing 40 foot permanent ROW at this location, the ROW encroaches slightly on this resource for an extended distance. However, it is expected that proper erosion control devices will be installed to protect this resource as constructing over top of it adds little usable construction space.

- Class AA Fresh Surface Waters - The best usages of Class AA waters are: a source of water supply for drinking; culinary or food processing purposes; primary and secondary contact recreation; and fishing. The waters shall be suitable for fish, shellfish, and wildlife propagation and survival. This classification may be given to those waters that, if subjected to approve disinfection treatment, with additional treatment if necessary to remove naturally present impurities, meet or will meet NYDOH drinking water standards and are or will be considered safe and satisfactory for drinking water purposes.

- Class A Fresh Surface Waters - The best usages of Class A waters are: a source of water supply for drinking; culinary or food processing purposes; primary and secondary contact recreation; and fishing. The waters shall be suitable for fish, shellfish, and wildlife propagation and survival. This classification may be given to those waters that, if subjected to approved treatment equal to coagulation, sedimentation, filtration and disinfection, with additional treatment if necessary to reduce naturally present impurities, meet or will meet NYDOH drinking water standards and are or will be considered safe and satisfactory for drinking water purposes.

- Class B Fresh Surface Waters - The best usages of Class B waters are primary and secondary contact recreation and fishing. These waters shall be suitable for fish, shellfish, and wildlife propagation and survival. The best usage of Class C waters is fishing. These waters shall be suitable for fish, shellfish, and wildlife propagation and survival. The water quality shall be suitable for primary and secondary contact recreation, although other factors may limit the use for these purposes.

- Class C Fresh Surface Waters - The best usage of Class C waters is fishing. These waters shall be suitable for fish, shellfish, and wildlife propagation and survival. The water quality shall be suitable for primary and secondary contact recreation, although other factors may limit the use for these purposes.

- Trout Waters (T or TS) - The symbol ("T"), appearing in an entry in the "standards" column in the classification tables of 6 NYCRR Parts 800 through 941, means that the classified waters in that specific Item are trout waters. Any water quality standard, guidance value, or thermal criterion that specifically refers to trout or trout waters applies. The symbol ("TS"), appearing in an entry in the "standards" column in the classification tables of 6 NYCRR Parts 800 through 941, means that the classified waters in that specific Item are trout spawning waters. Any water quality standard, guidance value, or thermal criterion that specifically refers to trout, trout spawning, trout waters, or trout spawning waters applies.

Special requirements apply to sustain waters that support these valuable and sensitive fisheries resources. Small ponds and lakes with a surface area of 10 acres or less, located within the course of a stream, are considered to be part of a stream and are subject to regulation under the stream protection category of Protection of Waters. Certain waters of the state are protected on the basis of their classification. Streams and small waterbodies located in the course of a stream that are designated as C(T) or higher (i.e., C(TS), B, or A) are collectively referred to as "protected streams" and are subject to the stream protection provisions of the Protection of Waters regulations (ECL Article 15-0501). A Protection of Waters Permit is required for disturbing the bed or banks of a stream with a classification and standard of C(T) or higher (disturbance may be either temporary or permanent in nature).

A Stream Protection Article 15 permit from the NYSDEC is not required for this Project. Based on a review of the USACE Buffalo District Nationwide Permit 12 ("NWP-12") conditions on in-stream construction activities in NY, and per consultation with the NYSDEC Region 7 Bureau of Habitat, construction activities are restricted in natural trout and salmon streams between October 1 and May 15, in stocked trout streams between October 1 and July 15, and in warm water fisheries between March 15 and July 15. Williams hereby requests permission from the NYPSC to conduct in-stream construction during the restriction dates of May 1 through July 15. As discussed in Section 2.1 above, the system capacity constraints are driving the need to expand the NY Mainline. In order to alleviate this constraint, the construction of the NY Mainline Loop Pipeline will need to begin as soon as the appropriate approvals are obtained. Based on the desired construction start date (May 1, 2014), Williams would need to cross the subject streams prior to July 15 to allow construction to progress in an efficient manner. Should approvals be received beyond June 1, construction progress would likely place the timing of the stream crossings outside of the restriction dates and would no longer require a waiver.

According to the NYSDEC's Environmental Resource Mapper and 6 NYCRR, Parts 800 through 941, the streams that the Project crosses are classified as Class C and Standard C.

***Watershed***. The Project is located within the Susquehanna River Basin. This watershed has a regulatory commission, the Susquehanna River Basin Commission, which has been charged with monitoring water withdrawals within the watershed. Water withdrawals are not proposed for the Project. The Project is located in the Upper Susquehanna Watershed [Hydrologic Unit Code # ("HUC#") 02050101]. The proposed NY Mainline Loop Pipeline, access roads, and Pipe Storage Yards #2 and #3 are located within the Occanum Creek-Susquehanna River (HUC #020501011208) and Trowbridge Creek (HUC #020501011307) watersheds. Pipe Storage Yard #1 is located within the Park Creek-Susquehanna River watershed (HUC #020501011313). **Exhibit K,** Watershed Boundary Map, identifies the watershed boundaries in relation to the Project.

### 2.5.1.2  *Wetlands*

The Freshwater Wetlands Act (Article 24 of the ECL), protects wetlands 12.4 acres (10 hectares) or larger. Wetlands of smaller size may be protected if they are considered to be of unusual local importance. The USACE also protects wetlands, irrespective of size, under Section 404 of the Clean Water Act (CWA).

The United States Fish and Wildlife Service's ("USFWS") National Wetlands Inventory and the NY State Freshwater Wetlands Map were reviewed by GAI Consultants, Inc. ("GAI") who also conducted wetland delineations for the Project in September, October, and November 2012 and February and September 2013. The NYSDEC Environmental Resources Mapper was also reviewed for the presence of NYSDEC regulated wetlands within 500 feet of the study area. NYSDEC regulated wetlands were not identified during field studies nor were they identified within the Project area on the NYSDEC Environmental Resource Mapper. The NYSDEC Wetlands map is located the WDSIR, **Exhibit J**.

GAI conducted environmental field studies for the Project and identified and delineated 71 wetlands within the Project study area. **Exhibit I**, CAS, shows the locations of these wetlands along the proposed NY Mainline Loop Pipeline route. **Exhibit J**, WDSIR dated September, 2013, describes each identified wetland in detail. Of the 71 delineated wetlands within the Project study area, 23 will be crossed by the proposed NY Mainline Loop Pipeline, 24 occur within the Project construction work limits, and 4 will be crossed by existing or proposed temporary access roads. The total acreage of wetlands that occur within the construction work limits is 2.07 acres. The size of delineated wetlands ranges from less than 0.01-acre to 0.8-acre. None of the wetlands identified as part of this Project are identified as regulated wetlands by the NYSDEC as discussed in the Project's WDSIR, **Exhibit J**. The environmental impacts are expected to be minimal and substantially limited to temporary, construction-related disturbance. See **Table 2.0**, Wetland Crossings, for detailed information related to each wetland crossed by the Project, the method of crossing, and the area to be impacted by construction.

Per EM&CS&P specifications, methods to cross wetlands during construction include the open-cut dry crossing, open-cut wet crossing with "push and pull" or "drag section" techniques, conventional bore, or HDD. For wetlands proposed to be crossed via open-cut, the specific method and technique will be dependent on whether the wetland area is dry, saturated or inundated at the time of construction. Mats will be used on all soft soils to avoid making ruts from heavy machinery. Where wetlands are proposed to be crossed using the HDD/Conventional Bore method the entry/exit points will be located at least 25 feet from the wetland edge where feasible. Prior to commencement of construction, a CWA Section 404 NWP-12 (Utility Line Activities) Pre-Construction Notification ("PCN"), detailing impacts and proposed crossing methods, will be completed and submitted to the USACE Buffalo District for approval.



AR 005018

**Table 2.0 Wetland Crossings**

| GAI Field and Map Designation | Crossed by | Acreage Affected by Construction (temporary impacts) Cowardin Designation: Palustrine Emergent | Palustrine Scrub-Shrub | Palustrine Forested | Acreage Affected by Operation (conversion impacts)[1] Cowardin Designation: Palustrine Emergent[2] | Palustrine Scrub-Shrub | Palustrine Forested | Length of Pipeline Centerline or Access Road Centerline Crossing (feet) | Crossing Construction Method |
|---|---|---|---|---|---|---|---|---|---|
| WNY-SJB-001 | AR-9 Construction ROW | < 0.01[3] | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SJB-002 | Construction ROW | < 0.01 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SJB-005 | Construction ROW | 0.02 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SJB-006 | Construction ROW | 0.01 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SJB-007 | Construction ROW | 0.01 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SJB-008 | Construction ROW | < 0.01 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SJB-009 | Construction ROW | 0.01 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SJB-010 | Construction ROW | 0.01 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SJB-012 | Construction ROW | 0.09 | - | < 0.01 | 0.00 | - | 0.00 | 0 | Timber Mat |
| WNY-SJB-014 | AR-8 | 0.09 | - | - | 0.00 | - | - | 144 | Timber Mat |
| WNY-SJB-016 | Pipeline | 0.13 | - | - | 0.00 | - | - | 96 | Timber Mat and Open-Cut |
| WNY-SJB-017 | Pipeline | 0.03 | - | - | 0.00 | - | - | 15 | Timber Mat and Open-Cut |
| WNY-SJB-018 | Pipeline | 0.04 | - | - | 0.00 | - | - | 25 | Timber Mat and Open-Cut |
| WNY-SJB-019 | Construction ROW | 0.02 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SJB-020 | Construction ROW | 0.05 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SJB-021 | Construction ROW | - | - | 0.02 | - | - | < 0.01 | 0 | Timber Mat |
| WNY-SJB-022 | Pipeline | - | 0.01 | - | - | 0.01 | - | 2 | Timber Mat and Open-Cut |
| WNY-SJB-023 | Pipeline | - | 0.05 | - | - | 0.03 | - | 40 | Timber Mat and Open-Cut |
| WNY-SJB-024 | Construction ROW | 0.03 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SJB-026 | Construction ROW | < 0.01 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SJB-027 | AR-5 Construction ROW | 0.01 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SJB-028 | Pipeline | 0.03 | - | - | 0.00 | - | - | 26 | Guided conventional bore[4] |
| WNY-SJB-029 | Pipeline | 0.01 | 0.01 | - | 0.00 | 0.00 | - | 4 | Timber Mat and Open-Cut |
| WNY-SJB-030 | AR-6 | 0.03 | - | - | 0.00 | - | - | 39 | Timber Mat |
| WNY-SJB-031 | AR-2A Construction ROW | 0.02 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SLH-001 | Pipeline | 0.26 | - | - | 0.00 | - | - | 149 | Timber Mat and Open-Cut |
| WNY-SLH-004 | Pipeline | - | 0.03 | - | - | 0.02 | - | 21 | Timber Mat and Open-Cut |
| WNY-SLH-005 | Construction ROW | 0.01 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SLH-006 | Pipeline | 0.02 | - | - | 0.00 | - | - | 40 | Timber Mat and HDD |

**Table 2.0  (Continued)**

| GAI Field and Map Designation | Crossed by | Acreage Affected by Construction (temporary impacts) | | | Acreage Affected by Operation (conversion impacts)[1] | | | Length of Pipeline Centerline or Access Road Centerline Crossing (feet) | Crossing Construction Method |
|---|---|---|---|---|---|---|---|---|---|
| | | Cowardin Designation | | | Cowardin Designation | | | | |
| | | Palustrine Emergent | Palustrine Scrub-Shrub | Palustrine Forested | Palustrine Emergent[2] | Palustrine Scrub-Shrub | Palustrine Forested | | |
| WNY-SLH-007 | Construction ROW | 0.01 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SLH-008 | Pipeline | 0.05 | - | - | 0.00 | - | - | 15 | HDD[4] |
| WNY-SLH-009 | Construction ROW | 0.04 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SLH-012 | Construction ROW | <0.01 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SLH-014 | Pipeline | 0.09 | - | - | 0.00 | - | - | 61 | Timber Mat and Open-Cut |
| WNY-SLH-017 | Pipeline | 0.12 | - | < 0.01 | 0.00 | - | < 0.01 | 63 | Timber Mat and Open-Cut |
| WNY-SLH-018 | Pipeline | 0.04 | - | - | 0.00 | - | - | 14 | Timber Mat and Open-Cut |
| WNY-SLH-020 | Construction ROW | 0.01 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SLH-023 | Pipeline | 0.06 | - | - | 0.00 | - | - | 30 | Timber Mat and Open-Cut |
| WNY-SLH-024 | Construction ROW | < 0.01 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SLH-025 | Pipeline | 0.05 | - | - | 0.00 | - | - | 48 | Timber Mat and Open-Cut |
| WNY-SLH-026 | Pipeline | 0.02 | - | - | 0.00 | - | - | 17 | Timber Mat and Open-Cut |
| WNY-SLH-027 | Pipeline | 0.02 | - | - | 0.00 | - | - | 10 | Timber Mat and Open-Cut |
| WNY-SLH-030 | Pipeline | 0.08 | - | - | 0.00 | - | - | 93 | HDD[4] |
| WNY-SLH-031 | Pipeline | 0.03 | - | - | 0.00 | - | - | 49 | HDD[4] |
| WNY-SLH-033 | Construction ROW | 0.03 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SLH-034 | Construction ROW | 0.02 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SLH-035 | Pipeline | 0.04 | 0.03 | - | 0.00 | 0.02 | - | 46 | Timber Mat and Open-Cut |
| WNY-SLH-036 | Pipeline and AR-4 Construction ROW | 0.07 | < 0.01 | - | 0.00 | 0.00 | - | 49 | Timber Mat and Open-Cut |
| WNY-SLH-037 | Construction ROW | < 0.01 | - | - | 0.00 | - | - | 0 | Timber Mat |
| WNY-SLH-039 | Pipeline | 0.03 | - | - | 0.00 | - | - | 28 | Timber Mat and Open-Cut |
| WNY-SLH-040 | AR-6A | 0.08 | - | - | 0.00 | - | - | 118 | Timber Mat |
| **Totals** | | **1.89** | **0.14** | **0.04** | **0.00** | **0.08** | **0.02** | **1,242** | |

Notes:

[1]   No fill will be placed into wetlands and grading in these areas will be restored to pre-construction conditions. PSS/Palustrine Forested ("PFO") wetlands will be converted to PEM wetlands.
[2]   PEM Wetlands will be restored to pre-construction conditions; therefore, no permanent impacts are anticipated.
[3]   For impacts less than 0.01-acre, 0.01 is added to the total impact number.
[4]   Although impacts to these resources are included, disturbance to these wetlands during construction is not anticipated, however they are included should the need arise to conduct work within these wetlands during Project construction.

AR  005020

### 2.5.1.3  Wetland Mitigation

Williams has designed the Project in a manner that minimizes wetland impacts to the greatest extent possible (through avoidance and impact minimization) and does not anticipate compensatory mitigation (wetland enhancement or creation) to be required as part of this Project. Prior to construction, Williams will submit a PCN under NWP-12 (Utility Line Activities), detailing impacts associated with the Project to the USACE Buffalo District. Based on stream and wetland impacts identified in Tables 1.0 and 2.0, respectively, the Project's permanent impacts are below the thresholds that would require compensatory mitigation. Williams will continue to work with the USACE Buffalo District as the PCN is developed and after the submission of the PCN to determine if compensatory mitigation is required. If the USACE determines that compensatory mitigation is required, Williams will develop a compensatory mitigation plan in coordination with the USACE Buffalo District and provide a copy of that plan to the NYPSC upon approval of the USACE.

Williams will also integrate and implement wetland crossing and restoration techniques described in Section 11 of the EM&CS&P as well as the Project's ROW Restoration and Revegetation Plan (**Exhibit S**), State Pollution Discharge Elimination System Permit, NWP-12, and any recommendations of the NYDPS and NYSDEC that are incorporated in the Article VII Certificate.

### 2.5.1.4  Springs and Wells

The proposed NY Mainline Loop Pipeline route was adjusted, when necessary, to avoid direct impact to springs and wells located within the Project's ROW. The location of a field identified spring house located within 200 feet of the proposed ROW is shown in **Table 3.0**. Only 1 spring house was identified within 200 feet of the proposed ROW, no water wells were identified. The location of the field identified spring house is provided as **Exhibit L**.

**Table 3.0  Field Identified Spring and Water Well
Locations within 200 Feet of the NY Mainline Loop Pipeline ROW**

| County | Tax ID No. | Owner's Name | Street | Approximate Distance from Work Areas (feet) |
|--------|-----------|--------------|--------|---------------------------------------------|
| Broome | 164.04-1-28.1 | Fox Farm, LLC | Fox Farm Road | 46 |

In verifying the location of wells within the NY Mainline Loop Pipeline ROW, Williams searched within 200 feet of the ROW for state listed wells. Based on a review of online data, there are no known NYSDEC state listed wells located in the Town of Windsor

within 200 feet of the NY Mainline Loop Pipeline ROW (NYSDEC, 2011). Additional springs and wells may be present in the vicinity that are not present in the NYSDEC database.

Williams agrees to conduct pre-and post-construction testing of identified water, streams, ponds, springs, and other sources located within 500 feet of the NY Mainline Loop Pipeline ROW. The test results or analysis shall be provided to the landowner. In an email dated October 16, 2012, Williams inquired with the NYDOH about public water supply intake sources and municipal water wells within 0.25-mile radius of the Project area. The NYDOH replied in a letter dated November 27, 2012 that there was only 1 system within the Project area and that it belongs to the City of Binghamton. Williams followed up with the NYDOH, the City of Binghamton, and the Town of Kirkwood inquiring about the presence of water supply intakes or municipal water wells within a 0.25-mile of the Project area. Based on consultation, there are no public water supply intakes or municipal water wells within 0.25-mile radius of the Project. Correspondence with the NYDOH, the City of Binghamton, and the Town of Kirkwood is provided as **Exhibit L-1**.

### *2.5.1.5  Floodplains*

Floodplains are low-lying lands typically adjacent to rivers and streams. When left in a natural state, floodplain systems store and dissipate floods without adverse impacts on humans, buildings, roads, and other infrastructure. NYSDEC Law (6 NYCRR Part 502) states that communities that participate in the National Flood Insurance Program must pass local laws or ordinances that regulate development within mapped floodplains.

Federal Emergency Management Agency ("FEMA") Flood Insurance Rate Maps ("FIRM"s) were reviewed to determine if the Project area is located within a flood zone. Flood zones are geographic areas that the FEMA has defined according to varying levels of flood risk. These zones are depicted on a community's FIRM or Flood Hazard Boundary Map. Williams reviewed FIRMs published on September 20, 1992 by FEMA for the Town of Windsor. Panels crossed by the Project include 360059 0025 C, 360059 0010 C, and 360059 0040 C; all of which are not printed panels because there are no mapped flood hazard areas depicted. Per consultation with FEMA and the Broome County Planning Office, preliminary updated FIRMs for Broome County were issued on February 5, 2010 but are not effective. There are no identified flood hazard areas crossed by the proposed NY Mainline Loop Pipeline, access roads, launcher/receiver mainline valve sites, or pipe storage yards. The Town of Windsor FIRM and 100-year floodplain map are provided as **Exhibit M**. Refer to Section 2.8.4.1 Flood Damage Prevention for additional discussion of floodplains as it applies to local laws.



### 2.5.1.6  Land Use

Land uses along the Project were identified based on field observations and aerial photography. **Table 4.0** identifies the land uses that are crossed by the NY Mainline Loop Pipeline centerline and **Table 4.1** identifies the acreage crossed by the Project and includes Abandoned Agricultural Land, Active Agriculture, Active Agriculture and Pastureland, Existing Pipeline ROW, Hay, Industrial, Open Land, Pastureland, Public Road ROW, Scrub Shrub, Unimproved Pasture, and Woodland.

**Table 4.0  Land Uses Crossed by the NY Mainline Loop Pipeline Centerline**

| Land Use Crossed by Pipeline Centerline | Length (feet) | Length (miles) | Percentage |
|---|---|---|---|
| Abandoned Agricultural Land | 1,685 | 0.3 | 3.4 |
| Active Agriculture | 4,717 | 0.9 | 9.4 |
| Active Agriculture and Pastureland | 165 | < 0.1 | 0.3 |
| Existing Pipeline ROW | 32,830 | 6.1 | 65.5 |
| Hay | 1,791 | 0.3 | 3.6 |
| Industrial | 307 | 0.1 | 0.6 |
| Open Land | 1,327 | 0.3 | 2.6 |
| Pastureland | 1,417 | 0.3 | 2.8 |
| Public Road ROW | 408 | 0.1 | 0.8 |
| Scrub Shrub | 711 | 0.1 | 1.4 |
| Unimproved Pasture | 998 | 0.2 | 2.0 |
| Woodland | 3,831 | 0.7 | 7.6 |
| **Totals** | **50,187** | **9.5** | **100.0** |

Woodland is the predominant land use adjacent to the Project as shown on the Land Use Map attached as **Exhibit N**. The proposed NY Mainline Loop Pipeline primarily travels through existing pipeline ROW bordered by woodland habitat.

No public lands were identified adjacent to the Project route. The Project route crosses through and adjacent to private property of either residential or industrial use.

NY State certified agricultural districts exist in Broome County. Specifically, the proposed Project is located within Agricultural District 4 along 2 segments totaling approximately 3 miles. Agricultural Lands and Districts are discussed in further detail in Section 2.5.1.8.

**Table 4.1  Land Use Acreage Crossed by the Project**

| Land Use Crossed | Operational ROW (acres) | Construction ROW (acres) |
|---|---|---|
| Abandoned Agricultural Land | 1.6 | 2.8 |
| Active Agriculture | 0.0 | 1.9 |
| Cropland | 4.3 | 13.9 |
| Cropland and Pastureland | 0.2 | 0.3 |
| Existing Pipeline ROW | 30.5 | 42.9 |
| Hay | 2.0 | 3.8 |
| Industrial | 0.3 | 4.8 |
| Open Land | 1.4 | 12.1 |
| Pastureland | 1.3 | 3.9 |
| Planting Area | 0.0 | 0.1 |
| Public Road ROW | 0.4 | 0.6 |
| Rock Pit/Quarry | 0.0 | 0.5 |
| Rural Residential | 0.0 | 0.5 |
| Scrub Shrub | 0.7 | 2.1 |
| Unimproved Pasture | 0.9 | 2.0 |
| Woodland | 3.2[1] | 14.7 |
| **Totals** | **46.8** | **106.9** |

Note:

[1]    The amount of additional permanent tree clearing for this Project is substantially less than the 30.2 acres of permanent tree clearing that was required for the NY Mainline.

The Town of Windsor zoning map was examined for each zoning district type crossed by the Project. The proposed Project crosses through residential, agricultural, and commercial zones. Zoning is discussed in Section 2.8.

Residences within 500 feet of the NY Mainline Loop Pipeline ROW are included in **Table 4.2**.

### Table 4.2  Residences within 500 Feet of the
### NY Mainline Loop Pipeline Construction ROW[1]

| Approximate Mile Post | Landowner Name | Approximate Distance from Pipeline (feet) | Nearby Public Road |
|---|---|---|---|
| 0.0 | Laser Northeast Gathering Company, LLC | 206 North | Patterson Road |
| 0.4 | Timothy P. McKnight | 460 West | Dunbar Road |
| 1.0 | Chester H. Travis | 92 Southwest | Dunbar Road |
| 1.1 | Helen G. Mott | 476 South-Southeast | Dunbar Road |
| 2.2 | Deborah Osterhout | 431 East | Fox Farm Road (CO RD 28) |
| 2.4 | Deborah Osterhout | 490 Northeast | Fox Farm Road (CO RD 28) |
| 2.4 | Eduardo C. Toloza | 193 East | Fox Farm Road (CO RD 28) |
| 2.7 | Leo Mulcahy | 197 East | Rockwell Road |
| 2.7 | David B. Mulcahy | 478 East | Rockwell Road |
| 3.4 | Mary Beth Marcel Donlick | 358 West | Hoadley Hill Road |
| 3.5 | Philip J. Smith | 453 East | Hoadley Hill Road |
| 4.3 | Francis T. Koury | 407 East | Trim Street (CO RD 32) |
| 5.3 | Kenny W. Frederick | 157 West | Bell Road |
| 5.5 | Alvah Shaffer | 521 East | Bell Road |
| 6.1 | Luella Dobish | 177 Southwest | John White Road |
| 6.1 | David Kaine | 381 Southwest | John White Road |
| 6.2 | David K. Kirgan | 240 West | John White Road |
| 7.5 | Steven Carinci | 316 North | Phillips Road |
| 7.6 | Jilda J. Rush | 229 Southeast | Farr Road |
| 7.7 | Nancy A. Nash | 407 Northwest | Farr Road |
| 7.7 | Carene A. Dinardo | 495 West | Farr Road |
| 8.0 | Reginald H. Collins | 248 East | Phillips Road |
| 8.7 | Robert Bigelow | 442 West | Blatchley Road |
| 9.0 | Michele Goff | 358 East | Blatchley Road |
| 9.0 | Michele Goff | 307 East | Blatchley Road |
| 9.5 | Roger Scott (PA Parcel) | 437 West | Bush Hill Road |

Note:

[1] This table is based upon available aerial imagery and parcel data. Residences are to be confirmed prior to construction. Orthophotography provided by Williams Field Services Company, LLC, 2012. National Agricultural Imagery Program (NAIP), aerial photography, 2009. ESRI World Imagery, UC-G, Microsoft Corporation and its data suppliers, 2011. Parcel Boundaries provided by Joe Hunt and Associates, December 2012. Construction Alignment Sheets, New York Mainline Loop Natural Gas Pipeline Project, November, 2013.

### 2.5.1.7  Geology and Soils

The proposed Project is located within 1 Major Land Resources Area ("MLRA") recognized by the Natural Resources Conservation Service, the Glaciated Allegheny Plateau and Catskill Mountains (MLRA 140). MLRAs are geographically associated land resource units, usually encompassing several thousand acres, characterized by a particular pattern of soils, geology, climate, water resources, and land use (USDA, 2006). Bedrock within the Project area consists of rock of the Upper Walton Formation and the Gardeau Formation. The Upper Walton Formation includes rock consisting of alternating shale and sandstone bed and conglomerate of Devonian age (USGS, 2010; USDA, 2006). The Gardeau Formation includes rock consisting of alternating shale and siltstone of Devonian age. The thickest and most uniform beds of certain sandstones are now valuable for local "bluestone" quarries. Rock colors are shades of red or bluish gray depending on the amount of oxygen in the environment during deposition (DCSWCD, 2007).

Some of the upper Devonian layers have been eroded away in areas of NY. Glacial drift mantles the area. Significant deposits of glacial outwash, consisting of unconsolidated sand and gravel, fill most of the valley floors. Some glacial lake sediments and ice-contact and stratified drift deposits occur in most of the valleys. These deposits are the primary aquifers in this area. Younger stream deposits cover some of the glacial deposits on the valley floors (USDA, 2006).

The dominant soil order in this MLRA is Inceptisols. They are shallow to very deep, well-drained to poorly drained and loamy or loamy-skeletal. *Dystrudepts* (Lordstown and Oquaga series) formed in tills on hills and dissected plateaus. *Fragiudepts* (Mardin series) and *Fragiaquepts* (Morris and Volusia series) formed in till on hills and till plains (USDA, 2006).

Soil survey data, as described in the *Web Soil Survey Geographic (SSURGO) Database for Broome County, NY* (NRCS, 2011) was reviewed for soil types within the area of the Project. **Table 5.0**, Soils Crossed by the proposed Project Route, contains a summary of the 17 soil types mapped to the area and the length in miles (or acres) that each of these soils types are crossed by the Project route. A soils map for the Project route is included as part of **Exhibit J**. Approximately 13.7 percent of the NY Mainline Loop Pipeline route crosses hydric soils and approximately 21.4 percent of the proposed temporary and permanent access roads cross hydric soil. Hydric soils were not identified within the proposed pipe storage yards. Approximately 2.6 percent of the NY Mainline Loop Pipeline route crosses Prime Farmland and approximately 6.9 percent of the proposed temporary and permanent access roads cross Prime Farmland. Prime Farmland consists of soils best suited for growing food, feed, forage,



## Table 5.0  Soils Crossed by the Proposed Project

| Soil Symbol | Soil Unit | Brief Description of Soil Unit | Hydric Soil | Distance Crossed (mile) | Percent of Total |
|---|---|---|---|---|---|
| **Soils Crossed by the Proposed NY Mainline Loop Pipeline Centerline** | | | | | |
| Ad | Alluvial land | This soil has 0 to 3 slopes and is poorly drained. This soil is frequently flooded and ponded. | Yes | 0.17 | 1.81 |
| CpB | Chippewa channery silt loam | This soil has 3 to 8 slopes and is poorly drained. This soil is not flooded and occasionally ponded. | Yes | 0.04 | 0.39 |
| LdC | Lordstown channery silt loam | This soil has 5 to 15 percent slopes and is well drained. This soil is not flooded and not ponded. | No | 0.53 | 5.63 |
| LdD | Lordstown channery silt loam | This soil has 15 to 25 percent slopes and is well drained. This soil is not flooded and not ponded. | No | 0.53 | 5.60 |
| LoE | Lordstown and Oquaga channery silt loams | This soil has 25 to 35 percent slopes and is well drained. This soil is not flooded and not ponded. | No | 0.92 | 9.64 |
| LsE | Lordstown and Oquaga extremely stony and rocky soils | This soil has 0 to 35 percent slopes and is well drained. This soil is not flooded and not ponded. | No | 0.45 | 4.75 |
| MhB | Mardin channery silt loam | This soil has 2 to 8 slopes and is moderately well drained. This soil is not flooded and not ponded. | No | 0.04 | 0.38 |
| MhC | Mardin channery silt loam | This soil has 8 to 15 percent slopes and is moderately well drained. This soil is not flooded and not ponded. | No | 1.76 | 18.57 |
| MhD | Mardin channery silt loam | This soil has 15 to 25 percent slopes and is moderately well drained. This soil is not flooded and not ponded. | No | 0.58 | 6.08 |
| MhE | Mardin channery silt loam | This soil has 25 to 35 percent slopes and is moderately well drained. This soil is not flooded and not ponded. | No | 0.18 | 1.87 |
| Ms | Middlebury silt loam | This soil has 0 to 3 percent slopes and is moderately well drained. This soil is occasionally flooded and is not ponded. | No | 0.20 | 2.16 |
| Ta | Tioga silt loam | This soil has 0 to 5 percent slopes and is well drained. This soil is occasionally flooded and is not ponded. | No | 0.04 | 0.39 |
| VoB | Volusia channery silt loam | This soil has 3 to 8 percent slopes and is somewhat poorly drained. This soil is not flooded and not ponded. | No | 0.70 | 7.42 |
| VoC | Volusia channery silt loam | This soil has 8 to 15 percent slopes and is somewhat poorly drained. This soil is not flooded and is not ponded. | No | 2.85 | 29.84 |
| VoD | Volusia channery silt loam | This soil has 15 to 25 percent slopes and is somewhat poorly drained. This soil is not flooded and not ponded. | No | 0.36 | 3.84 |
| Wd | Wayland silt loam | This soil has 0 to 3 percent slopes and is poorly drained. This soil is frequently flooded and ponded. | Yes | 0.15 | 1.63 |
| | | | **Totals** | **9.50** | **100.00** |

## Table 5.0 (Continued)

| Soil Symbol | Soil Unit | Brief Description of Soil Unit | Hydric Soil | Distance Crossed (mile) | Percent of Total |
|---|---|---|---|---|---|
| **Soils Crossed by the Proposed Access Roads** | | | | | |
| Ad | Alluvial land | This soil has 0 to 3 percent slopes and is poorly drained. This soil is frequently flooded and ponded. | Yes | 0.34 | 12.10 |
| ChA | Chenango and Howard gravelly loams | This soil has 0 to 5 percent slopes and is well drained. This soil is not flooded and not ponded. | No | 0.03 | 1.07 |
| LdC | Lordstown channery silt loam | This soil has 5 to 15 percent slopes and is well drained. This soil is not flooded and not ponded. | No | 0.02 | 0.71 |
| LdD | Lordstown channery silt loam | This soil has 15 to 25 percent slopes and is well drained. This soil is not flooded and not ponded. | No | 0.03 | 1.07 |
| LoE | Lordstown and Oquaga channery silt loams | This soil has 25 to 35 percent slopes and is well drained. This soil is not flooded and not ponded. | No | 0.02 | 0.71 |
| LsE | Lordstown and Oquaga extremely stony and rocky soils | This soil has 0 to 35 percent slopes and is well drained. This soil is not flooded and not ponded. | No | 0.11 | 3.91 |
| MhB | Mardin channery silt loam | This soil has 2 to 8 percent slopes and is moderately well drained. This soil is not flooded and not ponded. | No | 0.08 | 2.85 |
| MhC | Mardin channery silt loam | This soil has 8 to 15 percent slopes and is moderately well drained. This soil is not flooded and not ponded. | No | 0.35 | 12.46 |
| MhD | Mardin channery silt loam | This soil has 15 to 25 percent slopes and is moderately well drained. This soil is not flooded and not ponded. | No | 0.02 | 0.71 |
| Ms | Middlebury silt loam | This soil has 0 to 3 percent slopes and is moderately well drained. This soil is occasionally flooded and is not ponded. | No | 0.11 | 3.91 |
| Ta | Tioga silt loam | This soil has 0 to 5 percent slopes and is well drained. This soil is occasionally flooded and is not ponded. | No | 0.05 | 1.78 |
| VoB | Volusia channery silt loam | This soil has 3 to 8 percent slopes and is somewhat poorly drained. This soil is not flooded and not ponded. | No | 0.32 | 11.39 |
| VoC | Volusia channery silt loam | This soil has 8 to 15 percent slopes and is somewhat poorly drained. This soil is not flooded and is not ponded. | No | 1.12 | 43.06 |
| VoD | Volusia channery silt loam | This soil has 15 to 25 percent slopes and is somewhat poorly drained. This soil is not flooded and not ponded. | No | 0.12 | 4.27 |
| | | | **Totals** | **2.81** | **100.00** |
| **Soils Crossed by the Pipe Storage Yards** | | | | | |
| VoB | Volusia channery silt loam | This soil has 3 to 8 percent slopes and is somewhat poorly drained. This soil is not flooded and is not ponded. | No | 0.30 | 6.00 |
| VoC | Volusia channery silt loam | This soil has 8 to 15 percent slopes and is somewhat poorly drained. This soil is not flooded and is not ponded. | No | 4.90 | 94.00 |
| | | | **Totals** | **5.20** | **100.00** |

fiber and oilseed crops.   Additionally, approximately 62.1 percent of the NY Mainline Loop Pipeline route crosses soils that are classified as Farmland of Statewide Importance and approximately 68.8 percent of the proposed and existing temporary and permanent access roads cross soils that are classified as Farmland of Statewide Importance. Farmlands of Statewide Importance include lands other than Prime Farmland, which have a good combination of physical and chemical characteristics for the production of crops. As discussed in Section 2.5.1.8, Williams has consulted with the NYDAM and has integrated best management practices into the construction and restoration phases of the Project to minimize impacts to agricultural land.

Topography of the Project area ranges from rolling hills to steep slopes; slopes generally range from 0 to 35 percent. **Table 6.0**, Slopes Encountered Along the Proposed NY Mainline Loop Pipeline, presents a compilation of the slopes encountered along the proposed route. Approximately 95 percent of the proposed route traverses slopes that are 30 percent or less. For areas of steep slopes and where soil erosion may occur, Williams will comply with the temporary and permanent soil erosion control measures listed in the EM&CS&P.

**Table 6.0  Slopes Encountered Along the Proposed NY Mainline Loop Pipeline**

| Slope Interval (percent) | Distance | |
|---|---|---|
| | **Miles** | **Percent** |
| 0 to 5 | 1.18 | 12.47 |
| 6 to 10 | 2.60 | 27.37 |
| 11 to 15 | 2.48 | 26.11 |
| 16 to 20 | 1.32 | 13.89 |
| 21 to 25 | 1.08 | 11.37 |
| 26 to 30 | 0.37 | 3.89 |
| 31 to 35 | 0.22 | 2.32 |
| More Than 35 | 0.25 | 2.63 |
| **Totals** | **9.50** | **100.00** |

### 2.5.1.8  Agricultural Lands/District

According to a letter sent to the NYDPS dated October 22, 2010 regarding Case 10-T-0350, the NY Mainline (and now the proposed NY Mainline Loop Pipeline since it generally follows the same ROW) crosses through 6 agricultural land parcels as determined by the NYDAM. The active agricultural lands are parcels 164.02-1-3 (Travis; cropland and unimproved pasture), 164.04-1-9.1 (Fox Farm, LLC; cropland), 180.02-1-9.1 (Farr; cropland and pasture), 180.02-1-11 (Root; cropland), 181.01-1-13 (Donlick; pasture), and 212.04-1-25 (Nash; cropland and pasture) each of which are labeled on



JA2628

AR  005029

**Exhibit P**, Agricultural Districts and Land Map. Based on additional consultation with the NYDAM, the following properties were also identified as agricultural lands: 164.02-1-3 (Travis; unimproved pasture), 229.02-1-15 (Bigelow; hay field and pasture), and 229.04-1-3.1 (Goff property; abandoned agricultural land). During construction and operation on these properties, Williams proposes to follow the construction standards included in the NYDAM Pipeline ROW Construction Projects; Agricultural Mitigation Through the Stages of Project Planning, Construction/Restoration and Follow-up Monitoring (Rev. 11-97) and the EM&CS&P to minimize impacts to agricultural land. In restoring the construction ROW (permanent, temporary, additional temporary extra workspace ("ATWS"), temporary access roads) on these properties, Williams will first adhere to property owner preference for seed mixture, however, if the landowner does not request a specific mixture, Williams will then defer to the ROW Restoration and Revegetation Plan (**Exhibit S**) developed for the Project. Williams will also adhere to the Project's Preparedness, Prevention, and Contingency Plan for Construction Activities included in the Project's SPDES Permit.

The proposed Project crosses over Broome County District #4 Agricultural District as shown on **Exhibit P**.

The active and inactive agricultural crop land and pasture lands crossed by the Project are detailed in **Table 7.0**. According to an email from NYDAM dated November 30, 2012, the Agricultural Lands, topsoil stripping, and sub-soil decompaction locations identified in this table are consistent with the lands identified for NY Mainline project, and now applicable to this Project, and the conversations that occurred during the pre-application field review on November 7, 2012 and January 31, 2013. Pasture land in this table refers to land that is grazed land, mowed, or could have recently been used as cropland, but is currently fallowed. Active agricultural lands will have additional temporary extra workspace as necessary to accommodate topsoil segregation; the CAS attached hereto as **Exhibit I** shows the location of proposed ATWS.

Representatives from Williams, along with a representative of the NYDAM, conducted a site visit to the agricultural lands to be crossed by the Project on August 18, 2012. The following recommendations for ROW construction and restoration were discussed:

- The landowner of the active agricultural land will have the first preference for seeding mixtures and reseeding techniques.

- Prior to construction, Williams will strip the topsoil first. Typically, in the Project area, there is 6 to 8 inches of topsoil, however in some places it may be up to 12 inches.



## Table 7.0  Active and Inactive Cropland and Pasture Land

| Station Start | Station End | Property | Type of Agriculture Use | Total Footage | Topsoil Conservation Practice[1] | Sub-Soil Decompaction |
|---|---|---|---|---|---|---|
| 44+34 | 45+51 | Travis | Cropland | 117 | Topsoil Segregation[2] | Yes |
| 46+00 | 60+19 | Travis | Cropland | 1419 | Topsoil Segregation | Yes |
| 61+68 | 62+78 | Travis | Unimproved Pasture | 110 | Topsoil Segregation | No |
| 65+87 | 74+47 | Travis | Unimproved Pasture | 860 | Topsoil Segregation | No |
| 130+47 | 137+53 | Fox Farm, LLC | Cropland | 706 | Topsoil Segregation | Yes |
| 141+40 | 142+96 | Farr | Cropland and Pasture | 156 | Topsoil Segregation | Yes |
| 143+31 | 149+65 | Farr | Pasture | 634 | Topsoil Segregation | Yes |
| 167+20 | 179+83 | Root | Cropland | 1263 | Topsoil Segregation | Yes |
| 180+62 | 183+24 | Donlick | Pasture | 262 | Topsoil Segregation | Yes |
| 404+19 | 408+65 | Nash | Pasture | 446 | Topsoil Segregation | Yes |
| 408+65 | 419+82 | Nash | Cropland | 1117 | Topsoil Segregation | Yes |
| 447+99 | 466+18 | Bigelow | Hayfield | 1819 | Topsoil Segregation | Yes |
| 466+18 | 474+56 | Goff | Abandoned Agricultural Land | 838 | Topsoil Segregation | No |
| 475+15 | 483+39 | Goff | Abandoned Agricultural Land | 824 | Topsoil Segregation | No |

Notes:

[1]    Stripped topsoil will be placed on top of un-stripped topsoil overtop the existing NY Mainline and be contained within the proposed Project limits-of-disturbance.

[2]    AR-8 will either have the topsoil stripped or will be matted where crossing cropland.


- Williams will maintain a minimum of 4 feet of cover over the NY Mainline Loop Pipeline in agricultural fields.

- Williams will be cognizant of drain tiles during construction in agricultural lands so as not to cause damage to them. Additionally, Williams is aware that the centerline ditch may act as a French drain and that mitigation may be required during construction. Williams proposes to install trench breakers to mitigate for the potential French drain effect.

- Williams will monitor heavily mulched areas (should it occur) for vegetation growth and if no growth is occurring mulch will be removed.

- Sub-soil decompaction will occur in active agricultural crop and pasture land.

- Williams will remove rocks larger than 4 inches in diameter (from the top 12 inches of soil).



**Page 50**                                      12/2/2013

JA2630

AR  005031

- Williams will remove silt fence and other temporary erosion control devices upon successful restoration.

- The ideal seeding time is the first couple weeks of August; however, the construction schedule may conflict with this standard.

- Williams will negotiate with landowners to keep cattle out of the ROW to allow vegetation to re-grow during restoration periods.

- When reseeding, Williams will either utilize the drill method or broadcast the seed at 2 times the seed rate prescribed.

- In order to mitigate drainage alterations from the construction of NYPSC Case 10-T-0350, Williams will create a vegetated swale on the Nash property, south of Farr Road.

- In order to allow the intended vegetation such as clover to grow, Williams will mow down weeds in agricultural areas as necessary.

Williams has prepared the NYPSC Farmland Operator Forms for the properties crossed with active agriculture or pasture and is attached as **Exhibit Q**. Williams has also completed Appendix 7-G of 16 NYCRR and is provided as **Exhibit R**.

### *2.5.1.9  Migratory Birds*

Williams has designed the Project to avoid and minimize potential impacts to migratory bird species by the following:

- Where feasible, Williams will co-locate Project facilities in or adjacent to already disturbed areas and existing utility ROWs. Tree clearing and fragmentation of large, contiguous tracts of wildlife habitat, has been minimized by paralleling existing pipelines and utilizing the existing ROW, to the maximum extent possible.

- Proposed private access roads to be used for the Project are mostly existing and previously disturbed areas. Where new temporary or permanent access roads are proposed, impacts to migratory birds are expected to be minimal as they will be located in actively managed fields or small forested areas that have been previously disturbed. Therefore, the use of new access roads will be minimized to the greatest extent possible.

- Post-construction restoration and seeding will be accomplished according to Williams' Erosion and Sedimentation Control ("E&SC") Plan and will comply with the latest edition of the NYSDEC's Standards and Specifications for E&SC. Williams will also consult with the NYDAM and the NYDPS, and incorporate agreed to



AR  005032

recommendations into post-construction restoration and seeding. The Project's ROW Restoration and Revegetation Plan is attached as **Exhibit S**.

- The proposed Project will not cross wetlands regulated by the NYSDEC Freshwater Wetlands Program or waterbodies designated as C(T) or higher that require a permit under ECL Article 24 and Article 15-0501 respectively.

- A review of the NYSDEC's Bird Conservation Area ("BCA") Geographic Information Systems data did not identify a BCA within Broome County, NY; the nearest identified BCA (Long Pond) is over 20 miles from the Project (NYSDEC, 2008).

- According to the NY Audubon Society *Important Bird Areas in New York State* (Second Edition), no known Important Bird Areas ("IBA"s) are crossed by the proposed Project (Burger and Liner, 2005). The closest identified IBA is the Cannonsville/Steam Mill area located approximately 16.5 miles east of the Project.

Due to the co-locating of the proposed NY Mainline Loop Pipeline primarily within an existing pipeline ROW, no designated IBA or BCA areas within the Project area, no federal, state or local public recreation lands crossed by the Project, absence of nearby large bodies of open water, and availability of similar habitat crossed by the Project in the surrounding landscape, significant impacts to migratory birds of concern are not expected as a result of the proposed Project.

Although Project activities may cause some migratory birds to avoid the areas during construction, this impact will be limited to the relatively short period of active construction and will disturb an insignificant area compared with the distance travelled by migratory birds and the amount of available habitat in the landscape. Therefore, the Project is not expected to result in a significant or long-term change in migratory bird populations in the area.

To minimize potential impacts to migratory birds during pipeline operation, routine mowing will not occur between April 1 and July 15.

### 2.5.1.10 Rare, Threatened, and Endangered Species

Consultation with appropriate federal and state agencies was initiated on October 9, 2012 to determine if federally listed, state listed, or proposed Rare, Threatened, and Endangered ("RTE") species or their critical habitat potentially occur in the vicinity of the proposed Project.



***USFWS***. In a letter dated September 27, 2012, Williams initiated consultation with the USFWS NY Field Office. The USFWS NY Field Office responded in a letter dated November 14, 2012, indicating there are no anticipated impacts to RTE species for Project activities.

Since receiving initial clearance, Williams has conducted 3 90-day USFWS NY Field Office online reviews to ensure that listed species presence/absence information for the proposed Project is current.

Copies of USFWS NY Field Office correspondence and the 90-day online reviews are provided as **Exhibit T**.

***NYSDEC***. An online search of the Project area using the NYSDEC's Environmental Resource Mapper was used to search for RTE species within the vicinity of Project. The Environmental Resource Mapper showed no RTE Species within the Project area. In addition, consultation with the Division of Fish, Wildlife and Marine Resources and the NY Natural Heritage Program of the NYSDEC was initiated via "Request for Review" in a letter dated September 27, 2012. Williams received a response letter dated October 9, 2012 indicating that there are no known RTE species in the Project area.

A NYSDEC RTE clearance renewal letter was submitted on September 27, 2013. GAI received a response letter dated October 15, 2013 indicating that there are no known RTE species in the Project area.

Copies of these consultations are included as **Exhibit U**.

### 2.5.1.11  *Invasive Species*

According to the NYSDEC, invasive species are non-native species that can cause harm to the environment or to human health. The NYSDEC has created an "Interim List of Invasive Plant Species in New York State" (Revised May 14, 2012) which the NYSDEC uses as a tool for prevention, early detection, monitoring, rapid response, control and eradication, restoration, research, and public education for invasive species management.

Williams has outlined practical measures to minimize the introduction and spread of invasive species within the proposed Project's construction LOD and plans to implement construction activities in order to limit the impact of invasive species on the LOD and ROW.

These measures include:

- conducting a preliminary survey of the Project LOD to identify existing invasive species;
- training contractors and Environmental Inspectors ("EI") on how to recognize invasive species;
- using construction techniques along the NY Mainline Loop Pipeline route that minimize the transport and distribution of topsoil that may contain invasive species;
- minimize the time that bare soil is exposed and, therefore, minimize the opportunity for invasive species to become established;
- adherence to erosion control procedures to assure that sediment movement and the associated movement of invasive seeds into newly disturbed soils are minimized; and
- restoring and revegetating the ROW as soon after the final grading is completed to allow new vegetation to become established and discourage the growth of invasive species.

### Invasive Species Survey

Prior to construction, Williams will complete a survey to determine the extent of invasive species within the Project LOD. The survey results will be shared during the pre-construction training given to contractors and Project EI's.

### Training

As part of the Project's Environmental Training, Williams will train contractors and particularly the EI's on how to recognize invasive species. Personnel who will be on-site for the Project will receive the NYSDEC's *Revised Interim List of Invasive Species in New York State* (Revised May 14, 2012) along with a pamphlet containing photographs, common characteristics, and the results of the invasive species survey.

- <u>Clean Machinery and Equipment</u>: Machinery and equipment to be used in the construction of the proposed Project, including but not limited to, trucks, tractors, excavators, and hand tools such as shovels, rakes, hoes, picks, and etc., will be cleaned with high pressure air hoses (contractor may use water when cleaning is done off ROW) prior to delivery to the site, in an effort to keep them free of invasive species. The EI will check that trucks and equipment have been washed prior to first use, and that there is no dirt or plant material clinging to the wheels, tracks, or undercarriage of the vehicles or equipment. The intent is that equipment will be clean when arriving at the Project site.



**Page 54**                                                12/2/2013

AR 005035

### *Topsoil Segregation*

During construction, topsoil will be removed from the excavation areas and stored to the side for replacement once the construction is complete. This will minimize the introduction of invasive species and maintain the native plant seed bank. The stored topsoil will be seeded and mulched with cover crops and/or fast-growing grasses to control erosion and serve to minimize the associated movement of invasive seeds into newly disturbed soils.

- <u>Erosion Control</u>: Disturbed soils will be stabilized using erosion control/stormwater management technical standards as soon as feasible to minimize invasive species establishment in accordance with the EM&CS&P and approved soil erosion control plan.

- <u>Preserve and Restore Native Vegetation</u>: Impacts on native vegetation will be avoided or minimized. Wetland areas and riparian zones temporarily impacted during the construction of the Project will be restored to pre-construction contours and re-vegetated. Re-vegetation and restoration will be conducted in accordance with the EM&CS&P, the Project's ROW Restoration and Revegetation Plan included as **Exhibit S**, the approved soil erosion control plan, and conditions of the USACE NWP-12. Landowner agreements will supersede the restoration and seeding procedures on those properties along the ROW. Non-invasive or native seed cover for crops or revegetation will be used according to Project plans.

During construction, the EI will monitor the ROW during day-to-day activities and check for new infestations of invasive species or the spread of existing populations. Appropriate control measures will be determined and implemented such as mowing, hand-pulling, digging, or herbicide application (with landowner approval) based on the presence of invasive species and in consultation with the NYSDEC regarding suggested management time windows.

### 2.5.1.12   *Protected Vegetation*

No "Old Growth Forest", "Sugar Bush", active logging or Christmas tree operations were identified during Project field surveys in September, October, and November 2012. Additionally, there are no trees listed in the Registry of Big Trees that are located in the vicinity of the proposed Project route, according to the NY State Big Tree Register (NYSDEC, 2013).

### 2.5.1.13   *Visual Resources*

Visual resources on private lands are a function of geology, climate, and historical processes and are influenced by topographic relief, vegetation, water, wildlife, land use,



human uses and development. In Broome County, the topography ranges from rolling hills to steep slopes.

An online review was completed to identify visual resources crossed by the Project. The NY State DOT's Scenic Byways Program (NYSDOT, 2010) website was reviewed for scenic byways within the Project area. No national or state designated scenic byways or scenic roads or parkways are located within the Project area. Additionally, no national trails, forest preserves, wilderness protected areas, state parks or wild and scenic rivers are located within the Project area (NPS, 2010; NYSDEC, 2012a, NYSDEC, 2012b, NYSDEC, 2012c, NYSOPRHP, 2012).

Williams will add inserts to the fence or shrubs around the existing gate-valve north of Farr Road to maintain aesthetic quality.

In Case 10-T-0350, it was identified that a hillside (Station 150+00 to Station 166+50) south of Rockwell Road and north of Hoadley Hill Road has visual aesthetic appeal from Route 17/I-86. In order to help maintain its current visual aesthetics and minimize additional tree clearing, Williams evaluated several options through this area. As discussed in Section 2.4, a meeting between Williams, the NYDPS, and a pipeline contractor was held on February 8, 2013 to discuss the option of constructing through this area without removing additional trees greater than 6-inches diameter at breast height. Based on the outcome of this meeting it was determined that it is possible to install the proposed NY Mainline Loop Pipeline through this area (Station 153+94 to 165+79) without removing additional trees greater than 6-inches diameter at breast height. By not removing additional trees of this size, the existing trees that currently stand will remain and continue to provide canopy cover of the ROW and maintain its aesthetic appeal from Route 17/I-86. A work plan describing the special construction techniques through this area is provided in **Exhibit I-1**. However, should safety concerns arise during construction and the removal of a tree(s) is required to safely install the proposed NY Mainline Loop Pipeline, Williams will immediately cease construction and contact the NYDPS for approval to remove a tree(s). Construction activities will be short-term, therefore, any long-term changes to the Project area are anticipated to be relatively minor particularly because the proposed NY Mainline Loop Pipeline will mostly parallel the existing NY Mainline located within the existing permanent ROW.

### 2.5.1.14  *Project Construction and Economic Benefits*

Williams expects the construction and operation of the proposed Project to have a positive socioeconomic impact on the Project area. The Project is expected to create economic benefits for local communities by generating employment opportunities and local expenditures by workers. Construction material purchases, sales tax,

miscellaneous retail purchases, labor wages to local workers, temporary housing expenditures, and construction worker expenditures exhibit positive short-term effects. Williams expects that the short-term spending generated by the Project will create increased tax revenue within the Project area. Short-term spending includes money spent on food, entertainment, recreation, housing, and miscellaneous purchases. The additional tax revenue could stimulate economic growth within the Project communities.

The additional tax revenue from the operation of the proposed Project will have tax benefits for Broome County. Residents of the Windsor Central School District in Broome County have recently benefitted from a decrease in school taxes due to the installation of the existing NY Mainline and Dunbar CS by increasing the municipality's tax base by nearly $30 million (Web Staff, 2012). Specifically, recent natural gas project work has decreased the school tax rate by 5.8 percent, and the Town of Windsor experienced an increase in the municipality's tax base from $310.5 million in 2011 to $342.5 million in 2012 due to the existing NY Mainline pipeline and Dunbar CS (Reilly, 2012).

When available, local workers will be employed for construction; however, due to the specialized nature of this Project and potential unavailability of specialists within the Project area, local workers will be primarily hired for temporary positions (i.e. clearing, re-vegetation, road bores, hydrostatic testing, etc.). Specialized workers will be most likely employed from outside the Project area.

### 2.5.2    Cultural Resources

In a letter dated September 27, 2012, Williams initiated consultation with the NY State Office of Parks, Recreation and Historic Preservation ("NYSOPRHP") and requested a review of the proposed Project. The NYSOPRHP responded to Williams in a letter dated October 5, 2012 initiating conversations with Williams about the Project. Per conversations with NYSOPRHP, Williams provided additional Project information in a letter dated November 27, 2012. The NYSOPRHP indicated that the planned Project will have no effect on historic properties listed or eligible for listing on the National Register of Historic Places in a letter dated December 11, 2012. Correspondence letters with the NYSOPRHP are included as **Exhibit V.**

Williams has developed an Unanticipated Discoveries Plan, provided as **Exhibit W**, in the event that cultural resources are discovered during Project construction.

### 2.5.3    Other Resource Evaluations

Wetlands, floodplains, streams, and springs and water wells were identified within the Project area. Of the remaining items listed in 85-1.2(3)(ii) (Ecosystem Resources) none of  the following were found to exist in the Project area: unique old growth forests, active sugar bushes, productive timber stands, trees listed in the Registry of Big Trees in NY

State, and habitats of rare, threatened and endangered species. Erodible soils were addressed in the Stormwater Management Plan filed as part of Case 10-T-0350, which Williams will update as necessary and submit to the NYPSC for their records once approved by the NYSDEC. Also pursuant to 85-1.3(a)(2)(ii)(iii) all property boundaries, fences, walls and hedge rows to be crossed and any dwelling within 150 feet of the Project are shown on **Exhibit I**.

## 2.6    Streams, Road and Railroad Crossings

### 2.6.1    Stream Crossings

Thirty of the 59 streams that were delineated within the Project study area will be crossed by the proposed NY Mainline Loop Pipeline. These streams include 10 ephemeral streams, 6 intermittent streams, and 14 perennial streams. These features are labeled on **Exhibit I**. Crossing methods will be in compliance with the EM&CS&P specifications and applicable permit conditions. Williams will pin or stabilize temporary bridges to prevent them from flowing away during high rain events. Williams anticipates all stream crossings with the exception of Trowbridge Creek (SNY-SLH-004), SNY-SLH-003, and SNY-SJB-020 will be crossed via a dry-ditch open-cut method for pipeline installation. Water flow will be maintained during the construction of the crossing by one of the methods in the EM&CS&P. The crossing technique will depend on the flow at the time of construction and will likely utilize the dam and pump method (not necessarily a Coffer dam). Pump inlets will be screened to prevent aquatic life from entering the pump. Williams will take the following precautions in an effort to maintain the quality of the stream to be crossed at dry-ditch open-cut crossings:

- Water diversions around work areas will be adequate to protect water quality and quantity downstream.

- Water will be passed around the construction site by a gravity pipe or by active pumping. If pumped, the pump discharge will be directed against a solid object to prevent erosion of the bed and/or banks of the waterbody.

- Fish remaining in the dewatered area will be returned to the stream.

- During periods of work activity, flow immediately downstream of the work site will equal flow immediately upstream of the work site.

- Stream reaches downstream of construction areas will remain as clear as the reaches upstream of the construction areas.

- Silt fence or other erosion control practices will be installed.



**Page 58**                                                12/2/2013

AR  005039

- The stream bed will be restored to original elevations and will tie in smoothly with the upstream and downstream stream bed.

- The stream bed will not be graded flat. A low flow channel will be re-established in the pre-existing location and will tie in smoothly with the flow path both up and downstream.

- The stream bank will tie in smoothly with the adjacent stream bank, unless the bank has evidence of erosion (cut away, undercut, sloughing, etc.). In that case, it will be stabilized by grading to at least 1 vertical to 2 horizontal or flatter slope. Raw slopes within the temporary ROW may be stabilized by deep rooted vegetation such as woody plants, like shrub dogwoods, in addition to seeding and mulching. Riprap may be used in areas (temporary and permanent ROW) with high erosion potential.

- The pipe will be installed to a depth under the stream that accommodates the stream bed eroding downward over time. The depth of cover will be at least 5 feet at all open-cut streams. Trowbridge Creek will have a minimum of 10 feet of cover. The side castings during trenching will be located 10 feet from the top-of-bank.

- The streambed will be restored to its pre-existing condition with respect to contours, depth, and substrate.

To protect the bed and banks of Occanum Creek during the open-cut crossing, Williams will cut back the steep stream bank, slope, and revegetate the temporary ROW with appropriate vegetation suggested by the USDA Plant Materials Center. The entry/exit points of HDDs/conventional bores will be positioned as far from stream banks as practical and will be greater than 25 feet. To the extent possible, construction of stream crossings will be planned to occur when the amount of flow is minimal. Material to be stockpiled on the flood plain will be contained with silt fence or straw bales. These stock piles will then be removed immediately when work at the site is completed. With the use of Best Management Practices, the crossings will result in only temporary impacts to the waterbody. Once the crossing takes place, the area will be restored to its former conditions per the EM&CS&P and applicable permit conditions. Pipe installed at stream crossings will include heavier wall thickness and may be concrete coated with 2 to 3 inches of concrete and will be pre-cast prior to arriving to the Project area.

A Stream Protection Permit under ECL Article 15-0501 is not required for streams crossed by the Project.

### 2.6.2   Road and Railroad Crossings

Eleven public road crossings are planned for the construction of the Project and are included in **Table 8.0**.  These include Dunbar Road, Fox Farm Road, State Route 17



## Table 8.0  Road and Railroad Crossings for Proposed Route

| Number | Stationing | County Road ID No. | Name | Classification | Authority | Length (feet) | Type | Construction Method | Permit Status |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 45+78 | N/A | Dunbar Road | Township | Town of Windsor | 50 | Tar and Chip | Open-cut or conventional bore | Existing Agreement |
| 2 | 127+50 | CR 28 | Fox Farm Road | County | Broome County | 33 | Asphalt | Guided bore | Pending |
| 3 | 127+66 | N/A | SR-17/I-86 | State | NY State DOT | 43 West bound/ 41 East bound | Asphalt | Guided bore | Pending |
| 4 | 143+13 | N/A | Rockwell Road | Township | Town of Windsor | 18 | Tar and Chip | Open-cut or conventional bore | Existing Agreement |
| 5 | 180+34 | N/A | Hoadley Hill Road | Township | Town of Windsor | 21 | Asphalt | Open-cut or conventional bore | Existing Agreement |
| 6 | 226+88 | CR 32 | Trim Street | County | Broome County | 21 | Tar and Chip | Conventional Bore | Pending |
| 7 | 284+67 | N/A | Bell Road | Township | Town of Windsor | 19 | Tar and Chip | Open-cut or Conventional bore | Existing Agreement |
| 8 | 325+46 | N/A | John White Road | Township | Town of Windsor | 21 | Tar and Chip | Open-cut or Conventional Bore | Existing Agreement |
| 9 | 393+92 | N/A | Phillips Road | Township | Town of Windsor | 18 | Tar and Chip | Open-cut or conventional bore | Existing Agreement |
| 10 | 403+98 | N/A | Farr Road | Township | Town of Windsor | 14 | Tar and Chip | Open Cut or conventional bore | Existing Agreement |
| 11 | 474+85 | N/A | Blatchley Road | Township | Town of Windsor | 25 | Tar and Chip | Open-cut or conventional bore | Existing Agreement |

AR  005041

("SR 17")/I-86, Rockwell Road, Hoadley Hill Road, Trim Street, Bell Road, John White Road, Phillips Road, Farr Road, and Blatchley Road. With the exception of SR 17/I-86 and Fox Farm Road, roads are anticipated to be crossed using either the open-cut crossing method or the conventional bore method per the EM&CS&P and required permit specifications. Trim Street is anticipated to be crossed using the conventional bore crossing method per the EM&CS&P and required permit specifications. Williams plans on crossing SR 17/I-86 and Fox Farm Road using the guided bore method per the EM&CS&P and required permit specifications. Road Use Agreements are included as **Exhibit X**. Discussions are underway with the Town of Windsor to confirm that the existing Road Use Agreement allows Williams to cross and occupy the applicable Town of Windsor roads and ROW with the NY Mainline Loop Pipeline. As specified by the NYPSC in Case 10-T-0350, as a Certificate Condition, Williams will file a copy of the Broome County road crossing permit as soon as it is received.

## 2.7    <u>Additional Items</u>

A Notice of Intent ("NOI") and a Storm Water Pollution Prevention Plan were filed with the NYSDEC in order to obtain a SPDES General Permit for Stormwater Discharges from Construction Activity (GP-0-10-001) for the NY Mainline (Case 10-T-0350) and received coverage under Permit ID #NYR10T460. After consultation with the NYSDEC, Williams proposes using the existing open SPDES permit and providing the NYSDEC an updated NOI, E&S Control Drawings, and revised narrative text as necessary for the proposed Project. Upon approval of the revised SPDES a copy will be submitted to the NYPSC for its records. Changes to the Erosion and Sediment control practices will be proposed to the NYSDEC prior to implementation whenever possible, except when needed immediately to avoid violations of NY Water Quality Standards. During construction, water bars in the ROW that are disturbed will be restored at the end of each work day and to the specifications in the SWPPP. Water bars that are found to be installed incorrectly will be retrofitted to proper heights and slopes.

In addition, Williams has prepared a Hydrostatic Test Plan attached as **Exhibit Y**. Williams has also prepared a HDD Contingency Plan, **Exhibit Z**, included the HDD Geotechnical Bore Test Report, **Exhibit Z-1,** copies of the HDD construction drawings, **Exhibit Z-2**, prepared an HDD Inadvertent Returns Contingency Plan, **Exhibit AA**, and a Winter Construction, Restoration and Remediation Plan, **Exhibit BB.**

## 2.7.1    <u>ROW Agreements</u>

The proposed NY Mainline Loop Pipeline will be located predominantly on private property with Town of Windsor, County and State road crossings. Other than the road crossings, Williams is negotiating the additional ROW it requires for its NY Mainline Loop Pipeline from private landowners. A current list of affected private landowners and

acquisition status is attached as **Exhibit H**. Landowner agreements are provided as **Exhibits H-1 through H-30.**

### 2.7.2   Workspace

The locations for all workspace along the proposed NY Mainline Loop Pipeline are identified on **Exhibit I**. The workspace acquired from the landowners will be used per the terms of ROW/easement agreements.

Williams designed ATWS a minimum of 50 feet away from streams and wetlands per the EM&CS&P, except for the following locations:

- **ATWS between 10+00 and 14+85** - This ATWS is located between the ROW and AR-9 and is necessary to access the proposed NY Mainline Loop Pipeline, for parking, and extra space for a pull-off area to alleviate traffic congestion around Dunbar CS. Streams SNY-SJB-001 and SNY-SJB-010 are located within this ATWS boundary (**Exhibit I**, CAS Sheet 1). This ATWS is located on previously disturbed land.

- **ATWS between 129+25 and 130+50** - The 100-foot by 120-foot ATWS is located within 50 feet of wetland WNY-SJB-028 (**Exhibit I**, CAS Sheet 6) and is necessary to construct the bore pit which will be used to cross route 17/I-86 via guided bore.

- **ATWS between 191+00 and 192+00** - The 54-foot by 36-foot ATWS is located within 36 feet of Wetland WNY-SLH-034 (**Exhibit I**, CAS Sheet 9) and is necessary to remove a pile of logs that remains from the NY Mainline project.

- **ATWS between 393+00 and 393+92** – The 40-foot by 50-foot ATWS is necessary for safe and reliable construction across Phillips Road. Wetland WNY-SLH-009 is located within this ATWS boundary (**Exhibit I,** CAS Sheet 17). Additionally, the proposed LOD on the Carinci property is the same as that for the NY Mainline project as no modification to the existing easement is proposed.

- **ATWS between 394+17 and 394+50** - The 40-foot by 50-foot ATWS is necessary for safe and reliable construction across Phillips Road. Stream SNY-SLH-006 is located within this ATWS boundary (**Exhibit I,** CAS Sheet 17). Additionally, the proposed LOD on the Carinci property is the same as that for the NY Mainline project as no modification to the existing easement is proposed.

- **ATWS between 404+06 and 421+00** - The continuous ATWS located between these stations (**Exhibit I**, CAS Sheet 17 and 18) is necessary for topsoil storage and log storage space. Additionally, Williams plans to restore the agricultural land on this property to rectify conditions that currently exist as a result of NY Mainline



JA2642

AR 005043

construction. The extra space is also necessary for safely crossing stream SNY-SLH-010 which is located at the bottom of a steep hill. Resources that are located within 50 feet of the ATWS are wetlands WNY-SLH-011, WNY-SLH-012, WNY-SLH-013, WNY-SLH-014, and stream SNY-SLH-010.

- **ATWS between 452+80 and 456+00** – The 70 foot by 585 foot ATWS is located within 30 feet of wetland WNY-SLH-006 (**Exhibit I,** CAS Sheet 19) and is necessary for the safe and reliable construction of the end drill point which will be used to cross Trowbridge Creek (SNY-SLH-004) via HDD.

- **ATWS between 464+50 and 465+99** – The 50 foot by 107 foot ATWS is located within 20 feet of stream SNY-SLH-001 (**Exhibit I**, CAS Sheet 19) and is necessary for the construction and placement of the launcher-receiver valve.

- **ATWS at 491+40** - The 69-foot by 60-foot ATWS is located approximately 10 feet from Stream SNY-SJB-023 (**Exhibit I**, CAS Sheet 21) and is necessary to remove a pile of logs that remains from the NY Mainline project.

### 2.7.3    <u>Timber</u>

When clearing shrubs and trees for temporary workspace or in areas where the existing permanent ROW was not cleared of shrubs and trees in Case 10-T-0350 (NY Mainline), stumps will be cut as low to the ground as possible and trees will be felled into the ROW to avoid off ROW damage using bulldozers, bladed mowers, or skidders and forwarders. In general, new debris resulting from the clearing of shrubs and timber for the proposed Project will be hauled off to an approved disposal facility, unless requested to be kept by the landowner. Landowners will have the option to keep the non-merchantable timber that was harvested from their land. Merchantable timber cut will either be left on-site for possible sale to a third party by the landowner or hauled off-site by Williams' contractor or disposed of at an approved facility. Williams will negotiate with the landowner the necessary compensation for merchantable timber cut as a result of the proposed Project.

Timber, wood chip, and stump/root mass piles that were left on-site after construction of the NY Mainline and are located within the construction LOD for the proposed NY Mainline Loop Pipeline will be removed and disposed of at an approved disposal facility or will be reasonably relocated per landowner request. Prior to removing stump/root mass piles, a clam bucket will be used to shake off dirt prior to removal. If necessary, clean fill may be brought in to maintain site contours. For timber and wood chip piles that were left on-site after construction of the NY Mainline and are not located within the construction LOD for the proposed NY Mainline Loop Pipeline, Williams will discuss with the landowner if these piles may remain on-site.



Wood chips will not be stored or disposed of in wetlands, agricultural fields, or within 50 feet of a stream. If timber is left on-site at the request of the landowner, the timber will be neatly stacked, in tree length, along the edge of the ROW or in designated push-out locations. Log piles will not be placed in wetlands, streams, floodplains, floodways, or visually sensitive areas.

Where appropriate, wood chips may be incorporated in to the soil during grading, but will not occur in agricultural areas (e.g. cropland, hay fields, pasture, etc.) or in wetlands. Wood chips will be spread no more than 3 inches thick with fertilizer spread over the chips to minimize nitrogen depletion due to cellulose decomposition. Burning of shrubs, timber, or slash is not proposed for this Project.

Vegetative buffer areas will be maintained where specified on the Project's CAS provided in **Exhibit I**. In order to prevent soil erosion along streams and wetlands, vegetation (ground cover, shrubs, and tree stumps) will be left in place within a minimum 15-foot strip on the bank of each stream or border of each wetland until the time of crossing. Tree cutting will be limited to the use of chain saws. Where vegetation grubbing and initial grading is necessary for equipment crossing along the travel-way, erosion and sediment control structures will be installed as described in Section 7 of the EM&CS&P. Existing vegetation buffers will be maintained at selected road and stream crossings and other visually sensitive locations where identified and where possible, especially at HDD or boring sites where complete ROW grading is not needed. Buffer areas are marked on the Project's CAS **Exhibit I**, indicated on line lists, and will be marked in the field to avoid accidental clearing.

Williams will comply with the NYPSC EM&CS&P for the proper clearing methods and procedures in upland areas, log disposal, and slash and stump disposal. The measures described in Section 5 of the EM&CS&P that Williams proposes to use for this Project are identified in the EM&CS&P Check-off List provided as **Exhibit CC**.

### 2.7.4   Blasting

Blasting was not required during the construction of the NY Mainline. Williams does not anticipate blasting as part of the construction methods; however, a blasting plan is included as **Exhibit F** should it be deemed necessary. Should blasting be required, the pipeline contractor will develop a site-specific blasting plan per the requirements of **Exhibit F.** If blasting is required, pre-blast surveys will be performed on structures within a 500-foot radius from the blast zone. Locations of private and public water supplies and springs within 500 feet from blasting sites will also be identified and documented. Additionally, local municipalities and landowners will be notified. Williams will adhere to the blasting conditions outlined in the EM&CS&P.

## 2.7.5    One-Call Summary

Williams is a member of Dig Safely New York [6 NYCCR Part 753 (Code Rule 53)]. Prior to construction, the contractor will make requisite notifications. Williams has conducted its own inspection for verification purposes and the proposed NY Mainline Loop Pipeline will be crossing:

- under an overhead utility line and a buried cable near Blatchley Road on the Goff Property (tax parcel #229.04-1-3.1);

- under an overhead utility line, a buried cable, and a private waterline on the Carinci property (tax parcel #212.04-1-31);

- under an overhead utility line and an underground communication cable paralleling the south side of Bell Road and an overhead utility line on the north side of Bell Road on the Shaffer property (tax parcel #197.00-1-11);

- under 2 overhead utility lines and an underground cable paralleling the south side of County Road 32 (Trim Street) on the Rogan property (tax parcel #197.00-1-2);

- under an overhead utility line paralleling Hoadley Hill Road on the Donlick property (tax parcel #181.01-1-13);

- under an overhead utility line on the Root property (tax parcel #180.02-1-11);

- under an underground communications cable and an overhead utility line paralleling the north side of Rockwell Road on the Farr property (tax parcel #180.02-1-9.1);

- under 2 underground cables and an overhead utility line on the north side of County Road 28 (Fox Farm Road) on the Fox Farm, LLC property (tax parcel #164.02-1-28.1);

- under a telephone line and overhead electric line on the east side of Dunbar Road on the Chester property (tax parcel #164.02-1-3); and

- under an overhead utility line on the south side of Phillips Road along the driveway to the Dunbar CS on the Laser/Williams property (tax parcel #148.02-2-33).

Crossings are labeled on the CAS included as **Exhibit I**.

## 2.7.6    EM&CS&P

Williams will construct, operate and maintain the proposed NY Mainline Loop Pipeline in accordance with the NYPSC's Revised EM&CS&P, effective December 7, 2006 as

adopted in NYPSC Case 06-T-1383 except as described below and in this Application. The EM&CS&P check-off list is provided as **Exhibit CC**.

According to the EM&CS&P, construction equipment must be parked outside of a 100-foot buffer area from wetlands and waterbodies. However, where there is no reasonable alternative, refueling may occur within the buffer. Since some HDD drill or bore equipment associated with this Project cannot be moved during operation, there is no reasonable alternative to refueling it at a different location, therefore, Williams will make the appropriate notification to the EI and proper precautions to prevent spills.

Additionally, the EM&CS&P states that stringing, welding, and other pipeline fabrication activities should also take place outside of the 100-foot buffer zone of wetlands to the maximum extent practicable. Due to multiple constraints such as the location of the existing line, topography, land owner restrictions, and engineering constraints, these activities may occur within buffer zones at HDD sites or as needed for constructability reasons.

As discussed in Section 2.2.4.2, Noise Impacts, of this Application, Williams respectfully requests approval from the NYPSC to deviate from the restricted construction hours set forth in Section 15.3.1 of the EM&CS&P to allow concentrated construction activity to occur between 7:30 am and 7:00 pm and when necessary between 7:00 pm and 7:30 am. Construction activities such as HDD, hydrostatic testing, or other construction activities may require work to be continually conducted and uninterrupted for an extended (>24 hours) period of time. These activities are discussed more fully in connection with construction noise impacts in Section 2.8.4.2.

Williams has also prepared a ROW Restoration and Revegetation Plan attached as **Exhibit S**.

### 2.7.7    Community Outreach Program

The goal of the Williams outreach plan is to establish communication among affected stakeholders, create an understanding of the community concerns, and a shared understanding of the Project needs. Williams Operations group has been conducting outreach in the Town of Windsor, NY since acquiring the NY Mainline in February 2012. Because of Williams' existing presence in the Town of Windsor, outreach is being coordinated with both construction of the proposed Project and ongoing work related to the Dunbar CS. This outreach has intensified as Williams has worked to comply with sound standards prescribed in the Certificate (Case 10-T-0350). This outreach has included one-on-one meetings with neighbors of the Dunbar CS to discuss sound and safety concerns, tours of the Dunbar CS for neighbors and emergency response personnel, and providing a status update to neighbors and elected officials of Williams' sound mitigation work.

### 2.7.7.1  Pre-Application Communication

In the acquisition of land rights to construct the NY Mainline, the landowners along the NY Mainline Loop Pipeline ROW agreed to multiple line rights which allow for the construction and installation of a second pipeline within the existing pipeline easement. Negotiations are underway to secure the ATWS that will be needed to construct the proposed Project.

Prior to submitting this Application, Williams has communicated with local and State public officials notifying them of the pending Project and filing. On November 19, 2013, a description of the proposed Project was provided to the Town of Windsor Supervisor as well as the Broome County Office of Energy Development. Additionally, Local elected officials attending a Dunbar CS tour on December 10, 2012 were informed of the proposed Project.

Discussions are underway with the Town of Windsor to confirm that the existing Road Use Agreement allows Williams to cross and occupy Town Roads and ROW with the NY Mainline Loop Pipeline (refer to Section 2.6.2).

A letter to residents within one quarter mile of the proposed NY Mainline Loop Pipeline has been sent notifying them of Williams' plans to file the Application. Plans have also been made to place a copy of the Application at the Town of Windsor Library and Town of Windsor Community House for public viewing. On November 20 and 27, 2013, a notice was placed in the *Windsor Standard* newspaper notifying local residents of Williams' plans and upcoming Application filing.

### 2.7.7.2  Post-Application Communication

Since purchasing the Dunbar CS, Williams has implemented an outreach program to ensure that the Town of Windsor residents living near to the Dunbar CS, public officials, and first responders are kept informed of progress Williams is making upgrading the Dunbar CS and to develop and maintain open lines of communication to ensure that residents are able to raise their concerns and receive answers to their questions. This outreach has included, without limitation, letters to all of the above describing planned work and its purpose; participating in a Windsor Working Group made up of town and school officials, residents and first responders; attending town meetings to answer questions when questions about operations are raised; and meeting with residents one on one in their homes to answer questions.

Williams plans to build on this outreach with the construction of the NY Mainline Loop Pipeline.



After the application is filed with the NYPSC, communication with stakeholders will be tailored to address specific needs of each stakeholder and will reflect a milestone-based approach. For instance, just prior to mobilization of construction equipment, Williams will mail a newsletter to all Town of Windsor households and businesses. This, and other communication, will be designed to keep stakeholders abreast of progress and changes that develop, if any.

Williams will notify the appropriate State agencies, local and public officials, affected landowners, and residents within 1,320 feet or one quarter mile of each side of the center of the ROW, as the following occurs:

**Prior to construction**:   Assuming a Certificate is issued, Williams will notify stakeholders of the NYPSC's decision. Affected landowners will be notified at least 2 weeks in advance of construction activities. At least 7 days prior to construction activities, all Town of Windsor residents and public officials will receive a newsletter describing the "sequence of construction."   This document will describe each phase of construction and what to expect.

At least 10 days prior to the start of construction, Williams will hold a pre-construction meeting with the selected pipeline contractor, Williams' inspectors, and appropriate agency staff. The purpose of this meeting will be to review the construction plans and schedule, permit and Certificate conditions, landowner stipulations, as well as Project safety requirements.

**Once construction begins**:  As construction progresses, notifications will be made to the appropriate NY State agencies and affected landowners and residents within 1,320 feet of pending hydrostatic testing, blasting (not anticipated), or other similar activity. This notification will be made at least 10 days prior to beginning the hydrostatic tests or other aforesaid activities.

In coordination with the Town of Windsor Highway Department, impacts to road traffic will be coordinated in an effort to appropriately time impacts and that impacts to local residents are minimized. If Williams anticipates traffic slowdown resulting from construction, Williams will notify residents in an appropriate manner.

If blasting is required, notifications will be made to affected landowners and appropriate NY State agencies as soon as it is determined that excavation using conventional methods is not adequate.

Prior to placing the NY Mainline Loop Pipeline into service, notification letters will be sent to appropriate agency staff, local and state officials, and to affected landowners. In addition, an announcement will be made through local news media for all other Town of Windsor residents.



Once the NY Mainline Loop Pipeline has been placed into service, work will shift towards restoring the ROW to at least its previous condition.

As specified in the applicable conditions, specific actions will be taken in an effort to revegetate the ROW, agricultural lands, streams, and wetlands to successful levels before considering work complete. Upon completion of construction and before reclamation, a status report will be sent to the affected landowners providing the timeline for reclamation.

With the cooperation of affected landowners, agency staff, and other stakeholders, Williams anticipates a successful Project and long term positive relationship.

## 2.8    State and Local Laws

### 2.8.1    Introduction

This section addresses the requirements of Part 86.8 of Title 16 of the NYCRR and Article VII of the PSL.

Pursuant to § 126(1)(f) of the PSL, the NYPSC must find and determine that the proposed Project "… conforms to applicable State and Local laws and regulations issued thereunder ...". The NYPSC is authorized to refuse to apply any local ordinance, law, resolution, regulation or any local standard or requirement if the NYPSC finds that "… applied to the proposed facility such is unreasonably restrictive in view of the existing technology, or of factors of cost or economics, or of the needs of the consumers whether located inside or outside of such municipality."

PSL§ 130 prohibits a state agency or municipality from requiring "… any approval, consent, permit, certificate or other condition …" for a project subject to PSL Article VII.

In order to allow the NYPSC to make the required findings and determinations, 16 NYCRR § 86.8 requires the Applicant to submit a list of local substantive requirements applicable to the proposed major utility facility, specify any which the Applicant requests the NYPSC to refuse to apply, and submit a statement justifying a request that the NYPSC refuse to apply such a local requirement.

Pursuant to § 85-1.2(c), Williams' asks the NYPSC to review this Application under 16 NYCRR 85-1.7 and Section 121-a.7 of the PSL.

### 2.8.2    NY State

The NYSDEC regulates all substances covered by the Federal Comprehensive Environmental Response, Compensation and Liability Act, Federal Insecticide, Fungicide and Rodenticide Act, and Federal Toxic Substances Control Act and may



AR  005050

also regulate other chemicals known to be hazardous. The NYSDEC has enacted Chemical Bulk Storage Regulations (6 NYCRR Parts 595-599) which include rules on:

- requirements for release reporting, response and corrective action;

- State standards for new storage equipment (tanks, pipes, transfer stations and associated equipment); and

- tank and pipe testing inspection requirement.

Williams will comply with applicable NYSDEC hazardous substance regulations as applicable. Williams will remain in compliance with applicable NYSDEC hazardous substance regulations in addition to its Spill Prevention, Control and Countermeasures Plan and additional relevant requirements.

### 2.8.3    Broome County

#### 2.8.3.1  Air Pollution Control

Section 168-22(B) of the Broome County Sanitary Code prohibits burning refuse in open fire except for burning of rubbish, principally tree trimmings, derived from on premise agriculture operations and the burning of tree cuttings accrued from pulping, lumbering and similar operations, if the prevailing winds, at the time of the burning are away from populated areas and no nuisance is created. When burning tree cuttings and timber cleared from the ROW, Williams will comply with § 168-22(B) of the Broome County Sanitary Code for air pollution control. However, burning is not proposed as part of this Project.

Broome County Administrative Code § 168-22(E) prohibits all motor vehicles including stationary, earthmoving and those moving by rail, using gasoline or diesel fuel for motive power to idle for more than 3 minutes in any one period when not in use performing its intended functions as a source of power. Williams will comply with this code during construction of the proposed NY Mainline Loop Pipeline.

#### 2.8.3.2  Solid Waste

Section 179-29 of the Broome County Administrative Code requires companies generating commercial or industrial waste to source separate any recyclable materials. Williams will comply with the substantive requirements of this section.

#### 2.8.3.3  Motor Vehicles

Section 100 of the Broome County Administrative Code requires a permit from the Broome County Commissioner of Public Works to operate motor vehicles on County roads that exceed the weight and dimension limits in NY Vehicle and Traffic Law § 385.

AR 005051

Certain vehicles used in the construction of the Project may exceed the weight and dimension limits in NY Vehicle and Traffic Law § 385. Williams' contractors will obtain the required permits from Broome County prior to operating oversized motor vehicles on County roads.

## 2.8.4    Town of Windsor

### 2.8.4.1   Flood Damage Prevention

Chapter 51 of the Town Code and Article XII of the Chapter 93 Zoning Ordinance address flood zones. Both sections of the local law are intended to minimize the potential loss of life and property, both public and private, due to flood conditions within the Town of Windsor.

Section 51-10 of the Windsor Town Code states in part that "no structure shall hereafter be constructed, located, extended, converted or altered and no land shall be excavated or filled without full compliance with the terms of this chapter and any other applicable regulations". Pursuant to Section 51-13, the Code requires that a development permit be obtained before the start of construction or any other development within the area of special flood hazard.

FEMA FIRMs were reviewed to determine if the Project area is located within a flood zone. Flood zones are geographic areas that the FEMA has defined according to varying levels of flood risk. These zones are depicted on a community's FIRM or Flood Hazard Boundary Map. Williams reviewed FIRMs published on September 20, 1992 by FEMA for the Town of Windsor. Panels crossed by the Project include 360059 0025 C, 360059 0010 C, and 360059 0040 C; all of which are not printed panels because there are no mapped flood hazard areas depicted. Per consultation with FEMA and the Broome County Planning Office, preliminary updated FIRMs for Broome County were issued on February 5, 2010 but are not effective. There are no identified flood hazard areas crossed by the proposed NY Mainline Loop Pipeline, launcher/receiver valve sites, or pipe storage yards. The Town of Windsor FIRM and 100-year floodplain map is provided as **Exhibit M**.

Notwithstanding that the current approved FEMA Flood Hazard maps do not identify flood hazards in the Project area, Trowbridge Creek was an area identified in Case 10-T-0350 as designated with a 100-year flood zone in the Project area. In Case 10-T-0350, the NYPSC Order stated that "[t]he pipeline itself is anticipated to have no impact on the water surface elevation of the base flood as it will be buried below Trowbridge Creek. These impacts are classified as temporary in nature and will not increase the water surface elevation of the base flood."  As the proposed NY Mainline Loop Pipeline will be buried as well, it will comply with the substance of the local requirements concerning flood hazards as did the NY Mainline.



### 2.8.4.2 Noise Control

The Town of Windsor Noise Control Local Law (Chapter 68) ("Windsor Noise Law") establishes sound control standards. This law limits sound levels on property within the Town of Windsor to a maximum of 55 A-weighted decibels ("dBA") (5 dBA above demonstrated ambient noise levels during daytime and 3 dBA above demonstrated ambient noise levels during nighttime, with an absolute maximum of 55 dBA).

Construction sound is difficult to control due to the mobile nature of its sources and the fluid way in which most construction work must be done. The heavy equipment involved with building a pipeline will consistently produce sound above the maximum daytime level even while equipped with property functioning and best available sound muffling devices. Construction activities for the Project will generally be conducted between 7:30 am and 7:00 pm. However, as to the nighttime level, certain construction activities will occur that require continuous operation beyond daytime hours using heavy equipment and supporting labor. As explained in more detail below, these operations have the ability to produce sound that will not meet the applicable standards. Accordingly, the standards (both day and night) in the Windsor Noise Law, if applicable to construction sound, are unreasonably restrictive in view of the existing technology available to reduce sound levels. Williams respectfully requests that the Windsor Noise Law not be applied by the NYPSC to construction activities as explained herein.

Certain activities require continuous operation and will extend beyond daytime hours. These tasks have the ability to produce sound above the Town of Windsor's nighttime standard.

This is the case for the HDD, hydrostatic testing, and stream crossing processes. The HDD process requires a series of uninterrupted steps (pilot hole, hole opening, pipe pull-back) to successfully complete the necessary crossing(s). During this process, crews may work around the clock until the crossing(s) has been completed. The equipment used to complete the HDD will produce sound for most of the duration of the process.

Hydrostatic testing of the pipeline is another process that must proceed uninterrupted and involves sound producing equipment (air compressors, heavy equipment, pumps, portable generators, etc.). The testing process lasts a minimum of 12 hours once the appropriate test pressure is reached. Given the duration of the test, and the equipment needed to support this process, these activities cannot comply with the applicable limitations in the Windsor Noise Law.

For the proposed dry stream crossings, the EM&CS&P requires the crossings be completed within 24 hours from the start of trenching. Prior to trenching, Williams will take additional measures to minimize the time required to complete the crossing. This



will include; welding, coating, and x-raying the stream section of pipeline in advance of ditching; staging all material needed prior to trenching, and planning the actual crossing during optimal weather conditions. In order to complete this crossing within this time frame, construction activities may extend beyond the daytime working hours which would again allow sound to be produced above the applicable limit.

As such, Williams requests that the NYPSC not apply the Windsor Noise Law to construction activities during the daytime; as to the nighttime standard, Williams' requests that the Windsor Nose Law not be applied when the aforementioned activities will take place. Williams will provide notice to the Town of Windsor, adjacent neighbors and landowners when such activities are expected to occur beyond 7:00 pm.

### *2.8.4.3 Zoning*

The Town of Windsor Zoning Code establishes the different districts zoned within the Town of Windsor boundaries and describes accepted uses in those zones. Section 93-5 states that no building or land shall be occupied unless it is in conformity with the regulations described for the district in which it is located. Section 93-6 establishes 5 zoning districts within the Town of Windsor:  a Residential District, an Agriculture District, a Commercial District, an Industrial District, and a Flood Hazard District. The proposed NY Mainline Loop Pipeline traverses 3 of the districts:  Agriculture, Commercial, and Residential. The proposed Project will not conflict with existing or proposed land use or planned residential, commercial, industrial, institutional, recreational or agricultural land uses as a result of construction and operation of the Project as it will be paralleling and occupying an existing pipeline ROW.

Notwithstanding that the NYPSC Order in Case 10-T-0350 stated the NY Mainline traverses a Flood Hazard District where the pipeline crosses Trowbridge Creek, the Town of Windsor Zoning Map provided as **Exhibit DD** does not identify a Flood Hazard District crossed by the proposed Project. Nonetheless, as explained above, the NYPSC Order in Case 10-T-0350 states "Staff has reviewed the criteria of review outlined by the Town of Windsor and notes that the pipeline will be constructed underground and will not impact water levels or velocities, obstruct flows or reduce floodwater storage and is not among the types of uses in the Flood Hazard District that the statute is intended to prohibit. No further review under this section is required."

The Residential District (§93-10), Agriculture District (§93-17), and Commercial District (§93-22) permit electrical distribution substation and other public utility structures as permitted principal uses. Gas pipelines are public utility structures. Residential and Agriculture Districts have no other applicable regulations to be evaluated for gas pipelines.



The proposed NY Mainline Loop Pipeline traverses the Commercial District in the area around Fox Farm Road/Route 17/I-86. Among the permitted uses described in § 93-22 of the Windsor Town Code are electrical distribution substations and other public utility structures. As noted above, pipelines are public utility structures. Pursuant to § 93-21 of the Windsor Town Code, site plan review is required on all commercial developments. As described in § 93-21.2 of the Windsor Town Code, the Code Enforcement Officer would review the Commercial Site Plan to determine, among other factors, whether the application meets all zoning regulations and whether the property involved in the application is in a Flood Zone. The site plan process involves providing information on a form and providing plot plan information. This Application provides the information required by the site plan. The Town of Windsor's site plan approval process itself is preempted by PSL§ 130. In the Order for Case 10-T-0350 the NYPSC stated "The pipeline, which includes no buildings in this district, is a permitted use in this district and there are no other restrictions applicable to the pipeline."  Finally, the proposed pipe storage yard #1 is located on land zoned commercial and is the same pipe storage yard approved in Case 10-T-0350. The previously approved pipe storage yard #1 for the Project will be a temporary use of the land and will not be expanded beyond its current limits.

## 2.9     Stop Work Authority

The safety and health of all workers and the protection of our environment is important to Williams.

Williams believes that people must feel comfortable to voice safety concerns. As a result, all employees and contractors have been given the authority and responsibility (without fear of reprimand or retaliation) to immediately STOP any work activity that presents a danger to themselves, to co-workers, to other contractors, to Williams' employees or to the public. Each person is empowered to get involved, to question, and to seek to rectify any situation that is identified as not being in compliance with our safety policies, safe work practices or any deviation from agreed upon daily work plans.

## 3.0     <u>References</u>

Burger, M. F. and J. M. Line.. 2005. "Important Bird Areas of New York, Second Edition, Habitats Worth Protecting". Audubon New York. Albany, NY.

CUGIR dataset information for Broome County Agricultural Districts. 2010. http://cugir. mannlib.cornell.edu/bucketinfo.jsp?id=7950.  Accessed October 18, 2012.

Delaware County Soil and Water Conservation District. 2007. "East Branch Delaware River Stream Corridor Management Plan Volume 2". Prepared by DCSWCD Delaware County Planning Department, in cooperation with: the New York City



Department of Environmental Protection. http://dcswcd.org/Watershed%20Plans.htm. Accessed September 5, 2012.

Energy Resources and the Environment Office of Electricity and Environment New York State Department of Public Service. 2006. "Environmental Management and Construction Standards and Practices for Underground Transmission and Distribution Facilities in New York State". Albany, NY.

Environmental Management and Construction Standards and Practices. 2006. New York State Public Service Commission.

National Park Service. 2010. "National Trails System Map". http://www.nps.gov/nts/maps.html. Accessed October 2, 2012.

National Park Service. 2009. "National Rivers Inventory - NY Segments". http://www.nps.gov/ncrc/programs/rtca/nri/. Accessed October 2, 2012.

Natural Resources Conservation Service, United States Department of Agriculture. 2011. "Soil Survey Geographic (SSURGO) Database for Broome County, New York". http://soildatamart.nrcs.usda.gov. Accessed September 19, 2012.

New York State Department of Agriculture and Markets. September 2012. "Fertilizing, Lime, and Seeding Recommendations for Restoration of Construction Projects on Farmland in New York State".

New York State Department of Agriculture and Markets. February 2011. "Pipeline Right-of-Way Construction Projects Agricultural Mitigation Through the Stages of Project Planning, Construction/Restoration and Follow-Up Monitoring". http://www.agriculture.ny.gov/AP/agservices/WEBAPConstrGuides.pdf. Accessed October 8, 2012.

New York State Department of Environmental Conservation. 2013. "Registry of Big Trees".  http://www.dec.ny.gov/docs/lands_forests_pdf/treechampsci061413.pdf. Accessed September 5, 2013.

New York State Department of Environmental Conservation. 2012a. "Outdoor Activities - Broome County Map". http://www.dec.ny.gov/outdoor/44176.html. Accessed October 4, 2012.

New York State Department of Environmental Conservation. 2012b. "New York's Forest Preserve". http://www.dec.ny.gov/lands/4960.html.

New York State Department of Environmental Conservation. 2012c. "State Land Acreage by Classification". http://www.dec.ny.gov/lands/59645.html. Accessed November 16, 2012.

New York State Department of Environmental Conservation. 2011. "Water Wells Identified in the Water Well Program". http://www.dec.ny.gov/cfmx/extapps/ WaterWell/index.cfm. Accessed October 8, 2012.

New York State Department of Environmental Conservation. 2008. "Bird Conservation Areas New York State Map". http://www.dec.ny.gov/animals/32121.html. Accessed November 16, 2012.

New York State Department of Transportation. 2010. "Current New York Scenic Byways".    https://www.nysdot.gov/display/programs/scenic-byways/lists. Accessed October 2, 2012.

New York State Energy Planning Board. December 2009. "New York State Energy Plan".    www.nysenergyplan.com/final/New_York_State_Energy_Plan_ VolumeI.pdf.

New York State Office of Parks, Recreation and Historic Preservation. 2012. "State Parks - Central Region". http://nysparks.com/regions/central/default.aspx. Accessed October 4, 2012.

Reilly, S. 2012. "Windsor taxpayers get a break from Pa. gas drilling."  Pressconnects. http://www.pressconnects.com/article/20121008/NEWS01/310080024/Windsor- taxpayes-get-break-from-Pa-gas-rilling?odyssey=nav%7 Chead&nclick_check=1. Accessed October 10, 2012.

United States Department of Agriculture, Natural Resources Conservation Service. 2006. Land Resource        Regions and Major Land Resource Areas of the United States, the Caribbean, and the Pacific Basin. U.S. Department of Agriculture Handbook 296. Pp. 464-4-66. http://soils.usda.gov/survey /geography/mlra/. Accessed September 5, 2012.

United States Department of Health and Human Services. 2012. "HHS Poverty Guidelines". http://aspe.hhs.gov/poverty/12poverty.shtml.

United States Environmental Protection Agency. 2012. "Environmental Justice". http://www.epa.gov/environmentaljustice/. Accessed September 1, 2012.

United States Geological Survey. 2010. "Mineral Resources On-Line Spatial Data". http://mrdata.usgs.gov/sgmc/ny.html. Accessed September 5, 2012.

Web Staff. "Tax bills going down due to pipeline."  Your News Now. October 9, 2012. http://centralny.ynn.com/content/top_stories/603639/tas-bills-going-down-due-to- pipeline/.

Downloaded from ascelibrary.org by Stanford University on 07/13/23. Copyright ASCE. For personal use only; all rights reserved.

# Innovative Directional Microtunnel Garners Success
# for Crucial Trenchless Crossing

Jonathan L. Robison, PE[1] and Jim Elmore[2]

[1]GeoEngineers, Inc., 3050 South Delaware Avenue, Springfield, MO 65804; PH (417) 831-9700; FAX (417) 831-9777; email: jrobison@geoengineers.com
[2]Willbros Professional Services, Engineering, 2087 East 71st Street, Tulsa, OK 74170; PH (918) 499-2852; FAX (918) 499-3700; email: jim.elmore@willbros.com

## ABSTRACT

The purpose of this paper is to present a case history of the Interstate 84 and US Highway 6 Directional Microtunnel (I-84 DMT) crossing located near Matamoras, Pennsylvania and look at this innovative project as a whole to learn how the methods can be applied to future trenchless crossings with difficult site conditions. The crossing was a critical part of the Tennessee Gas Pipeline Company, LLC (Tennessee Gas), a Kinder Morgan Company, Northeast Upgrade Project (NEUP). Due to environmental and cultural resource areas and other constraints, the crossing had to be made where it was located despite challenging trenchless and geotechnical engineering issues posed by the location.

Due to geometric and geotechnical constraints several trenchless crossing methods were considered before the design team ultimately selected curved or Directional Microtunneling. The crossing was completed using Herrenknecht AG's (Herrenknecht's) Direct Pipe™ (DP) tunneling system incorporating Permalok™ (Permalok) casing pipe in a segmental or cartridge fashion since not enough workspace was available for a conventional DP pipe string layout. The 470-foot-long crossing consisted of 42-inch-diameter casing pipe in which the concrete-coated, 30-inch-diameter high pressure steel gas pipeline was later installed.

## PIPELINE ROUTE SELECTION

Early in the project design and scoping phase several options were reviewed for the 30-inch-diameter natural gas pipeline crossing of the Delaware River valley and I-84 as the route moved east from Pennsylvania into New Jersey. The existing Tennessee Gas right-of-way, which much of NEUP was able to parallel, was in this area located in the National Delaware River Water Gap Park. Accordingly, the project routers had to select another option for crossing the valley between Matamoras and Milford, Pennsylvania. The final crossing location (as shown in Figure 1) was selected as the best alternative to reduce potential impacts to adjacent property owners, and natural and cultural resources.

AR  005059

Downloaded from ascelibrary.org by Stanford University on 07/13/23. Copyright ASCE. For personal use only; all rights reserved.



**Figure 1.  I-84 DMT project vicinity.**

While the proposed route offered significant impact reductions and advantages as discussed above, its selection resulted in challenges from a geotechnical and trenchless engineering perspective.

## CROSSING SITE TOPOGRAPHY AND GEOLOGY

At the project location, I-84 runs generally along the northern edge of the nearly one-mile-wide, relatively flat Delaware River valley.  I-84 is built on a roughly 10- to 20-foot-thick embankment in this area.  North of I-84, the ground surface rises steeply, approximately 260 vertical feet in elevation.

The geology in the project area is reflective of the ground surface.  In the valley of the Delaware River, alluvial sediments and glacial till on the order of 200 feet in thickness consisting of sands, silts, and gravels are found.  Moving north from the Delaware River, shale and siltstone bedrock becomes progressively shallower until, along the hillside North of I-84, bedrock is noted at the surface or just beneath a scree slope.  I-84 is built on silty and sandy soil fill.  Figure 2 below shows the crossing area topography and geology.  Please note there is a two to one horizontal to vertical exaggeration in Figure 2.

AR  005060

Downloaded from ascelibrary.org by Stanford University on 07/13/23. Copyright ASCE. For personal use only; all rights reserved.



**Figure 2. Geologic cross section.**

## PRELIMINARY TRENCHLESS ENGINEERING

**Trenchless Methodology.**  Several trenchless methods were evaluated by the project team—Willbros Engineering (lead civil engineer), GeoEngineers, Inc. (trenchless and geotechnical engineer), and Michels Directional Crossings (trenchless contractor)— early in the design phase.  An early concept considered a horizontal directional drill (HDD) crossing from the Delaware River valley, below the river and I-84, exiting near the top of the mountain north of I-84.  This option was considered high risk and discounted due to the roughly 1,000 feet of dry hole that would have been required due to the difference in elevation of the entry and exit points.  A shorter HDD design was ultimately adopted to cross the Delaware River which still left I-84 and US 6 and an adjacent parking area to be crossed (a horizontal distance of roughly 470 feet).

To accomplish the 470-foot-long crossing, open faced auger or road bore was considered but discounted due to the overall crossing length and the risk of over-excavation of the silty and sandy soils.  To balance the earth pressures and reduce the risk of over-excavation, conventional, straight-line microtunnelling was considered but the option would have required relatively deep entry and exit pit excavations.  Conventional DP was evaluated to reduce the entry and exit pit excavations by incorporating a vertically-curved crossing path; however this option would have required a pipe stringing area south of the proposed entry point that would have impacted wetlands and forest resources and potentially the Delaware River itself.

Weighing all of the alternatives, the design team selected DMT as the preferred option for further engineering and design development.  This option incorporated the advantages of microtunneling, cartridge style feed of the pipe at entry and balancing earth pressures in a continuously cased tunnel, with the curved alignment of a DP to reduce entry and exit pit excavation requirements.  Entry for the proposed DMT was located on the south side of the project where a sufficiently large, relatively flat area was available for equipment and pipe storage and exit was located north of I-84 in the smaller area between the fill slope of I-84 and the steep rocky

Downloaded from ascelibrary.org by Stanford University on 07/13/23. Copyright ASCE. For personal use only; all rights reserved.

back slope leading up out of the valley.  The profile of the DMT is shown in Figure 3 below.



**Figure 3.  I-84 DMT profile.**

**Diameter of Machine and Jacking Pipe.**  A significant project constraint was the requirement of not retracting the microtunnel boring machine (MTBM) and casing pipe after it passed beneath the highways due to the risk of hole collapse and resulting risk of ground surface and highway embankment settlement.  The project design team discussed this aspect of the project in detail with multiple trenchless contractors along with Herrenknecht and decided that although a DP application was possible with a 30-inch-diameter MTBM, a 42-inch-diameter MTBM offered more power and could handle larger boulders if any were encountered.  Accordingly the project design moved to 42-inch-diameter casing pipe for the 30-inch-diameter product line. Installation of the product pipe in oversized casing was also in accordance with Pennsylvania State Department of Transportation typical practice.

To expedite construction schedule by reducing joint make-up time in the launch pit and to allow the contractor to fill the external annulus of the pipe after installation, Permalok push-together pipe with ports for post-installation of grout was specified for the casing pipe.

## DETAILED DESIGN

**Geotechnical Exploration.**     After completing the preliminary, conceptual engineering work, five borings were drilled within the area of the proposed DMT to evaluate the subsurface conditions likely to be encountered during construction.  The results of the borings (silty and sandy soils with some gravel but no evidence of large boulders and relatively shallow bedrock on the north side of I-84) were positive for the continued development of the DMT option from a trenchless feasibility perspective.  The relatively shallow bedrock also effectively constrained the design depth of the reception shaft.

**Directional Microtunnel Jacking Pipe Engineering.**     As the geotechnical engineering work was progressing, the designers recognized a need to be able to

Downloaded from ascelibrary.org by Stanford University on 07/13/23. Copyright ASCE. For personal use only; all rights reserved.

assess the stresses on the pipe during installation.  Detailed design guides and resources were available for assessing pipe stresses for straight-line microtunnelling. Ample literature and design guidance was also available for curved applications such as HDD where the pipe is installed by pulling it into an excavated hole.  However, the concept of jacking a steel pipe in compression through a curve and evaluating buckling along with axial, bending, hoop stresses, and combined stresses in compression for a trenchless method was not fully developed in engineering literature.

The designers of this project were also working on other Direct Pipe projects at the time and, therefore, felt an acute need to develop a design methodology for jacking steel pipe through a curve to satisfy pipeline owners and other project stakeholders that the methods were safe and should not result in undue risk to the jacking pipe.   Building on conventional microtunnelling theory and American Petroleum Institute Recommended Practices, the DMT designers developed a design method for estimating the anticipated loads generated during a jacked, curved steel pipe drive and for assessing the steel pipe axial, bending, and hoop stresses along with buckling and combined stresses (Robison, et. al, 2013).

**Jacking Force.**  Using the methods outlined in the above reference along with historic values of required thrust forces on prior DP projects, the designers calculated a likely maximum thrust force of approximately 100 to 200 Tons (US or short Tons). Because of the natural variability of subsurface conditions and of jacking force calculations, the designers specified a pipe (yield strength, wall thickness, and diameter) that was capable of safely handling 400 US Tons of axial force through the design alignment.  The jacking pipe ultimately selected was 42" O.D. X 0.750" W.T., 46 ksi minimum yield strength pipe.   Figure 4 below shows the estimated distribution of axial load in the pipe just prior to exit (i.e., at the theoretical maximum loading) assuming a theoretical maximum jacking force of 400 US Tons.  Please note, this is not meant to represent the anticipated loads measured at the thruster as the pipe is jacked, rather a "snapshot in time" graph of the theoretical maximum axial load in the jacking pipe from which estimates of the theoretical maximum axial stress and combined stresses are possible.

AR  005063

Downloaded from ascelibrary.org by Stanford University on 07/13/23. Copyright ASCE. For personal use only; all rights reserved.



**Figure 4.  I-84 DMT design axial load in pipe.**

**Pipe Stress and Capacity Analyses.**  To evaluate whether the proposed jacking pipe would be appropriate for the anticipated loading conditions, the axial, bending and hoop stresses along with buckling were analyzed using the methods outlined in the above reference.

Due to the use of Permalok push-together joints, the bending stresses were considered in two ways. First, bending was assumed to be distributed throughout the pipe more or less evenly as it would theoretically more or less be in a more typical, welded pipe.  This maximum anticipated bending stress was used in the design model to assess bending and combined stresses.  Second, the push-together joints were assumed to carry all of the alignment shifts required by the design vertical curvature while the pipe between joints had no bending stress; this resulted in each joint turning an angle of approximately 0.75 degrees, roughly one-half of the allowable joint angle specified by Permalok.  The estimated stresses—which assume bending uniformly distributed and at its maximum—are shown in Figure 5.

AR  005064

Downloaded from ascelibrary.org by Stanford University on 07/13/23. Copyright ASCE. For personal use only; all rights reserved.



**Figure 5. I-84 DMT design stresses in jacking pipe.**

After the stresses were calculated, the combined stress conditions were assessed and a stress capacity analysis made. The results of the capacity analysis are shown below in Figure 6. Note the bending and axial capacity analysis (the pipe stress capacity with an appropriate factor of safety divided by the anticipated stress) must be greater than 1.0 while the combined stress analysis must be less than 1.0, similar to combined stress analysis for HDD. The hoop capacity analysis is not shown as the hoop capacity far exceeded the anticipated hoop stress.



**Figure 6. I-84 DMT design stress capacity analyses.**

JA2663

AR 005065

Downloaded from ascelibrary.org by Stanford University on 07/13/23. Copyright ASCE. For personal use only; all rights reserved.

## CONSTRUCTION

The contractor began construction in June 2013 by installing entry and exit pit shoring systems and excavations. The MTBM was launched June 29, 2013 and punched out in the exit pit July 23, 2013. Figure 7 below shows the pipe thruster, MTBM, and launch seal in the launch pit. The backhoe visible in the background is working at the exit pit.



**Figure 7.   I-84 DMT launch pit.**

The contractor made excellent progress when the work was not delayed due to surveying and other routine issues not associated with the tunneling process itself. The configuration of the workspace and launch pit allowed the contractor to make up a few joints of casing at a time on the ground surface along with the required slurry and electrical connections for the DP machine.

The joints were then lifted into the launch pit and made up to the casing pipe behind the pipe thruster clamp. See Figure 8 below.

AR  005066

Downloaded from ascelibrary.org by Stanford University on 07/13/23. Copyright ASCE. For personal use only; all rights reserved.



**Figure 8.  Making up jacking pipe in launch pit.**

The rate of penetration for the tunneling machine ranged generally from roughly three to nine feet per hour (accounting for down time or roughly 20 to 60 feet per hour during jacking), with the best single shift achieving greater than 91 feet of casing installation.  Thrust loads were typically steady through the installation and, with a maximum of roughly 100 US Tons, did not approach the maximum loading (400 US Tons) for which the pipe was designed.  Figure 9 below shows both the penetration rates of the machine and the measured thrust loads through the length of the drive.



**Figure 9.  I-84 DMT penetration rate and thrust force.**

AR  005067

Downloaded from ascelibrary.org by Stanford University on 07/13/23. Copyright ASCE. For personal use only; all rights reserved.

Horizontal and vertical deviations of the tunnel were measured using the DP gyroscopic survey tool and manometer, respectively. Measurements taken through the length of the drive indicated that the drive was completed within the specified one-foot horizontal and vertical tolerance. See Figures 10 and 11 below.



**Figure 10. I-84 DMT horizontal deviation.**



**Figure 11. I-84 DMT vertical deviation.**

AR 005068

Downloaded from ascelibrary.org by Stanford University on 07/13/23. Copyright ASCE. For personal use only; all rights reserved.

In fact, as illustrated below in Figure 12, the MTBM arrived at the exit shaft nearly exactly where it was supposed to.



**Figure 12.  MTBM arrival in exit shaft.**

Deep survey monuments set along the DMT alignment did not indicate any significant settlement of the subsurface during tunneling.  After the casing pipe was installed the external annulus was filled with cement grout via grout holes in the Permalok pipe to reduce the risk of future ground surface settlement.

Finally, after exterior grouting was completed the product pipe was pulled into the casing and eventually tied into the HDD crossing of the Delaware River and the rest of the NEUP.

**SUMMARY**

In summary, the I-84 DMT was completed on time and budget and did not negatively impact the highway facilities that it passed beneath.  The DMT was installed in an area with geotechnical and geometric constraints that made traditional crossing methods high risk or prohibitively expensive.  Finally, the project further demonstrated the usefulness of the Herrenknect Direct Pipe system and provided another example of practical engineering design of jacked, curved steel pipe.

**REFERENCES**

Robison, J., Hotz, R., and Chen, C. (2013). "Emerging Technologies – A Suggested Design Method for Jacked, Curved Steel Pipe." *ASCE Pipelines Conference Proceedings*, 864.

AR  005069

Exhibit 7

AR 005070

#### 2.5.1.8      Cleanup and Restoration

After the completion of backfilling, disturbed areas would be graded, and any remaining debris would be properly disposed of in compliance with federal, state, and local regulations. The construction corridor would be protected through the implementation of erosion control measures including site-specific contouring, permanent slope breakers, mulching, and reseeding or sodding with soil-holding vegetation. Contouring would be accomplished using acceptable excess soils from construction. If sufficient soils are not available, additional soil would be imported.

Tennessee would restore the construction work area in accordance with the provisions detailed in its ECMP, as well as applicable seed mix requirements from the NRCS, or other agency recommendations and relevant landowner agreements.

#### 2.5.1.9      Cathodic Protection and Alternating Current Mitigation

The cathodic protection system for the pipeline may consist of rectifiers and/or anode beds. Tennessee is evaluating possible locations for cathodic protection rectifiers and/or anode beds at five locations within the permanent easement – one near the Pressure Regulation Station, one near the Cumberland Meter Station, and three at intermediate locations along the pipeline at approximate MPs 8, 16, and 24. All installations would be underground and require limited aboveground facilities. Rectifier boxes associated with external corrosion control systems are typically located within existing road rights-of-way for easy access for maintenance and to power utilities.

An underground alternating current (AC) mitigation system would be installed along portions of the pipeline co-located and adjacent to the existing TVA electric transmission line right-of-way. This system would mitigate AC currents that have the potential to be transmitted to the pipeline by conductive or inductive interference from the transmission line. Tennessee's AC mitigation system would consist of a gradient control wire or ribbon located adjacent to the pipeline and connected to the pipeline at regular intervals. It would be installed during construction in the same trench as the pipeline within the permanent right-of-way.

### 2.5.2      Aboveground Facility Construction Procedures

Tennessee would construct aboveground facilities in accordance with all applicable federal and state regulations (including 49 CFR 192). Generally, construction of aboveground facilities would begin with clearing and grading of the construction workspace, and excavation would be conducted where necessary to accommodate new foundations. Subsequent activities include preparing foundations, installing underground piping, installing aboveground piping and machinery, testing the piping and control equipment, and cleaning and stabilizing the work area. Security fencing would be installed around the perimeter of new aboveground facilities. Tennessee would cover areas around meters, piping, and associated equipment with gravel, or would seed and maintain an herbaceous cover.

### 2.5.3      Specialized Construction Procedures

#### 2.5.3.1      Waterbody Crossings

Waterbody and wetland construction methods would vary according to the physical and environmental characteristics of each crossing location. Three HDDs are proposed, which would cross a total of four streams (the HDD crossing of Yellow Creek would also cross under an unnamed tributary to Yellow Creek). The remaining streams would be crossed by dry-ditch open-cut methods, which may include a flumed crossing or a dam-and-pump, depending on site-specific conditions at the time of construction. Additional descriptions of these crossing methods are provided below.

**Dry-Ditch Crossing Construction Methods**

Dry-ditch open-cut crossing methods, which consist of flumed crossing or dam-and-pump crossing methods, involve temporarily diverting stream flow around or through the work area to minimize contact between stream water and the trench excavation, which would minimize sediment suspension during excavation, pipeline installation, and backfill activities.

Flumed Crossing – A flumed stream crossing redirects the water flow through one or more flume pipes to allow for the trenching and pipe installation to occur in relatively dry conditions. The number, length, and diameter of the pipes are dependent on estimated stream flow for the stream being crossed. This method allows for drier trenching, pipe installation, and restoration, while maintaining continuous downstream flow and passage for aquatic organisms. Soil types must have characteristics that allow stable stream bank conditions, and stream flow must be low enough for this method to be used successfully and safely. The flume pipe(s) must be long enough to account for the potential for the ditch width to increase during excavation (due to sloughing) and oversized somewhat to accommodate the possibility of high flow conditions. An effective seal must be created around the flume(s) at both the inlet and outlet ends, so that water does not penetrate and potentially compromise the channelized dam. Tennessee would implement the following measures where the flumed crossing method is used:

- the flume pipe would be installed after blasting (if necessary) but before any trenching;

- an effective seal would be created around the flume pipe with sandbags or an equivalent seal mechanism;

- the flume pipe(s) would be aligned parallel with natural water flow to prevent scouring of the bank, minimizing erosion and sedimentation;

- the flume pipe would not be removed during trenching, pipe-laying, backfilling, or initial streambed restoration efforts, except in rare conditions where a severe flow event causes conditions that make it unsafe for the pipe to remain; and

- flume pipes and dams that are not associated with an equipment bridge would be removed as soon as final clean-up of the stream bed and bank is complete.

Dam-and-Pump - The dam-and-pump method is used for stream crossings where pumps and hoses can adequately transfer stream flow volumes from upstream of the work area to downstream of the work area, and where there are no concerns with preventing the passage of aquatic organisms. Tennessee would implement the following measures where the dam-and-pump method is utilized:

- sufficient pump size, horsepower, and hose capacity, including on site backup pumps, would be used to maintain downstream flows;

- coffer dams would be constructed with "clean" materials to prevent pollutants from entering the waterbody (e.g., sandbags or clean gravel with plastic liner);

- water intakes would be suspended in the water column above the stream bed and would be screened to reduce entrainment of aquatic organisms or particles that may clog the pump;

- pumps would be located within secondary containment structures to catch petroleum liquids and prevent them from entering the waterbody during refueling or if a pump failure occurs;

- for waterbodies with large volumes and strong velocity discharges, water dispersion structures would be placed at the downstream discharge location to prevent streambed scour; and

- the coffer dam, pumps, and hoses would be monitored and maintained where necessary to ensure proper operation for the duration of the waterbody crossing.

**Trenchless Crossing Methods**

HDD is a specialized construction technique that is used to install pipelines in areas where traditional open-cut excavations are not practicable due to sensitive resource areas or logistical reasons. To begin, large staging areas must be established on either side of a crossing at the drill entry and exit point. After the initial set up of the drilling equipment and bore holes, The HDD method requires that a small diameter pilot hole be drilled from the entry point to the exit point by pumping a slurry mixture into the ground under high pressure. Once the pilot hole is complete, a reamer is attached to a drill string to enlarge the pilot hole. The reamer may pass through the pilot hole multiple times until the necessary diameter for pipeline installation is achieved. During this drilling process, a bentonite clay drilling fluid mixture would be used to lubricate the drill bit, remove drill cuttings from the hole, and fill void space to maintain the integrity of the drill pathway prior to pipe installation.[17] Cuttings would be separated from the drilling fluid when the mixture returns to the surface and is reclaimed. A final pass, the swab pass, is then completed to ensure the hole is ready to receive the pipe. From there, the hole is widened, and the pipeline is pulled into position and is tied-in to the pipeline facilities on both ends of the crossing. Compared to the other crossing methods, the HDD technique minimizes the impacts to an area by drilling down and under a sensitive resource, leaving the portion of land in between the entry and exit point relatively undisturbed.

HDDs are proposed for the crossings of Jones Creek (MP 3.2), Yellow Creek (MP 22.4), and Wells Creek (MP 30.7). The HDD at Yellow Creek would also include an unnamed tributary for a total of four streams crossed by HDDs. The use of HDDs at these locations would alleviate multiple traditional surface constraints, including the potential for surface resource impact minimization.

While the HDD method generally avoids impacts on the feature being crossed, Tennessee would use a guide wire system that would require hand-clearing of a path up to 5 feet wide between the entry and exit pits. In addition, Tennessee has proposed ATWS within the path of certain HDDs to withdraw water from Jones Creek and Wells Creek. Water withdrawals are addressed further in section 4.3.2.3. HDD personnel would walk the land-based path of the drill to monitor for any inadvertent return of drilling mud to the surface. Tennessee estimates each HDD would be completed within 16 weeks. Tennessee anticipates HDD activities may require 24-hours per day/7 days per week drilling. However, at drill locations where noise sensitive areas are within 0.5 mile of HDD activities, Tennessee would not perform nighttime or Sunday drilling activities. Tennessee would implement measures to reduce noise from HDD construction as described in its Plan for Reducing Noise Impacts from HDD Operations. Additional noise mitigation measures are discussed in section 4.11 and, with implementation of those measures, we find Tennessee's HDD construction schedule to be acceptable.

Tennessee has provided an HDD Plan that addresses the prevention, detection, notifications, and response to inadvertent returns in upland areas, wetlands, and waterbodies. In response to inadvertent returns of drilling mud to the surface, on-site personnel would assess the volume and discharge location to inform appropriate containment and response measures. In the event an inadvertent release enters a wetland or stream, Tennessee would work to stop the flow and isolate the release and upon completion of the drill, would develop a cleanup plan based on site-specific conditions in consultation with appropriate agencies. Tennessee has also assessed the feasibility of HDD construction for the Project and determined that the likelihood of success for each HDD is high. We find the measures outlined in the HDD Plan to be

---

[17] Bentonite clays are non-toxic and form a low permeability, low porosity boundary layer preventing any fluid migration wherever drilling fluids are present. This essentially seals the walls of the borehole, preventing the drilling fluids from becoming incorporated into groundwater within aquifers. Aquifers are the geologic layer that holds the water. The bentonite clays act as an aquitard that keeps these hydrologic units discrete.

acceptable and that implementation of the plan would adequately minimize and mitigate potential adverse impacts associated with HDD construction.

## 2.5.3.2    Wetland Crossings

Tennessee would protect and minimize potential adverse impacts on wetlands using construction procedures specified in its Plan and Procedures.  Tennessee would utilize one of the following two methods for crossing wetlands during construction:

- Standard Wetland Construction
- Conventional Wetland Construction

Standard Wetland Construction - The standard wetland construction method is used in wetlands where soils are non-saturated at the time of crossing and able to support construction equipment.  This method requires segregation of topsoil from subsoil along the trench line.  Where present, a maximum of 12 inches of topsoil is segregated from the area disturbed by trenching, except where standing water is present or if soils are super-saturated.  Topsoil segregation is followed by trench excavation, pipe laying, backfilling, and grade restoration.  Immediately after backfilling is complete, the segregated topsoil is restored to its original location.

Conventional Wetland Construction - Conventional wetland construction methods support construction equipment without significant soil disturbance.  Prior to crossing and movement of construction equipment through these wetlands, the construction workspace is stabilized using timber mats to allow for a stable, safe working conditions.  Unless soils are saturated, the top 12 inches of wetland topsoil are segregated over the trench line. Trench soil is temporarily stockpiled in a ridge along the pipeline trench.  Gaps in the spoil pile are left at appropriate intervals to provide for natural circulation or drainage of water.  While the trench is dug, the pipeline is assembled in a staging area located in an upland area.  After the pipeline is lowered into the trench, wide-track bulldozers or backhoes supported on timber mats are used for backfilling, final clean-up, and grading.  This method minimizes the amount of equipment and travel in wetland areas.

Where necessary, a drag-section may be used with the Conventional Wetland Construction method.  The drag-section involves the trenching, installation and backfill of a prefabricated length of pipeline containing several pipe segments, all in one day.  The trench is backfilled at the end of each day after the pipe is lowered in as necessary to ensure safety.

## 2.5.3.3    Road Crossings

Construction of the Project across paved roads (table 2.4-3) would require boring under the roadbed, thereby avoiding impacts on the road surface.  Unpaved roads would be crossed by either boring under the roadbed or by open-cut methods.  The pipeline would be installed at a minimum depth of 5 feet below the center of roadways or as required by applicable crossing permits and approvals and would be designed to withstand anticipated external loadings.  There are no active or abandoned railroads that would be crossed by the pipeline.

**Table 2.5-3: Roadways Crossed by the Cumberland Pipeline**

| Road Crossed | Milepost | Road Material | Proposed Crossing Method |
|---|---|---|---|
| Pack Road | 0.5 | Asphalt | Open Cut |
| Nosegay Road | 1.4 | Asphalt | Open Cut |
| White Oak Flatt Road | 4.5 | Asphalt | Open Cut |
| Highway 49 | 5.9 | Asphalt | Bore |
| Brummit Road | 7.2 | Asphalt | Open Cut |
| Harris Hollow Road | 8.8 | Asphalt | Open Cut |
| Highway 48 | 10.0 | Asphalt | Bore |
| Old State Highway 48 (County Highway 967) | 10.1 | Asphalt | Open Cut |
| Daniel Lane | 11.1 | Asphalt | Open Cut |
| Sweet Home Road | 12.1 | Asphalt | Open Cut |
| Bell Hollow Road | 12.3 | Asphalt | Open Cut |
| Highway 1420 (New Dry Hollow Road) | 14.1 | Asphalt | Bore |
| Butcher Ridge Road | 14.4 | Asphalt | Open Cut |
| Little Bartons Creek Road | 16.6 | Asphalt | Bore |
| Slayden Marion Road (Highway 235 and 387) | 17.2 | Asphalt | Bore |
| Leatherwood Road | 19.1 | Asphalt | Open Cut |
| Slaydenwood Road | 19.2 | Asphalt | Open Cut |
| Williamson Branch Road (Highway 1785) | 22.2 | Asphalt | Open Cut |
| Williamson Branch Road (Highway 1785) | 22.3 | Asphalt | HDD |
| Ellis Mills Road (Highway 939) | 22.7 | Asphalt | Open Cut |
| Herman Adams Road | 23.9 | Asphalt | Open Cut |
| Barber Highway | 24.4 | Asphalt | Open Cut |
| Highway 46 (Cumberland City Highway) | 26.5 | Asphalt | Bore |
| Highway 13 | 26.8 | Asphalt | Bore |
| Herman Clark Road | 27.6 | Asphalt | Open Cut |
| Kizer Ridge Road | 28.9 | Asphalt | Open Cut |
| Cumberland City Highway (Highway 149) | 29.9 | Asphalt | Bore |

Emergency vehicle access would be maintained by minimizing the duration of road and driveway outages and by keeping steel plates at the site of construction. Should emergency vehicles need to travel through the work area, the steel plates would be quickly installed over the open trench, allowing vehicles to pass. The Project would not require any active railroad crossings.

### 2.5.3.4    Construction in Residential Areas

Tennessee has designed the route of the pipeline to minimize construction activities on residential land; however, 7 houses and 11 other buildings are within 50 feet of the edge of the proposed construction workspaces. Construction near residential areas would be conducted in a manner to ensure that all construction activities minimize adverse impacts on adjacent residences and that clean-up is prompt and thorough. One of the seven houses identified in proximity to Tennessee's construction footprint is within 25 feet of the Project workspaces. Tennessee has designed a site-specific construction plan for this area and has submitted it for our review. This plan is included in appendix H, and we encouraged the affected

landowner to review and provide comments or concerns on the plan during the draft EIS comment period. No location-specific concerns were filed by this landowner during the comment period.

Temporary construction impacts on residential areas may include inconvenience caused by noise and dust generated by construction equipment, personnel, and trenching of roads or driveways; ground disturbance of lawns; removal of trees, landscaped shrubs, or other vegetation screening between residences; potential damage to existing septic systems or wells; and removal of aboveground structures such as fences, sheds, or trailers from the right-of-way.

Tennessee would maintain access for landowners to their homes and private property at all times except for the brief periods required for laying the new pipeline into the trench. Tennessee would advise landowners in advance of any planned temporary access limitations.

Construction through or near residential areas would be done in a manner to ensure that all construction activities minimize adverse impacts on residences and that clean-up is prompt and thorough. Affected landowners would be notified using a combination of mailings, phone calls, and/or in-person visits at least five days before construction commences unless more advance notice is required pursuant to a landowner agreement. Access to homes would be maintained, except for the brief periods essential for laying the new pipeline. Landowners would be advised of any temporary access limitations.

In certain circumstances where unoccupied buildings are present within 25 feet of the construction work area, such as at MPs 10.3 and 25.0, Tennessee has indicated that it would leave the buildings in place and avoid them during construction by placing a high visibility safety fence around each structure. Tennessee has also expressed its willingness to work with affected landowners in the event another strategy is preferred, such as relocating or replacing the buildings to a location outside the construction workspace, or compensating the landowners for removal of the buildings.

Topsoil in landscaped lawns would be segregated and replaced or topsoil would be imported. Following pipe installation, Tennessee would require its contractor to backfill trenches in residential areas as soon as practicable after installation of the pipeline. Further, cleanup and restoration in residential areas would take place within 10 days of backfilling in accordance with the Plan. Immediately after backfilling, and with appropriate weather and soil conditions, residential areas would be restored and all construction debris removed. Private property, such as mailboxes, fences, gates, and other structures that have been removed would be restored, unless alternate plans have been made with the landowner. Sidewalks, driveways, and roads disturbed by pipeline construction would be restored to their original condition upon completion of construction activities. After restoration is complete, a Tennessee representative would contact landowners to ensure that all agreement conditions have been met and that the landowner has been compensated for damage incurred during construction. [18]

### 2.5.3.5    Agricultural Land

Construction of the Project would affect 101.36 acres of agricultural land, defined by the presence of active or rotated crop production, hay, and improved pasture. Several temporary impacts (occur over one growing season), following restoration of affected lands, could occur as a result of the Project. These impacts include unsuitable drainage and the spread or introduction of non-native plant species, and soils impacts like compaction, uneven grade, ponding, and mixing of soils as discussed in section 4.3.2. Occasionally observed long-term impacts on soils (changes to soil composition and chemistry) could also affect agricultural land use and crop production. Project-related activities, which could take place over several months, would temporarily preclude the use of agricultural lands and could impact drain tiles and

---

[18] We note the Commission does not adjudicate disputes regarding compensation.

irrigation systems. As discussed in section 4.3.1, it is possible that saturated soil conditions could delay decompaction, topsoil replacement, and final grading until conditions allow for proper soil handling and restoration. During this time, affected lands would likely be encumbered, preventing or deterring agricultural-related grading, planting, soil enhancement, harvesting, and other activities. Also, hydrostatic testing discharges on agricultural lands could saturate soils, resulting in scouring, erosion, and other impacts, including hindering or otherwise delaying revegetation of temporary work areas and the pipeline right-of-way.

To preserve soil productivity in agricultural lands, up to 12 inches of topsoil would be segregated during grading and stored separately from subsoil. Tennessee would utilize full right-of-way topsoil segregation as required by landowner agreements, the NRCS District, or as appropriate based upon site-specific conditions. During the backfilling and restoration phases, topsoil would be replaced, and any stones uncovered during construction that are larger than 4 inches would be removed or handled in accordance with individual landowner agreements. Any drain tiles damaged during construction would be repaired or replaced. Cleanup and restoration of the construction right-of-way would leave it in a condition similar to surrounding areas.

Operation of the Project would affect 38.35 acres of agricultural land, most of which (38.06 acres) would be within the permanent right-of-way of the pipeline, where farming and grazing could resume immediately following restoration. About 0.3 acre would be permanently affected by the new Cumberland Meter Station. Tennessee would compensate for the permanent loss of agricultural land according to the terms of individual landowner agreements.[19] Given Tennessee's proposed mitigation measures, we find impacts on agricultural land would mostly be temporary and would not be significant.

## 2.5.3.6    Rugged Topography

Tennessee has completed a steep slope analysis of the Project and determined that the overall gradient of the right-of-way ranges from less than 5 percent to 47 percent. Tennessee has grouped by milepost the slopes crossed into three categories: 1) 5 to 15 percent slope, 2) 15 to 30 percent slope, and 3) greater than 30 percent slope. The approximate Project mileposts for sloped areas greater than 5 percent and where steep slope construction techniques may be employed are discussed in further detail in section 4.1.4.

Special construction techniques may be employed where slope gradient exceeds 30 percent, where construction activity must be conducted on side slopes, or where ground conditions warrant the use of such techniques to ensure the safety of workers, the public, or the environment. Pipe installation and construction activities across steep slopes would be similar to standard upland construction methods, but equipment may be tethered via a winch line to other stabilized equipment at the top of the slope. This technique provides a simple arrest to uncontrolled movements and can function as an assist to equipment when traversing across or up and down the slope within the right-of-way. Equipment used to prepare the construction corridor and excavate the trench would be secured with a series of winch tractors to maintain control and provide an additional level of safety. Spoil piles adjacent to the trench would be stabilized with temporary sediment controls as needed to keep excavated soils within the construction work area. All sediment and erosion controls would be installed in accordance with the Plan and Procedures.

In areas where pipeline construction involves side slopes, cut-and-fill grading may be necessary to create a safe, flat work terrace. Soil from the construction work area would be excavated and moved to be

---

[19] We note the Commission does not adjudicate disputes regarding compensation.

stockpiled as spoil or to create a temporary fill to support activity.  After the pipeline is installed, the slope's original contours would be restored to the greatest extent practicable.

Pipe joints may be stockpiled at various points on a slope in addition to staging areas at the top and bottom of the right-of-way.  A variety of methods to string, weld, and lower-in pipe may be employed.  Under some conditions, it may be possible to string, weld, and lower-in using typical methods.  Under other conditions it may be necessary or beneficial to connect multiple pipe segments on less steep areas and then transport the welded pipe string into position for installation.  Another method may be to use a tethered side boom carrying individual pipe lengths to their intended position one joint at a time up or down the slope before lowering-in and welding.  Grading may be minimized by detouring non-essential equipment around areas of excessively steep slopes using an approved temporary access road or bypass.  Two-toning (grading two small cuts where the working side is higher than the spoil side) may also be implemented to minimize grading for steep cuts.

Tennessee would install temporary trench plugs and temporary slope breakers during construction on slopes greater than 5 percent.  Temporary slope breakers would channel water off the right-of-way through a J-hook or other baffling device to limit water flow down long steep slopes.  Temporary trench plugs would reduce the velocity of water flowing along the trench and the volume of water that collects at the bottom of slopes.  Tennessee would install permanent trench breakers and permanent slope breakers in areas of steep slopes.  Trench breakers are designed to prevent preferential water flow along the pipeline trench by diverting subsurface water flow to the land surface.  Groundwater discharging to the land surface would then be redirected off the right-of-way by slope breakers.  Used in combination, these structures would prevent subsurface piping of soils that can lead to slope instability and failure.  Potential impacts associated with steep slopes, rugged terrain, and their associated mitigation measures, are further discussed in section 4.2.

### 2.5.3.7      Karst Areas

A Phase I Assessment indicated the possible presence of 31 karst features along the proposed Cumberland Pipeline route.  An additional karst feature was identified in the field during surveys.  After a detailed field assessment, 12 of the 32 features were confirmed karst features; however, 8 of the karst features were identified as occurring within or close enough to the Project to pose a hazard to construction and/or operation.  Geophysical investigations were completed at 7 of the 8 features (landowner permission was not granted for one of the eight features).  Based on the results of Tennessee's geophysical surveys, significant subsurface karst features are not anticipated; and site-specific mitigation plans would not be required[20].  A Project-specific Karst Hazards Mitigation Guidance Plan[21] would be followed during construction through all karst areas identified along the Project route to address any unexpected conditions and to minimize the risk of any construction-related issues associated with constructing in karst-prone regions.  Additional details regarding the locations of potential and confirmed karst features are included in section 4.1.

### 2.5.3.8      Foreign Utility Crossings

The Cumberland Pipeline would cross or come in close proximity to numerous foreign utilities or pipelines, including overhead electric or telephone utility lines.  Prior to construction, Tennessee would utilize the One-Call system to locate known utilities and would identify the precise location of each foreign

---

[20] Subsurface characterization will be conducted via geophysical methods at the one remaining site where landowner access was denied.

[21] Tennessee's Karst Hazard Mitigation Guidance Plan is available on FERC's eLibrary under accession no. 20220722-5052.  It is located within appendix 6.D in a report titled *Geohazard Mitigation Guidance Plans*.

line prior to excavation, using handheld devices. Tennessee would give each operator adequate notice so they could be present during construction around their utility lines. Tennessee would limit mechanical excavation in proximity to existing utilities and would install the pipeline at a minimum offset of 24 inches. If foreign utilities are accidentally damaged during construction, Tennessee would contact emergency response, and evacuate the immediate area, as appropriate. To aid in immediate response in the event of accidental damage, Tennessee would coordinate with the utility companies on the timing of construction so that the utility company could have a representative on-site during excavation.

## 2.6    CONSTRUCTION SCHEDULE AND WORKFORCE

Tennessee anticipates that construction of the Project would begin immediately following receipt of Notice to Proceed from the Commission (anticipated by Tennessee in August 2024 subject to receipt of required permits and regulatory approvals) for activities that do not require tree felling or tree clearing. Tree felling would begin in mid-October 2024. Construction is expected to take approximately 15 - 16 months. Tennessee is aiming to place the Project into service by September 2025, with final restoration by December 2025.

Construction activities would generally occur between the hours of 7:00 a.m. to 7:00 p.m., Monday through Saturday; however, work at hydrostatic testing sites would occur on a 24 hour per day, 7 day per week schedule during certain periods of the Project. In addition, we recognize that certain construction efforts (e.g., equipment and material unloading, operation of pumps, non-destructive testing, and large concrete foundation pours) may require uninterrupted completion extending into nighttime hours. Tennessee also states that dry-ditch stream crossing timing windows may necessitate nighttime work or work on Sundays and holidays in the event of construction delays due to weather conditions, challenging site conditions, or equipment breakdown compounded by back-up equipment breakdown.

Aside from HDD and stream or road crossing construction activities (as identified in the table below), if work were required outside of normal construction work hours, the duration of such work would typically be limited to one evening only. Known construction work activities that could occur outside of the normal construction work hours are identified in the table below. Tennessee commented on the draft EIS and indicated that it would not perform waterbody and road crossing activities overnight or on Sundays in areas where a noise-sensitive area (NSA) is located within 0.5 mile of the Project. Table 2.6-1, below, has been updated to reflect this change.

**Table 2.6-1:  Construction Work Activities and Corresponding Schedule for the Project**

| Project Phase | Months (beginning in Aug. 2024 – Sep. 2025) | Nighttime (Yes/No)[a/] | Details for Nighttime/Extended Work Locations | | |
|---|---|---|---|---|---|
| | | | When | Milepost | Noise Sensitive Area Distance (ft) |
| Survey and Staking | Aug. – Aug. | No | Daytime | N/A | N/A |
| Building Access Pads off Roads | Aug. – May | No | Daytime | N/A | N/A |
| Clearing | Oct. – Apr. | No | Daytime | N/A | N/A |
| Front-End Grading | Nov. – June | No | Daytime | N/A | N/A |
| ROW Topsoil Stripping | Nov. - June | No | Daytime | N/A | N/A |
| Restaking Centerline of Trench | Nov. – June | No | Daytime | N/A | N/A |
| Trenching | Nov. - July | No | Daytime | N/A | N/A |
| Blasting | Nov. - July | No | Daytime | N/A | N/A |
| Padding Trench Bottom | Nov. - July | No | Daytime | N/A | N/A |
| Stringing Pipe | Nov. - July | No | Daytime | N/A | N/A |
| Field Bending Pipe | Nov. - July | No | Daytime | N/A | N/A |

| Int. Revue ges. Hydrobiol. | 81 | 1996 | 2 | 161–181 |
|---|---|---|---|---|

P. D. ARMITAGE and R. J. M. GUNN

Institute of Freshwater Ecology, River Laboratory, East Stoke, Wareham, Dorset BH20 6BB, U.K.

# Differential Response of Benthos to Natural and Anthropogenic Disturbances in 3 Lowland Streams

*key words*: annual variability, environmental assessment, macroinvertebrates, streams, disturbance, substratum, Channel Tunnel

## Abstract

The macroinvertebrate faunal assemblages of 8 sites on three small streams in SE England were examined annually in spring between 1987 and 1993. Considerable 'natural' variability was observed in the sites superimposed over a background of low-intensity anthropogenic disturbance such as farming, quarrying, and urban influences. Landscape changes and activities in the catchment (saline drainage, removal of topsoil, pipeline crossings of streams) associated with the construction of the UK terminal for the Channel Tunnel, resulted in further temporary disturbance at some of the sites.

Most changes in faunal composition were related to natural and anthropogenically induced modifications of the stream substrate. The response and recovery time of sites to disturbances was very variable and was related to the hydraulic and substrate characteristics of the stream bed, with least change and quickest recovery at sites with coarse substrates and high slope. Variations between years in the occurrence of taxa were generally more apparent with species data than with family data except where environmental change was great. Despite the observed differences in faunal composition the main elements of the fauna were fairly constant throughout the study period.

Analyses of the data with biotic indices, the predictive RIVPACS system and ordination analyses have all shown clearly the annual variability of faunal parameters used to measure environmental quality. The study has shown that very basic rapid assessment techniques can provide insights into faunal responses to disturbance, especially if the work is long-term and that before authoritative statements concerning environmental impact can be made it is essential to have knowledge of the natural variation to be expected in streams of differing characteristics.

## 1. Introduction

Detailed quantitative approaches to monitoring have in the last 10 years shifted to what are now known as 'rapid assessment techniques' (RATS) (RESH and JACKSON, 1992). This situation has arisen through the high costs associated with quantitative sampling and its need for replication. RATS frequently involve a sampling of all habitats at a site (reduced stratification), (usually with a coarse-meshed kick net), a reduced taxonomic penetration (Family or Order level), and the use of sub-sampling in enumeration. These modifications allow a larger number of sites to be surveyed/monitored for the same cost than would be possible if rigorous quantitative studies were undertaken.

Two common assumptions in the use of macroinvertebrates in routine environmental monitoring are that it is possible to assess quality from a sample taken at one point in time and that will be a fair representation of unimpacted quality over a period of time. This has been the basis for many studies (see RESH and JACKSON, 1992 for a detailed listing) and is the favoured method for National Surveys in the UK (SWEETING et al., 1992). So example when assessing the effects of a bridge or road construction on a stream, changes have often

been assessed over a short period of time with samples taken above, at and below the impact before and after construction (BARTON, 1977). Once the effects are documented funding is frequently withdrawn and long-term studies are not possible (LIKENS, 1983) with the result that these assumptions are rarely tested. While they may be true in a few instances it is more likely that a site will vary considerably from year to year in response to both natural (rainfall) episodes (MCELRAVY et al., 1989), and unnatural (anthropogenic) activities (sand deposition, NUTTALL, 1972; impoundment, ARMITAGE and BLACKBURN, 1990; mitigation of channelisation, EDWARDS et al., 1984). In addition, sites will vary in their stability, response to disturbances and resilience of their faunal communities (MILNER, 1994). So while a single sample may be appropriate to assess quality in a stable site more estimates will be needed in unstable locations to establish the extent of natural variability. In the unstable environments it also would be necessary to establish whether the year selected to set the target quality is typical. The concept of 'normal' population levels, or a typical year is difficult when considering dynamic freshwater communities which are continually adjusting to biotic and abiotic influences. Pre-disturbance data would not necessarily provide the 'normal' target without some measure of 'natural' fluctuations over time. Environmental variability is a fundamental problem in the assessment of faunal changes in abundance and composition (NORRIS and GEORGES, 1992) and one which is frequently not addressed in surveys (LADLE et al., 1989; SWEETING et al., 1992) mainly due to the high costs of processing samples. Despite financial constraints on detailed sampling at a point in time, long-term less-detailed studies can help elucidate trends in environmental variability.

An opportunity to examine some of these aspects was provided by the construction of the UK terminal for the Channel Tunnel which links France and England by train. This involved a considerable degree of landscaping and disturbance and the developers initiated a large environmental impact programme (EUROTUNNEL, 1991) to monitor ecological conditions in both terrestrial, freshwater and marine habitats before during and after the main periods of construction activity between 1987 and 1993. Three small streams were involved and the objectives of this paper are to describe changes in faunal communities over this period, relate these changes to environmental events and to use these data to examine the effects of variability in faunal parameters on environmental quality assessment.

## 2. Study Area and Methods

### 2.1. Site Descriptions

The UK terminal is situated just north of the town of Folkestone in Kent, southern England. The three main streams in the area are the Saltwood and Seabrook, which enter the sea west of Folkestone, and the Pent Stream, which passes through the town itself. All three streams are fed from spring seepage at the junction of the Lower Chalk and Gault Clay layers and flow through Lower Greensand deposits (coarse sand and sand) and Quaternary alluvium to the sea. All the streams are short (<6 km) and fall quickly to the sea with slopes ranging from 17 to 23 m km$^{-1}$. The sampling frequency and number of sites studied varied according to the demands of the monitoring programme and construction activity and although some summer and autumn monitoring took place in the first three years this account will consider only those 8 sites sampled in spring over a period of six to seven years between 1987 and 1993. The location of these sites is shown in Fig. 1.

The Saltwood Stream after emerging from the chalk/clay interface flows through grassland and deciduous woods. At Oak Banks Wood an artificial pond lies between sites 1 and 2 and site 3 is situated at the edge of the town of Hythe. All sites are shaded by trees and rooted macrophytes are absent. The Seabrook Stream is slightly less steep than Saltwood but the basic characteristics of the catchment are very similar. Site 1 above the village of Frogholt is situated in pasture. Below Frogholt at site 2 the stream receives settled runoff from the motorway via a retention lagoon. This length of the stream was

AR 005312



Figure 1. Location of the sample sites in the Folkestone area on the three streams, Saltwood (SW), Seabrook (SB) and the Pent (P). All streams are culverted below the bottom sites before following to the sea. [Terminal area – horizonal hatching, urbanised areas – vertical hatching, motorway-whole thick line, railway-dashed line].

culverted in 1988 and the valley infilled and this site was omitted from the current analysis. Site 3 is situated downstream of a quarry in a wooded stretch. Site 4 flows through pasture land and site 5 lies below a small trout farm. The Pent Stream has three main sources at the chalk/clay interface but is predominantly an urban stream with most of its length culverted or flowing through housing estates. Site 3 is situated in the town of Folkestone.

## 2.2. Data Collected

Time variant physical data such as flow, stream width, depth and substrate conditions were collected at each site on each sampling visit. Additional time invariant data (slope, altitude, distance from source) were derived from maps. Mean and range of physical characteristics of the 8 sites over the study period are listed in Table 1. Full chemical analyses for all sites were not available but data collected by the National Rivers Authority (NRA) for the Seabrook Stream near site 3 between 1989 and 1993 show that the water draining from the chalk/clay interface is characterised by relatively high pH (8.00), a conductivity of 672 microsiemens, and relatively low nutrient levels (nitrate mg/l N 4.02, orthophosphate mg/l P 0.0842). Nearly 3 million cubic metres of marine sand were pumped into receiving lagons from on offshore pumping station and used to level the terminal site. This operation started in October 1988 and saline drainage from the terminal entered the Pent Stream at this time. Conductivity values were monitored in the stream between August 1988 and the present and are shown later in this paper with respect to changes in faunal parameters. Annual variations in the composition of the substrate at all sites are shown in Fig. 2.

Samples of invertebrates were obtained by a standard kick/sweep technique (FURSE et al., 1981) using a net (230×255 mm frame, 900 µm mesh). All available habitats at each site were sampled in proportion to their occurrence and three minutes of sweeping and substrate disturbance upstream of the net

AR 005313

164        P. D. Armitage and R. J. M. Gunn

Table 1. Location and physical features of sites on the Saltwood (SW1, SW2, SW3), Seabrook (SB1, SB3, SB4, SB5) and Pent (P3) streams. Values given for time variant features include mean and maximum and minimum values recorded over the whole study period.

| | SW1 TR 166366 | SW2 TR 167364 | SW3 TR 166351 | SB1 TR 175377 | SB3 TR 181367 | SB4 TR 186362 | SB5 TR 186353 | P3 TR 223367 |
|---|---|---|---|---|---|---|---|---|
| NGR | | | | | | | | |
| Altitude (mO.D) | 45 | 40 | 15 | 57 | 38 | 27 | 10 | 20 |
| Distance from source (km) | 1.7 | 2 | 3.3 | 2 | 3.4 | 4.3 | 5.5 | 2.4 |
| Slope (m/km) | 23.8 | 8.3 | 23.8 | 6.3 | 13.9 | 10.9 | 11.1 | 9.8 |
| Discharge (category)* | 1 | 2 | 2 | 1 | 2 | 2 | 2 | 1 |
| Width (m) | 1.5, 1.7-1.2 | 1.3, 1.6-1.0 | 1.6, 2.0-1.2 | 1.4, 1.7-1.0 | 3.4, 3.5-3.0 | 2.0, 2.5-1.6 | 2.9, 3.2-2.7 | 1.9, 2.0, 1.7 |
| Depth (cm) | 15, 22-7 | 14, 23-7 | 13, 17-9 | 23, 31-14 | 10, 15-4 | 22, 32-9 | 18, 31-8 | 12, 16-8 |
| Velocity (category)** | 2-3 | 2-4 | 3-5 | 2-4 | 4 | 3-4 | 4 | 3-4 |
| Substrate (% cover) | | | | | | | | |
| Boulders/Cobbles | 2.3, 5-0 | 2.7, 10-0 | 47.3, 74-10 | 0.6, 2-0 | 43.8, 68-20 | 0, 0-0 | 61.8, 90-30 | 53.4, 70-30 |
| Pebbles/Gravel | 19.1, 72-0 | 43.1, 80-0 | 44.1, 80-20 | 23.6, 86-2 | 43.3, 65-25 | 6.8, 30-0 | 19.3, 42-4 | 28.9, 40-20 |
| Sand | 70.6, 94-25 | 27.9, 95-10 | 7.1, 15-5 | 20.4, 60-5 | 10.2, 20-5 | 80.8, 98-45 | 15.8, 40-3 | 13.6, 50-1 |
| Silt | 7.6, 20-0 | 26.3, 90-1 | 1.4, 5-0 | 55.4, 90-2 | 2.5, 5-1 | 12.3, 25-1 | 3.0, 7-0 | 4.1, 15-0 |

[* Discharge in $m^3/s$ 1 = < 0.31, 2 = < 0.62: ** Velocity in cm/s 1 = < 10, 2 = < 25, 3 = < 50, 4 = < 100, 5 = > 100].

JA2681

AR 005314



Figure 2. The annual variation in estimated percentage cover of four substrate types (si silt, sa sand, pg pebbles/gravel, bc boulders/cobbles) at all sample sites on the Saltwood, Seabrook and Pent streams.

constituted a sample. Throughout the study period all sampling was carried out by only two operators (GUNN and ARMITAGE) to ensure standardisation of effort. Samples were preserved in 5% formaldehyde solution, and sorted into 70% alcohol and all sites were identified to 'Family' level (Hydracarina were not taken further and Chironomidae were identified to sub-Family or tribe level) with estimates of the relative abundance of animals in each 'family'. This level of taxonomic separation has been found to be suitable for general biological quality assessment (FURSE et al., 1984; PLAFKIN et al., 1989) and is the level usually employed in the routine monitoring of biological river water quality in the UK. In addition, for comparative purposes, all sites with the exception of the two bottom sites on the Seabrook (SB5) and the Saltwood (SW3) were further identified to species.

### 2.3. Analyses

The faunal data were analysed using standard descriptors (abundance, richness, faunal composition and diversity). Estimates of the persistence of the invertebrate communities were made using Cochran's Q test (COCHRAN, 1950) because the data are dichotomised ordinal information i.e. a taxon is either present or absent. The test compares the observed variance in total number of taxa among years with the variance expected if taxa are randomly distributed among years (DEATH and WINTERBOURN, 1994). The

stability of the relative abundance rankings of taxa over the entire study period was measured with Kendall's coefficient of concordance (W) (SIEGEL, 1956). A faunal assemblage at or near equilibrium would have more constant rankings of its constituent taxa than would an unstable assemblage. Kendall's W is a measure of the overall concordance among multiple samples under the null hypothesis of randomness (MEFFE and MINCKLEY, 1987; DEATH and WINTERBOURN, 1994).

Environmental quality assessments were made using biotic indices (ARMITAGE et al., 1983) and a system developed by the Institute of Freshwater Ecology in the UK for the classification and prediction of macroinvertebrate communities in running water, RIVPACS, (WRIGHT et al., 1993). Over the past 15 years about 600 species of macroinvertebrate have been identified from more than 400 substantially unpolluted sites throughout Great Britain for which environmental data have been recorded. The species lists have been used to construct a national classification of lotic sites and to develop a technique for predicting the probabilities of occurrence of individual taxa at sites of known environmental characteristics. This large data base provides a standard against which to assess the fauna of new sites and also places the site in a national context. The output from the program includes predictions of numbers of taxa, BMWP (Biological Monitoring Working Party) biotic score and ASPT (Average Score Per Taxon) which are biotic indices based on the tolerance of individual families to organic pollution (ARMITAGE et al., 1983). The environmental data used to predict the probabilities of faunal occurrence in the Folkestone streams were: Altitude, Distance from source, Discharge, Mean width and depth, Substrate composition, Slope and Alkalinity.

Temporal shifts in the faunal communities at the sites were examined using ordination techniques in CANOCO, (TER BRAAK, 1988).

# 3. Results

## 3.1. Environmental Assessment

In most surveys there is no objective way to place the sites under investigation in a national context but such information is essential in order to assess their current status and hence any subsequent changes. For example if a stream is being studied to assess possible future impacts it is essential to know the status of the sites on the stream at the start of the investigation. RIVPACS provides a means of doing this by using environmental variables to predict the value of selected faunal parameters which can be compared with observed values. In addition the use of probability theory and Monte Carlo simulation techniques have enabled 95% confidence intervals to be applied to target values. These data have been used to show the mean and upper and lower estimates of the observed/predicted ratio for BMWP score, ASPT and number of scoring taxa for all sites on the three streams, Fig. 3. Also shown in the figure are the bands used by the NRA to divide these indices into 4 categories of biological quality from the best A, to the worst D (WRIGHT et al., 1993, 1994). It is clear from this that there is a general reduction in quality from top to bottom of the streams in 1987, that most sites fall into the A or B classes and only one, P3 is shown to be in class C with each of the three parameters used to assess the site quality. Any subsequent changes can be related to this initial assessment. The lower part of the figure shows the values of indices for 1992, the last year when samples were available for all sites. Here the observed values of the faunal parameters are compared with the 1987 predicted values. This shows reductions in the observed/predicted indices at SW1, SW3, SB1, SB3, and P3 and increases at SB5. This information is useful and provides a measure of change over the period of study but we have no idea whether the initial year was 'normal', and the differences between upper and lower estimates of the indices are relatively large, sometimes spanning three quality bands. Further information can be obtained from a closer look at the annual variability in composition and density of the faunal assemblages occuring at the sites.

AR 005316



Figure 3.   The index of observed over predicted values (from RIVPACS) of three faunal parameters, score (BMWP biotic score), number of scoring taxa, and average score per taxon (ASPT) at all sites in the years 1987 and 1992. Also shown are the ranges for the indices derived from 95% confidence limits associated with the predicted values and the biological quality bands A–D, see text for details.

*3.2. The Fauna*

### 3.2.1.  General

A total of 138 taxa were recorded in spring samples at the 8 sites. For a detailed listing of species see GUNN and ARMITAGE (1996). Seven groups, (in order of abundance – Gammaridae, Hydrobiidae, Oligochaeta, Elmidae, Chironomidae, Sphaeriidae, and Baetidae), constitute over 90% of the faunal numbers though their proportions vary from site to site.

AR  005317

### 3.2.2. Annual Variation

The changes in faunal composition at all sites between years are illustrated in Figs. 4 (Saltwood and Pent), and 5 (Seabrook).

#### a) Saltwood

The three sites show substantial differences between each other and between years. At Saltwood 1 there was a complete change from a community dominated numerically by Gastropoda (*Potamopyrgus jenkinsi*) in 1987 to one where abundance had dropped by a fac-



Figure 4. The annual variation in faunal composition in terms of major groups at sites on the Saltwood and Pent streams.

AR 005318



Figure 5. The annual variation in faunal compositioon in terms of major groups at sites on the Sea-brook stream.

tor of 9 and where Oligochaeta were the most common group in 1993. This change was accompanied by a shift from a pebble/gravel stream bottom to a stream bed dominated by sand (90%) and silt (10%) (Fig. 2). This major shift was attributable to an event that took place on July 2/3 1988 when a quantity of sand was washed into the stream following heavy rain on an area from which the topsoil had been cleared. Subsequent dry winters failed to wash these deposits down the system. In April 1993 a day before sampling took place the headwaters of the Saltwood (about 500 m upstream of SW1) experienced a landslip from the adjacent railway embankment which temporarily diverted the course of the western fork of the stream. In addition the stream suffered oil contamination via a culvert under the track.

The benthic samples at SW1 revealed a major reduction in abundance and diversity at this time (Fig. 4).

Saltwood 2 also showed major changes in composition between 1987 and 1993. The site lies just below a small trout pond which acted as a sink for the sand that was washed downstream from Saltwood 1 thus avoiding deposition of sand at the site itself. Despite this there was a shift from a pebble/gravel substrate to a sand dominated one. In this case this was attributable to the formation of debris dams composed of fallen branches, twigs and leaves (TRISKA and CROMACK, 1980) which reduced water velocity, resulting in the deposition of silt and sand. This change was accompanied by a marked rise in total faunal abundance and a particularly large increase in the Sphaeriidae. In 1993 following heavy rain in the winter the abundance of the fauna decreased. Saltwood 3 showed the least change. The substratum remained dominated by boulders and cobbles throughout the study period and although there were changes in faunal abundance the composition remained very similar from year to year.

## b) Seabrook

In 1987 Seabrook 1 had a substrate of sandy gravel with only a small proportion of silt. In the next four years following construction activity associated with a pipeline crossing about 20 m above the site this proportion grew to a maximum value of 90% but in 1992 nearly all the silt was washed away to leave a substrate dominated by pebbles and gravel (Fig. 2). These changes were accompanied by increases in the proportion of dipteran larvae (Chironomidae) and oligochaetes in 1989 and 1990 and in 1992 a reversion to a crustacean (Gammaridae) dominated community (Fig. 5). Seabrook 3 was situated below a quarry and during periods of rain turbidity increased noticeably. However the slope of the site and hence water velocity generally prevented build up of sandy deposits and the substrate composition (mainly pebbles/gravel and boulders/cobbles) remained very similar throughout the period of study. Despite this there were shifts in faunal community composition with substantial increases in chironomids and worms in 1989 and 1990. Seabrook 4 was basically a sandy-bottomed site and changes in the proportion of the substrate were minimal throughout the study period although there was a major increase in the proportion of gravel in 1990. The faunal composition was very variable and the change in substrate in 1990 was reflected in a large increase in abundance of chironomids and worms. Seabrook 5 showed little change in substrate composition between 1987 and 1992 and the faunal assemblage showed only minor fluctuations in abundance of constituent groups and no major shifts in composition.

## c) Pent

The substrate of Pent 3 was predominantly boulders/cobbles and pebbles/gravel and this showed no major changes between 1987 and 1993 except for a temporary increase in the proportion of sand to 50% in 1990 (Fig. 2). The faunal composition (Fig. 4), in contrast, showed marked changes in response to the inflow of saline water which started in October 1988. The first sample of benthos to be taken after this event was that of spring 1989. The fauna was dominated numerically by oligochaetes (Naididae) with only one insect taxon (Tipulidae) present. The next year faunal abundance was still low and made up of oligochaetes (Enchytraeidae) and gastropods (Hydrobiidae – *Potamopyrgus jenkinsi*). In 1991 there was a 55-fold increase in *P. jenkinsi* and a six-fold increase in oligochaetes mainly due to the family Tubificidae. 1992 saw a severe drop in abundance but by 1993 a faunal composition resembling that of 1987 was found at the site with Chironomidae, Tipulidae, Baetidae and Gammaridae occuring in the sample.

AR 005320



Figure 6. The annual variation in 4 faunal parameters, total taxa, Simpson Diversity, BMWP biotic score and average score per taxon (ASPT) at sites on the Saltwood and Seabrook stream.

### 3.3. Faunal Assessment Parameters

The status of a site is frequently described with reference to biotic and diversity indices or estimates of abundance or number of taxa recorded. The values for these parameters (except abundance which is shown in Figs. 4 and 5) are presented for all Saltwood and





Figure 7.   The annual variation in 3 faunal parameters, total abundance, total taxa, and BMWP biotic score, in relation to conductivity values at Pent 3.

JA2689

AR  005322

Table 2.   The sign (negative–, positive +) and significance (*=<0.05, **=<0.02, ***=< 0.01) of product moment correlation coefficients of physical variables with faunal parameters, at the 8 sites (bc boulders/cobbles, pg pebbles/gravel, sa sand, si silt).

| Saltwood 1 | Saltwood 2 | Saltwood 3 | Pent 3 |
|---|---|---|---|
| width/taxa –* | bc/abund +* | depth/abund +*** | |
| pg/taxa +* | bc/taxa +* | depth/bmwp –* | |
| pg/bmwp +*** | sa/bmwp –*** | depth/aspt +* | No significant results |
| pg/spp. +* | sa/aspt –*** | sa/diversity +* | |
| bc/aspt +* | sa/spp. –* | | |
| sa/bmwp –* | | | |

| Seabrook 1 | Seabrook 3 | Seabrook 4 | Seabrook 5 |
|---|---|---|---|
| bc/taxa –* | sa/bmwp +* | pg/abund +* | bc/abund +* |
| bc/spp. –** | | sa/taxa –* | sa/abund –** |
| | | si/taxa +** | |
| | | si/spp. +** | |

Seabrook sites in Fig. 6. The data for Pent 3 (Fig. 7) are presented to show the relationship between the changes in conductivity following introduction of saline water and faunal parameters. There is considerable annual variation in these parameters even at sites where no obvious impact such as input of sand (at Saltwood 1) or saline flow (at Pent 3) has taken place. The relation between these parameters and the physical characteristics of the sites



Figure 8.   The coefficient of variation for 6 faunal parameters during the study period.

(width, depth, velocity, and proportions of substrate fractions – boulders/cobbles, pebbles/gravel, sand, silt) was examined with correlation analyses. Of the 322 tests only 24 gave statistically significant results and of these 20 were related to substrate features (Table 2). No significant relationships were seen at Pent 3 because all changes were dominated by the saline inflow. The fluctuations in values of faunal parameters can be summarised with the coefficient of variation and the results are shown in Fig. 8. Pent 3 shows the most change within the study period and this is consistent for all parameters except Diversity which shows greater variation at Saltwood 1.

### 3.4. Persistence and Stability

Table 3 presents the results of Cochran Q tests on both family and species data at all sites. At family level significant annual differences in faunal assemblage composition were observed at all but three sites SB3, SB4, and SB5. The annual differences were particularly great at SW1 and P3. The most significant results from the species data were again noted for SW1 and P3 but significant differences between years were also noted for SB3 and SB4. Thus variations between years in the occurrence of taxa were generally more apparent with species data than with family data (see RESH and McELRAVY, 1992 for discussion of family versus species level identifications). The degree of constancy of invertebrate densities identified to family level with time is indicated with the Kendall Coefficient of Concordance (Table 3). The significant results mean that the agreement in rank of common taxa is higher than it would be by chance. Thus despite the observed differences in faunal composition described above the main elements of the fauna were fairly constant throughout the study period. Exceptions were SB1 and P3 which showed major changes in densitiy of common taxa with time.

### 3.5. Community Composition

Biotic indices, number of taxa, faunal abundance and other similar fauna parameters are based on condensed data. Although they can identify sites which show relatively greater annual fluctuations they are not making the maximum use of the information available on the composition of the faunal assemblages which might reveal the more subtle effects of disturbance. To obtain more information about community changes the entire matrix of 53

Table 3. Test statistics for Cochran's Q test and Kendall's coefficient of concordance (W) based on both family and species level data for Q (Qf and Qs) and the most abundant 15 families (based on the average over the study period) for W. Significance levels associated with the observed Q and W values are indicated by *(p < 0.001 = ****, p < 0.01 = ***, p < 0.02 = **, p < 0.05 = *, ns = not significant).

|      | df | Qf        | Qs        | df | $\chi^2$ | W        |
|------|----|-----------|-----------|----|----------|----------|
| sw1  | 6  | 42.46**** | 52.23**** | 14 | 47.68    | 0.49**** |
| sw2  | 6  | 14.16*    | 11.89 ns  | 14 | 47.66    | 0.49**** |
| sw3  | 6  | 15.38**   | –         | 14 | 61.99    | 0.63**** |
| sb1  | 5  | 11.76*    | 10.20 ns  | 14 | 15.61    | 0.19 ns  |
| sb3  | 5  | 5.72 ns   | 18.45***  | 14 | 44.98    | 0.53**** |
| sb4  | 5  | 8.86 ns   | 15.37***  | 14 | 24.67    | 0.29*    |
| sb5  | 5  | 7.86 ns   | –         | 14 | 48.52    | 0.58**** |
| p3   | 6  | 38.44**** | 39.98***  | 14 | 15.21    | 0.16 ns  |

AR 005324





Figure 9.   DCA ordination of samples from the 8 sites surveyed between 1987 and 1993 based on fami-
ly quantitative data. The figure has been split into two for clarity and lines link the annual samples from
each site to produce a temporal trajectory for the study period.

'families' and 52 samples (7 in each site on the Saltwood and the Pent, and 6 at each site
on the Seabrook) was analysed using CANOCO (TER BRAAK, 1988). The data were ordina-
ted by dentrended correspondence analysis, DCA, (HILL and GAUCH, 1980) which searches
for major gradients in the faunal data irrespective of any environmental variables. Fig. 9 pre-
sents the results of an ordination on $\log_{10}(x + 1)$ transformed abundance data. The ordina-
tion characteristics are shown in Table 4. Eigenvalues >0.50 indicate a good separation of
'families' along the axis. The relatively low eigenvalues in this study indicate a moderate

AR  005325

Table 4.  The results of ordination analyses for family level and species level data together with product moment correlation coefficients of DCA site axis scores (I and II) with environmental variables. Bold type indicates correlation at p < 0.01.

| Axes | Family | | | | Species | | | |
|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | I | II | III | IV |
| Eigenvalues | 0.215 | 0.157 | 0.072 | 0.059 | 0.380 | 0.220 | 0.165 | 0.125 |
| Lengths of gradient | 3.018 | 1.825 | 1.379 | 1.867 | 3.830 | 1.810 | 2.322 | 2.355 |
| Cumulative percentage variance of species data | 12.80 | 22.10 | 26.40 | 29.90 | 8.50 | 13.50 | 17.20 | 20.00 |

| Axes | Family df = 50 | | Species df = 37 | |
|---|---|---|---|---|
| | I | II | I | II |
| width | 0.006 | **0.403** | 0.024 | −0.340 |
| depth | −0.206 | −0.261 | −0.198 | 0.021 |
| velocity | −0.280 | **0.406** | −0.027 | −0.222 |
| boulders/cobbles | 0.124 | **0.530** | **0.556** | −0.157 |
| pebbles/gravel | −0.239 | 0.261 | −0.154 | −0.071 |
| sand | 0.025 | −0.210 | −0.098 | 0.022 |
| silt | 0.067 | **−0.614** | −0.229 | 0.187 |
| altitude | −0.159 | **−0.684** | **−0.801** | −0.027 |
| slope | −0.052 | 0.257 | −0.027 | −0.284 |
| discharge | −0.304 | **0.447** | −0.135 | −0.175 |
| conductivity | **0.511** | 0.299 | **0.444** | 0.079 |

degree of variability between sites. The lengths of the gradients provide a measure of 'family' turnover in units of standard deviation where 4 SD represents a complete turnover. It is clear from these data that the turnover of taxa along axis 1 is nearly complete. Most of the variance in the 'family' data is accounted for by the first axis. A similar analysis (Fig. 10) was carried out for those sites for which species lists were available (39 sites 135 'species'). Correlation of axis scores from the family level analysis with environmental variables shows a strong relationship with conductivity along axis 1 (due to the high values at P3) and Axis II reflects an increase in the proportion of boulders/cobbles and a decrease in altitude from bottom to top. In the species level analysis Axis I also reflects an increase in the conductivity and the proportion of boulders/cobbles and a decrease in altitude from left to right. Axis II showed no significant correlations with environmental variables.

   The ordination diagram for family data has been split for clarity and lines link the annual samples from each site chronologically. If sites showed little to no change in their community structure there would be little movement of these lines. Examination of the diagram shows small change in the temporal trajectories at SW3 and SB5 in contrast to SW1, SW2, SB1, SB4 and most obviously Pent 3 where movement of the lines was at its greatest. The species level data (Fig. 10) which includes no information on abundance shows similar patterns with Pent 3 again showing maximum movement. It is perhaps not surprising that the temporal trajectories were very mobile in sites with obvious impacts. What is more interesting is that a large amount of movement is seen at sites without any obvious stresses. This is a reflection of the natural "noise" in communities and it is clear that this will vary with the physical features of a site. For example SB4 shows very large shifts in its faunal community despite no obvious impacts. The site is basically sandy bottomed and as such is par-

JA2693

AR 005326



Figure 10.   DCA ordination of samples from 6 sites surveyed between 1987 and 1993 based on species (presence/absence) data. Lines link the annual samples to produce a temporal trajectory for the study period.

ticularly susceptible to change. In contrast the next site downstream, SB5, is stony bottomed and more stable and the space occupied by the temporal trajectory is small (Fig. 9).

## 4. Discussion

The assessment of environmental change using macroinvertebrates requires at best a knowledge of faunal assemblages prior to the period of observation or some means of predicting those assemblages from unimpacted sites of similar physical and chemical characteristics. This latter can be achieved with RIVPACS (WRIGHT et al., 1993) which has used the 'best' quality sites available in the development of its data base. However the value of reference sites or predicted target communities is in question if their faunal characteristics vary with time. Short term studies will not reveal the extent of this variability and neither will the approach which presents results from two sets of observations separated by number of years (TOWNSEND et al., 1987; WALLACE et al., 1988). This latter method will show characteristics of faunal assemblages in the 2 study periods but provides no data on fluctuations in the intervening period. Several studies have however examined the persistence/constancy/and stability of faunal assemblages over periods of time of 4 or more years in temperature streams (TAYLOR and ROFF, 1986, MEFFE and MINCKLEY, 1987; MCELRAVY et al., 1989; ARMITAGE and BLACKBURN, 1990; WEATHERLEY and ORMEROD, 1990; RICHARDS and MINSHALL, 1992). The conclusions from these studies are varied but the common view is, at least in sites with minimal anthropogenic influences, that the structural trends (relative abundance and persistence of dominant taxa) tend to be stable when viewed over moderate periods of time (>3 years). These conclusions are based on observations in near pristine to low intensity land-use areas. In catchments where land-use is high and streams are small we might except considerably more variation in faunal parameters from year to year.

AR 005327

Although four of the sites (SW1, SB1, SB4, P3) were subject to obvious impacts the remaining four (SW2, SW3, SB3, SB5) were not. Despite this these latter sites showed considerable variation between years in the parameters used to assess them. In addition it was observed that substrate was a critical factor in determining the susceptibility of a site to, an recovery from, change. CLINE et al. (1982) and GURTZ and WALLACE (1984) have also noted the effects of substrate and the former study noted that the effects of construction activities (increase in suspended solids and proportion of fine sediment in the substrate) were ameliorated by the hydrologic characteristics and high gradient of the streams they studied. At Folkestone the sites which showed the least annual variability were the bottom sites on the Saltwood and Seabrook Streams where the substrate was coarse and the slope steep. At P3, also steeply sloped and with a coarse substrate, recovery from the severe effects of saline discharge was relatively rapid and faunal assemblages returned to a state similar to that at the start of investigations in 1987. The steep slopes of all the bottom sites result in higher velocities and coarser substrates which did not allow the build-up of fine sediments within the bed. In the upper sites a combination of small discharges and reduced slopes meant that fines deposited during extreme events were redistributed very slowly under the prevailing lower than average discharges.

Another substrate-related feature was noted at SW2 where the natural accumulation of woody debris resulted in a major increase in the proportion of fine material and consequent adjustments of the faunal assemblages. The role of woody debris in changing substrate conditions through its effects on current flow is well known (TRISKA and CROMACK, 1980) and its effects are particularly marked under low flow conditions (SHIELDS and SMITH, 1992) when habitat diversity and hydraulic roughness increase. In addition debris dams may support specific communities of invertebrates often dominated by shredders such as Limnephilidae and Gammaridae (WINKLER, 1991). In sandy bottomed streams much of the benthic fauna is associated with accumulations of debris and sudden changes in discharge may remove these, resulting in major reductions or changes in faunal diversity. The effects of sudden increase in discharge may be very marked in small streams where most of the fauna may have originated from a single patch of organic debris.

It is clear that the magnitude of change and recovery time is related not only to the type and intensity of the disturbance but also to the intrinsic characteristics of the stream. NIEMI et al. (1990) recognize that system variables such as stream gradient could determine how fast physical stream habitat and hence the biota can return to normal following increased siltation after a press disturbance (sensu BENDER et al., 1984) but find that data from the literature are insufficient to substantiate this. REICE et al., (1990) report unpublished work by REICE and SMITH in which the effects of disturbance on different categories of substrate were investigated. Species richness and total animal densities were most severely affected on sand/gravel bottoms and least affected on cobble bottoms. Thus expectations of impact effects and recovery time in environmental monitoring must take account of the possible differential responses of the sites.

Three main points have emerged from this study. Firstly there is very little information available on annual variability of faunal parameters in small streams situated in anthropogenically disturbed landscapes. Such streams are frequently omitted from general surveys and the Folkestone sites were not surveyed in detail by monitoring bodies before 1987. Secondly, small streams are very sensitive as indicators of change or disturbance in the catchment and thirdly, the faunal assemblages that live in them tend to integrate and respond to a variety of environmental stresses.

For developers who are required to carry out environmental impact studies it is important that changes can be identified and interpreted. RIVPACS offers a means of quantifying change because it provides insight into how far the site is from its optimum. ARMITAGE et al. (1992) cite an example where RIVPACS was used to monitor the effects of bridge construction on a small stream. The pre-construction predicted biotic score value at the impact site was 140 and the observed value was 100 (a 28.5% reduction). The disturbance associa-

AR 005328

ted with the road bridge depressed the observed score to 76. This represents a 45.7% reduction from the predicted value of which only 17% is attributable to construction work. Such information could be useful in the legislative aspects of environmental impact assessments when it is necessary to apportion responsibility for environmental degradation. However questions would still be raised as to whether the observed score for the pre-construction period is a 'naturally' low value. In order to provide answers to these questions it is necessary to obtain more information on 'natural' fluctuations in faunal assemblages. All streams in populated areas are subject to a variety of anthropogenic disturbance. This is the background against which any further disturbances are measured and therefore it is essential that knowledge is available on the expected variability in such areas.

## 5. Conclusions

1. Considerable 'natural' variability was observed in the Folkestone sites superimposed over a background of low-intensity anthropogenic disturbance such as farming, quarrying, and urban influences. Landscape changes and activities in the catchment (saline drainage, removal of topsoil, pipeline crossings of streams) resulted in further disturbance at some of the sites.

2. The response and recovery time of sites to disturbances was very variable and was related to the hydraulic and substrate characteristics of the stream bed. The persistence and stability of the stream faunal assemblage provide useful data when assessing impact effects and could sensibly be employed as part of a standard procedure when analyzing results from monitoring.

3. Very basic RATS can provide insights into faunal responses to disturbance especially if the work is long-term. This study was funded over a period of 7 years and has shown clearly the annual variability of faunal parameters used to measure environmental quality. Throughout this period the funders of the work asked whether the observed changes were significant or due to 'natural variability' or chance. This was best answered by reference to recorded estimates of natural variability. Such data are very few but are central to the interpretation of survey results (RESH and MCELVRAY, 1992; NORRIS and GEORGES, 1992). It should be a long-term aim of any organisation involved in environmental quality assessment to build up a data base of 'natural' variability in a number of contrasting habitats. Such a data base will identify sites which require intensive monitoring before authoritative statements regarding environmental change can be made.

## 6. Acknowledgements

The environmental surveys leading to this report were funded by both Eurotunnel and Transmanche Link. We are grateful to these organizations and most particularly to Mrs. K. R. KERSHAW of Eurotunnel for her help and advice and for always asking questions. We also thank our colleagues at The River Laboratory for help with sample processing and especially JON BASS (IFE, Eastern Rivers) for identification of the Sphaeriidae.

## 7. References

ARMITAGE, P. D. and J. H. BLACKBURN, 1990: Environmental stability and communities of Chironomidae (Diptera) in a regulated river. – Regul. Rivers: Res. & Mgmt 5: 319–328.
ARMITAGE, P. D., D. MOSS, J. F. WRIGHT and M. T. Furse, 1983: The perfomance of a new biological water quality score system based on macroinvertebrates over a wide range of unpolluted running-water sites. – Wat. Res. 17: 333–347.

AR 005329

ARMITAGE, P. D., M. T. FURSE and J. F. WRIGHT, 1992: Anexo: Calidad medioambiental y valvoracion biologica en los rios Britanicos. Perspectivas de pasado y futuro. pp 477–511. *In*: Caracterization Hidrobiologica de la Red Fluvial de Alava y Gipuzkoa, (eds, Servicio Central de Publicaciones del Gobierno Vasco). Itxaropena, S. A., Zarautz. 477–511.

BARTON, B. A., 1977: Short term effects of highway construction on the limnology of a small stream in southern Ontario. – Freshwat. Biol. **7**: 99–108.

BENDER, E. A., T. J. CASE and M. E. GILPIN, 1984: Perturbation experiments in community ecology: theory and practice. – Ecology **65**: 1–13.

CLINE, L. D., R. A. SHORT and J. V. WARD, 1982: The influence of highway construction on the macroinvertebrates and epilithic algae at a high mountain stream. – Hydrobiologia **96**: 149–159.

COCHRAN, W. G., 1950: The comparison of percentages in matched samples. – Biometrika **37**: 256–266.

DEATH, R. G. and M. J. WINTERBOURN, 1994: Environmental stability and community persistence: a multivariate approach. – J. N. Am. Benthol. Soc. **13**: 125–139.

EDWARDS, C. J., B. L. GRISWOLD, R. A. TUBB, E. C. WEBER and L. C. WOODS, 1984: Mitigating effects of artificial riffles and pools on the fauna of a channelized warmwater stream. – N. Am. J. Fish. Mgmt **4**: 194–203.

EUROTUNNEL, 1991: A Green Perspective – Eurotunnel and the environment. The Channel Tunnel Group Ltd. pp. 37.

FURSE, M. T., J. F. WRIGHT, P. D. ARMITAGE and D. MOSS, 1981: An appraisal of pond-net samples for biological monitoring of lotic macro-invertebrates. – Wat. Res. **15**: 679–689.

FURSE, M. T., D. MOSS, J. F. WRIGHT and P. D. ARMITAGE, 1984: The influence of seasonal and taxonomic factors on the ordination and classification of running-water sites in Great Britain and on the prediction of their macroinvertebrate communities. – Freshwat. Biol. **14**: 257–280.

GUNN, R. J. M. and P. D. ARMITAGE, 1996: The macroinvertebrates of some freshwater streams in the Folkestone area. – Trans of the Kent Field Club. **15**: 19–32.

GURTZ, M. E. and J. B. WALLACE, 1984: Substrate mediated response of stream invertebrates to disturbance. – Ecology **65**: 1556–1569.

HILL, M. O. and H. G. GAUCH, 1980: Detrended correspondence analysis, an improved ordination technique. – Vegetatio **42**: 47–58.

LADLE, M., W. A. HOUSE, P. D. ARMITAGE and I. S. FARR, 1989: Faunal characteristics of a site subject to sewage plant discharge. – Tenside Detergents **2**: 159–168.

LIKENS, G. E. 1983: A priority for ecological research. – Bull. Ecol. Soc. Am. **64**: 234–243.

MCELRAVY, E. P., G. A. LAMBERTI and V. H. RESH, 1989: Year-to-year variation in the aquatic macroinvertebrate fauna of a northern California stream. – J. N. Am. Benthol. Soc. **8**: 51–63.

MEFFE, G. K. and W. L. MINCKLEY, 1987: Persistence and stability of fish and invertebrate assemblages in a repeatedly disturbed Sonoran Desert stream. – Am. Midl. Nat. **117**: 177–191.

MILNER, A. M., 1994: System Recovery. – *In*: CALOW, P. and G. E. PETTS, The Rivers Handbook. Vol. 2. Blackwell Scientific Publications, London, UK.

NIEMI, G. J., P. DEVORE, N. DETENBECK, D. TAYLOR, A. LIMA, J. PASTOR, J. D. YOUNT and R. J. NAIMAN, 1990: Overview of case studies on recovery of aquatic systems from disturbance. – Environ. Mgmt **14**: 571–587.

NORRIS, R. H. and A. GEORGES, 1992: Analysis and interpetation of benthic macroinvertebrate surveys. – *In*: ROSENBERG, D. M. and V. H. RESH (Eds.). Freshwater biomonitoring and benthic macroinvertebrates: Chapman & Hall, New York and London: 234–286.

NUTTALL, P. M. 1972: The effects of sand deposition upon the macro-invertebrate fauna of the River Camel, Cornwall. – Freshwat. Biol. **2**: 181–186.

PLAFKIN, J. L., M. T. BARBOUR, K. D. PORTER, S. K. GROSS and R. M. HUGHES, 1989: Rapid bioassessment protocols for use in streams and rivers: Benthic macroinvertebrates and fish. – U.S. EPA, Office of Water, EPA/444/4-89-001, Washington, D.C.

REICE, S. R., R. C. WISSMAR and R. J. NAIMAN, 1990: Disturbance regimes, resilience, and recovery of animal communities and habitats in lotic systems. – Environ. Mgmt, **14**: 647–659.

RESH, V. H. and J. K. JACKSON, 1992: Rapid assessment approaches to biomonitoring using benthic macroinvertebrates. – *In*: Rosenberg, D. M. and V. H. RESH (eds.). Freshwater biomonitoring and benthic macroinvertebrates: Chapman & Hall, New York and London: 195–233.

RESH, V. H. and E. P. MCELRAVY, 1992: Contemporary quantitative approaches to biomonitoring using benthic macroinvertebrates. – *In*: ROSENBERG, D. M. and V. H. RESH (eds.). Freshwater biomonitoring and benthic macroinvertebrates: Chapman & Hall, New York and London: 159–194.

RICHARDS, C. and G. W. MINSHALL, 1992: Spatial and temporal trends in stream macroinvertebrate communities: the influence of catchment disturbance. – Hydrobiologia 241: 173–184.

SHIELDS, F. D. JR. and R. H. SMITH, 1992: Effects of large woody debris removal on physical characteristics of a sand-bed river. – Aquat. Conserv.: Mar. Freshwat. Ecosys. 2: 145–163.

SIEGEL, S., 1956: Nonparametric statistics for the behavioral sciences: McGraw-Hill Book Company, Inc., New York.

SWEETING, R. A., D. LOWSON, P. HALE and J. F. WRIGHT, 1992: Biological assessment of rivers in the UK – In: NEWMAN, P. J., M. A. PIAVAUX, and R. A. SWEETING (Eds.). River Water Quality – Ecological Assessment and Control: CEC, Brussels: 319–326.

TAYLOR, B. R. and J. C. ROFF, 1986: Long-term effects of highway construction on the ecology of a southern Ontario stream. – Environ. Poll. (Ser. A) 40: 317–344.

TER BRAAK, C. J. F. (1988): CANOCO-A FORTRAN program for canonical community ordination by [partial] [detrended] [canonical] correspondence analysis, principal components analysis and redundancy analysis (version 2.1). – Report LWA-88-02. Agricultural Mathematics Group, Wageningen, The Netherlands.

TOWNSEND, C. R., A. G. HILDREW and K. SCHOFIELD, 1987: Persistence of stream invertebrate communities in relation to environmental variability. – J. anim. Ecol. 56: 597–613.

TRISKA, F. J. and K. CROMACK, 1980: The role of wood debris in forests and streams. – In: WARING, R. H. (ed.). Forests: Fresh Perspectives from Ecosystem Analysis. – Proceedings 40th Biology Colloquium (1979) – Oregon State University Press Corvalis: 171–190.

WALLACE, J. B., M. E. GURTZ and F. SMITH-CUFFNEY, 1988: Long-term comparisons of insect abundances in disturbed and undisturbed Appalachian headwater streams. – Verh. int. ver. Limnol. 23: 1224–1231.

WEATHERLEY, N. S. and S. J. ORMEROD, 1990: The constancy of invertebrate assemblages in softwater streams: implications for the prediction and detection of environmental changes. – J. appl. Ecol. 27: 952–964.

WINKLER, G., 1991: Debris dams and retention in a low order stream (a backwater of Oberer Seebach – Ritrodat-Lunz study area, Austria). – Verh. int. ver. Limnol. 24: 1917–1920.

WRIGHT, J. F., M. T. FURSE and P. D. ARMITAGE, 1993: RIVPACS – a technique for evaluating the biological quality of rivers in the U.K. – Eur. Wat. Poll. Contr. 3: 15–25.

WRIGHT, J. F., M. T. FURSE and P. D. ARMITAGE, 1994: Use of macroinvertebrate communities to detect environmental stress in running waters. – In: SUTCLIFFE, D. W. (ed.). Water Quality and Stress Indicators in Marine and Freshwater Systems: 15–34.

Manuscript accepted January, 1996

AR 005331




# United States Department of the Interior

## FISH AND WILDLIFE SERVICE

Virginia Field Office
6669 Short Lane
Gloucester, VA 23061

February 28, 2023

Kimberly Bose, Secretary
Federal Energy Regulatory Commission
888 First Street NE, Room 1A
Washington, D.C. 20426

Attn: James Martin, Branch Chief

> Re:    Mountain Valley Pipeline, LLC;
> Docket Number CP16-10-000;
> Project #05E2VA00-2016-F-0880
> and #05E2WV00-2015-F-0046

Dear Secretary Bose:

On November 21, 2017, the U.S. Fish and Wildlife Service (Service or USFWS) provided the Federal Energy Regulatory Commission (FERC) with a non-jeopardy biological opinion (Opinion) based on our review of the referenced project and its effects on the federally listed species in Table 1 in accordance with Section 7 of the Endangered Species Act (16 U.S.C. 1531-1544, 87 Stat. 884), as amended (ESA). On August 28, 2019, FERC reinitiated consultation with the Service due to the listing of the candy darter and new information regarding potential effects of the Mountain Valley Pipeline (MVP) project on certain species (Roanoke logperch, Indiana bat, and northern long-eared bat). As part of the reinitiation, on July 2, 2020, Mountain Valley Pipeline, LLC (Mountain Valley) submitted a final draft of its supplement to the 2017 Biological Assessment, which included revised effect analyses for all federally listed species (including the candy darter) affected by the MVP project.

On September 4, 2020, the Service provided FERC with a non-jeopardy biological and conference opinion that replaced in its entirety the Service's 2017 Opinion based on our review of the referenced project and its effects on the federally listed species and proposed critical habitat in Table 1. On May 14, 2021, the Service provided FERC with a letter confirming the September 4, 2020, conference opinion as the biological opinion for candy darter critical habitat.

On February 3, 2022, the U.S. Court of Appeals for the Fourth Circuit issued a vacatur and remand of the Service's September 4, 2020, Opinion (*Appalachian Voices v. U.S. Dep't of the Interior*, 25 F.4th 259 (4th Cir. 2022)). On June 24, 2022, FERC sent a letter to the Service regarding reinitiation of Section 7 consultation on the MVP project. On July 29, 2022, Mountain

AR 005334

receiving water flow rate and turbulence, and the geometry of the tributary and the receiving water boundaries (U.S. Environmental Protection Agency [USEPA] and USACE 1998). Due to the large number of variables, each individual mixing zone area could not be quantified. Instead, the mixing zones were qualitatively assessed and were conservatively estimated to fall within an area extending 200 m upstream and 800 m downstream of the point where the tributary enters the stream of interest. The basis for this estimate is provided below. At the Service's request, Mountain Valley further assessed and identified mixing zones in any waterbody, in addition to the streams of interest (P. Moore, Beveridge & Diamond PC, emails to J. Stanhope, Service, August 14, 2020, and August 18, 2020). The mixing zones were identified at all locations where the calculated sediment concentration in a tributary to any receiving waterbody (regardless of whether or not the receiving water is a stream of interest) was above the concentration attenuation threshold (i.e., the point of discernibility as defined in the aquatic action area methodology above) at the receiving waterbody. In other words, the mixing zone location is when the tributary concentration is greater than the concentration attenuation threshold at the point it flows into the receiving water. These mixing zones are part of the aquatic action area (Mountain Valley 2022).

Summary of Action Area – The action area is defined as the project construction ROW plus the distance or location where (Mountain Valley 2020, 2022):

- meaningful concentrations of dust are expected to travel outside the project area, estimated at 350 ft;
- emitted nighttime light is expected to travel from the project area, estimated at 1,200 ft;
- air or substrate-borne sound or vibration is expected to travel, estimated at 2.0 miles;
- the dilution evaluation within streams (performed by stream reach) yields concentrations above the concentration attenuation threshold; and 800 m downstream/200 m upstream in any stream crossed by the project where evaluation indicates that no measurable increase in project-related sediment is expected to occur but where the crossing potentially could influence stream conditions (e.g., riparian clearing); and
- the mixing zones where the tributary sediment concentration is expected to be greater than the concentration attenuation threshold at the point it flows into the receiving water.

The scope of the terrestrial impacts described above are all within the 2.0-mile area associated with the maximum distance that sound from the project will occur above ambient conditions. As a result, 2.0 miles is used for the terrestrial portion of the action area. The aquatic portion of the action area is: (1) the distance at which the concentration attenuation threshold is reached in each stream expected to experience a measurable increase in project-related sediment, or (2) 800 m downstream and 200 m upstream – the area in which riparian clearing potentially could influence stream conditions – for any stream that the project crosses that is not expected to experience a measurable increase in project-related sediment, or (3) the mixing zone in a stream segment where sediment from tributaries (crossed or receiving sediment from the project) is delivered to receiving water. As such, the action area for this project consists of all lands within 2.0 miles of

54

AR 005387

the boundaries of the project area and approximately 1,153 miles of potentially impacted streams (note that the 1,153 miles does not include mixing zone distance due to qualitative assessment) (Figure 3) (P. Moore, Beveridge & Diamond PC, email to J. Stanhope, Service, November 14, 2022). Detailed maps of the action area, including the mixing zone action area locations, are in Appendix D in the SBA2 (Mountain Valley 2022).



Figure 3. Overview of the Action Area as defined by updates to construction and operational impacts of the Mountain Valley Pipeline.

55

Roanoke logperch (RLP)

The potential effects of the proposed action on RLP are described in Appendix B Table 4. Subactivities that are NE or NLAA RLP are described in Appendix B Table 4 and will not be further discussed in this Opinion. Subactivities that are LAA RLP are listed in Appendix B Table 4 and include[37]:

- Clearing – herbaceous vegetation and ground cover
- Clearing – trees and shrubs
- Grading, erosion control devices
- Trenching (digging, blasting, dewatering, open trench, sedimentation)
- Regrading and Stabilization – restoration of corridor
- ARs – upgrading existing roads, new roads temporary and permanent – grading, graveling
- ARs – upgrading existing roads, new roads temporary and permanent – tree trimming and tree removal
- Stream Crossing, dam and pump

For some components of the proposed action that are anticipated to affect RLP, AMMs have been incorporated to ameliorate those effects and those are also noted below. These subactivities are anticipated to result in a loss of prey items and/or an ability to see the prey, temporarily remove habitat, or result in habitat degradation and loss due to vegetation removal, pump around, placement of temporary dam structures, and/or altering water quality.

Subactivities related to clearing, ARs, and the North Fork Roanoke River 1 crossing (MP 227.2, Stream ID S-G36) will harm or kill RLP and alter/degrade RLP habitat. The following stressors will, or are expected to, occur from one or more of the subactivities listed above: increased sedimentation, increased embeddedness, increased water temperature, decreased dissolved oxygen, and impoundments.

---

[37] The 2020 Opinion also listed the following post-construction operation and maintenance (O&M) activities as LAA RLP, CD, and CD critical habitat: (1) ROW repair, regrading, revegetation (upland) – hand, mechanical; (2) AR maintenance – grading, graveling; and (for RLP only) (3) ROW repair, regrading, revegetation – instream stabilization and/or fill (which pertains only to the North Fork Roanoke River crossing 1). However, the extent to which these activities will actually occur in a RLP or CD watershed, and whether they will be implemented in a manner that is LAA RLP, CD, or CD critical habitat, cannot be determined at this point. Therefore, before beginning any future activity falling within categories (1)-(3) in any RLP or CD watershed, Mountain Valley has committed to submitting a pre-work plan to the Service for review and approval. The work plan will detail the specific location of the work, timing (e.g., season)/expected duration, scope of the work (e.g., amount of ground disturbance), any other ground-disturbing O&M subactivities that have occurred or are scheduled to occur in that watershed, and any specific AMMs/BMPs that will be implemented. This commitment applies only to O&M activities in the species watersheds that will not already require independent Section 7 consultation (e.g., O&M activities requiring Clean Water Act authorization would be subject to Section 7 consultation requirements and obviate the need to submit a pre-work plan). If we determine that the activity described in the work plan is LAA RLP, CD, or CD critical habitat, reinitiation of Section 7 consultation will be required.

*Increased sedimentation/suspended sediment*[38] – Increased sedimentation/suspended sediment is anticipated from all the subactivities listed above, although the magnitude and duration will vary depending on the specific subactivity. Measurable increases in sedimentation/suspended sediment from the project are expected to be episodic and temporary, resulting from waterbody crossings and storm events that deliver sediment from upland construction to waterbodies. We do not anticipate long-term sediment loss from upland areas or stream crossings after revegetation and restoration is completed. As described in the Description of the Proposed Action section, Mountain Valley adopted FERC's general construction, restoration, and operational mitigation measures as outlined in FERC's Upland Erosion Control Revegetation and Maintenance Plan (FERC 2013a). Within 20 days of backfilling the trench (10 days in residential areas), all work areas will be graded and restored, which includes permanent seeding and mulching (FERC 2017a). The goals of permanent seeding are to establish a dense, self-propagating, low-maintenance ground cover to minimize erosion and sedimentation while providing wildlife habitat benefits (Appendix B in Mountain Valley 2022). Mountain Valley anticipates that one full growing season is needed after restoration planting is complete to achieve revegetation. In addition, Mountain Valley is implementing post-construction monitoring, in which follow-up inspections and monitoring of all disturbed upland areas will be conducted for at least the first and second growing seasons to determine the success of restoration, including until revegetation thresholds are met, temporary erosion control devices are removed, and restoration is deemed complete. These measures are designed to ensure that erosion control measures and restoration efforts are successful and that long-term sediment loss is avoided.

Excessive sedimentation and suspended sediment in aquatic systems can cause multiple adverse effects on all life stages of benthic fish, including loss of stream habitat essential for sheltering, foraging, and spawning; increased mortality of eggs, YOY, juveniles, and adults; increased predation on eggs by sediment-dwelling invertebrates; avoidance of previously occupied habitat; increased vulnerability of adults to predation; reduced reproductive success; increased physiological stress; reduced feeding and subsequent weight loss; reduced prey availability; increased parasitism; reduced disease resistance; and clogging, abrasion, and necrosis of gills (Kundell and Rasmussen 1995, Newcombe and Jensen 1996).

Excessive sedimentation/suspended sediment increases sublethal impacts such as growth rate and gill health. Studies have found signs of physiological stress, such as increased oxygen consumption and loss of equilibrium, in remaining fish downstream of disturbed areas, as well as decreased abundance of fish downstream of instream work sites (Reid and Anderson 1999,

---

[38] Measurement of sediment suspended in water can be described in several ways such as suspended sediment, turbidity, total suspended solids (TSS), or suspended sediment concentration (SSC). For purposes of this Opinion, references to suspended sediment, turbidity, TSS, and SSC each refer to sediment that is suspended and has not settled out of water column. Furthermore, turbidity, SSC, and TSS are different methods for measuring suspended sediment. Turbidity is the "measure of relative clarity of a liquid. It is an optical characteristic of water and is a measurement of the amount of light that is scattered by material in the water when a light is shined through the water sample." (https://www.usgs.gov/special-topics/water-science-school/science/turbidity-and-water; accessed February 16, 2023; Rasmussen et al. 2009). TSS and SSC are defined below in this sub-section.

AR 005523

Levesque and Dube 2007). Sutherland and Meyer (2007) found growth rate of YOY spotfin chub (*Erimonax monachus*, federally listed threatened) was significantly and inversely related to increasing suspended sediment concentrations. They hypothesized that stress inhibited normal feeding behavior. Gill damage in spotfin chubs was noted with increased suspended sediment concentrations. There is no similar study for RLP, but we expect similar impacts would occur to YOY RLP when sediment enters small tributaries where individuals occur. Although this study focused on YOY we expect similar increased sedimentation would also impact the gills of adult RLP and stress might inhibit their normal feeding behavior.

Studies have shown negative effects of increases in sedimentation/suspended sediment on prey consumption and foraging behavior of darters (Swanbrow Becker et al. 2016, Kellogg and Leipzig-Scott 2017). RLP are sight feeders and flip rocks to expose invertebrates (Rosenberger and Angermeier 2002). Sediment deposited on the waterbody bottom will interfere with the ability of RLP to feed (Robertson et al. 2006). Increased sedimentation is anticipated to result in a loss of prey items and/or an ability to see the prey. Various studies have documented adverse effects to the benthic community from increased sedimentation (e.g., reduction in abundance and species diversity) and these effects can persist after construction has been completed, between 6 months and 4 years post-construction (Reid and Anderson 1999, Reid et al. 2008, Levesque and Dube 2007). Two studies (cited in Reid et al. 2008) documented no effect to benthic community and downstream habitats during and after construction. Seven studies (cited in Reid and Anderson 1999 and Reid et al. 2008) indicated recovery of the benthic invertebrate communities occurred within 6 months to 1 year after pipeline construction, with suspended sediment concentrations from 44 mg/L for a 12.4-hour duration up to 6,247 mg/L for 20 hours, which may have also led to sediment deposition. Increased rates of benthic invertebrate drift were also observed during construction for very short time periods (i.e., hours) due to high suspended sediment concentrations, ranging from 997 mg/L to 1,679 mg/L for a 7-hour duration (Reid et al. 2008). Armitage and Gunn (1996; cited in Levesque and Dube 2007) indicated that adverse effects from suspended sediment continued for 4 years after pipeline construction until a high, scouring flow event changed the stream bed; however, this study did not provide details on suspended sediment concentrations. The response and recovery time of sites to disturbances are expected to be variable and are generally related to the hydraulic and substrate characteristics of the stream bed and flushing events due to increased streamflow from rain events. As discussed below, we are conservatively assuming effects to benthic invertebrates in aquatic areas that receive significant increased sedimentation as a result of the MVP project will persist for up to 4 years. This assumption is particularly conservative because most of the available studies indicate post-construction recovery of benthic invertebrate communities within 0.5 to 1 year of pipeline construction activities (Reid and Anderson 1999, Reid et al. 2008, Mountain Valley 2022). Moreover, our conservative assumption does not mean that the affected aquatic areas will be devoid of benthic invertebrates for up to 4 years; rather, we would expect that increased sedimentation would reduce invertebrate populations in the affected areas and that those populations would gradually increase to pre-construction baseline levels over the course of no more than 4 years, as had been documented in studies cited in Reid et al. (2008) (e.g., Tsui and McCart 1981, Reid et al. 2002a). RLP would be expected to return to the impact areas after

initial sediment plumes dissipate and to continue to use the areas as habitat as benthic invertebrate populations gradually return to baseline levels.

Fish species that require clean cobble and gravel for spawning had decreased abundance in sediment-impaired streams (Sutherland et al. 2002) and typical riffle-dwelling fish species declined with increased siltation (Berkman and Rabeni 1987), indicating that RLP numbers may be reduced by increased suspended sediment concentrations in areas heavily affected by sediment. Increased sediment deposition and substrate compaction from instream construction can degrade fish spawning habitat, resulting in the production of fewer and smaller fish eggs, impaired egg and larvae development, and limited food availability for YOY (Reid and Anderson 1999, Levesque and Dube 2007). Burkhead and Jelks (2001) reported a decrease in spawning of the tricolored shiner (*Cyprinella trichroistia*) as suspended sediment concentration increased (0 [control], 100, 300, and 600 mg/L) for 6 days. When fish spawned, fewer eggs were laid as sediment concentrations increased, and spawning activity was delayed at higher levels of suspended sediment. Egg and larval mortality was negligible. Increased sedimentation is anticipated to result in similar effects to RLP if sediment entering a waterbody prior to the start of the TOYR is resuspended during the TOYR and reaches levels that could temporarily degrade ambient spawning conditions in swift waters and potential nursery habitats (i.e., lentic habitats).

The duration and severity of the effects of increased suspended sediment on individuals and populations depends on factors such as the duration of disturbance, the amount of sediment loading, the length of stream segment directly affected by construction, and whether there were repeated disturbances (Newcombe and Jensen 1996, Yount and Niemi 1990, Vondracek et al. 2003). Most studies documented recovery of the affected stream reach within 1 to 3 years after construction (Reid and Anderson 1999, Yount and Niemi 1990).

The effects to RLP will depend, in part, on the type, amount, and extent of sediments released into the water column, the magnitude and duration of discharge, and background suspended sediment concentrations in the waterbody. For the North Fork Roanoke River 1 crossing (MP 227.2, Stream ID S-G36), at the crossing location, temporary dam structure placement/removal and effluent pumped from within the temporary dam structures and through filter bags likely generated a temporary sediment plume.

The 2017 Opinion analyzed and expected that the clearing of herbaceous vegetation and trees and shrubs in the riparian corridor and uplands, AR grading, and the trenching would have minimal impacts to RLP based on implementation of E&S control measures. However, numerous alleged E&S control violations were documented, in part due to 2018 being the wettest year recorded in VA (https://www.ncei.noaa.gov/news/national-climate-201812 accessed 8/12/2020), and failure and/or improper installation and maintenance of E&S control measures. The petitioners in the Fourth Circuit litigation and others have submitted letters to the Service asserting other violations and sediment control failures along the project ROW (e.g., E. Benson, Sierra Club, letter to K. Hastie, S. Marino, and C. Schulz, Service, August 13, 2022). This letter states that the Service cannot ignore "the actual sedimentation and erosion impacts of the

AR 005525

Pipeline" or "real-world information in the form of MVP's long history of water quality related violations and other erosion and sedimentation problems." The letter also notes that the Fourth Circuit court remanded the environmental impact statement prepared by the USFS and BLM to those agencies and directed them to consider "relevant information indicating that the modeling used in the EIS may not be consistent with data about the actual impact of the Pipeline and its construction." The USFS and BLM's administrative process in response to the court's order is ongoing and will not be completed until after this Opinion is issued. Mountain Valley disputes the assertions in this letter and in similar assertions others submitted to the Service (e.g., T. Normane, Mountain Valley, letter to D. Olsen, USDA Forest Service, October 19, 2022, and M. Hoover, Mountain Valley, letter to Cindy Schulz, Service, December 16, 2022), and, as noted above, Mountain Valley has committed to increased E&S control inspection frequency and an accelerated deadline to repair ineffective controls. Mountain Valley has also noted that none of the alleged E&S violations that were documented alleged that project-related sediment loss significantly degraded aquatic habitat for listed species in the project action area or alleged violations under Virginia's Endangered Species Act.

For purposes of our analysis, to the extent any past violations or sediment control failures resulted in observable degradation of aquatic habitat for listed species in the project action area, those impacts likely would be reflected in the comprehensive baseline stream assessments conducted in 2022, which represent the best and most current information regarding stream conditions in the action area. As discussed, we are appropriately relying on those assessments to provide the required snapshot of current streambank and instream conditions in the aquatic action area. Our analysis of the effects of the action on RLP (and CD) described herein is also designed to capture the likely effects of the entire action, including portions of the project that have already been completed. We are aware of no alternative accurate and scientifically reliable methodology that would allow us to determine, at this point, the extent to which past violations, sediment control failures, or completed work may have impacted listed species or habitat conditions in the aquatic action area. Nor has the Service uncritically accepted the results of Mountain Valley's sediment modeling in defining the aquatic action area or impact areas, as suggested in the August 2022 letter referenced above. Mountain Valley's Hydrologic Analysis of Sedimentaion was peer reviewed by experts at multiple federal agencies, who concluded that it was a proper method for defining the aquatic action area. As noted elsewhere in this Opinion, the Service also conservatively added areas around stream crossings and mixing zones to the aquatic action area and the impact area initially defined using Mountain Valley's modeling. In addition, to avoid unanticipated impacts on listed species (whether from potential future failure of E&S control measures or other project-related factors), to ensure compliance with the ITS in the 2020 Opinion and in this Opinion, and to ensure that the aquatic impact areas are accurately delineated, the 2020 Opinion and this Opinion included an Aquatic Species Monitoring Plan (Appendix F). As outlined in the Monitoring Plan, a Rapid Response Protocol (RRP) is implemented when the predetermined take risk concentration is measured by a monitoring station for a particular impact area. The Monitoring Plan was reviewed by a USGS water quality expert, who concluded that the Plan (as revised in response to his review) would meet the objective of detecting project-related increases in suspended sediment in streams occupied by

AR 005526

RLP and CD. The monitoring and reporting requirements thus serve as a check on the sufficiency of Mountain Valley's E&S control measures, the results of Mountain Valley's modeling, and our delineation of the aquatic impact area, and will help ensure that impacts on RLP (and CD) from project-related sediment loss are no greater than anticipated. Finally, to the extent the USFS and BLM's ongoing administrative process ultimately identifies any deficiencies in Mountain Valley's modeling that indicate that the project's impacts on listed species or critical habitat may be greater than anticipated in this Opinion, reinitiation of formal consultation would be required 50 CFR 402.16(a)(2).

To date, the RRP was initiated 4 times, none of the events occurred in areas or catchments where active MVP project construction was occurring, follow-up inspections did not identify any damage to or failure of the E&S controls, nor was any project-related sediment loss observed. The RRP was triggered either from equipment requiring recalibration, a disconnected cable, or a non-MVP project related source (Appendix L in Mountain Valley 2022).

The benthic macroinvertebrate standard is a metric that corresponds to sediment load in the waterbody. The 2016 Roanoke River Bacteria and Sediment Total Maximum Daily Load (TMDL) Implementation Plan Part 1 (2016 VDEQ) states "During development of the benthic TMDL, a stressor analysis identified sedimentation as the most probable cause of the benthic macroinvertebrate community impairment. Using a reference watershed approach, the numeric TMDL endpoint for the impaired watershed was established based on the sediment loading rate in a similar, but non-impaired reference watershed." It identified portions of the Roanoke River (14 km) that exceed sediment standards for a healthy benthic community and calculated the need for a 75% reduction in sediment loading from all land use sources and instream erosion to meet the TMDL standard. However, the portion of the Roanoke River that is listed as impaired for benthic macroinvertebrates is 33.28 km downstream of the MVP project ROW and beyond the limits of the action area. The upper, headwater sections of the Pigg River (7.2 km) are on the list for benthic macroinvertebrates and are approximately 100 km upstream of the ROW, also beyond the limits of the action area. Based on the distances from the project ROW to the location of the benthic macroinvertebrate TMDL sections in the Roanoke and Pigg Rivers, we do not expect that the previous MVP project ground-disturbing activities or instream construction activities contributed additional sediment to those TMDL areas and would not further impact the benthic macroinvertebrate community in those areas.

Based on past events, sediment modeling conducted by Mountain Valley (2020), and conservative estimates of sediment concentration in waterways (M. Neylon, Mountain Valley, email to J. Stanhope, Service, June 10, 2020; M. Neylon, Mountain Valley, email to S. Hoskin, Service, June 17, 2020), we anticipate that clearing of herbaceous vegetation and trees and shrubs in the riparian corridor and uplands and the other ground-disturbing activities listed above will cause increases in sedimentation that will impact RLP and have incorporated portions of RLP habitat into our impact area, see additional discussion below.

Depending on the size and duration of a sediment plume that may occur, RLP may alter feeding

194

AR 005527

behaviors, and move to clearer water, resume normal activities, and use the area once again when suspended sediment concentrations return to background levels. Roberts et al. (2016a) indicated that RLP are very mobile and determined that median lifetime dispersal distance is 3.7 to 15 miles. Therefore, we expect that most adult RLP will have the ability to avoid areas of heavy sediment deposition and move to other areas of suitable habitat within the system as sediment above background levels moves within the channel. Younger life stages may not be able to move out of the area and, depending on the amount of sediment, will experience loss of habitat for feeding and sheltering. Changing foraging areas will cause decreased fitness to the majority of RLP that move from the North Fork Roanoke River 1 crossing (MP 227.2, Stream ID S-G36) area or any areas experiencing sedimentation from upland activities. If the RLP move into an already occupied area there is the potential for a decrease in fitness to some of the resident RLP because there will be increased competition for food if trophic resources are limited at the site. However, relocating is not unusual for RLP; Roberts et al. (2008) reported RLP frequently moved between marking and recapture site (15-75 m away) or to another site (2.5-3.2 km away). Therefore, shifting foraging areas or having additional RLP shift into a foraging area is a behavior to which the RLP is accustomed, and we expect it would take a large influx of RLP to decrease the fitness of the resident RLP. After the waterbody has returned to background suspended sediment concentrations, we anticipate that RLP will resume use of the waterbody. Therefore, we do not expect that project-related sedimentation will render any currently suitable RLP habitat permanently unsuitable.

As mentioned above and in the SBA2 (Mountain Valley 2022), there are no studies on specific suspended sediment concentrations (e.g., thresholds) and their effects on RLP and CD, and the data needed to develop species-specific thresholds is not available or readily obtainable. Obtaining such data would involve conducting novel laboratory research to quantify the effects of increased sedimentation levels on RLP and CD biology and physiology at multiple temporal scales (e.g., immediate short-term effects to physiology as well as longer-term effects to reproductive cycles and population dynamics). Such research would also necessitate sacrifice of numerous RLP and CD as experimental subjects. As such, this data is not readily obtainable for the purposes of this Opinion. To assess the suspended sediment concentrations at which adverse effects to both RLP and CD will occur and to determine the downstream extent to which these effects may extend as a result of the proposed project (impact area), we adapted the analytical framework in the Biological Effects of Sediment on Bull Trout and Their Habitat – Guidance for Evaluating Effects (Muck 2010) (framework; Appendix C). This framework was developed by the Service's Washington Fish and Wildlife Office (WAFWO) to assist in determining effects for Section 7 consultation for bull trout (*Salvelinus confluentus*). Newcombe and Jensen (1996) provided the basis for analyzing sediment effects to bull trout in Muck (2010) and is being applied in this Opinion as the basis for analyzing sediment effects to RLP and CD and their habitat.

Newcombe and Jensen (1996) conducted a literature review of pertinent documents on sediment effects to salmonids and nonsalmonids (none of the documents had specific data on bull trout or RLP or CD). The authors assessed 264 suspended-sediment dose-responses of fish based on a

AR 005528

literature review of 80 studies. They developed multiple models that calculated the "severity-of-effect" (SEV) to salmonids and nonsalmonids based on the suspended sediment dose (exposure duration) and concentration. In particular, they developed an adult freshwater nonsalmonids model (model 6), which might appear to be more appropriate; however, there are drawbacks to this model such as a small sample size (n=22), no juvenile data, and no values for sub-lethal effects. Due to these drawbacks, the Service does not believe it is reasonable to apply model 6 for nonsalmonids in Newcombe and Jensen (1996) to the RLP and CD. The most data rich model is the salmonid SEV model for adults and juveniles (model 1 in Newcombe and Jensen [1996] and Figure 1 in Muck [2010]); it provides sub-lethal levels and is based on a large sample size (n=171) that includes data for both adult and juvenile salmonids in multiple states and Canada in multiple eco-regions. The Service has determined that this salmonid SEV model for adults and juveniles is the most appropriate available model to use for establishing effects thresholds for RLP and CD, based on the above stated reasons and that RLP and CD share physical habitat requirements similar to salmonids, which is habitat that is relatively free of fine sediment for their breeding and feeding. In addition, suspended sediments affect behavior and physiology of both salmonids and nonsalmonids, including reducing their visibility. Darters, including RLP and CD rely strongly on vision for reproductive activities, including mate selection, recognizing conspecifics, and initiating spawning activities, and therefore might be as vulnerable to increased suspended sediment as salmonids (J. Roberts, Georgia Southern University, letter to S. Hoskin, Service, May 6, 2020). In addition, although RLP and CD are benthic feeders while salmonids are drift-feeders, RLP and CD are sight feeders (see Rosenberger and Angermeier 2002, Schoolcraft et al. 2007) and depth perception for RLP, CD, and salmonids is necessary for foraging in a three-dimensional benthic environment. Suspended sediment generally occurs throughout the water column, including the bottom layer, and therefore will likely affect RLP and CD. Sediment deposited on the waterbody bottom due to suspended sediment will interfere with the ability of RLP and CD to feed (see Robertson et al. 2006). Due to qualitative information on the sensitivity of RLP and CD to suspended sediments, studies on effects of suspended sediment concentrations on other nonsalmonid and darter species (Burkhead and Jelks 2001, Sutherland and Meyer 2007, Swanbrow Becker et al. 2016, Kellogg and Leipzig-Scott 2017), and no studies to indicate darters are more or less sensitive to suspended sediment than salmonids, including the bull trout (J. Roberts, Georgia Southern University, letter to S. Hoskin, Service, May 6, 2020), application of model 1 in Newcombe and Jensen (1996) is the most appropriate available model to use for establishing effects thresholds for RLP and CD.

The framework for evaluating effects to RLP and CD is based on suspended sediment concentration (SSC), duration, and exposure. Factors influencing SSC, exposure, and duration include waterbody size, volume of flow, the nature of the construction activity, construction methods, erosion controls, and substrate and sediment particle size. Factors influencing the SEV include duration and frequency of exposure, concentration, and life stage. Availability and access to refugia are other important considerations.

The framework requires an estimate of SSC (mg/L) and exposure duration. We expect that any measurable increases in suspended sediment will be short-term and episodic from waterway

crossings and from storm events that deliver sediment from construction activities in upland areas into waterways. Using this approach (an adaptation of Figure 1 in Muck [2010]) and an SEV of 5 to include sublethal effects to juveniles, we expect that adverse effects to adult, subadult, and juvenile RLP and CD are likely to occur under any of the following thresholds:

  a. Any time sediment concentrations exceed 148 mg/L over background.
  b. When sediment concentrations exceed 99 mg/L over background for more than 1 hour continuously.
  c. When sediment concentrations exceed 40 mg/L over background for more than 3 hours continuously.
  d. When sediment concentrations exceeded 20 mg/L over background for over 7 hours continuously.

The sediment concentration to be measured is SSC, and not total suspended sediment or solids (TSS), which are 2 different constituents and are not interchangeable (D. Chambers, USGS, email to J. Stanhope, Service, August 12, 2020). As described in Gray et al. (2000), "the method for determining SSC produces relatively reliable results for samples of natural water, regardless of the amount or percentage of sand-size material in the samples" and the method for determining TSS tends to have a bias towards lower concentration values than SSC when sediment dry weight samples have greater than 25% sand-size material. SSC is the method widely used by USGS. In addition, Newcombe and Jensen (1996), the basis for the framework in Muck (2010), uses the terminology of "suspended sediment concentration." Therefore, application of the SSC method is a conservative method to measure sediment concentration.

As noted in our 2020 Opinion, Muck (2010) used the term "cumulatively" instead of "continuously" for thresholds c and d, but used the term "continuously" for threshold b. "Cumulative" is defined as "summing or integrating overall data or values of a random variable less than or equal to a specified value" or "increasing by successive additions"; "continuous" is defined as "marked by uninterrupted extension in space, time, or sequence" (https://www.merriam-webster.com/dictionary/; accessed 8/31/2020). Newcombe and Jensen (1996), the basis for the framework in Muck (2010), used the term "exposure duration" in hours for their analysis and "duration" is defined as "continuance in time" (https://www.merriam-webster.com/dictionary/; accessed 8/31/2020). To be consistent with the basis for the determination of adverse effects, it is more appropriate to use "continuously." In its decision the Fourth Circuit Court encouraged the Service "to expound upon the reasons for its departure from the bull-trout framework on remand," so we do so here.

The use of "continuous" exposure duration for all 3 thresholds is consistent with Newcombe and Jensen (1996), which identified concentration thresholds using exposure duration without any reference to intermittent or cumulative exposures. Some of the 80 studies that the authors used to develop their thresholds may have considered intermittent or cumulative exposures. But had Newcombe and Jensen (1996) intended to incorporate intermittent or cumulative exposures into their SEV thresholds, they would have so stated and they would have provided the requisite time period over which those cumulative exposures should be tallied. If cumulative exposures were

197

AR 005530

part of the threshold, a set time period for measuring any cumulative exposures would be a critical component because, for example, sediment concentrations exceeding 40 mg/L over background for more than 3 hours in a 12-hour period would represent very different conditions than sediment concentrations exceeding 40 mg/L over background for more than 3 hours in a 1-month period. Thus, the only logical reading of Newcombe and Jensen (1996) is that the thresholds established therein are meant to reflect continuous exposure at or above the specified exposure concentration threshold. As stated in Levesque and Dube (2007), the dose-response models for fish developed by Newcombe and Jensen (1996) allow for quantification of effect significance through severity of-ill-effects values "based on the duration and concentration of sediment exposure *for a given sediment release event*" (italics added), not based on the aggregated total duration of intermittent release events over an unspecified period of time.

The sediment concentrations in Figure 1 of Newcombe and Jensen (1996) also do not represent average concentrations. Again, some of the controlled studies that the authors reviewed may have measured average concentrations over a fixed period. But Newcome and Jensen (1996) defines a sediment "dose" as a single "concentration of suspended sediment (SS) times duration of exposure," not as the average sediment concentration over the specified duration. Figure 1 also presents the "*Average empirical severity-of-ill-effect scores* … in the matrix of suspended sediment (SS) concentration and duration of exposure." "*Severity-of-ill-effect values* for each of the six data groups are presented *as rounded averages* in the cells of dose matrixes whose axes are concentration of suspended sediment and duration of exposure." If the sediment concentrations in the dose matrixes were also averages the authors would have noted that. The Muck (2010) analytical framework based on Newcombe and Jensen (1996) also does not call for measuring average concentrations, and we are not aware of any other state or federal regulatory entity applying the Figure 1 values in Newcombe and Jensen (1996) in that manner. Moreover, while measuring average concentrations may be useful in a controlled study, it is not feasible to develop take thresholds for use in the field based on average sediment concentrations because the average will depend entirely on when measurements begin and end.

Muck (2010) does not explain its departure from Newcombe and Jensen (1996) in adopting a cumulative exposure approach for the 40 mg/L and 20 mg/L concentration thresholds rather than the continuous exposure approach that Newcombe and Jensen (1996) developed and that Muck (2010) itself used for the 99 mg/L concentration threshold. Muck (2010) also does not identify any specific time period for measuring cumulative exposures for the 40 mg/L and 20 mg/L concentration thresholds, which as stated is required to determine when each threshold has been exceeded.

As Mountain Valley (2022) correctly notes, the Service's West Coast field offices that have looked to the Bull Trout Guidance during Section 7 consultations involving potential effects to the bull trout have also taken different approaches to this issue. One Opinion identified a 10-hour workday to track cumulative exceedances and reset the count each day (Service 2010). Another Opinion used a 10-hour workday in several sections of the document and a 12-hour workday in another section, resetting after each day (Service 2017d). The different approaches appear to

AR 005531

have been tied to the duration of the daily instream work for each project, which was identified as the predominant cause of increased sedimentation. For the MVP project, a predominant cause of increased sedimentation will be stormwater runoff from upland areas, regardless of whether Mountain Valley is engaged in upland construction work when a storm occurs, and (unlike instream work) storms may occur at any time of day rather than within the confines of a 10- or 12-hour workday. In addition, there were different approaches for frequency of measurements. One Opinion relied on monitoring at 30-minute intervals from the start of sediment generating activities, and if 3 consecutive 30-minute measurements did not exceed a specific threshold, then monitoring would occur once every 3 hours for the remainder of workday (Service 2010). Another Opinion also relied on monitoring at 30-minute intervals but indicated monitoring would occur once every 6 hours for the remainder of the workday if 3 consecutive 30-minute measurements did not exceed a specific threshold (Service 2017d). For the MVP project, monitoring is occurring at 15-minute intervals continuously 24 hours a day and every day. Thus, we believe that measuring continuous exposure duration for thresholds b, c, and d is both consistent with Newcombe and Jensen (1996) and appropriate for this specific project.

Finally, although Levesque and Dube (2007) discussed the potential for cumulative impacts from multiple pipeline crossings of streams within a watershed, the authors stated that the potential effects are not well understood and that future studies were needed to investigate the issue. To our knowledge, no such studies have been conducted. This project also does not involve multiple open-cut crossings of RLP- or CD-Occupied streams involving instream construction, the crossing technique of primary concern in Levesque and Dube (2007). Depending on the manner in which open-cut crossing are implemented, they may result not only in increased sedimentation, but also in the direct alteration of stream channels, beds, and banks resulting in changes in cover, channel morphology, and sediment transport dynamics, increased water velocities, stream degradation, and migrations in stream channel. Those impacts to the physical characteristics of RLP- and CD-occupied streams are not expected to result from upland construction activities, which are the primary concern for this project for RLP and CD. There is also no indication that such impacts resulted from the ROW crossing of the North Fork Roanoke River 1 open-cut crossing (MP 227.2, Stream ID S-G36), the one open-cut crossing of a RLP-occupied stream that was completed in 2018 (Mountain Valley 2022). If the open-cut crossing of a tributary to a RLP- or CD-occupied stream resulted in changes to the physical characteristics of the tributary at the crossing location, which appears unlikely based on the results of the North Fork Roanoke River 1 open-cut crossing (MP 227.2, Stream ID S-G36), it is difficult to predict the extent to which such changes could influence conditions in the occupied stream itself. Although the crossing of the tributary (or upland construction activities adjacent to the tributary) may contribute sediment to the occupied stream at levels that may harm RLP or CD, the impact areas in RLP- and CD-occupied streams defined below are designed to account for that potential harm where such potential exists. We are also unaware of any studies indicating that repeated exposures, over a particular time period, to sediment doses (whether from tributary crossing or from upland construction) that are below the above thresholds derived from Newcombe and Jensen (1996) would be reasonably certain to harm RLP or CD. Therefore, and for the additional reasons stated above, we believe that the model 1 thresholds in Newcombe and Jensen (1996)

199

that form the basis for our analysis provide the best available methodology for determining when any project-related sedimentation release event would reasonably be expected to adversely affect RLP or CD.

Because sediment sampling for concentration is labor intensive, the framework in Muck (2010) is based on using turbidity as a surrogate for SSC. To do this, the sediment concentration above background at which adverse effects to the species and/or habitat occurs expressed as mg/L will be converted to nephelometric turbidity units (NTU), based on existing regression relationships, as described in Hyer et al. (2015) or based on guidelines developed by USGS (Rasmussen et al. 2009).

To assess the potential extent of these effects due to the North Fork Roanoke River 1 open-cut crossing (MP 227.2, Stream ID S-G36), we relied on published literature. Reid et al. (2008) reviewed 27 past monitoring studies of open-cut pipeline crossings (both wet and dry crossing techniques) throughout Canada and the U.S. and found that sediment released from the construction sites was generally limited to a short distance downstream. This review found that biological effects to fish and benthic invertebrates were limited to several hundred meters downstream of the crossings and were temporary (<1 year). Some of the studies reviewed by Reid et al. (2008) found no effects on warmwater fish abundance (including darter species) downstream of pipeline crossings, however fish abundance does not account for sublethal impacts. Roberts et al. (2016c) observed that RLP densities routinely fluctuated by more than 25% per year, and occasionally by as much as 75% per year. This variability suggests difficulty in statistically detecting changes in darter species abundance if there is a 75% or less reduction in abundance. Reid et al. (2008) also reviewed pipeline crossing TSS monitoring data for different crossing methods and found that for dry, open-cut crossings using the dam and pump method, the mean TSS concentration was 22.7 mg/L (standard error [SE]=5.0 mg/L) above background levels, with mean peak TSS concentration of 334.0 mg/L (SE=23.0 mg/L) occurring a mean distance of 52.5 m (SE=6.3 m) downstream of the crossing. Reid et al. (2002a) studied the effects of a pipeline water crossing, using both wet and dry crossing techniques, on fish and benthic invertebrate communities. They reported habitat conditions >500 m downstream of the crossing were unaffected. Specifically, TSS concentrations decreased 500 m downstream of the crossing to 89-96% lower than the levels measured 50 m downstream of the crossing. Additional studies found that downstream impacts due to increases in TSS concentrations and sediment deposition occurred within 500 m of pipeline crossings and TSS concentrations in most of these studies were less than 1,500 mg/L (Reid and Anderson 1999; Reid et al. 2002b, 2004). To be protective of the RLP, we have determined that RLP will be impacted in the stream 200 m above and 800 m below the open-cut crossing plus the construction ROW width (23 m [75 ft]).

For RLP, the impact area (stream length) due to the open-cut crossing is 1,023 m in the North Fork Roanoke River (Table 30). Mountain Valley completed this open-cut crossing in 2018, subsequently completed the required restoration activities, and concluded the required post-restoration habitat assessment. During that habitat assessment, fish biologists confirmed suitable RLP habitat and observed RLP occupying the restored habitat.

200

AR 005533

Table 30. Open-cut crossing impacting RLP.

| County in VA | River Basin | RLP Stream Impacted | Stream ID | Stream Crossing MP | Total Length (m) of RLP Stream Impacts |
|---|---|---|---|---|---|
| Montgomery | Roanoke | North Fork Roanoke River | S-G36 | 227.2 | 1,023 |

In general, the effects of removal of streambank vegetation on sedimentation rates could be expected to continue for 3-5 years as streamside vegetation develops to provide streambank stabilization (FERC 2017b). However, as discussed above, Mountain Valley's post-construction monitoring and habitat assessments at the North Fork Roanoke River 1 open-cut crossing (MP 227.2, Stream ID S-G36) crossing site documented the continued presence of suitable RLP habitat and individuals, suggesting that RLP habitat has been restored (Mountain Valley 2022). The habitat assessment was conducted approximately 2 years post construction and demonstrated impacts were less than the 3-5 years that were originally estimated. Additional effects of clearing of streambank vegetation likely would be limited to minor temperature increases during the summer season, which would not be expected to harm RLP given that large segments of known occupied streams, including the North Fork Roanoke River and the stream section in the vicinity of the crossing site in particular, have at most limited forested riparian zones and RLP continue to occupy those areas (Mountain Valley 2022).

For the mixing zone areas, where sediment in tributaries discharges to occupied streams during storm events (i.e., sediment from construction in upland areas) and contributes increased suspended sediments, the areal extent of impact will vary depending on numerous factors including rainfall duration and the suspended sediment concentrations in the tributary, tributary discharge volume and flow rate, receiving water flow rate and turbulence, and the geometry of the tributary and the receiving water boundaries (USEPA and USACE 1998).

The Service reviewed estimated sediment concentrations (mg/L) modeled in the streams GIS shapefile that Mountain Valley provided, which is based on the screening-level methodology used to define the aquatic action area (M. Neylon, Mountain Valley, email to J. Stanhope, Service, June 10, 2020; M. Neylon, Mountain Valley, email to S. Hoskin, Service, June 17, 2020). As described in the Action Area section and based on expert review, it was determined that utilizing Mountain Valley's sedimentation analysis to develop the aquatic action area was a reasonable and conservative approach (J. Martin, FERC, letter to C. Schulz, Service, May 7, 2020). Mountain Valley indicated that their approach is conservative and overestimates the expected increased sediment concentrations from the project because it assumes all sediment loads from construction activities, in response to a 24-hour design storm, will arrive simultaneously to the stream segments within the watershed. The assumptions designed to ensure conservativism are detailed in Section 6.2 of the Hydrologic Analysis of Sedimentation report attached as Appendix B in the SBA2 (Mountain Valley 2022). In addition, following issuance of the 2020 Opinion, Mountain Valley completed installation of the monitoring stations in each monitoring watershed before resuming construction (Mountain Valley 2022). Those monitoring stations were brought online upon installation, with commission dates starting from July 2021

201

AR 005534

through September 2021, and have been collecting data since that time. Mountain Valley reports that the monitoring data collected at the aquatic species impact areas for the RLP confirms that the sedimentation modeling is conservative and significantly overstates potential sediment loss from the project (Mountain Valley 2022 and Appendix L in Mountain Valley 2022). As noted by FERC, it is difficult to extrapolate conditions following the commissioning of the monitoring stations to the conditions that existed in 2018 and 2019, when most of the project construction occurred (J. Martin, FERC, letter to C. Schulz, Service, January 11, 2023). However, the monitoring "has confirmed that runoff from the Project right-of-way during some large rain events over the monitoring period did not cause an exceedance of the TRC [Take Risk Concentration] for the Streams of Interest." For the timeframe when the monitoring stations were commissioned, as stated by Mountain Valley, "The Project, at most, contributes negligible amounts of sediment to species streams that are well below the concentrations at which USFWS concluded the RLP and CD would be impacted. In fact, the commissioned station tributary data, which are the most direct measure of potential Project sediment, show that, even during tropical and other flood-inducing severe storm events, sediment losses attributable to the Project do not appreciably contribute to suspended sediment levels in species streams." (Mountain Valley 2022 and Appendix L in Mountain Valley 2022).

The highest sediment concentration predicted for the MVP project in a tributary to a RLP stream was 702 mg/L (Mountain Valley 2020), which is in the same range of TSS concentrations from pipeline crossing studies that found downstream impacts due to increases in TSS concentrations and sediment deposition that occurred within 500 m of pipeline crossings (Reid and Anderson 1999; Reid et al. 2002b, 2004). Because the predicted sediment concentrations provided in the GIS shapefile from Mountain Valley are based on calculations and not actual laboratory methods, the Service thinks they are indicative of SSC values and do not have a bias towards lower values. As stated above, the method for determining TSS tends to have a bias towards lower concentration values and the SSC method is a conservative method to measure sediment concentration. As discussed above, some of the downstream impacts included short-term changes in abundance and community structure of benthic invertebrates and changes in fish abundance. To be protective of the RLP, the Service anticipates the areas in which the species will be impacted will be similar to the open-cut crossing and will also occur within 200 m above and 800 m below the point where the tributary enters the RLP-occupied stream (1,000 m total within the RLP-occupied stream). The 200 m area in the RLP-occupied stream upstream of the confluence with the tributary is included to address uncertainty of the mixing zone plume extent (i.e., due to the factors described above).

Based on the GIS shapefile, the Service identified:
- the tributaries with >20 mg/L sediment concentrations above background that discharged to assumed or known RLP-occupied streams and determined these to be mixing zone areas; and
- stream segments with assumed or known RLP-occupied streams that are predicted to have elevated sediment concentrations >20 mg/L above background beyond the mixing zone.

202

The mixing zone areas, applying the 200 m above and 800 m below distance to these inputs from tributaries, and the stream segments with elevated sediment concentrations beyond the mixing zone increases the total length of the impact area as follows (including the open-cut crossing) (Appendix D Table 1 and Figures 1 and 2): a total of 17.1 km, 11.3 km in the Upper Roanoke MU (7.0 km in the North Fork Roanoke River; 1 km in the South Fork Roanoke; and 3.3 km in the Roanoke River) plus 5.8 km in Bradshaw Creek (11.3 + 5.8 = 17.1 km); and a total of 4.7 km in the Pigg MU.

The potential habitat within the Upper Roanoke MU (range extent 354 km) plus the potential habitat in Bradshaw Creek (6 km) equal 360 km. The impact area consisting of portions of the Upper Roanoke MU plus Bradshaw Creek equals 17.1 km and represents approximately 4.8% (17.1 km/360 km = 0.048) of the RLP potential habitat within the Upper Roanoke MU plus Bradshaw Creek. As stated in the Environmental Baseline section, the mean current population size for the Upper Roanoke MU is 14,279 RLP and the mean current population density of the Upper Roanoke MU, including Bradshaw Creek is 39.7 RLP/km. We used this information to estimate the total number of RLP that would be likely present within the impact area. Assuming RLP are evenly distributed, approximately 679 RLP are present within the impact area (39.7 RLP/km x 17.1 km = 679 RLP), representing 4.8% of the total estimated number of RLP in the Upper Roanoke MU (679/14,279 = 0.048).

When estimating population size, the SSA (Service 2022b) focused on RLP 1 year of age or older because younger RLP are difficult to reliably capture (Rosenberger and Angermeier 2003). The SSA (Service 2022b) does not estimate the total population of YOY or juvenile RLP within the known range extent of the MUs, and no data is available or readily obtainable that would allow us to develop such an estimate with any degree of confidence. Attempting to develop such an estimate would require information such as: egg fecundity, hatching success, and natural mortality (FERC 2017b), which is unknown for RLP, and it would take extensive studies over numerous years to collect the information. While YOY estimates have been calculated using RLP population growth rates from information compiled from the literature, it is potentially biased (FERC 2017b). Attempting to develop a numeric estimate of juveniles present thus would require us to make multiple assumptions and would inadvertently suggest a level of confidence not justified by the available information. Therefore, although we cannot estimate the number of YOY or juveniles that may be present in the impact area, it is reasonable to assume that the proportion of YOY or juveniles present corresponds to the proportion of adults present (i.e., 4.8% of the total number of YOY or juvenile RLP in the Upper Roanoke MU are likely present in the impact area).

The potential habitat within the Pigg MU (range extent 233.2 km) plus the suitable RLP habitat section of Harpen Creek (3.2 km) equal 236.4 km. The impact area consists of portions of the Pigg MU (4.7 km) and represents approximately 2% (4.7 km/236.4 km = 0.019) of the RLP potential habitat within the Pigg MU plus the suitable habitat section of Harpen Creek. Harpen Creek is not in an impact area but as stated in the Environmental Baseline section, a portion is

203

AR 005536

considered suitable habitat. As such, the mean current population size for the Pigg MU is 7,080 RLP and the mean current population density of the Pigg MU, including the suitable portions of Harpen Creek is 29.9 RLP/km. We used this information to estimate the total number of RLP that would be likely present within the impact area. Assuming RLP are evenly distributed, approximately 141 RLP are present within the impact area (29.9 RLP/km x 4.7 km = 140.5 = 141 RLP), representing approximately 2% of the total estimated Pigg River population (141/7,080 = 0.02). Although the number of YOY and juveniles present in the impact area cannot practicably be estimated for the reasons stated above, assuming the proportion of YOY and juveniles present corresponds to the proportion of adults present, roughly 2% of YOY and juveniles in the Pigg MU would be present in the impact area.

The total impact area for the project is 21.8 km and a total of 820 adult RLP would be present in the impact area (679 RLP + 141 RLP). We expect this overestimates the number of adult RLP in the impact area because, as noted above, Roberts et al. (2016a) indicates that RLP are very mobile, and so we expect that most adult RLP will have the ability to avoid the impact areas and move to other areas of suitable habitat as sediment moves within the channel.

*Increased embeddedness* – Increased embeddedness is correlated with excessive sedimentation and is anticipated from all of the subactivities listed above although the magnitude and duration will vary depending on the specific subactivity. A commonly documented effect of instream work includes silt deposition that fills interstitial spaces in gravel and cobble substrates and reduces water flow through the substrate in the area where the instream work in occurring, as well as in areas downstream of the disturbance; the resulting increase in substrate embeddedness is expected to temporarily reduce habitat heterogeneity and primary productivity; increases fish egg and larval mortality; alters, degrades, and entombs microbenthic communities that RLP depend on as a food source (Burkhead and Jenkins 1991). These effects would be expected to persist until the deposited sediment is flushed downstream, which generally would be expected to occur within 1 year after construction (Reid and Anderson 1999), although, as noted above, we are conservatively assuming that the effects may persist for up to 4 years. Sutherland (2001) reported marginally significant negative relationship difference between both embeddedness and foraging time and feeding strikes of the gilt darter (*Percina evides*), where mean substrate embeddedness ranged from 40-70%. Sutherland (2001) also observed increased resting time with increased percent embeddedness although this relationship was not as strong. Overall, the study found embeddedness and foraging behavior was correlated, but the author did not determine if it was a function of increased turbidity, increased physiological stress, or possibly decreased prey abundance.

Rosenberger and Angermeier (2002) compared the habitat of RLP in the Roanoke, Pigg, and Nottoway Rivers. The following is a summary of their findings pertaining to embeddedness: RLP were observed using less embedded substrate in the winter than in the summer; they were consistently observed over loosely embedded substrate with little to no silt cover; RLP in the Roanoke River inhabit areas that are more embedded than those in the Pigg or Nottoway rivers; and RLP subadults were not observed selecting for embeddedness or silt in the Roanoke River

JA2717

although none of the age classes were observed in severely embedded or heavily silted substrate.

Because embeddedness is correlated with increased sedimentation we anticipate effects to RLP from embeddedness will be similar to those discussed in the increased sedimentation/suspended sediment section above. Moreover, the reaches likely impacted by sediment deposition and increased embeddedness would also be those that will exhibit the highest levels of project-related suspended sediment (Mountain Valley 2020, Mountain Valley 2022). Because 20 mg/L is a relatively low sediment concentration (Mountain Valley 2020), the conservatively-defined mixing zones associated with tributaries with ≥20 mg/L sediment concentration above background, and the stream segments with assumed or known RLP-occupied streams that are predicted to have elevated sediment concentrations of ≥20 mg/L above background beyond the mixing zone, encompass the areas in which project-related increases in embeddedness are reasonably likely to harm RLP. For the mixing zones, this conclusion is supported by the studies of pipeline crossings referenced above, which found that downstream impacts due to increases in TSS concentrations and sediment deposition occurred within 500 m of the crossings (Reid and Anderson 1999; Reid et al. 2002b, 2004). As previously noted, the highest sediment concentration predicted for the MVP project in a tributary to a RLP stream was 702 mg/L (Mountain Valley 2020), which is in the same range of TSS concentrations from the pipeline crossings analyzed in those studies.

Mountain Valley previously used a different methodology to identify deposition/embeddedness zones (Mountain Valley 2020), a portion of which fall outside the impact area derived under our methodology. Because we are not relying on Mountain Valley's methodology for the reasons discussed above and in the incidental take statement for RLP section, it would be inappropriate to use that methodology to identify areas where deposition is likely to harm RLP. Furthermore, under our approach, deposition posing a risk to the species will occur across 21.8 km of suitable RLP habitat where suspended sediment is expected to be elevated, whereas Mountain Valley's approach predicts that increased embeddedness will only occur over 10.5 km, regardless of any project-related increase in suspended sediment concentrations. Our approach is therefore more conservative and better accounts for the relationship between increases in suspended sediment concentrations and deposition. Mountain Valley now adopts the Service's more conservative approach (Mountain Valley 2022). In short, the impact area defined above encompasses the stream reaches in which harm to RLP from increased sedimentation/suspended sediment and from increased embeddedness is reasonably certain to occur.

Project-related sediment embedded in the impact areas may become resuspended during storm events and flushed downstream. In addition, studies show that sediment can remain in the river-floodplain system for an extended period of time (e.g., decades to centuries) before it is entirely flushed out of the system (Hamilton 2012). The sediment is stored in multiple areas throughout the river-floodplain system and not just the river channel, including fringing bars, islands, behind impoundments, and floodplain areas. This raises the possibility that resuspended sediment from the project could create new downstream impact areas. This risk would depend on numerous variables including flow rates associated with the storm events, stream channel geometry, the

205

AR 005538

extent of sediment embedded in the impact areas at the time of a storm, the characteristics (e.g., particle size, weight) of embedded sediment, the rates at which embedded sediment may be resuspended and transported downstream, and the distance any resuspended sediment may travel before resettling on the stream floor. To our knowledge there is no reliable and accurate methodology for determining the likelihood that resuspended sediments from the project may create new downstream impact areas, where such areas might be located or the potential size of such areas.

For two reasons we believe the risk is low that localized resuspension of project-related sediment will lead to new downstream impact areas. First, any embedded project-related sediment is expected to be transported downstream over time and during multiple storm events rather than all at once; that in part is the basis for our assumption that the effects of embedded sediment on benthic invertebrate populations in the impact areas could persist for up to 4 years. We do not expect the resuspended sediment will all be deposited in the same area. The resuspension of embedded sediment over time and during multiple storm events would be expected to settle gradually as the sediment travels downstream and over large distances depending on flow conditions, sediment particle size, and stream channel geometry, which reduces the likelihood that large quantities of project-related sediment will be deposited in significant quantities in the same area. Resuspended sediment may also be deposited in areas outside the river channel during storm events. Second, as discussed above, our impact areas are already conservatively defined (large) and thus may encompass any areas where significant resuspension and redeposition may occur before project-related sediment has been flushed downstream. For these reasons, we do not expect resuspended project-related sediments are likely to create new downstream impact areas in RLP-occupied habitat.

*Impoundments* – Impoundments resulted from the use of temporary dam structures as part of the dam and pump method associated with the North Fork Roanoke River 1 open-cut crossing (MP 227.2, Stream ID S-G36). As discussed above, the construction ROW is 22.86 m wide at this crossing. The crossing was completed in July 2018 via open-cut dry ditch (Table 9). No RLP were observed during the fish removals associated with 2 dewatering events (July 17-18, 2018, and August 15-17, 2018) at this crossing (Mountain Valley 2020). The streambed was re-contoured to reflect pre-construction streambed contours and restoration was finalized August 2018. Post-construction monitoring of RLP habitat was completed October 16-19, 2020. This crossing was completed prior to the 2020 Opinion, which required Mountain Valley to assess RLP habitat 6 months after the construction activities related to the crossings were completed and to monitor water quality in RLP streams. The habitat assessment for this crossing site has been completed.

The habitat assessment noted that cattle have access to the river from approximately 400 – 800 m downstream of the crossing; habitat in this area appeared degraded. However, degraded habitat was not observed "adjacent to the Project crossings nor were anecdotal differences in substrate

AR 005539

quality or silt coverage between upstream and downstream areas of the Project crossings." (Edge 2020). During the habitat assessment, 2 RLP were observed near microhabitat classified as high quality (Edge 2020).

Relocating RLP likely minimized effects from instream work (e.g., stream diversion, temporary dam structure placement). The fish removal/relocation portion of the action was conducted by individuals with state (VDWR) permits that are issued as part of the Cooperative Agreement for Management of Endangered Species between the Service and VDGIF (now called VDWR), thus no additional effects analysis is required for that portion of the action (Mountain Valley 2022). If RLP remained in the crossing area after removal/relocation efforts, we anticipate they would have become entrained. Instream structure placement also would have resulted in temporary impoundments which might have decreased feeding activity if RLP were in the impounded area and are no longer able to see their prey if water conditions are turbid. Because we anticipate that the majority of RLP would have been removed from the area, we expect at most there was the potential for 1 individual to remain in the impounded area. This individual either may have experienced a reduction in fitness due to a decrease in feeding or became entrained.

*Summary* – In summary, the duration of all project-related effects on RLP depend on the AMMs (e.g., trenchless crossing, TOYRs, fish removal and relocation, FERC Plan [FERC 2013a], and Restoration and Rehabilitation Plan [Mountain Valley 2017]), which are anticipated to protect RLP when they are spawning, and reduce surface water runoff and sedimentation, but not to insignificant levels (Mountain Valley 2020). The Restoration and Rehabilitation Plan states that herbaceous and woody seed mixes native to the area will be applied to the temporary construction ROW. Herbaceous seeds are assumed to take approximately 4 weeks to establish, 6 months to develop, and 1 year to become a maturing crop. A minimum of 6 tree species (bare-root saplings) and 4 shrub species will be planted at each stream crossing. We expect the effects from sedimentation and suspended sediment on food sources (benthic invertebrate community) within the impact areas will last up to 4 years (Reid and Anderson 1999, Reid et al. 2008, Levesque and Dube 2007) as reduced benthic invertebrate populations gradually return to baseline levels. However, we do not expect that project-related sedimentation will render any currently suitable RLP habitat permanently unsuitable. The effects of removal of streambank vegetation at the North Fork Roanoke River 1 open-cut crossing (MP 227.2, Stream ID S-G36) on sedimentation rates are expected to continue for 3-5 years as streamside vegetation develops to provide streambank stabilization (FERC 2017b). While implementation of AMMs is expected to significantly reduce the likelihood of injury or mortality and reduce adverse effects from habitat alteration, all impacts to RLP will not be avoided or minimized.

<u>Candy darter (CD)</u>

The potential effects of the proposed action on CD are described in Appendix B Table 5. Subactivities that are NE or NLAA CD are described in Appendix B Table 5. Subactivities that

AR 005540

are LAA CD are listed in Appendix B Table 5 and include[39]:

- Clearing – herbaceous vegetation and ground cover
- Clearing – trees and shrubs
- Grading, erosion control devices
- Trenching (digging, blasting, dewatering, open trench, sedimentation)
- Regrading and Stabilization – restoration of corridor
- ARs – upgrading existing roads, new roads temporary and permanent – grading, graveling
- ARs – upgrading existing roads, new roads temp and permanent – tree trimming and tree removal

The Gauley River pipeline crossing (Stream ID S-J29) (Table 9) is known to support CD. The proposed crossing method is microtunnel. This trenchless crossing method minimizes impacts in the riparian zones by eliminating construction activities within or directly adjacent to the crossed stream (M. Eggerding, Mountain Valley, letter to J. Martin, FERC, May 13, 2020). Because no open-cut trenching is performed, the stream channel itself would not be impacted, allowing existing riparian vegetation near the stream banks to remain in place. Therefore, no instream construction impacts or impacts to CD are anticipated at this crossing and this crossing will not be discussed further in this Opinion. However, as discussed above in the Environmental Baseline section for the CD, the ROW crossing area is included in the aquatic action area and addressed below because it overlaps with Mixing Zone 20.

The Gauley River, Nicholas County, WV, (Stream Project ID S-J29) water withdrawal location (Table 8) is known to support CD. Water withdrawals are conducted in compliance with conditions in the WVDEP Division of Water and Waste Management's Water Withdrawal Guidance Tool to avoid and minimize adverse impacts to aquatic organisms and ensure maintenance of existing instream physical, chemical, and biological characteristics. Mountain Valley will refrain from withdrawing water during low flows and drought conditions by adhering to the restrictions identified in the West Virginia Water Withdrawal Guidance Tool (M. Eggerding, Mountain Valley, letter to J. Martin, FERC, May 27, 2020). Mountain Valley anticipates installing holding tanks near the withdrawal points to pull water over a longer period, instead of a more acute withdrawal (M. Eggerding, Mountain Valley, letter to J. Martin, FERC, May 13, 2020). Mountain Valley commits to placing temporary water intakes within pools rather than riffles in the Gauley River (M. Eggerding, Mountain Valley, letter to J. Martin, FERC, May 27, 2020). Mountain Valley is committed to limiting surface water withdrawals to 10% of a stream's instantaneous flow, installing temporary water intakes situated above the instream substrates with screened openings not to exceed 3/16-inch mesh, and ensuring through-screen approach velocities less than 0.5 ft per second (Mountain Valley 2020). Therefore, no impacts to CD are anticipated from water withdrawals at this location and this water withdrawal will not be discussed further in this Opinion.

---

[39] See footnote 37 regarding post-construction O&M activities.

AR 005541

At MP 118.8 in Nicholas County, WV, near the Gauley River ROW crossing, the project crosses through a former deep-mining disposal area that was active 60 years ago (Mountain Valley 2022). The mine extracted in-place coal reserves from the Sewell coal seam and utilized a portion of the current project area to dispose of coal refuse waste materials that were generated during the extraction and processing operations; those materials are still present today. Mountain Valley's contactor performed a subsurface geotechnical survey of the buried refuse materials within and immediately adjacent to the MVP project ROW. Upon completion of the investigation, the WVDEP Division of Mining and Reclamation was consulted for disposal and handling options. Information collected during this geotechnical exploration indicates that several stratified areas within the mine refuse area exhibit temperatures above subsurface background conditions. The location of the mine spoils exhibiting temperatures above background is approximately 300 ft north of the Gauley River, outside of the OHWM, and outside of the location of the planned bore pits for the project's Gauley River crossing. The work at the Nicholas County Refuse Site requires no new tree cutting and will occur entirely within the project's existing LOD. Material that will be excavated and removed to create a buffer between the pipeline and the remaining coal refuse will be treated as necessary at a zero-discharge treatment location within the existing LOD to reduce elevated temperatures and then taken to an existing offsite refuse disposal facility. The excavated trench will then be backfilled with clean soils prior to pipeline insulation. As a result, project-related work at this site is not likely to cause any new impacts to CD or its habitat and will not be discussed further in this Opinion.

For some components of the proposed action that are anticipated to affect CD, AMMs have been incorporated to ameliorate those effects and those are also noted below. Subactivities related to clearing, grading, trenching, and ARs will harm or kill CD and alter/degrade CD habitat. The following stressors will, or are expected to, occur from one or more of the subactivities listed above: increased sedimentation/suspended sediment and increased embeddedness.

*Increased sedimentation/suspended sediment* – Increased sedimentation/suspended sediment is anticipated from all of the subactivities listed above, although the magnitude and duration will vary depending on the specific subactivity. Measurable increases in sedimentation/suspended sediment from the project are expected to be episodic and temporary, resulting from waterbody crossings and storm events that deliver sediment from upland construction to waterbodies. Excessive sedimentation and suspended sediments in aquatic systems can cause multiple adverse effects on all life stages of benthic fish, including loss of stream habitat essential for sheltering, foraging, and spawning; increased mortality of eggs, YOY, juveniles, and adults; increased predation on eggs by sediment-dwelling invertebrates; avoidance of previously occupied habitat; increased vulnerability of adults to predation; reduced reproductive success; creased physiological stress; reduced feeding and subsequent weight loss; reduced prey availability; increased parasitism; reduced disease resistance; and clogging, abrasion, and necrosis of gills (Kundell and Rasmussen 1995, Newcombe and Jensen 1996).

Excessive sedimentation/suspended sediment increases sublethal impacts such as growth rate and gill health. Studies have found signs of physiological stress, such as increased oxygen

209

consumption and loss of equilibrium, in remaining fish downstream of disturbed areas, as well as decreased abundance of fish downstream of instream work sites (Reid and Anderson 1999, Levesque and Dube 2007). Sutherland and Meyer (2007) found growth rate of YOY spotfin chub was significantly and inversely related to increasing suspended sediment concentrations. They hypothesized that stress inhibited normal feeding behavior. Gill damage in spotfin chubs was noted with increased suspended sediment concentrations. We expect similar impacts would occur to YOY CD if sediment were to enter small tributaries or stream margins and settle. Although this study focused on YOY we expect similar increased sedimentation would also impact the gills of adult CDs and stress might inhibit their normal feeding behavior.

Studies have shown negative effects of increases in sedimentation/suspended sediment on prey consumption and foraging behavior of darters (Swanbrow Becker et al. 2016, Kellogg and Leipzig-Scott 2017). CD are opportunistic invertivores, feeding almost exclusively on benthic macroinvertebrates (in particular, mayflies and caddisflies) (Schoolcraft et al. 2007). Sediment deposited on the waterbody bottom will interfere with the ability of CD to feed (Robertson et al. 2006). Increased sedimentation is anticipated to result in a loss of prey items and/or an ability to see the prey. Various studies have documented adverse effects to the benthic community from increased sedimentation (e.g., reduction in abundance and species diversity) and these effects can persist after construction has been completed, between 6 months and 4 years post-construction (Reid and Anderson 1999, Reid et al. 2008, Levesque and Dube 2007). Two studies (cited in Reid et al. 2008) documented no effect to benthic community and downstream habitats during and after construction. Seven studies (cited in Reid and Anderson 1999 and Reid et al. 2008) indicated recovery of the benthic invertebrate communities occurred within 6 months to 1 year after pipeline construction, with suspended sediment concentrations from 44 mg/L for a 12.4-hour duration up to 6,247 mg/L for 20 hours, which may have also led to sediment deposition. Increased rates of benthic invertebrate drift were also observed during construction for very short time periods (i.e., hours) due to high suspended sediment concentrations, ranging from 997 mg/L to 1,679 mg/L for a 7-hour duration (Reid et al. 2008). Armitage and Gunn (1996; cited in Levesque and Dube 2007) indicated that adverse effects from suspended sediment continued for 4 years after pipeline construction until a high, scouring flow event changed the stream bed; however, this study did not provide details on suspended sediment concentrations. The response and recovery time of sites to disturbances are expected to be variable and are generally related to the hydraulic and substrate characteristics of the stream bed and flushing events due to increased streamflow from rain events. As discussed below, we are conservatively assuming effects to benthic invertebrates in aquatic areas that receive significant increased sedimentation as a result of the MVP project will persist for up to 4 years. This assumption is conservative because most of the available studies indicate post-construction recovery of benthic invertebrate communities within 0.5 to 1 year of pipeline construction activities (Reid and Anderson 1999, Reid et al. 2008, Mountain Valley 2022). Moreover, our conservative assumption does not mean that the affected aquatic areas will be devoid of benthic invertebrates for up to 4 years; rather, we would expect that increased sedimentation would reduce invertebrate populations in the affected areas and that those populations would gradually increase to pre-construction baseline levels over the course of no more than four years, as had been documented in studies cited in Reid et al. (2008)

AR 005543

(e.g., Tsui and McCart 1981, Reid et al. 2002a). CD would be expected to return to the impact areas after initial sediment plumes dissipate and to continue to use the areas as habitat as benthic invertebrate populations gradually return to baseline levels.

Fish species that require clean cobble and gravel for spawning had decreased abundance in sediment-impaired streams (Sutherland et al. 2002) and typical riffle-dwelling fish species declined with increased siltation (Berkman and Rabeni 1987), indicating that CD numbers may be reduced by increased suspended sediment concentrations in areas heavily affected by sediment. Increased sediment deposition and substrate compaction from instream construction can degrade spawning habitat, resulting in the production of fewer and smaller fish eggs, impaired egg and larvae development, and limited food availability for YOY (Reid and Anderson 1999, Levesque and Dube 2007). As brood-hiding, benthic spawners that deposit eggs between unembedded pebble and gravel substrates within larger cobbles and boulders, CD are particularly sensitive to changes resulting from increased sedimentation. Burkhead and Jelks (2001) reported a decrease in spawning of the tricolored shiner as suspended sediment concentration increased (0 [control], 100, 300, and 600 mg/L) for 6 days. When fish spawned, fewer eggs were laid as sediment concentrations increased, and spawning activity was delayed at higher levels of suspended sediment. Egg and larval mortality was negligible. Increased sedimentation is anticipated to potentially result in similar effects to CD if the sediment entering a waterbody via tributaries rises to similar levels.

The duration and severity of the effects of increased sedimentation on individuals and populations depends on factors such as the duration of disturbance, the amount of sediment loading, the length of stream segment directly affected by construction, and whether there were repeated disturbances (Newcombe and Jensen 1996, Yount and Niemi 1990, Vondracek et al. 2003); however most studies documented recovery of the affected stream reach within 1 to 3 years after construction (Reid and Anderson 1999, Yount and Niemi 1990).

The effects to CD will depend, in part, on the type, amount, and extent of sediments released into the water column, the magnitude and duration of discharge, and background suspended sediment concentrations. The clearing of herbaceous vegetation and trees and shrubs in the riparian corridor and uplands, AR grading, and the trenching is expected to cause increases in sedimentation that will have impacts to CD. Based on past events, sediment modeling conducted by Mountain Valley (2020), which were confirmed to represent the best available information for the purposes of this reinitiated consultation, and conservative estimates of sediment concentration in waterways (M. Neylon, Mountain Valley, email to J. Stanhope, Service, June 10, 2020; M. Neylon, Mountain Valley, email to S. Hoskin, Service, June 17, 2020), we anticipate these activities will impact CD and have incorporated portions of CD habitat into our impact area, see additional discussion below.

Depending on the size and duration of a sediment plume that occurs, CD may alter normal feeding behaviors until sediment levels return to background levels. McBaine and Hallerman (2020) indicates that CD are mobile (i.e., capable of movements >4 km), but are generally

211

AR 005544

expected to move only within adjacent riffle complexes. Therefore, we expect that most adult CD will likely not avoid areas of heavy sediment deposition by moving to other areas of suitable habitat within the system as the sediment moves within the channel. However, if CDs were to undertake such movements to avoid areas of increased sedimentation, the physiological toll from such efforts may have negative consequences to individuals. Further, we expect a significant increase in the risk of predation if CDs were to move upstream across run/pool habitats, as they are primarily a benthic species that shelters within interstitial spaces in shallow riffles. Younger life stages may not be capable of moving out of an area and will experience loss of habitat for feeding and sheltering. However, recent work by McBaine et al. (2022) has challenged this assumption by finding that movement capacity of younger CD life stages is greater than previously believed.

As mentioned above and in the SBA2 (Mountain Valley 2022), there are no studies on specific suspended sediment concentrations (e.g., thresholds) and their effects on RLP and CD, and the data needed to develop such thresholds is not available or readily obtainable. Obtaining such data would involve conducting novel laboratory research to quantify the effects of increased sedimentation levels on RLP and CD biology and physiology at multiple temporal scales (e.g., immediate short-term effects to physiology as well as longer-term effects to reproductive cycles and population dynamics). Such research would also necessitate sacrifice of numerous RLP and CDs as experimental subjects. As such, this data is not readily obtainable for the purposes of this Opinion. As discussed above in the Effects of the Action section for the RLP, to assess the suspended sediment concentrations at which adverse effects to both RLP and CD will occur and to determine the downstream extent to which these effects may extend as a result of the proposed project, we adapted the analytical framework in Biological Effects of Sediment on Bull Trout and Their Habitat – Guidance for Evaluating Effects (Muck 2010) (framework; Appendix C), using as the basis for our analysis the model 1 thresholds in Newcombe and Jensen (1996).

Using this approach (an adaptation of Figure 1 in Muck [2010]) and an SEV of 5 to include sublethal effects to juveniles, we expect that adverse effects to adult, subadult, and juvenile RLP and CD are likely to occur under any of the following thresholds:
   a.  Any time sediment concentrations exceed 148 mg/L over background.
   b.  When sediment concentrations exceed 99 mg/L over background for more than 1 hour continuously.
   c.  When sediment concentrations exceed 40 mg/L over background for more than 3 hours continuously.
   d.  When sediment concentrations exceeded 20 mg/L over background for over 7 hours continuously.

As discussed in the Effects of the Action section for RLP, the sediment concentration to be measured is SSC, and not TSS. Because sediment sampling for concentration is labor intensive, the framework in Muck (2010) is based on using turbidity as a surrogate for SSC. To do this, the sediment concentration above background at which adverse effects to the species and/or habitat occurs expressed as mg/L will be converted to NTUs, based on existing regression relationships,

212

JA2725

AR 005545

as described in Hyer et al. (2015) or based on guidelines developed by USGS (Rasmussen et al. 2009).

For the mixing zone areas, where sediment in tributaries discharges to occupied streams during storm events (i.e., sediment from construction in upland areas) and contributes increased suspended sediments, the areal extent of impact will vary depending on numerous factors including rainfall duration and the suspended sediment concentrations in the tributary, tributary discharge volume and flow rate, receiving water flow rate and turbulence, and the geometry of the tributary and the receiving water boundaries (USEPA and USACE 1998).

The Service reviewed estimated sediment concentrations (mg/L) modeled in the streams GIS shapefile that Mountain Valley provided, which is based on the screening-level methodology used to define the aquatic action area (M. Neylon, Mountain Valley, email to J. Stanhope, Service, June 10, 2020; M. Neylon, Mountain Valley, email to S. Hoskin, Service, June 17, 2020). As described in the Action Area section and based on expert review, it was determined that utilizing Mountain Valley's sedimentation analysis to develop the aquatic action area was a reasonable and conservative approach (J. Martin, FERC, letter to C. Schulz, Service, May 7, 2020). Mountain Valley indicated that their approach is conservative and overestimates the expected increased sediment concentrations from the project because it assumes all sediment loads from construction activities, in response to a 24-hour design storm, will arrive simultaneously to the stream segments within the watershed. The assumptions designed to ensure conservativism are detailed in Section 6.2 of the Hydrologic Analysis of Sedimentation report attached as Appendix B in the SBA2 (Mountain Valley 2022). In addition, following issuance of the 2020 Opinion, Mountain Valley completed installation of the monitoring stations in each monitoring watershed before resuming construction (Mountain Valley 2022). Although project construction activities had not resumed in the CD watersheds, monitoring stations were brought online upon installation (date not provided) and have been collecting data since that time. Mountain Valley reports that the monitoring data collected at the aquatic species impact areas for the RLP confirms that the sedimentation modeling is conservative and significantly overstates potential sediment loss from the project (Mountain Valley 2022 and Appendix L in Mountain Valley 2022). As noted by FERC, it is difficult to extrapolate conditions following the commissioning of the monitoring stations to the conditions that existed in 2018 and 2019, when most of the project construction occurred (J. Martin, FERC, letter to C. Schulz, Service, January 11, 2023). However, the monitoring "has confirmed that runoff from the Project right-of-way during some large rain events over the monitoring period did not cause an exceedance of the TRC [Take Risk Concentration] for the Streams of Interest." For the timeframe when the monitoring stations were commissioned, as stated by Mountain Valley, "The Project, at most, contributes negligible amounts of sediment to species streams that are well below the concentrations at which USFWS concluded the RLP and CD would be impacted. In fact, the commissioned station tributary data, which are the most direct measure of potential Project sediment, show that, even during tropical and other flood-inducing severe storm events, sediment losses attributable to the Project do not appreciably contribute to suspended sediment levels in species streams." (Mountain Valley 2022 and Appendix L in Mountain Valley 2022).

213

AR 005546

The highest sediment concentration predicted for the MVP project in a tributary to a CD stream was 159 mg/L (Mountain Valley 2020), which is in the same range of TSS concentrations from pipeline crossing studies that found downstream impacts due to increases in TSS concentrations and sediment deposition that occurred within 500 m of pipeline crossings (Reid and Anderson 1999; Reid et al. 2002b, 2004). Because the predicted sediment concentrations provided in the GIS shapefile from Mountain Valley are based on calculations and not actual laboratory methods, the Service believes they are indicative of SSC values and do not have a bias towards lower values. As discussed above, some of the downstream impacts included short-term changes in abundance and community structure of benthic invertebrates and changes in fish abundance. To be protective of the CD, the Service anticipates the areas in which the species will be impacted will be similar to open-cut crossings and also occur within 200 m above and 800 m below the point where the tributary enters the CD-occupied stream (1,000 m total within CD-occupied stream). The 200 m area in the CD-occupied stream upstream of the confluence with the tributary is included to address uncertainty of the mixing zone plume extent (i.e., due to the factors described above).

Based on the GIS shapefile, the Service identified the tributaries with $\geq$20 mg/L sediment concentrations above background that discharged to assumed or known CD-occupied streams and determined these to be mixing zone areas. The GIS shapefile did not indicate any stream segments within assumed or known CD-occupied streams that are predicted to have elevated sediment concentrations $\geq$20 mg/L above background beyond the mixing zone.

The mixing zone areas, applying the 200 m above and 800 m below distance to these inputs from tributaries, results in the total impact lengths of (Appendix D Table 2 and Figures 3 and 4): 2,000 m in the Gauley River system (1,000 m of the Gauley River from each of Coon Creek and Little Laurel Creek); and 1,000 m in the Stony Creek system (1,000 m in Stony Creek from Kimballton Branch). As discussed above, the Stony Creek action area also includes a 1,000 m area around the Stony Creek ROW crossing (which is not expected to impact CD) to account for physical effects, such as increased sunlight due to tree-clearing (Alberts et al. 2018) that may be experienced due to potential clearing and work in riparian areas at the stream crossing. Mountain Valley (2022) reports that the Stony Creek crossing area lacks any appreciable riparian vegetation; therefore, changes in sunlight are anticipated to be insignificant. Furthermore, because the potential sediment loss is not expected to cause increases of >20 mg/L sediment concentrations above background in Stony Creek based on sediment load modeling in the Hydrologic Analysis of Sedimentation report (Mountain Valley 2020, 2022), this portion of the Stony Creek action area is not included in the Stony Creek CD impact area discussed below.

The Upper Gauley River metapopulation contains 6 populations within close proximity to each other (182 smi total) (Service 2018a), of which the Upper Gauley River population (within critical habitat unit 5b) constitutes 27.2 smi. The impact area in the Upper Gauley River system (2 km = 1.24 mi), assumed to support CD, represents approximately 4.56% of the CD occupied habitat within the Upper Gauley population and 0.68% of potential habitat within the Upper

214

JA2727

AR 005547

Gauley River system metapopulation. CD abundance was considered "good" in the Upper Gauley River during the SSA (Service 2018a), but no specific population estimates are available to estimate the number of CD in the impact area.

All sections of Stony Creek have not been surveyed for CDs, but the lower 19.3 smi of Stony Creek contain habitat that is suitable for the species and CD presence is assumed. The impact area in Stony Creek (1 km = 0.62 mi), assumed to support CD, represents approximately 3.21% of potential habitat within Stony Creek. CD CPUE is highest in the midpoint of the watershed in Stony Creek, with lower abundances within the impact area, closer to the confluence with the New River (McBaine and Hallerman 2020). No recent population density estimates are available to estimate the number of CD in the impact area.

*Increased embeddedness* – Increased embeddedness is correlated with excessive sedimentation and is anticipated from all of the subactivities listed above, although the magnitude and duration will vary depending on the specific subactivity. A commonly documented effect of upland deforestation/clearing includes silt deposition that fills interstitial spaces in gravel and cobble substrates and reduces water flow through the substrate in the areas downstream of the disturbance. The resulting increase in substrate embeddedness is expected to temporarily reduce habitat heterogeneity and primary productivity, increase egg and larval mortality, and alter, degrade, and entomb benthic macroinvertebrate communities that CD depend on as a food source (Burkhead and Jenkins 1991). These effects would be expected to persist until the deposited sediment is flushed downstream, which generally would be expected to occur within one year after construction (Reid and Anderson 1999), although, as noted above, we are conservatively assuming that the effects may persist for up to four years. Sutherland (2001) reported a marginally significant negative relationship difference between both embeddedness and foraging time and feeding strikes of the gilt darter, mean substrate embeddedness ranged from 40-70%. Sutherland (2001) also observed increased resting time with increased percent embeddedness although this relationship was not as strong. Overall, the study found embeddedness and foraging behavior was correlated, but the author did not determine if it was a function of increased turbidity, increased physiological stress, or possibly decreased prey abundance.

Because embeddedness is correlated with increased sedimentation we anticipate effects to CD from embeddedness will be similar to those discussed in the increased sedimentation/suspended sediment section above. Moreover, as discussed in the Effects of the Action section for RLP, the reaches likely impacted by sediment deposition and increased embeddedness would also be those that will exhibit the highest levels of project-related suspended sediment (Mountain Valley 2020). Because 20 mg/L is a relatively low sediment concentration (Mountain Valley 2020), the conservatively defined mixing zones associated with tributaries with $\geq$20 mg/L sediment concentrations above background encompass the areas in which project-related increases in embeddedness are reasonably likely to harm CD. This conclusion is supported by the studies of pipeline crossings referenced above, which found that downstream impacts due to increases in TSS concentrations and sediment deposition occurred within 500 m of the crossings (Reid and Anderson 1999; Reid et al. 2002b, 2004). As previously noted, the highest sediment

AR 005548

concentration predicted for the MVP project in a tributary to a CD stream was 159 mg/L (Mountain Valley 2020; Mountain Valley 2022), which is in the same range of TSS concentrations from the pipeline crossings analyzed in those studies. In short, the impact area defined above encompasses the stream reaches in which harm to CD from increased sedimentation/suspended sediment and from increased embeddedness is reasonably certain to occur.

Project-related sediment embedded in the impact areas may become resuspended during storm events and flushed downstream. In addition, studies show that sediment can remain in the river-floodplain system for an extended period of time (e.g., decades to centuries) before it is entirely flushed out of the system (Hamilton 2012). The sediment is stored in multiple areas throughout the river-floodplain system and not just the river channel, including fringing bars, islands, behind impoundments, and floodplain areas. This raises the possibility that resuspended sediment from the project could create new downstream impact areas. This risk would depend on numerous variables including flow rates associated with the storm events, stream channel geometry, the extent of sediment embedded in the impact areas at the time of a storm, the characteristics (e.g., particle size, weight) of embedded sediment, the rates at which embedded sediment may be resuspended and transported downstream, and the distance any resuspended sediment may travel before resettling on the stream floor. To our knowledge there is no reliable and accurate methodology for determining the likelihood that resuspended sediments from the project may create new downstream impact areas, where such areas might be located or the potential size of such areas.

For three reasons we believe the risk is low that localized resuspension of project-related sediment will lead to new downstream impact areas in CD occupied habitat. First, any embedded project-related sediment is expected to be transported downstream over time and during multiple storm events rather than all at once; that in part is the basis for our assumption that the effects of embedded sediment on benthic invertebrate populations in the impact areas could persist for up to 4 years. We do not expect the resuspended sediment will all be deposited in the same area. The resuspension of embedded sediment over time and during multiple storm events would be expected to settle gradually as the sediment travels downstream and over large distances depending on flow conditions, sediment particle size, and stream channel geometry, which reduces the likelihood that large quantities of project-related sediment will be deposited in significant quantities in the same area. Resuspended sediment may also be deposited in areas outside the river channel during storm events. Second, as discussed above, our impact areas are already conservatively defined (large) and thus may encompass any areas where significant resuspension and redeposition may occur before project-related sediment has been flushed downstream. Third, as summarized in the 2020 SBA and the 2022 SBA2, sediment deposition modeling performed for the project indicated that no Sediment Deposition Impact Area will form in any candy darter streams. Although we did not rely on Mountain Valley's sediment deposition modeling to define the CD impact areas, the modeling results further support our assessment that the risk of significant resuspension and downstream redeposition or project-related sediment is

216

AR 005549

low. For these reasons, we do not expect resuspended project-related sediments are likely to create new downstream impact areas in CD-occupied habitat.

*Summary* – The duration of all project-related effects on CD depends on the AMMs (e.g., FERC Plan [FERC 2013a], and Restoration and Rehabilitation Plan [Mountain Valley 2017]), which are anticipated to reduce surface water runoff and sedimentation, but not to insignificant levels (Mountain Valley 2020). The Restoration and Rehabilitation Plan states that herbaceous and woody seed mixes native to the area will be applied to the temporary construction ROW. Herbaceous seeds are assumed to take approximately 4 weeks to establish, 6 months to develop, and 1 year to become a maturing crop. A minimum of 6 tree species (bare-root saplings) and 4 shrub species will be planted at each stream crossing. We expect the effects from sedimentation and turbidity on food sources (benthic invertebrate community) will last up to 4 years (Reid and Anderson 1999, Reid et al. 2008, Levesque and Dube 2007) as reduced benthic invertebrate populations gradually return to baseline levels. However, we do not expect that project-related sedimentation will render any currently suitable CD habitat permanently unsuitable. Direct instream impacts at stream crossings known to support CD will be avoided using guided conventional bore or microtunneling methods. While implementation of AMMs is expected to significantly reduce the likelihood of injury or mortality and reduce adverse effects from habitat alteration, all impacts to CD will not be avoided or minimized.

Candy darter (CD) critical habitat

The potential effects of the proposed action on CD critical habitat are described in Appendix B Table 6. Subactivities that are NE or NLAA CD critical habitat are described in Appendix B Table 6 and will not be further discussed in this Opinion. Subactivities that are LAA CD critical habitat are listed in Appendix B Table 6 and include[40]:
- Clearing – herbaceous vegetation and ground cover
- Clearing – trees and shrubs
- Grading, erosion control devices
- Trenching (digging, blasting, dewatering, open trench, sedimentation)
- Regrading and Stabilization – restoration of corridor
- ARs – upgrading existing roads, new roads temporary and permanent – grading, graveling
- ARs – upgrading existing roads, new roads temporary and permanent – tree trimming and tree removal

Subactivities related to clearing, grading, trenching, and ARs will affect PBFs of both critical habitat subunit 2b (Stony Creek) and 5b (Upper Gauley River). The effects to PBFs described below will be limited to the impact areas within those subunits (see Appendix D Table 2 and Figures 3 and 4 for impact areas). The following stressors will, or are expected to, occur from one or more of the subactivities listed above: increased sedimentation/suspended sediment and

---

[40] See footnote 37 regarding post-construction O&M activities.

AR 005550

Exhibit 15

AR  005842

RIVER RESEARCH AND APPLICATIONS

*River Res. Applic.* **31**: 767–783 (2015)

Published online 20 May 2014 in Wiley Online Library
(wileyonlinelibrary.com) DOI: 10.1002/rra.2770

# RISK-BASED APPROACH TO DESIGNING AND REVIEWING PIPELINE STREAM CROSSINGS TO MINIMIZE IMPACTS TO AQUATIC HABITATS AND SPECIES

J. M. CASTRO[a]*, A. MACDONALD[b], E. LYNCH[c] AND C. R. THORNE[d]

[a] *US Fish and Wildlife Service, Portland, OR 97266, USA*
[b] *Rivergrove Environmental Consulting, Lake Oswego, OR, USA*
[c] *Ecology and Environment, Portland, OR, USA*
[d] *University of Nottingham, Nottingham, UK*

## ABSTRACT

Extensive new pipeline systems proposed to transport natural gas and oil throughout North America will potentially result in thousands of new stream crossings. The watercourses encountered at these crossings will range from small, ephemeral headwater streams to large, perennial mainstem rivers; from dynamic gravel-bed streams to stable bedrock channels; and from steep, source reaches to low gradient, response reaches. Based on past experience at pipeline crossings, the potential for both short and long-term negative impacts on aquatic habitat and species is substantial. In assessing potential hazards to aquatic habitat and species, the diverse physiography and ecology of the stream affected, combined with the number and range of new pipelines proposed, pose significant challenges for project developers charged with collecting, stratifying, evaluating, analysing, interpreting, and presenting stream crossing data in formats that are accessible, usable and useful. It is equally challenging for project reviewers to detect, distill and summarize potential project impacts and then identify reasonable options for their avoidance, minimization, and mitigation. To address these concerns, the US Fish and Wildlife Service, in conjunction with Ruby Pipeline, LLC, developed a pipeline crossing framework and risk analysis approach to stratify potential aquatic impacts, based on both stream characteristics and project types. In this approach, pipeline crossings are ranked in terms of relative short and long-term risk to aquatic habitat and are then analysed, designed, and monitored in ways appropriate to their risk. This approach allows project developers and reviewers to focus resources and monitoring on the crossings that present the highest risks to aquatic habitat and species, while expediting design and construction, and minimizing the monitoring of low-risk crossings. Published 2014. This article is a U.S. Government work and is in the public domain in the USA.

KEY WORDS: aquatic habitat; impact analysis; pipelines; risk analysis; risk screening matrix

*Received 23 September 2013; Revised 24 March 2014; Accepted 15 April 2014*

## INTRODUCTION

### Background

New discoveries of natural gas and oil fields, together with increasing use of hydrocarbons, are driving the demand for more extensive pipeline networks not only throughout North America (Figure 1) but also globally. In the Pacific Northwest (PNW), at least five separate pipeline projects have been proposed in the last 5 years. Only one, the Ruby Pipeline that traverses Oregon, Nevada, Utah, and Wyoming, crossing over 1200 waterbodies, has been completed to date, but several others are in the planning and permitting phases. For example, the Enbridge Northern Gateway Pipeline in Western Canada would cross approximately 780 waterways in three key salmonid watersheds (Levy, 2009). The need for increased oil and gas transmission is not only being addressed using new pipelines; existing pipelines are also being upgraded for this purpose. An example of a recently refurbished pipeline is the Western Route Export Pipeline that traverses Azerbaijan and Georgia, linking the Caspian Sea to the Black Sea (Hydrocarbons-Technology, 2014).

Linear transmission systems cross cut the landscape and thus intersect a wide variety of sensitive aquatic habitats that will potentially be affected by these pipeline crossing activities (Reid and Anderson, 1999). These include both short-term, construction-related impacts, such as increased turbidity, direct modification of aquatic habitat, and the potential for hydrocarbons to enter the stream through equipment failures and spills (Reid and Anderson, 1999; Reid et al., 2002a, 2002b), and long-term impacts that are more directly associated with the stream's response potential, such as channel incision and lateral migration (Thorne et al., 2014). Additionally, stream crossings constructed decades ago are being rebuilt or repaired to reduce the risk of rupture and extend pipeline design life. In other cases, the stream channels themselves have moved laterally or vertically, exposing an existing pipeline. Clearly, the effects of proposed and existing pipeline crossings on aquatic systems are significant because each pipeline may have hundreds, or even thousands, of stream crossings (Levy, 2009) and because each pipeline is a permanent infrastructure that

---

*Correspondence to: J. M. Castro, US Fish and Wildlife Service, 2600 SE 98th Ave., Suite 100, Portland, OR 97266, USA.
E-mail: Janine_M_Castro@fws.gov

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.



Source: Energy Information Administration, Office of Oil & Gas, Natural Gas Division, Gas Transportation Information System

Figure 1. US natural gas pipeline network in 2009, not including the recently completed Ruby Pipeline from http://www.eia.gov/pub/oil_gas/natural_gas/analysis_publications/ngpipeline/ngpipelines_map.html. This figure is available in colour online at wileyonlinelibrary.com/journal/rra

must be maintained over time. Past risk evaluation efforts have focused primarily on the short-term, construction-related impacts, especially to fisheries resources (Reid and Anderson, 1999; Reid *et al.*, 2002a, 2002b; Reid *et al.*, 2004; Lévesque and Dubé, 2007; Rempel and Porter, 2008), while the approach reported here concentrates more on long-term, physical effects to the aquatic environment.

While pipeline failures are relatively uncommon, the impacts to aquatic habitats and species can be substantial. For example, during a 25- to 50-year flood event in 2011, Exxon Mobil's Silvertip Oil Pipeline in Montana was exposed because of stream bed erosion and then ruptured, releasing an estimated 50 000 gallons of oil into the Yellowstone River (Atkins, 2012). In 1994, extreme flooding along the San Jacinto River in Texas resulted in eight pipeline ruptures during a single event, including ruptures because of the formation of new channels in the floodplain, and releasing 1.47 million gallons of petroleum into the river (NTSB, 1996). A broader study of pipeline failures in Alberta, Canada, over a 15-year period found an average of 762 pipeline failures per year, for a total of 12 191 failures (Levy, 2009). Predicting stream crossings that are at the highest risk for failure is, therefore, of primary importance to government agencies charged with protecting aquatic habitats and species, as well as water quality.

*Existing frameworks and tools*

A variety of pipeline evaluation tools have been developed and exist primarily in the form of conference proceedings and agency or consultant reports (Reid *et al.*, 2008; Rempel

and Porter, 2008 ) or are for a specific pipeline project (Atkins, 2012). Examples include the following:

(1) the Canadian Fisheries Risk Assessment Tool that is under development by Fisheries and Oceans Canada (Rempel and Porter, 2008);
(2) CROSSING—a decision support tool for pipeline crossings and construction impacts (Reid *et al.*, 2008) that focuses on suspended sediment concentrations and deposition rates;
(3) the Yellowstone River Pipeline Risk Assessment that was developed as a result of the pipeline rupture in 2011 (Atkins, 2012); and
(4) the Performance Measurement Framework for Pipeline Water Crossing Construction developed to evaluate completed crossings (Reid *et al.*, 2002a).

One of the most extensive and complete risk assessment methodologies currently available was developed in 2005 by the Canadian Association of Petroleum Producers, the Canadian Energy Pipeline Association, and the Canadian Gas Association (CAPP, 2005). Through this collaborative effort, the Risk Management Framework for Development Projects Impacting Fish Habitat was developed for pipeline projects. This has two components: the Pathways of Effects and the Risk Determination Matrix (CAPP, 2005). The framework and tools developed by CAPP, 2005 are excellent for reducing short-term impacts because of pipeline construction but differ from the proposed methodology in that it is narrowly focused on fisheries resources; the current effort is more widely focused on all aquatic resources and

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.

*River Res. Applic.* **31**: 767–783 (2015)
DOI: 10.1002/rra

longer term, cumulative impacts. Hence, the CAPP, 2005 framework and tools and this current effort are complimentary resources.

*US regulatory framework*

Each country has different regulatory requirements and controls. It is not within the scope of this paper to address the different regulatory environments found within North America or globally; however, we present the US federal regulatory environment as a case study.

For interstate and major US intrastate pipelines, the US Federal Energy Regulatory Commission (FERC) is the lead federal agency managing environmental impact minimization, while the US Department of Transportation is responsible for pipeline safety once pipeline construction is complete, regardless of the product carried in the pipeline. FERC both issues licenses and provides guidance for interstate and intrastate pipeline projects. FERC guidance attempts to balance the requirements of a fixed feature (the pipeline) in a landscape that is subject to both human and natural dynamic conditions. However, the geologic, ecologic, and climatic complexity of the USA makes it impossible to provide crossing design guidance that is applicable to all streams in all landscapes; hence, the capability to modify guidance depending on regional and local needs is essential.

For example, current FERC guidance for Wetland and Waterbody Construction and Mitigation Procedures (Procedures; FERC, 2013) is national in scope and general in nature and therefore does not provide sufficiently detailed and specific information at a regional level to adequately protect aquatic systems with numerous species in complex geographic and ecologic settings. Specifically, within the FERC (2013) Procedures, streams are designated into three broad categories—major, intermediate, and minor—based on wetted channel width at the time of construction, with progressively more latitude in design, construction, and oversight as channel size decreases. Hence, relatively large rivers may be identified as intermediate or even minor streams, especially in the arid west. Further, FERC Procedures allow some streams to be treated as uplands under the following conditions:

> *Crossing of waterbodies when they are dry or frozen and not flowing may proceed using standard upland construction techniques…* (FERC, 2013, page 6)

A few components of the FERC Upland Erosion Control, Revegetation, and Maintenance guidance (FERC, 2003) pertain to all waterbody crossings, including the following: (i) vegetation removal within right of way (RoW) during construction, except for streambank buffers; (ii) perpendicular stream crossings to the extent possible; and (iii) pipeline burial depth sufficient to maintain pipeline safety (FERC, 2013, 2003; CFR § 192.317), generally resulting in pipeline burial of 3 to 5 ft.

While the FERC Procedures do address some predictable pipeline impacts, especially during construction, the guidance does not address the longer term stream response potential, which is highly dependent on characteristics of the stream system rather than the pipeline. Therefore, depending upon the crossing location, stream and catchment characteristics, timing, extent of activities, and application of Best Management Practices (BMPs—construction conservation measures intended to reduce impacts to the environment), impacts to aquatic species will vary but may include simplification of habitat, loss of aquatic species passage, removal of spawning gravel, increased suspended sediment and turbidity, loss of side channels, disconnection from the floodplain, or change in hyporheic flow patterns (Reid *et al.*, 2002b). These impacts may occur at the project site or may propagate upstream, downstream, or laterally into the floodplain.

It is the ability of a stream system to adjust over time and space in response to changes in flow, sediment, and vegetation that creates and maintains aquatic and riparian habitat (Skidmore *et al.*, 2011). Hence, promoting this adjustment is of interest to federal, state, and local resource agencies. It is this same adjustability that may result in pipeline exposure, substantially increasing the potential for pipeline rupture, which is of prime importance to pipeline companies. Pipelines are strong in compression and weak in tension; thus, an exposed, unsupported pipe is at unacceptably high risk of rupture. Balancing the necessary level of stream stabilization to avoid pipeline exposure, while allowing for stream adjustability to provide habitat for species, is the challenge faced by pipeline companies and the agencies issuing permits for pipeline projects.

Because specific, detailed information about individual site conditions, construction implementation, BMPs, site restoration, and monitoring and maintenance is not required by FERC, it is currently impossible to predict the potential impacts of a proposed crossing on the aquatic environment based solely on the information provided to FERC (FERC, 2013, 2003) by the pipeline applicant. To address this need, the US Fish and Wildlife Service (FWS), in cooperation with Ruby Pipeline, LLC, developed the Waterbody Crossing Framework (herein referred to as the Framework) and the Pipeline Risk Screening Matrix (Risk Matrix). The Risk Matrix focuses on potential physical changes that may affect aquatic species and their habitats, especially in the long term.

## FRAMEWORK

Pipelines often cross hundreds or thousands of streams and wetlands. Thus, for the purpose of design by project proponents and review by permitting agencies, it is helpful to first organize data sets and then stratify the crossings into relative

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.

*River Res. Applic.* **31**: 767–783 (2015)
DOI: 10.1002/rra

AR 005845

levels of risk to aquatic resources so that the time allocated to designing each crossing is scaled on the level of risk. To facilitate the organizational process through which crossings are (i) evaluated for risk, (ii) allocated to the appropriate level of design, (iii) implemented, and then (iv) monitored, the FWS developed a generic waterbody crossing risk analysis framework (Framework; Figure 2). The risk categories established by the proposed Framework include low-risk crossings that may be addressed by prescriptive designs and subsample monitoring, medium-risk crossings where standardized designs and stratified subsample monitoring are appropriate, and high-risk crossings requiring bespoke designs and individual monitoring. To group crossings by risk indicates the need for a minimum level of data and assessment at each crossing; otherwise, it is impossible to assess risk to habitat and species.

The Framework is composed of four linked phases:

(I) Basic Stream Data,
(II) Risk Matrix (described below),
(III) Site Restoration, and
(IV) Implementation Monitoring,

with several subphases. While the Framework is represented as a linear process in Figure 2, there are feedback loops between the four phases, and the process iterates as more

data become available. In this context, Phase I is key to the success of the later phases and provides the benchmark against which everything else is measured.

The Framework has a progressive design that builds from a basic stream database for all proposed crossing sites. Once the basic data have been compiled, a qualitative, comparative risk assessment is completed and stream crossings are assigned to a preliminary risk category. As additional data become available, from either remote sensing or field data collection, the risk initially assigned may be adjusted. Where data are sparse or lacking, the Risk Matrix is designed to default to the highest category of risk. Hence, gathering additional data should always result in a relative decrease in the risk assigned to a crossing—an important point of principal discussed further in subsequent sections. The design approach and specificity of BMPs appropriate are designated for each risk category. Following the selected design and BMPs, the pipeline stream crossings are constructed, and the sites are restored to their pre-disturbance condition (site restoration). Site selection for monitoring is also based on the stream data (baseline data for monitoring) and the assigned risk category, with high-risk crossings requiring individualized monitoring and low-risk crossings needing only subsample monitoring.



Figure 2. Generic waterbody crossing framework developed by the FWS. This figure is available in colour online at wileyonlinelibrary.com/journal/rra

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.

*River Res. Applic.* **31**: 767–783 (2015)
DOI: 10.1002/rra

AR  005846

## BASIC STREAM DATA

Evaluation of environmental impacts at each waterbody crossing occurs within the wider context of permitting, construction, and maintenance decisions based on consideration of pipeline integrity, constructability, and impacts to fish and wildlife, water quality and other protected resources. Decisions must be supported by data, and a comprehensive project data set is often generated for this purpose. We have outlined an integrated data set recommended for stream crossings that includes the data typically required for major categories of permits [e.g. Clean Water Act sections 401 (water quality) and 404 (wetlands)], for crossing design and construction, site reconstruction and revegetation, and long-term pipeline maintenance in the vicinity of dynamic stream crossings (Table I).

The recommended data set is intended to provide the information necessary to establish baseline conditions for site restoration and monitoring and to support risk analysis and crossing design. Baseline data are also necessary for geomorphic analysis, estimation of impacts, and selection of crossing-specific methods or BMPs. Each of these considerations is included to some degree in the application of the Risk Matrix. Data are further separated into site versus reach-scale properties, and whether the data can be obtained or generated through a desktop study or require field observations and measurements. While collection of data in the field is usually expected (and guidance on this is provided), we recognize that advances in remote-sensing and geographic information system technologies are quickly increasing both the amount of environmental data that is available remotely and our capacity to analyse it. Furthermore, professional experience and expert judgment regarding data quality, reliability and resolution, combined with local knowledge of site conditions, may alter the approaches, technologies and resolutions recommended for data collection.

## RISK MATRIX

The 'Pipeline Screening Risk Matrix' is an outgrowth of a broader effort sponsored by the US federal government to more efficiently and effectively evaluate risk associated with stream management and restoration projects. The River Restoration Analysis Tool (RiverRAT) provides a thorough and comprehensive approach to the review and evaluation of proposed stream actions and projects (Cluer *et al.*, 2010; Skidmore *et al.*, 2011). As a part of this effort, a risk screening tool was developed to help National Oceanic and Atmospheric Administration (NOAA) Fisheries and US FWS reviewers to match the time and effort spent in reviewing project proposals to the risk to listed species (Skidmore *et al.*, 2011; Thorne *et al.*, 2014). In a similar

manner, the Pipeline Screening Risk Matrix described here is intended to facilitate a qualitative analysis of relative risk to aquatic habitat at stream crossings.

During the initial stages of pipeline project development, the Risk Matrix can be applied as a desktop exercise. However, as project development progresses, and certainly before construction, the risk analysis must be refined using site-specific, field observations and measurements.

### Description of the pipeline risk screening matrix

The screening tool takes the form of a two-axis matrix (Figure 3) in which the

$x$-axis = risk to resource as a result of stream response potential
$y$-axis = risk to resource as a result pipeline crossing impact potential

The principle underlying the Pipeline Risk Screening Matrix (adopted directly from the RiverRAT Project Screening Risk Matrix) is that pipeline crossings should do no long-term harm to aquatic habitat on-site, upstream, or downstream and that short and long-term negative impacts will be avoided where possible, minimized to the greatest extent possible, and mitigated where necessary (Thorne *et al.*, 2014).

### Explanation of the axes

The $x$-axis represents the risk to natural resources associated with the stream's sensitivity to disturbance and response potential (Knighton, 1998). Disturbances may be natural, such as those caused by a flood or drought, or anthropogenically driven—engineering interventions, land use modifications, management actions or restoration projects (Thorne *et al.*, 2014). Using catchment, landscape, stream and channel indicators, reviewers make an initial assessment of the overall risk to resources because of the intrinsic sensitivity of the fluvial system within which the pipeline is to be implemented (Sear *et al.*, 2010). Risk is considered to be greatest at crossings where disturbance and instability are widespread, the flow regime is flashy, the riparian corridor is damaged or missing, and the erosion resistance of the bed and/or bank materials is low. Additionally, impacts at high-risk crossings are more likely to persist for long periods because of the intrinsic sensitivity of the stream. Because the level of risk is associated with the stream's inherent sensitivity, risk along this axis cannot be reduced unless the pipeline is moved to another, more resilient, location.

The proposed action is represented by the $y$-axis. When implementing a pipeline project in or near a stream system, some level of habitat disturbance is inevitable (Sear *et al.*, 2010). This axis gauges the degree of disturbance using the level of floodplain and channel disruption, selected construction method, and presence of artificial bed and bank

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.

*River Res. Applic.* **31**: 767–783 (2015)
DOI: 10.1002/rra

Table I. Basic data needs

Basic data needs for risk-based design and review of waterbody crossings

| Data type | Where obtained | When needed | Intended use |
|---|---|---|---|
| Brief description of the data needed and the appropriate scale/resolution Reach—stream length of at least 20x channel width Site—within the project area of interest (e.g. corridor and regulatory buffers) | Office—GIS, lidar, photos, maps, reports Field—on-the-ground site visits | Permit review—at the time of permit application and/ or initiation of consultation Pre-construction—up to the time of ground disturbing activities covered by a permit | Risk Matrix—data are needed to complete a risk analysis; the specific evaluation factor(s) is listed Geomorphic analysis—data are needed to perform (1) project stratification based on channel width, valley width, and channel slope, and (2) appropriate channel types for moderate-risk projects Design—more detailed data are needed to perform specific technical analyses on high-risk projects Site restoration—data are needed to ensure the project site is restored to pre-project conditions, herein referred to as 'stream simulation' Implementation monitoring—baseline data are needed for shorter term monitoring to determine if designs, BMPs, construction specifications, and performance criteria were adhered to during construction Effectiveness monitoring—baseline data are needed for longer term monitoring to determine if the desired physical/biological outcomes were achieved |
| Drainage area | Office | Permit review | Risk Matrix: flashiness index (discharge estimate) Design: hydrologic analyses to determine channel size, frequency of out-of-bank flow, elevation of the floodplain where applicable, flow and sediment rating curves |
| Stream type (reach) | Office or field—observation of bedrock, colluvial, or alluvial | Permit review | Risk Matrix: landscape sensitivity/stream type, bank characteristics, bed characteristics, and construction method Geomorphic analysis: appropriate channel types |
| Stream slope (reach) | Office Field | Permit review Pre-construction | Design: threshold versus mobile bed channel, boundary conditions Risk Matrix: landscape sensitivity factor, bed characteristics (vertical scour potential) Geomorphic analysis: appropriate channel types Design: hydraulics, sediment transport Site restoration: stream simulation Implementation monitoring |
| Channel dimensions (site) | Office—estimate of channel width at ordinary high water Field—measurement of channel width, average depth, cross-sectional area at OHW. One cross section per aquatic habitat unit | Permit review Pre-construction | Risk Matrix: channel disturbance, riparian corridor, landscape sensitivity/stream type Geomorphic analysis: channel confinement, appropriate channel types Design: hydraulics, sediment transport, channel stability Site restoration: stream simulation Implementation monitoring Effectiveness monitoring |
| Valley width (reach) | Office | Permit review | Risk Matrix: riparian corridor, landscape sensitivity/stream type, floodplain disturbance Geomorphic analysis: channel confinement, appropriate channel types Design: sinuosity and slope range |

(*Continues*)

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.    *River Res. Applic.* **31**: 767–783 (2015)
DOI: 10.1002/rra

JA2737

AR 005848

Table I. (Continued)

Basic data needs for risk-based design and review of waterbody crossings

| Data type | Where obtained | When needed | Intended use |
|---|---|---|---|
| Floodplain dimensions (reach) | Office—estimate of floodplain width; Field—measurement of floodplain width and elevation | Permit review; Pre-construction | Risk Matrix: riparian corridor, landscape sensitivity/stream type, floodplain disturbance; Geomorphic analysis: channel confinement, appropriate channel types; Design: hydraulics, sediment storage; Site restoration: stream simulation and floodplain connectivity; Implementation monitoring; Effectiveness monitoring |
| Bed materials (site) | Field | Permit review | Risk Matrix: bed characteristics, artificial bank/bed stabilization; Geomorphic analysis: appropriate channel types; Design: sediment transport, hydraulics, channel stability; Site restoration: stream simulation; Implementation monitoring; Effectiveness monitoring |
| Bank materials (site) | Field | Permit review | Risk Matrix: bank characteristics, artificial bank/bed stabilization; Geomorphic analysis: appropriate channel types; Design: bank stability, channel stability, channel migration zone, hydraulics; Site restoration: stream simulation; Implementation monitoring |
| Grade controls (reach) | Field | Permit review | Risk Matrix: bed characteristics, landscape sensitivity/stream type, artificial bank/bed stabilization, construction method; Geomorphic analysis: appropriate channel types, incision potential; Implementation monitoring: to ensure that natural grade control has not been effected |
| Riparian corridor (reach) | Office—estimate of riparian width for each side of the channel; Field—composition, density, and distribution | Permit review; Pre-construction | Risk Matrix: riparian corridor, bank characteristics, artificial bank/bed stabilization; Geomorphic analysis: appropriate channel types; Design: channel and floodplain roughness, hydraulics, channel stability, streambank stability; Site restoration: typical species, density, structure of riparian vegetation and planting plan; Implementation monitoring: species composition, stocking levels; Effectiveness monitoring: survival rates and invasive species |
| Discharge (site)10-year2-yearbaseflowconstruction | Office—regression equations or similar | Permit review | Risk Matrix: flashiness index, channel disturbance, landscape sensitivity/stream type; Design: hydraulics, sediment transport, channel size, floodplain elevation, aquatic species passage; Site restoration: stream simulation, stability of bed and bank materials; Implementation Monitoring |
| Channel sinuosity (reach) | Office or field | Permit review | Geomorphic analysis: appropriate channel types; Design: hydraulics, sediment transport, channel slopeSite restoration: stream simulation; Implementation and effectiveness monitoring |

(Continues)

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.

River Res. Applic. 31: 767–783 (2015)
DOI: 10.1002/rra

Table I. (Continued)

| Data type | Where obtained | When needed | Intended use |
|---|---|---|---|
| Basic data needs for risk-based design and review of waterbody crossings | | | |
| Large wood loading (site) | Field—measurement of size class and configuration | Pre-construction | Geomorphic analysis: appropriate channel types; Design: channel and floodplain roughness, channel stability, vertical scour, flood elevations; Site restoration: stream simulationImplementation and effectiveness monitoring |
| Streambank erosion (reach) | Field | Pre-construction | Geomorphic analysis: appropriate channel types; Design: sediment transport, channel stability, streambank stability, channel migration zone; Implementation and effectiveness monitoring |
| Mass wasting (reach—upstream only) | Field | Pre-construction | Geomorphic analysis: appropriate channel types; Design: sediment transport, channel stability, channel migration zone; Implementation and effectiveness monitoring |
| Aquatic habitat units (site) | Field | Pre-construction | Site restoration: stream simulation; Design: hydraulics, channel roughness; Implementation and effectiveness monitoring |

stabilization. Because the degree of risk is related to project design and decision-making, reduction of risk on the *y*-axis is possible through, for example, realigning the crossing, modifying construction techniques, and, where possible, avoiding the need to introduce artificial constraints on the stream. There may, however, be trade-offs between mitigating the risks on the *y*-axis and design requirements for crossings on streams that are intrinsically sensitive to disturbance (that is, with high *x*-axis risks). It follows that increased risk of reducing resource values that depend on natural adjustments in dynamic, alluvial channels may be unavoidable because of the need to reduce or eliminate the potential for vertical and/or lateral instability at crossings.

*Explanation of the risk factors*

*X-axis risk factors related to stream response potential.* A full explanation of the *x*-axis risk factors can be found in Thorne *et al.* (2014). However, a brief explanation is provided herein to allow this paper to stand alone.

*Scale of problem.* The spatial extent of existing stream-related problems causing instability, whether it is site, reach or catchment in scope, affects the level of risk both to natural resources and the effectiveness of an intervention. Addressing a reach-scale problem with a site-scale restoration treatment may temporarily improve habitat, but the long-term viability of the project is reduced.

*Landscape sensitivity/stream type.* This risk factor is relevant at the reach scale and should be evaluated in the context of the geomorphology of the surrounding landscape unit (i.e. a stream reach having a similar channel pattern, slope and degree of valley confinement). At this scale, the stream's sensitivity to disturbance depends largely on its capacity to accommodate abrupt changes in the flow regime and/or sediment supply without abrupt or disproportionate morphological responses that destroy habitat. This factor is of overriding importance in bedrock and colluvial channels, where the influence of the remaining risk factors is small because the channel is substantially less responsive to disturbance over engineering timescales. Conversely, if the channel is on an alluvial fan, the site response potential is likely to be high even if the other risk factors are all rated low.

*Riparian corridor (for streams with slopes <4%).* The riparian corridor defines the area within which the stream interacts with the natural vegetation on its banks and floodplain in adjusting its channel morphology in response to natural or artificial disturbance (Rapp and Abbe, 2003). The capacity to adjust within dynamic equilibrium allows an alluvial stream to accommodate disturbances without abrupt changes in channel morphology, but this requires that the channel is hydraulically and geomorphologically connected to a floodplain. Consequently, this risk factor is

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.

*River Res. Applic.* **31**: 767–783 (2015)
DOI: 10.1002/rra

AR 005850



Figure 3. Pipeline risk screening matrix. This figure is available in colour online at wileyonlinelibrary.com/journal/rra

only applicable to stream reaches with average channel slopes less than 4% as steeper channels naturally lack functional floodplains (Castro, 1997; Montgomery and Buffington, 1998).

*Bank characteristics (lateral scour potential).* Streambanks may be naturally erosion resistant (because of the character of the native bank materials and the binding effects of dense vegetation) or highly erodible because of weak soils, geotechnical instability, or the removal of riparian vegetation (Thorne and Osman, 1988). In this context, streambanks that have been artificially revetted are classed as high risk because the presence of artificial protection indicates past bank retreat and naturally erodible/unstable bank materials (which prompted the need for a revetment).

*Bed characteristics (vertical scour potential).* The potential for rapid reductions in bed elevation through local scour, general scour and degradation is naturally limited in boulder and gravel-bed streams because of the low mobility of the bed particles and propensity for bed armouring. Conversely, channels with erodible bed materials such as sand and silt are naturally prone to rapid vertical adjustments. Channels featuring artificial grade controls are also ranked as high risk because the introduction of such measures is evidence

of the potential for vertical channel instability (Little and Murphey, 1982).

*Dominant hydrologic regime.* The range of discharges experienced in a reach depends on the hydrologic regime, which is controlled by climatic and catchment conditions (precipitation, geology, elevation, topography, soils and vegetation). The hydrologic regime can profoundly affect stream response potential. For example, spring-fed stream systems have low flow variability and are relatively stable and predictable, while stream systems that are driven by rapid run-off from convective storms have highly variable discharges that promote channel change, making them less predictable and more responsive to disturbance. If the hydrologic regime is predicted to shift because of climate change, then the regime with the highest relative risk should be applied.

*Y-axis risk factors related to project impact potential*

*Floodplain disturbance (average floodplain width/disturbed width).* This risk element is relevant only to alluvial streams with floodplains, which generally limits its applicability to streams with gradients less than 4% (Castro, 1997; Montgomery and Buffington, 1998). In alluvial streams,

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.

*River Res. Applic.* **31**: 767–783 (2015)
DOI: 10.1002/rra

AR 005851

J. M. CASTRO *ET AL.*

resilience to disturbance decreases as the proportion of the floodplain that is disturbed increases. For example, if the average floodplain width within the reach of interest is approximately 100 ft (Figure 4, red line), then a perpendicular pipeline crossing would affect 100% of the average width of the floodplain. However, if the crossing was relocated to a narrower area of the floodplain within the same reach (Figure 4, green line), then the degree of floodplain disturbance would be reduced. Alternatively, if the crossing was placed at a wider part of the floodplain (Figure 4, blue line), then the extent of disturbance would be greater. The worst-case scenario, in terms of floodplain disturbance, would be a pipeline paralleling the stream within the floodplain.

*Channel disturbance (construction corridor/stream width).* This risk element scales the potential for the pipeline crossing to adversely impact stream habitat based on the ratio of the long-stream extent of channel disturbed to the channel width at ordinary high water. For instance, for a construction corridor 75 ft wide crossing a stream with a width of 150 ft, the channel disturbance index would be 0.5; however, the index would be much higher (5) for a smaller stream with a width of only 15 ft. The risk is higher for the smaller stream because more habitat units (i.e. pools and riffles) are likely to be impacted by pipeline installation.

*Construction method.* The selected crossing construction method greatly influences project impact potential. Horizontal directional drilling (HDD) is generally considered to be low risk because of minimal impacts to the stream, while rock fracturing is considered to be high risk because of the potential for streamflow to be diverted below ground through fissures created by the fracturing process. Trenched crossings have intermediate risk because of direct disturbance to the stream channel and floodplain, the level of habitat disturbance increasing with the depth to which the trench must be excavated.

*Artificial bank/bed stabilization.* This factor considers the degree to which the proposed action or project may impede the capability of the stream to accommodate future changes in flow and sediment regimes because of, for example, extreme floods, catchment land use change, or climate change. Risks are higher in streams where channel morphology, sediment transfer, and stream processes are constrained than in non-constrained streams because constrained streams lack the multiple degrees of freedom necessary to absorb disturbance (Hey, 1978).

In this context, the potential risk to resources associated with channel stabilization measures is lower for temporary, deformable bed and bank stabilization structures than for permanent, rigid ones. Deformable structures are designed to provide short-term stability (5 to 10 years) before degrading, which allows vegetation to re-establish. Construction materials for deformable structures typically include large wood, soil lifts, brush mattresses, natural geotextiles, and other forms of live materials. Rigid structures are generally designed to last longer (50+ years) and are typically composed of non-degradable materials such as rock, concrete, and synthetic geotextiles.

### Determining the overall level of risk

Once all of the relevant risk factors have been assessed, reviewers and designers can screen crossings based on the overall level of risk. Risks associated with the stream and project attributes can be assessed in at least three different ways depending upon the underlying assumption:

(1) The risk associated with each factor poses a critical, independent threat of harm to the natural resource; thus, the overall risk category is defined by the highest individual risk factor on each of the *x* and *y*-axes.
(2) No factors are individually critical; thus, the overall risk category is defined by the average of the attributes on each of the *x* and *y*-axes.
(3) Some factors are more important than others; thus, the overall risk category is defined by weighting the factors on each of the *x* and *y*-axes.

Rather than using a default approach in deciding upon selection of the overall risk category, consistent, critical thinking and transparent, evidence-based decision-making is required for each project. Responsibility for correctly categorizing relative risk must rest with the individual making the decision. The Risk Matrix can be helpful in making that decision *understandable, explicable,* and *consistent*, but it should not be solely relied upon for *justification*.



Figure 4. Effect of different pipeline alignments on degree of floodplain width disturbance. This figure is available in colour online at wileyonlinelibrary.com/journal/rra

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.

*River Res. Applic.* **31**: 767–783 (2015)
DOI: 10.1002/rra

AR 005852

Likewise, a numerical method to rank relative risk can be added, but this should not replace best professional judgment or be a surrogate for field data.

Once the general level of risk has been assessed, the temporal aspects of disturbance can be evaluated in terms of short and long-term effects. The left side of the Risk Matrix, where the stream response potential is low, represents scenarios where the selection of crossing location, floodplain and channel alignment, and construction type dominates the overall impact. Hence, careful pipeline route planning, along with crossing design that minimizes direct impacts during construction, is of paramount importance. Because the stream has a low response potential, the focus is on reducing short-term impacts using standard BMPs. Long-term impacts are less of a risk, and randomized subsample monitoring provides a sufficient basis for post-project appraisal, maintenance and adaptive management.

The right-hand side of the Risk Matrix, which indicates high stream response potential, represents scenarios where risks related to the catchment context and stream type dominate overall impact. Hence, while minimization of construction impacts remains important, the potential for longer term responses in the stream system means that adverse impacts to habitat and species may be the greater risk. The high response potential at such crossings necessitates intensive investigations to understanding stream geomorphology and ecology and, in the case of pipelines with all but the lowest crossing impact potentials, requires individual crossing design elements, customized BMPs, and site specific post-construction monitoring.

### Level of review/design/monitoring

Once projects have been screened and allocated to one of nine general categories, the level of additional data collection, analysis, design, review, and monitoring can be determined (Figure 3).

Prescriptive designs are very general and include the design approach but do not include any site-specific drawings. They are intended to be widely applicable and rely heavily upon minimization of construction footprint, impacts (e.g. dewatering/rewatering or staging of equipment) and implementation of BMPs.

Standard designs are more specific to the stream type. For example, a standard crossing design could be developed for laterally confined stream channels with slopes ranging between 4 and 6% that lack floodplains and feature step-pool bed morphologies. BMPs appropriate to this specific catchment context and stream type would also be developed.

Site-specific, detailed designs are developed individually for high-risk crossings and include both the range and depth of analysis required to reduce risks to an acceptable level at that particular site.

### APPLICATION: CONTEXT

Pipeline projects are typically undertaken in several phases, regardless of what product the pipe will be carrying. The phases include the following:

(1) route selection,
(2) environmental permitting,
(3) construction,
(4) site restoration, and
(5) monitoring, maintenance and adaptive management.

### Route selection and land easements

One of the most challenging, and often contentious, issues in any pipeline project is route selection. Route selection involves consideration not only of physical factors but also of social and economic issues. Once pipelines are permitted, they are granted considerable legal standing to obtain desired rights of way, but permit issuance is generally contingent on the general location of a proposed pipeline. Hence, route selection is often an exercise in avoidance of impacts to natural, archaeological, and human resources. Consideration of costs related to construction and long-term operation of the pipeline also necessitates avoidance to the extent possible of existing and proposed future infrastructure, natural geohazards or other difficult surface or subsurface conditions. This complexity leads to the development of alternative routes during the early stages of project formulation, which are then reduced to a manageable number to carry into more detailed analyses.

If land easements are not secured early in the route selection process, alternative development and risk analyses can be significantly impeded if site access is denied by property owners. In such cases, maps, aerial photos, lidar-based topography, and other remotely sensed data are employed, and a worst-case scenario for site conditions must be assumed for initial risk screening and analysis.

### Environmental permitting

Once route selection has been reduced to a few feasible alternatives, the necessary federal, state, and local permits are acquired. Permitting agencies may, depending upon their regulatory authorities, focus on minimizing direct impacts to aquatic and riparian habitat, with an emphasis on maintaining channel and floodplain form and, by inference, habitat forming and maintaining processes. There is also a need to minimize off-site impacts, particularly with respect to water quality. Impact minimization is typically framed as reducing the disturbance footprint, but with dynamic stream crossings, a more sophisticated approach and context-specific design that recognizes stream sensitivity may be required.

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.

*River Res. Applic.* **31**: 767–783 (2015)
DOI: 10.1002/rra

AR 005853

Problematic site conditions, such as incising or laterally mobile streams with highly erodible bed and/or bank materials, need to be identified early in the project development process because unforeseen morphological responses may result in adverse impacts both on site (migration barriers and habitat destruction) and offsite (head cutting and degradation upstream and elevated sediment delivery downstream, leading to system-wide instability), leading to the potential for long-term habitat loss with limited potential for morphological recovery or revegetation. It follows that key aspects of the crossing need to be sufficiently characterized to allow for site evaluation and restoration that supports the level of design necessary to minimize short-term impacts and ensure long-term stability to minimize the need for future maintenance and adaptive management.

By adequately characterizing conditions and preliminary plans for crossing design and restoration, the proponents of a pipeline project can expedite the permitting process because reviewers with relevant services and agencies can identify any remaining issues and alert the proponent so that the initial design can be modified as necessary to meet the outstanding mitigation and monitoring requirements.

### Construction

Pipeline construction requires both an appropriate design and application of sound professional judgment and field skills to match the pipeline installation to landscape and local conditions, while also providing adequate site restoration. Consequently, the key to ensuring successful pipeline installation lies in assembling crossing design and construction teams that possess not only a robust understanding of options available for crossing the stream but also the practical experience necessary to deal with unpredictable site-specific problems as they arise.

The primary stream crossing construction methods for pipelines identified in the FERC Procedures (FERC, 2013) and used within the North America are dry ditch and open cut (Lévesque and Dubé, 2007). Dry-ditch crossing methods are categorically approved by FERC for streams up to 30 ft wide and may be constructed according to FERC by one of three different techniques: dam and pump, flume, or HDD (discussed below). Dam and pump and flume methods isolate a section of stream using a temporary coffer dam and divert the entire streamflow over or around the construction area and allow for trenching of the crossing in dry or nearly dry conditions (Figure 5). The open-cut crossing method involves excavation, emplacement, and backfilling of the pipeline trench with no effort to isolate flow from construction activities and is used on minor, intermediate, and major waterbody crossings (CAPP, 2005), however, FERC, (2013) limits the construction window with equipment in flowing water to 24 h for minor waterbodies and 48 h for intermediate



Figure 5. Typical flumed stream crossing. This figure is available in colour online at wileyonlinelibrary.com/journal/rra

waterbodies. FERC requires review and written approval of a detailed, site-specific construction plan and scaled drawings for each major waterbody crossing (FERC, 2013).

For any method requiring a ditch or trench to be excavated in the stream bed, excavation and backfilling are generally accomplished with equipment working in or near the stream (Figure 6). A section of pipe is pulled across the bottom of the trench to the opposite bank, floated across the stream, or carried into place and submerged into the trench. The trench is then backfilled, and the bed and banks of the stream are restored and, if necessary, revegetated or artificially stabilized. During the work, sediment barriers, such as silt fencing, staked straw bales, or trench plugs, are typically installed to prevent backfill and sediment-laden water from entering the stream from adjacent upland areas.

However, not all crossings require direct disturbance of stream bed or banks. While included in FERC guidelines as a 'dry-ditch' method, HDD is an alternative method by which a pipeline is installed beneath obstacles or sensitive areas without causing a surface disturbance. Pipelines are installed in an arc under the stream; therefore, entrance and exit points can be sited well beyond active streambank margins and often beyond FERC-required buffers. Properly designed, this process involves minimal disturbance of the

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.

*River Res. Applic.* **31**: 767–783 (2015)
DOI: 10.1002/rra



Figure 6. Backfilled crossing. This figure is available in colour online at wileyonlinelibrary.com/journal/rra

ground surface at the entry and exit points of the HDD and no disturbance to the ground or the stream between these points. At the crossing midpoint, the pipeline is often several tens of feet below the channel bed. The feasibility and length of crossing that can be constructed by HDD is limited by factors such as access to suitable entry and exit points, subsurface conditions (geology and sediments), and pipe diameter. Use of HDD avoids most of the risks associated with construction of excavated crossings, and site restoration is limited to reinstating and revegetating the ground surface around the crossing entrance and exit points.

### Site restoration

Site restoration methods and techniques depend on site conditions, stream type and channel stability prior to crossing construction, the properties of the bed and bank materials, the potential for vegetation regrowth, and how the channel is expected to respond to floods and other potentially destabilizing events during the design life of the crossing. Site restoration does not necessarily imply that a site will be returned to its pre-disturbance condition; this would be inappropriate if, for example, the stream was unstable or environmentally degraded prior to crossing construction. Consequently, site restoration may have dual and potentially conflicting aims of increased channel stability and improved habitat conditions. In such cases, restoration goals must be carefully set to avoid unacceptable environmental impacts while stabilizing the channel sufficiently to protect the pipeline throughout its design life and minimizing future maintenance requirements.

Site characterization provides a benchmark against which site restoration success can be measured. Setting minimum acceptable boundaries for channel stability and target trajectories for the environmental recovery allows designers to evaluate alternative restoration strategies. Experience shows

that rigid engineering structures (bed sills and bank revetments) may be essential to protect the pipeline from bed incision or bank line retreat at or around the crossing. In such cases, the potential for local site restoration is severely limited and may not represent a prudent use of resources, making off-site mitigation a more appropriate approach.

### Monitoring and maintenance

FERC and pipeline company inspections and monitoring emphasize safety and focus on detecting and avoiding the possibility of pipeline exposure, while permitting agencies are usually more focused on the possibility of adverse impacts on the environment as a result of operation of the pipeline and especially product leakage or spillage as a result of a pipeline rupture. For example, FERC often requires 3 years of vegetation monitoring to ensure soil stability along the pipeline, while pipeline companies aerially inspect their transmission projects at least annually and within a month following flood events of a magnitude sufficient to erode stream beds and banks, which informs maintenance needs (Floyd Robertson, Kinder Morgan, personal communication, August 14, 2013). Regulatory agencies, such as the FWS, may require specific monitoring of the ecological attributes of crossings, such as fish passage and riparian shade. However, a large number of federal, state, and local permits are required for pipeline construction and operation, and in practice, monitoring requirements vary between agencies.

The Framework presented here provides a vehicle with which to consolidate the diverse but overlapping monitoring and maintenance requirements of FERC, the pipeline companies, and the permitting agencies. Once basic data needs and monitoring requirements have been identified, including data resolution and temporal and spatial scales, derivation of an integrated monitoring plan becomes feasible. This has the added advantage that it supports production of a single, consolidated plan, rather than a plethora of customized plans prepared for each entity.

Because the Framework provides a single, well-documented baseline description of habitat conditions at the pipeline crossing, this constitutes an excellent foundation from which to build a comprehensive monitoring plan. The initial baseline condition can be refined and updated following pipeline construction, as field observations reveal further information and engineering adjustments are made. A thorough post-construction survey of the crossing 'as built' then provides the detailed, quantitative data against which all future surveys can be compared.

## APPLICATION: CASE STUDY

The Ruby Pipeline Project (Project), completed in 2011 by Ruby Pipeline, LLC (Ruby), was the first project to use both

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.

*River Res. Applic.* **31**: 767–783 (2015)
DOI: 10.1002/rra

AR  005855

the Framework and the Risk Matrix. Ruby worked directly with FWS to help create, refine and improve both the Framework and the Risk Matrix and continues to provide feedback to FWS on their efficacy and limitations.

(a) Basic stream data collection

The Ruby Project comprises approximately 675 miles of 42-inch diameter natural gas pipeline, along with associated compression and measurement facilities, extending between Opal, Wyoming and Malin, Oregon (Figure 7). There are a total of 849 stream crossings on 773 individual streams. Flow at 130 of the crossings is perennial; it is intermittent at 177 and ephemeral at 542. Ruby completed desk-based, remotely-sensed and field surveys for all these crossings during 2008 and 2009. Throughout that period, Ruby consulted with the FWS using the Framework to match basic stream data collection to the needs of FERC and the permitting agencies as well as the pipeline company (Table I).

(b) Initial screening

Once the basic stream data were collected, Ruby worked with the FWS to identify crossings that could be screened out from both further data collection and risk analysis because their potential for generating adverse impacts on habitat and channel stability was negligible.

Crossings screened out in this way included the following:

- perennial and intermittent crossings that required state-mandated fish passage designs
  ○ these crossings were already subject to a high level of technical and engineering review.

- irrigation canals not located in valley floors
  ○ these are stable channels that could be scheduled for construction when not in use, are maintained by other entities, and post-construction impacts would not be expected.
- swales and other unchanneled, fluvial features
  ○ these crossings have no distinct stream channel or bank features and, thus, present no risks related to scour or lateral erosion.
- crossings on very small waterbodies
  ○ these streams generate insufficient stream power to erode their channel boundary materials because of their low discharges and low channel slopes (as described below).

While crossings of streams with fish passage concerns, irrigation canals, and swales were screened out on the basis of qualitative assessment, those screened out because of the small size of the waterbody were eliminated on the basis of a quantitative analysis based on their bankfull discharge and depth, channel gradient, and bed grain size relative to the grain size predicted for sediment transport at bankfull discharge (MACTEC, 2010). This small waterbody screening procedure was applied to 488 crossings. Based on this quantitative analysis, 439 crossings were screened out from further assessment because they

- had insufficient stream energy to erode the channel boundaries;
- were high (>10%) gradient, non-alluvial cascades, in which channel adjustments are unlikely to propagate upstream or downstream;
- had channel boundaries that were immobile at bankfull flow; or



Figure 7. Ruby Pipeline route. This figure is available in colour online at wileyonlinelibrary.com/journal/rra

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.          *River Res. Applic.* **31**: 767–783 (2015)
DOI: 10.1002/rra

AR  005856

- were sufficiently small that they posed no hazard to the pipeline even if scour and lateral erosion were to occur (specifically bankfull discharge <2.5 ft³ per second, bank height <0.5 ft).

(c)  Use of the Risk Matrix

Further assessments were performed for the 340 crossings remaining after initial screening using the Risk Matrix: 35 in Wyoming, 128 in Utah, 122 in Nevada, and 55 in Oregon. Stream and site response risk variables were assessed based on field data, photographs, and topographic maps. Where construction involved blasting, the crossing was assessed as high risk on the *y*-axis regardless of the risk levels associated with other project risk factors. This is because the degree of modification of the bed and bank can be more extreme and less controllable with blasting that with normal excavation and grading. For factors assessed as lying between two categories (e.g. moderate and high), risk was categorized at the higher level. In cases where the information necessary to assess the level of risk associated with a factor was missing, the factor was categorized as being of high risk.

In terms of stream response potential (the *x*-axis of the Risk Matrix), approximately 30% of crossings were assessed as low risk, 34% as moderate, and 36% as high risk. Streams assessed as high risk tended to lack a riparian corridor and/or had fine-grained bed materials. For example, an ephemeral tributary to Eagle Creek located in Elko County, Nevada, was assessed as having a high stream response potential because of evidence of channel incision, lack of a riparian corridor, and a silt bed. Conversely, Spring Creek, a perennial stream located in Elko County, Nevada, was assessed as having a low stream risk because its stream type was classed as being colluvial. If the channel of a watercourse is classed as bedrock or colluvially controlled, then the remaining risk factors are less applicable because the stream is not fully alluvial and the risk associated with stream response potential is generally assessed as low.

In terms of project impact potential (the *y*-axis of the Risk Matrix), 75% of crossings were assessed as being of low project risk, 16% as moderate, and 9% as high. Blasting was the only factor that resulted in crossings being assessed as being of high project impact potential. For example, Maggie Creek, a perennial stream located in Elko County, Nevada, was assessed as having a high project risk because there was a high probability that blasting would be required as part of construction.

Only one crossing, on Rattlesnake Creek, a perennial stream in Elko County, Nevada, was identified as being of high risk in terms of its potential for both stream response and project impact. The factors responsible for this outcome were that the stream was found to lack a riparian corridor and that constructing the crossing was predicted to be likely to require blasting.

The outcomes of application of the Risk Matrix allowed Ruby and the FWS to focus attention on the streams and crossings with higher risks, while construction of streams and crossings that posed lower risks could be addressed in a more prescriptive manner and their crossing designs expedited.

(d)  Baseline and effectiveness monitoring

Baseline (pre-construction) monitoring was completed by Ruby at all crossing sites and included establishment of permanent survey markers for the entire monitoring area, surveying of channel long profiles and cross sections, and photographic documentation from marked photo points. It was followed by implementation monitoring to provide the basis for post-construction effectiveness monitoring and appraisal. Implementation monitoring helps determine if a project was implemented as planned and designed, while effectiveness monitoring evaluates if the project had the desired physical and/or biological effect. To date (2013), one season of effectiveness monitoring has been completed for the project.

The physical and biological effectiveness of crossings will be routinely monitored for 5 years following construction through a programme of annual, visual evaluations. For crossings assessed as low risk, effectiveness monitoring will be based on a randomly selected, 10% sample. Crossings on streams with moderate risk in terms of stream response potential have been grouped according to following characteristics:

(1)  limited riparian corridor,
(2)  requirement for fish passage,
(3)  construction required blasting, and
(4)  construction required HDD.

and a random sample of 25% of the crossings within each category will be monitored for effectiveness.

All crossings assessed as high risk will be monitored for effectiveness. To test the reliability of the ephemeral channel screening procedures discussed in the preceding texts, ten of the excluded crossings screened out in the initial site assessment have been randomly selected for further survey, analysis and effectiveness monitoring. In addition, future monitoring will include visual evaluation and reconnaissance level surveys performed at 2, 5, 10, 15, and 20 years following construction.

To date (2013), just one season of physical and biological effectiveness monitoring has been completed, and the results indicate that no mass wasting occurred at any of the sites during the first year post-construction, while bank erosion extended along less than 20% of the channel within the RoW at 76% of monitored crossings. However, the bank erosion performance target for the project is for at least 80%

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.

*River Res. Applic.* **31**: 767–783 (2015)
DOI: 10.1002/rra

of crossings to meet this criterion within 5 years. At the great majority (85%) of the crossings where more than 20% of the bank lines were found to be eroding, erosion was associated with cattle grazing (i.e. overgrazing, vegetation trampling, and mechanical damage to the bank). It is anticipated that the target for bank erosion will be met because of continued vegetative recovery during subsequent growing seasons, coupled with fencing to exclude livestock and, where necessary, engineering measures to protect the banks at crossings where persistent erosion and/or poaching prevents natural revegetation.

Effectiveness monitoring further established that 1-year post-construction fish passage has been unaffected at monitored crossings along the Ruby Pipeline.

## SUMMARY AND CONCLUSIONS

Expanding production of natural gas and oil is driving demand for new or improved pipelines, and past experience at waterbody crossings indicates that the potential for negative impacts to aquatic habitat and channel stability is substantial. To avoid adverse impacts to aquatic species while reducing the likelihood of pipe exposure, a risk-based approach to crossing design and permitting is appropriate. Stratifying crossings according to risk allows the allocation of time and resources to support pipeline design and permitting to be matched to the level of risk. Effort may then be focused on design and review higher risk waterbodies and crossings, with standard methods used to expedite treatment of lower risk streams and crossings.

The Waterbody Crossing Framework (referred to as the Framework) and the Pipeline Risk Screening Matrix (Risk Matrix) reported in this paper were designed by the US FWS in cooperation with Ruby Pipeline, LLC, to provide a robust but flexible and time-efficient approach to crossing design, review and monitoring. While the Framework and Risk Matrix were developed for the conservation of aquatic habitat and species, they are easy to adapt for other uses, including evaluation of geomorphic risks, such as channel incision and bank erosion, associated with pipeline exposure and failure. Similarly, while these tools were developed for natural gas pipelines in the PNW region of the USA, their applicability extends to any existing or proposed pipeline, regardless of geographic location or product being transported.

The Framework and Risk Matrix were both shown to be effective for structuring the evaluation of relative risk because of project implementation and stream response potential, but there is certainly room for improvement. The need for extensive field data to implement the Risk Matrix is a major limitation, especially when sites are inaccessible because of landownership or physical restrictions, as is commonly the case during the route selection process. Without the actual field data, risk factors must be assumed to be high, which may result in unnecessary rerouting of the pipeline. It can be anticipated that increased availability and applicability of LiDAR and improvements in other remote sensing technology will reduce the need for field intensive data collection.

A further limitation is that the Framework and Risk Matrix do not directly address climate change or predicted changes in the landscape because of development or land management, which is a significant limitation given the average life span of a pipeline.

Finally, additional research on how individual risk factors are evaluated and weighted would provide a more quantitative assessment of risk. This could be accomplished through forensic analysis of actual pipeline failures. Additional data analysis would also reduce the risk of overmonitoring factors that are actually low risk and missing high-risk factors.

The approach has been applied to hundreds of stream crossings along the Ruby Pipeline, demonstrating its practical utility, and experienced being gained during post-construction monitoring continues to provide insight into the efficacy and usefulness of these newly developed tools. Whether a pipeline is local or regional in nature, the Framework provides an efficient way to organize data, apply a risk-based approach, and stratify sites for future monitoring in a transparent and logical manner.

## ACKNOWLEDGEMENTS

The initial Risk Screening Matrix, on which the Pipeline Risk Screening Matrix is based, was developed as part of the joint RiverRAT effort by NOAA Fisheries and the US FWS. However, the findings and conclusions in this article are those of the authors and do not necessarily represent the views of the US FWS, NOAA Fisheries, or Ruby Pipeline, LLC.

## REFERENCES

Atkins. 2012. Yellowstone River Pipeline Risk Assessment and Floodplain Reclamation Planning Project. Final Report to the Yellowstone River Conservation District Council, September 21, 2012.

CAPP -- Canadian Association of Petroleum Producers, Canadian Energy Pipeline Association and Canadian Gas Association. 2005. Pipeline Associated Watercourse Crossings. Prepared by TERA Environmental Consultants and Salmo Consulting Inc. Calgary, AB.

Castro J. 1997. Stream classification in the Pacific Northwest: methodologies, regional analyses, and applications. PhD Dissertation, Oregon State University, Corvallis.

Cluer, B, Thorne, CR, Castro, JM, Pess, G, Beechie, T, Shea, C, Skidmore, P. 2010. Tools and Science Base for Evaluating Stream Engineering, Management, and Restoration Proposals, *Proceedings of the Federal Interagency Sediment Conference 2010*, Las Vegas, Nevada (June 2010).

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.

*River Res. Applic.* **31**: 767–783 (2015)
DOI: 10.1002/rra

Federal Energy Regulatory Commission (FERC). 2003. Upland erosion control, revegetation, and maintenance plan, January, 2003 version.

Federal Energy Regulatory Commission (FERC). 2013. Wetland and waterbody construction and mitigation procedures, May, 2003 version.

Hey, RD. 1978. Determinate hydraulic geometry of river channels. *Journal of the Hydraulics Division, ASCE* **104**(6): 869–885.

Hydrocarbons Technology.com 'Supsa Terminal and Pipeline, Georgia, Azerbaijan', http://www.hydrocarbons-technology.com/projects/supsa/, on-line, last visited 22 March 2014.

Knighton D. 1998. *Fluvial Forms and Processes: A New Perspective.* Arnold: London.

Lévesque LM, Dubé MG. 2007. Review of the effects of in-stream pipeline crossing construction on aquatic ecosystems and examination of Canadian methodologies for impact assessment. *Environmental Monitoring and Assessment* **132**: 395–409. DOI:10.1007/s10661-006-9542-9

Levy DA. 2009. Pipelines and salmon in northern British Columbia. Prepared for the Pembina Institute by Levy Research Services Ltd. 315 Lonsdale Ave. North Vancouver, B.C. V7M 2G3.

Little WC, Murphey JB. 1982. Model study of low drop grade control structures. *Journal of the Hydraulics Division, ASCE* **108**(10): 1132–1146.

MACTEC. 2010. Ruby Pipeline – Hydraulic Screening Procedures – Ephemeral Stream Crossings, Technical Memorandum, from Jeff Keaton and SU Mishra, MACTEC Engineering and Consulting, Inc., to Ruby Pipeline, LLC. June 28, 2010.

Montgomery DR, Buffington JM. 1998. Channel processes, classification, and response. *River Ecology and Management* **112**: 1250–1263.

NTSB (National Transportation Safety Board). 1996. Evaluation of pipeline failures during flooding and of spill response actions, San Jacinto River near Houston, Texas, October, 1994. Pipeline Special Investigation Report, PB96-917004, NTSB/SIR-96/04.

Rapp CF, Abbe T. 2003. A Framework for Delineating Channel Migration Zones. Washington State Department of Ecology Final Draft Publication #03-06-027. Available at: http://www.ecy.wa.gov/biblio/0306027.html.

Reid SM, Anderson PG. 1999. Effects of sediment released during open-cut water crossings. *Canadian Water Resources Journal* **24**(3): 235–251.

Reid SM, Jalbert A, Metikosh S, Bender M. 2002a. A performance measurement framework for pipeline water crossing construction. *7th International Symposium on Environmental Concerns in Rights-of-Way Management*. Elsevier Science: Calgary, Alberta; 697–703.

Reid SM, Stoklosar S, Metikosh S, Evans J. 2002b. Effectiveness of isolated pipeline crossing techniques to mitigate sediment impacts on brook trout streams. *Water Quality Research Journal of Canada* **37**(2): 473–488.

Reid SM, Ade F, Metikosh S. 2004. Sediment entrainment during pipeline water crossing construction: predictive models and crossing method comparison. *Journal of Environmental Engineering and Science* **3**: 81–88.

Reid SM, Metikosh M, Evans J. 2008. Overview of River and Stream Crossings study. *8th International Symposium on Environmental Concerns in Rights-of-Way Management*. New York Elsevier Science; 711–722.

Rempel LL, Porter M. 2008. A risk assessment tool for evaluating geohazards and fisheries sensitivity at pipeline water crossings. 7th International Pipeline Conference, International Petroleum Technology Institute and the Pipeline Division.

Sear DA, Newson MD, Thorne CR. 2010. Guidebook of Applied Fluvial Geomorphology, Thomas Telford, London, UK, ISBN 978-0-7277-3484-6, 257p.

Skidmore PB, Thorne CR, Cluer BL, Pess GR, Castro JM, Beechie TJ, Shea CC. 2011. Science Base and Tools for Evaluating Stream Engineering, Management and Restoration Proposals, NOAA Technical Memorandum NMFS-NWFSC-112, National Technical Information Service, 5285 Port Royal Road, Springfield, VA 22161, USA, 253p. Available via http://www.nwfsc.noaa.gov

Thorne CR, Osman AM. 1988. Riverbank stability analysis II: Applications. *Journal of Hydraulic Engineering* **114**(2): 151–172.

Thorne CR, Castro JM, Cluer B, Skidmore P, Beechie T, Pess G, Shea C. 2014. Project risk screening matrix. River Research and Applications.

Published 2014. This article is a U.S. Government work and is in the public domain in the USA.

*River Res. Applic.* **31**: 767–783 (2015)
DOI: 10.1002/rra

AR 005859

Exhibit 16

AR 005860

**EDITOR'S NOTE:** The following two draft policy statements have been developed and reviewed by the AFS Environmental Concerns Committee. They will be referred to the Executive Committee for consideration at the 114th AFS Annual Meeting in Ithaca, New York. Comments from the membership are invited and should be directed to Carl Sullivan at AFS headquarters. Existing policy statements developed by the Environmental Concerns Committee and adopted by AFS include: "AFS Overview Policy on Man-Induced Ecological Problems"; "Nonpoint Source Pollution"; "Sedimentation"; "Cumulative Effects of Small Modifications to Habitat"; "Effects of Toxic Substances in Surface Waters"; "Acidic Precipitation"; "Coping with Point Source Discharges"; "Effects of River and Streamflow Alteration on Fishery Resources"; and "Protection of Threatened and Endangered Aquatic Species." A recently developed policy statement, "Effects of Surface Mining on Aquatic Resources in North America," was presented to the Executive Committee for approval in March.

# CONSTRUCTION AND OPERATION OF OIL AND GAS PIPELINES

**Russ F. Penkal and Glenn R. Phillips**

## A. ISSUE DEFINITION

Transportation of oil and gas in North America is a vast operation with pipelines reaching virtually to every corner of the continent. Oil and gas may be transported from the field to process plants to storage areas to consumers in a system covering thousands of miles. For the most part, this network involves large diameter pipes. For example, gas-transmission pipelines are made of high-strength steel, generally 12 to 48 inches in diameter, and operate at pressures of 500 to 1,500 psi (Carter et al. 1982).

With improved technology, longer oil and gas transmission pipelines become feasible. The Northern Tier Pipeline proposed to transport Alaskan oil from Port Angeles (Washington) to Clearbrook (Minnesota) would have been 1,491 miles long. In Montana alone, the pipeline would have crossed 150 streams with comparable numbers of stream crossings in Washington, Idaho, North Dakota, and Minnesota. As the scale of these interstate projects has increased, so has regulatory involvement. In March 1976, the Northern Border Pipeline Company (gas) funded a study to explore permitting requirements. The study team concluded that 72,000 permit applications would be required and that the company would need to satisfy 14 federal agencies and 409 states, counties, and townships (Carter et al. 1982) to complete the pipeline between Fort Morgan, Montana and Ventura, Iowa.

Impacts from oil and gas pipelines potentially occur during construction and during operation with the type of impact different in each. During construction, typical impacts are related to clearing the pipeline right-of-way (ROW), constructing access roads, and laying the pipeline. The extent of damage depends, for example, on use of erosion control techniques, number of stream crossings, climate, and terrain. When a pipeline crosses a stream there can be biological and engineering problems. For example, the El Paso Pipeline (gas) crossing beneath the Santa Cruz River in Arizona was designed to withstand, but was severely damaged by flooding associated with a 100-year rainfall event. This pipeline was replaced by a pipe-suspension bridge.

Impacts during pre-operational testing and operation are associated not only with spills but also with maintenance of the ROWs. Cleared ROWs can continue to be a source of sedimentation. Petroleum spilled during construction of the Trans-Alaska Pipeline was estimated to be 535,000 gallons (Olson-Elliot and Associates 1979). Five oil spills occurred in the first months of operation of the Trans-Alaska Pipeline, two of which resulted in losses of 12,000 and 15,000 barrels (Montana Department of Natural Resources and Conservation 1979). On a national average, new pipelines have an annual spill frequency from all causes of 0.0022 spills per mile (U.S. Department of Interior 1979) or about one spill for every 455 miles of pipeline.

Because of the magnitude of pipeline projects, the number of waterways involved, the high quality of fishery resources in many of these waterways, and the potential for impacts to fisheries from spills or construction activities, safeguards must be adopted to protect these important resources.

## B. IMPACTS ON HABITAT

### Channel Alterations

Fishery habitat may be adversely affected by sedimentation from pipeline construction. Sedimentation can occur from (1) trenching to lay pipeline beneath the stream channel, (2) runoff at construction sites, (3) erosion resulting from construction of culverts, roads, bridges, or fords, and (4) hydrostatic testing. Additionally, silt or sand deposition can fill interstices in gravel and reduce water flow through substrate. Equipment operating in the stream can compact substrate, create sediment, and eliminate spawning habitat.

Streambank alterations where pipelines parallel or cross the stream channel can result in increased water velocity, increased erosion upstream (degradation), deposition of sediment downstream (aggradation), shortened stream length, and migrating stream channel. Additionally, vegetation removed from streambanks can change temperature regimes, and blasting can adversely alter stream habitat.

### Accidental Spills

Oil spilled during pre-operational testing and operation causes short- and long-term impacts to fish spawning habitat and invertebrate attachment sites. In addition to spills from the pipeline, oil or oil products can leak from construction equipment, broken hydraulic or fuel lines, ruptured storage tanks, overturned equipment, fuel hauling trucks, defective fuel bladders, and improperly disposed of waste oil containers.

Petroleum spilled directly into the aquatic environment immediately begins to undergo physical and chemical modifications. Changes include formation and dispersion of slicks on the water surface, evaporation of volatile components, dissolution of soluble components into the water beneath the slick, emulsification of fine petroleum particles into the water column by turbulent mixing, adsorption of petroleum onto particles and organisms, and photochemical modifications (Malins 1977).

### Fish Passage

Temporary dams, diversions, or flumes constructed at pipeline stream crossings impede fish passage. Long-term blockage has resulted from inadequately sized drainage structures (resulting in excessive water velocities) or from gravels accumulated from poorly stabilized stream crossings.

### Ancillary Development

Pipelines may stimulate development creating additional demands on aquatic resources and on water supplies. Refineries may be built or expanded and industries which consume oil or gas products may develop. For example, two coal gasification plants that would connect to the Northern Border Pipeline already have been proposed in northeastern Montana (Montana Department of Natural Resources and Conservation 1980). In northern Canada, a pipeline may result in construction of a new highway.

Construction of oil and gas pipelines and spin-off development may reduce the aesthetic quality of streams. Riprap, vegetation removed from ROWs and disturbed banks at trenched crossings, reduces aesthetic quality. Cleared ROWs and access roads adjacent to streams interrupt natural vegetation, provide increased vehicular access to streams, and increase need for bank stabilization structures. Bridges, pump stations, delivery facilities, and electric lines further reduce aesthetics of the fishing experience if within view of streams.

## C. EFFECTS ON BIOTA

### Oil

Oil interferes with vital functions of many aquatic organisms. Free oil and emulsions can cover epithelial surfaces of aquatic animals and interfere with respiration. Sublethal effects of petroleum are largely unquantified; however, many aquatic organisms are known to display adverse responses to petroleum components at levels 100–1,000 times lower than acutely toxic concentrations (i.e., in the parts-per-billion range). In plants, both respiration and photosynthesis can be inhibited. Oily substances can coat and destroy benthic organisms. Even very low oil concentrations can taint fish flesh.

### Other Toxic Materials

Fish and other aquatic organisms can be killed by compounds used during pipeline construction and testing. Hydraulic fluid, rust, and bacteriacides used during construction and cleaning may be washed into streams. Antifreeze, alcohol, or heated water added to the pipe to prevent freezing also can reach natural waters and adversely impact aquatic resources. Aquatic organisms can be impacted by depressed oxygen levels caused by decomposition of oil or organic matter (from spills). Reoxygenation by aquatic plants (McKee 1956) also can be retarded.

### Silt

Increased sediment in lakes or streams reduces light penetration and decreases primary production. Heavy loads of silt can cause direct mortality of aquatic plants, macroinvertebrates, and fish (Rulifson 1979). Silt can fill gravel interstices, reduce water flow through the gravel, cause declines in benthic production, and increase mortality of fish eggs or larvae. Heavy sediment loads on stream and lake bottoms can prevent successful reproduction of fishes and result in unstable and unsuitable substrates for periphyton, aquatic macroinvertebrates, and macrophytes.

### Blasting

Shock waves from blasting in or near a stream can kill or injure fish. Pressures of 4,050 psi killed northern pike where dynamite explosives were used. Charges of several pounds or more killed fish 200 to 400 feet away; fifty pound charges killed fish up to 1,000 feet away (Bell 1973; Wright 1982).

## D. NEEDED ACTIONS

### Planning

Prior to pipeline construction, less damaging, alternative modes of oil and gas transportation should be explored.

State natural resource agencies should be involved in the preliminary pipeline planning process to prevent violations of water quality and habitat protection laws and to minimize impact of pipeline construction and operation on aquatic resources. Several states have established committees to ensure state regulations are met, and construction and maintenance are environmentally compatible. Such committees are an effective safeguard against poor planning. If a pipeline crosses state borders, an interstate coordinating committee should be established. The interstate coordinating committee could ensure uniformity of environmental regulations and possibly lessen the regulatory burden of the pipeline company.

Coordinating committees and the pipeline company should establish generic siting and safeguard criteria to ensure minimal adverse impact on habitat and biota during pipeline construction and operation. For example, only specified equipment should be allowed on the streambed, spawning habitats should be avoided during construction, and service roads should be limited to specified grades and widths. All construction activities, especially erosion control, should be based on the best available technology. The coordinating committees should also develop mitigation strategies for companies to implement, (i.e., dealing with loss of wetlands or stream habitat). If, for example, stream improvement structures are prescribed, they could be installed during the construction period.

Companies and the coordinating committee should conduct joint audits of degree of compliance with the siting and construction criteria. Accurate records of compliance should be maintained.

JA2750

AR 005861

The coordinating committee and pipeline company also should develop an oil spill contingency plan. This plan should describe company plans for containment, clean-up, and mitigation of oil spills and detail how the company maintains clean-up readiness. Further, the plan should describe measures to prevent spills and to monitor for leaks.

Approved construction plans should be posted at the construction site and periodic review of construction activities should be made.

*Education*

During construction of the Alaska pipeline, problems resulted because some workers were uninformed about the hazards and consequences of spills and were inadequately trained to implement clean-up procedures. As a result, spills often were not reported or cleaned up. State natural resource agencies should provide information to pipeline company personnel, contractors, and the public concerning regulatory requirements, the environmental consequences of spills, and how to prevent and react to spills. For example, an educational series in a local newspaper on hazards and methods of dealing with spills may help promote more timely and effective response. Training and certification should be mandatory with certified employees assigned to each active construction site.

*Enforcement*

Strict federal regulations, including mandatory reporting requirements, presently govern discharge of oil to natural waters; however, enforcement is not always vigorous. A surveillance team which includes an aquatic biologist should be formed by each state to monitor compliance with state and federal laws during construction. The surveillance team should also monitor compliance with agreements reached between the state and the pipeline company such as oil spill contingency plans. *Strict enforcement* of laws and agreements which provide authority to stop construction or operation and to assess large fines, would help minimize habitat damage.

*Research*

The pipeline company should be encouraged to fund or conduct research to improve construction techniques and develop monitoring devices such as improved directional drilling methods and oil spill detection instruments, and to improve techniques of erosion control, habitat restoration, enhancement of productivity at stream crossings, and restoration of wetland areas.

## E. CONCLUSION

Construction and operation of pipelines can cause significant damage to aquatic habitats and fishery resources; however, these impacts can be substantially reduced with proper planning, education, and regulation. Society members involved with pipeline projects should seek to ensure that a good habitat protection program is established well in advance of construction initiation. The Society should continue to examine the adequacy of existing laws dealing with oil and gas pipelines and work to update and amend legislation so as to ensure protection of aquatic resources. Finally, the Society should consider forming a committee to draft an information manual on "best management practices for oil and gas pipeline construction and operation," and a directory of AFS members with expertise to assist oil and gas pipeline committees.

## LITERATURE CITED

Bell, M. 1973. Fisheries handbook of engineering requirements and biological criteria. Fisheries Engineering Research Program, U.S. Army Corps of Engineers, North Pacific Division, Portland, Oregon.

Carter, R. P., D. E. Edgar, and M. Pacholok. 1982. An assessment of environmental problems associated with installation and maintenance of new gas-transmission pipelines. Final Report. GRI-81/0114. Gas Research Institute, Chicago, Illinois.

Malins, D. C. 1977. Effects of petroleum on Arctic and Subarctic marine environments and organisms. Vol. I, Nature and Fate of Petroleum. 321 pp. Vol. II, Biological Effects of Petroleum. 500 pp. Academic Press, New York.

McKee, J. E. 1956. Report on oily substances and their effects on the beneficial uses of water. Calif. State Water Pollut. Control Board Publ. No. 16. Sacramento, California. 71 pp.

Montana Department of Natural Resources and Conservation. 1979. Draft EIS on the proposed Northern Tier Pipeline System. Helena, Montana. 151 pp.

———. 1980. Final environmental impact statement on the proposed Northern Border Pipeline. Helena, Montana. 48 pp.

Olson-Elliott and Associates. 1979. Environmental impact of the Northern Tier Pipeline on Montana aquatic resources. Prepared for Montana Department of Natural Resources and Conservation, Helena, Montana. 194 pp.

Rulifson, R. L. 1979. Sedimentation. Fisheries. 4:52–54.

U.S. Department of Interior. 1979. Bureau of Land Management draft environmental statement, crude oil transportation system: Port Angeles, Washington to Clearbrook, Minnesota (as proposed by the Northern Tier Pipeline Co.). Portland, Oregon.

Wright, D. G. 1982. A discussion paper on the effects of explosives on fish and marine mammals in the waters of the Northwest Territories. Canadian technical report series on fisheries and aquatic sciences. 1052:v + 16 pp.



# LAMINATED PLASTIC TAGS

**Durable - Highly Visible**

Now—Peterson discs or Carlin ovals in ten colors or combinations. Laminated over your specified printing for very long-lasting legibility.

**Discs easily attach** flat to fish with a nickel pin through dorsal rays, for good retention and no harm to fish, and are ideal for net fishery research.

**Stream fishery** large discs can be read through binoculars from the bank. Diameters to 1 5/16 inches, any center hole diameter.

**Oval tags** will also glue securely to shellfish; clams, oysters, abalone, etc. They're also good internal anchor tags, with exterior tubing indicators.

*Call or write for immediate price quotes and details.*

 **Floy Tag & Manufacturing, Inc.**
P.O. BOX 5357  4616 UNION BAY PLACE N.E.
SEATTLE, WA 98105  (206) 524-2700

# BEVERAGE CONTAINER LEGISLATION

## Gary Kimball and Jon Ross

### A. ISSUE DEFINITION

Everyone has at one time observed an empty can floating in a favorite lake or stream. This refuse does not pose any immediate harm to the aquatic environment, but it violates our aesthetic senses; somehow you really didn't quite "get away from it all." Aesthetics contribute a major part of what we find desirable about the sport fishing experience. While aesthetic impacts cannot be quantified as rigorously as toxic wastes, these impacts are certainly real even if less tangible.

We live in a consumer oriented society and one of the drawbacks of this society is the problem of disposing of the residues of that consumption. Litter and solid waste issues have received heightened public visibility in recent years because of the increase in litter, rapid filling of landfills and accompanied surface and ground water pollution, and difficulties in siting new landfills.

One solution, although somewhat controversial, has been container deposit legislation. This legislation encourages recycling and reducing litter by requiring a deposit, usually $.05 or $.10 on each beverage container sold to consumers, which is refunded upon return of the container. Enactment of container deposit legislation requires a decision to penalize those who carelessly dispose of empty beverage containers. Legislation of this type allows the individual to retain freedom of choice and is aimed only at those who choose to pollute. Incentives of this nature have an immediate and direct effect on individuals and require a minimum of governmental intervention.

Container deposit legislation has met staunch opposition from affected industries because of purported cost increases, job loss or dislocation, and differing opinion as to the amount of litter reduction to be experienced. There are many different types of litter found along our streams, lakes, rivers, and roadsides. Beverage containers, primarily for soft drinks and beer, compose a large percentage and are the types of litter usually controlled by container deposit legislation. Materials used to produce such containers include glass, plastic, and metal (primarily aluminum or steel).

Beverage container legislation has been enacted in both the U.S. and Canada. Presently, five Canadian provinces (Alberta, Quebec, Nova Scotia, New Brunswick, British Columbia) have container deposit legislation. In the U.S., container deposit laws are currently in force in nine states (Connecticut, Delaware, Iowa, Maine, Massachusetts, Michigan, New York, Oregon, Vermont); additional states are currently considering similar legislation. Many referenda have been voted on regarding the promulgation of container deposit laws. In 1981, legislation was introduced in the U.S. Congress to enact a National Container Deposit Law (U.S. Congress 1981).

Container deposit legislation has been proposed as a means of reducing the one way flow of materials that starts with extraction of resources from the earth and ends with burial in a landfill. The presumed benefits of introducing recycling into

this process is the reduction in pollution and energy usage associated with the extraction and manufacturing processes as well as reduction of the rate at which waste is placed in landfills (Sullivan 1978). Recycling will reduce the overall need for natural resources. But, recycling will incur additional costs.

Several states have monitored the effects of container deposit laws. Prior to enactment of container legislation, Michigan observed that the number of beverage cans found along roadsides increased from 69 cans per mile in 1968 to 176.5 cans per mile in 1978. Since enactment of their beverage container law, Michigan has experienced an 83% decrease in the number of regulated containers in litter counts (Special Joint Committee to Study the Impact of the Beverage Container Deposit Law 1980). Vermont has monitored litter since passing a container law in 1973. They report a 35% reduction in total litter and a 76% reduction in beverage container litter. Oregon found a 39% reduction in total litter, and an 83% reduction in beverage container litter since their law went into effect in 1972. Overall, the states report a reduction of 35% to 56% in total litter, and 76% to 83% in beverage container litter. These data are in agreement with a 1980 General Accounting Office (GAO) estimate that 80% to 90% of beverage containers are returned when container laws are in effect (U.S. General Accounting Office 1980). A number of sources have indicated container legislation results in a 6% reduction by volume in solid waste disposal in landfills. Reduced need for landfills lessens problems commonly associated with these sites, such as run-off and leachate generation and also preserves options for land use which include maintenance for fish and wildlife.

It is difficult to estimate directly the effects of container legislation on the manufacturing needs and requirements for raw materials used in producing containers and the resultant decrease in pollutants released into the environment as a result of decreased quantities of manufactured containers. New York estimates a 47% to 70% reduction in airborne pollutants and a 44% to 69% reduction in waterborne pollutants attributable to the beverage industry once deposit laws were in effect (Office of Development Planning 1982). It is obvious that iron, aluminum, and asbestos (and to a lesser extent copper, nickel, zinc, cobalt, chromium, and mercury) contamination will be reduced as a result of the reduction in mining operations needed to secure iron and aluminum for cans (U.S. Environmental Protection Agency 1982), but the degree of ecological improvement resulting from recycling is difficult to evaluate.

The need to conserve energy and natural resources in the U.S. and Canada has been used as support for arguments, both pro and con, in debates on container deposit legislation. The beverage and disposable container industry claims that refillable containers will increase fuel consumption of vehicles used to distribute beverages because of more frequent two-way trips as well as the need for more vehicles; refillables are heavier and require more storage space. In addition, it is claimed

Exhibit 17

AR 005863

Environ Monit Assess (2007) 132:395–409
DOI 10.1007/s10661-006-9542-9

# Review of the effects of in-stream pipeline crossing construction on aquatic ecosystems and examination of Canadian methodologies for impact assessment

**Lucie M. Lévesque · Monique G. Dubé**

Received: 13 June 2006 / Accepted: 26 September 2006 / Published online: 15 February 2007
© Springer Science + Business Media B.V. 2007

**Abstract** Pipeline crossing construction alters river and stream channels, hence may have detrimental effects on aquatic ecosystems. This review examines the effects of crossing construction on fish and fish habitat in rivers and streams, and recommends an approach to monitoring and assessment of impacts associated with these activities. Pipeline crossing construction is shown to not only compromise the integrity of the physical and chemical nature of fish habitat, but also to affect biological habitat (e.g., benthic invertebrates and invertebrate drift), and fish behavior and physiology. Indicators of effect include: water quality (total suspended solids TSS), physical habitat (substrate particle size, channel morphology), benthic invertebrate community structure and drift (abundance, species composition, diversity, standing crop), and fish behavior and physiology (hierarchy, feeding, respiration rate, loss of equilibrium, blood hematocrit and leukocrit levels, heart rate and stroke volume). The Before-After-Control-Impact (BACI) approach, which is often applied in Environmental Effects Monitoring (EEM), is recommended as a basis for impact assessment, as is consideration of site-specific sensitivities, assessment of significance, and cumulative effects.

**Keywords** Environmental effects monitoring · Fish habitat · Impact assessment · Pipeline crossing · Rivers and streams

## 1 Introduction

Pipeline crossing construction has the potential to negatively affect watercourse ecosystems (Zwirn 2002). Construction activities alter river and stream channel beds and banks, directly and indirectly affecting fish and fish habitat. In light of pipeline construction projects that have been proposed for such areas as the Mackenzie River valley in northern Canada, the ecological impacts of these activities, as well as their potential for cumulative effects, need to be understood and their methods of assessment thoroughly considered (Lévesque 2005). This document briefly outlines below-ground pipeline crossing construction methods, their potential to affect aquatic ecosystems, and Canadian regulations surrounding these activities. Impact assessment methodologies applied in Environmental Impact Assessments (EIAs) of pipeline crossing projects in Canadian waters are

L. M. Lévesque (✉)
National Hydrology Research Center,
11 Innovation Blvd.,
Saskatoon, SK S7N 3H5, Canada
e-mail: lucie.levesque@ec.gc.ca

M. G. Dubé
University of Saskatchewan,
Toxicology Centre, 44 Campus Drive,
Saskatoon, SK S7N 5B3, Canada
e-mail: monique.dube@usask.ca

_Springer

AR 005864

Environ Monit Assess (2007) 132:395–409

examined and compared with documented effects of crossing construction and short-term sediment disturbances on aquatic ecosystems. Through this, indicators of impacts associated with pipeline crossing construction are identified, and recommendations for more effective impact assessment methodology are made.

## 2 Pipeline crossing construction methods, potential for effect, and regulation

Pipeline crossings of streams and rivers are conducted using a variety of techniques. These include below- and above-ground methods, which disturb aquatic ecosystems to varying degrees (Zwirn 2002). Below-ground methods of crossing construction have greater potential to impact aquatic ecosystems than do above-ground methods (e.g., bridge), which typically do not involve in-stream activity. Among the most common methods of below-ground crossing construction are i) open-cut, in which crossing construction occurs without diversion of stream flow, ii) isolated, in which the stream channel is isolated for construction, with water temporarily diverted downstream, and iii) horizontal directional drilling (HDD or trenchless), in which a tunnel is drilled beneath the river channel.

Each of these crossing construction methods may impact watercourse ecosystems both during, and for potentially some time after, construction. All in-stream construction activities, particularly trench excavation and pipeline installation and backfill, result in disturbance of channel bed and banks, and have the potential to alter suspended sediment concentrations and sedimentation. Anderson et al. (1996) and Reid et al. (2003) emphasize that such activities are episodic in nature, and generate numerous, short-term pulses of highly concentrated suspended sediments. Selection of construction methods that are less destructive (e.g., HDD), however, will reduce impacts. Reid et al. (2002a, 2004) concluded that isolated construction methods more effectively mitigate increased sediment-loading than do open-cut methods, and eliminate the risk of frac-out (i.e., release of drilling fluids from HDD). Integration of site-specific physical and biological considerations into construction design may also limit impacts. For example, open-cut construction typically generates greater sediment loads than does isolated construction, hence the former is often applied during winter construction and in streams that freeze to the bed. Regardless, any in-stream construction activity has the potential to impact aquatic ecosystems through alteration of stream and river bed and banks and, therefore, may result in direct effects such as physical alteration of channel morphology and habitat, and indirect effects such as alteration of water quality and sediment dynamics, on aquatic ecosystems (e.g., Alberta Environment 2001; Alberta Transportation and Utilities 2000).

As such, crossing construction activities in Canada are regulated under the *Fisheries Act* (Department of Justice Canada 1985). The *Act* is triggered by the potential for crossing construction to result in "harmful alteration, disruption or destruction of fish habitat" (HADD – Section 35). Fish habitat is therein defined as "spawning grounds and nursery, rearing, food supply and migration areas on which fish depend directly or indirectly in order to carry out their life processes." This definition of habitat may, therefore, be considered to include: the organisms upon which fish feed, such as plankton, algae, invertebrates and fish, and the habitat upon which these organisms depend, including overhanging and aquatic vegetation, woody debris and streambed materials; conditions for reproduction including substrate, water temperature and velocity; cover for protection from predators and high flow velocities such as rocks and debris, bed and bank vegetation and pools); and open water for movement between stream and river reaches over various life stages; and appropriate water quality including dissolved oxygen or DO, pH, major ions, metals and toxics. All of these habitat features may affect fish behavior and physiology, and hence survival, growth and reproductive success (Alberta Transportation and Utilities 2000). An Environmental Impact Assessment must be completed for proposed crossings that require approval under Section 35 of the *Fisheries Act*. The *Canadian Environmental Assessment Act* (CEAA; Department of Justice Canada 1992) defines the responsibilities and regulations governing these assessments, including assessment of environmental effects associated with "physical activities carried out in a water body," determination of the significance of the effects, and mitigation of effects.

AR 005865

Environ Monit Assess (2007) 132:395–409

# 3 Environmental impact assessment and monitoring of effects

The *Fisheries Act* and the *CEAA* require that physical activities that occur both in and adjacent to water bodies, and that have the potential to alter or harmfully affect fish habitat or fish, be preceded by an Environmental Impact Assessment. The EIA determines the direction, extent, magnitude, duration and significance of impacts. The following examples of EIAs for pipeline crossing construction projects in Canadian waters provide an indication of the potential impacts of these activities on aquatic ecosystems and the proposed monitoring of effects.

The Mackenzie Gas Project (Imperial Oil Resources Ventures Limited 2004) proposed the construction of greater than 1,200 km of pipeline, with more than 500 stream and river crossings, along the Mackenzie Valley in the Northwest Territories. The EIA for this project identified that crossing construction activities have the potential to impact watercourses in three ways. First, construction may affect channel morphology through modification of suspended solids concentrations and hydrological characteristics of the channel. Second, in-stream activities may affect water (and sediment) quality via alteration of TSS, DO, total dissolved solids (TDS), nutrients, water temperature and turbidity, as well as particulate total organic carbon, grain size, metals and polycyclic aromatic hydrocarbons (PAHs). Third, crossing construction has the potential to impact fish and fish habitat through modification of (1) fish habitat with changes in cover, channel morphology and sediment deposition, (2) fish health with changes in water quality, and (3) fish abundance and distribution with changes in habitat, health and water quality. Monitoring during construction was to include measurement of turbidity and TSS. Monitoring after the completion of construction was to include evaluation of habitat quality and availability via examination of bed and bank stability and revegetation at, and downstream of, construction. Monitoring of fish health, fish distribution and abundance was also specified, and included measurements of turbidity, DO, pH, fish abnormalities, species composition and diversity, and habitat use. The assessment concluded that pipeline crossing construction would not have significant effects on watercourse hydrology, water and sediment quality, and fish and fish habitat, due primarily to mitigative measures and the expected short-term nature and localized geographic extent of the effects (Imperial Oil Resources Ventures Limited 2004).

Firebag In-Situ Oil Sands Project (Suncor Energy 2000) proposed numerous pipeline crossings of streams in the province of Alberta. Much like that above, this assessment identified the potential effects of construction on fish and fish habitat as those associated with physical changes to channel bed and banks directly via construction and indirectly via altered sediment deposition. Altered water quality, including TSS and deleterious substances, such as hydrocarbons from the channel bed. and modified hydrology with sediment entrainment and changes to channel morphology were also identified as potential sources of impact. Recommendations to assess the effectiveness of mitigation measures included monitoring of stream bed profile and substrate before and after in-stream construction, and monitoring of TSS and hydrocarbons during in-stream construction activities.

Other small-scale open-cut and isolated pipeline crossings have been proposed for streams and rivers in Alberta (Burlington Resources Canada Energy Ltd. 2001; ConocoPhillips Canada Resources Corp. 2004; Devon Canada Corporation 2004; Petro-Canada Oil and Gas 2005; Talisman Energy Inc. 2004). The potential effects of these proposed crossings on aquatic ecosystems were identified as including those on fish and fish habitat (i.e., bed and banks, hence substrate, sediment, and both in-stream and riparian cover) and water quality (i.e., concentrations of silt and deleterious substances). Measures that were implemented or recommended by these projects to assess the effectiveness of mitigation included monitoring of water quality (TSS, turbidity, DO) and, through site photos before and/or after construction, monitoring of physical stability of bed and banks, vegetation characteristics and erosion/sedimentation. Biological monitoring was also proposed in some cases; this consisted of TSS monitoring upstream and downstream of construction, before, during and after in-stream activity and comparison of TSS levels to guidelines for the protection of freshwater aquatic life.

EIAs have, therefore, identified alteration, disturbance or destruction of fish habitat as the primary potential effect of pipeline crossing construction on

_Springer_

AR 005866

aquatic ecosystems. Mitigative measures proposed in the above assessments were considered to be effective in reducing impacts of pipeline crossing construction to levels that were not significant. These measures included: site-specific selection of construction method (e.g., isolated for streams with under-ice water, and HDD for large, fish-inhabited rivers), timing and location (i.e., avoidance of sensitive life stages such as spawning, avoidance of fish habitat); limitation of duration of in-stream activities; establishment of drainage and erosion controls; reclamation of bed and banks, including substrate composition and cover, vegetation establishment, stabilization of slopes; and, biological monitoring during and after construction, often consisting of TSS measurement and comparisons to guidelines for the protection of aquatic life.

## 4 Documented effects of pipeline crossing construction on aquatic ecosystems

The effects of pipeline crossing construction on aquatic ecosystems have been studied by authors including Reid et al. (2004, 2003, 2002a, b), Anderson et al. (1998), Armitage and Gunn (1996), Young and Mackie (1991), and Tsui and McCart (1981). These studies have documented effects of crossing construction on stream and river TSS, invertebrates and fish in association with elevated suspended solids concentrations and increased sediment deposition.

Reid and Anderson (2000) documented the effects of isolated pipeline crossing construction on watercourses in northwestern Alberta. Mean TSS concentrations increased by between 4 and 100 mg l$^{-1}$ above background. Installation of dams and flumes for water diversion generated TSS concentrations on average less than 76 mg l$^{-1}$ greater than background over periods of 2 to 16.5 h (with one crossing experiencing an increase of 520 mg l$^{-1}$ for 3 h). Removal of dams and flumes resulted in TSS increases of between 1 and 703 mg l$^{-1}$ downstream of construction over periods of 20 min to 6.5 h. Other stages of construction were associated with average TSS increases of less than 8 mg l$^{-1}$, with exception of accidental leaks from construction infrastructure (e.g., 820 mg l$^{-1}$ over 5.5 h). Plumes of highly turbid water were observed downstream of construction. This was particularly evident at crossing sites with bed and bank materials consisting of fine-grained sediments and soils, and at those with rapidly flowing waters. Although suspended sediment concentrations increased with installation and removal of dams and flumes, and with leaks during construction, particle size distribution of bed materials did not change considerably.

Reid et al. (2002a), in examining the effects of isolated crossing construction on sediment, habitat and fish of watercourses in Minnesota (United States), Nova Scotia and Ontario, also found elevated TSS concentrations downstream of crossing sites. These increases were associated with installation and removal of construction infrastructure, as well as with leakage of sediment-laden waters from an upland sump. Total suspended solids concentrations increased downstream of all construction sites by between less than 4 and 80 mg l$^{-1}$ above background, on average, and by up to nearly 1,500 mg l$^{-1}$ with removal of infrastructure. These increases in TSS concentrations were of relatively short duration, with rapid return to background levels as in-stream activities came to completion (e.g., within approximately 1 to 10 h of cessation of in-stream activities). Fine-textured sediments that accumulated on the channel beds were cleared by subsequent stream flows.

Such effects of crossing construction on TSS concentrations and sediment deposition have been shown to have considerable effects on stream and river substrates and benthic invertebrate communities. Young and Mackie (1991) observed that pipeline crossing construction in Hodgson Creek, Northwest Territories, resulted in increased suspended solids concentrations, to levels >300 mg l$^{-1}$ above background on average, peaking near 3,000 mg l$^{-1}$, and dropping to <10 mg l$^{-1}$ within 4 days. The authors also observed increased benthic invertebrate drift density and standing crop downstream of construction, with no change in species richness. These effects lasted up to 5 weeks and were no longer apparent after passage of spring freshet. Anderson et al. (1998), in studying the effects of open-cut crossing construction on channel morphology, invertebrates and fish in Findlay Creek, Ontario, found that construction activities generated elevated suspended sediment concentrations, which reached up to 3,000 mg l$^{-1}$ above background with excavation and backfilling, decreased to <40 mg l$^{-1}$ within 4 h of the completion

of construction, and returned to near background within 24 h. Effects included minimal sediment deposition and erosion downstream of construction, increased invertebrate drift density, and altered species composition of drift and benthic invertebrate communities, the latter of which lasted for a period of at least 1 year. Armitage and Gunn (1996) noted that pipeline crossing construction in a stream in England resulted in a shift in invertebrate species due to an increased proportion of silt in stream substrates. This effect persisted for 4 years until a high magnitude flow event scoured the stream channel bed, promoting re-establishment of pre-construction invertebrate species. Tsui and McCart (1981) found that crossing construction of Archibald Creek, British Columbia, caused short-term increases in silt and sand accumulations and decreases in invertebrate standing crop and diversity, which lasted 1 to 2 years.

Pipeline crossing construction has also been shown to have effects on fish. The study by Anderson et al. (1998), in addition to noting changes in invertebrate communities, found that the abundance of brook trout and forage fish (e.g., yellow perch, northern redbelly dace) decreased downstream of an open-cut crossing. This effect lasted for a period of nearly 12 weeks, with recovery of abundance occurring at the same time as flow-related removal of disturbed sediments from the bed. Reid et al. (2002a, 2004) found that although suspended sediment concentrations increased with the construction of isolated stream crossings in Canada and the United States, fish abundance did not vary in a manner beyond that occurring naturally. Reid et al. (2002b) examined the behavioral responses of fish to open-cut crossing construction in Wildhay River, Alberta. The movement of Arctic grayling and mountain whitefish, which was tracked before, during and after pipeline installation, indicated that fish avoidance of elevated suspended sediment concentrations was minimal. This was attributed to low suspended sediment concentrations, lack of habitat alteration, and the occurrence of, hence adaptation of fish to, high natural sediment-loadings in this river (i.e., spring run-off and storm events).

More recently, Reid et al. (2003) conducted the first detailed examination of the effects of pipeline crossing construction on fish physiology. The study consisted of simulated crossings on a creek in Alberta and a river in Ontario, in which TSS concentrations upstream and downstream of construction were raised to between 55 and 70 mg l$^{-1}$, peaking at greater than 1,400 mg l$^{-1}$ downstream. Most sand settled out of the water column within 100 m of construction. The study found that gill damage and mortality of rainbow trout did not increase with fish exposure to elevated sediment loading. Physiological stress, however, increased, as reflected by elevated rates of respiration (i.e., oxygen consumption) and loss of equilibrium, as well as by altered blood hematocrit levels (indicating potential damage to, hence lower oxygen transfer across, gills). Reid et al. (2003) found these results to be consistent with acute stress response to high TSS levels as defined by Newcombe and Jensen (1996; see Section 5 for further discussion). The authors also found that elevated physiological stress associated with the simulated crossings was most pronounced in the river than in the creek, likely due to the predominance of coarse-grained sand in the former. The authors suggest that differences in oxygen consumption rates and mean time to death between sites upstream and downstream of the simulated construction may have been attributable to the acute TSS exposure of fish downstream, which impaired the short-term capacity of rainbow trout to tolerate hypoxia.

## 5 Sediment as a stressor

EIAs for pipeline watercourse crossings (Section 3) and literature documenting the effects of crossing construction on aquatic ecosystems (Section 4) both identify sediment as the primary stressor of crossing construction on river and stream ecosystems. The Alberta Transportation and Utilities (2000) *Fish Habitat Manual: Guidelines and Procedures for Watercourse Crossings in Alberta* and the Alberta Environment (2001) *Code of Practice for Pipelines and Telecommunication Lines Crossing a Water Body* also identify sediment as a significant stressor associated with construction of watercourse crossings. Altered sediment transport dynamics have the potential to modify habitat and invertebrate communities, and to directly affect fish behavior and physiology. Please see Wood and Armitage (1997), Anderson et al. (1996), Waters (1995), and Newcombe and MacDonald (1991) for further discussion.

Springer

## 5.1 Benthic invertebrates (fish habitat)

Many benthic invertebrate species thrive in coarse-grained substrates. River and stream beds of gravel and cobble provide pore spaces that benthic invertebrates use for attachment, protection, feeding, and oxygen consumption (Mayhood 1998; Wood and Armitage 1997). Those species that reside in coarse-rather than fine-grained substrates are typically the preferred prey for fish (DFO 2000). As such, altered sediment-loading and sedimentation will have implications not only for benthic invertebrates, but for fish as well. This section examines the potential effects of increased sediment-loading on invertebrates, and explores documented effects of chronic and acute sediment releases on these biota.

Increased sediment-loading may have detrimental effects on benthic invertebrates in streams (Anderson et al. 1996; DFO 2000). For example, the productivity of invertebrate grazers may decrease in response to reduced food availability as turbidity and scour/burial increase. The efficiency and growth of filter feeders may be reduced with clogging of filter apparatuses. Mortality may increase as sediment accumulates on coarse substrates and in interstitial spaces, increasing oxygen depletion and abrasion of respiratory surfaces. Sediment not only has the potential to directly affect the health and productivity of invertebrates, but may also affect community characteristics. For example, species composition and density of invertebrates are known to vary with substrate porosity and associated exchanges of water, organic matter, nutrients, oxygen and biota between the water column, groundwater and stream bed substrates (Malard et al. 2002).

Chronic increases in sediment-loading occurring in association with catchment land-use practices have been found to affect invertebrate communities in streams. For example, Roy et al. (2003) found that invertebrate diversity in forested and urbanized streams in Georgia, United States, varied with the texture of bed substrates. Less diverse and more tolerant taxa occurred in stream reaches that were exposed to increased turbidity, nutrients, and specific conductance generated by riparian disturbance. In a similar study, Freeman and Schorr (2004) noted that increased TSS concentration and sediment accumulation in small, urban streams in the United States resulted in increased abundance of tolerant, and decreased richness of sensitive invertebrates. Abundance of sensitive taxa, filterers, and predators was also reduced in these streams. Armitage and Gunn (1996) found that benthic invertebrate species composition in English streams that were exposed to various, low-intensity disturbances and short-term construction activities was attributable to altered stream substrate.

Acute increases in sediment-loading have also been documented as having effects on invertebrates. For example, Shaw and Richardson (2001) examined the effects of short-term sediment exposure on invertebrates (and fish) of Moffat Creek, British Columbia. Biota were exposed to sediment pulses of between 0 and 6 h duration over a period of 19 days. Invertebrate communities were most affected by exposure to sediment pulses of long duration (e.g., 6 h), the effects of which were apparent after 9 days (or five events) of exposure. Effects included decreased benthic invertebrate abundance and richness, particularly with respect to more sensitive taxa, as well as increased drift abundance and decreased drift richness. Barton (1977), however, found few effects of short-term sediment exposure on invertebrate communities exposed to culvert crossing construction in an Ontario stream. Although in-stream activities resulted in an increase in TSS concentrations between <5 and 1,390 mg l$^{-1}$ and a ten-fold increase in sediment deposition, the abundance and diversity of benthic invertebrates in riffle habitat did not change. Anderson et al. (1996) draw attention to dose–response work of Newcombe and Jensen (1996) in addressing the effects of sediment pulses on fish habitat, including invertebrates. The authors emphasize the significance of concentration and duration of sediment exposure (i.e., dose) in the study of short-term sediment disturbances (i.e., less than 1 month). Anderson et al. (1996), after the aforementioned authors, developed the following severity-of-ill-effects (SEV) ratings for sediment effects on fish habitat (in order of increasing severity): (1) change in habitat preference, (2) moderate degradation of habitat – modified invertebrate community, (3) moderately severe degradation of habitat – productivity of habitat affected over months or kilometers, (4) severe degradation of habitat – altered ability of habitat to support fish or invertebrates over years, and (5) catastrophic or total destruction of habitat.

Environ Monit Assess (2007) 132:395–409                                     401

## 5.2 Fish

Fish are sensitive to suspended sediment concentrations and the composition of stream bed substrates (DFO 2000; Lloyd 1987; Newcombe and MacDonald 1991; Waters 1995). Fish depend on sediment for many habitat and life requirements, including cover, spawning substrate and forage, and respond behaviorally and physiologically to altered sediment dynamics. As such, fish are sensitive to both the direct and indirect effects of increased sediment-loading. This section briefly examines the sensitivity of fish to increased sediment-loading and provides examples of the effects of long-term and short-term sediment exposure on fish.

Long-term exposure of fish to increased suspended sediment concentrations may cause effects ranging from behavioral responses in individuals to altered abundance and distribution of populations (DFO 2000; Newcombe and Jensen 1996; Newcombe and MacDonald 1991). For example, exposure to increased concentrations of suspended sediment may result in altered movement of fish (e.g., avoidance) and cause damage to gills. Feeding success may decline as turbidity increases and as sedimentation progresses, affecting primary and secondary productivity. Increased sediment deposition may also alter channel morphology and habitat availability. Spawning habitat may degrade, egg and larvae development be impaired, and fry emergence be reduced, with settling of fine-grained sediments onto and into the substrate. Such increases in embeddedness restrict DO and waste exchange between the water column and redds. Increased sediment-loading may, therefore, increase stress and reduce disease resistance, adaptive response, and growth and abundance of fish (DFO 2000).

Gray and Munkittrick (2005) studied sculpin in agricultural and forested reaches of a river in New Brunswick. The authors found that fish in agricultural streams, which were exposed to runoff with higher sediment, nutrient and pesticide loads, as well as higher water temperatures, had reduced abundance of young, smaller and fewer eggs, and smaller organs (i.e., liver, gonads). The authors suggest that these effects may be due, in part, to reduced reproductive effort, resulting from long-term accumulation of fines in spawning and rearing habitat. As well, sediment deposition may have limited food availability for young-of-the-year. Gray et al. (2005) also studied sculpin in agricultural and forested streams and rivers

of New Brunswick. Fish in agricultural watercourses had reduced young-of-the-year density and increased body size relative to those in forested watercourses. These effects were not, however, significantly correlated with sediment accumulation, rather they were most strongly correlated with water temperature.

A number of studies have examined the effects of short-term sediment exposure on fish. Short-term or episodic sediment exposure events are more consistent with the temporal patterns of sediment exposure associated with in-stream construction activity than are more chronic periods of exposure as discussed above. Au et al. (2004) studied the responses of coastal green grouper to suspended sediment concentrations between 0 and 2,000 mg l$^{-1}$ over a period of 6 weeks. The authors found that elevated suspended sediment concentrations did not affect food consumption or growth; however, increased sediment-loading did cause gill damage and increase osmoregulatory and physiological stress. Lake and Hinch (1999) found that fish exposure to suspended sediments at concentrations of greater than 40 g l$^{-1}$ for 96 h caused gill damage and increased stress in salmonids (as reflected by blood leukocrit and hematocrit levels). These effects were particularly pronounced in association with angular, rather than rounded, sediments. Bunt et al. (2004), in exposing rock bass experimentally to incremental increases in silt over a period of 140 min, observed altered cardiovascular performance in fish exposed to low concentrations of suspended particulates. This response was followed by rapid recovery, attributed to adaptive mechanisms. Berg and Northcote (1985) found temporary gill flaring, disruption of dominance hierarchy, reduced reaction to prey, and decreased capture success in fish exposed to experimental sediment pulses of 1 h and 2 days in duration. Barton (1977) attributed a temporary reduction in fish standing crop immediately downstream of a construction disturbance to avoidance.

An important consideration in the determination of sediment-related effects on fish is the duration of exposure to elevated suspended sediment concentrations (as discussed above for invertebrates). Newcombe and Jensen (1996; Newcombe and MacDonald 1991) modeled the severity of ill effects (SEV) of increased sediment loading on six groups of fish. These groups were based on fish species, life stage and life history, and suspended sediment particle size. The SEV ratings included (in order of increasing severity): (1) behavioral

⎰ Springer

AR  005870

effects – alarm, abandonment of cover, avoidance; (2) sublethal effects – short term reduction in feeding rate and success, minor physiological stress, cough and increased respiration rate, moderate physiological stress and habitat degradation, impaired homing, major physiological stress with long-term reduction in feeding rates and success, as well as poor condition; (3) lethal and paralethal effects – reduced growth, delayed hatching, reduced density, and 0–20% mortality with increased predation and moderate to severe habitat degradation, with mortality increasing incrementally from >20 to 100%. Shaw and Richardson (2001) investigated the effects of duration of sediment exposure on rainbow trout from Moffat Creek, British Columbia, and compared their results to those of the aforementioned model. The study found that as duration of exposure increased, the length of, and mass gained by, young fish was reduced. This was likely attributable to impaired vision, hence feeding, and increased physiological stress rather than to alteration of invertebrate (i.e., food) availability. The effects of longer duration exposure (e.g., 6 vs. 1 h) were apparent only after 9 days of dosing; hence the fish were sensitive not only to the duration of exposure, but the frequency as well. Reid et al. (2003) also evaluated the dose–response model. The authors identified that the SEV model was developed based on studies of chronic sediment exposure, hence they questioned it's utility in the prediction of effects associated with acute exposure to high sediment loadings, such as those arising from activities subject to regulation (e.g., pipeline crossing construction; see also Anderson et al. 1996). The authors found, however, that elevated TSS concentrations in crossing construction simulations affected the physiology of fish, elevating respiration rates and promoting loss of equilibrium; these results were consistent with stress as defined by the SEV model, suggesting that the model may be useful in the assessment of effects associated with both chronic and acute exposure of fish to elevated suspended sediment concentrations.

# 6 Impact assessment methodology for pipeline crossing construction

Pipeline crossing construction and short-term sediment disturbances have been shown to affect river and stream ecosystems. Monitoring for the purposes of impact assessment in these cases should ensure that physical, chemical and biological indicators of impact are measured. Also of importance are: the study design of the monitoring program; site-specific vulnerability to, and potential for recovery from, the effects of crossing construction; assessment of the significance of impacts; and, consideration of the potential for cumulative effects.

The above examination of Canadian legislation and EIAs for crossing construction is used to identify information requirements of, and methodologies applied in, the assessment of effects of in-stream construction on aquatic ecosystems. Recommendations for changes to these methods, as discussed below, are based on the review of effects of pipeline crossing construction and sediment disturbance on invertebrates and fish. These methodological recommendations are widely applicable as they are based upon effects that have been documented in a variety of aquatic ecosystems including those outside of Canada (Anderson et al. 1996 – compilation of data from various countries; Armitage and Gunn 1996; Barton 1977; Shaw and Richardson 2001).

## 6.1 Indicators of impact

Regulation of crossing construction activities aims to protect fish habitat (physical, chemical, biological), which affects the health, reproduction and survival of fish. The EIAs reviewed above (see Section 3) have emphasized the assessment and monitoring of fish and physical and chemical characteristics of fish habitat prior to construction. This information has been used to establish baseline conditions with respect to e.g., fish species diversity and abundance, life stages, habitat types, substrate and water quality (TSS concentrations), as well as site-specific construction and mitigation measures. Water quality monitoring has been used during construction for comparison against guidelines for the protection of aquatic life (i.e., CCME 1999). Finally, physical and chemical monitoring has been applied upon completion of construction in order to assess effects. The indicators of effect that have been used in monitoring crossing construction impacts (during and after construction) in Canadian EIAs are listed in Table 1 under "Pipeline EIA Monitoring." These are water chemistry measures, primarily DO and TSS and/or turbidity (and site-specific substances of concern e.g.,



AR 005871

Environ Monit Assess (2007) 132:395–409                                                                   403

PAHs), and physical habitat measures including stream substrate particle size and bed and bank morphology and cover. Although infrequently used in the EIAs reviewed here, monitoring of fish distribution and abundance before and after construction has also been incorporated into some EIA monitoring programs.

Research studies addressing the effects of pipeline crossing construction have found physical, chemical and biological impacts of this activity on river and stream ecosystems. Indicators of effect that have been measured in these studies (see Section 4) are marked in Table 1 under "Pipeline Research Studies." They include water quality, physical habitat and fish measures, much like those recommended for the EIA monitoring programs. However, these studies also include invertebrate measures including species composition, abundance and diversity of benthic and drift communities. More recent studies of the effects of pipeline crossing construction have made use of behavioral (Reid et al. 2002b) and physiological (Reid et al. 2003) indicators of fish response, which have included avoidance, respiration, equilibrium, and blood hematocrit and leukocrit levels. The majority of these indicators successfully reflected impacts associated with in-stream construction activity (Table 1).

In addition, research studies in the primary literature examining sediment pulses have identified a number of fish and habitat indicators that respond to short-term, potentially intermittent exposures to sediment (e.g., Bunt et al. 2004; Shaw and Richardson 2001; Lake and Hinch 1999; Berg and Northcote 1985; Barton 1977; see Section 5). The indicators identified by these studies are listed in Table 1 under "Sediment Pulse Research Studies" and include not only many of the invertebrate community and fish behavior and physiology measures consistent with the pipeline crossing studies, but other indicators as well (e.g., fish size, gonad, liver and fecundity; hierarchy; feeding; gill damage and flaring; heart rate and stroke volume).

Assessment of the impacts of pipeline crossing construction on aquatic ecosystems should, therefore, incorporate a suite of indicators that effectively identify the impacts of these activities on the physical, chemical and biological properties of rivers and streams. The Canadian EIAs reviewed herein emphasized indicators of water quality and physical habitat in monitoring for effects. It is apparent from research

studies of pipeline crossing construction and sediment pulse experiments that further emphasis must be placed on biological indicators such as invertebrate community measures, as well as measures of fish community, health, reproduction, behavior and physiology. Some of these indicators are part of the Canadian Environmental Effects Monitoring (EEM) framework required under the *Fisheries Act* to assess the effects of complex effluents on aquatic biota (Environment Canada 2002). These indicators are listed in Table 1 under "EEM." Although tailored to monitoring and assessment of chronic effects associated with pulp and paper mill and mining effluents, these indicators have been applied successfully in research addressing the effects of catchment land use (e.g., sedimentation – Gray and Munkittrick 2005; Gray et al. 2005) and pipeline crossing construction (e.g., Reid et al. 2002a; Anderson et al. 1998; Armitage and Gunn 1996; Young and Mackie 1991) on watercourses. The EEM indicators are broadly applicable as they assess fundamental properties of biological health in benthos and fish populations and, as such, are largely stressor-independent. EEM guidance on indicator measurement may, therefore, be useful to the development of a program to monitor and assess impacts associated with pipeline crossing construction.

## 6.2 Monitoring before, during and after construction

A Before-After-Control-Impact experimental design (BACI) is recommended for the assessment of pipeline crossing construction impacts on rivers and streams. This approach has been applied in research studying the effects of pipeline crossing construction on aquatic ecosystems, and control-impact studies have been implemented extensively through the EEM Program in Canada (Environment Canada 2002). This study design incorporates monitoring of relevant indicators both before and after the impact and also includes monitoring at control or background sites and impact sites at and downstream of crossing construction. This design therefore not only allows assessment of impact and system recovery from impact relative to a priori or baseline conditions, but also relative to the control conditions (spatial and temporal reference conditions). The BACI design also addresses site-specific considerations more explicitly than a simple before and after impact assessment design (e.g., site-specific bench-

Springer

Environ Monit Assess (2007) 132:395–409

**Table 1** Comparison of indicators to assess effect

| Indicators used to assess effects | (1) Pipeline EIA monitoring | (2) Pipeline research studies | (3) Sediment pulse research studies | (4) EEM |
|---|---|---|---|---|
| DO (dissolved oxygen) | √ | | | √ |
| TSS (total suspended solids) concentration (or turbidity) | √ | √* | √* | |
| Physical habitat: stream-bed substrate particle size (and ~ total organic carbon TOC) | √ | √*$_{particle\ size}$ | | √ |
| Physical habitat: channel morphology, habitat types, bank stability, in-stream and bank cover | √ | √*$_{channel\ morphology}$ | | |
| Benthic invertebrate abundance and species composition | | √* | √* | √ |
| Benthic invertebrate richness | | | √* | √ |
| Benthic invertebrate diversity | | √* | | √ |
| Benthic invertebrate standing crop | | √* | | √ |
| Benthic invertebrate drift density and species | | √* | √* | √ |
| Fish abundance and species composition (and diversity) | √ | √*$_{abundance}$ | | √ |
| Fish energy use (size-at-age, relative gonad size, relative fecundity) | | | √*$_{growth}$ | √ |
| Fish energy storage (weight, relative liver size, relative egg size) | | | √*$_{weight}$ | √ |
| Fish behavior (e.g., avoidance, hierarchy, feeding success) | | √*$_{avoidance}$ | √*$_{hierarchy,\ feeding}$ | |
| Fish physiology (respiration rate, loss of equilibrium, blood hematocrit and leukocrit levels), gill damage/ flaring and cardiovascular performance | | √*$_{physiology}$ | √*$_{hematocrit,\ leukocrit\ and\ gill\ damage/\ flaring,\ heart\ rate\ and\ stroke\ volume}$ | |

The indicators listed have been used in: (1) Canadian Environmental Impact Assessments (*EIAs*) for monitoring impacts of pipeline crossing construction, (2) research studies examining the effects of pipeline crossing construction on river and stream ecosystems, (3) research studies determining the effects short-term sediment pulses on aquatic ecosystems, and (4) the federally legislated Environmental Effects Monitoring (*EEM*) program in Canada.

√ Identifies endpoints recommended in Canadian EIA and EEM programs.

√* Identifies endpoints that have been documented as having responded to short-term sediment disturbances (e.g., pipeline crossing construction, experimental sediment pulses); fine print indicates, where appropriate, indicators that responded (e.g., √*$_{physiology}$).

marks against which to evaluate impact include physical, chemical and biological background conditions for the river or stream in question). For the purposes of assessing impacts of pipeline crossing construction in rivers and streams, this design should also incorporate an intensive period of monitoring during construction and until suspended sediment concentrations return to background levels. Based upon the literature reviewed in Sections 3, 4, and 5 and the BACI design, the following (generalized) design is proposed for the assessment of impacts associated with pipeline crossing construction.

Monitoring prior to construction should include both habitat and biological surveys upstream and downstream of the proposed crossing location. Characterization and photo documentation of channel bed and banks provides information on such things as habitat types (e.g., run, riffle, pool), substrate characteristics (e.g., particle-size, embeddedness, porosity, pebble count), and cover. Other important habitat measures pertain to flow characteristics (e.g., wetted width, discharge, flow velocity, water depth, flow regime) and water quality (e.g., TSS, turbidity, DO, water temperature, pH, conductivity). Biotic measures



AR 005873

provide information on fish and invertebrate communities specific to the river or stream, and/or habitat types, of interest. These measures may include species composition, diversity, density and distribution, as well as fish weight, length and energy use/ storage, depending on the indicators of effect of interest in the study. Monitoring prior to the start of construction activities will not only provide baseline information for use in effect assessment, but will also provide valuable information on site-specific characteristics such as sensitive species and life stages, and flow ability to carry sediment, as well as natural variability in the system (e.g., frequency and magnitude of spate events in northern rivers – Young and Mackie 1991; fish species adaptations to highly variable sediment loadings – Reid et al. 2002b and Bunt et al. 2004). This information is also useful in tailoring the study design to the river or stream of interest (e.g., selection of similar sites upstream and downstream of construction, lengthened monitoring of recovery in streams of lower flow and gradient).

Monitoring during construction and until suspended sediment concentrations downstream of construction return to background levels should take place upstream and downstream of in-stream activities, and include measures of TSS and biotic indicators of interest that may be affected by elevated suspended sediment concentrations. Frequent monitoring should be conducted immediately downstream of construction, particularly during the release of discrete sediment plumes from construction activities. TSS measurements and monitoring of deleterious substances that may be released from disturbed bed and banks allow quantification of mean and peak concentrations. Anderson et al. (1996) note that TSS concentrations over the course of in-stream construction are heterogeneous and typically episodic in nature, hence suggest that mean TSS concentration for the entire period of crossing construction provides a better measure of effect than do e.g., hourly TSS concentrations. Invertebrate benthic/drift, in particular, as well as fish behavioral/physiological, measures should also be incorporated into the biological monitoring component of the program. This monitoring during construction will provide information for assessment of the nature and magnitude of the effects associated with acute periods of suspended sediment loading and sedimentation due to construction.

Monitoring upon the completion of construction should include habitat and biological surveys much like those completed prior to construction, and should continue, lessening in intensity with time, until recovery of the system to pre-construction conditions. This information may then be used to assess the nature and significance of the effects of pipeline crossing construction on aquatic ecosystems over time and space.

For further guidance see Anderson et al. (1996), who detail issues specific to the study of acute sediment release events and present recommendations for monitoring and data analysis. National EEM guidance documents (Environment Canada 2002), though designed for monitoring effects of chronic stress due to effluents, provide valuable information on monitoring design, sampling and data analyses that may be useful in pipeline crossing studies. The recommended monitoring program suggests a minimum requirement during impact-related activities without consideration of seasonality.

### 6.3 Site-specific sensitivity and recovery

Site-specific conditions have implications for the design of impact monitoring and assessment programs. Physical and biological characteristics of a given stream or river will affect the susceptibility of the system to impacts and the rate of recovery of the ecosystem from disturbance. The intensity and nature of a monitoring program should, therefore, be tailored not only to the nature of the disturbance, but also to this vulnerability of the river or stream to such effects.

For example, site-specific geophysical conditions will determine, in part, the susceptibility of a stream or river channel to impacts from crossing construction (e.g., erosion and the potential adverse effects of altered sediment transport – Imperial Oil Resources Ventures Limited 2004). For example, sites with high percent fines in excavated material may be exposed to very high TSS concentrations and extensive plumes of suspended sediment downstream of construction. Sampling downstream of construction, in such an instance, would require a large number of sites to represent the entire potential zone of effect. Streams and rivers that do not freeze to the bed over winter, and that have low flows, are more susceptible to higher TSS concentrations with

winter construction than are streams that freeze to the bed or that have high under-ice flow. As well, systems with steep banks and melting permafrost will be prone to heavy sediment-loading, hence elevated TSS concentrations and channel accumulations.

Site-specific biology will, in turn, affect the vulnerability of an aquatic ecosystem to the effects of increased sediment loading and deposition (e.g., Bunt et al. 2004; Reid et al. 2002b). For example, some species of fish are well adapted to variable flow and substrate conditions due to such things as life history, with migratory species generally better adapted to variable conditions than forage species, while other species have specific habitat preferences or tolerances (e.g., smaller fish less tolerant of sediment exposure than larger fish, as are salmon when exposed to temperature above/ or below optimal – Servizi and Martens 1991).

The ability of an aquatic system to recover from sediment disturbance will also be site-specific. For example, flow magnitude and frequency are paramount to the rate of recovery of streams and rivers. High flows such as those occurring during freshet or storm runoff events scour sedimented accumulations on channel beds. Lower and less variable flows increase the potential for long-term effects of increased sediment deposition. Also important to the rate of recovery of a stream or river from a sediment release event are: water depth, which affects scour of bed geomorphological features; substrata and sediment type, such as armoured beds; duration of high magnitude flows; and stream gradient effects on sediment mobilization (Anderson et al. 1996). Pipeline crossing studies have found that, for the most part, the effects of crossing construction have been short-term, from near 1 month to 2 years. EIAs described in this document have concluded that, with appropriate mitigative measures, the effects of crossing construction are short-term and local, hence insignificant. Armitage and Gunn (1996), however, found that effects of crossing construction on substrate and invertebrate communities in a stream persisted over 4 years, clearing only after passage of a high magnitude flow. Hence, individual rivers and streams will be affected differently by crossing construction, hence should have a monitoring program tailored to identify site-specific sensitivities and responses to disturbance.

### 6.4 Assessment of significance

The significance of crossing construction impacts may be assessed in a variety of ways. This may include: comparisons between conditions before and after construction and between control and impact sites, identification of appropriate guidelines against which indicators may be measured, or use of effect rankings such as SEVs to assess effects on fish and fish habitat.

The BACI design allows for establishment of site-specific benchmarks against which to measure impact. Assessment of significance may be made by testing for significant differences between conditions before and after impact, and between conditions at the control and impacted sites (Environment Canada 2002).

Guidelines, such as those for the protection of aquatic life, are useful in the identification of harmful impacts of sediment, as well as project- or site-specific deleterious substances of concern, on aquatic ecosystems. For example, the Canadian Council of Ministers for the Environment (1999) guideline for TSS concentration is a maximum 25 mg $l^{-1}$ increase in concentration above background during low flow over a period of <24 h, and 5 mg $l^{-1}$ above background over a period between 24 h and 30 days. Many CCME guidelines, however, are derived from studies of chronic exposure and are based upon a small number of species, hence will likely not apply to short-term, episodic sediment disturbances and to site-specific tolerances or preferences of species in every watercourse. Site-specific objectives may be developed (e.g., objectives based on historical records or for example the 90th percentile of a reference condition in space and/or time – CCME 2003).

Dose–response models for fish and fish habitat, such as those developed by Newcombe and Jensen (1996) and Anderson et al. (1996), may also be useful in the assessment of impact significance. These SEVs (see Sections 5.1 and 5.2 for further discussion) allow quantification of effect significance through severity-of-ill-effects values based on the duration and concentration of sediment exposure for a given sediment release event.

### 6.5 Cumulative impacts

The potential for cumulative effects associated with pipeline crossing construction should be taken into



Case: 23-3682 Document: 56-6 Filed: 08/19/2024 Page: 390

consideration in assessing the impacts of these activities on rivers and streams. Construction of a single crossing on a stream or river, or within a watershed, may not have significant effects on fish and fish habitat in that system. Construction of multiple crossings on a stream or river, or within a watershed, however, has the potential for cumulative effects on that system. In such cases, the capacity of the system to recover from impact may be exceeded, and the detrimental effects of crossing construction permanent. The same may be said for the frequency of crossing construction within a given system; rivers and streams will have limited capacities to recover from multiple impacts. As well, recurrent stresses on fish, such as those that originate from elevated suspended sediment concentrations, may have cumulative effects on fish health, survival and reproduction. The long-term effects of such impacts are not well known at this time (Reid et al. 2003).

Employing a consistent monitoring design for multiple watercourse crossings associated with a pipeline (or for that matter other linear features with potential for effect) would allow for any changes associated with each crossing to be quantitatively assessed and integrated to assess cumulative effects for the pipeline along its length. In the Canadian EEM program for example, approximately 100 different pulp and paper facilities conducted monitoring programs of similar design with effect endpoints and approaches for assessing "an effect" defined *a priori*. As a result of this consistency, a national assessment of change associated with this industry could be quantitatively made (Lowell et al. 2005). Although the EEM program did not refer to the national assessment as a cumulative effects assessment per se, certainly application of a consistent design and analyses resulted in an assessment of *accumulating* change. To our knowledge, this type of assessment for a pipeline has not been conducted and would be of great value.

## 7 Conclusions

Pipeline crossing construction affects river and stream ecosystems through disturbance of channel bed and banks, resulting in increased suspended sediment loading and deposition. Canadian EIAs have emphasized monitoring and assessment of the physical and chemical impacts of in-stream construction on fish habitat, though biological habitat and fish health have also been shown to be affected by such activities. As such, it is recommended that impact assessment for crossing construction projects monitor indicators including: water quality (TSS, and site-specific substances of concern), physical habitat measures (substrate particle size, channel morphology), benthic invertebrate community and drift measures (abundance, species composition, diversity, standing crop), and fish abundance and diversity as well as individual metrics associated with energy storage and energy use. Behavioral and physiological parameters should also be considered. It is also recommended that the BACI approach be applied for assessment of impacts during and after construction, allowing site-specific determination of the nature, significance and longevity of impacts. It is desirable that further study be conducted on the effects of in-stream construction on fish growth, reproduction, physiology and behavior, and the cumulative effects of multiple crossings.

## References

Alberta Environment (2001). *Code of practice for pipelines and telecommunication lines crossing a water body.* Retrieved September 26, 2005, from http://www.qp.gov.ab.ca/documents/codes/pipeline.cfm.

Alberta Transportation and Utilities (2000). *Fish habitat manual: Guidelines and procedures for watercourse crossings in Alberta*. Retrieved September 09, 2005, from http://www.trans.gov.ab.ca/Content/docType123/Production/fishhabitatmanual.htm.

Anderson, P. G., Fraikin, C. G. J., & Chandler, T. J. (1998). Natural gas pipeline crossing of a coldwater stream: Impacts and recovery. In: *Proceedings of the International Pipeline Conference, vol. 2* (pp. 1013–1020). Calgary, AB, Canada: American Society of Mechanical Engineers.

Anderson, P. G., Taylor, B. R., & Balch, G. C. (1996). *Quantifying the effects of sediment release on fish and their habitats*. Canadian Manuscript Report of Fisheries and Aquatic Sciences no. 2346.

Armitage, P. D., & Gunn, R. J. M. (1996). Differential response of benthos to natural and anthropogenic disturbances in 3 lowland streams. *Internationale Revue der Gesamten Hydrobiologie, 81*(2), 161–181.

Au, D. W. T., Pollino, C. A., Wu, R. S. S., Shin, P. K. S., Lau, S. T. F., & Tang, J. Y. M. (2004). Chronic effects of suspended solids on gill structure, osmoregulation, growth, and triiodothyronine in juvenile green grouper *Epinephelus coioides. Marine Ecology Progress Series, 266*, 255–264.

Barton, B. A. (1977). Short-term effects of highway construction on the limnology of a small stream in southern Ontario. *Freshwater Biology, 7*, 99–108.

Berg, L., & Northcote, T. G. (1985). Changes in territorial, gill-flaring, and feeding behavior in juvenile coho salmon (*Oncorhynchus kisutch*) following short-term sediment pulses of suspended sediment. *Canadian Journal of Fisheries and Aquatic Sciences, 42*, 1410–1417.

Bunt, C. M., Cooke, S. J., Schreer, J. F., & Phillip, D. P. (2004). Effects of incremental increases in silt load on the cardiovascular performance of riverine and lacustrine rock bass, *Ambloplites rupestris*. *Environmental Pollution, 128*, 437–444.

Burlington Resources Canada Energy Ltd (2001). *Isolated method pipeline crossing of two unnamed creeks at SE 25-53-26 W5M, near Hinton in Alberta*. Calgary, AB, Canada. DFO File no. AB01-096.

CCME (1999). *Canadian environmental quality guidelines*. Winnipeg, MB, Canada: Canadian Council of Ministers of the Environment.

CCME (2003). *Guidance on the site-specific application of water quality guidelines in Canada: Procedures for deriving numerical water quality objectives*. Winnipeg, MB, Canada: Canadian Council of Ministers of the Environment.

ConocoPhillips Canada Resources Corp (2004). *Installation of a pipeline crossing using an open-cut with isolation method on Doctor Creek at 07-27-52-01 W6M and an unnamed creek at 08-28-52-01 W6M in Alberta*. Calgary, AB, Canada. DFO File no. ED-04-1528.

Department of Justice Canada (1985). *Fisheries Act*. Retrieved July 16, 2005, from http://www.laws.justice.gc.ca/en/F-14/text.html.

Department of Justice Canada (1992). *Canadian Environmental Assessment Act*. Retrieved July, 2005, from http://www.lois.justice.gc.ca/en/C-15.2/.

Devon Canada Corporation (2004). *Daniel Creek isolation open-cut in NE 5-6-9*. Calgary, AB, Canada. DFO File no. PC-09-3221.

DFO (2000). *Effects of sediment on fish and their habitat*. Department of Fisheries and Oceans Pacific Region Habitat Status Report 2000/01.

Environment Canada (2002). *The new metal mining effluent regulations*. Canada.

Freeman, P. L., & Schorr, M. S. (2004). Influence of watershed urbanization on fine sediment and macro-invertebrate assemblage characteristics in Tennessee ridge and valley streams. *Journal of Freshwater Ecology, 19*(3), 353–362.

Gray, M. A., Curry, R. A., & Munkittrick, K. R. (2005). Impacts of nonpoint inputs from potato farming on populations of slimy sculpin (*Cottus cognatus*). *Environmental Toxicology and Chemistry, 24*, 2291–2298.

Gray, M. A., & Munkittrick, K. R. (2005). An effects-based assessment of slimy sculpin (*Cottus cognatus*) populations in agricultural regions of northwestern New Brunswick. *Water Quality Research Journal of Canada, 40*(1), 16–27.

Imperial Oil Resources Ventures Limited (2004). *Environmental impact statement for the Mackenzie Gas Project* (vols. 2, 3 and 5). Calgary, AB, Canada.

Lake, R. G., & Hinch, S. G. (1999). Acute effects of suspended sediment angularity on juvenile coho salmon (*Oncorhynchus kisutch*). *Canadian Journal of Fisheries and Aquatic Sciences, 56*, 862–867.

Lévesque, L. (2005). *Method and design for assessment of aquatic impacts associated with pipeline crossing construction*. Saskatoon, SK, Canada.

Lloyd, D. S. (1987) Turbidity as a water quality standard for salmonid habitats in Alaska. *North American Journal of Fisheries Management, 7*, 34–45.

Lowell, R. B., Ring, B., Pastershank, G., Walker, S., Trudel, L., & Hedley, K. (2005). *National assessment of pulp and paper environmental effects monitoring data: Findings from cycle 1 through 3*. Burlington, ON, Canada: National Water Research Institute. NWRI Scientific Assessment Report series no. 5.

Malard, F., Tockner, K., Dole-Olivier, M-J., & Ward, J. V. (2002). A landscape perspective of surface–subsurface hydrological exchanges in river corridors. *Freshwater Biology, 47*, 621–640.

Mayhood, D. W. (1998). *Some effects of natural gas operations on fishes and their habitats on Canada's Rocky Mountain east slopes*. Rocky Mountain Ecosystem Coalition, Technical Report 95/1. Retrieved February, 2005, from http://www.fwresearch.ca/RMEC951.pdf.

Newcombe, C. P., & Jensen, J. O. T. (1996). Channel suspended sediment and fisheries: A synthesis for quantitative assessment of risk and impact. *North American Journal of Fisheries Management, 16*, 693–727.

Newcombe, C. P., & MacDonald, D. D. (1991). Effects of suspended sediments on aquatic ecosystems. *North American Journal of Fisheries Management, 11*, 72–82.

Petro-Canada Oil and Gas (2005). *Open cut pipeline crossing with isolation of the Livingstone River*. Calgary, AB, Canada. CEAR no. 05-01-11948.

Reid, S. M., Ade, F., & Metikosh, S. (2004). Sediment entrainment during pipeline water crossing construction: Predictive models and crossing method comparison. *Journal of Environmental Engineering and Science, 3*, 81–88.

Reid, S., & Anderson, P. G. (2000). Evaluation of isolated watercourse crossings during winter construction along the Alliance pipeline in northern Alberta. In *Proceedings of the 7th International Symposium, Environmental Concerns in Right-of-Way Management*, Calgary, AB.

Reid, S. M., Isaac, G., Metikosh, S., & Evans, J. (2003). Physiological response of rainbow trout to sediment released during open-cut pipeline water crossing construction. *Water Quality Research Journal of Canada, 38*(3), 473–481.

Reid, S. M., Metikosh, S., & Evans, J. (2002b). Movement of arctic grayling and mountain whitefish during an open-cut pipeline water crossing of the Wildhay River, Alberta. *Journal of Freshwater Ecology, 17*(3), 363–368.

Reid, S. M., Stoklosar, S., Metikosh, S., & Evans, J. (2002a). Effectiveness of isolated pipeline crossing techniques to mitigate sediment impacts on brook trout streams. *Water Quality Research Journal of Canada, 37*(2), 473–488.

Roy, A. H., Rosemond, A. D., Paul, M. J., Leigh, D. S., & Wallace, J. B. (2003). Stream macroinvertebrate response to catchment urbanization (Georgia, U.S.A.). *Freshwater Biology, 48*, 329–346.

Servizi, J. A., & Martens, D. W. (1991). Effect of temperature, season, and fish size on acute lethality of suspended sediments on coho salmon (*Oncorhynchus kisutch*). *Canadian Journal of Fisheries and Aquatic Sciences, 48*, 493–497.

JA2766

AR 005877

Shaw, E. A., & Richardson, J. S. (2001). Direct and indirect effects of sediment pulse duration on stream invertebrate assemblages and rainbow trout (*Oncorhynchus mykiss*) growth and survival. *Canadian Journal of Fisheries and Aquatic Sciences, 58*, 2213–2221.

Suncor Energy (2000). *Firebag In-Situ Oil Sands Project Application*. Canada.

Talisman Energy Inc. (2004). *Wabamun Loop Pipeline Project – Open-cut pipeline crossing tributary to Brown Creek (SE 3-44-17 W5M)*. Calgary, AB, Canada. DFO File no. CA-04-0109.

Tsui, P. T. P., & McCart, P. J. (1981). Effects of stream-crossing by a pipeline on the benthic macroinvertebrate communities of a small mountain stream. *Hydrobiologia, 79*, 271–276.

Waters, T. F. (1995). *Sediment in streams: Source, biological effects, and control*. Bethesda, MD, USA: American Fisheries Society.

Wood, P. J., & Armitage, P. D. (1997). Biological effects of fine sediment in the lotic environment. *Environmental Management, 21*, 203–217.

Young, R. J., & Mackie, G. L. (1991). Effect of oil pipeline construction on the benthic invertebrate community structure of Hodgson Creek, Northwest Territories. *Canadian Journal of Zoology, 69*, 2154–2160.

Zwirn, M. (2002). *Pipeline–stream crossing installations: Best management practices*. Retrieved February, 2005, from http://www.wildsalmoncenter.org/pipeline-stream-english.pdf.

Springer

AR 005878

# Sediment generation and impacts from dry-ditch open-cut stream crossings such as those proposed for the Mountain Valley Pipeline

**Evan Hansen**

**Meghan Betcher**



May 26, 2021

**911 Greenbag Road**
**Morgantown, WV 26508**
**downstreamstrategies.com**

JA2768

AR 005880

# TABLE OF CONTENTS

1. Introduction ................................................................................................................. 1

2. Pipeline crossings generate sediment ....................................................................... 2

  2.1 IMPACTS CAN LAST FOR YEARS ................................................................................ 2

  2.2 IMPACTS ARE SITE-SPECIFIC ................................................................................... 3

3. Excess sediment harms aquatic life .......................................................................... 4

4. Mountain Valley Pipeline's application does not support its assertions ................... 5

5. Conclusions ............................................................................................................... 6

References ...................................................................................................................... 7

JA2769

AR 005881

# 1. INTRODUCTION

As proposed, the Mountain Valley Pipeline (MVP) would extend for 304 miles from Wetzel County, West Virginia to Pittsylvania County, Virginia. Along this length, the pipeline itself, permanent and temporary access roads, and timber mats will cross hundreds of rivers and streams. (Tetra Tech 2021)

This report focuses on stream impacts from pipeline crossings using dry-ditch open-cut methods, as proposed for numerous MVP crossings. This method involves dewatering the construction site by diverting flow around the site while the ditch is dug and the pipe is laid. (Tetra Tech 2021)

Although the specific methods employed in dry-ditch crossings differ from those used in wet-ditch crossings, both methods have been documented to cause stream sedimentation and turbidity. Sediment inputs to the stream from either method may diminish if the stream successfully stabilizes over the buried pipe. However, as discussed below, stabilization of the original sediment source does not end the sediment impacts to the stream.

In addition to transporting water from the mountains downhill to the oceans, rivers and streams act as conveyor belts carrying suspended and dissolved loads of sediment, soil, and rock debris. Depending on the size of the river and other factors, loads of millions of tons per year can be transported. (Dunne and Leopold 1978)

Generally, the load is divided into size classes: clay, silt, sand, gravel, cobble, and boulder. When the flow is high enough, shears in the flow are created as faster water moves past slower water. Smaller sediment particles in the streambed, which can include clay, silt, and sand, are carried upward into the water column and become the suspended load.

Larger size classes require greater forces to move. Instead of being lifted into the water column, cobble and boulders are generally rolled or dragged along the river bed and constitute the bed load.

In this document, we focus on the suspended sediment load. Once sediment is suspended, or entrained, in a river, it will flow downstream. Along the way, the sediment will mix into the water column as it undergoes vertical, transverse, and longitudinal turbulent diffusion. The spatial extent of the exposure risk from suspended sediments—including, for example, the identification of the specific habitats affected by instream construction-induced suspended sediment—is not currently considered within many water quality management frameworks. (Courtice and Naser 2020)

Eventually, depending on the river conditions, the sediment will re-deposit on the streambed. This sediment will then be re-suspended in the water column at a later date, when conditions are right. In this manner, sediment that was originally generated from an upstream crossing will continue to impact downstream flora, fauna, and their habitats as the streams and rivers transport sediment loads downstream.

The amount of time it takes for this suspended sediment load to be flushed from a stream channel varies and depends on a number of factors, including the season of construction, droughts and floods, or other weather patterns.

1

AR 005882

# 2.  PIPELINE CROSSINGS GENERATE SEDIMENT

The most common methods for crossing streams during construction of pipelines include:

- wet-ditch open-cut crossings, where the stream is allowed to run through the construction site;
- dry-ditch open-cut crossings, which isolate the streamflow from the construction site; and
- trenchless methods, including conventional boring and horizontal directional drilling, in which the pipe is installed in a tunnel drilled under the streambed.

This review focuses on open-cut methods. Once the pipe has been installed in the streambed and covered, long-term sedimentation impacts are similar for both wet-ditch and dry-ditch methods. MVP does not propose to use wet-ditch methods; however, these methods are included in this review due to similarities in long-term impacts generated by both open-cut methods. Because impacts from trenchless methods are quite different, these methods are not included in this review.

The goal in utilizing dry-ditch stream crossings to construct pipelines is to reduce the release of sediment into the aquatic environment. However, such reductions fall short of complete avoidance of sediment releases and are less than would be achieved through the use of trenchless technologies. Sediment releases in dry-ditch crossings often occur during the installation and removal of isolation structures. Sediment is also commonly released when installation and maintenance of isolation structures is flawed. Inadequate installation and maintenance of these structures allow sediment releases due to leakage around and/or underneath dams, dam or flume failures, and pump failures. (Pharris and Kopla 2007, Reid et al. 2002)

One example of a failed dry-ditch stream crossing that released significant amounts of sediment to the aquatic environment occurred during construction of the WB Express Pipeline's crossing of the North Fork of the South Branch of the Potomac River in West Virginia. A pump-around dam failed, and the pumps were overwhelmed. This resulted in a sediment release that violated West Virginia's water quality standards, and settleable solids were observed 19 miles downstream following this release. (West Virginia Department of Environmental Protection 2019)

In general, while the influx of sediment from an open-cut stream crossing may diminish when the disturbance ends, some residual increases may occur due to scour of the trench, erosion of exposed surfaces at the crossing site, and resuspension of settled materials. (Reid and Anderson 1999, Armitage and Gunn 1996, Courtice and Naser 2020, Pharris and Kopla 2007)

## 2.1  Impacts can last for years

While the short-term impacts of stream crossings by pipeline projects are well-defined in the literature, there is a paucity of current, data-driven documentation of the long-term impacts. Following pipeline construction, silt deposits and increased embeddedness due to sediment deposition may continue to impact downstream streambeds and aquatic life for years following crossing completion (Armitage and Gunn 1996, Reid and Anderson 1999). Long-term impacts of pipeline crossings must be evaluated at each individual stream due to stream-specific factors that influence the duration of stream channel and aquatic life impacts. Because of the potential for isolation methods to fail, stream crossing construction sites must receive adequate oversight to ensure that large-scale sedimentation events do not occur.

Armitage and Gunn (1996) analyzed anthropogenic impacts associated with construction of the United Kingdom terminal of the Channel Tunnel on benthic communities in three streams. One stream was crossed by a pipeline using the open-cut construction method and provided an opportunity to examine the impacts of this type of construction project on the aquatic community

AR  005883

and sedimentation in the stream channel. Immediately following construction of the pipeline crossing, the proportion of silt in the substrate increased to 90 percent. This silt persisted in the streambed for more than four years until high spring flows washed away the silt, returning the streambed to a substrate dominated by pebbles and gravel. Macroinvertebrate communities shifted in correlation with the influx of silt: *Chironomidae* and *oligochaetes* became dominant following siltation, and the community returned to its pre-construction state dominated by crustaceans following silt flushing. (Armitage and Gunn 1996)

Reid and Anderson (1999) summarize 20 analyses of aquatic impacts following pipeline crossings. Of these, eight only assessed immediate impacts. Of the remaining twelve studies, ten found that sediment was flushed within one year and benthic communities had returned to their pre-construction status. The other two studies observed impacts two to four years after crossing construction. According to the authors, high stream flows, such as those produced during storms or spring melts, are required to flush sediment that has become embedded in stream bottoms (Reid and Anderson 1999).

Reid et al. (2002) found that fish populations were impacted up to one month following construction but returned to pre-construction numbers one year later. Notably, both studies (Reid and Anderson 1999, Reid et al. 2002) were funded and reviewed by the Interstate Natural Gas Association of America and the Gas Research Institute.

## 2.2  Impacts are site-specific

Pipeline stream crossings must be independently evaluated at each stream crossing to accurately assess impacts to the aquatic environment. The extent of sediment entrainment and deposition is highly dependent on flow conditions, construction activity and duration, and sediment particle size (Castro et al. 2014, Reid and Anderson 1999). "It is clear that the magnitude of change and recovery time is related not only to the type and intensity of the disturbance, but also to the intrinsic characteristics of the stream" (Armitage and Gunn 1996, p. 178). Stream morphology plays a role in determining the time required for sediment flushing to be complete. Sediment is maintained for longer periods of time in low-flow areas, such as behind boulders or in slow pools (Reid and Anderson 1999).

Stream responses to pipeline construction are highly dependent on characteristics of the stream system rather than the pipeline. These impacts occur not just at the project site, but may also propagate downstream, as discussed above. Impacts may also propagate upstream or laterally into the floodplain. (Castro et al. 2015)

In order to accurately predict the potential impacts of a proposed crossing on the aquatic environment, specific, detailed information would be required about individual site conditions, construction implementation, best management practices, site restoration, and monitoring and maintenance. (Castro et al. 2015)

AR 005884

# 3. EXCESS SEDIMENT HARMS AQUATIC LIFE

While sediment is a natural and important part of riverine ecosystems, it may be harmful to flora, fauna, and their habitats when it becomes suspended (Courtice and Naser 2020). Sediment that becomes entrained in the water column creates turbid conditions that negatively affect aquatic life. Once this suspended sediment is deposited, additional impacts are experienced by aquatic organisms as the streambed becomes embedded with fine sediment.

Suspended sediment leads to decreased aquatic biodiversity. Increased sediment loads impair breathing by clogging gills of fish and other aquatic species and by complicating feeding on suspended food sources. Increases in turbidity result in a relocation of aquatic organisms commonly utilized as a food source by fish species, which negatively affects fish populations.

Sediment already deposited, or embedded, in the stream channel often remains in the aquatic environment for extended periods of time. Embedded sediment harms habitat for many fish and other aquatic organisms. Fine sediment accumulation affects benthic macroinvertebrates in several ways: Sediment accumulation fills interstitial spaces used for refuge, decreases oxygen availability, and inhibits food sources (Harrison et al. 2007, Leitner et al. 2015). Some species are more susceptible to sediment impacts, which leads to a decrease in benthic biodiversity. Macroinvertebrates of the *Ephemeroptera*, *Plecoptera*, and *Trichoptera* orders are most impacted by sedimentation and are also important food sources for stream fish (Harrison et al. 2007). Also, many fish species require clean gravel substrate for reproduction, and regeneration rates suffer when streambeds are embedded. (Rabeni and Smale 1995, Berkman and Rabeni 1987)

Sediment inputs generated during construction of pipeline crossings have been documented to affect aquatic ecosystems and include direct effects such as physical alteration of channel morphology and habitat and indirect effects such as alteration of water quality and sediment dynamics. Castro et al. (2015) discuss impacts to aquatic species: "depending upon the crossing location, stream and catchment characteristics, timing, extent of activities, and application of Best Management Practices, impacts to aquatic species will vary but may include simplification of habitat, loss of aquatic species passage, removal of spawning gravel, increased suspended sediment and turbidity, loss of side channels, disconnection from the floodplain, or change in hyporheic flow patterns" (Castro et al. 2015, p. 769)

Sediment inputs in aquatic habitats result in decreases in benthic macroinvertebrate community diversity. Increases in silt and suspended solids in the water column and streambed sedimentation can cause invertebrate community drift where sensitive species relocate up- or downstream to unimpacted habitats. Reid and Anderson (1999) documented decreases in macroinvertebrate community biodiversity following construction of a pipeline crossing, and Armitage and Gunn (1996) observed a shift in benthic communities towards more tolerant species such as *Chironomidae* and *oligochaetes* after a pipeline crossing was constructed.

Similarly, fish communities are harmed by decreased water quality due to sediment entrainment in the water column and alteration of stream bottoms. Sediment in the water column decreases light penetration, which impacts primary production. This diminishes important food sources for fish communities, including macroinvertebrates and aquatic plants. Sediment deposition on gravel beds is harmful to fish and has been shown to decrease reproductive success rates. Many fish species rely on a gravel stream bottom for spawning; when a streambed becomes embedded due to sediment deposition, spawning success rates decrease. Additionally, silt reduces water flow through gravel, causing fish egg mortality. (Penkal and Phillips 1984, Castro et al. 2014, Lévesque and Dubé 2007, Reid et al. 2002)

4

AR 005885

# 4. MOUNTAIN VALLEY PIPELINE'S APPLICATION DOES NOT SUPPORT ITS ASSERTIONS

MVP's application addresses the generation of sediment from stream crossings, and its associated duration and impacts, with a sweeping statement:

> "Due to the dry-ditch open-cut construction practices discussed in Section 4.3.2, impacts to water quality will include minimal, short-term increases in sediment loads and turbidity level." (Tetra Tech 2021, p. 37)

The assertion that impacts will be minimal is not supported in the application.

The application does assert that the wet-ditch open-cut construction method "increases the potential for detrimental impacts to the aquatic environment" (Tetra Tech 2021, p. 50) and that the dry-ditch open-cut method is preferable: "With the use of diversion structures, the risk of increased levels of sediment and turbidity is largely reduced." (Tetra Tech 2021, p. 51)

But just because the dry-ditch method may reduce impacts compared with the wet-ditch method does not mean that the impacts will be minimal. As described above, the complete avoidance of sediment releases using the dry-ditch method is unlikely, and a variety of impacts to fish and other aquatic life can be expected once sediment leaves the site. The 19-mile sediment impact from a failed dry-ditch open-cut crossing during construction of the WB Express Pipeline, also described above, provides a vivid illustration of the scale of problems that can be caused.

MVP's assertion that impacts will be short-term is also not supported in the application. Nowhere in the application is data provided or summarized that supports this assertion.

As described above, while some studies document returns to pre-construction conditions within one year following the construction of pipeline crossings, one often-cited study found that sediment—and sediment-related impacts to aquatic life—persisted in the streambed for more than four years.

Detailed, site-specific and stream-specific information and modeling would be needed to predict the scale of impacts and the amount of time required to return to pre-construction conditions. This type of information and modeling is absent from MVP's application.

MVP's sweeping assurance about minimal, short-term water quality impacts must also be judged by taking into account its documented record of sediment-related violations. A review of agency inspection reports and violations received by MVP during its first 2.5 years of construction demonstrates that the company has a proven track record of carelessness in constructing erosion and sediment control devices. During an eight-month period in 2018, MVP was issued 25 notices of violation by the West Virginia Department of Environmental Protection. Each of these violations resulted in releases of sediment to the environment. Many of these releases occurred due to improper installation of commonly utilized sediment control measures such as water bars and perimeter fences. Other releases resulted from failures to adequately maintain and properly operate sediment control devices and incorrect calculations resulting in incorrectly sized controls. (Betcher et al. 2019)

Due to the importance of proper installation and maintenance of isolation structures while constructing dry-ditch crossings and MVP's record of violations, sediment impacts due to dry-ditch stream crossings are likely. Further, these violations demonstrate that MVP has been contributing sediment to streams along the pipeline's route during upland construction (Betcher et al. 2019). Construction of stream crossings would only compound the sediment inputs to streams along the pipeline's route.

5

AR 005886

# 5. CONCLUSIONS

While rivers and streams naturally carry suspended sediment from upstream to downstream, any type of construction performed in a river or stream—including open-cut stream crossings—disturb the streambed and generate additional sediment loads.

Once sediment is suspended in a river, it will begin to flow downstream. Eventually, it will re-deposit on the streambed, and this sediment will then be re-suspended when conditions are right.

Increased sediment loads harm aquatic life, whether suspended in the water column or embedded in the streambed.

Data on the long-term impacts of sediment generated from stream crossings is sparse. While some studies document returns to pre-construction conditions within one year following the construction of pipeline crossings, one often-cited study found that sediment—and sediment-related impacts to aquatic life—persisted in the streambed for more than four years.

Clearing of embedded sediment requires a flushing event. The amount of time it takes for sediment to be flushed from a stream channel varies and depends on the season of construction, droughts and floods, or other weather patterns.

Individual stream characteristics are important for predicting recovery; therefore, it is important to evaluate the potential for risk on a stream-by-stream basis. MVP's application does not include this type of detailed information.

MVP's application does not support its assertions that impacts will be minimal or short-term, nor does it include detailed, site-specific and stream-specific information and modeling to predict the scale of impacts and the amount of time required to return to pre-construction conditions.

Due to the importance of proper installation and maintenance of isolation structures while constructing dry-ditch crossings and MVP's record of sediment-related violations, sediment impacts due to dry-ditch stream crossings are likely.

AR 005887

# REFERENCES

Anderson, Paul G. Christian Fraikin, G.J. Chandler, J. Trevor. 1998. Impacts and recovery in a coldwater stream following a natural gas pipeline crossing installation. ASME. International Pipeline Conference. Volume II. 1013-1022.

Armitage, P.D. and R.J.M. Gunn. 1996. Differential response of benthos to natural and anthropogenic disturbances in 3 lowland streams. *Int. Revue ges. Hydrobiol*: 81, 2, 161-181.

Berkman, Hilary E. and Charles F. Rabeni. 1987. Effect of siltation on stream fish communities. *Environmental Biology of Fishes*. 18: 285-294.

Betcher, Meghan, Alyssa Hanna, Evan Hansen, David Hirschman. 2019. Pipeline Impacts to Water Quality, Documented impacts and recommendations for improvements. August 21.

Castro, J.M., A. Macdonald, E. Lynch, and C.R. Thorne. 2015. Risk-based approach to designing and reviewing pipeline stream crossings to minimize impacts to aquatic habitats and species. *River Res. Applic*. 31: 767-783.

Courtice, Gregory and Gholamreza Naser. 2020. In-stream construction-induced suspended sediment in riverine ecosystems. *River Res Applic*. 36:327-337.

Dejiang, Long, Michael J. Bender, Les F. Sawatsky, Paul Anderson, Serge Metikosh. 1998. Sediment entrainment during construction of river pipeline crossings: Occurrence, prediction, and control. ASME. International Pipeline Conference. Volume II. 1045-1050.

Dunne, Thomas and Luna B. Leopold. 1978. Water in Environmental Planning. New York: W.H. Freeman and Company.

Harrison, Evan T. Richard H. Norris, and Scott N. Wilkinson. 2007. The impact of fine sediment accumulation on benthic macroinvertebrates: implications for river management. Proceedings of the 5th Australian Stream Management Conference.

Leitner, P. C. Hauer, T. Ofenbock, F. Pletterbauer, A. Schmidt-Kloiber, W. Graf. 2015. Fine sediment deposition affects biodiversity and density of benthic macroinvertebrates: A case study in the freshwater pearl mussel river Waldaist (Upper Austria). *Limnnologica*: 50, 54-57.

Levesque, Lucie M. and Monique G. Dube. 2007. Review of the effects of in-stream pipeline crossing construction on aquatic ecosystems and examination of Canadian Methodologies for impact assessment. *Environ Monit Asses*. 132:395-409.

Penkal, Russ F. and Glenn R. Phillips. 1984. Construction and operation of oil and gas pipelines. *American Fisheries Society*. Vol 9, No. 3; 6-8.

Pharris, T.C. and R.L. Kopla. 2007. Overview of the Design, Construction, and Operation of Interstate Liquid Petroleum Pipelines. Argonne National Laboratory. Environmental Sciences Division. November.

Rabeni, Charles F. and Martin A. Smale. 1995. Effects of siltation on stream fishes and the potential mitigating role of the buffering riparian zone. *Hydrobiologia*. 303: 211-219.

Reid, Scott M, Scott Stoklosar, Serge Metikosh, and Jim Evans. 2002. Effectiveness of isolated pipeline crossing techniques to mitigate sediment impacts on brook trout streams. Water *Qual Res. J. Canada*: 37; 2, 473-488.

Reid, Scott M. and Paul G. Anderson. 1999. Effects of sediment released during open-cut pipeline water crossings. *Canadian Water Resources Journal*, 24:3, 235-251.

AR 005888

Tetra Tech. 2021. Mountain Valley Pipeline Project Individual Permit Application. Prepared for: Mountain Valley Pipeline, LLC. Submitted to: United States Army Corps of Engineers – Pittsburgh District, United States Army Corps of Engineers – Huntington District, United States Army Corps of Engineers – Norfolk District, Virginia Department of Environmental Quality, Virginia Marine Resources Commission. February.

West Virginia Department of Environmental Protection. 2019. Consent Order Issued Under the Water Pollution Control Act, West Virginia Code, Chapter 22, Article 11. To Columbia Natural Gas. February 22.

JA2777

AR 005889



**west virginia** department of environmental protection

Division of Water and Waste Management
601 57th Street SE
Charleston, WV 25304
Phone: (304) 926-0470
Fax:    (304) 926-0452

Austin Caperton, Cabinet Secretary
www.dep.wv.gov

## CONSENT ORDER
## ISSUED UNDER THE
## WATER POLLUTION CONTROL ACT
## WEST VIRGINIA CODE, CHAPTER 22, ARTICLE 11

TO:   Columbia Gas Transmission, LLC
       Attn: Jason Chambers
       1700 McCorkle Avenue
       Charleston, WV 25314

DATE: January 28, 2019

ORDER NO.: 8943

### INTRODUCTION

This Consent Order is issued by the Director of the Division of Water and Waste Management (hereinafter "Director"), under the authority of West Virginia Code, Chapter 22, Article 11, Section 1 et seq. to Columbia Gas Transmission, LLC (hereinafter "CGT").

### FINDINGS OF FACT

In support of this Order, the Director hereby finds the following:

1. CGT is conducting land disturbance activity associated with the WB Xpress Project in Seneca Rocks, Pendleton County, West Virginia. On November 14, 2017, CGT was issued Water Pollution Control Permit No. WV0116815, Registration No. WVR310884, for Stormwater Associated With Oil and Gas Related Construction Activities.

2. On October 22, 2018, West Virginia Department of Environmental Protection (WVDEP) personnel conducted an inspection of the facility. During the inspection, violations of the following sections of WV Legislative Rules and the permit were observed and documented:

   a. Section G.4.e.2. – CGT failed to properly implement controls at the upstream pump-around dam across the North Fork River near the Seneca Rocks Compressor Station crossing.

Promoting a healthy environment.
JA2778

b. Section F.2.a. – CGT failed to report noncompliance, which may have endangered health or the environment, to the designated WVDEP spill alert telephone number. Specifically, controls for the aforementioned pump-around dam failed, and it was not properly reported.

c. Section G.4.e.2.A.ii.j – CGT failed to prevent sediment-laden water from leaving the site without going through an appropriate device. Specifically, the upstream dam failed, and pumps were overwhelmed, thus allowing sediment laden water to leave the site.

d. 47CSR2 Section 3.2.a.- CGT caused conditions not allowable in waters of the State by creating distinctly visible settleable solids in the North Fork of the South Branch of the Potomac River (38° 50' 56.0" X 79° 22' 27.0"), which is a trout stream. The settleable solids continued nineteen (19) miles downstream into the North Fork River (38° 59' 24.0" X 79° 11' 06.0").

As a result of the aforementioned violations, Notice of Violation (NOV) No. W18-36-055-TAG was issued to CGT.

## ORDER FOR COMPLIANCE

Now, therefore, in accordance with Chapter 22, Article 11, Section 1 et seq. of the West Virginia Code, it is hereby agreed between the parties, and ORDERED by the Director:

1. CGT shall immediately take all measures to initiate compliance with all terms and conditions of its permit and pertinent laws and rules.

2. Within twenty (20) days of the effective date of this Order, CGT shall submit for approval a proposed plan of corrective action and schedule, outlining action items and completion dates for how and when CGT will achieve compliance with all terms and conditions of its permit and pertinent laws and rules. The plan of corrective action shall include, but not be limited to, provisions for proper remediation of all areas identified in this Order where conditions not allowable were observed and documented in waters of the State, as defined in WV Legislative Rule 47CSR2 Section 3.2. In addition, the plan of corrective action shall include, but not be limited to, provisions for submittal of a report which documents that proper remediation of the aforementioned areas has occurred. The plan of corrective action shall make reference to Permit No. WV0116815, Registration No. WVR310884, and Order No. 8943. The plan of corrective action shall be submitted to:

**Chief Inspector**
**Environmental Enforcement - Mail Code #031328**
**WVDEP**
**601 57th Street SE**
**Charleston, WV 25304**

Upon approval, the plan of corrective action and schedule shall be incorporated into and become part of this Order, as if fully set forth herein. Failure to submit an approvable

AR 005907

plan of corrective action and schedule or failure to adhere to the approved schedule is a violation of this Order.

3. Because of CGT's Legislative Rule and permit violations, CGT shall be assessed a civil administrative penalty of thirteen thousand three hundred forty dollars ($13,340) to be paid to the West Virginia Department of Environmental Protection for deposit in the Water Quality Management Fund within thirty (30) days of the effective date of this Order. Payments made pursuant to this paragraph are not tax-deductible for purposes of State or federal law. **Payment shall include a reference to the Order No. and shall be mailed to:**

<div align="center">

**Chief Inspector**
**Environmental Enforcement - Mail Code #031328**
**WV-DEP**
**601 57th Street SE**
**Charleston, WV 25304**

</div>

<div align="center">

**<u>OTHER PROVISIONS</u>**

</div>

1. CGT hereby waives its right to appeal this Order under the provisions of Chapter 22, Article 11, Section 21 of the Code of West Virginia. Under this Order, CGT agrees to take all actions required by the terms and conditions of this Order and consents to and will not contest the Director's jurisdiction regarding this Order. However, CGT does not admit to any factual and legal determinations made by the Director and reserves all rights and defenses available regarding liability or responsibility in any proceedings regarding CGT other than proceedings, administrative or civil, to enforce this Order.

2. The Director reserves the right to take further action if compliance with the terms and conditions of this Order does not adequately address the violations noted herein and reserves all rights and defenses which he may have pursuant to any legal authority, as well as the right to raise, as a basis for supporting such legal authority or defenses, facts other than those contained in the Findings of Fact.

3. If any event occurs which causes delay in the achievement of the requirements of this Order, CGT shall have the burden of proving that the delay was caused by circumstances beyond its reasonable control which could not have been overcome by due diligence (i.e., force majeure). Force majeure shall not include delays caused or contributed to by the lack of sufficient funding. Within three (3) working days after CGT becomes aware of such a delay, notification shall be provided to the Director/Chief Inspector and CGT shall, within ten (10) working days of initial notification, submit a detailed written explanation of the anticipated length and cause of the delay, the measures taken and/or to be taken to prevent or minimize the delay, and a timetable by which CGT intends to implement these measures. If the Director agrees that the delay has been or will be caused by circumstances beyond the reasonable control of CGT (i.e., force majeure), the time for performance hereunder shall be extended for a period of time equal to the delay resulting from such circumstances. A force majeure amendment granted by the Director

<div align="center">JA2780</div>

Consent Order
Page 4

shall be considered a binding extension of this Order and of the requirements herein. The determination of the Director shall be final and not subject to appeal.

4.  Compliance with the terms and conditions of this Order shall not in any way be construed as relieving CGT of the obligation to comply with any applicable law, permit, other order, or any other requirement otherwise applicable. Violations of the terms and conditions of this Order may subject CGT to additional penalties and injunctive relief in accordance with the applicable law.

5.  The provisions of this Order are severable and should a court or board of competent jurisdiction declare any provisions to be invalid or unenforceable, all other provisions shall remain in full force and effect.

6.  This Order is binding on CGT, its successors and assigns.

7.  This Order shall terminate upon CGT's notification of full compliance with the "Order for Compliance" and verification of this notification by WVDEP.

_____            2/1/19
Rodney Kimble                       Date
Columbia Gas Transmission, LLC

Public Notice begin:               _____
                                   Date

Public Notice end:                 _____
                                   Date

_____            _____
Harold D. Ward, Acting Director    Date
Division of Water and Waste Management

JA2781

AR 005909

COLUMBIA GAS TRANSMISSION, LLC, WVR310884, Phase 2 WB XPress Project, 10/22/18



Overview of the site specific pump around plan.



Photo taken off of the TAR 45 access bridge. This location is approximately ½ mile upstream of the pump around operation. The North Fork of the Potomac was flowing clear.

JA2782

AR  005910

COLUMBIA GAS TRANSMISSION, LLC, WVR310884, Phase 2 WB XPress Project, 10/22/18



North Fork of the Potomac was flowing clear directly above the pump around area adjacent to the Seneca Rocks Pumping station.



Approximately 20 intake lines pictured above upstream dam. Upstream dam control failed.

AR 005911

COLUMBIA GAS TRANSMISSION, LLC, WVR310884, Phase 2 WB XPress Project, 10/22/18



Close-up view of failed upstream dam.



Sediment laden water was leaving the site without going through an appropriate device and causing conditions not allowable (CNA) in the North Fork of the Potomac (38° 50' 56.0" X 79° 22' 27.0").

JA2784

AR  005912

COLUMBIA GAS TRANSMISSION, LLC, WVR310884, Phase 2 WB XPress Project, 10/22/18



Equipment working in the stream with failed upstream dam control.



CNA and sediment laden water between the upstream dam and the discharge lines.

AR 005913

COLUMBIA GAS TRANSMISSION, LLC, WVR310884, Phase 2 WB XPress Project, 10/22/18


North Fork River - turbid 3.6 miles downstream of the failed controls.


North Fork River - turbid 5 miles downstream of the failed controls.

AR 005914

COLUMBIA GAS TRANSMISSION, LLC, WVR310884, Phase 2 WB XPress Project, 10/22/18



Photo taken off of the TAR 45 access bridge on 10/23/18. This location is approximately ½ mile upstream of the pump around operation. The North Fork of the Potomac was flowing clear.



Equipment finishing pipe installation. Water was still turbid.

JA2787

AR 005915

COLUMBIA GAS TRANSMISSION, LLC, WVR310884, Phase 2 WB XPress Project, 10/22/18



Water was still turbid.  Upstream and downstream dam had been removed.



North Fork River was turbid approx. 5 miles downstream of the failed controls.

AR 005916

COLUMBIA GAS TRANSMISSION, LLC, WVR310884, Phase 2 WB XPress Project, 10/22/18



North Fork River was turbid near Cabins, approximately 12 miles downstream of the failed controls.



North Fork River was turbid near Smoke Hole Bridge, approximately 15.5 miles downstream of the failed controls.

AR 005917

COLUMBIA GAS TRANSMISSION, LLC, WVR310884, Phase 2 WB XPress Project, 10/22/18



North Fork River was turbid approximately 17.5 miles downstream of the failed controls.



North Fork River was turbid approximately 19 miles downstream of the failed controls.

AR 005918

# Base Penalty Calculation

(pursuant to 47CSR1-6.1)

**Responsible Party:** Columbia Gas Transmission, LLC          **Receiving Stream:**

**Treatment System Design Maximum Flow:** _____ MGD

**Treatment System Actual Average Flow:** _____ MGD    (if known)

Enter FOF# and rate each finding as to Potential and Extent.

| | Potential for Harm Factor | Factor Range | FOF# | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2a | 2b | 2d | | | | | | | | | |
| 1) | | | | | | | | | | | | | | |
| a) | Amount of Pollutant Released | 1 to 3 | 1 | 1 | 3 | | | | | | | | | |
| b) | Toxicity of Pollutant | 0 to 3 | 1 | 0 | 1 | | | | | | | | | |
| c) | Sensitivity of the Environment | 0 to 3 | 1 | 0 | 3 | | | | | | | | | |
| d) | Length of Time | 1 to 3 | 1 | 1 | 1 | | | | | | | | | |
| e) | Actual Exposure and Effects thereon | 0 to 3 | 1 | 0 | 3 | | | | | | | | | |
| | **Average Potential for Harm Factor** | | 1 | 0.4 | 2.2 | No | No | No | No | No | No | No | No | No |
| 2) | **Extent of Deviation Factor** | **Factor Range** | | | | | | | | | | | | |
| | Degree of Non-Compliance | 1 to 3 | 3 | 3 | 3 | | | | | | | | | |

**Potential for Harm Factors:**

1)c - Sensitivity of the Environment Potentially Affected (0 for "dead" stream)

1)d - Length of Time of Violation

1)e - Actual Human/Environmental Exposure and Resulting Effects thereon

**Examples/Guidance:**

**Note:** Rate as 1 for Minor, 2 for Moderate and 3 for Major.  Rate as 0 if it does not apply.

Minor = exceedance of permit limit by <=40% for Avg. Monthly or <=100% for Daily Max., exceed numeric WQ standard by <= 100%, or report doesn't contain some minor information.

Moderate = exceedance of permit limit by >= 41% and <= 300% for Avg. Monthly , >= 101% and <= 600% for Daily Max., exceed numeric WQ standard by >= 101% and <= of 600% or report doesn't fully address intended subject matter.

Major = exceedance of permit limit by >= 301% for Avg. Monthly, >= 601% for Daily Max., exceed numeric WQ standard by >= 601%, failure to submit a report, failure to obtain a permit, failure to report a spill, etc.  Note that a facility in SNC should be rated as major for length of time and degree of non-compliance.

Narrative WQ standard violations - case-by-case.

JA2791

AR 005919

**Continue rating Findings of Facts (FOF) here, if necessary.  Otherwise, continue on Page 3.**

| 1) | Potential for Harm Factor | Factor Range | FOF# | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| a) | Amount of Pollutant Released | 1 to 3 | | | | | | | | | | | | | |
| b) | Toxicity of Pollutant | 0 to 3 | | | | | | | | | | | | | |
| c) | Sensitivity of the Environment | 0 to 3 | | | | | | | | | | | | | |
| d) | Length of Time | 1 to 3 | | | | | | | | | | | | | |
| e) | Actual Exposure and Effects thereon | 0 to 3 | | | | | | | | | | | | | |
| | **Average Potential for Harm Factor** | | No | No | No | No | No | No | No | No | No | No | No | No | No |
| 2) | **Extent of Deviation Factor** | **Factor Range** | | | | | | | | | | | | | |
| | Degree of Non-Compliance | 1 to 3 | | | | | | | | | | | | | |

JA2792

AR  005920

| | | Extent of Deviation from Requirement | | |
|---|---|---|---|---|
| | | Major | Moderate | Minor |
| **Potential for Harm to Human Health or the Environment** | Major | $8,000 to $10,000 | $6,000 to $8,000 | $5,000 to $6,000 |
| | Moderate | $4,000 to $5,000 | $3,000 to $4,000 | $2,000 to $3,000 |
| | Minor | $1,500 to $2,000 | $1,000 to $1,500 | Up to $1,000 |

| FOF # | Potential for Harm | Extent of Deviation | Penalty | Multiple Factor | Base Penalty |
|---|---|---|---|---|---|
| 2a | Minor | Major | $2,000 | 1 | $2,000 |
| 2b | Minor | Major | $1,700 | 1 | $1,700 |
| 2d | Major | Major | $8,400 | 1 | $8,400 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| 0 | FALSE | FALSE | FALSE | 1 | $0 |
| **Total Base Penalty** | | | | | $12,100 |

JA2793

AR 005921

# Penalty Adjustment Factors
### (pursuant to 47CSR1-6.2)

**Penalty Adjustment Factor**

6.2.b.1 - Degree of or absence of willfulness and/or negligence - 0% to 30% increase

6.2.b.4 - Previous compliance/noncompliance history - 0% to 100% increase - based upon review of last three (3) years - Warning = maximum of 5% each, N.O.V. = maximum of 10% each, previous Order = maximum of 25% each - Consistent DMR violations for <1 year = 10% maximum, for >1 year but <2 years = 20% maximum, for >2 years but <3 years = 30% maximum, for >3 years = 40 % maximum

6.2.b.6 - Economic benefits derived by the responsible party (increase to be determined)

6.2.b.7 - Public Interest (increase to be determined)

6.2.b.8 - Loss of enjoyment of the environment (increase to be determined)

6.2.b.9 - Staff investigative costs (increase to be determined)

6.2.b.10 - Other factors

    **Size of Violator: 0 - 50% decrease**

    **NOTE:** This factor is not available to discharges that are causing a water quality violation. This factor does not apply to a commercial or industrial facility that employees or is part of a corporation that employees more than 100 individuals.

| Avg. Daily WW Discharge Flow (gpd) | % Reduction Factor |
|---|---|
| < 5,000 | 50 |
| 5,000 to 9,999 | 40 |
| 10,000 to 19,999 | 30 |
| 20,000 to 29,999 | 20 |
| 30,000 to 39,999 | 10 |
| 40,000 to 99,999 | 5 |
| > 100,000 | 0 |

    **Additional Other factors to be determined for increases or decreases on a case-by-case basis.**

Public Notice Costs (cost for newspaper advertisement)

6.2.b.2 - Good Faith - 10% decrease to 10% increase

6.2.b.3 - Cooperation with the Secretary - 0% to 10% decrease

6.2.b.5 - Ability to pay a civil penalty - 0% to 100% decrease

# Base Penalty Adjustments

(pursuant to 47CSR1-6.2)

| Penalty Adjustment Factor | % Increase | % Decrease | Base Penalty Adjustments |
|---|---|---|---|
| 6.2.b.1 - Willfulness and/or negligence - | 10 | | $1,210 |
| 6.2.b.4 - Compliance/noncompliance history | | | $0 |
| 6.2.b.6 - Economic benefits - (flat monetary increase) | | | $0 |
| 6.2.b.7 - Public Interest - (flat monetary increase) | | | $0 |
| 6.2.b.8 - Loss of enjoyment - (flat monetary increase) | | | $0 |
| 6.2.b.9 - Investigative costs - (flat monetary increase) | | | $0 |
| 6.2.b.10 - Other factors (size of violator) | | | $0 |
| 6.2.b.10 - Additional Other Factors - Increase (flat monetary increase) | | | $0 |
| 6.2.b.10 - Additional Other Factors - Decrease (flat monetary decrease) | | | $0 |
| Public Notice Costs (flat monetary increase) | $30 | | $30 |
| 6.2.b.2 - Good Faith - Increase | | | $0 |
| 6.2.b.2 - Good Faith - Decrease | | | $0 |
| 6.2.b.3 - Cooperation with the Secretary | | | $0 |
| 6.2.b.5 - Ability to Pay | | | $0 |
| **Penalty Adjustments** | | | **$1,240** |
| **Penalty =** | | | **$13,340** |

| Estimated Economic Benefit Item | Estimated Benefit ($) |
|---|---|
| Monitoring & Reporting | |
| Installation & Maintenance of Pollution Control Equipment | |
| O&M expenses and cost of equipment/materials needed for compliance | |
| Permit Application or Modification | |
| Competitive Advantage | |
| **Estimated Economic Benefit** | **$0** |

**Comments:** Economic benefit not warranted.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania  19103-2029**

Michael Hatten, Chief
Regulatory Branch
Huntington District
U.S. Army Corps of Engineers
502 Eighth Street
Huntington, West Virginia 25701

      Re: LRH-2015-00592-GBR, LRP-2015-798, NAO-2015-0898; Mountain Valley Pipeline, LLC;
Mountain Valley Pipeline, Wetzel County, West Virginia to Pittsylvania County, Virginia

Dear Mr. Hatten:

      The U.S. Environmental Protection Agency (EPA) has reviewed the public notice (PN) for the
proposal by Mountain Valley Pipeline, LLC (MVP) for the discharge of dredged and/or fill material into
waters of the United States associated with construction of the MVP Pipeline within the Huntington,
Pittsburgh, and Norfolk Districts of the U.S. Army Corps of Engineers regulatory boundaries.  The
project is proposed to be approximately 304 miles long and begin at the existing Equitrans, L.P.
transmission system near the Mobley processing facility in Wetzel County, West Virginia and end at the
Transcontinental Gas Pipe Line Company, LLC's (Transco) Zone 5 Compressor Station 165 in Transco
Village, Pittsylvania County, Virginia.  Proposed discharges associated with the project would
permanently impact 1,198 linear feet (lf) of streams and 0.5 acre (ac) of wetlands, temporarily impact
38,312 lf of streams and 13.92 ac of wetlands, and permanently convert 3.7 ac of forested and scrub-
shrub wetlands to emergent wetlands.  EPA's comments, provided herein, are based upon the PN and
supplemental documentation, including the application, associated attachments, and maps, in addition to
state databases.

      EPA's review is intended to help ensure that the proposed project complies with the Clean Water
Act (CWA) Section 404(b)(1) Guidelines (Guidelines) (40 C.F.R. Part 230), which provide the
substantive environmental review criteria for CWA Section 404 permit applications.  Based on the
information available for review, EPA has identified a number of substantial concerns with the project
as currently proposed, including whether all feasible avoidance and minimization measures have been
undertaken, deficient characterization of the aquatic resources to be impacted, insufficient assessment of
secondary and cumulative impacts and potential for significant degradation, and the proposed
mitigation.  More detailed concerns and comments are set forth below and in the attached enclosure.

      While EPA recognizes the proposed project's purpose and need for providing transmission of
natural gas, the extent of anticipated impacts, notably the large amount of temporary discharges from the
proposal to the aquatic resources, warrants careful review.  The project proposes impacts within streams

 *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

JA2796

AR  006351

and wetlands of the Little Muskingum – Middle Island, West Fork, Little Kanawha, Elk, Gauley, Lower New, Greenbriar, Middle New, Upper James, Upper Roanoke, and Banister watersheds in West Virginia and Virginia. The scientific literature provides strong weight of evidence that tributaries and their wetlands are vital components of the aquatic ecosystem.[1] They collectively provide habitat, water quality improvements, flood control, sediment transport, water supply, nutrient cycling, and organic matter sources, leading to maintenance of downstream aquatic communities and water quality. Even though some waterbodies may not exhibit surface flow every day of the year, they perform many of the foregoing important functions and contribute approximately 60% of the mean annual flow to all northeastern U.S. streams and rivers. Therefore, the proposed discharges to these aquatic resources have implications not only for the direct impacts, but also downstream waters.

Based on the information provided to EPA for review, more than 200 of the proposed 719 stream impacts are proposed in the Upper Roanoke watershed. This watershed includes Natural and Stockable Trout Waters, as well as habitat for Roanoke logperch (*Percina rex*), an endangered species. The Gauley and the Elk watersheds include Category B-2 Trout Waters and are proposed to have a combined total of nearly 200 stream impacts. The Middle New watershed is proposed to have nearly 100 stream impacts, one of which is a direct impact to a stream designated as critical habitat for the endangered Candy darter (*Etheostoma osburni*). Additionally, many of the waters within these watersheds already are impaired for a variety of parameters, including pH, fecal coliform, iron, other metals, and biology.

Because of the multitude of functions the existing streams and their wetlands provide and the documented water quality issues in these watersheds, every effort should be made to avoid and minimize impacts from discharges associated with this project consistent with the Guidelines. Furthermore, the direct, secondary, and cumulative impacts from the discharges associated with this project to these watersheds may result in significant degradation of the waters of the United States and reduce the ability for remaining aquatic resources to maintain hydrologic, geochemical, and biological functions. The above-mentioned qualities of these aquatic resources demonstrate the value they provide. For these reasons, EPA considers the protection of the proposed receiving waters to be important to the overall quality of the aquatic ecosystem both regionally and nationally.

In conclusion, it appears that the project, as proposed, may not comply with the Guidelines. It is not apparent that all impacts have been minimized, nor is it evident that the direct, secondary, and cumulative impacts have been thoroughly evaluated and mitigated so that the proposed project will not cause or contribute to significant degradation of the waters of the United States. EPA recommends modifications to the permit application and project be undertaken to address the detailed comments identified in the attached enclosure. EPA also requests the opportunity to meet with the Corps and others to work collaboratively to address EPA comments. At this time, EPA recommends that the permit not be issued until modifications described in the attachment, including the recommended special conditions, have been addressed and incorporated into the project.

Thank you for the opportunity to review and provide comment on the PN for the Mountain Valley Pipeline. EPA looks forward to continuing to work with the Corps and the applicant. Should you have questions, please do not hesitate to contact Christine Mazzarella, the Wetlands Branch Team Lead, at 215-814-5756 or by email at mazzarella.christine@epa.gov.

---

[1] Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence EPA/600/R-14/475F

2

Sincerely,

JEFFREY LAPP  Digitally signed by JEFFREY LAPP
Date: 2021.05.27 16:54:01 -04'00'

Jeffrey D. Lapp, Chief
Wetlands Branch

cc:    Scott Hans, Chief, Regulatory Branch, Pittsburgh District, U.S. Army Corps of Engineers
       Tom Walker, Chief, Regulatory Branch, Norfolk District, U.S. Army Corps of Engineers

3

AR 006353

**ENCLOSURE**
**EPA's Technical Comments on LRH-2015-00592-GBR, LRP-2015-798, NAO-2015-0898;**
**Mountain Valley Pipeline, Mountain Valley Pipeline, LLC, Wetzel, Harrison, Doddridge, Lewis,**
**Braxton, Webster, Nicholas, Greenbrier, Summers, and Monroe Counties, WV and Giles, Craig,**
**Montgomery, Roanoke, Franklin, and Pittsylvania Counties, VA**

The CWA 404(b)(1) Guidelines (40 C.F.R Part 230) direct the consideration of whether the proposed fill will cause and contribute to violations of any applicable State water quality standard or to significant degradation of waters of the U.S. (230.10(b) & (c)). This includes significant adverse effects of the discharge on aquatic ecosystem diversity, productivity, and stability. EPA is concerned that the applicant has not yet demonstrated that the discharges from the project, as proposed, will not cause or contribute to water quality standards exceedances or significant degradation of receiving waters. The project proposes a substantial amount of temporary impacts in conjunction with permanent impacts. Approximately 7.25 miles of streams and 13.92 ac of wetlands are proposed to be temporarily impacted across eleven watersheds in two states. Of the 1,095 total proposed discharges of fill, 850 of them are within the Upper Roanoke, Gauley, Elk, Middle New, and Greenbrier watersheds. The streams and rivers in these watersheds have many good quality designations, such as trout waters, and provide habitat to freshwater mussels, trout, and threatened and endangered aquatic species, such as the Roanoke logperch (*Percina rex*) and Candy darter (*Etheostoma osburni*). Additionally, some of these watersheds contain streams listed as impaired for iron, other metals, biology, etc. While many of the discharges of fill associated with the proposed construction activity may be considered temporary, the impacts from those discharges may have lasting effects, particularly due to the sensitivity of the aquatic resources and the repetitive nature of impacts to some of the tributaries. The scientific literature provides strong weight of evidence that tributaries and their wetlands are vital components of the aquatic ecosystem. [2] Therefore, the impacts to these aquatic resources, including the loss of functions provided to downstream resources such as dilution, biogeochemical processes, and biodiversity, have the potential to result in significant degradation of waters of the United States and should be thoroughly assessed. To ensure that the proposed project does not result in significant degradation of waters of the United States through significant adverse effects of the discharges on aquatic ecosystems, EPA offers the following recommendations to be addressed prior to any permit decision.

***Avoidance and Minimization***
As directed by the Section 404(b)(1) Guidelines, the Corps' issued permit should reflect the least environmentally damaging practicable alternative (LEDPA) (230.10(a)). To identify the LEDPA, a full range of practicable alternatives, defined by the purpose and need for the project, is recommended for evaluation. Alternatives include not only geographical siting but also operational options, such as design modifications. Based on the information available for review, it is not clear that the proposed project represents the LEDPA. EPA recommends that additional examination and documentation of functional alternatives that avoid and minimize impacts be provided to ensure the proposed project is the LEDPA. Specific recommendations are provided in the following list.

1. EPA recommends updating the alternatives analysis with a narrative and table that identifies and compares the changes to the proposal since the project was authorized under the Nationwide Permit (NWP) 12. Specifically, the additional analysis should describe changes to the proposed route, modifications to stream and wetland crossing methods and subsequent changes to impacts

---

[2] Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence EPA/600/R-14/475F

4

AR 006354

(both permanent and temporary), and the impacts that have occurred from clearing of the right-of-way (ROW) and pipe that has already been laid.

2. EPA recognizes the efforts the applicant has made to adjust crossing methods to reduce aquatic impacts. However, EPA also recommends information be provided to explain how these methods, such as Direct Pipe and microtunneling, were selected to be used or not used throughout the project. EPA also recommends further consideration of using these methods at streams where not currently proposed, particularly streams that will be crossed multiple times, streams that are of good quality, and/or steams that may contain threatened or endangered aquatic species to better avoid or minimize impacts.

3. More than 100 of the proposed crossings will result in the intersection of multiple unique waterbodies by a single crossing. Several of these crossings are proposed to cross two to as many as ten waterbodies. EPA recommends the applicant examine additional avoidance opportunities for crossings that intersect multiple unique waterbodies and minimization options such as modifying crossing methods or utilizing additional effective best management practices (BMP). If these are not practicable, the rationale should be provided. Specific examples of crossings with more than four waterbodies include, but are not limited to, the following:
   - A-016, Dry-Ditch Open-Cut, 5 waterbodies crossed
   - C-032, Dry-Ditch Open-Cut, 4 waterbodies crossed
   - C-034, Dry-Ditch Open-Cut, 4 waterbodies crossed
   - C-038, Dry-Ditch Open-Cut, 10 waterbodies crossed
   - D-028, Conventional Bore, 4 waterbodies crossed
   - E-020, Dry-Ditch Open-Cut, 5 waterbodies crossed
   - E-022, Dry-Ditch Open-Cut, 4 waterbodies crossed
   - F-001, Dry-Ditch Open-Cut, 8 waterbodies crossed
   - F-029-030, Dry-Ditch Open-Cut, 4 waterbodies crossed
   - F-037, Dry-Ditch Open-Cut, 8 waterbodies crossed
   - F-045, Dry-Ditch Open-Cut, 4 waterbodies crossed
   - G-013, Guided Conventional Bore, 5 waterbodies crossed
   - H-031, Conventional Bore, 6 waterbodies crossed
   - H-036, Dry-Ditch Open-Cut, 8 waterbodies crossed
   - H-042, Conventional Bore, 4 waterbodies crossed
   - I-046, Conventional Bore, 4 waterbodies crossed
   - I-121, Conventional Bore, 5 waterbodies crossed

4. While EPA appreciates the relocation of the Blackwater River crossing to downstream of the Rocky Mount water intake, EPA also recommends that the applicant use one of the new or established trenchless methods to cross Blackwater River instead of open cut methods to further avoid or minimize impacts. If not practicable, then additional rationale for crossing the river by a trench method should be provided.

5. The application states that "incurring an unreasonable cost to avoid a short-duration temporary impact to an individual crossing is not appropriate and practicable." However, the analysis of what would be practicable for these crossings did not include the consideration of the costs associated with site restoration, monitoring and management, as well as potential additional compensatory mitigation. Additionally, the applicant considered and rejected as not practicable the use of bridges to avoid permanent impacts to streams, but it is not apparent that the relative cost of compensatory mitigation was included in that analysis. EPA recommends that the applicant provide an updated analysis incorporating these factors, and consider if there are

5

AR 006355

additional opportunities, including but not limited to bridging, using trenchless methods, etc., to avoid and or minimize aquatic resources either in crossings or in access road construction.

***Aquatic Resource Characterization & Direct, Secondary and Cumulative Impacts***

To fully assess the alternatives and impacts under Section 404(b)(1) Guidelines, the quality of the aquatic resources in the proposed project area must be considered. This data is needed to help inform avoidance and minimization opportunities and assess the direct, secondary, and cumulative impacts of the proposal. Furthermore, it is necessary to demonstrate the adequacy of the mitigation proposal. The data provided in the application is insufficient to determine accurate baseline conditions of the aquatic resources. Below are specific recommendations to be addressed.

1. It is unclear if a baseline assessment was completed on the quality and function of the aquatic resources proposed to be impacted either permanently or temporarily. To better evaluate the proposed project's impacts and to ensure adequate functional replacement of the aquatic resources, EPA recommends the applicant conduct a baseline assessment of the condition and functions of aquatic resources to be impacted by the proposed project, including those resources subject to temporary impacts.

   a. Specifically, EPA recommends that baseline data include biological, physical, and chemical parameters consistent with the parameters used to calculate West Virginia Stream Wetland Valuation Metric (SWVM). This data should be collected for all impacts to aquatic resources in both states.

   b. A narrative describing the methodology undertaken, photographs, measurements, and other supporting should be provided to allow the agencies to confirm the findings.

2. Substantial temporary fills are associated with this project. However, the information provided for review does not describe how long the proposed temporary fills will be in place nor how they will be removed and aquatic resources restored. Without this information, it is difficult to ascertain if the temporary fill will or will not have lasting impacts on the aquatic resources or result in secondary effects to downstream resources. **EPA recommends the permit be conditioned to require a restoration plan for temporary impacts, including post-construction monitoring and adaptive management, that has been reviewed and approved by the resource agencies.** Depending on the quality of the resource being impacted, the sensitivity of the resource, or the number of times a water is being impacted, the pre and post construction monitoring requirements could vary.

   a. At a minimum, to ensure that temporary stream and wetland impacts have no significant adverse impact to aquatic resources, the restoration plan should document baseline conditions, and elevations through georeferenced photographs and surveys, explain how all temporary fills and structures will be removed and the area restored to pre-project conditions, and require submission of post-construction georeferenced photographs and surveys to demonstrate that the impacts are in fact temporary and successfully restored.

      i. In addition, upon final stream bed restoration, the stream must have similar physical characteristics to include substrate, pattern, profile, dimension, and embeddedness of the original stream channel.

      ii. In addition, upon final wetland restoration a delineation will be conducted. At the final monitoring event a final wetland delineation will be conducted to ensure hydrology, hydric soils, and hydric vegetation communities are similar to the original wetland.

      iii. Provide a map of monitoring locations and a table illustrating this information.

      iv. Post construction monitoring for a period of three years.

6

AR 006356

      v.   Should post-construction monitoring demonstrate longer term effects on the aquatic resources, EPA recommends additional corrective measures be undertaken including compensatory mitigation be provided to offset those impacts.

b. In addition to the foregoing, for the following types of receiving waters, EPA recommends the restoration plan include enhanced post-construction monitoring and an adaptive management plan to ensure that temporary impacts have no significant adverse effects. Specifically, resources that should have more extensive monitoring, include but are not limited to the following:

      i.   Trout waters

      ii.   Impaired waters

      iii.   Waters with threatened or endangered species or that contain critical habitat including:

            1.   S-S5 (Candy Darter) – proposed activity: timber mat crossing

            2.   S-C21 (Roanoke Logperch) – proposed activity: timber mat crossing

            3.   S-C3 (Roanoke Logperch) – proposed activity: timber mat crossing

            4.   S-G36 (Roanoke Logperch) – proposed activity: temporary access road

      iv.   Streams and wetlands impacted multiple times by crossings or construction activities

            1.   Table 15 lists more than 15 streams and wetlands crossed multiple times by the pipeline

            2.   Table 2 and 3 list single streams and wetlands that incur multiple impacts from timber mats, access roads, and ROW clearing

c. For the resources described in 'b', a detailed monitoring plan should be developed to measure the chemical, physical, and biological functions of the resources, along with specific success criteria, to determine successful restoration and ensure that there will be no significant adverse effects. EPA recommends that the baseline assessment of the streams and wetlands, as described above, be used to guide the development of these success criteria. In addition to the items in the above item 'a', specific recommendations for more detailed monitoring plan include, but are not limited to the following items:

      i.   Monitoring for the parameters that are used to calculate the SWVM to assess the chemical, physical, and biological condition of the stream resources.

      ii.   For stream hydrology, monitoring should be conducted to document that the flow maintains its preconstruction flow status. Wetland hydrology should be monitored to ensure that the overall seasonal hydroperiod (depth, degree, duration, and periodicity) is similar to that of the pre-construction wetland and the site is inundated or the water table is less than or equal to 12 inches below the soil surface for 14 or less consecutive days during the growing season.

      iii.   To ensure wetland soils are not compacted, an example success criteria could include that the subsoil shall have a bulk density of less than 90lbs/ cubic foot for clay textures, grading less than 112 lbs/ cubic foot for sands (prior to adding organic matter or topsoil to the site). Replaced topsoil layers should also be remediated to a similar bulk density range.

      iv.   To address potential sedimentation concerns, in-stream monitoring of turbidity and sedimentation should be conducted to identify any changes in sediment load. Criteria should be protective of aquatic species and water quality standards.

7

AR 006357

   v. For vegetation, the application states that "in unsaturated wetlands, most vegetation will be replaced by seeding when necessary…and saturated wetlands will typically be allowed to re-vegetate naturally." However, this may allow time for invasive species that are in the seed bank to colonize the wetland. Therefore, EPA recommends planting wherever possible. Further, the application states that revegetation is considered "successful when cover of herbaceous species is at least 70 percent of the cover of the vegetation in adjacent wetland areas that were not disturbed," however this does not account for invasive species. EPA recommends a success criterion that defines no greater than 5% aerial coverage for invasive species be allowed.

   vi. Post construction monitoring for a period of five years or until data from successive monitoring periods indicate site stability and success criteria have been achieved.

   vii. Develop an adaptive management plan (AMP) that outlines measures to be taken if temporarily impacted areas fail to achieve success. Should corrective actions be needed, the AMP should guide decisions for implementing measures to address identified parameters. Actions should be specified for problems that may adversely affect aquatic resources, such as, but not limited to, erosion, sedimentation, and invasive species colonization. Should there be long term effects on the aquatic resources, EPA recommends additional compensatory mitigation be provided to offset those impacts should corrective measure fail or pre-construction conditions not be achieved.

   viii. Review of post-construction monitoring be undertaken by an independent third party that is qualified to assess water quality, stream and wetland conditions and able to make recommendations for adaptive management measures and corrective actions; the applicant also should commit to implement such recommendations.

3. Additionally, it appears that the ROW could sever upstream reaches from downstream resources. EPA recommends analyzing the potential for effects to downstream reaches, such as, but not limited to, changes to the hydrogeomorphology and impacts of sedimentation and compaction from construction activities, to better determine if secondary impacts will occur to the remaining stream resource. Secondary effects to these downstream resources should be avoided and minimized to the maximum extent practicable. Should unavoidable secondary impacts remain, then EPA recommends additional compensatory mitigation be provided to offset those effects.

4. Although the information provided included some analysis of cumulative effects, EPA recommends a conclusive evaluation of cumulative effects at a watershed scale (i.e. HUC 12) be provided to ensure that measures are undertaken to avoid and minimize the potential of cumulative impacts.

***Compensatory Mitigation***

After all practicable avoidance and minimization measures have been incorporated into the proposed project, compensatory mitigation for those unavoidable impacts to waters of the US should be undertaken. Due to the significant amount of temporary impacts caused by this project and the potential for secondary and cumulative effects, it is currently unclear if the proposed mitigation will be sufficient to offset the loss of function of the impacted and downstream aquatic resources.

1. Section 332.3(b)(1) of the 2008 Mitigation Rule states that the required compensatory mitigation should be located within the same watershed as the impact site and should be located where it is

8

AR  006358

most likely to successfully replace lost functions and service.  To ensure a timely and functional replacement of aquatic resources in the impacted watershed, EPA recommends using a mitigation bank whose primary service area encompasses the project locations.  Additionally, basic information about the work performed at the bank, how the credits were generated (e.g. restoration, enhancement, preservation, etc.), and the credit type should be provided to ensure adequate compensation for the proposed impacts.

2.  Should a bank be used whose secondary service area (SSA) includes the project, EPA recommends that the applicant provide the Corps a narrative documenting how the use of that bank is offsetting the project impacts since SSAs are geographically large and sometimes drain to different river basins.

9

AR  006359

**Malaika J. Newball**

| | |
|---|---|
| **From:** | Water Permits |
| **Sent:** | Monday, July 17, 2023 8:35 AM |
| **To:** | Malaika J. Newball |
| **Subject:** | FW: [EXTERNAL] Comment on Division File Number: NRS22.192 |
| **Attachments:** | Letter of support.docx; ARAP Petition Comments.xlsx |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |
| | |
| **Categories:** | ARAP |

Kind regards,



**Beth Rorie**
William R. Snodgrass TN Tower, 11th Fl.
312 Rosa L. Parks Ave.
Nashville, TN 37243
Office: 615-532-1172
Elizabeth.Rorie@tn.gov
customer satisfaction survey

---

**From:** Angie Mummaw <angie.mummaw@appvoices.org>
**Sent:** Saturday, July 15, 2023 3:32 PM
**To:** Water Permits <Water.Permits@tn.gov>
**Subject:** [EXTERNAL] Comment on Division File Number: NRS22.192

**\*\*\* This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email - STS-Security. \*\*\***

ATTN: Claire Wainwright
Tennessee Department of Environment & Conservation
Division of Water Resources, Natural Resources Unit
William R. Snodgrass Tennessee Tower
312 Rosa L. Parks Avenue
Nashville, Tennessee 37243

AR 006736

Re: Notice Requesting Public Comments on Draft Permit Actions **FILE # NRS22.192**

On behalf of Appalachian Voices and individual signatories, please see the attached comment in response to Tennessee Department of Environment and Conservation's public scoping period for the Aquatic Resource Alteration Permit and Section 401 Water Quality Certification for the pipeline project being proposed by Tennessee Natural Gas Company, LLC.

This comment was signed by 115 individuals, including 20 personalized messages. The signatures and personalized messages can be found on a separate spreadsheet filed with this comment submission.

Thank you for your time and consideration.
-- Angie

--

**Angie Mummaw**
**Middle TN Organizer**
**Appalachian Voices**
**(931) 436-8210**

AR 006737



1

AppalachianVoices.org
outreach@appvoices.org

589 West King Street
Boone, NC 28607
828.262.1500

Office locations:

BOONE

CHARLOTTESVILLE

DURHAM

KNOXVILLE

NORTON

*Dear Claire Wainwright,*

Please see the following public comment regarding Tennessee Department of Environment and Conservation's public scoping period for the Aquatic Resource Alteration Permit and Section 401 Water Quality Certification for the pipeline project being proposed by Tennessee Natural Gas Company, LLC.. The comment was signed by 115 people with 20 personalized comments from people living near the proposed pipeline route.

These comments and signatures are in the attached spreadsheet. Please contact me with any questions.

Thank you,

Angie Mummaw
Middle Tennessee Organizer, Appalachian Voices

AR  006738

Dear Claire Wainwright,

Thank you for considering our comment on the Aquatic Resource Alteration Permit and Section 401 Water Quality Certification application from Tennessee Gas Pipeline Company for its proposed Cumberland Project under FILE # NRS22.192. Because of the significant threat that this project poses to local aquatic habitat and water quality, and because viable alternatives are available, we are asking that the Tennessee Department of Environment and Conservation deny these permits.

The proposed 32-mile gas pipeline in Middle Tennessee would destroy prime aquatic and ecological habitat by using mostly open-cut methods to cross 155 streams and seven wetlands. Many of the crossings might involve blasting a deep trench into the streambed, which would irreversibly damage stream quality and aquatic habitat. Wetland crossings would also involve permanent conversion of some pristine forested wetland to emergence/shrub-scrub wetlands, yet this application was submitted without a compensatory wetland mitigation plan. Likewise, TGP's application contains no site-specific information for the vast majority of proposed stream crossings about alternative crossing methods such as trenchless techniques that may be practical and less environmentally damaging.

Pipeline construction and related dumping of materials and sediment threatens drinking sources and streams with harmful pollution, irreversible habitat degradation and possible hydro morphological impacts. We are particularly concerned that Tennessee Gas plans to use open-cut methods for crossing streams with special aquatic sites that are protected under the Clean Water Act. For instance, Bartons Creek crossing site has a riffle and pool complex. There are many other streams that will be impacted that also have these special aquatic sites.

In the Draft Environmental Impact Statement from FERC, Tennessee Gas claims to have contacted landowners to understand where natural streams and wells are located in proximity to the project. But many local landowners have yet to be contacted about this issue and are concerned about possible impacts to their drinking water, especially those whose drinking water comes from natural springs. Along the total 32-mile project route, Tennessee Gas claims that only two natural springs are within 1,000 feet of the project.  This number does not likely reflect the actual number of springs within the project area, meaning some landowners may be especially susceptible to damage or loss of their primary drinking water sources.



AR  006739

Members of the community are also concerned about real risks of gas leaks and explosions. Some of the same community members impacted by TGP's project experienced a gas pipeline explosion in Dickson County in 1992 that burned over 400 acres before first responders could extinguish it. With only one emergency shutoff valve for TGP's full 32 miles of proposed pipeline, the threat of leaks and uncontrollable burns poses a significant risk to rural community members, wildlife, and farmland along the pipeline route. This is significant in its own right, but perhaps even more abhorrent when considering that TGP identified seven out of 11 census tracts along the pipeline corridor as environmental justice communities. Three of these block groups are considered EJ based on minority population thresholds and four were identified as EJ based on low-income thresholds.

The pipeline would permanently destroy more than 100 acres of farmland and over 290 acres of forested land, much of which is possibly prime habitat for several endangered bat species. There are other key features and habitats that are threatened by this project and not properly accounted for in application materials. For instance, in the DEIS that FERC issued for this project, Tennessee Gas claims that it "did not find suitable habitat for bald eagles during field surveys." However, bald eagles and their habitat/nesting areas have been observed by scientists and community members along the project route. As a protected species under the Bald and Golden Eagle Protection Act, injury to an eagle through the destruction or disturbance of their feeding, sheltering or nesting habits as a result of project construction is prohibited without a special permit from the U.S. Fish and Wildlife Service.

Economically, this pipeline is unlikely to provide much benefit and may in fact harm local communities. TVA's Cumberland Fossil Plant once provided hundreds of good-paying jobs to the community, but TGP's pipeline would create just one permanent job and TVA's proposed combined cycle gas plant would create just 25 to 35 permanent jobs. Even worse, 90% of the temporary construction jobs required for the pipeline project would be filled by non-local workers.

Studies have shown that renewable alternatives to TVA's gas plants and pipeline plans at Cumberland would generate 20-30 times more permanent jobs for the region. Recent research has also demonstrated that when taking advantage of benefits available through the Inflation Reduction Act, renewables are cheaper to build than 90% of gas plants. TVA's Payments in Lieu of Taxes likely would remain at similar levels as



4

long as TVA owns the Cumberland Reservation and produces energy there, regardless of whether that energy comes from gas, coal or renewables. Gas price volatility has already led to increased electric bills in the TVA region, which could become even more volatile and expensive if TVA moves forward with this proposed gas buildout. TGP's pipeline project would likely result in additional negative economic outcomes including decreased property values, environmental degradation, and potential property damage in the event of an explosion.

There are other reasonable and viable alternatives to this project. The Tennessee Valley Authority could select affordable and reliable energy alternatives for producing electricity that would not require the construction of a 32-mile pipeline that would inevitably have a profound and negative impact on the ecological health of the Cumberland River and Harpeth watersheds and the economic wellbeing and safety of the community. The Environmental Protection Agency found TVA's self-conducted National Environmental Policy Act analysis to be insufficient in multiple areas including in economic calculations and greenhouse gas calculations. EPA recommended that TVA modify its preferred alternative for a combined cycle gas plant and a 32-mile pipeline or select a different alternative entirely.

This project does not benefit the welfare of the people in Dickson, Houston and Stewart counties of Tennessee or people anywhere. Accordingly, TDEC should deny the application after holding its public hearing.



AR 006741

STATE OF TENNESSEE
**DEPARTMENT OF ENVIRONMENT AND CONSERVATION
DIVISION OF WATER RESOURCES**
William R. Snodgrass - Tennessee Tower
312 Rosa L. Parks Avenue, 11th Floor
Nashville, Tennessee  37243-1102

July 21, 2023

Tennessee Gas Pipeline Company, LLC
Attn: Gina Dorsey
1001 Louisiana St, Suite 1000
Houston, TX 77002-5089
e-copy: gina_dorsey@kindermorgan.com

Subject:  §401 Water Quality Certification
     Aquatic Resource Alteration Permit Application NRS22.192
     Cumberland Gas Pipeline Project

Location:  From near Claylick Rd., Dickson, to near Old Scott Rd., Cumberland City
     Dickson, Houston, and Stewart Counties, Tennessee
     Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed
     tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody
     Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek,
     Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons
     Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous
     tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells
     Creek, Barkley Reservoir
     Harpeth River Watershed and Lake Barkley Watershed
     From approximately 36.161840, -87.206428 to approximately 36.372977, -87.675641

Gina Dorsey:

We have reviewed and approved your application for Tennessee Gas Pipeline Company, LLC's unavoidable impacts to Waters of Tennessee in the Harpeth River Watershed and Lake Barkley Watershed in Dickson, Houston, and Stewart Counties, Tennessee. Authorized impacts are temporary impacts to 0.69 acres of wetland, permanent impacts to 0.03 acres of wetland, temporary impacts to approximately 5400 linear feet of stream, temporary water withdrawals from eight streams and one reservoir, and permanent impacts to 490 linear feet of stream associated with the construction of a 32-mile 30-inch diameter natural gas pipeline.

**Please note the following conditions of the final permit, including changes relative to the draft permit, and see permit for full list of conditions.**

- It is the responsibility of the permittee to convey all terms and conditions of this permit to all contractors. A copy of this permit, approved plans, and any other documentation pertinent to the activities authorized by this permit shall be maintained on site at all times during periods of construction activity.
- Impacts to streams or wetlands in the project area and along the pipeline ROW are not authorized until the permittee has:

JA2811

- Obtained a notice to proceed with Project construction from the Federal Energy Regulatory Commission and submitted a copy to the Division,
- Submitted amendments to the project aquatic resources inventory to the permit writer that address parcels not previously inventoried,
- Received an updated Aquatic Resources Inventory/HD concurrence letter from the Division,
- Submitted an application for a modified permit that addresses newly inventoried resources, and
- Received a modified ARAP covering all proposed impacts to aquatic resources for the entire pipeline project.

- The permittee must comply with the conditions of the National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges of Stormwater Associated with Construction Activities (CGP), TNR100000 for the entire area of disturbance associated with the construction project.
- Upon completion of construction activities, all temporary wetland and stream impact areas are to be restored to pre-construction conditions and contours and permanently stabilized with native vegetation. Other side-cast material shall not be placed within the temporary impact locations.
- Blasting will not be used in Tennessee jurisdictional wetlands or streams characterized by karst-prone geology or with an unacceptable risk of hydrologic loss. Only streams in which 1) karst is unlikely and 2) risk of hydrologic loss is "reduced" and 3) HDD has been determined to not be practicable may be considered as candidates for controlled blasting.
- The Division (Natural Resources Unit permit writer and Nashville Environmental Field Office) must be contacted in writing at least 48 hours in advance when controlled blasting is proposed. The permittee must provide site-specific documentation to the Natural Resources Unit permit writer supporting that controlled blasting is the least environmentally damaging practicable alternative per permit Special Condition g. Written authorization must be obtained from the Division prior to initiation of controlled blasting.
- In the event of an inadvertent release of drilling fluid, a site-specific contingency plan must be followed. This plan includes notification to the Division within 24 hours after release to surface waters. Site-specific proposed containment plans must be approved by the Division prior to initiation.
- The permittee shall submit a post-blasting monitoring report to the Division within 30 days of the restoration of the temporary stream impacts. See Monitoring Requirements section of this permit for details.
- The permittee shall submit a post-construction monitoring report to the Division annually for three years following the project's completion.  This annual report shall include documentation of the maintenance of jurisdictional status and resource value in all impacted wetlands and streams in each monitoring year. See Monitoring Requirements section of this permit for details.
- The permittee shall submit a one-time water withdrawal monitoring report to the Division following the completion of all water withdrawals to demonstrate adherence to permit conditions. See Monitoring Requirements section of this permit for details.

The planned activity was reviewed and the Division has reasonable assurance that the activity as proposed when conducted in accordance with all permit conditions herein will not violate applicable water quality standards and has issued the attached permit (enclosed). This permit may also serve as a Section 401 Water Quality Certification (pursuant to 40 C.F.R. §121.2).

The state of Tennessee may modify, suspend, or revoke this authorization or seek modification or revocation should the state determine that the activity results in more than an insignificant violation of applicable water quality standards or violation of the TWQCA. Failure to comply with permit terms may result in penalty in accordance with T.C.A. § 69-3-115.

It is the responsibility of the permittee to read and understand all permit conditions before the project begins. If you need any additional information or clarification, please contact me at 615-476-3450 or by email at Claire.wainwright@tn.gov.

Sincerely,

Claire Wainwright, PhD
Natural Resources Unit

Enclosure: § 401 Water Quality Certification

Cc:     Blake Amos, Tennessee Gas Pipeline Company, LLC:  blake_amos@kindermorgan.com
        David Jackson, Davey Resource Group: djackson@davey.com
        Lee Barber, TDEC DWR Nashville Central Office: lee.2.barber@tn.gov
        Stephanie Durman, TDEC Office of the General Counsel: stephanie.durman@tn.gov
        TDEC DWR, Nashville Environmental Field Office: DWR.NEFO@tn.gov
        US Army Corps of Engineers, Nashville District, Regulatory Division:
        NashvilleRegulatory@usace.army.mil
        File Copy

JA2813

AR  006761



STATE OF TENNESSEE
TENNESSEE DEPARTMENT OF ENVIRONMENT & CONSERVATION
DIVISION OF WATER RESOURCES
William R. Snodgrass - Tennessee Tower
312 Rosa L. Parks Avenue, 11TH Floor
Nashville, Tennessee  37243-1102

**NOTICE OF DETERMINATION**
Aquatic Resource Alteration Permit NRS22.192

Tennessee Gas Pipeline Company, LLC
1001 Louisiana Street, Suite 1000
Houston, TX 77002

This notice contains the final determination of the Tennessee Department of Environment and Conservation, Division of Water Resources (the Division) and responds to comments received on the application for NRS22.192, for Tennessee Gas Pipeline, LLC's (TGP) unavoidable temporary impacts to 0.69 acres of wetland, permanent impacts to 0.03 acres of wetland, temporary impacts to approximately 5400 linear feet of stream, temporary water withdrawals from eight streams and one reservoir, and permanent impacts 490 linear feet of stream associated with the construction of a 32-mile 30-inch diameter natural gas pipeline. Aquatic impacts will occur in Dickson, Houston, and Stewart Counties, Tennessee.

TGP submitted the application on July 22, 2022. The Division issued notices of deficiency to TGP on November 3, 2022 and February 24, 2023, requesting additional information. After receiving supplemental materials from TGP, the Division notified TGP that the application was complete on April 20, 2023. Public notice of the draft permit was issued on May 30, 2022. A public hearing was held in Dickson on July 6, 2023. The public comment period closed July 16, 2023.

The public hearing was attended by 42 people in person and 13 online. Approximately 13 people commented at the hearing. In addition, the Division has received written comments from the applicant, several NGOs, and numerous individuals in response to the Public Notice for this permit. The Division has reviewed all comments submitted at the hearing and in writing. The following comments have been edited and summarized from their original form to organize the presentation of content. It has not been the Division's intent to omit or alter content.

**Comment 1:** Tennessee Gas Pipeline Company, LLC (TGP) asserts that special conditions a.1-3 impermissibly govern property rights, which is outside the scope of TDEC's regulatory authority. These special conditions have not been applied in other individual permits. Also, Special Conditions a.8-9 are duplicative of a.6-7. Please substitute the following for Special Condition a.1-3:

Obtained a notice to proceed with Project construction from the Federal Energy Regulatory Commission and submitted documentation of the issued notice to proceed with Project construction to the Division.

**Response 1:** TDEC disagrees that Special Condition a in the draft permit is outside of its regulatory authority. There is legal precedent for TDEC to consider land ownership in water permits, particularly when

1

AR 006950

TDEC actually knows that the applicant is not the landowner. Moreover, the reason for Special Condition a is the special circumstance of this permit: unlike most ARAPs, this one is not for the complete project because ground-truthed information on proposed impacts within roughly 3% of the pipeline route was not included in the application.

Nonetheless, the intent of Special Conditions a.1-3 in the draft permit was to prevent aquatic impacts in the event that the pipeline could not be completed based on property disputes. The proposed alternative of relying on the Federal Energy Regulatory Commission (FERC) Notice to Proceed provides sufficient assurance in this regard. TGP is correct that conditions were duplicated in the draft. Accordingly Special Condition a is modified as follows:

a. Impacts to streams or wetlands in the project area and along the pipeline ROW are not authorized until the permittee has:
1. Obtained a notice to proceed with Project construction from the Federal Energy Regulatory Commission and submitted a copy to the Division.
2. Submitted amendments to the project aquatic resources inventory to the permit writer that address parcels not previously inventoried,
3. Received an updated Aquatic Resources Inventory/HD concurrence letter from the Division,
4. Submitted an application for a modified permit that addresses newly inventoried resources, and
5. Received a modified ARAP covering all proposed impacts to aquatic resources for the entire pipeline project.

**Comment 2:** A commenter asked whether TGP had submitted evidence of landowner permissions in accordance with the special condition a.

**Response 2**: TGP did not, and was not required to, submit affidavits based on a draft permit condition. That condition has been removed from the final permit, with a substituted requirement to submit a copy of the FERC notice to proceed.

**Comment 3:** TGP failed to demonstrate on a crossing-by-crossing basis that alternatives to dry-ditch, open-cut crossings are not practicable. These alternatives are less damaging to water resources.

**Response 3:** TDEC considers installation of utility lines via horizontal directional drill ("HDD") or "jack and bore" auger to be the least impactful alternatives for utility lines of this size. The applicant has proposed to utilize HDD for the four crossings where the underlying rock/substrate and channel and flow characteristics have been assessed as suitable for the practice. According to TGP, factors in deciding HDD suitability along the pipeline route included (1) the length of the crossing, (2) the potential for risk of loss of drilling fluid (i.e., inadvertent/lost returns), (3) geological considerations, and (4) length of time of the crossing (5) worker safety and technical feasibility, and (6) cost of the crossing method. For stream crossings where HDD has been assessed as not practicable based on the above factors, the applicant has proposed a range of trenching options to be evaluated at the time of crossing construction. Special Condition g of the permit requires the applicant to demonstrate on a crossing-by-crossing basis that the trenching method utilized is the least impactful practicable alternative for that location. Special Condition h of the permit dictates the method for accomplishing the crossing when controlled blasting is deemed to be the least impactful practicable alternative. The use of controlled blasting for any crossing also triggers extra reporting, approval, and monitoring requirements to ensure that features by which trenches are excavated by controlled blasting maintain their status as jurisdictional streams.

AR 006951

Based on comments received, Special Condition h has been changed to require the applicant to not only notify the Division, but to demonstrate that controlled blasting is the least impactful practicable alternative and receive written approval from the Division prior to initiating construction of any stream crossing by controlled blasting.

**Comment 4:** TGP failed to demonstrate that alternative pipeline routes that would result in less impacts to waters are not practicable.

**Response 4:** The ARAP rules provide "No Individual Permit shall be granted if there is a practicable alternative to the proposed activity that would have less adverse impact on resource values, *so long as the alternative does not have other significant adverse environmental consequences*." Tenn. Comp. R. & Regs. 0400-40-07-.04(5)(b). The second part of this clause is particularly applicable to linear projects such as roads, power lines, and pipelines, which must balance a variety of environmental and feasibility factors when selecting routes.

In this case, TGP is restricted by a fixed starting and ending point. Between these two points, TGP selected a generally straight route that follows an existing TVA powerline easement and other utility easements for roughly 80% of its course, a choice that minimizes overall environmental impacts such as clearing of vegetation, forest fragmentation, and aesthetic impacts. In addition, TDEC agrees with TGP that alternative routes are unlikely to involve a meaningful reduction in aquatic impacts because any route of a roughly 32-mile linear project in Tennessee would likely require multiple stream crossings. Less straight routes, moreover, would be longer and therefore likely to result in more aquatic impacts.

Finally, TGP has evaluated ten minor routing alternatives. TGP selected several minor route variations to avoid additional aquatic resource impacts, and to attain perpendicular stream crossings to the extent practicable. Accordingly, TGP has sufficiently demonstrated a lack of practicable routing options that would reduce aquatic impacts without resulting in other environmental impacts.

**Comment 5:** TGP did not evaluate practicable alternatives to the impacts associated with the 18 road crossings.

**Response 5:** Section 10.2 "Route Alternatives" of the "Project Narrative and Table of Contents" submitted on June 22, 2022 documents that the applicant compared impacts and assessed that impacts associated with utilization of a pipeline route aligned with the existing TVA power line easement for 80% of its length would be the least impactful alternative for access roads and other proposed impacts due to presence of existing access roads and minimization of need to remove additional vegetation due to prior right-of-way clearing and vegetation maintenance activities.

There are 13 features to be impacted by access road crossings authorized by this permit (the remaining five referred to by the commenter are for wet weather conveyances, for which ARAP coverage is not required), and seven features to be impacted by workspace crossings, which are summarized in the permit Table 1.

**Comment 6:** TGP has failed to demonstrate a lack of practicable alternatives as required by the Antidegradation Statement.

**Response 6:** TDEC has determined that the authorized aquatic alterations result in *de minimis* degradation.

AR 006952

Accordingly, the Antidegradation Statement does not require TGP to demonstrate a lack of practicable alternatives. Nonetheless, TDEC has determined that the applicant has demonstrated that the alterations represent the least environmentally damaging practicable alternative to accomplish the project's purpose, in accordance with requirements of Individual Permits per Tenn. Comp. R. & Regs. 0400-40-07. Please refer to the Alternatives Analysis section in the Rationale found in the permit's Appendices.

**Comment 7:** The draft permit impermissibly delegates permitting authority to TGP to determine whether to use blasting. TGP will just choose the most convenient, lowest cost option in the field. Blasting should not be allowed in karst areas.

**Response 7:** TDEC respectfully disagrees with this comment. Special Condition g establishes mandatory conditions for how to determine which technique to apply and requires selection of the least impactful practicable trenching technique. This condition prohibits controlled blasting unless all other alternatives are demonstrated to be impracticable, and at least one other alternative is actually attempted. Finally, this Special Condition prohibits controlled blasting in streams characterized by karst-prone geology or an unacceptable risk of hydrologic loss.

Based on comments received and to ensure the permittee's decision-making process is in accordance with permit conditions requiring implementation of the least environmentally damaging practicable alternative, TDEC has added the requirement to Special Condition h of the final permit that the permittee receive the Division's written approval prior to implementing controlled blasting as the trenching technique, rather than just providing notification TDEC.

**Comment 8:** Some streams that should be prohibited from blasting were listed as candidates for blasting.

**Response 8:** TGP is prohibited from blasting in streams characterized by karst-prone geology or with an unacceptable risk of hydrologic loss by permit Special Condition h.4. The Division requested information from TGP on how hydrologic loss potential was determined, including the definition of unacceptable risk of hydrologic loss, which TGP provided in the documented entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022. This prohibition is based on recommendations and other information submitted in the geologic and hydrotechnical hazard assessment, karst surveys, and geohazard mitigation guidance for the project which may be found in Attachment 6 of the above-referenced documented.

The commenter indicated that there was contradictory information in the application materials on hydrologic loss potential category and the proposed candidacy for controlled blasting. The Division has reviewed the list of proposed controlled blasting candidates in the Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022. The following features listed as potential candidates for controlled blasting were identified (using TGP's stream ID terminology):

- SDKB008, Nesbitt Branch, listed as having unlikely karst potential and high risk of hydrologic loss potential, proposed for open-cut crossing
- SDKA008 and SDKA006, UTs to Porters Branch, listed as having unlikely karst potential and medium risk of hydrologic loss potential, proposed for open-cut crossing
- SDKA048, Jones Creek, listed as having unlikely karst potential and reduced risk of hydrologic loss potential, proposed for HDD crossing
- SDKA051, SKDA049, SDKA053, SDKA055 UT to Jones Creek, listed as having unlikely karst potential and medium risk of hydrologic loss potential

AR 006953

The Division agrees with the commenter that the information provided for the features listed above does not align with TGP's assertion that controlled blasting will only be considered in streams with unlikely karst potential *and* in streams without unacceptable hydrologic loss potential. In addition, the Division agrees that Jones Creek should not be a candidate for controlled blasting, as it has been proposed by the applicant that HDD is a viable crossing method.

To ensure that the list of candidate streams in which controlled blasting may be considered (provided permit Special Condition g has been met) is clear, the Division has amended permit Special Condition h.4. The condition now clarifies that stream crossings may be considered for controlled blasting only for streams in which 1) karst is unlikely *and* 2) risk of hydrologic loss is reduced *and* 3) HDD has been determined not practicable. These three factors are based on the information presented in the Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022, which supersedes proposed crossing methods found in older documents submitted with the permit application.

**Comment 9:** Any final permit should delete the final three sentences of special condition hh, and replace them with a prohibition on the use of wet, open-cut crossings.

**Response 9:** This suggestion is well-taken, and has been incorporated into the final permit. Furthermore, the permit's Authorized Alterations found in the Rationale section in the permit's Appendices states the following: "Except for waterbodies that are proposed to be crossed using the trenchless HDD crossing method, TGP is authorized to cross the remaining waterbodies using dry open cut crossing methods. Dry open cut crossing methods, which consist of the "dam-and-pump" and "dry-flumed" crossing methods, will be accomplished by temporarily diverting stream flow around or through the work area to minimize contact between stream water and excavation and to minimize sediment suspension during trench excavation, pipeline installation, and backfill activities" All non-HDD crossings are required by the permit to be conducted in the dry, including those in which blasting is proposed.

Based on comments received, the Division has also edited language throughout the permit to clarify requirements of working in the dry and dewatering requirements of all trenched crossings (including in wetlands), and that wet-cut open crossings of jurisdictional waters are not authorized.

Regarding the sizing of temporary flow diversion and dewatering structures, the permit contains the following Special Conditions expressly prohibiting impoundment of baseflows, and unnecessary channel widening, as follows:
- Special Condition v - The pipeline, access roads, workspaces, and staging areas shall not impound normal or base flows on the upstream side, and shall not result in a permanent disruption or barrier to the movement of fish or other aquatic life on the downstream side. Base flow is the usual or normal flow of the stream that is supplied primarily by groundwater from springs and seeps, but not affected by rapid runoff during and after rainfall.
- Special Condition y - The stream channels shall not be over-widened as a result of the installation of the pipeline, access roads, workspaces, or staging areas.

**Comment 10:** The dry-ditch, open-cut crossings will cause or contribute to violations of state water quality criteria, particularly for sedimentation. Impacts may persist for as long as four years.

**Response 10:** Open-cut/trenched crossings of streams by utility lines of various types are routinely

authorized by coverage under TDEC's *General Aquatic Resource Alteration Permit for Utility Line Crossings* as temporary impacts that do not cause appreciable permanent loss of resource value when they are conducted under the specific Special and General Conditions of the permit. TDEC is not aware of violations of water quality standards resulting from work conducted in compliance with these conditions. These or similar conditions are included in this permit (e.g., Special Conditions i, j, o.). These comments are largely predicated on scenarios that would be considered violations of this permit, such as failure of EPSC measures. This permit does not authorize appreciable permanent loss of resource value or other violations of state water quality criteria. If violations of state water quality criteria occur, they will be addressed as permit violations through enforcement actions.

**Comment 11:** The proposed impacts will result in greater than *de minimis* degradation, particularly due to sedimentation.

**Response 11:** The Division has determined that the authorized activities, as carried out in accordance with the permit's terms and conditions, will not result in greater than *de minimis* degradation due to sedimentation or any other impact to streams or wetlands associated with construction of the pipeline.

Degradation is defined as the "alteration of the properties of waters by the addition of pollutants, withdrawal of water, or removal of habitat, *except those alterations of a short duration*." Rule 0400-40-03-.04(3). Almost all of the impacts authorized by this permit are temporary, which when of a sufficiently short duration does not constitute degradation. The permanent impacts authorized by this permit are for vegetation alteration, including in 0.03 acres of wetland, which represents a small reduction in resource value that is well within the limits of TDEC's *General Aquatic Resource Alteration Permit for Minor Alterations to Wetlands*.

This permit does not authorize excess sedimentation resulting from installation of stream crossings. TGP will implement a variety of standard construction "Best Management Practices" to reduce the risk of sedimentation. Streamflow will be diverted during open-trench construction to minimize sedimentation. Moreover, the permit includes numerous provisions to protect waters from sedimentation, including for example:

- Special Condition x - Erosion control measures shall be utilized where stream bank vegetation is disturbed for the purpose of temporary stream crossings. Stream beds shall not be used as linear transportation routes for mechanized equipment. The stream channel may be crossed perpendicularly with equipment provided no additional fill or excavation is necessary. EPSC measures shall be utilized when streambanks are disturbed
- Special Condition aa - All dewatering activities shall be conducted in a manner that prevents the discharge of sediment-laden water into waters of the state.
- Special Condition cc - Erosion prevention and sediment control measures must be in place and functional before any earth moving operations begin, and shall be designed according to the department's Erosion and Sediment Control Handbook (http://tnepsc.org/handbook.asp).
- Special Condition ee - Best Management Practices (BMPs) shall be stringently implemented throughout the construction period to prevent sediments, oils, or other project-related pollutants from being discharged into waters of the state.

In addition, in response to comments, the Division has further clarified the requirement that TGP comply with the terms of the National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges of Stormwater Associated with Construction Activities ("CGP"), TNR100000, for its disturbance activities. The CGP is protective of water quality criteria.

**Comment 12:** The proposed activities may impermissibly degrade waters with unavailable parameters due to additional sedimentation.

**Response 12:** The authorized work as carried out in accordance with the permit's terms and conditions will not result in significant degradation in waters with unavailable parameters for habitat alteration. None of the waterbodies (TDEC Waterbody IDs used in state water quality assessments) to be impacted have been assessed as having unavailable parameters for habitat alteration due to siltation/sedimentation. This comment appears to be based on erroneous usage of stream colloquial names to interpret state stream assessment data rather than the maps, coordinates, or TDEC Waterbody IDs provided in the permit.

The commenter asserts that two unnamed tributaries of Jones Creek are impaired because of flow alterations, and that Jones Creek and a third unnamed tributary of Jones Creek are impaired because of excessive sedimentation and siltation. The segment of Jones Creek to be impacted by the project corresponds to TDEC Waterbody ID TN05130204002_1000, which has been assessed as having available parameters for habitat alteration and is not listed as impaired due to sedimentation. The tributaries to Jones Creek to be impacted by this project include streams in TDEC Waterbody IDs TN05130204002_0999 and TN05130204002_0200, "Miscellaneous tributaries to Jones Creek" and "Unnamed tributaries to Jones Creek," respectively. TN05130204002_0999 has not been assessed for impairment due to sedimentation/siltation. TN05130204002_0200, which encompasses streams colloquially known as Porters Branch and its tributaries has unavailable parameters for habitat alteration due to flow regime modification resulting from a dam or impoundment. Tennessee's Water Quality Standards state "Where one or more of the parameters comprising the habitat criterion are unavailable, habitat alterations that cause significant degradation shall not be authorized." Alterations to this waterbody that would cause permanent loss of resource value and significant degradation are not authorized by this permit.

The commenter asserts that Leatherwood Creek is impaired from unknown causes. This appears to be due to an incorrect reference to the Leatherwood Creek system located in the Harpeth River watershed, TDEC Waterbody ID TN05130204001_0800, which is not within the proposed project area. Rather, the Leatherwood Creek system proposed for impact by this project is located in the Lake Barkley watershed, TDEC Waterbody ID TN05130205019_0100, which has been assessed as having available parameters for habitat alteration.

**Comment 13:** Concern was expressed concerning sedimentation associated with land-clearing activities for the pipeline.

**Response 13:** The applicant has attempted to minimize the amount of land clearing required for pipeline construction by making the route of the pipeline approximately 80% contiguous with the existing TVA power line right-of-way from which vegetation has already been cleared. General Condition b of the permit specifically requires the applicant to obtain all necessary authorizations prior to starting any work on pipeline construction. As stated above, the NPDES construction stormwater discharge permit (CGP) is fully protective of Tennessee's water quality criteria and the ARAP/401 Water Quality Certification now includes an express requirement for TGP to comply with that permit's conditions as a condition of the Section 401 Water Quality Certification.

**Comment 14:** TDEC has failed to evaluate cumulative impacts when there are two or three impacts to the same waterbody, or multiple impacts in the same watershed.

7

AR 006956

**Response 14:** During the application review process, TDEC evaluated impacts cumulatively for each individual stream and for each TDEC Waterbody ID, consistent with how impacts are evaluated across the ARAP program statewide. TDEC utilizes the system of unique Waterbody IDs developed for use in its assessment of water quality in streams across the state. TDEC Waterbody IDs or street addresses and nearby waterbodies may be viewed in map format on TDEC's public-facing Data Viewer at https://tdeconline.tn.gov/dwr/. In Tables 1 and 2 of the permit, the individual stream name corresponding to TGP's general usage of colloquial names for identifying streams, as well as individual segment/reach IDs within these streams, are provided for each impact location along with their TDEC Waterbody IDs to facilitate assessment of impacts at multiple spatial scales. All temporary and permanent impacts within stream segments/reaches, individual streams, and TDEC Waterbody IDs have been assessed cumulatively.

**Comment 15:** The proposed impacts would result in an appreciable loss of resource values, including the conversion of 0.03 acres of wetlands, the direct loss of stream length, and the direct loss of stream flow for which no mitigation is provided. Some impacts described as temporary will be permanent.

**Response 15:** Compensatory mitigation is required under state law where impacts would result in an appreciable permanent loss of resource value. The permit does not authorize appreciable permanent loss of resource value. Impacts of this magnitude have been avoided by the applicant through impact minimization. All of the proposed permanent impacts result from a 10-foot-wide corridor kept in an unforested state centered directly over the pipeline to facilitate inspections and maintenance. The associated permanent impacts to streams are minimal riparian vegetation conversion within this 10-foot corridor where it crosses a stream. These permanent impacts are conservatively estimated, as they include streams for which the existing riparian buffer on one or both banks already appears to be actively suppressed or otherwise unforested (e.g., SDKA041, SDKB025, SDKB001, SDKB002, SDKB011, SHNB033-1, SHNA001, SDKA046). The permanent impacts to wetlands are 0.03 acres of conversion of vegetation from forested to emergent where the corridor crosses a forested wetland. The permanent wetland impact is substantially less than what is authorized under the TDEC *General Aquatic Resource Alteration Permit for Minor Alterations to Wetlands*, which allows filling (i.e., complete loss) of up to 0.10 acres of moderate resource value wetlands without mitigation. Likewise the permanent stream impacts are substantially less than what is authorized under the TDEC General ARAPs for activities that tend to permanently impact stream bank vegetation and riparian canopy cover, such as the *General Aquatic Resource Alteration Permit for Bank Armoring and Vegetative Stabilization* and the *General Aquatic Resource Alteration Permit for Construction and Removal of Minor Road Crossings,* which assess impacts at single stream or TDEC Waterbody ID scales. Therefore, these permanent impacts do not represent appreciable permanent loss of resource value as defined in TDEC Rules 0400-40-07. TGP has also stated that no herbicides or pesticides are to be used in or within 100 feet of a waterbody during post-construction vegetation maintenance activities except as approved by appropriate authorities, which would include the Division.

The permit does not authorize any permanent loss of stream length, stream flow, or wetland acreage.

If, as the commenter asserts, some impacts listed as temporary will actually be permanent, that would need to be addressed through a future permit modification or through enforcement of the permit terms.

**Comment 16:** Several commenters are concerned that the proposed project plan involves the permanent impacts on some wetlands without a wetland mitigation plan.

**Response 16:** The 0.03 acres of permanent wetland impact authorized by this permit will result from conversion of a forested wetland to emergent (i.e., herbaceous) wetland. The magnitude of the permanent

AR 006957

impacts to wetlands authorized by the permit is well below the threshold requiring compensatory mitigation, generally corresponding to 0.10 acres or 0.25 acres of wetland impact for activities conducted according to the conditions of the TDEC *General Aquatic Resource Alteration Permit for Minor Alterations to Wetlands*. No permanent loss in wetland acreage is authorized by this permit. Accordingly, the permanent loss of resource values is not appreciable, and therefore no compensatory mitigation is required under the ARAP rules. *See* Rule 0400-40-07-.04(6)(c).

**Comment 17:** TGP's restoration plans will not minimize adverse impacts.

**Response 17:** The information TGP submitted to the Division on post-construction restoration is typical of ARAP applications and sufficient to ensure appropriate restoration. Detailed information on post-construction restoration techniques and requirements can be found in the document entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package. The permit conditions for TGP to return temporarily impacted streams and wetlands to their original contours using materials native to the stream bed or wetland, and re-establishing native vegetation, are similar to conditions in TDEC General and Individual ARAPs under which temporary impacts are routinely authorized. An annual post-construction monitoring report must be submitted for three years after project completion (per Special Condition f) to document evidence of the successful restoration within all temporarily impacted jurisdictional features, and shall include representative photographs of each feature pre-impact and post-impact. Wetland delineations and stream hydrologic determinations in accordance with the procedures in TDEC Rule 0400-40-03-.05(9) are also required. An adaptive management plan with a corrective action plan for full restoration will be required for any features that have not sufficiently returned to pre-impact condition. Noncompliance with these permit requirements would be addressed through enforcement actions.

**Comment 18:** TDEC must require TGP to collect baseline data for each impact location.

**Response 18:** Several types of baseline data for each impact location were provided to the Division during the permit application review process. General baseline data including aerial and topographic maps, TN Hydrologic Determination field sheets, wetland delineation forms, channel dimensions, and photographs from the original aquatic resources inventory dated May 26, 2022, can be found in the "Jurisdictional Waters Determinations and Tennessee Hydrologic Determinations Report" prepared by Stantec. Additional information including narrative stream buffer and channel characteristics for the final set of features to be impacted by the project can be found in TGP's response to a TDEC Request for Additional Information "TGP & USACE Cumberland Project – TDEC Field Review / Revisions (Supplement 1)," document dated September 29, 2022, such as in "Table 1. Cumberland Waterbodies Impact Table Revised 9/26/2022." Additional information including LiDAR imagery, topography and slopes, presence of sources of vertical or lateral stream instability, and underlying geology is available in the geotechnical reports prepared by Geosyntec Consultants, Inc. provided in TGP's response to a TDEC Request for Additional Information "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022. Additionally, the Division used a variety of internal and external data sources, including water quality monitoring data, and in some cases conducted in-person field visits, to assess existing conditions of all features to be impacted.

**Comment 19:** Several commenters assert that many of the impacts are at locations with riffle and pool complexes, which are particularly important aquatic resources.

AR 006958

**Response 19:** Riffle and pool complexes are typical features for many streams.  Neither the TWQCA nor the rules issued thereunder prohibit impacts to riffle and pool complexes.

**Comment 20:** Several commenters stated that a possible new species of crayfish had been found in one of the creeks to be impacted by the project.

**Response 20:** This specimen has not yet been recognized as either a new species, or a threatened or endangered species. USFWS, TDEC Division of Natural Areas, and TWRA have concurred that the pipeline project is not likely to adversely affect threatened or endangered species. Nonetheless, this permit expressly prohibits adverse impact to formally listed state or federal endangered species or their critical habitat in General Condition e.

**Comment 21:** Several commenters are concerned that the pipeline will damage the habitat of endangered bat and eagle species.

**Response 21:** This permit governs aquatic alterations, not terrestrial impacts. The applicant has been required to coordinate with TWRA on potential impacts to protected species of fish and wildlife, and with TDEC's Division of Natural Areas on potential impacts to protected plant species. TWRA has not indicated concerns with potential impacts to bald eagles or bats from the larger pipeline construction activity. Impacts to non-aquatic species are beyond the scope of the permit. USFWS, which also has jurisdiction over terrestrial species, has concurred that the pipeline project is not likely to adversely affect threatened or endangered species. Finally, the permit expressly prohibits adverse impact to formally listed state or federal endangered species or their critical habitat in General Condition e.

**Comment 22:** The permit should include a provision for capture of drilling fluids.

**Response 22**: Release of drilling fluids into jurisdictional waters is not authorized by this permit. However, in the case of inadvertent release of drilling fluid, TGP and its contractors must follow the HDD contingency plan submitted to the Division as part of "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package. The permit states in Special Condition j.3 that the permittee shall follow this contingency plan. This contingency plan includes notification to TDEC of the inadvertent release and development of a site-specific containment plan within 24 hours of the release. Containment methods listed in the plan include hand placed barriers (i.e., hay bales, sand bags, silt fences, etc.) and pumps, as practicable given the site and release conditions.

In response to this comment TDEC has amended the language in the permit Special Condition j.3 to clarify that TDEC must approve of the site-specific drilling fluid containment plan.

**Comment 23:** Several commentors expressed concerns that the pipeline would contribute to groundwater pollution and/or contaminate drinking water wells. At the hearing, a commenter noted that TGP had agreed to contact landowners with wells directly and conduct water testing, but some landowners have not been contacted.

**Response 23:** The authorized construction activities, when conducted in accordance with the conditions of this permit and the CGP, will not result in pollution of water resources. This permit does not govern the

operation of the pipeline, only the aquatic impacts associated with construction. While TDEC supports TGP's voluntary offer to test wells, that is not a requirement associated with this permit.

**Comment 24:** Several commenters are concerned that methane leaks from the pipeline will impact the streams, wetlands, and watersheds in the project route.

**Response 24:** This permit does not govern the operation of the pipeline, only the aquatic impacts associated with construction.

**Comment 25:** A local fire official expressed concerns about hazardous materials that might be dispersed during construction.

**Response 25:** The permit Special Conditions q, ee, ff, and gg specifically prohibit placement of hazardous materials and prohibit practices that may lead to release of hazardous materials into jurisdictional waters. In addition, for the small number of crossings to be accomplished by HDD, the applicant has been required to provide and follow a "frack-out" plan in the case of accidental release of drilling fluid. The applicant has also stated that they will adhere to the following construction Best Management Practices ("BMPs") related to hazardous materials: training employees and contractors regarding the handling of oils and hazardous materials commensurate with their position; inspecting equipment used in construction and operations at regular intervals; using only approved access roads for vehicles transporting oils or fuel to construction workspaces; at the discretion of the Environmental Inspector, fueling equipment at the construction workspaces at least 100 feet from any waterbody; storing hazardous materials, including chemicals, fuels, and oils, more than 100 feet from any waterbody; using secondary containment, as appropriate, for pumps that transfer hazardous substances or petroleum within 100 feet of a waterbody to prevent spills and overflow; and keeping spill response materials on site and in designated vehicles in the construction workspaces.

**Comment 26:** TGP has failed to demonstrate that greater than *de minimis* degradation is necessary for important social or economic development in the area of the impacts.

**Response 26:** Formal social and economic justification for the degradation associated with the impacts authorized by this permit is not required based on the Division's final determination that the impacts to jurisdictional waters will result in *de minimis* degradation. However, the applicant has provided information on social and economic justification. Please see the Social or Economic Justification Information in the Rationale section of the permit Appendices.

**Comment 27:** Several commenters are concerned that the pipeline and proposed natural gas power plant would only generate 26-36 total permanent jobs and that the temporary construction jobs would be filled by non-local workers.

**Response 27:** Formal social and economic justification for the impacts associated with this activity is not required based on the Division's final determination that the impacts to jurisdictional waters will result in *de minimis* degradation. Accordingly, it is outside of TDEC's authority to speculate on the number of total permanent jobs and the identities of the temporary workers associated with the construction of the pipeline.

11

JA2824

**Comment 28:** The pipeline will disproportionately affect environmental justice communities.

**Response 28:** The commenter is correct that a portion of the pipeline route will affect environmental justice (EJ) communities, as determined by FERC's EJ analysis conducted as part of the FEIS. This analysis concluded that seven out of 11 census block groups qualify as EJ communities based on low-income (4) and minority (3) populations. With respect to the pipeline project as a whole, TGP worked with FERC to conduct enhanced community outreach, including meetings with federal, state, county, and local elected officials listed in Table 4.8-2 of the Cumberland Final Environmental Impact Statement (FEIS). TGP also hosted three open house meetings. Copies of TGP's FERC application were provided to the Stewart County Public Library, Dickson County Public Library, and the Houston County Public Library.

Unlike FERC, the Division's role is limited to authorizing the aquatic alterations associated with the pipeline. To be absolutely clear: the ARAP/Section 401 Water Quality Certification does not authorize the pipeline itself. Almost all of the aquatic impacts are temporary, and the few permanent impacts are associated with changes in vegetation rather than complete loss of resource values. While some of these *de minimis* and short-term aquatic impacts will occur in low-income and minority census tracts (EJ communities), these impacts are not substantively different from the impacts authorized by this permit in non-EJ communities, or disproportionate when taken in context of ARAPs/Section 401 Water Quality Certifications issued by TDEC.

Finally,  the Division sees no evidence of intentional discrimination in TGP's selection of locations of aquatic impacts as would be required to establish a violation of Title VI. *See Alexander v. Sandoval*, 532 U.S. 275 (2001). These locations are driven by  routing between two fixed locations and the choice to maximize the use of existing utility easements.

**Comment 29:** Several commenters expressed concerns with TGP policing itself during construction.

**Response 29:** The entire field of environmental regulation, and citizen compliance with laws and regulations more generally, is premised on the practice of self-policing and voluntary compliance. State of Tennessee agencies such as TDEC are not resourced at the level necessary to accomplish direct compliance oversight of permitted activities on a daily basis.  TGP as the applicant must, by law, comply with the permit, including compliance with all monitoring and reporting requirements. Any permit violation potentially subjects TGP to a civil penalty of up to $10,000 per day, corrective action requirements, and assessment of damages, including natural resource damages if applicable. TDEC staff will review compliance with the permit. In addition, citizens who observe permit violations may submit complaints to TDEC, including formal complaints pursuant to Section 118(a) of the TWQCA.  Citizen water quality complaints may be submitted according to the instructions at:
https://www.tn.gov/environment/program-areas/wr-water-resources/water-quality/citizen-water-quality-complaints.html#:~:text=Citizens%20may%20submit%20complaints%20about,as%20possible%20in%20your%20request.

**Comment 30:** TDEC must seek additional time from the Corps and FERC for the 401 certification. FERC's 401 certification is broader than the Corps' and includes construction stormwater impacts associated with clearing. TGP has not yet applied for this coverage.

**Response 30:** While TDEC agrees that the federal Section 401 Water Quality Certification process for this project has been problematic given that TDEC only recently received a complete ARAP application, TDEC respectfully asserts that the decision of whether to challenge the U.S. Army Corps of Engineers ("USACE")

AR 006961

or FERC's reasonable period of time ("RPOT") determinations lies within TDEC's sole discretion, and is not – as the comment states - a mandatory requirement. The commenter's suggested course of action runs a significant risk of unintentionally waiving TDEC's 401 certification authority, particularly given judicial precedent regarding the one-year limit established by Section 401 of the Clean Water Act. Accordingly, TDEC declines to challenge the RPOT for either FERC or USACE, and instead issues this Section 401 Water Quality Certification with conditions.

The commenter is correct that the Section 401 Water Quality Certification for FERC would include impacts associated with construction stormwater, and that TGP has not yet applied for the requisite permit from TDEC. However, TGP has indicated its intent to obtain coverage under the NPDES construction stormwater discharge permit (CGP), TNR100000. The CGP is fully protective of Tennessee's water quality criteria. Because compliance with the CGP is necessary to ensure compliance with these criteria, the permit has been clarified to include an express requirement in Special Condition jj for TGP to comply with CGP conditions as a condition of the Section 401 Water Quality Certification.

**Comment 31:** Some commenters expressed concerns that the public notice was insufficient and requested an extension of the comment period.

**Response 31:** The Public Notice complied with all applicable legal requirements, and resulted in significant public participation, including by local residents. The Public Notice was published in four local newspapers: the Stewart County Standard, Houston County Herald, Dickson Post, and the Dickson Herald. Signs were posted in visible locations near aquatic impact locations. The Public Notice was emailed to everyone on the ARAP notice list, including anyone who had requested notice for this permit specifically, and was also posted to TDEC's website. All relevant documents, including maps, were available on the Division's permit Data Viewer prior to the notice period, and were also available upon request to the permit writer. An additional summary map was posted to the permit Data Viewer and hard copies were printed in large format in advance of the Public Hearing. Copies of detailed maps were also posted to the Data Viewer and hard copies were mailed to those who requested them following the Public Hearing. TDEC was unable to extend the comment period because both the USACE and FERC had set July 22, 2023, as the RPOT in which TDEC could issue a Section 401 Water Quality Certification.

**Comment 32:** Several commenters are concerned that language from the permit application was used in the draft permit.

**Response 32:** TDEC routinely utilizes language from the application in order to avoid misrepresenting the information provided by the applicant, particularly when technical in nature. Utilization of applicant's language verbatim is most common in the "Authorized Alterations," "Alternatives Analysis," and "Social or Economic Justification Information" sections of the permit's Rationale. Such excerpts of the application are typically preceded by language such as "The applicant has provided the following information on..." and is often distinguished by quotes or a different font in the final permit. TDEC has reviewed the applicant's submissions and has found them sufficient to comply with regulatory requirements.

**Comment 33:** Several commenters are concerned that TDEC refers to creeks by code and not their colloquial names in its public notices.

**Response 33:** Colloquial names for streams are not unique across the state (see Response 12 in this document), and many small waterbodies have no commonly recognized name. TDEC therefore utilizes the

13

AR 006962

system of unique Waterbody IDs developed for use in its assessment of water quality in streams across the state and for permitting. The system is roughly based on the USGS Hydrologic Unit Code (HUC) HUC-8 level watersheds. Waterbody IDs or street addresses and nearby waterbodies may be viewed in map format on TDEC's public facing Data Viewer at https://tdeconline.tn.gov/dwr/. The TDEC Waterbody ID for each stream impact is listed in Table 1 and 2 of the permit.

The use of codes in the draft permit and Public Notice was in no way intended to limit transparency. That said, both the Public Notice and the cover page of the permit and permit's Rationale section lists the following streams by name: Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, Barkley Reservoir Harpeth River Watershed and Lake Barkley Watershed. Part I of the draft permit also includes waterbody names used by TGP and TDEC, and the difference in these names amply demonstrates the need to use unique Waterbody IDs. The draft permit also included detailed maps for each impact location, the URL of the Data Viewer to download personal copies of the detailed maps, and the GPS coordinates of each impact location.

**Comment 34:** A number of commenters expressed disagreement with TVA's decision to convert to natural gas rather than renewables, citing climate change and other non-water quality impacts.

**Response 34:** TDEC's water quality permitting program does not govern TVA's fuel source decisions. Such comments should be directed to TVA.

**Comment 35:** Several NGOs submitted petitions with a list of signatures and individual notes opposing the pipeline.

**Response 35:** Division staff reviewed the petitions and individual notes. While the Division values the opinions of Tennessee residents, its ARAP permitting decisions are not based on popularity. Rather, these decisions are and must be based on whether the proposed activity complies with the Tennessee Water Quality Control Act, the ARAP rules, and Tennessee's Water Quality Criteria.

**Comment 36:** Several commenters expressed concerns about pipeline operations, natural beauty, reduction in property values, risk of pipeline explosion during operation, timber clearing in the right-of-way, TVA's NEPA analysis, use of eminent domain, impacts to historic property, and other issues not related to water quality.

**Response 36:** This permit governs only the impacts to jurisdictional aquatic resources associated with the construction of the pipeline. These other issues are beyond the scope of this permit and are more appropriately addressed to TGP, TVA, FERC, and other agencies. With regard to the impacts of vegetation clearing on streams and wetlands, the applicant's analysis of alternative routes indicates that the proposed route for this pipeline is ~80% contiguous with the existing TVA powerline right of way, minimizing the need for additional vegetation clearing and construction of new access routes.

**Comment 37:** Several comments were received regarding a compressed gas plant and pipeline in Cheatham

AR 006963

County affecting Sycamore Creek.

**Response 37:** The referenced impacts are not part of this permit. The Division has not yet received a permit application for these activities.

**Comment 38:** At the public hearing, commenters requested that TDEC provide a list of other permits required for this project.

**Response 38:** Although this request is inherently beyond the scope of this permit, as a service to commenters, TDEC has provided information below found in Table 1.4-1 of the FERC FEIS, which lists other public agencies involved in this project.

**Modified from "Table 1.4-1: Major Permits, Approvals, and Consultations for the Cumberland Project" from the FERC Final Environmental Impact Statement dated June 2023, pp. 1-4 and 1-5**

| Federal Permits | | |
|---|---|---|
| **Agency** | **Permit/Approval/ Consultation** | **Status** |
| FERC, Office of Energy Projects | Section 7(c) Natural Gas Act - Certificate of Public Convenience and Necessity | Certificate application filed 7/22/2022. |
| EPA Region 4 | Compliance with CWA | The EPA review anticipated to be concurrent with FERC's review of the certificate application. |
| USACE, Nashville Regulatory District, West Branch Section | Section 404 CWA/Section 10 Rivers and Harbors Act Permit | Permit Application submitted to the USACE on 7/22/2022. Supplement to Individual Permit Application filed on 9/30/2022. USACE issued a Preliminary Jurisdictional Determination on 1/4/2023. The Individual Permit public notice was issued on 2/9/2023 (PN 23-02). Due to additional information submitted, a second public notice was issued on 4/11/2023 (PN 23-13.) |
| USFWS, Tennessee Ecological Services Office | Consultation under Endangered Species Act, Bald and Golden Eagle Protection Act, and Migratory Bird Treaty Act | The USFWS provided concurrence of "not likely to adversely affect" dated 3/10/2022. Received concurrence of "not likely to adversely affect" the tricolored bat dated 3/15/2023. |
| Advisory Council on Historic Preservation (ACHP) | NHPA, Section 106 Consultation | The ACHP would be notified if it is determined that the Project would have an adverse effect on historic properties |

15

JA2828

| National Park Service (NPS), Southeast Region | Consultation under Wild and Scenic River Act for Crossing of Nationwide Rivers Inventory Segments | The NPS notified Tennessee on 4/25/2022 that the NPS has no comments or objections to the Project. |
| Natural Resources Conservation Service (NRCS), Nashville State Office | FERC Data Gathering Consultations | The NRCS provided Tennessee with seed mix recommendations on 3/29/2022 and confirmed that no NRCS Agricultural Conservation Easement Program easements are crossed by the Project. |

| State Permits | | |
| --- | --- | --- |
| **Agency** | **Permit/Approval/ Consultation** | **Status** |
| Tennessee Historical Commission - State Historic Preservation Office (SHPO) | NHPA, Section 106 Consultation | Concurrence with Phase I Cultural Resources surveys and reporting received on 11/3/21 and 7/12/2022. Concurrence with the Phase II Cultural Resources Surveys and Reporting and Avoidance Plans received on 7/19/22, 8/29/22, and 2/23/2023. |
| TDEC, Division of Natural Areas, Natural Heritage Program (NHP) | State Threatened and Endangered Species Review | Project review response received 6/29/2021. NHP letter stated it does not anticipate any impacts on protected species. |
| TDEC, DWR | Aquatic Resource Alteration Permit (ARAP), which also serves as the 401 CWA Water Quality Certification) | ARAP application submitted to TDEC on 7/22/2022. TDEC determined the application complete on 4/20/2023. A public Notice Requesting Public Comments on Draft Permit Actions (for draft ARAP Permit NRS22.192) was issued on 5/30/2023, and a TDEC public hearing was held on 7/6/2023. |
| TDEC, DWR | Hydrologic Determination | Determination received on 10/24/2022 |
| TDEC, DWR | Section 402 CWA, NPDES Construction General Permit No. TNR100000 | Application to be submitted prior to construction. |
| TDEC, DWR | NPDES Hydrostatic Test Water General Permit No. TNG670000 | Application to be submitted following issuance of FERC Certificate. |
| TDEC, DWR | Water Withdrawal Registration Program | Annual reporting of water withdrawals based on a calendar year and reported by February 15 of the next year. |

16

JA2829

| Tennessee Wildlife Resources Agency (TWRA) | State Threatened and Endangered Species Consultations | Initial notification letter / request for review of state listed species survey list sent 6/11/2021. Response dated 6/29/2021, stated the TWRA does not anticipate impacts on protected species. |
|---|---|---|

JA2830

AR  006966

# Tennessee Department of Environment and Conservation
## *General Aquatic Resource Alteration Permit for*
## Utility Line Crossings



**Effective Date:**     January 6, 2021
**Expiration Date:**    April 7, 2025

## Activities Covered by this Permit

This general permit authorizes the construction, maintenance, repair, rehabilitation or replacement of utility line crossings of streams. This general permit also authorizes horizontal directional drill crossings of wetlands in addition to the maintenance, repair, and rehabilitation of utility line crossings of wetlands. The alteration of wetlands and streams due to construction or easement maintenance of aerial utility lines, including permanent vegetation suppression is not authorized by this general permit. The cumulative number of crossings that may be authorized under this general permit is dependent on the trenching technique, and line alignment in relation to water resources. For example, a greater number of crossing points may be authorized for utility line types that typically involve directional drilling and do not follow surface topography, such as fiber optic, gas transmission, and electric lines, than for gravity sewer lines utilizing traditional blasting or hoe-ramming trenching techniques.

In addition, the following activities may be performed without submittal of an application or written authorization from the division prior to the commencement of work, provided the work is performed in accordance with the applicable terms and conditions of this general permit:

   a. Utility line activities employing non-invasive technologies such as pipe bursting, or slip-lining.

   b. Up to 3 crossings (boreholes) utilizing horizontal directional drilling, provided no Federal or State-listed deemed in need of management, threatened, or endangered aquatic species are located within one-mile of the project location, and all special conditions, including subparts of condition #5 are met.

   c. Utility lines suspended from a culvert, bridge, or similar structure.

   d. Single residential service lines.

Certain activities due to size, location or potential water quality impacts are not covered under this general permit, as described in both the Special and General Conditions sections. Activities not qualifying for authorization under this general permit may be authorized by a standard (individual) permit provided that all requirements of the *Tennessee Water Quality Control Act of 1977* (the *Act*) are met.

## Special Conditions

1. Written notification of the commencement of authorized work shall be provided to the local TDEC Environmental Field Office prior to, or within 24 hours after the authorized work has commenced.

2. Provisions shall be made to prevent the loss of stream flow due to fracturing of bedrock.

   a. Sewer line crossing streams with bedrock streambeds must provide non-erodible fill and cover, such as concrete or controlled low strength materials (flowable fill), and trench plugs at each end of the crossing.

AR 006967

    b.  No blasting will be permitted in the excavation of trenches that parallel or lie within 50 feet of a stream or wetland, including all stream crossings.

3.  In the case of proposed utility lines that follow the stream gradient or otherwise parallel the stream channel, the number of crossings shall be minimized to the maximum extent practicable.

4.  Trench plugs will be placed throughout any trench running parallel within 50 feet of a stream channel.

    a.  Trench plugs are barriers placed within an open pipeline excavation in order to slow flow and reduce erosion in the trench and also to prevent the trench from becoming a subsurface drainage path. Since the bedding and embedment are constructed using cohesionless, free-draining soils, a path is created for water to flow easily (French drain effect) alongside the pipe. In areas where there is high groundwater, where the pipeline crosses streams or aquifers, or where the natural groundwater flow would be affected or even diverted by the select material, trench plugs of compacted, cohesive, soils or impervious materials should be constructed at intervals along the pipeline.

    b.  The trench plug area will have a bedding of compacted, cohesive soils or impervious materials (such as concrete or controlled low strength materials a.k.a. flowable fill), whereas the bedding on both sides of the trench plug will have a bedding of uncompacted, cohesionless soil. Trench plugs must have lower permeability than the surrounding native soil.

    c.  Location and spacing of trench plugs:

        i)  Minimum of one trench plug between manholes, and one trench plug at each end of the stream crossing or wetland.

        ii)  The trench plugs between manholes shall be located near the upstream manhole.

5.  Crossings that utilize horizontal directional drilling are authorized, provided that:

    a.  Entry and exit locations are at least 50 feet from the stream bank or wetland margin.

    b.  The depth of bore below the streambed is sufficient to reasonably prevent release of drilling fluid, based on the parent material.

    c.  A site-specific contingency and containment plan for inadvertent release of drilling fluid must be received and approved by the Division prior to commencement of work. This plan must include notification to the division within 24 hours after release to surface waters. The site specific contingency and containment plan becomes a part of the application upon which coverage is issued and must be followed in the case of an inadvertent release.

    d.  Alignments with stream or wetland crossings in three or more counties are not authorized by this general permit.

6.  A maximum of 5 crossings may be authorized for open trenching techniques and auger boring (jack and bore).

    a.  Sewer line crossing of streams must provide non-erodible fill and cover, such as concrete or controlled low strength materials (flowable fill), and trench plugs at each end of the crossing.

    b.  Manholes shall not be located in wetlands, and must be a minimum of 50 feet from the stream bank.

AR 006968

    c.  The entry pit for auger boring shall be no closer than 20 feet from the stream bank or wetland margin.

7. For gravity sewer line installations, as-builts or record drawings of the line installation will be submitted to the division 45 days after completion of the project.

8. The alignment of new utility line crossings shall intersect the stream channel as close to 90 degrees or as perpendicular as possible. Alignment shall be no less than 45 degrees angle from the centerline of the stream.

9. New utility line crossings shall be located such as to avoid permanent alteration or damage to the integrity of the stream channel or wetland. Large trees, steep banks, rock outcroppings etc., should be avoided.

10. The crossing shall be designed to prevent the impoundment or loss of normal or base flows. Base flow is the usual or normal flow of the stream that is supplied primarily by groundwater from springs and seeps, but not affected by rapid runoff during and after rainfall. In the case of streams with bedrock streambeds, special provisions shall be made to prevent the loss of stream flow due to fracturing of the bedrock.

11. The excavation and fill activities associated with the utility line crossing of non-navigable streams shall be kept to a minimum and shall be separated from flowing waters. The crossing shall be constructed in the dry to the maximum extent practicable, by diverting flow utilizing cofferdams, berms, temporary channels or pipes. Temporary diversion channels shall be protected by non-erodible material and lined to the expected high water level. For navigable streams as defined by §10 of the *Rivers and Harbors Act of 1899*, the excavation and fill activities associated with utility line crossing may be accomplished within the flowing water.

12. New construction using open cut crossings of wetlands is not authorized. Maintenance, repair and rehabilitation of existing utility lines in wetlands is authorized provided that all of the following special provisions are met:

    a.  the total amount of excavation or fill within wetlands, including temporary equipment access roads does not exceed 50 cubic yards;

    b.  the wetlands alteration is located within the right of way of the existing utility line; and

    c.  temporary impacts to wetlands shall be mitigated by the removal and stockpiling of the first 12 inches of topsoil, prior to construction. Temporary wetland crossings or access roads shall utilize timber matting. Upon completion of construction activities, all temporary wetland impact areas are to be restored to pre-construction contours, and the stockpiled topsoil spread to restore these areas to pre-construction elevation. Other side-cast material shall not be placed within the temporary impact locations. Permanent vegetative stabilization using native species of all disturbed areas in or near the wetland must be initiated within 14 days of project completion (see also *Landscaping with Natives* at tneppc.org). Non-native, non-invasive annuals may be used as cover crops until native species can be established.

13. All spoil material from trench excavation, bore pits and other earth disturbing activities shall be deposited in an upland location and stabilized within 7 days in order to prevent erosion into waters of the state.

14. All dewatering activities shall be conducted in such a manner as to prevent the discharge of sediment-laden water into waters of the state.

AR 006969

15. Stream bank armoring at open cut crossings shall be minimized to the backfilled, disturbed area and shall in no case exceed 40 linear feet of stream bank. Riprap or concrete shall not line the bed of the channel. Non-erodible fill and cover, such as concrete or controlled low strength materials (flowable fill) required for pipe protection must be the minimum necessary to protect the pipeline, and should be overlain with natural bed material to the maximum extent practicable.

## General Conditions

1. The amount of fill, stream channel and bank modifications, or other impacts associated with the activity shall be limited to the minimum necessary to accomplish the project purpose. The permittee shall utilize the least impactful practicable method of construction.

2. All activities must be accomplished in conformance with the approved plans, specifications, data, and other information submitted in support of the ARAP application (form CN-1091) and the limitations, requirements, and conditions set forth herein. Failure to comply with the terms and conditions of this permit is a violation of the Act.

3. Activities, either individually or cumulatively, that may result in greater an appreciable permanent loss of resource values to streams or wetlands are not covered. This general permit shall not be used incrementally to combine with other activities resulting in a net loss of water resource values.

4. Clearing, grubbing, and other disturbance to riparian vegetation shall be kept at the minimum necessary for slope construction and equipment operations. Unnecessary native riparian vegetation removal, including tree removal, is prohibited. Native riparian vegetation must be reestablished in all areas of disturbance outside of any permanent authorized structures after work is completed. Coverage under this permit does not serve to waive any local riparian buffer protection requirement, and permittees are responsible for obtaining any necessary local approval.

5. This activity may not result in the permanent disruption to the movement of fish or other aquatic life upon project completion.

6. Blasting within 50 feet of any jurisdictional stream or wetland is prohibited.

7. Other than those activities described in Special Condition 12, activities that directly impact wetlands, or impair surface water flow into or out of any wetland areas are prohibited.

8. Activities located in a component of the National Wild and Scenic River System or waters designated as Outstanding National Resource Waters are not covered.

9. Activities occurring in known or likely habitat of state or federally listed threatened, endangered, deemed in need of management, or species of special concern may not be authorized without prior coordination with the Tennessee Wildlife Resources Agency (TWRA) and TDEC Division of Natural Areas (DNA) to determine if any special conditions are required to avoid and/or minimize harm to the listed species or their habitat. Adverse effects to federally listed threatened and endangered species are not authorized by this permit. Permittee is responsible for obtaining prior authorization from the United States Fish and Wildlife Service (USFWS) as required by Section 7 or Section 10 under the Endangered Species Act.

10. Work shall not commence until the permittee has obtained all necessary authorizations pursuant to applicable provisions of section 10 of The Rivers and Harbors Act of 1899, section 404 of the Clean Water Act, section 26a of The Tennessee Valley Authority Act, section 402 of the Clean Water Act (including, but not limited to, an NPDES permit for construction stormwater), or any other federal, state, or local laws.

AR 006970

11. Backfill activities must be accomplished in the least impactful manner possible that stabilizes the streambed and banks to prevent erosion. The completed activities may not disrupt or impound stream flow.

12. The use of monofilament-type erosion control netting or blanket is prohibited in the stream channel, stream banks, or any disturbed riparian areas within 30 feet of top of bank.

13. This permit does not authorize impacts to cultural, historic, or archaeological features or sites.

14. This permit does not authorize access to public or private property. Arrangements concerning the use of public or private property shall be made with the landowner. The permittee is responsible for obtaining any additional permitting or maintenance agreements with other government or public agencies or lands.

15. Where practicable, all activities shall be accomplished in the dry.  All surface water flowing towards this work shall be diverted using cofferdams and/or berms constructed of sandbags, clean rock (containing no fines or soils), steel sheeting, or other non-erodible, non-toxic material.  All such diversion materials shall be removed upon completion of the work. Any disturbance to the stream bed or banks must be restored to its original condition. As approved after Division review, activities may be conducted in the flowing water if working in the dry will likely cause additional degradation. Any work conducted in the flowing water must be for a short duration and with minimal impact, and conform to the Division-approved methodology.

16. All activities must be carried out in such a manner as will prevent violations of water quality criteria as stated in TDEC Rule Chapter 0400-40-03, or impairment of the uses of waters of the state as designated by Rule Chapter 0400-40-04.

17. Erosion prevention and sediment control measures must be in place and functional before any earth moving operations begin, and shall be designed according to the department's Erosion and Sediment Control Handbook (http://tnepsc.org/handbook.asp). Permanent vegetative stabilization using native species of all disturbed areas in or near the stream channel must be initiated within 14 days of project completion (see also Landscaping with Natives at tneppc.org).  Non-native, non-invasive annuals may be used as cover crops until native species can be established.

18. Temporary stream crossings shall be limited to one point in the construction area and erosion control measures shall be utilized where stream bank vegetation is disturbed. Stream beds shall not be used as linear transportation routes for mechanized equipment, rather, the stream channel may be crossed perpendicularly with equipment provided no additional fill or excavation is necessary.

**Obtaining Permit Coverage**

Utility Line Crossing activities requiring written notification and authorization may obtain coverage by submitting a signed and completed application (form CN-1091), along with any other required information, to the division. Work shall not commence until a written Notice of Coverage (NOC) from the division is received. As noted above, not all activities may be eligible for coverage under this general permit and coverage may be denied when appropriate.

Each Notice of Coverage under this general permit is valid until the expiration date specified on the NOC. If the General Permit is modified, reissued, or revoked, and the permittee has commenced or is under contract to commence this activity before the expiration date, the permittee may have up to twelve (12) months from the date of the modification, reissuance, or revocation of the General Permit to complete the activity under the present terms and conditions of the general permit.

JA2835

An application fee as established in Rule 0400-40-11-.02 will be assessed to applicants intending to receive an NOC to conduct activities under this general permit. An annual maintenance fee will be assessed to those individuals holding general permit coverage unless a Notice of Termination (NOT) form is received prior to the one-year anniversary of the issuance date of the NOC. An NOT form can be downloaded from the division's ARAP webpage (https://www.tn.gov/environment/permit-permits/water-permits1/aquatic-resource-alteration-permit--arap-.html).

APPROVED: _____    DATE: 01/06/2021
Jennifer Dodd
Director, Division of Water Resources

AR 006972

**Tennessee Department of Environment and Conservation**
*General Aquatic Resource Alteration Permit for*
**Minor Alterations to Wetlands**



**Effective Date:**      April 7, 2020
**Expiration Date:**    April 7, 2025

<u>**Activities Covered by this Permit**</u>

This general permit authorizes minor temporary or permanent alterations of wetlands, where avoidance is not possible. The individual or cumulative amount of alteration within a Common Plan of Development that may be authorized is based on degree of resource value impacted. Alterations of up to a total of 0.10 acres of wetlands representing moderate resource value may be authorized. Up to a total of 0.25 acres of wetlands that are degraded and of low resource value, may be authorized. Acreage limitations apply to total impacts from fill, access roads, hydrological modifications, or other project impacts, including permanent and temporary wetland impacts.

Certain activities due to size, location or potential water quality impacts are not covered under this general permit, as described in both the Special and General Conditions sections. Activities not qualifying for authorization under this general permit may be authorized by a standard (individual) permit provided that all requirements of the *Tennessee Water Quality Control Act of 1977* (the *Act*) are met.

<u>**Special Conditions**</u>

1.  Activities that impact high resource value wetlands, including but not limited to rare wetland types, Exceptional Tennessee Waters, and wetlands located in a component of the National Wild and Scenic River System or Outstanding Natural Resource Waters are not covered.

2.  Activities where all practicable measures to avoid and minimize adverse impacts to the wetlands and other waters of the state have not been employed are not covered.

3.  Excavation and fill activities associated with wetland alteration shall be kept to a minimum.

4.  Wetlands outside of the permitted impact areas shall be clearly marked with signs, high visibility fencing, or similar structures so that all work performed by the contractor is solely within the permitted impact area.

5.  Written notification of the commencement of authorized work shall be provided to the local TDEC Environmental Field Office prior to, or within 24 hours after initiation.

6.  Authorized wetland alterations shall not cause measureable degradation to resource values and classified uses of hydrologically connected wetlands or other waters of the state, including disruption of sustaining surface or groundwater hydrology. Adjacent wetlands or streams determined likely to be measurably degraded by such hydrologic alteration, or by partial fill, must be included in the cumulative impact calculation, even if not filled or otherwise directly altered physically.

7.  Temporary impacts to wetlands shall be mitigated by the removal and stockpiling of the first 12 inches of topsoil, prior to construction. Temporary wetland crossings or haul roads shall utilize timber matting. Gravel, riprap or other rock is not approved for construction of temporary crossings or haul

AR 006973

roads across wetlands. Upon completion of construction activities, all temporary wetland impact areas are to be restored to pre-construction contours, and the stockpiled topsoil spread to restore these areas to pre-construction elevation. Other side-cast material shall not be placed within the temporary impact locations. Permanent vegetative stabilization using native species of all disturbed areas in or near the wetland must be initiated within 14 days of project completion (see also *Landscaping with Natives* at tneppc.org). Non-native, non-invasive annuals may be used as cover crops until native species can be established.

8. Erosion prevention and sediment control measures such as silt fences shall be removed following completion of construction.

## General Conditions

1. The amount of fill, stream channel and bank modifications, or other impacts associated with the activity shall be limited to the minimum necessary to accomplish the project purpose. The permittee shall utilize the least impactful practicable method of construction.

2. All activities must be accomplished in conformance with the approved plans, specifications, data, and other information submitted in support of the ARAP application (form CN-1091) and the limitations, requirements, and conditions set forth herein. Failure to comply with the terms and conditions of this permit is a violation of the Act.

3. Activities, either individually or cumulatively, that may result in an appreciable permanent loss of resource values to streams or wetlands are not covered. This general permit shall not be used incrementally to combine with other activities resulting in a net loss of water resource values.

4. Clearing, grubbing, and other disturbance to wetland vegetation shall be kept at the minimum. Unnecessary native wetland vegetation removal, including tree removal, and soil disturbance is prohibited. Native wetland vegetation must be reestablished in all areas of disturbance outside of any permanent authorized structures after work is completed. Coverage under this permit does not serve to waive any local wetland buffer protection requirement, and permittees are responsible for obtaining any necessary local approval.

5. This activity may not result in a disruption or barrier to the movement of fish or other aquatic life and wetland dependent species upon project completion.

6. Blasting within 50 feet of any jurisdictional stream or wetland is prohibited.

7. Activities occurring in known or likely habitat of state or federally listed threatened, endangered, deemed in need of management, or species of special concern may not be authorized without prior coordination with the Tennessee Wildlife Resources Agency (TWRA) and TDEC Division of Natural Areas (DNA) to determine if any special conditions are required to avoid and/or minimize harm to the listed species or their habitat. Adverse effects to federally listed threatened and endangered species are not authorized by this permit. Permittee is responsible for obtaining prior authorization from the United States Fish and Wildlife Service (USFWS) as required by Section 7 or Section 10 under the Endangered Species Act.

8. Work shall not commence until the permittee has obtained all necessary authorizations pursuant to applicable provisions of section 10 of The Rivers and Harbors Act of 1899, section 404 of the Clean Water Act, section 26a of The Tennessee Valley Authority Act, section 402 of the Clean Water Act (including, but not limited to, an NPDES permit for construction stormwater), or any other federal, state or local laws.

9. This permit does not authorize impacts to cultural, historic, or archaeological features or sites.

AR 006974

10. This permit does not authorize access to public or private property. Arrangements concerning the use of public or private property shall be made with the landowner. The permittee is responsible for obtaining any additional permitting or maintenance agreements with other government or public agencies or lands.

11. Where practicable, all activities shall be accomplished during drier times of year or when recent conditions have been dry at the impact location. All surface water flowing towards or from the construction activity shall be diverted using cofferdams and/or berms constructed of sandbags, steel sheeting, or other non-erodible, non-toxic material. All such diversion materials shall be located outside of the wetland and removed upon completion of the work. Activities may be conducted in the water if working in the dry will likely cause additional degradation. If work is conducted in the water it must be of a short duration and with minimal impact

12. All activities must be carried out in such a manner as will prevent violations of water quality criteria as stated in TDEC Rule Chapter 0400-40-03, or impairment of the uses of waters of the state as designated by Rule Chapter 0400-40-04.

13. Erosion prevention and sediment control measures must be in place and functional before any earth moving operations begin, and shall be designed according to the department's Erosion and Sediment Control Handbook (http://tnepsc.org/handbook.asp). Permanent vegetative stabilization using native species of all disturbed areas in or near the stream channel must be initiated within 14 days of project completion (see also Landscaping with Natives at tneppc.org). Non-native, non-invasive annuals may be used as cover crops until native species can be established.

14. The use of monofilament-type erosion control netting or blanket is prohibited in the stream channel, stream banks, or any disturbed riparian areas within 30 feet of top of bank.

## Obtaining Permit Coverage

Proposed minor wetland alteration activities may obtain coverage by submitting a signed and completed application (form CN-1091), along with any other required information, to the division. Work shall not commence until a written Notice of Coverage (NOC) from the division is received. As noted above, not all activities may be eligible for coverage under this general permit and coverage may be denied when appropriate.

Each Notice of Coverage under this general permit is valid until the expiration date specified on the NOC. If the General Permit is modified, reissued, or revoked, and the permittee has commenced or is under contract to commence this activity before the expiration date, the permittee may have up to twelve (12) months from the date of the modification, reissuance, or revocation of the General Permit to complete the activity under the present terms and conditions of the general permit.

An application fee as established in Rule 0400-40-11-.02 will be assessed to applicants intending to receive an NOC to conduct activities under this general permit. An annual maintenance fee will be assessed to those individuals holding general permit coverage unless a Notice of Termination (NOT) form is received prior to the one-year anniversary of the issuance date of the NOC. An NOT form can be downloaded from the division's ARAP webpage (https://www.tn.gov/environment/permit-permits/water-permits1/aquatic-resource-alteration-permit--arap-.html)

APPROVED: _Jennifer Dodd (Apr 7, 2020)_____     DATE: 04/07/2020_____

Jennifer Dodd
Director, Division of Water Resources

AR  006975



# National Pollutant Discharge Elimination System (NPDES)

## General Permit for Discharges of Stormwater Associated with Construction Activities

## Permit Number TNR100000

---

Issued by
**Department of Environment and Conservation**
**Division of Water Resources**
**William R. Snodgrass - Tennessee Tower**
**312 Rosa L. Parks Avenue, 11th Floor**
**Nashville, Tennessee 37243-1102**

Under authority of the Tennessee Water Quality Control Act of 1977 (T.C.A. 69-3-101 et seq.) and the authorization by the United States Environmental Protection Agency under the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977 (33 U.S.C. 1251, et seq.) and the Water Quality Act of 1987, P.L. 100-4, including special requirements as provided in Subpart 6.4 of this general permit, operators of point source discharges of stormwater associated with construction activities into waters of the State of Tennessee, are authorized to discharge stormwater associated with construction activities in accordance with the following permit monitoring and reporting requirements, effluent limitations, and other provisions as set forth in parts 1 through 10 herein, from the subject outfalls to waters of the State of Tennessee.

This permit is issued on:      **September 27, 2021**

This permit is effective on:   **October 1, 2021**

This permit expires on:        **September 30, 2026**

for Jennifer Dodd
Director

# Tennessee General Permit No. TNR100000
# Stormwater Discharges Associated with Construction Activities

## Table of Contents

**PART 1**

1. COVERAGE UNDER THIS GENERAL PERMIT ........................................................................ 1
   1.1. PERMIT AREA .......................................................................................................... 1
   1.2. DISCHARGES COVERED BY THIS PERMIT .................................................................. 1
       1.2.1. Stormwater Discharges Associated with Construction Activities ........................ 1
       1.2.2. Stormwater Discharges Associated with Construction Support Activities ............ 2
       1.2.3. Non-Stormwater Discharges Authorized by this Permit ...................................... 2
       1.2.4. Other NPDES-Permitted Discharges ................................................................... 3
   1.3. LIMITATIONS ON COVERAGE ................................................................................... 3
   1.4. OBTAINING PERMIT COVERAGE ............................................................................... 5
       1.4.1. Notice of Intent (NOI) ....................................................................................... 6
       1.4.2. Stormwater Pollution Prevention Plan (SWPPP) ................................................ 6
       1.4.3. Permit Application Fee ....................................................................................... 7
       1.4.4. Submittal of Documents to Local Municipalities ................................................ 8
       1.4.5. Permit Coverage Through a Qualifying Local Program (QLP) .............................. 8
   1.5. NOTICE OF COVERAGE ............................................................................................ 9
       1.5.1. Permit Tracking Numbers ................................................................................. 9
       1.5.2. Notice of Coverage (NOC) ................................................................................. 9

**PART 2**

2. CONSTRUCTION SITE OPERATORS ................................................................................. 11
   2.1. TYPES OF OPERATORS ........................................................................................... 11
       2.1.1. Owner/Developer ............................................................................................ 11
       2.1.2. Commercial Builders ....................................................................................... 11
       2.1.3. Contractors ..................................................................................................... 12
   2.2. RESPONSIBILITIES OF OPERATORS ......................................................................... 12
       2.2.1. Permittees with Design Control ........................................................................ 13
       2.2.2. Permittees with Day-to-Day Operational Control .............................................. 13

**PART 3**

3. NOTICE OF INTENT (NOI) REQUIREMENTS ..................................................................... 15
   3.1. NOI SUBMITTAL .................................................................................................... 15
       3.1.1. Who Must Submit an NOI? ............................................................................... 15
       3.1.2. Existing Sites .................................................................................................. 15
       3.1.3. New Sites or New Phases of Existing Sites ........................................................ 15
       3.1.4. New Operators ................................................................................................ 16
       3.1.5. Late NOIs ........................................................................................................ 16
       3.1.6. Who Must Sign the NOI? .................................................................................. 17
   3.2. FORMAT AND CONTENT OF THE NOI FORM ............................................................ 17
       3.2.1. NOI Form ........................................................................................................ 17
       3.2.2. Construction Site Map ..................................................................................... 17
   3.3. WHERE AND HOW TO SUBMIT AN APPLICATION ..................................................... 18
       3.3.1. Traditional Submittal ....................................................................................... 18
       3.3.2. Submittal Using Electronic Forms ..................................................................... 18
   3.4. TDEC ENVIRONMENTAL FIELD OFFICES (EFOS) AND CORRESPONDING COUNTIES .......... 19

JA2841

AR 006977

**PART 4**

4. CONSTRUCTION AND DEVELOPMENT EFFLUENT GUIDELINES ...................................................20
   4.1. NON-NUMERIC EFFLUENT LIMITATIONS ....................................................................... 20
      4.1.1. Erosion prevention and sediment controls .......................................... 20
      4.1.2. Water Quality Riparian Buffer Zone Requirements ........................ 20
      4.1.2.1. Water quality riparian buffer zone exemption based on existing uses ........ 22
      4.1.2.2. Pre-approved sites ................................................................. 22
      4.1.3. Dewatering ..................................................................................... 22
      4.1.4. Pollution Prevention Measures ...................................................... 23
      4.1.5. Prohibited Discharges ................................................................... 23

**PART 5**

5. STORMWATER POLLUTION PREVENTION PLAN (SWPPP) REQUIREMENTS .........................24
   5.1. THE GENERAL PURPOSE OF THE SWPPP .................................................................... 24
   5.2. QUALIFICATION REQUIREMENTS ................................................................................ 25
   5.3. SWPPP PREPARATION AND COMPLIANCE .................................................................. 26
      5.3.1. Existing Sites ................................................................................. 26
      5.3.2. New Sites or New Phases of Existing Sites ................................... 26
      5.3.3. Signature Requirements ................................................................ 26
      5.3.4. SWPPP Availability ...................................................................... 26
   5.4. KEEPING SWPPP CURRENT ........................................................................................ 27
      5.4.1. SWPPP Modifications .................................................................. 27
   5.5. COMPONENTS OF THE SWPPP ................................................................................... 28
      5.5.1. SWPPP Narrative ......................................................................... 28
      5.5.2. SWPPP and EPSC plans ............................................................... 29
      5.5.3. Erosion Prevention and Sediment Controls (EPSC) ...................... 30
      5.5.3.1. General criteria and requirements .......................................... 30
      5.5.3.2. Construction phasing ............................................................. 31
      5.5.3.3. Projects Exceeding 50 acres of Disturbance ........................... 31
      5.5.3.4. Stabilization practices ............................................................ 33
      5.5.3.5. Structural practices ................................................................ 34
      5.5.3.6. Stormwater management ........................................................ 35
      5.5.3.7. Other items needing control ................................................... 36
      5.5.3.8. Site Assessments .................................................................... 36
      5.5.3.9. Inspections ............................................................................. 37
      5.5.3.10. Inspector qualifications ........................................................ 37
      5.5.3.11. Schedule of inspections ........................................................ 38
      5.5.3.12. Pollution prevention measures for non-stormwater discharges ........ 39

**PART 6**

6. SPECIAL CONDITIONS, MANAGEMENT PRACTICES, AND OTHER NON-NUMERIC LIMITATIONS ....................40
   6.1. RELEASES IN EXCESS OF REPORTABLE QUANTITIES ..................................................... 40
   6.2. SPILLS ........................................................................................................................ 40
   6.3. DISCHARGE COMPLIANCE WITH STATE WATER QUALITY STANDARDS ......................... 40
      6.3.1. Violation of water quality standards ............................................. 40
      6.3.2. Discharge quality .......................................................................... 40
   6.4. DISCHARGES INTO WATERS WITH UNAVAILABLE PARAMETERS OR EXCEPTIONAL TENNESSEE WATERS........ 41
      6.4.1. SWPPP/BMP Requirements .......................................................... 41
      6.4.2. Water Quality Riparian Buffer Zone Requirements ....................... 42

**PART 7**

7. RETENTION, ACCESSIBILITY AND SUBMISSION OF RECORDS ............................................44
   7.1. DOCUMENTS ............................................................................................................... 44
   7.2. ACCESSIBILITY AND RETENTION OF RECORDS ............................................................. 44
      7.2.1. Posting Information at the Construction Site .................................. 44
   7.3. ELECTRONIC SUBMISSION OF DOCUMENTS ................................................................ 45

JA2842

   7.3.1. Monitoring Results ................................................................................ 46

**PART 8**

8. STANDARD PERMIT CONDITIONS ......................................................................... 47
  8.1. DUTY TO COMPLY ........................................................................................ 47
    8.1.1. Duty to Comply .................................................................................. 47
    8.1.2. Penalties ............................................................................................ 47
    8.1.3. Civil and criminal liability .................................................................. 48
    8.1.4. Liability Under State Law .................................................................... 48
  8.2. CONTINUATION OF THE EXPIRED GENERAL PERMIT ....................................... 48
  8.3. NEED TO HALT OR REDUCE ACTIVITY NOT A DEFENSE .................................. 48
  8.4. DUTY TO MITIGATE ....................................................................................... 48
  8.5. DUTY TO PROVIDE INFORMATION ................................................................. 49
  8.6. OTHER INFORMATION ................................................................................... 49
  8.7. SIGNATORY REQUIREMENTS ......................................................................... 49
    8.7.1. Signatory Requirements for an NOI .................................................... 49
    8.7.2. Signatory Requirements for SWPPPs, Reports and Other Items ......... 50
    8.7.3. Duly Authorized Representative ......................................................... 50
    8.7.4. Changes to Authorization .................................................................. 51
    8.7.5. Signatory Requirements for Primary Permittees ................................ 51
    8.7.6. Signatory Requirements for Secondary Permittees ............................ 52
  8.8. OIL AND HAZARDOUS SUBSTANCE LIABILITY ................................................ 52
  8.9. PROPERTY RIGHTS ........................................................................................ 52
  8.10. SEVERABILITY .............................................................................................. 52
  8.11. INDIVIDUAL PERMITS ................................................................................... 53
    8.11.1. Required Individual Permit Coverage ................................................ 53
    8.11.2. Permittee-Requested Individual Permit Coverage ............................. 54
    8.11.3. General Permit Termination .............................................................. 54
  8.12. OTHER, NON-STORMWATER, PROGRAM REQUIREMENTS .............................. 54
  8.13. PROPER OPERATION AND MAINTENANCE ...................................................... 54
  8.14. Inspection and Entry ..................................................................................... 55
  8.15. PERMIT ACTIONS .......................................................................................... 55

**PART 9**

9. REQUIREMENTS FOR TERMINATION OF COVERAGE ............................................. 56
  9.1. TERMINATION OF DEVELOPER AND BUILDER COVERAGE ............................... 56
    9.1.1. Termination Process for Primary Permittees ...................................... 56
    9.1.2. NOT Review ....................................................................................... 57
  9.2. TERMINATION OF BUILDER AND CONTRACTOR COVERAGE ............................ 57
    9.2.1. Termination Process for Secondary Permittees .................................. 57
  9.3. NOT CERTIFICATION ...................................................................................... 58
  9.4. WHERE TO SUBMIT A NOT? ........................................................................... 58

**PART 10**

10. DEFINITIONS, ACRONYMS AND RESOURCES ....................................................... 59
  10.1. Definitions.................................................................................................... 59
  10.2. Acronyms and Abbreviations ........................................................................ 72
  10.3. Resources, Hyperlinks, and Web Pages ......................................................... 73

**APPENDIX A – NOTICE OF INTENT FORM (NOI)**

**APPENDIX B – NOTICE OF TERMINATION FORM (NOT)**

**APPENDIX C – INSPECTION REPORT FORM**

VMJ
TNR100000

**Page TOC-iii**

JA2843

**TN** Department of
**Environment &**
**Conservation**

# PART 1

## 1.     COVERAGE UNDER THIS GENERAL PERMIT

### 1.1.     PERMIT AREA

The construction general permit (CGP) covers all areas of the State of Tennessee.

### 1.2.     DISCHARGES COVERED BY THIS PERMIT

### 1.2.1.     Stormwater Discharges Associated with Construction Activities

Discharge of stormwater associated with construction activity, as used in this permit, refers to stormwater point source discharges from areas where soil disturbing activities, or associated construction support activities (see Section 1.2.2) are located. Soil disturbing activities include but are not limited to clearing, grading, grubbing, filling and excavation.

This permit authorizes stormwater point source discharges from construction activities that result in soil disturbances of one or more acres. Soil disturbances of less than one acre are required to obtain authorization under this permit if construction activities are part of a larger common plan of development or sale that comprises at least one acre of cumulative land disturbance. One or more site operators must maintain coverage under this permit for all portions of a site that have not been permanently stabilized.

Projects of less than one acre of total land disturbance require authorization under this permit if:

a) the director has determined that the stormwater discharge from a site is causing, contributing to, or is likely to contribute to a violation of a state water quality standard;
b) the director has determined that the stormwater discharge is, or is likely to be a significant contributor of pollutants to waters of the state[1]; or
c) changes in state or federal rules require sites of less than one acre that are not part of a larger common plan of development or sale to obtain a stormwater discharge permit.

---

[1] "*Significant contributor of pollutants to waters of the state*" means any discharge containing pollutants that are reasonably expected to cause or contribute to a violation of a water quality criteria or receiving stream designated uses.

AR  006980

TN Department of
**Environment &
Conservation**

**1.2.2.    Stormwater Discharges Associated with Construction Support Activities**

This permit also authorizes stormwater discharges from support activities associated with a permitted construction activity. Support activities may include concrete or asphalt batch plants, equipment staging yards, material storage areas, excavated material disposal areas and borrow areas. Support activities are authorized provided all of the following conditions are met:

a)  The support activity is related to a construction activity that is covered under this general permit.
b)  The operator of the support activity is the same as the operator of the construction activity.
c)  The support activity is not a commercial operation serving multiple unrelated construction projects by different operators.
d)  The support activity does not operate beyond the completion of the construction activity of the last construction project it supports.
e)  Support activities are identified in the Notice of Intent (NOI) and the Stormwater Pollution Prevention Plan (SWPPP). The appropriate erosion prevention and sediment controls and measures applicable to the support activity shall be described in a site-wide SWPPP covering all discharges from the support activity areas.

This permit does not authorize any process (dry weather) wastewater discharges from support activities. Process (dry weather) wastewater discharges from support activities must be authorized by an individual permit or other appropriate general permit.

TDOT projects shall be addressed in the *Waste and Borrow Policy*. Stormwater discharges associated with support activities that have been issued a separate individual permit or an alternative general permit are not authorized by this general permit.

**1.2.3.    Non-Stormwater Discharges Authorized by this Permit**

The following non-stormwater discharges from site-wide SWPPP areas of permitted construction activities are authorized by this permit provided the non-stormwater component of the discharge is in compliance with Subsection 5.5.3.12:

a)  Dewatering of collected stormwater and groundwater, discharged in accordance with section 4.1.3.

Page 2

JA2845



b) Waters used to wash dust and soils from vehicles where detergents are not used and detention and/or filtering is provided before the water leaves site. Wash removal of process materials such as oil, asphalt or concrete is not authorized.

c) Water used to control dust in accordance with Section 5.5.3.7.

d) Potable water sources, including waterline flushings, from which chlorine has been removed to the maximum extent practicable.

e) Routine external building washdown that does not use detergents or other chemicals.

f) Uncontaminated, non-turbid groundwater or spring water.

g) Foundation or footing drains where flows are not contaminated with pollutants (e.g., lubricants and fluids from mechanized equipment, process materials such as solvents, heavy metals, etc.).

h) Discharges from emergency fire-fighting activities.

i) Fire hydrant flushings.

j) Landscape irrigation.

k) Pavement wash waters, provided spills or leaks of toxic or hazardous substances have not occurred (unless all spill material has been removed) and where soaps, solvents, and detergents are not used.

l) Uncontaminated air conditioning or compressor condensate.

All non-stormwater discharges authorized by this permit must be free of sediment and other solids, must not cause erosion of soils, and must not result in sediment or erosion impacts to receiving streams.

### 1.2.4.    Other NPDES-Permitted Discharges

Discharges of stormwater or wastewater authorized by and in compliance with a different NPDES permit may be mixed with discharges authorized by this permit.

### 1.3.    LIMITATIONS ON COVERAGE

Except for discharges from support activities, as described in Section 1.2.2 and non-stormwater discharges listed in Section 1.2.3, all discharges covered by this permit shall be composed entirely of stormwater. This permit does not authorize the following discharges:

a) Post-construction discharges - Stormwater discharges associated with permanent stormwater management structures after construction



activities have been completed, the site has undergone permanent stabilization and the coverage under this permit has been terminated.

b) Discharges mixed with non-stormwater - Discharges that are mixed with sources of non-stormwater, other than discharges which are identified in Section 1.2.4 and in compliance with Subsection 5.5.3.12 of this permit.

c) Discharges covered by another permit - Discharges associated with construction activities that have been issued an individual permit in accordance with Subpart 8.11.

d) Discharges threatening water quality - Discharges from construction sites that the director determines will cause or has the reasonable potential to cause or contribute to violations of water quality standards. Where such a determination has been made, the division will notify the discharger in writing that an individual permit application is necessary as described in Subpart 8.11. The division may authorize coverage under this permit after appropriate controls and implementation procedures have been included in the SWPPP that are designed to bring the discharge into compliance with water quality standards.

e) Discharges into waters with unavailable parameters - Discharges to waters with unavailable parameters that would cause measurable degradation of water quality for the parameter that is unavailable; or that would cause additional loadings of unavailable parameters that are bioaccumulative or that have criteria below method detection levels. Waters with unavailable parameters means any segment of surface waters that has been identified by the division as failing to support its designated classified uses. A discharge that complies with the additional requirements set forth in Subpart 6.4 is not considered to cause measurable degradation of waters with unavailable parameters, unless the division determines upon review of the SWPPP that there is a reason to limit coverage as set forth in Subpart 1.3(d) and the SWPPP cannot be modified to bring the site into compliance.

f) Discharges into Outstanding National Resource Waters - Discharges into waters that are designated by the Water Quality Control Board as Outstanding National Resource Waters (ONRW) pursuant to Tennessee Rules, Chapter 0400-40-03-.06(5), except activities conducted by, or on behalf of, the National Park Service on its own lands.

g) Discharges into Exceptional Tennessee Waters - Discharges that would cause more than de minimisDE MINIMIS degradation of water quality for any available parameter in waters designated by TDEC as Exceptional Tennessee Waters. A discharge that complies with the additional requirements set forth in Subpart 6.4 is not considered to cause more than de minimis degradation of available parameters unless the division determines upon review of the SWPPP that there is a reason to limit

AR 006983


coverage as set forth in Subpart 1.3(d)) and the SWPPP cannot be modified to bring the site into compliance.

h) <u>Discharges not protective of aquatic or semi-aquatic threatened and endangered species, species deemed in need of management or special concern species</u> - Discharges or discharge-related activities that are likely to jeopardize the continued existence of listed or proposed threatened or endangered aquatic species, or their critical habitat, under the Endangered Species Act (ESA), or other applicable state law or rule.

Discharges or conducting discharge-related activities that will cause a prohibited "take" of federally listed aquatic species (as defined under Section 3 of the ESA and 50 CFR §17.3) unless such take is authorized under Sections 7 or 10 of the ESA.

Discharges or conducting discharge-related activities that will cause a prohibited "take" of state listed aquatic species[2], unless such take is authorized under the provisions of T.C.A. § 70-8-106(e).

i) <u>Discharges from a new or proposed mining operation</u> - Discharges from new or proposed mining operations are not authorized.

j) <u>Discharges into waters with an approved Total Maximum Daily Load</u> - Discharges of a pollutant to waters for which there is an EPA-approved or established total maximum daily load (TMDL) for that pollutant, unless the SWPPP incorporates measures or controls consistent with the assumptions and requirements of the TMDL.

Any discharge of stormwater or other fluids to groundwater via an improved sinkhole or injection well requires a Class V Underground Injection Control authorization by rule, or an individual permit under the provisions of Tennessee Rules, Chapter 0400-45-06.

## 1.4.    OBTAINING PERMIT COVERAGE

A complete NOI, Stormwater Pollution Prevention Plan (SWPPP) and application fee[3] are required to obtain coverage under this general permit. **Submitting for coverage under this permit means that an applicant has examined a copy of**

---

[2] As defined in the Tennessee Wildlife Resources Commission Proclamation, Endangered or Threatened Aquatic Species, and in the Tennessee Wildlife Resources Commission Proclamation, Wildlife in Need of Management.

[3] Any reference to an "*application*" in this permit should be considered equivalent to the phrase "*complete NOI, SWPPP and application fee*"

**this permit and thereby acknowledged the applicant's claim of ability to comply with permit terms and conditions.**

### 1.4.1.    Notice of Intent (NOI)

Operators wishing to obtain coverage under this permit must submit a complete NOI in accordance with Part 3, using the NOI form provided in Appendix A of this permit. Electronic submittal is encouraged (see NPDES Electronic Reporting for more information). The division may review NOIs and SWPPPs for completeness and accuracy and, when deemed necessary, investigate the proposed project for potential impacts to the waters of the state. Absent extraordinary circumstances, NOCs should be issued within 30 days of NOI submittal, unless the division has responded to the operator within that time requesting additional information. Permittees must obtain all required local authorizations related to stormwater management (see Section 1.4.4).

### 1.4.2.    Stormwater Pollution Prevention Plan (SWPPP)

Operators wishing to obtain coverage under this permit must submit a site-specific SWPPP with the NOI, or sign and certify an existing site-specific SWPPP. The SWPPP shall address all of the operators' construction-related activities from the date construction commences to the date of termination of permit coverage, to the maximum extent practicable. The SWPPP must address the total acreage planned to be disturbed, including any associated construction support activities (see Section 1.2.2). The SWPPP must be developed, implemented and updated according to the requirements in Part 5 and Section 6.4.1. The SWPPP must be implemented prior to commencement of construction activities.

Preparation and implementation of the SWPPP may be a cooperative effort with all operators at a site. New operators with design and operational control of their portion of the construction site are expected to adopt, modify, update and implement their portion of the SWPPP. Alternatively, permittees at the site may develop and submit a SWPPP addressing only their portion of the project, as long as the proposed Best Management Practices (BMPs) are compatible with the previously submitted SWPPPs, as updated, and complying with conditions of this general permit.

SWPPPs must be updated or addended if site activities diverge significantly from those indicated in the initial SWPPP. A copy of the most recent version of the SWPPP must be available at the site.

JA2849



Site operators who are building single family residences on at-grade lots (see Section 2.1.2) and who are submitting an application for coverage under this permit, may complete and submit Form CN-1249, the Stormwater Pollution Prevention Plan (SWPPP) for Single Family Residential Homebuilding Sites. This SWPPP template is available on our website at:
http://tdec.tn.gov/etdec/DownloadFile.aspx?row_id=CN-1249.

Form CN-1249 is not appropriate if significant grading of the lot or lots is necessary.

### 1.4.3. Permit Application Fee

The permit application fee should accompany the applicant's NOI form. The fee is based on the total acreage planned to be disturbed by an entire construction project for which the applicant is requesting coverage, including any associated construction support activities (see Section 1.2.2). The applicant may present documentation of areas in the project that will not be subject to disturbance at any time during the life of the project and have these areas excluded from the fee calculation.

The application fees shall be as specified in Tennessee Rules, Chapter 0400-40-11. The application will be deemed incomplete until the appropriate application fee is paid in full. Checks for the appropriate fee should be made payable to "Treasurer, State of Tennessee." Electronic payment methods, if made available by the State of Tennessee, are acceptable and are encouraged. The following conditions apply:

a) If stormwater discharges from the site or acreage to be disturbed was previously authorized by a CGP, but coverage has been since terminated, a primary operator must submit a new application for coverage under the CGP.

b) A new primary operator seeking subsequent coverage under an actively permitted activity must submit the subsequent coverage fee to obtain coverage under an active NOC.

c) Acreage additions up to 10% of the original plan area, but not to exceed a total of 5 acres, and other minor modifications of the original plan do not require separate NOI submittal. These minor additions require submittal of a plan indicating the additional area(s) of disturbance, the total acreage to be disturbed, and the updated SWPPP. The permittee is responsible for thoroughly and accurately identifying all waterbodies (including wetlands and streams) located on the added acreage and to provide a determination of the water's status if not previously provided. An additional fee and

Case: 23-3682    Document: 56-6    Filed: 08/19/2024    Page: 476

**TN** Department of
**Environment &**
**Conservation**

Tennessee General NPDES Permit No. TNR100000
Stormwater Discharges from Construction Activities

updated NOI are required only if the total acreage of disturbance would require a higher fee than originally paid, and then only the difference is due. New acreage disturbances cannot be added as previously disturbed acreage is stabilized, to create a 'rolling' total of disturbance. Iterative changes that would create cumulative impact exceeding 10% of the original plan area, or a total of 5 acres require submittal of updated NOI and SWPPP to the division.

d) In addition to the application fee, an annual maintenance fee applies per Tennessee Rules, Chapter 0400-40-11-.02(12)(i).

### 1.4.4.    Submittal of Documents to Local Municipalities

Some permittees may discharge stormwater through an NPDES-permitted municipal separate storm sewer system (MS4) who are not exempted in Section 1.4.5. These permittees are encouraged to coordinate with the local MS4 authority prior to submitting an NOI to the division. Permitting status of all permittees covered, or previously covered, under this general permit as well as the most current list of all MS4 permits is available at:
http://tn.gov/environment/article/tdec-dataviewers.

Permittees must obtain all necessary authorizations pursuant to provisions of any local ordinances that apply to construction activities, and permittees are expected to comply with any additional erosion prevention, sediment control, and construction stormwater management measures required by a local municipality, county or permitted MS4 program.

### 1.4.5.    Permit Coverage Through a Qualifying Local Program (QLP)

Coverage equivalent to coverage under this general permit may be obtained from a qualifying local erosion prevention and sediment control MS4 program. A Qualifying Local Program (QLP) is a municipal stormwater program implemented for stormwater discharges associated with construction activity that has been formally approved by the division. More information about Tennessee's QLP program and MS4 participants can be found at:
https://www.tn.gov/environment/permit-permits/water-permits1/npdes-permits1/npdes-stormwater-permitting-program/tennessee-qualifying-local-program.html.

If a construction site is within the jurisdiction of, and has obtained a notice of coverage from, a QLP, the operator is authorized to discharge stormwater associated with construction activity under this general permit without the submittal of an application to the division. Permitting of stormwater runoff from



construction sites from federal or state agencies (e.g., Tennessee Department of Transportation and Tennessee Valley Authority) and the local MS4 program itself will remain solely under the authority of TDEC.

The division may require any operator located within the jurisdiction of a QLP to obtain permit coverage directly from the division. The operator shall be notified in writing by the division that coverage by the QLP is no longer applicable and how to obtain coverage under this permit.

## 1.5.    NOTICE OF COVERAGE

### 1.5.1.    Permit Tracking Numbers

Construction activities covered under this permit will be assigned permit tracking numbers in the sequence TNR100001, TNR100002, etc. Permit tracking numbers assigned under a previous construction general permit will be retained. An operator applying for new permit coverage will be assigned a new permit tracking number. Assigning a permit tracking number by the division to a proposed discharge from a construction activity does not confirm or imply an authorization to discharge under this permit. Operators receiving new permit coverage will be listed as active on the TDEC Dataviewer.

### 1.5.2.    Notice of Coverage (NOC)

The NOC is a notice from the division to the primary permittee informing them that the NOI, the SWPPP, and the application fee were received and accepted. The primary permittee is authorized to discharge stormwater associated with construction activity as of the effective date listed on the NOC.

For new operators seeking subsequent coverage under an existing tracking number, the division will not issue a NOC. New operators that notify the division to be added to an existing coverage are covered upon receipt of notification of permit coverage by the division. The permit record reflecting the additional operator will be published on TDEC's DataViewer in the next update.

The division reserves the right to deny coverage to artificial entities (e.g., corporations or partnerships, excluding entities not required to register with the Tennessee Secretary of State) that are not properly registered and in good standing (i.e., listed with an entity status of "active") with the Tennessee Secretary of State, Division of Business Services. The division also reserves the right to issue permit coverage in the correct legal name of the individual or entity seeking



coverage, including each general partner of a general partnership in addition to the general partnership.

Alterations to channels or waterbodies (see definition of streams) that are contained on, traverse through or are adjacent to the construction site are not authorized by this permit. Such alterations may require an Aquatic Resources Alteration Permit (ARAP):https://www.tn.gov/environment/permit-permits/water-permits1/aquatic-resource-alteration-permit--arap-.html.

It is the responsibility of the applicant to thoroughly and accurately identify all waterbodies (see definition of streams) located on the site and to provide a determination of the water's status.

For channels, this determination must be conducted in accordance with Tennessee's standard operating procedures for hydrologic determinations set forth at Tennessee Rules, Chapter 0400-40-03.05(9). Wetlands determinations must include the submission of a wetland delineation completed utilizing the USACOE 1987 *Wetlands Delineation Manual* and applicable *Regional Supplement*. For the purposes of permitting, the permittee may choose to provide all aquatic features located on the site the protections afforded to streams and wetlands in lieu of conducting hydrologic determinations. ARAPs are independent requirements from CGP coverage and complete applications for ARAPs shall precede NOI submittal. The division reserves the right to delay or withhold issuance of coverage under the CGP in some cases until the appropriate ARAP coverage has been obtained.

The treatment and disposal of wastewater (e.g., sanitary, commercial or industrial wastewater) generated during and after the construction must be also addressed prior to issuance of the NOC. The NOC may be delayed until adequate wastewater treatment is identified and accompanying disposal permits are issued.

JA2853

AR 006989

# PART 2

## 2. CONSTRUCTION SITE OPERATORS

### 2.1. TYPES OF OPERATORS

#### 2.1.1. Owner/Developer

An owner or developer of a project is a primary permittee. This person has operational or design control over construction plans and specifications, including the ability to make modifications to those plans and specifications. This person may include, but is not limited to, a developer, landowner, realtor, commercial builder, homebuilder, utility company, etc. This person may be an individual, a corporate entity, or a governmental entity. An owner's or developer's responsibility to comply with requirements of this permit extends until permit coverage is terminated in accordance with requirements of Part 9.

The site-wide permittee is the first primary permittee to apply for coverage for a construction activity. There may be other primary permittees for a project, but there is only one site-wide permittee. Where there are multiple operators associated with the same project, all operators are required to obtain permit coverage. Once covered by a permit, each operator is responsible for complying with the permit. Permittees are jointly and severally liable for a violation related to construction activities that affect the same project site, unless a permittee affirmatively demonstrates to the satisfaction of the Department that its own action, or failure to act, was not a cause of the violation.

#### 2.1.2. Commercial Builders

A commercial builder can be a primary or secondary permittee at a construction site.

A commercial builder who purchases one or more lots from a primary permittee for the purpose of constructing and selling a structure[4] and has design or operational control over construction plans and specifications for that portion of

---

[4] e.g., residential house, non-residential structure, commercial building, industrial facility, etc.

the site, or is hired by an end user, such as a lot owner who may not be a permittee, must obtain coverage in one of the following ways:

a) The site-wide permittee may transfer coverage to the commercial builder, for the entire site or just the acreage/lots the builder has purchased;

b) The commercial builder may submit a new NOI for the acreage purchased, following requirements in Section 3.1.4; or

c) The commercial builder may be hired by the primary permittee or a lot owner to build a structure, and by mutual agreement build on the site under the existing coverage of the site-wide permit. In this case, the commercial builder signs the primary permittee's NOI and SWPPP as a contractor (see Section 2.1.3) and is considered a secondary permittee.

### 2.1.3. Contractors

A contractor is considered a secondary permittee. This person has day-to-day operational control of the activities necessary to ensure compliance with the SWPPP or other permit conditions (e.g., the contractor is authorized to direct workers at a site to carry out activities required by the SWPPP or comply with other permit conditions). A contractor may be:

- a general contractor
- a grading contractor
- an erosion control contractor
- a sub-contractor responsible for land disturbing activities or erosion prevention and sediment control (EPSC) implementation and maintenance
- a commercial builder hired by the primary permittee.

The contractor may need to include in their contract with the party that hired them specific details for the contractor's responsibilities concerning EPSC measures. This includes the ability of the contractor to make EPSC modifications. The contractor shall sign the primary permitee's NOI and SWPPP associated with the construction project at which they will be an operator (insofar as possible), or submit a separate NOI to the division indicating their intent to be added to the existing activity coverage as an operator.

### 2.2. RESPONSIBILITIES OF OPERATORS

A permittee may meet one or more of the operational control components in the definition of "operator" found in Subpart 2.1. Either Section 2.2.1 or 2.2.2, or both, will apply depending on the type of operational control exerted by an individual permittee.

### 2.2.1.    Permittees with Design Control

Permittees with operational control over construction plans and specifications at the construction site, including the ability to make modifications to those plans and specifications, must ensure that:

a) the project specifications meet the minimum requirements of Part 5 (SWPPP) and all other applicable conditions;
b) the SWPPP indicates the areas of the project where they have operational control;
c) all other permittees implementing and maintaining portions of the SWPPP impacted by any changes made to the plan are notified of such modifications in a timely manner;
d) all common BMPs (i.e., sediment treatment basin and drainage structures) necessary for the prevention of erosion or control of sediment are maintained and effective until all construction is complete and all disturbed areas in the entire project are stabilized, unless permit coverage has been obtained and responsibility has been taken over by a new primary permittee; and
e) all operators on the site have permit coverage, if required.

If parties with day-to-day operational control of the construction site have not been identified at the time the site-wide SWPPP is initially developed, the permittee with operational control shall be considered to be the responsible person until an NOI is submitted identifying the new operators (see Section 3.1.4). These new operators (e.g., general contractor, utilities contractors, sub-contractors, erosion control contractors, hired commercial builders) are considered secondary permittees. The SWPPP must be updated to reflect the addition of new operators.

### 2.2.2.    Permittees with Day-to-Day Operational Control

Permittees with day-to-day operational control of the activities necessary to ensure compliance with the SWPPP or other permit conditions must ensure that:

a) the SWPPP for portions of the project where they are operators meets the requirements of Part 5 and identifies the parties responsible for implementing the control measures identified in the plan;
b) the SWPPP indicates areas of the project where they have operational control over day-to-day activities; and

JA2856



   c)  measures in the SWPPP are adequate to prevent soil erosion and control any sediment that may result from their earth disturbing activity.

Permittees with operational control over only a portion of a larger construction project are responsible for compliance with all applicable terms and conditions of this permit as it relates to their activities on their portion of the construction site. This includes, but is not limited to, implementation of Best Management Practices (BMPs) and other controls required by the SWPPP. Permittees shall ensure either directly or through coordination with other permittees, that their activities do not render another person's pollution control ineffective. All permittees must implement their portions of the SWPPP.

**TN** Department of
**Environment &**
**Conservation**

# PART 3

## 3. NOTICE OF INTENT (NOI) REQUIREMENTS

### 3.1. NOI SUBMITTAL

#### 3.1.1. Who Must Submit an NOI?

All operators must submit an NOI form. For the purpose of this permit and in the context of stormwater associated with construction activity, an "operator" means any person associated with a construction project who meets either or both of the following two criteria:

a) The person has operational control over construction plans and specifications, including the ability to make modifications to those plans and specifications. This person is considered the primary permittee and is typically:
- the owner or developer of the project,
- the owner or developer of a portion of the project (e.g., subsequent builder), or
- the person who is the current owner of the construction site.

b) The person has day-to-day operational control of the activities necessary to ensure compliance with the SWPPP or other permit conditions. This person is typically a contractor, or a commercial builder hired by the primary permittee, and is considered a secondary permittee.

#### 3.1.2. Existing Sites

An operator presently permitted under the 2016 construction general permit shall be granted coverage under this new general permit. Coverage will be extended automatically without notification to the division or an additional fee being assessed. The existing SWPPP shall be modified according to the Section 5.3.1 of this permit.

If an operator does not wish to be continued under the new general permit, they may terminate coverage (Section 9.1). If a site with terminated coverage is unstable or if construction continues, a new NOI, SWPPP and application fee must be submitted.

#### 3.1.3. New Sites or New Phases of Existing Sites

Except as provided in Section 3.1.4, operators must submit a complete NOI, SWPPP and an application fee in accordance with the requirements described

JA2858

in Subpart 1.4. The complete application should be submitted at least 30 days prior to commencement of construction activities. The permittee is authorized to discharge stormwater associated with construction activity as of the effective date listed on the NOC or the TDEC DataViewer. The land disturbing activities shall not start until the NOC is received by the applicant according to Subpart 1.5.

### 3.1.4.    New Operators

New operators proposing to conduct construction activities at a site with existing coverage must submit an NOI. The NOI should be submitted prior to the new operator commencing work at the site. The NOI must reference the project name and tracking number assigned to the primary permittee's NOI. The NOI may not need to be submitted immediately upon assuming operational control if the portion of the site controlled by the new operator is inactive and all the previously disturbed areas are permanently stabilized.

A new operator working as a residential home builder may submit Form CN-1249, the Stormwater Pollution Prevention Plan (SWPPP) for Single Family Residential Homebuilding Sites. This form may be found at: http://tdec.tn.gov/etdec/DownloadFile.aspx?row_id=CN-1249.

If the primary permittee's company name has changed (but not the site ownership or authorized signators), an updated NOI should be submitted to the division within 30 days of the name change, along with documentation that the name change has been properly registered with the Tennessee Secretary of State, Division of Business Services. If the new operator agrees to comply with an existing site-wide SWPPP already implemented at the site, a copy of the SWPPP does not have to be submitted with the NOI.

If the transfer of ownership is due to foreclosure or a permittee filing for bankruptcy proceedings, the new owner (e.g., a lending institution) must obtain permit coverage if the construction activity is inactive but soil is not stabilized sufficiently. If the property is sufficiently stabilized permit coverage may not be necessary, unless and until construction activity at the site resumes.

### 3.1.5.    Late NOIs

Dischargers are not prohibited from submitting NOIs after construction at their site has already begun. When a late NOI is submitted, and if the division authorizes coverage under this permit, such authorization is only for future discharges. Any prior, unpermitted, discharges or permit noncompliances are subject to penalties as described in Section 8.1.2.

JA2859

### 3.1.6.    Who Must Sign the NOI?

All construction site operators as defined in Subpart 2.1 must sign the NOI form. Signatory requirements for a NOI are described in Section 8.7.1. Signatures on electronically submitted NOIs are deemed to be equivalent to a hardcopy signature. An NOI that does not bear a valid signature will be deemed incomplete.

## 3.2.    FORMAT AND CONTENT OF THE NOI FORM

### 3.2.1.    NOI Form

The NOI form is provided in Appendix A of this permit. This form and its instructions set forth the required content of the NOI. The NOI form must be filled in completely. If the division notifies applicants by mail, E-mail, public notice or by making information available on the world wide web of electronic NOI forms (see NPDES Electronic Reporting), the operators may be required to use those electronic options to submit the NOI (Section 3.3.2)

Owners, developers and contractors that meet the definition of the operator in Subpart 2.1 shall apply for permit coverage on the same NOI, if possible. The division may accept separate NOI forms from different operators for construction activities on the same construction site when warranted.

After permit coverage has been granted to the primary permittee, any subsequent NOI submittals must include the site's previously assigned permit tracking number and the project name. The SWPPP shall be prepared in accordance with Part 5, and must be submitted with the NOI unless the NOI is only being submitted to add a secondary permittee to an existing coverage.

### 3.2.2.    Construction Site Map

An excerpt (8 ½" by 11" or 11" by 17") from the appropriate 7.5 minute United States Geological Survey (USGS) topographic map (or other map showing contours) with the proposed construction site centered, must be included with the NOI. The entire proposed construction area must be clearly outlined on the map, with all acreage to be disturbed clearly identified. All outfalls[5] discharging runoff from the property, streams receiving the discharge, and storm sewer systems conveying the discharge from outfalls shall be clearly identified and marked on the map. NOIs for linear projects must specify the location of each end

---

[5] Phrase "point source" and term "outfall" are used interchangeably. For the purpose of this general permit, they can be considered synonyms.

of the construction area and all areas to be disturbed. Commercial builders that develop separate SWPPPs that cover only their portion of the project shall also submit a site or plat map that clearly indicates the lots for which they are applying for permit coverage, and the location of EPSCs that will be used at each lot (Section 5.5).

### 3.3. WHERE AND HOW TO SUBMIT AN APPLICATION

### 3.3.1. Traditional Submittal

The applicant shall submit the NOI, SWPPP and application fee to the appropriate Environmental Field Office (EFO) for the county where the construction activity is located and where stormwater discharges enters waters of the state. If a site straddles a county line of counties that are in different EFO service areas, the operators shall send the NOI and the application fee to the EFO that provides coverage for the majority of the proposed construction activity.

A list of counties and the corresponding EFOs is provided in Subpart 3.4. The division's Nashville Central Office will serve as a processing office for NOIs submitted by federal or state agencies (e.g., TDOT, TVA and the local MS4 programs).

### 3.3.2. Submittal Using Electronic Forms

The division is in the process of launching the new NPDES Electronic Reporting online customer portal for submission of permit applications and other reports. If the division notifies applicants by mail, E-mail, public notice or by making information available on the world wide web of electronic application submittal, the operators may be required to use those electronic options to submit the NOI, SWPPP and an application fee. For more information, visit https://www.tn.gov/environment/program-areas/wr-water-resources/netdmr-and-electronic-reporting.html.

AR 006997

### 3.4. TDEC ENVIRONMENTAL FIELD OFFICES (EFOS) AND CORRESPONDING COUNTIES

| EFO Name | List of Counties |
|---|---|
| Chattanooga | Bledsoe, Bradley, Grundy, Hamilton, Marion, McMinn, Meigs, Polk, Rhea, Sequatchie |
| Columbia | Bedford, Coffee, Franklin, Giles, Hickman, Lawrence, Lewis, Lincoln, Marshall, Maury, Moore, Perry, Wayne |
| Cookeville | Cannon, Clay, Cumberland, DeKalb, Fentress, Jackson, Macon, Overton, Pickett, Putnam, Smith, Trousdale, Van Buren, Warren, White |
| Jackson | Benton, Carroll, Chester, Crockett, Decatur, Dyer, Gibson, Hardin, Haywood, Henderson, Henry, Lake, Lauderdale, Madison, McNairy, Obion, Weakley |
| Johnson City | Carter, Greene, Hancock, Hawkins, Johnson, Sullivan, Unicoi, Washington |
| Knoxville | Anderson, Blount, Campbell, Claiborne, Cocke, Grainger, Hamblen, Jefferson, Knox, Loudon, Monroe, Morgan, Roane, Scott, Sevier, Union |
| Memphis | Fayette, Hardeman, Shelby, Tipton |
| Nashville | Cheatham, Davidson, Dickson, Houston, Humphreys, Montgomery, Robertson, Rutherford, Stewart, Sumner, Williamson, Wilson |

TDEC may be reached by telephone at the toll-free number 1-888-891-8332 (TDEC). Local EFOs may be reached directly when calling this number from the construction site, using a land line.

# PART 4

## 4.     CONSTRUCTION AND DEVELOPMENT EFFLUENT GUIDELINES

### 4.1.     NON-NUMERIC EFFLUENT LIMITATIONS

Any point source authorized by this general permit must achieve, at a minimum, the effluent limitations representing the degree of effluent reduction attainable by application of best practicable control technology (BPT) currently available.

### 4.1.1.     Erosion prevention and sediment controls

Design, install and maintain effective erosion and sediment controls to minimize the discharge of pollutants. At a minimum, such controls must be designed, installed and maintained to:

1.) Control stormwater volume and velocity to minimize soil erosion in order to minimize pollutant discharges;
2.) Control stormwater discharges, including both peak flowrates and total stormwater volume, to minimize channel and streambank erosion and scour in the immediate vicinity of discharge points;
3.) Minimize the amount of soil exposed during construction activity;
4.) Minimize the disturbance of steep slopes;
5.) Minimize sediment discharges from the site. The design, installation and maintenance of erosion and sediment controls must address factors such as the amount, frequency, intensity and duration of precipitation, the nature of resulting stormwater runoff, and soil characteristics, including the range of soil particle sizes expected to be present on the site;
6.) Provide and maintain natural buffers as described in Section 4.1.2, direct stormwater to vegetated areas and maximize stormwater infiltration to reduce pollutant discharges, unless infeasible;
7.) Minimize soil compaction. Minimizing soil compaction is not required where the intended function of a specific area of the site dictates that it be compacted; and
8.) Unless infeasible, preserve topsoil. Preserving topsoil is not required where the intended function of a specific area of the site dictates that the topsoil be disturbed or removed.

### 4.1.2.     Water Quality Riparian Buffer Zone Requirements

The water quality riparian buffer zone requirements in this section apply to all streams with available parameters adjacent to construction sites (for waters with

AR 006999



unavailable parameters or Exceptional Tennessee Waters, see Section 6.4.2). A 30-foot natural water quality riparian buffer shall be preserved between such waterbodies and the disturbed areas, to the maximum extent practicable, during construction activities. The water quality riparian buffer is required to protect waters of the state that are not wet weather conveyances as identified using Tennessee's standard operating procedures for hydrologic determinations set forth in Tennessee Rules, Chapter 0400-40-03-.05(9).[6] Because of the potential heavy sediment loading associated with construction site runoff, water quality riparian buffers are not primary sediment control measures and shall not be relied on as such; the primary purpose of water quality riparian buffers is additional pollutant removal. Stormwater discharges must enter the water quality riparian buffer zone as sheet flow, not as concentrated flow, where site conditions allow. Rehabilitation and enhancement of a natural buffer zone is allowed, if necessary, to improve its effectiveness in protecting waters of the state.

The water quality riparian buffer zone should be preserved between the top of stream bank and the disturbed construction area. The 30-foot criterion for the width of the buffer zone can be established on an average width basis at a project, as long as the minimum width of the buffer zone is more than 15 feet at any measured location. If the construction site encompasses both sides of a stream, buffer averaging can be applied to both sides, but each side must average the 30-foot criterion independently.

Construction activities within the water quality riparian buffer zone shall be avoided and existing forested buffer areas shall be preserved whenever possible. Where it is not practicable to maintain a full water quality riparian buffer, BMPs providing equivalent protection to a receiving stream as a natural water quality riparian buffer must be used. A justification for use and a design of equivalent BMPs shall be included in the SWPPP. Such equivalent BMPs are expected to be routinely used at construction projects typically located adjacent to surface waters. These projects may include sewer line construction, roadway construction, utility line or equipment installation, greenway construction, construction of a permanent outfall or a velocity dissipating structure.

---

[6] If obtaining permit coverage for the first time following the effective date of this permit, 15-foot buffers are also required for any wet weather conveyance identified as waters of the United States by the U.S. Army Corps of Engineers or the Environmental Protection Agency.

This requirement does not apply to any valid Aquatic Resources Alteration Permit (ARAP), or equivalent permits issued by federal authorities. Additional buffer zone requirements may be established by the local MS4 program.

4.1.2.1.   Water quality riparian buffer zone exemption based on existing uses

Water quality riparian buffer zones as described in Section 4.1.2 shall not be required in portions of the buffer where certain land uses exist and are to remain in place according to the following:

a)  A use shall be considered existing if it was present within the buffer zone as of the date of the Notice of Intent for coverage under the construction general permit. Existing uses may include buildings, parking lots, roadways, utility lines and on-site sanitary sewage systems. Only the portion of the buffer zone that contains the footprint of the existing land use is exempt from buffer zones. Activities necessary to maintain uses are allowed provided that no additional vegetation is removed from the buffer zone.

b)  If an area with an existing land use is proposed to be converted to another use or the impervious surfaces located within the buffer area are being removed, buffer zone requirements shall apply.

4.1.2.2.   Pre-approved sites

Construction activity at sites that were pre-approved prior to February 1, 2010, is exempt from the buffer requirements of Section 4.1.2. Evidence of pre-approval for highway projects shall be a final right-of-way plan; and, for other construction projects, the final design drawings with attached written and dated approval by the local, state or federal agency with authority to approve such design drawings for construction.

**4.1.3.   Dewatering**

Discharges from dewatering activities, including discharges from dewatering of trenches and excavations, are prohibited unless managed by appropriate controls. Appropriate controls may include weir tanks, dewatering tanks, gravity bag filters, sand media particulate filters, pressurized bag filters, cartridge filters or other control units providing the level of treatment necessary to comply with permit requirements.

JA2865

**4.1.4.    Pollution Prevention Measures**

The permittee must design, install, implement and maintain effective pollution prevention measures to minimize the discharge of sediment and other pollutants. At a minimum, such measures must be designed, installed, implemented and maintained to:

a)  Minimize the discharge of pollutants from equipment and vehicle washing, wheel wash water and other wash waters not containing soaps or solvents. Wash waters must be treated in a sediment basin or alternative control that provides equivalent or better treatment prior to discharge;

b)  Minimize the exposure of building materials, building products, construction wastes, trash, landscape materials, fertilizers, pesticides, herbicides, detergents, sanitary waste and other materials present on the site to precipitation and to stormwater; and

c)  Minimize the discharge of pollutants from spills and leaks, and implement chemical spill and leak prevention and response procedures.

**4.1.5.    Prohibited Discharges**

The following discharges are prohibited:

a)  Wastewater from washout of concrete, unless managed by an appropriate control.

b)  Wastewater from washout and cleanout of stucco, paint, form release oils, curing compounds and other construction materials.

c)  Fuels, oils or other potential pollutants used in vehicle and equipment operation and maintenance.

d)  Soaps or solvents used in vehicle and equipment washing.

# PART 5

## 5.    STORMWATER POLLUTION PREVENTION PLAN (SWPPP) REQUIREMENTS

### 5.1.    THE GENERAL PURPOSE OF THE SWPPP

A SWPPP must be prepared and submitted along with the NOI as required in Section 1.4.2. The primary permittee must implement the SWPPP and maintain effective Best Management Practices (BMPs) from commencement of construction activity until permanent stabilization is complete, or until the permittee does not have design or operational control of any portion of the construction site. If a SWPPP submittal contains contradictory or ambiguous information, the division will hold the permittee to the most stringent interpretation of the information submitted. Requirements for termination of site coverage are provided in Part 9.

A site-specific SWPPP must be developed for each construction project or activity covered by this permit. The design, inspection and maintenance of BMPs described in the SWPPP must be prepared in accordance with good engineering practices. At a minimum, BMPs shall be consistent with the recommendations contained in the current edition of the Tennessee Erosion and Sediment Control Handbook (the handbook).

Once a definable area has been permanently stabilized as described in Subsection 5.5.3.4, the permittee may identify this area on the SWPPP. No further SWPPP or inspection requirements apply to that portion of the site (e.g., earth-disturbing activities around one of three buildings in a complex are done and the area is permanently stabilized, one mile of a roadway or pipeline project is done and permanently stabilized, etc.).

For more effective implementation of BMPs, a cooperative effort by the different operators at a site to prepare and participate in a site-wide SWPPP is expected. Primary permittees at a site may develop separate SWPPPs that cover only their portion of the project. In instances where there is more than one SWPPP for a site, the permittees must ensure the stormwater discharge controls and other measures are compatible with one another and do not prevent another operator from complying with permit conditions. The site-wide SWPPP developed and submitted by the primary permittee must assign responsibilities to secondary permittees and coordinate all BMPs at the construction site. Assignment and coordination can be done by name or by job title.

**5.2.    QUALIFICATION REQUIREMENTS**

For sites greater than five acres of disturbance, the narrative portion of the SWPPP shall be prepared by an individual who has a working knowledge of erosion prevention and sediment controls, such as (but not limited to):

- a registered engineer or landscape architect,
- a Certified Professional in Erosion and Sediment Control (CPESC) or
- a person that successfully completed the "Level II Design Principles for Erosion Prevention and Sediment Control for Construction Sites" course.

For sites less than or equal to five acres of disturbance, these qualification requirements do not apply, and the division provides the following optional templates:

- Form CN-1249, the Stormwater Pollution Prevention Plan (SWPPP) for Single Family Residential Homebuilding Sites. This SWPPP template is available at: http://tdec.tn.gov/etdec/DownloadFile.aspx?row_id=CN-1249.    Form CN-1249 is not appropriate if significant grading of the lot or lots is necessary.
- SWPPP Template for Sites Not Requiring Engineer Design from the DWR – NR – G – 02 - Construction Stormwater – 05172019 Guidance regarding construction stormwater general permit coverage involving sites with Non-Engineer Design SWPPPs: https://www.tn.gov/content/dam/tn/environment/water/policy-and-guidance/dwr-nr-g-02-cgp-non-engineering-swppp-final-051719.pdf Attachment A (template): https://www.tn.gov/content/dam/tn/environment/water/policy-and-guidance/dwr-nr-g-02-cgp-non-engineering-swppp-final-051719-template.docx.

Plans and specifications for any building or structure, changes in topography and drainage, including the design or modification of sediment basins or other sediment controls involving structural, hydraulic, hydrologic or other engineering calculations shall be prepared by a professional engineer or landscape architect registered in Tennessee and signed and sealed in accordance with the Tennessee Code Annotated, Title 62, Chapter 2 and the rules of the Tennessee Board of Architectural and Engineering Examiners. Engineering design of sediment basins or equivalent sediment controls must be provided for construction sites involving

drainage to an outfall totaling 10 or more acres (Subsection 5.5.3.5) or 5 or more acres if draining to waters with unavailable parameters or Exceptional Tennessee Waters (Section 6.4.1).

## 5.3. SWPPP PREPARATION AND COMPLIANCE

### 5.3.1. Existing Sites

Operators of an existing site, presently permitted under the division's 2016 construction general permit, shall maintain full compliance with the existing SWPPP. The existing SWPPP shall be modified, if necessary, to meet requirements of this new general permit, and the SWPPP changes implemented as soon as practicable but no later than 12 months following the new permit effective date. The permittee shall make the updated SWPPP available for the division's review upon request.

### 5.3.2. New Sites or New Phases of Existing Sites

For construction stormwater discharges not authorized under an NPDES permit as of the effective date of this permit, a SWPPP that meets the requirements of Part 5 of this permit shall be prepared and submitted along with the NOI and an appropriate fee for coverage under this permit.

### 5.3.3. Signature Requirements

The SWPPP shall be signed by the operators in accordance with Subpart 8.7, and if applicable, certified according to requirements in Section 5.2. Signatures on electronically submitted documents are deemed equivalent to original signatures. A SWPPP that does not bear a valid signature will be deemed incomplete.

### 5.3.4. SWPPP Availability

A copy of the existing version of the SWPPP shall be retained on-site at the location which generates the stormwater discharge in accordance with Part 7 of this permit. If the site is inactive or does not have an onsite location adequate to store the SWPPP, the location of the SWPPP, along with a contact phone number, shall be posted on-site. If the SWPPP is located off-site, reasonable local access to the plan during normal working hours must be provided.

The permittee shall make the existing SWPPP and inspection reports available upon request to the director; the local agency approving erosion prevention and sediment control plans, grading plans, land disturbance plans or stormwater management plans; or the operator of an MS4.



## 5.4.    KEEPING SWPPP CURRENT

### 5.4.1.    SWPPP Modifications

The permittee must modify, update and recertify the SWPPP if any of the following conditions apply:

a)  Whenever there is a change in the scope of the project that would be expected to have a significant effect on the discharge of pollutants to the waters of the state and which has not otherwise been addressed in the SWPPP.

b)  Whenever there is a change in chemical treatment methods, including the use of different treatment chemical, different dosage or application rate or different area of application.

c)  Whenever inspections or investigations by site operators or local, state or federal officials indicate the SWPPP is proving ineffective in eliminating or significantly minimizing pollutants from sources identified under Section 5.5.2, or is otherwise not achieving the general objectives of controlling pollutants in stormwater discharges associated with construction activity. Where local, state or federal officials determine that the SWPPP is ineffective in eliminating or significantly minimizing pollutant sources, a copy of any correspondence to that effect must be retained in the SWPPP.

d)  Whenever any new operator (typically a secondary permittee) who will implement a measure of the SWPPP must be identified (see Subpart 3.1.1 for further description of which operators must be identified).

e)  Whenever it is necessary to include water quality protection measures as required by the applicable wildlife management agency intended to prevent a negative impact to legally protected state or federally listed fauna or flora (or species proposed for such protection – Subpart 1.3). Amendments to the SWPPP may be reviewed by the division, a local MS4, the EPA, or an authorized regulatory agency.

f)  Whenever a Total Maximum Daily Load (TMDL) is developed for the receiving waters for a pollutant of concern (e.g., siltation). A list of Tennessee's TMDLs can be found at:
https://www.tn.gov/environment/program-areas/wr-water-resources/watershed-stewardship/tennessee-s-total-maximum-daily-load--tmdl--program.html.

AR  007006

## 5.5.    COMPONENTS OF THE SWPPP

The SWPPP must:

a) identify all potential sources of pollutants likely to affect the quality of stormwater discharges from the construction site;
b) describe practices to be used to reduce pollutants in stormwater discharges from the construction site; and
c) assure compliance with the terms and conditions of this permit.

The SWPPP shall include the items described in Sections 5.5.1, 5.5.2 and 5.5.3.

### 5.5.1.    SWPPP Narrative

Each SWPPP shall provide a description of pollutant sources and other information as indicated below:

a) A description of all construction activities at the site, including the intended sequence of activities which disturb soils for major portions of the site (e.g., grubbing, excavation, grading, utilities and infrastructure installation).
b) Estimates of the total area of the site and the total area that is expected to be disturbed by excavation, grading, filling or other construction activities.
c) A description of the topography of the site, including an estimation of percent slope and delineation of drainage area (acres) serving each outfall. Drainage area estimates shall include off-site drainage, if applicable.
d) Hydric soils must be clearly identified.
e) A description of how the runoff will be handled to prevent erosion at the permanent outfall and receiving stream.
f) An erosion prevention and sediment control (EPSC) plan with the proposed construction area clearly outlined. The plan shall indicate the boundaries of the permitted area, drainage patterns, approximate slopes anticipated after major grading activities, areas of soil disturbance, an outline of areas which are not to be disturbed, the location of major structural and nonstructural controls identified in the SWPPP, the location of areas where stabilization practices are expected to occur, streams and sinkholes, and identification on the erosion control plan of outfall points intended for coverage. The erosion control plan must meet requirements stated in Section 5.5.3.
g) A description of any discharge associated with industrial activity other than construction stormwater that originates on site and the location of that activity and its permit number.



h) Identification of any streams on or adjacent to the project, a description of any anticipated alteration of these waters and the permit number or the tracking number of the Aquatic Resources Alteration Permit (ARAP) or Section 401 Certification issued for the alteration.

i) The name of the receiving waters (this does not include wet weather conveyances connecting the site discharge to the receiving stream).

j) Identification if those receiving waters have unavailable parameters for siltation.[7]

k) Identification if those receiving waters are Exceptional Tennessee Waters.[8]

l) If applicable, clearly identify and outline the buffer zones established to protect waters of the state located within the boundaries of the project.

m) A description of the construction phasing for projects of more than 50 acres (Subsection 5.5.3.2).

n) The timing of the planting of the vegetation cover must be discussed in the SWPPP if permanent or temporary vegetation is to be used as a control measure. Planting cover vegetation during winter months or dry months should be avoided.

### 5.5.2. SWPPP and EPSC plans

The SWPPP must include EPSC plans (Section 5.5.3) showing the approximate location of each control measure and a description of when the measure will be implemented during the construction process (e.g., prior to the start of earth disturbance, as the slopes are altered and after major grading is finished). The different stages of construction and the EPSC measures that will be utilized during each stage shall be depicted on multiple plan sheets as described below.

Three separate EPSC plan sheets should be developed for most sites, with the exception of single-lot homes, commercial lots, or linear infrastructure projects of less than or equal to 5 acres, for which a single plan sheet may be sufficient:

a. The first plan sheet will address the EPSC measures necessary to manage stormwater runoff, erosion and sediment during the initial land disturbance (grading) stage.

---

[7] DWR Construction Stormwater Permitting Map Viewer can be found at: https://tdeconline.tn.gov/dwrcgp/
[8] List of Exceptional Waters and ORNWs in Tennessee can be found at: https://tdec.tn.gov:8090/pls/enf_reports/f?p=9034:34304; corresponding map viewer is under development

    b. A second plan sheet will address the EPSC measures necessary to manage stormwater runoff, erosion and sediment during any interim grading and construction stages.

    c. The third plan sheet will address the EPSC measures necessary to manage stormwater runoff, erosion and sediment during the final grading stage while permanent site stabilization is being achieved.

The description and implementation of controls shall address the following minimum components, as described in Sections 5.5.3, 5.5.3.6 and 5.5.3.7. Additional controls may be necessary to comply with Section 6.3.2.

## 5.5.3. Erosion Prevention and Sediment Controls (EPSC)

5.5.3.1. Underline: General criteria and requirements

    a) The erosion prevention controls shall be designed to eliminate to the maximum extent practicable the dislodging and suspension of soil in water. Sediment controls shall be designed to retain mobilized sediment on site to the maximum extent practicable.

    b) All control measures must be properly selected, installed and maintained in accordance with the manufacturer's specifications and/or good engineering practices. If periodic inspections or other information indicate a control has been used inappropriately, or incorrectly, the permittee must replace or modify the control.

    c) If sediment escapes the permitted area, off-site accumulations that have not reached a stream must be removed at a frequency sufficient to minimize off-site impacts (e.g., sediment that has escaped a construction site and collected in a street must be removed so that it does not subsequently wash into storm sewers and streams during the next rain or so that it does not pose a safety hazard to users of public streets). Permittees shall not initiate remediation or restoration of a stream without receiving prior authorization from the division. This permit does not authorize access to private property. Arrangements concerning the removal of sediment on adjoining property must be settled by the permittee and the adjoining landowner.

    d) Sediment must be removed from sediment traps, silt fences, sediment basins and other sediment controls when design capacity has been reduced by 50%.

    e) Erodible material storage areas (e.g., overburden and stockpiles of soil) and borrow pits that are used primarily for the permitted project are considered a part of the site and shall be identified on the NOI, addressed in the SWPPP and included in the fee calculation. TDOT projects shall be addressed in the Waste and Borrow Manual per the Statewide Stormwater Management Plan (SSWMP).

f) Pre-construction vegetative ground cover shall not be destroyed, removed or disturbed more than 14 days prior to commencement of grading or earth moving activities unless the area is subsequently temporarily or permanently stabilized.

g) Clearing and grubbing must be held to the minimum necessary for grading and equipment operation. Existing vegetation at the site shall be preserved to the maximum extent practicable. The limits of soil disturbance shall be clearly outlined in the SWPPP and the areas to remain undisturbed clearly indicated on the site, with the methods to be used to mark these areas described in the SWPPP.

h) Construction must be sequenced to minimize the exposure time of graded or denuded areas.

i) EPSC measures must be in place and functional before earth moving operations begin and must be constructed and maintained throughout the construction period stages as appropriate. Temporary measures may be removed at the beginning of the workday but must be replaced at the end of the workday.

j) Off-site vehicle tracking of sediment and the generation of dust shall be minimized. A stabilized construction access shall be described and implemented to reduce the tracking of mud and dirt onto public roads by construction vehicles.

## 5.5.3.2. Construction phasing

Construction phasing is recommended on all projects regardless of size as an effective practice for minimizing erosion and limiting sedimentation. It is recommended that construction be phased to keep the total disturbed area less than 50 acres at any one time. This includes off-site borrow or disposal areas that meet the conditions of Section 1.2.2. Areas where construction is completed must be stabilized within 14 days (Subsection 5.5.3.4).

## 5.5.3.3. Projects Exceeding 50 acres of Disturbance

On projects where the permittee chooses to disturb more than 50 acres at one time, the following additional requirements shall apply:

a) The permittee shall notify the division immediately if more than 50 acres of disturbance at one time is planned.

b) Site assessments, as described in Subsection 5.5.3.8, shall be conducted on a quarterly basis.

c) Operator inspections as described in Subsection 5.5.3.9 shall be conducted twice per week and following any rainfall event of more than 0.5 inches in

Case: 23-3682    Document: 56-6    Filed: 08/19/2024    Page: 500

**TN** Department of
**Environment &
Conservation**

**Tennessee General NPDES Permit No. TNR100000
Stormwater Discharges from Construction Activities**

24 hours. Inspections following rainfall events can be counted as one of the twice-weekly inspections.

d) Data describing the erodibility of soils on site, how the soil type erodibility will dictate the needed control measures and how the soil may affect the expected quality of runoff from the site shall be provided. The data may be referenced or summarized. Hydric soils must be clearly identified.

e) A geospatial file shall be submitted to the division which identifies the project area boundaries as a polygon feature. This polygon feature can be submitted in any common data format (e.g., .kml file, shapefile, feature layer, etc.) that is compatible with common geographic systems software (e.g., Google Earth, ESRI, QGIS, etc.). The file name should reflect the same site name provided on the permit application, or a permit tracking number, if available.

f) Stormwater runoff monitoring shall be conducted at each outfall draining 10 or more acres (Section 5.5.3.5) or 5 or more acres if draining to waters with unavailable parameters or Exceptional Tennessee Waters (Section 6.4.1).

| Code | Parameter | Qualifier | Unit | Sample Type | Monitoring Frequency | Statistical Base |
|---|---|---|---|---|---|---|
| 00070 | Turbidity | Report | NTU | Grab | Monthly | Daily Maximum |
| 00070 | Turbidity | Report | NTU | Grab | Monthly | Monthly Average |
| 00530 | Total Suspended Solids (TSS) | Report | mg/L | Grab | Monthly | Daily Maximum |
| 00530 | Total Suspended Solids (TSS) | Report | mg/L | Grab | Monthly | Monthly Average |
| 45613 | Floating solids or visible foam-visual | Report | Y=1;N=0 | Visual | Monthly | Value |
| 50050 | Flow | Report | MGD | Estimate | Monthly | Daily Maximum |
| 50050 | Flow | Report | MGD | Estimate | Monthly | Monthly Average |

The permittee shall maintain a log of rainfall events including date, estimated duration (in hours), and total estimated rainfall per calendar day. For sampling events, the permittee shall provide an estimate of the total volume of the discharge per sampled outfall and the interval between the storm event sampled and the end of the previous measurable (greater than 0.1 inch rainfall) storm event.



The permittee shall report the estimated total drainage area and estimated acreage of land disturbance in the drainage area for each outfall for each sampling event. Record of the estimated drainage area and amount of land disturbance for a given sample event shall be reported in the notes section of the Discharge Monitoring Report.

5.5.3.4.    Stabilization practices

The SWPPP shall include a description of temporary and permanent stabilization practices, including site-specific scheduling of the implementation of the practices. Site plans should ensure that existing vegetation is preserved when possible. Stabilization practices may include: temporary seeding, permanent seeding, mulching, geotextiles, sod stabilization, vegetative buffer strips, protection of trees and the preservation of mature vegetation. When seasonal or climate conditions would prevent timely establishment of vegetation other stabilization practices must be utilized. Use of impervious surfaces for permanent stabilization in lieu of a permanent vegetative cover should be avoided where practicable. No stabilization control measures or EPSC measures are to be installed in a stream without obtaining a Section 404 permit and an Aquatic Resources Alteration Permit (ARAP).

Stabilization measures shall be initiated as soon as possible in portions of the site where construction activities have temporarily or permanently ceased. Temporary or permanent soil stabilization at the construction site must be completed within 14 days after the construction activity in that portion of the site has temporarily or permanently ceased. In the following situations, temporary stabilization measures are not required:

a)   Where the initiation of stabilization measures is precluded by snow cover or frozen ground conditions or adverse soggy ground conditions, stabilization measures shall be initiated as soon as practicable.
b)   Where construction activity on a portion of the site is temporarily ceased, but soil disturbing activities is planned to resume within 2weeks.
c)   In arid, semiarid, and drought-stricken areas where initiating vegetative stabilization measures immediately is infeasible, alternative stabilization measures such as properly anchored mulch, soil binders or matting must be employed.

Steep slopes shall be stabilized within one week after construction activity on the slope has temporarily or permanently ceased.

AR  007012



Permanent stabilization with perennial vegetation (using native herbaceous and woody plants where practicable) or other permanently stable, non-eroding surface shall replace any temporary measures as soon as practicable. Unpacked gravel containing fines (silt and clay sized particles) or crusher runs will not be considered a non-eroding surface. On sites where disturbed acreage will be returned to its prior agricultural use (i/e. row crops, pasture) normal agricultural practices can be substituted.

5.5.3.5.    Structural practices

The SWPPP shall include a description of structural practices utilized to divert flows from exposed soils, store flows or otherwise limit runoff and discharge of pollutants from exposed areas of the site. Such practices may include, but are not limited to silt fences, earth dikes, drainage swales, sediment traps, check dams, subsurface drains, pipe slope drains, level spreaders, storm drain inlet protection, rock outlet protection, reinforced soil retaining systems, gabions and temporary or permanent sediment basins. Structural controls shall not be placed in streams except as authorized by a section 404 permit and/or Aquatic Resources Alteration Permit (ARAP).

EPSC measures shall be designed to minimize erosion and maximize sediment removal resulting from a 2-year, 24-hour storm (the design storm). The design of erosion prevention and sediment controls must adhere to good engineering practices. The drainage area recommendations and treatment design specifications are provided in the Tennessee Erosion and Sediment Control Handbook. Chemical treatment of the stormwater runoff may be necessary to minimize the amount of sediment being discharged when clay and other fine particle soils or highly erodible soils are present at the construction site. However, the use of cationic polymers for treatment is prohibited.

For an outfall that receives drainage from 10 or more acres, a minimum sediment basin volume that will provide treatment for a calculated volume of runoff from a 2-year, 24-hour storm and runoff from each acre drained, or equivalent control measures as specified in the Tennessee Erosion and Sediment Control Handbook, shall be provided until permanent stabilization of the site. A drainage area of 10 or more acres includes disturbed and undisturbed portions of the site and areas adjacent to the site, all draining through the common outfall. Where an equivalent control measure is substituted for a sediment basin, the equivalency (with respect to sediment removal) must be justified to the division. Runoff from any undisturbed acreage should be diverted around the disturbed area and the sediment basin. Diverted runoff can be omitted from the volume calculation.



Sediment storage expected from the disturbed areas must be included. Discharges from basins and impoundments shall utilize outlet structures that only withdraw water from near the surface of the basin or impoundment, unless infeasible.

All calculations related to drainage areas, runoff coefficients, basin volumes and equivalent control measures must be provided in the SWPPP. The discharge structure from a sediment basin must be designed to retain sediment during the lower flows in accordance with the most current version of the Tennessee Erosion and Sediment Control Handbook. Muddy water to be pumped from excavation and work areas must be held in settling basins, filtered or chemically treated prior to its discharge into surface waters. Water must be discharged through a pipe, grassed or lined channel or other equivalent means so that the discharge does not cause erosion and sedimentation. Discharged water must not cause an objectionable color contrast with the receiving stream.

Sediment structures treating drainage areas in excess of 25 acres require a site-specific design that accurately defines the site hydrology, site-specific sediment loading, hydraulics of the site, and adheres to all Tennessee Erosion and Sediment Control Handbook design recommendations for sediment basins.

Velocity dissipation structures shall be installed if needed to provide for non-erosive discharge velocities to wet weather conveyances or streams.

5.5.3.6.  Stormwater management

The following factors must be accounted for in the design of all stormwater controls:

a) The nature of stormwater runoff and run-on at the site, including factors such as expected flow from impervious surfaces, slopes, and site drainage features. Stormwater controls must be designed to control stormwater volume, velocity, and peak flow rates to minimize discharges of pollutants in stormwater, as well as minimizing channel and streambank erosion at discharge points.

b) The soil type and range of soil particle sizes expected to be present on the site.

c) Description of any measures that will be installed during the construction process to control pollutants in stormwater discharges that will occur after construction operations have been completed, including a brief

AR 007014

description of applicable State or local erosion and sediment control requirements.

5.5.3.7.  <u>Other items needing control</u>

a)  No solid materials, including building materials, shall be placed in waters of the state, except as authorized by a section 404 permit and/or Aquatic Resources Alteration Permit (<u>ARAP</u>). Litter, construction debris and construction chemicals exposed to <u>stormwater</u> shall be picked up prior to storm events or before being carried off the site by wind so that they do not become a pollutant source for <u>stormwater discharges</u>. EPSC materials shall be prevented from becoming a pollutant source for <u>stormwater discharges</u>.

b)  The SWPPP shall identify and provide the necessary EPSC measures for the installation of any waste disposal system, sanitary sewer or septic system. Permittees must also comply with applicable state and local waste disposal, sanitary sewer or septic system regulations as necessary.

c)  The SWPPP shall include a description of construction and waste materials expected to be stored on-site. The SWPPP shall also include a description of controls used to reduce pollution from materials stored on site. Controls may include storage practices to minimize exposure of the materials to <u>stormwater</u> or spill prevention and response.

5.5.3.8.  <u>Site Assessments</u>

Site assessment shall be conducted at each <u>outfall</u> draining 10 or more acres (Section 5.5.3.5) or 5 or more acres if draining to <u>waters with unavailable parameters</u> or <u>Exceptional Tennessee Waters</u> (Section 6.4.1). The site assessment is a documented site inspection conducted by a qualified individual to verify the installation, functionality and performance of the EPSC measures described in the SWPPP. Site assessments shall cover the <u>entire disturbed area</u> and occur within 30 days of construction commencing at each portion of the site that drains the qualifying acreage. The site assessment shall be performed by individuals with one or more of the following qualifications:

1.  A licensed professional engineer or landscape architect;

2.  A Certified Professional in Erosion and Sediment Control (CPESC); or

3.  A person who has successfully completed the "Level II Design Principles for Erosion Prevention and Sediment Control for Construction Sites"



At a minimum, site assessments should be performed to verify the installation, functionality and performance of the EPSC measures described in the SWPPP. If structural BMPs (or equivalent EPSC measures) are not constructed or construction is in progress at the time of the site assessment, a follow-up monthly assessment(s) are required until the BMPs are constructed per the SWPPP. The site assessment should be performed with the inspector and should include a review and update (if applicable) of the SWPPP. Modifications of plans and specifications for any building or structure, including the design of sediment basins or other sediment controls involving structural, hydraulic, hydrologic or other engineering calculations shall be prepared by a licensed professional engineer or landscape architect and stamped and certified in accordance with the Tennessee Code Annotated, Title 62, Chapter 2 and the rules of the Tennessee Board of Architectural and Engineering Examiners.

5.5.3.9.    Inspections

Operators shall ensure proper installation, maintenance, and overall effectiveness of erosion prevention and sediment controls (EPSCs) by performing twice weekly site inspections. Inspections must verify and document the functionality and performance of the EPSC measures described in the SWPPP. Initial inspections shall also indicate if all EPSCs have been installed as designed in the submitted SWPPP and EPSC plans; and, if not, measures that need to be taken so those EPSCs meet the design specifications in the field SWPPP and EPSC plans.

5.5.3.10.    Inspector qualifications

Twice weekly inspections can be performed by:

a) a person with a valid certification from the "Level I - Fundamentals of Erosion Prevention and Sediment Control" course,
b) a licensed professional engineer or landscape architect,
c) a Certified Professional in Erosion and Sediment Control (CPESC), or
d) a person who has successfully completed the "Level II - Design Principles for Erosion Prevention and Sediment Control for Construction Sites" course.

An inspector performs and documents the required inspections, paying particular attention to time-sensitive permit requirements, such as stabilization and maintenance activities.

AR 007016



5.5.3.11.   Schedule of inspections

a) Inspections described in paragraphs b, c and d below, shall be performed at least twice weekly. Inspections shall be performed at least 72 hours apart. Where sites or portions of construction sites have been temporarily stabilized, inspections only have to be conducted once per month until construction activity resumes. Inspection requirements do not apply to definable areas that have been permanently stabilized. Changes to the inspection frequency and the justification for such request must be included in the records kept on site. For projects by the Tennessee Department of Transportation (TDOT) and the Tennessee Valley Authority (TVA), such request must be submitted to the division's Nashville Central Office. The division reserves the right to require more frequent inspections if deemed necessary to ensure compliance at a site.

b) Qualified personnel, as defined in Subsection 5.5.3.10 (provided by the permittee or cooperatively by multiple permittees), shall inspect disturbed areas of the construction site that have not been permanently stabilized, areas used for storage of materials that are exposed to precipitation, structural control measures, locations where vehicles enter or exit the site and each outfall.

c) Disturbed areas and areas used for storage of materials that are exposed to precipitation shall be inspected for evidence of, or the potential for, pollutants entering the site's drainage system. EPSC measures shall be observed to ensure that they are operating correctly.

d) Outfall points shall be inspected to determine whether EPSC measures are effectively preventing sediment discharges off-site or impacts to receiving waters. Where discharge locations are inaccessible, nearby downstream locations shall be inspected. Locations where vehicles enter or exit the site shall be inspected for evidence of offsite sediment tracking.

e) Based on the results of the inspection, any inadequate control measures or control measures in disrepair shall be replaced, modified or repaired as necessary, before the next rain event; but in no case more than seven days after the need is identified.

f) Based on the results of the inspection, the site description identified in the SWPPP in accordance with Section 5.5.1 and pollution prevention measures identified in the SWPPP in accordance with Section 5.5.3 shall be revised as appropriate. Such revisions shall be made no later than seven days following the inspection. In addition, any modifications to pollution prevention measures shall be implemented as soon as practicable but no later than 14 days following the inspection.



g) All inspections shall be documented on the *Construction Stormwater Inspection Certification Form* provided in Appendix C of this permit. An alternative inspection form may be used as long as the form contents and the inspection certification language are equivalent to the division's form and the permittee has obtained a written approval from the division to use the alternative form. The form must contain the printed name and signature of the inspector and the certification must be executed by a person who meets the signatory requirements of Section 8.7.2. Inspection reports must be submitted to the division within 10 days of the request.

h) Inspectors shall accurately document site conditions in their inspection reports. Falsifying inspection records, or other documentation; or failure to complete inspection documentation shall result in a violation of this permit and any other applicable acts or rules.

i) The initial primary permittee (such as a developer) is no longer required to inspect portions of the site that are covered by a subsequent primary permittee (such as a home builder). Subsequent primary permittees who have obtained coverage under this permit shall conduct twice weekly inspections as per the requirements in Subsection 5.5.3.9.

5.5.3.12. Pollution prevention measures for non-stormwater discharges

The SWPPP must identify source(s) of all non-stormwater discharge(s) listed in Section 1.2.3 if it is to be combined with stormwater discharges associated with construction activity. The SWPPP shall identify and ensure the implementation of appropriate pollution prevention measures for the non-stormwater components of the discharge. Any non-stormwater must be discharged through stable discharge structures. Estimated volume of the non-stormwater components of the discharge must be included in the design of all impacted control measures.

# PART 6

## 6. SPECIAL CONDITIONS, MANAGEMENT PRACTICES, AND OTHER NON-NUMERIC LIMITATIONS

### 6.1. RELEASES IN EXCESS OF REPORTABLE QUANTITIES

The discharge of hazardous substances or oil in the stormwater discharges from a facility shall be prevented or minimized in accordance with the applicable SWPPP for the facility. This permit does not relieve the permittee of the reporting requirements of 40 CFR 117 and 40 CFR 302.

### 6.2. SPILLS

This permit does not authorize the discharge of hazardous substances or oil resulting from an on-site spill.

### 6.3. DISCHARGE COMPLIANCE WITH STATE WATER QUALITY STANDARDS

#### 6.3.1. Violation of water quality standards

This permit does not authorize stormwater or other discharges that would cause or contribute to a violation of a state water quality standard (Tennessee State Rules, Chapters 0400-40-03, 0400-40-04). Such discharges constitute a violation of this permit.

Where a discharge is already authorized under this permit and the division determines the discharge to cause or contribute to the violation of applicable state water quality standards, the division will notify the operator of such violations. The permittee shall take all necessary actions to ensure future discharges do not cause or contribute to the violation of a water quality standard and shall document these actions in the SWPPP.

#### 6.3.2. Discharge quality

a) The construction activity shall be carried out in such a manner that will prevent violations of water quality criteria as stated in the Tennessee Rules, Chapter 0400-40-03-.03. This includes, but is not limited to, the prevention of any discharge that causes a condition in which visible solids, bottom deposits or turbidity impair the usefulness of waters of the state for any of the uses designated for that water body by Tennessee Rules, Chapter 0400-40-04. Construction activity carried out in the manner required by

JA2883



this permit shall be considered in compliance with the Tennessee Rules, Chapter 0400-40-03-.03.

b) There shall be no distinctly visible solids, scum, foam, oily slick, or the formation of slimes, bottom deposits, or sludge banks of such size or character as may be detrimental to fish and aquatic life.

c) The stormwater discharge must not contain total suspended solids, turbidity, or color in such amounts or character that will result in any objectionable appearance compared to the turbidity or color of the receiving water, considering the nature and location of the water.

d) The stormwater discharge shall not contain pollutants in quantities that will be hazardous or otherwise detrimental to humans, livestock, wildlife, plant life, or fish and aquatic life in the receiving stream. This provision includes species covered under Subpart 1.3.

e) Solids or other materials removed by any sediment control treatment devices must be disposed of in a manner that prevents its entrance into or pollution of any surface or subsurface waters.

## 6.4.    DISCHARGES INTO WATERS WITH UNAVAILABLE PARAMETERS OR EXCEPTIONAL TENNESSEE WATERS

### 6.4.1.    SWPPP/BMP Requirements

a) Discharges that would cause measurable degradation of waters with unavailable parameters or that would cause more than de minimis degradation of Exceptional Tennessee Waters are not authorized by this permit (Subpart 1.3). To be eligible to obtain and maintain coverage under this permit, the operator must satisfy, at a minimum, the following additional requirements for discharges into waters with unavailable parameters for siltation and for discharges to Exceptional Tennessee Waters[9]. All other provisions of this general permit that apply to receiving waters with available parameters shall also apply.

b) The SWPPP must certify that EPSC measures used at the site are designed to control stormwater runoff generated by a 5-year, 24-hour storm event (the design storm), at a minimum, either from total rainfall in the designated period or the equivalent intensity as specified on the following website https://hdsc.nws.noaa.gov/hdsc/pfds/pfds_map_cont.html.

---

[9] or discharges upstream of such waters and because of the proximity to the segment and the nature of the discharge is likely to cause more than de minimis degradation in the unavailable or exceptional segment.



c) The permittee shall perform inspections described in Section 5.5.3.9 at least twice every calendar week. Inspections shall be performed at least 72 hours apart.

d) If the division finds that an operator is contributing to the impairment of a receiving stream despite complying with the SWPPP, the operator will be notified by the division in writing that the discharge is no longer eligible for coverage under the general permit. The operator may update the SWPPP and implement the necessary changes designed to eliminate further impairment of the receiving stream. If the permittee does not implement the SWPPP changes within seven days of receipt of notification, the permittee will be notified in writing that continued discharges must be covered by an individual permit (Subpart 8.11). To obtain the individual permit, the operator must file an individual permit application and submit an updated SWPPP. The project must be stabilized immediately and remain stable until the SWPPP is updated and the individual permit is issued. Only discharges from earth disturbing activities necessary for stabilization are authorized to continue until the individual permit is issued.

e) For an on-site outfall in a drainage area totaling five or more acres, a minimum sediment basin volume that will provide treatment for a calculated volume of runoff from a 5-year, 24-hour storm and runoff from each acre drained; or equivalent control measures as specified in the Tennessee Erosion and Sediment Control Handbook, shall be provided until permanent stabilization of the site.

f) For an on-site outfall in a drainage area totaling 3.5 - 4.9 acres, a minimum sediment trap volume or engineering equivalent that will provide treatment for a calculated volume of runoff from a 5-year, 24-hour storm and runoff from each acre drained, is required until permanent stabilization of the site. A drainage area of 3.5 - 4.9 acres includes both disturbed and undisturbed portions of the site or areas adjacent to the site, all draining through the common outfall.

## 6.4.2. Water Quality Riparian Buffer Zone Requirements

Sites that contain, or are adjacent to, receiving waters with unavailable parameters for siltation or designated as Exceptional Tennessee Waters shall preserve a 60-foot natural water quality riparian buffer zone adjacent to the receiving stream. All other buffer zone requirements as stated in Section 4.1.2 will apply.



The natural water quality riparian buffer zone shall be preserved between the top of stream bank and the disturbed construction area. The 60-foot criterion for the width of the buffer can be established on an average width basis at a project, as long as the minimum width of the buffer is more than 30 feet at any measured location. If the construction site encompasses both sides of a stream, buffer averaging can be applied to both sides, but each side must average the 60-foot criterion independently.

This requirement does not apply to an area that is being altered under the authorization of a valid Aquatic Resources Alteration Permit (ARAP), or equivalent permits issued by federal authorities. Additional natural buffer zone requirements may be established by the local MS4 program.

# PART 7

## 7. RETENTION, ACCESSIBILITY AND SUBMISSION OF RECORDS

### 7.1. DOCUMENTS

The primary permittee shall retain copies of SWPPPs, reports required by this permit, records of all data used to complete the NOI and the NOT for a period of at least three years from the date the NOT is submitted. This period may be extended by written request of the director.

### 7.2. ACCESSIBILITY AND RETENTION OF RECORDS

The permittee shall retain a copy of the SWPPP and a copy of the permit at the construction site (or other location accessible to the division) from the date construction commences to the date of termination of permit coverage. Permittees with day-to-day operational control over SWPPP implementation shall have a copy of the SWPPP available at a central location onsite for the use of all operators and those identified as having responsibilities under the plan whenever they are on the construction site.

#### 7.2.1. Posting Information at the Construction Site

A notice shall be posted near the main entrance of the construction site visible to the public with the following information:

a) a copy of the NOC with the NPDES permit tracking number for the construction project;
b) a name or company name; E-mail address (if available); telephone number and address of the project site owner/operator or a local contact person; and
c) the location of the SWPPP (Subpart 7.2).

The notice must be maintained in a legible condition. The notice shall be posted in a local public building if posting this information near a main entrance is infeasible due to safety concerns or if the site is not accessible to the public. If the construction project is a linear construction project (e.g., pipeline or highway), the notice must be placed in a publicly accessible location near where construction is actively underway and moved as necessary. This permit does not provide the public with any right to trespass on a construction site for any reason, including inspection of a site. This permit does not require permittees to allow members of the public access to a construction site.

JA2887



The permittee shall also retain the following items in an appropriate location on-site (or other location accessible to the division):

a) A rain gauge (or use a reference site for a record of daily precipitation) and accurate rainfall records;
b) A copy of all required inspection reports; and
c) Records of the dates when major grading activities occur, when construction activities temporarily or permanently cease on a portion of the site, and when stabilization measures are initiated.

**7.3.    ELECTRONIC SUBMISSION OF DOCUMENTS**

This permit requires the submission of forms developed by the director in order for a person to comply with certain requirements, including, but not limited to, making reports, submitting inspection findings, applying for permit coverage and requesting for termination of permit coverage. The director may make these forms available electronically and, if submitted electronically, then that electronic submission shall comply with the requirements of Chapter 0400-01-40. Electronic submission may be required when available, unless waived by the Commissioner in accordance with 40 C.F.R. § 127.15.

If the division notifies applicants by mail, E-mail, public notice or by making information available on the world wide web of electronic forms (see NPDES Electronic Reporting), the operators may be required to use those electronic options to submit the NOI (Section 3.3.2)

In the event of large-scale emergencies and/or prolonged electronic reporting system outages, an episodic electronic reporting waiver may be granted by the Commissioner in accordance with 40 CFR § 127.15. A request for a deadline extension or episodic electronic reporting waiver should be submitted to DWRWater.Compliance@tn.gov, in compliance with the Federal NPDES Electronic Reporting Rule.

In the event that NPDES Electronic Reporting is not functioning, the permittee shall comply with reporting conditions by mailing reports with wet-ink original signatures shall to the following address:



*STATE OF TENNESSEE*
*DEPARTMENT OF ENVIRONMENT AND CONSERVATION*
*DIVISION OF WATER RESOURCES*
*COMPLIANCE & ENFORCEMENT UNIT*
*William R. Snodgrass - Tennessee Tower*
*312 Rosa L. Parks Avenue, 11th Floor*
*Nashville, Tennessee 37243-1102*

For purposes of determining compliance with this permit, data provided to the division electronically is legally equivalent to data submitted on signed and certified forms. A copy must be retained for the permittee's files.

### 7.3.1.  Monitoring Results

Monitoring results (if applicable, for projects exceeding 50 acres of disturbance at one time, see Subsection 5.5.3.3) shall be recorded monthly and submitted monthly using NetDMR. Submittals shall be no later than 15 days after the completion of the reporting period. If NetDMR is not functioning, a completed DMR with an original signature shall be submitted to the address for Compliance and Enforcement Unit as listed in the Subpart 7.3 above. The first DMR is due on the 15th of the month following permit effectiveness.

DMRs must be signed and certified by a responsible corporate officer as defined in Tennessee Rule 0400-40-05-.05(6), a general partner or proprietor, or a principal municipal executive officer or ranking elected official, or his duly authorized representative. Such authorization must be submitted in writing and must explain the duties and responsibilities of the authorized representative.

JA2889

# PART 8

## 8.    STANDARD PERMIT CONDITIONS

### 8.1.    DUTY TO COMPLY

#### 8.1.1.    Duty to Comply

The permittee must comply with all conditions of this permit. Any permit noncompliance constitutes a violation of the Tennessee Water Quality Control Act (TWQCA) and is grounds for an enforcement action, permit termination, revocation and reissuance, modification; or for denial of a permit renewal application.

#### 8.1.2.    Penalties

Pursuant to T.C.A. § 69-3-115 of The Tennessee Water Quality Control Act of 1977, as amended:

a) Any person who violates an effluent standard or limitation or a water quality standard established under this part (T.C.A. § 69-3-101, et. seq.); violates the terms or conditions of this permit; fails to complete a filing requirement; fails to allow or perform an entry, inspection, monitoring or reporting requirement; violates a final determination or order of the board, panel or commissioner; or violates any other provision of this part or any rule or regulation promulgated by the board, is subject to a civil penalty of up to ten thousand dollars ($10,000) per day for each day during which the act or omission continues or occurs.

b) Any person unlawfully polluting the waters of the state or violating or failing, neglecting, or refusing to comply with any of the provisions of this part (T.C.A. § 69-3-101, et. seq.) commits a Class C misdemeanor. Each day upon which such violation occurs constitutes a separate offense.

c) Any person who willfully and knowingly falsifies any records, information, plans, specifications, or other data required by the board or the commissioner, or who willfully and knowingly pollutes the waters of the state, or willfully fails, neglects or refuses to comply with any of the provisions of this part (T.C.A. § 69-3-101, et. seq.) commits a Class E felony and shall be punished by a fine of not more than twenty-five thousand dollars ($25,000) or incarceration, or both.

### 8.1.3.    Civil and criminal liability

Nothing in this permit shall be construed to relieve the discharger from civil or criminal penalties for noncompliance. Notwithstanding this permit, the discharger shall remain liable for any damages sustained by the State of Tennessee, including but not limited to fish kills and losses of aquatic life and/or wildlife, as a result of the discharge to any surface or subsurface waters. Additionally, notwithstanding this permit, it shall be the responsibility of the discharger to conduct stormwater discharge activities in a manner such that public or private nuisances or health hazards will not be created. Furthermore, nothing in this permit shall be construed to preclude the State of Tennessee from any legal action or relieve the discharger from any responsibilities, liabilities, or penalties established pursuant to any applicable state law or the Federal Water Pollution Control Act.

### 8.1.4.    Liability Under State Law

Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties established pursuant to any applicable local, state or federal law.

### 8.2.    CONTINUATION OF THE EXPIRED GENERAL PERMIT

Permittees shall maintain coverage under this general permit until a new general permit is issued.

Operator(s) of an existing site permitted under the division's 2016 construction general permit shall maintain full compliance with the existing SWPPP. The existing SWPPP shall be modifiedaccording to the Section 5.3.1 of this permit.

### 8.3.    NEED TO HALT OR REDUCE ACTIVITY NOT A DEFENSE

It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit.

### 8.4.    DUTY TO MITIGATE

The permittee shall take all reasonable steps to minimize or prevent any discharge in violation of this permit that has a reasonable likelihood of adversely affecting human health or the environment.

JA2891

**8.5.    DUTY TO PROVIDE INFORMATION**

The permittee shall furnish to the division or an authorized representative of the division, within a time specified by the division, any information that the division may request to determine compliance with this permit or other information relevant to the protection of the waters of the state. The permittee shall also furnish to the division, upon request, copies of records required to be kept by this permit.

**8.6.    OTHER INFORMATION**

When the permittee becomes aware that he or she failed to submit any relevant facts or submitted incorrect information in the Notice of Intent or in any other report to the director, he or she shall promptly submit such facts or information.

**8.7.    SIGNATORY REQUIREMENTS**

All NOIs, SWPPPs, NOTs, Construction Stormwater Inspection Certifications, Construction Stormwater Monitoring Report forms, reports, certifications or information either submitted to the director or the operator of a large or medium Municipal Separate Storm Sewer System (MS4) shall be signed as described in Sections 8.7.1 and 8.7.2 and dated.

**8.7.1.    Signatory Requirements for an NOI[10]**

The NOI shall be signed as follows:

a) For a corporation, by a responsible corporate officer. For the purpose of this section, a responsible corporate officer means:

   i. a president, secretary, treasurer, or vice-president of the corporation in charge of a principal business function, or any other person who performs similar policy or decision-making functions for the corporation, or

   ii. the manager of one or more manufacturing, production, or operating facilities, provided, the manager is authorized to make management decisions which govern the operation of the regulated site including having the explicit or implicit duty of making major capital investment recommendations, and initiating and directing other comprehensive

---

[10] As specified in 40 CFR 122.22(a)(1)-(3) [48 FR 14153, Apr. 1, 1983, as amended at 48 FR 39619, Sept. 1, 1983; 49 FR 38047, Sept. 29, 1984; 50 FR 6941, Feb. 19, 1985; 55 FR 48063, Nov. 16, 1990; 65 FR 30907, May 15, 2000]

AR  007028

measures to assure long term environmental compliance with environmental laws and regulations; the manager can ensure that the necessary systems are established or actions taken to gather complete and accurate information for permit application requirements; and where authority to sign documents has been assigned or delegated to the manager in accordance with corporate procedures.

b) For a general partnership, by each general partner in the general partnership,

c) For a sole proprietorship, by the proprietor,

d) For a municipality, state, federal, or other public agency, by either a principal executive officer or ranking elected official. For purposes of this section, a principal executive officer of a Federal agency includes:

  i.   the chief executive officer of the agency, or

  ii.  a senior executive officer having responsibility for the overall operations of a principle geographic unit of the agency (e.g., Regional Administrators of EPA).

NOTE: The division does not require specific assignments or delegations of authority to responsible corporate or municipal, state, federal, or other public agency officers. The division will presume that these officers have the requisite authority to sign permit applications unless the entity has notified the director to the contrary. Procedures governing authority to sign permit applications may provide for assignment or delegation to applicable positions rather than to specific individuals.

### 8.7.2. Signatory Requirements for SWPPPs, Reports and Other Items

SWPPPs, Construction Stormwater Inspection Certification forms, reports, certifications or other information submittals required by the permit and other information requested by the division, including but not limited to Notice of Violation responses, shall be signed by a person described in Section 8.7.1, or by a duly authorized representative of that person.

### 8.7.3. Duly Authorized Representative

For a purpose of satisfying signatory requirements for reports (Section 8.7.2), a person is a duly authorized representative only if:

a) the authorization is made in writing by a person described in Section 8.7.1;

b) the authorization specifies an individual having responsibility for the overall operation of the regulated site or activity such as the position of

JA2893

AR 007029

plant manager, superintendent, position of equivalent responsibility, or an individual or position having overall responsibility for environmental matters for the company; a duly authorized representative may thus be either a named individual or any individual occupying a named position; and

c) the written authorization is submitted to the director or an appropriate EFO. The written authorization shall be a written document including the name of the newly authorized person or any individual occupying a named position as described in paragraph b) above, and the corresponding contact information (title, mailing address, phone number and E-mail address) for the authorized person or position. The written authorization shall be signed by the newly authorized person accepting responsibility and by the person described in Section 8.7.1 delegating the authority.

### 8.7.4.  Changes to Authorization

If an authorization under Sections 8.7.1 or 8.7.3 is no longer accurate because a different individual or position has responsibility as the primary or secondary permittee, but the company name (permittee name) remains the same, a new NOI and SWPPP certification shall be submitted and signed by the new party who meets signatory authority satisfying the requirements of Sections 8.7.1 or 8.7.3 . The NOI shall include the new individual's information (title, mailing address, phone number and E-mail address), the existing tracking number and the project name.

### 8.7.5.  Signatory Requirements for Primary Permittees

Primary permittees required to sign an NOI and SWPPP because they meet the definition of an operator (Subpart 2.1) shall sign the following certification statement on the NOI and on the SWPPP:

*"I certify under penalty of law that this document and all attachments were prepared by me, or under my direction or supervision. The submitted information is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment. As specified in Tennessee Code Annotated Section 39-16-702(a)(4), this declaration is made under penalty of perjury."*

**8.7.6.    Signatory Requirements for Secondary Permittees**

Secondary permittees required to sign an NOI and SWPPP because they meet the definition of an operator but who are not primarily responsible for preparing an NOI and SWPPP, shall sign the following certification statement on the NOI and on the SWPPP:

> *"I certify under penalty of law that I have reviewed this document, any attachments, and the SWPPP referenced above. Based on my inquiry of the construction site owner/developer identified above and/or my inquiry of the person directly responsible for assembling this NOI and SWPPP, I believe the information submitted is accurate. I am aware that this NOI, if approved, makes the above-described construction activity subject to NPDES permit number TNR100000, and that certain of my activities on-site are thereby regulated. I am aware that there are significant penalties, including the possibility of fine and imprisonment for knowing violations, and for failure to comply with these permit requirements. As specified in Tennessee Code Annotated Section 39-16-702(a)(4), this declaration is made under penalty of perjury."*

**8.8.    OIL AND HAZARDOUS SUBSTANCE LIABILITY**

Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties to which the permittee is or may be subject to Section 311 of the Clean Water Act or Section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA).

**8.9.    PROPERTY RIGHTS**

The issuance of this permit does not convey any property rights of any sort, or any exclusive privileges; nor does it authorize any injury to private property, any invasion of personal rights or any infringement of federal, state or local laws or regulations. The issuance of this permit does not authorize trespassing or discharges of stormwater or non-stormwater across private property.

**8.10.    SEVERABILITY**

The provisions of this permit are severable, and if any provision of this permit, or the application of any provision of this permit to any circumstance, is held invalid, the application of such provision to other circumstances, and the remainder of this permit shall not be affected thereby.

JA2895

AR 007031

**8.11.    INDIVIDUAL PERMITS**

**8.11.1.    Required Individual Permit Coverage**

The director may require any person covered by this permit to apply for and obtain an individual NPDES permit to ensure adequate protection of designated uses of a receiving stream. Any interested person may petition the director in writing to take action under this paragraph but must include in their petition the justification for such an action. Where the director requires a discharger authorized to discharge under this permit to apply for an individual NPDES permit, the director shall notify the discharger in writing that an individual permit application is required. This notification will include a brief statement of the reasons for this decision, an application form, a statement setting a deadline for the discharger to file the application and a statement that coverage under this general permit shall terminate upon the effective date of an individual NPDES permit; or denial of coverage under an individual permit. An individual NPDES permit is required only when additional permit terms or conditions beyond those set forth herein are necessary to protect water quality. Criteria for the division to require an individual NPDES permit may include, but are not limited to:

a) Due to unique site conditions the discharge may result in greater than de minimis degradation, or a threat to threatened or endangered aquatic or semi-aquatic species.

b) The total acreage to be disturbed and/or total drainage area to an outfall may exceed the capability of standard EPSCs and other BMPs to prevent pollution to waters.

c) Steep grades or erosive soil conditions warrant site-specific controls that exceed the conditions of the CGP.

d) Other site-specific conditions, such as contaminated soils or public lands.

The notification may require stabilization of the site and suspend coverage under this general permit until the individual permit is issued. Individual permit applications and updated SWPPP shall be submitted to the appropriate Environmental Field Office of the division as indicated in Subpart 3.4. The director may grant additional time to submit the application upon request of the applicant. If a discharger fails to submit in a timely manner an individual NPDES permit application as required by the director under this paragraph, then the applicability of this permit to the discharger will be terminated at the end of the day specified by the director for application submittal.

If the decision to require an individual NPDES permit precedes the issuance of coverage under this general permit, earth disturbing activities cannot begin until the individual permit is issued.

### 8.11.2.    Permittee-Requested Individual Permit Coverage

Any discharger authorized by this permit may request to be excluded from the coverage of this permit by applying for an individual permit. Any discharger that knowingly cannot abide by the terms and conditions of this permit must apply for an individual permit. In such cases, the permittee shall submit an individual application in accordance with the requirements of 40 CFR 122.26(c)(1)(ii), with reasons supporting the request, and a SWPPP to the appropriate division's Environmental Field Office. The request may be granted by issuance of an individual permit, or alternative general permit, if the reasons cited by the permittee are adequate to support the request.

### 8.11.3.    General Permit Termination

When an individual NPDES permit is issued to a discharger otherwise subject to this permit, or the discharger is authorized to discharge under an alternative NPDES general permit, the applicability of this permit to the discharger is terminated on the effective date of the individual permit or the date of authorization of coverage under the alternative general permit, whichever the case may be. When an individual NPDES permit is denied to an owner or operator otherwise subject to this permit, or the owner or operator is denied for coverage under an alternative NPDES general permit, the applicability of this permit to the individual NPDES permittee is terminated on the date of such denial, unless otherwise specified by the director. Coverage under the Tennessee Multi-Sector General Permit for the Discharge of Stormwater from an Industrial Activity (TMSP) will not be considered as an alternative general permit under this section without being specified by the director.

### 8.12.    OTHER, NON-STORMWATER, PROGRAM REQUIREMENTS

No condition of this permit shall release the permittee from any responsibility or requirements under other environmental statutes or regulations.

### 8.13.    PROPER OPERATION AND MAINTENANCE

The permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related equipment) which are installed or used by the permittee to achieve compliance with the conditions of this permit and with the requirements of SWPPPs.

AR 007033



Proper operation and maintenance requires the operation of backup or auxiliary facilities or similar systems, installed by a permittee, when determined by the permittee or the division to be necessary to achieve compliance with the conditions of the permit.

## 8.14.    INSPECTION AND ENTRY

The permittee shall allow authorized representatives of the Environmental Protection Agency, the director or an authorized representative of the commissioner of TDEC, or, in the case of a construction site which discharges through a municipal separate storm sewer, an authorized representative of the MS4 receiving the discharge, upon the presentation of credentials and other documents as may be required by law:

    a) to enter upon the permittee's premises where a regulated facility or activity is located or conducted or where records must be kept under the conditions of this permit;

    b) to have access to and copy at reasonable times, any records that must be kept under the conditions of this permit; and

    c) to inspect any facilities or equipment, including monitoring and control equipment.

## 8.15.    PERMIT ACTIONS

This permit may be issued, modified, revoked, reissued or terminated for cause in accordance with this permit and the applicable requirements of T.C.A. § 69-3-108. The filing of a request by the permittee for a permit modification, revocation and reissuance, or termination, or a notification of planned changes or anticipated noncompliance does not stay any permit condition.

# PART 9

## 9.     REQUIREMENTS FOR TERMINATION OF COVERAGE

### 9.1.     TERMINATION OF DEVELOPER AND BUILDER COVERAGE

#### 9.1.1.     Termination Process for Primary Permittees

Primary permittees wishing to terminate coverage under this permit must submit a completed Notice of Termination (NOT) form provided in Appendix B of this permit (representative photo or video documentation of site stabilization is recommended). Electronic submittal is encouraged (see NPDES Electronic Reporting for more information). Primary permittees who abandon a site and fail to submit the NOT will be in violation of this permit. If the NOT was not submitted five years following the "estimated end date" (as identified on the NOI), the division can terminate the CGP coverage, unless the permittee specifically requests to maintain coverage. Signs notifying the public of the construction activity shall be in place until the NOT form has been submitted. Primary permittees may terminate permit coverage only if the conditions described below occur at the site:

a) For areas where the primary permittee has control, all earth-disturbing activities and, if applicable, construction support activities permitted under Section 1.2.2 at the site are complete and the following requirements are met:

   i.   For any areas that were disturbed during construction, are not covered by permanent structures and over which the permittee had control during the construction activities; the requirements for permanent vegetation or non-vegetative stabilization described in Subsection 5.5.3.4 are met;

   ii.  The permittee has removed and properly disposed of all construction materials, as well as waste and waste handling devices. The permittee has removed all equipment and vehicles that were used during construction, unless they are intended for long-term use following termination of permit coverage;

   iii. The permittee has removed all stormwater controls that were installed and maintained during construction, except those that are intended for long-term use following termination of permit coverage;

   iv.  The permittee has identified in the SWPPP who is responsible for ongoing maintenance of any stormwater controls left on the site for long-term use following termination of permit coverage, and

   v.   The groundcover achieves permanent stabilization.

JA2899



     b) The permittee has transferred control of all areas of the site for which he is responsible (including, but not limited to, infrastructure, common areas, stormwater drainage structures, sediment control basin) under this permit to another operator, and that operator has submitted an NOI and obtained coverage under this permit.

     c) The permittee obtains coverage under an individual or alternative general NPDES permit.

### 9.1.2. NOT Review

The division may review NOTs for completeness and accuracy and, when necessary, investigate the proposed site for which the NOT was submitted. Coverage under the permit is terminated when the permit record is published on TDEC's DataViewer as "Inactive." Operators may be liable for discharges that occur from the site after termination.

The division retains the right to deny termination of coverage under this general permit upon receipt of the NOT. If the local Environmental Field Office has information indicating that the permit coverage is not eligible for termination, written notification will be provided within 30 days of receipt that permit coverage has not been terminated. The notification will include a summary of existing deficiencies. When the site meets the termination criteria, the NOT should be re-submitted.

If any permittee files for bankruptcy or the site is foreclosed on by the lender, the permittee shall notify the division of the situation so that the division may assess the site to determine if permit coverage should be obtained by any other person or whether other action is needed.

### 9.2. TERMINATION OF BUILDER AND CONTRACTOR COVERAGE

### 9.2.1. Termination Process for Secondary Permittees

Secondary permittees must request termination of coverage under this permit by submitting a NOT when they are no longer an operator at the construction site. Electronic submittal is encouraged (see NPDES Electronic Reporting for more information). Secondary permittees receive coverage under this permit but are not normally mailed a NOC. Consequently, the division may, but is not required to, notify secondary permittees that their notice of termination has been received. If the division has reason to believe that the secondary permittee's NOT should

not have been submitted, the division will deny the secondary permittee's NOT in writing, with specific reasons as to why the NOT should not have been submitted.

## 9.3.    NOT CERTIFICATION

The NOT and the following certification must be signed in accordance with Subpart 8.7 of this permit:

> *"I certify under penalty of law that either: (a) all stormwater discharges associated with construction activity from the portion of the identified facility where I was an operator have ceased or have been eliminated or (b) I am no longer an operator at the construction site. I understand that by submitting this notice of termination, I am no longer authorized to discharge stormwater associated with construction activity under this general permit, and that discharging pollutants in stormwater associated with construction activity to waters of the state is unlawful under the Tennessee Water Quality Control Act where the discharge is not authorized by a NPDES permit. I also understand that the submittal of this notice of termination does not release an operator from liability for any violations of this permit or the Tennessee Water Quality Control Act. I certify under penalty of law that this document and all attachments were prepared by me, or under my direction or supervision. The submitted information is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment. As specified in Tennessee Code Annotated Section 39-16-702(a)(4), this declaration is made under penalty of perjury."*

## 9.4.    WHERE TO SUBMIT A NOT?

Electronic submittal is encouraged (see [NPDES Electronic Reporting](#) for more information). Otherwise, the NOT shall be submitted to the Environmental Field Office (EFO) which issued the NOC to the primary permittee. A list of counties and the corresponding EFOs is provided in Subpart 3.4. The appropriate permit tracking number must be clearly printed on the form.

AR  007037

# PART 10

## 10.    DEFINITIONS, ACRONYMS AND RESOURCES

## 10.1.    DEFINITIONS

| | |
|---|---|
| 2-year 24-hour<br>5-year 24-hour | **2-year and 5-year design storm depths and intensities**<br>The estimated design rainfall amounts, for any return period interval (i.e., 2-yr, 5-yr, 25-yr, etc.,) in terms of either 24-hour depths or intensities for any duration, can be found by accessing the data available at https://hdsc.nws.noaa.gov/hdsc/pfds/pfds_map_cont.html. Other data sources may be acceptable with prior written approval by TDEC Division of Water Resources. |
| ARAP | **Aquatic Resource Alteration Permit**<br>Persons who wish to make an alteration to a stream, river, lake or wetland must first obtain a water quality permit. Physical alterations to properties of waters of the state require an ARAP or a §401 Water Quality Certification (§401 certification). Examples of stream alterations that require a permit from the division include:<br>• Dredging, excavation, channel widening, or straightening<br>• Bank sloping; stabilization<br>• Channel relocation<br>• Water diversions or withdrawals<br>• Dams, weirs, dikes, levees or other similar structures<br>• Flooding, excavating, draining and/or filling a wetland<br>• Road and utility crossings<br>• Structural fill<br>General ARAPs are developed and maintained by the division to provide a streamlined, expedited means of authorizing projects that singularly or cumulatively propose minor impacts to water resources. |
| BMP | **Best Management Practices** ("BMPs") means schedules of activities, prohibitions of practices, maintenance procedures and other management practices to prevent or reduce the discharge of pollutants to waters of the state. BMPs also include treatment requirements, operating procedures; and practices to control plant site runoff, |



|  | spillage, leaks, sludge or waste disposal, or drainage from raw material storage. BMPs include source control practices (non-structural BMPs) and engineered structures designed to treat runoff.<br>Structural BMPs are facilities that help prevent pollutants in stormwater runoff from leaving the site.<br>Non-structural BMPs are techniques, activities and processes that reduce pollutants at the source. |
|---|---|
| borrow pit | **Borrow Pit** is an excavation from which erodible material (typically soil) is removed to be fill for another site. There is no processing or separation of erodible material conducted at the site. Given the nature of activity and pollutants present at such excavation, a borrow pit is considered a construction activity for the purpose of this permit. |
| buffer zone | **Buffer Zone** or **Water Quality Riparian Buffer** is a permanent strip of natural perennial vegetation, adjacent to a stream, river, wetland, pond, or lake that contains dense vegetation made up of grass, shrubs, and/or trees. The purpose of a water quality riparian buffer is to maintain existing water quality by minimizing risk of any potential sediments, nutrients or other pollutants reaching adjacent surface waters and to further prevent negative water quality impacts by providing canopy over adjacent waters |
| clearing | **Clearing** refers to removal of vegetation and disturbance of soil prior to grading or excavation in anticipation of construction activities. Clearing may also refer to wide area land disturbance in anticipation of non-construction activities. Clearing, grading and excavation do not refer to clearing of vegetation along existing or new roadways, highways, dams or power lines for sight distance or other maintenance and/or safety concerns, or cold planing, milling, and/or removal of concrete and/or bituminous asphalt roadway pavement surfaces. The clearing of land for agricultural purposes is exempt from federal stormwater NPDES permitting in accordance with Section 401(1)(1) of the 1987 Water Quality Act and state stormwater NPDES permitting in accordance with the Tennessee Water Quality Control Act of 1977 (T.C.A. 69-3-101 et seq.). |

| commencement | **Commencement of construction:** the initial disturbance of soils associated with clearing, grading, excavating or other construction activities. |
|---|---|
| common plan | **Common plan of development or sale** is broadly defined as any announcement or documentation (including a sign, public notice or hearing, sales pitch, advertisement, drawing, permit application, zoning request, computer design) or physical demarcation (including boundary signs, lot stakes, surveyor markings) indicating construction activities may occur on a specific plot. A common plan of development or sale identifies a situation in which multiple areas of disturbance are occurring on contiguous areas. This applies because the activities may take place at different times, on different schedules, by different operators. |
| control measure | **Control measure** refers to any Best Management Practice (BMP) or other method used to prevent or reduce the discharge of pollutants to waters of the state. |
| CWA | **CWA** means the Clean Water Act of 1977 or the Federal Water Pollution Control Act (33 U.S.C. 1251, et seq.) |
| director | **Director** means the director, or authorized representative, of the Division of Water Resources of the State of Tennessee, Department of Environment and Conservation. |
| degradation | **Degradation** means the alteration of the properties of waters by the addition of pollutants, withdrawal of water, or removal of habitat, except those alterations of a short duration. |
| de minimis | **De Minimis** is degradation of a small magnitude, as provided in this paragraph:<br>(a)   Discharges and withdrawals:<br>   1.  Subject to the limitation in part 3 of this subparagraph, a single discharge other than those from new domestic wastewater sources will be considered de minimis if it uses less than five percent of the available assimilative capacity for the substance being discharged.<br>   2.  Subject to the limitation in part 3 of this subparagraph, a single water withdrawal will be considered de minimis if it removes less than five percent of the 7Q10 flow of the stream. |

JA2904

|  |  |
|---|---|
|  | 3. If more than one activity described in part 1 or 2 of this subparagraph has been authorized in a segment and the total of the authorized and proposed impacts uses no more than 10% of the assimilative capacity, or 7Q10 low flow, they are presumed to be de minimis. Where the total of the authorized and proposed impacts uses 10% of the assimilative capacity, or 7Q10 low flow, additional degradation may only be treated as de minimis if the Division finds on a scientific basis that the additional degradation has an insignificant effect on the resource.<br><br>(b) Habitat alterations authorized by an Aquatic Resource Alteration Permit (ARAP) are de minimis if the Division finds that the impacts, individually and cumulatively, are offset by impact minimization and/or in-system mitigation, provided however, in Outstanding National Resource Waters (ONRWs) the mitigation must occur within the ONRW. |
| discharge of a pollutant | **Discharge** or **discharge of a pollutant** refers to the addition of pollutants to waters from a source. |
| disturbed area | **Disturbed area** means the total area presented as part of the development (and/or of a larger common plan of development) subject to being cleared, graded, grubbed, filled or excavated during the life of the development. The area cannot be limited to only the portion of the total area that the site-wide owner/developer initially disturbs through the process of various land clearing activities or in the construction of roadways, sewers, drainfields, and water utilities, stormwater drainage structures, etc., to make the property marketable. |
| division | **Division** means the Division of Water Resources of the State of Tennessee, Department of Environment and Conservation |
| exceptional waters | **Exceptional Tennessee Waters** are surface waters designated by the division as having the characteristics set forth at Tennessee Rules, Chapter 0400-40-03-.06(4). Characteristics include waters within parks or refuges; scenic rivers; waters with threatened or endangered species; waters that provide specialized recreational opportunities; waters within areas designated as lands |

| | |
|---|---|
| | unsuitable for mining; waters with naturally reproducing trout; waters with exceptional biological diversity and other waters with outstanding ecological or recreational value. |
| permanent stabilization | **Permanent Stabilization** means that all soil disturbing activities at the site have been completed and one of the three following criteria is met:<br>(1) A perennial, preferably native, vegetative cover with a uniform (i.e., evenly distributed, without large bare areas) density of at least 70 percent has been established on all unpaved areas and areas not covered by permanent structures, and all slopes and channels have been permanently stabilized against erosion.<br>(2) Equivalent permanent stabilization measures such as the use of riprap; permanent geotextiles; hardened surface materials including concrete, asphalt, gabion baskets or Reno mattresses have been employed.<br>(3) For construction projects on land used for agricultural or silvicultural purposes, permanent stabilization may be accomplished by returning the disturbed land to its preconstruction agricultural or silvicultural use. |
| improved sinkhole | **Improved sinkhole** is a natural surface depression that has been altered in order to direct fluids into the hole opening. Improved sinkhole is a type of injection well regulated under the Underground Injection Control (UIC) program. Underground injection constitutes an intentional disposal of waste waters in natural depressions, open fractures and crevices, such as those commonly associated with weathering of limestone. |
| Level 1 | **Level 1 - Fundamentals of Erosion Prevention and Sediment Control** training and certification program administered by University of Tennessee Water Resources Research Center (https://tnepsc.org/index.asp). The Fundamentals course is a foundation-building course intended for individuals involved in land-disturbing activities covered by the Construction General Permit. The course aims to build a working knowledge of erosion and sedimentation processes and practices and is intended for: site inspectors, inspection and enforcement personnel from all levels of government, plan preparers and reviewers, and designers and engineers. Topics include: |

JA2906

| | Construction General Permit and related SWPPP requirements; function, installation, limitations, inspection and maintenance of Best Management Practices; roles of local officials and state government agencies involved in the permitting process; and basic hydrologic and erosion processes. Upon successful completion of a Course Certification Exam, the participant receives a Level 1 TNEPSC certificate. The Level 1 certificate is valid for three full years following the year that the certificate was issued. To meet the requirement for Level 1 certified staff, TDOT may develop and administer an approved equivalent Level1 training and certification program as provided in the TDOT individual MS4 Permit. The equivalent TDOT Level 1 certification is valid only for TDOT staff and for projects where TDOT is the primary site operator. |
|---|---|
| Level 2 | **Level 2 - Design Principles for Erosion Prevention and Sediment Control for Construction Sites** training and certification program administered by University of Tennessee Water Resources Research Center (https://tnepsc.org/index.asp). It is an advanced 2-day workshop designed for engineers and other professionals who have completed the prerequisite Level 1 course. The Level 2 Design workshop provides the general tools needed for developing an acceptable, working SWPPP. Topics discussed in the course include: hydrologic methods for determining peak flows; principles of soil erosion, scouring and sediment transport processes, including practice examples for preventing erosion; and open channel principles and practices for designing a stable channel, including use and examples of riprap, blankets and matting, and vegetation; stormwater control requirements and design; sedimentation principles; and temporary sediment basin design requirements, and detailed examples. The Level 2 Design workshop provides a Certificate of Completion after attending both days and successfully completing the take-home exam. |
| linear project | **Linear Project** is a land disturbing activity as conducted by an underground/overhead utility or highway department, including, but not limited to, any cable line or wire for the transmission of electrical energy; any conveyance pipeline for transportation of gaseous or liquid substance; any |

JA2907



| | |
|---|---|
| | cable line or wire for communications; or any other energy resource transmission ROW or utility infrastructure, e.g., roads and highways. Activities include the construction and installation of these utilities within a corridor. Linear project activities also include the construction of access roads, staging areas and borrow/spoil sites associated with the linear project. Land disturbance specific to the development of residential and commercial subdivisions or high-rise structures is not considered a linear project. |
| measurable degradation | **Measurable Degradation**, as used in the context of discharges or withdrawals, means changes in parameters of waters that are of sufficient magnitude to be detectable by the best available instrumentation or laboratory analyses. |
| month | **Month** or **Monthly** refers to calendar months. |
| MS4 | "**Municipal Separate Storm Sewer System**" or "**MS4**" is defined in 40 CFR §122.26(b)(8) to mean a conveyance or system of conveyances (e.g., roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, manmade channels, or storm drains) that are:<br>a) owned and operated by a state, city, town, borough, county, parish, district, association, or other public body (created by or pursuant to state law) having jurisdiction over disposal of sewage, industrial wastes, stormwater, or other wastes, including special districts under state law such as a sewer district, flood control district or drainage district, or similar entity, or an Indian tribe or an authorized Indian tribal organization, or a designated and approved management agency under section 208 of the CWA that discharges to waters of the United States;<br>b) designed or used for collecting or conveying stormwater;<br>c) not a combined sewer; and<br>d) not part of a Publicly Owned Treatment Works (POTW) as defined in 40 CFR §122.2. |
| operator | **Operator** for the purpose of this permit and in the context of stormwater associated with construction activity, means any person (typically considered the primary permittee) |



|  | associated with a construction project that meets either of the following two criteria:<br><br>a) This person has operational or design control over construction plans and specifications, including the ability to make modifications to those plans and specifications. This person is typically the owner or developer of the project or a portion of the project (e.g., subsequent builder) or the person who is the current owner of the construction site.<br><br>b) This person has day-to-day operational control of those activities at a project which are necessary to ensure compliance with a SWPPP for the site or other permit conditions. This person is typically a contractor or a commercial builder who is hired by the primary permittee and is considered a secondary permittee.<br><br>It is anticipated that at different phases of a construction project, different types of parties may satisfy the definition of "operator" (see Part 2 of this permit). |
|---|---|
| point source (or outfall) | **Point source** means any discernible, confined and discrete conveyance, including but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, landfill leachate collection system, vessel or other floating craft from which pollutants are or may be discharged. This term does not include introduction of pollutants from non-point source agricultural and silvicultural activities, including stormwater runoff from orchards, cultivated crops, pastures, range lands, forest lands or return flows from irrigated agriculture or agricultural stormwater runoff. In short, outfall is a point where runoff leaves the site as a concentrated flow in a discrete conveyance. Phrase "point source" and term "outfall" are used interchangeably in this general permit, and can be considered synonyms. |
| pollutant | **Pollutant** means sewage, industrial wastes, or other wastes. |
| QLP | **Qualifying State, Tribal, or local erosion and sediment control program** is one that includes, as defined in 40 CFR 122.44(s): |

| | |
|---|---|
| | a) Requirements for construction site operators to implement appropriate erosion and sediment control best management practices. <br> b) Requirements for construction site operators to control waste such as discarded building materials, concrete truck washout, chemicals, litter, and sanitary waste at the construction site that may cause adverse impacts to water quality. <br> c) Requirements for construction site operators to develop and implement a stormwater pollution prevention plan. A stormwater pollution prevention plan includes site descriptions, descriptions of appropriate control measures, copies of approved State, Tribal or local requirements, maintenance procedures, inspection procedures and identification of non-stormwater discharges. <br> d) Requirements to submit a site plan for review that incorporates consideration of potential water quality impacts. |
| rainfall | A **rainfall event** is defined as any occurrence of rain preceded by 10 hours without precipitation that results in an accumulation of 0.01 inches or more. Instances of rainfall occurring within 10 hours of each other will be considered a single rainfall event. |
| registered engineer | **Registered Engineer** and **Registered Landscape Architect** An engineer or landscape architect certified and registered by the State Board of Architectural and Engineer Examiners pursuant to Section 62-202, Tennessee Code Annotated, to practice in Tennessee. |
| runoff coefficient | **Runoff coefficient** means the fraction of total rainfall that will appear at the conveyance as runoff. Runoff coefficient is also defined as the ratio of the amount of water that is not absorbed by the surface to the total amount of water that falls during a rainstorm. |
| sediment | **Sediment** means solid material, both inorganic (mineral) and organic, that is in suspension, is being transported; or has been moved from the site of origin by wind, water, gravity or ice as a product of erosion. |
| sediment basin | **Sediment basin** A temporary basin consisting of an embankment constructed across a wet weather |

AR  007046

| | |
|---|---|
| | conveyance, an excavation that creates a basin or by a combination of both. A sediment basin typically consists of a forebay cell, dam, impoundment, permanent pool, primary spillway, secondary or emergency spillway and surface dewatering device. The size and shape of the basin depends on the location, size of drainage area, incoming runoff volume and peak flow, soil type and particle size, land cover, and receiving stream classification (i.e., waters with unavailable parameters, Exceptional TN Waters, or waters with available parameters). |
| sedimentation | **Sedimentation** means the action or process of forming or depositing sediment. |
| soil | **Soil** or **Topsoil** means the unconsolidated mineral and organic material on the immediate surface of the earth that serves as a natural medium for the growth of plants. |
| steep slope | **Steep Slope** or **Steep Grade** means a natural or created slope of 35% grade or greater. Designers of sites with steep slopes must pay attention to stormwater management in the SWPPP to engineer runoff around or over a steep slope so as not to erode the slope. In addition, site managers should focus on erosion prevention on the slopes and stabilize the slopes as soon as practicable to prevent slope failure or sediment discharges from the project. |
| stormwater | **Stormwater** means rainfall runoff, snow melt runoff, and surface runoff and drainage. |
| stream | A **Stream** is a surface water that is not a wet weather conveyance. Therefore, as used in this permit, "stream" includes lakes, wetlands and other non-linear surface waters. |
| construction stormwater | **Stormwater associated with industrial activity** is defined in 40 CFR 122.26(b)(14) and incorporated here by reference. Most relevant to this permit is 40 CFR 122.26(b)(14)(x), which relates to construction activity including clearing, grading, filling and excavation activities, including borrow pits containing erodible material. Disturbance of soil for the purpose of crop production is exempt from permit requirements, but stormwater discharges from agriculture-related activities that involve construction of structures (e.g., barn construction, road construction, pond construction) are considered associated with industrial |

AR 007047

| | activity. Maintenance to the original line and grade, hydraulic capacity; or to the original purpose of the facility (e.g., re-clearing, minor excavation performed around an existing structure necessary for maintenance or repair and repaving of an existing road) is not considered a construction activity for the purpose of this permit. |
|---|---|
| discharge-related activities | **Stormwater discharge-related activities** means activities that cause, contribute to or result in point source stormwater pollutant discharges. These activities may include excavation, site development, grading and other surface disturbance activities; and activities to control stormwater including the siting, construction and operation of best management practices (BMPs). |
| SWPPP | **Stormwater Pollution Prevention Plan** is a written site-specific plan required by this permit that includes a narrative pollution prevention plan and graphical erosion and sediment control plan. In its basic form, the plan contains a site map, a description of construction activities that could introduce pollutants to stormwater runoff, a description of measures or practices to control these pollutants, and erosion and sediment control plans and specifications. It must be prepared and submitted before construction begins. In order to effectively reduce erosion and sedimentation impacts, Best Management Practices (BMPs) must be designed, installed and maintained during land disturbing activities. The SWPPP should be prepared in accordance with the Tennessee Erosion and Sediment Control Handbook. |
| take | **Take** of an endangered species means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or attempt to engage in any such conduct. |
| the handbook | **Tennessee Erosion and Sediment Control Handbook** is a guidance issued by the Division of Water Resources for the purpose of developing Stormwater Pollution Prevention Plans and Erosion and Sediment Control Plans required by the TNCGP.<br>The handbook is designed to provide information to planners, developers, engineers and contractors on the proper selection, installation and maintenance of BMPs. The handbook is intended for use during the design and |

| | construction of projects that require erosion and sediment controls to protect waters of the state. |
|---|---|
| temporary stabilization | **Temporary stabilization** is achieved when vegetation or non-erodible surface has been established on the area of disturbance and construction activity has temporarily ceased. Under certain conditions, temporary stabilization is required when construction activities temporarily cease. However, if future construction activity is planned, permit coverage continues. |
| TMDL | **Total maximum daily load (TMDL)** means the sum of the individual wasteload allocations for point sources and load allocations for nonpoint sources and natural background (40 CFR 130.2(I)). TMDL is a study that quantifies the amount of a pollutant in a stream, identifies the sources of the pollutant and recommends regulatory or other actions that may need to be taken in order for the stream to cease being polluted. TMDLs can also be described by the following equation:<br><br>TMDL = sum of nonpoint sources (LA)+ sum of point sources (WLA)+ margin of safety<br><br>A list of completed TMDLs that have been approved by EPA can be found at our web site: https://www.tn.gov/environment/program-areas/wr-water-resources/watershed-stewardship/tennessee-s-total-maximum-daily-load--tmdl--program.html |
| treatment chemicals | **Treatment chemicals** are polymers, flocculants or other chemicals used to reduce turbidity in stormwater discharges by chemically bonding to suspended silts and other soil materials and causing them to bind together and settle out. Common examples of anionic treatment chemicals are chitosan and anionic PAM. |
| turbidity | **Turbidity** is the cloudiness or haziness of a fluid caused by individual particles (suspended solids) that are generally invisible to the naked eye, similar to smoke in air. |
| waste site | **Waste site** is an area where material from a construction site is disposed of. When the material is erodible, such as soil, the site must be treated as a construction site. |

JA2913

| waters or waters of the state | **Waters** (or waters of the state) means any and all water, public or private, on or beneath the surface of the ground, which are contained within, flow through, or border upon Tennessee or any portion thereof, except those bodies of water confined to and retained within the limits of private property in single ownership which do not combine or effect a junction with natural surface or underground waters. |
|---|---|
| unavailable parameters | **Waters with unavailable parameters** means any segment of surface waters that has been identified by the division as failing to support one or more classified uses. For the purpose of this permit, pollutant of concern is siltation. Based on the most recent assessment information available to staff, the division will notify applicants and permittees if their discharge is into, or is affecting, waters with unavailable parameters. Resources to be used in making this determination include biennial compilations of impaired waters, databases of assessment information, updated GIS coverages (https://tdeconline.tn.gov/dwr/), and the results of recent field surveys. GIS coverages of the streams and lakes not meeting water quality standards, plus the biennial list of waters with unavailable parameters, can be found at https://www.tn.gov/environment/program-areas/wr-water-resources/water-quality/water-quality-reports---publications.html. |
| week | A **one-week period** is a synonym of a **calendar-week**; typically, a period from Sunday through Saturday. |
| wet weather conveyance | **Wet weather conveyances** are man-made or natural watercourses, including natural watercourses that have been modified by channelization, that meet the following: <br> a) The conveyance carries flow only in direct response to precipitation runoff in its immediate locality. <br> b) The conveyance's channels are at all times above the ground water table. <br> c) The flow carried by the conveyance is not suitable for drinking water supplies. <br> d) Hydrological and biological analyses indicate that, due to naturally occurring ephemeral or low flow under normal weather conditions, there is not sufficient water |

JA2914



| | to support fish or multiple populations of obligate lotic aquatic organisms whose life cycle includes an aquatic phase of at least two months. (Tennessee Rules, Chapter 0400-40-3-.04(3)). |
|---|---|

### 10.2.    ACRONYMS AND ABBREVIATIONS

7Q10        7-day minimum, 10-year recurrence interval
ARAP        Aquatic Resource Alteration Permit
BMP         Best Management Practice
BPT         Best Practicable Control Technology Currently Available
CERCLA      Comprehensive Environmental Response, Compensation and Liability Act
CFR         Code of Federal Regulations
CGP         Construction General Permit (this NPDES permit)
CWA         Clean Water Act
EFO         Environmental Field Office (see Subpart 3.4)
EPA         (U.S.) Environmental Protection Agency
EPSC        Erosion Prevention and Sediment Control
MS4         Municipal Separate Storm Sewer System
NOC         Notice of Coverage (see Subpart 1.5)
NOI         Notice of Intent (to be covered by this permit – see Section 1.4.1)
NOT         Notice of Termination (see Part 9)
NPDES       National Pollutant Discharge Elimination System
ONRW        Outstanding National Resource Waters
QLP         Qualifying Local Program (see Section 1.4.5)
SWPPP       Stormwater Pollution Prevention Plan
TDEC        Tennessee Department of Environment and Conservation
TDOT        Tennessee Department of Transportation
TMDL        Total Maximum Daily Load
TMSP        Tennessee Multi-Sector General Permit for the Discharge of Stormwater from an Industrial Activity
TVA         Tennessee Valley Authority
TWQCA       Tennessee Water Quality Control Act
UIC         Underground Injection Control
USGS        United States Geological Survey

## 10.3.    RESOURCES, HYPERLINKS, AND WEB PAGES

Electronic Code of Federal Regulations (eCFR), Title 40 (40 CFR § 1 through § 1099)
https://www.ecfr.gov/cgi-bin/text-idx?SID=75202eb5d09974cab585afeea981220b&mc=true&tpl=/ecfrbrowse/Title40/40chapterI.tpl

Electronic Reporting (NetDMR) Waiver Request
https://www.tn.gov/content/dam/tn/environment/water/documents/wr_ereporting_waiver.pdf

Online Forms
NPDES Electronic Reporting

NPDES Compliance Inspection Manual (EPA)
https://www.epa.gov/sites/production/files/2017-01/documents/npdesinspect.pdf

NPDES Electronic Reporting Rule
https://www.federalregister.gov/documents/2015/10/22/2015-24954/national-pollutant-discharge-elimination-system-npdes-electronic-reporting-rule

Rules of the TN Department of Environment and Conservation, Chapter 0400-40
https://publications.tnsosfiles.com/rules/0400/0400-40/0400-40.htm

TDEC Water Quality Rules, Reports, and Publications
https://www.tn.gov/environment/program-areas/wr-water-resources/water-quality/water-quality-reports---publications.html

Technical Support Document for Water Quality-based Toxics Control (EPA)
https://www3.epa.gov/npdes/pubs/owm0264.pdf

Tennessee Water Resources Data and Map Viewers
https://www.tn.gov/environment/program-areas/wr-water-resources/water-quality/water-resources-data-map-viewers.html

USGS StreamStats
https://www.usgs.gov/mission-areas/water-resources/science/streamstats-streamflow-statistics-and-spatial-analysis-tools?qt-science_center_objects=0#qt-science_center_objects



USGS SWToolbox
https://www.usgs.gov/software/swtoolbox-software-information

*(End of body of permit; appendices follow.)*

AR  007053

# APPENDIX A – NOTICE OF INTENT FORM (NOI)

(See Next Page)

AR 007054



**TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION**
Division of Water Resources
William R. Snodgrass Tennessee Tower, 312 Rosa L. Parks Avenue, 11th Floor
Nashville, TN 37243
Toll Free Number: 1-888-891-8332 (TDEC)

## NOTICE OF INTENT (NOI) FOR GENERAL NPDES PERMIT FOR
## STORMWATER DISCHARGES FROM CONSTRUCTION ACTIVITIES (TNR100000)

| Site or Project Name: | | NPDES Tracking Number: TNR | | |
|---|---|---|---|---|
| Street Address including city or zip code or Location: | | Construction Start Date: | | |
| | | Estimated End Date: | | |
| Site Description: | | Latitude (dd.dddd): | | |
| | | Longitude (-dd.dddd): | | |
| County(ies): | MS4 Jurisdiction (if applicable): | Acres Disturbed: | | |
| | | Total Acres: | | |
| Are there any streams ☐ and/or wetlands ☐ on or adjacent to the construction site? If wetlands are located on-site and may be impacted, attach wetlands delineation report. If an Aquatic Resource Alteration Permit has been obtained for this site, what is the permit number? | | | ARAP Number: | |
| Receiving waters: | | | | |
| Include the SWPPP with the NOI      ☐ SWPPP Included | | Include a site location map      ☐ Map Included | | |

| Name of Site Owner or Developer (Site-Wide Permittee): (correct legal name of person, company, or entity that has operational or design control over construction plans and specifications) | | | | |
|---|---|---|---|---|
| For corporate entities only, provide the Tennessee Secretary of State (SOS) Control Number: | | | | |
| Site Owner or Developer Contact Name: (individual responsible for site) | | Title or Position: (the party who signs the certification below): | | |
| Mailing Address: | | City: | State: | Zip: |
| Phone: ( ) | | E-mail: | | |

| Optional Contact Name: | | Title or Position: | | |
|---|---|---|---|---|
| Mailing Address: | | City: | State: | Zip: |
| Phone: ( ) | | E-mail: | | |

CN-0940 (Rev. 12-21)                                                        RDA 2366

JA2919

AR 007055

| **Owner or Developer Certification:** (must be signed by president, vice-president or equivalent, or ranking elected official) (Primary Permittee) | | |
|---|---|---|
| I certify under penalty of law that this document and all attachments were prepared by me, or under my direction or supervision. The submitted information is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment. As specified in Tennessee Code Annotated Section 39-16-702(a)(4), this declaration is made under penalty of perjury. | | |
| Owner or Developer Name: (print or type) | Signature: | Date: |

| **Contractor(s) Certification:** (must be signed by president, vice-president or equivalent, or ranking elected official) (Secondary Permittee) | | |
|---|---|---|
| I certify under penalty of law that I have reviewed this document, any attachments, and the SWPPP referenced above. Based on my inquiry of the construction site owner/developer identified above and/or my inquiry of the person directly responsible for assembling this NOI and SWPPP, I believe the information submitted is accurate. I am aware that this NOI, if approved, makes the above-described construction activity subject to NPDES permit number TNR100000, and that certain of my activities on-site are thereby regulated. I am aware that there are significant penalties, including the possibility of fine and imprisonment for knowing violations, and for failure to comply with these permit requirements. As specified in Tennessee Code Annotated Section 39-16-702(a)(4), this declaration is made under penalty of perjury. | | |
| Primary contractor name, address, and SOS control number (if applicable): (print or type) | Signature: | Date: |
| Primary contractor name, address, and SOS control number (if applicable): (print or type) | Signature: | Date: |
| Primary contractor name, address, and SOS control number (if applicable): (print or type) | Signature: | Date: |

CN-0940 (Rev. 12-21)          (Instructions on reverse)          RDA 2366

**Page A-3 of 5**

JA2920

**NOTICE OF INTENT (NOI) FOR GENERAL NPDES PERMIT FOR
STORMWATER DISCHARGES FROM CONSTRUCTION ACTIVITIES (TNR100000)**

Purpose of this form: A completed notice of intent (NOI) must be submitted to obtain coverage under the Tennessee General NPDES Permit for Discharges of Stormwater Associated with Construction Activity (permit). **Requesting coverage under this permit means that an applicant has obtained and examined a copy of this permit, and thereby acknowledges applicant's claim of ability to be in compliance with permit terms and conditions.** This permit is required for stormwater discharge(s) from construction activities including clearing, grading, filling and excavating (including borrow pits) of one or more acres of land. This form should be submitted at least 30 days prior to the commencement of land disturbing activities, or no later than 48 hours prior to when a new operator assumes operational control over site specifications or commences work at the site.

The appropriate permit application fee must accompany the NOI and is based on total acreage to be disturbed by an entire project, including any associated construction support activities (e.g., equipment staging yards, material storage areas, excavated material disposal areas, borrow or waste sites):

|  |  |
|---|---|
| (i) Projects equal to or greater than 150 acres | $10,000 |
| (ii) Projects equal to or greater than 50 acres and less than 150 acres | $6,000 |
| (iii) Projects equal to or greater than 20 acres and less than 50 acres | $3,000 |
| (iv) Projects equal to or greater than 5 acres and less than 20 acres | $1,000 |
| (v) Projects equal to or greater than 1 acre and less than 5 acres | $250 |
| (vi) Projects seeking subsequent coverage under an actively covered larger common plan of development or sale | $100 |

There is no fee for sites less than 1 acre. A separate annual maintenance fee is also required for construction activities that exceed 1 year under general permit coverage. Tennessee Rules, Chapter 0400-40-11-.02(b)(12)).

Who must submit the NOI form? Per Section 2 of the permit, all site operators must submit an NOI form. "Operator" for the purpose of this permit and in the context of stormwater associated with construction activity means any person associated with a construction project who meets either or both of the following two criteria: (1) The person has operational or design control over construction plans and specifications, including the ability to make modifications to those plans and specifications. This person is typically the owner or developer of the project or a portion of the project (e.g. subsequent builder), or the person that is the current landowner of the construction site. This person is considered the primary permittee; or (2) The person has day-to-day operational control of those activities at a project which are necessary to ensure compliance with a SWPPP for the site or other permit conditions. This person is typically a contractor or a commercial builder who is hired by the primary permittee and is considered a secondary permittee.

Owners, developers and all contractors that meet the definition of the operator in subsection 2.2 of the permit shall apply for permit coverage on the same NOI, insofar as possible. After permit coverage has been granted to the primary permittee, any separate or subsequent NOI submittals must include the site's previously assigned permit tracking number and the project name. The site-wide site-specific SWPPP shall be prepared in accordance with the requirements of part 5 of the permit and must be submitted with the NOI unless the NOI being submitted is to only add a contractor (secondary permittee) to an existing coverage.

Artificial entities (e.g., corporations or partnerships excluding entities not required to register) must submit the TN Secretary of State, Division of Business Services, control number. The Division reserves the right to deny coverage to artificial entities that are not properly registered and in good standing with the TN Secretary of State.

Notice of Coverage The division will review the NOI for completeness and accuracy and prepare a notice of coverage (NOC). Stormwater discharge from the construction site is authorized as of the effective date of the NOC.

Complete the form Type or print clearly, using ink and not markers or pencil. Answer each item or enter "NA," for not applicable, if a particular item does not fit the circumstances or characteristics of your construction site or activity. If you need additional space, attach a separate piece of paper to the NOI form. **The NOI will be considered incomplete without a permit fee, a map, and the SWPPP.**

Describe and locate the project Use the legal or official name of the construction site. If a construction site lacks street name or route number, give the most accurate geographic information available to describe the location (reference to adjacent highways, roads and structures; e.g. intersection of state highways 70 and 100). Latitude and longitude (expressed in decimal degrees) of the center of the site can be located on USGS quadrangle maps. The maps can be obtained at the USGS World Wide Web site: http://www.usgs.gov/; latitude and longitude information can be found at numerous other web sites. Attach a copy of a portion of a 7.5 minute topographic map, a city map, or a county map showing location of site, with boundaries at least one mile outside the site boundaries. Provide estimated starting date of clearing activities and completion date of the project, and an estimate of the number of acres of the site on which soil will be disturbed, including borrow areas, fill areas, stockpiles and the total acres. For linear projects, give location at each end of the construction area.

Give name of the receiving waters Trace the route of stormwater runoff from the construction site and determine the name of the river(s), stream(s), creek(s), wetland(s), lake(s) or any other water course(s) into which the stormwater runoff drains. Note that the receiving water course may or may not be located on the construction site. If the first water body receiving construction site runoff is unnamed ("unnamed tributary"), determine the name of the water body that the unnamed tributary enters.

An ARAP may be required **If your work will disturb or cause alterations of a stream or wetland, you must obtain an appropriate Aquatic Resource Alteration Permit (ARAP).** If you have a question about the ARAP program, contact your local Environmental Field Office (EFO).

Submitting the form and obtaining more information Note that this form must be signed by the company President, Vice-President, or a ranking elected official in the case of a municipality, for details see subpart 2.5. For more information, contact your local EFO at the toll-free number 1-888-891-8332 (TDEC). Submit the completed NOI form (keep a copy for your records) to the appropriate EFO for the county(ies) where the construction activity is located, addressed to **Attention: Stormwater NOI Processing** or use MyTDEC Forms for electronic submittal.

| EFO | Street Address | Zip Code | EFO | Street Address | Zip Code |
|---|---|---|---|---|---|
| Memphis | 8383 Wolf Lake Drive, Bartlett | 38133-4119 | Cookeville | 1221 South Willow Ave. | 38506 |
| Jackson | 1625 Hollywood Drive | 38305-4316 | Chattanooga | 1301 Riverfront Parkway, Suite 206 | 37402-2013 |
| Nashville | 711 R S Gass Boulevard | 37243 | Knoxville | 3711 Middlebrook Pike | 37921 |
| Columbia | 1421 Hampshire Pike | 38401 | Johnson City | 2305 Silverdale Road | 37601 |

CN-0940 (Rev. 12-21)                                                                 RDA 2366

# APPENDIX B – NOTICE OF TERMINATION FORM (NOT)

(See Next Page)

AR 007059



**TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION (TDEC)**
Division of Water Resources (DWR)
William R. Snodgrass Tennessee Tower, 312 Rosa L. Parks Avenue, 11th Floor
Nashville, Tennessee 37243
1-888-891-TDEC (8332)

### Notice of Termination (NOT) for
### General NPDES Permit for Stormwater Discharges from Construction Activities (CGP)

This form is required to be submitted when requesting termination of coverage from the CGP. The purpose of this form is to notify the TDEC that either all stormwater discharges associated with construction activity from the portion of the identified facility where you, as an operator, have ceased or have been eliminated; or you are no longer an operator at the construction site. Specifically, this means that all disturbed soils at the portion of the construction site where the operator had control have been permanently stabilized, the temporary erosion and sediment control measures have been removed, and/or subsequent operators have obtained permit coverage for the site or portions of the site where the operator had control. Submission of this form shall in no way relieve the permittee of permit obligations required prior to submission of this form.

Submit this form to the local DWR Environmental Field Office (EFO) address (see table below) or using MyTDEC Forms electronic submittal process. For more information, contact your local EFO at the toll-free number 1-888-891-8332 (TDEC).

| Site or Project Name: | | NPDES Tracking Number: TNR |
|---|---|---|
| Street Address or Location: | | County(ies): |

| Name of Permittee Requesting Termination of Coverage: | | | |
|---|---|---|---|
| Permittee Contact Name: | Title or Position: | | |
| Mailing Address: | City: | State: | Zip: |
| Phone: ( ) | E-mail: | | |

#### Check the reason(s) for termination of permit coverage: (check only one)

| | |
|---|---|
| ☐ | Primary permittee termination:  all requirements for termination under Permit Part 9.1.1. a) through c) have been met. This includes, but is not limited to, for areas the primary permittee has control all earth-disturbing activities at the site are complete and permanent stabilization as defined in Part 10 of the CGP has been achieved. (attach photo documentation). |
| | When applicable, and you are a primary permittee seeking termination, list who is responsible for ongoing maintenance of stormwater controls left on the site subject for long-term use following termination of coverage: |
| ☐ | Secondary permittee termination:  all requirements for termination under Permit Part 9.2.1. have been met (no longer an operator at the construction site). |

CN-1175 (Rev. 12-21)                                                                                    RDA 2366

**Certification and Signature:**
(must be signed by president, vice-president or equivalent ranking elected official)

I certify under penalty of law that either: (a) all stormwater discharges associated with construction activity from the portion of the identified facility where I was an operator have ceased or have been eliminated or (b) I am no longer an operator at the construction site. I understand that by submitting this notice of termination, I am no longer authorized to discharge stormwater associated with construction activity under this general permit, and that discharging pollutants in stormwater associated with construction activity to waters of the state is unlawful under the Tennessee Water Quality Control Act where the discharge is not authorized by a NPDES permit. I also understand that the submittal of this notice of termination does not release an operator from liability for any violations of this permit or the Tennessee Water Quality Control Act. I certify under penalty of law that this document and all attachments were prepared by me, or under my direction or supervision. The submitted information is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment. As specified in Tennessee Code Annotated Section 39-16-702(a)(4), this declaration is made under penalty of perjury.

| Permittee name (print or type): | Signature: | Date: |
|---|---|---|
| | | |

| EFO | Address | EFO | Street Address |
|---|---|---|---|
| Memphis | 8383 Wolf Lake Drive, Bartlett, TN 38133 | Cookeville | 1221 South Willow Ave., TN 38506 |
| Jackson | 1625 Hollywood Drive, TN 38305 | Chattanooga | 1301 Riverfront Parkway, Ste. 206, TN 37402 |
| Nashville | 711 R S Gass Boulevard, TN 37243 | Knoxville | 3711 Middlebrook Pike, TN 37921 |
| Columbia | 1421 Hampshire Pike, TN 38401 | Johnson City | 2305 Silverdale Road, TN 37601 |

CN-1175 (Rev. 12-21)                                                                                      RDA 2366

# APPENDIX C – INSPECTION REPORT FORM

(See Next Page)



**TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION (TDEC)**
Division of Water Resources (DWR)
William R. Snodgrass Tennessee Tower, 312 Rosa L. Parks Avenue, 11th Floor,
Nashville, Tennessee 37243
1-888-891-8332 (TDEC)
**General NPDES Permit for Stormwater Discharges from Construction Activities (CGP)**
**Construction Stormwater Inspection Certification (Inspection Form)**

| Site or Project Name: | | NPDES Tracking Number: TNR |
|---|---|---|
| Primary Permittee Name: | | Date of Inspection: |
| Current approximate <u>disturbed</u> acreage: | Has rainfall been checked/documented daily? ☐ Yes ☐ No | Name of Inspector: |
| Current weather/ground conditions: | Rainfall total since last inspection: | Inspector's TNEPSC Certification Number: |
| Site Assessment ☐ Yes ☐ No | Assessor's TN PE registration number: | Assessor's TNEPSC Level II/CPESC number: |

| Check the box if the following items are on-site: | | |
|---|---|---|
| ☐ | Notice of Coverage (NOC) | |
| ☐ | Stormwater Pollution Prevention Plan (SWPPP) | |
| ☐ | Weekly inspection documentation | |
| ☐ | Site contact information | |
| ☐ | Rain Gage | |
| Off-site Reference Rain Gage Location | | |

**Best Management Practices (BMPs):**

| | Are the Erosion Prevention and Sediment Controls (EPSCs) functioning correctly? If "No," describe below in Comment Section | | | |
|---|---|---|---|---|
| 1. | Are all applicable EPSCs installed and maintained per the SWPPP per the current phase? | | ☐ Yes | ☐ No |
| 2. | Are EPSCs functioning correctly at all disturbed areas/material storage areas? (permit section 5.5.3) | | ☐ Yes | ☐ No |
| 3. | Are EPSCs functioning correctly at outfall/discharge points such that there is no objectionable color contrast in the receiving stream, and no other water quality impacts? (permit section 5.5.3.5 and 6.3.2) | | ☐ Yes | ☐ No |
| 4. | Are EPSCs functioning correctly at ingress/egress points such that there is no evidence of track-out? (permit section 5.5.3.1) | | ☐ Yes | ☐ No |
| 5. | If applicable, have discharges from dewatering activities been managed by appropriate controls? (permit section 4.1.3) If "No," describe below the measure to be implemented to address deficiencies. | ☐ N/A | ☐ Yes | ☐ No |
| 6. | If construction activity at any location on-site has temporarily/permanently ceased, was the area stabilized within 14 days? (permit section 5.5.3.4) If "No," describe below each location and measures taken to stabilize the area(s). | ☐ N/A | ☐ Yes | ☐ No |
| 7. | Have pollution prevention measures been installed, implemented, and maintained to minimize the discharge of pollutants from wash waters, exposure of materials and discharges from spills and leaks per section 4.1.4? If "No," describe below the measure to be implemented to address deficiencies. | ☐ N/A | ☐ Yes | ☐ No |

CN-1173 (Rev. 12-21)                                                                RDA 2366

AR  007063

| Site or Project Name: | | | NPDES Tracking Number: TNR | | | |
|---|---|---|---|---|---|---|
| Primary Permittee Name: | | | Date of Inspection: | | | |

| | | | N/A | Yes | No |
|---|---|---|---|---|---|
| 8. | If a concrete washout facility is located on site, is it clearly identified on the project and maintained? If "No," describe below the measures to be implemented to address deficiencies. (permit section 1.2.2) | ☐ N/A | ☐ Yes | ☐ No |
| 9. | Have all previous deficiencies been addressed? If "No," describe the remaining deficiencies in the Comments section.<br>☐ Check if deficiencies/corrective measures have been reported on a previous form. | ☐ N/A | ☐ Yes | ☐ No |

Comment Section. If the answer is "No" for any of the above, describe the problem and summarize corrective actions to be taken. Otherwise, describe any pertinent observations:

**Certification and Signature** (must be signed by the certified inspector and the permittee per Sections 5.5.3.11 (g) and 8.7.2 of the CGP)

I certify under penalty of law that this document and all attachments were prepared by me, or under my direction or supervision. The submitted information is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment. As specified in Tennessee Code Annotated Section 39-16-702(a)(4), this declaration is made under penalty of perjury.

| Inspector Name and Title : | Signature: | Date: |
|---|---|---|
| Primary Permittee Name and Title: | Signature: | Date: |

CN-1173 (Rev. 12-21)                    (Instructions on next page)                    RDA 2366

**Construction Stormwater Inspection Certification Form (Inspection Form)**

**Purpose of this form/ Instructions**

An inspection, as described in subsection 5.5.3.9. of the General Permit for Stormwater Discharges from Construction Activities ("Permit"), shall be performed at the specified frequency and documented on this form. Inspections shall be performed at least 72 hours apart. Where sites or portion(s) of construction sites have been temporarily stabilized, or runoff is unlikely due to winter conditions (e.g., site covered with snow or ice), such inspection only has to be conducted once per month until thawing results in runoff or construction activity resumes.

Inspections can be performed by:

a)  a person with an valid certification from the "Fundamentals of Erosion Prevention and Sediment Control Level I" course,

b)  a licensed professional engineer or landscape architect,

c)  a Certified Professional in Erosion and Sediment Control (CPESC), or

d)  a person who has successfully completed the "Level II Design Principles for Erosion Prevention and Sediment Control for Construction Sites" course.

Qualified personnel, as defined in subsection 5.5.3.10 of the Permit (provided by the permittee or cooperatively by multiple permittees) shall inspect disturbed areas of the construction site that have not been permanently stabilized, areas used for storage of materials that are exposed to precipitation, structural control measures, locations where vehicles enter or exit the site, and each outfall.

Disturbed areas and areas used for storage of materials that are exposed to precipitation shall be inspected for evidence of, or the potential for, pollutants entering the site's drainage system. Erosion prevention and sediment control measures shall be observed to ensure that they are operating correctly.

Outfall points (where discharges leave the site and/or enter waters of the state) shall be inspected to determine whether erosion prevention and sediment control measures are effective in preventing significant impacts to receiving waters. Where discharge locations are inaccessible, nearby downstream locations shall be inspected. Locations where vehicles enter or exit the site shall be inspected for evidence of offsite sediment tracking.

Based on the results of the inspection, any inadequate control measures or control measures in disrepair shall be replaced or modified, or repaired as necessary, before the next rain event if possible, but in no case more than 7 days after the need is identified.

Based on the results of the inspection, the site description identified in the SWPPP in accordance with section 5.5.1 of the Permit and pollution prevention measures identified in the SWPPP in accordance with section 5.5.2 of the Permit, shall be revised as appropriate, but in no case later than 7 days following the inspection. Such modifications shall provide for timely implementation of any changes to the SWPPP, but in no case later than 14 days following the inspection.

All inspections shall be documented on this Construction Stormwater Inspection Certification form. Alternative inspection forms may be used as long as the form contents and the inspection certification language are, at a minimum, equivalent to the Division's form and the permittee has obtained a written approval from the Division to use the alternative form. Inspection documentation will be maintained on site and made available to the Division upon request. Inspection reports must be submitted to the Division within 10 days of the request.

Trained certified inspectors shall complete inspection documentation to the best of their ability. Falsifying inspection records or other documentation or failure to complete inspection documentation shall result in a violation of this permit and any other applicable acts or rules.

CN-1175 (Rev. 12-21)                                                                        RDA 2366

**Tennessee Department of Environment and Conservation**
*General Aquatic Resource Alteration Permit for*
**Bank Armoring and Vegetative Stabilization**



**Effective Date:**      January 6, 2021
**Expiration Date:**   April 7, 2025

## Activities Covered by this Permit

This general permit authorizes alterations associated with actively, excessively eroding stream and
reservoir banks. For the purpose of this general permit, all stabilization techniques including soil
bioengineering, in-stream structures, and hard armor treatments are subject to limitations, as described
in the Special Conditions section of this permit.

Hard armoring treatments for bank stabilization may be authorized when other alternatives using natural
materials or ecologically designed applications are not feasible due to site constraints. Examples of these
types of armoring treatments include riprap, gabion baskets, stacked stone, and other treatments.

Soil bioengineering is an applied science that combines structural, biological, and ecological concepts to
repair and reconstruct stable vegetated stream channels that mimic natural habitat in both composition and
structure for erosion prevention and sediment control. It is intended to compliment a natural stream's
ability to dissipate energy and provide a stable and productive habitat. It includes methods that facilitate
the stream bank recovery process by retaining or re-establishing native plant communities and re-
establishing naturally stable bank morphology.

Certain activities due to size, location or potential water quality impacts are not covered under this
general permit, as described in both the Special and General Conditions sections. Activities not
qualifying for authorization under this general permit may be authorized by a standard (individual)
permit provided that all requirements of the *Tennessee Water Quality Control Act of 1977* (the Act) are
met.

## Special Conditions

1. Hard armoring bank stabilization treatment shall not exceed 300 linear feet for the treatment of
   one bank, or 200 linear feet per bank if the treatment includes both banks, with the following
   special conditions:

   a. The use of structures or treatments such as seawalls, grouted riprap, concrete, retaining
      walls, bulkheads, etc. that prevent the establishment of woody rooted vegetation may
      only be permitted at vertical docking facilities at municipal or commercial marinas, or
      in areas where critical public infrastructure would prohibit other, less severe treatments
      from use.
   b. Activities located within Tennessee Valley Authority or the United States Army Corps of
      Engineers (USACE) reservoirs shall not exceed 500 linear feet of hard armoring
      treatments.

2. Soil bioengineering techniques used to stabilize streambanks are limited to 1000 linear feet.

   a. Hard armoring used in conjunction with these techniques is subject to the same
      limitations described in Special Condition # 1 above and is included in the total limitation

JA2930

of 1000 feet of work.

b. Stone toe protection in connection with, and directly below, soil bioengineering treatment is allowable, but must be limited to the minimum height necessary to stabilize the immediate bed-bank interface.  It may not exceed 1/4 the bank height.

3. In-stream structures may be used in conjunction with bank treatments, subject to the same cumulative limitations on streambank hard armoring and total project lengths of disturbance along the bank. These structures may include rock vanes, weirs, jetties, wing deflectors, or similar techniques, subject to the following conditions:

a. Placement of liners, matting, or hard armor in other locations along the stream bottom is not covered.
b. Projects must be limited to a maximum of five (5) in-stream structures.
c. Structures keyed into both banks that span the channel may not impede the movement of fish and aquatic life.
d. In-stream structures keyed into one bank must not extend past 1/3 the width of the stream channel.
e. Use of in-stream structures in any waterway which is identified by the department as having contaminated sediments, and the activity will likely mobilize the contaminated sediments, are not covered by this general permit.

4. Unless required to maintain the safety and structural integrity of public utility infrastructure (including utility line easements), or structures subject to State Safe Dam regulations or similar requirements,  any spraying, mowing, or other disturbance of the stabilization treatment that interferes with its ability to naturalize is prohibited. Removal of invasive species is permitted.

5. Written notification of the commencement of authorized work shall be provided to the local TDEC Environmental Field Office prior to, or within 24 hours after initiation of the approved work.

6. Work performed by vehicles and other related heavy equipment may not be staged within the stream channel.

7. Work performed by hand and related hand-operated equipment is allowed within the stream channel.

8. This permit does not authorize projects for which the primary purpose is stream relocation, compensatory mitigation, flood control or drainage improvement.

9. Only bank treatments utilizing bioengineering techniques with no in-channel deflection structures may be authorized in State Scenic Rivers.

10. The placement of riprap shall not interfere with an NPDES-permitted facility's ability to comply with the Seep Action Plan component of their permit.

11. Materials used for bank stabilization shall consist of rock, wood, or products made specifically for use in earthen slope stabilization. This permit does not authorize the use of other salvaged materials not found in the natural environment for bank stabilization.

## General Conditions

1. The amount of fill, stream channel and bank modifications, or other impacts associated with the activity shall be limited to the minimum necessary to accomplish the project purpose. The permittee shall utilize the least impactful practicable method of construction.

<div align="center">JA2931</div>

2. All activities must be accomplished in conformance with the approved plans, specifications, data, and other information submitted in support of the ARAP application (form CN-1091) (except where no application is required as specified below) and the limitations, requirements, and conditions set forth herein. Failure to comply with the terms and conditions of this permit is a violation of the Act.

3. Activities, either individually or cumulatively, that may result in an appreciable permanent loss of resource values to streams or wetlands are not covered. This general permit shall not be used incrementally to combine with other activities resulting in a net loss of water resource values.

4. Clearing, grubbing, and other disturbance to riparian vegetation shall be kept at the minimum necessary for slope construction and equipment operations. Unnecessary native riparian vegetation removal, including tree removal, is prohibited. Native riparian vegetation must be reestablished in all areas of disturbance outside of any permanent authorized structures after work is completed. Coverage under this permit does not serve to waive any local riparian buffer protection requirement, and permittees are responsible for obtaining any necessary local approval.

5. This activity may not result in the permanent disruption to the movement of fish or other aquatic life upon project completion.

6. Blasting within 50 feet of any jurisdictional stream or wetland is prohibited.

7. Activities that directly impact wetlands, or impair surface water flow into or out of any wetland areas are not covered.

8. Activities located in a component of the National Wild and Scenic River System or waters designated as Outstanding National Resource Waters are not covered.

9. Activities occurring in known or likely habitat of state or federally listed threatened, endangered, deemed in need of management, or species of special concern may not be authorized without prior coordination with the Tennessee Wildlife Resources Agency (TWRA) and TDEC Division of Natural Areas (DNA) to determine if any special conditions are required to avoid and/or minimize harm to the listed species or their habitat. Adverse effects to federally listed threatened and endangered species are not authorized by this permit. Permittee is responsible for obtaining prior authorization from the United States Fish and Wildlife Service (USFWS) as required by Section 7 or Section 10 under the Endangered Species Act.

10. Work shall not commence until the permittee has obtained all necessary authorizations pursuant to applicable provisions of section 10 of The Rivers and Harbors Act of 1899, section 404 of the Clean Water Act, section 26a of The Tennessee Valley Authority Act, section 402 of the Clean Water Act (including, but not limited to, an NPDES permit for construction stormwater), or any other federal, state, or local laws.

11. Backfill activities must be accomplished in the least impactful manner possible that stabilizes the streambed and banks to prevent erosion. The completed activities may not disrupt or impound stream flow.

12. The use of monofilament-type erosion control netting or blanket is prohibited in the stream channel, stream banks, or any disturbed riparian areas within 30 feet of top of bank.

13. This permit does not authorize impacts to cultural, historic, or archaeological features or sites.

JA2932

14. This permit does not authorize access to public or private property. Arrangements concerning the use of public or private property shall be made with the landowner. The permittee is responsible for obtaining any additional permitting or maintenance agreements with other government or public agencies or lands.

15. Where practicable, all activities shall be accomplished in the dry. All surface water flowing towards this work shall be diverted using cofferdams and/or berms constructed of sandbags, clean rock (containing no fines or soils), steel sheeting, or other non-erodible, non-toxic material. All such diversion materials shall be removed upon completion of the work. Any disturbance to the stream bed or banks must be restored to its original condition. As approved after Division review, activities may be conducted in the flowing water if working in the dry will likely cause additional degradation. Any work conducted in the flowing water must be for a short duration and with minimal impact, and conform to the Division-approved methodology.

16. All activities must be carried out in such a manner as will prevent violations of water quality criteria as stated in TDEC Rule Chapter 0400-40-03, or impairment of the uses of waters of the state as designated by Rule Chapter 0400-40-04.

17. Erosion prevention and sediment control measures must be in place and functional before any earth moving operations begin, and shall be designed according to the department's Erosion and Sediment Control Handbook ( http://tnepsc.org/handbook.asp). Permanent vegetative stabilization using native species of all disturbed areas in or near the stream channel must be initiated within 14 days of project completion (see also Landscaping with Natives at tneppc.org). Non-native, non-invasive annuals may be used as cover crops until native species can be established.

18. Temporary stream crossings shall be limited to one point in the construction area and erosion control measures shall be utilized where stream bank vegetation is disturbed. Stream beds shall not be used as linear transportation routes for mechanized equipment, rather, the stream channel may be crossed perpendicularly with equipment provided no additional fill or excavation is necessary.

Obtaining Permit Coverage

Activities where the length of the stream or reservoir bank (not channel bed) to be treated does not exceed a total length of 50 feet on one or both banks (limited to one site per 1000 linear feet of stream or reservoir bank) may be done without submittal of an application or written authorization from the division prior to the commencement of work, provided the work is performed in accordance with the permit terms and conditions.

Shoreline stabilization activities located within certain reservoirs managed by the Tennessee Valley Authority (Beech River Projects, Kentucky Lake, Pickwick Lake, Tims Ford Lake, Fort Loudoun Lake, Watts Bar Lake, Douglas Lake, Norris Lake, Cherokee Lake, South Holston Lake, Ft. Patrick Henry Lake, Boone Lake, Watauga Lake, Chickamauga Lake, Tellico Lake, Melton Hill Lake, and Nickajack Lake), and the U.S. Army Corps of Engineers' Nashville District (Old Hickory Lake, Lake Barkley, Cheatham Lake, Center Hill Lake, Cordell Hull Lake, Dale Hollow Lake, and J. Percy Priest Lake ) may be performed without submittal of an application or written authorization from the division prior to the commencement of work, provided the work is performed in accordance with the preceding permit limits, and each of the following limitations:

1. Riprap , individually or cumulatively, shall not exceed 150 linear feet of shoreline.

2. Riprap shall follow the natural contour of the shoreline.

3. Riprap shall not extend below the winter pool elevation.

AR 007069

4.  The placement of riprap shall not interfere with an NPDES-permitted facility's ability to comply with the Seep Action Plan component of their permit

5.  Seawalls, stacked gabion baskets, vertically stacked stone, retaining walls, bulkheads, etc. are not authorized under this no-notification provision, and would require written authorization under a valid ARAP permit.

6.  Vegetative stabilization techniques, including live vegetative plantings, live stakes, branch packing, live fascines, vegetated soil lifts, brush mattresses, tree revetments, and coconut fiber coir rolls may be authorized for an unlimited total length.

7.  Work shall not commence until proper authorization under a 26a permit from the TVA or a Shoreline Use Permit from the USACE Natural Resource Manager is obtained, as applicable.

Other proposed bank stabilization activities may obtain coverage by submitting a signed and completed ARAP application (form CN-1091), along with any other required information, to the Division.  Work shall not commence until a written Notice of Coverage (NOC) from the division is received. As noted above, not all activities may be eligible for coverage under this general permit and coverage may be denied when appropriate.

Each Notice of Coverage under this general permit is valid until the expiration date specified on the NOC. If the General Permit is modified, reissued, or revoked, and the permittee has commenced or is under contract to commence this activity before the expiration date, the permittee may have up to twelve (12) months from the date of the modification, reissuance, or revocation of the General Permit to complete the activity under the present terms and conditions of the general permit.

An application fee as established in Rule 0400-40-11-.02 will be assessed to applicants intending to receive an NOC to conduct activities under this general permit. An annual maintenance fee will be assessed to those individuals receiving an NOC unless a Notice of Termination (NOT) form is received prior to the one-year anniversary of the issuance date of the NOC. An NOT form can be downloaded from the division's ARAP webpage (https://www.tn.gov/environment/permit-permits/water-permits1/aquatic-resource-alteration-permit--arap-.html).

APPROVED, _____   01/06/2021
            Jennifer Dodd                              DATE:
            Director, Division of Water Resources

JA2934

AR 007070

# Tennessee Department of Environment and Conservation
## *General Aquatic Resource Alteration Permit for*
## Construction or Removal of Minor Road Crossings



**Effective Date:**      April 7, 2020
**Expiration Date:**    April 7, 2025

## Activities Covered by this Permit

This general permit authorizes the construction and/or removal of minor road crossings of streams, via bridge, culvert, pipe, or fords, for both linear and non-linear projects. Linear transportation projects include public roads, highways, and railways. Road crossings considered attendant features of non-linear projects include infrastructure associated with residential, commercial, industrial, or institutional developments, whether public or private.

Certain activities due to size, location or potential water quality impacts are not covered under this general permit, as described in both the Special and General Conditions sections. Activities not qualifying for authorization under this general permit may be authorized by a standard (individual) permit provided that all requirements of the *Tennessee Water Quality Control Act of 1977* (the *Act*) are met.

## Special Conditions

1. Road crossings for linear transportation projects, including transition channels, endwalls, aprons or rip rap, that either individually or cumulatively exceed 200 feet of impact, including temporary impacts, on an individual stream (entire reach of a single tributary) for the entire project are not covered.

2. Road crossings for non-linear projects, including transition channels, endwalls, aprons, or rip rap, that either individually or cumulatively exceed a total length of 200 feet of impact, including temporary impacts, in the same Stream Catalog Unit (Waterbody) for the entire project are not covered.

3. Encapsulations associated with non-road features such as vehicle maintenance or storage buildings, parking lots, culs-de-sac and turn-arounds are not covered.

4. Written notification of the commencement of authorized work shall be provided to the local TDEC Environmental Field Office prior to, or within 24 hours after initiation.

5. All riprap associated with the road crossings shall be placed as to mimic the existing/proposed contours of the stream channel. Riprap shall be countersunk and placed at the grade with the existing stream substrate. Voids within the riprap shall be filled with suitable bedload substrate to prevent stream flow loss within the riprap areas. Suitable substrate does not include soil. Over-excavation or grouting for placement of riprap is not covered.

6. Road crossings that may significantly alter the hydraulics of the stream (e.g., under-sizing or over widening the channel) are not covered.

AR 007071

7.  Slight changes in the channel alignment for proper flow into, or out of the installed culvert or bridge for short distances (25 feet or less) located directly upstream and downstream of culverts maybe authorized if they replicate the natural existing dimensions.

8.  The bottom of culverts shall be constructed below the stream bed elevation, in a manner that allows natural substrate to reestablish. All box culverts with more than one barrel shall be constructed in a manner which will concentrate baseflow into one barrel and not result in channel over widening.

9.  The crossing shall be culverted, bridged or otherwise designed to prevent the impoundment of normal or base flows on the upstream side, and not result in a disruption or barrier to the movement of fish or other aquatic life on the downstream side. Base flow is the usual or normal flow of the stream that is supplied primarily by groundwater from springs and seeps, but not affected by rapid runoff during and after rainfall.

10. The width of the fill, stream channel and bank modifications, or other impacts associated with the crossing shall be limited to the minimum necessary for the actual crossing.

11. Where a crossing is removed, natural channel characteristics (dimensions, shape, substrate, etc.) shall be replicated and stabilized using clean rock, riprap, anchored trees or other non-erodible materials found in the natural environment.

12. Road crossings that result in more than 10 feet of permanent stream length loss are not covered.

13. Activities located in a component of the National Wild and Scenic River System or waters designated as Outstanding National Resource Waters are not covered, except those projects specifically designed to improve aquatic organism passage at existing road crossings.

**<u>General Conditions</u>**

1.  The amount of fill, stream channel and bank modifications, or other impacts associated with the activity shall be limited to the minimum necessary to accomplish the project purpose. The permittee shall utilize the least impactful practicable method of construction.

2.  All activities must be accomplished in conformance with the approved plans, specifications, data, and other information submitted in support of the ARAP application (form CN-1091) and the limitations, requirements, and conditions set forth herein. Failure to comply with the terms and conditions of this permit is a violation of the Act.

3.  Activities, either individually or cumulatively, that may result in an appreciable permanent loss of resource values to streams or wetlands are not covered. This general permit shall not be used incrementally to combine with other activities resulting in a net loss of water resource values.

4.  Clearing, grubbing, and other disturbance to riparian vegetation shall be kept at the minimum necessary for slope construction and equipment operations. Unnecessary native riparian vegetation removal, including tree removal, is prohibited. Native riparian vegetation must be reestablished in all

AR  007072

areas of disturbance outside of any permanent authorized structures after work is completed. Coverage under this permit does not serve to waive any local riparian buffer protection requirement, and permittees are responsible for obtaining any necessary local approval.

5. This activity may not result in the permanent disruption to the movement of fish or other aquatic life upon project completion.

6. Blasting within 50 feet of any jurisdictional stream or wetland is prohibited.

7. Activities that directly impact wetlands, or impair surface water flow into or out of any wetland areas are not covered.

8. Activities occurring in known or likely habitat of state or federally listed threatened, endangered, deemed in need of management, or species of special concern may not be authorized without prior coordination with the Tennessee Wildlife Resources Agency (TWRA) and TDEC Division of Natural Areas (DNA) to determine if any special conditions are required to avoid and/or minimize harm to the listed species or their habitat. Adverse effects to federally listed threatened and endangered species are not authorized by this permit. Permittee is responsible for obtaining prior authorization from the United States Fish and Wildlife Service (USFWS) as required by Section 7 or Section 10 under the Endangered Species Act.

9. Work shall not commence until the permittee has obtained all necessary authorizations pursuant to applicable provisions of section 10 of The Rivers and Harbors Act of 1899, section 404 of the Clean Water Act, section 26a of The Tennessee Valley Authority Act, section 402 of the Clean Water Act (including, but not limited to, an NPDES permit for construction stormwater), or any other federal, state, or local laws.

10. Backfill activities must be accomplished in the least impactful manner possible that stabilizes the streambed and banks to prevent erosion. The completed activities may not disrupt or impound stream flow.

11. The use of monofilament-type erosion control netting or blanket is prohibited in the stream channel, stream banks, or any disturbed riparian areas within 30 feet of top of bank.

12. This permit does not authorize impacts to cultural, historic, or archaeological features or sites.

13. This permit does not authorize access to public or private property. Arrangements concerning the use of public or private property shall be made with the landowner. The permittee is responsible for obtaining any additional permitting or maintenance agreements with other government or public agencies or lands.

14. Where practicable, all activities shall be accomplished in the dry. All surface water flowing towards this work shall be diverted using cofferdams and/or berms constructed of sandbags, clean rock (containing no fines or soils), steel sheeting, or other non-erodible, non-toxic material. All such diversion materials shall be removed upon completion of the work. Any disturbance to the stream bed or banks must be restored to its original condition. As approved after Division review, activities may be conducted in the flowing water if working in the dry will likely cause additional degradation. Any work conducted in the flowing water must be for a short duration and with minimal impact, and conform to the Division-approved methodology.

AR 007073

15. All activities must be carried out in such a manner as will prevent violations of water quality criteria as stated in TDEC Rule Chapter 0400-40-03, or impairment of the uses of waters of the state as designated in TDEC Rule Chapter 0400-40-04.

16. Erosion prevention and sediment control measures must be in place and functional before any earth moving operations begin, and shall be designed according to the department's Erosion and Sediment Control Handbook (http://tnepsc.org/handbook.asp). Permanent vegetative stabilization using native species of all disturbed areas in or near the stream channel must be initiated within 14 days of project completion (see also Landscaping with Natives at tneppc.org). Non-native, non-invasive annuals may be used as cover crops until native species can be established.

17. Temporary stream crossings shall be limited to one point in the construction area and erosion control measures shall be utilized where stream bank vegetation is disturbed. Stream beds shall not be used as linear transportation routes for mechanized equipment, rather, the stream channel may be crossed perpendicularly with equipment provided no additional fill or excavation is necessary.

## Obtaining Permit Coverage

A temporary road crossing associated with ongoing construction activities where the total length of disturbance along the stream channel needed to temporarily install, and remove any fill or structure associated with the crossing is less than 25 feet may be done without submittal of an application or written authorization from the division prior to the commencement of work, provided the work is performed in accordance with this permit's terms and conditions. Following construction, all materials used for the temporary crossing shall be removed and disturbed stream bed and banks shall be restored and stabilized with native vegetation.

Proposed minor road crossing activities may obtain coverage by submitting a signed and completed application (form CN-1091), along with any other required information, to the division. Work shall not commence until a written Notice of Coverage (NOC) from the division is received. As noted above, not all activities may be eligible for coverage under this general permit and coverage may be denied when appropriate.

Each Notice of Coverage under this general permit is valid until the expiration date specified on the NOC. If the General Permit is modified, reissued, or revoked, and the permittee has commenced or is under contract to commence this activity before the expiration date, the permittee may have up to twelve (12) months from the date of the modification, reissuance, or revocation of the General Permit to complete the activity under the present terms and conditions of the general permit.

An application fee as established in Rule 0400-40-11-.02 will be assessed to applicants intending to receive an NOC to conduct activities under this general permit. An annual maintenance fee will be assessed to those individuals holding general permit coverage unless a Notice of Termination (NOT) form is received prior to the one-year anniversary of the issuance date of the NOC. An NOT form can be downloaded from the division's ARAP webpage (https://www.tn.gov/environment/permit-permits/water-permits1/aquatic-resource-alteration-permit--arap-.html).

APPROVED: _Jennifer Dodd (Apr 7, 2020)_____    DATE: **04/07/2020**_____

       Jennifer Dodd
       Director, Division of Water Resources

AR 007074

**EXHIBIT A PARTIES STIPULATION  REGARDING ADDITION OF CERTAIN DOCUMENTS TO RECORD**

| | |
|---|---|
| **From:** | Lee 2. Barber |
| **To:** | Robert J. Wayne |
| **Cc:** | Claire Wainwright |
| **Subject:** | RE: Gas Pipeline Project Discussion |
| **Date:** | Friday, May 20, 2022 8:15:57 AM |
| **Attachments:** | image001.jpg |

Robert,

Yes, Brady was actually asking about both of the TVA-affiliated gas pipeline projects – the ones to Cumberland Fossil Plant and Kingston Fossil Plant.  And yes, the responses you shared are appropriate, at least with regard to the actual utility line crossing impacts.  I think both projects will also have smaller permanent impacts associated with things like pump stations, etc.

At some point you, Claire and I should sit down and discuss so we can bring you up to speed on what we know so far.  As I mentioned in our call, the pipeline to Cumberland looks like it will have the added complication of applicant not currently having access to approximately 7% of the right of way where new pipeline will be installed.  I spoke with David Jackson about this yesterday, and in a nutshell, approach that seems reasonable is for them to submit partial HDs and application for impacts on parcels they do have access to, with potential permit mod in the future (there may be a protracted legal battle, but I see no way in which a private landowner would be able to block access to an existing right of way).

LEE

**Lee Barber, Ph.D. |** Manager, Natural Resources Unit
TDEC Division of Water Resources

lee.2.barber@tn.gov
615-532-3292 (o)
629-262-1509 (m)

**From:** Robert J. Wayne <Robert.J.Wayne@tn.gov>
**Sent:** Friday, May 20, 2022 6:49 AM
**To:** McPherson, Brady <Brady.McPherson@stantec.com>
**Cc:** Lee 2. Barber <Lee.2.Barber@tn.gov>
**Subject:** RE: Gas Pipeline Project Discussion

Brady,

The Division does not typically require mitigation for utility line crossings and therefore we do not need SQT data. If the crossings will result in additional impacts such as riparian clearing, hard armoring, fill, etc. that is greater than the general permit limits, mitigation would be required. I am not aware of any details for this project. It sounds like a fairly large project. We would need to evaluate all the impacts that would result from the UL crossings before we could give a definite answer on mitigation.

The Division does require that areas be returned to pre-impact conditions. Staffing stream restoration engineers and geomorphologists with the contractors installing the line is a good

AR  007099

**EXHIBIT A PARTIES STIPULATION  REGARDING ADDITION OF CERTAIN DOCUMENTS TO RECORD**

way to ensure the streams are restored following UL installation.

There may be post-construction monitoring to ensure impacts were only temporary. For streams this is usually an HD. For wetlands the Division requires a wetland delineation be submitted for two years post-construction.

Sorry I missed your call earlier this week. Other than a few meetings I'm around all day today. Feel free to give me a call if you would like to discuss further.

Robert

**From:** McPherson, Brady <Brady.McPherson@stantec.com>
**Sent:** Thursday, May 19, 2022 7:56 AM
**To:** Robert J. Wayne <Robert.J.Wayne@tn.gov>
**Subject:** [EXTERNAL] Gas Pipeline Project Discussion

**\*\*\* This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email - STS-Security. \*\*\***

Hey Robert,

I suspect you are aware of the large gas line project that is underway and it appears our team will be responsible for any aquatic resource assessments that need to happen.

I'd like to pick your brain about what you think we should expect in terms of needing to document existing conditions of the open cuts. Obviously we will be doing HD/JD determinations and loss of flow is always a concern, but I am more curious about the physical conditions of the streams and the quality.

Do I need to be prepping the applicant to be okay with performing SQT assessments? What about benthic sampling? Are you all considering that they have to do nothing? I have no idea where the department is leaning on this.

I will share that there was a recent job very similar to this that we led last year in Minnesota. What we ended up doing was staffing stream restoration engineers and geomorphologists with the contractors installing the line. They collected some profile and cross section data before the construction started and then helped the contractor just put it back the same way. Mostly sod mats were used, some bank structures here or there. We won't have sod here so it will likely be woven coir, seed and straw with plantings and then some structures where needed.  We have staff up there right now doing the revegetation.

It would be a great experience to collect a bunch of SQT/benthic data on all the streams but it will be a lot of work so I am not suggesting we do that. We would however if that was what the department determined to be necessary to get the permit.

If I can get out in front of this a little I think I can help manage expectations.

I want to be able to get this done as smoothly as possible for everyone's sake.

I don't know if you and Lee have already been discussing this or not but if you can catch his ear and give me a ring on the telephone it would be greatly appreciated.

**EXHIBIT A PARTIES STIPULATION  REGARDING ADDITION OF CERTAIN DOCUMENTS TO RECORD**

Brady McPherson, CERP
Project Manager
615.389.6063
Brady.McPherson@stantec.com

Stantec



The content of this email is the confidential property of Stantec and should not be copied, modified, retransmitted, or used for any purpose except with Stantec's written authorization. If you are not the intended recipient, please delete all copies and notify us immediately.

AR 007101

Page: 567

Filed: 02/07/2023

Document: 59-2

Case: 23-3682



Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

# Proposed Cumberland Project

## Meeting with Tennessee Department of Environment & Conservation
## Discussion of Blasting Plan/Procedures

**April 2022**

*Privileged and Confidential*
*Preliminary Information*

AR 007128

# Agenda



Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

- Introductions
- Project Overview
- Waterbodies and Wetlands
- Reasons for Controlled Blasting
- Examples of Areas where Blasting may be Required
- Controlled Blasting Procedures

- Controlled Trench Blasting Discussion
- Controlled Blasting Steps
- Controlled Blasting Monitoring Measures
- Additional Measures
- Restoration and On-Site Mitigation
- Questions

AR  007129     2

# Project Description



- **Approximately 32 miles of new 30-inch pipeline lateral**
  - Approximately 85% co-located adjacent to existing utility easements
  - 245,000 dekatherms per day incremental pipeline lateral capacity
- **New Meter Station**
- **New Mainline Back Pressure Regulator and Building**
- **Other Aboveground Facilities**
  - 3 Mainline Valves
  - 2 Pig Launchers/Receivers



AR  007130

3

Page 570  Filed: 02/07/2023  Document: 5962  Case: 23-3682

# Waterbodies and Wetlands



Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

- **Waterbodies**
  - 131 waterbodies crossed by the Project
    - 54 streams
      - 28 perennial streams
      - 26 intermittent streams
    - 73 ephemeral / WWC
    - 4 ponds
- No cold water fisheries

- **Wetlands**
  - 6 wetlands crossed by the Project
  - ~ 0.27 acre of wetland impact
    - Palustrine Emergent:  ~0.24 acre
    - Palustrine Forested:  ~0.03 acre

AR  007131

4

Page: 571    Filed: 03/07/2023    Document: 59-2    Case: 23-3682

# Waterbodies and Wetlands



- Conventional trenching techniques will typically be used to cross streams; however, field survey and desktop data have identified potential shallow bedrock where blasting will be necessary.

- TGP, in its ARAP, will provide a list of waterbodies where blasting is anticipated.

AR 007132    5

# What is the Driver for Controlled Blasting?



- Conventional trenching techniques will be used to cross streams where practicable

- Field surveys have identified hard, shallow bedrock where trenching is not practicable

- Controlled blasting will minimize the duration of in-stream work, and will minimize temporary disruption.



AR 007133

6

# Example

Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company



AR  007134

7

# Example





AR 007135

8

EXHIBIT A PARTIES STIPULATION REGARDING ADDITION OF CERTAIN DOCUMENTS TO RECORD

# Example





AR 007136

9

# Example





AR 007137

10

# Blasting Procedures



- TGP's blasting contractor will provide site-specific blasting plans

- Blasting will be localized to the trench line and controlled to minimize movement of material outside the waterbody

- Drill pattern will be set in a manner to achieve smaller rock fragments in order to reuse as much of the blasted rock as possible within the trench

- Rock fragments will be shifted, as needed, to maintain contours and flow patterns after blasting

AR 007138  11

Case: 23-3682    Document: 59-2    Filed: 02/07/2024    Page: 578

# Controlled Trench Blasting



- Why Have a Controlled Blasting Process:
  - Increases Safety
  - Less Disruptive to the Environment
  - Maximizes Crushing of Rock for Use During Backfilling
  - Prevents Fly Rock – Need that Material to Backfill Pipe
  - Minimizes Blasting Material Costs



AR 007139

Page 579

Filed: 03/07/2023

Document: 59-2

Case: 23-3662

# Controlled Blasting – Drilled Blast Hole





- Charges at different levels
- Aggregate rock packing between charges forces the blast energy to the surrounding rock
- Charges detonate fractions of a second apart from top to bottom
- Design of the charge size, spacing, and timing is very precise and controlled

AR 007140

Page 580

Filed: 02/07/2023

Document: 53-2

Case: 23-3602

# Controlled Blast Design



Tennessee Gas Pipeline
Company, L.L.C.
a Kinder Morgan company

Numerous blast holes are detonated fractions of a second apart







AR 007141

Page 581    Filed: 03/07/2023    Document: 59-2    Case: 23-3682

# Blasting Steps



- Design the Blast
- Drill Holes
- Load with Explosives
- Pack with Aggregate
- Pre-Blast Safety
- Detonate



AR  007142

Page 162

Filed: 07/07/2023

Document: 592

Case: 23-3682

# Blasting Monitoring Measures



- **Contractor will monitor operations including:**
  - Measure the peak particle velocity at adjacent pipeline(s), potable water sources, and at aboveground structures.
  - Complete a blast report summarizing activities
- **A qualified project biologist** will survey the proposed blasting zone immediately in advance of any drilling or blasting for the presence of sensitive species.
  - Any relocation of species will be conducted in accordance with applicable permit conditions and/or handling permits.

AR  007143  16

Page 583    Filed: 02/07/2023    Document: 59-2    Case: 23-3682

# Additional Measures



- **Avoiding or minimizing impacts to wetland and waterbodies to the extent practicable by**:
  - Limiting width of crossings to 75 feet
  - Locating extra work areas a minimum of 50 feet from waterbodies (except where adjacent land is agriculture or disturbed)
  - Expediting each crossing during construction activities
    - Completing stream crossings separate from mainline construction
  - Restoring crossings and original contours immediately following installation



AR 007144                17

# Restoration and On-Site Mitigation



- Restoration and on-site mitigation to be implemented during and following construction activities include:
  - Native material will be utilized for backfill
  - Wetlands and streams will be restored to pre-construction contours or stable areas of repose immediately following crossing activities
  - Disturbed riparian areas/buffers will be reseeded with native species, similar to adjacent undisturbed lands
  - FERC post-construction inspections of wetlands and waterbodies will be conducted annually for two years following construction

18

AR 007145

# Questions





AR 007146

19

EXHIBIT A PARTIES STIPULATION REGARDING ADDITION OF CERTAIN DOCUMENTS TO RECORD

(72 of 73)

Page 586

Filed: 02/07/2023

Document: 59-2

Case: 23-3682

# Contact Information



- Blake Amos, Project Permitting Lead, Tennessee Gas Pipeline Company, L.L.C.
  205-325-3548, blake_amos@kindermorgan.com
- Mike Letson, Project Permitting Lead, Tennessee Gas Pipeline Company, L.L.C.
  719-420-5360, michael_letson@kindermorgan.com
- Michael Stagg, Esq., Waller, Lansden, Dortch & Davis, LLP (TGP Outside Counsel)
  615-850-8876, michael.stagg@wallerlaw.com
- David Jackson, PG, PH, BDY Natural Sciences Consultants (TGP Consultant)
  615-460-9797, djackson@bdy-inc.com
- Rhett Baggett, Stantec (TGP Consultant). 615-829-5473. rhett.baggett@Stantec.com

AR 007147    20

## CERTIFICATE OF COMPLIANCE

Pursuant to 6 Cir R. 30(b)(4)(E), the undersigned certifies that the documents included in this joint appendix are properly part of the agency record filed on October 27, 2023 [ECF 20-1 – 20-2] and as supplemented on December 7, 2023 [ECF 29-1 – 29-3].

/s/ James S. Whitlock
James S. Whitlock

DATED: August 19, 2024

## CERTIFICATE OF SERVICE

I hereby certify that I have, on this 19th day of August 2024, electronically filed the foregoing deferred joint appendix using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ James S. Whitlock
James S. Whitlock