No. 23-3682

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

SIERRA CLUB, et al.,
*Petitioners*

v.

TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION,
et al.,
*Respondents*

and

TENNESSEE GAS PIPELINE COMPANY, L.L.C.,
*Intervenor-Respondent*

On Petition for Review from the
Tennessee Department of Environment and Conservation's
§401 Water Quality Certification and ARAP Permit NRS 22.192 (July 21, 2023)

## PETITIONERS' MOTION FOR STAY PENDING REVIEW

JAMES S. WHITLOCK
SPENCER SCHEIDT
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES
PO Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email: dteaney@appalmad.org

STEPHANIE BIGGS
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Email: sbiggs@selctn.org

*Counsel for Petitioners*

## **INTRODUCTION**

Pending before this Court (and fully briefed on the merits) is Petitioners' August 18, 2023 petition for review of the Clean Water Act ("CWA") §401 certification (the "Certification") issued by the Tennessee Department of Environment and Conservation ("TDEC") to Tennessee Gas Pipeline Company, LLC ("TGP"), for its Cumberland Pipeline (the "Pipeline") project. A copy of the Certification is attached as Exhibit 1 to this motion. On August 29, 2024—three days after merits briefing concluded—the Federal Energy Regulatory Commission ("FERC") issued a "Notice to Proceed with Construction and Approval of Modifications" to TGP, authorizing the construction of the Pipeline waterbody crossings authorized by the Certification. Ex. 2. Prior to FERC's action, pipeline construction and the attendant irreparable harm to Petitioners' members and the environment were not imminent. Now they are. TGP intends to commence construction of the Pipeline—including tree felling in the right-of-way—by mid-October 2024 at the latest. Ex. 3. And Petitioners learned on September 17, 2024 that, despite Petitioners' request, TGP will not commit to refrain from earth or vegetation disturbing work in the right-of-way before October 16, 2024.

Accordingly, pursuant to Federal Rule of Appellate Procedure 18(a), Petitioners respectfully request a stay of the Certification pending review.[1]

TGP proposes to construct and operate the 32-mile-long Pipeline to serve a proposed methane gas plant in Cumberland City, Tennessee. JA294.[2] The Pipeline would cross 118 waterbodies, including 56 streams and wetlands and 62 wet weather conveyances along its route through three Middle Tennessee counties. JA0048-53. All but four of those crossings would be constructed by blasting or excavating a 4.5 to 8-feet-deep and 4 to 5-feet-wide trench through the streambeds to bury a 30" diameter pipe. JA0300. Such open-cut crossings can choke miles of a waterway with sediment. *See, e.g.*, JA2778-90.

Because the proposed Pipeline's construction would involve the discharge of fill material into streams and wetlands along its path, the CWA requires TGP to obtain a CWA 404 permit from the U.S. Army Corps of Engineers. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251, 255 (4th Cir. 2020). TGP was also required to obtain a Certificate of Public Convenience and Necessity from FERC. *See* 15 U.S.C. §717f(c)(1)(a).

---

[1]    On August 29, 2024, Petitioners asked TDEC to stay the Certification pending review. Ex. 4. It declined, citing a lack of authority. Ex. 5.

[2]    The six-volume Joint Appendix in this matter is docketed as CM/ECF Document Number 56. Citations in this motion to that docket entry appear as "JA____".

Both those federal authorizations trigger CWA §401's requirement that TGP obtain a certification from the State of Tennessee that the Pipeline will not result in violations of state water quality requirements. 33 U.S.C. §1341(a)(1). Tennessee administers §401 through its Aquatic Resources Alteration Permit ("ARAP") program. T.C.A. §69-3-108(b)(1); TN ADC 0400-40-7-.04(3). Under Tennessee law, an ARAP "also serves as the §401 certification." *Id.* 0400-40-7-.04(1).

In pipeline construction, there are two main ways to cross waterbodies. *Sierra Club v. W. Va. Dep't of Envtl. Prot.*, 64 F.4th 487, 494 (4th Cir. 2023). The developer can trench *through* the waterbody using an open-cut crossing, or it can tunnel *under* the waterbody using a trenchless crossing. *Id.* Going under streams is less environmentally harmful than going through them. *See, e.g.*, JA2815.

