**SOUTHERN
ENVIRONMENTAL
LAW
CENTER**

1033 Demonbreun Street, Suite 205
Nashville, TN 37203

Telephone 615-921-9470
Facsimile 615-921-8011



EXHIBIT
**B**

April 4, 2022

Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street NE, Room 1A
Washington, DC 20426

**RE:  Conservation Groups' Comments on FERC's Notice of Scoping Comments Requested for the Tennessee Gas Pipeline Company's Cumberland Project; FERC Docket No. PF22-2-000**

Dear Ms. Bose,

Southern Environmental Law Center, Appalachian Mountain Advocates, Sierra Club, Center for Biological Diversity, Appalachian Voices, and Southern Alliance for Clean Energy (together, the "Conservation Groups") submit these comments on the Federal Energy Regulatory Commission's ("FERC" or "the Commission") notice requesting scoping comments on the Cumberland Project ("Cumberland Project" or "the proposed Project").[1]

FERC must assess whether the proposed Project meets the standard of public convenience and necessity. *See* 15 U.S.C. § 717f(c)(1)(A). For the reasons described in these comments, meeting that legal responsibility in this case means preparing an Environmental Impact Statement ("EIS") that addresses all the foreseeable impacts this Proposed Project can generate. FERC's analysis must include, without limitation:

- An appropriate assessment of the Tennessee Valley Authority's ("TVA") alleged need for the proposed Project that addresses the role it plays in TVA's broader program of building new methane gas infrastructure, the Biden Administration's climate policies, and the clean, reliable alternative sources of power available to TVA;

- A searching review of the proposed Project's environmental justice impacts that account for the preexisting disproportionate share of environmental impacts some communities already bear;

---

[1] Notice of Scoping Period Requesting Comments on Environmental Issues for the Planned Cumberland Project, Dkt. No. PF22-2-000 (March 3, 2022) [hereinafter "Cumberland Project Scoping Notice"]. Documents cited in the comments and not already widely published are included in an alphabetically organized index appended to these comments.

*Conservation Groups' Scoping Comments on the Cumberland Project*

- A detailed assessment of the proposed Project's greenhouse gas emissions—upstream and downstream, direct and indirect—that uses the best available methodologies to quantify the impacts those emissions will cause;

- A complete discussion of the impact the Cumberland Project may have on wildlife and in particular on federally protected species; and

- A careful analysis of the ways the proposed Project will affect protected waterways and historic resources.

Thank you for your consideration of our comments. Please contact us if we can answer any questions.

Sincerely,

s/ Amanda Garcia
Amanda Garcia
Trey Bussey
Stephanie Biggs
Daniel J. Metzger
Southern Environmental Law Center
1033 Demonbreun Street
Suite 205
Nashville, TN 37203
(615) 921-9470
agarcia@selctn.org
tbussey@selctn.org
sbiggs@selctn.org
dmetzger@selctn.org

Gregory Buppert
Southern Environmental Law Center
201 West Main Street
Suite 14
Charlottesville, VA 22902
(434) 977-4090
gbuppert@selcva.org

Brianna Knisley
Appalachian Voices
589 West King Street
Boone, NC 28607
(865) 219-3225
brianna@appvoices.org

Derek Teaney
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006
dteaney@appalmad.org

Amy Kelly
Sierra Club
PO Box 113
Powell, TN 37849
(423) 398-3506
amy.kelly@sierraclub.org

Maggie Shober
Southern Alliance for Clean Energy
P.O. Box 1842,
Knoxville, TN 37901
(615) 364-5527
maggie@cleanenergy.org

Gabriela Sarri-Tobar
Center for Biological Diversity
1411 K St. NW, Suite 1300
Washington, D.C. 2005
(202) 849-8401
gsarritobar@biologicaldiversity.org

*Conservation Groups' Scoping Comments on the Cumberland Project*

## Conservation Groups' Scoping Comments on the Cumberland Project

### I.   FERC must not defer to TVA's parallel NEPA review.

TVA proposes closing an aging coal plant, the Cumberland Fossil Plant, and replacing it with 1450 megawatts of new generation. Last year, TVA announced in its own National Environmental Policy Act ("NEPA") scoping notice that one of the generation options that it would consider would be a new combined-cycle gas plant located at its Cumberland City, Tennessee, site. If approved and built, that power plant would require a lateral pipeline, proposed here by Tennessee Gas Pipeline Company ("TGPC") as the Cumberland Project, for its fuel supply. The power plant and the pipeline are, in reality, a single project: each is inextricably entwined with the other, and both must be approved for either project to proceed. Under NEPA's 1978 implementing regulations (the "1978 Rules"), these projects are "connected actions" requiring consideration in the same impact statement.[2] Yet TVA and FERC are moving forward with parallel, but asynchronous, NEPA processes that are likely to overlap in their analyses of effects and alternatives. The timing of these reviews— TVA's review began last year—raises the very real risk that FERC may feel bound to defer to conclusions reached by the federal utility despite its own independent legal obligations. It should not.

In its May 2021 scoping notice for the replacement of the Cumberland Fossil Plant, TVA appropriately characterized the proposed Project as a "connected action" that it would evaluate as part of its environmental review.[3] TVA also anticipated that its review would include three other alternatives in addition to the combined-cycle gas plant: a "no action alternative," simple-cycle gas plants located at various sites, and a suite of solar and battery storage facilities located at various sites.[4] FERC's scoping notice noted that "TVA is evaluating options to replace capacity following the retirement of its existing coal-fired Cumberland Fossil Plant" but did not include the proposed gas plant in its description of the proposed Project under review.[5] FERC also said it will "evaluate reasonable alternatives to the planned project or portions of the project" but did not suggest specific alternative options.[6]

Both agencies have independent legal obligations to evaluate the environmental effects of both the proposed pipeline and the proposed power plant.[7] Both also have an independent obligation to evaluate reasonable energy alternatives like renewable energy options that could obviate the need for new gas infrastructure

---

[2] 18 C.F.R. § 1508.21(a)(1) (1978).

[3] Environmental Impact Statement for Cumberland Fossil Plant Retirement, 86 Fed. Reg. 25,933, 25,934 (May 11, 2021).

[4] *Id.*

[5] Tennessee Gas Pipeline Company, LLC; Notice of Scoping Period Requesting Comments on Environmental Issues for the Planned Cumberland Project, 87 Fed. Reg. 13,286, 13,287 (Mar. 9, 2022).

[6] *Id.*

[7] 42 U.S.C. § 4332(C), (E); 18 C.F.R. §1508.21(a)(1) (1978).

*Conservation Groups' Scoping Comments on the Cumberland Project*

entirely. TVA included solar and battery storage as an expected option that it will examine in its scoping notice, and FERC's regulations require applicants to submit an alternatives analysis that addresses a "no action alternative" and "the effect of energy conservation or energy alternatives to the project[.]"[8] Moreover, the 1978 Rules specifically instruct agencies to evaluate "reasonable alternatives not within the jurisdiction of the lead agency."[9] And the Natural Gas Act imposes on FERC a separate obligation to ensure that a project "is or will be required by the present or future public convenience and necessity[,]" a searching inquiry that must include renewable energy alternatives.[10]

These parallel NEPA reviews will cover identical issues and risk being inconsistent or even in conflict, yet neither TVA nor FERC explains how one will be squared with the other. FERC must not fall back on TVA's review to avoid its own independent review of environmental effects and reasonable alternatives to the entire combined project.[11] FERC's independent review is especially important here because TVA appears to have unlawfully predetermined the outcome of its own analysis: draft Resource Report 10 says that TGPC has entered a "binding precedent agreement with TVA . . . for all of the incremental firm transportation capacity" created by the proposed Project, even though TVA has not even released a draft impact statement for public comment.[12]

## II.    FERC should apply longstanding NEPA rules that comport with the statute's purpose and goals.

NEPA and the Council on Environmental Quality's ("CEQ") 1978 NEPA implementation rules (the "1978 Rules") provided consistent guidance to agencies and the affected public for decades.[13] Then, in 2020, a change prompted by then-President Trump's executive orders upset industry expectations and long-standing agency practice by overhauling the rules (the "2020 Revision").[14]

The draft 2020 Revision elicited over a million comments expressing stakeholders' concerns, and the final 2020 Revision prompted a range of lawsuits

---

[8] 18 C.F.R. pt. 380 App. A; *see also* 18 C.F.R. § 380.12(*l*)(1); 40 C.F.R. § 1502.14.

[9] 40 C.F.R. §1502.14(c) (1978). NEPA itself similarly requires an agency to consider all appropriate alternatives. *See* 42 U.S.C. § 4332(E) (requiring, without further limitation, all federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources").

[10] 15 U.S.C. §717f(e).

[11] *Cf. Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 84 (4th Cir. 2020) (requiring an "independent review" for an agency to adopt an impact statement published by FERC).

[12] Tennessee Gas Pipeline Company, L.L.C., Draft Resource Report 10: Alternatives at 10-2, Dkt. No. PF-22-2-00 (Feb. 2022) [hereinafter "Resource Report 10"]; *see also infra* Section IV.B.

[13] Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, 43 Fed. Reg. 55,978 (Nov. 29, 1978).

[14] *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020) [hereinafter "2020 Revision"].

*Conservation Groups' Scoping Comments on the Cumberland Project*

challenging its legality.[15] Just over a year later, and before waiting for courts to resolve all of the challenges filed against the new rulemaking, CEQ itself concluded that the 2020 Revision could have "negative repercussions for environmental protection and environmental quality," "may not reflect NEPA's statutory purposes," and "may not support science-based decision making."[16] To correct those errors, CEQ proposed, in a 2021 rulemaking, to return to "the language from the 1978 NEPA Regulations that was in effect for more than 40 years, subject to minor revisions for clarity."[17] The 1978 Rules serve NEPA's twin aims of causing an agency to consider "every significant aspect of the environmental impact of a proposed action," and to fully inform the public that it has considered those impacts.[18] They do so, most importantly here, by requiring an agency to use its expertise to evaluate the direct, indirect, and cumulative impacts of a proposed project.[19]

The 2020 Revision, in contrast, purports to limit long-standing requirements to evaluate indirect and cumulative impacts—regardless of how real, significant, and well-understood those effects are known to be.[20] But FERC (and TVA) have acknowledged that climate change impacts are within the scope of those environmental effects at which NEPA requires an agency to take a "hard look."[21] Applying the 1978 Rules will thus allow FERC to be consistent with NEPA, as well as its own —and CEQ's—interpretation of NEPA's requirements.

Moreover, FERC's draft guidance is more consistent with CEQ's 2021 rulemaking to restore the 1978 Rules than the short-lived and unlawful 2020 Revision. In addition to restoring key portions of the definition of "effects and impacts" from the 1978 Rules, the 2021 rulemaking encourages agencies to use their

---

[15] *See* National Environmental Policy Act Implementing Regulations Revisions, 86 Fed. Reg. 55,757, 55,758 (Oct. 7, 2021) [hereinafter "2021 Rulemaking"].

[16] *See id.* at 55759.

[17] *Id.* at 55760.

[18] *See Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 568 (D.C. Cir. 2016) (quoting *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983)).

[19] *See* 2021 Rulemaking, *supra* note 15, at 55762–67 (explaining how a return to the 1978 Rules will remedy problems created by the 2020 Rule's definition of "effects or impacts").

[20] 40 C.F.R. § 1508.1(g)(2) (2020).

[21] *See Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,108 (2022) [hereinafter "Interim Greenhouse Gas Policy"] ¶ 10 ("[FERC] staff has addressed climate change in some fashion in its NEPA documents for at least a decade."); TENN. VALLEY AUTH., CUMBERLAND FOSSIL PLANT RETIREMENT EIS SCOPING REPORT at 4.2 (2021) [hereinafter "Cumberland Retirement Scoping Report"], https://www.tva.com/docs/default-source/1-float/final_tva_cumberland_eis_scoping_report2b91b738-1fc7-4db7-8cf6-015ec504730bd.pdf?sfvrsn=bd3c1ed6_5 (noting that TVA identified "[a]ir quality and climate change (emissions and greenhouse gases)" as an area requiring review in its EIS for the same project at issue here).

own discretion to consider a range of factors in assessing the need for a project,[22] and to take responsibility for designing agency-specific procedures.[23] FERC has already laid out agency-specific factors it will consider when assessing the need for a project in the Commission's Updated Policy Statement.[24] FERC should comply with NEPA by applying the 1978 Rules, and by using its own agency-specific procedures to assess the need for the Cumberland Project.

## III. FERC must prepare an EIS pursuant to binding precedent, FERC's own understanding of its legal obligation, and the goals of NEPA.

The Cumberland Project far exceeds the threshold FERC has identified for preparing an EIS, rather than an environmental assessment ("EA"). In its draft guidance on greenhouse gas emissions, FERC presumes that, assuming a 100% utilization rate, a project with "estimated emissions of 100,000 metric tons per year" of carbon dioxide equivalents has a significant effect triggering a full EIS review.[25] The Cumberland Project will provide up to 245,000 dekatherms per day of gas to TVA.[26] At that rate, the proposed Project will transport gas accounting for about 4,739,525 metric tons of carbon dioxide per year—forty-seven times the threshold FERC set for significance and easily meeting any reasonable threshold the Commission may ultimately establish.[27]

---

[22] 2021 Rulemaking, *supra* note 15, at 55,760 ("Agencies should have discretion to base the purpose and need for their actions on a variety of factors, which include the goals of the applicant, but not to the exclusion of other factors.").

[23] *Id.* at 55,762 ("NEPA also expressly instructs agencies to develop methods and procedures for the development of EISs, indicating that agencies are intended to take responsibility for their own procedures, even while consulting with CEQ.").

[24] *Certification of New Interstate Natural Gas Facilities*, 178 FERC ¶ 61,107 (2022) [hereinafter "Updated Policy Statement"], https://www.ferc.gov/media/pl18-1-000 (affirming FERC's decision to consider, in addition to precedent agreements, evidence of a project's need that includes, among others, "how the gas to be transported by the proposed project will ultimately be used," "why the project is needed to serve that use," and "current and expected policy and regulatory developments [that] would affect future need for the project"). On March 24, 2022 the Commission issued another order designating the Updated Policy Statement and Interim Greenhouse Gas Policy as drafts, seeking public comment, and clarifying that they would not be automatically applied to pending applications— but not changing the substance of that guidance. *See* Press Release, FERC, FERC Seeks Comment on Draft Policy Statements on Pipeline Certification, GHG Emissions (March 24, 2022), https://www.ferc.gov/news-events/news/ferc-seeks-comment-draft-policy-statements-pipeline-certification-ghg-emissions.

[25] Interim Greenhouse Gas Policy, *supra* note 21, ¶ 79.

[26] Tennessee Gas Pipeline Company, L.L.C., Draft Resource Report 1: General Project Description at 1-1, Dkt. No. PF-22-2-00 (Feb. 2022) [hereinafter "Resource Report 1"].

[27] EPA's greenhouse gas equivalencies calculator indicates a conversion of 0.0053 metric tons of carbon dioxide per therm of "natural" gas burned as fuel. *See Greenhouse Gas Equivalencies Calculator*, ENV'T. PROT. AGENCY, https://www.epa.gov/energy/greenhouse-gases-equivalencies-calculator-calculations-and-references. 245,000 dekatherms per day are 2,450,000 therms, which convert to 12,985 tons of $CO_2$ each day—multiplying that figure by 365 days in the year yields 4,739,525 tons/year of carbon dioxide.

*Conservation Groups' Scoping Comments on the Cumberland Project*

Even if FERC ignores how far the proposed Project exceeds the carbon dioxide threshold in its own draft guidance, NEPA would require an EIS for the Cumberland Project. Building a new gas-fired power plant and a 32-mile, 30-inch pipeline to serve it raises, at a minimum "substantial questions whether a project may have a significant effect."[28] An action's significance is measured in terms of both context and intensity. Context means the project "must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality."[29] Intensity requires assessing a range of factors, which weigh strongly in favor of drafting an EIS here.

Building this pipeline "affects public health or safety" because it is dangerous and contributes to local air and water pollution.[30] The proposed Project poses immediate dangers from fires, explosions, and other incidents. A recent report examining data from 2010–2018 on gas transmission pipelines found that every year on average there are several explosions, hundreds of people evacuated, and a reportable incident which occurs about every three days.[31] Local air pollution from fugitive methane emissions along the pipeline route, even if in compliance with air permits, can further imperil local health by increasing risks of asthma, heart attacks, and death. Last year a group of thousands of doctors and organizations wrote to the EPA Administrator urging him to adopt strict rules for regulating methane.[32] The commenters pointed out that:

> Methane is associated with serious health effects through its contributions to climate change. Climate-related health impacts already being felt in the United States include death from heat stroke; damage to lung function; increased hospitalization for asthma aggravations, respiratory infections, bronchitis and chronic obstructive pulmonary disease (COPD); outbreaks of waterborne and diarrheal diseases; possible exposure to vector-borne diseases including Lyme, dengue fever, West Nile Virus, and Rocky Mountain spotted fever; food

---

[28] *Center for Biological Diversity v. Nat'l Hwy. Safety Admin.*, 538 F.3d 1172, 1219 (9th Cir. 2008) (citing *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998)).

[29] 40 C.F.R. § 1508.27 (1978). The 2020 Revision deleted but did not replace the significance factors. As discussed above, CEQ has published its intention to generally restore the 1978 Rules. The 1978 regulations, as well as the decades of case law interpreting NEPA itself, provide guidance to determine when an action "significantly affects the quality of the human environment" under NEPA. 42 U.S.C. § 4332(C).

[30] *See* 40 C.F.R. § 1508.27(2) (1978) (noting that considering a project's intensity should address the "degree to which the proposed action affects public health or safety.").

[31] *See* Matt Kelso, *Pipeline Incidents Continue to Impact Residents*, FRACTRACKER ALL. (Dec. 7, 2018), https://www.fractracker.org/2018/12/pipeline-incidents-impact-residents/.

[32] AMERICAN LUNG ASS'N, HEALTHCARE GROUPS COMMENTS ON REDUCING METHANE EMISSIONS 1, (2021), https://www.lung.org/getmedia/b4e25639-dc9a-4dc9-94bd-7aec979cc65a/health-groups-comment-on-reducing-methane-emissions.pdf.

*Conservation Groups' Scoping Comments on the Cumberland Project*

insecurity, and high levels of anxiety and post-traumatic stress disorder (PTSD).[33]

The Cumberland Project also carves out a regulatory path that similar projects will follow.[34] TVA's 2019 Integrated Resource Plan indicates that over the course of the next decade, TVA may propose thousands of additional megawatts of combined cycle plants requiring additional methane gas pipeline infrastructure projects.[35] For example, TVA's Kingston Fossil Plant Retirement ("Kingston Retirement") is proceeding on a similar, but slightly later schedule.[36] Both projects involve TVA plans to retire coal-combustion facilities and replace them with gas; both projects require new gas pipeline infrastructure to cut through Tennessee; and TVA has treated the two projects as a pair in a range of public-facing venues.[37] Since the projects raise substantially similar issues (as further discussed below) and since Kingston is scheduled to follow the Cumberland Project closely in time, FERC's decisions with respect to the Cumberland Project will create a clear expectation that the Commission will treat Kingston, and other pipelines proposed to serve TVA methane gas plants, similarly.

---

[33] *Id.* at 2.

[34] 40 C.F.R. § 1508.27(6) (1978) (directing agencies to consider whether "the action may establish a precedent for future actions with significant effects").

[35] TENN. VALLEY AUTH., 2019 INTEGRATED RESOURCE PLAN at 9-4 (2019) [hereinafter "2019 IRP"], https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/default-document-library/site-content/environment/environmental-stewardship/irp/2019-documents/tva-2019-integrated-resource-plan-volume-i-final-resource-plan.pdf?sfvrsn=44251e0a_4.

[36] *Compare Proposed NEPA Schedule [for Cumberland Retirement]*, TENN. VALLEY AUTH., https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/environment/environmental-stewardship/nepa-environmental-reviews/cumberland-retirement/tva-boards05-07-21-5_nepa-schedule0789b0c2-d728-4156-add3-806420fefde7.pdf?sfvrsn=c5a4f3ac_3 (last visited April 4, 2022), *with Proposed NEPA Schedule [for Kingston Retirement]*, TENN. VALLEY AUTH., https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/environment/environmental-stewardship/nepa-environmental-reviews/cumberland-retirement/tva-boards05-07-21-5_nepa-schedule0789b0c2-d728-4156-add3-806420fefde7.pdf?sfvrsn=c5a4f3ac_3 (last visited April 4, 2022).

[37] *See, e.g.*, TENN. VALLEY AUTH. NOV. 10, 2021 BOARD PRESENTATION at 43–48 (2021), https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/about-tva/board-of-directors/november-10-2021/22-4240-nov-2021-board-deck_fnl884febc3-fdb9-45ee-ab22-fb0672ec3f53.pdf?sfvrsn=b13500a0_3 (simultaneously delegating the TVA board's decisionmaking authority to the agency's CEO to take actions relating to the Cumberland and Kingston projects); Letter from Jeffrey J. Lyash, CEO, TVA, to U.S. House of Representatives Comm. on Energy and Com. at 4 (Feb. 2, 2022) [hereinafter "Lyash Letter"], https://cleanenergy.org/wp-content/uploads/TVAs-Energy-Commerce-Committee-Response.pdf ("TVA is currently conducting environmental reviews evaluating potential retirements at the Cumberland Fossil Plant (Cumberland) and Kingston Fossil Plant (Kingston), along with evaluation of replacement generation.").

