

# Pipeline Precedent Agreement

### by and between

### Tennessee Gas Pipeline Company, L.L.C.

### and

### Tennessee Valley Authority

### Dated August 11, 2021

## TABLE OF CONTENTS

1.  The Firm Service .................................................................................................... 2
2.  The Open Season ................................................................................................... 5
3.  Foundation Shipper Status ................................................................................... 6
4.  Transporter Obligations ....................................................................................... 7
5.  Shipper Obligations ............................................................................................. 9
6.  Commencement of Construction; Transporter's Obligation to Proceed ........... 12
7.  Termination Rights ............................................................................................. 12
8.  Delivery and Execution of Service Agreements ............................................... 15
9.  Reimbursement by Shipper of Reimbursable Costs ......................................... 15
10. Notices ............................................................................................................... 17
11. Assignment ........................................................................................................ 17
12. Miscellaneous .................................................................................................... 18

Exhibit A
Exhibit B
Exhibit C
Exhibit D
Exhibit E
Exhibit F

## PRECEDENT AGREEMENT
## TO CONTRACT FOR FIRM TRANSPORTATION SERVICE

This Precedent Agreement to Contract for Firm Transportation Service (this "**Agreement**") is entered into as of August 11, 2021 (the "**Effective Date**"), by and between TENNESSEE GAS PIPELINE COMPANY, L.L.C., a Delaware limited liability company ("**Transporter**" or "**TGP**"), and Tennessee Valley Authority ("**Shipper**" or "**TVA**").

**WHEREAS**, Transporter and Shipper may be referred to individually as a "**Party**" or collectively as the "**Parties**";

**WHEREAS**, Transporter owns and operates an interstate natural gas transmission pipeline system regulated by the Federal Energy Regulatory Commission that extends in a northeasterly direction from the international boundary with Mexico in south Texas through the States of Texas, Louisiana, Arkansas, Mississippi, Alabama, Tennessee, Kentucky, West Virginia, Ohio, Pennsylvania, New Jersey, New York, Connecticut, Rhode Island, Massachusetts, and New Hampshire ("**Transporter's System**");

**WHEREAS**, Transporter is developing its Cumberland Pipeline Project **("Project")** to provide up to (1) 245,040 dekatherms per day ("**Dth/day**") of firm transportation service on a new incremental lateral to be located on Transporter's 100 Line in Zone 1 near MLV 83 (the "**Cumberland Lateral Capacity**") and a related (2) 221,000 Dth/day of firm transportation service using existing unsubscribed mainline capacity on its 100 Leg system and 800 Leg system (the "**Mainline Capacity**"). The Cumberland Lateral Capacity and the Mainline Capacity referred to herein as the "**Project Capacity**".

WHEREAS, the Project, as contemplated, may require the installation of approximately 32 miles of a new 30" pipeline lateral from the takeoff of Transporter's 100 Line in Zone 1 near MLV 83, a backpressure regulator assembly near MLV 83, and a new meter station on the Cumberland Lateral, together with any other facilities Transporter deems necessary to provide the Project Capacity are referred to hereinafter as the "**Project Facilities**";

**WHEREAS**, Transporter intends to hold a binding open season ("**Open Season**") in connection with the Project to offer interested parties up to the Project Capacity; and

**WHEREAS**, Shipper desires to obtain the Transportation Quantity (as defined below in Section 1(E) of this Agreement) (the "**Firm Service**");

**WHEREAS**, Shipper acknowledges that the rendition by Transporter of the Firm Service as requested by Shipper will require Transporter to construct and/or acquire the Project Facilities; and

**WHEREAS**, the Parties agree that this Agreement shall be deemed a qualifying binding bid by Shipper in the Open Season.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, Transporter and Shipper agree as follows:

1. <u>**The Firm Service**</u>

    Subject to the satisfaction of the terms and conditions of this Agreement and any terms and conditions that may be imposed by the Federal Energy Regulatory Commission ("**Commission**" or "**FERC**"), Transporter agrees to use commercially reasonable efforts to construct the Project Facilities and to render the Firm Service as follows:

    A. **Service Agreements**

        The Firm Service shall be provided pursuant to the terms of two gas transportation agreements: 1) under Rate Schedule FT-A of Transporter's FERC Gas Tariff, as may be amended from time to time ("**Tariff**") (the "**FT-A Agreement**") and a related Discount Agreement, which shall be in a form substantially similar in all material respects to Exhibits A and B of this Agreement, respectively (together, the "**FT-A Service Agreements**"); and 2) under Rate Schedule FT-IL of Transporter's Tariff (the "**FT-IL Agreement**") and a related Negotiated Rate Agreement, which shall be in a form substantially similar in all material respects to Exhibits C and D, respectively (together, the "**FT-IL Service Agreements**"). The FT-A Service Agreement and the FT-IL Service Agreement shall be referred to collectively as the "**Service Agreements**." The Service Agreements and any other related agreements that are consistent with the terms hereof and required by this Agreement shall be referred to collectively as the "**Project Agreements.**"

    B. **Commencement Date**

        Unless Transporter and Shipper amend this Agreement to state otherwise, the Firm Service shall commence on the later of: (i) September 1, 2025; or (ii) the date on which all of the Project Facilities are placed in-service ("**Commencement Date**").

        i.    <u>Optional Interim Service</u>





ii.    <u>Required Interim Service</u>

C.    **Primary Term**

The **"Primary Term"** of the Service Agreements shall commence on the Commencement Date and shall continue in full force and effect for a period of twenty (20) years after the Commencement Date; provided, however, that the Primary Term shall end at the end of such calendar month that is twenty (20) years from the Commencement Date.

D.    **Applicable Rate**

i.    <u>Rate Election – FT-A Service Agreement</u>

Upon execution of this Agreement, Shipper must select one of the following rate options (indicated by an "X" in the space provided):

___X___    Shipper selects for the Primary Term of the FT-A Service Agreement the discounted rates for the Firm Service as reflected in the Discount Rate Agreement attached as Exhibit B hereto.

_____    Shipper selects for the Primary Term of the Service Agreement the recourse rate for the Firm Service, which shall be the applicable reservation and commodity rates, and any other applicable charges and surcharges set forth in Transporter's Tariff.

3

ii.    <u>Rate Election – FT-IL Service Agreement</u>

Upon execution of this Agreement, Shipper must select one of the following rate options (indicated by an "X" in the space provided):

   X            Shipper selects for the Primary Term of the FT-IL Service Agreement the negotiated rates for the Firm Service as reflected in the Negotiated Rate Agreement attached as Exhibit D hereto.

               Shipper selects for the Primary Term of the Service Agreement the recourse rate for the Firm Service, which shall be the applicable reservation and commodity rates, and any other applicable charges and surcharges set forth in Transporter's Tariff.

**E.    Transportation Quantity**

Transporter shall transport and deliver for Shipper on a firm basis up to 1) 245,040 Dth/day on the Cumberland Lateral pursuant to the FT-IL Service Agreement; and 2) 221,000 Dth/day on its 100 Leg and 800 Leg mainline system pursuant to the FT-A Service Agreement (collectively, the "**Transportation Quantity**" or "**TQ**").

**F.    Primary Receipt and Delivery Point(s)**

The Primary Receipt and Delivery Point quantities and locations shall be as follows:

i)    FT-A Agreement:



4



ii)    FT-IL Agreement:





2.    **The Open Season**

Transporter shall conduct the Open Season to market the Project Capacity. Interested parties shall have the option of submitting bids for the Cumberland Lateral Capacity, the Mainline Capacity, or for the Project Capacity, and such bids will be evaluated by Transporter as a whole to determine the highest net present value ("**NPV**") for the Project Capacity in conformance with Transporter's Tariff. The Parties agree that this Agreement



5



**A.    FERC-Mandated Reduction of Transportation Quantity**



**3.    Foundation Shipper Status**



**A.    Limited Proration in Open Season**





**B.**    **Contractual Right-of-First-Refusal**

**4.**    **Transporter Obligations**

**A.**    **Transporter Management Approvals**

Transporter shall use commercially reasonable efforts to obtain from its executive management and/or board of directors the Transporter Management Approval as defined in, and by the deadline provided in Section 7(A)(ii). Transporter shall provide written notice to Shipper that Transporter has received all Transporter Internal Approvals no later than five (5) business days after receipt of such approvals.

**B.**    **FERC Authorization**

Transporter will use commercially reasonable efforts to prepare and submit an application to FERC ("**FERC Application**") and obtain, a certificate of public convenience and necessity ("**FERC Certificate**") from FERC as may be required to construct, own and operate the Project and any other required authorizations from FERC to provide the transportation service contemplated herein and in the Service Agreements under the terms set forth therein (collectively, the "**FERC Authorization**"), in such timeframe as it deems appropriate to meet a projected in-service date of September 1, 2025, in its reasonable judgment, and consistent with Applicable Laws. As used in this Agreement, the term "FERC Authorizations" shall mean such FERC Authorizations as are final and no longer subject to Governmental Authority rehearing, reconsideration or review, except to the extent waived by Transporter in its discretion.

Transporter shall provide Shipper with a draft of Transporter's application for the FERC Authorization at least 30 days prior to the intended filing date thereof. Shipper will notify Transporter within ten (10) business days after the date of receipt of such draft application whether Shipper has any reasonable objections to such application and describe the specific language to which it objects. Transporter shall endeavor in good faith to incorporate Shipper's comments into Transporter's filing for its FERC authorization to the extent such comments are not inconsistent with this Precedent Agreement, including all exhibits hereto.

7

C.     **Other Governmental Authorizations**

Transporter will use commercially reasonable efforts to prepare and submit applications to other Governmental Authorities (collectively, the "**Other Governmental Authorizations Applications**") for, and will use commercially reasonable efforts to obtain, any other governmental authorizations that may be necessary for Transporter to proceed with the construction, ownership and operation of the Project, including, if necessary, orders from any federal or state court in which Transporter seeks to exercise eminent domain or otherwise obtain rights or access to land to construct and operate the Project Facilities, and to provide the transportation service contemplated herein and in the Service Agreements (collectively, the "**Other Governmental Authorizations**").    Transporter will submit the Other Governmental Authorizations Applications in such timeframe as it deems appropriate, in its reasonable judgment and consistent with Applicable Laws.  As used in this Agreement, the term "Other Governmental Authorizations" shall mean such Other Governmental Authorizations as are final and no longer subject to rehearing, reconsideration or review, except to the extent waived by Transporter in its discretion.

