RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0083p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

SIERRA CLUB; APPALACHIAN VOICES,

*Petitioners,*

*v.*

TENNESSEE DEPARTMENT OF ENVIRONMENT AND
CONSERVATION, et al.,

*Respondents,*

TENNESSEE GAS PIPELINE COMPANY,

*Intervenor.*

No. 23-3682

———————————

On Petition for Review of an Order of the Tennessee Department of Environment
and Conservation's § 401 Water Quality Certification and
Aquatic Resource Alteration Permit NRS 22.192.

Argued: December 10, 2024

Decided and Filed: April 4, 2025

Before: MOORE, CLAY, and THAPAR, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Derek O. Teaney, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West
Virginia, for Petitioners. Wilson S. Buntin, OFFICE OF THE TENNESSEE ATTORNEY
GENERAL, Nashville, Tennessee, for Respondents. David A. Super, BRACEWELL LLP,
Washington, D.C., for Intervenor. **ON BRIEF:** Derek O. Teaney, APPALACHIAN
MOUNTAIN ADVOCATES, Lewisburg, West Virginia, James S. Whitlock, Spencer Scheidt,
SOUTHERN ENVIRONMENTAL LAW CENTER, Asheville, North Carolina, Stephanie
Biggs, SOUTHERN ENVIRONMENTAL LAW CENTER, Nashville, Tennessee, for
Petitioners. Wilson S. Buntin, Joseph Ahillen, Harrison G. Kilgore, OFFICE OF THE
TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Respondents. David A.
Super, Kevin A. Ewing, BRACEWELL LLP, Washington, D.C., Bartholomew J. Kempf, Lela

M. Hollabaugh, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, Scott
Burnett Smith, Schyler B. Burney, BRADLEY ARANT BOULT CUMMINGS LLP, Huntsville,
Alabama, Emily M. Ruzic, BRADLEY ARANT BOULT CUMMINGS LLP, Birmingham,
Alabama, for Intervenor.

      CLAY, J., delivered the opinion of the court in which MOORE, J., joined.  THAPAR, J.
(pg. 21), delivered a separate dissenting opinion.

————————————

## OPINION

————————————

      CLAY, Circuit Judge.  Environmental groups Sierra Club and Appalachian Voices
(collectively, "Petitioners") petition for review of Respondent Tennessee Department of
Environment and Conservation's ("TDEC") order issuing a water quality certification to
Intervenor-Respondent Tennessee Gas Pipeline Company, L.L.C. ("TGP") pursuant to § 401 of
the Clean Water Act ("CWA"), 33 U.S.C. § 1341(a), for TGP's proposed Cumberland Pipeline
(the "Pipeline").  For the reasons set forth below, we **DENY** the petition for review.

## I. BACKGROUND

### A. Factual Background

      The dispute which gives rise to the Petition for Review concerns TDEC's approval of
TGP's plans to construct and operate a 32-mile natural gas pipeline in Tennessee which would
cross more than one hundred bodies of water and require drilling across miles of rocky terrain.
TDEC, conditioning its approval of the Pipeline project on various safeguards intended to
minimize environmental disruption, certified that the Pipeline's construction and operation
would not violate certain state and federal laws regulating water pollution.  Petitioners, on behalf
of individuals who claim they may be negatively affected by the Pipeline, argue that TDEC
failed to properly assess TGP's application and ensure that the Pipeline would not cause
significant environmental damage.  Respondents dispute Petitioners' contentions.  In the
discussion that follows, we outline the facts underlying TDEC's issuance of the certification and
assess the parties' competing arguments.

## 1. TGP's Application

On July 22, 2022, TGP applied to TDEC for an Aquatic Resource Alteration Permit ("ARAP") and § 401 water quality certification for the Pipeline.  TDEC is  "a state administrative agency charged by the [Tennessee] legislature with supervising water quality." *Jones v. City of Lakeland*, 224 F.3d 518, 521 (6th Cir. 2000) (en banc) (emphasis omitted).  As part of that water quality supervision authority, TDEC's commissioner, Respondent David Salyers, enforces Tennessee's Water Quality Control Act, *Clayton v. Dixon*, No. M2021-00521-COA-R3-CV, 2023 WL 2609644, at *7 (Tenn. Ct. App. Mar. 23, 2023) (citing Tenn. Code Ann. § 69-3-107(1)), and "establish[es] rules implementing the permitting system over any activities that may impair or obstruct the navigability of watercourses in Tennessee," *Arnett v. Myers*, 281 F.3d 552, 558 (6th Cir. 2002) (citing Tenn. Code Ann. § 69-1-117).

Among the various permits for such activities, ARAPs, which are synonymous with the Clean Water Act's § 401 water quality certifications, *see* Tenn. Comp. R. & Reg. 0400-40-07-.04(1), are required for activities which "alter[] . . . the physical, chemical, radiological, biological, or bacteriological properties" of Tennessee's water, Tenn. Code Ann. § 69-3-108(b)(1).  TDEC may not issue ARAPs "if there is a practicable alternative to the proposed activity that would have less adverse impact on resource values, so long as the alternative does not have other significant adverse environmental consequences."  Tenn. Comp. R. & Reg. 0400-40-07-.04(5)(b).  Practicable alternatives are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." Tenn. Comp. R. & Reg. 0400-40-07-.03(24).