There are multiple species of trenchless crossing methods. For example, horizontal directional drilling ("HDD") involves tunneling under a waterbody with a drill from one side to the other using pressurized drilling fluid and then pulling the pipe into position. JA0305. Another well-established trenchless method for pipeline stream crossings is conventional boring—sometimes called "jack and bore." JA2400-01. In conventional boring, a pit is dug on either side of the resource, a tunnel is bored under the stream, and the pipe is jacked through the tunnel. *Id.*

Here, TGP proposes to tunnel under only four streams, insisting that it be allowed to trench through 52 streams and wetlands and 62 wet weather conveyances

- 3 -

with dry, open-cut crossings. JA0008, JA0032, JA0048-53. However, TGP's application only discussed two trenchless methods—HDD and conventional bore—and even then only at a conceptual level of generality rather than a site-specific basis.[3] JA2350-02, JA2280-02, JA0317-20. Notwithstanding the fact that TGP intends to use conventional boring to cross eight public roads in the Pipeline's path (JA2672-73), TGP summarily dismissed that method for waterbody crossings. TGP did not evaluate the practicability of conventional boring (or any other non-HDD trenchless method) on a site-specific basis at any waterbody crossing.

On July 21, 2023, TDEC issued the ARAP and §401 Certification sought by TGP. Ex. 1. This petition for review (and merits briefing) followed. Petitioners now seek the Certification's stay pending resolution of their petition.

## STANDARD OF REVIEW

Four factors govern a stay pending review:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will

---

[3] TGP also recognized Direct Pipe® as an available trenchless method in an attachment to its application but failed to evaluate that technique for any crossing. JA0555.

substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987). In Natural Gas Act ("NGA") proceedings reviewing §401 certifications, federal circuit courts apply the Administrative Procedure Act's standard of review. *See, e.g.*, *W. Va. Dep't of Envtl. Prot.*, 64 F.4th at 501. Under that standard, the Court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).[4]

## ARGUMENT

### I.   Petitioners Are Likely To Succeed on the Merits.

Before issuing the Certification,  TDEC was required to evaluate, *inter alia*, **(1)** whether less damaging crossing methods are practicable, **(2)** the least environmentally impactful rock-removal technique, **(3)** whether TGP's activities in wet weather conveyances will lead to downstream water quality standards violations, **(4)** whether TGP's proposed open-cut crossings will cause water quality standards violations, and **(5)** how, based on a review of baseline data, TGP's

---

[4]   There is no material difference between the federal Administrative Procedure Act's standard and the standard under Tennessee law. *Compare* 5 U.S.C. §706(2) *with* T.C.A. §4-5-322(h); *see also Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 81-82 (4th Cir. 2020).

crossings would cumulatively affect the resource values of impacted streams and wetlands. On each of those tasks, TDEC's efforts fell short, rendering the Certification arbitrary, capricious, and otherwise not in accordance with law.[5]

1.      Tennessee's ARAP program prohibits TDEC from issuing a §401 certification "if there is a practicable alternative to the proposed activity that would have less adverse impact on resource values." TN ADC 0400-40-7-.04(5)(b). The program defines "activity" as "*any and all* work or acts associated with the performance, or carrying out of a project or plan, or construction of a measure." *Id.* 0400-40-7-.03(2) (emphasis added). Consequently, each waterbody crossing is a distinct activity, and TDEC must evaluate whether there is a practicable alternative *at each crossing* that would have less adverse impact on resource values.

TDEC concedes that trenchless crossings are less environmentally impactful than open-cut crossings. JA2815. Thus, the remaining question before TDEC was whether trenchless methods were practicable on a crossing-by-crossing basis. An alternative is practicable if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." TN ADC 0400-40-7-.03(24). But TDEC failed to conduct that required

---

[5]   Those issues have been fully briefed on their merits. CM/ECF Nos. 58 & 61. Petitioners incorporate those briefs by reference into this motion.

evaluation. Instead, it uncritically accepted TGP's unsubstantiated and *project-level* contentions.