*Conservation Groups' Scoping Comments on the Cumberland Project*

As further described below, the proposed Project collides with waterways in scores of places.[38] It would cross streams protected under the Wild and Scenic Rivers Act, potentially affect federally protected species which rely on these waterways, and be constructed using destructive stream crossing methods in a range of places.[39]

Finally, whether the proposed action is needed is controversial and whether the action itself "threatens a violation of federal . . . law or requirements imposed for the protection of the environment."[40] As further described below, the current alternatives that Kinder Morgan/TGPC suggests FERC consider overlook real options that would have less severe environmental impacts. Moreover, TVA's decision to charge ahead with new gas plants defies federal policy directing all agencies to "immediately commence work to confront the climate crisis."[41] And worse still, FERC approval of this project would allow TVA to begin using its procurement authority to directly violate federal climate policy. Because the proposed Project could violate federal requirements that related to environmental protection, FERC needs to draft an EIS to fully examine its consequences.

## IV.   FERC must consider whether TVA needs a new fossil plant at all.

FERC's authority under the Natural Gas Act ("NGA") is to certify that a project meets the standard of public convenience and necessity,[42] and the Commission's review of a proposed project under that section incorporates NEPA review.[43] FERC can certify a project subject to "reasonable terms and conditions as the public convenience and necessity may require."[44] FERC must use its NEPA process to fully examine whether the proposed Project is needed, and to properly understand what conditions it should put on any certificate it might issue for the Cumberland Project.

FERC's draft Updated Policy Statement gives stakeholders and project developers clear guidance—consistent with NEPA's aims—that the agency will review all the relevant benefits and consequences of new methane infrastructure projects. The need that will be served by a project is the most important factor in assessing whether it will benefit the public and must be balanced against its adverse

---

[38] The 1978 Rules suggest that an agency's review of a project's intensity should consider, among other things, "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(3) (1978).

[39] *See infra* Section IX.

[40] 40 C.F.R. § 1508.27(4, 10) (1978).

[41] Executive Order 13990, 86 Fed. Reg. 7036, 7037 (Jan 20, 2021).

[42] *See* 15 U.S.C. § 717f.

[43] *Food & Water Watch v. FERC*, No. 20-1132, 2022 WL 727037, at *1 (D.C. Cir. Mar. 11, 2022) ("The Section 7 certificate process incorporates review of proposed projects under the National Environmental Policy Act (NEPA)."); *see also Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021) (finding an NGA certification deficient "to the extent [it] relied on its NEPA analyses of the projects' impacts on climate change and environmental justice.").

[44] 15 U.S.C. § 717f(e).

*Conservation Groups' Scoping Comments on the Cumberland Project*

impacts.[45] FERC's review of the need to be met by the proposed Project must be searching, go beyond TVA's mere announcement that it needs this gas, and seriously consider whether the proposed Project is needed at all. In addition to the needs to be met by a project, FERC must consider the environmental impacts and mitigation steps to address them, including the impacts of "industrial development near residences, workplaces, religious institutions, and schools"[46]; health disparities that manifest as higher rates of asthma and cancers[47]; and demographic considerations.[48] The EIS is the right time to assess all mitigation options the Commission may ultimately link to the certificate it issues.

### A.  FERC must assess whether the Cumberland Project is needed in the first place.

There is no reason for the Cumberland Project except to deliver methane gas to TVA. The gas will be used to generate power, which TVA proposes against the backdrop of its own goal of reaching net-zero carbon emissions in electricity generation by 2050,[49] its stated support for helping to bring hundreds of thousands of new electric vehicles onto the road in the near term,[50] and the agency's asserted plans to expand its solar generation capacity to 10,000 MW by 2035.[51] As a federal agency—and particularly as the nation's largest federal utility—TVA has a responsibility to carry out the administration's goal of "immediately commenc[ing] work to confront the climate crisis" under Executive Order 13990,[52] and "to lead by example" to decarbonize the electric sector under Executive Order 14057.[53]

FERC should consider whether TVA could avoid building another methane pipeline altogether by instead deploying solar, battery storage, or combined zero-greenhouse gas resources to meet the generation needs TVA cites. TVA's planning model picks energy efficiency and demand response instead of new gas generation in its own sensitivity analysis in the 2019 Integrated Resource Plan ("IRP") when

---

[45] Updated Policy Statement, *supra* note 24, ¶ 52.

[46] *Id.* ¶ 86.

[47] *Id.* ¶ 86.

[48] *Id.* ¶ 88.

[49] TENN. VALLEY AUTH., LEADERSHIP & INNOVATION ON A PATH TO NET-ZERO 5 (2020) [hereinafter "PATH TO NET-ZERO"], https://southernenvironment.sharefile.com/d-s751391d8fcf74431af893b966b81ebf2.

[50] *Electric Vehicles*, TENN. VALLEY AUTH., https://www.tva.com/energy-system-of-the-future/electric-vehicles (last visited April 3, 2022).

[51] TENN. VALLEY AUTH., JOHNSONVILLE AERODERIVATIVE CT ENVIRONMENTAL ASSESSMENT 1 (Jan. 2022) [hereinafter "Johnsonville EA"], https://www.documentcloud.org/documents/21181195-johnsonville-aeroderivative-combustion-turbines-project-draft-environmental-assessment.

[52] 86 Fed. Reg. at 7037.

[53] 86 Fed. Reg. 70,935, 70,935 (Dec. 13, 2021).

*Conservation Groups' Scoping Comments on the Cumberland Project*

artificial caps are removed.[54] Further, FERC has indicated that it will consider local climate change policy when it considers what mitigation measures are appropriate.[55] Here, for example, Nashville Electric Service—one of TVA's largest customers,[56] as well as one of the twelve largest distributors in the nation and wholly within TVA's service area[57]—has committed to supporting the city of Nashville's goal of reducing its emissions by 80% by 2050.[58] With nearly all of Nashville's power supply coming from TVA, the federal utility's decision to build new gas instead of renewables is at odds with what its customers are demanding.

TVA may even be able to avoid new generation assets altogether: TVA's largest customer—Memphis Light, Gas, and Water, representing 9% of TVA's revenue in 2020[59]—is actively considering leaving TVA.[60] Two more utilities are appealing this Commission's decision to deny them unbundled access to TVA's grid, which would allow them to purchase non-TVA power.[61] TVA is in fact so concerned about losing its

---

[54] Tenn. Valley Auth., 2019 IRP Working Group Meeting 13 Presentation 52–57 (May 13–14, 2019), https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/default-document-library/site-content/environment/environmental-stewardship/irp/2019-documents/irp_working_group_meeting_13.pdf?sfvrsn=4edf600c_0.

[55] Interim Greenhouse Gas Policy, *supra* note 21, ¶ 111 ("Moreover, we recognize that determining an appropriate amount of mitigation, particularly for downstream uses, depends on a variety of complex factors, some of which may not be known at the time of an application, such as state and local climate change policies, the interconnected nature of the natural gas pipeline system, long-term changes in natural gas supply sources, changes in demand for natural gas over time, individual companies' long-term goals to reduce greenhouse gas emissions, the availability of renewable energy credits or other carbon offsets, and the potential for future action by other federal agencies.").

[56] Tenn. Valley Auth., Annual Report (Form 10-K) at 10 (Nov. 16, 2020) [hereinafter "TVA 10-K], https://www.sec.gov/ix?doc=/Archives/edgar/data/0001376986/000137698620000030/tve-20200930.htm (TVA sales to NES were 8% of TVA's total revenues in 2020, eclipsed only by Memphis Light, Gas, and Water's 9%).

[57] *Nashville Electric Service*, Tenn. Valley Auth., https://www.tva.com/energy/public-power-partnerships/local-power-companies/lpc/nashville-electric-service (last visited April 3, 2022).

[58] *Nashville Electric Service to play major role in Metro's 2022 Sustainability initiatives*, NES Power News (Feb. 8, 2022), https://nespowernews.com/nashville-electric-service-to-play-major-role-in-metros-2022-sustainability-initiatives/; Nashville Metro. Council, Res. RS 2022-1358, https://nashville.legistar.com/LegislationDetail.aspx?FullText=1&GUID=4471E711-0361-4489-B8D5-76347758BC0D&ID=5393859&Options=&sspostbackTarget=ctl00%24ContentPlaceHolder1%24gridLegislation%24ctl00%24ctl02%24ctl01%24ctl04.

[59] TVA 10-K, *supra* note 56, at 10 (TVA sales to NES were 8% of TVA's total revenues in 2020, eclipsed only by Memphis Light, Gas, and Water's 9%),

[60] Samuel Hardiman, *This week, a TVA competitor comes to Memphis. It's the start of the city's electricity endgame*, Memphis Comm. Appeal (March 20, 2022) https://www.commercialappeal.com/story/news/2022/03/20/tennessee-valley-authority-competitor-comes-memphis/9439526002/?gnt-cfr=1 ("The city of Memphis and Memphis, Light, Gas and Water are entering the home stretch of a seminal decision – whether it is going to leave the Tennessee Valley Authority and purchase power elsewhere.").

[61] *See* Petition for Review, *Athens Utilities Board, et al v. FERC* (D.C. Cir. Feb 18, 2022) (No. 22-rev-01024).

*Conservation Groups' Scoping Comments on the Cumberland Project*

customer base that in 2019 it radically changed its power supply contracts to attempt to block customers from considering alternatives.[62] Further, TVA's CEO recently wrote that efficiency programs could create load reductions of over 2000 megawatts.[63] Yet the Cumberland Project's Resource Report says the TVA is adding 1,450 megawatts of methane gas-fired generation supported by this proposed Project. FERC's statutory obligation to examine the public "necessity" of the Cumberland Project requires it to investigate this mismatch as the Commission takes its hard look at whether TVA needs to build a new gas plant at all.

Finally, FERC's review of need for the Cumberland Project should take President Biden's Executive Orders seriously by closely examining whether building new gas plants can be justified in light of national climate change policy. Federal policy clearly directs agencies to rapidly decarbonize, and as the nation's largest federal utility, TVA should be at the forefront of the effort, not actively undermining it.[64] FERC can help keep TVA on track with ratepayers and federal climate policy alike by taking the hard look at alternatives that NEPA requires.

### B. The Precedent Agreement between TVA and Kinder Morgan is not entitled to any weight as evidence of the Cumberland Project's need.

In its Updated Policy Statement, FERC makes clear that precedent agreements are no longer sufficient to satisfy the Commission's review of whether a project is needed,[65] but it has still maintained that that "precedent agreements remain important evidence of need."[66] TVA's Precedent Agreement with Kinder Morgan's subsidiary TGPC is not entitled to any weight as evidence of need. TVA has executed the Precedent Agreement before even issuing a draft EIS for the proposed

---

[62] Zack Hale, *TVA Hit With Suit Targeting Long-Term Contracts as Memphis Utility Weighs Exit*, S&P GLOBAL (Aug. 19, 2020), https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/tva-hit-with-suit-targeting-long-term-contracts-as-memphis-utility-weighs-exit-60003953 ("[T]he initial term of the TVA's long-term agreement is 20 years, [and] that term extends itself automatically each year . . . ."); Toby Sells, *New Suit Challenges TVA's Long-Term Contracts*, MEMPHIS FLYER (Aug. 18, 2020), https://www.memphisflyer.com/new-suit-challenges-tvas-long-term-contracts?msclkid=b2d300c3b36611ecbcb9a46b2ec96313.

[63] Lyash Letter, *supra* note 37, at 4.

[64] See Lisa Friedman, *Largest Federal Utility Chooses Gas, Undermining Biden's Climate Goals*, N.Y. TIMES (March 17, 2022), https://www.nytimes.com/2022/03/17/climate/tennessee-valley-authority-biden-climate.html (describing how TVA is "seeming to thwart Mr. Biden's climate agenda"); Executive Order 14057 further (instructing federal agencies "to lead by example in order to achieve a carbon pollution-free electricity sector by 2035").

[65] Updated Policy Statement, *supra* note 24, ¶ 54 ("[W]e find that looking only to precedent agreements, and ignoring other, potentially contrary, evidence may cause the Commission to reach a determination on need that is inconsistent with the weight of the evidence in any particular proceeding, in violation of both the NGA and the Commission's responsibilities under the Administrative Procedure Act.").

[66] *Id.*

*Conservation Groups' Scoping Comments on the Cumberland Project*

methane gas plant, much less completing its NEPA review.[67] Neither TVA nor FERC can claim the Precedent Agreement was the product of the kind of fully-informed, public decision making NEPA requires.[68] Instead, the Precedent Agreement only serves to justify TVA's premature commitment to its proposed methane gas plant alternative—and it does so at the expense of fully and lawfully considering alternatives that do not require a new gas pipeline.

## V.    FERC is required to fully consider zero- and lower-carbon alternatives to the proposed Project, especially ones that do not lock in new fossil fuel infrastructure.

Complying with NEPA and President Biden's Executive Orders requires FERC to consider a full range of carbon-free alternatives[69] to building the Cumberland Project. Considering TVA's one vaguely-described lower-carbon alternative—Alternative C, in the Scoping Report[70]—is not enough to satisfy the agency's obligation to take a hard look at both the alternative it prefers and the other alternatives available.[71]

Discussing project alternatives is the heart of an agency's NEPA analysis.[72] The 1978 Rules explain that analyzing alternatives requires FERC to "[r]igorously

---

[67] *See* Resource Report 10, *supra* note 12, at 10-2 (describing a "binding precedent agreement with TVA . . . for all of the incremental firm transportation capacity"); *see also Cumberland Fossil Plant Retirement*, TENN. VALLEY AUTH. https://www.tva.com/environment/environmental-stewardship/environmental-reviews/nepa-detail/cumberland-fossil-plant-retirement (last visited April 3, 2022).

[68] *See Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) ("[T]he comprehensive "hard look" mandated by Congress and required by [NEPA] must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made."); *cf. Burkholder v. Peters*, 58 F. App'x 94, 97 (6th Cir. 2003) (noting "clear" violation where contracts for final design work were executed before the NEPA process but declining requested injunction on separate grounds).

[69] "Carbon-free alternatives" and comparable terms, as used throughout these comments, refer to alternatives that eliminate the greenhouse gas emissions of the project so include, for example, alternatives that avoid pre-combustion methane leaks along a pipeline route.

[70] Cumberland Retirement Scoping Report, *supra* note 21, at 3.4 (noting TVA identified "[a]ir quality and climate change (emissions and [greenhouse gases])" as an area requiring review in its EIS for the same project at issue here). The National Park Service, for example, commented that TVA Alternative C is described in a way that made it "difficult to understand the potential impacts" of the facilities that alternative would require. *Id.* at 6.1.4.

[71] *See Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) ("[An EIS] forces the agency to take a "hard look" at the environmental consequences of its actions, including alternatives to its proposed course.") (citing *Baltimore Gas & Electric Co v. Natural Resources Defense Council*, 462 U.S. at 97).

[72] 42 U.S.C. § 4332(E) (agencies shall "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources"); *Sierra Club v. U.S. Army Corps of Engr's*, 803 F.3d 31, 37 (D.C. Cir. 2015) ("At the heart of NEPA is the procedural requirement that . . . the agencies consider alternatives that might lessen any adverse environmental impact."); *Citizens Against*

*Conservation Groups' Scoping Comments on the Cumberland Project*

explore and objectively evaluate all reasonable alternatives," to "[d]evote substantial treatment to each alternative considered in detail," and to address "reasonable alternatives not within the jurisdiction of the lead agency."[73] Even the short-lived and unlawful 2020 Revision requires FERC to evaluate alternatives in materially the same way, ensuring reviewers can evaluate each alternative's merits.[74]

A complete discussion of greenhouse gas-free alternatives in particular is required under President Biden's Executive Orders addressing climate change. FERC cannot support TVA's goal of waiting until some future date to fully decarbonize TVA's generation portfolio. Executive Order 14008 describes "a carbon pollution-free electricity sector no later than 2035" as a national priority.[75] To get there, the administration has set up a "[g]overnment-wide approach that reduces climate pollution in every sector of the economy . . . especially through innovation, commercialization, and deployment of clean energy technologies and infrastructure."[76] Executive Order 14057 further instructs federal agencies "to lead by example in order to achieve a carbon pollution-free electricity sector by 2035 . . . ."[77]

In the 2019 IRP, TVA opted to keep all of its options for generation open, acknowledging that "a variety of future scenarios are possible and each strategy has positive aspects."[78] While in 2019 TVA may have needed to maintain its "flexibility for how the future evolves," it can no longer claim any uncertainty about the appropriate path forward.[79] TVA must urgently achieve dramatic reductions in greenhouse gas emissions. And FERC must do its part by fully evaluating carbon-free alternatives that do not lock in TVA's fossil fuel use for years to come.

Finally, TVA's own emissions targets require the agency to quickly reduce its greenhouse gas emissions. TVA took up a goal of achieving net-zero carbon emissions by 2050.[80] TVA aims to help electrify the transportation sector by putting 200,000

---

*Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991) (the discussion of alternatives forms "the heart of the EIS") (quoting 40 C.F.R. § 1502.14 (1978)).

[73] 40 C.F.R. § 1502.14 (1978).

[74] *See* 40 C.F.R. § 1502.14 (2020). The only relevant change to the alternatives analysis by the 2020 Rules was to remove the 1978 clause directing the agency to consider alternatives outside its jurisdiction. But, for the reasons described above, FERC must apply the 1978 Rules. And even if it did not, FERC's analysis of need is multi-faceted and must include an analysis of carbon neutral alternatives that do not require new methane infrastructure and, therefore, may not trigger FERC's jurisdiction.

[75] Executive Order 14008, 86 Fed. Reg. 7619, 7624 (Jan. 27, 2021).

[76] *Id.* at 7622.

[77] Executive Order 14057, 86 Fed. Reg. 70,935, 70,935 (Dec. 8, 2021).

[78] 2019 IRP, *supra* note 35, at ES-1.; *see also* Friedman, *supra* note 64 ("The T.V.A.'s goal is to reduce emissions 80 percent by 2035, the time by which President Biden wants the entire country's electricity generation to be free of fossil fuel pollution.").

[79] 2019 IRP, *supra* note 35, at ES-1.

[80] PATH TO NET-ZERO, *supra* note 49, at 5.

electric vehicles on the road by 2028.[81] In a draft EA for another gas plant, the agency wrote that it plans to add ten thousand megawatts of solar by 2035.[82] And, along with every other federal agency, TVA is responsible for "immediately commenc[ing] work to confront the climate crisis" under Executive Order 13990.[83] Building more new gas plants now will impede TVA's ability to meet its 2050 goal, waste the progress TVA could make by encouraging electric vehicles, and defy the administration's climate mitigation priorities. FERC should not ratify that decision with an EIS that serves TVA's narrow goal of expanding its fleet of methane gas plants.

### A. FERC's EIS must consider alternatives that would rely on solar, battery, energy efficiency, and demand response options, as well as combinations thereof.

FERC should assess whether TVA could avoid building more methane infrastructure and instead consider a full range of solar, battery storage, energy efficiency, demand response options, and combined resources to meet the generation needs TVA cites. TVA itself has acknowledged that battery storage is a "highly flexible" resource[84] that can absorb excess generation and dispatch instantly. Battery storage can provide those benefits in a cost-effective way. Faced with a decarbonization deadline of 2035, new gas plants may have to deploy carbon capture and sequestration technology to keep pace. And even assuming they do, the overnight costs of constructing those plants would be double the cost of a four-hour battery alternative.[85] Further, renewable resources can hedge against the extreme volatility that can arise in gas markets.[86] FERC's EIS provides the opportunity to fully assess all the alternatives to building this pipeline, not just options that presume TVA will burn gas.

In addition to solar and battery options, FERC's EIS should consider an alternative under which TVA retires and does not replace the Cumberland Fossil Plant. The TVA Act requires the utility to consider energy efficiency and "to treat demand and supply resources on a consistent and integrated basis."[87] FERC should also assess whether TVA could meet its generation needs with existing pipelines.

---

[81] *Electric Vehicles*, TENN. VALLEY AUTH., https://www.tva.com/energy-system-of-the-future/electric-vehicles (last visited April 3, 2022).

[82] Johnsonville EA, *supra* note 51, at 1.

[83] 86 Fed. Reg. at 7037.

[84] 2019 IRP, *supra* note 35, Appendix D at D-1.

[85] The EIA's regional estimated overnight cost per kilowatt for combined-cycle plant with 90% carbon capture and sequestration is $2,492; for a four-hour lithium battery storage alternative the cost per kilowatt is $1,201. U.S. ENERGY INFO. ADMIN., ELECTRICITY MARKET MODULE 7 (Feb. 2021), https://www.eia.gov/outlooks/aeo/assumptions/pdf/electricity.pdf.

[86] *See, e.g.*, Dolf Gielen, Michael Taylor and Barbara Jinks, *Gas Crunch: time to factor in volatility and externalities to reveal its true costs*, ENERGYPOST.EU (Jan. 21, 2022), https://energypost.eu/gas-crunch-time-to-factor-in-volatility-and-externalities-to-reveal-its-true-costs/.

[87] 16 U.S.C. § 831m-1(b)(2).