D.     **Right to Seek Rehearing, Appeal or Judicial Review**

Nothing herein shall prevent Transporter from filing, amending, or prosecuting applications for the FERC Authorization or any Other Governmental Authorizations that it requires hereunder or seeking an appeal, a rehearing, or judicial review of any unfavorable term or condition contained in the FERC Certificate or Other Governmental Authorization.

E.     **Transporter Stakeholder Engagement**



F.     **Project Updates and Coordination**

i.     After execution of this Agreement, Transporter shall provide Shipper with monthly updates regarding the status and progress of the Project, including the status of its applications for its FERC Authorization and all necessary Other Governmental Authorizations and Transporter Stakeholder Engagement.  Following commencement of construction activities, Transporter shall provide monthly updates until the Commencement Date,

unless Shipper and Transporter mutually agree to a different schedule for updates.

ii. If Transporter has not started construction by ████████, Transporter will convene a meeting with Shipper no later than ████████ either by telephone or in person, to discuss the Project and Transporter's progress towards starting construction and Transporter's mitigation strategy to resolve such issues causing delay.

iii. If Transporter must stop construction on any portion of the Project, Transporter will convene a meeting with Shipper no later than one month after having to stop construction either by telephone or in person, to discuss the Project and Transporter's progress towards resuming construction and Transporter's mitigation strategy to resolve such issues.

iv. If Transporter is (a) downgraded below a credit rating of ████████



## 5. **Shipper Obligations**

### A. **Shipper Management Approvals**

Shipper shall use commercially reasonable efforts to obtain from its executive management and/or board of directors the Shipper Management Approval, as defined in, and by the deadline provided in, Section 7(A)(i). Shipper shall provide written notice to Transporter that Shipper has received all Shipper Internal Approvals no later than five (5) business days after receipt of such approvals.

### B. **Cooperation with Transporter's Prosecution of FERC and Other Governmental Authorizations**

Shipper agrees to (a) intervene and file comments in support of and not oppose directly or through any affiliate, Transporter's FERC Application, Other Governmental Authorizations Applications, and any other filings which Transporter determines are necessary or appropriate, by filing a motion to intervene and comments in support of such applications or filings and additional filings in support of the Project as may be requested by Transporter; and (b) provide Transporter such information as Transporter may reasonably request from time to time in order to prosecute the FERC Application, Other Governmental Authorizations Applications, and any other filings which the Transporter determines are necessary or appropriate.

9

### C.    Creditworthiness of the Parties

In exchange for Transporter's execution of this Agreement, the Service Agreements, and Project Agreements, Shipper shall satisfy the following credit assurance provisions as of the Effective Date of this Agreement, and shall have a continuing obligation to satisfy the credit assurance provisions of this Agreement throughout the term of this Agreement, the Service Agreements, and any other related agreements as may be in effect from time to time.

i.    <u>Creditworthiness Defined</u>

Shipper or its Guarantor shall be deemed creditworthy if:



If, at any time, Shipper does not meet the credit standards set forth in this <u>Section 5(C)(i)</u>, Shipper shall be deemed "**<u>uncreditworthy</u>**."

ii.    <u>Credit Assurances</u>



10



iii.     <u>Amount of Credit Assurance</u>



iv.     <u>Reimbursement</u>

Reimbursable Costs incurred by or on behalf of Transporter shall be recovered from Shipper in accordance with <u>Section 9</u> or shall be reflected in the rates that Shipper shall pay to Transporter for transportation service contemplated herein.

v.     <u>Shipper's Status</u>

The Parties acknowledge that as of the Effective Date of this Precedent Agreement, Shipper a) does not have a Guarantor and b) meets Transporter's creditworthiness standards. No credit support is required at this time and

11

will not be required unless Shipper fails to maintain Minimum Credit Rating Standards.

6.  **Commencement of Construction; Transporter's Obligation to Proceed**

Transporter shall be under no obligation to commence or continue at any time the acquisition of pipe and materials, the acquisition of rights-of-way, the construction of the Project Facilities, or any other activity involving either the commitment or actual expenditure of funds by or on behalf of Transporter that may be required to construct or procure the Project Facilities or to provide the proposed firm transportation service for Shipper unless:

    i.    Transporter has received or, in its sole discretion, waived receipt of (a) the Shipper Management Approval and the Transporter Management Approval in accordance with <u>Sections 7(A)(i)</u> and <u>7(A)(ii)</u>, respectively, and (b) all FERC Authorizations and Other Governmental Authorizations in accordance with <u>Sections 7(A)(iii)</u> and <u>7(A)(iv)</u>;

    ii.    Transporter and Shipper have executed all required agreements in accordance with <u>Section 8</u>, including the Service Agreements and any other Project Agreements and otherwise Shipper has complied with its obligations under this Agreement; and

    iii.    Transporter has obtained all real property rights required for the construction, ownership and operation of the Project, including any rights that must be acquired through eminent domain.

7.  **Termination Rights**

A.  **Transporter Termination Rights**

Transporter shall have the right to terminate this Agreement according to the provisions below:

    i.    <u>Shipper Management Approval</u>.  Transporter may terminate this Agreement if Shipper has not received all necessary approvals from its executive management and/or board of directors for the execution of the Project Agreements ("**Shipper Management Approval**") by ███████████ ("**Shipper Management Approval Date**").

    ii.    <u>Transporter Management Approval</u>.  Transporter may terminate this Agreement if Transporter has not received all necessary approvals from its executive management and/or board of directors for the continued development of the Project under the terms of this Agreement ("**Transporter Management Approval**") by ███████████ ("**Transporter Management Approval Date**").

12

iii.    <u>FERC Authorizations</u>.  Transporter may terminate this Agreement:  (a) if the FERC Authorization Application is denied by FERC; (b) if all FERC Authorizations required for Transporter to start construction of the Facilities ███████████████████████████████████████████████████████████ or (c) if, in Transporter's sole discretion, any of the FERC Authorizations differs materially and adversely in form and substance from the Authorization requested by Transporter, which may include, but shall not be limited to, changes to construction methods or type or location of specific facilities proposed by Transporter.

iv.    <u>Other Governmental Authorizations</u>.  Transporter may terminate this Agreement:  (a) if any Other Governmental Authorization Application is denied by any federal, state, or local agency; (b) if all Other Governmental Authorizations required for Transporter to start construction and operation ████████████████████████████████████████████ or (c) if, in Transporter's sole discretion, any of the Other Governmental Authorizations referenced differs materially and adversely in form and substance from the Authorization requested by Transporter, which may include, but shall not be limited to, changes to construction methods or type or location of specific facilities proposed by Transporter.

v.    <u>Shipper's Failure to Furnish Acceptable Credit Assurance</u>.  Shipper shall have failed to satisfy the credit requirements set forth in Section 5(C) of this Agreement.  If Shipper is uncreditworthy and fails to demonstrate or furnish acceptable credit assurances as required by Section 5(C) within ten (10) business days of receipt of written notice of such failure from Transporter, then Transporter shall, in addition to any other remedy available under this Agreement, have the right to terminate this Agreement, the Service Agreement, the Negotiated Rate Agreement, and any other related agreements upon thirty (30) days written notice to Shipper.

vi.    <u>Execution of Related Project Agreements</u>.  Transporter may terminate this Agreement if Shipper has not executed Service Agreements within fifteen (15) days following receipt of such agreements pursuant to Section 8.

vii.    <u>Construction Commencement Deadline</u>.  If Transporter has not started construction by ██████████████, Transporter may terminate this Agreement after ██████████████ to be effective ██████████████ if Transporter has not subsequently started construction by such date.

viii.    <u>Stay of Construction</u>. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**B.     Shipper Termination Rights**

Shipper shall have the right to terminate this Agreement according to the provisions below:

i.     <u>Shipper Management Approval</u>.  Shipper may terminate this Agreement if Shipper has not received the Shipper Management Approval by the Shipper Management Approval Date.

ii.     <u>Transporter Management Approval</u>.  Shipper may terminate this Agreement if Transporter has not received the Transporter Management Approval by the Transporter Management Approval Date.

iii.     <u>Construction Commencement Deadline</u>.  If Transporter has not started construction by ▮▮▮▮▮▮, Shipper may terminate this Agreement after ▮▮▮▮▮▮ to be effective ▮▮▮▮▮▮ if Transporter has not subsequently started construction by such date.

iv.     <u>Shipper's Project Environmental Reviews</u>.  Shipper may terminate this Agreement by no later than December 1, 2022 if Shipper determines that it will not proceed with the construction of the TVA-Cumberland Units based upon Shipper's completion of its environmental reviews under the National Environmental Policy Act and other applicable environmental laws and regulations, or if any federal or state authorization required by Shipper for the construction of TVA-Cumberland Units is not received or otherwise denied by the applicable federal or state agency.