Prior to submitting its § 401 application in July 2022, representatives from TGP met with TDEC staff to discuss the relevant permitting process in September and November of 2021 and March, April, and June of 2022.  TGP's § 401 application proposed constructing a natural gas pipeline approximately thirty-two miles in length and thirty inches in diameter which would connect existing TGP gas transmission lines to an electric power generation facility operated by the Tennessee Valley Authority ("TVA") near Cumberland City, Tennessee.  TGP intends for the Pipeline, which would run adjacent to an existing TVA right-of-way power-line easement for

approximately 80% of its length, to provide natural gas in replacement of the TVA facility's existing coal-fired power generation.

TGP proposed a path for the Pipeline that includes 149 watercourse crossings, including sixty-nine streams and eighty wet weather conveyances ("WWCs")[1], six wetlands, and two ponds. TGP did not propose any "permanent filling or loss of wetlands" in connection with the Pipeline, but noted that Pipeline construction "will result in the permanent conversion of 0.02 acre of forested wetlands within the new permanent easement to an herbaceous wetland due to construction clearing and periodic maintenance activities." ARAP Appl., ECF No. 56-1, 304. TGP also noted that Pipeline construction would "temporarily disturb two ponds (totaling 0.20 acre[s]) and six wetlands (totaling 0.27 acre[s])" and lead to clearing of 0.01 acre of forested wetland during construction, which would then be "allowed to revegetate to its forested state following restoration efforts." *Id.* at 303–04. TGP documented the Pipeline construction's expected impact on wetlands and waterbodies in a table attached to its § 401 application. The table individually listed waterbodies and wetlands, grouped by corresponding county, and included specific information for each entity, including flow regime (e.g., perennial, ephemeral, intermittent), substrate (e.g., bedrock, silt, gravel), geographical coordinates, expected temporary impacts measured in acres and linear feet for waterbody crossings, and brief descriptions of each waterbody.

TGP's application also set forth its proposed methods, including the alternatives considered, for installing the Pipeline across the various waterbodies along the proposed path. By way of background, pipelines can cross waterbodies using trenchless methods or open-cut crossings. Trenchless crossings, used "to conduct conventional boring under waterbodies, . . . do not require digging and excavating the soil." *Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487, 494 (4th Cir. 2023). In contrast, open-cut crossings "entail[] dewatering the streambeds to achieve dry working conditions," allowing for the "excavat[ion] [of] trenches through the

---

[1]Waterbodies include streams, ponds, and WWCs. WWCs, or ephemeral channels, are watercourses with short durations of water flow following rainfall.

streambeds to bury the pipeline beneath the surface," followed by the backfill of the trenches and the attempted restoration of the streambeds to allow normal streamflow to resume. *Id.*

TGP identified trench excavation as "the primary construction method to install the pipeline," and stated that trenchless "methods may be used to advance pipe under selected waterbody crossings." ARAP Appl. at 306. TGP intended to utilize dry open cut crossing methods at 145 watercourses and horizontal directional drill ("HDD")[2] construction methods at four streams "to avoid open cut construction methods in three [] larger and potentially higher-flow streams as well as one associated unnamed tributary." *Id.* at 307–08. To construct the Pipeline, TGP envisioned excavating a trench averaging approximately 5 feet deep and 4.5 feet wide, which would "be backfilled to grade by a minimum of 18 to 36 inches of cover (depending on location-specific soil and rock conditions) and vegetatively stabilized." *Id.* at 306. TGP stated that it assessed the practicability of alternative construction methods "based on environmental considerations, construction costs, technical feasibility, human safety, and logistics." *Id.* at 307. Alternatives "include[ed] wet open cut and dry open cut trenching crossing methods, as well as trenchless crossing methods including conventional bore and HDD." *Id.* TGP individually listed its proposed crossing method for each of the 149 waterbody crossings along the proposed Pipeline route.

For its trenched crossing methods, TGP "anticipate[d] encountering areas of shallow bedrock . . . that may require controlled blasting to remove." *Id.* at 309. Before employing controlled blasting, TGP stated that its construction contractor would first use at least one of four other rock removal methods. Those methods would "be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location." *Id.* at 321. TGP also committed to performing controlled blasts only in "non-karst areas that are also not in

---

[2]HDD is a "trenchless construction method." ARAP Appl. at 311. "With the HDD method, a small diameter pilot hole is drilled from the entry point to the exit point. Drilling fluids are pumped to the drill bit, to cool the bit, remove rock cuttings, seal the drilled path, and lubricate the drill stem. From there, the hole is widened, and the pipeline is pulled into position. Compared to the other crossing methods, the HDD technique minimizes the impacts to an area by drilling down and under a sensitive resource, leaving the portion of land in between the entry and exit point relatively undisturbed." *Id.*

wetlands or streams with an unacceptable risk of hydrologic loss," which it "evaluated for each stream crossing location at which a bedrock substrate ha[d] been identified." *Id.* at 310.