As a result, TDEC failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Simms v. Nat'l Traffic Safety Admin.*, 45 F.3d 999, 1004 (6th Cir. 1995) (cleaned up). TDEC entirely failed to consider the universe of available practicable trenchless methods. And it failed to grapple with contrary record evidence establishing the widespread practicability of trenchless crossings across its project. *See e.g.*, JA2284-85, JA2350. When a state issues a §401 certification to a pipeline without grappling with or further elaborating on contrary record evidence, it acts arbitrarily and capriciously, and its action must be set aside. *W. Va. Dep't of Envtl. Prot.*, 64 F.4th at 502.

For an example of what TDEC and TGP should have done—a "*detailed* location-specific review of practicable alternatives to open-cut crossings," *West Virginia Department of Environmental Protection*, 64 F.4th at 499 (emphasis added)—the Court should look to record evidence about and take judicial notice of the publicly available crossing-by-crossing analysis prepared by the operator of the Mountain Valley Pipeline ("MVP").[6] *See* Mountain Valley Pipeline LLC, Accession

---

[6] This Court may take judicial notice of this analysis because it is a "public record" available on FERC's docket and Petitioners offer it only as a point of comparison,

Number 20210304-5122, *a_MVP USACE Individual Permit Application* 128-76

(Table 15) [hereinafter, "MVP's Table 15"], *available at*

https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20210304-

5122&optimized=false. Even a cursory review of MVP's Table 15 and its crossing-

by-crossing analysis exposes the glaring deficiencies in TGP's application and

TDEC's analysis.

MVP's Table 15 scrutinizes hundreds of stream crossings, identifies potential

crossing methods, evaluates numerous logistical factors (including crossing length,

required bore-pit depth, stream depth, maximum slope steepness, average slope

steepness, maximum length of equipment winch needed on steep slopes, whether

karst terrain is present, and whether sufficient soil/rock stockpile storage is

available), and presents crossing-specific cost estimates. JA2486-89. Table 15 also

includes a narrative explanation of the company's rationale for each selected

crossing method. *See generally* MVP's Table 15.

Neither TGP nor TDEC engaged in anywhere near that level of analysis.

TGP's application and the Certification lack the fundamental technical and cost

---

and not "for the truth of the matter[s] asserted" therein. *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*, 894 F.3d 235, 245 (6th Cir. 2018).

evaluations of alternative crossing methods presented in MVP's Table 15. Accordingly, Petitioners are likely to succeed on the merits.

**2.**    TDEC was also required to evaluate whether TGP would implement the least impactful practicable rock-removal methods for its trenched crossings. The plain and unambiguous language of TN ADC 0400-40-7-.04(5)(b) requires (1) an Agency determination of the least impactful practicable alternative *before* permit issuance and (2) implementation of that alternative.

Regarding rock removal, TDEC relies on Special Condition g to satisfy TN ADC 0400-40-7-.04(5)(b). JA0011-12. That condition authorizes TGP to choose from a list of potential rock-removal methods, and based on wide-ranging criteria, "select the least impactful practicable trenching technique for each stream crossing" *during Pipeline construction.* JA0011. Based on that condition, TDEC claims that its "process for determining" the least impactful practicable alternative satisfied its regulations. JA0043. Not so.

TN ADC 0400-40-7-.04(5)(b) does not contemplate any type of *post-issuance* "process." Rather, the regulation conditions permit issuance on TDEC's identification of the least impactful practicable alternative. Courts construing the nearly identical language of the Army Corps' CWA §404(b)(1) guidelines, 40 C.F.R. §230.10(a), have held that it is the responsibility of the Corps—not an applicant— to "analyze alternatives … and *select* the least environmentally damaging practicable

alternative." *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 911 (9th Cir. 2018) (internal quotations and citation omitted) (emphasis added).