*Conservation Groups' Scoping Comments on the Cumberland Project*

FERC's broad authority to condition certificates under the NGA gives it the flexibility to "give proper consideration to logical alternatives which might serve the public interest better" than the alternatives the project proponent lays out.[88] Those alternatives can include, for example, extending or improving existing pipelines.[89] Within TVA's gas plant alternative, FERC should closely examine any opportunities to avoid siting new gas infrastructure by, for example, relying on existing pipeline capacity to existing gas-burning facilities, or at least locating new gas-burning power plants on the routes of existing gas pipelines.

## VI. FERC has a legal obligation to fully consider the upstream and downstream greenhouse gas emissions associated with the Cumberland Project and should use the Social Cost of Carbon as a metric to do so.

Because "[t]he harms associated with climate change are serious and well recognized,"[90] carefully considering a project's climate impacts is critical to NEPA review—particularly when the project involves combusting gas in power plants,[91] thereby emitting greenhouse gases that drive climate change. For the following reasons, the direct and indirect effects from greenhouse gas emissions from the Cumberland Project will be significant and warrant a hard look in an EIS.

### A. Addressing climate change is a federal policy priority.

As FERC has recognized, "Climate change poses a severe threat to the nation's security, economy, environment, and to the health of individual citizens."[92] While climate change is global, not all communities suffer equally. Instead, Black, indigenous, and other people of color—as well as low-income communities—are disproportionately harmed by climate change.[93] The Tennessee Valley and the Southeast are especially vulnerable.[94] For the Valley, 2018 through 2020 were the wettest years in 131 years of record keeping, and 2020 set the single-year record with

---

[88] *N. Nat. Gas Co. v. Fed. Power Comm'n*, 399 F.2d 953, 973 (D.C. Cir. 1968).

[89] *Panhandle Eastern Pipe Line Co. v. Federal Power Comm'n*, 204 F.2d 675, 683 (3d Cir. 1953) (holding 15 U.S.C. § 717f(a) authorizes the Commission to, "if necessary or desirable in the public interest, direct [a pipeline company] to improve its facilities by their rehabilitation and repair, or even reconstruction, to the extent necessary to restore them to their original designed and approved capacity or former actual capacity").

[90] *Massachusetts v. EPA*, 549 U.S. 497, 521 (2007).

[91] *See Sierra Club v. FERC*, 867 F.3d at 1374 (holding FERC must analyze climate change effects for a project whose purpose is to burn gas in power plants).

[92] *See* Interim Greenhouse Gas Policy, *supra* note 21, ¶ 2.

[93] Kristie S. Gutierrez and Catherine E. LePrevost, *Climate Justice in Rural Southeastern United States*, 13 INT'L. J. ENV'T. RES. & PUB. HEALTH 189 (2016).

[94] *Id.*

*Conservation Groups' Scoping Comments on the Cumberland Project*

rainfall 139 percent above normal.[95] There is broad scientific consensus that global anthropogenic greenhouse gas emissions must reach net zero within about 30 years to avoid the worst impacts of climate change.[96]

    To address the climate crisis, President Biden ordered the entire federal government to take decisive, bold action—including swiftly decarbonizing the electricity sector. In Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, President Biden emphasized the urgency of the moment: "The United States and the world face a profound climate crisis. We have a narrow moment to pursue action at home and abroad in order to avoid the most catastrophic impacts of that crisis and to seize the opportunity that tackling climate change presents."[97] Consequently, Executive Order 14008 calls for a "government-wide approach," as the "Federal Government must drive assessment, disclosure, and mitigation of climate pollution and climate-related risks in every sector of our economy, marshaling the creativity, courage, and capital necessary to make our Nation resilient in the face of this threat."[98] Executive Order 14008 establishes the goals of "net-zero emissions, economy-wide, by no later than 2050"[99] and "a carbon pollution-free electricity sector no later than 2035."[100] In Executive Order 13990, President Biden reestablished the Interagency Working Group on the Social Cost of Greenhouse Gases and instructed agencies "to capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account."[101]

    Because the direct and indirect greenhouse gas emissions from the proposed Project would persist beyond the deadlines ordered by President Biden, the Cumberland Project conflicts with our national climate goals and would have a significant impact on human health and the environment. A complete analysis of the proposed Project's climate change impacts in an EIS is therefore required.

---

[95] WBIR Staff, *TVA Calls 2020 the Wettest Year on Record for Tennessee Valley Authority*, WBIR (Jan. 5, 2021), https://www.wbir.com/article/weather/tva-calls-2020-the-wettest-year-on-record-for-tennessee-valley/51-4ec11426-feb4-4304-811e-45cd50714a57.

[96] INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, SPECIAL REPORT: GLOBAL WARMING OF 1.5° C, SUMMARY FOR POLICYMAKERS at 6, 14 (2018), https://www.ipcc.ch/sr15/chapter/spm/.

[97] 86 Fed. Reg. at 7622. Further, in its latest report, the IPCC adds that: "Reducing GHG emissions across the full energy sector requires major transitions, including a substantial reduction in overall fossil fuel use, the deployment of low-emission energy sources, switching to alternative energy carriers, and energy efficiency and conservation. The continued installation of unabated fossil fuel infrastructure will 'lock-in' GHG emissions." INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, CLIMATE CHANGE 2022: MITIGATION OF CLIMATE CHANGE, SUMMARY FOR POLICYMAKERS at 36 (2022), https://report.ipcc.ch/ar6wg3/pdf/IPCC_AR6_WGIII_SummaryForPolicymakers.pdf.

[98] *Id.*

[99] *Id.*

[100] *Id.* at 7624.

[101] 86 Fed. Reg. at 7037.

*Conservation Groups' Scoping Comments on the Cumberland Project*

### B.    FERC must fully assess foreseeable greenhouse gas emissions.

To fulfill its obligations under NEPA, the NGA, and the President's executive orders, FERC must fully assess all reasonably foreseeable greenhouse gas emissions related to the proposed Project—including upstream and downstream emissions—in an EIS. NEPA requires agencies to analyze and disclose the "environmental impact" of a proposed action,[102] as well as "alternatives to the proposed action."[103] FERC's analysis must "provide a full and fair discussion of significant environmental impacts,"[104] including all reasonably foreseeable effects of the proposal and its alternatives.[105] Effects are "reasonably foreseeable" when they are "sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision."[106]

FERC has both the authority and the obligation to assess climate change impacts. The NGA vests the Commission with authority to regulate the interstate transportation of methane gas.[107] Congress has instructed the Commission to broadly consider "the public convenience and necessity" of proposed interstate pipelines,[108] determining whether they will serve the public interest.[109] To do so, FERC must balance public benefits against adverse effects, and FERC has the authority to deny a pipeline certificate if the pipeline would be too harmful to the environment.[110]

As Chairman Glick observed just one year ago, "[a] proposed pipeline's contribution to climate change is one of its most consequential environmental impacts and we must consider all evidence in the record—both qualitative and quantitative— to assess the significance of that impact."[111] As FERC recently acknowledged, the D.C. Circuit has held that greenhouse gas emissions related to a methane gas pipeline "are relevant to whether the pipeline is required by the public convenience and necessity."[112] And "[a] rigorous review of a project's reasonably foreseeable [greenhouse gas emissions] is also an essential part of the Commission's responsibility under NEPA[.]"[113] Accordingly, FERC's environmental review must include a "rigorous review," characterizing quantitatively and qualitatively the

---

[102] 42 U.S.C. § 4332(C)(i).
[103] 42 U.S.C. § 4332(C)(iii).
[104] 40 C.F.R. § 1502.1 (1978).
[105] 40 C.F.R. § 1502.16(a)(1) (2020), 40 C.F.R. § 1508.1(aa) (2020).
[106] *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016) (citation omitted).
[107] 15 U.S.C. § 717.
[108] 15 U.S.C. § 717f(2).
[109] *Environmental Defense Fund v. FERC*, 2 F.4th 953, 961 (D.C. Cir. 2021).
[110] *Sierra Club v. FERC*, 867 F.3d at 1373.
[111] Press Release, FERC, FERC Reaches Compromise on Greenhouse Gas Significance (Mar. 18, 2021), https://www.ferc.gov/news-events/news/ferc-reaches-compromise-greenhouse-gas-significance#.
[112] *N. Nat. Gas Co.*, 174 FERC ¶ 61189, ¶ 29 (Mar. 22, 2021) (citing *Birckhhead v. FERC*, 925 F.3d 510, 519 (D.C. Cir. 2019)); *Sierra Club v. FERC*, 867 F.3d at 1374).
[113] *Id.*

*Conservation Groups' Scoping Comments on the Cumberland Project*

downstream greenhouse gas emissions produced from burning the gas transported by the pipeline as well as upstream and operational methane emissions from the pipeline itself.

### 1. FERC must analyze greenhouse gas emissions downstream from the Cumberland Project.

FERC must analyze the downstream greenhouse gas emissions related to burning gas at TVA's proposed methane gas power plant. Not only is burning the proposed Project's gas reasonably foreseeable, but "it is the project's entire purpose."[114] It is equally foreseeable "that burning natural gas will release into the atmosphere the sorts of carbon compounds that contribute to climate change."[115] FERC's obligation is particularly clear when the Commission already knows, "with a good deal of specificity, where the gas in question would be going . . . and how it would be used . . . ."[116] Here, all of the gas transported by the proposed Project would serve a single purpose: to fuel TVA's proposed gas-fired power plant. FERC must therefore "provide a quantitative estimate of the downstream emissions that will result from burning the natural gas that the pipelines will transport" as well as an assessment of the incremental effects of these emissions.[117]

### 2. FERC must analyze methane emissions upstream and throughout the Cumberland Project.

Not only are combustion-related emissions reasonably foreseeable, but so too are methane emissions throughout the gas infrastructure related to the proposed Project. During both production and transmission, whether through accidental leaks or intentional venting, gas infrastructure leaks significant amounts of methane.[118] As a greenhouse gas, methane is more than eighty times as powerful as carbon dioxide in its first twenty years in the atmosphere,[119] so methane emissions "substantially erode the potential climate benefits of natural gas use" relative to coal.[120] Yet methane is shorter lived than carbon dioxide. That means "achieving significant reductions would have a rapid and significant effect on atmospheric warming potential."[121]

---

[114] *Sierra Club v. FERC*, 867 F.3d at 1372.

[115] *Id.*

[116] *Food & Water Watch v. FERC*, 2022 WL 727037 at *1.

[117] *Id.* at 1374; *Sierra Club v. FERC*, 867 F.3d at 1374; *N. Nat Gas Co.*, 174 FERC ¶ 61,189, ¶ 32

[118] Ramon A. Alvarez et al., *Assessment of Methane Emissions from the U.S. Oil & Gas Supply Chain*, 361 SCIENCE 186 (2018); Dan Charles, *A Satellite Finds Massive Methane Leaks from Gas Pipelines*, NPR (Feb. 3, 2022), https://www.npr.org/2022/02/03/1077392791/a-satellite-finds-massive-methane-leaks-from-gas-pipelines.

[119] INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, FIFTH ASSESSMENT REPORT CHAPTER 8: ANTHROPOGENIC AND NATURAL RADIATIVE FORCING tbl. 8.7 (2013), https://www.ipcc.ch/site/assets/uploads/2018/02/WG1AR5_Chapter08_FINAL.pdf.

[120] Ramon A. Alvarez et al., *supra* note 118.

[121] *Importance of Methane*, ENV'T PROT. AGENCY, https://www.epa.gov/gmi/importance-methane (last visited April 3, 2020).

*Conservation Groups' Scoping Comments on the Cumberland Project*

Methane pollution is an important aspect of the proposed Project's climate impacts, and FERC cannot take a hard look at the effects of a new gas pipeline without evaluating the inevitable methane emissions that would result from it.

### 3.    FERC must gather information necessary for reasonable forecasting of greenhouse gas emissions.

To the extent FERC needs more information to assess greenhouse gas emissions, whether upstream, downstream, or along the proposed Project, FERC must seek out that information. "In the pipeline-approval context, as elsewhere, reasonable forecasting requires information. But an initial lack of information does not afford an agency carte blanche to disregard indirect effects."[122] "It should go without saying that NEPA also requires the Commission to at least *attempt* to obtain the information necessary to fulfill its statutory responsibilities."[123] And the Commission has acknowledged that its prior claims that "it was unable to assess the significance of a project's greenhouse gas... emissions or those emissions' contribution to climate change" are no longer viable or tenable.[124]

FERC cannot plead insufficient information about how the gas from the proposed Project will be used as a reason not to fully assess the proposed Project's climate change impacts. The Agency has ample opportunity to learn more about reasonably foreseeable greenhouse gas emissions, particularly since the Cumberland Project deals with a single pipeline that would service a single gas-fired power plant. At this early stage, FERC must request information related to greenhouse gas emissions from the TGPC and the end-user, TVA. FERC should request any and all data related to methane leaks and venting along TGPC's other pipelines, and it should request information regarding methane emissions at the likely sources for TGPC's gas, including "the location of the supply source and whether transported gas will come from new or existing production."[125] The Commission should request information from TVA regarding methane emissions along pipelines servicing its gas plants and about carbon emissions from the Authority's planned gas-fired power plant. When FERC asks questions, applicants "generally answer them as promptly as possible and as completely as possible."[126]

Additionally, FERC should perform its own analysis of methane-related climate impacts using the best available data. NEPA analysis necessarily involves "reasonable forecasting," requiring agencies to "make educated assumptions about an uncertain future."[127] Recent studies have indicated methane emissions occur

---

[122] *Food & Water Watch v. FERC*, 2022 WL 727037 at *1.
[123] *Birckhead v. FERC*, 925 F.3d at 520.
[124] *N. Nat. Gas Co.*, 174 FERC ¶ 61,189, ¶ 29.
[125] Interim Greenhouse Gas Policy, *supra* note 21, ¶ 43.
[126] *Birckhead v. FERC*, 925 F.3d at 520.
[127] *Sierra Club v. FERC*, 867 F.3d at 1374.

*Conservation Groups' Scoping Comments on the Cumberland Project*

throughout the gas supply chain,[128] and FERC must account for those emissions. To the extent information regarding methane emissions is incomplete or unavailable, FERC must summarize "existing credible scientific evidence that is relevant to evaluating the reasonably foreseeable significant adverse impacts"[129] and evaluate those impacts "based upon theoretical approaches or research methods generally accepted in the scientific community."[130]

4.    **FERC cannot rely on TVA retiring coal combustion at the Cumberland Fossil Plant to avoid the Commission's obligation to take a hard look the Cumberland Project's climate effects.**

Although TVA is concurrently considering retiring the Cumberland coal plant, FERC must nonetheless quantify and disclose the full scope of climate impacts from the proposed Project. As discussed,[131] TVA can retire and replace coal without adding *any* new greenhouse gas emissions. Because TVA has viable clean-energy alternatives, the Cumberland Project would "displace zero-emissions electric generation."[132] Regardless of the fate of the Cumberland coal plant, FERC must accurately evaluate the impacts of the proposed Project and associated gas-fired power plant. Under D.C. Circuit precedent, it is clear that FERC is not "excused from making emissions estimates just because the emissions in question might be partially offset by reductions elsewhere."[133] Accordingly, FERC cannot rely on the pending retirement of the Cumberland coal plant to avoid its obligations to take a hard look at *all* of the climate effects of the proposed Project in an EIS.

5.    **FERC must analyze climate impacts in the context of federal climate policy.**

FERC must not only quantify these emissions, but it must discuss their *effects*. Stated otherwise, FERC must present a qualitative analysis of the effects of the proposed Project's greenhouse gas emissions.

Under NEPA, FERC must "quantify *and consider*" a project's greenhouse emissions, or explain why it cannot.[134] "The key requirement of NEPA . . . is that the agency consider and disclose the *actual environmental effects* in a manner that . . .

---

[128] *See, e.g.*, Ramon A. Alvarez et al., *supra* note 118.
[129] 40 C.F.R. § 1502.21(c)(3) (2020).
[130] 40 C.F.R. § 1502.21(c)(4) (2020).
[131] *See supra* Sections IV., V.
[132] See Interim Greenhouse Gas Policy, *supra* note 21, ¶ 43.
[133] *Sierra Club v. FERC*, 867 F.3d at 1374–75; *see also Birckhead v. FERC*, 925 F.3d at 518–19 ("[T]he Commission is wrong to suggest that downstream emissions are not reasonably foreseeable simply because the gas transported by the Project may displace existing natural gas supplies or higher-emitting fuels.").
[134] *Sierra Club v. FERC*, 867 F.3d at 1374.

*Conservation Groups' Scoping Comments on the Cumberland Project*

brings those effects to bear on decisions to take particular actions that significantly affect the environment."[135] FERC must discuss the climate impacts of running a new pipeline and gas-fired power plant for decades to come. FERC's analysis must include a "qualitative summary discussion of the impacts of greenhouse gas emissions based on authoritative reports."[136] Those effects include, but are not limited to, "more frequent and intense heat waves, longer fire seasons and more severe wildfires, degraded air quality, more heavy downpours and flooding, increased drought, greater sea-level rise, more intense storms, harm to water resources, harm to agriculture, ocean acidification, and harm to wildlife and ecosystems."[137]

In the past, FERC has insisted that it was simply unable to conduct the required qualitative analysis of climate effects.[138] But in a 2021 certification decision, the Commission correctly recognized that such excuses are no longer available to it.[139]

Critically, FERC must discuss these greenhouse gas impacts in relation to federal and international climate policy. Paris Agreement signatories, including the United States, have committed to slowing global warming to well under 2°C above pre-industrial temperatures, requiring immediate, aggressive cuts to greenhouse gas emissions.[140] Accordingly, President Biden has set a federal goal to decarbonize the electricity sector by 2035 and to reach net-zero greenhouse gas emissions by 2050.[141] Those goals align what most experts say is required to avoid the worst effects of climate change.[142]

FERC must assess the proposed project's climate effects in light of these goals: Will building a new gas pipeline and plant in the 2020s impair President Biden's goals to decarbonize the electric grid by 2035 and achieve net-zero emissions economy-wide by 2050? Will the increased greenhouse gas emissions jeopardize federal and international efforts to avoid the worst effects of climate change? The

---

[135] *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. at 96 (emphasis added).

[136] Council on Env't Quality, Final Guidance on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change 10 (2016) [hereinafter "2016 CEQ Climate Guidance"], https://ceq.doe.gov/docs/ceq-regulations-and-guidance/nepa_final_ghg_guidance.pdf. Executive Order 13990 makes clear that federal agencies should look to CEQ's 2016 guidance during NEPA review. 86 Fed. Reg. at 7040.

[137] 2016 CEQ Climate Guidance, *supra* note 136 at 9.

[138] *N. Nat. Gas Co.*, 174 FERC ¶ 61,189, ¶ 29 (citing *Dominion Transmission, Inc.*, 163 FERC ¶ 61,128, ¶¶ 67–70 (2018) (LaFleur, Comm'r, dissenting in part; Glick, Comm'r, dissenting in part).

[139] *Id.*

[140] Paris Agreement to the United Nations Framework Convention on Climate Change art. 2 section 1(a), Dec. 12, 2015, T.I.A.S. No. 16-1104 (aiming to hold the increase in global average temperature to "well below 2°C above pre-industrial levels and pursuing efforts to limit the temperature increase to 1.5°C above pre-industrial levels, recognizing that this would significantly reduce the risks and impacts of climate change").

[141] 86 Fed. Reg. at 7624.

[142] Brad Plumer, *Nations Must Drop Fossil Fuels, Fast, World Energy Body Warns*, N.Y. Times (May 18, 2021), https://www.nytimes.com/2021/05/18/climate/climate-change-emissions-IEA.html.

answer to all those questions is an unquestionable, "Yes." CEQ has instructed agencies to "discuss relevant approved federal . . . plans, policies, or laws for greenhouse gas emission reductions or climate adaptation to make clear whether a proposed project's greenhouse gas emissions are consistent with such plans or laws."[143] Without comparing projected greenhouse gas emissions to "national emissions-control goals" like those established in Executive Order 14008 and the Paris Agreement, "it is difficult to see how FERC could engage in 'informed decision making' with respect to the greenhouse-gas effects of the proposed Project, or how 'informed public comment' could be possible."[144]

### C.  FERC should apply the Social Cost of Greenhouse Gases.

The Commission must accurately quantify and consider the greenhouse gas emissions associated with the proposed Project, including emissions upstream, downstream, and along the pipeline.[145] FERC should quantify those impacts using the Social Cost of Carbon, Methane, and Nitrous Oxide. Developed in 2010 and updated in 2016, the Social Cost of Carbon is a scientifically derived metric to "provide a consistent approach for agencies to quantify [climate change] damage in dollars."[146] The Social Cost of Carbon translates a one-ton increase in $CO_2$ emissions into changes in atmospheric greenhouse gas concentrations, consequent changes in temperature, and resulting economic damages.[147] Those harms include "changes in net agricultural productivity, human health, property damages from increased flood risk, and the value of ecosystem services."[148] The current values, which adjust the 2016 values for inflation, estimate that every additional ton of $CO_2$ released from anywhere on Earth will cause an approximately \$51 in climate damages.[149] The Interagency Working Group has also published values for the Social Cost of Methane and the Social Cost of Nitrous Oxide, both consistent with the methodology underlying the Social Cost of Carbon.[150] The Social Cost of Methane is \$1,500 per ton[151]—nearly 30 times greater than the cost of carbon, accounting for methane's

---

[143] 2016 CEQ Greenhouse Gas Guidance, *supra* note 136, at 28–29.