**C.     Termination Procedure**

Either Party may exercise its termination rights in <u>Section 7(A)</u> or <u>Section 7(B)</u> by giving written notice thereof (each, a "**Termination Notice**") to the other Party, which must be given within thirty (30) days of any event giving rise to a termination event.  For purposes of the termination rights in <u>Section 7(A)</u> and <u>Section 7(B)</u>, or any other termination rights in this Agreement, any right to terminate this Agreement shall also include the right to terminate the Project Agreements if it has been executed and any other agreement that has been executed according to the terms of this Agreement.  The Termination Notice shall specify the date of termination (the "**Termination Date**"), which shall be not less than thirty (30) days after or more than sixty (60) days following the date of the Termination Notice.  If either Party delivers a Termination Notice to the other Party in accordance with this <u>Section 7(C)</u>, then the Parties shall negotiate in good faith for a period between the date of the Termination Notice and the Termination Date (the "**Negotiation Period**") toward an amendment to this Agreement, the Project Agreements and/or any related agreements to accomplish the objectives of the Parties, provided,

14

however, that neither Party shall be required to consent to modifications of this Agreement, the Project Agreements and/or any related agreements. This Agreement, the Project Agreements and/or any related agreements shall terminate as of the Termination Date unless (a) the obligation or condition giving rise to the termination event is satisfied or waived in writing by the terminating Party; (b) the Parties otherwise mutually agree to an amendment to this Agreement, the Project Agreements and/or any related agreements, (c) the Parties agree in writing to extend the Negotiation Period, (d) the terminating Party withdraws its previously submitted Termination Notice. If either Party terminates this Agreement and, if then executed, the Service Agreement pursuant to this <u>Section 7</u>, then Shipper shall be liable to Transporter for Reimbursable Costs in accordance with <u>Section 9</u>.

## 8.  <u>Delivery and Execution of Service Agreements</u>

**A.  <u>Delivery of Service Agreements for Execution</u>**

At any time on or after the Commission issues the FERC Authorization for the Project, Transporter shall deliver to Shipper for Shipper's execution (i) a FT-A Service Agreement in a form substantially similar in all material respects to Exhibits A and B hereto; and (ii) a FT-IL Service Agreement in a form substantially similar in all material respects to Exhibits C and D hereto.

**B.  <u>Execution of Service Agreements by Shipper</u>**

Shipper shall be required to execute and return to Transporter the Service Agreements delivered by Transporter to Shipper pursuant to <u>Section 8(A)</u> of this Agreement no later than ten (10) business days following receipt of the Service Agreements pursuant to <u>Section 8(A)</u>.

**C.  <u>Execution of Service Agreements by Transporter</u>**

Transporter shall be required to execute the Service Agreements no later than ten (10) business days following execution by Shipper of the Service Agreements in accordance with Section 8(B).

## 9.  <u>Reimbursement by Shipper of Reimbursable Costs</u>

**A.  <u>Reimbursable Costs</u>**





**B.    Reimbursable Cost Sharing**

**C.    Reimbursement Process**



16

10. **Notices**

Any notice and/or request provided for in this Agreement or any notice either Party may desire to give to the other shall be transmitted in writing (overnight delivery, U.S. Mail, or electronic mail) such that it is received before 5 p.m. Central time on the due date.

Transporter:

> Tennessee Gas Pipeline Company, L.L.C.
> 1001 Louisiana Street
> Houston, TX  77002
> Attn:  Preston Troutman
> Director, Business Development
> Preston_Troutman@kindermorgan.com

Shipper:

> Tennessee Valley Authority
> 1101 Market Street
> Chattanooga, TN  37402
>
> Attention:     Karen Stampfil
> Phone Number: 423-751-8190
> Email: kstampfli@tva.gov

Notice shall be effective as of the date of confirmed receipt, or, in the absence of confirmed receipt, as of the date actually received.

11. **Assignment**

Neither Party shall assign or transfer all or any of its rights, interests, duties, or obligations under this Agreement without the prior written consent of the other Party, which shall not be unreasonably withheld, conditioned, or delayed, except to a Successor-in-Interest, to which such Party may freely assign, transfer, or novate this Agreement.  "***Successor-in-Interest***" means any entity to whom all or substantially all of the assets comprising the Party (as existing at that time) are sold or transferred.  Any assignment in violation of this Section 11 shall be void.  Transporter's conditioning consent on assignee's or replacement shipper's meeting the credit requirements set forth in Section 5(C) of this Agreement shall be deemed reasonable.  The restrictions on assignment contained in this Section 11 shall not in any way prevent either Party to this Agreement from pledging or mortgaging its rights hereunder as security for its indebtedness.  Once the Service Agreements are executed by both Parties and service has commenced thereunder, any assignment of such Service Agreements are subject to the terms and conditions of Transporter's Tariff and the terms of this provision shall no longer control.  The Parties agree to cooperate in the preparation and filing of all necessary applications for authorizations related to any assignment conforming to this Section 11 and, subject to the terms and conditions herein, agree to proceed with due diligence to prosecute such application(s), if necessary.

DocuSign Envelope ID: 48DBFCCF-65EE-4923-8EBE-2FAA8B3B862D

12. **Miscellaneous**

    A. **Modification**

No modification of the terms and provisions of this Agreement shall be made except by the execution by both Parties of a written agreement.

    B. **Choice of Law**

**THE PARTIES RECOGNIZE THAT TVA, AS A FEDERAL ENTITY, IS GOVERNED BY THE TVA ACT AND FEDERAL LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF TEXAS OR ANY OTHER JURISDICTION), PROVIDED THAT THE FOREGOING SHALL NOT PREVENT THE APPLICATION OF FEDERAL LAW WHERE APPLICABLE**.

    C. **Term**

Unless terminated sooner pursuant to the terms herein, this Agreement shall terminate upon the Commencement Date; provided however, the provisions in Section 5(C) related to Shipper credit requirements and obligations shall survive the termination of this Agreement.  To the extent this Agreement is terminated pursuant to Section 7 above prior to the Commencement Date, the only provisions of this Agreement which shall survive such termination shall be: Sections 9 and 12(B), 12(C), 12(E), 12(G), and 12(H).

    D. **No Waivers**

Except as expressly provided herein, no waiver by a Party of any default(s) by the other Party in the performance of any provision, condition, or requirement of this Agreement shall operate or be construed as a waiver of any future default(s), whether of a like or of a different character, nor in any manner release the defaulting Party from performance of any other provision, condition, or requirement herein.

    E. **Breach and Remedies**

Nothing in this Agreement shall be construed to preclude the Parties from pursuing any remedy at law or equity for the other Party's failure to execute the Service Agreements or any breach of this Agreement; provided however that neither Party shall be liable for consequential, incidental, punitive, exemplary, special or indirect damages, lost profits or loss of revenue, by statute, in tort or contract or otherwise; provided further that the foregoing shall not preclude Transporter from pursuing any remedy to recover reservation charges under the Service Agreements.  It is the intent of the Parties that the limitations herein imposed on remedies and the measure of damages be without regard to cause or causes related thereto, including the

18

negligence of any Party, whether such negligence be sole, joint, or concurrent, or active or passive.

**F.    Agreement Subject to Regulatory Authorities**

This Agreement, and all of the terms and provisions contained herein, and the respective obligations of the Parties, are subject to Transporter's Tariff and to all valid laws, orders, rules, and regulations of duly constituted governmental authorities having jurisdiction.

**G.    Severability**

If any provision of this Agreement is declared null and void or voidable by a court of competent jurisdiction, such declaration shall in no way affect the validity or effectiveness of the other provisions of this Agreement, which shall remain in full force and effect, and the Parties shall thereafter undertake commercially reasonable efforts to agree upon an equitable adjustment of the provisions of this Agreement with a view to effecting its purpose.

**H.    No Presumption Against Drafter**

No presumption shall operate in favor of or against any Party as a result of any responsibility or role that any Party may have had in the drafting of this Agreement.

**I.    Confidentiality**

Each Party shall hold the substance and terms of this Agreement confidential, but may disclose the substance and terms of this Agreement to its or its affiliates' directors, officers, employees, representatives, agents, lenders, consultants, attorneys or auditors ("**Representatives**") who have a need to know the substance and terms of this Agreement and who are subject to a confidentiality agreement covering the disclosed information.  Neither Party shall disclose or communicate, and will cause its Representatives not to disclose or communicate, the substance or terms of this Agreement to any other person, entity, firm, or corporation without the prior written consent of the other Party; provided that Transporter may disclose the Agreement in the FERC Application or Other Governmental Authorizations Applications.  Either Party may disclose the substance or terms of this Agreement as requested or required by law, order, rule or regulation of any duly constituted governmental body or official authority having jurisdiction; provided however, the Party requested or required to disclose the Agreement shall give prompt written notice of such requirement to the other Party so that either Party may seek a protective order or other appropriate remedy and/or waive the compliance with the terms hereof.

**J.    Whole Agreement**

This Agreement sets forth all understandings and agreements between the Parties respecting the subject matter hereof, and all prior agreements, understandings, and

representations, whether written or oral, respecting the subject matter hereof are merged into and superseded by this Agreement.  In the event of any conflict between the terms of this Agreement and the FT-A Service Agreement and/or the FT-IL Service Agreement, the terms of the FT-A Service Agreement or the FT-IL Service Agreement, as applicable, shall control.

**K.    Execution of Agreement**

This Agreement may be executed by the Parties in separate counterparts, each of which when so executed and delivered will be an original, but all such counterparts will together constitute but one and the same instrument.

**L.    Affirmative Action and Equal Opportunity**.  To the extent applicable, this Agreement incorporates by reference the Affirmative Action for Disabled Veterans and Veterans of the Vietnam-Era clause, 41 C.F.R. § 60-250.4; the Affirmative Action for Handicapped Workers clause, 41 C.F.R. § 60-741.4; the Equal Opportunity clause, 41 C.F.R. § 60-1.4; and the Discrimination on the Basis of Age clause, 18 C.F.R. § 1316.6; and all amendments thereto and all applicable regulations, rules, and orders issued thereunder. Transporter shall comply with applicable regulatory requirements, including information reports and affirmative action programs.

**M.    Small Business Policy.**  To the extent applicable, the requirements of 15 U.S.C § 637(d) are incorporated by reference.

**N.    Certification for Contracts, Grants, Loans, and Cooperative Agreements.**  Transporter's representative, by signing the agreement to which this certification is attached, certifies, to the best of his or her knowledge and belief, that:

(1)    No Federal appropriated funds have been paid or will be paid by or on behalf of Transporter to any person for influencing or attempting to influence an officer or employee of any agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with the awarding of this Agreement or the extension, continuation, renewal, amendment, or modification of this Agreement.