In addition, TGP's application included an assessment[3] of existing conditions along the proposed Pipeline route. To identify waterbodies along and adjacent to the route, TGP reviewed a bevy of sources, including the U.S. Geographic Survey topographic maps, National Hydrography Datasets, the United States Fish and Wildlife Service National Wetlands Inventory, and the Federal Emergency Management Agency designated 100-year floodplain. TGP then conducted field surveys between June 2021 and April 2022 to verify and assess waterbody locations. In all, TGP surveyed 200 waterbodies and ultimately determined that 128 of those waterbodies fell within the Pipeline's proposed path. TGP detailed its efforts to assess the various waterbodies' existing conditions in a report appended to its § 401 water quality certification application. The report included a table providing data collected for each waterbody.

### 2. TDEC's Additional Requests and Approval

On August 23 and September 14 of 2022, TDEC conducted field reviews of the six wetlands and two ponds in the Pipeline's proposed path to assess and verify information contained in TGP's application. Following the field reviews, TGP modified the Pipeline's path to avoid impacting newly classified wetlands and submitted revised data to TDEC. On October 21, 2022, TDEC notified TGP that TDEC "accept[ed] the jurisdictional determination of the assessed water features" documented in TGP's submissions to TDEC. TDEC Revised Determination (HD) of Water Res., ECF No. 56-2, 85.

On November 3, 2022, TDEC requested additional information from TGP concerning TGP's water quality certification application. Among other requests, TDEC requested that TGP supplement its wetland data and confirm that TGP's restoration of stream and wetland crossings following the Pipeline's construction would adhere to state regulations or to indicate any deviations. TGP responded to TDEC's request on December 1, 2022. In its response, TGP

---

[3]This assessment was conducted for TGP by a team of Tennessee Qualified Hydrologic Professionals employed by Stantec Consulting Services Inc. For ease of reference, this opinion refers to the assessment as if it was performed by TGP.

committed to restoring all stream and wetland crossings in accordance with TDEC's General Aquatic Resource Alteration Permit for Utility Line Crossings and General Aquatic Resource Alteration Permit for Minor Alterations to Wetlands following the Pipeline's construction.

TDEC requested additional information from TGP again on February 24, 2023. TDEC requested (i) updated maps, (ii) information concerning the credentials of TGP affiliates responsible for blasting oversight, and (iii) information concerning TGP's access to the proposed project area[4] and the identification of additional aquatic resources. TGP responded to TDEC's second request on March 17, 2023.

TDEC issued a draft water quality certification on May 30, 2023, and held a public hearing regarding the certification on July 6, 2023. Following the hearing, Petitioners and other members of the public submitted written comments to TDEC concerning the proposed water quality certification. TDEC responded to those comments on July 21, 2023.

On that same day, TDEC issued the § 401 water quality certification to TGP. The certification authorized "[t]emporary impacts to 0.69 acres of wetland, permanent impacts to 0.03 acres of wetland, temporary impacts to approximately 5400 linear feet of stream, temporary withdrawals from eight streams and one reservoir, and permanent impacts to 490 linear feet of stream." Aquatic Res. Alteration Permit NRS 22.192 ("NRS 22.192"), ECF No. 56-1, 7. On a waterbody-specific basis, the certification included tables listing authorized habitat alteration impacts to streams and wetlands and temporary water withdrawals from streams and reservoirs.

The certification also included thirty-six "special conditions." Special conditions g and h are particularly relevant to our review. Special Condition g requires TGP to "select the least impactful practicable trenching technique for each stream crossing" where it does not utilize HDD methods. *Id.* at 17. In addition, Special Condition h requires TGP, when it determines that controlled blasting is the least impactful practicable trenching technique, to provide TDEC with "documentation . . . supporting that controlled blasting is the least environmentally damaging

---

[4]TGP's initial application noted that "[a]ccess to 1.15 miles of the Project pipeline, equating to approximately 16.45 acres of the Project construction right-of way ("ROW"), [remained] outstanding." ARAP Appl. at 301.

practicable alternative for that particular stream crossing" and to attain written authorization from TDEC before deploying the controlled blasting method.  *Id.* at 18.

### B.  Procedural History

On August 18, 2023, Sierra Club and Appalachian Voices, pursuant to Rule 15(a) of the Federal Rules of Appellate Procedure and § 19(d)(1) of the Natural Gas Act ("NGA"), 15 U.S.C. § 717 *et seq.*, filed a timely Petition for Review in this Court of TDEC's order issuing the § 401 water quality certification to TGP.  One year later, on September 18, 2024, Petitioners moved to stay TDEC's issuance of the § 401 water quality certification pending this Court's review.  The following day, Petitioners moved for a temporary administrative stay "to preserve the status quo" until this Court resolved their motion for stay pending review.  Pet'rs' Mot. for Temp. Admin. Stay Pending Rev., ECF No. 65, 2.  Following assurances from TGP that Pipeline construction would not begin before October 15, 2024, the Court denied Petitioners' motion for an administrative stay as moot on September 26, 2024.  On October 11, 2024, the Court granted Petitioners' motion for stay pending review.