The "process" that TDEC touts cannot ensure that TGP will actually use the least impactful practicable rock removal method at each crossing. Under that "process" TGP can—with no prior authorization from TDEC and in full compliance with the Certification—trench through every stream in the Pipeline's path (except those where it utilizes blasting) with a rock trencher, the *most impactful* non-blasting technique. JA0011-12. By turning TGP loose in Tennessee's streams and empowering it to make on-the-fly decisions about how to trench through those streams, TDEC has failed to ensure that the practicable method with the least adverse environmental impact is used.

For example, TDEC allows TGP to make practicability and environmental impact determinations based on subjective criteria like its contractors' "best professional judgment." *Id.* However, the Tennessee General Assembly trusted TDEC's professional judgment when it empowered the Agency to administer the ARAP/§401 program, not that of a pipeline operator driven to keep an eye on cost and scheduling issues.

Relying on a "process" rather than substance places TDEC unlawfully in violation of its own regulations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004) (recognizing "elemental principle" of administrative law that

agencies are required to follow their own regulations). Consequently, Petitioners are likely to succeed on the merits.

3.      Streams and wetlands in the Cumberland Pipeline's path will not only be directly impacted by open-cut crossings, but also indirectly by Pipeline construction in wet weather conveyances. The Pipeline will impact 76 wet weather conveyances (JA0048-53), including 62 dry, open-cut pipeline crossings (JA0608-27). "[W]et weather conveyances" are "man-made or natural watercourses, including natural watercourses that have been modified by channelization … that flow only in direct response to precipitation runoff in their immediate locality[.]" T.C.A. §69-3-103(46).

Although Tennessee law may not require an ARAP for activities in wet weather conveyances, T.C.A. §69-3-108(q)(1), such activities are still subject to regulation by Tennessee state water quality requirements designed to protect downstream intermittent and perennial streams and wetlands. For example, Tennessee law prohibits sediment from wet weather conveyances from reaching "other waters of the state," *i.e.*, intermittent and perennial streams and wetlands. *Id.* §69-3-108(q)(1)(C)(i).

Because the prohibition on downstream sediment transport from activities in wet weather conveyances is a "water quality requirement," TDEC was required to ensure that TGP's proposed project would comply with it. 40 C.F.R. §121.1(n)

(2021) (defining "water quality requirements" to include "state … regulatory requirements for point source discharges"); *id.* §121.7(c) (2021) (requiring states to "include a statement that the discharge from the proposed project will comply with water quality requirements" in any granted §401 certification).

Exhibits to public comments alerted TDEC to the threat of downstream sediment transport from pipeline crossings, such as those proposed for wet weather conveyances. *See, e.g.*, JA2797, JA2700, JA2715, JA2727. And the risks of downstream sedimentation on this project are more than academic. TGP's application describes multiple wet weather conveyances that drain into higher order streams and wetlands after short distances. *See, e.g.*, JA0262-68.

Nonetheless, TDEC did not evaluate whether activities in wet weather conveyances would comply with all applicable water quality requirements. Nothing in the record indicates that TDEC considered the potential for downstream sediment transport to intermittent or perennial streams or wetlands. Indeed, TDEC did not even evaluate how far from such waters TGP's wet weather conveyance activities would occur. Rather, the Agency simply repeated a conclusory mantra—four different times—that impacts and alterations to wet weather conveyances "do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108(q)." JA0008, JA0011, JA0030, JA0053.

"To survive judicial review the agency must have examined the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Simms*, 45 F.3d at 1004. An agency's predictive judgment must have "a reasoned basis" and factual support in the record. *Cincinnati Bell Tel. Co. v. FCC*, 69 F.3d 752, 763 (6th Cir. 1995). Here, TDEC's boilerplate language about the statute governing wet weather conveyances "is not a statement of reasoning, but of conclusion," and, thus, is not a satisfactory explanation for the agency's action. *Tourus Recs., Inc. v. DEA*, 259 F.3d 731, 737 D.C. Cir. 2001).