[144] *Sierra Club v. FERC*, 867 F.3d at 1374 (D.C. Cir. 2017).

[145] Benjamin Storrow, *Methane Leaks Erase Some of the Climate Benefits of Natural Gas*, SCIENTIFIC AMERICAN (May 5, 2020), https://bit.ly/3ixdumX (describing studies that quantify the extent to which methane leaks into the atmosphere and can "erase the greenhouse gas benefits of quitting coal for gas in the near term").

[146] Fla. Se. Connection, LLC, 162 FERC ¶ 61,233, at P 45 (Mar. 14, 2018).

[147] See Interagency Working Group on the Social Cost of Carbon, Technical Support Document at 2, 5 (Feb. 2010), available at https://bit.ly/2TRF185.

[148] *Id.* at 2.

[149] INTERAGENCY WORKING GROUP ON SOCIAL COST OF GREENHOUSE GASES, TECHNICAL SUPPORT DOCUMENT: SOCIAL COST OF CARBON, METHANE, AND NITROUS OXIDE INTERIM ESTIMATES UNDER EXECUTIVE ORDER 13990 at 5 (2021) [hereinafter "IWG Technical Support Document"], https://bit.ly/3xedCvG; Jean Chemnick, *Cost of Carbon Pollution Pegged at \$51 a Ton*, SCIENTIFIC AMERICAN (Mar. 1, 2021), https://bit.ly/35cDPys.

[150] IWG Technical Support Document, *supra* note 149, at 2.

[151] *Id.* at 5.

*Conservation Groups' Scoping Comments on the Cumberland Project*

increased potency as a greenhouse gas. Not only will the Social Costs of Greenhouse Gases convey the *harms* of new gas pipelines and plants, but they will also allow FERC to incorporate the social *benefits* of reducing greenhouse gas emissions[152] for evaluating carbon-free alternatives.

Executive Order 13990 instructs federal agencies to use the Social Cost of Carbon,[153] which has been widely endorsed by economists and scientists,[154] as well as the Social Costs of Methane and Nitrous Oxide, which are based on the same methodology. The Social Costs of Carbon, Methane, and Nitrous Oxide are useful and appropriate here to meaningfully convey the impacts of building a new gas pipeline and plant—thereby adding decades of greenhouse gas emissions—in comparison to zero-carbon alternatives like energy efficiency, demand response, renewable energy, or battery storage.

NEPA requires agencies to use "theoretical approaches or research methods generally accepted in the scientific community"[155] like the Social Cost of Greenhouse Gases, and the D.C. Circuit recently vacated and remanded FERC's environmental review for failure to determine whether the Social Cost of Carbon is one such method.[156] FERC has since applied the metric,[157] providing information essential to inform the agency and the public. The Fifth Circuit Court of Appeals recently reversed a district court's nationwide injunction, thereby removing any obstacle to using this methodology to consistently account for climate impacts during cost-benefit analysis.[158]

Historically, agencies—including TVA and FERC—have commonly given three reasons to avoid using the Social Cost of Greenhouse Gas, as now required by President Biden's Executive Order: (1) there is a not enough consensus on the appropriate discount rate; (2) the Social Cost of Carbon fails to capture actual incremental impacts; and (3) there are no criteria to determine when monetary climate damages are significant for NEPA purposes.[159] None of those excuses has merit.

---

[152] *Id.* at 1.

[153] 86 Fed. Reg. at 7040.

[154] *See* NAT'L ACADS. SCI., ENG'G & MED., VALUING CLIMATE DAMAGES: UPDATING ESTIMATES OF THE SOCIAL COST OF CARBON DIOXIDE, Summary at 3, 10–17 (2017), https://bit.ly/3xenxBq; NAT'L ACADS. SCI., ENG'G & MED., ASSESSMENT OF APPROACHES TO UPDATING THE SOCIAL COST OF CARBON: PHASE 1 REPORT ON A NEAR-TERM UPDATE, Chapters, 2, 3 (2016), https://bit.ly/3gt3AQz; Richard L. Revesz et al., *Best Cost Estimate of Greenhouse Gas*, 357 SCIENCE 655 (2017)**.**

[155] 40 C.F.R. § 1502.21(4) (2020).

[156] *Vecinos Para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th at 1332.

[157] *Tenn. Gas Pipeline Co., L.L.C.*, 178 FERC ¶ 61,199, ¶ 93 (2022); *Columbia Gulf Transmission, LLC*, 178 FERC ¶ 61,198, ¶ 52 (2022).

[158] *Louisiana ex rel. Landry v. Biden*, No. 22-30087, 2022 WL 866282, at *3 (5th Cir. March 16, 2022) (per curiam).

[159] *See, e.g.*, *EarthReports v. FERC*, 828 F.3d 949 (D.C. Cir. 2017).

*Conservation Groups' Scoping Comments on the Cumberland Project*

*First,* the Interagency Working Group on the Social Cost of Greenhouse Gases has found a broad consensus among economists that use of a consumption-use discount rate[160] of 3% or lower is appropriate for evaluating climate impacts.[161]

*Second,* as CEQ has acknowledged that, "[c]limate change is a particularly complex challenge given its global nature and the inherent interrelationships among its sources, causation, mechanisms of action, and impacts."[162] NEPA does not allow agencies to give up when facing uncertainty. Agencies must analyze and disclose "*reasonably foreseeable*" environmental effects.[163] The Social Cost of Carbon does exactly that, assigning to each unit of emissions a cost in terms of climate harm.[164] When information is incomplete or unavailable, agencies must evaluate "such impacts based upon theoretical approaches or research methods generally accepted in the scientific community."[165] The Social Costs of Carbon, Methane, and Nitrous Oxide provide FERC and TVA with generally accepted approaches to fulfill their NEPA obligations and President Biden's Executive Order to "capture the full costs of greenhouse gas emissions *as accurately as possible*, including by taking global damages into account."[166]

*Third,* the fact that there is no numeric significance threshold for climate costs in NEPA review is true of every environmental effect. Significance is a multi-factor determination that requires agencies to use sound discretion within the bounds and purposes of NEPA.[167] As with local water, land, and air impacts, it remains both useful and essential to estimate the climate impacts of building new fossil fuel plants even where there is arguably some flexibility about where to set a threshold for significance.

---

[160] A discount rate "can tell us how much future benefits and costs are worth today." Env't Prot. Agency, Guidelines for Preparing Economic Analysis (Dec. 2010), https://www.epa.gov/sites/default/files/2017-09/documents/ee-0568-06.pdf. A lower rate results in more similar present and future values, while higher rates lead to greater disparities between present and future values.

[161] IWG Technical Support Document, *supra* note 149, at 17 ("[T]he latest data as well as recent discussion in the economics literature indicates that the 3 percent discount rate used by the IWG to develop its range of discount rates is likely an overestimate of the appropriate discount rate").

[162] 2016 CEQ Climate Guidance, *supra* note 136, at 2.

[163] 42 U.S.C. 4332(C); 40 C.F.R. § 1508.1(g) (2020); 40 C.F.R. § 1508.8 (1978).

[164] *Fla. Se. Connection, LLC*, 162 FERC ¶ 61,233, ¶ 48 (acknowledging that "the Social Cost of Carbon methodology does constitute a tool that can be used to estimate incremental physical climate change impacts").

[165] 40 C.F.R. § 1502.21 (2020).

[166] 86 Fed. Reg. at 7040 (emphasis added).

[167] The 1978 Rules provide that "significance" accounts for context and intensity. Intensity alone has ten factors. 40 C.F.R. 1508.27 (1978).

*Conservation Groups' Scoping Comments on the Cumberland Project*

### D.    FERC should apply the principles embodied in its Interim Greenhouse Gas Policy.

To analyze the project's greenhouse gas emissions, FERC should apply the principles set forth in its Interim Greenhouse Gas Policy. As Commissioner Glick has noted, "The U.S. Court of Appeals for the D.C. Circuit has on several occasions, including as recently as March 11th, cast significant doubt about the approach the Commission has been taking to site natural gas pipelines and LNG facilities. The policy statements were intended to provide a more legally durable framework for the Commission to consider proposed natural gas projects."[168] As such, the Interim Greenhouse Gas Policy embodies the Commission's already-existing legal requirements under NEPA.

Consistent with the principles reflected in the Interim Greenhouse Gas Policy and prior certifications, FERC should consider reasonably foreseeable greenhouse gas emissions, whether upstream or downstream. FERC should apply a 100% utilization rate and a sound threshold to determine whether climate impacts will be significant.[169] "This approach is consistent with the overall goal of NEPA to require a 'hard look' at adverse environmental impacts and assess whether those can be minimized or avoided."[170]

The Commission reasonably chose 100,000 metric tons, because the figure captures the majority of emissions from FERC-authorized projects and "[b]ecause of the dire effects at stake."[171] The threshold is consistent with approaches taken by EPA and state agencies, and it accounts for FERC's technical experience with regulated sources.[172] Establishing a uniform threshold provides "the Commission a workable and consistent path forward to analyze proposed projects" and "can be easily understood and applied by the regulated community and interested stakeholders."[173]

Because the 100,000 metric tons/year threshold is independently supported by its consistency with approaches taken by EPA and state agencies,[174] FERC should apply it here notwithstanding the fact that it also happens to be an element of its Interim Greenhouse Gas Policy. The proposed Project would provide 245,000 dekatherms—or 2,450,000 therms—of methane gas per day to TVA.[175] EPA predicts

---

[168] Press Release, FERC, FERC Seeks Comment on Draft Policy Statements on Pipeline Certification, Greenhouse Gas Emissions (March 24, 2022), https://ferc.gov/news-events/news/ferc-seeks-comment-draft-policy-statements-pipeline-certification--emissions.

[169] Interim Greenhouse Gas Policy, *supra* note 21, at 2–3.

[170] *Id.* at 3.

[171] Updated Policy Statement, *supra* note 24, at 62.

[172] *Id.* at 66.

[173] *Id.* at 61.

[174] *Id.* at 66.

[175] Cumberland Project Scoping Notice, *supra* note 1, at 3.

*Conservation Groups' Scoping Comments on the Cumberland Project*

that burning methane gas produces 0.0053 metric tons of carbon dioxide per therm.[176] Burning all of the gas delivered by the Cumberland Project to the proposed TVA plant would result in the emission of 12,985 metric tons of carbon dioxide per day, or *4,739,525 tons of carbon dioxide per year*. Stated otherwise, the carbon dioxide emissions exceed the 100,000 metric tons/year threshold by a factor of almost fifty. Consequently, the annual carbon dioxide emissions that would result from burning the gas transported by the proposed Project alone would have a significant impact on human health and the environment, warranting the preparation of an EIS.

## VII. FERC must evaluate the full range of environmental justice implications of the Cumberland Project and connected and cumulative actions.

FERC's review must, under NEPA, thoroughly examine the environmental justice impacts of the proposed Project from the outset.[177] Under Executive Order No. 12898, the Commission is urged, to "the greatest extent practicable and permitted by law," achieving environmental justice by "identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities."[178] The current Administration's Executive Order 14008 requires agencies to "make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."

*First,* FERC must consider direct impacts on low-wealth communities from construction of the proposed Project. Communities in the Tennessee Valley and the Southeast are vulnerable to climate change,[179] and Black, indigenous, and other people of color —as well as low-wealth individuals—will be disproportionately harmed.[180] Addressing environmental justice means, first, understanding the

---

[176] *See Greenhouse Gases Equivalencies Calculator*, ENV'T. PROT. AGENCY, https://www.epa.gov/energy/greenhouse-gases-equivalencies-calculator-calculations-and-references (last visited March 31, 2022).

[177] Executive Order 12898, 59 Fed. Reg. 7629 (Feb. 16, 1994); *see also Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d at 92 (reminding us that "environmental justice is not merely a box to be checked"); *Algonquin Gas Transmission, LLC Maritimes & Ne. Pipeline, L.L.C.*, 178 FERC ¶ 61,029 (2022) ("Although it is cold comfort for the residents near the compressor station, I hope that this proceeding will serve as a turning point for the Commission as we work to better consider, address, and act on issues of environmental justice.").

[178] 59 Fed. Reg. at 7629.

[179] FOURTH NATIONAL CLIMATE ASSESSMENT, CHAPTER 19: SOUTHEAST at 745 (Reidmiller, D.R. et al. eds., 2018) https://nca2018.globalchange.gov/.

[180] *See* Gutierrez & LeProvost, *supra* note 93.

*Conservation Groups' Scoping Comments on the Cumberland Project*

demographics of the population affected.[181] FERC should consider the extent to which it is reasonable to rely on tools like EPA's EJScreen and census data in light of the low level of granularity those tools can achieve.[182] Direct outreach in potentially impacted areas may be the only way to identify people of color and low-wealth communities actually affected by the proposed Project.[183] The agency must then evaluate the pipeline's disproportionate effects on each affected population.[184] Even though the risk of death or injury may be higher in urban areas in absolute terms—because there are more people living in proximity to pipelines than in rural areas—rural communities often have fewer resources to address those risks, and gas infrastructure "often exacerbates existing social vulnerability."[185]

*Second,* FERC must consider how the proposed Project, and connected and cumulative actions, will affect the energy burden felt by low-wealth TVA ratepayers. Tennessee—a state that gets its electricity almost exclusively from TVA—ranks in the top 15 in terms of electricity consumption.[186] The Southeast has the highest residential utilities bills in the country, and energy costs for low-income households can take up nearly a third of a household's income.[187] Because TVA directly passes fuel costs on to customers,[188] TVA's expanded reliance on methane gas burdens ratepayers with high and increasingly volatile gas prices.[189]

---

[181] *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 136–37 (D.D.C. 2017) (citing COUNCIL ON ENVIRONMENTAL QUALITY, ENVIRONMENTAL JUSTICE GUIDANCE UNDER THE NATIONAL ENVIRONMENTAL POLICY ACT (1997) [hereinafter "CEQ 1997 Guidance"], https://www.epa.gov/sites/default/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf).

[182] U.S. ENVTL. PROTECTION AGENCY, EJSCREEN FACT SHEET (2021), https://www.epa.gov/system/files/documents/2022-02/ejscreen_fact_sheet_2022.pdf?msclkid=91181c4eb09311ec8df33f0de535e3b4, https://static1.squarespace.com/static/5bf34064c3c16a648f15d85b/t/604a41925199fb5ef4ea389c/1615479187823/facct2021-final61-embedfonts_v2.pdf.

[183] CEQ 1997 Guidance, *supra* note 181, at 4, 9–13.

[184] *See Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d at 87.

[185] see Ryan E. Emanuel et al., *Natural Gas Gathering and Transmission Pipelines and Social Vulnerability in the United States*, 5 GEOHEALTH (2021) https://agupubs.onlinelibrary.wiley.com/doi/10.1029/2021GH000442

[186] *Tennessee Electricity Profile 2020*, ENERGY INFO. ADMIN., (Nov. 4, 2021), https://www.eia.gov/electricity/state/tennessee/.

[187] *Energy Insecurity in the Southeast*, SOUTHEAST ENERGY EFFICIENCY ALLIANCE (May 21, 2021), https://www.seealliance.org/initiatives/energy-insecurity/.

[188] *See* TVA 10-K, *supra* note 56, at 13 ("TVA recovers fuel costs and tax equivalent payments associated with fuel cost adjustment through a monthly rate reflecting the forecasted costs of fuel.").

[189] Francesca Maglione, *U.S. Natural Gas Volatility Hits 26-Year High as Wells Freeze Up*, BLOOMBERG (Feb. 2, 2022), https://www.bloomberg.com/news/articles/2022-02-03/u-s-natgas-pares-advances-as-milder-weather-seen-in-west; Stanley Reed, *The European Union Seeks Independence from Russian Oil and Gas*, N.Y. TIMES (March 8, 2022), https://www.nytimes.com/2022/03/08/business/european-union-russia-oil-gas.html.

*Third,* FERC must consider the role the proposed Project and connected and cumulative actions would have in exacerbating effects of climate change throughout TVA's service territory. As noted elsewhere in these comments, TVA's latest methane gas development at its Cumberland site is one part of a large set of connected projects that collectively increase the climate change burden on TVA's ratepayers. As described in Section IV.A above, those burdens will be disproportionately suffered by low-wealth communities and people of color in TVA's service territory, which spans parts of seven states in the Southeast.

## VIII. FERC must closely examine how this pipeline may harm species, including federally protected species.

In the EIS, FERC must address the proposed Project's potential impacts to mammals, reptiles, birds, invertebrates, and fish. This includes impacts to species' habitats and the larger ecological systems that link them throughout the entire Project area. This evaluation must include analysis of the direct and indirect impacts of the proposed Project, including from construction, operation, and decommissioning of the methane gas pipeline. Impacts to terrestrial and freshwater biology from combustion of methane gas must also be analyzed, including the proposed Project's impact on and contribution to climate change and its effect on terrestrial and freshwater biological resources. The EIS must also describe the proposed Project's effects on specific areas of plant communities and sensitive species' habitats.[190] Erosion, sedimentation, down-slope and downstream water quality impacts, and invasion by non-native plant species must also be addressed. Further, FERC must identify alternatives and consider ways to avoid, minimize, and mitigate these impacts.

The EIS must identify all federally listed endangered, threatened, and rare species that are known to or may reside within or migrate through areas that will be affected by the Project, as well as any other species subject to special protections such as golden and bald eagles (protected under the Bald and Golden Eagle Protection Act ("BGEPA") and migratory birds (protected under the Migratory Bird Treaty Act ("MBTA"). A detailed habitat assessment should be conducted based on thorough surveys undertaken to identify the presence of suitable habitat and to establish the presence of federally protected species in the Project area. The applicant should provide survey reports that include the following information, to be used by FERC in analyzing the potential impacts of the proposed Project on these species:

(1)    Name(s) and qualifications of person(s) conducting the survey;

---

[190] The EIS should describe and identify by milepost and length of crossing any unique, sensitive, or protected vegetation types, plant communities, or habitat areas that would be affected by Project activities, including all construction workspaces. The EIS should also describe any proposed mitigation, avoidance, or minimization measures which could be undertaken to better protect sensitive vegetation or habitat types.

(2) Method(s) used to conduct the survey;
(3) Date(s) of the survey;
(4) Area surveyed (include mileposts if applicable);
(5) Areas where species or potential habitats occur (include mileposts if applicable);
(6) Potential impacts, both beneficial and negative, that could result from the construction of the proposed project; and
(7) Proposed mitigation that would substantially minimize or eliminate the potential negative impacts.

### A.    Federally protected species

#### 1.    Bats

The proposed Project has the potential to harm listed bats through loss of roost and forage habitat, fragmentation of the landscape, poisoning of surface water resources from construction activities or spills, and associated impacts on food sources. Listed bats which have been identified as potentially being affected by the proposed Project include the gray bat (*Myotis grisescens*), Indiana bat (*Myotis sodalist*), and the northern long-eared bat (*Myotis septentrionalis*).

The geography where the proposed Project is located contains karst terrain which is characterized by underground drainage systems with sinkholes and caves. These caves and sinkholes can provide habitat for endangered and threatened bats; therefore, the proposed Project area should be fully surveyed for caves and mine portals to ascertain the existence of any local populations. In correspondence from the U.S. Fish and Wildlife Service ("FWS") to FERC, FWS has stated that "[g]ray bat roost sites are not known to occur within 0.5 miles of the project route."[191] However, it is not clear whether the area around the proposed Project route has actually been surveyed for roost sites. This surveying must be undertaken. Previous mist net surveys conducted between June and August 2021 resulted in the capture of nine gray bats,[192] and gray bat maternity colonies are usually located between 1 to 4 kilometers from their foraging locations.[193] Therefore, it is likely that the proposed Project is located near gray bat roost sites—some of which could be located within 0.5 miles of the proposed Project route—and surveys should be conducted to establish the

---

[191] Letter from Daniel Elbert, FWS, to Kimberly Bose, FERC, Re: FWS #2022-0011291. Environmental Review New Posting Notification: Department of Interior ER22/0092 Notice of Scoping Comments for the Cumberland Project, Tennessee Gas Pipeline Company, LLC. Dkt. No. PF22-2-000, (Mar. 25, 2022) [hereinafter "FWS Letter on Cumberland Project"].
[192] *Id.*
[193] U.S. FISH & WILDLIFE SERV., GRAY BAT (*MYOTIS GRISESCENS*) 5-YEAR REVIEW: SUMMARY AND EVALUATION 7 (approved Sept. 30, 2009) [hereinafter "Gray Bat 5-Year Review"], https://ecos.fws.gov/docs/tess/species_nonpublish/1502.pdf.

*Conservation Groups' Scoping Comments on the Cumberland Project*

presence of any such roost sites and to ensure that the proposed Project will not result in take or jeopardize the continued existence of protected bats.

Many bats, such as Indiana bats and gray bats, hibernate in caves and mines in the winter and migrate over varying distances to summer roosting locations in a variety of habitat types — most often forests, but also wetlands, parklands, and agricultural areas. Both Indiana bats and gray bats feed primarily on flying insects over rivers and lakes. Indiana bats are nocturnal insectivores, eating flying insects during the nighttime hours. A single bat can eat thousands of insects in one night, and if those insects have been exposed to the toxins associated with methane gas mining or leaks from the proposed pipeline, then it could cause a trophic effect up the food chain and poison the bats. Construction stressors such as increased noise, lights, and use of machinery all have the potential to also disturb bat roosting patterns and foraging practices. These effects would be particularly harmful to the overall viability of species like the Indiana bat, whose rapid decline from habitat loss and white nose syndrome has left it on the brink of extinction.