(2)    If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a member of congress, an officer or employee of Congress, or an employee of a member of Congress in connection with this Agreement, Transporter shall complete and submit Standard Form-LLL, "Disclosure of Lobbying Activities," in accordance with its instructions.

This certification is a material representation of fact upon which reliance was placed when this Agreement was made or entered into.  Submission of this certification is a prerequisite for making or entering into this Agreement imposed by 31 U.S.C. 1352.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first hereinabove written.

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**

By: _Kimberly Watson_
88645A2D57B64DC...

Name: Kimberly S. Watson

Title: President

8/11/2021

**TENNESSEE VALLEY AUTHORITY**

By: _Doug Perry_

Name:     Douglas Perry

Title:     SVP, Commercial Energy Solutions

21

# EXHIBIT A
# TO THE PRECEDENT AGREEMENT
GAS TRANSPORTATION AGREEMENT
(For Use Under FT-A Rate Schedule)

THIS AGREEMENT is made and entered into as of the _____ day of _____, _____, by and between TENNESSEE GAS PIPELINE COMPANY, L.L.C., a Delaware limited liability company, hereinafter referred to as "Transporter" and Tennessee Valley Authority, a _____ _____, hereinafter referred to as "Shipper." Transporter and Shipper shall collectively be referred to herein as the "Parties."

WHEREAS, Shipper and Transporter entered into a Precedent Agreement dated **[insert date]** (the "Precedent Agreement"), pursuant to which Transporter agreed to (i) provide shipper certain firm transportation service on a new incremental lateral located near MLV 83 at the takeoff of Transporter's 100 Line in Zone 1 (the "Cumberland Lateral") to serve Shipper's proposed Cumberland Combined Cycle Power Plant located in Stewart County, TN, and (ii) to construct and operate any facilities necessary to provide such firm transportation service ("Project Facilities");

WHEREAS, Shipper desires to contract for upstream firm transportation capacity on Transporter's mainline system for up to 221,000 dekatherms per day ("Dth/day") (the "Shipper Upstream Capacity") from one or more mutually agreeable receipt points on Transporters 100 Line in Zone 0 and Zone 1 to a new delivery point to be located at the interconnection of Transporter's mainline system with the Cumberland Lateral;

NOW THEREFORE, Transporter and Shipper agree as follows:

ARTICLE I

DEFINITIONS

1.1     TRANSPORTATION QUANTITY - shall mean the maximum daily quantity of gas which Transporter agrees to receive and transport on a firm basis, subject to Article II herein, for the account of Shipper hereunder on each day during the term hereof, as specified on Exhibit "A" attached hereto. Any limitations on the quantities to be received from each Point of Receipt and/or delivered to each Point of Delivery shall be as specified on Exhibit "A" attached hereto.

1.2     EQUIVALENT QUANTITY - shall be as defined in Article I of the General Terms and Conditions of Transporter's FERC Gas Tariff.

1.3     COMMENCEMENT DATE – shall mean the later of: (i) September 1, 2025; or (ii) the date on which all of the Project Facilities are place in-service ("**Commencement Date**"). Transporter shall provide Shipper no less than five (5) days advance written notice of the Commencement Date and the TQ that will be available.

ARTICLE II

TRANSPORTATION

Commencing upon the Commencement Date, Transporter agrees to accept and receive daily on a firm basis in accordance with Rate Schedule FT-A, at the Point(s) of Receipt from Shipper or for Shipper's account such quantity of gas as Shipper makes available up to the Transportation Quantity, and to deliver to or for the account of Shipper to the Point(s) of Delivery an Equivalent Quantity of gas.

ARTICLE III

POINT(S) OF RECEIPT AND DELIVERY

The Primary Point(s) of Receipt and Delivery shall be those points specified on Exhibit "A" attached hereto.

ARTICLE IV

FACILITIES

All facilities are in place to render the service provided for in this Agreement and Transporter shall have no obligation to build facilities to perform this service.

A-1

ARTICLE V

QUALITY SPECIFICATIONS AND STANDARDS FOR MEASUREMENT

For all gas received, transported and delivered hereunder the Parties agree to the Quality Specifications and Standards for Measurement as specified in the General Terms and Conditions of Transporter's FERC Gas Tariff.  To the extent that no new measurement facilities are installed to provide service hereunder, measurement operations will continue in the manner in which they have previously been handled.  In the event that such facilities are not operated by Transporter or a downstream pipeline, then responsibility for operations shall be deemed to be Shipper's.

ARTICLE VI

RATES AND CHARGES

6.1     TRANSPORTATION RATES - Commencing upon the Commencement Date, the rates, charges, and surcharges to be paid by Shipper to Transporter for the transportation service provided herein shall be in accordance with Transporter's Rate Schedule FT-A and the General Terms and Conditions of Transporter's FERC Gas Tariff.

Except as provided to the contrary in any written or electronic agreement(s) between Transporter and Shipper in effect during the term of this Agreement, Shipper shall pay Transporter the applicable maximum rate(s) and all other applicable charges and surcharges specified in the Summary of Rates and Charges in Transporter's FERC Gas Tariff and in  Rate Schedule FT-A.  Transporter and Shipper may mutually agree from time to time to discounted rates or Negotiated Rates for service provided hereunder in accordance with the provisions of Rate Schedule FT-A and the General Terms and Conditions of Transporter's FERC Gas Tariff.

Transporter and Shipper may agree that a specific discounted rate will apply only to certain volumes under the agreement.  Transporter and Shipper may agree that a specified discounted rate will apply only to specified volumes (MDQ, TQ, commodity volumes, Extended Receipt and Delivery Service Volumes or Authorized Overrun volumes) under the Agreement; that a specified discounted rate will apply only if specified volumes are achieved (with the maximum rates applicable to volumes above the specified volumes or to all volumes if the specified volumes are never achieved); that a specified discounted rate will apply only during specified periods of the year or over a specifically defined period of time; that a specified discounted rate will apply only to specified points, zones, markets or other defined geographical area; and/or that a specified discounted rate will apply only to production or reserves committed or dedicated to Transporter.  Transporter and Shipper may agree to a specified discounted rate pursuant to the provisions of this Section 6.1 provided that the discounted rate is between the applicable maximum and minimum rates for this service.

In addition, a discount agreement may include a provision that if one rate component which was at or below the applicable Maximum Rate at the time the discount agreement was executed subsequently exceeds the applicable Maximum Rate due to a change in Transporter's Maximum Rates so that such rate component must be adjusted downward to equal the new applicable Maximum Rate, then other rate components may be adjusted upward to achieve the agreed overall rate, as long as none of the resulting rate components exceed the Maximum Rate applicable to that rate component.  Such changes to rate components shall be applied prospectively, commencing with the date a Commission Order accepts revised tariff sheet rates.  However, nothing contained herein shall be construed to alter a refund obligation under applicable law for any period during which rates that had been charged under a discount agreement exceeded rates which ultimately are found to be just and reasonable.

6.2     INCIDENTAL CHARGES - Shipper agrees to reimburse Transporter for any filing or similar fees, which have not been previously paid for by Shipper, which Transporter incurs in rendering service hereunder.

6.3     CHANGES IN RATES AND CHARGES - Shipper agrees that Transporter shall have the unilateral right to file with the appropriate regulatory authority and make effective changes in (a) the rates and charges applicable to service pursuant to Transporter's Rate Schedule FT-A or any successor rate schedule, (b) the rate schedule(s) pursuant to which service hereunder is rendered, and/or (c) any provision of the General Terms and Conditions of Transporter's FERC Gas Tariff applicable to those rate schedules or this Agreement.  Transporter agrees that Shipper may protest or contest the aforementioned filings, and may seek authorization from duly constituted regulatory authorities for such adjustment of Transporter's existing FERC Gas Tariff as may be found necessary to assure Transporter just and reasonable rates.

6.4     Reserved.

A-2

ARTICLE VII

BILLINGS AND PAYMENTS

Transporter shall bill and Shipper shall pay all rates and charges in accordance with Articles VII and VIII, respectively, of the General Terms and Conditions of Transporter's FERC Gas Tariff.

ARTICLE VIII

RATE SCHEDULE AND GENERAL TERMS AND CONDITIONS

This Agreement shall be subject to the effective provisions of Transporter's Rate Schedule FT-A and to the General Terms and Conditions of Transporter's FERC Gas Tariff incorporated therein, as the same may be changed or superseded from time to time in accordance with the rules and regulations of the FERC.

ARTICLE IX

REGULATION

9.1 This Agreement shall be subject to all applicable and lawful governmental statutes, orders, rules and regulations and is contingent upon the receipt and continuation of all necessary regulatory approvals or authorizations upon terms acceptable to Transporter. This Agreement shall be void and of no force and effect if any necessary regulatory approval is not so obtained or continued. All Parties hereto shall cooperate to obtain or continue all necessary approvals or authorizations, but no Party shall be liable to any other Party for failure to obtain or continue such approvals or authorizations.

9.2 The transportation service described herein shall be provided subject to Subpart G of the FERC Regulations.

ARTICLE X

RESPONSIBILITY DURING TRANSPORTATION

Except as herein specified, the responsibility for gas during transportation shall be as stated in the General Terms and Conditions of Transporter's FERC Gas Tariff.

ARTICLE XI

WARRANTIES

11.1 In addition to the warranties set forth in Article XI of the General Terms and Conditions of Transporter's FERC Gas Tariff, Shipper warrants the following:

(a) Shipper warrants that all upstream and downstream transportation arrangements are in place, or will be in place by the Commencement Date, and that it has advised the upstream and downstream transporters of the receipt and delivery points under this Agreement and any quantity limitations for each point as specified on Exhibit "A" attached hereto. Shipper agrees to indemnify and hold Transporter harmless for refusal to transport gas hereunder in the event any upstream or downstream transporter fails to receive or deliver gas as contemplated by this Agreement.

(b) Not applicable.

(c) Shipper agrees to indemnify and hold Transporter harmless from all suits, actions, debts, accounts, damages, costs, losses and expenses (including reasonable attorney's fees) arising from or out of breach of any warranty by Shipper herein.