### II.  DISCUSSION

Respondents argue that Petitioners lack constitutional standing to challenge TDEC's issuance of the water quality certification to TGP.  Petitioners reject Respondents' standing argument and contend that TDEC's issuance of the water quality certification to TGP violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, because TDEC: (i) did not determine, on a crossing-by-crossing basis, the least impactful methods for the Pipeline's waterbody crossings; (ii) issued the water quality certification prior to analyzing TGP's rock removal methods and unlawfully delegated its regulatory authority over rock removal to TGP; (iii) did not consider the potential for downstream sedimentation and failed to comply with state law concerning conditions on activities in WWCs; (iv) improperly assessed the impact of TGP's proposed dry open-cut construction methods; and (v) failed to assess baseline data and consider cumulative impacts in violation of its regulations.  We address each argument in turn, but first provide a brief overview of the regulatory framework in which this case exists.

**A.  Regulatory Framework**

We have jurisdiction to review TDEC's issuance of the § 401 water quality certification pursuant to the NGA, which vests federal courts of appeals with "original and exclusive jurisdiction over any civil action for the review of an order or action" of a state administrative agency taken "pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval . . . required under Federal law."  15 U.S.C. § 717r(d)(1).  By issuing the water quality certification to TGP, TDEC acted "pursuant to federal law," and we therefore have jurisdiction to review the Petition.  *Del. Riverkeeper Network v. Sec'y Pa. Dep't of Env't Prot.*, 833 F.3d 360, 370–72 (3d Cir. 2016).

In addition to the NGA's grant of jurisdiction, the CWA's structure guides our review of the Petition.  "The NGA and CWA converge where, to construct an interstate pipeline, a company must discharge into—or displace water from—the navigable waters of the United States."  *Twp. of Bordentown v. Fed. Energy Regul. Comm'n*, 903 F.3d 234, 244 (3d Cir. 2018).  The CWA "prohibits the discharge of any pollutant into the navigable waters of the United States except when authorized by a permit or exception spelled out in the Act."  *Michigan Peat, a Div. of Bay-Houston Towing Co. v. U.S. E.P.A.*, 175 F.3d 422, 423–24 (6th Cir. 1999) (citing 33 U.S.C. § 1311(a)); *United States v. Holden*, 557 F.3d 698, 701 (6th Cir. 2009) (same).  "There are multiple parties responsible for enforcement of the Act, including the states, the federal government, and private citizens."  *Sierra Club v. Hamilton Cnty. Bd. of Cnty. Comm'rs*, 504 F.3d 634, 637 (6th Cir. 2007).

Section "401 of the Act requires States to provide a water quality certification before a federal license or permit can be issued for activities that may result in any discharge into intrastate navigable waters."  *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 707 (1994).  "A Water Quality Certification confirms that a given facility will comply with federal discharge limitations and state water quality standards."  *Del. Riverkeeper Network*, 833 F.3d at 368 (citing 33 U.S.C. § 1341(a)(1), (d)).  "States may condition certification upon any limitations necessary to ensure compliance with state water quality standards or any other 'appropriate requirement of State law.'"  *PUD No. 1*, 511 U.S. at 713–14.  In addition, states

may, expressly or by silence, waive their authority to issue § 401 water quality certifications. *City of Olmsted Falls v. U.S. Env't Prot. Agency*, 435 F.3d 632, 636 (6th Cir. 2006) (citing 33 U.S.C. § 1341(a)(1)).

With this understanding of our jurisdiction and the laws outlining the § 401 water quality certification process, we next turn to the issue of standing.

### B. Standing

Petitioners are environmental groups with members who live on and/or regularly use land that would be affected by the Pipeline's construction. "Because standing doctrine comes from Article III's case-or-controversy requirement, it is jurisdictional," and we must "address[] as a threshold matter" whether Petitioners have standing to challenge TDEC's issuance of the water quality certification. *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 405 (6th Cir. 2019).

The Supreme Court has described standing as "a bedrock constitutional requirement," *United States v. Texas*, 599 U.S. 670, 675 (2023), which "prevent[s] the judicial process from being used to usurp the powers of the political branches," *Clapper v. Amnesty International USA*, 568 U.S. 398, 408 (2013). "An organization like Sierra Club can establish standing through two routes: on behalf of its members, in what we have called 'representational standing,' or on its own behalf if directly injured." *Sierra Club v. EPA*, 793 F.3d 656, 661 (6th Cir. 2015) (quoting *Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540, 544 (6th Cir. 2004)). Here, Petitioners seek to bring this action on behalf of their members. To do so consistent with Article III of the Constitution, Petitioners must "present specific facts supporting standing through citations to the administrative record or 'affidavits or other evidence' attached to its opening brief, unless standing is self-evident.'" *Protecting Air for Waterville v. Env't Prot. Agency*, 763 F. App'x 504, 507 (6th Cir. 2019) (quoting *Tenn. Republican Party v. SEC*, 863 F.3d 507, 517 (6th Cir. 2017)). That evidence must "establish[] the 'irreducible constitutional minimum' of standing: that petitioners '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