Moreover, where a "state concludes that conditions on the operation of the project are necessary to ensure compliance with its water quality standards, those conditions must be set out in the §401 certification." *N.C. Dep't of Envtl. Quality v. FERC*, 3 F.4th 655, 661 (4th Cir. 2021). "[A] state must 'set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with … any appropriate requirement of State law.'" *W. Va. Dep't of Envtl. Prot.*, 64 F.4th at 505 (quoting 33 U.S.C. §1341(d)).

Crucially, TDEC did not include compliance with T.C.A. §69-3-108(q)(1) as a Certification condition. Consequently, TDEC has left "out of the federal permit a central justification for its reasonable assurance determination." *W. Va. Dep't of*

*Envtl. Prot.*, 64 F.4th at 506. Because the Certification does not require compliance with T.C.A. §69-3-108(q)(1), TDEC cannot rely on a contingent adherence to that statute to predict that activities in wet weather conveyances will comply with water quality requirements.

4.     At the heart of a state's review of a §401 certification application is the question whether the activities would result in water quality standards violations. 33 U.S.C. §1341(a)(1); *see also S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 374 (2006). In their comments on TGP's application, Petitioners established the risk of substantial, long-term sedimentation impacts (and concomitant water quality standards violations) from TGP's proposed open-cut crossings. JA2294-305. Those comments were supported by scientific literature (JA2678-98; JA2732-67) and expert reports (JA2346-67; JA2768-77).

TDEC did not evaluate that evidence or grapple with its import. That failure to grapple with or further elaborate on contrary record evidence renders the Certificate arbitrary and capricious. *W. Va. Dep't of Envtl. Prot.*, 64 F.4th at 502.

Instead of confronting the record evidence, TDEC sidestepped it, relying irrationally on a "demonstrably false impression" of pipeline crossings regulated under the state's general ARAP for utility line crossings. *Id.* at 508. In addition to issuing *individual* permits for specific projects (like it did here), TDEC can issue *general* permits for "specific categories of activities that are substantially similar in

nature." TN ADC 0400-40-7-.04(1)-(2), (5). TDEC has issued a general ARAP for utility line crossings (hereinafter, the "General ARAP") (JA2831-36), but TGP's proposed project is ineligible for that permit.

In its response to public comments on the draft Certification, TDEC acknowledged comments that "dry-ditch, open-cut crossings will cause or contribute to violations of state water quality criteria, particularly for sedimentation" and that such "[i]mpacts may persist for as long as four years." JA2818. In response, TDEC stated that:

> [o]pen-cut/trenched crossings of streams by utility lines of various types are routinely authorized by coverage under TDEC's *General Aquatic Alteration Permit for Utility Line Crossings* as temporary impacts that do not cause appreciable permanent loss of resource value when they are conducted under the specific Special and General Conditions of the permit. TDEC is not aware of violations of water quality standards resulting from work conducted in compliance with these conditions. These or similar conditions are included in this permit (e.g., Special Conditions i, j, o).

*Id.* In effect, TDEC asserted that, because the Certification includes "similar conditions" to the General ARAP, and since that permit does not routinely cause water quality standards violations, this Pipeline will not either.

But TDEC is comparing apples to oranges. Despite TDEC's assertions, the General ARAP's conditions are far more restrictive than the Certification's conditions. For example, the General ARAP prohibits in-stream blasting like that TGP intends to conduct, limits the number of stream crossings to a fraction of those

proposed by TGP, and prohibits open-cut crossings in wetlands like those TGP would construct. JA2832-33.

Moreover, none of the specific conditions TDEC cites (Special Conditions i, j, and o) address the water quality risks from sedimentation described in the scientific literature and by Petitioners' experts. Rather, Special Condition i addresses the risk of dewatering streams by bedrock fracturing (not the risk of choking streams with sediment), Special Condition j addresses horizontal directional drilling (not dry, open-cut crossings), and Special Condition o addresses storing wetland topsoil for reclamation (not instream construction). JA0014-15.