Bats need access to clean surface water both for direct consumption and because it serves as habitat for aquatic insects that serve as important prey species. Access to drinking water is especially important for lactating bats, which need far more of it.[194] Surface water habitat also produces higher concentrations of nocturnal insects that bats rely on to feed.[195] However, heavy metals and other toxins can reduce aquatic insect populations,[196] and environmental contaminants may be a major factor specifically in Indiana bat decline.[197] Ready access to clean water and the insects it supports is critical to these species, particularly during times of increasing drought.

Climate change also poses a direct threat to bats. Some species of bats, such as gray bats, selectively roost in caves with cooler temperatures and good air flow during parts of the year. Global warming and climate change could have a significant impact on these bats by adversely affecting the roosting temperature of their preferred caves.[198] Rises in ambient temperature in current habitat ranges could force gray bats

---

[194] Rick Adams et al., *Water availability and successful lactation by bats as related to climate change in the arid regions of western North America*, 77 J. OF ANIMAL ECOLOGY, 1115, 1115 (2008); Allen Kurta et al., *Water balance of free-ranging little brown bats (*Myotis lucifugus*) during pregnancy and lactation*, 67 CANADIAN J. OF ZOOLOGY 468–72 (1998); Joseph Johnson et al., *Day-roosts of Myotis leibii in the Appalachian ridge and valley of West Virginia*, 18 NORTHEASTERN NATURALIST 95–106 (2011).

[195] MacGregor, J. et al., *Recent reproductive records of eastern small-footed bat, Myotis leibii in Kentucky with notes on a maternity colony located in a concrete bridge*, BAT RESEARCH NEWS, Abstract (1998).

[196] CHRISTOPHER MASON, BIOLOGY OF FRESHWATER POLLUTION, (4th ed. 1997); Gareth Jones et al., Carpe noctem*: the importance of bats as bioindicators*, 8 ENDANGERED SPECIES RES., 93–115 (2009).

[197] U.S. FISH & WILDLIFE SERV., INDIANA BAT (*MYOTIS SODALIS*) DRAFT RECOVERY PLAN: FIRST REVISION, 93–94 (2007), https://ecos.fws.gov/docs/recovery_plan/070416.pdf.

[198] Gray Bat 5-Year Review, *supra* note 193, at 14.

*Conservation Groups' Scoping Comments on the Cumberland Project*

to shift their ranges, adversely affecting their ability to access their food supply which in turn could impede their ability to develop the necessary fat reserves which are essential to allowing the bats to survive the hibernation season.

Despite finding several gray bats in recent mist net surveys, FWS has issued a statement of concurrence that the proposed Project is not likely to adversely affect gray bats. FWS notes that "TGP[C] has determined that standard sediment control measures will sufficiently address the potential for impacts to the aquatic invertebrate forage base upon which the gray bat relies."[199] Conservation Groups are concerned that this concurrence, and the basis on which it relies, is premature, given that a NEPA analysis has not yet occurred to analyze the adequacy of these control measures to protect gray bat foraging areas. Moreover, it would appear a pointless exercise to engage in mist nest surveys to discover the presence of gray bats if the parties have prematurely assumed that "standard sediment control measures" would be sufficient to protect their forage grounds regardless of their presence.

Further, this analysis is incomplete. As noted above, any not-likely-to-adversely-affect determination is called into question given the documented presence of gray bats in the area, their known foraging range, and the apparent lack of surveys which have been undertaken to determine whether gray bats are roosting nearby. But it is also unclear whether surveys conducted in a three-month period over the course of one year are sufficient to ascertain the actual presence of bats in the area. For example, gray bats divide their time between different summer and wintering roosting sites, and it may be that different bat populations occupy the proposed Project area at different times of the year.[200] It is also not known at what time these surveys took place. Day time surveys, for instance, may have missed local populations of Indiana bats which feed at night. Further, sedimentation is not the only threat facing bat populations due to the proposed Project, so a determination based mainly on sedimentation control efforts is insufficient. Foraging and habitat destruction, construction stressors, and range fragmentation and climate change effects all pose further risk to bat species. A full NEPA analysis must be done to analyze the risk these activities could have on bat populations, and these risks should be holistically considered by FWS before it issues any project concurrences.

Conservation Groups also note that the FWS has recently published a proposed rule to reclassify the northern long-eared bat (*Myotis septentrionalis*) from a threatened species to an endangered species.[201] In its proposal, FWS acknowledges the devastating effects white-nose syndrome is having on the species and estimates that the disease has let to population declines of 97% to 100% across the northern long-eared bat's range.[202] Should the northern long-eared bat be reclassified, this

---

[199] FWS Letter on Cumberland Project, supra note 191, at 2.
[200] Gray Bat 5-Year Review, *supra* note 193, at 14–15.
[201] *Endangered Species Status for Northern Long-Eared Bat*, 87 Fed. Reg. 16,442 (Mar. 23, 2022).
[202] *Id*. at 16,446.

would likely trigger the need for FERC to reinitiate consultation with FWS regarding the proposed Project's potential to affect this species.[203] FERC and FWS should proactively begin consultation to evaluate the proposed Project's potential to affect northern long-eared bats with the understanding that this reclassification is likely to take place.

In sum, the proposed Project may result in the fragmentation and loss of areas that listed bats utilize for feeding, along with sedimentation and pollution of wetlands and streams they rely on for drinking water, and where the species they feed on breed. The proposed Project, including its construction, operation, and climate change impacts, could also force the relocation of bat populations, threatening their access to food and their ability to survive hibernation. The EIS must assess these potential harms to bats, including harm to caves that are relied on as hibernacula, and their larger habitat areas. This must include an analysis of the potential for construction-related activities and spills to adversely affect the water resources on which these bats depend. Further, Conservation Plans should be developed and shared with public for comment to ensure that the proposed Project will not harm these bats in violation of the Endangered Species Act ("ESA").

### 2.    Freshwater mussels

The proposed Project will result in direct impacts to streams and wetlands from construction activities, runoff, erosion, and could potentially contaminate waterbodies through construction-related spills with associated impacts to downstream species and communities. This includes the potential for significant adverse impacts to several species of imperiled freshwater mussels which may reside within the Project area including the rabbitsfoot (*Quadrula cylindrica*) and tan riffleshell (*Epioblasma walkeri*).

Freshwater mussels are extremely susceptible to sediment loading. Studies have shown that "[o]ne of the most ubiquitous factors that may adversely affect mussel populations is excessive sedimentation caused, in part, by poor land-use practices. Excessive sedimentation has been suspected as a cause of unionid mussel declines since the late 1800s."[204] Excessive amounts of sediments—especially fine particles—that wash into streams can affect mussels through multiple mechanisms. Fine sediments can lodge between coarse grains of the substrate to form a hardpan layer,[205] thereby reducing interstitial flow rates. Silt and clay particles can clog the

---

[203] *See* 50 C.F.R. § 402.16(a).

[204] Jayne Box et al., *Sediment, land use, and freshwater mussels: prospects and problems*, 18 J. N. AM. BENTHOL. SOC. 99, 100, (1999).

[205] NANCY GORDON ET AL., STREAM HYDROLOGY: AN INTRODUCTION FOR ECOLOGISTS (2d ed. 2004).

*Conservation Groups' Scoping Comments on the Cumberland Project*

gills of mussels,[206] interfere with filter feeding,[207] or affect mussels indirectly by reducing the light available for photosynthesis and the production of food items.[208]

Listed species which may occur within the Project area—such as the rabbitsfoot, which has been extirpated from 85% of its historic range in the Cumberland River Basin—have experienced precipitous population declines over the past several decades. These species are incredibly susceptible to water quality impacts, since they are filter-feeders which inhabit the bottom of streams and are exposed to contaminants contained within suspended particles and deposited in bottom substrates.[209]

The proposed Project runs through ecological communities characterized by sandy clay and gravelly silt loam soils which can be susceptible to erosion from soil disturbing activities. Construction activities therefore have the potential to cause sediment discharge into receiving waterways. The proposed Project route would go through freshwater mussel habitat, and the proposed Project route would require many stream crossings through waters that may support endangered freshwater mussels. Impacts to affected mussel populations must be analyzed in the EIS.

### 3.    Plants

An environmental review should be undertaken to assess the effect of the proposed Project on federally listed plant species. This includes Price's potato-bean (*Apios priceana*), and Short's bladderpod (*Physaria globosa*). FWS has acknowledged that habitat degradation or loss is "the greatest threat" to the Short's bladderpod.[210] And the main causes for this loss and degradation includes construction activities, ongoing maintenance of transportation and utility rights-of-way, and competition from invasive plant species. Price's potato-bean, which is frequently found within rights-of-way, is also at risk from these stressors. Construction and maintenance activities within the proposed Project area including land clearing, herbicide application, tree felling, and debris pileup all risk extirpating these at-risk plant communities.[211]

---

[206] M. M. Ellis, *Erosion silt as a factor in aquatic environments*, 17 ECOLOGY 29–42 (1936).

[207] D. W. Aldridge et al., *The effects of intermittent exposure to suspended solids and turbulence on three species of fresh-water mussels*, 45 ENVTL. POLLUTION 17–28 (1987).

[208] Robert Davies-Colley et al., *Effects of clay discharges on streams*, 248 HYDROBIOLOGIA 215–34 (1992).

[209] U.S. FISH & WILDLIFE SERV., RABBITSFOOT (*QUADRULA CYLINDRICA CYLINDRICA, SAY 1817*) 5-YEAR REVIEW:    SUMMARY    AND    EVALUATION    47    (June    17,    2020), https://ecos.fws.gov/docs/tess/species_nonpublish/2983.pdf.

[210] *Draft Recovery Plan for Short's Bladderpod*, 84 Fed. Reg. 33962 (July 16, 2019).

[211] U.S. FISH & WILDLIFE SERV., RECOVERY PLAN PRICE'S POTATO-BEAN (*APIOS PRICEANA*) 11 (Feb. 10, 1993), https://ecos.fws.gov/docs/recovery_plan/930210.pdf.

*Conservation Groups' Scoping Comments on the Cumberland Project*

Both Price's potato-bean and Short's bladderpod are known to or believed to occur in counties through which the proposed Project runs. The EIS must evaluate risks to these communities caused by the proposed Project as well as assess whether sufficient minimization and mitigation measures are being undertaken to protect any local populations from harm.

### 4.     Bald and golden eagles

Bald and golden eagles receive federal protection under the BGEPA and the MBTA. The BGEPA prohibits anyone without a valid permit from taking bald and golden eagles, including their parts, nests, or eggs.[212] Disturbance events under the Act include causing injury; decreasing productivity by substantially interfering with normal breeding, feeding, or sheltering behavior; or causing nest abandonment.[213] Disturbance therefore includes both direct impacts and those which are more attenuated, such as human-induced impacts where activities near previously-used nest sites agitate a returned eagle such that it interferes with its feeding patterns or causes the eagle to permanently quit a nest.

Bald and golden eagles are particularly susceptible to disturbance from construction-related activities and habitat loss. A variety of human activities can interfere with eagles and affect their ability to forage, nest, roost, breed, or raise young. If agitated by human activities, eagles may inadequately construct or repair their nest, expend energy defending the nest rather than tending to their young, or abandon the nest altogether. Activities that cause prolonged absences of adults from their nests can jeopardize eggs or young. If food delivery schedules are interrupted, the young may not develop healthy plumage, which can affect their survival. In addition, adults startled while incubating or brooding young may damage eggs or injure their young as they abruptly leave the nest. Older nestlings no longer require constant attention from the adults, but they may be startled by loud or intrusive human activities and prematurely jump from the nest before they are able to fly or care for themselves.[214] Activities that permanently alter communal roost sites and important foraging areas can altogether eliminate the elements that are essential for feeding and sheltering eagles.

Where a human activity, such as the construction and operation of the proposed Project, agitates roosting or foraging eagles to the degree that causes injury or substantially interferes with breeding, feeding, sheltering, or nesting behavior, the conduct of the activity constitutes a violation of the BGEPA's prohibition against disturbing eagles. The proposed Project has the potential to harm these protected

---

[212] The BGEPA defines "take" as "pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, molest, or disturb. *See* 16 U.S.C. § 668c.

[213] 50 C.F.R. § 22.3.

[214] *See* U.S. Fish & Wildlife Serv., National Bald Eagle Management Guidelines (May 2007), http://digitalmedia.fws.gov/cdm/ref/collection/document/id/1982.

species not only through construction and operation related impacts, but also through habitat loss and fragmentation, and climate disruption.

The EIS must evaluate these and other risks to determine the proposed Project's potential impacts to eagles and their habitats. Surveys must be undertaken to establish the presence of any local eagle populations, and the EIS must assess whether sufficient measures can be undertaken to protect these species from harm. The EIS should also evaluate whether a take permit is required for the applicant.[215] To avoid disturbing nesting bald eagles, the EIS should consider mitigation measures such as requiring that sufficient distance between the Proposed project and nests (distance buffers) are maintained, as well as forested or natural areas between the proposed Project and nest trees, including alternative or replacement nest trees (landscape buffers). The EIS should also analyze whether seasonal construction and tree-cutting restrictions should be put in place to reduce the likelihood that nesting eagles are disturbed, harmed, or otherwise taken.

## 5.    Migratory birds and birds of conservation concern

The MBTA, with certain exceptions, implements protection of all native migratory game and non-game birds. The MBTA prohibits the take of any migratory bird, part, nest, egg, or product.[216] Birds of Conservation Concern ("BCC") are protected under the MBTA but are further specified as those migratory nongame birds that, without additional conservation action, are likely to become candidates for listing under the ESA.[217] Pursuant to the Fish and Wildlife Conservation Act, the FWS identifies BCC as part of an effort to encourage proactive conservation and management actions to protect these species so as to eliminate any future need for their listing under the ESA.

FWS recommends that the most recent BCC list be consulted in accordance with Executive Order 13186, *Responsibilities of Federal Agencies to Protect Migratory Birds*, in order to better plan conservation actions to protect these species.[218] That Executive Order requires that permitting agencies consult with FWS to develop a memorandum of understanding ("MOU") "to promote the conservation of migratory bird populations."[219] FWS and FERC have entered into such an MOU, which specifies that FERC must, among other obligations, mitigate impacts on migratory birds and

---

[215] *See* 50 C.F.R. § 22.80.

[216] 16 U.S.C. § 703(a) (defining "take" as "by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess" or transport any migratory bird, nest, egg, or part thereof). FWS recently published a revision to its rule implementing the MBTA which reinstates the Service's previous interpretation of the MBTA as to prohibit the incidental take of migratory birds. *See Regulations Governing Take of Migratory Birds; Revocation of Provisions*, 86 Fed. Reg. 54,642, 54,643 (Dec. 3, 2021).

[217] *See* 16 U.S.C. §703(a); 50 C.F.R. § 20.10.

[218] 66 Fed. Reg. 3853 (Jan. 17, 2001).

[219] 66 Fed. Reg. 3853, 3854 (Jan. 17, 2001).

their habitats, direct project applicants to develop project-specific conservation measures where appropriate, and address migratory bird and BCC impacts within NEPA processes.[220] FERC must undertake all of these measures here, including directing the applicant to develop project-specific conservation measures for the proposed Project.

The proposed Project has the potential to take migratory birds and BCC through pipeline construction impacts to migratory bird feeding and breeding habitats (especially at river and stream crossings), loss of habitat, ecosystem fragmentation, damage of active nests during right-of-way maintenance and vegetation removal, and impacts associated with powerlines needed for the proposed Project, including increased risk of collision as well as predation from the increase in raptor nesting and edge habitat. The proposed Project will also contribute to climate change, which will lead to migratory bird habitat degradation in a myriad of ways.

The EIS must fully analyze these potential impacts to migratory birds and BCC. This includes analysis of the proposed Project's effects on the Blue-winged Warbler (*Vermivore pinus*), Kentucky Warbler (*Oporornis formosus*), Prairie Warbler (*Dendroica discolor*), Red-headed Woodpecker (*Melanerpes erythrocephalus*), and the Wood Thrush (*Hylocichla mustelina*). In particular, an environmental review should be undertaken to assess the risk of take and the detrimental alteration of habitats including those used for breeding, migration, roosting, or over-wintering. This analysis should utilize the best available demographic, population, and/or habitat association data. Where impacts on species of concern is likely, FERC should require the applicant to conduct pre-application surveys to facilitate the evaluation of effects on these birds and their habitats. The analysis should additionally consider reasonable modification or alternatives to the proposed Project that would avoid or minimize take as well as conservation measures, best management practices, and mitigation. This should also include efforts to minimize land and vegetations disturbance, establishment of buffer zones during Project construction, incorporation of designs which minimize disturbance during Project implementation and operation, and prohibitions on vegetation removal and tree cutting during nesting seasons.

FERC should additionally require that the applicant complete a migratory bird conservation plan with project-specific measures included. If an active nest is detected, all construction activities should cease until the nestlings have fledged or the nest becomes unoccupied.

---

[220] U.S. Fish & Wildlife Serv. & FERC, Memorandum of Understanding Between the Federal Energy Regulatory Commission and the U.S. Department of the Interior United States Fish and Wildlife Service Regarding Implementation of Executive Order 13186 "Responsibilities of Federal Agencies to Protect Migratory Birds" 6–7 (Mar. 30, 2011), https://ferc.gov/sites/default/files/2021-04/mou-fws.pdf?msclkid=9a2e4e1ab37811eca7bb7c1f916aa040.

*Conservation Groups' Scoping Comments on the Cumberland Project*

**B.    Other concerns regarding impacts to habitats and species.**

**1.    Stream crossings**

The proposed Project risks harming species due to the various stream crossings that would be required for the current proposed route. Stream crossings pose a risk of harm to bat and bird species that may feed and breed along the waterways and whose behaviors may be adversely impacted by construction activities and noise. Stream crossings may also impact aquatic species by contributing substantial sediment to the river during construction. As discussed, such sedimentation can have a drastic impact on freshwater mussels which can be susceptible to even small changes in sediment loading.

In the EIS, FERC must analyze the full range of potential impacts of water crossings, including potential harm to species. FERC must additionally consider alternative construction methods and locations, as well as temporal restrictions to avoid disrupting birds and mammals during certain seasons. To that end, FERC should require that the applicant provide the following:

- Information regarding any impaired waterbodies that would be crossed by the new pipeline;
- State water quality classification (and definition of the classification) and known or potential pollutants in water or sediment;
- Bank width for each waterbody crossed;
- Flow type for each waterbody crossed;
- The length of each waterbody crossing;
- Crossing method or impact;
- The approximate mileposts for each crossing/impact;
- Fishery classifications and habitat assessments for each waterbody, including the presence of threatened or endangered species (i.e., freshwater mussels);
- Information on threatened, endangered, protected, and migratory bird nesting periods.

**2.    Habitat fragmentation and invasive species from roads and pipeline rights-of-way.**

Construction of access roads and the pipeline right-of-way has the potential to produce myriad impacts to species and habitats through:

- Soil erosion, compaction, loss of forest productivity;
- Pollution, sedimentation, thermal loading;
- Rapid water runoff, peak flows;
- Impaired floodplain function;
- Barriers to movement of wood and spawning gravel;
- Fragmentation, wildlife dispersal barriers; and

*Conservation Groups' Scoping Comments on the Cumberland Project*

• Human disturbance, weed vector, hunting pressure, loss of snags, litter.

Over the last few decades, studies in a variety of terrestrial and aquatic ecosystems have demonstrated that road and cleared rights-of-way, like the proposed pipeline right-of-way, aggravate many of the most pervasive threats to biological diversity, including habitat destruction and fragmentation,[221] edge effects,[222] exotic species invasions,[223] and pollution.[224] These areas have been implicated as mortality sinks for animals ranging from snakes to wolves; displacement factors affecting animal distribution and movement patterns; population fragmenting factors; sources of sediments that clog streams and destroy fisheries; sources of deleterious edge effects; sources of pesticides which are used to maintain these areas; and access corridors that introduce invasive species and encourage development, logging and poaching of rare plants and animals. Several of these factors have cascading negative effects. For instance, invasive species can disrupt forest regeneration, soil chemistry, native habitat quality, hydrology, and land value. Following habitat loss and degradation, non-native invasive species are considered the second-most important threat to biodiversity.[225] Road and right-of-way construction therefore threatens the existence of species in the proposed Project area in a myriad of ways.

The EIS must consider the full range of impacts to habitats and species, including those protected by federal law, from the construction and maintenance of the roads necessary to construct and maintain the pipeline, as well as the pipeline right-of-way itself. The EIS must include evaluation of these and others risks created by habitat fragmentation, edge effects, exotic species invasion, and pollution. If pesticides or herbicides are used to maintain the ROWs, then FERC must additionally analyze how pesticide or herbicide use and application could harm species. Species such as the grey bat, for instance, are known to be negatively impacted by exposure to pesticides.[226]

### 3. Riparian buffers

The EIS must consider alternatives and mitigation measures to reduce the potential impacts to natural communities, and one of the best ways to mitigate impacts, especially to aquatic and riparian species, is to use substantial buffer areas.