11.2 Transporter shall not be obligated to provide or continue service hereunder in the event of any breach of warranty.

11.3 Not applicable.

ARTICLE XII

TERM

A-3

12.1    This Agreement shall be effective as of the date hereof. Service hereunder shall commence on the Commencement Date, and shall continue in effect until the end of such calendar month that is twenty (20) years from the Commencement Date ("Primary Term").unless modified as per Exhibit "B":   Any rights to Shipper's extension of this Agreement after the Primary Term shall be set forth in Exhibit "A" hereto: provided, however, if Exhibit "A" does not specify Shipper's extension rights under the Agreement, and if the Primary Term is one year or more, then any rights to Shipper's extension of this Agreement after the Primary Term shall be governed by Article V, Section 4 of the General Terms and Conditions of Transporter's FERC Gas Tariff: and provided further, that if the FERC or other governmental body having jurisdiction over the service rendered pursuant to this Agreement authorizes abandonment of such service, this Agreement shall terminate on the abandonment date permitted by the FERC or such other governmental body.

12.2    Any portions of this Agreement necessary to resolve or cash out imbalances under this Agreement as required by the General Terms and Conditions of Transporter's FERC Gas Tariff shall survive the other parts of this Agreement until such time as such balancing has been accomplished; provided, however, that Transporter notifies Shipper of such imbalance not later than twelve months after the termination of this Agreement.

12.3    This Agreement will terminate automatically upon written notice from Transporter in the event Shipper fails to pay all of the amount of any bill for service rendered by Transporter hereunder in accord with the terms and conditions of Article VIII of the General Terms and Conditions of Transporter's FERC Gas Tariff.

ARTICLE XIII

NOTICE

Except as otherwise provided in the General Terms and Conditions of Transporter's FERC Gas Tariff applicable to this Agreement, any notice under this Agreement shall be in writing and mailed to the address of the Party intended to receive the same, as follows:

TRANSPORTER:    Tennessee Gas Pipeline Company, L.L.C.
1001 Louisiana Street, Suite 1000
Houston, Texas 77002

    Attention:        Director, Transportation Services

    SHIPPER:          Tennessee Valley Authority

    NOTICES:         _____
                            _____
                            _____
                            _____

    Attention:        _____

    BILLING:          _____
                              _____
                            _____
                            _____

    Attention:        _____

or to such other address as either Party shall designate by formal written notice to the other.

A-4

DocuSign Envelope ID: 48DBFCCF-65EE-4923-8EBE-2FAA8B3B862D

ARTICLE XIV

ASSIGNMENTS

14.1    Either Party may assign or pledge this Agreement and all rights and obligations hereunder under the provisions of any mortgage, deed of trust, indenture, or other instrument which it has executed or may execute hereafter as security for indebtedness.  Either Party may, without relieving itself of its obligation under this Agreement, assign any of its rights hereunder to a company with which it is affiliated.  Otherwise, Shipper shall not assign this Agreement or any of its rights hereunder, except in accord with Article VI, Section 1 of the General Terms and Conditions of Transporter's FERC Gas Tariff.

14.2    Any person which shall succeed by purchase, merger, or consolidation to the properties, substantially as an entirety, of either Party hereto shall be entitled to the rights and shall be subject to the obligations of its predecessor in interest under this Agreement.

ARTICLE XV

MISCELLANEOUS

15.1    THE INTERPRETATION AND PERFORMANCE OF THIS CONTRACT SHALL BE IN ACCORDANCE WITH AND CONTROLLED BY THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO THE DOCTRINES GOVERNING CHOICE OF LAW.

15.2    If any provision of this Agreement is declared null and void, or voidable, by a court of competent jurisdiction, then that provision will be considered severable at either Party's option; and if the severability option is exercised, the remaining provisions of the Agreement shall remain in full force and effect.

15.3    Unless otherwise expressly provided in this Agreement or Transporter's FERC Gas Tariff, no modification of or supplement to the terms and provisions stated in this Agreement shall be or become effective until Shipper has submitted a request for change through Transporter's Interactive Website and Shipper has been notified through Transporter's Interactive Website of Transporter's agreement to such change.

15.4    Exhibit "A" and , when applicable, Exhibit "B" attached hereto are incorporated herein by reference and made a part hereof for all purposes.

15.6    Not applicable.

15.7    Not applicable.

A-5

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the date first hereinabove written.


TENNESSEE GAS PIPELINE COMPANY, L.L.C.


BY: _____
                    Agent and Attorney-in-Fact


TENNESSEE VALLEY AUTHORITY


BY: _____
                    Agent and Attorney-in-Fact


TITLE: _____


DATE: _____

A-6

DocuSign Envelope ID: 48DBFCCF-65EE-4023-8EBE-2FAA8B3B862D

GAS TRANSPORTATION AGREEMENT
(For Use Under FT-A Rate Schedule)


EXHIBIT A
AMENDMENT NO. 0
TO GAS TRANSPORTATION AGREEMENT
DATED _____
BETWEEN
TENNESSEE GAS PIPELINE COMPANY, L.L.C.
AND

TENNESSEE VALLEY AUTHORITY

Amendment Effective Date:

Service Package: _____

Service Package TQ: 221,000 Dth

| Beginning Date | Ending Date | TQ |
|---|---|---|
| Commencement Date | Commencement Date + 20 years * | 221,000 |
| | | |

*"; provided, however, that the Primary Term shall end at the end of such calendar month that is twenty (20) years from the Commencement Date.



Total Receipt TQ: 221,000

Total Delivery TQ: 221,000

A-7

Number of Receipt Points: █

Number of Delivery Points: █

Other Provisions Permitted By Tariff Under the Applicable Rate Schedule and/or General Terms and Conditions and Pursuant to Article XXXVI of the General Terms and Conditions of Transporter's FERC Gas Tariff:

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████

Note:    Exhibit A is a reflection of the contract and all amendments as of the amendment effective date.

A-8

# EXHIBIT B
## TO THE PRECEDENT AGREEMENT



Add date.

Tennessee Valley Authority
1101 Market Street
Chattanooga, TN 37402
Attention: Jeff Avery

RE:     Firm Transportation Discounted Rate Agreement ("Discount Rate Agreement")
        Rate Schedule FT-A Service Package No. Contract Number

Dear Jeff Avery:

Tennessee Gas Pipeline Company, L.L.C. ("Transporter" or "Tennessee") and Tennessee Valley Authority ("Shipper") entered into a Precedent Agreement dated July   , 2021 ("Precedent Agreement" or "PA") under which Shipper qualifies as a  Foundation Shipper for the Cumberland Project (the "Project") for the Primary Receipt Point(s), Primary Delivery Point(s), and Transportation Quantity ("TQ") as identified in the Transportation Service Agreement attached as Exhibit A of the PA.  As part of the Precedent Agreement, Shipper elected the discounted rate option for transportation service under Rate Schedule FT-A as offered by Transporter pursuant to Section 5.1 of Rate Schedule FT-A of Transporter's FERC Gas Tariff, as may be revised from time to time ("Transporter's Tariff").  For the period commencing on the Commencement Date and extending through the date that is twenty (20) years from the Commencement Date ("Primary Term") as listed in Exhibit A to the Gas Transportation Agreement, the rate shall be adjusted as follows:

1.    a)    If Shipper attempts to apply this discount to any volumes and/or to any points not eligible for the discount and thereby fails to pay correctly invoiced and undisputed amounts, then, if such failure is not cured within thirty days of provision of notice by Tennessee to Shipper of such failure, Tennessee shall have the right, in its sole discretion, to immediately terminate this discount with Shipper and/or to assess, from the date of such violation of the terms of discount, the applicable Base Rate on all transactions occurring under the Service Package for the month(s) in which such limits were exceeded.

     b)    For transportation service from the primary receipt point(s) listed in Exhibit A to the Gas Transportation Agreement to the primary delivery point(s) listed in Exhibit A to the Gas Transportation Agreement, the applicable Rate Schedule FT-A transportation rates for service provided under the Service Package will be:



B-1

f)    Receipts from and/or deliveries to points other than those listed above during the term of this Discounted Rate Agreement shall result in Shipper being assessed Tennessee's Base Reservation Rate under Rate Schedule FT-A applicable to the primary path divided by the number of days in the month for the entire gas transportation agreement TQ on the day(s) of such deliveries and Tennessee's applicable daily Base Commodity Rates under Rate Schedule FT-A as well as the applicable F&LR and EPCR charges and all applicable surcharges under Rate Schedule FT-A.

2.    If any terms of this Discounted Rate Agreement are disallowed by any order, rulemaking, regulation or policy of the Federal Energy Regulatory Commission, Tennessee may immediately terminate this Discounted Rate Agreement. If any terms of this Discounted Rate Agreement are in any way modified by order, rulemaking, regulation or policy of the Federal Energy Regulatory Commission, Tennessee and Shipper may mutually agree to amend this Discounted Rate Agreement in order to ensure that the original commercial intent of the parties is preserved. In the event that the parties cannot achieve mutual agreement, Tennessee reserves the right to immediately terminate this Discounted Rate Agreement.

If Shipper is interested in entering into the Discounted Rate Agreement for firm capacity in accordance with the terms proposed above, please have the authorized representative of Shipper execute this Discounted Rate Agreement and return to the undersigned. This Discounted Rate Agreement will become binding upon the parties only after it then is accepted and executed by Tennessee's authorized representative on the below "Agreed to and Accepted" portion. One fully executed copy will be returned for your records.

Sincerely,

Preston H. Troutman
Director, Business Development

B-2

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**

**AGREED TO AND ACCEPTED
THIS_____DAY OF_____, 20XX.**

By: _____

Name: _____

Title: _____

**TENNESSEE VALLEY
 AUTHORITY**
**AGREED TO AND ACCEPTED
THIS_____DAY OF_____, 20XX.**

By: _____

Name: _____

Title: _____

B-3

**EXHIBIT C**
LATERAL TRANSPORTATION AGREEMENT
(For Use Under FT-IL Rate Schedule)


THIS AGREEMENT is made and entered into as of the _____ day of _____, _____, by and between TENNESSEE GAS PIPELINE COMPANY, L.L.C., a Delaware limited liability company, hereinafter referred to as "Transporter" and Tennessee Valley Authority, a _____ _____, hereinafter referred to as "Shipper."  Transporter and Shipper shall collectively be referred to herein as the "Parties."