In support of their standing contention, Petitioners offer declarations from their members attesting to the potential impact of the Pipeline's construction.  Petitioners' members include individuals who own property which the Pipeline would cross if it were constructed as permitted by the water quality certification.  Petitioners' members also include individuals who own property nearby the Pipeline route and fear that the Pipeline's construction and operation will negatively affect their property by disrupting the habitats of native wildlife and reducing the quality of the properties' well water.  In addition, Petitioners count among their members individuals who use areas in the Pipeline's path for recreation and worry that the Pipeline will adversely impact their ability to continue using those areas.

Respondents contend that Petitioners fail to establish the final two requirements of standing, traceability and redressability.  With respect to traceability, Respondents assert that Petitioners may only "show injury from TDEC's actions [] if they could show that the terms of the Certification *reduced* water quality below that which it would have been if TDEC had waived certification entirely."  Resp'ts' Br., ECF No. 59, 20.  Respondents further argue that "Petitioners cannot show harm from TDEC's alleged failure to follow procedures it did not have to undertake, nor from TDEC's failure to impose additional conditions on Tennessee Gas when the agency could have imposed none." *Id.* at 28–29.  Respondents posit that "Petitioners' alleged harms are instead traceable to the certificate of public necessity and convenience recently issued by [the Federal Energy Regulatory Commission], as that is the action that allows pipeline construction to proceed." *Id.* at 29 (citing 15 U.S.C. § 717f).

Traceability requires "a causal connection between the injury and the conduct complained of." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Petitioners have established that causal connection here because the Pipeline's construction, and the resultant injuries which Petitioners' members allege they will suffer, are "condition[ed]" on TDEC's issuance of the water quality certification. *S.D. Warren Co. v. Maine Bd. of Env't Prot.*, 547 U.S. 370, 375 (2006).

For the same reason, Petitioners have also established redressability.  Respondents argue that Petitioners cannot show that a ruling by this Court in Petitioners' favor would redress

Petitioners' injuries because such a ruling would not "require TDEC to impose additional conditions on Tennessee Gas or deny the Certification for the Pipeline altogether." Resp'ts' Br. at 30. In Respondents' view, "TDEC could simply waive [§] 401 Certification for any new application for Certification it receives in the future," thus negating redressability. *Id.* (emphasis omitted). In contrast, Petitioners assert that they satisfy the redressability requirement of standing because, if they prevail, "TDEC would be required to either add additional conditions to the Certification or deny certification outright." Pet'rs' Reply Br., ECF No. 61, 17–18.

"To determine whether an injury is redressable," we "consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)). "If that relief does nothing to redress the alleged injury, a court could do nothing more than issue a jurisdiction-less 'advisory opinion.'" *Mann Constr., Inc. v. United States*, 86 F.4th 1159, 1162 (6th Cir. 2023) (quoting *California*, 593 U.S. at 673). Petitioners "must show that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *R.K. by and through J.K. v. Lee*, 53 F.4th 995, 1001 (6th Cir. 2022).

Petitioners have made the requisite showing to establish redressability because an order from this Court vacating TDEC's issuance of the water quality certification would grant Petitioners the relief they seek by halting construction of the Pipeline and abating any injury which the Pipeline's construction may have caused. *See Sierra Club*, 793 F.3d at 665 (finding the redressability and traceability requirements easily satisfied where an injury from the challenged agency's actions was caused by the agency action and vacating the agency action "would redress its injuries"). TDEC's discretion to waive its authority to certify TGP's compliance with water quality standards does not alter our view of Petitioners' successful showing of redressability because "those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground." *FEC v. Akins*, 524 U.S. 11, 25 (1998).

Accordingly, Petitioners have established Article III standing to challenge TDEC's issuance of the water quality certification to TGP.  *Accord Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 752–53 (4th Cir. 2019).

### C.  Standard of Review

"Because the Clean Water Act does not articulate its own standard of review, we review agency action pursuant to the Administrative Procedure Act."  *City of Olmsted Falls v. U.S. Env't Prot. Agency*, 435 F.3d 632, 636–37 (6th Cir. 2006).  "The APA provides that courts should set aside any agency decision that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Chamber of Com. v. Sec. & Exch. Comm'n*, 115 F.4th 740, 750 (6th Cir. 2024) (quoting 5 U.S.C. § 706(2)(A)); *Sierra Club*, 793 F.3d at 665 (same). At its core, this review is deferential.  *Wolverine Pipe Line Co. v. U.S. Dep't of Transp.*, 69 F.4th 365, 372 (6th Cir. 2023).  To survive review under the APA, an agency need only examine "the relevant data and articulate a satisfactory explanation for its own action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  However, "[e]ven when an agency explains its decision with less than ideal clarity," we will not "upset the decision on that account if the agency's path may reasonably be discerned."  *Chamber of Com.*, 115 F.4th at 749 (quoting *Oakbrook Land Holdings, LLC v. Comm'r of Internal Revenue*, 28 F.4th 700, 720 (6th Cir. 2022)).