TDEC's misplaced reliance on the Certification's similarity to the General ARAP is like West Virginia's arbitrary and capricious reliance on an EPA construction stormwater permit to justify its unlawful decision to certify a natural gas pipeline's open-cut crossings in *Sierra Club v. West Virginia Department of Environmental Protection*. In that case, West Virginia cited the conditions on *upland* construction in EPA's construction stormwater permit to support the state's determination that *in-stream* construction activities would comply with water quality standards. 64 F.4th at 507-08. West Virginia claimed that its certification was "nearly identical" to the EPA construction stormwater permit and, hence, it could be assured that water quality standards would not be violated. *Id.* at 508. But West Virginia was wrong—the EPA permit did not apply to in-stream construction. *Id.*

Accordingly, the state's reliance on that permit was arbitrary and capricious because it had a "demonstrably false impression" about the EPA permit. *Id.*

Similarly, here TDEC was under a "demonstrably false impression" that the Certification included conditions the same as or similar to the General ARAP's conditions. JA2819. Because TDEC's mistaken explanation runs counter to the record evidence before the Agency and lacks factual support in the record, the Agency's issuance of the Certification was arbitrary and capricious. *Simms*, 45 F.3d at 1004; *Cincinnati Bell Tel. Co.*, 69 F.3d at 763.

5.   Before issuing a §401 certification, TDEC must evaluate whether an activity will result in "any appreciable permanent loss of resource values." TN ADC 0400-40-7-.04(6)(c). And TDEC cannot authorize any activity "unless any appreciable permanent loss of resource values associated with the proposed impact is offset by mitigation sufficient to result in no overall net loss of resource values from existing conditions." *Id.* 0400-40-07.04(6)(c).

To conduct the resource values analysis, the rules require TDEC to: (1) calculate the loss of resource values *from existing conditions*; (2) balance any loss against the increase in resource values from proposed mitigation; and (3) consider a set of specific factors, including "[w]hether the proposed activity is reasonably likely to have cumulative or secondary impacts to the water resource[.]" TN ADC 0400-40-07.04(6)(c). TDEC did none of those things.

At the threshold, TDEC was required to gather sufficient baseline data on impacted waterways to assess "existing conditions." "Existing conditions" include the "biological, chemical, bacteriological, radiological, and physical conditions of a stream or wetland *at the time the project is proposed* as measured by a quantitative assessment tool or other defensible scientific method as approved or determined by the Division." TN ADC 0400-40-7-.03(16) (emphasis added). Baseline data is a prerequisite to understanding a stream's existing conditions and any appreciable permanent loss of resource values. Because TN ADC 0400-40-7-.04(6) compels TDEC to assess existing conditions of resource values, it was essential that the agency obtain (or require TGP to provide) comprehensive baseline data for impacted sites. TDEC did not do so.

Moreover, the resource values inquiry required TDEC to consider, *inter alia*, whether TGP's proposed pipeline construction and operations are "reasonably likely to have cumulative or secondary impacts to the water resource." TN ADC 0400-40-07-.04(6)(c). Yet again, TDEC impermissibly neglected a regulatory obligation. *See Ohio v. Becerra*, 87 F.4th 759, 772 (6th Cir. 2023) (an agency's failure to consider an important aspect of an issue is arbitrary and capricious).

Analyzing cumulative water quality impacts from pipeline construction is crucial because trenching or blasting through the same waterbody or through several waterbodies within the same watershed can overload "the capacity of the system to

recover from impact," making the "detrimental effects of crossing construction permanent." JA2765. And the Certification authorizes TGP to cut multiple streams multiple times. JA0004-08.

Instead of analyzing the cumulative impacts to those waterbodies from pipeline construction, TDEC merely asserts, repeatedly and superficially, that "[a]ll temporary and permanent impacts within stream segments/reaches, individual streams, and TDEC Waterbody IDs have been assessed cumulatively." JA2821; *see also id.* ("TDEC evaluated impacts cumulatively for each individual stream and for each TDEC Waterbody ID."). Yet TDEC provides no evidence of doing so—the record is barren. Special Condition r of the Permit references a "cumulative impact calculation" which should have occurred as part of TDEC's evaluation. *See* JA0015. Details of that calculation, if TDEC performed it at all, are not in the record.