---

[221] *See, e.g.*, Victoria Bennet, *Effects of Road Density and Pattern on the Conservation of Species and Biodiversity*, 2 CURRENT LANDSCAPE ECOLOGY REPORTS 1–11 (2017).

[222] *See, e.g.*, Elisa Fuentes-Montemayor et al., *Living on the edge: roads and edge effects on small mammal populations*, 78 JOURNAL OF ANIMAL ECOLOGY 857–65 (2009).

[223] *See, e.g.*, Adrián Lázaro-Lobo et al., *A global examination on the differential impacts of roadsides on native vs. exotic and weedy plant species*, 17 GLOBAL ECOLOGY & CONSERVATION 1–10 (2019).

[224] *See, e.g.*, Marinella Guinta, *Assessment of the environmental impact of road construction: Modelling and prediction of fine particulate matter emissions*, 176 BUILDING & ENV'T ABSTRACT (2020)

[225] David Wilcove et al., *Quantifying Threats to Imperiled Species in the United States*, 48 BIOSCIENCE 607–15 (1998).

[226] Gray Bat 5-Year Review, *supra* note 193, at 14.

*Conservation Groups' Scoping Comments on the Cumberland Project*

Wide, mature riparian vegetation buffers filter sediment from upslope sources as well as stabilize stream banks from erosion. They further provide shade and habitat for many species.

The best available science shows that larger buffers provide more ecosystem services, such as sediment filtration and mitigation to protect and restore aquatic resources, than smaller buffers. The EIS must analyze the potential for the proposed Project to include sufficiently large buffers to prevent and mitigate harm to riparian and aquatic communities.

### 4.  Climate change

Increased greenhouse gas emissions associated with the proposed Project will exacerbate global climate change, leading to loss of sea ice, sea level rise, extreme weather events, ocean acidification, and the loss of habitat and species. The EIS must disclose specific impacts from the proposed Project to protected species and their habitats resulting from climate change, including but not limited to changes in local precipitation patterns, increased severity of storms, droughts, and other weather events, and impacts to habitat ranges.

The EIS should analyze the impact that climate change will have on the local ecosystem and species. Take for instance, local migratory bird populations. Migratory bird population declines from climate change-driven threats are of significant concern. Studies have indicated that birds will be particularly affected by the changing climate.[227] Scientists have found that approximately 64 percent of North American bird species are moderately or highly vulnerable to climate change.[228] And the Southeast is expected to lose communities of breeding bird populations due to warming temperatures.[229] The EIS should analyze the impact that the proposed Project will have not only on the nesting, feeding, and migration practices of these birds within the proposed Project area, but also the impacts which climate change will wrought upon the species' ability to survive and flourish writ large within their traditional habitat areas.

### C.  FERC must consult with FWS.

Each federal agency has a duty to consult with FWS to ensure that agency action is not likely to jeopardize the continued existence of any threatened or endangered species.[230] "Agency action" is broadly defined to include "all activities or programs of any kind authorized, funded, or carried out, in whole or in part" including

---

[227] *See, e.g.*, Michela Pacifici et al., *Species' traits influenced their response to recent climate change*, 7 NATURE CLIMATE CHANGE 205–08 (2017).

[228] *See* CHAD B. WILSEY ET AL., NAT'L AUDUBON SOC'Y, SURVIVAL BY DEGREES: 389 BIRD SPECIES ON THE BRINK 10 (2019), https://nas-national-prod.s3.amazonaws.com/climatereport-2019-english-lowres.pdf.

[229] *Id.* at 12.

[230] 16 U.S.C. § 1536(a)(2).

*Conservation Groups' Scoping Comments on the Cumberland Project*

"the granting of licenses, contracts, leases, easements, rights-of-way, [or] permits," and any "actions directly or indirectly causing modifications to the land, water, or air."[231] FERC has an obligation to consult with FWS to ensure that its approval of the proposed Project is not likely to jeopardize threatened or endangered species within the Project area in violation of the ESA.

Each federal agency must review its actions at "the earliest possible time" to determine whether any action may affect listed species or their critical habitat in the action area.[232] The "action area" encompasses all areas that would be "affected directly or indirectly by the federal action and not merely the immediate area involved in the action."[233] Pursuant to the ESA, FERC must "use the best scientific and commercial data available" to make this determination,[234] and the term "may affect" is broadly construed to include "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character," and thus is easily triggered.[235] If an action agency concludes that the action may adversely affect listed species or critical habitat, as FERC must here, it must then enter into formal consultation with FWS.[236]

It is abundantly clear that the proposed Project may affect listed species, as discussed above. The threshold for triggering formal consultation is minimal with: "any possible effect. . . trigger[ing] formal consultation requirements."[237] Habitat fragmentation, alteration, and loss; construction-related contamination and noise; sedimentation of waterways; introduction of invasive species; and climate change impacts associated with this proposed Project all are effects which require FERC to undertake ESA consultation; therefore, a full and complete assessment of the potential impacts that the Cumberland Project will have on these imperiled species is warranted.

In early 2022, SELC sought public records from the FWS pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended, seeking access to agency records related to the proposed Project.[238] FWS responded that it did not anticipate being able to produce any records responsive to the request until late April

---

[231] 50 C.F.R. § 402.02.

[232] *Id.* § 402.14(a).

[233] *Id.* § 402.02.

[234] 16 U.S.C. § 1536(a)(2).

[235] *Interagency Cooperation—Endangered Species Act of 1973, As Amended*, 51 Fed. Reg. 19,926 (June 3, 1986).

[236] 50 C.F.R. §§ 402.12(k), 402.14(a).

[237] 51 Fed. Reg. at 19949.

[238] Letter from Trey Bussey, SELC, to Public Records Request Coordinator, FWS, Re: Freedom of Information Act Request for Records Related to Tennessee Gas Pipeline Company's Proposed Cumberland Project (Jan. 26, 2021).

*Conservation Groups' Scoping Comments on the Cumberland Project*

2022.[239] To date, SELC has not received any records from the Service; however, FWS recently notified FERC that it has issued a statement of concurrence on TGPC's determination that the proposed Project is not likely to adversely affect seven species which had previously been identified as potentially being effective by the proposed Project.[240] These include the gray bat (*Myotis grisescens*), Indiana bat (*Myotis sodalis*), northern long-eared bat (*Myotis septentrionalis*), rabbitsfoot (*Quadrula cylindrica*), tan riffleshell (*Epioblasma walkeri*), Price's potato-bean (*Apios priceana*), and Short's bladderpod (*Physaria globosa*).

Conservation Groups have neither the underlying surveys and data referenced in FWS' letter to FERC, nor have they obtained FWS' statement of concurrence. Thus, Conservation Groups are unable to effectively evaluate the appropriateness of the agency's determination, although, as discussed above, Conservation Groups believe any such determination is premature. Moreover, FWS' letter does not specifically address the impacts the proposed Project may have on eagles or BCC, and Conservation Groups do not have access to any underlying information which may have been relied on by FWS to come to any conclusions regarding these species. Given all of the ways the proposed Project may affect listed species, the apparent informal consultation that has occurred between FWS, FERC, and TGPC is insufficient, and formal consultation between FERC and FWS is required.

Formal consultation commences with the action agency's written request for consultation and concludes with the Services' issuance of a "biological opinion."[241] The "effects" which the biological opinion must analyze are broadly defined to include all consequences of the proposed action, plus the consequences of other actions that are caused by the proposed action, added to all existing environmental conditions—that is, added to the environmental baseline within the action area. "Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action."[242] The effects of the action must be considered together with "cumulative effects," which are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."[243]

The biological opinion is issued at the conclusion of formal consultation and states the opinion of the Service as to whether the effects of the action are "likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."[244] This includes "engag[ing] in an action that

---

[239] Letter from Stacey Cummins, FWS, to Trey Bussey, SELC, Re: FOIA request DOI-FWS-2022-001757 Cumberland Project (Feb. 9, 2022).

[240] FWS Letter on Cumberland Project, *supra* note 191, at 2–3.

[241] 50 C.F.R. § 402.02.

[242] *Id.*

[243] *Id.*

[244] *Id*. § 402.14(g)(4).

reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."[245]

If jeopardy is likely to occur, the Service must prescribe in the biological opinion "reasonable and prudent alternatives" to avoid "take" of listed species.[246] If the Service concludes that a project is not likely to jeopardize listed species, it must provide an "incidental take" statement with the biological opinion, specifying the amount or extent of incidental take, "reasonable and prudent measures" necessary or appropriate to minimize such take, and the "terms and conditions" that must be complied with by the action agency to implement any reasonable and prudent measures.[247]

It is readily apparent that the proposed Project may adversely affect several listed species. Endangered mussels, bats, birds, and plants are at risk, both short- and long-term, of harm caused by the proposed Project's construction and operational activities. FWS should issue a biological opinion which includes a full analysis of the potential impacts to protected species from the construction and maintenance of the proposed Project, as well as climate considerations and TVA's regional gas buildout including at the Cumberland Fossil Plant. FERC should consult with FWS, and FWS should issue a Biological Opinion analyzing whether the proposed Project is likely to jeopardize the continued existence of any listed species or adversely modify crucial habitat. This review, and any incidental take statement subsequently issued, is necessary to ensure that FERC and TGPC are not at risk of being held liable for take under Section 9 of the ESA.[248]

According to the FWS Endangered Species Consultation Handbook, the time required to conduct formal Section 7 consultation may be longer than the time required to complete preparation of NEPA compliance documents; therefore, "the action agency should be encouraged to initiate informal consultation prior to NEPA public scoping."[249] Furthermore, the Handbook makes it clear that "The Record of Decision [for an EIS] should address the results of section 7 consultation."[250] The consultation process must therefore commence prior to the issuance of a draft EIS, so that the results of consultation may be properly considered within the NEPA

---

[245] *Id.* § 402.02.

[246] *Id.* § 402.14(g).

[247] 16 U.S.C. § 1536(b)(4), 50 C.F.R. § 402.14(i).

[248] 16 U.S.C. § 1538(a); *see also Loggerhead Turtle v. County Council of Volusia County, Fla.*, 896 F. Supp. 1170, 1181 (M.D. Fla. 1995) (finding that a governmental entity with authority to regulate certain activities assumed responsibility for ensuring that parties engaging in those activities did not "take" federally protected species).

[249] U.S. Fish & Wildlife Serv. et al., Endangered Species Consultation Handbook 4–11 (1998) [hereinafter "ESA Handbook"], http://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf.

[250] *Id.*

*Conservation Groups' Scoping Comments on the Cumberland Project*

analysis.[251] It is not clear whether this recommendation has been complied with, and we urge FERC to begin consulting with FWS immediately and initiate the development of a biological assessment since doing so "would allow action agencies to share project information earlier and would improve interagency coordination and efficiency."[252]

## IX.    FERC must take a hard look at the alternatives to and significant effects of the Cumberland Project's proposed waterbody crossings.

Although the prefiling docket lacks necessary detail about (1) the streams and wetlands the proposed Project would cross, (2) the locations of those crossings, or (3) the methods that TGPC intends to use at each crossing, the prefiling materials reveal at least this:

- TGPC proposes to cross two streams that are listed on the National River Inventory under the Wild and Scenic Rivers Act: Jones Creek and Yellow Creek;[253]

- TGPC proposes to cross at least nine streams that are potential habitat for mussel species protected under the ESA: the threatened rabbitsfoot (*Quadrula cylindrica cylindrica*) and the endangered tan rifflleshell (*Epioblasma florentica walker*);[254]

- Field evaluations of stream crossings are complete, but TGPC is still evaluating waterbody crossing methodologies;[255]

- TGPC intends to use wet open-cut crossings, dry open-cut crossings, and horizontal directional drilling ("HDD") to construct its stream crossings;[256]

- TGPC intends to construct crossings of just three streams using HDD: Jones Creek, Yellow Creek, and Wells Creek.[257]

---

[251] Of course, analysis of a proposed project's potential impact on species requires different inquiries under NEPA and the ESA so that an evaluation of effects in compliance with one Act does not automatically guarantee sufficiency of analysis pursuant to the other. However, FERC should utilize the information obtained in its ESA consultation process with FWS to help inform its analysis of environmental impacts in its NEPA review.

[252] ESA HANDBOOK, *supra* note 249, at 4–11.

[253] Pre-Filing Monthly Activity Report for the Month of January 2022 at 1, Dkt. No. PF22-2-000, (Feb. 15, 2022) [hereinafter "January Activity Report"]

[254] Dinkins Biological Consulting, LLC, STUDY PLAN FOR MUSSEL SURVEYS FOR THE Tennessee Gas Pipeline Company, LLC, CUMBERLAND PROJECT, tbl 1 (Sept. 1, 2021) (included in Appendix 1.F to Draft Resource Report 1).

[255] January Activity Report, *supra* note 253, at 1.

[256] Draft Resource Report 1, *supra* note 26, at 1-29.

[257] *Id*. at 1-5

*Conservation Groups' Scoping Comments on the Cumberland Project*

That is enough to establish that (1) FERC's NEPA review will have to include a detailed and extensive analysis of routing and crossing-method alternatives and (2) FERC must prepare an EIS because of the significant impacts of (a) the crossing methods proposed and (b) the protected waterways and species affected.

### A. TGPC will have to obtain an individual Section 404 Permit for its proposed crossings.

As a threshold matter, FERC should recognize that the proposed Project will require an individual permit under Section 404 of the Clean Water Act[258] from the United States Army Corps of Engineers ("Corps"), and take steps to ensure that the environmental review for the project will be sufficient to meet the Corps' NEPA obligations.

Construction of open-cut stream crossings like those proposed by TGPC entail the discharge of fill material into the waters of the United States, requiring a permit under Section 404 of the Clean Water Act ("CWA") from the Corps.[259] The Corps can issue general—or "nationwide"—Section 404 permits—for activities that have minimal individual or cumulative adverse environmental effects.[260] If a nationwide permit is unavailable, then the discharge-proponent must seek and obtain an individual Section 404 permit from the Corps.[261]

Historically, methane gas pipelines have tried to avail themselves of Nationwide Permit ("NWP") 12—the Corps' nationwide permit for linear utility lines. On September 15, 2020, the Corps published a proposed rule in the Federal Register to reissue NWP 12.[262] The Corps published a rule finalizing the renewal of NWP 12 on January 13, 2021 for "Oil or Natural Gas Pipeline Activities."[263]

The proposed Project is ineligible for and not authorized by NWP 12 for at least five reasons. *First,* for the reasons alleged by the plaintiffs in *Center for Biological Diversity v. Spellmon*, Civ. No. 4:21-cv-00047-BMM, ECF #1 (D. Mont. May 3, 2021)), the Corps' January 13, 2021 reissuance of NWP was unlawful and invalid. Accordingly, TGPC cannot construct its waterbody crossings under the color of NWP 12.

*Second,* even if it were otherwise lawful, a recently-announced review of NWP 12 by the Corps raises sufficient uncertainty about the future viability of the permit that TGPC should not plan to rely on it. On March 28, 2022, the Corps published a

---

[258] 33 U.S.C. § 1344.
[259] *Id*. § 1344.
[260] *Id*. § 1344(e).
[261] *Id*. § 1344(a).
[262] *Proposal To Reissue and Modify Nationwide Permits*, 85 Fed. Reg. 57,298 (Sept. 15, 2020).
[263] *Reissuance and Modification of Nationwide Permits*, 86 Fed. Reg. 2744 (Jan. 13, 2021).

notice in the Federal Register announcing a formal review of NWP 12.[264] As part of that review, the Corps has solicited stakeholder input on, among other things, whether it should modify or revoke NWP 12 pursuant to 33 C.F.R. § 330.5, and whether such modifications should include additional triggers for individual permit review.[265] The public comment aspect of the NWP 12 review closes on May 27, 2022, making it very likely that the Corps will act on its review before construction of TGPC's proposed Project begins. Because there is a significant chance that the NWP 12 review will result in the revocation of NWP 12 or restrictions on its use that would affect TGPC's proposed Project, it would not be prudent for TGPC or FERC to rely on NWP for the construction of the waterbody crossings associated with the proposed Project.[266]

*Third,* TGPC's crossings are ineligible for verification under NWP 12. As discussed, the methods that TGPC proposes to use—including open-cut trenching—will have significant adverse impacts on water quality and aquatic life. Indeed, as explained throughout these comments, the project as a whole will have such effects. Consequently, both (1) the project's waterbody crossings and (2) the project as a whole, will have more than minimal individual and cumulative adverse effects on the environment, which would exceed the statutory standard for the use of a nationwide permit.[267]

*Fourth,* TGPC's planned use of wet crossings makes it ineligible for NWP 12 because the project cannot satisfy the permit's terms and conditions. As discussed below, it is very difficult, if not impossible, to restore a streambed to its pre-construction elevation while the stream is flowing.[268] But NWP 12 includes a requirement that, "[a]fter construction, . . . affected areas [must be] returned to pre-construction elevations."[269] If an activity cannot satisfy *all* of NWP 12's terms and

---

[264] *Notice of Virtual Public and Tribal Meetings Regarding the Review of Nationwide Permit 12; Establishment of a Public Docket; Request for Input*, 87 Fed. Reg. 17,281 (Mar. 28, 2022).
[265] *Id.* at 17,283.
[266] For an example of the consequences of a FERC-regulated pipeline imprudently attempting to use NWP 12 when it should have sought an individual permit from the outset, FERC need look no further than the still-unfinished Mountain Valley Pipeline. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir 2018) (observing that "an individual permit will likely be necessary" for the Mountain Valley Pipeline); *Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251, 255 (4th Cir. 2020) (in challenge to second effort by Mountain Valley Pipeline to use NWP 12, Court noted that it had observed two years prior that a nationwide permit would likely be necessary).
[267] 33 U.S.C. § 1344(e).
[268] Michael S. Rolband & Frank R. Graziano, Mountain Valley Pipeline Crossings of the Gauley, Greenbrier, Elk, and Meadow Rivers: Assessment of "Wet" vs "Dry" Open-cut Methods of Pipeline Installation at 2, Sierra Club v. U.S. Army Corps of Eng'rs, No. 18-1173 (4th Cir. July 11, 2018).
[269] 86 Fed. Reg. at 2860.

conditions, it cannot proceed under that permit.[270] Moreover, if even one of a pipeline's stream crossings is ineligible for NWP 12, then they all are.[271]

As a result of the unavailability of NWP 12, TGPC will have to seek an individual Section 404 permit from the Corps. Consequently, FERC must ensure that its environmental review of the proposed Project is sufficient to satisfy the Corps' NEPA obligations. That will entail conducting an alternatives analysis "thorough enough to use for both the public interest review and the 404(b)(1) [G]uidelines."[272] And the Section 404(b)(1) Guidelines require the identification of the least environmentally damaging alternative *on a crossing-by-crossing basis.*[273] Accordingly, FERC must take a hard look at *each* of TGPC's proposed crossings, and not simply address them at a high level of generality. If FERC fails to do so, it will jeopardize the Corps' ability to adopt its NEPA documents.[274]

## B.    FERC must evaluate the location and construction method proposed for each individual crossing.

As discussed elsewhere in these comments, NEPA requires a robust alternatives analysis.[275] Here, that requires FERC to review available alternatives to TGPC's proposed waterbody crossings.

FERC must consider two types of alternatives to TGPC's proposed crossings: (1) routing alternatives that would relocate proposed crossings to less-sensitive stream reaches or wetlands[276] and construction-method alternatives that would avoid discharges into aquatic resources entirely.[277]

---

[270] *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d at 649–50 (interpreting 33 C.F.R. § 330.1(c)).

[271] *Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d at 264 (interpreting 33 C.F.R. §330.6(d)).

[272] 33 C.F.R. pt. 325 App. B(9)(b)(5).

[273] 40 C.F.R. § 230.10(a). Section 404 authorizes the Corps to issue permits for discharges at "specified disposal sites," and requires the Corps to specify—and therefore evaluate—"each such disposal site" through the application of the 404(b)(1) Guidelines. 33 U.S.C. § 1344(a)–(b) (emphasis added); *see also Wild Bainbridge v. Mainlander Servs. Corp.*, 544 F. Supp. 2d 1159, 1163 (W.D. Wash. 2008) ("Each disposal site for which the Corps issues an individual permit must be specified in accordance with guidelines developed by the Administrator of the Environmental Protection Agency in conjunction with the Corps.") (emphasis added).

[274] *See, e.g., Cowpasture River Pres. Ass'n v. Forest Serv.*, 911 F.3d 150, 170–73 (4th Cir. 2018), *rev'd and remanded on others grounds sub nom. U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837 (2020); *Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 594–96 (4th Cir. 2018).

[275] 42 U.S.C. § 4332(C)(iii).

[276] *Cf.* 40 C.F.R. § 230.10(a)(1)(ii).

[277] *Cf. id.* § 230.10(a)(1)(i).