WHEREAS, Shipper and Transporter entered into a Precedent Agreement dated July   , 2021 (the "Precedent Agreement"), pursuant to which Transporter agreed to (i) provide shipper certain firm transportation service on a new incremental lateral located near MLV 83 at the takeoff of Transporter's 100 Line in Zone 1 (the "Cumberland Lateral") to serve Shipper's proposed Cumberland Combined Cycle Power Plant located in Stewart County, TN, and (ii) to construct and operate any facilities necessary to provide such firm transportation service ("Project Facilities");

WHEREAS, Shipper desires to contract for firm transportation capacity on the Cumberland Lateral for up to 245,040 dekatherms per day ("Dth/day") (the "FT-IL Capacity") from the interconnection of Transporter's mainline system with the Cumberland Lateral to a new point of delivery at the Cumberland Plant;

NOW THEREFORE, Transporter and Shipper agree as follows:

ARTICLE I

DEFINITIONS

1.1    TRANSPORTATION QUANTITY - shall mean the maximum daily quantity of gas which Transporter agrees to receive and transport on a firm basis, on a specified lateral, subject to Article II herein, for the account of Shipper hereunder on each day during the term hereof, as specified on Exhibit "A" attached hereto.  Any limitations on the quantities to be received from each Point of Receipt and/or delivered to each Point of Delivery shall be as specified on Exhibit "A" attached hereto.

1.2    EQUIVALENT QUANTITY - shall be as defined in Article I of the General Terms and Conditions of Transporter's FERC Gas Tariff.

1.3    COMMENCEMENT DATE – shall mean the later of: (i) September 1, 2025; or (ii) the date on which all of the Project Facilities are place in-service ("Commencement Date"). Transporter shall

C-1

provide Shipper no less than five (5) days advance written notice of the Commencement Date and the TQ that will be available.

INCREMENTAL LATERAL TRANSPORTATION AGREEMENT (continued)
(For Use Under FT-IL Rate Schedule)

ARTICLE II

TRANSPORTATION

Commencing upon the Commencement Date, Transporter agrees to accept and receive daily on a firm basis in accordance with Rate Schedule FT-IL, at the Point(s) of Receipt from Shipper or for Shipper's account such quantity of gas as Shipper makes available up to the Transportation Quantity, and to deliver to or for the account of Shipper to the Point(s) of Delivery an Equivalent Quantity of gas on a specified lateral as identified on Exhibit "A" attached hereto.

ARTICLE III

POINT(S) OF RECEIPT AND DELIVERY

The Primary Point(s) of Receipt and Delivery shall be those points specified on Exhibit "A" attached hereto.

ARTICLE IV

FACILITIES

Transporter shall construct, install, own and operate or otherwise acquire access to all necessary facilities to render the service provided for in this Agreement."

ARTICLE V

QUALITY SPECIFICATIONS AND STANDARDS FOR MEASUREMENT

For all gas received, transported and delivered hereunder the Parties agree to the Quality Specifications and Standards for Measurement as specified in the General Terms and Conditions of Transporter's FERC Gas Tariff.  To the extent that no new measurement facilities are installed to provide service hereunder, measurement operations will continue in the manner in which they have previously been handled.  In the event that such facilities are not operated by Transporter or a downstream pipeline, then responsibility for operations shall be deemed to be Shipper's.

C-2

INCREMENTAL LATERAL TRANSPORTATION AGREEMENT (continued)
(For Use Under FT-IL Rate Schedule)

ARTICLE VI

RATES AND CHARGES

6.1     TRANSPORTATION RATES - Commencing upon the Commencement Date, the rates, charges, and surcharges to be paid by Shipper to Transporter for the transportation service provided herein shall be in accordance with Transporter's Rate Schedule FT-IL and the General Terms and Conditions of Transporter's FERC Gas Tariff.

Except as provided to the contrary in any written or electronic agreement(s) between Transporter and Shipper in effect during the term of this Agreement, Shipper shall pay Transporter the applicable maximum rate(s) and applicable surcharges for the specified Incremental Lateral service in the Summary of Rates and Charges in Transporter's FERC Gas Tariff and in Rate Schedule FT-IL. Transporter and Shipper may mutually agree from time to time to discounted rates or Negotiated Rates for service provided hereunder in accordance with the provisions of Rate Schedule FT-IL and the General Terms and Conditions of Transporter's FERC Gas Tariff.

Transporter and Shipper may agree that a specific discounted rate will apply only to certain volumes under the agreement.  Transporter and Shipper may agree that a specified discounted rate will apply only to specified volumes (MDQ, TQ, commodity volumes, or Authorized Overrun volumes) under the Agreement; that a specified discounted rate will apply only if specified volumes are achieved (with the maximum rates applicable to volumes above the specified volumes or to all volumes if the specified volumes are never achieved); that a specified discounted rate will apply only during specified periods of the year or over a specifically defined period of time; and/or that a specified discounted rate will apply only to specified points.  Transporter and Shipper may agree to a specified discounted rate pursuant to the provisions of this Section 6.1 provided that the discounted rate is between the applicable maximum and minimum rates for this service.

In addition, a discount agreement may include a provision that if one rate component which was at or below the applicable Maximum Rate at the time the discount agreement was executed subsequently exceeds the applicable Maximum Rate due to a change in Transporter's Maximum Rates so that such rate component must be adjusted downward to equal the new applicable Maximum Rate, then other rate components may be adjusted upward to achieve the agreed overall rate, as long as none of the resulting rate components exceed the Maximum Rate applicable to that rate component.  Such changes to rate components shall be applied prospectively, commencing with the date a Commission Order accepts revised tariff sheet rates.  However, nothing contained herein shall be construed to alter a refund obligation under applicable law for any period during which rates that had been charged under a discount agreement exceeded rates which ultimately are found to be just and reasonable.

C-3

INCREMENTAL LATERAL TRANSPORTATION AGREEMENT (continued)
(For Use Under FT-IL Rate Schedule)

RATES AND CHARGES (continued)

6.2    INCIDENTAL CHARGES - Shipper agrees to reimburse Transporter for any filing or similar fees, which have not been previously paid for by Shipper, which Transporter incurs in rendering service hereunder.

6.3    CHANGES IN RATES AND CHARGES - Shipper agrees that Transporter shall have the unilateral right to file with the appropriate regulatory authority and make effective changes in (a) the rates and charges applicable to service pursuant to Transporter's Rate Schedule FT-IL or any successor rate schedule, (b) the rate schedule(s) pursuant to which service hereunder is rendered, and/or (c) any provision of the General Terms and Conditions of Transporter's FERC Gas Tariff applicable to those rate schedules or this Agreement. Transporter agrees that Shipper may protest or contest the aforementioned filings, and may seek authorization from duly constituted regulatory authorities for such adjustment of Transporter's existing FERC Gas Tariff as may be found necessary to assure Transporter just and reasonable rates.

6.4    Notwithstanding anything in Article XXVI, Section 4 of the General Terms and Conditions of Transporter's FERC Gas Tariff to the contrary, and in lieu of the credit requirements set forth therein, the credit requirements applicable to this Agreement are set forth in Section 5C of the Precedent Agreement to contract for Firm Service, dated [insert date] by and between Transporter and Shipper and are incorporated herein by reference and made a part of this Agreement.

ARTICLE VII

BILLINGS AND PAYMENTS

Transporter shall bill and Shipper shall pay all rates and charges in accordance with Articles VII and VIII, respectively, of the General Terms and Conditions of Transporter's FERC Gas Tariff.

C-4

INCREMENTAL LATERAL TRANSPORTATION AGREEMENT (continued)
(For Use Under FT-IL Rate Schedule)


ARTICLE VIII

RATE SCHEDULE AND GENERAL TERMS AND CONDITIONS

This Agreement shall be subject to the effective provisions of Transporter's Rate Schedule FT-IL and to the General Terms and Conditions of Transporter's FERC Gas Tariff incorporated therein, as the same may be changed or superseded from time to time in accordance with the rules and regulations of the FERC.


ARTICLE IX

REGULATION

9.1    This Agreement shall be subject to all applicable and lawful governmental statutes, orders, rules and regulations and is contingent upon the receipt and continuation of all necessary regulatory approvals or authorizations upon terms acceptable to Transporter.   This Agreement shall be void and of no force and effect if any necessary regulatory approval is not so obtained or continued.  All Parties hereto shall cooperate to obtain or continue all necessary approvals or authorizations, but no Party shall be liable to any other Party for failure to obtain or continue such approvals or authorizations.

9.2    The transportation service described herein shall be provided subject to Subpart G, Part 284 of the FERC Regulations.


ARTICLE X

RESPONSIBILITY DURING TRANSPORTATION

Except as herein specified, the responsibility for gas during transportation shall be as stated in the General Terms and Conditions of Transporter's FERC Gas Tariff.


C-5

INCREMENTAL LATERAL TRANSPORTATION AGREEMENT (continued)
(For Use Under FT-IL Rate Schedule)

## ARTICLE XI

## WARRANTIES

11.1    In addition to the warranties set forth in Article XI of the General Terms and Conditions of Transporter's FERC Gas Tariff, Shipper warrants the following:

(a)      Shipper warrants that all upstream and downstream transportation arrangements are in place, or will be in place by the Commencement Date, and that it has advised the upstream and downstream transporters of the receipt and delivery points under this Agreement and any quantity limitations for each point as specified on Exhibit "A" attached hereto.  Shipper agrees to indemnify and hold Transporter harmless for refusal to transport gas hereunder in the event any upstream or downstream transporter fails to receive or deliver gas as contemplated by this Agreement.