### D.  Analysis

#### 1.  Waterbody Crossing Methodology

Petitioners argue that TDEC violated the APA by arbitrarily and capriciously determining that TGP's proposed waterbody crossing methods were the least impactful practicable alternatives.  Petitioners argue that every waterbody crossing proposed by TGP constitutes a distinct activity which TDEC was required to assess individually to determine whether a practicable alternative would have created a less adverse impact than the method proposed by TGP.  In Petitioners' view, TDEC merely "rubberstamped TGP's predetermined decision to use

a dry, open-cut method at all certified waterbodies with the exception of three trenchless HDD crossings under four streams." Pet'rs' Br., ECF No. 58, 33 (footnote omitted). However, even if Petitioners' individual crossing argument is correct, Petitioners have failed to demonstrate that TDEC's assessment of TGP's waterbody crossing methods violated the APA.

As discussed above, TDEC's regulations bar it from issuing § 401 water quality certifications "if there is a practicable alternative to the proposed activity that would have less adverse impact on resource values, so long as the alternative does not have other significant adverse environmental consequences." Tenn. Comp. R. & Reg. 0400-40-07-.04(5)(b). In assessing practicable alternatives in connection with TGP's proposed waterbody crossings, the record is clear that TDEC considered the practicability of the trenchless crossings, which are preferred by Petitioners, on a stream-by-stream basis. After reviewing "available information," TDEC concluded that TGP "demonstrated that the route selection method and process for determining the appropriate crossing method will result in the use of the least impactful practicable alternative to accomplish the project purpose." NRS 22.192 at 49. Among that "available information" were detailed tables submitted by TGP to TDEC which analyze the features, including sedimentation type, of the waterbodies within the Pipeline's path. While TDEC acknowledged that the HDD crossing method is "the least impactful alternative[] for utility lines of this size," Notice of Determination, ECF No. 56-6, 440, in issuing the water quality certification to TGP, TDEC also noted that the HDD method was prone to "fail[ure] for reasons such as encountering soil conditions that are not conducive to boring, borehole collapse, and loss of the drill string or drilling fluid return," NRS 22.192 at 47. Indeed, as TDEC observed, the topography of "most waterbody crossing locations on this Project . . . limit[ed]" the use of trenchless boring methods. NRS 22.192 at 48. In addition, TDEC observed that trenchless crossings can be unduly expensive and time intensive and require larger amounts of land than trenched crossings, thus exposing larger amounts of land to potential impact and threatening groundwater in shallow terrain.

Importantly, our review of TDEC's assessment of waterbody crossing methodologies requires us "to 'review the whole record' compiled by the agency when evaluating the lawfulness of an agency decision.'" *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 580 (6th Cir.

2014) (quoting 5 U.S.C. § 706(2)).  The record in the instant case reflects data assessing the features of each specific stream crossing and a hydrologic risk analysis providing additional insight into the information before TDEC at the time it issued the water quality certification. Given that information and TDEC's requirement that TGP utilize trenchless crossing methods at four waterbody crossings with conditions TDEC determined to be conducive to the practice, it cannot be said that TDEC failed to assess the practicability of trenchless waterbody crossing methods.  Petitioners' waterbody crossing arguments essentially amount to a contention that TDEC "reached the wrong conclusion," and are therefore "not the type of argument[s] that allow[] a court to conclude that an agency's decision was arbitrary and capricious." *Sierra Club v. Slater*, 120 F.3d 623, 633 (6th Cir. 1997).

### 2. Rock Removal Methodology

Petitioners next argue that TDEC violated the APA by acting arbitrarily and capriciously with respect to analyzing TGP's proposed rock removal methods.  Petitioners claim that TDEC erred by (i) issuing the water quality certification prior to determining if TGP's proposed rock-removal methods were the least impactful practicable option; and (ii) unlawfully abdicating its regulatory authority to determine the least impactful practicable rock removal method by delegating that responsibility to TGP.  Petitioners assert that Special Condition g of the water quality certification unlawfully vests TGP with the discretion to make rock removal methodology choices which should be solely decided by TDEC.  However, Petitioners' arguments fail to account for the myriad ways in which TDEC's directives to TGP ensure TGP's compliance with TDEC's regulations.