In fact, in its Permit Rationale determining that pipeline construction will not result in any appreciable permanent loss of resource values, TDEC does not mention cumulative impacts at all. *See* JA0043-44. Instead, TDEC asks the public and the Court to take it at its word that none will occur. "Here, the agency decision is not accompanied by any explanation, let alone a satisfactory one." *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 293 (4th Cir. 2018). Accordingly, Petitioners are likely to succeed on the merits.

## II.    Petitioners Will Suffer Irreparable Harm.

Absent a stay, TGP will complete many—if not all—of its stream crossings before resolution of this petition. TGP's anticipated construction schedule would complete all crossings by March 5, 2025. Ex. 3. This petition for review is not yet set for oral argument, meaning TGP will have ample time to conduct the activities authorized by the Certification before an opinion is issued. Those circumstances justify a stay pending review. *See Sierra Club*, 981 F.3d at 264.

Environmental harms, "by [their] nature, can seldom be adequately remedied by money damages and [are] often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). And, as the Fourth Circuit has observed, pipeline stream crossings "that may occur while the Court decides the case cannot be undone and, if the end result is that [the permit should not have issued], irreparable harm will have occurred in the meantime." *Sierra Club*, 981 F.3d at 264 (cleaned up); *see also U.S. v. Bayshore Assocs., Inc.*, 934 F.2d 1391, 1398 (6th Cir. 1991) (recognizing fill activities "foreseeably cause irreparable harm"); *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 310 F.Supp.3d 707, 719-21 (M.D. La. 2018), *vacated on other grounds*, 894 F.3d 692 (5th Cir. 2018) (finding imminent irreparable harm likely from constructing pipeline waterbody crossings).

TGP's proposed stream crossings threaten to cause "significant permanent impacts" to the streams in the Pipeline's path. JA2347. As expert engineer Starr Silvis warned TDEC:

> Damage to aquatic ecosystems associated with installation of pipelines include: immediate mortality of fish and benthic macroinvertebrates in the area of active construction, downstream increases in turbidity and suspended sediment, downstream deposition of sediment, sedimentation from disturbance of stream banks, temperature increases, and increases in stormwater runoff due to change in runoff from upslope areas.

*Id*. And FERC has previously recognized that in-stream blasting, like that proposed by TGP, "has the potential to injure or kill aquatic organisms, displace organisms during blast-hole drilling operations, and temporarily increase stream turbidity." Fed. Energy Regul. Comm'n, Mountain Valley Project and Equitrans Expansion Project: Final Environmental Impact Statement 4-140 (June 2017), available at https://www.ferc.gov/sites/default/files/2020-05/Final-Environmental-Impact-Statement_1.pdf.

Those imminent irreparable consequences of Pipeline construction strike close to home for Petitioners' members. For example, Robert Connor owns a multi-generational family farm, through which flow several creeks that the Pipeline will cross with open-cut methods. Ex. 6, ¶¶5, 8. Connor enjoys hiking and seeing wildlife around those creeks, and he has expended significant time and resources obtaining grant money to improve the habitat on his farm. *Id.*, ¶¶ 6, 13. TGP plans to trench

through the creeks on Connor's property and clearcut 1.1 acres of forestland he has improved. *Id.*, ¶¶8, 13. Connor is concerned that increased sedimentation in those creeks will cause "long-term harm to water quality and aquatic life" and "disrupt wildlife habitat," and such effects constitute irreparable harm. *Id.*, ¶9. Moreover, "[a]ll of the work that [he] did to improve that forestland will be wasted if the area is cleared for construction of the Cumberland Pipeline." *Id.*, ¶13.

TGP plans to cross Yellow Creek and its tributaries multiple times upstream from Charles Crow's home. Ex. 7, ¶7. Buying his home on Yellow Creek "has been the realization of a dream," and Crow "get[s] so much joy" from spending time with his family and friends swimming and fishing in Yellow Creek and hosting cookouts on its banks. *Id.*, ¶¶8, 9, 14. Crow's aesthetic and recreational interests in Yellow Creek are harmed by his concerns about sedimentation threats from pipeline construction. *Id.*, ¶11. In fact, Crow does not believe "any amount of money would compensate losing [his] use and enjoyment and Yellow Creek in its current state." *Id.*, ¶¶11, 18.