### 1. FERC must evaluate route alignment alternatives for each crossing.

In its alternatives analysis, FERC must scrutinize TGPC's proposed route and examine whether there are routing alternatives that will allow it to avoid certain resources, including by crossing waterbodies at locations that would have fewer impacts. FERC is obligated to evaluate routing alternatives that would avoid stream reaches and wetlands with sensitive plant and animal species (such as the rabbitsfoot and tan riffleshell mussels), special aquatic sites (like wetlands and riffle-and-pool complexes),[278] and other sensitive resources. And it must do so on a crossing-by-crossing basis. That is, it must look at each crossing and determine whether alignment changes would allow TGPC to avoid a waterbody crossing entirely or the use of a crossing location that with fewer environmental impacts. Examining only the handful of routing variations discussed in Resource Report 10 will not suffice.[279]

### 2. FERC must evaluate the feasibility of less-destructive trenchless-crossing methods.

TGPC has proposed to use HDD—a trenchless crossing method—at three locations but appears to intend to use open-cut methods—including wet open cuts and dry-ditch methods like dam-and-pump or flumes—at the vast majority of its crossings.[280] In its environmental review, FERC must engage in an alternatives analysis to determine the impacts of each type of stream crossing and the feasibility of less-destructive methods.

"[T]renchless methods are the least destructive approach for pipeline crossings of waterbodies absent site specific conditions."[281] Although TGPC has stated that it intends to use a trenchless method—HDD—at three crossings (Jones Creek, Yellow Creek, and Wells Creek),[282] FERC's environmental review must consider whether *other* trenchless methods are feasible and less-destructive and whether a trenchless method is feasible at additional locations on a crossing-by-crossing basis.

Although HDD avoids direct impacts to waterbodies and streambeds by going *under* an aquatic resource, instead of *through* it, the technique's use of large quantities of drilling muds presents the risk of inadvert returns. Indeed, TGPC

---

[278] *See id.* §§ 230.41, .45.

[279] Resource Report 10, *supra* note 12, at 10-8 to -11.

[280] Resource Report 1, *supra* note 26, at 1-29.

[281] Starr Silvis, M.S., P.E., Review of Mountain Valley Pipeline, LLC's Application for an Individual Section 404 Permit from the U.S. Army Corps of Engineers 1 (May 27, 2021), https://elibrary.ferc.gov/eLibrary/filedownload?fileid=020E52CE-66E2-5005-8110-C31FAFC91712; *see also* W. Va. Dep't of Envtl. Prot., Division of Water & Waste Management, Erosion & Sediment Control Best Management Practice Manual 3.21-2 (2006, rev. Aug. 29, 2016) [hereinafter "WVDEP BMP Manual"].

[282] Resource Report 1, *supra* note 26, at 1-5.

*Conservation Groups' Scoping Comments on the Cumberland Project*

acknowledges the risk of "inadvertent returns during drilling operations resulting in the loss of drilling fluid through hydraulically induced fractures[.]"[283] Such releases can have severe impacts on water quality and aquatic life, by smothering streambeds and wetlands with drilling mud.[284]

But there are other available trenchless methods that at least reduce the use of drilling fluids, and thereby reduce the risk of inadvertent return. FERC must evaluate the use of such techniques. Four such techniques are (1) conventional boring, (2) guided conventional boring, (3) microtunneling, and (4) Direct Pipe®. FERC's environmental review must consider those methods as alternatives to both HDD and open-cut waterbody crossings.

- Conventional boring uses an auger to bore a tunnel under a resource to and from bore bits on either side of the resource.[285] FERC identifies conventional boring as an alternative to HDD.[286] On this project, TGPC intends to use conventional boring to cross eight public roads, but does not identify any waterbodies that it intends to cross using the method.[287] But conventional boring is frequently used to construct pipeline waterbody crossings, and TGPC has previously used the method for that purpose.[288]

- Guided conventional boring is a variation of the conventional boring technique that uses pilot tubes to guide the auger.[289] Like conventional boring, this method is used in waterbody crossings for methane gas pipelines.[290]

- Microtunneling allows pipe jacking with accurate guidance, remote operation, and continuous support of the bore hole.[291] The technique has been used to

---

[283] *Id.* at 1-28.

[284] *See, e.g.*, *Rover Pipeline, LLC and Energy Transfer Partners, L.P.*, 177 FERC ¶ 61,182 (Dec. 16, 2021) (FERC enforcement action proposing $40,000,000 penalty against pipeline developer for Natural Gas Act violations related to spill of 2 million gallons of drilling fluid during inadvertent return in Stark County, Ohio). FERC must take a hard look at the potential environmental impacts of an inadvertent return at HDD crossings proposed by the Project, including the National River Inventory streams discussed below.

[285] *See, e.g.*, Resource Report 1, *supra* note 26, at 1-27.

[286] Fed. ENERGY REGUL. COMM'N, OFFICE OF ENERGY PROJECTS, GUIDANCE FOR HORIZONTAL DIRECTIONAL DRILL MONITORING, INADVERTENT RETURN RESPONSE AND CONTINGENCY PLANS 13 (Oct. 2019), https://www.ferc.gov/sites/default/files/2020-04/guidance-natural-gas.pdf.

[287] *Id.*

[288] *See, e.g.*, *Tennessee Gas Pipeline Co.*, LLC, 156 FERC ¶ 61156, ¶ 111 (Sept. 6, 2016).

[289] Raymond L. Sterling, *Developments & Research Directions in Pipe Jacking and Microtunneling*, UNDERGROUND SPACE (BEIJING) VOLUME 5 at 4 (2020) [hereinafter "Sterling (2020)"], https://www.sciencedirect.com/science/article/pii/S2467967418301065/pdfft?md5=6bbb7dc48a705e7bf1acc4b5a0f7a459&pid=1-s2.0-S2467967418301065-main.pdf.

[290] WILLIAMS FIELD SERVS. CO., LLC ET AL., APPLICATION FOR A CERTIFICATE OF ENVIRONMENTAL COMPATIBILITY AND PUBLIC NEED TO CONSTRUCT AN APPROXIMATELY 9.5-MILE NATURAL GAS GATHERING LINE, NEW YORK MAINLINE LOOP NATURAL GAS PIPELINE PROJECT 17 (Dec. 2, 2013).

[291] Sterling (2020), *supra* note 289, at 2.

construct methane gas pipeline crossings beneath valuable aquatic resources such as streams protected by the Wild and Scenic Rivers Act.[292]

- Direct Pipe® "is a hybrid technique combining aspects of microtunneling and HDD."[293] But, unlike HDD, in this technique, "the borehole is never only mud supported."[294] This method has been used to construct methane gas pipelines under waterbodies inhabited by species listed as threated under the ESA.[295]

As part of the alternatives analysis in its environmental review, FERC must evaluate the feasibility of using each of those methods on a crossing-by-crossing basis.

### C. TGPC's proposed open-cut crossings will cause significant environmental impacts necessitating the preparation of an EIS.

TGPC proposes to use both (1) wet open-cut crossings and (2) dry open-cut crossings.[296] The significant environmental impacts of those two waterbody-crossing methods require FERC to prepare an EIS.

### 1. Wet open-cut crossings are environmentally devastating.

It is hard to envision a more damaging stream-crossing construction method than a wet open-cut crossing. Yet, TGPC intends to use that method on the proposed Project. The wet open-cut technique "does not use any method to divert the stream around the work area. The utility line is installed and backfilled while the river/stream continues to run through the site."[297] As one state regulatory agency has concluded, "this type of crossing produces some *very negative impacts*. These include *severe pollution* from greatly increased total suspended sediment ("TSS") concentrations, changes in channel morphology, and localized destruction of aquatic ecosystems."[298] And the Corps has argued *against* the use of wet open cut crossings in court filings, admitting "that downstream sedimentation can be *100 times greater* during wet open-cut construction than during" construction using other methods.[299]

Moreover, an industry consulting firm's white paper has also recognized the significant detrimental effects of wet open-cut crossings, concluding that:

---

[292] *See, e.g.*, *Rockies Express Pipeline LLC*, 123 FERC ¶61234, ¶ 131 (May 30, 2008).

[293] Sterling (2020), *supra* note 289, at 5.

[294] *Id.*

[295] *Transcontinental Gas Pipe Line Company, LLC*, 141 FERC ¶ 61091, ¶¶ 53, 57 (Nov. 2, 2012).

[296] Resource Report 1, *supra* note 26, at 1-29

[297] WVDEP BMP Manual, *supra* note 281, at 32.1-7.

[298] *Id.* (emphasis added).

[299] Brief for Fed. Respondents at 18, Sierra Club v. U.S. Army Corps of Eng'rs, No. 18-1173(L) (4th Cir. Aug. 16, 2018) (citing S.M. Reid et al., *Sediment Entrainment During Pipeline Water Crossing Construction*, 8 J. ENVTL. ENG. SCI. 3:81, 86–87 & tbl. 5 (2004) (emphasis original).

*Conservation Groups' Scoping Comments on the Cumberland Project*

While faster and cheaper, this methodology increases the potential for detrimental impacts to the aquatic environment. This is particularly true in larger rivers where flow rates are higher (even in low flow conditions) and, due to the length of the crossing, where the process takes longer. During construction the stream is flowing through the work site, which exposes the unconsolidated soil material below the stream bed and *creates a significant increase in turbidity*. In addition, because the instream trench remains exposed to the erosive force of flowing water during a "wet" open-cut crossing, downstream turbidity increases remain more or less constant for the duration of the crossing construction.[300]

The same consultants also concluded that wet crossings (1) increase the potential for the introduction of contaminants (such as fuel or hydraulic fluid) into streams from operating equipment in or overflowing water and (2) render streambed restoration "much more difficult."[301] In short, the significant impacts from TGPC's proposed wet open-cut crossings alone warrants preparing an EISs.

FERC's environmental review must quantify the turbidity and sedimentation that will result from TGPC's proposed wet open cut crossings. During FERC's environmental review of the still-unfinished Mountain Valley Pipeline, FERC required just such an analysis from the applicant:

Mountain Valley performed a quantitative modeling assessment for each of the three previously proposed wet open-cut crossings to quantify the amount of turbidity and sediment that would be expected downstream of the crossings. Results of the assessment estimate that monthly sediment loads would increase by 49 to 81 percent, 15 to 26 percent, and 19 to 52 percent for the Elk River, Gauley River, and Greenbrier River, respectively.[302]

---

[300] Rolband & Graziano, *supra* note 268, at 2.

[301] *Id.*

[302] FED. ENERGY REGUL. COMM'N, MOUNTAIN VALLEY PROJECT AND EQUITRANS EXPANSION PROJECT: FINAL EIS 4-139 (June 2017), https://www.ferc.gov/sites/default/files/2020-05/Final-Environmental-Impact-Statement_1.pdf.

Based on those significant increases in sediment loads, the applicant abandoned its plans for wet open-cut crossings. Similar modeling is warranted here for TGPC's proposed wet open-cut crossings.

### 2. Dry open-cut crossings cause long-lasting, significant impacts on water quality and aquatic life.

FERC must take a hard look at the environmental impacts to water quality and aquatic life from TGPC's proposed *dry* open-cut crossings as well. Because the duration of adverse environmental effects from dry open-cut crossings are measured in years—not days,[303] FERC must prepare an EIS.

The industry refrain that dry open-cut crossings do not have significant impacts is not accurate. A FWS biologist once grew so frustrated by that refrain that she felt it necessary to develop her own literature review to push back.[304] The following is her summary of the literature:

> Pipeline stream crossings can affect fish habitat; food availability; and fish behavior, heath, reproduction and survival. The most immediate effect of instream construction is the creation of short term pulses of highly turbid water and total suspended sediments (TSS) downstream of construction (Levesque & Dube 2007, pp. 399-400). Although these pulses are usually of relatively short duration and there is typically a rapid return to background conditions after activities cease, **instream construction has been shown to have considerable effects on stream substrates and benthic invert[ebrate] communities that persist after construction has been completed** (Levesque & Dube 2007, p. 396-397). Commonly documented effects include substrate compaction and silt deposition within the direct impact area and downstream that fills interstitial spaces in gravel substrates and reduces water flow through the substrate, this increases substrate embeddedness and reduces habitat quality (Levesque & Dube 2007, pp. 396-397; Penkal & Phillips 2011, pp. 6-7; Reid & Anderson 1999, p. 243). Construction also directly alters stream channels, beds, and banks resulting in changes in cover, channel morphology, and sediment transport dynamics. Streambank alterations can lead to increased water velocities, stream degradation, and migrations in stream channel.

---

[303] *See, e.g.*, U.S. FISH & WILDLIFE SERV., MOUNTAIN VALLEY PIPELINE, LLC; REVISED BIOLOGICAL OPINION 96 (Sept. 4, 2020), https://elibrary.ferc.gov/eLibrary/filedownload?fileid=0209d766-66e2-5005-8110-c31fafc91712 (assuming sedimentation effects on benthic invertebrates would persist for up to four years).

[304] Email from Barbara Douglas, Sr. Endangered Species Biologist, W. Va. Field Office, U.S. Fish & Wildlife Serv., to Cindy Shulz, U.S. Fish & Wildlife Serv. (Dec. 11, 2019, 11:44 AM), https://elibrary.ferc.gov/eLibrary/filedownload?fileid=020d9621-66e2-5005-8110-c31fafc91712.

*Conservation Groups' Scoping Comments on the Cumberland Project*

Removal of vegetation from the banks can change temperature regimes, and increase sediment and nutrient loads (Penkal & Phillips 2011, pp. 6-7).

These instream changes not only directly affect the suitability of fish habitat, they also affect the availability and quality of fish forage altering the composition and reducing the density of benthic invertebrate communities within and downstream of the construction area (Levesque & Dube 2007, pp. 396-399; Penkal & Phillips 2011, pp. 6-7; Reid & Anderson 1999, pp. 235, 244). **Various studies have documented adverse effects to the benthic community that have been apparent for between six months and four years post-construction** (Levesque & Dube 2007, pp. 399-400; Reid & Anderson 1999, pp. 235, 244). Stream crossings have also been shown to affect fish physiology, survival, growth, and reproductive success (Levesque & Dube 2007, p. 399). Studies have found decreased abundance of fish downstream of crossings, as well as signs of physiological stress such as increased oxygen consumption and loss of equilibrium in remaining fish downstream of crossings (Levesque & Dube 2007, pp. 399-401; Reid & Anderson 1999, pp. 244-245). Increased sediment deposition and substrate compaction from pipeline crossings can degrade spawning habitat, result in the production of fewer and smaller fish eggs, impair egg and larvae development, limit food availability for young-of-year fish, and increase stress and reduce disease resistance of fish, (Levesque & Dube 2007, pp. 401-402; Reid & Anderson 1999, pp. 244- 245).

The duration and severity of these effects depends on factors such as the duration of disturbance, the length of stream segment directly impacted by construction, and whether there were repeated disturbances (Yount & Niemi 1999, p. 557). Most studies documented recovery of the affected stream reach within one to three years after construction (Reid & Anderson 1999, p. 247; Yount & Niemi 1999, pp. 557-558, 562). **However caution should be used when interpreting results of short-term studies. Yount & Niemi (1999, p. 558) cite an example of one study that made a preliminary determination of stream recovery within one year, but when the site was re-examined six years later, fish biomass, fish populations, macroinvertebrate densities, and species composition were still changing. It was suspected that shifts in sediment and nutrient inputs to the site as a result of construction in and around the stream contributed to the long-term lack of recovery. In another study, alterations in channel morphology, such as increased channel width and reduced water depth, were evident two to four years post-construction at sites that lacked an intact forest canopy** (Reid & Anderson 1999, p. 243). There is also the potential for cumulative

*Conservation Groups' Scoping Comments on the Cumberland Project*

effects. **While a single crossing may have only short-term or minor effects, multiple crossings or multiple sources of disturbance and sedimentation in a watershed can have cumulative effects on fish survival and reproduction that exceed the recovery capacity of the river, resulting in permanent detrimental effects** (Levesque & Dube 2007, pp. 406-407). Whether or how quickly a stream population recovers depends on factors such as the life history characteristics of the species, and the availability of unaffected populations upstream and downstream as a source of organisms for recolonization (Yount & Niemi 1999, p. 547).[305]

And yet another FWS scientist (J.M. Castro) similarly concluded that there are significant and long-term effects from dry open-cut pipeline crossings in 2015, stating, "Based on past experience at pipeline crossings, the potential for both short and long-term negative impacts on aquatic habitat and species is substantial."[306] Such impacts:

include both short-term, construction related impacts, such as increased turbidity, direct modification of aquatic habitat, and the potential for hydrocarbons to enter the stream through equipment failures and spills (Reid and Anderson, 1999; Reid *et al*, 2002a, 2002b), and long-term impacts that are more directly associated with the stream's response potential, such as channel incision and lateral migration (Thorne *et al.*, 2014).[307]

These FWS scientists' conclusions are well-supported by the scientific literature. A seminal article on the effects of dry-ditch, open-cut crossings reached similar conclusions. Lévesque and Dubé, in their 2007 *Review of the Effects of In-Stream Pipeline Crossing Construction on Aquatic Ecosystems and Examination of Canadian Methodologies for Impact Assessment*, found the following:

- "Pipeline crossing construction is shown to not only compromise the integrity of the physical and chemical nature of fish habitat, but also to affect biological habitat (e.g., benthic invertebrates and invertebrate drift), and fish behavior and physiology. Indicators of effect include: water quality (total suspended solids TSS), physical habitat (substrate particle size, channel morphology), benthic invertebrate community structure and drift (abundance, species composition, diversity, standing crop), and fish behavior and physiology

---

[305] *Id.* (emphases added).
[306] J.M. Castro et al., *Risk-Based Approach to Designing and Reviewing Pipeline Stream Crossings to Minimize Impacts to Aquatic Habitats and Species*, 31 RIVER RES. & APPLICATIONS 767 (2015), https://elibrary.ferc.gov/eLibrary/filedownload?fileid=020d961d-66e2-5005-8110-c31fafc91712.
[307] *Id.*

*Conservation Groups' Scoping Comments on the Cumberland Project*

(hierarchy, feeding, respiration rate, loss of equilibrium, blood hematocrit and leukocrit levels, heart rate and stroke volume)."[308]

- "Construction activities alter river and stream channel beds and banks, directly and indirectly affecting fish and fish habitat."[309]

- "[Dry-ditch, open-cut methods] may impact watercourse ecosystems both during, and for potentially some time after, construction. All in-stream construction activities, particularly trench excavation and pipeline installation and backfill, result in disturbance of channel bed and banks, and have the potential to alter suspended sediment concentration and sedimentation."[310]

- "[A]ny in-stream construction activity has the potential to impact aquatic ecosystems through alteration of stream and river bed and banks and, therefore, may result in direct effects such as physical alteration of channel morphology and habitat, and indirect effects such as alteration of water quality and sediment dynamics, on aquatic ecosystems (e.g., Alberta Environment 2001; Alberta Transportation and Utilities 2000)."[311]

- Even with dry-ditch, open-cut methods, "[m]ean TSS concentrations increased by between 4 and 100 mg l$^{-1}$ above background. Installation of dams and flumes for water diversion generated TSS concentrations on average less than 76 mg l$^{-1}$ greater than background over periods of 2 to 16.5 h (with one crossing experiencing an increase of 520 mg l$^{-1}$ for 3 h). Removal of dams and flumes resulted in TSS increases of between 1 and 703 mg l$^{-1}$ downstream of construction over periods of 20 min to 6.5 hrs. Other stages of construction were associated with average TSS increases of less than 8 mg l$^{-1}$, with the exception of accidental leaks from construction infrastructure (e.g., 820 mg l$^{-1}$ over 5.5 h). Plumes of highly turbid water were observed downstream of construction. . . ."[312]

- "Armitage and Gunn (1996) noted that pipeline crossing construction in a stream in England resulted in a shift in invertebrate species due to an increased proportion of silt in stream substrates. This effect persisted for 4 years until a high magnitude flow event scoured the stream channel bed, promoting re-establishment of pre-construction invertebrate species. Tsui and

---

[308] Lucie M. Lévesque & Monique G. Dubé, *Review of the Effects of In-stream Pipeline Crossing Construction on Aquatic Ecosystems and Examination of Canadian Methodologies for Impact Assessment*, 132 ENVTL. MONITORING & ASSESSMENT 395 (2007), https://elibrary.ferc.gov/eLibrary/filedownload?fileid=020d9623-66e2-5005-8110-c31fafc91712.
[309] *Id.*
[310] *Id.* at 396.
[311] *Id.*
[312] *Id.* at 398.

*Conservation Groups' Scoping Comments on the Cumberland Project*

McCart (1981) found that crossing construction of Archibald Creek, British Columbia, caused short-term increases in silt and sand accumulations and decreases in invertebrate standing crop and diversity, which lasted 1 to 2 years."[313]; and

- "The potential for cumulative effects associated with pipeline crossing construction should be taken into consideration in assessing the impacts of these activities on rivers and streams. Construction of a single crossing on a stream or river, or within a watershed, may not have significant effects on fish and fish habitat in that system. **Construction of multiple crossings on a stream or river, or within a watershed, however, has the potential for cumulative effects on that system. In such cases, the capacity of the system to recover from impact may be exceeded, and the detrimental effects of crossing construction permanent. The same may be said for the frequency of crossing construction within a given system; rivers and streams will have limited capacities to recover from multiple impacts. As well, recurrent stresses on fish, such as those that originate from elevated suspended sediment concentrations, may have cumulative effects on fish health, survival and reproduction. The long-term effects of such impacts are not well known at this time (Reid et al. 2003).**[314]

Following their own reviews of the literature, Hansen and Betcher (2021) and Silvis (2021) concur that the effects of dry-ditch, open-cut crossings are substantial and long-term. Hansen and Betcher (2021) recognize that data on those effects are "sparse" in the literature, but that the available data in the literature does substantiate long-term effects.[315] And Silvis (2021) describes those effects this way:

Immediate environmental impacts associated with dry-ditch open-cut methods include death of all fish and benthic macroinvertebrates within the work area and increased turbidity and suspended sediment loads when the diversion is installed, for the duration of the disturbance, as well as when flow is returned to the disturbed channel bed. . . . There are long-term increases in sedimentation due to stream bank and upland disturbances until vegetation can be re-established. . . . Increased turbidity and high suspended sediment loads can cause long-

---

[313] *Id.* at 399.