(b)      Shipper agrees to indemnify and hold Transporter harmless from all suits, actions, debts, accounts, damages, costs, losses and expenses (including reasonable attorneys fees) arising from or out of breach of any warranty by Shipper herein.

11.2    Transporter shall not be obligated to provide or continue service hereunder in the event of any breach of warranty.

## ARTICLE XII

## TERM

12.1    This Agreement shall be effective as of the date hereof.  Service hereunder shall commence on the Commencement Date and shall continue in effect until the end of such calendar month that is twenty (20) years from the Commencement Date ("Primary Term"), unless modified as per Exhibit B".  Any rights to Shipper's extension of this Agreement after the Primary Term shall be set forth in Exhibit "A" hereto; provided, however,  if Exhibit "A" does not specify Shipper's extension rights under the Agreement, and if the Primary Term is one year or more, then any rights to Shipper's extension of this Agreement after the Primary Term shall be governed by Article V, Section 4 of the General Terms and Conditions of Transporter's FERC Gas Tariff; and provided further, that if the FERC or other governmental body having jurisdiction over the service rendered pursuant to this Agreement authorizes abandonment of such service, this Agreement shall terminate on the abandonment date permitted by the FERC or such other governmental body.

C-6

DocuSign Envelope ID: 48DBFCCF-65EE-4923-8EBE-2FAA8B3B862D

INCREMENTAL LATERAL TRANSPORTATION AGREEMENT (continued)
(For Use Under FT-IL Rate Schedule)

12.2    Any portions of this Agreement necessary to resolve or cash out imbalances under this Agreement as required by the General Terms and Conditions of Transporter's FERC Gas Tariff shall survive the other parts of this Agreement until such time as such balancing has been accomplished; provided, however, that Transporter notifies Shipper of such imbalance not later than twelve months after the termination of this Agreement.

12.3    This Agreement will terminate automatically upon written notice from Transporter in the event Shipper fails to pay all of the amount of any bill for service rendered by Transporter hereunder in accord with the terms and conditions of Article VIII of the General Terms and Conditions of Transporter's FERC Gas Tariff.

ARTICLE XIII

NOTICE

Except as otherwise provided in the General Terms and Conditions of Transporter's FERC Gas Tariff applicable to this Agreement, any notice under this Agreement shall be in writing and mailed to the address of the Party intended to receive the same, as follows:

TRANSPORTER:    Tennessee Gas Pipeline Company, L.L.C.
_____
_____

Attention:    _____


SHIPPER:    Tennessee Valley Authority

NOTICES:    _____
_____
_____
_____

Attention:    _____

C-7

DocuSign Envelope ID: 48DBFCCE-65EE-4923-8EBE-2FAA8B3B862D

INCREMENTAL LATERAL TRANSPORTATION AGREEMENT (continued)
(For Use Under FT-IL Rate Schedule)

BILLING: _____

_____

_____

_____

Attention: _____

or to such other address as either Party shall designate by formal written notice to the other.

## ARTICLE XIV

## ASSIGNMENTS

14.1    Either Party may assign or pledge this Agreement and all rights and obligations hereunder under the provisions of any mortgage, deed of trust, indenture, or other instrument which it has executed or may execute hereafter as security for indebtedness. Either Party may, without relieving itself of its obligation under this Agreement, assign any of its rights hereunder to a company with which it is affiliated. Otherwise, Shipper shall not assign this Agreement or any of its rights hereunder, except in accord with Article VI, Section 1 of the General Terms and Conditions of Transporter's FERC Gas Tariff.

14.2    Any person which shall succeed by purchase, merger, or consolidation to the properties, substantially as an entirety, of either Party hereto shall be entitled to the rights and shall be subject to the obligations of its predecessor in interest under this Agreement.

## ARTICLE XV

## MISCELLANEOUS

15.1    THE INTERPRETATION AND PERFORMANCE OF THIS CONTRACT SHALL BE IN ACCORDANCE WITH AND CONTROLLED BY THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO THE DOCTRINES GOVERNING CHOICE OF LAW.

15.2    If any provision of this Agreement is declared null and void, or voidable, by a court of competent jurisdiction, then that provision will be considered severable at either Party's option; and if the severability option is exercised, the remaining provisions of the Agreement shall remain in full force and effect.

INCREMENTAL LATERAL TRANSPORTATION AGREEMENT (continued)
(For Use Under FT-IL Rate Schedule)

15.3    Unless otherwise expressly provided in this Agreement or Transporter's FERC Gas Tariff, no modification of or supplement to the terms and provisions stated in this Agreement shall be or become effective until Shipper has submitted a request for change through Transporter's Interactive Website and Shipper has been notified through Transporter's Interactive Website of Transporter's agreement to such change.

15.4    Exhibit "A" and, when applicable, Exhibit "B" attached hereto are incorporated herein by reference and made a part hereof for all purposes.

15.5    Reserved.

15.6    Other provisions of this Agreement notwithstanding, Transporter shall be under no obligation to commence service hereunder unless and until (i) Transporter has received and accepted, all the necessary regulatory approvals and permits to construct, install, own and operate or otherwise acquire access to all necessary facilities to provide service under the Agreement, in form and substance satisfactory to Transporter and (ii) all necessary facilities to provide service under the Agreement have been authorized, installed and are in operating condition, in Transporter's sole determination"

INCREMENTAL LATERAL TRANSPORTATION AGREEMENT (continued)
(For Use Under FT-IL Rate Schedule)


IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the date first hereinabove written.


TENNESSEE GAS PIPELINE COMPANY, L.L.C.


BY: _____
Agent and Attorney-in-Fact


TENNESSEE VALLEY AUTHORITY


BY: _____
Agent and Attorney-in-Fact


TITLE: _____


DATE: _____

C-10

INCREMENTAL LATERAL TRANSPORTATION AGREEMENT
(For Use Under FT-IL Rate Schedule)


EXHIBIT A
AMENDMENT NO. _____
TO GAS TRANSPORTATION AGREEMENT
DATED _____
BETWEEN
TENNESSEE GAS PIPELINE COMPANY, L.L.C.
AND
TENNESSEE VALLEY AUTHORITY

For service on the Cumberland Lateral


Amendment Effective Date: _____ _____

Service Package: _____

Service Package TQ: 245,040Dth

| Beginning Date | Ending Date | TQ |
| --- | --- | --- |
| Commencement Date | Commencement Date + 20 years* | 245,040 Dth |
| | | |

\*\*: provided, however, that the Primary Term shall end at the end of such calendar month that is twenty (20) years from the Commencement Date.


BEGINNING      ENDING      METER      METER      INTERCONNECT

C-11

Case: 23-3682    Document: 74-4    Filed: 10/07/2024    Page: 45

DocuSign Envelope ID: 48DBFCCF-65EE-4023-8EBE-2FAA8B3B862D



Total Receipt TQ:  245,040

Total Delivery TQ: 245,040

Number of Receipt Points: █
Number of Delivery Points: █

Other Provisions Permitted By Tariff Under the Applicable Rate Schedule and/or General Terms and Conditions and Pursuant to Article XXXVI of the General Terms and Conditions of Transporter's FERC Gas Tariff:"



Note:   Exhibit A is a reflection of the contract and all amendments as of the amendment effective date.

C-12

**EXHIBIT D**
**TO PRECEDENT AGREEMENT**
**FT-IL NEGOTIATED RATE AGREEMENT**

[DATE}

Tennessee Valley Authority
1101 Market Street
Chattanooga, TN 37402
Attention: Jeff Avery

RE:  Firm Transportation Negotiated Rate Agreement ("Negotiated Rate Agreement")
     Rate Schedule FT-IL Service Package No. [_____] ("Service Package")[1]

Dear Jeff:

Tennessee Gas Pipeline Company, L.L.C. ("**Transporter**") and Tennessee Valley Authority ("**Shipper**") entered into a Precedent Agreement dated [Date] ("**Precedent Agreement**" or "**PA**") under which Shipper qualifies as a Foundation Shipper for the Cumberland Project (the "**Project**") for the Primary Receipt Point(s), Primary Delivery Point(s), and Transportation Quantity ("**TQ**") as identified in the Transportation Service Agreement attached as Exhibit C of the PA.  As part of the Precedent Agreement, Shipper elected the negotiated rate option for transportation service on the Cumberland Lateral under Rate Schedule FT-IL as offered by Transporter.  In response to the request of Shipper and pursuant to Section 5.7 of Rate Schedule FT-IL of Transporter's FERC Gas Tariff, as may be revised from time to time ("**Transporter's Tariff**"), Transporter hereby agrees to charge Shipper for service provided under the above-referenced Service Package as follows:

1.     For the Primary Term, for gas received by Transporter at the receipt points listed in Exhibit A to the Transportation Service Agreement, and delivered by Transporter on behalf of Shipper to the delivery points listed in Exhibit A to the Transportation Service Agreement:



---

[1] The term Service Package as referenced herein includes the Transportation Service Agreement referenced in Section 1A of the PA and this Negotiated Rate Agreement.

D-1

2.    In addition to the charges set forth in Section 1, Shipper shall be subject to:



3.    For capacity temporarily released or assigned by Shipper to third parties pursuant to Transporter's Tariff shall be subject to all of the terms and conditions of Shipper's Transportation Service Agreement, this Negotiated Rate Agreement, and Transporter's Tariff, including the applicable commodity rates, F&LR, EPCR and surcharges.

4.    This Negotiated Rate Agreement shall be filed with and is subject to approval by FERC. If any terms of this Negotiated Rate Agreement are disallowed by any order, rulemaking, regulation, or policy of the FERC, Transporter or Shipper may immediately terminate this Negotiated Rate Agreement.   In such event, or if any terms of this Negotiated Rate Agreement are in any way modified by order, rulemaking, regulation, or policy of FERC, Transporter and Shipper may use reasonable efforts to mutually agree to amend this Negotiated Rate Agreement to ensure that the original commercial intent of the parties is preserved.   Any such amendment shall be subject to authorizations and approvals acceptable to Shipper in Shipper's sole discretion. Transporter shall cooperate with Shipper in Shipper's efforts to obtain all approvals and authorizations referenced herein.  If the parties cannot achieve mutual agreement, Transporter and Shipper each reserve the right to immediately terminate this Negotiated Rate Agreement.