In issuing the water quality certification to TGP, TDEC limited TGP's ability to choose rock removal methods.  Pursuant to special condition g of the certification, which "establishes mandatory conditions for how to determine which technique to apply and requires selection of the least impactful practicable trenching technique," TGP may only employ controlled blasting if "all other alternatives are demonstrated to be impracticable, and at least one other alternative is actually attempted."  Notice of Determination at 442.  Importantly, TGP must choose a rock removal technique by assessing the "relative hardness, fracture susceptibility, and expected

volume of the bedrock, as well as its location."  NRS 22.192 at 39.  Special condition h further
limits TGP's ability to choose its preferred rock removal method by barring controlled blasting
in wetlands and "Tennessee jurisdictional streams characterized by karst-prone geology or with
an unacceptable risk of hydrologic loss."  *Id.* at 18.  Special condition h also imposes a
regimented process for any controlled blasting, including the presence of a Geohazard Inspector
working under the direction of a licensed Professional Engineer and the procurement of written
authorization from TDEC's Natural Resources Unit prior to the initiation of controlled blasting.

These conditions satisfy TDEC's compliance with the "elemental principal of
administrative law that agencies are bound to follow their own regulations."  *Billeke-Tolosa v.
Ashcroft*, 385 F.3d 708, 711 (6th Cir. 2004) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d
541, 545 (6th Cir. 2004)); *see also City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007)
("Agency action is 'not in accordance with the law' when it is in conflict with the language of
the statute relied upon by the agency.").  TDEC's regulations require it to determine the
existence of practicable alternatives with less adverse impact on resource values prior to issuing
water quality certifications.  Tenn. Comp. R. & Reg. 0400-40-07-.04(5)(b).  Far from abdicating
this oversight authority as Petitioners suggest, TDEC assured compliance with its mandate by
dictating a hierarchy of potentially practicable rock removal alternatives based on perceived
environmental impact.  While Petitioners contest TDEC's chosen method for achieving the least
impactful practicable alternative for rock removal, Petitioners have not demonstrated that TDEC
has acted inconsistently with the language of its regulations by providing TGP with the
flexibility necessary to make in-field determinations concerning rock removal methods while
retaining strict oversight over TGP's potential deployment of controlled blasting.  Accordingly,
we find no conflict with TDEC's actions and its governing regulations.  *See Jomaa v. United
States*, 940 F.3d 291, 297 (6th Cir. 2019) ("[W]e must also ensure that the agency action is in
accordance with the law, such that there is no conflict with the language of the statute relied
upon by the agency." (quoting *Hosseini v. Nielsen*, 911 F.3d 366, 371 (6th Cir. 2018))).

### 3. Wet Weather Conveyance Activities

Petitioners also argue that TDEC violated the APA by failing to evaluate whether TGP's Pipeline-related activities in WWCs would create downstream sedimentation and concluding that TGP would not violate state water quality standards by complying with the water quality certification's terms. Assuming that Petitioners did not forfeit these arguments by failing to initially present them to TDEC prior to filing the Petition, we hold that Petitioners' claims fail on the merits.

As a preliminary matter, Petitioners and Respondents agree that TGP was not generally required to seek a § 401 water quality certification for its activities in WWCs because the certification is only required if TGP's activities would "result in the discharge of waste or other substances" or "impair surface water flow into or out of any wetland area." Tenn. Code Ann. § 69-3-108(q)(1)(A), (B). TDEC stated in the water quality certification that the Pipeline's impact to WWCs would "not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q)." NRS 22.192 at 36. TDEC's determination in this regard was reasonable because TGP's compliance with the Tennessee Water Quality Control Act is not precluded by TDEC's issuance of the water quality certification, which expressly notes the general applicability of state law.

In addition, Petitioners' contentions with respect to WWCs is belied by the administrative record. In issuing the water quality certification, TDEC imposed numerous conditions on TGP's Pipeline activities to ensure that construction and operation of the Pipeline would result in no more than de minimis degradation due to sedimentation. In particular, TDEC required TGP to implement sediment control measures "before any earth moving operations begin" and to conduct dewatering activities "in a manner that prevents the discharge of sediment-laden water into waters of the state." NRS 22.192 at 21. Accordingly, it cannot be said that TDEC, which had before it data concerning the substrate types of the WWCs in the Pipeline's path, "fail[ed] to examine relevant evidence or articulate a satisfactory explanation for the decision." *Bangura v. Hansen*, 434 F.3d 487, 502 (6th Cir. 2006) (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42–43).

### 4. TDEC's Reliance on the General Utility Permit

Petitioners also contend that TDEC violated the APA by failing to evaluate and rebut record evidence establishing a risk of water quality standards violations caused by TGP's proposed dry, open-cut crossings. Petitioners assert that TDEC improperly relied upon its general permit issued for pipeline crossings used in utility line construction to assess the impact of the Pipeline. In Petitioners' view, TDEC's reliance on the general utility permit was akin to "comparing apples to oranges" because "the general utility line ARAP are far more restrictive than the condition in the [Water Quality] Certification." Pet'rs' Br. at 58. However, Petitioners misconstrue TDEC's actions in an effort to distort TDEC's reasoned decision-making.