Jerry Steven Shafer regularly takes his grandchildren swimming at the confluence of Gafford Branch and Peabody Branch. Ex. 8, ¶¶4, 5. Gafford Branch is hemmed in by steep and wooded terrain, and Shafer is concerned that TGP's plan to clearcut this area, as well as TGP's plan to cross Gafford Branch and its tributaries upstream from the family swimming spot, will pollute the creek with sediment. *Id.*,

¶¶6, 7. Shafer's recreational and aesthetic interests are already harmed by his concerns, and he will not take his grandchildren there to swim if pollution occurs. *Id.*, ¶¶7, 8.

There simply "is no adequate remedy at law to compensate the public for the harm caused by the disposal of fill material into waters … or in wetlands." *U.S. v. Malibu Beach, Inc.*, 711 F.Supp. 1301, 1313 (D.N.J. 1989). Hence, Crow's concerns that no amount of money could compensate him for the loss and enjoyment of Yellow Creek. Ex. 7, ¶¶11, 18. And the loss of mature forests—which will imminently occur on Conner's property—is not compensable by money, rendering that type of loss quintessentially irreparable. *See, e.g.*, *W. Land Exch. Project v. Dombeck*, 47 F.Supp.2d 1216, 1218 (D. Or. 1999). Finally, the Pipeline construction's lethal effect on aquatic life "is, by definition, irreparable." *Humane Soc'y v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008).

## III.    Preliminary Relief Will Not Substantially Harm TDEC or TGP.

Equitable relief would pose only minimal injury to TDEC. Although an agency has interests in defending its permits, "the effect of an injunction on these interests seems rather inconsequential." *Ohio Valley Envtl. Coalition v. U.S. Army Corps of Eng'rs*, 528 F.Supp.2d 625, 632 (S.D. W.Va. 2007).

Moreover, any economic harm to TGP from a stay does not outweigh the irreparable environmental harm in the balance of the equities. *Sierra Club*, 981 F.3d

at 264-65; *see also Baker v. Adams County/Ohio Valley School Bd.*, 310 F.3d 927, 930 (6th Cir. 2002) (holding "[p]otential monetary damage does not constitute irreparable harm").

## IV.    The Public Interest Favors Preliminary Relief.

The "public has an interest in the integrity of the waters of the United States, and in seeing that administrative agencies act within their statutory authorizations and abide by their own regulations." *Ohio Valley Envtl. Coalition v. Bulen*, 315 F.Supp.2d 821, 831 (S.D. W.Va. 2004); *see also Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, No. 3:12-cv-00682-TBR, 2013 WL 5278236, at *4 (W.D. Ky. Sept. 18, 2013). Moreover, in the public interest analysis, "the NGA yields to the CWA." *Sierra Club*, 981 F.3d at 264-65. Finally, "the public's *true* interest lies in the correct application of the law." *Tenn. v. Dep't of Educ.*, 104 F.4th 577, 614 (6th Cir. 2024) (cleaned up).

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should stay the Certification pending review.

Dated:  September 18, 2024

Respectfully submitted,

**/s/ JAMES S. WHITLOCK**
JAMES S. WHITLOCK
SPENCER SCHEIDT
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org
Email: sscheidt@selcnc.org

STEPHANIE BIGGS
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Email: sbiggs@selctn.org

*Counsel for Petitioners*

**/S/ DEREK O. TEANEY**
DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email: dteaney@appalmad.org

**CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMIT**

This motion complies with the type-face requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) and the type-volume limits of Federal Rule of Appellate Procedure 27(d)(2)(A), because this motion contains 5,192 words and has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

**/s/ JAMES S. WHITLOCK**
JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

## CERTIFICATE OF SERVICE

I hereby certify that, on September 18, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

**/s/ JAMES S. WHITLOCK**
JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org