[314] *Id.* at 406–07 (emphasis added).

[315] EVAN HANSEN & MEGHAN BETCHER, SEDIMENT GENERATION AND IMPACTS FROM DRY-DITCH OPEN-CUT STREAM CROSSINGS SUCH AS THOSE PROPOSED FOR THE MOUNTAIN VALLEY PIPELINE 6 (May 26, 2021), https://elibrary.ferc.gov/eLibrary/filedownload?fileid=020D9613-66E2-5005-8110-C31FAFC91712. That "paucity of current, data-driven documentation of the long-term impacts" requires that, for permitting purposes, an evaluation "at each individual stream [is required] due to stream-specific factors that influence the duration of stream channel and aquatic life impacts." *Id.* at 2.

term impacts to invertebrate communities downstream of the disturbance, including by reducing invertebrate biomass, growth rates and species diversity and increasing invertebrate mortality. Increased suspended and deposited sediment causes negative impacts in fish populations as well. These impacts can include smothering of fish eggs, changes in stream bed characteristics which can reduce reproductive success, reduction of juvenile survival rates, reduction of food sources, as well as reduction in in-stream dissolved oxygen which causes respiratory distress.[316]

Based on her "experience in stream restoration, hydrology, stream geomorphology, and erosion and sediment control," Silvis concludes "that there are significant permanent impacts associated with trenched methods of stream and wetland crossings."[317]

In sum, TGPC's proposed dry open-cut waterbody crossings will have significant adverse impacts on water quality and aquatic life. As a result, FERC must prepare an EIS.

### D.  FERC must take a hard look at the consequences of inadvertent returns of drilling fluid in waterbodies listed on the National River Inventory.

TGPC intends to use HDD to cross Jones Creek and Yellow Creek.[318] Those streams are on the National River Inventory ("NRI") created by the Wild and Scenic Rivers Act.[319] In addition to the consultation requirements imposed by the Wild and Scenic Rivers Act discussed below, FERC must take a hard look at the risks presented by TGPC's proposed use of HDD to cross NRI waterways.

As discussed above, TGPC acknowledges the risks of a "frac out"—the inadvertent return of pressurized drilling fluid into a flowing stream—posed by HDD.[320] Should such an event occur in Jones Creek or Yellow Creek, it could jeopardize any eventual designation of the affected stream as a Wild and Scenic River because of its effects on water quality and stream aesthetics.[321] Given FERC's obligations under Section 5(d) of the Wild and Scenic Rivers Act to give due consideration to a waterway's potential future designations, the risk of such event triggers FERC's NEPA duties to prepare an EIS.

---

[316] SILVIS, *supra* note 281, at 3.

[317] *Id.* at 2.

[318] Resource Report 1, *supra* note 26, at 1-5

[319] 16 U.S.C. § 1276(d).

[320] Resource Report 1, *supra* note 26, at 1-28.

[321] *Consultation Instructions*, NAT'L PARK SERV. (last updated Nov. 16, 2021), https://www.nps.gov/subjects/rivers/consultation-instructions.htm.

*Conservation Groups' Scoping Comments on the Cumberland Project*

E.    **FERC must evaluate crossings in potential protected mussel habitat.**

As discussed above, TGPC has identified at least 9 streams that it intends to cross that could include habitat for ESA-protected mussels.[322] And, as discussed further in Section VIII.A.2, *supra*, mussels are particularly sensitive to sediments like those generated during instream construction.

FERC must evaluate the feasibility and environmental consequences of using alternative crossing methods in streams with potential listed mussel habitat. TGPC plans to use HDD on at least two of the nine streams, but FERC should evaluate the use of trenchless crossings at all nine streams—including the use of trenchless alternatives to HDD such as those discussed above. Moreover, FERC should evaluate alternative crossing locations upstream or downstream from potential habitat to determine if a crossing location less susceptible to colonization by listed mussels is available.

Finally, FERC must ensure that *none* of TGPC's proposed stream crossings are in (or upstream from) critical habitat for the rabbitsfoot mussel. In May 2021, FWS created a list of listed species that may occur in the Cumberland Project area, noting that rabbitsfoot may occur in the area.[323] FWS confirmed that critical habitat for the rabbitsfoot has been designated, but stated that "[t]he location of the critical habitat is not available."[324] Accordingly, in its environmental review, FERC must determine the proximity of each proposed stream crossing to designated critical habitat for the rabbitsfoot and evaluate the potential impacts of any crossings that are located upstream from such habitat.

F.    **FERC must evaluate whether its generic procedures will effectively protect the specific streams at issue.**

TGPC insists that the project will be constructed in conformance with, among other things, "the May 2013 FERC *Wetland and Waterbody Construction and*

---

[322] DINKINS BIOLOGICAL CONSULTING, LLC, STUDY PLAN FOR MUSSEL SURVEYS FOR THE TENNESSEE GAS PIPELINE COMPANY, LLC, CUMBERLAND PROJECT, tbl 1 (Sept. 1, 2021) (included in Appendix 1.F to Resource Report 1, *supra* note 26).
[323] The Official Species List is included with Resource Report 1. Resource Report 1, *supra* note 26, at Appendix 1.F.
[324] *Id.*

*Conservation Groups' Scoping Comments on the Cumberland Project*

*Mitigation Procedures*."[325] In its NEPA review, however, FERC must take a hard look at the environmental effects of using those procedures.

A 2015 journal article authored by a FWS biologist examined FERC's *Wetland and Waterbody Construction and Mitigation Procedures* document and concluded that its national scope and general nature

> **does not provide sufficient detailed and specific information at a regional level to adequately protect aquatic ecosystems with numerous species in complex geographic and ecologic settings.**
>
> *\*\*\*\*\**
>
> While the FERC Procedures do address some predictable pipeline impacts, especially during construction, the guidance does not address the longer term stream response potential, which is highly dependent on characteristics of the stream system rather than the pipeline. Therefore, depending upon the crossing locations, stream and catchment characteristics, timing, extent of activities, and application of Best Management Practices (BMPs—construction conservation measures intended to reduce impacts to the environment), impacts to aquatic species will vary but may include simplification of habitat, loss of aquatic species passage, removal of spawning gravel, increased sediment and turbidity, loss of side channels, disconnection from the floodplain, or change in hyporheic flow patterns (Reid *et al.*, 2002b). These impacts may occur at the project site or may propagate upstream, downstream, or laterally into the floodplain.[326]

Given the generality of the *Wetland and Waterbody Construction and Mitigation Procedures*, FERC must take a hard look at the characteristics of each of the specific streams at issue during its environmental to identify additional protective measures necessary beyond those prescribed in the general procedures.

**X.    FERC must ensure that the Cumberland Project complies with all legal requirements applicable to the land and waterways through which it is routed.**

As part of its environmental analysis in an EIS, FERC must determine whether the proposed Project passes through any protected public lands and waterways (as well as private land subject to environmental protection through

---

[325] Resource Report 1, *supra* note 26, at 1-17.
[326] J.M. Castro et al., *supra* note 306, at 769.

*Conservation Groups' Scoping Comments on the Cumberland Project*

mechanisms like conservation easements). FERC must then analyze whether the proposed Project would comply with all applicable requirements and restrictions.

## A.    Protected waterways

As previously mentioned, the proposed Project is currently routed to cross several streams, at least some on the NRI. FERC must evaluate these stream crossings in its EIS, determine if the proposed Project could significantly alter any NRI segments, consult with the National Park Service ("NPS") if so, and "take care to avoid or mitigate adverse effects" upon these waterways.[327]

The NRI is a listing of over 3,200 free-flowing river segments which possess "outstandingly remarkable" natural or cultural values and are potential candidates for inclusion in the National Wild and Scenic River System.[328] The Wild and Scenic Rivers Act requires that all federal agencies consider a waterway's potential future inclusion in in the National Wild and Scenic River System during "all planning for the use and development of water and related land resources."[329] An Executive Memorandum further specifies that all agencies must "take care to avoid or mitigate adverse effects" on NRI rivers and that agencies should undertake consultation "prior to taking actions which could effectively foreclose wild, scenic, or recreation river status."[330] CEQ has provided further guidance for implementing the requirements of the Act, stating that "it is the role of the federal permitting agency (not the National Park Service) to ensure that effects to NRI rivers are avoided or mitigated.[331]

If a proposed action could significantly affect an NRI waterway segment, an environmental assessment or EIS may be required. Permitting agencies must determine whether an action could have an adverse effect on the natural, cultural, and recreational values of the NRI segment, including:

- Destruction or alteration of all or part of the free-flowing nature of the river;

- Introduction of visual, audible, or other sensory intrusions which are out of character with the river or alter its setting;

- Deterioration of water quality; or

---

[327] EXECUTIVE MEMORANDUM DATED AUGUST 2, 1979 1–2 (Aug. 2, 1979) [hereinafter "Executive Memorandum"], https://www.nps.gov/subjects/rivers/upload/Presidental-Memorandum-for-Heads-of-Departments-and-Agencies_508-2.pdf.

[328] 16 U.S.C. § 1271.

[329] 16 U.S.C. § 1276(d)(1).

[330] Executive Memorandum, *supra* note 327, at 1–2.

[331] *Consultation Instructions*, NAT'L PARK SERV., (last updated Nov. 16, 2021), https://www.nps.gov/subjects/rivers/consultation-instructions.htm.

*Conservation Groups' Scoping Comments on the Cumberland Project*

- Transfer or sale of property adjacent to an NRI river without adequate conditions or restriction for protecting the river and its surrounding environment.[332]

Permitting agencies must also determine whether a proposed action could foreclose the possibility of any portion of the NRI segment as being classified wild, scenic, or recreational in the future. CEQ explains that "[p]roposed actions (whether uses or physical changes), which are theoretically reversible, but which are not likely to be reversed in the short term, should be considered to have the effect of foreclosing for all practical purposes Wild and Scenic River status."[333] If such a preclusion could occur, the permitting agency should undertake consultation with the NPS. Yet regardless of whether consultation with the NPS occurs, permitting agencies are nevertheless obligated to take actions to avoid or mitigate adverse effects on NRI segments.

The Cumberland Project contemplates crossing at least two rivers that are listed on the NRI: Jones Creek and Yellow Creek. FERC, as the permitting agency, must analyze whether these crossing could affect the natural, cultural, and recreational values of these segments. And it is clear that they could. The construction and placement of a methane gas pipeline through these waterway segments has the potential to destroy or alter their free-flowing nature, and operation of the pipeline could create visual, audible, and olfactory intrusions which could alter the natural ambience. Sedimentation and erosion of the creek banks during installation could deteriorate local water quality, and if the proposed use of HDD were to result in inadvertent return of pressurized drilling fluid, effects on water quality would likely be substantial. Any of these effects could result in these NRI segments being foreclosed from being classified wild, scenic, or recreational. Therefore, FERC should consult with NPS regarding these crossing and identify and analyze actions which would avoid or mitigate these risks.

### B.    Historic resources

The proposed Project's potential impacts to historic resources of interest must be analyzed in the EIS. This includes potential impacts to National Historic Trails, high potential historic sites associated with National Historic Trails,[334] and National Heritage Areas (including the Tennessee Civil War National Heritage Area). The analysis must also include any potential impacts to properties listed on the National

---

[332] *Id.*

[333] *Id.*

[334] "High potential historic sites" are defined in the National Trails System Act as "those historic sites related to the route, or sites in close proximity thereto, which provide opportunity to interpret the historic significance of the trail during the period of its major use." 16 U.S.C. § 1251.

*Conservation Groups' Scoping Comments on the Cumberland Project*

Register of Historic Places including the Henry Hollister House, the Richard C. Napier House, Promise Land School, and the Nesbit Place Farm.

Under the National Historic Preservation Act, agencies are required to identify and assess the impact that their proposed actions might have on any historic property.[335] This includes "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register."[336] Agencies must also consult with State Historic Preservation Offices ("SHPO"), Tribal Historic Preservation Offices ("THPO"), and native American tribes to determine whether an agency action may effect historic properties which a tribe or historic preservation office ("HPO") attaches religious or cultural significance.[337]

Where an acting agency finds that historic properties may be adversely affected by a proposed action, the agency, in consultation with tribes and HPOs, must assess those adverse effects. To do so, an agency will evaluate whether the action "may alter, directly or indirectly, [the property] in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association."[338] These affects can include "reasonably foreseeable effects" which occur later in time, are cumulative, or occur at a distance. Adverse effects can include but are not limited to damaging or destruction of the property; changing the property's character or physical features; or adding visual, atmospheric, or audible elements to the property which diminish its integrity and historic significance.[339] If an adverse effect is found, the lead agency and consulting parties must develop and evaluate alternatives or modifications to the action to avoid, minimize, or mitigate those adverse effects.[340]

FERC must evaluate the proposed Project's impacts on known historic resources of interest, including those impacts to National Historic Trails, high potential historic sites, National Heritage Areas, and properties listed on the National Register of Historic Places. FERC must also consult with HPOs and potentially affected tribes to determine whether the proposed Project may have an adverse effect on any other historic properties. If any additional historic properties are located on or near the proposed Project, FERC must evaluate whether "reasonably foreseeable effects" such as the construction or operation of the pipeline could lead to adverse effects such as altering the character of a historic site. FERC must also evaluate whether a foreseeable event like a pipeline leak or spill could cause an adverse effect by, for example, damaging the property or diminishing its integrity through its contamination with spilled substances. FERC must then

---

[335] 54 U.S.C. § 306108.
[336] 54 U.S.C. § 300308.
[337] 36 C.F.R. §§ 800.3(c), .4(a).
[338] 36 C.F.R. § 800.5(a).
[339] 36 C.F.R. § 800.5(a).
[340] 36 C.F.R. § 800.6(a).

*Conservation Groups' Scoping Comments on the Cumberland Project*

evaluate alternatives or modifications to the proposed project which would avoid, minimize, or mitigate these risks. This evaluation and analysis should be included in the EIS.

## XI.  FERC should assess the appropriate scope of its review of the proposed Project in light of the pipeline's role in TVA's larger program of fossil fuel investment.

A programmatic EIS is appropriate where actions are connected, cumulative, or sufficiently similar that assessing them together is the best way to understand their combined impacts and alternatives to the connected actions.[341] A set of actions pending at the same time is the paradigmatic example of a situation that calls for a programmatic review.[342]

The Cumberland Project is one part of a TVA's massive buildout of brand-new gas-fired generation facilities. It is one of the biggest proposed methane gas buildouts in the nation. But TVA is proceeding with a constellation of separate NEPA processes despite the fact that many overlap, address similar power generation needs, and tackle materially identical issues. Right now, for example, TVA is separately conducting three NEPA reviews for new methane-gas powered generation facilities: at Cumberland City,[343] Kingston,[344] and Johnsonville.[345] Meanwhile the gas companies with whom TVA partners are advancing the program through their applications to FERC for this project and, soon, the closely related Ridgeline Expansion Project, which would fuel TVA's new Fossil Fuel Plant at Kingston.[346] All of these projects raise similar, sometimes identical, questions about the climate

---

[341] *See Nevada v. Dep't of Energy*, 457 F.3d 78, 92 (D.C. Cir. 2006) ("Under the CEQ regulations a programmatic EIS should be prepared if actions are 'connected,' 'cumulative,' or sufficiently 'similar' that a programmatic EIS is 'the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions.'") (quoting 40 C.F.R. § 1508.25(a) (1978)).

[342] *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) ("when several proposals for . . . actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together.").

[343] *Cumberland Fossil Plant Retirement*, TENN. VALLEY AUTH., https://www.tva.com/environment/environmental-stewardship/environmental-reviews/nepa-detail/cumberland-fossil-plant-retirement (last visited April 4, 2022).

[344] *Kingston Fossil Plant Retirement*, TENN. VALLEY AUTH., https://www.tva.com/environment/environmental-stewardship/environmental-reviews/nepa-detail/kingston-fossil-plant-retirement (last visited April 4, 2022).

[345] *Johnsonville Aeroderivative Combustion Turbine Project*, TENN. VALLEY AUTH., https://www.tva.com/environment/environmental-stewardship/environmental-reviews/nepa-detail/johnsonville-aeroderivative-combustion-turbine-project (last visited April 4, 2022).

[346] *See Ridgeline Expansion Project Opportunity*, ENBRIDGE, https://www.enbridge.com/projects-and-infrastructure/projects/ridgeline-expansion-project (last visited April 4, 2022) (listing a project timeline including "Spring/Summer 2022" for "Enbridge begins FERC pre-filing process").

*Conservation Groups' Scoping Comments on the Cumberland Project*

impacts of TVA's choices, the way federal policy is being followed (or not), and the consequences those choices have for TVA's ratepayers.

FERC should incorporate its review of the proposed Project into a programmatic environmental review that includes the second lateral pipeline planned to serve TVA's Kingston location. Both NEPA's 2020 Revision and 1978 Rules regulations acknowledge that "a group of concerted actions to implement a specific policy or plan" and "systematic and connected agency decisions . . . to implement a specific statutory program or executive direction" are major federal actions requiring NEPA review.[347] Here, the Cumberland Fossil Plant is not the only coal plant TVA plans to retire and replace with a new combined-cycle gas plant and new pipeline in 2022 and 2023. In June 2021, TVA released a scoping notice, virtually identical to the Cumberland notice, for retirement of the Kingston Fossil Plant to be replaced with 1,450 megawatts of new generation; one replacement option is a new combined-cycle gas plant.[348] And once again, TVA has entered a precedent agreement with a pipeline company for a new lateral to supply a new combined-cycle plant at its Kingston location.

The Kingston Fossil Plant retirement is only a few months behind Cumberland in the NEPA process.[349] Both projects involve TVA plans to retire coal-combustion facilities and replace them with gas; both projects require new gas pipeline infrastructure to cut through rural Tennessee counties; and TVA has treated the two projects as a pair in a range of public-facing venues.[350] The projects raise substantially similar issues about project need, adverse impacts, and potential alternatives. FERC's review must consider the way these projects interact.

---

[347] 40 C.F.R. §1508.1(q)(3)(iii) (2020); 40 C.F.R. §1508.18(b)(3) (1978); *Kleppe v. Sierra Club*, 427 U.S. at 390 ("[P]roposals for . . . actions that will have cumulative or synergistic environmental impact upon a region . . . pending concurrently before an agency . . . must be considered together.").

[348] *Environmental Impact Statement for Kingston Fossil Plant Retirement*, 86 Fed. Reg. 31,780 (June 15, 2021).

[349] *Compare Proposed NEPA Schedule [for Cumberland Retirement]*, TENN. VALLEY AUTH., https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/environment/environmental-stewardship/nepa-environmental-reviews/cumberland-retirement/tva-boards05-07-21-5_nepa-schedule0789b0c2-d728-4156-add3-806420fefde7.pdf?sfvrsn=c5a4f3ac_3 (last visited April 4, 2022), *with Proposed NEPA Schedule [for Kingston Retirement]*, TENN. VALLEY AUTH., https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/environment/environmental-stewardship/nepa-environmental-reviews/kingston-retirement/tva-kingston-boards_061421-nepa-scheduleceaf4958-fbb2-4495-b1ba-7014f0cb5ceb.pdf?sfvrsn=bedc83d5_3 (last visited April 4, 2022).

[350] See, e.g., TENN. VALLEY AUTH. NOV. 10, 2021 BOARD PRESENTATION at 43–48 (2021), https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/about-tva/board-of-directors/november-10-2021/22-4240-nov-2021-board-deck_fnl884febc3-fdb9-45ee-ab22-fb0672ec3f53.pdf?sfvrsn=b13500a0_3; Lyash Letter, *supra* note 37, at 4 ("TVA is currently conducting environmental reviews evaluating potential retirements at the Cumberland Fossil Plant (Cumberland) and Kingston Fossil Plant (Kingston), along with evaluation of replacement generation.").

*Conservation Groups' Scoping Comments on the Cumberland Project*

Finally, even to assess the impacts of the Cumberland Project itself, FERC must consider how this pipeline—and the fossil plant it makes possible—compounds the impacts of existing fossil fuel infrastructure. TVA's generation mix already includes gas-fired generators at seventeen sites in its territory, with a combined capacity of over 12,000 MW.[351] And methane-burning plants' share of TVA's total generation portfolio has been steadily increasing—from 10% in 2007 to 20% in 2017,[352] with the 2019 IRP forecasting the addition of several thousand more megawatts of gas-fired generation by 2038.[353] FERC's review must take into account how the impacts of these projects build on each other and add to the overall effect of completing the Cumberland Project.

## XII. Conclusion

For the foregoing reasons we urge FERC to draft an EIS for the Cumberland Project that fully and accurately characterizes the factors that bear on whether the project is needed and what its impacts would be.

---

[351] *Natural Gas*, TENN. VALLEY AUTH., https://www.tva.com/energy/our-power-system/natural-gas.
[352] *Id.*
[353] 2019 IRP, *supra* note 35, at 9-3.