5.    Any terms that are not defined herein shall have the meanings assigned to them in the Precedent Agreement or Transporter's Tariff.

6.    No modification of the terms and provisions of this Negotiated Rate Agreement shall be made except by written agreement executed by Transporter and Shipper.

If Shipper is interested in entering into this Negotiated Rate Agreement for firm capacity on the Cumberland Lateral in accordance with the terms proposed above, please have the authorized representative of Shipper execute this Negotiated Rate Agreement, and return to the undersigned. This Negotiated Rate Agreement will become binding upon the parties only after it is accepted and executed by Transporter's authorized representative on the below "Agreed to and Accepted" portion, which shall be done within ten (10) business days of receipt from Shipper. One fully executed copy of this Negotiated Rate Agreement will be returned to Shipper for its records.

Sincerely,

_____

Preston H. Troutman

D-2

DocuSign Envelope ID: 48DBFCCF-65EE-4923-8EBE-2FAA8B3B862D

Director, Business Development
Tennessee Gas Pipeline Company, L.L.C.


TENNESSEE GAS PIPELINE COMPANY, L.L.C.
AGREED TO AND ACCEPTED
THIS DAY _____ OF_____, [Year]

By_____

Name:

Title:


TENNESSEE VALLEY AUTHORITY

By_____

Name:

Title:

DocuSign Envelope ID: 48DBF2CF-65EE-4923-8EBF-2FAA8B3B862D

## APPENDIX A
## TO FT-IL NEGOTIATED RATE AGREEMENT
## RESERVATION RATE ADJUSTMENTS



DocuSign Envelope ID: 48DBF2CF-65EE-4923-8EBF-2FAA8B3B862D







# EXHIBIT E
## TO PRECEDENT AGREEMENT
### RESERVED

**EXHIBIT F**
**TO PRECEDENT AGREEMENT**
**IRREVOCABLE STANDBY LETTER OF CREDIT**

[DATE]

Tennessee Gas Pipeline Company, L.L.C.
1001 Louisiana Street
Houston, TX 77002
Attn: Credit Manager

For The Account of:
[Insert Customer Name]
[Insert Customer Address]

[Insert Issuer Name] ("Issuer") hereby issues this Irrevocable Standby Letter Of Credit number _____ ("Letter of Credit") in favor of Tennessee Gas Pipeline Company, L.L.C. ("Beneficiary") for the account of [insert customer name] ("Applicant"), in the amount of _____ dollars ($_____).

Funds hereunder are payable at sight upon Beneficiary's presentation of this Letter of Credit, including any subsequent amendments thereto along with a duly completed, dated and signed statement containing any of the following declarations and reading as substantially set forth as follows:

I, an authorized representative of Beneficiary, with respect to Issuer's Letter of Credit no. _____, hereby certify that:

a) Applicant is in default under one or more of the agreements between Applicant and Beneficiary, and the amount of this drawing USD (up to the full amount of coverage) is due and owing and remains unpaid under said agreement(s).

Or

b) Applicant has not remedied a payment default within 5 days of Applicant's receipt of a notice of default from Beneficiary, and the amount of this drawing USD (up to the full amount of coverage) is due and owing and remains unpaid.

Or

c) Issuer's Letter of Credit no. _____ will expire less than ninety (90) calendar days from the date hereof and an acceptable replacement Letter of Credit has not been provided. Therefore Beneficiary is entitled to draw USD (up to the full amount of coverage) under such letter of credit.

Or

d) The undersigned, an authorized representative of Tennessee Gas Pipeline Company L.L.C. hereby certifies that Applicant has become a party to a proceeding in bankruptcy

F-1

under the laws of the United States or pursuant to the laws of any state of foreign entity providing for liquidation, or debt reduction or relief procedures, and Beneficiary therefore is entitled to and does hereby draw the full amount of the Letter of Credit (or the remaining balance of the Letter of Credit if there have been any previous draws).

Payment hereunder shall be made by wire transfer of Federal Reserve Bank funds to Beneficiary's account in a bank on the Federal Reserve wire system specified in Beneficiary's demand for payment or by deposit of same day funds into a designated account that Beneficiary maintains with the banking institution designated in such demand.

This Letter of Credit shall initially be effective until _____ [Add as necessary for multi-year underlying obligations: provided however, that this Letter of Credit shall be deemed automatically extended by Issuer without amendment for successive one year periods thereafter, beginning with the initial expiry date hereof, unless at least ninety (90) days prior to the relevant expiration date Issuer notifies Beneficiary by overnight mail or by courier that Issuer has elected not to extend the term of this Letter of Credit for an additional one year period. Upon receipt by Beneficiary of such notice of no additional extensions, Beneficiary may draw upon this Letter of Credit for all amounts then available hereunder as provided above. The address for such notice to Beneficiary is as follows: _____.]

Following any partial drawing, this Letter of Credit will remain in effect (and, if extended, shall be extended in) an amount equal to its then-applicable face amount less the aggregate amount of all partial drawings theretofore made.

All demands, notices, and documents may be submitted to Issuer in writing or by fax to the following address:

[Insert Issuer's address, phone number and fax number]

All Issuer charges are for the account of Applicant.

Issuer hereby engages with Beneficiary that documents drawn under and in compliance with the terms of this Letter of Credit will be duly honored upon presentation as specified if presented on or before the applicable expiry date.

Except as otherwise expressly stated herein, this Irrevocable Standby Letter of Credit is subject to the International Standby Practices 1998 (ISP98), International Chamber of Commerce Publication no. 590 and, to the extent not governed by nor inconsistent with ISP98, to the laws of the State of New York except for conflicts-of-law or related principles that would operate to apply the laws of another jurisdiction.

[Issuer Name]


By: _____

F-2

DocuSign Envelope ID: 48DBFCCF-65EE-4923-8EBE-2FAA8B3B862D

Name: _____

Title: _____

F-3

# AMENDMENT TO PRECEDENT AGREEMENT

This Amendment to the Precedent Agreement ("<u>Amendment</u>") is made and entered into this <u>30</u>th day of November, 2022 (the "Effective Date"), by and between TENNESSEE GAS PIPELINE COMPANY, L.L.C., a Delaware limited liability company ("<u>Transporter</u>") and Tennessee Valley Authority, a corporate agency of the United States created by an act of Congress with its principal place of business in Knoxville, Tennessee ("Shipper"). Transporter and Shipper are sometimes referred to herein as "<u>Party</u>" or collectively as the "<u>Parties</u>".

**WHEREAS**, the Parties entered into that certain Precedent Agreement dated August, 11, 2021 (the "<u>Precedent Agreement</u>") for the purpose of setting forth the terms and conditions according to which Transporter would install certain pipeline facilities and associated equipment on its system to make available firm transportation capacity desired by Shipper, and Shipper would take and pay for such firm transportation service, all of which are subject to Transporter's right of termination for reasons, including, but not limited to, completion of required environmental reviews; and

**WHEREAS**, the Parties wish to amend the Precedent Agreement's Shipper Management Approval Date and Transporter Management Approval Dates in Section 7A(i) and Section 7(A)(ii) to provide Shipper with additional time to obtain necessary approvals from its executive management and/or board of directors for Shipper's execution of the Project Agreements; and

**WHEREAS**, the Parties wish to amend the Precedent Agreement's Section 7B(iv) to provide Shipper additional time to complete environmental reviews that will help Shipper determine whether or not it will proceed with construction of the TVA-Cumberland Units.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and the sufficiency of which are hereby acknowledged, Transporter and Shipper hereby agree as follows:

A.    <u>Definitions</u>. All capitalized terms used but not defined or modified herein shall have the meanings ascribed thereto in the Precedent Agreement.

B.    <u>General Amendments to Precedent Agreement</u>.    Upon the Effective Date of this Amendment, the Precedent Agreement is amended as follows:

1.    Section 7A(i) of the Precedent Agreement is hereby amended by deleting reference to "███████████," as the Shipper Management Approval Date and replacing it with the date of "████████████."

2.    Section 7(A)(ii) of the Precedent Agreement is hereby amended by deleting reference to "███████████" as the Transporter Management Approval Date and replacing it with the date of "███████████."

3.    Section 7B(iv) of the Precedent Agreement is hereby amended by deleting reference to "December 1, 2022" and replacing it with the date of "February 1, 2023."

C.    <u>Continuing Effect of the Precedent Agreement</u>. All references to the Precedent Agreement shall refer to the Precedent Agreement as amended by this Amendment. Except as expressly amended hereby, all the provisions, to include all the defined terms, of the Precedent Agreement shall remain in full force and effect and are hereby in all respects ratified and confirmed.

1

D.  One Agreement; Counterparts; Signatures. The Precedent Agreement, as amended by this Amendment, will be construed as one agreement. This Amendment may be executed in multiple counterparts, each of which shall be deemed an original and all of which, collectively, shall be one and the same instrument. This Amendment may be signed by facsimile signatures or other electronic delivery of an image file (such as a .pdf file) reflecting the execution hereof, and, if so signed: (a) may be relied on by each party as if the document were a manually signed original and (b) will be binding on each party for all purposes.

E.  Captions. The headings to the sections of this Amendment have been inserted for convenience of reference only and shall in no way modify or restrict any provisions hereof or be used to construe any such provisions.

F.  Governing Law. This Amendment shall be governed, construed an interpreted in accordance with the federal laws of the United States of America.  In the event such federal laws state no rule of decision with respect to any particular dispute or claim related to this Amendment, the law of the State of Tennessee, except for Tennessee's choice of law provisions, will apply.

**IN WITNESS WHEREOF**, the Parties have caused their duly authorized representatives to execute this Amendment, effective as of the Effective Date.

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**

By: _____

Name:  Ernesto Ochoa

Title:  Vice President, Commercial

**TENNESSEE VALLEY AUTHORITY**

By: _____

Name:    A. Douglas Perry

Title:    Senior Vice President

2