In contrast to Petitioners' characterization, TDEC directly engaged with record evidence concerning TGP's proposed dry open-cut crossings. Following public commentary on its draft water quality certification, TDEC issued a Notice of Determination explaining its rationale for granting the water quality certification and directly responding to criticisms of that decision. TDEC explained that, in response to commentary concerning TGP's planned dry open-cut crossings, TDEC "edited language throughout the permit to clarify requirements of working in the dry and dewatering requirements of all trenched crossings." Notice of Determination at 443. TDEC also explained that (a) open-cut crossings of streams are routinely authorized pursuant to TDEC's general ARAP permit for utility line crossings; (b) projects that comply with the conditions of that ARAP do not result in water quality standards violations; and (c) in the water quality certification at issue here, it inserted conditions akin to those in the general utility line ARAP. In drawing upon its experience with the pipeline crossings authorized by its general ARAP for utility line crossings, TDEC appropriately "articulate[d] a 'rational connection between the facts found and the choice [it] made.'" *Apogee Coal Co., LLC v. Dir., Off. of Workers' Comp. Programs*, 112 F.4th 343, 353 (6th Cir. 2024) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

### 5. Baseline Data and Cumulative Impact Analysis

Lastly, Petitioners argue that TDEC violated the APA by failing to comply with state regulations requiring TDEC to assess the baseline conditions of affected waterbodies and to

consider the potential cumulative effects of the Pipeline's crossings. Petitioners assert that, instead of analyzing the waterbodies' baseline conditions in the first instance, "TDEC unlawfully flipped the resource impact analysis on its head" by relying on its general certification concerning "utility line crossings to reason that, because those projects did not require mitigation, this Pipeline would not permanently affect resource values, and therefore baseline data need not be gathered on in-stream characteristics of impacted waterbodies." Pet'rs' Br. at 64–65. However, in issuing the water quality certification, TDEC properly complied with its regulations.

Petitioners wrongly assert that TDEC failed to comply with requirements to assess baseline conditions prior to issuing the water quality certification. TDEC's regulations bar it from authorizing activity "unless any appreciable permanent loss of resource values associated with the proposed impact is offset by mitigation sufficient to result in no overall net loss of resource values from existing conditions." Tenn. Comp. R. & Reg. 0400-40-07-.04(6)(c). Here, TDEC was not required to undertake this analysis because the water quality certification "does not authorize appreciable permanent loss of resource value." Notice of Determination at 446. Instead, TDEC authorized TGP to make temporary impacts in constructing and operating the Pipeline, and TDEC sought to ensure the temporary nature of those impacts by imposing conditions mandating the restoration of affected lands. *See, e.g.*, NRS 22.192 at 18 (requiring that "[a]ll streams and stream banks will be restored to original contours immediately following pipeline installation"). While TDEC authorized some permanent impacts, those impacts all stemmed "from a 10-foot-wide corridor kept in an unforested state centered directly over the pipeline." Notice of Determination at 446. TDEC anticipated that those permanent impacts would result in "minimal riparian vegetation conversion" near streams within the 10-foot corridor and "0.03 acres of conversion of vegetation from forested to emergent" where the corridor "crosses a forested wetland." *Id.* Given these minimal impacts, TDEC reasonably concluded that this corridor would not result in any "appreciable" impacts regardless of the existing conditions of the area which could potentially be affected.

Petitioners also wrongly assert that TDEC failed to consider the cumulative effects of crossing certain streams multiple times. In conducting its water quality certification analysis,

TDEC must evaluate "[w]hether the proposed activity is reasonably likely to have cumulative or secondary impacts to the water resource" as part of its analysis of whether permanent loss resource values will occur. Tenn. Comp. R. & Reg. 0400-40-07-.04(6)(c)6. TDEC properly made that evaluation when it issued the water quality certification. As it explained at the time, TDEC "evaluated impacts cumulatively for each individual stream and for each TDEC Waterbody ID, consistent with how impacts are evaluated across the ARAP program statewide." Notice of Determination at 446. Accordingly, TDEC did not disregard its own regulations in violation of the APA. *See Billeke-Tolosa*, 385 F.3d at 708.

### III. CONCLUSION

In conclusion, contrary to Petitioners' arguments, TDEC did not violate the APA by issuing TGP a § 401 water quality certification for the construction and operation of the Pipeline. TDEC adequately evaluated the water quality certification application and reasonably explained its Pipeline-related decision making with respect to waterbody crossings, rock removal methodology, downstream sedimentation, trench excavation, and waterbodies' baseline conditions. For the reasons stated above, we **DENY** the Petition for Review.

———————————

**DISSENT**

———————————

THAPAR, Circuit Judge, dissenting.  If I believed we had authority to reach the merits of this appeal, I would join the majority's thoughtful analysis explaining why the Tennessee Department of Environment and Conservation did not act arbitrarily in issuing a water-quality certificate to the Tennessee Gas Pipeline.  But for the reasons I previously explained, I don't believe that we have statutory subject-matter jurisdiction to review TDEC's decision.  *Sierra Club v. Tenn. Dep't of Env't & Conservation*, No. 23-3682, 2024 WL 4472048, at *5–8 (6th Cir. Oct. 11, 2024) (Thapar, J., dissenting).  For that reason, I would dismiss the petition for review without prejudice.